UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GEORGIA FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>ANADARKO PETROLEUM CORPORATION, R.A. WALKER, ROBERT G. GWIN, and ROBERT P. DANIELS,<br><br>　　　　　　　Defendants. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Georgia Firefighters' Pension Fund ("Georgia Firefighters" or "Plaintiff") alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Anadarko Petroleum Corporation ("Anadarko" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**I.　　NATURE OF THE ACTION AND OVERVIEW**

1.　　This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired Anadarko common stock between February 20, 2015, and May 2,

1

2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Anadarko, a Delaware corporation headquartered in The Woodlands, Texas, is an energy company that develops oil and natural gas resources in the United States and worldwide. In August 2019, Anadarko became an indirect, wholly owned subsidiary of Occidental Petroleum Corporation ("Occidental"). Prior to Anadarko's acquisition by Occidental, Anadarko common stock traded on the New York Stock Exchange under the ticker symbol "APC."

3. In 2009, Anadarko discovered the "Shenandoah" oil field in the Gulf of Mexico. The Company spent the following eight years appraising the field. During that time, including throughout the Class Period, Defendants made repeated positive representations about the prospects and value of the Shenandoah assets.

4. On May 2, 2017, however, Anadarko reported quarterly financial results in which it recorded a $467 million impairment charge and expensed $435 million in suspended exploratory well costs related to the Shenandoah project. Critically, the Company admitted that it was suspending the appraisal process due to poor results.

5. On this news, the price of Anadarko common stock fell $4.33 per share, or approximately 8%, from a close of $56.28 per share on May 2, 2017, to close at $51.95 per share on May 3, 2017.

6. This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) the value of the Shenandoah assets and the success of the Shenandoah appraisal wells were overstated; (2) the Company lacked effective internal control over financial

reporting; and (3) as a result of the foregoing, Defendants' statements about the Company's Shenandoah assets lacked a reasonable basis.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other members of the Class have suffered significant damages.

## II. JURISDICTION AND VENUE

8. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Anadarko is headquartered in this District, Defendants conduct business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

11. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

12. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Anadarko common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13. Defendant Anadarko is a Delaware corporation with its principal executive offices located at 1201 Lake Robbins Drive, The Woodlands, Texas, 77380.

14. Defendant R.A. Walker ("Walker") was the Company's Chairman, President, and Chief Executive Officer throughout the Class Period. Walker remained Chairman and Chief Executive Officer until the Company was acquired by Occidental in August 2019.

15. Defendant Robert G. Gwin ("Gwin") was, from May 2013 to November 2018, the Company's Executive Vice President, Finance and Chief Financial Officer. Gwin was named President of the Company in November 2018 and remained in that position until the Company was acquired by Occidental in August 2019.

16. Defendant Robert P. Daniels ("Daniels") was, from May 2013 until his retirement in December 2016, the Company's Executive Vice President, International and Deepwater Exploration.

17. Defendants Walker, Gwin, and Daniels are collectively referred to herein as the "Individual Defendants."

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Anadarko's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to,

4

and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

19. Anadarko and the Individual Defendants are collectively referred to herein as "Defendants."

20. Non-party Occidental, a Delaware corporation headquartered in Houston, Texas, is engaged in, among other things, oil and gas exploration, chemical manufacturing, and the provision of midstream and marketing services. In August 2019, Occidental acquired Anadarko.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

21. Throughout the Class Period, Anadarko was engaged in the development, acquisition, and exploration of oil and natural-gas resources in the United States and worldwide.

22. In 2009, Anadarko discovered the "Shenandoah" deepwater oil field in the Gulf of Mexico. After drilling an initial exploratory well named "Shenandoah-1" or "Shenandoah #1," Anadarko initiated an appraisal process in order to determine Shenandoah's potential before beginning commercial production. During this process, Anadarko drilled five appraisal wells: Shenandoah-2 (in or around 2012); Shenandoah-3 (in or around 2014); Shenandoah-4 (in or around 2015); Shenandoah-5 (in or around 2016); and Shenandoah-6 (in or around 2016).

### B. Defendants' False and Misleading Statements

23. The Class Period begins on February 20, 2015, to coincide with the filing of Anadarko's annual report for the year ended December 31, 2014, with the SEC on Form 10-K (the "2014 Annual Report"). In its 2014 Annual Report, the Company reported that it had "spud the Shenandoah-3 well," which had "found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands." The Company further

stated that "[t]he Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening."

24. The 2014 Annual Report explained that under the Company's method of accounting, "exploratory costs associated with a well discovering hydrocarbons are initially capitalized, or suspended, pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling. . . . If management determines that future appraisal drilling or development activities are unlikely to occur, associated suspended exploratory well costs are expensed." Anadarko reported $1.522 billion in suspended exploratory well costs as of December 31, 2014.

25. Regarding the Company's internal control over financial reporting, the 2014 Annual Report stated:

> **MANAGEMENT'S ASSESSMENT OF INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance to the Company's Management and Directors regarding the preparation and fair presentation of published financial statements.
>
> \*   \*   \*
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014. . . . Based on our assessment, we believe that as of December 31, 2014, the Company's internal control over financial reporting was effective based on those criteria.

26. As required by the Sarbanes-Oxley Act of 2002, Defendants Walker and Gwin certified that they had reviewed the 2014 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect

6

to the period covered by this report," and that they were "responsible for establishing and maintaining . . . internal control over financial reporting."

27. Defendants made additional positive representations about the Shenandoah-3 well. For example, on a March 3, 2015 capital program and guidance call, Defendant Daniels stated that the Shenandoah-3 well was a "very successful appraisal well" and that the Company was "excited about the advancement of Shenandoah."

28. In mid-2015, the Company spud the Shenandoah-4 well and, on an October 28, 2015 earnings call, Defendant Gwin stated:

> The team did a really good job on [Shenandoah-4], and we're real pleased with it. We got 622 feet of pay.
>
> What we ended up doing was we tested up to the north with trying to find out where the basin edge was, and the first well established where the basin edge was. Then we came in and drilled to the south with a side track, and got the 622 feet of pay. It was all oil, we encountered no water in that.
>
> The reservoir quality in the initial assessment looks pretty—well it looks comparable to everything else we've found out there. So very good reservoir quality. We're still in the early stages of that evaluation.
>
> We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well. And that's to establish the reservoir quality in the oil column, which will roll directly into our development planning.
>
> So it's very important to get that core, and we're just in the process of it. That's going to give us a much better handle on all the fluid properties, all the reservoir properties. But we pushed the most known oil down about 400 feet.
>
> As I've mentioned, we didn't establish an oil water contact here, so that tells us there's more down below us. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. But we're very encouraged with what we saw, and it was well within the range of expectation of what we had put out there.

7

29. On that same October 28, 2015 earnings call, Defendant Gwin also stated that, given the findings from the Shenandoah-4 well, "we're right where we thought" on the expected resource range at Shenandoah.

30. Defendants continued to tout the progress of Shenandoah, with Defendant Daniels explaining on a February 2, 2016 earnings call that Anadarko was "very pleased with" the Shenandoah-4 well, which contained "over 620 feet of high-quality oil pay," and that Anadarko had "high expectations for" the Shenandoah-5 well.

31. On February 17, 2016, Anadarko filed its annual report for the year ended December 31, 2015, with the SEC on Form 10-K (the "2015 Annual Report"). In its 2015 Annual Report, the Company reported that Anadarko had spud the Shenandoah-4 well and that its sidetrack "encountered more than 620 net feet of oil pay, extending the lowest known oil column down-dip." The Company also stated that "[f]ollowing the success of the Shenandoah-4 sidetrack, the Company and its partners successfully acquired more than 550 feet of whole-core from the hydrocarbon-bearing reservoir interval."

32. Anadarko also reported $1.124 billion in suspended exploratory well costs as of December 31, 2015. This total included $314 million in costs that had been "capitalized for a period greater than one year" in connection with projects located offshore the United States. The Company stated that "the majority" of these particular costs were "related to the Shenandoah discovery," and that "[w]ell costs have been suspended pending further appraisal activities, including drilling and analysis of well results." The Company further stated that "[i]f additional information becomes available that raises substantial doubt as to the economic or operational viability of any of" its appraisal projects, "the associated costs will be expensed at that time."

33. Regarding the Company's internal control over financial reporting, the 2015 Annual Report stated:

> **MANAGEMENT'S ASSESSMENT OF INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance to the Company's Management and Directors regarding the preparation and fair presentation of published financial statements.
>
> \* \* \*
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015. . . . Based on our assessment, we believe that as of December 31, 2015, the Company's internal control over financial reporting was effective based on those criteria.

34. As required by the Sarbanes-Oxley Act of 2002, Defendants Walker and Gwin certified that they had reviewed the 2015 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining . . . internal control over financial reporting."

35. Even when specifically asked about challenges related to Shenandoah, Defendants continued to represent that the Shenandoah project was going well. For example, when asked during a May 3, 2016 earnings call about what was "taking so long to appraise" Shenandoah, and why so many appraisal wells were required, Defendant Daniels claimed that the delay was due to scale and imaging complexities, and "not necessarily that we're seeing lots of bad surprises." And, on a July 27, 2016 earnings call, Defendant Walker stated that Anadarko was "real pleased with what we saw in the [Shenandoah] 5 well."

9

36. On February 17, 2017, Anadarko filed its annual report for the year ended December 31, 2016, with the SEC on Form 10-K (the "2016 Annual Report"). In its 2016 Annual Report, the Company reported that it had spud both the Shenandoah-5 well, which "encountered more than 1,040 net feet of oil pay, extending the resource in the central-to-eastern limits of the field," and the Shenandoah-6 well, with a drilling objective "to establish the oil-water contact on the eastern flank of the field and to help quantify the resource potential of the basin." The Company also reported that it had "increased its working interest in Shenandoah from 30% to 33% by participating in a preferential-right process."

37. In the 2016 Annual Report, the Company also reported "approximately $800 million" in suspended costs related to the "Shenandoah project in the Gulf of Mexico." In doing so, Defendants represented that the Shenandoah oil field contained "wells that have sufficient reserves to justify completion as a producing well" and that "sufficient progress is being made in assessing the reserves and the economic and operating viability of the project."

38. Regarding the Company's internal control over financial reporting, the 2016 Annual Report stated:

> **MANAGEMENT'S ASSESSMENT OF INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.
>
> \* \* \*
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. . . . Based on our assessment, we believe that the Company's internal control over financial reporting was effective as of December 31, 2016.

39. As required by the Sarbanes-Oxley Act of 2002, Defendants Walker and Gwin certified that they had reviewed the 2016 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining . . . internal control over financial reporting."

40. Defendants' statements about the prospects and value of the Shenandoah oil field were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) the value of the Shenandoah assets and the success of the Shenandoah appraisal wells were overstated; (2) the Company lacked effective internal control over financial reporting; and (3) as a result of the foregoing, Defendants' statements about the Company's Shenandoah assets lacked a reasonable basis.

**C.     Investors Learn that the Shenandoah Assets Were Overstated**

41. Investors began to learn the truth about the value of the Company's Shenandoah assets on May 2, 2017, when the Company filed financial results with the SEC on Form 10-Q, for the first quarter of 2017. In this Form 10-Q, the Company recorded a $467 million impairment charge and expensed $435 million in suspended exploratory well costs related to the Shenandoah project. The Company stated that "[g]iven the results of [Shenandoah-6] and the present commodity-price environment, the Company has currently suspended further appraisal activities," and the Shenandoah exploratory well costs could no longer be capitalized.

42. On this news, the price of Anadarko common stock fell $4.33 per share, or approximately 8%, from a close of $56.28 per share on May 2, 2017, to close at $51.95 per share on May 3, 2017.

**D.     Investors Learn that the Company's Statements Had Been Fraudulent**

43.     While investors learned in May 2017 that the Shenandoah assets had been overstated, investors did not learn that Defendants had fraudulently overstated the value of the Shenandoah assets until November 4, 2019, when allegations in a whistleblower case against Anadarko were publicly disclosed in an opinion from the Fifth Circuit Court of Appeals in *Frye v. Anadarko Petroleum Corp.*, No. 18-20543 (5th Cir.) (the "Whistleblower Action").

44.     As recounted in the Fifth Circuit opinion:

> Frye worked as an engineer for Anadarko Petroleum Corporation (Anadarko) from 2005 to 2016. Her job involved evaluating the size of oil fields and developing economic models related to the viability of drilling and production projects. . . .
>
> According to Frye, Anadarko fraudulently overstated the economic prospects of its Shenandoah oil field in the Gulf of Mexico and then retaliated against her for objecting to these misrepresentations. Frye was a Senior Reservoir Engineer and team lead for the Shenandoah project. In March 2014, Frye alleges that Anadarko "knowingly published inflated information about its 2013 exploration successes during an investor conference." Further, after drilling began on the Shenandoah 3 (Shen 3) appraisal well, Anadarko allegedly concealed bad reports about this well from the public. In a February 2015 call with investors, an Anadarko executive allegedly "described Shen 3 in glowing terms, claiming there was over 1,500 feet of 'quality sand,'" even though "well data revealed that Shen 3 was actually a dry hole." Finally, in an October 2015 earnings call, Anadarko allegedly exaggerated findings from the Shenandoah 4 appraisal, repeating past optimistic projections without revealing new data indicating that the potential of the well "was vastly overstated." Frye alleges that, although Anadarko "knew the Shenandoah resource was less than half the size Defendant had originally claimed in March 2014," it "made no corrections to its original projections."
>
> Between 2014 and 2015, Frye contends that she made clear she was uncomfortable with Anadarko's "false, misleading statements about Shenandoah and the misleading way faults were being mapped" to "justify resource projections that it knew were flimsy and unscientific." In a February 2014 meeting with Anadarko executives, Frye alleges that she presented an economic analysis stating "that the Shenandoah project value was likely much smaller

12

than Defendant's exploration team had previously claimed." An Anadarko vice president, Ernie Leyendecker, allegedly responded angrily to Frye's conclusions and berated her economic analysis. Frye further alleges that, in August 2014 emails, Leyendecker was "adamant" that she and others conceal maps revealing the existence of faulting and instead use false maps of Shenandoah.

45. The complaint and other pertinent filings in the Whistleblower Action remain under seal. Accordingly, until these allegations were publicly disclosed by the Fifth Circuit, investors did not know—and could not have known—that Defendants' prior statements about the value of Shenandoah were fraudulent.

## V.     **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

46. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Anadarko common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of Anadarko, and their families and affiliates.

47. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

48. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants omitted and/or misrepresented material facts;

    c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      e.      Whether the price of Anadarko common stock was artificially inflated; and

      f.      The extent of damage sustained by members of the Class and the appropriate measure of damages.

49. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

50. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

51. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

52. Plaintiff will rely upon the presumption of reliance establish by the fraud-on-the-market doctrine in that, among other things:

      a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      b.      The omissions and misrepresentations were material;

      c.      The Company's common stock traded in an efficient market;

      d.      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

  e.  Plaintiff and the Class purchased Anadarko common stock between the time Anadarko and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53. At all relevant times, the market for Anadarko common stock was efficient because: (1) as a regulated issuer, Anadarko filed periodic public reports with the SEC; and (2) Anadarko regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII. NO SAFE HARBOR

54. Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Anadarko who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

55. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of Anadarko common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Anadarko common stock during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

## IX. SCIENTER ALLEGATIONS

56. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Anadarko common stock during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
against All Defendants**

57. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

58. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Anadarko common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

59. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

60. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act against the Individual Defendants

61. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

62. The Individual Defendants acted as controlling persons of Anadarko within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

64. As described above, Anadarko and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Anadarko common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

   a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

   b. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

   d. Such other and further relief as the Court may deem just and proper.

## XI. **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 19, 2020                                Respectfully submitted,

                                                                          **AJAMIE LLP**

                                                   *s/ Thomas R. Ajamie*
                                                   Thomas R. Ajamie, Attorney-in-Charge
                                                   Texas Bar No. 00952400
                                                   S.D. Tex. No. 6165
                                                   John S. "Jack" Edwards, Jr.
                                                   Texas Bar No. 24040851
                                                   S.D. Tex. No. 38095
                                                   Pennzoil Place – South Tower
                                                   711 Louisiana, Suite 2150
                                                   Houston, TX 77002
                                                   Telephone: (713) 860-1600
                                                   Facsimile: (713) 860-1699
                                                   tajamie@ajamie.com
                                                   jedwards@ajamie.com

                                                   **KESSLER TOPAZ**
                                                      **MELTZER & CHECK, LLP**
                                                   Naumon A. Amjed
                                                   Darren J. Check
                                                   Jonathan R. Davidson
                                                   Ryan T. Degnan
                                                   Karissa J. Sauder
                                                   280 King of Prussia Road
                                                   Radnor, PA 19087
                                                   Telephone: (610) 667-7706
                                                   Facsimile: (610) 667-7056
                                                   namjed@ktmc.com
                                                   dcheck@ktmc.com
                                                   jrdavidson@ktmc.com
                                                   rdegnan@ktmc.com
                                                   ksauder@ktmc.com

                                                   *Attorneys for Plaintiff Georgia Firefighters'*
                                                   *Pension Fund*