# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576<br><br>District Judge Charles R. Eskridge III<br><br>CLASS ACTION |

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF ABBREVIATIONS..................................................................................iii

TABLE OF AUTHORITIES....................................................................................v

SUMMARY OF ARGUMENT................................................................................ 1

STATEMENT OF ISSUES .................................................................................... 3

NATURE AND STAGE OF PROCEEDINGS...................................................... 4

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................... 4

    I.       BACKGROUND................................................................................ 4

    II.      THE SHENANDOAH APPRAISAL.......................................................... 5

          A.     Shen-1 and Shen-2 Wells ................................................... 5

          B.     Shen-3 Well ........................................................................ 7

          C.     Shen-4 Well....................................................................... 10

          D.     Shen-5 Well....................................................................... 11

          E.     Shen-6 Well....................................................................... 13

          F.     Post-Shen-6 Efforts ......................................................... 14

          G.     Current Development at Shenandoah................................. 15

ARGUMENT.......................................................................................................... 15

    I.       PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS
           CONCLUDED DURING THE CLASS PERIOD THAT
           SHENANDOAH WAS NOT COMMERCIALLY VIABLE..................... 18

          A.     Plaintiffs Cannot Establish Falsity Based on Their Claim that
                Defendants Knew that Shenandoah Was Not Commercially
                Viable During the Class Period........................................ 20

          B.     Plaintiffs Cannot Demonstrate that Defendants Acted with
                Scienter........................................................................... 26

II.   PLAINTIFFS CANNOT OTHERWISE SHOW THAT THERE
      ARE ACTIONABLE MISREPRESENTATIONS. .................................... 30

      A.   Industry-Wide Risk Factors. ............................................. 31

      B.   Statements About Accounting Policies. ........................... 33

      C.   Accounting Decisions. ...................................................... 33

      D.   General Statements About Anadarko's Business............. 34

      E.   Statements of Corporate Optimism. ................................ 35

      F.   Truthful Statements About Appraisal Activities.............. 36

III.  PLAINTIFFS CANNOT PROVE THEIR SCHEME LIABILITY
      CLAIMS. ..................................................................................... 38

IV.   PLAINTIFFS' § 20(A) CLAIM MUST BE DISMISSED BECAUSE
      THEY HAVE FAILED TO ADDUCE SUFFICIENT EVIDENCE
      TO WITHSTAND SUMMARY JUDGMENT ON THE ALLEGED
      PRIMARY VIOLATION.......................................................... 39

CONCLUSION ............................................................................... 40

## TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Defendants | Anadarko Petroleum Corporation, R.A. Walker, Robert G. Gwin, Robert P. Daniels and Ernest Leyendecker, III |
| Individual Defendants | R.A. Walker, Robert G. Gwin, Robert P. Daniels and Ernest Leyendecker, III |
| Plaintiffs | Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Building Trades United Pension Trust Fund |
| **Filed Documents** | |
| Compl. | Amended Complaint for Violations of the Federal Securities Laws (Aug. 17, 2020) [Dkt. 55] |
| Rosenberg Decl. | Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment (Mar. 16, 2023) |
| SUMF | Defendants' Statement of Undisputed Material Fact |
| **Discovery Materials** | |
| Chernoff Tr. | Deposition Transcript of Carlotta Chernoff (June 16, 2022) |
| Oudin Tr. | Deposition Transcript of Charles "Chip" F. Oudin III (June 30, 2022) |
| Camden Tr. | Deposition Transcript of Chris Camden (July 14, 2022) |
| Strickling Tr. | Deposition Transcript of Robert Strickling (July 21, 2022) |
| Chandler Tr. | Deposition Transcript of Paul Chandler (July 28, 2022) |
| McGrievy Tr. | Deposition Transcript of Patrick McGrievy (Aug. 24, 2022) |
| Hollek Tr. | Deposition Transcript of Darrell Hollek (Sept. 1, 2022) |
| Leyendecker Tr. | Deposition Transcript of Ernie Leyendecker  (Sept. 22, 2022) |
| Green Tr. | Deposition Transcript of Catherine Anne Green (Sept. 28, 2022) |
| Frye Tr. | Deposition Transcript of Lea Frye (Oct. 7, 2022) |
| Daniels Tr. | Deposition Transcript of Robert Daniels (Oct. 13, 2022) |
| Kleckner Tr. | Deposition Transcript of James Kleckner  (Oct. 14, 2022) |
| Walker Tr. | Deposition Transcript of Al Walker (Oct. 20, 2022) |
| Zajac Tr. | Deposition Transcript of Mark Zajac (Nov. 2, 2022) |
| Merrill Tr. | Deposition Transcript of Robert Merrill (Dec. 7, 2022) |
| Pittinger Tr. | Deposition Transcript of Lyndon Pittinger (Dec. 16, 2022) |
| Steinholt Tr. | Deposition Transcript of Bjorn I. Steinholt  (Dec. 21, 2022) |

| | |
|---|---|
| Regan Tr. | Deposition Transcript of Paul Regan (Jan. 20, 2023) |
| Regan Rpt. | Expert Witness Report of Paul Regan (Nov. 9, 2022) |
| Merrill Rpt. | Expert Witness Report of Robert Merrill (Nov. 9, 2022) |
| Steinholt Rpt. | Expert Witness Merits Report of Bjorn I. Steinholt (Nov. 9, 2022) |
| Pittinger Rpt. | Expert Witness Report of Lyndon Pittinger (Nov. 29, 2022) |
| Steinholt Rebuttal | Rebuttal Report of Bjorn Steinholt (Jan. 25, 2023) |
| Berk Rpt. | Rebuttal Report of Noam Berk (Jan. 25, 2023) |
| Detomo Rpt. | Expert Witness Report of Rocco Detomo (Jan. 25, 2023) |
| Murphy Rpt. | Rebuttal Report of Kevin Murphy (Jan. 25, 2023) |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ................................................................. 29

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) ........................................................... 32

*Boudreaux v. Swift Transp. Co., Inc.*,
  402 F.3d 536 (5th Cir. 2005) ................................................................. 16

*Callinan v. Lexicon Pharms., Inc.*,
  479 F. Supp. 3d 379 (S.D. Tex. 2020) ................................................... 36

*Delaware Cnty. Employees Ret. Sys. v. Cabot Oil & Gas Corp.*,
  579 F. Supp. 3d 933 (S.D. Tex. 2022) ................................................... 33

*Fine v. Am. Solar King Corp.*,
  919 F.2d 290 (5th Cir. 1990) ................................................................. 26

*Firefighters Pension & Relief Fund of the City of New Orleans*
  *v. Bulmahn*, 53 F. Supp. 3d 882 (E.D. La. 2014) ................................. 32

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................................... 35

*In re Browning-Ferris Ind. Inc. Sec.*,
  876 F. Supp. 870 (S.D. Tex. 1995) ........................................................ 33

*In re Compaq Sec. Litig.*,
  848 F. Supp. 1307 (S.D. Tex. 1993) ...................................................... 16

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................... 32

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. MDL-1446, 2005 WL 1798423 (S.D. Tex. July 26, 2005) ............. 27

*In re Fannie Mae Sec. Litig.*,
  905 F. Supp.2d 63 (D.D.C. 2012) .......................................................... 29

v

*In re Key Energy Servs., Inc. Sec. Litig.*,
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ........................................................ 40

*In re KeySpan Corp. Sec. Litig.*,
  383 F.Supp.2d 358 (E.D.N.Y. 2003) .......................................................... 29

*In re NVE Corp. Sec. Litig.*,
  551 F. Supp. 2d 871 (D. Minn. 2007),
  *aff'd*, 527 F.3d 749 (8th Cir. 2008) .......................................................... 36

*In re Odyssey Healthcare, Inc. Sec.*,
  424 F. Supp. 2d 880 (N.D. Tex. 2005) ........................................................ 35

*In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB,
  2012 WL 3282819 (N.D. Cal. Aug. 10, 2012),
  *aff'd*, 611 F. App'x 387 (9th Cir. 2015) ...................................................... 36

*Kunzweiler v. Zero.Net, Inc.*,
  No. 3:00-CV-2553-P, 2002 WL 1461732 (N.D. Tex. July 3, 2002) .......................... 21

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) ................................................................. 16

*Mack v. Newton*,
  737 F.2d 1343 (5th Cir. 1984) ................................................................ 16

*Marlin v. Moody Nat. Bank, N.A.*,
  248 F. App'x 534 (5th Cir. 2007) ............................................................. 24

*Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*,
  935 F.3d 424 (5th Cir. 2019) ................................................................. 32

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ............................................................. 21, 35

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ............................................................. 27, 28

*Petry v. Texas Dep't of Crim. Just.*,
  No. 1:18-CV-373, 2021 WL 9881458 (E.D. Tex. Apr. 28, 2021) ............................. 16

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
  482 F.3d 372 (5th Cir. 2007) ............................................................. 38, 39

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ................................................................. 35

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)............................................................................... 39

*Scott v. Harris*,
    550 U.S. 372 (2007)........................................................................ 24, 27

*Small Ventures USA, L.P. v. Rizvi Traverse Mgmt., LLC*,
    No. H-11-3072, 2014 WL 3535339 (S.D. Tex. July 16, 2014) .................. 26

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) .................................................. 21, 26, 27, 40

*Spitzberg v. Hous. Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ................................................................. 26

*Tuchman v. DSC Commc'ns Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ................................................................. 29

*Wandel v. Gao*,
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)..................................................... 31

*Williams v. WMX Techs., Inc.*,
    112 F.3d 175 (5th Cir. 1997) ................................................................. 32

## Statutes & Rules

17 C.F.R. § 229.105........................................................................................ 31

17 CFR § 240.10b-5 ................................................................................. passim

Fed. R. Civ. P. 56(c) ..................................................................................... 15

## SUMMARY OF ARGUMENT

In this securities fraud action, Plaintiffs contend that Defendants knew that Shenandoah, a deepwater oil prospect in the Gulf of Mexico, was not commercially viable and would not be brought to development, yet invested hundreds of millions dollars to appraise it anyway, only then to change course inexplicably and announce that they would be suspending appraisal activities after drilling six wells that cost Anadarko and its partners well over one billion dollars.  Plaintiffs' theory is illogical and finds no footing in the evidence in this case.

*First*, there is no evidence that Defendants reached the conclusion that Shenandoah was commercially unviable during the Class Period.  No document.  No testimony. Nothing.  Why not?  Because no such determination was made at any point during the Class Period.  Indeed, even Plaintiffs' purported whistleblower testified that Shenandoah *was* commercially viable during the Class Period.  Her contemporaneous internal documents corroborate that testimony.  The record further demonstrates that  Anadarko's internal teams—as well as the teams at each of Anadarko's partners that were reviewing the data and themselves investing hundreds of millions of dollars into the project—were all engaged in a period of assessment and appraisal during the Class Period.  While there were disagreements about how optimistic everyone should be about the potential success of the project, these internal disagreements are a far cry from evidence that anyone determined that the project was a failure.  To the contrary, as Anadarko—and its partners— warned investors in the middle of the Class Period, a decision on whether the project would

proceed to development would not be made until at least the sixth well was drilled and results were obtained.  That was at the end of the Class Period.

Simply put, Plaintiffs' theory makes no sense.  They can provide no reasonable explanation for why Anadarko would continue to invest such significant time and money into a futile venture.  Nor can they explain why Anadarko's partners—four sophisticated oil and gas companies who are not alleged to have participated in the fraud—would have done the same.  Common sense, and the complete absence of any evidence supporting Plaintiffs' claims, precludes them from establishing either falsity or scienter, two elements of their securities fraud claims.  For this reason alone, judgment should be entered for Defendants.  (*See* Section I, *infra*.)

*Second*, Plaintiffs cannot pivot to claim that any of the alleged misrepresentations were false for reasons other than the lack of commercial viability without destroying both their only damages model and the very basis on which this Court granted class certification.  But even if they could, they would still fail.  The various alleged misstatements are not actionable for various other reasons, including in particular that there are no facts that would permit a reasonable jury to conclude that any of them were actually false or misleading for *any* reason that Plaintiffs might offer.  (*See* Section II, *infra*.)

*Third*, Plaintiffs have asserted a claim for scheme liability in addition to their claim based on alleged misrepresentations.  But their scheme liability claim cannot succeed without proof of misrepresentations because there are no allegations of any other

2

manipulative conduct.  Thus, because Plaintiffs cannot establish falsity or scienter, their scheme liability claim also fails.  (*See* Section III, *infra*.)

*Fourth,* and finally, Plaintiffs cannot proceed to trial on their control person liability claim against the Individual Defendants because any such claim requires a primary violation, which fails for all of the preceding reasons.  (*See* Section IV, *infra*.)

## STATEMENT OF ISSUES

1.      Whether summary judgment should be entered in favor of Defendants on Plaintiffs' Rule 10b-5 claims, which are premised on a theory that Defendants failed to disclose that Shenandoah was not commercially viable, because the evidence would not permit a reasonable jury to conclude that Defendants formed such an opinion during the Class Period.

2.      Whether summary judgment should be entered in favor of Defendants on Plaintiffs' Rule 10b-5 claims because Plaintiffs cannot otherwise establish falsity.

3.      Whether summary judgment should be entered in favor of Defendants on Plaintiffs' Rule 10b-5(a) and (c) claims because Plaintiffs cannot show that Defendants made a fraudulent misrepresentation or engaged in manipulative securities trading practices.

4.      Whether summary judgment should be entered in favor of Defendants on Plaintiffs' Section 20(a) claim because Plaintiffs have failed to raise a triable issue of fact as to any alleged primary violation.

## NATURE AND STAGE OF PROCEEDINGS

This action was filed on February 19, 2020, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (Dkt. 1.)  On August 17, 2020, Plaintiffs filed an amended complaint. (Dkt. 55.)  On September 14, 2020, Defendants filed a motion to dismiss the amended complaint (Dkt. 60), which was denied on January 19, 2021 (Dkt. 63).  Plaintiffs filed a motion to certify the class on October 1, 2021 (Dkt. 86), which was granted on September 28, 2022 (Dkt. 141).  Defendants moved for reconsideration of the class certification order on October 12, 2022.  (Dkt. 143.)  That motion remains pending.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

I.  **BACKGROUND**

Anadarko was a multi-billion dollar oil and gas company that engaged in oil exploration and development projects around the world.  (Ex. 86 at APC-01751755, -804.)[1] Among Anadarko's exploration projects was the Shenandoah prospect in the Gulf of Mexico, which is known to be an especially "challenging environment" for oil and gas exploration.  (Ex. 22 (Pittinger Rpt.) ¶ 14.)  Anadarko entered into an operating agreement with four companies (together, the "partners")—Cobalt International Energy, ConocoPhillips Corporation and Marathon Oil (and later, Venari Resources LLC)—to explore the Shenandoah prospect.  (Ex. 31 (ANACOP00003083).)  Anadarko was

---

[1] All references to "Ex." are to the exhibits accompanying the Rosenberg Decl.

designated as the operator, meaning it was responsible for planning and conducting drilling operations, but all partners received and independently assessed data gathered from every appraisal well in which they participated.  (Ex. 72 (APC-00741533); Ex. 1 (Chernoff Tr.) 37:8-19.)

As Plaintiffs' experts concede, the purpose of drilling appraisal wells is "to acquire information about the resource to decide to proceed with a commercially viable development", known as a final investment decision ("FID"), "or exit at a reasonable cost if the resource appears not viable."  (Ex. 22 (Pittinger Rpt.) ¶ 16.)  Although there is no set industry definition of a "commercially viable" project, Plaintiffs' experts have defined it as a project that has the potential to become profitable.  (Ex. 17 (Steinholt Tr.) 34:21-35:5; Ex. 15 (Merrill Tr.) 29:2-3; Ex. 16 (Pittinger Tr.) 26:6-8.)  Whether Anadarko reached an FID for a project depended on the size and quality of the resource, cost of the development solution and external factors like the price of oil.  (Ex. 22 (Pittinger Rpt.) ¶¶ 172, 228.)  It also depended on a variety of other factors, such as where the project fit in Anadarko's portfolio and its risk and cashflow profile of the project.  (Ex. 80 (Camden Decl.) ¶ 8.)

II.     **THE SHENANDOAH APPRAISAL**

  A.     **Shen-1 and Shen-2 Wells**

In 2009, Anadarko drilled the partners' discovery well, Shen-1, which encountered approximately 300 feet of net pay, demonstrating that there was oil in the reservoir.  (Ex. 81 (APC-01335462).)  In 2013, the partners drilled its first appraisal well, Shen-2, which encountered over 1,000 net feet of high quality oil pay, making it one of the largest

discoveries by any company in the Gulf of Mexico.  (Ex. 82 (APC-00572655).)  While this was promising, Anadarko publicly cautioned that it was "very early" in the appraisal process and "Shenandoah obviously need[ed] additional drilling".  (Ex. 83 at APC-01751689, -691, -694.)

From the start, a team of employees from Anadarko's Exploration group led the Shenandoah project internally.  (Ex. 5 (Chandler Tr.) 52:4-9; Ex. 2 (Oudin Tr.) 57:13-19.) Fundamentally, Exploration's mandate was to better understand the overall limits of the field—*i.e.* "how big it could be".  (Ex. 7 (Hollek Tr.) 105:15-18.)  In April 2013, Anadarko created an internal working group, the purpose of which was to foster an eventual smooth transition of the project from Exploration to the Development team. Unlike Exploration, Development's goals were to project the amount of producible oil (Ex. 4 (Strickling Tr.) 73:15-19, 85:2-8) and to design a suitable plan for commercial development if that day ever came.  (Ex. 10 (Frye Tr.) 35:4-9; Ex. 28 (APC-00573912)).

These divergent approaches led to differences of opinion, and internal disagreements.  For instance, they calculated different estimated resource ranges based on their independent assessments of the technical information learned to date.  Despite this disagreement, it is undisputed that Anadarko, in line with its general practice, did not publicly release resource estimates for Shenandoah.  (Ex. 13 (Walker Tr.) 174:18-23, 193:2-3; Ex. 8 (Leyendecker Tr.) 135:15-23.)  The teams also had different interpretations of potential faulting.  Faults are underground fractures or discontinuities, which sometimes

decrease or prevent the movement of oil.  (Ex. 20 (Merrill Rpt.) at 66; Ex. 22 (Pittinger Rpt.) ¶¶ 20-22.)  Faults are common and even expected in the deepwater Gulf of Mexico (Ex. 20 (Merrill Rpt.) ¶¶ 29, 32).  However, mapping faults is particularly challenging in a region like Shenandoah due to difficulties in interpreting seismic data so far below the ocean floor through massive salt structures.  (*Id.* ¶¶ 30, 48-60, 84; Ex. 22 (Pittinger Rpt.) ¶ 75.)  Just as the internal teams within Anadarko created maps with different degrees of faulting, so too did Anadarko's partners, who generally had the same underlying data as Anadarko.  (*E.g.*, Ex. 22 (Pittinger Rpt.) ¶¶ 55, 118.)

By the start of the Class Period, Anadarko had spent approximately $193.4 million on well costs for Shenandoah.  (Ex. 73 (APC-00328549).)  During the Class Period, the partners would drill three additional wells, costing Anadarko over $196 million in well costs alone, not to mention the millions spent on other technical work, such as the effort to develop technology capable of handling the high pressures at Shenandoah.  (*Id.*)  And this was only approximately 30% of the total amount that the partners spent.

### B.  Shen-3 Well

In May 2014, Anadarko began drilling operations for, or "spud", the Shen-3 appraisal well to the far southeastern edge of the predicted oil reservoir.  (Ex. 48 (Marathon_014286).)  As set out in Shen-3's Authorization for Expenditure ("AFE"), which is a request for funds to drill a well, Shen-3 was designed to test the sand continuity in the reservoir, find the oil-water contact and test pressure connectivity with Shen-2 sands.

(Ex. 32 (APC-00005093).)  The drilling results showed that Shen-3 drilled into water but not oil.  (Ex. 33 (APC-00001146) at 5.)   However, the results achieved Anadarko's objectives, including that Anadarko and its partners used Shen-3 pressure data to project oil-water contacts across the reservoir.  (Ex. 38 (APC-00001935); Ex. 4 (Strickling Tr.) 63:7-9; Ex. 20 (Merrill Rpt.) ¶ 82 ("[Shen-3] pressure data were used to estimate OWCs in each sand").)  Based on the information from Shen-3, Exploration included in its internal reservoir map a north-south fault, as Development had done prior to Shen-3 being drilled, and presented this interpretation to the partners.  (Ex. 22 (Pittinger Rpt.) ¶ 9.)

The partners announced the Shen-3 well results publicly in early 2015, as well as their respective accounting treatment for the expenses they incurred.  In January 2015, ConocoPhillips and Marathon expensed Shen-3 as a "dry hole", a term sometimes used to refer to a well that does not encounter hydrocarbons (Ex. 84 at APC-01753879; Ex. 22 (Pittinger Rpt.) ¶ 144; Ex. 88 (Marathon FY 2014 10-K) at 8), but Cobalt suspended at least a portion of the Shen-3 costs (Ex. 87 at APC-01752442, -524), meaning that for accounting purposes it continued to record the costs as an asset pending "subsequent determination whether the cost should continue to be recorded as an asset or should be recorded as an expense" (Ex. 29 (APC-00577160)).

Unlike in its announcement of Shen-1 and Shen-2, Anadarko did not attribute any net oil pay to Shen-3; rather, it disclosed in its Q4 2014 Operations Report on February 2, 2015 that it encountered "50% . . . more of the same well-developed reservoir sands" found

8

in the Shen-2 well.  (Ex. 85 at APC-01752397.)  This report included a map that placed Shen-3 in water, outside the oil-bearing portion of the reservoir.  (*Id*.)  Anadarko did not initially expense the well because its accounting policy did not require wells to be expensed solely on the basis that they did not encounter oil.  (Ex. 9 (Green Tr.) 81:25-84:13.)  Anadarko's auditor, KPMG, reviewed Anadarko's treatment of Shen-3 and found it to be consistent with GAAP.  (Ex. 30 at KPMG_APC_eA_0002514; Ex. 14 (Zajak Tr.) 21:11-22:2.)  In February 2016, Anadarko referred publicly to Shen-3 as a "wet well", meaning that it encountered no oil, (Ex. 101 at APC-01751426), and in Q3 of that year revised their accounting treatment to expense costs associated with Shen-3 (Ex. 62 (APC-00002132.)

The Class Period began on February 20, 2015, when Anadarko reiterated its Shen-3 results in its FY 2014 10-K.  The Shen-3 results led Anadarko to reduce its internal resource estimates to 780-940 or 565-940 millions of barrels of oil-equivalent ("MMBOE"), depending on assumptions about faulting. (Ex. 34 (APC-00153588).)  However, under either estimate, Shenandoah had the potential to be a "giant" resource, which Plaintiffs' experts define as above 500 MMBOE.  (Ex. 20 (Merrill Rpt.) ¶ 21; Ex. 23 (Steinholt Rebuttal) ¶ 29.)  As part of its effort to gather information about Shenandoah, Anadarko and the partners approved an AFE to drill another appraisal well, Shen-4, to explore the far west side of the field at an expected total cost of up to $213.7 million, with Anadarko alone committing up to $64 million.  (Ex. 35 (APC-00022648).)

### C.    Shen-4 Well

The partners spud Shen-4 in May 2015.  (Ex. 33 at 4.)  After the initial original wellbore drilled into salt, the partners drilled a sidetrack well extending from the original wellbore, which encountered 622 net feet of pay.  (Ex. 98 (JanHen_00014482).)  Anadarko proposed drilling another sidetrack; two partners did not consent, one of which was ConocoPhillips, which explained that it did not think the sidetrack would efficiently prove sufficient volumes for an FID, but noted that it "remain[ed] prepared to follow this discovery to development".  (Ex. 41 (APC-01730272); *see also* Ex. 39 (Marathon_014843); Ex. 42 (APC-00216034).)  The second sidetrack encountered drilling problems and was abandoned.  (Ex. 43 (APC-00356191.)  In October 2015, Anadarko announced the results of the original well and first sidetrack.  (Ex. 98 (JanHen_00014482).)  Anadarko disclosed that the Shen-4 original well "established where the basin edge was" (Ex. 99 at APC-00206914), based on the fact that it drilled into salt and the "lateral edges are formed . . . against salt" (Ex. 20 (Merrill Rpt.) ¶ 44).

Around the same time, internally within Anadarko, management of the project transitioned from Exploration to Development.  Prior to the transfer, the two teams met with the Risk Consistency Team in January 2016 to reconcile their analyses about Shenandoah's potential resource size and to develop a joint resource estimate.  (Ex. 3, 192:13-193:12; Ex. 44 at -563.)  Based on these meetings, they arrived at a joint estimate of a range between 185 and 693 MMBOE, with a mean of 426 MMBOE.  (Ex. 44 at APC-

10

00663564.)  The Development team cited this range in its AFE for Shen-5 and provided it to management for purposes of assessing Shenandoah within the overall company-wide portfolio.  (Ex. 47 (APC-00667721); Ex. 51 (APC-00070330).)

### D.  Shen-5 Well

Anadarko and the partners decided that they would need to drill Shen-5 and an additional appraisal well, Shen-6, before any decision could be made as to whether to sanction development.  (Ex. 40 (APC-00214429).)  In a December 16, 2015 presentation to the partners, the Development team noted that commercializing the Shenandoah project "likely requires success at Shen 5 & Shen 6".  (Ex. 46 (APC-00223098) at 2.)  That same presentation also stated that the overall likelihood of success in the project was 88.2%.  (*Id.* at 11.)  Pat McGrievy, the Manager of the Development team, testified that, at this time, Anadarko "viewed this field as definitely very viable commercial[ly] going forward" (Ex. 6 (McGrievy Tr.) 285:14-16), and that if Shen-5 and Shen-6 had been successful, the project would have been a "very, very, very successful case" (*id.* 288:18-289:10).  Al Walker, Anadarko's CEO, testified that after Shen-4, Anadarko thought that "wells 5, 6, and eventually 7 would be drilled before we could make a commercial decision".  (Ex. 13 (Walker Tr.) 192:17-22).)

Lea Frye, a Reservoir Engineer on the Development team, prepared the AFE for the next appraisal well, Shen-5, which she testified would "be a key well in determining whether or not [Shenandoah was] going to be a major oil producing hub for APC or not".

11

(Ex. 10 (Frye Tr.) 207:6-18.)  She testified that "[i]f Shen 5 has success in the amount of new hydrocarbon proven probable, we would then drill Shen 6", and depending on those results would "continue forward to that decision point", meaning an FID.  (Ex. 10 (Frye Tr.) 291:16-292:6.)  The AFE was for a total gross cost of $210 million dollars for the partners, with Anadarko's working interest amounting to $63 million.  (Ex. 45 (APC-00067336).)

Anadarko drilled Shen-5 as a "keeper well"—a more expensive well design than a simple appraisal well, which could be used to drill for oil once production began—in the eastern portion of the reservoir to better understand how far the field extended.  (Ex. 49 at APC-00067336.)  Anadarko announced in July 2016 that Shen-5 encountered 1,043 feet of net pay and extended the eastern limit of the field but did not encounter the oil-water contact.  (Ex. 58 (APC-00704016); Ex. 59 at APC-00002375.)

Three of the partners continued to participate in the project after Shen-5, when in October 2016, the partners approved an AFE for Shen-6 for an estimated cost of over $157 million.  (Ex. 61 (ANACOP00002102).)  One partner, Marathon, exited the project in April 2016 while Shen-5 was drilling (Ex. 50 (APC-00358928)), as part of a larger plan to divest $1.3 billion of assets (Ex. 119, Offshore Engineer, "Marathon sells Shenandoah stake").  Anadarko elected to exercise its contractual right to purchase part of Marathon's stake, increasing its working interest by 3%.  (Ex. 54 (APC-00244786); Ex. 50 (APC-00358928); Ex. 55 (APC-00245433).)

### E.    Shen-6 Well

In December 2016, the partners spud Shen-6 in an area farther to the east of Shen-5. It was designed to test the oil-water contacts and to extend the known limits of the eastern portion of the field.  (Ex. 63 (APC-00291032); Ex. 60 (APC-00276625).)  Shen-6 was also drilled as a keeper well, which indicated that "someone in the development team [was] . . . seeing something from the reservoir that gave them encouragement that we were on our way to a commercial capability with the reservoir".  (Ex. 13 (Walker Tr.) 216:1-6.)  After drilling completed on February 7, 2017, it was determined to be a dry hole.  (Ex. 67 (APC-00300370).)  However, the Development team continued to assess the economics of the field.  (Ex. 64 (APC-00725877).)  On February 13, the Development and Exploration teams sent a joint memo to Ernest Leyendecker, Executive Vice President, International and Deepwater Exploration, summarizing the Shen-6 results and recommending an immediate sidetrack to try to better define the oil-water contacts within the Shen-5 fault block.  (Ex. 65 (APC-00299954).)  The following day, Anadarko approved an AFE for almost $46 million for a Shen-6 sidetrack.  (Ex. 66 (APC-00089435).)

Drilling reports from late February 2017 noted that the sidetrack was encountering wet sands and no oil.  (Ex. 68 (APC-00091554).)  On April 4, Anadarko's asset team presented its conclusion that "additional appraisal drilling at Shenandoah will not materially move the needle" to the Executive Committee and recommended suspension of the project to "reduce pace" of capital spending and "allow[] more time to develop an

13

optimal solution for the basin". (Ex. 69 at APC-00091673, -693.) On May 2, 2017, Anadarko announced that "[g]iven the results of [Shen-6] and the present commodity-price environment," it "suspended further appraisal activities." (Ex. 118 at APC-01752126.) On that basis, it expensed exploratory well costs of $435 million and took a $467 million impairment charge. (*Id.*) Around this time, oil prices were hovering at about $50 a barrel and were expected to remain that price for the next three to seven years. (Ex. 24 (Berk Rpt.) ¶ 28.)

F.   **Post-Shen-6 Efforts**

Although Anadarko considered an exit strategy as part of its overall optionality analysis (Ex. 6 (McGrievy Tr.) 211:23-212:5), it never decided to pursue one at Shenandoah until after seeing the results of Shen-6 (Ex. 12, 162:17-19). After learning that Anadarko would suspend appraisal activity at Shenandoah, the partners expressed their disappointment to Anadarko, writing that "there are potentially viable options available at this point for identifying and implementing a development plan and obtaining an SOP [Suspension of Production], allowing the parties to . . . bring Shenandoah to first oil." (Ex. 71 at APC-00739429.) Anadarko considered this option (Ex. 69 (APC-00091671) at 4), which Plaintiffs' expert (evidently not recognizing that it had) opines was a strategy "Anadarko might have been expected to pursue if drilling results at Shenandoah were positive yet commodity prices were not sufficiently high to justify immediate project sanction" (Ex. 24 (Berk Rpt.) ¶ 77).

Anadarko continued to look for commercialization options (Ex. 70 (APC-00362397)), and even considered drilling Shen-7 in September 2017 (Ex. 74 (APC-00328743); Ex. 75 (APC-00750132)). Anadarko submitted the Shen-7 AFE to the partners on November 9, 2017 (Ex. 76 at APC-00336946), and Cobalt and Venari elected to approve it shortly thereafter (Ex. 77 (APC-00754122)). On December 6, 2017, ConocoPhillips notified Anadarko of its decision not to support the Shen-7 AFE. (Ex. 76 at APC-00336945.) On December 12, 2017, Anadarko stated its intent to withdraw from the operating agreement. (Ex. 78 (APC-00754345).)

### G.     Current Development at Shenandoah

On August 25, 2021, Beacon Offshore and its partners reached FID at Shenandoah, with production beginning in 2024 and peak production anticipated the following year. (Ex. 79 at APC-01760546; Ex. 25 (Detomo Rpt.) ¶¶ 33, 66.) As Plaintiffs' own expert notes, oil production estimates under current ownership indicate about 387 million barrels of oil equivalent, which is "remarkably similar" to Anadarko's own post-Shen-5 resource estimates. (Ex. 24 (Berk Rpt.) ¶ 38.)

### ARGUMENT

Summary judgment is appropriate if a party establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). The moving party "bears the burden to establish that its opponent has failed to raise a genuine issue of material fact", which can be achieved by "demonstrat[ing] that the evidence in the record insufficiently supports an essential element the opponent's claim".

15

*In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1312 (S.D. Tex. 1993) (citation omitted).  If the movant meets this burden, the burden shifts to the non-movant to demonstrate that summary judgment is inappropriate.  *Id.*  The nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 (5th Cir. 1994).  "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation marks omitted).

While a court must weigh evidence in favor of the non-moving party, "the court's obligation to draw reasonable inferences 'does not extend so far as to allow a wholly unreasonable inference or one which amounts to mere speculation and conjecture'". *Petry v. Texas Dep't of Crim. Just.*, No. 1:18-CV-373, 2021 WL 9881458, at *4 (E.D. Tex. Apr. 28, 2021) (quoting *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984)).  Plaintiffs fail to create a material issue of triable fact and judgment must be entered in Defendants' favor for at least four reasons.

*First*, Plaintiffs' case turns on the claim that Defendants concluded at the outset of the Class Period that the entire Shenandoah project was not commercially viable and failed to disclose this alleged opinion to the market.  However, the record is entirely devoid of any evidence establishing that Defendants held such an opinion at any point during the Class Period, never mind during the *entire* Class Period.  Accordingly, Plaintiffs cannot

16

establish that any of the alleged misstatements were materially false or misleading, nor can they establish that any of the alleged misstatements were made with the requisite scienter. Each provides an independent basis to enter judgment in Defendants' favor.  (Section I, *infra*.)

*Second*, to the extent Plaintiffs seek to establish that Defendants' statements were false or misleading for reasons other than Shenandoah's alleged lack of commercial viability—which would require decertification of the class—they still cannot withstand summary judgment.  As detailed below, the alleged misrepresentations are largely:  (1) risk factors affecting the industry as a whole; (2) accurate descriptions of accounting policies; (3) accounting decisions; (4) general statements about Anadarko's business; (5) statements of corporate optimism; or (6) truthful statements about appraisal activities.  (Section II, *infra*.)

*Third,* Plaintiffs' allegations of "scheme liability" pursuant to Rule 10b-5(a) and (c) fail because Plaintiffs cannot prove the existence of either an actionable misstatement or omission, or of market manipulation. (Section III, *infra*.)

*Fourth*, Plaintiffs cannot establish control person liability pursuant to § 20(a) because they fail to raise a triable issue that there was a primary violation.  (Section IV, *infra*.)

I.     PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS CONCLUDED DURING THE CLASS PERIOD THAT SHENANDOAH WAS NOT COMMERCIALLY VIABLE.

Most of Plaintiffs' challenged statements include recitations of technical facts related to the Shenandoah appraisal wells, such as net feet of pay and reservoir quality. Rather than contest the truth of these statements, Plaintiffs claim that each statement was misleading because—according to Plaintiffs—Defendants decided at the outset of the Class Period that the entire Shenandoah project was not commercially viable and failed to disclose this supposed "fact" each time Anadarko spoke about the project.

That Plaintiffs intend to prove that Defendants never believed the project was commercially viable at any time during the Class Period has been confirmed most directly by their damages expert Bjorn Steinholt, who has explained:  "Plaintiffs allege that Defendants engaged in a fraudulent scheme by multiple methods and means and made misleading statements during the Class Period that concealed the alleged truth—the lack of commercial viability of the Shenandoah project".  (Ex. 21 (Steinholt Rpt. ¶ 27); *see also id.* at ¶ 29 ("[T]he alleged truth, *i.e.*, the lack of commercial viability of the Shenandoah project, was disclosed after the market had closed on May 2, 2017".).)  Steinholt's damages model is premised on the notion that the truth at the very beginning of the Class Period was that the project was not commercially viable.  Absent such proof, his entire damages model falls apart.  Specifically, according to Steinholt, the artificial inflation started following the first misrepresentation on February 20, 2015, at the start of the Class Period: "At that point

18

in time, that's when you get an inflation, which is the difference between the stock price and the true value reflecting the alleged truth". (Ex. 17 (Steinholt Tr.) 66:7-21.) Although Plaintiffs allege subsequent misstatements, under Steinholt's damages model those later alleged misstatements do not "add to the inflation", but simply maintain it. (*Id.* at 70:13-21.) Indeed, Steinholt opines that "inflation during the class period is flat, except for one step up" when Anadarko increased its working interest in the project. (*See id.* at 71:13-21.)

Moreover, this theory that Shenandoah was *never* commercially viable at any point during the Class Period was critical to Plaintiffs' arguments—accepted by this Court—in support of class certification. At class certification, Plaintiffs disclaimed any reliance on a materialization-of-the-risk theory. (Dkt. 96 at 8-9.) This is because, as this Court noted in its class certification decision, the Fifth Circuit has held that a materialization-of-the-risk theory is "insufficient because it can't be applied uniformly across the class, as *Comcast* requires," and it "presumes substantial reliance on factors other than price, a theory not supported by *Basic* and the rationale for fraud-on-the-market theory." (Dkt. 141 at 12-13 (internal quotation marks omitted.) Thus, in granting Plaintiffs' motion, this Court found that Plaintiffs do not "assert that Defendants underrepresented an *unrealized* risk" but rather "that certain risks had *in fact* materialized, yet Defendants actively misled investors to the contrary". (Dkt. 141 at 13.) Defendants are contemporaneously filing a *Daubert* brief with respect to Steinholt's damages model, on the basis that it is inconsistent with the

19

factual conclusions offered by Plaintiffs' engineering expert, Lyndon Pittinger, who opines that the risk that Shenandoah was not commercially viable increased during the Class Period. Specifically, Pittinger opines that it was "more likely than not" that Shenandoah was not commercially viable as of April 2015 (Ex. 22 (Pittinger Rpt.) ¶ 11(h)) and not commercially viable "with reasonable certainty" as of December 31, 2015, after the drilling of Shen-4 (*id.* ¶ 11(j)).

As set forth in the following sections, no reasonable jury could conclude that Defendants made a decision at the outset of the Class Period that the Shenandoah project was not commercially viable. This precludes Plaintiffs from establishing two requisite elements of their securities claims: falsity and scienter.

A.   **Plaintiffs Cannot Establish Falsity Based on Their Claim that Defendants Knew that Shenandoah Was Not Commercially Viable During the Class Period.**

Plaintiffs cannot prevail on their misrepresentation claims unless they can prove that the challenged statements were materially false and misleading. Having staked their case on proving that Defendants concluded at the outset of the Class Period that the Shenandoah project was not commercially viable, that means Plaintiffs must come forward with some genuine dispute as to a material fact that would permit a reasonable jury to find that Defendants held that opinion throughout the entire Class Period. They cannot do so because there is not one piece of evidence indicating that Anadarko had determined Shenandoah was not commercial during the Class Period; to the contrary, the evidence shows that Anadarko was actively appraising Shenandoah throughout the Class Period.

Under the governing law, a statement is only actionable under Rule 10b-5 if it is materially false or misleading. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001). Where, as here, the argument is that certain omitted facts rendered affirmative statements misleading, Plaintiffs must prove that the allegedly omitted facts were "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading". 17 C.F.R. § 240.10b-5; *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 374 (5th Cir. 2004) (finding no liability for statements where plaintiffs "fail[ed] to explain how these statements were false or misleading due to material omissions when they were made"); *Kunzweiler v. Zero.Net, Inc.*, No. 3:00-CV-2553-P, 2002 WL 1461732, at *10 (N.D. Tex. July 3, 2002).

Plaintiffs cannot carry this burden. During the Class Period, Anadarko and its partners were engaged in the process of appraising the Shenandoah project. As Plaintiffs' expert recognizes, the purpose of the appraisal process is "to acquire information about the resource to decide to proceed with a commercially viable development". (Statement of Undisputed Material Facts ("SUMF")*, supra*, § I.) Shenandoah was no different, given the uncertainty inherent in off-shore drilling off the Gulf of Mexico. (*Id.*) In fact, one of Plaintiffs' own experts—Robert Merrill—*conceded* that the uncertainty was so great that "[i]t was unknown at any time during the class period" whether Shenandoah was commercially viable. (Ex. 15 (Merrill Tr.) 63:20-21.)

21

Because they are lacking any evidence whatsoever that any Defendant decided the entire project should be written off from the outset of the Class Period, Plaintiffs are forced to cobble together various disparate pieces of evidence that do not actually support their case. For example, Plaintiffs will likely contend that Anadarko's Exploration team, at the direction of Leyendecker, engaged in a "campaign" to suppress negative facts about Shenandoah known to the Development team (*e.g.*, Compl. ¶¶ 37-49, 146-150). This, however, does not create a basis for a reasonable jury to conclude that Defendants knew Shenandoah was not commercially viable. Putting aside that these events occurred almost entirely *before* the start of the Class Period, there is no evidence that anyone even *in Development* had concluded that Shenandoah was not viable at this time.

To the contrary, one member of Development, McGrievy, testified that after Shen-4, Anadarko "viewed this field as definitely very viable commercial[ly] going forward" and that if Shen-5 and Shen-6 had been successful, the project would have been a "very, very, very successful case". (SUMF § III.B.) Frye, another member of Development and the supposed "whistleblower", believed that the estimates of the Exploration Team were "overly optimistic", a point she made in a letter to the Company and then to the SEC in May 2016. (Ex. 52 at APC-00000545; Ex. 56 at APC-00113309.) However, she conceded during her deposition that she had not reached the conclusion during the Class Period that the project was unviable. (SUMF § II.D.) Indeed, after the results of Shen-4, she wrote that "[t]his is exactly the results this the project needed to keep things going." (Ex. 37 at

22

APC-00646864.)  Frye also prepared the AFE for Shen-5, which she testified would "be a key well in determining whether or not [Shenandoah was] going to be a major oil producing hub for APC or not".  (SUMF § II.D.)  Notably, a contemporaneous document prepared by Development notes that the overall likelihood of success of the project as of December 2015—nearly one year into the alleged Class Period—was *88.2%*.  (*Id.*)  It blinks at reality to suggest that the record evidence—which demonstrates support for the ongoing appraisal and exploration—somehow establishes that the insiders knew that the project was a dead end at the outset of the Class Period.

Plaintiffs and their experts also point to certain internal economic models that they claim showed that Shenandoah was uncommercial *under certain circumstances*.  But Plaintiffs cannot dispute that those very same presentations also had models under which Shenandoah was commercially viable.  (*E.g.*, Ex. 53 (APC-01355223); Ex. 57 (APC-01362172).)  That Anadarko had internal sensitivities that predicted different outcomes for Shenandoah depending on the outcome of future developments (such as oil prices) does not create a genuine issue as to whether Defendants knew that Shenandoah was not viable. Instead, it merely shows that there remained significant uncertainty—which is precisely what Anadarko disclosed to the public and what it believed internally.  (*See, e.g.*, SUMF §§ III.B, D.)  And while Plaintiffs point to some documents suggesting Anadarko considered alternative options, including an exit strategy, as McGrievy explained, "every project . . .  should have an [] exit strategy," and even though Anadarko had considered

one, it believed "that there's plenty of upside in this field to be able to reach [an] economic project going forward". (Ex. 6 (McGrievy Tr.) 286:23-287:4.) These documents demonstrate nothing more than prudent, standard business practices.

Plaintiffs cannot use their experts to fill the evidentiary void. For example, Plaintiffs appear poised to offer the testimony of their industry expert to establish not only that Shenandoah was not commercially viable during the Class Period, but also to speculate that Defendants shared this view. (Ex. 22 (Pittinger Rpt.) ¶ 11(j).) Of course, no expert—including Pittinger—is qualified to opine on the knowledge of Defendants or others at Anadarko, and thus this proffered testimony will be inadmissible at trial. *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007).[2] But even focusing on the evidence upon which he and Plaintiffs rely, no reasonable jury could conclude that Defendants knew that Shenandoah was not commercially viable during the Class Period, or that they had committed to spending over $196 million to appraise a prospect they believed was destined to fail. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

---

[2] Defendants are filing an accompanying *Daubert* motion on this basis with respect to both the expert reports of Pittinger and Merrill.

In fact, the record evidence directly refutes Plaintiffs' core theory. *First*, and perhaps most significantly, Anadarko and the partners would drill three additional wells during the Class Period, costing Anadarko over $196 million in well costs alone, not to mention the millions spent on other technical efforts (SUMF § II.A), after allegedly deciding that this project was doomed. This defies logic. *Second*, throughout the Class Period, Anadarko's internal estimates showed significant producible resource ranges. For example, after obtaining the results of Shen-3, Anadarko's internal estimates showed that Shenandoah had a likely producible resource range of either 780-940 or 565-940 MMBOE, depending on assumptions about faulting. (*Id.* § III.A.) Plaintiffs' experts have conceded that any range exceeding 500 MMBOE constitutes a "giant" reservoir. (*Id.* § II.B.) While the resource range estimates did decrease after Shen-4, the range of 185-693 MMBOE still included the possibility that the resource was a "giant". (*Id.* § II.C.) Internal documents confirm that Anadarko recognized at that point that further appraisal remained necessary. Under Development's direction, the partners drilled two "keeper" wells, a more expensive well design than a simple appraisal well, which could be used to drill for oil once production began. (*Id.* §§ II.D-E.) This led to Shen-5, which encountered *over 1,000 feet of net pay.* (*Id.* § III.D.)

*Third,* even at the close of the Class Period and after Shen-6 was discovered to be a dry hole, Defendants continued to assess the economics of the field to determine whether it could be commercially developed. (*Id.* § III.E.) The partners had their own technical

25

teams analyzing the same data and they too believed that Shenandoah was commercially viable.  (*Id.* § III.F.)  They even urged Anadarko to continue moving forward with Shenandoah, and Anadarko continued to look for commercialization options, even proposing an AFE to drill another appraisal well.  (*Id.*)  Today, the current owners of Shenandoah have decided to develop the field, which confirms what Anadarko thought throughout the Class Period:  Shenandoah had the potential to be profitable.  (*Id.* §§ I, III.F.)

In sum, Plaintiffs' claim turns on their allegation that Defendants misled the market by failing to disclose that Shenandoah was not commercially viable during the Class Period, but there is no evidence that Defendants held this view as Anadarko (and its partners) continued to invest hundreds of millions in the further appraisal of the Shenandoah field.

### B.  Plaintiffs Cannot Demonstrate that Defendants Acted with Scienter.

Plaintiffs also must prove scienter as an element of each of their claims under Rule 10b-5, including their claims under Rule 10b-5(a), Rule 10b-5(b) and Rule 10b-5(c). *See Fine v. Am. Solar King Corp.*, 919 F.2d 290, 294 (5th Cir. 1990); *Small Ventures USA, L.P. v. Rizvi Traverse Mgmt., LLC*, No. H-11-3072, 2014 WL 3535339, at *3 (S.D. Tex. July 16, 2014).  Plaintiffs must show scienter as to each of the Individual Defendants.  *See Southland*, 365 F. 3d at 366.  Scienter requires either "an intent to deceive, manipulate, or defraud, or severe recklessness".  *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684

(5th Cir. 2014).  No reasonable jury could conclude that Defendants acted with scienter with respect to Plaintiffs' claimed omission that the project was commercially unviable.

As an initial matter, while scienter can be established by demonstrating that the defendant knew its statements were false, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2005 WL 1798423, at *2 (S.D. Tex. July 26, 2005), that is of no help to Plaintiffs here.  As set forth in the preceding section, there is no evidence that would permit a reasonable jury to conclude that Anadarko knew during the Class Period that Shenandoah was not commercially viable.   *Southland*, 365 F.3d at 378 ("[T]hese allegations [] fail because they do not explain how any defendant knew, or was severely reckless in not knowing, . . . that the forward-looking earning statements were false when made." ).  Indeed, the undisputed evidence establishes that Defendants invested millions of dollars into actively appraising Shenandoah and that even after the results of Shen-6, Defendants had not concluded that Shenandoah was unviable.

While Plaintiffs can also prove scienter by demonstrating severe recklessness, this approach "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015) (citation omitted). Defendants never told the market that they had made a determination about Shenandoah's

27

commerciality.  To the contrary, Anadarko made repeated representations throughout the Class Period that further appraisal was necessary before Anadarko could make a decision to sanction Shenandoah.  For instance, during a May 5, 2015 earnings call, Robert Daniels, Executive Vice President, International and Deepwater Exploration, stated, "there's an awful lot of work that's gone into defining what data we still need to get to that FID decision" and that Anadarko needed data from Shen-4 and Shen-5 to "make the call as to whether [it] want[ed] to advance toward FID, do an additional appraisal well, whatever it may be".  (Ex. 93 at APC-01751491.)  The internal record is rife with documents showing that there was a reasonable chance that the project would be commercially viable through the entire Class Period and no documents even suggesting that the entire team had already given up on the project.  As such, Plaintiffs cannot demonstrate that Defendants engaged in "highly unreasonable omissions or misrepresentations" that were such an "extreme departure from the standard of ordinary care" and "present[ed] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it".  *Owens*, 789 F.3d at 536.

As noted above, Plaintiffs' allegations of scienter also make no sense.  Plaintiffs offer no reason why Defendants would have spent hundreds of millions of dollars drilling appraisal wells on a project if they knew that it was not commercially viable, only to suddenly reverse course and write down those expenses in May 2017.  Plaintiffs also offer no evidence to explain why four other partners—each of which was receiving all the data

that Anadarko had about the appraisal wells (SUMF §§ I, II.A)—would themselves have invested hundreds of millions of dollars in a project that Plaintiffs claim any reasonable person would have already decided was a waste of money as of February 2015.

That leaves Plaintiffs' generalized allegations of amorphous financial incentives. (Compl. ¶¶ 75, 95(e), 150.)  But the Fifth Circuit has held that "[o]nly insider trading in suspicious amounts or at suspicious times is probative of scienter".  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002).  Here, only one Defendant, Daniels, sold *any* shares during the Class Period; and even then, he did so on behalf of his ex-wife, to whom he had "previously transferred the economic interest in these stock options . . . pursuant to a divorce decree".  (Ex. 26 (Murphy Rpt.) at 28.)  In fact, all Defendants actually *increased* their interest in Anadarko stock during the Class Period, directly negating any inference of scienter.  (*Id.* at 30.)  *See In re Fannie Mae Sec. Litig.*, 905 F. Supp.2d 63, 78 (D.D.C. 2012) (noting that the defendant "substantially *increased her* ownership of . . . stock and vested stock options throughout the class period", which was "to say the least, inconsistent with a fraudulent intent"); *accord In re KeySpan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 383-84 (E.D.N.Y. 2003).

Plaintiffs also find no footing by pointing to the named Defendants' incentive compensation.  As a legal matter, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated", as "the executives of virtually every corporation in the United States would be subject to fraud allegations".  *Tuchman v. DSC*

29

*Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).  As a factual matter, the compensation of the Executive Committee was not even based on resource estimates. (Ex. 11 (Daniels Tr.) 40:19-22.)  And Leyendecker, the only named Defendant who was not on the Executive Committee for the entirety of the Class Period, stopped being directly responsible for Shenandoah only two months after the start of the Class Period.  (Ex. 8 (Leyendecker Tr.) 55:3-9.)  Thus, even if compensation of non-executives could be impacted by resource estimates, there is nothing to suggest that would motivate Leyendecker to perpetuate this allegedly massive fraud.

*   *   *

Because Plaintiffs cannot demonstrate that Defendants concluded that Shenandoah was not commercially viable during the Class Period, they cannot establish that Defendants engaged in a material omission or acted with the requisite scienter.  For both of these reasons, summary judgment in Defendants' favor is warranted.

## II.   PLAINTIFFS CANNOT OTHERWISE SHOW THAT THERE ARE ACTIONABLE MISREPRESENTATIONS.

As discussed in the preceding section, Plaintiffs have staked their case on proving that Anadarko concluded that Shenandoah was not commercially viable as of the beginning of the Class Period, even though it and its partners invested hundreds of millions of dollars into the project after allegedly making this determination.  There is no evidence that Defendants held this belief, rendering Plaintiffs unable to prove that there were any actionable misrepresentations or that Defendants had the requisite scienter.

30

Plaintiff cannot now pivot and claim that each of the challenged misstatements were inaccurate and caused the stock to trade at inflated levels because doing so will destroy not only their damages model, but also the basis on which they sought—and obtained—class certification.  As set forth below, any such pivot would also fail because Plaintiffs cannot establish falsity with respect to the alleged statements, as they are either:  (1) risk factors affecting the industry as a whole; (2) accurate descriptions of accounting policies; (3) accounting decisions; (4) general statements about Anadarko's business; (5) statements of corporate optimism; or (6) truthful statements about appraisal activities.

### A.      Industry-Wide Risk Factors.

Plaintiffs assert that Anadarko's SEC filings contained numerous "risk factors without disclosing that such risks had already materialized as to the Shenandoah resource, including 'the risk that we will not encounter commercially productive oil or natural-gas reservoirs' and 'exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons'". (Compl. ¶¶ 98, 116.)  These risk disclosures are not actionable.  (*See* App. §§ 2, 22.)[3]

As an initial matter, an issuer such as Anadarko is required to include risk factors in its publicly filed financial statements.  17 C.F.R. § 229.105.  Item 105 requires the disclosure of the "most significant risk factors" associated with the security.  *Wandel v.*

_____

[3] Citations to "App. §__" are to the appendix to this brief, which includes a numbered chart listing the alleged misrepresentations in the Amended Complaint.

*Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022).  There is no allegation—nor could there

be—that the disclosed factors were not risks that Anadarko reasonably believed related to

an investment in Anadarko.  They were not, therefore, false or misleading for that reason.

Plaintiffs also cannot weaponize the risk factors by arguing that the disclosed risks

had actually been realized.  "[A]s several courts have concluded, cautionary statements are

not actionable to the extent plaintiffs contend defendants should have disclosed risk factors

*are* affecting financial results rather than *may* affect financial results."  *Bondali v. Yum!*

*Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (emphasis added and internal quotation

marks omitted); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997).

"[W]hen the statement in question is merely a boilerplate list of risks affecting an industry

as a whole, it is unlikely that a reasonable investor would interpret the list as an assurance

of regulatory compliance."  *Firefighters Pension & Relief Fund of the City of New Orleans*

*v. Bulmahn*, 53 F. Supp. 3d 882, 915 (E.D. La. 2014).  Here, the statements at issue are just

that—a "list of risks affecting an industry as a whole".  *Id.* at 914.

Plaintiffs also attempt to invent a duty to disclose purported "uncertainty

surrounding Shenandoah's economic viability" under SEC Regulation S-K Item 303.

(Compl. ¶¶ 142-145.)  However, Item 303 does not "establish a duty to disclose that may

give rise to liability under § 10(b)".  *In re Enron Corp. Sec., Derivative & ERISA Litig.*,

258 F. Supp. 2d 576, 633 n.63 (S.D. Tex. 2003); *see also Mun. Employees' Ret. Sys. of*

*Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 436 (5th Cir. 2019).

B. **Statements About Accounting Policies.**

Plaintiffs also allege that several of Anadarko's statements about its accounting practices were misleading.  For example, Plaintiffs point to Anadarko's disclosures that "[i]f additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time".  (App. §§ 7, 23, 36, 47; *see also* § 3.)

None of these statements are actionable.  *See Delaware Cnty. Employees Ret. Sys. v. Cabot Oil & Gas Corp.*, 579 F. Supp. 3d 933, 948 (S.D. Tex. 2022) (finding that general statements of policy "cannot be reasonably read as promises or guarantees to investors of complete compliance").  Plaintiffs do not allege—and cannot allege—that Anadarko did not in fact have these accounting policies in place.  Indeed, many of these statements simply reflect the relevant accounting standards, such as ASC-932-360-35.  (Ex. 27 (APC-00113426).)  The fact that Anadarko allegedly did not follow these accounting policies with respect to Shenandoah—which is not true—would not itself render the statements that the policies existed false or misleading.

C. **Accounting Decisions.**

Plaintiffs take issue with Anadarko's accounting decisions regarding Shen-3 and the Shenandoah project as a whole.  However, these accounting decisions are not actionable statements.  As to Shen-3, while Defendants dispute that Anadarko's accounting was incorrect, it is undisputed that Anadarko expensed Shen-3 well costs later in the Class Period and, therefore, that accounting decision cannot serve as a basis for liability.  *In re*

*Browning-Ferris Ind. Inc. Sec.*, 876 F. Supp. 870, 883 (S.D. Tex. 1995) (finding that where "statements of anticipated growth rates" were "superseded" by the publishing of "actual rates of earnings growth" during the class period, "[t]hese statements did not remain alive during the class period and therefore did not require correction"). As to the accounting for the Shenandoah project as a whole, Plaintiffs' accounting expert, D. Paul Regan, contends that "[g]iven that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, Anadarko was . . . required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015." (Ex. 19 (Regan Rpt.) ¶ 11(e).) However, Regan himself testified that "substantial doubt" required there to be a roughly 30% or less likelihood that Shenandoah would be developed. (Ex. 18 (Regan Tr.) 137:8-24.) There is no evidence that anyone reached that conclusion after Shen-4. (*See* Section I, *supra*.) Therefore, this also cannot be an actionable statement.

### D. General Statements About Anadarko's Business.

Several of the alleged misstatements do not discuss Shenandoah at all; they instead concern general descriptions of Anadarko's overall business or business philosophy. (*See* App. §§ 4, 9-10, 13-14, 18, 25, 38-39.) This category includes statements about Anadarko's "high-quality portfolio of opportunities, strong balance sheet and efficient capital allocation" (*Id.* § 4), Anadarko's belief that its "actions and differentiating achievements, the depth and strength of our portfolio, and the commitment of our

employees, position us well for continued success" (*id.* § 10) and that "the Gulf of Mexico [has] become[] a place where our core skills create a competitive advantage" (*id.* § 9). Plaintiffs offer no reason to believe that any of these general statements about the overall Anadarko business were false or rendered materially misleading by any alleged omissions concerning Shenandoah, nor could they. They are not actionable. *See In re Odyssey Healthcare, Inc. Sec.*, 424 F. Supp. 2d 880, 894 (N.D. Tex. 2005) (dismissing complaint where there was "no apparent relationship between the subject matter of the allegedly misleading statements and the omitted information"). They are also not actionable for the additional reason that they are expressions of corporate optimism, as discussed next.

### E.    Statements of Corporate Optimism.

Plaintiffs also contend that certain optimistic or positive language was misleading given the facts known internally about Shenandoah, including statements that Shenandoah was "fantastic" or "remarkable". (*See* App. §§ 4-6, 8-16, 18-21, 24-25, 27-34, 38-39, 41-44.) This language, however, constitutes corporate optimism or "puffery", which is not actionable. *See Nathenson*, 267 F.3d at 419 ("[I]t is well-established that generalized positive statements about a company's progress are not a basis for liability."). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) ("[G]eneralized, positive statements

about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."); *In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012 WL 3282819, at *18 (N.D. Cal. Aug. 10, 2012), *aff'd*, 611 F. App'x 387 (9th Cir. 2015) ("Adjectives such as 'fantastic,' 'tremendous,' and 'good' do not rise to a level of materiality that would be actionable . . . ."); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 898 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) (dismissing as "vague puffery" the statement "[r]emarkable progress" because "[w]hether that progress was 'remarkable' is not subject to objective proof and is not material").

Similarly, Plaintiffs challenge Anadarko's descriptions of the Shen-3, Shen-4 and Shen-5 wells as "successful".  However, characterizing something as a "success" is a classic example of corporate optimism.  *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 418 (S.D. Tex. 2020) (citation omitted) (stating that "as a matter of law" the term "success" "is not a statement of fact, but is instead puffery").

### F.   Truthful Statements About Appraisal Activities.

Many of the alleged misrepresentations are statements regarding appraisal activities, including technical well results, such as net feet of pay, and plans for future wells.  (*See* App. §§ 1, 5-6, 8, 12, 15-19, 21, 24, 26-27, 29-31, 33, 35, 37, 40-42, 45-46.)  Plaintiffs do not allege that any of the factual assertions made in these statements are actually false. Instead, they maintain that they were misleading because Defendants disclosed these facts, while omitting other purportedly negative ones.  For instance, Plaintiffs contend that

36

Defendants statements regarding Shen-3 were misleading because Anadarko omitted that Shen-3 did not encounter oil.  However, Anadarko accurately disclosed the results of Shen-3.  In February 2015, Anadarko released its 2015 10-K, which described Shen-3 as having "confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening".  (App. § 1.)  Around the same time, Leyendecker noted internally that the well was "wet" (*i.e.*, it found water rather than oil), but provided "extremely valuable information" for "delineating [the] field's limits", "allowed the owners to project the oil-water-contacts" and was "potentially usable as a future water injection well for pressure maintenance".  (Ex. 36 at APC-00626533.)  Moreover, ConocoPhillips had disclosed earlier that Shen-3 was a dry hole, and Anadarko itself publicly stated later in the Class Period it was a "wet well".  (SUMF § II.B.)  Plaintiffs also take issue with the statement that the data acquired from Shen-3 "enabled the projection of oil-water contacts based on pressure data".  (Compl. ¶ 97.)  Plaintiffs' experts assert that Anadarko calculated the oil-water contacts incorrectly using Shen-3 pressure data (Ex. 20 (Merrill Rpt.) ¶ 81), but it is undisputed that Anadarko and its partners were able to use these results to make these projections (*id.* ¶ 82).

Likewise, Plaintiffs assert that Anadarko's statements regarding the results of Shen-4 were misleading because Anadarko omitted that the original Shen-4 well encountered salt.  (Compl. ¶ 95(h).)  However, it is undisputed that during an earnings call on October 28, 2015, Daniels stated that the Shen-4 original hole "established where the

37

basin edge was" (Ex. 99 (APC-00206914)), indicating that Shen-4 had hit salt (*see* Ex. 20 (Merrill Rpt.) at 15, Fig. 4) (showing that the entire Shenandoah basin is enclosed in salt)).

Plaintiffs further argue that statements regarding Shenandoah being "within the range of expectations" following Shen-4 are misleading.  (Compl. ¶¶ 110, 112.)  To the extent Plaintiffs assert that statements about being "within the range of expectations" concern Anadarko's resource estimates (*see* Ex. 15 (Merrill Tr.) 72:14-19), they have failed to establish that Anadarko ever publicly stated a resource estimate at any point during the Class Period.  Plaintiffs seek to rely on pre-Class Period statements that the Shenandoah Basin represented a "~\$2 to ~\$4 billion opportunity", but it is undisputed that such a statement is inactionable as it predates the Class Period.  (Dkt. 63 at 11.)  Additionally, these statements were made well before the Class Period, in March and April 2014, and thus it not reasonable to understand statements within the Class Period to refer back to information provided at conferences a year-and-a-half earlier.

III.    PLAINTIFFS CANNOT PROVE THEIR SCHEME LIABILITY CLAIMS.

Plaintiffs' "scheme liability" allegations pursuant to Rules 10b-5(a) and (c) fare no better on summary judgment.  The Fifth Circuit has held that "any defendant who does not make or affirmatively cause to be made a fraudulent statement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Regents*

*of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 388 (5th Cir. 2007) (citation omitted).  Plaintiffs have failed to satisfy either requirement.

*First*, Plaintiffs cannot show that Defendants "ma[d]e or affirmatively cause[d] to be made a fraudulent statement or omission", *id.*, or that they did so with scienter because, as described above, Plaintiffs have failed to prove that Shenandoah was not commercially viable or that any of Defendants' statements were otherwise materially false or misleading.

*Second*, Plaintiffs cannot show that Defendants "directly engage[d] in manipulative securities trading practices".  *Id.*  Plaintiffs have neither alleged nor adduced any evidence that Defendants engaged in market manipulation, which is defined as "practices in the marketplace which have the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself".  *Id.* at 390; *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (defining manipulative securities trading practices as "practices such as wash sales, matched orders, or rigged prices, . . . that are intended to mislead investors by artificially affecting market activity").

Therefore, Plaintiffs' scheme liability claims under Rules 10b-5(a) and (c) must fail.

IV.   PLAINTIFFS' § 20(A) CLAIM MUST BE DISMISSED BECAUSE THEY HAVE FAILED TO ADDUCE SUFFICIENT EVIDENCE TO WITHSTAND SUMMARY JUDGMENT ON THE ALLEGED PRIMARY VIOLATION.

"For a violation of § 20(a), a plaintiff must show (1) an underlying, primary violation of § 10(b) of the Exchange Act and Rule 10b-5 and (2) direct or indirect control

of the violator by the defendant." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 841 (S.D. Tex. 2016).  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  *Southland*, 365 F.3d at 383.  Plaintiffs have failed to adduce sufficient evidence to withstand summary judgment on the alleged primary violation and, therefore, summary judgment in favor of Defendants should also be entered on Plaintiffs' § 20(a) claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in favor of Defendants.

40

Dated:  March 16, 2023

Respectfully submitted,

*/s/ Kevin J. Orsini*

**CRAVATH, SWAINE & MOORE LLP**
Kevin Orsini (*pro hac vice*)
Benjamin Gruenstein (*pro hac vice*)
Lauren Rosenberg (*pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
korsini@cravath.com
bgruenstein@cravath.com
lrosenberg@cravath.com

**SHIPLEY SNELL MONTGOMERY LLP**
George T. Shipley
State Bar No. 18267100
Federal ID No. 02118
712 Main Street, Suite 1400
Houston, TX 77002
Telephone: (713) 652-5920
Facsimile: (713) 652-3057
gshipley@shipleysnell.com

*Attorneys for Defendants*

## **CERTIFICATE OF CONFERENCE**

In accordance with Rule 17(a) of Your Honor's Court Procedures, I hereby certify that counsel for Defendants has conferred with Plaintiffs' counsel regarding their position on this Motion.  Counsel for Plaintiffs have advised that they oppose this Motion.

Dated:          March 16, 2023

*/s/ Kevin J. Orsini*
Kevin J. Orsini

## <u>CERTIFICATION OF WORD COUNT</u>

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 9,977 words, exclusive of the caption, the table of contents, the table of abbreviations, the table of authorities and the signature block.

Dated: March 16, 2023

*/s/ Kevin J. Orsini*
Kevin Orsini

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 16, 2023, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:        March 16, 2023

*/s/ Kevin J. Orsini*
Kevin Orsini
