# Exhibit 27

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

## Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS

### PURPOSE

This accounting bulletin provides the policy for determining the well classifications and disposition of suspended well costs for financial accounting purposes. The policy applies to Anadarko Petroleum Corporation and its consolidated subsidiaries (collectively, "Anadarko" or the "Company"). The terms 'suspended well costs' and 'work in progress' are used in this bulletin interchangeably to refer to the initially capitalized costs of drilling and completing wells pending the determination of whether **proved reserves** have been found.

### POLICY

Anadarko uses the successful efforts method of accounting for oil and gas exploration and development activities. Under this method, costs associated with drilling and equipping **development wells** and **exploratory wells** that result in **proved reserve** additions are capitalized. All **exploratory well** costs are initially capitalized as incurred pending the determination of whether the well has found **proved reserves**. The initially capitalized costs of drilling **exploratory wells** that do not find **proved reserves** are expensed (net of any salvage value, as defined in the Accounting Bulletin 20.7) when determination is made that no proved reserves can be attributed as a result of such drilling. The capitalized costs of drilling **exploratory wells** that do find **proved reserves** continue to be capitalized, subject to depreciation and allowance for impairment.

As part of each quarter-end close, representatives from the Accounting and Exploration and Operations departments shall review the status of all **exploratory wells** in progress to verify that well costs are recorded in Anadarko's financial statements in accordance with this policy. Quarterly review of **exploratory wells** in progress shall involve senior management from the Property Accounting, International Accounting, as well as the Exploration and Operations Departments. Status of wells in progress shall continue to be monitored after the end of the calendar quarter and until Anadarko's annual report on Form 10-K, quarterly report on Form 10-Q, or another Security and Exchange Commission (SEC) report containing annual or quarterly financial statements filed with the SEC, and information obtained after the balance sheet date through the date of the filing shall be considered for adjustments in the financial statements included in such filing. Previously issued financial statements shall not be retroactively revised to account for information that became known after the financial statements for that period have been filed with the SEC.

*Questions regarding application of this Accounting Bulletin should be addressed to the Department Manager responsible for its application or Accounting Policy and Research.*

APC-00113426

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

---

**Title  WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

---

## DEFINITIONS

**Exploratory well:**  An exploratory well is a well that is not a **development well**, a **service well**, or a **stratigraphic test well** as those terms are defined below.

**Development well:** A well drilled within the proved area of an oil or gas reservoir to the depth of a stratigraphic horizon known to be productive.

**Field:**  Area consisting of a single **reservoir** or multiple **reservoirs** all grouped on or related to the same individual or similar geological structural feature and/or stratigraphic condition.

  o  There may be two or more **reservoirs** in a field which are separated vertically by intervening impervious strata, or laterally by local geologic barriers, or by both.

  o  **Reservoirs** that are associated by being in overlapping or adjacent fields may be treated as a single or common operational field.

  o  "Structural feature" and "stratigraphic condition" are intended to identify localized geological features as opposed to the broader terms of basins, trends, provinces, plays, areas-of-interest, etc.

**Proved area:** That part of a property to which **proved reserves** have been specifically attributed.

**Proved reserves:** Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known **reservoirs** under existing economic and operating conditions, i.e. as of the date the estimate is made.  **Reservoirs** are considered proved if economic producibility is supported by either actual production or conclusive formation tests.

**Reservoir:**  A porous and permeable underground formation containing a natural accumulation of producible oil or gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

**Service well:** A well drilled, completed or re-completed for the purpose of supporting production in an existing **field**.  Wells in this class are drilled for the following specific purposes: gas injection (natural gas, propane, butane, carbon dioxide, flue gas, etc.), water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.

---

APC-00113427

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

---

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

---

**Stratigraphic test well:** A drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition. Such wells customarily are drilled without the intention of being completed for hydrocarbon production. This classification also includes tests identified as core tests and all types of expendable holes related to hydrocarbon exploration. Stratigraphic test wells are classified as follows:

1. Exploratory-type stratigraphic test well: A stratigraphic test well not drilled in a **proved area**.
2. Development-type stratigraphic test well. A stratigraphic test well drilled in a **proved area**.

## PROCEDURES

### I.   Well Classification

Wells shall be classified as either **exploratory** or **development** on or before the spud date and may not be reclassified based upon information received or discovered after that date, except as provided below and demonstrated in examples presented in Exhibit I to this Accounting Bulletin.

A well shall be classified as **exploratory** if the well is drilled to find oil and gas in an unproved area, to find a new **reservoir** in a **field** found to be productive in another **reservoir**, or to extend a known **reservoir**. An exploratory well is a well drilled to an intended location or locations to which no SEC-defined **proved reserves** could have been assigned based on information available prior to the well having been spud.

A well shall be classified as **development** if the well is drilled to an intended location or locations to which SEC-defined **proved reserves** can be specifically attributed based on information available prior to the spud date. For purposes of classifying a well as **exploratory** or **development**, consideration of whether the well is drilled to access **proved reserves** shall be based on whether subject reserves meet SEC guidelines for classifying reserves as **proved**, rather than whether **proved reserves** have been booked in the Company's reserve system at that time. For non-operated wells, the operator's classification of a planned well shall not be relied upon *solely* to determine well classification for the Company's purposes. Classification of wells as **development** or **exploratory** shall be evidenced by the AFE request(s). Interpretative questions concerning reserve definitions and well classifications should be referred to the Reservoir Engineering Manager.

If a development well is spud to produce from a proved undeveloped area and, prior to reaching the intended horizon, a new stratigraphic horizon is found and the well is completed to produce

---

APC-00113428

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

---

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

---

from that horizon, the well shall be classified as an **exploratory well**, assuming the well was not drilled to the originally intended horizon after discovering new reserves.

Supplemental examples relative to determining well classification are provided in Exhibit I to this Accounting Bulletin.

## II.     Exploratory Wells

Pending the determination of whether a well has discovered **proved reserves**, all costs associated with drilling **exploratory** wells and **exploratory-type stratigraphic test wells** are capitalized and are classified as uncompleted wells, equipment and facilities (work in progress [WIP], or assets under construction [AUC]).   If an **exploratory well** has discovered **proved reserves**, the costs continue to be capitalized, but are reclassified from WIP to *wells, related equipment and facilities* when the well is capable of producing.   However, if no **proved reserves** are found, the capitalized well costs less any salvage value are charged to exploration expense.

Completion costs associated with wells that are initially classified as **exploratory** are classified as either **exploratory** or **development** depending on when determination of the well as successful is made.   If the determination is made prior to incurring completion costs, then those costs are classified as **development**, otherwise, they are classified as **exploratory**.

In certain circumstances, an **exploratory** well finds reserves but those reserves cannot be classified as **proved** when drilling is completed. For example, after reserves are found, the Company may be required to obtain additional geological information, government approvals, or sales contracts, before the reserves can be classified as **proved**. In those cases, the capitalized **exploratory** well costs shall continue to be capitalized as WIP if the well has found a sufficient quantity of reserves to justify its completion as a producing well (although it is not required that the well be completed as a producing well) and the Company is making *sufficient progress* assessing the reserves and the economic and operating viability of the project. For this purpose, a project may include more than one **exploratory well** or **exploratory-type stratigraphic well** if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure).

Whether the Company is making sufficient progress assessing reserves and the economic and operating viability of the project is a matter of judgment.   In making this determination, the following shall be considered indicators that the Company is making sufficient progress. However, all relevant facts and circumstances shall be evaluated and no single indicator is determinative.

---

Original Issue                                                          Page 4 of 12

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

a.  Commitment of project personnel who are at the appropriate levels and who have the appropriate skills;
b.  Costs are being incurred to assess the reserves and their potential development;
c.  An assessment process covering the economic, legal, political, and environmental aspects of the potential development is in progress;
d.  Existence (or active negotiations) of sales contracts with customers for the oil and gas;
e.  Existence (or active negotiations) of agreements with governments, lenders, and venture partners;
f.  Outstanding requests for proposals for development of any required facilities;
g.  Existence of firm plans, established timetables, or contractual commitments, which may include seismic testing and drilling of additional **exploratory wells**;
h.  Progress is being made on contractual arrangements that will permit future development;
i.  Identification of existing transportation and other infrastructure that is or will be available for the project (subject to negotiations for use).

If the Company has not engaged in substantial activities to assess the reserves or the development of the project in a reasonable period of time after the drilling of the well is completed or activities have been suspended, any capitalized costs associated with that well shall be expensed, net of any salvage value. After a reasonable period of time, the planning of future activities without engaging in substantial activities is not sufficient to continue the capitalization of **exploratory well** or **exploratory-type stratigraphic well** costs. However, brief interruptions in activities required to assess the reserves or the project, or other delays resulting from governmental or other third-party evaluation of a proposed project, do not require capitalized **exploratory well** or **exploratory-type stratigraphic well** costs to be expensed.  If costs of an **exploratory well** are expensed based on cessation of substantial activities, and activities resume at a later date, costs previously expensed shall not be reinstated.

To continue deferral of capitalized **exploratory well** costs (including **exploratory-type stratigraphic test wells**) as WIP beyond one year from the completion of drilling, justification by the respective asset management or exploration team of the economic and operating viability of the project as described in the preceding paragraphs is required.  All instances of **exploratory well** cost deferral beyond one year from the date the drilling was completed (as determined by the date the rig is released) must be approved by the Chief Accounting Officer and Senior VP, Worldwide Exploration.  If conditions for continuing capitalization in WIP as described above are not met, the **exploratory well** costs are assumed to be impaired and shall be charged to exploration expense, net of any salvage value.

As part of each quarter-end close, the Accounting, Exploration and Operations departments shall review the status of all **exploratory wells** in progress as of quarter-end to verify that well costs are recorded in Anadarko's financial statements in accordance with this policy.  Quarterly review

APC-00113430



**Accounting Bulletin**

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

of **exploratory wells** in progress shall include senior management from the Property Accounting, International Accounting and Exploration Departments.

If an **exploratory well** is in progress at the end of an accounting period and a determination is made after period-end but before the financial statements for the period are issued (generally within 60 days of year end and 40 days of quarter end) that the well did not find **proved reserves**, the costs incurred through the end of the period, net of any salvage value, shall be charged to expense for that period.  For example, for an **exploratory well** in progress as of December 31, 2007 declared to be dry on February 1, 2008, costs incurred through December 31 shall be expensed in 2007 income statement (assuming 2007 annual report on Form 10-K has not been filed with the SEC as of that date). The amount charged to expense should include costs incurred during the current period (2007 in the example above), as well as costs that were incurred and capitalized in prior periods.  Costs incurred subsequent to the balance sheet date shall be charged to expense when incurred (in the example above, costs incurred after December 31, 2007 would be expensed in 2008).  Previously issued financial statements shall not be retroactively revised to account for information that became known after the financial statements had been filed with the SEC.  The Senior VP, Worldwide Exploration, or designee, shall communicate **exploratory wells** determined to be dry after quarter end, but before financial statements are filed with the SEC, to the Chief Accounting Officer, regardless of the magnitude of cumulative costs incurred through quarter end.

## III.   Development Wells

All costs associated with drilling, completing and equipping **development wells**, **service wells** and **development-type stratigraphic test wells** are classified as uncompleted wells, equipment and facilities (WIP) until the drilling and/or facilities construction is completed.  Once the drilling and/or facilities construction are completed and the wells are ready for production, the associated costs are reclassified as *wells, related equipment and facilities*.  This includes costs related to drilling, completing and equipping unsuccessful **development**, **service** and **development-type stratigraphic test wells** (development dry holes).  The capitalized costs classified as *wells, related equipment and facilities* shall be amortized on a unit-of production basis as indicated in Accounting Bulletin 20.7.  Development dry holes are capitalized and classified in the same manner as productive wells, subject to an overall impairment test for the respective impairment unit, performed following the guidance in Accounting Bulletin 20.8.

APC-00113431

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

IV.     **Dual-Purpose Wells**

If a well is drilled within a **proved area** of an oil or gas **reservoir** with the intent to penetrate a **proved** stratigraphic horizon and to continue deeper into unproved strata, the costs to drill to the **proved** horizon shall be accounted for as **development well** costs.  The incremental cost to drill deeper to the unproved horizon shall be accounted for as **exploratory well** costs.  The well must be designed and drilled with the intent and capability of being completed in the **proved** horizon in order to qualify as a dual-purpose well.  However, the well does not have to be completed in the **proved** horizon in order for the drilling costs to that horizon to be accounted for as **development well** costs.   The re-entry of an existing well bore, either producing or non-producing, for re-completion to an unproved **exploratory** horizon is classified as an **exploratory** project, regardless of the original classification of the existing well bore.

V.     **Wells Not Completed due to Mechanical Failures**

If a well (**development**, **exploratory**, service, sidetrack, etc.) cannot be completed due to mechanical difficulties and a new well is drilled to the same horizon, under certain circumstances the cost of the original well may be deferred as WIP until the replacement well is completed. The replacement well must be designed and drilled with the intent and capability of being completed in the horizon intended for the original well in order to continue cost deferral of the original well costs.  If a decision is made to continue to defer the costs of the original well in WIP, such costs are then considered part of the cost of the replacement well and are ultimately capitalized (if the replacement well is a **development well** or successful **exploratory well**) or expensed (if the replacement well is an unsuccessful **exploratory well**).  Continuing deferral of well costs in WIP for wells not completed due to mechanical failures is subject to approval by Assistant Controller responsible for Property Accounting.

If the original well is abandoned due to mechanical failures and another well is not drilled to the same horizon, the cost of the original well is capitalized if it was a **development well** or expensed if it was an **exploratory well**.

Examples demonstrating classification of wells as **development** or **exploratory** in a **reservoir** development program are included in Exhibit I.

**EXHIBIT INDEX**
I.     Reservoir Development Well Classification

APC-00113432

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**CROSS-REFERENCES**

Accounting Bulletin No. 20.7, "Depreciation of Properties and Equipment"
Accounting Bulletin No. 20.8, "Impairment Tests for Long-Lived Assets in Use"
Financial Accounting Standards Board Statement of Financial Accounting Standards No. 19,
   "Financial Accounting and Reporting by Oil and Gas Producing Companies"

_____
Bruce Busmire
Chief Accounting Officer

Original Issue                                                    Page 8 of 12



**Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

---

Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS

---

<u>Exhibit I</u>

## Reservoir Development Well Classification

**Example 1**



A discovery well (**exploratory**) is drilled on **Site D** and establishes **Site D** and offset **Sites C and E** as proved areas.  Next, an offset **development** well is drilled on **Site E**, becomes a producing well and establishes offset **Site F** as a proved area.  Next, an offset **development** well is drilled on **Site F**, becomes a producing well, but does not establish **Site G** as a proved area. Then a step-out, **exploratory** well is drilled on **Site B** (an unproved site) and establishes **Sites B and A** as proved areas.  Next, an offset **development** well is drilled on **Site C** and becomes a producing well.  Then an offset, **development** well is drilled on **Site A**.  The well is dry and is plugged.  Costs of the well on Site A are capitalized as development costs.  Finally, an offset **exploratory** well is drilled on **Site G**.  The well is dry and is plugged.  Costs of the well on Site G are expensed.

---

Original Issue                                                    Page 9 of 12

APC-00113434


**Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**Example 2**



Assume **Pay Zone A** is a **proved area** and **Pay Zone B** is an **unproved area**.  An **exploratory** well is drilled with the intent to evaluate reserves in **Pay Zone B**.  Proved reserves are not found, the well is plugged back and produced from Pay Zone A.  When the original plan to develop Pay Zone B is abandoned, a new **development** AFE should be established to plug back and complete the well from **Pay Zone A**.  The allocated share of costs to drill to Pay Zone A and the completion costs are capitalized as development well costs and incremental costs to drill to and plug back Pay Zone B are expensed as exploratory dry hole costs.  Such treatment will likely require transferring costs between cost centers after the well is completed, since, based on the original designation of the well as an exploratory well targeting unproved Pay Zone B, costs to drill to Pay Zone A before continuing to Pay Zone B would have been initially categorized as exploratory well costs.

However, if the original plan is successful and proved reserves are associated with Pay Zone B, the entire cost of drilling the well will remain capitalized as successful exploratory well costs, subject to future depreciation and impairment evaluation.

Alternatively, if the original plan is to complete the well at Pay Zone A, then drill deeper to explore for reserves from Pay Zone B, costs to drill to **Pay Zone A** would be categorized as **development** and incremental costs to drill to **Pay Zone B** would be categorized as **exploratory**.

Original Issue                                                                 Page 10 of 12

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**Example 3**

Using the same image as in Example 2, assume **Pay Zone A** is an **unproved area** and **Pay Zone B** is a **proved area**.  A **development** well is drilled with the intent to produce from **Pay Zone B**. Unexpectedly, proved reserves from Pay Zone A are found.  The well is completed and produces from Pay Zone A only.  The well is reclassified to an exploratory well and costs are reclassified from WIP to wells, related equipment and facilities as successful exploratory well costs.

**Example 4**



Offshore **exploratory** well at **Site A** is drilled, finding proved reserves and establishing Site C as a proved area (but not Site B).  A **development** sidetrack well is drilled at **Site C** and is

APC-00113436



**Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

completed as a producing well.  An offset **exploratory** sidetrack well is drilled at **Site B**.  The well is dry and is plugged.  Costs of the well on Site B are expensed.  For well count purposes, this is considered one well with multiple penetrations.

APC-00113437

# Exhibit 28

**To:** Blakeley, David[David.Blakeley@anadarko.com]; Hollek, Darrell[Darrell.Hollek@anadarko.com]
**Cc:** Durkee, Todd[Todd.Durkee@anadarko.com]; Pfister, Mike[Mike.Pfister@anadarko.com]; McDaniel, Dennis[Dennis.McDaniel@anadarko.com]; Beattie, Mike [Mike.Beattie@anadarko.com]; Bryan, Jim[Jim.Bryan@anadarko.com]; Trautman, Tim[Tim.Trautman@anadarko.com]; McGrievy, Pat[Pat.McGrievy@anadarko.com]; Buck, Bob [Bob.Buck@anadarko.com]
**From:** Leyendecker, Ernie[O=APC/OU=INTEGRATION/CN=RECIPIENTS/CN=ZEAL3]
**Sent:** Thur 4/4/2013 2:31:24 PM Coordinated Universal Time
**Subject:** RE: Shenandoah Work Group

---

This is a great first step to advance this incredible discovery.  While the technical and commercial challenges are easily identified, I am confident this team will find solutions to accelerate the commercialization of what could be one of the largest discoveries in the GOM.  I look forward to frequent updates.

Thanks,
Ernie

---

**From:** Blakeley, David
**Sent:** Tuesday, April 02, 2013 3:17 PM
**To:** Leyendecker, Ernie; Hollek, Darrell
**Cc:** Durkee, Todd; Pfister, Mike; McDaniel, Dennis; Beattie, Mike; Bryan, Jim; Trautman, Tim; McGrievy, Pat; Buck, Bob
**Subject:** Shenandoah Work Group

**On behalf of Tim Trautman, Pat McGrievy and David Blakeley**

We would like to assemble a work group to begin preparing for an eventual Shenandoah development.  It would consist of stakeholders from Exploration, Development, Drilling/Completions, Facilities, Production, and Land.  There are numerous technical and commercial challenges we face in progressing this project that must be addressed.  The mission of the team would be to identify and make recommendations on the key decisions that we face in the coming months and develop a work plan for the next 18 – 24 months that would keep this important project on track for first production within 5 years.  We would envision the team identifying the challenges, opportunities, and solutions needed to fully appraise Shenandoah and move the project toward sanction as quickly and safely as possible.  This is not a task force to determine what to do with Shenandoah, but an effort to facilitate communication.  We would like to see an appraisal program that will lead to FID, a conceptual development plan to begin addressing the technology challenges, and a commercial plan to maintain leases and prepare for possible unitization.  As important as what we expect from the group is what we expect them not to do.  This is not an effort to re-interpret seismic or re-map the prospect, we are not creating a detailed full field development plan and we will not try to solve issues that may arise 10 years from now.

David Blakeley and Pat McGrievy will lead the group.

Thanks
Tim, Pat and David

The Work Group will consist of the following team members;

**Exploration**
Beth Kendall
Jake Ramsey
Robert Strickling

**Development**
Brad Browning

**Land**
Jeff Pachman

**Drilling / Completions**
Jim Kunning
John Cromb

**Production**
Steve Ashcraft

**Facilities**
Mike Beattie

Exhibit
250

# Exhibit 29

**To:** Daniels, Bob[Bob.Daniels@anadarko.com]
**From:** Line, Justin[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=JCL001]
**Sent:** Wed 5/1/2013 7:45:16 PM Coordinated Universal Time
**Subject:** FW: QK 7D Suspended wells
**Attachment:** QK-7D (Offshore and International).pdf

Bob,
Please find attached the Suspended Well List for Q1 2013 for your review and approval.  Items added to this list are Coronado, Shenandoah, a sidetrack at Vito, and Tubarao 2.  Dropped from the list are Heidelberg (sanction), Mercury and Jupiter (expense), and Badik (sale).  Everything else seems to be in order.

This needs to be filed on Monday 06 MAY, so if you'd like to approve via email, I can print that and attach to the list.  Otherwise,'ll need to get your signature prior to noon on Monday.
Please let me know if you have any questions.
Thanks,
jiime

---

**From:** Moore, Aspen
**Sent:** Tuesday, April 30, 2013 6:09 PM
**To:** Lime, Justin
**Subject:** QK 7D Suspended wells

Hi Justin,

Please see the attached 1st Quarter QK 7D Suspended wells for your review.
I am hoping to have international's signatures tomorrow and bring it to you.

We file Monday, May 6th do you think we will be able to get it signed by Bob Daniels before then?

Thanks,
*Aspen Moore*
Financial Analyst II
Financial Reporting - Audit Coordination
832-636-1197

APC-00577160

# Exhibit 30



<div align="right">Suspended Well Costs Memo</div>

| Client | | Period-end |
|---|---|---|
| Anadarko Petroleum Corporation | | 12/31/2014 |

| Prepared by | Date | W/P reference |
|---|---|---|
| Maggie Zahr | 1/15/2014 | **GG.4.A.8.05** |

**Purpose**

The purpose of this work paper is to test the Company's suspended well costs as of 12/31/2014 for completeness, accuracy, and presentation, in support of the completeness, accuracy, valuation, and presentation of PP&E (specifically AUC).

**Background**

KPMG notes that suspended well costs are costs that have been incurred for drilling activities and are currently suspended pending evaluation. These costs are in the exploratory assets under construction (AUC) account until a final determination is made. KPMG notes that these wells are not being depleted while in the AUC account.

FASB 932-360-35 provides the following guidance on the Sufficient Progress Assessment of wells in suspended status:

> 35-18 An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed. In those cases, the capitalized drilling costs shall continue to be capitalized if the well has found a sufficient quantity of reserves to justify its completion as a producing well and the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project. Note that an entity is not required to complete the exploratory or exploratory-type stratigraphic well as a producing well. For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure).

> 35-19 All relevant facts and circumstances shall be evaluated when determining whether an entity is making sufficient progress on assessing the reserves and the economic and operating viability of the project. The following are some indicators, among others, that an entity is making sufficient progress (see the following paragraph). No single indicator is determinative. An entity shall evaluate indicators in conjunction with all other relevant facts and circumstances. These indicators include:

> a) Commitment of project personnel who are at the appropriate levels and who have the appropriate skills

> b) Costs that are being incurred to assess the reserves and their potential development

> c) An assessment process covering the economic, legal, political, and environmental aspects of the potential development is in progress

> d) Existence (or active negotiations) of sales contracts with customers for the oil and gas

> e) Existence (or active negotiations) of agreements with governments, lenders, and venture partners

> f) Outstanding requests for proposals for development of any required facilities

> g) Existence of firm plans, established timetables, or contractual commitments, which may include seismic testing and drilling of additional exploratory wells

> h) Progress that is being made on contractual arrangements that will permit future development

> i) Identification of existing transportation and other infrastructure that is or will be available for the project (subject to negotiations for use).

Long delays in the assessment or development plan (whether anticipated or unexpected) may raise doubts about whether the entity is making sufficient progress to continue the capitalization of exploratory well or exploratory-type stratigraphic well costs after the completion of drilling. The longer the assessment process for the reserves and the project, the more difficult it is to conclude that the

<div align="right" style="color:#000; background:#FFD700;">**Exhibit 485**</div>

entity is making sufficient progress to continue the capitalization of those exploratory well or exploratory-type stratigraphic well costs.

35-20 If an entity has not engaged in substantial activities to assess the reserves or the development of the project in a reasonable period of time after the drilling of the well is completed or activities have been suspended, any capitalized costs associated with that well shall be expensed net of any salvage value. After a reasonable period of time, the planning of future activities without engaging in substantial activities shall not be sufficient to continue the capitalization of exploratory well or exploratory-type stratigraphic well costs. However, brief interruptions in activities required to assess the reserves or the project, or other delays resulting from governmental or other third-party evaluation of a proposed project, do not require capitalized exploratory well or exploratory-type stratigraphic well costs to be expensed.

**Relevant Controls**

KPMG performed a walkthrough of the Domestic Exploratory AUC process and tests of design over key controls at **2.11.G.1.65.A-B**. KPMG also documented international non-flowcharted controls at **2.11.G.1.80**. TOEs were also performed in the **3.1.G.1 series**.

4740 - Quarterly meetings are held with Operations to discuss status of exploratory wells.

Int. 2 - International Accounting holds Quarterly meetings with Operations to discuss status of exploratory wells and NPLH.

**Procedures**

1. KPMG obtained a detailed listing of Domestic Onshore and Offshore, and International suspended wells and their associated balances as of 12/31/2014. Please see the Domestic and International suspended wells rollforward at **GG.4.A.8.20** and **GG.4.A.8.15**, respectively.

2. As of 12/31/14, KPMG selected all suspended wells and combined plays that had more than $50 million (1/3 of PM) of costs in total for projects and specifically identified other items based on professional judgment. Per KSP, minimum sample size to test was 12, ad KPMG tested 14. As such, further samples were not selected.

3. For the suspended wells that were selected (per step #2 above), KPMG inquired of operations and corroboratively inquired with accounting to determine if sufficient progress is being made to assess the reserves and the economic and operating viability of the project to support management's view that these well costs should remain suspended as of 12/31/2014. In addition, KPMG performed the following:

   a. Obtained and read press releases throughout the year including those that publicly announced successful wells.

   b. Reviewed operations reports throughout the year that are also public information for successful well announcements as well as drill plans that the Company has made public.

   c. Confirmed with operations the inclusion of drill plans for the suspended wells within the proposed 2014 and 2015 budgets. Please see more detailed information for the suspended wells and their expected drilling dates in the tickmark explanations below.

   d. While evaluating the Company's justifications for continued suspense, KPMG additionally noted the following factors (refer to **G.1.65.A-B and G.1.80** for additional documentation over the Domestic Exploratory AUC and International processes):

      i. The suspended wells aging (**GG.4.A.8.10**) is reviewed by operations. In specific, the schedule is prepared by accounting and sent for review to operations twice. In the first review, the schedule is sent to the operational planning teams to verify that the list is accurate. After any adjustments are made, it is then signed by the operational vice presidents. KPMG obtains a signed version of the aging each quarter. KPMG verified that the Q4 domestic aging report was approved by Danny Brown (VP, Operations) on 2/6/2015 and by Doug Hazlett (VP, Exploration) on 2/10/2015, Charles Griffie (General Manager, US Onshore Exploration and Production) on 2/10/2015, Brad Holly (SVP, Operations) on 2/3/2015, Louis Williams ((Director, Expenditure Accounting) on 2/5/2015, Chris Campbell (Director, International

Accounting) on 2/5/2015, and Chuck Meloy (EVP, US Onshore Exploration and Production) on 2/11/2015.

ii.   For all plays, the Company has salaried operational staff dedicated to working on the projects.  This demonstrates the Company's commitment to continue exploring the area.

iii.  The Company's operations continues to review all exploratory AUC wells (including those not in suspense – e.g. still drilling as of 12/31/2014) and provides feedback to accounting if a well is deemed to be dry based on events that have occurred after the report date but before the report is filed.  Please dry hole testwork at **GG.4.G.3**.

See items selected for further explanation below.  See complete listing of Suspended Well Balances as of 12/31/2014 at **GG.4.A.8.15-20**.

**Tickmark Explanations** (See Tickmarks at **GG.4.A.8.10**):

*Domestic*

A.   **Shenandoah (Offshore) - $193.19 million (GG.4.A.8.10)**

a.   Background

i.   In February 2009, the Company publicly announced an oil discovery at its Shenandoah discovery well located in the Walker Ridge block 52 in the Deepwater Gulf of Mexico. The discovery well encountered net oil pay approaching 300 feet in the Wilcox formation in the Lower-Tertiary play.

b.   Associated AFEs

i.   SHENANDOAH - WALKER RIDGE 52 001 (AFE 2064247 - $62.2 million)

1.   Successful well, requires appraisal.

ii.   SHENANDOAH - WALKER RIDGE 51 001 (AFE 2064209 - $18.9 million)

1.   Original well abandoned due to mechanical issues from a poor cement job. Redrill SPUD on 9/16/14 on AFE 2077304 (successful appraisal).  SPUD Q2 2012 and suspended Q1 2013.  KPMG notes that the Company has capitalized this cost as the target of AFE 2077304 (see below), which is the same as this abandoned AFE.  As such, KPMG notes that the costs of drilling this well (or twin well) are simply unexpected additional costs to get a well drilled to the target.

iii.   SHENANDOAH - WALKER RIDGE 51 002 (AFE 2077304 - $45.8 million)

1.   Successful well, requires additional appraisal.

iv.   SHENANDOAH - WALKER RIDGE 51 002 BP01 (AFE 2081976 - $2.5 million)

1.   Bypass to conduct 3D vertical seismic profile for successful well SPUD Q3 2012 and suspended Q1 2013

v.   SHENANDOAH #3 – WALKER RIDGE 52 002 (AFE 2087315 - $55.0 million)

1.   Successful appraisal well to determine extent of reservoir.  Temporary abandoned operation complete; rig released early January 2015

vi.   SHENANDOAH #3 – WALKER RIDGE 52 002 BP01 (AFE 2105981 - $8.6 million)

1.   Coring operation complete; rig released early January 2015

c.   Current Justification for Suspended Status

CONFIDENTIAL

KPMG_APC_eA_0002513

i.   *PY Q4 Justification*: KPMG inquired of Justin Lime (Planning Manager) and noted that as of Q1 2014, there was currently an appraisal well being drilled with an expected completion date of Q2 2014.

ii.  *Q1 Justification*: KPMG inspected the suspended wells rollforward (**GG.4.A.8.15**) and Domestic Exposure Report (PPE PBC 9) and noted that there were no wells actively drilling for the Shenandoah play (as noted in the Q4 justification). KPMG inquired of Catherine Green (Accounting Manager) and noted that Justin Lime was referring to active drilling on Coronado play. Both the Shenandoah and Coronado plays are located in the Walker Ridge area. Specific to the Shenandoah play, per the Domestic Exposure Report, the Company added $341 thousand in pre-drill costs for the play in Q1 2014, with an expected spud date in Q4 2014. Per further inquiry with Catherine Green (Accounting Manager) the Shenandoah #3 appraisal well was scheduled to be spud on June 1st by the Diamond Ocean BlackHawk. The Shenandoah #4 appraisal well is scheduled to be spud Q1 2015. The drilling time for both wells was expected to be more than 150 days. Pre-development AFEs had also been approved during Q1 2014 for development and testing for completion of the Shenandoah wells and subsea production systems.

iii. *Q2 Justification*: KPMG noted that per the Domestic Exposure Report (PPE PBC 9), the Shenandoah 3 well was currently drilling with an expected rig release in late November. The well had accumulated $7.9 million in costs as of 6/30/2014. That activity was consistent with the plans noted in the Q1 justification above.

iv.  *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), Shenandoah well #3 is associated with AFE #2087315 for Walker Ridge 52 002 and was actively drilling. It had a balance of $30.5 million as of 9/30/2014 (an increase of $22.6 million from its 6/30/2014 balance of $7.9 million). KPMG notes that once operations on Shenandoah #3 cease, the Company has 180 days to resume operations in order to hold the lease; otherwise the lease will expire. The rig is expected to be released in late November.

v.   *Q4 Justification:* Per the Domestic Exposure Report (PBC PPE 9), Shenandoah well #3 is associated with AFE #2087315 for Walker Ridge 52 002 and was actively drilling at 12/31/14. It had a balance of $55 million as of 12/31/2014 (an increase of $24.5 million from its 9/30/2014 balance of $30.5 million). KPMG inquired as to the plans for Shenandoah #3 and notes that the rig was released from Shenandoah #3 on 1/2/2015. Per the Q4 Operations report, the approximately 1.5 times more of the same well-developed reservoir that the Shenandoah-2 well found. The well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. It also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range. KPMG inquired of the Company's further plans and noted that Shenandoah #4 is on the rig schedule beginning 6/21/2015 and is scheduled to utilize the rig for ~150 days. Shenandoah #5 is on the rig schedule for late 2015. KPMG notes that Anadarko is the operator of the wells at the Shenandoah oil field and holds a 30% interest. ConocoPhillips holds 40%, Cobalt holds 20%, and Marathon holds 10%[1].

vi.  *Conclusion as of Q4:* KPMG noted that the activities mentioned above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development. In addition, established timelines for continued plans to bring wells online provide further evidence of continued activity taking place on the wells as costs. KPMG will continue to monitor the situation for updates. KPMG will continue to monitor the situation for updates.

**B.   Wolfcamp (Southern) - $73.26 million (GG.4.A.8.10)**

    a.   Background

---

[1] http://www.subseaiq.com/data/Project.aspx?project_id=743

     i.   KPMG notes that the Wolfcamp Play is located in West Texas in the Delaware Basin.  The play is made up of a number of smaller wells that frequently flow through suspended status to developed in a short period of time.

  b.  Associated AFEs

     i.   WHEAT TRUST 1-52 1H (AFE 2094610 - $5.9 million)

       1.  Spud 4/11/2014 and suspended Q2 2014.  Well fractured in October 2014 and online in Q1 2015.

     ii.   WHEAT TRUST 1-52 3H (AFE 2094609 - $4.9 million)

       1.  Spud 5/11/2014 and suspended Q2 2014.  Well fractured in November 2014 and online in Q1 2015.

     iii.  WHEAT TRUST 1-52 5H (AFE 2094611 -  $9.2 million)

       1.  Spud 5/11/2014 and suspended Q2 2014.  Well fractured in November 2014 and online in Q1 2015.

     iv.  WHEAT TRUST 1-52 7H (AFE 2094613 -  $4.2 million)

       1.  Spud 5/16/2014 and suspended Q2 2014.  Well fractured in December 2014

     v.   HALEY JE 28-33 3H (AFE 2091444- $4.1 million)

       1.  Spud 8/5/2014 and suspended Q3 2014. To be fractured and online in Q2 2015.

     vi.  CODY 56-3-9 1H (AFE 2092358- $3.5 million)

       1.  Spud 8/10/2014 and suspended Q3 2014.  Well fractured in November 2014 and online in Q1 2015.

     vii.  TETON 56-2-39 1H (AFE 2098389 - $2.5 million)

       1.  Spud 6/22/2014 and suspended Q3 2014.  To be fractured and online in Q1 2015.

     viii.  CASPER 57-1-47 1H (AFE 2093563 - $4.3 million)

       1.  Spud 6/15/2014 and suspended Q3 2014.  Well fractured in November 2014 and online in Q1 2015.

     ix.  GREYBULL 55-4-9 1H (AFE 2093796 - $4.4 million)

       1.  Spud 7/31/2014 and suspended Q3 2014.  Well fractured in November 2014 and online in Q1 2015.

     x.   KAYCEE 57-3-41 1H (AFE 2093798  - $2.0 million)

       1.  Spud 7/30/2014 and suspended Q3 2014.  To be fractured in Q1 2015 and online in Q2 2015.

     xi.  WINGHEAD 56-2-29 1H (AFE 2097334 - $4.0 million)

       1.  Spud 7/28/2014 and suspended Q3 2014.  Well fractured in October 2014 and to be online in Q2 2015.

     xii.  BIG HORN 56-2-9 1H (AFE 2097337 - $0.2 million)

       1.  Suspended Q3 2014.  To be fractured and online in Q1 2015.

     xiii.  WINGHEAD 57-2-13 1H (AFE 2097510 - $1.9 million)

       1.  Spud 9/26/2014 and suspended Q3 2014.  To be fractured in 2016

     xiv.  COVINGTON 34-224 5H (AFE 2097512 - $9.3 million)

       1.  Spud 8/10/2014 and suspended Q3 2014.  Well fractured December 2014 and to be online Q1 2015.

Page [
PAGE ]

KPMG_APC_eA_0002515

xv.  WINGHEAD 56-2-43 2H (AFE 2097798  - $3.1 million)

1.  Spud 8/26/2014 and suspended Q3 2014.  Well fractured December 2014 and to be online Q2 2015.

xvi.  BANNER 57-1-21 1H (AFE 2098029 - $1.9 million)

1.  Spud 10/25/2014 and suspended Q4 2014.  To be fractured Q1 2015 and online Q4 2015.

xvii.  REED TRUST 55-1-46 1H (AFE 2098623 - $4.2 million)

1.  Spud 9/3/2014 and suspended Q3 2014.  Well fractured in December 2014.

xviii.  BOLANDER 33-95 1H (AFE 2099163  - $2.9 million)

1.  Spud 9/28/2014 and suspended Q3 2014.  To be fractured Q1 2015 and online Q2 2015.

c.  Current Justification for Suspended Status

i.  *Note: The Wolfcamp Play first came into scope in Q2 2014.*

ii.  *Q2 Justification*:  KPMG noted the Wolfcamp Play has a lot of smaller well activity that enters and leaves suspended status fairly quickly.  All 9 wells in the Wolfcamp play that were suspended in Q4 2012 were transferred to developed (total balance of $32.9 million), as seen in the domestic suspended wells rollforward at **GG.4.A.8.20**. The "oldest" wells in suspense for the play as of 6/30/2014 were both SPUD and suspended in Q1 2014, as noted above.  Per the Domestic Exposure Report (PPE PBC 9), of the 18 wells in suspended status, two wells are pending first production before being transferred over to developed.  The remaining wells were all expected to be fractured later in 2014.

iii.  *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 22 wells in the area. One well (COOPERSMITH 34-139 2H, AFE 2091418) was pending booking reserves, and the other 21 wells were in suspense as seen in the Suspended Wells Rollforward at **GG.4.A.8.20**. The individual balances of these Wolfcamp wells is relatively small as these are cheaper onshore wells, and the aggregate amount of the wells in suspense totaled $51.9 million. Thirteen of these wells were suspended in Q3 2014, while the remaining 8 had been suspended in Q2 2014. KPMG also notes that ten wells were transferred during Q3 in the amount of $32.7 million. Per the Exposure Report, all 21 of the Wolfcamp wells in suspense are either currently being completed or are awaiting completion. They will be fractured in Q4 2014 or at the beginning of 2015, and they will be brought online in the respective subsequent quarter.

iv.  *Q4 Justification:* KPMG notes that of the 21 wells that were in suspense in Q3, four wells in the amount of $17.1 million were transferred to developed property during Q4. The other 17 wells remained in suspense through Q4, and per the Q4 Domestic Exposure Report (PBC PPE 9) the aggregate balance of these wells totaled $73.3 million. In addition to these 17 wells, one well (BANNER 57-1-21 1H, AFE 2098029) entered into suspense during Q4 2014 as seen on the suspended wells rollforward at **GG.4.A.8.20.** Also, work began on one new well (SARATOGA 54-4-13 1H, AFE 2092357) and was noted as being in the pre-drill phase (e.g. not suspended). As such, there was a total of 19 wells associated with the play in Q4, 18 of which were in suspense.

Per the Q4 Domestic Exposure Report, the 18 wells that were in suspense in Q4 were all set to be fractured in either Q4 2014 or in the first half of 2015. Of these 18 wells in suspense, 16 wells are expected to be online by Q2 2015, while the other two are expected to be online by Q4 2015.

KPMG notes that the Company has continued to focus on the Wolfcamp play.  Per the Q4 2014 Operations Report, the Company expanded its leasehold by 10,000 net acres in Q4 2014. In addition, the Company acquired Nuevo Midstream assets in order to expand key infrastructure and facilitate future growth in the basin. (Refer to

Page [
PAGE ]

additional discussion over Nuevo Acquisition at **EE.4.5**.) KPMG notes that these actions in addition to the continued exploratory and developmental drilling in the region show that the Company is committed to the area.

In terms of 3rd party interest in the area, Pioneer Natural Resources is the operator that holds the largest acreage in the play, holding 825,000 gross acres, and operating more than 7000 producing wells[2]. Pioneer estimates that the Wolfcamp oil field contains more than 75 billion barrels of oil equivalent, placing it as the largest oil field in the country and the second largest in the world[3]. Pioneer, EOG Resources, and Apache Corporation have been operating in the region for years and have developed production rates that are four times higher than production by new producers who are just entering the play[4]. KPMG also notes that in 2014, ExxonMobil continuously expanded its acreage in the region through several purchases that took place throughout the year. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

  v.  *Conclusion as of Q4:*  KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development; and firm plans and established timetables exist for completion of the existing suspended wells. KPMG will continue to monitor the situation for updates.

**C.  Deep Powder River (Onshore – Rockies) - $18.14 million (GG.4.A.8.10)**

  a.  Note:  KPMG scoped this play in for Q4 2014 given the fact that the proved property portion of the play is under consideration for impairment purposes (see **GG.4.E.1.10, 12, and 16**).

  b.  Background

  i.  The first Deep Powder River wells were SPUD in late 2012 and early 2013 and started entering suspended status in Q1 2013.  The area is made up of a number of smaller wells that flow quickly through suspended status as they are completed and brought online.  The Deep Powder River wells are primarily operated by the Company and are in the Rockies region.

  c.  Associated AFEs

  i.  MOJAVE FED 4277-23-31F-H (AFE 2065201 – $9.2 million)

  1.  Spud 11/22/2013 and suspended Q1 2014. Well had operational issues during completion. May attempt to fish the stuck coil in 2015. If unsuccessful, will potentially plug and abandon.

  ii.  TMFU 4577-15-44SH-H (AFE 2074974 – $7.4 million)

  1.  Spud 8/26/2013 and suspended Q1 2014. Well is now producing and will book reserves in Q1 2015.

  iii.  ROCHELLE 11-33-69 A 1H (AFE 2090747 – $1.3 million)

  1.  Spud 9/7/2013 and suspended Q4 2014. Well is waiting on completion.

  iv.  ROCHELLE 11-33-69 A 1H (AFE 2107080 – $0.3 million)

  1.  Spud 9/7/2013 and suspended Q4 2014. Well is waiting on completion.

  d.  Current Justification for Suspended Status

  i.  *PY Justification*:  KPMG notes that the Mojave Fed 4227-27-44F-H was completed and placed into suspense in Q4 2013.  The Trinity Fee 3367-7 11N-H and E21N-H wells were spud 11/22/2013 and 11/23/2013 respectively.  These wells are

---

[2] http://www.ogj.com/articles/uogr/print/volume-2/issue-3/permian-operators-increasingly-target-shale-as-new-technology-rejuvenates-legacy-oil-field.html
[3] http://www.pxd.com/operations/permian-basin
[4] http://fuelfix.com/blog/2014/06/11/wolfcamp-shale-layers-could-put-play-among-most-profitable/

CONFIDENTIAL                                                                  KPMG_APC_eA_0002517

anticipated to be complete in 2014. KPMG additionally notes that the SHAWNEE STATE 3269-4-31H well was transferred to final asset, thereby providing additional evidence of the viability of the play.

ii.   *Q1 Justification*: KPMG notes that the Company placed 13 new wells ($59.9 million) into the PRB Deep DU. Of the total PRB Deep DU balance, 7 wells (59.4 million) were complete and were expected to transfer to depreciable assets once reserves were booked for Q2 2014 (reserves are recorded on a quarter lag). Another 9 wells ($30.4 million) were waiting on completion (all were added into suspense in Q1 2014). As of 3/31/2014, the Company had 4 AFEs ($4.6 million) in pre-drill or active drilling status. Additionally, as seen on the rollforward at **GG.4.A.8.20**, the TRINITY FEE 3468-17-31F-H (AFE 2071030 - $10.2 million as of 12/31/2013) was transferred to developed in Q1 2014.

iii.  *Q2 Justification*: KPMG noted that per the domestic suspended wells rollforward at **GG.4.A.8.20**, 4 wells (TRINITY FEE 3468-17-31F-H, SIMBA FED 4778-20-44SX-H, MOJAVE STATE 4377-16-11F-H, and SHAWNEE FEE 3368-26-11N-H) were transferred to developed in Q2 2014 at a value of $47.8 million. Three wells were added to suspended status in Q2 2014 (as noted above). Per the Domestic Exposure Report (PPE PBC 9), of the 17 AFEs in suspended status as of 6/30/2014, 13 were complete and were just pending the recording of reserves in the second half of 2014 before being transferred to developed. Two wells in suspended status had encountered mechanical issues with further work anticipated for 2015. The last two wells (both added to suspense in Q2 2014) were pending completion work.

iv.   *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 7 wells in Deep Powder River area. One well (TMFU 4577-22-41SH-H, AFE 2080194) is in the pre-drill phase; one well (SHAWNEE FEE 3368-28-E14N-H, AFE 2084626) is currently drilling; and the other six wells are in suspense as seen on the rollforward at **GG.4.A.8.20**. The aggregate amount of the six onshore wells in suspense totaled $43.8 million. One of these wells had been suspended in Q2 2013, while the remaining five were suspended in Q1 and Q2 2014. KPMG also notes that during Q3 ten wells were transferred from suspended wells to proved property in the amount of $65.9 million. Per the Exposure Report, four of the six wells in suspense were producing and just pending the recording of reserves Q4 2014 or in Q1 2015.

v.    *Q4 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 7 wells in Deep Powder River area. One well (TMFU 4577-22-41SH-H, AFE 2080194) remained in the pre-drill phase from Q3; two wells are currently drilling (SHAWNEE FEE 3368-28-E14N-H, AFE 2084626 and SHAWNEE FEE 3368-28-W14N-H, AFE 2095920); the other four wells were in suspense as seen on the Suspended Wells Rollforward at **GG.4.A.8.20**. The aggregate amount of the six onshore wells in suspense totaled $22.9 million. KPMG also notes that in Q4 three wells (NBV of $20.4 million) were transferred from suspended wells to proved property. Per the exposure report, two of the wells in suspense were waiting on completion while one was pending booking of reserves in Q1 2015 before being transferred to proved. As noted at **GG.4.E.1.16**, the Company anticipates spending ~$76 million in the PRB Deep area for 9 operated wells unless prices stay low, in which the program would be deferred to 2016/2017. At 12/31/2014, the portfolio value was estimated between $324 million to $452 million based on the potential for 90+ MMBOE, more than enough to cover the $18.4 million in suspended wells and $191.1 million in proved properties. The Company also is in discussion to two partners into the area and farm out a significant portion of their northern acreage for ~$30-$45 million. The Company also has budgeted in spending another $15 million on acreage in 2015 in addition to their budgeted capital on the drilling program.

In terms of other 3rd party interest, major players in the region include EOG Resources (which considers the Powder River its new core focus area), SM Energy, and Chesapeake Energy Corporation[5]. KPMG further notes that while Chesapeake

---

[5] http://www.oilandgasinvestor.com/powder-river-basin-759791

CONFIDENTIAL                                    KPMG_APC_eA_0002518

divested noncore assets in its portfolio during 2014, it emphasized that it intends to grow its operations in the Powder River play, and it entered into a complex deal to swap properties with oil company RKI in order to obtain additional leases in the Powder River Basin. Several private companies including Samson Resources, Anchutz, and Helis Oil & Gas are also actively drilling in the Powder River Basin. KPMG further notes that production in Powder River Basin rebounded from its low point of 38,000 barrels/day in 2009 to 78,000 barrels/day during Q1 2014. As such, several companies expanded their presence in the region this year: Devon Energy increased its production by 21% in the region, and companies EOG Resolute Energy, MDU Resources, and WPX Energy made plans to increasing their drilling and investments[6]. In addition, new infrastructure is aiding efforts to grow operations in the region as a new oil rail terminal, Black Thunder, has been built in Campbell County, Wyoming, to transport materials and crude oil. In addition, in September 2014, Enterprise Partners LP proposed a 1200 mile pipeline that would pass through Wyoming and Colorado, picking up crude oil pumped from the Powder River and DJ Basins, en route to the nation's Cushing central oil facility in Oklahoma[7]. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

vi.   *Conclusion as of Q4:* KPMG notes that the activities noted above were indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development and plans with established plans with firm timetables exist. KPMG will continue to monitor the situation for updates.

**D.   Resolution (Onshore – Rockies) - $6.29 million (GG.4.A.8.10)**

a.   Note: KPMG scoped this play in for Q4 2014 given the fact that the proved property portion of the play is under consideration for impairment purposes (see **GG.4.E.1.10, 12, and 16**).

b.   Background

i.   In 2014, the Wattenberg DU was split into two DUs – Wattenberg and Resolution. The Company determined that the use of two DUs more would more appropriately group operations considerations. Refer to Wattenberg DU Split Memo at **GG.4.D.3.50** for detailed explanation.

c.   Associated AFEs

i.   BULL CANYON 508-0607H (AFE 2102999 – $2.2 million)

1.   Suspended in Q4 2014. Well completed, and reserves to be booked in Q1 2015.

ii.   DURHAM 530-0719H (AFE 2104082 – $1.1 million)

1.   Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

iii.   DURHAM 526-0719H (AFE 2104204 – $1.1 million)

1.   Suspended in Q4 2014. Well completed, and reserves to be booked in Q1 2015.

iv.   JUBILEE 523-2128H (AFE 2104808 – $0.4 million)

1.   Spud 9/18/2014 and suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

v.   JUBILEE 515-2128H (AFE 2104810 – $0.6 million)

---

[6] http://www.naturalgasintel.com/articles/99712-fracking-revitalizing-powder-river-oil-production-eia-says
[7] http://www.bizjournals.com/denver/blog/earth_to_power/2014/09/enterprise-proposes-crude-oil-pipeline-from-north.html?page=all

CONFIDENTIAL

           1.   Spud 9/13/2014 and suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

     vi.  JUBILEE 521-2128H (AFE 2104811 – $0.5 million)

           1.   Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

    vii.  JUBILEE 117-2128H (AFE 2104812 – $0.5 million)

           1.   Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

d.   Current Justification for Suspended Status

      i.  *Note: The Resolution Play first came into as a separate DU from the Wattenberg DU in Q3 2014. In Q3 2014, there were 12 wells associated with the Resolution play as noted per the Q3 Domestic Exposure Report (PBC PPE 9). All 12 wells were in suspense at 9/30/14 and had a total AUC balance of 36.1 million*

     ii.  *Q4 Justification:* Of 12 wells ($36.0 million) that were suspended in Q3 2014, all were transferred to proved in Q4 2014 as evidenced on the Domestic Suspended Wells Rollforward at **GG.4.A.8.20**. In Q4, 8 new wells were added per the Q4 Domestic Exposure Report (PBC PPE9). All 8 wells were expected to have developed reserves added by Q1 2015, with 5 of them also needing additional completion procedures.

        KPMG notes that the Resolution wells are located in Laramie County on the Niobrara Shale, which has experienced a surge of production in 2014 as a result of horizontal drilling and hydraulic fracturing technologies. In May of 2014, the monthly production of the region surpassed 300,000 barrels, which is significantly higher than the monthly average of about 119,000 barrels that Laramie County had recorded during the previous two years[8]. During only the first half of 2014, the state of Wyoming received nearly 350 permit applications to drill in Laramie County. This number of applications more than doubled the total number of 147 applications that were filed throughout the whole year of 2013[9]. While Anadarko is the largest producer of the Niobrara Shale, other major producers include Noble Energy, Encana, and EOG Resources. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

        As noted at **GG.4.E.1.16**, the Company has allocated a budget of $270 million for Resolution. It will be the second highest funded asset in the region behind Wattenberg. In 2015, 96 wells are planned to be drilled, 96 operated by EOG, 6 by APC, and 6 from other operators.

    iii.  *Conclusion as of Q4:* KPMG notes that the activities noted above were indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development and plans with established plans with firm timetables exist. KPMG will continue to monitor the situation for updates.

**E.  Alaska - $33.00 million (GG.4.A.8.10)**

a.  Background

      i.  The Company's Alaskan wells are located on the Colville River unit (commonly referred to as Alpine) and are operated by ConocoPhillips[10]. Alpine has no permanent road connecting it to other infrastructure, and as such, an ice road is built in the winter to connect the area to other regions and move in supplies for the rest of the operating year[1]. In December 2011, ConocoPhillips was awarded a permit to construct a gravel road, bridge, and pipeline crossing over the Colville River for

---

[8] http://www.wyomingnews.com/articles/2014/07/12/news/01top_07-12-14.txt#.VNQH-J3F-fI
[9] http://www.wyomingnews.com/articles/2014/07/12/news/01top_07-12-14.txt#.VNQH-J3F-fI
[10] http://alaska.conocophillips.com/who-we-are/alaska-operations/Pages/alpine.aspx

CONFIDENTIAL

KPMG_APC_eA_0002520

development of the CD5 field[1]. Engineering and planning took place throughout 2013, and construction began in 2014 and continue through 2015, with first production expected in late 2015[1].

   b.   Associated AFEs

       i.   CHAR #1 (AFE 2017287 – $5.2 million)

           1.   Spud 2/12/2008 and suspended Q2 2008. Successful well with ongoing development plans and studies to optimize the drilling center, the number of wells for development, and the surface facilities

      ii.   PIONEER 1 (AFE 2029301 – $4.8 million)

           1.   Spud 3/12/2009 and suspended Q2 2009. Reserves found but no pipeline exists to produce or add PUDs. Is planned to be co-developed along with the Rendezvous discovery. Pioneer development is scheduled to follow CD5 development

     iii.   RENDEZVOUS 3 (AFE 2092672 – $7.6 million)

           1.   Suspended Q1 2014. Successful appraisal well drilled and tested during Q1 and Q2 2014. Results support moving forward with development, and conceptual development planning is underway

     iv.   FLAT TOP 1 (AFE 2094150 – $4.9 million)

           1.   Suspended Q2 2014. Successful exploration well drilled in Q1 and Q2 2014. Follow up offsetting appraisal work is planned in the future.

      v.   CASSIN #1 EXPLORATION WELL (AFE 2079389 – $5.8 million)

           1.   Spud 3/2/2013 and suspended Q1 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

     vi.   CASSIN 6 (AFE 2082557 – $2.7 million)

           1.   Spud 3/30/2013 and suspended Q2 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

    vii.   CASSIN # 1 COMPLETION & TESTING (AFE 2083038 – $2.0 million)

           1.   Spud 3/2/2013 and suspended Q1 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

   c.   Current Justification for Suspended Status

       i.   *Q4 Justification:* Per the Domestic Exposure Report (PBC PPE 9), the Company's seven Alaska wells were all being held in suspense as of Q4 2014. Operations in Alaska are currently in progress to construct the infrastructure needed to continue drilling these wells, and KPMG notes that throughout 2014, construction on the CD-5 field continued[11]. Per inquiry of Property Accounting, KPMG notes that, while the Company's Cassin wells #1 and #6 are not located on the CD-5 field (otherwise referred to as the Alpine West development), their progress is linked to progress made on the CD-5 development as these wells will be completed after the CD-5 infrastructure has been constructed. Property Accounting additionally noted that Cassin wells #1 and #6 are exploration wells and were both new oil discoveries in 2014. As such, data analysis of these wells is ongoing. In the coming years, appraisal wells may be drilled on these discoveries. Property Accounted noted that full development of the wells is set to be in 2019 after the infrastructure on the nearby CD-5 fields has been completed.

In terms of 3rd party interest in the area, KPMG notes that 15 oil companies are registered with the Alaska Oil & Gas Association (which represents the majority of

---

[11] http://alaska.conocophillips.com/who-we-are/Pages/projects.aspx and
http://alaska.conocophillips.com/Documents/Fact_Sheet_CD5_Construction_final.pdf

CONFIDENTIAL                                                 KPMG_APC_eA_0002521

oil/gas companies operating in the state), including Apache Corporation, BP, Chevron, Eni, ExxonMobil, Shell, Statoil, Tesoro, and XTO Energy. In 2014, the largest trend throughout the Alaskan fields was the arrival of smaller companies such as Caelus Energy and Miller Energy Resources. KPMG notes that the Colville River unit (where Anadarko assets are located) is neighbored by several units (such as the Kuparuk River unit and Tofkat unit), which are prospects that are being heavily developed as part of a three-company $450 million consortium to expand exploration operations in the region[12]. The three parties to the consortium are Thyssen Petroleum North Slope Development LLC, JK Tech Holdings Ltd., and MEP Alaska LLC. Their plans include developing infrastructure in the region, constructing a 15,000 barrel/day processing facility, and establishing three production wells to begin drilling in 2015. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

    ii. *Conclusion as of Q4:*  KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development.  In addition, established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

**F.  Samurai (Green Canyon – Offshore) - $30.61 million (GG.4.A.8.10)**

  a.  Associated AFEs

    i.  GREEN CANYON 432 001 (AFE 2064250 – $30.6 million)

      1.  Spud 3/18/2009 and suspended Q2 2009

  b.  Current Justification for Suspended Status

    i.  *Q4 Justification:* KPMG notes that the Samurai play is operated by Murphy oil. A sidetrack appraisal well is expected to be drilled in 2016. KPMG notes that the lease term is not set to expire until May 2018 (**GG.4.B.5.12**).  KPMG notes that given the Company has over 3 years until lease expiration, even if they hold off on drilling in 2015, they can hold out and wait for prices to become more favorable.

    ii.  *Conclusion as of Q4:* KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

**G.  Yucatan (Offshore) - $40.3 million (GG.4.A.8.10)**

  a.  Background

    i.  The Yucatan wells are operated by Shell and are part of the Walker Ridge Exploration area.  The Walker Ridge Exploration area also includes Coronado and Shenandoah.  The Yucatan exploratory wells were spud in July 2013 and suspended in Q3 2013.  Per the Q2 2013 earnings release, the Yucatan wells encountered more than 120 net feet of oil pay.

  b.  Associated AFEs

    i.  WALKER RIDGE 95 001 (AFE 2073454 – $34.9 million)

      1.  Spud 7/21/2012 and suspended Q3 2013

    ii.  WALKER RIDGE 95 001 YUCATAN NORTH EVALUATION (AFE 2086040 - $5.4 million)

      1.  Spud 7/21/2012 and suspended Q3 2013

---

[12] http://www.petroleumnews.com/pdfarch/Prod14.pdf

CONFIDENTIAL

    c.   Current Justification for Suspended Status

        i.   *Q4 Justification*:  Per the Domestic Exposure Report (PBC PPE 9), two wells associated with the Yucatan play were in suspense as of 12/31/2014. On each well, operations had encountered more than 120 net feet of oil pay, and the Walker Ridge 95 001 Evaluation well required appraisal drilling. KPMG inquired of Property Accounting regarding current activity in the play, and Property indicated that Shell (the operator of the wells) is currently evaluating next steps for the play.  KPMG notes that the lease term for block 95 is valid through October 2017 (**GG.4.B.5.12**). KPMG notes that given that the Company has nearly 3 years until lease expiration, even if they hold off on drilling in 2015, they can hold out and wait for prices to become more favorable.

        ii.   *Conclusion as of Q4:*  KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

***International***

As seen on the International suspended wells rollforward at **GG.4.A.8.15**, a large portion of the International suspended wells balance has been suspended for more than one year.  KPMG notes that international projects tend to have an elevated level of risk due to the economic, legal, political, and environmental aspects of the potential development in progress.  As such, and as common in the industry, the Company will enter into a potential area of development with joint venture partners in order to mitigate the associated risks mentioned above.  KPMG considered this in our evaluation noted below as a majority of the wells meeting our scope involved delays due to governmental approval as well as collaboration amongst the joint venture partners as to the potential development of the respective areas under exploration.

  **H.   Ghana Wells- $228.2 million (GG.4.A.8.15)**

    a.   Country Overview

    The Company's Ghana operations take place in the West Cape Three Points and Deepwater Tano blocks.  These blocks are located next to each other geographically (spanning a distance of approximately 40 miles East to West at the furthest points).  The Company has worked with the Ghanaian Ministry of Energy to group several of their discoveries into single appraisal areas in the hopes of maximizing efficiencies in development.  Akasa, Teak, and Mahogany are grouped into a single appraisal area (MTA), as are Tweneboa, Enyenra/OWO, and Ntomme (TEN). KPMG notes that the Company's discussions with the Ghanaian Ministry of Energy (MoE) over plans for production significantly slowed down with the passing of the Ghanaian president (John Dramani Mahama) in July 2012 as the Ghanaian president appoints the Energy Minister.  Ghana's vice president, John Dramani Mahama, served as interim president and was formally elected in December 2012.  This lead to the appointment of Emmanuel Armah Kofi Buah as the new Energy minister in January 2013, and normal development discussions commenced in resulting in moving the TEN assets into the development phase in Q2 2013.

    b.   Mahogany, Teak, Akasa **- $214.8 million** (Please see International Suspended Wells roll forward at **GG.4.A.8.15**, TM B for AFE list and individual amounts)

        i.   *Background*: MTA is located in the West Cape Three Points (WCTP) block.  The Mahogony 3, 4, 2Deep, and 5 wells were successful exploration wells drilled during 2009 and 2010.  Teak 1, 2, and 3 were drilled and deemed successful in 2011.  The Akasa 1 well were drilled and declared successful in 201.  Development plans and negotiations with the government were delayed for these wells due to the 2012 government hiatus (as noted in the overall background section) as well as the Company focusing efforts on development of the TEN assets after the hiatus ceased. In Q3 2013, the MoE granted an extension of the appraisal period for the area through 5/31/2014, and this was further extended to 12/31/2014 in Q1 2014. Additionally, the Akasa 2 well was declared successful in Q4 2013.  Kosmos is the operator in the WCTP area.

<div align="center">

Page [
PAGE ]

</div>

ii.  *Current Justification for Suspended Status*:

1. *PY Q4 Justification:* Per the International Exploration Exposure report, the Akasa 2 well was drilled in Q4 2013 and declared successful. Further, the partnership and the MOE came to an agreement for the MTA area that will extend the appraisal period for the Mahogany wells to 12/31/2014. The documents (Memorandum of Understanding for MTA) were with the MoE awaiting signatures as of 12/31/2013. KPMG inquired of Justin Lime (Planning Manager) and noted that the MoE signed the documents on 1/14/2014 (which extended the appraisal period to 12/31/2014). The current year appraisal activities planned included: additional drilling on the J-24 well in late Q1 2014 to assess sands deeper below the Jubilee unit, placing gauges on the Mahogany M-3 well, interpreting seismic data acquired from the Teak wells, and acquiring and evaluating gauge data from the Akasa 1 well.

2. *Q1 Justification:* As noted in the Q4 2013 justification, the MoE extended the appraisal period to 12/31/2014 in early Q1 2014. Per Q1 2014 the International Exploration Exposure report, the J-24 tail well was completed (with an appraisal tail into the Mahogany sands). Gauges were installed on Mahogany 3. Seismic data was acquired and was being interpreted over the Teak area. Additionally, pressure readings from the Akasa 1 well were expected to be taken to assist in the evaluation of development plans in Akasa.

3. *Q2 Justification:* Per the Q2 International Exploration Exposure report, pressure readings from the Akasa 1 well were expected to occur in Q3 2014 and seismic data was still being interpreted over the Teak area.

4. *Q3 Justification:* Per the Q3 International Exploration Exposure report, 2014 appraisal activities include a seismic acquisition program that was completed in Q2 and covered the TEN and Wawa areas. Processing the seismic data began in Q3, and the Exposure Report notes that regulatory authorities verbally agreed to extend the appraisal deadline from 7/17/2014 to 2/10/2016. The report also notes that the gauge installation and pressure readings from Akasa 1 well have been pushed back a quarter and will now take place in Q4 2014.

5. *Q4 Justification:* Per the Q4 International Exploration Exposure report, the Company is preparing a declaration of commerciality notification that will be presented to the government in Q1 2015. The declaration evidences intent to develop wells and bring them to production. In 2015, appraisal activities will include evaluation of the TEN/Wawa seismic data obtained from the 2014 program.

   KPMG notes that the Company has existing proved properties in other areas (Jubliee) of Ghana. As noted in the impairment questionnaire memo at **GG.4.E.1.10**, for the YTD 12/31/2014, with average oil prices of $102.63, the Company recognized margins of $90.73. KPMG notes even this margin were decreased by $50 (to reflect lower oil prices) that would leave a margin of $40.73 which leaves significant room even if the MTA negotiations with the government yield less favorable operating situations (e.g. more local taxes). Given these factors, KPMG does not consider it likely that the Company will walk away from negotiations with the Ghana government over MTA development unless significant and unreasonable requests are made during negotiation.

6. KPMG noted that these activities are indicative of sufficient progress per FASB 932-360-35 plans exist with established timetables and there are outstanding proposals for development of the area. KPMG will continue to monitor the situation for updates.

# I.  Brazil Wells - $594.86 million (GG.4.A.8.15)

Page [
PAGE ]

a.  Wahoo (BMC 30) Wells - $300 million (Please see International Suspended Wells roll
forward at **GG.4.A.8.15**, TM I, for AFE list and individual amounts).

    i.  *Background*: On 9/30/2008, Anadarko publicly announced the pre-salt discovery at
the Wahoo prospect offshore Brazil in the Campos Basin. The Wahoo #2 well was
declared successful in Q4 2009.  In Q3 2010, the Company completed DSTs on the
Wahoo and Wahoo 2 wells.  Wahoo #4 was completed and declared successful in Q4
2012, with Wahoo #5 following in Q3 2013.  The evaluation phase for the BMC-30
block expires November 2015.

    ii.  *Current Justification for Suspended Status*:

        1.  *PY Q4 Justification*: KPMG notes that per the Q4 2013 International
Exploration Exposure report, the partnership was scheduled to submit an
appraisal plan (PAD) in June 2014.  Additionally, seismic data was being
reprocessed.  KPMG inquired of Justin Lime (Planning Manager) and noted
that BMC-30 had been moved to the development team (as opposed to the
explorations team).  Core analysis was being performed on Wahoo #4 and
Wahoo #5 and the feasibility of commercial development is being
evaluated.

        2.  *Q1 Justification*: KPMG notes that per the Q1 2014 International
Exploration Exposure report, 2014 appraisal activities included the
development and technology teams working on geo-modeling and
simulation studies.  Reprocessing of seismic data for BMC-30 was 90%
complete.  The development team was moving forward with the subsurface
evaluation and evaluation of potential field development concepts.  The
partnership was on target to submit the Appraisal Plan (PAD) in June 2014.
FEED studies for the most likely development concepts were expected to
begin in Q2 2014.

        3.  *Q2 Justification*: KPMG noted that per the Q2 2014 International
Exploration Exposure report, seismic data reprocessing on BMC-30 and 32
is complete and remapping is underway.  Additionally, the Company met
with the ANP on 6/27/2014 and proposed the next firm activities to be
conducted under the appraisal plan. Including pre-FEED evaluation of four
development concepts in the second half of 2014 and FEED evaluation of
the preferred alternative in the first half of 2015.  As of 6/30/2014 there
were approximately $4.5 million of pre-development / evaluation costs still
in progress (not in suspense).  KPMG additionally noted that per an article
in the Oil & Gas Journal, Maersk (a partner in the BMC-30 joint venture)
had written down $1.7 billion in investments in Wahoo (BMC-30) and
Itaipu (BMC-32).  The Wahoo and Itaipu fields are expected to hold
significant potential resources, but were assessed by Maersk to have lower
value than originally anticipated.  Maersk still expects the partnership to
present commercially viable development plans.  The article stated that
Maersk had purchased interests in Wahoo, Itaipu, and Polvo from SK
Energy Co. Ltd. For $2.4 Billion in 2011. Maersk is also divesting its
interest in the producing Polvo field (the Company has no producing assets
in Brazil).  KPMG noted the Company is the Operator in BMC-30 and
consistent with the O&GJ article, the Company presented development
plans on 6/27/2014, as noted above.

        4.  *Q3 Justification*: Per the Q3 2014 International Exploration Exposure report,
seismic data remapping has continued throughout Q3. KPMG inquired for
further details and noted per Darrell Havill (International Accounting
Manager), the Company is scheduled to meet with ANP in November 2014
to discuss the evaluation of the Appraisal Plan on BMC-30. Based on
feedback from ANP, the Company expects that the submittal of the
recommended appraisal plan will be in Q1 2015.

CONFIDENTIAL

5. *Q4 Justification*: Per the Q4 2014 International Exploration Exposure report, the Company completed its pre-FEED evaluation of four development concepts and determined it will pursue further evaluation of two of the development concepts. The evaluation will conclude in Q1 2015 and the Partnership will determine the development plan in the first half of 2015 so that operations can be sanctioned in the second half of the year.

KPMG further notes that the Partnership met with the ANP on October 29, 2014, and presented a revised appraisal plan for BMC-30. The Partnership presented its plan for conducting a long term test on BMC-30, and per inquiry of Darrell Havill (International Accounting Manager) noted that the ANP was receptive to this plan. The Partnership is set to meet again with the ANP in September 2015 to present their current go-forward plans at that time.

6. KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 plans exist with established timetables and there are outstanding proposals for development of the area KPMG will continue to monitor the situation for updates.

b. Itaipu (BMC 32) Wells - $293.2 million (Please see International Suspended Wells roll forward at **GG.4.A.8.15**, TM I, for AFE list and individual amounts)

   i. *Background*: Itaipu BMC-32 was declared successful in Q1 2010. Itaipu 2 followed in Q4 2011, along with a DST on the Itaipu in Q3 2012, and Itaipu 3 in Q2 2013. The evaluation phase on the block expires in December 2014. BP is operator on the BMC-32 project.

   ii. *Current Justification for Suspended Status*:

1. *PY Q4 Justification*: KPMG notes that per the Q4 2013 International Exploration Exposure report, seismic data was being reprocessed for BMC-32. A unitization subcommittee was expected to take place in Q1 2014 with an objective of proposing a plan for formal unitization notification with supporting evidence of common shared reservoir with the Whale Park Pre-Salt field. Per Justin Lime (Planning Manager), BP was the operator of the project on BMC-32. They were currently working on unitization agreement negotiations with the government.

2. *Q1 Justification*: KPMG notes that per the Q1 2014 International Exploration Exposure report, reprocessing of the BMC-32 data was approximately 90% complete and was expected to be finalized in Q2 2014. The ANP (the Brazilian National Petroleum Agency) had not yet made a ruling on the notification of unitization and as of 4/24/2014 there was no established deadline on when the ruling would occur.

3. *Q2 Justification*: KPMG notes that per the Q2 2014 International Exploration Exposure report, seismic data reprocessing on BMC-30 and 32 is complete and remapping is underway. The ANP has still not yet made a ruling on the notification of unitization and no established deadline exists as of 7/23/2014. KPMG additionally notes that per an article in the Oil & Gas Journal, Maersk (a partner in the BMC-30 joint venture) had written down $1.7 billion in investments in Wahoo (BMC-30) and Itaipu (BMC-32). The Wahoo and Itaipu fields are expected to hold significant potential resources, but were assessed by Maersk to have lower value than originally anticipated. Maersk still expects the partnership to present commercially viable development plans. Maersk is also divesting its interest in the producing Polvo field (the Company has no producing assets in Brazil). The article stated that Maersk had purchased interests in Wahoo, Itaipu, and Polvo from SK Energy Co. Ltd. For $2.4 Billion in 2011. KPMG notes that BP is the Operator of the BMC-32 block. KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 as there are

Page [
PAGE ]

outstanding proposals for appraisal/development of the area.  KPMG will
continue to monitor the situation for updates.

4. *Q3 Justification*: Per the Q3 2014 International Exploration Exposure report,
seismic data remapping has continued throughout Q3. KPMG notes that per
the Q3 2014 International Exploration Exposure report, the ANP has still
not yet made a ruling on the notification of unitization and no established
deadline exists as of 9/30/2014. KPMG inquired of Darrell Havill
(International Accounting Manager) for further details and noted that a
deadline for ANP to respond to the unitization claim had been set and is
mid-November 2014.

5. *Q4 Justification*: Per the Q4 2014 International Exploration Exposure report,
pre-FEED and FEED studies are still underway to determine options for
developing blocks in the region. These studies will determine commercial
development options for the Itaipu prospect.  Per inquiry of International
Accounting, KPMG notes that Petrobas responded to the ANP in November
2014 with a counter proposal, and that Petrobas, the ANP, and the
Partnership are actively negotiating the unitization of the Whale Park Field.
Following Petrobas's November response, the Partnership will present
additional data to support its unitization claims. Darrell Havill (International
Accounting Manager) noted that as of 12/31/2014, the Partnership is
working on submitting an appraisal plan to the ANP, which will be
presented by the end of the Evaluation Phase in December 2015.

6. KPMG notes that these activities are indicative of sufficient progress per
FASB 932-360-35 as there are outstanding proposals for
appraisal/development of the area.  KPMG will continue to monitor the
situation for updates.

**J.  Tunisia Wells - $75.9 million (GG.4.A.8.15)**

a. Tunisia - $75.9 million (Please see International Suspended Wells rollforward at
**GG.4.A.8.15**, TM K, for AFE list and individual amounts)

i. *Background*:  The Company entered the Tunisia Onshore BEKS block in Q4 2011.
BEKS #1 well was declared successful in Q3 2013 and the RFA #1 was declared
successful in Q4 2013.

ii. *Current Justification for Suspended Status*:

1. *PY Q4 Justification:* Per the Q4 2013 International Exploration Exposure
report, the RSA 1 well was completed in Q4 2013 and declared successful.
2014 appraisal activities were to include analysis and integration of the
information obtained from the two exploration wells into the company's
database.  Planning for a shale well and an extended flow test to occur in
2015 will also be initiated in 2014.  KPMG inquired of Justin Lime
(Planning Manager) and noted that geological interpretation and analysis
work was currently being performed.

2. *Q1 Justification:* Per the Q1 2014 International Exploration Exposure
report, the 2014 appraisal activities were unchanged (integration of data
from two wells into the Company's database and planning for a shale well).
The planning for a shale well and an extended test flow had started.

3. *Q2 Justification:* Per the Q2 2014 International Exploration Exposure
report, the 2014 appraisal activities were unchanged (integration of data
from two wells into the Company's database and planning for a shale well).
The planning for a shale well and extended flow test was still ongoing, and
the extended flow test was expected to occur in 2015.  BEKS#3 was
currently in progress (e.g. not suspended), incurring pre-drill / evaluation

Page [
PAGE ]

costs.  As of 6/30/2013, there were a total of $150 thousand in costs incurred for BEKS#3.

4.  *Q3 Justification:* Per the Q3 2014 International Exploration Exposure report, 2014 appraisal activities continued throughout Q3. These activities include the integration of data from two wells into the Company's database and planning for a shale well.  KPMG inquired of Darrel Havill (International Accounting Manager) and noted that the sub-surface analysis activities have been completed, and preparations to execute the drilling program are on-going. Operations now expects that the multi-well drilling program will take place in 2016.

5.  *Q4 Justification:* Per the Q4 International Exploration Exposure Report, planning is underway for a multi-well drilling and testing program to occur in Q4 2015.  The Company had approximately $183 thousand in pre-drill costs associated with this anticipated drilling and testing program as of 12/31/2014.  KPMG inquired of Darrel Havill (International Accounting Manager) and noted that the blocks in Tunisia will not expire until May 2016.  KPMG will continue to monitor progress on the block in 2015.

6.  KPMG notes that these activities are indicative of sufficient progress as per FASB 932-360-35 as costs are being incurred to assess the reserves, and firm plans exist with established timetables.

K.  **Cote d'Ivoire - $71.3 million (GG.4.A.8.15)**

a.  Paon #1 - $71.0 million (Please see International Suspended Wells rollforward at **GG.4.A.8.15**, TM A, for AFE list and individual amounts)

   i.  *Background*: The Company owns interests in five offshore blocks and is currently appraising the Paon discovery (block CI-103).

   ii.  *Current Justification for Suspended Status*:

   1.  **Note:** Cote d'Ivorie first came into scope in Q4 2014.

      *Q4 Justification:* Per the Q4 2014 International Exploration Exposure report, the Morue well (block 516) was drilled in Q3 and was unsuccessful, and the Saumon (block 515) well was drilled in Q4 and was unsuccessful (see **GG.4.G.3**). In Q1 2015, the Company will evaluate information obtained from the Morue and Saumon operations to determine activities for the remainder of 2015. In addition, Paon well #1 was drilled and announced as a light oil discovery in Q2 2014, and Paon wells #3 and #4 were declared successful in Q4 2014. Paon well #5 is expected to be drilled in late 2015. As blocks 515 and 516 are set to expire in January 2015, KPMG inquired of Darrell Havill (International Accounting Manager) and noted that the Partnership has applied for a six month extension to allow sufficient time to continue appraisal work and to obtain and analyze data from the Morue and Saumon well operations. As of 2/17/2015, the Partnership and the Cote d'Ivorie government were actively negotiating the proposed commercial term changes and extension to the appraisal period. Darrell noted that the parties are expected to reach an agreement on the terms by the end of Q2 2015.

      In addition, Darrell noted that drilling on block 528 is set to occur in late 2015. This block was awarded to the Company in Q3 2013 along with block 529. A 3D seismic program on the blocks was completed in Q2 2014, and appraisal activity is expected to be completed in Q2 2015.

   2.  KPMG notes that these activities are indicative of sufficient progress as per FASB 932-360-35 as costs are being incurred to assess the reserves, and

Page [
PAGE ]

firm plans exist with established timetables.  KPMG will continue to monitor the situation.

**L.   Mozambique - $72.0 million (GG.4.A.8.15)**

a.   Orca wells #1, 2, 3, 4 - $44.3 million and Tubarao Tigre - $27.7 million (Please see International Suspended Wells rollforward at **GG.4.A.8.15**, TM I and TM J), for AFE list and individual amounts).

   i.   *Background*: The Company began drilling in the offshore area of Mozambique (Rovuma Basin) in 2010.  The Company now operates both onshore and offshore wells and is developing an onshore LNG plant.  In Q1 2014, the Company sold 10% of its interest in its Mozambique Offshore Area 1 operations, effectively writing down its NBV to zero (testwork at **GG.4.A.6.100**).  All costs noted below have been incurred subsequent to 2/28/2014.

   ii.   *Current Justification for Suspended Status*:

   1.   **Note:** Mozambique first came into scope in Q4 2014.

   2.   *Q4 Justification:* KPMG notes that operations in Mozambique are currently ongoing both onshore and offshore. KPMG also notes that for the Orca natural gas field, additional discoveries were made in 2013, and the estimated recoverable resource range increased from 35 to 65+ Tcf to a new range of 50 to 70+ Tcf[13].

   In addition, per the Q4 2014 International Exploration Exposure report, Orca #1 was declared successful in April 2013, and Orca #2 and #3 were completed in Q1 2014 and declared successful. Orca #4 was completed in Q4 2014 and declared successful. In addition, Tubarao Tigre #1 was completed in Q2 2014 and declared successful. KPMG notes that Tubarao Tigre is an offshore well related to the Mozambique LNG project that is currently underway. Once constructed, the LNG facilities will include storage units, shipping vessels, and subsea pipelines to transport natural gas from offshore wells to the onshore facilities[14].   On 1/20/2015, the Tubarao Tigre #2 well was completed and also deemed to be successful.  The well was actively drilling at 12/31/2014 and had a balance of $13.8 million.

   3.   KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 and firm plans exist with established timetables. KPMG will continue to monitor the situation.

**Plays Removed from Scope in Q4 2014**

**A.   Coronado (Offshore)**

a.   KPMG notes at 9/30/2014, the Coronado play had $59.5 million in suspended well costs.  The lease on the block was set to expire on 11/15/2014 and the Company was working on extending the lease so that they could continue appraising the area.  Given the sudden oil and price drops in Q4 2014, the Company determined that it would let the lease expire on 11/11/2014 and took the well costs and NPLH to expense.  See dry hole testwork at **GG.4.G.3**.

**Conclusion**

Based on the procedures performed, KPMG notes that the Company's suspended wells balance as of 12/31/2014 appears to be complete, accurate, and presented fairly.

---

[13] https://www.anadarko.com/Operations/Pages/LNGOffshoreArea1.aspx
[14] https://www.anadarko.com/Operations/Pages/LNGOffshoreArea1.aspx

CONFIDENTIAL

# Exhibit 31

**RATIFICATION, JOINDER AND THIRD AMENDMENT OF OPERATING AGREEMENT**

This Ratification, Joinder and Third Amendment of Operating Agreement ("Amendment") dated effective April 1, 2014, is made by and among Cobalt International Energy, L.P. ("Cobalt"), a Delaware limited partnership, Marathon Oil Company ("MOC"), an Ohio corporation, ConocoPhillips Company ("COPC"), a Delaware corporation, Venari Offshore LLC (formerly known as Venari Resources LLC) ("Venari"), a Delaware limited liability company, Anadarko Petroleum Corporation ("Anadarko"), a Delaware corporation, and Anadarko US Offshore Corporation ("AUOC"), a Delaware corporation. The parties herein may be individually referred to as "Party" or collectively as the "Parties".

<u>Recitals</u>

Whereas COPC and Anadarko (successor in interest to Anadarko E&P Company, LP) entered into that certain Operating Agreement, Shenandoah Prospect, effective April 1, 2008 ("Agreement") covering Walker Ridge Blocks 8, 51 and 52 ("Contract Area");

Whereas pursuant to that certain Participation Agreement dated May 7, 2008 between COPC and Cobalt, COPC assigned an undivided 20% record title interest in the Contract Area to Cobalt, effective May 1, 2008;

Whereas pursuant to that certain Participation Agreement dated July 17, 2008 between COPC and MOC, COPC assigned an undivided 10% record title interest in the Contract Area to MOC, effective June 1, 2008;

Whereas pursuant to that certain Ratification, Joinder and First Amendment of Operating Agreement between Cobalt, MOC, COPC and Anadarko, Cobalt and MOC joined and ratified the Agreement and the Agreement was amended to reflect such joinder and interest of the parties accordingly;

Whereas pursuant to that certain Second Amendment of Operating Agreement dated August 23, 2011 between Cobalt, MOC, COPC and Anadarko, the Contract Area was amended to exclude Lease OCS-G 20259 Walker Ridge Block 8 which had since expired and Article 11.5(c) was amended to provide additional time for the conclusion of Appraisal Operations;

Whereas Anadarko has assigned all of its undivided 30% record title interest in the Contract Area to AUOC, a wholly owned indirect subsidiary of Anadarko, effective October 1, 2011;

Whereas pursuant to that certain Participation Agreement dated October 2, 2012 between COPC and Venari, COPC assigned an undivided 10% record title interest in the Contract Area to Venari, effective June 1, 2012;

Whereas the Parties desire that AUOC and Venari join and ratify the Agreement and that the Agreement be amended to reflect such joinder and interest of the Parties as hereinafter provided;

Whereas the Parties desire to amend the Contract Area to include Lease OCS-G 28148 Walker Ridge Block 53 (North Half);

Page [ PAGE ] of [ NUMPAGES ]

Whereas the Bureau of Safety and Environmental Enforcement, effective April 1, 2014, has approved the formation of an exploratory federal unit covering and affecting all of the Contract Area, as amended herein, and the associated OCS Leases (the "Unit Area");

Whereas the Parties desire to adopt, effective May 1, 2014, the Agreement as the Unit Operating Agreement to govern the Unit Area, subject to the amendments set forth herein; and

Whereas inasmuch as the Agreement currently does not (i) contemplate the concept of Anadarko, as a non-working interest owner in the Leases, acting in the capacity as an affiliate operator of the Unit Area; nor (ii) adequately includes provisions to facilitate the purchasing, ordering, procuring, fabricating and/or contracting for long lead items envisioned for use in or associated with the operation of the Unit Area, the Parties desire, by virtue of this Amendment, to amend the Agreement to address these issues.

<u>Ratification, Joinder and Amendments</u>

Now, therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, together with the mutual covenants, conditions and obligations contained herein, the Parties do hereby amend the Agreement insofar and only insofar as described herein:

1.    Effective October 1, 2011, AUOC does hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, and agrees to perform its proportionate duties, covenants and obligations thereunder and takes cognizance of all of the terms and provisions thereof.

2.    Effective June 1, 2012, Venari does hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, and agrees to perform its proportionate duties, covenants and obligations thereunder and takes cognizance of all of the terms and provisions thereof.

3.    Effective May 1, 2014, the Parties hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, as the Unit Operating Agreement for the Walker Ridge Block 51 Unit and agree to perform their proportionate duties, covenants and obligations thereunder and take cognizance of all of the terms and provisions thereof.

4.    The Parties agree to delete Exhibit "A" to the Agreement in its entirety and replace it with Attachment 1 attached hereto and made a part hereof.

5.    All references in the Agreement to "Operating Agreement" shall be amended to read "Unit Operating Agreement".

6.    Article 2.3 (Agreement) is revised to read as provided below:

"**<u>Agreement</u>**:  This Unit Operating Agreement, together with its attached Exhibits."

7.    Article 2.10 (definition of *Contract Area*) is revised to read as provided below and all references to "Contract Area" in the Agreement shall read "Unit Area":

"**<u>Unit Area</u>**:  The OCS Leases or portions thereof, listed on Exhibit 'A'."

Page [ PAGE ] of [ NUMPAGES ]

ANACOP00003084

8.      Article 2.21 (definition of *Election, Elect, Elects, Elected, Electing*) is hereby automatically revised to read as follows:

> "**Election, Elect, Elects, Elected, Electing**:   A response or deemed response by a Working Interest Owner to a proposal requiring approval under Article 8.2.2 (*Approval by Election*), or the act by a Working Interest Owner of responding to a proposal requiring approval under Article 8.2.2 (*Approval by Election*).  Under no circumstances shall an Affiliate Operator have a right to make an Election under this Agreement."

9.      Article 2.33 is hereby automatically revised to read as provided below and all references to "MMS" in the Agreement shall read "BOEM":

> "**BOEM**:   The Bureau of Ocean Energy Management of the Department of Interior and/or the Bureau of Safety and Environmental Enforcement of the Department of Interior, and any predecessor or successor agencies."

10.     Article 2.41 (definition of *Operator*) is hereby automatically revised to incorporate the following sentence at the end of the Article:

> "Wherever Operator is used in this Agreement it shall read 'Operator or Affiliate Operator, as applicable', for the purposes of distinguishing between the rights and obligations of the Working Interest Owners and the rights and obligations of the Affiliate Operator, if applicable, to conduct activities and operations pursuant to this Agreement, under the direction of the Working Interest Owners and as BOEM approved Operator."

11.     Article 2.56 (definition of *Vote, Votes, Voted, Voting*) is hereby automatically revised to read as follows:

> "**Vote, Votes, Voted, Voting**:   A response or deemed response by a Working Interest Owner to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*), or the act of a Working Interest Owner of responding to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*).  Under no circumstances shall an Affiliate Operator have a right to Vote on any proposal."

12.     Add the following definitions as new Articles 2.60, 2.61, and 2.62:

> "2.60  **Affiliate Operator**:   A Party who does not own a Working Interest under this Agreement, who is an Affiliate of a Working Interest Owner to this Agreement, and who, subject to the approval of BOEM, is named by the Working Interest Owners to conduct activities and operations on behalf of, and under the direction of the Working Interest Owners.
>
> 2.61  **Operator's Affiliate**:   A Working Interest Owner which is an Affiliate of the Operator.  If there is not a Party to this Agreement who is an Operator's Affiliate and/or the Operator is a Working Interest Owner, all references to Operator's Affiliate within this Agreement shall be read as "Operator".
>
> 2.62  **Working Interest Owner**:   A Party who owns a record title leasehold interest and/or operating rights interest in and to a Lease.  Under no circumstances shall an Affiliate Operator be a Working Interest Owner under this Agreement."

Confidential                                                                                    ANACOP00003085

13.   Article 4.1 (*Designation of Operator*) is hereby automatically revised to read as follows:

"**Designation of the Operator**:   Anadarko Petroleum Corporation is designated the Affiliate Operator of the Unit Area and shall conduct all operations within the Unit Area for the Joint Account of the Working Interest Owners.   The Parties shall promptly execute and file all documents required by the BOEM in connection with the designation of Anadarko as Affiliate Operator or with the designation of any other Party as a substitute or successor Operator. Unless agreed otherwise by all the Working Interest Owners, the Operator shall be classified as the designated applicant for oil spill financial responsibility purposes, and each Non-Operating Party shall promptly execute the appropriate documentation reflecting that classification and promptly provide that documentation to the Operator for filing with the BOEM. Anadarko hereby undertakes and covenants with each of the other Parties to observe, perform, discharge and be bound by all the liabilities, duties and obligations of the Affiliate Operator under this Agreement. Anadarko's only rights, benefits, liabilities and obligations under this Agreement and the Leases shall be as Affiliate Operator.  Anadarko shall have no right to Vote or make an Election under the Agreement and has zero (0) percent record title under or operating rights to the Leases.  In no event shall Anadarko have a Working Interest or Participating Interest Share in relation to any operation carried out under this Agreement nor be deemed to have acquired a Working Interest or a Participating Interest Share directly or indirectly as a result of being Affiliate Operator under this Agreement.  In addition, during the time that Anadarko is serving as Affiliate Operator:

(a) the Affiliate Operator shall not have the right to exercise preferential rights, or exercise any other rights or take any other action reserved by or intended for the owner of a Working Interest;

(b) the Affiliate Operator shall have the same confidentiality obligations as the other Parties;

(c) all references to "Operator" in the Agreement which contemplate Operator's (i) ownership, encumbrance, assignment or other disposition of its Working Interest in the Unit Area or (ii) participation or non-participation in, Election or Vote regarding activities or operations taken pursuant to this Agreement shall be amended to read "Operator's Affiliate";

(d) similarly, all references to "Parties" in the Agreement which contemplate those actions and circumstances set forth in subsection (c) of this Article 4.1 shall be amended to read "Working Interest Owners";

(e) for purposes of Exhibit C (*Accounting Procedure*), any labor, materials, equipment and facilities provided by the Affiliate Operator shall be treated as being provided by the Operator's Affiliate and records pertaining to all such charges shall be available for audit by Non-Operating Parties;

(f) except as expressly provided otherwise in the Agreement, Affiliate Operator shall be considered a "Party" to the Agreement in all other circumstances.  Notwithstanding any other provision of this Agreement, Affiliate Operator is considered a "Party" under Article 22.5;

(g) Anadarko's rights hereunder are personal and Anadarko shall have no right to transfer or assign, whether by operation of law or otherwise, its operatorship hereunder and any attempt to do so shall be void *ab initio*;

(h) If the Affiliate Operator is removed for cause, then Operator's Affiliate shall not have the right to succeed as Operator; and

(i) If the Operator's Affiliate assigns or transfers any of its Working Interest and the assignment or transfer reduces its Working Interest to less than 80% of the next largest Working Interest of a Non-Operating Party, whether accomplished by a single assignment or multiple assignments, then Affiliate Operator shall have been deemed to have resigned with no action required by the other Parties other than selection of a Successor Operator."

Page [ PAGE ] of [ NUMPAGES  ]

(j) Amend Paragraph 5.6 of Exhibit "I" (Memorandum of Operating Agreement and Financing Statement) of the Operating Agreement to read as follows:

"5.6 Operator's Affiliate grants to Non-Operators a lien, mortgage, pledge and security interest equivalent to that granted to Operator as described in Paragraphs 5.1 and 5.2 above, to secure payment by Operator's Affiliate, of its share of costs when due, and any liabilities incurred or amounts owed by Affiliate Operator hereunder."

14.   Anadarko does hereby ratify, join, approve, adopt, confirm and is made a party to the Agreement as Affiliate Operator.  Anadarko does hereby accept and agree to be bound by all of the terms and provisions of the Agreement as Affiliate Operator.

15.   Add the following as a new Article 6.2.2.5:

"**6.2.2.5  Supplemental AFE for Cost Overruns on All Other AFEs**:  The Permitted Over-expenditure for all other AFEs is an amount equal to ten percent (10%) of the original approved AFE or ten million dollars ($10,000,000), whichever is less."

16.   Add the following as a new Article 6.2.4:

"**6.2.4  Long Lead AFEs**:

In order to facilitate the timely and orderly commencement of any single activity or operation that is anticipated to be proposed under Article 11 (*Appraisal Operations),* Article 12 (*Development Plan*), including any activity or operation that is proposed prior to the submission of a Fabrication AFE, Article 13 (*Development Operations*), or Article 14 (*Facilities and Gathering Systems*), the Operator may submit an AFE ("Long Lead AFE") to the other Parties for advance activities or the advance commitments for, or purchases of, equipment, materials, and/or other services (collectively "Long Lead Items") which are commercially reasonable and necessary to assist in the timely preparation and completion of an anticipated activity or operation.  A Long Lead AFE proposal shall include information on the Long Lead Items to be undertaken or purchased with the estimated costs, estimate of any cancellation fees, and a justification which shall include the description and estimated timing of the activity or operation that will utilize the Long Lead Items. Approval of a Long Lead AFE shall not constitute a Vote or Election on the subsequently proposed activity or operation described in the Long Lead AFE justification. Each Long Lead AFE shall require approval by the Parties, as follows:

(a)  Subject to Paragraph (b) below, each Long Lead AFE shall require approval by Vote pursuant to Article 8.2.2 (*Approval by Vote*).

(b)  After the cumulative estimated Cost of those Long Lead AFEs submitted for (i) the acquisition of Long Lead Items for a Development System; or (ii) preliminary activities related to the fabrication, transportation or installation of a Development System ("Long Lead Development System AFEs") exceed $200,000,000, excluding supplemental AFEs to previously approved Long Lead Development System AFEs, the approval of new Long Lead Development System AFEs requires an affirmative Vote by two (2) or more Parties with a combined Voting interest of sixty-one percent (61%) or more.

**6.2.4.1  Timely Operations and Non-Consent of Long Lead AFEs**:  At such time as a Long Lead AFE has been approved by Vote, the Operator shall proceed with the advance commitments or acquisition of the equipment, materials, and/or services authorized

Confidential            ANACOP00003087

thereunder for the benefit of the Participating Parties within one hundred twenty (120) days from the date upon which the last applicable Vote to participate may be made. If the Long Lead AFE activity has not been commenced within the one hundred twenty (120) day period, the proposal and approval shall be deemed withdrawn with the effect as if the proposal and Vote approval had never occurred. Activity on a Long Lead AFE shall be deemed to have commenced on the date when the first contract is let or the first purchase is made of equipment, materials, and/or services authorized by the Long Lead AFE.

Unless otherwise provided in this Agreement, each Non-Participating Party in a Long Lead AFE and/or its supplement(s), if applicable, shall retain the right to participate in any subsequently proposed activity or operation described in the Long Lead AFE justification, subject to the reimbursement to the Participating Parties in the Long Lead AFE that assumed a portion of the Non-Participating Interest Share of an amount equal to two hundred percent (200%) of the Non-Participating Interest Share of Costs incurred pursuant to the Long Lead AFE in the manner described hereafter. In the event a Non-Participating Party in a Long Lead AFE subsequently Elects, as prescribed in this Agreement, to participate in the activity and/or operation described in the Long Lead AFE justification, the Operator shall initially invoice said Long Lead AFE Non-Participating Party for one hundred percent (100%) of the Non-Participating Interest Share of the Costs incurred pursuant to the Long Lead AFE within thirty (30) days from the date of the last applicable day to Elect to participate in the activity or operation described in the Long Lead AFE justification. Thereafter, once the invoice is paid by said Party pursuant to Exhibit "C", the Operator will credit the accounts of the Long Lead AFE Participating Parties in the proportion that each Long Lead AFE Participating Party Elected to assume of the Non-Participating Interest Share in the Long Lead AFE within thirty (30) days of its receipt of the reimbursement. Within thirty (30) days of the commencement of the activity or operation the Long Lead AFE Non-Participating Party Elected to participate in, the Operator shall invoice the Long Lead AFE Non-Participating Party for the remaining one hundred percent (100%) of the Long Lead AFE Non-Participating Interest Share of Costs incurred (or firmly committed under executed contracts for such equipment, materials, and/or services) pursuant to the Long Lead AFE prior to its Election to participate in the associated activity or operation. Within thirty (30) days of its receipt of the reimbursement, the Operator will credit the accounts of the Long Lead AFE Participating Parties in the proportion that each Long Lead AFE Participating Party Elected to assume of the Long Lead AFE Non-Participating Interest Share in the Long Lead AFE.

If a Non-Participating Party in a Long Lead AFE also Elects not to participate in the subsequently proposed activity or operation described in the Long Lead AFE justification, the two hundred percent (200%) reimbursement referenced above shall not apply, but the Costs incurred pursuant to the Long Lead AFE, and any supplements thereto, shall be included in the calculations of the recoupment of the proposed activity or operation as set out in Article 16 (*Non-Consent Operations*).

**6.2.4.2 Subsequently Proposed Operations and/or Activities Utilizing Long Lead Equipment, Materials, and/or Services**: If a Party who participated in a Long Lead AFE becomes a Non-Participating Party (sometimes hereinafter referred to as a "Subsequent Non-Participating Party") in the approved activity or operation described in the Long Lead AFE justification, the Operator shall reimburse the Subsequent Non-Participating Party its Participating Interest Share of the Costs incurred pursuant to that Long Lead AFE, and any supplements thereto in the manner described hereafter. In the

Confidential

event a Party who participated in a Long Lead AFE becomes a Subsequent Non-Participating Party in the approved activity or operation that utilizes the equipment, materials and/or services obtained and/or procured via the Long Lead AFE, the Operator shall invoice the Participating Parties in the subsequent activity or operation for their share of the reimbursement in the proportion that each Participating Party in the subsequent activity or operation Elected to assume of the Subsequent Non-Participating Party's share in the subsequent activity or operation within thirty (30) days of the commencement of the approved activity or operation and credit the account of each Subsequent Non-Participating Party in said approved activity or operation within thirty (30) days of its receipt of the reimbursement.   However, the Subsequent Non-Participating Party's share of those Costs shall be included in the calculation of the applicable recoupment for the activity or operation as set out in Article 16 (*Non-Consent Operations*).

**6.2.4.3** **Participation in a Long Lead AFE and Non-Consent Fabrication AFE**: Notwithstanding anything to the contrary in this Agreement, any Party electing to participate in a Long Lead AFE for any activity or operation proposed under Article 12 (*Development Plan*) prior to the issuance of the Fabrication AFE for the Development System who subsequently elects not to participate in such Fabrication AFE, or any AFE for which such Non-Participating Party's non-participation Election would result in the forfeiture of its right, title and interest in and to the Unit Area as provided in Article 16.2 (*Acreage Forfeiture Provision*) or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), shall be entitled to and receive, although still subject to forfeiture of such Non-Participating Party's Working Interest in the Prospect Area as prescribed in Article 12.8 (*Assignment of Interest*), Article 16.2 (*Acreage Forfeiture Provision*), or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), as applicable, reimbursement for its Participating Interest share of the Costs incurred pursuant to the Long Lead AFE, and any supplements thereto.  Such reimbursement shall be the responsibility of the Participating Parties in the Fabrication AFE, or the AFE for which such Non-Participating Party's non-participation Election resulted in the forfeiture of its right, title and interest in and to the Unit Area as provided in Article 16.2 (*Acreage Forfeiture Provision*) or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), and shall be made by the Operator to such Non-Participating Party in the Fabrication AFE in the manner set forth in Article 6.2.4.2 (*Subsequently Proposed Operations and/or Activities Utilizing Long Lead Equipment, Materials, and/or Services*).

**6.2.4.4 Disposition of Items Associated with a Long Lead AFE**:  If the activity or operation described in the justification of an approved Long Lead AFE is not proposed under this Agreement, or if proposed and approved, such approved activity or operation is not timely commenced in accordance with this Agreement, any such Long Lead Item(s) purchased, procured and/or obtained, if applicable, under the approved Long Lead AFE shall be disposed of by the Operator pursuant to and in accordance with Article IV of Exhibit "C" (*Accounting Procedure*) and Article 18.3 (*Disposal of Surplus Materials*); provided, however, for purposes of this Article 6.2.4.4, a long lead operation shall be deemed to have been timely commenced in the event such operation is commenced within eighteen (18) months from the date of approval of such Long Lead

Confidential                                                                                           ANACOP00003089

AFE and provided, further, that if the long lead operation is delayed for reasons beyond the control of the Operator a reasonable extension shall be afforded the Operator in such instance.

17.     Article 8.6.3 (b) (*Other AFE Related Operations*) is hereby revised to read as follows:

      (b)AFE of $20,000,000 or more but less than $50,000,000; response will be made within forty-five (45) days after receipt of said proposal.

18.     Article 8.6.3 (c) (*Other AFE Related Operations*) is hereby revised to read as follows:

      (c)  AFE of $50,000,000 or more; response will be made within sixty (60) days after receipt of said proposal.

19.     Delete Article 12.8 Pre-Development AFEs in its entirety.

<u>Miscellaneous</u>

20.     This Amendment shall be binding upon the undersigned Parties and their respective heirs, successors and assigns.  Capitalized terms not otherwise defined herein shall have the same meaning as in the Agreement.

21.     This Amendment may be executed in any number of counterparts for filing with applicable governmental agencies and recording.  Each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one Amendment.

22.     Except as amended herein, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect as written therein.

23.     This Amendment shall be effective as of May 1, 2014, unless specifically provided otherwise herein.

WITNESSES:                                          Cobalt International Energy, L.P.

_____          By:     _____
                                                    Name:
_____          Title:
                                                    Date:   _____


WITNESSES:                                          Marathon Oil Company

_____          By:     _____
                                                    Name:
_____          Title:
                                                    Date:   _____

Confidential                                                                      ANACOP00003090

WITNESSES:                                    ConocoPhillips Company

_____              By:      _____
                                              Name:        Jim M. Higgins
_____              Title:       Attorney-in-Fact
                                              Date:     _____

WITNESSES:                                    Venari Offshore LLC

_____              By:      _____
                                              Name:
_____              Title:
                                              Date:     _____

WITNESSES:                                    Anadarko Petroleum Corporation

_____              By:      _____
                                              Name:        Jim W. Bryan
_____              Title:       Agent and Attorney-in-Fact
                                              Date:     _____

WITNESSES:                                    Anadarko US Offshore Corporation

_____              By:      _____
                                              Name:        Jim W. Bryan
_____              Title:       Agent and Attorney-in-Fact
                                              Date:     _____

Confidential
ANACOP00003091

## ACKNOWLEDGEMENTS

STATE OF TEXAS                )

                                       )

COUNTY OF HARRIS          )

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Cobalt International Energy, L.P., a Delaware limited partnership, on the day and year therein mentioned and as the act and deed of said limited partnership, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS                )

                                       )

COUNTY OF HARRIS          )

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Marathon Oil Company, an Ohio Corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS                )

                                       )

COUNTY OF HARRIS          )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim M. Higgins, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Attorney-in-Fact for ConocoPhillips Company, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

Confidential          ANACOP00003092

STATE OF TEXAS          )
                                    )
COUNTY OF HARRIS      )

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Venari Offshore LLC, a Delaware limited liability company, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS          )
                                    )
COUNTY OF MONTGOMERY )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim W. Bryan, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Agent and Attorney-in-Fact for Anadarko Petroleum Corporation, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS          )
                                    )
COUNTY OF MONTOGOMERY )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim W. Bryan, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Agent and Attorney-in-Fact for Anadarko US Offshore Corporation, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

Page [ PAGE ] of [ NUMPAGES ]

 ANACOP00003093

**Attachment 1**

**Attached to and made a part of that certain Ratification, Joinder and Third Amendment
of Operating Agreement, dated effective May 1, 2014, by and between
Cobalt International Energy, L.P., Marathon Oil Company, ConocoPhillips Company, Venari
Resources LLC, Anadarko Petroleum Corporation, and Anadarko US Offshore Corporation**

**Amended Exhibit "A"**

Attached to and made a part of that certain Unit Operating Agreement
dated effective May 1, 2014 by and between
ConocoPhillips Company and Anadarko E&P Company LP

## DESCRIPTION OF UNIT AREA, LEASES, WORKING INTEREST OF THE PARTIES, AND REPRESENTATIVES

**I.      DESCRIPTION OF PROPSPECT AREAS AND LEASES:**

| OCS-G No. | Area | Block | Expiration Date |
|---|---|---|---|
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2014 |
| 28148 | Walker Ridge | 53 (N/2) | April 30, 2016 |

**II.      WORKING INTEREST OF THE PARTIES:**

| | |
|---|---|
| ConocoPhillips Company | 30.00%* |
| Anadarko US Offshore Corporation | 30.00%* |
| Cobalt International Energy, L.P. | 20.00%* |
| Marathon Oil Company | 10.00%* |
| Venari Offshore LLC | 10.00%* |

**III.      EXISITNG OVERRIDING ROYALTY INTERESTS:**

(a)      Lease OCS-G 31938 Walker Ridge Block 51 & Lease OCS-G 25232 Walker Ridge Block 52:

| | **Gross** | **Net** | |
|---|---|---|---|
| *Exxon Mobil Corporation | 1.50% | ConocoPhillips | 0.45% |
| | | AUOC | 0.45% |
| | | Cobalt | 0.30% |
| | | Marathon | 0.15% |
| | | Venari | 0.15% |
| *Nexen Petroleum Offshore U.S.A. Inc. | 0.50% | ConocoPhillips | 0.15% |
| | | AUOC | 0.15% |
| | | Cobalt | 0.10% |

Page [ PAGE ] of [ NUMPAGES ]

Confidential

|  |  |
|---|---|
| Marathon | 0.05% |
| Venari | 0.05% |

For reference, please see (i) that certain Letter Agreement dated March 26, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Exxon Mobil Corporation; (ii) that certain Letter Agreement dated March 31, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Nexen Petroleum Offshore U.S.A. Inc.; (iii) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Exxon Mobil Corporation, as Assignee; (iv) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between ConocoPhillips Company, as Assignor, and Exxon Mobil Corporation, as Assignee; (v) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008, by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee; and (vi) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between ConocoPhillips Company, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee.

(b)    Lease OCS-G 28148 Walker Ridge Block 53 (North Half)

|  | Gross | Net | |
|---|---|---|---|
| Hunt Oil Company | 3.0% | ConocoPhillips | 0.90% |
|  |  | AUOC | 0.90% |
|  |  | Cobalt | 0.60% |
|  |  | Marathon | 0.30% |
|  |  | Venari | 0.30% |

For reference, please see that certain Assignment of Overriding Royalty Interest by and between Anadarko Offshore US Corporation, as Assignor, and Hunt Oil Company, as Assignee, dated effective February 1, 2013.


IV.    **OPERATOR:**  Anadarko Petroleum Corporation


V.    **ADDRESSES, CONTACT INFORMATION AND PARTY REPRESENTATIVES:**

|  | **ConocoPhillips Company** | **Anadarko Petroleum Corporation** |
|---|---|---|
| Mail: | P.O. Box 2197<br>Houston, TX  77252 | P.O. Box 1330<br>Houston, TX  77251-1330 |
| Office: | 600 North Dairy Ashford<br>Dubai, 3018<br>Houston, TX  77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX  77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone: | (281) 293-3139 | (832) 636-8831 |
| Facsimile: | (281) 293-6171 | (832) 636-8059 |

Confidential

| **Cobalt International Energy, L.P.** | **Marathon Oil Company** |
|---|---|
| Mail: 920 Memorial City Way<br>Suite 100<br>Houston, TX  77024 | P.O. Box 3128<br>Houston, TX  77253 |
| Office: 920 Memorial City Way<br>Suite 100<br>Houston, TX  77024 | 5555 San Felipe Rd.<br>Houston, TX  77056 |
| Attn:  Lynne Hackedorn – Vice President<br>Government/Public Affairs & Land | Brad L. Dowdell – Land Manager |
| Telephone:      (713) 579-9115 | (713) 296-3215 |
| Facsimile:      (731) 579-9196 | (713) 296-4209 |

|  | **Anadarko US Offshore Corporation** | **Venari Offshore LLC** |
|---|---|---|
| Mail:  | P.O. Box 1330<br>Houston, TX  77251-1330 | 5847 San Felipe Street, Suite 4675<br>Houston, TX 77057 |
| Office: | 1201 Lake Robbins Drive<br>The Woodlands, TX  77380 |  |
| Attn:  | Jim W. Bryan – Director, Land GOM | Scott Cornwell |
| Telephone: | (832) 636-8831 | (713) 266-5474 |
| Facsimile: | (832) 636-8059 | (713) 266-2330 |

**END OF EXHIBIT "A"**

Confidential

ANACOP00003096

# Exhibit 32

**To:** Trautman, Tim[Tim.Trautman@anadarko.com]; Ramsey, Jake[Jake.Ramsey@anadarko.com]; Strickling, Robert[Robert.Strickling@anadarko.com]; Kunning, Jim [jim.kunning@anadarko.com]; Kendall, Beth[Beth.Kendall@anadarko.com]
**Cc:** Leyendecker, Ernie[Ernie.Leyendecker@anadarko.com]; Bryan, Jim[Jim.Bryan@anadarko.com]; Blakeley, David[David.Blakeley@anadarko.com]; McGrievy, Pat [Pat.McGrievy@anadarko.com]; Frye, Lea[Lea.Frye@anadarko.com]; Butaud, Todd[Todd.Butaud@anadarko.com]; Rodriguez, Arnold[Arnold.Rodriguez@anadarko.com]; Browning, Brad[Brad.Browning@anadarko.com]; Pursell, Deborah[Deborah.Pursell@anadarko.com]; Capstin, Kim[Kim.Capstin@anadarko.com]; Sease, Diane[Diane.Sease@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Tue 4/8/2014 7:34:59 PM Coordinated Universal Time
**Subject:** FW: Shenandoah - WR 52 #2 AFE - Anadarklo AFE No. 2087315
**Attachment:** AFE No. 2087315 WR 52 No. 2.pdf

FYI

-----Original Message-----
From: Pachman, Jeff
Sent: Tuesday, April 08, 2014 2:24 PM
To: Jim Higgins - Conoco ; 'Flinner, Teri L'; ben.davis@cobaltintl.com; Dowdell, Brad (MRO); Hamrick Dan (jdhamrick@marathonoil.com); Scott Cornwell; jross@venari.net
Subject: Shenandoah - WR 52 #2 AFE - Anadarklo AFE No. 2087315

Attached is Anadarko AFE No. 2087315 in the gross (100%) amount of $225,165,000, whereby Anadarko proposes to drill, log, evaluate and abandon the WR 52 #2 well. Should you have any questions or need any additional information, please let me know.

A fax is being forwarded now and an original will be delivered to each company tomorrow.

**Exhibit
0186**

MAIN (832) 636-1000
1201 LAKE ROBBINS DR. • THE WOODLANDS, TEXAS 77380
P.O. BOX 1330 • HOUSTON, TX 77251-1330

ANADARKO PETROLEUM CORPORATION

April 8, 2014

**Anadarko**

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:  Jim Higgins/Teri Flinner
Fax:   281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:  Ben Davis
Fax:   713-579-9196

Marathon Oil Company
5555 San Felipe Road
Houston, TX 77056
Attn:  Brad Dowdell/Dan Hamrick
Fax:   713-296-4209

Venari Offshore LLC
1080 Eldridge Parkway, Suite 1100
Houston, TX 77077
Attn:  Scott Cornwell/Joe Ross
Fax:   713-266-2330

RE:  Shenandoah Prospect
     Anadarko AFE No. 2087315
     Lease OCS-G 25232 Walker Ridge Block 52 #2 Well
     Down-dip Appraisal Well – Lease Maintenance Operation

Gentlemen:

Enclosed herewith for your review and approval is Anadarko AFE No. 2087315 in the gross (100%) amount of $225,165,000, wherein Anadarko proposes drilling, logging, evaluating and abandoning the Walker Ridge Block 52 #2 Well (WR 52 #2).  The WR 52 #2 is a down-dip Appraisal Well (estimated to be 800'-900' structurally down-dip) to the full-to-base Walker Ridge Block 51 #2 Well (WR 51 #2) that was drilled and abandoned approximately 12,800' to the west of the proposed surface location of the WR 52 #2. The WR 52 #2 is proposed as a straight hole from an approximate surface location of 5,133' FNL & 6,896' FEL of Block 52 and to be drilled to a total depth of 33,000' MD/TVD with the primary geological objective targets being the stratigraphic equivalent of those certain oil-filled Upper (Upper Wilcox 1, 2 and 3) and Lower Wilcox (Lower Wilcox A, B, C, D and E) Sands encountered in the WR 51 #2.

The primary purpose(s) of the WR 52 #2 is to (a) test the lateral continuity of the pay sands encountered in the WR 51 #2; (b) attempt to find/encounter the oil/water contact(s); and (c) attempt to establish pressure connectivity (through MDT's) to the pay sands seen in the WR 51 #2.

The Objective Depth criteria for the WR 52 #2 is the shallower of:

(i)   The stratigraphic equivalent of the Top of the Cretaceous (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of 31,315' MD/TVD in the WR 51 #2); or

(ii)  A total MD/TVD of 33,000'.

CONFIDENTIAL

The logging and evaluation program is incorporated in the estimated Cost and is detailed on the attached wellbore schematic. Please note that the "dry hole case" equates to encountering wet sands and the "success case" equates to encountering oil via LWD, mud logs or other tools used while drilling through the objective section.

The proposed well will be drilled with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a new-build, state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Diamond Ocean Blackhawk is $550,000 and is anticipated to be delivered to Anadarko for drilling the WR 52 #2 on or about mid-to-late May 2014.

The attached AFE number (AFE No. 2087315) was originally submitted by Anadarko (and approved by partners in July 2013) as a Pre-Drill AFE in the gross (100%) amount of $800,000 to cover estimated pre-drill costs associated with the WR 52 #2. Administratively, this Pre-Drill AFE has been converted to a Drill AFE.

Under the Shenandoah OA/UOA, as amended, Appraisal Operations have contractually concluded (Article 11.5). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the WR 52 #2 is deemed an Appraisal Operation. Moreover, since the WR 52 #2 is an activity/operation necessary to maintain Lease OCS-G 25232 Walker Ridge Block 52, the WR 52 #2 is not only an Appraisal Operation, but it is also a lease maintenance operation, subject, in particular, to Article 16.4.2 of the OA, and for which a Vote does not apply.

In conjunction with the formation of the Walker Ridge Block 51 Unit, the WR 52 #2 will be a Unit well/operation, and pursuant to the "Ratification, Joinder and Third Amendment of Operating Agreement", executed by the Shenandoah partners effective April 1, 2014, the WR 52 #2 will be governed by the UOA accordingly.

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic detailing, in particular, the well design and projected casing/liner settings; (ii) an estimated pore pressure (to depth) plot; and (iii) an estimated days versus depth plot (in dollars). As a reminder from the February 18, 2014 Partner Meeting, the current well design will not afford the drilling of a geologic sidetrack as a subsequent operation.

Pursuant to Article 8.6.1, each Party has thirty (30) days from receipt of this proposal to make its participation election as to same. Should you have any questions or need anything further, please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622          AFE No.: 2087315          Type: DE – DRILLING – EXPLORATORY

Well #/Name: 1H302300/WALKER RIDGE 52 002          Field: 0990 WILDCAT (EXPL)

Country: USA          State/Province: NORTHERN GUL          County: WALKER RIDGE

Prospect:          Surface Loc:    60812 52

Target Zone:    WILCOX 9300          Bottom Hole Loc:  60812 52

Project Depth:

Project Name:  WALKER RIDGE 52 002

Project Description:  DRILL AND EVALUATE WALKER RIDGE 52 002, SHENANDOAH PROSPECT

| Working Interest Owners | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP. | | 0.30000000 | $67,549,500 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $67,549,500 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $45,033,000 |
| MARATHON OIL CO | | 0.10000000 | $22,516,500 |
| VENARI OFFSHORE LLC | | 0.10000000 | $22,516,500 |
| TOTAL | | | $225,165,000 |

| | PDE | DRL.DHC | TOTAL |
|---|---|---|---|
| ORIGINAL | $800,000 | $224,365,000 | $225,165,000 |
| TOTAL | $800,000 | $224,365,000 | $225,165,000 |

**Please mark your election in the box below**

☐  Election to Participate

☐  Election to Non-Consent

APPROVED BY:_____          PRINTED NAME:_____

COMPANY NAME:_____          DATE:_____/_____/_____

CONFIDENTIAL



## AUTHORIZATION FOR EXPENDITURE

Company Code:   622                    AFE No: 2087315          AFE Type: DE - DRILLING - EXPLORATORY
Well #/Name:    1H302300 / WALKER RIDGE 52 002

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 80012300 | Drilling & Wellwork Consulting Services | $200,000 | $0 | $200,000 | $0 | $200,000 |
| 80017060 | Environmental Consulting Services | $50,000 | $0 | $50,000 | $0 | $50,000 |
| 80011050 | Legal Services & Fees | $50,000 | $0 | $50,000 | $0 | $50,000 |
| 80010160 | Surveying | $500,000 | $0 | $500,000 | $0 | $500,000 |
|  | Total PDE | $800,000 | $0 | $800,000 | $0 | $800,000 |
| 80012410 | Casing > 30 in (>76.17 cm) | $383,675 | $0 | $0 | $383,675 | $383,675 |
| 80012370 | Casing 12.0-15.99 in. (30.46-40.61 cm) | $3,417,119 | $0 | $0 | $3,417,119 | $3,417,119 |
| 80012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $2,033,493 | $0 | $0 | $2,033,493 | $2,033,493 |
| 80012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $2,306,872 | $0 | $0 | $2,306,872 | $2,306,872 |
| 80012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $550,377 | $0 | $0 | $550,377 | $550,377 |
| 80012350 | Casing 7.0-8.99 in. (17.76-22.83 cm) | $374,075 | $0 | $0 | $374,075 | $374,075 |
| 80012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $1,570,101 | $0 | $0 | $1,570,101 | $1,570,101 |
| 80015240 | Casinghead | $800,000 | $0 | $0 | $800,000 | $800,000 |
| 80012010 | Contract Drilling | $103,050,000 | $0 | $103,050,000 | $0 | $103,050,000 |
| 80012020 | Directional Drilling Services | $4,581,500 | $0 | $4,581,500 | $0 | $4,581,500 |
| 80012060 | Downhole Rental Equipment | $7,386,500 | $0 | $7,386,500 | $0 | $7,386,500 |
| 80012040 | Drill Bits | $1,900,000 | $0 | $1,900,000 | $0 | $1,900,000 |
| 80012290 | Drilling & Wellwork Contract On Site Sup | $1,402,500 | $0 | $1,402,500 | $0 | $1,402,500 |
| 80012050 | Drilling & Wellwork Fuel | $8,415,000 | $0 | $8,415,000 | $0 | $8,415,000 |
| 80012330 | Drilling & Wellwork Misc Services | $4,675,000 | $0 | $4,675,000 | $0 | $4,675,000 |
| 80012080 | Drilling & Wellwork Mud & Chemicals | $9,350,000 | $0 | $9,350,000 | $0 | $9,350,000 |
| 80012070 | Drilling & Wellwork Surface Equip Rental | $4,675,000 | $0 | $4,675,000 | $0 | $4,675,000 |
| 80012320 | Drilling & Wellwork/G&G Meals & Entertai | $1,000 | $0 | $1,000 | $0 | $1,000 |
| 80012310 | Drilling & Wellwork/G&G Travel & Lodging | $35,000 | $0 | $35,000 | $0 | $35,000 |
| 80012160 | Fishing Tools and Services | $100,000 | $0 | $100,000 | $0 | $100,000 |
| 80012440 | Liner Hanger | $690,000 | $0 | $0 | $690,000 | $690,000 |
| 80012170 | Misc Drilling and Wellwork Consumables | $500,000 | $0 | $500,000 | $0 | $500,000 |
| 80012120 | Mud Logging | $5,610,000 | $0 | $5,610,000 | $0 | $5,610,000 |
| 80012110 | Open Hole Logging | $14,301,000 | $0 | $14,301,000 | $0 | $14,301,000 |
| 80031050 | Overhead Billed - System Calculated | $16,137,288 | $0 | $16,137,288 | $0 | $16,137,288 |
| 80012090 | Primary Cementing | $3,820,000 | $0 | $3,820,000 | $0 | $3,820,000 |
| 80012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 80014000 | Road & Location | $150,000 | $0 | $150,000 | $0 | $150,000 |
| 80025010 | Shore Base/Staging Area Expenses | $280,500 | $0 | $280,500 | $0 | $280,500 |
| 80025070 | Telephone & Communications | $374,000 | $0 | $374,000 | $0 | $374,000 |
| 80024000 | Transportation/Freight Air | $1,870,000 | $0 | $1,870,000 | $0 | $1,870,000 |
| 80024020 | Transportation/Freight Ground | $1,870,000 | $0 | $1,870,000 | $0 | $1,870,000 |
| 80024010 | Transportation/Freight Marine | $21,505,000 | $0 | $21,505,000 | $0 | $21,505,000 |
| $224,365,000 | Total DRL.DHC | $224,365,000 | $0 | $212,239,288 | $12,125,712 | $224,365,000 |
| TOTAL |  | $225,165,000 | $0 | $213,039,288 | $12,125,712 | $225,165,000 |

APC-00005096



# Shenandoah III Prospect

| Well: | Walker Ridge Block 52 #2 | Rig: | Diamond Ocean BlackHawk |
| | OCS-G 25232 | RKB to MSL: | 81' |
| | AFE TBD | WD: | 5,874' |
| Mudline Location: | Walker Ridge Block 52 #2 (SL:K) | RKB to ML: | 5955' |
| | Latitude: 26° 54' 42.5" N | | |
| | Longitude: -91° 32' 28.5" W | | |
| | 5,133' FNL & 6,895' FEL of Block 52 | | |
| BHL Location: | 5,133' FNL & 6,895' FEL of Block 52 | | |
| DIRECTIONAL: | Straight Hole | | |
| OBJECTIVES: | Wilcox | | |





## Confidential

Walker Ridge 52 #2
Drilling Plan Summary
SL: WR 52 "K"  [5,874' WD]





Anadarko Petroleum Corporation
Shenandoah
Walker Ridge 52 #2 "K"
Ocean BlackHawk
Water Depth: 5,874'
Spud Date: 5/18/14
Rig Rate: $550,000/day
Rig Release Date:
AFE $
Dry Hole Cost AFE - $224,368,000
36" @ 6,280' MD/TVD
28" @ 7,400' MD/TVD
22" @ 8,750' MD/TVD
18" @ 12,900' MD/TVD
16" @ 17,800' MD/TVD
14"&TB @ 26,000' MD/TVD
11-7/8" @ 28,000' MD/TVD
9-3/8" &TB @ 30,100' MD/TVD
SALT
Wilcox - 30,244' MD/TVD
AFE (P50) $224.36MM
P10 $152.64MM
P90 $364.60MM
TD - 33,000' MD/TVD
MD (ft)
Days
$

# Shenandoah III Prospect

Anadarko

Vendors

| | |
| --- | --- |
| LWD/MWD | Schlumberger |
| Pore Pressure Monitoring | Geoservices/Pinnacle |
| Real Time Paleo | Paleo Data |
| Wellsite Paleo | Paleo Data |
| Wellsite Geologist | WellLink |

| | |
| --- | --- |
| LWD/MWD | |
| Mud Logging | |
| Samples - Wet | |
| Samples - Washed and Dried | |
| Isotubes / Isojars | |
| Pore Pressure Monitoring | |
| Advanced Gas Detection and Analysis | |
| Real Time Paleo | |
| Wellsite Geologist | |

# Exhibit 33



# Shenandoah Appraisal Program Partnership Meeting

| | |
|---|---|
| *Tim Trautman* | *Exploration Manager* |
| *Robert Strickling* | *Exploration Reservoir Manager* |
| *Jim Kunning* | *Drilling Engineer for WR52 #2* |
| *Chris Krszjzaniek* | *Drilling Engineer for Shen 4* |
| *Beth Kendall* | *Geophysicist* |
| *Chris Camden* | *Reservoir Engineer* |
| *Jeff Pachman* | *Landman* |
| *Joe Termina* | *Petrophysicist* |
| *Bridget O'Farrell Villareal* | *Regulatory* |
| *Jake Ramsey* | *Geologist* |

December 10th 2014

**Exhibit 71**

# <u>Shenandoah Partner Meeting Agenda – December 10th 2014</u>



- **Introductions**
- **Project History / Revisit Shenandoah 3 Objectives**
- **Update on By-Pass Coring Operation**
- **Stratigraphic Analysis / Reservoir Correlation**
- **Petrophysical Comments**
- **Pressure Gradients - Projected O/W Contacts**
- **Updated Wilcox Structure Maps**
- **Shenandoah 4: Exploration Appraisal Objectives**
- **Shenandoah 4: Well Design**
- **Regulatory Update**
- **Land Comments**
- **Partner Discussion (Cobalt, Conoco, Marathon, Venari)**



# Project History & Revisit Shenandoah 3 Objectives
## - Tim Trautman -

# Shenandoah Exploration – Time Line



- Drilled Shenandoah 1 (234 days): June 3, 2008 – January 22, 2009

- **300' Net Oil Pay Announced - Shenandoah 1: February 4, 2009**

- Proprietary Reprocessing Project: July 2009 - September 2010

- Drilling Moratorium & Regulatory Delays: May 2010 through 2011

- Drilled Shenandoah 2 (213 days): July 1, 2012 - January 29, 2013

- **1,000' Net Oil Pay Announced - Shenandoah 2: March 19, 2013**

- Exploration Unit: October 2013 (Requested) & April 2014 (Approved)

- Western-Geco "Coil" Acquisition/Processing: 2013 - 2014

- Drilled Shenandoah 3 (163 days): May 28, 2014 - November 7, 2014

- By-Pass Coring Operation (480' Planned): December 2014

- Planned Spud - Shenandoah 4 (Diamond Ocean Blackhawk): April 2015

# Shenandoah 3 – Location Criteria (Pre-Spud)



- **Drill on Well-Imaged Seismic Data**
  - **Upper and Lower Wilcox Objectives**

- **Avoid Potential Drilling Hazards**

- **Locate > 1 Mile from Shenandoah 2**
  - **Establish Lateral Continuity**
    *Accomplished - Highly Correlative Reservoirs Encountered between Shenandoah 2 and 3*

- **Drill at Least 500' Structurally Down-Dip of Shenandoah 2**
  *Ended up 1,100' down-dip at Upper WX and 1,450' Down-Dip at Lower WX*
  *Pre-drill map prediction was to be approximately 700' - 800' Down-Dip*
  - **Increase Column Height** *Accomplished based on pressure gradients*
  - **Define Water Contact(s)** *Accomplished based on pressure gradients*

- **Locate the Well Within Closure Limits**
  - **Aggressive Test Close to the Spill Point** *Accomplished*
  - **Still within Southerly Dip** *Accomplished*



# By-Pass Coring Operation Update
**- Jim Kunning -**





# WR 52 #2 Stratigraphic Review & Correlations
**- Jake Ramsey -**

# Shenandoah Subsalt 3-Way Closure Base Map





- Shen #1 (WR52 #1 Discovery) to Shen #2 (WR51 #2 Appraisal) = ~6550 ft laterally
- Shen #1 (WR52 #1 Discovery) to Shen #3 (WR52 #2 Appraisal) = ~8000 ft laterally
- Shen #2 (WR51 #2 Appraisal) to Shen #3 (WR52 #2 Appraisal) = ~12,400' laterally
- Structural difference of Shen #2 & Shen #3 = 1370 ft to 1520 ft

**Stratigraphic Cross Section – Shenandoah Wells**
Datum = Top Lower Wilcox ~57.0 mya ; Scale:  1" = 100 ft TVD



**Stratigraphic Cross Section – Shenandoah Wells**
Datum = Top Lower Wilcox ~57.0 mya ; Scale:  1" = 100 ft TST



# WR 52 #2 Petrophysical Analysis
**- Joe Termina -**

# Methodology



- **The petrophysical interpretation was performed using Senergy's *Interactive Petrophysics*, and the following analysis techniques were applied:**

  - Shale volume was determined from the minimum of the Spectral GR data and the density-neutron and sonic-density crossplot techniques.

  - Porosity was computed from the sonic as well as the density-neutron crossplot, and a comparison made with the NMR porosity, where hole conditions allowed.

  - Water Saturations ($S_w$) were calculated using the *Poupon / Leveaux* equation

  - Net Reservoir and Pay, a Net Reservoir thickness was determined using a porosity cut-off of 13% and a $V_{cl}$ cut-off of 50%. Net Pay thickness was computed using an additional $S_w$ cut-off of 50%.

# Parameters



- **Rw**
  - In this analysis we have used an Rw = 0.055 ohm-m @ 60 degF (193,434 ppm NaCl) from regional data.

- **Archie parameters**
  - a=1, m=2, n=2 was used in analysis

# Fractures identification marl LWD





# Fractures identification marl wireline



**ZAIT fracture**          **PE fracture**          **NGI fracture**

# Fractures identification Wilcox LWD





# Fractures identification Wilcox wireline



**ZAIT fracture**          **PE fracture**          **NGI fracture**

# Upper Wilcox Sand 2-3

**Upper Wilcox 2**
**Net Res = 168.5 ft MD**
**Avg Phi = 17.7%**
**Avg Sw = 49.5%**
**Avg Vsh = 24.9%**

**Upper Wilcox 3**
**Net Res = 273.5ft MD**
**Avg Phi = 18.1%**
**Avg Sw = 89.5%**
**Avg Vsh = 20.3%**



# Lower Wilcox Sand A-B

**Lower Wilcox A**
**Net Res =  209.25ft MD**
**Avg Phi = 18.5%**
**Avg Sw = 87.6%**
**Avg Vsh = 18.6%**

**Lower Wilcox B**
**Net Res =  117ft MD**
**Avg Phi = 18.5%**
**Avg Sw = 92.7%**
**Avg Vsh = 24.3%**

# Lower Wilcox Sand C-D

**Lower Wilcox C**
**Net Res = 47ft MD**
**Avg Phi = 17.8%**
**Avg Sw = 84.0%**
**Avg Vsh = 19.6%**

**Lower Wilcox D**
**Net Res = 157.5ft MD**
**Avg Phi = 18.7%**
**Avg Sw = 90.5%**
**Avg Vsh = 20.9%**

# Lower Wilcox Sand E

**Lower Wilcox E**
**Net Res = 175.5ft MD**
**Avg Phi = 17.2%**
**Avg Sw = 78.8%**
**Avg Vsh = 23.5%**



# **Reservoir Summary**



Petrophysical Zone Averages Report

Well :  WR52-Shenandoah 3-002-ST00BP00
Date :  12/03/2014 15:56:44

Reservoir Summary

| Zn # | Zone Name | Top TVD | Bottom TVD | Gross TVD | Net TVD | N/G TVD | Av Phi | Av Sw | Av Vcl Ari | Av KLOA Ari | Av KLOG Geo | Phi*H TVD | PhiSo*H TVD |
|------|-----------|---------|-----------|-----------|---------|---------|--------|-------|-----------|-------------|-------------|-----------|-------------|
| 1 | Upper Wilcox | 30169.00 | 31000.00 | 831.00 | $$8.50 | 0.010 | | | | | | | |
| | | 30068.96 | 30812.81 | 743.85 | $$7.60 | 0.010 | 0.148 | 0.723 | 0.413 | 0.652 | 0.036 | 1.12 | 0.31 |
| 2 | Upper Wilcox 2 | 31000.00 | 31287.50 | 287.50 | 168.50 | 0.586 | | | | | | | |
| | | 30812.81 | 31071.11 | 258.30 | 151.39 | 0.586 | 0.177 | 0.459 | 0.249 | 3.837 | 1.931 | 26.84 | 14.53 |
| 3 | Upper Wilcox 3 | 31287.50 | 31637.50 | 350.00 | 273.50 | 0.781 | | | | | | | |
| | | 31071.11 | 31384.92 | 313.81 | 245.22 | 0.781 | 0.186 | 0.895 | 0.203 | 9.332 | 4.985 | 45.68 | 4.81 |
| 4 | Lower Wilcox | 31637.50 | 31673.00 | 35.50 | 0.25 | 0.007 | | | | | | | |
| | | 31384.92 | 31416.75 | 31.83 | 0.22 | 0.007 | 0.133 | 0.743 | 0.388 | 1.233 | 1.233 | 0.03 | 0.01 |
| 5 | Lower Wilcox A | 31673.00 | 31982.50 | 309.50 | 209.25 | 0.676 | | | | | | | |
| | | 31416.75 | 31694.42 | 277.68 | 187.73 | 0.676 | 0.185 | 0.876 | 0.186 | 10.543 | 2.852 | 34.82 | 4.32 |
| 6 | Lower Wilcox B | 31982.50 | 32352.50 | 370.00 | 117.00 | 0.316 | | | | | | | |
| | | 31694.42 | 32026.01 | 331.59 | 104.91 | 0.316 | 0.185 | 0.927 | 0.243 | 16.978 | 5.936 | 19.41 | 1.41 |
| 7 | Lower Wilcox C | 32352.50 | 32540.00 | 187.50 | 47.00 | 0.251 | | | | | | | |
| | | 32026.01 | 32193.87 | 167.86 | 42.09 | 0.251 | 0.178 | 0.840 | 0.196 | 8.736 | 2.065 | 7.47 | 1.19 |
| 8 | Lower Wilcox D | 32540.00 | 32885.50 | 345.50 | 157.50 | 0.456 | | | | | | | |
| | | 32193.87 | 32503.11 | 309.25 | 140.95 | 0.456 | 0.187 | 0.905 | 0.209 | 16.496 | 8.047 | 26.36 | 2.51 |
| 9 | Lower Wilcox E | 32885.50 | 33128.50 | 243.00 | 175.50 | 0.722 | | | | | | | |
| | | 32503.11 | 32720.74 | 217.63 | 157.18 | 0.722 | 0.172 | 0.788 | 0.235 | 8.358 | 6.963 | 27.07 | 5.74 |
| | All Zones | 30169.00 | 33128.50 | 2959.50 | $$1157.00 | 0.391 | | | | | | | |
| | | 30068.96 | 32720.74 | 2651.75 | 1037.29 | 0.391 | 0.182 | 0.815 | 0.218 | 10.328 | 4.833 | 188.81 | 34.84 |

$$' indicates missing or null data in the zone.



# Walker Ridge 52 002 - OCS G25232 Shenandoah Rotary Sidewall Cores

- **Inventory – <span style="color:red">In progress</span>**

- **Photography (WL – UV) – Core quality – <span style="color:red">In progress</span>**

- **CT Scanning – Core quality – <span style="color:red">In progress</span>**

- **TS/XRD/SEM - <span style="color:red">Pending</span>**

- **LPSA - <span style="color:red">Pending</span>**

- **Routine Analysis (Porosity/Permeability/Saturations) - <span style="color:red">Pending</span>**

- **Additional Analysis (MICP/EP) – <span style="color:red">Pending on whole core recovery.</span>**



# Shenandoah Porosity & Permeability Trends

**- Jake Ramsey -**

# Upper + Lower Wilcox Porosity vs Depth BML







# U + L Wilcox Permeability vs Depth BML







# WR 52 #2 Pressure Gradient Analysis & Projected Oil-Water Contacts

**- Chris Camden -**

# MDT Operations Summary – Nov 12-14, 2014



## Pressure Program – 84 stations attempted

*UW 2 & 3: 37 pre-tests attempted with 30 valid pressures*

*LW A: 11 pre-tests attempted with 9 valid pressures*

*LW B: 8 Pre-tests attempted with 5 valid pressures*

*LW C: 6 pre-tests attempted with 6 valid pressures*

*LW D: 9 pre-tests attempted with 7 valid pressures*

*LW E: 13 pre-tests attempted with 12 valid pressures*

## Sampling Program – 6 stations sampled

*UW 2 (30,109.28' MD): IFA indicated water. Sample bottles failed to open*

*UW 2 (31,019.30' MD): IFA indicated water. Filled 2 SPMC's and 1 MPSR*

*UW 2 (31,090.10' MD): IFA indicated water. Filled 1 SPMC and 1 MPSR*

*UW 3 (31,468'.79 MD): IFA indicated water. Filled 2 SPMC's*

*LW A (31,793.61' MD): IFA indicated water. Filled 2 MPSR's*

*LW B (32,060.79' MD): IFA indicated water. Filled 2 SPMC's*

*LW D (32,637.07' MD): IFA indicated water. Filled 1 SPMC and 1 MPSR*

*LW E (32,903.59' MD): IFA indicated water. Telemetry failed while attempting to open bottle. No samples.*

# MDT Pressures / Contacts Review



# MDT Pressures / Contacts Review



# Shenandoah Subsalt 3-Way Closure Base Map





- Shen #1 (WR52 #1 Discovery) to Shen #2 (WR51 #2 Appraisal) = ~6550 ft laterally
- Shen #1 (WR52 #1 Discovery) to Shen #3 (WR52 #2 Appraisal) = ~8000 ft laterally
- Shen #2 (WR51 #2 Appraisal) to Shen #3 (WR52 #2 Appraisal) = ~12,400' laterally
- Structural difference of Shen #2 & Shen #3 = 1370 ft to 1520 ft



# Lower Wilcox A (CI 250')





# Seismic Line along Cross Section Showing Expansion



# Seismic Line along Cross Section Showing Expansion



# Shenandoah WR 52#1BP2 to WR 52#2– Model 2





WR 52 #1 Discovery

WR 52 #2 Appraisal 2

Salt used in the depth migration

Salt stock
predicted
from the
Full Tensor
Gravity
inversion

# Shenandoah WR 52#1BP2 to WR 52#2– Model 2





WR 52 #1 Discovery

WR 52 #2 Appraisal 2

**Salt used in the depth migration**

Oligocene

Eocene

Upper Wilcox

Upper Wilcox Sand 2

A  B

Lower Wilcox

C

D  E

Cretaceous

**Salt stock predicted from the Full Tensor Gravity inversion**

# Shenandoah WR 51#2 to WR 52#2– Model 2



# Shenandoah WR 51#2 to WR 52#2– Model 2





# Full Tensor Gravity (FTG) Inversion for Salt Stocks

## Flat Irons Geophysics

# Upper Wilcox 2 (CI 250')





# North/South line west of WR 51#3 (Shen 4)



# North/South line west of WR 51#3 (Shen 4)



# North/South line through WR 51#3 (Shen 4)





# North/South line through WR 51#3 (Shen 4)





# North/South line through WR 51#2 (Shen 2)



South                                                                    North

Salt used in the depth migration

68

47

# North/South line through WR 51#2 (Shen 2)



# North/South line through WR 52#1BP2 (Shen 1)



# North/South line through WR 52#1BP2 (Shen 1)





# Post WR 52 #2 Updated Wilcox Structure Maps

**- Beth Kendall -**

# Upper Wilcox 2 (CI 250')





**Shen 4 is 3789' northwest of Shen 2 and 879' updip**

**Shen 3 is 12400' east of Shen 2 and 1518' downdip**

# Upper Wilcox 3 (CI 250')





**Shen 4 is 3930' northwest of Shen 2 and 886' updip**

**Shen 3 is 12400' east of Shen 2 and 1508' downdip**

# Lower Wilcox A (CI 250')





**Shen 4 is 4129' northwest of Shen 2
and 1062' updip**

**Shen 3 is 12400' east of Shen 2
and 1395' downdip**

# Lower Wilcox B (CI 250')





**Shen 4 is 4188' northwest of Shen 2 and 991' updip**

**Shen 3 is 12400' east of Shen 2 and 1414' downdip**

# Lower Wilcox C (CI 250')





**Shen 4 is 4310' northwest of Shen 2 and 1065' updip**

**Shen 3 is 12400' east of Shen 2 and 1426' downdip**

# Lower Wilcox D (CI 250')





**Shen 4 is 4500' northwest of Shen 2 and 983' updip**

**Shen 3 is 12400' east of Shen 2 and 1370' downdip**

# Lower Wilcox E (CI 250')





**Shen 4 is 4580' northwest of Shen 2 and 869' updip**

**Shen 3 is 12400' east of Shen 2 and 1497' downdip**



# Shenandoah 4: Objectives of 2015 Appraisal Well
**- Tim Trautman -**

# Shenandoah 4:  Exploration Appraisal Objectives



- **Prove-Up Significant Hydrocarbon Rock Volume West of Shenandoah 2**

  *Based on APC mapping 45% of closure area (1,750 out of 3,875 acres) lies to the west of Shenandoah 2*

  *Shenandoah 4 is positioned to test the area of greatest "volumetric uncertainty"*

- **Obtain Information for Commercial Planning**

  *Further constrain discovery resource range*

  *Prove-up a minimal commercial field size*

  *A step closer to getting "off the clock"*

  *Well results will assist in defining an optimal location for Shenandoah 5 (a possible take-point well)*

- **Acquire Conventional Core**

  *Currently lacking whole core from oil-saturated reservoirs*

- **Provide Utility for Geological Sidetracking**

  *Establish Oil / Water Contacts*

  *Deviate away from any Stratigraphic or Lithologic "Surprises" if they Occur*

# Shenandoah 4: Exploration Appraisal Objectives



- **Continue to Assess Lateral Continuity of Reservoir Sands**

    *Stratigraphic correlation between wells in basin indicate widespread sand deposition*

- **Evaluate Lateral Changes in the TST Thickness of Correlative Sand Bodies**

    *Some minor thickness variations noted between Shenandoah 2 & 3 due to "sand body compensation"*

- **Assist in "Ruling Out" any Significant Reservoir Compartmentalization**

    *Do any "sealing" faults exist between the Shenandoah 2 discovery & the Shenandoah 4 location?*

- **Gather Additional Petrophysical & Fluid Information**

    *Are there lateral variations in reservoir properties?*

# Upper Wilcox 2 (CI 250')





## Shenandoah Well Surface Location Hazards:

1.) Must be 2000' from potential fluid expulsion zones on the seafloor. >>>NE corner of WR 52

2.) Must be 500' from shallow surface faults. >>> red faults on map

3.) For now: no wells west of a prominent shallow salt overhang

4.) Avoid as many inclusions in the salt as possible, and identify potential inclusions.

# Shenandoah Shallow Hazard Overview



# Shenandoah Appraisal #3

**S** **N**

**Upper Wilcox 2 (CI 250')**





## Shenandoah WR 51 Appraisal #3:

1.) Western Lateral Stratigraphic Confirmation.
2.) 180-day clock unit operations.

# Upper Wilcox 2 (CI 250')





**Prove-Up Significant Hydrocarbon Rock Volume West of Shenandoah 2**

**Confirmation of 1000' WR 51#2 appraisal well**

**Continue to Assess Lateral Continuity of Reservoir Sands**

**Acquire Conventional Core & Fluid Information**

**Gain More Information to Evaluate Field Size (Resource Range)**

# WR 51 "G" to WR 51 #2 –Salt Inclusions– Model 2





# WR 51 "G" to WR 51 #2 –Salt Inclusions– Model 2





# Trace 32597 – West Shenandoah – Model 2

**3000' SW of the WR 51 "G" location**

NW                                                                                          SE



# Trace 32597 – West Shenandoah – Model 2

**NW** **3000' SW of the WR 51 "G" location** **SE**



# Trace 32677 - WR 51 "G"– Model 2
**1400' SW of the WR 51 "G" location**



# Trace 32677 - WR 51 "G"– Model 2

**1400' SW of the WR 51 "G" location**



# Trace 32717 - WR 51 "G"– Model 2

### Through the TD of the WR 51 "G" location



# Trace 32717 - WR 51 "G"– Model 2



Shenandoah WR 51 "G" location (west)

# Sidetrack Options
## Upper Wilcox 2 (CI 250')





**Shen 4ST is 3000' southwest of Shen 2 and 370' downdip and 948' above projected OWC.**

# Trace 32717 - WR 51 "G"– Model 2

### Through the TD of the WR 51 "G" location



# Trace 32717 - WR 51 "G"– Model 2



Shenandoah WR 51 "G" location (west)

# Sidetrack Options
## Upper Wilcox 2 (CI 250')





Shen 4 is 3789' northwest of Shen 2
and 879' updip

Shen 4ST is 3000' southwest of Shen 2
and 370' downdip and 948' above
projected OWC.

# Sidetrack Options
**Upper Wilcox 3 (CI 250')**





**Shen 4 is 3930' northwest of Shen 2 and 886' updip**

**Shen 4ST is 3000' southwest of Shen 2 and 784' downdip and 461' above projected OWC.**

# Sidetrack Options
**Lower Wilcox A (CI 250')**





**Shen 4 is 4129' northwest of Shen 2
and 1062' updip**

**Shen 4ST is 3300' southwest of Shen 2
and 1211' downdip confirming the OWC
and 430' below projected OWC.
All other penetrations are also below
their projected OWCs.**



# Well Design Planning for Shenandoah 4

**- Chris Krszjzaniek & Bridget O'FarrellVillareal -**

# Preliminary Wellbore Design

## Shenandoah Prospect IV, Appraisal III

| | | |
|---|---|---|
| WELL: | Walker Ridge 51 #3 | |
| EP SL: | Location G | |
| DIRECTIONAL: | Build & Hold | |
| OCS-G: | 31938 #3 | |

| | NORTHING | EASTING |
|---|---|---|
| SL: | 9,767,400 | 2,099,987 |
| BHL: | 9,768,190.54 | 2,098,388.19 |



| | |
|---|---|
| RIG: | Ocean Blackhawk |
| RKB to MSL: | 82' |
| WD: | 5,856' |
| RKB to ML: | 5,938' |

| | | |
|---|---|---|
| RKB to ML: | 5,938' | |
| 18-3/4" HPH: | 5,923' | (+15') |
| 36" LPH: | 5,920' | (+12') |



# Regulatory Status & Work Plan



- **Received final Site Clearance Letters for WR 51, Location E, F, and G on 10/17/14**

- **Supplemental Exploration Plan (EP) in progress for WR, Location E, F, and G.**
  - The Supplemental EP should NOT have to go to the states.

- **Environmental Impact Assessment (EIA) in progress for Location E, F, and G. Anticipate completion by 12/19/14, if consultant has final worst case discharge (WCD) and blowout scenario prior to the date.**

- **Drilling is finalizing wellbore designs for locations E & F, which will then be processed for WCD volumes pertaining to NTL 2010-N06.  Volumes WILL exceed the previously approved 80,000 bopd for the block.**

- **Pending wellbore design progress for E & F, the goal is to submit the Supplemental EP by 12/31/14 or sooner.  If not, then will be filed early 1/15.**

- **The Regional Oil Spill Response Plan (OSRP) WCD will most likely have to be updated after the WR 51 volumes are finalized.  This would be worked in conjunction with the EP review.  The OSRP update would need to be approved prior to obtaining the Application for Permit to Drill (APD) approval.**
  - The current Regional OSRP volume is 410,000 bopd for another block.



# Land Update

**- Jeff Pachman -**

# Exploration UNIT Status & AFE Timing

ANADARKO EXPLORATION

- **Release Ocean Blackhawk after By-Pass Core**
- **AFE Submittal in January for Shenandoah 4 – WR51 #3**
- **SPUD Shenandoah 4 – WR 51 #3 – in April 2015**





# New Imaging Technology for 3D VSPs w. VSPRS

## December 10, 2014

115

 **New 3D VSP Imaging funded by DeepStar** 

- The Geoscience Committee of the DeepStar Consortium is soliciting proposals to support improved VSP acquisition and imaging.

- Anadarko is a member of DeepStar, and with the approval of the Shenandoah Partners, would like to provide a suitably disguised version of the Shenandoah 3D VSP to support an experimental processing project together with a appropriately disguised local PreSDM velocity model.

- DeepStar, subject to member approval, would fund application of Panorama Technologies' VSPRS imaging to this dataset

116

 **3D VSP Imaging with Panorama VSPRS** 

- Traditional processing of vertical seismic profiles (VSPs) begins with the separation of recorded data into upward and downward components.

- Each such component is then processed independently.

- The final subsurface VSP image is usually a straightforward combination of the results of these two processing sequences.

- Panorama's VSPRS images every component within the VSP wavefield simultaneously in a single step.

- Wavefield separation into up- and down-going components is not required

117



## 3D VSP Imaging with Panorama VSPRS



- With VSPRS the imaging process achieves a more complete separation of the wavefields into directional components, and handles correlations between any two components of "source" and "receiver" wavefields.

- VSPRS is an RTM-style process in which correlations between two forward modeled wavefields are made to yield imaged trace output.

- Depending on the available information (shear velocity, 3C input, etc.), shear waves can also be handled internally by the algorithm without need to separate them from P - that separation can also be problematic.

118



## 3D VSP Imaging with Panorama VSPRS



- VSPRS includes the ability to pick first breaks and produce a vertical velocity profile, but a better approach is to begin the processing step using an existing PDSM velocity field as the initial velocity model.

- This usually produces an initial result that is much more consistent with existing surface-related images which is why provision of a local portion of the Shenandoah PreSDM velocity model is being requested.

119

# VSP imaging with Panorama VSPRS Technology





# Partner Feedback

**- Cobalt, Conoco, Marathon, Venari -**



# The END

# Exhibit 34

# GOM Exploration Engineering Activity Report – 1/7/15

## *NEXT WEEK: KEY EVENTS & DECISION POINTS*

**Camden:**
- Shenandoah #3: Rig off location 2 January 2015
    - Updated Shen basin OWC projections.
    - Preparing to update EC on well results
    - Updated Shen Area MMRA. Resources changed due to inclusion of major N-S fault
- Shenandoah #4:
    - EP prepared and submitted to BSEE by end of this week.
    - AFE preparation underway for completion end of Jan
- Shen-Cor-Tan Area Resources Update Effort:
    - Updating MMRA's for Portfolio submission this week. Will review with Ernie Thurs
    - Shen Area new MMRA's completed. Finalizing Coronado & Yucatan MMRA minor adj's
    - Shenandoah Resources Distribution

      |                            | P90 | P50  | Mean | P10  |
      |----------------------------|-----|------|------|------|
      | Post Drill Shen #2         | 950 | 1180 | 1200 | 1470 |
      | Post Drill Shen #3 (No Fault) | 780 | 910 | 920  | 1060 |
      | Post Drill Shen #3 (Fault) | 565 | 725  | 740  | 940  |

- Yucatan Economics – Updated and submitted.
- Shenandoah Economics – Breakeven Price Calcs. $34.50/bbl yields NPV=$0. $50/bbl yields P/I 0.30.
- Phobos mini-sim –Sathish and Carla for Technology are working.
    - First pass results goal Jan 22
    - Review meeting with Carla set for Thurs 8th

**Gauthier:**
- Yeti (Statoil operated) – Spud on 12/26 in WD, PTD=26,003' MD/25,575' TVD, AFE= $114MM DHC, $128MM success, APC carried to 114$MM
    - Current depth 10,127' tvd/md, $20.87MM cum cost
    - LOT at 22" shoe (9,481') to 11.5ppg, enter TOS @ 10,050', currently POOH looking for washout.
- Mile High – Created prospect specific inventory case to replace the type case placeholder. These numbers will change again once the G&G team has the 3D evaluated and we are able to update the prospect size estimate in Q1. MMRA based on the 2010 size estimate, revised reservoir properties and chance of success.
    - Geologic Resource 30-240-1915, Mean 690, Pg 13.6%
    - New NPV= $128MM and PIR10= 0.51
- Lambeau – Updated inventory case to reflect updated MMRA (changed from a multizone MMRA to a single zone MMRA).
    - MMRA changed from (P90-P50-P10, Mean) 21-88-267, 124, Pg 75.8% to 21-82-335, 136, Pg 51.8%.
    - NPV $224MM, PIR 0.4
- Penguin – (No Update) The G&G team is reviewing.

**Pilati:**
- Thunderdel (operated); Own 100% WI
    - Closed deal with BP in Dec 2014; assigned operatorship and control 90% of mapped prospect (10% open)
    - Meeting with team Jan 20th; to discuss path forward.
- Coral (Statoil operated): Uncaptured – Looking at deal
    - West GOM team looked at prospect 10/30/14; Geo team looking at seismic data 12/10;
    - Team agreed on moving forward with evaluation using APC MMRA (much larger than Statoil's resource range) 1/6/15
    - Will finalize and set up development plan and economics by Jan 14th.
- Thalassa: (operated) Own 100% WI; looking to sell down 50%
    - Working with team to put together sales presentation for first/second quarter. Likely partners are those involved in Gunnison (tie back option); Nexen and/or Talos

- Opal:

CONFIDENTIAL                                                                 APC-00153588

- o Completed multiple development sensitivities and ran gas case economics.  Minimum commercial field size is 2 TCF (geologic mean 1.4 TCF). Ran deterministic gas price sensitivities on geologic mean.
- o AFE preparation to be completed Jan 14th  (ANORM well has already been set up).
- o Met with Bill to review final Opal presentation 1/7, plan to present to Ernie next week.
- o Final Air Permits received for BlackHawk 12/31, will need to stack test engines upon arrival to Trinidad.
- Goldenye (Hess Operates Block) APC 50% Hess 50%
  - o New prospect West GOM team is looking at, finalized MMRA 1/6, will work up development case and economics by 1/15

**Burlin:**
- Peep:
  - o Working with the Prospect Inventory cases ~ Rolling forward the evaluation & report dates to 1/1/2105.  This has been completed.
- Prospect Inventory:
  - o Updating the database with the latest economics ~ which include all the changes that were made during portfolio planning (along with the new evaluation dates).  Goal is to have this complete by the end of the week so that the planning group may pull prospect counts for the QBR next week.
- Worldwide Exploration Bubble Plot
  - o A request was made by the International group to get our data updated for a presentation to Bob Daniels this afternoon.  I sent in a request for them to remove Ballymore from their presentation and NOT to show that in the meeting.  I also sent in the updates for Lambeau (Lisa made changes this morning and I had already pulled the data).

CONFIDENTIAL

APC-00153589

# Exhibit 35

1201 LAKE ROBBINS DRIVE • THE WOODLANDS, TEXAS 77380
P. O. BOX 1330 • HOUSTON, TEXAS 77251-1330 • TEL (832) 636-1000



US Offshore Corporation

February 9, 2015

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:   Jim Higgins/Teri Flinner
Fax:   281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:   Ben Davis
Fax:   713-579-9196

Marathon Oil Company
5555 San Felipe Road
Houston, TX 77056
Attn:   Brad Dowdell/Dan Hamrick
Fax:   713-296-4209

Venari Offshore LLC
1080 Eldridge Parkway, Suite 1100
Houston, TX 77077
Attn:   Scott Cornwell/Joe Ross
Fax:   713-266-2330

RE:   Shenandoah Prospect
Anadarko AFE No. 2104486
Lease OCS-G 31938 Walker Ridge Block 51 #3 Well
Lease Maintenance Operation

Gentlemen:

Enclosed for your review and approval is Anadarko AFE No. 2104486 in which  Anadarko proposes drilling, logging, evaluating and abandoning the Walker Ridge Block 51 #3 Well (WR 51 #3 – commonly referred to as the Shen 4) for an estimated gross (100%) cost of $213,741,413.  The WR 51 #3 is an Appraisal Well positioned to test the western side of the Shenandoah structure in hopes of penetrating an oil column similar to that encountered in the WR 51 #2 (commonly referred to as the Shen 2) which found approximately 1,000' of full-to-base net oil pay in several sands (said sands are referred to by Anadarko as the Upper Wilcox 1, 2 and 3, and the Lower Wilcox, A, B, C, D and E). The WR 51 #3 is proposed as a directional well and will be drilled from EP surface Location "G", from a permitted (APD) X&Y coordinate of X=2,100,390.38' and Y=9,767,200.55' being approximately 6,329' FEL and 6,080' FNL of Block 51.   The proposed bottom-hole location of the WR 51 #3 is X=2,098,605.91' and Y=9,768,082.88' projected to be approximately 7,726' FWL and 5,197' FNL of Block 51.

Although the WR 51 #3 is proposed to a total depth of approximately 31,025' TVD (31,446' MD), the Objective Depth, as prescribed in the Shenandoah UOA, is the shallower of:

(i)     The stratigraphic equivalent of the Top of the Cretaceous (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of 31,315' MD/TVD in the WR 51 #2); or
(ii)    A depth of 31,025' TVD.

A SUBSIDIARY OF ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL

The logging and evaluation program is incorporated in the estimated Cost and is detailed on the attached wellbore schematic.

The proposed well is currently planned to be drilled with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Diamond Ocean Blackhawk is approximately $525,000 and is anticipated to be delivered to Anadarko for drilling the WR 51 #3 on or about mid-to-late June 2015 after completing operations at K-2.

The well design of the WR 51 #3 will enable the drilling of a geologic sidetrack, but the ultimate determination can only be made once we reach/near Objective Depth. For example, if we have to run the 9-7/8" scab liner [like we did on the WR 52 #2 (Shen 3)], then the ability to sidetrack thereafter would likely not be possible. Although Anadarko is hopeful the well can be drilled in such a way that would facilitate a long reach, downdip sidetrack, please be advised, however, due to rig scheduling and managing the 180-day continuous operations clock, Anadarko is not currently considering proposing and/or drilling such sidetrack as a subsequent operation while the Ocean Blackhawk is on location, as contemplated in Article 11.2 of the Shenandoah UOA, and thus, plans to release the rig, and thereafter, consider re-entering and sidetracking at a later date. In the meantime, Anadarko will work up a preliminary well plan and cost for a geologic sidetrack and forward that information to you for future reference and planning.

As we collectively share the desire to acquire a Shenandoah oil-saturated core and have discussed the possibility of doing so in this well after drilling and logging to Objective Depth, Anadarko will continue to contemplate a by-pass core and work-up the associated preliminary cost and details as to same and forward that to you for future reference and planning. However, the results of the WR 51 #3 as well as Anadarko's rig situation and scheduling issues after reaching Objective Depth will be critical factors in determining the desire and/or timing of proposing a by-pass core while on location.

The attached AFE number (AFE No. 2104486) was originally submitted by Anadarko (and approved by partners in October 2014) as a Pre-Drill AFE in the gross (100%) amount of $750,000 to cover estimated pre-drill costs associated with the WR 51 #3. Administratively, this Pre-Drill AFE has been converted to a Drill AFE.

Under the Shenandoah UOA, as amended, Appraisal Operations have contractually concluded pursuant to Article 11.5(b). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the WR 51 #3 is deemed an Appraisal Operation. Moreover, since the WR 51 #3 is a Unit activity/operation necessary to maintain Lease OCS-G 25232 Walker Ridge Block 52, the WR 51 #3 is not only an Appraisal Operation (for which a Vote does not apply), but it is also a lease maintenance operation and subject to Article 16.4.2 (Acreage Forfeiture in a Portion of a Contract Area) of the UOA.

APC-00022649

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures and the anticipated evaluation program; and (ii) an estimated days versus depth plot (both in dollars and in days).

Pursuant to Article 8.6.1, each Party has thirty (30) days from receipt of this proposal to make its participation election as to same.

Anadarko plans to schedule a Pre-Spud meeting of the participating parties in and around May.  In the meantime, should you have any questions or comments or need any additional information, please don't hesitate contacting me at (832) 636-3170.


Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

APC-00022650



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

**Company Code:** 0622          **AFE No.:** 2104486                         **AFE Type:** DE – DRILLING-
                                        EXPLORATORY

**Midstream Capital Type:**                                 **Future Allocation Required:** NO

**Well #/Name:** 1J046700 / WALKER RIDGE 51 003   **Field:** 0990 WILDCAT (EXPLORATN)

**Country:** USA          **State/Province:** NORTHERN GUL   **County:** WALKER RIDGE

**AFE Project Manager:** Tim Trautman                    **AFE Coordinator:** Jake Ramsey

**Hierarchy Area:** WALKER RIDGE EXPLORATION          **Project Name:** SHENANDOAH

**Project Description:**

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORPORATION | X | 0.00000000 | $0 |
| Anadarko US Offshore Corporation | | 0.30000000 | $64,122,423.90 |
| ConocoPhillips Company | | 0.30000000 | $64,122,423.90 |
| Marathon Oil Company | | 0.10000000 | $21,374,141.30 |
| Cobalt International Energy LP | | 0.20000000 | $42,748,282.60 |
| Venari Offshore LLC | | 0.10000000 | $21,374,141.30 |
| **TOTAL** | | **1.00000000** | **$213,741,413.00** |

**Please mark your election in the box below**

☐  Election to Participate

☐  Election to Non-Consent

**APPROVED BY:**_____          **PRINTED NAME:**_____

**COMPANY NAME:**_____          **DATE:**_____/_____/_____

CONFIDENTIAL



## Anadarko
### Petroleum Corporation

### AUTHORIZATION FOR EXPENDITURE

Company Code:    622
Well #/Name:     1J046700/WALKER RIDGE 51 OO3

AFE No: 2104486          AFE Type: DE - DRILLING - EXPLORATION

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 80012410 | Casing >30 in (>76.17 cm) | $390,134 | $0 | $0 | $390,134 | $390,134 |
| 80012370 | Casing 12.0 -15.99 in. (30.46-40.61 cm) | $3,736,410 | $0 | $0 | $3,736,410 | $3,736,410 |
| 80012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $3,759,268 | $0 | | $3,759,268 | $3,759,268 |
| 80012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $1,074,461 | $0 | $0 | $1,074,461 | $1,074,461 |
| 80012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $413,665 | $0 | $0 | $413,665 | $413,665 |
| 80012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $705,350 | $0 | $0 | $705,350 | $705,350 |
| 80015240 | Casinghead | $750,000 | $0 | $0 | $750,000 | $750,000 |
| 80012000 | Rig Mobilization & Demobilization | $15,119,962 | $0 | $15,119,962 | $0 | $15,119,962 |
| 80012010 | Contract Drilling | $91,762,828 | $0 | $91,762,828 | $0 | $91,762,828 |
| 80012020 | Directional Drilling Services | $2,796,112 | $0 | $2,796,112 | $0 | $2,796,112 |
| 80012060 | Downhole Rental Equipment | $5,294,764 | $0 | $5,294,764 | $0 | $5,294,764 |
| 80012040 | Drill Bits | $850,000 | $0 | $850,000 | $0 | $850,000 |
| 80012050 | Drilling and Wellwork Fuel | $7,160,000 | $0 | $7,160,000 | $0 | $7,160,000 |
| 80012330 | Drilling and Wellwork Misc. Services | $6,639,248 | $0 | $6,639,248 | $0 | $6,639,248 |
| 80012080 | Drilling Mud & Chemicals | $10,457,280 | $0 | $10,457,280 | $0 | $10,457,280 |
| 80012070 | Drilling & Wellwork Surface Equip Rental | $6,702,544 | $0 | $6,702,544 | $0 | $6,702,544 |
| 80012300 | Drilling & Wellwork Consulting Services | $30,000 | $0 | $30,000 | $0 | $30,000 |
| 80012290 | Drilling & Wellwork Contract On Stie Sup | $3,028,910 | $0 | $3,028,910 | $0 | $3,028,910 |
| 80017000 | Environmental/Regulatory Studies and Plans | $4,000,000 | $0 | $4,000,000 | $0 | $4,000,000 |
| 80017030 | Environmental Waste Disposal | $264,000 | $0 | $264,000 | $0 | $264,000 |
| 80017070 | Environmental/Reg Permits, Licenses & Fees | $192,000 | $0 | $192,000 | $0 | $192,000 |
| 80012160 | Fishing Tools & Service | $699,600 | $0 | $699,600 | $0 | $699,600 |
| 80012440 | Liner Hanger | $250,000 | $0 | $0 | $250,000 | $250,000 |
| 80012430 | Casing Accessories | $650,000 | $0 | $650,000 | $0 | $650,000 |
| 80012540 | Mud Line Hanger Systems | $200,000 | $0 | $200,000 | $0 | $200,000 |
| 80012550 | Misc. Tangible Downhole Equipment | $180,000 | $0 | $0 | $180,000 | $180,000 |
| 80012170 | Misc. Drilling Consumables | $575,520 | $0 | $575,520 | $0 | $575,520 |
| 80012120 | Mud Logging | $2,663,944 | $0 | $2,663,944 | $0 | $2,663,944 |
| 80012230 | Cased Hole Logs, E-line + Slickline Ops | $320,760 | $0 | $320,760 | $0 | $320,760 |
| 80012110 | Open Hole Logging | $11,438,000 | $0 | $11,438,000 | $0 | $11,438,000 |
| 80012090 | Primary Cementing | $3,433,592 | $0 | $3,433,592 | $0 | $3,433,592 |
| 80012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 80025010 | Shore Base/Staging Area Expenses | $352,000 | $0 | $352,000 | $0 | $352,000 |
| 80025070 | Telephone & Communications | $264,000 | $0 | $264,000 | $0 | $264,000 |
| 80024000 | Transportation/Freight Air | $4,030,400 | $0 | $4,030,400 | $0 | $4,030,400 |
| 80024020 | Transportation/Freight Ground | $308,880 | $0 | $308,880 | $0 | $308,880 |
| 80042010 | Transportation/Freight Marine | $22,499,700 | $0 | $22,499,700 | $0 | $22,499,700 |
| 80025020 | Offshore Living & Camp/Housing Expenses | $498,080 | $0 | $498,080 | $0 | $498,080 |

CONFIDENTIAL



CONFIDENTIAL

APC-00022653



APC-00022654

# Exhibit 36

**To:** Leyendecker, Ernie[Ernie.Leyendecker@anadarko.com]; Trautman, Tim[Tim.Trautman@anadarko.com]; Sease, Diane[Diane.Sease@anadarko.com]; Bryan, Jim [Jim.Bryan@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Thur 2/12/2015 4:56:33 PM Coordinated Universal Time
**Subject:** RE: Shenandoah - WR 52 #2 (Shen 3) =>COP 4th Qtr Report

Okay,,,,thanks. I will request that Marathon state the Shenandoah was expensed in lieu of being classified as a dry hole.  We will see what they say.

**From:** Leyendecker, Ernie
**Sent:** Thursday, February 12, 2015 9:56 AM
**To:** Pachman, Jeff; Trautman, Tim; Sease, Diane; Bryan, Jim
**Subject:** RE: Shenandoah - WR 52 #2 (Shen 3) =>COP 4th Qtr Report


Would prefer they reference Shenandoah as expensed and not a dry well.

Yes it was a wet well, but extremely valuable information in the normal course of a prudent operator delineating a field's limits. Using industry best practices the well allowed the owners to project the oil-water-contacts and is potentially useable as a future water injection well for pressure maintenance.

**From:** Pachman, Jeff
**Sent:** Thursday, February 12, 2015 9:43 AM
**To:** Leyendecker, Ernie; Trautman, Tim; Sease, Diane; Bryan, Jim
**Subject:** FW: Shenandoah - WR 52 #2 (Shen 3) =>COP 4th Qtr Report


FYI

**From:** Hamrick, Dan (MRO) [mailto:jdhamrick@marathonoil.com]
**Sent:** Thursday, February 12, 2015 8:01 AM
**To:** Flinner, Teri L; Pachman, Jeff; jross@venari.net; Ben Davis
**Cc:** Bryan, Jim; Dowdell, Brad (MRO); Scott Cornwell
**Subject:** RE: Shenandoah - WR 52 #2 (Shen 3) =>COP 4th Qtr Report


The following sentence will be included in Marathon's earnings news release scheduled for Feb. 18.  Please let me know if you have any questions or concerns.


"Dry well costs included the Company-operated Key Largo, and outside-operated Perseus and second Shenandoah appraisal well in the Gulf of Mexico."


Dan Hamrick
Landman
Marathon Oil Company
P.O. Box 3128
Houston, Texas 77253-3128
Direct Phone:  713-296-3404
Fax:  713-296-4209
E-mail:  jdhamrick@marathonoil.com

**From:** Flinner, Teri L [mailto:Teri.L.Flinner@conocophillips.com]
**Sent:** Thursday, January 22, 2015 8:01 AM
**To:** Pachman, Jeff; jross@venari.net; Ben Davis; Hamrick, Dan (MRO)
**Cc:** Bryan, Jim; Dowdell, Brad (MRO); Scott Cornwell
**Subject:** Shenandoah - WR 52 #2 (Shen 3) =>COP 4th Qtr Report


Please be advised that ConocoPhillips Company will include the following statement in ConocoPhillips' fourth-quarter and full-year 2014 earnings report expected to follow our conference call that will be held on Jan. 29th.


"After evaluation, the company expensed the Shenandoah appraisal well as non-commercial."

CONFIDENTIAL

# Teri L. Flinner

GOM Principal Exploration Landman
ConocoPhillips Company
281-293-2055
CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe this e-mail message has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

**From:** Hamrick, Dan (MRO) [mailto:jdhamrick@marathonoil.com]
**Sent:** Monday, January 19, 2015 10:56 AM
**To:** Pachman, Jeff
**Cc:** Bryan, Jim; Flinner, Teri L; jross@venari.net; Ben Davis; Dowdell, Brad (MRO)
**Subject:** [EXTERNAL]RE: Shenandoah - WR 52 #2 (Shen 3) =>APC 4th Qtr Ops Report

Jeff,
Marathon has no issue with the Shenandoah statement referred to below.  Marathon will include a similar statement in our upcoming  fourth quarter and full-year 2014 earnings news release on Wednesday, Feb. 18, after the close of U.S. financial markets.  I will forward to the Shenandoah partners prior to release.
Thanks,
Dan

**From:** Flinner, Teri L [mailto:Teri.L.Flinner@conocophillips.com]
**Sent:** Monday, January 19, 2015 9:42 AM
**To:** Pachman, Jeff; Ben Davis; Hamrick, Dan (MRO); jross@venari.net
**Cc:** Bryan, Jim
**Subject:** RE: Shenandoah - WR 52 #2 (Shen 3) =>APC 4th Qtr Ops Report

Jeff,  ConocoPhillips Company has no issue with the statement listed below that Anadarko has indicated may be included in their 4th quarter 2014 Operations Report.

# Teri L. Flinner

GOM Principal Exploration Landman
ConocoPhillips Company
281-293-2055
CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe this e-mail message has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

**From:** Pachman, Jeff [mailto:Jeff.Pachman@anadarko.com]
**Sent:** Monday, January 12, 2015 9:18 AM
**To:** Flinner, Teri L; Ben Davis; Hamrick, Dan (MRO); jross@venari.net
**Cc:** Bryan, Jim
**Subject:** [EXTERNAL]Shenandoah - WR 52 #2 (Shen 3)

In regard to the recently drilled and plugged Shen 3 well (WR 52 #2), the following will likely appear in Anadarko's 4th quarter 2014 Operations Report.

If your company plans to include the Shen 3 in its update and/or operations report, please advise accordingly.If you have any questions or comments please let me know.  Thanks.

• Shenandoah Appraisal, Walker Ridge 51, 52 & 53 (WI 30%):  The second appraisal well was spud on WR 52 in the second quarter and finished at the end of 2014.  The well successfully tested the same well developed reservoir sands 1,500' down-dip and 2.3 miles east of the Shenandoah-2 well which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged.  The Shenandoah-3 well found an expanded geologic reservoir section and delineated the potential oil-water contacts of the field as expected.  Planning is currently underway for the next appraisal well which will spud in Q2 2015.

Click here for Anadarko's Electronic Mail Disclaimer

# Exhibit 37

Exhibit
358

**To:** Johnson, Breck[Breck.Johnson@anadarko.com]; Kendall, Beth[Beth.Kendall@anadarko.com]; Ramsey, Jake[Jake.Ramsey@anadarko.com]; Camden, Chris [Chris.Camden@anadarko.com]
**Cc:** Chandler, Paul[Paul.Chandler@anadarko.com]; Oudin, Chip[Chip.Oudin@anadarko.com]
**From:** Frye, Lea[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=VBL604]
**Sent:** Mon 9/21/2015 1:12:50 PM Coordinated Universal Time
**Subject:** RE: WR51# 3 ST01 Interpretation & Update

Congratulations and great work all. This is exactly the results this project needed to keep things going. Had me sweating bullets for a while but so happy to see your perseverance paying off.

---

**From:** Johnson, Breck
**Sent:** Monday, September 21, 2015 8:03 AM
**To:** Oudin, Chip
**Cc:** Ramsey, Jake; Kendall, Beth; Trautman, Tim; Chandler, Paul; Frye, Lea
**Subject:** RE: WR51# 3 ST01 Interpretation & Update

Here you go for now.  Still updating tops, etc.  These are very prelim.  Porosities look good.

Last night was because the partners requested something so I had to take Yuc-2 off.

Breck

---

**From:** Oudin, Chip
**Sent:** Monday, September 21, 2015 7:53 AM
**To:** Johnson, Breck
**Cc:** Ramsey, Jake; Kendall, Beth; Trautman, Tim; Chandler, Paul; Frye, Lea
**Subject:** FW: WR51# 3 ST01 Interpretation & Update

Breck,
Congrats for finding the Wilcox with pay, albeit a bit deeper than expected.  So far it looks great.
Favor to ask...on yesterday's morning x-section, you included Yucatan-2 as part of a four-well display, but on last night's update, you went back to the three Shenandoah wells.  When you add in the latest log data for Shen-4ST, could you please display it on the four-well x-section, including Yuc-2?
Thanks, and great job.
Chip

---

**From:** Johnson, Breck
**Sent:** Sunday, September 20, 2015 8:05 AM
**To:** Kendall, Beth; Trautman, Tim; Tedesco, Bill; Termina, Joe; Young, Susan; Ramsey, Jake; Krszjzaniek, Chris; Camden, Chris; Oudin, Chip; Chandler, Paul; 'Tim Trautman'
**Subject:** RE: WR51# 3 ST01 Interpretation & Update

Morning,

Currently drilling at 30,320' MD / -29,950 SSTVD
Still drilling UW shale section.  There are some ratty sands noted in this section (~ 29,500'/ ~29,600' SSTVD) and wellsite geo confirms lithology (up to 70% sand; "Wilcox type sands") and indicates minor residual staining.  Oldest paleo is ~54 MY Early Eocene (Upper Wilcox).  Top of the Lower Wilcox is ~ 57 MY.  My interpretation at the moment is that we haven't hit the top of the sand section yet owing to thicker shale section than predicted.

Updated SSTVD cross section is attached.  Note that we added Yuc-2 well for reference.  An exact tie based on log character to either Shen8 UW shale or Yuc-2 UW shale is tough and I haven't been able to convince myself I'm certain of where we are correlating to at the moment.

I've also added the UW2 OWC from Shen-2 for reference.  We are still > 500TVD above that contact.  If we assume the shale we're drilling in now is of similar thickness to Yuc-2, we should still hit the UW sands above the projected UW2 OWC predicted by Shen-2 and Shen-3 oil and water gradients respectively.

Regards,

Breck

---

**From:** Johnson, Breck
**Sent:** Saturday, September 19, 2015 11:19 AM
**To:** Kendall, Beth; Trautman, Tim; Tedesco, Bill; Termina, Joe; Young, Susan; Ramsey, Jake; Krszjzaniek, Chris; Camden, Chris; Oudin, Chip; Chandler, Paul; 'Tim Trautman'

APC-00646864

**Subject: RE: WR51# 3 ST01 Interpretation & Update**

Attached is the current interpretation.

-Currently drilling at 29,658' MD / -29,341' SSTVD.
-The TD of the well is currently 150' SSTVD low to the Shen-2 Top of UW 2 Sand. Every foot is increasing our LKO at this point. Our current forecast for the top of UW 2 Sand has us 300' SSTVD low to Shen-2 UW 2 Sand (~150' SSTVD deeper than current drilling TD). It all depends on how thick the shale interval is and if we see the UW 1 Sand or not and what its thickness is.

Regards,
Breck

---

**From:** Johnson, Breck
**Sent:** Friday, September 18, 2015 5:21 PM
**To:** Kendall, Beth; Trautman, Tim; Tedesco, Bill; Termina, Joe; Young, Susan; Ramsey, Jake; Krszjzaniek, Chris; Camden, Chris; Oudin, Chip; Chandler, Paul; Tim Trautman
**Subject:** WR51# 3 ST01 Interpretation & Update

Evening All,

- Currently drilling @ 29,062' MD in the Eocene Marl section (interpretation attached).
- Avg ROP's are 40-60 ft/hr.
- Top of Upper Wilcox is forecast @ 29,309' MD (i.e. 249' MD ahead of us)

- Top of UWlx 1 Sand is 29,692' MD (Potential 1st pay sand)
- Top of UWlx 2 Sand is 29,824' MD (Likely pay sand)
- MW= 14.9 ppg (15.44 ECD}

Please find my interpretation attached. This will be updated as we drill. Right now, we are coming in ~140w to Shen-2 but we will still drill through the highly variable thickness Upper Wilcox shale. We have it as ~ 150' thicker in this wellbore than Shen-2 which is why you are seeing the UWlx 2 and 3 sands coming in ~ 300' low to Shen-2. We also expect to get a bit further down-dip in this well as we hold our inclination before we start to reduce inclination back to vertical.

The current directional has us starting to decrease angle back to vertical in the UWlx 2 sand {30,000' MD}.

Let me know if you have questions. Have a great weekend!

Breck

APC-00646865

# Exhibit 38



# Shenandoah Exploration Overview

## November 2015

Geophysicist: Beth Kendall
Geologist: Breck Johnson (Jake Ramsey)
Reservoir Engineer: Chris Camden
Land: Jeff Pachman

ANADARKO PETROLEUM CORPORATION

APC002167
Confidential Treatment Requested Under FOIA
APC-00001935

CONFIDENTIAL



# Gulf of Mexico Exploration... *Lower Tertiary Play*



200 Miles South of New Orleans

- **An Emerging Giant**
  - *Multi-Billion Barrel Potential*
  - *"Back Basin" Sweet Spot*
- **Focused and Selective Strategy**
  - *Highest Quality Reservoirs*
  - *Infrastructure Advantage*



CONFIDENTIAL

APC002168
Confidential Treatment Requested Under FOIA
APC-00001936

Gulf of Mexico Exploration                           Central GOM Lease Sale

# SHENANDOAH BASIN ACTIVITY



**Shenandoah (Wilcox)**
By-Pass Coring Program
Net Oil Pay:
Shenandoah 1 – 300'
Shenandoah 2 – 1,000'
Shenandoah 4 – 600'
Resource Estimate (P90-Mean-P10)
780 – 920 - 1,070 MMBOE
Shenandoah 4 – Evaluating Results
Shenandoah 5 – Planning for "Keeper"

**Coronado (LM & Wilcox)**
Seismic Reprocessing
Lower Miocene & Wilcox Oil Pay
Lower Miocene ~300'
Basal Wilcox ~200'
Resource Estimate (P90–Mean–P10)
LM = 16 – 132 - 339 MMBOE
Wilcox = 102-187 - 288 MMBOE

**Yucatan (Wilcox)**
WR 96 Expired
w/o Shenandoah Sanctioning
~140' Oil Pay in Wilcox
Acquired Operatorship in 2015
Resource Estimate (P90-Mean-P10)
72 – 95 - 133 MMBOE

CONFIDENTIAL

# Structural Well Cross-Section (Shenandoah 1 – 2 – 3)





**Shenandoah 1**
Oil & Sand Quality
~300' Net Oil Pay
Upper Wilcox Salted Out
Near Basin Margin

**Shenandoah 2**
Full-to-Base Reservoirs
~1,000' Net Oil Pay
Upper Wilcox Present

**Shenandoah 3**
Structurally Low
Wet Reservoirs
Increased Sand Thickness

APC = 30%
Conoco = 30%
Cobalt = 20%
Marathon = 10%
Venari = 10%

CONFIDENTIAL

APC002170
**Confidential Treatment Requested Under FOIA**
APC-00001938

# Shenandoah 4 Objectives

## Shenandoah 4:
- Confirm Hydrocarbon Rock Volume in Image Challenged Area
- ~40% of Mapped Resource to the Northwest of Shenandoah 2
- Identify any Thickness Variations in Wilcox Sands (Lateral Continuity)
- AFE Well Cost = $214 MM Gross; Spud = May 2015

## Shenandoah 4: Sidetrack Options
- By-Pass to Acquire Core form Hydrocarbon-Saturated Reservoirs
- Down-Dip Sidetrack to Extend Column and/or Define Oil/Water Contacts



CONFIDENTIAL

APC002171
Confidential Treatment Requested Under FOIA
APC-00001939

# Shenandoah Structure (Post-Shenandoah 4): Upper Wilcox 2



ANADARKO
EXPLORATION



CONFIDENTIAL

APC002172
Confidential Treatment Requested Under FOIA
APC-00001940

# Shenandoah Structural Cross Section



ANADARKO EXPLORATION

*Wells are projected: Schematic Section*

**WEST**

**EAST**

| Shen-4 | | | Shen-2 | Shen-5 (E) | Shen-5 (L) | Shen-3 |
|---|---|---|---|---|---|---|
| OH | ST01 | ST01 BP01 | | | | Wet |
| Salt | 622' Pay | BP Core | 1001' Pay | ~$220 MM | ~$220 MM | $206 MM |
| 142$MM | 46$MM | $34 MM | $156 MM | | | |

SALT CANOPY

**NW Basin**

Miocene

Olig/Eocene Marls

UW Shale

UW 1,2,3

LW A&B

LW C

LW D&E

Cref

Shen-4 OH

ST SW

Shen-4 ST01

Shen-4 BP Core

?

WR 51    WR 52

APC002173
Confidential Treatment Requested Under FOIA
APC-00001941
CONFIDENTIAL

# Shenandoah Exploration – Historical Time Line



- Drilled Shenandoah 1 (**234 days**): June 3, 2008 – January 22, 2009

- **300' Net Oil Pay Announced - Shenandoah 1: February 4, 2009**

- Proprietary Reprocessing Project: July 2009 - September 2010

- Drilling Moratorium & Regulatory Delays: May 2010 through 2011

- Drilled Shenandoah 2 (**213 days**): July 1, 2012 - January 29, 2013

- **1,000' Net Oil Pay Announced - Shenandoah 2: March 19, 2013**

- Exploration Unit: October 2013 (Requested) &  April 2014 (Approved)

- Western-Geco "Coil" Acquisition/Processing: 2013 – 2015

- Drilled Shenandoah 3 (**163 days**): May 28, 2014 - November 7, 2014

- By-Pass Coring Operation in Aquifer (489' Recovered): December 2014

- Drilled Shenandoah 4 (**106 days** / $142 MM): May 25 – September 7, 2015

    Entire Wilcox Section Salted Out in OH

- Drilled Shenandoah 4 Sidetrack (**41 days** / $46 MM):

    Upper Wilcox Faulted Out in Sidetrack
    **Lower Wilcox – 622' Oil Pay in Sidetrack**

- Initiate By-Pass Coring Operation in Oil Reservoirs: October 2015

ANADARKO PETROLEUM CORPORATION                                                                    8

CONFIDENTIAL

APC002174
**Confidential Treatment Requested Under FOIA**
APC-00001942

# SHENANDOAH: BACK-UP



ANADARKO PETROLEUM CORPORATION                                                                9

APC002175
**Confidential Treatment Requested Under FOIA**
APC-00001943

CONFIDENTIAL

# Shenandoah 4 – Shenandoah 4 STRK – Yucatan 2





CONFIDENTIAL

# Shenandoah 4 - Appraisal Well Results



- **Prospective Area**
  - Identified: Northwestern Limit of Sub-Salt Basin
  - Confirmed: Wilcox Sands in "Image Challenged" Area
  - Mapped: An Untested (~ 900 Acre) Fault Block

- **Objective Section**
  - Wilcox Section "Salted Out" in Original Hole
  - Discovered > 600' Lower Wilcox Oil Pay in Sidetrack
  - Upper Wilcox "Missing" (Faulted Out) in Sidetrack

- **Reservoir**
  - Extended LKO 300' to 500' Lower on Structure
  - Refined Pressure Gradient Analysis (O/W Projections)
  - First Conventional Core from Oil Saturated Reservoirs
  - Refined Resource Range



ANADARKO PETROLEUM CORPORATION                                                          11

CONFIDENTIAL

APC002177
Confidential Treatment Requested Under FOIA
APC-00001945



# SHENANDOAH STRUCTURE: UPPER WILCOX 2 (CI 250')



APC002178
Confidential Treatment Requested Under FOIA
APC-00001946

CONFIDENTIAL

# Shenandoah Structure (Post-Shenandoah 4): Upper Wilcox 2



ANADARKO
EXPLORATION



**Post-Shenandoah 4 Changes**
(1) Basin Edge Encroachment (~950 Acres)
(2) LKO Extended (300' to 500')
(3) Untested Fault Block (~925 Acres)
(4) Pressure Separation S-2 to S-4

**Southwest Fault Segment**
925 Acres; 250 BO/AC-FT
600' Pay = 140 MMBOE
1,000' Pay = 230 MMBOE
SIDETRACK COST ~ $35 MM

Projected OWC (S-4)
SW BLOCK = ~925 acres

Contour Interval 250'

ANADARKO PETROLEUM CORPORATION

13

APC002179
Confidential Treatment Requested Under FOIA
APC-00001947

# Exhibit 39

1201 LAKE ROBBINS DRIVE • THE WOODLANDS, TEXAS 77380
P. O. BOX 1330 • HOUSTON, TEXAS 77251-1330 • TEL (832) 636-1000

November 25, 2015

**Anadarko**
US Offshore Corporation

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn: Jim Higgins/Teri Flinner
Fax: 281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn: Ben Davis
Fax: 713-579-9196

Marathon Oil Company
5555 San Felipe Road
Houston, TX 77056
Attn: Brad Dowdell/Matt Brown
Fax: 713-296-4209

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn: Scott Cornwell/Joe Ross
Fax: 713-266-2330

RE: **Shenandoah Prospect – Walker Ridge Block 51 #3(ST1BP1) Well**
Operator's Recommendation at Objective Depth
Subsequent Appraisal Operation at Objective Depth
Proposal to Drill a Sidetrack [WR 51 #3(ST2)]
Anadarko AFE No. 2118890

Gentlemen:

Reference is made to (i) approved Anadarko AFE No. 2104486 whereby the Shenandoah partners drilled, logged and evaluated the Walker Ridge Block 51 #3 Well; and (ii) as the first subsequent appraisal operation thereto, approved Anadarko AFE No. 2116188 for the drilling, logging, evaluation and abandonment of the WR 51 #3(ST1) Well; and (iii) as a second subsequent appraisal operation thereto, approved Anadarko AFE No. 2117303 for the By-Pass to Core operation [WR 51 #3(ST1BP1)], which is currently ongoing, whereby cores are being acquired and/or attempted to be acquired in the oil-filled reservoirs encountered in WR 51 #3(ST1).

Please be advised, the By-Pass to Core operation is nearing completion, and thus, as a third subsequent operation at Objective Depth, pursuant to Article 11.2 of the Shenandoah UOA, Anadarko hereby proposes to drill, log, evaluate and abandon a Sidetrack, down-to-the-southwest, namely, the WR 51 #3(ST2) Well, for an estimated gross (100%) Cost of $51,524,448 (46 days of rig time). Accordingly, attached for your review and approval is Anadarko AFE No. 2118890.

The Objective Depth of the WR 51 #3(ST2) Well is the shallower of:

(i)     The stratigraphic equivalent of the Top of the Cretaceous plus 100' (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of 31,315' MD/TVD in the WR 51 #2 (Shen 2);

(ii)    A depth of 32,600' TVD.

A SUBSIDIARY OF ANADARKO PETROLEUM CORPORATION

Marathon_014843

The logging and evaluation program of this Sidetrack is incorporated in the estimated Cost and is detailed on the attached wellbore schematic.

The proposed WR 51 #3(ST2) will kickoff in the open hole section of WR 51 #3(ST1) below salt at an approximate depth of 26,000' TVD and build angle to approximately 35 degrees from vertical and hold to Objective Depth. The primary purpose(s) of the WR 51 #3(ST2) is to penetrate and encounter the Wilcox formation, and in so doing, expand the field west of the WR 51 #3(ST1); and (ii) extend lowest known oil in the Wilcox reservoirs below the current levels seen in the WR 51 #3(ST1).

To assist you in your evaluation of this Sidetrack proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures/frac-gradients and the anticipated evaluation program; (ii) the directional plan; and (iii) an estimated days versus depth plot.

This Sidetrack is proposed as a subsequent Appraisal Operation pursuant to Article 11.2 of the Shenandoah UOA, as amended, and is proposed as the operation prescribed by Article 11.2(c) therein. Accordingly, pursuant to Article 11.2.1 (*Response to Operator's Proposal*), each Party has forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of this proposal, to make its participation Election. Although the By-Pass to Core operation is still ongoing, in an effort to provide partners with as much advance notice as reasonably possible (recognizing also the Thanksgiving holiday), please accept this Sidetrack proposal as Anadarko's recommended next subsequent operation associated with the WR 51 #3 Well. Although your early approval would be very much appreciated for rig efficiencies and operational planning purposes, inasmuch as the By-Pass to Core operation is still ongoing, the 48-hour response time to this Sidetrack proposal will not begin until such time as the By-Pass to Core operation has been completed and the acquired data is received by each participating party.

*Operationally, consistent with Anadarko's previously stated path forward plan, in the event this Sidetrack proposal does not receive full partner support, Anadarko plans to temporarily abandon the WR 51 #3 well, release the rig and return immediately to the WR 51 #3 well after Shenandoah is re-assigned the rig (currently forecasted to return to Shenandoah in February). In such event, after rig release and during the then running 180-day continuous operations timeframe, Anadarko plans to resubmit this Sidetrack proposal, modifying any applicable operational items, revising the Cost to reflect the increase in cost associated with the additional rig mobilization/demobilization as well as any other extra rig days required to operationally be in the same position (drill out cement plugs, clean-out, condition, etc.), as we are currently. The preliminary estimate of the extra cost associated with releasing the rig and coming back in February (including, but not limited to an extra abandonment, rig mob/demob) is approximately $38,000,000.*

Moreover, should this Sidetrack be re-proposed as such, said proposal will be deemed a lease maintenance operation, subject, in particular, to Article 16.5.2 (*Non-Consent*

*Appraisal Operations*), Article 16.5.7 (*Hydrocarbon Recoupment from Production*), and Article 16.4.2 (*Acreage Forfeiture in a Portion of a Contract Area*).

In the event this Sidetrack proposal is approved by all parties, once the operations prescribed have been completed, Anadarko will again go through the procedure set forth in Article 11.2 (Appraisal Operations at Objective Depth) and make a recommendation thereafter.

Please evidence your participation Election in the WR 51 #3(ST2) as proposed herein by (i) signing, dating and returning a copy of the attached AFE; and (ii) signing in the space provided below and returning one (1) copy of this letter to my attention.

If you have any questions or need any additional information please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

Concur with and Agree to Participate in the WR 51 #3(ST2)

**ConocoPhillips Company**

By: _____

Title: _____

Date: _____

Concur with and Agree to Participate in the WR 51 #3(ST2)

**Cobalt International Energy, L.P.**

By: _____

Title: _____

Date: _____

Marathon_014845

Concur with and Agree to Participate in the WR 51 #3(ST2)

**Marathon Oil Company**

By: _____

Title: _____

Date: _____


Concur with and Agree to Participate in the WR 51 #3(ST2)

**Venari Offshore LLC**

By: _____

Title: _____

Date: _____

Marathon_014846



**AUTHORIZATION FOR EXPENDITURE**

| | | |
|---|---|---|
| Company Code: 0622 | AFE No: 2118890 | AFE Type: DE - DRILLING - EXPLORATORY |
| Well #/Name: 1J046700 / WALKER RIDGE 51 003 | | Field: 0990 WILDCAT (EXPLORATN) |
| Country: USA | State/Province: NORTHERN ( | County: WALKER RIDGE |
| Prospect: | | Surface Loc: 60812 51 |
| Target Zone: WILCOX | | Bottom Hole Loc: 60812 51 |
| Project Depth: | | |

Project Name: WALKER RIDGE 51 003 ST02 BP00

Project Description: DRILLING COSTS FOR THE WALKER RIDGE 51 #3 SIDETRACK 02 (A.K.A SHENANDOAH-4 ST02 OR WR51 #3 ST02) TO DRILL A SIDETRACK WELL OUT OF THE EXISTING WALKER RIDGE 51 #3 ST01 WELLBORE TO AN OBJECTIVE DEPTH OF 32,800 FEET TVD OR 100 FEET INTO THE CRETACEOUS, WHICHEVER IS GREATER. THE WELL WILL TEST THE WILCOX FORMATION TO EXPAND THE FIELD WEST OF THE SHENANDOAH-4 ST01 APPRAISAL WELL AND INCREASE THE LOWEST KNOWN OIL IN THE WILCOX RESERVOIRS BELOW THE CURRENT SHENANDOAH-4 ST01 LEVELS. THE WELL WILL KICK-OFF IN THE OPEN-HOLE PORTION OF THE SHENANDOAH-4 ST01 WELL BELOW SALT AT ~26,000 FEET AND WILL BUILD ANGLE TO 35 DEGREES FROM VERTICAL AND HOLD THROUGH THE WILCOX FORMATION TO TD. THE AFE COSTS INCLUDE DRILLING TO THE OBJECTIVE DEPTH, WIRELINE FORMATION EVALUATION, AND ABANDONMENT.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP | | 0.30000000 | $15,457,334 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $15,457,334 |
| MARATHON OIL CO | | 0.10000000 | $6,152,445 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $10,304,890 |
| VENARI OFFSHORE LLC | | 0.10000000 | $5,152,445 |
| **TOTAL** | | 1.00000000 | $51,524,448 |

| | DRL.DHC | DRL.CNS | Total |
|---|---|---|---|
| **ORIGINAL** | $49,545,060 | $1,979,388 | $51,524,448 |
| Total | $49,545,060 | $1,979,388 | $51,524,448 |

**Please mark your election in the box below**

☐ Election to Participate

☑ Election to Non-Consent

APPROVED BY: _____

COMPANY NAME: MARATHON OIL

PRINTED NAME: SIMON SMITH

DATE: 12 / 09 / 16

Marathon_014847



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

**Company Code:** 0622    **AFE No:** 2118890    **AFE Type:** DE - DRILLING - EXPLORATORY

**Well #/Name:** 1J046700 / WALKER RIDGE 51 003

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 0080012010 | Contract Drilling | $22,940,632 | $0 | $22,940,632 | $0 | $22,940,632 |
| 0080012020 | Directional Drilling Services | $699,028 | $0 | $699,028 | $0 | $699,028 |
| 0080012060 | Downhole Rental Equipment | $1,082,996 | $0 | $1,082,996 | $0 | $1,082,996 |
| 0080012040 | Drill Bits | $160,000 | $0 | $160,000 | $0 | $160,000 |
| 6080012360 | Drilling & Wellwork Consulting Services | $30,000 | $0 | $30,000 | $0 | $30,000 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $744,920 | $0 | $744,920 | $0 | $744,920 |
| 0080012060 | Drilling & Wellwork Fuel | $1,760,000 | $0 | $1,760,000 | $0 | $1,760,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $1,659,812 | $0 | $1,659,812 | $0 | $1,659,812 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $789,320 | $0 | $789,320 | $0 | $789,320 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $1,665,139 | $0 | $1,665,139 | $0 | $1,665,139 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $64,000 | $0 | $64,000 | $0 | $64,000 |
| 0090017030 | Environmental Waste Disposal | $86,000 | $0 | $86,000 | $0 | $86,000 |
| 0080012160 | Fishing Tools and Services | $174,900 | $0 | $174,900 | $0 | $174,900 |
| 0080026020 | Living & Camp/Housing Expenses | $124,520 | $0 | $124,520 | $0 | $124,520 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $143,880 | $0 | $143,880 | $0 | $143,880 |
| 0080012120 | Mud Logging | $826,496 | $0 | $826,496 | $0 | $826,496 |
| 0080012110 | Open Hole Logging | $9,579,000 | $0 | $9,579,000 | $0 | $9,579,000 |
| 0030012090 | Primary Cementing | $325,600 | $0 | $325,600 | $0 | $325,600 |
| 0080025010 | Shore Base/Staging Area Expenses | $86,000 | $0 | $86,000 | $0 | $86,000 |
| 0080025070 | Telephone & Communications | $66,000 | $0 | $66,000 | $0 | $66,000 |
| 0080024000 | Transportation/Freight Air | $1,007,600 | $0 | $1,007,600 | $0 | $1,007,600 |
| 0080024020 | Transportation/Freight Ground | $77,220 | $0 | $77,220 | $0 | $77,220 |
| 0080024010 | Transportation/Freight Marine | $5,500,000 | $0 | $5,500,000 | $0 | $5,500,000 |
| | **Total DRL.DHC** | $49,545,080 | $0 | $49,545,080 | $0 | $49,545,080 |
| 0080012010 | Contract Drilling | $1,042,756 | $0 | $1,042,756 | $0 | $1,042,756 |
| 0080012060 | Downhole Rental Equipment | $46,318 | $0 | $46,318 | $0 | $46,318 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $33,860 | $0 | $33,860 | $0 | $33,860 |
| 0080012060 | Drilling & Wellwork Fuel | $80,000 | $0 | $80,000 | $0 | $80,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $75,446 | $0 | $75,446 | $0 | $75,446 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $4,080 | $0 | $4,080 | $0 | $4,080 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $75,888 | $0 | $75,888 | $0 | $75,888 |
| 0080017030 | Environmental Waste Disposal | $3,000 | $0 | $3,000 | $0 | $3,000 |
| 0080012160 | Fishing Tools and Services | $7,950 | $0 | $7,950 | $0 | $7,950 |
| 0080025020 | Living & Camp/Housing Expenses | $5,660 | $0 | $5,660 | $0 | $5,660 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $6,540 | $0 | $6,540 | $0 | $6,540 |
| 0080012550 | Misc Tangible Downhole Equipment | $25,000 | $0 | $0 | $25,000 | $25,000 |
| 0080012090 | Primary Cementing | $14,800 | $0 | $14,800 | $0 | $14,800 |
| 0060012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 0080025010 | Shore Base/Staging Area Expenses | $4,000 | $0 | $4,000 | $0 | $4,000 |
| 0080025070 | Telephone & Communications | $3,000 | $0 | $3,000 | $0 | $3,000 |
| 0080024000 | Transportation/Freight Air | $45,800 | $0 | $45,800 | $0 | $45,800 |
| 0080024020 | Transportation/Freight Ground | $3,510 | $0 | $3,510 | $0 | $3,510 |
| 0080024010 | Transportation/Freight Marine | $250,000 | $0 | $250,000 | $0 | $250,000 |
| | **Total DRL.CNS** | $1,979,388 | $0 | $1,954,388 | $25,000 | $1,979,388 |
| **TOTAL** | | $51,524,448 | $0 | $51,499,448 | $25,000 | $61,524,448 |

Marathon_014848



WR 51 #3 ST02 BP00

Marathon_014849

Marathon_014850

## WR051 003 ST02BP00 V4_ANT_28Oct15 Proposal Geodetic Report

(Non-Def Plan)

| Report Date: | November 17, 2015 - 01:06 PM | Survey / DLS Computation: | Minimum Curvature / Lat/Lon |
|---|---|---|---|
| Client: | Anadarko | Vertical Section Azimuth: | 203.76° * (Grid North) |
| Field: | Walker Ridge Blocks 051,052 (Shenandoah) | Vertical Section Origin: | 0.000 ft, 0.000 ft |
| Structure / Stck: | WR 051 003 / Walker Ridge 51 #3 | TVD Reference Datum: | RKB |
| Well: | OCS-G-31938 003 | TVD Reference Elevation: | 82.000 ft above MSL |
| Borehole: | ST02BP00 | Nearest / Ground Elevation: | 5857.000 ft below MSL |
| UWI / API#: | Unknown / Unknown | Magnetic Declination: | 0.581 * |
| Survey Name: | WR051 003 ST02BP00 V4_ANT_28Oct15 | Total Gravity Field Strength: | 993.24 (K-#5666 Rixed) |
| Survey Date: | November 16, 2015 | Gravity Model: | GARS |
| Top / AHD / DDI / ERD Ratio: | 53.329 * / 4350.662 ft / 5.353 / 0.132 | Total Magnetic Field Strength: | 45478.457 nT |

**Survey Type:** Non-Def Plan

**Survey Error Model:** ISCWSA Rev 0 *** 3-D 95.000% Confidence 2.7955 sigma
**Survey Program:**

Schlumberger

# WR051 003 ST02BP00 V4_ANT_28Oct15 Proposal Geodetic Report

(Non-Def Plan)

| | |
|---|---|
| Report Date: | November 17, 2015 - 01:26 PM |
| Client: | Anadarko |
| Field: | Walker Ridge Blocks 051,052 (Shenandoah) |
| Structure / Slot: | WR 051 003 / Walker Ridge 51 #3 |
| Well: | OCS-G-31938 003 |
| Borehole: | ST02BP00 |
| UWI / API#: | Unknown / Unknown |
| Survey Name: | WR051 003 ST02BP00 V4_ANT_28Oct15 |
| Survey Date: | November 16, 2015 |
| Tort / AHD / DDI / ERD Ratio: | 53.329 ° / 4380.466 ft / 6.381 / 0.132 |
| Coordinate Reference System: | NAD27 UTM Zone 15N, US Feet |
| Location Lat / Long: | N 28° 54' 34.91620", W 91° 35' 17.31963" |
| Location Grid N/E Y/X: | N 9787200.400 ftUS, E 2100390.360 ftUS |
| CRS Grid Convergence Angle: | 0.6391 ° |
| Grid Scale Factor: | 0.99984206 |
| Version / Patch: | 2.7.1043.0 |

| | |
|---|---|
| Survey / DLS Computation: | Minimum Curvature / Lubinski |
| Vertical Section Azimuth: | 220.784 ° (Grid North) |
| Vertical Section Origin: | 0.000 ft, 0.000 ft |
| TVD Reference Datum: | RKB |
| TVD Reference Elevation: | 82.000 ft above MSL |
| Seabed / Ground Elevation: | 5857.000 ft below MSL |
| Magnetic Declination: | 0.591 ° |
| Total Gravity Field Strength: | 998.3419mgn (9.80665 Based) |
| Gravity Model: | GARM |
| Total Magnetic Field Strength: | 45475.457 nT |
| Magnetic Dip Angle: | 55.579 ° |
| Declination Date: | November 09, 2015 |
| Magnetic Declination Model: | HDGM 2015 |
| North Reference: | Grid North |
| Grid Convergence Used: | 0.6391 ° |
| Total Corr Mag North->Grid North: | -0.0480 ° |
| Local Coord Referenced To: | Well Head |

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (E/W ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Marker MudLine* | *5939.00* | *0.00* | *0.00* | *5939.00* | *0.00* | *0.00* | *0.00* | *0.00* | *9787200.49* | *2100392.36* | *N 28 54 34.92* | *W 91 35 17.32* |
| Tie-In | 25869.00 | 0.12 | 119.00 | 25868.80 | -0.86 | 11.41 | -12.19 | N/A | 9787211.90 | 2100378.37 | N 28 54 35.03 | W 91 35 17.45 |
| | 25900.00 | 0.22 | 204.93 | 25899.98 | -0.87 | 11.41 | -12.20 | 3.17 | 9787211.90 | 2100378.16 | N 28 54 35.03 | W 91 35 17.45 |
| KOP | 26000.00 | 3.40 | 226.17 | 25999.62 | 0.53 | 12.01 | -15.05 | 3.17 | 9787213.29 | 2100375.32 | N 28 54 35.04 | W 91 35 17.48 |
| | 26100.00 | 4.21 | 238.12 | 26099.40 | 3.39 | 10.99 | -21.37 | 2.00 | 9787214.48 | 2100368.09 | N 28 54 35.06 | W 91 35 17.55 |
| | 26200.00 | 5.64 | 251.65 | 26199.04 | 13.07 | 12.33 | -29.70 | 2.00 | 9787212.83 | 2100360.66 | N 28 54 35.04 | W 91 35 17.65 |
| | 26300.00 | 7.34 | 242.28 | 26298.25 | 20.23 | 7.81 | -40.02 | 2.00 | 9787208.30 | 2100350.34 | N 28 54 35.00 | W 91 35 17.73 |
| | 26400.00 | 9.17 | 236.52 | 26397.36 | 33.84 | 0.44 | -52.32 | 2.00 | 9787200.85 | 2100338.05 | N 28 54 34.93 | W 91 35 17.90 |
| | 26500.00 | 11.05 | 232.66 | 26495.86 | 50.89 | -9.76 | -66.59 | 2.00 | 9787190.73 | 2100323.76 | N 28 54 34.82 | W 91 35 18.05 |
| | 26600.00 | 12.87 | 230.05 | 26593.91 | 71.34 | -22.79 | -82.80 | 2.00 | 9787177.70 | 2100307.57 | N 28 54 34.70 | W 91 35 18.24 |
| | 26700.00 | 14.91 | 227.92 | 26690.09 | 95.19 | -36.83 | -100.94 | 2.00 | 9787161.65 | 2100289.44 | N 28 54 34.54 | W 91 35 18.44 |
| | 26800.00 | 16.66 | 226.36 | 26786.84 | 122.39 | -57.25 | -120.66 | 2.00 | 9787143.24 | 2100269.40 | N 28 54 34.36 | W 91 35 18.66 |
| | 26900.00 | 18.62 | 225.10 | 26882.02 | 152.91 | -78.66 | -142.91 | 2.00 | 9787121.84 | 2100247.47 | N 28 54 34.15 | W 91 35 18.91 |
| | 27000.00 | 20.78 | 224.08 | 26976.10 | 186.72 | -107.80 | -169.89 | 2.00 | 9787097.70 | 2100223.70 | N 28 54 33.92 | W 91 35 19.17 |
| | 27100.00 | 22.77 | 223.23 | 27068.88 | 223.78 | -129.88 | -192.29 | 2.00 | 9787070.88 | 2100198.10 | N 28 54 33.66 | W 91 35 19.46 |
| | 27200.00 | 24.76 | 222.51 | 27160.48 | 264.04 | -159.19 | -219.69 | 2.00 | 9787041.33 | 2100170.70 | N 28 54 33.38 | W 91 35 19.77 |
| | 27300.00 | 26.73 | 221.98 | 27250.56 | 307.45 | -191.36 | -248.65 | 2.00 | 9787009.16 | 2100141.55 | N 28 54 33.05 | W 91 35 20.09 |
| | 27400.00 | 28.71 | 221.34 | 27339.07 | 353.98 | -226.15 | -279.74 | 2.00 | 9786974.36 | 2100110.57 | N 28 54 32.71 | W 91 35 20.44 |
| | 27500.00 | 30.70 | 220.86 | 27425.93 | 403.51 | -263.48 | -312.31 | 2.00 | 9786937.04 | 2100078.10 | N 28 54 32.34 | W 91 35 20.80 |
| | 27600.00 | 32.69 | 220.44 | 27511.01 | 456.05 | -303.35 | -346.58 | 2.00 | 9786897.19 | 2100043.89 | N 28 54 31.95 | W 91 35 21.18 |
| | 27700.00 | 34.68 | 220.06 | 27594.22 | 511.50 | -345.64 | -382.35 | 2.00 | 9786854.87 | 2100008.07 | N 28 54 31.53 | W 91 35 21.59 |
| | 27800.00 | 35.00 | 220.00 | 27676.16 | 568.81 | -389.86 | -419.20 | 0.00 | 9786810.97 | 2099971.22 | N 28 54 31.10 | W 91 35 22.00 |
| | 27900.00 | 35.00 | 220.00 | 27758.07 | 626.16 | -433.62 | -456.07 | 0.00 | 9786767.04 | 2099934.36 | N 28 54 30.67 | W 91 35 22.41 |
| | 28000.00 | 35.00 | 220.00 | 27839.99 | 683.52 | -477.46 | -492.94 | 0.00 | 9786723.11 | 2099897.50 | N 28 54 30.24 | W 91 35 22.82 |
| | 28100.00 | 35.00 | 220.00 | 27921.91 | 740.87 | -521.40 | -529.81 | 0.00 | 9786679.17 | 2099860.65 | N 28 54 29.81 | W 91 35 23.24 |
| | 28200.00 | 35.00 | 220.00 | 28003.82 | 798.22 | -565.34 | -566.68 | 0.00 | 9786635.24 | 2099823.77 | N 28 54 29.38 | W 91 35 23.65 |
| | 28300.00 | 35.00 | 220.00 | 28085.74 | 855.57 | -609.28 | -603.55 | 0.00 | 9786591.31 | 2099786.91 | N 28 54 28.95 | W 91 35 24.06 |
| | 28400.00 | 35.00 | 220.00 | 28167.65 | 912.93 | -653.21 | -640.42 | 0.00 | 9786547.38 | 2099750.05 | N 28 54 28.52 | W 91 35 24.47 |
| | 28500.00 | 35.00 | 220.00 | 28249.57 | 970.28 | -697.15 | -677.29 | 0.00 | 9786503.45 | 2099713.16 | N 28 54 28.09 | W 91 35 24.89 |
| | 28600.00 | 35.00 | 220.00 | 28331.48 | 1027.63 | -741.09 | -714.16 | 0.00 | 9786459.52 | 2099676.32 | N 28 54 27.66 | W 91 35 25.30 |
| | 28700.00 | 35.00 | 220.00 | 28413.40 | 1084.98 | -785.03 | -751.02 | 0.00 | 9786415.59 | 2099639.46 | N 28 54 27.22 | W 91 35 25.71 |
| | 28800.00 | 35.00 | 220.00 | 28495.31 | 1142.33 | -828.97 | -787.89 | 0.00 | 9786371.65 | 2099602.60 | N 28 54 26.79 | W 91 35 26.12 |
| | 28900.00 | 35.00 | 220.00 | 28577.23 | 1199.69 | -872.91 | -824.76 | 0.00 | 9786327.72 | 2099565.73 | N 28 54 26.36 | W 91 35 26.54 |
| | 29000.00 | 35.00 | 220.00 | 28659.14 | 1257.04 | -916.85 | -861.63 | 0.00 | 9786283.79 | 2099528.87 | N 28 54 25.93 | W 91 35 26.95 |
| | 29100.00 | 35.00 | 220.00 | 28741.06 | 1314.39 | -960.78 | -898.50 | 0.00 | 9786239.86 | 2099492.01 | N 28 54 25.50 | W 91 35 27.36 |
| | 29200.00 | 35.00 | 220.00 | 28822.97 | 1371.74 | -1004.72 | -935.37 | 0.00 | 9786195.93 | 2099455.14 | N 28 54 25.07 | W 91 35 27.78 |
| | 29300.00 | 35.00 | 220.00 | 28904.89 | 1429.10 | -1048.66 | -972.24 | 0.00 | 9786152.00 | 2099418.28 | N 28 54 24.64 | W 91 35 28.19 |
| | 29400.00 | 35.00 | 220.00 | 28986.80 | 1486.45 | -1092.60 | -1009.10 | 0.00 | 9786108.06 | 2099381.42 | N 28 54 24.21 | W 91 35 28.60 |
| | 29500.00 | 35.00 | 220.00 | 29068.72 | 1543.80 | -1136.54 | -1045.97 | 0.00 | 9786064.13 | 2099344.55 | N 28 54 23.78 | W 91 35 29.01 |
| | 29600.00 | 35.00 | 220.00 | 29150.63 | 1601.15 | -1180.48 | -1082.84 | 0.00 | 9786020.20 | 2099307.69 | N 28 54 23.34 | W 91 35 29.43 |
| | 29700.00 | 35.00 | 220.00 | 29232.55 | 1658.50 | -1224.41 | -1119.71 | 0.00 | 9785976.27 | 2099270.82 | N 28 54 22.91 | W 91 35 29.84 |
| | 29800.00 | 35.00 | 220.00 | 29314.46 | 1715.86 | -1268.35 | -1156.58 | 0.00 | 9785932.34 | 2099233.96 | N 28 54 22.48 | W 91 35 30.25 |
| | 29900.00 | 35.00 | 220.00 | 29396.38 | 1773.21 | -1312.29 | -1193.45 | 0.00 | 9785888.41 | 2099197.10 | N 28 54 22.05 | W 91 35 30.66 |
| | 30000.00 | 35.00 | 220.00 | 29478.29 | 1830.56 | -1356.23 | -1230.32 | 0.00 | 9785844.48 | 2099160.24 | N 28 54 21.62 | W 91 35 31.08 |
| | 30100.00 | 35.00 | 220.00 | 29560.21 | 1887.91 | -1400.17 | -1267.19 | 0.00 | 9785800.54 | 2099123.38 | N 28 54 21.19 | W 91 35 31.49 |
| | 30200.00 | 35.00 | 220.00 | 29642.12 | 1945.27 | -1444.11 | -1304.05 | 0.00 | 9785756.61 | 2099086.51 | N 28 54 20.76 | W 91 35 31.90 |
| | 30300.00 | 35.00 | 220.00 | 29724.04 | 2002.62 | -1488.05 | -1340.92 | 0.00 | 9785712.68 | 2099049.65 | N 28 54 20.33 | W 91 35 32.31 |
| | 30400.00 | 35.00 | 220.00 | 29805.95 | 2059.97 | -1531.98 | -1377.79 | 0.00 | 9785668.75 | 2099012.79 | N 28 54 19.90 | W 91 35 32.73 |
| | 30500.00 | 35.00 | 220.00 | 29887.87 | 2117.32 | -1575.92 | -1414.66 | 0.00 | 9785624.82 | 2098975.92 | N 28 54 19.47 | W 91 35 33.14 |
| | 30600.00 | 35.00 | 220.00 | 29969.78 | 2174.68 | -1619.86 | -1451.53 | 0.00 | 9785580.89 | 2098939.06 | N 28 54 19.03 | W 91 35 33.55 |
| | 30700.00 | 35.00 | 220.00 | 30051.70 | 2232.03 | -1663.80 | -1488.40 | 0.00 | 9785536.96 | 2098902.20 | N 28 54 18.60 | W 91 35 33.96 |
| *Upper Wilcox 1* | *30758.96* | *35.00* | *220.00* | *30100.00* | *2265.84* | *-1689.71* | *-1510.14* | *0.00* | *9785511.05* | *2098880.45* | *N 28 54 18.35* | *W 91 35 34.21* |
| | 30800.00 | 35.00 | 220.00 | 30133.62 | 2289.38 | -1707.74 | -1525.27 | 0.00 | 9785493.02 | 2098865.34 | N 28 54 18.17 | W 91 35 34.38 |
| | 30900.00 | 35.00 | 220.00 | 30215.53 | 2346.73 | -1751.68 | -1562.14 | 0.00 | 9785449.09 | 2098828.47 | N 28 54 17.74 | W 91 35 34.79 |
| *Upper Wilcox 2* | *30934.83* | *35.00* | *220.00* | *30244.00* | *2366.71* | *-1766.98* | *-1574.98* | *0.00* | *9785433.77* | *2098815.63* | *N 28 54 17.60* | *W 91 35 34.93* |
| | 31000.00 | 35.00 | 220.00 | 30297.45 | 2404.08 | -1795.62 | -1599.00 | 0.00 | 9785405.16 | 2098791.61 | N 28 54 17.31 | W 91 35 35.20 |
| | 31100.00 | 35.00 | 220.00 | 30379.36 | 2461.44 | -1839.55 | -1635.87 | 0.00 | 9785361.23 | 2098754.75 | N 28 54 16.88 | W 91 35 35.61 |
| | 31200.00 | 35.00 | 220.00 | 30461.28 | 2518.79 | -1883.49 | -1672.74 | 0.00 | 9785317.30 | 2098717.88 | N 28 54 16.45 | W 91 35 36.03 |
| *Upper Wilcox 3* | *31290.00* | *35.00* | *220.00* | *30535.00* | *2570.41* | *-1923.04* | *-1705.92* | *0.00* | *9785277.75* | *2098684.71* | *N 28 54 16.06* | *W 91 35 36.40* |
| | 31300.00 | 35.00 | 220.00 | 30543.19 | 2576.14 | -1927.43 | -1709.61 | 0.00 | 9785273.37 | 2098681.02 | N 28 54 16.02 | W 91 35 36.44 |
| | 31400.00 | 35.00 | 220.00 | 30625.11 | 2633.49 | -1971.37 | -1746.48 | 0.00 | 9785229.43 | 2098644.16 | N 28 54 15.59 | W 91 35 36.85 |
| | 31500.00 | 35.00 | 220.00 | 30707.02 | 2690.85 | -2015.31 | -1783.35 | 0.00 | 9785185.50 | 2098607.30 | N 28 54 15.15 | W 91 35 37.27 |
| | 31600.00 | 35.00 | 220.00 | 30788.94 | 2748.20 | -2059.25 | -1820.22 | 0.00 | 9785141.57 | 2098570.43 | N 28 54 14.72 | W 91 35 37.68 |
| | 31700.00 | 35.00 | 220.00 | 30870.85 | 2805.55 | -2103.18 | -1857.09 | 0.00 | 9785097.64 | 2098533.57 | N 28 54 14.29 | W 91 35 38.09 |
| *Lower Wilcox A* | *31711.17* | *35.00* | *220.00* | *30880.00* | *2811.95* | *-2108.09* | *-1861.20* | *0.00* | *9785092.73* | *2098529.45* | *N 28 54 14.24* | *W 91 35 38.14* |
| | 31800.00 | 35.00 | 220.00 | 30952.77 | 2862.90 | -2147.12 | -1893.96 | 0.00 | 9785053.71 | 2098496.71 | N 28 54 13.86 | W 91 35 38.50 |
| | 31900.00 | 35.00 | 220.00 | 31034.68 | 2920.25 | -2191.06 | -1930.82 | 0.00 | 9785009.78 | 2098459.84 | N 28 54 13.43 | W 91 35 38.92 |
| | 32000.00 | 35.00 | 220.00 | 31116.60 | 2977.61 | -2235.00 | -1967.69 | 0.00 | 9784965.85 | 2098422.98 | N 28 54 13.00 | W 91 35 39.33 |
| *Lower Wilcox B* | *32024.91* | *35.00* | *220.00* | *31137.00* | *2991.89* | *-2245.94* | *-1976.88* | *0.00* | *9784954.90* | *2098413.80* | *N 28 54 12.89* | *W 91 35 39.43* |
| | 32100.00 | 35.00 | 220.00 | 31198.51 | 3034.96 | -2278.94 | -2004.56 | 0.00 | 9784921.91 | 2098386.12 | N 28 54 12.57 | W 91 35 39.74 |
| | 32200.00 | 35.00 | 220.00 | 31280.43 | 3092.31 | -2322.88 | -2041.43 | 0.00 | 9784877.98 | 2098349.26 | N 28 54 12.14 | W 91 35 40.15 |
| | 32300.00 | 35.00 | 220.00 | 31362.34 | 3149.66 | -2366.82 | -2078.30 | 0.00 | 9784834.05 | 2098312.39 | N 28 54 11.71 | W 91 35 40.57 |
| *Lower Wilcox C* | *32374.05* | *35.00* | *220.00* | *31423.00* | *3192.13* | *-2399.35* | *-2105.60* | *0.00* | *9784801.52* | *2098285.10* | *N 28 54 11.39* | *W 91 35 40.87* |
| | 32400.00 | 35.00 | 220.00 | 31444.26 | 3207.02 | -2410.76 | -2115.17 | 0.00 | 9784790.12 | 2098275.53 | N 28 54 11.27 | W 91 35 40.98 |
| | 32500.00 | 35.00 | 220.00 | 31526.17 | 3264.37 | -2454.69 | -2152.04 | 0.00 | 9784746.19 | 2098238.67 | N 28 54 10.84 | W 91 35 41.39 |
| | 32600.00 | 35.00 | 220.00 | 31608.09 | 3321.72 | -2498.63 | -2188.91 | 0.00 | 9784702.26 | 2098201.80 | N 28 54 10.41 | W 91 35 41.80 |
| | 32700.00 | 35.00 | 220.00 | 31690.00 | 3379.07 | -2542.57 | -2225.77 | 0.00 | 9784658.33 | 2098164.94 | N 28 54 9.98 | W 91 35 42.22 |

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (deg ° ' ") | Longitude (deg ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lower Wilcox D | 32791.64 | 35.00 | 233.00 | 31765.00 | 3432.69 | -2592.60 | -2259.53 | 0.00 | 9704515.10 | 2098131.19 | N 28 56 8.52 | W 91 35 42.69 |
| | 32800.00 | 35.00 | 220.00 | 31771.92 | 3436.45 | -2568.51 | -2282.84 | 0.00 | 9204514.30 | 2099139.06 | N 28 54 8.59 | W 91 35 42.66 |
| | 32990.00 | 35.00 | 200.00 | 31803.33 | 3493.73 | -2630.45 | -2299.51 | 0.00 | 9204520.48 | 2098581.21 | N 28 54 9.12 | W 91 35 43.04 |
| | 33000.00 | 35.00 | 226.00 | 31035.75 | 3681.72 | -2674.39 | -2330.38 | 0.00 | 9704506.58 | 2098524.35 | N 28 54 8.09 | W 91 35 43.26 |
| | 33100.00 | 35.00 | 226.00 | 32017.87 | 3608.49 | -2718.92 | -2573.35 | 0.00 | 9704462.60 | 2098217.43 | N 28 54 8.39 | W 91 35 43.97 |
| Lower Wilcox E | 30172.43 | 35.00 | 203.00 | 32077.60 | 3680.02 | -3780.15 | -2792.85 | 0.00 | 9704490.78 | 2097992.70 | N 28 54 7.05 | W 91 56 44.17 |
| | 33200.00 | 35.00 | 220.00 | 32093.58 | 3695.83 | -3707.70 | -2410.12 | 0.00 | 9704426.67 | 2097985.65 | N 28 56 04 7.65 | W 91 56 44.28 |
| | 33300.00 | 35.00 | 220.00 | 32191.50 | 3733.19 | -2806.20 | -3446.60 | 0.00 | 9704194.74 | 2097043.76 | N 28 54 7.40 | W 91 35 44.80 |
| | 33400.00 | 35.00 | 220.00 | 32243.41 | 3780.56 | -3853.14 | -3463.60 | 0.00 | 9704350.62 | 2097908.90 | N 28 54 6.96 | W 91 35 45.10 |
| | 33500.00 | 35.00 | 220.00 | 32315.93 | 3937.49 | -3864.34 | -3550.72 | 0.00 | 9704306.67 | 2097970.84 | N 28 54 6.50 | W 91 35 45.12 |
| | 33600.00 | 35.00 | 220.00 | 32427.34 | 3995.25 | -2899.22 | -2557.98 | 0.00 | 9784273.04 | 2307433.17 | N 28 54 6.10 | W 91 05 45.53 |
| | 33700.00 | 35.00 | 220.00 | 32552.10 | 3993.60 | -2931.65 | -2584.49 | 0.00 | 9704219.01 | 2007763.31 | N 28 54 5.67 | W 91 20 49.34 |
| | 33150.00 | 35.00 | 220.00 | 32591.07 | 4000.95 | -3025.69 | -3651.21 | 0.00 | 9704170.03 | 2097760.45 | N 28 54 5.24 | W 91 25 43.76 |
| | 23990.00 | 35.00 | 790.00 | 32672.69 | 4067.30 | -3090.03 | -3666.20 | 0.00 | 9704131.15 | 2097729.90 | N 28 54 4.81 | W 91 25 47.17 |
| | 34000.00 | 25.00 | 220.00 | 32754.50 | 4124.56 | -3113.77 | -3753.07 | 0.00 | 9704097.32 | 2097660.32 | N 28 54 4.35 | W 91 39 47.35 |
| | 34100.00 | 35.00 | 220.00 | 32636.62 | 4182.00 | -3157.71 | -3741.94 | 0.00 | 9704043.60 | 2097646.88 | N 28 54 3.93 | W 91 06 47.99 |
| | 34200.00 | 35.00 | 220.00 | 32918.73 | 4239.36 | -3201.65 | -3778.01 | 0.00 | 9703999.35 | 2002612.06 | N 28 54 3.52 | W 91 35 48.41 |
| PBHL | 34273.57 | 25.00 | 220.00 | 32910.00 | 4261.56 | -3793.97 | -2805.93 | 0.00 | 9703997.03 | 2093566.26 | N 28 54 3.22 | W 91 35 48.71 |

Survey Type: Non Def Plan

Survey Error Model: ISCWSA Rev 0 *** 5-D 95.000% Confidence 2.7935 sigma
Survey Program:

| Description | Hole | MD From (ft) | MD To (ft) | EOU Freq (ft) | Hole Size (in.) | Casing Diameter (in.) | Survey Tool Type | Borehole / Survey |
|---|---|---|---|---|---|---|---|---|
| | 1 | 0.000 | 5039.000 | Act Srvs | 35.000 | 38.000 | SLB_NBG+MEHOT-FLT-Depth Only | ST00BP00 / WR051 003 ST002BP00 Definitive Composite Survey_0-5520ST_SDAz2015 |
| | 1 | 5039.000 | 6082.000 | Act Srvs | 28.000 | 54.000 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 6282.000 | 7054.000 | Act Srvs | 32.000 | 29.000 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 7054.000 | 6446.000 | Act Srvs | 26.000 | 72.000 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 6448.000 | 13499.000 | Ant Srvs | 21.508 | 18.000 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 13938.000 | 18099.315 | Act Srvs | 19.500 | 16.000 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 18099.315 | 24024.986 | Act Srvs | 18.500 | 14.005 | SLB_NBG+MEHOT-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 24924.980 | 24078.520 | Act Srvs | 19.500 | 14.000 | SLB_MWD-STD-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 24976.320 | 25249.000 | Act Srvs | 14.300 | 9.975 | SLB_MWD-STD-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 25249.000 | 25497.000 | 1/99.428 | 14.900 | 9.675 | SLB_MWD-STD-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 25857.000 | 25959.000 | Act Srvs | 14.800 | 8.875 | SLB_MWD-STD-FLT | ST00BP00 / WR051 003 ST00BP00 Definitive Composite |
| | 1 | 25899.000 | 34273.570 | 1/100.000 | 8.500 | 6.500 | SLB_MWD-STD-FLT | ST02BP00 V4_ANT_28Oct15 |

Marathon_014853

# Exhibit 40

**To:** Bryan, Jim[Jim.Bryan@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Tue 12/8/2015 2:46:08 PM Coordinated Universal Time
**Subject:** FW: Shenandoah Prospect-Project Schedule

FYI

---

**From:** Ben Davis [mailto:Ben.Davis@cobaltintl.com]
**Sent:** Tuesday, December 08, 2015 8:11 AM
**To:** Pachman, Jeff
**Subject:** Shenandoah Prospect-Project Schedule

Jeff,

This is not good news at all.

Where do you think we will be, spending wise, when, and if, we get to sanction after Shenandoah 6 ST?  Probably ~$2 billion?

Just between the two of us, this will not help us talk up the utility of the proposed Shenandoah 4 ST.

I believe that we will all be making some difficult decisions going forward.

Ben


-----Original Message-----
**From:** McGrievy, Pat [mailto:Pat.McGrievy@anadarko.com]
**Sent:** Monday, December 07, 2015 5:27 PM
**To:** Dana Cleland
**Cc:** Tule, Jenifer; Frye, Lea; Walz, Gregg; Kavanagh, Ryan; Prosser, Wendy
**Subject:** Re: Project Schedule - overall

Hi Dana, the project team is currently working on the completion of a revised schedule and will share it with the partnership in our 4Q partnership meeting on December, 16th. I can share with you the fact that SOP and sanction will slip into Q1, 2018 as a result of the somewhat disappointing results of the multiple SHEN 4 well penetrations and our firm belief that appraisal will require the SHEN 5 & 6 wells with a possible sidetrack in one or both wells to achieve sanction. Although the SOP and sanction dates have moved 4 or 5 months to the right since we last reviewed it with the partnership,we believe that other Optimizations within our schedule will effectively neutralize the impact on the first oil date. I am not at liberty at this time to provide specifics on how we will be able to hold our first production date, but should be able to share the drivers at our partner meeting next Wednesday.

I hope this helps you, Pat

Patrick McGrievy
Anadarko Petroleum Corp
General Mgr - USGOM
Wk phone/ (832) 636-3973
Cell phone (281) 798-4483


On Dec 7, 2015, at 11:20 AM, Dana Cleland <dana.cleland@cobaltintl.com<mailto:dana.cleland@cobaltintl.com>> wrote:

Pat,
Do you have a schedule similar to this that shows your latest view to first oil for the wet tree concepts?  I have the detailed schedules from Jenifer from our "select" meetings, but was looking for something more at a summary level.

Thanks,
Dana

<Picture (Device Independent Bitmap) 1.jpg>



Click here for Anadarko's Electronic Mail Disclaimer<http://www.anadarko.com/notices/Pages/Electronic-Mail-Disclaimer.aspx>

CONFIDENTIAL

APC-00214429



APC-00214430

# Exhibit 41

Teri L. Flinner
GOM Exploration Principal
Landman & Commercial Advisor

ConocoPhillips Company
600 N. Dairy Ashford
DU-3026
Houston, TX 77079
phone 281.293.2055
www.conocophillips.com



December 10, 2015

**VIA EMAIL**

Anadarko US Offshore Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attn:  Mr. Jim Bryan/ Mr.Jeff Pachman

Marathon Oil Company
5555 San Felipe Road
Houston, Texas 77056
Attn: Mr. Brad Dowdell/ Mr. Matt Brown

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, Texas 77024
Attn: Mr. Ben Davis

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, Texas 77079
Attn: Mr. Scott Cornwell/ Mr. Joe Ross

RE:  Shenandoah Prospect – Walker Ridge Block 51 #3 ST2 Well Proposal
Subsequent Appraisal Operation at Objective Depth
Second Opportunity to Participate after Non-Consent

Gentlemen:

Reference is made to the proposed Anadarko AFE No. 2118890 regarding the Operator's recommendation at Objective Depth in the current WR 51 #3 ST1BP1 Well to perform a second Sidetrack Operation.   COP has Elected not to participate in this proposed operation as evidenced by email documentation December 9, 2015.  Per the terms and conditions of the Shenandoah UOA, as amended, a second opportunity to participate is afforded to those parties who previously elected not to participate, with a 24 hour response time which elapses at 5:45pm on this day.

After careful consideration, ConocoPhillips Company will stay with the original position on this proposed operation at Objective Depth and Elect to not participate.

With Regards,

Teri L Flinner

Teri L. Flinner

CONFIDENTIAL

APC-01730272



**Matthew D. Brown**
Sr. Land Professional
LAND – GOM

**Marathon Oil Company**
5555 San Felipe
Houston, TX 77056
Telephone 713.296.3408
Fax 713.296.4209
MBROWN3@marathonoil.com

*Sent Electronically*

December 10, 2015

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:  Jim Higgins/Terri Flinner

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:  Ben Davis

Anadarko US Offshore Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attn: Mr. Jim Bryan/Jeff Pachman

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn:  Scott Cornwell/Joe Ross

RE:   Second Opportunity to Participate
        Subsequent Appraisal Operation at Objective Depth
        Walker Ridge Block 51#3 (ST2)

Jeff,

Reference is made to your email received by Marathon on December 9, 2015 at 5:45PM
whereby Anadarko, in accordance with the Shenandoah Offshore Operating Agreement,
as amended, afforded Marathon their Second Opportunity to Participate in the Walker
Ridge Block 51#3 (ST2) operation.  Please be advised that Marathon elects not to
participate in the Walker Ridge Block 51#3 (ST2) operation.

Regards,

Matt Brown
Sr. Land Professional

CONFIDENTIAL

## Pachman, Jeff

| | |
|---|---|
| **From:** | Pachman, Jeff |
| **Sent:** | Wednesday, December 09, 2015 6:26 PM |
| **To:** | Brown, Matthew D. (MRO) |
| **Subject:** | Re: [External] Shenandoah - Sidetrack Proposal |

Thanks, Matt.

Sent from my iPhone

On Dec 9, 2015, at 6:16 PM, Brown, Matthew D. (MRO) <mbrown3@marathonoil.com> wrote:

> Jeff, Email is valid notice for MRO. I'll submit our 2nd Opportunity Election tomorrow.

**From:** Pachman, Jeff <Jeff.Pachman@anadarko.com>
**Date:** December 9, 2015 at 17:45:22 CST
**To:** Ben Davis <Ben.Davis@cobaltintl.com>, Dowdell, Brad (MRO) <bldowdell@marathonoil.com>, Teri L Flinner <Teri.L.Flinner@conocophillips.com>, jross@venari.net <jross@venari.net>, Brown, Matthew D. (MRO) <mbrown3@marathonoil.com>, Jim M. Higgins <Jim.M.Higgins@conocophillips.com>, scornwell@venari.net <scornwell@venari.net>
**Cc:** Bryan, Jim <Jim.Bryan@anadarko.com>
**Subject:** [External] Shenandoah - Sidetrack Proposal

Beware of links/attachments.

Reference is made to Anadarko's recommendation and associated proposal and AFE to conduct a Sidetrack, namely the WR 51 #3(ST2), as a subsequent operation immediately following the current By-Pass to Core operation (WR 51 #3 (ST1BP1).

Please be advised, all parties entitled to make a participation election in the proposed Sidetrack have done so.

Anadarko (30%), Cobalt (20%), and Venari (10%) have each elected to participate and COP (30%) and Marathon (10%) have elected not to participate.

In accordance with the terms and conditions of the Shenandoah UOA, as amended, both COP and Marathon, respectively, are hereby afforded this second opportunity to participate.

The response time to this second opportunity to participate is 24 hours from receipt of this notice. If you do not consider this email valid notice and would prefer receiving a fax please advise and a fax will be forwarded in the morning to initiate the 24-hour response time. It is hoped, at a minimum, under the circumstances, both COP and Marathon will each consider this email as acceptable notice of the second opportunity to participate.

Anadarko is very much appreciative of each parties effort in expediting their respective elections to the Sidetrack proposal since the response time associated there with had not yet initiated. Thanks for that.

COP and Marathon, please advise as to your second opportunity. Thanks.

1

CONFIDENTIAL

APC-01730274

Sent from my iPhone


Click here for Anadarko's Electronic Mail Disclaimer<http://www.anadarko.com/notices/Pages/Electronic-Mail-Disclaimer.aspx>

CONFIDENTIAL

APC-01730275



**VIA EMAIL AND U.S. MAIL**

December 11, 2015

Mr. Jeff Pachman
Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Email Address: Jeff.Pachman@Anadarko.com

RE:    WELL SIDETRACK PROPOSAL & AFE
       OCS-G 31938 Well No. 3 ST2
       Shenandoah Prospect
       Walker Ridge Area-OCS Gulf of Mexico

Dear Jeff,

Attached for your further handling Anadarko AFE Number 2118890 outlining expenditures covering the captioned project as outlined in your letter of November 4, 2015.

Please note that this AFE has been appropriately executed on behalf of Cobalt to evidence our election to participate in the sidetrack drilling operation, as proposed.

If you require anything further at this time regarding this matter, please call me at (713) 579-9172.


Yours very truly,

COBALT INTERNATIONAL ENERGY, L.P.

Ben Davis

Cobalt International Energy, LP
Cobalt Center
920 Memorial City Way, Suite 100, Houston, Texas 77024
Tel: 713.579.9100   Fax: 713.579.9198   www.cobaltintl.com

CONFIDENTIAL



## Anadarko
### Petroleum Corporation

### AUTHORIZATION FOR EXPENDITURE

| | | |
|---|---|---|
| Company Code: 0622 | AFE No: 2118890 | AFE Type: DE - DRILLING - EXPLORATORY |
| Well #/Name: 1J046700 / WALKER RIDGE 51 003 | | Field: 0990 WILDCAT (EXPLORATN) |
| Country: USA | State/Province: NORTHERN ( | County: WALKER RIDGE |
| Prospect: | | Surface Loc: 60812 51 |
| Target Zone: WILCOX | | Bottom Hole Loc: 60812 51 |
| Project Depth: | | |

Project Name: WALKER RIDGE 51 003 ST02 BP00

Project Description: DRILLING COSTS FOR THE WALKER RIDGE 51 #3 SIDETRACK 02 (A.K.A SHENANDOAH-4 ST02 OR WR51 #3 ST02) TO DRILL A SIDETRACK WELL OUT OF THE EXISTING WALKER RIDGE 51 #3 ST01 WELLBORE TO AN OBJECTIVE DEPTH OF 32,600 FEET TVD OR 100 FEET INTO THE CRETACEOUS, WHICHEVER IS GREATER. THE WELL WILL TEST THE WILCOX FORMATION TO EXPAND THE FIELD WEST OF THE SHENANDOAH-4 ST01 APPRAISAL WELL AND INCREASE THE LOWEST KNOWN OIL IN THE WILCOX RESERVOIRS BELOW THE CURRENT SHENANDOAH-4 ST01 LEVELS. THE WELL WILL KICK-OFF IN THE OPEN-HOLE PORTION OF THE SHENANDOAH-4 ST01 WELL BELOW SALT AT ~26,000 FEET AND BUILD ANGLE TO 35 DEGREES FROM VERTICAL AND HOLD THROUGH THE WILCOX FORMATION TO TD. THE AFE COSTS INCLUDE DRILLING TO THE OBJECTIVE DEPTH, WIRELINE FORMATION EVALUATION, AND ABANDONMENT.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP | | 0.30000000 | $15,457,334 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $15,457,334 |
| MARATHON OIL CO | | 0.10000000 | $5,152,445 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $10,304,890 |
| VENARI OFFSHORE LLC | | 0.10000000 | $5,152,445 |
| TOTAL | | 1.00000000 | $51,524,448 |

| | DRL.DHC | DRL.CNS | Total |
|---|---|---|---|
| ORIGINAL | $49,545,060 | $1,979,388 | $51,524,448 |
| Total | $49,545,060 | $1,979,388 | $51,524,448 |

Please mark your election in the box below

☑ Election to Participate

☐ Election to Non-Consent

APPROVED BY: _James H. Painter_   PRINTED NAME: James H. Painter

Executive Vice President

COMPANY NAME: Cobalt International Energy, L.P. DATE: 12 / 9 / 2015

CONFIDENTIAL

APC-01730277

*Appraisal Operations)*, Article 16.5.7 (*Hydrocarbon Recoupment from Production*), and Article 16.4.2 (*Acreage Forfeiture in a Portion of a Contract Area*).

In the event this Sidetrack proposal is approved by all parties, once the operations prescribed have been completed, Anadarko will again go through the procedure set forth in Article 11.2 (Appraisal Operations at Objective Depth) and make a recommendation thereafter.

Please evidence your participation Election in the WR 51 #3(ST2) as proposed herein by (i) signing, dating and returning a copy of the attached AFE; and (ii) signing in the space provided below and returning one (1) copy of this letter to my attention.

If you have any questions or need any additional information please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor


Concur with and Agree to Participate in the WR 51 #3(ST2)

**ConocoPhillips Company**

By: _____

Title: _____

Date: _____

Concur with and Agree to Participate in the WR 51 #3(ST2)

**Cobalt International Energy, L.P.**

By: _____

Title: Executive Vice President

Date: December 9, 2015

APC-01730278

# FAX Cover Sheet



## Gulf of Mexico – *LAND*

**To:** Jeff Pachman
**Company:** Anadarko Petroleum Company
**Phone:** (832) 636-3170
**Fax:** (832) 636-8059

**From:** Matt Brown
**Company:** Marathon Oil Company
**Phone:** (713) 296-3408
**Fax:** (713) 296-4209

**Date:** December 9, 2015
**Pages including this cover page:** 12

*Jeff,*

*Enclosed for your further handling is the Marathon's election to non-consent the WR 51#3 ST2 proposal.*

*Regards,*

*Matt*

CONFIDENTIAL

Concur with and Agree to Participate in the WR 51 #3(ST2)

Marathon Oil Company

By: _____

Title: _____

Date: _____

Concur with and Agree to Participate in the WR 51 #3(ST2)

Venari Offshore LLC

By: _____

Title: _____

Date: _____

CONFIDENTIAL

# Anadarko
### Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622          AFE No: 2116890          AFE Type: DE - DRILLING - EXPLORATORY
Well #/Name: 1J040700V WALKER RIDGE 51 003          Field: 0800 WILDCAT (EXPLORATN)
Country: USA          State/Province: NORTHERN-G          County: WALKER RIDGE
Prospect:          Surface Loc: 60812 51
Target Zone: WILCOX          Bottom Hole Loc: 60812 51
Project Depth:
Project Name: WALKER RIDGE 51 003 ST02 BP00
Project Description: DRILLING COSTS FOR THE WALKER RIDGE 51 #3 SIDETRACK 02 (A.K.A SHENANDOAH-4 ST02 OR WR51 #3 ST02) TO DRILL A SIDETRACK WELL OUT OF THE EXISTING WALKER RIDGE 51 #3 ST01 WELLBORE TO AN OBJECTIVE DEPTH OF 32,600 FEET TVD OR 100 FEET INTO THE CRETACEOUS, WHICHEVER IS GREATER. THE WELL WILL TEST THE WILCOX FORMATION TO EXPAND THE FIELD WEST OF THE SHENANDOAH-4 ST01 APPRAISAL WELL AND INCREASE THE LOWEST KNOWN OIL IN THE WILCOX RESERVOIRS BELOW THE CURRENT SHENANDOAH-4 ST01 LEVELS. THE WELL WILL KICK-OFF IN THE OPEN-HOLE PORTION OF THE SHENANDOAH-4 ST01 WELL BELOW SALT AT ~28,000 FEET AND WILL BUILD ANGLE TO 35 DEGREES FROM VERTICAL AND HOLD THROUGH THE WILCOX FORMATION TO TD. THE AFE COSTS INCLUDE DRILLING TO THE OBJECTIVE DEPTH, WIRELINE FORMATION EVALUATION, AND ABANDONMENT.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0. |
| ANADARKO US OFFSHORE CORP | | 0.30000000 | $15,457,334 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $15,457,334 |
| MARATHON OIL CO | | 0.10000000 | $5,152,445 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $10,304,890 |
| VENARI OFFSHORE LLC | | 0.10000000 | $5,152,445 |
| TOTAL | | 1.00000000 | $51,524,448 |

| | DRL.OHG | DRL.ONS | Total |
|---|---|---|---|
| ORIGINAL | $49,545,080 | $1,979,366 | $51,524,446 |
| Total | $49,545,080 | $1,979,366 | $51,524,446 |

Please mark your election in the box below
□ Election to Participate
☑ Election to Non-Consent

APPROVED BY: _____          PRINTED NAME: Simon Smith

COMPANY NAME: Marathon Oil          DATE: 12 / 09 / 16

CONFIDENTIAL

*COP  NON-CONSENT*

## Pachman, Jeff

| | |
|---|---|
| **From:** | Flinner, Teri L <Teri.L.Flinner@conocophillips.com> |
| **Sent:** | Wednesday, December 09, 2015 11:23 AM |
| **To:** | Pachman, Jeff; Ben Davis; Dowdell, Brad (MRO); Brown, Matthew D. (MRO); scornwell@venari.net; jross@venari.net |
| **Cc:** | Higgins, Jim M.; Alaniz, Lindsay M |
| **Subject:** | RE: Operator's Recommendation for a Subsequent Operation at Objective Depth - WR 51 #3(ST2)=>COP response |
| **Attachments:** | COP election to Non-consent WR51#3ST2 9Dec2015.pdf |

Please see attached ConocoPhillips Company response to the Operator's Recommendation for a Subsequent Operation at Objective Depth in the WR51#3 ST1BP1 Well.  While this response is technically not required due to the currently ongoing operations being still in progress, notification will allow for planning by the Operator of the next steps.

ConocoPhillips has elected to Non-Consent this proposal.

Regards,

Teri L. Flinner
GOM Principal Exploration Landman
ConocoPhillips Company
281-293-2055

CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe this e-mail message has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

-----Original Message-----
From: Pachman, Jeff [mailto:Jeff.Pachman@anadarko.com]
Sent: Wednesday, November 25, 2015 8:01 AM
To: Higgins, Jim M. <Jim.M.Higgins@conocophillips.com>; Flinner, Teri L <Teri.L.Flinner@conocophillips.com>; Ben Davis <Ben.Davis@cobaltintl.com>; Dowdell, Brad (MRO) <bldowdell@marathonoil.com>; Brown, Matthew D. (MRO) <mbrown3@marathonoil.com>; scornwell@venari.net; jross@venari.net
Subject: [EXTERNAL]Operator's Recommendation for a Subsequent Operation at Objective Depth - WR 51 #3(ST2)

Attached is Anadarko's SW Sidetrack proposal and associated AFE and attachments.

As you know, the By-Pass to Core operation is still ongoing and is anticipated to remain ongoing into next week, and thus, the 48-hour election response time to this proposal will not begin until such time as the By-Pass to Core operation has been completed.

Since this is Anadarko's next recommended operation, Anadarko thought it would be helpful for each of you to receive the formal details associated therewith as early in the process as possible.

As noted in the attached proposal letter, and to reiterate Anadarko's current path forward plan, absent 100% partner support to commence this Sidetrack immediately after the By-Pass to Core, while the rig is on location (as a subsequent operation), the rig will be released, but will return to conduct such Sidetrack during the next 180-day continuous operations timeframe.

1

CONFIDENTIAL

The estimated "extra cost" the partnership would incur in having to T&A the well now and come back later is $38MM.

An original of this Sidetrack proposal will be placed in the mail and a fax of same will be forwarded momentarily.

Again, the 48-hour clock is not being initiated with your receipt hereof, but will initiate once the By-Pass to Core and the associated logging has been completed.

Should you have any questions or need any additional information, please let me know.  Thanks.

Click here for Anadarko's Electronic Mail Disclaimer<http://www.anadarko.com/notices/Pages/Electronic-Mail-Disclaimer.aspx>

2

CONFIDENTIAL

APC-01730283



Teri L. Flinner
GOM Exploration Principal
Landman & Commercial Advisor

ConocoPhillips Company
600 N. Dairy Ashford
DU-3026
Houston, TX 77079
phone 281.293.2055
www.conocophillips.com

December 9, 2015

**VIA EMAIL**

Anadarko US Offshore Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attn:  Mr. Jim Bryan/ Mr.Jeff Pachman

Marathon Oil Company
5555 San Felipe Road
Houston, Texas 77056
Attn: Mr. Brad Dowdell/ Mr. Matt Brown

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, Texas 77024
Attn: Mr. Ben Davis

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, Texas 77079
Attn: Mr. Scott Cornwell/ Mr. Joe Ross

RE:    Shenandoah Prospect – Walker Ridge Block 51 #3 ST2 Well Proposal
       Subsequent Appraisal Operation at Objective Depth

Gentlemen:

Reference is made to the proposed Anadarko AFE No. 2118890 regarding the Operator's recommendation at Objective Depth in the current WR 51 #3 ST1BP1 Well to perform a second Sidetrack Operation.  COP staff have consistently communicated that we do not see merit to sidetracking the WR 51 #3 ST1BP1 again given the original well and subsequent sidetrack results.   The proposed second sidetrack is unlikely to prove sufficient volumes to support field development in our opinion.  This can only be achieved with a successful Shen 5 well, in the undrilled central portion of the field.  While we see merit in preserving the ability to sidetrack the WR 51 #3 ST1BP1 at a later date, COP sees no technical justification in drilling this sidetrack until MEFS can be confirmed by the Shen 5 well. To be clear COP's stated position is that all remaining appraisal activities must be driven by the cost effective and efficient appraisal of the field and concept selection.   Our focus remains to support the ongoing appraisal of this discovery in the most efficient and cost effective manner and we remain prepared to follow this discovery to development and in the current low oil price environment we must advocate for the most cost effective, impactful well operations.

As a result of this position, COP will non-consent this proposal. If the Operator's proposal is approved by Election of the remaining parties entitled to make an Election and the conclusion of action under Article 8.3 (Second Opportunity to Participate) and Article 8.4 (Participation by Fewer than All Parties) as applicable, the Non-Participating Party(ies) to this Appraisal Operation at Objective Depth is subject to Article 16.5.2 (Non-Consent Appraisal Operations).

With Regards,

*Teri L Flinner*

Teri L. Flinner

CONFIDENTIAL

APC-01730284

*Appraisal Operations*), Article 16.5.7 (*Hydrocarbon Recoupment from Production*), and Article 16.4.2 (*Acreage Forfeiture in a Portion of a Contract Area*).

In the event this Sidetrack proposal is approved by all parties, once the operations prescribed have been completed, Anadarko will again go through the procedure set forth in Article 11.2 (*Appraisal Operations at Objective Depth*) and make a recommendation thereafter.

Please evidence your participation Election in the WR 51 #3(ST2) as proposed herein by (i) signing, dating and returning a copy of the attached AFE; and (ii) signing in the space provided below and returning one (1) copy of this letter to my attention.

If you have any questions or need any additional information please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

Concur with and Agree to Participate in the WR 51 #3(ST2)

**ConocoPhillips Company**

By: _____

Title: _____     *Non Consent*

Date: _____

Concur with and Agree to Participate in the WR 51 #3(ST2)

**Cobalt International Energy, L.P.**

By: _____

Title: _____

Date: _____

CONFIDENTIAL

APC-01730285



**Anadarko**
Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

| | | |
|---|---|---|
| Company Code: 0622 | AFE No: 2118890 | AFE Type: DE - DRILLING - EXPLORATORY |
| Well #/Name: 1J046700 / WALKER RIDGE 51 003 | | Field: 0990 WILDCAT (EXPLORATN) |
| Country: USA | State/Province: NORTHERN ( | County: WALKER RIDGE |
| Prospect: | | Surface Loc: 60812 51 |
| Target Zone: WILCOX | | Bottom Hole Loc: 60812 51 |

Project Depth:

Project Name: WALKER RIDGE 51 003 ST02 BP00

Project Description: DRILLING COSTS FOR THE WALKER RIDGE 51 #3 SIDETRACK 02 (A.K.A SHENANDOAH-4 ST02 OR WR51 #3 ST02) TO DRILL A SIDETRACK WELL OUT OF THE EXISTING WALKER RIDGE 51 #3 ST01 WELLBORE TO AN OBJECTIVE DEPTH OF 32,600 FEET TVD OR 100 FEET INTO THE CRETACEOUS, WHICHEVER IS GREATER.  THE WELL WILL TEST THE WILCOX FORMATION TO EXPAND THE FIELD WEST OF THE SHENANDOAH-4 ST01 APPRAISAL WELL AND INCREASE THE LOWEST KNOWN OIL IN THE WILCOX RESERVOIRS BELOW THE CURRENT SHENANDOAH-4 ST01 LEVELS.  THE WELL WILL KICK-OFF IN THE OPEN-HOLE PORTION OF THE SHENANDOAH-4 ST01 WELL BELOW SALT AT ~26,000 FEET AND WILL BUILD ANGLE TO 35 DEGREES FROM VERTICAL AND HOLD THROUGH THE WILCOX FORMATION TO TD.   THE AFE COSTS INCLUDE DRILLING TO THE OBJECTIVE DEPTH, WIRELINE FORMATION EVALUATION, AND ABANDONMENT.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP | | 0.30000000 | $15,457,334 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $15,457,334 |
| MARATHON OIL CO | | 0.10000000 | $5,152,445 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $10,304,890 |
| VENARI OFFSHORE LLC | | 0.10000000 | $5,152,445 |
| TOTAL | | 1.00000000 | $51,524,448 |

| | DRL.DHC | DRL.CNS | Total |
|---|---|---|---|
| ORIGINAL | $49,545,060 | $1,979,388 | $51,524,448 |
| Total | $49,545,060 | $1,979,388 | $51,524,448 |

Please mark your election in the box below

☐ Election to Participate

☑ Election to Non-Consent

APPROVED BY: _____

COMPANY NAME: _Conoco Phillips Company_

PRINTED NAME: _Paul McCafferty_

DATE: _12/09/2015_

CONFIDENTIAL

APC-01730286

Joseph C. Ross
Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Phone: (832) 781 5218
Fax: (713) 266 2330
Jross@venari.com



**VENARI**

**Facsimile Communication**

**DATE:** December 1, 2015

|  |  | **FACSIMILE NUMBER** | **COMPANY** |
|---|---|---|---|
| **TO:** | Jeff Pachman/Jim Bryan | (832) 636-8059 | Anadarko |
|  | Brad Dowdell/Matt Brown | (713) 296-4209 | Marathon |
|  | Jim Higgins/Teri Flinner | (281) 293-6171 | COP |
|  | Ben Davis | (713) 579-9196 | Cobalt |
| **FROM:** | Joe Ross | (713) 266 2330 | Venari |

**NO. PAGES** (including the coversheet) 10

If there are any problems with this transmission please telephone 832-781-5218.

Please see Venari Offshore LLC's attached (election/vote) in favor of the AFE below

| Date Received | Subject | AFE No. | Gross | Net |
|---|---|---|---|---|
| Nov 25, 2015 | Shenandoah WR 51 #3 ST1BP01 – ST2 | 2118890 | $51,524,448 | $5,152,444 |

CONFIDENTIAL

APC-01730287

**To:** Joe Ross
**Subject:** RE: Operator's Recommendation for a Subsequent Operation at Objective Depth - WR 51 # 3(ST2) - 48 hour election following the conclusion of the bypass

**From:** Scott Cornwell
**Sent:** Monday, November 30, 2015 4:40 PM
**To:** 'jeff.pachman@anadarko.com' <jeff.pachman@anadarko.com>
**Cc:** Scott Cornwell <scornwell@venari.com>; Joe Ross <jross@venari.com>; Jack Gregory <jgregory@venari.com>
**Subject:** Operator's Recommendation for a Subsequent Operation at Objective Depth - WR 51 #3(ST2) - 48 hour election following the conclusion of the bypass
**Importance:** High

Jeff

Attached hereto is an executed copy of the AFE and letter whereby Venari elects to participate in the proposed sidetrack as a Subsequent Operation at Objective Depth in the subject well at the conclusion of the bypass coring
operation currently being finalized. As discussed, we changed the objective depth language to coincide with the intended objective depth as set forth in your Election Letter.

Please let me know if you require anything further.

Respectfully,

Scott



Scott H. Cornwell
Senior Vice President, Commercial & Business Development
15375 Memorial Drive, Suite 800
Houston, Texas 77079
O: 832.781.5217
C: 832.458.5882
F: 713.266.2330
scornwell@venari.com

www.venari.com

1

CONFIDENTIAL

APC-01730288

Concur with and Agree to Participate in the WR 51 #3(ST2)

**Marathon Oil Company**

By: _____

Title: _____

Date: _____


Concur with and Agree to Participate in the WR 51 #3(ST2)

**Venari Offshore LLC**

By: _____
Brian Reinsborough

Title: Founder, President and CEO

Date: 11/30/2015

CONFIDENTIAL

APC-01730289



**Anadarko**
Petroleum Corporation

### AUTHORIZATION FOR EXPENDITURE

| | |
|---|---|
| Company Code: 0622 | AFE No: 2118990 |
| Well #/Name: 1J046700 / WALKER RIDGE 51 003 | AFE Type: DE - DRILLING - EXPLORATORY |
| Country: USA State/Province: NORTHERN C | Field: 0990 WILDCAT (EXPLORATN) |
| Prospect: | County: WALKER RIDGE |
| Target Zone: WILCOX | Surface Loc: 60812 51 |
| Project Depth: | Bottom Hole Loc: 60812 51 |

Project Name: WALKER RIDGE 51 003 ST02 BP00

Project Description: DRILLING COSTS FOR THE WALKER RIDGE 51 #3 SIDETRACK 02 (A.K.A SHENANDOAH-4 ST02 OR WR51 #3 ST02) TO DRILL A SIDETRACK WELL OUT OF THE EXISTING WALKER RIDGE 51 #3 ST01 WELLBORE TO AN OBJECTIVE DEPTH OF 32,600 FEET TVD OR 100 FEET ~~Shallower~~ INTO THE CRETACEOUS, WHICHEVER IS ~~GREATER~~. THE WELL WILL TEST THE WILCOX FORMATION TO EXPAND THE FIELD WEST OF THE SHENANDOAH-4 ST01 APPRAISAL WELL AND INCREASE THE LOWEST KNOWN OIL IN THE WILCOX RESERVOIRS BELOW THE CURRENT SHENANDOAH-4 ST01 LEVELS. THE WELL WILL KICK-OFF IN THE OPEN-HOLE PORTION OF THE SHENANDOAH-4 ST01 WELL BELOW SALT AT ~26,000 FEET AND WILL BUILD ANGLE TO 35 DEGREES FROM VERTICAL AND HOLD THROUGH THE WILCOX FORMATION TO TD. THE AFE COSTS INCLUDE DRILLING TO THE OBJECTIVE DEPTH, WIRELINE FORMATION EVALUATION, AND ABANDONMENT.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP | | 0.30000000 | $15,457,334 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $15,457,334 |
| MARATHON OIL CO | | 0.10000000 | $5,152,445 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $10,304,890 |
| VENARI OFFSHORE LLC | | 0.10000000 | $5,152,445 |
| TOTAL | | 1.00000000 | $51,524,449 |

| | DRL.DHC | DRL.CNS | Total |
|---|---|---|---|
| ORIGINAL | $49,545,060 | $1,979,388 | $51,524,448 |
| Total | $49,545,060 | $1,979,388 | $51,524,448 |

Please mark your election in the box below

☑ Election to Participate

☐ Election to Non-Consent

APPROVED BY: _[signature]_                    PRINTED NAME: Brian Reinsborough

COMPANY NAME: Venari Offshore LLC            DATE: 11/30/2015

CONFIDENTIAL

# Exhibit 42

**To:** Brown, Matthew D. (MRO)[mbrown3@marathonoil.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Mon 12/14/2015 1:27:56 PM Coordinated Universal Time
**Subject:** RE: Shen-4 S/T 2 Status

No problem.......The 51 #3(ST2) will proceed as Anadarko has elected to assume both COP's and Marathon's non-consent interest.

**From:** Brown, Matthew D. (MRO) [mailto:mbrown3@marathonoil.com]
**Sent:** Monday, December 14, 2015 7:18 AM
**To:** Pachman, Jeff
**Subject:** Shen-4 S/T 2 Status

Good Morning Jeff,
Did the Participating Parties in the S/T 2 proposal elect to pick up COP and MRO's working interest?  I know you aren't obligated to let me know but I thought I'd ask none the less.

Regards,

Matt Brown, CPL
Marathon Oil **Corporation**
Gulf of Mexico - Land
Ph# 713.296.3408 / Cell# 281.468.8833
5555 San Felipe Rd. / Houston, TX 77056

APC-00216034

# Exhibit 43

**To:** Ben Davis[Ben.Davis@cobaltintl.com]; jross@venari.net[jross@venari.net]; scornwell@venari.net[scornwell@venari.net]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Mon 1/4/2016 4:21:13 PM Coordinated Universal Time
**Subject:** FW: DIRECTIONAL PLAN FOR ST03
**Attachment:** 8x11_WR051 003 ST03BP00 Rev1_JN_02Jan16 Proposal.pdf
**Attachment:** ATT00001.htm
**Attachment:** WR051 003 ST03BP00 Rev1_JN_02Jan16 Proposal Geodetic Report.xlsx
**Attachment:** ATT00002.htm

In accordance with Article 11.1.4 of the Shenandoah UOA, in particular, Article 11.1.4(b), Anadarko has made the decision to plug and abandon the ST2 wellbore.

Anadarko has formulated a revised Well Plan (ST3) in such a way that will get us approximately 500' laterally away from the trouble zone, closer to the ST1 which we know did not encounter this issue/zone. This revised Well Plan is for the ST3 and would be deemed, under the Shenandoah UOA, a substitute well for which Cobalt and Venari would each be afforded an election, respectively. Although not internally finalized, a ST3 AFE would likely resemble, from an estimated cost perspective, the ST2 AFE ($51MM).

It is highly likely Anadarko would secure internal approval to fund its current working interest share (70%) of a ST3, but in this instance, will likely only make an internal recommendation to do so if both Cobalt and Venari were supportive of same.

Attached is the directional plan for the ST3. Please review and advise *ASAP* if your company would likely support an AFE for the ST3. If so, an AFE would be formally submitted for your review and election.

Call with any questions. Thanks.

# Exhibit 44

**To:** McGrievy, Pat[Pat.McGrievy@anadarko.com]
**Cc:** Oudin, Chip[Chip.Oudin@anadarko.com]; Chandler, Paul[Paul.Chandler@anadarko.com]; Prosser, Wendy[Wendy.Prosser@anadarko.com]
**From:** Frye, Lea[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=VBL604]
**Sent:** Wed 1/13/2016 7:40:50 PM Coordinated Universal Time
**Subject:** Final Resource Distribution
**Attachment:** 01-13-2016_Joint_Expl_Dev_Resource_.pptx

Pat,

Please find attached the joint exploration and development resource distribution and MMRA summary. The two groups met this morning and came to agreement on the Multi-zone Method derived resources. This was a comprise between the two groups on methodology and on the low side of the distribution. While the exploration group still believes the low side is too low and the development group stills believes the low side is too high, we agreed to go forward with the Multi-zone Method of combining two MMRAs, one for the West side of the field and one for the East side of the field, and applying some risk that the East side of Shenandoah could fail entirely. Over all, we are pleased with the end result.

Lea

Exhibit
139

APC-00663563

**Document Produced in Native Format**

CONFIDENTIAL

# Shenandoah Un-Risked
# Geolgic Resource Estimates



| Recoverable Resource | Prospect Aggregate Geologic | | | Prospect Aggregate Commercial | | |
|---|---|---|---|---|---|---|
| Thresholds | Zone and Prospect level thresholds NEVER applied. | | | Zone Thresholds disabled. Prospect Threshold applied (167 MMBO / 200 BCF) | | |
| Product | Liquids | Gas | Equivalent | Liquids | Gas | Equivalent |
| Units | MMBO | BCF | MMBOE | MMBO | BCF | MMBOE |
| P99 | 75.955 | 90.244 | 90.996 | 173.506 | 204.656 | 207.618 |
| P90 | 154.764 | 182.451 | 185.174 | 220.041 | 259.194 | 263.249 |
| Mode | 266.331 | 312.598 | 318.345 | 264.686 | 310.755 | 316.433 |
| P50 | 340.220 | 400.443 | 406.948 | 362.517 | 426.457 | 433.584 |
| Mean (P99->P01)* | 356.635 | 418.990 | 426.467 | 385.685 | 453.015 | 461.188 |
| P10 | 580.335 | 679.648 | 693.582 | 599.641 | 701.484 | 716.549 |
| P01 | 876.075 | 1,022.584 | 1,046.506 | 891.432 | 1,040.218 | 1,064.798 |
| Chance | NA | NA | 100.0% | NA | NA | 88.2% |
| Chance>=Mean** | NA | NA | 45.7% | NA | NA | 38.9% |
| Percentile sorting | Sorted | Sorted | Sorted | Sorted | Sorted | Sorted |
| Details | Number of Zones: 2 Zone Chance Dependency: FULLY INDEPENDENT | | | Chance trigger: Total HC Equivalent Resources: BOTH phases | | |

2

# Exhibit 45

**To:** Walker, Al[Al.Walker@anadarko.com]
**From:** AFE.Approval@anadarko.com[AFE.Approval@anadarko.com]
**Sent:** Wed 1/27/2016 9:44:02 PM Coordinated Universal Time
**Subject:** ACTION REQUIRED - #624550 AFE Request
**Attachment:** FinalEstimates01262016_100306.pdf
**Attachment:** Shen5_AFE_Attachment_Final.pdf

---

**Approve AFE: WALKER RIDGE 51 #4**

**Description:**
You have been asked to approve the following AFE:

**Please take the appropriate action by using the links below and follow the prompts. Since you are the final approver, these links are only available if you are authenticated to the Anadarko network.**

Approve
Approve with comments
Reject with comments

**Related Information:**
Reviewed By:

| | |
|---|---|
| McGrievy, Pat | Required recommender ( Operations Eastern Gulf of Mexico ) - 01/26/2016 |
| Abendschein, Bob | Required recommender ( Operations Gulf of Mexico ) - 01/26/2016 |
| Kleckner, Jim | Required recommender ( International & Deepwater Operations ) - 01/27/2016 |
| Walker, Al | Approver ( Executive Office ) |
| ------------------ - | ---------- |
| Type of Request: | Original |
| Date Submitted: | 12/09/2015 |
| Budget Year: | 2016 |
| AFE Type: | Drilling - Exploratory |
| Cost Center: | WALKER RIDGE 51 004 |
| Company: | Anadarko US Offshore LLC |
| Operated: | Y |
| Originator: | Frye, Lea |
| AFE Project Manager: | Frye, Lea |
| Working Interest: | 30.000000% |
| Total Gross Cost: | $ 210,000,000 |
| Total Net Cost: | $ 63,000,000 |
| Your Role: | Approver |
| Funding Approver: | Y |
| Description: | THE DRY HOLE AFE COST FOR THIS WELL, EXPECTED TO SPUD IN MARCH 2016 ON THE |

APC-00222712

DIAMOND
OCEAN
BLACK
HAWK, IS
$210MM
(GROSS)
WHICH
EQUATES
TO $63MM
(NET) TO
APC

Comments:

01/26/2016 -
McGrievy,
Pat:
The Black
Hawk
drillship is
expected on
location
around March
1st.

**Links:**

AFE Form
AFE Worklist
AFE Request Application

Created on Wed Jan 27 15:44:01 CST 2016 . Expires on Fri May 27 16:44:01 CDT 2016 .
Sent to awalker1 .

CONFIDENTIAL

APC-00222713

# Exhibit 46

**To:** Walker, Al[Al.Walker@anadarko.com]; Reeves, Bobby[Bobby.Reeves@anadarko.com]; Gwin, Robert[Robert.Gwin@anadarko.com]; Ingram, Mitch[mitch.ingram@anadarko.com];
Daniels, Bob[Bob.Daniels@anadarko.com]; Hollek, Darrell[Darrell.Hollek@anadarko.com]; Kleckner, Jim[Jim.Kleckner@anadarko.com]
**Cc:** Bevers, Tracie[Tracie.Bevers@anadarko.com]; Black, Emelie[Emelie.Black@anadarko.com]; Kirchhofer, Ruth[Ruth.Kirchhofer@anadarko.com]; Rising, Janis
[Janis.Rising@anadarko.com]; Sanchez, Candice[Candice.Sanchez@anadarko.com]
**From:** Rodriguez, Susie[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=KXN075]
**Sent:** Sun 1/31/2016 11:51:13 PM Coordinated Universal Time
**Subject:** Shenandoah Pre-read Material for EC Review
**Attachment:** Shen5_approval_ review_EC_preRead.pptx

Please find the Shenandoah pre-read attached for tomorrow's EC Meeting.

Thank you and have a great evening.

*Susie Rodriguez*
Sr. Executive Assistant to Jim Kleckner
EVP, International & Deepwater Operations
*Anadarko Petroleum Corporation*
*1201 Lake Robbins Dr.*
*The Woodlands, TX 77380*
832-636-8484

Exhibit
141

CONFIDENTIAL

APC-00223098

# Document Produced in Native Format

CONFIDENTIAL

APC-00223099



# Shenandoah 5, WR 51 #4 Appraisal Well Proposal (Pre-read)

## February 1st, 2016

# 2016-2017 Shenandoah Appraisal Program Update





- **AFE Cost of $210 MM to drill & Evaluate East Flank of Shenandoah Structure**

- **Well Appraisal Findings and Future Appraisal Assumptions:**
  - Shen 4ST & bypass wells reveal additional Structural Complexity on West Flank
  - Achieving commercial threshold likely requires success at Shen 5 & Shen 6; designed as "Keeper" wells
  - ST keeper well tentatively scheduled for Q4, 2017; chance for deferral
  - Extends SOP to early Q2, 2018 or possibly later

# Shenandoah Appraisal Plan

## Shen 5 Drilled as a Vertical Well (Keeper Well)

- Establish existence of Upper & Lower Wilcox pay
- Determine pressure connectivity
- Extend known resources to the east
-

## Shen 5 Success Next Operation

**Shen 6 drilled as a vertical well**

- Establish presence of water contact or extends LKO
- Extend field limits further to the east
- Further establish proven area of reservoir
- Potential Sidetrack to the north for <u>keeper well design</u>

# Shenandoah WR 51 #4 Well Recommendation

## Drill 600' Updip to the Shenandoah #2 (WR 51 #2) testing the central area of the reservoir

- AFE = $210 MM Gross, APC net at 30% = 63 MM
- Shenandoah Partnership: APC=30%, COP=30%, Cobalt=20%, Marathon-10%, Venari=10%
- Well anticipated to spud by March 2016 with the Diamond BlackHawk (APC Operated)

## Primary Objectives

- Extend Wilcox proven reservoirs to the east
- Confirm fault model by pressures relative to Shen 2 and Shen1
- Move project closer to a minimum economic field size for sanctioning



**ANADARKO**

SHENANDOAH
WR 51 #2
608124007900
ELEV_KB : 86

Top Upper Wilcox 49 mya

1
2
3

Top Lower Wilcox ~ 55 mya

A
B
C
D
E

WR 52 #1 Shen-1 Discovery UW Not Present

WR 51 #2 Shen-2 Appraisal

WR 51#3 Shen-4 OH (Salt)

WR 51#3ST1 Shen-4 ST1 & BP UW Faulted out?

WR 51#3ST2 Shen-4 ST2 DNR Wilcox

Proposed Shen 6

WR 52 #2/2BP1 Shen-3 Appraisal All Sands Wet

WR 51#4 Shen 5

*Upper Wilcox 2*
*C.I. = 100' (Post Shen 4 ST1)*

| Block: | WR 51 |
|---|---|
| Water Depth: | 5847' |
| Objective: | U. & L. Wilcox |
| Trap Type: | Salt trapped 3-Way |
| PTD: | 31,100' |
| D.H. Cost: | $210 MM ($63 MM net) |

A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N

4

Structural Cross Section
Across Shenandoah Field Area

Index Map



ANADARKO PETROLEUM CORPORATION

MD Logs

Vertical scale: 1" = 200'



5




Shen-4ST1 to Shen-2 to Shen-5 to Shen-6 to Shen-3

# Stand-alone Development Assumptions



**Targeted Zones**

## Assumptions

- **30 Year Field Life (well life 25 yrs.)**

- **1st Oil July 2021**

- **Facility (Spar):**
  - Oil Production: 100K BOPD
  - Gas Production: 120 MMCFD
  - Water Production: 100K BWPD
  - Liquid Production: 120K BLP

## Targeted Zones Phased Development:

- **Phase 1: (all cases)**
  - 4 wells and one flow loop

- **Phase 2: (P50 and P10 only)**
  - 6 additional wells and another flow loop (10 wells total)

- **No Injection**

- **Uptime = 95%**



# Decision Tree (100 MPOD Spar No Injection)





# Capital Summary







# Pre-drill WR 51 #4 Economic Summary
## (Stand-alone Spar Development)



## Risked and Un-risked Mean (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | Mean Gross EUR (MMBOE) | P$_c$ |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | | |
| **Risked Mean** | 208 | 0.22 | 15.38 | 478 | 0.48 | 16.07 | 412.6 | 88.2% |
| **Unrisked Mean** | 250 | 0.24 | 15.18 | 557 | 0.50 | 15.87 | 468.0 | 100% |

*Increased facilities costs at $80 oil (market driven)

**In the success case at WR 51 #4 (Shen-5), APC could prove additional resources moving this project toward a sanction decision. The size of the prize is characterized by the current un-risked P10 case below.**

## Un-risked P10 (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | Gross EUR (MMBOE) | P$_c$ |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | | |
| **Unrisked P10** | 656 | 0.62 | 9.90 | 1,098 | 0.99 | 10.35 | 717 | 100% |

*Increased facilities costs at $80 oil (market driven)

# Exhibit 47

**To:** Shareef, Isaac[Isaac.Shareef@anadarko.com]; Gauthier, Lisa[Lisa.Gauthier@anadarko.com]; Pursell, Deborah[Deborah.Pursell@anadarko.com]; Chandler, Paul [Paul.Chandler@anadarko.com]; Frye, Lea[Lea.Frye@anadarko.com]; Kunning, Jim[jim.kunning@anadarko.com]; Pachman, Jeff[Jeff.Pachman@anadarko.com]; Young, Susan [Susan.Young@anadarko.com]; Floyd, Jonathan[Jonathan.Floyd@anadarko.com]; Coker, Morgan [Air Resources Americ][Morgan.Coker@anadarko.com]; Oudin, Chip [Chip.Oudin@anadarko.com]; Prosser, Wendy[Wendy.Prosser@anadarko.com]
**From:** Workflow System[WF-BATCH@Anadarko.com]
**Sent:** Tue 2/2/2016 1:04:41 AM Coordinated Universal Time
**Subject:** AFE Approved - WALKER RIDGE 51 #4

Reviewed By:
McGrievy, Pat - Operations Eastern Gulf of Mexico  01/26/2016
Abendschein, Bob - Operations Gulf of Mexico  01/26/2016
Kleckner, Jim - International & Deepwater Operations  01/27/2016
Walker, Al - Executive Office  02/01/2016
------------------------------
Type of Request:   Original
AFE Number:   2120948
Date Submitted:  12/09/2015
Budget Year:   2016
AFE Type:   Drilling - Exploratory
Cost Center:   WALKER RIDGE 51 004
Company:   Anadarko US Offshore LLC
Operated:   Y
Operator:
Originator:   Frye, Lea
AFE Project Manager: Frye, Lea
Approved By:  Walker, Al
Working Interest:  30.000000%
Total Gross Cost:   $210,000,000.00
Total Net Cost:   $63,000,000.00
Description:
THE DRY HOLE AFE COST FOR THIS WELL, EXPECTED TO SPUD IN MARCH 2016 ON THE
DIAMOND OCEAN BLACK HAWK, IS $210MM (GROSS) WHICH EQUATES TO $63MM (NET) TO APC
Comments:
01/26/2016 - McGrievy, Pat:
The Black Hawk drillship is expected on location around March 1st.

CONFIDENTIAL
APC-00667721

# Exhibit 48

**DOCUMENT PRODUCED NATIVELY**

**Please review the native document Marathon_014286.xlsx**

**Confidential Information Subject to
Protective Order**

| AREA_BLOCK_OPER_WELL# | SHENANDOAH_NAME | API | Status | Drill_Order | Spud_Date | Lease | MD-ft | TVD-ft | WD-ft | KB-ft | X_SL-ft | Y_SL-ft | SL_Grid Coor_System | XY_SL_Source | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WR51_Anadarko_1 | Shenandoah_2 (Original) | 6081240007500 | PA | 4 | 6/29/2012 | OCS-G-25232 | 13075 | 13075 | 5838 | 87 | 2104205.66 | 9767107.79 | NAD27_UTM15_GridNorth_USFeet | DDR-DIR | Lost well Due to TD in Salt |
| WR51_Anadarko_2 | Shenandoah_2 (Re-Drill of Original) | 6081240007900 | TA | 5 | 9/17/2012 | OCS-G-25232 | 31405 | 31405 | 5837 | 86 | 2103016.93 | 9767039.85 | NAD27_UTM15_GridNorth_USFeet | DDR-DIR | Well developed Wilcox - All Sands Filled with Oil to Base |
| WR51_Anadarko_3 | Shenandoah_4 | 6081240010100 | SideTracked | 8 | 5/26/2015 | OCS-G-25232 | 31296 | 31024.83 | 5857 | 82 | 2100990.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Appraisal Well in North Western area of field-Initial wellbore encountered early salt stock-Additional salt position completly |
| WR51_Anadarko_3ST1 | Shenandoah_4ST1 | 6081240010101 | SideTracked | 9 | 9/8/2015 | OCS-G-25232 | 32105 | 31802.38 | 5857 | 82 | 2100990.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Sidetrack to south - upper Wilcox missing, no salt |
| WR51_Anadarko_3ST1BP1 | Shenandoah_4ST1BP1 | 6081240010102 | SideTracked | 10 | 10/26/2015 | OCS-G-25232 | 31765 | 31591.3 | 5857 | 82 | 2100990.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Core ByPass in Wilcox Section |
| WR51_Anadarko_3ST2 | Shenandoah_4ST2 | 6081240010103 | PA? | 11 | 12/21/2015 | OCS-G-25232 | n/a at this time 022616 | n/a at this time 022616 | 5857 | n/a at this time 022616 | 2100990.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | MRO went NonConsent / Mechanical Drill Problems?? Possible reentry for additional sidetrack |
| WR51_Anadarko_4 | Shenandoah_5 | 6081240010900 | Drilling as of 03/22/16 | 12 | 3/14/2016 | OCS-G-31938 | 30770 (Proposed) | n/a at this time 032216 | 5847 | 82 | 2105781.81 | 9768236.81 | NAD27_UTM15_GridNorth_USFeet | PLAT | Well Drilling as of 03/22/2016 |
| WR52_Anadarko_1 | Shenandoah_1 | 6081240003400 | SideTracked | 1 | 6/4/2008 | OCS-G-31938 | 16685 | 16684 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | |
| WR52_Anadarko_1BP1 | Shenandoah_1BP1 | 6081240003401 | SideTracked | 2 | 7/3/2008 | OCS-G-31938 | 25413 | 25367 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | Small Amount of Pay -Discovery well of field-Encountered salt stringers in apparent reservoir section |
| WR52_Anadarko_1BP2 | Shenandoah_1BP2 | 6081240003402 | PA | 3 | 11/11/2008 | OCS-G-31938 | 30039 | 29948 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | |
| WR52_Anadarko_2 | Shenandoah_3 | 6081240009300 | SideTracked | 6 | 5/29/2014 | OCS-G-31938 | 33225 | 32807.06 | 5874 | 82 | 2115664.01 | 976847.23 | NAD27_UTM15_GridNorth_USFeet | Fugro-DDR | All Sands wet -DownDip test of eastern part of field-Comparable sands as 51#2 in water leg-Water pressure allowed calculation of OWC at ~30510' |
| WR52_Anadarko_2BP1 | Shenandoah_3BP1 | 6081240009301 | PA | 7 | 12/7/2014 | OCS-G-31938 | 31767 | 31407.68 | 5874 | 82 | 2115664.01 | 976847.23 | NAD27_UTM15_GridNorth_USFeet | Fugro-DDR | Core ByPass in Wilcox Section-Note:Well was Deepened from 31239' to 31767' |

1

# Exhibit 49

## Shenandoah WR 51 #4 Well Recommendation

**Drill 600' Updip to the Shenandoah #2 (WR 51 #2) testing the central area of the reservoir**
- AFE = 210 MM Gross
- Shenandoah Partnership: APC=30%, COP=30%, Cobalt=20%, Marathon-10%, Venari=10%
- Well anticipated to spud in March 2016 with the Diamond BlackHawk (APC Operated)

### Primary Objectives
- Extend Wilcox proven reservoirs to the east
- Confirm fault model by pressures relative to Shen 2 and Shen1
- Move project closer to a minimum economic field size for sanctioning



*Upper Wilcox 2*
*C.I. = 100' (Post Shen 4 ST1)*

| Block: | WR 51 |
|---|---|
| Water Depth: | 5847' |
| Objective: | U. & L. Wilcox |
| Trap Type: | Salt trapped 3-Way |
| PTD: | 31,100' |
| D.H. Cost: | 210 MM |

ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL

# Upper Wilcox 2 (CI 250') – Rev8 Final 2 – After Shenandoah 4ST1





# Exhibit 50

*Execution Version*

# PURCHASE AND SALE AGREEMENT
## (SHENANDOAH PROSPECT)

by and among

**MARATHON OIL COMPANY**
as Seller

and

**VENARI OFFSHORE LLC**
as Buyer

**Dated as of March 29, 2016**

CONFIDENTIAL

APC-00358928

# TABLE OF CONTENTS

1. DEFINITIONS; INTERPRETATION ............................................................................. 1
   1.1   Definitions. ................................................................................................. 1
   1.2   Interpretation. ............................................................................................. 9
2. PURCHASE AND SALE. ......................................................................................... 10
   2.1   Purchase and Sale of Assets. .................................................................... 10
   2.2   Consideration. ......................................................................................... 10
   2.3   Adjustments to Purchase Price. ............................................................... 10
   2.4   Closing Statement. ................................................................................... 11
3. CLOSING .............................................................................................................. 11
   3.1   Closing. .................................................................................................... 11
   3.2   Effective Date. ........................................................................................ 11
   3.3   Buyer Deliverables. ................................................................................. 11
   3.4   Seller Deliverables. ................................................................................. 12
   3.5   Post-Closing Adjustment. ........................................................................ 12
4. REPRESENTATIONS AND WARRANTIES OF BUYER ............................................. 14
   4.1   Representations. ....................................................................................... 14
5. REPRESENTATIONS AND WARRANTIES OF SELLER ............................................ 14
   5.1   Representations. ....................................................................................... 15
6. COVENANTS OF THE PARTIES .............................................................................. 16
   6.1   Payments. ................................................................................................ 16
   6.2   Further Assurances. ................................................................................. 16
   6.3   Books and Records. ................................................................................. 16
   6.4   Fees and Expenses. ................................................................................. 17
   6.5   Transfer Taxes. ........................................................................................ 17
   6.6   Recording and Filing. .............................................................................. 17
   6.7   Replacement of Bonds, Letters of Credit, Guarantees and Security Deposits. .............. 17
   6.8   Third Party Approvals. ............................................................................. 18
   6.9   Shenandoah Preferential Right. ............................................................... 18
   6.10  Transfer of Interest. ................................................................................. 18
7. ASSUMPTION; INDEMNIFICATION; WAIVERS ....................................................... 19
   7.1   Buyer Assumption of Assumed Obligations. ........................................... 19
   7.2   Retained Obligations. .............................................................................. 19
   7.3   Seller Indemnity. ..................................................................................... 19
   7.4   Buyer Indemnity. ..................................................................................... 20
   7.5   **Express Negligence Rule.** ...................................................................... 20
   7.6   Limitations on Liability. .......................................................................... 20
   7.7   Waiver of Non-Compensatory Damages. ................................................. 21
8. CONDITIONS PRECEDENT TO CLOSING ................................................................ 21
   8.1   Buyer's Conditions Precedent. ................................................................ 22
   8.2   Seller's Conditions Precedent. ................................................................ 22
9. MISCELLANEOUS ................................................................................................. 22
   9.1   Notices. ................................................................................................... 22
   9.2   Assignment. ............................................................................................ 23
   9.3   Rights of Third Parties. ........................................................................... 24

CONFIDENTIAL

| 9.4 | Counterparts. | 24 |
| 9.5 | Entire Agreement. | 24 |
| 9.6 | Amendments. | 24 |
| 9.7 | Publicity. | 24 |
| 9.8 | Severability. | 25 |
| 9.9 | Governing Law; Jurisdiction. | 25 |
| 9.10 | Waivers. | 26 |
| 9.11 | **Conspicuous.** | 26 |
| 9.12 | Time of Essence. | 26 |
| 9.13 | Payments. | 27 |

Exhibit A – Leases
Exhibit B – Wells
Exhibit C – Form of Assignment of Record Title Interest
Exhibit D – Form of Assignment and Bill of Sale
Exhibit E– Material Contracts
Exhibit F – AFEs
Exhibit G – Form of Assignment for Recording

CONFIDENTIAL

APC-00358930

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is entered into as of March 29, 2016 (the "**Execution Date**"), by and among:

(A)   **Marathon Oil Company**, an Ohio corporation ("**Seller**"); and

(B)   **Venari Offshore LLC**, a Delaware limited liability company ("**Buyer**").

In this Agreement, Seller and Buyer are each referred to as a "**Party**" and collectively as the "**Parties**".

**WHEREAS,** Seller owns a ten percent (10%) Record Title Interest (as defined below) in three (3) leases in the Shenandoah prospect covering Walker Ridge Blocks 51, 52 and 53 located in the United States of America portion of the Gulf of Mexico; and

**WHEREAS,** in accordance with and subject to the terms and conditions of this Agreement, Buyer desires to acquire from Seller, and Seller desires to sell to Buyer, Seller's ten percent (10%) Record Title Interest in three (3) leases in the Shenandoah prospect covering Walker Ridge Blocks 51, 52 and 53 located in the United States of America portion of the Gulf of Mexico in exchange for the Purchase Price (as defined below) and the FID Payment (as defined below, and if applicable) (the "**Transaction**");

**NOW, THEREFORE,** in consideration of the above and of the mutual covenants and promises contained in this Agreement, the Parties agree as follows:

**1.**   **DEFINITIONS; INTERPRETATION**

1.1   <u>Definitions</u>.

In this Agreement, the following terms have the following given meanings:

"**AFE**" means authorizations for expenditures and other approved capital commitments under or in respect of the Operating Agreement.

"**Affiliate**" means with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For purposes of this definition, "control" shall mean the ownership, legally or beneficially, directly or indirectly, of more than fifty percent (50%) of the voting shares or membership interest of any company, corporation or business entity.

"**Agreement**" has the meaning set forth in the preamble.

"**Asset AFEs**" means:
    (a)      the AFEs listed on Exhibit F under the heading "Asset AFEs";

1

CONFIDENTIAL

(b)     all other AFEs to the extent such AFEs are approved on or after the Effective Date; and

(c)     all other AFEs to the extent such AFEs are for operations or work which occur on or after the Effective Date.

"**Assets**" means:

(a)     all of Seller's Record Title Interest in the Leases;

(b)     all of Seller's right, title and interest in and to:

      (i)     the Wells

      (ii)     the Equipment;

      (iii)     all oil and gas within or attributable to the Leases;

      (iv)     the Material Contracts; and

      (v)     the Records.

"**Assignments**" means, collectively:

(a)     an assignment and bill of sale in respect of the Material Contracts, the Wells and the Equipment substantially in the form attached as Exhibit D;

(b)     an assignment of Record Title Interest in respect of Seller's ten percent (10%) Record Title Interest in the Leases substantially in the form attached as Exhibit C; and

(c)     an assignment of OCS Oil and Gas Leases for recording in the applicable Parishes or Counties, substantially in the form attached as Exhibit G.

"**Assumed Obligations**" means:

(a)     all rights, obligations, liabilities and Claims, with respect to the Leases and other Assets, incurred with respect to or arising from or related to the ownership or operation of the Leases and other Assets, on or after the Closing Date, including rights, obligations, liabilities and Claims relating in any manner to the Material Contracts or the condition, use, ownership, or operation of the Leases or other Assets;

(b)     without limiting the generality of, and notwithstanding, (a) above in this definition, sole liability and responsibility for:

2

APC-00358932

(i)     the performance of Seller's obligations under the Operating Agreement in compliance with the terms and conditions of Article 24.1.4 of the Operating Agreement;

(ii)    any Environmental Obligations incurred with respect to, or arising from or related to the ownership or operation of, the Leases and other Assets, on or after the Closing Date;

(iii)   all costs, expenses and charges incurred with respect to or arising from or related to the WR 51-4 AFE;

(iv)   all costs, expenses and charges incurred with respect to or arising from or related to the Asset AFEs for activities which are conducted on or after the Effective Date; and

(v)    all plugging, replugging, abandonment, removal, restoration and decommissioning operations and activities which occur on or after the Closing Date with respect to the Leases, Wells and other Assets, including all obligations under 30 CFR 250.1700 et seq. or any successor regulations or any other applicable Law,

*provided however*, that notwithstanding anything contained herein to the contrary, the Assumed Obligations do not include any Retained Obligations.

"**BOEM/BSEE**" means the United States of America Department of the Interior, Bureau of Ocean Energy Management or United States of America Department of the Interior, Bureau of Safety & Environmental Enforcement, as applicable, or any successor agency or agencies.

"**Business Day**" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas, and that is not otherwise a federal holiday in the United States of America.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Indemnified Parties**" has the meaning set forth in Section 7.3.

"**Claims**" means any claim, liability loss, demand, damages, cause of action of any kind, costs, judgment, penalty, interest and award (including reasonable recoverable legal fees and reasonable costs of litigation of the person asserting the Claim), whether arising by Law, contract, tort, voluntary settlement or otherwise.

"**Closing**" has the meaning set forth in Section 3.1.

"**Closing Date**" has the meaning set forth in Section 3.1.

3

CONFIDENTIAL

APC-00358933

"**Closing Payment**" has the meaning set forth in Section 2.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consents**" means those consents, approvals, or authorizations to assignment pertaining to, required for or in connection with the transfer of the Assets to Buyer and the consummation of the Transaction.

"**Disagreement Notice**" has the meaning set forth in Section 3.5(a).

"**Dollars**" or "**$**" means United States of America dollars.

"**Effective Date**" means January 1, 2016, as of 12:01 a.m., Central Standard Time.

"**Environmental Obligations**" means all obligation, responsibility and liability for:

    (a)    the environmental condition of the Assets;

    (b)    environmental pollution or contamination in respect of the Assets, whether of the soil, surface, seafloor, subsurface, sea, groundwater, air or otherwise by Hydrocarbons, brine, hazardous materials, asbestos, NORM or other substance;

    (c)    the environmental clean-up of the Assets, including any clean-up response and the cost of remediation, control, assessment or compliance with respect to soil, surface, seafloor, subsurface, sea, groundwater, air or other pollution;

    (d)    disposal on or about the Assets of any hazardous materials and products generated by or used in connection with the ownership or operation of the Assets;

    (e)    any environmental liability in respect of the Assets; and

    (f)    any Losses, Claims or Claims of Third Party Claims relating to the foregoing.

"**Equipment**" means, if any, all equipment and other personal property used in connection with the development or operation of the Leases and Wells, and which have been charged to the joint account under the Operating Agreement.

"**Excluded Assets**" means:

    (a)    those Assets not conveyed to Buyer due to the exercise of, and completed transaction in respect of, the Shenandoah Preferential Right by an Other Shenandoah Party; and

4

(b)     all seismic, reprocessed seismic, geological, geophysical and other related technical data and information, or rights thereto, in respect of the Assets.

"**Execution Date**" has the meaning set forth in the preamble.

"**FID**" means Buyer's Election (as defined in the Operating Agreement) or the Election of Buyer's successor or assign at any level to participate in an approved Fabrication AFE (as defined in the Operating Agreement), or Buyer or its successor or assign at any level otherwise participates in a Fabrication AFE, through the participation approval processes set forth in Article 12 of the Operating Agreement.

With respect to the foregoing definition, it is understood and agreed herein that FID is meant to include the Fabrication AFE proposal for a development system or any other styled or similar election proposal, such as an "Execution AFE" proposal, under which Buyer or its successor or assign at any level, is provided under the Operating Agreement (as amended, modified or replaced) and to which the parties to the Operating Agreement (as amended, modified or replaced) elect to participate in or otherwise participates in the proposed AFE for such development system.  This may include such AFE election for or participation in a development system located on the contract area or off of the contract area whether owned by the parties to the Operating Agreement (as amended, modified or replaced) or owned by a Third Party.  It is further understood and agreed by the Parties that, notwithstanding anything herein to the contrary, Buyer's successor or assign, for purposes of this Agreement, does not include a Participating Party (as defined in the Operating Agreement) who receives its interest from Buyer or its successor or assign at any level when: (i) Buyer or its successor or assign at any level Elects not to participate in a Fabrication AFE and is a Non-Participating Party (as defined in the Operating Agreement) in such Fabrication AFE; (ii) Buyer or its successor or assign at any level assigns its interest as a Non-Participating Party to such Participating Party in accordance with Article 16.2.2 of the Operating Agreement; (iii) Buyer or its successor or assign at any level is deemed to have withdrawn from the Operating Agreement in accordance with Article 16.2.2; and (iv) Buyer or its successor or assign does not after such withdrawal otherwise participate in such Fabrication AFE.

"**FID Payment**" has the meaning set forth in Section 2.2(b).

"**Final Settlement Date**" means the earlier of:

(a)     the date Buyer and Seller agree in writing to the Final Settlement Statement;

(b)     the Revised Settlement Date should Buyer not deliver a Disagreement Notice to Seller on or before the Revised Settlement Date; or

(c)     the date the Settlement Statement Arbitrator determines the Final Settlement Statement in accordance with Section 3.5(b).

CONFIDENTIAL

"**Final Settlement Statement**" means either:

(a)     the Final Settlement Statement agreed or deemed final and binding in accordance with Section 3.5(a); or

(b)     the Final Settlement Statement issued by the Settlement Statement Arbitrator in accordance with Section 3.5(b).

"**Governmental Authority**" means any national, state, tribal, county or municipal government, domestic or foreign, any agency, board, bureau, commission, court, department or other instrumentality of any such government, or any arbitrator in any case that has jurisdiction over a Party or any of its respective properties or assets.

"**Hydrocarbons**" means crude oil, natural gas, casinghead gas, condensate, sulphur, natural gas liquids, plant products and other liquid or gaseous hydrocarbons produced in association therewith, including coalbed methane gas, $CO_2$, helium, nitrogen and all other minerals of every kind and character that may be covered by or included in any of the Assets.

"**Knowledge**" means the actual knowledge of any of the executive officers or senior management of such Person.

"**Law**" means any federal, state, local or foreign law (including common law), statute, ordinance, regulation, rule, code, decree or other requirement or rule of law.

"**Leases**" means the OCS oil and gas leases listed on Exhibit A.

"**Legal Proceeding**" means any judicial, administrative, arbitral or other action, suit, litigation, mediation, investigation, inquiry, proceeding, demand, claim (including any counterclaim) or cause of action by or before a Governmental Authority.

"**Losses**" means any and all liabilities, damages, losses, awards, fines, penalties, costs and expenses (including reasonable attorneys' and consultants' fees and expenses), whether known or unknown, absolute, accrued, contingent, fixed or otherwise, or whether due or to become due.

"**Material Contracts**" means those contracts set forth on Exhibit E.

"**NORM**" means naturally occurring radioactive material.

"**Notice**" has the meaning set forth in Section 9.1.

"**Operating Agreement**" means that certain "Unit Operating Agreement for the Walker Ridge Block 51 Unit" dated April 1, 2014, between the Other Shenandoah Parties, Seller and Buyer, as amended. Such Unit Operating Agreement replaced that certain "Operating

6

APC-00358936

Agreement (OA), Shenandoah Prospect, covering Walker Ridge Blocks, 8, 51 and 52"
dated April 1, 2008, originally between ConocoPhillips Company and Anadarko E&P
Company LP, as amended, insofar as the Unit Operating Agreement covers the Walker
Ridge Block 51 Unit area (Walker Ridge Blocks 51, 52 and the N/2 of 53).

**"Operating Expenses"** means operating and all other capital expenditures charged in
accordance with the Operating Agreement by the operator to Seller in respect of overhead
or general and administrative costs as set forth therein.

**"Order"** means any order, judgment, injunction, decree, ruling, sentence, subpoena, writ
or award issued, made, entered or rendered by any Governmental Authority.

**"Organizational Documents"** means, with respect to a particular Person (other than a
natural person), the certificate or articles of incorporation, by-laws, partnership
agreement, regulations, limited liability company agreement or similar organizational
document or agreement, as applicable, of such Person.

**"Other Shenandoah Party"** means each of Cobalt International Energy, L.P., Anadarko
US Offshore Corporation or ConocoPhillips Company, as the other parties to the
Operating Agreement other than the Parties.

**"Party"** and **"Parties"** have the respective meanings given to such terms in the preamble.

**"Person"** means any individual, firm, corporation, partnership, limited liability company,
incorporated or unincorporated association, joint venture, joint stock company,
Governmental Authority or any other entity of any kind.

**"Purchase Price"** has the meaning set forth in Section 2.2(a).

**"Records"** means the Material Contracts, title records, title opinions, lease and land files
in respect of the Leases and Wells.

**"Record Title Interest"** means, as to all depths, with respect to any Lease, the undivided,
fractional or percentage share of all right, title and interest in such Lease granted to the
original lessee (or lessees) by BOEM/BSEE, including an equal undivided, fractional or
percentage share of the operating rights in such lease.

**"Representatives"** means the directors, officers, partners, members, managers,
employees, agents, or advisors (including attorneys, accountants, consultants, bankers,
financial advisors, and any representatives of those advisors) of a Person.

**"Retained Obligations"** means:

    (a)    all rights, obligations, liabilities and Claims, with respect to the Leases and
other Assets, incurred with respect to or arising from or related to the
ownership or operation of the Leases and other Assets, prior to the Closing

<div align="center">7</div>

CONFIDENTIAL

APC-00358937

Date, including rights, obligations, liabilities and Claims relating in any manner to the Material Contracts or the condition, use, ownership, or operation of the Leases or other Assets;

(b)    without limiting the generality of, and notwithstanding, (a) above in this definition, sole liability and responsibility for:

   (i)    any Environmental Obligations incurred with respect to or arising from or related to the ownership or operation of the Leases and other Assets prior to the Closing Date;

   (ii)   all costs, expenses and charges incurred with respect to or arising from or related to AFEs other than the Asset AFEs and the WR 51-4 AFE; and

   (iii)  all costs, expenses and charges incurred with respect to seismic reprocessing for which Seller has Elected (as defined in the Operating Agreement) to participate as a Record Title Interest holder in the Leases,

*provided, however*, that, notwithstanding anything herein to the contrary, the Retained Obligations do not include any Assumed Obligations.

"**Revised Settlement Date**" has the meaning set forth in Section 3.5(a).

"**Revised Settlement Statement**" has the meaning set forth in Section 3.5(a).

"**Seller**" has the meaning given to such term in the preamble.

"**Seller Indemnified Parties**" has the meaning set forth in Section 7.3(c).

"**Settlement Statement**" has the meaning set forth in Section 2.4.

"**Settlement Statement Arbitrator**" means Deloitte LLP (or its Affiliate) or, if Deloitte LLP (or its Affiliate) is unwilling or unable to serve as the Settlement Statement Arbitrator, then such other independent national accounting firm as the Parties agree in good faith.

"**Settlement Statement Submission**" has the meaning set forth in Section 3.5(b).

"**Shenandoah Preferential Right**" means that certain preferential purchase right set forth in Article 24.2 of the Operating Agreement.

"**Third Party**" means a Person other than a Party or its Affiliates.

"**Transaction**" has the meaning set forth in the recitals.

8

CONFIDENTIAL

"**Transaction Documents**" means, with regard to a Party, those documents listed or referred to in Section 3.3 and 3.4 or otherwise delivered on the Execution Date or the Closing Date or post-Closing, in each case to the extent executed and delivered by such Party.

"**Well**" means the wells listed on Exhibit B, and any and all other wells located on the Leases.

"**WR 51-4 AFE**" means that AFE listed on Exhibit F under the heading "WR 51-4 AFE".

1.2    Interpretation.

(a)    References to the preamble or recitals, or to a "Section", "Schedule" or "Exhibit", means the preamble or recitals, or a Section, Schedule or Exhibit, to this Agreement.

(b)    The preamble, recitals, Schedules and Exhibits form a part of this Agreement.

(c)    References to "herein", "hereby", "hereunder", "hereof" and similar expressions are references to this Agreement and not to any particular Section, Schedule or Exhibit.

(d)    References to a Party or Person include references to such Party's or Person's successors or assigns (immediate or otherwise).

(e)    Words importing the singular include the plural and vice versa.

(f)    Words importing gender include the masculine, feminine and neutral genders.

(g)    The use of headings is for convenience of reference only and does not affect the construction or interpretation of this Agreement.

(h)    The words "include" or "including" mean "including without limitation".

(i)    Any reference to a statutory provision includes any subordinate legislation made from time to time under that provision.

(j)    Any reference to a statutory provision includes such provision as from time to time modified or re-enacted or consolidated, whether before, on or after the Execution Date so far as such modification, re-enactment or consolidation applies or is capable of applying to any transactions entered into under this Agreement prior to Closing.

(k)    If there is any conflict or inconsistency between a term in the main part of this Agreement and a term in any of the Schedules, Exhibits or other document referred to or otherwise incorporated into this Agreement, the term in the main part of this Agreement will prevail to the extent of such conflict or inconsistency.

CONFIDENTIAL

APC-00358939

2.    **PURCHASE AND SALE**

2.1   Purchase and Sale of Assets.

Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and acquire from Seller, at the Closing, the Assets.

2.2   Consideration.

In consideration for the purchase of the Assets, Buyer shall pay to Seller;

(a)   Seven million Dollars ($7,000,000.00) (the "**Purchase Price**"), as adjusted in accordance with Section 2.3 and payable in accordance with Section 3.3; and

(b)   Fifteen million Dollars ($15,000,000.00) (the "**FID Payment**"), no later than seven (7) Business Days after FID.  Buyer will promptly provide Notice to Seller upon the occurrence of FID.

2.3   Adjustments to Purchase Price.

The Purchase Price will be adjusted as follows, and the resulting amount will be the "**Closing Payment**":

(a)   The Purchase Price will be adjusted upward by the following amounts (without duplication):

(i)    an amount equal to all costs, expenses and charges incurred and paid by Marathon with respect to or arising from or related to the WR 51-4 AFE;

(ii)   an amount equal to all costs, expenses and charges incurred and paid by Marathon, with respect to or arising from or related to the Asset AFEs for activities or work which are conducted on or after the Effective Date;

(iii)  all Operating Expenses attributable to the WR 51-4 well and any Asset AFEs incurred from and after the Effective Date and which are paid by Seller; and

(iv)   any other upward adjustment to the Purchase Price provided for elsewhere in this Agreement or otherwise agreed upon by the Parties.

(b)   The Purchase Price will be adjusted downward by the following amounts (without duplication):

(i)    an amount equal to the aggregate value of any Excluded Assets; and

(ii)   any other amount provided for elsewhere in this Agreement or otherwise agreed upon by the Parties.

CONFIDENTIAL

APC-00358940

2.4     Closing Statement.

Not later than five (5) Business Days prior to the Closing Date, Seller shall prepare and deliver to Buyer a statement (the "**Settlement Statement**") showing Seller's good faith calculation of the adjustments to the Purchase Price and the resulting Closing Payment (using actual numbers and amounts where available, and using Seller's good faith estimate of other amounts, if actual amounts are not available). Buyer will have until three (3) Business Days prior to the Closing Date to provide written notice to Seller of any Buyer's objection to the adjustments to the Purchase Price regarding any item on the statement along with Buyer's proposed corrections thereto. The Parties will attempt to reconcile and agree on any discrepancies to the Settlement Statement. If the Parties are unable to reconcile and agree on any such discrepancies to the Settlement Statement no later than one (1) Business Day prior to the Closing Date, the Settlement Statement as prepared and delivered by Seller will be used to determine the Closing Payment made at Closing. Any disputed amounts not reconciled and paid by Buyer to Seller as Closing shall be included and resolved in the Post-Closing Adjustment process set forth in Section 3.5.

## 3.     CLOSING

3.1     Closing.

The closing of the sale and transfer of the Assets to Buyer as contemplated by this Agreement (the "**Closing**") shall take place at 10:00 a.m. Central Standard Time at Marathon's offices, located at 5555 San Felipe, Houston, Texas 77056, on the date that is the end of the calendar month following the later of:

(a)     the waiver (including deemed waiver); or

(b)     exercise of the Shenandoah Preferential Rights by the Other Shenandoah Parties

(the "**Closing Date**"), provided, however, that if the end of the calendar month is less than five (5) Business Days away, then Closing shall occur at the end of the calendar month following the month, or on such other date or at such other location as the Parties may agree.

3.2     Effective Date.

Should the Closing occur, Buyer's acquisition of the Assets will be effective as of the Effective Date.

3.3     Buyer Deliverables.

At Closing, Buyer shall deliver to Seller:

(a)     an amount equal to the Closing Payment;

(b)     Buyer executed Settlement Statement;

11

    (c)     Buyer executed and duly notarized (if applicable) Assignments; and

    (d)     such other documents, instruments and agreements as Seller reasonably requests as required to consummate the Transaction.

3.4    <u>Seller Deliverables</u>.

At Closing, Seller shall deliver to Buyer:

    (a)     Seller executed and duly notarized (if applicable) Assignments;

    (b)     Seller executed Settlement Statement;

    (c)     such other documents, instruments and agreements as Buyer reasonably requests as required to consummate the Transaction; and

    (d)     if available to Seller, such written election or waiver response in respect of the Shenandoah Preferential Right from each applicable Other Shenandoah Party.

3.5    <u>Post-Closing Adjustment</u>.

    (a)     *Revised Settlement Statement.* On or before the date that is one hundred and eighty (180) days after the Closing Date, Seller shall prepare and deliver to Buyer a revised Settlement Statement (the "**Revised Settlement Statement**") setting forth the revised Closing Payment and its determination of each adjustment to the Purchase Price necessary to determine any revisions to the Closing Payment and showing the calculation of such adjustments in accordance with Section 2.3. Seller shall provide to Buyer such data and information as Buyer may reasonably request supporting the amounts reflected on the Revised Settlement Statement to permit Buyer and its Representatives to perform or cause to be performed an audit of the Revised Settlement Statement, at Buyer's expense. Buyer will have forty-five (45) days from the date of receipt of the Revised Settlement Statement (such date the "**Revised Settlement Date**") to provide Seller with Notice of Buyer's disagreement (the "**Disagreement Notice**") with the Revised Settlement Statement, such Disagreement Notice to specify in reasonable detail the Dollar amount, nature, and basis (to the extent known to Buyer) of any such disagreement, along with data and information (to the extent available to Buyer) which reasonably substantiates such disagreement. Should Buyer not timely deliver a Disagreement Notice, or should Buyer execute and deliver to Seller a Buyer countersigned Revised Settlement Statement, then the Revised Settlement Statement shall be deemed the Final Settlement Statement, and shall be final and binding on the Parties.

    (b)     *Settlement Statement Dispute.* Should Buyer timely deliver a Disagreement Notice, then the Parties will, in good faith, use their commercially reasonable efforts for a period of forty-five (45) days following Seller's receipt of the Disagreement Notice to resolve the disagreements specified in the Disagreement Notice and agree and execute the Final Settlement Statement. If at the end of

<div align="center">12</div>

such forty-five (45) day period, the Parties have not reached agreement on all such disagreements, any Party may submit the matters that remain in disagreement (and only such matters) to the Settlement Statement Arbitrator (with a copy thereof to the other Party on the same day) for resolution (such submissions, each a "**Settlement Statement Submission**"). The Settlement Statement Arbitrator will set a hearing date, which may be no earlier than thirty (30) days and no later than sixty (60) days from the date the Settlement Statement Arbitrator received the first Settlement Statement Submission. Each Party shall, no later than seven (7) Business Days prior to the hearing date set by the Settlement Statement Arbitrator, submit a written brief to the Settlement Statement Arbitrator (and a copy thereof to the other Party on the same day) with Dollar figures, calculations, and supporting documentation and information that support such Party's position in respect of the matters set forth in the Settlement Statement Submission, along with such Party's proposed Final Settlement Statement. The hearing shall be conducted on a confidential basis. The Settlement Statement Arbitrator may consider only those matters in disagreement that were set forth in the Settlement Statement Submission and which remain in dispute. The Settlement Statement Arbitrator's decision shall be based upon and be consistent with the terms and conditions of this Agreement. In deciding any matter, the Settlement Statement Arbitrator (i) shall be bound by the provisions of this Section 3.5 and the related definitions and (ii) may not assign a value to any disputed item greater than the greatest value for such item claimed by a Party or less than the smallest value for such item claimed by a Party in its submission. The Settlement Statement Arbitrator shall render its decision, which will include a written statement of its findings and conclusions, along with the Final Settlement Statement (reflecting the Closing Payment) which reflects such decision, no later than thirty (30) days after the hearing date. The decision of the Settlement Statement Arbitrator, and the Final Settlement Statement (reflecting the Closing Payment) issued by the Settlement Statement Arbitrator, shall be (i) final and binding on the Parties and (ii) final and non-appealable for all purposes hereunder; *provided* that such decision may be reviewed, corrected, or set aside by a court of competent jurisdiction, but only if and to the extent that the Settlement Statement Arbitrator is found by such court of competent jurisdiction to have made mathematical errors with respect to its decision or the Final Settlement Statement issued by the Settlement Statement Arbitrator. Each of the Parties will bear its own legal fees and other costs of presenting its case. Each Party will bear one-half of the costs and expenses of the Settlement Statement Arbitrator.

(c)     *Final Settlement Statement.* If the amount of the Closing Payment set forth on the Final Settlement Statement exceeds the Closing Payment set forth in the Settlement Statement, then, within ten (10) Business Days after the Final Settlement Date, Buyer shall pay to Seller the amount by which the amount set forth on the Final Settlement Statement exceeds the Closing Payment set forth in the Settlement Statement. If the amount of the Closing Payment set forth on the Final Settlement Statement is less than the Closing Payment set forth in the Settlement Statement, then Seller shall pay to Buyer, within ten (10) Business

13

CONFIDENTIAL

Days after the Final Settlement Date, the amount by which the amount set forth on the Final Settlement Statement is less than the Closing Payment set forth in the Settlement Statement.

**4.    REPRESENTATIONS AND WARRANTIES OF BUYER**

4.1    <u>Representations</u>.

Buyer represents and warrants to Seller the following as of the Execution Date and as of the Closing Date:

(a)    *Organization.*   Buyer is a limited liability company, validly organized and existing in good standing under the laws of the State of Delaware.

(b)    *Authorization; Enforceability.*   Buyer has full capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and the Transaction Documents to which Buyer is a party, and the performance of the Transaction, have been duly and validly authorized by Buyer, and no other proceeding on the part of Buyer is necessary to authorize this Agreement or the performance of the Transaction.  This Agreement has been duly and validly executed and delivered by Buyer (and all Transaction Documents required hereunder to be executed and delivered by Buyer at Closing will be duly executed and delivered by Buyer), and this Agreement constitutes, and at Closing each Transaction Document will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(c)    *No Conflict.*   The execution and delivery of this Agreement and the Transaction Documents by Buyer and the consummation of the Transaction by Buyer do not and shall not:

(i)    violate any Law or Order applicable to Buyer; or

(ii)    violate any Organizational Document of Buyer.

(d)    *Regulatory.*   Buyer is qualified per applicable Law to own the Assets in all jurisdictions where the Assets are located, and the consummation of the Transaction will not cause Buyer to be disqualified as to such an owner.

(e)    *No Claims.*   There are no claims, demands, actions, suits, governmental inquiries or proceedings pending, or to Buyer's Knowledge threatened, against Buyer that will or can reasonably be expected to hinder or impede materially the consummation of the Transaction.

**5.    REPRESENTATIONS AND WARRANTIES OF SELLER**

14

CONFIDENTIAL

APC-00358944

5.1   <u>Representations</u>.

Seller represents and warrants to Buyer the following as of the Execution Date and as of the Closing Date:

(a)   *Organization*.   Seller is an entity duly formed, validly existing and in good standing under the laws of the State of Ohio.

(b)   *Authorization; Enforceability*.   Seller has full capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder.   The execution, delivery and performance of this Agreement and the Transaction Documents to which Seller is a party, and the performance of the Transaction, have been duly and validly authorized by Seller, and no other proceeding on the part of Seller is necessary to authorize this Agreement, such Transaction Document or the performance of the Transaction.   This Agreement has been duly and validly executed and delivered by Seller (and all Transaction Documents required hereunder to be executed and delivered by Seller at the Closing will be duly executed and delivered by Seller), and this Agreement constitutes, and at the Closing each such Transaction Document will constitute, a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(c)   *No Conflicts*.   The execution and delivery of this Agreement and the Transaction Documents by Seller and the consummation of the Transaction by Seller do not and shall not:

(i)   violate any Law or Order applicable to Seller; or

(ii)   violate any Organizational Document of Seller.

(d)   *Material Contracts*.   Except for the Material Contracts, to Seller's Knowledge, there are no other contracts or agreements which are in effect and to which Seller is a party which cover or affect the Leases or other Assets being conveyed in connection with this Transaction.

(e)   *Burdens and Liens*.   Except for:

(i)   lessor's royalty;

(ii)   the terms and conditions of the Leases;

(iii)   the terms and conditions of the Operating Agreement;

(iv)   the terms and conditions of the Material Contacts other than the Operating Agreement; and

15

CONFIDENTIAL

APC-00358945

       (v)     those described on Exhibit A,

       there are no liens, burdens or encumbrances affecting the Leases or other Assets.

  (f)     *No Claims.*  There are no Claims, demands, actions, suits, governmental inquiries or proceedings pending, or to Seller's Knowledge threatened, against Seller that will or can reasonably be expected to hinder or impede materially the consummation of the Transaction.

## 6.    COVENANTS OF THE PARTIES

6.1    <u>Payments</u>.

    Except as expressly provided otherwise in this Agreement, Buyer shall pay to Sellers any and all proceeds, reimbursements, credits and income paid to or received by Buyer and that are attributable to the Retained Obligations (to the extent not accounted for in the Revised Settlement Statement or the Final Settlement Statement).  Except as expressly provided otherwise in this Agreement, Seller shall pay to Buyer any and all proceeds, reimbursements, credits and income paid to or received by Seller and that are attributable to the Assumed Obligations (to the extent not accounted for in the Revised Settlement Statement or the Final Settlement Statement).  The Party responsible for the payment of such amounts received shall reimburse the other Party within fifteen (15) Business Days after the end of the month in which such amounts were received by the Party responsible for payment and no further adjustments shall be made with respect to such amounts in the Final Settlement Statement.

6.2    <u>Further Assurances</u>.

    Subject to the terms and conditions of this Agreement, each Party will use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the Transaction.  The Parties agree to use their commercially reasonable efforts to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transaction in accordance with the terms hereof.

6.3    <u>Books and Records</u>.

  (a)     Seller will use commercially reasonable efforts to deliver to Buyer no later than sixty (60) days after the Closing Date, to the extent permitted by applicable Laws or applicable contracts, originals of the Records (or copies if originals are not available).

  (b)     Seller may retain copies of any or all of the Records.

  (c)     Buyer will maintain the Records for a period of no less than seven (7) years post-Closing.

CONFIDENTIAL

(d)     Should Seller require originals of the Records in order to comply with any obligation, filing, request or requirement by a Governmental Authority, Buyer will promptly provide the originals of the applicable Records to Seller.  Following the need for the originals, Seller shall promptly return such originals to Buyer.

6.4     Fees and Expenses.

All fees and expenses, including fees and expenses of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transaction, will be paid by the Party incurring such fee or expense.  Notwithstanding anything to the contrary in this Agreement and for the avoidance of doubt, Buyer shall be responsible for all filing, recording, notice or transfer fees in respect of the Assets.

6.5     Transfer Taxes.

Notwithstanding anything to the contrary herein, it is acknowledged and agreed by and between Seller and Buyer that the Purchase Price and FID Payment excludes any sales taxes or other taxes of a similar nature in connection with the sale of Assets pursuant to this Agreement. Buyer and Seller will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments and transfers to be made to Buyer from any sales, use, stamp, real estate transfer, documentary, registration, recording and other similar taxes. If a determination is ever made that such a tax applies, Buyer will pay and be liable for all of such taxes and any fines, penalties or interest in connection with such taxes.

6.6     Recording and Filing.

(a)     No later than fifteen  (15) days after Closing, Buyer shall at its sole cost and expense file or record the Assignments, and any notice, financing or assignment documents, with the BOEM/BSEE and with any other appropriate Governmental Authority or applicable Third Party to the extent required by any applicable Law or contract.

(b)     Buyer shall take all necessary actions and provide all required or requested information to the BOEM/BSEE and any other appropriate Governmental Authority or applicable Third Party in order to ensure the approval of the Assignments, including the filing of all bonds, supplemental bonds, guarantees or other security to the extent required by any applicable Law or contract.

(c)     Buyer shall promptly provide to Seller copies of all documentation and information provided to BOEM/BSEE, other Governmental Authority or applicable Third Party in connection with this Section 6.6.

6.7     Replacement of Bonds, Letters of Credit, Guarantees and Security Deposits.

The Parties agree and acknowledge that none of the bonds, letters of credit, guarantees and security deposits, if any, posted by Seller with any Governmental Authority or Third Party in relation to the Assets will be transferred to Buyer.

17

APC-00358947

6.8     Third Party Approvals.

Other than the Shenandoah Preferential Right, each Party shall (and shall cause its respective Affiliates to) use commercially reasonable efforts to obtain all material consents and approvals of Third Parties that any Party or its Affiliates are required to obtain to consummate the Transaction; *provided* no Party or its Affiliates is required to make payments or undertake obligations to or for the benefit of any Person in order to obtain any such consents and approvals.

6.9     Shenandoah Preferential Right.

(a)     With respect to the Shenandoah Preferential Right, Seller shall, no later than two (2) Business Days after the Execution Date, use commercially reasonable efforts to send to each Other Shenandoah Party a notice, in material compliance with the contractual provisions of Article 24 of the Operating Agreement applicable to the Shenandoah Preferential Right.

(b)     If, in accordance with the terms and conditions of the Shenandoah Preferential Right as set forth in the Operating Agreement, should an Other Shenandoah Party elect to acquire its proportionate share of the Assets, then such proportionate share of the Assets will be deemed an Excluded Asset and the Purchase Price will be proportionately reduced.  Seller shall promptly notify Buyer of the exercise of any Shenandoah Preferential Right by an Other Shenandoah Party.

(c)     For the purposes of the Shenandoah Preferential Right and the consummation of the Transaction, Buyer shall be deemed to have elected to acquire its proportionate share of the Assets under the Operating Agreement should one of the Other Shenandoah Party elect to acquire its proportionte share of the Assets.

(d)     Closing under this Agreement and any closing in respect of any exercised Shenandoah Preferential Right by an Other Shenandoah Party shall occur simultaneously.

6.10    Transfer of Interest.

Any assignment of Record Title Interest under this Agreement shall be made, delivered and accepted:

(a)     without warranty of title, express or implied, including, without limitation any warranty as to merchantability, quality, quantity, or fitness for a particular purpose, except however as to any claims by another Person claiming interest in Seller's Record Title Interest in the Leases, by through and under the Seller but not otherwise;

(b)     subordinate to and made expressly subject to the Operating Agreement;

(c)     provide for the assumption by Buyer of the performance of all of Seller's obligations under the Operating Agreement;

18

CONFIDENTIAL

(d)    free and clear of any Claims, burdens, including any overriding royalty, mortgage, pledge, lien, production payment or net profits interest or any similar encumbrance, except:

       (i)    lessor's royalty;

       (ii)    the terms and conditions of the Leases;

       (iii)    the terms and conditions of the Operating Agreement;

       (iv)    the terms and conditions of the Material Contacts other than the Operating Agreement; and

       (v)    those described on Exhibit A,

(e)    with the understanding that the Record Title Interest conveyed shall be subject to the Leases, this Agreement, the Material Contracts and the approval of BOEM/BSEE of such assignment.  Should any terms of any assignment conflict with the terms of this Agreement, the terms of this Agreement shall control. There shall be no merger of any of this Agreement with any assignment hereunder; rather, this Agreement shall survive the granting of any assignment.

## 7.    ASSUMPTION; INDEMNIFICATION; WAIVERS

7.1    <u>Buyer Assumption of Assumed Obligations</u>.

Without limiting Buyer's rights to indemnity under this Section 7.1, from and after the Closing, Buyer assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) the Assumed Obligations.

7.2    <u>Retained Obligations</u>.

Other than the Assumed Obligations for which Seller will have no liability or responsibility, from and after Closing, Seller will retain and will remain solely liable and responsible for the fulfillment, performance, payment, and discharge of all obligations and liabilities, known or unknown, with respect to the Retained Obligations.

7.3    <u>Seller Indemnity</u>.

From and after Closing with respect to this Section 7.3, Seller shall indemnify, defend, and hold harmless Buyer, its Affiliates and each of their respective officers, members, managers, partners, directors, employees and representatives (the "**Buyer Indemnified Parties**") against any and all Losses incurred or suffered by any Buyer Indemnified Party as a result of, relating to, or arising out of:

(a)    any breach of any representation or warranty made by Seller in this Agreement;

19

APC-00358949

(b)    any breach of any covenant or agreement made or to be performed by Seller under this Agreement; and

(c)    any Retained Obligations.

7.4    <u>Buyer Indemnity</u>.

From and after Closing, Buyer shall indemnify, defend, and hold harmless Seller, its Affiliates and each of their respective officers, members, managers, partners, directors, employees, and representatives (the "**Seller Indemnified Parties**") against any and all Losses incurred or suffered by any Seller Indemnified Party as a result of, relating to, or arising out of:

(a)    any breach of any representation or warranty made by Buyer in this Agreement;

(b)    breach of any covenant or agreement made or to be performed by Buyer under this Agreement; and

(c)    the Assumed Obligations.

7.5    **<u>Express Negligence Rule</u>**.

**The indemnification and waiver provisions in this Section 7.5 shall be enforceable regardless of whether any Person (including the Person from whom indemnification is sought) alleges or proves the sole, concurrent, contributory, or comparative negligence of the Person seeking indemnification or the sole or concurrent strict liability imposed upon the Person seeking indemnification, except in the case of gross negligence or willful misconduct by such Person.**

7.6    <u>Limitations on Liability</u>.

(a)    *Reductions.* The amount of any Losses subject to indemnification under this Agreement shall be reduced or reimbursed, as the case may be, by any Third Party insurance proceeds (including reinsurance proceeds received by a wholly owned captive insurance company) and Third Party recoveries actually received by an Indemnified Party with respect to such Losses, net of any reasonable out-of-pocket costs and expenses (including all reasonable out-of-pocket costs and expenses incurred by Third Parties in investigating, prosecuting, defending and collecting such recovered amount and any deductibles paid to obtain insurance coverage) actually incurred by such Indemnified Party in obtaining such Third Party payment; *provided*, no Party shall have an obligation to seek any such proceeds or recoveries. If an Indemnified Party receives an amount under insurance coverage or from such Third Party with respect to Losses that were the subject of indemnification under this Agreement at any time subsequent to indemnification provided thereunder, then Buyer shall, in the case of a Buyer Indemnified Party that receives such proceeds, promptly reimburse or procure such reimbursement to Seller, and Seller shall, in the case of a Seller Indemnified Party that receives such proceeds, promptly reimburse or procure such

20

APC-00358950

reimbursement to Buyer, in each case net of any reasonable out-of-pocket costs and expenses (including all reasonable out-of-pocket costs and expenses incurred by Third Parties in investigating, prosecuting, defending and collecting such recovered amount and any deductibles paid to obtain insurance coverage) actually incurred by such Indemnified Party in obtaining such Third Party payment.

(b)    *Mitigation.*   Buyer shall, and shall procure that each Buyer Indemnified Party shall, and Seller shall, and shall procure that each Seller Indemnified Party shall, make commercially reasonable efforts to mitigate or minimize Losses under this Agreement upon and after becoming aware of any event or condition that would reasonably be expected to give rise to any Losses that are indemnifiable under this Agreement; *provided* that such Indemnified Party shall not be required to incur expense or risk to mitigate or minimize any such Losses.  If an Indemnified Party fails to use its commercially reasonable efforts to mitigate an indemnifiable loss under the preceding sentence, the Indemnifying Party shall have no liability for any portion of such loss that reasonably could have been avoided had the Indemnified Party made such efforts.

(c)    *Determining Amount of Losses.*   For the sole purpose of determining the amount of any Losses (and not for determining whether or not any breaches of representations or warranties have occurred), the representations and warranties set forth in this Agreement shall not be deemed qualified by any references to Dollar amounts, materiality or Material Adverse Effect, and such qualifiers shall be disregarded for purposes of calculating any Losses hereunder.

7.7    <u>Waiver of Non-Compensatory Damages.</u>

(a)    With respect to any and all Losses for which indemnification may be available under this Agreement, no Indemnifying Parties shall have any liability for any consequential, indirect, punitive, exemplary, remote, speculative (including damages for lost profits of any kind), or special damages with respect to any claim for which an Indemnifying Party may have liability pursuant to this Agreement; *provided, however,* that this waiver shall not apply to the extent (i) such consequential, indirect, punitive, exemplary, or special damages are awarded in respect of a Third Party Claim and (ii) of any Person's ability to recover any direct, reasonably foreseeable Losses suffered or incurred by such Person.

(b)    With respect to any and all Losses that may be available to a Party under this Agreement, no Party shall have any liability to the other Parties for any consequential, indirect, punitive, exemplary, remote, speculative (including damages for lost profits of any kind), or special damages with respect to any such Losses; *provided, however,* that this waiver shall not apply to the extent (i) such consequential, indirect, punitive, exemplary, or special damages are awarded in respect of a Third Party Claim and (ii) of any Person's ability to recover any direct, reasonably foreseeable Losses suffered or incurred by such Person.

8.    **CONDITIONS PRECEDENT TO CLOSING**

CONFIDENTIAL

APC-00358951

8.1     Buyer's Conditions Precedent.

The obligation of Buyer to consummate the Transaction is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)     *Representations and Warranties.*  The representations and warranties of Seller set forth in Section 5 shall be true and correct in all material respects (except for representations and warranties qualified by materiality or Dollar amounts, which shall be true and correct in all respects) on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date.

(b)     *Performance of Covenants and Agreements by Seller.*  Seller shall have performed and complied in all material respects with all other obligations and agreements required in this Agreement to be performed or complied with by Seller, in each case, on or prior to the Closing Date.

(c)     *Deliveries.*  Seller shall have delivered, or be ready, willing and able to deliver, the items listed in Section 3.4.

8.2     Seller's Conditions Precedent.

The obligation of Seller to consummate the Transaction is subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     *Representations and Warranties.*  The representations and warranties of Buyer set forth in Section 4 shall be true and correct in all material respects (except for representations and warranties qualified by materiality or Dollar amounts, which shall be true and correct in all respects) on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date.

(b)     *Performance of Covenants and Agreements by Buyer.*  Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     *Deliveries.*  Buyer shall have delivered, or be ready, willing and able to deliver, the items listed in Section 3.3.

9.     **MISCELLANEOUS**

9.1     Notices.

All notices and other communications and deliveries to and between the Parties pursuant to this Agreement ("**Notice**") must be in writing and will be deemed to have been duly

22

APC-00358952

given when (i) delivered in person, (ii) five (5) days after posting in the United States mail having been sent by registered or certified mail return receipt requested, or (iii) delivered by telecopy or e-mail and promptly confirmed by delivery in person or post as aforesaid in each case if received during the recipient's normal business hours, or at the beginning of the recipient's next Business Day after receipt if not received during the recipient's normal business hours, with postage prepaid, addressed as follows:

(a)     If to Seller, to:

        Marathon Oil Company
        5555 San Felipe St.
        Houston, Texas 77056
        Fax: (713) 513-4486
        Email: dakokoski@marathonoil.com
        Attention: Dale Kokoski, Vice President Technical Delivery

        With a copy to:

        Marathon Oil Company
        5555 San Felipe St.
        Houston, Texas 77056
        Fax: (713) 513-4121
        Email: bcromain@marathonoil.com
        Attention: Byron Romain, Senior Attorney

(b)     If to Buyer, to:

        Venari Offshore LLC
        15375 Memorial Drive, Suite 800
        Houston, Texas 77079
        scornwell@venari.com
        Scott H. Cornwell, Senior Vice President

or to such other address or addresses as a Party may from time to time designate to the other Parties in writing.

9.2     Assignment.

(a)     Except as set forth in Section 9.2(b), no Party may assign or otherwise transfer this Agreement in whole or in part, or assign or otherwise transfer any of its rights under this Agreement, or delegate or otherwise transfer any of its obligations or duties under this Agreement. Any attempted assignment or other transfer by a Party of this Agreement in whole or in part, or assignment or other transfer by a Party of any rights under this Agreement, or delegation or other transfer by a Party of any obligations or duties under this Agreement in violation of this Agreement, shall be deemed void and of no effect. This Agreement will inure to the benefit of a Party's successors and permitted assigns.

23

(b)   Section 9.2(a) shall not limit or impede Buyer's right to assign the Assets, or any portion thereof, after Closing to any Person. Should Buyer assign the Assets, or any portion thereof, to any Person after Closing, Buyer shall expressly include as part of such assignment the assumption by the assignee of the FID Payment obligation, if any, under this Agreement. Notwithstanding any such assignment and the assumption by any such assignee of the FID Payment obligations under this Agreement, Buyer shall not be released from the FID Payment obligation under this Agreement. Buyer shall promptly provide Notice to Seller upon the occurrence of any such assignment of the Assets.

9.3   Rights of Third Parties.

Except for the provisions of Sections 7.3 and 7.4, nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement.

9.4   Counterparts.

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any facsimile or email copies hereof or signature hereon shall, for all purposes, be deemed originals. No Party shall be bound until such time as all of the Parties have executed counterparts of this Agreement.

9.5   Entire Agreement.

This Agreement (together with the Schedules and Exhibits) and the Transaction Documents constitute the entire agreement among the Parties and supersede any other agreements, whether written or oral, which may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the Transaction.

9.6   Amendments.

This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

9.7   Publicity.

Buyer or Seller may make a press release or other public communication or announcement and any filings required by applicable Law in connection with the execution of this Agreement; *provided* that the Person making such release, communication, or announcement provides the other Parties reasonable opportunity to review and comment on any such release, communication, or announcement. Except for the foregoing, all press releases or other public communications of any nature whatsoever relating to the Transaction, and the method of the release for publication thereof, shall be subject to the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned, or delayed by such Parties; *provided, however*, that

24

APC-00358954

nothing herein shall prevent a Party from publishing such press releases or other public communications as is necessary to satisfy such Party's obligations at Law or under the rules of any stock or commodities exchange after consultation with the other Parties. In the event that a Party believes it is required to issue or make any press release or announcement, such Party shall (i) give prompt Notice thereof to the other Parties, (ii) allow such other Parties reasonable opportunity to review and provide comments with respect to the content of such press release or announcement, and (iii) use commercially reasonable efforts to incorporate any reasonable comment from the other Parties prior to any release or announcement.

9.8   <u>Severability</u>.

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

9.9   <u>Governing Law; Jurisdiction</u>.

(a)   *Law.* This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

(b)   *Forum.* The Parties agree, apart from the Settlement Statement dispute resolution procedure set forth in Section 3.5(b), that the appropriate, exclusive, and convenient forum for any disputes between any of the Parties arising out of this Agreement or the transactions contemplated hereby shall be in any state or federal court in Harris County, Texas, and each of the Parties irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or related to this Agreement. The Parties further agree that the Parties shall not bring suit with respect to any disputes arising out of this Agreement or the transactions contemplated hereby in any court or jurisdiction other than the above specified courts. The Parties further agree, to the extent permitted by Law, that a final and non-appealable judgment against a Party in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of such judgment. Except to the extent that a different determination or finding is mandated due to the applicable Law being that of a different jurisdiction, the Parties agree that all judicial determinations or findings

25

APC-00358955

by a state or federal court in Harris County, Texas with respect to any matter under this Agreement shall be binding.

(c) *Jurisdiction.* To the extent that any Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each such Party hereby irrevocably:

(i) waives such immunity in respect of its obligations with respect to this Agreement; and

(ii) submits to the personal jurisdiction of any court described in Section 9.9(b).

(d) *Waiver.* The Parties agree that they hereby irrevocably waive the right to trial by jury in any action to enforce or interpret the provisions of this Agreement.

9.10 Waivers.

Any failure by a Party to comply with any of its obligations, agreements or conditions herein contained may be waived by the Party or Parties to whom such compliance is owed by an instrument signed by such Party or Parties and expressly identified as a waiver, but not in any other manner. No waiver of, or consent to a change in, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

9.11 **Conspicuous.**

**The Parties agree that, to the extent required by applicable Law to be effective or enforceable, the provisions of this Agreement in bold-type font are "conspicuous" for the purpose of any applicable Law.**

9.12 Time of Essence.

This Agreement contains a number of dates and times by which performance or the exercise of rights is due, and the Parties intend that each and every such date and time be the firm and final date and time, as agreed. For this reason, each Party hereby waives and relinquishes any right it might otherwise have to challenge its failure to meet any performance or rights election date applicable to it on the basis that its late action constitutes substantial performance, to require the other Parties to show prejudice, or on any equitable grounds. Without limiting the foregoing, time is of the essence in this Agreement. If the date specified in this Agreement for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period

CONFIDENTIAL

during which Notice is required to be given or action taken) shall be the next day which is a Business Day.

9.13   Payments.

Unless otherwise agreed by the Parties, all payments to be made under this Agreement must be made by the paying Party or Parties to the receiving Party or Parties by wire transfer in immediately available funds.  The receiving Party or Parties will, before any such payment, notify the paying Party or Parties of the payment details of the receiving Party's or Parties' bank account for such payment.

*[SIGNATURE PAGE FOLLOWS]*

CONFIDENTIAL

APC-00358957

**IN WITNESS WHEREOF,** the Parties have duly executed this Agreement as of the Execution Date.

**SELLER**
**Marathon Oil Company**

By: *J. M. Little*
Name: T. M. Little
Title:  Vice President Conventional

**BUYER**
**Venari Offshore LLC**

By:
Name: Scott H. Cornwell
Title:  Senior Vice President - Commercial
        and Business Development

*Signature Page to Purchase and Sale Agreement (Shenandoah Prospect)*

CONFIDENTIAL

**Exhibit A**
**Leases**

### WR 51

**Oil and Gas Lease No. OCS-G 31938**, dated effective December 1, 2007, by and between the United States of America, as Lessor, and ConocoPhillips Company, Lessee, covering all of Block 51, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Seller's Record Title Interest:**          **10%**

**Subject to 2% of 8/8ths overriding royalty interest (1.5% to XOM and 0.5% to Nexen)**

### WR 52

**Oil and Gas Lease No. OCS-G 25232**, dated effective June 1, 2003, by and between the United States of America, as Lessor, and Kerr-McGee Oil & Gas Corporation, Lessee, covering all of Block 52, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Seller's Record Title Interest:**          **10%**

**Subject to 2% of 8/8ths overriding royalty interest (1.5% to XOM and 0.5% to Nexen)**

### WR 53

**Oil and Gas Lease No. OCS-G 28148**, dated effective May 1, 2006, by and between the United States of America, as Lessor, and Hunt Oil Company, Lessee, covering all of Block 53, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Seller's Record Title Interest:**          **10%**

**Subject to 3% of 8/8ths overriding royalty interest (3% to Hunt)**

Exhibit A

Exhibit B
Wells

| AREA_BLOCK_OPER_WELL# | SHENANDOAH_NAME | API |
|---|---|---|
| WR51_Anadarko_1 | Shenandoah_2 (Original) | 608124007500 |
| WR51_Anadarko_2 | Shenandoah_2 (Re-Drill of Original) | 608124007900 |
| WR51_Anadarko_3 | Shenandoah_4 | 608124010100 |
| WR51_Anadarko_3ST1 | Shenandoah_4ST1 | 608124010101 |
| WR51_Anadarko_3ST1BP1 | Shenandoah_4ST1BP1 | 608124010102 |
| WR51_Anadarko_3ST2 | Shenandoah_4ST2 | 608124010103 |
| WR51_Anadarko_4 | Shenandoah_5 | 608124010900 |
| WR52_Anadarko_1 | Shenandoah_1 | 608124003400 |
| WR52_Anadarko_1BP1 | Shenandoah_1BP1 | 608124003401 |
| WR52_Anadarko_1BP2 | Shenandoah_1BP2 | 608124003402 |
| WR52_Anadarko_2 | Shenandoah_3 | 608124009300 |
| WR52_Anadarko_2BP1 | Shenandoah_3BP1 | 608124009301 |

Exhibit B

CONFIDENTIAL

APC-00358960

**Exhibit C**
**Form of Assignment Record Title Interest**

See attached.

Exhibit C

CONFIDENTIAL

APC-00358961

## EXHIBIT "C"

**Attached to and made a part of that certain Purchase and Sale Agreement dated effective as of January 1, 2016 by and between Marathon Oil Company, as "Seller" and Venari Offshore LLC as "Buyer"**

| | |
|---|---|
| U.S. Department of the Interior<br>Bureau of Ocean Energy Management | OMB Control No.: 1010-0006<br>Expiration Date: 3/31/17 |

| | |
|---|---|
| **ASSIGNMENT OF RECORD TITLE INTEREST IN FEDERAL OCS OIL AND GAS LEASE** | Lease No<br><br>Lease Effective Date<br><br>New Lease No. (BOEM Use Only) |

---

### Part A: Assignment

Legal description of the OCS oil and gas lease or the officially designated subdivision of the lease being assigned:

Assignor(s) does (do) hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest (insert name and qualification number of each Assignor and Assignee below):

Assignor(s):                                                                    Percentage Interest Conveyed

Assignee(s):                                                                    Percentage Interest Received

The approval of this assignment is restricted to record title interest only.

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

---

### For BOEM use only

This Assignment of Record Title Interest has been filed as of the date stamped on this document and is hereby approved by the Bureau of Ocean Energy Management on the date shown below.

By_____        _____        _____
      Authorized Official for BOEM                      Title                          BOEM Approval Date

---

Paperwork Reduction Act of 1995 (PRA) Statement: The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. BOEM uses the information to track ownership of leases in the Federal OCS. Responses are required to obtain or retain a benefit. Proprietary data are covered under section 26 of the OCSLA, 30 CFR 556.10, and in accordance with regulations at 30 CFR parts 550, 551, and 552. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Comments on the burden estimate or any other aspect of this form should be directed to the Information Collection Clearance Office, Bureau of Ocean Energy Management, 45600 Woodland Road, Sterling, Virginia 20166.

| | |
|---|---|
| BOEM-0150 (March 2014)<br>Previous Editions are Obsolete. | Page 1 of 2 |

CONFIDENTIAL

**Part B: Certification and Acceptance**

1. Each Assignor certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE**: Each Assignor and Assignee certifies its compliance with the Department of the Interior's nonprocurement debarment and suspension regulations at 2 CFR Subtitle B, Part 1400, and agree to communicate the requirement to comply with these regulations to persons with whom it does business related to this record title interest assignment by including the terms of the regulations in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION**: Each Assignor and Assignee certifies that it is in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-01 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs.

4. **QUALIFICATIONS of ASSIGNOR(S) and ASSIGNEE(S)**. Each Assignor and Assignee certifies that it. is established and officially recognized by the Bureau of Ocean Energy Management as qualified and authorized to bid on, acquire interest in, and hold OCS oil and gas leases; is exercising and meeting due diligence requirements on any other OCS lease in accordance with section 3 of the OCSLA, as amended (43 U.S.C. 1337(d)); is in good standing with acceptable operating performance as required by 30 CFR §§ 550 and 556; is not disqualified by BOEM from acquiring any new OCS leases or assigned interest(s) in existing leases because of unacceptable operating performance on any other OCS lease; is not failing to meet or exercise due diligence (as determined by BOEM after notice and opportunity for a hearing under 30 CFR part 590, subpart A); and is not restricted from bidding or acquiring interests in the lease or officially designated subdivision therein, or grouped with any other entities on the restricted joint bidders list.

5. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR §§ 550 and 556. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is (are) subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Ocean Energy Management is governed by 30 CFR §§ 550 through 556.

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____, upon approval by the Bureau of Ocean Energy Management, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Ocean Energy Management unless all counterparts are filed simultaneously.

By signing this document, you certify that your statements made herein are true, complete and correct to the best of your knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

Assignor Name:
Assignor Qualification No.

By:_____
Signatory Name:
Signatory Title:

_____
Execution Date

Assignee Name:
Assignee Qualification No.

By:_____
Signatory Name:
Signatory Title:

_____
Execution Date

Assignor Name:
Assignor Qualification No.

By:_____
Signatory Name:
Signatory Title:

_____
Execution Date

Assignee Name:
Assignee Qualification No.

By:_____
Signatory Name:
Signatory Title:

_____
Execution Date

CONFIDENTIAL

APC-00358963

**Exhibit "A"**
**to Assignment of Record Title Interest in**
**Federal OCS Oil and Gas Lease**
**by Marathon Oil Company to Venari Offshore LLC**

This Exhibit "A" is attached to and made a part of Form BOEM-0150 Assignment of Record Title Interest in Federal OCS Oil and Gas Lease by Marathon Oil Company, an Ohio corporation ("Assignor"), to Venari Offshore LLC, a Delaware limited liability company ("Assignee") (this "Assignment").

This Assignment shall inure to the benefit of, and shall be binding upon, the successors and assigns of Assignor and Assignee. This Assignment is made for all purposes subject to and shall be governed by the terms and conditions of (i) that certain Purchase and Sale Agreement (Shenandoah Prospect) effective January 1, 2016, by and between Marathon Oil Company, as Seller, and Venari Offshore LLC, as Buyer (the "Agreement"); and (ii) that certain Assignment and Bill of Sale effective January 1, 2016, by and between Marathon Oil Company, as Assignor, and Venari Offshore LLC, as Assignee (the "ABOS"). The ABOS will be filed in the Non-required file maintained by the Bureau of Ocean Energy Management with respect to the lease being assigned, and recorded in the records of the adjacent Louisiana parish(es).

All of the terms and provisions of the ABOS are incorporated into this Assignment by reference thereto and made a part hereof, and this Assignment is not intended to convey to Assignee any additional interest in and to the lease described herein other than that intended to be conveyed in the ABOS. In the event of a conflict between the terms and provisions of this Assignment and those set forth in the Agreement and/or the ABOS, the terms and provisions of the Agreement shall control.

This Assignment also includes Assignor's rights, titles and interests in and to, is further made subject to, and Assignee is bound by and shall undertake to comply with, the terms and conditions of the agreements identified in the Agreement with respect to the lease described herein, insofar and only insofar as the agreements (i) pertain to the lease described herein and (ii) are otherwise assignable.

CONFIDENTIAL

APC-00358964

## EXHIBIT "C"

**Attached to and made a part of that certain Purchase and Sale Agreement dated effective as of January 1, 2016 by and between Marathon Oil Company, as "Seller" and Venari Offshore LLC as "Buyer"**

| | |
|---|---|
| U.S. Department of the Interior<br>Bureau of Ocean Energy Management | OMB Control No.: 1010-0006<br>Expiration Date: 3/31/17 |

Lease No.

## ASSIGNMENT OF RECORD TITLE INTEREST IN FEDERAL OCS OIL AND GAS LEASE

Lease Effective Date

New Lease No. (BOEM Use Only)

### Part A: Assignment

Legal description of the OCS oil and gas lease or the officially designated subdivision of the lease being assigned:

Assignor(s) does (do) hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest (insert name and qualification number of each Assignor and Assignee below):

Assignor(s):                                                                                    Percentage Interest Conveyed

Assignee(s):                                                                                    Percentage Interest Received

The approval of this assignment is restricted to record title interest only.

☐ Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

### For BOEM use only

This Assignment of Record Title Interest has been filed as of the date stamped on this document and is hereby approved by the Bureau of Ocean Energy Management on the date shown below.

By_____
     Authorized Official for BOEM                          Title                          BOEM Approval Date

Paperwork Reduction Act of 1995 (PRA) Statement: The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. BOEM uses the information to track ownership of leases in the Federal OCS. Responses are required to obtain or retain a benefit. Proprietary data are covered under section 26 of the OCSLA. 30 CFR 556.10, and in accordance with regulations in 30 CFR parts 550, 551, and 552. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Comments on the burden estimate or any other aspect of this form should be directed to the Information Collection Clearance Office, Bureau of Ocean Energy Management, 45600 Woodland Road, Sterling, Virginia 20166.

BOEM-0150 (March 2014)                                                                    Page 1 of 2
Previous Editions are Obsolete.

CONFIDENTIAL

**Part B: Certification and Acceptance**

1. Each Assignor certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE**: Each Assignor and Assignee certifies its compliance with the Department of the Interior's nonprocurement debarment and suspension regulations at 2 CFR Subtitle B, Part 1400, and agree to communicate the requirement to comply with these regulations to persons with whom it does business related to this record title interest assignment by including the terms of the regulations in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION**: Each Assignor and Assignee certifies that it is in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-01 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs.

4. **QUALIFICATIONS of ASSIGNOR(S) and ASSIGNEE(S)**: Each Assignor and Assignee certifies that it: is established and officially recognized by the Bureau of Ocean Energy Management as qualified and authorized to bid on, acquire interest in, and hold OCS oil and gas leases; is exercising and meeting due diligence requirements on any other OCS lease in accordance with section 8 of the OCSLA, as amended (43 U.S.C. 1337(b)); is in good standing with acceptable operating performance as required by 30 CFR §§ 550 and 556; is not disqualified by BOEM from acquiring any new OCS leases or assigned interest(s) in existing leases because of unacceptable operating performance on any other OCS lease; is not failing to meet or exercise due diligence (as determined by BOEM after notice and opportunity for a hearing under 30 CFR part 590, subpart A); and is not restricted from bidding or acquiring interests in the lease or officially designated subdivision, therein, or grouped with any other entities on the restricted joint bidders list.

5. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR §§ 550 and 556. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is (are) subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Ocean Energy Management is governed by 30 CFR §§ 550 through 556.

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____ upon approval by the Bureau of Ocean Energy Management, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Ocean Energy Management unless all counterparts are filed simultaneously.

By signing this document, you certify that your statement made herein are true, complete and correct to the best of your knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

Assignor Name:
Assignor Qualification No.

By: _____
Signatory Name:
Signatory Title:

Execution Date

Assignee Name:
Assignee Qualification No.

By: _____
Signatory Name:
Signatory Title:

Execution Date

Assignor Name:
Assignor Qualification No.

By: _____
Signatory Name:
Signatory Title:

Execution Date

Assignee Name:
Assignee Qualification No.

By: _____
Signatory Name:
Signatory Title:

Execution Date

CONFIDENTIAL

APC-00358966

**Exhibit "A"**
**to Assignment of Record Title Interest in**
**Federal OCS Oil and Gas Lease**
**by Marathon Oil Company to Venari Offshore LLC**

This Exhibit "A" is attached to and made a part of Form BOEM-0150 Assignment of Record Title Interest in Federal OCS Oil and Gas Lease by Marathon Oil Company, an Ohio corporation ("Assignor"), to Venari Offshore LLC, a Delaware limited liability company ("Assignee") (this "Assignment").

This Assignment shall inure to the benefit of, and shall be binding upon, the successors and assigns of Assignor and Assignee. This Assignment is made for all purposes subject to and shall be governed by the terms and conditions of (i) that certain Purchase and Sale Agreement (Shenandoah Prospect) effective January 1, 2016, by and between Marathon Oil Company, as Seller, and Venari Offshore LLC, as Buyer (the "Agreement"); and (ii) that certain Assignment and Bill of Sale effective January 1, 2016, by and between Marathon Oil Company, as Assignor, and Venari Offshore LLC, as Assignee (the "ABOS"). The ABOS will be filed in the Non-required file maintained by the Bureau of Ocean Energy Management with respect to the lease being assigned, and recorded in the records of the adjacent Louisiana parish(es).

All of the terms and provisions of the ABOS are incorporated into this Assignment by reference thereto and made a part hereof, and this Assignment is not intended to convey to Assignee any additional interest in and to the lease described herein other than that intended to be conveyed in the ABOS. In the event of a conflict between the terms and provisions of this Assignment and those set forth in the Agreement and/or the ABOS, the terms and provisions of the Agreement shall control.

This Assignment also includes Assignor's rights, titles and interests in and to, is further made subject to, and Assignee is bound by and shall undertake to comply with, the terms and conditions of the agreements identified in the Agreement with respect to the lease described herein, insofar and only insofar as the agreements (i) pertain to the lease described herein and (ii) are otherwise assignable.

CONFIDENTIAL

**Exhibit D**
**Form of Assignment and Bill of Sale**

See attached.

CONFIDENTIAL

APC-00358968

## EXHIBIT D

### Form of Assignment and Bill of Sale

### ASSIGNMENT AND BILL OF SALE

THIS ASSIGNMENT AND BILL OF SALE (this "**Assignment**"), effective as of 7:00 a.m. on January 1, 2016 (the "**Effective Date**"), is made by Marathon Oil Company, an Ohio corporation ("**Assignor**"), whose address is 5555 San Felipe, Houston, Texas 77056, to Venari Offshore LLC, a Delaware limited liability company ("**Assignee**") whose address is 15375 Memorial Drive, Suite 800, Houston, Texas 77079.  In this Assignment, Assignor and Assignee are each referred to as a "**Party**" and collectively as the "**Parties**".

### ARTICLE I
### DEFINITIONS

**1.1**  **Definitions.**  Capitalized terms used herein but not defined shall have the respective meanings ascribed to them in the Purchase and Sale Agreement (as defined below).   The following terms shall have the meanings set forth below:

"**AFE**" means authorizations for expenditures and other approved capital commitments under or in respect of the Operating Agreement.

"**Affiliate**" means with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For purposes of this definition, "control" shall mean the ownership, legally or beneficially, directly or indirectly, of fifty percent (50%) or more of the voting shares or membership interest of any company or corporation or business entity.

"**Asset AFEs**" means:

    (a)    the AFEs listed on Exhibit F to the Purchase and Sale Agreement under the heading "Asset AFEs";

    (b)    all other AFEs to the extent such AFEs are approved on or after the Effective Date; and

    (c)    all other AFEs to the extent such AFEs are for operations or work which occur on or after the Effective Date.

"**Assets**" means:

    (a)    all of Assignor's Record Title Interest in the Leases;

1

CONFIDENTIAL

(b)  all of Assignor's right, title and interest in and to:

    (i)  the Wells

    (ii)  the Equipment;

    (iii)  all oil and gas within or attributable to the Leases;

    (iv)  the Material Contracts; and

    (v)  the Records.

**"Assumed Obligations"** means:

(a)  all rights, obligations, liabilities and Claims, with respect to the Leases and other Assets, incurred with respect to or arising from or related to the ownership or operation of the Leases and other Assets, on or after the Closing Date, including rights, obligations, liabilities and Claims relating in any manner to the Material Contracts or the condition, use, ownership, or operation of the Leases or other Assets;

(b)  without limiting the generality of, and notwithstanding, (a) above in this definition, sole liability and responsibility for:

    (i)  the performance of Assignor's obligations under the Operating Agreement in compliance with the terms and conditions of Article 24.1.4 of the Operating Agreement;

    (ii)  any Environmental Obligations incurred with respect to, or arising from or related to the ownership or operation of, the Leases and other Assets, on or after the Closing Date;

    (iii)  all costs, expenses and charges incurred with respect to or arising from or related to the WR 51-4 AFE;

    (iv)  all costs, expenses and charges incurred with respect to or arising from or related to the Asset AFEs for activities which are conducted on or after the Effective Date; and

    (v)  all plugging, replugging, abandonment, removal, restoration and decommissioning operations and activities which occur on or after the Closing Date with respect to the Leases, Wells and other Assets, including all obligations under 30 CFR 250.1700 et seq. or any successor regulations or any other applicable Law,

2

provided however, that notwithstanding anything contained herein to the contrary, the Assumed Obligations do not include any Retained Obligations.

"**BOEM/BSEE**" means the United States of America Department of the Interior, Bureau of Ocean Energy Management or United States of America Department of the Interior, Bureau of Safety & Environmental Enforcement, as applicable, or any successor agency or agencies.

"**Claims**" means any claim, liability loss, demand, damages, cause of action of any kind, costs, judgment, penalty, interest and award (including reasonable recoverable legal fees and reasonable costs of litigation of the person asserting the Claim), whether arising by Law, contract, tort, voluntary settlement or otherwise.

"**Closing**" has the meaning set forth in Section 3.1 (Closing) of the Purchase and Sale Agreement.

"**Closing Date**" has the meaning set forth in Section 3.1 (Closing) the Purchase and Sale Agreement.

"**Effective Date**" means January 1, 2016, as of 12:01 a.m., Central Standard Time.

"**Environmental Obligations**" means all obligation, responsibility and liability for:

    (a)    the environmental condition of the Assets; and

    (b)    environmental pollution or contamination in respect of the Assets, whether of the soil, surface, seafloor, subsurface, sea, groundwater, air or otherwise by Hydrocarbons, brine, hazardous materials, asbestos, NORM or other substance;

    (c)    the environmental clean-up of the Assets, including any clean-up response and the cost of remediation, control, assessment or compliance with respect to soil, surface, seafloor, subsurface, sea, groundwater, air or other pollution;

    (d)    disposal on or about the Assets of any hazardous materials and products generated by or used in connection with the ownership or operation of the Assets;

    (e)    any environmental liability in respect of the Assets; and

    (f)    any Losses or Claims relating to the foregoing.

"**Equipment**" means, if any, all equipment and other personal property used in connection with the development or operation of the Leases and Wells, and which have been charged to the joint account under the Operating Agreement.

3

"**Governmental Authority**" means any national, state, tribal, county or municipal government, domestic or foreign, any agency, board, bureau, commission, court, department or other instrumentality of any such government, or any arbitrator in any case that has jurisdiction over a Party or any of its respective properties or assets.

"**Hydrocarbons**" means crude oil, natural gas, casinghead gas, condensate, sulphur, natural gas liquids, plant products and other liquid or gaseous hydrocarbons produced in association therewith, including coalbed methane gas, $CO_2$, helium and all other minerals of every kind and character that may be covered by or included in any of the Assets.

"**Law**" means any federal, state, local or foreign law (including common law), statute, ordinance, regulation, rule, code, decree or other requirement or rule of law.

"**Leases**" means the OCS oil and gas leases listed on Exhibit A.

"**Material Contracts**" means those contracts set forth on Exhibit E.

"**NORM**" means naturally occurring radioactive material.

"**Operating Agreement**" means that certain "Unit Operating Agreement for the Walker Ridge Block 51 Unit" dated April 1, 2014, between the Other Shenandoah Parties, Assignor and Assignee, as amended. Such Unit Operating Agreement replaced that certain "Operating Agreement (OA), Shenandoah Prospect, covering Walker Ridge Blocks, 8, 51 and 52" dated April 1, 2008, originally between ConocoPhillips Company and Anadarko E&P Company LP, as amended, insofar as the Unit Operating Agreement covers the Walker Ridge Block 51 Unit area (Walker Ridge Blocks 51, 52 and the N/2 of 53).

"**Other Shenandoah Party**" means each of Cobalt International Energy, L.P., Anadarko US Offshore Corporation or ConocoPhillips Company, as the other parties to the Operating Agreement other than the Parties.

"**Party**" and "**Parties**" have the respective meanings given to such terms in the preamble.

"**Person**" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or any other entity of any kind.

"**Purchase and Sale Agreement**" means that certain Purchase and Sale Agreement dated [ · ] by and between Assignor, as seller, and Assignee, as buyer, pertaining to the sale and purchase of the Assets, among other related matters expressly provided for therein.

"**Record Title Interest**" means, as to all depths, with respect to any Lease, the undivided, fractional or percentage share of all right, title and interest in such Lease granted to the

4

APC-00358972

original lessee (or lessees) by BOEM/BSEE, including an equal undivided, fractional or percentage share of the operating rights in such lease

"**Records**" means the Material Contracts, title records, title opinions, lease and land files in respect of the Leases and Wells.

"**Retained Obligations**" means:

(a) all rights, obligations, liabilities and Claims, with respect to the Leases and other Assets, incurred with respect to or arising from or related to the ownership or operation of the Leases and other Assets, prior to the Closing Date, including rights, obligations, liabilities and Claims relating in any manner to the Material Contracts or the condition, use, ownership, or operation of the Leases or other Assets;

(b) without limiting the generality of, and notwithstanding, (a) above in this definition, sole liability and responsibility for:

(i) any Environmental Obligations incurred with respect to or arising from or related to the ownership or operation of the Leases and other Assets prior to the Closing Date;

(ii) all costs, expenses and charges incurred with respect to or arising from or related to AFEs other than the Asset AFEs and the WR 51-4 AFE; and

(iii) all costs, expenses and charges incurred with respect to seismic reprocessing for which Assignor has Elected (as defined in the Operating Agreement) to participate as a Record Title Interest holder in the Leases,

*provided, however*, that, notwithstanding anything herein to the contrary, the Retained Obligations do not include any Assumed Obligations.

"**Third Party**" means a Person other than a Party or its Affiliates.

"**Transaction**" has the meaning set forth in the preamble to the Purchase and Sale Agreement.

"**Well**" means the wells listed on Exhibit B, and any and all other wells located on the Leases.

"**WR 51-4 AFE**" means that AFE listed on Exhibit F to the Purchase and Sale Agreement under the heading "WR 51-4 AFE".

CONFIDENTIAL

## ARTICLE II
## ASSIGNMENT

For Ten Dollars ($10.00) and other good and valuable consideration, the receipt, and sufficiency of which are hereby acknowledged, Assignor does hereby grant, bargain, sell, transfer, convey, set over, assign and deliver unto Assignee, subject to the terms and provisions of this Assignment, all of Assignor's Record Title Interest in the Leases, and all of Assignor's right, title and interest in and to the other Assets.

**TO HAVE AND TO HOLD** all of the Assets, together with all rights, titles, interests, estates, remedies, powers and privileges thereunto appertaining unto Assignee and its successors, legal representatives and assigns forever, subject to the terms, conditions, and reservations of this Assignment.

## ARTICLE III
## TITLE; DISCLAIMERS

**3.1** **Title.** The assignment of Record Title Interest under this Agreement is made, delivered and accepted:

(a) without warranty of title, express or implied, including, without limitation any warranty as to merchantability, quality, quantity, or fitness for a particular purpose, except however as to any claims by another Person claiming interest in Assignor's Record Title Interest in the Leases, by through and under Assignor but not otherwise;

(b) subordinate to and made expressly subject to the Operating Agreement;

(c) free and clear of any Claims, burdens, including any overriding royalty, mortgage, pledge, lien, production payment or net profits interest or any similar encumbrance, except:

   (i) lessor's royalty;

   (ii) the terms and conditions of the Leases;

   (iii) the terms and conditions of the Operating Agreement;

   (iv) the terms and conditions of the Material Contacts other than the Operating Agreement; and

   (v) those described on Exhibit A,

(e) with the understanding that the Record Title Interest conveyed shall be subject to the Leases, the Purchase and Sale Agreement, the Material Contracts and the

6

CONFIDENTIAL

approval of BOEM/BSEE of this Assignment.   Should any terms of this Assignment conflict with the terms of the Purchase and Sale Agreement, the terms of the Purchase and Sale Agreement shall control.   There shall be no merger of any of the Purchase and Sale Agreement with this Assignment; rather, the Purchase and Sale Agreement shall survive the granting of this Assignment.

3.2   **Disclaimers.**

(a)   DISCLAIMERS.   THE   EXPRESS   REPRESENTATIONS   AND WARRANTIES OF ASSIGNOR CONTAINED HEREIN AND IN THE PURCHASE AND SALE AGREEMENT (collectively, the "Assignor's Warranties") ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER REPRESENTATIONS,   WARRANTIES,   EXPRESS,   IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO ASSIGNOR, THE ASSETS, THE TRANSACTION OR ANY OTHER MATTERS THAT ARE THE SUBJECT OF THE ASSIGNOR'S WARRANTIES.   ASSIGNOR EXPRESSLY   DISCLAIMS   ANY   AND   ALL   SUCH   OTHER REPRESENTATIONS AND WARRANTIES. WITHOUT LIMITATION OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM   ENGINEERING   CONSULTANT,   OR   ANY ENGINEERING,   GEOLOGICAL   OR   SEISMIC   DATA   OR INTERPRETATION   RELATING   TO   THE   ASSETS,   (III)   THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR,   CONDITION,   QUALITY,   SUITABILITY,   DESIGN   OR MARKETABILITY OF THE ASSETS, (VII) THE EXPECTED COST OR TIMETABLE FOR INCURRING P&A OBLIGATIONS, (VIII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM,   REPORTS,   BROCHURES,   CHARTS   OR STATEMENTS PREPARED BY ASSIGNOR, ITS AFFILIATES OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (IX) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES OR ANY OF THEIR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTION OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (X) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.   EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN SECTION 5 OF THE PURCHASE AND SALE AGREEMENT   (REPRESENTATIONS   AND   WARRANTIES   OF

7

ASSIGNOR), ASSIGNOR FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT ASSIGNEE SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT ASSIGNEE HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS ASSIGNEE DEEMS APPROPRIATE. WITHOUT IN ANY WAY LIMITING THE FOREGOING, ASSIGNEE EXPRESSLY WAIVES ANY RIGHTS TO PURSUE ANY RIGHTS AGAINST ASSIGNOR RELATING TO THE CONDITION OF THE ASSETS UNDER LOUISIANA REDHIBITION LAWS.

(b)     CONSPICUOUS.   ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS ARTICLE ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

### ARTICLE IV
### ASSUMPTION OF LIABILITIES

**4.1**     **Assumption by Assignee.** Subject to and conditioned by the terms and provisions of the Purchase and Sale Agreement, Assignee agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) the Assumed Obligations.

**4.2**     **Contracts.** Assignee is taking the Assets subject to the terms of each Material Contract, and hereby assumes and agrees (in each case) to fulfill, perform, pay and discharge all of Assignor's obligations thereunder to the extent attributable to the Assets on and after the Closing Date or earlier as the same may be included in the Assumed Obligations.

### ARTICLE V
### MISCELLANEOUS

**5.1**     **Construction.** The captions in this Assignment are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Assignment. Assignor and Assignee acknowledge that they have participated jointly in the negotiation and drafting of this Assignment and as such they agree that if an ambiguity or

CONFIDENTIAL

APC-00358976

question of intent or interpretation arises hereunder, this Assignment shall not be construed more strictly against one party than another on the grounds of authorship.

**5.2    Governmental Approvals.** For governmental filing and approval purposes, Assignor and Assignee may execute separate assignment instruments with respect to certain of the Assets utilizing forms required by a governmental entity.  The interests in any of the Assets conveyed as a result of such separate assignments are the same, and not in addition to, the interests in such Assets conveyed pursuant to this Assignment.  Where separate assignments of the Assets have been or will be executed for filing with, and approval by, applicable Governmental Authorities, any such separate assignments (a) shall evidence this Assignment and assignment of the applicable Assets herein made and shall not constitute any additional assignment of such Assets, (b) are not intended to modify, and shall not modify, any of the terms, covenants and conditions or limitations on warranties set forth in this Assignment and are not intended to create, and shall not create, any representations, warranties or additional covenants of or by Assignor to Assignee and (c) shall be deemed to contain all of the terms and provisions of this Assignment as fully and to all intents and purposes as though the same were set forth at length in such separate assignments.

**5.3    Further Assurances.**  Assignor and Assignee agree to execute such additional transfers and other documents as may be necessary in order to accurately transfer of record all Assets owned by Assignor intended to be conveyed to Assignee pursuant to the terms and provisions of this Assignment.

**5.4    No Third Party Beneficiaries.** Nothing in this Assignment shall provide any benefit to any Third Party or entitle any Third Party to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties hereto that this Assignment shall otherwise not be construed as a Third Party beneficiary contract.

**5.5    Assignment.** This Assignment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**5.6    Governing Law.** This Assignment, other documents delivered pursuant hereto and the legal relations between the parties hereto shall be governed and construed in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of laws that would result in the application of the laws of another jurisdiction.

**5.7    Counterpart Execution.** This Assignment may be executed in any number of counterparts, and each counterpart hereof shall be effective as to each party that executes the same whether or not all of such parties execute the same counterpart. If counterparts of this Assignment are executed, the signature pages from various counterparts may be combined into one composite instrument for all purposes. All counterparts together shall constitute only one Assignment, but each counterpart shall be considered an original.

[Signature Pages Follow]

9

APC-00358977

**IN WITNESS WHEREOF,** this Assignment is executed by the parties on the date of their respective acknowledgments below, but shall be effective for all purposes as of the Effective Date.

**ASSIGNOR**
**Marathon Oil Company**

By: _____
Name: Brad L. Dowdell
Title:  Attorney-in-Fact

**ASSIGNEE:**
**Venari Offshore LLC**

By: _____
Name:
Title:

*Signature Page to Assignment and Bill of Sale*

CONFIDENTIAL

Exhibit A
Leases

### WR 51

**Oil and Gas Lease No. OCS-G 31938**, dated effective December 1, 2007, by and between the United States of America, as Lessor, and ConocoPhillips Company, Lessee, covering all of Block 51, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Assignor's Record Title Interest:**          **10%**

**Subject to 2% of 8/8ths overriding royalty interest** (1.5% to XOM and 0.5% to Nexen)

### WR 52

**Oil and Gas Lease No. OCS-G 25232**, dated effective June 1, 2003, by and between the United States of America, as Lessor, and Kerr-McGee Oil & Gas Corporation, Lessee, covering all of Block 52, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Assignor's Record Title Interest:**          **10%**

**Subject to 2% of 8/8ths overriding royalty interest** (1.5% to XOM and 0.5% to Nexen)

### WR 53

**Oil and Gas Lease No. OCS-G 28148**, dated effective May 1, 2006, by and between the United States of America, as Lessor, and Hunt Oil Company, Lessee, covering all of Block 53, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

**Assignor's Record Title Interest:**          **10%**

**Subject to 3% of 8/8ths overriding royalty interest** (3% to Hunt)

CONFIDENTIAL

**Exhibit B**
**Wells**

| AREA_BLOCK_OPER_WELL# | SHENANDOAH_NAME | API |
|---|---|---|
| WR51_Anadarko_1 | Shenandoah_2 (Original) | 608124007500 |
| WR51_Anadarko_2 | Shenandoah_2 (Re-Drill of Original) | 608124007900 |
| WR51_Anadarko_3 | Shenandoah_4 | 608124010100 |
| WR51_Anadarko_3ST1 | Shenandoah_4ST1 | 608124010101 |
| WR51_Anadarko_3ST1BP1 | Shenandoah_4ST1BP1 | 608124010102 |
| WR51_Anadarko_3ST2 | Shenandoah_4ST2 | 608124010103 |
| WR51_Anadarko_4 | Shenandoah_5 | 608124010900 |
| WR52_Anadarko_1 | Shenandoah_1 | 608124003400 |
| WR52_Anadarko_1BP1 | Shenandoah_1BP1 | 608124003401 |
| WR52_Anadarko_1BP2 | Shenandoah_1BP2 | 608124003402 |
| WR52_Anadarko_2 | Shenandoah_3 | 608124009300 |
| WR52_Anadarko_2BP1 | Shenandoah_3BP1 | 608124009301 |

CONFIDENTIAL

**Exhibit E**
**Material Contracts**

1. Unit Operating Agreement for the Walker Ridge Block 51 Unit, dated April 1, 2014, which contract area consists of OCS-G 31938 (Walker Ridge 51), OCS-G 25232 (Walker Ridge 52) and OCS-G 28148 (N/2 of Walker Ridge 53) by and among Cobalt International Energy, L.P., Marathon Oil Company, ConocoPhillips Company, Venari Offshore LLC, Anadarko Petroleum Corporation and Anadarko US Offshore Corporation, as amended.  Such Unit Operating Agreement replaced that certain Operating Agreement, Shenandoah Prospect, covering Walker Ridge Blocks, 8, 51 and 52 dated April 1, 2008, originally between ConocoPhillips Company and Anadarko E&P Company LP, as amended.

2. Unit Agreement for Outer Continental Shelf Exploration, Development, and Production Operations on the Walker Ridge Block 51 Unit (Contract No. 754314003), dated effective April 1, 2014 and covering the following Oil and Gas Leases:

    OCS-G 31938 (Walker Ridge 51)
    OCS-G 25232 (Walker Ridge 52)
    OCS-G 28148 (N/2 of Walker Ridge 53)

3. Like Kind Exchange Agreement, dated April 1, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. and Kerr-McGee Oil and Gas Corporation.

4. Letter Agreement, dated March 26, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P., Kerr-McGee Oil and Gas Corporation and Exxon Mobil Corporation.

5. Letter Agreement, dated March 31, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. Kerr-McGee Oil and Gas Corporation and Nexen Petroleum Offshore U.S.A. Inc.

6. Letter Agreement, dated February 25, 2014, by and among Anadarko US Offshore Corporation, ConocoPhillips Company, Cobalt International Energy, L.P., Marathon Oil Company and Venari Offshore LLC.

## Exhibit E
## Material Contracts

1. Unit Operating Agreement for the Walker Ridge Block 51 Unit, dated April 1, 2014, which contract area consists of OCS-G 31938 (Walker Ridge 51), OCS-G 25232 (Walker Ridge 52) and OCS-G 28148 (N/2 of Walker Ridge 53) by and among Cobalt International Energy, L.P., Marathon Oil Company, ConocoPhillips Company, Venari Offshore LLC, Anadarko Petroleum Corporation and Anadarko US Offshore Corporation, as amended. Such Unit Operating Agreement replaced that certain Operating Agreement, Shenandoah Prospect, covering Walker Ridge Blocks, 8, 51 and 52 dated April 1, 2008, originally between ConocoPhillips Company and Anadarko E&P Company LP, as amended.

2. Unit Agreement for Outer Continental Shelf Exploration, Development, and Production Operations on the Walker Ridge Block 51 Unit (Contract No. 754314003), dated effective April 1, 2014 and covering the following Oil and Gas Leases:

    OCS-G 31938 (Walker Ridge 51)
    OCS-G 25232 (Walker Ridge 52)
    OCS-G 28148 (N/2 of Walker Ridge 53)

3. Like Kind Exchange Agreement, dated April 1, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. and Kerr-McGee Oil and Gas Corporation.

4. Letter Agreement, dated March 26, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P., Kerr-McGee Oil and Gas Corporation and Exxon Mobil Corporation.

5. Letter Agreement, dated March 31, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. Kerr-McGee Oil and Gas Corporation and Nexen Petroleum Offshore U.S.A. Inc.

6. Letter Agreement, dated February 25, 2014, by and among Anadarko US Offshore Corporation, ConocoPhillips Company, Cobalt International Energy, L.P., Marathon Oil Company and Venari Offshore LLC.

CONFIDENTIAL

APC-00358982

**Exhibit F**

**AFEs**

**WR 51-4 AFE:**

| Operator's AFE #<br>2120948 | AFE Description<br>Drilling AFE –<br>Shenandoah WR 51 #4 Well | AFE Gross Amount<br>$210,000,000 |
|---|---|---|

The above mentioned AFE #2120948 by its terms rolled-up the following AFE #2114478 into the above mentioned AFE #2120948, and the following AFE #2114478 is included on this Exhibit F for reference and clarity only:

| Operator's AFE #<br>2114478 | AFE Description<br>Long Lead AFE –<br>Shenandoah WR 51 #4 Well | AFE Gross Amount<br>$7,800,000 |
|---|---|---|

**Asset AFEs:**

| Operator's AFE #<br>2114514 | AFE Description<br>Shenandoah Project Team | AFE Gross Amount<br>$8,750,000 |
|---|---|---|
| Operator's AFE #<br>2115177 | AFE Description<br>Subsea Tech Development &<br>Testing | AFE Gross Amount<br>$11,800,000 |
| Operator's AFE #<br>2115178 | AFE Description<br>20A Completions<br>Equipment Development | AFE Gross Amount<br>$16,800,000 |
| Operator's AFE #<br>2115179 | AFE Description<br>20A BOP and Riser<br>Development | AFE Gross Amount<br>$5,000,000 |
| Operator's AFE #<br>2115176 | AFE Description<br>20A CWOR Development | AFE Gross Amount<br>$13,600,000 |
| Operator's AFE #<br>2115180 | AFE Description<br>20A MODU Development | AFE Gross Amount<br>$4,100,000 |
| Operator's AFE #<br>2118906 | AFE Description<br>Core and Fluid Studies | AFE Gross Amount<br>$6,400,000 |

CONFIDENTIAL

<u>Operator's AFE #</u>
2119673

<u>AFE Description</u>
Engineering Design Work

<u>AFE Gross Amount</u>
$32,000,000

Exhibit F

CONFIDENTIAL                                                    APC-00358984

**Exhibit G**

**Form of Assignment for Recording**

See attached.

CONFIDENTIAL

APC-00358985

## EXHIBIT G

### Form of Assignment for Recording

| | |
|---|---|
| **OUTER CONTINENTAL SHELF** | § |
| | § |
| **OFFSHORE STATE OF LOUISIANA** | § |

## ASSIGNMENT OF OCS OIL AND GAS LEASES

THIS ASSIGNMENT OF OCS OIL AND GAS LEASES (this "**Assignment**"), effective as of 7:00 a.m. on January 1, 2016 (the "**Effective Date**"), is made by Marathon Oil Company, an Ohio corporation ("**Assignor**"), whose address is 5555 San Felipe, Houston, Texas 77056, to Venari Offshore LLC, a Delaware limited liability company ("**Assignee**") whose address is 15375 Memorial Drive, Suite 800, Houston, Texas 77079. In this Assignment, Assignor and Assignee are each referred to as a "**Party**" and collectively as the "**Parties**".

For Ten Dollars ($10.00) and other good and valuable consideration, the receipt, and sufficiency of which are hereby acknowledged, Assignor does hereby grant, bargain, sell, transfer, convey, set over, assign and deliver unto Assignee, subject to the terms and provisions of this Assignment, all of Assignor's Record Title Interest in the Federal Oil & Gas Leases set forth on Exhibit A hereto, all being located on the outer continental shelf of the Gulf of Mexico (collectively, the "**Leases**"), and includes all wells (including the wells set forth on Exhibit B hereto), equipment, all oil and gas within or attributable to the Leases (collectively, the "**Assets**").

**TO HAVE AND TO HOLD** the Assets unto Assignee and its successors, legal representatives and assigns forever, subject to the terms, conditions, and reservations of this Assignment.

1. **Assignment Subject to Prior Agreements**

   The Record Title interest conveyed in the Leases is subject to Assignee's assumption of the express and implied terms and conditions of the Leases and agreements set forth on Exhibit C hereto (the "**Material Contracts**"). Should any terms of this Assignment conflict with the terms of the Material Contracts, the terms of the Material Contracts shall control. There shall be no merger of any of the Material Contracts with this Assignment, rather, the Material Contracts shall survive the granting of this Assignment.

2. **Limited Warranty of Title**

   This Assignment is delivered and accepted without warranty of title, express or implied, except as to persons claiming by, through or under the Assignor, but not otherwise.

1

APC-00358986

3.  **Binding Effect**

This Assignment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

4.  **Governing Law**

This Assignment, other documents delivered pursuant hereto and the legal relations between the parties hereto shall be governed and construed in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of laws that would result in the application of the laws of another jurisdiction.

[Signature Pages Follow]

2

CONFIDENTIAL

APC-00358987

**IN WITNESS WHEREOF,** this Assignment is executed by the parties on the date of their respective acknowledgments below, but shall be effective for all purposes as of the Effective Date.

WITNESSES

**ASSIGNOR**
**Marathon Oil Company**

_____

_____
(PRINT NAME)

By: _____
Name: Brad L. Dowdell
Title:   Attorney-in-Fact

_____

_____
(PRINT NAME)

WITNESSES

**ASSIGNEE:**
**Venari Offshore LLC**

_____

_____
(PRINT NAME)

By: _____
Name:
Title:

_____

_____
(PRINT NAME)

*Signature Page to Assignment of OCS Oil and Gas Leases*

CONFIDENTIAL

## ACKNOWLEDGEMENT

STATE OF TEXAS            §

COUNTY OF HARRIS          §

On this _____ day of _____, 2016, before me appeared Brad L. Dowdell, to me personally known, who, being by me duly sworn (or affirmed), did say that he is the Attorney-in-Fact for Marathon Oil Company and that the instrument was signed on behalf of said company by authority of its board of directors, and he/she acknowledges said instrument to be the free act and deed of said company.

_____

Notary Public

My commission expires: _____

## ACKNOWLEDGEMENT

STATE OF TEXAS            §

COUNTY OF HARRIS          §

On this _____ day of _____, 2016, before me appeared [ · ], to me personally known, who, being by me duly sworn (or affirmed), did say that he is the [ · ] for Venari Offshore LLC, and that the instrument was signed on behalf of said limited liability company by authority of its member, and he/she acknowledges said instrument to be the free act and deed of said limited liability company.

_____

Notary Public

My commission expires: _____

*Acknowledgment Page to Assignment of OCS Oil and Gas Leases*

CONFIDENTIAL

Exhibit A
Leases

**WR 51**

**Oil and Gas Lease No. OCS-G 31938,** dated effective December 1, 2007, by and between the United States of America, as Lessor, and ConocoPhillips Company, Lessee, covering all of Block 51, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

    **Assignor's Record Title Interest:**       **10%**

    **Subject to 2% of 8/8ths overriding royalty interest** (1.5% to XOM and 0.5% to Nexen)

**WR 52**

**Oil and Gas Lease No. OCS-G 25232,** dated effective June 1, 2003, by and between the United States of America, as Lessor, and Kerr-McGee Oil & Gas Corporation, Lessee, covering all of Block 52, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

    **Assignor's Record Title Interest:**       **10%**

    **Subject to 2% of 8/8ths overriding royalty interest** (1.5% to XOM and 0.5% to Nexen)

**WR 53**

**Oil and Gas Lease No. OCS-G 28148,** dated effective May 1, 2006, by and between the United States of America, as Lessor, and Hunt Oil Company, Lessee, covering all of Block 53, Walker Ridge, OCS Official Protraction Diagram, NG15-06.

    **Assignor's Record Title Interest:**       **10%**

    **Subject to 3% of 8/8ths overriding royalty interest** (3% to Hunt)

CONFIDENTIAL

**Exhibit B**
**Wells**

| AREA_BLOCK_OPER_WELL# | SHENANDOAH_NAME | API |
|---|---|---|
| WR51_Anadarko_1 | Shenandoah_2 (Original) | 608124007500 |
| WR51_Anadarko_2 | Shenandoah_2 (Re-Drill of Original) | 608124007900 |
| WR51_Anadarko_3 | Shenandoah_4 | 608124010100 |
| WR51_Anadarko_3ST1 | Shenandoah_4ST1 | 608124010101 |
| WR51_Anadarko_3ST1BP1 | Shenandoah_4ST1BP1 | 608124010102 |
| WR51_Anadarko_3ST2 | Shenandoah_4ST2 | 608124010103 |
| WR51_Anadarko_4 | Shenandoah_5 | 608124010900 |
| WR52_Anadarko_1 | Shenandoah_1 | 608124003400 |
| WR52_Anadarko_1BP1 | Shenandoah_1BP1 | 608124003401 |
| WR52_Anadarko_1BP2 | Shenandoah_1BP2 | 608124003402 |
| WR52_Anadarko_2 | Shenandoah_3 | 608124009300 |
| WR52_Anadarko_2BP1 | Shenandoah_3BP1 | 608124009301 |

CONFIDENTIAL

**Exhibit C**
**Material Contracts**

1. Purchase and Sale Agreement (Shenandoah Prospect), dated March [ ], 2016, by and between Marathon Oil Company, as seller, and Venari Offshore LLC, as buyer.

2. Unit Operating Agreement for the Walker Ridge Block 51 Unit, dated April 1, 2014, which contract area consists of OCS-G 31938 (Walker Ridge 51), OCS-G 25232 (Walker Ridge 52) and OCS-G 28148 (N/2 of Walker Ridge 53) by and among Cobalt International Energy, L.P., Marathon Oil Company, ConocoPhillips Company, Venari Offshore LLC, Anadarko Petroleum Corporation and Anadarko US Offshore Corporation, as amended.   Such Unit Operating Agreement replaced that certain Operating Agreement, Shenandoah Prospect, covering Walker Ridge Blocks, 8, 51 and 52 dated April 1, 2008, originally between ConocoPhillips Company and Anadarko E&P Company LP, as amended.

3. Unit Agreement for Outer Continental Shelf Exploration, Development, and Production Operations on the Walker Ridge Block 51 Unit (Contract No. 754314003), dated effective April 1, 2014 and covering the following Oil and Gas Leases:

   OCS-G 31938 (Walker Ridge 51)
   OCS-G 25232 (Walker Ridge 52)
   OCS-G 28148 (N/2 of Walker Ridge 53)

4. Like Kind Exchange Agreement, dated April 1, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. and Kerr-McGee Oil and Gas Corporation.

5. Letter Agreement, dated March 26, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P., Kerr-McGee Oil and Gas Corporation and Exxon Mobil Corporation.

6. Letter Agreement, dated March 31, 2008, by and among ConocoPhillips Company, Anadarko E&P Company L.P. Kerr-McGee Oil and Gas Corporation and Nexen Petroleum Offshore U.S.A. Inc.

7. Letter Agreement, dated February 25, 2014, by and among Anadarko US Offshore Corporation, ConocoPhillips Company, Cobalt International Energy, L.P., Marathon Oil Company and Venari Offshore LLC.

CONFIDENTIAL

# Exhibit 51

**To:** Prosser, Wendy[Wendy.Prosser@anadarko.com]
**Cc:** Gauthier, Lisa[Lisa.Gauthier@anadarko.com]; McGrievy, Pat[Pat.McGrievy@anadarko.com]; Frye, Lea[Lea.Frye@anadarko.com]
**From:** Gandhi, Ankur[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=PXZ558]
**Sent:** Thur 4/7/2016 8:14:24 PM Coordinated Universal Time
**Subject:** RE: Porfolio Spring Update - Shenandoah

Thanks Wendy.
I did look at the case & all looks good.
All the assumptions are in line with our recent discussions as well.

We will change the effective date to 4/2016 before submitting for portfolio.
But once it's pulled you can change it back to what you like.

Thanks for the early turnaround.

Ankur

**From:** Prosser, Wendy
**Sent:** Thursday, April 07, 2016 2:55 PM
**To:** Gandhi, Ankur
**Cc:** Gauthier, Lisa; McGrievy, Pat; Frye, Lea; Prosser, Wendy
**Subject:** Porfolio Spring Update - Shenandoah

Ankur,

Please see our answers in red below.

Also, if you moved any of the starting report dates, we moved them back to 1/1/2016 because we wanted to check all of our cases against our spreadsheets before sending to you.

| | Current Scenario | | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 | Scenario 5 |
|---|---|---|---|---|---|---|---|
| **Enable Dry Hole Risk** | | | | | **POS (0 - 1)** | **1.000000** | |
| Enable Scenario Consolidations For All Calcs | | | | | | | |
| Consolidation Factor | | | 0.264600 | 0.352800 | 0.264600 | 0.118000 | 0.000000 |
| Oil | Base | | P10 | Base | P90 | FAIL | Base |
| Gas1 | Base | | P10 | Base | P90 | FAIL | Base |
| Gas2 | Base | | Base | Base | Base | Base | Base |
| Other 1 | Base | | Base | Base | Base | Base | Base |
| NGL | Base | | Base | Base | Base | Base | Base |
| Other 2 | Base | | Base | Base | Base | Base | Base |
| Other 3 | Base | | Base | Base | Base | Base | Base |
| Sulphur | Base | | Base | Base | Base | Base | Base |
| Other | Base | | Base | Base | Base | Base | Base |
| Water | Base | | P10 | Base | P90 | FAIL | Base |
| Inj. Water | Base | | Base | Base | Base | Base | Base |
| Interests | Base | | Base | Base | Base | Base | Base |
| Opcosts | Base | | P10 | Base | P90 | FAIL | Base |
| Capital | Base | | P10 | Base | P90 | FAIL | Base |
| Custom | Base | | Base | Base | Base | Base | Base |
| Burden | Base | | Base | Base | Base | Base | Base |
| Tax | Base | | P10 | Base | P90 | FAIL | Base |
| EOR | Base | | Base | Base | Base | Base | Base |

Shenandoah_April_2016_15K_Portfolio [Case]
Tabs: Parms | Links | Product | Price | Interests | Opcost | Custom | Burden | Capital | Tax | Risk | Report
Side tabs: General | Scenarios | User Prm | Calc Prm

**From:** Gandhi, Ankur
**Sent:** Monday, March 28, 2016 2:01 PM
**To:** Prosser, Wendy
**Cc:** Gauthier, Lisa
**Subject:** RE: Porfolio Spring Update

Wendy,
Here is what we need from the team before April 14th:

CONFIDENTIAL

- Identify the Peep case you think should be representative of Shenandoah in Portfolio. I know we already have a case in Sandbox, but make any changes to it if needed & let me know
  - o Peep case is Shenandoah_April_2016_15K_Portfolio

- Send me the basic assumptions behind the case like: #of wells, timing and any flexibility in investment you foresee, what risking is being used?

Assumed Sanction Date: July 2018.

Phase I:
- First production 7/1/2021
- 4 producers
- 1st completion 1/2021 (20K MODU will be ready 1/2021 which drives timing)

Phase II:
- 6 additional producers (10 total)
- Phase II startup 2/2024
  - o Timing is 12 months post final completion in Phase I to commit and move forward with Phase II

Risking:
$P_c$ =      88.20%

| PARMS | | |
|---|---|---|
| P10 | 0.3 | 0.2646 |
| P50 | 0.4 | 0.3528 |
| P90 | 0.3 | 0.2646 |
| FAIL | (1-.882) | 0.1180 |

- MEFS calculated at $60 invest
- Risking Pc = 88.2%
- We could potentially see first production moving to the right up to 2 additional years because we have production coming online ~3 years after SOP (you have up to 5 years)

- Does the net investment matches 2016-17 forecast? If not, then what's the reason?
  - o No because Shenandoah 5 has AFE costs assumed in the PEEP case and forecast has reduced rig rates incorporated in the estimate

CONFIDENTIAL

# Exhibit 52





**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

April 20, 2016

Ms. Amanda M. McMillian
Senior VP, General Counsel, Corporate Secretary and Chief Compliance Officer
Anadarko Petroleum Company
1201 Lake Robbins Drive
The Woodlands, Texas 77380

　　　Re:　　Lea Frye | Sarbanes-Oxley/Dodd-Frank Settlement Demand

Dear Ms. McMillian:

Our law firm represents Lea Frye, who has been placed in a very difficult position by Anadarko Petroleum Company ("Anadarko") through no fault of her own. Ms. Frye has asked to be included in the recent layoffs, but her requests were rejected. Now, she feels trapped, and she has asked us to write to you to explain why she is no longer willing to remain quiet about violations of law that have affected her and threaten to harm many others.

This letter is lengthy in order to provide Anadarko with enough information to make an informed decision about how best to proceed. Ms. Frye is currently on FMLA leave as a result of job-related anxiety and depression. She prefers to resolve this matter and move on with her life while she remains on leave. Accordingly, a deadline for resolution is provided and time is of the essence.

## OVERVIEW

This letter is necessary because in recent years, Lea Frye has witnessed an ongoing pattern of corporate fraud at the highest levels of Anadarko. As the size and dollar value of this fraud has grown, Ms. Frye has become increasingly uncomfortable and has realized that if she remains silent, she risks being perceived as a participant. She is unwilling to do that and has asked us to write in hopes that a resolution can be reached without the need for litigation or an SEC investigation.

Since joining Anadarko in October 2005, Ms. Frye has consistently proven herself to be an exemplary performer. She and other Reservoir Engineers provide reservoir engineering support for Anadarko's deepwater development teams in the Gulf of Mexico. More specifically, Ms. Frye's team provides data that is then ostensibly used to provide economic evaluations of prospective resources to determine whether to move a project forward to production or not.

6750 West Loop South, Suite 616 | Bellaire, TX 77401 | (t): 346-701-8563 | (f): 713-583-9795
www.mincespllc.com

APC000001
Confidential Treatment Requested Under FOIA

CONFIDENTIAL

APC-00000536

In 2014, Ms. Frye began to work on evaluating the Shenandoah discovery, which is located in Walker Ridge in the Gulf of Mexico. At this time, the Shenandoah project still resided with Anadarko's exploration team for funding of appraisal wells targeted to better define resource potential.

During this period, Ms. Frye and others on the development team furnished data that was ignored and/or manipulated by exploration executives in order to paint a rosy outlook for investors, partners and the general public regarding the Shenandoah project. Economic projections were made with selective disregard for the hard data and scientific analysis Ms. Frye and others are paid to provide. The result is what has now become a billion dollar fraud that Ms. Frye intends to stop before it harms her, colleagues and potentially shareholders and the general public.

As you consider the facts, keep in mind that this is not a demand letter written by a subpar employee with an axe to grind or a job to save. In fact, the opposite is true. Every one of Ms. Frye's performance evaluations proves that her work always meets and often exceeds expectations.[1] She loves the work she does and has formed close relationships with many of her peers, which is among the reasons she elected to seek a resolution without the collateral damage that will result if this litigation and an SEC investigation prove necessary.

<div align="center">TIMELINE OF EVENTS</div>

## A. Anadarko's pledged allegiance to SEC guidelines

In 2009, the SEC promulgated new rules that govern the reporting of oil and gas reserves. Aware of the strict nature of these rules, Anadarko CEO James T. Hackett's introductory statement in Anadarko's 2012 Reserves and Resources Manual includes the following assurance:

> The Anadarko Petroleum Corporation (Anadarko) Reserves and Resources Manual is provided as a comprehensive reference guide to assist company personnel and ensure accuracy and consistency in estimating and reporting Anadarko's oil and natural gas Reserves and potential Resources. The manual contains federal guidance and our company policies for properly estimating and assigning Proved, Probable, and Possible Reserves, as well as Contingent Resources.

---

[1]    For example, in her 2014 and 2015 evaluations, Ms. Frye received an overall score of A1 (usually exceeds but always meets performance standards). *See* Exhibit 5. In 2012, she received an E1—a rare feat that illustrates unusual excellence. Ms. Frye has never once been disciplined for misconduct, rules violations or any performance deficiency.

Following these policies, procedures and guidelines, will provide confidence to managers, technical staff, controllers, investors and government agencies that Anadarko's reported Reserves and Resources represent our best estimates in compliance with the appropriate rules and regulations. It is Anadarko's policy to strictly adhere to the U.S. Securities and Exchange Commission (SEC) regulations and SEC staff interpretations for all estimates of Proved, Probable, and Possible Reserves. ... As SEC guidance is not provided for Contingent and Prospective Resources except indirectly, the Society of Petroleum Engineers (SPE) 2007 Petroleum Resources Management System (PRMS) guidelines are utilized unless SEC guidelines take precedence.[2]

The above statements in the Manual are important. Expressly, they promise strict compliance, which inspires confidence in investors and government agencies who trust and rely on the integrity and accuracy with which Anadarko estimates and reports its reserves and potential resources. Implicitly, the verbiage in the Manual acknowledges the potential for abuse and fraud arising from overstating resources and reserves. However, while Mr. Hackett's sentiment pledges transparency and fidelity to the law, Ms. Frye has seen the opposite, as discussed below.

### B. New oil discovered in Walker Ridge 51 and 52

In 2009, Anadarko announced a new oil discovery in the area known as Walker Ridge 51 and 52. The Shenandoah 1 well found a section of porous rock (referred to in industry lingo as "reservoir sand") that for a vertical depth of around 300 feet contained oil that could be recovered. This was accurately reported to the public as an encouraging find.

### C. The Shen 2 well

Following the success of Shenandoah 1, surveys of the surrounding area indicated geological features that could contain oil in this area in significant quantities, enough to justify drilling a second exploratory well that became known as Shenandoah 2 ("Shen 2"). This well—located in Walker Ridge, Block 51— was also a success, prompting Vice President of International and Deepwater Exploration Bob Daniels to describe it as "one of Anadarko's largest oil discoveries in the Gulf of Mexico" attributing the success of the well to rock and fluid properties that were "of much higher quality than previously encountered by the industry in Lower Tertiary discoveries."[3]

---

[2]     *See* <u>Exhibit 2</u>, Reserves and Resources Manual (2012).

[3]     Press Release, Anadarko, Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay (Mar. 19, 2013) (on file with author).

### D. Exploration goal: 800+ MBOE

In March 2013, Anadarko held an investor relations conference. During the investor relations conference call, those in attendance were informed of the exploration goal of delivering "800+ Million Barrels of Oil Equivalents (MMBOE)."[4] This statement is significant not because it is evidence of wrongdoing but rather because it created internal pressure and therefore an incentive to exaggerate.

### E. Shen 2 and the March 19, 2013 Press Release

On March 19, 2013, Anadarko issued a press release about the results from its Shen 2 well. The well encountered recoverable oil over 1000 feet vertically of the rock formation they were drilling into.

While this was a very good result for a single well, Anadarko executives claimed "Net Risked Resources" (360 MMBOE) that were overly optimistic. To justify that number, they had to "draw a small fault" around the Shen 1 well, claim the wells were not connected, and then further assume that the vast majority of the geological structure thought to contain oil would be identical to what had been found in the Shen 2 well. This approach was inconsistent with sound science.

Geological faults are important features in oil exploration, since the amount of oil found (and the ability to extract that oil) can change dramatically when a fault line is encountered. In this case, there was no geological evidence to suggest a fault. Nevertheless, a decision was made by Anadarko executives to draw a fault line around the Shen 1 well to indicate a small area where the oil was only 300 feet deep.

The calculated purpose of this exercise was to justify *assuming* that the rest of the feature had uniformly deep oil deposits. Intriguingly, completed geological survey work suggested numerous other faults throughout the structure, yet no mention of those faults was made. The significance of this becomes clear after considering the events that followed.

### F. January 2014: Lea Frye asked to help develop field

In January 2014, Ms. Frye moved from the Eastern Gulf Of Mexico Development group to lead the Shenandoah Pre-Development group, which reported to Pat McGrievy. Her role was to coordinate subsurface efforts with facility efforts to evaluate multiple development scenarios incorporating uncertainty in resource size

---

[4]    *See* Exhibit 3, slide show prospectus entitled "2012 Anadarko Investor Conference: Delivering Differentiating Value," slide 100.

APC000004
Confidential Treatment Requested Under FOIA

CONFIDENTIAL

and recovery, based on different drive mechanisms. At the time, the project was still in the appraisal phase and was being funded by the exploration team.

Among the tasks assigned to Ms. Frye, one was to run economics. Thus, in anticipation of an upcoming meeting to discuss the project, Executive Vice President of Deepwater and International Development Jim Kleckner asked Ms. Frye to develop an economic model that summarized the development team's view of the Shenandoah prospect for an offsite development and exploration meeting.

Specifically, Ms. Frye was asked to focus on current perceived value and any associated risks to that value for Shenandoah. The goal was to use her model to assist the Executive Committee in establishing budgets for the following year, in order to maximize shareholder value.

### G. The February 2014 meeting

On February 19, 2014, a meeting was convened. Along with Ms. Frye, the following people attended the meeting:

- Darrell Hollek (Senior VP Gulf of Mexico and International Development)[5]
- Ernie Leyendecker (VP Gulf of Mexico Exploration)[6]
- David Blakeley (Manager Gulf of Mexico Exploration Engineering)
- David O'Brien (Business Advisor)[7]
- Pat McGrievy (General Manager, DWGOM)

During the meeting, Ms. Frye presented the economics based on all known information about the field. The information she provided was derived by utilizing industry best practice modeling and sensitivity analysis, with input from multiple team members on the integrated project team.

Certain executives did not like Ms. Frye's feedback, even though her findings were developed utilizing best estimates for oil in place, recovery and costs to develop the field. When it was clear that Ms. Frye's feedback did not mirror the overly optimistic claims made by the exploration side of the business, Vice President of Exploration Ernie Leyendecker became noticeably agitated. He viciously berated

---

[5]   Mr. Hollek's current title is Senior Vice President, On Shore Development.

[6]   Mr. Leyendecker has since been promoted to Senior VP, International Deepwater Exploration.

[7]   Mr. O'Brien has since been promoted to the position of General Manager, Delaware Basin - Growth & Technology.

Ms. Frye during the meeting because her findings were inconsistent with the narrative he preferred. He directed the following derisive remarks at Ms. Frye:

- "You do not know anything"
- "I have worked the Gulf of Mexico longer than you"
- "This is the best field ever ... it is as good as Troika"

These statements were at odds with the hard data, and Ms. Frye's methods were sound. As an engineer, Mr. Leyendecker should have known this. As a reminder, Ms. Frye had been recruited to the project *because* of her expertise. After her input and analysis was minimized, Ms. Frye left the meeting questioning whether the objective of the exploration team was to ascertain reliable data or simply maintain their preconceived, unsupportable assessments of value.

The February 19, 2014 meeting was Ms. Frye's first knowledge of a developing culture within Anadarko's exploration team. Mr. Leyendecker and other executives did not want to hear anything about the Shenandoah project that did not align with their desired outcome.

During the months that followed, it became increasingly clear that leaders of the exploration team did not want Ms. Frye to talk about obstacles such as faulting, lower than ideal recovery factors and increased technology costs because these rather fundamental considerations—if accounted for honestly—would reduce value.

## H. March 4, 2014: Inflated numbers published to shareholders

Ms. Frye's discomfort grew when Anadarko's exploration team ignored scientific data and known facts in exchange for optimistic projections that were published in contravention of accepted principles.

On March 4, 2014, shareholders were presented with inflated information about Anadarko's exploration successes in 2013. For example, the slide show used during the 2014 Investor Conference provided a forecast that was far too optimistic given the science. Slides 74 and 75 approximated "900+ MMBOE in net discovered resources," even though that figure was predicated in part on the grossly overstated Shenandoah resource.[8] True and correct copies of slides 74 and 75 are pasted on the following page.

---

[8]   *See* <u>Exhibit 4,</u> slide show prospectus entitled "2014 Anadarko Investor Conference: Driving Exploration Value Creation," slides 74-75.

APC000006
Confidential Treatment Requested Under FOIA

## Slide 74



# Industry-Leading Exploration Success Again in 2013

- 67% Deepwater Exploration/Appraisal Success
- 900+ MMBOE Net Discovered Resources
- ~1.5 BBOE Net Resources to Development

## Slide 75

- Consistent Outperformance vs. Industry Average



CONFIDENTIAL

Slide 83 is also misleading. It quantifies the size of the exaggeration in dollar figures, advising investors that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity."[9] The following is a cut and paste of that representation:

## Slide 83

# Shenandoah Basin: ~$2 - $4 Billion Net Opportunity

- **Emerging Giant Resource**

- **Significant Value Creation**
  - Less than $300 Million Net Investment Through 2013

- **Excellent Transmissibility**
  - Permeability
  - Thickness
  - Fluid Viscosity

- **Strategic and Expanding Position in Basin**

- **2014 Planned Activity**
  - Drill 3 - 4 Appraisal Wells



APC WI Block
APC Discovery
Planned Drilling
Oil Field
Salt

Misrepresentations such as this were not innocent. By March 2014, Ms. Frye had spent significant time working with exploration staff to demonstrate how proper use of modeling the available geological information required far lower projections of recoverable oil. She explained why numerous faults crossing the geological feature indicated that, without further appraisal wells, assuming such a large quantity of recoverable oil was inconsistent with scientific data and therefore inappropriate.

Numerous internal documents incriminate Anadarko, some of which are attached to this letter and others of which are not but can be easily accessed. If this matter is not resolved, the SEC will not need to delve too deeply into the data in order to figure out what happened.

---

9 *See* Exhibit 4, slide 83. The overstated value was worsened by Anadarko's understatement of the net capital required to develop the resource. A few months later in 2014, the development team valued the Shenandoah resource at $1.1 billion. Thus, the exploration team's inflated value was an overstatement ranging from 82% (at $2 billion) and 264% (at $4 billion).

CONFIDENTIAL

## I. Shen 3

Following the success of the Shenandoah 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen 3 was also located in Walker Ridge (Block 52), it was quickly apparent that Shen 3 did not have the promise of Shen 2. Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would likely accept distorted findings and projections based on the success of Shen 2. What the general public and the SEC do not know is that Shen 3 is nothing like Shen 2.

Even though Shen 3 was a wet well, the exploration team described it as successful in terms similar to those used to describe Shen 2. They did this in part by redefining the criteria by which resource capacity is projected. Aware that Shen 3 had the same sands (porous rock structure that can hold recoverable oil) that were present in Shen 2, the exploration team analogized Shen 3's resource projections to those of Shen 2. In doing this, they ignored the findings of Ms. Frye and other engineers, even though these persons' expertise is superior to theirs and even though ignoring material facts is inconsistent with both the law and Anadarko's published standards.

The calculated strategy of the exploration team can be accurately described as "piggybacking." This was achieved by deliberately manipulating the facts (and more specifically what was and was not known about Shen 3) and redefining the criteria for optimism when the facts did not match the desired narrative. For example, the exploration team defined oil-water contacts by incorrectly using pressure data obtained from Shen 2 and Shen 3 even though Shen 3 was two miles away from Shen 2, and seismic data indicates a discontinuity (faulting) between the wells that renders projections of oil-water contacts flimsy and unscientific. The development team pointed this out, but their feedback was ignored.

As the exploration team knows, even reliable pressure data is not by itself a definitive indicator of resources. The farther apart two wells are, the less likely the resources in one are cause for optimism in the other. Additionally, while pressure data is one indicator of what is in the well, such data must be considered in conjunction with other mitigating factors.

When projecting the resources in Shen 3, the exploration team looked at pressure data in a vacuum, even though legitimate projections require consideration of all relevant data. For example, Ms. Frye and other development team members identified a rather obvious fault between Shen 2 and Shen 3 that was visible in oil-

---

10      As you know, a "wet well" is often referred to in the oil and gas industry as a "dry hole."

based microimaging (OBMI). Executives on the exploration team ignored this and then made overly optimistic resource projections as if this information did not exist. In reality, the proven existence of this fault meant that oil-water contacts could not be extrapolated from data obtained from Shen 2 and Shen 3.[11] Rather, all that could be confirmed from the data in Shen 3 was the highest known water point for the Shen 3 fault block and a lowest known oil point for the Shen 2 fault block.[12] The extrapolation simply ignored the fault, and in doing so overstated the size of the resource in the Walker Ridge Basin.

### J. Shen 4

As with Shen 3, the anticipated size of the Shenandoah 4 ("Shen 4") resource was exaggerated beyond what the science supports.

#### (1) Walker Ridge 51 #3

The well involved multiple penetrations for diagnostic purposes. The first was Walker Ridge 51 #3. This penetration revealed salt, with no discernible sand. Salt is a rock structure that can never yield oil. Further, a portion of the area previously defined as hydrocarbon-bearing is no longer there. Accordingly, the reported size of the resource must necessarily shrink as a matter of established science.

#### (2) Sidetrack well (Walker Ridge 51 #3 ST #1)

The purpose of a sidetrack well is to gain a broader understanding of the size of the resource. Here, the sidetrack well was drilled in order to get away from the salt in the original well in hopes of finding hydrocarbon-bearing sands.

The well did find hydrocarbon in the range of 600+ vertical feet. While still significant, the well was not equivalent to the 1,000 vertical feet seen in the Shen 2 well, which was utilized by exploration to characterize the thickness over the entire Shenandoah area. To overcome this inconvenient obstacle, the mapping was manipulated in order to exaggerate the size of the resource. In other words, the resource-bearing area was overstated by manipulating the mapped area to minimize the impact of the salt encountered by the first penetration. The thickness over the area was still assumed to be analogous to Shen 2, even though only 600 vertical feet was seen in the sidetrack well.

---

[11]   Accurately extrapolating oil-water contact requires evaluation of data within the same fault block.

[12]   This approach was inconsistent with not only guidance provided by the Society of Petroleum Engineers but also SEC regulations as to projecting contacts across fault blocks without well control when defining "proven" or "P90 resources."

### (3) Bypass Well: Walker Ridge 51 #3 BP #1

Immediately after the sidetrack, the well was by-passed in order to capture whole core (essentially a core sample) over the hydrocarbon sands. The Walker Ridge bypass well revealed missing sands and a thinner overall section (vertically) than the sidetrack well, which is 200-300 feet away. Why is this significant? Because the proximity of the wells supports the likelihood of thinning (a reduced thickness of the sands (in height)). Thus, it was impossible to legitimately apply the 1000-foot measure across the entire area because of the known differences in thickness.

### K. August 12, 2014: Additional confirmation of faulting

On August 12, 2014, Geological Advisor Paul Chandler provided well log data to the exploration group establishing that faulting exists. He specifically identified a fault in Shen 2 (WR 51 32) that was located above all of the pay zones, while discussing the faulting and fracturing evidence from OBMI data. As explained below, this information was summarily ignored.

### L. August 18, 2014: Leyendecker directive to ignore the faults

On August 18, 2014, emails were exchanged regarding the method by which faulting would be represented in the Shenandoah project going forward. The most notable part of this email exchange was Mr. Leyendecker's "adamant" insistence (as reported by Pat McGrievy and Tim Trautman) that, no maps were to be used that revealed faulting during meetings about the amount of oil that could be recovered from the Shenandoah project.[13] Astonished, members of the development team expressed discomfort with this approach because it concealed highly relevant data.

Mr. Leyendecker's directive was an active suppression of internal data regarding the true size of the Shenandoah resource. This was disturbing for several reasons. First, the SEC prescribes standards regarding the use of defined pressure data to define oil-water contact, and Anadarko's internal standards mirror those of the SEC. Second, Mr. Leyendecker was advocating the deliberate improper analysis of faulting in a way that would skew the data in favor of perceived profitability.

---

[13]     See Exhibit 7, email exchange dated August 18, 2014.

APC000011
Confidential Treatment Requested Under FOIA

Ms. Amanda M. McMillian
April 20, 2016
Page 12 of 31

The first diagram below illustrates the *correct* use of SEC defined pressure data when defining oil-water contact. Note that the blank spaces separated by faulting cannot be deemed to have established resources based on current SEC rules.

**Correct Use of SEC Defined Pressure Data to Define Oil Water Contact**



The second diagram illustrates the manner in which Mr. Leyendecker ordered the resource to be mapped. This was a directive to mislead, which violated SEC rules.

**Incorrect Use of SEC Defined Pressure Data to Define Oil Water Contact**



CONFIDENTIAL

APC-00000547

By communicating that he was "adamant" about his approach to mapping, Mr. Leyendecker chilled people into silent adherence. To avoid any lingering doubt, he and others made repeated references to the mandate that only one map could be shown during presentations.[14] The development team's map (which was consistent with SEC requirements) was prohibited in favor of the exploration group's map, which showed no faults. This suppressed the truth, which was that the Shenandoah project could not produce the volume of oil the exploration team had projected.

## M. February 2-3, 2015: Operations Report and investor call with Daniels

On February 2, 2015 the Operations Report was published. An investor call followed a day later. During that call, Senior Vice President of Exploration Bob Daniels described the recently completed Shen 3 well in glowing terms.  In characterizing it as a successful appraisal well, he described over 1,500 feet of "quality sand."

This representation was stunning. The truth is that Shen 3 was a dry hole, and Mr. Daniels had at least constructive knowledge of this. No oil was found, and any claims that Shen 3 helped confirm prior assumptions made from Shen 2 could not be supported by sound science. Once again, a preponderance of internal information confirmed that the message given to shareholders regarding recoverable oil was inaccurate and misleading.

## N. February 17, 2015: Leyendecker continues to massage the message

On February 17, 2015 Mr. Leyendecker canceled a scheduled presentation to be given by Doug Shott (an internal expert not on the exploration team). The reason? He believed the Shott report included "unfavorable" news about the Shenandoah project. In truth, "unfavorable" was a synonym for "real." Mr. Leyendecker did not want the truth about the project to be revealed because it belied numerous, prior representations about the size (and attendant value) of the Shenandoah resource.

## O. October 28, 2015: Q3 earnings call perpetuates unfounded optimism

The exaggerations continued during the Q3 earnings call.  When discussing the Shenandoah project (following the completion of Shen 4), Al Walker and Bob Daniels represented that Shen 4 had found even more oil, pushing the known depth of oil down by more than 400 feet. They reiterated their overly optimistic projections, which had since been disproved by information provided by the development team. In fact, they went so far as to claim that the exploration team had now *increased* its assumptions of recoverable oil from the field.

---

[14]     *See* <u>Exhibit 7</u>, email exchange dated August 18, 2014.

APC000013
Confidential Treatment Requested Under FOIA

CONFIDENTIAL

The actual results were in stark contrast to the representations made to shareholders during the earnings call. In addition to being a dry hole, the initial well at Shen 4 also encountered salt. This meant that (1) they were completely out of the formation where oil might be found; and (2) the size of the formation that could hold oil was smaller than originally thought. While a second bore drilled from the Shen 4 sidetrack did locate oil, it was a much smaller amount than the amount found in the Shen 2 well. On top of all this, the Shen 4 well found clear evidence of multiple fault zones. Of course, these were not mentioned during the earnings call.

Any competent reservoir engineer or petroleum geologist knows the above data must be accounted for when determining the amount of oil that can be recovered from a formation. However, Anadarko executives sold a different story with their exaggerated projections. This was inconsistent with the transparency the company has repeatedly promised to shareholders and the general public.

## P. RCT feedback requested

During the process of evaluating Shen 4, it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data. This prompted an evaluation by Anadarko's Risk Consistency Team (RCT), which exists in part to prevent "salesmanship and overly optimistic evaluations of exploration prospects."[15] A stated goal of the RCT is to "minimize personal bias" of those involved in exploration efforts in order to "characterize the subsurface risk and potential of leads and prospects in a consistent manner."[16] With regard to the Shenandoah project, RCT intervention was long overdue.

The feedback from the RCT confirmed the dramatic overstatement of the Shenandoah resource. It was agreed that the exploration team and the development team would work toward a joint representation of the mean number. Thereafter, an agreed-upon mean number was established: 425 MMBOE.

In January 2016, Chris Camden circulated a chart, which illustrates the liberties taken by the exploration team. Note that their most *conservative* estimate of mean MMBOE was higher than the development team's most *aggressive* estimate, even though Ms. Frye and others had repeatedly explained why a downward adjustment to the size of the Shenandoah resource was necessary.[17] Here is the chart:

---

[15]   Dean Hennings, *The Power of the Portfolio*, 9 GEOEXPROM 6 (2013), *available at* http://www.geoexpro.com/articles/2013/06/the-power-of-the-portfolio.

[16]   *Id.*

[17]   As the chart also illustrates, the mean resource size advocated by the exploration team was 755 MBOE, which is startling given the data known to Mr. Leyendecker, Mr. Daniels and others in January 2016.

APC000014
Confidential Treatment Requested Under FOIA



After 425 MMBOE was agreed upon as the appropriate mean, Mr. Leyendecker, Mr. Daniels, Mr. Trautman and other Anadarko executives knew they were legally obligated to align their reporting with the scientific data. Unfortunately, Anadarko continued to publish an exaggerated resources mean at the insistence of Mr. Daniels.

The chart on the next page—prepared by the exploration team—is an example. As it illustrates, the mean resource size proposed by the RCT was rejected in favor of the inflated mean of 550 MMBOE (a 29.4% exaggeration). Notably, this chart was prepared on January 27, 2016, just *two weeks* after the RCT explained why 425 MMBOE should be the reported mean number going forward.

APC000015
Confidential Treatment Requested Under FOIA

Ms. Amanda M. McMillian
April 20, 2016
Page 16 of 31

## Resource Ranges



### Q. Ms. Frye speaks up

Ms. Frye was appalled to learn that Mr. Daniels and others were simply ignoring the RCT feedback and abandoning the agreed-upon mean of 425 MMBOE. She refused to be complicit and made this clear in late January 2016, when she aptly told Mr. McGrievy, "It's wrong."

### R. The size and scope of the Shenandoah misrepresentations

By sizing the Shenandoah resource at 550 MMBOE, Mr. Leyendecker, Mr. Daniels and other Anadarko executives represented to shareholders, investors, partners, the SEC and the general public that the Shenandoah field was the third richest resource *ever* discovered in the Gulf of Mexico.[18] Worse yet, they continued to do this even after the science flatly disproved such a representation.

It is impossible to calculate the monetary effect of the years-long overstatement of the Shenandoah resource. What we do know is that an overstatement by 125 MMBOE amounts to a $5 billion exaggeration at today's depressed oil prices. Further, important questions remain. How much did Anadarko profit as a result of its misrepresentations? How did this effect stock prices and investor confidence?

---

[18]      The only discoveries involving more than 550 MBOE were the Mars and Ursa fields.

APC000016
Confidential Treatment Requested Under FOIA

While we are not capable of ascertaining the answers to these questions, the SEC will surely seek those answers if an investigation proves necessary.

### S. Anadarko's compensation structure rewards resource exaggerations

Historically, a large part of investor value creation at Anadarko has come through conversion of exploration discoveries to shareholder value through monetization and/or conversion of discoveries to producing assets. This has led to the publication of annual exploration goals to the investor community.

Exaggerations and fuzzy math are actually incentivized by Anadarko's compensation structure. Exploration executives and their team members receive bonuses based on the *published* resource size and the related effect of such publications on the investor community. In other words, the bonus compensation paid to Mr. Leyendecker, Mr. Daniels and others is not deferred until after it is established that their optimistic projections were accurate. Executives receive their bonuses regardless of whether those projections pan out.

Here, there was a direct relationship between the exaggerated size of the Shenandoah resource and the compensation of those involved. Numerous individuals on the exploration team were rewarded with promotions despite their role in misleading the public. Below are examples:

| Name | Career trajectory |
|---|---|
| Ernie Leyendecker | Promoted to Senior Vice President, Exploration (Gulf of Mexico) |
| David Blakeley | Promoted to Director of Exploration Engineering |
| Robert Strickling | Promoted to Reservoir Engineering Manager (Gulf of Mexico) |
| Jake Ramsey | Promoted to Manager Exploration (Regional Team) |
| Beth Kendall | Promoted to Distinguished Geophysical Advisor |

CONFIDENTIAL

Ms. Amanda M. McMillian
April 20, 2016
Page 18 of 31

### T. False representations have not been corrected

Anadarko has compounded its potential liability by never squarely addressing the overstated size and value of the Shenandoah field. The motivation for remaining silent is obvious: the price of Anadarko stock is trading at less than half the value it was a year ago, and now is not an ideal time to inform the world that information provided to shareholders about the Shen 3 and Shen 4 wells was exaggerated rather dramatically for several years.

Statements made during the October 28, 2015 earnings call illustrates that deliberate silence and vague reassurances remain the preferred approach. Below are excerpts from a question-and-answer session between the investment community and Anadarko executives Al Walker (CEO) and Bob Daniels (Executive Vice President):

<u>Statements made by CEO Al Walker</u>

Q:   Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans?

A:   … It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. … we pushed the lowest known oil down about 400 feet. … But we're very encouraged with what we saw and *it was all well within the range of expectation of what we had put out there.* [19]

<u>Statements made by Executive Vice President Bob Daniels</u>[20]

Q:   And then maybe if I could do one quick follow up and you may not have anything to add on Shenandoah, but post the recent appraisal, any thoughts on resource range there at Shenandoah?

A:   On the resource range, *we're riding right where we thought.* We always do a probabilistic resource range. *We're still in that range with the results of the well.* [21]

---

[19]   *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

[20]   Mr. Daniels is the Vice President of International and Deepwater Exploration.

[21]   *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

APC000018
Confidential Treatment Requested Under FOIA

Mr. Walker's statements were false. He knew the size of the Shenandoah resource was not actually "all well within range of the expectation of what we had put out there" because his internal experts had repeatedly told him about many factors that would limit the size of the resource. Likewise, Mr. Daniels had actual knowledge that they were not actually "still in that range" when he falsely reassured the investment community.

## LEGAL STANDARDS

### A. The Sarbanes-Oxley Act

#### (1) Overview

The Sarbanes-Oxley Act was the first statute to provide specific whistleblower protection against employer retaliation based on the reporting of not only securities fraud but also corporate fraud generally.[22] The statute's stated purpose was to "protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes."

Since SOX became law, whistleblowers have been protected from retaliation if they provide information to (1) a federal or law enforcement agency; (2) a member or committee of Congress; or (3) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover or terminate misconduct).[23] The phrase "supervisory authority" has been broadly construed,[24] as has the galaxy of persons with authority to "investigate, discover, or terminate misconduct."[25]

#### (2) Protected activity

The Sarbanes-Oxley Act protects reports of information that employees "reasonably believe" to be in violation of the law.[26] The "reasonable belief" standard is met by reported violations of "any rule or regulation of the SEC." Proving actual fraud

---

[22]   *See, e.g., Sylvester v. Parexel Int'l LLC*, ARB 07-123 (ARB May 25, 2011)

[23]   *See* 18 U.S.C. § 1514A(a).

[24]   *See, e.g., Gonzalez v. Colonial Bank*, 2004-SOX039 (ALJ Aug. 20, 2004).

[25]   *See, e.g., Smith v. Hewlett-Packard*, ARB No. 06-064 (ARB Apr. 29, 2008); *Jayaraj v. Pro-Pharmaceuticals, Inc.*, 2003-SOX-32 (ALJ Feb. 11, 2005); *Deremer v. Gulfmark Offshore, Inc.*, 2006-SOX-2 (ALJ June 29, 2007).

[26]   While SOX does not define "reasonable belief," Senator Patrick Leay (D-Vt.)–who was instrumental in the enactment of SOX–has noted that "[t]he threshold [for reasonable belief] is intended to include *all* good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence." (italics added for emphasis)

APC000019
Confidential Treatment Requested Under FOIA

against shareholders is not a requirement.[27] Rather, SOX provides that the whistleblowing employee need only show that her belief of fraud is reasonable and that a reasonable person in her position would have believed the conduct constituted a violation. This is not an onerous burden.[28]

The breadth of SOX coverage also extends to reported violations of wrongdoing about which the employer is already aware.[29] Thus, protected activity can be a report of a fraud that has already occurred, a fraud that is ongoing or a fraud the complaining person believes is likely to occur.[30]

As the Administrative Review Board (ARB) has acknowledged, a narrower construction would defeat the intent of the Act and whistleblower law in general, which is aimed in part at preventing a fraud from ever occurring.[31] As such, the reach of SOX is wide-ranging and inclusive, and companies who presume that an employee's complaint is not protected by SOX do so at their peril.[32]

## B. The Dodd-Frank Act

### (1) Overview and legislative intent

The Dodd-Frank Act ("DFA") dramatically increased the risk of corporate fraud and malfeasance. In addition to protecting individuals who provide the SEC with "information relating to a violation of the securities laws,"[33] the statute also protects whistleblowers who initiate, testify or assist in any investigation relating to disclosures that are "required or protected" by SOX, the Securities Exchange Act of 1934 or any other law, rule or regulation of the SEC.[34] The purpose of the DFA was to "motivate those with knowledge to come forward and assist the Government to

---

[27]   *Brown v. Lockheed Martin*, ARB No. 10-050, ALJ No. 2008-SOX-049 (ARB Feb. 28, 2011).

[28]   *See, e.g., Allen v. Administrative Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008); *Inman v. Fannie Mae*, ARB No. 08-060, ALJ No. 2007-SOX-47 (ARB June 28, 2011); *Allen v. Administrative Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008)(SOX "objective reasonableness" standard is analogous to the objective reasonableness standard in Title VII).

[29]   *Allen v. DOL*, 514 F.3d 468 (5th Cir. 2008).

[30]   *See, e.g., Allen v. DOL*, 514 F.3d 468 (5th Cir. 2008); *Sylvester v. Parexel Int'l LLC*, ARB 07-123 (ARB May 25, 2011).

[31]   *See e.g., Getman v. Southwest Securities, Inc.*, 2003-SOX-8 at 20 n.8 (ALJ Feb. 2, 2004), rev'd on other grounds, 2005 WL 4888992 (ARB July 29, 2005); *Prioleau v. Sikorsky Aircraft Corp.*, ARB No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011).

[32]   *See, e.g., Hemphill v. Celanese Corp.*, 2010 WL 2473845 (N.D. Tex. 2010); *Prioleau v. Sikorsky Aircraft Corp.*, ARB No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011).

[33]   15 U.S.C. § 78u–6(a)(6).

[34]   17 C.F.R. § 21F(h)(1)(A).

identify and prosecute persons who have violated securities laws and recover money for victims of financial fraud."[35]

### (2) Additional remedies

The DFA authorizes harsh remedies aimed at motivating compliance and incentivizing whistleblowers. While SOX allows recovery of back pay, the DFA whistleblower-protection provision entitles a prevailing whistleblower to recover two times back pay.[36]

### (3) Longer limitations period

The DFA extended the time frame within which whistleblower claims can be asserted. It expanded the SOX limitations period from 90 days to 180 days. More worrisome for companies is that a DFA claimant has a deadline of six years after the date the retaliation occurs or three years after the date "facts material to the right of action are known or reasonably should have been known to the employee," with a maximum limitations period of ten years.[37] These protections virtually eliminate the previously significant risk of time-barred claims.

### (4) Jury trial and no requirement to exhaust remedies

The DFA does not require claimants to exhaust administrative remedies. Whereas SOX whistleblowers must complain to the Department of Labor, DFA plaintiffs can simply file a lawsuit in federal court, where they are entitled to a jury trial.[38]

### (5) Bounty program for whistleblowers

Section 922 of the DFA entitles whistleblowers to recover monetary awards if they provide information that leads to $1 million or more in criminal and civil proceedings.[39] The goal of the bounty program is "to motivate those with inside knowledge to come forward and assist the Government to identify and prosecute persons who have violated securities laws and recover money for victims of financial fraud."[40]

---

[35] S. Rep. No. 111-176 at 110-112 (2010).

[36] *Compare* 15 U.S.C. § 78u–6(h)(1)(C), *with* 18 U.S.C. § 1514A(c)(2). The enabling regulations of the whistleblower program took effect on August 12, 2011 and are codified at 17 C.F.R. parts 240 and 249.

[37] *Compare* 15 U.S.C. § 78u–6(h)(1)(B)(iii) *with* 18 U.S.C. § 1514A(b)(2)(D).

[38] *See* 15 U.S.C. § 78u–6(h).

[39] *See* 15 U.S.C.A. § 78u-6 (2010) (authorizing recovery of between 10% and 30% of the total recovery).

[40] S. Rep. No. 111-176 at 110-112 (2010).

would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The term "material" refers to information about which the average investor should be informed before buying or selling a security. Although the code does not provide examples, facts generally considered to be material include the risks associated with a particular investment and statements about the company's health.

### (2) Anadarko violated Rule 10b-5

Here, the exploration team violated Rule 10b-5 on a massive scale by repeatedly overstating the size of the Shenandoah resource. Underneath this global violation was a years-long series of misrepresentations and omissions of material fact. Along the way, they demonstrated an intent to mislead by hiding faults, ignoring science, ignoring RCT feedback and even attempting to silence and intimidate those who spoke up, such as Ms. Frye. Collectively, this sequence of events proves scienter.

Here is one example, from page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. *The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.*

The italicized excerpt was a misstatement of fact. As already discussed, the exploration team defined oil-water contacts in Shen 3 in disregard of established scientific principles. Shen 3 was two miles away from Shen 2, and seismic data showed faulting between the wells. Given this, oil-water contact could not be projected. Yet it was, and Anadarko published it as fact. This statement alone would draw significant scrutiny from the SEC, and any investigation will confirm that the exploration team knowingly misled the public.

### (3) Role of resources in share price proves materiality

It is no secret that resources and reserves are among the metrics that drive Anadarko's share price. When they characterized the Shenandoah resources as the third-largest resource ever found in the Gulf of Mexico, Mr. Leyendecker, Mr. Daniels and others on the exploration team knew the effect their representations would have on the investment community. Their manipulations of the verbiage and mapping used in reference to the Shenandoah resource was an effort to mislead the public into believing that the Shenandoah resource (and therefore Anadarko) were more robust than the science established. As Shell found out the hard way, the consequences for such actions are severe.

APC000023
Confidential Treatment Requested Under FOIA

CONFIDENTIAL

## D. The Shell Case

Roughly a decade ago, Shell paid a penalty of $120 million after an SEC investigation revealed a pattern of misrepresentations.[43] There is no telling what Shell paid to repair the collateral damage.[44]

The investigation was triggered by Shell's "overstatement of proved reserves," along with its "delay in correcting the overstatement."[45] The SEC also took note of "the lack of effective internal controls over the reserves estimation and reporting process."[46] The evidence established that Shell ignored repeated warnings that proved reserves had been overstated by unrealistic production forecasts. Instead of making the necessary adjustments, Shell attempted to "manage" the information flow by manipulating the data.[47]

While there are certainly differences, there are also similarities between the predicament Shell faced in 2003 and the potential liabilities created by Anadarko's exploration executives. Just as Shell overstated reserves, Anadarko has overstated the size of the Shenandoah resource.

We understand that reserves and resources are different, but as Anadarko's Reserves and Resources Manual indicates, both can affect share price, and both are subject to potential SEC scrutiny. This is why the Manual notes that reporting on reserves *and resources* should represent "best estimates in compliance with the appropriate rules and regulations" of not only the SEC but also the Society of Petroleum Engineers.[48] When reporting about the Shenandoah resource, Anadarko failed to meet these standards.

---

[43]   *See S.E.C. v. Royal Dutch Petroleum Company and The "Shell" Transport and Trading Co., p.l.c.,* H-04-3359 (S.D. Tex.) (Aug. 24, 2004).

[44]   For example, Shell was required to commit $5 million to developing and implementing a comprehensive internal compliance program, with SEC oversight thereafter.

[45]   Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[46]   *Id.*

[47]   *Id.*

[48]   *See* <u>Exhibit 2</u>, Reserves and Resources Manual (2012).

CONFIDENTIAL

There are other similarities in both scienter and scope. For example, the SEC concluded that Shell had overstated proved reserves by 4.47 billion barrels of hydrocarbon reserves (approximately 23%).[49] Here, Anadarko has overstated the Shenandoah resource size by 125 MMBOE, which amounts to a 29.4% exaggeration.[50] Shell was deemed to have overstated future cash flows by approximately $6.6 billion.[51] Similarly, after the development team valued the Shenandoah resource at $1.1 billion in 2014, Anadarko then published the value range as a "$2-4 billion net opportunity." This range was 82% higher than reality at the low end ($2 billion) and 264% higher than reality at the high end ($4 billion).

We mention the Shell case because it illustrates the potential consequences of a government investigation. The SEC takes no prisoners. The Shell case involved considerable public scrutiny, and this was deliberate. SEC administrators made it known that deterring future misrepresentations requires "a strong enforcement response" and "significant civil penalties."[52] Further, the investigation will not necessarily stop once Anadarko is punished. As the SEC pointed out during the Shell case, a complete investigation requires "focus on, among other things, the people responsible."[53] As you know, individuals are not immune from liability.

## IMPACT ON LEA FRYE'S LIFE

Until joining the Shenandoah project, Lea Frye loved her job. She was happy at work and happy at home. This all changed when Ms. Frye had to decide between being an accomplice to unlawful activity and working in an uncomfortable environment. While others may have been able to leave it all at the office, Ms. Frye could not.

---

[49]    Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[50]    As a reminder, Anadarko continued to use the inflated figure of 550 MMBOE as recently as January 27, 2016, immediately after the RCT had completed its analysis and then concluded that 425 MMBOE should be the operative figure based on the applicable data.

[51]    Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[52]    Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[53]    *Id.*

Originally, Ms. Frye assumed those involved in the Shenandoah project would reverse course and do the right thing if she continued to redirect them to the science. Regrettably, this did not happen. Instead, the opposite was true: the more assertive Ms. Frye became, the more those above her tried to intimidate her into quiet obsequiousness. She was attacked, berated, ignored, ordered to use phony maps and excluded from meetings.

## A. Health problems

The stress at work was compounded by stress at home. Ms. Frye gained 35 pounds and endured constant pain in her back and neck. She could no longer get consistent, restful sleep, in part because of work-related anxiety and fear and in part because of physical discomfort.

All of this led to depression and damage to Ms. Frye's most important relationships. She would come home exhausted—not from arduous work or long hours, but rather from the weight and fatigue of wondering when the other shoe might drop and what life might look like when that happens. Her teenage son began to struggle academically and became angry, withdrawn and depressed himself as he watched his mother's overall well-being deteriorate. Her marriage suffered, and tensions grew to a point that her husband ultimately cornered her to ask "what is it going to take to get my wife back?"

## B. Layoff request refused; medical care required

Aware of recent mass layoffs company-wide, Ms. Frye asked to be included in the layoffs in hopes of simply moving on with her life and getting out of a toxic environment. On February 19, 2016, she notified both Anadarko HR personnel and Pat McGrievy that it would be in the best interest of both Ms. Frye and the company if she could be included in the next layoff. A few weeks later, the next round of layoffs was announced, and Ms. Frye was not included.

In March 2016, it became clear that Ms. Frye needed medical care. Her physician diagnosed work-related stress, anxiety and depression and recommended FMLA leave. [54] Since then, Ms. Frye has realized that (1) there is no reason to believe that Anadarko plans to take steps to remedy the issues discussed in this letter; and (2) she has the opportunity to give Anadarko the chance to stop future fraud without taking the kind of scorched earth approach the whistleblower statutes encourage.

---

[54]   Currently on FMLA leave; expires on April 29, 2016.

APC000026
Confidential Treatment Requested Under FOIA

APC-00000561

## SETTLEMENT DEMAND

Mr. Leyendecker, Mr. Daniels and others have exposed Anadarko to massive liability by touting numbers that equate to a five-run home run. As the legislative history of the DFA recognizes, "whistleblowers often face the difficult choice between telling the truth and the risk of committing 'career suicide.'"[55] Ms. Frye has a firsthand understanding of this predicament.

To be clear, Ms. Frye is not resigning. Rather, she is demanding severance pay and other benefits as part of an agreed separation that will enable her to leave Anadarko, repair the damage done to her life and transition into a new job and perhaps a new career. While her desire to refrain from filing an SEC complaint may not undo the harm done to shareholders, Ms. Frye hopes this letter will deter future misrepresentations and protect her colleagues from the unenviable situation she has endured. Following are Ms. Frye's demands:

1) A lump sum payment of $940,325.00, which includes a component for attorney's fees;[56]

2) A paragraph in the separation agreement promising no future misrepresentations regarding the Shenandoah resource;

3) Internal personnel records characterizing her departure from Anadarko as a resignation (she is glad to provide a resignation letter);

4) A short letter recommending Ms. Frye to prospective employers with agreed-upon verbiage;

5) Agreed language in the separation agreement providing that any confidentiality and non-disparagement provisions are mutually applicable to Ms. Frye and management-level employees of Anadarko;

6) The company's assurance that it will not contest Ms. Frye's unemployment claim should she elect to seek unemployment benefits from the Texas Workforce Commission;

---

[55]   S. Rep. No. 111-176 at 110-112 (2010).

[56]   The sum demanded is not arbitrary. It was calculated by adding the following: (1) basic severance pay of $179,172 (calculated in accordance with Anadarko's Severance Plan); (2) the dollar value of Ms. Frye's unvested stock awards ($55,000); (3) Ms. Frye's prorated 2016 AIP bonus ($14,916); (4) the estimated COBRA subsidy for six months ($8,000); (5) compensatory damages in the amount of Ms. Frye's severance pay ($179,172); (6) two years front pay at Ms. Frye's current rate of pay ($340,000); and (7) attorney's fees in the amount of $164,065.

CONFIDENTIAL

7) A mutual release, with indemnity to Ms. Frye for all liability arising
from the acts and omissions described in this letter; and

8) Assistance in helping Ms. Frye obtain a lump sum payout of her vested
pension plan (valued at approximately $236,993 in October 2015).[57]

Between now and May 6, 2016, Anadarko will have the opportunity to resolve this
dispute quietly and confidentially,[58] without collateral damage. If a resolution is
reached, Mrs. Frye will refrain from filing the lawsuit and will sign a separation
agreement that includes a full and final release of all claims.

While Ms. Frye suspects that contacting the SEC and pursuing a bounty would be
more lucrative, that is not her preferred approach. She has no desire to take action
that will harm friends, coworkers and the company at large. Despite her miserable
experience during the past few years, Ms. Frye respects Anadarko and hopes to
avoid doing collateral damage to the company during a difficult economic period.
Also, she hates the spotlight and has no desire to provide sound bites during the
inevitable feeding frenzy that will begin once the media realizes the size and
significance of the matters discussed in this letter.

### ANALYSIS OF ANADARKO'S OPTIONS

Since much of our firm's practice is devoted to representing companies, we
understand that Anadarko will not relish the prospect of paying a significant sum to
resolve this case. However, this approach is the best business decision because the
other options have no upside and entail exponentially more risk.

### A. Ms. Frye's return to work

Ms. Frye found her working environment intolerable before she retained our law
firm. If she is forced to return to work now, it will be worse because there can be no
trust. She will be a pariah, and she knows this is unavoidable. While her bosses
may be coached to refrain from overt retaliation, Ms. Frye knows she will be
detested. Further, and perhaps more critically from Anadarko's perspective, she will
continue to have access to information that may later prove to be a liability if the
SEC does investigate. Thus, Ms. Frye's return to work following FMLA leave is a
dangerous prospect for Anadarko and a miserable, unhealthy prospect for her.

---

[57]   For obvious ERISA reasons, this sum is not considered to be part of the settlement demand.

[58]   Since Ms. Frye seeks an expeditious resolution, she has not informed coworkers or anybody
else that she has retained counsel or sent this demand letter. She has also not disclosed her
intended departure from the company.

## B. A return to work followed by a termination

We suspect Anadarko is too sophisticated to terminate Ms. Frye shortly after she returns to work.[59] She has a spotless record, will be returning from FMLA leave and has just engaged in protected activity. Regardless, since we cannot rule out such a scenario, a discussion of the consequences of such an approach is warranted.

Any firing will add to Ms. Frye's claims under both SOX and the DFA. A firing will incentivize her to notify the SEC and seek a bounty that will far exceed the amount demanded. Should that occur, Anadarko will be adverse to Ms. Frye and the SEC at the same time and will have no opportunity a "win" for a host of reasons:

- Ms. Frye has engaged in protected activity. She opposed actions she believed in good faith to be unlawful based on her training, education and experience, and disclosures made by employees concerning reasonably perceived violations of SEC rules governing internal control standards can constitute protected conduct under SOX.

- Since engaging in protected activity, Ms. Frye has been berated in the presence of her peers, subjected to derogatory comments, harassment, intimidation and veiled threats (from Mr. Leyendecker and Mr. Trautman) and has been excluded from meetings she should have been invited to attend.[60]

- In recent months, roughly 1,000 Anadarko employees have been laid off. Ms. Frye asked to be put on a layoff list, and her request was rejected.[61] If she is now "laid off" after Anadarko receives this letter, an inference of retaliation will be logical (unless her layoff is the product of an agreed separation on terms Ms. Frye proposes).

- The causation standard for SOX claims is preponderance of the evidence that protected activity was a "contributing factor." The ARB has expressly rejected efforts to impose higher standards such as "significant," "motivating," "substantial" or "predominant."

---

[59]   In addition to her protected activity at work, this letter is also a form of protected activity.

[60]   As you are aware, the DFA also protects employees from demotions and suspensions along with more subtle and amorphous forms of retaliation such as threats, harassment, blacklisting, discipline and intimidation. Even adverse actions that are "indirect" can violate the anti-retaliation provision.

[61]   We are not suggesting that not being laid off is an adverse action. However, a layoff that closely follows this demand letter will clearly satisfy the criteria for an adverse action, particularly since Ms. Frye's prior requests to be laid off were summarily rejected.

CONFIDENTIAL

- SOX authorizes Ms. Frye to recover "special damages" for emotional distress, impaired reputation, personal humiliation and other non-economic harm, and these damages are uncapped. Following recent SOX trials in other states, juries have awarded $1.6 million (New York) and $6 million (California).

- If Ms. Frye is required to pursue her claims, those forced to give depositions will include Bob Daniels, Ernie Leyendecker, Tim Trautman, David Blakeley, Robert Strickling, Beth Kendall and Jake Ramsey. Such depositions will expose Anadarko to significant ongoing liability that exceeds the scope of Ms. Frye's claims.

## C. Risks of an SEC investigation

If this matter cannot be resolved and an SEC investigation ensues, Anadarko has significant cause for concern. As you know, the SEC need not limit the scope of its investigation into Ms. Frye's specific allegations. Thus, the inquiry could grow to whatever extent the SEC decides is necessary. Ms. Frye and others on the development team will have little difficulty pointing the SEC in the right direction, and records attached to this letter will provide a helpful starting point.

Further, the potential for shareholder claims looms. As you know, parties who bring a successful 10b-5 claim are entitled to "actual damages," which can include the amount of the original investment. Considering that many investors likely purchased their shares high only to see them depreciate in value, this would not be an ideal time for the public to learn that those shares may have been overvalued by misrepresentations.[62] Now more than ever, the general public believes that large-scale corporate fraud is more common than previously imagined. As you are no doubt aware, perceptions such as this can be more dangerous than reality, and the damage done by an investigation will be done long before its outcome is determined.

Since we know you understand these risks, we will not belabor this discussion.

## D. Benefits of a resolution

The benefits of a confidential severance agreement are obvious. Ms. Frye will refrain from initiating any form of litigation and will not initiate an SEC investigation. If she had intended that approach, she would have done so already and would not have insisted on sending a 31-page letter that revealed Anadarko's

---

[62]   In any litigation (including cases initiated by shareholders), Ms. Frye would be a dual-capacity witness (fact witness and non-retained expert) because she has unique and specialized knowledge that could assist the trier of fact. *See* FED. R. EVID. 702.

APC000030
Confidential Treatment Requested Under FOIA

CONFIDENTIAL

wrongdoing (and her legal arguments) in granular detail. She insisted on a measured approach that places the ball squarely in Anadarko's court.

There is no question that Ms. Frye hopes to deter future misrepresentations without litigation or government intervention. She wants to move on with her life, start anew, get healthy and focus on her family. She has no desire to do more harm to anybody than is necessary. However, please do not mistake any of this for weakness. Ms. Frye has made clear that if a resolution is not reached, she is prepared to place her trust in the SEC and our courts.

## LITIGATION HOLD REQUEST

As we have made clear, Ms. Frye hopes to avoid litigation. However, since it is unclear whether this is realistic, she requests that Anadarko take all steps necessary to ensure that relevant evidence is preserved. To that end, a litigation hold letter is attached as <u>Exhibit 1</u> to this letter. It specifically identifies the categories of documents and information that Anadarko must take affirmative steps to preserve. This obligation encompasses but is not limited to email communications and other electronic data in its native format.

## CONCLUSION

Despite recent events, we know that Anadarko has an excellent reputation and a history of doing right by its employees and shareholders. Ms. Frye has fond memories of most of her employment with Anadarko and holds the company and many of her coworkers in high regard. However, the liability in this situation is clear, and the laws implicated are unforgiving. The exposure is significant, and a number of collateral risks can be avoided by a sound business decision.

We look forward to your response on or before 3:00 p.m. (Central Standard Time) on May 6, 2016 and hope your leadership team will treat this matter with the seriousness it clearly warrants.

Very truly yours,

David M. Minces

APC000031
Confidential Treatment Requested Under FOIA

# Exhibit 53

**Document Produced in Native Format**

CONFIDENTIAL



ANADARKO PETROLEUM CORPORATION

2016

# Forward Plan Formulation
## EC Discussion

April 27, 2016

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

1

A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N



# Business Plan Development – Competing Priorities

**▸Balance Sheet Management**
- Reduce gross debt / Improve credit metrics

**▸Manage DW Rig Obligations**
- Investment in mid to long-cycle projects

**▸Ramp-up Wolfcamp Development**
- Investment in long-cycle project (~5 years for positive FCF)

**▸Fund Meaningful DW/Intl Exploration Program**
- Investment in long-cycle projects

**▸Maintain WES Volumetric Growth**
- Key to maximize / preserve value of the WES/WGP franchise

**▸Move Forward with Mozambique Development**
- Appropriate contractual framework, offtake agreements, project financing & significant long-cycle investment required

**▸Mitigate Wattenberg Political Risk Exposure**
- Implies accelerated investment in development program

*Disciplined Balance of CAPEX with DCF Required*

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   2

2

A N A D A R K O     P E T R O L E U M     C O R P O R A T I O N

# Observations

## ‣No scenario evaluated meets all business needs/priorities

- No intuitively obvious solution given business priorities

## ‣Assets sales needed for balance sheet management

- Execution and proceeds challenged (crowded market and relatively unattractive gas assets)
- Cash flow dilution further strains business model and ability to adequately fund business needs

## ‣Wolfcamp ramp-up commitment (Scenario 2D)

- Yields moderately better operational, financial and credit metrics
- Little to no funding for DW/Intl Exploration or GOM development opportunities
- Mozambique not funded
- Does not meet DW rig commitment levels in 2017 and 2018

## ‣Scenario Pros/Cons Matrix



| Business Priority | Scenario | | | |
|---|---|---|---|---|
| | 1D | 2D | 3D | 4D |
| Wolfcamp Ramp-up | red | green | red | red |
| Wattenberg Political Risk Mitigation | green | yellow | green | yellow |
| DW/Intl Exploration | red | red | red | green |
| Execute GOM Devl Opportunities | red | yellow | red | red |
| Manage DW Rig Commitments | red | red | green | green |
| WES Volumetric Growth | yellow | light green | yellow | yellow |
| Mozambique Development | green | red | red | red |

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   3

3

A N A D A R K O    P E T R O L E U M    C O R P O R A T I O N



# Path Forward Concepts

## ‣ Wattenberg
- OPM on a defined area of the field (or a defined drilling program)
- Monetize WI (retain royalties)

## ‣ Delaware Basin
- Monetize a portion of non-core acreage

## ‣ Determine Commodity Pricing needed to adequately fund all objectives
- Testing completed using a $2.75 gas price

## ‣ Model FCX GOM acquisition with stock
- On hold pending data room assessment & analysis

## ‣ Consider Business Analysis under Various Commodity Price Scenarios
- "Crisis Management" $30-$50 oil ($40 average/$2.50 gas)
  - *What would business model need to look like?*
- "Back to Work" $50-$70 oil ($60 average/$2.75 gas)
  - *What would "optimal" business model look like*
- "Recovery" $70+ oil ($75 average/$2.75 gas)
  - *What would "optimal" business model look like*

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    4

4

A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N



# Portfolio Model Re-Build Status

▸ **Have received new economic case updates for all asset areas except Mozambique**

  ▪ Expect updated Mozambique case within next week

▸ **Significant changes for certain areas**

  ▪ Added additional Colombia cases to more accurately reflect potential
  ▪ New Wolfcamp cases incorporating significant type-curve improvements
  ▪ Shenandoah development case with significantly lower economic performance

▸ **Model calibration process with asset teams currently underway**

▸ **VP/GM model reviews planned by end of May**

▸ **Rebuild process completion by mid-June (at the latest)**

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    5

5



ANADARKO PETROLEUM CORPORATION

2016

# Additional Scenario Analysis

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

6

ANADARKO   PETROLEUM   CORPORATION



# "Desired Investment" Case – Scenario 5D

**▸ Methodology**
- Lock in "preferred" investment profile
  - *Wolfcamp (ramp up to ~400 wells/year; ~2/3 of submission case)*
  - *Wattenberg at submission case levels*
  - *Full funding of DW/Intl exploration program* ⎤ *More than fully utilizes contracted DW rigs*
  - *High ROR GOM development fully funded* ⎦
  - *Mozambique development*
- Solve for commodity pricing that provides adequate FCF

**▸ Considerable WTI improvement needed**
- Average WTI $58.75, NYMEX gas $2.75
- Current Calendar 2017 Strip: WTI $47, NYMEX gas $2.96

**▸ Post-2016 Production Drivers**
- Wattenberg
- Delaware Basin
- L48 Exploitation/Exploration
- Shenandoah
- Paon

**▸ Post-2016 Reserve Drivers**
- Wattenberg
- Delaware Basin
- Mozambique
- Shenandoah
- L48 Exploitation/Exploration

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    7

7

ANADARKO PETROLEUM CORPORATION



# Production/Reserves Profile – Scenario 5D

## Production



## Reserves



| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 5-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|
| Growth Rate | -6.1% | -22.7% | 12.7% | 6.7% | 9.2% | 9.5% | 2.1% | 9.5% |
| Divestiture Adjusted | 0.0% | -3.3% | 12.7% | 6.7% | 9.2% | 9.5% | 6.8% | 9.5% |
| PGNDAS @ $45* | -11.1% | -2.7% | 11.3% | 3.9% | 5.8% | 8.1% | 0.6% | 7.2% |

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 5-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|
| Reserve Growth* | -4.6% | -1.4% | 15.5% | 7.7% | 7.3% | 3.1% | 6.3% | 8.3% |
| Reserve Replacement* | 70% | 90% | 194% | 150% | 147% | 120% | 129% | 140% |
| F&D Cost | $17.80 | $18.34 | $8.99 | $13.62 | $13.34 | $15.52 | $13.59 | $13.25 |

*Divestiture adjusted*

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   8

8

A N A D A R K O    P E T R O L E U M    C O R P O R A T I O N



# Production/Reserves Profile – Scenario 5D

## Production

## Reserves



### Production

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth Rate | -6.1% | -22.7% | 12.7% | 6.7% | 9.2% | 9.5% | 7.8% | 12.4% | 3.5% | 0.9% | 1.7% | 3.7% |  |
| Divestiture Adjusted* | 0.0% | -3.3% | 12.7% | 6.7% | 9.2% | 9.5% | 7.8% | 12.4% | 3.5% | 0.9% | 1.7% | 6.0% | 7.1% |

### Reserves

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reserve Growth* | -4.6% | -1.4% | 15.5% | 7.7% | 7.3% | 3.1% | 14.8% | 5.7% | 9.7% | 8.2% | 8.4% | 7.8% | 8.9% |
| Reserve Replacement* | 70% | 90% | 194% | 150% | 147% | 120% | 190% | 135% | 161% | 157% | 161% | 143% | 151% |
| F&D Cost | $17.80 | $18.34 | $8.99 | $13.62 | $13.34 | $15.52 | $9.51 | $12.36 | $10.46 | $11.15 | $11.08 | $11.94 | $11.76 |

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Cum. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Free Cash Flow ($B) | (1.7) | (0.1) | 0.3 | (0.5) | - | 0.7 | 0.9 | 1.8 | 1.8 | 1.7 | 1.9 | 6.8 |
| Capital ($B) | 2.8 | 3.8 | 4.5 | 5.6 | 5.9 | 6.1 | 6.4 | 6.6 | 6.9 | 7.1 | 7.4 | 63.1 |

*Divestiture adjusted

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    9

9

A N A D A R K O    P E T R O L E U M    C O R P O R A T I O N

# Cost Inflation Effect on Break-even Oil



▸**Incremental 5% cost inflation requires ~$3/Bbl increase in WTI to remain FCF neutral**

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   10

10

ANADARKO  PETROLEUM  CORPORATION

# Meet Minimum Obligations - Scenario 6D

## ▶ Methodology
- Locked in investments projects on current DW Rig Schedule that are approved/planned to ensure obligations are met
- Locked in Wolfcamp activity associated with lease preservation
- Balance DCF with CAPEX over 2017-2021 horizon

## ▶ Run Characteristics
- Selects Wattenberg above submission case
- Does not select Mozambique
- Accelerates exploration in CI and New Zealand

## ▶ Post-2016 Production Drivers
- Wattenberg
- Delaware Basin
- L48 Exploitation/Exploration
- Shenandoah

## ▶ Post-2016 Reserve Drivers
- Wattenberg
- Delaware Basin
- L48 Exploitation/Exploration
- Ghana Jubilee
- Shenandoah

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   11

11



ANADARKO   PETROLEUM   CORPORATION

# Production/Reserves Profile – Scenario 6D



### Production



### Reserves



| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 5-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|
| Growth Rate | -6.1% | -24.5% | 7.5% | 11.5% | 4.7% | 6.6% | 0.2% | 7.6% |
| Divestiture Adjusted | 0.0% | -5.6% | 7.5% | 11.5% | 4.7% | 6.6% | 4.8% | 7.6% |
| PGNDAS @ $45* | -11.1% | -4.3% | 7.7% | 11.4% | 4.4% | 5.4% | 0.2% | 7.2% |

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 5-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|
| Reserve Growth* | -4.6% | -4.7% | 0.8% | 3.5% | 2.8% | -1.2% | 0.2% | 1.5% |
| Reserve Replacement* | 70% | 66% | 105% | 120% | 116% | 93% | 95% | 100% |
| F&D Cost | $17.80 | $18.05 | $13.25 | $12.22 | $13.13 | $17.33 | $14.73 | $14.37 |

*Divestiture adjusted

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   12

12

ANADARKO PETROLEUM CORPORATION



# Production/Reserves Profile – Scenario 6D



### Production

### Reserves

## Production

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth Rate | -6.1% | -24.5% | 7.5% | 11.5% | 4.7% | 6.6% | 4.5% | 11.5% | 7.4% | 3.8% | 0.6% | 2.8% | |
| Divestiture Adjusted* | 0.0% | -5.6% | 7.5% | 11.5% | 4.7% | 6.6% | 4.5% | 11.5% | 7.4% | 3.8% | 0.6% | 5.2% | 6.4% |

## Reserves

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-Year CAGR | Post-'17 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reserve Growth* | -4.6% | -4.7% | 0.8% | 3.5% | 2.8% | -1.2% | 0.0% | 5.0% | 14.9% | 9.9% | 8.6% | 3.8% | 4.8% |
| Reserve Replacement* | 70% | 66% | 105% | 120% | 116% | 93% | 100% | 123% | 167% | 149% | 147% | 114% | 119% |
| F&D Cost | $17.80 | $18.05 | $13.25 | $12.22 | $13.13 | $17.33 | $17.41 | $14.11 | $10.15 | $11.47 | $12.11 | $13.31 | $13.13 |

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Cum. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Free Cash Flow ($B) | (1.7) | 0.2 | 0.1 | - | (0.1) | (0.2) | (0.3) | (0.1) | 0.3 | 0.7 | 0.6 | (0.5) |
| Capital ($B) | 2.8 | 2.7 | 3.4 | 4.0 | 4.3 | 4.9 | 5.4 | 6.0 | 6.3 | 6.5 | 6.8 | 53.1 |

*Divestiture adjusted

IDENTIFY AND COMMERCIALIZE RESOURCES  ■  EXPLORE IN HIGH-POTENTIAL PROVEN BASINS  ■  GLOBAL BUSINESS DEVELOPMENT APPROACH  ■  ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    13

13

ANADARKO PETROLEUM CORPORATION



# Scenario Investment Allocation

| | | SCENARIO | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1D | 2D | 3D | 4D | 5D | 6D |
| Wolfcamp | | Flexible | **Locked In** | Flexible | **Locked In** | **Locked In** | **Locked In** |
| DW/Intl Exploration | | Flexible | Flexible | **Locked In** | **Locked In** | Flexible | Flexible |
| Mozambique | | Flexible | Flexible | Flexible | Flexible | Flexible | Flexible |

| **AVERAGE ANNUAL INVESTMENT (2017-2021)** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Asset** | **Submission** | | | | | | |
| Wattenberg | $1,185 | $1,630 | $1,273 | $1,568 | $776 | $1,201 | $1,314 |
| Wolfcamp | $1,251 | $307 | $1,251 | $351 | $1,251 | $978 | $643 |
| GGRB Resolution | $67 | $99 | $41 | $120 | $12 | $131 | $46 |
| PRB Deep | $78 | $109 | $75 | $115 | $45 | $115 | $109 |
| | | | | | | | |
| Caesar/Tonga | $63 | $7 | $63 | $0 | $0 | $63 | $63 |
| K2 | $114 | $12 | $29 | $13 | $7 | $114 | $127 |
| Heidelberg | $78 | $8 | $8 | $8 | $8 | $8 | $8 |
| Shenandoah | $335 | $0 | $0 | $0 | $0 | $273 | $137 |
| | | | | | | | |
| Intl Exploration | $783 | $126 | $166 | $267 | $231 | $476 | $218 |
| GOM Exploration | $911 | $59 | $254 | $518 | $439 | $511 | $417 |
| | | | | | | | |
| Mozambique | $504 | $504 | $0 | $0 | $0 | $504 | $0 |

- >Submission
- 100% - 75% of Submission
- 75% - 50% of Submission
- 50% - 25% of Submission
- <25% of Submission

| **DW/INTL ESTIMATED RIG UTILIZATION** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Contracted** | | | | | | |
| 2017 | 4.0 | 2.2 | 2.4 | 4.2 | 4.4 | 6.4 | 5.2 |
| 2018 | 2.3 | 3.1 | 2.0 | 4.8 | 4.3 | 5.3 | 3.0 |
| 2019 | 1.4 | 2.9 | 3.2 | 5.9 | 5.3 | 8.9 | 6.0 |
| 2020 | 0.3 | 3.2 | 3.3 | 5.4 | 5.7 | 9.4 | 5.9 |
| 2021 | 0.0 | 8.2 | 6.8 | 5.1 | 3.9 | 12.9 | 9.3 |

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   14

14

A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N

# Summary Operational/Financial Comparison

| | Without Divestments | | | | With Divestments | | | | | | | Legend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Scenario** | | | | | | | | | | | |
| | 1 | 2 | 3 | 4 | 1D | 2D | 3D | 4D | 5D* | 6D | | |
| Wolfcamp | Flexible | Locked In | Flexible | Locked In | Flexible | Locked In | Flexible | Locked In | Locked In | Locked In | | Lowest |
| Dw/Intl Exploration | Flexible | Flexible | Locked In | Locked In | Flexible | Flexible | Locked In | Locked In | Flexible | Flexible | | 50th Percentile |
| Mozambique | On | On | Off | Off | On | Off | Off | Off | Flexible | Off | | Highest |
| Shenandoah | On | Off | On | Off | Off | Off | Off | Off | On | On | | |
| | **2017-2021 Horizon** | | | | | | | | | | | |
| | **CAGR** | | | | | | | | | | | |
| Volume | 4% | 1% | 6% | 2% | 8% | 9% | 8% | 3% | 10% | 8% | | |
| Reserves | 1% | 3% | -3% | 0% | 2% | 2% | -2% | 1% | 8% | 2% | | |
| DCF | 11% | 5% | 13% | 7% | 12% | 13% | 13% | 6% | 17% | 13% | | |
| | **Cumulative** | | | | | | | | | | | |
| RRR | 100% | 113% | 80% | 92% | 110% | 105% | 87% | 98% | 140% | 100% | | |
| DCF $B | $ 18.9 | $ 17.5 | $ 20.1 | $ 18.6 | $ 18.4 | $ 20.2 | $ 19.0 | $ 17.2 | $ 26.5 | $ 19.2 | | |
| CAPEX $B | $ 18.6 | $ 17.1 | $ 19.7 | $ 18.5 | $ 18.1 | $ 19.5 | $ 18.5 | $ 17.2 | $ 25.9 | $ 19.3 | | |
| FCF $B | $ 0.3 | $ 0.4 | $ 0.4 | $ 0.1 | $ 0.3 | $ 0.7 | $ 0.5 | $ - | $ 0.6 | $ (0.1) | | |
| EBITDAX per BOE | $ 17.98 | $ 17.89 | $ 18.12 | $ 18.01 | $ 19.20 | $ 19.55 | $ 19.37 | $ 19.53 | $ 24.99 | $ 19.78 | | |
| | **Per DAS (Average)** | | | | | | | | | | | |
| Production | 0.32 | 0.31 | 0.34 | 0.32 | 0.30 | 0.33 | 0.31 | 0.29 | 0.31 | 0.31 | | |
| Reserves | 2.17 | 2.23 | 2.03 | 2.09 | 1.93 | 1.92 | 1.77 | 1.80 | 2.14 | 1.84 | | |
| DCF | $ 4.15 | $ 3.84 | $ 4.62 | $ 4.26 | $ 4.25 | $ 4.93 | $ 4.63 | $ 4.14 | $ 6.09 | $ 4.65 | | |

| | Credit Metrics (2017) | | | | | | | | | | Indicative BBB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Leverage Full Cycle Ratio (Moody's) | 0.84x | 0.84x | 0.87x | 0.85x | 0.98x | 1.03x | 0.99x | 0.98x | 1.19x | 0.97x | >1.00x |
| Retained Cash Flow / Debt (Moody's) | 17.1% | 16.9% | 18.3% | 18.2% | 17.9% | 19.5% | 19.2% | 19.2% | 24.1% | 19.5% | >20.0% |
| Debt / EBITDAX (Fitch) | 4.00x | 4.02x | 4.01x | 4.03x | 3.87x | 3.85x | 3.88x | 3.88x | 3.06x | 3.86x | <2.50x |
| Debt / Daily Production (Fitch) | $ 25.46x | $ 25.59x | $ 25.48x | $ 25.61x | $ 27.58x | $ 27.47x | $ 27.63x | $ 27.64x | $ 27.28x | $ 27.56x | <$15k |
| DCF / Debt (S&P) | 18.2% | 18.0% | 19.6% | 19.5% | 19.4% | 21.5% | 21.1% | 21.0% | 25.7% | 21.4% | >20.0% |

*Pricing – WTI $58.75/Bbl; $HH - $2.75/Mcf*

IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY   15

15

A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N

# Full Cycle- Maverick (Includes Dropdown)



IDENTIFY AND COMMERCIALIZE RESOURCES ■ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ■ GLOBAL BUSINESS DEVELOPMENT APPROACH ■ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY    16

16