# Exhibit 67

**To:** Kaye Rasmusson[krasmusson@KPMG.com]; apetry@kpmg.com[apetry@kpmg.com]
**Cc:** Gibson, Elizabeth[Elizabeth.Gibson@anadarko.com]; Williams, Louis[Louis.Williams@anadarko.com]
**From:** Roberts, Jennifer[O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=OJH157]
**Sent:** Thur 2/16/2017 9:15:11 PM Coordinated Universal Time
**Subject:** Fwd: Info on Shenandoah #6
**Attachment:** WR 52 #3 AM REPORT 2-15-17.pdf
**Attachment:** ATT00001.htm

Kaye,
See attached and let me know if any further questions.

Sent from my iPhone

Begin forwarded message:

> **From:** "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>
> **Date:** February 16, 2017 at 3:08:27 PM CST
> **To:** "Roberts, Jennifer" <Jennifer.Roberts@anadarko.com>
> **Cc:** "McGrievy, Pat" <Pat.McGrievy@anadarko.com>
> **Subject: Info on Shenandoah #6**
>
> Jennifer,
> Here is the information you had requested:
>
> - TD of the well: 32,047.0' MD, 31,768.9 TVD (see the attached latest Drilling Report)
> - Date of Dry-hole determination: 2/7/2017
>
> Please let me know if you have any follow-up questions.
>
> Anita

CONFIDENTIAL

# Exhibit 68

**To:** Brown, Danny[Danny.Brown@anadarko.com]; Hollek, Darrell[Darrell.Hollek@anadarko.com]
**Cc:** Abendschein, Bob[Bob.Abendschein@anadarko.com]; Hart, Danny[Danny.Hart@anadarko.com]; Tedesco, Bill[William.Tedesco@anadarko.com]
**From:** McGrievy, Pat[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=QAJ309]
**Sent:** Mon 4/3/2017 12:25:06 AM Coordinated Universal Time
**Subject:** RE: Shen 6ST01 - BP01 - Update 4 - 04.02.17

Date: 04.02.17
Report time: 7:00 pm
Days from sidetrack01 BP01 spud: 26
Cost to date: $43.4 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

We remain at a depth of 30,812' MD (30,074' TVD).  Over the course of the last week or so, we have been successful in managing fluid losses. If you recall, we made the decision to stop drilling operations at the current depth and commence openhole logging under drillpipe conveyed logging operations. Unfortunately, to date we have not been successful in getting wireline tools past the tar zone at a depth of approximately 30,700' md. We completed a clean out trip on Friday and attempted a quick entry without drillpipe but were unsuccessful in getting below the tar, yet again. We are currently in the process of making one last drill-pipe assisted wireline operation this evening and through the course of the next day or two.  In either case, this will be the last operation in this wellbore before T&A.

**Current operations:**

Initiated one last run with drill-pipe assisted openhole logging operations late this afternoon. We expect to complete the operation on Tuesday.

**Our operational forward plan:**
Conduct drill-pipe assisted TLC logging operations and then move to T&A phase.

**Subsurface Outlook:**

Unfortunately, if we are unable to obtain NGI or other imaging data below the tar zone, we will not be able to have confidence in the fault orientation and whether or not the Shen 5 will be open or closed off to aquifer energy. This will result in rather significant variation in recover between depletion and aquifer support in our simulation models. Anadarko was preparing to ballot the partnership late this past week to set a 9-3/8" liner to isolate the thief zones and drill ahead to see if we could get into an HC contact and also obtain critical logging information and fault orientation, but the partnership would not support this plan.

**End of report – 04.02.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

**From:** McGrievy, Pat
**Sent:** Saturday, March 25, 2017 5:26 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny; Tedesco, Bill
**Subject:** RE: Shen 6ST01 - BP01 - Update 3 - 03.25.17

Date: 03.25.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 17
Cost to date: $33.8 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

**We are currently at a depth of 30,812' MD (30,074' TVD) and have not made any drilling footage progress since the last update on 03.19.17.  Over the course of the last several days the drilling team has been attempting to manage fluid losses and just within the last day or so, the hole is finally staying full under static conditions. Earlier in the week the decision was made to stop drilling operations and commence openhole logging operations under drillpipe conveyed logging operations. A meeting was called with the exploration and development GOM management teams and a consensus decision was made to stop drilling and log the current openhole section.**

**Current operations:**

APC-00091554

Fluid losses were contained over the past 24 hr period. Completed tripping operations with BHA and now preparing to conduct BOP test in advance of logging operations.

**Our operational forward plan:**

Complete BOP test and rig up Schlumberger to conduct drillpipe-conveyed (TLC) logging operations over the course of the next several days. The decision to drill ahead will be predicated by the NGI log interpretation and also our ability to drill ahead, given the hydraulics may be challenging with smaller casing (9-3/8" ) which we must set to get the fluid loss problems behind us if in fact the decision is made to drill forward. Although it will be a real challenge, if we can convince with ourselves with a high degree of certainty that we are not in the same FB as the Shen 5 (NGI and pressure data); and we can isolate the fluid loss zone; and we can determine that we can safely drill ahead with reduced ID casing, additional drilling data will be extremely important in understanding the size of the Shen 5 FB and if it is or is not in communication with the aquifer. Otherwise, it makes sense to T&A the well and mobilize the rig so that we can conduct a more rigorous analysis of the current data before we make another recommendation, if at all, with this wellbore.

The current schedule suggests that we will be logging the UW series sometime late Monday evening or early on Tuesday, March 28th.

**Subsurface Outlook:**

We are currently in what we believe to be the top of the UW3 sand. Again, the UW1, UW2 and UW3 have all come in wet at this location. We have observed at least two faults in the by-pass well. The NGI will be instrumental in determining the direction of this faulting.

**End of report -- 03.25.17**


Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Sunday, March 19, 2017 3:30 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST01 - BP01 - Update 2 - 03.19.17


Date: 03.19.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 12
Cost to date: $27.8 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

**We are currently at a depth of 30,812' MD (30,074' TVD). Over the course of the last 24 hour period, drilling has been extremely slow as we have only made 275' of hole, largely as a result of the fluid loss problems. Although we have had several episodes of excessive fluid losses in the range of 200 bbls/hr over the past 24 hours, the drilling team has successfully managed losses by spotting LCM pills and the hole seems to respond well to these LCM applications. We will continue to drill ahead as the hole dictates. Unfortunately, we have lost communication to the density tool, but at this point the data is not critical and a BHA trip is unwarranted.It's also noteworthy that we encountered tar at a depth of approximately 30,713' (see attachment).**

**Current drilling operations:**

Currently at a drilling depth of 30,812' MD at 2:00 pm this afternoon pumping LCM pill to seal off fluid losses previously estimated to be at ~30% of full returns. They have been fighting fluid losses at this approximate depth since 8:00 am this morning. Since then, Fluid losses have completely diminished and hole remains full at this point. Plans are to monitor and drill ahead.

**Our operational forward plan:**
1. Continue to pump high viscosity fluid loss pills to manage fluid loss and drill ahead.

**Subsurface Outlook:**

We are currently in what we believe to be the top of the UW3 sand. Again, the UW1, UW2 and UW3 have all come in wet at this location. Given the geologic complexities, and despite the fluid loss situation, we feel that it is prudent to continue to drill ahead to see if we can get into an HC column in the Upper Wilcox section and through the LWA and possibly the LWB. It is unlikely that we will encountered H/C's below the LWB. What is clear so far, is that this structure is more complex than originally interpreted due to the evidence of sub-seismic faulting.Again, please note that there is still

APC-00091555

some uncertainty on the correlations and subject to revision as we drill deeper into the section.

**End of report – 03.19.17**


Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Saturday, March 18, 2017 3:15 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST01 - BP01 - Update 1 - 03.18.17

*Danny and Darrell:*

*In addition to the below report, I've added a newly-generated stratigraphic X-section and a more detailed narrative of the drilling results to date, by Paul Chandler. My view is a high level overview of Paul's comments in the subsurface outlook section.*

*Let me know of you have any questions at this point,*

*Pat*

Date: 03.18.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 11
Cost to date: $26.1 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,537' MD (29,851' SSTVD)

**Reached the 11-7/8" casing setting shoe depth of 31,109' MD (29,458' TVD) on 03.11. Shoe depth was estimated to be ~ 200' above the top of the projected UW1. Over the course of the next five days the rig conducted a BOP test; successfully ran and cemented the 11-7/8" casing liner; and successfully conducted a shoe test of 15.6 EMW. Drilling operations re-initiated drilling operations @ 0800 hrs on 03.17. Over the last 24 hour period, 641' of new hole was drilled from 30,082 to a current depth of 30,713' MD where we began losing fairly large volumes of fluid.**

**Current drilling operations:**

Currently at a drilling depth of 30,713' MD this morning and experiencing mud losses of ~200 bbls per hour; have pulled up into shoe to control losses. It appears that we are at or slightly within the top of the UW3 sand. We do not know if these losses are related to a fault or something else. An 80 lb/bbl pill was spotted on bottom prior to pulling into the shoe to minimize or eliminate hole losses.

**Our operational forward plan:**

1. Pump a high viscosity fluid loss pill and spot it on bottom and monitor losses. If it doesn't stop losses, another pill will follow.
2. If the losses stop, plans are to drill ahead. Otherwise, the mud weight will be cut to 14.5 ppg from a current weight of 14.6 ppg and see how the well responds while drilling ahead. This will give us a 14.8 ppg downhole mud weight, or essentially balanced with the pore pressure in the upper sand.
3. If this plan fails, the plan will be to engage BSEE to determine if, and how far we can drill ahead, assuming that the losses are manageable. This could be 400 feet, or we could request to drill ahead far enough to get the BHA below the loss zone so that the ECD is slightly reduced lower (more clearance with drill pipe versus drill collars and larger od BHA components).

**Note:** Setting another sting of casing to put the Upper (presumably higher pressure) sand behind pipe would allow us to cut mud weight even more, possibly, but this will be a last resort and there are no guarantees. Historically speaking, problems with losses usually get worse as we drill deeper into the section. We could set a casing string and still end up with an unmanageable drilling margin.

**Subsurface Outlook:**

We are currently correlating to be at the top of the UW3 in this BP01 well and at a similar stratigraphic point as in the ST01 borehole. We have encountered a complete Upper Wilcox section so far (UW1-UW3) but the sands have all come in wet. That said, the Wilcox section drilled so far appears to correlate well with the Shen 5 from the UW1 to the top of the UW3.

This section does appear to be different, stratigraphically speaking, relative to the Shen 6 ST01 well. It's now apparent that the Shen 6ST01 well had a partial missing section of Wilcox (missing the UW1 to near the T/UW2) which is likely explained by faulting. Given the geologic complexities, and despite the fluid loss situation, we feel that it is prudent to continue to drill ahead to see if we can get into an HC column in the Upper Wilcox section

APC-00091556

and through the LWA and possibly the LWB. It is unlikely that we will encountered H/C's below the LWB. What is clear so far, is that this structure is more complex than originally interpreted due to the evidence of sub-seismic faulting.Please note that these correlations are still under evaluation by Paul Chandler.

End of report -- 03.18.17

"To say this is a complex is huge understatement. We are dealing with correlations between three wells, the Shen Shen6 BP1, the Shen6 ST1 and the Shen 5. The ST1 and the BP1 are high angle wells that require TVD conversions to mimic the straight hole for the Shen 5. Comparing the shen 6ST to BP wells is best with MD to MD. Anyway, the point is these are all difficult to correlate with tremendous certainty but here is my opinion right now.

I was alarmed yesterday that the Wilcox section we were seeing in the BP1 well looked so different than the ST1 well. The differences were striking. These two boreholes are only a few hundred feet apart so this tells me it is likely a faulting scenario. I was hoping we could get more section drilled before I went out on this limb but unfortunately we did not. I believe the sand seen at 30282' MD in the BP1 is likely the UW1 sand. The actual T/UW2 does not occur until 30,375' MD or so. In fact, the entire Wilcox sand section we have drilled so far correlates pretty good to the Shen 5 -- the ST1 well does not. I also believe the ST1 well is faulted just above the T/UW2 at 30, 370' MD whereby taking out a 100' section which would include the UW1 not seen in the ST1 well. This is not the same fault seen at the bottom hole of that well and the one we think is likely the source of our loss of circulation issue. Where this puts us (if I'm right on all this) is the we are in the top of the UW3 in this BP1 hole just as we appeared to be in the ST1 hole. There is no resistivity spike seen in our well as was the case with the ST1 well but I do now think we are TDed in the same section stratigraphically via the faulting. I can't tell you if our losses are due to the same fault as before or something else but that we are topped into the UW3 just as I think we were in the ST well.

I apologize for the long narrative but there is no easy way to explain all this. I've got to figure out how to get his on a cross section. Of course all the sands we've seen so far have been wet and I still can't explain that too well until we can get deeper --just as before. I'm sure we will discuss this more."

Paul Chandler

Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Sunday, February 26, 2017 8:15 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST - Update 3 - 02.26.17


Date: 02.26.17
Report time: 8:00 pm
Days from sidetrack spud: 9
Cost to date: $7.6 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,670' MD (29,910' SSTVD)
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Currently drilling ahead in Upper Wilcox with at a depth of 30,670' MD (~ 29,910' SSTVD.) We initiated drilling operations late Saturday afternoon at a depth of 29,420' MD and have drilled approximately 1,250 ' over the last 26 hrs with controlled drilling ROP's ranging from 40-60 fph with no signs of wellbore instability issues.

**Subsurface Outlook and current work plan (see attached X-Section):**

The well encountered what we believe to be the UW2 at 29,687' SSTVD or about 100' low to prog; unfortunately we are encountering wet sands as we continue to drill deeper into the Upper Wilcox series.Obviously this is a rather significant setback and although we were optimistic on encountering HC's FTB in the Upper Wilcox, we did recognize the possibility of this outcome. Assuming that conditions continue as they are, we plan to drill through the Upper and Lower Wilcox and then run conventional logs and MDT's and conduct MDT fluid and pressure acquisition program. Assuming trouble free drilling operations, we should reach TD sometime Tuesday (02.28). We will be working to understand the STOIP impact as a result of these well results after completion of the MDT program.

**End of report -- 02.26.17**

Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp

The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

**From:** McGrievy, Pat
**Sent:** Thursday, February 23, 2017 11:52 AM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST - Update 2 - 02.23.17

Date: 02.23.17
Report time: 11:00 am
Days from sidetrack spud: 5
Cost to date: $4.4 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 29,420' MD
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Well TD is currently 29,420' MD (~ 28,900' SSTVD.) We are preparing to trip the drillstring to conduct a requisite BOP test for the next 24 hrs. Controlled drilling ROP's have ranged from 40-60 fph and there have been no signs of wellbore instability issues.

**Subsurface Outlook and current work plan (see attached X-Section):**

The well depth is currently tracking approximately 50' high to the original prognosis and currently we are through the base of the Eoccene which was the projected next casing point. The Upper Wilcox section is projected to be approximately 530 ' (TVD) below our current depth of 28,970' (TVD). This translates to about 720' of MD drilling before we expect to encounter the UW1, assuming that it is present. The drilling team is reasonably confident that they can drill through the entire Wilcox section and to TD without setting the 11-7/8" pipe.

We expect to be back to drilling on Friday evening or early Saturday morning (02.25). Additionally, we expect to encounter the Wilcox section before the end of the weekend.

**End of report – 02.23.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

**From:** McGrievy, Pat
**Sent:** Tuesday, February 21, 2017 7:35 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** Shen 6ST - Update 1 - 02.21.17

Gentlemen:

I am restarting the reporting on the Shen 6 with Sidetrack operations which started on 02.18.17. I will continue to report as necessary throughout the drilling and logging operations. All partners have approved the sidetrack operations.

Date: 02.21.17
Report time: 2:00 pm
Days from sidetrack spud: 3
Cost to date: $2.5 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 28,165' MD
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Started on Sidetrack Afe on 02.18.17. Began drilling off cement plug and building angle at 25,488' on 02.19 and currently control drilling at 60 fph with 12.25" x 14" drilling assembly at 28,165 and building angle to 34°. Plan to drill to CP at 29,300' MD.

**Subsurface Outlook and current work plan:**

CONFIDENTIAL

Attached is a X-section comparing the Shen 5 and Shen 6 wells with the current Shen 6ST. We are currently drilling in the Oligocene and correlating nicely with both wells. At 60 FPH, we should expect to be at CP #1 (11-7/8" casing section) late tomorrow evening. This will locate us approximately 200' below the base of the Marl section and ~ 200' above the top of the Upper Wilcox (UW2). From there, we will be spending the next several days running and cementing pipe.

**End of report – 02.21.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

**From:** McGrievy, Pat
**Sent:** Wednesday, February 08, 2017 10:17 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny; Tedesco, Bill; Steinberger-Glaser, Anita
**Subject:** RE: Shen 6 - Update 5 - 02.08.17

Days from spud: 55
Cost to date: $85.7 MM
AFE DHC cost: $154 MM
Current Depth: 32,047' MD
Report time: 9:00 pm

**Current drilling operations:**

TD was called at12 pm on 02.07. Completed C&C on the well and now POOH with drilling assy. Plan to conduct BOP test and proceed with logging operations around mid-day on 02.09. Logging operations are expected to be completed on late Sunday or early Monday, assuming trouble-free operations.

**Subsurface Outlook and current workplan:**

The subsurface team is in the process of revising the structural interpretations on the Upper and Lower Wilcox sands (UW2-LWE) based on the negative (wet) outcome of the Shen 6 throughout the U&L stratigraphic section. Although the sands correlated quite nicely with the Shen 5, they were clearly not in hydraulic communication. Chip and Paul see one or perhaps two parallel (down to the south) faults that appear to separate the Shen 5 from the Shen 6 well. The team is currently working on updating the volumetrics and should have some preliminary results by the end of the day on Thursday (02.09) for review.

**Preliminary Sidetrack Analysis:**

In parallel, the team is working on two sidetracking options to constrain the volumetrics of the field: (option 1) Sidetrack the well to the North to further delineate the eastern flank of the field; or (option 2) sidetrack the well due-west to encounter the Shen 5 FB to understand the OWC's within this FB and to help infer OWC's in a series of FB's in the western flank of the field.  Obviously, the Shen 6 has dealt a serious blow to the east flank resources and the team currently views this option as the riskier of the two sidetrack options with minimal column height potential. As a result (as currently mapped), a production take-point to the east is now much less likely. The team will  be completing their analysis tomorrow afternoon and will likely recommend a sidetrack well to the west to encounter the Shen 5 FB. Although the results of the logging program will not be completely understood until early next week, we do not see an outcome from this interpretation that will alter the sidetrack recommendation at this point.

**Partnership Opinion on Sidetrack:**

We met with the partnership today on issues relating to project management , host facility options, and the pending design AFE, but we did touch briefly on our opinion to sidetrack the well without mobilization. Our basic argument to the partnership was that we want to constrain the volumes and the host facility options quickly and in a capital efficient manner. Venari openly supported our lead while COPC and Cobalt admitted that it would be a challenge to obtain approvals for an immediate sidetrack.  Suffice it to say, we cannot designate this operation as a "lease saving event" since we have satisfied the criteria for 180 days with the Shen 6. As a result, we need 2 and 50% to proceed. I think we can get Cobalt and COPC on board but there's no penalty to recoup in this case, other than the data gathered from the sidetrack well.

**Expedited AFE:**

We expect to receive drilling costs for the proposed sidetrack operation sometime tomorrow afternoon and further we plan to begin AFE preparation on Friday. Ideally, we would like to share the results of our work with the management team late tomorrow afternoon to gain support going into the

APC-00091559

weekend. Our drilling team is estimating that we will need a go-forward decision (be it sidetrack or TxA) by sometime on Monday in order to execute on the program and avoid downtime. We also have to account for the partner approval time which is a 48 hr approval window. Effectively, with approvals on Monday, February 12th the timing will be tight. *Speaking for the team, we can certainly set up a 30 minute review late tomorrow afternoon if each of you have flexibility in your schedules. This will help us to expedite the internal approval process. Additionally, we are working on an EC memo for additional support.*

Please advise if you have questions or need additional information.

Thanks, Pat

**END of REPORT 02-08-17**


Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Tuesday, February 07, 2017 10:46 AM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6 - Update 4 - 02.07.17


**Shen 6 Update - 7 am Tuesday morning report:**

Days from spud: 54
Cost to date: $84 MM
AFE DHC cost: $154 MM
Current Depth: 31,952' MD
Report time: 8:00 am

**Current drilling operations:**

Drilling ahead in just within the top of the Cretaceous section at approximately 31,926' MD with a P-rate of 50'/hr. We expect to be calling TD within the next few hours.


**Subsurface Outlook:**

We completed drilling operations through the entire Upper (UW2, UW3) and Lower Wilcox (LWA through LWE) sand packages early this morning and will drill 150-200' into the Cretaceous in order to get open logging tools down through the LWE sand member. I have attached an updated X-section from Paul Chandler for reference. Although hole problems have historically frequently occurred in the LWC – LWE, we encountered absolutely trouble-free drilling throughout the section.

Currently we are planning a minimal logging program which will include 3 runs (1) NGI borehole imaging tool (fracture and fault detection)/sonic/RT Scanner; (2) Fluid and pressure data acquisition; (3) SWC's. We expect to begin rigging up wireline services sometime Thursday morning. Discussions around sidetracking opportunities (without mobilization) continue as the team will be determining volumetric STOOIP estimates up-dip and to the east. Additionally, there's consideration to sidetrack to the west, into the Shen 5 FB to further define volumetric estimates within this block. Sidetracking operations can be easily be achieved since casing milling operations will not be required. Recommendations will be subject to final well data analysis once we receive and interpret the pressure and fluid data and NGI results.

**END of REPORT 02-06-17**


Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Monday, February 06, 2017 9:00 AM
**To:** Brown, Danny; Hollek, Darrell

CONFIDENTIAL

APC-00091560

**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6 - Update 3 - 02.06.17

**Shen 6 Update - 7 am Monday morning report:**

Days from spud: 53
Cost to date: $83 MM
AFE DHC cost: $154 MM
Current Depth: 30,891' MD
Report time: 7:00 am

**Current drilling operations:**

Drilling ahead in the Lower Wilcox B sand at approximately 30,900' MD with a P-rate of 65'/hr (to maintain moderate ECD's). TD in the Cretaceous is expected around ~32,400' MD.

**Subsurface Outlook:**

So far, we have drilled through the UW2, UW3, and LWA and are currently into the LWB with each of the four sands logging wet. Again, the UW1 was not present but this is not a surprise because it does a laterally pervasive sand like the other 7 sands in the U&L Wilcox. I have attached an updated X-section from Paul Chandler for reference.

We are currently control drilling at a p-rate of 65'/hr but there is a chance that we slow down as we drill deeper into the section in order to maintain moderate ECD's. So far, we have not encounter any drilling-related problems in the Wilcox section. Hole problems have historically been encountered in the LWC, LWD and LWE. Taken into consideration the anticipation of reduced P-rates as we drill deeper, we should be completely through the U&L Wilcox by tomorrow morning or early afternoon and TD the well in the Cretaceous (somewhere around 32,400' MD), sometime Tuesday evening.If we drill the entire section wet as we currently expect, we will tentatively continue with a minimal logging program which will include fluid and pressure acquisition and possibly an NGI to analyze fracture and fault detection. Discussions around the possibility of sidetracking up-dip (without mobilization) will be held today subject to final well data analysis once we receive and interpret the pressure and fluid data and also possible NGI results.

**END of REPORT 02-06-17**

Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Sunday, February 05, 2017 8:04 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob
**Subject:** RE: Shen 6 - Update 2 - 02.05.17

**Shen 6 Update - 3pm Sunday afternoon:**

Days from spud: 51
Cost to date: $83 MM
AFE DHC cost: $154 MM
Current Depth: 30,100' md

**Current drilling operations:**

Drilling ahead through Upper Wilcox at a rate of 70'/hr with 12-1/4" slim hole drilling assembly to proposed TD of ~32,400' MD. Could reach TD as early as late Monday evening or Tuesday morning.

**Subsurface Outlook:**

We got back on bottom early Saturday morning and began making hole around noon. We were drilling at approximately 30,100' at report time today (3pm) and so far the results have been quite disappointing. We have drilled through what we believe to be the UW2 and UW3 and both sands appear to be wet. The UW1 was not present but this is not a surprise because it does a laterally pervasive sand like the other 7 sands in the U&L Wilcox. I

APC-00091561

have attached an updated X-section for reference.

The UW2 and UW3 have come in somewhere around 185-200' deeper than the pre-drill prediction. This MAY suggest that we are in communication with the original Shen 1 well, but without pressure data it is far too early to definitively say one way or another. We are currently control drilling at 70'/hr without any hole problems at this point. With a 200' correction, we should be completely through the U&L Wilcox and reach the top of the Cretaceous at somewhere around 32,000' MD, late Monday evening or perhaps sometime on Tuesday. If we drill the entire section wet, we will go with a minimal logging program which will include fluid and pressure acquisition and possibly an NGI to analyze fracture and fault detection. This will be discussed with the team tomorrow. We will also be looking at the merits and the possibility of an up-dip sidetrack without a mobilization.

**END of REPORT 02-05-17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Thursday, February 02, 2017 10:08 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob
**Subject:** Shen 6 - Update 1 - 02.02.17

Darrell and Danny, at the request of Bob A., I plan to initiate a daily report for the Shen 6 operations going forward through logging operations and will provide daily updates as necessary. Let me know if you have any questions. Also, I have attached a Paul Chandler x-section to help out on the visuals.

**Editorial: - 02.02.17**

The Shen 6 is drilling extraordinarily well and could easily finish 50 days ahead of the original AFE drilling time of 120 days. The real good news is that it resets the bar on all subsequent development drilling wells (both time and cost) at Shenandoah but it does put more pressure on the drilling schedule. We observed similar outstanding drilling performance on the prior Blackhawk well (Warrior) where we were able to drill, sidetrack and C&S the well for about the same cost as the original AFE dry hole cost. Fortunately or not, we had to sidetrack the Warrior well to get into the HC column and this sidetrack enabled the Shenandoah team to secure the APD and avoid rig downtime. There may be a couple of outcomes (certainly if we encounter the Wilcox (Full to base) where we would sidetrack the well down-dip (without mobilization) to chase the OWC and further constrain our STOIP distribution. There could be other potential outcomes that may lead us to an immediate sidetrack but too many to enumerate at this point. If we don't conduct an immediate sidetrack, we could easily be facing a rig gap subject to securing an APD for the Warrior GC 519 #1. The team is working diligently to mature this well on all fronts but there is still remains significant risk in a rig line gap despite the best efforts of the completions team to quickly mature P&A's as a stop gap.

**Shen 6 Update – 02.02.17**

Days from spud: 48
Cost to date: $79 MM
AFE DHC cost: $154 MM
Current Depth: 28,747' md

**Current drilling operations:**

POOH with 12-1/4 x 14-1/4" drilling assembly to pick up slim hole (12-1/4" drilling assembly) and drill to proposed TD of ~32,400'. May reach TD as early as 02.08.17.

**Subsurface outlook:**

We are currently at a depth of 28, 747' or about 675' above the UW1 at 29,420'.  We have drilled through the Oligocene and the Eocene and it appears the well is trending approximately 150' low to the original prognosis. All salt inclusions (several) were benign and caused no problems with drilling operations while drilling the salt section. The well was designed to cut projected OWC's in the UWB but since the well is drilling 150' low to the original projections, we now expect to see the OWC contacts somewhere within the LWA.

We expect to be on bottom drilling ahead sometime this Saturday and with controlled drilling rates of 50'/hr, we expect to be reach TD on Wednesday, February 8th.

**END OF REPORT – 02.02.17**

APC-00091562

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

CONFIDENTIAL

# Exhibit 69

**Document Produced in Native Format**

CONFIDENTIAL



**Shenandoah Project Update & Path Forward Executive Committee Review**

April 4th, 2017

ANADARKO PETROLEUM CORPORATION

1. **Before we get started with the discussion, I'd like to bring up three key points which I think summarize the subject of the discussion today:**

2. **The Results of the Shen 6 well have materially changed the economics for a stand-alone facility to the point** (at current market pricing) where it is no longer a viable stand-alone option without the help of basin exploration success.

3. **We have reached the point of diminishing returns** where additional appraisal drilling at Shenandoah will not materially move the needle. We believe that it makes sense to get off of the clock and put the capital to work  in the basin exploration program to supplement resources and achieve a critical mass for a Shenandoah hub. Merit to Stop the clock and slow down the spending.

4. **Leads us to a desire to get off of the clock but this requires a paradigm shift** in the way we view SOP's in terms of the degree of certainty of a development project coming to fruition and the length of time from SOP issuance to first production.  We do have industry precedence in the Shell Vito project which issued a 7 year SOP in 2013 with first production in 2020.

1

## Shenandoah Alternative Development Options



- **Meeting Objectives**
  - Seek Guidance and Direction
  - Achieve alignment on forward plans
- **Agenda**
  - Overview and Plan Forward Recommendation
  - Shenandoah Project – Current Status
  - Exploration Basin Value Proposition
  - Shenandoah Basin Optionality
  - Closing discussion and EC feedback

ANADARKO PETROLEUM CORPORATION

---

**Stated Meeting objectives** are to seek EC guidance and direction and achieve alignment on a path-forward.

Agenda:

Plan forward recommendation
Shenandoah Current status – Givens, challenges and opportunities
Shenandoah Basin exploration value proposition
Shenandoah basin optionality – Decsion

2



## Recommendation for a Shenandoah Basin Solution

- **Shenandoah Basin at a X-road: 3 different Strategies with multiple paths**
  - Status Quo - progress forward and maintain earliest first oil (2021)
  - Reduce Pace & Preserve Optionality
    - *Execute exploration program*
    - *Develop commercially viable basin solution*
  - Exit Basin - Relinquish or monetize
- **Recommended Path Forward:** *Reduce Pace/Spending* while *Preserving Basin Optionality*
  - Basin needs a host facility
  - Opportunity for exploration to add resources and achieve critical mass for host development
  - Realign the partnership to overall stronger and more committed GOM players
  - Opportunity to evaluate other commercial solutions (Anchor (CVX) JV, spar relocation & re-use, other)
  - Greatly reduces 2017-2020 Shenandoah capex spend rate

ANADARKO PETROLEUM CORPORATION

Subject to a thorough subsurface evaluation we believe that the Shen 6 has reduced STOIPs by approximately 40%.

Given the recent negative results of our appraisal program at Shenandoah, we believe we are at a cross-road in terms of the path that we choose to create the maximum value proposition for Anadarko and the Shenandoah basin.

3 strategies: spent several sessions and man and woman hours building and refining these options (still much more refinement required):

Each of these strategies have multiple execution paths and associated conceptual development options.

1. Status Quo – Progressing forward at the current pace can be achieved by a co-development with Anchor or perhaps a SSTB to Heildberg both of which still may be challenged without aid from a successful exploration program. Significant work needs to occur with respect to long-distance SSTB's.

2. Reduce Pace & preserve Optionality – Extended time allows for a more optimal basin solution and the exploration success will dictate the optimal development.

3

Preferred option since it enables time for exploration to play catch-up; considerably slows down capital spending; enables technology to catch up and it allows more time to develop an optimal solution for the basin.

3. Exit Basin – not recommended since we believe we have the building blocks with a major discovery and multiple exploration prospects that can add significant long term value for the basin.

## Plan to Preserve Basin Optionality



- **Finish Shen 6 evaluation**
- **Prepare for next lease holding operation Q3/Q4 2017**
- **Engage BSEE**
  - Explain issues and have a guidance meeting
  - Begin preparation of SOP for 2025 1st production
- **Evaluate regional host option**
  - CVX Anchor discussion
- **Execute exploration plan**

ANADARKO PETROLEUM CORPORATION

Key Elements to Slow down the pace and preserve optionality:

Finish Shen 6 subsurface work (static and dynamic modeling work)  to understand our current resource evaluation.

Prepare for the next lease holding operation in Q3/Q4, 2017 to bridge the gap (keeper well or perhaps a ST out of the Shen 4); assuming that we issue and SOP we will need to allow at least 6 months for BSEE SOP approval.

Engage BSEE in Q2 to provide a project overview and seek guidance and support for the issuance of an SOP.

Work with Venari and CVX to evaluate a centrally-located regional hub facility to service Anchor, Shenandoah and the surrounding exploration prospects. At a minimum, attempt to achieve synergies with the 20 K program, (i.e. rig sharing and alignment on BOP's)

Begin execution of a multi-year exploration program beginning with Coronado in Q4, 2017.

## Shenandoah Project – Current State



- **Givens:**
  - New-built stand-alone facility is uneconomic @ <$70/BO
    - *Reduction in estimated resources as a result of Shen 6*
  - Anadarko has a strong exploration lease presence within the Shenandoah basin
  - Write-down exposure in a failed development scenario (NBV is $865 MM)
- **Challenges:**
  - APC exploration prospect maturity currently does not support the Shenandoah decision time-line
  - 50% of the Shenandoah partnership is financially stressed or without commitment to the GOM
    - *Potential for non-consents for the next lease holding operation without SOP*
    - *APC potentially exposed to additional capex*
  - Partners are motivated to SOP and sell
    - *APC has been encouraged to submit development concept for SOP despite feasibility and economics*
    - *Partners do not have regulatory creditability risk*
- **Opportunities:**
  - Centrally-located (Anchor-Shen) facility could add significant value to existing and undiscovered resources
  - Although commercially challenging, the HB Spar relocation presents a value proposition for APC
  - Opportunity for partnership realignment in basin

ANADARKO PETROLEUM CORPORATION

Most of the bullets on this slide are self explanatory.

Givens:

We mentioned the fact that with the recent results of the Shen 6 well, a new-build Shenandoah Stand-alone is uneconomic with crude prices less than $70/bbl.

We do have substantial NBV (NPLH Of $465 MM) associated with the Shenandoah asset and currently working with Luis Williams in what could be a fairly large NBV revision given the results of Shen 6.

Challenges:

50% of the Shenandoah partnership is financially stressed or is without GOM commitment. Poses potential problems on the next lease holding operation but it may also present an opportunity for re-alignment of companies with a stronger commitment to the basin (i.e. STO).

Opportunities:

5

We currently have a team looking at the viability of relocating the HB spar as a potential hub at Shenandoah. Although it will be commercially challenging there is potential significant value if HB were to deplete prematurely.

5



## APC - SHENANDOAH BASIN EXPLORATION
## (VALUE PROPOSITION)

ANADARKO PETROLEUM CORPORATION







Un-Named (APC Operated Lead)
APC 50% / Venari 50%
Wilcox MMRA: "In Progress"
First Lease Expiration 2020
Bevo (APC Operated Lead)
APC 50% / Venari 50%
Wilcox MMRA: 52 - 330 – 830 MMBO
First Lease Expiration 2020
Grayling (APC Op Lead)
APC 50% / Venari 50%
Wilcox MMRA 54 - 375 – 935 MMBO
First Lease Expiration 2019
Fascin8 (OPEN Lead)
Wilcox MMRA 40 -190 – 430 MMBO
Anchor (Chevron Appraisal)
Chevron TD'd Anchor #3 in March 2017
Anchor #1 "Hub Class w/ ~690 ft Net Oil Pay"
UNIT Held by Operations
Anchor Partnership
CVX – 55%
CIE – 20%
Samson – 12.5%
Venari – 12.5%
Gallatin (APC 100% GC801; 2023)
Repsol 100% Blk 800; Lease Exp 2020
Lower Miocene & Wilcox Exploration
Super8 (OPEN Lead)
Wilcox MMRA 40 - 165 – 365 MMBO
Turtle Lake
Ardennes
SHENANDOAH
APC WI = 33%
Future Host Facility?
IPA (APC Operated "Lead")
APC = 60%, Venari = 40%
Lower Mio: 10 – 35 – 65 MMBOE
Wilcox MMRA: 50 – 205 – 445 MMBOE
First Lease Expiration 2022
Coronado (APC Appraisal)
APC = 60%, Venari = 40%
Lower Mio: 15 – 80 – 195 MMBOE
Wilcox MMRA: 45 – 235 – 555 MMBOE
Recommended 2017 Appraisal well.
First Lease Expiration 2022
Yucatan (APC Appraisal)
RDS 42.4%,APC 25%,NEX 15% Inpex 12.3%,CIE 5.3%
Wilcox MMRA: 79 – 105 – 135 MMBOE
Key Block Expires: 11-30-2017
Shenandoah Partnership
APC – 33%
COPC – 30%
CIE – 20%
Venari – 17%
Goodfellow
Solomon
Monument (Statoil Prospect)
Statoil 67% / Samson 33%; No Spud Date
APC Wilcox MMRA: 60 – 390 – 970 MMBOE
First Lease Expiration 2023
Lewis
Ironbark (XOM 100% Prospect)
Possible 2018 Drill; First Lease Exp 2022
APC Wilcox MMRA: 80 – 277 – 577 MMBOE
APC Lwr Mio MMRA: "Work-in-Progress"
GARDEN BANKS
GREEN CANYON
KEATHLEY CANYON
WALKER RIDGE
Open
Open
708
709
752
753
794
796
797
800
801
762
763
806
807
838
839
840
844
847
881
884
896
APC High Bid
APC High Bid
52
53
STO High Bid
55
56
Open
95
96
97
98
99
100
APC High Bid
144
129
141
142
143
185
186
187
225
227
229
230
231
271
272
274
315
316
LEGEND
APC Active Lease
Oil Well (Disc or Appr)
Wet Wilcox Penetration
Active Drill Location
Oil Discovery
Prospect or Lead Area
SHEN 20-Mile Radius
SHENANDOAH Area Exploration Set
"Drill Ready" Timeline
2017
Coronado Wilcox
2018
Coronado Miocene
2019
Yucatan Wilcox
Monument Wilcox
2020+
IPA Wilcox
Bevo-Grayling area Wilcox

# SHENANDOAH RECOMMENDED PATH FORWARD

ANADARKO PETROLEUM CORPORATION

9





Shenandoah Basin Optionality (Path-Forward Options)
ANADARKO
Shenandoah Optionality
Status Quo
Progress forward
Maintain earliest 1st oil
Recommended Path
Slow Down Pace
Delay 1st oil
Preserve Optionality
Reduce budget
Progress basin understanding
Exit
Shen-Anchor Co-development
Shen stand-alone
Shen SSTB
SOP & Delay 1st Oil Shen-Anchor Co-dev
SOP & Delay 1st oil Shenandoah - only
Relinquish & Re-Lease
Relinquish (Exit Basin)
Sell / Trade
New-build
Spar Re-use
New-build
Spar re-use
?
Proposed Anchor Host
?
SSTB to Heidelberg
New-build or Spar re-use
New-build or Spar re-use
SSTB to Heidelberg
ANADARKO PETROLEUM CORPORATION

# Conceptual Development Plan (Slow down pace preserve optionality)

ANADARKO

- **Provides timing alignment with exploration opportunities within 20 mile tie back distance**
  - Assumes SOP issued in Q2, 2017; approved in Q4, 2017
  - Requires additional well operation in Q4, 2017 to bridge Shenandoah leases to SOP
  - Alleviates capital spend 2017- 2020
  - FID in 2021
  - First oil in 2025

# Basin Capital Estimate through FID (Q1 2021)



**Shenandoah Gross Investment in Million $**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Drilling | 240 - 332 | | 10 - 14 | 86 - 126 |
| 20A | 59 | 28 | 10 | |
| Facilities | 25 - 30 | 10 - 20 | 20 - 40 | 20 - 40 |
| Subsurface | 7 - 8 | 2 - 3 | 2 - 3 | 2 - 3 |
| Total | 331 - 429 | 40 - 51 | 42 - 67 | 108 - 169 |

**Shenandoah Net Investment in Million $ (33% WI)**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| **Total** | **110 - 143** | **13 - 17** | **14 - 22** | **35 - 56** |

**Shenandoah Net Delta  Investment in Million $ compared to 4-well, 60MBOPD case**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Current | 121 | 142 | 202 | 226 |
| Reduction | 11 - (22) | 129 - 125 | 191 - 185 | 187 - 166 |

**Exploration Net Investment in Million $**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Exploration Drilling | **70** | **70** | **70** | **70** |

- **Shenandoah Drilling**
  - Keeper Well or ST in 2017 for lease holding operation
  - 60-90 day rig operation for completion & testing in 2020 at $250K rig rate
- **Shenandoah 20A**
  - Develop equipment for DST in 2020
    - Test-tree and MODU
- **Shenandoah Facilities**
  - Progress to detailed engineering in 2020
- **Shenandoah Subsurface**
  - Finish out core & fluid studies in 2017

- **Slow pace results in more than $450MM net capital reduction over 4 years**
- **$25-55MM in additional 2017 drilling spend if COPC and CIE non-consent**
- **Exploration Drilling assume one well/year at a 50% WI**

## Closing Discussion – EC alignment on Path Forward Plans



- **Alignment on recommendation: Reduce pace and spending while preserving basin optionality**

- **Key Issue/challenges with recommended path:**
  - Philosophical viewpoint on a long-term SOP of an essentially undefined development concept
  - Risk of issuing SOP and defaulting on agreement if basin resources do not materialize

- **Thoughts on evaluating HB or other Spars as relocation and re-use option**

- **Other Options under consideration**

ANADARKO PETROLEUM CORPORATION

13



## Facilities Capex Estimates



- **Shenandoah / Anchor co-development with spar reuse or Shenandoah stand-alone spar re-use currently rank out to be the cheapest options**
- **All cost estimates are preliminary**
  - Cost upside on the Spar-reuse figures
  - Spar re-use numbers do not include the purchase price

| Option | Comment | MM$, Gross | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Capex Estimate | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Shen Ancor Co-development w/ Spar re-use | Based on 50% split of host relocation cost | 950 | 55 | 20 | 20 | 100 | 200 | 250 | 325 |
| Shen Stand-alone Spar re-use | Based on HB re-use excl. spar purchase price | 1065 | 55 | 140 | 224 | 292 | 354 | | |
| SOP & Delay 1st oil - Spar re-use | | 1105 | 55 | 20 | 20 | 140 | 220 | 290 | 360 |
| Shen SSTB to Anchor | Based upon $300MM anchor facility cost (no engineering performed) | 1225 | 55 | 20 | 250 | 300 | 300 | 180 | 120 |
| Shen SSTB to Heidelberg | Based up a $300MM relocation of wellhead facility (no engineering performed) | 1305 | 55 | 275 | 410 | 350 | 200 | 15 | |
| SOP & Delay 1st oil - Tieback | | 1325 | 55 | 20 | 275 | 410 | 350 | 200 | 15 |
| Shen Ancor Co-development w/ New-build | Based on 40% split of host cost from venari | 1,625 | 55 | 350 | 350 | 300 | 300 | 200 | 70 |

ANADARKO PETROLEUM CORPORATION

15





# Shenandoah Development Options (4 Well Case)

ANADARKO

- **Recoverable Resource: ~210 MMBOE for all scenarios**

| Scenario | $50 oil AT NPV10 ($MM) | $50 oil AT PIR10 | $50 oil AT ROR | Strip AT NPV10 ($MM) | Strip AT PIR10 | Strip AT ROR | $ 70 Upside AT NPV10 ($MM) | $ 70 Upside AT PIR10 | $ 70 Upside AT ROR | Invest Gross ($B) | Invest Net ($B) | Assumptions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joint Dev. With Anchor using Heidelberg | 170 | 0.43 | 20.0% | 185 | 0.46 | 20.7% | 382 | 0.96 | 29.3% | 1.9 | 0.6 | Shen TB firm capacity 50 MBOPD<br>50% monthly OPEX<br>No facility purchase price |
| Heidelberg Relocation | 149 | 0.30 | 17.8% | 166 | 0.34 | 18.6% | 402 | 0.82 | 27.9% | 2.0 | 0.7 | 60 MBOPD capacity<br>No facility purchase price |
| Tie back to Anchor (40 miles) | 17 | 0.03 | 10.8% | 30 | 0.06 | 11.4% | 213 | 0.44 | 18.3% | 2.2 | 0.7 | Shen TB firm capacity 40 MBOPD<br>50% monthly OPEX |
| Joint Dev. With Anchor New Build | 29 | 0.05 | 11.0% | 43 | 0.07 | 11.5% | 240 | 0.40 | 17.2% | 2.6 | 0.9 | Firm capacity 60 MBOPD<br>50% monthly OPEX |
| Tie back to Heidelberg (60 miles) | 2 | 0.00 | 10.1% | 16 | 0.03 | 10.6% | 212 | 0.38 | 17.4% | 2.3 | 0.7 | Firm capacity 40 MBOPD<br>50% monthly OPEX |
| Little Shen | 23 | 0.03 | 10.9% | 41 | 0.06 | 11.5% | 277 | 0.40 | 18.7% | 2.8 | 0.9 | 60 MBOPD capacity |
| Big Shen | -33 | -0.04 | 8.9% | -15 | -0.02 | 9.5% | 221 | 0.28 | 16.4% | 3.2 | 1.0 | 100 MBOPD capacity |

**Recoverable Resource**:
178 MMSTB
192 BCF
210 MMBOE
RF: 33%

| Fault Block | STOOIP (MMSTB) |
|---|---|
| Shen 4 FB 1 | 105.6 |
| Shen-4 | 132.2 |
| Shen-2 | 193.6 |
| Shen-5 | 101.6 |
| Total: | 533 |

- **Optimistic resource view**
  - Pre-Shen 6 ST/BP
  - OWCs assume common aquifer for field
- **Optimistic RF**
  - Assumes 3x aquifer
- **Assumes no PI degradation**
- **Commingle all**
- **No additional compartmentalization**

# Shenandoah Development Options (3 Well Case)

ANADARKO

- **Recoverable Resource: ~175 MMBOE for all scenarios**

| | $50 oil | | | Strip | | | $ 70 Upside | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scenario | AT NPV10 ($MM) | AT PIR10 | AT ROR | AT NPV10 ($MM) | AT PIR10 | AT ROR | AT NPV10 ($MM) | AT PIR10 | AT ROR | Invest Gross ($B) | Invest Net ($B) | Assumptions |
| Joint Dev. With Anchor using Heidelberg | 115 | 0.33 | 17.4% | 140 | 0.41 | 18.9% | 285 | 0.81 | 25.9% | 1.7 | 0.5 | Shen TB firm capacity 50 MBOPD<br>50% monthly OPEX<br>No facility purchase price |
| Heidelberg Relocation | 85 | 0.19 | 14.8% | 115 | 0.27 | 16.4% | 285 | 0.66 | 23.9% | 1.8 | 0.6 | 60 MBOPD capacity<br>No facility purchase price |
| Tie back to Anchor (40 miles) | -20 | -0.04 | 9.1% | 10 | 0.02 | 10.3% | 140 | 0.32 | 16.0% | 1.9 | 0.6 | Shen TB firm capacity 40 MBOPD<br>50% monthly OPEX |
| Joint Dev. With Anchor New Build | -25 | -0.05 | 9.1% | 2 | 0.00 | 10.1% | 145 | 0.27 | 14.7% | 2.3 | 0.8 | Firm capacity 60 MBOPD<br>50% monthly OPEX |
| Tie back to Heidelberg (60 miles) | -35 | -0.07 | 8.4% | -10 | -0.02 | 9.6% | 132 | 0.27 | 15.0% | 2.0 | 0.7 | Firm capacity 40 MBOPD<br>50% monthly OPEX |
| Little Shen | -60 | -0.09 | 7.8% | -25 | -0.04 | 9.0% | 145 | 0.22 | 14.8% | 2.6 | 0.9 | 60 MBOPD capacity<br>No facility purchase price |
| Big Shen | -110 | -0.15 | 9.7% | -75 | -0.10 | 7.4% | 95 | 0.13 | 13.0% | 2.9 | 1.0 | 100 MBOPD capacity |

**Recoverable Resource**:
145 MMSTB
160 BCF
175 MMBOE
RF: 33%

| Fault Block | STOOIP (MMSTB) |
|---|---|
| Shen 4 FB 1 | 105.6 |
| Shen-4 | 132.2 |
| Shen-2 | 193.6 |
| Total: | 431.4 |

- **Optimistic resource view**
  - Placement uncertainty of OWCs
- **Optimistic RF**
  - Assumes 3x aquifer
- **Assumes no PI degradation**
- **Commingle all**
- **No additional compartmentalization**

ANADARKO PETROLEUM CORPORATION

## Shenandoah Estimated Capital through FID (Q1 2021)



**Gross Investment in Million $**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Drilling | 240- 332 | | 10- 14 | 86- 126 |
| 20A | 59 | 28 | 10 | |
| Facilities | 25- 30 | 10- 20 | 20- 40 | 20- 40 |
| Subsurface | 7- 8 | 2- 3 | 2- 3 | 2- 3 |
| **Total** | **331- 429** | **40- 51** | **42- 67** | **108- 169** |

**Net Investment in Million $ (33% WI)**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Drilling | 79- 110 | | 3- 5 | 28- 42 |
| 20A | 19 | 9 | 3 | |
| Facilities | 8- 10 | 3- 7 | 7- 13 | 7- 13 |
| Subsurface | 3- 4 | 1- 1 | 1- 1 | 1- 1 |
| **Total** | **110- 143** | **13- 17** | **14- 22** | **35- 56** |

**Net Delta Investment in Million $ compared to 4-well, 60MBOPD case**

|  | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Current | 121 | 142 | 202 | 226 |
| **Reduction** | **11- (22)** | **129- 125** | **191- 185** | **187- 166** |

- **Drilling**
  - Keeper Well or ST in 2017 for lease holding operation
  - 60-90 day rig operation for completion & testing in 2020 at $250K rig rate
- **20A**
  - Develop equipment for DST in 2020
    - ‣ Test-tree and MODU
- **Facilities**
  - Progress to detailed engineering in 2020
- **Subsurface**
  - Finish out core & fluid studies in 2017

- **Slow pace results in more than $450MM net capital reduction over 4 years**
- **$25-55MM in additional 2017 drilling spend if COPC and CIE non-consent**

18

## Wilcox Regional View

### Economic Metrics of Exploration Opportunities

| Prospect | NPV10 ($MM) | PI10 | Net Risked Resource (MMBOE) | Pg | Pc | Modeled WI |
|---|---|---|---|---|---|---|
| Coronado Wilcox | 330 | 0.49 | 100 | 100% | 58% | 50% |
| Coronado Miocene | 40 | 0.26 | 20 | 72% | 21% | 50% |
| Yucatan | 30 | 0.20 | 10 | 100% | 55% | 25% |
| Fascin8 | 50 | 0.34 | 20 | 30% | 18% | 50% |
| Super8 | 55 | 0.50 | 20 | 30% | 20% | 50% |
| Grayling | 80 | 0.24 | 40 | 30% | 20% | 50% |
| Bevo | 75 | 0.25 | 40 | 30% | 20% | 50% |
| IPA | 110 | 0.49 | 40 | 60% | 35% | 50% |
| **Total** | **770** | | **290** | | | |



## SHENANDOAH BASIN OPTIONS
## WORKSHOP SLIDES



**Status Quo**

**Centrally-located Shen/Anchor Co-development**

- **Concept & Strategy**
  - Moderate centrally located hub facility (Shen & Anchor)
  - Reduce capex to reduce resource threshold
  - Cross assign EXP & DEV acreage; align partnership
  - Eliminate stressed & non-GOM focused partners

- **Implementation**
  - Establish CA with CVX
  - Framing/alignment meeting with CVX (Q2, 2017)
    - Identify & mitigate gaps
    - Leverage APC project management
    - Pursue cross assignment of EXP & DEV Leases
    - Define 20K synergies (rig sharing, etc)
    - Scoping study - assess facility size, location, OME costs (Q3, 2017)
  - Shenandoah
    - Pursue 270day extension for SOP mid 2018
    - Potential Lease holding operation Q2 2018
  - 1st oil 2023

- **Benefits**
  - Potentially lowest cost for a new build option
  - Centrally located Hub class facility to service entire basin
  - Re-alignment with financially strong & committed partners
  - CVX likely desires another complimentary 20K player X-assignment allows for Portfolio effect with reduced exposure on single opportunity
  - 20K synergies (rig sharing, 20K development)

- **Challenges & Consequences**
  - Shen partners could non-consent (20-50%)
  - APC & CVX – conflicting Project Management philosophy
  - CVX must make paradigm shift
  - Synchronizing SOP and execution time-line with CVX
  - Current Central location for APC-Venari not central to CVX
  - Less control over operating cost

- **Optimization Phase**
  - HB Spar Re-use

| 2017 | | | | 2018 | | | |
|------|------|------|------|------|------|------|------|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Shen 6 & 6 ST | | | Shen 4 ST or Keeper Well | | | | |

180 days
270 days
SOP
Signed Agreement with CVX

ANADARKO PETROLEUM CORPORATION

21

## Status Quo
## Shen Stand-alone Spar Re-use



- **Concept & Strategy**
  - Spar redeployment and re-use
  - Fits APC GOM strategy
  - Capital back-end loaded, lowest development cost opportunity; lowest resource threshold; and upside for exploration success
  - Flexibility to defer capital and 1st production to 2023
  - APC largely controls destiny
  - Provides viable & reliable solution to get off clock

- **Implementation**
  - HB partner engagement in Q2 2017 to gauge interest
  - Shenandoah
    - *Start Shenandoah partner engagement Q1 2017*
    - *Drill Coronado in Q4, 2017; understand resource size*
    - *Potential Lease holding operation Q2 2018*
  - APC brokers purchase price with HB partners in Q1, 2018

- **Benefits**
  - Economic synergies for APC (win-win for HB & Shen)
  - Currently seems to be the lowest cost option
  - Moderately sized stand-alone facility as a area HUB
  - Control destiny and service successful exploration
  - Clear path to get off the clock w/ delayed capital spend rate
  - Re-use fits into APC GOM strategy

- **Challenges & Consequences**
  - Ability to reach palatable commercial agreement with HB partners
  - Partner re-alignment with financially strong companies
  - Contingent on BSEE approval
  - Uncertainty of timing of 1st production due to delays at HB; subsequent revisions to SOP milestones



22

## Status Quo
## Shen SSTB to Anchor or Heidelberg



- **Concept & Strategy**
  - 40-60 mile tieback to a proposed or existing facility
  - Potentially lower capital spend, but not likely
  - Anchor earliest 1st production date 2023 vs 2021 for Heidelberg
  - Option in failed HB relocation or CVX JD negotiations
  - Could be used to get off clock but not optimal solution
  - Not a solution for the basin

- **Implementation**
  - Anchor tie-back most likely lower cost than Heidelberg
  - Shenandoah
    - *Pursue 270day extension for SOP mid 2018*
    - *PHA agreement Q2 2018 (Anchor SOP Q4 2017),*
    - *Potential Lease holding operation Q2 2018*
  - SOP Q1- Q2 2018
  - Anchor PHA execution is more complex than Heidelberg

- **Benefits**
  - Potentially equally cost effective as Heidelberg relocation
  - Less complex agreements
  - Concept to get off clock but not optimal solution; buys time for more optimal Fills Heidelberg commitment & delays HB ARO
  - Option to delay capital spend with a delay in 1st production to 2023

- **Challenges & Consequences**
  - Shen partners could non-consent (20-50%)
  - Partner re-alignment with financially strong companies
  - Loss of resources with flow assurance issues
  - No benefit to exploration in the basin
  - Most likely topside capital commitments for Anchor
  - Anchor is least attractive fee structure
  - Technically challenging



ANADARKO PETROLEUM CORPORATION

23

## Slow-Down Pace, Preserve Optionality
### (Issue SOP & Delay 1st oil - Shenandoah only)



- **Concept & Strategy**
  - File "long term" SOP for small semi or HB SS tie-back
  - Long term precedent set with Vito SOP; 7 years
  - Delay 1st oil to 2025
  - Optimize the development to achieve a more economical solution after SOP

- **High Level Implementation**
  - Shenandoah
    - *ST or keeper well lease holding operation in the Q3, 2017*
    - *Resource assessment at Shen*
    - *Pursue 270day extension for SOP mid 2018*
    - *Potential Lease holding operation Q2 2018*
  - SOP Q1- Q2 2018

  *Note*
  *Shenandoah partnership: APC 33%, COP 30%, Cobalt 20%, Venari 17%*
  *Heidelberg partnership: APC 44%, Marubeni 12.75%, ENI 12.5%, Statoil 12%,*
  *ExxonMobil 9.375%, Cobalt 9.375%*

- **Benefits**
  - Ability to Control/manage capital spend
  - Gives exploration time to prove up the basin
  - Aligned partnership
  - Enables ability to close technology gaps
  - Buys time to get off the clock to find an optimal solution
  - For Heidelberg SS tieback
    - *Fills Heidelberg commitment & delays HB ARO*

- **Challenges & Consequences**
  - No clear economic path with current resources; philosophical change in SOP approach for APC
  - Risk of defaulting on obligation to fulfill SOP milestones
  - COPC and Cobalt have little incentive to invest post-SOP
  - SOP's may require PHA for SSTB and agreements; difficult to execute given timing issues
  - Heidelberg SS tie-back is technically challenging





# Slow-Down Pace, Preserve Optionality
## (Issue SOP & Delay 1st oil - Shen/Anchor Co-development)

▪ **Concept & Strategy**
- Moderate centrally located hub facility (Shen & Anchor)
- Cross assign acreage; align partnership
- Theoretically reduces capex to reduce resource threshold
- Eliminates stressed & non-GOM focused partners
- Delay first oil to 2025

▪ **Implementation**
- Conduct feasibility study, driven by Venari
- Framing/alignment meeting with CVX (Q2, 2017)
  ‣ Identify & mitigate gaps
  ‣ Leverage APC project management
  ‣ Pursue cross assignment of EXP & DEV Leases
  ‣ Define 20K synergies (rig sharing, etc)
- Shenandoah
  ‣ Lease maintenance operation (ST or Keeper well in Q3 2017)
  ‣ Pursue 270 day extension for SOP mid 2018
  ‣ Potential Lease holding operation Q2 2018
- 1st oil 2025

▪ **Benefits**
- Potentially lowest cost for a new build option
- Centrally located Hub class facility to service entire basin
- Re-alignment with financially strong & committed partners
- CVX desires another complimentary 20K player
- 20K synergies (rig sharing, 20K development)

▪ **Challenges & Consequences**
- Will this really be a cheaper option (capex/bbl); SS costs?
- APC & CVX – conflicting Project Management philosophy
- CVX must make paradigm shift
- Synchronizing SOP and execution time-line with CVX
- Current Central location for APC-Venari not central to CVX
- Less control over operating cost

▪ **Optimization Phase**
- HB Spar Re-use

| | 2017 | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| | Shen 6 & 6 ST | | | Shen 4 ST or Keeper well | 180 days | | SOP | |
| | | | | | 270 days | | | |

ANADARKO PETROLEUM CORPORATION

25

## Anchor-Shenandoah CO-development Concept
### Large Central Production Facility (co-development) – Venari Concept

- **Venari to Broker feasibility Study b/w APC & CVX**

- **CVX appears to be favorable to concept**

- **Central Hub location to service both APC & CVX discoveries and prospects**

- **APC & CVX must gain alignment on numerous fronts:**
  - Operatorship of hub
  - Project management philosophy
  - 20 K rig sharing
  - BOP philosophy (delta 15 v. 20K BOP)

- **Is there an opportunity for acreage normalization?**

*Note*
*Anchor partnership: Chevron: 55%, Cobalt: 20%, Samson: 12.5%, Venari: 12.5%*



Regional Co-Development of Anchor & Shenandoah

**Basic Concept**

1. Large central production facility at GC890

2. Tieback:
   – Anchor 18 miles
   – Shenandoah 19 miles

3. IPA, N. Yucatan, Coronado, Bevo, Super8, Crown, Gecko and Snapper all within tieback radius

4. ~1.0 bboe potential

- 20 mile radius lease block count
  – CVX: 20
  – APC: 27

ANADARKO PETROLEUM CORPORATION

# Slow-Down Pace, Preserve Optionality
## (Relinquish & Release)



- **Concept & Strategy**
  - Relinquish & re-lease; gain 10 years on clock; align with stronger partnership
  - Enables time for technology development
  - Enables measured approach to exploration program
  - Gets us off the clock

**Implementation**
  - Shenandoah
    - *Get partner buy-in to relinquish the leases (timing undefined)*
    - *Align with new partnership; re-lease in subsequent lease sale*

- **Benefits**
  - Controlled capital spend
  - Possibly enables ability to form stronger partnership for better alignment
  - Forces industry to help develop 20K technology
  - Re-aligns exploration timing with development schedule

- **Challenges & Consequences**
  - Competition to release Shenandoah expected to be high & expensive; Venari may align with CVX to release
    - *Option to work ourselves back into the leases in the event of an unsuccessful lease acquisition*
  - Potential partner opposition (Venari); may compromise relations with supportive partner
  - Negative signal to suppliers on 20K
  - Write-down of ~$850MM in 2017



| 2017 | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Shen 6 & 6 ST | | | ⭐ Lease expiration (October, 2017) | ⭐ March Lease Sale | | | |

ANADARKO PETROLEUM CORPORATION

27

## Exit Option
### Relinquish Leases



- **Concept & Strategy**
  - Relinquish leases and possibly exit Shenandoah-Wilcox basin
  - Hard stop on capital spending at Shenandoah; re-deploy capital and personnel
  - Option may be deployed after results of next well operation in Q3, 2017 in west flank failure case

- **Implementation**
  - Shenandoah
    - *Dependent technical analysis could exit after Shen 6ST or negative outcome on Shen 4ST*

- **Benefits**
  - No additional capital spend
  - Redeploy capital into other opportunities

- **Challenges & Consequences**
  - Serious partner opposition (Venari); damages preferred partner relations
  - Substantial write-down of ~$850MM in 2017 or 2018
  - Eliminates future growth platform beyond Shenandoah
  - Large scale Personnel redeployment



| 2017 | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Shen 6 & 6 ST | | Shen 4 ST(?) | | | ⭐ Relinquish | | |

ANADARKO PETROLEUM CORPORATION

28



## 20A Rig Contracting Context



- **Long term, to control APC basin wells timing,  APC will need to control a 20K rig and thus potentially hold the MODU contract**

- **Key question is does APC have enough wells to justify the rig contract and maintaining intervention equipment for the** *"life of the well"*
  - BSEE requires all the necessary 20K MODU, completion, intervention, and kill equipment be *"readily available and accessible and will remain so for the life of the well"*

- **Given Shen 6 results, APC needs other APC basin wells, Statoil wells, or CVX wells to achieve critical number of wells**

- **Actions:**
  - Develop a risk based well count and timeline estimate for the basin's 20K wells (APC, Statoil, and CVX)
  - Begin dialogs with Statoil and CVX **Asset Managers, Wells Managers, and VP levels**
    - *Starting position for the discussions should be that APC is to hold the rig contract*
    - *Rig sharing should be aligned with the other APC partnership discussions*

# Exhibit 70

CONFIDENTIAL

# MEMORANDUM

| TO: | Danny Brown | DATE: 5/30/2017 |
|---|---|---|
| FROM: | Shenandoah Development Team | |
| RE: | Fireside Chat: Options to Maximize Shenandoah Value Creation | |

## Executive Summary:

The Shenandoah Team requests a discussion and guidance on a path-forward plan for the project. Options to perpetuate the leases past April 2018 are limited given the recent capital constraints internally imposed by the EC on the project. Additionally, the ability to supplement resources through exploration spending is questionable in a timeframe beneficial to the Shenandoah project. Under these circumstances, forward options for Shenandoah become limited with only three reasonably viable base options identified to date: (1) Monetize and exit immediately, (2) move forward with an SOP or (3) maintain leases through a lease-holding operation carry by partners. Although plans are underway to engage with BSEE on less-conventional SOO options at the Washington, DC level, it is unlikely that Anadarko will receive a prompt and positive decision within the necessary timeframe to act. Moreover, we believe that delays in the decision of a path forward plan will jeopardize our ability to effectively monetize the project and will likely further strain partnership relations. Absent partner approval of a path-forward plan, the 20A project may be subject to non-funding by partners.

## Background & Key Facts

As operator, Anadarko has communicated to the partnership that appraisal drilling activities at Shenandoah have been suspended since it does not compete within Anadarko's portfolio in a $50 oil environment. Shenandoah, alone, is clearly not an attractive investment based on the current discovered resource base and the contemplated development solutions. Additionally, a near-term path to supplement discovered resources through exploration spending appears to be challenged by internal funding and our ability to align and execute with Statoil and Venari on a 4Q 2017 spud date. Although the team is currently working the co-development feasibility study with Chevron, finding an attractive development solution has been seriously hindered by the elimination of capital spending on the project side. Although we do have plans to engage with BSEE at the DC level to recommend various creative means to address the lease maintenance issues at Shenandoah, we see this as a low probability of success in the timeframe necessary to act on a decision. Additionally, there is concern that partnership funding of the 20A project will cease unless a path-forward plan is presented to and endorsed by the partnership.

Under these circumstances, we believe that it is in the best interest of Anadarko and its Shenandoah partners to bring forth an executable path forward plan while there is sufficient time to respond. Although our inability to materially invest in Shenandoah has limited our opportunity set, we believe the following options (see exhibit #1 decision tree) are reasonably viable and executable plans:

APC-00362397

1) **Monetize/Exit immediately:**
   a. Sell to either the Shenandoah partnership or an outside party (i.e. CVX) and assign operatorship to the purchasing party.
      i. **Benefits:** Receive some value for WI; limits partnership relations deterioration.
      ii. **Challenges**: Requires timely decision. As lease expiration approaches, perceived value diminishes due to the timing necessary to pursue lease holding activities by acquiring party.
      iii. **Risks:** Partners could force us out by proposing/executing lease holding operation. Inability to monetize prior to lease expiration.

2) **File SOP to preserve leasehold with minimal Capex:**
   a. Possible options for SOP are 60MBOPD facility, re-purposing of existing spar or co-development (Anchor).
      i. **Benefits:** Improves marketability and industry valuation with only minimal spend and it likely enables the completion of the 20A work scope at reduced WI.
      i. **Challenges:** To minimize near-term spending, APC would only commit to acquiring 20A BSEE approvals before re-starting IPT work. This would lead to a 2025 first production date and a 7-year project plan might not be acceptable to BSEE.
      ii. **Risks**: If unsuccessful in a divestiture or other circumstances, Anadarko might have to walk from an SOP.

3) **Maintain leases through a lease-holding operation carry by partners –** maintains leases into 2019 and allows APC and partners time to find technical development solution.
   a. Conduct a lease-holding operation in April 2018 with partners carrying Anadarko's share of a ST or grass roots well.
      i. **Benefits:** More time for APC and partners to execute.
      ii. **Challenges:** Partners likely not interested in continuing appraisal without a defined plan to first production, as this only extends the unknown while the majority of the partnership is attempting to sell their interest; SOP likely their preference.
      iii. **Risks:** Additional negative well information could shrink the resource or reveal additional compartmentalization.

**Conclusion:**
Given the capital constraints that have been imposed by the EC on the Shenandoah project, there are no clear identified short or intermediate term solutions to perpetuate the leases, other than to request an SOP. Absent our willingness to accept the risk of defaulting on an SOP, options to immediately progress to monetization in 2017 or to maintain the lease until 2019 through a partnership carry in 2018 are viable considerations. It is important that we reach an internal path-forward decision and communicate it with our partnership to preserve our net present value and partnership relations. Ideally, the goal for this fireside chat is to seek guidance and alignment with the EVP on a path forward plan with the EC and eventually the partnership.

CONFIDENTIAL                                                                                       APC-00362398

CONFIDENTIAL

**Exhibits:**

**Exhibit #1:** Shenandoah Plan Forward Decision Tree



CONFIDENTIAL

APC-00362399

# Exhibit 71



## VIA EMAIL AND U.S. MAIL

June 5, 2017

Mr. Pat McGrievey
Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Email Address: pat.mcgrievey@Anadarko.com

RE:    REQUEST TO EXPAND JUNE 14TH MEETING AGENDA AND ASSSOCIATED
       DELIVERABLES
       Shenandoah Prospect-Walker Ridge Area
       OCS Gulf of Mexico

Dear Pat,

Cobalt International Energy, L.P. ("Cobalt"), ConocoPhillips Company ("COPC"), and Venari Offshore, LLC, have expressed concern over Anadarko's recent public statement of its intent to suspend further operations towards development of our Shenandoah Prospect ("Shenandoah"), and that it cannot support the filing of a Suspension of Production ("SOP") committing to first production.

Cobalt, COPC, and Venari (collectively the "Non-Operators"), are disappointed that Anadarko unilaterally made this decision without engaging us. We see Anadarko's action as potentially putting our interests and investment in Shenandoah at great risk. It is our hope that, going forward, Anadarko will work cooperatively with the Non-Operators to identify and evaluate all options that could present an avenue for economic development of Shenandoah to the benefit of all parties.

In light of the Shenandoah No. 6 well results, a prompt reconsideration of a selected development concept with significant cost reductions is necessary to make the project economically attractive. We believe it not only prudent, but imperative, that the co-owners collectively take stock of the project, and work to achieve alignment on an appropriate path forward. This supports Anadarko's recent press release stating "the company has currently suspended appraisal activity in the field while it evaluates the path forward".

We are grateful that Anadarko has scheduled a meeting for June 14, 2017 with the Non-Operators to discuss the status and path forward for Shenandoah.

At this meeting, the Non-Operators respectfully request Anadarko address the items outlined in the attached List of Agenda Topics. Each of these items are work product's and deliverables that Anadarko has been engaged in during the past year, for which the Non-Operators have borne their proportionate share of the costs, but which have not been fully shared with the Non-Operators.

The Non-Operators' position is that there are potentially viable options available at this point for identifying and implementing a development plan and obtaining an SOP, allowing the parties to perpetuate the Walker Ridge Block 51 Unit leases and bring Shenandoah to first oil. The two options that appear most viable at this point are as follows:

- a minimally-sized, stand-alone facility, or relocated host, in the range of 40-60 mbopd; or,

CONFIDENTIAL                                                          APC-00739429

- a co-development with another development facility (e.g., Anchor, North Platte, Heidelberg, etc.).

In addition to the two options discussed above, the Non-Operators would also like to be apprised of Anadarko's thoughts on other possible economic solutions such as tie-backs or relocation of an existing facility.   Anadarko has reported previously that it has been engaged in such evaluation work, and the Non-Operators request a full briefing of the results, and receipt of all information from that work in support thereof, at the June 14th meeting.

The Non-Operators remain willing to support Anadarko in an agreed upon work plan that is clearly and concisely identifiable as preserving options for an ultimate development at Shenandoah.   However, without such a clear line of sight and a detailed schedule of milestones guiding such work, further spending in connection with the various open AFEs for Shenandoah by Anadarko and the Non-Operators would be imprudent and for no purpose.

We appreciate your earnest consideration of the requests outlined above, and look forward to your response to such requests in advance of, and during, our meeting on June 14, 2017.

Yours very truly,

Cobalt International Energy, L.P.         ConocoPhillips Company         Venari Offshore LLC

Robert Writt                             Brooks Barrett                 Cory Weigbel
Vice President, Projects                  Manager, Deepwater             SVP, Development Projects

Attachment

CONFIDENTIAL                                                    APC-00739430

**LIST OF AGENDA TOPICS**
June 14, 2017 Partners' Meeting-Shenandoah Prospect

1) Post Shenandoah 6 view of resources (STOOIP and EUR) based upon Anadarko's latest geo-model and dynamic simulation work.

2) Subsurface forward work scope and timeline for remaining studies; including any core and fluid studies

3) Review of each development option under study:

   a. 40-60 mbopd stand alone;
   b. Existing facility (i.e., Gunnison, Titan - wet or dry tree, etc.);
   c. Subsea tie-back/co-development options (including but not limited to Anchor, North Platte, Heidelberg, etc.).

   The review for each development option shall include the following:

   i.     Recoverable resource for the option
   ii.    Description / design basis
   iii.   Cost and schedule for the option, including supporting technical work
   iv.    For tie-back / co-developments, supporting Flow Assurance work
   v.     Economics for the option
   vi.    Key risks
   vii.   Requirements to further progress the option (technical and commercial), and timeline leading to SOP and first oil

   Prime focus will be on the 40-60 mbopd stand alone and Anchor co-development

   Review of any work completed on alternative development concepts by any of the Non-Operators

4) Update of lower completion design and sanding risk mitigation. This work is common to all options and integral to understanding the economic value of the project.

5) Plans for lease saving well operations (including a technical assessment and feasibility for re-entering existing wells to carry out sidetracks)

6) Spending to date on 20A, IPT and Engineering Design AFEs. Forward staffing plan and focus

CONFIDENTIAL                                                                          APC-00739431

# Exhibit 72

# UNIT OPERATING AGREEMENT

# SHENANDOAH PROSPECT

# WALKER RIDGE BLOCKS

# 51, 52, N/2 53

CONFIDENTIAL

# OPERATING AGREEMENT
## <u>OUTER CONTINENTAL SHELF – GULF OF MEXICO</u>

This Operating Agreement, effective as of April 1, 2008 (the "Effective Date"), is between **CONOCOPHILLIPS COMPANY** and **ANADARKO E&P COMPANY LP** the signers hereof, herein referred to individually as the "Party" and collectively as the "Parties."

**WHEREAS**, the Parties are owners of one or more Leases, identified in Exhibit "A" *(Description of Leases),* and desire to explore, appraise, develop and operate the Contract Area for the production of Hydrocarbons.

**WHEREAS**, pursuant to Like-Kind Exchange Agreement between the Parties dated April 1, 2008, the Parties herein enter into this Agreement for the exploration, development, production and operation of the Contract Area hence forth from the Effective Date of this Agreement.

**AND WHEREAS,** In the event of a conflict with the terms and provisions of this Agreement and the terms and conditions of said Like Kind Exchange Agreement the terms and conditions of the Like Kind Exchange Agreement shall prevail

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to explore, appraise, develop, and operate the Contract Area according to the following provisions:

## ARTICLE 1 – CONTRACT APPLICATION

1.1 **<u>Application in General:</u>** This Agreement governs the rights and obligations of the Parties relating without limitation, to the exploration, appraisal, development, operation, production, treatment, gathering and storage of Hydrocarbons. This Agreement does not apply to the fabrication or installation of export pipelines.

1.2 **<u>Application to Contract Area</u>:** This Agreement shall apply to the entire Contract Area as defined in Article 2 below. For purposes of this Agreement,

CONFIDENTIAL

APC-00741534

activities or operations affecting one Lease are considered activities or operations affecting all Leases in the Contract Area.  Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Leases comprising the Contract Area, all joint property, and all Hydrocarbons are owned by the Parties according to their respective Working Interests in the Contract Area.

## ARTICLE 2 – DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the initially capitalized terms listed below shall have the following meaning:

2.1    **Additional Testing, Logging, or Coring**:   Any testing (excluding Production Testing), coring, or logging that is in addition to that approved by virtue of any previously approved well or subsequent operation.

2.2    **Affiliate**:   Any corporation, company, limited liability company, partnership, or other legal entity that:

(a)    is owned or controlled by a Party, or

(b)    is owned or controlled by any other corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party, or

(c)    owns or controls a Party, or

(d)    is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

CONFIDENTIAL

APC-00741535

2.3   **Agreement:**  This Agreement, together with its attached Exhibits.

2.4   **Annual Operating Plan:**   The operational plan and estimate of Costs for activities and operations as described in Article 6.4 *(Annual Operating Plan)*.

2.5   **Appraisal Operations:**  Any operations (including, but not limited to, operations subsequent to an Appraisal Well reaching its Objective Depth but prior to the attempted or successful completion of such well) conducted under the provisions of Article 11 (*Appraisal Operations*) or Article 12.15.2 *(Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations)*.

2.6   **Appraisal Well:** Any well proposed and drilled as an Appraisal Operation [including, but not limited to, a substitute well for an Appraisal Well abandoned pursuant to Article 11.1.4 *(AFE Overruns and Substitute Well)*].

2.7   **Authorization for Expenditure (AFE):**  A written description and Cost estimate of a proposed activity or operation submitted by the Party proposing such activity or operation for the purpose of eliciting the other Party's Vote, Election or written statement, as applicable, on the proposed activity or operation.

2.8   **Complete Recoupment:**  The point in time when the Participating Parties have been reimbursed, through Hydrocarbon Recoupment, through Disproportionate Spending, and/or through a lump sum cash settlement, an amount equal to the Non-Participating Party's Non-Participating Interest Share of the Costs of the Non-Consent operation multiplied by the applicable percentage provided for in and in accordance with Article 16 *(Non-Consent Operations)*.

2.9   **Confidential Data:**  All proprietary geophysical, geological, geochemical, drilling, or engineering data acquired or derived from operations conducted pursuant to this Agreement and all analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate such data.  The term also includes, but is not limited to:

(a)   the terms and provisions of this Agreement, subject to Exhibit "G" ; and

CONFIDENTIAL

(b)     commercial, contractual or financial information acquired or derived from activities or operations conducted pursuant to this Agreement.

The term excludes "Confidential Information" as that term is defined in Exhibit "G".

**2.10**  __Contract Area__:  The OCS Leases or portions thereof, listed on Exhibit "A".

**2.11**  __Cost(s)__:  The monetary amount of all expenditures (or indebtedness) incurred by the Operator and the Participating Parties in the conduct of activities and operations, determined pursuant to this Agreement, which are billable to the Joint Account.

**2.12**  __Deepen or Deepening__:  Any operation to drill an existing well (including sidetracking a well to Deepen or re-entering a well to Deepen) deeper than the Objective Depth previously drilled under an approved AFE.

**2.13**  __Deeper Drilling__:  The drilling of an Appraisal Well or Development Well below the base of the Deepest Producible Reservoir existing at the time the well is proposed.

**2.14**  __Deepest Producible Reservoir__:  The Producible Reservoir located deeper than any other Producible Reservoir within the Contract Area as determined at the time a drilling or Deeper Drilling proposal is made.

**2.15**  __Development Operations__:  Any operations (including, but not limited to, Recompletions, Workovers, the attempted or successful completion of an Exploratory Well or an Appraisal Well, and operations subsequent to a Development Well reaching its Objective Depth) conducted under the provisions of Article 13 *(Development Operations)*.

**2.16**  __Development Phase__:  The proposals, activities, and operations associated with the design, fabrication, or other acquisition and installation of a Development System.

CONFIDENTIAL

APC-00741537

**2.17** **Development Plan:** The plan for a Development Phase as described in Article 12 *(Development Plan)*.

**2.18** **Development System:** A Production System and its associated Facilities.

**2.19** **Development Well:** Any well proposed and drilled as a Development Operation [including, but not limited to, a substitute well for a Development Well abandoned pursuant to Article 13.1.5 *(AFE Overruns and Substitute Well)*].

**2.20** **Disproportionate Spending:** The payment of the Costs of an activity or operation by a Participating Party in excess of its Participating Interest Share of the Costs of such activity or operation in order to settle an Underinvestment previously incurred by such Participating Party.

**2.21** **Election, Elect, Elects, Elected, Electing:** A response or deemed response by a Party to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*.

**2.22** **Exploratory Operations:** Any operations (including, but not limited to, operations subsequent to an Exploratory Well reaching its Objective Depth but prior to the attempted or successful completion of such well) conducted under the provisions of Article 10 *(Exploratory Operations)*.

**2.23** **Exploratory Well:** Any well proposed and drilled as an Exploratory Operation [including, but not limited to, a substitute well for an Exploratory Well abandoned pursuant to Article 10.1.4 *(AFE Overruns and Substitute Well)*].

**2.24** **Fabrication AFE:** The AFE's collectively submitted for the construction, fabrication, or acquisition and installation of a Development System which shall be deemed proposed, and approved or not approved as one AFE.

**2.25** **Facilities:** All production equipment beyond the wellhead connections that is installed on or outside the Contract Area pursuant to this Agreement in order to handle or process Hydrocarbon production. Facilities include, but are not limited

CONFIDENTIAL

APC-00741538

to, injection and disposal wells and the flowlines and gathering lines that transport Hydrocarbons from the wellhead. Facilities exclude (1) Production Systems, (2) pipelines used to transport Hydrocarbons or produced water to shore or to pipeline interconnections located downstream of the Production System, and (3) the facilities to take in kind provided for in Article 15.2 *(Facilities to Take in Kind)*.

2.26 __Final Design AFE:__ The AFE submitted to the Parties as part of a Development Plan pursuant to Article 12.4 (*Content of the Development Plan*) which sets forth the Costs of designing the Development System for a Development Phase.

2.27 __Force Majeure:__ Any flood, storm, hurricane, loop current/eddy, or other act of God; a fire, loss of well control, oil spill, or other environmental catastrophe; war; civil disturbance; labor dispute; strike; lockout; compliance with any law, order, rule, or regulation; governmental action or delay in granting necessary permits or permit approvals; inability to secure materials or rig; or any other event or cause, whether similar or dissimilar to those enumerated in this definition, that is reasonably beyond the control of the Party claiming the existence of such event or cause.

2.28 __Gross Negligence or Willful Misconduct:__ An act, by any person or entity which was intended to cause, or which was in reckless disregard of or wanton indifference to harmful consequences such person or entity knew, or should have known, such act or failure would have on the safety or property of another person or entity not justifiable by any special circumstances, by a Party's corporate officers, regular salaried supervisory staff or non-supervisory staff functioning at an equivalent level but shall not include any error or judgment or mistake made by the aforesaid persons while exercising in good faith any function, authority, or discretion conferred upon them.

2.29 __Hydrocarbon Recoupment:__ An amount to be recovered by the Participating Parties from all or a portion of the Non-Participating Interest Share of the proceeds from the sale of future Hydrocarbon production equal to the Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage in Article 16 *(Non-Consent Operations)*.

CONFIDENTIAL

APC-00741539

2.30  **Hydrocarbons:**  The oil and gas and associated liquid and gaseous by-products (except helium) that may be produced from a well bore located on the Contract Area.

2.31  **Joint Account:**  The account, maintained by the Operator in accordance with the provisions of this Agreement, showing the charges paid and credits received in connection with the activities and operations conducted under this Agreement.

2.32  **Lease:**  Each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A" and each future oil and gas lease covering one or more OCS blocks, or portions thereof, included within the Contract Area that is acquired during the term of this Agreement by the Operator and the Non-Operating Parties (including substitutions for or replacements of existing leases).

2.33  **MMS:**  The Minerals Management Service, Department of Interior, or its successor agency.

2.34  **Non-Consent Operation:**  Except when an activity or operation is approved by Vote and such approval is binding on all the Parties, any activity or operation proposed and approved under this Agreement in which one or more Parties, having the contractual right to do so, Elects or Votes not to participate and where the Participating Parties proceed to conduct the operation at their sole Cost and risk pursuant to Article 16 (*Non-Consent Operations*).

2.35  **Non-Operating Party:**  Any Party other than the Operator.

2.36  **Non-Participating Party:**  Except when an activity or operation is approved by Vote and such approval is binding on all the Parties, any Party who, having the contractual right to do so, Elects or Votes not to participate in the sharing of the Costs, risks, and benefits (including the rights to Hydrocarbons) of an activity or operation proposed and approved under the terms of this Agreement. The term excludes a Party who does not Vote to participate in a proposed activity or operation, but is nonetheless bound to participate in the proposed activity or operation if it is approved by Vote.

CONFIDENTIAL

APC-00741540

**2.37**   **Non-Participating Interest Share:**  The percentage of participation in the Costs, risks, and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have had in a proposed activity or operation if all Parties had participated in that proposed activity or operation.

**2.38**   **Objective Depth:**  For any well, the shallower of the total footage to be drilled (as measured in true vertical subsea depth) or the penetration by the drill bit to the base of the deepest target formation or interval, as such depth and target formation or interval are set forth in the AFE for the well.

**2.39**   **OCS:**  The Outer Continental Shelf of the Gulf of Mexico.

**2.40**   **Offsite Facility(ies):**  Structures, facilities, and pipelines that are not owned by the Parties pursuant to this Agreement.

**2.41**   **Operator:**  The Party identified in Article 4.1 *(Designation of the Operator)* or any successor Operator selected pursuant to Article 4.5 *(Selection of Successor Operator)* and, if applicable, any substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)*.

**2.42**   **Overinvested Party:**  A Party entitled to receive a portion of an Underinvestment.

**2.43**   **Participating Interest Share:**  A Participating Party's percentage of participation in:

(a)  the Costs and risks (exclusive of Disproportionate Spending) and benefits (including rights to Hydrocarbons) of an activity or operation conducted or

(b)  if applicable, interests to be assigned to the Parties

under the terms of this Agreement; that is, the proportion that the Participating Party's Working Interest bears to the total Working Interest of all the Participating Parties (unless a different basis for Cost sharing or assignment has been agreed upon by the Participating Parties).

CONFIDENTIAL

APC-00741541

2.44   **Participating Party:**   Any Party who, having the contractual right to do so, participates in the sharing of:

(a)   the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation, or

(b)   if applicable, the interests to be assigned to the Parties

under the terms of this Agreement.   The term includes a Party who does not Vote to participate in a proposed activity or operation but is nonetheless bound to participate in the proposed activity or operation if it is approved by Vote.

2.45   **Producible Reservoir:**   A Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from, and not in oil or gas communication with, any other Hydrocarbon accumulation.

2.46   **Producible Well:**   A well that:

(a)   is producing Hydrocarbons, or

(b)   meets the "well producibility criteria" set forth in Title 30 CFR 250.111, or any succeeding order or regulation issued by an appropriate governmental authority, or

(c)   the Participating Parties unanimously agree is a Producible Well.

2.47   **Production System:**   A system to develop and produce Hydrocarbons.   The term includes:

(a)   an offshore surface structure, whether fixed, compliant, or floating;

(b)   an offshore subsea structure or template, whether capable of accommodating one well or multiple wells;

(c)   any combination of the items mentioned in clauses (a) and (b);

CONFIDENTIAL

APC-00741542

(d)     any other type of system designed to develop and produce Hydrocarbons; and

(e)     all associated components of the items mentioned above.

The term excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.48   Production Testing:**  Operations for the controlled flow of Hydrocarbons to the surface for the purpose of measuring flow rates or flowing pressures, or gaining other subsurface data.

**2.49   Project Team:**  A group of employees or contractors of the Participating Parties, or their respective Affiliates, established for the purpose of assisting the Operator in (a) preparing any Development Plan and (b) planning for the design, engineering, fabrication, transportation, and installation, of any Development System.

**2.50   Project Team AFE:**  The AFE submitted for the formation and Costs of the Project Team.

**2.51   Recomplete, Recompleting, Recompletion:**  A Development Operation within a single well bore in which one or more Parties attempt a completion in a Producible Reservoir not then open to production in such well bore.

**2.52   Sidetrack, Sidetracking:**  Any operation to directionally control or intentionally deviate a well so as to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of any operation previously conducted in the well excluding an intentional deviation done to straighten the hole, drill around junk, drill around failed operations, sidetrack to core formations encountered or to overcome other mechanical difficulties.

**2.53   Transfer of Interest:**  Any conveyance, assignment, transfer, farmout, exchange or other disposition of all or a portion of a Party's undivided Working Interest,

CONFIDENTIAL

APC-00741543

except assignments made pursuant to Articles 16.2, 16.4, 17 and 18 of this Agreement.

**2.54** **Underinvested Party:** A Party with an Underinvestment.

**2.55** **Underinvestment:** A monetary obligation owed under the terms of this Agreement to be settled under Article 16.9 *(Settlement of Underinvestments)*.

**2.56** **Vote, Votes, Voted, Voting:** A response or deemed response by a Party to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*.

**2.57** **Well Plan:** A detailed written description of a proposed Exploratory Well, Appraisal Well, or Development Well, which must include, at a minimum:

(a)     the surface and target bottomhole locations;

(b)     the expected spud date and the anticipated time necessary to conclude drilling, evaluation, and/or abandonment operations;

(c)     the total vertical subsea depth to be drilled, along with the specified Objective Depth (and the target zones to be penetrated);

(d)     the proposed drilling plan, including the casing program and directional details;

(e)     details of any coring, logging or other evaluation operations to be conducted; and

(f)     information concerning the drilling rig to be used, including day rates, water depth rating, and other limitations relevant to the drilling operations to be conducted.

**2.58** **Working Interest:** The record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage set forth in Exhibit "A"). If a Party's record title interest is different

CONFIDENTIAL

from its operating rights, the Working Interest of each Party is the interest set forth in Exhibit "A".

**2.59** **Workover:** A Development Operation conducted in an existing well, after such well has been completed in one or more Producible Reservoirs, to restore, maintain, or improve production from one or more of those Producible Reservoirs.

# ARTICLE 3 – EXHIBITS

**3.1** **Exhibits:** All references in this Agreement to "Exhibits" without further qualification mean the Exhibits listed below and attached to this Agreement. Each Exhibit is made a part of this Agreement, and is deemed incorporated into this Agreement by this reference. If the provisions of any of the Exhibits conflict with any provisions of the body of this Agreement, the provisions of the body of this Agreement prevail, with the exception of Exhibits "D" and "G", which shall prevail over any provision of the body of this Agreement. If the provisions of Exhibit "C" and "G" conflict, the provisions of Exhibit "G" will prevail. If the provisions of Exhibit "C" and "D" conflict, the provisions of Exhibit "D" will prevail.

| | |
|---|---|
| **Exhibit "A"** | Description of Leases, Working Interests of the Parties, Operator and Representatives |
| **Exhibit "B"** | Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Nonsegregated Facilities |
| **Exhibit "F"** | Security Interest Provisions |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Memorandum of Operating Agreement and Financing Statement |

CONFIDENTIAL

# ARTICLE 4 – SELECTION OF OPERATOR

4.1     **Designation of the Operator:**    Anadarko E&P Company LP is designated the Operator of the Contract Area and shall conduct all operations within the Contract Area for the Joint Account of the Parties.  This designation of Operator is subject to approval by the MMS and the Parties agree to promptly execute and file such documents as may be required to gain approval of this designation of Operator.

4.2     **Substitute Operator:**    Except for the circumstances set forth in Article 4.2.1 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, if the Operator becomes a Non-Participating Party in a Non-Consent Operation, the Participating Parties may approve by Vote the designation of any Participating Party as the substitute Operator.  The substitute Operator shall serve only (a) for only the Non-Consent Operation and, subject to these limitations, (b) with the same authority, rights, obligations and duties as the Operator.  However, if a Non-Operating Party is the only Participating Party, then the Non-Operating Party that is participating shall be designated substitute Operator for such Non-Consent Operation with no Vote required, unless such Non-Operating Party elects not to accept such designation. In no event shall a Non-Operating Party be designated a substitute Operator against its will. If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties and the Operator, conduct such Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk in accordance with Article 16 *(Non-Consent Operations)*.

4.2.1     **Circumstances Under Which the Operator Must Conduct a Non-Consent Operation:**  If

(a)     a drilling rig is on location and the Operator becomes a Non-Participating Party in a supplemental AFE for an Exploratory Operation, Appraisal Operation or Development Operation or an Exploratory Operation, Appraisal Operation or Development

CONFIDENTIAL

APC-00741546

Operation subsequent to such well reaching its Objective Depth, but prior to release of the drilling rig used to drill such well, or

(b)     the Operator becomes a Non-Participating Party in an operation which is to be conducted from a Development System being operated by the Operator,

the Operator, as a Non-Participating Party, shall conduct such Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk in accordance with Article 16 *(Non-Consent Operations)*.

4.2.2   **Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party:**

When, under Article 4.2 *(Substitute Operator)* or Article 4.2.1 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, the Operator conducts a Non-Consent Operation in which it is a Non-Participating Party, it shall follow the practices and standards set forth in Article 5 *(Rights and Duties of Operator)*; provided, however, the Operator shall not be required to proceed with such Non-Consent Operation unless and until the Participating Parties advance the Costs thereof to the Operator to the end that the Operator need not expend any of its own funds for such Non-Consent Operation.

4.2.3   **Appointment of a Substitute Operator:**   After the expiration of all applicable response periods for the Non-Consent Operation and the selection of a substitute Operator, each Party shall promptly provide the substitute Operator with the appropriate MMS designation of operator forms.   The Operator and the substitute Operator shall coordinate the change of operatorship so as to not interfere with ongoing activities or operations, if any, including, any lease maintenance activities or operations.

4.2.4   **Redesignation of Operator:**   Except for an acreage forfeiture by the Operator in a situation arising under Article 16.2 *(Acreage Forfeiture*

CONFIDENTIAL

APC-00741547

*Provisions*), within thirty (30) days of the conclusion of the Non-Consent Operation, all Parties shall promptly execute and provide the Operator with the appropriate MMS designation of operator forms to return operatorship to the Operator, and thus supersede the Parties' designation of the substitute Operator made pursuant to Article 4.2.3 *(Appointment of a Substitute Operator)*.

4.3 **Resignation of Operator**:   The Operator may resign at any time by giving written notice to the Parties; provided, however, the Operator shall not resign during a Force Majeure or an emergency which poses a threat to life, safety, property or the environment.  If the Operator ceases to own a Working Interest, the Operator shall be deemed to have resigned without any action on the part of the Non-Operating Parties unless the Operator is resigning because it is transferring its Working Interest to an Affiliate.  In such case, the Parties shall designate such Affiliate as the new Operator.

4.4 **Removal of Operator**:   The Operator may be removed under the following circumstances.

4.4.1 **Removal Upon Partial Assignment**:   If the Operator assigns any portion of its Working Interest (excluding any interest assigned to an Affiliate or as a result of a merger, reorganization, consolidation or sale or other transfer of substantially all of a Party's assets in the Gulf of Mexico) which reduces the Operator's Working Interest to less than eighty percent (80%) of the next largest Working Interest of a Non-Operating Party, whether accomplished by a single assignment or by multiple assignments, then the removal of the Operator shall be approved by Vote.

4.4.2 **Removal for Cause by Vote**:   If the Operator commits any of the following acts, the removal of the Operator shall be approved by Vote, excluding the Vote of the Operator or its Affiliates:

CONFIDENTIAL

(a)  the Operator is found liable by a final non-appealable judicial decision or a final decision under binding arbitration for an act of Gross Negligence or Willful Misconduct; or

(b)  the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of written notice of such breach from a Non-Operating Party. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed. The Operator shall not be removed under this Article 4.4.2 if the Operator is able to prove the non-existence of the alleged breach within 30 days after receipt of written notice of such alleged breach; or

(c)  the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of its creditors, commits any act of bankruptcy or seeks relief under laws providing for the relief of debtors; or

(d)  a receiver is appointed for the Operator or for substantially all of its property or affairs.

If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and if a federal bankruptcy court prevents the removal of Operator, all Non-Operating Parties and Operator shall comprise an interim operating committee to operate until Operator has elected to reject or assume this Agreement under the Bankruptcy Code. An election by Operator as a debtor-in-possession or by a trustee in bankruptcy to reject this Agreement shall be deemed to be a resignation by Operator without any action by the Non-Operating Parties, except the selection of a successor.

CONFIDENTIAL

**4.4.3**    **Timing of Vote to Remove Operator:**  A Vote to remove the Operator for any cause provided for in this Article 4.4 shall be taken within ninety (90) days after the Non-Operating Party's actual knowledge of the cause.

**4.5**    **Selection of Successor Operator:**   Upon the resignation or removal of the Operator, a successor Operator shall be approved by Vote; provided, however, in the event the resigned or removed Operator is not entitled to Vote, fails to Vote or Votes only to succeed itself, then the successor Operator shall be approved by Vote after excluding the Vote of the resigned or removed Operator. If the Operator assigns all or a part of its Working Interest, then pursuant to Article 4.3 *(Resignation of Operator)* or Article 4.4.1 *(Removal Upon Assignment)* the Party who acquired all or a part of the former Operator's Working Interest shall not be excluded from Voting for a successor Operator.  If there are only two Parties to this Agreement when the Operator resigns or is removed, then the Non-Operating Party automatically has the right, but not the obligation, to become Operator.   If no Party is willing to become the Operator, this Agreement shall terminate under Article 26.1 *(Term)*.

**4.6**    **Effective Date of Resignation or Removal:**  The resignation or removal of the Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period of time is required for the Parties to obtain approval of the designation of the successor Operator by the MMS or at that time when the successor Operator is able to assume the duties of Operator subject to the approval of the MMS whichever occurs first.  The outgoing Operator will fully cooperate with the successor Operator in seeking MMS approval of the change of Operator.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities resulting from its operatorship.  The successor Operator shall be entitled to charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship.

**4.7**    **Delivery of Property:**  On the effective date of resignation, removal or replacing the Operator at the conclusion of Appraisal Operations, as provided in Article

CONFIDENTIAL                                                                                       APC-00741550

4.1, the outgoing Operator shall deliver to the successor Operator possession of all items purchased for the Joint Account pursuant to this Agreement, all Hydrocarbons which are not the separate property of a Party, all equipment, materials and appurtenances purchased for the Joint Account pursuant to this Agreement, and all books, records and inventories relating to the Joint Account (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest).   The outgoing Operator shall distribute or return all funds related to the Joint Account to the Parties who contributed or are entitled to receive such funds pursuant to the terms of this Agreement.   The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of such resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted pursuant to this Agreement, and the successor Operator shall assume all obligations of the Operator under such contracts which are assignable.   The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons which are not the separate property of a Party, and such inventory shall be used in the return of and the accounting by the outgoing Operator of the property and the Hydrocarbons which are not the separate property of a Party.   Such inventory and audit shall be conducted in accordance with Exhibit "C".

## ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR

**5.1**   **Exclusive Right to Operate:**   Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations pursuant to this Agreement.   In performing services under this Agreement for the Non-Operating Parties, the Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except with regard to the selection of the type of activity or operation to be undertaken in accordance with Article 8.2 *(Voting and Election Procedures)* or Articles 8.5 *(Unanimous Agreement)*.   The Operator is not the agent or fiduciary of the Non-Operating Parties.   Except as provided in Exhibit "G", the number of employees or contractors used by the Operator in conducting activities or operations hereunder, their selection, and the hours of labor and the compensation for services rendered shall be determined by the Operator and all

CONFIDENTIAL                                                                                                    APC-00741551

such employees or contractors shall be the employees or contractors of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the activities or operations provided for in this Agreement.

**5.2**   **Workmanlike Conduct:**  The Operator shall timely commence and conduct all activities or operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  The Operator shall not be liable to the Non-Operating Parties for losses sustained or liabilities incurred, except as may result from Operator's Gross Negligence or Willful Misconduct. Unless otherwise provided in this Agreement, Operator shall consult with the Non-Operating Parties and keep them all informed of all important matters. Operator shall not be required to conduct an operation under this Agreement that it believes would be unsafe or would endanger persons or property.

**5.3**   **Drilling and Other Contracts:**  The Operator may contract for and employ any drilling units or vessels, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct operations under this Agreement, including the fabrication, construction, and installation of any Production System, Facilities or pipelines. Operator may use its reasonable judgment in contracting for such items under long-term contracts with parties not Affiliated with Operator, and the actual costs incurred by Operator in such long-term contracts shall be chargeable to and paid by the Participating Parties in the affected operation.  All drilling shall be conducted by qualified and responsible independent contractors, or at Operator's election, by utilizing Operator-owned or Operator's Affiliate-owned drilling units or vessels or drilling units or vessels under contract to Operator, under competitive drilling contracts.  A competitive drilling contract is a contract containing terms, rates and provisions that, when the contract was made, did not exceed those generally prevailing in the Gulf of Mexico for operations involving drilling rigs of an equivalent type, operating in similar environments, water depths and water bottoms, and equipped to the Operator's standard conditions, which are capable of drilling the proposed well(s) or conducting other required operations within the time schedule for the operations to be conducted.   The Operator may employ its or its Affiliate's

CONFIDENTIAL

APC-00741552

material, services, equipment, personnel, Operator-owned or Operator's Affiliate-owned drilling units or vessels, Workover rig, snubbing unit, or Production System in the conduct of operations hereunder and charges to the Participating Parties for same shall be made in accordance with Exhibit "C" *(Accounting Procedure)*.  If the Operator's or its Affiliate's materials, services, equipment, personnel, drilling unit or vessel, Workover rig, snubbing unit, or Production System are employed in conducting operations under this Agreement, the terms, rates and provisions for use shall be consistent with then current competitive contracts prevailing in the deepwater Gulf of Mexico.

5.4   **Liens and Encumbrances:**  The Operator shall endeavor to keep the Leases, Production Systems, Facilities and other equipment purchased for the Joint Account pursuant to this Agreement and any Hydrocarbons free from all liens and encumbrances (except those provided for in Exhibit "F" and those prior agreements affecting the Contract Area listed on Exhibit A) which might arise by reason of the activities or operations conducted under this Agreement.  In the event a lien is placed on the Leases, Production Systems, Facilities or other equipment or any Hydrocarbons, the Operator shall make reasonable efforts to remove such lien.

5.5   **Records:**  The Operator shall keep accurate books, accounts and records of activities or operations hereunder in compliance with the Accounting Procedure in Exhibit "C".  Unless otherwise provided for in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C".  The Operator shall use good faith efforts to ensure the settlements, billings, and reports rendered to each Party, as provided in this Agreement, are complete and accurate.  The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party.  This provision does not affect a Party's audit rights under this Agreement.  This provision shall also apply to the Non-Operating Parties as to their books, accounts and records that support its charges to any Project Team.

CONFIDENTIAL                                                                         APC-00741553

**5.6** **Reports to Government Agencies:**  The Operator shall make timely reports to all governmental authorities to which it has a duty to make such reports and, upon specific written request, shall furnish copies of such reports to the Participating Parties.  The Operator shall provide the Non-Operating Party copies of any notices, orders or directives received from the MMS.  As soon as reasonably practicable, the Operator, or a Non-Operating Party if applicable, shall give written notice to the other Parties prior to all meetings with government authorities of which it has notice and which affect the Contract Area or operations under this Agreement.

**5.7** **Information to Participating Parties:**  The Operator shall, as soon as reasonably practicable, furnish each Participating Party the following information pertaining to well operations (provided such information was obtained or received by Operator):

(a)  copy of the application for permit to drill and all amendments thereto;

(b)  drilling and Workover reports, which shall include, but not be limited to, the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs of well operations conducted;

(c)  complete report of all core data and analysis;

(d)  copies of logs and surveys as run including all digitally recorded data;

(e)  copies of well test results, bottomhole pressure surveys, Hydrocarbon analyses or similar information, including any PVT analyses;

(f)  copies of reports made to regulatory agencies;

(g)  48 hours advance notice of logging, coring or testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

CONFIDENTIAL                                                                                   APC-00741554

(h)     upon written request, and if sufficient quantities are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, access to the rig for a Participating Party requesting to inspect and evaluate said cores; and

(k)     samples of Hydrocarbons, if sufficient quantities are available, after performing routine tests.

Upon written request, the Operator shall use reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and risk).   The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

**5.8    Completed Well Information:**    Operator shall as soon as reasonably practicable, furnish to each Participating Party the following information pertaining to each completed well:

(a)     monthly report of production and injection;

(b)     copies of routine reports made to regulatory agencies;

(c)     report on the status of wells not producing and not abandoned;

(d)     bottomhole pressure data and surface pressure data;

(e)     composite of all logs run (e.g., TDT, Carbon-Oxygen, Spinner Surveys, Casing Collar, etc.); and

(f)     reports of inventory.

CONFIDENTIAL                                                                    APC-00741555

**5.9** **Information to Non-Participating Parties:**  The Operator shall furnish, as soon as reasonably practicable, to each Non-Participating Party (a) copies of all non-confidential reports made to regulatory agencies, and (b) after Complete Recoupment, if applicable, information specified in Articles 5.7 *(Information to Participating Parties)* and 5.8 *(Completed Well Information).*  Prior to Complete Recoupment, a Non-Participating Party shall be entitled to review financial records pertaining to a Non–Consent Operation, to the extent necessary to conduct an audit of the Recoupment account and/or Underinvestment balance. A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles 5.7 and 5.8 above, or in this Article 5.9.

## ARTICLE 6– EXPENDITURES AND ANNUAL OPERATING PLAN

**6.1** **Basis of Charges to the Parties:**  Except as otherwise provided, the Operator shall pay all the Costs of all activities and operations, and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest Share, for the Costs of such activities and operations.  All charges, credits and accounting for expenditures shall be made pursuant to Exhibit "C".  Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

**6.2** **AFEs:**  The Operator shall not make any single expenditure or undertake any activity or operation costing three hundred thousand Dollars ($300,000) or more, unless an AFE has been included in a proposal for an activity or operation and such proposal has been approved by Vote, Election or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers authorized under this Agreement.  An approved proposal grants the Operator the authority to commit or expend funds on the activity or operation approved in the proposal in accordance with this Agreement for the account of the Participating Parties.  For any single expenditure in excess of one hundred thousand Dollars ($100,000), but less than three hundred thousand Dollars ($300,000), the Operator need not submit a proposal and an associated AFE, but shall furnish written information describing the expenditure to each of the Participating Parties.   Notwithstanding the foregoing, in the event of an

CONFIDENTIAL                                                                 APC-00741556

emergency which poses a threat to life, safety, property or the environment the Operator is empowered to immediately make such expenditures for the Joint Account as, in its opinion as a reasonable and prudent Operator, are necessary to deal with the emergency.   The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and action taken and the Costs incurred.

6.2.1   **AFE Overrun Notice:**   For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with any separate AFE will exceed the original approved AFE or the latest approved supplemental AFE by more than ten (10)% or three hundred thousand dollars ($300,000), whichever is greater, but such over expenditure will not require submission of a supplemental AFE unless otherwise required under Article 6.2.2 (*Supplemental AFEs*); however, such informational AFEs will not be required when supplemental AFEs are required pursuant to Article 6.2.2 (*Supplemental AFEs*).

6.2.2   **Supplemental AFEs:**   Except as provided in Article 6.2.3 *(Further Operations During a Force Majeure)* if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or its latest approved supplemental AFE will exceed the relevant Permitted Over-expenditure, as defined below, the Operator shall submit a supplemental AFE to the Participating Parties.   Subject to Article 8.6.1 *(Well Proposals, Recompletions and Workovers)*, after receipt of the supplemental AFE each Participating Party has the right to make an Election as to its further participation in the approved activity or operation.   If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with such supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE.   Any Participating Party Electing not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs

CONFIDENTIAL

expended on the activity or operation exceed the Permitted Over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations (including plugging and abandonment) in the original AFE have been conducted by such time.  A Non-Participating Party in a supplemental AFE is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation, except a Hydrocarbon Recoupment premium or an Underinvestment shall only apply to the Costs of the approved activity or operation not borne by such Non-Participating Party.  If a supplemental AFE is not approved by Election, the Operator shall conclude the last authorized activity or operation in the well or the project to which the over-expended AFE pertained as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the operation or activity, including any Costs in excess of the Permitted Over-expenditure amount.

6.2.2.1 **Supplemental AFE for Cost Overruns on Wells and Well Operations At Objective Depth:**  The Permitted Over-expenditure for the drilling of Exploratory Wells, Appraisal Wells or Development Wells, or operations in such wells subsequent to such wells reaching their Objective Depths, is an amount equal to ten percent (10%) of the original approved AFE for such well or subsequent operation or ten million dollars ($10,000,000), whichever is less.

6.2.2.2 **Supplemental AFE for Cost Overruns on Project Team AFE:**  The Permitted Over-expenditure for the Project Team is an amount equal to ten percent (10%) of the original approved Project Team AFE or ten million dollars ($10,000,000), whichever is less.

CONFIDENTIAL

APC-00741558

**6.2.2.3** **Supplemental AFE for Cost Overruns on Final Design AFE:** The Permitted Over-expenditure for the Final Design AFE is an amount equal to ten percent (10%) of the original approved Final Design AFE or ten million dollars ($10,000,000), whichever is less.

**6.2.2.4** **Supplemental AFE for Cost Overruns on Fabrication AFE:** The Permitted Over-expenditure for the Fabrication AFE is an amount equal to ten percent (10%) of the Fabrication AFE or twenty million dollars ($20,000,000), whichever is less.

**6.2.3** **Further Operations During a Force Majeure:** No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 *(Supplemental AFEs)* during a Force Majeure event or during an emergency which poses a threat to life, safety, property or the environment, but may make an Election not to participate in further activities or operations which are to be conducted after the termination of such Force Majeure or emergency. Notwithstanding anything herein to the contrary, if Costs arising as a result of Force Majeure or emergency cause the amount of the latest approved AFE to be exceeded by more than the Permitted Over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit a supplemental AFE for the activities or operations which are to be conducted after termination of such Force Majeure or emergency to the Participating Parties in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in such activities or operations which are to be conducted after termination of such Force Majeure or emergency.

**6.3** **Security Rights:** Exhibit "F (LOUISIANA)" applies.

CONFIDENTIAL

**6.4** **Annual Operating Plan**

**6.4.1** **Effect and Content of Annual Operating Plan:** Beginning with the year following first production and each subsequent year thereafter, the Operator shall develop an Annual Operating Plan. The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any expenditure or constitute a Vote, Election or unanimous agreement to participate in any specific activity or operation. To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

**6.4.1.1** **Capital Budget**

(a) a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well (Development, Appraisal, etc.), purpose of well (production, injection, etc.) and estimated Costs;

(b) capital Workovers, which are defined as any Workover operation conducted to Recomplete a well to a new zone or install artificial lift, listed by well, with their estimated Cost;

(c) other capital projects requiring a gross expenditure greater than five million dollars ($5,000,000). The term "capital project" includes addition of new equipment, expansion or upgrades of existing equipment; and

(d) an estimated total amount (in aggregate) for capital projects.

CONFIDENTIAL

APC-00741560

**6.4.1.2   Expense Budget**

    (a)    expense Workovers, which are defined as any anticipated Workover operation which is not a capital Workover (such as repair work or reworks within the same zone), listed by well, with their estimated Cost;

    (b)    all expense projects requiring a gross expenditure greater than five million dollars ($5,000,000).  The term "expense project" includes repair, replacement, inspection and maintenance of existing equipment;

    (c)    an estimated total amount (in aggregate) for expense projects; and

    (d)    estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate.   O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

**6.4.1.3   Operator Forecasts and Informational Items:**

    (a)    production forecasts;

    (b)    injection forecasts;

    (c)    fuel gas forecasts;

    (d)    scheduled or planned downtime exceeding three (3) days;

    (e)    data collection programs;

    (f)    any geochemical or geophysical survey(s) or special test(s) which might be contemplated; and

    (g)    other areas deemed of significance by the Operator.

CONFIDENTIAL

**6.4.2**   **Submission of Draft Annual Operating Plan:**  Beginning in the year in which a Development Plan is approved, and each subsequent year thereafter, the Operator shall develop and submit to the Non-Operating Parties, by July 1, a draft Annual Operating Plan for the next calendar year.   The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses and capital expenditures.

**6.4.3**   **Review of Draft Annual Operating Plan:**  The Non-Operating Parties may provide suggested changes, additions or deletions to the Annual Operating Plan to the Operator and all other Parties in writing prior to August 1 of each year.   The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than October 1 of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

## ARTICLE 7 – CONFIDENTIALITY OF DATA

**7.1**   **Confidentiality Obligation**:  Confidential Data acquired or obtained by any Party shall be kept confidential during the term of this Agreement and for an additional period of two (2) years after the termination of this Agreement, and shall not be disclosed to any third party, unless disclosed under Article 7.1.1 *(Exceptions to Confidentiality)* or Article 7.1.2 *(Permitted Disclosures)*.   Each Party shall maintain the secrecy of the Confidential Data, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

**7.1.1**   **Exceptions to Confidentiality**:  The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

CONFIDENTIAL

APC-00741562

(a)     are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party); or

(b)     are now or later become available to a Party on a non-confidential basis from a source, other than a Party hereto, that is legally permitted to disclose the item of Confidential Data; or

(c)     were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

(d)     are independently developed by employees, Affiliate employees, or contractors of a Party who have not had access to the Confidential Data.

**7.1.2**     **Permitted Disclosures**:     The Operator may disclose items of Confidential Data to third parties as may be necessary to conduct activities and operations pursuant to this Agreement, provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than is set forth in this Agreement (or a lesser period if agreed by all Parties).  Notwithstanding anything herein to the contrary and subject to the restrictions that: (a) the Confidential Data shall not be removed from the custody and premises of the disclosing Party, (excepting disclosure made pursuant to (a), (c), (d) and (e) below); and (b) the receiving party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Data:

(a)     to any Affiliate of such Party provided such Affiliate is bound by the confidentiality provision contained herein and is not actively engaged in acquiring OCS oil and gas leases in competition with the Parties; or

(b)     to any bona fide, financially responsible, prospective assignee of any portion of such Party's Working Interest (including but not

CONFIDENTIAL

APC-00741563

limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets on the OCS); or

(c)    to any potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of such Party and acting in a capacity where such disclosure is essential to such contractor's, consultant's, or outside legal counsel's work; or

(d)    to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or

(e)    to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).  If a Party is required to disclose any Confidential Data under this Article 7.1.2(e), such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy; provided, however, any Confidential Data routinely required to be given the MMS shall not require notice to the Parties.  A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed; or

(f)    to an entity desiring to transport or purchase Hydrocarbons produced hereunder for the purpose of making Hydrocarbon reserve estimates and other technical evaluations.

**7.1.3**     <u>**Limited Releases to Offshore Scout Association**</u>:  The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings.  The Confidential Data that may be disclosed

CONFIDENTIAL

APC-00741564

is limited to information concerning well locations, well operations and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.1.4** <u>**Continuing Confidentiality Obligation**</u>:  Any Party who ceases to own a Working Interest remains bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement pursuant to Article 7.1 *(Confidentiality Obligation)*.

**7.2** <u>**Ownership of Confidential Data**</u>:  Except as otherwise provided for in this Article 7, all Confidential Data produced as a result of an activity or operation shall be the property of all Participating Parties in that activity or operation.  A Non-Participating Party has no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until Complete Recoupment has taken place, except as provided in Article 5.9.

**7.2.1** <u>**Trades of Confidential Data**</u>:  Any Participating Party may propose the exchange or trade of any Confidential Data for other similar data or information owned by a third party.  Upon approval of said exchange or trade by a Vote of the Participating Parties, such vote shall bind all Participating Parties, and the Operator, or such other Participating Party should the Operator be excluded, shall consummate such exchange or trade with the third party.  The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to such exchange or trade.

**7.2.2** <u>**Ownership of Non-Consent Data**</u>:  After Complete Recoupment has taken place and a Non-Participating Party has become a Participating Party in an activity or operation, such Non-Participating Party shall become an owner of the Confidential Data and information resulting from such activity or operation.  Within thirty (30) days of Complete Recoupment, the Operator shall furnish such information to the former Non-Participating Party.

CONFIDENTIAL

APC-00741565

**7.3**   **Access to the Lease and Rig**:  Except as provided in Article 6.3(b) *(Default)*, each Participating Party shall have the right to attend meetings between the Operator and any contractors designing or constructing the Production System or Facilities specified in the Fabrication AFE as well as access to the construction sites.   Except as provided in Article 6.3 (b) *(Default)*, each Participating Party shall have access to any drilling rig, Production System or Facility to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto).  Access by the Participating Party to any drilling rig, Production System or Facility serving a Contract Area shall be arranged through the Operator at least forty-eight (48) hours in advance (or, if conditions do not permit, as much advance notice as is reasonably possible). Each Party's access will be at its sole risk and expense and at reasonable times, provided such access does not unreasonably interfere with the operations being conducted at such site.

**7.4**   **Development of Proprietary Information and/or Technology:**  The ownership, use, treatment and disclosure of any proprietary information or technology including but not limited to drilling technology, production technology, production systems and facilities and their transportation and installation, pipelines, flowlines and offshore oil and gas transportation which are charged to the Joint Account shall be handled in accordance with Exhibit "G".

## ARTICLE 8-APPROVALS AND NOTICES

**8.1**   **Classes of Matters:**  Action will be taken on a proposed activity or operation only after the procedures and approval requirements set forth in this Agreement have been met.  There are four general classes of activities or operations under this Agreement: (a) those requiring approval by Vote, (b) those requiring approval by Election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the Operator.

**8.1.1**   **Voting and Electing Interest:**   Subject to Article 6.3 (b) *(Default)*, each Party has a Voting interest or an Electing interest equal to its Working Interest or its Participating Interest Share, as applicable.

CONFIDENTIAL

APC-00741566

**8.2**   **Voting and Election Procedures:**   The Parties shall Vote or make an Election on proposals requiring a Vote or Election in the order in which such proposals are submitted, except as specified in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth),* and 13.2 *(Development Operations at Objective Depth)*.   Subject to Article 6.2 *(AFEs),* after receipt of a notice properly given for an activity or operation requiring a Vote or Election, the Parties entitled to make such Vote or Election (a) may Vote or make an Election in accordance with this Article 8.2 *(Voting and Election Procedures)* and Article 8.7 *(Giving and Receiving Notices and Responses)* or (b) shall be deemed to have Voted or made an Election in accordance with Article 8.6.5 *(Failure to Vote or Make an Election)*.

A Vote or Election to participate in a proposal is evidenced by a Party making a written affirmative response to the proposal or by a Party's execution of the AFE associated with the proposal.   Unless otherwise provided in this Agreement, a Vote or Election not to participate in a proposal is evidenced by a Party's written negative response to the proposal, a Party's failure to make a timely written affirmative response to the proposal or timely execute the AFE, or a Party's failure to timely make a subsequent Vote or Election as set forth in Article 8.3 *(Second Opportunity)*.

**8.2.1**   **Approval by Vote:**   Approval by Vote shall be decided by a Vote of the Parties as follows:

(a)   when one Party or two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of one or more Parties with a Voting interest of fifty-one percent (51%) or more, or if two Parties entitled to Vote have equal Voting interests, the affirmative Vote of all Parties entitled to Vote.

(b)   when more than two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of two (2) or more Parties entitled to Vote with a combined Voting interest of fifty-one percent (51%) or more.

CONFIDENTIAL

**8.2.2**   **Approval by Election:**   When one (1) Party or two (2) Parties are entitled to make an Election, approval by Election shall be decided by an affirmative Election by one or more Parties entitled to make an Election with a combined Electing interest of twenty-five percent (25%) or more.   However, in the event there are more than two (2) Parties to this Agreement or more than two (2) Parties entitled to make an Election, approval by Election shall be decided by an affirmative Election by two (2) or more Parties with a combined Electing interest of fifty percent (50%) or more.

**8.3**   **Second Opportunity to Participate:**   Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by Vote or Election but is not approved by all of the Parties, a Party who Voted or Elected not to participate in the approved activity or operation shall have the right to make a subsequent Vote or Election to participate in the approved activity or operation within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the original Voting or Election results from the Operator; provided however, if a drilling rig is on location and charges are accumulating with respect to such proposed operation, the Election period shall be forty-eight (48) hours inclusive of Saturdays, Sundays, and federal holidays.  If a Party does not exercise its right to make a subsequent Vote or Election to participate, it shall be deemed to have Voted or Elected not to participate in the approved activity or operation.  If (a) all the Parties entitled to do so make an original Vote or Election or a subsequent Vote or Election to participate in a proposed activity or operation or (b) an approval by Vote is binding on all Parties, then the Operator shall commence the activity or operation in accordance with the applicable timely operations provisions of this Agreement.

**8.4**   **Participation by Fewer Than All Parties:**   If, after the period in which a Party may make a subsequent Vote or Election to participate, there is at least one Non-Participating Party in the approved activity or operation, each Party who made an original or a subsequent Vote or Election to participate in the approved activity or operation shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the subsequent Voting or Election results,

CONFIDENTIAL

APC-00741568

(a)  limit its participation in the approved activity or operation to its Working Interest share, or

(b)  agree to bear its Participating Interest Share of the approved activity or operation

by written correspondence to the Operator.   Notwithstanding the foregoing, if a drilling rig is on location and charges are accumulating with respect to such proposed operation, the Parties shall respond within forty-eight (48) hours inclusive of Saturdays, Sundays, and federal holidays.  Failure to submit such written correspondence shall be deemed a written correspondence under (a). Once the Parties, who made an original or a subsequent Vote or Election to participate in an approved activity or operation in which there is a Non-Participating Party, agree to bear all of the Costs of the approved activity or operation, the Operator shall commence the activity or operation at the sole Cost and risk of the Participating Parties in accordance with the applicable timely operations provisions of this Agreement.   Notwithstanding the foregoing, the Election periods provided for in Article 10.2.1, 11.2.1 and 13.2.1 shall govern in the event of a conflict.

8.5  **Approval by Unanimous Agreement**:  After receipt of a notice properly given for an activity or operation requiring unanimous agreement, each Party entitled to approve (or disapprove) such activity or operation may indicate its approval or disapproval by providing a written statement in accordance with Article 8.7 *(Giving and Receiving Notices and Responses)*.  Unless otherwise specifically provided, failure of a Party to give its response or approval in accordance with Article 8.7 *(Giving and Receiving Notices and Responses)* is deemed its disapproval.

8.6  **Response Time for Notices**:  After receipt of an AFE or notice pursuant to this Article 8, the Parties may (a) submit their Vote or (b) make an Election or (c) submit a written statement as described in Article 8.5 *(Unanimous Agreement)*, whichever is applicable.  If requested in writing by a Party entitled to (a) submit their Vote or (b) make an Election or (c) submit a written statement on an AFE or notice, the Operator shall give prompt notice of the results of such Voting, Elections or written statements to each Party entitled to Vote or make an Election

CONFIDENTIAL
APC-00741569

or submit a written statement.  Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

**8.6.1**   **Well Proposals, Deepening, Sidetrack, Recompletions and Workovers:**   When any proposed well, Deepening, Sidetrack, Recompletion or Workover does not require construction or acquisition of a Development System, each Party entitled to Vote or make an Election or submit a written statement as described in Article 8.5 *(Unanimous Agreement),* whichever is applicable, has thirty (30) days (sixty (60) days for the first Exploratory Well) after receipt of the proposal to respond to it.  When a drilling rig is on location and standby charges are accumulating and if a Party who is entitled to do so has proposed a substitute well (for which said substitute well is proposed to be commenced while the rig is on location) or a supplemental AFE to a well or a subsequent operation, or a Deepening, Sidetrack, Recompletion or Workover in or through the same well bore in which the previous operation was conducted, a Party entitled to Vote or make an Election or submit a written statement as described in Article 8.5 *(Unanimous Agreement),* has forty-eight (48) hours after receipt of the proposal (exclusive of Saturdays, Sundays and federal holidays) to respond to it. The response times for operations at Objective Depth are set forth in Article 10.2 (*Exploratory Operations at Objective Depth*), *Article* 11.2 (*Appraisal Operations at Objective Depth*), *and Article* 13.2 (*Development Operations at Objective Depth*).

**8.6.2**   **Development System Construction:**   Each Party entitled to make an Election on a Fabrication AFE has one hundred and twenty (120) days from the date of its receipt of the Fabrication AFE to make such Election.

**8.6.3**   **Other AFE Related Operations:**   Except as otherwise provided in Articles 8.6.1 *(Well Proposals, Deepening, Sidetrack, Recompletions and Workovers)* and 8.6.2 *(Development System Construction)*, the response time to a proposed activity or operation will depend upon the gross AFE amount.  Response times will be as follows:

CONFIDENTIAL

(a)     AFE of $300,000 or more but less than $20,000,000; response will be made within thirty (30) days after receipt of said proposal.

(b)     AFE of $20,000,000 or more but less than $50,000,000; response will be made within ninety (60) days after receipt of said proposal.

(c)     AFE of $50,000,000 or more; response will be made within one hundred and twenty (120) days after receipt of said proposal.

8.6.4   **Other Proposals:**  For all other proposals requiring notice, and any supplemental AFEs other than those subject to Article 8.6.1 *(Well Proposals, Recompletions and Workovers)*, each Party has thirty (30) days after receipt of the proposal to respond to it.

8.6.5   **Failure to Vote or Make an Election:**  Unless otherwise specifically provided, failure of a Party to Vote or make an Election, whichever is applicable, within the period required by this Agreement is deemed to be a Vote or Election not to participate.

8.6.6   **Suspensions of Operations and Suspensions of Production:** Anything in Article 8.6 *(Response Time for Notices)* notwithstanding, if the MMS grants a Suspension of Production ("SOP"), a Suspension of Operations ("SOO"), or similar regulatory grant, for all or any part of the Contract Area, and the SOP, SOO, or grant requires the commencement of an activity or operation, prior to the expiration of the period for Voting, making an Election, or submitting a written statement as described in Article 8.5 *(Unanimous Agreement)* for such activity or operation, the Parties shall cast their Votes or make their Elections or submit a written statement on the activity or operation at least fifteen (15) days prior to the commencement date required in the SOO, SOP, or grant.

8.6.7   **Standby Costs:**  When an operation has been completed as authorized, or terminated pursuant to this Agreement, Costs incurred pending a Vote or Election on a proposal to conduct another operation

CONFIDENTIAL

in the well shall be charged to and borne by the Participating Parties in the operation just completed or terminated. All Costs incurred after the final Vote or Election being made or the expiration of the Voting or Election period, whichever occurs first, are the responsibility of the Participating Parties in the subsequent operation. Costs incurred subsequent to the final Vote or Election being made, or expiration of the Voting or Election period, and prior to agreement as to the Participating Interest of the Participating Parties shall be charged to and borne as part of the proposed subsequent operation, but if the proposal is withdrawn, such Costs shall be allocated between the Participating Parties in the proposed subsequent operation in proportion to their respective Working Interest.

**8.7** **Giving and Receiving Notices and Responses:** Except as otherwise provided in this Agreement, all notices and responses required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A". A notice is deemed delivered only when received by the Party to whom it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received. "Receipt" of a written notice, means actual delivery of the notice to the Party's address or transmission to the facsimile number set forth in Exhibit "A". A response is deemed delivered when it is deposited in the United States mail, delivered to a courier, transmitted by facsimile transmission, or is personally delivered to a Party.

However, when a drilling rig is on location and charges are accumulating, notices or responses pertaining to operations utilizing such drilling rig shall be given orally or by telephone. "Receipt" of an oral or telephone notice, means actual and immediate communication to the Party to be notified. All telephone or oral notices or responses permitted by this Agreement shall be confirmed immediately thereafter by facsimile transmission. A message left on an answering machine or with an answering service or other third person is not adequate telephone or oral notice or response. If a Party is unavailable to receive a notice or a response is required to be given orally or by telephone, the

CONFIDENTIAL

APC-00741572

notice or response may be delivered by any other method specified in this Article 8.7.

**8.8**  **Content of Notices:**  A notice requiring a response shall indicate the appropriate response time specified in Article 8.6 *(Response Time for Notices)*.  A well proposal notice shall include the type of well being proposed, i.e., Exploratory Well, Appraisal Well, or Development Well, a Well Plan and an AFE which shall include the Costs of permanently plugging and abandoning the well.  If a proposed activity or operation is subject to Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, the notice shall specify that the proposal is a Lease maintenance activity or operation.

**8.9**  **Designation of Representatives:**  The names, addresses, and telephone and facsimile numbers of a designated *representative* and alternate for each Party to whom notices or responses shall be directed, are set forth in Exhibit "A".  The designated representative or alternate may be changed by written notice to the other Parties.

**8.10**  **Meetings:**  Any Party may call a meeting.  Except in an emergency, no meeting shall be called on less than ten (10) days advance notice and such notice shall include a proposed agenda.  The Operator shall be chairman of each meeting and take minutes of each meeting.  Only matters included in the agenda may be Voted on at a meeting unless unanimously agreed to by all the Parties entitled to Vote or make an Election on such additional proposed items.

**8.11**  **Obligations of Well Participation:**  Subject to Article 6.2 *(AFEs),* a Participating Party in an Exploratory Well, an Appraisal Well or a Development Well is responsible for its Participating Interest Share of all necessary Costs set forth in the original well AFE, which shall include only the Cost to drill, test (except Production Testing), and log the well to its Objective Depth, or shallower depth if applicable, and to plug and abandon the well.

## ARTICLE 9 – NEWS RELEASES

CONFIDENTIAL

APC-00741573

**9.1**   **Proposal of News Releases:**  Any Party may propose to the other Parties the issuance of a news release to the media concerning activities or operations covered by this Agreement, and such news release shall require approval by Vote.

**9.1.1**   **Operator's News Release:**  The Operator has an exclusive thirty (30) day period, commencing immediately after a proposed news release is not approved by Vote, in which to issue a basic news release to the media.  A basic news release does not require approval by Vote and its content is restricted to the following information:

(a)   name of well and water depth

(b)   location of well by area, block, and adjacent state

(c)   lease bonus paid and lease acquisition date

(d)   tested interval(s), if applicable

(e)   test(s) results, if applicable

(f)   participants and percentages of working interest

(g)   acreage controlled.

The Operator will transmit the basic news release to the Non-Operating Parties not less than seventy-two (72) hours (exclusive of Saturdays, Sundays, and federal holidays) before it is to be issued to the media. Any Party may have its name excluded from the proposed basic news release by notifying the Operator of that desire within forty-eight (48) hours of its receipt of the proposed basic news release.

**9.1.2**   **Non-Operating Party's News Release:**  If the Operator does issue a basic news release to the media within its exclusive period set forth in Article 9.1.1 *(Operator's News Release),* any other Participating Party may prepare and issue its own basic news release, using the content guidelines and procedures set forth in Article 9.1.1 *(Operator's News Release)*, simultaneously with or following the Operator's basic news

CONFIDENTIAL

release.  If the Operator does not issue a basic news release to the media within its exclusive period set forth in Article 9.1.1 *(Operator's News Release),* any other Participating Party may prepare and issue its own basic news release, using the content guidelines and procedures set forth in Article 9.1.1 *(Operator's News Release).*

9.2  **Emergency News Releases:**  In an emergency involving extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the Parties, the Operator may furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction.  The Operator shall promptly notify the Parties of the information furnished in response to the emergency.

## ARTICLE 10 – EXPLORATORY OPERATIONS

10.1  **Proposal of an Exploratory Well:**  Any Party may propose the drilling of an Exploratory Well within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all the other Parties.  Any proposal for the drilling of an Exploratory Well requires approval by Election.  Any Non-Participating Party in an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations).*  If in response to a proposal from a Non-Operating Party, the Operator counter-proposes an alternative Exploratory Operation within thirty (30) days of a proposal by any other Party or Parties, the alternative Exploratory Operation proposed by Operator shall take precedence for consideration over any other proposed Exploration Operation.  If fewer than all Parties Elect to participate in the proposed Exploratory Operation or alternative Exploratory Operation, each Party who originally elected not to participate shall, after receipt of such Election results, make a subsequent Election under Article 8.3, if applicable.  Thereafter, the Participating Parties shall, after receipt of all such Election results, make an Election under Article 8.4.  After all participation elections have been made, the Operator (or substitute Operator) shall commence the approved Exploratory Operation at the sole Cost and risk of the Participating Parties and the remaining proposals shall be deemed withdrawn. A

CONFIDENTIAL

Non-Participating Party in an Exploratory Operation will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

Any proposal for an Exploratory Operation must include a commitment by the proposing Party to provide access to a suitable drilling unit or vessel capable of drilling the proposed well within the time frames allowed by this Agreement for timely operations.  Any proposal that does not include timely access to suitable drilling equipment shall be considered invalid.  No Party shall be compelled to provide access to drilling rigs under contract to it by way of a proposal for operations from another Party.  Any drilling unit or vessel proposed to be utilized to drill a well on the Contract Area must be capable of operating in environments expected to be encountered on the Contract Area and within the time schedule for the operations to be conducted.

10.1.1   **Revision of Well Plan:**  Any revisions to the approved Well Plan or AFE proposed prior to the commencement of actual drilling operations on an Exploratory Well shall require the unanimous agreement of the Participating Parties. In the absence of such unanimous agreement on a proposed revision to the Well Plan or AFE, the latest approved Well Plan and AFE will stand as approved.

10.1.2   **Automatic Revision of the Well Plan:**  During the drilling of an Exploratory Well, the Well Plan may be revised by the Operator as is necessary for it to employ prudent oilfield practices or to conduct safe operations, and, except as provided in Article 6.2.2 *(Supplemental AFEs)*, such revisions will not require the approval of the Participating Parties as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE.

10.1.3   **Timely Operations:**  Actual drilling operations on an Exploratory Well shall be commenced within two hundred seventy (270) days from the conclusion of the period for the approval of an Exploratory Well, and prior to the expiration/termination deadline (including any extensions thereof granted by the MMS) of the Lease on which the Exploratory Well is being drilled if such Lease is in jeopardy of expiring/terminating.

CONFIDENTIAL

APC-00741576

In all events, including the occurrence of a Force Majeure, if the Operator does not commence actual drilling operations on an Exploratory Well within two hundred seventy (270) days from the conclusion of the period for the approval of an Exploratory Well, the proposal of an Exploratory Well and its approval will be deemed withdrawn.  If an Exploratory Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Exploratory Well will be chargeable to the Participating Parties.

10.1.4    **AFE Overruns and Substitute Well:**  Once an Exploratory Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)    any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs )* or

(b)    the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

(c)    the Participating Parties unanimously agree to cease drilling an Exploratory Well before reaching Objective Depth.

If an Exploratory Well is abandoned due to the conditions described under Article 10.1.4(b) or (c), then any Participating Party in the abandoned Exploratory Well may, within one hundred eighty (180) days from the decision to abandon the Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Exploratory Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Exploratory Well.  Notwithstanding the provisions of Article 10.4 *(Conclusion of Exploratory Operations)* to the contrary,

CONFIDENTIAL

APC-00741577

such substitute well shall be an Exploratory Well.  The Well Plan for the substitute Exploratory Well shall be substantially the same as the Well Plan for the abandoned Exploratory Well and shall also take into account those conditions which rendered further drilling of the abandoned Exploratory Well impractical.

Any Non-Participating Party in a substitute Exploratory Well or an approved supplemental AFE for an Exploratory Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* and Article 6.2.2. (*Supplemental AFEs*) that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation.  If a Non-Participating Party in a substitute Exploratory Well was also a Non-Participating Party in the abandoned Exploratory Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Exploratory Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations)*.  In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Exploratory Well and the substitute well.

Notwithstanding anything to the contrary in this Agreement, in the event a Non-Operating Participating Party in an Exploratory Well abandoned pursuant to Article 10.1.4(b) or (c) above, proposes a substitute well, in the form of an AFE, while the rig is on location and proposes the substitute well commence drilling operations prior to rig release from the Contract Area, the Operator, at its sole option and discretion, in the event the rig is under a long term contract with the Operator and/or a multi-well/slot contract with the Operator for future wells and has been on location for more than thirty (30) days, shall have the exclusive and unilateral right to release the rig from the Contract Area and not utilize said rig to drill the proposed substitute well.  In such event, said substitute well proposal AFE shall have no further force and effect.

CONFIDENTIAL

APC-00741578

**10.2** **Exploratory Operations at Objective Depth:**   After an Exploratory Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 10.2, of its proposal to conduct subsequent operations in the well.   Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include the associated AFE and the plan for the operation. The Parties entitled to make such Election hereunder are the Participating Parties.

The Operator's proposal shall be for one of the following operations:

(a)      conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)      by-pass to core the formations encountered;

(c)      Deepen the well to a new Objective Depth (however, if in the Operator's sole opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth);

(d)      Sidetrack the well;

(e)      conduct Production Testing;

(f)      conduct other operations on the well not listed;

(g)      temporarily abandon the well; or

(h)      permanently plug and abandon the well.

If an Exploratory Well is temporarily abandoned under (g), then any additional operation in such well shall be proposed as a new well operation.  A proposal to complete an Exploratory Well which has been temporarily abandoned under (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the

CONFIDENTIAL

APC-00741579

Exploratory Well, then any Participating Party may make a proposal.   In such event, the procedures set forth in this Article 10.2 shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

**10.2.1** <u>**Response to Operator's Proposal**</u>:   A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with the associated AFE and the plan for the operation, except if the  proposal is to permanently plug and abandon the well) for one of the operations in Article 10.2 *(Exploratory Operations at Objective Depth)*, and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made.   If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).   If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*.   If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 10.3 *(Permanent Plugging and Abandonment and Cost Allocation)* or Article 18.1 *(Abandonment of Wells)* shall apply to such proposal.   If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer than All Parties)*, or both, apply to any Election in Article 10.2 *(Exploratory Operations at Objective Depth)*, then the response period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in

CONFIDENTIAL

APC-00741580

**10.2.4** <u>**Non-Participating Parties in Exploratory Operations at Objective Depth:**</u>   A Non-Participating Party in an Exploratory Operation at Objective Depth [as provided for in this Article 10.2 *(Exploratory Operations at Objective Depth)*] is subject to Article 16.5.1 *(Non-Consent Exploratory Operations)* and is relieved of the Costs and risks of such Exploratory Operation, except as to its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.1 *(Non-Consent Exploratory Operations)* shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing.   The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing the well bore to core the formations encountered, or Production Testing shall not be entitled to the information resulting from such operation.   A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in any subsequent Deepening and/or Sidetracking and/or any subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**10.2.5** <u>**Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth:**</u>   A Non-Participating Party does not have the right to participate (until recoupment) in the Deepening or Sidetracking of an Exploratory Well proposed and conducted pursuant to Article 10.

**10.3** <u>**Permanent Plugging and Abandonment and Cost Allocation:**</u>   The permanent plugging and abandonment of an Exploratory Well which:

(a)        is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 10.1.4 (b), or

(b)        is to be plugged and abandoned in accordance with Article 10.2 *(Exploratory Operations at Objective Depth)*, or

CONFIDENTIAL

APC-00741581

(c)          has been previously temporarily abandoned in accordance with Article 10.2 (*Exploratory Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote.  Approval to plug and abandon an Exploratory Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If a proposal to plug and abandon an Exploratory Well receives such approval by Vote, the approved proposal binds all Parties.  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the Exploratory Well.  If a rig is on location and a proposal to plug and abandon an Exploratory Well under either Article 10.3(a) or 10.3(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled to make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of the proposal to permanently plug and abandon the well, the Operator may nevertheless proceed to plug and abandon the Exploratory Well and shall notify each Participating Party of that fact.  If the proposal to plug and abandon any Exploratory Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon the Exploratory Well and shall notify each Participating Party of that fact.

The Participating Parties in the Exploratory Well AFE shall pay all Costs of plugging and abandoning the Exploratory Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.2 *(Exploratory Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

**10.4**    **Conclusion of Exploratory Operations**:  Except as provided in Article 10.1.4 (*AFE Overruns and Substitute Well*) after the permanent or temporary

CONFIDENTIAL

abandonment of the first Producible Well and the release of the rig from such Producible Well, Exploratory Operations conclude, and all subsequent operations in the Contract Area are either Appraisal Operations or Development Operations.

## ARTICLE 11 – APPRAISAL OPERATIONS

**11.1**   **Proposal of Appraisal Wells:**

(a)  After the conclusion of Exploratory Operations, any Party may propose the drilling of an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Parties. Each proposed Appraisal Well requires approval by Election.  Any Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

(b) If in response to a proposal from a Non-Operating Party, the Operator counter-proposes an alternative Appraisal Operation within thirty (30) days of a proposal by any other Party or Parties, the alternative Appraisal Operation proposed by Operator shall take precedence for consideration over any other proposed Appraisal Operation provided Operator's proposal is approved by Election with a higher cumulative affirmative Election than the proposal made by such Non-Operating Party. If fewer than all Parties Elect to participate in the proposed Appraisal Operation or alternative Appraisal Operation, each Party who originally elected not to participate shall, after receipt of such Election results, make a subsequent Election under Article 8.3, if applicable.  Thereafter, the Participating Parties shall, after receipt of all such Election results, make an Election under Article 8.4.  After all Participation elections have been made, the Operator (or substitute Operator) shall commence the approved Appraisal Operation at the sole Cost and risk of the Participating Parties and the remaining proposals shall be deemed withdrawn. Any Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.  Any proposal for an Appraisal Operation must include a commitment by the

CONFIDENTIAL

APC-00741583

proposing Party to provide access to a suitable drilling unit or vessel capable of drilling the proposed well within the time frames allowed by this Agreement for timely operations.  Any proposal that does not include timely access to suitable drilling equipment shall be considered invalid.  No Party shall be compelled to provide access to drilling rigs under contract to it by way of a proposal for operations from another Party.  Any drilling unit or vessel proposed to be utilized to drill a well on the Contract Area must be capable of operating in environments expected to be encountered on the Contract Area and within the time schedule for the operations to be conducted.

**11.1.1**   **Revision of Well Plan:**  Any revisions of the Well Plan or AFE for an Appraisal Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.1 *(Revision of Well Plan)*.

**11.1.2**   **Automatic Revision of the Well Plan:**  The Well Plan for an Appraisal Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Automatic Revision of the Well Plan)*.

**11.1.3**   **Timely Operations:**  Actual drilling operations on an Appraisal Well shall be commenced within two hundred seventy (270) days from the conclusion of the period for approval of an Appraisal Well, and prior to the expiration/termination deadline  (including  any extensions thereof granted by the MMS) of the Lease on which the Appraisal Well is being drilled if such Lease is in jeopardy of expiring/terminating.  In all events, including the occurrence of a Force Majeure, if the Operator does not commence actual drilling operations on an Appraisal Well within two hundred seventy (270) days from the conclusion of the period for approval of an Appraisal Well, the proposal of an Appraisal Well and its approval will be deemed withdrawn.  If an Appraisal Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Appraisal Well will be chargeable to the Participating Parties.

CONFIDENTIAL

APC-00741584

**11.1.4** **AFE Overruns and Substitute Well:**  Once an Appraisal Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)     any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs )* or

(b)     the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

(c)     the Participating Parties unanimously agree to cease drilling an Appraisal Well before reaching Objective Depth.

If an Appraisal Well is abandoned due to the conditions described under Article 11.1.4(b) or (c), then any Participating Party in the abandoned Appraisal Well may, within one hundred eighty (180) days from the decision to abandon  such Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Appraisal Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Appraisal Well. Notwithstanding any contrary provision of Article 11.5, the substitute well shall be an Appraisal Well. The Well Plan for the substitute Appraisal Well shall be substantially the same as the abandoned Appraisal Well's Well Plan and shall also take into account those conditions which rendered further drilling of the abandoned Appraisal Well impractical.

Any Non-Participating Party in a substitute Appraisal Well or an approved supplemental AFE for an Appraisal Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)*

CONFIDENTIAL

APC-00741585

and Article 6.2.2. (*Supplemental AFEs*) that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation.   If a Non-Participating Party in a substitute Appraisal Well was also a Non-Participating Party in the abandoned Appraisal Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Appraisal Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations)*.   In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Appraisal Well and the substitute well.

Notwithstanding anything to the contrary in this Agreement, in the event a Non-Operating Participating Party in an Appraisal Well abandoned pursuant to Article 11.1.4(b) or (c) above, proposes a substitute well while a rig is on location and proposes the substitute well commence drilling operations prior to rig release from the Contract Area, the Operator, at its sole option and discretion, in the event the rig has been on location for more than thirty (30) days, shall have the exclusive and unilateral right to release the rig from the Contract Area and not utilize said rig to drill the proposed substitute well.   In such event, said substitute well proposal AFE shall have no further force and effect.

**11.2**   **Appraisal Operations at Objective Depth**:   After an Appraisal Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 11.2, of its proposal to conduct subsequent operations in the well.   Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include

CONFIDENTIAL                                                                                    APC-00741586

the associated AFE and the plan for the operation.  The Parties entitled to make such Election hereunder are the Participating Parties.

The Operator's proposal shall be for one of the following operations:

(a)      conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)      by-pass to core the formations encountered;

(c)      Sidetrack the well;

(d)      Deepen the well to a new Objective Depth;

(e)      conduct Production Testing;

(f)      conduct other operations on the well not listed;

(g)      temporarily abandon the well; or

(h)      permanently plug and abandon the well.

If the Appraisal Well is temporarily abandoned under (g), then any additional operation in such well shall be proposed as a new well operation.  A proposal to complete an Appraisal Well which has been temporarily abandoned under (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the Appraisal Well, then any Participating Party may make a proposal.  In such event, the procedures set forth in this Article 11.2 shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

**11.2.1**   <u>**Response to Operator's Proposal:**</u>  A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate

CONFIDENTIAL

APC-00741587

proposal (along with the associated AFE and the plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 11.2 *(Appraisal Operations at Objective Depth)*, and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made. If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*. If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 11.4 *(Permanent Plugging and Abandonment and Cost Allocation)* or Article 18.1 *(Abandonment of Wells)* shall apply to such proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer than All Parties)*, or both, apply to any Election in Article 11.2 *(Appraisal Operation at Objective Depth)*, then the response period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in Article 11.2 *(Appraisal Operations at Objective Depth)* of the information resulting from the previously approved operation. Notwithstanding anything to the contrary in this Article 11.2, in the event the Operator has a long term and/or multiple-slot-use contract with the drilling rig being utilized, the Operator shall have the right, at its sole option and discretion, to limit the number of geologic Sidetracks performed pursuant to Article 11.2, but in no event shall the Operator

CONFIDENTIAL

have the right, unless otherwise provided in this Agreement, to limit the number of geologic Sidetracks to less than one (1).

**11.2.2**   **Response to Highest Priority Proposal:** If a separate proposal is made, each Party entitled to make an Election hereunder shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 11.2(a) has the highest priority, and Article 11.2(h) has the lowest priority. If different depths or locations are proposed for the same type of operation under Article 11.2 (c), (d) or (e), preference shall be given to the deepest depth, or the location farthest from the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure set forth in Article 11.2 *(Appraisal Operations at Objective Depth)* for any other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

**11.2.3**   **Response on Next Highest Priority Proposal:** If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon the Appraisal Well.

**11.2.4**   **Non-Participating Parties in Appraisal Operations at Objective Depth:** A Non-Participating Party in an Appraisal Operation at Objective Depth [as provided for in this Article 11.2 *(Appraisal Operations at Objective Depth)*] is subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* and is relieved of the Costs and risks of such Appraisal Operation at Objective Depth, except as to its Participating Interest Share of the Costs of plugging and abandoning

CONFIDENTIAL

APC-00741589

the Appraisal Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.2 *(Non-Consent Appraisal Operations)* shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing. The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing the well bore to core the formations encountered, or Production Testing shall not be entitled to the information resulting from such operation.  A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in any subsequent Deepening and/or Sidetracking and/or any subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**11.2.5** <u>**Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth**</u>:  A Non-Participating Party does not have the right to participate (until recoupment) in the Deepening or Sidetracking of an Appraisal Well proposed and conducted pursuant to Article 11 (proposed with a rig on location).  However, a Non-Participating Party is afforded the right (assuming the requisite approvals have already been obtained) to participate in re-entering a temporarily abandoned Appraisal Well that has been approved to be Deepened or Sidetracked.

**11.3** <u>**Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir**</u>:  Any Party may propose an Appraisal Well with an Objective Depth below the Deepest Producible Reservoir, and in response to such well proposal each Party may in writing limit its participation in the drilling of the Appraisal Well to the base of the Deepest Producible Reservoir to be penetrated by the Appraisal Well.  A Party who limits its participation in an Appraisal Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling the Appraisal Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party in the Appraisal Well for all depths between

CONFIDENTIAL

APC-00741590

the stratigraphic equivalent of the base of the Deepest Producible Reservoir and the Objective Depth of the Appraisal Well and shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* in regard to operations between those depths.  The provisions of Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* and Article 13.3.2 *(Completion Attempts At or Above the Deepest Producible Horizon)* shall also apply to operations that are conducted pursuant to this Article 11.3.

11.4    **Permanent Plugging and Abandonment and Cost Allocation:**    The permanent plugging and abandonment of an Appraisal Well which:

(a)    is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 11.1.4 (b), or

(a)    is to be plugged and abandoned in accordance with Article 11.2 *(Appraisal Operations at Objective Depth)*, or

(b)    has been previously temporarily abandoned in accordance with Article 11.2 *(Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote.  Approval to plug and abandon an Appraisal Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon an Appraisal Well receives such approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraisal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.4(a) or 11.4(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of the proposal to permanently plug and abandon the well, the Operator may nevertheless proceed

CONFIDENTIAL

to plug and abandon of the Appraisal Well and shall notify the Participating Parties of that fact. If the proposal to plug and abandon any Appraisal Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon of the Appraisal Well and shall notify the Participating Parties of that fact.

The Participating Parties in the Appraisal Well AFE shall pay all Costs of plugging and abandoning the Appraisal Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Appraisal Operations at Objective Depth)* or Article 6.2.2. *(Supplemental AFEs)*. The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

**11.5** **Conclusion of Appraisal Operations:** Except as provided for in Article 11.6 (*Operations Prior to the Approval of the Development Plan*) and in Article 12.15.2 (*Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations*), upon the earlier of:

(a) the approval of the conclusion of Appraisal Operations by Vote; or

(b) the point in time when no Appraisal Operation has been approved within a period of twelve (12) months from the rig release (or cessation of operations) from the previous Appraisal Operation; or

(c) twenty-four (24) months from the conclusion of Exploratory Operations, provided no Appraisal Operation has been approved prior to the end of such twenty-four (24) month period,

Appraisal Operations for the ensuing Development Phase shall conclude and all subsequent operations in the Contract Area will be Development Operations for the ensuing Development Phase, including operations on temporarily abandoned Exploratory or Appraisal Wells. However, if an Appraisal Operation is being conducted at the occurrence of either (a), (b) or (c) above, Appraisal Operations

CONFIDENTIAL

for the ensuing Development Phase shall conclude when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned.

11.6   **Operations Prior to the Approval of the Development Plan:**   After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but prior to the approval of a Development Plan for the ensuing Development Phase, any Party may propose the drilling of an additional well as an Appraisal Well.   Provided however that, unless the provisions of Article 16.4 *(Non-Consent Operations to Maintain the Contract Area)* apply to such proposed well, such proposal shall require the Vote of the Parties.   Any substitute well for and any operations upon reaching Objective Depth, conducted in or through the well bore of such well, shall be deemed Appraisal Operations, and shall be proposed, approved and conducted accordingly.

# ARTICLE 12 – DEVELOPMENT PLAN

12.1   **Phased Development Plans:**   If the results of Exploratory Operations or Appraisal Operations justify the development of one or more Producible Reservoirs within the Contract Area, the Operator may prepare on behalf of the Parties a Development Plan in order to commence the development of the Contract Area.   In view of the Costs and scope of each Development Plan for the Contract Area, the Parties may agree to undertake an initial Development Phase and one or more subsequent Development Phases.   Each Development Phase will be centered upon the installation of a new Development System for the Contract Area.   A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be generated, approved and implemented pursuant to this Article 12 *(Development Plan)*.

12.2   **Project Team Proposal:** For a period of twelve (12) months from the conclusion of Appraisal Operations as provided in (a), (b), or (c) of Article 11.5 *(Conclusion of Appraisal Operations)*, the Operator has the exclusive right to propose the formation of a Project Team and submit a Project Team AFE.   If the Operator does not propose the formation of a Project Team and submit a Project Team AFE during its exclusive period, then any Party may propose the formation of a

CONFIDENTIAL

Project Team and submit a Project Team AFE. The Project Team AFE shall be accompanied by a memorandum describing, in sufficient detail to allow the Parties to make an informed decision concerning their participation in the Project Team, the anticipated scope of the work to be undertaken by the Project Team, including, but not limited to, the estimated type and number of staff required to complete the Project Team's assignment and the estimated duration of the Project Team. The formation and administration of the Project Team will be handled in accordance with Exhibit "G". All Project Team Costs will be handled in accordance with Exhibit "C". No Party may propose the formation of a Project Team and submit a Project Team AFE for a Development Phase until such time as any previously formed Project Team for that Development Phase has terminated in accordance with the provisions of Article 12.2.2 *(Project Team Termination)*.

12.2.1   **Project Team Approval:** A Project Team proposal requires approval by Election. Any Non-Participating Party in the Project Team proposal is subject to Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs, or Development Plan)*.

12.2.2   **Project Team Termination:**   A Project Team formed to work on a Development System terminates as provided in Section 3.3 of Exhibit "G".

12.3   **Proposal of a Development Plan:** The Operator has the exclusive right for a period of twelve (12) months from the conclusion of the response period for an approved Project Team proposal to submit a Development Plan for the Parties' review and approval. If no Party submits a Project Team proposal or if no Project Team proposal is approved, then the Operator has the exclusive right to propose a Development Plan for a period of eighteen (18) months following the conclusion of Appraisal Operations as provided in (a), (b) or (c) of Article 11.5 *(Conclusion of Appraisal Operations)*, whichever occurs first.

12.4   **Content of the Development Plan:** A Development Plan proposal shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development System. If a Project Team is

CONFIDENTIAL

approved and formed pursuant to Article 12.2.1 (*Project Team Approval*), any proposed Development Plan shall be based upon the work and recommendations of the Project Team. All Development Plans submitted shall include at a minimum the following information:

(a)    **Production System:** Description of the Development System including:

(i)    the type of Production System proposed, i.e. tension leg well jacket, floating production system, etc., including the Production System's location, configuration (i.e. number of well slots or subsea tiebacks) and production capacity;

(ii)    a description of the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline or offtake point servicing the Contract Area;

(iii)    a projected time schedule for designing, contracting, fabricating, constructing or otherwise acquiring, transporting and installing the Development System;

(iv)    the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter; and,

(v)    the estimated Costs of the Development System , not in the form of an AFE;

(vi)    a description of any proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)    a description of the proposed well completion techniques, i.e. dual vs. single;

(b)    **Producible Reservoirs:**    A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

CONFIDENTIAL

(c) **Recoverable Reserves and Production Profile:** An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d) **Pre-drilling Operations:** A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e) **Development Wells:** A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and surface and bottomhole location of each well;

(f) **Tieback Operations:** If the Development Plan requires the tieback or use of Offsite Facilities, a written proposal from the operator of such Offsite Facilities to handle or process Hydrocarbons, to include an estimate of the amount of any tariffs, processing or other fees the operator of such Offsite Facilities proposes to charge the Participating Parties to handle or process Hydrocarbons, and the capacity on the Offsite Facilities for the Hydrocarbons;

(g) **Final Design AFE:** An AFE for the completion of the detailed design of the Development System, including final specifications, blueprints and models with which contractors will be able to formulate their bids on the components of the Development System;

(h) **Field Operating Scheme:** a description of the field operating scheme, its method, requirements, expected frequencies of intervention and Costs;

(i) **Field Abandonment:** a description of field abandonment plan (if applicable); .

(j) **Reservoir Plan:** A reservoir plan which shall provide strategies, objectives, and methods for developing, managing, and depleting each

CONFIDENTIAL

APC-00741596

Producible Reservoir during its producible life and shall include, but not be limited to:

(i) an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

(ii) the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii) a reservoir management and depletion strategy for each Producible Reservoir addressing issues which shall include, but not be limited to:

(A) estimates of oil and gas in place;

(B) reservoir rock and fluid characteristics;

(C) depletion mechanism;

(D) water and gas injection plans and objectives;

(E) reservoir surveillance programs (e.g., cased-hole logging, static pressures, etc.) and their objectives;

(F) well performance goals (e.g., target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets, etc.);

(G) reservoir performance goals (e.g., target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals, etc.); and

(H) other relevant information;

(k) **Disposal Wells:** the estimated Cost of disposal wells, if applicable;

(l) **Hydrocarbon Transmission System:** the type of Hydrocarbon transmission system to be made available to the Participating Parties (e.g., pipeline vs. barge, etc.); and

CONFIDENTIAL

(m)     **Other Data:** Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Development System provided for in the Development Plan.

**12.5**   <u>**Alternative Development Plans:**</u> If a Development Plan is not timely submitted by the Operator during its exclusive period, or if Operators Development Plan is not approved pursuant to Article 12.6, any Party may submit a Development Plan to the other Parties for approval.

**12.6**   <u>**Approval of Operator's Development Plan Submitted During its Exclusive Period:**</u> The Operator shall have ninety (90) days to obtain the unanimous agreement of the Parties on any Development Plan proposal submitted by the Operator during its exclusive period.

**12.6.1**   <u>**Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period:**</u> If either

(a)     the Operator fails to gain the unanimous agreement of the Parties on the Development Plan it submitted during its exclusive period, or

(b)     the Operator fails to submit a Development Plan during its exclusive period,

the Parties shall have a period of ninety (90) days, commencing with either the expiration of the Operator's exclusive period or its failure to obtain approval of the Development Plan it submitted during its exclusive period, to unanimously agree to the Operator's Development Plan or an alternate Development Plan.

**12.6.2**   <u>**Approval of a Development Plan by Vote:**</u> .  If the ninety (90) day period provided in Article 12.6.1 *(Approval of Development Plan after the Conclusion of the Operator's Exclusive Period)* terminates and the Parties still have not unanimously approved a Development Plan, then the Parties shall have a ninety (90) day period in which to approve a

CONFIDENTIAL

APC-00741598

Development Plan by an affirmative vote of 2 or more Parties with a fifty-one (51%) percent voting interest.   No new Development Plans shall be submitted during the last sixty (60) days of this ninety (90) day period.

12.6.3   **Approval of a Development Plan if One is Not Approved by Vote:**   If a Development Plan is not approved as provided in Article 12.6.1 *(Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period)*, or Article 12.6.2 *(Approval of a Development Plan by Vote)* if applicable, and if there was only one Development Plan submitted and such Development Plan received an affirmative vote of at least fifty percent (50%) of the voting interest, such Development Plan shall be deemed approved by the Parties.  If there were two (2) or more Development Plans submitted and one Development Plan received an affirmative vote of at least fifty percent (50%) of the voting interest such Development Plan shall be deemed approved by the Parties.   If two competing Development Plans each received an affirmative vote of fifty percent (50%) voting interest, the Development Plan approved by the Operator shall be deemed approved. Notwithstanding the foregoing, if the approved Development Plan includes acquisition of usage rights in the proposing Party's, or its Affiliate's, owned or operated production handling facilities, structures, gathering systems or pipelines which were (or are planned to be) acquired outside the scope of this Agreement, then each Party shall negotiate tariff charges with respect to its share of production that utilizes such facilities, structures, gathering systems or pipelines.

12.7   **Approved Development Plan:** By unanimously agreeing or Voting to approve a Development Plan or subsequently Voting to participate in an approved Development Plan under Article 8.3 *(Second Opportunity to Participate),* each Participating Party in an approved Development Plan also agrees or Votes to participate in the Final Design AFE submitted as a part of such approved Development Plan.   Any Non-Participating Party in an approved Development Plan is subject to the provisions of Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs or Development Plan)*.

CONFIDENTIAL

**12.8**   **Pre-Development AFEs:**   In order to facilitate the early and orderly commencement of a Development Plan, the Operator has the right, prior to the submission of the Fabrication AFE, to submit AFEs ("Pre-Development AFEs") for (a) engineering design studies, (b) the acquisition of long lead-time items, (c) preliminary activities related to the construction, fabrication, acquisition or installation of the Development System, or (d) any other activity or operation, excluding Development Wells, necessary to assist the Operator in the preparation and completion of the Development Plan; provided, however, a Pre-Development AFE may not be submitted for the aforementioned items (b) and (c) until after the selection of a Development System and the initiation of the detailed design for that Development System.   Each Pre-Development AFE requires approval of the Parties by Vote.  Any Non-Participating Party in the Pre-Development AFE is subject to the provisions of Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs, or Development Plan)*.

**12.9**   **Fabrication AFE:**   Within twelve (12) months from the date on which a Development Plan is approved, the Operator shall submit a Fabrication AFE for the Development System (which conforms to the approved Development Plan) to all Parties for approval by Election.   The Fabrication AFE shall consist of separate Cost estimates for each major component in the construction, fabrication or other acquisition and installation of the Development System identified in the Development Plan.  The Fabrication AFE shall not include any Cost estimates or AFEs for Development Wells.  If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the Development System (which conforms to the approved Development Plan) for approval by Election.

**12.9.1**   **Approval of a Fabrication AFE:**   By Electing to participate in the Fabrication AFE, each Participating Party shall bear its Participating Interest Share of the Costs and risks of the Development System as set forth in the Fabrication AFE.  The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFEs comprising the Fabrication AFE.

CONFIDENTIAL

APC-00741600

**12.10  Assignment of Interest**:  Any Non-Participating Party in the Fabrication AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions)*.

**12.11  Minor Modifications to Development Plans**:  In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team.  As additional information becomes available to the Operator, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if such minor modifications are both reasonable and prudent.  For purposes of this paragraph, a minor modification means

(a)  a modification which does not cause the cumulative estimated Cost of the Final Design AFE to increase by more than twenty percent (20%) or ten million dollars ($10,000,000), whichever is less; or

(b)  a modification which does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than twenty percent (20%) or twenty million dollars ($20,000,000), whichever is less.

If the Operator exercises its discretionary right to make a minor modification for health, safety or environmental reasons or regulatory requirements, the Operator shall give each Participating Party written notice of that fact.  A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

**12.12  Major Modifications to Development Plans**:  A major modification shall be deemed to have occurred when:

(a)  the type of Production System, e.g. tension leg well jacket, floating production system, etc., is to be changed; or

(b)  the number of well slots of the Production System is to be changed by at least fifty percent (50%); or

(c)  the type of Hydrocarbon transmission system is changed (e.g., pipeline vs. barge, etc.); or

CONFIDENTIAL

(d)     the daily production processing capacity of any Facilities is to be changed by at least fifty percent (50%);

(e)     a modification causes the cumulative estimated Cost of the Final Design AFE or the Fabrication AFE to increase by more than the limits set forth in Article 12.11 *(Minor Modifications to Development Plans)*.

**12.12.1    Major Modifications to Development Plans Prior to the Approval of the Fabrication AFE:**    Whenever a major modification to a Development Plan is proposed prior to the approval of the Fabrication AFE, the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).  Such major modification shall require the unanimous agreement of the Participating Parties in the Development Plan.  If a major modification to the Development Plan is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.  Such Non-Participating Party has the right for a period of thirty (30) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs).  If such Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities and operations associated with the original Development Plan (and associated AFEs).

**12.12.2    Major Modifications to Development Plans after a Party Elects to Participate in the Fabrication AFE:**  Whenever a major modification to a Development Plan is proposed after the approval of a Fabrication AFE and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Fabrication AFE with the proposed modification to the Development Plan (and associated AFEs).   Such major modification shall require the unanimous agreement of the Participating Parties in the Fabrication AFE.  If a major modification to the Development Plan as set forth in

CONFIDENTIAL

Article 12.12 (a), or Article 12.12 (c) is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Fabrication AFE. Such Non-Participating Party has the right for a period of thirty (30) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs).  If such Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities and operations associated with (a) the original Development Plan (and associated AFEs) if it did not participate in such Development Plan and (b) the Fabrication AFE.  Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Fabrication AFE for the initial Development System shall deliver to a Non-Participating Party in the Fabrication AFE for the initial Development System who Elects to participate in a modified Development Plan (and associated AFEs) for the initial Development System an assignment of one hundred percent (100%), of such Non-Participating Party's former Working Interest in the Contract Area, the wells therein and production therefrom. A Non-Participating Party in the Fabrication AFE for a subsequent Development System who Elects to participate in a modified Development Plan (and associated AFEs) for such subsequent Development System shall not be subject to the provisions of Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* in regard to such subsequent Development System.  Provided, however, if a major modification to the Development Plan as set forth in Article 12.12 (a) or 12.12 (c) is approved by the Participating Parties:

(a) after the commencement of construction or the acquisition of the Development System, and

(b) after the execution of a bona fide contract providing for the Transfer of Interest of all or a part of the Non-Participating Party's former Working Interest in the Contract Area by a Participating Party to a party

CONFIDENTIAL

APC-00741603

(other than an Affiliate of the assignor) not a Party to this Agreement ("third party") at the time such contract is executed,

the Non-Participating Party shall not have the right to participate in the modified Development Plan.

**12.12.3** **Approval of Major Modifications**:  If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan.  In the event a major modification is not approved, the Operator shall continue to implement the Development Plan as it was before the proposed major modification.

**12.13** **Termination of a Development Plan**:  A Development Plan terminates if (a) the Fabrication AFE for such Development Plan is not approved by Election, (b) the Participating Parties unanimously agree in writing to terminate the Development Plan, or (c) the construction or acquisition of the Development System is not commenced within the time frame provided in Article 12.14 *(Timely Operations for Development Systems)*.

**12.13.1** **Termination Prior to Fabrication AFE Approval**:  The Costs, risks and liabilities associated with a Development Plan, which is terminated prior to its associated Fabrication AFE being approved by Election, shall be borne by the Participating Parties in such Development Plan.

**12.13.2** **Termination After Fabrication AFE Approval**:  The Costs, risks and liabilities associated with a Development Plan, which is terminated after its associated Fabrication AFE is approved by Election, shall be borne by the Participating Parties in such Fabrication AFE.

**12.14** **Timely Operations for Development Systems**:  The Operator shall commence or cause to be commenced the construction or acquisition of a Development System by the earlier of (a) twelve (12) months from the conclusion of the period for approval of the Fabrication AFE or (b) thirty (30) days prior to the date the Operator is required to commence such construction or acquisition under an

CONFIDENTIAL

SOO, SOP or Unit Plan.  Such construction or acquisition shall be deemed to have commenced on the date the major fabrication contract for the Development System is awarded, or the date the contract for acquiring an existing Development System is executed, whichever is applicable.

**12.15** **Subsequent Development Phases**:  At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party in any previous Development Phase may propose a subsequent Development Phase and the installation of a subsequent Development System. Such proposal shall require approval by Vote except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

**12.15.1** **Proposal of a Subsequent Development Phase**:  If a subsequent Development Phase is approved, the procedures specified in Article 12.2 *(Project Team Proposal)* and Article 12.2.1 *(Project Team Approval)* shall apply to the proposal of the Project Team, the approval of the Project Team proposal, and the formation of the Project Team for such subsequent Development Phase with the exception however, that the first Producible Well, as identified in Article 12.2.1, shall be replaced with the first Producible Well of such Subsequent Development Phase.

**12.15.2** **Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations**:  If an additional well is needed before a Development Plan can be prepared for a subsequent Development Phase, such well shall be proposed and drilled in accordance with the terms of Article 11 *(Appraisal Operations)*, and any Non-Participating Party in such well is subject to the provisions of Article 16.5.2 *(Non-Consent Appraisal Operations)*.

**12.15.3** **Development Plan in a Subsequent Development Phase**:  The procedures specified in Articles 12.3 *(Proposal of a Development Plan)*, 12.4 *(Content of the Development Plan)*, 12.5 *(Alternative Development Plans)*, and Article 12.6 *(Approval of Operator's Development Plan Submitted During its Exclusive Period)* shall govern the preparation,

CONFIDENTIAL

submission, and approval of the Development Plan for a subsequent Development Phase.

**12.15.4** <u>**Fabrication AFE in a Subsequent Development Phase**</u>:   The procedures specified in Article 12.9 *(Fabrication AFE)* and Article 12.9.1 *(Approval of a Fabrication AFE)* shall govern the preparation and submission of a Fabrication AFE for a subsequent Development Phase.   Any Non-Participating Party in a Fabrication AFE for a subsequent Development Phase is subject to the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* or Article 16.4 *(Non-Consent Operations to Maintain the Lease),* if applicable, and not the provisions of Article 16.2 *(Acreage Forfeiture Provisions).*   Although a Non-Participating Party in a Fabrication AFE for a subsequent Development Phase will retain its Working Interest in the Contract Area, it will only be entitled to Hydrocarbon production from a subsequent Development Phase after it has fulfilled the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities).*   Such Non-Participating Party shall not unreasonably interfere with any activities or operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Parties in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices).   In all events, the sequence and conduct of activities and operations in a subsequent Development Phase shall be controlled by the Participating Parties in the Fabrication AFE for the subsequent Development Phase.

**12.16** <u>**Access to Existing Facilities**</u>:   A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase.   Such proposal shall require approval by Vote of the Participating Parties in such previous Development Phase and shall include the basic terms under which the access is to be granted, which, if approved, shall be incorporated into a formal Facilities usage agreement.   If approved, the proposal shall be binding on all of the Parties.

CONFIDENTIAL

## ARTICLE 13 – DEVELOPMENT OPERATIONS

**13.1**   **Proposal of Development Wells and Operations**:  It is the intent of the Parties to proceed with the development of the Contract Area in accordance with an approved Development Plan.  Development Wells shall be subject to separate AFEs unless a Development Plan calls for a number of Development Wells to be drilled together in order to set conductor casing or to be pre-drilled together prior to the installation of the Development System, in which case such wells shall be included in a single AFE.

Once a Development Well has been completed and placed on production, the Participating Parties in such well must unanimously agree to allow any Party to conduct a Non-Consent Operation in such well, unless such well becomes incapable of producing in paying quantities.  A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or completion zone in the proposal.

**13.1.1**   **Proposal of Development Wells Included in a Development Plan**:  Subject to Article 13.1 *(Proposal of Development Wells and Operations)*, any Participating Party in a Development Plan and Fabrication AFE may propose the drilling of a Development Well which was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Parties.  Each proposed Development Well that was included in the Development Plan requires approval by Election.  Any Non-Participating Party in a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

**13.1.2**   **Proposal of Development Wells Not Included in a Development Plan**:  Subject to Article 13.1 *(Proposal of Development Wells and Operations)*, any Participating Party in a Development Plan and Fabrication AFE may propose the drilling of a Development Well which was not included in the Development Plan by giving notice of the

CONFIDENTIAL

APC-00741607

proposal (along with the associated AFE and Well Plan) to all of the other Parties. The proposal shall specify that the well was not included in the Development Plan. Each proposed Development Well which was not included in the Development Plan requires approval by Vote. Any Non-Participating Party in a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

13.1.3 **Operator's Counterproposal:** If a Non-Operating Party makes a proposal that was not included in the Development Plan, the Operator shall have the option to:

(a) Vote to approve the operation proposed by the Non-Operating Party as set forth in the Article 13.1.2; or,

(b) Become a Non-Participating Party subject to Article 16.5.4 (Non-Consent Development Operations); or,

(c) Make a counterproposal within the applicable response time, which attempts to satisfy the same or similar objectives (in terms of timing and development of the Contract Area) as would the Non-Operating Party's proposal.

The Operator's counterproposal shall take precedence over any other proposed Development Operation and, if approved, shall have the effect of voiding the Non-Operating Party's proposal. Any Non-Participating Party in the approved Development Operation will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*. If the Operator's counterproposal is not approved, the Operator may make an Election to participate in the operation proposed by the Non-Operating Party in accordance with Article 13.1.2.

13.1.4 **Timely Operations:** Actual drilling operations on a Development Well shall be commenced within two hundred seventy (270) days from the

CONFIDENTIAL

conclusion of the period for the approval of a Development Well; provided, however, if multiple Development Wells are included in a single AFE, operations shall be deemed timely commenced if actual drilling operations are commenced on one such Development Well within two hundred seventy (270) days from expiration of the period for approval of such AFE.  Thereafter, Operator shall proceed to drill the remainder of the Development Wells included in the single AFE in a diligent manner.  In a like manner, if multiple Development Wells are proposed simultaneously, but on separate AFEs, operations shall be deemed timely commenced if actual drilling operations are commenced on one such Development Well within two hundred seventy (270) days from expiration of the period for approval of such AFEs.  Thereafter, Operator shall proceed to drill the remainder of the Development Wells covered by such simultaneously proposed AFE's in a diligent manner. In all events, including the occurrence of a Force Majeure, if the Operator does not timely commence actual drilling operations, the proposal of a Development Well and its approval will be deemed withdrawn.  If a Development Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Development Well will be chargeable to the Participating Parties.

13.1.5   **AFE Overruns and Substitute Well:** Once a Development Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)     any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs)* or

(b)     the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

CONFIDENTIAL

(c)    the Participating Parties unanimously agree to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.5(b) or (c), then any Participating Party in the abandoned Development Well may, within one hundred eighty (180) days from the decision to  abandon such Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Development Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Development Well.  The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well Plan and shall also take into account those conditions which rendered further drilling of the abandoned Development Well impractical.

Any Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* and Article 6.2.2. *(Supplemental AFEs)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation. If a Non-Participating Party in a substitute Development Well was also a Non-Participating Party in the abandoned Development Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Development Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations)*.  In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Development Well and the substitute well.

CONFIDENTIAL

APC-00741610

**13.2**   **Development Operations at Objective Depth:**   After a Development Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 13.2, of its proposal to conduct subsequent operations in the well.   Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include the associated AFE and the plan for the operation.   The Parties entitled to make such Election hereunder are:

(A)      the Participating Parties, and

(B)      the Non-Participating Parties if the proposal is to Sidetrack or Deepen the well at its initial Objective Depth only, and provided Article 16.4 (*Non-Consent Operations to Maintain Prospect Area*) was not applicable to the drilling of the Development Well.

The Operator's proposal shall be for one of the following operations:

(a)      conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)      complete the well at the Objective Depth in the objective zone or formation;

(c)      Sidetrack the well;

(d)      plug back the well and attempt a completion in a shallower zone or formation;

(e)      Deepen the well to a new Objective Depth;

(f)      conduct other operations on the well not listed;

(g)      temporarily abandon the well; or

CONFIDENTIAL

APC-00741611

(h)       permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the Development Well, then any Participating Party may make a proposal.  In such event, the procedures set forth in this Article 13.2 *(Development Operations at Objective Depth)* shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

13.2.1   **Response to Operator's Proposal:**  A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with the associated AFE and the plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made.  If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* or Article 18.1 *(Abandonment of Wells)* shall apply to such proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer than All Parties)*, or both, apply to any Election in Article 13.2 *(Development Operations at Objective Depth)*, then the response

CONFIDENTIAL

APC-00741612

period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previous approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* of the information resulting from the previous approved operation.   Notwithstanding anything to the contrary in Article 13.2, in the event the Operator has a long term and/or multiple-slot-use contract with the drilling rig being utilized, the Operator shall have the right, at its sole option and discretion, to limit the number of geologic Sidetracks performed pursuant to Article 13.2.

13.2.2   **Response to Highest Priority Proposal:** If a separate proposal is made, each Party entitled to make an Election hereunder shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well).  Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority.  If different depths or locations are proposed for the same type of operation under Article 13.2(c), (d) or (e), preference shall be given to the shallowest depth (except under Article 13.2(d), preference shall be given to the deepest depth), or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure set forth in this Article 13.2 *(Development Operations at Objective Depth)* for any other proposals for operations in the well bore until such time as the well is completed, temporarily abandoned or permanently abandoned.

CONFIDENTIAL

APC-00741613

**13.2.3** **Response on Next Highest Priority Proposal:** If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 13.2.2 (*Response to Highest Priority Proposal*). This process will continue until a proposal is approved to either complete the well or temporarily abandon or permanently plug and abandon the Development Well.

**13.2.4** **Non-Participating Parties in Development Operations:** A Non-Participating Party in a Development Operation at Objective Depth [as provided for in this Article 13.2 (*Development Operations at Objective Depth*)] is subject to Article 16.5.4 (*Non-Consent Development Operations*) and is relieved of the Costs and risks of such Development Operation at Objective Depth, except as to its Participating Interest Share of the Costs of plugging and abandoning the Development Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.4 (*Non-Consent Development Operations*) shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing. The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing to core the formations encountered or Production Testing shall not be entitled to the information resulting from such operation. A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**13.2.5** **Participation in a Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth:** If a Development Well is drilled to its Objective Depth and a Non-Participating Party in the Development Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 13.2 (c) or (e), such former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating

CONFIDENTIAL

APC-00741614

Interest Share of the Costs of such Development Well  to its Objective Depth prior to such Sidetracking or Deepening.   The original Participating Parties that bore the Non-Participating Interest Share of Costs in the Development Well are Overinvested Parties in that amount.  A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in the Development Well from the surface to the Objective Depth until (a) its Underinvestment has been eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. In the event a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Development Well, such former Non-Participating Party shall become an Underinvested Party only with regard to the first such approved Sidetracking or Deepening in which such Party participates.

13.3   **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir:**  Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to such well proposal each Party may, in writing, limit its participation in the drilling of the Development Well to the base of the Deepest Producible Reservoir to be penetrated by the Development Well.  A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling the Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for all depths between the stratigraphic equivalent of the base of the Deepest Producible Reservoir and the Objective Depth of the Appraisal Well and shall be subject to Article 16.5.4 (*Non-Consent Development Operations*) in regard to operations between those depths.

CONFIDENTIAL                                                                        APC-00741615

13.3.1   **Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir**

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 *(Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* or Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a)   **Multiple Completion:** If before drilling of the well commences, all Participating Parties in the well agree that multiple well completions are possible and practicable and that those completions will involve (i) a completion at or above the Deepest Producible Reservoir and (ii) a completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir, that are in excess of the Costs to drill and complete the well in the Deepest Producible Reservoir.

(b)   **Single Completions:** If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well completions are possible, then the first completion shall be at the objective deeper than the Deepest Producible Reservoir. After drilling beyond the Deepest Producible Reservoir, a Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir, and the Participating Parties that bore a portion of the Non-Participating Interest Share of the Costs in the Deeper Drilling on the well are

CONFIDENTIAL

APC-00741616

Underinvested Parties for that amount until the Underinvestment is eliminated under Article 16.9 (*Settlement of Underinvestments*).

After drilling beyond the Deepest Producible Reservoir, upon the first of events (i), (ii), (iii) or (iv) below to occur,

(i)     the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(ii)    the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii)   the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv)    the well is plugged and abandoned prior to an attempted completion at or above the Deepest Producible Reservoir,

the Non-Participating Party in the Deeper Drilling becomes an Underinvested Party in the well in an amount equal to its Participating Interest Share of depreciated Costs (as described below) of drilling the well to the base of the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling that bore a portion of the Non-Participating Interest Share of Costs in the well become Overinvested Parties for that amount until the Underinvestment is eliminated under Article 16.9 (*Settlement of Underinvestments*).

CONFIDENTIAL

The Underinvestment of the Costs of drilling the well to the base of the Deepest Producible Reservoir will be depreciated at the rate of one-half percent (1/2%) per month from the date the Deeper Drilling commences to the date one of the above events occurs, but that depreciation will not reduce the Underinvestment below forty percent (40%) of the original Underinvestment.

13.3.2 **Completion Attempts At or Above the Deepest Producible Reservoir:** If an Appraisal Well or a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in such well down to the Deepest Producible Reservoir have the right to utilize the well for completion in a zone at or above the Deepest Producible Reservoir. The Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir pursuant to Article 11.3 (*Appraisal Well Proposals that Include Drilling Below the Deepest Producible Reservoir*) or Article 13.3 (*Development Well Proposals that Include Drilling Below the Deepest Producible Reservoir*) shall have the right to participate in the completion attempt in the zone at or above the Deepest Producible Reservoir. The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its completion in the zone at or above the Deepest Producible Reservoir. If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for the Non-Participating Parties' Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir less any Underinvestments previously paid with respect to such Costs.

13.4 **Recompletions and Workovers:** Any of the Participating Parties in the subsequent Development Operation, Recompletion or Workover which resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of such Development Well. Each

CONFIDENTIAL

Recompletion or Workover requires approval by Vote of such Participating Parties. A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* or Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* and is relieved of the Costs and risks of the Recompletion or Workover, except as to its Participating Interest Share of the Costs of plugging and abandoning the Development Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. An Election not to participate in a completion attempt, Recompletion or Workover of a well shall be deemed an Election not to participate in any subsequent Workover operation proposed in such well, or portion thereof, to which the Non-Consent Election applied, that is conducted prior to Complete Recoupment by the Participating Parties.

13.5 **Permanent Plugging and Abandonment and Cost Allocation:** The permanent plugging and abandonment of a Development Well which:

(a)    is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 13.1.5 (b), or

(b)    is to be plugged and abandoned due in accordance with Article 13.2 *(Development Operations at Objective Depth)*, or

(c)    has been previously temporarily abandoned in accordance with Article 13.2 *(Development Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote. Approval to plug and abandon a Development Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon a Development Well receives such approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the

CONFIDENTIAL

APC-00741619

Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5(a) or 13.5(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of such proposal, the Operator may nevertheless proceed to plug and abandon the Development Well and shall notify the Participating Parties of that fact. If the proposal to abandon any Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon of the Development Well and shall notify the Participating Parties of that fact.

The Participating Parties in the Development Well AFE shall pay all Costs of plugging and abandoning the Development Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 *(Development Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

14.1    **Facilities as a Part of Development Plan:**  The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbon production.   If the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled at Offsite Facilities, the Development Plan shall provide for a Development System designed to utilize Offsite Facilities.

14.2    **Use of Offsite Facilities:**  In the event that excess capacity exists at an Offsite Facility and the approved Development Plan calls for a "tie-back" development of the Contract Area to such Offsite Facility, the Operator will use reasonable

CONFIDENTIAL

APC-00741620

commercial efforts to secure a "Facilities Use and Production Handling Agreement" from the owners of the Offsite Facility for use in handling Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable commercial efforts to secure access to the Offsite Facility on behalf of the Participating Parties in the Development Plan;  provided, however, Operator is prohibited from contracting for such excess capacity for its own account for the handling of its production from the Contract Area unless the Participating Parties in the Development Plan have been afforded an opportunity to participate on the same terms and have declined in writing.  Participating Parties shall be signatory parties to any such "Facilities Use and Production Handling Agreement" securing access to an Offsite Facility and such access shall be shared proportionately by the signatory Participating Parties on the basis of their Participating Interests in the Development Plan.   In the event that such Offsite Facility is owned and operated by the Operator for the Development Plan (provided the Operator is a Participating Party in the Development Plan) and/or its Affiliate solely or jointly with a third party(ies), then, subject to obtaining any required third party concurrence (which such Party shall exercise reasonable commercial efforts to secure), the applicable "Facilities Use and Handling Agreement" shall provide the other Participating Parties in the Development Plan with access to the Offsite Facility under the then prevailing market rates that Operator has offered or would offer third parties for access to its Offsite Facility (in the event there are no prevailing market rates for the Offsite Facility, the then prevailing rates under the same or similar circumstances in the immediate area of the Offsite Facility); provided, however, the Operator shall have no duty to use reasonable efforts (1) to secure priority in such excess capacity for the Participating Parties in the Development Plan over other third parties desiring to utilize the Offsite Facility, or (2) to assure the Participating Parties in the Development Plan of any particular quality of the excess capacity production handling services, whether firm or interruptible.   This Article 14.2 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 *(Disposition of Hydrocarbon Production)*.

14.3   **Use of Development System/Facilities:**    The Participating Parties in a Development System have priority access to and utilization of the Facilities

CONFIDENTIAL

associated with the Development System in order to operate and develop the Contract Area pursuant to an approved Development Plan.

14.4    **Processing Hydrocarbon Production from Outside the Contract Area:**   If processing capacity beyond the requirements of an approved Development Plan is available in the Facilities associated with the Development System, the Participating Parties may unanimously agree to use the Facilities for handling hydrocarbon production from outside the Contract Area.   Such use of excess processing capacity in the Development System is subject to the following priority of usage:

(a)    First priority to hydrocarbon production from outside the Contract Area, which is owned by all of the Participating Parties in the Development System.

(b)    Second priority to hydrocarbon production from outside the Contract Area, which is owned by one or more Participating Parties in the Development System but not by all of them.

(c)    Third priority to hydrocarbon production owned by third parties coming from outside the Contract Area.

Any hydrocarbon production coming from outside the Contract Area, which utilizes a Development System, shall be processed under and subject to the terms and conditions of a Facilities Use and Production Handling Agreement unanimously agreed to by the Participating Parties in the Fabrication AFE for the Development System.

14.5    **Approval of Additional Facilities:**  This Article 14.5 shall only apply to Facilities which were not included in an approved Development Plan.  Any Participating Party in an approved Development System may propose the installation of additional Facilities beyond those specified in such Development Plan by giving notice to the other Participating Parties (along with the associated AFE) together with  information  adequate  to  describe  the  proposed  Facilities.   Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote

CONFIDENTIAL

of the Participating Parties in the Fabrication AFE (and all supplemental AFEs thereto) for the Development System which is to receive additional Facilities. Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Additional Facilities)*

**14.6**   **Expansion or Modification of Existing Facilities or Production System:** Subsequent to the installation of Facilities or a Production System described and approved in a Development Plan for the Contract Area, any Participating Party in such Facilities or Production System may propose the expansion or modification of such Facilities or Production System by written notice (along with its associated AFE) to the other Participating Parties in such Facilities or Production System. Such proposal requires the approval by Vote of the Participating Parties in such Facilities or Production System. If approved, such proposal will be binding on all Participating Parties in such Facilities or Production System and the Operator shall commence such expansion or modification at the sole Cost and risk of all of the Participating Parties in such Facilities or Production System unless otherwise agreed.

**14.7**   **Additions, Expansion or Modification of Production System or Facilities for Health, Safety or Environmental Reasons:** If a proposal for additional Facilities or a proposal for the expansion or modification of Facilities or a Production System does not receive approval by Vote of the Participating Parties in the Facilities or the Production System, whichever is applicable, and such proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install such additional Facilities or make such expansions or modifications to the Facilities or Production System. If the Operator elects to exercise its discretionary right to make such installations, modifications, or expansions, the Operator shall provide each Participating Party in the Facilities or Production System, whichever is applicable, with written notice of its decision

CONFIDENTIAL

APC-00741623

and the Participating Parties shall be responsible for their Participating Interest Share of Costs resulting from such installations, expansions or modifications.

**14.8**   **Repairs of Production System or Facilities:**   The Operator at its sole discretion shall make repairs on the Production System and Facilities as needed to keep the Production System and Facilities in good working order.  No approval by the Parties is required for the Operator to make such repairs.

# ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION.

**15.1**   **Duty to Take in Kind:**   Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons, excluding (i) Hydrocarbon production which the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing purposes and (ii) Hydrocarbons which are unavoidably lost.

**15.2**   **Facilities to Take in Kind:**   Each Participating Party in the Fabrication AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities and pipelines for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator, the installation and operation of such facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Contract Area.

**15.3**   **Failure to Take Oil or Condensate in Kind:**   If any Party fails to take in kind or dispose of its share of the oil or condensate, or both, produced from the Contract Area, the Operator shall have the right, but not the obligation, to either purchase for its own account, sell to others, or otherwise dispose of all or part of such production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate, or if lessor takes its royalty in kind, or if the Leases qualify for royalty relief, settlement for such oil or condensate shall be based on the   price prevailing in the area for oil or condensate of the same kind, gravity and quality reasonably obtainable by the Operator under the circumstances.   The Operator shall have no obligation to obtain a price equal to the price at which its production is sold.  The Operator's

CONFIDENTIAL

right to take in kind or dispose of a non-taking Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate.  All contracts of sale by the Operator of any Party's share of oil or condensate production shall be only for such reasonable periods of time, but in no event shall any contract be for a period in excess of one (1) year.   Proceeds of all sales made by the Operator pursuant to this Article 15.3 shall be paid each calendar month to the Parties entitled thereto in time to allow them to make timely payment, without penalty, of lessor's royalty.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

**15.4**   **Gas Balancing Provision:**   If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled in accordance with Exhibit "D".

**15.5**   **Expenses of Delivery in Kind:**   Any Cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party.

## ARTICLE 16 – NON-CONSENT OPERATIONS

**16.1**   **Conduct of Non-Consent Operations:**   Any activity or operation that invokes the provisions of this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths which are reasonable for the Contract Area.    Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

**16.1.1**   **Costs:**   The Costs of any Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the

CONFIDENTIAL                                                                    APC-00741625

Participating Parties).  Within one hundred twenty (120) days after the completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of the equipment pertaining thereto or at its option, Operator may submit a detailed statement of monthly billings. The Operator shall furnish to the Parties a monthly statement showing operating, maintenance and other expenses attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the proceeds from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16 *(Non-Consent Operations)*.  In accounting for the proceeds from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests. If a portion of the Hydrocarbon production attributable to the Non-Participating Party's relinquished interest is produced and saved or used for operations not subject to this Agreement, but not sold, for the purpose of calculating the Hydrocarbon Recoupment amount, the proceeds attributable to such portion shall be based on the price used to pay Lessor's royalty; provided, however, in the event the Leases qualify for royalty relief or the Lessor takes its royalty in kind, the proceeds attributable to such portion shall be the based on price prevailing in the area for Hydrocarbons of the same kind,.

The calculation of the balance of Hydrocarbon Recoupment shall be accomplished as follows:

Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds from the sale of all Non-Participating Parties' relinquished Hydrocarbons based on the proceeds received for the Operator's share of Hydrocarbons. When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties.  The Participating Parties shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-Participating Parties'

CONFIDENTIAL

relinquished Hydrocarbons.  Operator shall revise the payout date using the actual proceeds from the sale of the Non-Participating Party's relinquished Hydrocarbons and administer any subsequent adjustments between the Parties.

**16.1.2**   **Multiple Completions:**   Non-Consent Operations shall not be conducted in any well having multiple completions unless:

    (a)   each of the multiple completions are owned by the same Parties in the same proportion; or

    (b)   none of the previous well completions are capable of producing in paying quantities; or

    (c)   the Participating Parties in the well containing the multiple completions unanimously agree to such Non-Consent Operations.

For the purposes of this Article 16 *(Non-Consent Operations)*, each completion is a separate well.

**16.2**   **Acreage Forfeiture Provisions:**   In view of the significantly greater risks associated with the first Exploratory Well and the Fabrication AFE for the initial Development System, the Participating Parties in the first Exploratory Well or such Fabrication AFE are entitled to an assignment of all of the right, title and interest (including operating rights) in the Contract Area of the Non-Participating Parties in such well or AFE as provided below.

**16.2.1**   **First Exploratory Well:** The Parties have approved that certain AFE dated April 28, 2008, for the drilling of the Walker Ridge Block 8 No. 1 Well and for purposes herein shall be the first Exploratory Well.  If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and

    (a)   the first Exploratory Well is drilled to its Objective Depth;

    (b)   the first Exploratory Well is drilled to a depth shallower than its Objective Depth and seventy-five percent (75%) or more of the

CONFIDENTIAL

APC-00741627

total amount of the original AFE for that Exploratory Well is expended; or

(c)    the first Exploratory Well is abandoned under Article 10.1.4 (*AFE Overruns and Substitute Wells*) prior to reaching its Objective Depth and prior to the Participating Parties expending at least seventy-five percent (75%) or more of the original AFE for that Exploratory Well, but the Participating Parties timely commence the drilling of a substitute well, and the cumulative Costs of that Exploratory Well and its substitute well equal or exceed seventy-five percent (75%) of the total amount of the original AFE for the first Exploratory Well;

then within thirty (30) days of notice of the occurrence of either (a), (b), or (c) above, any Non-Participating Party in the first Exploratory Well or its substitute well, as applicable, shall execute and deliver an assignment, effective on the first day of the month in which the well is commenced, of all of its right, title and interest in the Contract Area including property and equipment acquired pursuant to this Agreement to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to such Participating Parties.  If an assignment is made pursuant to this Article 16.2.1, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer than All Parties)*, of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election not to participate in the first Exploratory Well shall be deemed a withdrawal pursuant to Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to the provisions of Article 17 *(Withdrawal From Agreement)*.  After the first Exploratory Well, or its substitute well, has been drilled to the Objective Depth, any Non-Consent Operations performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1 but shall be subject to the Hydrocarbon Recoupment premium set forth in Article 16.5.1 (*Non-Consent*

CONFIDENTIAL

APC-00741628

*Exploratory Operations*) except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

16.2.2 **Fabrication AFE:**    Within thirty (30) days of notice of the commencement of construction or acquisition of the initial Development System pursuant to the Fabrication AFE, any Non-Participating Party in such Fabrication AFE shall execute and deliver an assignment, effective on the first day of the month in which the construction or acquisition of the Development System is deemed to have commenced, pursuant to Article 12.14 *(Timely Operations for Development Systems),* of all of its right, title and interest in the Contract Area, including property and equipment acquired pursuant to this Agreement, to the Participating Parties in such Fabrication AFE, with no reimbursement by and at no Cost to such Participating Parties. If an assignment is made pursuant to this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer than All Parties),* of the Non-Participating Party's assigned interest.    The Non-Participating Party's Election not to participate in the Fabrication AFE for the initial Development System shall be deemed a withdrawal pursuant to Article 17 *(Withdrawal From Agreement),* and the Parties shall be subject to the provisions of Article 17 *(Withdrawal From Agreement)*.

16.3 **Costs and Liabilities of Prior Operations:**    Subject to Article 6.2.2 *(Supplemental AFEs)*, a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)*.

16.4 **Non-Consent Operations to Maintain Contract Area:**  If a proposal is made for

CONFIDENTIAL

APC-00741629

(a)   an activity or operation required under a governmental agency order, notice, regulation, or Lease in order to maintain all or any portion of the Contract Area; or

(b)   an activity or operation

(i)   within the final twelve (12) months of the primary term of a Lease which has no Producible Well and such Lease is not held by a unit, SOO or SOP, or

(ii)   within ninety (90) days of the deadline for any activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote or Election or unanimous agreement and such approval or agreement is not obtained within the applicable response period, then, notwithstanding any provisions to the contrary in Article 8 *(Approvals and Notices)*, the proposed activity or operation shall be deemed approved and any Parties who Voted or Elected or agreed by written statement to participate in the proposed activity or operation shall have the right to proceed with the proposed activity or operation at their sole Cost and risk.   However, before such Parties commence such activity or operation, they shall give written notice to the other Parties of their intention to commence the activity or operation.   The other Parties shall have a second opportunity to participate in such activity or operation, in accordance with Article 8.3 *(Second Opportunity to Participate)*.

**16.4.1**   <u>**Acreage Forfeiture in the Entire Contract Area**</u>:   If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain the entire Contract Area, then each Non-Participating Party in such activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area, including property and equipment acquired pursuant to this Agreement, within thirty (30) days of the

CONFIDENTIAL

commencement of such activity or operation.  Such assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in such activity or operation.  Failure to participate in such activity or operation is deemed a withdrawal, and the Parties will be subject to the provisions of Article 17 *(Withdrawal From Agreement)*.

16.4.2    **Acreage Forfeiture in a Portion of a Contract Area:**  If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain a portion of the Contract Area, then each Non-Participating Party in such activity or operation shall relinquish and permanently assign, effective on the date the operation commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area, including property and equipment acquired pursuant to this Agreement, within thirty (30) days of the commencement of such activity or operation.  Such assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in such activity or operation. Failure to participate in such activity or operation is deemed a withdrawal as to the affected portion of the Contract Area, and the Parties will be subject to the provisions of Article 17 *(Withdrawal From Agreement)*.  Upon MMS approval of such assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Contract Area.  If such assignment is to two or more Participating Parties in such activity or operation, then (a) the assigned acreage shall be deemed governed by an operating agreement incorporating identical terms and conditions as contained in this Agreement (unless clearly inappropriate), (b) the execution of the operating agreement by such Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare such operating agreement, and (d) the Participating Parties shall promptly execute it.

CONFIDENTIAL

APC-00741631

**16.4.3** **Limitations on Acreage Forfeiture:** Notwithstanding the foregoing, if more than one activity or operation is conducted in compliance with Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, any one of which would maintain the entire Contract Area or the affected portion of the Contract Area, a Participating Party in any one of those activities or operations shall not be required to make an assignment pursuant to Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.  In addition, no Party is required to relinquish or assign all or any portion of its Working Interest in the Contract Area if a governmental agency order, notice, regulation, Lease provision, SOO or SOP activity schedule, or unit plan of operation requiring the activity or operation is appealed and successfully overturned.

**16.5** **Percentage Hydrocarbon Recoupment and Underinvestment for Non-Consent Operations:**  Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, upon the timely commencement of any Non-Consent Operation, each Non-Participating Party's Working Interest in the Non-Consent Operation along with its title to that portion of any future Hydrocarbon production set forth in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation as determined pursuant to Article 8.4 *(Participation by Fewer Than All Parties)*.  A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Cost of the well operation prior to computation of the Hydrocarbon Recoupment amount for the Non-Consent Operation.

**16.5.1** **Non-Consent Exploratory Operations:**  The Hydrocarbon Recoupment amount for all Exploratory Operations conducted as Non-Consent Operations, except as provided in Article 16.2.1 *(First Exploratory Well)* is the Non-Participating Interest Share of the Costs of the Exploratory Operation multiplied by eight hundred percent (800%).

**16.5.2** **Non-Consent Appraisal Operations:** The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent

CONFIDENTIAL

APC-00741632

Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

16.5.3   **Non-Consent Project Team Proposals, Pre-Development AFEs or Development Plan**:   A Non-Participating Party in a Project Team proposal, Pre-Development AFE or Development Plan is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount such Party would have paid had it participated in such activity, operation or AFE until the Underinvestment is eliminated in accordance with Article 16.9 *(Settlement of Underinvestments)*.

16.5.4   **Non-Consent Development Operations**:     The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Development Operation multiplied by three hundred percent (300%).

16.5.5   **Non-Consent Subsequent Development System and Additional Facilities**:   The Hydrocarbon Recoupment amount for a non-consent Fabrication AFE for a subsequent Development System or additional Facilities not included in a Fabrication AFE is the Non-Participating Interest Share of the Cost incurred with respect to such Fabrication AFE or additional Facilities not included in a Fabrication AFE, as the case may be, multiplied by three hundred percent (300%).

16.5.6   **Additional Hydrocarbon Recoupment**:   In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)     three hundred percent (300%) of the Non-Participating Interest Share of the Cost of using any Development System already installed pursuant to this Agreement which is needed to service

CONFIDENTIAL

a well drilled or a Production System or Facilities installed as a Non-Consent Operation; plus

(b) two hundred percent (200%) of the Non-Participating Interest Share of the Cost of operating expenses (including operating Costs charged pursuant to Article 16.8.3), maintenance Costs, royalties, and severance, gathering and production taxes and other governmental fees based on production.

16.5.7 **Hydrocarbon Recoupment From Production:** Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

16.5.7.1 **Non-Consent Operations which Discover or Extend a Producible Reservoir:** If a Non-Consent Operation results in the discovery or extension of a Producible Reservoir, Hydrocarbon Recoupment will be taken from one hundred percent (100%) of the Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation is completed and produced, and from fifty percent (50%) of the Non-Participating Party's Participating Interest Share of all Hydrocarbons produced and saved from operations subsequently conducted in the Producible Reservoir discovered or in the extended portion discovered by such Non-Consent Operation.

16.5.7.2 **Non-Consent Operations in an Existing Producible Reservoir:** If a Non-Consent Operation does not result in the discovery or extension of a Producible Reservoir, Hydrocarbon Recoupment will be taken from one hundred percent (100%) of the Non-Participating Interest Share of Hydrocarbons produced and saved from the Non-Consent Operation if the Non-Consent Operation is completed and produced.

CONFIDENTIAL

APC-00741634

**16.5.7.3** <u>**Non-Consent Subsequent Development Systems**</u>: If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, Hydrocarbon Recoupment shall be taken from the Non-Participating Party's interest in Hydrocarbons produced and saved as follows:

(a) from one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever is applicable) of Hydrocarbons produced and saved from all Development Operations which are conducted from such subsequent Development System, and

(b) from one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever is applicable) of Hydrocarbons produced and saved from all wells which benefit from injection or disposal wells drilled and/or operated from such subsequent Development System.

**16.6** <u>**Restoration of Interests to Non-Participating Party**</u>: Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, a Non-Participating Party's Working Interest shall revert back to the Non-Participating Party, as of 7:00 a.m. of the day after the occurrence of the first of the following events:

(a) the well bore of the Non-Consent Operation does not qualify as a Producible Well on the date the permanent plugging and abandonment of the well concludes; or

(b) Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment from Production)* as result of the Non-Consent Operation permanently ceases prior to Complete Recoupment; or

CONFIDENTIAL

APC-00741635

(c)   the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well or Development Well and such well does not qualify as a Producible Well; or

(d)   upon Complete Recoupment,

and the settlement of the Underinvestment incurred with respect to such well, if any, in accordance with Article 16.9 *(Settlement of Underinvestments)*.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

**16.6.1   Dry Hole Reversion:** If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, results in an event set forth in Article 16.6 (a), (b), or (c) and a Non-Participating Party's Working Interest shall revert back to the Non-Participating Party, all well equipment in place as a result of such Non-Consent Operation and all Development Systems fabricated and installed as a result of such Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by such Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties.  Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

**16.6.2   Sidetracking or Deepening a Non-Consent Well:**   If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth)* and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of such well.  If the Participating Parties have recouped a portion, but

CONFIDENTIAL                                                                                    APC-00741636

not all, of the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party's Underinvestment balance shall be reduced by an amount equal to the amount recouped by the Participating Parties with respect to such Non-Participating Party. The Participating Parties in the original well shall be entitled to achieve Complete Recoupment in accordance with Article 16.5.7.1 or Article 16.5.7.2, whichever is applicable.

16.7 **Operations From a Non-Consent Subsequent Development System:** A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from such subsequent Development System.  If such Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment under Article 16 *(Non-Consent Operations)* for which it is still liable.  The Operator shall then distribute to the Participating Parties in the subsequent Development System their share of the payment based on the proportion in which they elected to carry the Non-Participating Interest Share(s).  Upon such payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

16.8 **Allocation of Development System Costs to Non-Consent Operations:** In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in such well or if the Participating Parties' Participating Interest Share in such Production System or Facilities are different from the Participating Interest Shares in such well,  the Costs to utilize such Production System or Facilities for such well shall be determined as follows:

16.8.1 **Investment Charges:**

The Participating Parties in such well shall pay to the Operator, for credit to the owners of the Development System, a one-time usage fee for the right to use the Development System.  Such usage fee shall be determined in accordance with Articles 16.8.1(a), 16.8.1(b) and

CONFIDENTIAL

APC-00741637

16.8.1(c) below.   However, the following slot and Facility usage fees shall not be assessed to a Participating Party for any Non-Consent well/Operation conducted and performed under an approved Development Plan.

(a)    A fee for slot usage will be determined as follows:

(i)    In the event the well uses a Production System with well slots and such Production System has no Facilities installed on it, the slot usage fee shall be an amount equal to two percent (2%) of the Cost of the Production System.  Such fee shall be shared by the owners of the Production System in proportion to their Participating Interest Share in the Production System.

(ii)    In the event the well uses a Production System with well slots and such Production System has Facilities installed on it, the slot usage fee shall be an amount equal to two percent (2%) of the Cost of the Production System attributable to well slots at the time of connection of the Non-Consent Well, determined as follows:

Slot Usage Fee    = two percent (2%) x [(Total Cost of Development System – Any Cost of Facilities Included In the Total Cost of Development System) x Well Slot Area %]

Well Slot Area %   = Deck Space Dedicated to Well Slots divided by (Deck Space Dedicated to Well Slots + Deck Space Dedicated to Facilities)

The Cost of Facilities [as used in Article 16.8.1 (a) and (b)] shall include the Cost of design, material, fabrication, transportation, installation and modifications of such Facilities.

For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by 0.83333% per month, commencing on the first day of the month following the

CONFIDENTIAL

APC-00741638

date the Production System was installed and continuing every month thereafter until the month actual drilling operations on such well is commenced; however, the total Cost of the Production System shall not be reduced by more than forty percent (40%) of the total Production System's Costs.  The Cost of additions to the Production System shall be reduced in the same manner commencing the first day of the month after the addition is installed.

If such well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in such well to utilize the Production System slot through which such well was drilled shall terminate unless such Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment.   If such substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in such well to utilize the Production System slot through which such well was drilled shall terminate.

No refund or credit of the slot usage fee shall be given or due if a subsequent well operation is conducted through the same system slot or if that Production System slot is restored to a usable condition.

If subsequent Non-Consent Operations (such as Workover, Recompletion, Deepening or Sidetracking operations) are conducted in any wellbore where either all Parties to this agreement participated in the original well drilling costs or a previous Non-Consent Operation was conducted, no slot usage fee shall be charged to the Participating Parties in the subsequent Non-Consent Operation.

The slot usage fee shall not apply to a slot deemed to be "surplus".  A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

CONFIDENTIAL

APC-00741639

(b)     The Participating Parties in such well shall pay to the owners of the Facilities a sum equal to that portion of the Total Cost of Facilities which the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities at the time such well is connected.  Throughput volume shall be estimated by the Operator using an average daily volume of the first three months of Hydrocarbon production from the Non-Consent Operation.

The "Total Cost of Facilities" [as used in this Article 16.8.1 (b)] shall include the Cost of design, material, fabrication, transportation, installation and modifications of such Facilities plus that portion of the Cost of the Development System attributable to Facilities Area.  The Facilities Usage Fee shall be based on the following:

Facilities Usage Fee = Total Cost of Facilities x Throughput Volume of Non-Consent Well divided by Total Design Throughput of Facilities

Total Cost of Facilities = Cost of Facilities + [(Total Cost of Development System – Any Cost of Facilities Included In the Total Cost of Development System) x Facilities Area %]

Facilities Area % = Deck Space Dedicated to Facilities divided by (Deck Space Dedicated to Well Slots + Deck Space Dedicated to Facilities)

For purposes of calculating the Facilities usage fee, the Total Cost of Facilities, shall be reduced by 0.83333% per month, commencing from the first day of the month following the date when the Facilities were installed and continuing every month thereafter until the first day of the month during which production from the Non-Consent Operation is commenced; however, the Total Cost of Facilities shall not be reduced more than forty percent (40%).  If modifications, expansions or additions to the

CONFIDENTIAL

APC-00741640

Facilities are made after commencing first production and prior to the connection of the Non-Consent Operation to the Facilities, such Facilities investment shall be reduced in the same manner as described above, from the first day of the month the Facilities modification, expansion or addition is completed until the first day of the month during which production from the Non-Consent Operation is commenced.

If modifications, expansions or additions are made to the Facilities after connection of the Non-Consent Well which benefit the Non-Consent Well, such Costs shall be shared by the Non-Consent Well based on that portion which the throughput volume of the Non-Consent Well bears to the total design throughput volume of the Facilities at the time of completion of such modification, expansion or addition.   The Non-Consent Well's throughput volumes shall be determined in the same manner as described above.

(c)   If Hydrocarbon production from the Non-Consent Well is handled through a Subsea Production System owned by all Parties, the Participating Parties shall pay to the owners of the Subsea Production System a sum equal to that portion of the total Cost of such Subsea Production System which one well bears to the total number of wells which the Subsea Production System is designed to accommodate.

**16.8.2**   **Payments:**   Payment of any usage fee shall not be deemed a purchase of an additional interest in the Production System or Facilities by the Participating Parties.  Such payments shall be included in the total amount which the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-Consent Operation pursuant to Article 16.5.6(a).

**16.8.3**   **Operating and Maintenance Charges:**   The Participating Parties in a well drilled as a Non-Consent Operation shall pay all Costs necessary to connect the well to   the Production System and the Facilities. The

APC-00741641

expense of operating and maintaining the Production System shall be allocated equally among all active completions served. Subsea Production System operating and maintenance expenses shall be allocated equally among all active subsea well completions served by such Subsea Production system. Operating and Maintenance costs for the Facilities which handle or process production shall be allocated to each well completion in the proportion that the volume throughput of the well completion bears to the total volume throughput of all well completions connected to the Facilities. Operating and maintenance expense for support facilities (e.g., electrical systems and living quarters) shall be allocated based on usage.

16.9   **Settlement of Underinvestments**: Except as provided in Article 16.9.1, upon a Non-Participating Party making a revised Election to participate in a specific proposal/operation, any applicable Underinvestment shall be settled through Disproportionate Spending with the Underinvested Party being responsible for and paying one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated. However, an Underinvestment under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* shall be settled through Disproportionate Spending with the Underinvested Party being responsible for and paying one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs pursuant to this Agreement in which one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated. If any Party is simultaneously both an Underinvested Party and an Overinvested Party under any provision(s) of this Agreement, the Underinvestment shall first be reduced by the amount of the Overinvestment prior to any further settlement of the Underinvestment under this Article 16.9.

CONFIDENTIAL

**16.9.1** **Cash Settlement of Underinvestment:** If the Parties do not plan or propose any further activities or operations pursuant to this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvested amount in cash in accordance with the applicable provisions of Exhibit "C". If Disproportionate Spending within the Contract Area does not eliminate an Underinvestment within two (2) years from the date the Underinvestment is incurred, or upon final accounting and settlement pursuant to this Agreement, or the Underinvested Party or the Overinvested Party withdraws from the Contract Area in accordance with Article 17 *(Withdrawal From Agreement)*, whichever first occurs, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash in accordance with the applicable provisions of Exhibit "C".

## ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

**17.1** **Right to Withdraw:** Subject to the provisions of this Article, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw (the "withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal which shall be at least sixty (60) days, but not more than one hundred eighty (180) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving such written notice to join in the withdrawal are "Other Withdrawing Parties". The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production and all other property and equipment owned under the terms of this Agreement.

CONFIDENTIAL

**17.2**   **Response to Withdrawal Notice:**   Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**17.2.1**   **Unanimous Withdrawal:**   If all the other Parties join in the withdrawal,

(a)   no assignment of Working Interests shall take place;

(b)   no further proposals may be made under this Agreement unless agreed by all Parties;

(c)   the Parties shall abandon all activities and operations within the Contract Area and relinquish all of their Working Interests to the MMS within one hundred eighty (180) days of the conclusion of the thirty (30) day joining period; and

(d)   notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage),* the Operator shall:

(i)   furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within ninety (90) days after the conclusion of the thirty (30) day joining period; and

(ii)   cease operations and begin to permanently abandon all wells, Production Systems and Facilities in accordance with the abandonment plan.

**17.2.2**   **No Additional Withdrawing Parties:**   If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest.

**17.2.3**   **Acceptance of the Withdrawing Parties' Interests:**   If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall

CONFIDENTIAL

APC-00741644

submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make such written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within one hundred twenty (120) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

17.2.4   **Effects of Withdrawal**:   Except as specifically provided elsewhere herein to the contrary, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Contract Area, other than those activities or operations for which they retain a financial responsibility.   The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

17.3   **Limitation Upon and Conditions of Withdrawal**:

17.3.1   **Prior Expenses**:   The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of any Costs of activities, operations, rentals, royalties, taxes, damages or other liability or expense accruing or relating to operations (i) conducted prior to the effective date of the

CONFIDENTIAL

APC-00741645

withdrawal or (ii) approved by the Withdrawing Party and Other Withdrawing Parties prior to the effective date of the withdrawal or (iii) which the Operator has commenced under one of its discretionary powers authorized under this Agreement prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their share of all identifiable Costs set forth above in this Article 17.3.1, and (2) their Participating Interest Share of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities and other material and equipment serving the Contract Area, less their Participating Interest Share of the estimated salvage value of the assets at the time of abandonment, as approved by the Parties by Vote. Such expenses, Costs and salvage value shall be prepared by the Operator in accordance with Exhibit "C". Prior to accomplishing their withdrawal, the Withdrawing Party and Other Withdrawing Parties shall pay to the Operator, for the benefit of the Remaining Parties, the amount of such statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities which they have incurred or which are attributable to them prior to the effective date of the withdrawal. Any liens, charges and other encumbrances which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its or their withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to such liens, charges and other encumbrances).

17.3.2 **Confidentiality:** The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties any Confidential Data acquired prior to the effective date of the withdrawal.

CONFIDENTIAL

APC-00741646

**17.3.3** **Emergencies and Force Majeure:** No Party may withdraw during a Force Majeure or emergency which poses a threat to life, safety, property or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the Force Majeure or emergency.

## ARTICLE 18 – ABANDONMENT AND SALVAGE

**18.1** **Abandonment of Wells:** Any Participating Party may propose the permanent plugging and abandonment of a well which has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the plugging and abandonment of the well. If the plugging and abandonment proposal is unanimously agreed to by the Participating Parties in such well, the well shall be plugged and abandoned in accordance with the applicable regulations at the Cost and risk of the Participating Parties. If the Participating Parties do not unanimously agree to plug and abandon the well, and no proposal to conduct further Development Operations in the well proposed to be abandoned has been made within the response period for the proposed abandonment, the Operator shall prepare an estimate of the Costs of plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C", and each Participating Party desiring to plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its proportionate share of such estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus.

CONFIDENTIAL

APC-00741647

**18.1.1 <u>Assignment of Interest</u>:**  Each Party desiring to abandon ("Abandoning Party") a wellbore under Article 18.1 (*Abandonment of Wells*) shall assign to the non-abandoning Party or Parties, effective as of the first day of the month following the last applicable election date for the abandonment proposal, all of its Working Interest insofar only as it pertains to such wellbore, including the equipment used solely in connection with such wellbore, and including Hydrocarbon production from the zone then open to production in the well proposed to be abandoned. Thereafter, the non-abandoning Parties shall own the interest assigned in the proportion that the Participating Interest of each non-abandoning Party bears to the total of their Participating Interests.  Any Abandoning Party that delivers such an assignment shall be relieved from any further liability with respect to said well, subject to making the Cost settlement provided for in Article 18.1 (*Abandonment of Wells*), provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Hydrocarbons produced from any other portion of a Contract Area nor in the ownership in any other property and equipment owned by the Parties.  Operator shall continue to operate the wellbore, in which such assignment under this Article 18.1.1 has been made, for the account of the non-abandoning Parties.

**18.2 <u>Abandonment of Facilities and Production Systems</u>:**  Any Participating Party in a Production System or Facility may propose the abandonment and disposition of such equipment.  If such proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of such equipment at the Cost and risk of the Participating Parties.  If any Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Production System or Facilities.  If all Participating Parties do not approve abandoning and disposing of the Production System or Facilities, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposal of the Production System or Facilities, less the estimated salvage value of the Production System or Facilities, as determined under Exhibit "C", and each Participating Party desiring to abandon and dispose of the Production System or Facilities shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its proportionate share of such estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater

CONFIDENTIAL

than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus.

**18.2.1** **Assignment of Interest**:   Each Party desiring to abandon ("Abandoning Party") a Facility or Production System under Article 18.2 (*Abandonment of Facilities and Production Systems*) shall assign to the non-abandoning Party or Parties, effective as of the first day of the month following the last applicable election date for the abandonment proposal, all of its right, title and interest in the Facility or Production System, including the equipment used solely in connection with such Facility or Production System. Thereafter, the non-abandoning Parties shall own the interest assigned in the proportion that the Participating Interest of each non-abandoning Party bears to the total of their Participating Interests.   Any Abandoning Party that delivers such an assignment shall be relieved from any further future liability with respect to said Facility or Production System, subject   to making the Cost settlement provided for in Article 18.2 (*Abandonment of Facilities and Production Systems*), provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Hydrocarbons produced from any other portion of a Contract Area nor in the ownership in any other property and equipment owned by the Parties.  Operator shall continue to operate the Facility or Production System in which such assignment under this Article 18.2.1 has been made, for the account of the non-abandoning Parties at the rates and charges contemplated by this Agreement, plus any additional cost and charges which may arise as the result of the separate ownership of said Facility or Production System.

**18.3** **Disposal of Surplus Material**:  Material acquired under this Agreement may be classified as surplus by the Operator when the Operator deems it is no longer needed in present or foreseeable activities or operations.  The Operator shall determine the value and Cost of disposing of the materials in accordance with Exhibit "C".  If the material is classified as junk or if the value, less the Cost of

CONFIDENTIAL

APC-00741649

disposal, is less than or equal to three hundred thousand Dollars ($300,000), the Operator may dispose of the surplus materials in any manner it deems appropriate.  If the value, less the Cost of disposal of the surplus material, is greater than three hundred thousand Dollars ($300,000), the Operator shall give written notice thereof to the Parties owning the material, and the surplus material shall be disposed of in accordance with the method of disposal approved by a Vote of the Parties owning the material.  Subject to Article 16.6.1 *(Dry Hole Reversion)*, proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of the retirement or disposition of the material.

18.4   **Abandonment Operations Required by Governmental Authority:**   The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds of such abandonment and disposal will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

# ARTICLE 19 – RENTALS, ROYALTIES AND MINIMUM ROYALTIES

19.1   **Burdens on Hydrocarbon Production:**  If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest or other type of burden on Hydrocarbon production other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment under this Agreement of all or a portion of that Party's Working Interest to another party.  The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Lease Burden.

19.1.1   **Subsequently Created Lease Burdens:**  Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this

CONFIDENTIAL

Agreement, creates a Lease Burden, such Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which any Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well pursuant to Article 18.1, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" *(Security Interest Provisions)* will be applicable against such Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F" *(Security Interest Provisions)*.

19.2    **Payment of Rentals and Royalties:**    The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely payment of such rentals, all minimum royalties or other similar payments accruing under the terms of the Leases. Upon receipt of proper evidence of such payments and the Operator's invoice for its proportionate share of such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of such payments.  In the event Operator fails to make proper payment of any rental, minimum royalty or other similar payments accruing under the terms of a Lease through mistake or oversight where such payment is required to continue such Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss which results from such non-payment unless such non-payment is due to the Gross Negligence or Willful Misconduct of the Operator.  The loss of a Lease or interest therein which results from the Operator's failure to pay or the Operator's erroneous payment of a rental, minimum royalty or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof.  For production delivered in-kind by the Operator to a Non-Operating Party or to another for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in a

CONFIDENTIAL

APC-00741651

timely manner in order for the Operator to make payments of any minimum royalties due.

**19.2.1**  **Non-Participation in Payments:**  If any Party notifies the other Parties, in writing at least sixty (60) days prior to the date on which such payment is due, of its intention not to pay its share of any rental, minimum royalty or other similar payments, then such Party shall be deemed to have given a withdrawal notice pursuant to Article 17 *(Withdrawal From Agreement)*, which means that such Party must withdraw from the entire Contract Area, not just the Lease on which such payment is due.  Upon this occurrence, the Operator shall make such payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of such payment based on the results of the procedures set forth in Article 17.2 *(Response to Withdrawal Notice)*.

**19.2.2**  **Royalty Payments:**  Each Party shall pay or cause to be paid all royalty and other amounts payable which are based on its share of Hydrocarbon production.  When the Participating Parties are recouping their Costs from a Non-Consent Operation and any applicable premium in accordance with Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*) and its sub-articles, each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.

# ARTICLE 20 – TAXES

**20.1**  **Internal Revenue Provision:**  Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations hereunder do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar

CONFIDENTIAL

provisions of applicable state laws if for federal income tax purposes this Agreement and the activities and operations hereunder are regarded as a partnership.

20.2    **Other Taxes and Assessments**:   The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and assessments levied with respect to activities and operations conducted under this Agreement.   The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator.   The Operator will charge each Party its Working Interest share of all taxes and assessments paid and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements and receipts for such taxes.   The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

20.2.1    **Property Taxes**:   The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party.   The Operator shall timely and diligently protest any valuation of the Leases for tax purposes it deems unreasonable.   Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on the Leases at the assessed value of the Leases.   If upon final determination, any additional taxes are due or if any interest or penalty has accrued as a result of such protest, the Operator shall pay such taxes, interest or penalty and charge each Party its Working Interest share of such taxes, interest or penalty in accordance with Exhibit "C".

20.2.2    **Production and Severance Taxes**:   Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it receives pursuant to this

CONFIDENTIAL                                                                APC-00741653

Agreement.   Each Party shall upon written request from the Operator, provide evidence that such taxes have been paid.

## ARTICLE 21 – INSURANCE AND BONDS

**21.1**   **Insurance:**   The Operator shall provide and maintain the insurance coverage specified in Exhibit "B" and charge such Costs to the Joint Account.   No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

**21.2**   **Bonds:**   Operator shall obtain and maintain all bonds or financial guarantees required by any applicable law, regulation or rule.   The Costs of such bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of such bond or financial guarantee if Operator provides such bond or guarantee itself and does not engage a third party to do so.   Operator shall require all contractors to obtain and maintain all bonds required by any applicable law, regulation or rule.

## ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

**22.1**   **Individual Obligations:**   The obligations, duties and liabilities of the Parties are several and not joint or collective; and, except as may be provided in Article 20 *(Taxes)*, nothing contained herein shall be construed as creating a partnership, joint venture, association or other form of business entity recognizable in law for any purpose.   In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective self-interests.

**22.2**   **Notice of Claim or Lawsuit:**   If, on account of any matter involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, a claim is made against any Party, or if any party outside of this Agreement files a lawsuit against a Party, or if any Party files a lawsuit, or if a Party receives notice

CONFIDENTIAL

APC-00741654

of a material administrative or judicial hearing or other proceeding, such Party shall give written notice of the claim, lawsuit, hearing or proceeding ("Claim") to the other Parties as soon as reasonably practicable.

**22.3**   **Settlements:**   The Operator may settle any single claim or lawsuit, or multiple claims or lawsuits arising out of the same incident, involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, if the aggregate expenditure does not exceed three hundred thousand ($300,000) and if the payment is in complete settlement of such claim or lawsuit.  If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or lawsuit pursuant to Article 22.4 (*Defense of Claims and Lawsuits*).

**22.4**   **Defense of Claims and Lawsuits:**   The Operator shall supervise the handling, conduct, or prosecution of any Claims, involving activities or operations under this Agreement or affecting the Leases or the Contract Area.  Claims may be settled in excess of the amount specified in Article 22.3 (*Settlements*) above if approved by Vote of the Participating Parties in the activity or operation out of which the Claim arose; however, any Party shall have the right to independently settle any Claim or the portion of any Claim which is attributable to its Participating Interest Share alone as long as such settlement does not directly adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge any final judgment, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the selection of such counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which such Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

CONFIDENTIAL

APC-00741655

**22.5** **Liability for Damages:** Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses or Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area which are not covered by or are in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which such liability arises, except that when liability results from the Gross Negligence or Willful Misconduct of a Party, such Party shall be solely responsible for liability resulting from its Gross Negligence or Willful Misconduct.

**22.6** **Indemnification for Non-Consent Operations:** To the extent allowed by law, the Participating Parties will HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND AND INDEMNIFY them against all claims, demands, liabilities, regulatory decrees and liens for environmental pollution and property damage or personal injury, including sickness and death, caused by, arising out of, or incidental to Non-Consent Operations, and any loss and cost suffered by any Non-Participating Party as an incident thereof, except when such loss or cost results from the sole, concurrent, or joint negligence, fault or strict liability of any Non-Participating Party, in which case each Party shall pay or contribute to the settlement or satisfaction of judgment in the proportion that its negligence, fault or strict liability caused or contributed to the incident. Should any indemnity contained herein be determined to be in violation of law or public policy, said indemnity shall then be enforceable only to the maximum extent allowed by law.

**22.7** **Damage to Reservoir, Loss of Reserves and Profits:** Notwithstanding anything to the contrary in this Agreement, no Party is liable to any other Party for damage to a reservoir, loss of Hydrocarbons, or for loss of profits or for other consequential, business interruption or punitive damages, except if such damage or loss arises from a Party's Gross Negligence or Willful Misconduct in which case the Party's liability shall be limited solely to liability resulting from its Gross Negligence or Willful Misconduct, nor does any Party indemnify any other Party for such damage or loss.

CONFIDENTIAL

APC-00741656

**22.8** **Non-Essential Personnel:** A Non-Operating Party, who requests transportation or access, or both, to a drilling rig, Production System, vessel or any other facility utilized for activities or operations under this Agreement, agrees to HOLD THE OTHER PARTIES HARMLESS AND TO RELEASE, DEFEND AND INDEMNIFY them against (i) all claims, demands and liabilities for property damage y and (ii) all claims, demands and liabilities for any loss or cost suffered by any Party as an incident thereof, including, but not limited to, sickness and death, caused by, arising out of, or incidental to such transportation or access, or both, INCLUDING CLAIMS, DEMANDS, AND LIABILITIES RESULTING FROM SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT OR STRICT LIABILITY OF THE INDEMNIFIED PARTY, but excluding claims, demands and liabilities resulting from or arising out of the Gross Negligence or Willful Misconduct of the indemnified Party.

**22.9** **Dispute Resolution Procedure:** Any claim, controversy or dispute arising out of, relating to or in connection with this Agreement or any activity or operation conducted hereunder, shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

## ARTICLE 23 – CONTRIBUTIONS

**23.1** **Contributions from Third Parties:** A "Contribution" means a bottom hole cash contribution, dry hole cash contribution or acreage contribution from third parties as consideration for data from wells or well operations on the Contract Area. This Article 23 does not apply to the following:

(a) Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling or engineering data from third parties. Such trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data)*.

(b) Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, loans and other financial arrangements.

CONFIDENTIAL

(c)    A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

**23.2    Methods of Obtaining Contributions:**    The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation. A Contribution may be obtained in the following ways:

(a)    Any Participating Party in a well or well operation may propose that the Participating Parties in such well or well operation seek a Contribution from a third party towards such well or well operation.

(b)    If a Participating Party in a well or well operation receives a Contribution offer for such well or well operation from a third party, such Party shall notify all other Participating Parties in such well or well operation of the terms of such offer within five (5) days of its receipt of such offer.

**23.3    Counteroffers:**  If a third party makes a counteroffer to the Participating Parties' offer, or if a Participating Party proposes to make a counteroffer to a third party offer, the Operator shall submit the counteroffer to the other Participating Parties.

**23.4    Approval of Contributions:**  Such proposals and the acceptance of an offer or a counteroffer from a third party require the unanimous agreement of the Participating Parties in the well or well operation, who shall respond within thirty (30) days of their receipt of a notice of a Contribution proposal, offer or counteroffer.

**23.5    Cash Contributions:**  If a bottom hole or dry hole cash Contribution is offered and accepted, such cash Contribution shall be paid to the Operator and the Operator shall credit the amount of the cash Contribution against the Costs of such well or well operation to each Participating Party in proportion to its Participating Interest Share.  Such cash Contribution shall be deducted from the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount which the Participating Parties are entitled to receive from the Non-Participating Parties in accordance with Article 16 *(Non-Consent Operations)* and from the Underinvestment, if any, attributable to such operation.

CONFIDENTIAL

23.6   **Acreage Contributions:**   Any acreage Contribution, which is offered and accepted in accordance with this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein.  The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Contract Area.

23.6.1   **Two or More Parties Own 100% of the Acreage Contribution:**  If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed governed by an operating agreement incorporating identical terms and conditions as contained in this Agreement (unless clearly inappropriate), (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) once prepared, the Parties participating in the acreage Contribution shall promptly execute the operating agreement.

23.6.2   **Two or More Parties Own Less Than 100% of the Acreage Contribution:**   If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then such Parties shall use reasonable efforts to negotiate and execute with the other working interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

CONFIDENTIAL

APC-00741659

# ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE

24.1   **Transfer of Interest:**  Except as provided in 24.1.1, any Transfer of Interest shall be preceded by written notice to the Operator and the other Parties ("the transfer notice").  Subject to the limitations set forth in Article 12.1.2, if the proposed Transfer of Interest includes any Working Interest acquired from a Non-Participating Party pursuant to Article 16.2.2, such Non-Participating Party ("Former Party") shall receive written notice of the proposed Transfer of Interest. Any Transfer of Interest shall be made to a party financially capable of assuming the obligations hereunder.  No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights set forth in Exhibit "F" *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of such obligations and liabilities.

24.1.1   **Exceptions to Transfer Notice:**  Notwithstanding any provision of this Agreement to the contrary, the transfer notice is not required when a Party is assigning all or an undivided part of its Working Interest to an Affiliate; or a Party is assigning an overriding royalty interest, net profits interest, production payment, etc. to an Affiliate or a Third Party; or a Party assigns substantially all of a Party's assets in the Gulf of Mexico; or a Party proposes to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by such security device), any Production Systems, Facilities or equipment.  However, any encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

24.1.2   **Effective Date of Transfer of Interest:**  The effective date of any Transfer of Interest shall be at least sixty (60) days but not more than one hundred eighty (180) days after the date of the transfer notice.  No Transfer of Interest, other than those provided in Article 24.1.1 *(Exceptions to Prior Written Notice),* is binding upon the Parties unless and until the assignor or assignee provides all remaining Parties with (i) a photocopy of a fully executed Transfer of Interest, and if required, an

CONFIDENTIAL

APC-00741660

executed MMS Form 1123, "Designation of Operator" and (ii) evidence of receipt of any necessary approval by the MMS. The Parties shall promptly join in such reasonable actions as may be necessary to secure such approvals and shall execute and deliver any and all documents necessary to effect any such Transfer of Interest. Any costs attributable to such a Transfer of Interest are the sole obligation of the assigning Party.

**24.1.3** **Minimum Transfer of Interest:** Notwithstanding the prior agreements affecting the Contract Area as described on Exhibit "A", except as otherwise provided in this Agreement, any Transfer of Interest shall cover an undivided Working Interest in the entire Contract Area. No Transfer of Interest to a third party shall be made that is not at least an undivided ten percent (10%) Working Interest in the entire Prospect Contract Area unless unanimous agreement of the Parties is obtained.

**24.1.4** **Form of Transfer of Interest:** Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all of the assigning Party's obligations under this Agreement. Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

**24.1.5** **Warranty:** Any Transfer of Interest, vesting or relinquishment of Working Interest or other interest between the Parties under this Agreement shall be made without warranty of title or any other warranty, express or implied, including, without limitation any warranty as to merchantability, quality, quantity, or fitness for a particular purpose; however all encumbrances made by assignor or known by assignor shall be disclosed to assignee.

**24.2** **Preferential Right to Purchase:** Subsequent to reaching the Objective Depth in the first Exploratory Well, any Transfer of Interest shall be subject to the following provisions:

CONFIDENTIAL

APC-00741661

**24.2.1**   **Notice of Proposed Transfer of Interest:**   The transfer notice shall provide full information about the proposed Transfer of Interest, including, but not limited to, the name and address of the prospective assignee (who must be ready, willing, and able to acquire the interest and deliver the stated consideration therefore), the full consideration for the Transfer of Interest and all other terms of the offer.

In the case of a Transfer of Interest that is part of a transaction involving interests outside the Contract Area, or if the proposed Transfer of Interest is structured as a like-kind exchange, the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by such prospective assignee.   The provisions of Article 24.2 *(Preferential Right to Purchase)* and its sub-articles shall only apply to the Working Interest which is subject to the Transfer of Interest.

**24.2.2**   **Exercise of Preferential Right to Purchase:**   Within thirty (30) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties.  If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered and the non-assigning Parties who wish to exercise their preferential right to purchase do not agree to pay the full consideration for the Transfer of Interest and to accept all of the other terms of the third party offer with respect to the Working Interest subject to the proposed transaction within fifteen (15) days after the thirty (30) period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party shall be free to complete the proposed conveyance on the terms disclosed in the notice.  If the other non-assigning Parties agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer, the

CONFIDENTIAL                                                                                    APC-00741662

assigning Party shall transfer the Working Interest to the non-assigning Parties who exercised their preferential right to purchase in accordance with this Article 24 *(Transfer of Interest and Preferential Right to Purchase)*. If more than one Party elects to acquire the Working Interest offered, then each such Party shall acquire a proportion of the Working Interest offered equal to the ratio its own pre-acquisition Working Interest bears to the total pre-acquisition Working Interests of all acquiring Parties (unless the acquiring Parties agree upon a different ratio). The Transfer of Interest shall be concluded within a reasonable time, but no later than one hundred eighty (180) days after the applicable period in which the non-assigning Parties may exercise their preferential right to purchase.

24.2.3 <u>**Transfer of Interest Not Affected by the Preferential Right to Purchase:**</u>  Article 24.2 shall not apply when a Party proposes to:

(a) mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by such security device), or

(b) dispose of its Working Interest by:

(i)  (ii)  merger, reorganization or consolidation;

(iii)  a Transfer of Interest of substantially all of a Party's exploration and production properties in the deepwater Gulf of Mexico;

(iv)  a Transfer of Interest to an Affiliate, provided there is included in such Transfer of Interest a provision that if for any reason such assignee ceases to be an Affiliate of such Party within two (2) years of the Transfer of Interest, such rights shall be immediately reassigned to the original Party before such assignee ceases to be an Affiliate, and that all rights of the assignee in the Prospect Contract

CONFIDENTIAL

APC-00741663

Area shall terminate if such re-assignment does not take place.

24.2.4 **Completion of Transfer of Interest:**  If the proposed Transfer of Interest is not executed and filed of record with the MMS within one hundred eighty (180) days after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 (*Preferential Right to Purchase*).

## ARTICLE 25 – FORCE MAJEURE

25.1 **Force Majeure:**  If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, then the Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it.  Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.   Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

## ARTICLE 26 – ADMINISTRATIVE PROVISIONS

26.1 **Term:** This Agreement shall remain in effect so long as any Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities and equipment have been

CONFIDENTIAL

APC-00741664

disposed by the Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement.   In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, however the Agreement shall remain in effect until (a) through (d) hereinabove have been completed.   Termination of this Agreement shall not relieve a Party of any liability or obligation accrued or incurred before termination and is without prejudice to any continuing confidentiality obligations or other obligations provided in this Agreement.

26.2   **Waiver:**   A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.   The failure or delay of any Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.   Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

26.3   **Waiver of Right to Partition:**   Each Party waives the right to bring an action for partition of its interest in the Contract Area, Production System, Facilities and equipment held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

26.4   **Compliance With Laws and Regulations:**   This Agreement, and all activities or operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.

26.4.1   **Applicable Law:**   THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO THE FEDERAL LAWS OF THE

CONFIDENTIAL   APC-00741665

UNITED STATES OF AMERICA TO THE EXTENT APPLICABLE, AND TO THE EXTENT STATE LAW MAY BE APPLICABLE, BY THE INTERNAL LAWS OF THE STATE OF LOUISIANA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.

26.4.2  **Severance of Invalid Provisions:**  If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity.   Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated.   The surviving provisions of this Agreement will remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void.

26.4.3  **Fair and Equal Employment:** Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated herein by reference.   The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated herein by reference.   In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" attached hereto, pertaining to nonsegregated facilities.

## 26.5  Construction and Interpretation of this Agreement

26.5.1  **Headings for Convenience:**   Except for the definition headings contained in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences and paragraph headings used in this Agreement

CONFIDENTIAL

are inserted for convenience only and in no way define or limit the scope or intent of this Agreement.

26.5.2   **Article References:**   Unless specifically indicated otherwise, a reference to an article of this Agreement shall include all of the referenced article and its sub-articles.

26.5.2   **Gender and Number:**   The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof. Reference herein to the singular of a noun or pronoun includes the plural and vice versa.

26.5.3   **Joint Preparation:**   This Agreement shall be deemed for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party or the other as a result of the preparation, submittal, or other event of negotiation, drafting, or execution hereof.

26.5.4 **Integrated Agreement:**   This Agreement and the  Like-Kind Exchange Agreement contain the final and entire agreement of the Parties for the matters covered herein and, as such, supersedes all prior written or oral communications and agreements.   This Agreement may not be modified or changed except by written amendment signed by the Parties.   In the event of a conflict between this Agreement and the Like-Kind Exchange Agreement, the  Like-Kind Exchange Agreement shall prevail.   For purposes of a conflict as referenced in the previous sentence, a conflict shall only exist if a statement or concept in said Like Kind Exchange Agreement can not be read to be consistent and/or in conjunction with a statement or concept in this Agreement.

26.5.5   **Binding Effect:**   To the extent assignable hereunder, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land comprising the Contract Area.   This Agreement

CONFIDENTIAL

APC-00741667

does not benefit or create any rights in any person or entity not a Party to this Agreement.

**26.5.6** **Further Assurances:**  Each Party will take any actions necessary and will sign any documents necessary to implement the terms of this Agreement.  Unless otherwise provided in this Agreement, all Parties within (30) days of their receipt of a written request for such documents from a Party shall prepare and execute such documents.

**26.5.7** **Counterpart Execution:**  This Agreement may be executed by signing the original or a counterpart thereof.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement, but no Party shall be bound to this Agreement unless and until all Parties have executed a counterpart or the original.  This Agreement may also be ratified by a separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

**26.6** **Restricted Bidding:**  If at any time during the term of this Agreement, more than one of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the Minerals Management Service pursuant to 30 CFR 256.44, then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement.

CONFIDENTIAL

APC-00741668

EXECUTED on the dates set forth below each signature but effective as of April 1, 2008.

**Anadarko E&P Company LP**

By:

Its: Agent & Attorney-in-Fact

Date: May 7, 2008

Witnesses

**ConocoPhillips Company**

By: Jim M. Higgins

Its: Attorney-in-Fact

Date: May 7, 2008

Signature page for that certain Operating Agreement date effective April 1, 2008 between Anadarko E&P Company LP and ConocoPhillips Company covering the following Leases:

OCS-G 20259 WR 8; OCS-G 31938 WR 51; OCS-G 25232 WR 52

CONFIDENTIAL

APC-00741669

## Exhibit "A"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

### DESCRIPTION OF PROSPECT AREA, LEASES, WORKING INTEREST OF THE PARTIES, AND REPRESENTATIVES

**I.     DESCRIPTION OF PROSPECT AREAS AND LEASES:**

| OCS-G No. | Area | Block | Expiration Date |
|---|---|---|---|
| 20259 | Walker Ridge | 8 | June 30, 2008 |
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2013 |

**II.     WORKING INTEREST OF THE PARTIES:**

ConocoPhillips Company                          70.00%*
Anadarko E&P Company LP                     30.00%*

**III.     EXISTING OVERRIDING ROYALTY INTERESTS:**

*Exxon Mobil Corporation                          1.50% (ConocoPhillips – 1.05%;
                                                                          Anadarko 0.45%)
*Nexen Petroleum Offshore U.S.A. Inc.     0.50% (ConocoPhillips – 0.35%;
                                                                          Anadarko 0.15%)

For reference, please see (i) that certain Letter Agreement dated March 26, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Exxon Mobil Corporation; (ii) that certain Letter Agreement dated March 31, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Nexen Petroleum Offshore U.S.A. Inc.; (iii) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Exxon Mobil Corporation, as Assignee; (iv) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between ConocoPhillips Company, as Assignor, and Exxon Mobil Corporation, as Assignee; (v) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee; and (vi) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between ConocoPhillips Company, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee.

**IV.     OPERATOR:**  Anadarko E&P Company LP

JOAEXHIBITA.doc

CONFIDENTIAL

APC-00741670

V.    ADRESSES, CONTACT INFORMATION AND PARTY REPRESENTATIVES:

|  | **ConocoPhillips Company** | **Anadarko E&P Company LP** |
|---|---|---|
| Mail: | P. O. Box 2197<br>Houston, TX 77252 | P.O. Box 1330<br>Houston, TX 77251-1330 |
| Office: | 550 Westlake Park Blvd.<br>Three Westlake Park, Suite 3000<br>Houston, TX 77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone:<br>Facsimile: | (832) 486-2039<br>(832) 486-2691 | Telephone:    (832) 636-8831<br>Facsimile:    (832) 636-8059 |

**END OF EXHIBIT "A"**

JOAEXHIBITA.doc

CONFIDENTIAL

APC-00741671

EXHIBIT "B"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

### INSURANCE PROVISIONS

Operator shall carry insurance as follows for the benefit and protection of the Parties to this Agreement:

1.  Insurance which shall comply with all applicable Worker's Compensation and Occupational Disease laws and which shall cover all of Operator's employees performing work.  Such insurance must also be endorsed, if applicable, to cover claims under the United States Longshoremen's and Harbor Workers' Compensation Act extended to include the Outer Continental Shelf, the Jones Act, and other maritime law.  Employer's Liability Insurance shall be provided with a limit of $1,000,000 per accident.

2.  Operator may include the aforesaid risks under its self-insurance program provided Operator complies with applicable laws and, in such event, Operator shall charge to the Joint Account a premium determined by applying manual insurance rates to the payroll.

3.  Operator shall not be obligated or authorized to obtain or carry on behalf of the Joint Account any additional insurance covering the Parties or the operations to be conducted hereunder without the consent and agreement of all Parties.  Each Party individually may acquire at its own expense such insurance as it deems proper to protect itself against claims, losses, or damages arising out of the operations conducted under the Operating Agreement, provided that such insurance shall include a waiver of subrogation against the other Parties in respect of their interests hereunder.  All uninsured losses and all damages to jointly owned property shall be borne by the Parties in proportion to their respective cost interests.

4.  Operator shall promptly notify Non-Operating Parties in writing of all losses involving damage to jointly owned property in excess of $300,000.

5.  Operator shall require all contractors engaged in operations under this Agreement to comply with the applicable Worker's Compensation laws and to maintain such other insurance and in such amounts as Operator deems necessary.

6.  In the event fewer than all Parties participate in an operation conducted under the terms of this Agreement, then the insurance requirement and costs, as well as all losses, liabilities, and expenses incurred as the result of such operation, shall be the burden of the Party or Parties participating therein.

CONFIDENTIAL

# EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008, by and between
ConocoPhillips Company and Anadarko E&P Copmany LP

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

   All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning as in the Agreement to which this is attached.

   **"Agreement"** shall mean the operating agreement between the Parties to which this Accounting Procedure is attached.

   **"Equalized Freight"** shall mean the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest railway receiving point to the property

   **"Joint Property"** shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

   **"Joint Operations"** shall mean all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment and restoration of the Joint Property.

   **"Joint Account"** shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   **"Operator"** shall mean the Party designated to conduct the Joint Operations.

   **"Non-Operators"** shall mean the Parties to this agreement other than the Operator.

   **"Parties"** shall mean legal entities signatory to the Agreement, or their successors or assigns, to which this Accounting Procedure is attached.

   **"Supervisors"** shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   **"Technical Employees"** shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   **"Personal Expenses"** shall mean travel, temporary living expenses, relocation costs, and other reimbursable expenses of Operator's employees as well as Non-Operator's employees whose costs are chargeable to the Joint Account under Section II.2.A.

   **"Material"** shall mean personal property, equipment, supplies, or consumables acquired or held for use on the Joint Property.

   **"Controllable Material"** shall mean Material that at the time of acquisition of disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies.

   **"Shore Base Facilities"** shall mean onshore support facilities that during drilling, development, maintenance, producing, and abandonment operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services, communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

   **"Offshore Facilities"** shall mean platforms, productions systems, development systems and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine

CONFIDENTIAL

docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

**"Project Team"** shall mean employees of the Parties directly assigned to perform work and/or studies as defined under the terms of the Agreement.

**"Affiliate"** shall have the same meaning as in the Agreement.

2. **Statements and Billings**

    A.    Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be summarized by major Material classification. Intangible drilling costs and audit exceptions shall be separately and clearly identified.

    B.    Non-Operators shall bill the Operator, on a monthly basis, in accordance with the provisions contained herein, for the salaries, wages, payroll burden, and Personal Expenses, if any, of its employees assigned to the Project Team. In a like manner, the Non-Operator shall bill the Operator for such expenses of the Non-Operator's Affiliate employees and/or contractor employees retained by the Non-Operator who are assigned to the Project Team. The Operator shall reimburse the Non-Operators in accordance with Section I, Paragraph 3.B. For the purposes of Paragraphs 3, 4, and 5 of this Section I, the Non-Operator's costs which are billable pursuant to this Agreement shall be considered a Joint Account.

3. **Advances and Payments by Non-Operators**

    A.    The Operator may require the Non-Operators to advance their share of the estimated cash outlay for the month's operations. Unless otherwise provided in the agreement, any billing for such advance shall be payable within thirty (30) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the excess to subsequent months' billings or advances, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within 15 days of receipt of such written request.

    B.    Each Non-Operator shall pay its proportion of all bills within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the prime rate in effect at JPMorgan Chase Bank, or its successor, plus 2% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws in the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. Interest shall begin accruing on the first day of the month in which the payment was due.

4. **Adjustments**

    A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) rendered during any calendar year shall conclusively be presumed to be true and correct, with respect to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

    B.    All adjustments initiated by the Parties except those described in (1) through (4) below are limited to the twenty-four month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account

2

CONFIDENTIAL

statement or payout status statement, insofar as adjustments pertain to expenditures. Adjustments made beyond the twenty-four month period are limited to the following:

(1) a physical inventory of Controllable Material as provided for in Section V.
(2) an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.
(3) a government/regulatory audit.
(4) working interest ownership or Participating Interest adjustments.

**5.   Expenditure Audits**

A. A Non-Operator, upon written notice to the Operator and other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four 24 month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (Adjustments). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (Adjustments) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on the exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (Advances and Payments by the Parties).

3

APC-00741675

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (Advances and Payments by the Parties).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Opeartor receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in Exhibit "H." The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participates throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved

If the audit issues cannot be resolved by negotiation, the dispute shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

E. This Accounting Procedure contemplates Non-Operators may incur Project Team expenditures that are subsequently billed to the Operator and charged to the Joint Account pursuant to Section I, Paragraph 2.B. Accordingly, such Non-Operators are required to maintain auditable records supporting such charges. Regarding such charges, the Operator and/or any other Non-Operators are hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A through 5.D., as pertain to the Non-Operators in audit of the Joint Account. Conversely in such situation, the Non-Operator being audited is hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D. for the Operator.

6.   **Approval by Parties**
     Where an approval or other agreement of the Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Rentals and Royalties**
     Lease rentals and royalties paid by Operator for the Joint Operations.

2.   **Labor**
     A. (1) Project Team
          All salaries and wages for Operator's employees and/or Non-Operator's employees assigned to the Project Team on a full time basis shall be considered a direct cost and shall be charged to

4

CONFIDENTIAL

the Joint Account. Such employees shall include personnel who are directly engaged in project management, evaluation, design, construction and installation activities regardless of location. Part time Project Team employees and Technical employees not assigned to the Project Team, but working under the direction of the Project Team shall be charged to the Joint Account, based on actual days worked, only when such time involves at least one (1) day or more per month that is devoted to the projects. Contractor and Affiliate charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraphs 5 and 7, respectively.

(2) Labor - Other Operations
The following salaries and wages shall be charged, when employees are not assigned to a Project Team.

    (a)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (b)    Salaries and wages of Operator's employees directly employed on Shore Base Facilities and other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II.

    (c)    Salaries and wages of first level Supervisors in the field.

    (d)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

    (e)    Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.    Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A. of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A. of this Section II. If percentage assessment is used, the rate shall be based on the Operator's or Non-Operator's cost experience, as appropriate.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A .and B. of this Section II.

D.    Personal Expenses, other than relocation expenses, of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A .of this Section II. Relocation costs, consistent with the employer's established policy, are chargeable to the extent the salaries and wages of the person being relocated are chargeable, in accordance with the following:

(1) For personnel transferred and assigned to a Project Team for a minimum of 12 consecutive months, relocation costs shall be charged to the Joint Account. For personnel assigned to a Project Team for less than 12 consecutive months, relocation costs shall not be chargeable unless agreed to by the Parties pursuant to Section I, Paragraph 6.

(2) For Operator's field employees and/or First Level Supervisors, relocation costs shall be charged to the Joint Account.

(3) Relocation costs for Technical Employees not assigned to a Project Team shall not be chargeable to the Joint Account unless approved by the Parties pursuant to Section I, Paragraph 6.

5

CONFIDENTIAL

Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations such as Alaska or overseas, shall be charged if approved by the Parties pursuant to the provisions in Section I, Paragraph 6.

E.   Training costs as specified in COPAS MFI-35 ("Charging of Training Cost to the Joint Account") for personnel whose salaries and wages are chargable under Section II.2.A. Training charges shall include the wages, salaries, training course cost, and reimbursable travel, meals, and lodging incurred during the training session as specified in COPAS MFI-35. The cost of the training course will be limited to prevailing commercial rates.

F.   Cost of established plans for employees' benefits as described in COPAS MFI-27 determined by applying the employee benefits percent most recently published by COPAS to the chargeable salaries and wages.

G.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.(2).(A).

**3.   Material**
Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4.   Transportation**
Except as provided in Section 7.3 of the Agreement, transportation of company labor, contract personnel, and Material necessary for the Joint Operations but subject to the following limitations:
A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.
B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like Material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties, unless agreed to by the Parties.
C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges.   Examples of accessorial charges are listed in COPAS MFI-38 ("Material Pricing Manual").

**5.   Services**
The cost of contract services, equipment and utilities used in the conduct of Joint Operations and provided by sources other than the Parties, except for those contract services, equipment and utilities covered by the Section III overhead provisions, or excluded under Paragraph 9 of Section II. The cost of third-party technical services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI- 49 ("Awards to Employees and Contractors").

**6.   Equipment and Facilities Furnished by Operator**
A   Equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such equipment.  If an average commercial rate is used to bill the Joint Account,

6

CONFIDENTIAL

Operator shall adequately document and support such rate and periodically review and update the rate.

B.    In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator, will be charged to the Joint Account at the Operator's actual cost. Such costs are limited to expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed ten percent ( 10 %) per annum. In addition, the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement, to the extent such charges exceed estimated salvage value. Charges for depreciation will no longer be allowable once the equipment has been fully depreciated. Charges shall not exceed the average prevailing commercial rate.

C.    When applicable for Operator owned or leased motor vehicles, Operator may use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates.

7.    **Affiliates**
Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

A.    If any Operator Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team and the charges for such Materials, facilities and services are expected to exceed three hundred thousand dollars ($300,000.00) per annum, as to a given Affiliate, or if such expenditures exceeded said amount during the preceding 12-month period, charges to the Joint Account for such Materials, facilities or services, as to any Affiliate whose charges exceed such threshold, shall be pursuant to written agreement between the Parties. If any Operator Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team and the charges for such Materials, facilities and services are less than or equal to three hundred thousand dollars ($300,000.00), charges for such Materials, facilities or services shall not require prior approval of the Parties and shall not exceed average commerical rates.

B.    If a Non-Operator's Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team, charges shall be considered third-party services as provided in Paragraph 5 of this Section II.

C.    An Affiliate of the Operator or Non-Operator assigned to or working at the request of a Project Team shall be chargeable to the Joint Account as follows:

Any Party planning to utilize Affiliate Materials, facilities or services shall submit a proposal that details such Party's Affiliate Materials, facilities, or services to be provided and the costs/rates charged by such Affiliates, prior to using such Affiliate. Such proposal and costs/rates contained therein shall require the agreement and written approval of the Parties in accordance with the applicable provisions of the Agreement. Once agreed to, such Affiliate costs/rates shall remain in effect for the duration of the AFE/Project, unless revised by the Parties in accordance with Section I, Paragraph 6 of this Accounting Procedure.

Any Party may request adjustments to Affiliate costs or rates at any time it deems appropriate but no more than once per year for a given Affiliate. The Parties shall respond to proposals for revised Affiliate costs or rates within the time prescribed in the Agreement for general voting matters. Approval of proposed Affiliate rates shall be determined in accordance with the provisions of Section I Paragraph 6 and shall not be unreasonably withheld by the Parties.

7

APC-00741679

D. Each Party will make a good faith effort to obtain sufficient evidentiary supporting documentation from its Affiliate and shall maintain auditable records to support all Affiliate charges to the Joint Account. Unless otherwise provided below, such documentation shall be subject to audit in accordance with Section I, Paragraph 5.

If Affiliate charges are based on rates established using a fixed rate basis, the audit of the Affiliate charges shall be limited to verification that the rates charged were as agreed to by the Parties, and that the units or basis to which the rates were applied are correct.

If charges to the Joint Account are based on the Affiliate's actual costs incurred ("Cost Basis"), rather than a fixed rate basis, the Parties agree that the Affiliate's records relating to the Materials, facilities, or services provided by the Affiliates will not be made available for audit by auditors of the other Parties.

If the Cost Basis method is used, the Party charging its Affiliates on a Cost Basis will, if requested, provide an annual certification by its independent public accounting firm that Affiliate charges to the Joint Account relating to Materials, facilities or services provided by the Affiliates are fair and equitable, exlude any element of profit and are consistent in application to all of its activities.  If such Party's independent public accounting firm is not an internationally recognized public accounting firm, the other Parites may, at their option, select an internationally recognized firm, subject to the approval of the Party being audited, to perform a review of the Affiliate charges to the Joint Account.  The Costs of this review shall be charged to the Joint Account.  The Parties requesting the audit may advise the public accountants on the scope of the review, however, the scope shall be limited to that reasonably necessary to confirm that the Affiliate charges to the Joint Account are fair and equitable, exclude any element of profit, and are consistent in application to all of its activities.  However, a favorable audit report shall not preclude the other Parties from taking exception to the rate as being in excess of average commercial rates.

8.   **Damages and Losses to Joint Property**
All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except to the extent of those resulting from a Party's Gross Negligence or Willful Misconduct, in which case such Party shall be solely liable.

9.   **Legal Expenses**
Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from  operations under the Agreement or necessary to protect or recover  the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties.  All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by  the Parties.

10.   **Taxes and Permits**
All taxes and permits of every kind and nature assessed or levied upon or in connection with the Joint Property or production therefrom and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, unless the penalties and interest result from Operator's Gross Negligence or Willful Misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations  of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11.   **Insurance**
Coverage(s) required to be procured by Operator for the protection of the  Parties herein shall be billed to  the Joint Account.  For Workers' Compensation  and Employer's Liability, where Joint Operations are conducted in jurisdictions that permit self-insurance, Operator shall charge Joint

8

CONFIDENTIAL

APC-00741680

Account manual or advisory rates (whichever is applicable) if Operator meets the self-insurance requirements in such jurisdiction. Such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate. In no circumstance shall Operator charge in excess of manual or advisory rates.

12.    **Communications**
Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's office. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 6 of this Section II.

13.    **Ecological, Environmental and Safety**

(A)    Costs incurred
       ( ̶ ̶) ̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶b̶e̶n̶e̶f̶i̶t̶ ̶o̶f̶ ̶t̶h̶e̶ ̶J̶o̶i̶n̶t̶ ̶P̶r̶o̶p̶e̶r̶t̶y̶,̶ ̶o̶r̶
       ( X ) on the Joint Property

       resulting from statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations.

(B)    Costs incurred
       (̶ ̶X̶ ̶)̶ ̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶b̶e̶n̶e̶f̶i̶t̶ ̶o̶f̶ ̶t̶h̶e̶ ̶J̶o̶i̶n̶t̶ ̶P̶r̶o̶p̶e̶r̶t̶y̶,̶ ̶o̶r̶
       ( X ) on the Joint Property

       to conduct and/or implement safe operational practices/guidelines as a result of statutory regulations, or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies.

(C)    Technical training costs for employees whose time is chargeable under (A) or (B) above regardless of whether training is mandated by statute or regulatory agency is chargeable to the Joint Account.

(D)    Subject to Article 6.2 of the Agreement, safety awards in the conduct of Joint Operations

       ( X )  shall be chargeable to the Joint Account.
       (̶ ̶ ̶)̶ ̶ ̶s̶h̶a̶l̶l̶ ̶n̶o̶t̶ ̶b̶e̶ ̶c̶h̶a̶r̶g̶e̶a̶b̶l̶e̶ ̶t̶o̶ ̶t̶h̶e̶ ̶J̶o̶i̶n̶t̶ ̶A̶c̶c̶o̶u̶n̶t̶.̶

14.    **Abandonment and Reclamation**
Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental or other regulatory authority.

15.    **Other Expenditures**
Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under Section II.15 shall require the approval of the Parties.

# III. OVERHEAD

9

CONFIDENTIAL

A. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

i.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden, and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:
    ( ) ~~shall be covered by the overhead rates.~~
    (X) shall not be covered by the overhead rates.

ii.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden, and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:
    ( ) ~~shall be covered by the overhead rates.~~
    (X) shall be charged direct to the Joint Account only to the extent such Technical Employees and/or costs of professional consultant services and contract services of technical personnel are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Employees and/or costs of professional consultant services and contract services of technical personnel for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section II.2.A(1) (*Labor – Project Team*), Section II.7 (*Affiliates*) insofar as the Affiiate costs pertain to an authorized Project Team, or Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

1.  **Overhead - Project Team**
    To compensate the Operator (or chairing Party if the Operator is a Non-Participating Party) for overhead costs incurred in support of a Project Team, Operator (or charing Party) shall charge a rate of three Percent ( 3.0 %) of the total cost of the Project Team as defined in Section II, Paragraph 2.A(1). Such overhead costs shall include, but shall not be limited to: all personnel not directly chargeable to the Project Team under Section II.2.A, computer equipment and supplies, office space, utilities, office furniture and equipment, cleaning and general housekeeping, office supplies, conference room facilities, facsimile machines, copy machines, telephones and other general costs supporting the Project Team.

2.  **Overhead - Development and Operating**
    As compensation for overhead in connection with drilling and producing operations, Operator shall charge on ~~either~~:
    ( ) ~~Fixed Rate Basis, Paragraph 2.A., or~~
    ( X ) Percentage Basis, Paragraph 2.B.

    A. ~~Overhead - Fixed Rate Basis~~
       ~~(1)    Operator shall charge the Joint Account at the following rates per well per month:~~
       ~~————Drilling Well Rate per month  $————(Prorated for less than a full month)~~
       ~~————Producing Well Rate per month $————~~

       ~~(2)    Application of Overhead - Drilling Well Rate shall be as follows:~~

10

APC-00741682

~~(a)    Charges for drilling wells shall begin on the date drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first. No charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.~~

~~(b)    Charges for wells undergoing any type of workover, recompletion, or abandonment for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.~~

~~(3)    Application of Overhead - Producing Well Rate shall be as follows:~~

~~(a)    An active well completion for any portion of the month shall qualify for a one-well charge for the entire month. An active completion is one which is~~

~~(1)    produced,~~
~~(2)    injected into for recovery or disposal,~~
~~(3)    used to obtain water supply to support production operations,~~
~~(4)    used to maintain pressure in the producing zone, or~~
~~(5)    shut-in oil or gas wells not capable of producing against line pressure or due to market conditions.~~

~~(b)    Each active completion in a multi-completed well in which production is not commingled downhole shall qualify for a one-well charge providing each completion is considered a separate well by the governing regulatory authority.~~

~~(c)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when the drilling well rate applies.~~

~~(d)    All wells not meeting the criteria set forth in the Paragraph A.(3) (a), (b), or (c) shall not qualify for a producing overhead charge.~~

~~(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.~~

B.    Overhead -Percentage Basis (exclusive of Project Team costs)

    (1)    Operator shall charge the Joint Account at the following rates;

        (a)    Development Rate two and one-half percent ( 2.5 %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II, all salvage credits, and all Project Team expenses.

        (b)    Operating Rate thirteen percent ( 13 %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for enhanced recovery and all property taxes and any tax and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

    (2)    Application of Overhead - Percentage Basis shall be as follows:

        (a)    Development shall include all costs in connection with

            [1] drilling, redrilling, plugging back or deepening of any or all wells,

11

[2] workover operations requiring a period of five (5) consecutive work days or more on any or all wells,

[3] preliminary expenditures necessary in preparation for drilling,

[4] expenditures incurred in abandoning when the well is not completed as a producer,

[5] original construction or installation of fixed assets, expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 3 of Section III, or any Project Team expenses.

(b)   Operating shall include all other costs in connection with Joint Operations those subject to Paragraphs 1 and 3 of Section III.

3.   **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $300,000.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)  4 % of total costs if such costs are more than $100,000 but less than $500,000; plus

(2)  2 % of total costs in excess of $500,000 but less than $1,000,000; plus

(3)  2 % of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)  3 % of total costs if such costs are more than $100,000 but less than $500,000; plus

(2)  2 % of total costs in excess of $500,000 but less than $1,000,000; plus

(3) 1 % of total costs in excess of $1,000,000.

C. If Operator charges engineering, design and drafting costs associated with a Major Construction project AFE to a Project Team AFE, the overhead assessment shall be three percent ( 3 %) of total project costs.

Total cost shall mean the gross cost of any one project, but shall exclude Pojrect Team costs that are recorded to a separate Project Team AFE and for wich overhead is charged under Section III.1. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 5, the provisions of this paragraph shall govern.

4.  **Overhead - Catastrophe**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or

12

APC-00741684

shall charge the Joint Account for overhead based on the  rates as set forth in Section III.2.

**5. Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

# IV.  MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions.  The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option.  Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1.   Direct Purchases**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received.  The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's Gross Negligence or Willful Misconduct.  A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location.  Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase.  If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2.   Transfers**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material.  Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer.  Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

**A.   Pricing**

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer.  Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation.  When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6 (*Approval by Parties*).  Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

13

CONFIDENTIAL

APC-00741685

   (1)  Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

      (a)  For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B *(Freight)*.

      (b)  For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

   (2)  Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

   (3)  Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

   (4)  As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

## B.  Freight

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

   (1)  Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

   (2)  Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

   (3)  Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

   (4)  Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

## C.  Taxes

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

CONFIDENTIAL

APC-00741686

**D. Condition**

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6 (*Approval by Parties*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

15

APC-00741687

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

### E.  Other Pricing Provisions

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service.  New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable.  No charges or credits shall be made for used coating or wrapping.  Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

### 3.  Disposition Of Surplus

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator.  To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with Article 18.3 of the Agreement.

### 4.  Special Pricing Provisions

#### A.  Premium Pricing

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property.  Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

#### B.  Shop-Made Items

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item.  If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in

16

APC-00741688

Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

## C. Mill Rejects

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Sections IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

# V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

## 1. Directed Inventories

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.(*Approval by Parties*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

## 2. Non-Directed Inventories

### A. Operator Inventories

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

CONFIDENTIAL

APC-00741689

**B. Non-Operator Inventories**

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory field work.

**C. Special Inventories**

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*) to the extent allowed under the Agreement.

18

CONFIDENTIAL

APC-00741690

EXHIBIT "D"
GAS BALANCING AGREEMENT ("AGREEMENT")

## Attached to and made a part of that certain Operating Agreement
## dated effective April 1, 2008 by and between
## ConocoPhillips Company and Anadarko E&P Company LP

1. **DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01　"Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the price under such agreement equals or exceeds the Published Reference Price, less any applicable transportation or gathering charges.

1.02　"Balancing Area" shall mean all of the acreage and depths subject to the Operating Agreement.

1.03　"Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04　"Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its delivery from the Balancing Area.

1.05　"Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06　"Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07　"MMBtu" shall mean one million British Thermal Units. A British thermal unit shall mean the quantity of heat required to raise one-pound avoir dupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08　"Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09　"Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10　"Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11　"Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12　"Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13　"Published Reference Price" shall mean the Index price published for the applicable geographic area on the transporting pipeline in the first of the production month's edition of *McGraw-Hill's Inside FERC's Gas Market Report* ("*Inside FERC* Index"). In the event that the *Inside FERC* Index ceases to be published, the parties will attempt in good faith to agree on a replacement reference price reflective of the same market reflected by the *Inside FERC* Index. If the parties are unable to agree on a satisfactory replacement reference price within thirty (30) days of commencing negotiations, the matter will be resolved in accordance with the Dispute Resolution Procedures set forth in Exhibit "H" to the Operating Agreement.

1.14　"Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.15　"Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.16　"Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.17　"Winter Period" shall mean the month(s) of November and December in one calendar year and the month(s) of January and February in the succeeding calendar year.

2. **BALANCING AREA**

2.1　If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in MMBtu.

2.2　In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered as produced from a separate Balancing Area.

CONFIDENTIAL

APC-00741691

3.    **RIGHT OF PARTIES TO TAKE GAS**

3.1    Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2    Each Party is required to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect as set forth in 30 CFR 250.180, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3    When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take.   To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas.   If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective   Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4    All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5    Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or  to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6    In the event that the Operator determines that a Party has failed to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect as set forth in 30 CFR 250.180, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator shall notify such Party that it has failed to take its Full Share of Current Production, along with the applicable reason(s), as originally stated in Section 3.2, that it is required to take its Full Share of Current Production. If the notified Party does not begin taking its Full Share of Current Production effective the second business day following notification from the Operator, the Operator shall, to the extent practicable, make available to the Underproduced Party(ies) any part of such Party's Full Share of Current Production that such Party fails to take, or the Operator may sell  any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and will render  to  such  Party, on  a  current  basis, the  full  proceeds  of  the  sale, less  any reasonable  marketing, compression,  treating,  gathering  or  transportation  costs  incurred  directly  in  connection  with the sale of such  Full  Share  of Current  Production. In  making  the  sale  contemplated  herein, the Operator shall  be obligated only  to obtain such price and conditions  for  the  sale  as  are  reasonable  under the circumstances and shall not be obligated to share any of its markets. Any such  sale by Operator under  the terms hereof shall  be  only  for  such  reasonable  periods  of  time  as  are consistent with  the minimum  needs  of  the  Parties  under  the  particular  circumstances, but  in  no  event  for a  period  in  excess  of  one  year. Notwithstanding  the  provisions  of  Section 3.4  hereof, Gas  sold  by Operator for a Party under the provisions hereof  shall be deemed to be Gas taken for the account of such Party.

4.    **IN-KIND BALANCING**

4.1    Effective the first day of any calendar month following at least thirty (30) days' prior written notice to  the  Operator, any  Underproduced  Party  may  begin  taking,  in  addition  to  its  Full  Share  of Current Production and any Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying fifty  percent (50%) of the Full Shares of Current Production of all Overproduced Parties by  a  fraction,  the  numerator  of  which  is the  Percentage Interest of  such  Underproduced  Party  and  the  denominator  of  which  is  the  total  of  the  Percentage  Interests  of all Underproduced Parties desiring to take Makeup Gas.  In no event will an Overproduced Party be required to provide more  than fifty percent  (50%) of its  Full  Share of Current Production for Makeup Gas. The Operator  will  promptly  notify all Overproduced  Parties  of  the election  of  an  Underproduced Party to begin taking Makeup Gas.  See Section 13.1 for additional provisions.

4.2    Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent (25%) of its Full Share of Current Production for Makeup Gas during any month of the Winter Period.

5.    **STATEMENT OF GAS BALANCES**

5.1    The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and  the  volumes  of  Gas  actually taken or sold for each Party's account. Within sixty (60) days after the month  of  production, the  Operator  will  furnish  a  statement  for  such  month  showing  (1)  each Party's Full Share of Current  Production, (2) the  current, total  volume  of  Gas  actually taken  or sold  for  each  Party's  account, (3) the difference between the  volume  taken  by each  Party and that  Party's  Full  Share  of  Current  Production, (4) the current month and cumulative  Overproduction  or Underproduction of  each  Party, and  (5)  other  data  as recommended  by  the provisions  of  the Council  of  Petroleum  Accountants  Societies  Bulletin  No. 24, as amended  or  supplemented  hereafter. Each  Party  taking  Gas will promptly provide to the Operator any data required by the Operator for preparations of the statements required hereunder.

CONFIDENTIAL

5.2     If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. The cost of conducting such audit will be charged to the account of the Party failing to provide the required data.

## 6.     PAYMENTS ON PRODUCTION

6.1     Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

6.2     Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3     In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

## 7.     CASH SETTLEMENTS

7.1     Upon the earlier of; (i) Plugging and abandonment of the last producing interval in the Balancing Area, (ii) the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, (iii) any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, or (iv) all leases in the Balancing Area have expired, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2     Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3     Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

7.4     Subject to Section 13.1, the amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of this Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.

7.5     Subject to Section 13.1, the values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1     For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.

7.6     To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for all Gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the Published Reference Price.

7.7     Interest compounded at the rate of _the U.S. Treasury Bill 13-week discount rate plus three_ percent (3 %) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1, beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8     In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

## 8.     OPERATING COSTS

Page 3 of 5

CONFIDENTIAL

APC-00741693

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**9.     LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**10.    AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of six (6) years from the end of the calendar year in which any information to be furnished under Section 5 and 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 10 shall be in addition to those provided for in Section 5.2 of this Agreement.

**11.    MISCELLANEOUS**

11.1     As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

11.2     EACH PARTY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS ALL OTHER PARTIES FROM AND AGAINST ANY AND ALL LIABILITY FOR ANY CLAIMS, WHICH MAY BE ASSERTED BY ANY THIRD PARTY WHICH NOW OR HEREAFTER STANDS IN A CONTRACTUAL RELATIONSHIP WITH SUCH INDEMNIFYING PARTY AND WHICH ARISE OUT OF THE OPERATION OF THIS AGREEMENT OR ANY ACTIVITIES OF SUCH INDEMNIFYING PARTY UNDER THE PROVISIONS OF THIS AGREEMENT, AND DOES FURTHER AGREE TO SAVE THE OTHER PARTIES HARMLESS FROM ALL JUDGMENTS OR DAMAGES SUSTAINED AND COSTS INCURRED IN CONNECTION THEREWITH.

11.3     Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof.

11.4     This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefits of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

11.5     Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

11.6     This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

11.7     In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service based on the quantity of Gas taken for its account (the cumulative method) in accordance with such regulations, insofar as same relate to sales method tax computations.

**12.    ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

12.1     Subject to the provisions of Sections 12.2 and 12.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its

CONFIDENTIAL

APC-00741694

assignee or other transferee to assume its obligations hereunder.

12.2    Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 12.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 12.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least ninety (90) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 12, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 12 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.2 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 12.1 hereof.

12.3    The provisions of this Section 12 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

## 13.    OTHER PROVISIONS

13.1 The Parties agree that the intent of this Gas Balancing Agreement is for each Party to ultimately take or otherwise receive the benefit of its Percentage Interest of the Gas produced from the Balancing Area after satisfaction of royalty obligations over the life of such production. Therefore, in the event royalty relief or lessor take-in-kind or other programs cause changes in the royalty burden affecting Gas produced from the Balancing Area over the life of such production such that the Parties are precluded from achieving that end, Makeup Gas volumes and cash settlement volumes shall be adjusted to ensure that each party receives its Percentage Interest in Gas after satisfaction of royalty obligations. The Operator shall maintain documentation on volumes subject to royalty relief, and each party shall maintain documents with respect to royalty taken in kind to effect this provision.

CONFIDENTIAL

APC-00741695

## EXHIBIT "E"

Attached to and made a part of the Joint Operating Agreement
dated effective June 1, 2006 by and between Newfield Exploration Company and Anadarko
Petroleum Corporation.

## CERTIFICATION OF NONSEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator.  As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Non-segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 NLAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "Contractor" refers to each Party to this Agreement.

EXHIBIT "F"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

## ARTICLE 6.3 ET SEQ.
## OPERATING AGREEMENT (Louisiana)

Security Rights; Default; Unpaid Charges; Carved-out Interests.

## 6.3    Security Rights.

a.    Security Rights - Properties Located Offshore Adjacent to the State of Louisiana.  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties herein, the Parties shall have the following security rights:

(i)    Mortgage in Favor of the Operator.  Each Non-Operating Party hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by each Non-Operating Party of all financial obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator herein shall secure the payment of all Costs and other expenses or financial obligations properly charged to such Party, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If any Non-Operating Party does not pay such Costs and other expenses or perform its financial obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operating Party's Hydrocarbon production and collect such Costs and other expenses or financial obligations out of the proceeds from the sale of the defaulting Non-Operating Party's share of Hydrocarbon production until the amount owed has been paid.  The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operating Party's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the

CONFIDENTIAL

amount of Costs and other expenses or financial obligations owed by the defaulting Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operating Party.

The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the financial obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.a.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to this Agreement.

(ii)     <u>Security Interest in Favor of the Operator</u>. To secure the complete and timely performance of and payment by each Non-Operating Party of all financial obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement, each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells

CONFIDENTIAL

located on the Leases or the Contract Area.  To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers: (A) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area.

PAGE 3 of 8

CONFIDENTIAL

(iii)    Mortgage in Favor of the Non-Operating Parties.  The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases; (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area; and (c) all other immovable property or other property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all financial obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-Operating Party herein shall secure the payment of all Costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, Costs, and other expenses or financial obligations at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If the Operator does not pay such Costs and other expenses or perform its financial obligations under this Agreement when due, the Non-Operating Parties shall have the additional right to notify the purchaser or purchasers of the Operator's Hydrocarbon production and collect such Costs and other expenses or financial obligations out of the proceeds from the sale of the Operator's share of Hydrocarbon production until the amount owed has been paid.  The Non-Operating Parties shall have the right to offset the amount owed against the proceeds from the sale of the Operator's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Non-Operating Parties' statement concerning the amount of Costs and other expenses or financial obligations owed by the Operator and payment made to the Non-Operating Parties by any purchaser shall be binding and conclusive as between such purchaser and the Operator.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the financial obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.a.(v) hereof) outstanding and unpaid and that are attributable to or charged against

CONFIDENTIAL

APC-00741700

the interest of the Operator pursuant to this Agreement.

(iv)    Security Interest in Favor of the Non-Operating Parties.  To secure the complete and timely performance of and payment by the Operator of all financial obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or included within the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Contract Area, the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or

CONFIDENTIAL

not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

    (2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

    (3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Contract Area.

    (v)    <u>Recordation</u>.  To provide evidence of, and to further perfect the Parties' security rights created hereunder, upon request, each Party shall execute and acknowledge the Memorandum of Operating Agreement and Financing Statement (Louisiana) attached as Exhibit "I" (the "Memorandum of Operating Agreement and Financing Statement (Louisiana)") in multiple counterparts as appropriate.  The Parties authorize the Operator to file the Memorandum of Operating Agreement and Financing Statement (Louisiana) in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of the Operator and the Non-Operating Parties to their interests in the Leases or the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement (Louisiana) to a standard UCC-1 in the forms attached as Exhibit "I" to the Agreement for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Upon the acquisition of a leasehold interest in the Contract Area, the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation such a Memorandum of Operating Agreement and Financing Statement (Louisiana) describing such leasehold interest.  Such Memorandum of Operating Agreement and Financing Statement (Louisiana) shall be amended from time to time upon acquisition of additional leasehold interests in the Contract Area, and the Parties shall, within five business days following request by one of the Parties hereto, execute and

CONFIDENTIAL

furnish to the requesting Party for recordation any such amendment.

The Memorandum of Operating Agreement and Financing Statement (Louisiana) is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Leases or contained within the Contract Area pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records.

b.   <u>Default</u>.  If any Party does not pay its share of the charges authorized under this Agreement when due or otherwise fails to discharge any of its financial obligations under this Agreement, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default and if the Operator is the Party in default, the applicable notices can be delivered by any Non-Operating Party.  A Party in default shall have no further access to the rig, Production System, Facilities, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with activities or operations hereunder or be allowed to participate in meetings.  A Party in default shall not be entitled to Vote or to make an Election until such time as the defaulting Party is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Working Interest bears to the total non-defaulting Working Interests.  As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Parties to the dispute shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

c.   <u>Unpaid Charges</u>.  If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefore or to otherwise perform any of its financial obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Section 6.3, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay.  If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection at Joint Account expense of the unpaid Costs and other expenses owed by such Participating Party, , and to exercise the mortgage and security rights granted by this Agreement.  The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein. In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Contract Area is located or such other states as such Party may deem appropriate.

CONFIDENTIAL

The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and collection costs) and any amounts collected with respect to amounts owed by the nonperforming Party.  In the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of Costs in the proportion that its Working Interest bears to the total non-defaulting Working Interests.  Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

      d.   <u>Carved-out Interests</u>.  Any agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Leases or the Contract Area shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Working Interest is so encumbered does not pay its share of Costs and other expenses authorized under this Agreement or to otherwise perform any of its financial obligations under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Section are insufficient to pay such Costs, expenses, or obligations the security rights provided for in this Section may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Leases or the Contract Area is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Section.

CONFIDENTIAL

APC-00741704

EXHIBIT "G"

**Attached to and made a part of that certain Operating Agreement**
**dated effective April 1, 2008 by and between**
**ConocoPhillips Company and Anadarko E&P Company LP**

**PROJECT TEAM EXHIBIT**
**(with Technology Sharing Provisions)**

## SECTION 1.0 DEFINITIONS

1.1   **Background Technology and Information:** shall mean any proprietary geophysical, geological, geochemical, drilling, engineering or other similar technical data, information, reports, studies, analysis, models or similar data and documents incorporating such information, which is (a) developed, acquired, owned or controlled by an individual Participating Party as a result of activities outside of the scope of both the Operating Agreement and this Exhibit, or (b) developed, acquired, owned or controlled by an individual Participating Party as a result of activities that are within the scope of either the Operating Agreement or this Exhibit but were conducted as a Non-Consent Operation, and for which the Hydrocarbon Recoupment provisions of Article 16 of the Operating Agreement have not been met, and (c) that is identified and declared as Background Technology and disclosed by a Party or exchanged by the Parties for use by the Project Team.

1.2   **Confidential Information:**   shall mean all Project Technology and Information and Background Technology and Information.   Confidential Information does not include "Confidential Data" as that term is defined in the Operating Agreement.   To the extent that "Confidential Data" is submitted by a Participating Party for use by the Project Team, such "Confidential Data" continues to be governed solely by the terms of the Operating Agreement.

1.3   **Operating Agreement:**   shall mean that certain Operating Agreement effective April 1, 2008 by and between ConocoPhillips Company and Anadarko E&P Company LP, to which this Exhibit is attached.

1.4   **Project Manager:** shall mean the designated representative of the chairing Party who will direct, supervise and oversee the work of the Project Team.

1.5   **Project Technology and Information:** shall mean all proprietary geophysical, geological, geochemical, drilling, engineering or other similar technical data, along with information, reports, studies, analysis, models or similar data and documents that are (a) acquired or developed by the Project Team, or provided to, the Project Team by the Participating Parties and (b) charged to the Joint Account.   The provisions of this Exhibit shall not be applicable to "Confidential Data", as that term is defined in the Operating Agreement.

1.6   **Other Terms:**   Except as defined in this Exhibit, capitalized terms used herein shall have

CONFIDENTIAL

the meanings as defined in the Operating Agreement.

## SECTION 2.0 PROJECT TEAM FORMATION

2.1 **Formation and Staffing of the Project Team:** A Project Team of technical and support personnel may be established pursuant to the terms of Article 12 of the Operating Agreement. The Project Manager shall determine the make-up, size and composition of the Project Team and shall notify the Participating Parties of the positions that may be available on the Project Team, so long as it is within the scope of the approved Project Team project. Each Participating Party may nominate representatives possessing specific backgrounds as identified by the Project Manager to progress the Development Plan. Each Participating Party may nominate members for positions at every level of the Project Team, with the exception of the Project Manager level. Each Participating Party shall have the right, at its discretion, to representation on a Project Team in proportion to its Participating Interest, provided that such representatives are duly qualified. However, a Participating Party shall not be precluded from having more than its respective Participating Interest representation on the Project Team, if approved by the Project Manager and consistent with the needs of the Project Team. The Project Manager must approve actual participation of any individual nominated by a Party for participation on the Project Team, and such approval shall not be unreasonably withheld.  In selecting team members, the Project Manager shall give Participating Parties', or their Affiliates', employees preference over contractors, and contractors shall not displace qualified employees as team members.

The Project Manager may dismiss a Project Team member whose performance has become unsatisfactory or if such person has become superfluous to requirements of the Project Team.   The Project Manager shall provide to the Party whose member is being dismissed at least one month's written notice, or a shorter period of time as is practical in the case of a serious breach of security, confidentiality, or other of the Project Manager's policies.  If a Party, other than the chairing Party, wishes to withdraw from the Project Team any of its representatives, such Party shall provide at least one month's written notice to the Project Manager.  If such Party's Project Team member is leaving the employ of such Party, the Project Team member may be withdrawn in such lesser time as may be required by the conditions of employment applicable to that employee.

If the Project Manager decides that a member of the Project Team should be replaced, the Participating Party whose representative is to be replaced shall make arrangements to effect a reassignment of the member in question.  The Participating Party whose member was removed shall then be entitled to nominate another person to fill the vacant position on the Project Team.  In the event a new position is created on the Project Team, the Project Manager shall notify the Participating Parties.  The Participating Parties shall have the right for a period of thirty (30) days after receipt of such notice to nominate a representative to fill such new position.  However, selection of the representative shall be at the Project Manager's sole discretion.

2.1.1 **Employee Staff Contribution:** Each Participating Party in the Project Team AFE shall have the right (but not the obligation) to nominate its employees as members

CONFIDENTIAL

of the Project Team. Nominated employees may include project, technical or support personnel. The individuals nominated for participation by the Participating Parties must have experience commensurate with the position to which they are being nominated, and must meet the needs and objectives of the Project Team as described in the Project Team AFE and scoping memo.

**2.1.2** **Affiliate and Contract Staff:** The Project Team may utilize the resources of the Participating Parties' Affiliates and contractors (as used in this Exhibit, "contractors" includes "consultants") to carry out the work of the Project Team. Each Participating Party in the Project Team may nominate Affiliate employees or contractors to serve on the Project Team in the place of such Participating Party's employees. The individuals nominated for participation by the Participating Parties must have experience commensurate with the position to which they are being nominated, and must meet the needs and objectives of the Project Team as described in the Project Team AFE and scoping memo.

**2.2** **Project Manager:** The Project Team shall operate under the direction of the Project Manager, who shall be selected by the chairing Party of the Project Team. The Operator shall be the chairing Party of the Project Team; provided, however, if Operator elects not to participate in the Project Team a chairing Party shall be selected by a vote of a majority in interest of the Participating Parties. The Project Manager shall be responsible for making team assignments and shall be responsible for the overall management and supervision of specific work tasks for the Project Team. The Project Manager shall determine the location(s) where the Project Team work is to be undertaken. The Project Manager shall be responsible for selecting team members from the nominations provided by Participating Parties and dismissing Project Team members as needed in order to accomplish specific tasks or phases of the Project Team. The Project Manager shall also be responsible for determining the need for and selecting outside contractors to perform certain Project Team activities, acquiring supplies and services needed by the Project Team and for instituting rules and procedures for maintaining confidential information. The Project Manager shall also be responsible for making presentations on the work of the Project Team and associated documentation at meetings that are conducted under the Operating Agreement.

**2.3** **Status of Team Members:** Each employee member of the Project Team (i.e., a Project Team member who is an employee of a Participating Party of its Affiliate) shall remain an employee of its respective company and each Party shall remain responsible for paying or causing to be paid their employees' salaries, benefits and payroll burden as well as maintaining worker's compensation insurance on their employees. Accordingly, each Party will continue to administer or cause to be administered the compensation, benefits, allowances and staff planning of its employees on the Project Team. Each Party retains the right to ultimately direct the details and means by which their employees participate on the Project Team. However, employees who participate on the Project Team will receive team assignments and general supervision from the Project Manager in connection with their day to day work. An individual selected to the Project Team shall, insofar as possible, and consistent with the needs of the Project Team and the individual's employer, serve on the Project Team for the duration of the Project Team. Notwithstanding the above, some Project Team members may be selected for specific tasks or phases of

CONFIDENTIAL

Project Team work after which these team members may be dismissed by the Project Manager.

In the event a contractor of a Participating Party or its Affiliate is a Project Team member, such Participating Party or Affiliate will remain responsible for and will administer such contractor's compensation, unless agreed otherwise by the Project Manager.  The Project Manager will administer the compensation of contractors whose services are secured directly by the Integrated Project Team.

**2.4**   **Liability of Project Team Members:** TO THE EXTENT ALLOWED BY LAW, EACH PARTY AGREES TO DEFEND, HOLD HARMLESS AND INDEMNIFY THE OTHER PARTIES FROM AND AGAINST ANY LOSS, DAMAGE, CLAIM SUIT, LIABILITY, JUDGMENT AND EXPENSE (INCLUDING ATTORNEY FEES AND OTHER COSTS OF LITIGATION) FOR ANY PERSONAL INJURY (INCLUDING DEATH) OF ITS REPRESENTATIVES ON THE PROJECT TEAM, WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR STRICT LIABILITY OF ANY OTHER PARTY.

## SECTION 3.0 WORK SCOPE AND DURATION OF PROJECT TEAM

**3.1**   **Work Scope of the Project Team:** The primary objective for forming any Project Team is to pool the talents of the Parties in preparing Development Plans and in planning, design, engineering, fabricating, transportation and installation of a Production System and accompanying Facilities.  The proposal of the Development Plan (including the Initial Production System) and commitment of funds thereto shall be handled in accordance with Article 12 *(Development Plan)* of the Operating Agreement.  To propose a Project Team, the proposing Party shall provide the other Parties with: (1) a memo describing the anticipated scope of the team's work to be undertaken in reasonable detail such that the other Parties may make an informed decision concerning its participation in the Project Team; (2) a memo describing the type and number of staff required to complete the assignment; and (3) an AFE itemizing the estimated of the Cost of the Project Team, (4) proposed location(s) where Project Team representatives will be housed, a list of goods and services covered by Project Team overhead and the proposed overhead recovery method, if not already agreed to by the Parties, and (5) the estimated duration of the Project Team.

**3.2**   **Reports by the Project Team:** The Project Team shall review the progress of its work with all Participating Parties at least quarterly, and present the results of any studies or planning upon their conclusion.  The time and place of the Project Team meetings shall be determined by the Project Manager.

**3.3**   **Duration of the Project Team:** The Project Team shall remain in place until (1) the team has completed the work described in the approved Project Team AFE and scoping memo, or (2) the planning, design, construction, installation and start-up phase of the Production System and accompanying Facilities designed/construction/installed under the direction of such Project Team has been completed, or (3) Project Team work has been terminated by

CONFIDENTIAL

unanimous approval of the Participating Parties, whichever is the earlier event.   Upon dissolution of the Project Team, the Operator shall conduct any further work required for the installation of the Production System and/or Facilities.   Any Project Team AFE in progress at the time of the Project Team's dissolution shall continue to be accounted for under the applicable provisions of Exhibit "C", or as otherwise agreed to by the Participating Parties.

## SECTION 4.0 COSTS AND ADMINISTRATION OF THE PROJECT TEAM

4.1     **Project Team Costs:** The costs and expenses for the Project Team shall be charged to the Joint Account pursuant to Exhibit "C", *(Accounting Procedure)* of the Operating Agreement.   Each Participating Party in the Project Team shall be responsible for its Participating Interest Share of the Project Team Costs, regardless of its level of employee, Affiliate or contractor participation on the Project Team.

4.1.1     **Project Team Representative Charges:** Each Participating Party in a Project Team shall recover the Costs of its representatives assigned to the Project Team through charges to the Joint Account under Sections I and II of Exhibit "C" (Accounting Procedure) of the Operating Agreement.

4.1.2     **Contractors:** The Project Manager may retain the services of such contractors as is reasonably necessary to carry out the studies and tasks assigned to the Project Team.   Costs of contractors directly employed by the Project Team shall be charged to the Joint Account under Section II.5 of Exhibit "C" *(Accounting Procedure)* of the Operating Agreement. So long as the Costs of the contractor are within the scope of an approved AFE, the Project Manager's retention of contractors shall not require additional approval by the Participating Parties.

## SECTION 5.0 CONFIDENTIALITY

5.1     **Confidentiality Obligation:** Each Party agrees to maintain as confidential and not to use or disclose to any third party Confidential Information, except as expressly provided hereunder, for a confidentiality period commencing on the date of execution of the Operating Agreement and extending through the later of: (a) two (2) years following the termination of the Project Team work pursuant to Section 3.3 of this Exhibit or (b) termination of the Operating Agreement.   After expiration of the confidentiality period the receiving Party's obligations of confidentiality and restrictions on use shall be determined in accordance with Section 6.2 and Subsections 6.2.1 and 6.2.2 of this Exhibit.   Each Party agrees to treat the disclosure of the Confidential Information in the same manner as it treats its own confidential information.

5.1.1     **Identification, Declaration, and Use of Background Technology and Information:**   The Parties shall use reasonable, good faith efforts to identify and declare Background Technology and Information that will be utilized by the Project Team prior to establishment of the Project Team.   Background Technology and

CONFIDENTIAL

Information must be identified and declared in writing before it is submitted to the Project Team. The decision to identify, declare, and submit Background Technology and Information to the Project Team is at the sole and absolute discretion of the individual Participating Party possessing such technology or information. A Participating Party designating data as Background Technology and Information is not subject to the confidentiality obligation of this Exhibit or the Operating Agreement as to the identified Background Technology and Information. The Project Manager is responsible for maintaining a list describing all Background Technology and Information (and its ownership). This list will be updated from time to time as the Participating Parties submit such Background Technology and Information.

Nothing in the Operating Agreement or this Exhibit impairs the right of any owner of Background Technology and Information from using, exchanging, disclosing, or otherwise freely dealing with its own Background Technology and Information.

**5.1.2** **Supporting Agreements:** Each Party shall be responsible for insuring that its respective representatives fully abide by all obligations associated with the confidentiality of all information learned as a result of its participation on the Project Team and agrees to convey such information to others in its company, or its Affiliates, on a "need-to-know" basis only. In this regard, there shall be limited reproduction of Project Team-generated data. Upon the Project Manager's request, each Party shall require its respective representatives participating on the Project Team to execute a confidentiality agreement consistent with the confidentiality obligations specified in the Operating Agreement and this Exhibit and shall furnish the other Parties with a copy of same upon request. The Project Manager shall be responsible for securing confidentiality agreements from outside contractor services; provided, however, a Non-Operator represented on the Project Team by a contractor shall remain responsible for securing confidentiality agreements from such contractors.

**5.2** **Exceptions and Permitted Disclosures:** Any Participating Party may disclose Confidential Information to third parties if such disclosure is either an exception to the confidentiality obligation or is a permitted disclosure in the same manner as provided for Confidential Data, pursuant to Article 7.1.1 *(Exceptions to Confidentiality)* or Article 7.1.2 *(Permitted Disclosures)* of the Operating Agreement.

**5.3** **Security Policies:** All Parties' representatives assigned to or working under the direction of the Project Team shall honor Operator's security system and shall treat all information directly or indirectly learned or received by virtue of its participation on the Project Team as confidential in accordance with the provisions of Operator's security policies/procedures, and all revisions thereto that are made prior to termination of this Exhibit. A copy of the security policies/procedures and any revisions thereto shall be made available to the Participating Parties' representatives by the Project Manager for their use during the project. This obligation of confidentiality shall also apply to any other proprietary and confidential information that may relate to matters other than the Contract Area to which Project Team members are exposed by virtue of working in Operator's offices. Operator

CONFIDENTIAL

will use reasonable efforts to minimize the exposure of Non-Operating Party representatives to the Operator's proprietary and confidential information.  In no event shall confidential information be disclosed to a third party without the prior written consent of the Participating Parties except as provided in the Operating Agreement.

**5.4**     **Subsequent Disclosures:** Following the expiration of the period of confidentiality set forth in Section 5.1 above, each Party may freely use and disclose the Confidential Information without accounting to any other Party, subject only to whatever patent rights, copyright restrictions or confidentiality obligations are owed to third parties.  Subject to the obligations of confidentiality set forth herein, each Party has the right to copy, display, publish, distribute and prepare derivative works of all documents, drawings or other writings or materials created or conveyed under this Exhibit, including the rights to license, sell or otherwise transfer such rights.

## SECTION 6.0 USE OF CONFIDENTIAL INFORMATION

**6.1**     **Receipt of Confidential Information:** Each Party will be entitled to receive the full reports of all technical studies, detail reports, general conclusions, numerical results, and design drawings from all engineering services that are charged to the Joint Account pursuant to an AFE in which it is a Participating Party, whether such information is developed by a Party participating in the Project Team, an Affiliate or by a third party.

**6.2**     **Right to use Confidential Information:** Subject to the obligation of confidentiality of Section 5, and the obligation of Subsections 6.2.1 and 6.2.2, and subject to the patent rights and copyrights relating to Background Technology and Information of the Parties, each Participating Party may use for its own account (and free of cost) all Confidential Information received or developed by the Project Team under this Agreement.  Each Participating Party may disclose Confidential Information to other members of joint ventures or production sharing arrangements in which the Party or its Affiliate has an ownership interest provided the other members agree, in writing, to hold the Confidential Information in confidence and to use it only for the benefit of that joint venture or production sharing arrangement.

**6.2.1**     **Third Party Limitations:** The Parties acknowledge that various Background Technology may have been received or may be received from third parties under certain restrictions (e.g., that the Party may disclose the third party source information to a co-venturer in a joint venture only under obligations of confidentiality and under restriction to use the information only in connection with the joint venture).  Each delivering Party agrees to identify, in writing, any Background Technology subject to third party restrictions and disclose the nature of the restriction to the receiving Party prior to disclosure of the Background Technology.  The delivering Party shall secure the receiving Party's acknowledgment of such restrictions prior to transmittal of such third party Background Technology.  The receiving Party's acknowledgment constitutes its acceptance of such obligations and restrictions imposed upon disclosure and use of the Background Technology.

Page 7 of 10

APC-00741711

**6.2.2** **Proprietary Software:** During the term of the Project Team, a Party may be authorized to use various computer software and programs that are identified as being proprietary to the authorizing Party or its Affiliate. Such proprietary computer software and programs shall not be considered Project Technology and Information and such computer software and programs are not a deliverable under this Agreement. Use of such proprietary software and programs is not a grant of license of any rights outside of this Agreement and the authorizing Party retains all rights to such property. Use of any such proprietary software is only for the purposes and duration of the Project Team, and each Participating Party must destroy or return to the authorizing Party all copies of any such proprietary software upon completion of the Project Team's activities. Computer software and programs which are not proprietary to one of the Parties or its Affiliate, but which were developed by the Project Team, shall be considered Project Technology and Information and joint property of the Participating Parties.

## SECTION 7.0 INVENTIONS, PATENTS AND COPYRIGHTS

**7.1** **Patent Assignment with Right to License and Sublicense:** All inventions, whether patentable or not, that (1) are conceived solely by outside contractors employed for the Joint Account, or conceived jointly among the Participating Parties (each including its respective Affiliates) while working on the Project Team and (2) result from work which has been charged to the Joint Account are assigned to the Party designated as Operator, or the chairing Party if Operator is a Non-Participating Party, as of the date the patent is issued. The Operator, or chairing Party if applicable, grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license to practice under all such patents, including the right to grant sublicenses under such patents to any third party or Affiliate on such other terms and conditions that such Party deems appropriate, without accounting to any other Party.

**7.2** **Patent Assignment and License With Limited Right to Sublicense:** Patents on inventions not covered in Section 7.1, that are conceived or first reduced to practice (actual or constructive), by a Party or its Affiliate, either alone or jointly with any outside contractors or consultants, and as a direct result of work that has been charged to the Joint Account, will be owned by that Party. The Party owning any such patent grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license under all such patents to make, have made, use and have used such invention for such other Party's own business, including any joint venture or production sharing arrangement in which such other Party has an ownership interest. Further, each such other Participating Party has the right to extend these rights to its Affiliates, but may not otherwise sub-license any such patent.

**7.3** **No Commitment to Disclose Technology:** Except as expressly set forth above, nothing in this Exhibit "G" will be deemed to require any Party or Affiliate to grant any licenses under any patents, copyrights or trade secrets to anyone. The scope and content of any Background Technology disclosed under this Agreement will be determined in the sole discretion of the disclosing Party.

CONFIDENTIAL

APC-00741712

## SECTION 8.0 WARRANTIES AND INDEMNITIES

8.1    **Disclaimer of Warranties:** ALL INFORMATION OR TECHNOLOGY DISCLOSED OR RECEIVED BY THE PARTIES HEREUNDER SHALL BE PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED AND EXCLUDED FROM THIS AGREEMENT.  IN NO EVENT SHALL A PARTICIPATING PARTY CONVEYING OR DISCLOSING INFORMATION OR TECHNOLOGY BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF INFORMATION OR TECHNOLOGY CONVEYED OR DISCLOSED UNDER THIS EXHIBIT.

8.2 **Indemnities:** Each Party agrees to DEFEND, HOLD HARMLESS AND INDEMNIFY the other Parties from and against any loss, damage, claim, suit, liability, judgment and expense (including attorney fees and other costs of litigation) related to, arising out of, or in connection with its use (including use by others which it authorizes), outside of the Contract Area, of any information or technology disclosed, exchanged under or developed pursuant to this Exhibit.

## SECTION 9.0 MISCELLANEOUS PROVISIONS

9.1    **Export Controls:** Each Party agrees to abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Party hereunder.

9.2    **Independent Research:** Nothing herein shall in any way restrict or impair the right of any Party to conduct its own independent research, development, or design activities even though such activities may parallel or overlap the activities of the Project Team.  Any such Party conducting such independent research activities shall be under no obligation pursuant to the Operating Agreement or this Exhibit to disclose any results of independent research to the other Party(ies) or with respect to the use or disposition of the results of independent research, including but not limited to all information and data resulting therefrom.  Any Background Technology presently owned and developed by a Party prior to the effective date of the Operating Agreement shall remain the property of that Party

9.3    **Assignability:** A third party (not a Party to this Agreement at the time the Project Team was formed) which acquires a Working Interest in the Contract Area may join the Project Team upon the unanimous approval of the Participating Parties.  A new Party joining the Project Team must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit.  Such new Party will have all rights, duties and obligations under this Exhibit regarding the use of all Confidential Information exchanged or developed prior to the date it joins the Project Team and during its participation thereunder.  However, patent rights received by such new Party hereunder pursuant to Section 7.0 of this Exhibit shall be

CONFIDENTIAL

limited to patents based on developments after the date such Party joins the Project Team.  In the event that a Party assigns its entire interest in the Leases, the assigning Party shall have all the rights specified in this Exhibit, including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit "G" relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

9.4     **Confidential Information to a Non-Participating Party:**  Any Party to the Operating Agreement who elected not to participate in a Project Team but who receives, upon the satisfaction of the applicable non-consent provisions of Article 16.5.3 of the Operating Agreement, Confidential Data or Confidential Information resulting from the Project Team, shall be subject to all obligations and duties, and shall have all the rights set forth in this Exhibit with respect to confidentiality, restrictions, licensing, sub-licensing, indemnity and export controls.

9.5     **Survival of Certain Provisions**:  All provisions of this Exhibit related to the confidentiality and use of information, patents, licensing and sub-licensing, export controls, and indemnity will survive the termination of this Exhibit or the Operating Agreement or both.

CONFIDENTIAL

APC-00741714

EXHIBIT "H"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

DISPUTE RESOLUTION PROCEDURE

1.     **Dispute Resolution Procedure:** Compliance with this Exhibit "H" shall constitute a condition precedent to any Party seeking judicial enforcement of any provisions of this Agreement.   Any dispute concerning this Agreement (other than claims by a third party under which a Party hereto is claiming indemnity, and such third party claim is in litigation) shall be resolved under the mediation and binding arbitration procedures of this Exhibit "H".  The Parties to the dispute ("Disputing Parties") will first attempt in good faith to resolve all disputes by negotiations between management level persons who have authority to settle the controversy.   If any Party believes further negotiations are futile, such Party may initiate the mediation process by so notifying the other Disputing Parties in writing.  The Disputing Parties shall then attempt in good faith to resolve the dispute by mediation in the city designated by the Operator, in accordance with the Center for Public Resources Model Procedure for Mediation of Business Disputes, as such procedure may be modified by agreement of the Disputing Parties. The Disputing Parties shall share the costs of mediation services equally and shall each have present at the mediation at least one individual who has authority to settle the dispute.   If the dispute has not been resolved pursuant to mediation within ninety (90) days after initiating the mediation process, the dispute shall be resolved through binding arbitration, as follows:

2.     **Selection of Arbitrators**:   If any dispute or controversy arises between the Parties out of this Agreement, the alleged breach thereof, or any tort in connection therewith, or out of the refusal to perform the whole or any part thereof, and the Parties are unable to agree with respect to the matter or matters in dispute or controversy, the same shall be submitted to arbitration before a panel of three (3) arbitrators in accordance with the Louisiana Arbitration Law, (La. R.S. 9.4201, et seq.) and the provisions in this Section 2.  The panel of arbitrators shall be chosen as follows:  Upon the written demand of any of the Disputing Parties and within fifteen (15) days from the date of such demand, each Disputing Party (or group of Disputing Parties) shall name an arbitrator (one (1) for each position) and these two (2) so named shall promptly

CONFIDENTIAL

thereafter choose a third. If a Disputing Party (or group of Disputing Parties) fails to name an arbitrator within fifteen (15) days from such demand, the other Disputing Party (or group of Disputing Parties) shall name the second arbitrator as well as the first, or if the two arbitrators fail within fifteen (15) days from their appointment to agree upon and appoint the third arbitrator, then upon written application by any Party to the dispute, such third arbitrator may be appointed by the senior Judge in active service of the United States District Court for the Western District of Louisiana; and if said Judge shall fail to act, then such third arbitrator shall be appointed by the President of the Center for Public Resources, Inc. The arbitrators selected to act hereunder shall be qualified by education, experience, and training to pass upon the particular matter or matters in dispute.

**3.**   **Arbitration Proceedings**:   The panel of arbitrators so chosen shall proceed promptly to hear and determine the matter or matters in dispute, after giving the Disputing Parties due notice of hearing and a reasonable opportunity to be heard. The procedure of the arbitration proceedings shall be in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as may be modified by the panel of arbitrators. Unless otherwise determined by the arbitrators, the hearing and presentations of the Parties shall not exceed two days cumulative. All arbitration proceedings hereunder shall be held in the city in which the Operator's office is located, unless the panel of arbitrators determines that another venue is more appropriate. The award of the panel of arbitrators or a majority thereof shall be made within forty-five (45) days after the appointment of the third arbitrator, subject to any reasonable delay due to unforeseen circumstances. In the event the panel or a majority thereof fail to make an award within sixty (60) days after the appointment of the third arbitrator, new arbitrators may, at the election of any Disputing Party, be chosen in like manner as if none had been previously selected.

**4.**   **Award and Arbitration Expenses**: The award of the arbitrators, or a majority thereof, shall be in writing, determined in accordance with the substantive law as determined in Article 26.4.1 (*Applicable Law*) of the Agreement, and shall be final and binding on the Parties as to the question or questions submitted and the Parties shall abide by such award and perform the conditions thereof. The award of the arbitrators shall be based on the applicable law and facts, the merits of the parties' positions in the controversy or dispute, and the arbitrators' assessment of the fairness and reasonableness of any settlement proposal of any Party. The arbitrators may not award

CONFIDENTIAL

any punitive or exemplary damages. The award shall not provide or create any rights or benefits in any person or entity which is not a Party to this Agreement, as this Agreement and any arbitration thereunder shall not be construed as a third party beneficiary contract. Unless otherwise determined by the arbitrators, all expenses in connection with such arbitration shall be divided equally between the Disputing Parties, except that the expenses of counsel, witnesses, employees, or other representatives of each Party shall be borne solely by the Party incurring them, and the compensation of any arbitrator named by a Party or group of Parties shall be borne solely by such Party or group of Parties; provided that if court proceedings to stay litigation or compel arbitration are necessary, the Party who unsuccessfully opposes such proceedings shall pay all reasonable associated costs, expenses, and attorneys' fees of such court proceedings.  Except as otherwise provided in the immediately preceding sentence, each Party shall bear its own attorneys' fees in connection with any appeal of an arbitration award, or in any other court litigation arising out of this Agreement.

**5.** **Confidentiality**:  The arbitrators may, but shall not be required, to explain reasons for the award.  No transcript or other recording shall be made of the arbitration proceedings. Except (i) in connection with a suit for enforcement of the award, (ii) as required by law, court order, or regulation, (iii) when reasonably necessary to explain the terms and conditions of the award to outside attorneys, auditors, and insurers, or (iv) as part of good faith compliance with disclosure obligations under applicable law, the arbitration proceedings, the award, and the Parties' actions in connection with the arbitration are confidential and shall not be disclosed to third parties, and no disclosure of or reference to the arbitration, the award, or of the Parties' statements or actions in connection with the arbitration shall be made to any third party.  All offers, promises, conduct, statements, and evidence, whether oral or written, made in the course of the arbitration by any of the Parties, their agents, employees, experts, or attorneys are confidential.  Such offers, promises, conduct, statements, and evidence shall be considered inadmissible under Rule 408 of the Federal Rules of Evidence and any similar state-law provisions, and shall be inadmissible for any purpose, including impeachment.  However, evidence that is otherwise admissible shall not be rendered inadmissible as a result of its use in the arbitration.

**6.** **Enforceability**:  The award of the panel of arbitrators and the obligation to abide by same and perform the conditions thereof shall be enforceable in the Louisiana state district courts in Lafayette Parish, Louisiana, or in any federal court having jurisdiction.

CONFIDENTIAL

APC-00741717

**7.**   **Indemnification**:   The provisions of this Exhibit "H" shall not limit the obligation of a Party to defend, indemnify or hold harmless another Party against court proceedings or other claims, loss, damages or expenses as provided elsewhere in Article 22 *(Liability, Claims, and Lawsuits)* of the Agreement.

**8.**   **Preservation of Rights**:   Notwithstanding the above, any Party may file a complaint for statute of limitations or venue reasons, or seek a preliminary injunction or other provisional judicial relief, if in its sole judgment such action is necessary to avoid irreparable damage or to preserve the status quo.   Despite such actions, the Parties shall continue to try to resolve the dispute by negotiation, mediation, or arbitration as necessary.

CONFIDENTIAL

APC-00741718

EXHIBIT "I"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

## MEMORANDUM OF OPERATING AGREEMENT
## AND FINANCING STATEMENT

### (LOUISIANA)

**To be filed in the conveyance records and
in the mortgage records and as a non-
standard financing statement in accordance
with Paragraph 6.0 herein.**

**1.0** This Memorandum of Operating Agreement and Financing Statement (Louisiana) (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of ConocoPhillips Company, a Delaware Corporation, whose taxpayer identification number is 73-0400345 and whose address is 550 Westlake Park Blvd., Three Westlake Park, Suite 9000, Houston, TX 77079 (the "Operator"), and the undersigned, duly authorized representative of Anadarko E&P Company LP, a Delaware Corporation, whose taxpayer identification number is 73-0739973 and whose address is Anadarko E&P Company LP, 1201 Lake Robbins Drive, Woodlands, TX 77380 (the "Non-Operating Party").

**2.0** The Operator and the Non-Operating Parties are parties to that certain Operating Agreement dated April 1, 2008 (the "Operating Agreement") which Operating Agreement provides for the development and production of crude oil, natural gas and associated substances from the OCS blocks, or portions thereof, described in Exhibit "A" of the Operating Agreement and in Attachment "1" to this Memorandum, or covered by the Leases (hereinafter called the "Contract Area") and which designates Anadarko Petroleum Corporation, as the Operator, to conduct such operations for itself and the Non-Operating Parties. All OCS federal oil and gas leases (or portions thereof) described in Exhibit "A" of the Operating Agreement and in Attachment "1" to this Memorandum and any future oil and gas leases covering OCS blocks, or portions thereof, included within the Contract Area that may be acquired by the Operator or any Non-Operating Party (including substitutions for or replacements of existing leases) are hereinafter called the "Leases."

For the purposes of this Memorandum the term "Development Systems" means:

(a) systems to develop and produce oil and gas and associated liquid and gaseous by-products from a wellbore located on the Contract Area ("*Hydrocarbons*"), including (i) offshore surface structures, whether fixed, compliant or floating, (ii) offshore subsea structures or templates, whether capable of accommodating one or multiple wells, (iii) any combination of (i) and (ii), (iv) any other type of system designed to develop and produce Hydrocarbons, and (v) all associated components of any of the above, and

(b) associated production equipment beyond the wellhead connections

Page 1 of 10

CONFIDENTIAL

APC-00741719

that is installed on or outside the Contract Area pursuant to the Operating Agreement in order to handle or process Hydrocarbon production, including, but not limited to, injection and disposal and disposal wells and the flowlines and gathering lines that transport Hydrocarbons from the wellhead.

**3.0**  Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the parties of their respective share of costs and performance of other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, (c) includes non-consent clauses which establish that parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Leases or portions thereof involved in such operations, (d) grants each party to the Operating Agreement the right to take in kind its proportionate share of all oil and gas produced from the Contract Area, and (e) includes a volumetric Gas Balancing Agreement which is attached as Exhibit "D" to the Operating Agreement.

**4.0**  The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

**5.0**  In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties set forth in the Operating Agreement, the Operator and the Non-Operating Parties hereby agree as follows:

**5.1**  Each Non-Operating Party hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

**5.2**  Each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or

Page 2 of 10

the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers (i) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles, and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of such Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Contract Area.

5.3     To the extent susceptible under applicable law, the mortgage and the security interest granted by each Non-Operating Party in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by such Non-Operating Party to the Operator of all of its obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all expenses incurred by the Operator and the Participating Parties for (or on

CONFIDENTIAL

APC-00741721

account of) any and all operations conducted pursuant to the Operating Agreement ("Costs") and other expenses properly charged to such Non-Operating Party together with (1) interest on such indebtedness, Costs, and other expenses at the rate of the U.S. Treasury Bill 13-week discount rate plus three percent (3%) or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.4     This Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana, with the Operator being the secured party and the Non-Operating Parties being the debtors with respect to such filing.

5.5     The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to the Operating Agreement.

5.6     The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.7     The Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases or the Contract Area when

CONFIDENTIAL                                              APC-00741722

extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers (i) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area.

**5.8** To the extent susceptible under applicable law, the mortgage and the security interest granted by the Operator in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by the Operator to the Non-Operating Parties of all of its obligations and indebtedness of every kind and nature, whether now owed or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all Costs and other expenses properly charged to

CONFIDENTIAL

APC-00741723

the Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate of the U.S. Treasury Bill 13-week discount rate plus three percent (3%) or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.9     For the purposes of the security interest in favor of the Non-Operating Parties, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana, with the Non-Operating Parties being the secured parties and the Operator being the debtor with respect to such filing.

5.10    The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operating Parties to the Operating Agreement at any time.  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0     To serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operating Parties to their interests in and to the Leases and the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the offshore blocks covered by the Leases or included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records.  All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0     If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each party to the Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured party under the Uniform Commercial Code.  If any Non-Operating Party does not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of such Non-Operating Party's production and collect such indebtedness out of the proceeds from the sale of such Non-Operating Party's share of production until the amount owed has been paid.  The Operator shall have the right to offset the amount owed against the proceeds from the sale of such Non-Operating Party's share of

CONFIDENTIAL

APC-00741724

production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by such Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such Non-Operating Party.

**8.0**   Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all parties to the Operating Agreement.  Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such release and termination instrument, each of the Operator and the Non-Operating Parties shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

**9.0**   It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

**10.0**   This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.  The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

**11.0**   A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof.  By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

**12.0**   This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument.  For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of each Non-Operating Party, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured party, and another filing for the Non-Operating Parties, as secured parties.  The respective addresses of the Operator, as both secured party and debtor, and the Non-Operating Parties, as both debtors and secured parties, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

**13.0**   The Operator and the Non-Operating Parties hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating

CONFIDENTIAL

APC-00741725

Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

**14.0** Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

EXECUTED on the dates set forth below each signature but effective as of the 1st day of March, 2006.

**OPERATOR:**

WITNESSES:                    **Anadarko E&P Company LP**

_____          By:_____
                              Name:_____
_____          Title: _____
                              Date: _____

**NON-OPERATING PARTY:**

WITNESSES:                    **ConocoPhillips Company**

_____          By: _____
                              Name: David W. Twomey
_____          Title:  Attorney-in-Fact
                              Date: _____

CONFIDENTIAL                                    APC-00741726

**ACKNOWLEDGMENT**

<div align="center">

**OPERATOR:**

</div>

STATE OF:  TEXAS

COUNTY OF:  MONTGOMERY

On this _____ day of _____, 2007, before me, appeared _____, to me personally known, who, being by me duly sworn, did say that he is the **Agent & Attorney-in-Fact** of **Anadarko E&P Company LP**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

<div align="right">

_____
**NOTARY PUBLIC - STATE OF TEXAS**

</div>

My Commission expires:

<div align="center">

**NON-OPERATING PARTIES:**

</div>

**STATE OF TEXAS**

**COUNTY OF HARRIS**

On this _____ day of _____, 2006, before me, appeared **David W. Twomey**, to me personally known, who, being by me duly sworn, did say that he is the **Attorney-in-Fact** of **ConocoPhillips Company**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

<div align="right">

_____
**NOTARY PUBLIC - STATE OF TEXAS**

</div>

My Commission expires:

CONFIDENTIAL

APC-00741727

## ATTACHMENT "1" TO EXHIBIT "I"

Attached to and made a part of the
Memorandum of Operating Agreement and
Financing Statement (Louisiana) dated
Effective April 1, 2008, by and between
ConocoPhillips Company and Anadarko E&P Company LP

### I.   DESCRIPTION OF LANDS AND LEASES

| OCS-G No. | Area | Block | Expiration Date |
|-----------|------|-------|-----------------|
| 20259 | Walker Ridge | 8 | June 30, 2008 |
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2013 |

### II.   OPERATOR

Anadarko E&P Company LP

### IV.   ADDRESSES/NAMES OF REPRESENTATIVES:

|  | ConocoPhillips Company | Anadarko E&P Company LP |
|--|------------------------|-------------------------|
| Mail: | P. O. Box 2197<br>Houston, TX 77252 | P.O. Box 1330<br>Houston, TX 77251-1330 |
| Office: | 550 Westlake Park Blvd.<br>Three Westlake Park, Suite 3000<br>Houston, TX  77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone:<br>Facsimile: | (832) 486-2000<br>(832) 486-2691 | Telephone:  (832) 636-8831<br>Facsimile:  (832) 636-8059 |

CONFIDENTIAL

APC-00741728

# Exhibit 73

**Shenandoah Prospect**
**Exploration & Development Hierarchy**
**Period Ending August 31, 2017**

| | | Net Spent | Net Expensed | Remaining | Cost Center | Expensed Timing |
|---|---|---:|---:|---:|---|---|
| Walker Ridge 8 001 (52 001) 2064247 | Shen 1 | 62,220,305.30 | 62,220,305.30 | - | 19967230 | Expensed 2017/03 |
| Walker Ridge 51 001 2064209 | Shen 2 J&A | 18,917,596.16 | 18,917,596.16 | - | 1E698330 | Expensed 2017/03 |
| Walker Ridge 51 002 2077304 | Shen 2 | 45,922,741.66 | 45,922,741.66 | - | 1F999900 | Expensed 2017/03 |
| Walker Ridge 51 002 BP01 2081976 | Shen 2 BP1 | 2,540,356.12 | 2,540,356.12 | - | 1F999900 | Expensed 2016/09 |
| Walker Ridge 52 002 2087315 | Shen 3 | 56,686,460.31 | 56,686,460.31 | - | 1H302300 | Expensed 2016/09 |
| Walker Ridge 52 002 BP01 2107090 | Shen 3 BP1 | 7,178,050.17 | 7,178,050.17 | - | 1H302300 | Expensed 2016/09 |
| Walker Ridge 51 003 2104486 | Shen 4 | 43,500,409.44 | 43,500,409.44 | - | 1J046700 | Exp 2015/09&2017/03 |
| Walker Ridge 51 003 ST01 BP00 2116188 | Shen 4 ST1 | 13,145,191.56 | 13,145,191.56 | - | 1J046700 | Expensed 2017/03 |
| Walker Ridge 51 003 ST01 BP01 (Core) 2117303 | Shen 4 ST1 BP1 | 17,502,208.41 | 17,502,208.41 | - | 1J046700 | Expensed 2017/03 |
| Walker Ridge 51 003 ST02 BP00 2118890 | Shen 4 ST2 | 13,724,835.80 | 13,724,835.80 | - | 1J046700 | Expensed 2015/12 |
| Walker Ridge 51 004 2120948 | Shen 5 | 61,385,973.59 | 61,385,973.59 | - | 1J613300 | Expensed 2017/03 |
| Walker Ridge 52 003 2124648 | Shen 6 | 28,394,855.55 | 28,394,855.55 | - | 1J557400 | Expensed 2017/03 |
| Walker Ridge 52 003 ST01 2131100 | Shen 6 ST1 BP1 | 18,503,930.68 | 18,503,930.68 | - | 1J557400 | Expensed 2017/03 |
| Total Shenandoah Exploratory Drilling | | 389,622,914.75 | 389,622,914.75 | - | | |
| | | | | | | |
| Walker Ridge 52 - Remaining KMG book value | | 244,034.13 | 244,034.13 | - | 42000437 | Expensed 2017/03 |
| Walker Ridge 53 - Remaining KMG book value | | 344,277.33 | 344,277.33 | - | 43101851 | Expensed 2017/03 |
| Shenadoah-Remaining KMG Purchase Price Alloc. | | 458,370,183.15 | 458,370,183.15 | - | 43104077 | Expensed 2017/03 |
| Shenandoah P&S with Marathon | | 4,250,668.37 | 4,250,668.37 | - | 43102015 | Expensed 2017/03 |
| Total Shenandoah Leasehold | | 463,209,162.98 | 463,209,162.98 | - | | |
| | | | | | | |
| Various AFEs | | 1,524,192.94 | 1,524,192.94 | - | 40051059 | As Incurred |
| Various AFEs | | 1,979,600.00 | 1,979,600.00 | - | 43103684 | As Incurred |
| Various AFEs | | 6,749,999.97 | 6,749,999.97 | - | 43102015 | As Incurred |
| Various AFEs | | 3,310,036.25 | 3,310,036.25 | - | 43102744 | As Incurred |
| Total Shenandoah Exploration G&G | | 13,563,829.16 | 13,563,829.16 | - | | |
| | | | | | | |
| Various AFEs | | 35,349,051.90 | 35,349,051.90 | - | 43102744 | Expensed 2017/03 |
| Shenadoah COP Carry For JDA 2118398 | | 3,477,567.79 | 3,477,567.79 | - | 43103684 | Expensed 2017/03 |
| Walker Ridge 52 002 TASK PROJECT 2119208 | | 48,929.32 | 48,929.32 | - | 1H302300 | Expensed 2016/10 |
| SHENANDOAH 20A PROJECT NET COSTS 2135425 | | 3,273,193.63 | 3,273,193.63 | - | 43103684 | As Incurred |
| Total Shenandoah Other Exploration Expense | | 42,148,742.64 | 42,148,742.64 | - | | |
| | | | | | | |
| Various AFEs | | 15,616,005.96 | 15,616,005.96 | - | 43102744 | Expensed 2017/03 |
| Total Shenandoah Other Development | | 15,616,005.96 | 15,616,005.96 | - | | |
| | | | | | | |
| Shenandoah Prospect | | 72,727,303.87 | 72,727,303.87 | - | 43101338 | Expensed 2017/03 |
| Total Shenandoah Capitalized Interest | | 72,727,303.87 | 72,727,303.87 | - | | |
| Total Shenandoah Investment | | 996,887,959.36 | 996,887,959.36 | - | | |

CONFIDENTIAL

# Exhibit 74

**To:** 'Fitzgerald, Michael D'[Michael.D.Fitzgerald@conocophillips.com]; Ben.Davis@cobaltintl.com[Ben.Davis@cobaltintl.com]; Lynne Hackedorn[lynne.hackedorn@cobaltintl.com]; scornwell@venari.net[scornwell@venari.net]; 'Randy Bennett'[rbennett@venari.com]
**Cc:** Meyer, Frank[Frank.Meyer@anadarko.com]; Poole, Andrew[Andrew.Poole@anadarko.com]
**From:** Pachman, Jeff['O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Thur 9/21/2017 7:36:58 PM Coordinated Universal Time
**Subject:** Shenandoah

As a follow-up to my phone conversation with each of you on Tuesday, as a direct result of the progression and encouraging results of the Gunnison Relocation Concept and its associated economics, the Asset Team's current path forward plan for Shenandoah is as follows:

- Attempt to secure internal approval to fund our 33% WI share of a Grass Roots Keeper Well, the Shen 7, twinning the Shen 2 – hopeful to secure internal approval the week of October 9th;
- The AFE will include the cost to drill and log the Shen 7 to a depth equivalent to the B/C Shale;
- The preliminary estimated cost of the AFE is projected to be $118MM;
- If the Shen 7 is successful, the preliminary estimated cost to set a production liner and T&A is projected to be $21MM;
- If internal approval is secured for the Drill and Log AFE, the AFE will be formally submitted to Partners – hopeful to submit said AFE the week of October 9th;
- Simultaneously, Anadarko would also be submitting a (i) 2018 20A AFE projected to be $13.7MM; (ii) a 2018 IPT AFE projected to be $7MM; and (iii) a Detailed Engineering Design AFE projected to be $22MM;
- Regarding the currently open and approved AFE's, please refer to the most recently provided VOWD (Value of Work Done) Spreadsheet (through August 2017) to review the current status and 2017 year-end projections associated therewith;
- Soon after submitting the foregoing AFE's to Partners, Anadarko will host a Partner Meeting to present and collectively review all details - The Partner Meeting is currently planned for the week of October 16th as a Meeting Notice will soon appear on your calendars.

During the interim, Anadarko's subsurface team will be forwarding your team with the pertinent details associated with the Grass Roots Keeper Shen 7 well. Please feel free to contact me should you have any questions or need any additional information.

CONFIDENTIAL

# Exhibit 75

**To:** Sanders, Allen[Allen.Sanders@anadarko.com]
**From:** McGrievy, Pat[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=QAJ309]
**Sent:** Sun 10/15/2017 12:45:25 AM Coordinated Universal Time
**Subject:** Re: EC Offsite slide for Shenandoah

We will try to maximize the amount of capital rolled into the financing arrangement during negotiations but I was just indicating to you that our ability to accomplish this (2018 IPT costs) will be less than likely. Your idea about rolling the IPT costs into the financing terms and then reimbursing if we do not go to sanction seems like a reasonable compromise if we have to go there.


Sent from my iPhone

On Oct 14, 2017, at 7:03 PM, Sanders, Allen <Allen.Sanders@anadarko.com> wrote:

Any we request reimbursement on the 2018 capital from arclight? And then if we don't progress things fully, we reimburse them, so we take on the risk to progress the project.


---------------------
*Allen Sanders*
*Anadarko Gulf of Mexico*
*832.636.3918 - office*
*936.499.1379 - mobile*

On Oct 14, 2017, at 5:37 PM, McGrievy, Pat <Pat.McGrievy@anadarko.com> wrote:

Allen,

I will get you the line item details on our current assumptions for the Arclight financing structure later this afternoon. I discussed your question with Colin this morning and he and I both agree that 2018 capital will not be impacted or reduced by the Arclight agreement and that the current proposed 2018 budget of $50 MM will not change. We will certainly have a better understanding once we meet with Arclight on Tuesday afternoon on their framework proposal.  Again, I will have the breakdown on financing assumptions to you within the next few hours as Colin is on the road traveling.

On another note, I have attached a short 2 slide powerpoint presentation that Eulalia Munoz-Cortija put together displaying a waterfall chart showing the incremental economics for a Shen 2 twin and a Shen 2 mid-dip location of ~1,200'. I miss-informed you yesterday about the ROR differential for the base case. It's only about 0.9% as you had suggested. When I saw the results initially, I was actually looking at the low case ROR differential which is about 3% lower.


Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

From: Sanders, Allen
Sent: Saturday, October 14, 2017 8:31 AM
To: McGrievy, Pat <Pat.McGrievy@anadarko.com>
Subject: Re: EC Offsite slide for Shenandoah

Okay, thanks. I need to better understand what parts get recouped trough financing.

---------------------
Allen Sanders
Anadarko Gulf of Mexico
832.636.3918 - office
936.499.1379 - mobile

On Oct 13, 2017, at 9:56 PM, McGrievy, Pat <Pat.McGrievy@anadarko.com<mailto:Pat.McGrievy@anadarko.com>> wrote:
You are Dead-on with my understanding of EC's position after last EC meeting. Surprised to hear that they still believe that this project will go forward capital-free without STO in play. For your understanding only, the vast majority, if not all of the recoupment of 2018 capital (Detailed engineering, etc)  will likely not be recovered through financing.

Sent from my iPhone

CONFIDENTIAL

On Oct 13, 2017, at 6:31 PM, Sanders, Allen <Allen.Sanders@anadarko.com<mailto:Allen.Sanders@anadarko.com>> wrote:
Confidential. Don't pass this around. But want you to be on same page with me.

Let me know if you see it different than I wrote.

- Allen

Begin forwarded message:
From: "Ingram, Mitch" <Mitchell.Ingram@anadarko.com<mailto:Mitchell.Ingram@anadarko.com>>
Date: October 13, 2017 at 6:24:41 PM CDT
To: "Sanders, Allen" <Allen.Sanders@anadarko.com<mailto:Allen.Sanders@anadarko.com>>
Subject: Re: EC Offsite slide for Shenandoah
Thanks - this is very helpful and I will get back to over the weekend, if I need any additional information.

Mitch
Sent from my iPhone

On Oct 13, 2017, at 4:55 PM, Sanders, Allen <Allen.Sanders@anadarko.com<mailto:Allen.Sanders@anadarko.com>> wrote:
I understand. It's hard to pack all the information and planning thoughts into a single slide, so I hope I haven't misled, some of that $50MM in 2018 would be recouped through future financing. Here are some things that we thought we heard that may help with your questions for me.

What we thought we heard when we walked away from the EC meeting, is minimize spending and create future optionality to either develop or monetize…

1)    The EC felt like we were giving away too much value to STO with just a small carry in a ST well

2)    The EC was willing to lose the small STO carry on a ST and make a counter offer to STO for a GR well (but, STO was unwilling to budge)

3)    The EC would be willing to review a GR well without STO, no guarantees on approval though

4)    A ST only perpetuated the lease, but a GR well at least gave us a 2nd producer

5)    A 2nd producer allowed us a path to production

6)    A path to production allowed us a way to gain financing from ArcLight (or similar) to finance the Spar topside ~$350MM and through FMC possibly finance the SS system ~$350MM

7)    With this in place we would be able to move this toward a development scenario that would allow us the optionality to monetize or develop with very little future investment

Hope this helps with some of the thought process

Allen


From: Ingram, Mitch
Sent: Friday, October 13, 2017 4:19 PM
To: Sanders, Allen <Allen.Sanders@anadarko.com<mailto:Allen.Sanders@anadarko.com>>
Subject: Re: EC Offsite slide for Shenandoah

Allen,

Thanks  - I didn't expect to see this......there is obviously a major disconnect between what the EC think of Shenandoah (eg no more money being spent on it) and the plan being presented here!!

Let me think about this a bit more and I may get back to you over the weekend.

Mitch


Sent from my iPad

On 13 Oct 2017, at 16:13, Sanders, Allen <Allen.Sanders@anadarko.com<mailto:Allen.Sanders@anadarko.com>> wrote:
Mitch, Here is a slide for you at the EC offsite with key milestones that will need to occur in 2017 and into 2018/19 for progress of this project. The key driver for the timing of this project is the lease expiration in April 2018, then we will be on a 365 day clock to exit or file SOP. - Allen
<2017-10-13_Mich-EC Offsite - Shenandoah.pptx>
<2017_10_06_Shen economic update_Shen7 (006).PPTX>

CONFIDENTIAL

# Exhibit 76


**ConocoPhillips**

**Melissa Coleman**
Manager, Strategy, Portfolio, Assurance & Deepwater
600 North Dairy Ashford, OA-3036
Houston, Texas 77079
Tel (281) 293-4973
Fax (281) 293-6921

December 6, 2017

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, TX 77380
Attn: Frank Meyer

Re:   Shenandoah Prospect- Shenandoah WR51#5 ("Shen-7") Well AFE
      Anadarko AFE No. 2140195

Dear Mr. Meyer:

This letter is in response to that certain Lease OCS-G 31938 Walker Ridge Block 51 Well No.5 AFE (Anadarko AFE No. 2140195) ("Shen-7 AFE") submitted to ConocoPhillips Company ("COPC"), Cobalt International Energy, L.P. ("Cobalt") and Venari Offshore LLC ("Venari") by Anadarko Petroleum Corporation ("APC") (the "Operator"). Unfortunately, due to lack of clarity surrounding the Operator's forward plan for the project, COPC cannot support the Shen-7 Well AFE.

Following results of the Shenandoah WR52#3 ("Shen-6") and WR52#3ST ("Shen-6ST") wells in the 1st Quarter of 2017, which triggered APC's write down of the book value in its Q1 earnings report, the Operator continued to focus resources on progressing plans for a new build host. This was despite frequent attempts by COPC, Cobalt and Venari to redirect the Operator's project team to investigate the technical and economic merits of alternative development concepts. These delays cost the partnership valuable time.

Over the past couple months, the Operator had begun to progress a phased development concept based on relocating and reconditioning the Gunnison SPAR. Preliminary discussions were very encouraging, but details have yet to be communicated on critical elements of this new plan, including: timeline to achieving alignment on a new single development concept, path forward to a 20 K psi completion rig, details and justification for the well completion strategy, host procurement plans and estimated operating costs. It was indicated by APC that this information would be provided through a series of meetings and workshops to be completed before new project AFEs were due to be approved, but these meetings have since been cancelled.

Based on these actions, COPC has diminished confidence the Shenandoah project will progress to a viable development solution, and therefore sees significant risk to committing additional capital. As such, please find attached our non-consent to the Shen-7 Well AFE.

Should you have any questions or concerns please feel free to contact Michael Fitzgerald at (281)293-1690, michael.d.fitzgerald@cop.com, for commercial matters, or the undersigned for technical matters.

Yours very truly,

Melissa Coleman
Manager, Strategy, Portfolio, Assurance & Deepwater

Shen-7 AFE Response- ConocoPhillips Company

CONFIDENTIAL                                                                                          APC-00336945

ANADARKO PETROLEUM CORPORATION                                    P.O. BOX 1330 • HOUSTON, TEXAS 77251-1330



November 9, 2017

ConocoPhillips Company                          Cobalt International Energy, L.P.
600 N. Dairy Ashford, Suite DU 3018            920 Memorial City Way, Suite 100
Houston, TX 77079                              Houston, TX 77024
Attn:  Lindsay Alaniz/Michael Fitzgerald       Attn:  Ben Davis
Fax:   281-293-6171                            Fax:   713-579-9196

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn:  Scott Cornwell/Randy Bennett
Fax:   713-266-2330

RE:    Shenandoah Prospect
       Anadarko AFE No. 2140195
       Lease OCS-G 31938 Walker Ridge Block 51 Well No. 5 (Shen 7)
       Unit/Lease Maintenance Operation

Gentlemen:

Enclosed for your review and approval is Anadarko AFE No. 2140195 in which Anadarko proposes drilling, logging, and evaluating the Walker Ridge Block 51 No. 5 Well, referred to as the "Shen 7", for an estimated gross (100%) cost of $108,040,481. The Shen 7 is targeting previously discovered Upper and Lower Wilcox reservoir sands approximately 150'-350' updip of the WR 51 #2 (Shen 2), with a projected penetration point approximately 600' laterally north-northeast therefrom.

The Shen 7 is proposed as a directional well from the Shen 5 Fault Block to the Shen 2 Fault Block, namely, from EP Location "EEE", at or about an X&Y coordinate of X=2,105,587 and Y=9,768,207' being approximately 1,132' FEL and 5,072' FNL of Block 51 to an estimated bottom-hole X&Y coordinate of X=2,102,991' and Y=9,767,629' being approximately 3,738' FEL and 5,650' FNL of Block 51. The Shen 7 is proposed to be drilled to a total depth of approximately 30,442' TVD/30,737' MD, with the <u>Objective Depth</u>, as prescribed in the Shenandoah UOA, being the shallower of:

(i)     The base of the Lower Wilcox C Sand with sufficient rat hole (the Lower Wilcox C Sand is defined as the stratigraphic equivalent of that certain sand encountered at a depth of approximately 30,578' TVD/MD in the Shen 2); or

(ii)    A depth of 30,814' TVD.

The anticipated logging and evaluation program at TD currently consists of Density, Neutron, Magnetic Resonance, Spectral Gamma Ray, Elemental Capture Spectroscopy,

CONFIDENTIAL                                                               APC-00336946

Tr-axial Resistivity, Sonic Scanner, Quanta Geo (NGI), MDT w/quicksilver for pressures and samples, and possibly rotary cores. Opportunities to combine runs and optimize data collection will be based primarily upon the quality of the LWD data.

Although Anadarko will make a formal recommendation pursuant to Article 11.2 (*Appraisal Operations at Objective Depth*) after the Shen 7 has been drilled to Objective Depth and logged/evaluated, for informational purposes, the current estimated cost to Case & Suspend the well (in addition to the AFE amount prescribed herein) is $5.8MM. Please be reminded, however, any original Participating Party in the Shen 7 shall remain responsible for its participating interest share of any and all Cost (less and except any additional Cost attributable to a non-consent operation) to permanently plug and abandon same.

The proposed well is currently planned to be drilled (utilizing approximately 90 days of rig time) with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Blackhawk is approximately $525,000 and is anticipated to be delivered to the Shen 7 participants for mobilization to the proposed location for a March 2018 spud.

Under the Shenandoah UOA, as amended, Appraisal Operations have contractually concluded pursuant to Article 11.5(b). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the Shen 7 is deemed an Appraisal Operation. Moreover, since the Shen 7 is a Unit activity/operation necessary to maintain the entire Unit Area, the Shen 7 is not only an Appraisal Operation (for which a Vote does not apply), but it is also an operation in which any Non-Participating Party is subject to forfeiture pursuant, in particular, to Article 16.4.1 (*Acreage Forfeiture in the entire Unit Area*).

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures and the anticipated evaluation program; (ii) an estimated days versus depth plot (both in dollars and in days); and (iii) a directional well plan.

**Pursuant to Article 8.6.1 (*Well Proposals, Deepening, Sidetrack, Recompletions and Workovers*), each Party has thirty (30) days from receipt of this proposal or on or before December 9, 2017 to make its participation election as to same.** Should you have any questions or need any additional information, please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

CONFIDENTIAL



## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622          AFE No: 2140195          AFE Type: DE - DRILLING - EXPLORATORY
Well #/Name: 1K151500 / WALKER RIDGE 51 005          Field: 2535 UNNAMED  (MID-CONTIN
Country: USA          State/Province: NORTHERN (          County: WALKER RIDGE
Prospect:          Surface Loc: 60812 51
Target Zone: WILCOX 9300          Bottom Hole Loc: 60812 51
Project Depth:
Project Name: WALKER RIDGE 51 005
Project Description: THE SHENANDOAH TEAM SEEKS INTERNAL APPROVAL IN THE AMOUNT OF $35.6MM NET TO
DRILL & LOG THE WR51-5 (SHEN 7) WELL TARGETING PREVIOUSLY DISCOVERED
PRODUCTIVE WILCOX RESERVOIR SANDS 150-350 FT UP-DIP OF SHEN 2, WHICH IS A
LOCATION 600 FT LATERALLY NNE OF SHEN2. THIS WELL WILL PERPETUATE THE
SHENANDOAH LEASES PAST THE CURRENT APRIL 2018 LEASE EXPIRATION FOR ONE YEAR IN
ORDER TO FURTHER EVALUATE DEVELOPMENT OPTIONS FOR SHENANDOAH. THE CASE &
SUSPEND COST IS ESTIMATED TO BE AN ADDITIONAL $5.8MM NET. THE WELL IS
CURRENTLY REFLECTED ON THE RIG-SCHEDULE TO SPUD IN MARCH 2018 WITH OPERATIONS
ESTIMATED TO LAST 90 DAYS.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE LLC | | 0.33000000 | $35,653,359 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $32,412,144 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $21,608,096 |
| VENARI OFFSHORE LLC | | 0.17000000 | $18,366,882 |
| TOTAL | | 1.00000000 | $108,040,481 |

| | DRL.DHC | Total |
|---|---|---|
| ORIGINAL | $108,040,481 | $108,040,481 |
| Total | $108,040,481 | $108,040,481 |

### Please mark your election in the box below

☐ Election to Participate

☒ Election to Non-Consent

APPROVED BY: _Mtlamon_          PRINTED NAME: _MERVA GRAHAN_

COMPANY NAME: _ConocoPhillips_          DATE: _12, 6, 2017_

CONFIDENTIAL          APC-00336948



## Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622   AFE No: 2140195

Well #/Name: 1K151500 / WALKER RIDGE 51 005

AFE Type: DE - DRILLING - EXPLORATORY

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 0080012230 | Cased Hole Logs & E-line Ops | $18,070 | $0 | $18,070 | $0 | $18,070 |
| 0080012410 | Casing > 30 in (>76.17 cm) | $1,115,467 | $0 | $0 | $1,115,467 | $1,115,467 |
| 0080012370 | Casing 12.0-15.99 in. (30.46-40.61 cm) | $3,790,700 | $0 | $0 | $3,790,700 | $3,790,700 |
| 0080012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $3,558,500 | $0 | $0 | $3,558,500 | $3,558,500 |
| 0080012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $893,200 | $0 | $0 | $893,200 | $893,200 |
| 0080012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $564,000 | $0 | $0 | $564,000 | $564,000 |
| 0080012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $456,000 | $0 | $0 | $456,000 | $456,000 |
| 0080012430 | Casing Accessories | $350,000 | $0 | $0 | $350,000 | $350,000 |
| 0080012010 | Contract Drilling | $35,847,420 | $0 | $35,847,420 | $0 | $35,847,420 |
| 0080012020 | Directional Drilling Services | $1,209,357 | $0 | $1,209,357 | $0 | $1,209,357 |
| 0080012060 | Downhole Rental Equipment | $2,090,830 | $0 | $2,090,830 | $0 | $2,090,830 |
| 0080012040 | Drill Bits | $700,000 | $0 | $700,000 | $0 | $700,000 |
| 0080012300 | Drilling & Wellwork Consulting Services | $25,000 | $0 | $25,000 | $0 | $25,000 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $859,715 | $0 | $859,715 | $0 | $859,715 |
| 0080012050 | Drilling & Wellwork Fuel | $2,085,000 | $0 | $2,085,000 | $0 | $2,085,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $2,628,699 | $0 | $2,628,699 | $0 | $2,628,699 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $8,579,835 | $0 | $17,159,670 | $8,579,835 | $8,579,835 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $2,649,618 | $0 | $2,649,618 | $0 | $2,649,618 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $76,450 | $0 | $76,450 | $0 | $76,450 |
| 0080017030 | Environmental Waste Disposal | $104,250 | $0 | $104,250 | $0 | $104,250 |
| 0080017000 | Environmental/Regulatory Studies & Plans | $14,000,000 | $0 | $14,000,000 | $0 | $14,000,000 |
| 0080012160 | Fishing Tools and Services | $276,263 | $0 | $276,263 | $0 | $276,263 |
| 0080012440 | Liner Hanger | $500,000 | $0 | $0 | $500,000 | $500,000 |
| 0080025020 | Living & Camp/Housing Expenses | $196,685 | $0 | $196,685 | $0 | $196,685 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $227,265 | $0 | $227,265 | $0 | $227,265 |
| 0080012540 | Mud Line Hanger Systems | $454,212 | $0 | $0 | $454,212 | $454,212 |
| 0080012120 | Mud Logging | $607,500 | $0 | $607,500 | $0 | $607,500 |
| 0080012110 | Open Hole Logging | $5,139,560 | $0 | $5,139,560 | $0 | $5,139,560 |
| 0080031050 | Overhead Billed - System Calculated | $6,598,417 | $0 | $6,598,417 | $0 | $6,598,417 |
| 0080012090 | Primary Cementing | $2,573,169 | $0 | $2,573,169 | $0 | $2,573,169 |
| 0080012000 | Rig Mobilization/Demobilization | $523,320 | $0 | $523,320 | $0 | $523,320 |
| 0080025010 | Shore Base/Staging Area Expenses | $139,000 | $0 | $139,000 | $0 | $139,000 |
| 0080015250 | Subsea Wellhead | $741,551 | $0 | $0 | $741,551 | $741,551 |
| 0080025070 | Telephone & Communications | $104,250 | $0 | $104,250 | $0 | $104,250 |
| 0080024000 | Transportation/Freight Air | $1,591,550 | $0 | $1,591,550 | $0 | $1,591,550 |
| 0080024020 | Transportation/Freight Ground | $121,973 | $0 | $121,973 | $0 | $121,973 |
| 0080024010 | Transportation/Freight Marine | $6,643,655 | $0 | $6,643,655 | $0 | $6,643,655 |
|  | **Total  DRL.DHC** | $108,040,481 | $0 | $104,196,686 | $21,003,465 | $108,040,481 |
| **TOTAL** | | $108,040,481 | $0 | $104,196,686 | $21,003,465 | $108,040,481 |



# WR 51 #5 ST00BP00
# Shenandoah VII

**WELL:** [illegible]
**EP SL:** [illegible]
**DIRECTIONAL:** [illegible]
**OCS-G:** [illegible]

| | NORTHING | EASTING |
|---|---|---|
| SL: | [illegible] | [illegible] |
| BHL: | [illegible] | [illegible] |

**RIG:** [illegible]
**RKB to MSL:** [illegible]
**WD:** [illegible]
**RKB to ML:** [illegible]

SF FG: Fracture Gradient using Surface Mud Weight
DH FG: Fracture Gradient using Downhole Mud Weight
SF FIT: FIT Value using Surface Mud Weight
SF LOT: LOT Value using Surface Mud Weight

**RKB to ML:** [illegible]
**18-3/4" HPH:** [illegible]
**36" LPH:** [illegible]

DIRECTIONAL SUMMARY: DHB to 18,300' MD and kick-off at 1.5°/100 ft to 12.8° inclination, Hold angle to TD

CONFIDENTIAL

**Schlumberger**

## WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17  Proposal Geodetic Report
### (Def Plan)



| | |
|---|---|
| Report Date: | October 24, 2017 - 09:17 AM |
| Client: | Anadarko Petroleum Corporation |
| Field: | Walker Ridge Block 051,052 (Shenandoah) |
| Structure / Slot: | WR051 005 / WR051 005 Shen-7 |
| Well: | OCS-G 31938 005 (Shen-7) |
| Borehole: | ST00BP00 |
| UWI / API#: | Unknown / Unknown |
| Survey Name: | WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |
| Survey Date: | October 24, 2017 |
| Tort / AHD / DDI / ERD Ratio: | 12.795 ° / 2660.268 ft / 4.536 / 0.087 |
| Coordinate Reference System: | NAD27 UTM Zone 15N, US Feet |
| Location Lat / Long: | N 26° 54' 44.31455", W 91° 34' 19.78163" |
| Location Grid N/E Y/X: | N 9758207.800 ftUS, E 2105587.390 ftUS |
| CRS Grid Convergence Angle: | 0.8464 ° |
| Grid Scale Factor: | 0.99984818 |
| Version / Patch: | 2.10.544.0 |

| | |
|---|---|
| Survey / DLS Computation: | Minimum Curvature / Lubinski |
| Vertical Section Azimuth: | 257.434 ° (Grid North) |
| Vertical Section Origin: | 0.000 ft, 0.000 ft |
| TVD Reference Datum: | Rotary Table |
| TVD Reference Elevation: | 92.000 ft above MSL |
| Seabed / Ground Elevation: | 5840.619 ft below MSL |
| Magnetic Declination: | 0.316 ° |
| Total Gravity Field Strength: | 998.3409mgn (9.80665 Based) |
| Gravity Model: | GARM |
| Total Magnetic Field Strength: | 45214.546 nT |
| Magnetic Dip Angle: | 56.246 ° |
| Declination Date: | March 12, 2018 |
| Magnetic Declination Model: | HDGM 2017 |
| North Reference: | Grid North |
| Grid Convergence Used: | 0.8464 ° |
| Total Corr Mag North->Grid North: | -0.3281 ° |
| Local Coord Referenced To: | Well Head |

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (E/W ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tie-In | 0.00 | 0.00 | 0.00 | 0.00 | -92.00 | 0.00 | 0.00 | 0.00 | N/A | 9758207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| MudLine | 5932.62 | 0.00 | 257.43 | 5932.62 | 5840.62 | 0.00 | 0.00 | 0.00 | 0.00 | 9758207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| KOP | 18300.00 | 0.00 | 257.43 | 18300.00 | 18216.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9758207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| | 18400.00 | 1.50 | 257.43 | 18399.99 | 18317.99 | 1.31 | -0.28 | -1.28 | 1.50 | 9758207.52 | 2105586.11 | N 26 54 44.31 | W 91 34 19.78 |
| | 18500.00 | 3.00 | 257.43 | 18499.91 | 18417.91 | 5.23 | -1.14 | -5.11 | 1.50 | 9758206.66 | 2105582.28 | N 26 54 44.30 | W 91 34 19.84 |
| | 18600.00 | 4.50 | 257.43 | 18599.69 | 18517.69 | 11.77 | -2.58 | -11.49 | 1.50 | 9758205.24 | 2105575.90 | N 26 54 44.29 | W 91 34 19.91 |
| | 18700.00 | 6.00 | 257.43 | 18699.27 | 18617.27 | 20.92 | -4.55 | -20.42 | 1.50 | 9758203.25 | 2105566.97 | N 26 54 44.27 | W 91 34 20.01 |
| | 18800.00 | 7.50 | 257.43 | 18798.57 | 18716.57 | 32.68 | -7.11 | -31.90 | 1.50 | 9758200.69 | 2105555.50 | N 26 54 44.25 | W 91 34 20.14 |
| | 18900.00 | 9.00 | 257.43 | 18897.54 | 18815.54 | 47.03 | -10.23 | -45.90 | 1.50 | 9758197.57 | 2105541.50 | N 26 54 44.22 | W 91 34 20.29 |
| | 19000.00 | 10.50 | 257.43 | 18996.09 | 18914.09 | 63.96 | -13.92 | -62.43 | 1.50 | 9758193.89 | 2105524.97 | N 26 54 44.18 | W 91 34 20.47 |
| EOC (Curve-Hold) | 19153.02 | 12.80 | 257.43 | 19145.94 | 19063.94 | 93.47 | -18.16 | -81.47 | 1.50 | 9758189.64 | 2105505.93 | N 26 54 44.14 | W 91 34 20.68 |
| | 19200.00 | 12.80 | 257.43 | 19191.76 | 19109.76 | 94.35 | -20.64 | -92.58 | 1.50 | 9758187.17 | 2105494.82 | N 26 54 44.12 | W 91 34 20.81 |
| | 19300.00 | 12.80 | 257.43 | 19289.26 | 19207.26 | 105.26 | -22.50 | -102.74 | 0.00 | 9758184.60 | 2105484.67 | N 26 54 44.10 | W 91 34 20.92 |
| | 19400.00 | 12.80 | 257.43 | 19386.79 | 19304.79 | 149.55 | -27.72 | -124.35 | 0.00 | 9758180.09 | 2105463.06 | N 26 54 44.05 | W 91 34 21.16 |
| | 19500.00 | 12.80 | 257.43 | 19484.31 | 19402.31 | 171.70 | -32.54 | -146.97 | 0.00 | 9758175.27 | 2105441.44 | N 26 54 44.01 | W 91 34 21.40 |
| | 19600.00 | 12.80 | 257.43 | 19581.83 | 19499.83 | 193.84 | -37.35 | -167.59 | 0.00 | 9758170.45 | 2105419.83 | N 26 54 43.96 | W 91 34 21.64 |
| | 19700.00 | 12.80 | 257.43 | 19679.34 | 19597.34 | 215.99 | -42.17 | -189.20 | 0.00 | 9758165.63 | 2105368.22 | N 26 54 43.92 | W 91 34 21.88 |
| | 19800.00 | 12.80 | 257.43 | 19776.86 | 19694.86 | 238.14 | -51.61 | -210.82 | 0.00 | 9758160.82 | 2105376.60 | N 26 54 43.87 | W 91 34 22.12 |
| | 19900.00 | 12.80 | 257.43 | 19874.38 | 19792.38 | 260.28 | -56.63 | -254.05 | 0.00 | 9758156.00 | 2105354.99 | N 26 54 43.83 | W 91 34 22.36 |
| | 20000.00 | 12.80 | 257.43 | 19971.89 | 19889.89 | 282.43 | -61.44 | -275.67 | 0.00 | 9758146.36 | 2105311.77 | N 26 54 43.74 | W 91 34 22.83 |
| | 20100.00 | 12.80 | 257.43 | 20069.41 | 19987.41 | 304.58 | -66.26 | -297.28 | 0.00 | 9758141.55 | 2105290.15 | N 26 54 43.69 | W 91 34 23.07 |
| | 20200.00 | 12.80 | 257.43 | 20166.93 | 20084.93 | 326.73 | -71.08 | -318.90 | 0.00 | 9758136.73 | 2105268.54 | N 26 54 43.65 | W 91 34 23.31 |
| | 20300.00 | 12.80 | 257.43 | 20264.45 | 20182.45 | 348.87 | -75.90 | -340.52 | 0.00 | 9758131.91 | 2105246.93 | N 26 54 43.60 | W 91 34 23.55 |
| | 20400.00 | 12.80 | 257.43 | 20361.96 | 20279.96 | 371.02 | -80.72 | -362.13 | 0.00 | 9758127.10 | 2105225.31 | N 26 54 43.56 | W 91 34 23.79 |
| | 20500.00 | 12.80 | 257.43 | 20459.48 | 20377.48 | 393.17 | -85.54 | -383.75 | 0.00 | 9758122.28 | 2105203.70 | N 26 54 43.51 | W 91 34 24.03 |
| | 20600.00 | 12.80 | 257.43 | 20557.00 | 20475.00 | 415.31 | -90.35 | -405.36 | 0.00 | 9758117.46 | 2105182.09 | N 26 54 43.47 | W 91 34 24.27 |
| | 20700.00 | 12.80 | 257.43 | 20654.51 | 20572.51 | 437.46 | -95.17 | -426.98 | 0.00 | 9758112.64 | 2105160.47 | N 26 54 43.42 | W 91 34 24.51 |
| | 20800.00 | 12.80 | 257.43 | 20752.03 | 20670.03 | 459.61 | -99.99 | -448.60 | 0.00 | 9758107.83 | 2105138.86 | N 26 54 43.37 | W 91 34 24.75 |
| | 20900.00 | 12.80 | 257.43 | 20849.55 | 20767.55 | 481.75 | -104.61 | -470.21 | 0.00 | 9758103.01 | 2105117.25 | N 26 54 43.33 | W 91 34 24.99 |
| | 21000.00 | 12.80 | 257.43 | 20947.06 | 20865.06 | 503.90 | -109.63 | -491.83 | 0.00 | 9758098.19 | 2105095.64 | N 26 54 43.28 | W 91 34 25.23 |
| | 21100.00 | 12.80 | 257.43 | 21044.58 | 20962.58 | 526.05 | -114.44 | -513.45 | 0.00 | 9758093.37 | 2105074.02 | N 26 54 43.24 | W 91 34 25.47 |
| | 21200.00 | 12.80 | 257.43 | 21142.10 | 21060.10 | 548.19 | -119.26 | -535.06 | 0.00 | 9758088.56 | 2105052.41 | N 26 54 43.19 | W 91 34 25.71 |
| | 21300.00 | 12.80 | 257.43 | 21239.61 | 21157.61 | 570.34 | -124.08 | -556.68 | 0.00 | 9758083.74 | 2105030.80 | N 26 54 43.15 | W 91 34 25.95 |
| | 21400.00 | 12.80 | 257.43 | 21337.13 | 21255.13 | 592.49 | -128.90 | -578.30 | 0.00 | 9758079.92 | 2105009.18 | N 26 54 43.10 | W 91 34 26.19 |

APC-00336951

CONFIDENTIAL

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (EW ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 21500.00 | 12.80 | 257.43 | 21424.65 | 21352.65 | 614.63 | -133.72 | -599.91 | 0.00 | 9768074.10 | 2104987.57 | N 26 54 43.06 | W 91 34 26.42 |
| | 21600.00 | 12.80 | 257.43 | 21532.16 | 21450.16 | 635.78 | -138.54 | -621.53 | 0.00 | 9768069.29 | 2104965.96 | N 26 54 43.01 | W 91 34 26.66 |
| | 21700.00 | 12.80 | 257.43 | 21629.68 | 21547.68 | 658.93 | -143.35 | -643.14 | 0.00 | 9768064.47 | 2104944.35 | N 26 54 42.97 | W 91 34 26.89 |
| | 21800.00 | 12.80 | 257.43 | 21727.20 | 21645.20 | 681.07 | -148.17 | -664.76 | 0.00 | 9768059.65 | 2104922.73 | N 26 54 42.92 | W 91 34 27.14 |
| | 21900.00 | 12.80 | 257.43 | 21824.71 | 21742.71 | 703.22 | -152.99 | -686.36 | 0.00 | 9768054.83 | 2104901.12 | N 26 54 42.88 | W 91 34 27.38 |
| | 22000.00 | 12.80 | 257.43 | 21922.23 | 21840.23 | 725.37 | -157.81 | -707.99 | 0.00 | 9768050.02 | 2104879.51 | N 26 54 42.83 | W 91 34 27.62 |
| | 22100.00 | 12.80 | 257.43 | 22019.75 | 21937.75 | 747.51 | -162.63 | -729.61 | 0.00 | 9768045.20 | 2104857.89 | N 26 54 42.79 | W 91 34 27.86 |
| | 22200.00 | 12.80 | 257.43 | 22117.26 | 22035.26 | 769.66 | -167.44 | -751.23 | 0.00 | 9768040.38 | 2104836.28 | N 26 54 42.74 | W 91 34 28.10 |
| | 22300.00 | 12.80 | 257.43 | 22214.78 | 22132.78 | 791.81 | -172.26 | -772.84 | 0.00 | 9768035.56 | 2104814.67 | N 26 54 42.69 | W 91 34 28.34 |
| | 22400.00 | 12.80 | 257.43 | 22312.30 | 22230.30 | 813.95 | -177.08 | -794.46 | 0.00 | 9768030.75 | 2104793.05 | N 26 54 42.65 | W 91 34 28.82 |
| | 22500.00 | 12.80 | 257.43 | 22409.81 | 22327.81 | 836.10 | -181.90 | -816.07 | 0.00 | 9768025.93 | 2104771.44 | N 26 54 42.60 | W 91 34 28.82 |
| | 22600.00 | 12.80 | 257.43 | 22507.33 | 22425.33 | 858.25 | -186.72 | -837.69 | 0.00 | 9768021.11 | 2104749.83 | N 26 54 42.56 | W 91 34 29.06 |
| | 22700.00 | 12.80 | 257.43 | 22604.85 | 22522.85 | 880.39 | -191.54 | -859.31 | 0.00 | 9768016.29 | 2104728.22 | N 26 54 42.51 | W 91 34 29.30 |
| | 22800.00 | 12.80 | 257.43 | 22702.36 | 22620.36 | 902.54 | -196.35 | -880.92 | 0.00 | 9768011.48 | 2104706.60 | N 26 54 42.47 | W 91 34 29.54 |
| | 22900.00 | 12.80 | 257.43 | 22799.88 | 22717.88 | 924.69 | -201.17 | -902.54 | 0.00 | 9768006.66 | 2104684.99 | N 26 54 42.42 | W 91 34 29.78 |
| | 23000.00 | 12.80 | 257.43 | 22897.40 | 22815.40 | 946.83 | -205.99 | -924.16 | 0.00 | 9768001.84 | 2104663.38 | N 26 54 42.38 | W 91 34 30.02 |
| | 23100.00 | 12.80 | 257.43 | 22994.91 | 22912.91 | 968.98 | -210.81 | -945.77 | 0.00 | 9767997.02 | 2104641.76 | N 26 54 42.33 | W 91 34 30.25 |
| | 23200.00 | 12.80 | 257.43 | 23092.43 | 23010.43 | 991.13 | -215.63 | -967.39 | 0.00 | 9767992.21 | 2104620.15 | N 26 54 42.29 | W 91 34 30.49 |
| | 23300.00 | 12.80 | 257.43 | 23189.95 | 23107.95 | 1013.27 | -220.44 | -989.00 | 0.00 | 9767987.39 | 2104598.54 | N 26 54 42.24 | W 91 34 30.73 |
| | 23400.00 | 12.80 | 257.43 | 23287.47 | 23205.47 | 1035.42 | -225.26 | -1010.62 | 0.00 | 9767982.57 | 2104576.92 | N 26 54 42.20 | W 91 34 30.97 |
| | 23500.00 | 12.80 | 257.43 | 23384.98 | 23302.98 | 1057.57 | -230.08 | -1032.24 | 0.00 | 9767977.76 | 2104555.31 | N 26 54 42.15 | W 91 34 31.21 |
| | 23600.00 | 12.80 | 257.43 | 23482.50 | 23400.50 | 1079.72 | -234.90 | -1053.85 | 0.00 | 9767972.94 | 2104533.70 | N 26 54 42.11 | W 91 34 31.45 |
| | 23700.00 | 12.80 | 257.43 | 23580.02 | 23498.02 | 1101.86 | -239.72 | -1075.47 | 0.00 | 9767968.12 | 2104512.09 | N 26 54 42.06 | W 91 34 31.69 |
| | 23800.00 | 12.80 | 257.43 | 23677.53 | 23595.53 | 1124.01 | -244.53 | -1097.09 | 0.00 | 9767963.30 | 2104490.47 | N 26 54 42.02 | W 91 34 31.93 |
| | 23900.00 | 12.80 | 257.43 | 23775.05 | 23693.05 | 1146.16 | -249.35 | -1118.70 | 0.00 | 9767958.49 | 2104468.86 | N 26 54 41.97 | W 91 34 32.17 |
| | 24000.00 | 12.80 | 257.43 | 23872.57 | 23790.57 | 1168.30 | -254.17 | -1140.32 | 0.00 | 9767953.67 | 2104447.25 | N 26 54 41.92 | W 91 34 32.41 |
| | 24100.00 | 12.80 | 257.43 | 23970.08 | 23888.08 | 1190.45 | -258.99 | -1161.94 | 0.00 | 9767948.85 | 2104425.63 | N 26 54 41.88 | W 91 34 32.65 |
| | 24200.00 | 12.80 | 257.43 | 24067.60 | 23985.60 | 1212.60 | -263.81 | -1183.55 | 0.00 | 9767944.03 | 2104404.02 | N 26 54 41.83 | W 91 34 32.89 |
| | 24300.00 | 12.80 | 257.43 | 24165.12 | 24083.12 | 1234.74 | -268.63 | -1205.17 | 0.00 | 9767939.22 | 2104382.41 | N 26 54 41.79 | W 91 34 33.13 |
| | 24400.00 | 12.80 | 257.43 | 24262.63 | 24160.63 | 1256.89 | -273.44 | -1226.78 | 0.00 | 9767934.40 | 2104360.79 | N 26 54 41.74 | W 91 34 33.37 |
| | 24500.00 | 12.80 | 257.43 | 24360.15 | 24278.15 | 1279.04 | -278.26 | -1248.40 | 0.00 | 9767929.58 | 2104339.18 | N 26 54 41.70 | W 91 34 33.61 |
| | 24600.00 | 12.80 | 257.43 | 24457.67 | 24375.67 | 1301.18 | -283.08 | -1270.02 | 0.00 | 9767924.76 | 2104317.57 | N 26 54 41.65 | W 91 34 33.85 |
| | 24700.00 | 12.80 | 257.43 | 24555.18 | 24473.18 | 1323.33 | -287.90 | -1291.63 | 0.00 | 9767919.95 | 2104295.96 | N 26 54 41.61 | W 91 34 34.08 |
| | 24800.00 | 12.80 | 257.43 | 24652.70 | 24570.70 | 1345.48 | -292.72 | -1313.25 | 0.00 | 9767915.13 | 2104274.34 | N 26 54 41.56 | W 91 34 34.32 |
| | 24900.00 | 12.80 | 257.43 | 24750.22 | 24668.22 | 1367.62 | -297.53 | -1334.87 | 0.00 | 9767910.31 | 2104252.73 | N 26 54 41.52 | W 91 34 34.56 |
| | 25000.00 | 12.80 | 257.43 | 24847.73 | 24765.73 | 1389.77 | -302.35 | -1356.48 | 0.00 | 9767905.49 | 2104231.12 | N 26 54 41.47 | W 91 34 34.80 |
| | 25100.00 | 12.80 | 257.43 | 24945.25 | 24863.25 | 1411.92 | -307.17 | -1378.10 | 0.00 | 9767900.68 | 2104209.50 | N 26 54 41.43 | W 91 34 35.04 |
| | 25200.00 | 12.80 | 257.43 | 25042.77 | 24960.77 | 1434.06 | -311.99 | -1399.71 | 0.00 | 9767895.86 | 2104187.89 | N 26 54 41.38 | W 91 34 35.28 |
| | 25300.00 | 12.80 | 257.43 | 25140.28 | 25058.28 | 1456.21 | -316.81 | -1421.33 | 0.00 | 9767891.04 | 2104166.28 | N 26 54 41.34 | W 91 34 35.52 |
| | 25400.00 | 12.80 | 257.43 | 25237.80 | 25155.80 | 1478.35 | -321.63 | -1442.95 | 0.00 | 9767886.22 | 2104144.67 | N 26 54 41.29 | W 91 34 35.76 |
| | 25500.00 | 12.80 | 257.43 | 25335.32 | 25253.32 | 1500.50 | -326.44 | -1464.56 | 0.00 | 9767881.41 | 2104123.05 | N 26 54 41.25 | W 91 34 36.00 |
| | 25600.00 | 12.80 | 257.43 | 25432.83 | 25350.83 | 1522.65 | -331.26 | -1486.18 | 0.00 | 9767876.59 | 2104101.44 | N 26 54 41.20 | W 91 34 36.24 |
| | 25700.00 | 12.80 | 257.43 | 25530.35 | 25448.35 | 1544.80 | -336.08 | -1507.80 | 0.00 | 9767871.77 | 2104079.83 | N 26 54 41.16 | W 91 34 36.48 |
| | 25800.00 | 12.80 | 257.43 | 25627.87 | 25545.87 | 1566.94 | -340.90 | -1529.41 | 0.00 | 9767866.95 | 2104058.21 | N 26 54 41.11 | W 91 34 36.72 |
| | 25900.00 | 12.80 | 257.43 | 25725.38 | 25643.38 | 1589.09 | -345.72 | -1551.03 | 0.00 | 9767862.14 | 2104036.60 | N 26 54 41.06 | W 91 34 36.95 |
| | 26000.00 | 12.80 | 257.43 | 25822.90 | 25740.90 | 1611.24 | -350.53 | -1572.64 | 0.00 | 9767857.32 | 2104014.99 | N 26 54 41.02 | W 91 34 37.20 |
| | 26100.00 | 12.80 | 257.43 | 25920.42 | 25838.42 | 1633.38 | -355.35 | -1594.26 | 0.00 | 9767852.50 | 2103993.37 | N 26 54 40.97 | W 91 34 37.43 |
| | 26200.00 | 12.80 | 257.43 | 26017.93 | 25935.93 | 1655.53 | -360.17 | -1615.88 | 0.00 | 9767847.68 | 2103971.76 | N 26 54 40.93 | W 91 34 37.88 |
| | 26300.00 | 12.80 | 257.43 | 26115.45 | 26033.45 | 1677.68 | -364.99 | -1637.49 | 0.00 | 9767842.87 | 2103950.15 | N 26 54 40.88 | W 91 34 37.91 |
| | 26400.00 | 12.80 | 257.43 | 26212.97 | 26130.97 | 1699.82 | -369.81 | -1659.11 | 0.00 | 9767838.05 | 2103928.54 | N 26 54 40.84 | W 91 34 38.15 |
| | 26500.00 | 12.80 | 257.43 | 26310.49 | 26228.49 | 1721.97 | -374.63 | -1680.73 | 0.00 | 9767833.23 | 2103906.92 | N 26 54 40.79 | W 91 34 38.39 |
| | 26600.00 | 12.80 | 257.43 | 26408.00 | 26326.00 | 1744.12 | -379.44 | -1702.34 | 0.00 | 9767828.42 | 2103885.31 | N 26 54 40.75 | W 91 34 38.63 |
| | 26700.00 | 12.80 | 257.43 | 26505.52 | 26423.52 | 1766.26 | -384.26 | -1723.96 | 0.00 | 9767823.60 | 2103863.70 | N 26 54 40.70 | W 91 34 38.87 |
| | 26800.00 | 12.80 | 257.43 | 26603.04 | 26521.04 | 1788.41 | -389.08 | -1745.58 | 0.00 | 9767818.78 | 2103842.08 | N 26 54 40.66 | W 91 34 39.11 |
| | 26900.00 | 12.80 | 257.43 | 26700.55 | 26618.55 | 1810.56 | -393.90 | -1767.19 | 0.00 | 9767813.96 | 2103820.47 | N 26 54 40.61 | W 91 34 39.35 |
| | 27000.00 | 12.80 | 257.43 | 26798.07 | 26716.07 | 1832.70 | -398.72 | -1788.81 | 0.00 | 9767809.15 | 2103798.86 | N 26 54 40.57 | W 91 34 39.59 |
| | 27100.00 | 12.80 | 257.43 | 26895.59 | 26813.59 | 1854.85 | -403.53 | -1810.42 | 0.00 | 9767804.33 | 2103777.24 | N 26 54 40.52 | W 91 34 39.83 |
| | 27200.00 | 12.80 | 257.43 | 26993.10 | 26911.10 | 1877.00 | -408.35 | -1832.04 | 0.00 | 9767799.51 | 2103755.63 | N 26 54 40.47 | W 91 34 40.07 |
| | 27300.00 | 12.80 | 257.43 | 27090.62 | 27008.62 | 1899.15 | -413.17 | -1853.66 | 0.00 | 9767794.69 | 2103734.02 | N 26 54 40.43 | W 91 34 40.31 |
| | 27400.00 | 12.80 | 257.43 | 27188.14 | 27106.14 | 1921.29 | -417.99 | -1875.27 | 0.00 | 9767789.88 | 2103712.41 | N 26 54 40.38 | W 91 34 40.55 |
| | 27500.00 | 12.80 | 257.43 | 27285.65 | 27203.65 | 1943.44 | -422.81 | -1896.89 | 0.00 | 9767785.06 | 2103690.79 | N 26 54 40.34 | W 91 34 40.79 |
| | 27600.00 | 12.80 | 257.43 | 27383.17 | 27301.17 | 1965.59 | -427.62 | -1918.51 | 0.00 | 9767780.24 | 2103669.18 | N 26 54 40.29 | W 91 34 41.03 |
| | 27700.00 | 12.80 | 257.43 | 27480.69 | 27398.69 | 1987.73 | -432.44 | -1940.12 | 0.00 | 9767775.42 | 2103647.57 | N 26 54 40.25 | W 91 34 41.27 |
| | 27800.00 | 12.80 | 257.43 | 27578.20 | 27496.20 | 2009.88 | -437.26 | -1961.74 | 0.00 | 9767770.61 | 2103625.95 | N 26 54 40.20 | W 91 34 41.50 |
| | 27900.00 | 12.80 | 257.43 | 27675.72 | 27593.72 | 2032.03 | -442.08 | -1983.35 | 0.00 | 9767765.79 | 2103604.34 | N 26 54 40.16 | W 91 34 41.74 |

APC-00336952

CONFIDENTIAL

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (EW ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 28000.00 | 12.80 | 257.43 | 27773.24 | 27691.24 | 2054.17 | -446.90 | -2004.97 | 0.00 | 9767760.97 | 2103562.73 | N 26 54 40.11 | W 91 34 41.98 |
| | 28100.00 | 12.80 | 257.43 | 27870.75 | 27788.75 | 2076.32 | -451.72 | -2026.59 | 0.00 | 9767758.15 | 2103541.11 | N 26 54 40.07 | W 91 34 42.22 |
| | 28200.00 | 12.80 | 257.43 | 27968.27 | 27886.27 | 2098.47 | -456.53 | -2048.20 | 0.00 | 9767751.34 | 2103538.50 | N 26 54 40.02 | W 91 34 42.46 |
| | 28300.00 | 12.80 | 257.43 | 28065.79 | 27983.79 | 2120.61 | -461.35 | -2069.82 | 0.00 | 9767746.52 | 2103517.89 | N 26 54 39.98 | W 91 34 42.70 |
| | 28400.00 | 12.80 | 257.43 | 28163.30 | 28081.30 | 2142.76 | -466.17 | -2091.44 | 0.00 | 9767741.70 | 2103496.28 | N 26 54 39.93 | W 91 34 42.94 |
| | 28500.00 | 12.80 | 257.43 | 28260.82 | 28178.82 | 2164.91 | -470.99 | -2113.05 | 0.00 | 9767736.88 | 2103474.66 | N 26 54 39.89 | W 91 34 43.18 |
| | 28600.00 | 12.80 | 257.43 | 28358.34 | 28276.34 | 2187.05 | -475.81 | -2134.67 | 0.00 | 9767732.07 | 2103453.05 | N 26 54 39.84 | W 91 34 43.42 |
| | 28700.00 | 12.80 | 257.43 | 28455.85 | 28373.85 | 2209.20 | -480.62 | -2156.28 | 0.00 | 9767727.25 | 2103431.44 | N 26 54 39.80 | W 91 34 43.66 |
| | 28800.00 | 12.80 | 257.43 | 28553.37 | 28471.37 | 2231.35 | -485.44 | -2177.90 | 0.00 | 9767722.43 | 2103409.82 | N 26 54 39.75 | W 91 34 43.90 |
| | 28900.00 | 12.80 | 257.43 | 28650.89 | 28568.89 | 2253.49 | -490.26 | -2199.52 | 0.00 | 9767717.61 | 2103388.21 | N 26 54 39.70 | W 91 34 44.14 |
| | 29000.00 | 12.80 | 257.43 | 28748.40 | 28666.40 | 2275.64 | -495.08 | -2221.13 | 0.00 | 9767712.80 | 2103366.60 | N 26 54 39.66 | W 91 34 44.38 |
| | 29100.00 | 12.80 | 257.43 | 28845.92 | 28763.92 | 2297.79 | -499.90 | -2242.75 | 0.00 | 9767707.98 | 2103344.98 | N 26 54 39.61 | W 91 34 44.62 |
| | 29200.00 | 12.80 | 257.43 | 28943.44 | 28861.44 | 2319.93 | -504.72 | -2264.37 | 0.00 | 9767703.16 | 2103323.37 | N 26 54 39.57 | W 91 34 44.86 |
| | 29300.00 | 12.80 | 257.43 | 29040.95 | 28958.95 | 2342.08 | -509.53 | -2285.98 | 0.00 | 9767698.34 | 2103301.76 | N 26 54 39.52 | W 91 34 45.10 |
| | 29400.00 | 12.80 | 257.43 | 29138.47 | 29056.47 | 2364.23 | -514.35 | -2307.60 | 0.00 | 9767693.53 | 2103280.15 | N 26 54 39.48 | W 91 34 45.33 |
| | 29500.00 | 12.80 | 257.43 | 29235.99 | 29153.99 | 2386.37 | -519.17 | -2329.22 | 0.00 | 9767688.71 | 2103258.53 | N 26 54 39.43 | W 91 34 45.57 |
| | 29600.00 | 12.80 | 257.43 | 29333.51 | 29251.51 | 2408.52 | -523.99 | -2350.83 | 0.00 | 9767683.89 | 2103236.92 | N 26 54 39.38 | W 91 34 45.81 |
| | 29700.00 | 12.80 | 257.43 | 29431.02 | 29349.02 | 2430.67 | -528.81 | -2372.45 | 0.00 | 9767679.08 | 2103215.31 | N 26 54 39.34 | W 91 34 46.05 |
| | 29800.00 | 12.80 | 257.43 | 29528.54 | 29446.54 | 2452.81 | -533.62 | -2394.06 | 0.00 | 9767674.26 | 2103193.69 | N 26 54 39.30 | W 91 34 46.29 |
| | 29900.00 | 12.80 | 257.43 | 29626.06 | 29544.06 | 2474.96 | -538.44 | -2415.68 | 0.00 | 9767669.44 | 2103172.08 | N 26 54 39.25 | W 91 34 46.53 |
| | 30000.00 | 12.80 | 257.43 | 29723.57 | 29641.57 | 2497.11 | -543.26 | -2437.30 | 0.00 | 9767664.62 | 2103150.47 | N 26 54 39.21 | W 91 34 46.77 |
| | 30100.00 | 12.80 | 257.43 | 29821.09 | 29739.09 | 2519.25 | -548.08 | -2458.91 | 0.00 | 9767659.81 | 2103128.86 | N 26 54 39.16 | W 91 34 47.01 |
| | 30200.00 | 12.80 | 257.43 | 29918.61 | 29836.61 | 2541.40 | -552.90 | -2480.53 | 0.00 | 9767654.99 | 2103107.24 | N 26 54 39.12 | W 91 34 47.25 |
| | 30300.00 | 12.80 | 257.43 | 30016.12 | 29934.12 | 2563.55 | -557.72 | -2502.15 | 0.00 | 9767650.17 | 2103085.63 | N 26 54 39.07 | W 91 34 47.49 |
| | 30400.00 | 12.80 | 257.43 | 30113.64 | 30031.64 | 2585.69 | -562.53 | -2523.76 | 0.00 | 9767645.35 | 2103064.02 | N 26 54 39.03 | W 91 34 47.73 |
| | 30500.00 | 12.80 | 257.43 | 30211.16 | 30129.16 | 2607.84 | -567.35 | -2545.38 | 0.00 | 9767640.54 | 2103042.40 | N 26 54 38.98 | W 91 34 47.97 |
| Top LWC | 30511.12 | 12.80 | 257.43 | 30222.00 | 30140.00 | 2610.30 | -567.89 | -2547.78 | 0.00 | 9767640.00 | 2103040.00 | N 26 54 38.97 | W 91 34 47.99 |
| | 30600.00 | 12.80 | 257.43 | 30308.67 | 30226.67 | 2629.99 | -572.17 | -2566.99 | 0.00 | 9767635.72 | 2103020.79 | N 26 54 38.93 | W 91 34 48.21 |
| | 30700.00 | 12.80 | 257.43 | 30406.19 | 30324.19 | 2652.14 | -576.99 | -2588.61 | 0.00 | 9767630.90 | 2102999.18 | N 26 54 38.89 | W 91 34 48.45 |
| TD | 30738.72 | 12.80 | 257.43 | 30442.00 | 30360.00 | 2660.27 | -578.76 | -2596.55 | 0.00 | 9767629.13 | 2102991.24 | N 26 54 38.87 | W 91 34 48.53 |

Survey Type:     Def Plan

Survey Error Model:     ISCWSA Rev 0 *** 3-D 95.000% Confidence 2.7955 sigma

Survey Program:

| Description | Part | MD From (ft) | MD To (ft) | EOU Freq (ft) | Hole Size (in) | Casing Diameter (in) | Expected Max Inclination (deg) | Survey Tool Type | Borehole / Survey |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 0.000 | 5922.619 | 1/100.000 | 0.000 | 0.000 | | SLB_MWD-STD-FLT-Depth Only | ST00BP00 / WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |
| | 1 | 5922.619 | 30736.722 | 1/100.000 | 30.000 | 30.000 | | SLB_MWD-STD-FLT | ST00BP00 / WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |

APC-00336953

| DOL (P50) | DEPTH | COST | PHASE |
|---|---|---|---|
| 0 | 5922 | $0.00 | BEGIN WR 52 #3 |
| 1 | 5922 | $14,938,546.30 | TRANSIT |
| 3.5 | 5922 | $19,165,183.05 | MIRU/RIH w/ 42" & TAG ML |
| 4 | 6222 | $19,640,730.80 | JET-IN 42" STRUCTURAL |
| 4.5 | 6222 | $20,116,278.55 | SOAK 42" & POOH |
| 5.5 | 7400 | $21,647,374.05 | DRILL 26" x 32" HOLE SECTION |
| 8.5 | 7400 | $25,427,229.55 | INSTALL 28" CASING |
| 9.5 | 8722 | $26,958,325.05 | DRILL 26" HOLE SECTION |
| 16.5 | 8722 | $35,803,744.56 | INSTALL 22" CASING RUN/TEST RISER & BOPE |
| 19.5 | 14000 | $39,322,031.06 | DRILL 18-1/8" x 21-1/2" HOLE |
| 26.5 | 14000 | $47,600,699.56 | INSTALL 18" CASING |
| 28.5 | 18100 | $50,377,890.56 | DRILL 16-1/2" x 19-1/2" HOLE |
| 35.5 | 18100 | $59,714,059.06 | INSTALL 16" CASING |
| 39.5 | 25000 | $64,413,441.06 | DRILL 14-1/2" x 17-1/2" HOLE |
| 46.5 | 25000 | $75,978,809.57 | INSTALL 14" CASING |
| 50.5 | 28500 | $80,710,191.57 | DRILL TO TOP OF EOCENE |
| 57.5 | 28500 | $88,811,360.07 | INSTALL 11-7/8" |
| 62.5 | 31118 | $94,569,337.57 | DRILL TO TD (BASE OF LWC SAND) |
| 69.5 | 31118 | $105,700,506.07 | FORMATION EVALUATION |
| 76.5 | 31118 | $114,421,674.58 | RUN & CEMENT 10-1/8" |
| 86.5 | 31118 | $125,532,678.00 | TA WELL & RDMO |

CONFIDENTIAL

# Exhibit 77

**To:** Beard, Corrie[Corrie.Beard@anadarko.com]
**Cc:** McGrievy, Pat[Pat.McGrievy@anadarko.com]
**From:** McGrievy, Pat[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CDB587FF820A4A41A6E3944E832BCE77-MCGRIEVY, P]
**Sent:** Fri 12/8/2017 2:22:29 PM Coordinated Universal Time
**Subject:** RE: BOD Memo - December

Corrie,

Oops! This is the e-mail that includes the changes/edits to the BOD memo.

Let me know if you have any edits. As you are fully aware, the Shenandoah project is a political football and the edits below are certainly subject to higher levels of scrutiny.

Pat

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** Beard, Corrie
**Sent:** Wednesday, December 06, 2017 6:22 PM
**To:** McGrievy, Pat <Pat.McGrievy@anadarko.com>
**Subject:** BOD Memo - December

Pat,

The BOD Memo is due early next week and I need your help in updating the verbiage from the October memo below shown below. I did update the K2 production bullet point. Please send me the verbiage that you would like included by noon on Monday. It's amazing how out of the loop I feel with what's going on with these assets after only being out of the group for two months!

- o  K2
  - ▪ ·Production averaged ~25,000 BOPD (gross) for November.
  - ▪ ·Balloting for the approval of the GC 562-6 AFE is due in Mid-December 2017. The well, which is targeting the main field pay sands (M14 and M20), is expected to spud in Q2 2018. The team is also working to mature a subsequent K2 well which is expected to spud in late 2018.

- o  Warrior
  - ▪ ·The Warrior appraisal well (GC 519 #1) was spud in April, sidetracked in August and P&A'd in September. The well found 74' of highly dispersed net pays in Middle and Lower Miocene sands. As a result, resources were not sufficient to support future development costs necessary to bring this well to production at this location of the Warrior structure. Meanwhile, development FEED studies to commercialize the GC 563 discovery are likely to commence in 2018.
  - ▪ ·At the Murphy-operated Samurai (GC 432 & 476) discovery, located ~ 9 miles north of APC's Warrior discovery, APC has elected to non-consent a proposed $58 MM drilling AFE to delineate resources in the Upper and Middle Miocene reservoirs. APC will correspondingly relinquish their 25% working interest in these blocks.

- o  Shenandoah
  - ▪ ·Anadarko issued an AFE to the Shenandoah partnership for the drilling of the WR 51 #4 (Shen 7) in November 2018. Venari and CIE have recently elected to approve the AFE, while COPC has elected to non-consent. If the AFE is not fully subscribed by the remaining partnership, the well will not be drilled and will result in lease relinquishment of the Shenandoah blocks (WR 51, WR 52 & WR 53) in April 2018 as a result of the expiration of the 365 day clock.

Thanks,
Corrie Beard
GOM Planning Engineer
Anadarko Petroleum Corporation
O: 832.636.3438 | C: 832.445.4899

CONFIDENTIAL

# Exhibit 78

ANADARKO PETROLEUM CORPORATION                1201 LAKE ROBBINS DRIVE • HOUSTON, TEXAS 77380
                                              P.O. BOX 1330 • HOUSTON, TEXAS 77251-1300

## DEEPWATER GULF OF MEXICO



Petroleum Corporation

December 12, 2017

ConocoPhillips Company                          Cobalt International Energy, L.P.
600 N. Dairy Ashford, Suite DU 3018             920 Memorial City Way, Suite 100
Houston, TX 77079                               Houston, TX 77024
Attn: Lindsay Alaniz/Michael Fitzgerald         Attn: Ben Davis
Fax: 281-293-6171                               Fax: 713-579-9196

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn: Scott Cornwell/Randy Bennett
Fax: 713-266-2330

RE:     Shenandoah Prospect
        Withdrawal Notice and Written Notice to Join in the Withdrawal

Gentlemen:

Reference is made to Anadarko AFE No. 2140195, transmitted via proposal letter dated November 9, 2017, in which Anadarko proposed, as an Operation to Maintain Contract Area, the drilling of the Walker Ridge Block 51 No. 5 Well ("Shen 7 AFE").

By letter dated December 6, 2017, ConocoPhillips Company elected not to participate in the Shen 7 AFE. In accordance with Article 8.3 of the Shenandoah UOA (*Second Opportunity to Participate*), ConocoPhillips was provided with a subsequent election to participate in the Shen 7 AFE, as evidenced by that certain Election Results & Notice of Second Opportunity to Participate, dated December 6, 2017. By letter dated also dated December 6, 2017, ConocoPhillips Company made a subsequent election not to participate in the Shen 7 AFE.

Pursuant to Article 16.4.1 of the Shenandoah UOA, failure to participate in an Operation to Maintain Contract Area is deemed a withdrawal, and the Parties will be subject to the provisions of Article 17 of the Shenandoah UOA (*Withdrawal From Agreement*). Anadarko hereby provides notice to the Parties of ConocoPhillips Company's deemed withdrawal ("Withdrawal Notice") from the Shenandoah UOA due to its failure to participate in the Shen 7 AFE, with such withdrawal being effective sixty (60) days from the date of this Withdrawal Notice.

Pursuant to Article 17 of the Shenandoah UOA, within thirty (30) days of the receipt of the Withdrawal Notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator. Due to COP's failure to participate in the Shen 7 AFE and subsequent deemed withdrawal, Anadarko US Offshore LLC and Anadarko Petroleum Corporation hereby provide the other Parties with notice of their election to join in the withdrawal ("Notice to Join Withdrawal") as an Other Withdrawing Party(ies) under the Shenandoah UOA, with such withdrawal being effective sixty (60) days from the date of this Notice to Join Withdrawal.

CONFIDENTIAL                                                                                      APC-00754345

Venari Offshore LLC and Cobalt International Energy, L.P. also have the option to join in the withdrawal, and we respectfully request your election to join in the withdrawal within thirty (30) days of the receipt of this Withdrawal Notice.

In the event that you have any questions or need further information, please do not hesitate to contact Pat McGrievy via telephone at (832) 636-3973.

Very truly yours,

Frank D. Meyer
Land Manager, Gulf of Mexico

CONFIDENTIAL

# Exhibit 79

# LIONBRIDGE

STATE OF NEW YORK      }
                               }    ss
COUNTY OF NEW YORK   }

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Hebrew into English of the attached Navitas Petroleum Annual

Report to December 31, 2021.

Laura Musich, Managing Editor
Lionbridge

Sworn to and subscribed before me

this 15th day of January , 20 23

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WI6203702
Qualified in New York County
My Commission Expires 04/27/2028

259 W 30th Street, 11th Floor  New York, NY 10001  +1.212.631.7432

APC-01760538



**Navitas Petroleum**

**Limited Partnership**





Annual Report

To December 31,

2021

APC-01760539

# Table of Contents

**Chapter A** ◈ Description of the Partnership's Business

**Chapter B** ◈ Board of Directors Report on the State of Affairs of the Partnership

**Chapter C** ◈ Financial Report for December 31, 2021

**Chapter D** ◈ Additional Details about the Partnership

**Chapter E** ◈ Report on the Effectiveness of Internal Control over Financial Reporting and Disclosure



APC-01760540

Chapter A

_____

# Description of

# the Partnership's Business



APC-01760541

## Chapter A - Description of the Partnership's Business

| Section | Subject | Page |
|---|---|---|
| 1 | Description of the general development of the partnership's business | 2 |
| 2 | Field of activity | 4 |
| 3 | Investments in the capital of the partnership and transactions in its securities | 6 |
| 4 | Profit sharing | 4 |
| 5 | Financial information regarding the partnership's field of activity | 8 |
| 6 | General environment and the influence of external factors on the partnership's activity | 8 |
| 7 | Description of the partnership's business by areas of activity | 10 |
| 8 | The partnership's oil properties | 17 |
| 8.1 | Buckskin | 17 |
| 8.2 | Shenandoah | 50 |
| 8.3 | North Yucatan | 82 |
| 8.4 | Denbury Fields | 95 |
| 8.5 | Nachas | 127 |
| 8.6 | Various onshore oil assets | 144 |
| 8.7 | Block 7 | 146 |
| 9 | Ceased activity | 160 |
| 10 | Memorandum of understanding - Sea-Lion Discovery | 160 |
| 11 | Renewable energies | 162 |
| 12 | Products | 163 |
| 13 | Clients | 164 |
| 14 | Marketing and distribution | 164 |
| 15 | Competition | 168 |
| 16 | Seasonality | 164 |
| 17 | Human Capital | 165 |
| 18 | Raw materials and suppliers | 165 |
| 19 | Working capital | 167 |
| 20 | Funding | 167 |
| 21 | Taxation | 168 |
| 22 | Environmental risks and ways of managing them | 168 |
| 23 | Limitations and supervision of partnership activity | 169 |
| 24 | Essential agreements and cooperation agreements | 175 |
| 25 | Legal procedures | 175 |
| 26 | Business objectives and strategy | 176 |
| 27 | Expected development within the coming year | 176 |
| 28 | Risk factors | 177 |
| **Appendices** | | |
| **Appendix of professional terms** | | **183** |

APC-01760542

## 8.2 Shenandoah

The partnership holds, through ShenHai LLC, a subsidiary (holding in concatenation) in full ownership of the partnership (hereinafter in this section: "**ShenHai**" or "the **Project Company**"), 49% of the rights in the Shenandoah oil property in the Gulf of Mexico, USA (hereinafter in this section: "**Shenandoah**")".

### 8.2.1 General Details

| General details regarding the Shenandoah oil property | |
|---|---|
| Name of Property: | Shenandoah |
| Location: | Maritime property in the Gulf of Mexico, approximately 255 miles south of New Orleans, Louisiana, USA, in the deep waters of the Gulf of Mexico, at a water depth of between 1,770 and 1,920 meters. |
| Area: | The area of each of the licenses is 5,760 acres (about 23.3 square kilometers). The total area of the oil property is about 17,280 acres (about 69.9 square kilometers), and it includes the entire area of licenses No. 31938 and 25232 and most of the area of license 28148 ("**the Licenses**" or "**Shenandoah Licenses**"). |
| Type of the oil property and description of the operations permitted according to this type: | Discovery in development; Permitted operations - exploration, development and production of oil and gas in a defined area of land called Lease. |
| Original grant date of the oil property: | 12.1.2007 - OCS-G 31938 (WR 51 block) 6.1.2003 - OCS-G 25232 (WR 52 block) 5.1.2006 - OCS-G 28148 (WR 53 block) |
| Original expiration date of the oil property: | 11.30.2017 - OCS-G 31938 5.31.2014 - OCS-G 25232 4.30.2016 - OCS-G 28148 |
| Dates on which it was decided to extend the period of the oil property: | In September 2018, it was decided to transfer the licenses to SOP status - see section 8.2.5 hereinafter |
| Current oil property expiration date: | The licenses are held in SOP status - see section 8.2.5 hereinafter |
| Specifying whether there is another option for extending the period of the oil property: | The extension of a license validity beyond its original validity or beyond the granted extension is carried out in one of three main ways: 1. Drilling and/or approved operations at the license area entitles the license holders to an automatic extension of up to one year from the date of operation completion. There are also additional operations (such as seismic surveys, etc.) that can be carried out with a license and for which an extension can be obtained from BSEE. 2. SOP - Suspension of Production, if oil production does not begin from the license during the license period (original or extended), it is possible to obtain approval for a "suspension of production" (SOP). As part of the SOP granting, a mandatory work plan will be determined that includes milestones for the development of the property, from the grant date until the start of production. The extension of the validity of the license based on SOP will not be granted until the date of the start of production according to the work plan, but only for limited periods - usually, about one year each time (that is, not until the start of production). As long as the license holders comply with the work plan, the SOP will be extended for an additional fixed period. As of the date of the report, the SOP has been extended until September 30, 2022. Production - HBP, from the start of commercial production in the license area - the validity of the license is automatically extended up to one year from the end of commercial production. |
| Specifying the name of the operator (Operator): | BOE Exploration & Production, LLC[34] |

---

[34] A full-ownership company owned by Beacon (as defined hereinafter) which is used as an operator as of November 2020.

APC-01760543

8.2 Shenandoah

| General details about the Shenandoah oil property | | |
|---|---|---|
| Specifying the names of the direct partners in the oil property and their direct share in the oil property, as well as, to the best of the partnership's knowledge, the names of the holders of controlling interest of the said partners (assuming the implementation of all such agreements as stated hereinafter): | ShenHai LLC.[35], [36] | 49% |
| | Beacon Offshore Energy Development LLC. [37] | 20.05% |
| | BOE II Shen LLC.[38] | 20% |
| | BOE II Exploration LLC[39] | 10.95% |

| General details regarding the partnership's share in the Shenandoah oil property | |
|---|---|
| In favor of holding a purchased oil property - specifying the date of purchase : | Rights at the rate of 23.1% in the oil assets were purchased on April 5, 2018. Rights at a rate of 30.00% in the oil assets were purchased on November 27, 2019, effective from October 1, 2019. At the time of the FID, 4.1% of the rights in the project were sold to Beacon[40]. |
| Description of the nature and manner of the partnership's holding in the oil property: | Holding of the oil property at a rate of 49% through ShenHai, a subsidiary (holding in concatenation) in full (100%) ownership of the partnership. |
| Specifying the actual share associated with the holders of the partnership's capital rights in the revenues from the oil property: | 38.68% |
| The total share of the holders of the partnership's capital right in the cumulative investment in the oil property during the five years preceding 12.31.2021 (whether it was recognized as an expense or as a property in the financial statements): | Approximately 111,484 thousand Dollars. |

---

[35] A subsidiary (holding in concatenation) in full (100%) ownership of the partnership.

[36] In addition to the aforementioned rights, the partnership holds the southern half of license OCS-G 28148 (WR 53 block ) in the area of the Shenandoah oil property at the rate of 95.44%. The southern half of this license is in the exploration phase and is not included in the existing Shenandoah development plan. To the best of the partnership's knowledge, there are no liabilities upon it.

37 A private company fully owned by funds of the Blackstone Group (aforementioned and hereinafter: "**Beacon**").

38 A private company fully owned by HEQ Deepwater. HEQ Deepwater is a dedicated partnership focused on deep-water drilling in the Gulf of Mexico in the US and it is owned by Quantum Energy Partners, a leading and well-known investment fund specializing in oil and gas fields in the US and Houston Energy LP, a company active in the oil and gas field in the Gulf of Mexico in the USA. As informed to the partnership, in August 2021, binding agreements were signed between the parent company of BOE II Shen, LLC (hereinafter: "BOE II Shen") and HEQ Deepwater for the purchase of the shares of BOE II Shen by HEQ Deepwater. In addition, after the purchase of the shares as mentioned above, BOE II Shen sold 10.95% of the rights in the project to a designated company named BOE II Exploration LLC which is fully owned by the parent company of Beacon**.**

39 A private company fully owned by Blackstone Group funds.

[40] For details regarding the sale of the rights, see note 12a' to the financial statements.

APC-01760544

<u>8.2 Shenandoah</u>

### 8.2.2 **Operations prior to holding the oil property**

Until the partnership won the tender for the purchase of Shenandoah, Cobalt held 20% of the rights in the Shenandoah licenses, while the other partners were: Anadarko Petroleum Corporation (which also served as its operator) - 33%; ConocoPhillips Company - 30% (hereinafter: "**ConocoPhillips**"); Venari- 17%.

In February 2018, Anadarko and ConocoPhillips informed the other partners in Shenandoah that they decided to give up their shares in the licenses. In light of the foregoing, it was determined that the aforementioned rights will be transferred to Cobalt and Venari in a proportional manner to their share in the licenses, and that Cobalt will be appointed as an operator in the property. After the aforementioned transfer of the rights, the possession in the property was as follows: Cobalt – 54.05%; Venari- 45.95%.

On April 5, 2018, the Bankruptcy Court of the Southern District of Texas, the Houston Division, USA, issued an order confirming the execution of the sale transaction, including the transfer of the rights in the property to the partnership. In April 2018, the appointment of LLOG as an operator in Shenandoah was also approved.

In September 2018, the Regulator's approval of the SOP request was received, the main parts of which are described hereinafter.

Below is a table that includes, to the best of the partnership's knowledge, a description of material past operations in the oil property, which were carried out before the partnership owned the oil property:

| <u>Part of the project</u> | <u>Identity of the rights holder at the time the action was performed</u> | <u>Period in which the action was performed</u> | <u>Succinct description of the action</u> | <u>Succinct description of the action results</u> |
|---|---|---|---|---|
| Shenandoah | Anadarko | **2017-2008** | • 9 discovery, evaluation and verification wells were drilled at licenses OCS-G 28148 OCS-G 31938 OCS-G 2523*. <br>• Additional 3D seismic information was acquired and the results of appraisal wells were processed <br>• A development plan was formed and presented | A total of approx. 1.8 billion dollars were invested in the property. |

*The discovery well was drilled in 2009, to a total depth of about 9,000 meters and discovered an oil-bearing reservoir layer with a net thickness of about 100 meters. Following the discovery, five additional drillings were carried out for the purpose of verification and evaluation. Two of the drillings were dry, while the other three discovered thicker reservoir layers, with the thickest of them having a net thickness of about 358 meters. The area of the reservoir is estimated at about 14 square kilometers.

### 8.2.3 **The development of the oil property**

The project partners have begun to develop the Shenandoah oil property in accordance with the approved development plan.

APC-01760545

8.2 Shenandoah

### 8.2.4 **Work plan compliance**

To the best of the General Partner's knowledge, the work plan detailed in the Shenandoah license up to this date was fully implemented.

### 8.2.5 **Actual and planned work plan**

The licenses in the Shenandoah oil property are in "Suspension of Production" (or "**SOP**") status, which was initially issued on September 11, 2018, and was extended until September 30, 2022.

Final Investment Decision (FID) and Field Development Plan (FDP)

On August 25, 2021, the project partners[41] received a Final Investment Decision – ("**FID**") for the development of the Shenandoah project with a total budget (for 100% of the rights in the project) of approximately 1.8 billion dollars.

As part of the FID approval, the project company signed authorizations for expenses (AFE) in the amount of approximately 890 million US dollars, for its share in the project budget, in accordance with a detailed development plan (FDP) for the project, which was approved by the project partners during the month of February 2021, the main points of which are detailed hereinafter:

- The plan includes drilling and completion of four production wells, installation of underwater equipment and pipelines for transmission, control and inspection of the oil and gas from the production wells to the production platform, establishment of a floating production system (FPS) (which is adapted to the production of approximately 100,000 barrels of oil per day, 140 million cubic feet of natural gas per day and 40,000 barrels of production water per day) and the installation of oil and gas export pipelines from the production platform and their connection to an existing main transmission pipeline to the coast. According to the partners, the production platform (FPS) will also be able to handle the production of additional existing and future oil discoveries in the area. The revenue from these additional services is not included at this stage in the projected cash flow.

- The development budget is added to the past cost invested by Shenandoah's previous partners, which amounts to approximately 1.8 billion dollars. This cost includes the execution of 9 exploration, verification and evaluation wells and the acquisition of information for the purpose of evaluating the oil property.

---

[41] For details about the partners, see the table in section 8.2.1 above.

APC-01760546

<u>8.2 Shenandoah</u>

<u>Actions and agreements carried out in connection with the project development</u>

In the years 2021 and 2020, actions and agreements were carried out in connection with the development of the project, the main points of which are as follows:

- As part of the evaluations for the development of the Shenandoah project, an early procurement of services and equipment with a long lead time (Long Lead Items) including Subsea Production Trees (wellhead units for underwater production, control and inspection installed above the production wells) were ordered from TechnipFMC.
- On June 30, 2020, the operator entered into an agreement with Transocean[42] to receive drilling and completion services for the four development wells planned in the project. For more details, see the partnership's immediate report from July 2, 2020 (reference number: - 2020-01-070536) whereas the information pertaining to which is presented in the report by way of reference.
- On June 14, 2021, agreements were signed for the construction of oil and gas export pipelines from the production platform to existing transmission pipelines (hereinafter: the "**Agreements**"). The agreements were signed between the operator and the project partners and several suppliers (hereinafter: the "**Suppliers**"). The export pipelines will be established and developed at the expense of the suppliers, and the transmission fees that will be paid to the suppliers during the production period will increase the total production cost per barrel of oil, and this is subject to certain minimum payments established in the agreements. The production rate from Shenandoah, expected according to the resource report, is about 80 thousand barrels of oil per day (for details about the resource report, see section 8.2 10. hereinafter). Following the agreements, the Breakeven cost (which includes the cost of construction and production - Capex + Opex) of the project is expected to be approximately 16 dollars per barrel of oil in relation to the 2P category presented in this report. For further details, see the partnership's immediate report from June 16, 2021 (reference number: 2021-01-039655), the information pertaining to which is presented in the report by way of reference.
- On August 4, 2021, the operator updated that after the completion of an open and competitive process that included several bidders, the operator signed a multi-year contract for the engineering, procurement, and construction (EPC) of a floating production system (FPS) for the project (hereinafter in this section: the "**Installation**"). As informed by the operator, the FPS will be built by the Korean company Hyundai Heavy Industries. Co, Ltd (hereinafter: "**Hyundai**"), the largest shipyard in the world. According to the agreed specifications, the FPS will be of the Semi-Submersible type, 91 meters long, 91 meters wide and 90 meters high. After installation, the handling and production capacity of the FPS is expected to be about 100,000 barrels per day and about 140 MMSCF of gas per day. The planning, construction and installation will be carried out by Hyundai during the 36 months from the date of signing, with the first year being devoted to engineering design. Hyundai is expected to begin construction of the FPS in the third quarter of 2022. After the construction of the

---

[42] A public company traded on the New York Stock Exchange. To the best of the partnership's knowledge, the company is one of the largest drilling companies in the world.

APC-01760547

8.2 Shenandoah

> After the construction of the FPS is completed, this system will be transported to the US and is expected to be installed over the Shenandoah oil reservoir during the second half of 2024.

- On January 25, 2022, an agreement was signed for the establishment of the production and control systems and the underwater infrastructures of the project (hereinafter: "**The Underwater Systems**") with the Subsea 7 S.A. company[43]. The agreement includes the receipt of planning, procurement, construction and installation services for the underwater systems, which will connect the development wells in the project to the FPS, as well as services related to the installation of the FPS and the construction of the gas export pipeline. The costs involved in the agreement are lower than those budgeted in the development budget (which was approved as detailed above). The agreement is the last substantial agreement for the development of the project, and its signing is one of the conditions for the first withdrawal of the project financing.

The development of the project is progressing according to the plan, according to which, estimated by the operator, production from the project is expected to begin at the end of 2024.

**Warning regarding forward-looking information - the estimates above and hereinafter, including in relation to the Breakeven cost, the rate of production from the project, the handling and production capacity of the FPS, the expected dates for the planning, construction and installation of the FPS, the date of the first withdrawal, and the expected date for the start of production of the project constitute forward-looking information within the meaning of the Securities Law. The aforementioned estimates are based on engineering information, estimated data of availability and equipment, economic and other information, and may not materialize or materialize in a significantly different manner if changes and/or delays in a variety of factors apply, as well as if the received estimates change, and/or the operational and technical conditions and /or following changes and/or delays in a variety of factors, including changes in market conditions in general and the oil sector in particular and/or geopolitical changes and/or changes in operational and technical conditions at the oil property and/or following unexpected factors related to the development of oil properties and/or following external factors which are not under the control of the partnership and/or due to various factors that cannot be estimated in advance.**

Funding of the project

On August 1, 2021, the project company, simultaneously with the signing of the other partners in the project, signed a project financing agreement with a consortium of local and foreign banks and financial institutions, led by Societe Generale Bank, for the purpose of financing each of the Shenandoah partners' share of the development costs of the project. According to the financing agreement, ShenHai will be nominated for loans in the total amount of approximately 444 million US dollars, and it will be entitled to increase this amount by approximately 100 million additional US dollars, up to a total amount of approximately 544 million US dollars. The first withdrawal will only be made after the investment of all the capital required for the project and is expected towards the end of 2022.

---

[43] A company incorporated in Luxembourg and traded on the Oslo Stock Exchange.

APC-01760548

8.2 Shenandoah

At the time of receiving the aforementioned FID, all the prerequisites for financial closing (Closing) of the project financing agreements were met.

In November 2021, the partnership exercised its right to increase the amount of project financing by an additional 100 million US dollars. The increase in the amount of the project financing was carried out through the joining of Navitas ShenHai Financing Ltd., a designated company fully owned by the partnership (hereinafter: "**the Designated Company**") as an additional lender in the consortium of lenders.

The increase in the amount of the aforementioned project financing was carried out by the partnership through the raising of negotiable bonds in the amount of approximately 100 million US dollars (about 330 million NIS) in November 2021, whereas upon the fulfillment of the conditions for release in exchange for the issuance on November 11, 2021, the full proceeds of the issuance (net) were placed as a shareholder loan by the partnership to the designated company, and was used by the designated company for the purpose of joining the consortium of lenders as an additional lender in the project financing agreement of the project company.

Following the joining of the designated company to the consortium of lenders and the provision of its loan to the project company, the amount of project financing, which the project company is entitled to withdraw, increased to a total of approximately 544 million US dollars (hereinafter: "**the Increased Amount of Project Financing**").

In addition to the increased amount of project financing and the equity in the amount of approximately 311 million US dollars that the partnership deposited for the project company on August 23, 2021, the project company deposited on November 16, 2021 an additional equity in the amount of approximately 60 million US dollars in an escrow account, and thus it completed the deposit of the entire amount of capital required for ShenHai's share in the Shenandoah project development budget and retained its share in the Shenandoah project.

In March 2022, the project company, the partnership, and Societe Generale Bank, in its role as the technical bank of the project financing, entered into a Contingent Equity Support Agreement, within the framework of which the partnership undertook that if required, in the event of deviations in the project budget, the partnership would provide ShenHai with a sum of up to 40 million dollars which will be intended to cover an additional cushion for budget deviations (CERA - Contingent Equity Reserve Account) in the form of a capital investment or an inferior shareholder loan. The signing of this agreement is the main condition remaining for the first withdrawal of the project financing funds.

For details regarding raising capital and debt carried out by the partnership, including the issuance of preferred shares in a subsidiary company and the investment agreement in connection with this issuance, which were used to establish the equity capital as stated above, see section B' of the board of directors' report attached as chapter B' of this report.

For more details regarding the project financing agreements, the commercial agreements and their updates, the increase in the project financing of the Shenandoah project and the completion of the project financing, see note 8(3) to the financial statements.

APC-01760549

8.2 Shenandoah

The plan detailed in the table below is the plan defined in the SOP and the schedules that constitute the SOP requirements. For details regarding the estimated total budget for the development of the Shenandoah project, divided by year, see the cash flow report prepared by NSAI hereinafter.

| Period | A concise description of actions performed in practice for the period or of the planned work plan | Estimated total budget for actions approved by the partners at the level of the oil property (in thousands of dollars)[44] | Extent of actual participation of the capital license holders of the budget partnership (in thousands of dollars) |
|---|---|---|---|
| 2019 | • Examination of development alternatives and engineering planning continued<br>• The development and licensing of components required to comply with HPHT (High Pressure, High Temperature) conditions<br>• Contracts were awarded for the engineering design of some of the components that will be required for the development of the project<br>• Equipment with a long lead time was ordered, including the Subsea Production Trees units (subsea production, control and inspection units installed above the production wells), which were ordered from the TechnipFMC company ("Subsea Systems").<br>• A proposed initial development plan (Field Development Plan) was submitted to the partners | 13,643 | 3,377 |
| 2020 | • Signing an agreement with Transocean Ltd for drilling and completion services for the four development wells.<br>• Engineering planning (FEED) stage was promoted | 22,891 | 12,155 |
| 2021 | • Approval of a development plan and acceptance of a final investment decision (FID) for the development of the Shenandoah project<br>• Ordering additional equipment whose delivery time is long (Long Lead Time) to be used in drilling<br>• Signing of the agreement to establish the export pipeline<br>• Signing an agreement to establish the production platform<br>• Starting Hyundai works under the EPC agreement (engineering, procurement, and construction) of the floating production vessel | 168,812 | 82,718 |
| 2022 | • Promotion of the approval procedure for the components required to comply with the HPHT (High Pressure, High Temperature) conditions<br>• Start of drilling operations<br>• Continue establishing the production platform<br>• The start of construction works for the export pipeline | 643,286 | 315,210 |
| 2023 | • Beginning of completion works<br>• Installation of the export pipeline | 504,294 | 247,104 |
| 2024 | • Completion of installation of the export pipeline<br>• Transfer of the production platform to the Gulf of Mexico and installation<br>• Start of production | 391,968 | 192,064 |
| 2025 and beyond | • Deferred payment to the production platform contractor and outstanding payments to contractors | 134,070 | 65,694 |

---

[44] Estimates regarding development plan costs appear in the flow forecast and constitute general estimates only. The budget described in this table refers to the partnership's holdings in the rights of the oil property at the time referred to in the section – at a rate of 23.1% until September 30, 2019, the partnership's holdings in the rights at a rate of 53.1% in Shenandoah as of October 1, 2019, and the partnership's holdings in the rights at a rate of 49% starting on August 25, 2021.

APC-01760550

## 8.2 Shenandoah

**Warning regarding forward-looking information** - the aforementioned estimates regarding the planned operations in the oil property, including costs and schedules, and regarding the date of execution of the development works and their completion, as stated above, are forward-looking information within the meaning of the Securities Law, based on estimates provided to the General Partner by the operator of the oil property, among other things, based on engineering, financial and other information received from the operator based on a variety of factors, including the development plan and the timetables for its implementation, obtaining regulatory approvals, estimated data on the availability of equipment, services and costs, as well as on past experience, and they constitute professional estimates and assumptions only for which there is no certainty.

### 8.2.6 Actual participation rate in expenses and revenue related to the oil property

| Participation rate | Percentage | Rate embodied to %100 | Explanations |
|---|---|---|---|
| The rate associated in practice with the holders of the partnership's capital rights in the oil property | 49% | 100% | See the description of the chain holdings in section 8.2.1 above |
| The rate associated in practice with the holders of the partnership's capital rights in the oil property revenues | 38.68% | 78.75% | See calculation in section 8.2.7 hereinafter |
| The rate associated in practice with the holders of the capital rights of the partnership in the expenses associated with exploration, development, or production activities in the oil property | 49% | 100% | See calculation in section 8.2.8 hereinafter |

### 8.2.7 The participation rate in practice of the holders of the capital rights of the partnership in expenses of the development and production of the oil property

| Item | Percentage | Concise explanation of how the royalties or payments are calculated |
|---|---|---|
| Theoretical expenses of an oil property (without the aforementioned royalties) | 49% | |
| The details of payments (derived from expenses) at the level of the oil property: | | |
| The total rate of expenses in practice at the level of the oil property | 100% | |
| The share of the holders of the capital rights of the partnership in the expenses of the oil property (concatenation) | 49% | |
| The total rate in practice of the holders of the partnership's capital rights, in expenses, at the level of the oil property (and before other expenses at the partnership level) | 49% | |
| Details of payments (derived from the expenses) in connection with the oil property and at the partnership level (the percentages below will be calculated according to the proportion of the holders of the capital rights of the partnership in the oil property): | | |
| The rate associated in practice with the holders of the capital rights of the partnership, in the expenses associated with development or production activity in the oil property | 49% | |

APC-01760551

8.2 Shenandoah

**8.2.8 Remuneration and payments paid during the exploration, development, and production activities in the oil property**

| Item | The total rate of the holders of the capital rights of the partnership in investments during this period in the oil property (in thousands of dollars) | Of this, the rate of the holders of the capital rights of the partnership in payments to the federal government in the USA |
|---|---|---|
| **Budget actually invested in 2019** | 3,377 | - |
| **Budget actually invested in 2020** | 12,155 | - |
| **Budget actually invested in 2021** | 82,718 | - |

59

APC-01760552

### 8.2 Shenandoah

#### 8.2.9 **Reserves in the Shenandoah oil property**
(A) Quantity data

(1) According to a report received by the partnership from NSAI and which was prepared in accordance with the rules of the petroleum resources management system (SPE-PRMS), the oil and natural gas reserves in the oil property as of December 31, 2021, are as detailed below.

| Reserves category | Total in oil assets (Gross) | | | Total share of the partnership (Net)[45] | | | |
|---|---|---|---|---|---|---|---|
| | Natural gas BCF | Oil MMBBL | Total equal value of barrels of oil MMBOE | Natural gas BCF | Natural gas liquids MMBBL | Oil MMBBL | Total equal value of barrels of oil MMBOE |
| Proved Reserves 1P | 140.8 | 120.7 | 144.2 | 40.2 | 6.6 | 45.1 | 58.4 |
| Probable Reserves | 239.1 | 203.7 | 243.6 | 67.5 | 11.2 | 76.4 | 98.9 |
| Total reserves of the 2P type (Proved+Probable Reserves) | 379.9 | 324.4 | 387.8 | 107.7 | 17.8 | 121.5 | 157.3 |
| Possible Reserves | 341.5 | 297.6 | 354.5 | 96.5 | 16.0 | 111.6 | 143.7 |
| Total reserves of the 3P type (Proved+Probable+Possible Reserves) | 721.4 | 622.0 | 742.3 | 204.2 | 33.8 | 233.1 | 300.9 |

(2) In the report, NSAI stated, among other things, a number of assumptions and reservations, including that: (a) the estimates, as is customary in estimating reserves according to the rules of the Petroleum Resources Management System (SPE-PRMS), and they are not risk-adjusted; (b) NSAI did not visit the area of the oil properties and did not check the mechanical operation of the facilities and the wells or their condition; (c) NSAI did not examine possible exposure arising from environmental issues and therefore did not include in the reserves report costs that may arise from such liability; (d) NSAI stated that its estimates in the report are based, among other things, on the assumptions that the properties will be developed in accordance with the existing development plans presented by the operator of the property, that the properties will be operated properly, that no new regulations or regulatory restrictions will apply that will affect the ability of the rights holders to maintain production, and that the actual production data will match its forecasts; (e) NSAI made use of technical and economic information that includes among other things, logs, geological maps, seismic information, and property ownership rights (f) NSAI was provided with all the necessary information for the preparation of the report and NSAI's access was not restricted to any information that it believed was necessary for the preparation of the report (g) as customary in the oil and gas assessments, there are inherent uncertainties in the engineering and geo-physical interpretation, therefore the NSAI conclusions represent, as usual, a professional interpretation

---

[45] For this matter, "Net" means multiplying the total amount of oil and natural gas, as applicable, in the oil property (Gross) by the rate associated in practice with the holders of the capital rights of the partnership in the revenue from the oil property. This definition is also valid for the rest of the reserves' tables in this report.

APC-01760553

8.2 Shenandoah

only; (h) NSAI made use of information received from the partnership, from the operator of the oil property, from public information sources and non-confidential information available to NSAI; (i) NSAI did not examine the contractual rights in the properties.

**Warning regarding forward-looking information - NSAI's estimates regarding the quantities of oil and natural gas reserves in the oil property are forward-looking information within the meaning of the Securities Law. The aforementioned estimates are based, among other things, on geological, geophysical, engineering, and other information received from the drilling and from the operator in the reservoir and are only NSAI's estimates and assumptions and regarding which there is no certainty. The quantities of natural gas and/or oil that will be actively produced may differ from the above estimates and assumptions, among other things, as a result of operational and technical conditions and/or regulatory changes and/or supply and demand conditions in the natural gas and/or oil market and/or commercial conditions and/or as a result of the actual performance of the reservoir. The aforementioned estimates and assumptions may be updated as more information is accumulated and/or as a result of a set of factors related to the oil property and the production of oil and natural gas.**

**Possible Reserves are the additional reserves that are not expected to be produced to the same extent as the Probable Reserves. There is a 10% chance that the quantities that will be produced in practice will be equal to or higher than the quantity of Proved Reserves, along with the quantity of Probable Reserves and along with the quantity of Possible Reserves.**

(B) Capitalized cash flow data

In relation to the calculation of the capitalized cash flow detailed below, it should be noted as follows:

(1) The capitalized flow is calculated according to the partnership's assessment based on the average of oil and gas price forecasts of international bodies that include banks and research bodies taken from the FactSet database[46]: (1) Oil prices - forecasts were taken regarding West Texas Intermediate (WTI) oil prices. The oil price is adjusted to the quality of the oil, to transmission costs and rate differentials, relative to WTI; (2) Gas prices - forecasts were taken regarding Henry Hub natural gas prices. The gas price is adjusted to gas quality, transmission costs and rate differentials.

---

[46] Updated as of the date close to the approval of the report.

APC-01760554

8.2 Shenandoah

Below is a table summarizing the oil and natural gas price forecasts that were used (before adjustments):

| End of period | Oil price Dollar/Barrel | Natural gas price Dollar/MMBTU |
|---|---|---|
| 12.31.2022 | 76.51 | 3.97 |
| 12.31.2023 | 72.27 | 3.55 |
| 12.31.2024 | 68.83 | 3.26 |
| 12.31.2025 | 66.13 | 3.23 |
| Beyond | 66.13 | 3.23 |

(2) The operational costs considered are those assumed by the operator Shenandoah and by NSAI. These costs are intended to include transmission costs, export pipeline costs, pipeline export fees, well overhead expenses and estimates of various costs. Operating costs were divided into costs at the level of field costs, costs per well and costs per production unit. Operating costs are not adjusted for inflation.

(3) The capital expenditures considered for the purpose of preparing the capitalized flow are based on approved expenditures and actual expenditures incurred in the project and include capital expenditures that will be required for the maintenance of the wells, drilling of new wells, various services and production equipment. The capital expenditures provided to NSAI by the operator of the property seem reasonable to it, these costs are not adjusted for inflation.

(4) The abandonment costs considered are estimates provided to NSAI by the operator of the property in accordance with its estimates regarding the cost of abandoning the wells, abandoning the production platform and the production equipment. As defined by the operator, the abandonment costs do not include the utilization of the facilities (Salvage Value) and are not adjusted for inflation.

(5) The actual production rate may be lower or higher than the production rate used to estimate the discounted flow. NSAI did not conduct a sensitivity analysis regarding the production rate of the wells.

(6) In the calculation of the capitalized flow, a tax rate of 21% was considered, the rate of royalties to be paid at the level of the oil property to the federal government, at a rate of 12.5%-16.67%. In addition, a royalty to third parties at a rate of 2% and to the General Partner at a rate of 6% was considered.

APC-01760555

8.2 Shenandoah

The capitalized flow has been updated in relation to the capitalized flow included in the reserves report published on October 20, 2021[47] (hereinafter in this section: "**the Previous Reserves Report**") mainly considering the latest forecast of oil prices and a change in the remaining time for capitalization.

Below is the estimate of the capitalized flow as of 12.31.2021 in thousands of dollars, attributed to the partnership's share of the reserves in the oil property:

---

[47] See the immediate report of the partnership dated October 20, 2021 (reference number: 2021-01-157983), the information according to which is presented in the report by way of reference.

63

APC-01760556

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[48] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | - | - | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,554 | 2,999 | 87,376 | (19,226) | (3,349) | (188,956) | - | (124,154) | - | (124,154) | (109,890) | (97,819) | (87,525) | (78,686) |
| 2025 | 30,643 | 35,993 | 1,005,534 | (231,406) | (38,508) | (24,979) | - | 710,641 | (27,468) | 683,174 | 575,890 | 489,328 | 418,799 | 360,818 |
| 2026 | 25,756 | 30,244 | 845,152 | (197,395) | (37,900) | (24,715) | - | 585,142 | (100,249) | 484,893 | 389,283 | 315,735 | 258,478 | 213,414 |
| 2027 | 15,579 | 18,282 | 511,165 | (119,389) | (38,030) | - | - | 353,746 | (66,329) | 287,417 | 219,757 | 170,136 | 133,227 | 105,416 |
| 2028 | 9,439 | 11,070 | 309,702 | (72,336) | (35,204) | - | - | 202,163 | (36,666) | 165,496 | 120,495 | 89,036 | 66,681 | 50,557 |
| 2029 | 5,768 | 6,760 | 189,140 | (44,177) | (34,890) | - | - | 110,073 | (17,324) | 92,749 | 64,314 | 45,362 | 32,496 | 23,612 |
| 2030 | 5,404 | 6,231 | 175,822 | (41,070) | (27,060) | (59,780) | - | 47,911 | (11,223) | 36,688 | 24,229 | 16,312 | 11,178 | 7,783 |
| 2031 | 5,392 | 6,140 | 175,261 | (40,946) | (26,984) | - | - | 107,331 | (17,658) | 89,673 | 56,400 | 36,246 | 23,757 | 15,853 |
| 2032 | 2,520 | 2,854 | 81,870 | (19,128) | (25,884) | (9,800) | - | 27,058 | (5,224) | 21,834 | 13,077 | 8,021 | 5,028 | 3,215 |
| 2033 | 6,034 | 6,909 | 196,196 | (45,834) | (24,951) | (49,980) | - | 75,431 | (20,503) | 54,928 | 31,331 | 18,344 | 10,999 | 6,740 |
| 2034 | 6,047 | 6,940 | 196,669 | (45,943) | (23,836) | - | - | 126,890 | (24,403) | 102,487 | 55,675 | 31,115 | 17,846 | 10,480 |
| 2035 | 3,317 | 3,807 | 107,863 | (25,197) | (23,532) | - | - | 59,134 | (10,553) | 48,581 | 25,134 | 13,408 | 7,356 | 4,140 |
| 2036 | 1,726 | 1,981 | 56,124 | (13,111) | (23,532) | - | - | 19,481 | (2,516) | 16,965 | 8,358 | 4,256 | 2,233 | 1,204 |
| 2037-2038 | 522 | 599 | 16,965 | (3,963) | (11,766) | - | (31,850) | (30,614) | - | (30,614) | (13,653) | (6,321) | (3,028) | (1,497) |
| Total | 120,701 | 140,808 | 3,954,841 | (919,121) | (375,426) | (947,239) | (31,850) | 1,681,205 | (340,118) | 1,341,088 | 897,516 | 593,834 | 379,529 | 224,469 |

Total capitalized cash flow from Proved Reserves as of December 31, 2021 (in thousands of dollars in relation to the partnership's share in the oil property)

---

[48] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760557

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[49] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2024 | 152 | 186 | 5,219 | (1,145) | - | - | - | 4,074 | - | 4,074 | 3,606 | 3,210 | 2,872 | 2,582 |
| 2025 | 1,824 | 2,230 | 60,067 | (13,809) | - | (950) | - | 45,308 | (1,699) | 43,609 | 36,761 | 31,235 | 26,733 | 23,032 |
| 2026 | 6,710 | 7,977 | 220,412 | (51,472) | - | (15,401) | - | 153,539 | (40,403) | 113,137 | 90,829 | 73,668 | 60,309 | 49,794 |
| 2027 | 13,640 | 16,059 | 447,675 | (104,556) | - | (38,958) | - | 304,161 | (67,670) | 236,491 | 180,819 | 139,990 | 109,621 | 86,738 |
| 2028 | 13,972 | 16,587 | 458,902 | (107,167) | (392) | (82,089) | - | 269,254 | (64,379) | 204,875 | 149,166 | 110,221 | 82,547 | 62,587 |
| 2029 | 19,709 | 23,233 | 646,528 | (150,996) | (1,764) | (55,106) | - | 438,662 | (94,854) | 343,808 | 238,401 | 168,151 | 120,457 | 87,525 |
| 2030 | 18,845 | 21,896 | 613,480 | (143,290) | (2,352) | 59,780 | - | 527,618 | (99,569) | 428,049 | 282,681 | 190,320 | 130,410 | 90,809 |
| 2031 | 12,276 | 14,351 | 399,816 | (93,378) | (2,428) | - | - | 304,010 | (62,584) | 241,427 | 151,845 | 97,585 | 63,960 | 42,681 |
| 2032 | 9,562 | 11,165 | 311,407 | (72,731) | (3,528) | 9,800 | - | 244,949 | (49,302) | 195,647 | 117,176 | 71,873 | 45,054 | 28,809 |
| 2033 | 2,251 | 2,708 | 73,493 | (17,158) | (4,461) | 49,980 | - | 101,854 | (14,599) | 87,254 | 49,770 | 29,140 | 17,472 | 10,707 |
| 2034 | 3,183 | 4,208 | 104,764 | (24,429) | (5,576) | (59,780) | - | 14,979 | (10,597) | 4,382 | 2,380 | 1,330 | 763 | 448 |
| 2035 | 6,944 | 8,876 | 227,883 | (53,162) | (5,880) | (79,380) | - | 89,460 | (26,899) | 62,562 | 32,368 | 17,267 | 9,473 | 5,331 |
| 2036 | 20,659 | 24,660 | 674,011 | (157,376) | (5,880) | (40,180) | - | 470,575 | (101,160) | 369,415 | 181,998 | 92,667 | 48,620 | 26,220 |
| 2037-2047 | 73,944 | 84,960 | 2,405,019 | (551,292) | (238,342) | (119,560) | (17,150) | 1,478,676 | (304,369) | 1,174,306 | 510,774 | 231,720 | 109,263 | 53,374 |
| **Total** | **203,672** | **239,097** | **6,648,676** | **(1,541,961)** | **(270,602)** | **(371,844)** | **(17,150)** | **4,447,118** | **(938,083)** | **3,509,035** | **2,028,574** | **1,258,380** | **827,554** | **570,637** |

The table title reads: Total capitalized cash flow from Probable Reserves as of December 31, 2021 (in thousands of dollars in relation to the partnership's share in the oil property)

[49] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760558

8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[50] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | 92,596 | (20,371) | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,706 | 3,185 | 92,596 | (20,371) | (3,349) | (188,956) | - | (120,080) | - | (120,080) | (106,284) | (94,609) | (84,653) | (76,104) |
| 2025 | 32,467 | 38,222 | 1,065,601 | (245,215) | (38,508) | (25,928) | - | 755,949 | (29,167) | 726,783 | 612,651 | 520,563 | 445,532 | 383,850 |
| 2026 | 32,466 | 38,221 | 1,065,564 | (248,867) | (37,900) | (40,115) | - | 738,682 | (140,651) | 598,030 | 480,112 | 389,403 | 318,786 | 263,208 |
| 2027 | 29,219 | 34,341 | 958,840 | (223,946) | (38,030) | (38,958) | - | 657,907 | (133,999) | 523,908 | 400,576 | 310,126 | 242,847 | 192,154 |
| 2028 | 23,411 | 27,657 | 768,604 | (179,503) | (35,596) | (82,089) | - | 471,416 | (101,045) | 370,371 | 269,662 | 199,257 | 149,228 | 113,145 |
| 2029 | 25,477 | 29,993 | 835,667 | (195,172) | (36,654) | (55,106) | - | 548,735 | (112,178) | 436,557 | 302,715 | 213,514 | 152,953 | 111,136 |
| 2030 | 24,249 | 28,127 | 789,302 | (184,361) | (29,412) | - | - | 575,529 | (110,792) | 464,737 | 306,910 | 206,633 | 141,588 | 98,592 |
| 2031 | 17,668 | 20,491 | 575,077 | (134,324) | (29,412) | - | - | 411,342 | (80,242) | 331,100 | 208,244 | 133,831 | 87,716 | 58,534 |
| 2032 | 12,082 | 14,019 | 393,277 | (91,859) | (29,412) | - | - | 272,006 | (54,526) | 217,481 | 130,253 | 79,894 | 50,082 | 32,024 |
| 2033 | 8,285 | 9,617 | 269,689 | (62,992) | (29,412) | - | - | 177,285 | (35,103) | 142,183 | 81,101 | 47,484 | 28,471 | 17,447 |
| 2034 | 9,230 | 11,148 | 301,433 | (70,372) | (29,412) | (59,780) | - | 141,869 | (35,001) | 106,869 | 58,055 | 32,446 | 18,609 | 10,928 |
| 2035 | 10,261 | 12,683 | 335,746 | (78,359) | (29,412) | (79,380) | - | 148,594 | (37,452) | 111,142 | 57,502 | 30,676 | 16,828 | 9,471 |
| 2036 | 22,385 | 26,641 | 730,135 | (170,487) | (29,412) | (40,180) | - | 490,056 | (103,676) | 386,380 | 190,356 | 96,922 | 50,853 | 27,424 |
| 2037-2047 | 74,466 | 85,559 | 2,421,984 | (555,255) | (250,108) | (119,560) | (49,000) | 1,448,062 | (304,369) | 1,143,692 | 497,121 | 225,399 | 106,235 | 51,877 |
| **Total** | **324,372** | **379,905** | **10,603,516** | **(2,461,082)** | **(646,028)** | **(1,319,082)** | **(49,000)** | **6,128,323** | **(1,278,200)** | **4,850,123** | **2,926,090** | **1,852,214** | **1,207,083** | **795,106** |

The title row of the table reads: Total capitalized cash flow from Proved+Probable Reserves (2P) as of 12.31.2021 (in thousands of dollars in relation to the partnership's share of the oil property)

---

[50] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760559

8.2 Shenandoah

| Total capitalized cash flow from Possible Reserves as of 12.31.2021 (in thousands of dollars in relation to the partnership's share of the oil property) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Oil sales amount (thousands of barrels) | Sales amount (MMCF)[51] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
| | (100% from the oil assets) | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2024 | 30 | 2 | 956 | (225) | - | - | - | 731 | - | 731 | 647 | 576 | 515 | 463 |
| 2025 | 365 | 28 | 10,992 | (2,596) | - | (950) | - | 7,446 | (259) | 7,187 | 6,059 | 5,148 | 4,406 | 3,796 |
| 2026 | 366 | 30 | 11,029 | (2,608) | - | (14,643) | - | (6,221) | (850) | (7,072) | (5,677) | (4,605) | (3,770) | (3,112) |
| 2027 | 2,965 | 3,112 | 96,391 | (22,543) | - | 29,225 | - | 103,073 | (17,609) | 85,465 | 65,346 | 50,591 | 39,616 | 31,346 |
| 2028 | 5,714 | 6,156 | 186,142 | (43,519) | 392 | 32,885 | - | 175,899 | (33,648) | 142,251 | 103,571 | 76,530 | 57,315 | 43,456 |
| 2029 | 3,028 | 3,248 | 98,503 | (23,031) | 1,372 | (36,505) | - | 40,340 | (14,013) | 26,326 | 18,255 | 12,876 | 9,224 | 6,702 |
| 2030 | 5,004 | 6,331 | 164,067 | (38,280) | 1,176 | (73,218) | - | 53,745 | (19,444) | 34,301 | 22,652 | 15,251 | 10,450 | 7,277 |
| 2031 | 13,543 | 16,013 | 441,495 | (103,098) | 98 | (37,591) | - | 300,904 | (64,979) | 235,925 | 148,385 | 95,362 | 62,502 | 41,709 |
| 2032 | 18,528 | 21,220 | 602,471 | (140,743) | (588) | (42,715) | - | 418,424 | (89,904) | 328,520 | 196,757 | 120,686 | 75,652 | 48,375 |
| 2033 | 20,268 | 22,681 | 657,862 | (152,881) | (1,274) | (66,639) | - | 437,068 | (96,323) | 340,746 | 194,361 | 113,797 | 68,232 | 41,812 |
| 2034 | 18,857 | 20,522 | 610,756 | (135,054) | (2,352) | 59,780 | - | 533,129 | (100,613) | 432,517 | 234,959 | 131,314 | 75,312 | 44,228 |
| 2035 | 11,410 | 11,638 | 367,797 | (81,478) | (2,352) | 79,380 | - | 363,346 | (65,293) | 298,053 | 154,203 | 82,264 | 45,129 | 25,398 |
| 2036 | (1,922) | (3,189) | (64,728) | 17,735 | (2,352) | (19,600) | - | (68,945) | 11,634 | (57,311) | (28,235) | (14,376) | (7,543) | (4,068) |
| 2037-2067 | 199,449 | 233,689 | 6,497,195 | (1,508,983) | (550,652) | (179,340) | (14,700) | 4,243,521 | (896,930) | 3,346,591 | 974,288 | 313,510 | 109,989 | 41,570 |
| Total | 297,606 | 341,482 | 9,680,929 | (2,237,304) | (556,533) | (269,931) | (14,700) | 6,602,462 | (1,388,231) | 5,214,231 | 2,085,569 | 998,923 | 547,030 | 328,952 |

---

[51] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760560

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) | Sales amount (MMCF)[52] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (100% from the oil assets) | | | | | | | | | | | | | |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | - | - | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,736 | 3,188 | 93,552 | (20,596) | (3,349) | (188,956) | - | (119,349) | - | (119,349) | (105,637) | (94,033) | (84,137) | (75,641) |
| 2025 | 32,832 | 38,251 | 1,076,593 | (247,811) | (38,508) | (26,878) | - | 763,396 | (29,426) | 733,970 | 618,710 | 525,711 | 449,938 | 387,646 |
| 2026 | 32,832 | 38,251 | 1,076,593 | (251,475) | (37,900) | (54,758) | - | 732,460 | (141,502) | 590,959 | 474,434 | 384,798 | 315,017 | 260,096 |
| 2027 | 32,184 | 37,453 | 1,055,231 | (246,488) | (38,030) | (9,733) | - | 760,980 | (151,608) | 609,372 | 465,921 | 360,717 | 282,463 | 223,500 |
| 2028 | 29,125 | 33,813 | 954,746 | (223,022) | (35,204) | (49,204) | - | 647,315 | (134,693) | 512,622 | 373,233 | 275,788 | 206,544 | 156,601 |
| 2029 | 28,505 | 33,241 | 934,171 | (218,203) | (35,282) | (91,611) | - | 589,075 | (126,191) | 462,883 | 320,970 | 226,389 | 162,177 | 117,838 |
| 2030 | 29,254 | 34,458 | 953,369 | (222,641) | (28,236) | (73,218) | - | 629,275 | (130,236) | 499,038 | 329,562 | 221,884 | 152,038 | 105,869 |
| 2031 | 31,211 | 36,504 | 1,016,572 | (237,421) | (29,314) | (37,591) | - | 712,246 | (145,221) | 567,025 | 356,629 | 229,193 | 150,218 | 100,243 |
| 2032 | 30,610 | 35,240 | 995,748 | (232,603) | (30,000) | (42,715) | - | 690,431 | (144,430) | 546,001 | 327,010 | 200,580 | 125,733 | 80,399 |
| 2033 | 28,554 | 32,298 | 927,551 | (215,873) | (30,686) | (66,639) | - | 614,353 | (131,425) | 482,928 | 275,461 | 161,281 | 96,703 | 59,259 |
| 2034 | 28,088 | 31,670 | 912,189 | (205,426) | (31,764) | - | - | 674,999 | (135,613) | 539,385 | 293,014 | 163,760 | 93,921 | 55,156 |
| 2035 | 21,671 | 24,321 | 703,543 | (159,838) | (31,764) | - | - | 511,941 | (102,745) | 409,196 | 211,705 | 112,940 | 61,958 | 34,869 |
| 2036 | 20,463 | 23,452 | 665,407 | (152,752) | (31,764) | (59,780) | - | 421,111 | (92,042) | 329,069 | 162,121 | 82,546 | 43,310 | 23,356 |
| 2037-2067 | 273,915 | 319,248 | 8,919,179 | (2,064,237) | (800,759) | (298,900) | (63,700) | 5,691,582 | (1,201,299) | 4,490,283 | 1,471,409 | 538,909 | 216,224 | 93,448 |
| Total | 621,978 | 721,388 | 20,284,445 | (4,698,386) | (1,202,561) | (1,589,013) | (63,700) | 12,730,785 | (2,666,432) | 10,064,353 | 5,011,660 | 2,851,137 | 1,754,113 | 1,124,058 |

Table header: Total capitalized cash flow from Proved+Probable+Possible Reserves (3P) as of 12.31.2021 (in thousands of dollars in relation to the partnership's share of the oil property). The last five columns fall under the span heading "Total capitalized cash flow after tax".

---

[52] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760561

8.2 Shenandoah

**Warning - it will be clarified that capitalized cash flow data, whether calculated with a certain capitalization rate or without a capitalized rate, represents a current value but does not necessarily represent a fair value.**
**Warning regarding forward-looking information - the figures of the capitalized flows as mentioned above are forward-looking information within the meaning of the Securities Law. The above data are based on various assumptions, among them in relation to the quantities of oil, natural gas and natural gas liquids that will be produced, the rate and duration of their sales from the Shenandoah oil property, operating costs, capital expenditures, abandonment costs, royalty rates and sales prices, and regarding which there is no certainty that they will be realized. It should be noted that the quantities of natural gas and/or oil and/or natural gas liquids and/or condensate that will actually be produced, the aforementioned expenses and the aforementioned revenues may differ substantially from the above estimates and hypotheses, among other things, as a result of operational and technical conditions and/or regulatory changes and /or from supply and demand conditions in the natural gas market and/or oil and/or natural gas liquids and/or condensate and/or from the actual performance of the project and/or as a result of actual sales prices and/or as a result of geopolitical changes that will apply.**

( C ) Below is a sensitivity analysis for the main parameters that constitute the capitalized cash flow of the reserves in the oil property (the price of oil and gas and the amount of oil and gas sales) for 12.31.2021 (in thousands of dollars), which was performed by the partnership:

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalize d value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A 10% increase in the price of oil and gas | | | | | | A 10% decrease in the price of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,601,496 | 1,091,424 | 743,137 | 497,579 | 319,815 | 1P Proved Reserves (Proved Reserves) | 1,080,679 | 703,580 | 444,484 | 261,422 | 129,059 |
| Probable Reserves (Probable Reserves) | 3,948,131 | 2,276,365 | 1,409,717 | 926,056 | 638,059 | Probable Reserves (Probable Reserves) | 3,069,939 | 1,780,442 | 1,106,489 | 728,373 | 502,468 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,549,627 | 3,367,789 | 2,152,855 | 1,423,636 | 957,874 | Total 2P Reserves (Proved+Probable Reserves) | 4,150,618 | 2,484,022 | 1,550,973 | 989,795 | 631,527 |
| Possible Reserves (Possible Reserves) | 5,854,840 | 2,331,015 | 1,114,524 | 609,970 | 366,711 | Possible Reserves (Possible Reserves) | 4,573,193 | 1,840,021 | 883,230 | 483,983 | 291,076 |
| Total 3P Reserves (Proved+Probable+Po ssible Reserves) | 11,404,467 | 5,698,804 | 3,267,378 | 2,033,606 | 1,324,585 | Total 3P Reserves (Proved+Probable+Po ssible Reserves) | 8,723,812 | 4,324,043 | 2,434,204 | 1,473,778 | 922,603 |
| A 15% increase in the price of oil and gas | | | | | | A 15% decrease in the price of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,731,700 | 1,188,079 | 817,304 | 556,008 | 366,832 | 1P Proved Reserves (Proved Reserves) | 950,475 | 606,611 | 369,809 | 202,368 | 81,354 |
| Probable Reserves (Probable Reserves) | 4,167,679 | 2,400,412 | 1,485,632 | 975,609 | 672,102 | Probable Reserves (Probable Reserves) | 2,850,392 | 1,656,376 | 1,030,544 | 678,783 | 468,384 |

69

## 8.2 Shenandoah

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total 2P Reserves (Proved+Probable Reserves) | 5,899,380 | 3,588,491 | 2,302,936 | 1,531,618 | 1,038,934 | Total 2P Reserves (Proved+Probable Reserves) | 3,800,866 | 2,262,988 | 1,400,353 | 881,150 | 549,738 |
| Possible Reserves (Possible Reserves) | 6,175,145 | 2,453,761 | 1,172,361 | 641,486 | 385,642 | Possible Reserves (Possible Reserves) | 4,252,595 | 1,717,235 | 825,381 | 452,459 | 272,137 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 12,074,524 | 6,042,252 | 3,475,297 | 2,173,104 | 1,424,576 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 8,053,461 | 3,980,222 | 2,225,734 | 1,333,609 | 821,875 |
| **A 20% increase in the price of oil and gas** | | | | | | **A 20% decrease in the price of oil and gas** | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,861,905 | 1,284,733 | 891,470 | 614,437 | 413,849 | 1P Proved Reserves (Proved Reserves) | 820,270 | 509,643 | 295,134 | 143,314 | 33,649 |
| Probable Reserves (Probable Reserves) | 4,387,127 | 2,524,429 | 1,561,537 | 1,025,159 | 706,144 | Probable Reserves (Probable Reserves) | 2,630,844 | 1,532,308 | 954,597 | 629,191 | 434,299 |
| Total 2P Reserves (Proved+Probable Reserves) | 6,249,032 | 3,809,163 | 2,453,007 | 1,639,597 | 1,119,993 | Total 2P Reserves (Proved+Probable Reserves) | 3,451,114 | 2,041,951 | 1,249,731 | 772,505 | 467,948 |
| Possible Reserves (Possible Reserves) | 6,495,549 | 2,576,537 | 1,230,209 | 673,006 | 404,574 | Possible Reserves (Possible Reserves) | 3,931,997 | 1,594,449 | 767,534 | 420,936 | 253,199 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 12,744,581 | 6,385,700 | 3,683,216 | 2,312,602 | 1,524,567 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 7,383,111 | 3,636,400 | 2,017,265 | 1,193,441 | 721,147 |
| **A 10% increase in the sales quantity of oil and gas** | | | | | | **A 10% decrease in the sales quantity of oil and gas** | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,581,182 | 1,076,394 | 731,630 | 488,526 | 312,534 | 1P Proved Reserves (Proved Reserves) | 1,100,993 | 718,638 | 456,039 | 270,533 | 136,403 |
| Probable Reserves (Probable Reserves) | 3,912,485 | 2,256,374 | 1,397,580 | 918,199 | 632,705 | Probable Reserves (Probable Reserves) | 3,105,585 | 1,800,455 | 1,118,661 | 736,274 | 507,870 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,493,668 | 3,332,768 | 2,129,210 | 1,406,724 | 945,239 | Total 2P Reserves (Proved+Probable Reserves) | 4,206,578 | 2,519,094 | 1,574,700 | 1,006,807 | 644,273 |
| Possible Reserves (Possible Reserves) | 5,801,984 | 2,310,817 | 1,105,044 | 604,826 | 363,635 | Possible Reserves (Possible Reserves) | 4,626,096 | 1,860,225 | 892,711 | 489,128 | 294,153 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 11,295,652 | 5,643,585 | 3,234,254 | 2,011,551 | 1,308,874 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 8,832,674 | 4,379,319 | 2,467,411 | 1,495,935 | 938,426 |

APC-01760563

8.2 Shenandoah

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A 15% increase in the sales quantity of oil and gas | | | | | | A 15% decrease in the sales quantity of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,701,230 | 1,165,563 | 800,089 | 542,484 | 355,973 | 1P Proved Reserves (Proved Reserves) | 980,945 | 629,199 | 387,141 | 216,035 | 92,370 |
| Probable Reserves (Probable Reserves) | 4,114,210 | 2,370,397 | 1,467,381 | 963,767 | 664,009 | Probable Reserves (Probable Reserves) | 2,903,860 | 1,686,396 | 1,048,802 | 690,634 | 476,487 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,815,440 | 3,535,960 | 2,267,469 | 1,506,251 | 1,019,982 | Total 2P Reserves (Proved+Probable Reserves) | 3,884,806 | 2,315,595 | 1,435,943 | 906,669 | 568,857 |
| Possible Reserves (Possible Reserves) | 6,095,861 | 2,423,464 | 1,158,142 | 633,771 | 381,027 | Possible Reserves (Possible Reserves) | 4,331,950 | 1,747,541 | 839,603 | 460,176 | 276,754 |
| Total 3P Reserves (Proved+Probable+ Possible Reserves) | 11,911,302 | 5,959,424 | 3,425,611 | 2,140,022 | 1,401,009 | Total 3P Reserves (Proved+Probable+ Possible Reserves) | 8,216,755 | 4,063,136 | 2,275,546 | 1,366,845 | 845,611 |
| A 20% increase in the sales quantity of oil and gas | | | | | | A 20% decrease in the sales quantity of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,821,277 | 1,254,712 | 868,516 | 596,405 | 399,371 | 1P Proved Reserves (Proved Reserves) | 860,898 | 539,760 | 318,243 | 161,537 | 48,337 |
| Probable Reserves (Probable Reserves) | 4,315,888 | 2,484,425 | 1,537,207 | 1,009,370 | 695,354 | Probable Reserves (Probable Reserves) | 2,702,136 | 1,572,337 | 978,943 | 644,994 | 445,103 |
| Total 2P Reserves (Proved+Probable Reserves) | 6,137,165 | 3,739,137 | 2,405,723 | 1,605,776 | 1,094,725 | Total 2P Reserves (Proved+Probable Reserves) | 3,563,033 | 2,112,097 | 1,297,186 | 806,531 | 493,440 |
| Possible Reserves (Possible Reserves) | 6,389,786 | 2,536,126 | 1,211,245 | 662,717 | 398,420 | Possible Reserves (Possible Reserves) | 4,037,803 | 1,634,856 | 786,495 | 431,224 | 259,354 |
| Total 3P Reserves (Proved+Probable+ Possible Reserves) | 12,526,951 | 6,275,263 | 3,616,969 | 2,268,493 | 1,493,145 | Total 3P Reserves (Proved+Probable+ Possible Reserves) | 7,600,836 | 3,746,953 | 2,083,681 | 1,237,755 | 752,795 |

APC-01760564

8.2 Shenandoah

The partnership declares that all the aforementioned data was compiled in a manner consistent with the rules of the Petroleum Resources Management System (SPE-PRMS).

Appraiser Opinion

Attached to this report is a resource report prepared by NSAI, as of 12/31/2021, as well as NSAI's consent to its inclusion in this report.

Management's Declaration

1. Declaration date: March 17, 2022;
2. Stating the name of the corporation: Navitas Petroleum - Limited Partnership;
3. The person authorized to assess the resources in the partnership, his name and position: Amit Kornhauser, CEO of the General Partner;
4. We hereby confirm that the appraiser was provided with all the data required for the purpose of performing his work;
5. We hereby confirm that no information has come to our attention that indicates an affinity between the appraiser and the partnership;
6. We hereby confirm that, to the best of our knowledge, the resources reported are the best and most recent estimates available to us;
7. We hereby confirm that the data included in this report was prepared according to the professional terms listed in Chapter 7 of the Third Addendum of the Securities Regulations (Details of the Prospectus and Draft Prospectus - Structure and Form), 5729 -1969, and in the meaning given to them in Resources Petroleum Management System (2007) as published by the Association of Petroleum Engineers (SPE), the American Association of Petroleum Geologists (AAPG), the World Petroleum Council (WPC) and the Association of Petroleum Evaluation Engineers (SPEE), as of the date of the report;
8. We hereby confirm that no change has been made to the identity of the appraiser who made the last resource disclosure published by the partnership;
9. We agree to the inclusion of the aforementioned statement in this report.


_____

Amit Kornhauser, CEO of
the General Partner

APC-01760565

APC-01760566





# נאוויטס פטרוליום
## שותפות מוגבלת



# דוח שנתי
### ליום 31 בדצמבר
# 2021

APC-01760567

# תוכן עניינים

| | | |
|---|---|---|
| **פרק א'** | ◆ | תיאור עסקי השותפות |
| **פרק ב'** | ◆ | דוח הדירקטוריון על מצב ענייני השותפות |
| **פרק ג'** | ◆ | דוחות כספיים ליום 31 בדצמבר 2021 |
| **פרק ד'** | ◆ | פרטים נוספים על השותפות |
| **פרק ה'** | ◆ | דוח בדבר אפקטיביות הבקרה הפנימית על הדיווח הכספי ועל הגילוי |



פרק א׳

# תיאור עסקי השותפות



APC-01760569

## פרק א – תיאור עסקי השותפות

| סעיף | נושא | עמוד |
|---|---|---|
| 1 | תיאור ההתפתחות הכללית של עסקי השותפות | 2 |
| 2 | תחום הפעילות | 4 |
| 3 | השקעות בהון השותפות ועסקאות בניירות הערך שלה | 6 |
| 4 | חלוקת רווחים | 4 |
| 5 | מידע כספי לגבי תחום הפעילות של השותפות | 8 |
| 6 | סביבה כללית והשפעת גורמים חיצוניים על פעילות השותפות | 8 |
| 7 | תיאור עסקי השותפות לפי תחומי פעילות | 10 |
| 8 | נכסי הנפט של השותפות | 17 |
| 8.1 | בקסקין | 17 |
| 8.2 | שננדואה | 50 |
| 8.3 | יוקטן צפון | 82 |
| 8.4 | שדות דבר י | 95 |
| 8.5 | נצ'יס | 127 |
| 8.6 | נכסי נפט יבשתיים שונים | 144 |
| 8.7 | בלוק 7 | 146 |
| 9 | פעילות שהופסקה | 160 |
| 10 | הסכם הבנות – תגלית Sea-Lion | 160 |
| 11 | אנרגיות מתחדשות | 162 |
| 12 | מוצרים | 163 |
| 13 | לקוחות | 164 |
| 14 | שיווק והפצה | 164 |
| 15 | תחרות | 168 |
| 16 | עונתיות | 164 |
| 17 | הון אנושי | 165 |
| 18 | חומרי גלם וספקים | 165 |
| 19 | הון חוזר | 167 |
| 20 | מימון | 167 |
| 21 | מיסוי | 168 |
| 22 | סיכונים סביבתיים ודרכי ניהולם | 168 |
| 23 | מגבלות ופיקוח על פעילות השותפות | 169 |
| 24 | הסכמים מהותיים והסכמי שיתוף פעולה | 175 |
| 25 | הליכים משפטיים | 175 |
| 26 | יעדים ואסטרטגיה עסקית | 176 |
| 27 | צפי להתפתחות בשנה הקרובה | 176 |
| 28 | גורמי סיכון | 177 |
| | **נספחים** | |
| | **נספח מונחים מקצועיים** | 183 |

APC-01760570

8.2 שננדואה

השותפות מחזיקה באמצעות ShenHai LLC חברה בת (בשרשור) בבעלות מלאה של השותפות
(להלן בסעיף זה : "ShenHai" או "**חברת הפרויקט**"), ב-49% מהזכויות בנכס הנפט שננדואה
שבמפרץ מקסיקו, ארה"ב (להלן בסעיף זה : "**שננדואה**").

8.2.1 פרטים כלליים

| פרטים כלליים אודות נכס הנפט שננדואה | |
|---|---|
| שם נכס הנפט : | Shenandoah |
| מיקום : | נכס ימי במפרץ מקסיקו, כ-255 מייל דרומית מניו אורלינס, לואיזיאנה, ארה"ב, במים העמוקים של מפרץ מקסיקו, בעומק מים של בין 1,770 ל- 1,920 מטר. |
| שטח : | שטחו של כל אחד מהרישיונות הינו 5,760 אקרים (כ-23.3 קמ"ר). שטחו הכולל של נכס הנפט הינו כ-17,280 אקרים (כ-69.9 קמ"ר), והוא כולל את מלוא שטחם של רישיונות מס' 31938 ו- 25232 ואת מרבית שטחו של רישיון 28148 ("**הרישיונות**" או "**רישיונות שננדואה**"). |
| סוג נכס הנפט ותיאור הפעולות המותרות לפי סוג זה : | תגלית בפיתוח; פעולות מותרות - חיפושים, פיתוח והפקה של נפט וגז בשטח קרקע מוגדר הנקרא Lease. |
| תאריך הענקה מקורי של נכס הנפט : | 1.12.2007 - OCS-G 31938 (WR 51 block)<br>1.6.2003 - OCS-G 25232 (WR 52 block)<br>1.5.2006 - OCS-G 28148 (WR 53 block) |
| תאריך פקיעה מקורי של נכס הנפט : | 30.11.2017 - OCS-G 31938<br>31.5.2014 - OCS-G 25232<br>30.4.2016 - OCS-G 28148 |
| תאריכים שבהם הוחלט על הארכה של תקופת נכס הנפט : | בחודש ספטמבר 2018 הוחלט על העברת הרישיונות לסטטוס SOP - ראו סעיף 8.2.5 להלן |
| תאריך נוכחי לפקיעת נכס הנפט : | הרישיונות מוחזקים בסטטוס SOP - ראו סעיף 8.2.5 להלן |
| ציון האם קיימת אפשרות נוספת להארכת תקופת נכס הנפט : | הארכה של תוקף רישיון מעבר לתוקפו המקורי או מעבר להארכה שניתנה, מתבצעת באחת משלושה דרכים עיקריות:<br>1. ביצוע קידוח ו/או פעולות מאושרות בשטח הרישיון מזכה את בעלי הרישיון בהארכה אוטומטית של עד שנה ממועד סיום העבודות. ישנן גם עבודות נוספות (דוגמת סקרים סייסמיים וכיו"ב) שניתן לבצע ברישיון ולקבל בגינן אישור הארכה מ-BSEE.<br>2. SOP - Suspension of Production, במקרה שלא הוחלה הפקת נפט מהרישיון בתקופת הרישיון (המקורי או המוארך), ניתן לקבל אישור על "השהיית הפקה" (SOP). במסגרת הענקת ה-SOP תיקבע תכנית עבודה מחייבת הכוללת אבני דרך לפיתוח הנכס, ממועד ההענקה ועד לתחילת הפקה. הארכת תוקף הרישיון על בסיס SOP לא ניתנן עד למועד תחילת ההפקה לפי תכנית העבודה, אלא לתקופות קצובות בלבד - לרוב, בנות כשנה בכל פעם (כלומר לא עד לתחילת הפקה). כל עוד בעלי הרישיון עומדים בתכנית העבודה, ה-SOP יוארך לתקופה קצובה נוספת. נכון למועד הדוח, ה-SOP הוארך עד ליום 30 בספטמבר 2022.<br>הפקה – HBP, מעת תחילת הפקה מסחרית בשטח הרישיון – תוקפו של הרישיון מוארך אוטומטית לשען מתוח הפקה מסחרית. |
| ציון שם המפעיל (Operator): | BOE Exploration & Production, LLC[34] |

_____

[34]   חברה בבעלותה המלאה של Beacon (כהגדרתה להלן) המשמשת כמפעילה החל מחודש נובמבר 2020.

8.2 <u>שננדואה</u>

| פרטים כלליים אודות נכס הנפט שננדואה | |
|---|---|
| ציון שמות השותפים הישירים בנכס הנפט וחלקם הישיר בנכס הנפט וכן, למיטב ידיעת השותפות, שמות בעלי השליטה בשותפים האמורים (בהנחת מימוש כל ההסכמים כאמור להלן): | ShenHai LLC.³⁵, ³⁶ - 49% <br> Beacon Offshore Energy Development LLC.³⁷ 20.05% <br> BOE II Shen LLC.³⁸ 20% <br> BOE II Exploration LLC³⁹ 10.95% |

| פרטים כלליים אודות חלקה של השותפות בנכס הנפט שננדואה | |
|---|---|
| בעד החזקה בנכס נפט שננדואה - ציון תאריך הרכישה: | זכויות בשיעור של 23.1% בנכסי הנפט נרכשו ביום 5 באפריל 2018. זכויות בשיעור של 30.00% בנכסי הנפט נרכשו ביום 27 בנובמבר 2019, בתוקף מיום 1 באוקטובר 2019. במועד ה-FID נמכרו ל-Beacon 4.1% מהזכויות בפרויקט.⁴⁰ |
| תיאור מהות ואופן ההחזקה של השותפות בנכס הנפט: | החזקה בנכס הנפט בשיעור של 49% באמצעות ShenHai, חברה בת (בשרשור) בבעלות מלאה (100%) של השותפות. |
| ציון החלק בפועל המשויך למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט: | 38.68% |
| סך חלקם של מחזיקי הזכויות ההוניות של השותפות בהשקעה המצטברת בנכס הנפט במהלך חמש השנים שקדמו ליום 31.12.2021 (בין אם הוכרה כהוצאה או כנכס בדוחות הכספיים): | כ- 111,484 אלפי דולר. |

---

35 חברה בת (בשרשור) בבעלות מלאה (100%) של השותפות.

36 בנוסף לזכויות האמורות, מחזיקה השותפות בחציו הדרומי של רישיון (WR 53 block) OCS-G 28148 בשטח נכס הנפט בשננדואה בשיעור של 95.44%. חציו הדרומי של רישיון זה נמצא בשלב אקספלורציה ואינו נכלל בתכנית הפיתוח הקיימת של שננדואה. למיטב ידיעת השותפות לא קיימות חבויות בגינו.

37 חברת פרטית המוחזקת במלואה על ידי קרנות של קבוצת Blackstone (לעיל ולהלן : "Beacon").

38 חברת פרטית המוחזקת במלואה על ידי HEQ Deepwater. HEQ Deepwater הינה שותפות ייעודית הממוקדת בקידוחים במים העמוקים במפרץ מקסיקו בארה"ב והמוחזקת על ידי Quantum Energy Partners, קרן השקעות מובילה ומוכרת המתמחה בתחום הנפט והגז בארה"ב ו-Houston Energy LP, חברה הפעילה בתחום הנפט והגז במפרץ מקסיקו בארה"ב. כפי שנמסר לשותפות, בחודש באוגוסט 2021 נחתמו הסכמים מחייבים בין חברת האם של BOE II Shen, LLC (להלן) "BOE II Shen" לבין HEQ Deepwater לרכישת מניותיה של BOE II Shen על ידי HEQ Deepwater. בנוסף, לאחר רכישת המניות כאמור לעיל, מכרה 10.95% BOE II Shen מהזכויות בפרויקט לחברה ייעודית בשם BOE II Exploration LLC, שהיא בבעלות מלאה של חברת הנפט Beacon של.

39 חברה פרטית המוחזקת במלואה על ידי קרנות של קבוצת Blackstone.

40 לפרטים בדבר מכירת הזכויות, ראו באור 12א' לדוחות הכספיים.

APC-01760572

8.2 שננדואה

### 8.2.2 פעולות טרם ההחזקה בנכס הנפט

עד לזכייתה של השותפות במכרז לרכישת שננדואה, החזיקה Cobalt ב-20%
מהזכויות ברישיונות שננדואה, כאשר יתר השותפים היו: Anadarko Petroleum
Corporation (אשר שימשה גם כמפעילה) – 33%; ConocoPhillips Company – 30%
(להלן: "**ConocoPhillips**"); Venari– 17%.

בחודש פברואר 2018, הודיעו Anadarko ו-ConocoPhillips ליתר השותפים
בשננדואה, כי החליטו לוותר על חלקן ברישיונות. לאור האמור, נקבע כי הזכויות
האמורות יועברו ל-Cobalt ו-Venari באופן פרופורציונאלי לחלקן ברישיונות, וכי
Cobalt תמונה כמפעילה בנכס. לאחר העברת הזכויות האמורה, ההחזקה בנכס היתה
כדלקמן: Cobalt – 54.05%; Venari – 45.95%.

ביום 5 באפריל 2018 ניתן על ידי בית המשפט לענייני פשיטות רגל במחוז הדרומי של
טקסס חטיבת יוסטון, ארה"ב, צו המאשר את ביצוע עסקת המכר, לרבות העברת
הזכויות בנכס לשותפות. עוד אושר בחודש אפריל 2018 מינויה של LLOG כמפעילה
בשננדואה.

בחודש ספטמבר 2018 התקבל אישור הרגולטור לבקשת ה-SOP, אשר עיקריה
מתוארים להלן.

להלן טבלה הכוללת, למיטב ידיעת השותפות, תיאור פעולות עבר מהותיות בשטח
נכס הנפט, שבוצעו לפני שהשותפות החזיקה בנכס הנפט:

| חלק הפרויקט | זהות בעל הזכות במועד ביצוע הפעולה | תיאור תמציתי של הפעולה | תקופה שבה הפעולה בוצעה | תיאור תמציתי של תוצאות הפעולה |
|---|---|---|---|---|
| שננדואה | Anadarko | • 9 קידוחי תגלית, הערכה ואימות נקדחו ברישיונות OCS-G 28148 OCS-G 31938 וOCS-G 2523*.<br>• נרכש מידע סייסמי 3D נוסף ועובדו תוצאות קידוחי הערכה (appraisal wells)<br>• גובשה והוצגה תכנית פיתוח | 2008–2017 | סה"כ הושקעו בנכס כ-1.8 מיליארד דולר |

* קידוח התגלית נקדח בשנת 2009, לעומק כולל של כ-9,000 מטר וגילה שכבת מאגר
נושאת נפט בעובי של כ-100 מטר נטו. בעקבות התגלית בוצעו חמישה קידוחים נוספים
לטובת אימות והערכה. שניים מהקידוחים היו יבשים ואילו שלושת הנוספים גילו
שכבות מאגר עבות יותר, כאשר העובה מביניהן בעובי של כ-358 מטר נטו. שטח המאגר
מוערך בכ- 14 קמ"ר.

### 8.2.3 פיתוח נכס הנפט

שותפי הפרויקט החלו לפתח את נכס הנפט שננדואה בהתאם לתכנית הפיתוח
המאושרת.

52

8.2 שננדואה

### 8.2.4 עמידה בתכנית עבודה

למיטב ידיעת השותף הכללי, תכנית העבודה המפורטת ברישיון שננדואה עד למועד זה, קוימה במלואה.

### 8.2.5 תכנית עבודה בפועל ומתוכננת

הרישיונות בנכס הנפט שננדואה הינם בסטטוס "השהיית ההפקה" (Suspension of Production, או "SOP") אשר ניתן לראשונה ביום 11 בספטמבר 2018, והוארך עד ליום 30 בספטמבר 2022.

<u>קבלת החלטת השקעה (FID) ועיקרי תכנית הפיתוח (FDP)</u>

ביום 25 באוגוסט 2021 קיבלו שותפי הפרוייקט[41] החלטת השקעה סופית - ("FID" Final Investment Decision) לפיתוח פרוייקט שננדואה בתקציב כולל (בגין 100% מהזכויות בפרוייקט) של כ-1.8 מיליארד דולר.

במסגרת אישור ה-FID, חתמה חברת הפרוייקט על הרשאות להוצאות (AFE) בהיקף של כ-890 מיליון דולר ארה"ב, בגין חלקה בתקציב הפרוייקט, בהתאם לתכנית פיתוח מפורטת (FDP) לפרוייקט, שאושרה על ידי שותפי הפרוייקט במהלך חודש פברואר 2021, אשר עיקריה מפורטים להלן :

- התכנית כוללת קידוח והשלמה של ארבע בארות הפקה, התקנת ציוד וצנרת תת ימיים להולכה, שליטה ובקרה של הנפט והגז מבארות ההפקה לפלטפורמת ההפקה, הקמת פלטפורמת הפקה צפה (FPS) (המותאמת להפקה של כ- 100,000 חביות נפט ביום, 140 מליון רגל מעוקב גז טבעי ליום ו-40 אלף חביות מי הפקה ליום) והתקנת צנרת יצוא של הנפט והגז מפלטפורמת ההפקה וחיבורן לצנרת הולכה ראשית קיימת אל החוף. להערכת השותפים פלטפורמת ההפקה (FPS) תוכל לטפל בעתיד גם בהפקה מתגליות נפט נוספות קיימות ועתידיות באזור. ההכנסה משירותים נוספים אלה אינה כלולה בשלב זה בתזרים המזומנים החזוי.

- תקציב הפיתוח מתוקף לעלות העבר שהושקעה על ידי שותפי שננדואה הקודמים המסתכמת לכ-1.8 מיליארד דולר. עלות זו כללה ביצוע של 9 קידוחי אקספלורציה, אימות וההערכה ורכישת מידע לצורך הערכת נכס הנפט.

---

[41]    לפרטים אודות השותפים, ראו בטבלה בסעיף 8.2.1 לעיל.

APC-01760574

שננדואה 8.2

<u>פעולות והסכמים שבוצעו בקשר עם פיתוח הפרויקט</u>

בשנים 2020- ו-2021 בוצעו פעולות והסכמים בקשר עם פיתוח הפרויקט שעיקרם כדלקמן :

- במסגרת ההערכות לפיתוח פרויקט שננדואה, בוצע רכש מוקדם של שירותים וציוד בעלי זמן אספקה ארוך (Long Lead Items) לרבות Subsea Production Trees (יחידות ראש באר לצורך הפקה, שליטה ובקרה תת ימיית המותקנות מעל בארות ההפקה) שהוזמנו מחברת TechnipFMC.

- ביום 30 ביוני 2020 המפעילה התקשרה בהסכם עם חברת Transocean[42], לקבלת שירותי קידוח והשלמה של ארבעת בארות הפיתוח המותכננות בפרויקט. לפרטים נוספים ראו דיווח מיידי של השותפות מיום 2 ביולי 2020 (אסמכתא מספר: -2020 070536-01) אשר המידע על פיו מובא בדרך של הפניה.

- ביום 14 ביוני 2021 נחתמו הסכמים להקמת צנרות יצוא הנפט והגז ומפלטפורמת הפקה לצנרות הולכת הסכמים קיימות (להלן : "**ההסכמים**"). ההסכמים נחתמו בין המפעילה ושותפי הפרויקט לבין מספר ספקים (להלן : "**הספקים**"). צנרות היצוא יוקמו ויופתחו על חשבונם של הספקים, ודמי ההולכה שישולמו לספקים במהלך תקופת ההפקה יגדילו את עלות ההפקה הכוללת לחבית נפט, וזאת בכפוף לתשלומי מינימום מסויימים שנקבעו בהסכמים. קצב ההפקה משננדואה, הצפוי לפי דוח המשאבים, הינו כ-80 אלף חבית נפט ביום (לפרטים אודות דוח המשאבים ראו סעיף 8.2.10 להלן). בעקבות ההסכמים, עלות ה-Breakeven (הכוללת עלות הקמה והפקה - Capex + Opex) של הפרויקט צפויה לעמוד על כ-16 דולר לחבית נפט ביחס לקטגורית 2P המוצגת בדוח זה. לפרטים נוספים ראו דיווח מיידי של השותפות מיום 16 ביוני 2021 (אסמכתא מספר : 039655-01-2021), אשר המידע על פיו מובא בדרך של הפניה.

- ביום 4 באוגוסט 2021 עדכנה המפעילה כי לאחר השלמת תהליך פתוח ותחרותי שכלל מספר מציעים, חתמה המפעילה על חוזה רב שנתי להנדסה, רכש ובנייה (EPC) של מערכת הפקה צפה (FPS) לפרויקט (להלן בסעיף זה : "**ההתקנה**"). כפי שנמסר על ידי המפעילה, ה-FPS ייבנה על ידי החברה הקוריאנית Hyundai Heavy Industries Co, Ltd. (להלן : "**Hyundai**"), המספנה הגדולה בעולם. על פי המפרט המוסכם, ה-FPS תהיה מסוג Semi-Submersible, באורך 91 מטרים, ברוחב 91 מטרים ובגובה 90 מטרים. לאחר ההתקנה, כושר הטיפול וההפקה של ה-FPS צפוי לעמוד על כ-100,000 חבית ליום וכ-140 MMSCF של גז ליום. התכנון, הבנייה וההתקנה תבוצע על ידי Hyundai במהלך 36 החודשים ממועד החתימה, כאשר השנה הראשונה תוקדש לתכנון הנדסי. Hyundai צפויה להתחיל בבניית ה-FPS ברבעון השלישי של

---

[42]   חברה ציבורית הנסחרת בבורסת ניו יורק. למיטב ידיעת השותפות, החברה הינה אחת מחברות הקידוחים הגדולות בעולם.

8.2 שננדואה

שנת 2022. לאחר השלמת בניית ה-FPS, מערכת זו תועבר לארה"ב וצפויה להיות מותקנת מעל מאגר הנפט שננדואה במהלך החציון השני של שנת 2024.

- ביום 25 בינואר 2022 נחתם הסכם להקמת מערכות ההפקה והבקרה והתשתיות התת ימיות בפרויקט (להלן: "**המערכות התת-ימיות**") עם חברת Subsea 7 S.A.[43] ההסכם כולל קבלת שירותי תכנון, רכש, הקמה והתקנה של המערכות התת ימיות, שתחבר את בארות הפיתוח בפרויקט ל-FPS, וכן שירותים בקשר עם התקנת ה-FPS והקמת צנרת ייצוא הגז. העלויות הכרוכות בהסכם הינן נמוכות מאלו שתוקצבו בתקציב הפיתוח (אשר אושר כמפורט לעיל). ההסכם הינו ההסכם המהותי האחרון לפיתוח הפרויקט, והתחימה עליו מהווה התקיימות אחד מהתנאים המתלים למשיכה ראשונה של המימון הפרויקטלי.

פיתוח הפרויקט מתקדם על פי התכנון, אשר לפיו, להערכת המפעילה, ההפקה מהפרויקט צפויה להתחיל בסוף שנת 2024.

**אזהרה בגין מידע צופה פני עתיד** – ההערכות לעיל ולהלן, לרבות ביחס לעלות ה-Breakeven, קצב ההפקה מהפרויקט, כושר הטיפול וההפקה של ה-FPS, המועדים הצפויים לתכנון, הבנייה וההתקנה של ה- FPS, מועד המשיכה הראשונה, והמועד הצפוי לתחילת ההפקה מהפרויקט מהווה מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. ההערכות הנ"ל מבוססות על מידע הנדרש, נתונים משוערים של זמינות וציוד, מידע כלכלי ואחר, ועשויות שלא להתממש או להתממש באופן שונה מהותית אם יחולו שינויים ו/או עיכובים במגוון גורמים, וכן אם ישתנו ההערכות שנתקבלו, ו/או התנאים התפעוליים והטכניים ו/או בעקבות שינויים ו/או עיכובים במגוון גורמים, לרבות שינויים בתנאי השוק בכלל ובסקטור הנפט בפרט ו/או שינויים גיאופוליטיים ו/או שינויים בתנאים תפעוליים וטכניים בנכס הנפט ו/או בעקבות גורמים בלתי צפויים הקשורים בפיתוח נכסי נפט ו/או בעקבות גורמים חיצוניים שאינם בשליטת השותפות ו/או בעקבות גורמים שונים שלא ניתן להעריכם מראש.

מימון הפרויקט

ביום 1 באוגוסט 2021 חתמה חברת הפרויקט, במקביל לחתימת השותפות האחרות בפרויקט, על הסכם מימון פרויקטלי עם קונסורציום של בנקים ומוסדות פיננסיים מקומיים וזרים, בהובלת בנק Societe Generale, לצורך מימון חלקה של כל אחת משותפות שננדואה בעלויות הפיתוח של הפרויקט. לפי הסכם המימון, תועמדנה ל-ShenHai הלוואות בסך כולל של כ-444 מיליון דולר ארה"ב, וכן היא תהיה זכאית להגדיל סכום זה בכ-100 מיליון דולר ארה"ב נוספים, עד לסכום כולל של כ-544 מיליון דולר ארה"ב. המשיכה הראשונה תתבצע רק לאחר השקעת כל סך ההון הנדרש לפרויקט, וצפויה לקראת סוף שנת 2022.

---

43 חברה המאוגדת בלוקסמבורג ונסחרת בבורסת אוסלו.

במועד קבלת ה-FID כאמור לעיל, התקיימו כל התנאים המוקדמים לסגירה פיננסית (Closing) של הסכם המימון הפרויקטלי.

בחודש נובמבר 2021, מימשה השותפות את זכאותה להגדלת סכום המימון הפרויקטלי בכ-100 מיליון דולר ארה"ב נוספים. הגדלת סכום המימון הפרויקטלי בוצעה באמצעות הצטרפותה של נאוויטס שנחי מימון בע"מ, חברה ייעודית בבעלות מלאה של השותפות (להלן: "**החברה הייעודית**") כמלווה נוסף בקונסורציום המלווים.

הגדלת סכום המימון הפרויקטלי כאמור בוצעה על ידי השותפות באמצעות גיוס אג"ח סחיר בהיקף של כ-100 מיליון דולר ארה"ב (כ-330 מיליון ש"ח) בחודש נובמבר 2021, כאשר עם התקיימות התנאים המתלים לשחרור תמורת ההנפקה ביום 11 בנובמבר 2021, הועמדה מלוא תמורת ההנפקה (נטו) כהלוואת בעלים על ידי השותפות לחברה הייעודית, ושימשה את החברה הייעודית לצורך הצטרפותה לקונסורציום המלווים כמלווה נוסף בהסכם המימון הפרויקטלי של חברת הפרויקט.

בעקבות הצטרפות החברה הייעודית לקונסורציום המלווים והעמדת הלוואתה לחברת הפרויקט, גדל סכום המימון הפרויקטלי, שאותו חברת הפרויקט זכאית למשוך, לסך של כ-544 מיליון דולר ארה"ב (להלן: "**סכום המימון הפרויקטלי המוגדל**").

בנוסף לסכום המימון הפרויקטלי המוגדל ולהון עצמי בסך של כ-311 מיליון דולר ארה"ב שהפקידה השותפות עבור חברת הפרויקט ביום 23 באוגוסט 2021, הפקידה חברת הפרויקט ביום 16 בנובמבר 2021 הון עצמי נוסף בהיקף של כ-60 מיליון דולר ארה"ב בחשבון נאמנות, ובכך השלימה את הפקדת כל סכום ההון הנדרש בגין חלקה של ShenHai בתקציב פיתוח פרויקט שנדואה ושמרה על חלקה בפרויקט שנדואה.

בחודש מרץ 2022 התקשרו חברת הפרויקט, השותפות, ובנק Societe Generale בתפקידו כבנק הטכני של המימון הפרויקטלי, בהסכם Contingent Equity Support, במסגרתו התחייבה השותפות כי במידה שתדרש לכך, במקרה של חריגות בתקציב הפרויקט, תעמיד השותפות ל-ShenHai סך עד 40 מיליון דולר אשר ייועד לכיסוי כרית נוספת לחריגות בתקציב (CERA - Contingent Equity Reserve Account) בדרך של השקעה הונית או הלוואת בעלים נחותה. החתימה על הסכם זה מהווה התנאי המתלה העיקרי הנותר למשיכת הראשונה של כספי המימון הפרויקטלי.

לפרטים אודות גיוסי הון וחוב שביצעה השותפות לרבות הנפקת מניות בכורה בחברה בת והסכם ההשקעה בקשר להנפקה זו, אשר שימשו להעמדת ההון העצמי כאמור לעיל, ראו בסעיף ב' לדוח הדירקטוריון המצורף כפרק ב' לדוח זה.

לפרטים נוספים אודות הסכמי המימון הפרויקטלי, ההסכמים המסחריים והעדכונים להם, הגדלת המימון הפרויקטלי של פרויקט שנדואה והשלמת מימון הפרויקט, ראו באור 8(3) לדוחות הכספיים.

APC-01760577

8.2 שנננדואה

התכנית המפורטת בטבלה להלן הינה התכנית שהוגדרה ב-SOP ולוחות הזמנים
המהווים את דרישות ה-SOP. לפרטים אודות התקציב הכולל המעורך לפיתוח פרוייקט
שנננדואה, בחלוקה לפי שנים, ראו דוח התזרים שהוכן על ידי NSAI להלן.

| תקופה | תיאור תמציתי של פעולות שבוצעו בפועל לתקופה או של תכנית העבודה המתוכננת | תקציב משוער לפעולות שאושרו על ידי השותפים ברמת נכס הנטו (באלפי דולר) [44] | היקף השתתפותם בפועל מחזיקי הרישיונות ההוניים של השותפות בתקציב (באלפי דולר) |
|---|---|---|---|
| 2019 | • נמשכה בחינת חלופות פיתוח ותכנון הנדסי<br>• נמשך פיתוח ורישיון רכיבים הנדרשים לעמידה בתנאי HPHT – לחץ גבוה, טמפרטורה גבוהה (High Pressure, High Temperature)<br>• הועתקו חוזים לתכנון הנדסי של חלק מהרכיבים שיידרשו לפיתוח הפרוייקט<br>• הוזמן ציוד שזמן אספקתו ארוך (Long lead), לרבות יחידות Subsea Production Trees (יחידות הפקה, שליטה ובקרה תת ימיות המותקנות מעל בארות ההפקה), אשר הוזמנו מחברת TechnipFMC ("מערכות תת ימיות")<br>• הוגשה תכנית פיתוח ראשונית מוצעת (Field Development Plan) לשותפים | 13,643 | 3,377 |
| 2020 | • חתימה על הסכם עם חברת Transocean Ltd. לקבלת שירותי קדיחה והשלמה של ארבעת קידוחי הפיתוח.<br>• קודם שלב תכנון הנדסי (FEED) | 22,891 | 12,155 |
| 2021 | • אישור תכנית פיתוח וקבלת החלטת השקעה סופית (FID) לפיתוח פרוייקט שנננדואה<br>• הזמנת ציוד נוסף שזמן אספקתו ארוך (Long Lead) שישמש בקידוחים<br>• חתימה על הסכם הקמה של צנרת הייצוא<br>• חתימה על הסכם להקמת פלטפורמת ההפקה<br>• התחלת עבודות Hyundai תחת הסכם EPC (הנדסה, רכש ובנייה) של אסדת ההפקה הצפה | 168,812 | 82,718 |
| 2022 | קידום הליך אישור הרכיבים הנדרשים לעמידה בתנאי HPHT – לחץ גבוה, טמפרטורה גבוהה (High Pressure, High Temperature)<br>• תחילת פעולות קידוח<br>• המשך הקמת פלטפורמת ההפקה<br>• תחילת ביצוע עבודות הקמת צנרת הייצוא | 643,286 | 315,210 |
| 2023 | • תחילת עבודות השלמה<br>• התקנת צנרת הייצוא | 504,294 | 247,104 |
| 2024 | • השלמת התקנת צנרת הייצוא<br>• הערכת פלטפורמת ההפקה למפרץ מקסיקו והתקנה<br>• תחילת הפקה | 391,968 | 192,064 |
| 2025 ואילך | • תשלום נדחה לקבלן פלטפורמת ההפקה ויתרת תשלומים לקבלנים | 134,070 | 65,694 |

44   הערכות בדבר עלויות תכניות פיתוח מופיעות בתחזית התזרים ומהוות הערכות כלליות בלבד. התקציב המתואר בטבלה זו מתייחס להחזקות השותפות בזכויות בנכס הנטו במועד אליו מתייחס הסעיף - שיעור של 23.1% עד ליום 30 בספטמבר, 2019, החזקות השותפות בזכויות בשיעור של 53.1% בשנננדואה החל מיום 1 באוקטובר 2019 והחזקות השותפות בזכויות בשיעור של 49% החל מיום 25 באוגוסט 2021.

APC-01760578

8.2 שננדואה

אזהרה בגין מידע צופה פני עתיד – ההערכות דלעיל לעניין הפעולות המתוכננות בנכס הנפט, לרבות עלויות ולוחות זמנים, ולרבות בנוגע למועד ביצוע עבודות הפיתוח והשלמתן, כאמור לעיל, הינן מידע צופה פני עתיד כמשמעו בחוק ניירות ערך, המבוססות על הערכות שנמסרו לשותף הכללי על ידי המפעילה בנכס הנפט, בין היתר על בסיס מידע הנדסי, כלכלי ואחר, שנתקבל מהמפעילה בהתבסס על מגוון גורמים וביניהם, תכנית הפיתוח ולוחות הזמנים ליישומה, קבלת אישורים רגולטוריים, נתונים משוערים של זמינות ציוד, שירותים ועלויות וכן על ניסיון העבר והינן בגדר הערכות והשערות מקצועיות בלבד אשר לגביהן לא קיימת כל ודאות.

8.2.6 שיעור השתתפות בפועל בהוצאות והכנסות הקשורות בנכס הנפט

| שיעור ההשתתפות | אחוז | שיעור מגולם ל-%100 | הסברים |
|---|---|---|---|
| השיעור המשוייך בפועל למחזיקי הזכויות ההוניות של השותפות בנכס הנפט | 49% | 100% | ראו תיאור שרשרת החזקות בסעיף 8.2.1 לעיל |
| השיעור המשוייך בפועל למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט | 38.68% | 78.75% | ראו תחשיב בסעיף 8.2.7 להלן |
| השיעור המשוייך בפועל למחזיקי הזכויות ההוניות של השותפות בהוצאות הכרוכות בפעילות חיפושים, פיתוח או הפקה בנכס הנפט | 49% | 100% | ראו תחשיב בסעיף 8.2.8 להלן |

8.2.7 שיעור ההשתתפות בפועל של מחזיקי הזכויות ההוניות של השותפות בהוצאות הפיתוח וההפקה בנכס הנפט

| פריט | אחוז | הסבר תמציתי כיצד מחושבים התמלוגים או התשלומים |
|---|---|---|
| הוצאות תיאורטיות של נכס נפט (בלא התמלוגים האמורים) | 49% | |
| פירוט תשלומים (הנגזרים מההוצאות) ברמת נכס הנפט: | | |
| סה"כ שיעור ההוצאות בפועל ברמת נכס הנפט | 100% | |
| שיעורם של מחזיקי הזכויות ההוניות של השותפות בהוצאות נכס הנפט (בשרשור) | 49% | |
| סה"כ שיעורם בפועל של מחזיקי הזכויות ההוניות של השותפות, בהוצאות, ברמת נכס הנפט (ולפני תשלומים אחרים ברמת השותפות) | 49% | |
| פירוט תשלומים (הנגזרים מההוצאות) בקשר עם נכס הנפט וברמת השותפות (האחוזים להלן יחושבו לפי שיעורם של מחזיקי הזכויות ההוניות של השותפות בנכס הנפט): | | |
| השיעור המשוייך בפועל למחזיקי הזכויות ההוניות של השותפות, בהוצאות, הכרוכות בפעילות פיתוח או הפקה בנכס הנפט | 49% | |

58

8.2 <u>האורדננש</u>

### 8.2.8 תגמולים ותשלומים ששולמו במהלך פעילות החיפוש, הפיתוח וההפקה בנכס הנפט

| מתוכו, שיעורם של מחזיקי הזכויות ההוניות של השותפות בתשלומים לממשל הפדרלי בארה"ב | סך הכל שיעורם של מחזיקי הזכויות ההוניות של השותפות בהשקעות בתקופה זו בנכס הנפט (באלפי דולר) | פריט |
|---|---|---|
| - | 3,377 | תקציב שהושקע בפועל בשנת 2019 |
| - | 12,155 | תקציב שהושקע בפועל בשנת 2020 |
| - | 82,718 | תקציב שהושקע בפועל בשנת 2021 |

59

APC-01760580

8.2 שנדוואה

8.2.9 עתודות בנכס הנפט שנדוואה

(א) נתוני כמויות

(1) על פי דוח שקיבלה השותפות מ-NSAI ואשר הוכן בהתאם לכללי המערכת לניהול משאבי פטרוליים (SPE-PRMS), עתודות הנפט והגז הטבעי שבנכס הנפט נכון ליום 31 בדצמבר 2021 הינם כמפורט להלן.

| קטגוריית עתודות | סה"כ בנכסי הנפט (Gross) | | | סה"כ חלק השותפות (Net)[45] | | | |
|---|---|---|---|---|---|---|---|
| | גז טבעי BCF | נפט MMBBL | סה"כ בשווה ערך של חבית נפט MMBOE | גז טבעי BCF | נוזלי גז טבעי MMBBL | נפט MMBBL | סה"כ בשווה ערך של חבית נפט MMBOE |
| עתודות מוכחות 1P (Proved Reserves) | 140.8 | 120.7 | 144.2 | 40.2 | 6.6 | 45.1 | 58.4 |
| עתודות צפויות (Probable Reserves) | 239.1 | 203.7 | 243.6 | 67.5 | 11.2 | 76.4 | 98.9 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 379.9 | 324.4 | 387.8 | 107.7 | 17.8 | 121.5 | 157.3 |
| עתודות אפשריות (Possible Reserves) | 341.5 | 297.6 | 354.5 | 96.5 | 16.0 | 111.6 | 143.7 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 721.4 | 622.0 | 742.3 | 204.2 | 33.8 | 233.1 | 300.9 |

(2) בדוח ציינה NSAI, בין היתר, מספר הנחות והסתייגויות ובכללן כי: (א) ההערכות, כמקובל בהערכת עתודות על פי כללי המערכת לניהול משאבי פטרוליים (SPE-PRMS), ואינן מותאמות לסיכונים; (ב) NSAI לא ביקרה באזור נכסי הנפט ולא בדקה את התפעול המכני של המתקנים והבארות או את מצבם; (ג) NSAI לא בחנה חשיפה אפשרית מעניני איכות הסביבה ועל כן לא כללה בדוח העתודות עלויות שעלולות לנבוע מחמבות כאמור; (ד) NSAI ציינה כי הערכות שלה בדוח מבוססות, בין היתר, על ההנחות שהנכסים יפותחו בהתאם לתכניות הפיתוח הקיימות שהוצגו על ידי מפעילת הנכס, שהנכסים יתופעלו כראוי, שלא יחולו תקנות או מגבלות רגולטוריות חדשות שישפיעו על יכולתם של בעלי הזכויות לשמור על ההפקה, ושנתוני ההפקה בפועל יתאמו את ההתחזיות שלה; (ה) NSAI עשתה שימוש במידע טכני וכללי הכולל, בין היתר, לוגים, מפות גיאולוגיות, מידע סיסמי, וזכויות בעלות בנכסים; (ו) ל-NSAI סופק כל המידע הנחוץ לצורך הכנת הדוח ולא הוגבלה הגישה ל-NSAI לאף מידע אשר היה בדעתה כי הוא הכרחי להכנת הדוח; (ז) כמקובל בהערכות בתחום הנפט והגז, ישנן אי ודאויות מובנות בפרשנות ההנדסית והגאו-פיזית, ולכן מסקנות NSAI מייצגות, כמקובל, פרשנות מקצועית בלבד;

---

[45] לעניין זה, "Net" משמעו מכפלת סה"כ כמות הנפט והגז הטבעי, לפי העניין, בנכס הנפט (Gross) בשיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט. הגדרה זו תקפה גם ליתר טבלאות העתודות בדו"ח זה.

APC-01760581

(ח) NSAI עשתה שימוש במידע שהתקבל מהשותפות, מהמפעילה בנכס הנפט, ממקורות מידע פומביים וממידע לא חסוי המצוי בידי NSAI ; (ט) NSAI לא בחנה את הזכויות החוזיות בנכסים.

**<u>אזהרה בגין מידע צופה פני עתיד</u> - הערכות NSAI בדבר כמויות עתודות הנפט והגז הטבעי בנכס הנפט הינן מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. ההערכות לעיל מבוססות, בין היתר, על מידע גיאולוגי, גיאופיסי, הנדסי ואחר, שנתקבל מהקידוחים ומאת המפעילה במאגר, והינן בגדר הערכות והשערות בלבד של NSAI.ואשר לגביהן קיימת לא קיימת כל ודאות. כמויות הגז הטבעי ו/או הנפט שיופקו בפועל עשויות להיות שונות מההערכות וההשערות הנ״ל, בין היתר, כתוצאה מתנאים תפעוליים וטכניים ו/או משינויים רגולטוריים ו/או מתנאי היצע וביקוש בשוק הגז הטבעי ו/או הנפט ו/או מתנאים מסחריים ו/או כתוצאה מהביצועים בפועל של המאגר. ההערכות וההשערות הנ״ל עשויות להתעדכן ככל שיצטבר מידע נוסף ו/או כתוצאה ממכלול של גורמים הקשורים בנכס הנפט והפקה של נפט וגז טבעי.**

**רזרבות אפשריות (Possible Reserves) הן הרזרבות הנוספות אשר אינן צפויות להיות מופקות באותה מידה כמו הרזרבות הצפויות ( Probable Reserves) ישנו סיכוי של 10% שהכמויות שיופקו בפועל יהיו שווה או גבוהות ממכמות הרזרבות המוכחות (Proved Reserves), בצירוף כמות הרזרבות הצפויות (Probable Reserves) ובצירוף כמות הרזרבות האפשריות (Possible Reserves).**

(ב)    <u>נתוני תזרים מהוון</u>

ביחס לחישוב התזרים המהוון המפורט להלן, יצוין כדלקמן :

(1)    התזרים המהוון חושב לפי הערכת השותפות המבוססת על ממוצע תחזיות מחירי נפט וגז של גופים בינלאומיים הכוללים בנקים וגופי מחקר שנלקחו ממאגר FactSet[46]: (1) מחירי נפט- נלקחו תחזיות לגבי מחירי נפט West Texas Intermediate (WTI). מחיר הנפט מותאם לאיכות הנפט, לעלויות הולכה ולהפרשי שערים, ביחס ל-WTI ; (2) מחירי גז- נלקחו תחזיות לגבי מחירי גז טבעי Henry Hub. מחיר הגז מותאם לאיכות הגז, לעלויות הולכה ולהפרשי שערים.

---

[46] המעודכנים למועד הסמוך לאישור הדוח.

8.2 <u>שנהדואה</u>

להלן טבלה המרכזת את תחזיות מחירי הנפט והגז הטבעי בהם נעשה
שימוש (לפני התאמות) :

| סוף תקופה | מחיר נפט<br>דולר/חבית | מחיר גז טבעי<br>דולר/MMBTU |
|---|---|---|
| **31.12.2022** | 76.51 | 3.97 |
| **31.12.2023** | 72.27 | 3.55 |
| **31.12.2024** | 68.83 | 3.26 |
| **31.12.2025** | 66.13 | 3.23 |
| לאחר מכן | 66.13 | 3.23 |

(2)   עלויות התפעול שנלקחו בחשבון הן עלויות שהונחו על ידי מפעילת
שנהדואה ועל ידי NSAI. עלויות אלו נועדו לכלול עלויות הולכה, עלויות
צנרת ייצוא, דמי ייצוא בצינור, הוצאות תקורה לבאר ואומדנים של
עלויות שונות. עלויות התפעול חולקו לעלויות ברמת עלויות השדה, עלויות
לבאר ועלויות ליחידת ייצור. עלויות התפעול אינן מותאמות לשינוי
אינפלציה.

(3)   ההוצאות ההוניות שנלקחו בחשבון לצורך הכנת התזרים המהוון
מבוססות על הוצאות מאושרות והוצאות בפועל שהוצאו בפרויקט
וכוללות הוצאות הוניות אשר תידרשנה לתחזוקת הבארות, קידיחת
בארות חדשות, שירותים שונים ולציוד הפקה. ההוצאות ההוניות שסופקו
ל-NSAI על-ידי המפעילה בנכס נראות סבירות בעיניה, עלויות אלו אינן
מותאמות לשינוי אינפלציה.

(4)   עלויות נטישה שנלקחו בחשבון היינן הערכות שסופקו ל-NSAI על-ידי
המפעילה בנכס בהתאם להערכותיה באשר לעלות נטישת הבארות, נטישת
פלטפורמת ההפקה וציוד ההפקה. כפי שהוגדר על ידי המפעילה, עלויות
הנטישה אינן כוללות את הניצולת של המתקנים (Salvage Value) ואינן
מותאמות לשינוי אינפלציה.

(5)   קצב ההפקה בפועל עשוי להיות נמוך או גבוה מקצב ההפקה בו נעשה
שימוש לצורך הערכת התזרים המהוון. NSAI לא ערכה ניתוח רגישות
ביחס לקצב ההפקה של הבארות.

(6)   בחישוב התזרים המהוון נלקח בחשבון מס בשיעור 21%, שיעור התמלוגים
שישולמו לרמת נכס הנפט לממשל הפדרלי, בשיעור של 12.5%-16.67%.
בנוסף נלקח בחשבון תמלוג על לצדדים שלישיים בשיעור של 2% ולשותף
הכללי בשיעור של 6%.

APC-01760583

<div dir="rtl">

8.2 <u>שנדואה</u>

התזרים המהוון עודכן ביחס לתזרים המהוון שנכלל בדוח העתודות שפורסם בתאריך 20 באוקטובר 2021[47] (להלן בסעיף זה: **"דוח העתודות הקודם"**) בעיקר לאור תחזית עדכנית של מחירי נפט ושינוי ביתרת הזמן להיוון.

להלן הערכת התזרים המהוון נכון ליום 31.12.2021 באלפי דולר, המיוחס לחלקה של השותפות בעתודות שבנכס הנפט:

---

[47]   ראו דיווח מיידי של השותפות מיום 20 באוקטובר 2021 (אסמכתא מספר: 157983-01-2021), אשר המידע על פיו מובא בדוח בדרך של הפניה.

</div>

APC-01760584

8.2 האנדסשנ

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים ושישולמו | הכנסות | כמות מכירת (MMCF) [48] | כמות מכירת נפט (אלפי חביות) (100% נכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | סה"כ תזרים מהוון אחרי מס | | | | | | | | | | | | |
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (78,686) | (87,525) | (97,819) | (109,890) | (124,154) | - | (124,154) | - | (188,956) | (3,349) | (19,226) | 87,376 | 2,999 | 2,554 | 2024 |
| 360,818 | 418,799 | 489,328 | 575,890 | 683,174 | (27,468) | 710,641 | - | (24,979) | (38,508) | (231,406) | 1,005,534 | 35,993 | 30,643 | 2025 |
| 213,414 | 258,478 | 315,254 | 389,283 | 484,893 | (100,249) | 585,142 | - | (24,715) | (37,900) | (197,395) | 845,152 | 30,244 | 25,756 | 2026 |
| 105,416 | 133,227 | 170,136 | 219,757 | 287,417 | (66,331) | 353,746 | - | | (38,030) | (119,389) | 511,165 | 18,282 | 15,579 | 2027 |
| 50,557 | 66,681 | 89,036 | 120,495 | 165,496 | (36,666) | 202,163 | - | | (35,204) | (72,336) | 309,702 | 11,070 | 9,439 | 2028 |
| 23,612 | 32,496 | 45,362 | 64,314 | 92,749 | (17,324) | 110,073 | - | | (34,890) | (44,177) | 189,140 | 6,760 | 5,768 | 2029 |
| 7,783 | 11,178 | 16,312 | 24,229 | 36,688 | (11,223) | 47,911 | - | (59,780) | (27,060) | (41,070) | 175,822 | 6,231 | 5,404 | 2030 |
| 15,853 | 23,757 | 36,246 | 56,400 | 89,673 | (17,658) | 107,331 | - | | (26,984) | (40,946) | 175,261 | 6,140 | 5,392 | 2031 |
| 3,215 | 5,028 | 8,021 | 13,077 | 21,834 | (5,224) | 27,058 | - | (9,800) | (25,884) | (19,128) | 81,870 | 2,854 | 2,520 | 2032 |
| 6,740 | 10,999 | 18,344 | 31,331 | 54,928 | (20,503) | 75,431 | - | (49,980) | (24,951) | (45,834) | 196,196 | 6,909 | 6,034 | 2033 |
| 10,480 | 17,846 | 31,115 | 55,675 | 102,487 | (24,403) | 126,890 | - | | (23,836) | (45,943) | 196,669 | 6,940 | 6,047 | 2034 |
| 4,140 | 7,356 | 13,408 | 25,134 | 48,581 | (10,553) | 59,134 | - | | (23,532) | (25,197) | 107,863 | 3,807 | 3,317 | 2035 |
| 1,204 | 2,233 | 4,256 | 8,358 | 16,965 | (2,516) | 19,481 | - | | (23,532) | (13,111) | 56,124 | 1,981 | 1,726 | 2036 |
| (1,497) | (3,028) | (6,321) | (13,653) | (30,614) | - | (30,614) | (31,850) | - | (11,766) | (3,963) | 16,965 | 599 | 522 | 2037-2038 |
| **224,469** | **379,529** | **593,834** | **897,516** | **1,341,088** | **(340,118)** | **1,681,205** | **(31,850)** | **(947,239)** | **(375,426)** | **(919,121)** | **3,954,841** | **140,808** | **120,701** | **סה"כ** |

סה"כ תזרים מהוון מעתודות מוכחות Proved Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלוקה של השותפות בנכס הנפט)

---

[48] כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

APC-01760585

8.2 שנדואה

**סה"כ תזרים מהוון מעתדות צפויות Probable Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)**

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירות נפט (MMCF) [49] | כמות מכירות נפט (אלפי חביות) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | סה"כ תזרים מהוון אחרי מס | | | | | | | | | (100% מנכסי הנפט) | (100% מנכסי הנפט) | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2022 |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2023 |
| 2,582 | 2,872 | 3,210 | 3,606 | 4,074 | - | 4,074 | - | - | - | (1,145) | 5,219 | 186 | 152 | 2024 |
| 23,032 | 26,733 | 31,235 | 36,761 | 43,609 | (1,699) | 45,308 | - | (950) | - | (13,809) | 60,067 | 2,230 | 1,824 | 2025 |
| 49,794 | 60,309 | 73,668 | 90,829 | 113,137 | (40,403) | 153,539 | - | (15,401) | - | (51,472) | 220,412 | 7,977 | 6,710 | 2026 |
| 86,738 | 109,621 | 139,990 | 180,819 | 236,491 | (67,670) | 304,161 | - | (38,958) | - | (104,556) | 447,675 | 16,059 | 13,640 | 2027 |
| 62,587 | 82,547 | 110,221 | 149,166 | 204,875 | (64,379) | 269,254 | - | (82,089) | (392) | (107,167) | 458,902 | 16,587 | 13,972 | 2028 |
| 87,525 | 120,457 | 168,151 | 238,401 | 343,808 | (94,854) | 438,662 | - | (55,106) | (1,764) | (150,996) | 646,528 | 23,233 | 19,709 | 2029 |
| 90,809 | 130,410 | 190,320 | 282,681 | 428,049 | (99,569) | 527,618 | - | 59,780 | (2,352) | (143,290) | 613,480 | 21,896 | 18,845 | 2030 |
| 42,681 | 63,960 | 97,585 | 151,845 | 241,427 | (62,584) | 304,010 | - | - | (2,428) | (93,378) | 399,816 | 14,351 | 12,276 | 2031 |
| 28,809 | 45,054 | 71,873 | 117,176 | 195,647 | (49,302) | 244,949 | - | 9,800 | (3,528) | (72,731) | 311,407 | 11,165 | 9,562 | 2032 |
| 10,707 | 17,472 | 29,140 | 49,770 | 87,254 | (14,599) | 101,854 | - | 49,980 | (4,461) | (17,158) | 73,493 | 2,708 | 2,251 | 2033 |
| 448 | 763 | 1,330 | 2,380 | 4,382 | (10,597) | 14,979 | - | (59,780) | (5,576) | (24,429) | 104,764 | 4,208 | 3,183 | 2034 |
| 5,331 | 9,473 | 17,267 | 32,368 | 62,562 | (26,899) | 89,460 | - | (79,380) | (5,880) | (53,162) | 227,883 | 8,876 | 6,944 | 2035 |
| 26,220 | 48,620 | 92,667 | 181,998 | 369,415 | (101,160) | 470,575 | - | (40,180) | (5,880) | (157,376) | 674,011 | 24,660 | 20,659 | 2036 |
| 53,374 | 109,263 | 231,720 | 510,774 | 1,174,306 | (304,369) | 1,478,676 | (17,150) | (119,560) | (238,342) | (551,292) | 2,405,019 | 84,960 | 73,944 | 2037-2047 |
| **570,637** | **827,554** | **1,258,380** | **2,028,574** | **3,509,035** | **(938,083)** | **4,447,118** | **(17,150)** | **(371,844)** | **(270,602)** | **(1,541,961)** | **6,648,676** | **239,097** | **203,672** | **סה"כ** |

---

[49]   כמות המכירות כוללת מכירת גזולי גז טבעי וגז טבעי

APC-01760586

8.2 האנדנש

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים לישמלומ | הכנסות | כמות מכירה (MMCF) 50 | כמות מכירה נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | סה"כ תזרים מהוון אחרי מס | | | | | | | | | | | |
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (76,104) | (84,653) | (94,609) | (106,284) | (120,080) | - | (120,080) | - | (188,956) | (3,349) | (20,371) | 92,596 | 3,185 | 2,706 | 2024 |
| 383,850 | 445,532 | 520,561 | 612,651 | 726,783 | (29,167) | 755,949 | - | (25,928) | (38,508) | (245,215) | 1,065,601 | 38,222 | 32,467 | 2025 |
| 263,208 | 318,786 | 389,403 | 480,112 | 598,030 | (140,651) | 738,682 | - | (40,115) | (37,900) | (248,867) | 1,065,564 | 38,221 | 32,466 | 2026 |
| 192,154 | 242,847 | 310,126 | 400,576 | 523,908 | (133,999) | 657,907 | - | (38,958) | (38,030) | (223,946) | 958,840 | 34,341 | 29,219 | 2027 |
| 113,145 | 149,228 | 199,257 | 269,662 | 370,371 | (101,045) | 471,416 | - | (82,089) | (35,596) | (179,503) | 768,604 | 27,657 | 23,411 | 2028 |
| 111,136 | 152,953 | 213,514 | 302,715 | 436,557 | (112,178) | 548,735 | - | (55,106) | (36,654) | (195,172) | 835,667 | 29,993 | 25,477 | 2029 |
| 98,592 | 141,588 | 206,633 | 306,910 | 464,737 | (110,792) | 575,529 | - | - | (29,412) | (184,361) | 789,302 | 28,127 | 24,249 | 2030 |
| 58,534 | 87,716 | 133,831 | 208,244 | 331,100 | (80,242) | 411,342 | - | - | (29,412) | (134,324) | 575,077 | 20,491 | 17,668 | 2031 |
| 32,024 | 50,082 | 79,894 | 130,253 | 217,481 | (54,526) | 272,006 | - | - | (29,412) | (91,859) | 393,277 | 14,019 | 12,082 | 2032 |
| 17,447 | 28,471 | 47,484 | 81,101 | 142,183 | (35,103) | 177,285 | - | - | (29,412) | (62,992) | 269,689 | 9,617 | 8,285 | 2033 |
| 10,928 | 18,609 | 32,446 | 58,055 | 106,869 | (35,001) | 141,869 | - | (59,780) | (29,412) | (70,372) | 301,433 | 11,148 | 9,230 | 2034 |
| 9,471 | 16,828 | 30,676 | 57,502 | 111,142 | (37,452) | 148,594 | - | (79,380) | (29,412) | (78,359) | 335,746 | 12,683 | 10,261 | 2035 |
| 27,424 | 50,853 | 96,922 | 190,356 | 386,380 | (103,676) | 490,056 | - | (40,180) | (29,412) | (170,487) | 730,135 | 26,641 | 22,385 | 2036 |
| 51,877 | 106,235 | 225,399 | 497,121 | 1,143,692 | (304,369) | 1,448,062 | (49,000) | (119,560) | (250,108) | (555,255) | 2,421,984 | 85,559 | 74,466 | 2037-2047 |
| 795,106 | 1,207,083 | 1,852,214 | 2,926,090 | 4,850,123 | (1,278,200) | 6,128,323 | (49,000) | (1,319,082) | (646,028) | (2,461,082) | 10,603,516 | 379,905 | 324,372 | סה"כ |

סה"כ תזרים מהוון מעתודות מוכחות וצפויות (2P) Proved+Probable Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

50 כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

APC-01760587

8.2 האדנשש

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים וישלומם | הכנסות | כמות מכירת (MMCF) 51 | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2022 |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2023 |
| 463 | 515 | 576 | 647 | 731 | - | 731 | - | - | - | (225) | 956 | 2 | 30 | 2024 |
| 3,796 | 4,406 | 5,148 | 6,059 | 7,187 | (259) | 7,446 | - | (950) | - | (2,596) | 10,992 | 28 | 365 | 2025 |
| (3,112) | (3,770) | (4,605) | (5,677) | (7,072) | (850) | (6,221) | - | (14,643) | - | (2,608) | 11,029 | 30 | 366 | 2026 |
| 31,346 | 39,616 | 50,591 | 65,346 | 85,465 | (17,609) | 103,073 | - | 29,225 | - | (22,543) | 96,391 | 3,112 | 2,965 | 2027 |
| 43,456 | 57,315 | 76,530 | 103,571 | 142,251 | (33,648) | 175,899 | - | 32,885 | 392 | (43,519) | 186,142 | 6,156 | 5,714 | 2028 |
| 6,702 | 9,224 | 12,876 | 18,255 | 26,326 | (14,013) | 40,340 | - | (36,505) | 1,372 | (23,031) | 98,503 | 3,248 | 3,028 | 2029 |
| 7,277 | 10,450 | 15,251 | 22,652 | 34,301 | (19,444) | 53,745 | - | (73,218) | 1,176 | (38,280) | 164,067 | 6,331 | 5,004 | 2030 |
| 41,709 | 62,502 | 95,362 | 148,385 | 235,925 | (64,979) | 300,904 | - | (37,591) | 98 | (103,098) | 441,495 | 16,013 | 13,543 | 2031 |
| 48,375 | 75,652 | 120,686 | 196,757 | 328,520 | (89,904) | 418,424 | - | (42,715) | (588) | (140,743) | 602,471 | 21,220 | 18,528 | 2032 |
| 41,812 | 68,232 | 113,797 | 194,361 | 340,746 | (96,323) | 437,068 | - | (66,639) | (1,274) | (152,881) | 657,862 | 22,681 | 20,268 | 2033 |
| 44,228 | 75,312 | 131,314 | 234,959 | 432,517 | (100,613) | 533,129 | - | 59,780 | (2,352) | (135,054) | 610,756 | 20,522 | 18,857 | 2034 |
| 25,398 | 45,129 | 82,264 | 154,203 | 298,053 | (65,293) | 363,346 | - | 79,380 | (2,352) | (81,478) | 367,797 | 11,638 | 11,410 | 2035 |
| (4,068) | (7,543) | (14,376) | (28,235) | (57,311) | 11,634 | (68,945) | - | (19,600) | (2,352) | 17,735 | (64,728) | (3,189) | (1,922) | 2036 |
| 41,570 | 109,989 | 313,510 | 974,288 | 3,346,591 | (896,930) | 4,243,521 | (14,700) | (179,340) | (550,652) | (1,508,983) | 6,497,195 | 233,689 | 199,449 | 2037-2067 |
| 328,952 | 547,030 | 998,923 | 2,085,569 | 5,214,231 | (1,388,231) | 6,602,462 | (14,700) | (269,931) | (556,533) | (2,237,304) | 9,680,929 | 341,482 | 297,606 | סה"כ |

Table title: סה"כ תזרים מהוון מעתודות אפשריות Possible Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

Spanning header: סה"כ תזרים מהוון אחרי מס (covering the five מהוון columns)

---

51 כמות המכירות כוללת מכירת נזולי גז טבעי וגז טבעי.

APC-01760588

8.2 האדנדואה

**סה"כ תזרים מהוון מעתדות מוכחות, צפויות ואפשריות Proved+Probable+Possible Reserves (3P) ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)**

| סה"כ תזרים מהוון אחרי מס | | | | | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטושה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירת (MMCF) [52] | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | | | | | | | | | | |
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (75,641) | (84,137) | (94,033) | (105,637) | (119,349) | - | (119,349) | - | (188,956) | (3,349) | (20,596) | 93,552 | 3,188 | 2,736 | 2024 |
| 387,646 | 449,938 | 525,511 | 618,710 | 733,970 | (29,426) | 763,396 | - | (26,458) | (38,508) | (247,811) | 1,076,593 | 38,251 | 32,832 | 2025 |
| 260,096 | 315,017 | 384,798 | 474,434 | 590,959 | (141,502) | 732,460 | - | (54,758) | (37,900) | (251,475) | 1,076,593 | 38,251 | 32,184 | 2026 |
| 223,500 | 282,463 | 360,717 | 465,921 | 609,372 | (151,608) | 760,980 | - | (9,733) | (38,030) | (246,488) | 1,055,231 | 37,453 | 32,184 | 2027 |
| 156,601 | 206,544 | 275,788 | 373,233 | 512,622 | (134,693) | 647,315 | - | (49,204) | (35,204) | (223,022) | 954,746 | 33,813 | 29,125 | 2028 |
| 117,838 | 162,177 | 226,389 | 320,970 | 462,883 | (126,191) | 589,075 | - | (91,611) | (35,282) | (218,203) | 934,171 | 33,241 | 28,505 | 2029 |
| 105,869 | 152,038 | 221,884 | 329,562 | 499,038 | (130,236) | 629,275 | - | (73,218) | (28,236) | (222,641) | 953,369 | 34,458 | 29,254 | 2030 |
| 100,243 | 150,218 | 229,193 | 356,629 | 567,025 | (145,221) | 712,246 | - | (37,591) | (29,314) | (232,421) | 1,016,572 | 36,504 | 31,211 | 2031 |
| 80,399 | 125,733 | 200,580 | 327,010 | 546,001 | (144,430) | 690,431 | - | (42,715) | (30,000) | (232,603) | 995,748 | 35,240 | 30,610 | 2032 |
| 59,259 | 96,703 | 161,281 | 275,461 | 482,928 | (131,425) | 614,353 | - | (66,639) | (30,686) | (215,873) | 927,551 | 32,298 | 28,554 | 2033 |
| 55,156 | 93,921 | 163,760 | 293,014 | 539,385 | (135,613) | 674,999 | - | - | (31,764) | (205,426) | 912,189 | 31,670 | 28,088 | 2034 |
| 34,869 | 61,958 | 112,940 | 211,705 | 409,196 | (102,745) | 511,941 | - | - | (31,764) | (159,838) | 703,543 | 24,321 | 21,671 | 2035 |
| 23,356 | 43,310 | 82,546 | 162,121 | 329,069 | (92,042) | 421,111 | - | (59,780) | (31,764) | (152,752) | 665,407 | 23,452 | 20,463 | 2036 |
| 93,448 | 216,224 | 538,909 | 1,471,409 | 4,490,283 | (1,201,299) | 5,691,582 | (63,700) | (298,900) | (800,759) | (2,064,237) | 8,919,179 | 319,248 | 273,915 | 2037-2067 |
| **1,124,058** | **1,754,113** | **2,851,137** | **5,011,660** | **10,064,353** | **(2,666,432)** | **12,730,785** | **(63,700)** | **(1,589,013)** | **(1,202,561)** | **(4,698,386)** | **20,284,445** | **721,388** | **621,978** | **סה"כ** |

---

[52] כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

APC-01760589

8.2 שנדואה

אזהרה - יובהר כי נתוני תזרים מהוונים, בין אם חושבו בשיעור היוון מסוים או ללא שיעור היוון מייצגים ערך נוכחי אך לאו דווקא מייצגים שווי הוגן.

אזהרה בגין מידע צופה פני עתיד - נתוני התזרימים המהוונים כאמור לעיל הינם מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. הנתונים לעיל מבוססים על הנחות שונות, ביניהן ביחס לכמויות הנפט, הגז הטבעי ונוזלי הגז הטבעי שיופקו, קצב ומשך מכירותיהם מכירותיהם, עלויות תפעוליות, הוצאות הוניות, הוצאות נטישה, שיעורי תמלוגים ומחירי המכירה ואשר לגביהן אין כל ודאות כי יתממשו. יצוין, כי כמויות הגז הטבעי ו/או נפט ו/או נוזלי הגז הטבעי ו/או הקונדנסט שיופקו בפועל, ההוצאות האמורות וההכנסות האמורות עשויות להיות שונות מהותית מהערכות מהתוצאות וההשערות הנ"ל, בין היתר, כתוצאה ממצאים תפעוליים וטכניים ו/או שינויים רגולטוריים ו/או מתנאי היצע וביקוש בשוק הגז הטבעי ו/או הנפט ו/או נוזלי הגז הטבעי ו/או הקונדנסט ו/או מהביצועים בפועל של הפרויקט ו/או כתוצאה ממחירי המכירה בפועל ו/או כתוצאה משינויים גיאופוליטיים שיחולו.

(ג)   להלן ניתוח רגישות לפרמטרים העיקריים המרכיבים את התזרים המהוון של העתודות בבנק הנפט (מחיר הנפט והגז וכמות מכירות הנפט והגז) ליום 31.12.2021 (באלפי דולר), אשר בוצע על ידי השותפות :

| שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה | שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | קיטון במחיר הנפט והגז בשיעור של 10% | | | | | | גידול במחיר הנפט והגז בשיעור של 10% |
| 129,059 | 261,422 | 444,484 | 703,580 | 1,080,679 | עתודות מוכחות 1P (Proved Reserves) | 319,815 | 497,579 | 743,137 | 1,091,424 | 1,601,496 | עתודות מוכחות 1P (Proved Reserves) |
| 502,468 | 728,373 | 1,106,489 | 1,780,442 | 3,069,939 | עתודות צפויות (Probable Reserves) | 638,059 | 926,056 | 1,409,717 | 2,276,365 | 3,948,131 | עתודות צפויות (Probable Reserves) |
| 631,527 | 989,795 | 1,550,973 | 2,484,022 | 4,150,618 | סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 957,874 | 1,423,636 | 2,152,855 | 3,367,789 | 5,549,627 | סה"כ עתודות מסוג 2P (Proved+Probable Reserves) |
| 291,076 | 483,983 | 883,230 | 1,840,021 | 4,573,193 | עתודות אפשריות (Possible Reserves) | 366,711 | 609,970 | 1,114,524 | 2,331,015 | 5,854,840 | עתודות אפשריות (Possible Reserves) |
| 922,603 | 1,473,778 | 2,434,204 | 4,324,043 | 8,723,812 | סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 1,324,585 | 2,033,606 | 3,267,378 | 5,698,804 | 11,404,467 | סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) |
| | | | | | קיטון במחיר הנפט והגז בשיעור של 15% | | | | | | גידול במחיר הנפט והגז בשיעור של 15% |
| 81,354 | 202,368 | 369,809 | 606,611 | 950,475 | עתודות מוכחות 1P (Proved Reserves) | 366,832 | 556,008 | 817,304 | 1,188,079 | 1,731,700 | עתודות מוכחות 1P (Proved Reserves) |
| 468,384 | 678,783 | 1,030,544 | 1,656,376 | 2,850,392 | עתודות צפויות (Probable Reserves) | 672,102 | 975,609 | 1,485,632 | 2,400,412 | 4,167,679 | עתודות צפויות (Probable Reserves) |

69

8.2 האנדונש

**טבלה ימנית**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 5,899,380 | 3,588,491 | 2,302,936 | 1,531,618 | 1,038,934 |
| עתודות אפשריות (Possible Reserves) | 6,175,145 | 2,453,761 | 1,172,361 | 641,486 | 385,642 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 12,074,524 | 6,042,252 | 3,475,297 | 2,173,104 | 1,424,576 |
| גידול במחיר הנפט והגז בשיעור של 20% | | | | | |
| עתודות מוכחות 1P (Proved Reserves) | 1,861,905 | 1,284,733 | 891,470 | 614,437 | 413,849 |
| עתודות צפויות (Probable Reserves) | 4,387,127 | 2,524,429 | 1,561,537 | 1,025,159 | 706,144 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 6,249,032 | 3,809,163 | 2,453,007 | 1,639,597 | 1,119,993 |
| עתודות אפשריות (Possible Reserves) | 6,495,549 | 2,576,537 | 1,230,209 | 673,006 | 404,574 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 12,744,581 | 6,385,700 | 3,683,216 | 2,312,602 | 1,524,567 |
| גידול בכמות מכירות הנפט והגז בשיעור של 10% | | | | | |
| עתודות מוכחות 1P (Proved Reserves) | 1,581,182 | 1,076,394 | 731,630 | 488,526 | 312,534 |
| עתודות צפויות (Probable Reserves) | 3,912,485 | 2,256,374 | 1,397,580 | 918,199 | 632,705 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 5,493,668 | 3,332,768 | 2,129,210 | 1,406,724 | 945,239 |
| עתודות אפשריות (Possible Reserves) | 5,801,984 | 2,310,817 | 1,105,044 | 604,826 | 363,635 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 11,295,652 | 5,643,585 | 3,234,254 | 2,011,551 | 1,308,874 |

**טבלה שמאלית**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 3,800,866 | 2,262,988 | 1,400,353 | 881,150 | 549,738 |
| עתודות אפשריות (Possible Reserves) | 4,252,595 | 1,717,235 | 825,381 | 452,459 | 272,137 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 8,053,461 | 3,980,222 | 2,225,734 | 1,333,609 | 821,875 |
| קיטון במחיר הנפט והגז בשיעור של 20% | | | | | |
| עתודות מוכחות 1P (Proved Reserves) | 820,270 | 509,643 | 295,134 | 143,314 | 33,649 |
| עתודות צפויות (Probable Reserves) | 2,630,844 | 1,532,308 | 954,597 | 629,191 | 434,299 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 3,451,114 | 2,041,951 | 1,249,731 | 772,505 | 467,948 |
| עתודות אפשריות (Possible Reserves) | 3,931,997 | 1,594,449 | 767,534 | 420,936 | 253,199 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 7,383,111 | 3,636,400 | 2,017,265 | 1,193,441 | 721,147 |
| קיטון בכמות מכירות הנפט והגז בשיעור של 10% | | | | | |
| עתודות מוכחות 1P (Proved Reserves) | 1,100,993 | 718,638 | 456,039 | 270,533 | 136,403 |
| עתודות צפויות (Probable Reserves) | 3,105,585 | 1,800,455 | 1,118,661 | 736,274 | 507,870 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 4,206,578 | 2,519,094 | 1,574,700 | 1,006,807 | 644,273 |
| עתודות אפשריות (Possible Reserves) | 4,626,096 | 1,860,225 | 892,711 | 489,128 | 294,153 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 8,832,674 | 4,379,319 | 2,467,411 | 1,495,935 | 938,426 |

APC-01760591

8.2 שנדואה

**גידול בכמות מכירות הנפט והגז בשיעור של 15%**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| עתודות מוכחות 1P (Proved Reserves) | 1,701,230 | 1,165,563 | 800,089 | 542,484 | 355,973 |
| עתודות צפויות (Probable Reserves) | 4,114,210 | 2,370,397 | 1,467,381 | 963,767 | 664,009 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 5,815,440 | 3,535,960 | 2,267,469 | 1,506,251 | 1,019,982 |
| עתודות אפשריות (Possible Reserves) | 6,095,861 | 2,423,464 | 1,158,142 | 633,771 | 381,027 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 11,911,302 | 5,959,424 | 3,425,611 | 2,140,022 | 1,401,009 |

**גידול בכמות מכירות הנפט והגז בשיעור של 20%**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| עתודות מוכחות 1P (Proved Reserves) | 1,821,277 | 1,254,712 | 868,516 | 596,405 | 399,371 |
| עתודות צפויות (Probable Reserves) | 4,315,888 | 2,484,425 | 1,537,207 | 1,009,370 | 695,354 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 6,137,165 | 3,739,137 | 2,405,723 | 1,605,776 | 1,094,725 |
| עתודות אפשריות (Possible Reserves) | 6,389,786 | 2,536,126 | 1,211,245 | 662,717 | 398,420 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 12,526,951 | 6,275,263 | 3,616,969 | 2,268,493 | 1,493,145 |

**קיטון בכמות מכירות הנפט והגז בשיעור של 15%**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| עתודות מוכחות 1P (Proved Reserves) | 980,945 | 629,199 | 387,141 | 216,035 | 92,370 |
| עתודות צפויות (Probable Reserves) | 2,903,860 | 1,686,396 | 1,048,802 | 690,634 | 476,487 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 3,884,806 | 2,315,595 | 1,435,943 | 906,669 | 568,857 |
| עתודות אפשריות (Possible Reserves) | 4,331,950 | 1,747,541 | 839,603 | 460,176 | 276,754 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 8,216,755 | 4,063,136 | 2,275,546 | 1,366,845 | 845,611 |

**קיטון בכמות מכירות הנפט והגז בשיעור של 20%**

| רגישות / קטגוריה | שווי נוכחי בהוון של 0% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 20% |
|---|---|---|---|---|---|
| עתודות מוכחות 1P (Proved Reserves) | 860,898 | 539,760 | 318,243 | 161,537 | 48,337 |
| עתודות צפויות (Probable Reserves) | 2,702,136 | 1,572,337 | 978,943 | 644,994 | 445,103 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 3,563,033 | 2,112,097 | 1,297,186 | 806,531 | 493,440 |
| עתודות אפשריות (Possible Reserves) | 4,037,803 | 1,634,856 | 786,495 | 431,224 | 259,354 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 7,600,836 | 3,746,953 | 2,083,681 | 1,237,755 | 752,795 |

APC-01760592

8.2 <u>האדננש</u>

השותפות מצהירה כי כל הנתונים דלעיל נערכו באופן התואם לכללי המערכת לניהול משאבי פטרוליום (SPE-PRMS).

<u>חוות דעת של המעריך</u>

מצורף לדוח זה דוח משאבים שהוכן על-ידי NSAI, נכון ליום 31.12.2021, וכן הסכמת NSAI להכללתו בדוח זה.

<u>הצהרת הנהלה</u>

1. תאריך ההצהרה: 17 במרץ 2022 ;

2. ציון שם התאגיד: נאוויטס פטרוליום - שותפות מוגבלת ;

3. המוסמך להעריך את המשאבים בשותפות, שמו ותפקידו: עמית קורנהאוזר, מנכ"ל השותף הכללי;

4. הרינו לאשר, כי נמסרו למעריך כל הנתונים הנדרשים לצורך ביצוע עבודתו;

5. הרינו לאשר, כי לא בא לידיעתנו כל מידע המצביע על קיום תלות בין המעריך לבין השותפות,

6. הרינו לאשר, כי למיטב ידיעתנו המשאבים שדווחו הם האומדנים הטובים והעדכניים ביותר הקיימים ברשותנו ;

7. הרינו לאשר, כי הנתונים שנכללו בדוח זה נערכו לפי המונחים המקצועיים המנויים בפרק ז' לתוספת השלישית לתקנות ניירות ערך (פרטי התשקיף וטיוטת התשקיף – מבנה וצורה), התשכ"ט-1969, ובמשמעות הנודעת להם ב- Resources (2007) Petroleum Management System כפי שפרסמו איגוד מהנדסי הפטרוליום (SPE), הארגון האמריקאי של גיאולוגים בתחום הפטרוליום (AAPG), המועצה העולמית לפטרוליום (WPC) ואיגוד מהנדסי הערכת הפטרוליום (SPEE), כתוקפם בתאריך הדוח ;

8. הרינו לאשר, כי לא נעשה שינוי בזהות המעריך שביצע את הגילוי בדבר המשאבים האחרון שפורסם על-ידי השותפות ;

9. הרינו מסכימים להכללת ההצהרה האמורה לעיל בדוח זה.

_____

עמית קורנהאוזר, מנכ"ל

השותף הכללי

72

# Exhibit 80

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576<br><br>District Judge Charles R. Eskridge III<br><br>CLASS ACTION |

<u>DECLARATION OF CHRISTOPHER CAMDEN ON BEHALF OF DEFENDANTS</u>

Pursuant to 28 U.S.C. § 1746, I, Christopher Fenton Camden, declare as follows:

1. I respectfully submit this declaration in support of Defendants Anadarko Petroleum Corporation, R.A. Walker, Ernest A. Leyendecker III, Robert G. Gwin and Robert P. Daniels ("Defendants").

2. I am currently a deepwater exploration engineer at Occidental Petroleum Corporation.

3. From 2006 until 2019, I worked as a reservoir engineer at Anadarko Petroleum Corporation ("Anadarko"). From approximately 2014 until 2017, I worked as a reservoir engineer on the Shenandoah appraisal project.

4. In my role as a reservoir engineer on the Shenandoah appraisal project, I conducted economic modeling and reviewed the models prepared by others. These models included sensitivity analyses that were conducted to examine how changes in assumptions would

impact the economics of Shenandoah.  In conducting these analyses, I sometimes calculated the potential profit to investment ratio ("PIR") and net present value ("NPV") of Shenandoah based on certain assumptions about the reservoir, capital inputs and oil prices.

5.      The economic models and sensitivities generated throughout the Anadarko appraisal project, particularly during earlier stages of that project, incorporated significant uncertainty.  One of the purposes of an appraisal project is to reduce uncertainty about the reservoir and ultimately determine if a prospect will be economical to produce.  Anadarko's economic models and sensitivities were expected to, and did, change as Anadarko learned additional information about the reservoir and expected capital expenditures.  They also changed when Anadarko varied its assumptions, such as the price of oil and the costs of development. Anadarko appraisal teams generally modeled the PIR based on a company-wide base oil price forecast case, as this allowed for comparison between projects.  However, it was often also modeled at other higher or lower oil prices, as this helped Anadarko appraisal teams understand the impact of oil prices on the potential profitability of a project.

6.      While at Anadarko, I was involved in creating presentations for Anadarko executives containing projected PIRs for some of Anadarko's exploration and appraisal projects, such as Shenandoah.  These PIRs were used primarily to help Anadarko executives rank and compare projects across Anadarko's portfolio.

7.      During my time at Anadarko, Anadarko sometimes used an informal PIR "hurdle rate" of 0.3, meaning that it was generally understood that projects should deliver 30%, or greater, more profit than the sum of investments over the life of the project.  However, there was no policy requiring that a project receive a PIR of a 0.3 to continue appraisal or to be sanctioned, and a 0.3 hurdle rate was not a strict guideline for investment.  Rather, project teams

would aim for a PIR of 0.3 or greater as an appraisal process progressed and the project approached a final investment decision.  During the appraisal process, the appraisal team would not consider a PIR rate less than 0.3 to signify that the appraisal should cease or the project should not proceed further, particularly if there remained uncertainties about the resource and cost of development.  I have worked on projects that under some conditions and assumptions, had a PIR of less than 0.3 during the appraisal stage and were ultimately sanctioned.

8.      A project's projected PIR was only one factor that Anadarko executives considered in making investment decisions.  The decision to invest in a project depended on a variety of factors, such as the expected time for the investment to see returns, potential infrastructure synergies, how a project fit into Anadarko's CapEx budget, the cashflow profile of the project, the company's relationship with the operator, the life cycle of the project, the risk profile of the project, the potential resource size of the project, and less tangible factors such as the optics of a project within the investment community.  Anadarko invested in projects that had a PIR less than 0.3 at the final investment stages when other factors favored investment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _Jan 23, 2023_

Christopher Fenton Camden

3