EXHIBIT 3

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4

5    In re ANADARKO PETROLEUM      ) Civil Action No.

     CORPORATION SECURITIES        ) 4:20-cv-00576

6    LITIGATION                    )

     _____ )

7

8

9

10

11

12   VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

13                     PETER KELLER

14

15            Tuesday, January 17, 2023

16   Remotely Testifying from Hilton Head, South Carolina

17

18

19

20

21

22

23   Stenographically Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 5630979

                                          Page 1

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4

5  In re ANADARKO PETROLEUM     ) Civil Action No.

    CORPORATION SECURITIES      ) 4:20-cv-00576

6  LITIGATION                 )

    _____ )

7

8

9

10

11

12        Virtual videoconference video-recorded

13  deposition of PETER KELLER, remotely testifying from

14  Hilton Head, South Carolina, on Tuesday, January 17,

15  2023, pursuant to the stipulations of counsel

16  thereof, before Hanna Kim, CLR, Certified Shorthand

17  Reporter, No. 13083.

18

19

20

21

22

23

24

25

                                Page 2

```
1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

2

3   For Plaintiffs:

4            ROBBINS GELLER RUDMAN & DOWD LLP

5            BY:  RACHEL JENSEN, ESQ.

6            BY:  RAPHAELLA FRIEDMAN, ESQ.

7            BY:  FRANCISCO MEJIA, ESQ.

8            655 West Broadway

9            San Diego, California 92101

10           rjensen@rgrdlaw.com

11           rfriedman@rgrdlaw.com

12           fmejia@rgrdlaw.com

13

14  For Defendant and the Witness:

15           CRAVATH, SWAINE & MOORE

16           BY:  BENJAMIN GRUENSTEIN, ESQ.

17           BY:  LAUREN PHILLIPS, ESQ.

18           BY:  CHIZOBA UKAIRO, ESQ.

19           825 8th Avenue

20           New York, New York 10019

21           bgruenstein@cravath.com

22           lphillips@cravath.com

23           cukairo@cravath.com

24

25
```

Page  3

```
 1        REMOTE  APPEARANCES  OF  COUNSEL:   (CONTINUED)

 2

 3   For Defendants:

 4           SHIPLEY  SNELL  &  MONTGOMERY

 5           BY:   GEORGE  SHIPLEY,  ESQ.

 6           712  Main  Street,  Suite  1400

 7           Houston,  Texas  77002

 8           713.652.5920

 9           gshipley@shipleysnell.com

10

11   Also  Present:

12           KALLIE  GALLAGHER,  Andarko

13           JOHN  MACDONELL,  Video  Operator

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  4
```

```
 1                  INDEX OF EXAMINATION

 2

 3   WITNESS:  PETER KELLER

 4   EXAMINATION                              PAGE

 5        BY MS. JENSEN:                        10

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  INDEX OF EXHIBITS

 2

 3   KELLER DEPOSITION EXHIBITS                    PAGE

 4   Exhibit 505    "Expert Report of Peter          44

 5                   Keller, November 9, 2022";

 6                   199 pages

 7   Exhibit 506    "Third Quarter 2015,            111

 8                   Operations Report, October

 9                   27, 2015"; Bates nos.

10                   JanHen_00014482 through

11                   '14499

12   Exhibit 507    "Declaration of Noah           119

13                   Barrett"; 3 pages

14   Exhibit 508    "Goldman Sachs Company         127

15                   Update:  Anadarko Petroleum

16                   Corp."; Bates nos. GS-002754

17                   through '2784

18   Exhibit 509    "4Q14 results recap:           136

19                   'preserve

20                   value, don't chase growth'";

21                   Bates nos. BOFAS_APC-000488

22                   through '498

23

24

25

                                           Page  6
```

```
 1                  INDEX OF EXHIBITS (CONTINUED)

 2

 3    KELLER DEPOSITION EXHIBITS                        PAGE

 4    Exhibit 510   RBC Capital Markets                 151

 5                  "October 28, 2015

 6                  Anadarko Petroleum Corp.

 7                  Onshore Oil Growth Assets

 8                  Outperform"; Bates nos.

 9                  RBCCM00000150 through '157

10    Exhibit 511   Imperial Capital "Anadarko          158

11                  Petroleum Corp. 1

12                  (APC: $88.90 Outperform; $117

13                  PT)"; Bates nos. IC-000001

14                  through '21

15    Exhibit 512   "Anadarko Petroleum Corp            183

16                  Stock at 10 month low, cash

17                  represents 20% of market

18                  value.  Headline risk

19                  overdone"; Bates nos. SG_PROD

20                  068976; 21 pages

21    Exhibit 513   Simmons & Company document;         187

22                  Bates nos. APC-01329241

23                  through '9247

24

25

                                              Page 7
```

```
1              INDEX OF EXHIBITS (CONTINUED)

2

3   KELLER DEPOSITION EXHIBITS                    PAGE

4   Exhibit 514   Lazard Asset Management          210

5                 document; Bates nos.

6                 L00000080 through '81

7                       --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1    Remotely Testifying from Hilton Head, South Carolina
 2        Tuesday, January 17, 2023; 11:05 a.m., EST
 3                          --o0o--
 4            THE VIDEOGRAPHER:  Okay.  And we're on the
 5    record.                                         11:05:50
 6            It's 11:05 a.m., Eastern Time, on
 7    January 17th, 2023.
 8            This is the deposition of Peter Keller.
 9    We're here in the matter of Anadarko Petroleum
10    Corporation Securities Litigation.              11:06:05
11            I'm John Macdonell, the videographer with
12    Veritext.
13            Before the reporter swears the witness,
14    would counsel please identify themselves, beginning
15    with the noticing attorney, please.             11:06:13
16            MS. JENSEN:  Good morning.  Rachel Jensen
17    from Robbins Geller Rudman & Dowd on behalf of the
18    Plaintiffs.
19            And with me today are Raphael Friedman,
20    and, also, Francisco Mejia should be joining us.  11:06:27
21            MR. GRUENSTEIN:  Good morning.  Benjamin
22    Gruenstein of Cravath, Swaine & Moore for the
23    Defendants.
24            And with me are Lauren Phillips and
25    Chizoba Ukairo of my firm, as well as George Shipley  11:06:46
```

Page 9

```
 1    of Shipley & Snell, and Kallie Gallagher of

 2    Occidental.

 3

 4                    PETER KELLER,

 5       having been duly administered an oath over

 6     videoconference as stipulated by all counsel, was

 7            examined and testified as follows:

 8

 9           MS. JENSEN:  Okay.  Just a reminder, we'll

10    have everyone go off video, except for the -- the    11:07:23

11    taking attorney.

12

13                    EXAMINATION

14    BY MS. JENSEN:

15       Q.   Okay.  Good morning, Mr. Keller.            11:07:30

16       A.   Good morning.

17       Q.   Where are you physically located today?

18       A.   I'm in Hilton Head, South Caroline.

19       Q.   And is anybody else in the room with you

20    today?                                               11:07:44

21       A.   No.

22       Q.   Do you have any documents in reach?

23       A.   I have my expert report.

24       Q.   And is that your expert report dated

25    November 9th, 2022?                                  11:07:52
```

Page 10

1       A.   Yes, it -- yes, it is.

2       Q.   And have you removed from reach all

3    technology not being used for purposes of this

4    deposition right now?

5       A.   I have.                                11:08:04

6       Q.   And do you understand that you are not to

7    communicate with anyone except for myself while

8    we're on the record today?

9       A.   Yes, I do.

10      Q.   Okay.                                   11:08:13

11           Have you ever had your deposition taken

12    before?

13      A.   Yes, I have.

14      Q.   How many times?

15      A.   Three or four times.                    11:08:19

16      Q.   And in what -- what occasion did you have

17    to have your deposition taken before?

18      A.   As an expert in several proceedings.  One

19    in Wilmington, Delaware, one in Harris County,

20    Texas.                                          11:08:38

21      Q.   And the Harris County, Texas, case, is

22    that the SPM --

23      A.   Ma'am, yes -- yes.  Yes, it is.

24      Q.   And what did that case concern?

25      A.   It concerned a dispute between SPM, being  11:08:47

Page 11

```
 1    multiple subsidiaries, affiliates of Schlumberger,

 2    against an oil company, SM Energy.

 3         Q.   And on whose behalf were you retained?

 4         A.   I was retained on behalf of SPM,

 5    Schlumberger.                                          11:09:13

 6         Q.   And what was the nature of your opinion in

 7    that case, if any?

 8         A.   The nature of my opinion was that the

 9    valuation parameters used by SM Energy were

10    incorrect to the detriment of Schlumberger and        11:09:25

11    affiliates.

12         Q.   And what was the nature of the investment?

13         A.   Schlumberger, as is sometimes common in

14    the industry, rather than providing services for

15    fees, provided services in exchange for ownership     11:09:44

16    interests in wells being drilled by SME.

17         Q.   And what was the nature of the wells being

18    drilled in that case?

19         A.   They were oil and gas wells in the

20    Dakotas.                                               11:10:06

21         Q.   Onshore?

22         A.   Onshore, yes, yep.

23         Q.   What was the outcome of that case?

24         A.   It was settled.

25         Q.   You mentioned a case in Delaware.  Was      11:10:14
```

Page 12

1   that the LCT Cap case, or Capital case --

2        A.   Yes.  Yes -- yes, it is, yep.

3        Q.   Okay.  And in that case, you represented

4   NGL or were retained on their behalf?

5        A.   That is correct.                          11:10:31

6        Q.   And what was the nature of your opinion in

7   that case?

8        A.   The nature -- my opinion in that case was

9   that the fees earned by LCT should have been on the

10  order of -- of a million to $2 million versus a      11:10:43

11  claim of $45 million.

12       Q.   And specific- -- that did not involve the

13  valuation of a -- an oil and gas asset; correct?

14       A.   No.  It was a fee in connection with

15  acquisition of an oil and gas asset.                 11:11:05

16       Q.   What was the resolution of that case, if

17  there has been one?

18       A.   There was a resolution with a jury trial

19  finding damages in the amount of a -- a million and

20  a half dollars for LCT, but then assessing           11:11:22

21  punitives.

22            That verdict was eventually thrown out,

23  and it is now scheduled for retrial in February of

24  2023.

25            THE COURT REPORTER:  Excuse me, Counsel.   11:11:38

                                            Page 13

```
 1      I'm going to admit somebody, Mr. Mejia.

 2              MS. JENSEN:  Okay.

 3      BY MS. JENSEN:

 4          Q.    So it's going for retrial next month?

 5          A.    That is correct, yes.                   11:11:47

 6          Q.    And you were retained on behalf of the

 7      defense in that case?

 8          A.    Yes, I am.

 9          Q.    And I believe you said -- was there a

10      third case?                                       11:11:56

11          A.    There -- there were several arbitrations.

12      ArcLight Capital was one.  Yes.

13          Q.    Is that Michael Christopher versus

14      ArcLight Capital?

15          A.    That is correct, yeah.                  11:12:12

16          Q.    And on whose behalf were you retained in

17      that case?

18          A.    On behalf of ArcLight Capital, the

19      defendant.

20          Q.    And what was the nature of your opinion in  11:12:24

21      that case?

22          A.    The nature of my opinion in that case was

23      that Mr. Christopher was not, in fact, entitled to

24      the damages he was seeking from ArcLight.

25          Q.    And what were the damages he was seeking?  11:12:37
```

Page 14

```
 1        A.   He had claimed that he, by virtue of

 2   employment, had earned an interest in certain of the

 3   properties that ArcLight had acquired or was

 4   managing.

 5        Q.   What was the resolution of that case, if     11:12:52

 6   any?

 7        A.   I don't know the final resolution.  It was

 8   settled, and I did not see the settlement documents.

 9        Q.   Any other depositions?

10        A.   Not within the past decade, no.              11:13:10

11        Q.   Did you prepare -- prepare for this

12   deposition today?

13        A.   I did.

14        Q.   And what did you do to prepare for the

15   deposition?                                            11:13:24

16        A.   I re-read my report since it was issued

17   several months ago.

18        Q.   Anything else?

19        A.   Re-read it and, you know, kind of looked

20   at some of the attachments and supporting documents,   11:13:38

21   yes.

22             Discussed with counsel the housekeeping

23   details for today.

24        Q.   So you met with counsel in preparation for

25   your deposition?                                       11:13:51
```

Page 15

```
1           A.    I did.

2           Q.    For how long?

3           A.    I think it was probably an hour on Friday,

4      the 13th, and about that same amount of time

5      yesterday.                                        11:14:02

6           Q.    So you re-reviewed your dep- -- your

7      report in preparation for today.  Is there anything

8      in your report that you'd like to withdraw or

9      modify?

10          A.    There is not.                          11:14:22

11          Q.    Anything you believe to be incorrect?

12          A.    No.

13          Q.    So you stand by your report in its

14     entirety?

15          A.    Yes, I do.                             11:14:32

16          Q.    Is there any further work you intend to

17     do?

18          A.    I am working on some rebuttal report on

19     behalf of Cravath.

20          Q.    And what is the nature of your rebuttal  11:14:47

21     report?

22          A.    Rebuttal report to several of the experts

23     that Plaintiffs have retained.

24          Q.    Rebuttal to whom?

25          A.    Merrill, Regan, and Steinhold.         11:15:00
```

Page 16

1          Q.   So do you intend to offer opinions other

2     than what you state in your report, your November 9,

3     2022, report?

4               (Simultaneous speaking.)

5               (Interruption in audio/video.)          11:15:31

6               THE COURT REPORTER:  I'm sorry, there was

7     some talking over.  November?

8     BY MS. JENSEN:

9          Q.   9th, 2022, report.

10         A.   I'm rebutting certain statements, but I    11:15:38

11    found the expert reports largely supported of --

12    supportive of the opinions in my November report.

13         Q.   So that doesn't answer my question.

14              My question was, do you intend to offer

15    additional opinions other than what's set forth in    11:15:54

16    your November 9th, 2022 --

17         A.   Yeah.  Yes, I do.

18         Q.   -- report?

19         A.   Yes.

20         Q.   And what are those opinions?              11:16:03

21         A.   That report has not been finalized yet.

22    I'm still working on it.

23         Q.   And so you don't know?

24         A.   I -- I don't -- it's not final yet, no, I

25    don't.                                               11:16:12

                                              Page 17

```
 1        Q.   When were you retained in this case?

 2        A.   I was retained in August of 2021.

 3        Q.   And you used to work with Anadarko as a

 4   banking client of yours; correct?

 5        A.   That is correct, yes.                   11:16:57

 6        Q.   For -- for how long?

 7        A.   I led the oil and gas division at the Bank

 8   of New York until 2014 so my -- my banking

 9   relationships would have ended really around 2008

10   after BNY bought Mellon Financial.               11:17:09

11        Q.   And how many years up until that point?

12        A.   2000 -- 1998 through 2007 or '08.

13        Q.   So about 20 years?

14        A.   No.  That would be --

15        Q.   I'm sorry, about ten years?             11:17:31

16        A.   Yes, that's correct.

17        Q.   Apologies.

18        A.   No, that's fine.

19        Q.   Anadarko was a large client?

20        A.   They were, you know, one of -- it was a  11:17:39

21   $7 billion portfolio I ran, so it was one of a

22   hundred clients in the portfolio.

23        Q.   And where do they rank as a $7 billion

24   portfolio in -- in your clients?

25        A.   I think our typical exposure to Anadarko 11:17:53
```

Page 18

```
1    was on the order of a hundred to a hundred and a

2    quarter.  At the time, they purchased in 2006

3    Kerr-McGee and Western Gas, we stepped up in our

4    bridge financing of a couple hundred million dollars

5    additional, but that was paid down pretty quickly      11:18:13

6    with capital markets proceeds.

7         Q.   So we may be talking about two different

8    things.  Anadarko was also a -- a banking client of

9    yours; correct?

10        A.   Yes.  So they're -- they're typical          11:18:22

11   exposure was on the order of 100 to $125 million in

12   a book of $7 billion.

13        Q.   So could you describe the nature of the

14   relationship with Anadarko in this time period of

15   1998 to 2008?                                          11:18:42

16        A.   Yes.  Typical commercial banking

17   relationship.  We were a lender, i.e., a participant

18   in a general working capital line of credit that

19   Anadarko had.  In addition, we were a capital

20   markets bank, meaning we would participate in the      11:18:58

21   sale of debt securities on their behalf.  And we

22   also managed a portion of their pension fund.

23        Q.   In the course of that relationship, were

24   you involved in the valuation of any of Anadarko's

25   oil and gas assets?                                    11:19:26
```

Page 19

```
 1        A.   Not asset specific, if you will, but as an

 2   example when they purchased Kerr-McGee, we looked at

 3   the underlying asset value before we financed the

 4   transaction.

 5        Q.   Over the course of that decade, how much        11:19:48

 6   money approximately did Anadarko bring into the bank

 7   as a client?

 8        A.   I -- I would have to look back and see.  I

 9   mean, it varied from year to year.  Typical

10   revolving credits, you get a fee for your             11:20:06

11   commitment.  So, you know, hundreds of thousand of

12   dollars a year and then a -- a bigger fee on

13   something like a bridge loan.

14        Q.   Okay.  Could you add all that up and give

15   me an estimate?                                       11:20:18

16        A.   I can give you top of -- top of my head

17   estimate, if it's -- if -- if at the max it was

18   200,000 bucks a year times ten years, it would be 2

19   million bucks, but -- give or take.

20        Q.   So a million dollars from Anadarko as a      11:20:37

21   client while you were at the bank?

22        A.   That's generally correct, yeah.

23        Q.   And -- and do you know any of the

24   individual defendants in this case?

25        A.   I know two of them.                          11:20:49
```

Page 20

1          Q.    And who's that?

2          A.    Al Walker and Bob Gwin.

3          Q.    And in what capacity do you know them?

4          A.    I first met Al Walker when he was the

5    chief financial officer.  So as the CFO, he would        11:21:05

6    have been a principal contact at Anadarko.  He then

7    moved up to become CEO when Jim Hackett retired and

8    Bob Gwin became CFO.  So I -- I dealt with them as

9    principal contacts in a banking relationship.

10         Q.    And did you know either Walker or Gwin in      11:21:25

11   any other capacity?

12         A.    I did not, no.

13         Q.    You ever worked with Occidental before?

14         A.    I have not directly worked with

15   Occidental.  People -- relationship managers who          11:21:40

16   worked for me handled Occidental, but I -- I never

17   had any real contact with Oxy.

18         Q.    So Occidental was also a -- a client of

19   the bank?

20         A.    Yes, it was.                                  11:21:52

21         Q.    How many hours have you spent on this

22   case?

23         A.    I'm going to estimate probably 100 to

24   200 hours.  I -- I don't have my sheets in front of

25   me but a significant amount of time, obviously,           11:22:19

                                                    Page 21

```
 1    since we've gone on, since August of 2021.
 2         Q.   And how much time did you spend on your
 3    report?
 4         A.   Oh, my report would be the bulk of that.
 5         Q.   And how much have you been paid so far by    11:22:31
 6    defendants in the case?
 7         A.   Me personally or my firm?
 8         Q.   Either.  Both.
 9         A.   My personal time is something in the order
10    of -- I'm going to guess again, $150,000.  And          11:22:49
11    associates of mine at the firm, staff support, I
12    would say roughly about the same amount.
13         Q.   So you had supporting staff work with you
14    on the report?
15         A.   Yes, I have had.                               11:23:17
16         Q.   Did you have help drafting your report?
17         A.   I wrote the report.  Did -- I worked on
18    edits with staff members, yes.
19         Q.   Did staff write any portion of your
20    report?                                                 11:23:36
21         A.   When you say "wrote," they edited portions
22    for clarity, yes.  And citations, they -- they did
23    an awful lot of the citation work.
24         Q.   Beyond staff, did anybody else help you
25    edit your report?                                       11:23:53
```

Page 22

```
1          A.   I sent certain drafts to the lawyers at

2    Cravath.

3          Q.   And did they edit your report?

4          A.   They made some suggestions as to clarity

5    and -- and -- and chronology.                    11:24:06

6          Q.   So the answer is yes; correct?

7          A.   Yes.

8          Q.   What percentage of your work now is as a

9    testifying expert?

10         A.   It fluctuates.  I mean, sometimes this is 11:24:22

11   my principal work.  Other times, I'm engaged in

12   other things, as strategic advisor to a number of

13   utility and power players.

14         Q.   Okay.  At -- at this point --

15         A.   Right now, the last two weeks, this has  11:24:38

16   been -- the bulk of my time has been working on

17   this -- this case and on the NGL/LCT case.

18         Q.   So currently, the bulk of your work is

19   as --

20         A.   Yes.                                     11:24:50

21         Q.   -- a testifying expert; correct?

22         A.   That is -- that is correct.

23         Q.   Have your opinions ever been admitted by a

24   court in a securities fraud case?

25         A.   In a securities fraud case?  I don't     11:25:04
```

Page 23

```
 1    believe so.  And I'm differentiating between
 2    securities fraud and damages, so...
 3         Q.   Are you offering any legal opinions in
 4    this matter?
 5         A.   I am not.                              11:25:26
 6         Q.   You're not a lawyer; correct?
 7         A.   I am not a lawyer; no.
 8         Q.   You're not a securities law expert?
 9         A.   I am not; no.
10         Q.   And do you hold yourself out as a -- a   11:25:34
11    market efficiency expert?
12         A.   Yes, I've done an awful lot of market
13    efficiency work.
14         Q.   And what relevant credent- -- credentials
15    do you have to be a market efficiency expert?      11:25:48
16         A.   40 years in this industry, both as -- as
17    an institutional investment manager, where I managed
18    assets on behalf of a number of large pension funds
19    and university, college endowments and as commercial
20    banker, where I had to look at market valuations     11:26:05
21    prior to signing off on exposure -- large exposures
22    to oil and gas and utility and power companies.
23         Q.   Maybe you misunderstood my question, I
24    said market efficiency expert.
25         A.   Yes, yes.                                 11:26:19
```

Page 24

 1          Q.   Okay.  And so, that's the --

 2          A.   I think those are -- I think those are

 3     intertwined.

 4               (Simultaneous speaking.)

 5               (Interruption in audio/video.)          11:26:25

 6               THE COURT REPORTER:  I'm sorry, excuse me,

 7     one person at a time, please.

 8               THE WITNESS:  Yes, sorry.

 9     BY MS. JENSEN:

10          Q.   Okay.  So -- so that's the relevant        11:26:27

11     experience you believe you have to be a market

12     efficiency expert?

13          A.   It is.

14          Q.   Do you -- are you a chartered financial

15     analyst?                                            11:26:40

16          A.   I am not.

17          Q.   Do you have an MBA?

18          A.   I do not.

19          Q.   And, in fact, the highest level of

20     education you have is a Bachelors degree in history,  11:26:52

21     environmental studies and economics; correct?

22          A.   That is correct.

23          Q.   That was 1975?

24          A.   Yes.

25          Q.   No postgraduate degrees?                  11:27:02

                                              Page 25

1          A.    No degrees.

2          Q.    Do you hold any current licenses?

3          A.    I do not.

4          Q.    And you're not an accountant; correct?

5          A.    I am not.                              11:27:18

6          Q.    Not an auditor?

7          A.    I am not.

8          Q.    Are you offering an opinion whether the

9    market for Anadarko's stock was efficient?

10         A.    Yes.                                   11:27:43

11         Q.    And that information was immediately

12   impounded into the market price?

13         A.    That is my belief and opinion, yes.

14         Q.    And what's the -- what's the basis for

15   that opinion?                                      11:27:55

16         A.    The basis is looking at historical

17   movements in the stock price versus disclosures made

18   by Anadarko and other parties.

19         Q.    Did you undertake an event study?

20         A.    I did not.                             11:28:10

21         Q.    How do you define market efficiency?

22         A.    I define market efficiency as a market

23   taking into account evaluation, events transpiring

24   at a company and the macro environment.

25         Q.    In your report, you cite Brealey, Myers,   11:28:32

Page 26

1    and Allen; correct?

2         A.   I do.

3         Q.   And you're aware that after the quote that

4    you have on page -- or paragraph 19, that it goes on

5    to refer to the "strong form of market efficiency"?   11:28:46

6         A.   Mm-hmm.

7         Q.   And that's a definition that you use for

8    your report?

9         A.   I would have to reread that to -- to know

10   how much I relied on that.                           11:28:58

11        Q.   Okay.  Well, let's take this separately.

12   So the -- the version of market efficiency that you

13   are relying on for your report is the strong form of

14   market efficiency; correct?

15        A.   Yes.                                        11:29:11

16        Q.   Do you know what the Grossman-Stiglitz

17   Paradox is?

18        A.   Not that I recall, no.

19        Q.   If information was instantaneously

20   impounded into the stock price, there'd be           11:29:38

21   no make -- there'd be no way to make profits on the

22   information; correct?

23        A.   On a -- a specific piece of information,

24   yes.

25        Q.   And so, you're opining that Anadarko's      11:29:49

Page 27

1    stock price reflected the totality of information at

2    any point in time?

3         A.   Generally speaking, yes.

4         Q.   Does that include opinions?

5         A.   Can you be more specific, please.          11:30:04

6         Q.   Do you know the difference between a fact

7    and an opinion?

8         A.   I do.

9         Q.   And so, under your definition of market

10   efficiency, the -- the strong form of market         11:30:19

11   efficiency, does that include opinions?

12        A.   In totality, if you're speaking of

13   opinions of, say, analysts, I think those are

14   reflected, yes.

15        Q.   And what if there are conflicting          11:30:33

16   opinions?

17        A.   Then one has to synthesize those opinions.

18        Q.   So how do you decide which opinion is

19   reflected in the stock price?

20        A.   I'm not -- as I said, you would synthesize  11:30:46

21   them.  Some are material, some are irrelevant, some

22   are specifically applicable to the situation.

23        Q.   And what's your methodology for -- for

24   determining which opinion, if conflicting, was

25   impounded in the stock price?                        11:31:07

                                        Page 28

```
1          A.   I'm hesitating only because when you
2    say "which opinion," there are, for instance, in
3    this case, hundreds of analysts reviewing Anadarko
4    and giving reports and opinions.  So there's, you
5    know, a plethora of information out there, which an      11:31:30
6    investor has to sift through, where the market has
7    to kind of get a consensus view.
8          Q.   So -- but my question is a little
9    different.  So what if --
10         A.   Okay.                                          11:31:42
11         Q.   -- analysts disagree, which do you choose
12   as the -- the correct one as reflected in the stock
13   price?
14              MR. GRUENSTEIN:  Objection.  Form.
15              You can answer, if you understand it.          11:31:58
16              THE WITNESS:  I -- I'm not sure I fully
17   understand it.  I will say that obviously there are
18   lots of opinions out there.  Some are relevant, some
19   are irrelevant.
20   BY MS. JENSEN:                                            11:32:10
21         Q.   And the ones that agree with you, those
22   are the relevant ones?
23         A.   No.
24         Q.   So how do you choose between conflicting
25   opinions?                                                 11:32:17
```

Page 29

```
 1              MR. GRUENSTEIN:  Objection.

 2              THE WITNESS:  How do I choose between

 3     conflicting opinions?  I think you -- you come to

 4     some sort of a consensus, if you will.  There are --

 5     you know, obviously it's axiomatic that in any          11:32:40

 6     transaction where there is a buyer there's also a

 7     seller.  So clearly different people have different

 8     ideas about value, current value versus future

 9     value.  Otherwise, a buyer could never find -- a

10     seller could never find a buyer.  So it doesn't        11:32:57

11     surprise me that some analysts bullish, and some

12     analysts are bearish.

13     BY MS. JENSEN:

14        Q.   And so which one is reflected in the stock

15     price at any given point?                              11:33:05

16        A.   Something that's in the middle would be my

17     opinion.

18        Q.   And what's that based on?

19        A.   What I would think a sophisticated

20     investor looks for is -- that level of granularity I   11:33:20

21     don't think is of real concern to an investor.

22     You're looking at sort of the consensus view, not

23     the granularity of what one person said at one point

24     in time.

25        Q.   And so -- and you agree that analysts can      11:33:34
```

Page 30

1    disagree; correct?

2         A.   Yes, I do.

3         Q.   In your report you talk about credible

4    publicly available information being reflected in

5    the price of publicly traded stock.  What is your        11:33:45

6    definition of "credible"?

7         A.   SEC filings, 8-Ks, Ks and Qs, investor

8    presentations, press releases.

9         Q.   And why are those credible?

10        A.   Well, they're subject -- generally subject    11:34:02

11   to certain standards of disclosure of -- of honesty

12   and truthfulness in the terms of SEC filings.  And

13   when I say "credible," I'm talking about, you know,

14   investor conferences, statements by significant

15   company employees as opposed to an individual stock      11:34:25

16   picker, for instance.  So things that are in the

17   public domain, things that are filed with the SEC I

18   have a presumption of truthfulness.

19        Q.   In a securities fraud case like this, you

20   also have a presumption of truthfulness?                 11:34:39

21        A.   I do.

22        Q.   Is credibility a binary determination?

23        A.   Can you expand, please.

24        Q.   Well, it's credible or not, is that your

25   view?                                                    11:34:55

Page 31

```
 1        A.    I think different people could have

 2   different opinions on the validity or credibility of

 3   information.

 4        Q.    Is the source an important factor for

 5   credibility?                                        11:35:15

 6        A.    Yes, it -- to me, it is, yes.

 7        Q.    And the source is a subjective

 8   determination, is it not?

 9        A.    The credibility of the source?

10        Q.    Yes.                                     11:35:28

11        A.    I would only restate what I said before.

12   Something that's done in a public forum, a press

13   release or an SEC filing, to me is -- would be more

14   credible than what one individual stock picker says

15   he thinks something's worth.                        11:35:49

16        Q.    And generally, the company that -- that

17   owns the asset, would they be a more credible source

18   than commentators in the market?

19        A.    It would depend on the commentator.  There

20   are investment banks with very deep research teams   11:36:18

21   that do an awful lot of granular work.  There are

22   other sources that are more seat of the pants.  So

23   it depends on the effort and time devoted to the

24   situation.

25        Q.    And the commentators that you were -- or   11:36:32
```

Page 32

1    the investment banks that you referenced, is BofA

2    one of those commentators that you think is

3    credible?

4         A.   Yes, it is.

5         Q.   How about Goldman Sachs?                    11:36:48

6         A.   Yes, I would consider Goldman credible.

7         Q.   When assessing credibility, would it be

8    important to distinguish between fact and opinion?

9         A.   Yes.  To me fact trump -- fact trumps

10   opinion, yes.                                         11:37:45

11        Q.   Did you distinguish between facts and

12   opinions in your discussion of publicly available

13   information?

14        A.   I believe I did.

15        Q.   Can you point me to an instance in your    11:37:53

16   report where you did so?

17        A.   Can I point you to a specific instance?

18   I -- if you want to guide me, fine.  I -- I mean,

19   it's a 150-page report.  Do I know the specific

20   situation?  I -- not off the top of my head, no.     11:38:07

21        Q.   So you can't name one instance in your

22   report where you distinguish between facts and

23   opinions sitting here?

24        A.   There are -- there are many.  Can I show

25   the ci- -- citation off the top of my head?  No, I   11:38:19

Page 33

1    cannot.

2         Q.   So the answer is -- is no?

3              MR. GRUENSTEIN:  Objection.

4              THE WITNESS:  If you would like to point

5    to an example, I can -- I can --                     11:38:30

6    BY MS. JENSEN:

7         Q.   No.  I'm asking --

8         A.   -- definitely --

9         Q.   -- you -- I'm asking you to point to an

10   example.                                             11:38:36

11        A.   I can -- I -- I can read through a

12   164-page report and find examples, if you'd like.

13        Q.   Okay.

14        A.   Would you like me to do --

15        Q.   So sitting -- sitting here right now, even  11:38:47

16   though you just re- -- re-reviewed your report, you

17   can't point me to an instance where you

18   distinguished between facts and opinion; correct.

19        A.   Can I point to a specific citation?  Not

20   off the top of my head, no.                          11:39:00

21        Q.   In this case are you offering an opinion

22   that defendants' allegedly misleading statements

23   were not misleading to investors?

24        A.   That is correct.

25        Q.   And are you offering an opinion that       11:39:21

                                              Page 34

```
 1    defendants' alleged omissions were legally
 2    immaterial?
 3         A.   Yes, I am.
 4         Q.   Are you offering a legal opinion that the
 5    truth was on the market before the close of market    11:39:36
 6    on May 2nd, 2020 -- '17?
 7         A.   I'm offering an investors's opinion, not a
 8    legal opinion, as I'm not a lawyer.
 9         Q.   Do you believe that with your report
10    you've proven the defendants' truth-on-the-market    11:39:50
11    defense?
12         A.   I do.
13              MR. GRUENSTEIN:   Objection.   Calls for a
14    legal conclusion.
15    BY MS. JENSEN:                                        11:39:59
16         Q.   Are you offering an opinion that the
17    existence of defendants' fraudulent scheme was
18    publicly known before the close of market on
19    May 2nd, 2017?
20              MR. GRUENSTEIN:   Objection.   Assume a fact  11:40:10
21    not in evidence.
22              THE WITNESS:   I dispute the notion of the
23    existence of a fraudulent scheme, yes.
24    BY MS. JENSEN:
25         Q.   Are you opining that the existence of a    11:40:27
```

Page 35

1    whistleblower complaint by Shenandoah's lead

2    reservoir engineer at Anadarko was publicly known at

3    any time during the class period?

4         A.   I did not opine on the whistleblower

5    complaint.                                          11:40:43

6         Q.   Not one way or the other; correct?

7         A.   That's correct.

8         Q.   And you're not opining that it was

9    publicly known during the class period; correct?

10        A.   That's correct.                           11:40:51

11        Q.   And I take it you're not opining that

12   Anadarko's decision to suspend its appraisal of

13   Shenandoah was publicly known before the close of

14   market on May 2nd, 2017?

15        A.   Can you repeat that, please.              11:41:03

16        Q.   I take it you're not opining that

17   Anadarko's decision to suspend its appraisal of

18   Shenandoah was publicly known before close of market

19   on May 2nd, 2017?

20        A.   I have opined that there were many risks  11:41:18

21   to moving ahead and that that was well known.

22        Q.   You're not answering my question.  My

23   question is:  Are you opining that Anadarko's

24   decision to suspend its appraisal of Shenandoah was

25   publicly known before close of market on May 2nd,    11:41:35

                                              Page 36

```
1    2- -- May 2nd, 2017?

2         A.   It was first disclosed as a fact by Conoco

3    in its write-off.  Okay, yes, correct.

4         Q.   Do you mean Anadarko?  You said Conoco.

5         A.   Well, Conoco announced the write-off        11:41:53

6    before Anadar- -- the day before Anadarko was

7    suspended.

8         Q.   Okay.  So you're saying that

9    ConocoPhillips said it -- that appraisal activities

10   were being suspended at Shenandoah before close of     11:42:02

11   market on May 2nd, 2017?

12             Is that your testimony?

13        A.   That's -- that's my recollection, yes.

14        Q.   That's your testimony?

15        A.   That's my recollection, yes.              11:42:11

16        Q.   Under oath?

17        A.   Yes.

18        Q.   And if that's not the case, you would be

19   incorrect; yes?

20        A.   I can double check the dates.  The class    11:42:21

21   period ended on May 2nd.  Conoco announced the day

22   before Anadarko announced suspension that it was

23   writing off its investments in Shenandoah.  So I

24   believe that's the day before.  May 2nd, May 3rd.

25   I -- you know, I -- I'd have to relook.              11:42:39
```

Page 37

1          Q.    So your testimony under oath is that

2     ConocoPhillips disclosed to the market that Anadarko

3     was suspending appraisal activities at Shenandoah

4     before Anadarko did?

5          A.    Conoco announced it was writing off its          11:42:56

6     investment in -- in Shenandoah.  And then my

7     recollection is the next day, Anadarko announced it

8     was suspending activities at Shenandoah.

9          Q.    So -- so, Mr. Keller, I'd like for you

10    just to think on the question that I'm asking.          11:43:11

11         A.    Yeah.

12         Q.    Focus my question and answer my question.

13               Okay.  So my question is very simple.  It

14    is that are you opining that the market knew

15    Anadarko was suspending appraisal activities at          11:43:23

16    Shenandoah before Anadarko disclosed that post

17    market close on May 2nd, 2017?

18         A.    The market knew that a 30 percent working

19    interest owner in the field had written it off.  So,

20    yes, I would say the market knew the before Anadarko     11:43:42

21    announced that Conoco had written off its investment

22    in Shenandoah.

23         Q.    So your testimony is that Conoco wrote off

24    its entire Shenandoah investment before Anadarko

25    announced it was suspending appraisal activities at      11:43:54

Page 38

1    Shenandoah?

2         A.   It -- it -- the next day, that's correct.

3         Q.   And if you're incorrect, then your opinion

4    would also be incorrect; yes?

5              MR. GRUENSTEIN:  Objection.            11:44:09

6              THE WITNESS:  I -- I don't think that

7    differentiation is material.  It's a matter of

8    12 hours one way or the other.  Conoco announced and

9    Anoco suspe- -- and Anadarko suspended.

10   BY MS. JENSEN:                                  11:44:27

11        Q.   In this case are you offering an opinion

12   on loss causation?

13        A.   Not as such, no.

14        Q.   Are you offering an opinion on damages?

15        A.   No.                                   11:44:44

16        Q.   Did you receive any inside information

17   about Shenandoah during the class period from

18   Anadarko or any of the partners?

19        A.   I did not, no.

20        Q.   Were you an investor at Anadarko during  11:45:05

21   the class period?

22        A.   I was not.

23        Q.   Any other Shenandoah partner?

24        A.   I was not, no.

25        Q.   Did you follow Shenandoah at the time?   11:45:15

                                            Page 39

1          A.    I followed developments, yes.

2          Q.    And how did you do so?

3          A.    Again, I ran the energy group at a large

4    bank, and so as a result I followed developments in

5    the industry.  From a macro standpoint, pricing          11:45:31

6    trends, and from a development standpoint, emerging

7    trends and emerging research place [verbatim].

8          Q.    And during what time frame?

9          A.    During my entire period at the Bank of

10   New York.  So from 1998 through of May of 2014.          11:45:48

11         Q.    So you followed it through May of 2014; is

12   that right?

13         A.    Well, I said during my period at the bank.

14   I continue to follow it.  I -- I still do energy

15   consulting work, so I -- I continue to follow the        11:46:03

16   industry, yes.

17         Q.    And how did you follow it after May of

18   2014?

19         A.    I look at press releases.  I follow

20   common -- I've got a screen of common stock prices       11:46:15

21   of major oil and gas companies to see developments.

22   I dial into investor calls for major oil companies.

23         Q.    So were you on any earnings calls for

24   Anadarko relating --

25         A.    I don't --

                                                    Page 40

```
 1          Q.    -- to Shenandoah?

 2                (Simultaneous speaking.)

 3                (Interruption in audio/video.)

 4                THE COURT REPORTER:  I'm sorry --

 5                THE WITNESS:  I do not --

 6                THE COURT REPORTER:  Wait.  Mr. Keller, if

 7    you can wait for the full question.  I didn't get

 8    it, please.

 9                THE WITNESS:  Sure.  Sorry.

10                I don't believe that I dialled into any    11:46:43

11    Anadarko earnings calls during this period, no.

12    BY MS. JENSEN:

13          Q.   Anything else that you did to follow

14    Shenandoah?

15          A.   I have a number of screens that give me     11:46:59

16    updates on the industry, a -- a number of investment

17    banks I get to research, and entities like S&P

18    Global which I subscribe to that I get industry

19    updates and flash briefings for major developments.

20          Q.   And which briefings did you get that        11:47:24

21    related to Shenandoah?

22          A.   I -- I couldn't recall any specific

23    briefing on Shenandoah.  Again, it was one field in

24    a big company with multiple prospects around the

25    globe.                                                 11:47:39
```

Page 41

1      Q.    So you don't recall any briefings about

2   Shenandoah?

3      A.    I recall knowing of the Shenandoah

4   discovery.  But, again, I don't think it was ever

5   more than, you know, a percent or two of Anadarko.      11:47:51

6          So I didn't follow it on that level of

7   granularity.  I just looked at, you know, are there

8   emerging trends in the deepwater Gulf that could be

9   interesting.

10     Q.    Have you ever been an investor in             11:48:04

11  Anadarko?

12     A.    I was many years prior to this.  At the

13  Bank of New York, division heads we're not allowed

14  to own individual stocks.

15          So I -- you know, certainly from the time     11:48:18

16  I started running the energy group, I -- I had to

17  get rid of any individual stockholdings.

18          So if I had owned Anadarko, it would have

19  been before 2003 or '4.

20     Q.    How about Occidental stock?                   11:48:31

21     A.    No, I never owned Occidental stock.

22     Q.    And marathon?

23     A.    Never -- Marathon was a banking client.  I

24  never owned equity in them, no.

25     Q.    Cobalt?                                       11:48:40

                                                   Page 42

```
 1        A.   No.

 2        Q.   Your report says that you managed

 3   significant investments offshore in the Gulf of

 4   Mexico.

 5        A.   That is correct.                        11:49:07

 6        Q.   Which -- which offshore projects --

 7        A.   Offshore -- Offshore Gulf of Mexico.  I

 8   bought a number of properties on behalf of

 9   principally General Motors and various of its

10   pension plans.  So there were multiple fields in   11:49:21

11   the -- in the Gulf of Mexico.

12        Q.   What fields?

13        A.   Off the top of my head, Chandeleur Sound,

14   which is a field we bought from --

15             THE COURT REPORTER:  I'm sorry, Chandler?  11:49:37

16   I didn't hear you.

17             THE WITNESS:  Chan- -- Chandeleur,

18   C-H-A-N-D-E-L-E-U-R, Sound, which is a field we

19   bought from -- from Arco on behalf of our

20   institutional clients.                             11:49:43

21             Black Bay Complex, which is a field that

22   we bought from Chevron.  South Bayou Field, again, a

23   Chevron acquisition.  Mystic Bayou Field, also a

24   Chevron acquisition.  And some blocks from W&T

25   Offshore in the Gulf of Mexico.                    11:50:01
```

Page 43

```
 1    BY MS. JENSEN:

 2         Q.    Any others?

 3         A.    To the best of my recollection, those

 4    are -- those are the significant fields.  We also

 5    had a lot of onshore fields for institutional        11:50:14

 6    clients, but General Motors is primarily focused in

 7    the offshore.

 8         Q.    Okay.  In your own words, what was your

 9    assignment in the case?

10         A.    My assignment was to review the complaints  11:50:35

11    as filed and to opine on truth of the market,

12    whether information was out in the market, whether

13    disclosures by Anadarko were truthful or misleading,

14    and also to talk about the general chronology and

15    time frame of deepwater exploration.                 11:51:00

16         Q.    What was in the market at the time is a

17    factual ques- -- question; correct?

18         A.    That is correct, yes.

19         Q.    And your analysis was based on documents

20    in the record?                                       11:51:52

21         A.    That is correct, yes.

22         Q.    Okay.  Mr. Keller, you should be able to

23    see what has been marked as Exhibit 505.

24              (Keller Deposition Exhibit 505 was marked

25               electronically.)                          11:52:47
```

Page 44

```
1                THE WITNESS:  Okay.  Let me call it up

2      here.

3                Open with.  Okay.  It's coming up now.

4                Okay.  This is my report, yes.

5      BY MS. JENSEN:                                   11:53:25

6           Q.   Okay.  And specifically this is your

7      November 9th, 2022 --

8           A.   That is --

9           Q.   -- report?

10               THE COURT REPORTER:  I'm sorry --       11:53:33

11               THE WITNESS:  That is correct.

12               THE COURT REPORTER:  One at a time,

13      please.

14               THE WITNESS:  Yes, my November 9th, 2022,

15      report.                                          11:53:43

16      BY MS. JENSEN:

17           Q.   Okay.  And near the end of this document

18      is Appendix B.

19           A.   Yes.

20           Q.   And that is all the materials that you   11:53:52

21      relied in forming your opinions; correct?

22           A.   That is correct.

23           Q.   And did you personally review all these

24      documents?

25           A.   I believe that I did.  There were a lot of  11:54:07
```

Page 45

1    documents.

2        Q.   So if a document formed the basis for your

3    opinion, you would have listed it in this appendix;

4    correct?

5        A.   That was my intention.  Now, whether out        11:54:26

6    of 548 documents something did not make it, but I

7    cross-referenced what I had reviewed and what was in

8    my files, so I believe this is inclusive, yes.

9        Q.   And did you also cite the documents that

10   you relied on for particular opinions in the           11:54:46

11   relevant section of your report?

12       A.   Yes, the report is heavily footnoted.

13       Q.   In addition to the documents in Appendix

14   B, did you review any other documents?

15       A.   Not that I recall, no.                          11:55:01

16       Q.   So you haven't read any deposition

17   transcripts in this case?

18       A.   Not in formulating this report, no.

19       Q.   And you didn't review any of the internal

20   communications at the company?                          11:55:22

21       A.   Not in formulating this report.  As I

22   mentioned earlier, I'm in -- in process of working

23   on a rebuttal report.

24       Q.   But you didn't review any of the internal

25   communications in forming your opinions in this        11:55:39

Page  46

```
 1    report; correct?
 2         A.    I believe that's correct.
 3         Q.    Did you review the whistleblower
 4    complaint?
 5         A.    I did see the whistleblower complaint,     11:55:51
 6    yes.
 7         Q.    But it's not listed in your Appendix B, so
 8    you didn't consider it in forming your opinions?
 9         A.    I did not.  I -- I retrieved that on my
10    own when I first read the Complaint.                  11:56:06
11         Q.    Besides looking at documents, what, if
12    any, analysis did you perform?
13         A.    The documents helped inform my opinion.
14    An awful of lot what I did was based on 40-plus
15    years of personal experience in this field.          11:56:28
16              So I reviewed documents, but I also relied
17    on my own experiences as a -- as an oil and gas
18    banker and as an oil and gas investor.
19         Q.    Okay.  By my -- my question's a little
20    different.                                            11:56:38
21              Mr. Keller, it's what additional analysis,
22    if any, did you perform?
23         A.    Well, I crossed the reasonableness of --
24    of various of the documents that I read.  So company
25    disclosures versus company investor presentations    11:56:51
```

Page 47

```
1    versus bank/analyst presentations or reports.

2         Q.   You didn't perform an -- an event study;

3    correct?

4         A.   I did not, no.

5         Q.   You didn't perform any other economic        11:57:08

6    analysis?

7         A.   I did not.

8         Q.   You say in your report that you understand

9    "this report will be used, among other ways, in

10   support of Defendants' truth-on-the-market defense."   11:57:18

11            We talked about the truth-on-the-market

12   defense a little bit.

13            What are the other ways that your report

14   will be used?

15        A.   I -- I believe that's it.  I know that        11:57:29

16   Cravath has retained other experts in this case.

17        Q.   But that's not answering my question.

18            You said "among other ways."  What are the

19   "other ways" in which your report will be used?

20        A.   I think truth of the market.  I'm sorry,      11:57:43

21   yeah, I think that's why I was retained.

22        Q.   Okay.  So no other ways that your report

23   will be used, to your knowledge?

24        A.   Not to my knowledge, no.

25        Q.   Mr. Keller, do you agree that for an          11:58:01
```

Page 48

```
 1   opinion to be reliable, it needs to be the product

 2   of a reliable methodology?

 3       A.   I do.

 4       Q.   And a reliable methodology that can be

 5   tested?                                          11:58:12

 6       A.   I do.

 7       Q.   A methodology that can be replicated?

 8       A.   I do.

 9       Q.   Can you cite any peer-reviewed literature

10   that your methodology is based on?               11:58:25

11       A.   Can I cite peer-review method- --

12   literature?  I -- I -- not off the top of my head, I

13   cannot, no.

14       Q.   Have you published any peer-reviewed

15   literature about your methodology on in this case?   11:58:47

16       A.   I have not.

17       Q.   Has your work in this case been subject to

18   peer reviewed?

19       A.   It has been subject reviewed by colleagues

20   of mine at BRG and by the folks at Cravath.  Outside   11:58:55

21   of that, no, no one else has seen this report.

22       Q.   And when you're referring to BRG, you're

23   talking about the staff?

24       A.   That's correct.

25       Q.   The staff that helped you with citations;   11:59:09
```

Page 49

1    correct?

2         A.   More than that.  I had several senior

3    staffers who -- who assisted in this assignment.

4         Q.   And who's that?

5         A.   Eric Ma- -- Madsen, who is a -- a managing    11:59:20

6    director of BRG in -- in Los Angeles.  And Keming

7    Liang, who's a -- an M.D. in China and Los Angeles.

8         Q.   Can you spell their names for the record.

9         A.   Yes.  Keming, K-E-M-I-N-G.  Let me give

10   you the correct spelling of his last name so I don't    11:59:46

11   botch it.  There are three principal people I'm

12   going to re- -- refer you to now.

13              So -- excuse me.  L-I-A-N-G; K-E-M,

14   L-I-A-N-G, Keming.  Eric Madsen, M-A-D-S-E-N.  And

15   the third person, who's sort of intermediate staff    12:00:16

16   level, is a Caroline Iannacone, I-A-N-N-A-C-O-N-E,

17   in our New York office.

18        Q.   And they're all part of your offices;

19   correct?

20        A.   They all are employees of BRG, that's    12:00:38

21   correct, yes.

22        Q.   Now, what tests did you perform to assure

23   yourself that your opinions were correct?

24        A.   I performed multiple tests.  I looked at

25   movements of Anadarko stock price and correlating    12:00:57

Page 50

1    that to movements of West Texas Intermediate Crude,

2    which is a typical metric in looking at E&P company

3    stock prices is to correlate them to underlying

4    commodity prices, which tend to be the most

5    significant driver in equity prices.                    12:01:13

6           I looked at movements in the stock price

7    over time.  So I graphed out Anadarko's underlying

8    equity price from 2009 through 2019.  And then

9    looked at various disclosures during the period that

10   I was examining.                                        12:01:34

11      Q.   And how did that assure yourself that your

12   opinions were correct?

13      A.   Well, a couple of points.  Number one,

14   the -- the graphs of APC stock price versus WTI

15   are -- are very much in sync, i.e., going down as      12:01:52

16   oil prices go down, going up as oil prices recover.

17   I -- I looked at many of the i-banks' analysts

18   covering Anadarko to see if there was any undue

19   concentration in assets, and -- and it -- it is my

20   belief, actually my opinion, that there was no undue    12:02:12

21   concentration.  Anadarko had a large portfolio

22   spread around the globe.  No single asset accounted

23   for a disproportionate share of the company's asset

24   base, and accordingly, a disproportionate share of

25   valuation.  So to me, Anadarko performed the way one

Page 51

```
 1    would expect a large --

 2              THE COURT REPORTER:  I'm sorry.

 3              THE WITNESS:  -- diversified --

 4              THE COURT REPORTER:  Could you slow down?

 5              THE WITNESS:  -- company --

 6              THE COURT REPORTER:  Anadarko performed,

 7    I'm sorry?

 8              THE WITNESS:  The -- the way one would

 9    expect, the way I would expect a large diversified

10    E&P company to perform.

11              THE COURT REPORTER:  I'm going to ask you

12    to slow down, please, just a little bit, sir.  Thank

13    you.

14              THE WITNESS:  I'm sorry.  Yeah, sure.

15    BY MS. JENSEN:

16         Q.   And that -- that goes to your market

17    efficiency opinion?

18         A.   Yes, it does.

19         Q.   Any others?

20         A.   That would be a principal metric, yes.      12:02:50

21         Q.   Any other tests that you performed?

22         A.   As I said, looking at -- at movements if

23    they correlated with disclosures in the marketplace.

24         Q.   And that relates to your market efficiency

25    opinion; correct?                                     12:03:10
```

Page 52

```
 1        A.    It relates to market efficiency and
 2   overlaying that with macro analyses by various
 3   investment banks or consultants.  There was a Wood
 4   Mac report as an example that tries to correlate
 5   which large projects would be economic in the          12:03:28
 6   then-prevailing oil and gas pricing environment.
 7   And it was reasonably bearish in what projects would
 8   go to FID in a $50-a-barrel price environment.
 9        Q.    And where is that cited?
10        A.    I will have to look up that citation.        12:03:46
11   I -- I -- it is cited and it's a July 2016 Wood Mac
12   report and I -- I -- I'm going to have to look at
13   the citation.  I -- I -- I recall it, but I don't
14   have the exact citation at my -- at my hands.
15             Again, a number -- there were a number of    12:04:12
16   reports during this period, all of which are
17   footnoted about, you know, various banks attributing
18   value to Anadarko and to Shen specifically, you
19   know, during this time period that I've got a graph
20   which lists NAV during the time period.  I think it   12:04:34
21   ranged -- Shenandoah ranged from 1 percent to
22   5 percent or something.  It was never a
23   significant -- and this is a graph on page 50.  It
24   was never -- never a significant component of
25   Anadarko's overall net asset value.                    12:04:50
```

Page 53

```
 1        Q.   How -- how much value would 5 percent of

 2   Anadarko's market cap equate to?

 3        A.   Well, Anadarko's market cap varied pretty

 4   significant over this time with the oil and gas

 5   prices.  But obviously if it was -- if it was a -- a    12:05:08

 6   couple billion dollars when it was an $80 billion

 7   market cap, it's -- it's, you know, twelfth or

 8   something.  If it was a couple billion dollars and

 9   it was a $15 million -- billion dollar market cap,

10   it's -- it's obviously more.                            12:05:22

11        But this was never a booked asset.  It was

12   always potential upside.  But clearly, no oil and

13   gas asset ever has any value until an FID is made.

14   So oil on the ground has no value unless there are

15   wells drilled, a platform set, and production          12:05:37

16   commences.  So this was -- by the admission of

17   essentially every analyst, this was potential

18   upside, but there were never booked reserves

19   associated with this field.

20        Q.   So it's --                                    12:05:51

21        A.   Which is the norm.

22        Q.   It's your opinion that they're -- that

23   investors ascribe zero value to Shenandoah; that's

24   your testimony?

25        A.   Hard value, that is correct, it was          12:06:00
```

Page 54

1    potential upside but unquantified.  And multiple

2    statements by company executives of their period

3    said it was too early to tell.  Additional wells

4    needed to be drilled.  It was promising but clearly,

5    no value until you make an FID.                    12:06:18

6        Q.   So your opinion relies or turns on the

7    fact that in your view no investor believed

8    Shenandoah had value for Anadarko; correct?

9        A.   No.

10            MR. GRUENSTEIN:  Objection.              12:06:30

11            THE WITNESS:  That's not correct.  That's

12   not correct.  There was not quantifiable value.

13   There was reason to believe there was upside

14   potential, but it was not a quantified value.

15   BY MS. JENSEN:                                    12:06:41

16       Q.   And -- and your testimony relies on

17   investors agreeing with you; correct?

18            MR. GRUENSTEIN:  Objection.

19            THE WITNESS:  It is -- was the consensus

20   of the street, which is a conglomeration of        12:06:50

21   sophisticated investors.  And it has been my

22   experience in I said -- as I said, 40 years in the

23   business that until you have taken certain steps to

24   meet SEC and SPEE requirements, there are no booked

25   reserves.  There is no asset on the balance sheet  12:07:07

Page 55

```
 1    until certain things take place, and they never took

 2    place in this case.

 3    BY MS. JENSEN:

 4         Q.   In this case you're offering opinion about

 5    what investors in Anadarko common stock understood      12:07:20

 6    about Shenandoah during the class period; correct?

 7         A.   That is correct.

 8         Q.   And in forming that opinion, did you

 9    survey Anadarko investors about what they

10    understood?                                             12:07:33

11         A.   I sur- -- did -- individual investors?  I

12    surveyed analysts who followed the company.  And

13    I --

14         Q.   Did you iss- --  issue --

15         A.   -- talked to individual investors --         12:07:38

16              THE COURT REPORTER:  I'm sorry.

17    BY MS. JENSEN:

18         Q.   Did you iss- -- you issued a survey to

19    analysts?

20         A.   I did not issue a survey to analysts.  I      12:07:47

21    reviewed analyst reports.

22         Q.   Did you survey any Anadarko investors?

23         A.   I did not.

24         Q.   Did you talk to any Anadarko investors?

25         A.   I did not.                                    12:07:59
```

Veritext Legal Solutions
866 299-5127

```
 1        Q.   And you're not claiming to --

 2             MR. GRUENSTEIN:  I don't know if when do

 3    you think a good time to break will be.

 4             MS. JENSEN:  Yeah, so give me a few more

 5    minutes.                                          12:08:17

 6    BY MS. JENSEN:

 7        Q.   Mr. Keller, you don't claim to have any

 8    special powers of mind reading, do you?

 9        A.   I wish I did.  I -- no.

10        Q.   You reference investors up front in       12:08:24

11    your -- well, you reference investors in your

12    report.  But up front you limit that definition to

13    sophisticated and professional; correct?

14        A.   Yes.

15        Q.   And what is your definition of a          12:08:40

16    sophisticated investor?

17        A.   It's an investor who is generally

18    knowledgeable about the way markets works and does a

19    certain level of due diligence.

20        Q.   Is there any peer report -- peer-reviewed 12:08:56

21    literature that you can point me to that supports

22    your definition?

23        A.   Not that I can point you to, no.  This is

24    anecdotal on my experience.

25        Q.   It's just anecdotal -- anecdotal; correct? 12:09:19
```

Page 57

1          A.    That's correct, yes.

2                MS. JENSEN:  Okay.  We can go ahead and

3     take a quick break.

4                THE VIDEOGRAPHER:  Okay.  We're off the

5     record.  It's 12:09 p.m.                        12:09:36

6                (Short recess taken.)

7                THE VIDEOGRAPHER:  We're back on the

8     record.  It's 12:22 p.m.

9     BY MS. JENSEN:

10         Q.    Okay.  Mr. Keller, in your report you also  12:22:52

11    reference professional investors; correct?

12         A.    I -- I don't recall that, but that's

13    entirely possible.

14         Q.    Well, that's how you're -- that's how

15    you're defining investors for purposes of your    12:23:09

16    report; correct?

17         A.    That's a little more granular than I

18    recall, but that could be correct.  I -- I talk

19    about investors, sophisticated investors.  I don't

20    recall using professional investors, but if you say  12:23:32

21    I did, I'm sure I did.

22         Q.    So are your opinions limited to

23    sophisticated investors, then?

24         A.    Not exclusively, no.  I think I may have

25    used those terms interchangeably.  Sophisticated --  12:23:41

                                                    Page 58

```
 1    I don't -- again, I don't recall using professional

 2    investors.  I'm not sure.  That's a term of art, I

 3    guess.

 4          Q.    So they're the same in your mind?

 5          A.    Professional vers- -- investors versus      12:23:49

 6    sophisticated?

 7          Q.    Yes.

 8          A.    Yeah, I mean, I guess I would think a

 9    professional investor is somebody whose only job is

10    investing, whereas an awful lot of us are investors     12:24:01

11    outside of our professional work.  So that's the

12    distinction I would make.

13          Q.    And is there a peer-reviewed definition of

14    what a professional investor is?

15          A.    Not that I'm aware of, no.  I'm using it     12:24:15

16    colloquially.

17          Q.    Colloquially to -- to mean what, someone

18    who works full time investing?

19          A.    Yeah, I -- I would -- in my mind to me, a

20    professional investor would be someone whose job is     12:24:29

21    investing, so an investment manager at a pension

22    fund, an investment manager at a company, as opposed

23    to most investors actually are -- have other jobs

24    and invest their retirement, their -- their, you

25    know, personal assets, but that's not their           12:24:41
```

                                                        Page 59

```
 1    principal employment.

 2         Q.   Okay.  So all professional investors are

 3    not sophisticated investors; correct?

 4         A.   I'd almost turn that on its head.  I would

 5    think -- if you use my definition of a professional    12:25:07

 6    investor as someone who that's their principal job,

 7    I would say those are more likely to be

 8    sophisticated whereas a -- a -- a retail investor on

 9    the street might be less sophisticated.  So I -- I

10    would actually think the opposite.  A professional    12:25:21

11    investor is likely someone who spends the bulk of

12    his or her time in the markets.

13         Q.   So those collapse upon each other, then?

14         A.   I'm not sure what you mean by "collapse

15    upon each other."                                       12:25:35

16         Q.   Well, are all professional investors

17    sophisticated investors?

18         A.   Yes, I -- I think that's -- that's

19    correct.  I think a professional investor is more

20    likely to be sophisticated than a retail investor.    12:25:42

21         Q.   Okay.  So why have two different

22    categories?

23         A.   You know, you raised the question.  I'm

24    not sure -- I'm not sure the point of your question.

25         Q.   So why have two different categories?       12:25:58
```

Page 60

```
 1          A.   I'm -- I -- I'm not certain.  As I said, I

 2    don't recall using professional investors.  You say

 3    I did, so I'm sure I did.  But I -- I'm not sure I

 4    made that distinction or intended to make that

 5    distinction.                                   12:26:17

 6          Q.   So in -- in your mind, your -- your

 7    analysis here is limited to sophisticated investors;

 8    correct?

 9          A.   Yes.

10          Q.   You understand that a class of Anadarko  12:26:27

11    common stock investors has been certified in this

12    case?

13          A.   I do.

14          Q.   And do you understand that two of the

15    Plaintiffs are class representatives?            12:26:35

16          A.   I -- I do.  Yes, I do.

17          Q.   Which -- which Plaintiffs are class reps?

18          A.   Well, the -- when I first got involved,

19    the only named Plaintiffs -- Plaintiff was the

20    Georgia Firefighters' Pension Fund.             12:26:53

21          Q.   When did you get retained?

22          A.   August of 2001 -- 2021.  Excuse me.

23          Q.   Okay.  So it's your testimony that at that

24    point it was only the Georgia Firefighters involved?

25          A.   Well, Georgia Firefighters -- I'm -- I'm   12:27:08
```

Page 61

1    not -- again, I'm not certain the class was

2    certified at that point.  I know there were several

3    motions to certify the class.  My -- all my files

4    list this as Georgia Firefighters' Pension Fund,

5    et al., v Anadarko and the -- and the three named        12:27:24

6    individuals.

7            So I -- I've -- I've always referred to it

8    as the Georgia Firefighters versus Anadarko case.  I

9    know there were class motions later.

10       Q.   So do you know who the class                    12:27:36

11   representatives are in this case?

12       A.   I -- not off -- I can't tell you, no.

13       Q.   Are you including what the class

14   representatives understood when you talk about what

15   investors understood about Shenandoah in your           12:27:59

16   opinion?

17       A.   Yes.  Well, let me clarify.  Initially, as

18   I said, when I first started, it was Georgia

19   Firefighters.  I knew that that was a plaintiff that

20   was an institutional investor and that had asset        12:28:09

21   managers, including at least one oil and gas

22   investment manager.

23       Q.   Have you ever heard of the class

24   representative Norfolk?

25       A.   Can you say that -- can you spell it,          12:28:26

Page 62

1   please.

2        Q.   N-O-R-F-O-L-K.

3        A.   Oh, like the railroad.  I -- I know the

4   rail- -- I know Norfolk.  I don't know -- it could

5   be Norfolk, Virginia.  I -- I'm -- I'm not sure what    12:28:39

6   Norfolk it is.

7        Q.   Okay.  So you're not aware of any class

8   rep in this case that's Norfolk?

9        A.   I'm not.

10       Q.   How about Ironworkers?                          12:28:52

11       A.   I've seen that name.  They're a union, I

12   believe.

13       Q.   And what do you think Ironworkers is in

14   this case?

15       A.   I believe it's a -- a -- a union of -- of      12:29:02

16   ironworkers, a trade union.

17       Q.   Are all class members included in your

18   definition of investors?

19       A.   I -- I can't say that because I don't --

20   as I said, I -- at least I don't recall all class       12:29:24

21   members.  I knew the initial -- initial plaintiff.

22   And I'm not sure I have seen a comprehensive list of

23   all class members.  I know it -- it was a broad

24   class, is my understanding.

25       Q.   What percentage of the class is included       12:29:38

Page 63

1    in your definition of investors?

2         A.   Well, I'm assuming in -- assuming.  Class

3    certification, I would think all of the class

4    members are investors or they wouldn't have been

5    certified as part of this class.  That's an          12:29:53

6    assumption I'm making.

7         Q.   So you're including all class members when

8    you say what investors understood?

9         A.   Yes.

10        Q.   Does your definition of investors include   12:30:03

11   retail investors?

12        A.   It -- it could.  As I said, I don't know

13   the full extent of the class.

14        Q.   Sitting here, you don't know what class

15   has been certified in this case; correct?           12:30:25

16        A.   I don't know the full extent of that

17   class, that's correct, yes.

18        Q.   In your definition of investors, are you

19   including the class representatives' investment

20   managers?                                           12:30:42

21        A.   Am I including them, or am I opining that

22   the investors were -- in fact, received advice and

23   counsel from the investment managers, which, as I --

24   I was formerly an institutional investment manager,

25   so I'm assuming that un- -- unless it's a           12:31:03

                                                         Page 64

1    nondiscretionary account, the investors make

2    decisions with input from the investment managers.

3          But the investment managers, unless

4    they've got discretion, don't make the final

5    decision.                                      12:31:17

6          Q.   So is that a yes or a no?

7          A.   It's I'm not certain.  I don't know

8    whether these asset managers who are -- I -- I have

9    managed both discretionary and nondiscretionary

10   accounts, and there's a significant difference   12:31:33

11   between those two types of accounts.

12         Q.   So you don't know whether the class

13   representatives' investment managers are included in

14   your definition of investors; is that right?

15         A.   If they were discretionary accounts, I   12:31:45

16   would -- I would say they are.  If they're

17   nondiscretionary accounts, I'd say they're not.

18         Q.   But you don't know one way or the other;

19   correct?

20         A.   I -- I don't know.  Yeah, that's correct.   12:31:55

21         Q.   Are you including market commentators that

22   were not investors in your definition of investors?

23         A.   Are you speaking of analysts?

24         Q.   Yes, among others.

25         A.   Did I read -- well, let me just restate   12:32:07

Page 65

1    this.

2            In general, when analysts or i-banks make

3    recommendations, usually at the end of that

4    recommendation there is a disclosure as to whether

5    or not they're currently long in the security that      12:32:25

6    they're recommending or opining on.

7            Did I in every case look at those

8    footnotes to see if the analyst or the i-bank at

9    that time was long or short or just opining, I -- I

10   did not, no.                                            12:32:40

11       Q.   So your answer is, you don't -- you don't

12   know?

13       A.   I -- I could -- I could not say

14   definitively across every one, that's correct, yes.

15       Q.   So as to investors, name all the investors   12:32:47

16   that you intend to include when you say what they

17   understood about Shenandoah.

18       A.   I can't name all the investors.

19       Q.   Okay.  Well, which -- which ones can you

20   name?                                                   12:33:13

21       A.   Well, initially the Georgia Firefighters'

22   Pension Fund, which I -- I would -- again, with --

23   with institutions, I would differentiate between the

24   institution making the investment and the underlying

25   investors, who would be, by my definition, retail      12:33:27

Page 66

```
 1    investors.
 2            So I'd expect that the underlying
 3    investors would know less -- i.e. the retail
 4    investors would know less than -- than the Pension
 5    Fund and/or its asset manager.                    12:33:39
 6        Q.   Okay.  So you named Georgia Firefighters.
 7            Any other investors that you're
 8    including --
 9        A.   That's the name I focused on --
10        Q.   -- as to what they understood?           12:33:48
11            (Simultaneous speaking.)
12            (Interruption in audio/video.)
13            THE COURT REPORTER:  I'm sorry, I didn't
14    hear.
15            THE WITNESS:  Excuse me.                   12:33:54
16            That's the name I fo- -- focused on,
17    that's correct.
18    BY MS. JENSEN:
19        Q.   Right.
20            And that -- that's the only one you -- you  12:33:57
21    can name; correct?
22        A.   At this point, that's correct, yes.
23        Q.   So is it your opinion that all the
24    investors that fall within your definition of
25    sophisticated agree how to interpret information     12:34:13
```

Page 67

```
1    such as an earnings release?
2         A.   Do all investors?  I'd say there are
3    varying levels of expertise in capability.
4         Q.   Okay.  So do sophisticated ex- --
5    sophisticated investors of the same levels of          12:34:34
6    expertise, do they interpret all publicly available
7    information exactly the same?
8         A.   No, not exactly the same.
9         Q.   So what makes you the --
10        A.   There are --                                 12:34:51
11        Q.   -- what makes you an expert in what
12   investors understood?
13        A.   Well, I have banked and invested in this
14   sector for 40 years, so I -- I -- I would say I have
15   a good understanding of what is material or -- or     12:35:01
16   what is germane to an investor and a differentiation
17   between investing in a small single asset or a
18   couple asset sort of entity and investing in a large
19   diversified entity like Anadarko where no one asset
20   is -- is a key driver of asset valuation or of        12:35:22
21   future earnings potential.
22        Q.   And it's your opinion that all
23   sophisticated investors understood information about
24   Anadarko exactly the way you do?
25        A.   Yes.                                         12:35:34
```

Page 68

1        Q.    And if a -- an investor disagrees with

2    you, are they included in the definition of a

3    sophisticated investor in your opinion?

4        A.    I -- I'm certain there are investors who

5    would disagree with me.                          12:35:50

6        Q.    So in -- in that instance, are they

7    included in your definition for purposes of your

8    report?

9        A.    Yes.  There -- there can be sophisticated

10   investors who do not agree with my opinions.  So the   12:35:58

11   answer's yes.

12       Q.    Do you know any guidelines followed by

13   securities analysts when writing reports?

14       A.    Do I know guidelines?

15       Q.    Yes.                                     12:36:19

16       A.    Yeah.  I mean, I -- as I've said, I was a

17   banker for many years.  I know -- I know

18   expectations about -- about -- about truth, about

19   full disclosure, about, you know, ever since SEC

20   adopted FT, the requirement to fully disclose     12:36:34

21   information and to disclose information that's

22   truthful.

23       Q.    Any other guidelines?

24       A.    Certainly when any investor or when I

25   personally as a banker looked at companies, one   12:36:49

Page 69

```
1    tends to focus on significant value drivers on -- on
2    materiality.  Not in the legal definition of
3    materiality, but a -- a company such as Anadarko has
4    got literally thousands of wells around the globe,
5    some of which are germane and material to an              12:37:07
6    investor.
7            But the level of granularity is not -- you
8    wouldn't analyze assets at that level of
9    granularity.  It would be impossible.
10       Q.   So are you aware of guidelines regarding       12:37:25
11   the -- the differentiation between fact and opinion?
12       A.   Yeah.  When -- when I read analyst
13   reports, they will often differentiate and say,
14   "This is my opinion" as opposed -- I mean, they'll
15   state facts and then state an opinion based on those   12:37:44
16   facts.  An opinion is --
17       Q.   Okay.  But my question is different.
18            Are you --
19       A.   Okay.
20       Q.   -- aware of any guidelines for securities     12:37:48
21   analysts when writing reports with respect to
22   opinion versus fact?
23       A.   Only that there's truthful disclosure.
24   Can I can cite specific guidelines, I cannot.
25       Q.   But you -- sitting here right now, you        12:38:06
```

Page 70

1    can't -- you can't cite any guideline?

2         A.    That's correct.  That's correct.

3         Q.    It's important to distinguish between fact

4    and opinions; correct?

5         A.    Absolutely.                              12:38:17

6         Q.    And why is that?

7         A.    Everyone's entitled to their own opinion,

8    but you're not entitled to your own facts.  Facts

9    are facts.  They're demonstrable.  They're

10   verifiable.  They're consistent, if you will.      12:38:31

11             Opinions are colored by subjective --

12   subjective views.

13        Q.    In your report, do you ever cite an

14   analyst's opinion as opposed to fact as evidence of

15   what investors understood?                          12:38:48

16        A.    Opinions are driven by facts, so an

17   analyst would look at the fact situation.

18             For -- for instance, an analyst's

19   recommendation -- typical buy/sell/hold

20   recommendations, those are opinions driven by the  12:39:00

21   underlying facts.

22             So you can and often do have various banks

23   or analysts -- one analyst having a buy on a stock,

24   somebody else having a sell, somebody else having a

25   hold.  Those buy, sell, or holds are opinions that 12:39:17

Page 71

1    are based on a synthesis of the underlying facts.

2        Q.   And so you cited analyst opinions as

3    opposed to fact as evidence of what investors

4    understood in your report; correct?

5        A.   Both, that's correct, yes.                    12:39:30

6        Q.   How did you decide which analyst reports

7    to cite and which not to cite?

8        A.   I -- as I've said, I think I looked at

9    something like 400 analyst opinions.  I looked at

10   ones that seemed to be more specific.               12:39:44

11          I did a search based on Shenandoah because

12   an awful lot of the analyst reports I looked at were

13   higher level, didn't talk about specific assets,

14   and -- and, accordingly, were not as significant to

15   me in forming my opinions.                           12:39:57

16          Some of the other analysts were

17   specifically focused on value attributable to the

18   Shenandoah Basin or the Shenandoah Field or the Gulf

19   of Mexico in general, since Anadarko had such a

20   broad range of assets.                               12:40:13

21       Q.   And did you include in your report

22   analysts who disagreed with your opinions?

23       A.   I -- I -- I would say I did not find

24   analysts who significantly disagreed with my

25   opinions.                                            12:40:29

Page 72

```
 1              Over the course of this class period,
 2    Anadarko made repeated observations that more work
 3    needed to be done, that they weren't near FID yet.
 4              And analysts, did they refine their
 5    valuations, they did because that's why one drills    12:40:44
 6    wells, to get information.  One never drills an
 7    initial well in search of a dry hole.  So those
 8    migrated over time, but based on the facts as
 9    presented by drilling.
10         Q.   So it's your -- your testimony that no       12:40:57
11    analysts disagree with the opinions in your report?
12         A.   I would say that's correct, yes.
13         Q.   And if you're not correct, then your
14    opinion would be wrong; right?
15              MR. GRUENSTEIN:  Objection.               12:41:12
16              THE WITNESS:  I don't think that's true.
17    It would depend on the specifics of the analysts
18    that you're talking about.
19    BY MS. JENSEN:
20         Q.   Would you consider changing your opinion    12:41:21
21    if there was an analyst who disagreed with your
22    respective opinions?
23         A.   It would be very unlikely because as I
24    mentioned at the outset, Shenandoah was never a
25    major portion of Anadarko's asset valuation.          12:41:34
```

Page 73

1        Q.   So you wouldn't change your opinion if

2    there was evidence that analysts disagreed with you?

3        A.   I would say the analysts would have to

4    demonstrate to me that that disagreement was

5    significant and would -- would have driven value of      12:41:55

6    their APC stock, and I don't believe that was ever

7    the case.

8        Q.   So you're saying that you would not change

9    your opinion; is that right?

10            MR. GRUENSTEIN:  Objection.                      12:42:07

11            THE WITNESS:  I'm not aware of any

12   information that would make me change my opinion.

13   BY MS. JENSEN:

14       Q.   Did you cite any sophisticated investors

15   in your report?                                          12:42:24

16       A.   I would say the majority of the analysts

17   that I reference or that I either footnoted or

18   referenced were, in fact, sophisticated investors.

19   There was large, broadly diversified street

20   involvement in Anadarko and in the sector as a           12:42:46

21   whole.

22       Q.   So are you saying that all the analysts

23   that you cited in your report were sophisticated

24   investors?

25       A.   I would say that's true.                        12:42:55

                                                    Page 74

```
 1          Q.   And so -- and you know for a fact that

 2     they were investors; is that right?

 3          A.   No.  I've said earlier to you, I did not

 4     review the -- every footnote to every analyst report

 5     to see if at the time that report was issued, the        12:43:09

 6     analyst at the bank was long or short in a security.

 7          Q.   So sitting here, you don't know one way or

 8     the other?

 9          A.   Some were long, and some were -- some were

10     not invested.                                            12:43:23

11          Q.   You can't --

12          A.   But can I --

13          Q.   You can't name --

14          A.   No, I --

15          Q.   -- any sitting here?                           12:43:26

16          A.   No.

17          Q.   So to characterize an understanding as

18     shared by investors, you needed every possible piece

19     of information to inform your decision; right?

20          A.   I needed every relevant piece of              12:43:39

21     information.  That's correct.

22          Q.   And you already testified that you did not

23     survey investors; correct?

24          A.   I did not survey investors.

25          Q.   And you did not includes all the news         12:43:54
```

Page 75

```
 1    reports during the relevant time; correct?
 2         A.   When you say -- certainly I could not have
 3    included all the news reports.  I did a keyword
 4    search for Shenandoah, for Anadarko, for Gulf of
 5    Mexico.  There were thousands of things that did not    12:44:12
 6    reference any of those three items.
 7         Q.   When you say "keyword search," where did
 8    you do -- or I guess across what body of documents
 9    did you do such a search?
10         A.   I -- I did searches in general.  On the       12:44:25
11    internet my team did searches through -- through
12    typical search sites, LexisNexis and others looking
13    for hits, S&P, Moody's, looking for hits on
14    Shenandoah and Anadarko.
15         Q.   Did you search Bloomberg?                      12:44:42
16         A.   Yes.
17         Q.   And you're aware, then, that there were
18    5,000 media accounts on Bloomberg during the class
19    period about Anadarko?
20         A.   5,000 media accounts?                          12:44:55
21         Q.   Yeah.
22         A.   I -- I -- I couldn't say whether that's
23    true or not.
24         Q.   You didn't review 5,000 media accounts;
25    correct?                                                 12:45:02
```

Page 76

```
 1          A.   I certainly -- I certainly did not, no.

 2          Q.   And you'd need to review all the analyst

 3     reports to inform your decision as well; correct?

 4          A.   I would not say all of the analyst

 5     reports.  That's likely a physical impossibility.    12:45:18

 6     I -- I reviewed many analyst reports.

 7          Q.   How many?

 8          A.   Hundreds.

 9          Q.   Can you be more specific?

10          A.   Not -- not without going back and looking   12:45:31

11     at notes, no.

12          Q.   And you're aware --

13          A.   I think my --

14          Q.   You're aware that --

15          A.   I'm sorry.                                   12:45:37

16          Q.   -- there were over a thousand reports

17     during the class period?

18          A.   Does not surprise me.

19          Q.   But you -- you did not read all of those

20     reports; correct?                                     12:45:45

21          A.   I did not, no.

22          Q.   You reviewed reports from 30 analysts?

23          A.   Give or take, yes.

24          Q.   Are you aware of how many analysts were

25     covering Anadarko during the class period?            12:45:58
```

Page 77

1      A.   I'm not aware of how many.  I am aware

2  that when you say "analysts," that would run the

3  gamut from people like Goldman Sachs to smaller

4  shops like Seeking Alpha that -- that are not

5  particularly either credible or have broad exposure.   12:46:15

6  So when I look at the major i-banks, they would tend

7  to have sector-specific analysts working in the oil

8  and gas business, and to me that makes them more

9  credible because they have technical experience and

10  background.                                          12:46:32

11      Q.   So some analysts you decided were not

12  credible; correct?

13      A.   Some analysts I didn't attempt to review

14  because I didn't view them as having particular

15  insights into the market, that's correct.           12:46:44

16      Q.   And how did you determine whether they had

17  insights into the market?

18      A.   There are certain banks that have

19  traditionally been big players in the oil and gas

20  sector.  I know they have analysts who follow        12:46:57

21  companies closely.  I know they have broad pools of

22  assets that they manage.  And then there are small

23  boutique shops that tend to be much smaller but tend

24  to be industry focused.

25           So there have always been in Denver and in   12:47:11

Page 78

1    Houston and in New York some smaller investment

2    advisors or asset managers or analysts who

3    exclusively focus on the E&P business.  So it's

4    looking at credentials and looking at history.

5         Q.   Okay.  But you -- you decided whether      12:47:30

6    you -- you found an an- -- a particular analyst to

7    be credi- -- credible; correct?

8         A.   Yeah.  I -- I would say -- I would say

9    that's correct.

10        Q.   Did you follow any authoritative source in   12:47:43

11   determining which analysts were credible and which

12   weren't?

13        A.   I would say not an authoritative source.

14   It's based on my experience over decades in the

15   business --                                            12:47:58

16        Q.   So --

17        A.   -- who's a good coverage, yeah.

18        Q.   So -- right.

19             So and "good coverage" is a subjective

20   term; correct?                                         12:48:01

21        A.   That is very -- definitely subjective,

22   yes.

23        Q.   And are you aware that there were some

24   40-odd analysts covering Anadarko during the time?

25        A.   Yes.                                         12:48:19

                                                   Page 79

1        Q.    And that -- and there were other analysts

2    that covered other Shenandoah partners?

3        A.    Yes, that's correct.

4        Q.    So you did not review analyst reports by

5    all the analysts that were covering Anadarko or the        12:48:33

6    partners; correct?

7        A.    I'm sure I did not review every single

8    analyst report, that's correct.

9        Q.    Did you review all the documents that were

10   produced by investment managers in this case?            12:48:51

11       A.    I'm certain that I did not.

12       Q.    Did you review all the documents produced

13   by the plaintiffs in this case?

14       A.    Again, I'm quite certain I did not.  I

15   reviewed documents that were presented to me by           12:49:09

16   counsel for the defendants.  And my team and I

17   sourced additional documents.  But I couldn't tell

18   you I reviewed everything that was in the mark- --

19   everything that was out there, no.

20       Q.    And did you -- you personally search          12:49:30

21   documents in the production database in the case?

22       A.    I did, yes.

23       Q.    And which documents did you review in that

24   database?

25       A.    To the best of my knowledge, the -- the        12:49:42

Page 80

```
 1    list in Appendix B is complete list of the documents
 2    that I reviewed and relied upon.  There were
 3    documents that I opened and found to be not focused
 4    on Anadarko or Shenandoah.  It's not uncommon for
 5    the big banks to issue a general industry update        12:50:02
 6    that had nothing specific about Anadarko or about
 7    Shenandoah.  And those I did not spend any time on.
 8         Q.   So if a particular document didn't have
 9    any specific reference to Shenandoah, it was not
10    relevant to your analysis; correct?                     12:50:15
11         A.   I'd only caveat that -- that by saying if
12    it listed the author's then-prevailing price deck, I
13    may have looked at Goldman's price deck for 2016
14    even though it didn't reference Anadarko or
15    Shenandoah because that would be a macro driver.        12:50:37
16         Q.   Any others other than the Goldman's price
17    deck for 2016?
18         A.   Well, yes.  I mean, as I said, as I opened
19    documents, if I saw anything that looked germane to
20    me about the macro environment, I would look at it      12:50:52
21    even if -- even if it didn't reference Anadarko or
22    Shenandoah.  In general, you know, I -- I used to
23    keep pretty close tabs on what major bank's price
24    decks were as they'd be updated quarterly or
25    semiannual.  So in most cases I kind of had a sense     12:51:12
```

Page 81

```
 1    of what the street's emphasis on the oil and gas

 2    prices was or what the NYMEX features were for --

 3    for oil and gas prices going forward.

 4         Q.   You're -- you're referencing oil prices;

 5    right?                                          12:51:23

 6         A.   Oil and gas prices, that's correct, yes.

 7         Q.   So for the -- the analysts, are you aware

 8    that there were approximately 20,000 documents

 9    totaling over 200,000 pages in this case?

10         A.   It does not surprise me.              12:51:41

11         Q.   You reviewed, as you said, only a few

12    hun- -- only a few hundred; correct?

13         A.   That is correct, yes.

14         Q.   Okay.  Sitting here, can you name the

15    investment managers for the class representatives?  12:52:22

16         A.   I am aware that Fidelity was an investment

17    manager.  I believe Janus Henderson was an

18    investment manager.  Those are the two names that

19    come to mind without going back and looking.

20         Q.   Who was Fidelity an investment manager   12:52:39

21    for?

22         A.   I believe Fidelity was investment manager

23    for the Georgia Firefighters' Pension Fund.

24         Q.   And Georgia Firefighters is not a class

25    representative in this case; correct?            12:52:49
```

Page 82

```
 1        A.    That, I can't answer.  I thought they

 2   were.  They were initially.  So if they were removed

 3   later, it's --

 4        Q.    So that's your -- your testimony is that

 5   Georgia Firefighters was appointed as a class          12:53:03

 6   representative in this case by the Court?

 7        A.    They were the initial plaintiff is my

 8   understanding.  I don't have a list of the final

 9   class representatives.  So I can't answer that.

10        Q.    And so besides Janus, what other           12:53:22

11   investment managers for the class representatives

12   are you aware of?

13        A.    Well, I -- I -- I'd say I can't answer

14   that question since I just said -- said to you I

15   couldn't tell you the full list of class              12:53:38

16   representatives.  So for me to tell who represented

17   a group, I can't identify, you know, that's

18   meaningful.

19        Q.    Okay.  All the opinions you intend to

20   offer in this case are set forth in your summary of    12:54:00

21   opinions in paragraph 16 of your report; correct?

22        A.    That is correct, yes.

23        Q.    You aren't opining that the defendants did

24   not engage in a fraudulent scheme; correct?

25        A.    I'm not opining on a negative, no.  My --   12:54:22
```

Page 83

1    my opinion is that the information that was out

2    there was not misleading.  Maybe they're flip sides

3    of the same coin.

4         Q.   So let's step back.  The statements,

5    beyond the statements, are you opining that the          12:54:42

6    defendants did not engage in a fraudulent scheme in

7    this case?

8         A.   Yes.  I don't believe there was a

9    fraudulent sche- -- scheme.

10        Q.   And are you opining that defendants did       12:54:52

11   not engage in any deceptive business practices?

12        A.   Yes.

13        Q.   As to the allegedly misleading statements,

14   are all of the statements you intend to opine on

15   included in your report?                                 12:55:13

16             MR. GRUENSTEIN:  Objection.

17             THE WITNESS:  With -- with the caveat

18   that, as I mentioned earlier, I'm in the process of

19   compiling a rebuttal report which will address other

20   issues.                                                  12:55:33

21   BY MS. JENSEN:

22        Q.   So let's just focus on your report.

23        A.   Right, right.

24        Q.   So the -- for purposes of your

25   November 9th, 2022, report --                            12:55:37

Page 84

1        A.    Yes.

2        Q.    -- all of the allegedly misleading

3   statements that you opine on are contained within

4   your report; correct?

5        A.    That is correct.                          12:55:47

6        Q.    So fair to say, then, that you're not

7   offering an opinion about the risk factor statements

8   that are alleged to be misleading?

9        A.    My opinion is that the risk -- risks

10  involved in Shenandoah were fully disclosed.          12:56:08

11       Q.    But that's not my question, Mr. Keller.

12  Just focus on my question.

13            So the allegedly misleading risk factor

14  statements, are you opining on that as part of your

15  report?                                               12:56:26

16       A.    I do not believe there were risk

17  statements, that's correct -- I -- that there were

18  misleading risk statements.

19       Q.    Okay.  So show me in your report where you

20  address whether or not the risk factor statements    12:56:35

21  were misleading.

22       A.    Without going to a specific page, after

23  every well, Anadarko clearly stated that additional

24  appraisal activity was necessary, that they were not

25  yet near a point to make an FID, that this was a      12:56:53

Page 85

```
 1   complex reservoir, and they needed more information

 2   before they could move forward.

 3           So I think this is consistent throughout

 4   my report that they needed to confirm the areal

 5   extent of the reservoir, they couldn't proceed to      12:57:08

 6   development yet.  And, again, throughout the class

 7   period.  In 2015, I recall Anadarko disclosing that

 8   they still were seeking a drill ship that had 20,000

 9   psi capability.  So at every well announcement,

10   there was a clear statement that they were not near    12:57:26

11   an FID and additional information had to be

12   developed before they could proceed further.

13           MS. JENSEN:  Move to strike as

14   nonresponsive.

15   BY MS. JENSEN:                                          12:57:39

16       Q.   Mr. Keller, show me in your report where

17   you address the risk factor statements.

18       A.   If you want to go to my -- just flip to

19   paragraph 50, under investors understand that during

20   the appraisal process they create internal resource    12:57:58

21   estimates, that this is a process: exploration well,

22   successful move to first appraisal well, move to

23   second, third, fourth, and fifth in this case.

24       Q.   Mr. Keller, I -- I'm sorry, I'm going to

25   stop you --
```

Page 86

```
 1        A.   Okay.  Okay.

 2        Q.   Because you're not -- you're not

 3   addressing --

 4        A.   Okay.

 5             MR. GRUENSTEIN:  No, no, no.

 6   BY MS. JENSEN:

 7        Q.   -- the question.

 8             MR. GRUENSTEIN:  No, no, no.  You're not

 9   allowed to stop him in the middle of an answer.

10             Mr. Keller, you can finish the answer.    12:58:20

11   Then Rachel can ask a question.

12             THE WITNESS:  I -- I think I finished.

13   You -- go ahead.

14   BY MS. JENSEN:

15        Q.   Okay.                                     12:58:26

16        A.   Direct me a little --

17        Q.   So --

18        A.   -- more clearly.

19        Q.   -- where in paragraph 50 do you recite the

20   risk factor statement?                              12:58:33

21        A.   Let me go back to paragraph 16, then.

22   "appraisal drilling is a high-risk business."

23        Q.   Okay.  So -- so that -- that's your --

24   that -- that's the part of your report that

25   addresses the risk factor statements during the     12:58:58
```

 1    class period?

 2         A.   It's in multiple spots.  I mean, if -- if

 3    you want to give me a minute, I'll -- I'll find us a

 4    more specific citation.  I mean, I've addressed the

 5    allegations and the information provided by          12:59:12

 6    Anadarko.  And --

 7         Q.   Mr. Keller, maybe we can -- maybe we can

 8    do it this way.  If you address the risk factor

 9    statements in your report, it would be there; right?

10         A.   That's correct.                           12:59:33

11         Q.   Okay.  So is it -- is it also fair to say

12    that you are not offering an opinion about the

13    accounting statements in this report?

14         A.   I'm not an accountant, and there's a

15    separate accounting expert.                         12:59:48

16         Q.   And who is that?

17         A.   I -- I don't know that expert.  I've not

18    reviewed that person's report.  I just know there's

19    a separate accounting expert.

20         Q.   Okay.  Turn to paragraph 154.            12:59:59

21         A.   Okay.  Mm-hmm, I'm there.

22              I'm at 154.

23         Q.   Good.  I'm getting there.

24              Okay.  All right.

25              Paragraph 154, you have a list of         13:00:33

                                                          Page 88

1    plaintiffs' alleged omissions here; correct?

2        A.   That's correct, yes.  Yes.

3        Q.   And of these omissions, your report

4    addresses (g), (h), and (l); correct?

5        A.   That's correct.                        13:00:50

6        Q.   And it does not address the other alleged

7    omissions; correct?

8        A.   I believe that's correct.

9        Q.   Now, you opine in your report that

10   investors understood appraisal as a high-risk      13:01:14

11   business; is that right?

12       A.   That's correct.

13       Q.   And what's your basis for opining that all

14   investors understood the business the same way as

15   you set forth in your report?                    13:01:27

16       A.   Drilling the well in almost 6,000 feet of

17   water to 31,000 feet is a well that would have been

18   unimaginable ten years ago.  It is high risk because

19   the simple physics of penetrating zones miles below

20   the earth crust are significant.  Anadarko had      13:01:49

21   disclosed many times that we needed advances in

22   technology.  20,000 psi blowout preventer.  So,

23   again, I -- I think any investor in the oil and gas

24   business realizes that drilling is risky, ocean

25   drilling is riskier, and deepwater subsalt drilling  13:02:09

                                         Page 89

1    is even riskier.  So these, to -- to my mind, are

2    well known risks that an investor can and should

3    have been aware of.

4         Q.   Now, how does a sophisticated investor

5    define high risk?                                        13:02:22

6         A.   If you want a specific number, I mean, to

7    me, again, this is my -- my speaking something

8    that's, you know, a 10 to 15 percent probability of

9    success is high risk.  And there's a gradation from

10   drilling into blanket sands where you've got a high     13:02:43

11   probability of completion and commerciality, and

12   then drilling in deepwater untested horizons such as

13   Shenandoah where there are geologic risks.  They're

14   a huge capital risk because this is a, you know,

15   decade-long process, so huge risks associated with      13:02:59

16   drilling, financing, and developing.  This is --

17   this is -- these are risks that to my mind are well

18   known by investors.

19        Q.   So sophisticated investors believed there

20   was a 10 to 15 percent probability of success; is       13:03:12

21   that -- that right?

22        A.   I'm not saying -- I -- I define that as my

23   definition of high risk.  I -- I think a

24   sophisticated investor -- well, let -- let me

25   differentiate this.                                      13:03:25

                                                   Page 90

```
1              None of these investors who were investing

2      in Shenandoah was not a single-asset investment.

3      They were investing in a company where Shenandoah

4      was a very small percentage of the overall company

5      prospects.                                      13:03:42

6              So success at Anadarko or failure was not

7      a key driver.  So if this was a 10 or 20 percent

8      probability of success, it added upside and had some

9      downside risk, but this was not an asset that was

10     key to the company's valuation under any scenario.  13:03:54

11             MS. JENSEN:  So, Mr. Keller, I -- I'm

12     going to move that to strike -- I'm going to move to

13     strike as unresponsive.

14     BY MS. JENSEN:

15         Q.  My question was simply, so do -- so do    13:04:05

16     sophisticated investors believe there was a 10 to 15

17     percent probability of success?

18         A.  I did -- I -- I will not say that.  I will

19     say sophisticated investors understand that

20     deepwater subsalt drilling is a high-risk endeavor.  13:04:16

21         Q.  And so no -- no percentage --

22         A.  I won't put a number on that.

23             (Simultaneous speaking.)

24             (Interruption in audio/video.)

25             THE COURT REPORTER:  I'm sorry.
```

Page 91

```
 1              THE WITNESS:  No.

 2              THE COURT REPORTER:  Wait.  One -- can we

 3    slow down a little bit?  I'm getting talking over.

 4    BY MS. JENSEN:

 5         Q.   So there's no percentage that you can put    13:04:26

 6    on that; right?

 7         A.   I would say it would vary by investor.

 8         Q.   And some investors have different

 9    appetites for risk; isn't that right?

10         A.   That's absolutely true.                      13:04:45

11         Q.   So some buy while others sell?

12         A.   It's always the case, yes.

13         Q.   You ever heard, the phrase, "high risk

14    equals high reward"?

15         A.   I have.                                      13:04:56

16         Q.   So when the risk gets high, the potential

17    reward is also high; correct?

18         A.   The potential reward, that's the key,

19    potential.

20         Q.   So fair to say that an investor would want  13:05:05

21    to be compensated for the high risk so the potential

22    reward is also high?

23         A.   I would be a little more focused than

24    that.  The investor is buying a -- a derivative

25    instrument, a common stock in a big company.  I       13:05:22
```

Page 92

```
 1    would say the company would expect that.  The hurdle

 2    rate for something like this, at the company level

 3    [verbatim].  And it's the company investing the

 4    money would be higher.  Anadarko's invested money in

 5    Shenandoah.  The investors are investing money in        13:05:50

 6    Anadarko common stock.  Those are two very different

 7    sort of risk paradigms.

 8         Q.   And who is in a better position to assess

 9    the risk, Anadarko or the investor?

10         A.   Anadarko.                                       13:05:48

11         Q.   And when it's risky, it's even important

12    to have accurate information about what those risks

13    are; correct?

14         A.   Absolutely.

15         Q.   And, again, the operator is in a better         13:05:57

16    position than the investors to know what those risks

17    are?

18         A.   That's correct.

19         Q.   Now, your report cites hurdle rates for

20    deepwater oil of 18 percent.  So just using that as       13:06:10

21    a -- in a hypothetical, if Anadarko was to invest 1

22    billion, it would expect to earn at least 150

23    million to $180 million each year in profits?

24         A.   Well, it's not a straight line.  Oil and

25    gas production is never a straight line.  Investment      13:06:31
```

Page 93

```
 1    precedes revenues by as much as a decade.  So it's

 2    not -- the calculation's a little bit more complex

 3    than that.

 4         Q.   But the point remains that Anadarko would

 5    expect to receive a profit on that investment;        13:06:45

 6    correct?

 7         A.   If your hurdle was 18 percent, you'd

 8    assu- -- you would assume, or it's axiomatic that

 9    the internal rate of return on that project is

10    18 percent, that's correct.  It's not straight line,  13:07:01

11    but that is correct.  The math is correct.

12              MS. JENSEN:  Okay.  Why don't we go ahead

13    and take a quick break.

14              THE VIDEOGRAPHER:  All right.  We're off

15    the record.  It's 1:07 p.m.                           13:07:23

16              (Short recess taken.)

17              THE VIDEOGRAPHER:  We're back on the

18    record.  It's 1:28 p.m.

19    BY MS. JENSEN:

20         Q.   Okay.  Mr. Keller, would you please turn    13:28:58

21    to page 50 of your report.

22         A.   Yes, I will.

23              Yes.

24         Q.   Okay.  And there's a figure eight here;

25    correct?                                              13:29:17
```

Page 94

```
 1        A.    That's correct.

 2        Q.    And the figure eight is a portion of

 3   Anadarko's valuation attributed to Shenandoah; is

 4   that right?

 5        A.    That is correct.                      13:29:23

 6        Q.    Now, did you include all analysts and

 7   investment managers who attributed a portion of

 8   Anadarko's valuation to Shenandoah in this figure?

 9        A.    I believe I did.  I know there was some

10   that attributed no value to Shenandoah.          13:29:41

11        Q.    So my question is, did you include all of

12   them that attributed a portion of Anadarko's

13   valuation to Shenandoah?

14        A.    All that I was aware of, that's correct.

15        Q.    Now, you do have references to Credit     13:29:56

16   Suisse in your report; correct?

17        A.    Yes, I do.

18        Q.    And Credit Suisse also attributed a

19   portion of Anadarko's valuation to Shenandoah; is

20   that correct?                                    13:30:10

21        A.    That -- that could be correct, yes.

22        Q.    Oh.

23        A.    I don't -- I don't recall.

24        Q.    You also mention Capital One in your

25   report?                                          13:30:16
```

Page 95

1          A.    I do.

2          Q.    And Capital One also attributed a portion

3     of Anadarko's valuation to Shenandoah; correct?

4          A.    If -- if you say so?

5          Q.    So you don't know whether this list is          13:30:27

6     complete; is that right?

7          A.    It -- it is possible that there are

8     analysts that I did not capture, that's correct,

9     yes.

10         Q.    Okay.  Now, did you look at the investment       13:30:40

11    managers in the case to see if they attributed a

12    portion of Anadarko's valuation to Shenandoah?

13         A.    As I mentioned to you, I knew that

14    Fidelity was an asset manager.  I did not look

15    specifically at asset managers, no.  I just looked     13:30:59

16    at the broader universe.

17         Q.    Okay.  And you're -- you're aware that

18    Fidelity is not an investment manager for one of the

19    class representatives; correct?

20         A.    I -- I am after you told me, yes.              13:31:09

21         Q.    Okay.  You don't mention Sar- -- Sarasin

22    here; correct?

23         A.    Not that I recall, no.

24         Q.    Okay.  Do you have any reason to doubt

25    that class representative Norfolk's investment           13:31:18

                                                          Page 96

```
1    manager, Sarasin, had Shenandoah in their NAV at

2    2.28 billion or $4 per share as of April 2 -- 2017?

3         A.   If -- if you say so, I'll take your word

4    for it.  I -- I don't know that.

5         Q.   You have no reason to doubt that; correct?   13:31:42

6         A.   No, no.  I believe you're telling me the

7    truth.

8         Q.   In fact, you don't mention Sarasin

9    anywhere in your report; do you?

10        A.   I don't recall that I do.  I don't believe   13:32:02

11   I do, no.

12        Q.   And you also didn't include Lazard?

13        A.   Lazard.

14        Q.   Lazard, thank you.

15        A.   At all or on this graph?  I don't have      13:32:16

16   them on this graph, certainly.

17        Q.   Do you mention them at all throughout your

18   report?

19        A.   I'm very particular with Lazard, and I --

20   I can't tell you for sure whether I mention then at   13:32:29

21   all or not.  They're certainly a major bank.

22        Q.   And so, you do note Janus Henderson here

23   under the -- under this figure eight.  And you note

24   that it "invested on the Anadarko based on its

25   overall business, not any single field."  [As read]   13:32:47
```

Page 97

1    Correct?

2         A.   That's correct.  That is correct.

3         Q.   So Anadarko's business is confined to the

4    oil industry; correct?

5         A.   Yes, it is, yeah.                        13:32:56

6         Q.   Yeah.  So its assets are primarily oil

7    fields?

8         A.   They are primarily oil and gas fields;

9    that's correct.

10        Q.   And --                                   13:33:03

11        A.   And associated production facilities,

12   yeah.

13        Q.   And one of those assets, oil fields during

14   the class period, included Shenandoah; correct?

15        A.   No, one of those prospects included        13:33:14

16   Shenandoah.  It was not an oil field because it was

17   not in production.  It was not developed.

18        Q.   It was one of the assets of the Anadarko

19   at the time; correct?

20        A.   It was a prospect; that's correct.         13:33:25

21        Q.   It was an asset at the time; correct?

22        A.   I'm not trying to split hairs, but they

23   had capitalized costs related to Anadarko -- or

24   excuse me, related to Shenandoah.  There were no

25   reserves related to Shenandoah.  There were no        13:33:41

Page 98

```
 1    facilities related to Shenandoah.  There was
 2    leasehold acquisition cost, G and G cost, and
 3    drilling cost.  So yes, an asset, yes, okay, fine.
 4         Q.   Now, you opine that investors did not
 5    understand Anadarko's pre-class period statements as   13:34:02
 6    a resource estimate for Shen; is that correct?
 7         A.   That is correct.
 8         Q.   And what is your basis for opining that
 9    all investors understood the statements the same way
10    as you did?                                            13:34:16
11         A.   Well, on two things.  Number one,
12    Anadarko, as a matter of process, did not disclose
13    resource ranges.  It disclosed net pay when it drove
14    wells.  So it did not disclose resource ranges.  And
15    in many cases throughout this long process from 2009   13:34:36
16    to 2017, various representatives made it clear that
17    they needed additional information before they could
18    proceed to develop, which is a precursor to booking
19    assets.
20         Q.   So that's your basis for opining that all   13:34:55
21    investors understood the statements the same way as
22    you did?
23         A.   Can you clarify that again if you would,
24    please.
25         Q.   Is that -- are there any other bases for    13:35:07
```

Page 99

```
 1    saying that all investors understood the statements

 2    the same way you did?

 3         A.   In totality, I would say that's true.  Any

 4    one individual statement could people have

 5    interpreted it differently, yes, but I think the      13:35:24

 6    totality of the statements is supportive of my

 7    opinions.

 8         Q.   And you didn't survey any investors;

 9    correct?

10         A.   That is correct.                            13:35:34

11         Q.   And you didn't speak to any investors;

12    correct?

13         A.   That is -- that is correct.

14         Q.   Now, as part of this opinion, you say that

15    Anadarko consistently and properly disclosed          13:35:39

16    different aspects of the appraisal; is that correct?

17         A.   That is correct.

18         Q.   And off -- are you offering a legal

19    opinion about the sufficiency of Anadarko's

20    disclosures about Shenandoah?                         13:35:53

21         A.   I'm not offering a legal opinion, no.

22         Q.   Does it matter what the company knew

23    internally to determine whether its public

24    statements were proper?

25         A.   Does -- does it matter?                     13:36:05
```

Page 100

1        Q.    Yes.

2        A.    I'm not sure -- I'm not sure what your

3   question is getting at.

4        Q.    You don't understand the question?

5        A.    No, I don't.                              13:36:15

6        Q.    So -- so you're making -- let's back up

7   for a second.  So earlier you testified that you did

8   not review any internal documents to form your

9   opinions; correct?

10       A.    Correct.                                  13:36:26

11       Q.    And so, you didn't review any internal

12  documents to determine what the company knew about

13  Shenandoah; correct?

14       A.    That is correct.

15       Q.    And so, you can't opine about whether     13:36:40

16  Anadarko properly disclosed aspects of the appraisal

17  of Shenandoah if you don't know what the company

18  knew at the time; correct?

19       A.    In any appraisal, I'm interested in what

20  the company consensus view is.  So I would expect    13:36:56

21  from my decades of experience that internally,

22  different engineers, geologists, geophysicists might

23  have different opinions.  What's conveyed to the

24  street, what's conveyed in investor presentations or

25  earnings calls, wouldn't -- would -- would and       13:37:15

                                              Page 101

```
 1    should be the company consensus view, which would be

 2    generally the midpoint of -- of various opinions

 3    within a company.

 4         Q.   And --

 5         A.   That's been my experience.              13:37:26

 6         Q.   And you don't know whether it was a

 7    consensus review -- you don't know whether it was a

 8    consensus view because you didn't return -- you

 9    didn't review any of the internal documents;

10    correct?                                          13:37:38

11         A.   I'm -- that's fine, yes.  I'm -- I'm

12    assuming the statements that the company made were

13    consensus -- were -- was the company's viewpoint on

14    the then current situation, yes.

15         Q.   So you're -- you're assuming that all of  13:37:47

16    the statements by the company were true and

17    accurate?

18         A.   Yes, I am.

19         Q.   And that's goes for all your opinions;

20    correct?                                          13:37:56

21         A.   They were true and accurate based on the

22    information known at the time.  Yes, that's correct.

23         Q.   And you don't know what the company

24    actually knew because you didn't look at any -- any

25    of the internal documents; correct?              13:38:06
```

                                              Page 102

1      A.    If the company was making public

2    statements at odds with the facts, I would suspect

3    that would be a cause for SEC action, not just a --

4    a shareholder lawsuit.

5      Q.    Is it --                                    13:38:24

6      A.    I do not -- I have no -- no reason to

7    believe they were making misleading -- false and

8    misleading statements to the public.

9      Q.    But you also have no basis to say that

10   they were true and accurate, do you?              13:38:35

11     A.    I start with the assumption that public

12   statements in SEC filings are true and accurate;

13   that's correct.

14     Q.    You don't just start there, you also end

15   there; correct?                                   13:38:53

16     A.    That's correct.

17     Q.    Okay.  And so, Mr. Keller, is it your

18   opinion that Anadarko gave no indication of the size

19   of Shenandoah leading up to and during the class

20   period?                                           13:39:06

21     A.    They, at several junctures, talked about

22   potential size.  Although, in an ambiguous way,

23   there is a slide at an investor conference that

24   talked about about to 2 to $4 billion opportunity,

25   but it was for the Shenandoah basin, not for the   13:39:25

                                                       Page 103

```
 1    Shenandoah field.
 2         Q.   Is -- is that it?  That's the only --
 3    that's the only reference, the size?
 4         A.   They talked about encouraging results, but
 5    the only -- only dollar quantified estimate I recall    13:39:38
 6    was that 2 to $4 billion in an investor
 7    presentation.
 8         Q.   And what about -- what about resource
 9    size, any indication on the resource size?
10         A.   They would, after the drilling of their     13:39:51
11    well, talk about net pay and talk about sand quality
12    but not reserves, per se.
13         Q.   The Shenandoah 2 press release referred to
14    Shenandoah being one of Anadarko's largest oil
15    discoveries in the -- the Gulf of Mexico; correct?     13:40:06
16         A.   That's correct.
17         Q.   And it also referred to Shenandoah as a
18    potentially giant project; correct?
19         A.   With the keyword being "potentially," yes.
20         Q.   And also with the word "giant"?             13:40:23
21         A.   Yes, "potentially giant," correct.
22         Q.   And giant has a --
23         A.   Potentially nothing.
24              (Simultaneous speaking.)
25              (Interruption in audio/video.)              13:40:31
```

Page 104

```
 1              THE COURT REPORTER:  I'm sorry, can you

 2      start your question over, please.

 3      BY MS. JENSEN:

 4          Q.   And "giant" has a specific definition in

 5      the context of the oil and gas industry; correct?     13:40:35

 6          A.   Giant's a relative term.

 7          Q.   And so, is it your testimony that a giant

 8      field is a relative term?

 9          A.   Well, again, they didn't say "giant

10      field."  They just said "potentially giant field."    13:40:53

11          Q.   And a giant field has a well known

12      definition in the industry; correct?

13          A.   I would say that is not correct.  For a

14      small comp- -- for a small company, a field could be

15      giant to them, whereas it would not be giant to       13:41:10

16      Exxon or to Chevron or to -- to Total.

17          Q.   So you've never heard of the term "giant

18      field"?

19          A.   Yeah, I've heard it used many times.

20          Q.   And you're aware then that giant field     13:41:23

21      refers to an oil field that has 500 MMBOE net or

22      recoverable; correct?

23          A.   So I've heard that phraseology before,

24      yes.

25          Q.   And that is well understood in the          13:41:35
```

Page 105

```
 1    industry; correct?

 2        A.   I -- I'd say a general parameter, yes.

 3        Q.   So when Anadarko used the term "giant

 4    field," the market understood that Anadarko was

 5    describing Shenandoah as having more than 500          13:41:53

 6    million barrels of oil recoverable; correct?

 7        A.   No, not correct.

 8        Q.   Okay.  And what is that based on?

 9        A.   So "potentially giant field."  So if one

10    were to say there's 500 million barrels of oil in a    13:42:09

11    field, it doesn't mean it's necessarily producible.

12    If the costs or the timeframe or the political

13    climate were such that -- there are many large

14    fields that are never developed because they're not

15    economic.  There are many smaller fields that are      13:42:27

16    developed because the economics are different.  So

17    size alone does not determine whether a field is

18    developed.

19        Q.   But that's not my question, Mr Keller.  I

20    was asking about size.                                 13:42:37

21        A.   Right.

22        Q.   And so, is it your testimony under oath

23    that investors did not take any meaning away from

24    the term "giant field"?

25        A.   To go back to your initial question, you      13:42:45
```

Page 106

```
 1    said "producible," I believe is what I heard you

 2    say.

 3         Q.   Recoverable.

 4         A.   500 million --

 5         Q.   Recoverable.                              13:42:54

 6         A.   Recoverable.  That's not the same thing.

 7    500 million barrels in the ground is not 500 million

 8    barrels recoverable.

 9         Q.   So my question is, is it your testimony

10    under oath that no investor took from Anadarko's      13:43:04

11    reference to "giant field" the meaning that it meant

12    possibly more than 500 million barrels?

13              MR. GRUENSTEIN:  Objection.

14              THE WITNESS:  Investors very well could

15    have interpreted that as 500 million barrels in the   13:43:25

16    ground, not necessarily recoverable, not necessarily

17    commercially producible.

18    BY MS. JENSEN:

19         Q.   Well, the definition of a giant field is

20    500 MMBOE recoverable; correct?                       13:43:35

21         A.   I don't believe that's correct.  It's

22    500 MMBOE, but again, recoverables can depend on

23    cost, it's going to depend on production, expenses,

24    it's going to depend on commodity prices.  So I --

25         Q.   So after 40 --                              13:43:51
```

Page 107

```
 1                    (Simultaneous speaking.)

 2                    (Interruption in audio/video.)

 3              THE COURT REPORTER:  I'm sorry --

 4    BY MS. JENSEN:

 5         Q.   So after 40 years in the industry, you      13:43:53

 6    don't know whether a giant field means recoverable?

 7         A.   Well, at -- at a point in time, but that's

 8    always a moving target because the key drivers of

 9    economics are volumes, times costs, times commodity

10    prices.  So 500 million barrels, that could be a       13:44:10

11    true statement, and it could be recoverable at a

12    $100 price environment, and it could very well not

13    be recoverable in a $40 price environment.

14              So could -- could it have been a true

15    statement at the point in time when it was made?       13:44:26

16    Yes, it could have been.  Does that necessarily mean

17    it will be produced?  It does not.

18         Q.   So would you consider bank -- BofA as a

19    sophisticated investor?

20         A.   I would.                                     13:44:43

21         Q.   And do -- you have no reason to dispute

22    that BofA after the Shenandoah 2 announcement said

23    that management has taken the rare step of

24    describing Shenandoah as a potential giant, meaning

25    possibly more than 500 million barrels?                13:44:55
```

Page 108

```
 1        A.   I don't dispute that statement.  They also
 2   said additional drilling was necessary.
 3             MS. JENSEN:  I'm going to move to strike
 4   that as -- as nonresponsive.
 5   BY MS. JENSEN:                                    13:45:09
 6        Q.   So you do then understand that -- that
 7   Bank of America took management statements about
 8   Shenandoah as meaning Shenandoah possibly had more
 9   than 500 million barrels recoverable?
10        A.   Yes.                                     13:45:30
11        Q.   Now, we talked about Sarasin earlier.
12   This is an investment manager for class
13   representative Norfolk that you mentioned nowhere in
14   your report; correct?
15        A.   That is correct.                         13:45:46
16        Q.   And they -- they produced documents in
17   this matter; correct?
18        A.   That may be correct.  I don't know.  I
19   can't answer that.
20        Q.   Did you review them?                     13:45:54
21        A.   Not to the best of my recollection.
22        Q.   And so, you have no reason to dispute then
23   that Sarasin also -- also understood from Anadarko
24   management that Shen is a giant field, which means
25   500 plus million barrels; correct?                 13:46:20
```

Page 109

```
 1        A.   Yes, I believe I -- I'll take your word

 2   for it.

 3        Q.   And do you have any reason to dispute that

 4   internally at Anadarko company personnel understood

 5   the term "giant" to mean 500 million barrels        13:46:43

 6   recoverable?

 7        A.   I would -- I'd be happy to say that, yes.

 8        Q.   In fact, Anadarko continued to describe

 9   Shenandoah as a giant during the class period;

10   correct?                                            13:47:06

11        A.   Potentially giant with additional drilling

12   necessary.

13        Q.   So it's your testimony that Anadarko

14   always said that it was only potentially a giant?

15        A.    It is my opinion, and it is my testimony   13:47:19

16   that after the drilling of every well, Anadarko

17   commented that additional appraisal drilling was

18   necessary and that they were not near a final

19   investment decision.

20             MS. JENSEN:  I'm going to move to strike   13:47:33

21   as unresponsive.

22   BY MS. JENSEN:

23        Q.   Is it your testimony that Anadarko -- is

24   it your testimony that Anadarko only said it was

25   potentially a giant?                                13:47:44
```

Page 110

```
1         A.    It may have used other -- other

2    adjectives, but it was not a developed field, yes.

3         Q.    Well, in referencing giant, it did all --

4    not always say potential; correct?

5         A.    Until a field is developed, it's always      13:47:57

6    potential.  There is no production until a field is

7    developed.  It doesn't matter how big the resource

8    size is, unless you spend the money, it's not

9    developed.  It's not -- it's just potential.

10        Q.    Just give me one second.                      13:48:23

11              Okay, Mr. Keller, you should be able to

12   see what's been marked as Exhibit 506.

13              (Keller Deposition Exhibit 506 was marked

14              electronically.)

15              THE WITNESS:  Okay.  Bear with me.  I'm       13:49:28

16   trying to navigate back.  I'm stuck on 505.  So let

17   me just navigate to 506.

18              MS. JENSEN:  Do you need assistance?

19              THE WITNESS:  I just don't want to -- I

20   don't want to go back.  Let me just --                   13:49:42

21              MS. JENSEN:  I think you may -- let's go

22   ahead and go off the record.

23              THE VIDEOGRAPHER:  Okay.  We're off the

24   record.  It's 1:49 p.m.

25              (Discussion off the record.)                  14:00:24
```

Page 111

```
 1            THE VIDEOGRAPHER:  We're back on the
 2   record.  It's 2:01 p.m.
 3   BY MS. JENSEN:
 4        Q.   Okay.  Mr. Keller, do you see what's been
 5   marked as Exhibit 506?                          14:01:18
 6        A.   I do see this, yes.
 7        Q.   Okay.  And for the record, this is
 8   JanHen_00014482.
 9             Okay.  Will you scroll -- actually, before
10   you scroll, do you see the title of this document?   14:01:32
11        A.   I do, yes.
12        Q.   Okay.  And what does this document appear
13   to be?
14        A.   This appears to be a Third-Quarter
15   Operations Report dated October 27th, 2015.        14:01:41
16        Q.   For Anadarko?
17        A.   That is correct, yes.
18        Q.   Okay.  If you turn to the first page of
19   the document, after the cover page --
20        A.   Yes.                                    14:01:56
21        Q.   -- there is a heading that says
22   "Third-Quarter 2015 Highlights."
23             Do you see that?
24        A.   I do.
25        Q.   Okay.  And do you see there is several    14:02:03
```

Veritext Legal Solutions
866 299-5127

```
 1    different subheadings, and there's a heading on the

 2    right-hand side of the page that says "Creating

 3    Option Value With Exploration."

 4         A.   I do see that.

 5         Q.   Do you see that?                      14:02:19

 6         A.   Yes, I do.

 7         Q.   Okay.  And could you read into the record

 8    that paragraph.

 9         A.   Yes.

10              "During the quarter, Anadarko drilled a   14:02:27

11    successful appraisal well at Shenandoah in the Gulf

12    of Mexico.  This well encountered more than 620 feet

13    of oil" -- "net feet of oil pay and continued to

14    progress the giant oil discovery towards

15    development." [As read]                          14:02:45

16         Q.   And do you have an understanding of what

17    well they're talking about?

18         A.    This would be -- looking at that, I

19    believe this would be Shen 4.

20         Q.   Okay.  And do you see the reference to   14:02:54

21    "giant oil discovery" there?

22         A.   I do, yes.

23         Q.   And it doesn't say the word "potential"

24    before it, does it?

25         A.   No, it does not.                        14:03:08
```

                                              Page 113

```
 1        Q.    Okay.  All right.  You can put that away.

 2              Now, the -- in -- in market -- or at least

 3   some investors took the results of Shen 5 with its

 4   500 million barrels recoverable to be of sufficient

 5   commercial scale to develop; correct?              14:03:31

 6        A.    Some did.  I would only add that Shen 5

 7   took place just about the time that oil prices

 8   troughed.

 9        Q.    Are we talking about two different things,

10   because I was talking about --                     14:03:53

11        A.    Shen 5, you said.

12        Q.    Oh, I -- I apologize.  I misspoke.  I

13   intended to say Shen 2.

14        A.    Oh, Shen 2, okay, yeah.  Yeah, okay.

15        Q.    Okay.  So you agree with that statement?  14:04:04

16        A.    Yeah, I -- Shen 2 encountered over 1,000

17   feet of net pay, yeah.

18        Q.    Now, turning to your opinion regarding the

19   March 4th, 2014, statement about the 2 to 4 billion

20   net opportunity, what is your basis for opining that  14:04:27

21   all investors understood that statement in the --

22   exactly the same way as you do?

23              MR. GRUENSTEIN:  Objection.

24              THE WITNESS:  Well, the math that

25   accompany that presentation show the field that it  14:04:42
```

                                           Page 114

1    was clear -- show the basis rather.  It was clearly

2    the basin, not the field.

3    BY MS. JENSEN:

4         Q.   You're not opining, however, that the

5    investors took no meaning about the value from that      14:04:51

6    statement with regard to Shenandoah?

7         A.   It's a point in time statement.

8         Q.   But that's not my -- that's not my

9    question, Mr. Value -- Mr. Keller, excuse me.

10             You're -- you're not opining that              14:05:08

11   investors took nothing away from that statement

12   about the value of Shenandoah --

13        A.   I'm not opining --

14        Q.   -- are you?

15        A.   No, I'm not.                                   14:05:17

16        Q.   Okay.

17        A.   It was an encouraging time of the

18   development of Shenandoah.

19        Q.   Now, you also opine that investors

20   understood throughout the class period that Anadarko     14:05:29

21   had not made a final decision to develop Shenandoah;

22   is that right?

23        A.   That is correct.

24        Q.   And so, implicit in that opinion is the

25   assumption that Anadarko had not made a final            14:05:44

                                                Page 115

```
 1    decision whether or not to develop Shenandoah

 2    throughout that same time period; correct?

 3         A.   That is correct.

 4         Q.   And if your assumption is wrong, would you

 5    reconsider your opinion?                          14:05:56

 6         A.   I don't believe my assumption's wrong.

 7         Q.   What if it was?

 8         A.   That's a hypothetical.

 9         Q.   And -- and so, you -- would you have the

10    same opinion even if your assumption was wrong?   14:06:07

11         A.   The facts don't bear out that

12    hypothetical, I don't believe.

13         Q.   Have you looked at any internal documents

14    about when Anadarko decided not to develop Shen?

15         A.   I -- I've looked at their statements that  14:06:25

16    after four, they needed five and after five, they

17    needed six.

18         Q.   You haven't looked at any internal

19    documents about --

20         A.   No.                                      14:06:35

21         Q.   -- their decisionmaking process?

22         A.   No.  No, I haven't.

23              What the market knew was that they needed

24    five, and then they needed six.

25         Q.   And so, the market believed Anadarko when  14:06:43
```

Page 116

1    it said it needed the results of Shenandoah to

2    decide whether or not to develop -- develop the

3    field; correct?

4         A.   You just said Shenandoah.  They needed the

5    results of five and then the results of six.  That's    14:06:55

6    correct.

7         Q.   So the market believed Anadarko when it

8    said it needed the results of Shenandoah 6 to decide

9    whether or not to develop the field; correct?

10        A.   I believe that's correct.  After five, it    14:07:07

11   said they needed six.

12        Q.   And so you're taking those statements at

13   face value; correct?

14        A.   I am.

15        Q.   And so if the evidence showed that senior    14:07:15

16   management had decided not to develop Shenandoah

17   before the end of the class periods, then -- then

18   investors would have been mistaken in their

19   understanding; correct?

20        A.   If they made a definitive decision not to    14:07:34

21   develop, I would say that's correct.

22        Q.   Is it your opinion that all material

23   adverse information known by Anadarko about

24   Shenandoah during the class period was known to

25   investors?                                              14:07:55

                                              Page 117

```
 1          A.    I -- I could not say all.

 2          Q.    And you couldn't say all because you

 3    haven't read any internal --

 4          A.    That's correct.

 5          Q.    -- Anadarko documents?                    14:08:07

 6          A.    That's -- that's correct, yes.

 7          Q.    If Defendants have admitted in this case

 8    that they didn't disclose certain adverse facts, you

 9    don't have any reason to dispute that testimony, do

10    you?                                                  14:08:20

11          A.    I -- I don't -- I don't know what you're

12    ta- -- I don't know what facts you're talking about.

13          Q.    So if the Defendants in their depositions

14    have admitted that they didn't disclose certain

15    adverse facts, you don't have any reason to dispute   14:08:33

16    that deposition testimony under oath, do you?

17          A.    I don't have any reason to dispute it, no.

18    I have no knowledge of it, so I can't dispute it.

19          Q.    Now, in your report, you cited a

20    declaration by Noah Barrett.                          14:08:53

21                Do you know who he is?

22          A.    I don't recall at this point in time.  I

23    wrote that three months ago -- or two and a half

24    months ago.

25          Q.    But you cited his declaration because you  14:09:08
```

                                                        Page 118

```
 1    thought he was a credible source of information?

 2         A.   I'm going to assume that's true.  I

 3    don't -- I don't recall it at this point in time.

 4         Q.   You -- you don't have any idea whether

 5    he's a credible source or not?                    14:09:21

 6         A.   I would be unlikely to cite someone who I

 7    did not believe was credible.

 8         Q.   And you said earlier that you didn't find

 9    some analysts cred- -- credible because they didn't

10    have enough sophistication.                        14:09:38

11             Is that about right?

12         A.   I don't believe I said I didn't find them

13    credible.  I said I didn't rely on and didn't cite

14    certain -- I didn't cite every analyst whose report

15    I read, that's correct.                            14:09:53

16         Q.   But you -- you only cited sources that you

17    found credible?

18         A.   That is correct.

19         Q.   Okay.  Mr. Keller, you should be able to

20    see what has been marked as Exhibit 507.          14:10:29

21             (Keller Deposition Exhibit 507 was marked

22             electronically.)

23             THE WITNESS:  Let's see if I have better

24    luck this time.

25             All right.  I got it.  Yes.  Okay.       14:10:46
```

Page 119

```
 1    BY MS. JENSEN:

 2         Q.   Have you seen this document before?

 3         A.   I'm having to look a little closer.  Let

 4    me zoom in.  I can't read it.

 5              I don't have a recollection of this         14:11:12

 6    document.  It's entirely possible I -- that I read

 7    it.  I don't recall this specific document.

 8         Q.   Okay.  If you scroll down to the bottom of

 9    the document, do you see this to be a declaration of

10    Noah Barrett that is --                               14:11:29

11         A.   I do, ye- -- yes.  Yeah, I see where the

12    declaration is, yes.

13         Q.   Okay -- dated January 12th, 2023?

14         A.   Yes.

15         Q.   Okay.                                       14:11:37

16         A.   I certainly have not seen anything from

17    January of 2023, that's correct.  That was --

18         Q.   Okay.  Okay.

19         A.   That would have been last Thursday.

20         Q.   So -- and -- and sitting here, you don't    14:11:44

21    know who Noah Barrett is?

22         A.   Well, I see he's an analyst at Janus.

23         Q.   Okay.

24         A.   But I -- yeah.

25         Q.   All right.                                  14:11:55
```

Page 120

```
 1              And as an analyst at -- at Janus -- and he

 2      is an analyst that you cited in your report;

 3      correct?

 4          A.   Yeah.  Yeah.

 5          Q.   Okay.  And in his declaration here, he        14:12:05

 6      states, at paragraph number 5, "Throughout the Class

 7      Period, I was unaware of the existence of any

 8      whistleblower complaint involving" Shenandoah --

 9      "Anadarko or Shenandoah or any allegation that

10      Anadarko public disclosures misrepresented or          14:12:27

11      omitted material information about Shenandoah."

12          A.   Did I read that, yes.

13          Q.   You don't have any reason -- you don't

14      have any reason --

15              (Simultaneous speaking.)

16              (Interruption in audio/video.)

17              THE COURT REPORTER:  I'm sorry, I didn't

18      hear what the witness said.

19              THE WITNESS:  I have no reason to doubt

20      that that's what he's saying, I believe, in --        14:12:38

21      BY MS. JENSEN:

22          Q.   Right.

23              And as an analyst who is following

24      Anadarko and Shenandoah at the time, you have no

25      reason to dispute this testimony?                      14:12:46
```

                                                    Page 121

```
 1          A.    I do not, no.

 2          Q.    Okay.  And turning to paragraph 6, it

 3     states, "During the Class Period, I do not recall

 4     being aware of any allegation that fault

 5     compartmentalization, small-scale faulting, tar, and   14:13:02

 6     asphaltene onset pressures jeopardize commer-" --

 7     "Shenandoah's commercial viability.  I also do not

 8     recall being aware of any allegation that

 9     Shenandoah's producible resource size shrank

10     substantially with each appraisal well after          14:13:17

11     Shenandoah 2 and over" -- by over half during the

12     course of the Class Period." [As read]

13             Do you see that?

14          A.    I do.

15          Q.    Okay.  You have no reason to dispute that   14:13:25

16     testimony?

17          A.    It's his sworn testimony.  I would -- I

18     believe it's truthful.

19          Q.    Okay.  And so you're -- you're not opining

20     that the information contained in paragraphs 5 and 6   14:13:35

21     of his declaration were known and understood by all

22     investors, are you?

23          A.    No.  But I am aware of Janus's declaration

24     that it was investing in Anadarko based on the

25     overall company, not on -- based on individual         14:13:52
```

Page 122

```
 1   fields.
 2           MS. JENSEN:  I'm going to move to strike
 3   as unresponsive everything after "no."
 4           THE WITNESS:  Fine.  Fine.  Okay.
 5   BY MS. JENSEN:                              14:14:03
 6       Q.  All right.
 7           You also -- you can set that aside.
 8           You also have an opinion about the 20-kpsi
 9   technology in your report; is that right?
10       A.  That's correct.                     14:14:17
11       Q.  Okay.  Now, you -- you are not an
12   engineer; correct?
13       A.  I'm not, no.
14       Q.  Also not a technology expert?
15       A.  Well, I've got decades of experience in   14:14:26
16   the offshore.  So I'm not -- am I a degreed
17   engineer, no.  Have I done an awful lot of work
18   involving oil drilling, yes, I have.
19       Q.  So you -- do you hold yourself out as an
20   engineering expert?                          14:14:42
21       A.  No, I do not.
22       Q.  Okay.  Now, the 20-kpsi tech was not a
23   reason listed by Anadarko in writing off Shenandoah;
24   correct?
25       A.  Not specifically, no, it was not.    14:14:57
```

Page 123

1        Q.   It -- it wasn't -- it wasn't cited as a

2    reason for writ- -- writing off Shenandoah; correct?

3        A.   It was not cited as a reason.

4        Q.   And -- and you didn't review any internal

5    documents to figure out why Anadarko wrote off        14:15:14

6    Shenandoah; correct?

7        A.   Not internal documents, no, I did not.

8             As early as June of 2015 Anadarko had said

9    it needed 20-k technology, though.  The market was

10   aware of that.                                        14:15:33

11       Q.   That wasn't my question, Mr. Keller.

12       A.   Okay.  Fine.  Fine.

13       Q.   Okay.  All right.

14            Moving to Shenandoah 3.  Okay.  Sorry,

15   just give -- give me a quick second here.             14:16:06

16       A.   Take your time.

17       Q.   Okay.  All right.

18            So in your report you have a -- an

19   eight-paragraph summary discussing Anadarko's -- oh,

20   gosh, I'm sorry, hold on one second.  I apologize.    14:16:37

21       A.   You're fine.

22       Q.   Okay.  All right.

23            So you -- you spend quite a -- a bit of

24   time in your report discussing Shenandoah 3.

25            Is it your opinion that all investors        14:17:06

                                                    Page 124

1    understood the information about Anadarko's

2    statements about Shenandoah 3 exactly as you

3    describe it in your summaries?

4         A.   It is.

5         Q.   And what is the basis for saying that all      14:17:18

6    investors understood this information exactly as you

7    did?

8         A.   On -- in -- in January of 2015, shortly

9    after the well finished drilling, Conoco publicly

10   announced it was writing off Shen 3, dispensing it.      14:17:38

11        Q.   And that's -- and so do you take from that

12   that all investors understood that Shenandoah 3 was

13   a dry hole?

14        A.   Yes.

15        Q.   Okay.  And so is it your testimony that        14:18:00

16   all sophisticated investors understood Shenandoah 3

17   was a dry hole?

18        A.   I would say all sophisticated investors

19   that cared to look at the details knew it was a dry

20   hole.                                                    14:18:19

21             Were there investors who didn't focus on

22   Shenandoah for a period of time, that's potentially

23   true, yeah.

24        Q.   Okay.  So --

25        A.   The market knew this was a dry hole.           14:18:28

                                                        Page 125

1      Q.   And you -- you --

2      A.   Did every --

3      Q.   -- you agree that it's not --

4      A.   Go ahead.  I'm sorry.

5      Q.   You agree that some sophisticated          14:18:30

6  investors did not understand Shen 3 to be a dry

7  hole; correct?

8      A.   Given that this was one well in one

9  prospect, are there investors who didn't focus on

10  Shenandoah, that is entirely possible.              14:18:47

11      Q.   Okay.  So you're saying that for a

12  sophisticated investor to disagree with you meant

13  they weren't paying attention?

14      A.   The news was in the market.  It had been

15  publicly disclosed by a 30 percent working interest   14:18:57

16  owner of the well.

17           THE COURT REPORTER:  I'm sorry.  "It had

18  been disclosed by a 30 percent" what?

19           THE WITNESS:  Working interest owner of

20  the well, that being ConocoPhillips.                14:19:04

21  BY MS. JENSEN:

22      Q.   Did you find any evidence that

23  sophisticated investors did not understand it this

24  way?

25      A.   I did not.                                  14:19:24

                                            Page 126

```
1          Q.   And you -- you say that you looked at

2     Goldman Sachs' reports; correct?

3          A.   I looked at a number of reports, yes.

4          Q.   Okay.  You should be able to see what has

5     been marked as Exhibit 508.                        14:20:38

6          A.   Okay.  Let me go back.

7               (Keller Deposition Exhibit 508 was marked

8               electronically.)

9     BY MS. JENSEN:

10         Q.   And, for the record, this is a Bates stamp   14:20:42

11    document with the Bates starting GS-002754.

12         A.   I've got to go back in.  It didn't --

13    didn't pop up as 508.  Let me reload.

14              There we go, 508.

15              Okay.  This is a Goldman research report   14:21:06

16    dated February 5th of 2017; is that corr- -- yeah,

17    '17, yes.

18              Yes, I've got it.

19         Q.   Okay.  And Goldman Sachs is a source that

20    you cite in your report; correct?                   14:21:30

21         A.   That is correct.

22         Q.   Okay.  And, in fact, you cite this very

23    report in your --

24         A.   I do.  Yes, I do.

25         Q.   Okay.  Will you turn to page 15?          14:21:39
```

                                               Page 127

```
1         A.    Bear with me.  It's refreshing.  Hold on.

2               Okay.  I'm at page 15 now, yes.

3         Q.    Okay.  So would you read the second bullet

4    there?

5         A.    The second bullet.  You want me to read      14:22:10

6    it?

7         Q.    Yeah.

8         A.    I mean out loud?

9         Q.    Yeah.

10        A.    Okay.  Yeah.                                  14:22:23

11              "2Q 2014:  The Shenandoah #3 appraisal

12   well and evaluated the same well-developed reservoir

13   sands" that -- "1500" -- "sands 1500 feet down-dip

14   and 2.3 miles east of the first appraisal well.

15   This well found an expanded geologic reservoir         14:22:40

16   section, confirmed excellent reservoir qualities,

17   delineated the potential oil-water contacts of the

18   field.  The Shenandoah #3 appraisal well found 490

19   feet of net pay." [As read]

20        Q.    Okay.  So -- and you cite this very report   14:23:00

21   in your report as evidence of what investors

22   understood about Shenandoah; correct?

23        A.    I do.  The net pay is -- is an error by

24   Goldman.

25        Q.    So it's fair to say that not all investors   14:23:13
```

                                                        Page 128

```
 1    understood Shenan 3 a -- Shenandoah 3 was a dry
 2    hole; correct?
 3         A.   This -- this is in 2017.  So this is after
 4    4, 5, and 6 were drilled.  This -- this is simply --
 5    well, no, no.  Excuse me.  Excuse me.            14:23:35
 6              Some of the confusion here results from
 7    calling -- like the Number -- some people call the
 8    Number 1 appraisal well, which it was -- the first
 9    well is a discovery -- Number 1 appraisal well as
10    Shen 2.                                          14:23:57
11              I think the confusion here is Shen 3 --
12    it's the third appraisal well, but it's Shen 4.
13    Yeah, Shen 3 encountered no net pay.
14         Q.   Okay.  But that's not --
15         A.   The company never said it encountered net  14:24:09
16    pay.
17         Q.   Okay.  But you'll agree that some
18    investors --
19         A.   Goldman sa- -- Goldman says that --
20              (Simultaneous speaking.)              14:24:21
21              (Interruption in audio/video.)
22              THE COURT REPORTER:  I'm sorry --
23              THE WITNESS:  -- that's correct.
24              THE COURT REPORTER:  -- I can't -- one
25    person at a time, please.                        14:24:21
```

                                                    Page 129

```
 1              THE WITNESS:  I will agree, yes.
 2    BY MS. JENSEN:
 3        Q.   Okay.  I think it got garbled, Mr. Keller;
 4    so, unfortunately, we have to repeat this.
 5              So you'll agree that -- that some           14:24:31
 6    investors understood Shenandoah did encounter
 7    hydrocarbons; correct?
 8              MR. GRUENSTEIN:  Objection.
 9              THE WITNESS:  I would agree that the
10    Goldman report says this, but it's an error.  And,    14:24:44
11    in fact, well before this report was -- was
12    released, parties had disclosed that this was a dry
13    hole or that this was -- was not productive or not
14    producing.
15              MS. JENSEN:  I'm going to move to strike     14:25:02
16    everything after "this."
17              THE WITNESS:  Okay.  Okay.  Fine.
18    BY MS. JENSEN:
19        Q.   Okay.  Goldman Sachs wasn't the only one;
20    correct?                                              14:25:19
21        A.   The only one attributing net pay to 3?
22        Q.   Yeah.
23        A.   I don't recall whether -- people
24    attributing net pay to 3.
25        Q.   Jefferies did; correct?                      14:25:32
```

Page 130

```
 1          A.   If you say so.  I'm saying I don't recall

 2     that.

 3          Q.   Okay.  Lazard did?

 4          A.   Again, I'll take your word for it even

 5     though a 30 percent working interest owner had       14:25:43

 6     written off the well.

 7          Q.   Lazard is a sophisticated investor;

 8     correct?

 9          A.   They are indeed.

10          Q.   So as part of its announcement about       14:26:07

11     Shen 3, Anadarko did not describe it as a dry hole,

12     did they?

13          A.   That is correct, they did not.

14          Q.   Instead, Shenandoah -- I mean, instead,

15     Anadarko described Shenandoah 3 as finding           14:26:25

16     50 percent more of the same sands?

17          A.   It did.

18          Q.   And also said that pressure data confirmed

19     the oil-water contacts across the field?

20          A.   Yes, it did.                               14:26:35

21          Q.   Now, you referenced earlier

22     ConocoPhillips' accounting decision with respect to

23     Shen 3.

24               ConocoPhillips wasn't the operator of

25     Shenandoah; right?                                   14:26:59
```

Page 131

```
 1          A.    That is correct.

 2          Q.    Anadarko was?

 3          A.    That is correct.

 4          Q.    As the operator, Anadarko had more control

 5    over the appraisal process; correct?              14:27:06

 6          A.    That is correct, yes.

 7          Q.    And as the operator, investors tended to

 8    listen more to Anadarko than the passive partners?

 9          A.    I would say that depends.

10          Q.    Well, you found evidence of that, didn't   14:27:32

11    you, in the record?

12          A.    Would -- yes, I do.  And I would also not

13    characterize Conoco as a passive partner.

14          Q.    It was not the operator; correct?

15          A.    There's a difference.                  14:27:54

16          Q.    Okay.  But you're agreeing it's not the

17    operator?

18          A.    It's certainly not the operator, yes.

19          Q.    And do you agree that each Shenandoah

20    partner made independent accounting determinations   14:28:04

21    with respect to the various Shen wells?

22          A.    Yes, I do.

23          Q.    Okay.  So Anadarko investors wouldn't

24    necessarily credit ConocoPhillips' accounting

25    decisions for Anadarko information; correct?        14:28:20
```

                                              Page 132

1          A.    That is correct.

2          Q.    Anadarko also did not say that the

3    resource size reduced with the results of Shenandoah

4    3, did it?

5          A.    It did not.  It also did not attribute any    14:28:37

6    net pay to 3.

7                MS. JENSEN:  Strike after "It did not."

8    BY MS. JENSEN:

9          Q.    And certainly didn't disclose that Shen 3

10   reduced the size of the prospect by 50 to -- sorry,    14:28:51

11   25 to 50 percent; correct?

12         A.    It said additional drilling was necessary.

13         Q.    In answer to my question, did it disclose

14   that Shenandoah --

15         A.    It did not, no.                              14:29:03

16         Q.    Thank you.

17                Now, in your report you opine that

18   investors understood the results of Shenandoah 3

19   resulted in a smaller resource; correct?

20         A.    Yes.                                         14:29:38

21         Q.    And what is your basis for saying that all

22   investors understood the results of Shen 3 the same

23   exact way that you interpreted that information?

24         A.    Shen 3 was drilled to test the areal

25   extent of the reservoir.  It was the far eastern        14:29:53

                                                      Page 133

```
1    side of the -- of the field, and it did not

2    encounter any net pay.

3         Q.   My question's a little different.

4              What's the basis for saying all investors

5    understood the information the same exact way you    14:30:06

6    did?

7         A.   Because you had a fourth data point that

8    showed no reservoir --

9              MR. GRUENSTEIN:  Objection.

10             (Simultaneous speaking.)                    14:30:16

11             (Interruption in audio/video.)

12             THE COURT REPORTER:  I'm sorry, one

13   second.  Because you had a what?

14             THE WITNESS:  -- a fourth data point, i.e.

15   Shen 3, that showed no net pay on the eastern flank   14:30:21

16   of the field.

17   BY MS. JENSEN:

18        Q.   And if there was evidence that investors

19   thought differently than you did, would you change

20   your opinion?                                         14:30:31

21        A.   The facts are the facts, and there was, in

22   fact, no net pay in Shen 3.  So I'm not sure what

23   you're telling me investors could tell me.

24        Q.   So it doesn't matter what I put in front

25   of you, you're not going to change your opinion?      14:30:47
```

Page 134

```
 1                    MR. GRUENSTEIN:  Objection.

 2                    THE WITNESS:  The facts are there was no

 3       net pay at Shen 3.

 4       BY MS. JENSEN:

 5            Q.   And as we just saw, some investors thought    14:30:54

 6       there was; correct?

 7            A.   Some --

 8                    MR. GRUENSTEIN:  Objection.

 9                    THE WITNESS:  -- investors in a report

10       written well after 4 and 5 were drilled misstated      14:31:04

11       something.  This is a '17 report from Goldman, which

12       was -- would have been after Shen 4 or 5 and 6 were

13       drilled.  So, again, I'm not sure of the relevance

14       of it.

15       BY MS. JENSEN:                                          14:31:18

16            Q.   So if investors thought that, with the

17       results of Shenandoah 3, Shenandoah got bigger,

18       would that change your opinion?

19            A.   There would be no basis to think that.

20            Q.   And so -- so it wouldn't change your          14:31:32

21       opinion?

22            A.   You -- you couldn't present me a fact

23       situation that supported that.

24            Q.   Okay.  Now, BofA, again, is a -- a source

25       that you cite throughout your report; correct?         14:31:46
```

Veritext Legal Solutions
866 299-5127

```
 1          A.   Yes, a large bank.

 2          Q.   And a credible source?

 3          A.   In general, yes.

 4          Q.   A sophisticated investor; correct?

 5          A.   Yes.                                    14:32:00

 6          Q.   Okay.  You should be able to see what's

 7     been marked as Exhibit 509.

 8               (Keller Deposition Exhibit 509 was marked

 9               electronically.)

10               THE WITNESS:  Okay.  Hold on one second.   14:33:00

11               Oops, one moment.

12     BY MS. JENSEN:

13          Q.   And while you're pulling that up, for the

14     record --

15          A.   I have 509.                             14:33:30

16          Q.   -- this is B- -- this is a -- a document

17     bearing the Bates stamp BOFAS_APC-000488.

18          A.   I've got it now, yes.

19          Q.   Okay.  Is this one of the documents that

20     you reviewed in -- in forming your opinions?      14:33:44

21          A.   I did review this document to the best of

22     my recollection, yeah.

23          Q.   Okay.  If you'd turn to page 4.

24          A.   Okay.

25          Q.   There's a series of bullets.            14:33:55
```

Page 136

```
 1        A.   I'm sorry.  Going there.

 2             Okay.  There we go.  Got you.

 3        Q.   So the fifth bullet down --

 4        A.   Yes.

 5        Q.   -- do you see the heading "Shenandoah gets    14:34:09

 6   bigger"?

 7        A.   I do see that, yes.

 8        Q.   And this is dated February 3rd, 2015;

 9   correct?

10        A.   Yes.  Yes.                                     14:34:18

11        Q.   And so this is right after the results of

12   Shen 3 are announced?

13        A.   That's correct.

14        Q.   And -- and Bank of America, Merrill Lynch,

15   its highlight here is that "Shenandoah gets bigger";     14:34:31

16   right?

17        A.   I do see that, yes.

18        Q.   And you left this one out of your report;

19   correct?

20        A.   I don't think I cited this; but, again,        14:34:38

21   unlike any other well, there was no discussion by

22   Anadarko of net pay at Shen 3.

23             THE COURT REPORTER:  I'm sorry.

24   There's -- wait, wait, wait.  Please slow down.

25   Unlike --                                                14:34:43
```

                                                      Page 137

```
 1              THE WITNESS:  No discussion of -- I'm

 2     sorry.  No discussion of net pay at Shen 3.

 3     BY MS. JENSEN:

 4         Q.   So when you say that investors understood

 5     Shenandoah got smaller as a result of Shen 3,        14:34:57

 6     apparently you did not include Bank of America,

 7     Merrill Lynch, in that opinion; is that correct?

 8              MR. GRUENSTEIN:  Objection.

 9              THE WITNESS:  I certainly didn't include

10     this quote, that's correct.                          14:35:11

11     BY MS. JENSEN:

12         Q.   Are you aware that the company failed to

13     write off Shenandoah 3 at the time because its own

14     accounting department thought that Shenandoah 3

15     increased the resource size?                         14:35:26

16         A.   I am aware of that, yes, I am.

17         Q.   And did you review those documents in

18     forming your opinions?

19         A.   I --

20              MR. GRUENSTEIN:  Objection.                 14:35:33

21              THE WITNESS:  I'm not sure which document

22     you're talking about.  I am aware that Conoco

23     expensed and Anadarko did not.

24     BY MS. JENSEN:

25         Q.   But my question was different.              14:35:39
```

Page 138

1            Are you aware that the company failed to

2    write off Shenandoah because its own accounting

3    department thought that Shenandoah increased the

4    resource size?

5        A.   Different people have different          14:35:51

6    interpretations.

7        Q.   And so do you think that Shenandoah --

8    Anadarko's accounting department was unreasonable or

9    not credible in it interpretation of the

10   announcement of Shenandoah 3?                      14:36:07

11            MR. GRUENSTEIN:  Objection.  Foundation.

12            THE WITNESS:  Yeah, I have no basis to --

13   to -- to answer that.

14   BY MS. JENSEN:

15       Q.   You didn't review those documents?       14:36:19

16       A.   Not to the best of my recollection, no.

17       Q.   So you really -- you have no idea, one way

18   or the other?

19            MR. GRUENSTEIN:  Objection.

20            THE WITNESS:  I know what the public       14:36:30

21   disclosures were, which is distinct from what

22   internal discussions may have taken place.

23            MR. GRUENSTEIN:  Rachel, if there's a good

24   point to take a five-minute break --

25            MS. JENSEN:  Yep, we can go ahead and take  14:37:02

                                        Page 139

```
 1    a five-minute break.

 2              THE VIDEOGRAPHER:  Go off the record?

 3              Okay.  Off the record; it's 2:37 p.m.

 4              (Short recess taken.)

 5              THE VIDEOGRAPHER:  We're back on the        14:50:40

 6    record.  It's 12- -- 2:51 p.m.

 7    BY MS. JENSEN:

 8         Q.   Okay.  Mr. Keller, earlier in your

 9    testimony you mentioned two staffers who worked with

10    you to check cites and so forth in your complaint.    14:51:18

11    That's Eric Madsen and Keming Liang?

12         A.   Yes.

13         Q.   Okay.  And both of those worked at Compass

14    Lexicon; correct?

15         A.   Before they joined BRG, that's correct,    14:51:35

16    yes.

17         Q.   All right.

18              And Compass Lexicon is the same company

19    where Defendants' expert Dr. Allen Ferrell works;

20    correct?                                             14:51:41

21         A.   I believe that's correct, yes.

22         Q.   Okay.  So in your report, you opined that

23    investors understood after Shen 3 Anadarko needed to

24    drill additional appraisal wells to understand the

25    Shenandoah resource potential; correct?             14:52:14
```

Page 140

1        A.   Yes.

2        Q.   And what's the basis for saying all

3   investors understood this, the same way that you

4   interpreted the information?

5        A.   Again, I -- I would not say "all          14:52:26

6   investors."  I would say the market understood it

7   based on repeated public comments by Anadarko

8   management.

9        Q.   So you're conceding that not all investors

10  understood the information that way; correct?        14:52:38

11       A.   I could never make a statement about all

12  investors, that's correct.  I'm talking about the

13  market, what the market knew.

14       Q.   Okay.  And you're not saying that all

15  sophisticated investors understood the -- the --     14:52:51

16  that the same way you did?

17       A.   Again, I would not use the word "all,"

18  that's correct.

19       Q.   So -- I mean, because you -- you -- it

20  would be speculation on your part to opine on what   14:52:59

21  investors understood about Shenandoah through the

22  class period; correct?

23       A.   Yes.

24       Q.   Now, did you -- in -- in reaching this

25  opinion, did you review any internal documents to    14:53:17

                                            Page 141

1    confirm that this is what Anadarko and the partners

2    actually thought at the time?

3         A.   I -- I did not.  Having been in this

4    business a long time, the partners signed AFEs and

5    committed funds, so I'm making the assumption they        14:53:38

6    were in agreement with the operator --

7         Q.   So your opinion --

8         A.   -- or they would have gone non-consent.

9         Q.   So an assumption in your opinion is that

10   that is what actually -- what Anadarko and the           14:53:49

11   partners actually thought at the time; correct?

12        A.   They did not go nonconsent, that's

13   correct?

14        Q.   And are -- are you aware that

15   ConocoPhillip [verbatim] was trying to sell its          14:54:01

16   interests after Shenandoah 3?

17        A.   That's a normal part of portfolio

18   optimization.  It does not surprise me at all.

19        Q.   But my question is different.

20             Are you aware of that fact?                    14:54:14

21        A.   I am not certain that I was aware of that

22   fact.  I was aware Conoco was reevaluating strategic

23   priorities.

24        Q.   Okay.  So -- but you'll agree with me you

25   have no basis to dispute that ConocoPhillips was         14:54:26

                                             Page 142

```
 1    starting to --

 2         A.   I have no basis, that's --

 3              (Simultaneous speaking.)

 4              (Interruption in audio/video.)

 5              THE COURT REPORTER:  I'm sorry --        14:54:33

 6              THE WITNESS:  -- that's correct.

 7    BY MS. JENSEN:

 8         Q.   Okay.  Yeah, just wait until I finish my

 9    question.  I know it's --

10         A.   I'm sorry.                              14:54:36

11         Q.   No, it's -- it's okay.  It's not always

12    easy to know when I'm done with my question, so I

13    give you that.  But just -- yeah, we'll try to stay

14    out of each other's way.

15         A.   Yep.                                    14:54:47

16         Q.   So let me just ask it again so that the

17    record is clear.

18              So you have no reason to dispute that

19    after Shenandoah 3, ConocoPhillips was trying to

20    sell its interests in Shenandoah?                 14:54:58

21         A.   Was exploring the possibility, I would

22    agree, yes.

23         Q.   Okay.  And so if it was trying to sell its

24    interests, then you don't know that She- -- that

25    ConocoPhillips needed additional wells to understand  14:55:12
```

Page 143

```
1    the resource potential?

2         A.   I do know that ConocoPhillips did not go

3    nonconsent on 4, 5, or 6.

4         Q.   But that's not my question.  And,

5    actually, I'm not sure that's a correct statement    14:55:27

6    either.

7              But if ConocoPhillips was trying to get

8    out of Shenandoah, then you have no reason to be- --

9    to believe that ConocoPhillips thought it needed to

10   drill additional appraisal wells to understand the   14:55:41

11   resource potential?

12             MR. GRUENSTEIN:  Objection.

13             THE WITNESS:  I don't agree with the

14   characterization "trying to get out of."

15   BY MS. JENSEN:                                        14:55:49

16        Q.   Okay.  Okay.  But have you reviewed any

17   internal documents from ConocoPhillips about --

18        A.   I have not.

19        Q.   -- what it was trying to do?

20        A.   No.                                         14:55:58

21        Q.   Okay.  So just assume for purposes of this

22   question that ConocoPhillips was exploring how to

23   exit from Shenandoah after Shenandoah 3.

24             In that instance, you'll agree with me

25   that ConocoPhillips didn't need additional appraisal  14:56:11
```

Page 144

```
1    wells to understand the Shenandoah resource

2    potential?

3              MR. GRUENSTEIN:  Objection.

4              THE WITNESS:  I would not necessarily

5    agree.                                          14:56:24

6    BY MS. JENSEN:

7         Q.   You -- you don't have enough information

8    to agree or disagree, do you?

9         A.   That's correct.

10        Q.   Okay.  You opined that after the results   14:56:32

11   of Shen 3 were released, investors understood

12   Anadarko was unlikely to invest in Shenandoah at

13   then-prevailing oil prices; right?

14        A.   I would not say just at then-prevailing

15   prices.  With what was known at that time, yes,    14:56:57

16   that's correct.  It's not merely a pricing issue.

17        Q.   Okay.  So do you want to amend your

18   opinions that refer to "then-prevailing oil prices,"

19   then?

20        A.   No.  Then-prevailing oil prices were a    14:57:32

21   driver, but the decision to proceed is a function of

22   oil prices, plus reserve potential, plus development

23   and costs.  There are three main inputs into that

24   decision.

25        Q.   Okay.  But you do refer in your opinions   14:57:59
```

Page 145

1    to then-prevailing oil prices; correct?

2         A.   Yes.  Yes.  That was a -- that's certainly

3    a negative, yes.

4         Q.   What is your opinion -- what is the basis

5    for saying that all investors understood this        14:58:12

6    information the same way as you interpreted it?

7         A.   Again, I am not saying all investors.  I'm

8    saying the market interpreted this, that in a

9    declining price environment, the volume of reserves

10   necessary and/or the cost to install a platform      14:58:28

11   would need to change to justify investments, all

12   things being equal.

13        Q.   And if the company had told the market

14   that it didn't believe its -- its exploration was

15   being hurt by oil -- lower oil prices, would you     14:58:56

16   change your opinion?

17             MR. GRUENSTEIN:  Objection.

18             THE WITNESS:  I would say everyone in the

19   market knew that exploration was impacted by lower

20   oil prices.  This is --                              14:59:08

21   BY MS. JENSEN:

22        Q.   And --

23        A.   -- again --

24        Q.   And so just --

25        A.   -- the driver.                             14:59:12

                                            Page 146

1        Q.   So if -- and -- but if the company told

2    the market that lower oil prices would not hurt its

3    exploration, would you change your opinion?

4        A.   If the company said lower -- lower oil --

5    and I -- I -- I'd -- I'd -- I can't quite understand    14:59:33

6    that scenario.  A commodity-focused entity saying

7    oil prices didn't have any impact, that -- that

8    simply doesn't make sense to me.

9        Q.   So are you disputing that the company told

10   the market it didn't believe that its exploration    14:59:56

11   was hurt by lower oil prices?

12       A.   Well, no, I'm not disputing that because

13   obviously at this point, this is a field that wasn't

14   going to come on production for several years.  So

15   it isn't current oil prices.  It's the projection of    15:00:11

16   oil prices at the time production commences.  Those

17   are two very different time frames.

18       Q.   Right.

19            Because the then-prevailing oil prices

20   were not what was projected into the future;    15:00:23

21   correct?

22       A.   That is correct.

23       Q.   And, in fact, Anadarko didn't use spot

24   pricing, did it?

25       A.   Few people use spot pricing.  You use a    15:00:36

                                                  Page 147

```
 1    strip or a consensus on forward prices, that's

 2    correct.

 3         Q.   Which looks at future prices?

 4         A.   That's the strip, and that's what forwards

 5    are, yeah.                                    15:00:48

 6         Q.   And at the time the under- -- using strip

 7    prices, the prices of oil were expected to go up;

 8    correct?

 9         A.   They were.

10         Q.   So, for example, Bank of America had the  15:01:21

11    Brent price of oil at $80 a barrel in 2019; correct?

12         A.   I believe that's correct, yes.  I don't

13    have that number in front of me, but that sounds

14    reasonable.

15         Q.   And -- and the market didn't expect for   15:01:37

16    Shenandoah to come online before then, did it?

17         A.   The market did not expect that, no.

18         Q.   Okay.  In your report you also opine that

19    investors understood the Shen 4 encountered salt;

20    correct?                                      15:02:13

21         A.   That is correct, yes.

22         Q.   And what's the basis for opining that all

23    investors understood that the same way you did?

24         A.   Again, not all investors, but the market,

25    this was disclosed.                           15:02:23
```

Page 148

```
1        Q.   And where was it disclosed?

2        A.   In -- in public announcements after Shen 4

3   was drilled.  So this would have been -- let's see,

4   it -- the Shen 4, my recollection, was finalized at

5   the end of 2015, so results were known beginning        15:02:38

6   2016-ish.  I -- I do know -- I -- I recall that in

7   an earnings call after Shen 4, the company said Shen

8   5 would be necessary.

9        Q.   Okay.  But that's a different question

10  than what I asked.                                        15:02:58

11           Can you point me to one statement by the

12  company that used the word "salt"?

13       A.   I -- I can't right now, no.  No.

14       Q.   And, in fact, the company never said the

15  word "salt" --                                            15:03:11

16       A.   Okay.  Fine.  We knew we were drilling

17  subsalt.  So that's fine, yeah.

18       Q.   Any analyst report talk about Shenandoah 4

19  hitting salt?

20       A.   Not that I recall, no.                          15:03:24

21       Q.   An- -- any investor?

22       A.   Not that I recall, no.

23       Q.   And the company also didn't disclose that

24  Shen 4 hitting salt reduced the resource size by a

25  third; correct?                                           15:03:40
```

                                                    Page 149

 1          A.    They -- they did not disclose that, no.

 2    They did not make that statement.

 3          Q.    Okay.  And no statement that Shenandoah

 4    reduced the areal extent of the reservoir by more

 5    than 900 acres?                                    15:03:49

 6                MR. GRUENSTEIN:  Objection.

 7                THE WITNESS:  Not a specific -- not that I

 8    recall, no.

 9    BY MS. JENSEN:

10          Q.    And, in fact, some investors understood --   15:04:07

11    or misunderstood that Shenandoah 4 actually

12    increased the resource size; correct?

13          A.    So- -- I can't speak to what some

14    investors -- what an investor could have said.  I do

15    know the Shen 4 was drilled on the western side of     15:04:26

16    the reservoir and was certainly not as -- as

17    encouraging as Shen 5 proved to be.

18          Q.    You cite RBC in your report?

19          A.    I do.

20          Q.    And that's a credible source?              15:04:38

21          A.    They are, yes.

22          Q.    A sophisticated investor?

23          A.    It's a -- a major bank, an investment

24    bank, yes.

25          Q.    Okay.  You should be able to see what has   15:05:12

                                                    Page 150

1    been marked as Exhibit 510.

2              (Keller Deposition Exhibit 510 was marked

3              electronically.)

4              THE WITNESS:  I'm going to.  It's not up

5    yet.  Give me a second.  I'm on 509.  There's 510      15:05:25

6    just came up.

7              Okay.  I got it now.

8    BY MS. JENSEN:

9         Q.   Okay.  So for the record, this is a

10   document that bears the Bates stamp RBCCM00000150.      15:05:47

11             Have you seen this document before?

12        A.   I believe I have, yes.

13        Q.   Is this a document that's cited in your

14   report?

15        A.   I believe it is.                              15:06:06

16        Q.   And you didn't cite it for this

17   proposition, did you?

18        A.   I don't recall.  I reviewed hundreds of

19   reports, so...

20        Q.   Well, if it was relevant to this question,   15:06:16

21   you would have of course cited it in your report;

22   correct?

23        A.   I would hope so.

24        Q.   So you -- turn down -- so the -- on the

25   first page there is a heading in blue that says "Key   15:06:35

                                                    Page 151

1    points."

2            Do you see that?

3        A.   I do see it, yes.

4        Q.   And the second-to-the-last paragraph --

5        A.   "Continued success" --                     15:06:46

6            THE COURT REPORTER:  I'm sorry.

7    BY MS. JENSEN:

8        Q.   Yes.

9            THE COURT REPORTER:  One at a time,

10   please.                                             15:06:50

11   BY MS. JENSEN:

12       Q.   Okay.  Could you read that par- --

13   paragraph, please.

14       A.   Yes.  "Continued success in development

15   projects" -- "projects in the Gulf of Mexico.  The   15:06:57

16   fourth Shenandoah appraisal well successfully

17   encountered more than 620 net feet of oil pay,

18   extending the lowest known oil column downdip.  This

19   could portend increasing the resource potential in

20   the basin.  Additionally, first oil at the           15:07:14

21   Heidelberg pro-" -- "project is expected in 2016."

22   [As read]

23       Q.   So this report doesn't mention anything

24   about salt; correct?

25       A.   My recollection is that the initial well    15:07:26

                                        Page 152

```
 1    encountered salt and that the net pay was

 2    encountered in the sidetrack, two different

 3    wellbores.

 4         Q.   Okay.  This one doesn't mention anything

 5    about salt; correct?                              15:07:41

 6         A.   It does not.  But the -- the wellbore it's

 7    mentioning was 620 feet of net pay.  I don't believe

 8    encountered any salt.  That was a -- a sidetrack.

 9         Q.   Okay.  But it doesn't mention anything

10    about the initial results of the well being salt;  15:07:56

11    correct?

12         A.   I -- not that I read, no, it does not.

13         Q.   Yeah.

14              It also doesn't say that it reduced the

15    resource size?                                     15:08:05

16         A.   It does not say that, no.

17         Q.   Okay.  And, in fact, it says that it

18    portended the increase of the resource potential?

19              MR. GRUENSTEIN:  Objection.

20              THE WITNESS:  It portended.              15:08:18

21    BY MS. JENSEN:

22         Q.   Right.  That's what I said; right?

23         A.   I -- no, no.  I'm -- I'm agreeing.  It

24    says --

25         Q.   Oh.                                      15:08:26
```

Page 153

1      A.   -- portended.

2      Q.   Okay.

3      A.   Which does not mean it confirmed.  It

4   portended.  It was a data point.

5      Q.   Well, portend means to be a sign; correct?   15:08:33

6      A.   Well -- well, it -- it -- again, it's

7   potential.  Portend, an increasing resource

8   potential, again, potential.  And at the same time

9   Anadarko said it needed to drill 5 after drilling 4.

10     Q.   And so it's a sign of something likely to   15:08:52

11   happen; correct?  Do I need to get a dictionary out?

12     A.   No, you don't need to get --

13          MR. GRUENSTEIN:  Objection.

14          THE WITNESS:  -- dictionary out.

15   BY MS. JENSEN:                                      15:09:06

16     Q.   You'll agree with me; right?

17          THE WITNESS:  It portends.  I'll agree it

18   says --

19          THE COURT REPORTER:  I'm sorry.

20          THE WITNESS:  -- portend --                 15:09:08

21          THE COURT REPORTER:  One person -- wait --

22          THE WITNESS:  -- potential.

23          THE COURT REPORTER:  Hold on.  Can we slow

24   down?

25          MS. JENSEN:  Okay.

                                            Page 154

```
 1              THE COURT REPORTER:  There's multiple
 2    people --
 3              THE WITNESS:  Yes.
 4              THE COURT REPORTER:  -- speaking.
 5              THE WITNESS:  It portends potential, I        15:09:09
 6    would agree that that's what it says, yes.
 7    BY MS. JENSEN:
 8        Q.   Okay.  Thank you.
 9             Okay.  You also opine in your report that
10    investors did not view defendant statements about      15:09:20
11    Shen 4 results as confirming any particular resource
12    range.
13             What's the basis for saying all investors
14    understood this information the same way as you did?
15        A.   Once again, I'm not saying all investors.     15:09:33
16    I'm saying the market understood this because
17    Anadarko definitively stated it needed to drill 5.
18    It did not yet have enough information to sanction
19    this project.
20        Q.   Did you talk to any investors about what      15:09:47
21    they understood this to mean?
22        A.   I did not.
23        Q.   You don't say in this the market, you say
24    investors; correct?
25        A.   Okay.  I'm using the two interchangeably.      15:09:57
```

Page 155

```
 1    You're saying all investors.  I'm differentiating to

 2    your all investors and my investors.

 3         Q.   Okay.  So did you speak to any investors

 4    to confirm that that's the way they understood this

 5    information?                                    15:10:14

 6         A.   I did not.

 7         Q.   And in this portion of your report, you do

 8    not cite any investors, do you?

 9         A.   No.  I said -- I'm speaking of the market.

10    I'm using the market and investors interchangeably.  15:10:22

11         Q.   But you don't cite any investors in

12    your --

13         A.   That's correct.

14         Q.   -- report.

15         A.   I do not.

16              THE COURT REPORTER:  Sorry.  Wait.

17              THE WITNESS:  That's corr- --

18              THE COURT REPORTER:  If we can wait --

19    BY MS. JENSEN:

20         Q.   You also don't cite any analysts in this    15:10:31

21    section of your report, do you?

22         A.   Not that I recall.

23         Q.   So you don't have any support for this

24    opinion other than your own interpretation; correct?

25              MR. GRUENSTEIN:  Objection.              15:10:44
```

                                                    Page 156

```
 1            THE WITNESS:  And Anadarko's statement
 2    that it needed additional information before moving
 3    forward.
 4    BY MS. JENSEN:
 5         Q.   Which you credit as true; correct?         15:10:51
 6         A.   I do.
 7         Q.   And the market understood that Anadarko
 8    was drilling Shen 5 just to confirm its ultimate
 9    size; correct?
10         A.   To get additional information to confirm   15:11:36
11    the size of the reservoir, that's correct.
12         Q.   But it was just confirming its ultimate
13    size; correct?
14         A.   I'm not sure the -- the point you're
15    making.                                              15:11:49
16         Q.   Do you know Imperial Capital?
17         A.   I know the name.
18         Q.   And you cite it in your report; correct?
19         A.   Yes, I do.
20         Q.   So it's a credible source?                 15:11:59
21         A.   I believe them to be credible.
22         Q.   Okay.  A sophisticated investor?
23         A.   I would agree.
24         Q.   Okay.  You should be able to see what has
25    been marked as Exhibit 511.                          15:12:52
```

Page 157

```
 1              (Keller Deposition Exhibit 511 was marked

 2          electronically.)

 3              THE WITNESS:  Okay.  Hold on.  Coming up.

 4     I've got it.

 5     BY MS. JENSEN:                              15:13:10

 6         Q.   And did you review this report in forming

 7     your opinions?

 8         A.   I believe that I reviewed it.

 9         Q.   And, in fact, you cite this in your

10     report?                                     15:13:23

11         A.   Yes, I believe that's correct.

12         Q.   And so you've reviewed what Imperial

13     Capital said about Shenandoah at this time?

14         A.   I would have to refresh my memory.

15         Q.   So if you look at page 7.           15:13:35

16         A.   Okay.  I'm scrolling.

17         Q.   And for the record, this document --

18         A.   I'm at page 7, yes.

19         Q.   Okay.  Good.

20              Now, for the record, this document bears  15:14:01

21     the Bates stamp IC-000001.

22              Okay.  So you're on page 7 now?

23         A.   I am on page 7, yes.

24         Q.   Okay.  And it refers to, if you look down

25     the page, to APC's mega-projects.            15:14:16
```

Page 158

```
 1        A.    Yes.

 2              (Simultaneous speaking.)

 3              (Interruption in audio/video.)

 4              THE COURT REPORTER:  I'm sorry, mega what?

 5              MS. JENSEN:  Projects.              15:14:26

 6   BY MS. JENSEN:

 7        Q.    And you see that according to Imperial

 8   Capital, those mega-projects "include the potential

 9   +1.0 billion barrel Shenandoah discovery in the U.S.

10   Gulf of Mexico perhaps one of the largest oil fields  15:14:45

11   found in the last -- past five years in the U.S.

12   deepwater"?

13        A.    Yes.

14        Q.    And so it's parroting the terminology that

15   the company used with one of the largest oil fields?  15:15:02

16        A.    Potentially.

17              (Simultaneous speaking.)

18              (Interruption in audio/video.)

19              THE COURT REPORTER:  Was there an

20   objection?                                    15:15:11

21              MR. GRUENSTEIN:  Yes.

22   BY MS. JENSEN:

23        Q.    Okay.  If you turn back now to page 3.

24        A.    Okay.  Going there.

25              Okay.                              15:15:25
```

                                              Page 159

```
 1        Q.   Okay.  So the page has at the top the

 2   heading "Rationale"?

 3        A.   Yes, I'm at page 3.

 4        Q.   Okay.  And you see if you scroll down the

 5   page, APC also has some next generation mega-pro- --   15:15:37

 6        A.   Yes.

 7        Q.   -- -jects?

 8             "Advancing quickly."

 9             And that refers the same projects as we

10   just saw on the page prior --                          15:15:44

11        A.   Yes.

12        Q.   -- to that?

13        A.   Yes.

14        Q.   Okay.  And it says here, "They just need

15   an appraisal well or two"?                             15:15:52

16        A.   Yes, I read that.

17        Q.   Okay.  And it says, also, "The giant

18   Shenandoah oil field in the deep-water Gulf of

19   Mexico will go forward, in our opinion, as APC is

20   just confirming its ultimate size with the next       15:16:06

21   (4th) well to design facilities."  [As read]

22        A.   I read that, yes.

23        Q.   And so are they talking about the 4th or

24   the 5th?

25        A.   They are talking -- this says here the      15:16:18
```

Page 160

```
 1      4th.

 2              Q.   And so is that Shen 4, or is that Shen 5?

 3              A.   I believe this is Shen 4.

 4              Q.   Okay.  So the market understood that with

 5      Shen 4, Anadarko was just confor-  -- confirming its      15:16:30

 6      ultimate size; correct?

 7              A.   I don't agree with that characterization.

 8              Q.   Well --

 9              A.   This is Imperial saying in our opinion,

10      APC is just confirming.  Anadarko, on contrast, had      15:16:42

11      said it needed to drill 5 and 6.  So this is

12      Imperial's opinion.  This is not the market's

13      opinion.

14              Q.   Okay.  How do you differentiate between

15      the two?                                                 15:16:53

16              A.   Imperial is one bank out of a larger

17      universe.  So Imperial thinks this to be true.  I

18      would assume that they have reasonable basis to

19      believe it's true.  But Anadarko, the operator in

20      possession of more information than Imperial, said      15:17:09

21      it still did not have enough information to sanction

22      and needed to drill 5, and then needed to drill 6.

23              Q.   So are --

24              A.   This is a process.

25              Q.   Okay.  So even though this is a source      15:17:19
```

Page 161

```
 1    that you cite as credible and you've agreed it's a

 2    sophisticated investor, this is -- you don't credit

 3    this opinion?

 4              MR. GRUENSTEIN:  Objection.  Compound.

 5              THE WITNESS:  I'm saying it's an opinion.    15:17:35

 6    BY MS. JENSEN:

 7         Q.   And did this --

 8         A.   Sub --

 9         Q.   Did you factor --

10         A.   Sub --                                        15:17:41

11         Q.   -- this opinion into --

12              (Simultaneous speaking.)

13              (Interruption in audio/video.)

14              THE COURT REPORTER:  I'm sorry, did you

15    have -- I didn't -- could you start over, please.      15:17:46

16    BY MS. JENSEN:

17         Q.   Did you consider this report when you were

18    forming your opinion?

19         A.   I read this report and took it as one --

20    one entity's opinion.  But I certainly gave more       15:17:56

21    weight to the fact that the operator said it needed

22    additional information before it could move forward.

23         Q.   So this is referring to Shen 4, and at

24    least one sophisticated investor believes Anadarko

25    is simply confirming its ultimate size; correct?      15:18:22
```

Page 162

1          A.    Anadarko never said that.  This --

2    Imperial Capital says this, correct.

3          Q.    Right.  And that's what I'm referring to.

4          A.    Yeah, yeah.

5          Q.    Okay.  And so on a conference call after      15:18:31

6    Shen 4, defendant Daniel said we're in the same

7    range; correct?

8          A.    I believe that's correct.

9          Q.    And that was important to the market

10   because that was what sophisticated investors wanted    15:18:46

11   to know from Shen 4?

12              MR. GRUENSTEIN:  Objection.

13              THE WITNESS:  Again, I'd only caveat that

14   by saying range of reserves does not necessar- --

15   large reserves are not necessarily producible.         15:19:05

16   There are lots of big reserves that are never

17   produced because the costs are too high relative to

18   the potential value.  So reserves -- the existence

19   of reserves does not necessarily mean they will be

20   developed.                                              15:19:19

21   BY MS. JENSEN:

22        Q.    But with that caveat, otherwise you agree;

23   correct?

24              MR. GRUENSTEIN:  Objection.

25              THE WITNESS:  I agree with -- I -- repeat    15:19:25

                                              Page 163

1    your statement, please, before I can agree or

2    disagree.

3    BY MS. JENSEN:

4         Q.   But that's what the market was looking for

5    with Shen 4 to confirm the size of Shenandoah?        15:19:33

6         A.   No --

7              MR. GRUENSTEIN:  Object --

8              THE WITNESS:  -- I didn't -- I don't agree

9    with that.  That's what -- that's what one analyst,

10   one bank was saying, whereas others were saying        15:19:42

11   they -- it was still too early.

12   BY MS. JENSEN:

13        Q.   Okay.  But you'll agree with me that at

14   least one sophisticated investor --

15        A.   I would agree that Imperial said this,        15:19:51

16   yes.

17        Q.   Okay.

18             MR. GRUENSTEIN:  Peter, just let -- let

19   Rachel finish her question.

20             THE WITNESS:  I'm sorry.  Yeah.              15:19:59

21             MS. JENSEN:  So eager to answer my

22   questions.  Okay.

23   BY MS. JENSEN:

24        Q.   Okay.  In your report you also opine that

25   investors understood after Shen 4 that any FID would    15:20:38

Page 164

1    depend on the information gathered from Shen 5 and

2    Shen 6 as Anadarko --

3         A.   Correct.

4         Q.   -- could better understand the size and

5    quality on the east side of the prospect; co- --        15:20:50

6    correct?

7         A.   Correct.  Yes.

8         Q.   And what's the basis for your opinion that

9    investors understood this information exactly as you

10   did?                                                     15:21:04

11        A.   Repeated statements by the company that

12   they needed to drill 5 and 6 before they could

13   commit capital to develop the field.

14        Q.   You don't -- you -- you didn't survey --

15   survey any investors --                                  15:21:18

16        A.   I did not.

17        Q.   -- for this opinion?

18             (Simultaneous speaking.)

19             (Interruption in audio/video.)

20             THE COURT REPORTER:  I'm sorry, I did --       15:21:24

21   for this what?

22   BY MS. JENSEN:

23        Q.   Opinion.

24        A.   I did not.

25        Q.   And, in fact, you don't cite any investors     15:21:32

                                                  Page 165

1    for this opinion, do you?

2        A.   I cite public statements by the company

3    about what was necessary to advance the project.

4        Q.   But that's not answering my question.  You

5    don't cite any investors, do you?                    15:21:44

6        A.    You've asked me repeatedly; and, no, I

7    have not cited any individual investor.  I'm citing

8    what the market was aware of.

9        Q.   So you don't have any reason to believe

10   that investors understood this information exactly   15:22:04

11   as you did; correct?

12       A.   My opinion is the market understood this,

13   and could you find an investor that had a different

14   opinion, I'm certain that you could.  But the market

15   understood what was necessary to advance this        15:22:20

16   project.

17       Q.   Okay.  And, in fact, in this section you

18   don't cite any source other than the company;

19   correct?

20       A.   That is correct.                            15:22:30

21       Q.   And you're assuming with this opinion that

22   Anadarko, its internal decision-making was what it

23   said to the market; correct?

24            MR. GRUENSTEIN:  Objection.

25            THE WITNESS:  I would say correct because    15:22:56

                                                Page 166

1    Anadarko controls the capital investment.  And

2    without capital investment in a platform, there will

3    be no development; there will be no reserves, that's

4    correct.

5    BY MS. JENSEN:                                          15:23:11

6         Q.   And you're assuming that Anadarko's

7    decision depended on the results of both Shen 5 and

8    Shen 6?

9         A.   That was their statement, and I believe it

10   to be true, yes.                                        15:23:24

11        Q.   And if it is incorrect, then your opinion

12   would be ba- -- would be based on a faulty

13   assumption; correct?

14        A.   It's a statement of intention.  I don't

15   know how you would prove that to be false.  They       15:23:37

16   said it was dependent on 5, and they drilled 5 and

17   spent significant money.  Then they drilled 6 and

18   spent significant money.  So it wasn't just a

19   statement.  It was a statement followed by

20   dedication of significant capital.                      15:23:49

21        Q.   And you didn't review any internal

22   documents to determine when Anadarko made its

23   decision to write off Shenandoah, did you?

24        A.   I -- I did not, no.

25        Q.   So you have no idea whether Anadarko based   15:24:01

Page 167

1    its decision on results of Shenandoah 5 or 6;

2    correct?

3         A.   I have an opinion.

4         Q.   Do you have any information for that

5    opinion, or you're just going to go ahead and make     15:24:16

6    that opinion?

7         A.   I have --

8              MR. GRUENSTEIN:  Objection.

9              THE WITNESS:  -- an opinion based on the

10   fact that Anadarko comitted a significant part of      15:24:22

11   its capital budget to the drilling of two additional

12   wells.

13   BY MS. JENSEN:

14        Q.   But you haven't looked at any internal

15   documents?                                             15:24:30

16        A.   That's correct.

17        Q.   So you don't know what the decision turned

18   on; correct?

19        A.   I am taking their statements as true.

20             MS. JENSEN:  Okay.  Let's go off the         15:24:48

21   record.

22             THE VIDEOGRAPHER:  We're off the record?

23   Okay.

24             Off the record.  It's 3:24 p.m.

25             (Short recess taken.)                        15:25:24

                                                    Page 168

```
 1            THE VIDEOGRAPHER:  We're back on the

 2   record.  It's 3:49 p.m.

 3   BY MS. JENSEN:

 4       Q.   Okay.  Welcome back, Mr. Keller.  Now,

 5   your report at paragraph 90 talks about how,          15:49:13

 6   "Investors understood that investments in Shenandoah

 7   would be impacted by develop- -- developments in the

 8   rest of the Gulf of Mexico, as Anadarko [sic] would

 9   be able to leverage existing infrastructure and take

10   advantage of tiebacks"; correct?                      15:49:31

11       A.   That's correct.

12       Q.   Is -- another way of saying that is

13   brownfield; correct?

14       A.   Not brownfield.  I'm talking about subsea

15   tieback, so you can spread capital cost over          15:49:47

16   multiple fields.

17       Q.   Well, taking advantage of existing

18   infrastructure; right?

19       A.   Yeah, yeah.

20       Q.   And so taking advantage of existing          15:49:57

21   infrastructure is one form of brownfield; correct?

22       A.   I guess you can say that.  Brownfield's a

23   little incongruence when you're talking about

24   deepwater.  But I -- I get your drift, yeah.

25       Q.   Right.  In other words, it's being able to   15:50:14
```

                                              Page 169

1    use existing infrastructure and not creating

2    everything from scratch?

3         A.   Correct.

4         Q.   Okay.  And you're aware that the company

5    said in September of 2016 that Anadarko didn't need      15:50:31

6    material commodity price improvements to make money

7    in the Gulf of Mexico; correct?

8         A.   I am aware of that, yes.

9         Q.   That's an instance at which the company

10   referred to strip pricing which refers to future        15:50:56

11   pricing of oil, not --

12        A.   Correct.

13        Q.   -- the then-prevailing pricing of oil;

14   correct?

15        A.   Correct.                                       15:51:04

16        Q.   Okay.

17        A.   Not spot price, yeah.

18        Q.   Okay.  You also opine that by no later

19   than May 2016, investors understood there was

20   faulting in the Shenandoah basin, including between      15:51:17

21   Shen 2 and Shen 3 and between Shen 2 and Shen 4;

22   correct?

23        A.   Can repeat the date, please.

24        Q.   May 2016.

25        A.   By May -- May of 2016, yeah, okay.             15:51:31

Veritext Legal Solutions
866 299-5127

1   She- -- Shen 4 was completed, that's correct.  Shen

2   4 was done, yeah.

3        Q.   Okay.  And so you'll -- you'll concede

4   there was no statement before May 2016; correct?

5        A.   That there was no statement on faulting?   15:51:47

6        Q.   Yes.

7        A.   I -- I don't recall.

8        Q.   If there was, you would have included it

9   in your report; correct?

10        A.   I would expect myself to have done that,   15:52:03

11   yes.

12             But I -- I don't recall that there was a

13   statement.  That's all I'm saying.

14        Q.   You don't recall there was a statement

15   before May of 2016; correct?                       15:52:13

16        A.   Correct.

17        Q.   Okay.  And you understand that a

18   whistleblower complaint had been launched with the

19   company by this date; correct?

20        A.   I was.                                    15:52:23

21        Q.   You weren't aware at the time, were you?

22        A.   At -- at what time?

23        Q.   In May of 2016.

24        A.   No.  No, certainly not.

25        Q.   You only became aware of that as part of  15:52:32

                                            Page 171

1    this ligation?

2         A.    That is correct, yes.

3         Q.    And by this time frame of May 2016,

4    Anadarko was aware of small-scale faulting at the

5    scale of 300 to 400 feet; correct?                    15:52:48

6         A.    By May of 2016, yes, they had drilled 3

7    and 4, so they had some information about faulting.

8         Q.    That's not -- that's not my question.

9              My question is that they were re aware of

10   small-scale faulting at the scale of 300 to          15:53:02

11   400 feet?

12        A.    I don't recall the exact scale.  They were

13   aware of faulting, so I don't recall exact -- exact

14   scale.

15        Q.    Okay.  And so are you aware that at the     15:53:13

16   time Anadarko was aware of small-scale faulting?

17        A.    I don't -- I don't recall.

18        Q.    Okay.  And are you aware that by this

19   time, the company had concerns that Shenandoah may

20   be a busted-up reservoir?                              15:53:29

21        A.    Generally, yes.

22        Q.    And the -- that piece, the busted-up

23   reservoir, that was not disclosed to the market;

24   correct?

25              MR. GRUENSTEIN:  Objection.                 15:53:40

                                              Page 172

```
 1              THE WITNESS:  I don't believe it was in

 2      its one factor.

 3      BY MS. JENSEN:

 4          Q.   Now, the statement from the company in May

 5      of 2013 blamed poor seismic imaging; correct?        15:53:52

 6              MR. GRUENSTEIN:  Objection.

 7              THE WITNESS:  Seismic is generally

 8      degraded subsalt, that's correct.

 9      BY MS. JENSEN:

10          Q.   Right.  And -- and they blamed -- they       15:54:08

11      blamed it on poor seismic imaging; correct?

12              MR. GRUENSTEIN:  Objection.

13              THE WITNESS:  That's my recollection, yes.

14      BY MS. JENSEN:

15          Q.   But faults were known internally at the      15:54:20

16      company long before then; correct?

17              MR. GRUENSTEIN:  Objection.

18              THE WITNESS:  It's a re- -- it's a region

19      characterized by faulting.  Exact location generally

20      is not known with certainty until there are           15:54:32

21      penetration [verbatim].

22      BY MS. JENSEN:

23          Q.   And the company specifically held out

24      Shenandoah as above average for the region; correct?

25              MR. GRUENSTEIN:  Objection.              15:54:46
```

Page 173

```
 1              THE WITNESS:  I believe that's --

 2     statements were made to that effect, yes.

 3     BY MS. JENSEN:

 4          Q.   And nowhere in the statement in May of

 5     2016 did the company disclose that it had known      15:55:01

 6     years before that about faulting in -- in

 7     Shenandoah; correct?

 8              MR. GRUENSTEIN:  Objection.

 9              THE WITNESS:  That region of the gulf was

10     generally acknowledged to be subject to faulting.    15:55:17

11     BY MS. JENSEN:

12          Q.   But, yeah.  I -- so, Mr. Keller, I don't

13     want to go round and round on this because we could

14     just go --

15          A.   Yeah, understand.                           15:55:27

16          Q.   Okay.  So if you could answer my question,

17     because you've already answered that question, we've

18     gone around on that one.

19          A.   Okay.

20          Q.   So -- so my -- my question to you was to    15:55:36

21     nowhere in that statement did the company disclose

22     to them nine years before that about faulting in

23     Shenandoah; correct?

24              MR. GRUENSTEIN:  Objection.

25              THE WITNESS:  I believe that's correct.      15:55:51
```

Page 174

```
 1    BY MS. JENSEN:

 2         Q.   And in that statement the company also

 3    said that it was -- it needed to include the

 4    faulting in its development plan?

 5         A.   Different geologists and geophysicists had    15:56:04

 6    different interpretations of the data.

 7              MS. JENSEN:  I'm going to strike that as

 8    nonresponsive.  That has nothing to do with the

 9    question I asked.

10    BY MS. JENSEN:                                          15:56:23

11         Q.   Did -- the -- the company also said it

12    needed to include that in its development plan;

13    correct?

14              MR. GRUENSTEIN:  Objection.

15              THE WITNESS:  That would be a factor          15:56:30

16    included, yeah.

17    BY MS. JENSEN:

18         Q.   Right.  In other words, it inferred that

19    Shenandoah's still on track for development; right?

20              MR. GRUENSTEIN:  Objection.                   15:56:36

21              THE WITNESS:  It was still on track until

22    Shenandoah 6.

23    BY MS. JENSEN:

24         Q.   And that's what your opinion's based on;

25    right?                                                  15:56:49
```

                                            Page 175

```
 1         A.   Yes, ma'am.  Yes, it is.
 2         Q.   Okay.  And nowhere in that statement did
 3    it -- did the company say that faulting had rendered
 4    Shenandoah uncommercial; correct?
 5         A.   Faulting per se does not do that.         15:57:02
 6         Q.   And so they didn't say that; right?
 7         A.   That's correct.
 8         Q.   Okay.  It also didn't say that senior
 9    management had already decided against developing
10    Shenandoah as the operator; right?               15:57:16
11         A.   Correct.
12         Q.   All right.
13              Bear with me here for a second -- a
14    moment.
15              Okay.  So paragraph 266 you talk about     15:57:54
16    what Cobalt said around this time?
17         A.   I'm going to the citation.  266?
18         Q.   Yes.  And just to orient you, that is on
19    page 126.
20         A.   Okay.  I'm there now.                     15:58:28
21         Q.   Okay.  So nothing in that paragraph
22    mentions faulting; correct?
23         A.   I'm reading the paragraph now.
24              I do not see any mention of faulting, no.
25         Q.   Okay.  And you don't cite any other       15:58:47
```

Page 176

```
 1    company statement that uses the word "faulting";
 2    correct?
 3         A.   I don't believe I do.
 4         Q.   In your paragraph 268, you say that
 5    "Plaintiffs' investment managers were clearly aware   15:59:11
 6    of Shenandoah's complex structural properties and
 7    appraisal uncertainties."  What's the basis for this
 8    statement?
 9         A.   You have corrected me today.  My -- the
10    basis of the statements by Fidelity, Janus and        15:59:24
11    Wellington, who you -- I did not realize until today
12    when you told me that they were not in fact IMs to
13    the plaintiffs.
14         Q.   For the class reps, that's right.
15         A.   Yeah, excuse me, the class reps.  Excuse   15:59:36
16    me, yes.  Yes.
17         Q.   Except for -- and I just want to make sure
18    we're clear, except for Janus?
19         A.   Yeah, okay.  Excuse me, yes.  Yeah.
20         Q.   Yeah.  And so, then the only basis for      15:59:48
21    your statement here is the paragraph -- let's see,
22    268 b?
23         A.   268 b, as in "boy"?
24         Q.   Yeah.
25         A.   Okay.  I read it.                           16:00:12
```

Page 177

1          Q.   Okay.  So that's what I'm saying.  So --

2     so taking out the other entities, that is the basis

3     for this paragraph; correct?

4          A.   I would say yes.

5          Q.   And 268 b does not have the word "fault"     16:00:38

6     in it, does it?

7          A.   No.

8          Q.   And it also says that it doesn't

9     necessarily mean the reservoir is bad; correct?

10         A.   That is correct.                             16:00:55

11              Complexity is often a function of

12    faulting, though.  A complex reservoir is one that's

13    not continuous or not interconnected with good

14    communication.

15         Q.   It's not synonymous, but it can be used      16:01:14

16    for?

17         A.   That is correct.

18         Q.   But again, just to reiterate, the --

19    that -- that quote does not mention --

20         A.   I don't see faulting in that quote; that's   16:01:23

21    correct.

22         Q.   Okay.  And so, just to reiterate, there's

23    no other company statement that said there was

24    faulting; correct?

25         A.   I'd have to refresh myself.  I think         16:01:40

                                                  Page 178

```
 1    Anadarko had discussed faulting it had encountered

 2    when it was drilling.

 3         Q.   The May 26 statement; right?

 4         A.   I believe even earlier.  I believe on

 5    May 3rd, Anadarko talked about faulting.          16:02:05

 6         Q.   Well, that's the one we talked about

 7    before.

 8         A.   Okay, yeah.  Yeah, I'm sorry, you said

 9    May 26th.  I thought you were talking about

10    something else.  Yeah, okay, fine.               16:02:16

11         Q.   Okay.  So -- but that was the only time

12    that the company mentioned faulting; correct?

13         A.   Well, May 20 -- the -- the UBS conference

14    sales had mentioned faulting.

15         Q.   Well, they didn't say it anywhere during  16:02:26

16    the conference, did they?

17         A.   I would have to refresh myself.  My

18    recollection was that they did talk about faulting.

19         Q.   But if they didn't, then would you change

20    your opinions?                                   16:02:40

21         A.   I don't know --

22              MR. GRUENSTEIN:  Objection.

23              (Simultaneous speaking.)

24              (Interruption in audio/video.)

25              THE COURT REPORTER:  I'm sorry, could you  16:02:46
```

Page 179

```
 1    start -- could you repeat.
 2    BY MS. JENSEN:
 3         Q.   So that was not part of the --
 4              MR. GRUENSTEIN:  Let him answer the
 5    question.                                        16:02:51
 6    BY MS. JENSEN:
 7         Q.   So you didn't rely on --
 8              MR. GRUENSTEIN:  No.  No.  There was a
 9    question that was pending.  I objected, and he can
10    answer.                                          16:02:57
11              Do you have the question, Peter?
12              THE WITNESS:  No.  Can you repeat the
13    question, please.
14    BY MS. JENSEN:
15         Q.   If they didn't, would that change your    16:03:08
16    opinion?
17         A.   Again, can you -- if they didn't what?
18         Q.   If they didn't mention the word "faulting"
19    at the UBS conference, would that change your
20    opinion?                                         16:03:20
21         A.   Again, faulting is -- is just one
22    component.
23         Q.   Okay.  But you're not contending that they
24    said the word "fault" at that conference; correct?
25         A.   As I said, I'd -- I'd have to refresh my    16:03:29
```

                                                    Page 180

```
 1    recollection.  I -- I don't recall if they
 2    specifically used the word "faulting."
 3         Q.   In fact, they did not use the
 4    word "faulting."
 5              MR. GRUENSTEIN:  Objection.          16:03:43
 6    BY MS. JENSEN:
 7         Q.   Right.  Sitting here today, you don't know
 8    that they used that word?
 9         A.   My recollection the graphic from that UBS
10    conference included a line that would indicate a    16:03:54
11    fault.
12         Q.   But they didn't say the word "fault";
13    correct?
14         A.   I'd -- I'd have to read the transcript
15    again.  Looking at the graphic, I would say I see    16:04:06
16    fault.
17         Q.   Well, but it doesn't say the word "fault";
18    does it?
19         A.   Okay, okay, fine.
20         Q.   And there's not a key that says fault;      16:04:17
21    correct?
22         A.   There's not a key that says fault; that's
23    correct.
24         Q.   In fact, after the write-off, analysts
25    said that it appeared to be much more               16:04:32
```

```
 1    compartmentalized than they had thought; correct?

 2         A.    Compartmentalization is a result of

 3    faulting.  But you can have compartmentalization

 4    with a thick pay zone and/or high permeability and

 5    prosody and still high commerciality.  So, again,        16:04:54

 6    faulting and compartmentalization is one function,

 7    as is permeability, porocity, reservoir drive, and

 8    depth of the productive horizon.

 9         Q.    Okay.  So Mr. Keller, if you could just

10    focus on my question.                                    16:05:13

11         A.    Yep, I'm trying to.

12         Q.    I know.  We'll get through this, I

13    promise, if you can just focus on my question.  So

14    your answer had nothing to do with my question.

15              My question was:  After the write-off, did    16:05:23

16    analysts say that Shenandoah appeared to be much

17    more compartmentalized than they had thought during

18    the class period?

19         A.    I think there were analysts at multiple

20    times that said this was a complex -- a rise in         16:05:37

21    complex reservoir, not just after the -- not just

22    after the write-off, but during the development and

23    during the drilling appraisal.

24         Q.    So are you denying that analysts said that

25    after the write-off it appeared --                      16:05:51
```

Page 182

```
 1        A.    No, I'm not deny- -- I'm not denying it.

 2        Q.    Okay.

 3              MR. GRUENSTEIN:  Peter, just wait for the

 4   question --

 5              THE WITNESS:  Sorry.                  16:05:58

 6              MR. GRUENSTEIN:  -- to --

 7              THE WITNESS:  Yeah.

 8   BY MS. JENSEN:

 9        Q.    So Société Générale is one of the analysts

10   that you cite in your report; correct?            16:06:24

11        A.    SocGen, yes.  Yep.

12        Q.    Did you review the reports that were

13   produced by Société Générale?

14        A.    I reviewed the reports that I footnoted.

15        Q.    And so, if they pertained to your          16:06:36

16   opinions, you would have cited in your report;

17   correct?

18        A.    I would have attempted to.  Again, did I

19   see every single report, I'm not sure that I did.

20        Q.    Okay.  So I have marked what's -- what     16:06:55

21   we're identifying here as Exhibit 512.

22              (Keller Deposition Exhibit 512 was marked

23              electronically.)

24        A.    Okay.  One moment.

25        Q.    And for the record, this is a document     16:07:07
```

Page 183

```
 1    bears the Bates stamp SG_PROD 068976.

 2         A.   Okay.  I'm there.

 3         Q.   Okay.  Have you reviewed this report

 4    before?

 5         A.   I believe I have.                       16:07:37

 6         Q.   Okay.  And then you'll recognize when I

 7    point you to the direct -- the portion of the

 8    report, that refers to compartmentalized structure,

 9    that this was one of the analysts that said post

10    write-off that Shenandoah was more compartmentalized  16:07:56

11    than first thought; correct?

12         A.   I'm -- I'm reading through it now.

13         Q.   If you need me to point you to the --

14         A.   Yeah, if you can point me to --

15         Q.   Sure.                                   16:08:18

16         A.   That would save us some time.

17         Q.   Okay.  So page 10.

18         A.   Okay.  Yes, I read that, yes.

19         Q.   So analysts did comment that after the

20    write-off, it appeared Shenandoah was much more     16:08:59

21    compartmentalized than first thought; right?

22         A.   Yes, I mean, the drilling of an additional

23    dry hole shows lack of continuity of reservoir, so

24    that's correct, yes.

25         Q.   Well, it doesn't refer in that sentence  16:09:13
```

Veritext Legal Solutions
866 299-5127

 1    the Shenandoah 6; does it?

 2        A.   No.   But you will recall that after 4,

 3    they said they needed 5.   After 5, they said they

 4    needed 6, and 6 did not confirm what they were

 5    looking for.   So then the decision was made to -- to    16:09:27

 6    stop.

 7        Q.   Again, you haven't reviewed any internal

 8    documents to know --

 9        A.   That's correct.

10             (Simultaneous speaking.)                       16:09:44

11             (Interruption in audio/video.)

12             THE COURT REPORTER:  I'm sorry, wait.  I

13    didn't hear the full question.

14             THE WITNESS:  I have not reviewed internal

15    documents.                                              16:09:49

16    BY MS. JENSEN:

17        Q.   I mean, if you want to just answer

18    "correct" to all my questions going forward, that's

19    fine, Mr. Keller.  I'd be alright with that.  I'm

20    not sure your --                                        16:09:58

21        A.   No, I'll wait -- I'll wait for your

22    questions.  I'm sorry.

23             MR. GRUENSTEIN:  If he doesn't wait for

24    the answer, just saying "correct" won't help you

25    very much either.                                       16:10:08

                                              Page 185

```
 1              MS. JENSEN:  That's a good point, Touche.
 2     BY MS. JENSEN:
 3         Q.    Okay.  Your report talks about Shenandoah
 4     5; correct?
 5         A.    That is correct.                        16:10:31
 6         Q.    And in your report, you acknowledge that
 7     the market thought Shenandoah 5 was a promising
 8     development; correct?
 9         A.    That's correct.
10         Q.    In fact, Shenandoah 5 had more net pay    16:10:45
11     than Shenandoah 2; right?
12         A.    Yes, it did, yes.
13         Q.    And so, the market understood, did it not,
14     that Shenandoah 5 resulted in a -- an increase in
15     the resource size?                                 16:11:06
16         A.    I don't think that's necessarily true.  It
17     was a positive data point, but that still needed to
18     drill an additional well.
19         Q.    So is it your testimony that no investors
20     thought that Shenandoah 5 increased the resource    16:11:25
21     size of Shenandoah?
22         A.    Some might have, some might not have.  If
23     you recall, Shen 5 was located in between 1 and 2,
24     not in the flanks, so it did not expand the areal
25     extent.                                             16:11:41
```

Page 186

1          Q.   So I marked what's been identified as

2     Exhibit 513, which for the record, is APC-01329 --

3          A.   Going to it now -- mm-hmm.

4          Q.   -- 41 -- I'm sorry, Mr. Keller, just let

5     me finish the Bates number so that the record is          16:12:11

6     clear.

7               So this is a document that bears the Bates

8     stamp APC-01329241.

9               (Keller Deposition Exhibit 513 was marked

10              electronically.)                                16:12:23

11    BY MS. JENSEN:

12         Q.   Can you see this document?

13         A.   I just pulled it up, yes.

14         Q.   Okay.

15         A.   I've got it.                                    16:12:39

16         Q.   Okay.  And are you familiar with Simmons &

17    Company?

18         A.   Matt Simmons was a well regarded analyst,

19    yep.

20         Q.   And -- and so, you would -- you would          16:12:50

21    regard Simmons as a sophisticated investor?

22         A.   As a knowledgeable oil and gas investor,

23    yes, I would.

24         Q.   As a sophisticated investor?

25         A.   Yes.                                            16:13:02

                                                   Page 187

```
 1        Q.    Okay.  Now, if you turned to page 3.

 2        A.    Okay.  I'm going there now.

 3              Yes.

 4        Q.    Okay.  And you'll see there's a discussion

 5   of Shenandoah?                                   16:13:35

 6        A.    I'm searching for it now on page 3.  I'm

 7   sorry, here we -- again -- yes, I'm sorry, I've got

 8   it now.

 9        Q.    Okay.  It's somewhat small, so you may

10   need to zoom in.                                 16:14:10

11        A.    I got -- that's what I was doing.  Yeah.

12        Q.    Okay.  Okay.

13              So in approximately the -- it's like a

14   little below the middle of the paragraph, do you see

15   the sentence, "While the company" -- referring to  16:14:33

16   Anadarko -- "has not changed its resource estimate,

17   it appears likely that this has upside to its prior

18   500 MMboe EUR estimate."

19              Do you see that?

20        A.    Yes.                                   16:14:52

21        Q.    Okay.  And the reference to the 500

22   million barrels UR -- I'm sorry, EUR estimate,

23   that's what we were talking about earlier --

24        A.    Yes.

25        Q.    -- with respect to giant field; correct?  16:15:01
```

```
 1        A.    Ultimate recoverables; that's correct.

 2        Q.    Yeah.  So that refreshes your recollection

 3   that giant field refers to 500 MMboe --

 4        A.    Yes.

 5        Q.    -- EUR?                                   16:15:11

 6        A.    Yes.

 7        Q.    Okay.  So that -- that's not gross, that's

 8   recoverable --

 9        A.    Estimated --

10        Q.    -- right?                                 16:15:19

11        A.    -- ultimate -- yes.

12        Q.    Okay.  So based on this report, the

13   sophisticated -- at least one sophisticated investor

14   believed that Shenandoah likely increased the

15   resource size above the company's giant field        16:15:32

16   estimate; correct?

17        A.    Well, this would have been after 4, but

18   before 5, if I'm looking at the date correctly, this

19   is June of '16.  And 5 didn't -- 5 was drilling in

20   June of '16.  It hadn't reached total depth yet.      16:15:54

21        Q.    Okay.  Well, do you see right after that,

22   the -- it says, "At this juncture APC has shared

23   that the pay zone is as large as 1,000"?

24        A.    Yes.

25        Q.    What well do you think that's referring    16:16:07
```

Page 189

1    to?

2         A.   Shen 5.

3         Q.   Okay.  And areal extent of 5 -- of --

4    sorry, strike that.

5              Has an "areal extent of 9 miles (three        16:16:14

6    blocks)."  Is that --

7         A.   Yes.

8         Q.   -- an increase in what the areal extent

9    was up until that point?

10        A.   Well, it's hard for me to say definitively  16:16:26

11   because, as I said, Shen 5 was between 1 and 2, it

12   wasn't on the flank.  Shen 4 was western flank,

13   Shen 3 was eastern flank.  So that would increase

14   the areal extent.  Shen 5 is in the middle, almost

15   midpoint between 1 and 2.  So it's confirming good    16:16:44

16   pay in the middle, but I -- I don't know that it

17   necessarily increases the areal extent because you

18   already had 1 and 2 down and penetrated.

19        Q.   Okay.  And it says that it "has Miocene

20   like rock prop" -- "properties" --                    16:17:00

21        A.   Yes, yes.

22        Q.   And -- and that was intended to say it was

23   a -- above the average for GOM; correct?

24        A.   Yes, yes.

25        Q.   Okay.  And certainly it doesn't appear       16:17:11

                                              Page 190

1    that Simmons, as a sophisticated investor, thought

2    that Shenandoah 5 resulted in a significant

3    reduction of Shenandoah resource size --

4         A.   No, I thought --

5         Q.   -- correct?                              16:17:26

6         A.   -- Shenandoah 5 was a good well.

7         Q.   Yeah.  And so, it's your opinion that it

8    increased the resource size?

9         A.   Potential resource size, but again, until

10   you make an FID, nothing is recoverable, it's        16:17:41

11   estimated ultimate recoverables, but until you make

12   FID, you can't make anything.

13        Q.   Well, certainly Anadarko didn't disclose

14   to the market that Shenandoah resulted in a

15   significant reduction of the resource size; correct?  16:17:55

16             MR. GRUENSTEIN:  Objection.  Shen --

17             THE WITNESS:  No --

18             (Simultaneous speaking.)

19             (Interruption in audio/video.)

20             THE COURT REPORTER:  I'm sorry, I didn't    16:18:07

21   hear some of that.  Can you please repeat the

22   objection.

23             MR. GRUENSTEIN:  I said Shen 5.

24   Ms. Jensen said Shenandoah resulted in a significant

25   reduction.                                          16:18:14

                                          Page 191

```
 1              MS. JENSEN:  Okay.  Thank you for

 2    clarifying.

 3    BY MS. JENSEN:

 4         Q.   Correct?  I'm sorry.  You've already --

 5    you've already answered the question.          16:18:24

 6         A.   Fine, fine.

 7         Q.   Okay.  The company didn't disclose that

 8    Shen 5 hit tar; correct?

 9         A.   Not to the best of my knowledge, no.

10         Q.   Okay.  You also opine that after Shen 5 --  16:18:37

11    strike that.

12              You also opine that investors understood

13    that after Shen 5, any FID would depend on the

14    results of Shen 6 --

15         A.   That's correct.                        16:19:07

16         Q.   -- the ability to reduce --

17              (Simultaneous speaking.)

18              (Interruption in audio/video.)

19              THE COURT REPORTER:  I'm sorry?

20    BY MS. JENSEN:                                   16:19:12

21         Q.   The ability to reduce development costs

22    and commodity prices; correct?

23         A.   Correct.

24         Q.   Now, you're assuming that Anadarko made

25    its decision to write down Shenandoah at least in  16:19:23
```

Page 192

```
 1   part based on Shen 6 results; correct?

 2        A.   That is correct.

 3        Q.   And if they had decided already, prior to

 4   the results of Shen 6, would that change your

 5   opinion?                                      16:19:37

 6             MR. GRUENSTEIN:  Objection.

 7             THE WITNESS:  I'm not aware that any such

 8   decision was ever made.

 9   BY MS. JENSEN:

10        Q.   Right.  So -- so that's an assumption    16:19:48

11   you're making.  So if your assumption was faulty,

12   your opinion would also be incorrect; right?

13             MR. GRUENSTEIN:  Objection.

14             THE WITNESS:  I'm sorry, again?

15   BY MS. JENSEN:                                16:19:57

16        Q.   So --

17             MR. GRUENSTEIN:  I said objection, but you

18   can answer.

19             THE WITNESS:  Oh, okay.  If they had made

20   that decision prior to the drilling of Shen 6, then  16:20:04

21   their statements about it being dependent on Shen 6

22   would have been inaccurate, so yes.

23   BY MS. JENSEN:

24        Q.   You also opine that investors understood

25   in late 2016 and early 2017, as Anadarko discussed   16:20:19
```

Page 193

1    potential development solutions for Shenandoah, that

2    the prospect would not be developed in the existing

3    economic environment; correct?

4         A.   Yes.

5         Q.   And what does the "existing economic          16:20:37

6    environment" mean?

7         A.   That then prevailing estimates of future

8    oil and gas prices and the then expected costs of

9    development.

10        Q.   Okay.  So the then prevailing estimates of   16:20:56

11   future oil and gas prices, are you referring -- what

12   timeframe are you referring to?

13        A.   I -- I didn't specify a time period.

14   It's, you know, intermediate to longer term.

15   You're -- you -- you're forced to make a go/no-go      16:21:17

16   decision based on estimates, of course, you don't

17   have a crystal ball as to oil and gas prices.  They

18   were doing a feed study to try to bring down the

19   cost of development, but there are multiple

20   variables, and you've got to do it based on the best  16:21:41

21   available information recognizing it's incomplete at

22   that time.

23        Q.   So intermediate to long term; right, and

24   as you testified earlier, Shenandoah was not

25   expected to be online prior to 2019; correct?         16:21:49

                                            Page 194

```
 1        A.   That is correct, yes.

 2        Q.   And the 2019 prices at the time were

 3   estimated to be $80 a barrel; correct?

 4        A.   There was a wide range depending on who

 5   you -- who you talked to.  And as oil prices trended    16:22:06

 6   downward and during the class period, which they

 7   did, I mean, they -- they troughed in about the

 8   middle of the class period, people's future

 9   expectations came down somewhat.  So yeah, it was --

10   it was a range.                                          16:22:22

11        Q.   But the Brent oil pricing for 2019 was $80

12   a barrel; correct?

13        A.   I don't have that in front of me, but --

14        Q.   If that's --

15        A.   -- order of magnitude.                         16:22:33

16        Q.   Yeah, if that's what's in your report, you

17   have no reason to dispute it?

18        A.   No, I don't.

19        Q.   Okay.

20        A.   I am aware that during this same time          16:22:41

21   period, Wood Mac, which is a fairly highly regarded

22   company, thought the break even for Shenandoah was

23   closer to $100 -- $100 a barrel.

24        Q.   And what time period are you talking

25   about?                                                   16:22:57
```

Page 195

1          A.    I think the Wood Mac report, if my

2     recollection is correct, was middle of 2016.

3          Q.    Okay.  So but that was also a -- an

4     opinion; correct?

5          A.    That -- that is correct.  Of course, yeah.   16:23:13

6          Q.    And opinions vary; correct?

7          A.    Yes, they do.

8          Q.    And, in fact, the company never said it

9     would take $100 a barrel to develop Shen, did they?

10          A.    No.  My recollection is the company said    16:23:30

11     it couldn't state a price at which it would proceed.

12     There were still too many variables.

13          Q.    And the company also said in September of

14     2016 that they didn't need material commodity price

15     improvement to make money with the GOM for            16:23:47

16     Shenandoah; correct?

17          A.    At what -- I'm sorry, what date again?

18          Q.    It was September 2016.

19          A.    So before 5 or 6 were drilled, or before 5

20     or 6 were known; correct?                             16:24:07

21          Q.    Before -- I would say that's before 6 is

22     known.

23          A.    Before 6 is known, yeah.

24          Q.    Yeah.

25          A.    So I believe they made that statement, but   16:24:13

                                                    Page 196

```
 1   they also said that they needed 6 before they could

 2   proceed, independent of pricing.

 3        Q.   So in -- in forming your opinion about the

 4   existing economic environment, you -- you don't cite

 5   any investors, that they understood it that way;          16:24:42

 6   correct?

 7        A.   That they understood it what way?  Excuse

 8   me, can you elaborate?

 9        Q.   That -- that Anadarko would not develop

10   Shenandoah in the existing economic environment.          16:24:50

11        A.   Did I cite any investors?

12        Q.   Right.

13        A.   Well, I would -- I would call Wood Mac an

14   investor, and they -- they said it would take $100

15   oil.  I don't think -- Anadarko did not make that         16:25:04

16   statement, but there were other people that I -- I

17   recall JPMorgan, I think, saying this was breakeven

18   at 60.  So -- so there was a range of people giving

19   different prices at which this would clear the

20   market.                                                   16:25:17

21            Anadarko did not, but some investors did

22   or some analysts did.

23        Q.   So you're not saying all investors

24   understood that; right?

25        A.   I've never said anything about all           16:25:28
```

Page 197

```
1    investors.  No, that's correct.

2         Q.   When you said "Wood Mac," do you mean Wood

3    Mackenzie?

4         A.   I'm sorry, yes, Wood Mackenzie.

5         Q.   Can you point me to the paragraph where      16:25:49

6    you cite that report?

7         A.   Not without doing some hunting, I

8    couldn't.  I remember -- I remember the report but

9    exactly what page it appears on, let me look for a

10   minute.                                             16:26:08

11             I'm -- I'm still hunting.  Excuse me.

12             I'm getting there.

13             I'm looking at 142, but I've got a little

14   mismatch in my notes here.  Hold on.

15        Q.   Sorry, what notes?                         16:28:03

16        A.   Well, I'm looking at -- at my Exhibit B.

17        Q.   Mm-hmm.

18        A.   I'm just trying to find what page Wood Mac

19   appears on.

20             My Exhibit B doesn't cite by -- does not    16:28:52

21   cross reference to footnote number.  That's what I'm

22   trying to find.

23             The Wood Mac reports that I referred to

24   are Items 136 through 142 in Exhibit B, but I don't

25   have -- global breakeven analysis and cost curves     16:29:10
```

Page 198

```
 1    pre-FID private.  And -- and I don't -- it doesn't

 2    tie to the footnotes.  I'm sorry.

 3            Do you want to go off for a minute while I

 4    look for it, because I --

 5       Q.   Yeah, that's fine.  Let's go off the          16:29:57

 6    record.

 7            THE VIDEOGRAPHER:  We're off the record.

 8    It's 4:29 p.m.

 9            (Off the record.)

10            THE VIDEOGRAPHER:  We're back on the          16:32:36

11    record.  It's 4:32 p.m.

12            THE WITNESS:  Okay.  The first Wood Mac

13    report I cited appears on page 144.  This would be

14    at 290 c.  Wood Mac entitled, "Pre-FID Oil Projects

15    in This Litigation."                                 16:33:17

16            "[I]f prices remain around $50/bbl, most

17    major projects are at risk of deferral or

18    cancellation without further cost deflation.  That

19    same slide included a graphic listing Shenandoah as

20    having" --                                           16:33:40

21            THE COURT REPORTER:  Can you slow down,

22    please, sir.

23            THE WITNESS:  I'm sorry.

24            "That same slide included a graphic

25    listing Shenandoah as having a start-up date around  16:33:43
```

Page 199

1    2021, with breakeven pricing hovering around 90 to

2    $100/bbl."  [As read]

3            Second citation is the Wood Mac report

4    from 2017.  This appears on page 154.  Actually, 153

5    and 154.                                        16:34:14

6            And, again, "In January 2017, Wood

7    Mackenzie indicated they believed the region is

8    going to pause in the near future, wait for the cost

9    structure and long-term view on oil prices to

10   stabilize before embarking on large, capex-heavy    16:34:46

11   projects again.  Shenandoah has thus far 'produced

12   encouraging results' but it 'assumed' that it would

13   'undergo additional appraisal drilling in 2017 prior

14   to receiving FID' and cautioned that 'negative

15   results may result in a bleaker outlook' for        16:35:06

16   Shenandoah and the 'Inboard Lower Tertiary as a

17   whole.'"  [As read]

18           That's page 154, paragraph 310.

19   BY MS. JENSEN:

20       Q.   Okay.  Thank you.                          16:35:21

21           Okay.  So, let's take this piece by piece.

22   So July 2016, that report with its breakeven was one

23   investor's opinion about the breakeven price;

24   correct?

25       A.   That is correct.                           16:35:40

                                            Page 200

```
 1        Q.   And other investor -- investor's discrete;
 2   correct?
 3        A.   And other -- yeah, there's a range of
 4   expectations from different investors; that's
 5   correct.                                          16:35:56
 6        Q.   And, in fact, another report that you
 7   cited in your report from Deutsche Bank had
 8   Shenandoah break even at $46; correct?
 9        A.   That's correct.  Yep.
10        Q.   So do you credit one of their opinions   16:36:12
11   more than the other?
12        A.   No.  I'm simply saying that that
13   uncertainty adds to risk.  Uncertainty as to future
14   product prices and uncertainty as to at what price
15   this gets sanctioned.                             16:36:46
16        Q.   And the -- the company hadn't said what
17   that price would be?
18        A.   That is correct.  They had not said.
19        Q.   Okay.  Now, turning to paragraph 310, you
20   read from a sentence about Shenandoah, and its      16:37:04
21   assumption as of January 2017 was that it would have
22   additional appraisal drilling in 2017 prior to
23   receiving FID; correct?
24        A.   That is correct.
25        Q.   And is that a reference to Shenandoah 6?   16:37:22
```

Page 201

```
1            A.   Yes, it is.
2            Q.   Okay.  Now, Shenandoah Saba [verbatim] had
3     also said there may be a Shen 7; correct?
4            A.   I don't recall that.
5            Q.   You have no reason to dispute that; right?   16:37:38
6            A.   I don't.  I don't recall it though.
7            Q.   Okay.  But the company never said Shen 6
8     was the end of the line, did it?
9            A.   It said continuation would be dependent on
10    5 and then on 6.  I never heard mention of 7, so no.   16:37:55
11           Q.   In other words, it -- it didn't say that
12    was going to be the end of its appraisal program?
13           A.   That -- that is correct.
14           Q.   The Mac -- I'm sorry, Wood Mac report that
15    you were just quoting from, it talks about if there     16:38:27
16    were negative results, then it would be a bleak --
17    bleaker outlook; is that right?
18           A.   That's what Wood Mac said, that's correct,
19    yeah.
20           Q.   As in it would be more negative than it       16:38:43
21    was as that time?
22           A.   That's how I interpret "bleaker," yes.
23           Q.   Okay.  Now, Anadarko never told the market
24    it had no intentions of developing Shenandoah before
25    the write-down; correct?                                16:39:02
```

Page 202

```
 1        A.   It said it needed furtherance of a once --
 2   flipsides [verbatim] of the coin, it said it needed
 3   additional information from 6 before it could move
 4   forward.  The inverse of that was, you know, if they
 5   didn't get information, 6 wouldn't be moving forward    16:39:20
 6   yet.
 7        Q.   Well, the company also mentioned the
 8   possible Shenandoah 7; correct?
 9        A.   As I said, I don't recall that.
10        Q.   And you have no reason to dispute that?      16:39:28
11        A.   I do not.
12             MR. GRUENSTEIN:  Objection.
13   BY MS. JENSEN:
14        Q.   And if that's true, then the inference is
15   not there; correct?                                    16:39:36
16        A.   Well, that was -- that was dependent on a
17   qualitative assessment, a qualitative and
18   quantitative assessment of 6, which we now know was
19   a dry hole.
20        Q.   That's not exactly my question though.  If   16:39:54
21   the company --
22        A.   Okay, restate it, if you would, please.
23        Q.   Sure, of course.
24             So if the company said that there may be a
25   Shen 7, then there is no inference to be taken that    16:40:02
```

Page 203

1    Shen 6 was end of the line?

2        A.   I'll agree with that.

3        Q.   Are the only choices for an oil company to

4    develop an oil field or a write-off entirely?

5        A.   There -- there's something of a ticking      16:40:17

6    clock, if you will.  You can't -- you can't suspend

7    activities forever.  There -- there are accounting

8    issues.  There are also lease expiration issues.

9        Q.   A company could also sell its working

10   interest; right?                                       16:40:36

11       A.   Yes, yes, of course it could, yes.

12       Q.   And, in fact, one of the Shen partners did

13   just that; right?

14       A.   Marathon exited and Anadarko exercised its

15   preference, that's correct.                            16:40:48

16       Q.   And so, it made money on Shenandoah

17   without developing it; correct?

18       A.   I can't tell you if that's correct or not.

19   I don't know what they received versus what they had

20   expended.  They -- my recollection is, Marathon sold   16:41:03

21   in July of '16, so they would have sold after Shen

22   4, but before Shen 5, so I'm not sure what they had

23   expensed and what they received.  So I don't know

24   whether they made money or not.

25       Q.   You'll -- you'll agree, though, that          16:41:21

                                                    Page 204

```
 1   whatever that number was, it was north of 0?
 2        A.   Presumably.
 3        Q.   You think they sold it for less than $0?
 4        A.   I don't think -- no.  I don't -- no.  Yes,
 5   I -- I agree it's more than 0, I don't know what it      16:41:32
 6   was then.
 7        Q.   Okay, okay.
 8        A.   Point taken.
 9        Q.   In fact, there's -- your report talks
10   about other ways of monetizing -- monetizing assets;     16:41:41
11   right?
12        A.   That's correct, yeah.
13        Q.   Okay.  So, for example, paragraph 10 talks
14   about asset sale -- sales, paragraph 140 talks about
15   different options that companies have; right?            16:41:52
16        A.   Yeah, yeah, throughout this period,
17   Anadarko at one point bought all of McMoRan's
18   interest in the Gulf of Mexico.  They sold other
19   interests.  So that's sort of dynamic portfolio
20   optimization.  At the right price, everything is for     16:42:12
21   sale.  At the right price, you want to buy
22   everything.
23        Q.   That's right.  So in other words,
24   investors didn't think it was develop or bust;
25   right?                                                   16:42:21
```

Page 205

```
 1        A.    That is correct.
 2        Q.    Okay.  In your report, you opine that
 3   investors understood before Anadarko's alleged
 4   corrective disclosure that Shenandoah 6 was wet; is
 5   that right?                                        16:43:02
 6        A.    That's correct.
 7        Q.    The company had told the market that it
 8   was sidetracking Shen 6; right?
 9        A.    That's right.
10        Q.    And the market didn't know the results of  16:43:08
11   Shen 6's sidetrack before the corrective disclosure
12   by Anadarko; correct?
13        A.    That's my recollection.
14        Q.    Likewise, Anadarko's decision to suspend
15   Shenandoah appraisal was not known before the       16:43:29
16   corrective disclosure; correct?
17        A.    That is correct.
18        Q.    And the write-down in the amount of
19   $902 million was also not disclosed to the market
20   prior to the corrective disclosure; correct?        16:43:44
21        A.    That is correct.
22        Q.    Now, in the wake of the corrective
23   disclosure, some so- -- sophisticated investors said
24   that the news was surprising; correct?
25        A.    Some said it was not surprising, and some  16:44:01
```

Page 206

1    were surprised.

2        Q.   So in answer to my question, some

3    sophisticated investors said they were surprised;

4    correct?

5        A.   I -- I -- I suspect that's true.  I don't      16:44:17

6    recall any of those statements.  I recall people

7    saying it's disappointing but not surprising.  But

8    I -- I --

9        Q.   If -- if you had -- if you had reviewed

10   documents where sophisticated investors said it was      16:44:33

11   surprising, would that change your opinion?

12           MR. GRUENSTEIN:   Objection.

13           THE WITNESS:   An attentive investor to my

14   mind would have heard -- go back a minute.

15           The discovery well was a discovery well.      16:44:53

16   The second well was the most successful well to

17   date.  So we had two good wells, then a dry hole.

18   Then 4 is a so-so well, 5 is a good well, and 6 is a

19   dry hole.

20           So if one followed the chronology here, I      16:45:08

21   don't think people should have been shocked at the

22   ultimate decision.

23   BY MS. JENSEN:

24       Q.   And that's -- that's just your

25   interpretation; correct?      16:45:18

                                                    Page 207

```
 1        A.   That -- that is correct.  That's my

 2   interpretation.

 3        Q.   In fact, class representatives' investment

 4   manager Lazard was surprised; right?

 5        A.   I -- I -- I don't recall it, but I'm not    16:45:32

 6   -- I -- I -- I don't dispute it, no.

 7        Q.   You're not surprised to hear that Lazard

 8   was surprised, are you?

 9        A.    It -- it would not shock me to hear that

10   one or more investment managers did not expect this  16:45:45

11   write-off to happen, no.  That's --

12        Q.   Not just any investment managers, the

13   investment managers for the class representatives in

14   this case.

15        A.   I'd say any investment manager, because    16:45:57

16   I -- I didn't -- as I said, since I didn't know the

17   class representatives, I did not know that Lazard

18   represented a class representative -- or was an

19   asset manager for a class.  Since I didn't know

20   that, I can just say that Lazard -- am I shocked     16:46:11

21   that Lazard was surprised, no, that happens.

22             As we -- as we know from subsequent

23   investments, Beacon and Navitas are drilling as we

24   speak.  So there are people that --

25             (Simultaneous speaking.)                   16:46:28

                                             Page 208
```

```
 1              (Interruption in audio/video.)

 2              THE COURT REPORTER:  Can you say that

 3       again?  "As we know from subsequent investments"?

 4              THE WITNESS:  -- subsequent developments,

 5       Beacon and Navitas are developing Shenandoah as we      16:46:32

 6       speak.

 7              And a final investment decision for

 8       $1.8 billion was made last August, so there is --

 9       there are smart oil and gas investors who think that

10       there is still very significant potential here.        16:46:45

11       BY MS. JENSEN:

12          Q.   And did at the time; right?

13          A.   No, not -- I would not necessarily say

14       they did at the time.

15          Q.   Okay.  Let's --                                16:46:56

16          A.   But at the time we did not have the

17       current drill ship that's working there.  We did not

18       have the current oil prices.  So a number of factors

19       have changed since the decision in May of 2017.

20          Q.   Okay.  Well, let's -- let's get to what's      16:47:08

21       happening at Shenandoah now.  A little bit later,

22       that's not --

23          A.   Fine.  I'm -- I'm sorry.  I didn't mean to

24       jump the gun.

25          Q.   You're -- you're -- you're not -- yeah,        16:47:27
```

                                                    Page 209

1    you're -- you're going on a rant about something I'm

2    not asking you about.

3         A.   Fine.  Fine.

4         Q.   So let's -- let's look at Exhibit 514,

5    which, for the record, is a document with the Bates      16:47:36

6    stamp L00000080.

7              (Keller Deposition Exhibit 514 was marked

8              electronically.)

9    BY MS. JENSEN:

10        Q.   Can you see this document?                      16:47:49

11        A.   I'm opening it now.  Hold on.

12             Yes, I've opened it now.

13        Q.   Okay.  And if you go down the page, below

14   the "COMMENTS" --

15        A.   Yes, I see it.                                  16:48:13

16        Q.   Yeah.

17             -- so the third bullet there, could you

18   read that into the record, please.

19        A.   "Deepwater Gulf of Mexico has shifted from

20   being a positive to a problem.  The decision to         16:48:26

21   impair Shenandoah (to the tune of $1 billion) was

22   surprising given that APC had already drilled five

23   appraisal wells.  While APC has not yet decided to

24   relinquish the leases, it appears that management

25   has little confidence that the project will move        16:48:44

Veritext Legal Solutions
866 299-5127

1    forward.  This in turns removes an expected source

2    of future production (and cash flow), and it raises

3    questions about APC's ability to find new tie-back

4    developments for its significant infrastructure in

5    the Gulf.  Unexpectedly, CEO Al Walker opined on the      16:49:02

6    call that 'at'" 40 to 60 -- excuse me, "'50 to 60

7    dollar oil, the Gulf of'" -- "'Gulf of Mexico

8    development is a challenge.'  Worrying given that it

9    is sub-50 today,'" end of paragraph. [As read]

10        Q.   Okay.  Thank you.                               16:49:22

11             So, again, this -- this is Lazard that's

12   writing this; correct?

13        A.   That is correct.

14        Q.   No reason to doubt that that is the class

15   representatives' investment manager?                      16:49:29

16        A.   As you say.

17        Q.   And no reason to dispute that this was the

18   class representatives' investment manager's reaction

19   after the write-off of --

20        A.   No.  I -- I've -- I've just read it, yep.       16:49:41

21        Q.   Okay.  Other analysts that you cite in

22   your report were also surprised by the news of the

23   write-off; correct?

24        A.   It -- it was disappointing news, but I

25   think they were cautioned in this direction by the        16:50:00

                                              Page 211

```
 1    statements made after 4 and after 5, that they

 2    needed additional drilling, that it was dependent on

 3    6, and 6 was dry.  So that certainly was a -- a bad

 4    data point in a deteriorating environment.

 5            MS. JENSEN:  Okay.  I'm going to move to      16:50:15

 6    strike as nonresponsive.

 7    BY MS. JENSEN:

 8        Q.   You are aware --

 9        A.   Fine.

10        Q.   -- that other analysts also?                 16:50:19

11        A.   Yes.

12        Q.   -- were surprised?

13            (Simultaneous speaking.)

14            (Interruption in audio/video.)

15            THE COURT REPORTER:  I'm sorry.  One           16:50:22

16    second.

17            THE WITNESS:  Some other analysts were

18    surprised.

19    BY MS. JENSEN:

20        Q.   Including Wolfe Research?                     16:50:27

21        A.   I don't recall Wolfe specifically, but I

22    do recall other analysts did not expect this

23    write-down.

24        Q.   And you didn't cite them in your report;

25    correct?                                              16:50:39
```

Page 212

```
 1         A.   I didn't cite everything in my report,

 2    that's correct.

 3         Q.   Well, these ones went against your

 4    opinion; correct?

 5              MR. GRUENSTEIN:  Objection.              16:50:48

 6    BY MS. JENSEN:

 7         Q.   You didn't cite these analysts who

 8    disagreed with your opinion; correct?

 9              MR. GRUENSTEIN:  Objection.

10              THE WITNESS:  I believe the decision that  16:50:56

11    Anadarko made was based on the facts known at the

12    time.  So I -- again, I -- I mean, it -- did other

13    people have a different opinion, yes.

14              The fact that someone else is taking over

15    the lease just shows you that there is a current     16:51:18

16    belief that this is a -- a valuable asset.

17    BY MS. JENSEN:

18         Q.   And so you just disagree with them;

19    correct?

20              MR. GRUENSTEIN:  Objection.              16:51:29

21              THE WITNESS:  I stated elsewhere in the

22    report that the decision to proceed is a function of

23    not just any individual prospect, but other

24    opportunities available to the investors, so-called

25    high grading of a portfolio and a risk appetite.     16:51:48
```

Page 213

```
 1              So in a capital constrained world, you
 2    might have a resource that some people find valuable
 3    and a resource that you simply feel you've got other
 4    opportunities that are economically more attractive.
 5              MS. JENSEN:  So, again, nonresponsive.        16:52:09
 6    BY MS. JENSEN:
 7        Q.   So Wolfe Re- -- Research, for example,
 8    they found the Shenandoah write-down to be a
 9    negative surprise -- surprise, and -- and you just
10    disagree with them; right?                            16:52:21
11              MR. GRUENSTEIN:  Objection.  Compound.
12              THE WITNESS:  One investor disagreed
13    with that -- if -- if you're telling me that that
14    was Wolfe's opinion, yes.  That -- that one
15    encountered Anadarko and what a number of other       16:52:38
16    people felt [verbatim].
17    BY MS. JENSEN:
18        Q.   And so you just disagree with Wolfe;
19    correct?
20              MR. GRUENSTEIN:  Objection.               16:52:43
21    BY MS. JENSEN:
22        Q.   It's just a difference of opinion; right?
23        A.   That's fine, yes.
24        Q.   So since there's differing opinions on
25    this, isn't the best way to determine the reaction    16:52:58
```

Page 214

1    to the corrective disclosure an event study of the

2    stock decline?

3              MR. GRUENSTEIN:  Objection.

4              THE WITNESS:  That's one approach and

5    might be the preferred approach if this was a -- a      16:53:13

6    very significant part of Anadarko's operations,

7    which it was not.

8    BY MS. JENSEN:

9         Q.   You didn't perform an event study --

10        A.   I did not.  I did not.                         16:53:25

11        Q.   Now, I think you were eager to mention

12   Navitas earlier.

13             Navitas was not involved until after the

14   class period; correct?

15        A.   That is correct.                               16:53:46

16        Q.   And when did Navitas become a partner?

17        A.   I believe that the Beacon, which is a

18   Blackstone vehicle, Beacon and Navitas I believe

19   became involved in 2018 or 2019.  I'd have to

20   refresh my memory of the exact date.                    16:54:06

21        Q.   And Navitas is not the operator; correct?

22        A.   They may have assumed -- initially I

23   believe Beacon Off- -- Offshore was the operator.

24   Navitas may have assumed operatorship.  I -- I --

25   I'd -- I'd have to refresh my memory.                   16:54:20

                                              Page 215

1          Q.    Isn't Beacon the operator?

2          A.    Beacon was the operator, and I think

3    Navitas acquired -- Blackstone had several

4    investment vehicles in this asset.

5          And my recollection, without going back to      16:54:32

6    notes not in my report, is that Navitas subsequently

7    bought out one of the Blackstone partnerships and

8    has a bigger working interest in Beacon now.

9          So I'd -- I'd have to confirm who the

10   current operator is.  I think it was Navitas that      16:54:52

11   made the FID.

12         Q.    Well, paragraph 43 says that Beacon is the

13   current operator.

14         Do you --

15         A.    Okay.                                      16:54:57

16         Q.    -- disagree with your report?

17         A.    No.  No, I -- I don't disagree, but --

18   yeah.  Okay.  Fine.

19         Q.    Now, in your report you only cite

20   documents from Navitas; correct?                       16:55:05

21         A.    If -- if -- again, I'm not looking at that

22   particular paragraph.  That may be true.  You know,

23   they're all partners in the same well.

24         Q.    But -- but you only cited documents from

25   Navitas even though there is multiple partners;        16:55:24

                                              Page 216

```
 1   correct?
 2       A.   I -- I -- I believe that's correct, yes.
 3       Q.   And you only cite investor presentations;
 4   right?
 5       A.   I -- I can't recall exactly what I cited.    16:55:33
 6   I've looked in the trade press and in trade
 7   periodicals about -- to -- to follow developments.
 8   Obviously this is well past the class period, so
 9   I've just been keeping tabs on what's happening at
10   Shenandoah.                                           16:55:51
11       Q.   I'm just looking at your -- your notes
12   here.  Do you have any reason to dispute that you
13   only cited investor --
14       A.   No, I -- I don't know if --
15            (Simultaneous speaking.)                     16:55:59
16            (Interruption in audio/video.)
17            THE COURT REPORTER:  I'm sorry.  Excuse
18   me.  I didn't get the rest of the question.
19   BY MS. JENSEN:
20       Q.   -- investor presentations.                   16:56:03
21       A.   I have no reason to -- to dispute that,
22   no.
23       Q.   Okay.  In other words, that's Navitas's
24   dog-and-pony show about Shenandoah to potential
25   investors and investors; correct?                     16:56:19
```

Page 217

```
 1              MR. GRUENSTEIN:  Objection.

 2              THE WITNESS:  I don't know that it was to

 3    potential investors.  I -- I couldn't tell you right

 4    now who the audience was of that presentation.

 5    BY MS. JENSEN:                                 16:56:27

 6       Q.   But they are entitled "Investor Con-" --

 7    "Presentations"; right?

 8       A.   Yes.  Yeah.

 9       Q.   You don't cite any internal documents from

10    Navitas?                                       16:56:35

11       A.   No.  I've -- I've never met the Navitas

12    people.

13       Q.   Right.

14              And so you don't know what they internally

15    think about Shenandoah; correct?              16:56:41

16       A.   I know that they're committing capital to

17    it, so that gives me a -- a -- a sense of what they

18    think about it.

19       Q.   And Navitas isn't traded on the New York

20    Stock Exchange; correct?                       16:56:55

21       A.   No.  It's an Israeli company.

22       Q.   And Israeli companies aren't subject to

23    the same disclosure requirements; correct?

24              MR. GRUENSTEIN:  Objection.

25              THE WITNESS:  I -- I don't have spec- --  16:57:03
```

Page 218

```
 1    specific knowledge about Israeli disclosure

 2    requirements, no.

 3    BY MS. JENSEN:

 4         Q.   You're not an expert in Israeli disclosure

 5    obligations?                                      16:57:12

 6         A.   I have to admit I'm not.

 7         Q.   Okay.

 8              MS. JENSEN:  Okay.  Let's go ahead and

 9    take a quick break.

10              THE VIDEOGRAPHER:  Okay.  Off the record.   16:57:18

11    It's 4:57 p.m.

12              (Short recess taken.)

13              THE VIDEOGRAPHER:  We're back on the

14    record.  It's 5:06 p.m.

15              MS. JENSEN:  Okay.  Mr. Keller, I have no   17:06:23

16    more questions for you today.

17              THE WITNESS:  Oh, you kept me waiting

18    there.

19              MS. JENSEN:  I did.  I kept you in

20    suspense.  We're all done now.                    17:06:32

21              THE WITNESS:  Okay.

22              MR. GRUENSTEIN:  Okay.  Nothing from me.

23              Let's go off the record.

24              Thank you.

25              THE VIDEOGRAPHER:  Okay.  Off the record.   17:06:37
```

Page 219

1    It's 5:06 p.m.

2              (Proceedings concluded, 5:06 p.m., on

3              January 17, 2023.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 220

1                         JURAT

2

3          I, PETER KELLER, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken remotely via

6    videoconference on Tuesday, January 17, 2023; that I

7    have made such corrections as appear noted herein in

8    ink, initialed by me; that my testimony as contained

9    herein, as corrected, is true and correct.

10

11          Dated this _____ day of _____2023, at

12    _____.

13

14

15

16                      _____

                        PETER KELLER

17

18

19

20

21

22

23

24

25

                                          Page 221

```
1                    CERTIFICATE OF REPORTER

2               I, Hanna Kim, a Certified Shorthand

3      Reporter, do hereby certify:

4               That prior to being examined, the witness

5      in the foregoing proceedings was by me duly sworn to

6      testify to the truth, the whole truth, and nothing

7      but the truth;

8               That said proceedings were taken before me

9      at the time and place therein set forth remotely via

10     videoconference and were taken down by me in

11     shorthand and thereafter transcribed into

12     typewriting under my direction and supervision;

13              I further certify that I am neither

14     counsel for, nor related to, any party to said

15     proceedings, not in anywise interested in the

16     outcome thereof.

17              Further, that if the foregoing pertains to

18     the original transcript of a deposition in a federal

19     case, before completion of the proceedings, review

20     of the transcript [ ] was [x] was not requested.

21              In witness whereof, I have hereunto

22     subscribed my name.

23     Dated:   1/20/23

24
                                Hanna Kim

25                              CLR, CSR No. 13083

                                            Page 222
```