# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |
|---|---|
| )<br>)<br>)<br>In re ANADARKO PETROLEUM )<br>CORPORATE SECURITIES LITIGATION )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>_____ ) | Civil Action No. 4:20-cv-00576<br><br><br>REBUTTAL REPORT OF<br>KEVIN J. MURPHY |

# Rebuttal Report of Kevin J. Murphy

1. Introduction .................................................................................................................. 1

2. Summary of Opinions .................................................................................................. 4

3. Executive Compensation at Anadarko Petroleum ..................................................... 5
   3.1. Overview ............................................................................................................ 5
   3.2. Annual Bonuses (AIP) ...................................................................................... 6
   3.3. Restricted Stock Units (RSUs) ......................................................................... 8
   3.4. Non-Qualified Stock Options (NQSOs) ........................................................... 9
   3.5. Performance Units (PUs) .................................................................................. 9

4. Stock Ownership and Trading Patterns for Named Defendants, 2014-2018 ......... 11
   4.1. Mr. Walker ...................................................................................................... 11
   4.2. Mr. Gwin ......................................................................................................... 12
   4.3. Mr. Daniels ..................................................................................................... 13
   4.4. Mr. Leyendecker ............................................................................................. 14

5. Did Named Defendants benefit financially from the alleged stock-price inflation through increased
   compensation? .......................................................................................................... 15
   5.1. Annual Bonuses (AIP) .................................................................................... 16
   5.2. Restricted Stock Units (RSUs) ....................................................................... 17
   5.3. Non-Qualified Stock Options (NQSOs) ......................................................... 19
   5.4. Performance Units (PUs) ................................................................................ 21
   5.5. Summary .......................................................................................................... 25

6. Did Named Defendants benefit financially from the alleged stock-price inflation through their
   trading activities? .................................................................................................... 25
   6.1. Mr. Walker ...................................................................................................... 26
   6.2. Mr. Gwin ......................................................................................................... 27
   6.3. Mr. Daniels ..................................................................................................... 28
   6.4. Mr. Leyendecker ............................................................................................. 29
   6.5. Summary .......................................................................................................... 30

7. Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko
   management? ............................................................................................................. 31

8. Did the alleged inflation increase the payments to the Named Defendants in connection with the
   August 2019 acquisition by Occidental? .................................................................. 35

9. Author's Statement and Qualifications .................................................................... 37

Exhibit A: Curriculum Vitae ........................................................................................... 62

Exhibit B: Testifying Experience in the Last Five Years ................................................ 76

Exhibit C: Materials Considered in Producing this Report ............................................. 77

# Rebuttal Report of Kevin J. Murphy

## 1. Introduction

In its Form 10-Q filed after market close on May 2, 2017, Anadarko Petroleum Corporation ("Anadarko") reported its first-quarter financials for 2017. In that filing, Anadarko disclosed that it had suspended further appraisal activities of the Shenandoah oil prospect.[1] In their Amended Complaint (the "Complaint"), Plaintiffs allege that Anadarko executives Robert "Al" Walker ("Mr. Walker"), Robert G. Gwin ("Mr. Gwin"), Robert P. Daniels ("Mr. Daniels") and Ernest A. Leyendecker, III ("Mr. Leyendecker") (collectively, the "Named Defendants") made false and misleading statements to conceal that Shenandoah was not commercially viable from February 20, 2015 to May 2, 2017 (the "Class Period"). Among approximately 20 other allegedly false and misleading statements, Plaintiffs allege that Anadarko knew but failed to disclose that the "Shen-3" appraisal well was a "dry hole" since at least February 20, 2015 (the start of the "Class Period"), and as a consequence failed to expense the exploratory well costs until the third quarter of 2016.[2]

As a result of the alleged misstatements (the "alleged fraud"), Plaintiffs' expert Bjorn I. Steinholt ("Mr. Steinholt") contends that the price of Anadarko's common shares was artificially inflated by $1.75 per share from February 23, 2015 through July 26, 2016, and by $1.92 per share from July 27, 2016 through May 2, 2017.[3] In addition, Plaintiffs' expert

---

[1]   Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017, Note 5 (p. 13).

[2]   Amended Complaint, August 17, 2020, ¶¶ 4, 97-139; Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016, p. 11.

[3]   Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022 (the "Steinholt Report"), ¶¶ 105-106 and Exhibit D. Mr. Steinholt contends that the price of Anadarko shares was correct on February 20, 2015, and May 3, 2017 (the beginning and ending of the Class Period, respectively).

D. Paul Regan ("Mr. Regan") drew a connection between executive bonuses and the alleged delay in expensing suspended exploratory well costs.[4] Plaintiffs also contend that the Named Defendants benefited from the alleged fraud through golden parachute payments received in connection with the August 2019 acquisition of Anadarko by Occidental Petroleum Corporation ("Occidental").[5]

I, Kevin J. Murphy, have been retained by Cravath, Swaine & Moore LLP, counsel for Anadarko and the Named Defendants, to assess Plaintiffs' assertions that the Named Defendants stood to benefit financially from the alleged fraud. In particular, I have been asked to analyze and assess:

- whether the Named Defendants benefited financially from the alleged stock-price inflation through increased compensation;

- whether the Named Defendants benefited financially from the alleged stock-price inflation through their trading activity;

- whether the alleged misstatements with respect to Shen-3 increased the bonus awards to Named Defendants; and

- whether the alleged inflation in Anadarko's stock prices during the Class Period increased the amounts received by the Named Defendants in connection with the acquisition by Occidental.

As described in detail in Section 9 below, I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I am a recognized expert on executive compensation, and have written more than fifty articles, case studies, books, and book chapters relating to compensation and incentives in organizations. I have served as a compensation consultant on issues related to CEO pay for many public and private companies,

---

[4]   Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022 (the "Regan Report") ¶¶ 77(c), 86.
[5]   Complaint, ¶¶ 5(s), 9, 150.

and I have provided expert testimony related to executive compensation to Congress, the Court of Chancery of the State of Delaware, and in other federal and state Courts.

I am being compensated for my work on this matter at my customary billing rate of $1,200 per hour. While the opinions expressed herein are entirely my own, I have been assisted in this matter by staff of a research firm, Compass Lexecon, who worked under my direction and supervision. My compensation, and that of Compass Lexecon, is neither contingent nor dependent on the outcome of this matter. The conclusions in this report are my own.

My report proceeds as follows. My opinions are briefly summarized in Section 2. In Section 3, I describe Anadarko's executive compensation practices and policies, focusing on components potentially impacted by the alleged fraud. Section 4 describes the stock ownership and trading activities for the Named Defendants from 2014–2018 (*i.e.*, from the calendar-year before the Class Period to the calendar-year after the Class Period). Sections 5–8 provide my opinions related to the four bullet points above, respectively. My qualifications are described in Section 9, "Author's Statement and Qualifications," and I have attached my curriculum vitae at the end of this report as Exhibit A. A list of cases in which I have testified or given depositions within the last five years is attached as Exhibit B. In performing my analysis, I have relied upon materials produced in this case and other publicly available information. A list of the materials upon which I have relied in forming my opinions in this report is attached as Exhibit C.

I reserve the right to amend this report to reflect any additional information obtained after the submission of this report. I also reserve the right to supplement this report to address additional issues raised by Plaintiffs' experts in the pending litigation.

## 2.  Summary of Opinions

### 2.1. Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?

- No. The Named Defendants did not benefit financially from the alleged inflation through increased compensation. In fact, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 or $1.92 per share lower during the Class Period.

### 2.2. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activity?

- No. I find no evidence that trades by Named Defendants were "in suspicious amounts or at suspicious times" during the Class Period.[6] In fact, I find no evidence that the Named Defendants sold shares during the Class Period when prices were allegedly inflated, but instead kept reinvesting vested Restricted Stock Units ("RSUs") and exercised options into Anadarko, and (in the case of Mr. Walker) made large open-market purchases of Anadarko shares just after the Class Period.

- In addition, I find relevant the fact that Anadarko increased its working interest in the Shenandoah project from 30% to 33% at a time when Named Defendants allegedly had inside information that the project was a failure. This increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

### 2.3. Did the alleged misstatements with respect to Shen-3 increase bonus awards to Anadarko top executives?

- No. In fact, I find that expensing the Shen-3 cost in 2014 rather than in 2016 would have had no effect on 2014 executive bonuses but would have increased 2016 executive bonuses.

---

[6]   I understand that the Fifth Circuit has found that trading "in suspicious amounts or at suspicious times" may be suggestive of scienter. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). Such suspicious trades include trades that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citing *In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)).  My assessments with respect to suspicious timing or amount of trading are from the perspective of my expertise in economics and are not legal opinions.

- In addition, I note that Anadarko's bonus structure for top executives does not include anything related to unproved reserves.

*2.4. Did the alleged stock-price inflation increase the golden parachute payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?*

- No. I estimate that the Named Defendants would have realized approximately $1.3 million in additional payouts in connection with the Occidental acquisition *absent* the alleged inflation, across all pay components.

## 3. Executive Compensation at Anadarko Petroleum

*3.1. Overview*

Anadarko's executive compensation plans and policies are described in detail in Anadarko's DEF 14A or "Proxy Statements" issued each March in advance of the annual meeting of shareholders. As emphasized in every Proxy Statement from 2010 through 2019, executive compensation at Anadarko is established and administered by the Compensation and Benefits Committee (the "Committee") consisting solely of independent outside directors. The Committee has overall responsibility for approving and evaluating Anadarko's director and officer compensation plans, policies, and programs. Since 2011, the Committee has been assisted by its independent executive compensation consultant, Frederick W. Cook & Company, Inc.[7]

As described in the Compensation Discussion and Analysis section of each Proxy Statement, executive compensation at Anadarko consists of three primary components: base salary, annual bonus, and long-term incentives in the form of Restricted Stock Units ("RSUs"),

---

[7]    Prior to 2011, the Committee's outside consultant was Hewitt Associates LLC; it briefly retained Meridian Compensation Partners, LLC in late 2010 after its separation from Hewitt. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011, p. 34.

Non-Qualified Stock Options ("NQSOs"), and Performance Units ("PUs"), as described in detail below.[8] Table 1 summarizes the 2014–2018 target compensation for the Named Defendants. As shown in the table, target compensation for Mr. Walker, Mr. Gwin, and Mr. Daniels did not change from the calendar-year before the Class Period to the calendar-year after the Class Period, and Mr. Leyendecker's target compensation changed only upon his promotion to Executive Vice President ("EVP") in August 2016. Target Bonuses are defined as a percentage of Base Salary (130% for Mr. Walker and 95% for EVPs). Target Equity awards are expressed in dollars and are allocated across PUs, RSUs, and NQSOs based on predetermined percentages.[9] Since 2015, EVPs and above have received 50% of their equity compensation in PUs, and 25% each in RSUs and NQSOs.

*3.2. Annual Bonuses (AIP)*

Bonuses under Anadarko's Annual Incentive Plan ("AIP") are determined by the following formula:[10]



Each February, Anadarko's Compensation Committee (the "Committee") meets to approve the specific performance measures that determine the AIP Performance Score for the current

---

8   While not relevant to my opinions and analyses, Anadarko executives also participated in qualified and non-qualified pension and deferred-compensation programs.

9   The target equity percentages are reported in the Proxy Statements. The Total Target Equity amounts in Table 1 differ slightly from the amounts reported in Anadarko's proxy statements because the latter is based on finalized accounting values under ASC Topic 718. The targets in Table 1 are derived from various sources, including APC-00779479 at 527; APC-00786269 at 275; APC-00771156 at 156; APC-00790771 at 777, 788; APC-00790250 at 256, 267.

10  *See*, *e.g.*, Anadarko Petroleum Corporation DEF14A Proxy Statement filed March 17, 2017, p. 43.

year and to certify performance results for the prior year.[11] Table 2 summarizes the performance measures and weights used for the AIP Performance Score from 2014–2018, generally consisting of the following: *operational measures* tied to proved reserves and sales volumes (in million barrels of oil equivalents, or "MMBOE"),[12] *financial measures* (*e.g.*, capital expenditures, controllable cash costs), and *safety measures* (*e.g.*, Total Recordable Incident Rate).

Each performance measure in Table 2 is measured against a target performance goal also approved by the Committee at its February meeting. The performance goals are based on Anadarko's annual capital budget, which in turn is based on a company-wide portfolio evaluation effort led by the company's Corporate Planning team with multiple reviews by both executive management and the Board of Directors.[13] The Committee approves the associated AIP performance goals to align with the short- and long-term strategic objectives of the budget. The Committee then monitors progress during the year, reserving the right to adjust the goals based on various internal and external factors that might arise during the year. In addition, the Committee can use its discretion to *reduce* (but not increase) the year-end AIP Performance Score. Payouts under the AIP are capped at 200% of each executive's Target Bonus.

---

[11]  *See*, *e.g.,* Minutes from the Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471); February 8, 2016 (APC-00783560-573); February 8, 2017 (APC-00787943 at 944-952); February 12, 2019 (APC-00790975 at 976-984).

[12]  As defined by the Financial Accounting Foundation, proved oil and gas reserves include only quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible (*see* Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022). Notably, Anadarko did not book any reserves in connection with the Shenandoah prospect during the Class Period (*see* Deposition of Charles F. Oudin, III dated June 30, 2022, 243:7-11).

[13]  The budget process and the determination of the AIP performance measures and goals is described in the Compensation Discussion and Analysis of each DEF 14A (Proxy) Statement.

Table 3 shows the actual payouts under the AIP for Anadarko's Named Executive Officers (or "NEOs," defined as the executive officers named in proxy statements) from 2014–2018. The actual bonus received by any NEO is determined by multiplying the NEO's Target Bonus by the Final AIP Bonus percentage. For example, Mr. Walker's 2014 bonus was $2,551,900, which is 151% of his Target Bonus (which in turn is 130% of his $1.3 million base salary). As shown in the table, the Committee used its discretion to reduce bonuses by 86.5% in 2015, and by 7.6% in 2017. No NEO received an individual performance adjustment from 2014 to 2018.

### 3.3. Restricted Stock Units (RSUs)

As shown in Table 1, 25% of the equity pay for Anadarko EVPs or higher is conveyed in the form of RSUs, which vest equally over three years beginning one year from the grant date. The number of RSUs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the closing price of Anadarko common stock on the grant date.

Upon vesting, the market value of the Anadarko shares associated with the RSUs is considered ordinary taxable income to the recipient. To satisfy the tax obligations, Anadarko reduces the number of RSUs subject to the applicable vesting period by the number of RSUs equal to the applicable withholding taxes, resulting in the distribution of net shares to the participant.[14] Dividends on RSUs are accrued and reinvested quarterly in additional shares of Anadarko common stock and paid, less applicable withholding taxes, upon vesting.

---

[14]  *See* APC-00776406 at 419 (2014); APC-00780428 at 444 (2015); APC-00786209 at 217 (2016); APC-00790250 at 259 (2017); APC-00790771 at 780 (2018). The shares withheld by Anadarko are noted by the Transaction Code "F" in the Form 4s of the Named Defendants.

### 3.4. Non-Qualified Stock Options (NQSOs)

Stock options give the recipient the right, but not the obligation, to purchase shares at a predetermined "exercise price" over a predetermined period. Stock options for Anadarko executives—comprising 25% of the equity pay for Anadarko CEO and EVPs from 2014 through 2018—have a term of seven years and are granted with an exercise price equal to the closing stock price on the grant date.[15] The number of NQSOs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the calculated value per option as of the grant date.[16]

Anadarko stock options become exercisable over three years, beginning one year from the grant date. When options are exercised, the difference between the stock price on the exercise date and the exercise price is considered taxable ordinary income to the recipient. Under Anadarko's Stock Option plans, employees exercising options can deliver cash or use shares of Company stock for full or partial payment of the exercise price and the minimum tax withholding due upon exercise.[17]

### 3.5. Performance Units (PUs)

Anadarko's Performance Unit plan is a cash plan where the payoffs are based on both Anadarko's stock price and its Total Shareholder Return ("TSR").[18] In particular, in each year

---

[15]   Senior Vice Presidents ("SVPs"), including Mr. Leyendecker prior to his August 2016 promotion to EVP, had a Target NQSO Percentage of 35% in 2014 and 2015. *See* APC-00789245 at 286.

[16]   These values differ slightly from the ASC 718 values reported in the proxy statements.

[17]   *See* APC-00776406 at 418 (2014); APC-00780428 at 443 (2015); APC-00786209 at 215 (2016); APC-00790250 at 257 (2017); APC-00790771 at 778 (2018).

[18]   For purposes of PU vesting, TSR for Anadarko and its 11 peers is defined as the average closing stock price for the last 30 trading days of the performance period *minus* the average closing stock price for the 30 trading days preceding the beginning of the performance period *plus* dividends per share over the performance period, all divided by the average closing stock price for the 30 trading days preceding the beginning of the performance period *See* APC-00776406 at 420 (2014); APC-00780428 at 445 (2015); APC-00786209 at 219 (2016); APC-00790250 at 261 (2017); APC-00790771 at 782 (2018).

each executive is granted a "target number" of PUs. Each PU conveys the right for the participant to receive the cash value of one share of Anadarko stock, but the number of PUs conveyed depends on Anadarko's TSR rank relative to the TSR realized by eleven peer companies. Table 4 shows the payoff levels under Anadarko's PU plan, reflecting differences for grants made before November 2014 and in or after November 2014. In both time periods, executives will receive the cash value of 200% of target PUs if Anadarko is at the top of the 12-firm cohort (*i.e.*, Anadarko plus 11 peers), and will receive nothing if Anadarko is ranked among the bottom three of the cohort.

Half (50%) of the grants before November 2014 were based on two-year TSR performance, and the remaining 50% were based on three-year TSR performance; grants made in November 2014 or after are based only on three-year TSR performance. Grants are typically made in late October or early November, with the performance period commencing on the following January 1st.[19] For example, the three-year performance period for the grant made on November 6, 2014 is January 1, 2015 through December 31, 2017.[20]

The target number of PUs granted to each executive (EVP and above) is determined by dividing 50% of the Target Equity Award by the value of each PU, which in turn is calculated using a Monte Carlo estimation that takes into account the payoff structure in Table 4 and the relative probabilities (and associated stock prices) of ending up at each performance rank.[21] Given the convexity inherent in Table 4 (*e.g.*, more PUs are granted when stock prices are

---

[19] The only exception for the Named Defendants with unvested PUs from 2014–2018 was a special grant to Mr. Walker made on May 15, 2012 in connection with his appointment as Anadarko's President and CEO. Half of this grant vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2014, while the other half vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2015. *See* Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 23, 2015, p. 50 and Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 18, 2016, p. 51.

[20] *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 62.

[21] *See* APC-00789245 at 253.

higher), the per-unit value of each PU granted from 2014 to 2018 averages about 10% higher than the grant-date stock price.[22] Accordingly, the target number of PUs granted each year (representing 50% of the Target Equity Award) will be somewhat less than twice the target number of RSUs granted each year (representing 25% of the Target Equity Award).

### 4.   Stock Ownership and Trading Patterns for Named Defendants, 2014-2018

#### 4.1. Mr. Walker

Figure 1 depicts Mr. Walker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including shares held indirectly in an LLC. In August 2014, six months prior to the Class Period, Mr. Walker exercised 62,200 options from his November 2007 grant due to expire in November 2014, selling all the shares acquired (including shares sold to pay the exercise price and taxes).[23] The same month, he also exercised 182,900 options from his November 2008 grant due to expire in November 2015, again selling all shares acquired.[24] Mr. Walker did not exercise any other options from 2014–2018, and also retained all vesting RSUs beyond those that Anadarko withheld for tax purposes.[25] Mr. Walker sold no Anadarko shares during the Class Period, and his only other transaction between 2014 and 2018 was an open market purchase of 19,300 Anadarko shares on May 17, 2017, two weeks after the end of the Class Period.[26]

---

[22]   As with stock options, the PU values used by the Committee in finalizing grants differ slightly from the ASC 718 values reported in the proxy statements.

[23]   R. A. Walker Form 4 filed August 8, 2014.

[24]   R. A. Walker Form 4 filed August 8, 2014.

[25]   Options granted to Mr. Walker in November 2009, November 2010, and November 2011 expired out-of-the-money (i.e., the exercise price exceeded Anadarko's stock price on the expiration date, and therefore expired unexercised).

[26]   R. A. Walker Form 4 filed May 17, 2017.

Under Anadarko's Stock Ownership Guidelines for Non-Management Directors and Executive Officers ("Stock Ownership Guidelines"), Mr. Walker (as Anadarko's CEO) is required to hold six times his base salary in Anadarko shares or RSUs.[27] Based on his $1.3 million base salary from 2014–2018, Mr. Walker was therefore required to hold $7.8 million in shares or RSUs.[28] Figure 2 shows the value of Mr. Walker's shares and RSUs, where (consistent with the Stock Ownership Guidelines) the value is defined as Mr. Walker's shares (or RSUs) multiplied by the average daily stock price over the preceding year. As evident from the figure, Mr. Walker's ownership significantly exceeded his ownership requirements throughout the depicted time period.

### 4.2. Mr. Gwin

Figure 3 depicts Mr. Gwin's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including Anadarko shares held in his 401(k) Plan. In August 2014, Mr. Gwin exercised all remaining options from his soon-to-expire November 2007 and March 2008 grants, selling all the shares acquired (including those used to pay the exercise price and taxes).[29] Mr. Gwin also exercised remaining options from his November 2008 grant in October 2015 (a month before expiration), and the remaining options from his March 2009 grant in February 2016 (a day before expiration), *retaining* all the net shares acquired (after Anadarko withheld enough shares to pay the exercise price and taxes).[30] He also retained all net shares acquired when RSUs vested. Beyond these transactions,

---

[27]  *See*, *e.g.,* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 57.

[28]  To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[29]  Robert G. Gwin Form 4 filed August 8, 2014.

[30]  Robert G. Gwin Form 4s filed October 9, 2015 and March 2, 2016, indicating shares withheld by Anadarko by Transaction Code "F".

Mr. Gwin's only other transactions from 2014 to 2018 were November 2017 transfers of 57,064 Anadarko shares and 2018 RSUs (upon vesting) to his ex-wife pursuant to a domestic relations order; these transfers occurred after the Class Period.[31] Mr. Gwin did not sell or transfer any Anadarko shares during the Class Period.

Under Anadarko's Stock Ownership Guidelines, Mr. Gwin (like other EVPs) was required to hold three times his base salary in Anadarko shares or RSUs. Based on his $750,000 base salary from 2014–2018, Mr. Gwin was therefore required to hold $2,250,000 in shares or RSUs.[32] Figure 4 shows the value of Mr. Gwin's shares and RSUs, where value is again defined based on the average daily stock price over the preceding year. As evident from the figure, Mr. Gwin's ownership significantly exceeded his required ownership throughout the depicted time period, even after the sizable November 2017 transfers to his ex-wife.

### 4.3. Mr. Daniels

Figure 5 depicts Mr. Daniels' holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement in December 2016, including Anadarko shares held in his family's Limited Partnership and his 401(k) Plan. Pursuant to a divorce decree, Mr. Daniels exercised and sold soon-to-expire options in both April 2014 and March 2015 at his ex-wife's request.[33] In May 2014 (prior to the Class Period), he exercised and sold options, and additionally sold 10,000 Anadarko shares he held directly.[34] In October 2015, Mr. Daniels exercised soon-to-expire options, retaining all net shares acquired (after Anadarko

---

[31]   Robert G. Gwin Form 4 filed November 8, 2017.

[32]   To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[33]   Robert P. Daniels Form 4s filed April 11, 2014 and March 24, 2015. Both Form 4s note that Mr. Daniels "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."

[34]   Robert P. Daniels Form 4 filed May 22, 2014.

withheld enough shares to pay the exercise price and taxes).[35] He retained all net shares acquired upon vesting of RSUs, and had no other transactions prior to his retirement effective December 30, 2016. Excluding the transaction connected to his divorce decree, he did not sell any Anadarko shares from the beginning of the Class Period through his retirement.

As an EVP, Mr. Daniels was required to hold three times his $700,000 base salary in Anadarko shares or RSUs. As shown in Figure 6, Mr. Daniels' ownership significantly exceeded his required ownership from 2014 through his retirement in December 2016.

### 4.4. Mr. Leyendecker

Figure 7 depicts Mr. Leyendecker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement on June 1, 2018. Data from August 2016 onward (when Mr. Leyendecker was appointed as EVP) are based on required public disclosures of ownership and changes in ownership.[36] Between January 2014 and his retirement in June 2018, Mr. Leyendecker never sold shares or exercised options, and retained all shares acquired upon RSU vesting net of shares withheld by Anadarko to satisfy tax obligations.[37] Upon his retirement in June 2018, Mr. Leyendecker's outstanding RSUs became fully vested and converted into Anadarko shares.[38]

While a Senior Vice President ("SVP"), Mr. Leyendecker was required (under the Stock Ownership Guidelines) to hold shares and RSUs worth 2.5 times his Base Salary (which

---

[35]  Robert P. Daniels Form 4s filed October 16, 2015, indicating shares withheld by Anadarko by Transaction Code F.

[36]  Data for common stock holdings prior to August 2016 are less reliable. *See* footnote to Figure 7.

[37]  The depicted declines in outstanding options in March and May 2017 are due to options granted in March and May 2010 that expired out-of-the-money and were canceled.

[38]  *See* Ernest A. Leyendecker, III Form 4 filed June 5, 2018.

increased from $400,000 to $420,000 in January 2015).[39] Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary). As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required under the Guidelines.

## 5.  Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?

Shares of Anadarko common stock closed at $51.95 on May 3, 2017, down 7.69% from the closing price of $56.28 on the previous day. In his report, Mr. Steinholt contends that $1.92 of Anadarko's $4.33 share-price decline on that day was based on its disclosure that it was expensing suspended exploratory well costs in connection with the Shenandoah project.[40] Mr. Steinholt opines that Anadarko's share price was artificially inflated by $1.92 per share from July 27, 2016 through May 2, 2017, and by $1.75 per share from February 23, 2015 (the first trading day following the first alleged misleading statement) through July 26, 2016.[41] Mr. Steinholt's change in the alleged inflation on July 27, 2016 was based on Anadarko's

---

[39]  *See* APC-00775517 at 520 showing salary $400,000 as of June 30, 2014, and APC-00784847 showing salary of $420,000 by year-end 2014 and again in 2015, and APC-00783757 at 784 showing 2016 salary (as SVP) of $420,000 prior to promotion.

[40]  Steinholt Report, ¶ 99. To be clear, it is *not* my opinion that $1.92 of the May 3, 2017 price drop is attributable to the Shenandoah disclosure.

[41]  Steinholt Report, ¶ 14(d) and footnote 5: "Because the Class Period began with an alleged misleading statement made after the market closed on [Friday] February 20, 2015, the first day with inflation as a result of that misleading statement would be the next day, [Saturday] February 21, 2015."

disclosure that it had increased its working interest in the Shenandoah project from 30% to 33%.[42]

In this section, I take Mr. Steinholt's alleged inflation as given, and ask whether the Named Defendants would have benefited from the $1.75 or $1.92 per share inflation from February 23, 2015 through May 2, 2017 in the form of increased realized compensation. I focus on the components of compensation that are directly or indirectly affected by Anadarko's stock price.

### 5.1. Annual Bonuses (AIP)

As discussed in Section 3.2, bonuses under Anadarko's AIP are based on a variety of operational, financial, and safety performance measures approved by the Committee each year. In 2015 (and only in 2015), the Committee introduced relative TSR as one of the performance measures, making up 5% of the overall AIP Performance Score. Like the PU Plan, the TSR component in the AIP plan was based on Anadarko's TSR among its cohort (Anadarko plus its eleven peers). The contribution to the AIP Performance Score is summarized in Table 5. If Anadarko's 2015 TSR ranked first among the cohort, for example, the AIP Performance Score would be 13.75 percentage points higher than if it ranked twelfth.

Table 6 shows the 2015 TSR performance for Anadarko and its eleven peer firms, where TSR is based on the 30-day average stock price prior to the beginning and at the end of the year, plus dividends.[43] As shown in the table, Anadarko's TSR for 2015 was -33.6%, which ranked ninth among the cohort, earning the Anadarko executives 2.5% towards their AIP

---

[42]  Steinholt Report, ¶ 106 and footnote 129, showing that $1.75 equals $1.92 × (.30/.33). Mr. Steinholt does not explain why Anadarko would increase its working interest in the project if the top executives believed that Anadarko was not or was not likely to be commercially viable.

[43]  The peer group is identified in Anadarko's DEF 14A (Proxy) Statement filed March 18, 2016, p. 40.

Performance Score.[44] Absent the alleged inflation (*i.e.*, reducing Anadarko's closing price by $1.75), Anadarko's TSR for 2015 would have been -35.7%, which would still have been ranked ninth in the twelve-firm cohort.[45] Therefore, as evident from Table 6, the alleged inflation affected neither the AIP Performance Score nor the ultimate AIP payout. In any case, and as described in Table 3, the Committee ultimately used its discretion to reduce the 2015 AIP Performance Score from 196.5% to 110.0%.

Overall, it is my opinion that the Named Defendants would not have benefited from the alleged inflation through their AIP payouts during the Class Period, and in fact the AIP payouts would have remained the same under the alleged inflation (the "Steinholt Stock Prices").

## 5.2. Restricted Stock Units (RSUs)

As discussed above in Section 3.3, the number of RSUs granted to each Named Defendant is determined by multiplying the Target RSU Award and dividing by the stock price on the grant date.[46] Since the dollar value of the grant is fixed, lower grant-date stock prices imply more RSUs, while higher grant-date stock prices imply fewer RSUs. The Anadarko Named Defendants received two RSU grants during the Class Period. Mr. Steinholt contends that the October 26, 2015 grant was made when the $69.00 stock price was artificially inflated by $1.75, while the November 10, 2016 grant was made when the $61.87 stock price was artificially inflated by $1.92.

---

[44] Similar to the PU Plan, TSR for the AIP is measured based on 30-day average stock prices at the end of the year ($53.54) and the beginning of the year ($82.20). Dividends during the year totaled $1.08, yielding a TSR of ($53.54 + $1.08- $82.20)/$82.20 = -33.6%.

[45] Absent the alleged inflation, Anadarko's TRS would be ($53.54 - $1.75 + $1.08- $82.20)/$82.20 = -35.68%.

[46] The Target RSU Award is calculated as the Target Equity Award multiplied by the Target RSU Percentage (which was 25% for all Named Defendants between 2014 and 2018; *see* Table 1).

Table 7 compares the RSU awards made at the actual grant-date stock prices to the RSU awards that would have been made absent the Steinholt Stock Price.[47] As shown in the table, the Named Defendants in total would have received 2,046 *more* RSUs under the Steinholt Stock Price in the October 2015 grant, and would have received 2,336 *more* RSUs under the Steinholt Stock Price in the November 2016 grant.

Table 8 provides my analysis of the value upon vesting of the additional RSUs that would have been granted absent the alleged inflation. To be conservative, I exclude dividend equivalents that would have been paid on these RSUs as of vesting. The values for RSUs vesting on October 26, 2016 are based on the Steinholt Stock Price (*i.e.*, the actual $60.90 closing price minus $1.92) and the value for RSUs vesting on August 8, 2019 are based on the $72.50 per share merger consideration; all other values are based on Anadarko closing stock prices on vesting dates.[48] The vesting dates for Mr. Walker and Mr. Gwin are straightforward, since they continued as Section 16 reporting employees until the Occidental acquisition. The vesting dates for Mr. Leyendecker are also straightforward, since all unvested RSUs vested upon his departure in June 2018.[49] For Mr. Daniels, I assume his unvested RSUs were forfeited upon his voluntary retirement.[50]

As shown in Table 8, the additional 4,382 RSUs earned by the Named Defendants in the absence of alleged inflation would have an aggregate vesting value of $241,098 (not counting dividend equivalents). Therefore, it is my opinion that the Named Defendants did not benefit

---

[47]   The "RSU Award at Actual Stock Price" differs slightly from the actual grant reported in Anadarko's Proxy Statement due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

[48]   Upon the merger, each RSU was converted into $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or $72.50 in total. *See* Anadarko Petroleum Corporation DEFM14A Statement filed July 11, 2019 ("Merger Proxy"), p. 80.

[49]   *See* Ernest A. Leyendecker III Form 4 filed June 5, 2018.

[50]   *See* APC-00780428 at 444.

from the alleged inflation through their RSU grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.3. Non-Qualified Stock Options (NQSOs)

As discussed above in Section 3.4, the number of NQSOs granted to each Named Defendant is determined by dividing the Target NQSO Award by the per-unit value for each option. Since the dollar value of the NQSO Award is fixed, lower grant-date stock prices (as alleged by Mr. Steinholt) imply that more options will be granted at lower exercise prices. Thus, the Named Defendants would have been better off under the Steinholt Stock Prices.

The Named Defendants received stock options in October 2015 at an exercise price of $69.00 per share, and in November 2016 at an exercise price of $61.87 per share. Table 9 compares the option grants actually made during the Class Period to those that would have been made under the Steinholt Stock Prices. Since the value of an at-the-money option is proportional to the stock price,[51] the option value at the Steinholt Stock Price is calculated as the option value at the actual price multiplied by the ratio of the Steinholt Stock Price to the actual stock price.[52] The "NQSO Award at Steinholt Stock Price" is then calculated as the Target NQSO Award divided by the Option Value at Steinholt Stock Price.

As shown in Table 9, the Named Defendants received 311,217 options at an exercise price of $69.00 per share in October 2015, and 222,229 options at an exercise price of $61.87 per share in November 2016. Absent the alleged inflation, the Named Defendants would have received 319,316 options at an exercise price of $67.25 per share in October 2015 (+8,099

---

[51] *See* Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (1985), Eq. (1) on p. 19.

[52] Using Mr. Walker's 2015 grant as an example, $17.948 × ($67.25/$69.00) = $17.493.

options), and 229,346 options at an exercise price of \$59.95 per share in November 2016 (+7,117 options).

Table 10 compares the ultimate gains-upon-exercise for the Named Defendants with and without the assumed inflation. Quantifying the ultimate gains of the options absent the alleged inflation for Mr. Walker and Mr. Gwin is straightforward, since SEC disclosures confirm they held the options from the 2015 and 2016 grants until August 8, 2019, when they were effectively exercised for the merger consideration of \$72.50/share.[53] As shown in Table 10, Mr. Walker's options would have been worth an additional \$609,017 absent the alleged inflation, while Mr. Gwin's options would have been worth an additional \$244,186.

For Mr. Daniels, I assume that (1) his unvested options were forfeited upon his retirement in December 2016; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction in August 2019.[54] One third of Mr. Daniels' 2015 NQSO grant of 63,393 options (as reported) or 65,043 (absent the alleged inflation) would have been vested upon his retirement. As shown in Table 10, Mr. Daniels' options would have been worth an additional \$39,867 absent the alleged inflation.

Similarly for Mr. Leyendecker, I assume that (1) his unvested options were forfeited upon his retirement in June 2018; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction.[55] Two thirds of

---

[53]   Upon the merger, each in-the-money Anadarko stock option was cashed out based on the cash value of the merger consideration (\$59.00 in cash per-share plus the cash value of .2934 shares of Occidental common stock on the day prior to closing, or \$13.50). *See* Merger Proxy, p. 79.

[54]   Termination provisions under voluntary resignation (including retirement) provides for unvested options to be forfeited, and vested options (if retirement eligible) to have 36 months to exercise. *See* APC-00779578 at 634. Mr. Daniels could have exercised his options prior to the Occidental transaction at prices higher or lower than the merger consideration.

[55]   *See* note 54, *supra*. The Merger Proxy confirms that Mr. Leyendecker's vested options were cashed out in the transaction. *See* Merger Proxy, p. 80.

Mr. Leyendecker's 2015 NQSO grant of 31,209 options (as reported) or 32,021 (absent the alleged inflation) would have been vested upon his retirement, and one-third of his 2016 grant of 30,780 options (as reported) or 31,766 (absent alleged inflation) would have been vested. As shown in Table 10, Mr. Leyendecker's options would have been worth an additional $63,081 absent the alleged inflation.

In aggregate across grants and executives, Table 10 shows that the options granted to the Named Defendants during the Class Period would have been worth an additional $956,152 absent the alleged inflation. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their NQSO grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.4. Performance Units (PUs)

As discussed above in Section 3.5, Anadarko's PU plan is a cash plan where the payoffs are based on both Anadarko's stock price and its TSR-ranking compared to eleven industry peers. The payout from the PU plans is based on the number of shares earned (determined by the relative TSR) and Anadarko's closing stock price when the units are cashed out (generally Anadarko's closing price on the 15th business day after the Performance Period).[56] Several PU grants are potentially affected by the alleged inflation in Anadarko stock prices, including:

1. *Grants made prior to the Class Period where the Performance Period ends during the Class Period.* In these instances, the alleged inflation artificially raises Anadarko's TSR, which could artificially raise its ranking among its cohort and, thus, increase the number of units earned. In addition, the stock price when the PUs are converted to cash would also be artificially inflated, leading to larger cash payouts;

2. *Grants made during the Class Period where the Performance Period ends after the Class Period.* Since the target number of PUs granted is determined by multiplying the fixed-dollar Target PU Award and dividing by the PU per-unit value (which moves with the

---

[56] *See, e.g.*, APC-00790250 at 264-265. Formally, the value is calculated based on Anadarko's stock price on the date the Committee certifies the performance results and approves the payouts.

stock price) on the grant date,[57] the target number of PUs would be higher absent the alleged inflation. In addition, the alleged inflation artificially lowers Anadarko's TSR which could artificially lower its ranking among its cohort and, thus, decrease the number of units earned and lead to lower cash payments.

The Named Defendants unambiguously gain from the alleged inflation for PU grants in Group 1 above, and unambiguously lose from the alleged inflation for PU grants in Group 2.[58] Whether the Named Defendants would financially benefit from the alleged inflation therefore depends on the relative gains and losses.

Table 11 identifies the PU Grants potentially impacted by the alleged inflation. The table shows the Grant Date, the Performance Period, the TSR rank as reported in the proxies, the TSR rank in the absence of the alleged inflation, the alleged inflation in the final stock price used to determine cash payouts (*i.e.*, $1.75 or $1.92 for grants with Performance Periods ending during the Class Period) and the difference in the Award Value earned in the absence of the alleged inflation. The number in parentheses next to the rank is the payout percentage from Table 4.

The top panel (Group 1) shows that the absence of the alleged inflation would not change Anadarko's TSR ranking among its peers in any grant except for the 2013 grant with the two-year Performance Period, where Anadarko's rank absent the alleged inflation would have slipped from #7 to #8 and its payout percentage would have fallen from 92% of target to 72% of target. The four Named Defendants had a combined November 2013 target PU award of 85,112 PUs, to be split evenly between grants with two-year and three-year Performance

---

[57] The Target PU Award is calculated as the Target Equity Award multiplied by the Target PU Percentage (which was 40% for Mr. Leyendecker in 2014 and 2015 and 50% in 2016 and 2017, and 50% for all other Named Defendants between 2014 and 2018; *see* Table 1).

[58] Note that I am excluding grants made before that Class Period where the Performance Period ends after the Class Period (*e.g.*, the November 2014 grant) since the alleged inflation would not affect such grants; I also need not consider grants with Performance Periods either entirely before or entirely after the Class Period. Also, there were no grants where the Performance Period both began and ended during the Class Period.

Periods.[59] The Named Defendants earned 39,151.5 PUs from the two-year portion of this grant, worth approximately $1,389,095 based on the $35.48 stock price on the payout date.[60] However, in the absence of the alleged inflation, they would have only received 30,640.3 PUs (72% of target rather than 92%), and the cash-out value would be based on the Steinholt Stock Price of $33.73 (i.e., the closing price less $1.75), yielding $1,033,497. Thus, as shown in Table 11, the Named Defendants would have been $355,598 *worse off* with respect to this PU grant in the absence of the alleged inflation.

For the other PU grants in Group 1 in Table 11, the alleged inflation would not affect the number of PUs earned, but would rather affect only the settlement price when cashed out. In the absence of inflation, grants with Performance Periods ending in 2015 would have a settlement price $1.75 lower, while grants with Performance Periods ending in 2016 would have a settlement price $1.92 lower. The aggregate difference in payouts for the Named Defendants in the absence of inflation is therefore calculated as the aggregate PU target multiplied by the payout percentage (in parentheses in Table 11) multiplied by the inflation at payout (*i.e.*, $1.75 or $1.92).[61]

For the Group 2 grants in Table 11, the ultimate award would potentially change absent the alleged inflation for two reasons: (1) the reduced Steinholt Stock Price on the grant date would increase the number of target PUs granted; and (2) the reduced Steinholt Stock Price on

---

[59]   Target PU grants for 2013 for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014, p. 48. *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant.

[60]   That is, 50% × (81,112) × 92% = 39,151.5 PUs, multiplied by Anadarko's closing stock price of $35.48 on the January 22, 2016 settlement date.

[61]   Target PU grants for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statements filed March 25, 2013 (p. 51) and March 21, 2014 (p. 48). *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant. Mr. Leyendecker's 2012 PU Target is inferred from the PUs vesting in 2015 (APC-00784868 at 881) less the number of PUs vesting in 2015 from the 2013 PU grant (APC-00784868 at 883).

the grant date would increase Anadarko's TSR over the Performance Period. For (1), I estimate that the Target 2015 PU grant for the Named Defendants would have increased from 149,384 to 153,126 PUs, while the Target 2016 PU grant would have increased from 129,091 to 132,716 PUs.[62] For (2), I find that starting with the Steinholt Stock Prices increases Anadarko's 3-year TSR for the October 2015 grant from -3.60% to -0.32%, which increases Anadarko's rank among its cohort from 8th to 7th, which in turn increases the ultimate award from 60% of Target to 80% of Target.

The Named Defendants earned 75,869 units from October 2015 grant, worth approximately $3,480,861 based on the $45.88 stock price on the payout date.[63] However, in the absence of the alleged inflation, they would have received 103,692 PUs, yielding $4,757,393.[64] The Named Defendants would therefore have received cash payments of $1,276,531 more from the October 2015 grant.

As per the Occidental Merger Agreement, unvested PUs held as the transaction were deemed to be earned at 200% of target and cashed out at a fixed price of $76.00 per PU.[65] Accordingly, the Named Defendants earned 239,308.7 PUs from the November 2016 grant, cashed out at $18,187,459. Absent the alleged inflation, the Named Defendants would have earned 246,029.5 PUs with a cash-out value of $18,698,239. Thus, absent the alleged inflation,

---

[62]   I assume that the value per Performance Unit is equal to the value implied in the Proxy Statements (Total PU Value divided by target units) less the alleged inflation (*i.e.*, $1.75 for Class Period grants before July 27, 2016 and $1.92 after).

[63]   Target 2015 PU awards for Mr. Walker, Mr. Gwin, Mr. Daniels, and Mr. Leyendecker were 77,548, 31,096, 31,795, and 8,945 respectively (Anadarko Petroleum Corporation DEF 14A Statement filed March 23, 2018; APC-0078847). Upon certification on January 19, 2019 (when Anadarko's stock price closed at $45.88), Mr. Walker and Mr. Gwin received 60% of their target, Mr. Daniels received 60% of one-third of his target (since he served only 12 of the 36-month of the Performance Period), and Mr. Leyendecker received 60% of 29/36th (since he served only 29 of the 36-month of the Performance Period).

[64]   As described in the prior footnote, the award value assumes the proration of Mr. Daniels' and Mr. Leyendecker's award.

[65]   *See* Merger Proxy, p. 81.

the Named Defendants would have received cash payments of $510,781 more from the November 2016 grant.

Table 12 summarizes the change in PU payouts to each Named Defendant in the absence of the alleged inflation. All Defendants would have been better off under the Steinholt Stock Prices than the actual prices. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their PU grants.

### 5.5. Summary

Table 13 summarizes my findings of how the Named Defendants compensation would be impacted absent the alleged inflation in Anadarko stock prices. Overall, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 per share lower from February 23, 2015 to July 26, 2016, and $1.92 per share lower from July 27, 2016 to May 2, 2017. Collectively, the Named Defendants would have realized nearly $2.5 million more absent the alleged inflation. It is therefore my opinion that the Named Defendants did not benefit financially from the alleged inflation through increased compensation.

## 6. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activities?

Trading by executives that is "out of line with prior trading practices or at times calculated to maximize personal profit" may be indicia of scienter.[66] For example, an insider, aware of material inside information about their company's stock price, may sell shares when

---

[66]  *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 435 (5th Cir. 2002).

they know the market price is too high, and purchase shares when they know the market price is too low.[67] Plaintiffs and Mr. Steinholt allege that, beginning on February 20, 2015, Defendants "defrauded investors by various means and methods concerning the commercial viability and producible resource size of Shenandoah", allegedly inflating Anadarko's stock until the alleged truth was revealed on May 2, 2017.[68]

Under Plaintiffs' theory of the case, we would expect to see that the Named Defendants actively sold Anadarko shares during the Class Period, by selling shares owned directly and shares acquired through the exercise of stock options or the vesting of RSUs. In fact, as I document in this section, the Named Defendants did not sell any direct shares during the Class Period, retained all shares from vesting RSUs (except for those withheld by Anadarko for tax purposes), and generally retained all shares acquired through option exercises (except for shares used to pay the exercise price and to satisfy tax obligations, including shares withheld by Anadarko).[69]

### 6.1. Mr. Walker

As shown in Figure 1, Mr. Walker did not sell shares or exercise options during the Class Period. When his RSUs vested in May 2015, November 2015, October 2016, and November 2016 he transferred only the shares required to satisfy tax obligations, retaining the remaining

---

[67] There is a robust academic literature analyzing how informed insider trading allows insiders to profit from their information advantage (*e.g.*, Seyhun (1986); Fishman and Hagerty (1992); Bettis et al. (2000); Jagolinzer et al. (2011); Agrawal and Nasser (2012); Kraft et al. (2014); Lee et al. (2014); Agrawal and Cooper (2015); Aitken et al. (2015); Hillier et al. (2015)).

[68] Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated October 1, 2021, at 1; Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022, at 51:1-21.

[69] As noted in Section 4.3, the only exception was options/shares exercised/sold by Mr. Daniels at his ex-wife's request and pursuant to a divorce decree.

shares and dividend equivalents.[70] Overall, there is no evidence of suspicious trading activity by Mr. Walker during the Class Period. The fact that Mr. Walker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 2, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his direct shareholdings increased by 45,632 shares during the Class Period, in addition to an increase of 8,155 RSUs and 218,576 NQSOs.

### 6.2. Mr. Gwin

As shown in Figure 3, Mr. Gwin exercised options at two points during the Class Period, but did not sell the shares acquired during the Class Period. On October 7, 2015, he exercised 78,600 options set to expire on November 4, 2015, retaining 22,408 shares after Anadarko withheld 56,192 shares to finance the exercise price and taxes.[71] He did not sell the shares acquired upon exercise during the Class Period, and therefore could not have taken advantage of any alleged inflation. Mr. Gwin also exercised options on February 29, 2016, exercising 66,200 options set to expire the following day. Again, Mr. Gwin retained all net shares after those withheld by Anadarko to pay exercise prices and taxes.[72] Similarly, when his RSUs vested in November 2015, October 2016, and November 2016 he retained all net shares after those withheld by Anadarko to satisfy tax obligations.[73] Mr. Gwin had no other stock transactions during the Class Period.

---

[70]   *See* R. A. Walker Form 4s filed May 19, 2015, November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Walker's Form 4s.

[71]   Robert G. Gwin Form 4 filed October 9, 2015.

[72]   Robert G. Gwin Form 4 filed March 2, 2016.

[73]   Robert G. Gwin Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Gwin's Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Gwin during the Class Period. The fact that Mr. Gwin did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 4, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly and in his 401(k) increased by 41,918 shares during the Class Period, in addition to an increase of 6,438 RSUs and 69,588 NQSOs.

### 6.3. Mr. Daniels

As shown in Figure 5, Mr. Daniels exercised options at two points during the Class Period. On March 20, 2015, Mr. Daniels exercised 38,449 options from his 2008 and 2009 grants, immediately selling all the shares acquired. In his Form 4 filed on March 24, Mr. Daniels explains that he "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."[74] In my opinion, Mr. Daniels did not personally benefit from this exercise during the Class Period.[75]

Mr. Daniels also exercised 30,841 options on October 14-15, 2015, retaining all shares net of those withheld by Anadarko to pay the exercise price and taxes.[76] He sold no other shares during the Class Period prior to his December 2016 retirement, and retained all shares (net of those withheld by Anadarko to satisfy tax obligations) when his RSUs vested in November 2015, October 2016, and November 2016.[77]

---

[74]   Robert P. Daniels Form 4 filed March 24, 2015.

[75]   Mr. Daniels' ex-wife may have benefited by as much as $65,536 before taxes (37,449 shares × $1.75 alleged inflation) more than she would have received absent the alleged inflation.

[76]   Robert P. Daniels Form 4 filed October 16, 2015. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4.

[77]   Robert P. Daniels Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Daniels from the beginning of the Class Period through his December 2016 retirement.[78] The fact that Mr. Daniels did not sell shares during the Class Period (beyond those related to his divorce decree) is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 6, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly, in his family's LP, and in his 401(k) increased by 26,335 shares during the Class Period.[79]

### 6.4. Mr. Leyendecker

As shown in Figure 7, Mr. Leyendecker did not exercise any options or sell any shares during the Class Period. When his RSUs vested in November 2015, October 2016, and November 2016, he retained all shares and dividend equivalents except for the shares withheld by Anadarko to satisfy tax obligations.[80] As discussed in Section 4.4, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary) following his promotion to EVP in August 2016. As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required

---

[78]  I understand that a whistleblower letter from a former Anadarko employee, Lea Frye, asserts that a May 21, 2014 transaction in stock by Mr. Daniels, which she characterizes as a sale of "61,379 shares of his Anadarko stock (transaction of approximately $6.143 million)" might constitute insider trading (Exhibit 355 to Deposition of Lea Frye dated October 7, 2022). As noted in Section 4.3 above, Mr. Daniels indeed exercised 51,379 options and sold the shares acquired on this day, and additionally sold 10,000 Anadarko shares held directly (*see* Robert P. Daniels Form 4 filed May 22, 2014). These transactions predate the Class Period, prior to which it is not alleged that Anadarko's share price was inflated. Notably, Ms. Frye traded in Anadarko stock within a few days of Daniels' trade, asserting that she did not possess any knowledge which would be considered insider information regarding current Anadarko activities (Deposition of Lea Frye dated October 7, 2022, at 236:23-240:22; *see also* Exhibit 364 to that Deposition).

[79]  Mr. Daniels' RSUs and NQSOs declined near his retirement, primarily reflecting that (because of his pending retirement) he did not receive grants of RSUs and NQSOs in November 2016.

[80]  Ernest A. Leyendecker III Form 4s filed October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Leyendecker's Form 4s

under the Guidelines. Therefore, his "lack" of trading over this period is not explained by Anadarko's Stock Ownership Guidelines.

Overall, there is no evidence of suspicious trading activity by Mr. Leyendecker during the Class Period. The fact that Mr. Leyendecker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 8, he was in compliance with the guidelines before, during, and after the Class Period.[81] Indeed, his direct holdings increased by 5,574 shares during the Class Period, in addition to an increase of 6,777 RSUs and 53,161 NQSOs.

### 6.5. Summary

In summary, there is no evidence of suspicious trading by the Named Defendants during the Class Period. Indeed, rather than actively selling shares to exploit the alleged inflation in Anadarko stock, the Named Defendants kept reinvesting vested RSUs and exercised options into Anadarko, and collectively and individually *increased* their holdings of Anadarko shares. Notably, the Named Defendants were among the shareholders who lost money when Anadarko's stock prices fell by $4.33 on May 3, 2017. In particular, Mr. Walker's 265,418 shares and 81,495 RSUs fell by $1,502,142 on May 3, Mr. Gwin's 112,476 shares and 32,659 RSUs fell by $628,435, and Mr. Leyendecker's 17,441 shares and 15,304 RSUs fell by $141,786.

Finally, in addition to analyzing the trading activity of the Named Defendants, it is relevant to also analyze the trading-related activity of their employer. The Complaint alleges

---

[81] While Mr. Leyendecker was technically in compliance with the Stock Ownership Guidelines between August 2016 and October 2016 (since he had three years to increase his holdings to 3 times his base salary), he was nonetheless prohibited during this period under the Guidelines from selling shares upon the exercise of options or the vesting of RSUs. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 56.

that the Named Defendants led Anadarko's day-to-day operations, "monitored and/or oversaw the Shenandoah project" and "were the persons with ultimate responsibility for directing and managing the Company's business, operations, and communications to investors."[82] If Plaintiffs' allegations as to responsibilities are correct, the Named Defendants were logically involved in the July 26, 2016 decision to increase Anadarko's working interest in the Shenandoah project from 30% to 33%.[83] If Anadarko's stock was indeed inflated as suggested by Mr. Steinholt, this increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

### 7. Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko management?

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014 (and reported in Anadarko's 10-K for fiscal year 2014) instead of in the third quarter of 2016 (as actually reported in Anadarko's 10-Q filed on October 31, 2016) once Anadarko concluded it was a dry hole.[84] Mr. Regan further argues that even "quantitatively small misstatements" can be considered material if "the misstatement has the effect of increasing management's compensation".[85] He then contends that:

> "The Shen-3 results and the associated reduction in resource estimates was further significant considering that management's bonus[es] were affected by performance goals that included consideration of MMBOE sales and related

---

[82]   Complaint, ¶ 149(a).

[83]   Steinholt Report, ¶ 106.

[84]   Regan Report, ¶ 11(a).

[85]   Regan Report, ¶ 77 (c).

*reserves (representing an aggregate of performance goal weighting factor ranging from 42% – 50%). Although the Shenandoah basin project, including Shen-3, was exploratory in nature and in fact, a dry hole, the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well to extract oil resources that could impact management performance goals and related compensation in the future.*"[86]

Mr. Regan's emphasis on "performance goals that included consideration of MMBOE sales and related reserves" in the above quote seems irrelevant, since Anadarko never booked any reserves in connection with the Shen-3 well or the Shenandoah prospect more broadly.[87] Moreover, as discussed in Section 3.2 and as evident from Table 2, there are no AIP performance measures related to unproved reserves or resource targets.[88] In addition, the Committee did not make any Individual Performance adjustments to AIP bonuses from 2014--2018 related to unproved reserves (and in fact did not make any individual adjustments at all).

Beyond making some general allusions to Anadarko's management bonus plans, Mr. Regan provides no analysis of how and to what extent bonuses might be impacted by the decision of when to expense drilling costs associated with Shen-3. Indeed, during his deposition Mr. Regan admitted that he did not know whether expensing Shen-3 or not would impact bonus awards.[89] Ultimately, analyzing these impacts requires a nuanced understanding of how such expenses effect AIP performance measures and subsequent bonuses.

---

[86]   Regan Report, ¶ 86.

[87]   *See* Deposition of Charles F. Oudin, III dated June 30, 2022, at 243:7-11.

[88]   *See* also Deposition of Robert P. Daniels dated October 13, 2022, at 40:19-42:18.

[89]   *See* Deposition of Paul Regan dated January 20, 2023, at 129:4-23.

As shown in Table 2, AIP bonuses in 2014 were based on sales volumes and reserve additions (weighted 50%), capital expenditures (weighted 20%), and a safety measure (weighted 10%). None of these measures is directly impacted by exploratory drilling expenses. Moreover, the fifth measure, EBITDAX/BOE (weighted 20%), is defined as "earnings before interest, taxes, depreciation, depletion, amortization, and *exploration expenses* divided by sales volume for the year" (emphasis added).[90] Investopedia defines the exploration expense component of EBITDAX as follows:

> *"Exploration costs are the costs an oil or gas company incurs while searching for oil or gas to drill. Exploration costs include the cost of researching appropriate places to drill and the cost of actually drilling. Exploration costs are recognized in the financial statements as exploration, abandonment, and dry hole costs."[91]*

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014. While such expensing would have reduced Anadarko's reported net earnings, it would not have reduced Anadarko's EBITDAX and therefore would not have reduced 2014 bonuses under the AIP.

In contrast, by 2016 Anadarko had introduced "Controllable Cash Costs" as an AIP performance measure with a 25% weight (*see* Table 2).[92] Notably, Controllable Cash Costs includes suspended exploratory well costs that are "subsequently reclassified to exploration expense for accounting purposes."[93] If Anadarko had expensed the $64 million drilling costs

---

[90]  Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 47.

[91]  https://www.investopedia.com/terms/e/ebitdax.asp, accessed on January 23, 2023.

[92]  Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 41.

[93]  Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 43.

for Shen-3 in 2014 rather than 2016, its Controllable Cash Costs for 2016 would be reduced by $64 million, or $0.22 per BOE.[94]

As reported in its 2017 Proxy Statement, Anadarko's Target Controllable Cash Costs (after mid-year adjustments for certain divestitures) was $13.56/BOE, which at target would contribute 25% to the AIP Performance Score.[95] Anadarko's reported 2016 Controllable Cash Costs was $12.70/BOE, resulting in a contribution of 44.8% to the final AIP Performance Score.[96] Internal documents confirm that the relation between Controllable Cash Costs per BOE and the 2016 AIP contribution is linear, up to a maximum contribution to the final AIP Performance Score of 50% (*i.e.*, 200% of 25%).[97] This linearity allows me to determine that a $0.22 reduction in the Cash Cost per BOE corresponds to an increase in this component's contribution to the AIP Performance Score from 44.8% to 49.9%, or a difference of 5.1%.[98] This 5.1% increase in the AIP Performance Score (caused by shifting the $64 million in expenses to 2014) would have increased Mr. Walker's 2016 AIP bonus by $86,190, Mr. Gwin's bonus by $36,338, and Mr. Leyendecker's by $20,579.[99]

---

[94] Calculation based on 2016 sales volume of 290 MMBOE (*see* Anadarko Petroleum Corporation Form 10-K filed February 15, 2017, p. 19).

[95] Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[96] Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[97] APC-00782204 at 212.

[98] In particular, if a $0.86 decrease in Controllable Cash Costs/BOE (from $13.56 to $12.70) corresponds to an increase in payout contribution by 19.8%, we can derive that each dollar reduction in Controllable Cash Costs/BOE increases payout contribution by 23 percentage points. Multiplying 23% by $0.22 suggest an increase in the AIP Performance Score of 5.1 percentage points.

[99] Results based on increasing 2016 AIP awards from 158% of target to 163.1% of target (Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 43). The Committee determined that Mr. Daniels was not eligible for a 2016 AIP payout, since his retirement date preceded the date of the actual payout (*see* APC-00787898 at 906).

To summarize, it is my opinion that expensing Shen-3 drilling expenses in 2014 rather than 2016—as proposed by Mr. Regan—would have not changed 2014 AIP bonuses for the Named Defendants, but would have significantly increased their 2016 AIP bonuses.

## 8. Did the alleged inflation increase the payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?

In connection with the Occidental acquisition in August 2019, several departing Anadarko executives (including Mr. Walker and Mr. Gwin) became eligible for certain benefits, including:

- Conversion of Anadarko RSU awards (including dividend equivalents) into equivalent Occidental restricted stock/cash unit awards, vesting according to their original schedule;[100]

- Immediate vesting and cash-out of all outstanding Anadarko stock options, at the merger consideration price of about $72.50;[101]

- Each Anadarko PU award immediately vested and converted into the right to receive cash equal to 200% of the target award multiplied by $76/unit.[102]

In addition, upon their departure within three years following the acquisition, Mr. Walker and Mr. Gwin would each receive a multiple of the sum of their respective salary and bonus (2.5 times for Mr. Walker, and 2.9 times for Mr. Gwin), continuation of medical and other benefits for three years, outplacement services, and service-credits related to Anadarko's retirement and savings plans.

---

[100] *See* Merger Proxy, pp. 12, 80.

[101] *See* Merger Proxy, pp. 12, 79. As discussed before, the merger consideration was $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or about $72.50 in total.

[102] *See* Merger Proxy, pp. 12, 81.

In the Complaint, Plaintiffs repeatedly emphasize so-called "golden parachute" payments received by Anadarko executives in connection with the Occidental acquisition.[103] Plaintiffs provide no account of how an alleged fraud that was revealed in May 2017 could have impacted compensation in relation to Occidental's late 2019 acquisition of Anadarko.

As discussed at length in Section 5, because of the fixed dollar equity grants, the Named Defendants would have received more RSUs, more PUs, and more NQSOs during the Class Period absent the alleged inflation. For continuing Named Defendants Walker and Gwin, one third of the additional RSUs granted in November 2016 would still be unvested as of the Occidental transaction, as would all of the November 2016 PUs (since the relevant Performance Period was set to end in December 2019, after the transaction). Similarly, unexercised stock options issued in October 2016 and November 2017 would remain outstanding upon the transaction.

Table 14 summarizes the additional amounts the Named Defendants *would* have received in connection with the Occidental acquisition absent the alleged inflation. The amounts are taken directly from Table 8 (RSUs), Table 10 (NQSOs), and Table 12 (PUs), and reflects the value of the additional equity at the $72.50 merger consideration (for RSUs and NQSOs) or $76.00 (for PUs). Across all pay components, I estimate that the Named Defendants would have realized approximately $1.5 million in additional payouts absent the alleged inflation.

In sum, the alleged inflation would continue to cost Named Defendants even in connection with the Occidental acquisition.

---

[103] *See, e.g.*, Complaint ¶¶ 5(s), 9, 150, and 156. Significantly, Mr. Daniels and Mr. Leyendecker had retired well before the acquisition, though Mr. Leyendecker still had outstanding Anadarko PUs and stock options that were cashed out in the transaction. *See* Merger Proxy, pp. 79-81. The foregoing discussion is accordingly limited to Mr. Walker and Mr. Gwin.

### 9. Author's Statement and Qualifications

I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I have been a Full Professor of the Department of Finance and Business Economics at the USC Marshall School since 1995, and I currently serve as Department Chairman. I also hold a joint appointment in the USC School of Law (as Professor of Business, Economics and Law). I previously served as Department Chairman from 2003 to 2004, and as the Marshall School's Vice Dean of Faculty and Academic Affairs from 2004 to 2007. From 1991 to 1995, I was an Associate Professor of Business Administration at the Harvard Business School, and from 1983 to 1991, I was an Assistant and Associate Professor at the University of Rochester's William E. Simon Graduate School of Business Administration.

I received a Ph.D. in Economics from the University of Chicago in 1984, where my honors included a National Science Foundation Fellowship, a Milton Friedman Fund Fellowship, and a Social Science Foundation Dissertation Fellowship. I also have an M.A. in Economics from the University of Chicago, and a B.A. degree (summa cum laude) from the University of California, Los Angeles. I am a member of Phi Beta Kappa, the American Economic Association, and the American Finance Association. I am an associate editor of the *Journal of Financial Economics,* a former associate editor of the *Journal of Accounting and Economics* and the *Journal of Corporate Finance,* and I serve as referee to over thirty professional and academic journals. I am the former chairman of the Academic Research Committee of WorldAtWork (formerly the American Compensation Association). My curriculum vitae is attached at the end of this report.

I am a recognized expert on executive compensation, and I have written and published extensively on issues related to executive compensation, beginning with my 1984 dissertation. During 1992 and 1993, I conducted annual surveys of executive compensation practices in the 1,000 largest U.S. corporations. These surveys, sponsored by the United Shareholders Association, were used extensively by institutional investors and large shareholders in evaluating and comparing the effectiveness of compensation policies. I also advised the SEC in formulating its 1992 disclosure rules for top management pay, and I was a prominent member of the 1992 and 2003 National Association of Corporate Directors' Blue Ribbon Commissions on Executive Compensation, which issued reports calling for the overhaul of CEO pay practices. In 2009, I served as advisor to the U. S. Treasury's Special Master of Executive Compensation, charged with approving the level and structure of compensation for companies receiving "special assistance" from the U.S. government.

I have written more than fifty articles, cases, books, and book chapters relating to compensation and incentives in organizations. Results from my research on executive compensation have been widely cited in the press (including the *Wall Street Journal, New York Times*, *Washington Post*, *Los Angeles Times*, *Chicago Tribune*, *USA Today*, *Economist*, *Fortune*, *Forbes*, *Business Week*, and *Time*) and on national television (including CNN and CBS news). I have offered testimony relating to executive compensation to the U.S. House of Representatives Financial Services Committee and the TARP Congressional Oversight Panel, and given speeches and presentations on compensation and incentives to a variety of academic and practitioner audiences, including the Conference Board, the American Compensation Association, and the Board of Governors of the Federal Reserve.

My university teaching encompasses a wide variety of courses at the undergraduate, MBA, Ph.D., and executive levels. At USC, I have taught undergraduate, MBA, and Ph.D. courses in economics and corporate finance and have developed and taught undergraduate and MBA courses on compensation, incentives, and corporate governance. At Harvard, I taught courses on compensation and incentives in organizations, human resource management, and on the coordination, control, and management of organizations. At Rochester and Chicago, I taught undergraduate courses in microeconomics, MBA and executive courses in microeconomics and pricing policies, MBA and Ph.D. courses in organizational theory, and Ph.D. courses in price theory. I also developed and taught a course in the Economics of Human Resource Management, with a primary focus on compensation for top-level managers.

I have testified as an expert witness in multiple proceedings in federal and state courts. I have consulted with organizations and conducted research on compensation and incentives in professional partnerships and corporations. I spent the 1994–1995 academic year on leave from Harvard as the Visiting Scholar and Consultant at Towers Perrin (now Willis Towers Watson), a major benefits and compensation consulting firm, where my activities included making formal presentations and leading roundtable discussions on executive compensation to clients nationwide, as well as being involved in a variety of consulting engagements.

Kevin J. Murphy
January 25, 2023

**Table 1    Target Compensation for Named Defendants, 2014 – 2018**

| | | | | Allocation of Target Equity | | |
|---|---|---|---|---|---|---|
| Year | Salary Rate | Target Bonus (% of Salary) | Target Equity | Performance Units (PUs) | Restricted Stock Units (RSUs) | Non-Qualified Stock Options (NQSOs) |
| *Robert A. Walker (Chairman, President, and CEO)* | | | | | | |
| 2014 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2015 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2016 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2017 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2018 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| *Robert G. Gwin (EVP and CFO)* | | | | | | |
| 2014 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2015 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2016 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2017 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2018 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| *Robert P. Daniels (Until 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2015 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2016 | $700,000 | 95% | — | — | — | — |
| *Ernest A. Leyendecker, III (After 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 (SVP) | $400,000 | 80% | $1,500,000 | 40% | 25% | 35% |
| 2015 (SVP) | $420,000 | 80% | $1,600,000 | 40% | 25% | 35% |
| 2016 (SVP) | $420,000 | 80% | — | — | — | — |
| 2016 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |
| 2017 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |

Note:    Data from annual proxy statements and "tally sheets" (APC-00789245 at 294-313 (2014); APC-00779479 at 530-550 (2015); APC-00784849-867 (2016); APC-01727486 at 531-548 (2018)). Mr. Leyendecker's compensation is inferred from several documents, including APC-00784868 at 881-883; APC-00785266 at 279-280; APC-00786269 at 275; APC-00790225 at 230. Target equity awards differ slightly from ASC 718 grant-date accounting values reported in the proxy statements.

**Table 2    Performance Measures and Weights in Anadarko AIP Plan, 2014 – 2018**

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| *Operational* | | | | | |
| Reserve Additions (MMBOE) | 25% | 20% | 20% | 15% | |
| Reserve Additions Growth per DAS | | | | | 20% |
| Sales Volumes (MMBOE) | 25% | 10% | 20% | 20% | |
| Sales Volume Growth per DAS | | | | | 20% |
| Company-Operated Base Sales Volume (MMBOE) | | 15% | | | |
| *Financial* | | | | | |
| Capital Expenditures ($ mil) | 20% | 10% | 25% | 15% | |
| EBITDAX/BOE ($/BOE) | 20% | 15% | | | |
| Controllable Cash Costs ($/BOE) | | 15% | 25% | 15% | 20% |
| Cash Operating Income ($/BOE) | | | | 25% | |
| Cash-Flow ROIC | | | | | 20% |
| Relative One-Year TSR | | 5% | | | |
| *Safety* | | | | | |
| Total Recordable Incident Rate (TRIR) | 10% | 10% | 10% | 10% | 10% |
| Level 3 Incidents | | | | | 10% |

Note:   Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 3     Payouts for Named Executive Officers under AIP Plan, 2014 – 2018**

| Year | Initial AIP Performance Score | Discretionary AIP Score Adjustment | Individual Performance Adjustment | Final AIP Bonus |
|------|------|------|------|------|
| 2014 | 151.0% | 0% | 0% | 151.0% |
| 2015 | 196.5% | -86.5% | 0% | 110.0% |
| 2016 | 158.0% | 0% | 0% | 158.0% |
| 2017 | 92.6% | -7.6% | 0% | 85.0% |
| 2018 | 150.0% | 0% | 0% | 150.0% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 4    Payout Levels under Performance Unit Plan**

| Relative TSR Ranking | Payout Level (before 11/2014) | Payout Level (11/2014 and later) |
|:---:|:---:|:---:|
| 1 | 200% | 200% |
| 2 | 182% | 182% |
| 3 | 164% | 164% |
| 4 | 146% | 146% |
| 5 | 128% | 128% |
| 6 | 110% | 100% |
| 7 | 92% | 80% |
| 8 | 72% | 60% |
| 9 | 54% | 40% |
| 10 | 0% | 0% |
| 11 | 0% | 0% |
| 12 | 0% | 0% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 5    Schedule for TSR Component of 2015 AIP Plan**

| Relative TSR Ranking | Score for TRS Component | Contribution to 5% of AIP Performance Score |
|:---:|:---:|:---:|
| 1 | 275% | 13.75% |
| 2 | 240% | 12.00% |
| 3 | 205% | 10.25% |
| 4 | 170% | 8.50% |
| 5 | 135% | 6.75% |
| 6 | 100% | 5.00% |
| 7 | 83% | 4.15% |
| 8 | 67% | 3.35% |
| 9 | 50% | 2.50% |
| 10 | 33% | 1.65% |
| 11 | 17% | 0.85% |
| 12 | 0% | 0.00% |

Note:    APC-00779578 at 619; Anadarko Petroleum Corporation DEF 14 (Proxy) Statement filed March 18, 2016.

**Table 6    Anadarko's Share-Price Performance vs. Peers, 2015**

| Company | Beginning Average Price | Ending Average Price | Dividends During Period | Total Shareholder Return (TSR) | Rank |
|---|---|---|---|---|---|
| Pioneer Natural Resources | $149.63 | $136.52 | $0.08 | -8.7% | 1 |
| Occidental Petroleum | $81.02 | $70.51 | $2.97 | -9.3% | 2 |
| Chevron | $111.20 | $90.24 | $4.28 | -15.0% | 3 |
| EOG Resources | $92.42 | $77.44 | $0.67 | -15.5% | 4 |
| ConocoPhillips | $68.65 | $50.15 | $2.94 | -22.7% | 5 |
| Apache | $64.29 | $46.14 | $1.00 | -26.7% | 6 |
| Hess | $74.82 | $53.64 | $1.00 | -27.0% | 7 |
| Noble Energy | $49.91 | $34.07 | $0.72 | -30.3% | 8 |
| *Anadarko Petroleum* | *$82.20* | *$53.54* | *$1.08* | *-33.6%* | *9* |
| Devon Energy | $60.19 | $37.25 | $0.96 | -36.5% | 10 |
| Marathon Oil | $29.10 | $15.13 | $0.68 | -45.7% | 11 |
| Chesapeake Energy | $20.04 | $4.64 | $0.18 | -76.0% | 12 |

Note:   Anadarko's 2015 Peers from Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016, p. 40; price and dividend data from CRSP. Beginning Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2015; Ending Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2016. Total Shareholder Return (TSR) defined as (Ending Price – Beginning Price + Dividends) divided by Beginning Price.

**Table 7    RSU Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Actual Stock Price | Steinholt Stock Price | Target RSU Award | RSU Award at Actual Stock Price | RSU Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $69.00 | $67.25 | $2,775,000 | 40,217 | 41,264 | +1,047 |
| Gwin | $69.00 | $67.25 | $1,112,500 | 16,123 | 16,543 | +420 |
| Daniels | $69.00 | $67.25 | $1,137,500 | 16,486 | 16,914 | +428 |
| Leyendecker | $69.00 | $67.25 | $400,000 | 5,797 | 5,948 | +151 |
| *Total:* | | | *$5,425,000* | *78,623* | *80,669* | *+2,046* |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $61.87 | $59.95 | $2,775,000 | 44,852 | 46,289 | +1,437 |
| Gwin | $61.87 | $59.95 | $1,112,500 | 17,981 | 18,557 | +576 |
| Leyendecker | $61.87 | $59.95 | $625,000 | 10,102 | 10,425 | +323 |
| *Total:* | | | *$4,512,500* | *72,935* | *75,271* | *+2,336* |

Note:  Data from Table 1; Steinholt Report, Exhibit D; CRSP. Target RSU Awards are calculated based on the Total Equity Award and Target RSU Percentage in Table 1. Actual RSU awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 8     Vesting Value of Additional RSUs Granted under Steinholt Stock Prices**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Additional October 2015 RSU Grant under Steinholt Prices* | 1,047 | 420 | 428 | 151 | 2,046 |
| Vesting October 26, 2016     ($58.98) | $20,584 | $8,257 | $8,414 | $2,969 | $40,224 |
| Vesting October 26, 2017     ($47.69) | $16,644 | $6,677 |  | $2,400 | $25,721 |
| Vesting June 1, 2018     ($71.05) |  |  |  | $3,576 | $3,576 |
| Vesting October 26, 2018     ($58.84) | $20,535 | $8,238 |  |  | $28,773 |
| Total from October 2015 Grant: | $57,763 | $23,171 | $8,414 | $8,945 | $98,294 |
| *Additional November 2016 RSU Grant under Steinholt Prices* | 1,437 | 576 |  | 323 | 2,336 |
| Vesting November 10, 2017 ($51.11) | $24,482 | $9,813 |  | $5,503 | $39,798 |
| Vesting June 1, 2018     ($71.05) |  |  |  | $15,299 | $15,299 |
| Vesting November 10, 2018 ($58.21) | $27,883 | $11,176 |  |  | $39,059 |
| Vesting August 8, 2019     ($72.50) | $34,728 | $13,920 |  |  | $48,648 |
| *Total from November 2016 Grant:* | $87,092 | $34,909 |  | $20,802 | $142,803 |
| *Total from both Grants:* | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |

Note:   Data from Table 7; Form 4 filings; Proxy Statements; Steinholt Report, Exhibit D; Merger Proxy; CRSP. Table shows the value of the additional RSUs that would have been granted absent the alleged inflation in stock prices. Values are based on Anadarko closing stock prices on each vesting date, except for October 26, 2016 (during the Class Period) when values are based on the Steinholt Stock Price (the actual closing price of $60.90 minus the alleged inflation of $1.92), and for August 8, 2019 when values are based on the $72.50 per share merger consideration. Amounts exclude the value of dividend equivalents that would have been paid upon vesting.

**Table 9    NQSO Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Option Value at Actual Stock Price | Option Value at Steinholt Stock Price | Target NQSO Award | NQSO Award at Actual Stock Price | NQSO Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $17.948 | $17.49 | $2,775,000 | 154,615 | 158,638 | 4,023 |
| Gwin | $17.944 | $17.49 | $1,112,500 | 62,000 | 63,613 | 1,613 |
| Daniels | $17.944 | $17.49 | $1,137,500 | 63,393 | 65,043 | 1,650 |
| Leyendecker | $17.944 | $17.49 | $560,000 | 31,209 | 32,021 | 812 |
| *Total:* | | | *$5,585,000* | *311,217* | *319,316* | 8,099 |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $20.306 | $19.676 | $2,775,000 | 136,661 | 141,038 | 4,377 |
| Gwin | $20.306 | $19.675 | $1,112,500 | 54,788 | 56,543 | 1,755 |
| Leyendecker | $20.305 | $19.675 | $625,000 | 30,780 | 31,766 | 986 |
| *Total:* | | | *$4,512,500* | 222,229 | 229,346 | 7,117 |

Note: Data from Table 1; Proxy Statements; Form 4 filings; Steinholt Report, Exhibit D. Target NQSO Awards are calculated based on the Total Equity Award and Target NQSO Percentage in Table 1. Actual NQSO awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 10   NQSO Exercises under Actual and Steinholt Stock Prices during Class Period**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Actual October 2015 NQSO Grant* | 154,615 | 62,000 | 21,131 | 20,806 | 258,552 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 | $72.50 |
| Exercise Price | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 |
| Gain from Exercise | $541,153 | $217,000 | $73,959 | $72,821 | $904,932 |
| *Actual November 2016 NQSO Grant* | 136,661 | 54,788 | — | 10,260 | 201,709 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 | $72.50 |
| Exercise Price | $61.87 | $61.87 | — | $61.87 | $61.87 |
| Gain from Exercise | $1,452,706 | $582,396 |  | $109,064 | $2,144,167 |
| *Steinholt October 2015 NQSO Grant* | 158,638 | 63,613 | 21,681 | 21,347 | 265,279 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 |  |
| Exercise Price | $67.25 | $67.25 | $67.25 | $67.25 |  |
| Gain from Exercise | $832,850 | $333,968 | $113,825 | $112,074 | $1,392,717 |
| *Steinholt November 2016 NQSO Grant* | 141,038 | 56,543 | — | 10,589 | 208,170 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 |  |
| Exercise Price | $59.95 | $59.95 | — | $59.95 |  |
| Gain from Exercise | $1,770,027 | $709,615 |  | $132,892 | $2,612,534 |
| *Net gain using Steinholt Stock Prices* | *$609,017* | *$244,186* | *$39,867* | *$63,081* | *$956,152* |

Note:  Data from Table 9; Form 4 filings; Steinholt Report, Exhibit D; Merger Proxy. Mr. Walker's and Mr. Gwin's options were effectively fully vested and exercised upon the Occidental acquisition on August 8, 2019 at the merger consideration of $72.50. I assume that Mr. Daniels and Mr. Leyendecker held the options vested as of their retirements until the merger.

**Table 11   Performance Unit Grants Impacted by Alleged Inflation**

| Grant Date | Performance Period | Reported Rank (Payout as % of Target) | Rank Absent Alleged Inflation | Inflation at Payout | Change in Award Value Absent Alleged Inflation |
|---|---|---|---|---|---|
| *GROUP 1: PU Grants Before Class Period with Performance Periods ending During Class Period* | | | | | |
| 5/15/2012 | 5/15/2012 – 5/14/2015 | 5 (128%) | 5 (128%) | –$1.75 | ($11,769) |
| 11/5/2012 | 1/1/2013 – 12/31/2015 | 8 (72%) | 8 (72%) | –$1.75 | ($39,616) |
| 11/6/2013 | 1/1/2014 – 12/31/2015 | 7 (92%) | 8 (72%) | –$1.75 | ($355,598) |
| 11/6/2013 | 1/1/2014 – 12/31/2016 | 5 (128%) | 5 (128%) | –$1.92 | ($104,588) |
| *GROUP 2: PU Grants During Class Period with Performance Periods ending After Class Period* | | | | | |
| 10/26/15 | 1/1/2016 – 12/31/2018 | 8 (60%) | 7 (80%) | $0 | $1,276,531 |
| 11/10/16 | 1/1/2017 – 12/31/2019 | (200%) | (200%) | $0 | $510,781 |
| | | | | *Total:* | $1,275,741 |

Note:   Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 12   Change in PU Payouts to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| 5/15/2012 (3-Yr) | ($11,769) |  |  |  | ($11,769) |
| 11/5/2012 (3-Yr) | ($21,632) | ($7,710) | ($7,915) | ($2,359) | ($39,616) |
| 11/6/2013 (2-Yr) | ($183,815) | ($73,382) | ($75,045) | ($23,355) | ($355,598) |
| 11/6/2013 (3-Yr) | ($54,065) | ($21,583) | ($22,072) | ($6,869) | ($104,588) |
| 10/26/15 (3-Yr) | $782,871 | $313,924 | $106,993 | $72,744 | $1,276,531 |
| 11/10/16 (3-Yr) | $338,879 | $135,859 | 0 | $36,043 | $510,781 |
| Total: | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |

Note:   Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 13   Summary of Changes in Compensation to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Base Salary | $0 | $0 | $0 | $0 | $0 |
| TSR Component of AIP | $0 | $0 | $0 | $0 | $0 |
| Restricted Stock Units | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |
| Stock Options | $609,017 | $244,186 | $39,867 | $63,076 | $956,147 |
| Performance Units | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |
| Total: | $1,604,341 | $649,374 | $50,242 | $169,032 | $2,472,990 |

Sources:  Tables 8, Table 10, Table 12.

**Table 14   Summary of Additional Amounts Named Defendants Would Receive in the Occidental Transaction Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Restricted Stock Units (Table 8) | $34,728 | $13,920 | $0 | $0 | $48,648 |
| Stock Options (Table 10) | $609,017 | $244,186 | $39,867 | $63,081 | $956,152 |
| Performance Units (Table 12) | $338,879 | $135,859 | $0 | $36,043 | $510,781 |
| Total: | $982,624 | $393,965 | $39,867 | $99,124 | $1,515,580 |

Sources: Tables 8; Table 10; Table 12

**Figure 1   Mr. Walker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s.

**Figure 2   Mr. Walker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As CEO, Mr. Walker is required to hold six times his $1.3 million Base Salary in Anadarko shares or RSUs.

**Figure 3    Mr. Gwin's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Shares include Anadarko shares held in his 401(k) plan.

**Figure 4   Mr. Gwin's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Gwin is required to hold three times his $750,000 Base Salary in Anadarko shares or RSUs.

**Figure 5   Mr. Daniels' Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Shares include Anadarko shares held in his family Limited Partnership and his 401(k) plan. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert P. Daniels dated October 13, 2022 at p. 32).

**Figure 6   Mr. Daniels' Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Daniels is required to hold three times his $700,000 Base Salary in Anadarko shares or RSUs. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert Daniels, October 13, 2022 at p. 32).

**Figure 7   Mr. Leyendecker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions. I have been unable to reconcile a difference of 450 Anadarko shares prior to August 2016 and have incorporated those shares in the chart above to a vesting event in November 2015.

**Figure 8   Mr. Leyendecker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions.  Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an SVP through August 2016, Mr. Leyendecker was required to hold 2.5 times his Base Salary (which increased from $400,000 to $420,000 in January 2015) in Anadarko shares or RSUs. Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings of shares and RSUs to $1,725,000 (*i.e.*, three times the $575.000 Base Salary he earned upon his promotion).

## Exhibit A: Curriculum Vitae

**KEVIN JAMES MURPHY**

**Resume**
January 2023

| | |
|---|---|
| **Address** | Marshall School of Business |
| | Finance and Business Economics |
| | University of Southern California |
| | Los Angeles, CA 90089-1422 |
| | *email: kjmurphy@usc.edu* |
| | *website: www.marshall.usc.edu/faculty/directory/kjmurphy* |
| | |
| **Telephone** | (213) 740-6553 |

**Current Positions**

Kenneth L. Trefftzs Chair in Finance, Marshall School of Business, University of Southern California, 2006 -

Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2020 -

Professor of Finance and Business Economics, Marshall School of Business, University of Southern California, 1995 -

Professor of Business and Law (courtesy), Gould School of Law, University of Southern California, 2001 -

**Previous Positions**

Vice Dean for Faculty and Academic Affairs, Marshall School of Business, University of Southern California, 2004 - 2007

E. Morgan Stanley Chair in Business Administration, Marshall School of Business, University of Southern California, 2002 - 2005

Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2003 - 2004

Visiting Scholar and Consultant, Towers Perrin, Boston, MA, 1994 - 1995

Associate Professor, Graduate School of Business Administration, Harvard University, 1991 - 1995

Associate Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1989 - 1991.

Assistant Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1983 - 1989.

Marvin Bower Fellow, Graduate School of Business Administration, Harvard University, 1987-1988.

**Education**

University of Chicago, Ph.D. (Economics), 1984.

University of Chicago, M.A. (Economics), 1981.

University of California, Los Angeles, B.A. (Economics) (Summa Cum Laude), 1979.

**Thesis**

"Ability, Performance, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts"

**Teaching Experience**

University of Southern California, Marshall School of Business, 1995-. Undergraduate, MBA, and Ph.D. courses in financial policies, economics, corporate control, compensation, incentives, and corporate governance.

Harvard University, Graduate School of Business Administration, 1991-1995. Graduate courses in compensation and incentives, human resource management, and coordination, control, and the management of organizations.

University of Rochester, William E. Simon Graduate School of Business Administration, 1984-1991. Graduate courses in compensation and human resource management, organization theory, economics, advanced price theory, and pricing policies.

University of Chicago, Department of Economics, 1981-83. Undergraduate courses in price theory.

**Fellowships, Scholarships, Academic Honors**

Drexel University award for Outstanding Contribution to Research in Corporate Governance, 2013
Marvin Bower Fellowship, Harvard University, 1987-88.
AT&T Faculty Fellowship, University of Rochester, 1986-87.
Social Science Research Council Dissertation Fellowship, 1983-84.
PEW Teaching Fellowship, University of Chicago, 1981-83.
Milton Friedman Fund Fellowship, University of Chicago, 1979-83.
National Science Foundation Fellowship, 1979-82.
Regents Scholarship, UCLA, 1977-79.
Department Scholar (Economics), UCLA, 1978-79.
Phi Beta Kappa, 1979.

**Other Activities**

Associate Editor, *Journal of Financial Economics*, 1992-2021.
Associate Editor, *Journal of Accounting and Economics*, 1988-2006.
Associate Editor, *Journal of Corporate Finance*, 1993-2010.
Associate Editor, *Economic Bulletin*, 2001-2003.
Expert, U.S. Department of Treasury, Office of the Special Master for Executive Compensation, 2009.
Board Member, Scleroderma Foundation (Southern California Chapter), 2008-2011.
Chairman, Academic Research Committee, American Compensation Association, 1997 - 1999.
Research Advisory Board, American Compensation Association, 1997 - 1999.
Chairman, Research Advisory Panel, American Compensation Association, 1995 - 1997.
Program Committee, American Economic Association Meetings, 2000-2001.
Program Committee, *Journal of Financial Economics* Corporate Governance Conference, 2000.
Program Committee, Western Finance Association Conference, 1996, 1997.
Program Committee, American Finance Association Meetings, 1998, 2003.
University of Southern California, Academic Senate, 2011-2015 (Executive Committee 2012-2015); Professional Conflict of Interest Committee, 2013-; Provost's Interdisciplinary Professor Committee, 2007-2013; Deans of Faculty Council, 2004-2007; Academic Leadership Committee, 2004-2006; Probationary Deadlines Committee, 2004-2006; Provost Advisory Committee, 2003-2004.
University of Southern California, Marshall School of Business, Faculty Council 2011-; Faculty Consultative Committee, 2001-2003. Strategic Planning Steering Group (co-chairman), 1999-2000; Research Committee, 1997-1998; Budget Advisory Committee, 1998-1999; STAR Committee, 1998-1999; Space Utilization Task Force, 1998-; MBA Quality of Life Committee, 1997.
University of Southern California, Marshall School of Business, Finance and Business Economics, Faculty recruiting co-chairman, 1995-1999, 2011-2012; APR Committee 2001-2003; 2007-2012.
William E. Simon Graduate School of Business Administration, University of Rochester, Area Coordinator for Applied Economics and Organizations and Markets, 1985-1991; Ph.D. Committee, 1984-1987, 1988-1991; Committee on Computing and Data Bases, 1990–1991.
Referee for Professional Journals: *Academy of Management Journal; Accounting Review; Administrative Science Quarterly; American Economic Review; American Journal of Sociology; Canadian Journal of Economics; Econometrica; Economic Inquiry; The Economic Journal; Economic Policy Review (NY Fed); Financial Management; Industrial and Labor Relations Review; Industrial Relations; Journal of Accounting and Economics; Journal of Accounting, Auditing, and Finance; Journal of Accounting and Public Policy; Journal of Business; Journal of Economics and Business; Journal of Finance; Journal of Financial and Quantitative Analysis; Journal of Financial Economics; Journal of Institutional and Theoretical Economics; Journal of Labor Economics; Journal of Law & Economics; Journal of Law, Economics, and Organization; Journal of Management Studies; Journal of Monetary Economics; Journal of Political Economy; Journal of Risk and Insurance; Management Science; Managerial and Decision Economics; National Tax Journal; Pacific-Basin Finance Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Business; Rand Journal of Economics; Review of Economics and Statistics; Review of Financial Studies; Review of Quantitative Finance and Economics; Strategic Management Journal;* and the National Science Foundation.
Advisory Board, *Business Month*, 1990-1991.
Member, American Economic Association, 1981-present.
Member, Society of Labor Economists, 1995-2007.
Member, American Finance Association, 1995-present.
Member, WorldAtWork (formerly American Compensation Association), 1995-2002.
Member, Task Force on Executive Compensation, American Compensation Association, 1984-1985.
Commissioner, National Association of Corporate Directors Blue Ribbon Commission on Executive Compensation, 1992, 2003.

**Publications: Professional Articles**

Baker, George, Robert Gibbons, and Kevin J. Murphy, "From Incentives to Control to Adaptation: Exploring Interactions Between Formal and Relational Governance." *Journal of Institutional and Theoretical Economics* (Forthcoming 2023).

Dial, Jay and Kevin J. Murphy, "Downsizing and Value Creation at General Dynamics: A PE-like Solution for Industries that Must Shrink," *Journal of Applied Corporate Finance*, Vol. 33(3) (Summer 2021).

Barron, Daniel, Robert Gibbons, Ricard Gil and Kevin J. Murphy, "Relational Adaptation Under Reel Authority." *Management Science* 66(5) (May 2020) 1868-1889.

Murphy, Kevin J. and Tatiana Sandino, "Compensation Consultants and the Level, Composition and Complexity of CEO Pay" *The Accounting Review* 95(1) (January 2020) 311-341.

Murphy, Kevin J. and Michael C. Jensen, "The Politics of Pay: The Unintended Consequences of Regulating Executive Compensation." *Journal of Law, Finance, and Accounting* 3(2) (2018) 189-242.

Murphy, Kevin J., "Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences," *European Financial Management* 19(4) (2013) 631-657.

Fernandes, Nuno, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "Are US CEOs Paid More? New International Evidence." *Review of Financial Studies* 26(2) (2013), 323-367.

Murphy, Kevin J., "Executive Compensation: Where we are, and how we got there," in George Constantinides, Milton Harris, and René Stulz (eds.), *Handbook of the Economics of Finance*. Elsevier Science North Holland (2013) Chapter 4: 211-356.

Conyon, Martin J., Nuno Fernandes, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "The Executive Compensation Controversy: A Transatlantic Analysis" in Tito Boeri, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Packages: Productivity, Profits, and Pay,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013) Part I: 8-115.

Murphy, Kevin J., "Pay, Politics, and the Financial Crisis" in Alan Blinder, Andrew Lo and Robert Solow (eds.), *Economic Lessons from the Financial Crisis*. Russell Sage Foundation (2012).

Murphy, Kevin J., "The Politics of Pay: A Legislative History of Executive Compensation," in Jennifer Hill and Randall Thomas (eds.), *Research Handbook on Executive Pay,* Edward Elgar Publishers (2012).

Murphy, Kevin J. and Tatiana Sandino, "Executive Pay and "Independent" Compensation Consultants," *Journal of Accounting & Economics* 49(3) (April 2010): pp. 247-262.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Strategic Alliances: Bridges Between 'Islands of Conscious Power'," *Journal of the Japanese and International Economies,* 22(2) (June 2008) 146-163.

Lowry, Michelle and Kevin J. Murphy, "Executive Stock Options and IPO Underpricing," *Journal of Financial Economics* 85 (2007) 39-65.

Murphy, Kevin J. and Ján Zábojník, "CEO pay and appointments: A market-based explanation for recent trends," *American Economic Review Papers and Proceedings,* (May 2004).

**Publications: Professional Articles (continued)**

Hall, Brian J. and Kevin J. Murphy, "The Trouble with Stock Options," *Journal of Economic Perspectives*, Vol. 17(3), (Summer 2003).

Murphy, Kevin J., "Stock-Based Pay in New Economy firms," *Journal of Accounting and Economics*, Vol 34 (2003): 129-147.

Murphy, Kevin J., "Explaining Executive Compensation: Managerial Power versus the Perceived Cost of Stock Options," *University of Chicago Law Review*, Vol. 69(3) (Summer 2002): 847-869.

Hall, Brian J. and Kevin J. Murphy, "Stock Options for Undiversified Executives," *Journal of Accounting and Economics*, Vol 33(1) (February 2002): 3-42.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Contracts and the Theory of the Firm," *Quarterly Journal of Economics,* Vol. 117 (February 2002): 39-84.

> Reprinted in
> C. Ménard (ed.), *The International Library of the New Institutional Economics*, (Forthcoming 2004): Edward Elgar Publishing, Ltd.

Conyon, Martin J. and Kevin J. Murphy, "Stock-Based Executive Compensation," in J. McCahery, P. Moerland, T. Raaijmakers, and L. Renneboog, ed., *Corporate Governance Regimes: Convergence and Diversity*, Oxford University Press (2002), Chapter 26: 625-646.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Bringing the Market Inside the Firm?" *American Economic Review Papers and Proceedings,* Vol 92(2) (May 2001): 212-18.

Murphy, Kevin J., "Performance Standards in Incentive Contracts," *Journal of Accounting and Economics*, Vol. 30 (3) (December 2000): 245-78.

Conyon, Martin J. and Kevin J. Murphy, "The Prince and the Pauper? CEO Pay in the US and UK," *Economic Journal* Vol 110 (November 2000): F640-71.

> Reprinted in
> van Frederikslust, R. A. I, J. S. Ang, and S. Sudarsanam (eds), *Corporate Governance and Corporate Finance: a European Perspective*. Routledge (2007)

Hall, Brian J. and Kevin J. Murphy, "Optimal Exercise Prices for Executive Stock Options," *American Economic Review Papers and Proceedings,* Vol 90(2) (May 2000): 209-214.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Informal Authority in Organizations," *Journal of Law, Economics, and Organizations* Vol. 15(1) (April 1999): 56-73.

Murphy, Kevin J., "Executive Compensation," in Orley Ashenfelter and David Card (eds.), *Handbook of Labor Economics*, Vol. 3b, Elsevier Science North Holland (1999), Chapter 38: 2485-2563.

Murphy, Kevin J., "Executive Compensation and the Modern Industrial Revolution," *International Journal of Industrial Organization*, Vol. 15(4) (July 1997): 417-25.

Murphy, Kevin J., "Reporting Choice and the 1992 Proxy Disclosure Rules," *Journal of Accounting, Auditing, and Finance*, Vol. 11(3) (Summer 1996): 497-515.

Dial, Jay and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics*, Vol. 37(3) (March 1995): 261-314.

Murphy, Kevin J., "Politics, Economics, and Executive Compensation," *University of Cincinnati Law Review*, Volume 63, No. 2 (Winter 1995): 713-748.

**Publications: Professional Articles (continued)**

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Subjective Performance Measures in Optimal Incentive Contracts," *Quarterly Journal of Economics*, Vol. 109(4) (November 1994): 1125-56.

Murphy, Kevin J. and Jerold L. Zimmerman, "Financial Performance Surrounding CEO Turnover," *Journal of Accounting and Economics*, Vol. 16 (1993): 273-315.
  Reprinted in
    K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 2 (1999): 377-419 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Does Executive Compensation Affect Investment?" *Journal of Applied Corporate Finance*, Vol. 5(2) (Summer 1992).

Gibbons, Robert and Kevin J. Murphy, "Optimal Incentive Contracts in the Presence of Career Concerns: Theory and Evidence," *Journal of Political Economy*, Vol. 100(3) (June 1992): 468-505.

  Reprinted in
    K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 1 (1999): 515-52 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Performance Measurement and Appraisal: Motivating Managers to Identify and Reward Performance," *Performance Measurement, Evaluation, and Incentives*, edited by William J. Bruns, Jr. (Harvard Business School Press, Boston, 1992).

  Reprinted in
    *Employment Relations Today*, Vol. 20, No. 1 (Spring, 1993).

Jensen, Michael C. and Kevin J. Murphy, "CEO Incentives: It's Not *How Much* You Pay, But *How*", *Harvard Business Review*, (May/June, 1990).

  Reprinted in:
    M. Jensen, *Foundations of Organizational Strategy* (1998): 270-98, *Harvard University Press*;
    *Journal of Applied Corporate Finance*, Vol. 3(3) (Fall 1990).

Jensen, Michael C. and Kevin J. Murphy, "Performance Pay and Top-Management Incentives" *Journal of Political Economy*, Vol. 98(2) (April 1990): 225-64.

  Reprinted in:
    M. Jensen, *Foundations of Organizational Strategy* (1998): 229-69, *Harvard University Press*.

    K. Keasey, S. Thompson, and M. Wright (eds), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 236-75 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;

    K. Hallock and K. Murphy (eds), *The Economics of Executive Compensation* , Vol. 1 (1999): 260-299, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Relative Performance Evaluation for Chief Executive Officers", *Industrial and Labor Relations Review*, Vol. 43, No. 3 (February 1990): 30S-51S.

  Reprinted in:
    R. G. Ehrenberg (ed.), *Do Compensation Policies Matter?* 1990, ILR Press-Cornell, Ithaca NY;
    K. Hallock and K. Murphy (eds), *The Economics of Executive Compensation* , Vol. 1 (1999): 392-413, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

**Publications: Professional Articles (continued)**

Baker, George, Michael C. Jensen, and Kevin J. Murphy "Compensation and Incentives: Practice vs. Theory," *Journal of Finance*, Vol. 43(3) (July 1988): 593-616.

> Reprinted in:
> M. Jensen, *Foundations of Organizational Strategy* (1998), *Harvard University Press*.
>
> K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 121-44 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106.

Murphy, Kevin J., "Incentives, Learning, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts," *Rand Journal of Economics*, Vol. 17(1) (Spring 1986): 59-76.

> Reprinted in:
> K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 417-34, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Top Executives Are Worth Every Nickel They Get," *Harvard Business Review*, Vol. 64(2) (March/April 1986).

> Reprinted in:
> L. Newton and M. Ford (eds.), *Taking Sides*, 2nd edition, edited by Lisa H. Newton and Maureen M. Ford (Dushkin Publishing Group, Inc., Guilford CT, 1992).

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42.

> Reprinted in:
> O. Ashenfelter and K. F. Hallock (eds.) *Labor Economics*, Vol. 2 (Edward Elgar Publishing: 1995);
>
> K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 204-35 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;
>
> K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 204-35, Elgar Reference Collection, International Library of Critical Writings in Economics.

**Books**

Boeri, Tito, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Remuneration and Employee Performance-Related Pay: A Transatlantic Perspective,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013).

Hallock, Kevin F. and Kevin J. Murphy (co-editors), *The Economics of Executive Compensation*, Edward Elgar Publishing, 1999.

**Comments, Cases, and Other Articles**

Kevin J. Murphy, "Executive Pay Restrictions for TARP Recipients: An Assessment," Testimony to the Congressional Oversight Panel, October 21, 2010.

Kevin J. Murphy, Congressional Testimony on Compensation Structure and Systemic Risk, June 11, 2009.

Hall, Brian J. and Kevin J. Murphy, "Expensing will improve compensation decisions," *Boston Globe*, October 6, 2002.

Hall, Brian J. and Kevin J. Murphy, "Option Value Does Not Equal Option Cost," *WorldatWork Journal*, 10(2), 2001.

Hallock, Kevin F. and Kevin J. Murphy, "The Economics of Executive Compensation: Introduction," in *The Economics of Executive Compensation* (K. Murphy and K. Hallock, eds.), Edward Elgar Publishing, 1999.

Murphy, Kevin J., "Executive Stock Options: An Economist's Perspective," in *Stock Options*, American Compensation Association, 1998.

Murphy, Kevin J., "Disney Offers a Model for Executive Compensation," *Los Angeles Business Journal*, June 23, 1997.

Murphy, Kevin J., "CEO Pay and Downsizing: The Social Consequences," in *CEO Pay: A Comprehensive Look*, American Compensation Association, 1997.

Jensen, Michael C. and Kevin J. Murphy, "Compensation at Lexerd Systems," Harvard Business Case 494-066 (April 1994).

Murphy, Kevin J., "Executive Compensation in Corporate America 1993," United Shareholders Association, (Nov. 1993).

Murphy, Kevin J., "Executive Compensation in Corporate America 1992," United Shareholders Association, (Dec. 1992).

Murphy, Kevin J. and Jay Dial, "Compensation and Strategy and General Dynamics (A), (B)," Harvard Business Cases 9-494-048 and 9-494-049 (October 1993).

Murphy, Kevin J., "Merck & Co., Inc. (A), (B), (C)," Harvard Business Cases 9-491-005, 9-491-006, and 9-491-007 (November, 1991).

Jensen, Michael C. and Kevin J. Murphy, "A New Survey of Executive Compensation: Full Survey and Technical Appendix to 'CEO Incentives — It's Not *How* Much You Pay but *How*," Simon School of Business, University of Rochester (June 1990).

Murphy, Kevin J., "The Control and Performance of State-Owned Enterprises: Comment," in *Privatization and State-Owned Enterprises*, edited by Paul MacAvoy, W. T. Stanbury, George Yarrow, and Richard J. Zeckhauser (Kluwer Academic Publishers, Boston, 1989): 59-68.

Murphy, Kevin J., "Is Executive Compensation Related to Company Performance?" *Rochester Management Review* (1985).

Jensen, Michael C. and Kevin J. Murphy, "Beware the Self-Serving Critics" *New York Times* (May 20, 1984).

**Unpublished Papers**

Murphy, Kevin J. and Marshall D. Vance, "Debunking Diversification: Evidence from Employee Stock Option Exercises" (March 2020)

Lee, Joonil, Sunghan Lee, Kevin J. Murphy, and Peter S. H. Oh, "Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay." (October 2021)

Lee, Joonil, Kevin J. Murphy, Peter S. H. Oh, and Marshall D. Vance, "CEO Inside Debt and Corporate Investment." (December 2020)

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Adaptation." (December 2011)

Murphy, Kevin J. and Ján Zábojník, "Managerial Capital and the Market for CEOs" University of Southern California (August 2007).

Murphy, Kevin J. and Paul Oyer, "Discretion in Executive Incentive Contracts," University of Southern California (January 2004).

Murphy, Kevin J. and Karen E. Van Nuys, "Governance, Behavior, and Performance of State and Corporate Pension Funds," Harvard University (September 1994).

Murphy, Kevin J., "Executive Compensation in Regulated Firms," William E. Simon Graduate School of Business Administration, University of Rochester (April 1987).

**Consulting and Expert Witness Activities**

Law Firms:
Bartlit Beck Herman Palenchar & Scott; Foley & Lardner; Gibson, Dunn & Crutcher; Girard and Green; Goodwin Procter LLP; Greenberg, Glusker; Kirkland & Ellis; Irell & Manella; Laski & Gordon; Latham & Watkins; Milberg Weiss; Morgan Lewis & Bockius; Munger, Tolles & Olson; Nixon and Peabody; O'Melveny & Myers LLP; Orrick, Herrington & Sutcliffe; Pillsbury Winthrop; Seyfarth Shaw LLP; Sheppard Mullin Richter & Hampton LLP; Simpson Thacher & Bartlett; Skadden, Arps, Slate, Meagher & Flom; Steptoe & Johnson; Swaab Attorneys (Sydney, Australia); Tanenbaum Keale LLP; Teadle (C. Tucker); Wheeler Trigg O'Donnell LLP; Williams & Connolly; Willkie Farr & Gallagher; Wilson Sonsini Goodrich & Rosati; Winston & Strawn.

Economic Litigation Firms:
Analysis Group; Chicago Partners; CRA International; Compass Lexecon; Cornerstone Research; Econalytics; LECG, Navigant.

Consulting Clients:
Arthur D. Little, Inc.; AT&T; Atlantic Richfield Corporation; Axos Financial, Inc.; Bristol-Myers Company; British Petroleum; California Franchise Tax Board; California Franchise Tax Board; CalPers; Casa Cuervo, S.A. de C.V.; Cemex; Chatham Technologies Inc.; Gannett Co.; Genzyme; Grupo Reforma; GTE; Hunt Oil Company; Internal Revenue Service; Kay and Associates, Inc.; Life Technologies; Management Compensation Group; Merck & Co; the State of Michigan; Moody's Inc.; Nellie Mae; Pulsar; Remington Oil and Gas Corporation; Residence Mutual Insurance Company; Selbert Perkins Design; TCL Beatrice; Towers Perrin; University of Pennsylvania; VectorMAX; Western Mutual Insurance.

**Papers and Speeches Presented (1991–Present)**

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Panel on "Executive Pay during Covid," University of Miami, Miami FL, November 13, 2020.
– Panel on "The Role of Corporate Governance amidst the Covid-19 Pandemic," Drexel University, Philadelphia PA, April 17, 2020.
– Principles of Executive Pay Roundtable, Aspen Institute, New York, NY, November 6, 2019
– Overview and Research Session, "Executive Compensation: The Politics of Pay," Financial Management Association Annual Meeting, Boston, MA, October 12, 2017.
– Keynote Speech, "Explaining CEO Pay," 10th International Conference on Asia-Pacific Financial Markets, Seoul, South Korea, December 5, 2015.
– "Earnings Management and Executive Pay: Are Options to Blame?" Korean Capital Market Research Center, Seoul, South Korea, December 4, 2015
– "Explaining CEO Pay," Federal Reserve Bank of New York, September 15, 2015.
– "Paying for Performance: Metrics, Maladies and Mistakes," CFO Roundtable, March 5, 2015.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 14, 2014.
– "Measuring CEO Performance: Metrics, Maladies and Mistakes," West Coast Chairs Roundtable, November 3, 2014.
– Panelist, Equilar Executive Compensation Summit, Coronado, CA, June 17, 2014.
– Keynote Speech, "Explaining CEO Pay," Ackerman Conference on Corporate Governance, Bar Ilan University, Ramat Gan, Israel, December 15, 2013.
– Roundtable on Incentive Pay for Bankers, Board of Governors, U.S. Federal Reserve, Washington DC, November 19, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 15, 2013.
– Keynote Speech, "Explaining CEO Pay," CEO, Boards and other High Potentials, Institute for Financial Research, Stockholm School of Economics, Stockholm, Sweden, October 16, 2013.
– Keynote Speech, "Explaining CEO Pay," Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 24, 2013.
– Keynote Speech, "Explaining CEO Pay," Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 6, 2013.
– Keynote Speech, "Explaining CEO Pay," Claremont College, May 6, 2013.
– Keynote Speech, "Explaining CEO Pay," 6th Annual Conference on Corporate Governance, Drexel University, April 5, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 9, 2012.
– Executive Compensation Workshop, Swedish Remuneration Academy, Stockholm, Sweden, September 25-26, 2012.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 28, 2011.
– Equilar Executive Compensation Summit, Carlsbad, CA, June 14, 2011.
– NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
– X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 26, 2010
– Testimony to the Congressional Oversight Panel, Washington, DC, October 21, 2010
– Risk Conference, Federal Reserve Bank of Chicago, Chicago, Il, April 7, 2010
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 13, 2009
– Testimony to the U.S. House of Representatives, Committee on Financial Services, Hearing on "Compensation Structure and Systemic Risk," Washington, DC, June 11, 2009
– Conference on Financial Innovation, Owen Graduate School of Management, Vanderbilt University, October 17, 2008
– Executive Compensation Workshop: Rethinking Pay for Performance, U.C. Berkeley Law School, September 26, 2008
– Weil Gotshal & Manges Roundtable, Yale Law School, May 4, 2007

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Corporate Governance Summit, University of Southern California, Los Angeles, CA, March 23, 2007
– Corporate Governance Conference, University of Melbourne School of Law, Melbourne, Victoria, Australia, March 15, 2007
– Chief Financial Officer Forum, University of Washington, Seattle, WA, February 7, 2007
– Conference Board Executive Pay Conference, New York City, NY, September 27, 2006
– Fireside Talk, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006
– 125 Celebration, University of Southern California, Los Angeles, CA, October 7, 2005.
– Corporate Governance Conference, London School of Economics, London, UK, November 4, 2004.
– Challenges to Executive Compensation Conference, University of Zurich, Zurich, Switzerland, November 2, 2004.
– Academic Advisory Board, Wells Capital Management, San Francisco, CA, May 25, 2004.
– Executive Session, European Science Days, Steyr, Austria, July 16 , 2003.
– The Economist Human Resource Roundtable, New York, NY, June 5, 2003.
– Corporate Governance Conference, Wilmington, DE, April 9, 2003.
– Annual Meeting, Center for Effective Organizations, Marina del Rey, CA, April 24, 2003.
– Executive Compensation Workshop, Harvard Business School, Boston, MA, October 10, 2002.
– Special Board of Directors Meeting, Genzyme Inc., Cambridge, MA, October 2, 2002.
– Option Workshop, California Public Employees' Retirement System, Sacramento CA, June 17, 2002.
– American Economic Association Annual Meetings, New Orleans, LA, January 7, 2001.
– Princeton/Cornell Conference on Labor Policy, Ithaca, NY, October 7, 2000.
– University of Illinois, Northbrook, IL, October 6, 2000.
– United States Department of Justice, Washington, D.C., September 27, 2000
– Singapore Institute of Directors, September 13, 2000.
– Corporate Governance and Value Creation Conference, National University of Singapore, September 12, 2000.
– Young Presidents Organization, Los Angeles, CA, November 12, 1998.
– Keynote Speech, Executive Compensation Forum, American Compensation Association, Chicago IL, September 24, 1998.
– Towers Perrin Training Session, London, UK, June 22-24, 1998.
– Institute of Management Accountants, Los Angeles, CA, March 27, 1998.
– Executive Compensation Seminar, The Conference Board, San Diego, CA, March 11, 1998.
– Executive Briefing Seminars and Roundtables, Irvine, CA (Oct. 29, 1997), Woodland Hills (Nov. 4, 1997), Los Angeles, CA (Nov. 5, 1997)
– Conference on Executive Compensation and Shareholder Value, New York University Stern School of Business, October 24, 1997.
– Board of Governors of the Federal Reserve, Washington, DC. October 23, 1997.
– Committee on Corporate Governance, TIAA-CREFF, Stanford, CA. June 27, 1997.
– Executive Compensation Seminar, The Conference Board, Chicago, IL, June 4, 1997.
– Society of Human Resource Managers, Marina del Rey, CA, April 30, 1997.
– Financial Management Association Meetings, New Orleans, LA, October 10, 1996.
– International Business Machines, Armonk, NY, September 13, 1996.
– Bristol-Myers-Squibb Corporation, New York City, NY, September 11, 1996.
– American Enterprise Institute, Washington DC, July 22, 1996.
– USC Center for Effective Organizations sponsors meeting, Newport Beach, CA, May 8, 1996.
– Corporate Governance Seminar, University of Toronto Law School, Toronto, CA, Dec. 8, 1995
– Yale Finance Institute, Woodstock, VT, October 23, 1995
– Oil Industry Roundtable, Colorado Springs, CO, September 21, 1995
– Corporate Governance Seminar, London School of Economics, London, MA, June 15, 1995
— Executive Briefing Seminars and Roundtables, Dallas TX (Sept. 14, 1994), Chicago IL (Nov. 17, 1994), Philadelphia PA (Jan. 3, 1995) Washington DC (Feb. 1, 1995), Richmond VA (Feb. 2, 1995), Irvine CA (March 6, 1995), Boston MA (March 9, 1995), Minneapolis MN (Dec. 15, 1994), Atlanta GA (April 26, 1995)
– Merck Corporation, White House Station, NJ, June 19, 1995

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

–   Chubb Corporation, NJ, March 30, 1995
–   Bristol-Myers-Squibb Corporation, New York City, NY, February 10, 1995
–   Prudential Corporation, Newark, NJ, January 24, 1995
–   Mead Corporation, Dayton, OH, September 14, 1994
–   Procter & Gamble, Cincinnati, OH, September 14, 1994–         International Business Machines, Armonk, NY,
    September 8, 1994
–   AT&T, Basking Ridge, NJ, August 11, 1994
–   Philip Morris, New York, NY, August 9, 1994
–   General Motors, New York, NY, August 9, 1994
–   Conference on Management Compensation, Strategy, and Firm Performance, Humboldt-University, Berlin,
    Germany, June 13, 1994.
–   Human Resource Executive Association, Cincinnati, OH, March 16, 1994.
–   Corporate Law Symposium, University of Cincinnati Law School, Cincinnati, March 18, 1994.
–   Executive Compensation Training Session, Towers Perrin, Leesburg, VA, October 7, 1993.
–   SEC and Financial Reporting Institute Conference, Pasadena, CA, May 27, 1993.
–   NASDAQ Regional Conference, Atlanta, GA, May 25, 1993.
–   NASDAQ Regional Conference, Dallas, TX, May 24, 1993.
–   Management Conference, University of Chicago Graduate School of Business, Chicago, Illinois, April 28, 1993.
–   National Investor Relations Institute—Chicago Chapter, Chicago, Illinois, April 7, 1993.
–   National Association of Corporate Directors, Waltham, MA, March 23, 1993.
–   Conference on Managerial Pay and Corporate Performance, March 20, 1993.
–   Shadow SEC, Washington, D.C., November 9, 1992.
–   American Enterprise Institute, Washington, D.C., October 21, 1992.
–   MCG/NACD Seminar on Executive Compensation, San Francisco, CA, May 5, 1992.
–   Security and Exchange Commission Conference on Corporate Governance, Washington, D.C., March 19, 1992.
–   MCG/NACD Seminar on the Compensation Committee in the 1990s, New York, NY, December 12, 1991.
–   United Shareholders Association, Washington, D.C., November 15, 1991.
–   Olin Business School, Washington University, St. Louis, MO, September 26, 1991.
–   Human Resources Management Association of Chicago, Chicago, IL, March 14, 1991.

"Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay"
–   McGill Accounting Research Conference, McGill University, Montreal, Canada, May 28, 2021.
–   Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 12, 2021.

"Debunking Diversification: Evidence from Employee Stock Option Exercises"
–   Ackerman Corporate Governance Conference, Bar Ilan University, Tel Aviv, Israel December 16, 2019.
–   Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 26, 2019.
–   BI Corporate Governance Conference, BI Norwegian Business School, Oslo, Norway, May 24, 2019.

"The Politics of Pay"
–   Securities and Exchange Commission, Washington DC, October 24, 2018.
–   Journal of Law, Finance, and Accounting Conference, Hong Kong Polytechnic University, Hong Kong, June 9,
    2017.
–   Vanderbilt Law & Business Conference, Nashville, TN. October 14, 2011.

"Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences"
–   European Financial Management Association Annual Meeting, Reading UK, June 27, 2013.

"CEO Inside Debt and Corporate Investment"
–   Finance Seminar, Gies College of Business, University of Illinois, Champaign, IL, April 18, 2019.
–   2016 Corporate Governance Conference, LeBow College of Business, Drexel University, Philadelphia, PA, April
    15, 2016.
–   Finance Seminar, Freeman School of Business, Tulane University, New Orleans LA, April 1, 2016.

"Relational Adaptation under Reel Authority"
–   Strategy Seminar, Rotman School of Business, University of Toronto, Toronto, ON, November 9, 2017.
–   Microeconomics Seminar, Economics Department, Queens University, Kingston, ON, October 20, 2016.
–   Finance Seminar, Jesse Jones School of Business, Rice University, October 23, 2015.
–   Finance, Organizations, and Markets Conference, University of Chicago Booth School of Business, October 15,

2015.
–   Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 22, 2014.

"Compensation Consultants and the Level, Composition, and Complexity of CEO Pay"
–   Securities and Exchange Commission, Washington DC, October 23, 2018.
–   Accounting Workshop, McGill University Desautels School of Business, September 14, 2018.
–   Labor Workshop, School of Industrial and Labor Relations, Cornell University, April 23, 2018.
–   Finance Workshop, R. H. Smith School of Business, University of Maryland, October 10, 2014.
–   Finance and Accounting Workshop, Edwin L. Cox School of Business, Southern Methodist University, August 29, 2014.

"Executive Compensation: Where We Are, and How We Got There"
–   Accounting for Accounting in Economics Conference, Laboratory for Aggregate Economics and Finance, Santa Barbara, CA, November 8, 2013.
–   Finance Seminar, Copenhagen Business School, Copenhagen, Denmark. June 1, 2012.
–   Finance Seminar, BI Norwegian Business School, Oslo, Norway. May 30, 2012.
–   Helsinki Finance Seminar, Aalto University, Helsinki, Finland. May 28, 2012.
–   Workshop on Executive Compensation and Corporate Governance, Erasmus University, Rotterdam, Netherlands. May 25, 2012.
–   Finance Seminar, Louisiana State University E. J. Ourso College of Business, Baton Rouge, LA. April 20, 2012.

"Pay, Politics, and the Financial Crisis"
–   KAIST CEO Forum, Seoul, South Korea, December 4, 2015
–   Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 25, 2013.
–   Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 7, 2013.
–   Finance Seminar, University of Colorado Leeds School of Business, April 6, 2012.
–   Finance Seminar, University of Michigan Ross School of Business, December 16, 2011.
–   Conference on Economic Lessons from the Financial Crisis, Russell Sage Foundation, New York City, September 9, 2011.

"Are US CEOs *Still* Paid More?"
–   Jindal School of Management, University of Texas - Dallas, Richardson, TX, November 4, 2011.
–   Kelley School of Business, University of Indiana, Bloomington, IN, April 29, 2011.
–   NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
–   X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
–   American Finance Association Annual Meetings, Denver, CO, January 8, 2011.

"Executive Pay and 'Independent' Compensation Consultants"
–   Finance Seminar, Board of Governors, Federal Reserve, Washington D.C., June 9, 2009.
–   Oliver E. Williamson Seminar on Institutional Analysis, Haas Business School, University of California, Berkeley, May 7, 2009.
–   Interdisciplinary Seminar, Case Western University, April 1, 2009

"The Executive Compensation Controversy: A Transatlantic Analysis"
–   Conference on "Productivity, Profits and Pay," Cagliari, Sardinia Italy May 29, 2010.
–   Faculty Seminar, Said Business School, Oxford University, May 25, 2010.

"Executive Stock Options and IPO Underpricing"
–   Financial Seminar, University of Washington, Seattle, WA, February 7, 2007
–   Law and Economics Seminar, Yale Law School, November 16, 2006.
–   Research Seminar, Federal Reserve Bank of New York, New York, NY, June 15, 2006.
–   Finance Seminar, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006.
–   Finance Seminar, Harvard Business School, Boston MA, April 6, 2005.

"The Trouble with Stock Options"
–   Finance Seminar, University of Oregon, Eugene, OR, May 16, 2003.
–   Conference on Work and Productivity, European Science Days, Steyr, Austria, July 18 , 2003.

"Managerial Capital and the Market for CEOs" (with Ján Zábojník)
–   Labor Economcs/Industrial Relations Seminar, Princeton University, Princeton, NJ, November 17, 2004.
–   Corporate Governance and Financial Reporting Conference, Napa, CA, April 3, 2004.

–    American Economic Association Annual Meetings, Washington DC, January 5, 2003.


"Discretion in Executive Incentive Contracts"
–    Information, Markets, and Organizations Conference, Harvard Business School, June 21, 2004
–    Finance Seminar, Arizona State University, Tempe, AZ, October 26, 2002.
–    Finance Seminar, DePaul University, Chicago, IL, September 17, 2002.
–    National Bureau of Economic Research, Corporate Finance Seminars, August 1, 2002
–    Personnel Economics Conference, Stanford Institute of Theoretical Economics, Stanford University, Palo Alto, CA, June 21, 2002.
–    CLEO Workshop, University of Southern California School of Law, Los Angeles, CA, July 2, 2001.
–    American Economic Association Annual Meetings, New Orleans, LA, January 6, 2001.

"Stock Options for Undiversified Executives"
–    Law and Business Conference, Vanderbilt University Law School, March 22, 2002.
–    Accounting Workshop, Stanford Graduate School of Business, Palo Alto, CA, October 17, 2001.
–    Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Management, Cambridge, MA October 11, 2001
–    Corporate Governance Conference, Journal of Financial Economics and Tuck Business School, Dartmouth College, Hanover, NH, July 7, 2000
–    European Summer Symposium on Economic Theory, Gerzensee, Switzerland, July 11, 2000

"Optimal Exercise Prices for Executive Stock Options"
–    American Economic Association meetings, Boston, MA, January 5, 2000.

"The Prince and the Pauper: CEO Pay in the US and UK"

–    Research Seminar, IZA Institute for Labor Studies, Bonn, Germany, July 20, 1999.
–    Conference on Convergence and Diversity in Corporate Governance Regimes and Capital Markets, Tilburg University, Eindhoven, Netherlands, November 5, 1999.

"Performance Standards in Incentive Contracts"
–    Theory of Organizations Workshop, Graduate School of Business, University of Chicago, Chicago, IL May 15, 2000.
–    Labor and Population Seminar, Department of Economics, University of California, Los Angeles, March 7, 2000.
–    Business Law and Economics Seminar, Olin School of Business, Washington University, St. Louis, September 30, 1999.
–    Accounting and Finance Joint Seminar, Graduate School of Business Administration, University of Michigan, Ann Arbor, September 24, 1999.
–    Accounting Seminar, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, May 27, 1999.
–    Finance Seminar, Lunquist School of Management, University of Oregon, Eugene, Oregon, April 2, 1999.Corporate Finance Seminar, Yale School of Management, Yale University, March 26, 1999.
–    Finance Seminar, Graduate School of Management, University of California, Irvine, December 2, 1998.
–    Joint Microeconomics and Finance Seminar, Marshall School of Business, University of Southern California, October 23, 1998.
–    Finance Seminar, Stern School of Business, New York University, New York, October 21, 1998.
–    Joint Management and Strategy and Accounting Seminar, Kellogg Graduate School of Management, Northwestern University, Evanston, IL, October 14, 1998.
–    Economics Seminar, Claremont Graduate School, Claremont, CA, September 30, 1998.
–    Finance Seminar, University of Warwick, Warwick, UK, July 18, 1998.
–    UCI-UCLA-USC Finance Conference, Ojai, CA, May 14, 1998.
–    Society of Labor Economists Meetings, San Francisco, CA, May 1, 1998.
–    Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Business, February 19, 1998
–    Finance Workshop, Kenan-Flagler Business School, Univ. of North Carolina, October 21, 1997.
–    Academy of Management Symposium, Vancouver, B.C., August 7, 1995

"Relational Contracts and the Theory of the Firm"

–    Finance Workshop, Tuck Business School, Dartmouth College, Hanover, NH, December 3, 1996.
–    Finance and Economics Workshop, Jesse Jones School of Business, Rice University, Houston, TX, November 15,

1996.
– Economics, Finance, and Strategy Workshop, Marshall School of Business, University of Southern California, November 1, 1996.
– Industrial Organization Workshop, Economics Department, University of California at Los Angeles, October 18, 1996.
– Finance and Economics Workshop, Graduate School of Business, Columbia University, New York, NY, September 14, 1996.
– American Law and Economics Association Conference, Chicago, IL, May 11, 1996.
– Atlanta Financial Forum, Goizueta School of Business, Emory University, Atlanta, GA, May 3, 1996.
– Finance Workshop, School of Business, Texas A&M, College Station, TX, April 26, 1996.

"Executive Compensation"
– Workshop on Corporate Governance; Contracts and Managerial Incentives, Humbodlt University, Berlin, Germany, July 2, 1998.
– Handbook of Labor Economics Conference, Princeton University, Princeton, NJ, September 6, 1997.

"Incentives, Downsizing, and Value Creation at General Dynamics"
– Finance Seminar, Marshall School of Business, University of Southern California, January 13, 1995.
– Harvard Business School, Boston, MA, October 1, 1995.
– American Economic Association Meetings, Boston, MA, January 4, 1994.

"Subjective Performance Measures in Optimal Incentive Contracts"
– Applied Economics Workshop, Laval University, Quebec City, Canada, April 8, 1993.
– Applied Microeconomics Workshop, Graduate School of Business, Columbia University, New York, NY, February 3, 1993.
– Finance Workshop, Graduate School of Business, University of Indiana, Bloomington, IN, December 11, 1992.
– Conference on Compensation and Incentives, Montreal, Canada, June 13, 1992.

"Financial Performance Surrounding CEO Turnover"
– Applied Economics Seminar, University of Delaware, April 29, 1992.
– Finance Seminar, Graduate School of Business Administration, University of Texas, Austin, TX, May 8, 1992.
– Organizational Behavior Work-in-Progress Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, December 2, 1991.
– Conference on Managerial Incentives and Corporate Performance, University of Rochester, Rochester, NY, November 1-2, 1991.

"Governance, Behavior, and Performance of State and Corporate Pension Funds"
– Pension Conference, Miami University, Oxford, Ohio, June 3, 1994
– Finance Workshop, Graduate School of Business, University of Texas, Austin, TX, May 6, 1994.
– Faculty Research Seminar, Owen Graduate School of Management, Nashville, TN, April 26, 1994.
– Research Seminar, Faculty of Management, University of Toronto, Toronto, Ontario, April 4, 1994.
– Faculty Research Seminar, University of Cincinnati Law School, Cincinnati, OH, March 17, 1994.
– Finance Seminar, University of Cincinnati Business School, Cincinnati, OH, March 16, 1994.
– Finance Workshop, Ohio State University, Columbus, OH, March 11, 1994.
– Economics and Legal Organizations Workshop, Economics Department and Graduate School of Business, University of Chicago, Chicago, IL, March 3, 1994.
– Baker West Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, February 28, 1994.
– Applied Economics Workshop, Economics Department, Cornell University, Ithaca, New York, February 23, 1994.
– Applied Economics Workshop, Economics Department, Clemson University, Clemson, South Carolina, February 4, 1994.
– Organizations and Markets Workshop, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, December 16, 1993.
– Finance Workshop, Smeal College of Business Administration, Pennsylvania State University, State College, PA, December 10, 1993.
– Organizational Behavior and Theory of the Firm Workshop, Graduate School of Business Administration, Harvard University, Boston, MA, November 15, 1993.
– Finance Workshop, Boston College, Brookline, MA, November 12, 1993.
– Economics Workshop, Miami University, Oxford, Ohio, October 22, 1993
– Applied Economics Workshop, Marshall School of Business, University of Southern California, October 16, 1993.

**Exhibit B: Testifying Experience in the Last Five Years**

I have testified as an expert at trial or by deposition in the following cases within the preceding five years:

1. Richard J. Tornetta v. Elon Musk, et al.
   Testimony: November 18, 2022
   Deposition: September 19, 2021
   C.A. No. 2018-0408-JRS
   Delaware Chancery Court

2. In re Mindbody, Inc. Stockholder Litigation.
   Testimony: March 7, 2022
   Deposition: January 20, 2022
   C.A. No. 2019-0442-KSJM
   Delaware Chancery Court

3. Larry A. Lawson v. Spirit Aerosystems
   Testimony: June 17, 2021
   Deposition: August 7, 2020
   Case No. 6:18-CV-01100-EFM-ADM
   United States District Court for the District of Kansas

4. In re the Marriage of Clarke v. Clarke
   Deposition: August 6, 2020
   Case No. RID1601464
   Superior Court of the State of California, County of Riverside

5. Laborers' Local #231 Pension Fund vs. Rory J. Cowan, et al.
   Deposition: July 31, 2019
   Case No. 1:17-cv-00478-CFC
   United States District Court, District of Delaware

6. Gadeco, LLC, et al. vs Jack J. Grynberg, et al.
   Testimony: June 12, 2019
   Deposition: September 11, 2017
   Case No. 2016CV030959
   District Court, Arapahoe County, Colorado

7. In re the Marriage of Bunting vs. Bunting
   Testimony: June 12, 2018
   Case No. 15D000711
   Superior Court of the State of California, County of Orange

8. Priority Posting & Publishing, Inc. vs The California Franchise Tax Board
   Testimony: June 6, 2018
   Case No. CGC-15-544791
   Superior Court of the State of California, County of San Francisco

**Exhibit C: Materials Considered in Producing this Report**

**Legal Pleadings, Expert Reports and Court Documents**

Amended Complaint for Violations of Federal Securities Laws, August 17, 2020
Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022
Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022
*In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)
*Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002)
Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated
        October 1, 2021

**Depositions and Exhibits**

Deposition of Charles F. Oudin, III dated June 30, 2022 (with Exhibits)
Deposition of David Blakeley, dated August 19, 2022 (with Exhibits)
Deposition of Ernest A. Leyendecker, III, dated September 22, 2022 (with Exhibits)
Deposition of Lea Frye, dated October 7, 2022 (with Exhibits)
Deposition of Robert Daniels, dated October 13, 2022 (with Exhibits)
Deposition of Robert Alvin Walker, dated October 20, 2022 (with Exhibits)
Deposition of Robert G. Gwin, dated October 26, 2022 (with Exhibits)
Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022 (with Exhibits)
Deposition of Paul Regan, dated January 20, 2023 (with Exhibits)
Deposition of Sean Boyle, November 9, 2021 (with Exhibits)
Deposition of Chris Camden, July 14, 2022 (with Exhibits)
Deposition of James Kleckner, October 14, 2022 (with Exhibits)
Deposition of Patrick McGrievy, August 24, 2022 (with Exhibits)
Deposition of Robert Strickling, July 21, 2022 (with Exhibits)
Deposition of John Schmidt, June 1, 2022 (with Exhibits)
Deposition of Darrell Hollek, September 1, 2022 (with Exhibits)
Deposition of Shandell Szabo, October 28, 2022 (with Exhibits)
Deposition of Mark Zajac, November 2, 2022 (with Exhibits)

**Board and Committee Minutes**

Anadarko Petroleum Corporation Meeting of the Board of Directors (07/26/2013 Draft), May
        13 & 14, 2013 (APC-00584025-039; APC-00584041-055; APC-00584057-071)
Anadarko Petroleum Corporation Meeting of the Board of Directors, May 13 & 14, 2013
        (APC-00772672-686)
Anadarko Petroleum Corporation Approval of Minutes for May 13 & 14, 2013, May 20,
        2013, May 28, 2013, and June 14, 2013 (07/31/2013 drafts) (APC-00772520-548)
Anadarko Petroleum Corporation Risk Council Meeting Agenda and Meeting Materials,
        January 28, 2014 (APC-00596519-565)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471)

Anadarko Petroleum Corporation Shenandoah Integrated Partner Meeting, April 30, 2014 (APC-00690371-442)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 (APC-00789245-316)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 and November 6, 2014 (APC-00776406-424)

Anadarko Petroleum Corporation Risk Council Meeting Discussion Materials, January 21, 2015 (APC-00611028-077)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 27, 2015 (APC-00778129-244; APC-00778263-385)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 21, 2015 (APC-00779479-550)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 26, 2015 (APC-00779578-647)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, October 21, 2015 and October 26, 2015 (APC-00780428-448)

Anadarko Petroleum Corporation Meeting of the Board of Directors (12/22/2015 Draft), November 2 & 3, 2015 (APC-00667005-014)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2016 (APC-00783560-572)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, May 9, 2016 (APC-01452536)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 26, 2016 (APC-00783757-870)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, July 26, 2016, August 19, 2016 and October 24, 2016 (APC-00785266-283)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, October 24, 2016 (APC-00784922-999)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 10, 2016 (APC-00786209-223; APC-00786269-284)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2017 and March 13, 2017 (APC-00787943-952)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, March 13, 2017 (APC-00787342)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 14, 2017 (APC-00790250-267)

Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
 Benefits Committee Agenda and Meeting Materials, October 25, 2018 (APC-
 01727486-548)
Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
 Benefits Committee Agenda (APC-00771149)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
 Committee of the Board of Directors, November 14, 2018 (APC-00790771-786)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
 Committee of the Board of Directors, November 15, 2018 (APC-00790787-788)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
 Committee of the Board of Directors, February 12, 2019, March 14, 2019, April 10,
 2019 and April 11, 2019 (APC-00790975-986)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
 Committee of the Board of Directors, April 10, 2019 (APC-00790956-967)


**Other Bates-stamped Documents**

ANACOP00000001
ANACOP00000400
ANACOP00000485
ANACOP00000536
ANACOP00001235
APC-00001146
APC-00003844
APC-00011019
APC-00015880
APC-00016935
APC-00017295
APC-00021089
APC-00022603
APC-00028226
APC-00100713
APC-00129328
APC-00129328
APC-00148012
APC-00170332
APC-00175650
APC-00346806
APC-00358392
APC-00564433
APC-00570424
APC-00570526
APC-00570642

APC-00571115
APC-00583654
APC-00584025
APC-00584041
APC-00584057
APC-00584245
APC-00590807
APC-00592109
APC-00593995
APC-00596519
APC-00599188
APC-00611028
APC-00618360
APC-00633494
APC-00634041
APC-00634058
APC-00634183
APC-00634206
APC-00634268
APC-00639341
APC-00639483
APC-00639546
APC-00650760
APC-00664216
APC-00664217
APC-00667005
APC-00673040
APC-00673190
APC-00679074
APC-00690371
APC-00713302
APC-00718272
APC-00755169
APC-00755204
APC-00771148
APC-00771149
APC-00771156
APC-00771173
APC-00771208
APC-00771357
APC-00771473
APC-00772520
APC-00772672
APC-00773377

APC-00775014
APC-00775107
APC-00775206
APC-00775243
APC-00775465
APC-00775502
APC-00775517
APC-00775633
APC-00775866
APC-00775892
APC-00775926
APC-00776181
APC-00776400
APC-00776406
APC-00776506
APC-00776775
APC-00777028
APC-00777034
APC-00777235
APC-00777329
APC-00777428
APC-00777528
APC-00777567
APC-00777611
APC-00777809
APC-00778050
APC-00778059
APC-00778075
APC-00778093
APC-00778123
APC-00778129
APC-00778263
APC-00778824
APC-00779065
APC-00779449
APC-00779469
APC-00779479
APC-00779578
APC-00780285
APC-00780289
APC-00780408
APC-00780418
APC-00780428
APC-00780449

APC-00781025
APC-00781236
APC-00781345
APC-00781455
APC-00781459
APC-00782108
APC-00782124
APC-00782136
APC-00782162
APC-00782204
APC-00782215
APC-00782330
APC-00783560
APC-00783757
APC-00784849
APC-00784868
APC-00784888
APC-00784918
APC-00784922
APC-00785122
APC-00785266
APC-00785301
APC-00785303
APC-00785868
APC-00785882
APC-00786056
APC-00786209
APC-00786241
APC-00786269
APC-00786285
APC-00786817
APC-00787155
APC-00787246
APC-00787342
APC-00787898
APC-00787943
APC-00787955
APC-00788457
APC-00788472
APC-00788515
APC-00789146
APC-00789245
APC-00789317
APC-00790225

APC-00790250
APC-00790664
APC-00790771
APC-00790793
APC-00790956
APC-00790975
APC-00790987
APC-00790994
APC-00791188
APC-00825104
APC-01170568
APC-01227135
APC-01323609
APC-01333637
APC-01340182
APC-01340189
APC-01340190
APC-01381739
APC-01413339
APC-01413845
APC-01433117
APC-01433355
APC-01439197
APC-01452536
APC-01549864
APC-01678952
APC-01716332
APC-01720982
APC-01721074
APC-01721174
APC-01721804
APC-01721899
APC-01723224
APC-01723384
APC-01723477
APC-01723568
APC-01723659
APC-01723761
APC-01723863
APC-01723999
APC-01724000
APC-01724002
APC-01724214
APC-01724426

APC-01725455
APC-01725562
APC-01725797
APC-01726188
APC-01726402
APC-01727482
APC-01727485
APC-01727486
JanHen_00005019
JanHen_00035898


**SEC Filings**

Anadarko Petroleum Corporation DEFM14A (Merger Proxy) Statement filed July 11, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2018
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2013
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2012
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 26, 2010
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2009
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 31, 2008
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 27, 2007


Anadarko Petroleum Corporation Form 10-K filed February 14, 2019
Anadarko Petroleum Corporation Form 10-K filed February 15, 2018
Anadarko Petroleum Corporation Form 10-K filed February 15, 2017
Anadarko Petroleum Corporation Form 10-K filed February 17, 2016
Anadarko Petroleum Corporation Form 10-K filed February 20, 2015
Anadarko Petroleum Corporation Form 10-K filed February 28, 2014
Anadarko Petroleum Corporation Form 10-K filed February 19, 2013
Anadarko Petroleum Corporation Form 10-K filed February 21, 2012
Anadarko Petroleum Corporation Form 10-K filed February 23, 2011
Anadarko Petroleum Corporation Form 10-K filed February 23, 2010


Anadarko Petroleum Corporation Form 10-Q filed July 30, 2019
Anadarko Petroleum Corporation Form 10-Q filed May 8, 2019
Anadarko Petroleum Corporation Form 10-Q filed October 30, 2018
Anadarko Petroleum Corporation Form 10-Q filed July 31, 2018
Anadarko Petroleum Corporation Form 10-Q filed May 1, 2018
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2017

Anadarko Petroleum Corporation Form 10-Q filed July 24, 2017
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016
Anadarko Petroleum Corporation Form 10-Q filed July 26, 2016
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2016
Anadarko Petroleum Corporation Form 10-Q filed October 27, 2015
Anadarko Petroleum Corporation Form 10-Q filed July 28, 2015
Anadarko Petroleum Corporation Form 10-Q filed May 4, 2015
Anadarko Petroleum Corporation Form 10-Q filed October 28, 2014
Anadarko Petroleum Corporation Form 10-Q filed July 29, 2014
Anadarko Petroleum Corporation Form 10-Q filed May 5, 2014

ConocoPhillips DEF 14A (Proxy) Statement filed March 30, 2020
EOG Resources, Inc. DEF 14A filed March 15, 2018

Robert P. Daniels Form 4 filed November 7, 2016
Robert P. Daniels Form 4 filed October 27, 2016
Robert P. Daniels Form 4 filed November 9, 2015
Robert P. Daniels Form 4 filed October 28, 2015
Robert P. Daniels Form 4 filed October 16, 2015
Robert P. Daniels Form 4 filed March 24, 2015
Robert P. Daniels Form 4 filed November 10, 2014
Robert P. Daniels Form 4 filed November 6, 2014
Robert P. Daniels Form 4 filed May 22, 2014
Robert P. Daniels Form 4 filed April 11, 2014
Robert P. Daniels Form 4 filed November 12, 2013
Robert P. Daniels Form 4 filed November 7, 2013
Robert P. Daniels Form 4 filed July 3, 2013
Robert P. Daniels Form 4 filed February 13, 2013
Robert P. Daniels Form 4 filed November 13, 2012
Robert P. Daniels Form 4 filed November 7, 2012
Robert P. Daniels Form 4 filed March 16, 2012
Robert P. Daniels Form 4 filed December 2, 2011
Robert P. Daniels Form 4 filed November 14, 2011
Robert P. Daniels Form 4 filed November 10, 2011

R. A. Walker Form 4 filed August 9, 2019
R. A. Walker Form 4 filed November 16, 2018
R. A. Walker Form 4 filed November 14, 2018
R. A. Walker Form 4 filed October 30, 2018
R. A. Walker Form 4 filed November 16, 2017
R. A. Walker Form 4 filed November 14, 2017
R. A. Walker Form 4 filed November 8, 2017
R. A. Walker Form 4 filed October 30, 2017
R. A. Walker Form 4 filed May 17, 2017
R. A. Walker Form 4 filed November 15, 2016

R. A. Walker Form 4 filed November 7, 2016
R. A. Walker Form 4 filed October 27, 2016
R. A. Walker Form 4 filed November 9, 2015
R. A. Walker Form 4 filed October 28, 2015
R. A. Walker Form 4 filed May 19, 2015
R. A. Walker Form 4 filed November 10, 2014
R. A. Walker Form 4 filed November 6, 2014
R. A. Walker Form 4 filed August 8, 2014
R. A. Walker Form 4 filed May 16, 2014
R. A. Walker Form 4 filed November 15, 2013

Robert G. Gwin Form 4 filed August 9, 2019
Robert G. Gwin Form 4 filed November 16, 2018
Robert G. Gwin Form 4 filed November 14, 2018
Robert G. Gwin Form 4 filed October 30, 2018
Robert G. Gwin Form 4 filed November 16, 2017
Robert G. Gwin Form 4 filed November 14, 2017
Robert G. Gwin Form 4 filed November 8, 2017
Robert G. Gwin Form 4 filed October 30, 2017
Robert G. Gwin Form 4 filed November 15, 2016
Robert G. Gwin Form 4 filed November 7, 2016
Robert G. Gwin Form 4 filed October 27, 2016
Robert G. Gwin Form 4 filed March 2, 2016
Robert G. Gwin Form 4 filed November 9, 2015
Robert G. Gwin Form 4 filed October 28, 2015
Robert G. Gwin Form 4 filed October 9, 2015
Robert G. Gwin Form 4 filed November 10, 2014
Robert G. Gwin Form 4 filed November 6, 2014
Robert G. Gwin Form 4 filed August 8, 2014
Robert G. Gwin Form 4 filed November 21, 2013

Ernest A. Leyendecker III Form 4 filed June 5, 2018
Ernest A. Leyendecker III Form 4 filed November 16, 2017
Ernest A. Leyendecker III Form 4 filed November 14, 2017
Ernest A. Leyendecker III Form 4 filed November 8, 2017
Ernest A. Leyendecker III Form 4 filed October 30, 2017
Ernest A. Leyendecker III Form 4 filed November 15, 2016
Ernest A. Leyendecker III Form 4 filed November 7, 2016
Ernest A. Leyendecker III Form 4 filed October 27, 2016
Ernest A. Leyendecker III Form 3 filed September 1, 2016

## Other Documents

Agrawal, Anup, and Tommy Cooper, "Insider Trading Before Accounting Scandals,"
    *Journal of Corporate Finance*, Vol. 34 (2015): 169-190

Agrawal, Anup, and Tareque Nasser, "Insider Trading in Takeover Targets," *Journal of Corporate Finance*, Vol. 18 (2012): 598-625

Aitken, Michael, Douglas Cumming, and Feng Zhan, "Exchange Trading Rules, Surveillance and Suspected Insider Trading," *Journal of Corporate Finance*, Vol. 34 (2015): 311-330

Bettis, J. C., J.L. Coles, and M. L. Lemmon, "Corporate Policies Restricting Trading by Insiders," *Journal of Financial Economics*, Vol. 57 (2000): 191-220

Fishman, Michael J., and Kathleen M. Hagerty, "Insider Trading and the Efficiency of Stock Prices," *RAND Journal of Economics*, Vol. 23, No. 1 (Spring 1992): 106-122

Hillier, David, Adriana Korczak, and Pitor Korczak, "The Impact of Personal Attributes on Corporate Insider Trading," *Journal of Corporate Finance*, Vol. 30 (2015): 150-167

Jagolinzer, Alan D., David F. Larcker, and Daniel J. Taylor, "Corporate Governance and the Information Content of Insider Trades," *Journal of Accounting Research*, Vol. 49, No. 5 (December 2011): 1249-1274

Kraft, Anastasia, Bong Soo Lee, and Kerstin Lopatta, "Management Earnings Forecasts, Insider Trading, and Information Asymmetry," *Journal of Corporate Finance*, Vol. 26 (2014): 96-123

Lee, Inmoo, Michael Lemmon, Yan Li, and John M. Sequeira, "Do Voluntary Corporate Restrictions on Insider Trading Eliminate Informed Insider Trading?" *Journal of Corporate Finance*, Vol. 29 (2014): 158-178

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42

Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022

Seyhun, H. Nejat, "Insiders' Profits, Costs of Trading, and Market Efficiency," *Journal of Financial Economics*, Vol. 16 (1986): 189-212

**Data Sources**

Bloomberg, L.P.

2022 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business