# EXHIBIT 1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE SOUTHERN DISTRICT OF TEXAS

 3                            HOUSTON DIVISION

 4   GEORGIA FIREFIGHTER'S        §     CASE NO. 4:20-cv-00576
     PENSION FUND                 §     HOUSTON, TX
 5                                §     FRIDAY,
     VERSUS                       §     MARCH 17, 2023
 6                                §     10:31 AM TO 11:41 AM
     ANADARKO PETROLEUM           §
 7   CORPORATION, ET AL.          §

 8                             MOTION HEARING

 9             BEFORE THE HONORABLE CHARLES ESKRIDGE
                   UNITED STATES MAGISTRATE JUDGE
10
                              APPEARANCES:
11

12        FOR THE PARTIES:            SEE NEXT PAGE

13        COURT REPORTER:             MAYRA M. MARQUEZ

14        COURT CLERK:                JACKIE MATA

15

16

17

18

19

20

21                     TRANSCRIPTION SERVICE BY:

22                     Veritext Legal Solutions
                       330 Old Country Road, Suite 300
23                          Mineola, NY 11501
                     Tel: 800-727-6396 ▼ www.veritext.com
24
         Proceedings recorded by electronic sound recording; transcript
25                  produced by transcription service.
```

1                              APPEARANCES:

2

3    FOR THE PLAINTIFF:          ROBBINS GELLER RUDMAN & DOWD, LLP
                                 Rachel Jensen
4                                Daniel Drosman
                                 655 W. Broadway
5                                San Diego, CA 92101
                                 619-231-1058
6
     FOR THE DEFENDANTS:         SHIPLEY SNELL MONTGOMERY, LLP
7                                George Shipley
                                 717 Texas Avenue
8                                Houston, TX 77002
                                 713-652-5920
9
                                 CRAVATH SWAINE & MOORE, LLP
10                               Kevin Orsini
                                 Lauren Rosenberg
11                               Lauren Phillips
                                 825 Eighth Avenue
12                               New York, NY 10019
                                 212-474-1000
13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>HOUSTON, TEXAS; FRIDAY, MARCH 17, 2023; 10:31 AM</u> |
| 2 | CLERK:  All rise.  All rise, the United States |
| 3 | District Court for the Southern District of Texas is now |
| 4 | session with the Honorable Charles Eskridge presiding.  God |
| 5 | save the United States and this Honorable Court. |
| 6 | THE COURT:  Thank you.  Everyone please be seated. |
| 7 | All right, I call case 20-576 Georgia Firefighter's Pension |
| 8 | Fund v. Anadarko.  Can I get appearance of counsel, please? |
| 9 | MS. JENSEN:  Good morning, Your Honor.  Rachel Jensen |
| 10 | from Robbins Geller Rudman & Dowd on behalf of Plaintiffs in |
| 11 | the Class. |
| 12 | THE COURT:  Okay.  And that was, I'm sorry, what |
| 13 | name, Rachael? |
| 14 | MS. JENSEN:  Rachael Jensen, J-E-N-S-E-N. |
| 15 | THE COURT:  Okay.  Have you filed a notice of |
| 16 | appearance? |
| 17 | MS. JENSEN:  Yes. |
| 18 | THE COURT:  Okay. |
| 19 | MS. JENSEN:  Some time ago. |
| 20 | THE COURT:  All right, I sort of figured you had, I |
| 21 | don't see it on the docket sheet, but that's probably fine. |
| 22 | And you, sir? |
| 23 | MR. DROSMAN:  Good morning, Your Honor.  Daniel |
| 24 | Drosman on behalf of the Plaintiffs in the Class as well from |
| 25 | the law firm Robbins Geller Rudman & Dowd. |

```
 1              THE COURT:  All right, thank you.  And for

 2   Defendants?

 3              MR. SHIPLEY:  George Shipley for the Defendants and

 4   I'll let the other colleagues introduce themselves.  They've

 5   all filed, they've all made appearances --

 6              THE COURT:  Okay.

 7              MR. SHIPLEY:  -- to be proactive.

 8              THE COURT:  Great.

 9              MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini

10   from Cravath, Swaine & Moore, my appearance was more recent, so

11   it may not be showing up on the list.

12              THE COURT:  It's there, thank you.

13              MR. SHIPLEY:  It's number 155.

14              MS. ROSENBERG:  Good morning, Your Honor.  Lauren

15   Rosenberg also with Cravath, Swaine & Moore on behalf of

16   Defense.

17              THE COURT:  All right.

18              MS. PHILLIPS:  Good morning.  Lauren Phillips also

19   from Cravath, Swaine & Moore.

20              THE COURT:  Okay, and your name was?

21              MS. PHILLIPS:  Lauren Phillips.

22              THE COURT:  Okay.  All right, thank you, all.  All

23   right, so, we're here on some discovery issues.  The easiest

24   thing -- I don't think I've ruled on a pending motion to seal.

25   And is it just the materials that were submitted as part B that
```

1    are still needing to be sealed at this point?  Do you all

2    recall?

3            I'm sure this is not what was top of mind with you

4    all.  There was -- I've got information that, I think, it was

5    like A through F was filed and you needed a number of

6    materials sealed.  A, B, F, G, and H, those exhibits.  But you

7    all have apparently agreed that only B still needs to be filed

8    under seal.  And I'm trying to catch up on what's done by

9    agreement, which is why you all aren't thinking about it

10   anymore.

11           MR. SHIPLEY:  I think we're -- I might be a little

12   confused because yesterday we filed a joint motion for

13   temporary sealing because yesterday there were about a dozen --

14   about ten motions --

15           THE COURT:  Exactly.

16           MR. SHIPLEY:  There's a summary --

17           THE COURT:  This is different than that.  This was

18   prior filings --

19           MR. SHIPLEY:  Right.

20           THE COURT:  This relates to dockets number 116 and

21   121.  And so, I don't need to rule on it right if somebody can

22   -- there's several attorney sitting at tables if somebody can

23   just sort of look and confirm.  I think with 121 it indicates

24   where we are.  And I'm -- whatever needs to remain under seal,

25   I'm fine granting what needs to be under seal, but I just need

```
 1    to specify what those documents are so the clerk's office
 2    knows.
 3              MR. SHIPLEY:  We'll figure that out.
 4              THE COURT:  Okay.
 5              MR. SHIPLEY:  Maybe on a break or something.
 6              THE COURT:  Okay.  All right.  So, let's turn to the
 7    motion to compel.  And there's quite a number of different
 8    issues that are raised there.  And I have a question -- who's
 9    going to be arguing for Plaintiffs?
10              MR. DROSMAN:  I'll be arguing, Your Honor.
11              THE COURT:  Okay.  So, I'll let you start.  One thing
12    I have in mind.  There was the -- they're the competing
13    observations at the end about a special master and I understand
14    how you all are thinking about that.  I'm looking at -- even
15    though as to the waiver issues and other things, I'm wondering
16    whether I have sufficient information, factual information, in
17    front of me to understand what the correct ruling is on what
18    happened behind the scenes with all of this.
19              And does there need to be something more by way of
20    evidence that needs to be put in front of me.  But I'm also
21    thinking about whether if I'm satisfied that there's the
22    potential, potentially, waiver might have occurred here that
23    that be referred to the special master to take a look at and
24    gather what information needs to be done to make a
25    recommendation in that regard.
```

```
 1              Because I don't want to -- I don't personally want to

 2      do a mini-trial on waiver of privilege that may have happened

 3      in this regard.  I don't think that's terribly efficient.  So,

 4      with those -- with that in mind, why don't you start wherever

 5      you'd like.

 6              MR. DROSMAN:  Sure, Your Honor.  I'll start with the

 7      attorney/client privilege.  I mean, as you're aware there's two

 8      separate issues.

 9              THE COURT:  Yep.

10              MR. DROSMAN:  There's the attorney/client privilege

11      area and the work product protection area.  I'll start with

12      attorney/client privilege.  And with respect to whether a

13      special master is necessary for the purposes of reviewing

14      attorney/client privilege information, we would submit that it

15      is not -- would not be useful and would not be necessary for

16      the reasons --

17              THE COURT:  Let me ask this.  They -- on the -- just

18      so I'm understanding the volume, I had asked that question, the

19      volume of material that's at issue.  I have a privilege log

20      that looks like 913 documents.  Is that right?  Is that the

21      universe that we are going to be talking about here or is that

22      -- did I get some subset of --

23              MR. DROSMAN:  You're talking about the privilege log

24      in Exhibit I, correct?

25              THE COURT:  Yes.
```

1          MR. DROSMAN:  Yeah, that is inclusive of every

2   document except for the documents withheld by the audit

3   committee on the grounds of the attorney/client privilege log.

4   So, those are 59 documents that I don't believe are included.

5          THE COURT:  So, there's another 59?

6          MR. DROSMAN:  Another 59.

7          THE COURT:  That just didn't even get logged?

8          MR. DROSMAN:  I'm not sure, Your Honor.  I think that

9   Defendants or the audit committee may have logged it, but it

10  doesn't appear in the particular privilege log.

11         THE COURT:  Let me just ask Defendants about that.

12  Are there -- because I just sort of want to have in mind how

13  big is the universe that we're talking about here.

14         MS. ROSENBERG:  It is.

15         THE COURT:  And so, are there some documents that are

16  at issue that have been withheld that aren't on the log?

17         MS. ROSENBERG:  So, what Mr. Drosman is referring to,

18  Your Honor, is there were separate subpoenas sent to

19  independent directors of Anadarko.  And they responded to the

20  subpoena provided nonprivileged documents in response to the

21  subpoena to the extent there were any documents that were

22  withheld or redacted those were reflected on their own separate

23  privilege logs.  So, there are some additional privileged logs.

24         THE COURT:  So, there's other privilege logs beyond

25  Exhibit I.

```
 1            MR. ROSENBERG:  That is correct.

 2            THE COURT:  Okay.

 3            MS. ROSENBERG:  It's a very narrow set as Mr. Drosman

 4   said at about 50 documents total.

 5            THE COURT:  Okay.

 6            MS. ROSENBERG:  I should also just advise for Your

 7   Honor.  My understanding is that the total number of documents

 8   at issue as reflected in Plaintiff's motion aside from this is

 9   537 is I believe the number that they have identified.  And I

10   think the distinction there might be that there is some

11   attachments listed on the log that really might have been

12   logged.  The total numbers, I think, is a little bit smaller,

13   like 500.

14            THE COURT:  Oh.  But it might be of the 900 that are

15   reflected there, some of those just might be attachments to

16   other things --

17            MS. ROSENBERG:  That's correct.

18            THE COURT:  -- but there.  And has anybody printed

19   these out, do we know how many boxes we're talking about?

20            MS. ROSENBERG:  I don't know how many boxes off hand,

21   Your Honor.

22            THE COURT:  Okay.  Anybody have like any estimate at

23   all about?

24            MR. DROSMAN:  We would love to see --

25            THE COURT:  Well, I guess you wouldn't know because
```

1    they're not -- well, because they're not listing on the log,

2    well, they are dates.  But I -- some have dates beginning and

3    ending and some don't, which is unusual.

4              MS. ROSENBERG:  I believe the documents that were

5    withheld are in fact control numbers, as opposed to Bates

6    numbers.  The documents that were redacted had a Bates range.

7    My understanding is that the, and I don't have an exact number

8    of boxes for Your Honor, but that is a combination of emails,

9    certain memoranda --

10             THE COURT:  Okay.

11             MS. ROSENBERG:  And then, certain draft

12   presentations, I believe.

13             THE COURT:  Okay.

14             MS. ROSENBERG:  So, I don't imagine these are

15   incredibly voluminous documents each and every one.  So,

16   probably a couple of boxes.

17             THE COURT:  Okay.

18             MS. ROSENBERG:  It's not on the order of 50 boxes is

19   my guess.

20             THE COURT:  Okay, all right, go ahead.

21             MR. DROSMAN:  Sure.  So, with respect to

22   attorney/client privilege.  As Your Honor is aware the law is

23   clear that when a party discloses significant parts of the

24   privilege communication to a third party, that disclosure

25   waives the attorney/client privilege as to all other

 1    communications relating to those communications.

 2              And that's out of the SEC v. Microtune case makes

 3    very clear that that's the law.  So, we look at what Defendants

 4    have done in this particular case.  And what they've done is

 5    they've disclosed attorney/client privilege information

 6    unquestionably to KPMG.  They've disclosed it, although there

 7    is pushback from the Defendants, they have disclosed it to the

 8    SEC as well and they've disclosed it to their underwriter JP

 9    Morgan.  So, there is waiver.

10              And the reason, Your Honor, that we know that

11    attorney/client privileged information was disclosed to the SEC

12    in this case, we have a few different facts that give rise to

13    that belief.  Frist, there is a confidentiality agreement as

14    Your Honor is aware between the audit committee and the SEC

15    that admits that the audit committee materials that are going

16    to be provided were in fact privileged.

17              I think the quote is the audit committee believes

18    that the confidential materials are protected by the minimum

19    the attorney work product doctrine, and the attorney/client

20    privilege.  This of course, contradicts Mr. Pecht's declaration

21    he's the partner exposing charge of the North Rose

22    investigation.  He said, no attorney/client privileged

23    information was provided to the SEC.

24              In addition, every page of the, I think, 180-page

25    PowerPoint presentation provided to the SEC was labeled

1   attorney/client privilege.  And the presentation that was given

2   to the SEC was given to the audit committee a week earlier

3   presumably as an attorney/client communication as well.  And

4   finally, we have that the --

5           THE COURT:  Then it's -- so, it's a PowerPoint

6   presentation that was given by whom to whom?

7           MR. DROSMAN:  It was given by Norton Rose is my

8   understanding --

9           THE COURT:  By Norton Rose

10          MR. DROSMAN:  -- to the audit committee about a week

11  before Norton Rose presented it to the SEC during their

12  meeting.

13          THE COURT:  So, when it's -- when it's a PowerPoint

14  that Norton Rose is presenting to the SEC, it's labeled an

15  attorney/client communication but that doesn't make it

16  attorney/client communication, does it?  I mean, --

17          MR. DROSMAN:  Well, I think it --

18          THE COURT:  -- the SEC's not their client, that's

19  just an overexuberant associate stamping things with privilege.

20  But I don't know that it really reflects that something's

21  actually privileged.  Is it that -- we're going to have to be

22  looking at the material that's on it to understand whether that

23  was an attorney/client communication.

24          But the PowerPoint itself just because it's stamped

25  that if we know that it's being -- this is a communication

1    that's being made to the SEC, that's not in of in itself

2    indicative that it's an attorney/client communication.

3            MR. DROSMAN:  I agree with Your Honor that it

4    certainly not dispositive of the issue.  It should have to look

5    beyond the labels.  But it's probative if obviously somebody

6    labeled it and gave it as an attorney/client privilege.

7            THE COURT:  I think it's probative that we're talking

8    about a sensitive and attorneys are working on it, I get all of

9    that.  And then, you're saying it was Norton Rose -- well, you

10   haven't seen it, so you don't know.  But essentially, you think

11   it was a draft presentation or it was an earlier version of

12   what was shown to the SEC, they showed that to the  audit

13   committee?

14           MR. DROSMAN:  Correct.  I think there's -- there are

15   indications in the KPMG work papers that that was provided to

16   the audit committee about a week before it was provided to the

17   SEC.

18           THE COURT:  Okay, okay.

19           MR. DROSMAN:  They may call it the presentation and

20   meet earlier to talk about the presentation that they intended

21   to provide to the SEC was provided to the audit committee.

22           THE COURT:  Okay, okay, all right.

23           MR. DROSMAN:  And then, you know, also, Your Honor,

24   they gave a copy -- I don't know if you remember this.  But

25   they gave a copy of this presentation to KPMG, their auditors

```
 1   in the case.  And they -- in the audit committee's work papers.

 2   I'm sorry, in KPMG's work papers KPMG says they provided us a

 3   copy, but they took it back because it was attorney/client

 4   privileged and they didn't want to waive it essentially.

 5           So, I think all these facts add up to -- and one of

 6   them probably is inadequate, but all of them together add to a

 7   very strong inference that the particular presentation if given

 8   to the SEC was in fact attorney/client privilege.

 9           THE COURT:  So, the PowerPoint that shown to the --

10   given to the SEC has not been turned over or it has only been

11   turned over redacted?

12           MR. DROSMAN:  We have the entirety of the

13   PowerPoint's presentation, Your Honor.

14           THE COURT:  Okay.

15           MR. DROSMAN:  In unredacted form.

16           THE COURT:  Okay.

17           MR. DROSMAN:  Okay.  And you know, I would just note

18   --

19           THE COURT:  And what you want the prior version that

20   was shown to the -- so, you're focusing on this PowerPoint,

21   you've got it.  Do you have the prior version that was shown to

22   the audit committee or?

23           MR. DROSMAN:  We don't know, Your Honor.  I mean, I

24   don't know whether it changed between the time it was filed.

25           THE COURT:  No because you don't have that prior
```

1    version.

2              MR. DROSMAN:  Because we do not have that, right.  We

3    have the one presumably that was presented to the SEC.

4              THE COURT:  Okay.

5              MR. DROSMAN:  So, you know, I just note while we're

6    on the subject of the PowerPoint that the Pecht declaration,

7    Mr. Pecht from Norton Rose, also said there were no summaries

8    of witness interviews provided to the SEC, apparently trying to

9    avoid a waiver argument.

10             But in fact, Your Honor, there was indeed witness

11   summaries given.  We know that because of the quaint language

12   of the PowerPoint presentation shows a summary of Ms. Frye's

13   witness interview in presumably a light most favorable to the

14   Defendants.

15             And so, that absolutely contradicts Mr. Pecht's

16   declaration which I think, you know, those two flaws in his

17   declaration which are contradicted by the documents themselves

18   needs to weigh in favor of disregarding Mr. Pecht's declaration

19   in its entirety.  I don't know whether he just failed to look

20   at the declaration before, I mean, at the PowerPoint

21   presentation before he made his declaration.

22             But it's obviously not the case that witness

23   summaries were not provided to the SEC.  And you know, I'd say

24   one more thing about this PowerPoint presentation.  We both

25   know that PowerPoint presentations are geared talking points.

```
 1              THE COURT:  Mm hm.
 2              MR. DROSMAN:  They're not entirely what was told to
 3    the SEC is not in this PowerPoint presentation.  The PowerPoint
 4    presentation were a launching pad for Norton Rose to talk to
 5    the SEC about the items in the PowerPoint presentation.  And
 6    there's a whole section on witnesses, who they interviewed, you
 7    know, that sort of thing.  It sort of defies probability that
 8    Norton Rose said nothing about what was said during these
 9    interviews.
10              I mean, we know that they talked about what Ms. Frye
11    said and I can't imagine that it wouldn't be the case that they
12    spoke about what others said to the extent it was favorable for
13    the Defendants.  So, we know that, I think that if there's a
14    very strong case to be made that the PowerPoint presentation
15    was privileged and to the extent that it was there is subject
16    matter waiver and that's why I said I don't think a special
17    master would be necessary to review at least the documents that
18    are withheld on privilege alone because if indeed the
19    PowerPoint presentation was privileged, there's subject matter
20    waiver for all of the privileged documents --
21              THE COURT:  Mm hm.
22              MR. DROSMAN:  -- which would include the 59 documents
23    withheld by the audit committee.  We also have a case where the
24    documents were provided, privileged documents, were provided to
25    KPMG.  And we know that because if we look at that KPMG work
```

1    paper, which I think is Exhibit A Your Honor has it's quite

2    lengthy.

3           And it's essentially KPMG documenting all of their

4    dozens of meetings with Norton Rose to get updates and status

5    reports and details about the investigation.  So, they're

6    providing all this information to KPMG.  This is privileged

7    information.  So, there's subject matter waiver with respect to

8    all of the privileged information that was provided to KPMG as

9    well.

10          And then, you know, we know that the presentation, it

11   was described as a half hour, was provided to JP Morgan as well

12   updating them on the status of the investigation and the work

13   paper talks about a detailed update.  They use the word detail;

14   in detail I think to describe that particular presentation to

15   JP Morgan.  It's fairly clear that these three third parties

16   received privileged information within the (indiscernible).

17          THE COURT:  And so, it's attorney/client materials

18   that were disclosed to the SEC, KPMG, and JP Morgan Chase that

19   you want, correct?

20          MR. DROSMAN:  Correct.

21          THE COURT:  And I think -- have you gotten everything

22   though that was given to the SEC?  Hasn't --

23          MR. DROSMAN:  We apparently --

24          THE COURT:  Hasn't that been turned over already and

25   so that -- I understand so those are the three entities that

```
 1   you're interested in.  I'm thinking that -- and I know that
 2   you've been given some, so then, I'm trying to figure out okay
 3   what areas haven't been turned over.
 4            MR. DROSMAN:  So --
 5            THE COURT:  Potentially.
 6            MR. DROSMAN:  Apparently, we've been provided with
 7   the documents that were shown to the SEC, okay.  Those have
 8   been produced.  What we haven't been given is the 59 documents
 9   that are apparently being withheld on privilege alone by the
10   audit committee.
11            And whether those documents that are being withheld
12   on privilege were actually shown to KPMG or JP Morgan Chase or
13   to the SEC is not the inquiry.  The inquiry is have they waived
14   privilege, in which case there would be subject matter waiver
15   as to those documents.
16            THE COURT:  Okay.
17            MR. DROSMAN:  So, that's the contention in a nutshell
18   and I apologize to Your Honor --
19            THE COURT:  And those 59 documents are the ones that
20   I don't have a privilege log in front of me on?
21            MR. DROSMAN:  Correct.
22            THE COURT:  Okay.  Does that privilege log indicate
23   the typical to/from, generally what it was about?
24            MR. DROSMAN:  My understanding is that it did, yes,
25   Your Honor.
```

 1            THE COURT:  Do you have that privilege log?

 2            MR. DROSMAN:  We do, I think we do have it.  I'm

 3    fairly new to the case --

 4            THE COURT:  Okay.

 5            MR. DROSMAN:  -- and as I was preparing for this

 6    argument I asked the same question Your Honor asked and was

 7    told that we do have a privilege log, I haven't seen it.

 8            THE COURT:  Okay.

 9            MR. DROSMAN:  I think we can provide it to you if

10    that would be helpful to Your Honor.

11            THE COURT:  All right.  So, that's -- is that --

12    that's your argument as to subject matter waiver due to

13    disclosure, is that right?

14            MR. DROSMAN:  With respect to attorney/client

15    privilege, right.  And so, I'll move on to the work product

16    issue.

17            THE COURT:  Well, let's make -- let me -- just to

18    keep these I'm going to turn to Defense --

19            MR. DROSMAN:  Sure.

20            THE COURT:  -- to hear on the attorney/client

21    privilege waiver in a second.  Is there anything else on

22    attorney/client privilege waiver that you want to argue?  I

23    think there's some, you know, argument as to use of the

24    privileges of sword and shield.  Do you want to address

25    anything on that?

```
 1              MR. DROSMAN:  There is, Your Honor.  Yeah, I mean,

 2    Your Honor is aware the Defendants during the questioning of

 3    the Class representatives in this case put in front of them the

 4    declamation letter from the SEC.  And said to them, or at least

 5    said to one of them and I think implied to the other one,

 6    doesn't this change your view of the case.

 7              I think with respect to the second Class

 8    representative they say that they put that particular

 9    declamation letter in the front of him so that they could

10    understand his position on whether the SEC upheld the

11    allegations.  It appeared to me that they were trying to

12    impeach his testimony that the SEC upheld the allegations by

13    putting the declamation letter in front of them.

14              In any case, it was clear that in that case they were

15    using the results of this presentation, which then persuaded

16    the SEC to decline the filing of an enforcement action as the

17    sword.  While withholding all of the privileged and work

18    product information on shielding it under those particular

19    doctrines.  The witness memos and so forth they've also

20    withheld.

21              And presumably they described the witness interviews

22    to the SEC.  The PowerPoint presentation certainly indicates

23    that they did.  So, it's various if they're going to use this

24    declamation letter, whether they're going to make use of it in

25    trial or in class certification, the cases don't make that
```

1    final distinction, they simple say if you're going to use it

2    offensively than you can produce the documents that underlie

3    it.

4                    THE COURT:  Okay.  All right.  Anything else on

5    attorney/client?

6                    MR. DROSMAN:  No, Your Honor.

7                    THE COURT:  All right.  Who's arguing for Defense?

8                    MS. ROSENBERG:  Lauren Rosenberg, Your Honor.

9                    THE COURT:  All right, go ahead.

10                   MS. ROSENBERG:  Thank you.  With respect to

11   attorney/client privilege Your Honor knows the document that

12   Mr. Drosman focused on, the presentation provided to the SEC,

13   has already been produced to Plaintiffs in full before any of

14   this began.  So, to the extent there was a waiver about this

15   particular document, that's not at issue here.  We provided

16   that.

17                   The argument that the Plaintiffs here are advancing

18   is that as a result of having a presentation with SEC, that

19   Defendant somehow waived privilege, attorney/client privilege,

20   over the entirety of their investigation.  That they,

21   therefore, have no right to assert that the communications

22   between their lawyer, Norton Rose, and the audit committee are

23   privileged.

24                   There is simply no support for that broad proposition

25   in the case law or anything that the Plaintiffs have cited

```
 1    here.  In fact, what it would mean is that any company who goes
 2    to a regulator and makes a presentation has somehow waived
 3    entirely the privilege over any investigation, any review.
 4    That simply can't be the basis on the law.
 5            Same is true for a company that discloses the status
 6    of an investigation publicly.  That there was an investigation
 7    and the SEC, or any other regulator has declined to press
 8    charges, has declined to have an enforcement action.  That
 9    again, can't waive everything related to the underlying
10    investigation at issue.  That's simply not the law.  And with
11    respect to the narrow width --
12            THE COURT:  So, let me ask.  So, as to the SEC your
13    arguments focusing on the PowerPoint that's been turned over,
14    great.  But is there, excuse me, anything else that was shown
15    or given to the SEC that hasn't been turned over?
16            MS. ROSENBERG:  There was not.
17            THE COURT:  All right, so there's that has been
18    turned over.  What about KPMG and JP Morgan?
19            MS. ROSENBERG:  Wait sorry, I should just clarify one
20    thing.  There was not that hasn't been turned over.  There was
21    a production of documents to the SEC by the audit committee, we
22    also turned those over to Plaintiffs, just to be clear.
23            THE COURT:  That's kind of what I mean.  So, like
24    anything from the Defendants --
25            MS. ROSENBERG:  Anything that was provided to the SEC
```

1    --

2              THE COURT:  -- that was given to SEC --

3              MS. ROSENBERG:  -- has been provided to the

4    Plaintiffs.

5              THE COURT:  -- has been turned over.

6              MS. ROSENBERG:  Yes.

7              THE COURT:  Okay.  And what about -- what's the

8    answer as to KPMG and JP Morgan?

9              MS. ROSENBERG:  So, KPMG and JP Morgan, respectfully

10   Your Honor, that's not an issue of attorney/client privilege,

11   that's an issue of work product protection.

12             THE COURT:  Okay.

13             MS. ROSENBERG:  So, the -- what was communicated to

14   KPMG and to JP Morgan, those -- that was updates about the

15   status of the investigation.  And there was not discussion or

16   disclosure of the discussions between Norton Rose

17   (indiscernible), the lawyers and our client at the audit

18   committee, right.  That would be a waiver of attorney/client

19   privilege when you suddenly disclose confidential

20   communications with your client to a third party.

21             That's very different from disclosing the work

22   product, the mental impressions of lawyers in an ongoing

23   investigation to a third party.  That's a work product issue.

24             THE COURT:  Okay, then we'll take that up with work

25   product, okay.  So, for the SEC, who at Norton Rose had the

```
 1    speaking roles there?

 2              MS. ROSENBERG:  So, Mr. Pecht was the lead lawyer --

 3              THE COURT:  Okay.

 4              MS. ROSENBERG:  -- at Norton Rose on that and that's

 5    who submitted the declaration.

 6              THE COURT:  All right.  So, Mr. Pecht presented to

 7    the SEC and if there are bullet points as represented that are

 8    indicating here's witness interviews that we've done, wouldn't

 9    I need to know has Mr. Pecht been deposed?

10              MS. ROSENBERG:  Mr. Pecht has not been deposed.

11              THE COURT:  Okay.  I'm not saying that he should of

12    have been, I'm just sort of like -- because to resolve this

13    dispute wouldn't I or someone need to be understanding what Mr.

14    Pecht says he disclosed about that.  I mean, because a question

15    would be okay I see it on the PowerPoint here, did you -- what

16    was said about those things.

17              And let's assume that he said these are all the

18    interviews that we undertook and we -- there was nothing of any

19    concern that was raised in those.  I'm not saying Mr. Pecht

20    would ever, you know, fabricate, or say something that's not

21    true to the SEC.

22              But to the extent that he vouches for something or

23    discusses it any way isn't it then legitimate for the

24    Plaintiffs to be well we want to know what was in those.  I

25    mean, you talked about those to the SEC, we now need to
```

1    understand whether what you were saying to them was true

2    because it's all getting towards this declamation letter that

3    I'm also hearing about.  What's your thoughts on that?

4              MS. ROSENBERG:  So, two points Your Honor.  The first

5    is that what Mr. Drosman raises is what's specifically noted in

6    the presentation.  So, they have full access to that.

7              THE COURT:  Right.

8              MS. ROSENBERG:  It's a long PowerPoint presentation,

9    it's over 100 slides.  And Plaintiffs as a result have had the

10   opportunity to depose witnesses, ask them about what was

11   included, ask them about the very things that the PowerPoint

12   slides indicates that they mentioned.  And they've done that.

13   We've had more than 20 depositions in this case, they deposed

14   most of the individuals who are named in this PowerPoint

15   presentation.

16             THE COURT:  Okay.

17             MS. ROSENBERG:  So, that's the first point.  The

18   second point, Your Honor, is that the case law on this issue is

19   very narrow.  It is that when a company discloses the actual

20   witness memoranda or read the witness memoranda, read a summary

21   of what happens, what they were told, that in fairness that

22   should be turned over.  We've turned that over because it's

23   been included on the PowerPoint presentation by Mr. Pecht.

24             THE COURT:  Turned what over?

25             MS. ROSENBERG:  The slides, rather.

```
 1              THE COURT:  Well then, okay.  So, --

 2              MS. ROSENBERG:  And Mr. Pecht's declaration that was

 3    submitted indicates that Anadarko attorneys did not provide or

 4    read notes, summaries, memoranda, or other materials

 5    memorializing interviews during the investigation at any time

 6    to the SEC including in that meeting.  So, I think that puts to

 7    rest the question that Your Honor had.  Mr. Drosman raised that

 8    of course it includes in these slides' references to

 9    interviews.  That's exactly what was presented to the SEC was

10    presented to Plaintiffs themselves and they had the opportunity

11    to depose people on that issue.

12              Ultimately, the question for purposes of

13    attorney/client privilege on this issue is handled under

14    federal rule that is 502.  Which establishes that when

15    disclosure is made to a federal office or an agency and waives

16    the attorney/client privilege or work product perfection as to

17    a particular document, that only extends to an undisclosed

18    communication if, and a relevant part here, if in fairness be

19    considered together.

20              And the cases on that issue are very narrow.

21    Microtune for example, which Mr. Drosman mentioned was a case

22    in which there had actually been a disclosure of the witness

23    interviews, of those underlying memoranda to the SEC.  Which is

24    very different from what happened here.

25              And additionally, the fairness concerns were very
```

```
 1    different because at issue in that case was that the SEC
 2    actually brought charges against an individual at company.  And
 3    so, in fairness to be able to launch their own defense, mount
 4    an appropriate defense, they needed the opportunity to
 5    understand what the SEC had been told.
 6              That's obviously very different from the situation
 7    here.  This is a securities fraud case.  We understand,
 8    obviously, that the underlying allegations were originally made
 9    and alleged by a whistleblower that sent a letter to the SEC,
10    but this case isn't about a security -- about the SEC
11    investigation.  This case is about the facts of what happened
12    with respect to a particular oil field in Shenandoah.
13              So, there's nothing about that particular
14    investigation that we've put at issue.  To the contrary, this
15    is Plaintiffs that are repeatedly putting this mis rise SEC
16    letter  at issue in this case.  And we're repeatedly trying to
17    focus on the facts.  We're not trying to put the investigation
18    at issue, that's not our intention.  So, I think that that is a
19    real explanation of the distinction between cases here on
20    attorney/client privilege.
21              THE COURT:  So, then how was the declamation letter
22    used in depositions?
23              MS. ROSENBERG:  Yes, Your Honor.  So, the declamation
24    letter was used in the depositions of the Class representatives
25    to understand because they had testified about their knowledge
```

```
 1    about the aspect Ms. Frye had issued an SEC letter to ask

 2    whether they were aware that there was also a declamation

 3    letter, information letter, by the SEC.  And at least one

 4    question was asked whether that would at all change their view

 5    on these issues.

 6            Now, of course, there's going to be a question at

 7    some point in advance of trial.  I'm sure Plaintiffs will file

 8    a motion in limine about whether we can or cannot reference the

 9    SEC termination letter.  As you can obviously imagine our

10    position is that if they're going to reference that Ms. Frye

11    filed a letter with the SEC, in fairness we ought to be able to

12    say that the SEC declined to press charges.  But that's issue

13    for another day, that's about admissibility, it's not an issue

14    about waiver.  There is nothing about saying that because a

15    third party --

16            THE COURT:  I would guess if we --

17            MS. ROSENBERG:  -- letter, that should waive

18    attorney/client privilege.

19            THE COURT:  As we get towards trial and thinking

20    about that, I would bet that the Plaintiffs would say we're

21    fine for you to use the declamation letter if you give us all

22    of these other materials.  Because we'd like to know what went

23    into the decision to decline and whether -- I'm not even sure

24    these witness interviews how closely touching the underlying

25    merits of this are, but I take it that you're wanting to get to
```

 1   the fact that maybe also that wasn't accurately communicated.

 2           MR. DROSMAN:  100 percent, Your Honor.  I think these

 3   witness letters, just to clear up any confusion, they're

 4   directly relevant to our case.  I mean, Ms. Frye's allegations

 5   were that Anadarko misrepresented and mis-accounted for these

 6   particular oil wells, they're a part of our case the Shenandoah

 7   oil well that was a dry well.  It capitalizes the expense that

 8   she says that they knew that this was wrong, and they should

 9   have expensed it.

10           I mean, this is at the very heart of our case.  So,

11   certainly relevant no question about that.  I don't think

12   Defendants would dispute that.  But if they're going to use it,

13   I mean, that is ultimate sword and shield scenario where they

14   talk it up at trial and say see the SEC declined to prosecute,

15   but Plaintiffs you don't get any of the information that that

16   was based on.

17           THE COURT:  Mm hm.

18           MR. DROSMAN:  So, yes, I mean I --

19           THE COURT:  And so, now I hear that it was used and

20   you're telling me, well, Judge you can take care of that on a

21   motion in limine and not have it -- not have that come in and

22   so we remove any issue about the background of what went into

23   that declamation letter.  But I instead sit here for whatever

24   purpose it was used at a deposition, it was pulled out and used

25   by an attorney at the deposition.

1           And asked whether what was on the face of that letter

2    as I'm understanding the question, read this, does that change

3    your view about facts that you're communicating to me about

4    your thoughts on this litigation.  Is that kind of in sum about

5    how it was used?

6           MS. ROSENBERG:  It was used in that way, it was asked

7    -- there were two questions that were asked about it.

8           THE COURT:  So, this declamation letter says

9    absolutely nothing wrong was going on, that's the SEC's

10   conclusion.  Does that change your view about whether you've

11   got a good case here to get the witness to say hm I wasn't

12   aware of that and yeah that might change my view a little bit.

13   That was the intent of that question?

14          MS. ROSENBERG:  Well, I think the question was just

15   to know what the Class representatives were aware of in the

16   case, whether they were in fact aware of that.  But the other

17   point that I think is important to raise, Your Honor, is that

18   the SEC's termination letter is not attorney/client privilege.

19   It is not a confidential document, that's a document by --

20          THE COURT:  The declamation letter?

21          MS. ROSENBERG:  Yes.

22          THE COURT:  Oh, of course.  Yeah, no, I mean

23   obviously it's not privileged.

24          MS. ROSENBERG:  So, and then sword and shield

25   argument really doesn't apply in terms of an attorney/client

1    privilege waiver.  There's nothing about using a third-party

2    document that would somehow put at issue attorney/client

3    communications.  There's no support for that in the caselaw.

4            And as I said that that would mean is that if a

5    company disclosed the fact that there was an investigation

6    publicly and then discloses the fact that the investigation has

7    been closed and the regulatory body has not decided to have

8    enforcement action, that that would somehow waive

9    attorney/client privilege over the full investigation.

10           THE COURT:  But I assume was the declamation letter

11   already public or at least disclosed that the SEC had

12   investigated and declined to pursue anything.  Had that been

13   said?

14           MS. ROSENBERG:  I'm not sure that the declamation

15   letter had been publicly disclosed in (indiscernible) part,

16   Your Honor.  But that doesn't change the fact that it's not

17   privileged information.  That's a letter from a third party,

18   the SEC.

19           THE COURT:  Well, I understand that that's not, that

20   the declamation letter is not privileged, but the sword/shield

21   doesn't go to okay you pull out at a deposition the document

22   that you've previously been withholding as privilege and say

23   let me show you this and now for some reason, I mean, obviously

24   you have to turn that over.

25           What is at issue is the way something's being used

1   where there's privileged information, the user of that

2   information knows the privileged material that went into what's

3   going on there.  And trying to get a result from what's on the

4   face of that document without giving the information that went

5   into it.

6          And I understand that it's issued by -- the

7   declamation letter is issued by the SEC, and it's being used by

8   counsel for Anadarko.  But it's counsel for Anadarko that knows

9   everything that's in the privileged material that informed the

10  decision that's stated on the face of the declamation letter.

11  So, why isn't that a sword and shield issue?

12          MS. ROSENBERG:  Well, I think there's a few reasons,

13  Your Honor.  One is, the SEC certainly was not privy to any

14  attorney/client privilege information, right.  So, their

15  decision is based off of the information that was presented to

16  them which is the information that was presented --

17          THE COURT:  Right.  But okay, that doesn't -- but

18  let's assume and I'm not saying anything misleading was said

19  and disclosed by Mr. Pecht or anyone else to the SEC.  I'm only

20  talking about like how it's been put at issue.  And ultimately,

21  I take it from this declamation letter the SEC says we don't

22  see any problem with what is going on here.

23          But their point is you did an investigation and then

24  were spoon feeding material to the SEC to get that result.  And

25  then, you used it against us, used it with one of our, I guess,

 1    one of the named representatives.

 2              And presumably if you're doing that in a deposition,

 3    you want to do that in front of a jury.  So, you can't use it

 4    and then -- you can't use it in a deposition and say well you

 5    can cure that because, you know, that'll never see the light of

 6    day before a jury.  If that's the answer, it shouldn't have

 7    been pulled out and used in a deposition.

 8              And so, why isn't it whether it's looking at it as

 9    sword and shield or subject matter waiver.  I mean, the subject

10    matter of that letter implicitly is what does Anadarko know

11    about what went into the SEC declining to conduct a -- to find

12    a problem in what it was investigating.

13              MS. ROSENBERG:  So, Your Honor, the letter itself as

14    we've discussed is not privileged.

15              THE COURT:  Right.

16              MS. ROSENBERG:  To the extent Your Honor believes

17    that it's inappropriate to raise or mention the SEC termination

18    letter without having insight into the investigation, that's an

19    issue for admissibility.  But using a third-party document

20    cannot waive attorney/client privilege.  I can ask an

21    inappropriate question at deposition that's not all

22    admissibility that doesn't mean that I somehow waived all

23    attorney/client privilege communications about our current

24    views on this case.  The question that was asked was a third-

25    party document that revealed --

```
 1              THE COURT:  My understanding of deposition practice
 2     is you're sitting there asking questions as if you are in front
 3     the jury.  And that you are asking questions that you fully
 4     intend to read into the record before the jury.  And it's not -
 5     - the witness is under oath, court reporter is there, it's not
 6     just a roving license to like go inquire generally about
 7     things.
 8              What you're doing is what is happening before the
 9     jury.  And so, by getting into it that way -- I just don't -- I
10     don't have a firm view on this, but I do see that it drags in a
11     lot of material, I think, about what's implied by the
12     declamation letter.  The information that went into that
13     result.
14              And that's not me saying oh well that would, you
15     know, complicate things for anybody that's being investigated
16     by the SEC, it really wouldn't is that you shouldn't pull those
17     out and use them in front of a witness if you don't want to put
18     at issue -- like, if you want to argue the merits of what went
19     on and keep the SEC out of it, you can give whatever the SEC
20     said, did whatever, you can turn that over.
21              But then, stay just on the facts of -- well, the
22     facts that were actually given to the SEC and rest on your
23     privilege assertions.  But to be doing something that drags in
24     stuff that really is behind the scenes on a letter like that,
25     that's why there's an issue before me.
```

1          MS. ROSENBERG:  Well, I think the thing that I'm not

2     following Your Honor is that there's nothing behind the scenes.

3     The SEC received certain information from the company.  Based

4     off of the information it received from the -- and all of that

5     has been turned over.

6          THE COURT:  And all of it, I know, and all of it is

7     perceived, I think, from your assumption, perhaps correctly,

8     that it's like the declamation letter was the correct result to

9     reach there.  Everything -- anything that was said and

10    honestly, you know, bullet points on a PowerPoint slide, I

11    mean, I understand what Mr. Pecht's declaration is saying about

12    that.  It's on the PowerPoint slide, it's being discussed a

13    little bit.

14         And it's clearly not being put on the PowerPoint

15    slide so that there's something -- that there's a witness

16    interview that was terrible for you that you're then -- that

17    Mr. Pecht is then just like well I'm just not even going to

18    mention how badly that witness interview went.  You're vouching

19    for the fact that all these witness interviews don't, you know,

20    don't complicate the issue for us before you.  I mean, that's

21    implicitly what's being vouched for there.

22         And then, you're using it with a witness, one of the

23    Class representatives to say because the SEC had this

24    investigation and they said no, you would agree that you don't

25    have a case.  I mean, if I was that witness I'd be sort of like

 1   -- I'd want to know everything that went into that

 2   investigation, and I think that's what the Plaintiffs are

 3   saying.  Isn't that right?

 4            MR. DROSMAN:  That's right, Your Honor.

 5            THE COURT:  Yeah.  And so, tell me you have -- you

 6   articulated it as you don't understand why I'm having a problem

 7   with that.  Does that unpack it for you about how this thing

 8   connects back to what it is that the Plaintiffs are trying to

 9   show.

10            MS. ROSENBERG:  I absolutely see what Your Honor is

11   focused on.  What I would submit is that there is no law that

12   supports that when there is an investigation that's launched

13   and then a decision by a regulator not to bring an enforcement

14   action that that somehow causes attorney/client privilege

15   waiver.

16            THE COURT:  Right.  And in the cases that you have in

17   mind does it get to this idea of the declamation letter being

18   used in the --

19            MS. ROSENBERG:  I have not seen a single case with

20   respect to the use of a termination letter with respect to

21   attorney/client privilege.  As I said, because a termination

22   letter was a third-party document it just does not seem to come

23   up in the case law.  I do think that's different from whether,

24   as I said, whether that evidence should be admitted or not.

25   And we would have argument about that and motion practice about

1     that closer to trial.

2              I will just submit for Your Honor that the difficulty

3     we're having here, we would be happy to have no discussion

4     whatsoever about the SEC investigation in this case.  The

5     Plaintiffs have put at issue that Ms. Frye went to the SEC and

6     put a whole bunch of allegations before the SEC and then they

7     just want to say we cannot say anything about it, but if

8     because if we do we suddenly waived full privilege over the

9     independent investigation that was conducted.

10             That is the sword and shield argument that we're

11    having.  They put at issue this SEC investigation and we've

12    been asking that as a matter of fairness we should be able to

13    say that the SEC didn't bring any charges.  Now, we'd be

14    perfectly happy, Your Honor, with a ruling that they cannot

15    mention the SEC investigation, we cannot mention the

16    termination letter, and we won't mention anything about the

17    investigation.  No problem, all fair.

18             The issue we're having is they're the ones that are

19    putting this at issue, not the Defendants.  And it cannot be

20    the case that we're not allowed to say are you aware that in

21    fact no criminal charges were brought.  Are you aware that in

22    fact no other charges --

23             THE COURT:  So, --

24             MS. ROSENBERG:  And they can, of course, attack the

25    fact that we provided certain information that they can suggest

```
 1    that we did that in an unfair way, but we can't be in a

 2    position where we're tied with an arm behind our back because

 3    they mention an SEC letter, but we can't say anything or risk

 4    our own privilege.

 5              THE COURT:  So, focusing just on the witness

 6    interview summaries that I suppose exist in written form

 7    somewhere.  Are those the persons that were interviewed that

 8    information that was turned over to them and they could have

 9    and perhaps did depose those people?

10              MS. ROSENBERG:  Correct, Your Honor.  The full list

11    of individuals who were interviewed --

12              THE COURT:  So, the full list of interviews were

13    turned over and you deposed all of them, some of them?

14              MR. DROSMAN:  No, we deposed a handful of them just

15    because of obvious constraints of the number of people being

16    deposed.  But we never got the witness interviews.

17              THE COURT:  Right, no, I understand that.

18              MR. DROSMAN:  Yeah, and so, we received a list, but

19    we never received any memoranda or anything like that

20    documenting their witness interviews.  So, that's the answer to

21    your question, Your Honor.

22              And can I just say one thing about this idea or

23    notion that we're trying to put this in issue.  Of course, the

24    whistleblower wrote a letter to the SEC that makes allegations

25    to dovetail with our case.  We're not saying the Defendants
```

```
 1   can't ask the whistleblower about the SEC declamation or ask
 2   anybody about the SEC declamation.  We're not saying that it
 3   was improper necessarily to ask the Class representatives about
 4   the SEC declamation.
 5          What we're saying is that as the fairness requires
 6   that if they're going to inject that into the litigation, which
 7   they have offensively, that we need the full panoply of
 8   information that went into that declamation.  That's what we're
 9   saying.  So, that's the fairness issue.  They can have at it;
10   they can put the SEC declamation letter in there so long as we
11   know what the SEC declamation letter was based on.
12          THE COURT:  Mm hm, okay.
13          MS. ROSENBERG:  I just have one more point, Your
14   Honor, just because it is an important one.
15          THE COURT:  Yeah.
16          MS. ROSENBERG:  An important one which is that the
17   investigation was run by Anadarko's audit committee which is
18   composed of independent directors.  Anadarko does not control
19   those individuals; it cannot waive privilege or choose to waive
20   privilege on behalf of those independent directors.
21          THE COURT:  Who cannot, you're saying?
22          MS. ROSENBERG:  Anadarko, the company does not
23   control the audit committee.  And I think that's important for
24   two points.  One is the one the I just made which is that
25   Anadarko cannot ask or control them in any way to waive
```

 1    privilege over that investigation or their attorney/client

 2    communications.

 3              And the second is that that goes to what Your Honor

 4    was asking before about what the desire to be would to have to

 5    suggest that the SEC that nothing went wrong.  This was done by

 6    an independent audit committee that was legitimately looking

 7    into what these underlying allegations were.  If Your Honor

 8    looks at the SEC presentation it does not suggest nothing

 9    happened.  It goes through point by point the underlying

10    allegations by Ms. Frye, the supporting documents, what they

11    say.

12              It does not say nothing happened here nor does the

13    termination letter.  To be clear, the termination letter says

14    based off of the information that has been provided to us at

15    that time, we have elected not to ensue enforcement action.  It

16    doesn't -- and then, I believe it has -- it goes off to have

17    additional cautionary language.  It doesn't at all say you

18    didn't do anything wrong, and we've given you a gold star.  It

19    says we've chosen not to --

20              THE COURT:  Right.

21              MS. ROSENBERG:  -- press charges.

22              THE COURT:  Right.

23              MS. ROSENBERG:  So, that doesn't put at issue as Mr.

24    Drosman is suggesting every piece of attorney/client privileged

25    information that went into the investigation.  It's just a

1   matter of fairness that if they're going to say Ms. Frye went

2   to the SEC, we need to be able to explain to the jury that well

3   the SEC didn't actually bring charges.  Again though, that's an

4   issue with admissibility.  It's not an issue of waiver.

5              THE COURT:  Okay.  Anything else on attorney/client?

6              MS. ROSENBERG:  No, Your Honor.

7              THE COURT:  All right.  Thank you.  All right.  Let's

8   turn to work product.

9              MR. DROSMAN:  Your Honor, with respect to work

10  product.

11             THE COURT:  Oh, let me ask one question.  So, the --

12  when you were referencing the independent audit committee, is

13  that right?

14             MS. ROSENBERG:  Yes.

15             THE COURT:  Is that the 59 documents that?

16             MS. ROSENBERG:  Yes.

17             THE COURT:  Okay.  And do those 59 documents include

18  the witness summaries?

19             MS. ROSENBERG:  I would have to check.  I believe

20  that most of these documents are emails between Norton Rose and

21  the audit committee members about the status of the

22  investigation, their preliminary findings.  And like I don't

23  know that they actually emailed the witness memoranda, but I

24  would need to check.

25             THE COURT:  Norton Rose was retained by Anadarko?

```
 1              MS. ROSENBERG:  The audit committee.

 2              THE COURT:  By just the audit committee.

 3              MS. ROSENBERG:  The audit committee.

 4              THE COURT:  So, then the Exhibit I which is 900

 5    documents, who physically has those?

 6              MS. ROSENBERG:  Those are Anadarko's documents.

 7              THE COURT:  Those are Anadarko's documents?

 8              MS. ROSENBERG:  Correct.

 9              THE COURT:  And those do not include -- we've been

10    talking mostly about the witness summaries, that's not on this

11    list, or do you know?

12              MS. ROSENBERG:  I would need to look.

13              THE COURT:  Okay.  All right.

14              MS. ROSENBERG:  I believe each of those documents are

15    work product documents.

16              THE COURT:  On Exhibit I, it's just work product?

17              MS. ROSENBERG:  Yes, yes.

18              THE COURT:  Okay.

19              MR. DROSMAN:  Exhibit I is a sub combination of work

20    product alone and work product attorney/client privilege.

21              THE COURT:  All right.

22              MR. DROSMAN:  About half the documents --

23              THE COURT:  Yeah, I'm just opening up to the first

24    page, Plaintiff's number 203 it says attorney/client privilege,

25    actually everything on that page, 198, 203, 210 are both
```

1   attorney/client privilege and work product.  I'm going to guess

2   that there's a lot of those designations.  Work product, work

3   product, yeah, there's -- there is a lot of attorney/client

4   work product, attorney/client privilege marked there.

5           MS. ROSENBERG:  Yes, to be clear I was not suggesting

6   that there's not attorney/client privilege marked there.  It's

7   just that every document identified on that log is also work

8   product.

9           THE COURT:  Oh, okay.  Okay, let's go to work

10  product.

11          MR. DROSMAN:  Sure.  With respect to work product,

12  I'm going to start with the KPMG work papers.  I think that's

13  probably the easiest case.  You have the primary purpose test

14  which is the 5th Circuit's test to determine whether documents

15  are indeed work product.  Whether the primary purpose was to

16  convey attorney work product or whether it was some other

17  purpose that was the primary purpose.

18          And you have KPMG receiving much of this information

19  as Your Honor is aware through their work product -- through

20  their work papers which we've attached as Exhibit A as part of

21  their audit.  There's another work paper that we attached where

22  they say we need this information before we can agree to file

23  the before the (indiscernible) was filed.

24          They're engaged in an audit of the company of their

25  accounting.  And as part of that they're looking at all the

1   information relative to that accounting.  So, clearly the

2   primary purpose is so that they can document their auditing,

3   audit (indiscernible).  I don't think Defendants dispute that

4   point.

5        So, we have essentially a situation where Defendants

6   are providing work product and attorney/client privilege

7   information, the work product to KPMG for use in their audit

8   opinion.  And this also falls under the sword and shield

9   doctrine.  Because when you look at it what they're doing is

10  they're saying they're going to make selected disclosure.

11       They wouldn't (indiscernible) they provide

12  everything, they provided a good chunk of information to KPMG,

13  we're going to make selected disclosure of information that

14  benefits us so that we obtain a clean audit (indiscernible),

15  and KPMG then looks at this selective, selectively disclosed

16  information, decides that Anadarko's auditing is perfectly

17  fine.

18       And then, Anadarko turns around and says guess what

19  and they'll say this at trial, they've said this at deposition,

20  they've said this in their motions, their expert relies on it,

21  guess what, KPMG passed on our audit and didn't have any

22  problems with our auditing and our accounting.  So, ergo

23  everything's fine.

24       And that is another instance where they're injecting

25  KPMG's decision which is based in part on these selectively

1    disclosed documents both work product and attorney/client

2    privileged information in order to obtain a certain result.  We

3    can't, you know, we can't look under the kimono because we

4    don't have these documents.  We can't see what they based this

5    clean audit opinion on, because they haven't been produced to

6    us.  And that's not fair.  That is, you know, the cases talk

7    about fairness.

8            And they say if in fairness Plaintiffs should have

9    this information in order to have a sort of holistic ability to

10   evaluate, then the information needs to be turned over.  And

11   you know, particularly here where KPMG's audit opinion is going

12   to be one of their main defenses.  And this is designed to

13   support their defense that their accounting was perfectly fine,

14   we should obtain those documents.

15           I think the Chevron Corporation talks about

16   fundamental fairness.  It says fundamental fairness precludes

17   the Ecuadorian plaintiffs from using communications concerning

18   Stratus and Mr. Cabrera as a shield for production after

19   wielding the conclusions from the disclosure of these

20   communications as multi-billion-dollar damages assort.  And

21   Your Honor, this is no -- this case is no different than the

22   Chevron case which is out of the Southern District of Texas in

23   January of 2011.

24           We also have disclosure of -- we also have instances

25   where KPMG and Norton Rose disclosed information to KPMG which

1    they say it did so without -- you know, they disclosed

2    information to the SEC that's going to be work product as well.

3    The witness interviews that they disclosed, we know that they

4    disclosed that information, they have bullet points.

5            That's classic work product where they're providing

6    information that was garnered through their investigation.

7    They're disclosing that information to the SEC.  That

8    information should be produced because that's a waiver as well.

9    And it's also covered under the sword and shield issue that we

10   talked about, but it's waiver as well.  I think that's in

11   essence our work product argument in a nutshell.

12           THE COURT:  Okay.

13           MR. DROSMAN:  There's several instances of waiver.

14           THE COURT:  All right.  Ms. Rosenberg, are you on

15   this one as well?

16           MS. ROSENBERG:  I am, Your Honor.

17           THE COURT:  All right.

18           MS. ROSENBERG:  Thank you.  Work product immunity is

19   a very different question than attorney/client privilege.

20           THE COURT:  Mm hm.

21           MS. ROSENBERG:  And courts including the 5th Circuit

22   recognize the importance of an attorney's mental impressions

23   and notes.  And that providing such information to a third

24   party does not waive work product so long as that person is not

25   an adversary.  And here, neither KPMG nor JP Morgan are

1    adversaries of Anadarko's audit committee or Anadarko.  They

2    were provided in the context of providing updates on the status

3    of an investigation.

4            And they have not suggested anything that would put

5    KPMG or certainly JP Morgan at odds with Anadarko.  And

6    importantly, for purposes of work product, work product

7    protection -- work product immunity only protects the documents

8    not the underlying facts.

9            And so, as this -- as the 5th Circuit's actually

10   found, I think in SEC v. Brady, if a party is able to procure

11   the information through other avenues such as depositions then

12   there's no undue hardship that's been shown.  And undue

13   hardship is the standard for work product protection because of

14   the importance of work product protection to a company's

15   lawyers.

16           Unlike when we're dealing with attorney/client

17   privilege and the question is whether fairness ought to apply.

18   Work product protection has an even higher standard.  They

19   would need to say that they would have undue hardship to be

20   able to obtain the underlying facts.

21           They certainly can't do that here since they know

22   exactly who was -- who was that Norton Rose had met with, we

23   specifically identified those individuals, there's 28 of them

24   that's on page 12 of the SEC presentation.  And while Mr.

25   Drosman says that they didn't interview, they did not depose

1  all of them, they certainly deposed the key ones.

2  Every single senior executive listed on that page

3  they were all deposed.  Exploration personnel, I believe, all

4  but two, maybe one actually, of ten people listed here were

5  deposed.  Development personnel, all but one I believe were

6  deposed.  And then, also certain accounting personnel.

7  So, the individuals that were not deposed in this

8  case are the ones who that are listed near the bottom under

9  personnel, those that were not key witnesses for purposes of

10  the presentation to the SEC.  So, disclosing certain limited

11  updates to KPMG and JP Morgan certainly can't provide a waiver

12  entirely over a document that was sent to them because that's a

13  different issue.  That's a work product protection issue that

14  certainly doesn't apply.

15  I would say that just to mention the Chevron case

16  that Mr. Drosman mentioned, that's a quite a different case

17  because in that scenario they gave a testifying expert work

18  product.  And in fairness you can't provide work product

19  protection to a testifying expert and not disclose what was

20  provided.

21  THE COURT:  Mm hm.

22  MS. ROSENBERG:  So, that's an entirely different

23  issue.  That certainly doesn't apply.

24  THE COURT:  Okay.  That was succinct.  Anything else?

25  MS. ROSENBERG:  (indiscernible).

```
 1              THE COURT:  All right.  Anything further on that?
 2              MR. DROSMAN:  Sure, just one word about the undue
 3   hardship test, Your Honor.  You don't defend undue hardship
 4   until you determine that --
 5              THE COURT:  Right.
 6              MR. DROSMAN:  -- the documents of work product that
 7   have not been waived.  And then, in that case you turn to undue
 8   hardship and determine whether it's producible under that
 9   particular doctrine.  That's not -- we haven't gotten there
10   because we have waiver.  I mean, there's no question that the
11   SEC is an adversary and that they provided information to the
12   SEC about witness interviews that we don't have and therefore,
13   they've waived that particular work product.
14              Now, she says that -- Defense Counsel says that the
15   other personnel are not important.  I don't have that,
16   presumably they were on the list for a reason.  Presumably, Mr.
17   Pecht wanted to talk about what these other witnesses have to
18   say in front of the SEC.  I have no reason to believe that
19   these other personnel were not important.
20              THE COURT:  Okay, okay.  All right.  Does that
21   address everything in the motion.  I'm not going to rule from
22   the bench on this, I'm going to have to think about it.  Is
23   there anything else that needed to be covered as to that?
24              MR. DROSMAN:  I don't think so, Your Honor.  I think
25   that covered it.
```

```
 1            THE COURT:  All right.  What -- anything else from

 2   the Defendant's side?

 3            MS. ROSENBERG:  I'll just add just very briefly

 4   because Mr. Drosman appears to be very focused on Mr. Pecht's

 5   declaration.  There is nothing that suggests some, on these

 6   grounds, that there's any facts to indicate that Mr. Pecht was

 7   wrong in his declaration.  I understand that Mr. Drosman

 8   believes that there were other people that they could have

 9   deposed, but they didn't ask to depose anyone else.

10            THE COURT:  Mm hm.

11            MS. ROSENBERG:  There was not a single person here

12   that they said here's a reason we'd like to depose them, and we

13   said no you may not do that.  That was not denied from here and

14   the situation does not give them -- there's no waiver because

15   there's no adversary with respect to KPMG and JP Morgan.  And

16   we already discussed earlier why this particular investigation,

17   I'm sorry, this particular communication was already turned

18   over.  So, there's no further waiver given that they already

19   have all the underlying materials there.

20            THE COURT:  Okay.

21            MR. DROSMAN:  Your Honor, just to clarify.  Mr.

22   Pecht's declaration is unequivocally incorrect when he says no

23   witness summaries were given to the SEC.  On page 95 of the --

24            THE COURT:  No, I got that from your original

25   argument.
```

```
 1              MR. DROSMAN:  Okay.  I just wanted to --

 2              THE COURT:  You pointed out the two instances that

 3   you think are inconsistencies, I got that.

 4              MR. DROSMAN:  Yeah.

 5              THE COURT:  Where are we in the scheduling order on

 6   this.  What -- I didn't, I don't have I here and I didn't take

 7   a look at it before I came on the bench.

 8              MS. JENSEN:  Yes, Your Honor, Rachel Jensen and I

 9   wanted to relay to Your Honor that Mr. Kendall sends his

10   regrets.

11              THE COURT:  Okay, I hope he's doing -- I don't know

12   if everybody (indiscernible), but he had asked to allow

13   somebody else to argue on this which I said fine.  He's

14   apparently recovering from a knee replacement, and I expressed

15   sympathies that I had recently had a knee replacement and it

16   can be a little bit difficult.  So, I hope he's doing well.

17              MS. JENSEN:  Yes, Your Honor.  And Mr. Kendall

18   appreciated (indiscernible).

19              THE COURT:  Good.

20              MS. JENSEN:  He had hoped to be here by now, but it's

21   just he's not recovering quite as quickly would like.

22              THE COURT:  I'll just say I had my on a Wednesday and

23   I had a criminal trial scheduled the week -- a week from Monday

24   after that.  Based on everything that had been told to me,

25   you'll be up around walking, you'll do this and that.  I was
```

1    like, I was grossly misinformed on what I was going to be able

2    to do.  So, Judge Harmon took that case to trial instead of me.

3    Anyways, go ahead.

4              MS. JENSEN:  I think you and Mr. Kendall have that in

5    common.

6              THE COURT:  Exactly.

7              MS. JENSEN:  Your Honor, to address the schedule

8    issues.  So, the motion cut off was yesterday.

9              THE COURT:  Okay.

10             MS. JENSEN:  And what went across the wires, I think

11   into the wee hours of this morning.

12             THE COURT:  This is why my law clerk came in and said

13   there were a lot of filings yesterday.  I was like really, are

14   they asking me to rule on it today.  Okay.  All right.

15             MS. JENSEN:  And so, I believe, and Defense can

16   correct if I mischaracterize this, I believe that the parties

17   collectively filed eight motions to exclude various expert

18   testimony.

19             THE COURT:  Okay.

20             MS. JENSEN:  And then, the Defense filed a motion for

21   summary judgment.

22             THE COURT:  Okay.  All right.  And so, discovery has

23   closed.

24             MS. JENSEN:  Yes.

25             THE COURT:  Subject to this issue.  Okay.  My

1    scheduling orders then with the dispositive motion having been

2    filed requires mediation at a certain point and time like

3    within 45 days.  And I don't know that you all are in a

4    position to make that reasonable right now.  There's --

5              MR. SHIPLEY:  That's one of the things we wanted to

6    bring up.

7              THE COURT:  Okay.  And so, --

8              MR. SHIPLEY:  We have a medication scheduled early

9    June, that's more than 45 days, but it's before what's in your

10   scheduling order.  For the deadline for mediation, we presume

11   that's okay with you that --

12             THE COURT:  That's fine if the parties -- it's going

13   to take me a while to rule on those.  That can take like a huge

14   amount of time, it's going to take me a while to rule on this

15   and there may be then the idea that, depending on my ruling,

16   maybe there's more documents that need to be produced.  I don't

17   know what that would then mean to the pending motions for

18   summary judgment, etcetera.

19             And so, just as to mediation right now.  I'm happy

20   for you all to go to mediation whenever you want to.  But if it

21   is sort of your mediation attempt because it's part of my

22   orders, do you want to go forward then or do you want to wait

23   until things shake out at least on this issue?

24             MR. SHIPLEY:  I think (indiscernible) because we

25   might want to talk about it.  My presumption is we're going to

1    go forward, it's been very hard to get a schedule and my guess

2    is we'll want to go forward to.

3              THE COURT:  Can I inquire on who the mediator is, is

4    it --

5              MR. SHIPLEY:  Judge Phillips.

6              THE COURT:  Oh, good, okay.

7              MR. ORSINI:  And on that point if I may, Kevin

8    Orsini.  I agree with Mr. Shipley; we ought to talk and see if

9    we can schedule.  Your Honor obviously knows who Judge Phillips

10   is.

11             THE COURT:  Yeah.

12             MR. ORSINI:  Your Honor probably knows his schedule

13   is exceedingly difficult.

14             THE COURT:  Yep.

15             MR. ORSINI:  I'm trying to get him in three other

16   cases right now.  So, I suspect we have a date, we'll keep it,

17   but we can confer and report back.

18             THE COURT:  Okay.  All right.  I'll just say this as

19   to deadlines, I have my scheduling order deadlines, fairly

20   routine deadlines that I set.  This is not a -- this is more

21   complex case than, you know, 98 percent of the cases on my

22   docket.  So, if you all need more time on things like that,

23   just let me know what you need, and I would accommodate that.

24             But I never discourage anybody from going to

25   mediation if they're ready to.  I'm just sort of realistically

1    with what's at issue here and the quality of counsel on both

2    sides.  If you don't think it's at the most productive time to

3    go have mediation, I would not require you to do it simply

4    because it's a deadline I have on my scheduling order.  Okay,

5    so, just let me know if you want to push that off.  And you all

6    can confer about that and let me know.  Anything else?  All

7    right.  Anything further, it looks like there's something else.

8            MR. ORSINI:  Well, the only other issue Your Honor

9    just to (indiscernible) for the Court is the other pending

10   motion, not the ones that were filed last night, is the motion

11   for reconsideration on class certification which we can address

12   if Your Honor would like or not.  I just wanted --

13           THE COURT:  When was that, I have not -- I apologize,

14   I have not looked at that coming onto the bench.

15           MR. DROSMAN:  That was fully briefed -- the motion

16   was docketed at 143 is the original motion.

17           MR. ORSINI:  Yeah, out replied brief, Your Honor, was

18   on November 14, 2022.  So, both the docket numbers for that is,

19   as Mr. Shipley said, the motion is at number 143 --

20           THE COURT:  Okay.

21           MR. ORSINI:  The opposition is docket number 146 and

22   then 147 is replies.

23           THE COURT:  I am not prepared to hear argument on

24   that, but that doesn't mean I can set it for argument in the

25   near future.  Give me what's the thumbnail of what was teed up

```
 1   for me there.  What did I do wrong?

 2               MR. ORSINI:  So, it's always fun to argue

 3   reconsideration --

 4               THE COURT:  Right.

 5               MR. ORSINI:  The thumbnail, Your Honor, is there were

 6   basically three primary points the Court focused on with

 7   respect to price impact.

 8               THE COURT:  Okay.

 9               MR. ORSINI:  It was the impact or lack thereof on the

10   stock (indiscernible) disclosure went out and what that says or

11   doesn't say.  There was -- what can we glean from the fact that

12   Cobalt, which is another one of the partners in this

13   exploration did have a stock reaction, what does that say or

14   what does it not say.  And then, there was the issue of whether

15   and to what extent the stock impact was driven by separate news

16   about the fire in Colorado.

17               Our position, Your Honor, respectfully, is that there

18   were a series of factual errors that underly the decision that

19   the Court made.

20               THE COURT:  Okay, good.  I'll take a look at those

21   and anything that you want to say in response.  I'm like

22   literally not ruling on it because I haven't read it yet.  But

23   anything to clarify on that.  Other than, of course, that I had

24   all the facts right.

25               MS. ROSENBERG:  Your Honor, we believe you did
```

```
 1   everything right.

 2              THE COURT:  All right.  So, --

 3              MR. DROSMAN:  I just wanted to raise one more sort of

 4   housekeeping matter that I spoke with Defense Counsel about.

 5   We have, I guess it's a docket call, pretrial conference on the

 6   19th of September in this case.  And I was going to ask if Your

 7   Honor would set a date certain for the trial.

 8              THE COURT:  Yeah.

 9              MR. DROSMAN:  Because both sides are obviously coming

10   in from out of town to try this case.  We typically come in

11   several weeks in advance to prepare to try the case.  And so if

12   we had a due certain that would be really helpful --

13              THE COURT:  Yeah.

14              MR. DROSMAN:  -- in terms of our preparation.

15              THE COURT:  How long do you need for this trial?

16   Have you all conferred about that?

17              MR. DROSMAN:  Yeah, we have.  And that's another

18   issue I wanted to talk to you about.  If Your Honor's inclined

19   I think 30 hours per side --

20              THE COURT:  Okay.

21              MR. DROSMAN:  -- would make sense.  That would be a

22   total of 60 hours.  I would figure, not including jury

23   selection, that would be about a two-week trial.

24              THE COURT:  You're right.

25              MR. DROSMAN:  Two weeks and a day.
```

```
 1              THE COURT:  All right.

 2              MR. DROSMAN:  Depending on the length of jury

 3   selection.

 4              MR. SHIPLEY:  We talked, we've actually thought about

 5   this, the three of us, and (indiscernible) some thought.  We

 6   did talk to them because we actually think it may take a little

 7   bit longer than that.  We think probably three weeks is

 8   probably --

 9              THE COURT:  Okay.

10              MR. SHIPLEY:  -- more realistic.  It's a lot of

11   witnesses, this is a pretty complicated case.

12              THE COURT:  Yeah, okay.

13              MR. SHIPLEY:  So, we do embrace the (indiscernible)

14   equal time and all that.  It's just a matter of we just think

15   we need more than just the two weeks or ten days.

16              THE COURT:  Sure, and right now, we're set for --

17              MR. SHIPLEY:  (indiscernible).

18              THE COURT:  And right now, we're set for docket call

19   on what day?

20              MR. DROSMAN:  September 19th.

21              THE COURT:  All right.  I will look at my calendar

22   and my case manager will reach out next week to start talking

23   with you all about -- that's a large chunk of time.  I can find

24   it on my docket before the end of the year, but with the number

25   of witnesses, etcetera, I understand you all do need to start -
```

1   - you need to have a date certain sooner rather than later.

2   Okay.

3           MR. DROSMAN:  Appreciate that, Your Honor.

4           THE COURT:  All right, we'll take a look at that.

5   Anything else?  All right.  Yes?

6           MR. SHIPLEY:  We filed, as you know, we filed a lot

7   of motions last night.  And one of those we filed a joint

8   motion to temporarily seal those documents and give us two to

9   three weeks to try and reach an agreement.

10          THE COURT:  Okay.

11          MR. SHIPLEY:  Your rules, I think, section six says

12  you want courtesy copies of the stuff delivered.  Do you really

13  want that, or do you want us to get all this sorted out before

14  we deliver the courtesy copy?

15          THE COURT:  Why don't you get all that sorted out and

16  do you need me to grant that they're filed temporarily under

17  seal right now?

18          MR. SHIPLEY:  Yes.

19          THE COURT:  Okay.

20          MR. SHIPLEY:  Yeah, that was at docket 159 is the

21  joint motion to seal.

22          THE COURT:  Okay.  So, that's docket 159, is there a

23  proposed order with that?

24          MR. SHIPLEY:  Yes, sir.

25          THE COURT:  All right.  I'll get that.  And is that,

1   it's being sealed now, but then you're going to come let me

2   know which ones --

3            MR. SHIPLEY:  Yes, a temporary seal to give us some

4   time to sort this out.

5            THE COURT:  All right.  We'll enter that today.

6            MR. SHIPLEY:  Okay, thank you.

7            THE COURT:  Docket 159, okay.  Anything else?  All

8   right, thank you all very much, we're good.

9            ALL:  Thank you.

10        (Hearing adjourned at 11:41 A.M.)

11                              *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  April 10, 2023
```