TAB 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
| --- | --- |
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576 |
|  | District Judge Charles R. Eskridge III |
|  | CLASS ACTION |

## DECLARATION OF BENJAMIN GRUENSTEIN IN SUPPORT OF DEFENDANTS AND NON-PARTIES ERIC MULLINS, KEVIN CHILTON AND MARK MCKINLEY'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

Pursuant to 28 U.S.C. § 1746, I, Benjamin Gruenstein, declare as follows:

1.      I am a partner in the law firm Cravath, Swaine & Moore LLP and have been admitted *pro hac vice* in the above-captioned action.  I am counsel to Defendants Anadarko Petroleum Corporation, R.A. Walker, Ernest A. Leyendecker III, Robert G. Gwin and Robert P. Daniels ("Defendants"), and Non-Parties Eric Mullins, Kevin Chilton and Mark McKinley.

2.      I respectfully submit this declaration in support of Defendants and Non-Parties Eric Mullins, Kevin Chilton and Mark McKinley's Opposition to Plaintiffs' Motion to Compel (ECF No. 115).

3.      Submitted with this Declaration as Exhibit A is a true and correct copy of the Declaration of Gerard G. Pecht on behalf of Norton Rose Fulbright LLP in support of

Defendants and Non-Parties Eric Mullins, Kevin Chilton and Mark McKinley's Opposition to Plaintiffs' Motion to Compel, dated May 4, 2022.

      4.    Submitted with this Declaration as Exhibit B is an excerpt of a true and correct copy of the Deposition Transcript of Sean Boyle, testifying on behalf of Iron Workers Local #580 Joint Funds, taken on November 9, 2021.

      5.    Submitted with this Declaration as Exhibit C is an excerpt of a true and correct copy of the Deposition Transcript of Alexander Younger, testifying on behalf of Norfolk County Council as Administering Authority of the Norfolk Pension Fund, taken on November 19, 2021.

      6.    Submitted with this Declaration as Exhibit D is a true and correct copy of KPMG LLP's 2015 Engagement Letter, dated March 30, 2015.

      7.    Submitted with this Declaration as Exhibit E is a true and correct copy of KPMG LLP's 2016 Engagement Letter, dated March 22, 2016.

      8.    Submitted with this Declaration as Exhibit F is a true and correct copy of Anadarko Petroleum Corporation's Form S-3 Registration Statement, dated August 12, 2016.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2022

Benjamin Gruenstein

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576 <br><br> District Judge Charles R. Eskridge III <br><br> CLASS ACTION |

---

## DECLARATION OF GERARD G. PECHT
## ON BEHALF OF NORTON ROSE FULBRIGHT
## IN SUPPORT OF DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION TO COMPEL

Gerard G. Pecht on behalf of non-party Norton Rose Fulbright US LLP ("NRF") declares as follows:

1. I, Gerard G. Pecht, make this declaration pursuant to 28 U.S.C. § 1746 based on personal knowledge of the facts stated herein.

2. I currently serve as Global Chief Executive for NRF.

3. I have reviewed Plaintiffs' Motion to Compel Documents Concerning Anadarko Audit Committee's Purported Investigation. (ECF No. 115 ("Motion").) I am aware that the Motion seeks the production of certain documents related to an investigation by the Anadarko Audit Committee ("AAC") into allegations

made in 2016 by former Anadarko employee Lea Frye concerning Anadarko's appraisal of the Shenandoah oil field in the Gulf of Mexico ("Investigation").

4.      In April 2016, NRF was retained to represent and provide legal advice to the AAC in connection with the Investigation.  The terms of the AAC's retention of NRF in connection with the Investigation are set forth in a May 2, 2016 engagement letter, attached hereto as Exhibit 1.  Among other provisions in the engagement letter, NRF stated that it did not intend to waive any privileges and/or protections without instruction from the AAC to do so.  NRF and the AAC also understood that Ms. Frye's allegations may result in the commencement of legal proceedings by Ms. Frye, the SEC, or other parties such as Anadarko shareholders.

5.      Part of NRF's representation of the AAC included communicating on its behalf with the staff of the SEC's Enforcement Division (the "SEC"), to whom Ms. Frye submitted allegations in a whistleblower letter dated May 9, 2016.  I and other NRF attorneys communicated periodically with the SEC between May 2016 and January 2017 regarding the Investigation, but at no point were any privileged communications between NRF and the AAC intentionally, or to my knowledge unintentionally, shared with the SEC.

6.      Similarly, part of NRF's representation of the AAC included providing Anadarko's independent auditor KPMG with non-privileged facts and non-privileged communications relevant to KPMG's role.  I and other NRF attorneys communicated periodically with KPMG between May 2016 and January 2017 regarding

the Investigation, but at no point were any privileged communications between NRF and the AAC intentionally, or to my knowledge unintentionally, shared with KPMG.

7.      I did not participate in any discussions with J.P. Morgan or their representatives regarding the Investigation—nor am I aware of any NRF attorneys having participated in any such discussions—either in connection with a September 2016 offering of Anadarko securities or otherwise.

8.      During the course of the Investigation, I and other attorneys at NRF communicated with the SEC regarding NRF's review of Anadarko documents.  Contrary to what Plaintiffs allege in their Motion, NRF did not make "selective disclosures to obtain an SEC declination".  (Motion at 2.)  At the SEC's request, NRF attorneys produced documents relevant to Ms. Frye's allegations.  NRF attorneys did not withhold from their productions to the SEC any non-privileged Anadarko documents that NRF considered to be relevant to Ms. Frye's allegations.

9.      NRF attorneys presented the factual findings from its Investigation to the SEC on November 22, 2016.  The presentation included both a PowerPoint presentation and reports from four experts retained by NRF to assist in the Investigation. Contrary to what Plaintiffs suggest in their Motion, the presentation was designed to focus on the facts uncovered during the Investigation and the expert opinions on the subject.  NRF did not "sp[i]n the information in the light most favorable to the Company" (Motion at 4) but rather presented facts NRF learned during the investigation.  NRF had previously produced all Anadarko documents referred to in the presentation and accompanying expert reports and, after entering into a confidentiality agreement with the

3

SEC on November 30, 2016, NRF produced the presentation and expert reports to the SEC as well.  The confidentiality agreement entered into by NRF and the SEC is attached hereto as Exhibit 2.

10.     During the course of the Investigation, NRF attorneys were cognizant of case law concerning the scope of waiver for disclosures to third parties, including the SEC.  As with any investigation conducted by NRF, I and other attorneys disclosed factual information related to the Investigation that was not subject to the attorney-client privilege.

11.     In particular, the final presentation to the SEC and accompanying expert reports were not subject to the attorney-client privilege, were drafted specifically for production to the SEC, and do not contain any privileged communications between NRF and the AAC.  At no point during the Investigation, including in the November 22, 2016 meeting with the SEC where Investigation findings were presented, did NRF attorneys provide or read notes, summaries, memoranda or other materials memorializing interviews with Anadarko employees conducted during the Investigation.

12.     NRF understands that Defendants produced to Plaintiffs NRF's November 22, 2016 presentation to the SEC, all documents NRF produced to the SEC and all written communication between NRF and the SEC.  NRF did not give the SEC any additional work product created in connection with the Investigation.

13.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2022.

_____

Gerard G. Pecht

# EXHIBIT 1

# NORTON ROSE FULBRIGHT

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
United States

Direct line +1 713 651 5601
shauna.clark@nortonrosefulbright.com

Tel +1 713 651 5151
Fax +1 713 651 5246
nortonrosefulbright.com

May 2, 2016

Mr. Eric D. Mullins
Co-Chief Executive Officer
Lime Rock Resources
1111 Bagby, Suite 4600
Houston, TX 77002

Dear Mr. Mullins:

This letter confirms that Norton Rose Fulbright US LLP has agreed to represent and provide legal advice to the Audit Committee of Anadarko Petroleum Corporation ("Anadarko" or "the Company") in connection with the Audit Committee's review of the allegations contained in an April 20, 2016 letter (the "Demand") sent on behalf of current Anadarko employee Lea Frye (the "Matter"). Our acceptance of the representation (the "Representation") became effective on April 25, 2016.

## Terms of Engagement

This letter sets out the terms of our engagement in the Representation. Certain of those terms are included in the body of this letter, and additional terms are contained in the attached document, entitled *Additional Terms of Engagement*. That document is expressly incorporated into this letter, and it should be read carefully. The execution and return of the enclosed copy of this letter constitutes an unqualified agreement to all the terms set forth in this letter and in the attached *Additional Terms of Engagement*.

## Our Personnel Who Will Be Working on the Matter

Shauna Johnson Clark, Gerry Pecht and Peggy Heeg will be working on the Matter, and you may call, write, or e-mail us whenever the Audit Committee has any questions about the Representation. Other firm personnel, including firm lawyers and paralegals, will participate in the Representation if, in our judgment, their participation is necessary or appropriate.

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

27212053.1

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

CONFIDENTIAL

# NORTON ROSE FULBRIGHT

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
United States

Direct line +1 713 651 5601
shauna.clark@nortonrosefulbright.com

Tel +1 713 651 5151
Fax +1 713 651 5246
nortonrosefulbright.com

May 2, 2016

Mr. Eric D. Mullins
Co-Chief Executive Officer
Lime Rock Resources
1111 Bagby, Suite 4600
Houston, TX 77002

Dear Mr. Mullins:

This letter confirms that Norton Rose Fulbright US LLP has agreed to represent and provide legal advice to the Audit Committee of Anadarko Petroleum Corporation ("Anadarko" or "the Company") in connection with the Audit Committee's review of the allegations contained in an April 20, 2016 letter (the "Demand") sent on behalf of current Anadarko employee Lea Frye (the "Matter"). Our acceptance of the representation (the "Representation") became effective on April 25, 2016.

## Terms of Engagement

This letter sets out the terms of our engagement in the Representation. Certain of those terms are included in the body of this letter, and additional terms are contained in the attached document, entitled *Additional Terms of Engagement*. That document is expressly incorporated into this letter, and it should be read carefully. The execution and return of the enclosed copy of this letter constitutes an unqualified agreement to all the terms set forth in this letter and in the attached *Additional Terms of Engagement*.

## Our Personnel Who Will Be Working on the Matter

Shauna Johnson Clark, Gerry Pecht and Peggy Heeg will be working on the Matter, and you may call, write, or e-mail us whenever the Audit Committee has any questions about the Representation. Other firm personnel, including firm lawyers and paralegals, will participate in the Representation if, in our judgment, their participation is necessary or appropriate.

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

27212053.1

MULLINS-00002181
F08910-3-000010997.0001

Mr. Eric D. Mullins
May 2, 2016
Page 2

NORTON ROSE FULBRIGHT

**Our Legal Fees and Other Charges**

Legal fees and costs are difficult to estimate. Accordingly, we have made no commitment concerning the maximum fees and charges that will be necessary to resolve or complete the Representation.

It is expressly understood that payment of our fees and charges is in no way contingent on the ultimate outcome of the Representation.

Our fees in the Matter will be based on the time spent by firm personnel, primarily firm lawyers or paralegals, who participate in the Representation. We will charge for all time spent by such personnel in the Representation in increments of quarters of an hour. For example, we charge for time spent in the following: telephone and office conferences with clients, representatives of clients, opposing counsel, and others; conferences among our attorneys and paralegals; factual investigation if needed; legal research; responding to requests from you that we provide information to you or your auditors; drafting letters and other documents; and travel, if needed.

Generally, our hourly billing rates for domestic offices range from $595 to $1,155 for partners; from $460 to $840 for senior associates; from $525 to $940 for senior counsel; from $240 to $850 for counsel; from $230 to $760 for associates; from $720 to $1,265 for patent agents; from $655 to $1,150 for of counsel; from $165 to $465 for paralegals; and from $230 to $415 for senior paralegals. Other lawyers, paralegals, and other personnel may be assigned as necessary to achieve proper staffing.

**Discovery and Data Management Services.** Information management, eDiscovery services, and technology support are highly specialized services that may be required in the Representation. Norton Rose Fulbright US LLP provides a range of these services in connection with the identification, preservation, collection, review, and production of electronic information. These tasks, services, and costs may become necessary to the Representation and may be required by the nature and volume of electronically stored information that must be organized and accessed to provide effective representation in the Matter and meet discovery obligations imposed by generally applicable rules and case law. Technical and practice support services will be performed by Norton Rose Fulbright US LLP attorney and non-attorney personnel.

To provide you with greater predictability and improved management of discovery related expenses, we will assess a per gigabyte data management fee of $200 per gigabyte per month for data actively managed and stored in Norton Rose Fulbright US LLP's litigation technology platforms. The monthly per gigabyte fee will include project management and technical services required to support the implementation and use of Norton Rose Fulbright US LLP's litigation technology for data management and document productions during the discovery phase of the case. After the discovery phase of the case is completed, a nominal per gigabyte storage fee of $25 per gigabyte per month will be assessed in lieu of the data management fee. These per gigabyte charges will be included as line items in the expense section of Norton Rose Fulbright US LLP's invoice.

In addition, required litigation technology licenses for non-Norton Rose Fulbright US LLP users will be billed at cost. Required electronic document production charges will be billed on a per

27212053.1

MULLINS-00002182
F08910-3-000010997.0001

Mr. Eric D. Mullins
May 2, 2016
Page 3

NORTON ROSE FULBRIGHT

page or per file basis. An allocated cost for hosting on-site document review performed by outside third party contract attorneys will be billed at a rate of $10 per contract attorney hour worked. These charges will be included as a line item in the expense section of Norton Rose Fulbright US LLP's invoice. Costs for third party vendors associated with staging and processing electronic data or other aspects of discovery will be billed at cost, and such third party invoices typically will be sent directly to you for payment.

**Conflicts of Interest**

Before accepting the Representation, we have undertaken reasonable and customary efforts to determine whether there are any potential conflicts of interest that would bar our firm from representing the Audit Committee in the Matter. Based on the information available to us, we are not aware of any potential disqualification. We reviewed that issue in accordance with the rules of professional responsibility adopted in Texas. We believe that those rules, rather than the rules of any other jurisdiction, are applicable to the Representation; and the execution and return of the enclosed copy of this letter by you represents an express agreement to the applicability of those rules.

The Audit Committee has been advised that we represent Anadarko and affiliated entities in unrelated matters. The execution and return of the enclosed copy of this letter by the Chairperson of the Audit Committee represents an acknowledgement of that representation and an express agreement to the applicability of the applicable professional responsibility rules.

**Conclusion**

This letter and the attached *Additional Terms of Engagement* constitute the entire terms of the engagement of Norton Rose Fulbright US LLP in the Representation. These written terms of engagement are not subject to any oral agreements or understandings, and they can be modified only by further written agreement signed both by the Audit Committee and Norton Rose Fulbright US LLP. Unless expressly stated in these terms of engagement, no obligation or undertaking shall be implied on the part of either the Audit Committee or Norton Rose Fulbright US LLP.

Please carefully review this letter and the attached *Additional Terms of Engagement*. If there are any questions about these terms of engagement, or if these terms are inaccurate in any way, please let me know immediately. If both documents are acceptable, please sign and return the enclosed copy of this letter, so that we may commence the Representation.

Very truly yours,

Shauna Johnson Clark

SJC/cyn

27212053.1

CONFIDENTIAL

Mr. Eric D. Mullins
May 2, 2016
Page 4

NORTON ROSE FULBRIGHT

Audit Committee, Anadarko Petroleum Corporation Agrees to
and Accepts this Letter and the Attached Terms of Engagement:

Audit Committee, Anadarko Petroleum Corporation


By: _____
Title: Chairperson, Audit Committee
Date: _____

27212053.1

CONFIDENTIAL

MULLINS-00002184
F08910-3-000010997.0001

## NORTON ROSE FULBRIGHT US LLP

### *Additional Terms of Engagement*

This is a supplement to our engagement letter, dated April 25, 2016. The purpose of this document is to set out additional terms of our agreement to provide the representation described in our engagement letter (the "Representation") concerning our representation of the Audit Committee of Anadarko Petroleum Corporation ("Anadarko" or "the Company") and provide legal advice in connection with the Audit committee's review of the allegations contained in an April 20, 2016 letter (the "Demand") sent on behalf of current Anadarko employee Frye (the "Matter"). Because these additional terms of engagement are a part of our agreement to provide legal services, the Audit Committee should review them carefully and should promptly communicate to us any questions concerning this document. We suggest that the Audit Committee retain this statement of additional terms along with our engagement letter and any related documents.

### The Scope of the Representation

As lawyers, we undertake to provide representation and advice on the legal matters for which we are engaged. It is important for our clients to have a clear understanding of the legal services that we have agreed to provide. Thus, if there are any questions about the scope of the Representation that we are to provide in the Matter, please raise those questions promptly, so that we may resolve them at the outset of the Representation.

Any expressions on our part concerning the outcome of the Representation, or any other legal matters, are based on our professional judgment and are not guarantees. Such expressions, even when described as opinions, are necessarily limited by our knowledge of the facts and are based on our views of the state of the law at the time they are expressed.

Upon accepting this engagement on the Audit Committee's behalf, Norton Rose Fulbright US LLP agrees to do the following: (1) provide legal counsel in accordance with these terms of engagement and the related engagement letter, and in reliance upon information and guidance provided by the Audit Committee; and (2) keep the Chairperson of the Audit Committee reasonably informed about the status and progress of the Representation.

To enable us to provide effective representation, the Audit Committee agrees to do the following: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the Representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us. In this regard, you have instructed us to work with Anadarko's legal department to obtain such information that we believe is needed for the Representation.

Our firm has been engaged to provide legal services in connection with the Representation in the Matter, as specifically defined in our engagement letter. After completion of the Representation, changes may occur in the applicable laws or regulations that could affect the Audit Committee's future rights and liabilities in regard to the Matter. Unless we are actually engaged after the completion of the Representation to provide additional advice on such issues, the firm has no continuing obligation to give advice with respect to any future legal developments that may pertain to the Matter.

27212053.1                                           - 5 -

CONFIDENTIAL

Our investigative activities and findings shall be subject to the attorney-client privilege and other applicable privileges and protections to the full extent permissible by law, and we do not intend to waive any such privileges and/or protections without instruction from Anadarko to do so.

### Who Will Provide the Legal Services

As our engagement letter confirms, Norton Rose Fulbright US LLP will represent the Audit Committee in the Matter. Norton Rose Fulbright US LLP is a registered limited liability partnership under Chapter 152 of the Texas Business Organizations Code.

Although our firm will be providing legal services, each client of the firm customarily has a relationship principally with one attorney, or perhaps a few attorneys. At the same time, however, the work required in the Representation, or parts of it, may be performed by other firm personnel, including lawyers and paralegals. Such delegation may be for the purpose of involving other firm personnel with experience in a given area or for the purpose of providing services on an efficient and timely basis.

### Our Relationships With Others

Our law firm represents many companies and individuals. In some instances, the applicable rules of professional conduct may limit our ability to represent clients with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if the other clients consent to that representation.

Rules concerning conflicts of interest vary with the jurisdiction. In order to avoid any uncertainty, it is our policy that the governing rules will be those applicable to the particular office of our firm that prepares the engagement letter for a particular matter. The acceptance by the Audit Committee of our engagement letter constitutes an express agreement with that policy, unless the engagement letter specifically states that some other rules of professional responsibility will govern our attorney-client relationship.

If a controversy unrelated to the Matter develops between the Audit Committee and any other client of the firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either the Audit Committee or the other client in the unrelated controversy.

From time to time, our firm may concurrently represent one client in a particular case or matter and, at the same time, our firm may be asked to represent an adversary of that same client in an unrelated case or matter. We would consider doing so only if it is our professional judgment that the firm could undertake the concurrent representation impartially and without any adverse effect on the responsibilities that the firm has to either client.

With respect to any such issues that may relate to the Representation, we agree to exercise our professional judgment in accordance with the governing rules pertaining to conflicts of interest. At the same time, it is agreed that the Audit Committee will consent to our representation of other clients in such circumstances if the request for consent is reasonable.

In addition to our representation of other companies and individuals, we also regularly represent lawyers and law firms. As a result, opposing counsel in the Matter may be a lawyer or law firm that we may represent now or in the future. Likewise, opposing counsel in the Matter may represent our firm now or in the future. Further, we have professional and personal

27212053.1                                          - 6 -

CONFIDENTIAL

MULLINS-00002186
F08910-3-000010997.0001

relationships with many other attorneys, often because of our participation in bar associations and other professional organizations. It is our professional judgment that such relationships with other attorneys do not adversely affect our ability to represent any client. The acceptance of these terms of engagement represents an unqualified consent to any such relationships between our firm and other lawyers or law firms, even counsel who is representing a party that is adverse to the Audit Committee in the Matter that is the subject of this engagement or in some other matter.

## Communications and Confidentiality

We have available Internet communication procedures that allow our attorneys to use e-mail for client communications in many instances. Accordingly, unless the Audit Committee specifically directs us otherwise, we may use unencrypted e-mail sent on the Internet to communicate with the Audit Committee and to send documents we have prepared or reviewed.

We recognize our obligation to preserve the confidentiality of attorney-client communications as well as client confidences, as required by the governing rules of professional responsibility. If the Matter involves transactions, litigation or administrative proceedings or like proceedings in which we appear as counsel of record for the Audit Committee in publicly available records, we reserve the right to inform others of the fact of our representation of the Audit Committee in the Matter and (if likewise reflected of record in publicly available records) the results obtained, unless the Audit Committee specifically directs otherwise.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc, each of which is a separate legal entity, are members in Norton Rose Fulbright Verein, a Swiss verein that does not itself provide legal services. Although the members in Norton Rose Fulbright remain separate legal entities, we operate as a single legal practice. We share with other members non-privileged information about our practice and clients for research, practice management, training, administrative and other business purposes. Confidentiality agreements are in place among all members. If you have any concerns about this sharing of non-privileged information that relates to you, please promptly notify us so that we can address your concerns.

## Disclaimer

Norton Rose Fulbright US LLP has made no promises or guarantees to the Audit Committee about the outcome of the Representation or the Matter, and nothing in these terms of engagement shall be construed as such a promise or guarantee.

## Termination

At any time, the Audit Committee may, with or without cause, terminate the Representation by notifying us of the Audit Committee's intention to do so.

We are subject to the codes or rules of professional responsibility for the jurisdictions in which we practice. There are several types of conduct or circumstances that could result in our withdrawing from representing a client, including, for example, the following: non-payment of fees or charges; misrepresentation or failure to disclose material facts; fraudulent or criminal conduct; action contrary to our advice; and conflict of interest with another client. The right of Norton Rose Fulbright US LLP to withdraw in such circumstances is in addition to any rights created by statute or recognized by the governing rules of professional conduct. Further, a failure by the Audit Committee to meet any obligations under these terms of engagement shall

27212053.1                                    - 7 -

CONFIDENTIAL

entitle us to terminate the Representation. We try to identify in advance and discuss with our clients any situation that may lead to our withdrawal.

Termination of the Representation will not affect the Audit Committee's obligation to pay for legal services rendered and expenses and charges incurred before termination, as well as additional services and charges incurred in connection with an orderly transition of the Matter. Further, in the event of termination of the Representation, the Audit Committee will take all steps necessary to release Norton Rose Fulbright US LLP of any further obligations in the Representation or the Matter, including without limitation the execution of any documents necessary to effectuate our withdrawal from the Representation or the Matter.

### Billing Arrangements and Terms of Payment

Our engagement letter specifically explains our fees for services in the Matter. We will bill on a regular basis, normally each month, for fees and expenses and charges. It is agreed that the Audit Committee will make full payment within 30 days of receiving our statement. We will give notice if an account becomes delinquent, and it is further agreed that any delinquent account must be paid upon the giving of such notice. If the delinquency continues and the Audit Committee does not arrange satisfactory payment terms, we may withdraw from the Representation and pursue collection of our account.

### Document Retention

At the close of any matter, we send our files in that matter to a storage facility for storage at our expense. The attorney closing the file determines how long we will maintain the files in storage. After that time, we will destroy the documents in the stored files.

At the conclusion of the Representation, we return to the client any documents that are specifically requested to be returned. As to any documents so returned, we may elect to keep a copy of the documents in our stored files.

### Charges for Other Expenses and Services

Typically, our invoices will include amounts, not only for legal services rendered, but also for other expenses and services. Examples include charges for photocopying, travel and conference expenses, messenger deliveries, telephone conferences, and computerized research. In addition, we reserve the right to send to the Audit Committee for direct payment any invoices delivered to us by others, including experts and any vendors. It is further agreed that we are expressly authorized to retain any consultants, experts, or vendors that are appropriate, in our judgment, during the Representation.

In situations where we can readily determine the exact amount of expenses for products and services provided by third parties to be charged to the Audit Committee's account, our invoices will reflect the cost to us of the products and services. In many situations, however, the precise total cost of providing a product or service is difficult to establish, in which case we will use our professional judgment on the charges to be made for such product or service, which charges may vary from or exceed our direct cost of such product or service. In some situations, we can arrange for ancillary services to be provided by third parties with direct billing to the client. Attached is a copy of our current recharge schedule for expenses and services, which is subject to change from time to time.

27212053.1

- 8 -

MULLINS-00002188
F08910-3-000010997.0001

**Standards of Professionalism and Attorney Complaint Information**

Pursuant to rules promulgated by the Texas Supreme Court and the State Bar of Texas, [we are to advise our clients of the contents of the Texas Lawyer's Creed, a copy of which is attached. In addition,] we are to advise clients that the State Bar of Texas investigates and prosecutes complaints of professional misconduct against attorneys licensed in Texas. A brochure entitled *Attorney Complaint Information* is available at all of our Texas offices and is likewise available upon request. A client that has any questions about State Bar's disciplinary process should call the Office of the General Counsel of the State Bar of Texas at 1-800-932-1900 toll free.

CONFIDENTIAL                                                    MULLINS-00002189
F08910-3-000010997.0001

## THE TEXAS LAWYER'S CREED — A MANDATE FOR PROFESSIONALISM

The Texas Supreme Court and the Texas Court of Criminal Appeals
adopted this Creed, with the requirement that lawyers advise their clients
of its contents when undertaking representation.

I am a lawyer; I am entrusted by the People of Texas to preserve and improve our legal system. I am licensed by the Supreme Court of Texas. I must therefore abide by the Texas Disciplinary Rules of Professional Conduct, but I know that Professionalism requires more than merely avoiding the violation of laws and rules. I am committed to this Creed for no other reason than it is right.

**I. OUR LEGAL SYSTEM.** A lawyer owes to the administration of justice personal dignity, integrity, and independence. A lawyer should always adhere to the highest principles of professionalism. I am passionately proud of my profession. Therefore, "My word is my bond." I am responsible to assure that all persons have access to competent representation regardless of wealth or position in life. I commit myself to an adequate and effective pro bono program. I am obligated to educate my clients, the public, and other lawyers regarding the spirit and letter of this Creed. I will always be conscious of my duty to the judicial system.

**II. LAWYER TO CLIENT.** A lawyer owes to a client allegiance, learning, skill, and industry. A lawyer shall employ all appropriate means to protect and advance the client's legitimate rights, claims, and objectives. A lawyer shall not be deterred by any real or imagined fear of judicial disfavor or public unpopularity, nor be influenced by mere self-interest. I will advise my client of the contents of this Creed when undertaking representation. I will endeavor to achieve my client's lawful objectives in legal transactions and in litigation as quickly and economically as possible. I will be loyal and committed to my client's lawful objectives, but I will not permit that loyalty and commitment to interfere with my duty to provide objective and independent advice. I will advise my client that civility and courtesy are expected and are not a sign of weakness. I will advise my client of proper and expected behavior. I will treat adverse parties and witnesses with fairness and due consideration. A client has no right to demand that I abuse anyone or indulge in any offensive conduct. I will advise my client that we will not pursue conduct which is intended primarily to harass or drain the financial resources of the opposing party. I will advise my client that we will not pursue tactics which are intended primarily for delay. I will advise my client that we will not pursue any course of action which is without merit. I will advise my client that I reserve the right to determine whether to grant accommodations to opposing counsel in all matters that do not adversely affect my client's lawful objectives. A client has no right to instruct me to refuse reasonable requests made by other counsel. I will advise my client regarding the availability of mediation, arbitration, and other alternative methods of resolving and settling disputes.

**III. LAWYER TO LAWYER.** A lawyer owes to opposing counsel, in the conduct of legal transactions and the pursuit of litigation, courtesy, candor, cooperation, and scrupulous observance of all agreements and mutual understandings. Ill feelings between clients shall not influence a lawyer's conduct, attitude, or demeanor toward opposing counsel. A lawyer shall not engage in unprofessional conduct in retaliation against other unprofessional conduct. I will be courteous, civil, and prompt in oral and written communications. I will not quarrel over matters of form or style, but I will concentrate on matters of substance. I will identify for other counsel or parties all changes I have made in documents submitted for review. I will attempt to prepare documents which correctly reflect the agreement of the parties. I will not include provisions which have not been agreed upon or omit provisions which are necessary to reflect the agreement of the parties. I will notify opposing counsel, and, if appropriate, the Court or other persons, as soon as practicable

when hearings, depositions, meetings, conferences or closings are canceled. I will agree to reasonable requests for extensions of time and for waiver of procedural formalities, provided legitimate objectives of my client will not be adversely affected. I will not serve motions or pleadings in any manner that unfairly limits another party's opportunity to respond. I will attempt to resolve by agreement my objections to matters contained in pleadings and discovery requests and responses. I can disagree without being disagreeable. I recognize that effective representation does not require antagonistic or obnoxious behavior. I will neither encourage nor knowingly permit my client or anyone under my control to do anything which would be unethical or improper if done by me. I will not, without good cause, attribute bad motives or unethical conduct to opposing counsel nor bring the profession into disrepute by unfounded accusations of impropriety. I will avoid disparaging personal remarks or acrimony towards opposing counsel, parties and witnesses. I will not be influenced by any ill feeling between clients. I will abstain from any allusion to personal peculiarities or idiosyncrasies of opposing counsel. I will not take advantage, by causing any default or dismissal to be rendered, when I know the identity of an opposing counsel, without first inquiring about that counsel's intention to proceed. I will promptly submit orders to the Court. I will deliver copies to opposing counsel before or contemporaneously with submission to the court. I will promptly approve the form of orders which accurately reflect the substance of the rulings of the Court. I will not attempt to gain an unfair advantage by sending the Court or its staff correspondence or copies of correspondence. I will not arbitrarily schedule a deposition, Court appearance, or hearing until a good faith effort has been made to schedule it by agreement. I will readily stipulate to undisputed facts in order to avoid needless costs or inconvenience for any party. I will refrain from excessive and abusive discovery. I will comply with all reasonable discovery requests. I will not resist discovery requests which are not objectionable. I will not make objections nor give instructions to a witness for the purpose of delaying or obstructing the discovery process. I will encourage witnesses to respond to all deposition questions which are reasonably understandable. I will neither encourage nor permit my witness to quibble about words where their meaning is reasonably clear. I will not seek Court intervention to obtain discovery which is clearly improper and not discoverable. I will not seek sanctions or disqualification unless it is necessary for protection of my client's lawful objectives or is fully justified by the circumstances.

**IV. LAWYER AND JUDGE.** Lawyers and judges owe each other respect, diligence, candor, punctuality, and protection against unjust and improper criticism and attack. Lawyers and judges are equally responsible to protect the dignity and independence of the Court and the profession. I will always recognize that the position of judge is the symbol of both the judicial system and administration of justice. I will refrain from conduct that degrades this symbol. I will conduct myself in court in a professional manner and demonstrate my respect for the Court and the law. I will treat counsel, opposing parties, the Court, and members of the Court staff with courtesy and civility. I will be punctual. I will not engage in any conduct which offends the dignity and decorum of proceedings. I will not knowingly misrepresent, mischaracterize, misquote or miscite facts or authorities to gain an advantage. I will respect the rulings of the Court. I will give the issues in controversy deliberate, impartial and studied analysis and consideration. I will be considerate of the time constraints and pressures imposed upon the Court, Court staff and counsel in efforts to administer justice and resolve disputes.

27212053.1

- 10 -

CONFIDENTIAL

MULLINS-00002190
F08910-3-000010997.0001

# EXHIBIT 2

# CONFIDENTIALITY AGREEMENT

November 30, 2016

Robert C. Hannan
Fort Worth Regional Office
U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, TX 76102

      Re: In the Matter of Anadarko Petroleum Corporation, FW-4106

Dear Mr. Hannan:

The Audit Committee of Anadarko Petroleum Corporation ("Audit Committee") commenced an investigation of certain issues raised by Lea Frye on or about April 20, 2016. Norton Rose Fulbright US LLP, on behalf of the Audit Committee, has prepared a report in connection with this investigation. In light of the interest of the Staff of the U.S. Securities and Exchange Commission (the "Staff") in determining whether there have been any violations of the federal securities laws, and the Audit Committee's interests in investigating and analyzing the circumstances and people involved in the events at issue, the Audit Committee will provide to the Staff copies of the report ("Confidential Materials").

Please be advised that by producing the Confidential Materials pursuant to this agreement, the Audit Committee does not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties. The Audit Committee believes that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and the attorney-client privilege. The Audit Committee believes that the Confidential Materials warrant protection from disclosure.

The Staff will maintain the confidentiality of the Confidential Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities.

The Staff will not assert that the Audit Committee's production of the Confidential Materials to the Commission constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party. The Staff agrees that production of the Confidential Materials provides the Staff with no additional grounds to subpoena testimony, documents or other privileged materials from the Audit Committee, although any such grounds that may exist apart from such production shall remain unaffected by this agreement.

Georgia Firefighters' v. Anadarko
Non-Party_NRF_00000622

The Staff's agreement to the terms of this letter is signified by your signature on the line provided below.

Sincerely,

Gerard G. Pecht
Norton Rose Fulbright US LLP

*Counsel for the Audit Committee of Anadarko Petroleum Corporation*

AGREED AND ACCEPTED:
United States Securities and Exchange Commission

By: _____
    Division of Enforcement

CONFIDENTIAL

# EXHIBIT B

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF TEXAS
 4   HOUSTON DIVISION
 5   - - - - - - - - - - - - - - - - - - -x
 6   GEORGIA FIREFIGHTERS' PENSION FUND,
     Individually and on Behalf of All Others
 7   Similarly Situated,
 8                        Plaintiff,   Case No.
                                       4:20-cv-00576
 9        -against-
10   ANADARKO PETROLEUM CORPORATION, R.A.
     WALKER, ROBERT G. GWIN, ROBERT P. DANIELS,
11   and ERNEST A. LEYENDECKER, III,
12                        Defendants.
13   - - - - - - - - - - - - - - - - - - -x
14                   Virtual Zoom Deposition
15
                        November 9, 2021
16                      10:00 a.m.
17
18      VIRTUAL VIDEOTAPED DEPOSITION of SEAN
     BOYLE, in the above-entitled action, held
19   at the above time and place, taken before
     Jeremy Richman, a Shorthand Reporter and
20   Notary Public of the State of New York,
     pursuant to the Federal Rules of Civil
21   Procedure, and stipulations between
     Counsel.
22
23
24
25
```

```
 1
 2   APPEARANCES:
 3      ROBBINS GELLER RUDMAN & DOWD LLP
                Attorneys for Plaintiffs
 4              655 West Broadway, Suite 1900
                San Diego, California 92101
 5
        BY:  RACHEL JENSEN, ESQ.
 6              SARA POLYCHRON, ESQ.
                JASON A. FORGE, ESQ.
 7              MARK SOLOMON, ESQ.
 8
 9      CRAVATH, SWAINE & MOORE LLP
                Attorneys for Defendants
10              825 Eighth Avenue
                New York, New York 10019
11
        BY:  NATHALIE BAKER, ESQ.
12              ALEXANDRA BUTLER, ESQ.
13
14
     PRESENT:
15   KALLIE GALLAGHER
     ROCCO MERCURIO, Videographer
16   COREY McMILLAN, Concierge
17
18
19
20
21
22
23
24
25
```

```
 1                    S. BOYLE
 2        Q.    Okay.  Can you describe for
 3   me what Iron Workers alleges Anadarko
 4   did?
 5        A.    I believe the allegations are
 6   listed pretty clearly in the complaint.
 7   If you want, I can try to find the
 8   exact paragraphs that note it.
 9        Q.    I would like for you to tell
10   me, Mr. Boyle, as Iron Workers'
11   designee, what Iron Workers is alleging
12   Anadarko did.
13             MS. JENSEN:  Objection, asked
14        and answered.
15        A.    Again, I would say the
16   allegations are laid out pretty clearly
17   in the complaint you just put in front
18   of me.
19        Q.    Mr. Boyle, you're prepared to
20   testify today about the nature of the
21   claims in this lawsuit, correct?
22        A.    Correct.
23        Q.    And as part of that, you're
24   prepared to describe the allegations
25   that Iron Workers has made against my
```

```
 1                   S. BOYLE
 2   clients, correct?
 3        A.    I am.
 4        Q.    So can you please describe
 5   those allegations for me?
 6              MS. JENSEN:  Asked and
 7        answered.
 8        A.    I still would refer you to
 9   the amended complaint, which lays out
10   the allegations in a very clear format.
11        Q.    Let's go to paragraph 6 of
12   the complaint.  I believe that's on PDF
13   page 4.  Let me know when you're there.
14        A.    I do have paragraph 6, page
15   4, I have in front of me.
16        Q.    Okay.  Do you see a reference
17   here to an engineer named Lea S. Frye?
18        A.    I do.
19        Q.    Do you know how Ms. Frye is
20   connected to this lawsuit?
21        A.    I believe, based on my
22   reading and understanding of the case,
23   Ms. Frye is an engineer that did
24   analysis related to the Shenandoah oil
25   fields.
```

Page 73

```
  1                    S. BOYLE
  2        Q.    And --
  3        A.    She --
  4        Q.    Go ahead.
  5        A.    I'm sorry, I, you can go
  6   ahead.
  7        Q.    Do you see at the bottom of
  8   paragraph 6, second to last sentence,
  9   it reads, Frye chose to quit, but not
 10   until after submitting a whistleblower
 11   complaint to the SEC on May 9, 2016?
 12        A.    I do see that sentence.
 13        Q.    Have you seen a copy of that
 14   whistleblower complaint?
 15        A.    I don't believe I have seen a
 16   copy of the May 9, 2016, SEC letter.
 17        Q.    Do you have an understanding
 18   as to what's described in the May 9,
 19   2016, SEC letter?
 20        A.    I do have an understanding of
 21   what was laid out as far as the
 22   whistleblower's complaint.
 23        Q.    And what's your
 24   understanding?
 25        A.    That Mrs. Frye felt that the
```

1          S. BOYLE

2     Shenandoah oil field was not a viable

3     investment for Anadarko.

4          Q.    And do you know whether the

5     SEC investigated Ms. Frye's

6     whistleblower complaint?

7          A.    I do not.

8          Q.    Do you allege that Anadarko

9     should have disclosed Ms. Frye's

10    whistleblower complaint to investors?

11         A.    I believe that's noted in the

12    complaint.

13         Q.    So your answer is yes?

14         A.    Yes.

15         Q.    I'm going to mark another

16    exhibit.  You can open up Exhibit 6 in

17    your Exhibit Share.

18              (Exhibit 6, marked for

19          identification, Bates stamped

20          APC-00771504.)

21         A.    I have Exhibit 6 in front of

22    me.

23         Q.    Okay, so Mr. Boyle, this is a

24    document that was produced in this

25    litigation.  I will read the Bates

```
 1                  S. BOYLE
 2    number, APC-00771504.  Can you take a
 3    look at this document and let me know
 4    when you're done reading it?
 5         A.    Okay, I've read the letter.
 6         Q.    Okay.  So do you understand
 7    this letter is from the SEC's assistant
 8    regional director to outside counsel
 9    for Anadarko?
10              MS. JENSEN:  Objection,
11        document speaks for itself.
12         Q.    You can answer.
13         A.    I understand that this
14    appears to be a letter from the SEC,
15    from the assistant regional director.
16         Q.    Do you see where it says --
17    I'm sorry, go ahead.
18         A.    It looks like it's addressed
19    to a Gerard Pecht at Norton Rose
20    Fulbright.
21         Q.    Do you see the second
22    sentence of the body of the letter
23    where it says, Based on the information
24    we have as of this date, we do not
25    intend to recommend an enforcement
```

```
 1                    S. BOYLE
 2   action by the commission against
 3   Anadarko Petroleum Corporation?
 4             MS. JENSEN:  Objection,
 5       document speaks for itself.
 6       Q.    You can answer.
 7       A.    The second sentence does read
 8   that.
 9       Q.    Does that change your view as
10   to any of the allegations in Iron
11   Workers' complaint?
12       A.    No.
13       Q.    Why not?
14       A.    The remainder of the letter
15   has a portion that says, Must in no way
16   be construed as indicating that the
17   party has been exonerated, or that no
18   action may ultimately result from the
19   staff's investigation.
20       Q.    Do you understand that
21   Anadarko should have disclosed that
22   letter to investors?
23             MS. JENSEN:  Objection,
24       speculation.
25       A.    I don't know if I can speak
```

```
 1                 S. BOYLE
 2   to that.
 3        Q.    Okay.  All right, let's turn
 4   back to Exhibit 5, the amended
 5   complaint.
 6        A.    Okay.
 7        Q.    Let's go to paragraph 29,
 8   which is on PDF page 9.
 9        A.    Sorry, what paragraph?
10        Q.    Twenty-nine.
11        A.    Twenty-nine, okay.
12        Q.    I want to focus your
13   attention on the language that says,
14   Leading up to and throughout the class
15   period, defendants engaged in a
16   fraudulent scheme through various means
17   and methods that operated as a
18   deception on the investing public
19   concerning the size and commercial
20   viability of the Shenandoah project.
21             What do you mean by the size
22   and commercial viability of the
23   Shenandoah project?
24        A.    That the Shenandoah project
25   was going to be a profitable project
```

```
 1                    S. BOYLE
 2    for Anadarko.
 3        Q.     Okay.  Do you allege that
 4    Anadarko omitted to state certain facts
 5    about Shenandoah's profitability?
 6        A.     Yes.
 7        Q.     And what do you allege
 8    Anadarko did not say to investors about
 9    Shenandoah's profitability, but should
10    have said?
11        A.     That is laid out in the
12    complaint.  I could check and find the
13    paragraphs, but I would need a few
14    minutes.
15        Q.     That's okay.  And is it your
16    testimony that if you knew the
17    information that you allege in the
18    complaint should have been disclosed,
19    but was not disclosed, you would not
20    have invested in Anadarko?
21        A.     There would be an expectation
22    that our investors' managers, and their
23    review of their investments in certain
24    stocks like Anadarko, if they had had
25    that information, they would not have
```

```
 1                   S. BOYLE
 2   invested.
 3        Q.    And if an investment manager
 4   had invested in Anadarko knowing this
 5   information, would that violate your
 6   agreement with the investment manager?
 7             MS. JENSEN:  Objection, calls
 8        for speculation.
 9        Q.    You can answer.
10        A.    If an investment manager
11   invests in stocks that perform poorly,
12   and as a result underperform their
13   benchmark, you know, they will be
14   looking in other directions for other
15   investments.  Or investment managers,
16   excuse me.
17        Q.    Okay.  Let's go to paragraph
18   97, which is on page 28 of the PDF.
19        A.    Paragraph 97, you said?
20        Q.    Yes.
21        A.    Yep, I have it in front of
22   me.
23        Q.    Okay.  Do you see the quoted
24   language beginning with Shenandoah
25   Basin:  The Company Spud, the
```

# EXHIBIT C

Page 1

```
 1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF TEXAS

 4   HOUSTON DIVISION

 5   ----------------------------------------x

 6   GEORGIA FIREFIGHTERS' PENSION

     FUND, individually and on Behalf

 7   of All Others Similarly Situated,

 8                    Plaintiffs,

 9                         Case No.

10                         4:20-cv-00576

11                    v.

12   ANADARKO PETROLEUM CORPORATION, R.

     A. WALKER, ROBERT G. GWIN, ROBERT

13   P. DANIELS, and ERNEST A.

     LEYENDECKER, III,

14

                     Defendants.

15   ----------------------------------------x

16                    10:05 a.m.

                     November 19, 2021

17

18        * CONFIDENTIAL *

19        VIRTUAL DEPOSITION of ALEXANDER YOUNGER,

20   testifying on behalf of the Norfolk County Council

21   as Administering Authority of the Norfolk Pension

22   Fund in the above entitled matter, pursuant to

23   Notice, before Stephen J. Moore, a Registered

24   Professional Reporter, Certified Realtime Reporter

25   and Notary Public of the State of New York.
```

```
                                           Page 2
 1          ALEXANDER YOUNGER - CONFIDENTIAL
 2   A P P E A R A N C E S:
 3          ROBBINS GELLER RUDMAN & DOWD LLP
 4                 Attorneys for Plaintiffs
 5                 655 West Broadway
 6                 San DIego, California  92101
 7
 8      BY:    MARK SOLOMON, ESQ.
 9             - and -
10             RACHEL JENSEN, ESQ.
11             - and -
12             SARA POLYCHRON, ESQ.
13
14          CRAVATH SWAINE & MOORE
15                 Attorneys for Defendant
16                 825 Eighth Avenue
17                 New York, New York  10019
18
19      BY:    NATHALIE BAKER, ESQ.
20             - and -
21             ALEXANDRA BUTLE, ESQ.
22
23   ALSO PRESENT:
24          KALLIE GALLAGHER, ESQ.
25
```

```
 1              ALEXANDER YOUNGER - CONFIDENTIAL
 2     review of the investigation by Robbins Geller
 3     and discussions with counsel.
 4              Q       So, you did not have an
 5     independent view as to whether the
 6     whistleblower allegations were credible?
 7              A       We formed an ind -- well, we
 8     formed our view based on that discussion and
 9     review of that evidence.
10              Q       And did you review the
11     whistleblower letter?
12              A       I don't recall precisely whether
13     that was in the packs that we looked at.
14              Q       Do you recall whether you ever
15     asked to review the whistleblower letter?
16              A       I don't recall.
17              Q       Do you know what happened with
18     the whistleblower claims?
19              A       In general terms as provided in
20     the Complaint, yes.
21              Q       What's your understanding of
22     what happened with the whistleblower claims?
23              A       I believe they were upheld by
24     the SEC.
25              Q       And what's your basis for
```

```
 1            ALEXANDER YOUNGER - CONFIDENTIAL
 2   believing that they were upheld by the SEC?
 3          A       Our review of documentation.
 4          Q       What documentation did you
 5   review?
 6          A       I can't recall specifically.
 7          Q       I am going to introduce another
 8   exhibit, I am introducing what's been
 9   previously marked as DX 6.
10          A       Should that be there now?
11          Q       It will be in about one second.
12                  Okay, you should be able to see
13   it now.
14          A       Sorry, I've got a circle.  Thank
15   you, I can see now.
16                  MR. SOLOMON:  Can you just wait a
17          second until it's pulled up on my
18          screen, please.
19                  MS. BAKER:  Sure, no problem.
20                  MR. SOLOMON:  What number is it,
21          Nathalie?
22                  MS. BAKER:  DX 6.
23                  MR. SOLOMON:  I don't see it yet.
24                  THE CONCIERGE:  It should be at
25          the very top.  It should be the first
```

```
 1           ALEXANDER YOUNGER - CONFIDENTIAL
 2      one.
 3               MR. SOLOMON:  At the moment the
 4      very top is 13.
 5               THE CONCIERGE:  Could you try
 6      double clicking on the folder that says
 7      "marked exhibits."
 8               MR. SOLOMON:  I will.
 9               THE WITNESS:  It appeared as a
10      slightly different order than they did
11      in my one.
12               MR. SOLOMON:  Yes, still no
13      additional ones, still no 6.  I will
14      click again.  Hold on.
15               MS. BAKER:  It might be out of
16      order, just because this has been
17      previously marked in another deposition.
18               Mark, this is the SEC letter, if
19      you are familiar.
20               THE CONCIERGE:  Besides that, I
21      would just trying refreshing the page.
22               MR. SOLOMON:  I guessed it would
23      be, but it still hasn't appeared, and I
24      would rather see it when it comes up.
25               MS. BAKER:  Yes.
```

```
 1            ALEXANDER YOUNGER - CONFIDENTIAL
 2                  THE CONCIERGE:  Are you on
 3          Chrome?  Try hitting on the very top
 4          left corner there is a back button.
 5                  Don't hit that little circle arrow.
 6                  MR. SOLOMON:  Okay, got you.
 7          Okay, let me just open it, it may take a
 8          few seconds more, but I do have it
 9          delivered.
10                  Okay.
11          Q      Mr. Younger, do you recognize
12   this document?
13          A      I believe I have seen it
14   previously.
15          Q      And what is it?
16          A      It's a letter from the SEC.
17          Q      Okay, and do you see in the
18   first two sentences of this letter where it
19   says, "We have concluded the investigation as
20   to Anadarko Petroleum Corporation.
21                  "Based on the information we
22   have as of this date, we do not intend to
23   recommend an enforcement action by the
24   commission against Anadarko Petroleum
25   Corporation."
```

```
 1            ALEXANDER YOUNGER - CONFIDENTIAL
 2            A       I see that and then I read on
 3    this states, "Must in no way be construed as
 4    indicating that the party has been exonerated
 5    or that no action will ultimately result from
 6    this investigation."
 7            Q       Do you understand this letter to
 8    be an indication that the SEC has upheld the
 9    whistleblower claims against Anadarko?
10            A       I understand it to reflect that
11    it can't be construed that there is no further
12    action to arise.
13            Q       But you previously said that you
14    understood the Securities and Exchange
15    Commission had upheld claims against Anadarko
16    related to the whistleblower claims, and I am
17    asking where in this letter do you see an
18    indication that the claims have been upheld?
19            A       Well, the phrase upheld is not
20    used in the letter.
21            Q       Okay.
22            MS. BAKER:  All right, I am going
23            to mark another exhibit.
24            I will ask the court reporter to
25            help me out here.  My exhibit numbering
```

```
 1            ALEXANDER YOUNGER - CONFIDENTIAL
 2            just went off, can you recall where we
 3            left off?
 4            Q      You should be able to see what's
 5      been marked as DX 19 in your Exhibit Share
 6      folder.
 7                      (The above described document was
 8            marked Exhibit DX 19 for identification as
 9            of this date.)
10            A      One second.
11                  MR. SOLOMON:  Mine, as usual, is
12            still behind Alex's.
13                  MR. SOLOMON:  I think the more
14            exhibits you introduce the slower this
15            is going to get.
16                  MS. BAKER:  I know, I will try
17            and cut down, but I've got to use what
18            I've got to use.
19                  MR. SOLOMON:  I understand.
20                  So I refresh again, grant?
21                  THE CONCIERGE:  Sorry, yes, I
22            would try refreshing each time when it
23            introduced, yes.
24                  If it's not popping up for you.
25                  MR. SOLOMON:  I've got 19.
```

# EXHIBIT D

# Appendix B


# KPMG 2015 Engagement Letter



**KPMG LLP**
811 Main Street
Houston, TX 77002

Telephone    +1 713 319 2000
Fax          +1 713 319 2041
Internet     www.us.kpmg.com

March 30, 2015

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380

Attention: Mr. Eric Mullins, Chairperson of the Audit Committee
           Mr. Robert G. Gwin, Executive Vice President, Finance and Chief Financial Officer

This letter (the Engagement Letter) confirms our understanding of our engagement to provide professional services to Anadarko Petroleum Corporation (Anadarko).

## Objectives and Limitations of Services

### *Integrated Audit Services*

We will perform an audit of Anadarko's consolidated financial statements and an audit of its internal control over financial reporting (collectively, the Integrated Audit).

Based on our Integrated Audit, we will issue our reports on:

- The consolidated financial statements of Anadarko as set forth in Appendix I;

- The effectiveness of internal control over financial reporting as set forth in Appendix I.

These reports will be included in the annual report (Form 10-K) proposed to be filed by Anadarko under the Securities Exchange Act of 1934.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of the financial reporting and preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

We have the responsibility to conduct and will conduct the:

KPMG LLP is a Delaware limited liability partnership, the U.S. member firm of KPMG International Cooperative ("KPMG International"), a Swiss entity.



Anadarko Petroleum Corporation
March 30, 2015
Page 2 of 16

a.  audit of the consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements conforms with U.S. generally accepted accounting principles.

b.  audit of internal control over financial reporting in accordance with the standards of the PCAOB, with the objective of expressing an opinion on the effectiveness of internal control over financial reporting. We will plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

The consolidated financial statements, management's assessment of the effectiveness of internal control over financial reporting, and our reports on the consolidated financial statements and the effectiveness of internal control over financial reporting are subject to review by the Securities and Exchange Commission (SEC) staff and to the application by them of their interpretation of the relevant rules and regulations.

Our Integrated Audit will include:

a.  performing tests of the accounting records and such other procedures, as we consider necessary in the circumstances, to provide a reasonable basis for our opinion(s).

b.  assessing the accounting policies used and significant estimates made by management, and evaluating the overall consolidated financial statement presentation.

c.  obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we consider necessary in the circumstances.

Our Integrated Audit:

a.  will be planned and performed to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether caused by error or fraud and whether effective internal control over financial reporting was maintained in all material respects. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Although not absolute assurance, reasonable assurance is a high level of assurance. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, there is also a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an Integrated Audit performed in accordance with the standards of the PCAOB. Also, an Integrated Audit is not designed to detect errors or fraud that is immaterial to the consolidated financial statements or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.



Anadarko Petroleum Corporation
March 30, 2015
Page 3 of 16

b.  cannot provide absolute assurance of achieving financial reporting objectives because of
its inherent limitations. Internal control over financial reporting is a process that involves
human diligence and compliance and is subject to lapses in judgment and breakdowns
resulting from human failures. Internal control over financial reporting can be
circumvented by collusion or improper management override. Because of such limitations,
there is a risk that material misstatements may not be prevented or detected on a timely
basis by internal control over financial reporting. Also, projections of any evaluation of
effectiveness to future periods are subject to the risk that controls may become inadequate
because of changes in conditions, or that the degree of compliance with the policies or
procedures may deteriorate.

Subject to the remainder of this paragraph, we will issue written reports upon completion of our
Integrated Audit addressed to the board of directors of Anadarko. The reports will be in a form
that is in accordance with the published rules and regulations of the SEC and the standards of the
PCAOB. If, for any reason, we are unable to complete the audit or unable to form or have not
formed an opinion, we may decline to express an opinion or decline to issue a report as a result
of the engagement. In addition, we cannot provide assurance that unqualified opinions will be
rendered. Circumstances may arise in which it is necessary for us to modify our reports, add
emphasis-of-matter or other-matter paragraphs or withdraw from the engagement. If, during the
performance of our Integrated Audit procedures, such circumstances arise, we will communicate
to the audit committee our reasons for modification or withdrawal.

As part of our Integrated Audit, we will read the other information in your annual report (Form
10-K) and consider whether such information, or the manner of its presentation, is materially
inconsistent with information, or the manner of its presentation, appearing in the consolidated
financial statements or is inconsistent with the results of our audit of internal control over
financial reporting. However, our Integrated Audit does not include the performance of
procedures to corroborate such other information (including forward-looking statements).

### *Quarterly Review Services*

We will review the condensed consolidated balance sheets of Anadarko, as set forth in Appendix
I, and the related condensed consolidated statements of income, comprehensive income, equity
and cash flows for the quarterly and year-to-date periods, which are to be included in the
quarterly reports (Form 10-Q) proposed to be filed by Anadarko under the Securities Exchange
Act of 1934. We will also review the selected quarterly financial data specified by Item 302 of
Regulation S-K, which is required to be included in the annual report (Form 10-K) proposed to
be filed by Anadarko under the Securities Exchange Act of 1934.

We have the responsibility to conduct our reviews in accordance with the standards of the
PCAOB. The objective of a review of interim financial information is to provide us with a basis
for communicating whether we are aware of any material modifications that should be made to
such interim financial information for it to conform with U.S. generally accepted accounting
principles. Our procedures will be substantially less in scope than an Integrated Audit performed
in accordance with the standards of the PCAOB, the objective of which is the expression of



Anadarko Petroleum Corporation
March 30, 2015
Page 4 of 16

opinions regarding the financial statements and internal control over financial reporting. Accordingly, we will not express an opinion on Anadarko's interim financial information. Our review reports will contain a statement to that effect.

Our reviews will consist principally of performing analytical procedures applied to financial data and making inquiries of Anadarko's personnel responsible for financial and accounting matters. Our reviews will include obtaining sufficient knowledge of Anadarko's business and its internal control as it relates to the preparation of both annual and interim financial information to (a) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and (b) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with U.S. generally accepted accounting principles.

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an Integrated Audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an Integrated Audit. Further, a review is not designed to provide assurance on internal control or to identify material weaknesses or significant deficiencies and cannot be relied on to detect errors, fraud, or illegal acts.

Upon completion of each review, we will issue a written report addressed to the board of directors of Anadarko that will state whether we are aware of any material modifications that should be made to the interim financial information for it to be in conformity with U.S. generally accepted accounting principles.

Our report will be solely for the information of Anadarko and is not to be used or referred to in quarterly reports to shareholders or other third parties (including the SEC) regarding quarterly financial results.

If during the performance of our quarterly review services we become aware of matters that cause us to believe the interim information filed, or to be filed, with the SEC, is probably materially misstated as a result of a departure from U.S. generally accepted accounting principles, we will discuss such matters with management and, if appropriate, communicate such matters to the audit committee.

### *Registration Statements and Other Offering Documents*

We understand that the consolidated financial statements, management's assessment of the effectiveness of internal control over financial reporting, and our written audit reports on the financial statements and the effectiveness of internal control over financial reporting, as described above, are to be included by Anadarko in its annual report (Form 10-K), and that in so doing, Anadarko will be incorporating by reference the consolidated financial statements, management's assessment of the effectiveness of internal control over financial reporting, and our reports on the financial statements and the effectiveness of internal control over financial



Anadarko Petroleum Corporation
March 30, 2015
Page 5 of 16

reporting in previously filed and effective Forms S-3 and S-8. Prior to issuing our consent to the incorporation by reference in these registration statements of our reports with respect to the consolidated financial statements and internal control over financial reporting described above, we will perform procedures as required by the standards of the PCAOB, including, but not limited to, reading information incorporated by reference in these registration statements and performing subsequent event procedures.

Should Anadarko wish to include or incorporate by reference the consolidated financial statements, management's assessment of the effectiveness of internal control over financial reporting, and our audit reports on the financial statements and the effectiveness of internal control over financial reporting into a future filing under the Securities Act of 1933, or an exempt offering, prior to our consenting to include or incorporate by reference our reports on the consolidated financial statements and internal control over financial reporting, we would consider our consent to the inclusion of our reports and the terms thereof at that time. We will be required to perform procedures as required by the standards of the PCAOB, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements or is inconsistent with the results of our audit of internal control over financial reporting. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be determined at the time the services are to be performed.

Should Anadarko wish to include or incorporate by reference our review report in a registration statement, Anadarko will be required to request and receive from us a "letter re: unaudited interim financial information" that Anadarko will be required to file as an exhibit to the registration statement or quarterly report (Form 10-Q) to acknowledge our awareness of Anadarko's use of our review report that is not subject to the consent requirements of Section 7 of the Securities Act of 1933.

### *Comfort Letters*

Should a comfort letter be requested in connection with a future filing under the Securities Act of 1933, or an exempt offering, the specific terms of our services will be determined at that time. Prior to our issuance of a comfort letter, management of Anadarko agrees to supply us with a representation letter that will, among other things, confirm that no events have occurred that would require adjustments to (or additional disclosures in) the audited consolidated financial statements or management's assessment of the effectiveness of Anadarko's internal control over financial reporting referred to above and confirm Anadarko's responses to certain inquiries made in connection with our issuance of the comfort letter.



Anadarko Petroleum Corporation
March 30, 2015
Page 6 of 16

## Our Responsibility to Communicate with the Audit Committee and the Board of Directors

We will report to the audit committee the following matters prior to the issuance of our audit reports:

- An overview of our overall audit strategy, timing of the audit and the significant risks identified during our risk assessment procedures.

- Management's initial selection of, or changes in, significant accounting policies or the application of such policies in the current period; and the effect on consolidated financial statements or disclosures of significant accounting policies in controversial areas or areas for which there is a lack of authoritative guidance or consensus, or diversity in practice.

- All critical accounting policies and practices to be used, including the reasons certain policies and practices are considered critical; and how current and anticipated future events might affect the determination of whether certain policies and practices are considered critical.

- A description of the process management used to develop critical accounting estimates, management's significant assumptions used in critical accounting estimates that have a high degree of subjectivity, and any significant changes management made to the process used to develop critical accounting estimates or management's significant assumptions, including a description of management's reasons for the changes and the effects of the changes on the financial statements.

- Significant transactions that are outside of the normal course of business for Anadarko or that otherwise appear to be unusual due to their timing, size, or nature; and the policies and practices used to account for significant unusual transactions, and our understanding of the business rationale for significant unusual transactions.

- Our evaluation of the quality of Anadarko's financial reporting.

- All material weaknesses[1] and significant deficiencies[2] in internal control over financial reporting identified during the Integrated Audit, in writing, and after we have informed management of all internal control deficiencies.

- Corrected misstatements arising from the Integrated Audit and the implications that such corrected misstatements might have on Anadarko's financial reporting process. In this context, corrected misstatements are proposed corrections of the consolidated financial

---

[1] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

[2] A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.



Anadarko Petroleum Corporation
March 30, 2015
Page 7 of 16

> statements that were recorded by management and, in our judgment, may not have been detected except through the auditing procedures performed.

- Uncorrected misstatements aggregated during the current engagement and pertaining to the latest period presented that were determined by management to be immaterial, both individually and in aggregate.

- All relationships between KPMG LLP (KPMG) and its related entities and Anadarko and its related entities or persons in financial reporting oversight roles at Anadarko that may reasonably be thought to bear on independence.

- Other matters required to be communicated by the standards of the PCAOB or that are deemed by us to be significant to the oversight of Anadarko's financial reporting process.

We will report to the board of directors in writing if there is any conclusion that the audit committee's oversight of Anadarko's external financial reporting and internal control over financial reporting is ineffective.

We will also read minutes, if any, of audit committee meetings for consistency with our understanding of the communications made to the audit committee and determine that the audit committee has received copies of all material written communications between ourselves and management. We will also determine that the audit committee has been informed of i) the initial selection of, or the reasons for any change in, significant accounting policies or their application during the period under audit, ii) the methods used by management to account for significant unusual transactions, iii) the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus, and iv) our communication to management of all internal control deficiencies identified during the audit and not previously communicated in writing by us or others, including internal auditors or others within Anadarko.

To the extent that they come to our attention, we will inform the appropriate level of management about any illegal acts, unless they are clearly inconsequential, material errors in the consolidated financial statements and any instances of fraud. Further, to the extent they come to our attention, we also will communicate directly to the audit committee illegal acts unless they are clearly inconsequential, material errors in the consolidated financial statements and any instances of fraud that involve senior management or that, in our judgment, cause a material misstatement of the consolidated financial statements. In the case of illegal acts which, in our judgment, would have a material effect on the consolidated financial statements of Anadarko, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances requires us to communicate our conclusions to the SEC.

In addition, if we become aware of information that relates to the consolidated financial statements and/or management's assessment of the effectiveness of internal control over financial reporting after we have issued our reports or completed our interim review procedures, but which was not known to us at the date of our reports or completion of our interim review



Anadarko Petroleum Corporation
March 30, 2015
Page 8 of 16

procedures, and which is of such a nature and from such a source that we would have investigated that information had it come to our attention during the course of our Integrated Audit and/or interim review procedures, we will, as soon as practicable: (1) communicate such an occurrence to the audit committee; and (2) undertake an investigation to determine whether the information is reliable and whether the facts existed at the date of our reports or completion of our interim review procedures. Further, management agrees that in conducting that investigation, we will have the full cooperation of Anadarko's personnel. If the subsequently discovered information is found to be of such a nature that our reports or completion of our interim review procedures would have been affected if the information had been known as of the date of our reports or completion of our interim review procedures and (b) we believe that the reports or interim review procedures are currently being relied upon or are likely to be relied upon by someone who would attach importance to the information, appropriate steps will be taken by KPMG and expected from Anadarko to prevent further reliance on our reports or interim review procedures. Such steps include appropriate disclosures by Anadarko of the newly discovered facts and the impact to the consolidated financial statements.

## Our Responsibility to Communicate with Management

We will report to management the following matters in writing prior to the issuance of our audit reports:

- All material weaknesses in internal control over financial reporting identified during the Integrated Audit.

- All internal control deficiencies identified during the Integrated Audit and not previously communicated in writing by us or by others, including internal auditors or others within Anadarko.

## Audit Committee Responsibilities

The audit committee is directly responsible for the appointment of KPMG as independent auditor, determining our compensation, and oversight of our Integrated Audit work, including resolution of disagreements between management and us regarding financial reporting. We understand that we report directly to the audit committee. The audit committee is responsible for preapproval of all audit and nonaudit services provided by us.

## Management Responsibilities

The management of Anadarko is responsible for the fair presentation, in accordance with U.S. generally accepted accounting principles, of the consolidated financial statements, including disclosures, schedules, and interim financial information and all representations contained therein. Management also is responsible for identifying and ensuring that Anadarko complies with the laws and regulations applicable to its activities, and for informing us of any known material violations of such laws and regulations. Management also is responsible for preventing and detecting fraud, including the design and implementation of programs and controls to prevent and detect fraud, for adopting sound accounting policies, and for establishing and



Anadarko Petroleum Corporation
March 30, 2015
Page 9 of 16

maintaining effective internal control over financial reporting and procedures for financial reporting to maintain the reliability of the consolidated financial statements or interim financial information and to provide reasonable assurance against the possibility of misstatements that are material to the consolidated financial statements or interim financial information. Management is also responsible for informing us, of which it has knowledge, of all deficiencies in the design or operation of such controls.

The management of Anadarko is also responsible for:

- Accepting responsibility for the effectiveness of Anadarko's internal control over financial reporting;

- Evaluating the effectiveness of Anadarko's internal control over financial reporting using a suitable control criteria;

- Supporting its evaluation with sufficient evidence, including documentation; and

- Presenting a written assessment of the effectiveness of Anadarko's internal control over financial reporting as of Anadarko's fiscal year end.

The Integrated Audit does not relieve management or those charged with governance of their responsibilities. If management does not fulfill these responsibilities above, we cannot complete the Integrated Audit.

Management is responsible for making all financial records and relevant information available to the auditor and agrees that all records, documentation, and information we request in connection with our Integrated Audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of Anadarko's personnel. At the conclusion of the engagement, management will provide us with a letter that confirms certain representations made during the audit, including specific inquiries of management required by the standards of the PCAOB about the representations embodied in the consolidated financial statements or interim financial information and the effectiveness of internal control over financial reporting. The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the consolidated financial statements, and the effectiveness of internal control over financial reporting.

Management is responsible for adjusting the annual consolidated financial statements and interim financial information to correct material misstatements relating to accounts or disclosures and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements being reported upon, or the interim information being reviewed, taken as a whole.

*Use of Internal Audit*



Anadarko Petroleum Corporation
March 30, 2015
Page 10 of 16

Management and the audit committee acknowledge and understand that Anadarko Corporate Audit and Anadarko Internal Controls Group (Internal Auditors), providing direct assistance to us will be allowed to follow our instructions and that personnel of Anadarko will not intervene in the work the Internal Auditors perform for us. Further, management and the audit committee acknowledge and understand that if, in our sole judgment, we believe the objectivity of Internal Auditors providing direct assistance to us has been impaired, we will be unable to use the work performed or planned to be performed.

**Dispute Resolution**

Any dispute or claim between the parties arising out of this Engagement Letter shall be submitted first to non-binding mediation and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("IICPR"). Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these dispute resolution procedures, including any contention that all or part of these procedures is invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. By operation of this provision, the parties agree to forgo litigation over such disputes in any court of competent jurisdiction.

Mediation shall take place in Houston, Texas using Mediation Procedures of the IICPR, with the exception of paragraph 2 (Selecting the Mediator). Arbitration shall take place in New York, New York. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these dispute resolution procedures, including any contention that all or part of these procedures is invalid or unenforceable, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq and resolved by the arbitrators. Party-selected arbitrators shall be selected from the lists of neutrals maintained by either the IICPR or by JAMS, Inc., but the chair of the arbitration panel does not have to be selected from those specific lists. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in IICPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. For the sake of clarity the preceding sentence is not intended to prohibit any claim for punitive damages with respect to the services provided under this Engagement Letter. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction, provided that any party moving to enforce, confirm or vacate any such agreement or



Anadarko Petroleum Corporation
March 30, 2015
Page 11 of 16

award, as the case may be, will file such motion under seal unless prohibited under applicable court rules. Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

**Other Matters**

All disputes between the parties arising out of this Engagement Letter (whether based in contract, tort, statute, regulation, or otherwise and whether pending in court or in an arbitral forum) shall be governed by and construed in accordance with the substantive and procedural laws of the State of New York, including without limitation, its statutes of limitations, without regard to the conflict of laws provisions of New York or any other state or jurisdiction. In the event that any term or provision of this Engagement Letter shall be held to be invalid, void or unenforceable, then the remainder of the Engagement Letter shall not be affected, and each such term and provision shall be valid and enforceable to the fullest extent permitted by law.

This letter shall serve as Anadarko's authorization for the use of e-mail and other electronic methods to transmit and receive information, including confidential information, between KPMG and Anadarko and between KPMG and outside specialists or other entities engaged by either KPMG or Anadarko. Anadarko acknowledges that e-mail travels over the public Internet, which is not a secure means of communication and, thus, confidentiality of the transmitted information could be compromised through no fault of KPMG. KPMG will employ commercially reasonable efforts and take appropriate precautions to protect the privacy and confidentiality of transmitted information.

Further, for purposes of the services described in this letter only, Anadarko hereby grants to KPMG a limited, revocable, non-exclusive, non-transferable, paid up and royalty-free license, without right of sublicense, to use all logos, trademarks and service marks of Anadarko solely for presentations or reports to Anadarko.

KPMG is a limited liability partnership comprising both certified public accountants and certain principals who are not licensed as certified public accountants. Such principals may participate in the engagements to provide the services described in this letter.

Without our prior written approval, Anadarko will not solicit for employment, nor will Anadarko hire, any current or former partner or professional employee of KPMG or any of its affiliated member firms, in a financial reporting oversight role (as defined in the SEC independence rules) if such partner or professional employee previously participated in the Integrated Audit of Anadarko or quarterly review procedures until the applicable "cooling off" period under the SEC independence rules has expired. That period would commence with the latest date on which the individual participated in the Integrated Audit or quarterly review procedures and would expire upon the filing by Anadarko of its Form 10-K for the succeeding fiscal year.

KPMG, as an accounting firm, has an obligation to comply with applicable professional standards. Certain professional standards, including AICPA Code of Professional Conduct Section 1.700, "Confidential Client Information Rule," adopted by the American Institute of Certified Public Accountants and similar rules adopted by the boards of accountancy of many



states, prohibit the disclosure of client confidential information without client consent, except in limited circumstances. KPMG represents to Anadarko that KPMG will treat Anadarko's confidential information in accordance with applicable professional standards.

KPMG may work with and use the services of other members of the international KPMG network of independent firms and entities controlled by, or under common control with, one or more KPMG member firms (together with KPMG, the "KPMG Firms") to provide services to Anadarko. In connection with the performance of services under this Engagement Letter, the KPMG Firms may, in their discretion, utilize the services of third party service providers within or outside of the United States to complete the services under this Engagement Letter. KPMG Firms and such third parties may have access to your confidential information from offshore locations. In addition, KPMG uses third party service providers within and outside of the United States to provide, at its direction, back-office administrative and clerical services to KPMG and these third party service providers may in the performance of such services have access to your confidential information. KPMG represents that it has technical, legal and/or other safeguards, measures and controls in place to protect your confidential information from unauthorized disclosure or use.

You also understand and agree that the KPMG Firms, with the assistance of third parties as outlined above, may use your confidential information obtained to complete this engagement for other purposes, such as improving the delivery of audit and other services to you and to other clients and for use in presentations to you, other clients and non-clients. When your confidential information is used outside of the KPMG Firms or third parties discussed above for any purpose other than the provision of audit or other services to you, back-office administrative and clerical services to KPMG or service quality improvement, it will be de-identified so that Anadarko cannot be attributed as the source of the information.

Anadarko agrees to provide prompt notification if Anadarko or any of its subsidiaries currently are or become subject to the laws of a foreign jurisdiction that require regulation of any securities issued by Anadarko or such subsidiary. For the purpose of complying with S-X Rule 210.2-01 and related releases set forth in Section 600 of the Codification of Financial Reporting Policies (FRR) and other SEC correspondence relative to independence, Anadarko further agrees to provide to KPMG, at least annually, a complete and accurate legal entity listing and a listing of other affiliated entities not included on the legal entity listing (e.g., parent company, entities under common control, joint ventures, equity method investments, and others), as well as prompt notification of any action or transaction that results in changes to the legal entity listing or the listing of other affiliated entities.

### *Access to Audit Documentation by Regulators and Others*

The audit documentation for this engagement is the property of KPMG. If KPMG receives a subpoena or other validly issued administrative, judicial, government or investigative regulatory demand/request ("Legal Demand") requiring it to disclose Anadarko's confidential information, KPMG shall, unless prohibited by law or demand of a law enforcement agency, provide prompt written notice to Anadarko of such demand. So long as KPMG gives notice as provided herein,



Anadarko Petroleum Corporation
March 30, 2015
Page 13 of 16

KPMG shall be entitled to comply with such Legal Demand to the extent required by law, subject to any protective order or the like that may have been entered in the matter. In the event KPMG is requested or authorized by Anadarko or is required by law, rule or regulation, Legal Demand, or other legal process to produce KPMG's documents or personnel as witnesses or for interviews, or otherwise to make information relating to the service under the Engagement Letter available to a third party or Anadarko or its agents, Anadarko shall reimburse KPMG for its professional time at its standard hourly rates, and expenses, including reasonable attorney's fees and expenses, incurred in responding to such requests.

We may be requested to make certain audit documentation available to the PCAOB pursuant to authority provided by law or regulation. If so requested, access to such audit documentation will be provided and KPMG will also respond to written and oral questions related to our audit, if received. Furthermore, the PCAOB may obtain copies of selected audit documentation. The PCAOB may intend, or decide, to distribute the copies or information so received to others, including the SEC. We agree to communicate to you on a timely basis (a) receipt of a notification of inspection by the PCAOB of the audit covered by this Engagement Letter and the related requests for access to the audit documentation and (b) when the PCAOB desires direct contact with members of the audit committee.

### Additional Reports and Fees for Services

Appendix I to this letter lists the additional reports we will issue as part of this engagement and our fees for professional services to be performed under this letter.

In addition, fees for any special audit-related projects, such as research and/or consultation on special business or financial issues, will be billed separately from the audit fees for professional services set forth in Appendix I and may be subject to written arrangements supplemental to those in this letter.

\* \* \* \* \* \* \*

Our engagement herein is for the provision of annual audit services for the financial statements and for the periods described in Appendix I, and it is understood that such services are provided as a single annual engagement. Pursuant to our arrangement as reflected in this letter, we will provide the services set forth in Appendix I as a single engagement for each of Anadarko's subsequent fiscal years until either the audit committee or we terminate this agreement, or mutually agree to the modification of its terms. The fees for each subsequent year will be annually subject to negotiation and approval by the audit committee.

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us to indicate your acknowledgement of, and agreement with, the arrangements for our Integrated Audit of the consolidated financial statements including our respective responsibilities.



Anadarko Petroleum Corporation
March 30, 2015
Page 14 of 16

Very truly yours,

KPMG LLP

Mark L. Zajac
*Partner*

<u>ACCEPTED:</u>

Anadarko Petroleum Corporation

Mr. Eric Mullins, Chairman of the Audit Committee

Mr. Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer



## Appendix I

### Fees for Services

Based upon our discussions with and representations of management, our fees for services we will perform are estimated as follows:

Integrated Audit:

| | |
|---|---:|
| Audit and quarterly reviews of consolidated balance sheets of Anadarko Petroleum Corporation as of December 31, 2015 and 2014 and the related consolidated statements of income comprehensive income, equity and cash flows for each of the years in the three-year period ended December 31, 2015 and the related notes to the financial statements and audit of internal control over financial reporting as of December 31, 2015 | $6,625,000 |

The above estimates are based on the level of experience of the individuals who will perform the services. In addition, expenses are billed for reimbursement as incurred. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed. Further, pursuant to the Pre-Approval Policy adopted by the Audit Committee, any increase in fees above those previously approved will be presented, in advance, for the Audit Committee (or by the Chairperson on an interim basis pursuant to such Policy) consideration and approval.

Our fees and expenses will be billed in accordance with a schedule agreed to by us and Anadarko management. The ethics of our profession prohibit the rendering of professional services where the fee for such services is contingent, or has the appearance of being contingent, upon the results of such services. Accordingly, in order to avoid the possible implication that our fee is contingent upon the results of our services, it is important that our bills be paid promptly when rendered. If a situation arises in which it may appear that our independence would be questioned because of significant unpaid bills, we may be prohibited from signing our audit report and consent.

Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to the client. Instead, KPMG applies such payments to reduce its overhead



costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges which may be charged to clients.

# EXHIBIT E

# Appendix B


# KPMG

# 2016 Engagement

# Letter



**KPMG LLP**
811 Main Street
Houston, TX 77002

Telephone +1 713 319 2000
Fax +1 713 319 2041
Internet www.us.kpmg.com

March 22, 2016

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380

Attention: Mr. Eric Mullins, Chairperson of the Audit Committee
Mr. Robert G. Gwin, Executive Vice President, Finance and Chief Financial Officer

This letter ("Amendment") amends our engagement letter dated March 30, 2015 ("Engagement Letter"), confirming our understanding to provide professional audit services to Anadarko Petroleum Corporation (Anadarko) by substituting the attached Appendix I for the Appendix I originally attached to our Engagement Letter.

The attached Appendix I lists the services to be rendered and related fees to provide each specified service for the identified time period. Except as specified in this Amendment and in the Appendix I attached to this Amendment, all provisions of the Engagement Letter remain in effect until either the audit committee or we terminate this agreement or mutually agree to the modification of its terms.

Except as otherwise provided for in the Engagement Letter, neither party may assign, transfer or delegate any of its rights, obligations, claims or proceeds from claims arising under or relating to the Engagement Letter (including by operation of law, in which case the assigning party will, to the extent legally permissible, give as much advance written notice as is reasonably practicable thereof) without the prior written consent of the other party, such consent not to be unreasonably withheld. Any assignment in violation hereof shall be null and void.

\* \* \* \* \* \* \*

We shall be pleased to discuss this Amendment with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this Amendment. Please sign in the space provided and return the copy to us.

Very truly yours

KPMG LLP

Mark L. Zajac
*Partner*

KPMG LLP is a Delaware limited liability partnership,
the U.S. member firm of KPMG International Cooperative
("KPMG International"), a Swiss entity.



Anadarko Petroleum Corporation
March 22, 2016
Page 2 of 2


**ACCEPTED:**

Anadarko Petroleum Corporation

_____
Mr. Eric Mullins, Chairman of the Audit Committee


_____
Mr. Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

**Appendix I**

**Fees for Services**

Based upon our discussions with and representations of management, our fees for services we will perform are estimated as follows:

Integrated Audit:

> Audit and quarterly reviews of consolidated balance sheets of Anadarko Petroleum Corporation as of December 31, 2016 and 2015 and the related consolidated statements of income, comprehensive income, equity and cash flows for each of the years in the three-year period ended December 31, 2016 and the related notes to the financial statements and audit of internal control over financial reporting as of December 31, 2016            $5,900,000

The above estimates are based on the level of experience of the individuals who will perform the services. In addition, expenses are billed for reimbursement as incurred. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed. Further, pursuant to the Pre-Approval Policy adopted by the Audit Committee, any increase in fees above those previously approved will be presented, in advance, for the Audit Committee (or by the Chairperson on an interim basis pursuant to such Policy) consideration and approval.

Our fees and expenses will be billed in accordance with a schedule agreed to by us and Anadarko management. The ethics of our profession prohibit the rendering of professional services where the fee for such services is contingent, or has the appearance of being contingent, upon the results of such services. Accordingly, in order to avoid the possible implication that our fee is contingent upon the results of our services, it is important that our bills be paid promptly when rendered. If a situation arises in which it may appear that our independence would be questioned because of significant unpaid bills, we may be prohibited from signing our audit report and consent.

Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to the client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges which may be charged to clients.

All fees, charges and other amounts payable to KPMG under the engagement letter do not include any sales, use, excise, value added, income or other applicable taxes, tariffs or duties, payment of which shall be Anadarko's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the employment or independent contractor relationship between KPMG and its personnel.

# EXHIBIT F

EX-1.1 2 d249239dex11.htm EX-1.1

**Exhibit 1.1**

*Execution Version*

## ANADARKO PETROLEUM CORPORATION
### (a Delaware corporation)

**35,250,000 Shares**

**Common Stock**
**($0.10 par value per Share)**

**UNDERWRITING AGREEMENT**

September 12, 2016

J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

Dear Sirs:

Anadarko Petroleum Corporation, a Delaware corporation (the "**Company**"), proposes to issue and sell to J.P. Morgan Securities LLC (the "**Underwriter**") an aggregate of 35,250,000 shares (the "**Firm Securities**") of the Company's common stock, par value $0.10 per share (the "**Securities**"), and, at the option of the Underwriter, up to an additional 5,287,500 shares of its Securities (the "**Optional Securities**"), in each case on the terms set forth in this agreement (this "**Agreement**"). The Firm Securities and the Optional Securities are herein collectively called the "**Offered Securities**."

For purposes of this Agreement:

"**430B Information**" means information included in a prospectus then deemed to be a part of the Registration Statement pursuant to Rule 430B(e) or retroactively deemed to be a part of the Registration Statement pursuant to Rule 430B(f).

"**430C Information**" means information included in a prospectus then deemed to be a part of the Registration Statement pursuant to Rule 430C.

"**Act**" means the Securities Act of 1933, as amended.

"**Applicable Time**" means 7:00 pm (Eastern Time) on the date of this Agreement.

"**Closing Date**" has the meaning defined in Section 2 hereof.

"**Commission**" means the Securities and Exchange Commission.

"**Effective Date**" of the Registration Statement relating to the Offered Securities means the time of the first contract of sale for the Offered Securities.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**General Use Issuer Free Writing Prospectus**" means any Issuer Free Writing Prospectus that is intended for general distribution to prospective investors, as evidenced by its being so specified in <u>Schedule II</u> to this Agreement.

"**Issuer Free Writing Prospectus**" means any "issuer free writing prospectus," as defined in Rule 433, relating to the Offered Securities in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g).

"**Limited Use Issuer Free Writing Prospectus**" means any Issuer Free Writing Prospectus that is not a General Use Issuer Free Writing Prospectus.

"**Prospectus**" means the Statutory Prospectus that discloses the public offering price, other 430B Information, 430C Information and other final terms of the Offered Securities and otherwise satisfies Section 10(a) of the Act.

"**Registration Statement**" at any particular time means such registration statement in the form then filed with the Commission, including any amendment thereto, any document incorporated by reference therein and all 430B Information and all 430C Information with respect to such registration statement, that in any case has not been superseded or modified. "**Registration Statement**" without reference to a time means the Registration Statement as of the Effective Date. For purposes of this definition, 430B Information shall be considered to be included in the Registration Statement as of the time specified in Rule 430B.

"**Rules and Regulations**" means the rules and regulations of the Commission.

"**Statutory Prospectus**" with reference to any particular time means the prospectus relating to the Offered Securities that is included in the Registration Statement immediately prior to that time, including all 430B Information and all 430C Information with respect to the Registration Statement. For purposes of the foregoing definition, 430B Information and 430C Information shall be considered to be included in the Statutory Prospectus only as of the actual time that form of prospectus (including a prospectus supplement) is filed with the Commission pursuant to Rule 424(b) and not retroactively.

Unless otherwise specified, a reference to a "**rule**" is to the indicated rule under the Act.

Section 1. *Representations and Warranties of the Company*. The Company represents and warrants to the Underwriter as follows:

(a) The Company has filed with the Commission a registration statement on Form S-3 (No. 333-213104), including a related prospectus or prospectuses, covering the registration of the Offered Securities under the Act, which has become effective.

(b) The Registration Statement constitutes an "**automatic shelf registration statement**" (as defined in Rule 405 of the Act) filed within three years of the date of this Agreement, and the Company is a "**well-known seasoned issuer**" (as defined in Rule 405 of the Act). No order suspending the effectiveness of the Registration Statement has been issued by the Commission and no proceeding for that purpose or pursuant to Section 8A of the Act against the

Company or related to the offering has been initiated or threatened by the Commission. The Company has not received from the Commission any notice pursuant to Rule 401(g)(2) objecting to use of the automatic shelf registration statement form. The Company has paid or shall pay the required Commission filing fees relating to the Offered Securities within the time required by Rule 456(b)(1) without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r).

(c) (i) At the time of filing the Registration Statement and (ii) at the date of this Agreement, the Company was not and is not an "ineligible issuer," as defined in Rule 405.

(d) (i) (A) At the time the Registration Statement initially became effective, (B) at the time of each amendment thereto for the purposes of complying with Section 10(a)(3) of the Act (whether by post-effective amendment, incorporated report or form of prospectus), (C) on the Effective Date relating to the Offered Securities and (D) on the Closing Date, the Registration Statement conformed and will conform in all material respects to the requirements of the Act and the Rules and Regulations and did not and will not include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and (ii) (A) on its date, (B) at the time of filing the Prospectus pursuant to Rule 424(b) and (C) on the Closing Date, the Prospectus will conform in all material respects to the requirements of the Act and the Rules and Regulations, and will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The preceding sentence does not apply to statements in or omissions from any such document made in reliance upon and in conformity with written information furnished to the Company by the Underwriter, if any, specifically for use therein, it being understood and agreed that the only such information is that described as such in this Agreement.

(e) As of the Applicable Time, neither (i) the General Use Issuer Free Writing Prospectus(es) issued at or prior to the Applicable Time and the preliminary prospectus supplement, dated September 12, 2016, including the base prospectus, dated August 12, 2016 (which is the most recent Statutory Prospectus distributed to investors generally), and the other information, if any, stated in Schedule II to this Agreement to be included in the Disclosure Package, all considered together (collectively, the "**Disclosure Package**"), nor (ii) any electronic road show or other written communications reviewed and consented to by the Underwriter and listed on Schedule III hereto (each a, "**Company Additional Written Communication**") or any individual Limited Use Issuer Free Writing Prospectus, when considered together with the Disclosure Package, included any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The preceding sentences do not apply to statements in or omissions from any Statutory Prospectus, any Issuer Free Writing Prospectus or any Company Additional Written Communication in reliance upon and in conformity with written information furnished to the Company by the Underwriter specifically for use therein, it being understood and agreed that the only such information is that described as such in this Agreement.

3

(f) Each Issuer Free Writing Prospectus, as of its issue date and at all subsequent times through the completion of the public offer and sale of the Offered Securities or until any earlier date that the Company notified or notifies the Underwriter as described in the next sentence, did not, does not and will not include any information that conflicted, conflicts or will conflict with the information then contained in the Registration Statement. If at any time following issuance of an Issuer Free Writing Prospectus there occurred or occurs an event or development as a result of which such Issuer Free Writing Prospectus conflicted or would conflict with the information then contained in the Registration Statement or as a result of which such Issuer Free Writing Prospectus, if republished immediately following such event or development, would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances prevailing at that subsequent time, not misleading, (i) the Company has promptly notified or will promptly notify the Underwriter and (ii) the Company has promptly amended or will promptly amend or supplement such Issuer Free Writing Prospectus to eliminate or correct such conflict, untrue statement or omission. The preceding sentences do not apply to statements in or omissions from any Issuer Free Writing Prospectus in reliance upon and in conformity with written information furnished to the Company by the Underwriter specifically for use therein, it being understood and agreed that the only such information is that described as such in this Agreement.

(g) The accountants who certified the financial statements of the Company included or incorporated in the Registration Statement, the Prospectus and the Disclosure Package are independent public accountants as required by the Act, the Rules and Regulations and the rules and regulations of the Public Company Accounting Oversight Board.

(h) The consolidated financial statements of the Company together with related schedules and notes, included or incorporated in the Registration Statement, the Prospectus and the Disclosure Package present fairly the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and the changes in their financial position for the periods specified; said financial statements have been prepared in conformity with generally accepted accounting principles consistently applied during the period, except as stated therein.

If applicable, the *pro forma* financial information set forth or incorporated by reference in the Registration Statement, the Prospectus and the Disclosure Package is, in all material respects, fairly presented and prepared on a basis consistent with the historical financial statements of the Company and its subsidiaries, except to the extent stated therein, and gives effect to assumptions used in the preparation thereof which have been made on a reasonable basis and in good faith.

(i) The Company has established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any subsidiary, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system. The Company and each of its subsidiaries maintain a system of internal control over financial reporting (as such term is defined in

4

Rule 13a-15 under the Exchange Act) sufficient to provide reasonable assurances that (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company's auditors and the audit committee of the board of directors of the Company have been advised of: (A) any significant deficiencies in the design or operation of internal control over financial reporting which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (B) any fraud, whether or not material, that involves management or other employees who have a role in the Company's internal control over financial reporting; any material weaknesses in internal control over financial reporting have been identified for the Company's auditors; and since the date of the most recent evaluation of the Company's internal control over financial reporting, there have been no significant changes in internal control over financial reporting or in other factors that could significantly affect internal control over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses. The Company made available to the Underwriter or its counsel for review true and complete copies of all minutes or draft minutes of meetings, or resolutions adopted by written consent, of the board of directors of the Company and each significant subsidiary of the Company within the meaning of Regulation S-X (each "**Significant Subsidiary**") and each committee of each such board in the past three years, and all agendas for each such meeting for which minutes or draft minutes do not exist.

(j) Except as described in the Disclosure Package as of the Applicable Time, since the date of the latest audited financial statements included or incorporated by reference in the Disclosure Package, there has been no change, nor any development or event involving a prospective change, in the financial condition, results of operations, business, properties or prospects of the Company and its subsidiaries, taken as a whole, that is material and adverse (a "**Material Adverse Change**").

(k) Except as described in the Prospectus and the Disclosure Package as of the Applicable Time, since the date of the latest audited financial statements included or incorporated by reference in the Disclosure Package, no litigation or governmental proceeding has been instituted or, to the knowledge of the Company, threatened against the Company or any subsidiary which would reasonably be expected to have any material adverse effect on the financial condition, results of operations, business, properties or prospects of the Company and its subsidiaries taken as a whole (a "**Material Adverse Effect**").

(l) The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware with the corporate power and authority to own, lease and operate its properties and conduct its business as described in the Prospectus and the Disclosure Package; and the Company is duly qualified or licensed to do business as a foreign corporation in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification or licensing, except to the extent that the failure to be so qualified or licensed or be in good standing would not have a Material Adverse Effect.

(m) Each Significant Subsidiary is a duly incorporated or formed and validly existing corporation, partnership or limited liability company, as applicable, in good standing under the laws of its jurisdiction of incorporation or formation with full corporate, partnership or limited liability company power and authority to own, lease and operate its properties and conduct its business as described in the Prospectus and the Disclosure Package. Each Significant Subsidiary is duly qualified or licensed to do business as a foreign corporation, partnership or limited liability company in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification or licensing, except to the extent that the failure to be so qualified or licensed or be in good standing would not have a Material Adverse Effect. The issued and outstanding common stock or other equity interests of each of the Significant Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable and, except as disclosed in the Prospectus and the Disclosure Package, are owned by the Company free and clear of any mortgages, liens or similar encumbrances.

(n) Neither the Company nor any Significant Subsidiary is (i) in violation of its certificate of incorporation or bylaws or similar organizational documents, (ii) in default in the performance or observance of any obligation in any indenture, mortgage, evidence of indebtedness or similar agreement or instrument to which it is a party or by which it or any of its properties may be bound or (iii) in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except, in the case of clauses (ii) and (iii) above, for any such default or violation that would not have a Material Adverse Effect. The execution and delivery of this Agreement and the consummation of the transactions contemplated herein and the incurrence of the obligations herein set forth (including, without limitation, the delivery and sale of the Offered Securities), have been duly authorized by all necessary corporate action and do not and will not, conflict with, or constitute or result in a breach of or default under, the certificate of incorporation or bylaws of the Company or, except for any such conflict, breach or default which would not have a Material Adverse Effect, any law, order, rule, regulation or court decree or any bond, debenture, note or other evidence of indebtedness or any material contract, lease, license, indenture, mortgage, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries or any of their respective properties may be bound; and the Company has full corporate power and authority to issue and sell the Offered Securities as contemplated by this Agreement.

(o) No consent, approval, authorization, order or qualification or registration of or with any court or governmental agency or body is required for the consummation of the transactions contemplated herein, except for (i) the registration of the offer and sale of the Offered Securities under the Act and such consents, approvals, authorizations, orders, qualifications or registrations as may be required under the Blue Sky or securities laws of any jurisdiction in connection with the purchase and distribution of the Offered Securities by the Underwriter; and (ii) such consents, approvals, authorizations, orders, qualifications or registrations, the failure of which to obtain or make would not individually or in the aggregate, have a Material Adverse Effect.

(p) The Company and each Significant Subsidiary possess such valid franchises, certificates of convenience and necessity, easements, rights of way, operating rights, licenses, permits, consents, authorizations and orders of governmental political subdivisions or

6

regulatory authorities as, in the opinion of the Company, are necessary to carry on the respective businesses of each as described in the Prospectus and the Disclosure Package, except where the failure to possess such would not have a Material Adverse Effect.

(q) Except as disclosed in the Disclosure Package and the Prospectus and except for matters that would not, individually or in the aggregate, have a Material Adverse Effect: (i) the Company and its subsidiaries and their respective properties and operations are and, during the relevant time periods specified in all applicable statutes of limitations, have been in compliance with all applicable federal, state, local and foreign laws, rules, regulations, ordinances, codes, orders, and other legally enforceable requirements relating to the prevention of pollution, the preservation of environmental quality, the protection of natural resources, or the remediation of environmental contamination (collectively, "**Environmental Laws**"); (ii) the Company and its subsidiaries and their respective properties and operations are not subject to any proceeding, lawsuit, or other legal action or, to the Company's knowledge, any investigation or formal request for information, by or before any governmental authority pursuant to any Environmental Law; (iii) the Company and its subsidiaries and their respective properties and operations are not subject to any liability (including any obligation to perform any investigatory, corrective or remedial action that has been asserted) pursuant to Environmental Laws in connection with any release into the environment of, or any exposure of any person or property to, any pollutant, contaminant, solid or hazardous waste, hazardous or toxic substance, or any other material regulated under Environmental Laws.

(r) Except as disclosed in the Disclosure Package and the Prospectus, the Company and its subsidiaries have (i) generally satisfactory title to their oil and gas properties, title investigations having been carried out by the Company in accordance with the practice in the oil and gas industries in the areas in which the Company operates, (ii) good and marketable title to all other real property owned by them to the extent necessary to carry on their business and (iii) good and marketable title to all personal property owned by them, in each case free from liens, encumbrances and defects that would materially affect the value thereof or materially interfere with the use made or to be made thereof by them; and except as disclosed in the Disclosure Package and the Prospectus, the Company and its subsidiaries hold any leased real or personal property under valid and enforceable leases with no exceptions that would materially interfere with the use made or to be made thereof by them.

(s) (i) The oil and natural gas reserve estimates of the Company and its subsidiaries, as of December 31, 2013, 2014 and 2015 contained in the Disclosure Package and the Prospectus are derived from reports by the Company and reviewed by Miller and Lents, Ltd., as set forth and to the extent indicated therein, and (ii) such estimates reasonably reflect the oil and natural gas reserves of the Company and its subsidiaries, as applicable, at the dates indicated therein and are in accordance, in all material respects, with Commission guidelines applied on a consistent basis throughout the periods involved.

(t) Miller and Lents, Ltd. has represented to the Company that it is, and the Company believes it to be, an independent petroleum engineer with respect to the Company and its subsidiaries and for the periods set forth in the Disclosure Package and the Prospectus.

(u) This Agreement has been duly authorized, executed and delivered by the Company.

(v) The Offered Securities have been duly authorized; when the Offered Securities have been issued, delivered and paid for in accordance with this Agreement on each Closing Date, such Offered Securities will have been, validly issued, fully paid and nonassessable, and will conform to the information in the Disclosure Package and to the description of such Offered Securities contained in the Prospectus; the stockholders of the Company have no preemptive rights with respect to the Securities; and none of the outstanding shares of capital stock of the Company have been issued in violation of any preemptive or similar rights of any security holder. Except as disclosed in the Registration Statement, the Disclosure Package and the Prospectus, including by way of incorporation by reference to the Company's filings with the Commission, there are no outstanding (A) securities or obligations of the Company convertible into or exchangeable for any capital stock of the Company, (B) warrants, rights or options to subscribe for or purchase from the Company any such capital stock or any such convertible or exchangeable securities or obligations or (C) obligations of the Company to issue or sell any shares of capital stock, any such convertible or exchangeable securities or obligations or any such warrants, rights or options. The Company has not, directly or indirectly, offered or sold any of the Offered Securities by means of any "prospectus" (within the meaning of the Act and the Rules and Regulations) or used any "prospectus" or made any offer (within the meaning of the Act and the Rules and Regulations) in connection with the offer or sale of the Offered Securities, in each case other than through the preliminary prospectus supplement referred to in Section 1(e), the Prospectus and any Permitted Free Writing Prospectus (as defined herein). No person has the right to require the Company or any of its subsidiaries to register any securities for sale under the Act by reason of the filing of the Registration Statement with the Commission or the issuance and sale of the Offered Securities.

(w) The documents incorporated by reference in the Registration Statement, the Disclosure Package and the Prospectus, when they were filed with the Commission conformed in all material respects to the requirements of the Exchange Act and none of such documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and any further documents so filed and incorporated by reference in the Registration Statement, the Disclosure Package and the Prospectus, when such documents become effective or are filed with the Commission, as the case may be, will conform in all material respects to the requirements of the Act or the Exchange Act, as applicable, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(x) The Company is not and, after giving effect to the offering and sale of the Offered Securities and the application of the proceeds therefrom, will not be, an "investment company" or an entity "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

8

(y) The Company has an authorized capitalization as set forth in the Disclosure Package and all of the issued shares of capital stock of the Company have been duly and validly authorized and issued and are fully paid and non-assessable.

(z) No litigation or governmental proceeding has been instituted or, to the Company's knowledge, threatened, against the Company or any subsidiary which would reasonably be expected to have a material adverse effect on the Company's ability to perform its obligations under and consummate the transactions contemplated by this Agreement.

(aa) The operations of the Company and its subsidiaries are and have been conducted at all times in material compliance with applicable financial record-keeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of jurisdictions where the Company and its subsidiaries conduct business, the applicable rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued administered or enforced by any governmental agency (collectively, the "**Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Money Laundering Laws is pending or, to the Company's knowledge, threatened.

(bb) Neither the Company nor, to the Company's knowledge, any director, officer, agent, employee, affiliate or representative of the Company or any of its subsidiaries is currently the target or subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"), the United Nations Security Council ("**UNSC**"), the European Union, Her Majesty's Treasury ("**HMT**") or any similar sanctions imposed by any other body, governmental or other, to which the Company or any of its subsidiaries is subject (collectively, "**other economic sanctions**"); and the Company will not directly or indirectly use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC or other economic sanctions.

(cc) Neither the Company nor any of its subsidiaries nor, to the Company's knowledge, any director, officer or employee: (i) has used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) has made any direct or indirect unlawful contribution or payment to any official of, or candidate for, or any employee of, any federal, state or foreign office from corporate funds; (iii) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment; or (iv) is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions ("**OECD Convention**"), the Foreign Corrupt Practice Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "**FCPA**") or any similar law or regulation to which the Company, any of its subsidiaries, any director, officer, agent, employee, affiliate or other person associated with or acting on behalf of the Company or any of its subsidiaries is subject. The Company, its subsidiaries and their affiliates have each conducted

9

their businesses in compliance with the FCPA and any applicable similar law or regulation and have institutes and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

(dd) Except for matters that would not individually or in the aggregate have a Material Adverse Effect, (i) none of the Company or its subsidiaries has any liability for any prohibited transaction or any complete or partial withdrawal liability with respect to any pension, profit sharing or other plan that is subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), to which the Company or any of its subsidiaries makes or ever has made a contribution and in which any employee of the Company or of any of its subsidiaries is or has ever been a participant and (ii) with respect to such plans, the Company and each subsidiary is in compliance with all applicable provisions of ERISA (including the funding provisions thereof).

Section 2. *Purchase and Sale*. On the basis of the representations, warranties and agreements and subject to the terms and conditions set forth herein, the Company agrees to sell to the Underwriter, and the Underwriter agrees to purchase from the Company, at a purchase price of $53.2310 per share, that number of Firm Securities set forth opposite the name of the Underwriter in <u>Schedule I</u> hereto under the caption "Number of Firm Securities to be Purchased".

The Company will deliver the Firm Securities to the Underwriter in a form reasonably acceptable to the Underwriter against payment of the purchase price in Federal (same day) funds by official bank check or checks or wire transfer to an account at a bank acceptable to the Underwriter drawn to the order of the Company, at the office of Akin Gump Strauss Hauer & Feld LLP, 1111 Louisiana St., 44th Floor, Houston, Texas 77002, at 9:00 am (Eastern Time), on September 16, 2016, or at such other time not later than seven full business days thereafter as the Underwriter and the Company determine, such time being herein referred to as the "**First Closing Date**". For purposes of Rule 15c6-1 under the Exchange Act, the First Closing Date (if later than the otherwise applicable settlement date) shall be the settlement date for payment of funds and delivery of securities for all the Offered Securities sold pursuant to the offering. Delivery of the Firm Securities will be made through the facilities of the Depositary Trust Company (the "**DTC**") unless the Underwriter shall otherwise instruct.

In addition, upon written notice from the Underwriter given to the Company from time to time not more than 30 days subsequent to the date of the Prospectus, the Underwriter may purchase all or less than all of the Optional Securities at the purchase price per Security to be paid for the Firm Securities; *provided, however*, that the amount paid by the Underwriter for any Optional Securities shall be reduced by an amount per Security equal to any dividends declared by the Company and payable on the Firm Securities but not payable on such Optional Securities. Such notice shall set forth (i) the aggregate number of shares of Optional Securities to be sold by the Company as to which the Underwriter is exercising the option and (ii) the time, date and place at which the Optional Securities will be delivered (each time for the delivery of and payment for the Optional Securities being herein referred to as an "**Optional Closing Date**," which may be the First Closing Date) (the First Closing Date and each Optional Closing Date, if any, being sometimes referred to as a "**Closing Date**"). The Company agrees to sell to the Underwriter the number of Optional Securities specified in such notice and the Underwriter

10

agrees to purchase such Optional Securities. No Optional Securities shall be sold or delivered unless the Firm Securities previously have been, or simultaneously are, sold and delivered. The right to purchase the Optional Securities or any portion thereof may be exercised from time to time and to the extent not previously exercised may be surrendered and terminated at any time upon notice by the Underwriter to the Company.

Each Optional Closing Date shall be determined by the Underwriter but shall be not later than five full business days after written notice of election to purchase Optional Securities is given. The Company will deliver the Optional Securities being purchased on each Optional Closing Date to the Underwriter in a form reasonably acceptable to the Underwriter, against payment of the purchase price therefor in Federal (same day) funds by official bank check or checks or wire transfer to an account at a bank acceptable to the Underwriter drawn to the order of the Company, at the above office of Akin Gump Strauss Hauer & Feld LLP. The delivery of any Optional Securities will be made through the facilities of the DTC unless the Underwriter shall otherwise instruct.

Section 3. *Offering by the Underwriter*. It is understood that the Underwriter proposes to offer the Offered Securities for sale to the public as set forth in the Prospectus.

Section 4. *Covenants of the Company*. The Company covenants with the Underwriter as follows with respect to such offering of Offered Securities:

(a) The Company will file the Prospectus with the Commission within the time periods specified by Rule 424(b) and Rule 430A, 430B or 430C under the Act, will file any Issuer Free Writing Prospectus to the extent required by Rule 433 under the Act; and the Company will file promptly all reports and any definitive proxy or information statements required to be filed by the Company with the Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date of the Prospectus and for so long as the delivery of a prospectus is required in connection with the offering or sale of the Offered Securities; and the Company will furnish copies of the Prospectus and each Issuer Free Writing Prospectus (to the extent not previously delivered) to the Underwriter prior to 10:00 A.M., New York City time, on the business day next succeeding the date of this Agreement in such quantities as the Underwriter may reasonably request.

(b) If at any time when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) under the Act) is required by the Act to be delivered in connection with sales of such Offered Securities any event shall occur or condition exist as a result of which it is necessary to further amend or supplement the Prospectus in order that the Prospectus will not include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in the light of circumstances existing at the time it is delivered to a purchaser or if it shall be necessary to amend or supplement the Registration Statement or the Prospectus in order to comply with the requirements of the Act or the Rules and Regulations, the Company will, as soon as practicable, prepare and file (if required) with the Commission such amendment or supplement, whether by filing documents pursuant to the Exchange Act or otherwise, as may be necessary to correct such untrue statement or omission or to make the Registration Statement comply with such requirements.

11

(c) If the Disclosure Package is being used to solicit offers to buy the Offered Securities at a time when the Prospectus is not yet available to prospective purchasers and any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Disclosure Package in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if any event shall occur or condition exist as a result of which the Disclosure Package conflicts with the information contained in the Registration Statement then on file, or if, in the opinion of counsel for the Underwriter, it is necessary to amend or supplement the Disclosure Package to comply with applicable law, the Company will prepare, file with the Commission and furnish, at its own expense, to the Underwriter and to any dealer upon request, either amendments or supplements to the Disclosure Package so that the statements in the Disclosure Package as so amended or supplemented will not contain any statement of untrue material fact or omit to state a material fact necessary in order to make the statements not misleading, in the light of the circumstances when delivered to a prospective purchaser, or so that the Disclosure Package, as amended or supplemented, will no longer conflict with the Registration Statement, or so that the Disclosure Package, as amended or supplemented, will comply with applicable law.

(d) The Company will make generally available to its security holders as soon as practicable, but in any event not later than 18 months after the date of this Agreement, earnings statements of the Company and its subsidiaries (which need not be audited) complying with Section 11(a) of the Act and the Rules and Regulations (including, at the option of the Company, Rule 158 under the Act).

(e) The Company, during the period when the Prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) is required by the Act to be delivered in connection with sales of such Offered Securities, will give the Underwriter notice of its intention to file any amendment to the Registration Statement or any amendment or supplement to the Prospectus or the Disclosure Package, whether pursuant to the Act or otherwise and will furnish the Underwriter with copies of any such amendment or supplement or other documents proposed to be filed in a reasonable time for review by the Underwriter in advance of filing.

(f) The Company, during the period when the Prospectus (or in lieu thereof, the notice referred to in Rule 173(a) under the Act) is required by the Act to be delivered in connection with sales of such Offered Securities, will notify the Underwriter, as soon as practicable, and confirm the notice in writing, of: (i) the effectiveness of any amendment to the Registration Statement; (ii) the mailing or delivery to the Commission for filing of any supplement to the Prospectus or the Disclosure Package, or any document to be filed pursuant to the Exchange Act; (iii) the receipt of any comments from the Commission with respect to the Registration Statement, the Prospectus or the Disclosure Package; (iv) any request by the Commission for any amendment to the Registration Statement or any amendment or supplement to the Prospectus or the Disclosure Package or for additional information; (v) the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or of the threat or initiation of any proceedings for that purpose or pursuant to Section 8A of the Act; and (vi) the receipt by the Company of any notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) under the Act. The Company will make every reasonable effort to prevent the issuance of any such stop order and, if any such stop order is issued, to obtain the lifting thereof at the earliest possible moment.

(g) The Company will deliver to the Underwriter, as soon as practicable, as many conformed copies of the Registration Statement (as originally filed) and of each amendment thereto (including, except to the extent available on the Commission's Electronic Data Gathering, Analysis, and Retrieval system, exhibits filed therewith or incorporated by reference therein and documents incorporated by reference in the Prospectus and the Disclosure Package pursuant to Item 12 of Form S-3 under the Act) as the Underwriter may reasonably request and will also deliver to the Underwriter, upon request, a conformed copy of the Registration Statement and each amendment thereto for the Underwriter.

(h) The Company will cooperate with the Underwriter to qualify the Offered Securities for offering and sale under the applicable Blue Sky or securities laws of such states and other jurisdictions of the United States as the Underwriter may designate, and will cooperate in maintaining such qualifications in effect for as long as may be required for the distribution of such Offered Securities except that the Company shall not be obligated to file any general consent to service or to qualify as a foreign corporation or as a dealer in securities in any jurisdiction in which it is not so qualified. In each jurisdiction in which such Offered Securities or the sale thereof shall have been qualified as above provided, the Company will cooperate with the Underwriter to make and file such statements and reports in each year as may be required by the laws of such jurisdiction. The Company will cooperate in the determination of the eligibility for investment of the Offered Securities under the laws of such jurisdictions as the Underwriter reasonably requests.

(i) So long as the Offered Securities are outstanding, the Company will furnish to the Underwriter, as soon as they are available, copies of all reports or other communications (financial or other) furnished to holders of the Offered Securities, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system; provided the Company will be deemed to have furnished such reports and financial statements to the Underwriter to the extent they are filed on the Commission's Electronic Data Gathering, Analysis, and Retrieval system.

(j) The Company will use the net proceeds received by it in connection with this offering in the manner described in under the caption "Use of Proceeds" in the Disclosure Package and the Prospectus.

(k) The Company will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in, stabilization or manipulation of the price of any securities of the Company to facilitate the sale or resale of the Offered Securities.

(l) The Company will use its reasonable best efforts to list, subject to notice of issuance, the Offered Securities on the New York Stock Exchange (the "**Exchange**").

(m) For a period of 75 days after the date of the Prospectus, the Company will not (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any

13

option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, or file with the Commission a registration statement under the Act relating to, any Securities or any securities convertible into or exercisable or exchangeable for Securities, or publicly disclose the intention to make any offer, sale, pledge, disposition or filing, or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the Securities or any such other securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Stock or such other securities, in cash or otherwise, without the prior written consent of the Underwriter, other than (A) the Securities to be sold hereunder, (B) any Securities issued upon the exercise of options granted under stock-based compensation plans of the Company and its subsidiaries and (C) any Securities deliverable to settle purchase contracts relating to the Company's 7.50% Tangible Equity Units.

Section 5. *Free Writing Prospectuses*. The Company represents and agrees that, unless it obtains the prior consent of the Underwriter, and the Underwriter represents and agrees, that, unless it obtains the prior consent of the Company, it has not made and will not make any offer relating to the Offered Securities that would constitute an Issuer Free Writing Prospectus, or that would otherwise constitute a "free writing prospectus," as defined in Rule 405, required to be filed with the Commission. Any such free writing prospectus consented to by the Company and the Underwriter is hereinafter referred to as a "**Permitted Free Writing Prospectus**." The Company represents that it has treated and agrees that it will treat each Permitted Free Writing Prospectus as an "issuer free writing prospectus," as defined in Rule 433, and has complied and will comply with the requirements of Rules 164 and 433 applicable to any Permitted Free Writing Prospectus, including timely Commission filing where required, legending and record keeping. The Company represents that it has satisfied and agrees that it will satisfy the conditions under Rule 433 under the Act to avoid a requirement to file with the Commission any Company Additional Written Communication made in connection with the offering of the Offered Securities.

Section 6. *Conditions to the Obligations of the Underwriter*. The obligations of the Underwriter to purchase and pay for the Firm Securities on the First Closing Date and the Optional Securities to be purchased on each Optional Closing Date will be subject to the accuracy in all material respects, unless otherwise qualified by materiality (in which case such representations and warranties will be accurate), of the representations and warranties of the Company herein (as though made on such Closing Date), to the performance by the Company in all material respects of its covenants and other obligations hereunder and to the following further conditions:

(a) The Prospectus shall have been filed with the Commission in accordance with the Rules and Regulations and Section 4(b) hereof. No stop order suspending the effectiveness of the Registration Statement shall have been issued under the Act or proceedings therefor initiated or threatened by the Commission.

14

(b) At the applicable Closing Date, the Underwriter shall have received signed copies of:

1. The opinion, dated as of the applicable Closing Date, of Vinson & Elkins L.L.P., special counsel for the Company that:

(i) The Company is validly existing as a corporation in good standing under the laws of the State of Delaware and has the corporate power and authority under the Delaware General Corporation Law and its certificate of incorporation and bylaws to own, lease and operate its properties and conduct its business as described in the Prospectus and the Disclosure Package.

(ii) The Company and each Significant Subsidiary is duly qualified or licensed to do business as a foreign corporation, partnership or limited liability company in good standing in each jurisdiction listed on a schedule to such opinion in which the conduct of its business or its ownership or leasing of property requires such qualification or licensing, except to the extent that the failure to be so qualified or licensed or be in good standing would not have a Material Adverse Effect.

(iii) Each domestic Significant Subsidiary is validly existing as an entity in good standing under the laws of the jurisdiction of its organization, has the entity power and authority under the applicable entity law and its certificate of incorporation and bylaws or similar organizational documents to own, lease and operate its properties and conduct its business as described in the Prospectus and the Disclosure Package.

(iv) The authorized capital stock of the Company conforms as to legal matters to the description thereof contained in the Registration Statement, Disclosure Package and the Prospectus. The authorized, issued and outstanding capital stock of the Company is as set forth in the Registration Statement, Disclosure Package and the Prospectus under the caption "Capitalization."

(v) The execution and delivery of this Agreement by the Company has been duly authorized by all necessary corporate action by the Company. This Agreement has been duly and validly executed and delivered by the Company.

(vi) The Securities to be issued and sold by the Company to the Underwriter under this Agreement have been duly authorized in accordance with the Company's Governing Documents and, when issued and delivered by the Company to the Underwriter upon payment therefor in accordance with this Agreement, will be validly issued in accordance with the Governing Documents, free of preemptive rights under federal law, the General Corporation Law of the State of Delaware or the Governing Documents, fully paid and non-assessable.

(vii) The Registration Statement has become effective under the Act and, to such counsel's knowledge, no stop order suspending the effectiveness of the Registration Statement has been issued under the Act, and no proceeding pursuant to Section 8A of the Act against the Company or in connection with the offering is pending or, to the knowledge of such counsel, threatened by the Commission.

(viii) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body (each, a "**Filing**") is required to be made or obtained by the Company under any laws for the due execution and delivery of this Agreement, the issuance of the Offered Securities, the incurrence of the obligations set forth herein and therein, the consummation of the transactions herein and therein contemplated and the performance by the Company of its obligations hereunder, except (i) such Filings as have been obtained or made, (ii) Filings under state securities or Blue Sky laws in connection with the purchase and distribution of the Offered Securities by the Underwriter, (iii) such filings under the Act or the Exchange Act as may be required under Section 4 hereof and (iv) for such Filings that, if not obtained, have not or would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(ix) The execution and delivery of this Agreement, the issuance of the Offered Securities, the incurrence of the obligations set forth herein, the consummation of the transactions herein contemplated and the performance by the Company of its obligations hereunder do not and will not result in a violation of the Company's certificate of incorporation or bylaws or the laws of the State of New York, other than state securities laws or "Blue Sky" laws, as to which such counsel need express no opinion.

(x) The Company is not, and immediately after giving effect to the offering and sale of the Offered Securities and the application of the proceeds thereof, as described in the Prospectus, will not be, required to register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.

(xi) The descriptions included in, or incorporated by reference into, the Disclosure Package and the Prospectus under the headings "Material U.S. federal income tax considerations for non-U.S. holders," "Description of Capital Stock" and "Underwriting" and the statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 under the heading "Business—Regulatory and Environmental Matters," to the extent that they constitute summaries of the terms of capital stock of the Company, agreements, documents or proceedings, matters of law or regulation or legal conclusions, are accurate in all material respects.

Such special counsel shall also state that:

(A) Each of the Registration Statement, the documents incorporated by reference therein, the Prospectus and any supplements or amendments thereto (except the financial statements, financial schedules and other financial, accounting, reserve and production data contained or incorporated by reference therein), at the time it was filed with the Commission, appeared on its face to be appropriately responsive in all material respects to the requirements of the Act and the Exchange Act and the rules and regulations thereunder; and

(B) No information has come to such counsel's attention that causes such special counsel to believe that (i) the Registration Statement, as of its effective date and as of the date of this Agreement, contained an untrue statement of a material fact or omitted to

state a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) the Disclosure Package, as of the Applicable Time, included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (iii) the Prospectus, as amended or supplemented, if applicable, as of their respective dates and as of the Closing Date, included or includes an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that in the case of each of clauses (i)-(iii) above, such counsel need not express any view as to the financial statements, financial schedules and other financial, accounting, reserve and production data contained or incorporated by reference therein.

With respect to subparagraphs (A) and (B) above, such counsel may state that their opinion and belief are based upon their participation in the preparation of the Registration Statement, the Prospectus and the Disclosure Package, and any amendments or supplements thereto, and review and discussion of the contents thereof, but are without independent check or verification except as specified and without assumption of any responsibility for the accuracy, completeness or fairness of the statements contained or incorporated therein except as otherwise provided in clauses (iii), (iv), (v), (ix), (x) and (xi) above.

In rendering such opinion, such special counsel may opine only as to the Federal laws of the United States, the laws of the State of Texas and the General Corporation Law of the State of Delaware. Such counsel may also state that they have relied as to certain factual matters on information obtained from public officials, officers of the Company and other sources. In rendering such opinion, special counsel for the Company may have received and may rely upon such certificates and other documents and information as they may reasonably request to pass upon such matters.

2. The opinion, dated as of the applicable Closing Date, of the General Counsel or Deputy General Counsel of the Company, in form and substance satisfactory to the Underwriter, to the effect that:

(i) The issued and outstanding common stock or other equity interests of each Significant Subsidiary have been duly authorized and validly issued and are fully paid and non-assessable; and the Company owns all of the issued and outstanding common stock or other equity interests of each Significant Subsidiary free and clear of any mortgages, liens or similar encumbrances.

(ii) The execution and delivery of the this Agreement, the issuance of the Offered Securities, the incurrence of the obligations set forth herein, the consummation of the transactions herein contemplated and the performance by the Company of its obligations hereunder do not and will not conflict with or constitute or result in a breach of, or default under: (a) any judgment, order or decree of the United States government, governmental instrumentality thereof or any United States court having jurisdiction over the Company, any Significant Subsidiary, or any of their property, which is material to such entities, taken as a whole; (b) any provision of any

17

contract, indenture, mortgage, loan agreement, note, lease or similar agreement or instrument known to such counsel to which the Company or any Significant Subsidiary is a party or by which they or any material part of their property is bound; or (c) federal laws or the General Corporation Law of the State of Delaware, in all cases except for such conflicts, breaches or defaults as would not have a Material Adverse Effect.

(iii) Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or bylaws or similar organizational documents and, to the best of such counsel's knowledge no default (or event which, with the giving of notice or lapse of time would be a default) has occurred in the due performance or observance of any obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, loan agreement, note, lease or other agreement or instrument that is described or referred to in the Registration Statement or the Disclosure Package or filed or incorporated by reference as an exhibit to the Registration Statement, except for such defaults as would not have a Material Adverse Effect.

(iv) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body (each, a "**Filing**") is required under any laws for the due execution and delivery of this Agreement by the Company, the issuance of the Offered Securities, the incurrence of the obligations set forth herein, the consummation of the transactions herein contemplated and the performance by the Company of its obligations hereunder, except (i) such Filings as have been obtained or made, (ii) Filings under state securities or Blue Sky laws in connection with the purchase and distribution of the Offered Securities by the Underwriter and (iii) such filings under the Act or the Exchange Act as may be required under Section 4 hereof.

(v) To the best of such counsel's knowledge, there is no litigation or governmental proceeding instituted or threatened against the Company or any Significant Subsidiary which would be required to be disclosed in the Prospectus or the Disclosure Package and which is not disclosed.

Such counsel shall also state that each of the Registration Statement, the documents incorporated by reference therein, the Prospectus and any supplements or amendments thereto (except the financial statements, financial schedules and other financial, accounting, reserve and production data contained or incorporated by reference therein), at the time it was filed with the Commission, appeared on its face to be appropriately responsive in all material respects to the requirements of the Act and the Exchange Act and the rules and regulations thereunder; and

With respect to the paragraph above, such counsel may state that his or her opinion and belief are based upon his or her participation, or the participation of the attorneys over whom he or she supervises, in the preparation of the Registration Statement, the Prospectus and the Disclosure Package, and any amendments or supplements thereto, and review and discussion of the contents thereof, but are without independent check or verification except as specified and without assumption for any responsibility for the accuracy, completeness or fairness of the statements contained or incorporated therein.

18

In rendering the foregoing opinion or opinions, such counsel may opine only as to the Federal laws of the United States, the laws of the State of Texas and the statutes of the State of Delaware governing corporations, partnerships and limited liability companies. Such counsel may also state that they have relied as to certain factual matters on information obtained from public officials, officers of the Company and other sources believed by them to be responsible. In rendering the foregoing opinion, such counsel may have received and may rely upon such certificates and other documents and information as he or she may reasonably request to pass upon such matters.

3. The opinion or opinions, dated as of the applicable Closing Date, of counsel for the Underwriter specified in the Prospectus and the Disclosure Package, with respect to the validity of the Offered Securities the Registration Statement, the Prospectus, the Disclosure Package and other related matters as the Underwriter reasonably may request. In rendering the foregoing opinion, such counsel may rely, to the extent recited therein, as to matters involving the laws of any jurisdiction other than the States of Delaware and New York, upon opinions of local counsel. Such counsel may also state that they have relied as to certain factual matters on information obtained from public officials, officers of the Company and other sources believed by them to be responsible.

(c) Subsequent to the execution and delivery of this Agreement, there shall not have occurred (i) any Material Adverse Change which, in the judgment of the Underwriter, is material and adverse and makes it impractical or inadvisable to proceed with the offering, sale or delivery of the Offered Securities; (ii) any downgrading in the rating of any debt securities of the Company by Moody's Investors Service, Inc., Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Fitch Ratings Inc., or any public announcement that any such organization has under surveillance or review its rating of any debt securities of the Company (other than an announcement with positive implications of a possible upgrading, and no implication of a possible downgrading, of such rating) or any announcement that the Company has been placed on negative outlook (other than an announcement, following a ratings upgrading by a ratings agency, that the Company has been placed on negative outlook by such ratings agency); (iii) any change in U.S. or international financial, political or economic conditions or currency exchange rates or exchange controls, the effect of which is such as to make it, in the judgment of the Underwriter, impractical to proceed with the offering, sale or delivery of, or to enforce contracts for the sale of, the Offered Securities, whether in the primary market or in respect of dealings in the secondary market; (iv) any suspension or material limitation of trading in securities generally on the Exchange, or any setting of minimum or maximum prices for trading on such exchange; (v) any suspension of trading of any securities of the Company on any exchange or in the over-the-counter market; (vi) any banking moratorium declared by any U.S. federal or New York authorities; (vii) any major disruption of settlements of securities, payment, or clearance services in the United States or any other country where such securities are listed or (viii) any attack on, outbreak or escalation of hostilities or act of terrorism involving the United States, any declaration of war by Congress or any other national or international calamity or emergency if, in the judgment of the Underwriter, the effect of any such attack, outbreak, escalation, act, declaration, calamity or emergency is such as to make it impractical or inadvisable to proceed with the offering, sale or delivery of, or to enforce contracts for the sale of, the Offered Securities.

19

(d) (i) On the date of this Agreement, concurrent with its execution, the Underwriter shall have received from KPMG LLP a letter, dated such date, in form and substance satisfactory to the Underwriter, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information relating to the Company and its subsidiaries contained in or incorporated by reference into the Registration Statement, the Prospectus and the Disclosure Package and (ii) at the applicable Closing Date, KPMG LLP shall have furnished to the Underwriter a letter, dated the date of delivery thereof, to the effect that they reaffirm the statements made in their letter furnished pursuant to the preceding clause (i), except that the specified date referred to shall be a date not more than three business days prior to the Closing Date.

(e) (i) On the date of this Agreement but prior to its execution, the Underwriter shall have received from Miller and Lents, Ltd., a letter, dated such date, in form and substance satisfactory to the Underwriter, with respect to the December 31, 2015 reserve information for the Company, included or incorporated by reference into the Registration Statement, the Prospectus and the Disclosure Package and (ii) at the applicable Closing Date, Miller and Lents, Ltd. shall have furnished to the Underwriter a letter, dated the date of delivery thereof, to the effect that they reaffirm the statements made in their letter furnished pursuant to the preceding clause (i).

(f) The Underwriter shall have received a certificate, dated the applicable Closing Date, of an executive officer of the Company and a principal financial or accounting officer of the Company in which such officers shall state, in their respective capacities as officers of the Company, that: the representations and warranties of the Company in this Agreement are true and correct; the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date; no stop order suspending the effectiveness of the Registration Statement or of any part thereof has been issued and no proceedings for that purpose have been instituted or, to such counsel's knowledge and after reasonable investigation, are contemplated by the Commission; and subsequent to the date of the most recent financial statements in the Disclosure Package, there has been no Material Adverse Change except as set forth in the Disclosure Package.

(g) At the applicable Closing Date, counsel for the Underwriter shall have been furnished with such documents as they may reasonably require for the purpose of enabling them to pass upon the issuance and sale of the Offered Securities as herein contemplated and related proceedings or in order to evidence the accuracy and completeness of any of the representations and warranties, or the fulfillment of any of the conditions, herein contained; and all proceedings taken by the Company in connection with the issuance and sale of the Offered Securities as herein contemplated shall be satisfactory in form and substance to the Underwriter and counsel for the Underwriter.

(h) The Financial Industry Regulatory Authority, Inc. ("**FINRA**") shall not have raised any objection with respect to the fairness or reasonableness of the underwriting, or other arrangements of the transactions, contemplated hereby.

(i) The Offered Securities shall have been approved for listing on the Exchange, subject to official notice of issuance, and satisfactory evidence of such actions shall have been provided to the Underwriter.

(j) On or prior to the date hereof, the Underwriter shall have received lock-up letters in the form of Exhibit A from each of the persons listed on Schedule IV hereto.

If any condition specified in this Section shall not have been fulfilled when and as required by this Agreement to be fulfilled, this Agreement may be terminated by the Underwriter by notice to the Company at any time at or prior to the applicable Closing Date, and such termination shall be without liability of any party to any other party except as otherwise provided in Sections 7, 8 and 9 hereof.

The Company will furnish the Underwriter with any additional opinions, certificates, letters and documents as the Underwriter reasonably requests and conformed copies of documents delivered pursuant to this Section 6. The Underwriter may in its sole discretion waive compliance with any conditions to the obligations of the Underwriter hereunder, whether in respect of an Optional Closing Date or otherwise.

Section 7. *Payment of Expenses*. The Company will pay all expenses incident to the performance of its obligations under this Agreement, including but not limited to any filing fees and other expenses (including reasonable fees and disbursements of counsel to the Underwriter) incurred in connection with qualification of the Offered Securities for sale under the laws of such jurisdictions as the Underwriter may designate and the preparation and printing of memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Securities, for any costs and expenses related to, the review by FINRA of the Offered Securities (including filing fees and the reasonable fees and expenses of counsel for the Underwriter relating to such review), costs and expenses relating to investor presentations or any "road show" in connection with the offering and sale of the Offered Securities including, without limitation, any travel expenses of the Company's officers and employees and any other expenses of the Company including the chartering of airplanes, fees and expenses incident to listing the Offered Securities on the Exchange, fees and expenses in connection with the registration of the Offered Securities under the Exchange Act, and expenses incurred in distributing any Statutory Prospectuses and the Prospectus (including any amendments and supplements thereto) to the Underwriter and for expenses incurred for preparing, printing and distributing any Issuer Free Writing Prospectuses to investors or prospective investors.

Section 8. *Indemnity and Contribution*.

(a) *Indemnification of Underwriter by the Company*. The Company will indemnify and hold harmless the Underwriter, its partners, members, directors, officers, employees, agents, affiliates and each person, if any, who controls the Underwriter within the meaning of Section 15 of the Act or Section 20 of the Exchange Act (each, an "**Indemnified Party**"), against any and all losses, claims, damages or liabilities, joint or several, to which such Indemnified Party may become subject, under the Act, the Exchange Act, or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in

21

any part of the Registration Statement at any time, any Statutory Prospectus as of any time, the Prospectus, any Issuer Free Writing Prospectus or any Company Additional Written Communication, or arise out of or are based upon the omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Indemnified Party for any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending against any such loss, claim, damage, liability, action, litigation, investigation or proceeding whatsoever (whether or not such Indemnified Party is a party thereto), whether threatened or commenced, and in connection with the enforcement of this provision with respect to any of the above as such expenses are incurred; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement in or omission or alleged omission from any of such documents in reliance upon and in conformity with written information furnished to the Company by the Underwriter, if any, specifically for use therein, it being understood and agreed that the only such information furnished by the Underwriter consists of the information described as such in this Agreement.

(b) *Indemnification of the Company*. The Underwriter will indemnify and hold harmless the Company, its directors and officers who sign the Registration Statement, and each person, if any, who controls the Company within the meaning of Section 15 of the Act or Section 20 of the Exchange Act (each, an "**Underwriter Indemnified Party**"), against any losses, claims, damages or liabilities, joint or several, to which the Underwriter Indemnified Party may become subject, under the Act, the Exchange Act, or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any part of the Registration Statement at any time, any Statutory Prospectus as of any time, the Prospectus, any Issuer Free Writing Prospectus or any Company Additional Written Communication, or arise out of or are based upon the omission or the alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by the Underwriter, if any, specifically for use therein, and will reimburse any legal or other expenses reasonably incurred by such Underwriter Indemnified Party in connection with investigating or defending against any such loss, claim, damage, liability, action, litigation, investigation or proceeding whatsoever (whether or not such Underwriter Indemnified Party is a party thereto), whether threatened or commenced, and in connection with the enforcement of this provision with respect to any of the above as such expenses are incurred, it being understood and agreed that the only such information furnished by the Underwriter consists of the information described as such in this Agreement.

(c) *Actions against Parties; Notification*. Promptly after receipt by an indemnified party under this Section of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under subsection (a) or (b) above, notify the indemnifying party in writing of the commencement thereof; but the failure to notify the indemnifying party shall not relieve it from any liability that it may have under subsection (a) or (b) above except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided

22

further that the failure to notify the indemnifying party shall not relieve it from any liability that it may have to an indemnified party otherwise than under subsection (a) or (b) above. In case any such action is brought against any indemnified party and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party will not be liable to such indemnified party under this Section for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof, provided that the indemnifying party shall reimburse any legal or other expenses incurred by such indemnified party for separate counsel (including a local counsel) if (i) the indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the indemnifying party or (ii) the named parties in any such action (including any impleaded parties) include both the indemnifying party and the indemnified party and the indemnified party reasonably determines that representation of both parties by the same counsel would be inappropriate due to the actual or potential differing interest between them. It is understood and agreed that the indemnifying party shall not, in connection with any action or related action in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all indemnified parties. The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent (which consent shall not be unreasonably withheld), but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time the indemnified party shall have requested in writing that the indemnifying party reimburse the indemnified party for fees and expenses of counsel as contemplated by this Section 8, the indemnifying party shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the indemnifying party of such request and (ii) the indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement (i) includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action and (ii) does not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an indemnified party. In no event shall the indemnifying party be liable for the fees and expenses of more than one counsel (in addition to appropriate local counsel) at any time for any indemnified party in connection with any one action or separate but substantially similar or related actions arising in the same jurisdiction out of the same general allegations or circumstances.

(d) *Contribution*. If the indemnification provided for in this Section is unavailable or insufficient to hold harmless an indemnified party under subsection (a) or (b) above, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of the losses, claims, damages or liabilities referred to in subsection

23

(a) or (b) above (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Underwriter on the other from the offering of the Offered Securities or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company on the one hand and the Underwriter on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Underwriter on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) received by the Company bear to the total underwriting discounts and commissions received by the Underwriter from the Company hereunder. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Underwriter and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The amount paid by an indemnified party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any action or claim which is the subject of this subsection (d). Notwithstanding the provisions of this subsection (d), the Underwriter shall not be required to contribute any amount in excess of the amount by which the total price at which the Offered Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which the Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Company and the Underwriter agree that it would not be just and equitable if contribution pursuant to this Section 8(d) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 8(d).

(e) *Control Persons*. The obligations of the Company under this Section shall be in addition to any liability which the Company may otherwise have and shall extend, upon the same terms and conditions, to each person, if any, who controls the Underwriter within the meaning of the Act; and the obligations of the Underwriter under this Section shall be in addition to any liability which the Underwriter may otherwise have and shall extend, upon the same terms and conditions, to each director of the Company, to each officer of the Company who has signed the Registration Statement, and to each person, if any, who controls the Company within the meaning of the Act.

Section 9. *Survival of Certain Representations and Obligations*. The respective indemnities, agreements, representations, warranties and other statements of the Company or its officers, and of the Underwriter set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by or on behalf of the Underwriter, the Company, or any of their respective representatives, officers or directors or any controlling person, and will survive delivery of and payment for the Offered Securities. If the purchase of the Offered Securities by the Underwriter is not

24

consummated for any reason other than because of the termination of this Agreement pursuant to Sections 6(c)(iii), (iv), (vi), (vii) and (viii) hereof, the Company will reimburse the Underwriter for all out-of-pocket expenses (including fees and disbursements of counsel) reasonably incurred by them in connection with the offering of the Offered Securities, and the respective obligations of the Company and the Underwriter pursuant to Section 8 hereof shall remain in effect. In addition, if any Offered Securities have been purchased under this Agreement, the representations and warranties in Section 1 hereof and all obligations under Section 4 hereof shall also remain in effect.

Section 10. [Reserved].

Section 11. *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, or transmitted by any standard form of telecommunication. Notices to the Underwriter shall be directed to it at: J.P. Morgan Securities LLC, 383 Madison Avenue, New York, New York 10179, Attention: Equity Syndicate Desk, with a copy to the Legal Department; and notices to the Company shall be directed to it at: 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, attention of Vice President and Treasurer, or to such other address or person as may be designated in any such notice, or to such other address or person as may be designated in any such notice.

Section 12. *Parties.* This Agreement shall inure to the benefit of and be binding upon the Underwriter and the Company, and their respective successors. Nothing expressed or mentioned herein is intended or shall be construed to give any person, firm or corporation, other than the parties hereto or thereto and their respective successors and the controlling persons and officers and directors referred to in Section 8 hereof and their heirs and legal representatives, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein or therein contained. This Agreement and all conditions and provisions hereof and thereof are intended to be for the sole and exclusive benefit of the parties and their respective successors and such controlling persons and officers and directors and their heirs and legal representatives, and for the benefit of no other person, firm or corporation. No purchaser of any Offered Securities from the Underwriter shall be deemed to be a successor by reason merely of such purchase.

Section 13. *GOVERNING LAW.* THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Section 14. *Counterparts.* This Agreement may be signed by the parties in counterparts which together shall constitute one and the same agreement among the parties and shall become effective at such time as each of the parties shall have signed such counterparts and shall have notified the other parties thereof.

Section 15. *Absence of Fiduciary Relationship.* The Company acknowledges and agrees that:

25

(a) *No Other Relationship*. The Underwriter has been retained solely to act as underwriter in connection with the sale of the Offered Securities and that no fiduciary, advisory or agency relationship between the Company and the Underwriter have been created in respect of any of the transactions contemplated by this Agreement or the Prospectus, irrespective of whether the Underwriter has advised or is advising the Company on other matters;

(b) *Arm's-Length Negotiations*. The price of the Offered Securities set forth in this Agreement was established by the Company following discussions and arm's-length negotiations with the Underwriter, and the Company is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this Agreement;

(c) *Absence of Obligation to Disclose*. The Company has been advised that the Underwriter and its affiliates are engaged in a broad range of transactions which may involve interests that differ from those of the Company, and that the Underwriter has no obligation to disclose such interests and transactions to the Company by virtue of any fiduciary, advisory or agency relationship; and

(d) *Waiver*. The Company waives, to the fullest extent permitted by law, any claims it may have against the Underwriter for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Underwriter shall have no liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including stockholders, partners, employees or creditors of the Company.

Section 16. *Patriot Act*. In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriter is required to obtain, verify and record information that identifies its clients, including the Company, which information may include the name and address of its clients, as well as other information that will allow the Underwriter to properly identify its clients.

Section 17. *Waiver of Jury Trial*. **Each of the Company and the Underwriter hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.**

Section 18. *Research Analyst Independence*. The Company acknowledges that the Underwriter's research analysts and research department is required to be independent from its investment banking divisions and is subject to certain regulations and internal policies, and that the Underwriter's research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering that differ from the views of its respective investment banking divisions. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Underwriter with respect to any conflict of interest that may arise from the fact that the views expressed by its independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by the Underwriter's investment banking divisions. The Company acknowledges that the Underwriter

26

is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

[Signature Pages Follow]

27

If the foregoing is in accordance with your understanding, please indicate your acceptance of this Agreement by signing in the space provided below.

Very truly yours,

**ANADARKO PETROLEUM CORPORATION**

By: /s/ Michael C. Pearl

Name: Michael C. Pearl

Title: Vice President, Finance and Treasurer

*[Signature Page to Underwriting Agreement]*

The foregoing Underwriting Agreement is hereby confirmed and accepted as of the date first above written.

J.P. MORGAN SECURITIES LLC

By: /s/ Yaw Asamoah-Duodu
Name: Yaw Asamoah-Duodu
Title: Managing Director

*[Signature Page to Underwriting Agreement]*

**Schedule I**

| Underwriter | Number of Firm Securities to be Purchased |
|---|---|
| J.P. Morgan Securities LLC | 35,250,000 |
| **Total** | **35,250,000** |

**Disclosure Package**

1.    Price per share to the public: Variable price reoffering

**Schedule III**

**Company Additional Written Communication**

Company Presentation dated September 12, 2016

Schedule IV

**Persons Signing Lock-Up Agreement**

R. A. Walker

Robert P. Daniels

Robert G. Gwin

Darrell E. Hollek

Mitchell W. Ingram

Robert K. Reeves

Ernest A. Leyendecker

**Exhibit A**

**Form of Lock-Up Letter**

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380-1046

J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

       Re: Anadarko Petroleum Corporation – Public Offering

Ladies and Gentlemen:

       As an inducement to the Underwriter to execute the Underwriting Agreement (the "**Underwriting Agreement**"), pursuant to which an offering will be made of shares of common stock, par value $0.10 per share (the "**Securities**"), of Anadarko Petroleum Corporation and any successor (by merger or otherwise) thereto (the "**Company**"), the undersigned hereby agrees pursuant to the terms of this Lock-Up Agreement (this "**Lock-Up Agreement**") that during the period specified in the following paragraph (the "**Lock-Up Period**"), the undersigned will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any Securities or securities convertible into or exchangeable or exercisable for any Securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of the Securities, whether any such aforementioned transaction is to be settled by delivery of the Securities or such other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, without, in each case, the prior written consent of J.P. Morgan Securities LLC ("**J.P. Morgan**"). In addition, the undersigned agrees that, without the prior written consent of J.P. Morgan, it will not, during the Lock-Up Period, make any demand for or exercise any right with respect to, the registration of any Securities or any security convertible into or exercisable or exchangeable for the Securities.

       The Lock-Up Period will commence on the date of this Lock-Up Agreement and continue and include the date 75 days after the public offering date set forth on the final prospectus used to sell the Securities (the "**Public Offering Date**") pursuant to the Underwriting Agreement.

       Any Securities received upon exercise of options or other securities of the Company granted to the undersigned will also be subject to this Lock-Up Agreement. The restrictions in this Lock-Up Agreement shall not apply to (a) any transactions relating to Securities acquired in the open market after the closing of the offering, provided that with respect to any sale or other disposition of such Securities, no filing under the Securities Exchange Act of 1934 (the "**Exchange Act**") (other than on Form 5) or other public announcement shall be required or shall be voluntarily made by any party in connection with subsequent sales of such Securities acquired in such open market transactions during the Lock-Up Period, (b) any exercise of options or vesting or exercise of any other equity-based award, in each case, outstanding on the

Public Offering Date, and in each case under the Company's equity incentive plan or any other plan or agreement described in the prospectus included or incorporated by reference in the Registration Statement, and the withholding of Securities by the Company for the payment of taxes due upon such exercise or vesting, provided that any Securities received upon such exercise or vesting will also be subject to this Lock-Up Agreement, (c) transfers as a bona fide gift or gifts, (d) transfers to a family member, trust, family limited partnership or family limited liability company for the direct or indirect benefit of the undersigned or his or her family members, (e) transfers by testate or intestate succession, provided that in each transfer pursuant to clauses (c)-(e) the transferee agrees to be bound in writing by the terms of this Lock-Up Agreement prior to such transfer, such transfer shall not involve a disposition for value and no filing or public announcement by any party (donor, donee, transferor or transferee) under the Exchange Act or otherwise shall be required or shall be voluntarily made in connection with such transfer (other than a filing on a Form 5), or (f) (i) the establishment of any written contract, instruction or plan that satisfies all of the requirements of Rule 10b5-1 (a "**Rule 10b5-1 Plan**") under the Exchange Act or (ii) sales pursuant to any Rule 10b5-1 plan currently in effect on the date hereof; *provided, however*, that with respect to clause (i), no sales of Securities or securities convertible into, or exchangeable or exercisable for, Securities, shall be made pursuant to such a Rule 10b5-1 Plan prior to the expiration of the Lock-Up Period (as the same may be extended pursuant to the provisions hereof); and *provided further*, that no party is required to publicly announce, file, or report the establishment of such Rule 10b5-1 Plan in any public report, announcement, or filing with the Securities and Exchange Commission under the Exchange Act during the Lock-Up Period and does not otherwise voluntarily effect any such public report, announcement, or filing regarding such Rule 10b5-1 Plan.

In furtherance of the foregoing, the Company and its transfer agent and registrar are hereby authorized to decline to make any transfer of shares of Securities if such transfer would constitute a violation or breach of this Lock-Up Agreement.

This Lock-Up Agreement shall be binding on the undersigned and the successors, heirs, personal representatives and assigns of the undersigned.

It is understood that if the Underwriting Agreement is executed and delivered by the parties thereto yet terminates (other than the provisions thereof that survive termination) prior to payment for and delivery of the Offered Securities (as defined therein), the undersigned shall be released from all obligations under this Lock-Up Agreement. Further, this Lock-Up Agreement shall lapse and become null and void if the Public Offering Date shall not have occurred on or before November 8, 2016. **This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

Very truly yours,

_____

[*Name of officer or director*]