TAB 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION



| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | § § § § § | Civil Action No. 4:20-cv-00576 |
| | | CLASS ACTION |
| | | The Honorable Charles R. Eskridge III |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION
TO COMPEL DOCUMENTS CONCERNING ANADARKO AUDIT
COMMITTEE'S PURPORTED INVESTIGATION**

## I. INTRODUCTION

Defendants and former Anadarko Audit Committee ("AAC") members Eric Mullins, Kevin Chilton, and Mark McKinley ("Anadarko Parties") concede that intentional disclosure to adversarial third parties waives attorney-client privilege and work product protection. They also acknowledge "summaries" of witness interviews is tantamount to work product waiver; yet, slide after slide of their 4.5 hour presentation to the U.S. Securities and Exchange Commission ("SEC") did just that – understandably, in a light favorable to Anadarko. It was in the Anadarko Parties' self-interest to dissuade the SEC from taking enforcement action to avoid the likely negative repercussions it could bring. Similarly, the Anadarko Parties intentionally disclosed privileged information to advance their own interests with independent auditor KPMG and underwriter J.P. Morgan ("JPM"). Yet, the Anadarko Parties argue their opportunistic disclosures do not create an unfair playing field.

To this day, Defendants continue to wield the AAC's investigation as it suits them. After refusing to produce any withheld document for months, on the eve of their opposition deadline, the Anadarko Parties collectively produced 48 documents, including documents that were never privileged in the first place, because they thought it would benefit them. *See* ECF 125-1 at 8-18. This is yet another blatant example why Plaintiffs' motion should be granted.

The Anadarko Parties have selectively disclosed privileged information to benefit themselves, and have sought to parlay it to their tactical advantage in this litigation, including at Plaintiffs' depositions. Plaintiffs are thus entitled to the full picture. *See, e.g.*, *In re OM Grp. Sec. Litig.*, 226 F.R.D. 579, 593 (N.D. Ohio 2005). Plaintiffs respectfully

- 1 -

request that the Court grant their motion to compel the production of documents underlying or concerning the AAC's purported investigation.

## II. ARGUMENT

### A. Attorney-Client Privilege Was Waived for the Subject Matter.

The Anadarko Parties attempt to avoid a finding of subject-matter waiver by arguing that their widespread disclosures to the SEC, KPMG, and JPM did not reveal privileged communications and were instead limited to "underlying facts" about the investigation. ECF 124 at 14. Contemporaneous evidence proves otherwise.

Just a week prior to the SEC presentation, Norton Rose Fulbright US LLP ("NRF") communicated the substance of its investigation to the AAC in a "final presentation" (ECF 122-1 at 2), which plainly implicates attorney-client communications. *See, e.g.*, *SEC v. Brady*, 238 F.R.D. 429, 439 (N.D. Tex. 2006) (report presentation from Baker Botts to the audit committee was "the equivalent of a confidential communication between an attorney and his client"). The SEC presentation also states that the "presentation and all of its contents are strictly confidential and ***wholly subject to the attorney-client*** and work product privileges," and every slide is designated as containing attorney-client communications. Accordingly, Gerard Pecht's statement that, "at no point were any privileged communications between NRF and the AAC . . . shared with the SEC" (ECF 125-1 at 3 (¶5)), is belied by contemporaneous evidence, including the presentation and the confidentiality agreement that Mr. Pecht himself executed prior to it, stating that "[t]he ***Audit Committee believes*** that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and attorney-client privilege." ECF 125-1 at 20.

The Anadarko Parties also invite the Court to ignore prevailing case law by citing Federal Rule of Evidence 502(a). But the notes to Rule 502 make clear that, "while establishing some exceptions to waiver, the rule does not purport to supplant applicable waiver doctrine generally." Fed. R. Evid. 502 advisory committee's explanatory note. Moreover, under 502(a), "when a party makes an intentional waiver in a federal proceeding, the Court can make undisclosed communications that concerns the same subject matter available if it ought in fairness to be considered together." *Nalco Co., Inc. v. Baker Hughes Inc.*, 2017 WL 3033997, at *4 (S.D. Tex. July 18, 2017).

Here, the disclosures to the SEC, KPMG, and JPM still constitute subject-matter waiver under Rule 502(a). First, the Anadarko Parties don't dispute that their disclosures were intentional. Second, they admit all of the withheld documents concern the same subject matter. Third, these opportunistic disclosures have created an unfair playing field, as Defendants tried to influence Plaintiffs' testimony by affirmatively invoking the SEC declination letter and there's nothing stopping them from doing it again. *See id.* at *5 (scope of waiver should "'be informed by notions of fairness and a concern with stopping a party from deriving a tactical advantage through selective disclosure'") (citation omitted).

Undaunted, the Anadarko Parties rely on non-binding secondary authorities to argue self-servingly that fairness does not require them to share with Plaintiffs materials they have freely shared with other third-parties. However, by its terms, Rule 502(a) extends waiver to undisclosed documents where "they ought in fairness to be considered together." Importantly, the Anadarko Parties do not deny the withheld documents are relevant or would provide important context to documents already produced. *See id.* Having made substantial

disclosures of privileged information to third-parties and selectively disclosed a fraction of the investigation materials in this action, "it [would be] unfair to protect the documents underlying the presentation." *OM Grp.*, 226 F.R.D. at 593 ("There is no reason Defendants, who voluntarily disclosed substantial information about an investigation . . . should now be able to withhold information that would allow Plaintiff to view the whole picture."); *see also DataTreasury Corp. v. Wells Fargo & Co.*, 2009 WL 10679839, at *3 (E.D. Tex. Nov. 13, 2009) ("[W]aiver of attorney-client privilege is effective not just for litigation in which it occurs but is also effective for subsequent litigation.").

Further highlighting why the withheld documents should in fairness be considered alongside the selectively disclosed documents is the belated production of 48 supposedly "privileged" documents on the eve of their opposition. ECF 124 at 11. The parties met and conferred on multiple occasions, including on April 11, 2022, after the Court granted Plaintiffs' initiating letter. ECF 122 at 24. Still, Defendants refused to compromise, waiting until after Plaintiffs filed their motion to produce a subset of documents to use affirmatively against them. *See* ECF 125-1 at 7-18.

Finally, to the extent the AAC tries to rely on its confidentiality agreement with the SEC to argue against subject-matter waiver, courts in this Circuit reject the selective-waiver doctrine. *Brady*, 238 F.R.D. at 440 (collecting cases).

### B. Plaintiffs Are Entitled to KPMG's Full Audit Papers.

Plaintiffs are also entitled to KPMG's full audit work papers, which Defendants forced KPMG to redact regarding the AAC investigation. Defendants ask this Court to ignore binding Fifth Circuit authority in seeking to shield audit materials created in the

regular course of KPMG's business from discovery based upon untenable assertions of attorney work product.

The Fifth Circuit has held, and subsequently reaffirmed, that the relevant inquiry for work product protection is the primary motivating purpose behind the creation of the document. *See United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982); *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000). Even *United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010), the out-of-Circuit decision upon which Defendants principally rely, recognizes this distinction. *See id.* at 136-37 ("The Fifth Circuit, however, requires that anticipation of litigation be the 'primary motivating purpose' behind the document's creation.") (citation omitted). Here, the primary motivating purpose behind KPMG's audit work papers was compliance with KPMG's own audit documentation requirements. ECF 122 at 15-16. There is, therefore, no basis for extending work product protection to KPMG's audit materials.

Defendants attempt to distinguish *El Paso* and its progeny based on semantics, arguing that the holdings in those cases were limited to whether the documents, rather than the information contained in them, qualified as work product. ECF 124 at 19. The cases, however, do not support such a narrow reading. In *El Paso*, for example, the court expressly "recognize[d] that the tax pool analysis involve[d] weighing legal arguments, predicting the stance of the IRS, and forecasting the ultimate likelihood of sustaining El Paso's position in court," but found it wasn't work product because its "sole function" was to comply with SEC regulations. 682 F.2d at 543-44. Indeed, Defendants do not deny that they disclosed

- 5 -

information to KPMG solely for their audits in the regular course of business, not to aid in litigation. Accordingly, KPMG's full audit work papers should be produced.

### C.  Defendants Waived Work Product Protection over the AAC Investigation.

#### 1.  Defendants Wielded the SEC Declination as a Sword.

Defendants principally argue that their use of the SEC declination letter does not implicate subject-matter waiver of work product under the sword-and-shield doctrine because the SEC letter itself is not Defendants' work product. ECF 124 at 21. That is not the point. Defendants do not, and cannot, dispute that they used the AAC investigation to obtain the declination, or that the investigation itself was protected work product. Nor do they cite any authority for the proposition that the AAC investigation and the resulting SEC declination, which they affirmatively invoked at Plaintiffs' depositions to influence their views of the case, should be treated separately for purposes of the analysis.

Further, the fact that Defendants did not benefit from their offensive use of the SEC termination letter to try to undermine Plaintiffs at their depositions does not militate against a finding of subject-matter waiver. Ex. A; *see also DataTreasury*, 2009 WL 10679839, at *3 ("Plaintiff's use of the Ballard E-mail [in a deposition] was offensive and therefore warrants a subject matter waiver.").

#### 2.  Defendants Waived Work Product Protection over Information Orally Disclosed to the SEC.

Defendants claim that any waiver of work product is limited to the documents (rather than information) disclosed to the SEC. But it is clear from the SEC presentation itself that the Anadarko Parties provided detailed summaries of witness interviews to the SEC, belying

- 6 -

Mr. Pecht's *post hoc* submission that NRF did not "provide or read notes, summaries, memoranda or other materials memorializing interviews." *Compare* ECF 122-4 at 10, *with* ECF 125-1 at 5 (¶11). As noted above, Mr. Pecht's prior contemporaneous assertions of privilege as set forth in the SEC presentation and the Confidentiality Agreement (ECF 125-1 at 20-21) contradict what he now claims in his declaration. Thus, his submission should be viewed with skepticism.

Further, Defendants do not deny that they orally disclosed attorney work product to the SEC. *See Doe 1 v. Baylor Univ.*, 335 F.R.D. 476 499 n.24 (W.D. Tex. 2020) ("work product includes intangible material, such as conversations"). As explained in Plaintiffs' opening papers, for purposes of waiver, "the transmission of privileged information is what matters, not the medium through which it is conveyed." *United States v. Reyes*, 239 F.R.D. 591, 604 (N.D. Cal. 2006).

As to any witness memoranda, the summaries of their testimony waived any work product protection that may have previously existed. And to the extent that the contents of other withheld documents were not entirely disclosed to the SEC, such documents should be produced and redacted accordingly. *See* ECF 80, ¶12.2.

## III. APPOINTMENT OF A SPECIAL MASTER

That Defendants should bear the costs of a special master if the Court grants the Motion has become clearer since their belated production of 48 documents on the eve of their opposition. Plaintiffs should not have been forced to move to compel these documents, and on their face, some reveal no basis for withholding in the first place. *See* ECF 125-1 at 8-18. Plaintiffs propose that the Special Master review *in camera* the documents listed on

- 7 -

Defendants' and AAC members' privilege log relating to the investigation, as well as any

redacted or withheld KPMG documents to ensure: (1) they were properly withheld in the

first place as containing confidential legal advice or attorney work product; and (2) that any

privilege or protection has not since been waived.

## IV. CONCLUSION

Plaintiffs respectfully request that the Court order the Anadarko Parties to produce the

documents underlying and relating to the AAC's purported investigation, including all

documents listed on Defendants' and AAC members' privilege logs regarding the

investigation, witness memoranda and summaries of interviews, AAC communications, and

KPMG documents.

DATED: May 16, 2022                    Respectfully submitted,

                                       KENDALL LAW GROUP, PLLC
                                       JOE KENDALL (Texas Bar No. 11260700)
                                       (SDTX Bar No. 30973)
                                         Attorney-in-charge


                                                  s/ Joe Kendall
                                       _____
                                                JOE KENDALL

                                       3811 Turtle Creek Blvd., Suite 1450
                                       Dallas, TX  75219
                                       Telephone:  214/744-3000
                                       214/744-3015 (fax)
                                       jkendall@kendalllawgroup.com

                                       Texas Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
DANIEL S. DROSMAN (*pro hac vice* pending)
JASON A. FORGE
RACHEL L. JENSEN
SARA B. POLYCHRON
FRANCISCO J. MEJIA
MEGAN A. ROSSI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
dand@rgrdlaw.com
jforge@rgrdlaw.com
rachelj@rgrdlaw.com
spolychron@rgrdlaw.com
fmejia@rgrdlaw.com
mrossi@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## CERTIFICATION OF WORD COUNT

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 1,999 words, exclusive of the caption and the signature block.

DATED: May 16, 2022

s/ Joe Kendall
_____
JOE KENDALL

4858-4126-4416.v1

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing on all counsel of record who have appeared

in this matter via the Court's CM/ECF system on this, the 16th day of May, 2022.


s/ Joe Kendall
JOE KENDALL

# EXHIBIT A

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF TEXAS
 4    HOUSTON DIVISION
 5    ----------------------------------------x
 6    GEORGIA FIREFIGHTERS' PENSION
      FUND, individually and on Behalf
 7    of All Others Similarly Situated,
 8                    Plaintiffs,
 9                        Case No.
10                        4:20-cv-00576
11                    v.
12    ANADARKO PETROLEUM CORPORATION, R.
      A. WALKER, ROBERT G. GWIN, ROBERT
13    P. DANIELS, and ERNEST A.
      LEYENDECKER, III,
14
                      Defendants.
15    ----------------------------------------x
16                    10:05 a.m.
                      November 19, 2021
17
18         * CONFIDENTIAL *
19         VIRTUAL DEPOSITION of ALEXANDER YOUNGER,
20    testifying on behalf of the Norfolk County Council
21    as Administering Authority of the Norfolk Pension
22    Fund in the above entitled matter, pursuant to
23    Notice, before Stephen J. Moore, a Registered
24    Professional Reporter, Certified Realtime Reporter
25    and Notary Public of the State of New York.
```

```
 1              ALEXANDER YOUNGER - CONFIDENTIAL
 2      retainer agreement, did Norfolk review a draft
 3      of the Complaint in this litigation?
 4              A       We had sight, yes.
 5              Q       Did you provide any comments on
 6      the draft Complaint?
 7              A       You will forgive me, I can't
 8      recall the timeline of that exercise, so the
 9      timing of that I don't recall.
10              Q       But have you at any point in
11      time during the pendency of this litigation
12      provided comments on a draft Complaint?
13              A       We have reviewed and discussed
14      the draft Complaint.
15              Q       Okay.
16                      MS. BAKER:  I'm going to mark
17              another exhibit, if you will just give
18              me one moment, please.
19                      I've just introduced DX 18, let me
20              know when you can see it.
21                      (The above described document was
22              marked Exhibit DX 18 for identification as
23              of this date.)
24              A       I can see that, thank you.
25              Q       Do you recognize this document?
```

```
 1              ALEXANDER YOUNGER - CONFIDENTIAL

 2         A        Yes, I do.

 3         Q        And what is it?

 4         A        It's the e-mail from Simon

 5    George who we have discussed previously,

 6    providing the final go ahead to proceed in

 7    respect of the Anadarko case.

 8         Q        Okay, and turning your attention

 9    to the bottom of the first page under the

10    heading, "Anadarko Petroleum potential new

11    case," do you see the second sentence of that

12    paragraph where it says, "The case relates to

13    credible whistleblower allegations made in

14    respect of the company and certain of its

15    senior directors?"

16         A        I do, yes.

17         Q        What's the basis, what's your

18    basis for indicating to Mr. George that the

19    whistleblower claims are credible?

20              MR. SOLOMON:  And again, I want

21         to caution you to not divulge any

22         attorney-client communications.

23              Answer the question if you can

24         without doing so.

25         A        With that in mind, based on my
```

```
 1              ALEXANDER YOUNGER - CONFIDENTIAL
 2      review of the investigation by Robbins Geller
 3      and discussions with counsel.
 4              Q       So, you did not have an
 5      independent view as to whether the
 6      whistleblower allegations were credible?
 7              A       We formed an ind -- well, we
 8      formed our view based on that discussion and
 9      review of that evidence.
10              Q       And did you review the
11      whistleblower letter?
12              A       I don't recall precisely whether
13      that was in the packs that we looked at.
14              Q       Do you recall whether you ever
15      asked to review the whistleblower letter?
16              A       I don't recall.
17              Q       Do you know what happened with
18      the whistleblower claims?
19              A       In general terms as provided in
20      the Complaint, yes.
21              Q       What's your understanding of
22      what happened with the whistleblower claims?
23              A       I believe they were upheld by
24      the SEC.
25              Q       And what's your basis for
```

1    ALEXANDER YOUNGER - CONFIDENTIAL

2 believing that they were upheld by the SEC?

3    A  Our review of documentation.

4    Q  What documentation did you

5 review?

6    A  I can't recall specifically.

7    Q  I am going to introduce another

8 exhibit, I am introducing what's been

9 previously marked as DX 6.

10    A  Should that be there now?

11    Q  It will be in about one second.

12      Okay, you should be able to see

13 it now.

14    A  Sorry, I've got a circle.  Thank

15 you, I can see now.

16     MR. SOLOMON:  Can you just wait a

17    second until it's pulled up on my

18    screen, please.

19     MS. BAKER:  Sure, no problem.

20     MR. SOLOMON:  What number is it,

21    Nathalie?

22     MS. BAKER:  DX 6.

23     MR. SOLOMON:  I don't see it yet.

24     THE CONCIERGE:  It should be at

25    the very top.  It should be the first

```
 1        ALEXANDER YOUNGER - CONFIDENTIAL
 2        one.
 3               MR. SOLOMON:  At the moment the
 4        very top is 13.
 5               THE CONCIERGE:  Could you try
 6        double clicking on the folder that says
 7        "marked exhibits."
 8               MR. SOLOMON:  I will.
 9               THE WITNESS:  It appeared as a
10        slightly different order than they did
11        in my one.
12               MR. SOLOMON:  Yes, still no
13        additional ones, still no 6.  I will
14        click again.  Hold on.
15               MS. BAKER:  It might be out of
16        order, just because this has been
17        previously marked in another deposition.
18               Mark, this is the SEC letter, if
19        you are familiar.
20               THE CONCIERGE:  Besides that, I
21        would just trying refreshing the page.
22               MR. SOLOMON:  I guessed it would
23        be, but it still hasn't appeared, and I
24        would rather see it when it comes up.
25               MS. BAKER:  Yes.
```

```
 1              ALEXANDER YOUNGER - CONFIDENTIAL
 2                    THE CONCIERGE:  Are you on
 3         Chrome?  Try hitting on the very top
 4         left corner there is a back button.
 5                    Don't hit that little circle arrow.
 6                    MR. SOLOMON:  Okay, got you.
 7         Okay, let me just open it, it may take a
 8         few seconds more, but I do have it
 9         delivered.
10                    Okay.
11         Q       Mr. Younger, do you recognize
12    this document?
13         A       I believe I have seen it
14    previously.
15         Q       And what is it?
16         A       It's a letter from the SEC.
17         Q       Okay, and do you see in the
18    first two sentences of this letter where it
19    says, "We have concluded the investigation as
20    to Anadarko Petroleum Corporation.
21                    "Based on the information we
22    have as of this date, we do not intend to
23    recommend an enforcement action by the
24    commission against Anadarko Petroleum
25    Corporation."
```

1            ALEXANDER YOUNGER - CONFIDENTIAL

2           A       I see that and then I read on

3      this states, "Must in no way be construed as

4      indicating that the party has been exonerated

5      or that no action will ultimately result from

6      this investigation."

7           Q       Do you understand this letter to

8      be an indication that the SEC has upheld the

9      whistleblower claims against Anadarko?

10          A       I understand it to reflect that

11     it can't be construed that there is no further

12     action to arise.

13          Q       But you previously said that you

14     understood the Securities and Exchange

15     Commission had upheld claims against Anadarko

16     related to the whistleblower claims, and I am

17     asking where in this letter do you see an

18     indication that the claims have been upheld?

19          A       Well, the phrase upheld is not

20     used in the letter.

21          Q       Okay.

22                  MS. BAKER:  All right, I am going

23          to mark another exhibit.

24                  I will ask the court reporter to

25          help me out here.  My exhibit numbering