TAB 17

No. 23-20350

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### IN RE ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

On Petition for Writ of Mandamus to the United States District Court
for the Southern District of Texas,
Docket No. 4:20-CV-576.
Honorable Charles R. Eskridge, III

### PLAINTIFF-RESPONDENT'S OPPOSITION
### TO PETITION FOR WRIT OF MANDAMUS

ROBBINS GELLER RUDMAN
 & DOWD LLP
JOSEPH D. DALEY
DANIEL S. DROSMAN
RACHEL L. JENSEN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, PLLC
JOE KENDALL
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)

*Counsel for Plaintiff-Respondent*

*In re Anadarko Petroleum Corporation Securities Litigation*
Fifth Circuit No. 23-20350

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.      Plaintiff-Respondent and Class: All persons or entities that purchased or otherwise acquired Anadarko Petroleum Corporation's publicly traded common stock between February 20, 2015 and May 2, 2017, inclusive, and were damaged thereby; Norfolk County Council as Administering Authority of the Norfolk Pension Fund; Iron Workers Local #580 Joint Funds; Building Trades United Pension Trust Fund.

2.      Counsel for Plaintiff-Respondent: Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101 (Mark Solomon, Joseph D. Daley, Daniel Drosman, Rachel Jensen, Luke Brooks, Hillary Stakem); Kendall Law Group, PLLC, 3811 Turtle Creek Boulevard, Suite 1450, Dallas, Texas 75219 (Joe Kendall).

4880-0970-0471.v1

*In re Anadarko Petroleum Corporation Securities Litigation*
Fifth Circuit No. 23-20350

3.      Defendants-Petitioners: Anadarko Petroleum Corporation, an indirect wholly owned subsidiary of Occidental Petroleum Corporation; R.A. Walker; Robert G. Gwin; Robert P. Daniels; Ernest A. Leyendecker, III.

4.      Counsel for Defendants-Petitioners: Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019 (Kevin Orsini, Lauren Rosenberg); Shipley Snell Montgomery LLP, 712 Main Street, Suite 1400, Houston, Texas 77002 (George Shipley).

5.      Other Entities: Insurers of Defendants-Petitioners (National Union Fire Insurance Company of Pittsburgh, Pa., XL Specialty Insurance Company, Zurich American Insurance Company, U.S. Specialty Insurance Company, ACE American Insurance Company, American International Reinsurance Company, LTD., Freedom Specialty Insurance Company, RSUI Indemnity Company, Navigators Insurance Company, AXIS Insurance Company, QBE Insurance Corporation, Continental Casualty Company, Berkley Insurance Company, Beazley Insurance Company, Westchester Fire Insurance Company, Illinois National Insurance Company); Occidental Petroleum Corporation, a publicly held corporation that has no parent corporation.  Berkshire Hathaway Inc. indirectly owns 10% or more of the issued and outstanding shares of common stock of Occidental Petroleum

- ii -

*In re Anadarko Petroleum Corporation Securities Litigation*
Fifth Circuit No. 23-20350

Corporation. No other publicly traded company owns more than 10% of the

common stock of Occidental Petroleum Corporation.

      6.     District Court Judge: Hon. Charles R. Eskridge, III, U.S. District Judge,

Southern District of Texas.

DATED: August 14, 2023        ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                               JOSEPH D. DALEY
                               DANIEL S. DROSMAN
                               RACHEL L. JENSEN

                                    *s/Joseph D. Daley*
                                    JOSEPH D. DALEY

                               655 West Broadway, Suite 1900
                               San Diego, CA 92101
                               Telephone: 619/231-1058
                               619/231-7423 (fax)

                               *Attorneys for Plaintiff-Respondent*

- iii -

## STATEMENT REGARDING ORAL ARGUMENT

While Plaintiff does not believe oral argument is required in this matter—which the district court correctly described as a "garden-variety privilege dispute" (MR588)—nonetheless its counsel stands ready to accommodate the Court's wishes if oral argument may possibly be helpful.

4880-0970-0471.v1

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ....................................................................1

II.  COUNTERSTATEMENT OF ISSUE PRESENTED ...................................3

III.  APPLICABLE STANDARDS OF REVIEW ..................................................3

    A.  Mandamus Generally ...........................................................................3

    B.  The District Court's Wide-Ranging Discretion ...................................4

IV.  STATEMENT OF THE CASE .......................................................................5

    A.  Factual Background...............................................................................5

        1.  A whistleblower's complaint spurs Anadarko board
            action, a law firm's internal investigation, and selective
            disclosure of the investigation's procedures and results to
            third parties. ...............................................................................5

        2.  Defendants' strategic use of the Termination Letter and
            Norton Rose's investigation even as they refused to turn
            over waived materials. .................................................................7

        3.  Defendants concede at oral argument that they will use
            the Termination Letter as a sword based upon Norton
            Rose's investigation and presentation, while Plaintiff
            informs the court that a Norton Rose attorney's
            declaration is demonstrably inaccurate......................................9

    B.  The district court issues its Order finding waiver and
        compelling document production, along with its follow-on
        denial of reconsideration. ...................................................................11

        1.  Order finding waiver and compelling production. ...................11

        2.  Denial of reconsideration/§1292(b) certification......................15

4880-0970-0471.v1

**Page**

V.    REASONS WHY THE WRIT SHOULD NOT ISSUE .............................. 16

     A.    Defendants fail to show their "clear and indisputable" right to mandamus relief. ................................................................. 16

          1.    Defendants fail to transform a "garden-variety privilege dispute" with "intensely factual" underpinnings into a question of legal error requiring this Court's intercession. ...... 17

          2.    Defendants' attempt to dispute their "subject matter" waiver fails on myriad record facts. .......................................... 23

     B.    This is not an "appropriate" case for extraordinary interlocutory review. ............................................................................. 31

VI.    CONCLUSION ............................................................................ 34

4880-0970-0471.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. C & H Distribs., L.L.C.*,
   813 F.3d 566 (5th Cir. 2015) ...............................................................5

*Bankers Life & Cas. Co. v. Holland*,
   346 U.S. 379 (1953)............................................................................16

*Cheney v. United States Dist. Ct.*,
   542 U.S. 367 (2004)....................................................................*passim*

*Crain v. City of Selma*,
   952 F.3d 634 (5th Cir. 2020) ...........................................4, 5, 20, 32

*Doe 1 v. Baylor Univ.*,
   335 F.R.D. 476 (W.D. Tex. 2020) .....................................13, 23, 30

*Ergo Sci. v. Martin*,
   73 F.3d 595 (5th Cir. 1996) ...............................................................22

*Forever Green Ath. Fields, Inc. v. Babcock L. Firm, LLC*,
   2014 U.S. Dist. LEXIS 416 (M.D. La. Jan. 3, 2014) ......................29

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................5, 6

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .............................................................21

*Harte v. Bd. of Comm'rs of the Cnty. of Johnson*,
   940 F.3d 498 (10th Cir. 2019) ............................................................4

*In re Ariz.*,
   2022 U.S. App. LEXIS 10160 (9th Cir. Apr. 14, 2022)...................22

*In re Avantel, S.A.*,
   343 F.3d 311 (5th Cir. 2003) ....................................................*passim*

4880-0970-0471.v1

**Page**

*In re Int'l Sys. & Controls Corp. Sec. Litig.*,
   693 F.2d 1235 (5th Cir. 1982) ...................................................................29, 30

*In re Itron, Inc.*,
   883 F.3d 553 (5th Cir. 2018) ....................................................................*passim*

*In re Ivantis, Inc.*,
   835 F. App'x 560 (Fed. Cir. 2020) ...................................................................33

*In re King's Daughters Health Sys.*,
   31 F.4th 520 (6th Cir. 2022) ............................................................................32

*In re Lloyd's Register N. Am., Inc.*,
   780 F.3d 283 (5th Cir. 2015) .............................................................................4

*In re Moore*,
   955 F.3d 384 (4th Cir. 2020) ............................................................................33

*In re Occidental Petroleum Corp.*,
   217 F.3d 293 (5th Cir. 2000) ...........................................................4, 16, 32, 33

*J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
   628 F.2d 994 (7th Cir. 1980) ............................................................................21

*Nguyen v. Excel Corp.*,
   197 F.3d 200 (5th Cir. 1999) ............................................................................24

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ...........................................................................33

*United States v. Helmsley*,
   864 F.2d 266 (2d Cir. 1988) .............................................................................34

*Veillon v. Expl. Servs., Inc.*,
   876 F.2d 1197 (5th Cir. 1989) ..........................................................................22

*Willy v. Admin. Review Bd.*,
   423 F.3d 483 (5th Cir. 2005) ............................................................................33

**Page**

**STATUTES, RULES AND REGULATIONS**

28 U.S.C.
  §1292(b) ............................................................................................................ 15

Federal Rule of Evidence
  Rule 502(a) ............................................................................... 14, 23, 24, 27

4880-0970-0471.v1

## I.   PRELIMINARY STATEMENT

The "'drastic and extraordinary' remedy" of mandamus is to be "'reserved for really extraordinary causes.'"  *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380 (2004).  What it is *not* to be used for is to disturb a district court's fact-bound, and ultimately discretionary, findings—especially ones like the court noted here, in what is nothing more than a "garden-variety privilege dispute."  MR588.

Defendants injected into that garden-variety dispute a series of tactical maneuvers that led the district court to correctly rule that they had waived both attorney-client and work-product privileges that formerly attached to an internal investigation's details and findings.

For instance, they held a lengthy PowerPoint presentation on the investigation's specifics with the U.S. Securities and Exchange Commission ("SEC").  MR309.  That four-and-a-half-hour presentation spanned some 250 pages, included a Q&A session along with information from 55 witness interviews—and was plainly marked "Attorney-Client Communication and Attorney Work Product."  *Id*.

In addition, Defendants selectively disclosed privileged information to other third parties.  For instance, the day before the SEC PowerPoint session, Defendants previewed that *same presentation* for Anadarko's independent auditor KPMG—

- 1 -

granting it full access to the presentation materials, and engaging in an unscripted Q&A session. MR309. (Tellingly, KPMG "wasn't permitted to retain a copy" (*id*.)—which denial KPMG later noted reflected attorney-client privilege concerns. MR101.) Similarly, in connection with a planned equity offering, Anadarko's general counsel held a call with lead underwriter J.P. Morgan in which they discussed "in detail" the investigation's status and the investigating law firm's preliminary "findings." MR070.

Defendants' self-serving use of the investigation did not end there. When the SEC later issued its Termination Letter declining to bring an enforcement action against Anadarko, Defendants tried to use that same Letter in depositions to undermine the Class Representatives' views of the litigation. They later admitted in open court, twice, that they would use the Letter again at trial. MR402:7-12; *see also* MR415:1-3.

In light of the foregoing, the district court found that "[t]he record establishes that a significant portion of confidential communications between Norton Rose and Anadarko was apparently revealed to the SEC, KPMG, and JP Morgan." MR316. At the same time, the court took into "consideration … Anadarko's use of privilege as a sword and a shield." *Id*. Given those findings, "[f]airness thus dictates that waiver extend to the entire subject matter of the AAC investigation." *Id*.

- 2 -

The district court's findings and resulting production Order are fully supported by the record. Defendants have failed to show that their right to a writ's issuance is "'"clear and indisputable"'" and "appropriate under the circumstances." *Cheney*, 542 U.S. at 381. This Court should deny their Petition.

## II. COUNTERSTATEMENT OF ISSUE PRESENTED

1. Whether this Court should grant extraordinary mandamus relief from the district court's discretionary decision to compel production of documents that: (i) were used to secure a favorable SEC decision that Defendants then wielded affirmatively in litigation; and (ii) whose subject matter is inextricably intertwined with materials that Defendants voluntarily disclosed to several other third parties (including outside auditors whose clean audit opinion relied upon that subject matter and those materials)?

## III. APPLICABLE STANDARDS OF REVIEW

### A. Mandamus Generally

Mandamus is "a '*drastic and extraordinary*' remedy 'reserved for really extraordinary causes.'" *Cheney*, 542 U.S. at 380.[1] Courts undertake a three-pronged inquiry when deciding whether to take the extraordinary step of issuing a writ;

---

[1] Throughout this Opposition emphasis is added and internal citations omitted, unless otherwise noted.

- 3 -

petitioners must show: (i) that they have "'no other adequate means to attain the relief'" they desire; (ii) that their right to the writ is ""*clear and indisputable*""'; and (iii) even if (i) and (ii) are deemed satisfied, that "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is *appropriate* under the circumstances." *Id*. at 380-81.

"Review of a district court's determination with respect to the attorney-client privilege, even on direct appeal, let alone via a mandamus petition, is limited." *In re Avantel, S.A.*, 343 F.3d 311, 318 (5th Cir. 2003). Notably, a district court's "reversible error by itself is not enough to obtain mandamus." *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 290 (5th Cir. 2015); *see also In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 (5th Cir. 2000) (a petitioner "must show not only that the district court erred, but that it *clearly and indisputably erred*") (Court's emphasis).

## B. The District Court's Wide-Ranging Discretion

"'A district court has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse.'" *Crain v. City of Selma*, 952 F.3d 634, 638-39 (5th Cir. 2020); *see also Harte v. Bd. of Comm'rs of the Cnty. of Johnson*, 940 F.3d 498, 522 (10th Cir. 2019) (district court's determination of attorney-client and work-product privilege operates within the abuse-of-discretion standard).

- 4 -

In order to find an abuse of discretion, this Court must conclude that the district court's Order: "'(1) relie[d] on clearly erroneous factual findings; (2) relie[d] on erroneous conclusions of law; or (3) misapplie[d] the law to the facts.'" *Allen v. C & H Distribs., L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015); *see also Crain*, 952 F.3d at 638 (factual findings reviewed for clear error, while legal conclusions are reviewed *de novo*).

That the district court abused its discretion is a conclusion that is never easily reached, for "deference ... is the hallmark of abuse-of-discretion review." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).

## IV. STATEMENT OF THE CASE

### A. Factual Background

#### 1. A whistleblower's complaint spurs Anadarko board action, a law firm's internal investigation, and selective disclosure of the investigation's procedures and results to third parties.

In May 2016, Anadarko's senior staff reservoir engineer and Shenandoah subsurface lead, Lea Frye, submitted a whistleblower complaint to the SEC alleging that Anadarko was overstating to investors the size and value of Shenandoah. MR355-56. In response, the Anadarko Audit Committee ("ACC") hired law firm Norton Rose Fulbright US LLP ("Norton Rose," or "NRF") to investigate the allegations. MR356.

Norton Rose stayed in contact with the SEC throughout 2016, providing the federal agency with select documents and revealing details about its investigation. *Id.* Norton Rose also provided detailed information about the investigation to Anadarko outside auditor KPMG on a dozen conference calls, including information about witness interviews and internal documents. *Id.* And, in connection with a planned equity offering, Anadarko's general counsel held a September 8, 2016 conference call with lead underwriter J.P. Morgan in which they discussed "in detail" the investigation's status and Norton Rose's preliminary "findings." MR070.

On November 21, 2016, Norton Rose actually previewed for KPMG the materials they intended to present to the SEC the following day. *Id.*; *see also* MR097 (KPMG workpapers note that "prior to the November 22, 2016 meeting with the SEC, [Norton Rose will] present their findings to the Audit Committee/Board and KPMG"). KPMG was granted "full access" to the presentation, including a Q&A session with Norton Rose "[a]fter reading through the presentation"—but Norton Rose did not allow KPMG to keep a copy due to attorney-client privilege concerns. MR070-71; MR101.

On November 22, 2016, Norton Rose gave a lengthy PowerPoint presentation to the SEC. The presentation spanned 250 pages, lasted more than 4.5 hours, and—like KPMG's session the day before—included an unscripted Q&A session.

- 6 -

MR356.    Norton  Rose  revealed  detailed  information  about  the  investigation,

including  its  review  of  300,000  documents  and  interviews  of  28  Anadarko

employees.  *Id*.  The presentation was marked "Attorney-Client Communication and

Attorney Work Product."  MR309.

The  law  firm's  overtures  to  the  agency  worked.   On January 10, 2017, the

SEC sent Norton Rose the "Termination Letter" ending its investigation of Anadarko

without an enforcement action, "[b]ased on the information we have as of this date."

MR071.

> **2.** **Defendants' strategic use of the Termination Letter
> and Norton Rose's investigation even as they refused
> to turn over waived materials.**

At  subsequent  depositions  in  the  underlying  securities-fraud  matter,

Defendants'  counsel  deliberately  wielded  the  Termination  Letter  while  cross-

examining Class Representatives in order to make them question their views of the

litigation's merits.  They asked one representative, "[d]oes [the Termination Letter]

change  your  view  as  to  any  of  the  allegations  in  Iron  Workers'  complaint[?]"

MR356.  Showing it to another representative, they inquired, "[d]o you understand

this  letter  to  be  an  indication  that  the  SEC  has  upheld  the  whistleblower  claims

against Anadarko?"  MR356-57.

Beyond the class-representative depositions, Defendants continued to rely upon the ACC investigation and its related work product to erect defenses in their favor.

For instance, Defendants' interrogatory responses confirmed their intention to assert an affirmative defense—good-faith reliance on KPMG's work and advice— even as the auditor's workpapers, in turn, made clear that its 3Q2016 review and 2016 year-end audit opinion blessing Anadarko's Shenandoah's accounting relied heavily on the selective information and analysis Norton Rose provided regarding the Audit Committee investigation.  MR357.

Similarly, when moving for summary judgment in early 2023, Defendants submitted an expert report both: (i) based on KPMG's audit opinion; and (ii) relying on Norton Rose's presentation to the SEC.  MR357-58.

Despite the foregoing, Plaintiff was forced to move to compel 500-plus documents concerning the ACC investigation that were withheld outright or redacted on work-product grounds—including certain KPMG workpapers—as well as 36 documents by non-party Audit Committee members that were being withheld or redacted as attorney-client privileged.  MR357.

4880-0970-0471.v1

3.      **Defendants concede at oral argument that they will
use the Termination Letter as a sword based upon
Norton Rose's investigation and presentation, while
Plaintiff informs the court that a Norton Rose
attorney's declaration is demonstrably inaccurate.**

At the hearing on Plaintiff's motion-to-compel, Defendants' counsel
conceded, twice, that Defendants would wield the SEC's Termination Letter at trial
to counter any probative effect of whistleblower Frye's initial letter to the SEC:

> I'm sure Plaintiffs will file a motion in limine about whether we can or
> cannot reference the SEC termination letter. *As you can obviously
> imagine* our position is that if they're going to reference that Ms. Frye
> filed a letter with the SEC, in fairness we ought to be able to say that
> the SEC declined to press charges.

MR402:7-12; *see also* MR415:1-3 ("[I]f they're going to say Ms. Frye went to the
SEC, we need to be able to explain to the jury that well the SEC didn't actually bring
charges.").

In addition, Plaintiff pointed out that a declaration by Norton Rose's lead
attorney dealing with the SEC incorrectly declared that no privileged materials had
been provided to the agency.  MR385:17-MR386:1.  That same declaration further
incorrectly declared that there were no summaries of witness interviews given to the
SEC—when in fact there were witness summaries provided.  MR389:5-23.

The errors mattered, explained Plaintiff, for while the PowerPoint slides may
have tabulated *some* of what was conveyed to the SEC in securing a termination

letter, logically the *entirety* of that conveyance was not: "We both know that PowerPoint presentations are geared talking points…. They're not entirely what was told to the SEC …." MR389:24-MR390:3; *see also* MR390:7-9 ("It sort of defies probability that Norton Rose said nothing [to the SEC] about what was said during these interviews."). Indeed, it was obvious that not every interviewee supported Anadarko's story. *See, e.g.*, MR122 ("[w]itnesses … *largely agreed*" with Anadarko-friendly point); MR123 ("interviewees *generally agreed*" with point in Anadarko's favor). Given that conspicuous equivocating, what other interviewees said about Shenandoah—the ones that *didn't* agree—also warranted disclosure. *See, e.g.*, MR413:5-8 ("fairness requires that if they're going to inject [the SEC Termination Letter] into the litigation, which they have offensively, that we need the full panoply of information that went into" that decision); MR361 ("Defendants refused to provide Plaintiffs with the facts and opinions that NRF reached as part of the AAC investigation, but chose *not* to share with the SEC") (emphasis in original).

The district court agreed with that assessment of missing information, both at the hearing and later in its Order compelling production. *See*, *e.g.*, MR409:25-MR410:3 ("I mean, if I was that witness" being presented with SEC's Termination Letter, "I'd be sort of like—I'd want to know everything that went into that investigation"); MR406:23-24 ("But [Plaintiff's] point is you did an investigation

- 10 -

and then were spoon feeding material to the SEC to get that result."); *see also* MR314 (court notes "Anadarko … wants to shield the underlying information that went into the decision by the SEC—or that potentially was withheld from it").

### B. The district court issues its Order finding waiver and compelling document production, along with its follow-on denial of reconsideration.

#### 1. Order finding waiver and compelling production.

Following briefing and oral argument on the issues, the district court granted Plaintiff's motion to compel. *See* MR311 ("Anadarko has used privilege as both a sword and a shield, thus likely waiving privilege as to the entire subject matter of the ACC investigation."). Several of the court's rationales and findings undergirding that holding warrant mention.

As a preliminary matter, the district court found it "pertinent" that Norton Rose had shared the underlying investigation materials with several third parties in addition to the SEC: *i.e.*, (i) the "full access" preview granted KPMG that included actual materials, a Q&A session, and a dozen conference calls; (ii) the "detail[ed]" conference call with J.P. Morgan's counsel that covered the investigation's status and "'NRF's preliminary "findings"'"; and (iii) the lengthy, 250-page PowerPoint presentation to the SEC that was marked "Attorney-Client Communication and Attorney Work Product," while lasting more than 4.5 hours and including an

unscripted Q&A session. MR309. The resulting documents at issue—some produced with redactions, while others withheld entirely—numbered over 500. *Id*.

After noting its "'broad discretion'" in deciding whether to compel the documents' production (MR311), the district court analyzed their waiver generally, as well as that waiver's scope.

*Waiver of privileges generally.* "Important here," observed the district court, "is the concept of waiver of privilege due to use of privileged information as both *a sword and a shield*." MR312 (court's emphasis). In other words, when a privilege-holder uses confidential information against his adversary, he implicitly waives its use "protectively (the shield)." *Id*. Moreover, where the privilege-holder seeks to use some protected material as evidence but asserts privilege as to other, related materials, "the party 'thereby waives the privilege as to all related privileged matters on the same subject.'" MR313.

The key, said the district court, is deciding just "what is it that puts a matter *in issue* for such purposes?" *Id*. (court's emphasis). The answer, noted the court, is provided by this Court's decision in *In re Itron, Inc.*, 883 F.3d 553 (5th Cir. 2018): a party injects the privileged communication's contents into litigation "'either by making the content of the communications a factual basis of a claim or defense or by disclosing the communication itself.'" MR313. Some examples of that injection

- 12 -

included "*advice of counsel*," and "*employer reliance on investigation.*"  *Id.* (court's emphasis) (citing *Doe 1 v. Baylor Univ.*, 335 F.R.D. 476, 498 (W.D. Tex. 2020)).[2]

Both were present here.  MR314.  The district court found that Anadarko "seeks to rely on the SEC's termination letter" to indicate that whistleblower Frye's allegations "were unfounded or false," because the investigation's results presented to the agency "resulted in it choosing *not* to pursue and enforcement action."  *Id.* (court's emphasis).  But at "the same time," Anadarko "wants to shield the underlying information" that went into the SEC's decision—"*or that potentially was withheld from it.*"  *Id.*

That gambit was wrong, held the district court.  "Anadarko can't separate the *result* of the SEC investigation from the facts and representations by attorneys that went *into* that investigation."  *Id.* (court's emphasis).  The court further found that

---

[2]  In *Baylor*, the university hired an outside law firm to conduct an independent investigation of Baylor's "institutional responses" to various Title IX and related compliance issues—with the law firm making remedial recommendations to the school's Board of Regents.  MR314.  The university sought in subsequent litigation to demonstrate that it had responded properly to the issues by pointing to actions it had taken—while simultaneously asserting privilege to shield its lawyers' advice on the subject.  *Id.*  That conduct amounted to waiver, held the *Baylor* court, as Baylor wanted to "'dramatically restrict'" fact discovery by "'restricting discovery of [its law firm's] work,'" while at the same time "'want[ing] to get the benefit of relying on the investigation and reforms.'"  *Id.*  Given that particular fact pattern echoing the situation here, it is little wonder the district court here found *Baylor* "instructive" in assessing Anadarko's conduct.  *Id.* ("So, too, here.").

- 13 -

the lack of separation "naturally extends to and encompasses—in terms of both fairness and completeness—what Anadarko chose *not* to present to the SEC." *Id.* (court's emphasis); *see also* MR315 (Anadarko cannot "selectively withhold documents" defending itself via the SEC's Termination Letter "while simultaneously restricting" Plaintiff's access to the underlying facts that the SEC relied upon and that Norton Rose "presented—or chose to withhold"). *Id.* Thus, both attorney-client and work-product privilege were waived. *Id.*

*The waiver's scope*. The district court next considered "subject-matter waiver" under Federal Rule of Evidence 502(a). MR315-316. Waiver of both attorney-client and work-product privileges may extend to undisclosed communications, observed the court, when the initial waiver was intentional, the disclosed and undisclosed communications or information "'concern the same subject matter,'" and "'in fairness'" they ought to be considered together. MR315. That is precisely what occurred here:

> *The record establishes that* a significant portion of confidential communications between Norton Rose and Anadarko was apparently revealed to the SEC, KPMG, and JP Morgan. Also in consideration is Anadarko's *use of privilege as a sword and a shield*, as discussed above.

MR316. Given those findings, "[f]airness thus dictates that waiver extend to the entire subject matter of the AAC investigation." *Id.*

- 14 -

## 2. Denial of reconsideration/§1292(b) certification.

Defendants sought reconsideration of the court's Order or, alternatively, its certification for interlocutory appeal via 28 U.S.C. §1292(b), but the district court made short work of both attempts.  MR586-588.

Anadarko again insisted that it hadn't used the SEC Termination Letter as a sword, but the court correctly noted that the argument had been "considered and disposed of" in its Order.  MR587; *see also id*. (motions for reconsideration "'may not be used to rehash rejected arguments'").  Importantly, while Anadarko now offered to stipulate that it *would not* introduce or rely on the Termination Letter in the litigation going forward, that strategic backpedaling didn't sway the court: "That conflicts with representations made by counsel" at the motion-to-compel hearing. *Id*.  "A change in Anadarko's position *after* decision in no way warrants reconsideration of that decision."  *Id*. (court's emphasis).  And Anadarko's additional arguments against subject-matter waiver "present nothing" that hadn't already been considered and addressed in the court's Order.  *Id*.

Anadarko's attempt at §1292(b) interlocutory certification fared no better. Section 1292(b)'s exacting criteria—including that there exist a "'controlling question of law'"—simply weren't met, held the court.  Instead, its Order had

concerned "a garden-variety privilege dispute, where resolution of privilege issues is intensely factual."  MR588.

## V.    REASONS WHY THE WRIT SHOULD NOT ISSUE

### A.    Defendants fail to show their "clear and indisputable" right to mandamus relief.

Prominent among the three criteria that Defendants must satisfy before a writ will issue is that they have a "'"clear and indisputable"'" right to its issuance. *Cheney*, 542 U.S. at 380.  Their burden is a significant one, however (*Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953)), and as the following shows, they've fallen woefully short of meeting it.[3]

---

[3]   Plaintiff addresses a second criterion, the writ's "appropriateness," *infra* in §V.B. As for the third criterion necessary for a writ to issue—whether there exist other adequate means to attain relief—Plaintiff acknowledges this Court's observation that ordinarily "'an appeal after disclosure of the privileged communication is an inadequate remedy'" (*In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 n.9 (5th Cir. 2000)), and thus this Opposition doesn't challenge that prerequisite.  Because *all three* criteria must be met in order to justify mandamus review, however, even an unreviewable privilege ruling doesn't mean perforce that mandamus is appropriate.  *See, e.g.*, *Avantel*, 343 F.3d 311 (acknowledging unreviewable nature of issue presented, but denying mandamus nonetheless).

- 16 -

1.    **Defendants fail to transform a "garden-variety privilege dispute" with "intensely factual" underpinnings into a question of legal error requiring this Court's intercession.**

Defendants concede the axiom that wielding ostensibly privileged communications as a so-called "sword-and-shield" will likely waive those privileges.  Petition at 17-18.  They also concede that reliance on purportedly privileged materials in order to support a legal defense also allows waiver. *Id*.  And they agree, as they must, that using reportedly privileged materials to influence a decisionmaker while denying access to the same for a litigation adversary also triggers a waiver. *Id*. at 18.

Those concessions control here, for in its discretion the district court assessed the facts of this case and found *each* of those scenarios existed, thus justifying its compelled-production Order; among those facts were that:

- it was "[p]ertinent" that investigating law firm Norton Rose "'previewed with KPMG the materials they intended to present to the SEC'";[4]

- it was "[p]ertinent" that Norton Rose "'granted KPMG full access' to the presentation";[5]

---

[4]    MR309.

[5]    *Id*.

- it was "[p]ertinent" that Norton Rose "held a Q&A with KPMG" on the subject, and that KPMG wasn't "permitted to retain a copy"—which denial KPMG later noted reflected attorney-client privilege concerns;[6]

- it was "[p]ertinent" that Norton Rose provided "'detailed information to KPMG on a dozen conference calls, including witness interviews and Anadarko's internal documents'";[7]

- it was "[a]lso pertinent" that Norton Rose made a PowerPoint presentation to the SEC spanning some 250 pages and lasting "'more than 4.5 hours,'" and that it included a Q&A session along with information from "55 witness interviews" and internal Anadarko documents;[8] additionally, that "at this meeting" Norton Rose "'revealed detailed information about the investigation' and then 'stayed in touch with the SEC's Fort Worth office, providing select documents and revealing details about the investigation'";[9]

- Norton Rose's presentation to the SEC was marked "Attorney-Client Communication and Attorney Work Product";[10]

- also "pertinent" was that Anadarko's general counsel held a conference call "with JP Morgan's counsel 'to discuss "in detail" the status of the investigation and [Norton Rose's] preliminary "findings"'";[11]

---

[6]  *Id.*; *see also* MR070-71 (retention "would waive the privilege"); MR101 ("Due to attorney/client privileges, KPMG did not retain a copy of the presentation for the audit workpapers.").

[7]  MR309.

[8]  *Id.*

[9]  *Id.*

[10]  *Id.*

[11]  *Id.*

4880-0970-0471.v1

- Defendants' counsel conceded in open court that only "most"—*i.e.*, not *all*—of the individuals named in the PowerPoint had been deposed;[12]

- speaking to Anadarko's use of the Termination Letter at the depositions, the district court observed at the motion-to-compel hearing, "presumably if you're doing that in a deposition, you want to do that in front of a jury…. [but] you can't use it in a deposition and say well you can cure that because, you know, that'll never see the light of day before a jury. *If that's the answer, it shouldn't have been pulled out and used in a deposition*";[13]

- in that same hearing Defendants' counsel admitted, twice, that Anadarko *would* use the SEC Termination Letter offensively in the litigation, should Plaintiff even mention that whistleblower Frye approached the SEC;[14]

- having put the SEC Termination Letter before Class Representatives in their depositions, "Anadarko seeks to rely on [the Letter] to indicate that the whistleblower's allegations were unfounded or false because the information uncovered upon investigation, when presented to the SEC, resulted in it choosing *not* to pursue an enforcement action";[15]

- "at the same time," Anadarko "wants to shield the underlying information that went into that decision by the SEC—or that potentially was withheld from it";[16]

- but Anadarko cannot separate "the *result* of the SEC investigation from the facts and representations by attorneys that went *into* that

---

[12] MR399:13-15.

[13] MR407:2-7.

[14] MR402:7-12; *see also* MR415:1-3.

[15] MR314 (court's emphasis).

[16] *Id*.

4880-0970-0471.v1

investigation," which "quite naturally extends to and encompasses—in terms of both fairness and completeness—what Anadarko chose *not* to present to the SEC";[17]

- "[t]his was a voluntary choice *to put in issue* the privileged matters underlying the internal investigation conducted by Norton Rose on behalf of the ACC";[18] and

- only when Anadarko realized its concession that it would use the Termination Letter at trial had contributed to the court's Order, did it try to walk back that concession—to no avail: "A change in Anadarko's position *after* [the motion-to-compel] decision in no way warrants reconsideration of that decision."[19]

Considered cumulatively these facts and findings demonstrate, beyond debate, the district court's conclusion that Anadarko's "sword-and-shield use is apparent here." MR315. Those myriad facts and findings must be deferred to now, unless shown to be clearly erroneous. *Crain*, 952 F.3d at 638. Defendants haven't made any such showing.

Defendants nonetheless insist waiver isn't warranted because they didn't actually place the deposition testimony centering on the SEC's Termination Letter before a "factfinder," and have already "stipulated" that they won't use it later in the litigation (Petition at 19, 22), but they're wrong several times over.

---

[17]  *Id*. (court's emphasis).

[18]  MR315.

[19]  MR587 (court's emphasis).

- 20 -

First, had their deposition gambit succeeded, Defendants most certainly *would* have placed the resulting testimony before the district court—whether while combatting class certification or urging summary judgment—likely arguing some (imagined) shortcoming of a class representative who now viewed the case differently in light of the SEC's Termination Letter. *Cf. Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation'"); *see also J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("the presence of even an arguable defense peculiar to the named plaintiff … may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation"). Just because Defendants' deposition questioning failed to elicit the damaging admissions from Class Representatives that they sought, that failure doesn't mean that their efforts didn't constitute a waiver—or that this Court should reward that gambit with a writ of mandamus.

Moreover, that stipulation—conveniently extended now for Defendants' benefit—was offered only *after the fact*, while moving for reconsideration, when Defendants knew: (i) their strategy to undercut the Class Representatives via the Termination Letter had failed; and (ii) the district court had already ruled against

them on the waiver issue.[20]  The belated stipulation thus meant nothing.  *Cf. In re Ariz.*, 2022 U.S. App. LEXIS 10160, at *6-*7 (9th Cir. Apr. 14, 2022) (in seeking mandamus to avoid producing waived documents, certain defendants "disclaim reliance on an advice of counsel defense" at the appellate oral argument; Ninth Circuit remained unpersuaded because "the State defendants did not make this concession in front of the district court, it could not have factored into the district court's decision").

It means nothing now, as well.  Defendants are again trying to use the stipulation to avoid their earlier representations concerning the SEC Termination Letter, but this Court needn't indulge their tactics.  *See Ergo Sci. v. Martin*, 73 F.3d 595, 600 (5th Cir. 1996) (whether judge's reliance on statements made by counsel earlier in proceedings "is labeled as 'waiver,' 'judicial estoppel,' or 'renunciation' is immaterial.  What is clear is that *the district court … is entitled to rely on statements made by counsel in open court*"); *see also Veillon v. Expl. Servs., Inc.*,

---

[20]  That fact removes the present situation from that in *Itron*, where this Court found relevant the fact that defendants had stipulated to not using privileged materials *before* the district court ruled against them.  *Itron*, 883 F.3d at 557 (defendants stipulated to non-use while opposing motion to compel).  Tellingly, Defendants do not argue now that the district court erred in denying them reconsideration, or in ruling that "[a] change in Anadarko's position *after* decision in no way warrants reconsideration" of the court's earlier waiver decision.  MR587 (court's emphasis).

4880-0970-0471.v1

876 F.2d 1197, 1201 (5th Cir. 1989) (rejecting appellant insurance company's attempt to disavow earlier concessions made by its counsel in open court). And the stipulation studiously avoids Defendants' plan to use as defenses in this matter both KPMG's clean audit as well as favorable expert accounting testimony—both of which rely, in significant part, on the ACC's investigation.

In light of the foregoing, the district court's fact-centric holding was not clearly and indisputably wrong, and remains safely within its wide-ranging discretion.[21]

### 2. Defendants' attempt to dispute their "subject matter" waiver fails on myriad record facts.

Federal Rule of Evidence 502(a) addresses the scope of waiver as to both attorney-client privilege and work-product protection, extending it to undisclosed

---

[21] Defendants dispute the district court's characterization of *Baylor* as "instructive" given the similar sword-and-shield shenanigans there, pointing out that the *Baylor* defendants had persisted in relying upon the university's internal investigation despite being expressly "warned of potential waiver." Petition at 20-22. Their dispute relies upon two discredited premises, however: (i) that they've stipulated to not using the SEC's/ACC's investigations to defend against liability; and (ii) they haven't sought "to influence a decisionmaker" via reliance on those investigations. *Id*. As demonstrated *supra*: (i) Defendants' belated, tactical "stipulation" was too little, too late; and (ii) their unusual gambit of questioning Class Representatives about the import of the SEC's Termination Letter was patently an effort to undermine those representatives for future scrutiny by a *decisionmaker*—the district court or the jury—at class certification or summary judgment, or even at trial.

- 23 -

communications only if: (i) "the waiver is intentional"; (ii) "the disclosed and undisclosed communications or information concern the same subject matter"; and (iii) "they ought in fairness to be considered together."  Fed. R. Evid. 502(a); *see also* Fed. R. Evid. 502(a) advisory committee's note (waiver limited "to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner").  Thus, "'[d]isclosure of any significant portion of a confidential communication waives the privilege as to the whole.'" *Nguyen v. Excel Corp.*, 197 F.3d 200, 208 (5th Cir. 1999).

The district court held that subject-matter waiver was easily established here, pointing to facts that warrant deference in the absence of clear error: "The record *establishes that a significant portion of confidential communications* between" Norton Rose and the Company "was apparently revealed" to a trio of third parties who were very interested in the law firm's investigation at the behest of Anadarko's Audit Committee: the SEC, auditor KPMG, and underwriter J.P. Morgan.  MR316; *see also* MR309 ("Pertinent here," Norton Rose previewed with KPMG the SEC materials, granted KPMG "'full access'" to the presentation, and held a related "Q&A with KPMG" even though the auditor "wasn't permitted to retain a copy";

- 24 -

Norton Rose "also 'provided detailed information to KPMG on a dozen conference calls, including witness interviews and Anadarko's internal documents'").[22]

Added to those facts—surely enough on their own to support waiver—is the additional fact that Anadarko had deliberately "use[d the] privilege as a sword and a shield" (MR315) when it sought to rely upon the SEC's Termination Letter "to indicate that the whistleblower's allegations were unfounded or false." MR314; *accord* MR314-315; *see also* MR407:2-7 (addressing deposition tactic during motion-to-compel hearing, district court notes "[a]nd presumably if you're doing that in a deposition, you want to do that in front of a jury. So, you can't use it and then—you can't use it in a deposition and say well you can cure that because, you know, that'll never see the light of day before a jury. If that's the answer, it shouldn't have been pulled out and used in a deposition."). Given the foregoing, "[f]airness thus dictates that [the] waiver extend to the *entire subject matter* of the ACC investigation." MR316.

Turning the concept of waiver-related "fairness" on its head, Defendants assert that it's not fair *to them* to find such a broad waiver—even if it were true,

---

[22]  While the district court referred to these recitations as "alleg[ations]" (MR309), they are hard facts taken directly from KPMG's workpapers. *See* MR070-71; MR097; MR101.

*arguendo*, that they *did* use the privilege as both a sword and a shield.  Petition at 25-26.  That's because, they insist, Plaintiff already: (i) was given "*all* of the information that Defendants produced to the SEC"; (ii) interviewed some "20 fact witnesses"; and (iii) "had the opportunity to depose any … individuals" listed as being interviewed during Norton Rose's internal investigation.  Petition at 26 (Defendants' emphasis).

Defendants are being too clever by half.

For one thing, the purported "opportunity" to depose any one of a series of listed interviewees was truncated by Defendants themselves—they *refused* Plaintiff's access to any more than the select individuals that were deposed.  *See, e.g.*, MR412:12-16 (responding to district court's direct question whether Plaintiff had been able to depose "all" or just "some" of the listed interviewees, Plaintiff's counsel notes, "[n]o, we deposed a handful of them just because of obvious constraints of the number of people being deposed.  But we never got the witness interviews").  At that same hearing Defendants' counsel grudgingly conceded—choosing her words carefully—that Plaintiff had only deposed "*most* of the individuals who are named in this PowerPoint presentation").  MR399:13-15.  "Most" is not "all," however, and so Defendants' vaunted deposition "opportunity" is illusory.

- 26 -

For another, even if Plaintiff already has "all" of the information Defendants gave the SEC (Petition at 26), that doesn't include *additional* materials that now are in play as a result of the broad subject-matter waiver associated with Defendants' improper sword-and-shield tactics. It's Defendants' *undisclosed* communications that matter in that scenario (Fed. R. Evid. 502(a))—and here, both Plaintiff and district court noted that what was sought were investigation-related materials that *were not* handed over to, or discussed with, the SEC. *See, e.g.*, MR314 (Anadarko "wants to shield the underlying information" that went into the SEC's termination decision—"*or that potentially was withheld from it*"); MR315 (Anadarko can't restrict Plaintiff's access to underlying facts that Norton Rose "chose to withhold" from the SEC); MR314 (fairness and completeness compel production of materials that "Anadarko chose *not* to present to the SEC") (court's emphasis); MR406:23-24 ("But [Plaintiff's] point is you did an investigation and then were spoon feeding material to the SEC to get that result."); MR361 ("Defendants refused to provide … facts and opinions that NRF reached as part of the ACC investigation, but chose *not* to share with the SEC") (emphasis in original). Defendants' pointing to some documents that *were* turned over ignores the related universe of materials that *would* be covered under a sword-and-shield waiver.

- 27 -

Defendants continue their half-cleverness by raising the specter of a *verboten* forced production of their attorneys' "opinion[s]" and "'mental impressions.'" Petition at 27-28.  They carp that the district court's Order covers "all materials relating to the AAC Investigation, *without exception*, and thus requires Anadarko to disclose opinion work product."  Petition at 28; *see also id*. at 29 ("there is no rational reason to conclude that … Plaintiffs are somehow entitled to learn the legal opinions of the Audit Committee's counsel").

Defendants' overwrought protests overlook several realities—both factual and legal.

First, Defendants haven't even told Plaintiff—and they certainly don't tell this Court—just *what* specific withheld or redacted documents they believe contain their counsel's "opinions" and "legal theories."  And yet they've updated their privilege log some six times after its initial production nearly two years ago.  *See* MR072;  *see also* MR146-212.  Aside from their *ipse dixit*, Defendants offer no tangible evidence of which materials require this Court's attention via the extraordinary vehicle of mandamus.

Second, it is hard to imagine how the *entire* universe of materials that Defendants didn't hand over to the SEC would comprise "'mental impressions,'" attorney "'opinions,'" or "'legal theories.'"  Petition at 27.  For example, while most

- 28 -

interviewees supported Anadarko's story concerning Shenandoah, not all did—and the PowerPoint presentation to the SEC bears this out. *See*, *e.g.*, MR122 ("[w]itnesses … *largely agreed*" with Anadarko-friendly point); MR123 ("interviewees *generally agreed*" with point in Anadarko's favor). What those other interviewees said about Shenandoah, but wasn't shared with the SEC, is precisely the sort of factual information that Plaintiff is entitled to given Defendants' waiver—and the district court agreed. MR314 (district court notes "Anadarko wants to shield the underlying information that went into the decision by the SEC—or that potentially was withheld from it").[23]

Third, Defendants ignore that although the protection against disclosure of "opinion" work product is high, it isn't absolute. *See, e.g.*, *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982) ("Some courts have provided *an almost absolute* protection for such materials."); *Forever Green Ath. Fields, Inc. v. Babcock L. Firm, LLC*, 2014 U.S. Dist. LEXIS 416, at *20 (M.D. La. Jan. 3, 2014)

---

[23] Defendants probably believe that choosing *not* to share those other interviewees' impressions with the SEC was itself the embodiment of Norton Rose's "mental impressions" or "legal theories," but that belief is a non-starter given its logical corollary: Norton Rose also affirmatively decided *what* to show the SEC in the 4.5-hour PowerPoint presentation, and yet Defendants have turned over every bit of *that* information without complaining about the "opinions" or "legal theories" involved in that decision. *See* MR388:12-13 ("We have the entirety of the PowerPoint's presentation, Your Honor.").

("This protection is not absolute, however.").[24]  Thus, when a party puts certain information "at issue" and seeks to use that as a legal defense—such as a law firm's investigation and resulting conclusions—the "waiver applies to everything that has been put 'at issue,' *whether they be facts or opinions*."  *Baylor*, 335 F.R.D. at 497-98.  That's exactly what Defendants have done here several times over, while erecting defenses in their favor: (i) an affirmative defense centered on KPMG's clean audit opinion, which itself relied "heavily on the selective information and analysis [Norton Rose] provided regarding the AAC investigation" (MR357); (ii) at summary judgment, using an expert report that was (a) based on KPMG's audit opinion and (b) relied upon Norton Rose's presentation to the SEC (MR357-58); and (iii) the SEC Termination Letter (and the underlying information that went into the agency's decision) used in an attempt to undermine Class Representatives' views of the litigation.  Given Defendants' sword-and-shield tactics, waiver of even ostensibly "opinion" work product is justified.

---

[24]  Defendants' Petition omits the "[s]ome courts" qualification from their quote of *Int'l Sys.* (Petition at 27), which makes clear this Court wasn't announcing an inviolate blanket rule.

4880-0970-0471.v1

Finally, Defendants ignore that the district court built a safety valve into its Order: it acknowledged that even under its broad mandate to produce waived materials, there still might be some that would enjoy privilege protections:

> Even so, *legitimate disputes may exist about specific documents that assertedly wouldn't fall under this waiver*. Defendants request— if, as here, waiver is found—that "the parties meet and confer to determine which documents fall within the scope of the waiver," and that (depending upon the quantity left at issue) appointment of a Special Master may be appropriate, with costs to be shifted away from the prevailing party.

MR316; *see also id*. ("The parties are ORDERED to confer in good faith *about the scope of the waiver* found by this Order."); *see also* MR311 ("Later dispute as to any particular document may be submitted to the extent not already resolved by this ruling."). Defendants don't acknowledge the court's express exception to a wholesale waiver, or the fact that they themselves requested the safety outlet. *See* MR316 ("Defendants request …").

### B.  This is not an "appropriate" case for extraordinary interlocutory review.

In considering Defendants' Petition, this Court must be satisfied that a writ's issuance is "appropriate under the circumstances." *Cheney*, 542 U.S. at 381. Defendants fail to make that showing here, for several reasons.

As a threshold matter, there's no need for the Court to even undertake an "appropriateness" inquiry given Defendants' demonstrated failure to carry their

- 31 -

significant burden of showing a "clear and indisputable right" to a writ. *See supra* §V.A.; *see also In re King's Daughters Health Sys.*, 31 F.4th 520, 529 (6th Cir. 2022) ("[B]ecause [the petitioner] is not clearly entitled to relief, we need not consider whether mandamus is otherwise appropriate under the circumstances.").

Moreover, even if this Court were to indulge Defendants' arguments on the third criterion, it should conclude that mandamus relief is inappropriate for several reasons.

First, as the district court found, the underlying matter is a "garden-variety privilege dispute" whose resolution depends upon "intensely factual" inquiries. MR588. Beyond warranting this Court's deference (*Crain*, 952 F.3d at 638), those findings also show that the unremarkable discovery dispute, having resulted in the district court's Order compelling production of a narrow set of documents, is far afield from an order of "extraordinary size and scope" that might warrant mandamus review. *Cf. Occidental*, 217 F.3d at 296.

Second, despite striving mightily to make it so, Defendants haven't established that district court committed *legal error*. Instead, they're quibbling with the court's application of settled law to a unique fact pattern—the sort of quibble this Court holds unworthy of mandamus review. *Id*. (petitioner "is challenging not a conclusion of law, but merely the court's document review and resulting factual

- 32 -

determination"); *see also In re Ivantis, Inc.*, 835 F. App'x 560, 561 (Fed. Cir. 2020) ("We discern no obvious basic, undecided legal issue underlying the district court's ruling, nor can we say that it was so patently unreasonable as to warrant mandamus.").

Finally, there's nothing "'important and potentially far-reaching'" about the district court's Order that is likely to "'recur in future cases'" (*cf. Occidental*, 217 F.3d at 296), given the court's fact-saturated analysis of the "garden-variety" situation presented. The law is well-settled concerning waiver generally, as well as the sword-and-shield doctrine. *See, e.g.*, *Willy v. Admin. Review Bd*., 423 F.3d 483, 497 n.63 (5th Cir. 2005) (collecting cases); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (tracing sword-and-shield doctrine—albeit not by its modern name—back to 1933).[25] The parade of horribles Defendants raise are nothing more than mere speculation (Petition at 32 (positing "if" and "could" scenarios)), and do not justify granting an extraordinary writ here. *See, e.g.*, *In re Moore*, 955 F.3d 384, 388 (4th Cir. 2020) (agreeing with respondent that "the

---

[25] That settled nature, combined with this matter's "garden-variety privilege dispute," distinguish the situation from the "implied waiver" doctrine at issue in *Itron*, where this Court admitted that *that* doctrine's application in the district courts was haphazard. *Itron*, 883 F.3d at 568 ("Because we rarely have occasion to address the nuances of the implied waiver doctrine, district courts have applied our *Conkling* decision with less than perfect 'consistency of outcomes.'").

speculative basis for [petitioner's] claim" of what might happen in the future "makes

the grant of extraordinary mandamus relief especially inappropriate"); *see also*

*United States v. Helmsley*, 864 F.2d 266, 270 (2d Cir. 1988) (denying interlocutory

review—there, under the collateral-order exception—where suggested "parade of

horribles is too remote and speculative to be persuasive").

## VI. CONCLUSION

The Court should deny Defendants' Petition.

DATED:  August 14, 2023                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOSEPH D. DALEY
DANIEL S. DROSMAN
RACHEL L. JENSEN

*s/Joseph D. Daley*

JOSEPH D. DALEY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, PLLC
JOE KENDALL
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)

- 34 -

*Attorneys for Plaintiff-Respondent*

4880-0970-0471.v1

## RULE 32(g) CERTIFICATE

The undersigned counsel certifies that PLAINTIFF-RESPONDENT'S OPPOSITION TO PETITION FOR WRIT OF MANDAMUS uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 7,174 words according to the word count provided by Microsoft Word 2016 word processing software.

*s/Joseph D. Daley*
_____
JOSEPH D. DALEY

# DECLARATION OF SERVICE

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101-8498.

2. I hereby certify that on August 14, 2023, I electronically filed the foregoing document: PLAINTIFF-RESPONDENT'S OPPOSITION TO PETITION FOR WRIT OF MANDAMUS with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

3. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 14th day of August, 2023, at San Diego, California.

*s/Joseph D. Daley*
JOSEPH D. DALEY

- 1 -