# EXHIBIT 1

CONFIDENTIAL

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4    ---------------------------------------------------x

5

6    In re ANADARKO PETROLEUM          Civil Action No.

     CORPORATION SECURITIES            4:20-cv-00576

7    LITIGATION

8

9    ---------------------------------------------------x

10

11                   **CONFIDENTIAL**

12

13     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

14                  ALLEN FERRELL, Ph.D.

15                Thursday, March 2, 2023

16

17

18

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5772235

                                         Page 1

CONFIDENTIAL

**Page 2**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHER DISTRICT OF TEXAS
 3                  HOUSTON DIVISION
 4  -----------------------------------------------------x
 5
 6  In re ANADARKO PETROLEUM      Civil Action No.
    CORPORATION SECURITIES        4:20-cv-00576
 7  LITIGATION
 8
 9  -----------------------------------------------------x
10
11
12          Videotaped deposition of ALLEN FERRELL, Ph.D.,
13  taken in Lexington, Massachusetts, commencing at
14  1:34 p.m. EST on Thursday, March 2, 2023 before
15  Lynne Ledanois, Certified Shorthand Reporter No.
16  6811
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2          REMOTE APPEARANCES
 3
 4  Counsel for the Lead Plaintiffs:
 5      ROBBINS GELLER RUDMAN & DOWD LLP
 6      BY: RACHEL JENSEN
 7          FRANCISCO MEJIA
 8      Attorneys at Law
 9      655 West Broadway
10      Suite 1900
11      San Diego, California 92101
12      rjensen@rgrdlaw.com
13
14  Counsel for the Defendants:
15      CRAVATH, SWAINE & MOORE LLP
16      BY: LAUREN ROSENBERG
17          MIKA FITZGERALD
18      Attorneys at Law
19      Worldwide Plaza
20      825 Eighth Avenue
21      New York, New York 10019
22      lrosenberg@cravath.com
23
24  ALSO PRESENT:
25  John MacDonnell, Videographer
```

**Page 4**

```
 1          I N D E X  O F  E X A M I N A T I O N
 2
 3  Examination by:                      Page
 4      Ms. Jensen                         4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  ///
```

**Page 5**

```
 1          I N D E X  O F  E X H I B I T S
 2  Deposition     Description          Page
 3  Exhibit 519  Expert Rebuttal Report of Allen    17
 4              Ferrell, 1/25/23;
 5  Exhibit 520  Document headed, Dow Jones         52
 6              Newswires by Alison Sider,
 7              APC-01761560;
 8  Exhibit 521  Email to                          122
 9              saurigemma@loradabbet.com from
10              Konrad Krill dated 4/17/17;
11  Exhibit 522  Document headed, UBS Anadarko     126
12              Petrolum, Large Exploration
13              Expense Drives 1Q17 EPS/CFPS
14              Miss but EBITDX Beats; Maintains
15              2017 Guidance,
16              UBS_0001735;
17  Exhibit 523  Expert Report of Allen Ferrell    131
18              re Class Certification;
19  Exhibit 524  Document headed, Evercore ISI     151
20              Flash Note, Anadarko Petroleum,
21              APC-01334718;
22  Exhibit 525  Anadarko Petroleum Corporation    154
23              Form 10-Q;
24
25  ///
```

```
 1        I N D E X  O F  E X H I B I T S
 2 Deposition      Description        Page
 3 Exhibit 526  Email to Robin Fielder from    214
 4         Al Walker, 5/3/17;
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 ///
                                          Page 6
```

```
 1    having been duly sworn, testified as follows:    1:35PM
 2              EXAMINATION
 3 BY MS. JENSEN:
 4    Q   Good afternoon, Dr. Ferrell.  Where are
 5 you physically today?                1:35PM
 6    A   Lexington, Massachusetts.
 7    Q   Anyone else in the room with you?
 8    A   No.
 9    Q   Do you have any documents within reach?
10    A   I do.  I'm happy to put them aside.  I have  1:35PM
11 my expert report in this matter, but I'm happy to put
12 that aside.
13    Q   Specifically the January 25th, 2023
14 report?
15    A   Correct.                1:35PM
16    Q   Okay.  You don't need to put that aside.
17 That's fine to have it with you.  But no other
18 documents within reach?
19    A   I do have the other three reports, but I'll
20 put those in the folder.  That's it.        1:36PM
21    Q   Okay.  You have had your deposition taken
22 before; correct?
23    A   Yes.
24    Q   So you're familiar with the ground rules?
25    A   Yes.                    1:36PM
                                          Page 8
```

```
 1        Thursday, March 2, 2023
 2            1:34 p.m. EST
 3 ---------------------------------------------
 4        THE VIDEOGRAPHER:  We're on the record.
 5 It's 1:34 p.m. Eastern time on March 3rd --    1:34PM
 6 March 2nd, 2023.  This is the deposition of
 7 Dr. Allen Ferrell.
 8        We're here in the matter of Anadarko
 9 Petroleum Corporation Securities Litigation.
10        I'm John McDonnell, the videographer with    1:34PM
11 Veritext.
12        Before the reporter swears the witness,
13 would counsel identify themselves beginning with the
14 noticing attorney, please.
15        MS. JENSEN:  Yes.  Good morning.  This is    1:34PM
16 Rachel Jensen with the law firm of Robbins Geller
17 Rudman & Dowd on behalf of the plaintiffs in the
18 class.
19        I also have Frankie Mejia with me as well
20 from Robbins Geller.                1:34PM
21        MS. ROSENBERG:  This is Lauren Rosenberg
22 from Cravath Swaine & Moore on behalf of defendants.
23 And with me as well is Mika Fitzgerald.
24
25        ALLEN FERRELL, Ph.D.        1:35PM
                                          Page 7
```

```
 1    Q   And you've also had your deposition taken    1:36PM
 2 via Zoom before?
 3    A   Yes.
 4    Q   So you're familiar with how this works
 5 today in terms of the Zoom platform?        1:36PM
 6    A   Yes.
 7    Q   Okay.  Any reason you cannot testify
 8 completely and truthfully today?
 9    A   No.
10    Q   Did you prepare for this deposition?    1:36PM
11    A   Yes.
12    Q   And how so?
13    A   I reread my reports, I reread
14 Mr. Steinholt's reports, I looked at some underlying
15 documents.                    1:36PM
16        In addition to that, kind of review on my
17 own time, I had a call with counsel for about 30 to
18 40 minutes yesterday.
19    Q   And counsel is Ms. Rosenberg?
20    A   Yes.                    1:36PM
21    Q   Okay.
22    A   There was another -- I'm really terrible
23 with names, there was a Cravath associate as well.
24    Q   And you referenced underlying documents.
25 What were your referring to?            1:37PM
                                          Page 9
```

3 (Pages 6 - 9)

CONFIDENTIAL

1   A   I looked at the complaint. What else did I   1:37PM
2   take a look at? I looked at some analyst reports.
3   This is, again, from my personal review.
4       I looked at the corrected disclosures
5   here. And I looked at Steinholt's reports as well.   1:37PM
6   Q   Have you reviewed any other court
7   documents in this case?
8   A   No, I did review -- I mean, just to add, I
9   did review Mr. Steinholt's depositions. I believe he
10  was deposed twice and I did review those.   1:37PM
11  Q   No other court documents?
12  A   None that occur to me, no.
13  Q   You haven't read the court's class
14  certification decision?
15  A   I don't have a specific recollection.   1:38PM
16  Q   Okay. You've been retained as a proposed
17  testifying expert for the defendants in this case?
18  A   Yes.
19  Q   And how many hours have you personally
20  spent on the case?   1:38PM
21  A   So I have not added it up because my memory
22  is I was retained back in 2021, so it's been awhile.
23  I would say -- so I have not added the hours up since
24  2021.
25      I did take a look at hours since --   1:38PM

Page 10

1   Q   And how many securities cases   1:39PM
2   approximately have you offered expert testimony?
3   A   I don't have a specific recollection. I
4   would go to my C.V. where I do list all of my
5   testimony from last four years and I would just   1:39PM
6   reference that.
7   Q   And do you have a ballpark of the number
8   of cases total because, of course, that would just
9   be the last four years, right? So do you have a
10  ballpark total number?   1:40PM
11  A   Well, I've been doing this since around
12  2005, so I guess I'm getting older. So if you do the
13  last 20 years -- this is a ballpark and big margin of
14  error here, I would say I've probably been deposed, if
15  I had to guess, somewhere between 80, 85 times.   1:40PM
16      But it could be more, it could be less,
17  but if you were to do a 20-year span, that would be
18  my best guess.
19  Q   And in any of those securities cases, have
20  you offered expert testimony on behalf of   1:40PM
21  plaintiffs?
22  A   Yes, I have. I've done expert work for
23  plaintiffs, yes.
24  Q   My question is a little different. Have
25  you offered expert testimony on behalf of plaintiffs   1:40PM

Page 12

1   including since the fall of 2022. And not including   1:38PM
2   February -- I'm sorry, not including March, it's
3   roughly -- there is going to be a margin of error
4   here around 80 hours.
5       But again, I want to reiterate that's from   1:38PM
6   the fall of 2022 through 2023. I did not add up my
7   hours back to 2021.
8   Q   Sure. Have you added up how much you've
9   been paid in the case?
10  A   I have not.   1:38PM
11  Q   What percentage of your work in a given
12  year is as a testifying expert?
13  A   It's a question as to a percentage of my
14  consulting work or -- could you restate the question?
15  Q   As a testifying expert, what percentage of   1:39PM
16  your time in a given year is spent in litigation
17  matters as a testifying expert?
18  A   So in terms of economic consulting, it would
19  all be matters involving litigation.
20  Q   Okay. And what percentage of your work in   1:39PM
21  a given year is taken by a consulting or testifying
22  in litigation?
23  A   Yes, so the number really varies a lot, but
24  again, it can vary in some periods, but roughly
25  20 percent of my total time.   1:39PM

Page 11

1   in a securities case?   1:41PM
2   A   The one case that comes to mind was a
3   securities case under state law involving investment
4   guidelines but not for federal securities.
5   Q   Okay. So in no federal securities fraud   1:41PM
6   actions have you testified on behalf of plaintiffs;
7   correct?
8   A   I believe that's correct.
9   Q   Have you ever opined in the ballpark --
10  A   Sorry, just a clarification. I have   1:41PM
11  testified in a federal securities matter for the U.S.
12  attorney in the Southern District, so that would be a
13  federal case in a criminal matter.
14  Q   In a criminal case. Is that case listed
15  on your C.V.?   1:41PM
16  A   I don't remember. I don't remember the
17  date. We would have to pull it up. US v. Block is
18  the case.
19  Q   So in all class securities class
20  actions -- so I'll try to tease this out.   1:42PM
21      So in every securities class action that
22  you've been involved in, you've testified on behalf
23  of the defendants; is that right?
24  A   For federal securities not including the
25  U.S. government, I believe that's correct.   1:42PM

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

```
 1    Q   Right.  I mean the U.S. government        1:42PM
 2   wouldn't bring a class action; correct?
 3    A   That's correct.
 4    Q   Okay.  So the answer to my question is
 5   correct; right?  If you want, I can restate it.   1:42PM
 6    A   I believe that's accurate.
 7    Q   Okay.  Thanks.
 8        So in any securities class action, have
 9   you opined that the alleged misrepresentations or
10   omissions did, in fact, have an impact on the price   1:42PM
11   of security at issue?
12    A   I have in the following sense.  So I have,
13   for example, Bank of America, also in the Household
14   litigation, done damages per share under certain
15   assumptions.                                   1:42PM
16        So I have in that context.
17    Q   But that wasn't an opinion about the price
18   impact, that was an assumption; correct?
19    A   I don't think I quite agree with your
20   framing.  It would be based on certain assumptions   1:43PM
21   including assumptions of liability.  I did calculate
22   per share damages and that was an opinion.
23    Q   So just to be clear, it was a damages
24   opinion in which one of the assumptions was there
25   would be liability found; is that right?       1:43PM
```

Page 15

```
 1    A   That's my best recollection.  My specific   1:43PM
 2   recollection is I have in securities class action
 3   litigation estimated per share damages.
 4    Q   Assuming liability was found?
 5    A   Well, I don't -- yes, I don't know what    1:43PM
 6   damages would mean, if there is not liability, so I
 7   think that's --
 8    Q   I guess what I'm trying to say is that
 9   that was assuming that liability would be found.  In
10   other words, your opinion was limited to damages; is   1:43PM
11   that right?
12    A   I mean, I have to go back and refresh my
13   recollection.  My memory is there was an assumption of
14   liability.  Again, I'm not sure what damages means, if
15   there was -- I guess if there is no liability, the   1:44PM
16   damages are easy, it's zero.
17    Q   Understood.  I was trying to clarify the
18   nature of the opinion.  So it was a damages opinion
19   assuming liability would be found?
20    A   I gave you my best recollection.        1:44PM
21    Q   Okay.  The record will stand.
22        Are you offering any legal opinions in
23   this case?
24    A   No.
25    Q   Do you hold yourself out as an expert in   1:44PM
```

Page 16

```
 1   accounting?                                    1:44PM
 2    A   No.
 3    Q   Do you hold yourself out as an expert in
 4   the oil and gas industry?
 5    A   No.                                       1:44PM
 6    Q   Are you a geoscientist?
 7    A   No.
 8    Q   Do you have an engineering degree?
 9    A   No.
10    Q   Are you offering an opinion in this case   1:44PM
11   as to the reason Anadarko wrote off Shenandoah?
12    A   No.
13    Q   All right.  Even though you have your
14   report there with you, I'm going to mark one for the
15   record so that it will be an exhibit.  You can   1:45PM
16   continue to look at the version in front of you
17   except for just to confirm that what I'm introducing
18   here is in fact your report.
19        So if you'll bear with me for a moment
20   while I introduce this.                        1:45PM
21    A   Okay.  Take your time.
22    MS. JENSEN:  If all has gone well, there
23   should be an exhibit that you can see in your
24   Exhibit Share folder.  Again, making sure that
25   you're looking at the March 2nd folder.  It should   1:45PM
```

Page 17

```
 1   be under marked exhibits and it should be      1:45PM
 2   Exhibit 519.
 3        (Whereupon, Exhibit 519 was marked for
 4   identification.)
 5        THE WITNESS:  I'm there.                  1:46PM
 6    MS. JENSEN:  Okay.  Great.
 7        So for the record, I've introduced this
 8   Exhibit 519, the expert rebuttal report of Allen
 9   Ferrell Ph.D., dated January 25th, 2023.
10    Q   And I would like you to scroll through    1:46PM
11   very briefly and confirm that this, in fact, is your
12   report.
13    A   Okay.  When I turn away from the camera,
14   it's because I'm looking at the screen with the
15   exhibit.                                       1:46PM
16    Q   Okay.  Understood.
17    A   Yes, this looks like my January 25th report.
18    Q   Who wrote this report?
19    A   I did with the assistance of Compass
20   Lexecon.                                       1:46PM
21    Q   What assistance did Compass Lexecon
22   provide?
23    A   So they did a number of things.  For
24   example, they helped organize the flow of materials to
25   me that's reflected in the docs relied upon list.   1:46PM
```

5 (Pages 14 - 17)

1        They put together the, pursuant to my        1:46PM
2    instructions, supervision, the actual exhibits.  If
3    I were doing it myself, I think we would still be
4    waiting for the formatting and so forth.
5        I did work with a draft with them.  So I     1:47PM
6    did the drafting, but I did have an iterative
7    process with them on the drafting.
8    Q    So I want to make sure I understand here.
9    So they provided the documents --
10   A    No, that's not correct.                     1:47PM
11   Q    Tell me what you mean there.
12   A    I would have the documents flow go through
13   Compass Lexecon so they can keep track of it, they
14   could put it in binders for me to help the -- an
15   organized flow of information.                    1:47PM
16   Q    And how did the documents come to you?
17   A    A number of different ways.  I had binders
18   sent to me, so hard copies, I had --
19   Q    From counsel?
20   A    Sorry?                                       1:47PM
21   Q    From counsel?
22   A    No, this is from Compass Lexecon, I would
23   have them put together binders --
24   Q    Let's set aside the logistics.
25       How did you come to review the documents     1:48PM

Page 18

1    that you now have relied on?                      1:48PM
2    A    I interacted with my team at Compass Lexecon
3    in terms of the assignment and the material I would
4    need.
5        Obviously when I'm responding to             1:48PM
6    Mr. Steinholt, if we're talking about my
7    January 25th report, obviously I would want to look
8    at materials that would be relevant to the
9    assignment as reflected in Paragraph 16.
10       So that really framed the set of materials    1:48PM
11   that would be appropriate to look at.
12   Q    Okay.  So my question is:  How did you
13   come about receiving or otherwise deciding which
14   documents you should look at and consider?
15   A    Well, so if you're talking about my         1:48PM
16   January 25th report, I was asked to assess
17   Mr. Steinholt's report.  And so I obviously -- in
18   reviewing his report, there were certain materials
19   that would be relevant.  Obviously I had written some
20   earlier reports, I was not coming up with this fresh.  1:49PM
21       So that really framed the set of materials
22   that would be logical to take a look at.
23   Q    I think we're going round and round here.
24   I'm asking just you, who gathered documents for you
25   in this case?  Let's just ask it that way.        1:49PM

Page 19

1    A    I would talk with my team at Compass Lexecon  1:49PM
2    about the materials I wanted given my assignment in
3    Paragraph 16.  They would gather those materials such
4    as analyst reports and forward those materials to me.
5    Q    So is it your testimony then that you        1:49PM
6    reviewed all the analyst reports about Anadarko
7    throughout the relevant time period?
8    A    I know there is 1,071 in my initial report,
9    yes, I did review everything.  Obviously some of them
10   skimming and some of them were more important, but   1:49PM
11   yes.
12   Q    And so were those limited to the class
13   period then, what you reviewed?
14   A    It's whatever the -- I think they are
15   basically during the class period, but the dates of   1:50PM
16   the analysts reports are reflected in the documents
17   relied upon and we can just refer to that.
18   Q    So in other words, the documents -- the
19   universe of documents that you reviewed in this
20   case, are they all reflected in your appendices?     1:50PM
21   A    I believe that's accurate.  With one
22   exception, actually, something I noticed when I was
23   rereading my reports in preparation for the
24   deposition.
25       But one thing that wasn't on there that        1:50PM

Page 20

1    was, in fact, one of the things that I reviewed very   1:50PM
2    early on was the earnings call transcript from
3    May 3rd.
4    Q    Okay.
5    A    With that exception, I believe it's a        1:50PM
6    complete list.
7    Q    And just for clarity of the record, you're
8    talking about May 3rd, 2017?
9    A    Yes.
10   Q    Did counsel for the defendants select any    1:50PM
11   documents for your consideration?
12   A    Not that I recall.  Obviously we had a
13   discussion and I got the complaint, nothing that I can
14   recall.
15   Q    Did counsel for the defendants assist you    1:51PM
16   in drafting or editing the report?
17   A    No.  My interactions were with my team at
18   Compass Lexecon.  Obviously the assignment, turning to
19   Paragraph 16, is from counsel.
20   Q    And did you talk to counsel at any point     1:51PM
21   before you finalized the report?
22   A    Yes.
23   Q    About the report, I should say, before you
24   finalized it?
25   A    Yes.                                         1:51PM

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

1   Q   How many times?                    1:51PM
2   A   So in your question are we referring to all
3   four reports going back to 2021 or are we talking
4   about just this report?
5   Q   That's a good clarification. I understand   1:51PM
6   that they build on each other. So let's just take
7   it for this report.
8   A   I do remember talking with counsel, maybe I
9   think that was -- besides the 30 to 40-minute
10  conversation I mentioned before, I don't have a   1:52PM
11  recollection of talking with counsel for a good long
12  while. I'm sure we had a call about the assignment in
13  Paragraph 16, but that's my best recollection.
14  Q   Obviously there were conversations earlier
15  on when you were formulating earlier reports as   1:52PM
16  well; correct?
17  A   Yes.
18  Q   Now you've referred to your assignment in
19  Paragraph 16 and in Paragraph 16 you referenced
20  materials in Appendix 2.                    1:52PM
21      So all of the documents that you
22  considered in forming your opinions listed in
23  Appendix 2 with the exception of the May 3rd, 2017
24  earnings transcript call -- or call transcript,
25  sorry?                                      1:53PM

Page 22

1   A   Well, no. In the sense that Footnote 32, I   1:53PM
2   say I incorporate by reference my other reports.
3   Q   Okay. So when -- okay. But your
4   Paragraph 16 only refers to the review of the
5   materials in Appendix 2; correct?          1:53PM
6   A   It does mention Appendix 2 and I also say
7   incorporate by reference my other work.
8   Q   Okay. So beside the documents that were
9   listed in your various reports, as you said earlier
10  or testified earlier, you didn't review any other   1:53PM
11  documents other than the May 3rd, 2017 earnings call
12  transcript?
13  A   Yes, that was an omission by accident. I
14  believe that's accurate.
15      In addition to the two -- I can't remember   1:53PM
16  whether the deposition transcripts by Mr. Steinholt
17  are listed or not, but whether they are or not, I
18  did review those.
19  Q   Okay.
20  A   I do cite to his deposition. I just don't   1:54PM
21  remember -- I did review those.
22  Q   Okay. So besides Mr. Steinholt's
23  deposition transcript, you did not review any other
24  depositions in the case; correct?
25  A   I don't believe any others were cited or   1:54PM

Page 23

1   listed.                                      1:54PM
2   Q   And you didn't review any of the internal
3   communications of the company in forming your
4   opinions?
5   A   If it's not listed, it was not considered in   1:54PM
6   forming my opinion.
7   Q   Now, are all of the opinions that you
8   intend to offer at trial set forth in Paragraph 16
9   of your January 25th, 2023 report?
10  A   Well, these are the principal conclusions.   1:54PM
11  Obviously I have analyses and subconclusions in the
12  report itself. And I've also referenced the fact that
13  I am incorporating by reference my other work in this
14  matter.
15  Q   Okay. So the principal conclusions are   1:54PM
16  listed there and as I understand it, that includes
17  Mr. Bjorn Steinholt's opinion about the materiality
18  of the alleged misstatements as flawed?
19  A   Again, these are the principal conclusions
20  for this report. Obviously there is a lot of analyses   1:55PM
21  and points that I make in conjunction with that. But
22  yes, the --
23  Q   I used the same verbiage that you just
24  did.
25  A   Okay. So it is true that Part A is talking   1:55PM

Page 24

1   about his opinion concerning materiality.   1:55PM
2   Q   Right. So my question was that's one of
3   your principal conclusions.
4       You also have listed here that
5   Mr. Steinholt failed to reliably demonstrate the   1:55PM
6   May 3rd, 2017 price decline is caused by the
7   correction to the alleged misstatements?
8   A   Correct.
9   Q   And then also that Mr. Steinholt did not
10  demonstrate damages could be reliably estimated? So   1:55PM
11  those are your principal conclusions in the case?
12  A   Yes, with respect to the January 25th
13  report, that's correct.
14  Q   Now, are you offering an opinion that the
15  market for Anadarko common stock was efficient?   1:56PM
16  A   I accept that. I'm not disputing the
17  efficiency of the market.
18  Q   You're assuming it?
19  A   Yes.
20  Q   And now, when you assume market   1:56PM
21  efficiency, are you embracing a strong form of
22  market efficiency?
23  A   No, it's -- efficiency in this context means
24  semi-strong efficiency.
25  Q   It would be a mistake to call -- to   1:56PM

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

1 embrace the strong form of market efficiency at this    1:56PM
2 point; right?
3      A   I just don't think that's relevant here.
4      Q   I mean, that would be an incorrect form of
5 market efficiency to espouse in a securities fraud    1:56PM
6 case; right?
7      A   I just -- I've never seen that.  When I say
8 the word "efficiency," I mean semi-strong efficiency.
9      Q   And that's the correct standard, more or
10 less; correct?                         1:56PM
11     A   I'm not opining legally, but when I use the
12 term "efficiency," I mean semi-strong efficiency.
13     Q   That's the accepted version of efficiency
14 in these types of cases; correct?
15     A   I believe that's accurate.         1:57PM
16     Q   Now, do you opine that information was
17 immediately impounded into the marketplace for
18 Anadarko common stock?
19     A   So the definition of semi-strong is all
20 public information is, quote, quickly impounded.    1:57PM
21 Typically, although not inevitably,
22 quickly means it's usually measured by reference to
23 a close-to-close window.
24     Q   Did you undertake any event study analysis
25 to determine how quickly information was impounded    1:57PM

1 into the price of the Anadarko stock?         1:57PM
2      A   I did do an efficiency analysis where I used
3 close-to-close for answering that question.
4      Q   And what did you conclude?
5      A   Well, as reflected -- I just want to be    1:57PM
6 specific here.
7          So I'm referring to the appendix, the
8 header which is "Analysis of Market Efficiency
9 Factors Based on the Factors/Methodology Steinholt
10 Applied to Anadarko."  I do have there some of that    1:58PM
11 study results and that is on a close-to-close basis.
12     Q   Are you offering a truth-on-the-market
13 opinion in this case?
14     A   I am a little hesitant because I know the
15 meaning of truth of the market has a -- you have to    1:58PM
16 define to me what you mean legally by "truth of the
17 market."
18     Q   Are you offering a legal opinion that the
19 truth was on the market in this case?
20     A   Not offering a legal opinion.       1:59PM
21     Q   Are you offering any other type of opinion
22 that the truth was in the market in this case?
23     A   I mean, I want to be careful here.
24 Obviously I looked at the so-called corrective
25 disclosures in the total informational environment and  1:59PM

1 I analyze it in that context.              1:59PM
2          I guess that's how would I frame how I
3 think about what information was available and what
4 was not.
5      Q   Are you intending to testify on behalf of    1:59PM
6 the defendants in this case that the truth was in
7 the market?
8      A   I would use the framing I have in the
9 January -- in my January 25th report, which is focused
10 on analyzing in various ways the so-called corrective    1:59PM
11 disclosure.
12          I also, obviously I should add to that
13 answer, do the upfront as well, which is the
14 misrepresentation dates.
15     Q   But nowhere in your report, as far as I    2:00PM
16 can find, do you reference truth on the market, do
17 you?
18     A   That's a legal doctrine, so I wouldn't
19 invoke directly a legal doctrine personally.
20     Q   Are you offering an opinion that the       2:00PM
21 existence of the alleged fraudulent scheme was
22 publicly known before market close on May 2nd, 2017?
23     A   That's not how I would frame my opinion.
24     Q   So the answer is no?
25     A   It's not how I would frame it.  That    2:00PM

1 statement can have different meanings.  I certainly    2:00PM
2 analyzed whether the corrective information as
3 identified by Mr. Steinholt caused a negative stock
4 price reaction, in conjunction with looking at the
5 upfront events that resulted, so that's how I would    2:00PM
6 frame it.
7      Q   Let's take it piece by piece.  Are you
8 opining that there was no fraudulent scheme?
9      A   I'm not opining that.  That's a liability
10 question.                          2:01PM
11     Q   And are you opining that it was known in
12 the market that the defendants had engaged in a
13 fraudulent scheme at the end of the class period?
14     A   I'm not providing the opinion that the
15 market knew that there was a fraudulent scheme.    2:01PM
16 That's not how I would frame things.
17     Q   Are you offering an opinion that the
18 existence of a whistleblower complaint by Anadarko's
19 lead reservoir engineer at Anadarko was publicly
20 known at any time during the class period?    2:01PM
21     A   I don't think I talk about the whistleblower
22 in my report, no.
23     Q   And are you opining that Anadarko's
24 decision to suspend its appraisal of Shenandoah was
25 publicly known before market closed on May 2nd,    2:01PM

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

```
 1  2017?                        2:01PM
 2     A  Well, I do opine that the dry hole expenses
 3  were known a day earlier, but putting that aside, I'm
 4  not providing that opinion.
 5     Q  By "the dry hole expense," you mean the   2:02PM
 6  Shenandoah 6 well?
 7     A  Yes.
 8     Q  So the answer to my question, you're not
 9  opining then that Anadarko's decision to suspend its
10  appraisal of Shenandoah, that it was known by the   2:02PM
11  market prior to close of market 20 -- I'm sorry.
12        I want to ask that question again because
13  it got muddled.  Let me try again.
14        So the answer to my question is that you
15  are not opining then that the decision by Anadarko   2:02PM
16  to suspend its Shenandoah appraisal was known prior
17  to close of market on May 2nd, 2017?
18     A  Correct.
19     Q  And you're not opining that Anadarko's
20  902 million write-down of Shenandoah was known by   2:02PM
21  the market prior to the evening of May 2nd, 2017;
22  correct?
23     A  Correct.  My understanding is that the 902,
24  which is adding two separate figures, was disclosed
25  for the first time in May.                2:03PM
```

Page 31

```
 1     Q  Right.  After market close on May 2nd,   2:03PM
 2  2017?
 3     A  Correct.
 4     Q  Are you offering an opinion that the
 5  defendants' alleged misconduct was legally   2:03PM
 6  immaterial?
 7     A  Legally -- I'm not providing an opinion that
 8  was legally immaterial, no.
 9     Q  And are you offering an opinion that the
10  defendants' statements -- alleged statements were   2:03PM
11  not misleading?
12     A  Could you restate the question?
13     Q  No, I need to restate that.
14        Are you offering an opinion that the
15  defendants' alleged misstatements were not, in fact,   2:03PM
16  misleading?
17     A  No.  As I understand the question, that goes
18  to liability.
19     Q  You do agree that the price of Anadarko
20  common stock declined by a statistically significant   2:04PM
21  amount on May 3rd, 2017; correct?
22     A  Yes.
23     Q  Are you offering an affirmative opinion
24  that the information disclosed about Shenandoah
25  after the close of market on May 2nd was not   2:04PM
```

Page 32

```
 1  corrective?                      2:04PM
 2        MS. ROSENBERG:  Objection to form, calls
 3  for a legal conclusion.
 4        THE WITNESS:  As I understand the
 5  question, the notion of corrective can intersect   2:04PM
 6  with legal questions.  So the answer, given that
 7  understanding, is no.
 8  BY MS. JENSEN:
 9     Q  Are you offering an affirmative opinion
10  that the defendants' alleged misconduct had zero   2:05PM
11  impact on the price of Anadarko's stock at any point
12  in time?
13     A  My opinion is there's no reliable economic
14  basis to say that the so-called corrective information
15  or the misreps upfront had a price impact.   2:05PM
16     Q  So I just want to make sure I understand.
17        Is your opinion limited to a critique of
18  Mr. Steinholt's opinion?
19     A  Well, in the course of, you know, analyzing
20  Mr. Steinholt's opinion, as well as my prior work, my   2:05PM
21  opinion as an economist, the way you think about price
22  impact, is whether there's reliable economic evidence
23  or not.
24        In my view there is not, so that is an
25  affirmative opinion that obviously is also at odds   2:05PM
```

Page 33

```
 1  with what Mr. Steinholt -- Dr. Steinholt --   2:05PM
 2  Mr. Steinholt said.
 3     Q  And have you ever opined in a securities
 4  fraud class action that the -- there was reliable
 5  economic evidence of price impact?           2:06PM
 6     A  Yes.
 7     Q  In which cases?
 8     A  I think this is going back to our earlier
 9  discussion, in Household, which I think your firm may
10  have been involved in, I do have price impacts   2:06PM
11  associated with corrective disclosures there.
12        Bank of America is another example.  So,
13  again, those would be matters in which I do a price
14  impact from corrective disclosures.
15     Q  In the sense that you have provided   2:06PM
16  damages analysis?
17     A  Yes.  It was in the context of damages, loss
18  causation, all of these things that intersect with
19  each other.
20        But, yes, it was in the context of the   2:07PM
21  pricing effect of corrective information,
22  information corrected of earlier alleged
23  misstatements.
24     Q  So Household and Bank of America, we
25  should look at those.  Any others come to mind?   2:07PM
```

9 (Pages 30 - 33)

CONFIDENTIAL

1     A   Those are the two that come to mind off the   2:07PM
2   top of my head.  I would have to think some more about
3   it, but those are kind of two prominent examples that
4   come to mind.
5     Q   For purposes of your opinions, are you   2:07PM
6   assuming that all of defendants' statements leading
7   up to and during the class period were true?
8     A   Again, that goes to liability.  So the
9   answer -- so I should answer the question.  The answer
10   is no.                                         2:07PM
11     Q   So is it fair to say, then, you are
12   agnostic about whether the defendants' statements
13   were true or not true?
14     A   I think "agnostic" is the wrong word.  I'm
15   just not taking a position on that.  I'm not here to   2:08PM
16   opine on liability in the way that we've been
17   describing.
18         I would be a little hesitant here.
19   Obviously I do provide a price impact opinion and
20   that could speak to liability, but I'm doing that as   2:08PM
21   an economist.
22     Q   So just to make sure I understand.  You're
23   just not taking a position on whether or not the
24   defendants' statements about Shenandoah leading up
25   to and during the class period were true?   2:08PM
Page 34

1   Shenandoah was not commercially viable at the start   2:10PM
2   of the class period, but the Shenandoah project was
3   'certainly' (i.e., 100 percent) not commercially
4   viable after Shen 4."
5         So that's the understanding that I was --   2:10PM
6   that's what I was referencing earlier.
7     Q   Okay.  Now, do you understand that
8   corrective disclosures don't need to be the mere
9   image of the alleged misstatement?
10     A   That's my understanding.               2:11PM
11     Q   Did analysts discuss the results of
12   different Shenandoah wells following the public
13   announcements of each?
14     A   What public announcement are you referring
15   to?                                            2:11PM
16     Q   So you probably know there were a number
17   of different wells for Shenandoah leading up to and
18   during the class period.
19         So my question is whether analysts
20   discussed the result of the different wells         2:11PM
21   following their announced results?
22     A   I believe that's accurate.
23     Q   Okay.  And, in fact, analysts issued
24   reports after each and every well; correct?
25     A   I don't have that specific recollection, but   2:12PM
Page 36

1     A   That's correct.                          2:08PM
2     Q   Okay.  Based on your understanding of this
3   case, what information was allegedly concealed from
4   investors during the class period?
5     A   So this is off the top of my head.        2:09PM
6   Obviously the complaint can speak for itself.
7         But the general claim -- I guess I would
8   really reference Mr. Steinholt here is he refers to
9   some probability of whether the Shenandoah project
10   would be viable or not.                          2:09PM
11         And then working off my memory, after
12   Shen 4, I believe he says that that probability
13   changed for the worst, is my memory of his
14   characterization of the alleged -- the alleged truth
15   that was, according to him, his understanding,   2:09PM
16   concealed.
17     Q   So when you say viability, what does that
18   mean to you?
19     A   It means whatever Mr. Steinholt says.  So
20   after he says -- I just want to -- I'll refer to the   2:10PM
21   specific part of my report here.
22         Yes, I would look at Paragraph 47 of my
23   report.  In the second sentence I say, "In fact,
24   Mr. Steinholt states that his understanding was that
25   there was more than a 50 percent chance that   2:10PM
Page 35

1   that sounds correct to me.                        2:12PM
2     Q   So that would include Shenandoah 1?
3     A   I'm going to get -- I know there is a
4   Shenandoah 1, I just don't remember whether that was
5   pre or post February 2015.                        2:12PM
6         I'm not saying it is or isn't.  I just
7   want to make sure I'm not getting the timing of this
8   incorrect as it relates to the class period.
9     Q   Understood.  So -- and my question was, I
10   believe, leading up to and during class period.  If   2:12PM
11   it's not, then I want to make sure that's clear.
12         So I understand that Shenandoah 1, that
13   was in 2009; right?
14     A   So I'm referring to analysts reporting on
15   the results of each Shenandoah well, which some were   2:12PM
16   pre-class period and some were post or during the
17   class period; correct?
18     A   Yes.  My general recollection -- I have to
19   go back to my analysts -- the long list of analysts
20   reports I have in my initial report.  My memory is I   2:13PM
21   focused on the class period in particular.
22     Q   But you have no reason to doubt that
23   Shenandoah 1 and 2 also got the attention of
24   analysts, those were pre-class period?
25     A   I'm not disputing that.                    2:13PM
Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

**Page 38**

1  Q   So if Shenandoah 1 and Shenandoah 2 were   2:13PM
2  pre-class period, then Shenandoah 3, 4, 5 and 6 were
3  during the class period.  And you have no reason to
4  dispute that each one of those well results were
5  reported out by analysts?                    2:13PM
6  A   Correct.
7  Q   And analysts reported on this information,
8  generally speaking, because it's the type of
9  information investors would want to know about
10 Anadarko; correct?                            2:13PM
11 A   It depends on the analyst, but analysts
12 generally discuss and frame the -- do report what the
13 company is saying and provide their own commentary on
14 that.
15     So I view them in, among other things,   2:14PM
16 playing that role.
17 Q   And analysts also asked questions about
18 Shenandoah at earnings calls?
19 A   Yes.
20 Q   Did you analyze Anadarko's announcements   2:14PM
21 of the Shenandoah well results?
22 A   All of the event study results I did is in
23 my report.  So that would be the alleged misrep dates
24 and the corrected -- then the May dates.  So that
25 is the complete list of dates that I looked at.   2:14PM

**Page 39**

1  Q   And your analysis --                      2:14PM
2  A   I did a little work on April, too, so
3  there's April Firestone, there's the May dates and
4  there's the alleged misrepresentation dates.
5     I guess one -- there is a lot of event    2:14PM
6  studies.  The other thing I would say is and then
7  for my efficiency analysis, I looked at some dates
8  as well.  So I'm sorry.
9     Those would be the complete list of dates
10 that I looked at.                             2:14PM
11 Q   Okay.  So that would be the complete list
12 of dates that you looked at and your analysis is
13 contained within the four corners of your various
14 reports; correct?
15 A   Yes.                                      2:15PM
16 Q   Now, I understand your testimony to be
17 that you focused in mostly on the class period
18 dates.  Did you also analyze the Shenandoah 1
19 announcement?
20 A   I don't have a specific discussion of that.  2:15PM
21 I would have to go back to my original report from a
22 year and a half ago -- a year plus ago for the analyst
23 reports.
24     My memory is that's mostly class period,
25 but I would have to confirm that.             2:15PM

**Page 40**

1  Q   Shenandoah 1 as the name denotes, that was   2:15PM
2  the first well that discovered oil in Shenandoah;
3  correct?
4  A   That's my understanding.
5  Q   And that was in 2009?                     2:16PM
6  A   Yes.
7  Q   And the announcement that oil was
8  discovered was the kind of information investors
9  would want to know about Anadarko; correct?
10 A   Yes.  I think we agreed that I did not     2:16PM
11 analyze the 2009 pre-class period disclosure.  So I'm
12 very hesitant to weigh in on that.
13 Q   Sure.  Let's step back for a moment.
14     Anadarko is an oil and gas company; right?
15 A   Yes.                                      2:16PM
16 Q   And Anadarko seeks to find oil; correct?
17 A   Yes.
18 Q   Shenandoah 1 was an announcement of
19 finding oil in the Gulf of Mexico; correct?
20 A   That's my understanding.                  2:16PM
21 Q   So generally speaking, it would be the
22 type of announcement that investors would be
23 interested in about Anadarko; correct?
24 A   Again, you're asking me to analyze an
25 announcement and analyst commentary I did not focus   2:16PM

**Page 41**

1  on.  It was not Mr. Steinholt.               2:16PM
2     But I agree at a high level of generality
3  that if, for example, an oil company was going to
4  make a lot of money from oil, that that would be
5  something that would be relevant.            2:17PM
6  Q   There was a statistically significant
7  increase following that announcement?
8  A   I did not analyze that.  I did not see that
9  in Mr. Steinholt's reports.
10 Q   So it's your testimony that in none of his   2:17PM
11 reports he mentioned the increase following the
12 Shen 1 disclosure?
13 A   You know, sitting here, I can refresh my recollection.
14 Sitting here off the top of my head, I do not recall
15 that.                                         2:17PM
16 Q   In any event, you did not test Shen 1 for
17 statistical significance?
18 A   That's correct.  All of the event study
19 results are the ones that I enumerated earlier.
20 Q   Now, for purposes of analyzing price       2:17PM
21 impact, it's informative that there was a price
22 increase that's statistically significant following
23 the announcement of Shenandoah 1; right?
24 A   No, I don't -- the analysis that's
25 appropriate is the one -- the set of analyses that I   2:17PM

11 (Pages 38 - 41)

1 did.                                    2:18PM
2    Q   But you sitting here today have no reason
3 to dispute that following the announcement of the
4 results of Shenandoah 1, there was a statistically
5 significant increase of the price for Anadarko    2:18PM
6 common stock?
7    A   I don't have a view as to the statistical
8 significance of a day in 2009, six years before the
9 class period.
10   Q   That announced the discovery of       2:18PM
11 Shenandoah?
12   A   In your hypothetical, yes, that's correct.
13 So I did not -- I don't recall seeing that in
14 Mr. Steinholt's reports, in his damages or anything
15 else.                                    2:18PM
16       But no, I don't know offhand that
17 particular result six years before the class period
18 of time.
19   Q   Okay.  Again, announcing Shenandoah but
20 we'll leave that aside.                   2:18PM
21       No one else at Compass Lexecon performed
22 any analysis to discern whether the Shenandoah 1
23 announcement was statistically significant?
24   A   Not to my knowledge.
25   Q   Now, the results of Shenandoah 2 were  2:19PM

Page 42

1 announced in March of 2013; right?          2:19PM
2    A   That's my memory.
3    Q   Okay.  And do you also recall that in
4 those announcements, the company said the Shenandoah
5 field was one of Anadarko's largest oil discoveries  2:19PM
6 in the Gulf of Mexico?
7    A   I don't remember that specific language, but
8 I do remember maybe it was in the complaint or
9 Mr. Steinholt's background, March 2013.
10   Q   And so an announcement that Shenandoah was  2:19PM
11 one of the largest oil discoveries in the Gulf of
12 Mexico, that would be the type of information an
13 investor would want to know about Anadarko; right?
14   A   Look, I agree that if any company has
15 something that's highly profitable, then that would be  2:19PM
16 value relevant.
17       Again, I focused on the class period
18 misrepresentations alleged and the corrective
19 disclosure and the treatment thereof by
20 Mr. Steinholt.                           2:20PM
21   Q   Are you -- do you also recall that the
22 company boasted in that announcement that it was
23 strategically positioned in the Shenandoah basin,
24 which had the potential to become one of the most
25 prolific new areas in the Deepwater Gulf of Mexico?  2:20PM

Page 43

1    A   I did not memorize the March 2013     2:20PM
2 announcement.  I'm sure the document speaks for
3 itself.
4    Q   Again, that would be value-relevant
5 information for Anadarko; correct?           2:20PM
6    A   It's possible.  Depends on the facts and
7 circumstances, including oil prices.
8        But again, a statement years before the
9 class period, I don't see the relevance of.
10       Again, it did not figure, in my memory, in  2:20PM
11 Mr. Steinholt's work.
12       MS. JENSEN:  So I'm going to move to
13 strike everything after "depends on the facts and
14 circumstances."
15       The rest of it is nonresponsive,       2:20PM
16 Dr. Ferrell.
17   Q   The Shenandoah 2 announcement also
18 indicated that the company was holding it out as a
19 potentially giant field.  Do you recall that?
20   A   I do not.  I would be happy to look at the  2:21PM
21 disclosure if you want to refresh my recollection.
22   Q   The announcement?
23   A   As I understand your question, you're citing
24 to an announcement by the company in 2013.  All I'm
25 saying is I did not memorize the wording in this  2:21PM

Page 44

1 particular announcement.                    2:21PM
2    Q   Okay.
3    A   So I would be happy to take a look at a
4 document --
5    Q   Sure.  But no reason to dispute that    2:21PM
6 Anadarko was holding Shenandoah out as a potentially
7 giant field in that Shenandoah 2 announcement?
8        MS. ROSENBERG:  Objection to form.
9        THE WITNESS:  I'm sure there is a record
10 of what the company said and it says what it says.  2:21PM
11 BY MS. JENSEN:
12   Q   Do you understand what a giant oil field
13 is?
14   A   I understand the English terms, yes.
15   Q   You don't understand the industry term?  2:22PM
16   A   Well, you're doing an excerpt from the
17 company announcement.  I do understand the phrase
18 "giant oil field."
19   Q   What do you understand that to be?
20   A   An oil field that is large.            2:22PM
21   Q   So you don't understand what the industry
22 term is?
23   A   I'm not sure I'm following what your
24 question is.
25   Q   Sure.  Someone who is not an oil and gas  2:22PM

Page 45

12 (Pages 42 - 45)

**Page 46**

1  expert wouldn't be expected to understand the    2:22PM
2  industry term for a giant field as one that has
3  500 million barrels of oil --
4      A   That I do recall.  I remember seeing that in
5  the documents.    2:22PM
6      Q   Okay.
7      A   I do not know that this particular phrase
8  from this particular announcement was referring to
9  that, but yes, I do recall that.
10     Q   And a reference to a field having    2:22PM
11 500 million barrels of oil or oil equivalent would
12 be also value-relevant information to investors;
13 correct?
14     A   Depending on the facts and circumstances,
15 the oil prices, the cost of getting it out, et cetera,    2:23PM
16 et cetera.
17     Q   But standing on its own, all things equal,
18 it would be a pretty exciting development to find a
19 giant oil field; right?
20        MS. ROSENBERG:  Objection.    2:23PM
21        THE WITNESS:  It depends on the cost and
22 the oil prices and so forth, but I'm not disputing
23 it could be value relevant, sure.
24 BY MS. JENSEN:
25     Q   And you have no reason to dispute that the    2:23PM

**Page 47**

1  price of Anadarko common stock increased by a    2:23PM
2  statistically significant amount after the results
3  of Shenandoah 2 were announced; correct?
4      A   I'm going to have the same colloquially that
5  we had with Shenandoah 1.  It was not, as I remember,    2:23PM
6  either in Mr. Steinholt's work or mine in terms of the
7  event study results.
8      Q   So I'm just focusing on you, Dr. Ferrell.
9  So let's leave Mr. Steinholt out of this.  Whether
10 or not you can recall or whatever what he put in his    2:23PM
11 report is a different matter, but I'm just asking
12 for you.
13        You have no reason to dispute that the
14 price of Anadarko common stock increased by a
15 statistically significant amount following the    2:24PM
16 Shen 2 announcement; correct?
17     A   That's correct.
18     Q   And that type of information, a
19 statistically significant increase in the price,
20 would be informative for a price impact analysis;    2:24PM
21 correct?
22     A   Well, I want to be careful here.  The price
23 impact analysis, as I understand it, is concerning the
24 price impact of the alleged misrepresentations which
25 happened years after the events that we're talking    2:24PM

**Page 48**

1  about.    2:24PM
2      So the answer to the question would be no.
3      Q   So the -- you do understand the notion of
4  a price maintenance theory; right?
5      A   Yes.    2:25PM
6      Q   And that is that the price -- or inflation
7  is already priced into the stock at the beginning of
8  the class period; is that right?
9      A   I think that's a fair way to put it.  That
10 is to say that there is no price reaction because the    2:25PM
11 alleged misrepresentation is meeting expectations or
12 some notion like that.
13     Q   Now, the larger the oil resource range in
14 the context of an oil discovery, the greater the
15 expectations for future cash flow; correct?    2:25PM
16     A   Could you restate the question?
17     Q   Yes, I know, it didn't come out quite
18 right.  Let me try that again.
19        In the oil and gas business, the larger
20 the oil discovery, or the resource range as it's    2:26PM
21 sometimes called, the greater the expectation is for
22 future of cash flow; is that right?
23        MS. ROSENBERG:  Objection to form.
24        THE WITNESS:  Again, you know, and this is
25 I think reflected in the analysts' reports during    2:26PM

**Page 49**

1  the class period is it would be a function of a    2:26PM
2  number of variables, including the cost of getting
3  it out, including oil prices and et cetera.
4      So you certainly want to consider the size
5  in conjunction with all those other factors.    2:26PM
6  BY MS. JENSEN:
7      Q   Resource size is one of those other
8  factors?
9      A   Sure, so the resource size meaning is it X
10 number of barrels or Y number of barrels in    2:26PM
11 conjunction with oil prices and cost and so forth.
12     Q   So a reasonable investor then would want
13 to know if the resource size was shrinking over
14 time; right?
15     A   You used the phrase "reasonable investor."    2:27PM
16 To my mind that has a legal connotation.
17     Q   Sure.  Okay.  That's fair.  Okay.
18        But investors, generally speaking, we'll
19 set aside reasonable investor, but that is the type
20 of information that investors would be interested in    2:27PM
21 as value relevant; correct?
22     A   I agree that investors, the market would
23 want to know value-relevant information.  And if an
24 oil find, given the costs and the revenues given oil
25 prices, is going to generate positive net present    2:27PM

13 (Pages 46 - 49)

CONFIDENTIAL

1 value, that would be value-relevant information.     2:27PM
2     Q    And so it would be value-relevant
3 information if, for example, the resource size
4 shrank by 70 percent?
5         MS. ROSENBERG:  Objection to form.     2:27PM
6         THE WITNESS:  It could, but it depends on
7 the facts and circumstances.  So if oil prices, for
8 example, were such that whether it's one size or
9 another, it was never going to be developed or
10 profitable, that would be a factor as well.     2:28PM
11        So I would want to look at the market's
12 view, either through an event study analysis and all
13 the potential factors that would feed into what is
14 value-relevant information.
15 BY MS. JENSEN:     2:28PM
16     Q    So for purposes of my question, let's just
17 hold everything steady, okay?
18         Everything else is steady, we've got oil
19 prices steady.  We've got costs steady.  The one
20 thing that is changing, the variable that is dynamic     2:28PM
21 here and decreasing is resource size.
22     A    Mm-hmm.
23     Q    On the order of magnitude of 70 percent.
24 Now, that would be value-relevant information for
25 investors; correct?     2:28PM

Page 50

1         MS. ROSENBERG:  Objection --     2:28PM
2         THE WITNESS:  It could be value relevant,
3 again, if what you're holding constant doesn't
4 render unprofitable or not a net value present
5 project to begin with.     2:28PM
6         So but I'm not arguing that it could be
7 value relevant.  It would depend on -- it would be
8 an empirical question.
9         But -- so with that framing, I agree that
10 it could be value relevant.     2:29PM
11 BY MS. JENSEN:
12     Q    And if the resource size shrank so much
13 that all other things being held steady but that
14 factor rendered the oil prospect unviable, that
15 would be value relevant; correct?     2:29PM
16     A    So if I understand the hypothetical, your
17 hypothetical is that -- your hypothetical is there is
18 a value -- net present value project that the market
19 views as net present value.
20         And something changed, in your example the     2:29PM
21 resource size changed, such that it's no longer, in
22 your hypothetical, viewed as a net present value
23 project.
24         I agree, it follows that that would be
25 value relevant.  I mean almost tautologically.     2:29PM

Page 51

1         MS. JENSEN:  Okay.  Let's take a quick     2:30PM
2 break.  We can go off the record.
3         THE VIDEOGRAPHER:  Going off the record.
4 The time is 2:30 p.m.
5         (Recess taken.)     2:44PM
6         THE VIDEOGRAPHER:  We're back on the
7 record.  It's 2:44 p.m.
8         MS. JENSEN:  Okay.  Welcome back,
9 Dr. Ferrell.
10        I have marked an exhibit, though I will     2:44PM
11 say, Lynne, that the stamp does not seem to be
12 showing up on here.  So I don't know if that's
13 something you can do on the back end.
14        (Discussion off the record.)
15        MS. JENSEN:  Great.  This is -- I have     2:44PM
16 marked as Exhibit 520 a document that bears the
17 Bates stamp APC-01761560.
18        (Whereupon, Exhibit 520 was marked for
19 identification.)
20 BY MS. JENSEN:     2:45PM
21     Q    Dr. Ferrell, do you see that document?
22     A    I do.
23     Q    Minus an exhibit stamp.
24        Have you seen this document before?
25     A    I might have seen it referenced in the     2:45PM

Page 52

1 complaint or discussion of Shen 2, that's my general     2:45PM
2 recollection.
3     Q    So this is a document that was cited in
4 your report at Appendix 2-7.
5     A    Can I take a look at the document?  Can I     2:45PM
6 read it?
7     Q    Yes.
8     A    Yes, okay.  I see it.
9     Q    And does it appear to be the same document
10 as you cited in your report?     2:45PM
11        This is an article "Anadarko Petroleum,
12 Four Partners Announce Gulf of Mexico Discovery."
13 This is March 19th, 2013 on the Dow Jones News
14 wires.
15     A    You want me to look at my docs relied upon     2:46PM
16 list, is that the question?
17     Q    You can, yes.  Do you have any reason to
18 doubt that you cited this?
19     A    I was just asking you what your question
20 was.  No, I don't have any reason to doubt.     2:46PM
21     Q    Okay.  We were talking a little bit
22 earlier about Shen 2 and whether you had analyzed
23 the price increase after the announcement.
24        You see that this report, which you cite
25 as a materials relied upon, as saying that shares of     2:46PM

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

1 the Anadarko are up 2.3 percent in after-hours      2:46PM
2 trading the date of this announcement?
3      A   It does say that.
4      Q   And in this announcement, it also uses the
5 same language I had referred to earlier as the      2:47PM
6 potentially giant project?
7      A   That's in the beginning of the document.
8      Q   Okay.  So this was in your materials
9 relied upon, but you did not analyze whether this
10 increase was statistically significant?      2:47PM
11      A   Correct.
12      Q   Okay.  You can set that aside.
13          Okay.  We talked a little bit about
14 value-relevant information.  In your opinion would
15 investors have wanted to know about risks to the      2:48PM
16 commercial viability of Shenandoah?
17      A   This is a very abstract question, but I
18 think that for any -- if a project is value relevant,
19 then in holding constant cash flows if the risk is
20 non-diversifiable, then it would affect the net      2:48PM
21 present value calculation.
22          Again, holding constant cash flows, if the
23 source of risk is non-diversifiable, that's the type
24 of risk that we priced.
25          So to that extent, it would be relevant to      2:48PM

Page 54

1 the net present value calculation.      2:48PM
2      Q   Right.  Because it would have implications
3 for future cash flows; right?
4      A   No, no, no.  So as I understood your
5 question, you have cash flows and you have the risks      2:48PM
6 that are -- so holding constant the cash flows, if you
7 change the risk profile, that can affect the net
8 present value if what we mean by risk is
9 non-diversifiable sources of risk.
10      Q   What do you mean by non-diversifiable      2:49PM
11 risks?
12      A   If we're talking about a net present value,
13 traditionally you discount cash flows by risk that
14 can't be shed by, for example, owning a diversified
15 portfolio.      2:49PM
16      Q   Right.  So again, in my hypothetical or in
17 my question really, we're holding this constant and
18 we're saying that it would either -- as I
19 understand, it would either increase the risk
20 thereby, it would change the cash flow profile of it      2:49PM
21 or it could also impact the discount rate; right?
22      A   So we're talking at a very high-level
23 generality, so I'm not --
24      Q   Yes.
25      A   I'm not making an interpretation of any      2:50PM

Page 55

1 disclosure or omission.      2:50PM
2          But at a high-level generality it is to
3 say that in a net present value calculation, there's
4 two inputs, the discount rate or the measure of risk
5 and the cash flows.      2:50PM
6          So yes, by definition, if you change one,
7 it would change the net present value.
8          Again, risk meaning -- defined in the way
9 that I just did.
10      Q   Now, in your opinion, would investors want      2:50PM
11 to know if someone on the Shenandoah project, a lead
12 reservoir engineer, had filed a SEC whistleblower
13 complaint with the SEC?
14          MS. ROSENBERG:  Objection, form.
15          THE WITNESS:  You're asking things outside      2:50PM
16 the scope of my opinion.  So with respect to any
17 piece of information, I'm looking at whether it's
18 value relevant and would have a price impact, I
19 would want to do the type of analysis that I do for
20 the information that I do analyze.      2:51PM
21 BY MS. JENSEN:
22      Q   Why don't you go ahead and -- in the
23 context of, for example, my question.
24          So my question being, would investors want
25 to know if the project lead had filed a      2:51PM

Page 56

1 whistleblower complaint with the SEC alleging      2:51PM
2 Anadarko was misleading the market about Shen's
3 commerciality?
4          Would that be value relevant?
5      A   Again, I don't know the content -- I mean, I      2:51PM
6 did read the complaint that references that.  I don't
7 know all the fact and circumstances.
8          But, again, any piece of information,
9 whether it's a whistleblower or some other piece of
10 information, I would want to look at event study      2:51PM
11 analyses to see whether the market priced it when it
12 is disclosed.
13          So, again, I analyzed specific pieces of
14 information and for any hypothetical with any other
15 type of information, your example of whistleblower,      2:51PM
16 I would do the same approach that I did here.
17      Q   And in the absence of data on a market
18 reaction because in this instance, for example,
19 Anadarko was acquired and no longer sold on the
20 market when it was disclosed, what would be the      2:52PM
21 factors you would want to look at to determine
22 whether it would be value relevant?
23      A   I would have to think about it.  I don't
24 have an off-the-cuff answer.
25      Q   Okay.  But certainly it could increase the      2:52PM

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

1 risks for the project if it was meritorious;     2:52PM
2 correct?
3        MS. ROSENBERG:  Objection, form.
4        THE WITNESS:  It's an incomplete
5 hypothetical.  I would need to think about it,     2:52PM
6 including whether risk is diversifiable or not.
7        I would -- I just would need to think
8 about it.  It's not the subject of my report.
9 BY MS. JENSEN:
10       Q   Sure.  But a whistleblower complaint --     2:52PM
11 I'm just stepping back for a second.  I mean, you've
12 been doing this for a long time.
13       A whistleblower complaint can increase
14 the -- can increase legal costs to the company, for
15 example?     2:53PM
16       A   Anything is possible.  But I just haven't
17 considered it -- I don't have an answer off the cuff.
18 It's just not the subject of my report.
19       Q   So you're not opining one way or the other
20 as to whether the whistleblower complaint in this     2:53PM
21 case was value relevant?
22       A   Correct.
23       Q   In your opinion would investors want to
24 know --
25       A   With a quick caveat, which is I do analyze     2:53PM

Page 58

1 certain disclosures.  To the extent -- I'm not saying     2:53PM
2 if this holds true, but to the extent that the
3 information I do analyze the after-market close
4 disclosures on May 3rd intersect with what some --
5 your whistleblower complaint would only be to that     2:53PM
6 extent.
7       Q   Well, I mean, let's not talk in
8 generalities.  Are you saying that you've analyzed
9 the whistleblower complaint in your report?
10       A   No, what I am saying is I did analyze     2:54PM
11 specific disclosures and to the extent that those
12 disclosures would have been revealed in your
13 hypothetical disclosure whistleblower is the extent to
14 which I analyzed it.
15       I'm not providing an opinion on     2:54PM
16 whistleblower complaint.
17       Q   I mean, I just want to be clear.  I don't
18 want to have us two ships in the night.
19       Did you analyze the whistleblower
20 complaint in your report or not?     2:54PM
21       A   No, I analyzed specific disclosures that had
22 a price impact.
23       And again, to the extent that those two
24 questions overlap is the extent to which I analyzed
25 it, but I'm not providing an opinion on the     2:54PM

Page 59

1 whistleblower complaint.     2:54PM
2       Q   So in your opinion, would investors want
3 to consider that Shenandoah was not commercial
4 during the class period?
5       A   Your questions are pitched at a very-high     2:55PM
6 level generality.  So what the market would want to
7 know is value-relevant information.  And so it's an
8 empirical question as to whether any piece of
9 information is value relevant or not.
10       Q   And the commerciality of Shenandoah would     2:55PM
11 fall into the category of value-relevant
12 information; correct?
13       A   Well, I would want to look at the
14 disclosures concerning what is alleged to be value
15 relevant and see -- you know, do the analysis to see     2:55PM
16 how the market prices that information.
17       Q   One of the things that would be important
18 to find out whether, for example, after the
19 Shenandoah discovery was announced, whether the
20 price increased; right?     2:55PM
21       A   So if you're referring to a statement made
22 six years and two years before the class period, I
23 don't think that's the -- you know, I'm analyzing the
24 alleged misstatements, the 21 or so here in the
25 alleged corrective disclosures.  In my view that's the  2:56PM

Page 60

1 appropriate way to do the analysis.     2:56PM
2       Q   But you limited your analysis to the class
3 period even though there were announcements related
4 to Shenandoah that predated it?
5       A   Well, this is not an open-ended exercise.     2:56PM
6 There's specific statements that are alleged to be
7 misrepresentations that do not include the two
8 statements that we have been discussing.  They begin
9 in 2015.
10       And there's information that is alleged to     2:56PM
11 be corrected and to measure the value of that
12 information, the information being the corrective
13 information in the statement.
14       So that's my understanding of the relevant
15 inquiry.     2:56PM
16       Q   You do understand the life span of oil
17 discoveries can be long; right?
18       A   That seems fair.
19       Q   And you also understand that in securities
20 fraud cases, there are statutes of limitations;     2:56PM
21 right?
22       A   That sounds right.
23       Q   So you have no reason to doubt that some
24 of the time frame that may be relevant to Shenandoah
25 predates the class period for legal reasons?     2:57PM

Page 61

16 (Pages 58 - 61)

1    MS. ROSENBERG:  Objection to form.    2:57PM
2    THE WITNESS:  I'm not sure I understand
3 what the question is.
4    My understanding is and my assignment was
5 for whatever reasons, there is a complaint that    2:57PM
6 alleges specific misstatements beginning in February
7 2015 and there is an analysis that reports the
8 value, the impact of those misstatements and
9 that's -- whatever the legal context is that arrived
10 at those claims, those are the claims that I am    2:57PM
11 addressing in this context.
12 BY MS. JENSEN:
13    Q   Sure.  There's -- to close the loop on
14 that, you're not opining that any information prior
15 to the class period is immaterial; correct, on    2:57PM
16 the --
17    A   If the question is, is it possible, prior to
18 February 2015, there were other disclosures by the
19 company, whether it be -- whatever the disclosure
20 might be that could be value relevant, sure.    2:58PM
21    But that's not -- the question here is
22 there's 21 specific alleged misrepresentations and
23 corrective disclosures thereof and that's what I'm
24 focused on.
25    Q   So in terms of those 21 days that --    2:58PM

Page 62

1    A   I believe it's 21.  Let me -- I don't want    2:58PM
2 to -- let me confirm that.
3    I believe it's -- yes, there's 21 dates
4 listed in my Appendix 4.
5    Q   So is it your contention that if    2:58PM
6 Anadarko's alleged misleading statements contained
7 new value-relevant information, then the stock price
8 would have increased on those 21 days by a
9 statistically significant amount?
10    A   It's my contention that that would be    2:59PM
11 relevant economic evidence that would need to be
12 considered, that is, whether the misrepresentations
13 reveal value-relevant information as evidenced by the
14 stock price reaction.
15    Q   But you're not opining that there is no    2:59PM
16 other way to evidence the value-relevant information
17 that was priced into the stock during the class
18 period?
19    A   Well, I do -- I do think it's important to
20 do not just the front end 21 alleged    2:59PM
21 misrepresentations but the back end as well, by which
22 I mean the alleged corrective disclosures, the
23 corrected disclosure reactions to which are being used
24 to measure the value of the information that's claimed
25 to have been misrepresented in those 21 alleged    3:00PM

Page 63

1 misstatements.    3:00PM
2    Q   Earnings announcements represent new
3 information; right?
4    A   They can.  They can meet expectations or
5 they can be -- it could be a surprise or it could meet    3:00PM
6 expectations.  Obviously it depends.
7    Q   So is earnings information the type of
8 information investors want to know?
9    A   Well, again, earnings can certainly be value
10 relevant.  Whether -- again, it can meet expectations    3:00PM
11 or it could be a surprise that's negative or positive
12 for the company.
13    Q   So is it -- are you opining that new
14 relevant information has to miss or exceed
15 expectations, it can never be meeting expectations?    3:01PM
16    A   That's not what I said.  I said that
17 earnings can take different forms, including meeting
18 expectations.  That's not to say that in the
19 hypothetical earnings that met expectations, that's
20 not to say that an earnings miss would not have    3:01PM
21 elicited a stock price reaction.
22    Q   So let me just make sure I understand.
23    So is it possible then that there can be
24 new value-relevant information that meets
25 expectations?    3:01PM

Page 64

1    A   Well, if we're going to get into I think    3:01PM
2 semantics here.  It wouldn't be new in the sense that
3 it was anticipated by the market.  So if it meets
4 expectations, it's not new.  It can be value relevant,
5 but it wouldn't be new because it's anticipated.    3:01PM
6    It would be value relevant in the sense
7 that if another disclosure had been made, some
8 but-for disclosure that could and should have been
9 made that deviated from that expected earnings, that
10 that could have elicited a price reaction.    3:02PM
11    Q   Now, as I understand it, you contend that
12 this is a basic economic principle; is that right?
13    A   I don't --
14    Q   That's not how you would say it?
15    A   I don't understand what your question is.    3:02PM
16    Q   Okay.  So is there somewhere in the
17 literature I could look for this definition of new
18 value-relevant information?
19    A   Well, I think it's the definition of the
20 efficient markets, right.  So the semi-strong    3:02PM
21 efficient market would be a market that quickly
22 impounds new value-relevant information.
23    So a market that's efficient, if
24 information is anticipated, that means it's been
25 priced.    3:03PM

Page 65

17 (Pages 62 - 65)

CONFIDENTIAL

---

**Page 66**

1        So the way I would view it is it goes to        3:03PM
2   the definition of an efficient market.
3        If the market anticipated the information,
4   that means it would have been priced.
5        Q   Okay.  So if I understand your explanation   3:03PM
6   in your report of the alleged misstatement days,
7   even if there is a statistically significant price
8   increase, there is another step that an expert must
9   look for, which is confounding factors that could
10  have offset the representation; is that right?      3:03PM
11       A   Yes, or, you know, just -- I'm putting it at
12  a more general level.  You want to think about the
13  informational market and the change in the total mix
14  that would be consistent with a stock price reaction
15  that one is observing.                              3:04PM
16       Q   And did you perform this step for each of
17  the 21 days that you analyzed?
18       A   I did that for the -- I believe three days
19  that are statistically significant.
20       Q   How did you go about doing that?           3:04PM
21       A   Well, I looked at the -- let me turn to my
22  report.  Sorry, this is in my appendix.
23       So I'm looking at Appendix 5-1.  So I
24  obviously looked at the information release in
25  question.  I look at analysts' reports that's, you   3:05PM

---

**Page 67**

1   know, for these three dates, February 2nd, obviously   3:05PM
2   I look at the disclosures by the company, the
3   associated analyst reports, again, to understand the
4   total mix of information and how it might have
5   changed the way that's consistent with the observed   3:05PM
6   stock price reactions.
7        Q   Okay.  So you looked at analysts reports?
8        A   Well, my appendix speaks for itself.  But,
9   yes, I did -- in my Appendix 5, going through
10  Appendix 5-1 through 5-7, did I look at analyst        3:05PM
11  reports.  Also press articles.
12       Q   Okay.  And how did you go about looking at
13  press articles?
14       A   Well, I'll read from my report.
15       So, for example, in Paragraph 5 I state,         3:06PM
16  "I also searched for press articles related to
17  Anadarko on July 28th-29th, 2015."
18       I have a footnote on that.
19       I found press articles, and then I
20  describe the press articles.  So that in conjunction   3:06PM
21  with analyst reports, the actual company disclosures
22  and so forth.
23       Q   Okay.  So I just want to be clear, so you
24  searched for press articles.  How did you search for
25  press articles?                                       3:06PM

---

**Page 68**

1        A   I'll read Footnote 14.  I state            3:06PM
2   "Specifically, I searched the Lexis-Nexis and Factiva
3   databases for news articles with 'Anadarko' in the
4   headline and lead paragraph."
5        Q   Why did you use that methodology?          3:06PM
6        A   To try to understand the total mix of
7   information.
8        Q   And that's a reliable way of understanding
9   the total mix of information?
10       A   Reading -- there's nothing wrong with      3:07PM
11  reading -- I'm not quite sure I understand.  So is it
12  reliable to read press articles, I mean, it obviously
13  depends on what you do with it.
14       But I don't see why as part of
15  understanding the total mix that wouldn't be          3:07PM
16  something that you could consider.
17       Q   It's a reliable way of searching for press
18  articles; correct?
19       A   It's going to pull according to the search
20  terms.                                                3:07PM
21       Q   What is the database it pulls against?
22       A   Lexis-Nexis and the Factiva databases per
23  Footnote 14.
24       Q   No, I understand that.  So what's in the
25  Lexis database?                                       3:07PM

---

**Page 69**

1        A   Oh, I don't know the specifics.  It's a    3:07PM
2   general database of news articles.  And Factiva I know
3   covers lots of the leading publications, financial
4   times, a lot of the general publication newspapers.
5   But I don't have a specific list.                     3:08PM
6        I do know Factiva in particular is a very
7   standard database for this sort of thing.
8        Q   So you would expect that any news report
9   of note would be contained in those databases?
10       A   I think you're misstating what I'm saying.   3:08PM
11  I'm saying I'm going to pull from these databases,
12  standard databases, information based on the search
13  term.
14       Q   Right.  And so it pulls from all major
15  news sources?                                         3:08PM
16       A   Well, my general understanding --
17  recollection of Factiva is it has a lot of the major
18  newspapers.  And again, obviously, you know, you have
19  to search it and so I used these search terms.
20       Q   Those databases do not contain Twitter      3:08PM
21  feeds; right?
22       A   I do not believe so.
23       Q   And all of the analysis that you did for
24  these three statistically significant days are
25  contained in this appendix; right?                    3:09PM

---

18 (Pages 66 - 69)

1    A   Yes, and I think this mirrors an earlier    3:09PM
2 report that is incorporated by reference, which I
3 believe is my opening report.
4    Q   Now, is it your opinion that the
5 statistically significant price impact following the    3:09PM
6 February 2nd, 2016 statement was not caused by the
7 alleged misleading statement or omission?
8    A   Let me just review this.
9        Yes, so that would be my opinion based on
10 what I say in Paragraphs 6 through 8 inclusive.    3:09PM
11    Q   Okay.  And one of your reasons why the
12 decline was not caused by the misleading statement
13 was that investors were already aware that Anadarko
14 planned to invest --
15    A   I don't think it was a decline.    3:10PM
16    Q   I misspoke.  You're right.  Let me try
17 that one again.
18        And one of your reasons why the price
19 increase was not caused by the misleading statement
20 was that investors were already aware that Anadarko    3:10PM
21 planned to invest in longer-dated projects despite
22 low oil prices?
23    A   Yes, I mean, you're reading in part the
24 earlier disclosure.
25    Q   Okay.  Right.  And so that's based on a    3:10PM

Page 70

1 statement by the company on October 28th, 2015?    3:10PM
2    A   Yes.
3    Q   Okay.  And what was that statement?
4    A   I can just read that from my report.
5        "Given the challenging supply and demand    3:11PM
6 fundamentals and continued uncertainty around
7 sustainably longer oil prices - sustainably higher
8 oil prices, you can expect us to see continued
9 investment in higher percentage longer cycle
10 opportunities, such as exploration, where we have    3:11PM
11 achieved very encouraging early results offshore
12 Colombia as well as success delineating our
13 activities at Shenandoah."
14    Q   And nowhere in that statement is 30-dollar
15 oil prices mentioned; is that correct?    3:11PM
16    A   That's correct.  So $30 is not specifically
17 mentioned in that excerpt.
18    Q   Right, right, right.  So the statements
19 are different in that regard; right?
20    A   We can agree that $30 is not in that portion    3:11PM
21 of the statement.
22    Q   Right.  And the oil price on February 2nd,
23 2016, was it more or less than $30?
24    A   Well, I have a figure on this.
25        So on Page 22, I have the oil prices --    3:12PM

Page 71

1 I'm sorry, what was the question again?    3:12PM
2    Q   What was the difference in the oil prices
3 there?
4    A   So February 2016, jeez, I'm going to -- it's
5 going to be hard to read this.  I am a little hesitant    3:12PM
6 to -- I mean, I'm not going to be able to get the
7 exact --
8    Q   That's okay.  But there is a difference;
9 right?
10    A   Oil prices do fluctuate, that's true.    3:13PM
11    Q   And so the oil price in October of 2015 --
12        MS. JENSEN:  Sorry, let's go off the
13 record real quick.  Lauren, you probably want me to
14 take this if it's the court.
15        MS. ROSENBERG:  Okay.    3:13PM
16        MS. JENSEN:  Go off the record.
17        THE VIDEOGRAPHER:  We're off the record at
18 3:13 p.m.
19        (Recess taken.)
20        THE VIDEOGRAPHER:  We're back on the    3:14PM
21 record.  It's 3:14 p.m.
22 BY MS. JENSEN:
23    Q   Okay.  So the oil price in October 2015
24 was around 45?
25    A   I'm sorry, October 2015?    3:15PM

Page 72

1    Q   Yes.    3:15PM
2    A   Forty, 45, I'm not quite sure.  It's hard
3 to --
4    Q   Sure.
5    A   Given the spacing of the X axis to really    3:15PM
6 pin that down.
7    Q   So in any event, it's different to say
8 you're going to invest in long-dated projects
9 despite low oil prices in the 30s as opposed to when
10 oil is 46 or $45 a barrel; right?    3:15PM
11    A   The oil price between February and October,
12 over that couple of month period did change.  So
13 that's fair.
14    Q   Now, you mentioned in your report that
15 Shenandoah was not mentioned in some percentage of    3:15PM
16 analysts reports on that particular day, I believe
17 it was 58 percent.
18    A   That I have to refresh my recollection.  So
19 we're focused on -- I'm sorry, so we're in
20 Paragraph 7, yes.  I see that.    3:16PM
21    Q   Right.  What percentages is necessary for
22 there to be an impact in your opinion?
23    A   I don't have -- I have no opinion.  That's
24 not how I view it, so --
25    Q   Okay.  There's nothing in the literature    3:16PM

Page 73

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1 that supports a certain percentage of analysts          3:16PM
2 having to mention something for there to be impact?
3     A   I never claimed otherwise.
4     Q   Okay.  And you mentioned that none of the
5 analysts' reports mention Shenandoah when adjusting     3:16PM
6 estimates or price targets; right?
7     A   Yes.
8     Q   And that's important because if there was
9 an adjustment to the price target based on the
10 information, that means that future cash flows are      3:16PM
11 different than previously expected; right?
12     A   Well, according to that analyst.  Obviously
13 you want to look at the total mix of information, but
14 according to that analyst, then they are making an
15 adjustment.                                             3:17PM
16        So you want to look at the totality of the
17 information, but yes, that would be part of the
18 total mix.
19     Q   Right.  And that relates to the value of
20 the stock; right?                                       3:17PM
21     A   Well, no.  I mean, analysts can have --
22 like, for example, there's analysts for Anadarko that
23 during the class period have price targets
24 consistently above the market price.
25        So obviously analysts are commenting and        3:17PM

Page 74

1 they're giving their own view, including views that     3:17PM
2 are different than the market pricing.
3     Q   But a change in the price target is -- can
4 be evidence of price impact; right?
5     A   I would view it in the context of the total     3:17PM
6 mix of information.
7     Q   But generally speaking, the answer is yes;
8 right?
9     A   I would frame that the way I just did.
10     Q   So you would view it in the context of the     3:17PM
11 total mix of information, so it would be one indicia
12 of price impact; correct?
13     A   Again, one analyst changing one price
14 target, certainly you can look at it.  I think -- and
15 you want to look at it in conjunction with it's the     3:18PM
16 market price, which is the consensus view of all the
17 market actors, not just one on one, in terms of the
18 value relevance of new information.
19     Q   But all things holding steady, it could be
20 an indication of price impact?                          3:18PM
21     A   Again, there's nothing wrong with reviewing
22 analyst reports in conjunction with thinking about
23 stock price reactions.
24     Q   So it's just one piece of information?
25     A   I would just frame it just the way I did.      3:18PM

Page 75

1     Q   Which is what?                                  3:18PM
2     A   Which is you can certainly look at the mix
3 of analyst reports, as I'm doing here, in conjunction
4 with, as I'm doing here, thinking about whether what
5 might be causing stock price reactions in conjunction  3:18PM
6 with the total mix of information that the market has.
7     Q   Well, I mean, what you just described is a
8 subjective analysis; right?  I mean, thinking about
9 what could have caused the price reaction, I mean,
10 you're just looking at the analyst reports and then    3:19PM
11 saying, well, this is what I think?
12     A   I don't think that's a fair
13 characterization.
14     Q   Well, I mean, how do you determine what
15 causes the stock reaction then?                         3:19PM
16     A   Well, I would refer to my statistical
17 analysis as well as my discussion in Paragraphs 6
18 through 8 inclusive.
19     Q   And statistical analysis, by that you mean
20 an event study?                                         3:19PM
21     A   Yes.  And the efficient market which prices
22 all publicly-available information as the backdrop to
23 this analysis.
24     Q   So we talked about the change in price
25 targets.  Is the converse true, if information is      3:20PM

Page 76

1 not mentioned when adjustments are made to the price    3:20PM
2 target, then conversely, is it fair to say that
3 information most likely did not have an impact on
4 the stock price?
5     A   No, I would not put it that way.  What I        3:20PM
6 would say is in thinking about stock price reactions,
7 you want to look at the total mix of public
8 information, which includes analyst commentary to be
9 sure.
10     Q   And not just commentary, we're talking         3:20PM
11 about price target changes; right?
12     A   I would view that as part of the commentary,
13 right.  There are views and different ways, whether
14 it's price targets, commentary, what have you, that's
15 part of the total mix of information.                   3:20PM
16        I think it's logical to think about that
17 in -- you know, in the context of, for example, why
18 is the stock price changing.
19     Q   Now, analysts reduced their price target
20 for Anadarko following its write-off of Shenandoah;    3:21PM
21 correct?
22     A   I believe there is a couple.  I think --
23 well, there's -- I think Goldman might have done the
24 net asset value.  I'm not sure if that's the same
25 thing as a price target.  But there is a couple of     3:21PM

Page 77

20 (Pages 74 - 77)

**Page 78**

1 analysts that are in that vein.                3:21PM
2   Q   Right.  So Goldman Sachs changed its net
3 asset value; right?  It reduced --
4   A   I think that's different than the price
5 target, if I remember exactly, but we can take a look   3:21PM
6 at the Goldman report to refresh my recollection if
7 that's helpful.
8   Q   So -- but I think your recollection was
9 right that Goldman Sachs changes its asset -- net
10 asset value.                3:21PM
11       Also Evercore reduced its price target
12 from 88 to 80; correct?
13   A   Right, I believe both -- if my memory serves
14 me correctly, both of them are -- the reduced and the
15 higher number are both above the Anadarko stock price.   3:21PM
16   Q   But hold on a second, because let's just
17 answer my question, okay?
18   A   Okay.  That's my general recollection,
19 although I want to make sure I'm not testifying off of
20 memory of what a -- out of a thousand plus analyst   3:22PM
21 reports, what one particularly said.
22   Q   I mean, understood.  I mean, look, it
23 stands for itself; right, that the Evercore May 3rd,
24 2017 report reduced its price target from 88 to $80   3:22PM
25 based on revisions of the undeveloped GoM resource?

**Page 79**

1   A   I thought you -- so now this is the danger   3:22PM
2 of going off memory.  Because the numbers that you
3 give me earlier were different, so --
4   Q   No, I said 88 to 80.  Did I misspeak?
5   A   I thought you said 86.                3:22PM
6   Q   No, 88 to 80.
7   A   My fault.
8   Q   Okay.  Lazard also reduced its price
9 target?
10   A   That I don't -- that might be right.  I want   3:22PM
11 to look at the report to refresh my recollection.  But
12 I do remember Goldman with the net asset value, not
13 the price target, and the -- and then the 80-dollar
14 discussion that we just had.
15   Q   And I'm not trying to withhold documents   3:23PM
16 from you.  I just know we have a long day, but I can
17 pull up the Lazard.
18   A   I'm in your hands.  Up to you.
19   Q   Okay.  So this is what has been previously
20 marked as -- I'm sorry, hold on one second.   3:23PM
21       So this is what has been previously marked
22 as Exhibit 514.  You should be able to see the
23 document.
24   A   I'm just pulling it up now.
25   Q   Okay.  Good.                3:24PM

**Page 80**

1       MS. JENSEN:  For the record, this is L, a   3:24PM
2 string of zeros, 80.
3   Q   Have you seen this document before?
4   A   Yes, I believe so.  Okay.  I skimmed it
5 again.  Sorry, I've forgotten what the question is.   3:25PM
6   Q   That's okay.  So you have seen this
7 document before?
8   A   Yes, I do recall.
9   Q   Okay.  And at the bottom actually it says,
10 "Target prices under review.  Tentatively trimming   3:25PM
11 base target to 64 per share, bear case target to 44
12 per share and bull target" --
13   A   Yes, I do see those numbers, yes.  And this
14 is after discussion about DJ, about -- there is a
15 number of things that they discuss here, but that is   3:26PM
16 at the very end of the document.
17   Q   Right.  So there is a number of things
18 that are discussed here; correct?  One of the things
19 that is discussed in detail is the disappointing GoM
20 appraisal results; right?                3:26PM
21   A   Yes, so there's the third paragraph under
22 the comments, that full paragraph.  And then it says,
23 "it raises questions about APC's ability to find new
24 tie-back developments for its significant
25 infrastructure."                3:26PM

**Page 81**

1   Q   Right.  It also says that "Deepwater Gulf   3:26PM
2 of Mexico has shifted from being a positive to a
3 problem"; right?
4   A   That's the first sentence, yes.
5   Q   Right.  And the second sentence is, "The   3:26PM
6 decision to impair Shenandoah (to the tune of
7 1 billion) was surprising given that APC had already
8 drilled five appraisal wells."
9   A   I see that.
10   Q   Right.  Is this a document that you   3:27PM
11 considered?
12   A   Yes.
13   Q   Is this in your appendix?
14   A   That, I don't remember.  I do remember
15 seeing this.  Maybe it was in -- I forget what   3:27PM
16 context.  Maybe it was in Steinholt or -- I just don't
17 remember exactly where.  I've read so many analyst
18 reports.
19   Q   Understood.  And this is one where it was
20 tentatively, but tentatively trimmed its base target   3:27PM
21 based on the news at this time which includes
22 Shenandoah; right?
23   A   Yes, it says what it says.
24   Q   Okay.  Going back to February 2nd, 2016,
25 you mentioned that analysts noted Anadarko's good   3:27PM

21 (Pages 78 - 81)

CONFIDENTIAL

1  performance on that date; correct?            3:27PM
2     A   I'm sorry, so I believe you're in
3  Paragraph 7?
4     Q   Yes.
5     A   Okay.  I do see the Barclays and the     3:28PM
6  Jeffries and Capital One quotations.
7     Q   Okay.  Now, how many of the analysts
8  reports identified good performance when making
9  adjustments to their estimates or price targets?
10    A   I don't have a formal answer to that.    3:28PM
11    Q   Do you have any answer to that?
12    A   What I would say as a general matter, not
13 speaking specifically about any particular analyst,
14 that if there is a big update to a target, I wouldn't
15 be surprised to see an explanation for why that is.   3:28PM
16    Q   Okay.  Were there any adjustments to the
17 estimates or price targets based on good
18 performance?
19    A   I don't recall that offhand.  I don't know
20 the answer to that offhand.                  3:28PM
21    Q   Why did you provide that information for
22 Shenandoah but not the good performance?
23    A   Well, the question here is it's a very
24 particular one, which is, is it Shenandoah the reason
25 for the stock price increase or is there other    3:29PM

Page 82

1  factors.                                     3:29PM
2        So I thought it was particularly useful
3  given that is a focal point to point out that, you
4  know, how Shenandoah in particular was considered in
5  conjunction with these disclosures.          3:29PM
6     Q   In your report you also noted that press
7  articles focused on earnings rather than Shenandoah;
8  is that right?
9     A   I don't have a photographic memory.  I'll
10 just read what I said.                        3:29PM
11       "I found that press articles focused on
12 Anadarko's earnings report."
13       That's the first part of the second
14 sentence in Paragraph 8.
15    Q   Based on this, you concluded that no       3:29PM
16 portion of the statistically significant price
17 increase on February 2nd, 2016 was attributable to
18 the Shenandoah statement?
19    A   Yes.  So the economic evidence is consistent
20 with the view that the price increase is due to       3:30PM
21 non-Shenandoah reasons, including, as I say here, the
22 fact that we're assuming that a semi-strong efficient
23 market.
24    Q   In fact, you're attributing all of the
25 price increase here to better-than-expected          3:30PM

Page 83

1  performance?                                  3:30PM
2     A   Well, I don't have a -- yes, there is better
3  performance, but I'm saying there's positive news
4  here.  There's -- you know, if we turn to Paragraph 8,
5  I talk about cash management, there is         3:30PM
6  better-than-expected earnings, fourth quarter earnings
7  results and so forth.
8        But that in conjunction with the
9  efficiency of the market and the treatment of the
10 Shenandoah I think is all supportive of that view.   3:31PM
11    Q   And so the analysis that you've got laid
12 out here, this is the proper way of doing this
13 analysis of what caused the price change; right?
14    A   Look, the proper analysis I would pitch at a
15 higher level of generality, which is if you have a    3:31PM
16 stock price reaction to think about the total mix of
17 information, how that might have changed.
18       And so that's how I would frame the
19 inquiry.
20    Q   Now, in your report you criticize        3:31PM
21 Mr. Steinholt for failing to undertake any analysis
22 to establish an economic basis for his price
23 maintenance theory; right?
24    A   I do remember that.
25    Q   Okay.                                   3:31PM

Page 84

1     A   If you could point me to the particular part 3:31PM
2  of the report that we're discussing, that would be
3  helpful.
4     Q   So this is Paragraph 19 at the end.
5        Nineteen.  If you need a page number, it's   3:32PM
6  Page 11.
7     A   You said the end?
8     Q   Yes.
9     A   I do see that.
10    Q   Okay.  You don't explain in your report    3:32PM
11 what analysis that would include, do you?
12    A   Well, it's really an observation that as I
13 understand it, Mr. Steinholt is just saying the words
14 "price maintenance" without establishing that that
15 theory is applicable here.                    3:33PM
16    Q   Does he use the words "price maintenance
17 theory"?
18    A   I don't know exactly how he phrases it, but
19 I would go to the Footnote 45 where he goes -- where
20 this dialogue:  "In your opinion, did these alleged    3:33PM
21 statements add to the inflation of the price?
22       "Add to the inflation, no."
23       So I interpret that, it's just using
24 semantics, as a price maintenance theory.
25    Q   Okay.  But he didn't use those words       3:33PM

Page 85

22 (Pages 82 - 85)

1 actually?                        3:33PM
2    A   I don't recall either way.
3    Q   Okay.  And you never performed this
4 analysis yourself; right?
5    A   I'm making an observation and then I do do   3:33PM
6 the analysis of is there stock price reactions.
7    Q   But you didn't perform the analysis of
8 whether there was an economic basis for the price
9 maintenance theory?
10   A   Well, I disagree with that.  What I did do   3:34PM
11 is I did look at, you know, one way to assess a price
12 maintenance theory is did the alleged truth, when it
13 did come out, did it elicit the stock price reaction.
14 So I did assess the price maintenance theory in that
15 way.                            3:34PM
16   Q   Okay.  You did not, however, analyze, for
17 example, whether there was a price increase after
18 the announcement for Shenandoah 1 or the Shenandoah
19 discovery; right?
20   A   I think we -- I'm just going to repeat what   3:34PM
21 we discussed earlier, which is I did not do analysis
22 of disclosures years before.  This is your first
23 example, six years before the class period.
24   Q   So, I mean, you did not analyze whether
25 there was any price increase associated with the      3:34PM

Page 86

1 announcement of the discovery itself?         3:35PM
2    A   I can just repeat what we went over I think
3 in detail, which is one of -- I've done many event
4 studies, but I did not include in my event study the
5 2009 or 2013 statements, the statements that occurred   3:35PM
6 years before the class period.
7    Q   You could have, obviously; right?
8       MS. ROSENBERG:  Objection --
9       THE WITNESS:  I could have done anything
10 that I felt was appropriate for the purposes of the     3:35PM
11 assignment that I was given.
12 BY MS. JENSEN:
13   Q   Another way to determine -- besides
14 looking at the announcements where there were
15 statistically significant increases, another way to    3:35PM
16 determine how investors viewed Shenandoah would be
17 to look at how analysts valued it; right?
18   A   You could certainly look at, as part of the
19 total mix of information, analyst commentary and
20 whether that's -- explains the price reactions that     3:36PM
21 one observes when the alleged corrective information
22 came out.
23   Q   So you are aware that a Capital One
24 analyst report from February 2nd, 2015 attributed
25 1.8 to $3.6 billion in value to Shenandoah?             3:36PM

Page 87

1    A   I remember it in -- I don't remember -- I'm   3:36PM
2 not going to get the exact analyst, but I do remember
3 the 5 to $7 that Mr. Steinholt points to and obviously
4 that's from analyst reports.
5    Q   Okay.  And so just to be clear, because       3:36PM
6 you said 5 to 7, so the Capital One analyst report
7 was $4 per share to $7 per share, you're aware of
8 that?
9    A   Look, there's over a thousand analyst
10 reports, if you're going to quiz me on what's          3:37PM
11 contained in one analyst report, you're going to have
12 to show me the document.  I do remember a handful of
13 analyst reports that Mr. Steinholt cites and I looked
14 at in this regard.
15   Q   Look, Dr. Ferrell, I want to be respectful   3:37PM
16 for your time and also get through all the things we
17 need to.  So we'll just run through some of them
18 here.
19       So no reason to dispute that a March 3rd,
20 2015 Morgan Stanley analyst report valued Anadarko's   3:37PM
21 interest in Shenandoah at $3 a share?
22   A   That could well be right.  I would want to
23 look at the document to refresh my recollection.
24   Q   Okay.  But no reason to dispute that.  Any
25 reason to --                     3:37PM

Page 88

1    A   I don't have a photographic memory of a      3:37PM
2 thousand plus analysts.  I certainly looked at the
3 claim that the reason for the price decline on May 3rd
4 is because of these earlier evaluations.
5    Q   Okay.                         3:38PM
6    A   As reflected in these earlier evaluations,
7 the 5 to 7, the 3, the 4, what have you.
8    Q   I mean, look, you can characterize this
9 however you're going to.  That's your prerogative.
10 But I'm just asking you right now about the analyst    3:38PM
11 reports.
12       So there's also an April 9th, 2015
13 Imperial Capital analyst report that valued
14 Anadarko's interest in Shenandoah at $3 billion.
15 Are you aware of that?               3:38PM
16   A   I'm aware of these valuations in the general
17 way that we talked about.  As to any specific analyst
18 report, I would like to have the opportunity to review
19 to refresh my recollection.
20   Q   Sure.  But in general you're aware that      3:38PM
21 some analysts attributed substantial value to
22 Shenandoah at or around the beginning of the class
23 period?
24   A   So that's a fair question.  So my general
25 view -- my general recollection of these analysts      3:38PM

Page 89

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1 reports that we're talking about is there are some   3:39PM
2 that valued it, you know, conditional or assuming that
3 it gets sanctioned, so that's obviously a function of
4 oil prices.
5       There's some that put it into the net   3:39PM
6 asset value. There's some that do a risk
7 adjustment, some don't.
8       So there is a couple of different things
9 going on here. And then some of them have price
10 targets above the stock price of Anadarko. So   3:39PM
11 there's sort of a mix of different things going on
12 here.
13   Q   Okay.
14   A   My general memory, which I want to come back
15 to is a number -- I'm not saying all of these numbers   3:39PM
16 are conditional or assuming that the project gets
17 sanctioned.
18   Q   I think the -- you would have to look
19 report by report, it would state on its face; right?
20   A   I said the statement I just made is based on   3:39PM
21 my reading of the analyst reports, and my memory is
22 that the analysts say assuming conditional on it being
23 sanctioned.
24   Q   But you're not saying that all analysts
25 said that; right? That's not what you're saying?   3:40PM

Page 91

1   A   I think there is a mix of things. I'm not   3:40PM
2 saying all analysts saying that. I think a number of
3 these evaluations are that.
4       But there's others that are saying low to
5 zero, there's others that are doing a risk   3:40PM
6 adjustment. So there is a couple of different
7 numbers floating around here.
8   Q   Understood. I just want to make sure.
9 And, look, if we need to make this deposition be a
10 two-day deposition because I have to put all of   3:40PM
11 these analyst reports in front of you, we can
12 talk about that.
13       What I would like for you to be able to
14 honestly testify to is that not all analysts
15 conditioned their evaluation of Shenandoah being   3:40PM
16 sanctioned. I think you should be able to confirm
17 that.
18   A   So my recollection -- I know a deposition is
19 not a memory test, my recollection is some but not all
20 the analysts did the explicit condition when   3:41PM
21 sanctioning is my best recollection.
22       That being said, the analyst reports speak
23 for themselves.
24   Q   So going back to some of the examples that
25 we talked through, some of the analysts, including   3:41PM

Page 92

1 Morgan Stanley, Capital One and others, had   3:41PM
2 significantly greater evaluations of Shenandoah for
3 Anadarko's overall evaluation than Mr. Steinholt's
4 estimates of inflation during the early part of the
5 class period; right?   3:41PM
6       MS. ROSENBERG: Objection to form.
7       THE WITNESS: Again, my memory is many,
8 I'm not saying all, of these analysts are
9 conditional on sanctioning the project.
10       And not all analysts -- you know, there is   3:42PM
11 a handful of analyst that is say it's low to zero.
12       So there's different numbers floating out
13 here that are pitched and framed in different ways.
14 BY MS. JENSEN:
15   Q   So, look, we talked about it earlier. So   3:42PM
16 I don't think we need to go back there.
17       But earlier you did testify that some
18 lowered their NAV after the write-off; right? So
19 that couldn't have been conditional. Will you just
20 generally agree with that?   3:42PM
21   A   So my memory -- I am a little nervous, this
22 is turning into a memory test. My memory is that
23 Goldman changed its NAV but not its price target. I
24 think that's the -- that's my memory. Obviously the
25 Goldman report speaks for itself.   3:42PM

Page 93

1   Q   So in any event, you will agree that the   3:42PM
2 analysts who attributed 5 to $7 per share in value
3 to Shenandoah for purposes of Anadarko is a greater
4 amount than Mr. Steinholt's estimate of inflation
5 during the early start part of the class period;   3:43PM
6 right?
7   A   I agree that 5 is bigger than 2 or whatever
8 the exact number is.
9       My memory of the 5, but we would have to
10 double check the record, is that that particular   3:43PM
11 number, the 5, was conditionally sanctioned is my
12 memory, but I could be misremembering.
13   Q   And the report will speak for itself.
14   A   I agree with that.
15   Q   So the substantial evaluations of analysts   3:43PM
16 to Shenandoah in the early part of the class period
17 indicates that the stock price reflected substantial
18 value for Shenandoah; correct?
19   A   I don't agree with your statement. Your
20 question has an assumption baked in which I don't   3:44PM
21 agree with.
22   Q   Okay. And that's based on what you're
23 saying is a conditional?
24   A   In part that there is a -- there's different
25 numbers including conditional and sanctioning, the 60,   3:44PM

24 (Pages 90 - 93)

CONFIDENTIAL

1 the $70 oral price when prices are in the 30s or 40s.   3:44PM
2      It's also other analysts ascribe little to
3 zero value.
4      So, again, I just don't agree with the
5 predicate of your question.                3:44PM
6    Q   Let's make sure that I understand each one
7 of your disagreements, the basis for it.
8      So you disagree with that statement
9 because some analysts had a conditional price for
10 Anadarko -- for Shenandoah's valuation of Anadarko?   3:45PM
11    A   Yes, I think the way you framed it glosses
12 over that important point.
13    Q   Okay.  So that's a basis for disagreement.
14      What other basis do you have for
15 disagreement with that statement?          3:45PM
16    A   Well, some did an NAV adjustment and
17 aligning to the price target; some did a risk
18 adjustment; some don't talk about that.
19      Some have a low to zero value, as I
20 described in my report.                    3:45PM
21      So your generalized statement I think
22 glosses over all that information.
23    Q   Okay.  Is there any other reason that you
24 disagree with the statement?
25    A   Those are the ones that come to mind.    3:45PM

Page 94

1    Q   Well, I mean, I want to understand your   3:45PM
2 testimony.  So is there any other reason under your
3 analysis that you disagree with that statement?
4    A   No.  I mean, in terms of the particular
5 statement you made in your question, I would point to   3:45PM
6 that, but I also -- and this is critically important,
7 at the end of the day we want to understand the basis
8 for Mr. Steinholt's inflation line, which is the
9 May 3rd price reaction.
10    Q   Okay.  So elaborate on that.            3:46PM
11      So why do you disagree based on
12 Mr. Steinholt's inflation?
13    A   Well, so the damages, the inflation line
14 Mr. Steinholt works off of, his estimate of the
15 abnormal return to Anadarko on May 3rd that he    3:46PM
16 ascribes to the accounting write-off.
17      So at the end of the day, that's the basis
18 for the inflation line.
19    Q   Okay.  So -- but my question had nothing
20 to do with that because my question talked about the   3:46PM
21 stock price at the beginning of the class period.
22      So you're now talking about the end of the
23 class period?
24    A   I disagree with that, because he is saying
25 that when an inflation line, which he goes to the   3:47PM

Page 95

1 beginning of the class period with, is saying that's   3:47PM
2 the price in the beginning of the class period the
3 information the plaintiffs allege could ensure it's
4 disclosed.
5    Q   Okay.  But again, you agree that there is   3:47PM
6 a statistically significant price decrease on
7 May 3rd, 2017?
8    A   I do.
9    Q   Now, if -- hypothetically, if the
10 disclosure of the alleged truths in the corrective   3:47PM
11 disclosure causes the price to climb by a
12 statistically significant amount, that is evidence
13 that the price had been inflated; is it not?
14    A   I just want to be real clear, forgive me for
15 restating the question.                    3:48PM
16      So your assumption is there's corrective
17 information, it is corrective of the misstatements.
18 No argument about whether it's corrective or not.
19      It's new corrective information, so the
20 market hadn't priced it earlier, that there is no   3:48PM
21 confounding information, and, ergo, that caused what
22 we're positing to be a statistically significant
23 negative residual in your hypothetical.
24      Under all those conditions, I agree.
25      Now, separate question as to what the    3:48PM

Page 96

1 inflation line looks like, as I said in my report,   3:48PM
2 you know, if Mr. Steinholt is saying that Shen 4
3 changed the commercial viability, that has to be
4 incorporated in the inflation line.
5      So I'm not agreeing to the quantum of the   3:48PM
6 inflation itself, but I think I agree with your hypo
7 as I understand it.
8    Q   So -- okay.  When you say that Shen 4
9 changed commercial liability that has to be
10 incorporated in the inflation line, what you're   3:49PM
11 saying there is that the inflation has to be
12 increased; right?
13    A   Well, I'm referring to -- so this business
14 about Shen 4 is a reference to Mr. Steinholt, and
15 that's Paragraph 47 in my report.          3:49PM
16      So the effect of it would be it would
17 decrease the inflation at the beginning of the class
18 period.  I think he has -- he increases the
19 inflation as you go back in time, he has it the
20 wrong way.                                 3:49PM
21      That is, if it's -- I'm not saying this is
22 true, but his claim is after Shen 4, it became even
23 more unviable or it was certainly unviable.
24      Under that theory, the inflation would
25 necessarily be lower pre-Shen 4 relative to --    3:49PM

Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

1 anyway, directionally he's wrong on the inflation   3:50PM
2 line.
3    Q   Well, I mean, if you're going to talk
4 relative -- we might end up with a word salad here.
5      But if you're talking relative, isn't it   3:50PM
6 the same principle, however, that the inflation
7 would be a greater amount after Shen 4?
8      I'm not talking about what it should be
9 pre-Shen 4, but in relative terms, after Shen 4,
10 that should be a greater amount?   3:50PM
11    A   I think we agree.  That is, if I'm saying X
12 is less than Y, that means Y is bigger than X.  But
13 remember, he's getting the bigger number from the
14 corrective disclosure that he's taking back.
15      He's not haircutting that.  But what he   3:50PM
16 says is this major change in the commercial
17 liability for the worst, doesn't really make any
18 sense to me.
19    Q   But if -- and let's leave aside the
20 directionality of it.  Okay?  But if what we're   3:51PM
21 saying -- what you're saying is that the inflation
22 should be greater after Shen 4, then leaving aside
23 directionality, your complaint is that
24 Mr. Steinholt's inflation or damages model is too
25 conservative?   3:51PM

Page 98

1    A   No, I disagree with that.  So first of all,   3:51PM
2 I'm not saying there's any inflation.  I'm saying on
3 his own terms, he gets it wrong.
4    Q   I understand you're not -- you don't have
5 to concede there's damages.   3:51PM
6      I'm just trying to understand, Number 1,
7 your critique and also to confirm, I think, that
8 what you're saying is that post Shen 4, it should be
9 greater than pre-Shen 4?
10    A   According to Mr. Steinholt's theory as   3:51PM
11 elaborated in Paragraph 47.  And it's not conservative
12 because even on those terms, his own terms, the
13 inflation should be lower in the beginning of the
14 class period, he makes it higher.
15    Q   But the number -- I think I understand   3:52PM
16 your position.
17      Okay.  Event studies are a generally
18 accepted methodology for determining price impact in
19 securities fraud litigation; right?
20    A   Yes.   3:52PM
21    Q   And also a generally accepted methodology
22 for determining loss causation in securities fraud
23 litigation?
24    A   Yes, not by itself, but yes.
25    Q   And the same holds for materiality?   3:52PM

Page 99

1    A   I'm not going to opine on materiality.  I   3:52PM
2 can opine on -- value-relevant information materiality
3 has a legal connotation that I want to avoid.
4    Q   But you can agree setting that aside the
5 legal term "materiality," that event studies can   3:52PM
6 be -- are a generally accepted methodology for
7 determining value -- new value-relevant information;
8 is that how you would say it?
9    A   Yes.
10    Q   Now, your report at Paragraph 26 states   3:53PM
11 that market and industry indices selected are
12 intended to capture the impact on a stock price of
13 regular market-wide and industry-wide related
14 information; is that right?
15    A   Yes.   3:53PM
16    Q   And what do you mean by "regular"?
17    A   All I mean is during the estimation period,
18 you're using the entire estimation period to estimate
19 the coefficients on the market and the industry.  So
20 those coefficients are estimated using the estimation   3:53PM
21 period are going to reflect that relationship between
22 the industry and the individual stock that's occurring
23 during that period, the period for which -- that
24 you're using for the estimation of the coefficients.
25    Q   So in your mind, is there a distinction   3:54PM

Page 100

1 between regular and irregular market and industry   3:54PM
2 factors?
3    A   It's a reference to the fact that you're
4 estimating this relationship based on the estimation
5 period.   3:54PM
6      So whatever is occurring in the estimation
7 period that's affecting the relationship between the
8 industry and the individual stock is what's going to
9 be reflected in your coefficient estimate.
10    Q   So is there a way -- according to the   3:54PM
11 academic research, is there a way to distinguish
12 between regular versus irregular market and industry
13 information?
14    A   Again, the reference to regular is a
15 reference to the fact that using estimation period and   3:54PM
16 observing over that time period, 252 days or whatever
17 your estimation period is, what the historical
18 relationship is.
19    Q   Now, in other parts of your report, you
20 don't use the word "regular," so, for example,   3:55PM
21 Footnote 53.  Was that intentional?
22    A   What was intentional?  What was the
23 question?
24    Q   Leaving out the word "regular."
25    A   Again, what I -- if we're talking about   3:55PM

Page 101

26 (Pages 98 - 101)

CONFIDENTIAL

1 regular, it's in exactly the way that I just described  3:55PM
2 it, so I'm having trouble understanding -- I mean, so
3 the academic literature obviously talks about the use
4 of estimation periods to estimate the coefficients in
5 your model. I guess I'm not seeing what the question  3:56PM
6 is.
7    Q    Yes. I'm just trying to understand why
8 you use that term "regular" in one place but not in
9 another.
10    A    Well, it's just a reference that you are  3:56PM
11 estimating the coefficients in the model, what's going
12 on during the estimation period in terms of the
13 relationship between the industry index and individual
14 stock.
15    MS. JENSEN:  Okay. Can we take a quick  3:56PM
16 break?
17    THE WITNESS:  Sure.
18    THE VIDEOGRAPHER:  We're off the record.
19 It's 3:56 p.m.
20    (Recess taken.)  3:56PM
21    THE VIDEOGRAPHER:  We're back on the
22 record. The time is 4:32 p.m.
23 BY MS. JENSEN:
24    Q    Okay. Welcome back, Dr. Ferrell.
25    A    Thank you.  4:32PM

Page 102

1    Q    So we talked a little bit about the use of  4:32PM
2 the term "regular" prior to the break. And I want
3 to understand whether the use of "regular" is
4 intended to denote regular events?
5    A    You know, I'll just go back to what we were  4:32PM
6 discussing earlier. It's referring to the fact that
7 the coefficient estimates in a market model reflect
8 the historic -- the relationship between the industry
9 index and the individual stock during an estimation
10 period.  4:33PM
11    So whatever events, macroeconomic events,
12 what have you, et cetera, et cetera, are affecting
13 that relationship is what's going to be reflected in
14 your coefficient estimates when you estimate the
15 market model.  4:33PM
16    Q    So let me take it one more step to try to
17 understand what it is that you are positing.
18    Are you talking about, for example,
19 regular events versus in a regular event -- so, for
20 example, 9/11, would that be an irregular event?  4:33PM
21    A    The use of the regular is of reference to
22 you're estimating the relationship over an estimation
23 period and whatever events factors that effect that
24 historical relationship is what's going to be
25 estimated in the coefficient.  4:34PM

Page 103

1    Q    Okay. So maybe the use of the term just  4:34PM
2 threw me off.
3    So you're not saying, for example, that an
4 economist couldn't control for a one-time event like
5 9/11?  4:34PM
6    A    Well, I would want to look at the event
7 study, but the coefficient estimates which are going
8 to form the basis for the predicated return is going
9 to reflect that historical relationship as estimated
10 in the time period that you select.  4:34PM
11    Q    But at a high level of generality, you're
12 not opining, for example, that a one-time event
13 can't be controlled for such as a 9/11?
14    A    I don't know what you mean by "controlled
15 for." You can certainly do an event study --  4:34PM
16    Q    Okay.
17    A    -- which would then create a predicted
18 return based on those historical coefficients which
19 then would generate an abnormal return.
20    But again, the coefficients represent that  4:35PM
21 relationship that exists during your estimation
22 period, the period for which you're using to
23 calibrate your model.
24    Q    Right. Okay. But you're not -- I'm sorry
25 to belabor this. I just want to make sure I  4:35PM

Page 104

1 understand exactly what it is that you're saying is  4:35PM
2 you are not, for example, saying that one could not
3 use an event study -- sorry for the double negative
4 but --
5    A    Can you restart the question?  4:35PM
6    Q    Sure, of course.
7    So it's not your opinion, for example,
8 that one could not use an event study for an event
9 like 9/11?
10    A    I would want to look at the event study.  4:36PM
11 But you could do an event study for 9/11, yes, I
12 suppose so.
13    I said suppose so because I want to know
14 what context is. I'm simply saying that predicted
15 return in your hypothetical event study reflects the  4:36PM
16 historical relationship as estimated in the -- in
17 your estimation period.
18    Q    Okay. So turning to Page 13 of your
19 report, there is what appears to be an unnumbered
20 footnote, unless it's just carrying over. That  4:37PM
21 might be the case. I don't think so, though.
22    A    It starts with "Mr. Steinholt"?
23    Q    Yes, a lot of them do. But yes, this one
24 is -- so under the text line, right, it does not
25 have a number next to it and it also does not appear  4:37PM

Page 105

27 (Pages 102 - 105)

CONFIDENTIAL

1  to be in a continuation of a text footnote?          4:37PM
2      A  I see that.
3      Q  You see what I'm saying?  It's kind of an
4  unnumbered footnote is what I'll call it.  Okay?
5          And so there's a reference here to          4:37PM
6  "Mr. Steinholt's methodology" and you say that his
7  methodology "to determine Anadarko's abnormal return
8  on May 3rd, 2017 appears to be ad hoc and
9  results-driven"?
10     A  Yes.                          4:37PM
11     Q  Is that the only reference in your report
12 to his methodology being results-driven?
13     A  I don't remember.  It might be.  I just
14 don't recall whether that exact phrase is used
15 elsewhere, but it is a reference to this swapping out   4:38PM
16 of industry control here.
17     Q  Okay.  So I'll just tell you, I'm running
18 a word search across your report and unless that is
19 somehow mistaken, the only result I get for
20 results-driven in terms of an explanation for          4:38PM
21 appears to be this unnumbered footnote.
22         So you're not aware of any other
23 appearance of that term or explanation for the use
24 of that term?
25     A  I believe your search.                 4:38PM

Page 106

1      Q  Okay.  And so the basis for this claim of   4:38PM
2  results-driven is that he uses a different event
3  study when studying market efficiency versus price
4  impact versus inflation; is that what it is?
5      A  Let me just make sure I'm catching on.  One   4:39PM
6  second here.
7          Actually, I think the results-driven, I
8  have to take back what I said, it's both in the
9  footnote and text of Paragraph 25.  So I think
10 "results-driven" is there as well.                 4:39PM
11     Q  It says, "However, as I explain below,"
12 and then you say, "results-driven," but I don't see
13 any other explanation for why --
14     A  Well, I have a couple of paragraphs here
15 where I discuss his event study and the issues that I   4:40PM
16 have with that.
17     Q  Okay.  So let's make sure we understand
18 what the basis is for the results-driven claim.
19         So is it that there's different event
20 studies for different functions in the case?          4:40PM
21     A  No, I don't think that really captures the
22 full analysis here.
23         So, you know, he had an industry control.
24 My memory is that industry control was based on the
25 10-K of Anadarko.  I think 11 companies were          4:40PM

Page 107

1  identified there, if I remember correctly.          4:40PM
2          He uses that as an industry control.  And
3  he conducts analysis using that industry control.
4  Here he switched from May 3rd to a different
5  industry control, his so-called Colorado Peer Group   4:41PM
6  Index.  If --
7      Q  I'm sorry, go ahead.  I didn't mean to
8  interrupt.
9      A  So the text here in this particular
10 unnumbered footnote is referring to the use of the    4:41PM
11 Colorado Peer Group Index.
12     Q  All right.  So it's based on the
13 difference in the use of the index essentially --
14     A  Yes.  Well, I mean, I would just reference
15 the entirety of my discussion.                 4:41PM
16         But I would say that if one thought that
17 there's some need for a third factor, factor in
18 addition to the market index and the industry
19 control constructed from the Anadarko's 10-K, the
20 control that I also use, you know, you would expect   4:42PM
21 him to add or one would expect one to add a third
22 factor to that model, not to ditch the industry
23 control, an industry control based on Anadarko's
24 10-K for some -- for this alternative index based on
25 a one-time event in April.                 4:42PM

Page 108

1          Or hopefully a one-time event, but a          4:42PM
2  particular back in April.
3      Q  Anything else?
4      A  Well, I mean, I don't want to be boxed in, I
5  would reference my discussion of -- my further          4:42PM
6  discussion of the use of the Colorado Peer Index --
7  I'm going through the rest of my Paragraph 27.
8          Yes, I mean, I would reference my full
9  discussion in the text as well.
10     Q  Full discussion in the text in which          4:43PM
11 paragraphs?
12     A  Well, I say, "However, as I explain below,
13 Mr. Steinholt's event study analysis is fundamentally
14 flawed and results-driven," Paragraph 26,
15 Paragraph 27, Paragraph 28, Paragraph 29 and then     4:43PM
16 obviously in Paragraph 30, I kind of go off on another
17 discussion focusing on Conoco.
18     Q  So the relevant portion of your report is
19 Paragraphs 26 through 29?
20     A  Well, I mean, for that immediate discussion,  4:44PM
21 I would also note that I incorporate by reference my
22 earlier reports, including my Daubert reports where I
23 also discuss these issues.
24     Q  And by "these issues," what are "these
25 issues"?                          4:44PM

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

1    A   His use of the Colorado Peer Group.        4:44PM
2    Q   So the Colorado Peer Group, now, those
3  companies came from your report; right?
4    A   I think these companies are from analyst
5  commentary in relation to April. I think that's    4:44PM
6  right.
7    Q   Wells Fargo?
8    A   I believe that's right. But there is a
9  discussion of other -- Noble and other companies,
10 Noble, SRC, PDC, and then XLN, I believe.    4:44PM
11   Q   He didn't make up this index; right?
12 These were the same companies that appeared in your
13 earlier report; right?
14   A   Yes, and in the analyst commentary in -- in
15 the context of the incident in Colorado.        4:45PM
16   Q   Now, do experts only run one event study
17 or do they sometimes run more than one event study
18 in a case?
19   A   I ran multiple event studies in this case.
20   Q   How many did you run?        4:45PM
21   A   A number. I did not tally it up. In my
22 market efficiency, I have event study results. In my
23 market efficiency analysis, I've run event studies and
24 each one has misrepresentation dates. I believe
25 there's 21.                    4:45PM

Page 110

1    There is no rule that you can only run    4:45PM
2  one.
3    Q   How many events studies did you use to
4  analyze the May 2013 residual return for Anadarko?
5    A   I used the industry and the market. I also    4:46PM
6  in my Daubert report, if I can call it such, looked at
7  his use of the results from the Colorado Peer Group
8  including the preexisting industry control that we
9  looked at.
10   So I did run those event study results for    4:46PM
11 that day.
12   Q   What was the control period?
13   A   Now you're testing my memory. I would go
14 to -- I believe it's 252 days, but I have to go to my
15 appendix.                    4:46PM
16   Appendix 3 for my Table 1 results, I have
17 the control period, so Paragraph 3 of Appendix 3 is
18 252 trading day, I'm following Steinholt's rolling
19 estimation period. I also run it including and
20 excluding Conoco for the reasons that I give in that    4:47PM
21 group.
22   And as I mentioned before, in my Daubert I
23 also ran it with Colorado Peer Group in conjunction
24 with -- in conjunction with the preexisting control.
25   Again, this discussion is for the Table 1    4:47PM

Page 111

1  results.                    4:47PM
2    Q   What was Anadarko's residual return on
3  May 3rd, 2017?
4    A   Well, this is my table. I do know the
5  number, but it's in a decimal point.        4:47PM
6    In Table 2, Page 28, the abnormal or the
7  residual return for Anadarko is negative 8.3. And
8  this is from May 3rd. This is for May 3rd, 2017.
9    Q   How many events studies did Compass
10 Lexecon run to analyze May 3rd, 2017 residual    4:48PM
11 return?
12   A   To my knowledge, none beyond what I did.
13   Q   Turning to Mr. Steinholt's event studies,
14 all of the event studies that he ran in his three
15 reports indicate that the May 3rd residual return    4:48PM
16 for Anadarko was statistically significant at the
17 1 percent level; right?
18   A   I remember 5 percent. It might be
19 1 percent, but I use 5 percent as the cutoff. I
20 believe that's --                4:48PM
21   Q   Okay.
22   A   Again, to be clear, we're talking about
23 May 3rd.
24   Q   Right. But --
25   A   You know, the pricing impact of the    4:49PM

Page 112

1  disclosure was after-hours, so it would be the next    4:49PM
2  trading day.
3    Q   Right. And the event study that
4  Mr. Steinholt used to actually quantify the
5  inflation results in the lowest amount of inflation;    4:49PM
6  correct?
7    MS. ROSENBERG: Objection to form.
8    THE WITNESS: Lowest amount of inflation
9  according to what?
10 BY MS. JENSEN:                4:49PM
11   Q   Of all of his reports.
12   MS. ROSENBERG: Objection, form.
13   THE WITNESS: I don't think any of his
14 reports establish any inflation. So I wouldn't view
15 it as the lowest of the inflation numbers. I would    4:49PM
16 view it as a flawed finding of inflation.
17 BY MS. JENSEN:
18   Q   And flawed again for the same reasons that
19 you indicated earlier?
20   A   Same reasons as identified in my reports.    4:50PM
21   Q   So do you contend that Steinholt's event
22 study methodology was ad hoc and results oriented?
23   A   I would go back to the exact language I
24 used. I think that his swapping -- ditching of the
25 industry control for this set of three or four --    4:50PM

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL

1 sometimes he uses three, sometimes I think he uses    4:50PM
2 four -- of the Colorado peers is ad hoc.
3      Q   Okay.  Again, even though those are the
4 same companies that you cite in your report; right?
5      A   Well, I cited it for purposes of discussing    4:50PM
6 the Firestone incident, yes.
7      Q   Do you contend that Steinholt's market
8 efficiency event methodology was ad hoc and flawed?
9      A   We have to go back to his market efficiency.
10 My memory is that he used the -- I would have to go    4:51PM
11 back, but my memory is he used the industry control
12 constructed from the 10-K of Anadarko.  I did not
13 criticize him for that.
14      Q   Okay.
15      A   I don't dispute that market efficiency    4:51PM
16 finding, as we discussed earlier today.
17      Q   Right.  Again, as we've established,
18 Steinholt's Colorado Peer Group were the same
19 companies identified by you in your prior report;
20 right?    4:51PM
21      MS. ROSENBERG:  Objection to form.
22      THE WITNESS:  I think I've answered this.
23 So I do have a discussion concerning the Firestone
24 incident and I believe there is an analyst report
25 that I discuss that has these particular companies,    4:52PM

Page 114

1      THE WITNESS:  So, again, I used 5 percent    4:53PM
2 as the cutoff.  We can look at the T-statistic.  My
3 memory --
4      (Discussion off the record.)
5 BY MS. ROSENBERG:    4:53PM
6      Q   Let's set aside the 1 percent.
7      The Steinholt event studies, the two that
8 we just talked about, resulted in a statistically
9 significant price decline on May 3rd, 2017; right?
10      A   That's my memory.    4:54PM
11      Q   Okay.  And so did the event study that he
12 used to analyze market efficiency; correct?
13      A   Yes.
14      Q   So what result do you suggest Steinholt
15 was attempting to obtain by only using the companies    4:54PM
16 you identified as Colorado operators?
17      A   Well, I explain this in my Daubert report,
18 we can turn to that.  But he has a test, a test that
19 he constructs to prove that his Colorado peer accounts
20 for the Colorado issues.    4:54PM
21      And, you know, we can go to my Daubert
22 report, but you know, if you were just to add the
23 Colorado peers rather than in substitution of that
24 preexisting industry control, as I explained in that
25 report, it would not pass his so-called test, his    4:55PM

Page 116

1 the four I believe.    4:52PM
2 BY MS. JENSEN:
3      Q   One of the companies that you identified
4 in your report, Extraction Gas & Oil, are you aware
5 that it did not trade for the full year prior to    4:52PM
6 April 27th, 2017?
7      A   Yes, I remember that.
8      Q   Okay.  So Steinholt performed two
9 analyses, the first was with the only three
10 companies that traded the entire year prior to    4:52PM
11 April 27, 2017, the second with all four companies
12 for a shorter period of time; right?
13      A   We can look at his report.  That's
14 consistent with my general memory.  I didn't memorize
15 every aspect of his report, but that's consistent with    4:52PM
16 my overall memory.
17      Again, those groupings being the new
18 industry control in lieu of the old industry
19 control.
20      Q   And both of the event studies that    4:53PM
21 Steinholt ran with the Colorado companies that were
22 identified in your report resulted in a
23 statistically significant decline at the 1 percent
24 level on May 3rd, 2017; right?
25      MS. ROSENBERG:  Objection --    4:53PM

Page 115

1 test for whether the Colorado peers, in fact,    4:55PM
2 controls for Anadarko the Colorado effects.
3      Q   So would the price impact opinion have
4 been any different if he used any other inputs?
5      A   Well, I'm not here to speak for him.    4:55PM
6      As I understand his argument is he's
7 claiming, erroneously, but he's claiming that for
8 May 3rd -- I think my understanding of what he's
9 saying is he does agree there's confounding
10 information on May 3rd, the Firestone investigation    4:55PM
11 information.
12      And that he purports to control for that,
13 what he admits is confounding information on
14 May 3rd, he purports to control for that via the
15 Colorado Peer Group.    4:56PM
16      He makes the further argument, as I
17 remember, that he proves that this is an adequate
18 control for the Colorado effects on Anadarko by
19 virtue of the fact that when he runs it for
20 April 27th, I believe, there is no statistically    4:56PM
21 significant residual for Anadarko.
22      But that's only because he swapped out the
23 industry control rather than adding what he already
24 deemed to be an appropriate industry control in the
25 first instance.    4:56PM

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

1        So I think part of -- I'm not trying to        4:56PM
2   capture everything here, but part of what's going on
3   is you need to substitute out what was a perfectly
4   good industry control for this new control in the
5   way that he did in order for it to pass this test        4:56PM
6   that he constructs.
7        Q   So you're not contending, however, that
8   any construction of his event study for purposes of
9   May 3rd would result in a not statistically
10  significant residual return for Anadarko?        4:57PM
11       A   That's not what I'm saying.
12       Q   In Paragraph 26 you talk about --
13       A   Give me one second while I get there.
14       Q   Sure.
15       A   Yes.        4:58PM
16       Q   So you talk about oil prices and so my
17  question to you is:  Is it your opinion that an
18  industry index can only be used to control for oil
19  prices?
20       A   No, that's not what I'm saying.        4:58PM
21       Q   Okay.  So other factors that relate to the
22  industry may also impact the price across an index;
23  right, an index of oil companies?
24       A   Yes.
25       Q   And an oil company index can control for        4:58PM

Page 118

1   any industry -- I'm sorry, industry-wide new        4:58PM
2   information; right?
3        MS. ROSENBERG:  Objection to form.
4        THE WITNESS:  What the industry index
5   controls for is going to be a function of how the        4:59PM
6   industry index is constructed and we can talk about
7   how to do that.
8        But certainly industry effects is not
9   confined to one variable, although obviously oil is
10  a particularly important variable for an oil company        4:59PM
11  but it's certainly not confined to that.
12  BY MS. JENSEN:
13       Q   It's not unique to oil companies; right?
14  I mean, any company operating in a particular
15  industry, an industry index would control for        4:59PM
16  industry-wide events?
17       A   Properly constructed and properly estimated.
18       Q   So --
19       A   Just to be clear, it would capture the
20  average effects on the company in question.  So the        5:00PM
21  average effect as represented by the coefficient of
22  industry movements on a particular company.
23       So if a company had a disproportionate
24  effect from an event, the industry control by
25  construction wouldn't capture that, it would only        5:00PM

Page 119

1   capture the average -- the industry effect, the        5:00PM
2   impact on the industry and, hence, on the individual
3   company through the estimated coefficient.
4        Q   But it could control for industry-wide
5   information; right?        5:00PM
6        A   It can, but -- and this is critically
7   important -- if there is a disproportionate effect on
8   the individual company, then the industry control is
9   not going to fully capture that because by definition,
10  there would be an effect above and beyond what would        5:00PM
11  otherwise be -- above and beyond what is otherwise
12  captured by the industry effect.
13       Q   So you discussed the Firestone explosion
14  in your report and that occurred on April 17th,
15  2017; correct?        5:01PM
16       A   Correct, and I think I earlier said
17  April 27th, I misspoke, it's April 17th.
18       Q   And it was publicly-available information
19  that there was a well owned or operated by Anadarko
20  200 feet from the house; right?        5:01PM
21       A   I think it's 200 feet.  But yes, there is a
22  nearby well, yes.
23       Q   And the company issued a statement on
24  April 26th, 2017 about the Firestone explosion;
25  right?        5:02PM

Page 120

1        A   Yes, there is a company disclosure        5:02PM
2   concerning that.
3        Q   Okay.  And so the linkage of the explosion
4   to Anadarko was first reported on April 26th when
5   Anadarko made that announcement; right?        5:02PM
6        A   I don't agree with that.  I don't think the
7   cause for the explosion is known until May 3rd.
8        Q   So the cause is suspected to be this well
9   at least as of April 26th, 2017; correct?
10       A   I mean, it's known that the well is nearby.        5:02PM
11  It's obviously known that there is an explosion, but
12  the cause of the explosion and the results of the
13  investigation are not reported until May 3rd.
14       Q   But my question was a little different.
15       Analysts were saying as of April 26th or        5:02PM
16  thereabouts that the Anadarko well 200 feet away
17  from the home that exploded was suspected to be
18  linked to the explosion; correct?
19       A   I think there is discussion of a nearby
20  well, but it was not known at that point that it was        5:03PM
21  in fact the cause.
22       Q   So you're agreeing with me, however, that
23  the market suspected it to be linked to the
24  explosion as of April 26th, 2017?
25       A   My understanding of the facts are it was        5:03PM

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

1  known to the market that the well was nearby.  It was   5:03PM
2  also known to the market that Anadarko was the largest
3  operator in Colorado.  It was not known by the market
4  that the cause of the explosion was the well.
5      Q   But it was suspected to be the cause?   5:03PM
6      A   I don't remember the word "suspected" in
7  April 27th, but it was known that the well was nearby.
8  It was not known that the cause of the well explosion
9  until the investigation and the information concerning
10 the investigation from May 3rd.   5:03PM
11     Q   So if -- hold on one second.
12         MS. JENSEN:  I've marked as an exhibit a
13 document that bears the Bates stamp
14 LA-APCSUB-013613.  This is marked as Exhibit 521.
15         (Whereupon, Exhibit 521 was marked for   5:05PM
16 identification.)
17 BY MS. JENSEN:
18     Q   Have you seen this document before?
19     A   I don't recall this offhand.
20     Q   You do recall that Anadarko issued a press   5:05PM
21 release on April 26th?
22     A   I do.
23     Q   And Anadarko confirmed in that statement
24 that its well was 200 feet from the home that
25 exploded?   5:06PM

Page 122

---

1      Q   But prior to May 3rd, you don't dispute   5:07PM
2  that the well was suspected to be the cause?
3      A   I'm just going to restate what I said, which
4  is the market was aware that the well was nearby, that
5  there was an explosion, so obviously the well could   5:07PM
6  have been a potential cause, and the market learned
7  that the cause was, in fact, the well on May 3rd.
8      Q   Okay.  I mean, I understand you're
9  skirting my question, that's okay.  So let's look at
10 the exhibit.  And on Page 2 of this document.   5:07PM
11     A   Yes.
12     Q   If you look at -- sorry, I just lost the
13 place.
14         E&P, so this is on the second page of this
15 document.   5:08PM
16     A   Yes.
17     Q   And it discusses APC, its press release.
18     A   Yes.
19     Q   Right?
20         And it says here that the "Tragic   5:08PM
21 Wattenberg incident likely puts the oil and gas
22 industry back in Colorado political crosshairs."
23 And that APC had issued a statement yesterday
24 regarding the Firestone home explosion that resulted
25 in the deaths of two men.   5:08PM

Page 124

---

1      A   Yes, I agree that the market knew that there   5:06PM
2  is a nearby well.
3      Q   And Anadarko also said that it was working
4  cooperatively with regulatory agencies in their
5  investigations?   5:06PM
6      A   Yes.
7      Q   It also said that it was shutting in
8  3,000 producing vertical wells in Colorado?
9      A   Yes.
10     Q   And at that time the market -- market   5:06PM
11 participants commented that the well was expected to
12 be linked to the explosion; right?
13     A   I don't remember the -- that might well be
14 the case, but that's consistent with my memory, which
15 is the market in the total mix of information was   5:06PM
16 aware of that fact.
17         So obviously that was one potential cause
18 for the explosion.
19     Q   It was the anticipated cause at that
20 point?   5:07PM
21     A   I think that's an aggressive statement.
22 It's the market knew the well was nearby and that
23 certainly was obviously a potential cause, but the
24 actual cause for the explosion, as I understand the
25 total mix, was May 3rd.   5:07PM

Page 123

---

1          And it states that it operated "an older   5:08PM
2  vertical well only 200 feet away from the home which
3  is suspected to be linked to the explosion"; right?
4      A   You read that correctly.
5      Q   Okay.  Now, when the fire department made   5:08PM
6  its statements, the analysts stated that the
7  information just confirmed the linkage, not that the
8  linkage was new information; right?
9          MS. ROSENBERG:  Objection to form.
10         THE WITNESS:  It is new information, but   5:09PM
11 the cause in fact was the well.  And that is new
12 information that is released on May 3rd.
13 BY MS. JENSEN:
14     Q   Are you disputing that analysts said that
15 the investigators had confirmed the cause?   5:09PM
16     A   I don't remember the exact way it was
17 phrased, but again, it was well known that there was a
18 nearby well.  Obviously that's a potential reason for
19 the explosion.
20         The actual in fact reason as a result of   5:09PM
21 the investigation was learned May 3rd.
22     Q   So let's break that down a little bit.
23         UBS, this is an analyst that I believe
24 you've cited in your reports; correct?
25     A   You have to show me the analyst report.   5:10PM

Page 125

32 (Pages 122 - 125)

Page 126

```
1    Q   Okay.  You're familiar with UBS?        5:10PM
2    A   Yes.
3    Q   It's a large reputable analyst?
4    A   Yes.
5        MS. JENSEN:  I've marked as Exhibit 522 a    5:11PM
6  May 3rd, 2017 UBS analyst report.
7        (Whereupon, Exhibit 522 was marked for
8  identification.)
9        THE WITNESS:  Yes.
10       MS. JENSEN:  I should state for the record   5:11PM
11 that this is a document that bears Bates stamp
12 UBS0001735.
13   Q   Dr. Ferrell, you've seen this before;
14 right?
15   A   I believe so, yes.                      5:11PM
16   Q   And the headline here, "Large Exploration
17 Expense Drives 1Q17 EPS/CFPS Miss but EBITDX Beats;
18 Maintains 2017 Guidance."
19       Do you see that?
20   A   I do.                                   5:12PM
21   Q   And the third paragraph or third heading
22 in this document says, first sentence,
23 "Investigators confirmed" -- do you see the use of
24 the word "confirmed"?
25   A   I do.                                   5:12PM
```

Page 127

```
1    Q   -- "the recent home explosion in        5:12PM
2  Firestone, CO was caused by an abandoned, severed
3  1-inch gas line that was still connected to APC's
4  nearby well."
5        So the market analysts referred to the   5:12PM
6  investigation as confirmation of the cause; right?
7    A   This particular analyst used the word
8  "confirmed," but again, it doesn't change my opinion.
9  It was known to the market that the well was nearby.
10       Obviously it's a potential reason for the   5:12PM
11 explosion.
12       And in fact, the actual cause was released
13 on May 3rd.
14   Q   Now, on April 26th, there was a
15 statistically significant price decline following    5:13PM
16 Anadarko's press release about Firestone; right?
17   A   That might be true.  I don't have a specific
18 recollection of that.
19   Q   Did you know about the April 26th price
20 decline when you wrote your first rebuttal report    5:13PM
21 for class certification?
22   A   I don't have a recollection either way.
23       You know, the regression results have all
24 the regression outputs.  But I don't have a specific
25 recollection of that.                            5:13PM
```

Page 128

```
1    Q   And in that report you talked about the  5:13PM
2  3,000 wells shut in, but you didn't disclose that it
3  was actually announced on April 26th, 2017.  Why?
4    A   If you want to discuss a particular part of
5  my report originally, I would be happy to take a look.  5:13PM
6    Q   You don't deny that's -- that you
7  discussed the 3,000 shut-in wells but you did not
8  disclose the date on it?
9    A   I don't remember that particular -- I
10 remember discussing the 3,000 wells.  If you want to   5:14PM
11 discuss a particular aspect of my earlier report and
12 why I framed it the way I did, I will be happy to take
13 a look.
14   Q   That's what I'm asking.  Why didn't you
15 disclose that it was actually April 26th, 2017?      5:14PM
16   A   You're making -- you want to discuss a
17 particular part of my earlier report, I would like to
18 see that part of the report that we're discussing.
19   Q   So you don't have an answer to it without
20 seeing that you didn't say the date?                 5:14PM
21       MS. ROSENBERG:  Objection, argumentative.
22       THE WITNESS:  If you want to discuss a
23 different report and the framing that I did there, I
24 want to take a look at what we're talking about.
25 And I'll be happy to discuss it.                     5:14PM
```

Page 129

```
1  BY MS. JENSEN:                                 5:14PM
2    Q   I mean, let's just assume that I'm right,
3  okay, for purposes of this discussion.
4        You didn't disclose that the 3,000 shut-in
5  wells were actually announced on April 26th, 2017.   5:14PM
6  Why?
7        MS. ROSENBERG:  Objection --
8        THE WITNESS:  Again, if you want to
9  discuss a previous report of mine and the discussion
10 there, I'll be happy to take a look.                 5:15PM
11       You're making representations about my
12 prior report, I would like to take a look at what
13 we're discussing.
14 BY MS. JENSEN:
15   Q   Sitting here right now, you don't know one  5:15PM
16 way or the other whether that's true?
17       MS. ROSENBERG:  Objection to form.
18 BY MS. JENSEN:
19   Q   Is that what you're saying?
20   A   All the documents I relied upon in my     5:15PM
21 reports are contained in the documents relied upon.
22 You know, there are effects of the Colorado incident
23 on the companies operating there.
24       But if you want to look at particular
25 language in my earlier report, I would like to take   5:15PM
```

33 (Pages 126 - 129)

CONFIDENTIAL

1 a look to see what you have in mind and what we're    5:15PM
2 discussing.
3    Q   Well, all I'm saying is language that's
4 not there, Dr. Ferrell.
5    Look, it doesn't -- it's language you    5:15PM
6 didn't put in your report and I'm just asking if you
7 knew that the 3,000 well shut-in occurred on
8 April 26th when you wrote your first report?
9    A   No.
10    MS. ROSENBERG:  Rachel, Dr. Ferrell has    5:16PM
11 repeatedly asked you to please show him the portion
12 of his report that you would like to ask questions
13 about.
14    If you're going to refuse to do that and
15 continue to badger him about it, he's not going to    5:16PM
16 be able to answer your question.
17    MS. JENSEN:  Let's just step away from the
18 report, okay.  Let's just forget about the report.
19    Q   Did you know when you wrote your class
20 certification report that the wells shut-in occurred    5:16PM
21 actually on April 26th, 2017?
22    A   I don't remember offhand the specific date.
23 I cite all the documents that I used, which obviously
24 are dated.  Again, I want to look at my report if
25 you're going to ask me questions about it.    5:16PM

Page 130

1    MS. JENSEN:  Okay.  Let's take a quick    5:16PM
2 break so we can do that.
3    THE VIDEOGRAPHER:  We're off the record.
4 It's 5:16 p.m.
5    (Recess taken.)    5:17PM
6    THE VIDEOGRAPHER:  We're back on the
7 record.  It's 5:26 p.m.
8 BY MS. JENSEN:
9    Q   All right.  Dr. Ferrell, I've marked as
10 Exhibit 523 your expert report from December 10th,    5:27PM
11 2021.  You should be able to see it.
12    (Whereupon, Exhibit 523 was marked for
13 identification.)
14    THE WITNESS:  I do.
15 BY MS. JENSEN:    5:27PM
16    Q   Okay.  And is this one of the reports you
17 incorporated into your current report?
18    A   Yes.
19    Q   So if you turn to Page 7.
20    A   Yes.    5:27PM
21    Q   It's a continuation of Paragraph 14.  And
22 so I might as well start at the beginning.
23    So Paragraph 14 is talking about a
24 chronology of events on May 2nd after the filing of
25 the 10-Q; correct?    5:27PM

Page 131

1    A   Well, it's a general discussion of, you    5:27PM
2 know, this -- the confounding -- the fact that there's
3 confounding information on the -- relating to the
4 May 3rd price reaction.
5    Q   That you claim to be confounding; right?    5:28PM
6    So at the top of Page 7, it says, "Related
7 to this incident, Anadarko shut down 3,000 of its
8 older, vertical oil and gas wells in northeastern
9 Colorado as a precaution."
10    And the footnote is to a May 2nd, 2017    5:28PM
11 article; correct?
12    A   Footnote 24, I believe that's correct.  Yes.
13    Q   Okay.  And -- but in fact, it was much
14 earlier than that.  It was on April 26th, 2017;
15 correct?    5:28PM
16    A   Correct.  I'm not -- I never claimed and I'm
17 not claiming that that is the confounding information
18 that is referencing earlier actions that happened in
19 the aftermath of Firestone.
20    Q   Right.  But it's citing to a May 2nd, 2017    5:29PM
21 article?
22    A   Sure, it's a May 2nd article that's
23 discussing these effects of the earlier explosion.
24    Q   Right.  Which were known since April 26th,
25 2017?    5:29PM

Page 132

1    A   Well, what's confounding, as I explained and    5:29PM
2 as we've been discussing, is the fact that Anadarko
3 well was the cause of the explosion.
4    Q   But that's what you're claiming to be
5 confounding?    5:29PM
6    A   Yes, that the information about the cause as
7 documented in my report and we've been discussing
8 today is the results of the investigation as to who
9 was responsible for the explosion.
10    Q   Now, the investigation was -- that was not    5:29PM
11 the results of the investigation, the investigation
12 was ongoing at that time; correct?
13    A   Right.  There was announcements concerning
14 the investigation on May 2nd that I have reflected in
15 the tweets that I include.    5:30PM
16    Q   And in your January 25th, 2023 report in
17 Paragraph 13, you reference Anadarko's statement on
18 May 2nd at 5:18 p.m. and it refers to cooperation
19 with ongoing -- the ongoing investigations; right?
20    A   I believe that's accurate.  You're in    5:30PM
21 Paragraph 13?
22    Q   Yes, on Page 6.  Coincidentally also
23 Page 6.
24    A   Yes.
25    Q   Now, you can set this aside.    5:30PM

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

1    Okay.  Let's turn now to Paragraph 13 on    5:31PM
2  Page 6 of your January 2023 report.  And that
3  same --
4    A    Sorry, what page again?
5    Q    Page 6.                          5:31PM
6    A    Okay.
7    Q    So that same statement that Anadarko
8  issued on 5:18 p.m.?
9    A    Yes.
10    Q    It should be at 5:18 p.m. on May 2nd,    5:31PM
11  2017, it also referred to the Colorado Oil and Gas
12  Conservation Commission on additional steps.
13      An around that same time, the governor
14  made an announcement; correct?
15    A    Yes, there's this statement concerning its    5:31PM
16  cooperation with the Colorado Oil and Gas Conservation
17  Commission.
18    Q    Around this same time in the evening of
19  May 2nd, 2017, the governor made a statement as
20  well?                                5:32PM
21    A    That I don't have a specific recollection
22  whether that was earlier or May 2nd.  What I do recall
23  is the fire investigation's finding that Anadarko was
24  responsible and then obviously Anadarko released a
25  press release.                        5:32PM

Page 134

1    Q    They never actually said that Anadarko was    5:32PM
2  responsible, did they?
3    A    The -- well, the language is reflected in my
4  report in Footnotes 22 and 23.
5    Q    Right.  But they never say that Anadarko    5:32PM
6  is responsible, do they?
7    A    I'm happy to read the language.  I would
8  rather be specific here.
9      So Footnote 22, "Officials are providing
10  an update on last month's home explosion in    5:32PM
11  Firestone.  The event is under investigation by the
12  authorities and no conclusion has been reached as to
13  its cause."  This is April 27.
14      I'll skip over the April 27 stuff.
15      So April 27th is "The cause of the    5:33PM
16  explosion is still unknown."
17      And then going on to Footnote 23,
18  "Officials:  Firestone home explosion caused by gas
19  leaking into home from abandoned flow line."
20      "Cause of deadly Firestone home explosion    5:33PM
21  was a cut line to an oil and gas well."
22    Q    Right.
23    A    And then there's the Denver Post which
24  states, at 4:51, "Fire investigators found a 1-inch
25  diameter black plastic pipeline running from an    5:33PM

Page 135

1  Anadarko Petroleum well near the house that had been    5:33PM
2  cut when a tank battery was moved before the Oak
3  Meadows subdivision was built."
4    Q    Right.  So none of those said that
5  Anadarko is responsible; right?          5:33PM
6    A    I can repeat the language.  The language --
7    Q    That's okay.  You just read the language,
8  so it's fresh in your mind --
9    A    I'm going to finish answering the question.
10      The text I just read are talking about the    5:34PM
11  cause of the explosion, the cause being this
12  pipeline that's been cut and as we discussed
13  earlier, it was well known that Anadarko's well was
14  about 200 feet away.
15    Q    So I'm going to repeat my question.        5:34PM
16      So none of the words that you just read
17  said that Anadarko was responsible; right?
18      MS. ROSENBERG:  Objection to form, asked
19  and answered.
20      THE WITNESS:  I'm going to reread what it    5:34PM
21  actually says.
22      "Firestone home explosion caused by gas
23  leaking into that home from an abandoned flow line."
24      "Cause" --
25

Page 136

1  BY MS. JENSEN:                        5:34PM
2    Q    Let me stop you there.
3      (Unreportable crosstalk.)
4      MS. JENSEN:  Wait, hold on a second.
5      THE REPORTER:  Dr. Ferrell, I cannot --    5:34PM
6      MS. JENSEN:  Dr. Ferrell, please stop.
7      THE REPORTER:  Dr. Ferrell, excuse me,
8  this is the reporter --
9      MS. JENSEN:  I was trying to tell you the
10  court reporter was asking you to stop.  Okay.    5:35PM
11      Dr. Ferrell, if we need to take a break so
12  we can reset.
13      THE REPORTER:  I need to take a break.
14      THE VIDEOGRAPHER:  We're off the record.
15  It's 5:35 p.m.                        5:35PM
16      (Recess taken.)
17      THE VIDEOGRAPHER:  We're back on the
18  record.  It's 5:45 p.m.
19  BY MS. JENSEN:
20    Q    Okay.  Welcome back, Dr. Ferrell.        5:45PM
21      So we had a little Zoom issue.  We're
22  going to go ahead and move forward.
23    A    Yes.
24    Q    Okay.  So let me see if I can pick up
25  where we left off and there may be a slightly    5:46PM

Page 137

35 (Pages 134 - 137)

CONFIDENTIAL

1 different way to ask my question in a way that we     5:46PM
2 can sort of move forward in a more streamlined way
3 as well, which is to say that the -- I had asked if
4 any of these statements here in your footnotes have
5 the words that Anadarko is responsible.     5:46PM
6        And can you just please confirm that the
7 answer is no?
8     A   No.
9     Q   Thank you.
10    A   That exact set of words does not appear in     5:46PM
11 Footnotes 23 or 24.
12    Q   Okay.  We talked just very shortly ago
13 about a statement from the Colorado governor.  And I
14 see it here in your report on Page 6.  It's about
15 the middle of the paragraph of Paragraph 13 which     5:46PM
16 goes over onto Page 6.
17        And there is a reference to the Colorado
18 governor's order relating to oil and gas companies
19 statewide to inspect and pressure test oil and gas
20 flow lines within 1,000 feet of occupied buildings.     5:47PM
21        So is that something that also occurred in
22 the evening of May 2nd, 2017?
23    A   I don't believe so.  It is referenced in the
24 Denver Post on May 2nd.  I believe that is with
25 respect to earlier events, earlier events involving     5:47PM

Page 138

1 the incident.     5:47PM
2     Q   When do you think that was?
3     A   I do remember after the April 17th
4 explosion, there was actions by the governor in terms
5 of preventative measures.     5:47PM
6        I don't remember whether it was April 17th
7 or April 27th, but my memory sitting here right now
8 is that this would not be part of the confounding
9 information on after-hours on May 2nd.
10    Q   Well, in your report it says, "soon after     5:48PM
11 the firefighters released their report."  That's on
12 May 2nd after close of market; correct?
13    A   So the firefighters' report is May 2nd.  I
14 believe the reference to the governor in the article
15 May 2nd is a reference to earlier actions is my best     5:48PM
16 recollection.
17        So I would not view that as part of the
18 confounding information on this day.
19    Q   That's not my question, Dr. Ferrell.  So
20 I'm going to read from your report.     5:48PM
21        "Soon after the firefighters released
22 their report, then Colorado Governor John
23 Hickenlooper ordered oil and gas companies statewide
24 to inspect and pressure test oil and gas flow lines
25 within 1,000 feet of occupied buildings."     5:49PM

Page 139

1        That was a true statement; correct?     5:49PM
2     A   I think it could have been more artfully
3 written.  I think the statement is a reference to the
4 later Denver Post article that references that.  But I
5 do believe that it's an earlier action, earlier than     5:49PM
6 May 2nd actions by the governor.
7        As to whether it was April 17th or 27th, I
8 don't remember.  I think it was shortly after the
9 initial incident is my best recollection.
10    Q   And you don't -- you don't cite any source     5:49PM
11 for that report or that order that you say occurs
12 after the firefighters release their report.  You
13 don't cite any source for that prior to 4:51 p.m. on
14 May 2nd, 2017; correct?
15    A   Footnote 25 is 4:51 p.m., that's correct.     5:49PM
16    Q   My question is a little broader than that.
17        You don't say anywhere any report of that
18 order prior to 4:51 on May 2nd, 2017; correct?
19    A   The governor's order?
20    Q   Yes.     5:50PM
21    A   I don't have a specific -- I know Steinholt
22 talks about it, I just don't have a specific
23 recollection if it's in my prior reports.
24        But my memory sitting here is that this
25 would not be confounding information.  This would be     5:50PM

Page 140

1 with respect to earlier actions that are being     5:50PM
2 referenced in the 4:51 Denver Post.
3     Q   That's your position despite the fact that
4 you don't have a source for that prior to May 2nd,
5 2017 at 4:51 p.m.?     5:50PM
6     A   That's my memory of the record and the time
7 frame.  So the confounding information on May 2nd
8 would be the cause of the explosion.
9     Q   Which would relate only to Anadarko then?
10    A   Well, I mean relate only, I mean, the facts     5:50PM
11 could affect other companies as well, although maybe
12 not in a proportionate way if this affects the
13 regulatory environment going forward.
14    Q   In your class certification report, you
15 cite the price declines of the other Colorado     5:51PM
16 companies to argue that the Firestone issue would
17 cause a similar decline in the Anadarko, do you not?
18    A   I don't remember the words "similar to
19 Anadarko."  It's certainly an event, even if it were
20 to have a disproportionate effect on Anadarko, that     5:51PM
21 would affect other companies.
22    Q   So if the news was solely about the cause
23 of the explosion, how would it have any impact on
24 other companies?
25    A   Sure, so this -- this is obviously going to     5:51PM

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

1  create a regulatory issue, an issue of safety          5:51PM
2  environmental.  So you could easily imagine folks
3  thinking about how is this explosion going to affect
4  the industry as well as Anadarko in particular.
5      Q   So there was a concern about the              5:52PM
6  regulatory environment in Colorado; correct?
7      A   I think that's fair.
8      Q   So concerns about issues such as setback
9  rules and the overall cost of operating in Colorado?
10     A   I think at that general level -- that level  5:52PM
11 of generality, obviously that would happen after the
12 explosion itself, but there would be -- this is
13 obviously a developing story as well.
14         So it's not like those concerns all of a
15 sudden only appear on May 2nd.  This is an ongoing    5:52PM
16 story that is going to disproportionately affect
17 Anadarko given its status as the largest oil and gas
18 producer being the cause of it, but certainly
19 implicates other companies.
20     Q   And so it would implicate other companies    5:53PM
21 that had substantial operations in Colorado; right?
22     A   Yes, I think that's reasonable.
23     Q   And it would -- it would impact companies
24 that had all or most of their operations in Colorado
25 the most; right?                                       5:53PM

Page 142

1      A   That would be one factor.  Another factor    5:53PM
2  would be responsibility.  Another factor would be the
3  size of those operations.
4          So there would be a mix of reasons that
5  would affect different companies, companies with      5:53PM
6  operations that is in Colorado.
7      Q   You're familiar with the term "OLS
8  regression"?
9      A   Yes.
10     Q   And what does that stand for?                 5:53PM
11     A   Ordinary least squares.
12     Q   Are OLS regressions commonly used in event
13 studies?
14     A   Yes.
15     Q   In fact, it's the form of regression used    5:54PM
16 in almost every securities fraud class action;
17 correct?
18     A   Yes.
19     Q   And when referring to an event study, it
20 generally means an event study that used an OLS       5:54PM
21 regression; correct?
22     A   Generally.  I mean, you could have --
23 generally speaking, unless there is a particular
24 issue.
25     Q   And OLS regressions give equal weight to     5:54PM

Page 143

1  each observation that they do give equal weight to    5:54PM
2  each observation, that means there is no distinction
3  made between the different types of market or
4  industry information disclosed on a particular day;
5  right?                                                 5:54PM
6      A   I'm not sure quite what you mean, but in the
7  regression, the calibration of the model, you use all
8  the data in the estimation period to calibrate the
9  model or to estimate the model.
10     Q   And no distinction is made between the        5:55PM
11 different types of market or industry information
12 disclosed on a particular day?
13     A   Well, it depends on what we're talking
14 about.  If we're talking about the estimation period
15 that's used to estimate the coefficients, by          5:55PM
16 definition if it's in that estimation period, it would
17 feed into the -- be part of the data being used to
18 estimate the coefficients that are then going to be
19 used for the predicted return.
20     Q   So in addition to market and general          5:55PM
21 industry factors, the Colorado Peer Group reflected
22 industry factors unique to operating in Colorado;
23 right?
24     A   It could.  So obviously the historical
25 relationship estimated for those companies would      5:55PM

Page 144

1  reflect, you know, the relationship between the index  5:55PM
2  that you're using and the individual firm.
3      Q   Did you investigate if it did reflect
4  industry factors that were unique to Colorado?
5      A   When you say "it," I'm not sure what you      5:56PM
6  mean.
7      Q   Okay.  If the Colorado Peer Group
8  reflected industry factors unique to Colorado.
9      A   Well, I did investigate whether there's
10 factors unique to these Colorado companies on this    5:56PM
11 particular disclosure date, so I did do that for these
12 purposes, albeit I used a general market index for the
13 model.
14     Q   So as someone who's investigated this
15 issue, what were the unique Colorado-specific issues   5:56PM
16 that were reflected in the Colorado Peer Group but
17 not the E&P peer group?
18     A   The Colorado Peer Group as an industry
19 control is not my industry control.
20         What I did investigate is these individual    5:57PM
21 Colorado companies and how they reacted on this
22 date.
23     Q   So what did you find was causing their --
24 the impact in their decline?
25     A   Well, the results of that study are reported  5:57PM

Page 145

37 (Pages 142 - 145)

1 in -- give me a second here. It's reported in         5:57PM
2 Page 29.
3      Q   So hold on a second. I think we're
4 talking about two different things because I said
5 what was the reason rather than the results.         5:58PM
6      A   Well, I mean, this is just showing that --
7 let me get the exact language.
8          Well, this is showing the effects on these
9 particular Colorado companies of any new
10 value-relevant information that was disclosed on         5:59PM
11 May 2nd on these particular companies.
12      Q   Okay. So what was the new value-relevant
13 information?
14      A   Well, it's just whatever new information is
15 released on May 2nd if we're going to explain the         5:59PM
16 commonality of these price declines across the group,
17 it would be, at least in part, the information
18 concerning the status of the situation in Colorado.
19      Q   Well, where do you say that it's in part?
20 You're saying only some of the price decline for         5:59PM
21 these companies was in part?
22      A   Well, I mean, the group is chosen because
23 these are identified by analysts or an analyst as
24 having particular exposure to Colorado and, hence,
25 what's going on in Colorado. So this is just         6:00PM

Page 146

1 illustrative of the fact that indeed this -- these         6:00PM
2 companies as a group did experience declines on this
3 date.
4      Q   But only part was because of the Colorado
5 situation?                                                6:00PM
6      A   Well, sitting here, I'm not aware of any
7 firm-specific news for Noble, PDC, SRC or
8 Extraction O&G in addition to the Colorado news that
9 would explain any of these individual negative
10 residuals.                                               6:00PM
11          But the pattern for all of these firms is
12 significant reductions in value.
13      Q   And why --
14      A   Reductions in value in the sense of a
15 statistically significant negative residual.         6:00PM
16      Q   But why?
17      A   I've already explained my view. So I'm not
18 aware sitting here of other firm-specific
19 value-relevant information with respect to any of
20 these four that was released the night before.         6:01PM
21          The fact that there is a pattern here of
22 all of them falling is consistent with the news
23 about Colorado after-hours on May 2nd as being new
24 value-relevant information.
25      Q   That being what?         6:01PM

Page 147

1      A   What I discuss in my report and -- let me go  6:01PM
2 back to that part of the report.
3          That would include the fire investigation,
4 the news coming out concerning that.
5      Q   So it included the regulatory environment         6:01PM
6 and the expected cost of operating in Colorado;
7 right? I believe you said that before.
8      A   Well, these concerns about the regulatory
9 environment is something that was expressed in the
10 analyst reports. But it's obviously affecting -- the  6:02PM
11 information on May 2nd is affecting -- the information
12 in southern Colorado is affecting, if you look at the
13 pattern here, this group of peer firms.
14      Q   Okay. Again, we're going to go back to
15 the fire department and what they said. What is         6:02PM
16 your understanding of what was disclosed?
17      A   Well, my understanding of what was disclosed
18 is reflected in those two footnotes, Footnote 23 and
19 Footnote 24 concerning the fire investigation.
20      Q   Okay.                                            6:02PM
21      A   And of course, there is the later Denver
22 Post which is also discussing these issues.
23          I'm sorry, I should amend my answer,
24 Footnote 23, 24, 25, there's also the press release
25 from May 2nd as well.                                    6:03PM

Page 148

1      Q   Now, at no point during that press         6:03PM
2 conference did the fire department say that Anadarko
3 violated any laws; correct?
4      A   My knowledge of what was disclosed in the
5 market is reflected in these footnotes and these         6:03PM
6 citations.
7      Q   Okay. So you'll stand on what is in those
8 footnotes so we don't have to go around and around
9 on that one again?
10     A   Yes.                                              6:03PM
11     Q   Okay. All right. Is it your opinion that
12 this information was value relevant?
13     A   Yes.
14     Q   And how so?
15         Let me amend the answer, actually. I want         6:04PM
16 to ask a more specific question.
17         So how would the linkage between Anadarko
18 and the explosion impact its future cash flow?
19     A   Well, I don't have a DCF model where I'm
20 tracking the cash flow at Anadarko. What is relevant  6:04PM
21 here from an event study analysis is there's negative
22 new value-relevant information, value relevant as
23 evidenced by the fact that Anadarko, in conjunction
24 with these other peer Colorado companies had
25 significant -- statistically significant price         6:04PM

Page 149

38 (Pages 146 - 149)

1   declines.                              6:04PM
2       Q   So you did not analyze, for example, what
3   Anadarko's expenses would be if the company was
4   found liable for the explosion?
5       A   No, in an event study I'm not doing a DCF   6:05PM
6   model.  I'm asking the question, how did the market
7   perceive the value relevance of this information?
8           And that's why the event study approach is
9   useful here.
10      Q   So did Anadarko have liability insurance   6:05PM
11  to cover such accidents as the home explosion?
12      A   I don't know.
13      Q   Any reason to doubt that Anadarko had
14  insurance that would cover the Firestone incident?
15      A   I don't have a view, it's not relevant to my  6:05PM
16  opinion.
17      Q   So you're just assuming it would be -- it
18  would have an impact on the future cash flows?
19      A   I'm saying that the market viewed this as
20  negative value-relevant information as evidenced by   6:06PM
21  the statistically significant declines.
22      Q   Well, if you read the analyst reports,
23  then you would know also that analysts viewed the
24  value implication as likely immaterial; right?
25      A   There is a mix of analyst coverage.  It's

Page 150

1   certainly a subject of discussion.          6:06PM
2           At the end of the day, this group of
3   companies, the Colorado companies, did experience
4   statistically significant negative residuals in
5   conjunction with this information.          6:06PM
6       Q   So you cited a report, an analyst report
7   from Evercore from -- in your report and cited some
8   but not all of it.
9           Do you have any reason to dispute that
10  Evercore said that the value implication directly   6:07PM
11  associated was likely immaterial for Anadarko?
12      A   You have to show me the report to refresh my
13  recollection.  There's over a thousand reports.  So
14  you would have to show it to me to refresh my
15  recollection.                           6:07PM
16          MS. JENSEN:  Okay.  So I just marked as
17  Exhibit 524 a document that bears the Bates stamp
18  APC-01334718.
19          (Whereupon, Exhibit 524 was marked for
20  identification.)                        1:33PM
21  BY MS. JENSEN:
22      Q   This is an Evercore analyst report that
23  you cite in your report, April 27th, 2017.
24      A   Yes, I see that.
25      Q   So you quote some of this report but not   6:08PM

Page 151

1   the -- it would be the third or fourth sentence in   6:08PM
2   this report that says, "the value implication
3   directly associated with the shut-in production and
4   any physical remediation is likely" --
5       A   Is it the third paragraph?          6:08PM
6       Q   No, I'm sorry, it's the first paragraph.
7       A   Okay.  Yes.
8       Q   So you see that?
9       A   I'm reading the paragraph now, give me a
10  second.                                 6:08PM
11      Q   Okay.
12      A   I was reading the first bullet, sorry, I
13  have to start over.
14      Q   That's okay.  Yes.  It's under the heading
15  "Residential Explosion."                6:09PM
16      A   I see it.
17      Q   So you see the reference to immaterial?
18      A   Yes, I see that full sentence.
19      Q   Okay.  And also it says on April 27th,
20  "the market likely overreacted to the tangible value   6:09PM
21  implication of the incident today."
22      A   Yes.
23      Q   Okay.  Anadarko also said that any
24  liability would be immaterial; correct?
25      A   I don't remember that specific language.  I  6:09PM

Page 152

1   would have to -- you know, obviously they released a   6:09PM
2   press release talking about cooperating and doing
3   what's necessary, including earlier that is their
4   actions with respect to the wells.
5       Q   So I'm actually referring to their 10-Q.   6:10PM
6   Did you look at any of their SEC filings on this?
7       A   I did.
8       Q   You did?
9       A   I did.
10      Q   Okay.  And so do you cite them in your   6:10PM
11  report?
12      A   Do I cite them in my report?  If we're
13  talking about the 4:16 filing of the 10-Q, is that
14  what we're referring to?
15      Q   I'm actually talking about the 10-Q that   6:10PM
16  they issued after the explosion, so the next
17  quarterly report.
18      A   I looked at a lot of 10-Qs, I don't have a
19  specific recollection.
20      Q   Okay.                           6:10PM
21          MS. ROSENBERG:  You're referring, Rachel,
22  to the 10-Q after the class period?
23          MS. JENSEN:  I'm talking about the form
24  10-Q where they reported that there were no new
25  material contingencies after the Firestone   6:11PM

Page 153

39 (Pages 150 - 153)

**Page 154**

1 explosion.                            6:11PM
2  Q   Did you look at that?
3  A   You have to show me the document.  What date
4 is that released?
5  Q   It's on July 24th, 2017.          6:11PM
6  A   So after the class period?
7  Q   Yes.
8  A   I don't believe that's on my -- it postdates
9 the class period, so obviously the market would not
10 have access to that, or at least to that particular    6:11PM
11 disclosure.
12      I have the 10-Q -- looking at my
13 Appendix 2, I have the 10-Q from -- that's filed
14 March 31st, 2017 -- I'm sorry, yes.  The 10-Q listed
15 on my Appendix 2 of this report is -- that's the      6:11PM
16 last 10-Q.
17  Q   Okay.  So this is the 10-Q that was filed
18 on July 24th, 2017.  And you should be able to see
19 it now, it's Exhibit 525.
20      (Whereupon, Exhibit 525 was marked for    6:12PM
21 identification.)
22      THE WITNESS:  Maybe I need to refresh.
23      I have it.
24      MS. JENSEN:  Lynne, this is one that
25 you'll also need to put the stamp on.        6:12PM

**Page 155**

1  Q   This is Anadarko's July 24, 2017 10-Q    6:12PM
2 which is for Q2 2017.
3  A   I have it up.
4  Q   So if you turn to what's Page 24 on the
5 PDF.                                 6:13PM
6  A   Okay.
7  Q   And it states here, "There are no material
8 developments in previously reported contingencies
9 nor are there any other material matters that have
10 arisen since the filing of the Company's Annual    6:13PM
11 Report on Form 10-K for the year ended December" --
12  A   I'm sorry, I'm not seeing it.  So page 24 at
13 the bottom?  I see noncontrolling interests.  Am I at
14 the wrong place?
15  Q   Yes, I'm looking at contingencies.  It's    6:13PM
16 kind of odd -- well, maybe not odd, but on the PDF,
17 it's Page 24, but then if you look at the page
18 number of the document, it appears to be 22.
19      I mean, but the page number is very high
20 up on the page.                        6:14PM
21      So it must be just a partial page.
22  A   So it's the contingency part of the 10-Q?
23  Q   Yes.
24  A   All right.  That's Note 10.  It looks like
25 it's on Page 22.  Yes, I'm there.          6:14PM

**Page 156**

1  Q   Okay.  I'm just asking you to confirm that   6:14PM
2 the company said there were no material matters that
3 have arisen since the Form 10-K?
4  A   Yes.
5  Q   Okay.  You can also turn to Page 49.  Do    6:14PM
6 you see under Item 1, "Legal Proceedings"?
7  A   Yes, I do.
8  Q   Okay.  And you see it's the seventh line
9 in the first paragraph, reading an excerpt,
10 "management believes that the resolution of pending    6:15PM
11 proceedings will not have a material adverse effect
12 on the Company's financial condition, results of
13 operations, or cash flows."
14  A   Is this in the first paragraph?
15  Q   Yes, I mean that's just part of it,        6:15PM
16 there's actually a number of different --
17  A   I see where you're looking.
18  Q   Do you see where --
19  A   I see it.
20  Q   You see that there, where the company said    6:15PM
21 they didn't believe that any of the pending
22 proceedings would have a material adverse effect?
23  A   I see that language.
24  Q   Now, some of the information that came out
25 of the fire department's investigation was positive    6:16PM

**Page 157**

1 for the company; right?                  6:16PM
2  A   I'm not sure what you have in mind.
3  Q   Sure.  So let me be more specific.
4      So they said, for example, that no -- none
5 of the adjacent homes were in danger as a result of    6:16PM
6 the severed line?
7  A   That's consistent with my general memory.
8  Q   Yes.  That was a positive because it
9 limited the exposure to that one home?
10  A   It would be positive in the sense that other   6:17PM
11 people are probably are not going to get hurt.  I'm
12 not sure if it changes the overall valuation effects
13 in the marketplace.
14  Q   The severed line that caused the Firestone
15 explosion at the well, was it at the well or in the    6:17PM
16 property?
17  A   Oh, what is the question again?
18  Q   Was the severed line at the well or the
19 property?
20  A   I thought there was discussion of something   6:17PM
21 being moved and then it getting severed.  Hold on a
22 second.  Let me pull it out.
23  Q   It was very close to that particular
24 property; correct?
25  A   It says in Footnote 24 that a black plastic    6:17PM

CONFIDENTIAL

1  pipeline near the house had been cut when a tank          6:17PM
2  battery was moved.
3     Q   Right.  So it was near the home and not at
4  the well, so that would also be positive
5  information; correct?                                     6:18PM
6     A   I don't know how positive that is.  Somebody
7  died.  But I'm not sure why that would be positive,
8  but that is what the fire investigator said.
9     Q   How many analyst reports discussed
10 potential liability as a result of the linkage           6:18PM
11 between the Firestone explosion and the Anadarko
12 well as being material?
13    A   It's potential liability.  I don't recall
14 one offhand.
15    Q   That's part of your standard analysis of        6:18PM
16 materiality; right?
17       MS. ROSENBERG:  Objection to form.
18       THE WITNESS:  I don't do materiality.
19 BY MS. JENSEN:
20    Q   And how many analyst reports lowered             6:18PM
21 Anadarko's price target as a result of the linkage
22 between the Firestone explosion and the Anadarko
23 well?
24    A   I'm not aware of any offhand that reduced
25 the price target on May 3rd or the immediate            6:19PM
                                                      Page 158

1  aftermath.                                               6:19PM
2     Q   Did you perform any economic analysis to
3  determine whether the confirmation of the linkage
4  between the well and Anadarko was value-relevant new
5  information that impacted cash flows?                    6:19PM
6     A   I notice that in your question, you built in
7  an assumption --
8        MS. ROSENBERG:  Objection, form.
9        THE WITNESS:  -- or a predicate, which is
10 the confirmation.  I would frame it the way I did       6:19PM
11 earlier, which is the cause was disclosed after
12 market on May 2nd.
13       Yes, I did do standard economic analysis,
14 which is what did these group of firms, the firms
15 with economic exposure to Colorado, what happened to    6:19PM
16 them in the marketplace when this negative
17 information came out and, in fact, they all declined
18 in a statistically significant way.
19       So in my view that's very powerful
20 evidence that the market didn't like this.              6:20PM
21    Q   Now, is it your opinion that Anadarko had
22 greater exposure than the Colorado Peer Group?
23    A   I didn't say that.
24    Q   Is it your opinion or no?
25    A   No.  My opinion is that Anadarko was the        6:20PM
                                                      Page 159

1  largest oil and gas producer in Colorado at the time.  6:20PM
2     Q   So largest oil producer, do you analyze
3  what percentage of Anadarko's operations were
4  impacted versus the other companies?
5     A   No.  I obviously read analyst reports           6:20PM
6  covering all of these companies and talking about the
7  basin and the effect of that but I did not quantify
8  that but rather asked the question what did the market
9  think.
10    Q   Do you consider that Anadarko is a              6:21PM
11 well-diversified global producer?
12    A   I do think, as I described in the opening of
13 my reports, that they have operations in lots of
14 places.
15    Q   Do you agree with defendants' other expert     6:21PM
16 in this case, his name is Mr. Keller, that Anadarko
17 had a large and diversified asset base?
18    A   Again, I think that's consistent with the
19 description -- I can't remember whether it's in this
20 report or my opening report -- of the operations they  6:21PM
21 had in a variety of places.
22    Q   So from an economic standpoint,
23 diversification is the equivalent to the adage don't
24 put all your eggs in one basket; right?
25    A   You know, it depends on how you define the      6:22PM
                                                      Page 160

1  basket.  These are oil and gas.  It will be exposed in  6:22PM
2  that way.  But you're in a different location, it's
3  not exposed in that way.
4        So, yes, it's diversified in some ways and
5  not in other ways.                                      6:22PM
6     Q   In other words, if you drop the basket --
7  maybe I'm straining the metaphor here.  But if you
8  drop the Colorado basket, you haven't broken all
9  your eggs; right?
10    A   That's fair.                                     6:22PM
11    Q   And so Anadarko had a large diversified
12 asset base across the world, if something happened
13 in one place, here, Colorado, it would have a lesser
14 impact than a company who had all their baskets --
15 all their eggs -- now I've really messed that up        6:22PM
16 metaphor -- all their eggs in the Colorado basket?
17    A   I think that's right, holding constant
18 everything else.  So, for example, who is responsible
19 for the accident.
20       So holding all else equal, I agree with          6:22PM
21 that.
22    Q   Did you look to see that the other
23 companies -- I believe you already testified that
24 you did not do this analysis.  But I just want to
25 make sure that I have got this right.                    6:23PM
                                                      Page 161

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1   What percentage of the other Colorado peer   6:23PM
2 groups operations were in Colorado?
3      A   So just give me a second here. Let me make
4 sure I have the right page.
5      So I did not do a quantification of the   6:23PM
6 distribution of oil and gas assets across these
7 companies. Obviously this is something that is
8 talked about in analyst reports including for
9 Anadarko.
10      So, no, I don't have a hidden analysis   6:24PM
11 that I didn't provide in my report.
12   Q   Okay. You have no reason to doubt that
13 Extraction Oil & Gas had disclosed in its SEC
14 filings prior to this that substantially all of our
15 producing properties are geographically concentrated   6:24PM
16 in the DJ basin of Colorado?
17   A   I have no reason to dispute that.
18   Q   Also, the company is much smaller than
19 Anadarko was at the time; correct?
20   A   So just give me a second here.   6:24PM
21      So in my analysis of market efficiency, I
22 have the market caps for these different companies,
23 I would just reference that.
24      I do think it's accurate that they are
25 smaller as we look at the market capitalization row,   6:25PM

Page 163

1 Row 7 of that exhibit.   6:25PM
2   Q   Okay. Could you just identify for the
3 record where you're talking about in your report?
4   A   Yes. So it's right after Appendix 3-3. So
5 unfortunately -- I'm sorry, 4. So I think it's   6:25PM
6 Appendix 3-4, I believe.
7   Q   Okay. So it does have the market cap,
8 okay.
9      So Anadarko at the time was 15 to
10 50 billion versus the others were anywhere from   6:25PM
11 607 million to -- I'm seeing up to -- so all of them
12 are smaller, okay.
13      But in any event, your chart reflects the
14 market cap at the time for the other companies?
15   A   Yes.   6:26PM
16   Q   Okay. All right. Now, with SRC Energy,
17 do you have any reason to doubt that like Extraction
18 Oil & Gas, they had disclosed to investors prior to
19 this occurring that substantially all of our
20 producing properties are located in the DJ basin in   6:26PM
21 Colorado?
22   A   I have no particular reason to disagree.
23   Q   And they go on to warn their investors
24 that they are disproportionately exposed to
25 government regulation in Colorado?   6:27PM

Page 164

1   A   I would have no basis to disagree.   6:27PM
2   Q   Okay. And its market cap was around
3 1.5 billion?
4   A   Which paragraph was that?
5   Q   That was -- I hope I didn't say the wrong   6:27PM
6 number -- SRC Energy.
7   A   Yes, I mean they are 2 billion or lower.
8   Q   Right. Yeah, I got it, 607 million to
9 2 billion.
10      Also PDC Energy, prior to this occurring,   6:27PM
11 had disclosed to their investors that a substantial
12 part of their operations were in the Wattenberg
13 field, making the company vulnerable to risks
14 associated with operating primarily in a single
15 geographic area?   6:27PM
16   A   I have no basis to disagree.
17   Q   Okay. And again, also much smaller than
18 Anadarko.
19      Noble Energy also had substantial
20 operations in the DJ basin?   6:28PM
21   A   I believe that's right. They tend to be a
22 bigger company relative to these other ones.
23   Q   Right. But was less geographically
24 diversified than Anadarko?
25   A   I would have no basis to disagree.   6:28PM

Page 165

1   Q   So given that all the other companies in   6:28PM
2 the Colorado Peer Group had much greater exposure to
3 Colorado, the impact of the Colorado regulatory
4 concerns would be much less on Anadarko than the
5 other companies; right?   6:28PM
6   A   It's possible. Although, again, it depends
7 on how the market views how Anadarko is going to be
8 treated relative to others given its role in the
9 incident.
10      So it would be a question for the market   6:28PM
11 to value and that's why it's so helpful to have the
12 event study.
13   Q   So -- but just a matter of common sense,
14 if not economic sense, right, that if there's less
15 exposure, there'd likely to be less impact?   6:29PM
16      MS. ROSENBERG: Objection to form.
17      THE WITNESS: I would say it depends, what
18 type of wells, how is that going to be impacted by
19 the regulation, what is Anadarko's role and what
20 effect does that have on how it's going to be   6:29PM
21 treated regulatorily.
22      So, again, all these things would have to
23 be valued by the market and that's why it's so
24 helpful to have an event study.
25

42 (Pages 162 - 165)

CONFIDENTIAL

1 BY MS. JENSEN:                          6:29PM
2     Q   You didn't perform economic analysis to
3 demonstrate that the impacts would be greater or
4 less?
5     A   I did.  So the event study shows that it's  6:29PM
6 negative eight -- let me just go to the paper.  I
7 would just reference my event study results.  That's
8 the market's view of the valuation effect.
9     Q   And it's your view that that entire drop
10 was about the regulatory concerns in Colorado?   6:30PM
11    A   No, not quite.  As I said before, I'm not
12 aware of other firm-specific news for this peer group,
13 these four.  I'm not aware of any.
14        And so the commonality of the stock drop
15 is powerful economic evidence in my view that the   6:30PM
16 market viewed, for these companies, this information
17 in a very negative way.
18        And its regulation, it could be
19 reputation, it could be any number of things that
20 the market is valuing in how it updates the market   6:30PM
21 value of these particular companies.
22    Q   Okay.  So all the Colorado operators had a
23 statistically significant price decline on May 3rd,
24 2017; right?
25    A   Yes.  Let me go to my table.   6:30PM

Page 166

1    Q   Okay.                          6:30PM
2    A   Let me make sure we're all on the same page
3 here.
4        I'm on Table -- I would go to Table 2 on
5 Page 28.                              6:31PM
6    Q   Okay.  So Table 2, okay.  We're on the
7 same page literally.
8        Okay.  So the measure of the statistical
9 significance is called a T-statistic; right?
10   A   Yes.                          6:31PM
11   Q   And if you look at your Table 2, all of
12 the Colorado operators other than Anadarko had a
13 T-statistic of three-point something; correct?
14   A   Yes.
15   Q   And so that's common to all of the   6:32PM
16 Colorado Peer Group?
17   A   Yes, and in my view the only thing that's
18 relevant is that it exceeds the absolute value 1.96.
19   Q   But again, they all similarly have a
20 T-statistic of three something?   6:32PM
21   A   Sure.
22   Q   Okay.  However, Anadarko's T-statistic is
23 7.42, which is significantly greater than the other
24 companies that had a T-statistic of three-point
25 something; right?                     6:32PM

Page 167

1        MS. ROSENBERG:  Objection, form.   6:32PM
2        THE WITNESS:  I actually think it's
3 negative 7.42 but --
4 BY MS. JENSEN:
5    Q   Apologies.                     6:32PM
6    A   Yes, the T-statistics are different, it
7 doesn't -- it's completely irrelevant.
8    Q   And why do you say it's irrelevant?
9    A   Because all of them meet the standard -- and
10 I think Mr. Steinholt agrees with me the standard   6:33PM
11 statistical threshold of absolute value of 1.96.
12   Q   Okay.  So your view is that the
13 T-statistic is completely irrelevant to the economic
14 analysis; is that right?
15   A   I did not say that.  I said what's relevant   6:33PM
16 to the economic analysis is that the absolute value of
17 the T-statistics for all five of these companies
18 exceeds the statistical threshold of the absolute
19 value exceeding the -- the absolute value of which
20 exceeds 1.96.                         6:33PM
21   Q   When I said, so your view is that the
22 T-statistic is completely irrelevant, why did you
23 disagree?
24   A   Because I do look at the T-statistics to see
25 whether it meets that statistical threshold, so it is   6:33PM

Page 168

1 relevant for that.                     6:34PM
2    Q   And it could be relevant to the level of
3 confidence as well; right?
4    A   Well, different T-stats will have different
5 levels of confidence.  But again, in a statistical   6:34PM
6 enterprise or test, you need to have a test with
7 statistical significance, the standard test is
8 5 percent.
9        MS. JENSEN:  Okay.  Let's take a quick
10 break.                              6:34PM
11       THE WITNESS:  Sure.
12       THE VIDEOGRAPHER:  We're off the record.
13 It's 6:34 p.m.
14       (Recess taken.)
15       THE VIDEOGRAPHER:  Back on the record.   6:53PM
16 It's 6:53 p.m.
17 BY MS. JENSEN:
18   Q   Welcome back, Dr. Ferrell.
19       In your opinion, did the suspension of
20 Shenandoah and associated write-down have zero   6:53PM
21 impact on the company's expected future cash flows?
22   A   I'm not looking at it through the cash flows
23 but rather the market valuation, which would
24 incorporate the market's view as to cash flows.
25   Q   Okay.  So you're not looking at it from a   6:53PM

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL

1 cash flow perspective?                    6:54PM
2     A   I would not say that.  I would say in an
3 efficient market, the market prices all value-relevant
4 information.  Value-relevant information, that is
5 public.  And value-relevant information would include   6:54PM
6 information that changes the market's view as to cash
7 flows.
8     Q   Okay.  And so if market participants,
9 their views changed as to future cash flows
10 following the announcement of the suspension of        6:54PM
11 appraisal activities at Shenandoah and associated
12 write-down, then that would indicate there was an
13 impact?
14     A   So the question is the market, which is the
15 consensus view of the market actors, views the cash    6:55PM
16 flows, for example, being significantly altered as a
17 result of a disclosure, then the market price will
18 change accordingly.  So, again, it's the consensus
19 market view as to the value implications, if any, of a
20 particular disclosure.                      6:55PM
21     Q   Okay.  So -- I just want to make sure I
22 understand your position.
23         So you're not taking a position one way or
24 the other whether the 902 million-dollar write-down
25 of Shenandoah had implication for Anadarko's future   6:55PM

Page 170

1 cash flows?                                6:55PM
2     A   Well, I'm taking a position that the market
3 did not view that disclosure as changing its view as
4 to the market view of Anadarko.
5         I also have a discussion of accounting and    6:56PM
6 accounting is not cash flows, or at least it's not
7 future cash flows.
8         So I definitely have a discussion of why
9 it is that the market would not view an accounting
10 issue as changing its perception of the value of the   6:56PM
11 company.
12     Q   The basis for your position about what the
13 market viewed the disclosure as -- is contained in
14 your report here of January 25th, 2023?
15     A   Yes, I do incorporate by reference my       6:56PM
16 earlier reports.
17     Q   But the -- in your January 25th, 2023, are
18 there certain paragraphs where you set forth the
19 basis of this opinion?
20     A   Yes, it's the entirety of the report that's   6:57PM
21 assessing Mr. Steinholt's analysis and my view of the
22 economic evidence.
23     Q   But where is your view of the economic
24 evidence?  And now I'm talking about the disclosure.
25 Is it contained in one central place that I can look   6:57PM

Page 171

1 at in your report?                          6:57PM
2     A   I'm not trying to avoid the question, but
3 it's the entirety of my economic analysis, including
4 but not limited to the event study analyses with
5 respect to May 3rd.                         6:57PM
6     Q   So when you say the event study analysis
7 with respect to May 3rd, you're talking about the
8 analysis of the Colorado Peer Group companies?
9     A   And also my Cobalt and Conoco analysis as
10 well.  But that's not the entirety of my analysis.  I   6:57PM
11 would incorporate in my answer the entirety of my
12 economic analysis.
13     Q   Let's turn to the Cobalt -- your analysis
14 of Cobalt.  So if the suspension of the Shenandoah
15 was not new value-relevant information, why would      6:58PM
16 analysts use it to reduce Cobalt's value?
17     A   There is, I agree, a -- the dollar amount is
18 small.  I think if you gross it up, it's like
19 $31 million.  So it's a small dollar drop but it is a
20 statistically significant negative residual.  And so   6:58PM
21 here I would reference Table 1 on Page 16.
22     Q   So given that there was a statistically
23 significant negative residual, that indicates it was
24 new value-relevant information; correct?
25     A   It would indicate that for Cobalt, given its   6:58PM

Page 172

1 situation and its very modest market capitalization, I   6:58PM
2 think 167 million, that it did -- it is associated
3 with a statistically significant price drop again.  If
4 you gross it up to the 33 percent, it's something --
5 it's somewhere in the order of $31 million.            6:59PM
6     Q   Therefore, given the efficient market,
7 then the information you would agree is new;
8 correct?
9     A   Yes.  So some of the disclosures that we've
10 been talking about on May 2nd is new information, not   6:59PM
11 the dry hole but yes, there is new information.
12     Q   Okay.  So the new information again being
13 suspension of appraisal activities and the
14 write-down of Shenandoah; correct?
15     A   Yes, and the -- I just want to be clear, the   6:59PM
16 earlier disclosure of May 2nd concerns the dry hole
17 and the dry hole expense.
18     Q   So we've talked about Cobalt just a little
19 bit.  The issue regarding ConocoPhillips relates to
20 whether the impact on ConocoPhillips was large        7:00PM
21 enough to be statistically significant, which it's
22 not; right?
23     A   Yes.  So the stock price on Conoco went
24 actually up on May 3rd.  Statistically, that increase
25 in the stock price is statistically indistinguishable   7:00PM

Page 173

44 (Pages 170 - 173)

1 from zero.                                     7:00PM
2    Q   Give me one moment here.
3        So for purposes of the T-statistic for it
4 to be statistically significance, it has to be 1.96
5 or greater?                                    7:01PM
6    A   Absolute value, yes.
7    Q   For ConocoPhillips to meet the benchmark
8 mark for statistical significance, it has to be more
9 than 2.17 percent; is that right?
10   A   Maybe 2.18 percent.  It would basically be   7:01PM
11 the standard error, the regression times your standard
12 for statistical significance.
13   Q   The standard error for the ConocoPhillips
14 event study is roughly 1.11 percent?
15   A   I don't have -- I didn't memorize it.  That   7:01PM
16 might be right.  I mean, you can easily back it out of
17 the ratio.
18   Q   The abnormal return for ConocoPhillips was
19 positive; right?
20   A   Yes.                                   7:02PM
21   Q   So -- but it's fair to say there was
22 positive information relating to ConocoPhillips on
23 May 3rd that increased -- that explained the
24 increase in ConocoPhillips's stock price?
25   A   No, no.  Because as I said, that abnormal   7:02PM

Page 174

1 return, the 71 basis points, as you can see in   7:02PM
2 Table 1, is statistically indistinguishable from zero.
3    Q   But on an absolute basis, it's positive;
4 right?
5    A   Yes, but statistically it's          7:02PM
6 indistinguishable from zero.
7    Q   What did you do to determine that there
8 was no new information disclosed on May 3rd
9 regarding ConocoPhillips?
10   A   Give me a minute here.               7:03PM
11       I have the wrong part of my report, I'm
12 sorry.
13   Q   That's okay.  Take your time.
14   A   So it's Paragraph 29 and Footnote 60 in
15 particular, Page 15.                          7:04PM
16   Q   So you searched all news on the Factiva
17 and Bloomberg's databases; is that right?
18   A   Yes.
19   Q   Did you do anything else?
20   A   That -- no, that's my answer.        7:04PM
21   Q   Were there any analyst reports issued
22 about ConocoPhillips after the market closed on
23 May 2nd through the close on May 3rd, 2017?
24   A   I'm sure there were, but there's so many
25 analyst reports, you would have to refresh my   7:04PM

Page 175

1 recollection.  Hang on a second here.          7:04PM
2        I'm not going to do this all from memory.
3 But the basis of my statement is I was not able to
4 find any confounding news.
5    Q   Right.  I'm just asking -- and it sounds   7:05PM
6 like you're confirming that there were analyst
7 reports during that same time frame?
8    A   That's consistent with any memory.  But
9 again, there are so many analyst reports in this case,
10 I would need to take a look to refresh my       7:05PM
11 recollection.
12   Q   So sitting here right now, you don't know
13 how many analyst reports were issued about
14 ConocoPhillips in that same time period?
15   A   No, I have not memorized the wording of   7:05PM
16 analyst reports, you know, they obviously say what
17 they say.
18   Q   Right.  Did you review the 29-page Barclay
19 report on May 3rd to look for potentially
20 confounding information?                       7:05PM
21   A   I don't recall that specifically.  If it's
22 on my list, I did, but I don't have a specific
23 recollection.
24       As I said, there's well over a thousand
25 analyst reports in this matter.  But I don't, to   7:06PM

Page 176

1 your question, have a specific recollection.   7:06PM
2    Q   Right.  Did any analysts increase their
3 earnings per share estimate on May 3rd for
4 ConocoPhillips?
5    A   I don't have that memorized.  I don't know   7:06PM
6 offhand.
7    Q   Hillyard Lynn did; right?
8    A   I'm sorry?
9    Q   Hillyard Lynn did; correct?
10   A   I'm sorry, I'm not understanding.      7:06PM
11   Q   Hillyard Lynn, are you familiar with
12 Hillyard Lynn?
13   A   Is this a question have I read the report?
14   Q   Yes.
15   A   I don't have a specific recollection.   7:06PM
16 There's so many analysts and commentary that I would
17 have to see it to refresh my recollection.
18   Q   An analyst increase in earnings per share
19 would be positive confounding information; correct?
20   A   Not per se.  I would want to take a look   7:06PM
21 at -- obviously you want to consider analyst reports.
22       There's nothing wrong with looking at
23 analyst reports, but would you want to think about
24 the totality, the total mix of information, event
25 study results and so forth before performing -- in   7:07PM

Page 177

45 (Pages 174 - 177)

CONFIDENTIAL

1 making that assessment.                    7:07PM
2    Q   Right.  And you would not be able to
3 assess it if you didn't analyze the analyst reports;
4 right?
5    A   Well --                              7:07PM
6        MS. ROSENBERG:  Objection.
7        THE WITNESS:  If I didn't read it,
8 obviously I didn't read it.  Again, I don't have a
9 specific recollection either way.
10       I would have to go through my -- the     7:07PM
11 thousands plus analyst reports in my initial report
12 and the ones listed here.
13       If it's not on the list, then I've not
14 reviewed it unless it's quoted or excerpted in some
15 way in Mr. Steinholt's work.                 7:07PM
16 BY MS. JENSEN:
17   Q   Right.  But generally, an analyst opinion
18 sometimes provide new information that can result in
19 a price reaction; right?
20   A   I guess it's theoretically possible.    7:07PM
21 Normally, my general experience is analyst commentary
22 can be helpful in explaining what folks are talking
23 about in the marketplace or what are different market
24 actors to use at different points in time.
25   Q   Are you aware of any academic research on   7:08PM

1 premium or attention given to the operator who    7:09PM
2 controls the enterprise?
3    A   Well, there is a literature on the private
4 benefits of control or control premium.  None of that
5 is applicable here.                          7:10PM
6    Q   What research is that or what literature
7 is that?
8    A   I don't have the articles memorized.
9 There's -- oh, my friend Nusha Bachak has a famous
10 paper on private benefits of control.  So there's    7:10PM
11 academic literature on, you know, if I have a position
12 in a company or control position, I could divert
13 benefits to myself at the expense of others.
14       There is a famous paper, now that I am
15 talking, by Sindal Malatharian who's at the    7:10PM
16 University of Chicago now about diversion of cash
17 flows in the Indian conglomerates.
18       There's just lots of papers that talk
19 about benefits of control in the sense of gathering
20 in a disproportionate way cash flows to myself    7:11PM
21 perhaps at the expense of others.
22   Q   And also --
23   A   There is a famous article on the
24 non-pecuniary benefits of control of media companies
25 by Demsetz and I think Ken Lehn.  So there's lots of    7:11PM

1 this topic?                                  7:08PM
2    A   Yes.  So I don't have the papers off the top
3 of my head.  There are papers that do find
4 occasionally an analyst report that has some kind of
5 new valuation or something that the market deems    7:08PM
6 independently important can cause a price reaction.
7        But again, generally my experience -- this
8 is consistent with the academic literature.  It's
9 more about how is the market reacting to a
10 disclosure that, you know, for example, the company    7:08PM
11 made.
12   Q   Is it your opinion that the Shenandoah --
13 sorry, the Shenandoah news after the market closed
14 on May 2nd, 2017 would have the same or similar
15 impact on ConocoPhillips as Anadarko?        7:09PM
16   A   No, I think -- I don't want to get these
17 percentages wrong.  Anadarko at that point I think had
18 33 percent, if I remember correctly, Conoco had
19 30 percent, if my memory serves me.  So there was a
20 little bit of difference in their cash flow position.  7:09PM
21   Q   And also Anadarko was the operator;
22 correct?
23   A   Yes, but that doesn't affect my judgment as
24 to the economics of the -- of having a position.
25   Q   So it's your opinion that there is no    7:09PM

1 papers on the private benefits and control, none of    7:11PM
2 that is applicable here.
3    Q   And also with the operator -- strike that.
4        And here Anadarko as the operator had more
5 control over the decision-making; right?     7:11PM
6    A   That's my general understanding.
7    Q   So, for example, Anadarko made the
8 decision to suspend appraisal activities at
9 Shenandoah without telling any of its partners in
10 advance; is that right?                      7:12PM
11   A   That I don't know whether they told them or
12 not.  It's beyond my knowledge.
13   Q   You are aware, however, that
14 ConocoPhillips amended its financials after Anadarko
15 released its alleged corrective disclosure and it    7:12PM
16 did so because of Anadarko's surprise announcement?
17   A   I don't know if there is an amendment of
18 financials, but there is a Conoco disclosure on
19 May 4th, that is true.
20   Q   In redaction to Anadarko's filing;    7:12PM
21 correct?
22   A   I think -- you're really testing my memory
23 of documents.  I think on May 4th, there is a
24 reference, as I remember -- the document speaks for
25 itself -- referencing the earlier disclosure or in    7:12PM

CONFIDENTIAL

1  reaction or something like that. That's my        7:12PM
2  recollection as best I can remember.
3      Q   And again, if we had the luxury of so many
4  hours, I would go through all these documents with
5  you, so I'm not trying to do a gotcha.            7:12PM
6      A   I believe you.
7      Q   I'm just trying to -- every exhibit adds
8  time, so just -- yes, thank you for believing me.
9          So you referenced earlier the difference
10 in the working interest between ConocoPhillips     7:13PM
11 versus Anadarko.  So Anadarko owned 33 percent of
12 working interest versus ConocoPhillips owning
13 30 percent.
14         And so if we assume for sake of this
15 discussion that the impact on Anadarko was          7:13PM
16 1,075,000,000, the impact on ConocoPhillips would be
17 about 975 million; correct?
18     A   I totally reject the 1.07 figure which I
19 know is from Steinholt.  I think that's completely
20 erroneous.  But, yes.  So the effect, you would want  7:13PM
21 to adjust to reflect the 30 or the 33 percent.
22     Q   But my numbers are right, I'm not asking
23 you to change your opinions in the case and all of a
24 sudden come around to praising Mr. Steinholt, I'm
25 just saying the numbers that I've just set forth are  7:14PM

Page 182

1  correct; right?                                    7:14PM
2      A   I can pull up my iPhone and put them in a
3  calculator, but I trust you can do arithmetic.
4      Q   Given that ConocoPhillips had
5  1.237 billion shares outstanding, that would be     7:14PM
6  approximately an impact of 79 cents per share?
7      A   I don't remember how many shares are
8  outstanding but you would --
9          MS. ROSENBERG:  Object to form.
10         THE WITNESS:  Whatever your hypothetical    7:14PM
11 is you would adjust for the ownership share and then
12 if you wanted to normalize another share account,
13 you could do so.
14 BY MS. JENSEN:
15     Q   In any event, it would all come out         7:14PM
16 essentially to a 1.69 percent change in the closing
17 price for ConocoPhillips, which would not be
18 statistically significant; right?
19         MS. ROSENBERG:  Objection to form.
20         THE WITNESS:  So you're asking me to agree   7:15PM
21 to a calculation.  I'm not -- you know, I'm not
22 going to do --
23 BY MS. JENSEN:
24     Q   You haven't done --
25     A   There's a calculation that you can do, but   7:15PM

Page 183

1  I'm not going to agree to a calculation that I have  7:15PM
2  not verified.
3      Q   And you haven't run this calculation?
4      A   I did a calculation for Cobalt in my Daubert
5  opinion, so it would be a similar calculation.        7:15PM
6      Q   But you haven't run it for ConocoPhillips?
7      A   No.  No.  But again, it's simple arithmetic.
8  It would just be the way I did it for Cobalt in the
9  opposition, which would be doing the adjustment for
10 the interest and yes -- anyway.                       7:15PM
11     Q   Okay.  In any event, I won't make you do
12 more calculations or pull out your iPhone.
13         But in light of the difference in the
14 working interest and the size of the companies, all
15 things equal, the impact would not be expected to be  7:16PM
16 the same on ConocoPhillips as to Anadarko; right?
17     A   On a percentage basis or an absolute basis
18 or are we talking both?
19     Q   I'm talking about statistical significance
20 really.                                               7:16PM
21     A   Well, I mean, again, if the ownership
22 interest of Conoco is lower, which it is, then the
23 impact would be, you know, the difference between 33
24 and 30 percent, 1/11th, if you will.
25         And that would be the dollar impact and      7:16PM

Page 184

1  you could translate that into a return calculation   7:16PM
2  for the company, again, accepting a number that I
3  don't accept.
4      Q   I understand.  I'm just setting that aside
5  for now.  Don't worry.                               7:16PM
6          But -- and then also the market cap for
7  ConocoPhillips is much larger, so for purposes of
8  the analysis, it would also be expected to have a
9  lesser impact?
10     A   On a percentage basis, I think that's right.  7:17PM
11     Q   Now, the May 2nd, 2017 ConocoPhillips
12 disclosure, it did not disclose the amount of dry
13 hole expense relating to Shen 6; right?
14     A   So are we talking about the May 6th?
15     Q   May 2nd.                                     7:17PM
16     A   May 2nd, okay.  Sorry.
17         My memory is a dry hole of 100 and some
18 million, but I want to -- I don't want to
19 misremember here.  Let me go to the report before I
20 discuss that.                                         7:17PM
21     Q   So -- sure, that's fine.  I believe the
22 statement was that there was a dry hole expense
23 including Shen 6, but it didn't break it out.
24         MS. ROSENBERG:  Is that a question?
25         THE WITNESS:  I'm going to pause and find    7:17PM

Page 185

47 (Pages 182 - 185)

1  the relevant part of my report.  I'm sorry, give me      7:18PM
2  another minute.
3          Thank you for your patience.
4  BY MS. JENSEN:
5      Q  I found it --                    7:19PM
6      A  Table 3, Paragraph 33 --
7      Q  Yes.
8      A  My understanding is on the morning of
9  May 2nd, 2017, ConocoPhillips disclosed that, quote,
10  first quarter earnings were negatively impacted by      7:19PM
11  101 million of pretax dry hole expense, which includes
12  the Shenandoah 6 well in the Gulf of Mexico.
13      Q  So it didn't break out what the expense
14  was for Shenandoah 6?
15      A  That's the disclosure.            7:20PM
16      Q  Right?  I mean it says includes?
17      A  It does say includes.
18      Q  Okay.  And it does not mention in that
19  disclosure the Shenandoah 6 sidetrack?
20      A  I believe that's correct.         7:20PM
21      Q  Was this the first time that Shenandoah 6
22  was reportedly dry or wet?
23      A  I think there might -- I know that -- I am
24  trying to remember Mr. Steinholt that talks about this
25  or he says something -- let me see here.  Hold on.      7:20PM

Page 186

1          You have to refresh my recollection on      7:21PM
2  that.
3      Q  So I think the record will speak for
4  itself on that.  But you're not saying that that's
5  the first time the Shen 6 being wet was reported?      7:21PM
6      A  Correct.
7      Q  Okay.  During the class period, the
8  company never specified an oil price at which it
9  would sanction Shenandoah; right?
10      A  My recollection is there is discussion of      7:21PM
11  $70, there's also discussion of $60.  So let me go to
12  that part of my report.  And it's really what's
13  reflected in Paragraph 35.
14          Let me see what is the most relevant.  So
15  I would go to Page 20, the first bullet there,      7:22PM
16  April 12th, 2016, at least according to the
17  Wellington analyst, the operator, that is Anadarko,
18  is on record saying they wouldn't sanction
19  Shenandoah until oil was back in the 70s given where
20  costs are today.                       7:22PM
21      I think that's probably most responsive to
22  your question.
23      Q  This was in April 2016?
24      A  Yes, and then there's one in November 2016
25  from the chairman of the company saying, "I do believe  7:22PM

Page 187

1  today it will take more than 70, most likely, before      7:22PM
2  we see greenfield projects in deepwater basins around
3  the world."
4          So I guess -- and then Goldman says in
5  March of 2017 that Anadarko indicated that it was      7:22PM
6  unlikely to get approval at 50 to 55.
7          So that's -- that forms my understanding.
8      Q  So that is the basis for your view.  And I
9  think the record is the record on each of these
10  statements.                            7:23PM
11          Okay.  So the company never said at what
12  oil price it would write Shenandoah down; right?
13      A  I don't recall seeing that.
14      Q  And you're aware that there's other ways
15  of monetizing an oil prospect other than sanctioning      7:23PM
16  it for development?
17      A  Monetize -- I mean, you could always sell an
18  asset, so I know that Cobalt was trying to, I believe
19  it was on the verge of bankruptcy, to do that is my
20  understanding.                         7:23PM
21      Q  ConocoPhillips had been trying to do so
22  since 2015 as well; right?
23      A  That I don't recall.
24      Q  ConocoPhillips had also said it was
25  exiting GoM deepwater back in 2015; right?      7:24PM

Page 188

1      A  I do remember a statement at some point in      7:24PM
2  the record along those lines.  That's my best
3  recollection.
4      Q  So you have a statement in Paragraph 36,
5  Page 20 of your report that says, "oil prices, which      7:24PM
6  are observable, are a key factor."  And it goes on.
7          I just want to zero in on the reference to
8  observable.  What oil prices are you referring to
9  there?
10      A  Particularly Figure 2.            7:24PM
11      Q  Okay.  And so for the record, what prices
12  are these?
13      A  The WTI oil prices per barrel.
14      Q  There is a reference to spot oil price?
15      A  Yes.                           7:24PM
16      Q  And that wasn't how Anadarko was analyzing
17  Shenandoah; right?
18      A  I don't think that's accurate.  I think that
19  my memory of the record is Anadarko, in thinking about
20  sanctioning and where Shenandoah was, did reference in  7:25PM
21  that consideration or those statements the short-run
22  prices of the oil.
23      Q  Anadarko was analyzing Shenandoah using
24  mid to long cycle oil prices; right?
25      A  I don't know the answer to that.  I would      7:25PM

Page 189

1  not -- I'm not saying they didn't.          7:25PM
2      All I'm saying is they did reference, is
3  my memory, Anadarko did reference to the market in
4  its discussion of sanctioning did reference the
5  current oil prices.          7:25PM
6      Q   Well, the record I think will stand for
7  itself there.
8      On Figure 2 there's also a reference to
9  WTI futures oil price.  How far into the future are
10 those future prices that you cite in your Figure 2?   7:26PM
11     A   I believe five months.
12     Q   Five months?
13     A   Yes.
14     Q   And how far into the future would the oil
15 from a potential Shenandoah field be sold?          7:26PM
16     A   If it was a long-winded project, it would be
17 a significant number of years would be my assumption.
18     Q   And that oil price is not --
19     A   Including you not selling it, yes, and
20 somebody else does it.          7:26PM
21     Q   That oil price is not observable; correct?
22     A   I think my memory is if you go out further,
23 it gets less liquid is my memory of these futures.
24     But again, the spot and the futures a few
25 months out are consistent with, you know, where we
          Page 190

1  are today or in the near future in terms of the oil   7:26PM
2  price situation.
3      Q   So you wouldn't think that Shenandoah
4  would be sold prior to 2019, would you, at this
5  time?          7:27PM
6      MS. ROSENBERG:  Objection, form.
7      THE WITNESS:  I don't have a view on that.
8  BY MS. JENSEN:
9      Q   Are you aware that the Brent oil prices
10 were 80 or above for 2019?          7:27PM
11     MS. ROSENBERG:  Objection.
12     THE WITNESS:  In 2019?  So this is way
13 after the class period.  I don't know that offhand.
14     I do know that looking at my figure for
15 WTI, it is above, you know, as we go out, there was   7:27PM
16 a brief moment where it is above 70.
17 BY MS. JENSEN:
18     Q   Sitting here you're not aware of what oil
19 price Anadarko used internally to analyze the
20 commerciality of the Shen project; right?          7:27PM
21     A   Correct, I'm relying on my understanding of
22 what Anadarko told the market.
23     Q   Again, existing oil prices or spot prices
24 wouldn't be relevant to oil that wouldn't be sold
25 for years; right?          7:28PM
          Page 191

1      A   I don't agree with that statement.          7:28PM
2      Q   But you would be looking at future prices;
3  right?
4      A   Well, again, Anadarko is saying that -- and
5  these analysts on Pages 19 and 20 are saying given   7:28PM
6  where oil is today, it's unlikely to be sanctioned.
7      Q   Okay.  Let's -- the record speaks for
8  itself on that score.
9      Okay.  Let's turn to Page 22 of your
10 report.          7:28PM
11     A   Yes.
12     Q   So you have a heading here that says
13 Steinholt says Shenandoah's market value must be at
14 least as much as its book value; right?
15     A   Yes.          7:29PM
16     Q   That's not true; right?
17     A   I don't agree with that.
18     Q   I mean, Mr. Steinholt didn't say that, did
19 he?
20     A   That's my interpretation of when he says   7:29PM
21 it's a conservative measure of value.
22     Q   Did you write that?
23     A   What's that?
24     Q   Did you write that?
25     A   So Paragraph -- no, what I just read is from   7:29PM
          Page 192

1  his report.          7:29PM
2      Q   So I'm talking about the heading, did you
3  write that heading?
4      A   Yes.  I remember having a discussion about
5  this conservative measure of value and his use of the   7:29PM
6  book value.
7      Q   Did investors generally value Anadarko
8  higher than the book value of its reported net
9  assets?
10     A   I'm sorry, could you repeat that question?   7:30PM
11     Q   Did investors generally value Anadarko
12 higher than the book value of its reported net
13 assets?
14     A   I do believe -- my memory is there are times
15 that the overall book value was lower than the market   7:30PM
16 price for the entirety of the entity.  Hold on one
17 second.  I think I have a statement about that here.
18     I think that might be true at different
19 points in time for the entirety of the enterprise.
20     Q   So during the class period, Anadarko's   7:31PM
21 book value ranged from 14.6 billion to 19.4 billion,
22 whereas the market value ranged from 15 billion to
23 50 billion.  Does that sound about right?
24     A   I don't remember the book values for the
25 entire enterprise.  I do have the market cap range in   7:31PM
          Page 193

49 (Pages 190 - 193)

CONFIDENTIAL

1 my report in that exhibit, which I have as -- for          7:31PM
2 Anadarko I have the ranges being 15 to 50.
3      Q   Right.  So in Paragraph 37 you cite to
4 other oil companies in saying they had market values
5 that were less than their book values.          7:31PM
6          Why did you use those as examples instead
7 of analyzing Anadarko, which is the relevant company
8 here?
9      A   It's just illustrative of the point that
10 this is accounting and book values and it's not market  7:31PM
11 prices.  So it's just illustrative of that point.
12     Q   Even though it wasn't true or Anadarko?
13     A   Well, I think it is true for Anadarko that
14 the book values are not market prices, it's accounting
15 conventions.          7:32PM
16     Q   That's a slightly different question.
17         It's not true that the book value of an
18 asset is the same as a sunk cost; right?
19     A   We're going to quickly get into accounting
20 and beyond my knowledge.  My understanding is some of  7:32PM
21 the costs are disclosed on May 2nd are sunk
22 costs, but I think that statement is also true.
23     Q   The statement that I made?
24     A   Yes.  Yes, I think that statement is true,
25 but it's also my understanding that some of the costs  7:32PM

Page 194

1 that are written down, if I can use that phrase, in   7:32PM
2 the non-accounting sense, because I know write-down
3 has a particular accounting meaning, but the
4 write-down, so to speak, on May 2nd did include in my
5 understanding sunk costs.          7:33PM
6      Q   So you understand that the book value of
7 Anadarko's assets had to be reported in accordance
8 with GAAP; right?
9      A   I'm not an accountant, that's my general
10 understanding.          7:33PM
11     Q   Okay.  So this is outside of your area of
12 expertise here?
13     A   If you're going to ask me accounting
14 questions, yes.  Beyond the observation that book
15 value are not market prices, beyond the observation     7:33PM
16 that's what is being written down on May 2nd is
17 reflecting some costs.
18     Q   But -- well, let me ask you this:  Do you
19 understand that under GAAP, an asset represents a
20 right to an economic benefit?          7:33PM
21     A   That sounds right.
22     Q   Okay.  So unlike the concept --
23     A   I'm not an accountant.
24     Q   Okay.  Unlike the -- your reference to
25 sunk cost is past cash outlays.  The economic          7:33PM

Page 195

1 benefits held through Anadarko's assets represented    7:34PM
2 potential future cash in-flows under GAAP; right?
3      A   That, I don't know.  We've just hit the end
4 of --
5      Q   We're going beyond?          7:34PM
6      A   -- my knowledge, so I'm out.
7      Q   You're out, okay.
8      A   Book value is not market prices.
9      Q   Okay.
10     A   Accounting has their own way of doing     7:34PM
11 things.
12     Q   You'll agree, then, that this issue of the
13 accounting of Anadarko is really outside of your
14 area of expertise?
15     A   Well, beyond what I say in my report, which   7:34PM
16 is book value is not market prices.  It can be a bit
17 higher, it can be lower depending on the accounting
18 conventions and the actual write-downs relate to past
19 stuff, sunk costs, leasehold interests from years ago.
20     Q   I think that's where we're going a little    7:34PM
21 sideways here.
22         You do understand that that the write-down
23 included assets that were acquired from Kerr-McGee?
24     A   Are we -- if this is a reference to the
25 leasehold interest, that's my understanding.           7:35PM

Page 196

1      Q   Right.  That was based on its fair value    7:35PM
2 at the date of the acquisition; right?
3      A   I don't know.
4      Q   So -- but in any event, you'll agree with
5 me that a good portion of the write-down related to    7:35PM
6 an asset?
7      A   Well, a good portion related to the
8 leasehold interest from this acquisition years ago.
9          There's two numbers, but it was one of the
10 numbers -- let me just go to the report.  Give me a    7:35PM
11 second -- does, as I understand it, relate basically
12 or largely to that leasehold interest that we've
13 been discussing.
14     Q   And that leasehold or the asset was
15 reported on the company's books based on its          7:36PM
16 expected future cash flows related to that asset;
17 correct?
18     MS. ROSENBERG:  Objection.
19     THE WITNESS:  I don't --
20 BY MS. JENSEN:          7:36PM
21     Q   You're out?
22     A   I don't know.  That's an accounting
23 question.
24     Q   Okay.
25     A   Accountants do things that are not market  7:36PM

Page 197

50 (Pages 194 - 197)

CONFIDENTIAL

1 prices, not market value, so you cannot look at what   7:36PM
2 the accountants and their conventions are to estimate
3 market prices.
4    Q   Well, I mean, in this instance with
5 Anadarko writing down its asset to zero, that   7:36PM
6 indicated that that was the expected future cash
7 in-flows for that asset; correct?
8    A   You know, my view and opinion is that how
9 accountants adjust the books for accounting purposes
10 follows their own conventions and it's not market   7:36PM
11 prices, it's not a DCF as an economist would think
12 about it.
13    Q   In any event, this is outside of your area
14 of expertise?
15    A   I don't know the particulars of GAAP. I do   7:37PM
16 know that some of the write-downs relate to sunk
17 costs.
18       As an economist, that's not relevant to
19 the value of the company on an ongoing basis.
20    Q   Okay. But would you defer to the   7:37PM
21 accountants on this issue?
22    A   I would defer to the accountants on what the
23 accounting conventions are, I would not defer to an
24 accountant if the accountant were to say, this is
25 market prices.   7:37PM

Page 198

1    Q   So -- okay. I think the fact that you   7:37PM
2 keep trying to wade into it without understanding
3 the accounting issues make this a little tricky.
4       But what I hear you say is you're out, I
5 won't ask you any more detailed questions about GAAP   7:37PM
6 and how this all works together in terms of the
7 asset.
8    A   Okay.
9    Q   That doesn't mean we're entirely out of
10 the woods, though, because I do want to ask you a   7:38PM
11 little bit about your opinions or your statements in
12 your report about how Anadarko's write-down differed
13 from ConocoPhillips.
14    A   Okay.
15    Q   So you, for example, wouldn't expect for   7:38PM
16 ConocoPhillips to report the same asset associated
17 with Anadarko's acquisition of Kerr-McGee; right?
18       MS. ROSENBERG: Objection --
19       THE WITNESS: That sounds reasonable to
20 me.   7:38PM
21 BY MS. JENSEN:
22    Q   You wouldn't expect ConocoPhillips to have
23 recorded them like Anadarko; right?
24    A   That seems reasonable to me; that is to say,
25 the accountants have the GAAP obligations that relate   7:38PM

Page 199

1 to the different things at the particular company in   7:38PM
2 terms of the GAAP treatment. But I'm not going to be
3 able to tell you the details on that.
4    Q   Okay. So in addition, the suspended well
5 costs were different as well for ConocoPhillips;   7:39PM
6 right?
7    A   Yes. I mean, we can go to the part of the
8 report. But yes, they do report on May 4th, if that's
9 what we're referring to, some costs there.
10    Q   Right. So, for example, ConocoPhillips   7:39PM
11 had already written off Shen 3; right?
12    A   I don't have a specific recollection. I do
13 remember the May 4th -- I remember 51 million, but let
14 me go to my report here, make sure I'm getting that
15 right.   7:39PM
16       So the suspended well costs, as I
17 understand it, are past expenditures regardless of
18 how it's treated from an accounting perspective.
19       And I'm just -- anyway, so Conoco has its
20 disclosure on May 4th, which is a lower number, I   7:40PM
21 believe, than what -- you know, the accounting
22 treatment that Anadarko reported the day before.
23    Q   And to be clear, for Anadarko's suspended
24 well costs that were written off after close of
25 market May 2nd, 2017, that did not include all of   7:40PM

Page 200

1 its investment dollars to date; right?   7:40PM
2    A   I'm not providing that opinion, no, meaning
3 I'm not weighing in on that.
4    Q   Okay. I mean, just so you know -- or I
5 guess I should ask you to confirm, Anadarko also had   7:41PM
6 already written off Shen 3 by that time; right?
7    A   That might be true, I just don't have a
8 specific recollection.
9    Q   Now, as we talked about earlier,
10 ConocoPhillips had announced back in 2015 that it   7:41PM
11 was divesting itself of all deepwater drilling
12 assets; right?
13    A   I don't know if I can confirm that. I do
14 remember that statement that you had mentioned earlier
15 concerning -- by the company at that point.   7:41PM
16    Q   And with the write-down of Shenandoah,
17 ConocoPhillips confirmed that that was the end of
18 that process; in other words, they had closed up
19 shop in the GoM as they had intended to do?
20    A   I remember an analyst making comments along   7:41PM
21 those lines is my best recollection. But obviously
22 the record records what folks said and didn't say.
23    Q   So ConocoPhillips, based on its
24 statements, didn't view deepwater drilling in the
25 GoM as being valuable to its future business   7:42PM

Page 201

51 (Pages 198 - 201)

**Page 202**

1 strategy in the same way as Anadarko; right?          7:42PM
2     A    I don't have a view on how they viewed their
3 business strategy and their competitive advantage
4 and -- I just don't have a view on that.
5     Q    In any event, ConocoPhillips's stock price    7:42PM
6 didn't include a premium for deepwater drilling?
7     A    I didn't analyze that either way.  Rather
8 I'm analyzing whether the market value, whatever it
9 might be, updated in response to particular pieces of
10 information.          7:42PM
11    Q    Nor did ConocoPhillips's future growth
12 depend on deepwater drilling because it had all but
13 exited that business by the time of this
14 announcement?
15    A    That might well be true, but, you know,    7:42PM
16 again, the question is:  How did the market view all
17 this?
18    Q    And the market comment is that
19 ConocoPhillips had already decided to exit deepwater
20 GoM; right?          7:43PM
21    A    So again, my best recollection, there's a
22 ton of analyst reports here, is that there is
23 commentary about that in the aftermath of the May
24 disclosures.
25    Q    I would like to turn to Paragraph 39.    7:43PM

**Page 203**

1     A    Yes.          7:43PM
2     Q    Okay.  So you cite here a discussion -- or
3 a statement by Cobalt about the fair market value;
4 correct?
5     A    What sentence are we talking about now?    7:43PM
6     Q    It's near the end of the paragraph, this
7 is on Page 25.
8     A    So am I supposed to be reading that sentence
9 that begins "on May 4th"?
10    Q    "On May 8th."  So Cobalt made a          7:44PM
11 statement --
12    A    I'm on Page 24.  You mean Page 39?
13    Q    I think we're probably both getting tired.
14 I'm talking about Page 25.
15    A    I'm on the wrong page.          7:44PM
16       Okay.  I see it now.
17    Q    Okay.  So Cobalt made a statement about
18 the write-down not being indicative of what Cobalt
19 believed to be the intrinsic or fair market value of
20 the Shenandoah discovery; right?          7:44PM
21    A    Yes.
22    Q    Anadarko did not make a similar statement;
23 correct?
24    A    I'm not aware of such.
25    Q    Okay.  And by impairing the          7:44PM

**Page 204**

1 Shenandoah-related assets to zero, it effectively    7:45PM
2 was saying under GAAP that the Shenandoah assets'
3 fair value was zero; right?
4     A    This is an accounting question.  So --
5     Q    Okay.          7:45PM
6     A    You know, generally speaking, the book value
7 of GAAP is not about -- is not equivalent to market
8 pricing.
9     Q    But again, that's beyond your expertise
10 because it has to do with GAAP; right?          7:45PM
11    A    I don't have any expertise in the
12 particulars of GAAP treatment.  I can say and I am
13 saying book value is not a reliable indication of
14 value, including the fact that the book value, as you
15 discussed earlier, the market value of Anadarko is    7:45PM
16 greater than the book value of its assets, that's
17 consistent with my view that it's not market pricing.
18    Q    And are you aware that under GAAP, in
19 order to carry that value of the asset on your
20 books, it has to support that amount on a          7:45PM
21 going-forward basis?
22    A    We're beyond my knowledge again, so...
23    Q    What does it mean that a price decline was
24 caused by the correction of some alleged
25 misstatements as stated on Page 25 of your report?    7:46PM

**Page 205**

1     A    Are you looking at the last sentence?    7:46PM
2     A    Yes.
3     Q    I guess Mr. Steinholt is trying to value the
4 information that is alleged to have been concealed or
5 omitted.  And I'm saying here he fails to reliably    7:46PM
6 value that information or, in fact, whether that
7 information being disclosed, in fact, caused harm to
8 the stockholders.
9     Q    What standard are you using there?  Are
10 you using a loss causation standard?          7:47PM
11    A    I'm using standard events that all the
12 analyses that I do in support of that statement, which
13 includes event study analyses.
14    Q    And are you providing an opinion of what
15 the appropriate loss causation standard should be in    7:47PM
16 this case?
17    A    I'm not sure what you mean by "loss
18 causation standard."
19    Q    Are you offering an opinion on what the
20 appropriate loss causation standard should be in    7:47PM
21 this case?
22       MS. ROSENBERG:  Objection to form.
23       THE WITNESS:  I am in the sense that I
24 provide economic analysis for why he's failed to
25 reliably establish his inflation band or the    7:47PM

52 (Pages 202 - 205)

CONFIDENTIAL

1 valuation effects of the alleged corrective          7:47PM
2 information.
3 BY MS. JENSEN:
4     Q   But you're not trying to set forth a
5 standard here?                                        7:48PM
6     A   I do have standards.  I use event study
7 standards, I use economic analysis.  So I'm not going
8 to agree to the proposition I don't have standards.
9     Q   Are you familiar with Esther Bruegger's
10 2009 article published by NERA?                      7:48PM
11    A   You have to tell me the name of the article.
12    Q   So this is "Estimating Financial Fraud
13 Damages with Response Coefficients."
14    Q   Is this with Dunbar?
15    Q   Yes.                                          7:49PM
16    A   So I read that awhile ago.
17    Q   Okay.
18    A   Lovely guy.
19    Q   In that article they talk about "One of
20 the most common events associated with securities    7:49PM
21 litigation is a large, unexpected write-off."
22        Are you familiar with that?
23    A   Am I familiar -- do I have a specific
24 recollection that it's in that article from 14 years
25 ago, no, I don't.                                     7:50PM

Page 206

1     Q   Is that something that's understood in the   7:50PM
2 literature?
3        MS. ROSENBERG:  Objection.
4        THE WITNESS:  I guess the way I would
5 frame it is it's the case that financial restatement  7:50PM
6 cases, these accounting restatement cases, did lead
7 to a lot of securities litigation, so I'm thinking
8 WorldCom, Enron.
9        So yes, accounting restatements, I think
10 it's a fact securities class action litigation.      7:50PM
11    Q   You wrote an article in 2007 that's called
12 "The Loss Causation Requirement for Rule 10B-5
13 Causes of Action."
14        Are you familiar or recall that article?
15    A   I do recall it.                               7:50PM
16    Q   And in that article you wrote that
17 examination of intraday data allows one to
18 disentangle the confounding effects of two events.
19        Do you recall that?
20    A   I do.                                         7:51PM
21    Q   That's something that's been discussed in
22 the literature, not just in your articles but in
23 others; right?
24    A   Yes.  So just to be clear, intraday event
25 studies in the context of the trading day, yes.      7:51PM

Page 207

1     Q   There's also -- but the same analysis       7:51PM
2 holds true in the sense that you can look at the
3 chronology of events; right?
4     A   I've not seen an after-market event
5 intraday -- I don't know if "intra" is the right word, 7:51PM
6 but I have seen closed open.  I've not seen
7 after-market alone intraday type event study.  I think
8 it's for the reasons I described in my report or
9 reports.
10    Q   You have described previously that one can  7:52PM
11 look at the chronology of events to disentangle the
12 effects of confounding information; right?
13    A   Sure.  So you certainly would look at
14 chronology to understand, you know, the changing
15 informational environment.                           7:52PM
16    Q   Let's turn to the events of May 2nd.  You
17 wrote in are your report that the Firestone news was
18 disseminated at --
19    A   Where are you reading?
20    Q   Sorry, let me turn there real quickly.       7:52PM
21        Okay.  You have a reference here to
22 4:03 p.m., that's when the fire --
23    A   Please tell me where you are in my report.
24    Q   Sorry, it's Page 5.
25    A   Thank you.  Okay.                             7:53PM

Page 208

1     Q   So you reference the fire officials press   7:53PM
2 conference starting at 4:03 p.m.; right?
3     A   Yes.
4     Q   Okay.  And so the news at the time was
5 just that the press conference was starting;          7:54PM
6 correct?
7     A   I believe that's accurate as of 4:03.
8     Q   Now, in your prior report from December of
9 2021, you stated that the first news was the Denver
10 Post article at 4:51 p.m.; right?                    7:54PM
11    A   I do -- it is true the first news I
12 identified that is.  I don't know if I say the first,
13 but I could be misremembering.
14    Q   Well, that was the first news you cited;
15 right?                                               7:55PM
16    A   That's a different point.  That's different
17 than what you originally said.
18        So, yes, I believe we can confirm by
19 looking at my earlier report that the first news
20 item that I identified here was at 4:51 as best I    7:55PM
21 can recollect.
22    Q   Now, after Mr. Steinholt filed his -- or
23 submitted his rebuttal report, you came back with
24 several tweets, which we've gone over already today;
25 right?                                               7:55PM

Page 209

53 (Pages 206 - 209)

1   A   True.                              7:55PM
2   Q   Okay.  And did you know about the tweets
3   at the time?
4   A   No.  My point in the original report is,
5   look, there's confounding information here.  So that   7:55PM
6   first report at 4:51 or whatever it was was sufficient
7   for that.
8   Q   You did not know about the tweets at the
9   time.  Is that because they didn't come up in your
10  media search?                           7:56PM
11  A   Again, I wanted to -- we can pull up the
12  original report, the search criteria there, but given
13  my purpose there, that was sufficient.
14      That is to say, there's confounding
15  information.  I believe that's the Denver Post,   7:56PM
16  which we talked about earlier, which is after market
17  on May 2nd where they talk about the fact that, in
18  fact, as I remember, the governor made some
19  announcements after market on May 2nd.
20  Q   Now, in these tweets, I'm going to tread   7:56PM
21  lightly here.  Let's do our best.
22      The 4:03 tweet just said that the press
23  conference was starting; right?
24  A   I believe that's accurate.
25  Q   And the 4:09 tweet does not mention   7:57PM

Page 210

1   Anadarko by name; correct?                7:57PM
2   A   You know -- yes, I'm looking at Footnote 23,
3   that tweet does not.
4   Q   And the 4:11 tweet also does not mention
5   Anadarko by name; right?                  7:57PM
6   A   Agreed.
7   Q   Now, there is no evidence that any
8   investors read these tweets; right?
9   A   I have no view either way.
10  Q   But you're not aware of any evidence that   7:57PM
11  investors read these tweets?
12  A   I don't have any view either way.  I would
13  note that there is a reporter that is responsible for
14  the 4:09 p.m., but beyond that, no.
15  Q   In any event, there was no stock decline   7:58PM
16  following either -- or all three of those tweets;
17  right?
18      MS. ROSENBERG:  Objection.
19      THE WITNESS:  Again, when we say the word
20  "stock declined," I would put it in an event study   7:58PM
21  statistical framework, so I wouldn't just eyeball a
22  smattering of after-market trades.
23  BY MS. JENSEN:
24  Q   Okay.
25  A   As a -- you can look at whatever you want,   7:58PM

Page 211

1   but not as a basis by itself, I should say, that there   7:58PM
2   is a statistically significant reaction to any piece
3   of the news.
4   Q   Okay.  Let's set that aside for just a
5   minute.  You're not aware of any price declines in   7:58PM
6   the trading immediately following those tweets;
7   right?
8   A   I think there is a bunch of -- I think I
9   talk about this in my Daubert opinion, that a bunch of
10  them don't even trade, but I would have to refer back   7:59PM
11  to that discussion where -- you know, for which
12  companies do you even have trades.
13      I also make a reference to what was
14  happening with the Colorado peers again outside the
15  statistical context.                     7:59PM
16  Q   And when Bloomberg issued its 4:43 p.m.
17  article saying that Anadarko shares had dropped by
18  4.1 percent after the release of the earnings, it
19  was unaware at that time of any finding by the fire
20  department; right?                       7:59PM
21  A   I don't --
22      MS. ROSENBERG:  Objection.
23      THE WITNESS:  I don't know what it knew or
24  did not know.
25

Page 212

1   BY MS. JENSEN:                          7:59PM
2   Q   Do you know what article I'm talking
3   about?
4   A   I do.
5   Q   You don't dispute that Bloomberg said in   8:00PM
6   that article that authorities still had not made a
7   finding?
8   A   I don't dispute that.  I don't have a
9   perfect recall.  We can look at the document.  It says
10  what it says.                            8:00PM
11  Q   Now, if the folks at Anadarko reported
12  contemporaneously that not many people had heard of
13  the fire department's conference until after
14  Anadarko released its statements about Firestone,
15  would you have any reason to dispute that?   8:00PM
16  A   I don't have a view and it wouldn't be
17  relevant to my opinion, in a market that's efficient,
18  all public information gets reflected quickly.
19      There was our earlier discussion about
20  what quickly means, but that would be my general   8:01PM
21  view.
22  Q   Have you seen the document I'm referring
23  to?
24  A   I do remember the Bloomberg, I think maybe
25  Steinholt excerpts it or -- I do remember -- I forget   8:01PM

Page 213

CONFIDENTIAL

1 the context. Maybe it was excerpted by Steinholt. I   8:01PM
2 do remember the Bloomberg article. But you can show
3 it to me to refresh my recollection.
4    Q   You should be able to see what's been
5 marked as Exhibit 526.                          8:02PM
6        (Whereupon, Exhibit 526 was marked for
7 identification.)
8 BY MS. JENSEN:
9    Q   This is a document that bears the Bates
10 stamp --                                        8:02PM
11   A   My internet just went down.
12       MS. JENSEN:  Okay.  Let's go off the
13 record?
14       THE VIDEOGRAPHER:  Off the record.  It's
15 8:02 p.m.                                       8:02PM
16       (Recess taken.)
17       THE VIDEOGRAPHER:  Back on the record.
18 It's 8:11 p.m.
19 BY MS. JENSEN:
20   Q   Welcome back, Dr. Ferrell.               8:11PM
21       So you should be able to see what's been
22 marked as Exhibit 526.  For the record, this bears
23 Bates stamp APC-00737523.
24   A   Yes.
25   Q   Have you seen this document before?       8:11PM

Page 214

1    A   I don't have a specific recollection.  Let   8:11PM
2 me just double check.
3    I don't recall.  I don't have a specific
4 recollection.
5    Q   Okay.  Do you know who Robin Fielder is?   8:12PM
6    A   No.
7    Q   She was in the investment relations
8 department of Anadarko.
9        Do you know who Al Walker is?
10   A   Yes, he was the president and chairman, I   8:12PM
11 believe.  I'll look in my report.  So I think he was
12 the chairman, president, CEO.
13   Q   So this is an email from Robin Fielder to
14 Al Walker and this is at -- well, her email is
15 9:15 p.m., which I assume to be central time.   8:13PM
16   A   Okay.
17   Q   In it she's saying that the "earnings
18 release when out a little later and thus we didn't
19 start making calls until close to 3:30 CST."
20       You understand that to be 4:30 Eastern;    8:13PM
21 right?
22   A   That sounds right.
23   Q   She indicates that not many people had
24 heard about the fire department's press conference,
25 but then there was a second release that came out.   8:14PM

Page 215

1        And she is talking about a release that     8:14PM
2 Anadarko affirmatively sent out to the market about
3 Firestone around 5:18 p.m.; correct?
4    A   That's my memory.
5    Q   Okay.  And it was only after that the       8:14PM
6 calls started coming in.
7        Now, are you aware there was no price
8 declines that had occurred prior to the release of
9 the earnings?
10   A   Well, I do talk about the after-market data   8:14PM
11 in my Daubert report.  When we use the word or phrase
12 "price declines," you know, you can look at the raw
13 returns, but I would want to think about it
14 statistically.
15       So I don't think any analysis has been      8:14PM
16 done or likely could be done on the after-market
17 data, so it hasn't been done to show that.
18   Q   You see that she references areas of focus
19 and top questions that she would expect for the
20 following day?                                   8:15PM
21   A   I do.
22   Q   And that's the earnings call; right?
23   A   I would assume so.
24   Q   And second on that list was "Understanding
25 what, if any, go-forward plans are around         8:15PM

Page 216

1 Shenandoah"; right?                              8:15PM
2    A   There is that parenthetical.
3    Q   Okay.  You can set that aside.
4        You have no reason to dispute that
5 investors started to sell off Anadarko shares      8:15PM
6 immediately after the disclosure of the Shenandoah
7 write-off and that the decline was documented in two
8 Bloomberg articles that afternoon?
9        MS. ROSENBERG:  Objection, form.
10       THE WITNESS:  I don't accept that as an      8:15PM
11 economist.  When we think about price
12 declines reacting to information, you think about it
13 in the context of a proper statistical analysis.
14       So, no, I don't accept that.
15   Q   Do you have any reason to doubt that        8:16PM
16 Bloomberg published an article at 4:24 with the
17 headline that shares were down 3.5 since the
18 earnings release?
19   A   I don't have reason to dispute that.  It's
20 not relevant to my opinion.                       8:16PM
21   Q   And during that same period, the stock
22 prices of the four Colorado Peer Group companies did
23 not decline at all?
24   A   Now you're testing my memory.  I do discuss
25 this -- the pattern, the raw return pattern or the   8:16PM

Page 217

55 (Pages 214 - 217)

CONFIDENTIAL

1 trades or the lack thereof that appears in my Daubert   8:16PM
2 opinion reports, but I would have to look back at that
3 to refresh my recollection.
4     Q   So the prices of the Colorado companies
5 fell after the governor's statement; right?        8:16PM
6     A   Again, I would -- to answer these questions,
7 I did look at this. I would want to refresh my
8 recollection, and I think it's in one of the two
9 Daubert opinions where I discuss the after-market
10 data.                                8:17PM
11         But my general view is that this is just
12 inappropriate analysis. It's not a statistical
13 analysis. It's eyeballing data. It's not using
14 predefined event windows. It's just a lot of junk
15 science.                           8:17PM
16     Q   You state that despite your literature and
17 published articles that talk about the chronology of
18 event helping to disentangle confounding
19 information; right?
20     A   It's completely consistent with my article   8:17PM
21 including the discussion of intraday trading events
22 studies, yes.
23     Q   So for purposes of your opinions in your
24 report, are you accepting the factual allegations of
25 the case?                           8:18PM
Page 218

1     A   I am accepting the liability -- I'm assuming   8:18PM
2 liability for damages, yes.
3     Q   Do you understand the case involves
4 concealment of an alleged truth?
5     A   Yes.                         8:18PM
6     Q   And you understand that the alleged truth
7 was revealed when Anadarko disclosed the suspension
8 of Shenandoah and associated write-down?
9     A   Yes.
10     Q   Now, if the company stated internally at   8:18PM
11 the time that Shenandoah was the reason for the Q1
12 2017 earnings miss, would you have any reason to
13 dispute it?
14     A   I would -- I look at public information and
15 public stock price reactions. I don't have review of   8:18PM
16 internal deliberations.
17     Q   So would you have any reason to dispute
18 the company's opinion that the big driver in EPS for
19 the Quarter 1 2017 quarter was the write-down of
20 book value at Shenandoah?                8:19PM
21     A   I'm not taking a position on that.
22         I do talk about the analysts' discussion
23 of the earnings and the effect of the impairment or
24 the write-downs on that. But it's really in terms
25 of the public information. I am not weighing in on   8:19PM
Page 219

1 what the internal thinking, so to speak, was at   8:19PM
2 Anadarko.
3     Q   Had the company previously provided
4 guidance for 2Q2017?
5     A   For earnings?                  8:19PM
6     Q   Right, for Q2.
7     A   I don't recall either way.
8     Q   Do you have any reason to dispute that the
9 2Q2017 guidance was not lowered from prior guidance,
10 it simply may have been lower than what some   8:19PM
11 analysts had said?
12     A   So, again, I want to be clear. Are you
13 talking about earnings or are you taking about the
14 volume guidance?
15     Q   So the -- any of the Q2 2017 guidance.   8:19PM
16     A   In terms of the volume guidance, there is
17 some analyst commentary saying it was below
18 expectations or disappointing or something to that
19 effect, or "light" I believe was the word used.
20     Q   But the company had not put out a number;   8:20PM
21 right?
22     A   That I don't know offhand. Rather than --
23 the analyst commentary, some of it at least, was
24 indicating some level of disappointment.
25     Q   So -- but I'm trying to ask the specific   8:20PM
Page 220

1 question about what the company said and it sounds   8:20PM
2 like you don't know one way or the other?
3     A   The company said about what?
4     Q   About 2Q2017 guidance.
5     A   Well, they do discuss in the earnings call,   8:20PM
6 and I think there's even questions about it, about the
7 second quarter 2017 volume guidance.
8         So I do believe -- well, I would want to
9 double check the earnings conference, so there is
10 analyst commentary on that.              8:21PM
11     Q   Now, did --
12     A   That I recall.
13     Q   Was there any impact on the overall full
14 year 2017 guidance?
15     A   My understanding is that there was not.   8:21PM
16     Q   And that was reflected in the analyst
17 reports; right?
18     A   I believe that's accurate.
19     Q   And so since it didn't impact FY 2017
20 guidance, that meant that 2Q2017 guidance would be   8:21PM
21 higher than expectations; right?
22     A   I don't --
23         MS. ROSENBERG: Objection to form.
24         THE WITNESS: I don't follow.
25 BY MS. JENSEN:                       8:21PM
Page 221

56 (Pages 218 - 221)

1    Q   I'll withdraw the question.          8:21PM
2        I think you referenced an earnings call.
3    In that earnings call, the company explained the
4    lower 2Q2017 guidance was simply due to scheduling
5    of maintenance; right?                    8:22PM
6    A   Look, a lot of the deposition has been
7    testing my memory of documents that speak for
8    themselves, so I'll just note that.
9        There is discussion of maintenance
10   affecting the second quarter. Whether it's the     8:22PM
11   primary or the only reason, I don't specifically
12   remember.
13       But I do remember that maintenance was
14   discussed in connection with the second quarter.
15   Q   We can agree to disagree about the       8:22PM
16   deposition.
17       MS. JENSEN:  I'll also note that I have
18   been trying to move it along for the witness's
19   schedule in addition to everybody else's.
20   Q   Are you opining that Anadarko scheduling    8:22PM
21   more of its maintenance in 2Q2017 and less in other
22   quarters had a material negative impact on
23   Anadarko's stock price?
24   A   No, I'm not providing that opinion.  I'm
25   just saying it is a potential confounding negative   8:23PM

Page 222

1    piece of information.                     8:23PM
2    Q   Did you perform --
3    A   And I'm leaving it at that.
4    Q   Did you perform any economic analysis to
5    determine whether it's a material confounding     8:23PM
6    factor?
7    A   Just the endless commentary identifying that
8    as an issue.  You know, the event study on May 3rd is
9    going to encapsulate the cumulative price effect of
10   all the new value-relevant information.           8:23PM
11       So the event study by itself would enable
12   one to disentangle that.
13   Q   When you refer to analysts, you're just
14   referring to a JPMorgan analyst report?
15   A   I think there's another one as well.      8:23PM
16   There's two or three as best I can recall.
17   Q   I guess they would all be cited in your
18   report; right?
19   A   Yes.
20   Q   Did you consider the positive 1Q2017      8:23PM
21   results aside from the write-down were also
22   disclosed at that time?
23   A   I did consider the analyst commentary on the
24   reaction to the 10-Q and the earnings call itself.
25   Q   So, for example, the Credit Suisse        8:24PM

Page 223

1    May 2nd, 2017 report said that Anadarko had a strong    8:24PM
2    quarter?
3        MS. ROSENBERG:  Objection.
4        THE WITNESS:  Again, you could refresh my
5    recollection.  Did you say it's a May 2nd or May 3rd    8:24PM
6    report?
7    BY MS. JENSEN:
8    Q   I would have to check the date, actually,
9    thank you.  I'll double check that, but the record
10   speaks for itself?                          8:24PM
11   A   I definitely agree with that.
12   Q   Okay.  So why did you exclude confounding
13   factors that were positive in your overall analysis
14   of the price decline?
15   A   Well, again, there is a big negative stock    8:24PM
16   price reaction.  Obviously there's negative
17   information that's impacting that.  The question is
18   whether that negative information consists of the
19   Shenandoah.
20       So really the question is can we ascribe     8:25PM
21   that negative residual whether, you know, for
22   example, using Mr. Steinholt's event study, to the
23   negative information about Shenandoah.  So that was
24   really the focus.
25       But, you know, obviously the analysts are    8:25PM

Page 224

1    commenting on the total mix of information.         8:25PM
2    Q   Are you saying that you included the
3    considerations of positive information in your
4    analysis?
5    A   Well, I certainly reviewed the analyst      8:25PM
6    reports in the aftermath of Anadarko, the earnings
7    transcript and the discussions.  Obviously given that
8    it's a 10-Q they are using discussing, among other
9    things, the 10-Q.  So yes, I certainly considered all
10   that.                                       8:26PM
11   Q   Let's turn to Paragraph 47.
12   A   Yes.
13   Q   So in Paragraph 47, you criticize
14   Steinholt for not increasing the inflation ribbon
15   with growing confidence if the company that        8:26PM
16   Shenandoah was not commercially viable.  Now, we
17   talked about this a little bit earlier.
18   A   You got the point, but yes, you did talk
19   about it earlier.
20   Q   Setting aside sort of the directionality,    8:26PM
21   I think we agreed that the number later would be
22   higher than the number earlier.
23       But assuming that you are correct on
24   percentages, according to defendants' expert
25   Mr. Keller, investors viewed the value of Shenandoah   8:27PM

Page 225

57 (Pages 222 - 225)

CONFIDENTIAL

1 greater during the earlier parts of the class        8:27PM
2 period.
3        So if so, shouldn't you adjust for this as
4 well?
5        MS. ROSENBERG:  Objection to form.        8:27PM
6        THE WITNESS:  I have not read his report.
7 I don't understand -- I would need to consider
8 carefully what he said and why he's saying it before
9 I made any adjustment.  So I'm not in a position to
10 do that.                                        8:27PM
11 BY MS. JENSEN:
12    Q   Are you counter proposing a damages model
13 in this case?
14    A   No.
15        I want to be clear what that means.  Are     8:27PM
16 you saying -- the way I interpreted that question,
17 and hence my "no", is am I proposing an inflation
18 ribbon and the answer to that is no.
19        Other than zero, which I don't think
20 would -- I'm excluding that under the umbrella of an   8:27PM
21 inflation ribbon.
22    Q   Let's say that the jury agrees with your
23 argument that the later part of the class period
24 should be a greater amount of inflation than the
25 earlier part.                                    8:28PM

1        Is it difficult to multiply                8:28PM
2 Mr. Steinholt's inflation during the earlier parts
3 of the class period by some amount or --
4    A   Well -- I'm sorry, I cut you off.
5    Q   Or vice versa?                             8:28PM
6    A   I agree that it's easy to multiply a number
7 by a percentage.  So I agree that's easy.  How are
8 you going to get this percentage, we don't know.
9    Q   But it's -- if the jury makes the
10 determination, it can do simple arithmetic?      8:28PM
11    A   I'm not going to -- it's not my job to tell
12 the jury what to do.
13        I agree that multiplication is simple.
14 Where this number is going to come from, let alone
15 the other factors that would be affecting things     8:29PM
16 like oil prices, I don't know how that's going to be
17 dealt with either.
18    Q   But wouldn't you agree that it's
19 sufficient to have a framework in place so the jury
20 can make that determination?                     8:29PM
21    A   I don't think this is a framework, what
22 Mr. Steinholt is proposing.
23    Q   Okay.
24    A   Just to say it was kind of commercially
25 nonviable and then it became more commercially     8:29PM

1 nonviable, I don't view that as much of an analytical   8:29PM
2 framework.
3    Q   Again, you're not an oil and gas expert;
4 right?
5    A   That is true.                             8:29PM
6    Q   Near the end of your report, I think it's
7 in fact the last paragraph of your report.
8    A   Yes.
9    Q   You talk about the defendants' behavior
10 being inconsistent with the price of Anadarko's     8:30PM
11 stock being artificially inflated; right?
12    A   Yes.
13    Q   Now, you're not a behavioral expert;
14 right?
15        MS. ROSENBERG:  Objection.              8:30PM
16        THE WITNESS:  I would not frame it that
17 way, no.
18 BY MS. JENSEN:
19    Q   Earlier you testified you didn't look at
20 any internal documents, that's right, isn't it?      8:30PM
21    A   I believe it's accurate that -- I would want
22 to double check my various appendices with the
23 documents relied upon, but I think that's generally
24 correct.
25    Q   So you don't know what the decision-making   8:31PM

1 tree was in this case; right?                    8:31PM
2    A   Internally, no, I'm not opining on that.
3    Q   You have no idea if anyone in the company
4 intended to monetize Shenandoah in some other way?
5    A   Not providing an opinion on that.         8:31PM
6    Q   No idea if it was a gamble?
7        MS. ROSENBERG:  Objection to form.
8        THE WITNESS:  I'm not going to provide an
9 opinion on subjective beliefs or subjective views of
10 anybody including company officials.             8:31PM
11        MS. JENSEN:  Okay.  I'm going to take a
12 quick break.
13        THE WITNESS:  Sure.
14        THE VIDEOGRAPHER:  We're off the record.
15 It's 8:31 p.m.                                   8:31PM
16        (Recess taken.)
17        THE VIDEOGRAPHER:  We're back on the
18 record.  It's 8:37 p.m.
19        MS. JENSEN:  Okay.  Dr. Ferrell, thank you
20 for your time today.  I have no further questions at   8:38PM
21 this time.
22        THE WITNESS:  Thank you.
23        MS. ROSENBERG:  No questions.  The
24 deposition is concluded.
25        MS. JENSEN:  All right.  Everybody have a   8:38PM

58 (Pages 226 - 229)

CONFIDENTIAL

1  good night.                                    8:38PM
2       THE VIDEOGRAPHER:  Off the record.  It's
3  8:38 p.m.
4       (Proceedings concluded at 8:38 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 230

---

1  NAME OF CASE: In re Anadarka Securities Litigation
2  DATE OF DEPOSITION: 3/2/23
3  NAME OF WITNESS: Allen Ferrell
4  Reason codes:
5     1. To clarify the record.
      2. To conform to the facts.
6     3. To correct transcription errors.
7  Page _____ Line _____ Reason_____
   From _____ to _____
8
9  Page _____ Line _____ Reason_____
   From _____ to _____
10
11 Page _____ Line _____ Reason_____
   From _____ to _____
12
13 Page _____ Line _____ Reason_____
   From _____ to _____
14
15 Page _____ Line _____ Reason_____
   From _____ to _____
16
17 Page _____ Line _____ Reason_____
   From _____ to _____
18
19 Page _____ Line _____ Reason_____
   From _____ to _____
20
21
22
23
24     _____
25          Signature of Deponent

Page 232

---

1       I, LYNNE M. LEDANOIS, a Certified
2  Shorthand Reporter of the State of California, do
3  hereby certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10 direction; that the foregoing transcript is a true
11 record of the testimony given.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [ ] was [x] was not requested.
16      I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or party to this action.
19      IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: March 6, 2023
22
23
24     *Lynne Marie Ledanois*
       LYNNE MARIE LEDANOIS
25          CSR No. 6811

Page 231

---

59 (Pages 230 - 232)