**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576<br><br>District Judge Charles R. Eskridge III<br><br>CLASS ACTION |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE**
**CERTAIN TESTIMONY OF DEFENDANTS' CLASS CERTIFICATION**
**EXPERT DR. ALLEN FERRELL**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..............................................................................................ii

PRELIMINARY STATEMENT ........................................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS........................................................... 2

STATEMENT OF ISSUES ............................................................................................... 3

FACTUAL BACKGROUND ............................................................................................ 4

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT.................................................................................................................... 8

      I.     Dr. Ferrell's Basic Finance and Valuation Opinion Is Admissible.............. 8

          A.     Dr. Ferrell Is Qualified To Offer His Basic Finance and Valuation Opinion. ....................................................................... 8

          B.     GAAP Is Not Relevant to Dr. Ferrell's Opinions, Which Are Consistent with the Factual Record................................................ 10

      II.    Dr. Ferrell's Firestone Timeline Is Reliable and Admissible. .................... 13

      III.   Dr. Ferrell's ConocoPhillips May 3, 2017 Event Study Is Reliable and Admissible. ........................................................................................... 16

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allan v. Manitowoc Cranes, Inc.*,
    2008 WL 11388549 (S.D. Tex. Oct. 31, 2008)............................................................ 6

*Armstrong v. Wing Enters. Inc.*,
    2022 WL 950873 (S.D. Tex. Mar. 30, 2022) (Eskridge, J.) .......................................... 6

*BHI Energy I Power Servs. v. KVP Holdings, LLC*,
    2024 WL 1809499 (N.D. Tex. Apr. 24, 2024) ............................................................. 7

*Daubert v. Merrill Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................2, 7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) ............................................................................. 14

*Fail-Safe, LLC v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010) ...................................................................... 12

*Gen. Electric Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................. 12

*Gonzalez v. Inter Mexicana de Transporte S.A. de C.V.*,
    2021 WL 3816337 (S.D. Tex. July 22, 2021)............................................................... 6

*Guy v. Crown Equip. Corp.*,
    394 F.3d 320 (5th Cir. 2004) ..................................................................................... 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................................. 17

*In re Actiq Sales & Mktg. Pracs. Litig.*,
    2014 WL 3572932 (E.D. Pa. July 21, 2014)............................................................... 10

*Jacked Up, LLC v. Sara Lee Corp.*,
    291 F. Supp. 3d 795 (N.D. Tex. 2018) ..................................................................... 12

*Kelley v. Am. Heyer-Schulte Corp.*,
    957 F. Supp. 873 (W.D. Tex. 1997) ......................................................................... 18

*Kim v. Nationwide Mut. Ins. Co.*,
    614 F. Supp. 3d 475 (N.D. Tex. 2022) ....................................................................... 7

*Leonardo Worldwide Corp. v. Pegasus Sols., Inc.*,
    2016 WL 9282409 (N.D. Tex. July 28, 2016) ............................................................... 9

*Moore v. Int'l Paint, LLC*,
    547 F. App'x 513 (5th Cir. 2013) ............................................................... 12

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019) ............................................................... 7

*Ramos v. Home Depot Inc.*,
    2022 WL 615023 (N.D. Tex. Mar. 1, 2022) ............................................................... 7

*SEC v. Cuban*,
    2013 WL 3809654 (N.D. Tex. July 23, 2013) ............................................................... 12

**Statutes & Rules**

Federal Rule of Evidence 702 ............................................................... 2, 6, 7

**Other Authorities**

*Investigation*, https://www.facebook.com/Denver7News/videos/latest-onfirestone-
    home-explosion-investigation/10154807218543271/ (last visited Sept. 27,
    2024) ............................................................... 15

McGraw Hill, *Fundamentals of Corporate Finance, 13th Edition*,
    https://www.mheducation.com/highered/product/fundamentals-corporate-
    finance-ross-westerfield/M9781260772395.html (last visited Sept. 27, 2024) ............. 9

Stephen Ross, Randolph Westerfield & Bradford Jordan, *Fundamentals of
Corporate Finance* 351 (McGraw Hill, 11th ed. 2015) ............................................... 9

## PRELIMINARY STATEMENT

Plaintiffs' motion, which seeks to exclude three opinions offered by Dr. Allen Ferrell ("Motion to Exclude"), should be denied in its entirety.

*First*, Plaintiffs mischaracterize Dr. Ferrell's opinion about sunk costs as an accounting opinion. But it is a textbook principle of corporate finance that sunk costs do not impact future cash flows, and thus the stock price of a company. Dr. Ferrell—with a PhD in econometrics and finance from the Massachusetts Institute of Technology ("MIT") and extensive publications in the field—is qualified to offer this opinion. Plaintiffs' argument that the opinion fails to comply with GAAP has no bearing, as Dr. Ferrell's valuation opinion is consistent with the factual record—as Plaintiffs themselves concede. (*Infra* Section I.)

*Second*, Plaintiffs ignore that Dr. Ferrell included the detailed May 2, 2017, Firestone timeline in his sur-reply report to respond to Mr. Bjorn Steinholt's inaccurate timeline in his reply report. Plaintiffs' attempt to exclude Dr. Ferrell's opinion for using the *correct* timeline of afterhours disclosures on May 2, 2017, makes no sense. While Plaintiffs question whether the press conference on May 2, 2017, provided new information—which it did—Plaintiffs do not contest the timing of those news events in Dr. Ferrell's sur-reply report. (*Infra* Section II.)

*Third*, Plaintiffs erroneously suggest that Dr. Ferrell's May 3, 2017, ConocoPhillips event study is unreliable. Courts routinely recognize that single-firm event studies may be used to demonstrate lack of price impact. And, critically, Plaintiffs' suggestion that

Dr. Ferrell's event study is unreliable because of its purported type II error rate ignores one crucial fact: ConocoPhillips's stock price *increased* on May 3, 2017, so any potential type II error would only further support Dr. Ferrell's opinions. (*Infra* Section III.)

The Court should deny Plaintiffs' Motion to Exclude under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed this securities fraud lawsuit against Anadarko Petroleum Corporation ("Anadarko") and certain of its former executives in 2020. (Dkts. 1 & 55.) Plaintiffs moved for class certification in October 2021 and submitted a supporting expert report from Mr. Steinholt. (Dkt. 86.) In opposing class certification, Defendants submitted an expert report from Dr. Ferrell. (Dkt. 93-1, Ex. A ("Ferrell Rep.").) With their reply, Plaintiffs submitted a rebuttal expert report from Mr. Steinholt. (Dkts. 96 & 96-1, Ex. A ("Steinholt Reply Rep.").) Defendants moved for leave to file a sur-reply and rebuttal expert report, which the Court denied on March 25, 2022. (Dkts. 97 at 2, 110.) In April 2022, Defendants filed a motion to exclude Mr. Steinholt's rebuttal opinions ("Defendants' *Daubert* Motion"). (Dkt. 111.) On September 28, 2022, the Court denied Defendants' *Daubert* Motion and granted class certification. (*See* Dkt. 141 ("Class Certification Order") at 4, 10-12.)

After denial of Defendants' motion for reconsideration (Dkts. 143, 146, 198), Defendants appealed, and on April 25, 2024, the Fifth Circuit vacated the Class Certification Order and remanded to allow Defendants to file a class certification sur-reply

and for full consideration of Defendants' *Daubert* Motion (Dkts. 231, 232).  On June 12, 2024, Defendants filed their sur-reply in opposition to class certification, supported by a report from Dr. Ferrell.  (Dkts. 237 & 237-1, Ex. A ("Ferrell Sur-Reply Rep.").)  On July 12, 2024, Plaintiffs filed a sur-sur-reply in support of class certification (Dkt. 242) and sought leave to file their Motion to Exclude.  (Dkt. 240.)  On August 2, 2024, Defendants filed their opposition to Plaintiffs' motion for leave.  (Dkt. 244.)  On September 6, 2024, the Court granted Plaintiffs leave to file their Motion to Exclude (Dkt. 247) and docketed that motion (Dkt. 248 ("Pls.' Mot.")).

## STATEMENT OF ISSUES

1.      Whether Dr. Ferrell's opinion about the market value of Shenandoah is admissible where (a) it involves basic finance and valuation principles, about which he is qualified to testify, and (b) his opinion is consistent with the factual record.

2.      Whether Dr. Ferrell's opinion about the May 2, 2017, Firestone event is admissible where his timeline is correct and offered to rebut Mr. Steinholt's incorrect timeline.

3.      Whether Dr. Ferrell's opinion about the May 2, 2017, ConocoPhillips event study is admissible where courts routinely allow single-firm event studies to demonstrate lack of price impact, and Plaintiffs ignore that any type II error—should one exist—would rebut any inference of impact on Anadarko's stock price.

3

## FACTUAL BACKGROUND

After market close on May 2, 2017, news broke confirming that Anadarko's equipment caused a tragic fatal home explosion in Firestone, Colorado, which killed two and injured others.  (Ferrell Sur-Reply Rep. ¶¶25-26, 33.)  Soon after, the Colorado Governor "ordered oil and gas companies statewide"—including Anadarko—"to inspect and pressure-test oil and gas flowlines within 1,000 feet of occupied buildings," and analysts noted the risk to Colorado operators of enhanced regulatory scrutiny.  (*Id.* ¶¶12, 26; Ferrell Rep. ¶14.)  That same evening, Anadarko announced that it "recently completed drilling operations at the Shenandoah-6 appraisal and sidetrack well, which did not encounter the oil-water contact in the eastern portion of the field" and that the "company has currently suspended appraisal activity in the field while it evaluates the path forward." (Ferrell Rep. ¶13.)  Soon after, Anadarko disclosed a write-off of $902 million in Shen-related expenses, which consisted of $435 million in capitalized exploratory well costs and $467 million for an impairment of unproved property balance originating "from the purchase price allocated to the Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006."  (Ferrell Sur-Reply Rep. ¶8; Ferrell Rep. ¶13.)  It is undisputed that Anadarko saw a stock price drop the next day, May 3, 2017.  (Ferrell Rep. ¶56; Dkt. 86-1 ("Steinholt Rep.") ¶44.)

Because these two pieces of potentially value-relevant news broke after the market closed on May 2, 2017, Dr. Ferrell evaluated the impact of each news item on Anadarko's stock price.  Anadarko and ConocoPhillips had nearly identical ownership interests in

Shenandoah, making ConocoPhillips a good proxy to determine whether Anadarko's May 2, 2017, Shen disclosure impacted Anadarko's stock price. (Ferrell Rep. ¶¶32, 39, n.73.) If a Shen-related disclosure impacted the stock price of one of these Shen partners, it would be expected to also impact the stock price of the other. (*Id.* ¶32.) ConocoPhillips "did not have other firm-specific value-relevant news" on May 2, 2017, so if ConocoPhillips's stock price did not drop in a statistically significant way on May 3, 2017, it is unlikely that Anadarko's Shen disclosure impacted Anadarko's stock price on May 3, 2017. (*Id.* ¶¶32, 57.) Dr. Ferrell performed an event study analyzing ConocoPhillips's stock price, finding "there was no statistically significant price change in ConocoPhillips's stock price on May 3, 2017, which demonstrates the lack of a price impact of the alleged corrective disclosures on Anadarko's stock." (*Id.* ¶57.)

In his reply report, Mr. Steinholt claimed Anadarko's May 2, 2017, Shen write-offs "demonstrate[] that Anadarko itself (prior to the write-off) had assigned a substantial economic value to the Shenandoah asset, which logically would have had some negative impact on Anadarko's stock price during the Class Period if the project was suspended and written off (as was the case at the end of the Class Period)." (Steinholt Reply Rep. ¶8.) In Dr. Ferrell's sur-reply report, he explains that the write-offs were sunk costs and therefore could not impact Anadarko's market value (and, in turn, stock price). (Ferrell Sur-Reply Rep. ¶¶7-9.)

Mr. Steinholt also asserted that Anadarko's stock price declined in aftermarket trading after Anadarko disclosed the Shen information but before the news related to the

Firestone explosion broke, concluding that the Firestone explosion could not have impacted the earlier decline in Anadarko's stock price.  (Steinholt Reply Rep. ¶¶7, 38.) Dr. Ferrell's sur-reply report demonstrates that Mr. Steinholt's aftermarket analysis is, among other deficiencies, based on a wrong timeline.  (Ferrell Sur-Reply Rep. ¶¶24-26.)

## LEGAL STANDARD

As this Court has noted, "the exclusion of expert testimony is a highly discretionary enterprise." *Armstrong v. Wing Enters. Inc.*, 2022 WL 950873, at *2 (S.D. Tex. Mar. 30, 2022) (Eskridge, J.).  Expert testimony meeting the requirements of Federal Rule of Evidence 702 is admissible.  Fed. R. Evid. 702.  "Rule 702 provides that a witness 'qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'"  *Gonzalez v. Inter Mexicana de Transporte S.A. de C.V.*, 2021 WL 3816337, at *1 (S.D. Tex. July 22, 2021) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

To be qualified, an expert need only "minimal education or experiential qualifications in a field that is relevant to a subject that will assist the trier of fact." *Allan v. Manitowoc Cranes, Inc.*, 2008 WL 11388549, at *4 (S.D. Tex. Oct. 31, 2008).  If an expert is minimally qualified, "[t]he strength of [the expert's] credentials will go to the weight of his testimony and not its admissibility."  *Id.*

6

As to the sufficiency of facts and data, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019). That said, an expert may not rely on "indisputably wrong facts." *BHI Energy I Power Servs. v. KVP Holdings, LLC*, 2024 WL 1809499, at *5 (N.D. Tex. Apr. 24, 2024).

In determining reliability, courts look to the "five nonexclusive factors known as the *Daubert* factors, which are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community". *Id.* at *4 (quoting *Ramos v. Home Depot Inc.*, 2022 WL 615023, at *1 & n.11 (N.D. Tex. Mar. 1, 2022)). "But these factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Id.* (quoting *Kim v. Nationwide Mut. Ins. Co.*, 614 F. Supp. 3d 475, 486 (N.D. Tex. 2022)).

The "rejection of expert testimony is the exception rather than the rule." *Puga*, 922 F.3d at 294 (quoting Fed. R. Evid. 702, Adv. Comm. Notes). To that end, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

## ARGUMENT

The Court should deny Plaintiffs' Motion to Exclude because Dr. Ferrell offers reliable opinions regarding (i) basic finance (*infra* Section I); (ii) the May 2, 2017, Firestone timeline (*infra* Section II); and (iii) the ConocoPhillips event study (*infra* Section III).

## I.    Dr. Ferrell's Basic Finance and Valuation Opinion Is Admissible.

In responding to Mr. Steinholt's reply opinion that Anadarko's May 2, 2017, Shen write-off announcement impacted the company's stock price, Dr. Ferrell explains that the write-off consisted of "sunk costs," that is, previously incurred costs.  (Ferrell Sur-Reply Rep. ¶¶7-9.)  These sunk costs did not represent any future cash flow for Anadarko, and because a company's value (and, in turn, stock price) is determined by its future cash flows, this write-off would have had no impact on Anadarko's value.  (*Id.* ¶9.)

Plaintiffs' argument confuses basic finance and valuation with accounting, misunderstanding the nature of the write-off.  First, Dr. Ferrell is plainly qualified to offer this finance and valuation opinion.  (*Infra* Section I.A.)  Second, Dr. Ferrell's opinion is based on reliable principles of finance and valuation and supported by the record. Plaintiffs' argument that the record contains evidence that may undermine his opinion goes to the weight of Dr. Ferrell's opinion, not its admissibility.  (*Infra* Section I.B.)

### A.    Dr. Ferrell Is Qualified To Offer His Basic Finance and Valuation Opinion.

Dr. Ferrell's opinion that the Shenandoah write-off represented "sunk costs" is not an "accounting" opinion as Plaintiffs frame it, but rather one involving basic principles of

8

finance and valuation.  As Dr. Ferrell explained in his deposition, "[a]ccountants do things that are not market prices, not market value, so you cannot look at what the accountants and their conventions are to estimate market prices."  (Dkt. 239-1, Ex. 1 ("Ferrell Dep. Tr.") at 197:25-198:3.)  The idea that sunk costs are outside of Dr. Ferrell's wheelhouse is defied by basic, authoritative textbooks on corporate finance.  Corporate finance principles establish that valuation looks to "relevant cash flows, avoiding such things as sunk costs". (Ferrell Sur-Reply Rep. ¶9, n.24 (quoting Stephen Ross, Randolph Westerfield & Bradford Jordan, *Fundamentals of Corporate Finance* 351 (McGraw Hill, 11th ed. 2015)); *see also* McGraw Hill, *Fundamentals of Corporate Finance, 13th Edition*, https://www.mheducation.com/highered/product/fundamentals-corporate-finance-ross-westerfield/M9781260772395.html (last visited Sept. 27, 2024) (describing how this textbook "was designed and developed for a *first course in business or corporate finance, for both finance majors and non-majors alike*" (emphasis added)).)

Dr. Ferrell need not be a CPA or have an accounting degree to be qualified to opine on what financial metrics determine a company's value.  (Pls.' Mot. at 7.)  Rather, Dr. Ferrell's PhD in econometrics and finance from MIT, experience consulting on the valuation of businesses, and 30-odd published articles "in leading law and finance journals" more than qualify him to offer this opinion.  (Ferrell Rep. ¶¶1, 3, App'x A at 2-4.)  *See Leonardo Worldwide Corp. v. Pegasus Sols., Inc.*, 2016 WL 9282409, at *3 (N.D. Tex. July 28, 2016) (finding expert was "qualified to offer expert testimony on the value of [plaintiff's] business," among other things, because expert "has significant experience and

education in the areas of . . . corporate finance and valuation"); *see also In re Actiq Sales & Mktg. Pracs. Litig.*, 2014 WL 3572932, at *3-4, 8 (E.D. Pa. July 21, 2014) (finding economist expert was qualified to render opinions about "product-level profits," which included an analysis of sunk costs, and rejecting defendants' "unsupported assumption that only an accountant with specific expertise in cost accounting has the necessary expertise to testify regarding economic loss").

B.  GAAP Is Not Relevant to Dr. Ferrell's Opinions, Which Are Consistent with the Factual Record.

Plaintiffs' argument that Dr. Ferrell's opinion about the value of Shenandoah is inconsistent with GAAP further demonstrates Plaintiffs' confusion of valuation principles with accounting standards.  The May 2, 2017, write-off is not the market value of Shen. (Ferrell Dep. Tr. at 196:8-11 ("Book value is not market price."); *id.* at 197:25-198:3 ("[Y]ou cannot look at what the accountants and their conventions are to estimate market prices.").)  Rather, it comprises two costs.  First, $435 million of that write-off consisted of expensed well costs.  (Pls.' Mot., Ex. 3 at 13.)  That such costs had been recorded for accounting purposes as capitalized costs does not change the fact that the costs already were incurred and therefore constituted sunk costs.  (*See* Ferrell Sur-Reply Rep. ¶8.) Second, the remaining $467 million write-off was an impairment of an unproved property balance that "originated from the purchase price allocated to the Gulf of Mexico exploration projects from the acquisition of the Kerr-McGee Corporation in 2006."  (Pls.' Mot., Ex. 3 at 12.)  That is, it represented an accounting allocation of the purchase price for the Shen assets that had been acquired more than a decade prior—in 2006. (*See* Ferrell

Sur-Reply Rep. ¶8.)  Because these expenses were sunk costs, they would not impact the stock price.  (*See id.*)

Plaintiffs' other argument—that Dr. Ferrell highlighted analyst reports assigning a "low to zero" value to Shen when other reports attributed different values—lacks merit. Dr. Ferrell explains that "some analysts assigned a 'low to zero' value to Shen given its uncertainty," so "to the extent that the write-off signaled the loss of this value, because the value of Shen embedded in Anadarko's stock *prior* to the May 2 announcement would have been 'low to zero,' any loss thereof also would have been 'low to zero.'"  (Ferrell Sur-Reply Rep. ¶14.)  As Dr. Ferrell explained in his deposition, he considered the other analyst reports, which included reports that conditioned analysts' value of Shen on the sanctioning of the project for development—sanctioning that had not yet occurred.  (Ferrell Dep. at 91:24-92:9.)  Plaintiffs are wrong that Dr. Ferrell "admits that other analysts attributed substantial value to Shen throughout the Class Period but offers no explanation as to why he discarded these data points."  (Pls.' Mot. at 10.)  To the contrary, Dr. Ferrell testified in deposition that he explicitly disagreed that "the substantial evaluations of analysts to Shenandoah in the early part of the class period indicates that the stock price reflected substantial value for Shenandoah."  (Ferrell Dep. at 93:15-21.)  This was precisely because some of those analysts conditioned their valuation on the sanctioning of the project (*id.* at 92:9-94:24) and others made risk adjustments (*id.* at 94:13-22).

In any event, even if Plaintiffs are correct—and they are not—this is not an admissibility issue.  That some analysts may have ascribed more than "low to zero value"

to Shenandoah "goes to the weight, rather than the admissibility" of Dr. Ferrell's opinion. *SEC v. Cuban*, 2013 WL 3809654, at *4 & n.7 (N.D. Tex. July 23, 2013) (overruling "cherry-picking" objection as a weight, not admissibility, issue because defendant "is free to identify other relevant facts for the jury, if any, that he believes should be considered when assessing any alteration of the total mix of information").

Plaintiffs' cases are inapposite. In *Jacked Up, LLC v. Sara Lee Corp.*, the court excluded the expert's opinion because the plaintiff "point[ed] to no supporting evidence and offer[ed] no argument or explanation as to how [the expert] made [certain] assumptions and why they were reasonable based on the facts of this case." 291 F. Supp. 3d 795, 807 (N.D. Tex. 2018). That is not the case here—Plaintiffs concede that Dr. Ferrell's opinion is supported by record evidence. (*See* Pls.' Mot. at 10.)

*Moore v. International Paint, LLC* and *Fail-Safe, LLC v. A.O. Smith Corporation* are also unsupportive of Plaintiffs' argument. The *Moore* court "identified numerous aspects of [the expert's] cumulative exposure analysis that either had no support in the record or were flatly contradicted by all the available evidence." 547 F. App'x 513, 515-16 (5th Cir. 2013). The *Fail-Safe* court found that the expert "treated all evidence that undermined his underlying conclusion" via "unwarranted dismissal of the evidence or outright blindness to contrary evidence." 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010). Unlike those cases, Dr. Ferrell's opinion is consistent with the factual record. (*Supra* p.11.)

Finally, Plaintiffs' reliance on *General Electric Co. v. Joiner* is also misplaced. There, the expert's opinion had "simply too great an analytical gap between the data and

12

the opinions proffered." 522 U.S. 136, 146 (1997). The studies the expert relied upon "were so dissimilar to the facts presented in th[e] litigation" because, among other issues, the studies used infant mice with "massive doses of PCB's injected directly into" them at much higher concentrations than the amount to which the plaintiff was exposed. *Id.* at 144-46. That is not the case here—there is no gap between the data and Dr. Ferrell's opinion, and the data directly supports his opinion.

## II.   Dr. Ferrell's Firestone Timeline Is Reliable and Admissible.

In responding to Mr. Steinholt's reply opinions on afterhours trading activity, Dr. Ferrell explains that the afterhours disclosure timeline on which Mr. Steinholt relies is inaccurate. (Ferrell Sur-Reply Rep. ¶¶24-26.) To show the inaccuracies, Dr. Ferrell provides specific details about the May 2, 2017, Firestone events in his sur-reply report. (*Id.* ¶¶25-26.)

Plaintiffs are wrong to suggest that Dr. Ferrell "change[d] his testimony" about the timeline of media coverage of the May 2, 2017, Firestone press conference. (Pls.' Mot. at 12.) Dr. Ferrell's reference to a 4:51 PM Firestone article in his initial report was to establish that Firestone disclosures also occurred after the market closed on May 2, 2017. (Ferrell Rep. ¶14; Ferrell Sur-Reply Rep. ¶25.) Setting forth a more comprehensive timeline was unnecessary until Mr. Steinholt placed the precise afterhours timing at issue in his reply report. (*See id.*)

Moreover, despite taking no issue with the accuracy of Dr. Ferrell's timeline with respect to the timing and sequence of certain news events, Plaintiffs untenably argue that

Dr. Ferrell's "methodology for identifying news" is unreliable.  (Pls.' Mot. at 12-13.)  As Dr. Ferrell testified, "the search criteria" he used in identifying news articles for his original report was sufficient for his original report's purpose of identifying confounding information.  (Ferrell Dep. Tr. 210:2-19.)  It was only after Mr. Steinholt's reply report put the Firestone timeline at issue that Dr. Ferrell went back and identified the tweets to show why Mr. Steinholt's timeline is wrong.  (*See id.* at 209:22-210:19.)

Plaintiffs' additional arguments similarly fail.  First, in arguing Dr. Ferrell's "opinion is based on pure speculation" because he cannot "point to any evidence that investors had actually read the three tweets he pointed to as impacting Anadarko's stock price," Plaintiffs ascribe to Dr. Ferrell an "opinion" that he is not offering.  (Pls.' Mot. at 13.)  It is Mr. Steinholt—not Dr. Ferrell—who seeks to offer opinions based on afterhours trading.  Dr. Ferrell simply sets out why Mr. Steinholt's afterhours analysis is flawed: (1) it is based on an inaccurate timeline of the afterhours disclosures, and (2) Mr. Steinholt makes no showing that the afterhours market for Anadarko stock is efficient.  In arguing that Dr. Ferrell was required to show actual investor reliance in afterhours trading, Plaintiffs effectively concede that the afterhours market is inefficient, which is the very point of Dr. Ferrell's rebuttal.  Mr. Steinholt assumed—but did not assess—the efficiency of the afterhours trading market.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015) ("An efficient market is said to digest or impound news into the stock price in a matter of minutes . . . .").

Second, Plaintiffs ignore what the market knew before May 2, 2017, when they argue that "the Firestone investigators never assigned responsibility" to Anadarko during the May 2 press conference. (Pls.' Mot. at 13.)  Before the press conference, it was already "known that there was a pipeline from an Anadarko well near the house that exploded." (Ferrell Sur-Reply Rep. ¶25, n.60.)  What had not been announced until May 2, was that the explosion was caused by gas leaking into the home from that abandoned flow line to an oil and gas well.  (*Id.* ¶26.)  Anadarko was mentioned by name at several points in the May 2 press conference, including at approximately 4:14 PM when the fire official stated that the Firestone investigators have asked for and received the cooperation of, among others, "Anadarko, who was the operator of the well."  (Denver 7 News, *Latest on Firestone Home Explosion Investigation*, https://www.facebook.com/Denver7News/videos/latest-onfirestone-home-explosion-investigation/10154807218543271/ (last visited Sept. 27, 2024).)  There is no "gap" between Dr. Ferrell's testimony and the facts as Plaintiffs claim.  (Pls.' Mot. at 13.)

Third, Plaintiffs are wrong that "the linkage to Anadarko's well was already known by the market by April 26 when Anadarko disclosed its well" was near the house that exploded, suggesting that the press conference did not provide any new information.  (Pls.' Mot. at 14.)  As Plaintiffs' expert acknowledges, Anadarko issued a press release on April 26, 2017, stating that "*[w]hile there is still much that is not yet known regarding the potential contributing factors*, Anadarko operates an older vertical well that was drilled by a previous operator in 1993 and is located approximately 200 feet from where the home

was recently built," and that "*these events remain under active investigation and much remains to be determined*."   (Steinholt Reply Rep. n.84 (emphasis added).)   The information revealed on May 2, 2017, went far beyond the April 26 press release by confirming that Anadarko's equipment caused the earlier fatal explosion.   As Dr. Ferrell explained, the May 2 press conference "disclosed *for the first time* the results of the Firestone, Colorado fire officials' investigation as to the cause of the fatal house explosion." (Ferrell Sur-Reply Rep. ¶26 (emphasis added).)   This is evidenced by analyst comments made on an earnings call the next day, May 3, 2017, that "the market has shaved a couple billion dollars of equity value as the market has priced in some impacts" of the Colorado regulatory risk.   (*Id.* ¶11.)

Unable to refute the reliability of Dr. Ferrell's analysis here, Plaintiffs cite other cases involving Dr. Ferrell's opinions, none of which excluded such opinions under *Daubert*.   (Pls.' Mot. at 14-15.)   While the courts in those cases may have disagreed with certain aspects of Dr. Ferrell's opinions, this only further shows that Plaintiffs' arguments go to the weight, and not the admissibility, of Dr. Ferrell's opinions.   Dr. Ferrell has served as an expert witness in a variety of securities matters, and courts have repeatedly relied on his opinions.   (Orsini Decl., Ex. A ("Ferrell *Daubert* Rep.") ¶6; Ferrell Rep. ¶3.)

## III. Dr. Ferrell's ConocoPhillips May 3, 2017 Event Study Is Reliable and Admissible.

It is undisputed that two sets of potentially value-relevant information were disclosed after the market closed on May 2, 2017:  (1) Anadarko's Shen disclosures, and (2) the Firestone news.  To determine which set of news had a price impact on Anadarko's

stock, Dr. Ferrell conducted, among other event studies, a single-firm event study of ConocoPhillips's May 3, 2017, stock price—as the Shen disclosures would have impacted the stock price of Shen partner ConocoPhillips (with its near-identical ownership stake), but the Firestone news would not as ConocoPhillips did not operate in Colorado. Dr. Ferrell found that "there was no statistically significant price change in ConocoPhillips's stock price on May 3, 2017, which demonstrates the lack of a price impact of the alleged corrective disclosures on Anadarko's stock."  (Ferrell Rep. ¶57.)

Plaintiffs' challenge of this event study fails.  Single-firm event studies are commonly used by experts to evaluate the impact of alleged corrective disclosures on a company's stock price and are standard in the academic literature.  (Ferrell *Daubert* Rep. ¶5.)  Even Plaintiffs' own expert acknowledges this.  (*See* Steinholt Rep. ¶37, n.48; *see also* Steinholt Reply Rep. ¶1 ("I also concluded that class-wide damages can be calculated in this case using the widely accepted event study methodology . . . .").)  In fact, Plaintiffs' expert used the same type of single-firm event study in this case.  (Steinholt Rep. ¶¶37-59.) The U.S. Supreme Court also endorses the use of such studies, finding that defendants may use single-firm event studies to show lack of price impact at class certification.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280-81 (2014) (describing plaintiff's "event study of various episodes that might have been expected to affect the price of [defendant's] stock" and finding that defendants may submit similar price impact evidence).

Plaintiffs' claim that Dr. Ferrell's "ConocoPhillips event study has a Type II error rate of 67%" is misleading.  (Pls.' Mot. at 16.)  Not only do Plaintiffs fail to cite to any expert or other record evidence to support this assertion, but they also ignore the impact of a type II error rate in this case.  A higher type II error rate means that it is more likely that an event study did not detect a statistically significant price movement.  (Ferrell *Daubert* Rep. ¶7; *see also* Dkt. 160, Ex. 3 ("Steinholt *Daubert* Rep.") ¶¶2, 10-12.)  But, here, ConocoPhillips's stock price on May 3, 2017, *increased*.  Even assuming that Dr. Ferrell's ConocoPhillips event study has a type II error rate of 67%, that would mean that it is more likely than not that ConocoPhillips's stock price *increased* in a statistically significant way on May 3, 2017.  (Ferrell *Daubert* Rep. ¶8.)  Such an increase would show that Anadarko's May 2 Shen disclosure *did not* negatively impact the stock price of ConocoPhillips and, thus, also did not have the price impact on Anadarko's stock that Plaintiffs claim.  In other words, even assuming Plaintiffs are correct, it would *rebut* any inference of price impact related to Shenandoah.

The single case Plaintiffs cite to support excluding a study with an error rate of "62.5%" is similarly misleading.  (Pls.' Mot. at 16-17.)  In *Kelley v. American Heyer-Schulte Corp.*, the court was not assessing a type II error rate.  957 F. Supp. 873, 882 (W.D. Tex. 1997).  Rather, the court was assessing an expert's "testimony on specific causation" about whether "breast implants . . . cause[d] Sjogren's Syndrome."  *Id.*  The court excluded the expert's testimony because of "extremely suspect" reasoning, such as finding a person with "a scratchy throat, runny nose, and a nasty cough" to have a cold, but

18

a person with "a scratchy throat, runny nose, nasty cough, and wear[ing] a watch" to "have a watch-induced cold." *Id.* Such suspect reasoning is plainly not an issue here.

Again, Plaintiffs cite no case in which an expert opinion was excluded under *Daubert* on the basis that single-firm event studies are unreliable. (Pls.' Mot. at 17-18.) And no court has ever excluded Dr. Ferrell's opinions regarding event studies—let alone single-firm event studies. (*See* Ferrell *Daubert* Rep. ¶6.) The Court should therefore reject Plaintiffs' challenge to Dr. Ferrell's ConocoPhillips event study.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion to Exclude.

Dated:  September 27, 2024       Respectfully submitted,

/s/ Kevin J. Orsini
**CRAVATH, SWAINE & MOORE LLP**
Kevin J. Orsini (*pro hac vice*)
Lauren M. Rosenberg (*pro hac vice*)
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
korsini@cravath.com
lrosenberg@cravath.com

**SHIPLEY SNELL MONTGOMERY LLP**
George T. Shipley
State Bar No. 18267100
Federal ID No. 02118
712 Main Street, Suite 1400
Houston, TX 77002
Telephone: (713) 652-5920
Facsimile: (713) 652-3057
gshipley@shipleysnell.com

*Attorneys for Defendants*

## <u>CERTIFICATION OF WORD COUNT</u>

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 4,912 words, exclusive of the caption, table of contents, table of authorities and signature block.

Dated:  September 27, 2024

*/s/ Kevin J. Orsini*
_____
Kevin J. Orsini

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 27, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:  September 27, 2024

*/s/ Kevin J. Orsini*
Kevin J. Orsini