Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF TEXAS

3    HOUSTON DIVISION

4    Case No. 4:20-CV-576

5    - - - - - - - - - - - - - - - - - -x

6    IN RE: ANADARKO PETROLEUM CORPORATE

7    SECURITIES LITIGATION

8    - - - - - - - - - - - - - - - - - -x

9

10

11                    December 21, 2022

                      9:08 a.m. (PST)

12

13

14        REMOTE VIDEOTAPED DEPOSITION of BJORN

15    STEINHOLT, an Expert Witness, in the

16    above-entitled action, held at the above

17    time and place, taken before Dawn Matera,

18    a Shorthand Reporter and Notary Public of

19    the State of New York.

20

21              *        *        *

22

23

24

25

DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO.

Page 2

1  APPEARANCES:
2
   ROBBINS GELLER RUDMAN & DOWD LLP
3  Lead counsel for Lead Plaintiff
      655 West Broadway
4      Suite 1900
      San Diego, California 92101
5  BY: RACHEL JENSEN, ESQ.
      racheljrgrdlaw.com
6  BY: FRANCISCO MEJIA, ESQ.
      fmejiargrdlaw.com
7
8
9  CRAVATH SWAINE & MOORE LLP
   Attorneys for Defendants
10     825 Eighth Ave
      Suite 4043B
11     New York New York 10019
   BY: DANIEL SLIFKIN, ESQ.
12     dslifkin@cravath.com
   BY: MING-TOY TAYLOR, ESQ.
13     mtaylor@cravath.com
14
15
16
17 Also Present:
18  MARC FRIEDMAN, Videographer
19  KALLIE GALLAGHER
20
21
22
23
24
25

Page 3

1       THE VIDEOGRAPHER: Good morning.
2   We are going on the record at 9:08
3   a.m. Pacific Standard Time, on
4   Wednesday, December 21st, 2022.
5       Please note this deposition is
6   being conducted virtually. Quality of
7   the recording depends on the quality
8   of the camera and Internet connection
9   of all participants.
10      What is heard from the witness
11  and seen on screen is what will be
12  recorded. Audio and video recording
13  will continue to take place unless all
14  parties agree to go off the record.
15      This is media unit number 1 of
16  the video-recorded deposition of Bjorn
17  Steinholt in the matter of Anadarko
18  Petroleum Corporation Securities
19  Litigation. This case is filed in the
20  United States District Court, Southern
21  District of Texas, Houston division,
22  case number 4:20-CV-576.
23      My name is Mark Friedman. I am
24  your certified video legal specialist.
25  Your court reporter today is Dawn

Page 4

1   Matera, and we are both from the firm
2   of Veritext Legal Solutions.
3       I am not related to any parties
4   in this action nor financially
5   interested in the outcome. If there
6   are any objections to these
7   proceedings, please state them now.
8       Hearing no objection, counsel
9   will be noticed on the stenographic
10  record. And at this time our court
11  reporter will swear in our witness and
12  we can proceed.
13  B J O R N   S T E I N H O L T,
14      the Witness herein, having first
15      been duly sworn by the Notary
16      Public, was examined and
17      testified as follows:
18  EXAMINATION BY
19  MS. JENSEN:
20  Q.   Good morning, Mr. Steinholt.
21  A.   Good morning.
22  Q.   Do you have the November 9,
23  2022 expert report that you submitted in
24  this matter in front of you?
25  A.   I do.

Page 5

1       MR. SLIFKIN: Okay. For the
2   record, I want to mark that as Exhibit
3   503.
4       (Exhibit Number 503, the
5   November 9th, 2022 expert report by
6   Bjorn Steinholt was so marked for
7   identification, as of this date.)
8       MR. SLIFKIN: And we can put
9   that in the Exhibit Share for folks.
10  But since you've got the hard copy in
11  front of you, it's much easier to deal
12  with it that way.
13      That's okay with you,
14  Rachel?
15      MS. JENSEN: Yes, that's fine.
16  Q.   So Exhibit 503, which you
17  should have in front of you; is this in
18  fact your report?
19  A.   It is.
20  Q.   Could you turn to page 3,
21  paragraph 5?
22  A.   Yes.
23  Q.   You see in paragraph 5 there is
24  a footnote 1, and a reference to an
25  expert report you submitted in October

2 (Pages 2 - 5)

Page 6

1  1st, 2021; do you see that?
2    A.  Yes, I do.
3    Q.  And that's what you refer to as
4  the "Steinholt class cert report"; do you
5  see that?
6    A.  Yes.
7    Q.  And you say that is "hereby
8  incorporated by reference."
9    A.  Yes.
10    Q.  Right.  So am I to take it that
11  that report is also part of the opinion
12  that you would submit were there to be a
13  trial of this matter?
14    A.  That is correct, yes.
15    Q.  And for the record, that
16  report, the Steinholt class cert report,
17  was previously marked as Exhibit 10.  Can
18  you turn to the next page, page 4,
19  paragraph 7.
20        And by the way, before I move
21  on, Mr. Steinholt, do you have that class
22  cert report with you?
23    A.  I do, yes.
24    Q.  Okay.  Great.  Splendid.
25        And again, that was previously

Page 7

1  marked as Exhibit 10.
2        So if you are on page 4,
3  paragraph 7, you see there is a reference
4  to a rebuttal report, dated February 2,
5  2022; do you see that?
6    A.  Yes, I do.
7        (Exhibit Number 10, document
8    consisting of Steinholt class cert
9    report previously marked for
10    identification.)
11    Q.  And that's referred to as the
12  Steinholt class cert rebuttal; do you see
13  that?
14    A.  Yes.
15    Q.  And you say "that is hereby
16  incorporated by reference to."
17    A.  Correct.
18    Q.  Do you have that in front of
19  you?
20    A.  I do, yes.
21        MR. SLIFKIN:  Okay.  And for the
22    record, I would like to mark that as
23    Exhibit 504.
24        (Exhibit Number 504, rebuttal
25    report dated February 2, 2022 was so

Page 8

1    marked for identification, as of this
2    date.)
3    Q.  And again, that will appear, if
4  Ming does this for me, in the Exhibit
5  Share, but I am glad that you have them
6  in front of you.  Okay.
7        And again, by incorporating
8  that rebuttal report into your report of
9  November 9th, 2022, Exhibit 503, did that
10  rebuttal report form part of the opinions
11  that you may present to the Court were
12  this case to go to trial?
13    A.  Yes.
14    Q.  Okay.  Okay.  So now we've seen
15  Exhibit 503, Exhibit 10, Exhibit 504.  I
16  take it you have all of those in front of
17  you?
18    A.  That's correct, yes.
19    Q.  Do they comprise the totality
20  of the opinions that you would offer or
21  potentially offer were you to be called
22  as a witness at trial of this matter?
23    A.  As of right now, yes.
24    Q.  Is there anything that you
25  intend to opine on, as of now, that is

Page 9

1  not included in those three exhibits that
2  I just identified, 503, 10, and 504?
3    A.  I do not have anything else in
4  mind as of right now.
5    Q.  Now I know taken together, they
6  were really long, but -- and we can break
7  this up, if you want to, but for now,
8  taking those three exhibits together,
9  503, 10 and 504, is there anything in any
10  of those that you wish to withdraw?
11    A.  No.
12    Q.  Is there anything in any of
13  those exhibits, 503, 10 and 504 that you
14  wish to change?
15    A.  No.
16    Q.  Is there anything in those
17  exhibits, 503, 10 and 504, that you
18  believe today to be incorrect?
19    A.  No.
20    Q.  Okay.  Could you in your own
21  words describe the scope of your
22  expertise relevant to this matter?
23    A.  My expertise is typically on
24  issues of market efficiency and
25  materiality, loss causation and damages

3 (Pages 6 - 9)

Page 10

1  in securities litigation cases.
2      Q.   Sorry, I am having a little
3  trouble hearing you, I am going to put my
4  volume up.  Okay.
5          And in this matter, what
6  expertise are you offering to assist the
7  trier of fact?
8      A.   This relates to those four
9  areas, which is, again, market
10  efficiency, materiality, loss causation
11  and the quantification of classwide
12  damages.
13     Q.   I take it you're offering an
14  opinion as a financial analyst; is that
15  fair?
16     A.   That's fair, securities
17  analyst, yes.
18     Q.   I take it you're not offering n
19  legal opinions?
20     A.   That is correct, yes.
21     Q.   So when you talk about
22  materiality, causation and damages,
23  you're not offering any legal opinion on
24  those three subjects, I take it?
25     A.   No, I do not offer legal

Page 11

1  opinions.  But the type of work that I do
2  is performed in the context of
3  litigation.
4          So, for instance, when I
5  discuss market efficiency, I do take into
6  account opinions such as Cammer and
7  Krogman that guides the analysis that is
8  to be performed in order to determine
9  market efficiency.
10         With respect to materiality, I
11  know there is a legal definition of
12  materiality.  When I look at materiality,
13  I look at it as a securities analyst.  I
14  look at it as is the information value
15  relevant.  And I also try, to the best of
16  my ability, to provide an economic
17  analysis that are relevant to what
18  typically is needed in securities
19  litigation.  But I do not provide any
20  opinion with respect to what the law is
21  or should be.
22     Q.   I take it you are provided with
23  legal rules, and you seek to analyze the
24  factual issues that those legal rules
25  mandate an inquiry into?

Page 12

1      A.   Correct.  So the 90-day
2  look-back, for instance, it's not an
3  economic issue, but I incorporate it,
4  because that is my understanding of the
5  law.  I am not opining that is the law.
6  That is just my understanding, having
7  performed these type of analysis for
8  quite a few years.  A couple of decades.
9  But, no, I do not provide any legal
10  opinions.
11     Q.   And that was going to be my
12  next -- sorry, that was going to be my
13  next question.
14         From where do you derive your
15  understanding of the legal rules
16  applicable for this matter?
17     A.   From my work in, work
18  performing these type of analysis in a
19  legal context.
20     Q.   Okay.  Now, do you have an
21  engineering background?
22     A.   Well, I have an engineering
23  degree.  I did not work as an engineer.
24  I went straight to graduate business
25  school, and worked in the finance field

Page 13

1  after graduating graduate school.  But I
2  do have an engineering degree.
3      Q.   Do you have any experience --
4  withdrawn.
5          Do you have any expertise in
6  petroleum engineering?
7      A.   No.  In my youth, I worked for
8  geologists and geophysicists at a company
9  called GFisco, a company of Norway, which
10  was acquired by Schlumberger.  But, and I
11  did some programming and operating
12  computers for them and did provide,
13  provide them seismic graphs and things of
14  that nature.  But, no, I do not profess
15  to have any special expertise in the area
16  of, in that particular area.
17     Q.   Okay.  So you say you have some
18  experience with geology, correct?
19     A.   I have experience assisting
20  geologists.  We are talking about early
21  '80s here.  So whatever experience I had
22  would have been, you know, far back in my
23  memory bank by now.
24         So I do not profess to have any
25  specialized experience in that particular

4 (Pages 10 - 13)

1  area. I know enough to know that it's a
2  complicated issue. So I know a little
3  bit about what I don't know, to put it
4  that way.
5     Q.  In this matter you're not
6  offering any opinion with respect to
7  geology, I take it?
8     A.  That is correct, yes.
9     Q.  And you're not offering any
10 opinion with respect to geophysics?
11    A.  That is correct, yes.
12    Q.  And you're not offering any
13 opinion with respect to petroleum
14 engineering?
15    A.  That is correct, yes.
16    Q.  Just to switch over to the
17 finance of oil and gas, the oil and gas
18 industry, do you have any expertise with
19 respect to investing in the oil and gas
20 industry?
21    A.  I personally have invested in
22 the oil and gas industry, yes.
23    Q.  I am asking if you have any
24 expertise in it?
25    A.  I have analyzed oil and gas

1  companies, yes.
2     Q.  And when was that?
3     A.  I analyzed a company quite
4  recently. I was testifying as an expert
5  in a trial this summer. The company was
6  Dakota Plains. And it was an oil-related
7  company transporting oil from North
8  Dakota to other areas in the United
9  States. But I have various different
10 projects, oil projects, in terms of my
11 own personal investing and also different
12 cases I have taken on in the litigation
13 context, where that would include oil
14 companies.
15    Q.  Okay. So you said you, you
16 personally have invested in oil and
17 gas companies; is that correct?
18    A.  Yes, yes.
19    Q.  Did you ever invest in
20 Anadarko?
21    A.  No.
22    Q.  Did you ever invest in
23 Occidental?
24    A.  No.
25    Q.  Did you ever invest in

1  ConocoPhillips?
2     A.  No.
3     Q.  Did you ever invest in
4  Marathon?
5     A.  No.
6     Q.  Did you ever invest in Minali?
7     A.  No.
8     Q.  Did you ever invest in Cobalt?
9     A.  No.
10    Q.  Can you give me a list of the
11 oil and gas companies that you have
12 analyzed over the years?
13    A.  It could be from Schlumberger
14 to Exxon Mobil to, of course, Dakota
15 Plains, which was the case I had.
16 SandRidge was another oil and gas
17 company. Those are the ones that come to
18 mind on the top of my head. But on
19 occasions, I do analyze oil companies.
20    Q.  Have you ever had the occasion
21 to analyze a project, an oil and gas
22 project, in the Gulf of Mexico?
23    A.  A project like Shenandoah, not
24 specifically. A project like Shenandoah
25 in the Gulf of Mexico, no.

1     Q.  One other question. I
2  understand you have a master's in
3  international business and you are a
4  chartered financial analyst. I assume
5  that's correct, still?
6     A.  Yes, I am a chartered financial
7  analyst.
8     Q.  Are you, do you have any
9  expertise with respect to accounting?
10    A.  It is part of both of those,
11 both the graduate business degree as well
12 as is part of the, what they call the
13 body of knowledge that you need to know
14 in order to earn the CFA designation.
15 But I am not an accountant, no.
16    Q.  And in your prior answer, I
17 think -- okay, I want to clarify, because
18 I am not sure I heard you correctly. But
19 is it the case that accounting was part
20 of both your graduate business degree and
21 the body of knowledge you need to earn
22 the CFA designation?
23    A.  Yes, it's part of -- you
24 literally had to take accounting classes,
25 financial accounting and cost accounting,

5 (Pages 14 - 17)

1  with respect to the graduate business
2  degree. And there was also accounting
3  they have, I don't recall exactly what
4  percentage of the totality it is, but,
5  yes.
6          So financial statement analysis
7  is part of my background and training.
8  That is different, though, than being a
9  CPA and working on it day-in and day-out.
10 So I don't present myself as being an
11 accountant. I am a user of financial
12 statements. I am not -- I don't prepare
13 financial statements. So there is a big
14 difference there.
15    Q.  Are you offering any expertise
16 in this matter in the accounting world?
17    A.  I mean I obviously look at
18 accounting numbers in this particular
19 case, but I am not providing accounting
20 opinions. No.
21    Q.  That was my next question. Are
22 you offering an opinion with respect to
23 the accounting that was conducted at
24 Anadarko during the class period?
25    A.  No, I am not offering an

1  opinion in terms of as to whether or not
2  the accounting was correct or incorrect.
3  I have no opinion.
4     Q.  Do you have any expertise with
5  respect to auditing?
6     A.  Auditing, no. I mean,
7  auditing, a lot of my cases sometimes
8  auditing GAAP and GAAS is -- and that is
9  G-A-A-P and G-A-A-S -- those type of
10 issues come up. But I have not been an
11 auditor, no.
12    Q.  And are you offering any
13 opinions in this matter with respect to
14 the auditing of Anadarko during the class
15 period?
16    A.  No, I have no opinion with
17 respect to how the auditing of Anadarko
18 was in this particular case.
19    Q.  Now, let's focus on the
20 Shenandoah. So you mentioned the
21 Shenandoah project. Explain to me in
22 your own words what you were referring
23 to?
24    A.  Shenandoah was an oil field in
25 the Gulf of Mexico. It was first

1  discovered in 2009 by Anadarko. And it
2  is central to this particular case. And
3  more precise, more precisely, the
4  commercial viability of this particular
5  oil field is a central part of this
6  particular case.
7     Q.  Okay. Did you understand the
8  Shenandoah project to be, essentially, a
9  joint venture?
10    A.  It was, yes, there were a
11 handful of partners. It changed a little
12 bit over time. But, yes, it was
13 different partners was engaged in this
14 particular venture. Anadarko was the
15 operator. And then you had other
16 partners who also had an interest in, an
17 economic interest in this particular
18 field.
19    Q.  And do you recall who those
20 other partners were?
21    A.  Yes, it was ConocoPhillips. It
22 was Cobalt. In the beginning it was
23 Marathon Manali. And at some point
24 Marathon sold their interest to Manali
25 and Anadarko. But those were the

1  different partners in the -- with respect
2  to the Shenandoah venture.
3     Q.  And do you recall -- when you
4  say they were partners, did they each
5  have an ownership interest in this
6  project?
7     A.  Yes, they did each have an
8  ownership interest in the project.
9     Q.  And do you recall in percentage
10 terms what the ownership interest of the
11 various players were?
12    A.  Yes, for Anadarko it started
13 out being 30 percent. It was increased
14 to 33 percent. For Manali it was 10
15 percent, and then increased to 17
16 percent. And ConocoPhillips had 30
17 percent. And then Cobalt had the
18 remainder.
19    Q.  And Marathon?
20    A.  Marathon had 10 percent in the
21 beginning. With 3 percent going to
22 Anadarko, and 7 percent going to Manali.
23    Q.  Can you turn to page 5 of your
24 report, Exhibit 503?
25        MS. JENSEN: Is that the

6 (Pages 18 - 21)

Page 22

1    11/9/2022?
2        MR. SLIFKIN: Yes.
3        MS. JENSEN: Okay.
4    A.   You said page 5?
5    Q.   Page 5.
6    A.   Yes.
7    Q.   Okay. And you see paragraph 12
8    there?
9    A.   Yes.
10   Q.   Okay. And there they reference
11   there to information that you reviewed in
12   forming your opinion; do you see that?
13   A.   Correct. There may be more
14   information, but, I mean, that's the key
15   information that I focused in on, yes.
16   Q.   And there is a list, there is a
17   list of paragraphs (a) through (j) in
18   paragraph 12, correct?
19   A.   That's correct.
20   Q.   And then you also refer to
21   Exhibit B, and that's appended to your
22   report, right?
23   A.   I apologize, I am just coming
24   over a cold here. Yes.
25       MS. JENSEN: And Bjorn, at any

Page 23

1    time you need to take a break, just
2    let us know.
3        THE WITNESS: I will.
4    Q.   So Exhibit B is a further
5    itemization of the materials that you
6    considered in forming your opinions,
7    right?
8    A.   Yes, in this particular case
9    there is a lot of information. There is
10   more than a thousand analyst reports. I
11   mean there is just a lot of information.
12   And this just trying to distill it down
13   to more of the key information that I
14   relied on and considered in forming my
15   opinion. Yeah.
16   Q.   So is there additional
17   information that you reviewed, but didn't
18   factor into your opinion in this matter?
19   A.   Yes, there will always be more
20   information that you may review. I had
21   available to me as footnote 4 points out,
22   access to pretty much all of the
23   documents produced in this particular
24   case. And, you know, you can go overly
25   broad and say, okay, you know, these are

Page 24

1    all of the documents or you can kind of
2    focus in on the key documents that you
3    used in forming your opinions. And if
4    you want everything, well, you know, I
5    don't think that's particularly helpful.
6    I think it's more helpful to focus in on
7    the particular documents that I relied on
8    in forming my opinion. But obviously, I
9    looked at, you know, other things as
10   well.
11   Q.   You referred to there being, I
12   believe, more than a thousand analyst
13   reports. What are you referring to?
14   A.   In this particular case, there
15   were analyst reports written about
16   Anadarko as well as some of these other
17   partners.
18       And my recollection, at the top
19   of my head, as I sit here right now, that
20   that exceeded a thousand analyst reports.
21   Now, I didn't, I did not list every
22   analyst report written, because there may
23   be nothing in there about Shenandoah.
24   And it was not something that was really
25   in my mind when I was forming my opinion.

Page 25

1    Q.   Okay. With respect to
2    materials you actually relied upon in
3    forming your opinion -- so are you with
4    me? I am now talking about what you
5    actually relied upon, as opposed to what
6    you may have reviewed or had available.
7    Are you with me?
8    A.   Yes.
9    Q.   With respect to those materials
10   that you actually relied upon, are there
11   any materials you relied upon which are
12   not identified in paragraph 12 or Exhibit
13   B?
14   A.   I do not believe so. I think
15   that there may be something in a
16   footnote, where I talk about an analyst
17   report that maybe it didn't make it into
18   my list there. But it should have made
19   it into the list -- you know, so,
20   anything that I mention in my report in
21   the footnotes, and so on, should have
22   been also in Exhibit B.
23   Q.   Now, I think you mentioned
24   analyst reports about Anadarko and its
25   partners.

7 (Pages 22 - 25)

Page 26

1    A.   Correct.
2    Q.   I think that's what you said a
3 few minutes ago, yes?
4    A.   Yes.
5    Q.   And by partners, you mean the
6 list you gave me before, Conoco, Cobalt,
7 Marathon and Manali?
8    A.   Yes.
9    Q.   And of those four companies
10 that I just listed, which was public?
11    A.   Well, Cobalt was public.
12 ConocoPhillips was public.  Of course
13 Anadarko was public.  Marathon would have
14 been public, but they sold their interest
15 at one point in time.  Manali would not
16 have been public.
17    Q.   Okay.  So let's take a look
18 back at your paragraph 12.  In D, you
19 refer to public filings by Anadarko with
20 the SEC including 10-K, 10-Q, 8-K, and so
21 forth; do you see that?
22    A.   Yes.
23    Q.   And publicly-traded companies
24 are required to file Ks, Qs and other
25 such documents with the SEC, right?

Page 27

1    A.   That's correct, yes.
2    Q.   Okay.  Did you look at Ks, Qs
3 and other publicly-filed documents for
4 Conoco?
5    A.   I think I did.  And if there
6 wasn't anything there about Shenandoah,
7 then I considered, I would not have
8 included it.  I would have to look at
9 Exhibit B, and see if there was anything
10 that I listed.
11    Q.   But if you did look at it, it
12 would be on Exhibit B?
13       MS. JENSEN:  Objection,
14    misstates.
15    A.   It would be even, you know, for
16 instance, I recall that they had,
17 ConocoPhillips had an earnings release on
18 May 2nd of 2017.  I know I looked at
19 their earnings release.  I know that I
20 looked at the Form 10Q.  I can
21 double-check to see whether -- and I talk
22 about it in here -- and whether or not it
23 made it into my information.  I think it
24 made it into my information relied on
25 here.  I would have to double -- yeah.

Page 28

1       So, on Exhibit B, page 2, at
2 the very top there, I have,
3 ConocoPhillips form 8-K that was filed on
4 May 2nd.  There was one sentence there
5 talking about the whole expense they had
6 taken with respect to the Shen-6 --
7 that's S-H-E-N-6, that particular well.
8 So I looked at that.
9       Other than that, I don't think
10 I found much with respect to
11 ConocoPhillips.  So I don't -- I didn't
12 really list anything.
13    Q.   Did you look at any filings
14 with the SEC for Cobalt?
15    A.   Yes.
16    Q.   And did you rely upon any of
17 those?
18    A.   It was, actually, I think with
19 respect to Cobalt, it would have been, I
20 know that they made a press release and a
21 filing after the fact.  So from my
22 analysis, I don't know if I referenced
23 anything in my report with respect to
24 that, but I am certainly aware of it.
25 And I am certainly aware of the analyst

Page 29

1 reports discussing the impact of the
2 suspension of the appraisal at the
3 Shenandoah on Cobalt's stock price.
4    Q.   I will come to press releases
5 and analyst reports in a minute.  Right
6 now I am just focused on public filings
7 with the SEC.
8       And so the question is, did you
9 rely upon any SEC filings of Cobalt in
10 forming your opinion?
11    A.   I certainly reviewed their
12 press release that also would be a part
13 of an SEC filing.  But beyond that, I
14 don't, I don't believe I did.
15    Q.   Okay.  And did you rely upon
16 any SEC filings by Marathon in forming
17 your opinion in this matter?
18    A.   I don't believe I did, no.
19    Q.   Okay.  Now, you previously
20 mentioned press releases.  If you look
21 again at paragraph 12 of your report
22 under the item (e), it says "Anadarko
23 press releases and conference call
24 transcripts."  Do you see that?
25    A.   Yes.

8 (Pages 26 - 29)

Page 30

1    Q.    Did you review any Conoco press
2 releases?
3    A.    Yes.
4    Q.    And did you rely upon any
5 Conoco press releases?
6    A.    Yes, I looked at the first
7 quarter of 2017 earnings release of
8 ConocoPhillips, yes.
9    Q.    Okay. And are all of the press
10 releases that you relied upon from Conoco
11 identified on page 2 and 3 of Exhibit B?
12    A.    The two specific ones that I
13 recall is the one on May 2nd, 2017 and
14 May 4th, 2017. And both of them are
15 here, listed here in Exhibit B.
16    Q.    Okay.
17    A.    By the way, let me add
18 something, I think that I referenced
19 another one and that was July 16, 2015.
20 And that is also listed here.
21    Q.    And did you rely upon any press
22 releases by Marathon?
23    A.    No, I don't think so.
24    Q.    And did you rely upon any press
25 releases by Cobalt?

Page 31

1    A.    Yes.
2    Q.    And are those identified on
3 pages 2 and 3 of Exhibit B?
4    A.    Yes.
5    Q.    Now, in paragraph 12, you refer
6 to "Conference call transcripts." What
7 are you talking about?
8    A.    Following earns releases,
9 typically, the company has a conference
10 call with analysts where analysts can ask
11 -- well, first they typically provide a
12 short presentation discussing their
13 results. And then typically there is a
14 question and answer session where
15 analysts can ask questions. And we
16 typically refer to those as conference
17 calls.
18    Q.    Now, on page 3 of Exhibit B,
19 there is a heading "Conference Calls"; do
20 you have that?
21    A.    Yes.
22    Q.    And you list 11 separate
23 Anadarko conference calls; do you see
24 that?
25    A.    Yes.

Page 32

1    Q.    And you list, if I am correct,
2 two Cobalt conference calls; do you see
3 that?
4    A.    That is correct.
5    Q.    And did you rely upon all of
6 those conference call transcripts in
7 forming your opinion?
8    A.    Yes.
9    Q.    Did you look at any
10 ConocoPhillips conference call
11 transcripts?
12    A.    I looked at ConocoPhillips
13 conference calls, but typically they
14 would not discuss anything of relevance
15 relating to Shenandoah.
16    Q.    So I take it you didn't rely on
17 any ConocoPhillips conference calls?
18    A.    Correct.
19    Q.    And did you look at any
20 Marathon conference call transcripts?
21    A.    I don't recall if I did or
22 didn't. They were not the partner during
23 the time period that I focused on the
24 most. So I certainly did not rely on it
25 in forming my opinions.

Page 33

1    Q.    And to be clear, when you said
2 the time period that you focused on the
3 most, what time period is that?
4    A.    My analysis focuses -- a lot of
5 my analysis focuses on the, what happened
6 when, you know, the truth was exposed to
7 the market. In other words, what was the
8 impact on Anadarko's stock price by the
9 release of the alleged truth. And that
10 occurred on May 2nd, 2017 after the
11 market had closed. And also in the
12 morning of May 3rd, 2017, which is when
13 the conference call took place.
14    Q.    Just so we are all on the same
15 page, when you say the alleged truth,
16 what are you referring to?
17    A.    It is the truth that plaintiffs
18 allege was concealed throughout the class
19 period.
20    Q.    And in this case, what is that?
21    A.    The truth with respect to the
22 commercial viability of Shenandoah.
23    Q.    Okay. And I take it you're not
24 offering an opinion with respect to
25 whether Shenandoah was or was not

9 (Pages 30 - 33)

Page 34

1  commercially viable; is that fair?
2      A.   That's correct, yes.
3      Q.   Right.  You're leaving that as
4  a matter of proof by plaintiffs, I take
5  it?
6      A.   That's correct, yes.
7      Q.   But your assumption is that
8  plaintiffs will prove its allegations,
9  correct?
10     A.   That's correct.  That's the
11  general way of approaching this
12  particular issue as a damage expert, yes.
13     Q.   Okay.  Let's try and get some
14  base lines established here.  When you
15  say commercial viability in this context,
16  what do you understand that to mean?
17     A.   Commercial viability has to do
18  with whether or not the economics of the
19  Shenandoah was such that it could be
20  pursued -- pursued in a commercially
21  viable matter.  Another, as an investment
22  whereby you would make money on it.
23  There are costs associated with it.  And
24  there are presumably some revenues and
25  profits that come later on.

Page 35

1          So typically, for something to
2  be viable, it has to, you know, you
3  certainly need to get more money back or
4  expect to get more money back than what
5  you spend upfront as an investment.
6          And then there was a threshold
7  matter.  And that is that you don't
8  engage in this type of endeavor just to
9  break even.  There are certain threshold
10  profits that are -- that one would
11  expect.  And if that threshold is met,
12  then the investment is viable.
13     Q.   Now, you mentioned costs.  So
14  what, in your understanding, were the
15  potential costs with a commercial
16  development of the Shenandoah field?
17     A.   Well, there is, of course,
18  initial drilling costs.  We talk about
19  the exploration well, the appraisal well,
20  sidetrack well, bypass well.  The experts
21  can talk about the different type of data
22  that these wells collect, and so on.  But
23  these things are very, very costly.
24  Hundreds of millions of dollars.  And of
25  course, so you have to invest in them.

Page 36

1  And a lot of investment is upfront.  And
2  those are the costs.  And of course,
3  there are always, if you decide to
4  sanction the field and build it out,
5  infrastructure is all set up.  Then there
6  are, of course, the costs for operating
7  it.  But those costs are typically much
8  less than the initial costs.  But those
9  are the costs typically in a project like
10  this.
11     Q.   In your understanding was any
12  special type of drilling technology
13  required for developing and exploiting
14  the Shenandoah field?
15         MS. JENSEN:  Objection.
16  Compound.  Vague.
17         MR. SLIFKIN:  All right.  Let me
18  fix that.
19     Q.   In your understanding, was any
20  special type of drilling technology
21  required for exploiting the Shenandoah
22  field?
23     A.   I know that there was some
24  discussion about what type of technology
25  that they were, they might be using.  But

Page 37

1  in terms of the technology itself, I am
2  not intimately aware of all of the
3  technical differences between the
4  different technologies.
5      Q.   Do you know if the technology
6  that was needed for the exploitation of
7  Shenandoah was in place at the beginning
8  of the class period?
9      A.   I have not investigated that
10  particular issue, to what extent they had
11  everything in place or had to modify
12  things, you know.  It's not something
13  that I have investigated.
14     Q.   Do you know if the technology
15  necessary to exploit the Shenandoah field
16  was in place at the end of the class
17  period?
18     A.   It's not something that I have
19  specifically investigated.
20     Q.   Okay.  You mentioned revenues
21  from a project.  I assume that's from the
22  sale of whatever hydrocarbons are
23  obtained from the field, right?
24     A.   Yeah.  So ultimately what
25  happens is that often you have to put the

10 (Pages 34 - 37)

Page 38

1  infrastructure in place. You spent all
2  that money. You have the infrastructure
3  in place. And then over the next years,
4  decades, you know, you effectively are
5  extracting, in this case oil, and you're
6  selling that oil on the market. And, you
7  know, that's how you would generate
8  revenues.
9      Q.   Okay. During the class period,
10 did you look at what the price of oil
11 was?
12     A.   Yes, I am familiar with the ups
13 and downs of oil prices before, during
14 and after the class period in general
15 terms. It's not something I have
16 memorized but.
17     Q.   Do you have any recollection of
18 what the price of oil was for the kind of
19 oil that could be extracted from
20 Shenandoah during the class period?
21     A.   It varied. And, you know, oil
22 prices varied during the class period.
23 It ended up, I think it was around 50
24 bucks a barrel at the very end of the
25 class period, average. I think I

Page 39

1  calculated somewhere was slightly below
2  that. But it also was below 30 at some
3  point, I believe.
4        And again, this is just my
5  recollection. It had been much higher
6  prior to the class period. I think there
7  was a five-year period where it was above
8  $60 -- more than a five-year period where
9  it was more than $60. But that's the way
10 that oil prices are, you know. They go
11 up. They go down.
12       And I think that one of the
13 points that Walker was making somewhere,
14 I can't recall exactly where, is that you
15 had to have a long-term perspective on
16 this. So you own something for a very,
17 very long time. And at some points the
18 oil prices are going to be high and
19 sometimes they are going to be low.
20       But the question is that, you
21 know, when we look at an average over a
22 long period of time, is it a viable field
23 to explore --
24     Q.   I take it --
25     A.   Oh, I am sorry -- develop.

Page 40

1  Sorry.
2      Q.   I take it -- well, let me
3  withdraw that and go back.
4        You mentioned revenues, right?
5  And revenues are from selling the
6  hydrocarbons that are extracted from the
7  field, right?
8      A.   Yes. Selling the oil.
9      Q.   So I take it if the price of
10 oil goes up, then there are more
11 potential revenues?
12     MS. JENSEN: Objection, to the
13     extent it calls for speculation.
14     A.   If costs are the same and
15 revenue goes up, then profits go up, yes.
16     Q.   That's not what I asked you. I
17 asked you if the price of oil goes up
18 then everything else being equal, the
19 potential revenues go up, correct?
20     MS. JENSEN: Objection, to the
21     extent that it calls for speculation.
22     Foundation.
23     A.   I think that it's reasonable to
24 expect that revenues go up. If
25 everything else held constant, then the

Page 41

1  price of oil goes up. Yes, I think
2  that's a reasonable expectation.
3      Q.   And conversely, everything else
4  being equal, if oil prices go down, then
5  potential revenues go down, as well?
6      MS. JENSEN: Again, foundation.
7      And objection, to the extent that it
8      calls for speculation.
9      A.   I think it's reasonable to
10 expect that holding everything else
11 equal, if the price of oil declines, then
12 revenues will decline.
13     Q.   I think you said you're
14 familiar with oil prices after the class
15 period ended. Did I hear that correct?
16     A.   Yeah. Well, I looked -- I
17 think that, you know, as part of
18 investing a little bit in oil companies,
19 and so on, yeah, I followed it a little
20 `bit, yes.
21     Q.   And --
22     MS. JENSEN: I am sorry. I am
23     sorry, Dan, let me just get an
24     objection to beyond the scope.
25     Q.   As we sit here today, has oil

11 (Pages 38 - 41)

Page 42

1  prices gone up since the end of the class
2  period?
3      MS. JENSEN: Objection. Beyond
4  the scope.
5      A.  Yeah, what happened -- one of
6  the things that I was interested in was
7  that internally in March of 2017, there
8  was an internal memo. And my
9  understanding of the way I interpreted
10  the internal memo was that they expected
11  oil prices in 2018 to average about $64,
12  $67 a barrel. And it seems to me that
13  that was pretty much where oil went, on
14  average. And in 2018 was roughly, you
15  know, in the mid-60s. So, you know, but
16  that's just an observation.
17      Q.  So as we sit here today, is it
18  fair to say that oil prices have spiked?
19      MS. JENSEN: Objection. Beyond
20  the scope. Vague as to time.
21      A.  I think that in connection with
22  the Russian invasion of the Ukraine, it
23  probably spiked. But it has come down
24  quite a bit since then.
25      Q.  Do you have any sense, as you

Page 43

1  sit here today, of what the current price
2  of oil is?
3      MS. JENSEN: Objection. Beyond
4  the scope. This is -- so, Dan, I
5  mean, look, I think you're getting
6  pretty far afield. This is far after
7  the class period. So I'll leave it
8  there. But I expect you'll move on
9  pretty quickly.
10      Q.  Do you have the question in
11  mind?
12      A.  Yeah. I mean, I know it went
13  above, above 100 and now it has come down
14  below 100. I think it went down below
15  80, even. So I haven't really looked at
16  the prices, you know, lately.
17      But I think I was reading that
18  in the beginning of the war we were, the
19  U.S. was releasing oil from their
20  reserves. And know that they were buying
21  it back at much cheaper prices. So, you
22  know, I mean I have a general
23  understanding.
24      Q.  Do you have any understanding
25  as to whether the Shenandoah field is

Page 44

1  being exploited today?
2      MS. JENSEN: Objection. Far
3  beyond the scope.
4      A.  My understanding is that there
5  are some -- well, effectively, Anadarko
6  and Parship Group had to give up their
7  lease. That's my understanding. My
8  understanding is that there may be some
9  other group looking into it. I mean
10  that's a factual issue that I am not here
11  to provide that type of information.
12      Q.  Did the current status of the
13  exploitation of the Shenandoah field,
14  factor at all into your opinions in this
15  matter?
16      MS. JENSEN: Objection. Dan,
17  again, far beyond the scope. Far
18  after the class period.
19      A.  It would not factor into my
20  analysis of the price decline in, on May
21  3rd of 2017. No.
22      Q.  Now, I believe you testified
23  that during the class period that the
24  price of oil fluctuated; is that fair?
25      A.  Yes.

Page 45

1      Q.  Did that fluctuation of the
2  price of oil during the class period
3  factor in any way into the opinion that
4  you're offering in this matter?
5      A.  There is always a question
6  whether or not you should include some
7  adjustment for multiple factors operating
8  on the fraud on the inflation. So I have
9  a footnote with respect to that.
10      And, you know, I think the most
11  common thing is not to make any
12  adjustments because there are other
13  things that one would have to consider as
14  well. And ultimately, it's a wash. And
15  in this case, it would lead to higher
16  inflation on most of the base during the
17  class period. And I was not comfortable,
18  without a better basis to increase
19  damages based on that.
20      And there is also the issue of
21  the fact that the price that you would
22  sell the oil in Shenandoah for is not
23  today's price. It would be the price,
24  whatever it would be, when the field was
25  fully developed and that price is, of

12 (Pages 42 - 45)

Page 46

1 course, not known.
2        So, you had to have, you know,
3 it's more common to take a long-term
4 perspective with respect to that.
5    Q.   Okay.  Now, you mentioned --
6 well, withdrawn.  Let me ask one more
7 question or one more topic on this.
8        I take it you didn't make your
9 own assessment of commercial viability of
10 the Shenandoah field?
11        MS. JENSEN:  Asked and answered.
12   A.   No.  That would involve a lot
13 of expertise that I do not have in
14 geology, geophysics and so on.  So no, I
15 did not.
16   Q.   Do you have any understanding
17 as to whether the fluctuating price of
18 oil during the class period affected the
19 commercial viability of the Shenandoah
20 field?
21        MS. JENSEN:  Objection,
22 foundation.  Objection, to the extent
23 that it calls for speculation.
24   A.   It depends on the way that -- I
25 mean, what you're trying to determine

Page 47

1 from an economic point of view is what is
2 the price of oil that you will receive
3 when you sell the oil.
4        And so it's not clear to me
5 exactly how the current price of oil
6 necessarily changes the price of oil of a
7 field over a long period of time.  There
8 may be, but it's not exactly clear to me.
9        Typically what happens is that
10 you have periods where, you know, you
11 have more supply than demand.  And, you
12 know, the price is so low.  And then
13 everybody corrects for that and then the
14 prices go up, and so on.  So you have
15 a  fluctuation.  And if you have a
16 long-term perspective, then it kind of
17 cancels out.
18        But there can be other factors.
19 And they are more complicated to actually
20 get to where there could be change --
21 changes with respect to expectations with
22 respect to what the oil price will be
23 five, 10 years from now.  I certainly
24 have not performed that analysis.  So I
25 can only work with what I have.

Page 48

1    Q.   Do you have any knowledge as to
2 whether expected future oil prices
3 changed during the class period?
4    A.   There would be changes, but it
5 would -- you can look at the future
6 prices, the futures being traded on the
7 New York Mercantile Exchange.  But
8 typically those are going to be more
9 short term, maybe a year or two.  So it
10 depends on what you mean by long-term old
11 prices.  It's a complicated -- it's a
12 difficult thing to forecast.  And then
13 you have events such as Covid that can
14 all of a sudden have a big impact on oil
15 prices.  The oil prices went down.  And
16 then you have the Russian invasion of
17 Ukraine.  And the oil price goes up.  So
18 you have all of these factors that you
19 just don't know.
20        So it's very, very difficult to
21 forecast oil prices, you know, five
22 years, 10 years.  But over a long period
23 of time, you know, you can have some
24 sense that you probably will go through
25 periods with low prices and periods with

Page 49

1 high prices.
2    Q.   Did you make any effort to look
3 at what the expectation of future oil
4 prices was internally at Anadarko during
5 the class period?
6        MS. JENSEN:  Objection.  Beyond
7    the scope.
8    A.   The only thing that comes to
9 mind is, I think it was March 17th --
10 March -- it was probably March 17th,
11 2017, or something like that, I reference
12 it in one of my reports.
13        And I think their expectation
14 was that the oil prices would be 64 to 67
15 dollars on average during 2018.  And I
16 also think that -- I think it was Walker
17 who made some statements that he thought
18 that that average oil price in 2017 would
19 be, probably be around $60.  That may be
20 a reflection of what they thought
21 internally.  But that is also very, very
22 short term because, you know, the oil
23 from Shenandoah would not be sold in
24 either 2017 or 2018.
25    Q.   In your understanding, had

13 (Pages 46 - 49)

Page 50

1 Shenandoah been commercially developed,
2 in what time frame would the sale of oil
3 have been?
4    A.   It would have been a few years
5 away, that's my understanding.  But as I
6 sit here right now, I don't know exactly
7 when that would be.
8    Q.   Okay.  So you reference this
9 document and something that Mr. Walker
10 said.
11       Do you have any knowledge as to
12 how those expectations with respect to
13 the future price of oil compared to
14 internal Anadarko expectations earlier in
15 the class period?
16    A.   I do not know.  I don't have
17 any opinions relating to that.  And it's
18 beyond the scope of what I was focusing
19 on.
20    Q.   Okay.  So to come back you
21 spoke about the alleged truth coming out.
22 And you said in this case it's the truth
23 with respect to commercial viability.
24 Are you with me?
25    A.   Correct.

Page 51

1    Q.   And in your understanding, at
2 least, for the purposes of your analysis,
3 what was the truth that came out?
4       MS. JENSEN:  Objection.  Asked
5    and answered.
6    A.   Well, the specific alleged
7 truth in this particular case relates to
8 the suspension of appraisal activities at
9 the Shenandoah; as well as the impairment
10 charge that they took at the time; as
11 well as the expenses of the drilling
12 costs, including drilling costs -- some
13 drilling costs that had previously been
14 capitalized.  And as well as, you know,
15 results of the Shen-6 sidetrack well that
16 was dry.
17    Q.   Okay.  So you say that's the
18 truth with respect to Shenandoah?
19    A.   No, that is the alleged truth.
20 That is what plaintiffs allege in the
21 complaint.
22       I am not here -- I am not the
23 paid juror to determine whether or not
24 those allegations are correct or not, but
25 that is information that was fraudulently

Page 52

1 concealed.  It was something that the
2 company, you know, that or similar
3 information, is something that the
4 company should have revealed earlier.
5 It's just an alleged truth.  It's in the
6 complaint.
7    Q.   And for purposes of your
8 analysis, when should that alleged truth
9 have been disclosed to the market?
10    A.   The misrepresentations relating
11 to the commercial viability of the
12 Shenandoah started on, when they filed
13 the 10-K.  So that was, I think it was
14 after the market closed on February 20th.
15 So it would be on February 21st, 2015.
16 That's where you would have, there would
17 have been some truth.
18       And my understanding is that
19 the truth at that point in time would
20 have been that the Shenandoah was most
21 likely not commercially viable as of that
22 time.
23    Q.   When you say most likely, what
24 do you mean by most likely?
25    A.   Well, that is the determination

Page 53

1 of the other experts in this particular
2 case.  So most likely means that it is
3 more than 50 percent.  That's the way I
4 read it.
5    Q.   Okay.  And did that, did that
6 change during the class period, the
7 likelihood of commercial viability?
8    A.   After the Shen-4, the experts
9 concluded, the assumption is that it
10 certainly was not commercially viable
11 after.  So it goes from most likely to
12 certainly not commercially viable.
13    Q.   And this analysis of most
14 likely shifting to certainly not, in your
15 understanding, was that known within
16 Anadarko during the class period?
17       MS. JENSEN:  Objection, to the
18    extent that it calls for speculation.
19    Objection, beyond the scope.
20    A.   Could you repeat the question?
21    Q.   Yes.  That shift with respect
22 to commercial viability during the class
23 period that you just described to me,
24 from most likely to be -- most likely not
25 commercially viable to certainly not

14 (Pages 50 - 53)

Page 54

1  commercially viable. Are you with me, I
2  am talking about that distinction that
3  you just described?
4      A.   Correct.
5      Q.   So that distinction, in your
6  understanding, was that distinction known
7  to folks within Anadarko during the class
8  period?
9          MS. JENSEN: Objection.
10     Characterization and beyond the scope.
11     A.   I don't know what was known
12  internally at Anadarko. But all I know
13  is that based on the experts' review of
14  the results from the Shen-4, that is what
15  they determined. That's my
16  understanding.
17     Q.   And so you haven't done an
18  independent analysis of this. You're
19  just taking the work and conclusions of
20  other experts; is that fair?
21         MS. JENSEN: Objection to the
22  characterization.
23     A.   Yes, I am. I have no knowledge
24  of what Shenandoah understood internally.
25     Q.   Okay. So you -- do you know

Page 55

1  who Lea Frye is?
2      A.   Yes. I believe she was the
3  lady who filed a whistleblower complaint.
4      Q.   Did that whistleblower
5  complaint factor into your analysis at
6  all?
7      A.   I think it probably factored
8  into -- it may have factored into the
9  other experts' work in this case. And I
10  am taking my assumptions from them.
11         So indirectly, you know, maybe
12  it impacted my analysis. But I am
13  looking at the assumptions that were
14  provided to me. So I don't know to what
15  extent her whistleblower complaint, you
16  know, factored into these assumptions and
17  consequently how that factored into my
18  analysis, which is based on those
19  assumptions.
20     Q.   Did you investigate what Ms.
21  Frye's understanding with respect to the
22  commercial viability of the Shenandoah
23  field was during the class period?
24     A.   No, I did not.
25     Q.   Do you have any understanding

Page 56

1  as to what her analysis was?
2      A.   Obviously, there is some
3  discussion about it, about her
4  whistleblower complaint. But, no, I
5  don't have any particular understanding
6  of what her view was, no.
7      Q.   Okay. Did you investigate the
8  understanding of the non-Anadarko
9  partners, the Shen partners who weren't
10  Anadarko, was during the class period
11  with respect to commercial viability?
12     A.   I have no knowledge other than
13  the public statements that they were
14  making with respect to what their
15  internal view was with respect to
16  Shenandoah.
17     Q.   Now, you mentioned Shen-4, are
18  you with me?
19     A.   Yes.
20     Q.   Okay. I take it you're aware
21  that after the, after the Shen-4 well
22  results came out, wells were drilled
23  known as Shen-5 and Shen-6, correct?
24     A.   That's correct, yes.
25     Q.   And you mentioned the end of

Page 57

1  the class period is the announcement of
2  the Shen-6 results, correct?
3          MS. JENSEN: Objection.
4      Characterization.
5      A.   It was a suspension of the
6  appraisal of Shenandoah and also the
7  result of the Shen-6 sidetrack well that
8  ended the class period.
9      Q.   And I think you mentioned the
10  Shen-6 sidetrack well was dry?
11     A.   That was disclosed at that
12  point in time, yes.
13     Q.   And do you know when those
14  results actually came in?
15     A.   You mean to Anadarko?
16     Q.   Yes.
17     A.   No, I do not know when those
18  results came in.
19     Q.   But you understand that at the
20  time of the Shen-4 well results, Shen-5
21  and Shen-6 hadn't been drilled?
22     A.   Yeah, yes.
23     Q.   And thereby their results by
24  definition were not available?
25         MS. JENSEN: Objection,

15 (Pages 54 - 57)

Page 58

1  characterization.
2      A.   Yes.  Obviously, in a case like
3  this the argument is not that the Shen-6
4  results should have been disclosed at the
5  time of the Shen-4 results were disclosed
6  or at the time the Shen-3 results were
7  disclosed.
8          The issue there, I mean the
9  arguments in these type of cases is that
10 the results or the information that the
11 company already had would have
12 demonstrated the lack of commercial
13 viability of the Shenandoah.  Not the
14 specific Shen-6 results.
15     Q.   Do you have any understanding
16 as to why the Shen-5 well was drilled?
17         MS. JENSEN:  Objection, to the
18 extent that it calls for speculation.
19 Foundation.
20     A.   Other than the obvious answer
21 that they wanted more information.  I
22 don't, I don't have anything -- I haven't
23 reviewed any internal documents to
24 investigate anything in particular with
25 respect to anything more in particular

Page 59

1  with respect to that issue.
2      Q.   Do you have any understanding
3  as to the process for the approval of
4  Shen-5 -- let's take Shen-5 -- the
5  process for the approval of the Shen-5
6  well?
7          MS. JENSEN:  Objection.  Beyond
8  scope.
9      A.   The internal process that
10 Anadarko went through in order to
11 determine whether or not to drill Shen-5
12 is beyond what I have looked at.
13         MR. SLIFKIN:  Okay.  Well, why
14 don't we take a little bit of a break,
15 and we can go to the restroom, and so
16 forth.  Maybe 10 minutes.  Is that
17 fair?
18         MS. JENSEN:  Sure.
19         THE VIDEOGRAPHER:  The time is
20 10:26 a.m., we are going off the
21 record.  This will end media unit
22 number 1.
23         [Off the record.]
24         THE VIDEOGRAPHER:  The time is
25 10:41 a.m., and we are back on the

Page 60

1  record.  This will be the start of
2  media unit number 2.  You can proceed,
3  counsel.
4          MR. SLIFKIN:  Thank you.
5  BY MR. SLIFKIN:
6      Q.   Do you have any understanding
7  of what the results of Shen-4 were?
8      A.   Yeah, just what they stated in
9  -- publicly stated, that they encountered
10 620 net feet of oil pay.  And I have, you
11 know, a brief summary of that in
12 paragraph 21 in my report.
13     Q.   In your understanding was
14 there, in fact, 620 net feet of oil pay
15 in Shen-4?
16         MS. JENSEN:  Objection.  Beyond
17 the scope.
18     A.   I have not been asked to assume
19 anything.  I mean I don't know.
20     Q.   For purposes of your analysis,
21 you know, did you deem that statement to
22 be false?
23     A.   I think that the argument by
24 plaintiffs, to my understanding, is that
25 the statement was misleading, and that it

Page 61

1  did not fully reflect what the company
2  knew about Shen-4.
3      Q.   About Shen-4 or Shen as a
4  whole?
5      A.   Well, what I am working with is
6  the assumption with respect to commercial
7  viability.  So that is really what I am
8  working with.  But that, that assumption
9  became stronger after Shen-4, presumably
10 because of results relating to Shen-4.
11     Q.   Do you have any understanding
12 as to whether -- withdrawn.
13         I know you're not sort of an
14 oil and gas expert, but do you have any
15 understanding as to whether or not 620
16 net feet of oil pay is a lot or a little
17 or good, bad; any understanding in that
18 regard?
19         MS. JENSEN:  Objection.  Beyond
20 scope and form.
21     A.   Well, it depends on -- you
22 know, it depends on what the expectations
23 are, right?  And it depends on what you
24 compare it to.  And so I think that what
25 you would do, I mean if you compare it to

16 (Pages 58 - 61)

1 the thousand feet of net oil pay from
2 Shen-2, you know, it's less than that.
3 But, you know, you know, it's more than
4 Shen-1.
5          So I think there is a lot of
6 information that is derived from drilling
7 a well that may or may not be reflected
8 in just one number, 620 net feet of oil
9 pay. You know, it seems to me that the
10 company viewed it as pretty good.
11          I think the quote -- they were
12 talking about it, the reservoir quality,
13 and the initial assessment looks pretty
14 comparable to everything else we found
15 out there. And it goes on to say that we
16 are very encouraged.
17          So I think that the color alone
18 also is a second thing that the investor
19 would assess when they, when they receive
20 a result like this.
21     Q.   Okay. Now, you mentioned that
22 Shen-2 -- Shen-2 had a thousand feet of
23 pay in your prior answer; are you with
24 me?
25     A.   Correct. So what I am saying

1 is that if the only thing that you're
2 looking at, because the only thing in
3 your question was the number, 620. Is
4 620 good?
5          Well, you know, it's not as
6 good as a thousand; right? But then
7 again, I mean, I think you have to, you
8 know, look at the entire picture. I
9 mean, how many wells did they drill, you
10 know? And from all of them, is this the
11 best one of a bunch of them? I mean what
12 else is there? You know, is there other
13 information there that would detract from
14 this particular number?
15          So I would be, you know,
16 depending on your level of expertise in
17 this particular field, an investor
18 would -- some investor would take great
19 guidance from the way that the results
20 were characterized by the company.
21 Others may look at it a little bit
22 different.
23          So just looking at one number,
24 I think you have to look at how it's
25 characterized by the company, and whether

1 or not there are other issues or other
2 facts or information that was also
3 revealed by the results of that
4 particular well.
5     Q.   Just to go back to Shen-2 for a
6 moment. So Shen-2 had a thousand feet of
7 net oil pay, right?
8          MS. JENSEN: Objection.
9     A.   Yes, that is what I recall. I
10 have it in paragraph 18. And I don't
11 know if I specifically said that it has a
12 thousand feet of oil pay. But I am
13 pretty sure that's what it had.
14     Q.   Well, this is not a trick
15 question. You can look at your footnote
16 12, if you want.
17     A.   Yes, exactly. Yeah.
18     Q.   Right. Okay. So then -- and
19 that was before the class period, right?
20     A.   That's correct, yes.
21     Q.   And in your understanding, is
22 that statement alleged to be either false
23 or misleading?
24     A.   No, I mean, my understanding is
25 that the class period starts with the

1 misrepresentation, alleged
2 misrepresentation in the Form 10-K that
3 came out after the market closed on
4 February 20th, 2015. So that is the
5 first alleged misrepresentation that's
6 relevant, for my purposes. You know,
7 they may, you know, this may have been a
8 false statement, too. But I mean for my
9 purposes, you know, I explicitly start my
10 inflation following that filing of Form
11 10-K.
12     Q.   So in your opinion, which are
13 the inflationary statements?
14     A.   Inflationary statements?
15     Q.   Right.
16     A.   Well, I mean, I typically call
17 them misrepresentations. The alleged
18 misrepresentations starts with the
19 statement, the representations in the
20 Form 10-K for the year-ended 2014.
21     Q.   So that's the document that was
22 filed with the SEC on February 20th,
23 2015; is that right?
24     A.   Correct, yes. That is the
25 first misrepresentation that I had for

17 (Pages 62 - 65)

Page 66

1 the purposes of establishing when
2 liability starts in this particular case.
3     Q.   Okay.  But your opinion has to
4 do with artificial inflation in the stock
5 price, correct?
6     A.   Correct, yes.
7     Q.   And so my question is, in your
8 opinion, when did that artificial
9 inflation start?
10     A.   Well, that started following
11 the first misrepresentation, which was
12 the filing of the 10-K.  At that point in
13 time, that's when you get an inflation,
14 which is the difference between the stock
15 price and the true value reflecting the
16 alleged truth.
17     Q.   And again that's February 20th,
18 2015?
19     A.   Well, it was after the market,
20 so it ends up being February 21st of
21 2015, yes.
22     Q.   Okay.  So I've asked you -- you
23 know, and I am looking at your paragraph
24 20, just to be clear, right, I assume you
25 have it in front of you?

Page 67

1     A.   Yes, I do.
2     Q.   And I was talking to you about
3 paragraph 21, and that's the Shen-4
4 result.
5          And then if we go to paragraph
6 22, that's the Shen-5 results.  And you
7 see there's, you quote an Anadarko
8 announcement on July 26th, 2016 that
9 Shen-5 had encountered more than 1,040
10 net pay -- net feet of oil pay; do you
11 see that?
12     A.   That's correct, yes.
13     Q.   Okay.  And in your
14 understanding, was that a false
15 statement?
16     A.   It was a misrepresentation.
17 That's my understanding.
18     Q.   When you say that --
19     A.   Because it was not -- typically
20 the way that these cases work is that
21 something is or may be false or
22 misleading if it conceals material
23 information that is necessary in order to
24 fully understand the subject.
25          So with respect to the Shen-5

Page 68

1 disclosure, the issue there is whether or
2 not this is a full and accurate
3 disclosure of the results up until that
4 point in time.
5     Q.   Okay.  But, again, my question
6 is a little bit narrower, which is in
7 your understanding for purposes of your
8 analysis, is it actually incorrect that
9 there was 1,040 net feet of oil pay in
10 Shen-5?
11          MS. JENSEN:  Objection.
12     Misleading.
13     A.   No, that is not my
14 understanding of their allegations.  I
15 think my understanding of their
16 allegations is that there is more
17 information that should have been
18 disclosed with respect to the results of
19 the Shen-5.
20     Q.   Okay.  Again, and your
21 understanding is that 1,040 net feet of
22 oil pay, is that a lot or no big deal or
23 what?
24          MS. JENSEN:  Objection to form.
25     A.   Well, you're on your fifth well

Page 69

1 and you have the highest net pay.  So if
2 you just look -- again, if you just look
3 at the number, the number is the highest
4 of all of the wells that had been drilled
5 up until that point in time.  So if you
6 just look at the number, that would seem
7 to be pretty good.
8     Q.   Okay.  Now, there were a series
9 of misstatements alleged in this matter.
10 Are you familiar with that?
11     A.   I know that there are a series
12 of misstatements.  So, yes.
13          MR. SLIFKIN:  Your video is
14 cutting in and out a little bit.  I
15 got something that says my Internet is
16 unstable.
17          Let's go off the record for a
18 second.
19          THE VIDEOGRAPHER:  Time is
20 10:54, and we are going off the
21 record.  Hold on a second.
22          [Off the record.]
23          THE VIDEOGRAPHER:  The time is
24 11:07 a.m., and we are back on the
25 record.

18 (Pages 66 - 69)

1     [Discussion held off the
2   record.]
3 BY MR. SLIFKIN:
4    Q.   Okay.  I apologize for the
5 technical difficulty.  Let's go back to
6 where we were.
7       I take it you're familiar with
8 the fact that in the operative complaint
9 in this matter, there is a series of
10 alleged misstatements during the class
11 period?
12   A.   Yes, I am.
13   Q.   Okay.  In your opinion, did
14 those alleged misstatements add to the
15 inflation in the price?
16   A.   Add to the inflation, no.  They
17 are statements that, to my understanding,
18 were false and misleading, because they
19 did not disclose the entire truth as
20 alleged by plaintiffs with respect to the
21 issues that were disclosed.
22   Q.   Okay.  Did you perform some
23 kind of event study analysis with respect
24 to each of those 21 alleged
25 misstatements?

1    A.   The initial analysis that I did
2 for market efficiency did look at each
3 day.  But I did not -- I do not recall
4 whether or not any of those days had a
5 statistically significant price increase.
6 But I wouldn't -- given the allegation in
7 this particular case, I wouldn't
8 necessarily expect there to be any
9 increase because it relates to
10 information that was concealed throughout
11 the class period and then was disclosed
12 at the very end of the class period.
13   Q.   I take it in your analysis
14 inflation during the class period is
15 flat, except for one step up, correct?
16   A.   Yes.  So the primary analysis
17 that I performed in this particular case,
18 was to quantify the inflation based on
19 the price decline when the alleged truth
20 was disclosed at the end of the class
21 period.
22       So in other words, very often
23 the best estimate of the impact of
24 disclosing the alleged truth is to see
25 what actually occurred when the alleged

1 truth was disclosed.  So that's, that's
2 what I did in this particular case.
3    Q.   Just to go back to my point,
4 inflation is -- withdrawn.
5       I take it under your analysis
6 there were two separate bands of
7 inflation during the class period.  There
8 is the initial class period and then
9 there is later in the class period,
10 correct?
11   A.   Correct.  There is an increase
12 because their ownership increased.  In
13 other words, I looked at the price
14 decline at the very end of the class
15 period.  And then I reduced that
16 inflation because during the earlier
17 period, in the class period, the company
18 only owned 30 percent of the Shenandoah
19 as opposed to 33 percent, which was the
20 ownership at the time of the corrective
21 disclosure.
22   Q.   Can you explain to us why that
23 change in ownership makes a difference
24 for you?
25   A.   Well, the issue is what the

1 ownership was at the time of the
2 disclosure.  And the more the company
3 would own of Shenandoah, the more the
4 impact would be.
5       So the question then became,
6 well, what happened during the early
7 period of the class period when they own
8 30 percent and not 33 percent, shouldn't
9 they -- wouldn't the inflation be less
10 than.  So I made an adjustment to account
11 for that.
12   Q.   And isn't that because the
13 inflation is premised on expected future
14 cash flows?
15   A.   Well, the investors make their
16 own determination that is then reflected
17 in the price decline.  And, yes, that
18 would be, I mean, the value of the stock
19 is based on the present value of the
20 future cash flows.  So if you own 30
21 percent versus 33 percent, there would be
22 some difference there.  So the question
23 is do you make an adjustment or do you
24 not make an adjustment.  And my view was
25 more conservative to make an adjustment.

19 (Pages 70 - 73)



Page 74

1 And that's what I did.
2    Q.   When you say the future cash
3 flows and you refer to 30 percent, I take
4 it you mean the future cash flows that
5 would be attributable to a 30 percent
6 ownership stake of Shenandoah, right?
7    A.   Well, there are many factors
8 that, I mean they were the operator.
9 There may be different ways of looking at
10 it. But I think that in this particular
11 case, that's the numbers that I had, and
12 so I make the adjustment based on the
13 numbers that I had. And that is the
14 ownership interest that they had. So
15 that's why I made the adjustment.
16    Q.   Is it fair to say that the
17 ownership goes from 30 percent to 33
18 percent, so -- well, let's take it in
19 pieces, the ownership goes from 30
20 percent to 33 percent, right, at some
21 point in time?
22    A.   Yes, in the -- yes.
23    Q.   So what you do is you calculate
24 inflation at a point in time when the
25 ownership is 33 percent, correct?

Page 75

1    A.   Correct.
2    Q.   Then you reduce inflation to
3 account for the fact that an earlier
4 point in time the ownership interest is
5 only 30 percent, right?
6    A.   Correct. What I want to do is
7 to account for the fact that the
8 ownership is less in the early part of
9 the class period. The only numbers I
10 have to work with is the ownership
11 interest. So that's what I did to make
12 that adjustment.
13    Q.   Okay. Can you go back to your
14 report, please, paragraph --
15       MS. JENSEN: Dan, which report?
16       MR. SLIFKIN: I am sorry,
17    Exhibit 503, the principal report of
18    this date.
19       MS. JENSEN: Got it.
20    Q.   Mr. Steinholt, can you go back
21 to Exhibit 503?
22    A.   Correct, I have that in front
23 of me.
24    Q.   I just can't see what's in
25 front of you; so, yes. So can you look

Page 76

1 at paragraph 28.
2    A.   Yes, I am here.
3    Q.   Okay. So you see in paragraph
4 28, there is an (a) through (j) of
5 various, what you describe as material
6 facts necessary not to make their
7 statements misleading; do you see that?
8    A.   Yes, I do.
9    Q.   And have you done any
10 independent analysis of each of these (a)
11 through (j) to determine their
12 materiality?
13    A.   No, I have not made any
14 determination of each of these
15 statements. I think the important one to
16 me was the last statement, which is
17 statement (j) which reads "Shen was more
18 likely than not uncommercial after the
19 result of Shen-3 and certainly not
20 commercially viable after Shen-4."
21    Q.   I see. So if we take "the
22 asphaltene deposition properties," can
23 you tell me what that means?
24    A.   It has to do with a
25 compartmentalization of the liquids,

Page 77

1 that's my understanding. But I haven't
2 really looked into these particular
3 issues and looked into the
4 materialization of these particular --
5 into the materiality of these particular
6 issues.
7       To me the issue is is this
8 commercially viable or not. That's what
9 you're trying to determine. So that's,
10 that was kind of my focus. And a lot of
11 these issues become too technical for me.
12    Q.   Because you said earlier on, I
13 think, that part of your opinion has to
14 do with materiality, right, from an
15 economic perspective?
16    A.   Yes, yeah. In terms of the
17 individual issues here, that is not, I am
18 not opining on materiality of each
19 particular issue.
20       Looking at materiality in the
21 context of the corrective disclosure,
22 which I found to be statistically,
23 resulting in a price decline that was
24 statistically significant. The 1
25 percent, that's certainly material.

20 (Pages 74 - 77)

1      And so I had a discussion about
2  materiality, the way that I look at it,
3  whether or not, you know, the information
4  impacts the present value of the future
5  cash flows, that is information that is
6  typically considered to be material to
7  investors, and so on.
8      So I do touch upon materiality.
9  But if you are asking me what was the
10 materiality of one particular item here
11 in this list in paragraph 28, I have not
12 performed that analysis and it's nowhere
13 in my report.
14    Q.  Right.  So again, I don't want
15 to belabor this too much.  Let's look at
16 (d), it says "Pressure data from Shen-3."
17    I take you haven't analyzed the
18 materiality of pressure data from Shen-3?
19    A.  No, I have not --
20    Q.  Right.
21    A.  -- that is what you would find
22 in the other expert reports.
23    Q.  Right.  And again (e), you
24 haven't analyzed -- let me make it
25 easier.

1      (e), what is asphaltene?
2    A.  It has to do with the
3  properties of the oil.  And beyond that,
4  I can't really go into detail.
5    Q.  Okay.
6    A.  Or I certainly am not going to,
7  you know, glean my understanding of it
8  here at this deposition.  Because it's --
9  I read the report.  I read what they had
10 been discussing.  And it's not something
11 that, you know, I am here to testify on.
12    Q.  Well, similarly, if I just go
13 up, in (c), it talks about sand thickness
14 variability.  I take it you're not
15 opining specifically about the
16 materiality of sand thickness
17 variability?
18    A.  No.  I have no opinion here.  I
19 don't discuss either of those two issues
20 in my report.
21    Q.  And again, right above that,
22 there is a reference to fault
23 compartmentalization.  Do you see that?
24    A.  Yes.
25    Q.  And I take it you're not

1  offering an opinion, specifically, about
2  the materiality of information regarding
3  fault compartmentalization?
4    A.  Yes.  In terms of, if you have
5  oil deposits that are in different
6  compartments, and you need more oil rigs,
7  I can talk about, you know, the fact that
8  the cost is going to increase and that is
9  material from an economic point of view.
10 But in terms of, you know, analyzing the
11 fault lines of the Shenandoah and
12 determining, well, this is a lot, this is
13 a little.  You know, that's why you have
14 these other experts.  That's not what I
15 do.  I look at the numbers.  I analyze
16 the economics.
17    Q.  And did you analyze the
18 potential future costs of how many oil
19 rigs would be necessary for Shenandoah
20 given its geological structure?
21    A.  No.  That's why it's not in my
22 report.
23    Q.  Now, I take it your
24 understanding is that the -- well,
25 withdrawn.

1      I take it your opinion is that
2  the corrective disclosure in this matter
3  was made after the close of the stock
4  market on May 2nd, 2017?
5    A.  The alleged truth, by
6  definition, because it's the plaintiffs
7  who define what it is, occurred, you
8  know, it occurred after the market closed
9  on May 2nd and also includes the
10 conference call in the morning and the
11 next day.  I don't really view that as --
12 I mean, that is the alleged truth in this
13 case.
14    Q.  To be clear, you're not opining
15 on that, that is just what you're taking
16 from plaintiffs?
17    MS. JENSEN:  Objection.  Vague.
18    A.  I read the complaint.  And I
19 look at their allegations.  And I look at
20 when that was disclosed.  And that's I
21 just discussed.
22    Q.  Okay.  So maybe you can just
23 turn in your report, Exhibit 503, again,
24 to Exhibit B, and page 3.  Actually.
25 Let's start at the top of page 2.  Are

21 (Pages 78 - 81)

Page 82

1 you with me, of Exhibit B?
2    A.   Exhibit B, page 2.
3    Q.   You see the very top line is,
4 under it says Exhibit B, "Information
5 Relied Upon." And then it says
6 "ConocoPhillips Form 8-K filed with the
7 SEC on May 2nd, 2017."
8    A.   Yes, I do.
9    Q.   And if you look at the top of
10 page 3, the first substantive entry is
11 "May 2nd, 2017, ConocoPhillips Press
12 Release, ConocoPhillips Reports
13 First-Quarter 2017 Results."
14       Do you see that?
15    A.   Yes.
16    Q.   Are the press release and the
17 8-K the same or different?
18    A.   Well, I think that actually
19 this is the same. I think that probably,
20 that should refer to the 10-Q that the
21 company filed. But they had both an 8-K
22 -- actually, they didn't have a Q. I
23 think it's the same. I think it's the
24 same thing. I don't think that they
25 filed a Q on May 2nd. So that would be

Page 83

1 the same thing, yes. Probably. As I sit
2 here right now. I might have put it both
3 places. You know, I have a press
4 release. That press release also was
5 included in the SEC filing.
6    Q.   And do you know when during the
7 day the press release was issued?
8    A.   That press release was issued
9 in the morning, so that was prior to the
10 close.
11    Q.   Was it prior to the open of the
12 markets?
13    A.   I think it was. But as I sit
14 here right now, I don't know.
15    Q.   Is it fair to say that that
16 information in that press release was
17 available to the market at some point
18 during the trading day?
19    A.   Yes, at the very beginning.
20 Yeah, it was early in the morning.
21    Q.   Do you recall if there is any
22 reference to Shen-6 in that Conoco press
23 release?
24    A.   Yes. I think I discuss that in
25 one of my reports. There is one line

Page 84

1 that talks about dry hole expense of 101
2 million dollars and that dry hole expense
3 would include Shen-6.
4    Q.   And do you know if there was
5 any price reaction in the ConocoPhillips
6 stock to that news during the trading day
7 on May 2nd, 2017?
8    A.   There was certainly not a
9 statistically significant price impact.
10 Obviously, this was an earnings
11 announcement. So there is a lot of
12 information. We are talking about one
13 sentence in a press release that included
14 the company's performance during the
15 first quarter. So the totality of all
16 the information that was disclosed by
17 ConocoPhillips did not, did not result in
18 a statistically significant price
19 movement on that day.
20    Q.   Would you agree that the
21 information was available to the market
22 as of the beginning of the trading day on
23 May 2nd, 2017 that Shen-6 was a dry hole?
24    A.   You know, it may, that may be
25 true. I think it's true. But, you know,

Page 85

1 it's a factual issue. It's just a matter
2 of double-checking, you know, when the
3 information came out.
4    Q.   And that is just to check
5 exactly when this press release was
6 issued?
7    A.   Yes, exactly.
8    Q.   Okay. Was there any
9 statistically significant price movement
10 of Cobalt stock during the trading day on
11 May 2nd, 2017?
12    A.   No, I don't believe so.
13    Q.   Was there any statistically
14 significant movement, price movement of
15 Anadarko stock during the trading day on
16 May 2nd, 2017?
17    A.   I do not believe so, no.
18    Q.   Okay. On May 3rd, I take it,
19 there was a statistically significant
20 movement in Anadarko price stock -- stock
21 price. Sorry, let me start that again.
22       On May 3rd, I take it, there
23 was statistically significant movement in
24 the Anadarko stock price, correct?
25    A.   That is correct, yes.

22 (Pages 82 - 85)

1    Q.    Okay. Was there a
2  statistically significant movement in
3  Conoco, in Conoco's stock price on May
4  3rd, 2017?
5    A.    No. There was a statistically
6  significant price decline in Anadarko's
7  stock and in Cobalt stock.
8    Q.    Okay. But not in Conoco stock?
9    A.    That is correct.
10        MS. JENSEN: Asked and answered.
11    Q.    And at that point in time, what
12  was Conoco's percentage ownership of
13  Shen?
14    A.    It was 30 percent.
15    Q.    And I take it the Anadarko
16  ownership was 33 percent, correct?
17    A.    Anadarko's ownership was 33
18  percent, correct.
19    Q.    And Cobalt's was 20 percent; is
20  that right?
21    A.    I believe that's correct, yes.
22    Q.    Do you recall what the market
23  cap of Cobalt was on May 3rd, 2017?
24    A.    I can look it up in one of my
25  reports. I think I discussed that. It

1  was less than 200 million.
2    Q.    And what was Anadarko's market
3  cap, if you recall?
4    A.    The Anadarko market
5  capitalization was 31-and-a-half billion.
6    Q.    And do you recall what
7  ConocoPhillip's market cap was on May
8  3rd, 2017, or thereabouts?
9    A.    They had a 57 billion market
10  capitalization.
11    Q.    Now, in your report you have
12  something called the E&P Peer Group; do
13  you recall that?
14    A.    Yes, I recall an E&P Peer
15  Group, yes.
16    Q.    Okay. And explain to us what
17  that is.
18    A.    It was a group of companies
19  that was identified by Anadarko as their
20  peers. In other words, similar companies
21  for the purposes of measuring its stock
22  price.
23    Q.    Did you use that peer group in
24  your analysis?
25    A.    It was -- I used it in my class

1  certification analysis. It was the peer
2  group I used to determine and analyze
3  market efficiency.
4    Q.    Did you use that peer group on
5  your, in your more recent analysis with
6  respect to causation and damages?
7    A.    I analyzed the May 3rd price
8  decline using the E&P Peer Group, but for
9  the purposes of quantifying the impact of
10  the corrected disclosure or the alleged
11  truth on Anadarko's stock price, I used a
12  different peer group, because I wanted to
13  make sure that I controlled for a
14  particular issue relating to the Colorado
15  regulatory environment that would only
16  impact operators in Colorado. So I used
17  a different peer group that resulted in a
18  much smaller impact, residual return or
19  company-specific return on March -- I am
20  sorry, on May 3rd, 2017. In other words,
21  the inflation is much lower using that
22  what I call Colorado Peer Group as
23  opposed to the E&P Peer Group.
24    Q.    The E&P Peer Group was
25  something that Anadarko itself had

1  described in its SEC filings prior to
2  this litigation, correct?
3    A.    That's correct. Every company
4  has to provide a performance graph of
5  their stock price versus that of the
6  market and the industry. And in doing so
7  Anadarko came up with a peer group, which
8  were really large companies similar to
9  Anadarko that then they used to compare
10  their own stock price.
11    Q.    And was ConocoPhillips in that
12  E&P Peer Group?
13    A.    Yes, it was.
14    Q.    And was Cobalt in that E&P Peer
15  Group?
16    A.    No, it was not.
17    Q.    And you used that E&P Peer
18  Group in your initial report with respect
19  to class certification; is that right?
20    A.    I used it in order to analyze
21  market efficiency, yes.
22    Q.    Okay. So I am looking still at
23  Exhibit 503, which is your report with
24  respect to causation and damages. And I
25  am looking at paragraph 44. I just want

Page 90

1 to make sure I got this straight.
2    A.    Yes.
3    Q.    Are you with me at paragraph
4 44?
5    A.    I am at page 22, paragraph 44,
6 yes.
7    Q.    In the carryover sentence you
8 wrote "I found that using the S&P 500
9 Index in combination with the Colorado
10 Peer Group explained more than 75
11 percent of the price movements in
12 Anadarko's stock price. While using the
13 S&P 500 Index in combination with the E&P
14 Peer Group Index explained approximately
15 73 percent."
16        Right; is that right?
17    A.    Yes, that's correct.
18    Q.    And so explain to me what you
19 mean by like "explained approximately
20 percentage of price movement" like in
21 layperson's language?
22    A.    It relates to what's called the
23 variance. The variance is as the stock
24 price goes up and down and up and down.
25 And let's, for argument's sake, say that

Page 91

1 it goes up 1 percent and down 1 percent
2 and up 1 percent and down 1 percent. You
3 would, by using this index, actually,
4 both the market and the industry index,
5 you could reduce the variation, plus,
6 minus 1 percent -- you could reduce it by
7 73 percent, because it's explained by the
8 market and the industry index.
9        So now you only have the
10 company specific portion left. Which if
11 the, if the regression explains 73
12 percent, that means that there is 27
13 percent unexplained by the regression.
14 And that is what we call the
15 company-specific price movements.
16        So in my example, which is a
17 very simplistic example, the stock price
18 increases by 1 percent, decreases by 1
19 percent. And after you control for the
20 market and the industry, what would be
21 remaining and what would be unexplained
22 would be the company specific portion,
23 which would be an increase of 0.27
24 percent, a decrease of 0.27 percent.
25    Q.    So in your opening class cert

Page 92

1 brief -- sorry, let me start again.
2        In your opening class
3 certification report, Exhibit 10, you use
4 the S&P 500 and the E&P Peer Group; is
5 that right?
6    A.    Correct. In order to look at
7 company-specific price movements and
8 reaction to company-specific price
9 movements to see, to analyze better
10 whether the market was efficient or not.
11    Q.    And then in your rebuttal
12 report on the class cert, Exhibit 504,
13 you used something you call, I believe, a
14 Colorado Peer Group; is that correct?
15    A.    I believe I did something
16 similar to that as well. If you want me
17 to take a look at it.
18    Q.    Yes, if you look at Exhibit
19 504, at page 28, footnote 103.
20    A.    Yes.
21    Q.    So then in your rebuttal report
22 on class cert, you use the Colorado Peer
23 Group, that's Noble Energy, PDC Energy
24 and SRC Energy; is that correct?
25    A.    That's correct, yes.

Page 93

1    Q.    And how did you pick those
2 companies?
3    A.    Well, I looked at the analyst
4 -- well, a couple of reasons. They were
5 the -- I was addressing a particular
6 issue raised by defendants' expert. And
7 he had selected those four companies as
8 evidence that the E&P Peer Group that I
9 used did not control for a very
10 particular issue, and that had to do with
11 the regulatory environment in Colorado
12 following an explosion, this is referred
13 to as the Firestone explosion. And he
14 provided evidence that demonstrated that
15 this regulatory issue explained a
16 portion -- although he may have claimed
17 that it explained all of it -- the
18 evidence would indicate that this
19 particular issue would explain a portion
20 of Anadarko's price decline on May 3rd of
21 2017.
22    Q.    Okay. So I think you just said
23 four companies, but I only listed three
24 companies. Noble, P --
25    A.    Well, in fact, I did four

24 (Pages 90 - 93)

Page 94

1 different regressions. I had two at four
2 companies and two at three companies.
3 And the one I discussed right here only
4 used the three companies because I wanted
5 to keep it consistent in terms of the
6 control period with the work that I had
7 already done. So I felt kind of
8 constrained on that particular issue.
9        In my report, my expert report,
10 I included all four. It's the more
11 conservative approach, because it
12 includes extraction of oil and gas as
13 well. So the Colorado Peer Group that I
14 have in the expert report actually comes
15 in with a lower inflation because I used
16 all four companies.
17        It doesn't really matter in
18 terms of the statistical significance,
19 which is what I addressed in my rebuttal
20 report. Although I did four different
21 analyses to demonstrate, it doesn't
22 matter. When it comes to the
23 quantification of inflation, it does
24 matter. Because, you know, one comes up
25 with a higher inflation than the other.

Page 95

1 And I picked the most conservative one,
2 which was to include all four companies.
3    Q.   Okay. So let me just -- when
4 you say your report, I think you shifted
5 to talk about Exhibit 503, which is your
6 causation and damages report?
7    A.   Yes, I thought that your
8 question is why is there four companies
9 in that, in my, in Exhibit 503, and in
10 this particular footnote 103 there are
11 three companies. And so that is why I
12 kind of explained why. And in fact that
13 in the rebuttal report, I actually did
14 run it with four companies as well,
15 because I was looking at statistical
16 significance and only statistical
17 significance, not the magnitude. It
18 didn't make a difference. In Exhibit 503
19 it does make a difference. And I chose
20 the most conservative approach which has
21 the lower inflation and consequently the
22 lower damages.
23    Q.   Just to be clear, in Exhibit
24 20, your class cert report, you used the
25 E&P group which was out of Anadarko's

Page 96

1 securities files, right?
2    A.   Correct.
3        MS. JENSEN: Objection.
4    Q.   And in Exhibit 504, looking at
5 footnote 103, which is your class cert
6 rebuttal report, you used a three-member
7 Colorado Peer Group excluding extraction
8 O&G, right?
9    A.   No, I looked at both.
10    Q.   But in footnote 103 it says
11 "The Colorado Peer Group included the
12 following three of the four companies,
13 extraction O&G was not included."
14        I read that correctly; did I
15 not?
16    A.   Well, you didn't read the
17 entire footnote. The last sentence is
18 "Including extraction O&G for a shorter
19 control period would not have changed the
20 determination of statistical
21 significance."
22        So I kept the control period
23 the same, which was one year. It doesn't
24 matter whether or not I -- I kept it to
25 be consistent with my first report,

Page 97

1 that's what I was explaining earlier.
2 But that doesn't mean that I ignored the
3 fourth company. I also did it with the
4 fourth company mand it had no impact on
5 statistical significance, which is what I
6 was analyzing in that particular report.
7        Now, with respect to Exhibit
8 503, now we have the quantification of
9 the impact, in other words, the dollars
10 and cents. So now you have to make a
11 determination.
12        And so, as I stated earlier, I
13 decided on a conservative report, which
14 is a shorter control period, including
15 because that's all I have available when
16 I include O&G.
17        So I have a shorter control
18 period, which is not my preferred way of
19 doing it. But the benefit of it is that
20 I also include O&G. The result of it is
21 that inflation, my quantification of the
22 inflation, is slightly less than it would
23 have been had I only used the three
24 companies.
25    Q.   Okay. And so as we covered

25 (Pages 94 - 97)

Page 98

1 then in paragraph 44 of your causation
2 and damages report, Exhibit 503, if
3 instead of using S&P 500 and the E&P Peer
4 Group, you used the S&P 500 and the
5 four-member Colorado Group, you go from
6 73 percent to 75 percent; is that
7 right?
8    A.   Correct.  That has to do with,
9 you know, how much is explained by the
10 regression during the control period,
11 yes.
12    Q.   Now, in footnote 56 on page 23
13 of Exhibit 503, you say you could have
14 done a three-factor regression including
15 the S&P 500, the E&P Peer Group, and the
16 Colorado Peer Group and that would have
17 had a, what you call "The best fit, 81
18 percent."  Do you see that?
19    A.   Correct, yes.
20    Q.   Can you explain to us what you
21 mean by best fit?
22    A.   It would provide a predicted
23 return during the control period that
24 fits the actual return the best.
25    Q.   And that 81, is that the same

Page 99

1 kind of analysis as the 73, 75, 81?
2    A.   Correct.  Relates to the
3 variance, yes.  It would explain more
4 during the control period.  My point is,
5 it wouldn't explain more in terms of the
6 price decline on May 3rd.  And in this
7 case, I opted for the peer group that
8 explained more of the price decline on
9 May 3rd.  In other words, the Firestone
10 issue, the Colorado regulatory
11 environment factor.
12    Q.   So explain to us what the
13 difference is between the one you used,
14 the 75 percent model, and the 81 percent
15 model.  What would the difference have
16 been for May 3rd?
17    A.   The 81 percent model, what
18 you're calling an 81 percent model, is
19 what's called a three-factor model.  So
20 in other words, it would include the S&P
21 500.  It would include the E&P Peer
22 Group.  And then it would include the
23 Colorado Peer Group.
24        So you would have three factors
25 as inputs to the regression to try to

Page 100

1 explain the changes in Anadarko's stock
2 price.  And that works well during the
3 control period.  It reduces -- it
4 explains the most, out of the models, out
5 of Anadarko's stock price, during the
6 control period.  But we have a unique
7 situation in this particular case in that
8 we have this Colorado issue.  And what I
9 wanted to do was to make sure that I
10 controlled for the Colorado issue.
11        Consequently, I chose the
12 regression that best explained the May
13 3rd price decline the most which resulted
14 in the lowest inflation and also the
15 lowest damages.  But that was the basis
16 for choosing the Colorado Peer Group.
17    Q.   And if you had done the
18 three-factor regression, what would the
19 inflation have been, or did you not do
20 that analysis?
21    A.   Well, I did the calculations.
22 I don't remember what that would be.  I
23 don't think I referenced it anywhere.
24 But it certainly would be larger than the
25 $1.92 inflation that I use.

Page 101

1    Q.   If you look at the carryover on
2 paragraph 45 on your report, which is on
3 page 23 and carries over onto page 24.
4 And again, that's Exhibit 503; if you
5 look at that.
6    A.   Yes.
7    Q.   And you refer to -- this is the
8 sentence that carries over to page 24,
9 you refer to "A decline of $1.92 per
10 share."  Do you see that?
11    A.   Correct, yes.
12    Q.   "Or reduction of Anadarko's
13 market capitalization by 1 billion 75
14 million dollars."
15        Do you see that?
16    A.   Correct, yes.
17    Q.   So is market capitalization
18 reduction a surrogate for damages?
19    A.   I don't know if there was a
20 special meaning of surrogate, but, no,
21 it's not the same as damages, no.
22    Q.   Because not every share that is
23 counted for market capitalization is
24 purchased during the class period and,
25 therefore, aren't eligible for damages, I

26 (Pages 98 - 101)

Page 102

1 take it?
2        MS. JENSEN: Objection to form.
3    A.   Yes. I mean that's one reason.
4 Another reason is that inflation is not
5 the $1.92 during the entire class period.
6    Q.   And so you refer to this market
7 capitalization reduction, but that's not
8 a damages number that you're putting out,
9 I take it?
10   A.   That's correct. I mean it
11 would be less than 1 billion 75 million.
12 Aggregate damages in this particular case
13 would be less than that number.
14   Q.   Have you done a calculation of
15 what aggregate damages in this matter
16 would be?
17       MS. JENSEN: Objection to the
18   extent that it's beyond scope.
19   A.   I don't recall as I sit here
20 right now. I may have.
21   Q.   Okay. Do you have any
22 understanding as to what maximum
23 aggregate damages might be?
24       MS. JENSEN: Same objection.
25   A.   What maximum aggregate damages

Page 103

1 could be. Well, I think that maximum
2 aggregate damages recently would be that
3 1 billion and 75 million. I mean there
4 there is -- I don't want to get into too
5 much complexity in terms of how things
6 work. But I think that, I am fairly
7 certain that actual damages, if every one
8 showed up to claim, would be less than 1
9 billion and 75 million. I mean without
10 getting into the complexity. I think
11 it's a reasonable number to say that it's
12 not going to be more than that number.
13 And, of course, this is before
14 prejudgment interest and all of that
15 stuff.
16       MR. SLIFKIN: Why don't we take
17   a break because I would like to use
18   the restroom, if that's okay with
19   everybody?
20       THE VIDEOGRAPHER: The time is
21   11:59, and we are going off the
22   record. This will end media unit
23   number 2.
24   [Off the record.]
25       THE VIDEOGRAPHER: Time is 12:13

Page 104

1    p.m., and we are back on the record.
2    This will be the start of media unit
3    number 3.
4 BY MR. SLIFKIN:
5    Q.   Okay, Mr. Steinholt, let's go
6 back to your causation and damages
7 report, Exhibit 503. Are you with me?
8    A.   Yes.
9    Q.   And let's zip on forward to
10 paragraph 49.
11   A.   Yes, I am here.
12   Q.   So in your first sentence you
13 talk about the value of an investment
14 being based on the expected future cash
15 flows including the timing and associated
16 risk of such cash flows. Do you see
17 that? And I think we've spoken about
18 that already.
19   A.   Yes.
20   Q.   And explain to me what you mean
21 by cash flows?
22   A.   It's the actual cash that goes
23 to the -- technically, it's the actual
24 cash that goes to the investor. But
25 generally what we use is, we look at the

Page 105

1 earnings as a proxy for cash flows very
2 often. So it is basically the, we value
3 a company by looking at the earnings that
4 that company is generating and the
5 present value of those earnings back to
6 today, in order to come up with the value
7 of the company.
8    Q.   Okay. And so, again, when you
9 say earnings, you mean very roughly
10 revenues minus costs?
11   A.   Yes. I think it's easier just
12 to look at it very simplistic. And I
13 think that's a good way of looking at it.
14 You have X amount of revenues and it cost
15 you Y. So the cash flows or earnings is
16 the difference between the two.
17   Q.   So have you actually formed an
18 opinion as to what the value in dollar
19 terms was of the Shenandoah project at
20 the start of the class period?
21   A.   No, I have not performed a
22 valuation of the Shenandoah. What I had
23 done is to analyze the price impact of
24 the corrective disclosure, the disclosure
25 of the alleged truth.

27 (Pages 102 - 105)

1    Q.   Okay.  Did you perform a
2 valuation of Shenandoah after the
3 corrected disclosure?
4    A.   No, I have not performed a
5 valuation of the Shenandoah after or
6 before the corrective disclosure.
7    Q.   So to be clear, you didn't do
8 it at the beginning of the class period.
9 You didn't do at the end of the class
10 period.  I assume you didn't perform a
11 valuation of Shenandoah at any point
12 during the class period?
13   A.   Well, I mean I looked at the --
14 no, I have not performed a valuation of
15 the Shenandoah specifically during the
16 class period.  What I've looked at is the
17 corrected disclosure, which is the
18 suspension of appraisal activities as
19 they are reassessing the resource and
20 which relates to the economic viability
21 of the Shenandoah.  And I used that as
22 the estimate of the inflation throughout
23 the class period.
24   Q.   So if you look at the bottom of
25 the text, right above the footnote, on

1 page 26, and onto page 27, you refer to a
2 couple of analyst reports; do you see
3 that?
4    A.   Yes, I looked at a couple of
5 analyst reports to see what the potential
6 value could be.  What they believed the
7 potential value could be.
8    Q.   So you looked at KLR, do you
9 see that, KLR Group --
10   A.   Yes.
11   Q.   -- footnote 69?
12   A.   Yes.
13   Q.   Who is KLR Group?
14   A.   It's just an entity that issued
15 analyst reports during the class period.
16   Q.   Okay.  And you wrote "If
17 successfully sanctioned, the value could
18 be higher than one analyst estimating $5
19 per share."  And that's your reference to
20 KLR, right?
21   A.   Correct.  That is the
22 potential.  It's not what the value was
23 at that point in time.  But that gives an
24 indication of what it potentially could
25 be worth.

1    Q.   What did you mean by "If
2 successfully sanctioned"?
3    A.   I think that that's exactly
4 what the analyst stated.  So that's
5 probably where I got the actual
6 terminology.
7         But in my mind, that would mean
8 if, in fact, this was a viable field that
9 was sanctioned, in other words, what was
10 developed was determined to be viable
11 economically and developed, then this
12 would add value to Anadarko's stock price
13 potentially to the tune of $5.
14   Q.   Okay.  And then you refer to
15 Capital One, do you see that, that's the
16 next sentence in this footnote 70?
17   A.   Yes.
18   Q.   And to be clear, Capital One
19 Securities.  And who are Capital One
20 Securities?
21   A.   That's another research firm
22 that issues analyst reports throughout
23 the class period.
24   Q.   And then you refer to potential
25 value, do you see that, right at the top

1 of paragraph -- sorry, page 27?
2    A.   Yes, page 27.  And at the very
3 top there, I refer to it as potential
4 value.  In other words, they are not
5 saying that is the value, in fact.  You
6 know, they had a different take on how to
7 interpret Shen-3, for instance.  But
8 potentially, that is what the value could
9 be.  I think it was based on a billion
10 barrel of oil equivalents, if that was
11 the size of the resource, and then
12 multiply that by some factor based on how
13 profitable you think that the resource
14 will be in the future.  And that's how
15 you come up with the 3.6 billion or $7
16 per share.
17   Q.   And did you, in your review of
18 analyst reports, did you come across any.
19       That placed no value per share?
20   A.   No value?  I don't think that
21 -- typically when an analyst, what
22 analysts will do is to come up with a
23 target price.  And certainly there were
24 analysts that would say that, I think
25 J.P. Morgan, if I recall correctly, would

28 (Pages 106 - 109)

Page 110

1  say something along the line because of
2  the risk involved in this particular
3  field, we are not going to include it in
4  our valuation. Which then would inform
5  the reader that while there is a
6  potential upside here, because it's not
7  included in the target price. But that
8  doesn't mean that it doesn't have -- just
9  because they don't value the potential
10 upside, it doesn't mean that the
11 potential upside doesn't have value.
12       So I am not sure if there were
13 anyone who actually said it had zero
14 value. That would be kind of strange,
15 because that would imply that the company
16 is, that would be a significant negative
17 for the company, given that they are
18 spending hundreds of millions of dollars
19 developing this or appraising this field.
20 So it would be a significant negative,
21 if, in fact, investors thought that the
22 potential value of this field was zero.
23    Q.  But there were analysts, I
24 think you said, that did not include Shen
25 in their valuation?

Page 111

1     A.  Yes. Part of it has to do with
2  the valuation model. Do you only include
3  the provable fields? And, for example,
4  the most simplistic valuation model may
5  be the commonly used valuation model,
6  maybe the price earnings model, and you
7  look at both what the peers are trading
8  at. Maybe they are trading at 15 times
9  next year's earnings. And that's what
10 you use in your valuation. But that
11 doesn't mean that two years from now
12 their earnings are irrelevant. So it
13 depends on how detailed the valuation
14 model that, that you are using is. But
15 certainly, you can come up with a range
16 of values with respect to Shenandoah in
17 this particular case.
18       I was looking in the section
19 that you were referring to. I was kind
20 of looking at what the potential could
21 be. So that's what 5 to $7 would
22 represent. That's kind of high end. And
23 of course, if it's not sanctioned, then,
24 you know, it is zero.
25    Q.  And during the class period,

Page 112

1  there had never been a sanction of
2  Shenandoah; has there?
3     A.  No. I mean that was what they
4  were appraising, right? When I say
5  sanctioned, I mean, you know, the final
6  investment decision, the FID, so that's
7  basically what you would look at. The
8  company making, making the decision to
9  develop the field and they did not make
10 that decision during the class period.
11 To the contrary, they suspended their
12 appraisal of the field on May 2nd, 2017.
13    Q.  So a moment ago you used the
14 phrase "provable fields," what did you
15 mean by that?
16    A.  Well, some analysts look at oil
17 fields and categorize them. Some are
18 provable. They are generating oil. They
19 have gone through the process. You have
20 probable fields. And then you have
21 possible fields. So those are different
22 categorizations of different fields.
23       So Shenandoah had not been
24 sanctioned. They had not made a decision
25 to develop it yet. So, you know, the

Page 113

1  resource size and all of the appraisal
2  work that would be needed in order to
3  take that step had not been completed.
4     Q.  So in that categorization of
5  provable, going through the process,
6  possible, where in your understanding did
7  Shenandoah fit?
8        MS. JENSEN: Objection to form.
9     A.  I can only talk about what
10 their analysts reported. And the analyst
11 report that I had in mind put it in
12 probable.
13    Q.  And the one you have in mind is
14 which one?
15    A.  I don't recall off the top of
16 my head if that was, if that was UBS.
17 Yeah, there are just so many analyst
18 reports, that I can't really -- but it
19 certainly would be -- I think it was UBS,
20 but I can't be 100 percent certain.
21    Q.  Okay. But these analysts, we
22 can go-see for ourselves what the
23 analysts said during the period, right?
24    A.  Yes.
25    Q.  And I this you said earlier

29 (Pages 110 - 113)

Page 114

1 that there must be something like a
2 thousand analyst reports?
3    A.   There is a lot.
4    Q.   During the period?  Yeah.  And
5 you, I take it, looked at many of them?
6    A.   I looked at a lot of them, yes.
7    Q.   Okay.  Can we just go back to
8 paragraph 49 of Exhibit 503.  Just the
9 sentence -- so there is a sentence about
10 book value on page 26; do you see that?
11    A.   What page are you on?
12    Q.   26.
13    A.   Sorry.  Okay.
14    Q.   Right before the two sentences
15 I was asking you about, you say "While
16 book value is an accounting measure"; do
17 you see that?
18    A.   Yes, exactly.
19    Q.   Okay.  Did you go look at the
20 book value of Shen on the books of
21 Conoco?
22    A.   I looked at the book value in
23 2007 -- I think, January and March of
24 2017.  And the one that I reference is
25 the one that was closest to the end of

Page 115

1 the class period.  I think it says here
2 footnote 67, actually, I don't see it
3 here, but I thought it was the book value
4 as of May 31st, 2017.
5    Q.   So I am a little bit confused.
6 In your answer you said 2007.  And then
7 you said 2017.  So what year are we
8 talking about?
9    A.   2017.  I misspoke when I said
10 2007.
11    Q.   Okay.  And if you look at
12 footnote 67, you refer to Shenandoah book
13 value as of March 31st, March 31st, 2017;
14 do you see that?
15    A.   Yes.  Yes.  That's what I was
16 looking for.
17    Q.   Okay.  And my question was
18 actually slightly different.  It was did
19 you go and look at the book value of
20 Shenandoah on the books of Conoco?
21    A.   No, I do not.
22    Q.   And did you go and look at the
23 book value of Shenandoah for Cobalt?
24    A.   No, I did not.  But both of
25 those would have been reflected in their

Page 116

1 respective write-offs.
2    Q.   Did you look at the book value
3 of Shenandoah for Marathon?
4    A.   No, I did not.  I don't know if
5 that would have been publicly available.
6 I do know that the, both for Conoco and
7 for Cobalt, that write-offs would be a
8 reflection of what they had Shenandoah on
9 the books at.
10       So I don't think that that
11 would be -- that is something that I may
12 even have referenced in one of my
13 reports, but I didn't go to internal
14 documents of those two companies to look
15 at book value, other than what was
16 publicly disclosed toward the end of the
17 class period.
18    Q.   Okay.  So why don't we now --
19 let me ask you a couple of questions
20 about Exhibit 504, which is your rebuttal
21 report.
22    A.   Yes.
23    Q.   Okay.  And I am going to refer
24 you to paragraph 27 on pages 16 and 17.
25 Are you with me?

Page 117

1    A.   Yes.
2    Q.   Okay.  The sentence in the
3 bottom of page 16 on the text, you write
4 "Anadarko on the other hand was very
5 involved in deep water exploration and,
6 as one analyst stated, the Shenandoah
7 write-off does take away from APC's
8 premium for exploration, which is gone,
9 and no longer in our price target."
10       And then you go on and talk
11 about "While ConocoPhillips' working
12 interest 30 percent was almost as high as
13 that of Anadarko," and then you refer to
14 something called "a control premium."
15       Do you see that?
16    A.   Yes.
17    Q.   Is it your testimony that there
18 was a control premium in the valuation --
19 withdrawn.
20       Is it your testimony that there
21 was a control premium given Anadarko's
22 relative involvement in the Shenandoah
23 that was reflected in the Anadarko stock
24 price?
25    A.   My testimony is that being the

30 (Pages 114 - 117)

Page 118

1  operator provides you with certain
2  control. That control has value. And so
3  that's what I pointed out here.
4      Q.   Do you believe that's reflected
5  in -- that was reflected in the inflation
6  in the stock price?
7      A.   It reflected in the inflation?
8  I, you know, I don't -- I am not quite
9  sure how you would -- if you want an
10  empirical test of that, all I can say is
11  that, you know, if you were to value the
12  Shenandoah, you would take into account
13  the fact the control that they would have
14  over decisions relating to the field.
15  That's how you would value it.
16          And do I believe it's reflected
17  in how investors valued it? Yes. But
18  it's not something that you can, you
19  know, necessarily empirically test, You
20  know. But theoretically, yes. I mean
21  there is a value to having control, of
22  course.
23      Q.   So is that the same thing, is
24  it premium for exploration that you cite
25  in the prior sentence that I read to you?

Page 119

1      A.   No, that's a different issue.
2  You have two different companies, and
3  they are pursuing two different
4  strategies.
5          Anadarko is pursuing a
6  strategy, where deep water drilling is a
7  big part of, or an important part of what
8  they are trying to excel at. And
9  ConocoPhillips, on the other hand, does
10  not view or is effectively exiting that
11  space. They are getting out of deep
12  water drilling.
13          So the results that relate to
14  how successful Anadarko is related to
15  deep water drilling, would have a greater
16  impact on Anadarko's stock price than --
17  particularly since they are the operator,
18  because this is a little bit of a
19  different issue -- than for
20  ConocoPhillips. Because for them this is
21  an investment that they are, you know, in
22  an area that they are effectively
23  leaving.
24      Q.   And so this reference to a
25  premium for exploration, that's a quote

Page 120

1  from an analyst report; am I right?
2      A.   Yes. That is an analyst that
3  talks about his, his interpretation of
4  the, or his evaluation of Anadarko having
5  a premium because of their perceived
6  success with respect to deep water
7  drilling. And then eliminating that
8  premium as a result of the Shenandoah
9  disclosure.
10      Q.   And then that is Wolf Research.
11  And who is Wolf Research?
12      A.   That's another research firm
13  that provided analyst reports during the
14  class period.
15      Q.   Okay. And did you seek to
16  quantify that exploration premium?
17      A.   No, the point of this
18  particular section is to demonstrate that
19  an investor or the value of Shenandoah
20  to, as perceived by investors, could be
21  very different with respect to
22  ConocoPhillips than with respect to
23  Anadarko, given the fact that Anadarko
24  was so involved in deep water drilling.
25  It was a big part of what the company was

Page 121

1  doing. And because they were the
2  operator, so they have a lot more
3  control.
4          Other things that I mentioned
5  here is, of course, the market
6  capitalization of the two companies were
7  different. ConocoPhillips was a much
8  larger company.
9          So these are things that one
10  would look at in addition to the fact
11  that, you know, they had a different
12  working interest in the Shenandoah.
13          These are things that one would
14  look at in order to determine what value
15  Shenandoah had to respective companies.
16      Q.   All right. So on this control
17  premium point, you said as operator of
18  the project Anadarko had, what, a greater
19  say than the other participants; is that
20  fair?
21      A.   Quite frankly it was Anadarko
22  who decided to stop the appraisal of
23  Shenandoah. It was not some of the other
24  owners. So they have a greater say. And
25  whenever you can make these decisions,

31 (Pages 118 - 121)

Page 122

1 that has value, because you can make
2 decisions that are in your best interest.
3 And maybe something that is in your best
4 interest is not necessarily in the best
5 interest of the other partners.
6    Q.   Okay.  So Anadarko was able to
7 decide not to pursue further exploration
8 in Shenandoah, right?
9    A.   That was a decision that was
10 made by, made by Anadarko.
11    Q.   And did all the partners in
12 Anadarko agree with that decision?
13       MS. JENSEN:  Objection, to the
14    extent it calls for speculation.
15    Beyond the scope.
16    A.   Well, all I can say is that
17 based on my reading of the reaction by
18 Cobalt, they were not overly happy.
19 Because during this period of time, they
20 were trying to sell their interest in
21 Shenandoah, so it certainly didn't help
22 them.
23    Q.   Other than this decision to
24 terminate, what other valuable benefit
25 did Anadarko get from its control?

Page 123

1    A.   I am not sufficiently close to
2 the specifics and to the operation of the
3 Shenandoah oil field.  They are the
4 operator.  So certainly there are
5 decisions that they can control that is
6 within their purview.  But it's not
7 something that I have spent a lot of time
8 investigating.  But I did think it was
9 interesting that there was a --
10    Q.   Well --
11       MS. JENSEN:  Dan, I think he was
12    continuing to answer.
13       MR. SLIFKIN:  I am sorry.
14    A.   I did think it was interesting
15 that there clearly was a difference in
16 terms of this disclosure to suspend
17 Shenandoah, at least between Anadarko and
18 Cobalt.
19    Q.   Okay.  So other than the
20 decision to suspend, are you able as you
21 sit here today, to identify any other
22 aspects of this control?
23       MS. JENSEN:  Asked and answered.
24    He's already given you an answer.
25    A.   Without going in and

Page 124

1 investigating exactly how it was
2 operated, and so on, I cannot go into
3 more detail.  But I think that whether or
4 not to suspend the appraisal is quite an
5 important decision.
6    Q.   Let's go back to Exhibit 503.
7 So can you go to page 13, paragraph 30?
8    A.   Yes.
9    Q.   So in footnote 28, you talk
10 about or you say how "It's reasonable to
11 assume that new and material information
12 is incorporated into a stock price within
13 one day."
14       Do you see that?
15    A.   Yes.
16    Q.   By one day, do you mean one
17 trading day?
18    A.   Yes, correct.  And when I did
19 my analysis I looked at the changes in
20 the stock price from a daily basis from
21 closing price to closing price.  And that
22 is the customary way of doing it.
23    Q.   So if information is released,
24 say in the morning, before the stock
25 market opened, would you assume that

Page 125

1 information had been fully incorporated
2 into the price by the end of the trading
3 day?
4       MS. JENSEN:  Objection, vague.
5    A.   As I stated here in the
6 footnote, that that is a reasonable
7 assumption.
8    Q.   So I mean to be clear, so the
9 New York Stock Exchange opens at 9:30
10 a.m. Eastern Time and closes at 4 p.m.
11 Eastern Time.  Are you with me?
12    A.   Yeah.
13    Q.   Okay.  So if information is
14 released at 10 a.m., would you expect the
15 information to be incorporated into the
16 price by 4 p.m. that day or would we have
17 a to wait until 10 a.m. the next day?
18       MS. JENSEN:  Objection, form.
19    Objection, to the extent it calls for
20    speculation.
21    A.   In an efficient market, what
22 would happen is that that information
23 would be reviewed and analyzed and
24 incorporated into the stock price
25 throughout the day.  And typically, it

32 (Pages 122 - 125)

Page 126

1 would be reflected, fully reflected in
2 the stock price by the end of the day.
3        There were situations where,
4 you know, you have information disclosed
5 and it takes time to analyze the
6 information, and maybe there is
7 additional information that is also
8 released later on. So you can have
9 complex disclosures that are not this
10 simple. I don't think that that really
11 applies in this particular case to the
12 information that was released.
13        I think doing it, doing the
14 analysis on a close by close, in other
15 words, close of trading in one day to the
16 close of trading on the next day, works
17 very well in this particular case.
18    Q.   All right. So if information
19 is released after the close of the stock
20 market, so after 4 p.m. on any given
21 trading day, would you assume that that
22 information has become reflected in the
23 price at the open the next day, or would
24 you wait for the close the next day?
25    A.   No, you would wait for the

Page 127

1 close. You would want to have a full day
2 of trading. Sometimes the open price is
3 like in an anomaly, typically, people
4 like to go by the closing price. That's
5 not to say you can't go by the open
6 price. People certainly have done that,
7 if that is the way that you want to do
8 it.
9        But typically, what you want to
10 do is to have a full day of trading and
11 then look at the closing price and use
12 the closing price to closing price. I
13 think that's the common way of doing it.
14 And that ensures that everything,
15 including analyst commentary, and so on,
16 as has been, has been out there. So I
17 would go by the close to close. I would
18 not go by the close to open.
19    Q.   So if I were to suggest to you
20 that the better view is that information
21 released after the -- after the end of
22 the closing day is impounded in the price
23 the next morning, you would disagree, I
24 take it?
25    A.   Yes. Because you have to -- I

Page 128

1 mean you have to think of it this way. I
2 mean, the big players, the ones with a
3 lot of money, and so on, typically trade
4 during the day.
5        And so what you want to do is
6 to have, have the information analyzed
7 and have the trading. And that also
8 would allow for, you know, analyst
9 commentary and thoughts, and so on, to be
10 a part of the public mix of information.
11        I can't think of -- as I sit
12 here right now, I can't think of a single
13 case where somebody would go from a
14 closing price to an open price. It could
15 be informative but, you know, it's not
16 what I would do.
17        In fact, in this case, you
18 know, we also have off-the-market trading
19 that kind of starts trending down
20 following that initial, the initial
21 announcement of the earnings, and still
22 went to the closing price the next day to
23 follow the standard way of doing it, and
24 to make sure that everything is
25 incorporated into the stock price.

Page 129

1        I think that's the much better.
2 Following the standard way of doing it,
3 is the best way of doing it.
4        MR. SLIFKIN: Okay. Would it be
5    okay to now -- I am mindful of the
6    fact that it is now 12:50 p.m. in
7    California, and 3:50 here on the East
8    Coast.
9        So is this an okay -- you said
10   let's do a short one and then take a
11   lunch. Would this be a good time to
12   take maybe a half an hour break or
13   whatever you prefer. I have some more
14   materials to cover, and I think if I
15   take a break I can make it shorter.
16       THE VIDEOGRAPHER: Time is
17   12:51, and we are going off the
18   record.
19       [Off the record.]
20       THE VIDEOGRAPHER: The time is
21   1:25 p.m., we are back on the record.
22 BY MR. SLIFKIN:
23    Q.   I think you talked about the
24 aftermarket -- the price movement in the
25 aftermarket; do you recall that?

33 (Pages 126 - 129)

Page 130

1    A.    Yes.
2    Q.    I take it you analyzed the
3    market for Anadarko stock during the
4    class period and found it to be
5    efficient?
6    A.    That's correct, yes.
7    Q.    And that's on a close-to-close
8    basis?
9    A.    And sufficient in context of
10   reliance using the standard Cammer and
11   Krogman factors that we used, yes.
12   Q.    Did you separately analyze the
13   aftermarket to determine whether the
14   aftermarket was efficient?
15   A.    Well, the Cammer and Krogman
16   factors are not really suited to do that
17   type of an analysis.
18         On one hand, you can say you
19   have the same number of analysts covering
20   the stock, for instance.  You can look at
21   things such as institutional investor.
22   It's going to be the same.  So some of
23   these factors are exactly the same.  But
24   it's not particularly designed to
25   determine whether or not the stock prices

Page 131

1    react quickly to new information.
2          What I observed is that, in the
3    case of Anadarko, it did react, there was
4    a quick reaction to that, the information
5    that was released, the earnings
6    announcement that was released.  And I
7    mention that in my report.  So there is
8    evidence that investors reacted quickly
9    to that information.
10         But in terms of actually
11   quantifying price impact, I used the
12   close to close, the standard way of
13   looking at it.  And that's what I used in
14   order to quantify the inflation.  So I am
15   not quite sure in terms of what type of
16   analysis would be required in a reliance
17   context to analyze aftermarket trading.
18   Q.    Let's focus in on the
19   aftermarket trading in Anadarko stock
20   that took place on, I believe, May 2nd,
21   2017.  Are you with me?
22   A.    Yes.
23   Q.    What was the volume, what was
24   the trading volume in the aftermarket
25   that day as compared to the subsequent

Page 132

1    trading day, May 3rd, 2017?
2    A.    I don't know.
3    Q.    Do you know if it was more or
4    less?
5    A.    You mean aftermarket trading
6    volume?
7    Q.    Yes.
8    A.    I have not analyzed anything
9    other than the data that was provided to
10   me by the defendants' expert, which was
11   the aftermarket trading on May 2nd of
12   2017.  It was something that he brought
13   up.  And when I looked at it, it was
14   clear that exactly at the time of the
15   earnings announcement, there was, the
16   stock price of Anadarko started to move
17   down.
18   Q.    And did you look to see if
19   there were marketmakers acting in the
20   aftermarket that day, May 2nd, 2017?
21   A.    I only responded to the data
22   that was provided to me by your expert.
23   Q.    And did you look to see if
24   there were arbitragers operating in the
25   aftermarket on May 2nd, 2017?

Page 133

1    A.    I have not looked at anything
2    other than observing that exactly the
3    time of the earnings announcement in a
4    couple of minutes there, there were half
5    a million shares that traded and the
6    stock was down.
7    Q.    Did you look to see if there
8    were any analyst reports that were issued
9    that evening after the market closed on
10   May 2nd, 2017, with respect to Anadarko?
11   A.    I have mentioned analyst
12   reports issued discussing the earnings
13   release on May 2nd in my report.  So yes,
14   we know that there were analysts that
15   were following the company and provided
16   commentary on March 2nd, 2017.
17   Q.    Could you turn in your most
18   recent report, Exhibit 503, to paragraph
19   92, please?  Do you have that?
20   A.    Yes.
21   Q.    In paragraph 92 you refer to a
22   "Wells Fargo equity research report"; do
23   you see that?
24   A.    Yes.
25   Q.    And is that the report you were

34 (Pages 130 - 133)

Page 134

1 just referring to in your testimony?
2    A.   No.  I was referring to the RBC
3 capital markets analyst report from May
4 2nd, 2017 that I discuss in paragraph 73.
5        I was referencing the BMO
6 capital markets May 2nd, 2017 report that
7 I discuss in paragraph 74.
8        I was referencing the Bank of
9 America analyst report, dated May 2nd,
10 2017 that I discuss in paragraph 75.
11       I was referencing the Cohen
12 analyst report dated May 2nd, 2017 that I
13 discuss in paragraph 76.
14       I was referencing the Credit
15 Suisse analyst report on May 2nd, 2017
16 that I discuss in paragraph 77.
17       I was referencing the Raymond
18 James analyst report dated May 2nd, 2017,
19 that I discuss in paragraph 78.
20       And I was referencing the J.P.
21 Morgan analyst report dated May 2nd,
22 2017, that I discuss in paragraph 79.
23       These were analyst reports
24 issued following the earnings release,
25 Anadarko earnings release, and discussed

Page 135

1 Anadarko's earnings on May 2nd of 2017.
2    Q.   Okay.  But you weren't
3 referring to the report at paragraph --
4 the Wells Fargo report that you cite at
5 paragraph 92?
6    A.   No, I had those in mind.  That
7 is another example of such report.  But
8 we were discussing the earnings.  This
9 one here is discussing the Firestone
10 explosion.
11       So, you know, it depends on
12 what you want to discuss.  You want to
13 discuss the Firestone explosion, I think
14 that this is the key analyst report which
15 is why I included it in this particular
16 section.
17   Q.   When you're referring to this
18 particular section, you're referring to
19 the section contained in paragraph 92?
20   A.   Correct, the section relating
21 to the Firestone explosion.  Yes.
22   Q.   Okay.  So let's stay on
23 Firestone for a moment, if we may.  If
24 you're on paragraph 92, maybe I can just
25 ask you a few questions about it now.

Page 136

1        So there are two bullets, one
2 saying "Uncertainty and overhang on APC";
3 do you see that?  And then the second
4 bullet "And regulatory concern could
5 pressure all DJ players."
6        Do you see that?
7    A.   Yes.
8    Q.   What is DJ?
9    A.   DJ is the DJ basin.  That's the
10 area in, around Denver, Colorado where
11 Anadarko had a lot of oil wells.
12   Q.   And so you attribute part of a
13 decline in Anadarko stock on May 3rd,
14 2017 to regulatory concerns, right?
15   A.   Yes.  There is evidence that
16 investors were concerned about increased
17 regulation.
18   Q.   Okay.  Did you separately
19 analyze whether there was any overhang
20 specific to Anadarko that went beyond the
21 regulatory concerns applicable to all DJ
22 players?
23   A.   I looked at that.  I think my
24 view, which is also, I think the
25 consensus view of the analyst reports

Page 137

1 that I reviewed, is, number 1, that would
2 have a minor impact on Anadarko.
3        And number 2, you know, this
4 would relate to an issue that was
5 disclosed earlier on April 27th.
6        So it's unclear to me what the
7 new information would be that would
8 provide increased liability, let alone
9 any material increased liability, on the
10 part of Anadarko.  So that's the way that
11 I interpreted it.  And I think that that
12 is consistent with the way that other
13 analysts viewed it.
14   Q.   So there had been an explosion
15 in Colorado, right?
16   A.   Correct.
17   Q.   A house exploded and the people
18 in the house died?
19   A.   Correct.  Two individuals died,
20 yes.
21   Q.   And it was determined that the
22 gas that was in the house came from an
23 Anadarko well, right?
24       MS. JENSEN:  Objection,
25 characterization.

35 (Pages 134 - 137)

Page 138

1    A.    The connection to the Anadarko
2  well was made in April 27th.  The well
3  was 200 feet, I believe, from the home.
4  But there was no finding of wrongdoing,
5  in April, with respect to Anadarko nor on
6  May 3rd, with respect to Anadarko.
7    Q.    So isn't it the case that on
8  May 2nd, there was a press conference
9  given by the Frederick Firestone Fire
10 Department?
11   A.    Yes, absolutely.
12   Q.    And from your perspective, was
13 there any new information provided in
14 that press conference?
15   A.    In the press conference itself?
16 I mean, certainly there were -- it was an
17 update with respect to information that
18 had been revealed on April 27th.  So
19 certainly there was an update.  There is
20 certainly new information.  I am not
21 entirely sure what material new
22 information was disclosed at that point
23 in time that could have a material impact
24 on Anadarko, specifically.
25         However, there is no question,

Page 139

1  in my mind, that regulatory concern
2  increased as Governor Hickenlooper was
3  responding to this particular press
4  coverage.  So regulatory concerns were
5  certainly increased.
6          But you're talking about some
7  company specific.  I don't know
8  specifically what that information would
9  be.  And I don't really see that as being
10 material.  Clearly two lives were lost.
11 If there is liability, you know,
12 certainly there will be some compensation
13 there.  Certainly there was a house that
14 was destroyed.  The neighborhood was no
15 longer in any danger.  So I am not quite
16 sure what you mean when you say -- when
17 you talk about company specific factor,
18 other than the increased regulatory
19 concern.
20   Q.    Okay.  In your paragraph 92 in
21 this quote from Wells Fargo, there is a
22 bullet which says "Uncertainty and
23 overhang on APC."
24         Do you see that?
25   A.    Correct.

Page 140

1    Q.    And APC is Anadarko, right?
2    A.    Correct.
3    Q.    And Anadarko is the only
4  company that's referred to in that
5  paragraph?
6    A.    Correct.  And that is an
7  uncertainty that started on April 27th.
8    Q.    And you referred to the
9  preliminary findings of the Firestone
10 Fire Department; do you see that?
11   A.    Correct.
12   Q.    And when were those preliminary
13 findings released?
14   A.    I don't know if it's referring,
15 specifically, it refers to the update
16 that the fire department made after the
17 market closed on May 2nd.
18         But that wasn't the first time,
19 you know, that Anadarko well was linked
20 to the Firestone explosion.  In fact, on
21 April 27th, that's when Anadarko
22 disclosed that it would shut-in 3000
23 wells.  That is a company-specific event
24 that was specific to Anadarko.  But I
25 don't see anything new here that would be

Page 141

1  materially different than what was
2  disclosed on April 27th.
3    Q.    And the Firestone Fire
4  Department press conference, do you know
5  when that started?
6    A.    It started -- I have it in my
7  -- I think it was a couple of minutes
8  after 4 o'clock Eastern Time.
9    Q.    So a couple of minutes after
10 the close of the New York Stock Exchange?
11   A.    Correct.
12   Q.    And do you know when Anadarko
13 released its results?
14   A.    Yes, I think it was 4:16.  And
15 that's exactly when the Anadarko stock
16 price started to decline.
17   Q.    You have referred me to some
18 other paragraph in your report.  Notably
19 paragraph 73 through 79.  You just did
20 that a few minutes ago.  Do you remember?
21 Do you remember that?
22   A.    Yes.
23   Q.    Okay.  So in paragraph 79 there
24 is a reference to a "J.P. Morgan analyst
25 report."

36 (Pages 138 - 141)

Page 142

1      Do you see that?
2    A.   I have to go to paragraph 79,
3 yes.
4    Q.   And do you see that it says in
5 the middle of that: "In the JPM view, we
6 expect a mixed reaction to the print
7 given the weaker Q2 '17 guide."
8      Do you see that?
9    A.   Yes.
10    Q.   What's the print?
11    A.   Well, you can ask the analyst,
12 but I assume it has to do with the press
13 release.
14    Q.   Okay.  And when it says "weaker
15 Q2 '17 guide," do you know what that is
16 referring to?
17    A.   Yes, the company provided a
18 second quarter 2017 guidance and a full
19 year 2017 guidance.
20      The full year guidance was,
21 essentially, maintained.  The second
22 quarter guidance was a little bit weaker
23 than some, some analysts had expected --
24 which the company explained by, well, it
25 was anticipated making its costs, and

Page 143

1 they decided to take it in the second
2 quarter, so it wouldn't have, you know, a
3 long-term impact.  In other words, the
4 guidance for the full year was the same.
5    Q.   But the guidance for the second
6 quarter was weaker; is that right?
7    A.   It was weaker because of the
8 company deciding to take, do some
9 maintenance in the second quarter.  So it
10 was weaker.  But, obviously, it had to be
11 better.  It would be made up in the third
12 and the fourth quarter, because the
13 guidance for the full year was
14 maintained.
15    Q.   Okay.  And here J.P. Morgan
16 talks of "Given the weaker Q2 '17 guide,
17 owing to GOM shut-ins for well times and
18 maintenance."
19      And that's what you were just
20 referring to when you mentioned
21 maintenance, I take it?
22    A.   No.  The maintenance was
23 discussed the following day on the
24 conference call.  And analysts -- because
25 different analysts interpret things

Page 144

1 differently.  So they asked the question
2 to the company, should we be concerned
3 with respect to the second quarter
4 guidance.
5      And the answer from the company
6 was that, no, this was an anticipated
7 maintenance that we were doing.  And the
8 full year guidance was as before.
9    Q.   And then this J.P. Morgan
10 analyst continues, "And lingering
11 uncertainty associated with the home
12 explosion incident in the DJ Basin."
13      Do you see that?
14    A.   Yes.
15    Q.   And I take it that that's a
16 reference to the Firestone explosion?
17    A.   Correct, yes.
18      MR. SLIFKIN:  Let me just go off
19 the record for a couple of minutes,
20 but I may be done.
21      THE VIDEOGRAPHER:  The time is
22 1:47, we are going off the record.
23      [Off the record.]
24      THE VIDEOGRAPHER:  Time is 1:50
25 p.m., and we are back on the record.

Page 145

1      MR. SLIFKIN:  I have no further
2 questions at this time.  Thank you,
3 Mr. Steinholt.  Thank you.
4      MS. JENSEN:  Okay.  Thank you
5 everyone.
6      THE VIDEOGRAPHER:  This
7 concludes today's deposition of Bjorn
8 Steinholt.  The number of media units
9 used is three.  They will be retained
10 by Veritext Legal Solutions.  We are
11 off the record at 1:51 p.m. Pacific
12 Time.
13      Thank you very much.  Everybody,
14 have a great holiday.
15
16      (Whereupon, at 1:51 P.M. PST,
17 the deposition was concluded.)
18
19
20
21
22
23
24
25

37 (Pages 142 - 145)

Page 146

1 ANADARKO PETROLEUM CORPORATE SECURITIES
  LITIGATION
2 12/21/2022 - BJORN STEINHOLT
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, BJORN STEINHOLT, do hereby declare
5 that I have read the foregoing transcript,
6 I have made any corrections, additions, or
7 changes I deemed necessary as noted on the
8 Errata to be appended hereto, and that the
9 same is a true, correct and complete
10 transcript of the testimony given by me.
11
12 _____  _____
13 BJORN STEINHOLT          Date
14 *If notary is required
15
16    SUBSCRIBED AND SWORN TO BEFORE ME THIS
17 _____ DAY OF _____, 20___.
18
19
20 _____
21    NOTARY PUBLIC
22
23
24
25

Page 147

1 ------------- I N D E X --------------
2 WITNESS   EXAMINATION BY      PAGE
3 BJORN STEINHOLT  Ms. Jensen      4
4
5 -------------- EXHIBITS ---------------
6 NUMBERS              FOR I.D.
7 Exh 503, document consisting of the  5
8 November 9th, 2022 expert report
9 by Bjorn Steinholt
10 Exh 10, document consisting of      7
11 Steinholt class cert report
12 previously marked
13 Exh 504, rebuttal report dated      7
14 February 2, 2022
15
16
17
18        (Exhibit Share)
19
20
21
22
23
24
25

Page 148

1             CERTIFICATION
2
3    I, DAWN MATERA, a Notary Public for
4 and within the State of New York, do
5 hereby certify:
6    That the witness whose testimony as
7 herein set forth, was duly sworn by me;
8 and that the within transcript is a true
9 record of the testimony given by said
10 witness.
11    I further certify that I am not
12 related to any of the parties to this
13 action by blood or marriage, and that I
14 am in no way interested in the outcome of
15 this matter.
16    IN WITNESS WHEREOF, I have hereunto
17 set my hand this 22nd day of December,
18 2022.
19
20    Dawn Matera
21    _____
22        DAWN MATERA
23
24
25

Page 149

1 ANADARKO PETROLEUM CORPORATE SECURITIES
  LITIGATION
2 12/21/2022 - BJORN STEINHOLT
3    E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 BJORN STEINHOLT          Date
25

38 (Pages 146 - 149)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.