United States District Court
Southern District of Texas
**ENTERED**
March 10, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | CIVIL ACTION NUMBER |
| | § | 4:20-cv-00576 |
| IN RE: ANADARKO | § | |
| PETROLEUM | § | JUDGE CHARLES ESKRIDGE |
| CORPORATION | § | |
| SECURITIES LITIGATION | § | |
| | § | |

OPINION AND ORDER
DENYING MOTIONS TO EXCLUDE AND
GRANTING MOTION FOR CLASS CERTIFICATION

The competing motions by Lead Plaintiff Norfolk County Council as Administrative Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Defendants Anadarko Petroleum Corporation, Robert G. Gwin, R.A. Walker, Robert P. Daniels, and Ernest A. Leyendecker, III, to exclude certain testimony of each other's expert is denied. Dkts 111 & 248.

The motion by Plaintiff for class certification is granted. Dkt 86.

For reasons stated at length below, both the record evidence and common sense point to the same conclusion. And that is, when news broke on the same day of both an *actual* $900 million write-off as to the complained-of event and a *potential* $140 million in new regulatory costs as to an entirely different event, an eight percent decline in the company's stock price the following day isn't *solely* attributable to the latter regulatory costs.

1.  Background

Defendant Anadarko Petroleum Corporation was a large oil and gas exploration company until it was purchased by Occidental Petroleum Corporation in August 2019. Dkt 55 at ¶2. Lead Plaintiff Norfolk County Council

and Plaintiff Building Trades United Pension Fund, as well as other putative class members, purchased Anadarko common stock between the dates of February 20, 2015, and May 2, 2017. Dkt 55 at ¶¶1, 15. Those are also dates within which Defendants R.A. Walker, Robert G. Gwin, Robert P. Daniels, and Ernest A. Leyendecker III served as senior Anadarko executives. Dkt 55 at ¶¶16–20.

Plaintiff alleges that Anadarko and its corporate representatives actively misled investors about the viability and profitability of a deepwater asset in the Gulf of Mexico—the Shenandoah oil field project, known as *Shen.* Dkts 55 at ¶¶4–5 & 93 at 8. Plaintiff specifically contends that Defendants recklessly overstated the viability of the project and concealed negative information from investors. Dkt 55 at ¶5; see also *Frye v Anadarko Petroleum Corp,* 953 F3d 285, 288 (5th Cir 2019).

After nine years of development and expenditures, with attendant public statements and projections, Anadarko announced that it was suspending Shen appraisal activity, resulting in $435 million in expensed suspended exploratory well costs and a $467 million impairment. Dkt 86-1 at 26. It made that announcement on May 2, 2017, at 4:16 PM EST, after trading concluded. Dkts 86-1 at 25–26 (Steinholt expert report) & 93-1 at 10 n 9, 12 (Ferrell expert report).

Coincidentally, and within the same hour, news also broke regarding Anadarko's involvement in a fatal explosion of a natural gas pipeline. The explosion occurred on April 17, 2017, in Firestone, Colorado. Dkt 93-1 at 12–13, 15–16. An investigation ensued. On the afternoon of May 2nd, Firestone fire officials held a press conference beginning at approximately 4:03 PM EST. Dkt 111-1 at 10, n 16. Three tweets regarding the press conference, but without reference to Anadarko, were published as early as 4:03 PM EST. See Dkt 111-1 at 10, n 16 (Ferrell report in support of *Daubert* motion). Later, at 4:51 PM EST, the Denver Post reported the explosion was caused by gas seeping from a severed pipeline running from an Anadarko well. See Dkt 93-1 at 12, n 22.

2

During the next trading day of May 3, 2017, Anadarko stock dropped almost eight percent. Dkt 55 at ¶¶152–54; see also Dkt 86-1 at 26.

Georgia Firefighters' Pension Fund filed this putative class action in February 2020 for violations of Sections 10(b) and 20(a) of the Exchange Act. Dkt 1; see 15 USC §§78j & 78t. Judge Nancy Atlas appointed Norfolk County Council (as administering authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Building Trades United Pension Trust Fund) as lead plaintiff and Robbins Geller Rudman & Dowd LLP as lead counsel. Dkt 41. The case was later reassigned to Judge Vanessa D. Gilmore and thereafter to this Court in December 2021. Dkts 66 & 91.

Pending is a motion by Plaintiff to certify the following class:

> All persons and entities that purchased or acquired the common stock of Anadarko Petroleum Corporation between February 20, 2015, and May 2, 2017, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers, directors, subsidiaries, and affiliates of Anadarko during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to which this litigation is assigned.

Dkt 86 at 9–10; see also Dkt 55 at ¶¶1, 165–71 (amended class action complaint).

Originally pending with the class-certification motion was a motion by Defendants for leave to file a surreply in further opposition to class certification. Dkt 97. It contended that Plaintiff's reply (along with an attached rebuttal report) contained new arguments and data analysis by Plaintiff's expert, Dr. Bjorn I. Steinholt, about the price impact of the alleged corrective Shen disclosure.

Id at 2–3; see also Dkts 96 (reply) & 96-1 (rebuttal report). That motion was denied based on a finding that the reply only responded to arguments in Defendants' response. Dkt 110.

Also during the original pendency of the class-certification motion was a motion by Defendants to exclude the referenced expert rebuttal testimony of Plaintiff's expert. Dkt 111. It contended that the rebuttal report was itself inadmissible under *Daubert*. Id at 13–20. Upon consideration, the motion to exclude was denied and the motion for class certification was granted. Dkt 141; see also Dkt 198 (order denying reconsideration).

Defendants appealed under Rule 23(f) of the Federal Rules of Civil Procedure. Dkt 206. They argued that (i) evidence and argument presented with the motion for leave to file a surreply should have been considered on the merits, and (ii) Plaintiff's expert should have been excluded under *Daubert*. The Fifth Circuit found that Plaintiff indeed raised new arguments in their reply, thus entitling Defendants to file a surreply. It also found that the *Daubert* analysis should be considered again more fulsomely, given (in part) the contentions brought to bear in the surreply. As such, the order on class certification was vacated with instructions to reconsider the motions, including the ultimate conclusion as to class certification. See *Georgia Firefighters' Pension Fund v Anadarko Petroleum Corporation*, 99 F4th 770, 774–75 (5th Cir 2024).

On remand, Defendants filed the surreply that was the subject of the appeal. See Dkt 237; see also Dkt 239 (further response by Plaintiff). Plaintiff also filed a motion to exclude certain testimony of Defendants' expert, Dr. Allen Ferrell. Dkt 248. Plaintiff didn't challenge Ferrell's initial report opposing class certification. See Dkt 93-1.

And so, considered now on remand are motions (i) by Plaintiff for class certification, (ii) by Defendants to exclude rebuttal testimony of Plaintiff's expert, Dr. Bjorn I. Steinholt, and (iii) by Plaintiff to exclude certain testimony of Defendants' expert, Dr. Allen Ferrell. Dkts 86, 111 & 248. Both Steinholt and Ferrell testified and were subject

4

to cross-examination at hearing on the motions. Dkt 286 (minute entry).

2.  Admissibility of expert testimony

The proponent of testimony by an expert witness must "prove by a preponderance of the evidence that the testimony is reliable." *Moore v Ashland Chemical Inc*, 151 F3d 269, 276 (5th Cir 1998). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure. It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

This rule "assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Curtis v M & S Petroleum Inc*, 174 F3d 661, 668 (5th Cir 1999), citing *Daubert v Merrell Dow Pharmaceuticals Inc*, 509 US 579, 597 (1993). In making this assessment, courts must make "a preliminary assessment" as to the validity of the reasoning or methodology underlying the testimony and "whether that reasoning or methodology properly can be applied to the facts in issue." *Brown v Illinois Central Rail Co*, 705 F3d 531, 535 (5th Cir 2013) (cleaned up). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Guile v United States*, 422 F3d 221, 227 (5th Cir 2005) (cleaned up). And "nothing in either *Daubert* or the

5

Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co v Carmichael*, 526 US 137, 157 (1999) (cleaned up).

Both parties move to exclude opposing experts on *Daubert* grounds. Both fail because the experts are plainly qualified, and their methods are sufficiently reliable. Any complaints ultimately go to the weight of testimony, not its admissibility. As such, opinions from both experts will be considered, where pertinent, regarding the motion for class certification.

a. Rebuttal report by Plaintiff's expert

Defendants filed a motion to exclude the rebuttal report of Plaintiff's expert, Bjorn I. Steinholt. Dkt 111; see Dkt 96-1 (rebuttal report). Defendants don't dispute Steinholt's qualifications. Nor could they, as he has a Master of International Business degree from University of San Diego, is a Chartered Financial Analyst, and has been routinely retained to offer expert opinions in similar securities class action cases. See Dkt 86-1 at 4–6.

Instead, Defendants challenge only his reliability, for purposes of this action, under *Daubert*. Dkt 111 at 13–14. They argue that the Steinholt rebuttal report—but not his original report—is unreliable for six different reasons. See Dkt 111 at 14–20. But none are persuasive upon inspection. Instead, the Steinholt rebuttal report is sufficiently reliable under *Daubert*.

*First*, Defendants contend that Steinholt assumed, without proving, that the common stock was traded after-hours in an efficient market. Dkts 111 at 14–15 & 123 at 6. To the contrary, the rebuttal report focuses on the price impact on the following trading day of May 3rd, and not the after-hours period on May 2nd. Dkt 118 at 12–13; see also Dkt 96-1 at 29–32. And there is no dispute that Anadarko's shares are efficiently traded.

*Second*, Defendants argue that Steinholt has no basis for his opinion that the 4.1% price shift was abnormal or statistically significant because he failed to conduct an

event study that considered after-hours trading. Dkt 111 at 15–16. This fails for reasons similar to the first. Plaintiff explains that the Steinholt event study and its conclusions are based on a *different* price point—the price at market close on May 3rd—not the 4.1% after-market price decline on May 2nd. Dkt 118 at 13–14.

*Third*, Defendants raise a series of reliability concerns pertaining to the factual timeline of news releases that Steinholt relies upon for his report. Dkt 111 at 16–17. The parties dispute when certain information became available on May 2nd, the content of those releases, and the impact of those releases. For example, see Dkts 93-1 at 39–41 (Ferrell report, discussing and ascribing Anadarko price drop to Firestone news timeline), 96-1 at 27–28 (Steinholt rebuttal report, outlining why Firestone news disclosure couldn't have caused price decline as described by Ferrell); see also Dkts 111 at 16 (contention by Defendants that Steinholt is "wrong on the facts" because Firestone news broke at 4:03 PM, before 4:16 PM earnings announcement) & 118 at 14 (contention by Plaintiff that 4:03 PM tweets were inapposite because Anadarko's stock price didn't decline until after 4:16 PM earnings announcement and corrective disclosure). Such factual disputes don't establish that any of Steinholt's conclusions are so unreliable that they are inadmissible under *Daubert*. The Supreme Court instead held in *Daubert* that "shaky but admissible evidence" should be evaluated through traditional methods, including "presentation of contrary evidence," and not excluded through motions to strike expert testimony. 509 US at 596. The timeline-related argument is that type of evidence. It doesn't render the analysis by Steinholt unreliable in and of its very nature.

*Fourth*, Defendants claim that Steinholt with his rebuttal report excluded a relevant industry index that he used in his first event study. Dkt 111 at 17–18. But this mischaracterizes what Steinholt did. With his rebuttal, Steinholt performed an event study controlling for the Firestone news by using an index of Colorado peer companies identified by Ferrell—*in response to* a gap

identified by Defendants' own expert. Dkt 118 at 15–16; see also Dkt 96-1 at 30–31. This isn't a "shift in methodology" that means his overall testimony changed or is unreliable. He instead responded to a point identified by Defendants. Likewise, event studies are a well-recognized method for analyzing the effect of a corrective disclosure on a company's stock price. See *Ludlow v BP, PLC*, 800 F3d 674, 683–84, n 37 (5th Cir 2015).

*Fifth*, Defendants argue that Steinholt's reliability is undermined by his assumption that the company's reported write-off would be reflected in a drop in market value. See Dkt 111 at 19. In this first place, Defendants appear to conflate "sunk" costs with "lost" costs. Ibid. These aren't the same thing, and it was only Anadarko's write-off that indicated future cash flows could no longer be expected on the Shen investment. See Dkt 118 at 17. In any event, the argument must be rejected at this stage, as it simply critiques the basis of Steinholt's opinion, thus ultimately going to its weight and not admissibility. *Puga v RCX Solutions, Inc*, 922 F3d 285, 294 (5th Cir 2019), citing *Rock v Arkansas*, 483 US 44, 61 (1987): "As a general rule, questions related to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." Last, this "cost approach" is one of several "recognized and generally accepted approaches to measuring the fair value of an asset." *SEC v Yorkville Advisors, LLC*, 305 F Supp 3d 486, 505–06 (SDNY 2018).

*Sixth*, Defendants contend that the Steinholt used unreliable reasoning because, if he was accurate, other Shen partners (such as Conoco Phillips and Cobalt) would have experienced a decline relatively proportional to Anadarko, which didn't occur. Dkt 111 at 20. This is unavailing for purposes of exclusion, as it evinces a disagreement with Steinholt's *conclusion* as applied to the facts, and not as to his *methods*. And for his part, Steinholt articulates reasons why impacts would be different as between the partners. See Dkt 96-1 at 18–24. Such dispute is more properly dealt with on the merits, to preserve the

adversarial system. See *Pipitone v Biomatrix, Inc*, 288 F3d 239, 249–50 (5th Cir 2002).

Plaintiff has otherwise shown that Steinholt's opinion on the May 3rd decline is reliable. As noted above, it demonstrates that the event study of the type conducted is "a well-established method for analyzing the effect" of company disclosures on stock prices, citing binding precedent stating as much. Dkt 118 at 15, citing *Ludlow*, 800 F3d at 683–84, n 37; see also *Halliburton Co v Erica P. John Fund Inc (Halliburton II)*, 573 US 258, 280–82 (2014) (discussing function and utility of event studies in securities litigation). But analysis for purposes of exclusion here isn't a determination whether the event study's results are *correct*, or even that this particular event study is the "best" one for the circumstances. It is instead limited to determination whether Steinholt's opinions are based on reliable methods, and whether he applied those methods to the facts under recognized methods and procedures of science.

In sum, the motion by Defendants to exclude the Steinholt rebuttal report will be denied. Dkt 111. Plaintiff has shown that the report isn't unsupported speculation or subjective belief, but rather, is based on accepted methods reliably applied to the facts of this case. The Steinholt rebuttal report will thus be considered where pertinent for purposes of the motion for class certification.

### b. Surreply report by Defendants' expert

The surreply by Defendants contains a report by its expert, Dr. Allen Ferrell. Dkts 237 & 237-1 (report). Plaintiff filed a motion to exclude portions of that report. See Dkt 248. As with the Steinholt report, where Defendants didn't dispute his qualifications, Plaintiff doesn't challenge Ferrell's qualifications. And again, nor could they. Ferrell has a Ph.D. in Economics from Massachusetts Institute of Technology, is a professor of securities law at Harvard Law School, and has routinely offered expert testimony in securities class action litigation. See Dkt 237-1 at 31–36 (resume).

Plaintiff instead challenges only three of Ferrell's class-certification opinions, being his (i) accounting opinions, (ii) "flip-flop" on the Firestone news timeline, and (iii) ConocoPhillips event study. Dkt 248 at 11. None of these opinions need to be excluded.

*As to Ferrell's accounting opinions,* Plaintiff contends that Ferrell offers putative "accounting-related" opinions, which should be excluded, they say, because he "does not qualify as an accounting expert." Dkt 248 at 11–12. This derives from the fact that Ferrell is not a CPA by training, but rather, is a lawyer and an academic of finance and securities law. Id at 11; see Dkt 93-1 at 47–53 (Ferrell CV). But Defendants offer his expert opinion largely to show that the Shen write-off represented a "sunk cost" that doesn't affect future cash flow, which in turn cannot—in his view—affect the company's value and stock price. See Dkts 249 at 12 & 237-1 (Ferrell's report) at 10–14. And they maintain that such testimony is based on the principles of "finance and valuation," not accounting. Dkt 249 at 12.

To the extent that Ferrell touches on matters "related to" finance and valuation, even if they do veer all the way into accounting, disagreement goes to weight, not admissibility. For example, the Fifth Circuit stated in *United States v Wen Chyu Liu* that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." 716 F3d 159, 168–69 (5th Cir 2013) (citation omitted).

Plaintiff seeks to frame Ferrell's opinions as being "accounting-based" and "rel[ying] exclusively on accounting standards." Dkt 250 at 3. It also describes part of his analysis—a determination that the "impairment" from the write-off is a sunk-cost—as being "undeniably an *accounting* determination." Id at 4 (emphasis in original). But they provide no explanation for why that is necessarily so. And to the contrary, Ferrell clearly has the experience needed to testify on such matters in this case. He has routinely testified on securities fraud cases, has experience

performing the necessary analyses, and is plainly qualified by his education and publications. Dkt 237-1 at 31–36; see also Dkt 249 at 12–13. In essence, Ferrell's testimony focuses on the connection between the Shen "sunk cost" to Anadarko's stock price and, thus, is within the scope of his financial valuation expertise. Dkt 249 at 13.

Plaintiff also argues that Ferrell's accounting opinions regarding the book value of Shen are inconsistent with Generally Accepted Accounting Principles and, in turn, Anadarko's previous representations to its investors that the company's valuations complied with GAAP. Dkt 248 at 13–17. In sum, they contend that Ferrell is unreliable because (i) his opinion that the $902 million write-off consists of sunk costs is inconsistent with Anadarko's representations in financial statements to investors that "its accounting complied with GAAP," (ii) his sunk-costs opinion necessarily assumes Anadarko didn't conduct an impairment analysis that would be required if the write-off were indeed of sunk costs, which would mean that Anadarko wasn't in compliance with GAAP, and (iii) he relied on a minority view of analysts covering Anadarko to support his conclusions as to Anadarko's valuation. Id at 13–16.

None of these arguments are reason to exclude Ferrell's opinions. Defendants have provided sufficient evidence that his sunk-cost opinions are based on valid valuation principles. See Dkt 249 at 14–15. That he relied more heavily on analyst reports that assigned a "low to zero" value to Shen, while other analysts assigned a higher value, again goes to weight and credibility, not to its admissibility as evidence. See *SEC v Cuban*, 2013 WL 3809654, *4 (ND Tex). Ferrell's accounting-related opinions are thus admissible and considered where pertinent below.

*As to the Firestone news timeline*, Plaintiff argues that Ferrell's causation analysis is unreliable because it relies on a series of false assumptions and factual errors. Dkt 248 at 17–18. They point, factually, to two "fundamental problems" with his testimony, being that (i) Ferrell fails to

provide evidence that investors actually read and relied upon the three tweets that supposedly broke the further Firestone news at 4:03 PM on May 2nd, and thus, his "opinion" based on how these tweets affected Anadarko's stock price is pure speculation, and (ii) the investigators during that May 2nd press conference didn't assign any responsibility for the accident, so investors couldn't have assigned fault to Anadarko. Id at 16–18.

At issue is Rule 702(d) of the Federal Rules of Evidence, which requires that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Plaintiff's objections in this regard amount to mere factual disputes, to which Defendants counter with ready explanation. See Dkts 248 at 17–20 & 249 at 17–20. Where, as here, the expert employs a reliable methodology and applies it to facts, it should be left for jury consideration. Such "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga*, 922 F3d at 294. Beyond that, exclusion would usurp the jury's fact-finding role.

*As to the ConocoPhillips event study,* Plaintiff argues that it's unreliable because of a high error rate that can cause false negatives—so-called "Type II errors." Dkt 248 at 20–23. Potential error rates are relevant to the *Daubert* inquiry. Id at 21, citing *Moore v Ashland Chemical Inc*, 151 F3d 269, 275 (5th Cir 2009). On this, Plaintiff specifically argues that, based on the parameters Ferrell used and identified, the event study has a 67% "Type II" error rate and is thus unreliable. Id at 21. It also maintains that the study "does not establish a lack of price impact." Id at 22 (emphasis omitted). Defendants respond by explaining that Type II errors are actually indicators of a lack of statistically significant price movement, meaning that Plaintiff's characterization of the study is misleading. Dkt 249 at 20–22. They also argue that, because ConocoPhillips's stock price *increased* on May 3, 2017, any Type II error rate would only support Defendants' position

that the Shen disclosure did not *negatively* impact its stock price. Id at 22.

Like the conclusion as to Plaintiff's expert rebuttal report, all that Defendants must do at this stage is establish by a preponderance of the evidence that Ferrell's testimony is "grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief." *In re Taxotere (Docetaxel) Products Liability Litigation*, 26 F4th 256, 268 (5th Cir 2022) (cleaned up). By showing that he relied on a scientific process to come to his conclusion, Defendants have carried their burden on reliability in addition to the *Daubert* analysis as a whole.

In sum, the motion by Plaintiff to exclude certain opinions of Dr. Allen Ferrell will be denied. Dkt 248. Defendants have shown that his report isn't unsupported speculation or subjective belief, but rather, is based on accepted methods reliably applied to the facts of this case. The Ferrell report will thus be considered where pertinent for purposes of the motion for class certification.

### 3. Class certification

Class actions proceed under Rule 23 of the Federal Rules of Civil Procedure. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." *Comcast Corp v Behrend*, 569 US 27, 33 (2013) (quotation marks and citation omitted). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." Ibid; see also *Madison v Chalmette Refining LLC*, 637 F3d 551, 554 (5th Cir 2011).

Rule 23(a) begins by listing four prerequisites to class certification—*numerosity*, *commonality*, *typicality*, and *adequacy of representation*. Meeting these requirements isn't alone sufficient. Rule 23(b) instead specifies three class types and the requirements for each. The putative class here seeks to proceed under Rule 23(b)(3), which permits class certification where common questions of law

or fact predominate over individual questions. See Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§1772, 1775, 1777 (3d ed). This in turn requires a showing as to both *predominance* and *superiority*.

The reviewing court must "rigorously consider" the Rule 23(a) prerequisites and the requirements specific to the class type under Rule 23(b). *Chavez v Plan Benefit Services, Inc*, 957 F3d 542, 546 (5th Cir 2020). This requires a court to look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." *Flecha v Medicredit, Inc*, 946 F3d 762, 766 (5th Cir 2020). A court must also consider how any trial on the merits would be conducted if the class was certified. *Prantil v Arkema Inc*, 986 F3d 570, 574 (5th Cir 2021).

a. Rule 23(a)

Plaintiff asserts that this action satisfies all prerequisites of Rule 23. Dkt 86 at 13. The only aspect challenged by Defendants pertains to *predominance* under Rule(b)(2). Even with such concessions, the Fifth Circuit holds that Rule 23 nonetheless "requires the court to 'find,' not merely assume, the facts favoring class certification." *Unger v Amedisys Inc*, 401 F3d 316, 321 (5th Cir 2005). Each requirement is thus addressed in turn.

*As to numerosity,* a plaintiff must show that "the class is so numerous that joinder of all members is impracticable." FRCP 23(a)(1). In addition to the sheer number of purported class members, a court may consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Ibe v Jones*, 836 F3d 516, 528 (5th Cir 2016).

Numerosity "'is generally assumed to have been met' in a class action suit involving nationally traded securities, since the putative class is likely sufficiently numerous, geographically dispersed, and difficult to identify." *Prause v TechnipFMC, PLC*, 2020 WL 3549686, *2 (SD Tex), quoting *Zeidman v J. Ray McDermott & Co*,

651 F2d 1030, 1039 (5th Cir 1981). This action falls squarely within that general rule. Anadarko was listed on the New York Stock Exchange for the entire class period with a trading volume of 2.9 billion shares and over 1,800 institutional investors. Dkt 86-1 at 15, 20. Joinder of all members is plainly impracticable.

*As to commonality,* a plaintiff must show that "there are questions of law or fact common to the class." FRCP 23(a)(2). As the Supreme Court stated in *Wal-Mart Stores Inc v Dukes,* the class members must have a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 564 US 338, 350 (2011); see also *Ahmad v Old Republic National Title Insurance Co,* 690 F3d 698, 702 (5th Cir 2012). A common instance of the defendant's injurious conduct can establish commonality "even if the amount of damages differs for each injured class member." *Prause,* 2020 WL 3549686 at *3, citing *In re Deepwater Horizon,* 739 F3d 790, 810 (5th Cir 2014).

Whether Defendants made false and misleading statements, what effect those statements had on the Anadarko stock price, what damages (if any) were sustained by class members—these and others are all common questions capable of classwide resolution within the meaning of *Dukes.* Common evidence will likewise answer these common legal questions. For example, see *Rooney v EZCORP, Inc,* 330 FRD 439, 445 (WD Tex 2019) (finding commonality satisfied in securities litigation where multiple questions common to class existed).

*As to typicality,* a plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). This inquiry "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v Treasure Chest Casino, LLC,* 186 F3d 620, 625 (5th Cir 1999) (quotation marks and citation omitted). A plaintiff can satisfy typicality "by showing that class representatives'

claims arise from a similar course of conduct and share the same legal theory." *In re Cobalt International Energy, Inc Securities Litigation,* 2017 WL 2608243, *2 (SD Tex).

Plaintiff purchased Anadarko stock during the class period. Its allegations of fraudulent conduct and its damages theories are shared by the entire class. See Dkts 26-2, 26-3, 55 & 86-2.

*As to adequacy of representation,* a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4). Adequacy explores "the zeal and competence" of lead counsel, the "willingness and ability" of the class representative to "take an active role in and control the litigation and to protect the interests of absentees," and the "risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v Progressive Securities Insurance Co,* 856 F3d 408, 412 (5th Cir 2017) (cleaned up).

Here, lead counsel Robbins Geller has served as lead counsel in multiple securities class actions. It has demonstrated a prior willingness to take securities fraud actions to trial, and it has here been active in this litigation. See Dkt 86-4 (firm resume), listing matters including *In re Enron Corp Securities, Derivative & ERISA Litigation*, 586 F Supp 2d 732 (SD Tex 2008). Plaintiff is similarly well situated for class representation, being a large and sophisticated investor. Dkt 86-2 at 3. Large institutional investors are the preferred named plaintiffs in securities fraud litigation because they generally have the same interests as the plaintiff class. See *In re BP, PLC Securities Litigation*, 758 F Supp 2d 428, 439 (SD Tex 2010). The interests of the group are also aligned with other class members, as all seek to maximize recovery stemming from the alleged misconduct by Anadarko and its executives. See Dkt 86-2. And the group has demonstrated "a sufficient level of knowledge and understanding" in this litigation to date. *Prause*, 2020 WL 3549686, at *4, quoting *Ibe*, 836 F3d at 529.

### b. Rule 23(b)(3) predominance

Certification under Rule 23(b)(3) requires a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members." This is known as the *predominance* requirement.

The same analytical principles that govern Rule 23(a) pertain, but "Rule 23(b)(3)'s predominance criterion is even more demanding." *Comcast Corp*, 569 US at 34. A court must identify "the substantive issues that will control the outcome" of the case and assess "which issues will predominate." *Madison*, 637 F3d at 555 (quotation marks and citation omitted). It must therefore consider "how a trial on the merits would be conducted if a class were certified." Ibid (quotation marks and citation omitted). The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Torres v SGE Management, LLC*, 838 F3d 629, 636 (5th Cir 2016, *en banc*) (quotation marks and citation omitted). But of note, this showing doesn't require that the court find that the common questions "will be answered, on the merits, in favor of the class." *Amgen Inc v Connecticut Retirement Plans & Trust Funds*, 568 US 455, 459 (2013).

Defendants forward two contentions. First, that Plaintiff fails to establish a critical requirement in securities class actions prosecuted under Rule 23(b)(3)—that being reliance on the alleged misstatements. Dkt 93 at 5. Second, that the posited damages theory is too vague to adequately connect to the liability theory. Id at 7, 26. Neither ultimately has merit.

### i. Showing as to reliance

"In securities law cases, predominance often hinges upon whether or not class members will need to individually demonstrate they relied upon a misrepresentation or omission made by the defendant." *Rooney*, 330 FRD at 448, citing *Amgen,* 568 US at 461. Plaintiff proposes to satisfy reliance by pointing to the

*Affiliated Ute* and *Basic* presumptions. Dkt 86 at 18. While the former isn't applicable, the latter quite clearly is.

To invoke the *Affiliated Ute* presumption, a plaintiff must "allege a case primarily based on omissions or nondisclosure" and "demonstrate that the defendant owed him a duty of disclosure." *In re Enron Corp Securities, Derivative & ERISA Litigation*, 610 F Supp 2d 600, 610 (SD Tex), quoting *Regents of University of California v Credit Suisse First Boston, Inc*, 482 F3d 372, 384 (5th Cir 2007). A defendant omits information when it says "absolutely nothing about matters whose very existence plaintiffs have no reason to consider." *In re Enron*, 610 F Supp 2d at 630 n 33.

This action is primarily based upon certain affirmative representations by Defendants regarding Shen upon which Plaintiff and other putative class members purport to have relied. By contrast, the alleged omissions are those that putatively would have served primarily to *clarify* those representations. In other words, the subject statements are said to be misleading in part *because of* the omissions. And the Fifth Circuit holds that the *Affiliated Ute* presumption does not apply to such "true statements that are nonetheless so incomplete as to be misleading." *In re Enron*, 610 F Supp 2d at 631 n 33. As a result, the *Affiliated Ute* presumption isn't applicable.

The *Basic* presumption holds that "a public, material misrepresentation will distort the price of stock traded in an efficient market." *Halliburton II,* 573 US at 283–84; see also *Basic Inc v Levinson*, 485 US 224, 241–42, 247 (1988). An investor thus relies on the misrepresentation "so long as it was reflected in the market price at the time of his transaction." *Goldman Sachs*, 594 US at 118 (cleaned up). As the Supreme Court summarized, "The presumption allows class-action plaintiffs to prove reliance through evidence common to the class," which "in turn makes it easier for plaintiffs to establish the predominance requirement" of Rule 23(b)(3). Id at 119.

To invoke this presumption, a plaintiff must prove that (i) "the alleged misrepresentation was publicly known,"

(ii) "it was material," (iii) "the stock traded in an efficient market," and (iv) "the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." Id at 118. Defendants can then rebut the presumption by demonstrating that the misstatements *did not* affect the market price of the stock—a point upon which they bear the burden of persuasion. Id at 118, 124. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." Id at 126–27.

Defendants made the alleged misstatements in public SEC filings, and the misstatements concerned a significant asset. See Dkt 55 at ¶¶94–141. The statements were thus both public and material. Additionally, Anadarko stock was traded on the New York Stock Exchange, which is an indicia of market efficiency. See *Strougo v Barclays PLC*, 312 FRD 307, 318 (SDNY 2016). And Anadarko stock meets three further indicia of market efficiency—large market capitalization, narrow bid-ask spread, and large stock float. See Dkt 86-1 at 26–29; *Krogman v Sterritt*, 202 FRD 467, 478 (ND Tex 2001).

Dispute by Defendants as to the *Basic* presumption is twofold. First, they appear to argue that Plaintiff fails to invoke the *Basic* presumption in the first instance because it doesn't establish efficiency in the after-market. Dkt 237 at 9–10. Second, they maintain they can rebut the *Basic* presumption. Dkt 93 at 13–21; see also Dkt 237 at 4–9.

*As to after-market efficiency,* Defendants maintain in their surreply that Steinholt's report is unreliable because he failed to establish market efficiency for aftermarket trading in Anadarko stock on May 2nd. Dkt 237 at 9–10. Defendants rely on differences between after-hours and normal trading hours such as "fewer participants, thinner volume, wider bid-ask spreads, and higher volatility after-hours." Ibid. This is unpersuasive, however, because it fails to account for the finding by Steinholt as to *when* the price change was statistically significant. He unambiguously concludes it was the "May 3, 2017 residual decline in

Anadarko's stock price [that] was statistically significant." Dkt 86-1 at 26. And the prices he compares are the closing prices on May 2nd and May 3rd. Ibid.

Given how the stock market and stock prices adjust during normal trading hours, the May 3rd closing price would necessarily reflect after-hours trades. The argument thus doesn't undermine Steinholt's findings.

*As to rebutting the* Basic *presumption*, the arguments proceed in four parts.

*First*, Defendants note that ConocoPhillips—the development partner of Anadarko—disclosed similar information about Shen before markets opened on May 2, 2017. And the stock price of neither ConocoPhillips nor Anadarko dropped during that trading day. Dkt 93 at 14–15. But the disclosure by ConocoPhillips on May 2nd was quite limited, being a single sentence noting, "First-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico." Dkt 96-1 at 15. ConocoPhillips didn't disclose the suspension of Shen appraisal activity, it didn't write down Shen, and it didn't disclose Shen sidetrack well results. Id at 15–18. The point is thus unpersuasive.

*Second*, Defendants observe that ConocoPhillips' stock didn't drop after the Shen disclosures by Anadarko, despite ConocoPhillips' $101 million stake in the project. Dkt 93 at 10, 15–16. But ConocoPhillips isn't a proper comparator, given that the Shen project was a minor expenditure relative to its massive market cap. What's more, its $101 million stake paled in comparison to the $902 million stake held by Anadarko. Dkt 96-1 at 15–16. And notably, other Shen development partners with high Shen-stake-to-market-cap ratios suffered major price drops on May 3rd. Id at 22–24.

*Third*, Defendants highlight a potential $140 million in new regulatory costs as a result of the Firestone news. Dkt 93 at 16–18. In their surreply, Defendants claim that investors were apprised of Anadarko's liability as early as

4:03 PM, when a tweet mentioning a news conference featuring Colorado officials first was published. Dkt 237 at 10. This means, Defendants say, that public information regarding the company's Firestone liability preceded the 4:16 PM Shen disclosure. Ibid. The parties dispute whether investors could discern from these tweets that Anadarko was indeed liable for the Firestone incident or if investors even were aware of these tweets. Regardless, what is clear is that Anadarko's stock price dropped 4.1% during after-hours trading between the time Anadarko made its Shen disclosures at 4:16 PM and the time the Firestone news broke in a report by the *Denver Post* at 4:51 PM. See Dkt 96-1 at 27. There was no price decline between 4:03 PM and 4:15 PM, but there was 2.3% price decline in the two minutes between 4:16 PM and 4:18 PM. Dkt 118-1 at 12–13 (Steinholt report in opposition to Defendants' motion to exclude). And the Steinholt event study concluded that the price drop on May 3rd remained statistically significant even when controlling for the Firestone news. Dkt 96-1 at 30–32.

*Fourth*, Defendants contend that the Shen write-off is representative of "sunk costs" which would not impact stock price as a matter of basic finance, whereas expected future value of the project does impact stock price. Dkt 237 at 11–12. But this argument itself only attacks Plaintiff's *contention*. It doesn't carry Defendants' burden of showing that the alleged misstatements had *no bearing* on Anadarko's market price.

The Supreme Court admonishes, "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman Sachs*, 594 US at 122 (quotation marks omitted). Common sense suggests here that, when news broke on the same day of both an *actual* $900 million write-off and a *potential* $140 million in new regulatory costs, an eight percent decline in the company's stock price the following day isn't *solely* attributable to the latter, lesser regulatory costs. Cf *In re Signet Jewelers Limited Securities*

21

*Litigation*, 2019 WL 3001084, *17 (SDNY) (stating that "common sense" appeared contrary to certain opinions offered by Ferrell).

Plaintiff has adequately invoked the *Basic* presumption. And in response, Defendants have failed to meet their burden of showing *lack of price impact*. All Defendants establish is that there is a possible alternative reason for stock price changes, which is more properly considered at the merits stage than class certification. Plaintiff has thus established reliance sufficient to satisfy the predominance requirement of Rule 23(b)(3).

ii.    Showing as to damages

Plaintiff bears the burden of demonstrating that damages may be measured using a common methodology that's consistent with the theory of liability. *Comcast Corp*, 569 US at 35. But damages at the class-certification stage needn't be exact. *Ludlow*, 800 F3d at 683; see also *Story Parchment Co v Paterson Parchment Paper Co*, 282 US 555, 563 (1931). Nor must plaintiff prove loss causation as a condition of obtaining class certification. *Ludlow*, 800 F3d at 687, citing *Erica P. John Fund Inc v Halliburton Co (Halliburton I)*, 563 US 804, 813 (2011).

Steinholt in his expert report presents a *stock price inflation* theory (also known as the *out-of-pocket measure*). See Dkt 86-1 at 29–31. "That is, the theory alleges that the stock price was higher than it would have been, and the damage is the difference between the 'true' price and the 'paid' price." *Ludlow*, 800 F3d at 689.

Here, the underlying theory is that the alleged misrepresentations inflated the Anadarko stock price. Steinholt proposes calculating the "true" price—the price the stock would have been absent the alleged misrepresentations—by conducting an event study supplemented by fundamental valuation tools that help control for other influencing factors. The individual damages of each class member can then be calculated based on the difference between the price they paid and the

22

"true" price at the time of their respective purchases and sales. See Dkt 86-1 at 29–31.

Defendants contend that this theory is "so vague and imprecise that it is impossible to assess whether Plaintiff has presented a damages methodology consistent with their theory of liability." Dkt 93 at 26. But the Fifth Circuit approved a nearly identical theory of damages in *Ludlow*, noting that the damages theory remained "tied to a theory of liability common to all" putative class members. See 800 F3d at 687. The same is true here. See Dkt 96 at 12. Plaintiff contends that Defendants are liable to all putative class members for misstatements regarding the viability of Shen. And the loss forming the basis for its damages model "comes from the inflated stock price caused by those misstatements." See *Ludlow*, 800 F3d at 687.

Defendants also attempt to brand the damages theory proposed by Plaintiff as a *materialization of the risk* model. Dkt 93 at 27. Under such a theory, "investors are harmed by [ ] corrective events that represent materializations of the risk that was improperly disclosed." *Ludlow*, 800 F3d at 689 (quotation marks and citation omitted, omission in original). The Fifth Circuit has explained that such a model is insufficient because it can't "be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have. It also presumes substantial reliance on factors other than price, a theory not supported by *Basic* and the rationale for fraud-on-the-market theory." Id at 691.

But such problems aren't present here. See Dkt 96 at 12–13. Plaintiff doesn't assert that Defendants under-represented an *unrealized* risk. It instead asserts that certain risks had *in fact* materialized, yet Defendants actively misled investors to the contrary. For example, see Dkt 55 at ¶¶6, 98, 116; see also Dkt 63 at 15 (order denying motion to dismiss). These misrepresentations (they say) artificially inflated the Anadarko stock price, and it is *that* artificial inflation that was subsequently removed via a corrective disclosure. The theory thus bears the "hallmarks

of the fraud on the market theory of liability." *Rougier v Applied Optoelectronics, Inc*, 2019 WL 6111303, *17 (SD Tex). And it stands in stark contrast to the theory rejected in *Ludlow*, where individual investors relied on their own risk assessment as opposed to the integrity of the market price. *In re BP PLC Securities Litigation*, 2014 WL 2112823, *11 (SD Tex), affirmed by *Ludlow*, 800 F3d at 691.

In sum, the intended damages model measures "only the difference between the price paid and the true value of the security at the time of the initial purchase by the defrauded buyer" without the need to inquire into other factors such as individual risk tolerance. *Ludlow*, 800 F3d at 682, 691 (cleaned up). Plaintiff has thus satisfied its burden under *Comcast* to demonstrate that its methodology is "sound" and produces a "commonality of damages." *Comcast Corp*, 569 US at 37.

c.   Rule 23(b)(3) superiority

Certification under Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This is known as the *superiority* requirement.

The inquiry is fact specific on factors of (i) "the interests of members of the class in individually controlling the prosecution or defense of separate actions," (ii) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum", and (iv) "the likely difficulties encountered in managing a class action." *Ibe*, 836 F3d at 529–30, citing *Amchem Products, Inc v Windsor*, 521 US 591, 615–16. Courts have routinely found that plaintiffs in securities litigation meet the superiority requirement. For example, see *In re BP PLC Securities Litigation*, 2013 WL 6388408, *18 (SD Tex); *Prause*, 2020 WL 3549686 at *7; *Rooney*, 330 FRD at 451.

Superiority is easily met here. *First*, as is often the case in securities litigation, "[t]he costs and expenses of

individual litigation would prove prohibitive for potential class members, who would have little incentive to litigate their claims outside the context of a class action." *Prause*, 2020 WL 3549686 at *7. *Second*, there's no other pending litigation concerning the alleged misconduct of Anadarko and its officials. Dkt 86 at 26. *Third,* concentrating this litigation will promote judicial efficiency, economy, and uniformity by avoiding "the time and expense of requiring all class members to litigate individually." *Rougier*, 2019 WL 6111303 at *19, quoting *In re BP PLC Securities Litigation*, 2013 WL 6388408 at *18. *Fourth*, the potential for individualized issues has been adequately addressed above, with no further manageability issues either noted by the parties or readily ascertainable.

The superiority requirement of Rule 23(b)(3) is met.

### 4. Conclusion

The motion by Defendants to exclude the expert rebuttal report of Bjorn I. Steinholt is DENIED. Dkt 111.

The motion by Plaintiff to exclude certain testimony of Dr. Allen Ferrell is DENIED. Dkt 248.

The motion by Plaintiff for class certification is GRANTED. Dkt 86.

The following class is CERTIFIED pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities that purchased or acquired the common stock of Anadarko Petroleum Corporation between February 20, 2015, and May 2, 2017, inclusive, and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers, directors, subsidiaries, and affiliates of Anadarko during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to which this litigation is assigned.

SO ORDERED.

Signed on March 10, 2026, at Houston, Texas.

Honorable Charles Eskridge
United States District Judge