# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| In re ANADARKO PETROLEUM | ) | Civil Action No. 4:20-cv-00576 |
| CORPORATE SECURITIES LITIGATION | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | REBUTTAL REPORT OF |
| | ) | KEVIN J. MURPHY |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# Rebuttal Report of Kevin J. Murphy

1. **Introduction** ...................................................................................................................1

2. **Summary of Opinions** ...................................................................................................4

3. **Executive Compensation at Anadarko Petroleum** ...................................................5
    3.1.    Overview .................................................................................................................5
    3.2.    Annual Bonuses (AIP) ...........................................................................................6
    3.3.    Restricted Stock Units (RSUs) ..............................................................................8
    3.4.    Non-Qualified Stock Options (NQSOs) .................................................................9
    3.5.    Performance Units (PUs) .......................................................................................9

4. **Stock Ownership and Trading Patterns for Named Defendants, 2014-2018** .......11
    4.1.    Mr. Walker ............................................................................................................11
    4.2.    Mr. Gwin ...............................................................................................................12
    4.3.    Mr. Daniels ...........................................................................................................13
    4.4.    Mr. Leyendecker ...................................................................................................14

5. **Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?** ....................................................................................................15
    5.1.    Annual Bonuses (AIP) .........................................................................................16
    5.2.    Restricted Stock Units (RSUs) ............................................................................17
    5.3.    Non-Qualified Stock Options (NQSOs) ...............................................................19
    5.4.    Performance Units (PUs) .....................................................................................21
    5.5.    Summary ...............................................................................................................25

6. **Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activities?** ....................................................................................................25
    6.1.    Mr. Walker ............................................................................................................26
    6.2.    Mr. Gwin ...............................................................................................................27
    6.3.    Mr. Daniels ...........................................................................................................28
    6.4.    Mr. Leyendecker ...................................................................................................29
    6.5.    Summary ...............................................................................................................30

7. **Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko management?** ...................................................................................................................31

8. **Did the alleged inflation increase the payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?** ......................................................................35

9. **Author's Statement and Qualifications** ...................................................................37

**Exhibit A: Curriculum Vitae** .............................................................................................62

**Exhibit B: Testifying Experience in the Last Five Years** ...............................................76

**Exhibit C: Materials Considered in Producing this Report** ..........................................77

# Rebuttal Report of Kevin J. Murphy

## 1. Introduction

In its Form 10-Q filed after market close on May 2, 2017, Anadarko Petroleum Corporation ("Anadarko") reported its first-quarter financials for 2017. In that filing, Anadarko disclosed that it had suspended further appraisal activities of the Shenandoah oil prospect.[1] In their Amended Complaint (the "Complaint"), Plaintiffs allege that Anadarko executives Robert "Al" Walker ("Mr. Walker"), Robert G. Gwin ("Mr. Gwin"), Robert P. Daniels ("Mr. Daniels") and Ernest A. Leyendecker, III ("Mr. Leyendecker") (collectively, the "Named Defendants") made false and misleading statements to conceal that Shenandoah was not commercially viable from February 20, 2015 to May 2, 2017 (the "Class Period"). Among approximately 20 other allegedly false and misleading statements, Plaintiffs allege that Anadarko knew but failed to disclose that the "Shen-3" appraisal well was a "dry hole" since at least February 20, 2015 (the start of the "Class Period"), and as a consequence failed to expense the exploratory well costs until the third quarter of 2016.[2]

As a result of the alleged misstatements (the "alleged fraud"), Plaintiffs' expert Bjorn I. Steinholt ("Mr. Steinholt") contends that the price of Anadarko's common shares was artificially inflated by $1.75 per share from February 23, 2015 through July 26, 2016, and by $1.92 per share from July 27, 2016 through May 2, 2017.[3] In addition, Plaintiffs' expert

---

[1] Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017, Note 5 (p. 13).

[2] Amended Complaint, August 17, 2020, ¶¶ 4, 97-139; Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016, p. 11.

[3] Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022 (the "Steinholt Report"), ¶¶ 105-106 and Exhibit D. Mr. Steinholt contends that the price of Anadarko shares was correct on February 20, 2015, and May 3, 2017 (the beginning and ending of the Class Period, respectively).

D. Paul Regan ("Mr. Regan") drew a connection between executive bonuses and the alleged delay in expensing suspended exploratory well costs.[4] Plaintiffs also contend that the Named Defendants benefited from the alleged fraud through golden parachute payments received in connection with the August 2019 acquisition of Anadarko by Occidental Petroleum Corporation ("Occidental").[5]

I, Kevin J. Murphy, have been retained by Cravath, Swaine & Moore LLP, counsel for Anadarko and the Named Defendants, to assess Plaintiffs' assertions that the Named Defendants stood to benefit financially from the alleged fraud. In particular, I have been asked to analyze and assess:

- whether the Named Defendants benefited financially from the alleged stock-price inflation through increased compensation;

- whether the Named Defendants benefited financially from the alleged stock-price inflation through their trading activity;

- whether the alleged misstatements with respect to Shen-3 increased the bonus awards to Named Defendants; and

- whether the alleged inflation in Anadarko's stock prices during the Class Period increased the amounts received by the Named Defendants in connection with the acquisition by Occidental.

As described in detail in Section 9 below, I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I am a recognized expert on executive compensation, and have written more than fifty articles, case studies, books, and book chapters relating to compensation and incentives in organizations. I have served as a compensation consultant on issues related to CEO pay for many public and private companies,

---

[4]    Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022 (the "Regan Report") ¶¶ 77(c), 86.
[5]    Complaint, ¶¶ 5(s), 9, 150.

and I have provided expert testimony related to executive compensation to Congress, the Court of Chancery of the State of Delaware, and in other federal and state Courts.

I am being compensated for my work on this matter at my customary billing rate of $1,200 per hour. While the opinions expressed herein are entirely my own, I have been assisted in this matter by staff of a research firm, Compass Lexecon, who worked under my direction and supervision. My compensation, and that of Compass Lexecon, is neither contingent nor dependent on the outcome of this matter. The conclusions in this report are my own.

My report proceeds as follows. My opinions are briefly summarized in Section 2. In Section 3, I describe Anadarko's executive compensation practices and policies, focusing on components potentially impacted by the alleged fraud. Section 4 describes the stock ownership and trading activities for the Named Defendants from 2014–2018 (*i.e.*, from the calendar-year before the Class Period to the calendar-year after the Class Period). Sections 5–8 provide my opinions related to the four bullet points above, respectively. My qualifications are described in Section 9, "Author's Statement and Qualifications," and I have attached my curriculum vitae at the end of this report as Exhibit A. A list of cases in which I have testified or given depositions within the last five years is attached as Exhibit B. In performing my analysis, I have relied upon materials produced in this case and other publicly available information. A list of the materials upon which I have relied in forming my opinions in this report is attached as Exhibit C.

I reserve the right to amend this report to reflect any additional information obtained after the submission of this report. I also reserve the right to supplement this report to address additional issues raised by Plaintiffs' experts in the pending litigation.

## 2.  Summary of Opinions

*2.1. Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?*

- No. The Named Defendants did not benefit financially from the alleged inflation through increased compensation. In fact, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 or $1.92 per share lower during the Class Period.

*2.2. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activity?*

- No. I find no evidence that trades by Named Defendants were "in suspicious amounts or at suspicious times" during the Class Period.[6] In fact, I find no evidence that the Named Defendants sold shares during the Class Period when prices were allegedly inflated, but instead kept reinvesting vested Restricted Stock Units ("RSUs") and exercised options into Anadarko, and (in the case of Mr. Walker) made large open-market purchases of Anadarko shares just after the Class Period.

- In addition, I find relevant the fact that Anadarko increased its working interest in the Shenandoah project from 30% to 33% at a time when Named Defendants allegedly had inside information that the project was a failure. This increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

*2.3. Did the alleged misstatements with respect to Shen-3 increase bonus awards to Anadarko top executives?*

- No. In fact, I find that expensing the Shen-3 cost in 2014 rather than in 2016 would have had no effect on 2014 executive bonuses but would have increased 2016 executive bonuses.

---

[6] I understand that the Fifth Circuit has found that trading "in suspicious amounts or at suspicious times" may be suggestive of scienter. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). Such suspicious trades include trades that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citing *In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)).  My assessments with respect to suspicious timing or amount of trading are from the perspective of my expertise in economics and are not legal opinions.

- In addition, I note that Anadarko's bonus structure for top executives does not include anything related to unproved reserves.

2.4. *Did the alleged stock-price inflation increase the golden parachute payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?*

- No. I estimate that the Named Defendants would have realized approximately $1.3 million in additional payouts in connection with the Occidental acquisition *absent* the alleged inflation, across all pay components.

## 3. Executive Compensation at Anadarko Petroleum

### 3.1. Overview

Anadarko's executive compensation plans and policies are described in detail in Anadarko's DEF 14A or "Proxy Statements" issued each March in advance of the annual meeting of shareholders. As emphasized in every Proxy Statement from 2010 through 2019, executive compensation at Anadarko is established and administered by the Compensation and Benefits Committee (the "Committee") consisting solely of independent outside directors. The Committee has overall responsibility for approving and evaluating Anadarko's director and officer compensation plans, policies, and programs. Since 2011, the Committee has been assisted by its independent executive compensation consultant, Frederick W. Cook & Company, Inc.[7]

As described in the Compensation Discussion and Analysis section of each Proxy Statement, executive compensation at Anadarko consists of three primary components: base salary, annual bonus, and long-term incentives in the form of Restricted Stock Units ("RSUs"),

---

[7]   Prior to 2011, the Committee's outside consultant was Hewitt Associates LLC; it briefly retained Meridian Compensation Partners, LLC in late 2010 after its separation from Hewitt. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011, p. 34.

Non-Qualified Stock Options ("NQSOs"), and Performance Units ("PUs"), as described in detail below.[8] Table 1 summarizes the 2014–2018 target compensation for the Named Defendants. As shown in the table, target compensation for Mr. Walker, Mr. Gwin, and Mr. Daniels did not change from the calendar-year before the Class Period to the calendar-year after the Class Period, and Mr. Leyendecker's target compensation changed only upon his promotion to Executive Vice President ("EVP") in August 2016. Target Bonuses are defined as a percentage of Base Salary (130% for Mr. Walker and 95% for EVPs). Target Equity awards are expressed in dollars and are allocated across PUs, RSUs, and NQSOs based on predetermined percentages.[9] Since 2015, EVPs and above have received 50% of their equity compensation in PUs, and 25% each in RSUs and NQSOs.

### 3.2. Annual Bonuses (AIP)

Bonuses under Anadarko's Annual Incentive Plan ("AIP") are determined by the following formula:[10]



Each February, Anadarko's Compensation Committee (the "Committee") meets to approve the specific performance measures that determine the AIP Performance Score for the current

---

[8] While not relevant to my opinions and analyses, Anadarko executives also participated in qualified and non-qualified pension and deferred-compensation programs.

[9] The target equity percentages are reported in the Proxy Statements. The Total Target Equity amounts in Table 1 differ slightly from the amounts reported in Anadarko's proxy statements because the latter is based on finalized accounting values under ASC Topic 718. The targets in Table 1 are derived from various sources, including APC-00779479 at 527; APC-00786269 at 275; APC-00771156 at 156; APC-00790771 at 777, 788; APC-00790250 at 256, 267.

[10] *See*, *e.g.*, Anadarko Petroleum Corporation DEF14A Proxy Statement filed March 17, 2017, p. 43.

year and to certify performance results for the prior year.[11] Table 2 summarizes the performance measures and weights used for the AIP Performance Score from 2014–2018, generally consisting of the following: *operational measures* tied to proved reserves and sales volumes (in million barrels of oil equivalents, or "MMBOE"),[12] *financial measures* (*e.g.*, capital expenditures, controllable cash costs), and *safety measures* (*e.g.*, Total Recordable Incident Rate).

Each performance measure in Table 2 is measured against a target performance goal also approved by the Committee at its February meeting. The performance goals are based on Anadarko's annual capital budget, which in turn is based on a company-wide portfolio evaluation effort led by the company's Corporate Planning team with multiple reviews by both executive management and the Board of Directors.[13] The Committee approves the associated AIP performance goals to align with the short- and long-term strategic objectives of the budget. The Committee then monitors progress during the year, reserving the right to adjust the goals based on various internal and external factors that might arise during the year. In addition, the Committee can use its discretion to *reduce* (but not increase) the year-end AIP Performance Score. Payouts under the AIP are capped at 200% of each executive's Target Bonus.

---

[11]  *See*, *e.g.,* Minutes from the Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471); February 8, 2016 (APC-00783560-573); February 8, 2017 (APC-00787943 at 944-952); February 12, 2019 (APC-00790975 at 976-984).

[12]  As defined by the Financial Accounting Foundation, proved oil and gas reserves include only quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible (*see* Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022). Notably, Anadarko did not book any reserves in connection with the Shenandoah prospect during the Class Period (*see* Deposition of Charles F. Oudin, III dated June 30, 2022, 243:7-11).

[13]  The budget process and the determination of the AIP performance measures and goals is described in the Compensation Discussion and Analysis of each DEF 14A (Proxy) Statement.

Table 3 shows the actual payouts under the AIP for Anadarko's Named Executive Officers (or "NEOs," defined as the executive officers named in proxy statements) from 2014–2018. The actual bonus received by any NEO is determined by multiplying the NEO's Target Bonus by the Final AIP Bonus percentage. For example, Mr. Walker's 2014 bonus was $2,551,900, which is 151% of his Target Bonus (which in turn is 130% of his $1.3 million base salary). As shown in the table, the Committee used its discretion to reduce bonuses by 86.5% in 2015, and by 7.6% in 2017. No NEO received an individual performance adjustment from 2014 to 2018.

### 3.3. Restricted Stock Units (RSUs)

As shown in Table 1, 25% of the equity pay for Anadarko EVPs or higher is conveyed in the form of RSUs, which vest equally over three years beginning one year from the grant date. The number of RSUs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the closing price of Anadarko common stock on the grant date.

Upon vesting, the market value of the Anadarko shares associated with the RSUs is considered ordinary taxable income to the recipient. To satisfy the tax obligations, Anadarko reduces the number of RSUs subject to the applicable vesting period by the number of RSUs equal to the applicable withholding taxes, resulting in the distribution of net shares to the participant.[14] Dividends on RSUs are accrued and reinvested quarterly in additional shares of Anadarko common stock and paid, less applicable withholding taxes, upon vesting.

---

[14] *See* APC-00776406 at 419 (2014); APC-00780428 at 444 (2015); APC-00786209 at 217 (2016); APC-00790250 at 259 (2017); APC-00790771 at 780 (2018). The shares withheld by Anadarko are noted by the Transaction Code "F" in the Form 4s of the Named Defendants.

### 3.4. Non-Qualified Stock Options (NQSOs)

Stock options give the recipient the right, but not the obligation, to purchase shares at a predetermined "exercise price" over a predetermined period. Stock options for Anadarko executives—comprising 25% of the equity pay for Anadarko CEO and EVPs from 2014 through 2018—have a term of seven years and are granted with an exercise price equal to the closing stock price on the grant date.[15] The number of NQSOs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the calculated value per option as of the grant date.[16]

Anadarko stock options become exercisable over three years, beginning one year from the grant date. When options are exercised, the difference between the stock price on the exercise date and the exercise price is considered taxable ordinary income to the recipient. Under Anadarko's Stock Option plans, employees exercising options can deliver cash or use shares of Company stock for full or partial payment of the exercise price and the minimum tax withholding due upon exercise.[17]

### 3.5. Performance Units (PUs)

Anadarko's Performance Unit plan is a cash plan where the payoffs are based on both Anadarko's stock price and its Total Shareholder Return ("TSR").[18] In particular, in each year

---

[15]  Senior Vice Presidents ("SVPs"), including Mr. Leyendecker prior to his August 2016 promotion to EVP, had a Target NQSO Percentage of 35% in 2014 and 2015. *See* APC-00789245 at 286.

[16]  These values differ slightly from the ASC 718 values reported in the proxy statements.

[17]  *See* APC-00776406 at 418 (2014); APC-00780428 at 443 (2015); APC-00786209 at 215 (2016); APC-00790250 at 257 (2017); APC-00790771 at 778 (2018).

[18]  For purposes of PU vesting, TSR for Anadarko and its 11 peers is defined as the average closing stock price for the last 30 trading days of the performance period *minus* the average closing stock price for the 30 trading days preceding the beginning of the performance period *plus* dividends per share over the performance period, all divided by the average closing stock price for the 30 trading days preceding the beginning of the performance period *See* APC-00776406 at 420 (2014); APC-00780428 at 445 (2015); APC-00786209 at 219 (2016); APC-0790250 at 261 (2017); APC-00790771 at 782 (2018).

each executive is granted a "target number" of PUs. Each PU conveys the right for the participant to receive the cash value of one share of Anadarko stock, but the number of PUs conveyed depends on Anadarko's TSR rank relative to the TSR realized by eleven peer companies. Table 4 shows the payoff levels under Anadarko's PU plan, reflecting differences for grants made before November 2014 and in or after November 2014. In both time periods, executives will receive the cash value of 200% of target PUs if Anadarko is at the top of the 12-firm cohort (*i.e.*, Anadarko plus 11 peers), and will receive nothing if Anadarko is ranked among the bottom three of the cohort.

Half (50%) of the grants before November 2014 were based on two-year TSR performance, and the remaining 50% were based on three-year TSR performance; grants made in November 2014 or after are based only on three-year TSR performance. Grants are typically made in late October or early November, with the performance period commencing on the following January 1st.[19] For example, the three-year performance period for the grant made on November 6, 2014 is January 1, 2015 through December 31, 2017.[20]

The target number of PUs granted to each executive (EVP and above) is determined by dividing 50% of the Target Equity Award by the value of each PU, which in turn is calculated using a Monte Carlo estimation that takes into account the payoff structure in Table 4 and the relative probabilities (and associated stock prices) of ending up at each performance rank.[21] Given the convexity inherent in Table 4 (*e.g.*, more PUs are granted when stock prices are

---

[19] The only exception for the Named Defendants with unvested PUs from 2014–2018 was a special grant to Mr. Walker made on May 15, 2012 in connection with his appointment as Anadarko's President and CEO. Half of this grant vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2014, while the other half vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2015. *See* Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 23, 2015, p. 50 and Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 18, 2016, p. 51.

[20] *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 62.

[21] *See* APC-00789245 at 253.

higher), the per-unit value of each PU granted from 2014 to 2018 averages about 10% higher than the grant-date stock price.[22] Accordingly, the target number of PUs granted each year (representing 50% of the Target Equity Award) will be somewhat less than twice the target number of RSUs granted each year (representing 25% of the Target Equity Award).

### 4. Stock Ownership and Trading Patterns for Named Defendants, 2014-2018

#### 4.1. Mr. Walker

Figure 1 depicts Mr. Walker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including shares held indirectly in an LLC. In August 2014, six months prior to the Class Period, Mr. Walker exercised 62,200 options from his November 2007 grant due to expire in November 2014, selling all the shares acquired (including shares sold to pay the exercise price and taxes).[23] The same month, he also exercised 182,900 options from his November 2008 grant due to expire in November 2015, again selling all shares acquired.[24] Mr. Walker did not exercise any other options from 2014–2018, and also retained all vesting RSUs beyond those that Anadarko withheld for tax purposes.[25] Mr. Walker sold no Anadarko shares during the Class Period, and his only other transaction between 2014 and 2018 was an open market purchase of 19,300 Anadarko shares on May 17, 2017, two weeks after the end of the Class Period.[26]

---

[22]  As with stock options, the PU values used by the Committee in finalizing grants differ slightly from the ASC 718 values reported in the proxy statements.

[23]  R. A. Walker Form 4 filed August 8, 2014.

[24]  R. A. Walker Form 4 filed August 8, 2014.

[25]  Options granted to Mr. Walker in November 2009, November 2010, and November 2011 expired out-of-the-money (*i.e.*, the exercise price exceeded Anadarko's stock price on the expiration date, and therefore expired unexercised).

[26]  R. A. Walker Form 4 filed May 17, 2017.

Under Anadarko's Stock Ownership Guidelines for Non-Management Directors and Executive Officers ("Stock Ownership Guidelines"), Mr. Walker (as Anadarko's CEO) is required to hold six times his base salary in Anadarko shares or RSUs.[27] Based on his $1.3 million base salary from 2014–2018, Mr. Walker was therefore required to hold $7.8 million in shares or RSUs.[28] Figure 2 shows the value of Mr. Walker's shares and RSUs, where (consistent with the Stock Ownership Guidelines) the value is defined as Mr. Walker's shares (or RSUs) multiplied by the average daily stock price over the preceding year. As evident from the figure, Mr. Walker's ownership significantly exceeded his ownership requirements throughout the depicted time period.

### 4.2. Mr. Gwin

Figure 3 depicts Mr. Gwin's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including Anadarko shares held in his 401(k) Plan. In August 2014, Mr. Gwin exercised all remaining options from his soon-to-expire November 2007 and March 2008 grants, selling all the shares acquired (including those used to pay the exercise price and taxes).[29] Mr. Gwin also exercised remaining options from his November 2008 grant in October 2015 (a month before expiration), and the remaining options from his March 2009 grant in February 2016 (a day before expiration), *retaining* all the net shares acquired (after Anadarko withheld enough shares to pay the exercise price and taxes).[30] He also retained all net shares acquired when RSUs vested. Beyond these transactions,

---

[27]   *See*, *e.g.,* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 57.

[28]   To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[29]   Robert G. Gwin Form 4 filed August 8, 2014.

[30]   Robert G. Gwin Form 4s filed October 9, 2015 and March 2, 2016, indicating shares withheld by Anadarko by Transaction Code "F".

Mr. Gwin's only other transactions from 2014 to 2018 were November 2017 transfers of 57,064 Anadarko shares and 2018 RSUs (upon vesting) to his ex-wife pursuant to a domestic relations order; these transfers occurred after the Class Period.[31] Mr. Gwin did not sell or transfer any Anadarko shares during the Class Period.

Under Anadarko's Stock Ownership Guidelines, Mr. Gwin (like other EVPs) was required to hold three times his base salary in Anadarko shares or RSUs. Based on his $750,000 base salary from 2014–2018, Mr. Gwin was therefore required to hold $2,250,000 in shares or RSUs.[32] Figure 4 shows the value of Mr. Gwin's shares and RSUs, where value is again defined based on the average daily stock price over the preceding year. As evident from the figure, Mr. Gwin's ownership significantly exceeded his required ownership throughout the depicted time period, even after the sizable November 2017 transfers to his ex-wife.

### 4.3. Mr. Daniels

Figure 5 depicts Mr. Daniels' holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement in December 2016, including Anadarko shares held in his family's Limited Partnership and his 401(k) Plan. Pursuant to a divorce decree, Mr. Daniels exercised and sold soon-to-expire options in both April 2014 and March 2015 at his ex-wife's request.[33] In May 2014 (prior to the Class Period), he exercised and sold options, and additionally sold 10,000 Anadarko shares he held directly.[34] In October 2015, Mr. Daniels exercised soon-to-expire options, retaining all net shares acquired (after Anadarko

---

[31] Robert G. Gwin Form 4 filed November 8, 2017.

[32] To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[33] Robert P. Daniels Form 4s filed April 11, 2014 and March 24, 2015. Both Form 4s note that Mr. Daniels "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."

[34] Robert P. Daniels Form 4 filed May 22, 2014.

withheld enough shares to pay the exercise price and taxes).[35] He retained all net shares acquired upon vesting of RSUs, and had no other transactions prior to his retirement effective December 30, 2016. Excluding the transaction connected to his divorce decree, he did not sell any Anadarko shares from the beginning of the Class Period through his retirement.

As an EVP, Mr. Daniels was required to hold three times his $700,000 base salary in Anadarko shares or RSUs. As shown in Figure 6, Mr. Daniels' ownership significantly exceeded his required ownership from 2014 through his retirement in December 2016.

### 4.4. Mr. Leyendecker

Figure 7 depicts Mr. Leyendecker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement on June 1, 2018. Data from August 2016 onward (when Mr. Leyendecker was appointed as EVP) are based on required public disclosures of ownership and changes in ownership.[36] Between January 2014 and his retirement in June 2018, Mr. Leyendecker never sold shares or exercised options, and retained all shares acquired upon RSU vesting net of shares withheld by Anadarko to satisfy tax obligations.[37] Upon his retirement in June 2018, Mr. Leyendecker's outstanding RSUs became fully vested and converted into Anadarko shares.[38]

While a Senior Vice President ("SVP"), Mr. Leyendecker was required (under the Stock Ownership Guidelines) to hold shares and RSUs worth 2.5 times his Base Salary (which

---

[35] Robert P. Daniels Form 4s filed October 16, 2015, indicating shares withheld by Anadarko by Transaction Code F.

[36] Data for common stock holdings prior to August 2016 are less reliable. *See* footnote to Figure 7.

[37] The depicted declines in outstanding options in March and May 2017 are due to options granted in March and May 2010 that expired out-of-the-money and were canceled.

[38] *See* Ernest A. Leyendecker, III Form 4 filed June 5, 2018.

increased from $400,000 to $420,000 in January 2015).[39] Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary). As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required under the Guidelines.

5. **Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?**

Shares of Anadarko common stock closed at $51.95 on May 3, 2017, down 7.69% from the closing price of $56.28 on the previous day. In his report, Mr. Steinholt contends that $1.92 of Anadarko's $4.33 share-price decline on that day was based on its disclosure that it was expensing suspended exploratory well costs in connection with the Shenandoah project.[40] Mr. Steinholt opines that Anadarko's share price was artificially inflated by $1.92 per share from July 27, 2016 through May 2, 2017, and by $1.75 per share from February 23, 2015 (the first trading day following the first alleged misleading statement) through July 26, 2016.[41] Mr. Steinholt's change in the alleged inflation on July 27, 2016 was based on Anadarko's

---

[39] *See* APC-00775517 at 520 showing salary $400,000 as of June 30, 2014, and APC-00784847 showing salary of $420,000 by year-end 2014 and again in 2015, and APC-00783757 at 784 showing 2016 salary (as SVP) of $420,000 prior to promotion.

[40] Steinholt Report, ¶ 99. To be clear, it is *not* my opinion that $1.92 of the May 3, 2017 price drop is attributable to the Shenandoah disclosure.

[41] Steinholt Report, ¶ 14(d) and footnote 5: "Because the Class Period began with an alleged misleading statement made after the market closed on [Friday] February 20, 2015, the first day with inflation as a result of that misleading statement would be the next day, [Saturday] February 21, 2015."

disclosure that it had increased its working interest in the Shenandoah project from 30% to 33%.[42]

In this section, I take Mr. Steinholt's alleged inflation as given, and ask whether the Named Defendants would have benefited from the $1.75 or $1.92 per share inflation from February 23, 2015 through May 2, 2017 in the form of increased realized compensation. I focus on the components of compensation that are directly or indirectly affected by Anadarko's stock price.

### 5.1. Annual Bonuses (AIP)

As discussed in Section 3.2, bonuses under Anadarko's AIP are based on a variety of operational, financial, and safety performance measures approved by the Committee each year. In 2015 (and only in 2015), the Committee introduced relative TSR as one of the performance measures, making up 5% of the overall AIP Performance Score. Like the PU Plan, the TSR component in the AIP plan was based on Anadarko's TSR among its cohort (Anadarko plus its eleven peers). The contribution to the AIP Performance Score is summarized in Table 5. If Anadarko's 2015 TSR ranked first among the cohort, for example, the AIP Performance Score would be 13.75 percentage points higher than if it ranked twelfth.

Table 6 shows the 2015 TSR performance for Anadarko and its eleven peer firms, where TSR is based on the 30-day average stock price prior to the beginning and at the end of the year, plus dividends.[43] As shown in the table, Anadarko's TSR for 2015 was -33.6%, which ranked ninth among the cohort, earning the Anadarko executives 2.5% towards their AIP

---

[42] Steinholt Report, ¶ 106 and footnote 129, showing that $1.75 equals $1.92 × (.30/.33). Mr. Steinholt does not explain why Anadarko would increase its working interest in the project if the top executives believed that Anadarko was not or was not likely to be commercially viable.

[43] The peer group is identified in Anadarko's DEF 14A (Proxy) Statement filed March 18, 2016, p. 40.

Performance Score.[44] Absent the alleged inflation (*i.e.*, reducing Anadarko's closing price by $1.75), Anadarko's TSR for 2015 would have been -35.7%, which would still have been ranked ninth in the twelve-firm cohort.[45] Therefore, as evident from Table 6, the alleged inflation affected neither the AIP Performance Score nor the ultimate AIP payout. In any case, and as described in Table 3, the Committee ultimately used its discretion to reduce the 2015 AIP Performance Score from 196.5% to 110.0%.

Overall, it is my opinion that the Named Defendants would not have benefited from the alleged inflation through their AIP payouts during the Class Period, and in fact the AIP payouts would have remained the same under the alleged inflation (the "Steinholt Stock Prices").

### 5.2. Restricted Stock Units (RSUs)

As discussed above in Section 3.3, the number of RSUs granted to each Named Defendant is determined by multiplying the Target RSU Award and dividing by the stock price on the grant date.[46] Since the dollar value of the grant is fixed, lower grant-date stock prices imply more RSUs, while higher grant-date stock prices imply fewer RSUs. The Anadarko Named Defendants received two RSU grants during the Class Period. Mr. Steinholt contends that the October 26, 2015 grant was made when the $69.00 stock price was artificially inflated by $1.75, while the November 10, 2016 grant was made when the $61.87 stock price was artificially inflated by $1.92.

---

[44]  Similar to the PU Plan, TSR for the AIP is measured based on 30-day average stock prices at the end of the year ($53.54) and the beginning of the year ($82.20). Dividends during the year totaled $1.08, yielding a TSR of ($53.54 + $1.08- $82.20)/$82.20 = -33.6%.

[45]  Absent the alleged inflation, Anadarko's TRS would be ($53.54 - $1.75 + $1.08- $82.20)/$82.20 = -35.68%.

[46]  The Target RSU Award is calculated as the Target Equity Award multiplied by the Target RSU Percentage (which was 25% for all Named Defendants between 2014 and 2018; *see* Table 1).

Table 7 compares the RSU awards made at the actual grant-date stock prices to the RSU awards that would have been made absent the Steinholt Stock Price.[47] As shown in the table, the Named Defendants in total would have received 2,046 *more* RSUs under the Steinholt Stock Price in the October 2015 grant, and would have received 2,336 *more* RSUs under the Steinholt Stock Price in the November 2016 grant.

Table 8 provides my analysis of the value upon vesting of the additional RSUs that would have been granted absent the alleged inflation. To be conservative, I exclude dividend equivalents that would have been paid on these RSUs as of vesting. The values for RSUs vesting on October 26, 2016 are based on the Steinholt Stock Price (*i.e.*, the actual $60.90 closing price minus $1.92) and the value for RSUs vesting on August 8, 2019 are based on the $72.50 per share merger consideration; all other values are based on Anadarko closing stock prices on vesting dates.[48] The vesting dates for Mr. Walker and Mr. Gwin are straightforward, since they continued as Section 16 reporting employees until the Occidental acquisition. The vesting dates for Mr. Leyendecker are also straightforward, since all unvested RSUs vested upon his departure in June 2018.[49] For Mr. Daniels, I assume his unvested RSUs were forfeited upon his voluntary retirement.[50]

As shown in Table 8, the additional 4,382 RSUs earned by the Named Defendants in the absence of alleged inflation would have an aggregate vesting value of $241,098 (not counting dividend equivalents). Therefore, it is my opinion that the Named Defendants did not benefit

---

[47] The "RSU Award at Actual Stock Price" differs slightly from the actual grant reported in Anadarko's Proxy Statement due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

[48] Upon the merger, each RSU was converted into $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or $72.50 in total. *See* Anadarko Petroleum Corporation DEFM14A Statement filed July 11, 2019 ("Merger Proxy"), p. 80.

[49] *See* Ernest A. Leyendecker III Form 4 filed June 5, 2018.

[50] *See* APC-00780428 at 444.

from the alleged inflation through their RSU grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.3. Non-Qualified Stock Options (NQSOs)

As discussed above in Section 3.4, the number of NQSOs granted to each Named Defendant is determined by dividing the Target NQSO Award by the per-unit value for each option. Since the dollar value of the NQSO Award is fixed, lower grant-date stock prices (as alleged by Mr. Steinholt) imply that more options will be granted at lower exercise prices. Thus, the Named Defendants would have been better off under the Steinholt Stock Prices.

The Named Defendants received stock options in October 2015 at an exercise price of $69.00 per share, and in November 2016 at an exercise price of $61.87 per share. Table 9 compares the option grants actually made during the Class Period to those that would have been made under the Steinholt Stock Prices. Since the value of an at-the-money option is proportional to the stock price,[51] the option value at the Steinholt Stock Price is calculated as the option value at the actual price multiplied by the ratio of the Steinholt Stock Price to the actual stock price.[52] The "NQSO Award at Steinholt Stock Price" is then calculated as the Target NQSO Award divided by the Option Value at Steinholt Stock Price.

As shown in Table 9, the Named Defendants received 311,217 options at an exercise price of $69.00 per share in October 2015, and 222,229 options at an exercise price of $61.87 per share in November 2016. Absent the alleged inflation, the Named Defendants would have received 319,316 options at an exercise price of $67.25 per share in October 2015 (+8,099

---

[51]  *See* Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (1985), Eq. (1) on p. 19.

[52]  Using Mr. Walker's 2015 grant as an example, $17.948 × ($67.25/$69.00) = $17.493.

options), and 229,346 options at an exercise price of $59.95 per share in November 2016 (+7,117 options).

Table 10 compares the ultimate gains-upon-exercise for the Named Defendants with and without the assumed inflation. Quantifying the ultimate gains of the options absent the alleged inflation for Mr. Walker and Mr. Gwin is straightforward, since SEC disclosures confirm they held the options from the 2015 and 2016 grants until August 8, 2019, when they were effectively exercised for the merger consideration of $72.50/share.[53] As shown in Table 10, Mr. Walker's options would have been worth an additional $609,017 absent the alleged inflation, while Mr. Gwin's options would have been worth an additional $244,186.

For Mr. Daniels, I assume that (1) his unvested options were forfeited upon his retirement in December 2016; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction in August 2019.[54] One third of Mr. Daniels' 2015 NQSO grant of 63,393 options (as reported) or 65,043 (absent the alleged inflation) would have been vested upon his retirement. As shown in Table 10, Mr. Daniels' options would have been worth an additional $39,867 absent the alleged inflation.

Similarly for Mr. Leyendecker, I assume that (1) his unvested options were forfeited upon his retirement in June 2018; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction.[55] Two thirds of

---

[53]  Upon the merger, each in-the-money Anadarko stock option was cashed out based on the cash value of the merger consideration ($59.00 in cash per-share plus the cash value of .2934 shares of Occidental common stock on the day prior to closing, or $13.50). *See* Merger Proxy, p. 79.

[54]  Termination provisions under voluntary resignation (including retirement) provides for unvested options to be forfeited, and vested options (if retirement eligible) to have 36 months to exercise. *See* APC-00779578 at 634. Mr. Daniels could have exercised his options prior to the Occidental transaction at prices higher or lower than the merger consideration.

[55]  *See* note 54, *supra*. The Merger Proxy confirms that Mr. Leyendecker's vested options were cashed out in the transaction. *See* Merger Proxy, p. 80.

Mr. Leyendecker's 2015 NQSO grant of 31,209 options (as reported) or 32,021 (absent the alleged inflation) would have been vested upon his retirement, and one-third of his 2016 grant of 30,780 options (as reported) or 31,766 (absent alleged inflation) would have been vested. As shown in Table 10, Mr. Leyendecker's options would have been worth an additional $63,081 absent the alleged inflation.

In aggregate across grants and executives, Table 10 shows that the options granted to the Named Defendants during the Class Period would have been worth an additional $956,152 absent the alleged inflation. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their NQSO grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.4. Performance Units (PUs)

As discussed above in Section 3.5, Anadarko's PU plan is a cash plan where the payoffs are based on both Anadarko's stock price and its TSR-ranking compared to eleven industry peers. The payout from the PU plans is based on the number of shares earned (determined by the relative TSR) and Anadarko's closing stock price when the units are cashed out (generally Anadarko's closing price on the 15th business day after the Performance Period).[56] Several PU grants are potentially affected by the alleged inflation in Anadarko stock prices, including:

1. *Grants made prior to the Class Period where the Performance Period ends during the Class Period.* In these instances, the alleged inflation artificially raises Anadarko's TSR, which could artificially raise its ranking among its cohort and, thus, increase the number of units earned. In addition, the stock price when the PUs are converted to cash would also be artificially inflated, leading to larger cash payouts;

2. *Grants made during the Class Period where the Performance Period ends after the Class Period.* Since the target number of PUs granted is determined by multiplying the fixed-dollar Target PU Award and dividing by the PU per-unit value (which moves with the

---

[56] *See, e.g.*, APC-00790250 at 264-265. Formally, the value is calculated based on Anadarko's stock price on the date the Committee certifies the performance results and approves the payouts.

stock price) on the grant date,[57] the target number of PUs would be higher absent the alleged inflation. In addition, the alleged inflation artificially lowers Anadarko's TSR which could artificially lower its ranking among its cohort and, thus, decrease the number of units earned and lead to lower cash payments.

The Named Defendants unambiguously gain from the alleged inflation for PU grants in Group 1 above, and unambiguously lose from the alleged inflation for PU grants in Group 2.[58] Whether the Named Defendants would financially benefit from the alleged inflation therefore depends on the relative gains and losses.

Table 11 identifies the PU Grants potentially impacted by the alleged inflation. The table shows the Grant Date, the Performance Period, the TSR rank as reported in the proxies, the TSR rank in the absence of the alleged inflation, the alleged inflation in the final stock price used to determine cash payouts (*i.e.*, $1.75 or $1.92 for grants with Performance Periods ending during the Class Period) and the difference in the Award Value earned in the absence of the alleged inflation. The number in parentheses next to the rank is the payout percentage from Table 4.

The top panel (Group 1) shows that the absence of the alleged inflation would not change Anadarko's TSR ranking among its peers in any grant except for the 2013 grant with the two-year Performance Period, where Anadarko's rank absent the alleged inflation would have slipped from #7 to #8 and its payout percentage would have fallen from 92% of target to 72% of target. The four Named Defendants had a combined November 2013 target PU award of 85,112 PUs, to be split evenly between grants with two-year and three-year Performance

---

[57] The Target PU Award is calculated as the Target Equity Award multiplied by the Target PU Percentage (which was 40% for Mr. Leyendecker in 2014 and 2015 and 50% in 2016 and 2017, and 50% for all other Named Defendants between 2014 and 2018; *see* Table 1).

[58] Note that I am excluding grants made before that Class Period where the Performance Period ends after the Class Period (*e.g.*, the November 2014 grant) since the alleged inflation would not affect such grants; I also need not consider grants with Performance Periods either entirely before or entirely after the Class Period. Also, there were no grants where the Performance Period both began and ended during the Class Period.

Periods.[59] The Named Defendants earned 39,151.5 PUs from the two-year portion of this grant, worth approximately $1,389,095 based on the $35.48 stock price on the payout date.[60] However, in the absence of the alleged inflation, they would have only received 30,640.3 PUs (72% of target rather than 92%), and the cash-out value would be based on the Steinholt Stock Price of $33.73 (i.e., the closing price less $1.75), yielding $1,033,497. Thus, as shown in Table 11, the Named Defendants would have been $355,598 *worse off* with respect to this PU grant in the absence of the alleged inflation.

For the other PU grants in Group 1 in Table 11, the alleged inflation would not affect the number of PUs earned, but would rather affect only the settlement price when cashed out. In the absence of inflation, grants with Performance Periods ending in 2015 would have a settlement price $1.75 lower, while grants with Performance Periods ending in 2016 would have a settlement price $1.92 lower. The aggregate difference in payouts for the Named Defendants in the absence of inflation is therefore calculated as the aggregate PU target multiplied by the payout percentage (in parentheses in Table 11) multiplied by the inflation at payout (*i.e.*, $1.75 or $1.92).[61]

For the Group 2 grants in Table 11, the ultimate award would potentially change absent the alleged inflation for two reasons: (1) the reduced Steinholt Stock Price on the grant date would increase the number of target PUs granted; and (2) the reduced Steinholt Stock Price on

---

[59] Target PU grants for 2013 for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014, p. 48. *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant.

[60] That is, 50% × (81,112) × 92% = 39,151.5 PUs, multiplied by Anadarko's closing stock price of $35.48 on the January 22, 2016 settlement date.

[61] Target PU grants for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statements filed March 25, 2013 (p. 51) and March 21, 2014 (p. 48). *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant. Mr. Leyendecker's 2012 PU Target is inferred from the PUs vesting in 2015 (APC-00784868 at 881) less the number of PUs vesting in 2015 from the 2013 PU grant (APC-00784868 at 883).

the grant date would increase Anadarko's TSR over the Performance Period. For (1), I estimate that the Target 2015 PU grant for the Named Defendants would have increased from 149,384 to 153,126 PUs, while the Target 2016 PU grant would have increased from 129,091 to 132,716 PUs.[62] For (2), I find that starting with the Steinholt Stock Prices increases Anadarko's 3-year TSR for the October 2015 grant from -3.60% to -0.32%, which increases Anadarko's rank among its cohort from 8th to 7th, which in turn increases the ultimate award from 60% of Target to 80% of Target.

The Named Defendants earned 75,869 units from October 2015 grant, worth approximately $3,480,861 based on the $45.88 stock price on the payout date.[63] However, in the absence of the alleged inflation, they would have received 103,692 PUs, yielding $4,757,393.[64] The Named Defendants would therefore have received cash payments of $1,276,531 more from the October 2015 grant.

As per the Occidental Merger Agreement, unvested PUs held as the transaction were deemed to be earned at 200% of target and cashed out at a fixed price of $76.00 per PU.[65] Accordingly, the Named Defendants earned 239,308.7 PUs from the November 2016 grant, cashed out at $18,187,459. Absent the alleged inflation, the Named Defendants would have earned 246,029.5 PUs with a cash-out value of $18,698,239. Thus, absent the alleged inflation,

---

[62] I assume that the value per Performance Unit is equal to the value implied in the Proxy Statements (Total PU Value divided by target units) less the alleged inflation (*i.e.*, $1.75 for Class Period grants before July 27, 2016 and $1.92 after).

[63] Target 2015 PU awards for Mr. Walker, Mr. Gwin, Mr. Daniels, and Mr. Leyendecker were 77,548, 31,096, 31,795, and 8,945 respectively (Anadarko Petroleum Corporation DEF 14A Statement filed March 23, 2018; APC-0078847). Upon certification on January 19, 2019 (when Anadarko's stock price closed at $45.88), Mr. Walker and Mr. Gwin received 60% of their target, Mr. Daniels received 60% of one-third of his target (since he served only 12 of the 36-month of the Performance Period), and Mr. Leyendecker received 60% of 29/36th (since he served only 29 of the 36-month of the Performance Period).

[64] As described in the prior footnote, the award value assumes the proration of Mr. Daniels' and Mr. Leyendecker's award.

[65] *See* Merger Proxy, p. 81.

the Named Defendants would have received cash payments of $510,781 more from the November 2016 grant.

Table 12 summarizes the change in PU payouts to each Named Defendant in the absence of the alleged inflation. All Defendants would have been better off under the Steinholt Stock Prices than the actual prices. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their PU grants.

### 5.5. Summary

Table 13 summarizes my findings of how the Named Defendants compensation would be impacted absent the alleged inflation in Anadarko stock prices. Overall, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 per share lower from February 23, 2015 to July 26, 2016, and $1.92 per share lower from July 27, 2016 to May 2, 2017. Collectively, the Named Defendants would have realized nearly $2.5 million more absent the alleged inflation. It is therefore my opinion that the Named Defendants did not benefit financially from the alleged inflation through increased compensation.

## 6. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activities?

Trading by executives that is "out of line with prior trading practices or at times calculated to maximize personal profit" may be indicia of scienter.[66] For example, an insider, aware of material inside information about their company's stock price, may sell shares when

---

[66]   *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 435 (5th Cir. 2002).

they know the market price is too high, and purchase shares when they know the market price is too low.[67] Plaintiffs and Mr. Steinholt allege that, beginning on February 20, 2015, Defendants "defrauded investors by various means and methods concerning the commercial viability and producible resource size of Shenandoah", allegedly inflating Anadarko's stock until the alleged truth was revealed on May 2, 2017.[68]

Under Plaintiffs' theory of the case, we would expect to see that the Named Defendants actively sold Anadarko shares during the Class Period, by selling shares owned directly and shares acquired through the exercise of stock options or the vesting of RSUs. In fact, as I document in this section, the Named Defendants did not sell any direct shares during the Class Period, retained all shares from vesting RSUs (except for those withheld by Anadarko for tax purposes), and generally retained all shares acquired through option exercises (except for shares used to pay the exercise price and to satisfy tax obligations, including shares withheld by Anadarko).[69]

### 6.1. Mr. Walker

As shown in Figure 1, Mr. Walker did not sell shares or exercise options during the Class Period. When his RSUs vested in May 2015, November 2015, October 2016, and November 2016 he transferred only the shares required to satisfy tax obligations, retaining the remaining

---

[67] There is a robust academic literature analyzing how informed insider trading allows insiders to profit from their information advantage (*e.g.*, Seyhun (1986); Fishman and Hagerty (1992); Bettis et al. (2000); Jagolinzer et al. (2011); Agrawal and Nasser (2012); Kraft et al. (2014); Lee et al. (2014); Agrawal and Cooper (2015); Aitken et al. (2015); Hillier et al. (2015)).

[68] Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated October 1, 2021, at 1; Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022, at 51:1-21.

[69] As noted in Section 4.3, the only exception was options/shares exercised/sold by Mr. Daniels at his ex-wife's request and pursuant to a divorce decree.

shares and dividend equivalents.[70] Overall, there is no evidence of suspicious trading activity by Mr. Walker during the Class Period. The fact that Mr. Walker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 2, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his direct shareholdings increased by 45,632 shares during the Class Period, in addition to an increase of 8,155 RSUs and 218,576 NQSOs.

### 6.2. Mr. Gwin

As shown in Figure 3, Mr. Gwin exercised options at two points during the Class Period, but did not sell the shares acquired during the Class Period. On October 7, 2015, he exercised 78,600 options set to expire on November 4, 2015, retaining 22,408 shares after Anadarko withheld 56,192 shares to finance the exercise price and taxes.[71] He did not sell the shares acquired upon exercise during the Class Period, and therefore could not have taken advantage of any alleged inflation. Mr. Gwin also exercised options on February 29, 2016, exercising 66,200 options set to expire the following day. Again, Mr. Gwin retained all net shares after those withheld by Anadarko to pay exercise prices and taxes.[72] Similarly, when his RSUs vested in November 2015, October 2016, and November 2016 he retained all net shares after those withheld by Anadarko to satisfy tax obligations.[73] Mr. Gwin had no other stock transactions during the Class Period.

---

[70] *See* R. A. Walker Form 4s filed May 19, 2015, November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Walker's Form 4s.

[71] Robert G. Gwin Form 4 filed October 9, 2015.

[72] Robert G. Gwin Form 4 filed March 2, 2016.

[73] Robert G. Gwin Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Gwin's Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Gwin during the Class Period. The fact that Mr. Gwin did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 4, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly and in his 401(k) increased by 41,918 shares during the Class Period, in addition to an increase of 6,438 RSUs and 69,588 NQSOs.

### 6.3. Mr. Daniels

As shown in Figure 5, Mr. Daniels exercised options at two points during the Class Period. On March 20, 2015, Mr. Daniels exercised 38,449 options from his 2008 and 2009 grants, immediately selling all the shares acquired. In his Form 4 filed on March 24, Mr. Daniels explains that he "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."[74] In my opinion, Mr. Daniels did not personally benefit from this exercise during the Class Period.[75]

Mr. Daniels also exercised 30,841 options on October 14-15, 2015, retaining all shares net of those withheld by Anadarko to pay the exercise price and taxes.[76] He sold no other shares during the Class Period prior to his December 2016 retirement, and retained all shares (net of those withheld by Anadarko to satisfy tax obligations) when his RSUs vested in November 2015, October 2016, and November 2016.[77]

---

[74] Robert P. Daniels Form 4 filed March 24, 2015.

[75] Mr. Daniels' ex-wife may have benefited by as much as $65,536 before taxes (37,449 shares × $1.75 alleged inflation) more than she would have received absent the alleged inflation.

[76] Robert P. Daniels Form 4 filed October 16, 2015. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4.

[77] Robert P. Daniels Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Daniels from the beginning of the Class Period through his December 2016 retirement.[78] The fact that Mr. Daniels did not sell shares during the Class Period (beyond those related to his divorce decree) is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 6, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly, in his family's LP, and in his 401(k) increased by 26,335 shares during the Class Period.[79]

### 6.4. Mr. Leyendecker

As shown in Figure 7, Mr. Leyendecker did not exercise any options or sell any shares during the Class Period. When his RSUs vested in November 2015, October 2016, and November 2016, he retained all shares and dividend equivalents except for the shares withheld by Anadarko to satisfy tax obligations.[80] As discussed in Section 4.4, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary) following his promotion to EVP in August 2016. As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required

---

[78] I understand that a whistleblower letter from a former Anadarko employee, Lea Frye, asserts that a May 21, 2014 transaction in stock by Mr. Daniels, which she characterizes as a sale of "61,379 shares of his Anadarko stock (transaction of approximately $6.143 million)" might constitute insider trading (Exhibit 355 to Deposition of Lea Frye dated October 7, 2022). As noted in Section 4.3 above, Mr. Daniels indeed exercised 51,379 options and sold the shares acquired on this day, and additionally sold 10,000 Anadarko shares held directly (*see* Robert P. Daniels Form 4 filed May 22, 2014). These transactions predate the Class Period, prior to which it is not alleged that Anadarko's share price was inflated. Notably, Ms. Frye traded in Anadarko stock within a few days of Daniels' trade, asserting that she did not possess any knowledge which would be considered insider information regarding current Anadarko activities (Deposition of Lea Frye dated October 7, 2022, at 236:23-240:22; *see also* Exhibit 364 to that Deposition).

[79] Mr. Daniels' RSUs and NQSOs declined near his retirement, primarily reflecting that (because of his pending retirement) he did not receive grants of RSUs and NQSOs in November 2016.

[80] Ernest A. Leyendecker III Form 4s filed October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Leyendecker's Form 4s

under the Guidelines. Therefore, his "lack" of trading over this period is not explained by Anadarko's Stock Ownership Guidelines.

Overall, there is no evidence of suspicious trading activity by Mr. Leyendecker during the Class Period. The fact that Mr. Leyendecker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 8, he was in compliance with the guidelines before, during, and after the Class Period.[81] Indeed, his direct holdings increased by 5,574 shares during the Class Period, in addition to an increase of 6,777 RSUs and 53,161 NQSOs.

### 6.5. Summary

In summary, there is no evidence of suspicious trading by the Named Defendants during the Class Period. Indeed, rather than actively selling shares to exploit the alleged inflation in Anadarko stock, the Named Defendants kept reinvesting vested RSUs and exercised options into Anadarko, and collectively and individually *increased* their holdings of Anadarko shares. Notably, the Named Defendants were among the shareholders who lost money when Anadarko's stock prices fell by $4.33 on May 3, 2017. In particular, Mr. Walker's 265,418 shares and 81,495 RSUs fell by $1,502,142 on May 3, Mr. Gwin's 112,476 shares and 32,659 RSUs fell by $628,435, and Mr. Leyendecker's 17,441 shares and 15,304 RSUs fell by $141,786.

Finally, in addition to analyzing the trading activity of the Named Defendants, it is relevant to also analyze the trading-related activity of their employer. The Complaint alleges

---

[81] While Mr. Leyendecker was technically in compliance with the Stock Ownership Guidelines between August 2016 and October 2016 (since he had three years to increase his holdings to 3 times his base salary), he was nonetheless prohibited during this period under the Guidelines from selling shares upon the exercise of options or the vesting of RSUs. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 56.

that the Named Defendants led Anadarko's day-to-day operations, "monitored and/or oversaw the Shenandoah project" and "were the persons with ultimate responsibility for directing and managing the Company's business, operations, and communications to investors."[82] If Plaintiffs' allegations as to responsibilities are correct, the Named Defendants were logically involved in the July 26, 2016 decision to increase Anadarko's working interest in the Shenandoah project from 30% to 33%.[83] If Anadarko's stock was indeed inflated as suggested by Mr. Steinholt, this increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

### 7.  Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko management?

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014 (and reported in Anadarko's 10-K for fiscal year 2014) instead of in the third quarter of 2016 (as actually reported in Anadarko's 10-Q filed on October 31, 2016) once Anadarko concluded it was a dry hole.[84] Mr. Regan further argues that even "quantitatively small misstatements" can be considered material if "the misstatement has the effect of increasing management's compensation".[85] He then contends that:

> "The Shen-3 results and the associated reduction in resource estimates was further significant considering that management's bonus[es] were affected by performance goals that included consideration of MMBOE sales and related

---

[82]  Complaint, ¶ 149(a).
[83]  Steinholt Report, ¶ 106.
[84]  Regan Report, ¶ 11(a).
[85]  Regan Report, ¶ 77 (c).

*reserves (representing an aggregate of performance goal weighting factor ranging from 42% – 50%). Although the Shenandoah basin project, including Shen-3, was exploratory in nature and in fact, a dry hole, the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well to extract oil resources that could impact management performance goals and related compensation in the future."*[86]

Mr. Regan's emphasis on "performance goals that included consideration of MMBOE sales and related reserves" in the above quote seems irrelevant, since Anadarko never booked any reserves in connection with the Shen-3 well or the Shenandoah prospect more broadly.[87] Moreover, as discussed in Section 3.2 and as evident from Table 2, there are no AIP performance measures related to unproved reserves or resource targets.[88] In addition, the Committee did not make any Individual Performance adjustments to AIP bonuses from 2014--2018 related to unproved reserves (and in fact did not make any individual adjustments at all).

Beyond making some general allusions to Anadarko's management bonus plans, Mr. Regan provides no analysis of how and to what extent bonuses might be impacted by the decision of when to expense drilling costs associated with Shen-3. Indeed, during his deposition Mr. Regan admitted that he did not know whether expensing Shen-3 or not would impact bonus awards.[89] Ultimately, analyzing these impacts requires a nuanced understanding of how such expenses effect AIP performance measures and subsequent bonuses.

---

[86] Regan Report, ¶ 86.

[87] *See* Deposition of Charles F. Oudin, III dated June 30, 2022, at 243:7-11.

[88] *See* also Deposition of Robert P. Daniels dated October 13, 2022, at 40:19-42:18.

[89] *See* Deposition of Paul Regan dated January 20, 2023, at 129:4-23.

As shown in Table 2, AIP bonuses in 2014 were based on sales volumes and reserve additions (weighted 50%), capital expenditures (weighted 20%), and a safety measure (weighted 10%). None of these measures is directly impacted by exploratory drilling expenses. Moreover, the fifth measure, EBITDAX/BOE (weighted 20%), is defined as "earnings before interest, taxes, depreciation, depletion, amortization, and *exploration expenses* divided by sales volume for the year" (emphasis added).[90] Investopedia defines the exploration expense component of EBITDAX as follows:

> *"Exploration costs are the costs an oil or gas company incurs while searching for oil or gas to drill. Exploration costs include the cost of researching appropriate places to drill and the cost of actually drilling. Exploration costs are recognized in the financial statements as exploration, abandonment, and dry hole costs."[91]*

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014. While such expensing would have reduced Anadarko's reported net earnings, it would not have reduced Anadarko's EBITDAX and therefore would not have reduced 2014 bonuses under the AIP.

In contrast, by 2016 Anadarko had introduced "Controllable Cash Costs" as an AIP performance measure with a 25% weight (*see* Table 2).[92] Notably, Controllable Cash Costs includes suspended exploratory well costs that are "subsequently reclassified to exploration expense for accounting purposes."[93] If Anadarko had expensed the $64 million drilling costs

---

[90]   Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 47.

[91]   https://www.investopedia.com/terms/e/ebitdax.asp, accessed on January 23, 2023.

[92]   Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 41.

[93]   Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 43.

for Shen-3 in 2014 rather than 2016, its Controllable Cash Costs for 2016 would be reduced by $64 million, or $0.22 per BOE.[94]

As reported in its 2017 Proxy Statement, Anadarko's Target Controllable Cash Costs (after mid-year adjustments for certain divestitures) was $13.56/BOE, which at target would contribute 25% to the AIP Performance Score.[95] Anadarko's reported 2016 Controllable Cash Costs was $12.70/BOE, resulting in a contribution of 44.8% to the final AIP Performance Score.[96] Internal documents confirm that the relation between Controllable Cash Costs per BOE and the 2016 AIP contribution is linear, up to a maximum contribution to the final AIP Performance Score of 50% (*i.e.*, 200% of 25%).[97] This linearity allows me to determine that a $0.22 reduction in the Cash Cost per BOE corresponds to an increase in this component's contribution to the AIP Performance Score from 44.8% to 49.9%, or a difference of 5.1%.[98] This 5.1% increase in the AIP Performance Score (caused by shifting the $64 million in expenses to 2014) would have increased Mr. Walker's 2016 AIP bonus by $86,190, Mr. Gwin's bonus by $36,338, and Mr. Leyendecker's by $20,579.[99]

---

[94] Calculation based on 2016 sales volume of 290 MMBOE (s*ee* Anadarko Petroleum Corporation Form 10-K filed February 15, 2017, p. 19).

[95] Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[96] Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[97] APC-00782204 at 212.

[98] In particular, if a $0.86 decrease in Controllable Cash Costs/BOE (from $13.56 to $12.70) corresponds to an increase in payout contribution by 19.8%, we can derive that each dollar reduction in Controllable Cash Costs/BOE increases payout contribution by 23 percentage points. Multiplying 23% by $0.22 suggest an increase in the AIP Performance Score of 5.1 percentage points.

[99] Results based on increasing 2016 AIP awards from 158% of target to 163.1% of target (Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, pp. 43). The Committee determined that Mr. Daniels was not eligible for a 2016 AIP payout, since his retirement date preceded the date of the actual payout (*see* APC-00787898 at 906).

To summarize, it is my opinion that expensing Shen-3 drilling expenses in 2014 rather than 2016—as proposed by Mr. Regan—would have not changed 2014 AIP bonuses for the Named Defendants, but would have significantly increased their 2016 AIP bonuses.

## 8. Did the alleged inflation increase the payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?

In connection with the Occidental acquisition in August 2019, several departing Anadarko executives (including Mr. Walker and Mr. Gwin) became eligible for certain benefits, including:

- Conversion of Anadarko RSU awards (including dividend equivalents) into equivalent Occidental restricted stock/cash unit awards, vesting according to their original schedule;[100]

- Immediate vesting and cash-out of all outstanding Anadarko stock options, at the merger consideration price of about $72.50;[101]

- Each Anadarko PU award immediately vested and converted into the right to receive cash equal to 200% of the target award multiplied by $76/unit.[102]

In addition, upon their departure within three years following the acquisition, Mr. Walker and Mr. Gwin would each receive a multiple of the sum of their respective salary and bonus (2.5 times for Mr. Walker, and 2.9 times for Mr. Gwin), continuation of medical and other benefits for three years, outplacement services, and service-credits related to Anadarko's retirement and savings plans.

---

[100] *See* Merger Proxy, pp. 12, 80.

[101] *See* Merger Proxy, pp. 12, 79. As discussed before, the merger consideration was $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or about $72.50 in total.

[102] *See* Merger Proxy, pp. 12, 81.

In the Complaint, Plaintiffs repeatedly emphasize so-called "golden parachute" payments received by Anadarko executives in connection with the Occidental acquisition.[103] Plaintiffs provide no account of how an alleged fraud that was revealed in May 2017 could have impacted compensation in relation to Occidental's late 2019 acquisition of Anadarko.

As discussed at length in Section 5, because of the fixed dollar equity grants, the Named Defendants would have received more RSUs, more PUs, and more NQSOs during the Class Period absent the alleged inflation. For continuing Named Defendants Walker and Gwin, one third of the additional RSUs granted in November 2016 would still be unvested as of the Occidental transaction, as would all of the November 2016 PUs (since the relevant Performance Period was set to end in December 2019, after the transaction). Similarly, unexercised stock options issued in October 2016 and November 2017 would remain outstanding upon the transaction.

Table 14 summarizes the additional amounts the Named Defendants *would* have received in connection with the Occidental acquisition absent the alleged inflation. The amounts are taken directly from Table 8 (RSUs), Table 10 (NQSOs), and Table 12 (PUs), and reflects the value of the additional equity at the $72.50 merger consideration (for RSUs and NQSOs) or $76.00 (for PUs). Across all pay components, I estimate that the Named Defendants would have realized approximately $1.5 million in additional payouts absent the alleged inflation.

In sum, the alleged inflation would continue to cost Named Defendants even in connection with the Occidental acquisition.

---

[103] *See, e.g.*, Complaint ¶¶ 5(s), 9, 150, and 156. Significantly, Mr. Daniels and Mr. Leyendecker had retired well before the acquisition, though Mr. Leyendecker still had outstanding Anadarko PUs and stock options that were cashed out in the transaction. *See* Merger Proxy, pp. 79-81. The foregoing discussion is accordingly limited to Mr. Walker and Mr. Gwin.

## 9. Author's Statement and Qualifications

I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I have been a Full Professor of the Department of Finance and Business Economics at the USC Marshall School since 1995, and I currently serve as Department Chairman. I also hold a joint appointment in the USC School of Law (as Professor of Business, Economics and Law). I previously served as Department Chairman from 2003 to 2004, and as the Marshall School's Vice Dean of Faculty and Academic Affairs from 2004 to 2007. From 1991 to 1995, I was an Associate Professor of Business Administration at the Harvard Business School, and from 1983 to 1991, I was an Assistant and Associate Professor at the University of Rochester's William E. Simon Graduate School of Business Administration.

I received a Ph.D. in Economics from the University of Chicago in 1984, where my honors included a National Science Foundation Fellowship, a Milton Friedman Fund Fellowship, and a Social Science Foundation Dissertation Fellowship. I also have an M.A. in Economics from the University of Chicago, and a B.A. degree (summa cum laude) from the University of California, Los Angeles. I am a member of Phi Beta Kappa, the American Economic Association, and the American Finance Association. I am an associate editor of the *Journal of Financial Economics,* a former associate editor of the *Journal of Accounting and Economics* and the *Journal of Corporate Finance,* and I serve as referee to over thirty professional and academic journals. I am the former chairman of the Academic Research Committee of WorldAtWork (formerly the American Compensation Association). My curriculum vitae is attached at the end of this report.

I am a recognized expert on executive compensation, and I have written and published extensively on issues related to executive compensation, beginning with my 1984 dissertation. During 1992 and 1993, I conducted annual surveys of executive compensation practices in the 1,000 largest U.S. corporations. These surveys, sponsored by the United Shareholders Association, were used extensively by institutional investors and large shareholders in evaluating and comparing the effectiveness of compensation policies. I also advised the SEC in formulating its 1992 disclosure rules for top management pay, and I was a prominent member of the 1992 and 2003 National Association of Corporate Directors' Blue Ribbon Commissions on Executive Compensation, which issued reports calling for the overhaul of CEO pay practices. In 2009, I served as advisor to the U. S. Treasury's Special Master of Executive Compensation, charged with approving the level and structure of compensation for companies receiving "special assistance" from the U.S. government.

I have written more than fifty articles, cases, books, and book chapters relating to compensation and incentives in organizations. Results from my research on executive compensation have been widely cited in the press (including the *Wall Street Journal, New York Times*, *Washington Post*, *Los Angeles Times*, *Chicago Tribune*, *USA Today*, *Economist*, *Fortune*, *Forbes*, *Business Week*, and *Time*) and on national television (including CNN and CBS news). I have offered testimony relating to executive compensation to the U.S. House of Representatives Financial Services Committee and the TARP Congressional Oversight Panel, and given speeches and presentations on compensation and incentives to a variety of academic and practitioner audiences, including the Conference Board, the American Compensation Association, and the Board of Governors of the Federal Reserve.

My university teaching encompasses a wide variety of courses at the undergraduate, MBA, Ph.D., and executive levels. At USC, I have taught undergraduate, MBA, and Ph.D. courses in economics and corporate finance and have developed and taught undergraduate and MBA courses on compensation, incentives, and corporate governance. At Harvard, I taught courses on compensation and incentives in organizations, human resource management, and on the coordination, control, and management of organizations. At Rochester and Chicago, I taught undergraduate courses in microeconomics, MBA and executive courses in microeconomics and pricing policies, MBA and Ph.D. courses in organizational theory, and Ph.D. courses in price theory. I also developed and taught a course in the Economics of Human Resource Management, with a primary focus on compensation for top-level managers.

I have testified as an expert witness in multiple proceedings in federal and state courts. I have consulted with organizations and conducted research on compensation and incentives in professional partnerships and corporations. I spent the 1994–1995 academic year on leave from Harvard as the Visiting Scholar and Consultant at Towers Perrin (now Willis Towers Watson), a major benefits and compensation consulting firm, where my activities included making formal presentations and leading roundtable discussions on executive compensation to clients nationwide, as well as being involved in a variety of consulting engagements.

Kevin J. Murphy
January 25, 2023

**Table 1    Target Compensation for Named Defendants, 2014 – 2018**

| | | | | Allocation of Target Equity | | |
| Year | Salary Rate | Target Bonus (% of Salary) | Target Equity | Performance Units (PUs) | Restricted Stock Units (RSUs) | Non-Qualified Stock Options (NQSOs) |
|---|---|---|---|---|---|---|
| *Robert A. Walker (Chairman, President, and CEO)* | | | | | | |
| 2014 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2015 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2016 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2017 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2018 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| *Robert G. Gwin (EVP and CFO)* | | | | | | |
| 2014 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2015 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2016 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2017 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2018 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| *Robert P. Daniels (Until 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2015 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2016 | $700,000 | 95% | — | — | — | — |
| *Ernest A. Leyendecker, III (After 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 (SVP) | $400,000 | 80% | $1,500,000 | 40% | 25% | 35% |
| 2015 (SVP) | $420,000 | 80% | $1,600,000 | 40% | 25% | 35% |
| 2016 (SVP) | $420,000 | 80% | — | — | — | — |
| 2016 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |
| 2017 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |

Note:    Data from annual proxy statements and "tally sheets" (APC-00789245 at 294-313 (2014); APC-00779479 at 530-550 (2015); APC-00784849-867 (2016); APC-01727486 at 531-548 (2018)). Mr. Leyendecker's compensation is inferred from several documents, including APC-00784868 at 881-883; APC-00785266 at 279-280; APC-00786269 at 275; APC-00790225 at 230. Target equity awards differ slightly from ASC 718 grant-date accounting values reported in the proxy statements.

**Table 2    Performance Measures and Weights in Anadarko AIP Plan, 2014 – 2018**

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| *Operational* | | | | | |
| Reserve Additions (MMBOE) | 25% | 20% | 20% | 15% | |
| Reserve Additions Growth per DAS | | | | | 20% |
| Sales Volumes (MMBOE) | 25% | 10% | 20% | 20% | |
| Sales Volume Growth per DAS | | | | | 20% |
| Company-Operated Base Sales Volume (MMBOE) | | 15% | | | |
| *Financial* | | | | | |
| Capital Expenditures ($ mil) | 20% | 10% | 25% | 15% | |
| EBITDAX/BOE ($/BOE) | 20% | 15% | | | |
| Controllable Cash Costs ($/BOE) | | 15% | 25% | 15% | 20% |
| Cash Operating Income ($/BOE) | | | | 25% | |
| Cash-Flow ROIC | | | | | 20% |
| Relative One-Year TSR | | 5% | | | |
| *Safety* | | | | | |
| Total Recordable Incident Rate (TRIR) | 10% | 10% | 10% | 10% | 10% |
| Level 3 Incidents | | | | | 10% |

Note:   Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 3     Payouts for Named Executive Officers under AIP Plan, 2014 – 2018**

| Year | Initial AIP Performance Score | Discretionary AIP Score Adjustment | Individual Performance Adjustment | Final AIP Bonus |
|------|-------------------------------|-------------------------------------|------------------------------------|-----------------|
| 2014 | 151.0% | 0% | 0% | 151.0% |
| 2015 | 196.5% | -86.5% | 0% | 110.0% |
| 2016 | 158.0% | 0% | 0% | 158.0% |
| 2017 | 92.6% | -7.6% | 0% | 85.0% |
| 2018 | 150.0% | 0% | 0% | 150.0% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 4    Payout Levels under Performance Unit Plan**

| Relative TSR Ranking | Payout Level (before 11/2014) | Payout Level (11/2014 and later) |
|---|---|---|
| 1 | 200% | 200% |
| 2 | 182% | 182% |
| 3 | 164% | 164% |
| 4 | 146% | 146% |
| 5 | 128% | 128% |
| 6 | 110% | 100% |
| 7 | 92% | 80% |
| 8 | 72% | 60% |
| 9 | 54% | 40% |
| 10 | 0% | 0% |
| 11 | 0% | 0% |
| 12 | 0% | 0% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 5    Schedule for TSR Component of 2015 AIP Plan**

| Relative TSR Ranking | Score for TRS Component | Contribution to 5% of AIP Performance Score |
|---|---|---|
| 1 | 275% | 13.75% |
| 2 | 240% | 12.00% |
| 3 | 205% | 10.25% |
| 4 | 170% | 8.50% |
| 5 | 135% | 6.75% |
| 6 | 100% | 5.00% |
| 7 | 83% | 4.15% |
| 8 | 67% | 3.35% |
| 9 | 50% | 2.50% |
| 10 | 33% | 1.65% |
| 11 | 17% | 0.85% |
| 12 | 0% | 0.00% |

Note:    APC-00779578 at 619; Anadarko Petroleum Corporation DEF 14 (Proxy) Statement filed March 18, 2016.

**Table 6    Anadarko's Share-Price Performance vs. Peers, 2015**

| Company | Beginning Average Price | Ending Average Price | Dividends During Period | Total Shareholder Return (TSR) | Rank |
|---|---|---|---|---|---|
| Pioneer Natural Resources | $149.63 | $136.52 | $0.08 | -8.7% | 1 |
| Occidental Petroleum | $81.02 | $70.51 | $2.97 | -9.3% | 2 |
| Chevron | $111.20 | $90.24 | $4.28 | -15.0% | 3 |
| EOG Resources | $92.42 | $77.44 | $0.67 | -15.5% | 4 |
| ConocoPhillips | $68.65 | $50.15 | $2.94 | -22.7% | 5 |
| Apache | $64.29 | $46.14 | $1.00 | -26.7% | 6 |
| Hess | $74.82 | $53.64 | $1.00 | -27.0% | 7 |
| Noble Energy | $49.91 | $34.07 | $0.72 | -30.3% | 8 |
| *Anadarko Petroleum* | *$82.20* | *$53.54* | *$1.08* | *-33.6%* | *9* |
| Devon Energy | $60.19 | $37.25 | $0.96 | -36.5% | 10 |
| Marathon Oil | $29.10 | $15.13 | $0.68 | -45.7% | 11 |
| Chesapeake Energy | $20.04 | $4.64 | $0.18 | -76.0% | 12 |

Note:   Anadarko's 2015 Peers from Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016, p. 40; price and dividend data from CRSP. Beginning Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2015; Ending Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2016. Total Shareholder Return (TSR) defined as (Ending Price – Beginning Price + Dividends) divided by Beginning Price.

**Table 7    RSU Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Actual Stock Price | Steinholt Stock Price | Target RSU Award | RSU Award at Actual Stock Price | RSU Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $69.00 | $67.25 | $2,775,000 | 40,217 | 41,264 | +1,047 |
| Gwin | $69.00 | $67.25 | $1,112,500 | 16,123 | 16,543 | +420 |
| Daniels | $69.00 | $67.25 | $1,137,500 | 16,486 | 16,914 | +428 |
| Leyendecker | $69.00 | $67.25 | $400,000 | 5,797 | 5,948 | +151 |
| *Total:* | | | *$5,425,000* | *78,623* | *80,669* | *+2,046* |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $61.87 | $59.95 | $2,775,000 | 44,852 | 46,289 | +1,437 |
| Gwin | $61.87 | $59.95 | $1,112,500 | 17,981 | 18,557 | +576 |
| Leyendecker | $61.87 | $59.95 | $625,000 | 10,102 | 10,425 | +323 |
| *Total:* | | | *$4,512,500* | *72,935* | *75,271* | *+2,336* |

Note:  Data from Table 1; Steinholt Report, Exhibit D; CRSP. Target RSU Awards are calculated based on the Total Equity Award and Target RSU Percentage in Table 1. Actual RSU awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 8    Vesting Value of Additional RSUs Granted under Steinholt Stock Prices**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Additional October 2015 RSU Grant under Steinholt Prices* | 1,047 | 420 | 428 | 151 | 2,046 |
| Vesting October 26, 2016    ($58.98) | $20,584 | $8,257 | $8,414 | $2,969 | $40,224 |
| Vesting October 26, 2017    ($47.69) | $16,644 | $6,677 |  | $2,400 | $25,721 |
| Vesting June 1, 2018    ($71.05) |  |  |  | $3,576 | $3,576 |
| Vesting October 26, 2018    ($58.84) | $20,535 | $8,238 |  |  | $28,773 |
| Total from October 2015 Grant: | $57,763 | $23,171 | $8,414 | $8,945 | $98,294 |
| *Additional November 2016 RSU Grant under Steinholt Prices* | 1,437 | 576 |  | 323 | 2,336 |
| Vesting November 10, 2017 ($51.11) | $24,482 | $9,813 |  | $5,503 | $39,798 |
| Vesting June 1, 2018    ($71.05) |  |  |  | $15,299 | $15,299 |
| Vesting November 10, 2018 ($58.21) | $27,883 | $11,176 |  |  | $39,059 |
| Vesting August 8, 2019    ($72.50) | $34,728 | $13,920 |  |  | $48,648 |
| *Total from November 2016 Grant:* | $87,092 | $34,909 |  | $20,802 | $142,803 |
| *Total from both Grants:* | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |

Note:  Data from Table 7; Form 4 filings; Proxy Statements; Steinholt Report, Exhibit D; Merger Proxy; CRSP. Table shows the value of the additional RSUs that would have been granted absent the alleged inflation in stock prices. Values are based on Anadarko closing stock prices on each vesting date, except for October 26, 2016 (during the Class Period) when values are based on the Steinholt Stock Price (the actual closing price of $60.90 minus the alleged inflation of $1.92), and for August 8, 2019 when values are based on the $72.50 per share merger consideration. Amounts exclude the value of dividend equivalents that would have been paid upon vesting.

**Table 9    NQSO Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Option Value at Actual Stock Price | Option Value at Steinholt Stock Price | Target NQSO Award | NQSO Award at Actual Stock Price | NQSO Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $17.948 | $17.49 | $2,775,000 | 154,615 | 158,638 | 4,023 |
| Gwin | $17.944 | $17.49 | $1,112,500 | 62,000 | 63,613 | 1,613 |
| Daniels | $17.944 | $17.49 | $1,137,500 | 63,393 | 65,043 | 1,650 |
| Leyendecker | $17.944 | $17.49 | $560,000 | 31,209 | 32,021 | 812 |
| *Total:* | | | *$5,585,000* | *311,217* | *319,316* | 8,099 |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $20.306 | $19.676 | $2,775,000 | 136,661 | 141,038 | 4,377 |
| Gwin | $20.306 | $19.675 | $1,112,500 | 54,788 | 56,543 | 1,755 |
| Leyendecker | $20.305 | $19.675 | $625,000 | 30,780 | 31,766 | 986 |
| *Total:* | | | *$4,512,500* | 222,229 | 229,346 | 7,117 |

Note:  Data from Table 1; Proxy Statements; Form 4 filings; Steinholt Report, Exhibit D. Target NQSO Awards are calculated based on the Total Equity Award and Target NQSO Percentage in Table 1. Actual NQSO awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 10    NQSO Exercises under Actual and Steinholt Stock Prices during Class Period**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Actual October 2015 NQSO Grant* | 154,615 | 62,000 | 21,131 | 20,806 | 258,552 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 | $72.50 |
| Exercise Price | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 |
| Gain from Exercise | $541,153 | $217,000 | $73,959 | $72,821 | $904,932 |
| *Actual November 2016 NQSO Grant* | 136,661 | 54,788 | — | 10,260 | 201,709 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 | $72.50 |
| Exercise Price | $61.87 | $61.87 | — | $61.87 | $61.87 |
| Gain from Exercise | $1,452,706 | $582,396 |  | $109,064 | $2,144,167 |
| *Steinholt October 2015 NQSO Grant* | 158,638 | 63,613 | 21,681 | 21,347 | 265,279 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 |  |
| Exercise Price | $67.25 | $67.25 | $67.25 | $67.25 |  |
| Gain from Exercise | $832,850 | $333,968 | $113,825 | $112,074 | $1,392,717 |
| *Steinholt November 2016 NQSO Grant* | 141,038 | 56,543 | — | 10,589 | 208,170 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 |  |
| Exercise Price | $59.95 | $59.95 | — | $59.95 |  |
| Gain from Exercise | $1,770,027 | $709,615 |  | $132,892 | $2,612,534 |
| *Net gain using Steinholt Stock Prices* | *$609,017* | *$244,186* | *$39,867* | *$63,081* | *$956,152* |

Note:  Data from Table 9; Form 4 filings; Steinholt Report, Exhibit D; Merger Proxy. Mr. Walker's and Mr. Gwin's options were effectively fully vested and exercised upon the Occidental acquisition on August 8, 2019 at the merger consideration of $72.50. I assume that Mr. Daniels and Mr. Leyendecker held the options vested as of their retirements until the merger.

**Table 11    Performance Unit Grants Impacted by Alleged Inflation**

| Grant Date | Performance Period | Reported Rank (Payout as % of Target) | Rank Absent Alleged Inflation | Inflation at Payout | Change in Award Value Absent Alleged Inflation |
|---|---|---|---|---|---|
| *GROUP 1: PU Grants Before Class Period with Performance Periods ending During Class Period* | | | | | |
| 5/15/2012 | 5/15/2012 – 5/14/2015 | 5 (128%) | 5 (128%) | –$1.75 | ($11,769) |
| 11/5/2012 | 1/1/2013 – 12/31/2015 | 8 (72%) | 8 (72%) | –$1.75 | ($39,616) |
| 11/6/2013 | 1/1/2014 – 12/31/2015 | 7 (92%) | 8 (72%) | –$1.75 | ($355,598) |
| 11/6/2013 | 1/1/2014 – 12/31/2016 | 5 (128%) | 5 (128%) | –$1.92 | ($104,588) |
| *GROUP 2: PU Grants During Class Period with Performance Periods ending After Class Period* | | | | | |
| 10/26/15 | 1/1/2016 – 12/31/2018 | 8 (60%) | 7 (80%) | $0 | $1,276,531 |
| 11/10/16 | 1/1/2017 – 12/31/2019 | (200%) | (200%) | $0 | $510,781 |
| | | | | *Total:* | $1,275,741 |

Note:  Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 12  Change in PU Payouts to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| 5/15/2012 (3-Yr) | ($11,769) | | | | ($11,769) |
| 11/5/2012 (3-Yr) | ($21,632) | ($7,710) | ($7,915) | ($2,359) | ($39,616) |
| 11/6/2013 (2-Yr) | ($183,815) | ($73,382) | ($75,045) | ($23,355) | ($355,598) |
| 11/6/2013 (3-Yr) | ($54,065) | ($21,583) | ($22,072) | ($6,869) | ($104,588) |
| 10/26/15 (3-Yr) | $782,871 | $313,924 | $106,993 | $72,744 | $1,276,531 |
| 11/10/16 (3-Yr) | $338,879 | $135,859 | 0 | $36,043 | $510,781 |
| Total: | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |

Note:  Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 13   Summary of Changes in Compensation to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Base Salary | $0 | $0 | $0 | $0 | $0 |
| TSR Component of AIP | $0 | $0 | $0 | $0 | $0 |
| Restricted Stock Units | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |
| Stock Options | $609,017 | $244,186 | $39,867 | $63,076 | $956,147 |
| Performance Units | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |
| Total: | $1,604,341 | $649,374 | $50,242 | $169,032 | $2,472,990 |

Sources:  Tables 8, Table 10, Table 12.

**Table 14  Summary of Additional Amounts Named Defendants Would Receive in the Occidental Transaction Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Restricted Stock Units (Table 8) | $34,728 | $13,920 | $0 | $0 | $48,648 |
| Stock Options (Table 10) | $609,017 | $244,186 | $39,867 | $63,081 | $956,152 |
| Performance Units (Table 12) | $338,879 | $135,859 | $0 | $36,043 | $510,781 |
| Total: | $982,624 | $393,965 | $39,867 | $99,124 | $1,515,580 |

Sources: Tables 8; Table 10; Table 12

**Figure 1    Mr. Walker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s.

**Figure 2    Mr. Walker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As CEO, Mr. Walker is required to hold six times his $1.3 million Base Salary in Anadarko shares or RSUs.

**Figure 3    Mr. Gwin's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Shares include Anadarko shares held in his 401(k) plan.

**Figure 4    Mr. Gwin's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Gwin is required to hold three times his $750,000 Base Salary in Anadarko shares or RSUs.

**Figure 5    Mr. Daniels' Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Shares include Anadarko shares held in his family Limited Partnership and his 401(k) plan. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert P. Daniels dated October 13, 2022 at p. 32).

**Figure 6   Mr. Daniels' Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Daniels is required to hold three times his $700,000 Base Salary in Anadarko shares or RSUs. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert Daniels, October 13, 2022 at p. 32).

**Figure 7    Mr. Leyendecker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions. I have been unable to reconcile a difference of 450 Anadarko shares prior to August 2016 and have incorporated those shares in the chart above to a vesting event in November 2015.

**Figure 8    Mr. Leyendecker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions.  Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an SVP through August 2016, Mr. Leyendecker was required to hold 2.5 times his Base Salary (which increased from $400,000 to $420,000 in January 2015) in Anadarko shares or RSUs. Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings of shares and RSUs to $1,725,000 (*i.e.*, three times the $575.000 Base Salary he earned upon his promotion).

## Exhibit A: Curriculum Vitae

**KEVIN JAMES MURPHY**

**Resume**
January 2023

**Address**       Marshall School of Business
Finance and Business Economics
University of Southern California
Los Angeles, CA 90089-1422
*email: kjmurphy@usc.edu*
*website: www.marshall.usc.edu/faculty/directory/kjmurphy*

**Telephone**       (213) 740-6553

**Current Positions**

Kenneth L. Trefftzs Chair in Finance, Marshall School of Business, University of Southern California, 2006 -
Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2020 -
Professor of Finance and Business Economics, Marshall School of Business, University of Southern California, 1995 -
Professor of Business and Law (courtesy), Gould School of Law, University of Southern California, 2001 -

**Previous Positions**

Vice Dean for Faculty and Academic Affairs, Marshall School of Business, University of Southern California, 2004 - 2007
E. Morgan Stanley Chair in Business Administration, Marshall School of Business, University of Southern California, 2002 - 2005
Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2003 - 2004
Visiting Scholar and Consultant, Towers Perrin, Boston, MA, 1994 - 1995
Associate Professor, Graduate School of Business Administration, Harvard University, 1991 - 1995
Associate Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1989 - 1991.
Assistant Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1983 - 1989.
Marvin Bower Fellow, Graduate School of Business Administration, Harvard University, 1987-1988.

**Education**

University of Chicago, Ph.D. (Economics), 1984.
University of Chicago, M.A. (Economics), 1981.
University of California, Los Angeles, B.A. (Economics) (Summa Cum Laude), 1979.

**Thesis**

"Ability, Performance, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts"

**Teaching Experience**

University of Southern California, Marshall School of Business, 1995-. Undergraduate, MBA, and Ph.D. courses in financial policies, economics, corporate control, compensation, incentives, and corporate governance.
Harvard University, Graduate School of Business Administration, 1991-1995. Graduate courses in compensation and incentives, human resource management, and coordination, control, and the management of organizations.
University of Rochester, William E. Simon Graduate School of Business Administration, 1984-1991. Graduate courses in compensation and human resource management, organization theory, economics, advanced price theory, and pricing policies.
University of Chicago, Department of Economics, 1981-83. Undergraduate courses in price theory.

**Fellowships, Scholarships, Academic Honors**

Drexel University award for Outstanding Contribution to Research in Corporate Governance, 2013

Marvin Bower Fellowship, Harvard University, 1987-88.

AT&T Faculty Fellowship, University of Rochester, 1986-87.

Social Science Research Council Dissertation Fellowship, 1983-84.

PEW Teaching Fellowship, University of Chicago, 1981-83.

Milton Friedman Fund Fellowship, University of Chicago, 1979-83.

National Science Foundation Fellowship, 1979-82.

Regents Scholarship, UCLA, 1977-79.

Department Scholar (Economics), UCLA, 1978-79.

Phi Beta Kappa, 1979.

**Other Activities**

Associate Editor, *Journal of Financial Economics*, 1992-2021.

Associate Editor, *Journal of Accounting and Economics*, 1988-2006.

Associate Editor, *Journal of Corporate Finance*, 1993-2010.

Associate Editor, *Economic Bulletin*, 2001-2003.

Expert, U.S. Department of Treasury, Office of the Special Master for Executive Compensation, 2009.

Board Member, Scleroderma Foundation (Southern California Chapter), 2008-2011.

Chairman, Academic Research Committee, American Compensation Association, 1997 - 1999.

Research Advisory Board, American Compensation Association, 1997 - 1999.

Chairman, Research Advisory Panel, American Compensation Association, 1995 - 1997.

Program Committee, American Economic Association Meetings, 2000-2001.

Program Committee, *Journal of Financial Economics* Corporate Governance Conference, 2000.

Program Committee, Western Finance Association Conference, 1996, 1997.

Program Committee, American Finance Association Meetings, 1998, 2003.

University of Southern California, Academic Senate, 2011-2015 (Executive Committee 2012-2015); Professional Conflict of Interest Committee, 2013-; Provost's Interdisciplinary Professor Committee, 2007-2013; Deans of Faculty Council, 2004-2007; Academic Leadership Committee, 2004-2006; Probationary Deadlines Committee, 2004-2006; Provost Advisory Committee, 2003-2004.

University of Southern California, Marshall School of Business, Faculty Council 2011-; Faculty Consultative Committee, 2001-2003. Strategic Planning Steering Group (co-chairman), 1999-2000; Research Committee, 1997-1998; Budget Advisory Committee, 1998-1999; STAR Committee, 1998-1999; Space Utilization Task Force, 1998-; MBA Quality of Life Committee, 1997.

University of Southern California, Marshall School of Business, Finance and Business Economics, Faculty recruiting co-chairman, 1995-1999, 2011-2012; APR Committee 2001-2003; 2007-2012.

William E. Simon Graduate School of Business Administration, University of Rochester, Area Coordinator for Applied Economics and Organizations and Markets, 1985-1991; Ph.D. Committee, 1984-1987, 1988-1991; Committee on Computing and Data Bases, 1990–1991.

Referee for Professional Journals: *Academy of Management Journal; Accounting Review; Administrative Science Quarterly; American Economic Review; American Journal of Sociology; Canadian Journal of Economics; Econometrica; Economic Inquiry; The Economic Journal; Economic Policy Review (NY Fed); Financial Management; Industrial and Labor Relations Review; Industrial Relations; Journal of Accounting and Economics; Journal of Accounting, Auditing, and Finance; Journal of Accounting and Public Policy; Journal of Business; Journal of Economics and Business; Journal of Finance; Journal of Financial and Quantitative Analysis; Journal of Financial Economics; Journal of Institutional and Theoretical Economics; Journal of Labor Economics; Journal of Law & Economics; Journal of Law, Economics, and Organization; Journal of Management Studies; Journal of Monetary Economics; Journal of Political Economy; Journal of Risk and Insurance; Management Science; Managerial and Decision Economics; National Tax Journal; Pacific-Basin Finance Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Business; Rand Journal of Economics; Review of Economics and Statistics; Review of Financial Studies; Review of Quantitative Finance and Economics; Strategic Management Journal;* and the National Science Foundation.

Advisory Board, *Business Month*, 1990-1991.

Member, American Economic Association, 1981-present.

Member, Society of Labor Economists, 1995-2007.

Member, American Finance Association, 1995-present.

Member, WorldAtWork (formerly American Compensation Association), 1995-2002.

Member, Task Force on Executive Compensation, American Compensation Association, 1984-1985.

Commissioner, National Association of Corporate Directors Blue Ribbon Commission on Executive Compensation, 1992, 2003.

## Publications: Professional Articles

Baker, George, Robert Gibbons, and Kevin J. Murphy, "From Incentives to Control to Adaptation: Exploring Interactions Between Formal and Relational Governance." *Journal of Institutional and Theoretical Economics* (Forthcoming 2023).

Dial, Jay and Kevin J. Murphy, "Downsizing and Value Creation at General Dynamics: A PE-like Solution for Industries that Must Shrink," *Journal of Applied Corporate Finance*, Vol. 33(3) (Summer 2021).

Barron, Daniel, Robert Gibbons, Ricard Gil and Kevin J. Murphy, "Relational Adaptation Under Reel Authority." *Management Science* 66(5) (May 2020) 1868-1889.

Murphy, Kevin J. and Tatiana Sandino, "Compensation Consultants and the Level, Composition and Complexity of CEO Pay" *The Accounting Review* 95(1) (January 2020) 311-341.

Murphy, Kevin J. and Michael C. Jensen, "The Politics of Pay: The Unintended Consequences of Regulating Executive Compensation." *Journal of Law, Finance, and Accounting* 3(2) (2018) 189-242.

Murphy, Kevin J., "Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences," *European Financial Management* 19(4) (2013) 631-657.

Fernandes, Nuno, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "Are US CEOs Paid More? New International Evidence." *Review of Financial Studies* 26(2) (2013), 323-367.

Murphy, Kevin J., "Executive Compensation: Where we are, and how we got there," in George Constantinides, Milton Harris, and René Stulz (eds.), *Handbook of the Economics of Finance*. Elsevier Science North Holland (2013) Chapter 4: 211-356.

Conyon, Martin J., Nuno Fernandes, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "The Executive Compensation Controversy: A Transatlantic Analysis" in Tito Boeri, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Packages: Productivity, Profits, and Pay,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013) Part I: 8-115.

Murphy, Kevin J., "Pay, Politics, and the Financial Crisis" in Alan Blinder, Andrew Lo and Robert Solow (eds.), *Economic Lessons from the Financial Crisis*. Russell Sage Foundation (2012).

Murphy, Kevin J., "The Politics of Pay: A Legislative History of Executive Compensation," in Jennifer Hill and Randall Thomas (eds.), *Research Handbook on Executive Pay,* Edward Elgar Publishers (2012).

Murphy, Kevin J. and Tatiana Sandino, "Executive Pay and "Independent" Compensation Consultants," *Journal of Accounting & Economics* 49(3) (April 2010): pp. 247-262.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Strategic Alliances: Bridges Between 'Islands of Conscious Power'," *Journal of the Japanese and International Economies,* 22(2) (June 2008) 146-163.

Lowry, Michelle and Kevin J. Murphy, "Executive Stock Options and IPO Underpricing," *Journal of Financial Economics* 85 (2007) 39-65.

Murphy, Kevin J. and Ján Zábojník, "CEO pay and appointments: A market-based explanation for recent trends," *American Economic Review Papers and Proceedings,* (May 2004).

**Publications: Professional Articles (continued)**

Hall, Brian J. and Kevin J. Murphy, "The Trouble with Stock Options," *Journal of Economic Perspectives*, Vol. 17(3), (Summer 2003).

Murphy, Kevin J., "Stock-Based Pay in New Economy firms," *Journal of Accounting and Economics*, Vol 34 (2003): 129-147.

Murphy, Kevin J., "Explaining Executive Compensation: Managerial Power versus the Perceived Cost of Stock Options," *University of Chicago Law Review*, Vol. 69(3) (Summer 2002): 847-869.

Hall, Brian J. and Kevin J. Murphy, "Stock Options for Undiversified Executives," *Journal of Accounting and Economics*, Vol 33(1) (February 2002): 3-42.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Contracts and the Theory of the Firm," *Quarterly Journal of Economics,* Vol. 117 (February 2002): 39-84.

    Reprinted in
        C. Ménard (ed.), *The International Library of the New Institutional Economics*, (Forthcoming 2004): Edward Elgar Publishing, Ltd.

Conyon, Martin J. and Kevin J. Murphy, "Stock-Based Executive Compensation," in J. McCahery, P. Moerland, T. Raaijmakers, and L. Renneboog, ed., *Corporate Governance Regimes: Convergence and Diversity*, Oxford University Press (2002), Chapter 26: 625-646.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Bringing the Market Inside the Firm?" *American Economic Review Papers and Proceedings,* Vol 92(2) (May 2001): 212-18.

Murphy, Kevin J., "Performance Standards in Incentive Contracts," *Journal of Accounting and Economics*, Vol. 30 (3) (December 2000): 245-78.

Conyon, Martin J. and Kevin J. Murphy, "The Prince and the Pauper? CEO Pay in the US and UK," *Economic Journal* Vol 110 (November 2000): F640-71.

    Reprinted in
        van Frederikslust, R. A. I, J. S. Ang, and S. Sudarsanam (eds), *Corporate Governance and Corporate Finance: a European Perspective*. Routledge (2007)

Hall, Brian J. and Kevin J. Murphy, "Optimal Exercise Prices for Executive Stock Options," *American Economic Review Papers and Proceedings,* Vol 90(2) (May 2000): 209-214.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Informal Authority in Organizations," *Journal of Law, Economics, and Organizations* Vol. 15(1) (April 1999): 56-73.

Murphy, Kevin J., "Executive Compensation," in Orley Ashenfelter and David Card (eds.), *Handbook of Labor Economics*, Vol. 3b, Elsevier Science North Holland (1999), Chapter 38: 2485-2563.

Murphy, Kevin J., "Executive Compensation and the Modern Industrial Revolution," *International Journal of Industrial Organization*, Vol. 15(4) (July 1997): 417-25.

Murphy, Kevin J., "Reporting Choice and the 1992 Proxy Disclosure Rules," *Journal of Accounting, Auditing, and Finance*, Vol. 11(3) (Summer 1996): 497-515.

Dial, Jay and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics*, Vol. 37(3) (March 1995): 261-314.

Murphy, Kevin J., "Politics, Economics, and Executive Compensation," *University of Cincinnati Law Review*, Volume 63, No. 2 (Winter 1995): 713-748.

**Publications: Professional Articles (continued)**

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Subjective Performance Measures in Optimal Incentive Contracts," *Quarterly Journal of Economics*, Vol. 109(4) (November 1994): 1125-56.

Murphy, Kevin J. and Jerold L. Zimmerman, "Financial Performance Surrounding CEO Turnover," *Journal of Accounting and Economics*, Vol. 16 (1993): 273-315.
Reprinted in
   K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 2 (1999): 377-419 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Does Executive Compensation Affect Investment?" *Journal of Applied Corporate Finance*, Vol. 5(2) (Summer 1992).

Gibbons, Robert and Kevin J. Murphy, "Optimal Incentive Contracts in the Presence of Career Concerns: Theory and Evidence," *Journal of Political Economy*, Vol. 100(3) (June 1992): 468-505.

   Reprinted in
   K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 1 (1999): 515-52 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Performance Measurement and Appraisal: Motivating Managers to Identify and Reward Performance," *Performance Measurement, Evaluation, and Incentives*, edited by William J. Bruns, Jr. (Harvard Business School Press, Boston, 1992).

   Reprinted in
   *Employment Relations Today*, Vol. 20, No. 1 (Spring, 1993).

Jensen, Michael C. and Kevin J. Murphy, "CEO Incentives: It's Not *How Much* You Pay, But *How*", *Harvard Business Review*, (May/June, 1990).

   Reprinted in:
   M. Jensen, *Foundations of Organizational Strategy* (1998): 270-98, *Harvard University Press*; *Journal of Applied Corporate Finance*, Vol. 3(3) (Fall 1990).

Jensen, Michael C. and Kevin J. Murphy, "Performance Pay and Top-Management Incentives" *Journal of Political Economy*, Vol. 98(2) (April 1990): 225-64.

   Reprinted in:
   M. Jensen, *Foundations of Organizational Strategy* (1998): 229-69, *Harvard University Press*.

   K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 236-75 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;

   K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 260-299, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Relative Performance Evaluation for Chief Executive Officers", *Industrial and Labor Relations Review*, Vol. 43, No. 3 (February 1990): 30S-51S.

   Reprinted in:
   R. G. Ehrenberg (ed.), *Do Compensation Policies Matter?* 1990, ILR Press-Cornell, Ithaca NY;
   K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 392-413, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

**Publications: Professional Articles (continued)**

Baker, George, Michael C. Jensen, and Kevin J. Murphy "Compensation and Incentives: Practice vs. Theory," *Journal of Finance*, Vol. 43(3) (July 1988): 593-616.

> Reprinted in:
>> M. Jensen, *Foundations of Organizational Strategy* (1998), *Harvard University Press*.
>>
>> K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 121-44 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106.

Murphy, Kevin J., "Incentives, Learning, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts," *Rand Journal of Economics*, Vol. 17(1) (Spring 1986): 59-76.

> Reprinted in:
>> K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 417-34, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Top Executives Are Worth Every Nickel They Get," *Harvard Business Review*, Vol. 64(2) (March/April 1986).

> Reprinted in:
>> L. Newton and M. Ford (eds.), *Taking Sides*, 2nd edition, edited by Lisa H. Newton and Maureen M. Ford (Dushkin Publishing Group, Inc., Guilford CT, 1992).

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42.

> Reprinted in:
>> O. Ashenfelter and K. F. Hallock (eds.) *Labor Economics*, Vol. 2 (Edward Elgar Publishing: 1995);
>>
>> K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 204-35 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;
>>
>> K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 204-35, Elgar Reference Collection, International Library of Critical Writings in Economics.

## Books

Boeri, Tito, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Remuneration and Employee Performance-Related Pay: A Transatlantic Perspective,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013).

Hallock, Kevin F. and Kevin J. Murphy (co-editors), *The Economics of Executive Compensation*, Edward Elgar Publishing, 1999.

## Comments, Cases, and Other Articles

Kevin J. Murphy, "Executive Pay Restrictions for TARP Recipients: An Assessment," Testimony to the Congressional Oversight Panel, October 21, 2010.

Kevin J. Murphy, Congressional Testimony on Compensation Structure and Systemic Risk, June 11, 2009.

Hall, Brian J. and Kevin J. Murphy, "Expensing will improve compensation decisions," *Boston Globe*, October 6, 2002.

Hall, Brian J. and Kevin J. Murphy, "Option Value Does Not Equal Option Cost," *WorldatWork Journal*, 10(2), 2001.

Hallock, Kevin F. and Kevin J. Murphy, "The Economics of Executive Compensation: Introduction," in *The Economics of Executive Compensation* (K. Murphy and K. Hallock, eds.), Edward Elgar Publishing, 1999.

Murphy, Kevin J., "Executive Stock Options: An Economist's Perspective," in *Stock Options*, American Compensation Association, 1998.

Murphy, Kevin J., "Disney Offers a Model for Executive Compensation," *Los Angeles Business Journal*, June 23, 1997.

Murphy, Kevin J., "CEO Pay and Downsizing: The Social Consequences," in *CEO Pay: A Comprehensive Look*, American Compensation Association, 1997.

Jensen, Michael C. and Kevin J. Murphy, "Compensation at Lexerd Systems," Harvard Business Case 494-066 (April 1994).

Murphy, Kevin J., "Executive Compensation in Corporate America 1993," United Shareholders Association, (Nov. 1993).

Murphy, Kevin J., "Executive Compensation in Corporate America 1992," United Shareholders Association, (Dec. 1992).

Murphy, Kevin J. and Jay Dial, "Compensation and Strategy and General Dynamics (A), (B)," Harvard Business Cases 9-494-048 and 9-494-049 (October 1993).

Murphy, Kevin J., "Merck & Co., Inc. (A), (B), (C)," Harvard Business Cases 9-491-005, 9-491-006, and 9-491-007 (November, 1991).

Jensen, Michael C. and Kevin J. Murphy, "A New Survey of Executive Compensation: Full Survey and Technical Appendix to 'CEO Incentives — It's Not *How* Much You Pay but *How*," Simon School of Business, University of Rochester (June 1990).

Murphy, Kevin J., "The Control and Performance of State-Owned Enterprises: Comment," in *Privatization and State-Owned Enterprises*, edited by Paul MacAvoy, W. T. Stanbury, George Yarrow, and Richard J. Zeckhauser (Kluwer Academic Publishers, Boston, 1989): 59-68.

Murphy, Kevin J., "Is Executive Compensation Related to Company Performance?" *Rochester Management Review* (1985).

Jensen, Michael C. and Kevin J. Murphy, "Beware the Self-Serving Critics" *New York Times* (May 20, 1984).

**Unpublished Papers**

Murphy, Kevin J. and Marshall D. Vance, "Debunking Diversification: Evidence from Employee Stock Option Exercises" (March 2020)

Lee, Joonil, Sunghan Lee, Kevin J. Murphy, and Peter S. H. Oh, "Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay." (October 2021)

Lee, Joonil, Kevin J. Murphy, Peter S. H. Oh, and Marshall D. Vance, "CEO Inside Debt and Corporate Investment." (December 2020)

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Adaptation." (December 2011)

Murphy, Kevin J. and Ján Zábojník, "Managerial Capital and the Market for CEOs" University of Southern California (August 2007).

Murphy, Kevin J. and Paul Oyer, "Discretion in Executive Incentive Contracts," University of Southern California (January 2004).

Murphy, Kevin J. and Karen E. Van Nuys, "Governance, Behavior, and Performance of State and Corporate Pension Funds," Harvard University (September 1994).

Murphy, Kevin J., "Executive Compensation in Regulated Firms," William E. Simon Graduate School of Business Administration, University of Rochester (April 1987).

**Consulting and Expert Witness Activities**

Law Firms:
Bartlit Beck Herman Palenchar & Scott; Foley & Lardner; Gibson, Dunn & Crutcher; Girard and Green; Goodwin Procter LLP; Greenberg, Glusker; Kirkland & Ellis; Irell & Manella; Laski & Gordon; Latham & Watkins; Milberg Weiss; Morgan Lewis & Bockius; Munger, Tolles & Olson; Nixon and Peabody; O'Melveny & Myers LLP; Orrick, Herrington & Sutcliffe; Pillsbury Winthrop; Seyfarth Shaw LLP; Sheppard Mullin Richter & Hampton LLP; Simpson Thacher & Bartlett; Skadden, Arps, Slate, Meagher & Flom; Steptoe & Johnson; Swaab Attorneys (Sydney, Australia); Tanenbaum Keale LLP; Teadle (C. Tucker); Wheeler Trigg O'Donnell LLP; Williams & Connolly; Willkie Farr & Gallagher; Wilson Sonsini Goodrich & Rosati; Winston & Strawn.

Economic Litigation Firms:
Analysis Group; Chicago Partners; CRA International; Compass Lexecon; Cornerstone Research; Econalytics; LECG, Navigant.

Consulting Clients:
Arthur D. Little, Inc.; AT&T; Atlantic Richfield Corporation; Axos Financial, Inc.; Bristol-Myers Company; British Petroleum; California Franchise Tax Board; California Franchise Tax Board; CalPers; Casa Cuervo, S.A. de C.V.; Cemex; Chatham Technologies Inc.; Gannett Co.; Genzyme; Grupo Reforma; GTE; Hunt Oil Company; Internal Revenue Service; Kay and Associates, Inc.; Life Technologies; Management Compensation Group; Merck & Co; the State of Michigan; Moody's Inc.; Nellie Mae; Pulsar; Remington Oil and Gas Corporation; Residence Mutual Insurance Company; Selbert Perkins Design; TCL Beatrice; Towers Perrin; University of Pennsylvania; VectorMAX; Western Mutual Insurance.

**Papers and Speeches Presented (1991–Present)**

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Panel on "Executive Pay during Covid," University of Miami, Miami FL, November 13, 2020.
– Panel on "The Role of Corporate Governance amidst the Covid-19 Pandemic," Drexel University, Philadelphia PA, April 17, 2020.
– Principles of Executive Pay Roundtable, Aspen Institute, New York, NY, November 6, 2019
– Overview and Research Session, "Executive Compensation: The Politics of Pay," Financial Management Association Annual Meeting, Boston, MA, October 12, 2017.
– Keynote Speech, "Explaining CEO Pay," 10th International Conference on Asia-Pacific Financial Markets, Seoul, South Korea, December 5, 2015.
– "Earnings Management and Executive Pay: Are Options to Blame?" Korean Capital Market Research Center, Seoul, South Korea, December 4, 2015
– "Explaining CEO Pay," Federal Reserve Bank of New York, September 15, 2015.
– "Paying for Performance: Metrics, Maladies and Mistakes," CFO Roundtable, March 5, 2015.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 14, 2014.
– "Measuring CEO Performance: Metrics, Maladies and Mistakes," West Coast Chairs Roundtable, November 3, 2014.
– Panelist, Equilar Executive Compensation Summit, Coronado, CA, June 17, 2014.
– Keynote Speech, "Explaining CEO Pay," Ackerman Conference on Corporate Governance, Bar Ilan University, Ramat Gan, Israel, December 15, 2013.
– Roundtable on Incentive Pay for Bankers, Board of Governors, U.S. Federal Reserve, Washington DC, November 19, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 15, 2013.
– Keynote Speech, "Explaining CEO Pay," CEO, Boards and other High Potentials, Institute for Financial Research, Stockholm School of Economics, Stockholm, Sweden, October 16, 2013.
– Keynote Speech, "Explaining CEO Pay," Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 24, 2013.
– Keynote Speech, "Explaining CEO Pay," Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 6, 2013.
– Keynote Speech, "Explaining CEO Pay," Claremont College, May 6, 2013.
– Keynote Speech, "Explaining CEO Pay," 6th Annual Conference on Corporate Governance, Drexel University, April 5, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 9, 2012.
– Executive Compensation Workshop, Swedish Remuneration Academy, Stockholm, Sweden, September 25-26, 2012.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 28, 2011.
– Equilar Executive Compensation Summit, Carlsbad, CA, June 14, 2011.
– NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
– X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 26, 2010
– Testimony to the Congressional Oversight Panel, Washington, DC, October 21, 2010
– Risk Conference, Federal Reserve Bank of Chicago, Chicago, Il, April 7, 2010
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 13, 2009
– Testimony to the U.S. House of Representatives, Committee on Financial Services, Hearing on "Compensation Structure and Systemic Risk," Washington, DC, June 11, 2009
– Conference on Financial Innovation, Owen Graduate School of Management, Vanderbilt University, October 17, 2008
– Executive Compensation Workshop: Rethinking Pay for Performance, U.C. Berkeley Law School, September 26, 2008
– Weil Gotshal & Manges Roundtable, Yale Law School, May 4, 2007

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Corporate Governance Summit, University of Southern California, Los Angeles, CA, March 23, 2007
– Corporate Governance Conference, University of Melbourne School of Law, Melbourne, Victoria, Australia, March 15, 2007
– Chief Financial Officer Forum, University of Washington, Seattle, WA, February 7, 2007
– Conference Board Executive Pay Conference, New York City, NY, September 27, 2006
– Fireside Talk, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006
– 125 Celebration, University of Southern California, Los Angeles, CA, October 7, 2005.
– Corporate Governance Conference, London School of Economics, London, UK, November 4, 2004.
– Challenges to Executive Compensation Conference, University of Zurich, Zurich, Switzerland, November 2, 2004.
– Academic Advisory Board, Wells Capital Management, San Francisco, CA, May 25, 2004.
– Executive Session, European Science Days, Steyr, Austria, July 16 , 2003.
– The Economist Human Resource Roundtable, New York, NY, June 5, 2003.
– Corporate Governance Conference, Wilmington, DE, April 9, 2003.
– Annual Meeting, Center for Effective Organizations, Marina del Rey, CA, April 24, 2003.
– Executive Compensation Workshop, Harvard Business School, Boston, MA, October 10, 2002.
– Special Board of Directors Meeting, Genzyme Inc., Cambridge, MA, October 2, 2002.
– Option Workshop, California Public Employees' Retirement System, Sacramento CA, June 17, 2002.
– American Economic Association Annual Meetings, New Orleans, LA, January 7, 2001.
– Princeton/Cornell Conference on Labor Policy, Ithaca, NY, October 7, 2000.
– University of Illinois, Northbrook, IL, October 6, 2000.
– United States Department of Justice, Washington, D.C., September 27, 2000
– Singapore Institute of Directors, September 13, 2000.
– Corporate Governance and Value Creation Conference, National University of Singapore, September 12, 2000.
– Young Presidents Organization, Los Angeles, CA, November 12, 1998.
– Keynote Speech, Executive Compensation Forum, American Compensation Association, Chicago IL, September 24, 1998.
– Towers Perrin Training Session, London, UK, June 22-24, 1998.
– Institute of Management Accountants, Los Angeles, CA, March 27, 1998.
– Executive Compensation Seminar, The Conference Board, San Diego, CA, March 11, 1998.
– Executive Briefing Seminars and Roundtables, Irvine, CA (Oct. 29, 1997), Woodland Hills (Nov. 4, 1997), Los Angeles, CA (Nov. 5, 1997)
– Conference on Executive Compensation and Shareholder Value, New York University Stern School of Business, October 24, 1997.
– Board of Governors of the Federal Reserve, Washington, DC. October 23, 1997.
– Committee on Corporate Governance, TIAA-CREFF, Stanford, CA. June 27, 1997.
– Executive Compensation Seminar, The Conference Board, Chicago, IL, June 4, 1997.
– Society of Human Resource Managers, Marina del Rey, CA, April 30, 1997.
– Financial Management Association Meetings, New Orleans, LA, October 10, 1996.
– International Business Machines, Armonk, NY, September 13, 1996.
– Bristol-Myers-Squibb Corporation, New York City, NY, September 11, 1996.
– American Enterprise Institute, Washington DC, July 22, 1996.
– USC Center for Effective Organizations sponsors meeting, Newport Beach, CA, May 8, 1996.
– Corporate Governance Seminar, University of Toronto Law School, Toronto, CA, Dec. 8, 1995
– Yale Finance Institute, Woodstock, VT, October 23, 1995
– Oil Industry Roundtable, Colorado Springs, CO, September 21, 1995
– Corporate Governance Seminar, London School of Economics, London, MA, June 15, 1995
— Executive Briefing Seminars and Roundtables, Dallas TX (Sept. 14, 1994), Chicago IL (Nov. 17, 1994), Philadelphia PA (Jan. 3, 1995) Washington DC (Feb. 1, 1995), Richmond VA (Feb. 2, 1995), Irvine CA (March 6, 1995), Boston MA (March 9, 1995), Minneapolis MN (Dec. 15, 1994), Atlanta GA (April 26, 1995)
– Merck Corporation, White House Station, NJ, June 19, 1995

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Chubb Corporation, NJ, March 30, 1995
– Bristol-Myers-Squibb Corporation, New York City, NY, February 10, 1995
– Prudential Corporation, Newark, NJ, January 24, 1995
– Mead Corporation, Dayton, OH, September 14, 1994
– Procter & Gamble, Cincinnati, OH, September 14, 1994–    International Business Machines, Armonk, NY, September 8, 1994
– AT&T, Basking Ridge, NJ, August 11, 1994
– Philip Morris, New York, NY, August 9, 1994
– General Motors, New York, NY, August 9, 1994
– Conference on Management Compensation, Strategy, and Firm Performance, Humboldt-University, Berlin, Germany, June 13, 1994.
– Human Resource Executive Association, Cincinnati, OH, March 16, 1994.
– Corporate Law Symposium, University of Cincinnati Law School, Cincinnati, March 18, 1994.
– Executive Compensation Training Session, Towers Perrin, Leesburg, VA, October 7, 1993.
– SEC and Financial Reporting Institute Conference, Pasadena, CA, May 27, 1993.
– NASDAQ Regional Conference, Atlanta, GA, May 25, 1993.
– NASDAQ Regional Conference, Dallas, TX, May 24, 1993.
– Management Conference, University of Chicago Graduate School of Business, Chicago, Illinois, April 28, 1993.
– National Investor Relations Institute—Chicago Chapter, Chicago, Illinois, April 7, 1993.
– National Association of Corporate Directors, Waltham, MA, March 23, 1993.
– Conference on Managerial Pay and Corporate Performance, March 20, 1993.
– Shadow SEC, Washington, D.C., November 9, 1992.
– American Enterprise Institute, Washington, D.C., October 21, 1992.
– MCG/NACD Seminar on Executive Compensation, San Francisco, CA, May 5, 1992.
– Security and Exchange Commission Conference on Corporate Governance, Washington, D.C., March 19, 1992.
– MCG/NACD Seminar on the Compensation Committee in the 1990s, New York, NY, December 12, 1991.
– United Shareholders Association, Washington, D.C., November 15, 1991.
– Olin Business School, Washington University, St. Louis, MO, September 26, 1991.
– Human Resources Management Association of Chicago, Chicago, IL, March 14, 1991.

"Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay"
– McGill Accounting Research Conference, McGill University, Montreal, Canada, May 28, 2021.
– Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 12, 2021.

"Debunking Diversification: Evidence from Employee Stock Option Exercises"
– Ackerman Corporate Governance Conference, Bar Ilan University, Tel Aviv, Israel December 16, 2019.
– Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 16, 2019.
– BI Corporate Governance Conference, BI Norwegian Business School, Oslo, Norway, May 24, 2019.

"The Politics of Pay"
– Securities and Exchange Commission, Washington DC, October 24, 2018.
– Journal of Law, Finance, and Accounting Conference, Hong Kong Polytechnic University, Hong Kong, June 9, 2017.
– Vanderbilt Law & Business Conference, Nashville, TN. October 14, 2011.

"Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences"
– European Financial Management Association Annual Meeting, Reading UK, June 27, 2013.

"CEO Inside Debt and Corporate Investment"
– Finance Seminar, Gies College of Business, University of Illinois, Champaign, IL, April 18, 2019.
– 2016 Corporate Governance Conference, LeBow College of Business, Drexel University, Philadelphia, PA, April 15, 2016.
– Finance Seminar, Freeman School of Business, Tulane University, New Orleans LA, April 1, 2016.

"Relational Adaptation under Reel Authority"
– Strategy Seminar, Rotman School of Business, University of Toronto, Toronto, ON, November 9, 2017.
– Microeconomics Seminar, Economics Department, Queens University, Kingston, ON, October 20, 2016.
– Finance Seminar, Jesse Jones School of Business, Rice University, October 23, 2015.
– Finance, Organizations, and Markets Conference, University of Chicago Booth School of Business, October 15,

2015.
– Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 22, 2014.

"Compensation Consultants and the Level, Composition, and Complexity of CEO Pay"
– Securities and Exchange Commission, Washington DC, October 23, 2018.
– Accounting Workshop, McGill University Desautels School of Business, September 14, 2018.
– Labor Workshop, School of Industrial and Labor Relations, Cornell University, April 23, 2018.
– Finance Workshop, R. H. Smith School of Business, University of Maryland, October 10, 2014.
– Finance and Accounting Workshop, Edwin L. Cox School of Business, Southern Methodist University, August 29, 2014.

"Executive Compensation: Where We Are, and How We Got There"
– Accounting for Accounting in Economics Conference, Laboratory for Aggregate Economics and Finance, Santa Barbara, CA, November 8, 2013.
– Finance Seminar, Copenhagen Business School, Copenhagen, Denmark. June 1, 2012.
– Finance Seminar, BI Norwegian Business School, Oslo, Norway. May 30, 2012.
– Helsinki Finance Seminar, Aalto University, Helsinki, Finland. May 28, 2012.
– Workshop on Executive Compensation and Corporate Governance, Erasmus University, Rotterdam, Netherlands. May 25, 2012.
– Finance Seminar, Louisiana State University E. J. Ourso College of Business, Baton Rouge, LA. April 20, 2012.

"Pay, Politics, and the Financial Crisis"
– KAIST CEO Forum, Seoul, South Korea, December 4, 2015
– Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 25, 2013.
– Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 7, 2013.
– Finance Seminar, University of Colorado Leeds School of Business, April 6, 2012.
– Finance Seminar, University of Michigan Ross School of Business, December 16, 2011.
– Conference on Economic Lessons from the Financial Crisis, Russell Sage Foundation, New York City, September 9, 2011.

"Are US CEOs *Still* Paid More?"
– Jindal School of Management, University of Texas - Dallas, Richardson, TX, November 4, 2011.
– Kelley School of Business, University of Indiana, Bloomington, IN, April 29, 2011.
– NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
– X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
– American Finance Association Annual Meetings, Denver, CO, January 8, 2011.

"Executive Pay and 'Independent' Compensation Consultants"
– Finance Seminar, Board of Governors, Federal Reserve, Washington D.C., June 9, 2009.
– Oliver E. Williamson Seminar on Institutional Analysis, Haas Business School, University of California, Berkeley, May 7, 2009.
– Interdisciplinary Seminar, Case Western University, April 1, 2009

"The Executive Compensation Controversy: A Transatlantic Analysis"
– Conference on "Productivity, Profits and Pay," Cagliari, Sardinia Italy May 29, 2010.
– Faculty Seminar, Said Business School, Oxford University, May 25, 2010.

"Executive Stock Options and IPO Underpricing"
– Financial Seminar, University of Washington, Seattle, WA, February 7, 2007
– Law and Economics Seminar, Yale Law School, November 16, 2006.
– Research Seminar, Federal Reserve Bank of New York, New York, NY, June 15, 2006.
– Finance Seminar, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006.
– Finance Seminar, Harvard Business School, Boston MA, April 6, 2005.

"The Trouble with Stock Options"
– Finance Seminar, University of Oregon, Eugene, OR, May 16, 2003.
– Conference on Work and Productivity, European Science Days, Steyr, Austria, July 18 , 2003.

"Managerial Capital and the Market for CEOs" (with Ján Zábojník)
– Labor Economcs/Industrial Relations Seminar, Princeton University, Princeton, NJ, November 17, 2004.
– Corporate Governance and Financial Reporting Conference, Napa, CA, April 3, 2004.

– American Economic Association Annual Meetings, Washington DC, January 5, 2003.


"Discretion in Executive Incentive Contracts"
– Information, Markets, and Organizations Conference, Harvard Business School, June 21, 2004
– Finance Seminar, Arizona State University, Tempe, AZ, October 26, 2002.
– Finance Seminar, DePaul University, Chicago, IL, September 17, 2002.
– National Bureau of Economic Research, Corporate Finance Seminars, August 1, 2002
– Personnel Economics Conference, Stanford Institute of Theoretical Economics, Stanford University, Palo Alto, CA, June 21, 2002.
– CLEO Workshop, University of Southern California School of Law, Los Angeles, CA, July 2, 2001.
– American Economic Association Annual Meetings, New Orleans, LA, January 6, 2001.

"Stock Options for Undiversified Executives"
– Law and Business Conference, Vanderbilt University Law School, March 22, 2002.
– Accounting Workshop, Stanford Graduate School of Business, Palo Alto, CA, October 17, 2001.
– Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Management, Cambridge, MA October 11, 2001
– Corporate Governance Conference, Journal of Financial Economics and Tuck Business School, Dartmouth College, Hanover, NH, July 7, 2000
– European Summer Symposium on Economic Theory, Gerzensee, Switzerland, July 11, 2000

"Optimal Exercise Prices for Executive Stock Options"
– American Economic Association meetings, Boston, MA, January 5, 2000.

"The Prince and the Pauper: CEO Pay in the US and UK"

– Research Seminar, IZA Institute for Labor Studies, Bonn, Germany, July 20, 1999.
– Conference on Convergence and Diversity in Corporate Governance Regimes and Capital Markets, Tilburg University, Eindhoven, Netherlands, November 5, 1999.

"Performance Standards in Incentive Contracts"
– Theory of Organizations Workshop, Graduate School of Business, University of Chicago, Chicago, IL May 15, 2000.
– Labor and Population Seminar, Department of Economics, University of California, Los Angeles, March 7, 2000.
– Business Law and Economics Seminar, Olin School of Business, Washington University, St. Louis, September 30, 1999.
– Accounting and Finance Joint Seminar, Graduate School of Business Administration, University of Michigan, Ann Arbor, September 24, 1999.
– Accounting Seminar, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, May 27, 1999.
– Finance Seminar, Lunquist School of Management, University of Oregon, Eugene, Oregon, April 2, 1999.Corporate Finance Seminar, Yale School of Management, Yale University, March 26, 1999.
– Finance Seminar, Graduate School of Management, University of California, Irvine, December 2, 1998.
– Joint Microeconomics and Finance Seminar, Marshall School of Business, University of Southern California, October 23, 1998.
– Finance Seminar, Stern School of Business, New York University, New York, October 21, 1998.
– Joint Management and Strategy and Accounting Seminar, Kellogg Graduate School of Management, Northwestern University, Evanston, IL, October 14, 1998.
– Economics Seminar, Claremont Graduate School, Claremont, CA, September 30, 1998.
– Finance Seminar, University of Warwick, Warwick, UK, July 18, 1998.
– UCI-UCLA-USC Finance Conference, Ojai, CA, May 14, 1998.
– Society of Labor Economists Meetings, San Francisco, CA, May 1, 1998.
– Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Business, February 19, 1998
– Finance Workshop, Kenan-Flagler Business School, Univ. of North Carolina, October 21, 1997.
– Academy of Management Symposium, Vancouver, B.C., August 7, 1995

"Relational Contracts and the Theory of the Firm"

– Finance Workshop, Tuck Business School, Dartmouth College, Hanover, NH, December 3, 1996.
– Finance and Economics Workshop, Jesse Jones School of Business, Rice University, Houston, TX, November 15,

1996.
– Economics, Finance, and Strategy Workshop, Marshall School of Business, University of Southern California, November 1, 1996.
– Industrial Organization Workshop, Economics Department, University of California at Los Angeles, October 18, 1996.
– Finance and Economics Workshop, Graduate School of Business, Columbia University, New York, NY, September 14, 1996.
– American Law and Economics Association Conference, Chicago, IL, May 11, 1996.
– Atlanta Financial Forum, Goizueta School of Business, Emory University, Atlanta, GA, May 3, 1996.
– Finance Workshop, School of Business, Texas A&M, College Station, TX, April 26, 1996.

"Executive Compensation"
– Workshop on Corporate Governance; Contracts and Managerial Incentives, Humbodlt University, Berlin, Germany, July 2, 1998.
– Handbook of Labor Economics Conference, Princeton University, Princeton, NJ, September 6, 1997.

"Incentives, Downsizing, and Value Creation at General Dynamics"
– Finance Seminar, Marshall School of Business, University of Southern California, January 13, 1995.
– Harvard Business School, Boston, MA, October 1, 1995.
– American Economic Association Meetings, Boston, MA, January 4, 1994.

"Subjective Performance Measures in Optimal Incentive Contracts"
– Applied Economics Workshop, Laval University, Quebec City, Canada, April 8, 1993.
– Applied Microeconomics Workshop, Graduate School of Business, Columbia University, New York, NY, February 3, 1993.
– Finance Workshop, Graduate School of Business, University of Indiana, Bloomington, IN, December 11, 1992.
– Conference on Compensation and Incentives, Montreal, Canada, June 13, 1992.

"Financial Performance Surrounding CEO Turnover"
– Applied Economics Seminar, University of Delaware, April 29, 1992.
– Finance Seminar, Graduate School of Business Administration, University of Texas, Austin, TX, May 8, 1992.
– Organizational Behavior Work-in-Progress Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, December 2, 1991.
– Conference on Managerial Incentives and Corporate Performance, University of Rochester, Rochester, NY, November 1-2, 1991.

"Governance, Behavior, and Performance of State and Corporate Pension Funds"
– Pension Conference, Miami University, Oxford, Ohio, June 3, 1994
– Finance Workshop, Graduate School of Business, University of Texas, Austin, TX, May 6, 1994.
– Faculty Research Seminar, Owen Graduate School of Management, Nashville, TN, April 26, 1994.
– Research Seminar, Faculty of Management, University of Toronto, Toronto, Ontario, April 4, 1994.
– Faculty Research Seminar, University of Cincinnati Law School, Cincinnati, OH, March 17, 1994.
– Finance Seminar, University of Cincinnati Business School, Cincinnati, OH, March 16, 1994.
– Finance Workshop, Ohio State University, Columbus, OH, March 11, 1994.
– Economics and Legal Organizations Workshop, Economics Department and Graduate School of Business, University of Chicago, Chicago, IL, March 3, 1994.
– Baker West Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, February 28, 1994.
– Applied Economics Workshop, Economics Department, Cornell University, Ithaca, New York, February 23, 1994.
– Applied Economics Workshop, Economics Department, Clemson University, Clemson, South Carolina, February 4, 1994.
– Organizations and Markets Workshop, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, December 16, 1993.
– Finance Workshop, Smeal College of Business Administration, Pennsylvania State University, State College, PA, December 10, 1993.
– Organizational Behavior and Theory of the Firm Workshop, Graduate School of Business Administration, Harvard University, Boston, MA, November 15, 1993.
– Finance Workshop, Boston College, Brookline, MA, November 12, 1993.
– Economics Workshop, Miami University, Oxford, Ohio, October 22, 1993
– Applied Economics Workshop, Marshall School of Business, University of Southern California, October 16, 1993.

**Exhibit B: Testifying Experience in the Last Five Years**

I have testified as an expert at trial or by deposition in the following cases within the preceding five years:

1. Richard J. Tornetta v. Elon Musk, et al.
   Testimony: November 18, 2022
   Deposition: September 19, 2021
   C.A. No. 2018-0408-JRS
   Delaware Chancery Court

2. In re Mindbody, Inc. Stockholder Litigation.
   Testimony: March 7, 2022
   Deposition: January 20, 2022
   C.A. No. 2019-0442-KSJM
   Delaware Chancery Court

3. Larry A. Lawson v. Spirit Aerosystems
   Testimony: June 17, 2021
   Deposition: August 7, 2020
   Case No. 6:18-CV-01100-EFM-ADM
   United States District Court for the District of Kansas

4. In re the Marriage of Clarke v. Clarke
   Deposition: August 6, 2020
   Case No. RID1601464
   Superior Court of the State of California, County of Riverside

5. Laborers' Local #231 Pension Fund vs. Rory J. Cowan, et al.
   Deposition: July 31, 2019
   Case No. 1:17-cv-00478-CFC
   United States District Court, District of Delaware

6. Gadeco, LLC, et al. vs Jack J. Grynberg, et al.
   Testimony: June 12, 2019
   Deposition: September 11, 2017
   Case No. 2016CV030959
   District Court, Arapahoe County, Colorado

7. In re the Marriage of Bunting vs. Bunting
   Testimony: June 12, 2018
   Case No. 15D000711
   Superior Court of the State of California, County of Orange

8. Priority Posting & Publishing, Inc. vs The California Franchise Tax Board
   Testimony: June 6, 2018
   Case No. CGC-15-544791
   Superior Court of the State of California, County of San Francisco

**Exhibit C: Materials Considered in Producing this Report**

**Legal Pleadings, Expert Reports and Court Documents**

Amended Complaint for Violations of Federal Securities Laws, August 17, 2020
Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022
Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022
*In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)
*Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002)
Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated
    October 1, 2021

**Depositions and Exhibits**

Deposition of Charles F. Oudin, III dated June 30, 2022 (with Exhibits)
Deposition of David Blakeley, dated August 19, 2022 (with Exhibits)
Deposition of Ernest A. Leyendecker, III, dated September 22, 2022 (with Exhibits)
Deposition of Lea Frye, dated October 7, 2022 (with Exhibits)
Deposition of Robert Daniels, dated October 13, 2022 (with Exhibits)
Deposition of Robert Alvin Walker, dated October 20, 2022 (with Exhibits)
Deposition of Robert G. Gwin, dated October 26, 2022 (with Exhibits)
Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022 (with Exhibits)
Deposition of Paul Regan, dated January 20, 2023 (with Exhibits)
Deposition of Sean Boyle, November 9, 2021 (with Exhibits)
Deposition of Chris Camden, July 14, 2022 (with Exhibits)
Deposition of James Kleckner, October 14, 2022 (with Exhibits)
Deposition of Patrick McGrievy, August 24, 2022 (with Exhibits)
Deposition of Robert Strickling, July 21, 2022 (with Exhibits)
Deposition of John Schmidt, June 1, 2022 (with Exhibits)
Deposition of Darrell Hollek, September 1, 2022 (with Exhibits)
Deposition of Shandell Szabo, October 28, 2022 (with Exhibits)
Deposition of Mark Zajac, November 2, 2022 (with Exhibits)

**Board and Committee Minutes**

Anadarko Petroleum Corporation Meeting of the Board of Directors (07/26/2013 Draft), May
    13 & 14, 2013 (APC-00584025-039; APC-00584041-055; APC-00584057-071)
Anadarko Petroleum Corporation Meeting of the Board of Directors, May 13 & 14, 2013
    (APC-00772672-686)
Anadarko Petroleum Corporation Approval of Minutes for May 13 & 14, 2013, May 20,
    2013, May 28, 2013, and June 14, 2013 (07/31/2013 drafts) (APC-00772520-548)
Anadarko Petroleum Corporation Risk Council Meeting Agenda and Meeting Materials,
    January 28, 2014 (APC-00596519-565)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471)

Anadarko Petroleum Corporation Shenandoah Integrated Partner Meeting, April 30, 2014 (APC-00690371-442)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 (APC-00789245-316)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 and November 6, 2014 (APC-00776406-424)

Anadarko Petroleum Corporation Risk Council Meeting Discussion Materials, January 21, 2015 (APC-00611028-077)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 27, 2015 (APC-00778129-244; APC-00778263-385)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 21, 2015 (APC-00779479-550)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 26, 2015 (APC-00779578-647)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, October 21, 2015 and October 26, 2015 (APC-00780428-448)

Anadarko Petroleum Corporation Meeting of the Board of Directors (12/22/2015 Draft), November 2 & 3, 2015 (APC-00667005-014)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2016 (APC-00783560-572)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, May 9, 2016 (APC-01452536)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 26, 2016 (APC-00783757-870)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, July 26, 2016, August 19, 2016 and October 24, 2016 (APC-00785266-283)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, October 24, 2016 (APC-00784922-999)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 10, 2016 (APC-00786209-223; APC-00786269-284)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2017 and March 13, 2017 (APC-00787943-952)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, March 13, 2017 (APC-00787342)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 14, 2017 (APC-00790250-267)

Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
    Benefits Committee Agenda and Meeting Materials, October 25, 2018 (APC-
    01727486-548)
Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
    Benefits Committee Agenda (APC-00771149)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
    Committee of the Board of Directors, November 14, 2018 (APC-00790771-786)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
    Committee of the Board of Directors, November 15, 2018 (APC-00790787-788)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
    Committee of the Board of Directors, February 12, 2019, March 14, 2019, April 10,
    2019 and April 11, 2019 (APC-00790975-986)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
    Committee of the Board of Directors, April 10, 2019 (APC-00790956-967)


**Other Bates-stamped Documents**

ANACOP00000001
ANACOP00000400
ANACOP00000485
ANACOP00000536
ANACOP00001235
APC-00001146
APC-00003844
APC-00011019
APC-00015880
APC-00016935
APC-00017295
APC-00021089
APC-00022603
APC-00028226
APC-00100713
APC-00129328
APC-00129328
APC-00148012
APC-00170332
APC-00175650
APC-00346806
APC-00358392
APC-00564433
APC-00570424
APC-00570526
APC-00570642

APC-00571115
APC-00583654
APC-00584025
APC-00584041
APC-00584057
APC-00584245
APC-00590807
APC-00592109
APC-00593995
APC-00596519
APC-00599188
APC-00611028
APC-00618360
APC-00633494
APC-00634041
APC-00634058
APC-00634183
APC-00634206
APC-00634268
APC-00639341
APC-00639483
APC-00639546
APC-00650760
APC-00664216
APC-00664217
APC-00667005
APC-00673040
APC-00673190
APC-00679074
APC-00690371
APC-00713302
APC-00718272
APC-00755169
APC-00755204
APC-00771148
APC-00771149
APC-00771156
APC-00771173
APC-00771208
APC-00771357
APC-00771473
APC-00772520
APC-00772672
APC-00773377

APC-00775014
APC-00775107
APC-00775206
APC-00775243
APC-00775465
APC-00775502
APC-00775517
APC-00775633
APC-00775866
APC-00775892
APC-00775926
APC-00776181
APC-00776400
APC-00776406
APC-00776506
APC-00776775
APC-00777028
APC-00777034
APC-00777235
APC-00777329
APC-00777428
APC-00777528
APC-00777567
APC-00777611
APC-00777809
APC-00778050
APC-00778059
APC-00778075
APC-00778093
APC-00778123
APC-00778129
APC-00778263
APC-00778824
APC-00779065
APC-00779449
APC-00779469
APC-00779479
APC-00779578
APC-00780285
APC-00780289
APC-00780408
APC-00780418
APC-00780428
APC-00780449

APC-00781025
APC-00781236
APC-00781345
APC-00781455
APC-00781459
APC-00782108
APC-00782124
APC-00782136
APC-00782162
APC-00782204
APC-00782215
APC-00782330
APC-00783560
APC-00783757
APC-00784849
APC-00784868
APC-00784888
APC-00784918
APC-00784922
APC-00785122
APC-00785266
APC-00785301
APC-00785303
APC-00785868
APC-00785882
APC-00786056
APC-00786209
APC-00786241
APC-00786269
APC-00786285
APC-00786817
APC-00787155
APC-00787246
APC-00787342
APC-00787898
APC-00787943
APC-00787955
APC-00788457
APC-00788472
APC-00788515
APC-00789146
APC-00789245
APC-00789317
APC-00790225

APC-00790250
APC-00790664
APC-00790771
APC-00790793
APC-00790956
APC-00790975
APC-00790987
APC-00790994
APC-00791188
APC-00825104
APC-01170568
APC-01227135
APC-01323609
APC-01333637
APC-01340182
APC-01340189
APC-01340190
APC-01381739
APC-01413339
APC-01413845
APC-01433117
APC-01433355
APC-01439197
APC-01452536
APC-01549864
APC-01678952
APC-01716332
APC-01720982
APC-01721074
APC-01721174
APC-01721804
APC-01721899
APC-01723224
APC-01723384
APC-01723477
APC-01723568
APC-01723659
APC-01723761
APC-01723863
APC-01723999
APC-01724000
APC-01724002
APC-01724214
APC-01724426

APC-01725455
APC-01725562
APC-01725797
APC-01726188
APC-01726402
APC-01727482
APC-01727485
APC-01727486
JanHen_00005019
JanHen_00035898

**SEC Filings**

Anadarko Petroleum Corporation DEFM14A (Merger Proxy) Statement filed July 11, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2018
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2013
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2012
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 26, 2010
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2009
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 31, 2008
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 27, 2007

Anadarko Petroleum Corporation Form 10-K filed February 14, 2019
Anadarko Petroleum Corporation Form 10-K filed February 15, 2018
Anadarko Petroleum Corporation Form 10-K filed February 15, 2017
Anadarko Petroleum Corporation Form 10-K filed February 17, 2016
Anadarko Petroleum Corporation Form 10-K filed February 20, 2015
Anadarko Petroleum Corporation Form 10-K filed February 28, 2014
Anadarko Petroleum Corporation Form 10-K filed February 19, 2013
Anadarko Petroleum Corporation Form 10-K filed February 21, 2012
Anadarko Petroleum Corporation Form 10-K filed February 23, 2011
Anadarko Petroleum Corporation Form 10-K filed February 23, 2010

Anadarko Petroleum Corporation Form 10-Q filed July 30, 2019
Anadarko Petroleum Corporation Form 10-Q filed May 8, 2019
Anadarko Petroleum Corporation Form 10-Q filed October 30, 2018
Anadarko Petroleum Corporation Form 10-Q filed July 31, 2018
Anadarko Petroleum Corporation Form 10-Q filed May 1, 2018
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2017

Anadarko Petroleum Corporation Form 10-Q filed July 24, 2017
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016
Anadarko Petroleum Corporation Form 10-Q filed July 26, 2016
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2016
Anadarko Petroleum Corporation Form 10-Q filed October 27, 2015
Anadarko Petroleum Corporation Form 10-Q filed July 28, 2015
Anadarko Petroleum Corporation Form 10-Q filed May 4, 2015
Anadarko Petroleum Corporation Form 10-Q filed October 28, 2014
Anadarko Petroleum Corporation Form 10-Q filed July 29, 2014
Anadarko Petroleum Corporation Form 10-Q filed May 5, 2014

ConocoPhillips DEF 14A (Proxy) Statement filed March 30, 2020
EOG Resources, Inc. DEF 14A filed March 15, 2018

Robert P. Daniels Form 4 filed November 7, 2016
Robert P. Daniels Form 4 filed October 27, 2016
Robert P. Daniels Form 4 filed November 9, 2015
Robert P. Daniels Form 4 filed October 28, 2015
Robert P. Daniels Form 4 filed October 16, 2015
Robert P. Daniels Form 4 filed March 24, 2015
Robert P. Daniels Form 4 filed November 10, 2014
Robert P. Daniels Form 4 filed November 6, 2014
Robert P. Daniels Form 4 filed May 22, 2014
Robert P. Daniels Form 4 filed April 11, 2014
Robert P. Daniels Form 4 filed November 12, 2013
Robert P. Daniels Form 4 filed November 7, 2013
Robert P. Daniels Form 4 filed July 3, 2013
Robert P. Daniels Form 4 filed February 13, 2013
Robert P. Daniels Form 4 filed November 13, 2012
Robert P. Daniels Form 4 filed November 7, 2012
Robert P. Daniels Form 4 filed March 16, 2012
Robert P. Daniels Form 4 filed December 2, 2011
Robert P. Daniels Form 4 filed November 14, 2011
Robert P. Daniels Form 4 filed November 10, 2011

R. A. Walker Form 4 filed August 9, 2019
R. A. Walker Form 4 filed November 16, 2018
R. A. Walker Form 4 filed November 14, 2018
R. A. Walker Form 4 filed October 30, 2018
R. A. Walker Form 4 filed November 16, 2017
R. A. Walker Form 4 filed November 14, 2017
R. A. Walker Form 4 filed November 8, 2017
R. A. Walker Form 4 filed October 30, 2017
R. A. Walker Form 4 filed May 17, 2017
R. A. Walker Form 4 filed November 15, 2016

R. A. Walker Form 4 filed November 7, 2016
R. A. Walker Form 4 filed October 27, 2016
R. A. Walker Form 4 filed November 9, 2015
R. A. Walker Form 4 filed October 28, 2015
R. A. Walker Form 4 filed May 19, 2015
R. A. Walker Form 4 filed November 10, 2014
R. A. Walker Form 4 filed November 6, 2014
R. A. Walker Form 4 filed August 8, 2014
R. A. Walker Form 4 filed May 16, 2014
R. A. Walker Form 4 filed November 15, 2013

Robert G. Gwin Form 4 filed August 9, 2019
Robert G. Gwin Form 4 filed November 16, 2018
Robert G. Gwin Form 4 filed November 14, 2018
Robert G. Gwin Form 4 filed October 30, 2018
Robert G. Gwin Form 4 filed November 16, 2017
Robert G. Gwin Form 4 filed November 14, 2017
Robert G. Gwin Form 4 filed November 8, 2017
Robert G. Gwin Form 4 filed October 30, 2017
Robert G. Gwin Form 4 filed November 15, 2016
Robert G. Gwin Form 4 filed November 7, 2016
Robert G. Gwin Form 4 filed October 27, 2016
Robert G. Gwin Form 4 filed March 2, 2016
Robert G. Gwin Form 4 filed November 9, 2015
Robert G. Gwin Form 4 filed October 28, 2015
Robert G. Gwin Form 4 filed October 9, 2015
Robert G. Gwin Form 4 filed November 10, 2014
Robert G. Gwin Form 4 filed November 6, 2014
Robert G. Gwin Form 4 filed August 8, 2014
Robert G. Gwin Form 4 filed November 21, 2013

Ernest A. Leyendecker III Form 4 filed June 5, 2018
Ernest A. Leyendecker III Form 4 filed November 16, 2017
Ernest A. Leyendecker III Form 4 filed November 14, 2017
Ernest A. Leyendecker III Form 4 filed November 8, 2017
Ernest A. Leyendecker III Form 4 filed October 30, 2017
Ernest A. Leyendecker III Form 4 filed November 15, 2016
Ernest A. Leyendecker III Form 4 filed November 7, 2016
Ernest A. Leyendecker III Form 4 filed October 27, 2016
Ernest A. Leyendecker III Form 3 filed September 1, 2016

## Other Documents

Agrawal, Anup, and Tommy Cooper, "Insider Trading Before Accounting Scandals,"
      *Journal of Corporate Finance*, Vol. 34 (2015): 169-190

Agrawal, Anup, and Tareque Nasser, "Insider Trading in Takeover Targets," *Journal of Corporate Finance*, Vol. 18 (2012): 598-625

Aitken, Michael, Douglas Cumming, and Feng Zhan, "Exchange Trading Rules, Surveillance and Suspected Insider Trading," *Journal of Corporate Finance*, Vol. 34 (2015): 311-330

Bettis, J. C., J.L. Coles, and M. L. Lemmon, "Corporate Policies Restricting Trading by Insiders," *Journal of Financial Economics*, Vol. 57 (2000): 191-220

Fishman, Michael J., and Kathleen M. Hagerty, "Insider Trading and the Efficiency of Stock Prices," *RAND Journal of Economics*, Vol. 23, No. 1 (Spring 1992): 106-122

Hillier, David, Adriana Korczak, and Pitor Korczak, "The Impact of Personal Attributes on Corporate Insider Trading," *Journal of Corporate Finance*, Vol. 30 (2015): 150-167

Jagolinzer, Alan D., David F. Larcker, and Daniel J. Taylor, "Corporate Governance and the Information Content of Insider Trades," *Journal of Accounting Research*, Vol. 49, No. 5 (December 2011): 1249-1274

Kraft, Anastasia, Bong Soo Lee, and Kerstin Lopatta, "Management Earnings Forecasts, Insider Trading, and Information Asymmetry," *Journal of Corporate Finance*, Vol. 26 (2014): 96-123

Lee, Inmoo, Michael Lemmon, Yan Li, and John M. Sequeira, "Do Voluntary Corporate Restrictions on Insider Trading Eliminate Informed Insider Trading?" *Journal of Corporate Finance*, Vol. 29 (2014): 158-178

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42

Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022

Seyhun, H. Nejat, "Insiders' Profits, Costs of Trading, and Market Efficiency," *Journal of Financial Economics*, Vol. 16 (1986): 189-212

**Data Sources**

Bloomberg, L.P.

2022 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business

# EXHIBIT 2

| | |
|---|---|
| **From:** | Lauren E. Phillips |
| **To:** | Rachel Jensen; Benjamin Gruenstein; Lauren Rosenberg |
| **Cc:** | Francisco Mejia; Megan Rossi; Raffi Friedman; Dan Drosman; Nicole Gilliland |
| **Subject:** | RE: In re Anadarko Petroleum Corp. Sec. Litig., No. 4:20-cv-00576 (S.D. Tex.) |
| **Date:** | Tuesday, March 14, 2023 4:57:33 PM |

EXTERNAL SENDER

Rachel,

Mr. Murphy's report goes to scienter, on which Defendants do not have the burden of proof. Accordingly, his report was timely filed on January 25, 2023, independent of Regan's report, and need not be withdrawn on the basis that you have partially withdrawn Regan's report.

Best,
Lauren

Lauren E. Phillips

Cravath, Swaine & Moore LLP

825 Eighth Avenue | New York, NY 10019

T: 1 (212) 474-1795

lephillips@cravath.com

---

**From:** Rachel Jensen <RachelJ@rgrdlaw.com>
**Sent:** Sunday, March 12, 2023 5:55 PM
**To:** Benjamin Gruenstein <bgruenstein@cravath.com>; Lauren Rosenberg <lrosenberg@cravath.com>; Lauren E. Phillips <lephillips@cravath.com>; Daniel Slifkin <DSlifkin@cravath.com>
**Cc:** Francisco Mejia <FMejia@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>; Raffi Friedman <RFriedman@rgrdlaw.com>; Dan Drosman <DanD@rgrdlaw.com>; Nicole Gilliland <NGilliland@rgrdlaw.com>
**Subject:** In re Anadarko Petroleum Corp. Sec. Litig., No. 4:20-cv-00576 (S.D. Tex.)

Counsel:

Pursuant to the Court's October 11, 2022 Amended Scheduling and Docket Control Order (Dkt. No. 142), expert designations and rebuttal expert designations were due by November 9, 2022 and January 25, 2023, respectively.  On November 9, 2022, Plaintiffs served the Expert Report of D. Paul Regan, CPA/CFF ("Regan Report").  On January 25, 2023, Defendants served the Rebuttal Report of Kevin J. Murphy ("Rebuttal Murphy Report"), which purports to rebut portions of the Regan Report that reference executive compensation.

Plaintiffs hereby withdraw Mr. Regan's opinion regarding executive compensation in paragraphs 77(c) and 86 of his report.  Given that the Murphy Rebuttal does not purport to rebut or contradict any of Mr. Regan's remaining opinions or any other opinion offered by Plaintiffs' other experts, Murphy's "rebuttal opinions are necessarily irrelevant."  *LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 2012

WL 466785, at *22 (S.D.N.Y. Feb. 14, 2012); *see e.g.*, *Spencer v. Peters*, 2013 WL 74447, at *1 (W.D. Wash. Jan. 7, 2013).

Please confirm by Tuesday, March 14, 2023, that Defendants will withdraw the Rebuttal Murphy Report.

Best,
Rachel

**Rachel L. Jensen**
Partner



655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058



**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

This e-mail is confidential and may be privileged. Use or disclosure of it by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please delete this e-mail from the computer on which you received it.

# EXHIBIT 3

CONFIDENTIAL

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| **IN RE ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION** | Civil Action No. 4:20-cv-00576 |

**EXPERT REPORT**

**of**

**D. PAUL REGAN, CPA/CFF**

**NOVEMBER 9, 2022**

CONFIDENTIAL

TABLE OF CONTENTS

I.   THE NATURE OF MY ASSIGNMENT ..................................................................1

II.  SUMMARY OF OPINIONS ...............................................................................3

III. QUALIFICATIONS ..........................................................................................5

IV.  BACKGROUND RELEVANT TO MY OPINIONS..........................................................7

     A.   ANADARKO'S FINANCIAL STATEMENTS WERE REQUIRED TO COMPLY WITH
          GAAP, INCLUDING EXPLICIT OIL AND GAS INDUSTRY-RELATED
          ACCOUNTING GUIDANCE ...........................................................................8

     B.   OVERVIEW OF THE SHENANDOAH PROJECT...........................................11

V.   BASES FOR MY OPINIONS .................................................................................13

     A.   GAAP REQUIRED THAT ANADARKO EXPENSE SHEN-3 DRILLING COSTS
          FOLLOWING THE DETERMINATION THAT SHEN-3 FOUND NO
          HYDROCARBONS AND WAS UNLIKELY TO BE USED AS A SERVICE WELL AS
          PART OF A SHENANDOAH DEVELOPMENT PHASE .......................................14

          1.   It was Evident that Prior to the Issuance of Anadarko's 2014
               Annual Report Shen-3 Found No Hydrocarbons......................................15

          2.   The Successful Efforts Method of Accounting Required that
               Anadarko Expense the Cost of Drilling Exploratory Well and
               Exploratory-Type Stratigraphic Wells, Including Shen-3, When No
               Hydrocarbons Were Found ........................................................20

          3.   The Unlikely Use of Shen-3 As An Injection Well Further Supports
               Anadarko's Requirement Under GAAP to Expense Shen-3 Drilling
               Costs When No Hydrocarbons Were Found ...............................................29

     B.   ANADARKO'S Q3 2016 ASSERTION THAT CONTINUED CAPITALIZATION OF
          SHEN-3 WAS ACCEPTABLE BECAUSE A "REASONABLE POSSIBILITY"
          EXISTED THAT THE WELL WOULD BE USED AS AN INJECTION WELL OR
          SIDETRACK WELL IS FLAWED AND UNSUPPORTED IN GAAP ................................29

          1.   The Company Acknowledged That Shen-3 Well Costs Were Not
               Exploration Costs that Could Be Capitalized under ASC 932-360-
               25-18 ........................................................................................29

          2.   The Company Acknowledged That Shen-3 Well Costs Were Not
               Development Costs that Could Be Capitalized under ASC 932-
               360-25-14........................................................................................30

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**

CONFIDENTIAL

3.  The Company's Q3 2016 Accounting Position To Justify the Suspension of Shen-3 Costs Until Q3 2016 Is Unsupported ....................32

C.  ANADARKO REPEATEDLY FAILED TO EXPENSE AND DISCLOSE MILLIONS OF DOLLARS IN SHEN-3-RELATED DRY HOLE EXPENSES DURING EACH OF THE RESPECTIVE FINANCIAL REPORTING PERIODS BETWEEN DECEMBER 31, 2014 AND JUNE 30, 2015, IN VIOLATION OF GAAP ..................................................36

1.  Anadarko's Overstatement and Disclosure of Shen-3 Suspended Well Costs Were Material ..........................................................36

D.  GAAP REQUIRED ANADARKO TO IMPAIR AND EXPENSE, ASSETS CAPITALIZED IN CONNECTION WITH THE SHENANDOAH BASIN PROJECT WHEN SUBSTANTIAL DOUBT ABOUT THE PROJECT'S ECONOMIC VIABILITY EXISTED ....................................................................................................49

1.  The Required Impairment of Shenandoah Completed Exploration Wells and Exploratory-Type Stratigraphic Well Costs ..............................50

2.  The Required Impairment of Other Capitalized Costs Associated with The Shenandoah Basin Project ..........................................................51

3.  Information Available is Consistent with The Understanding That There Was Substantial Doubt that the Shenandoah Basin Project (as a whole) Would Be Economically Viable ............................................54

E.  ANADARKO REPEATEDLY FAILED TO EXPENSE AND PROPERLY DISCLOSE SHENANDOAH-RELATED SUSPENDED WELL COSTS, LEASEHOLD COSTS AND OTHER CAPITALIZED COSTS DURING EACH OF THE RESPECTIVE ANNUAL AND QUARTERLY FINANCIAL REPORTING PERIODS ENDED BETWEEN DECEMBER 31, 2015 AND 2016 IN VIOLATION OF GAAP AND SEC ACCOUNTING-RELATED REPORTING RULES ..........................................57

1.  Anadarko's Overstatement of Shenandoah's Suspended Well Costs and Non-Producing Leasehold Assets and Other Related Assets and Corresponding Disclosure Omissions Beginning December 31, 2015 Were Material ....................................................................................58

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**

CONFIDENTIAL

## I.    THE NATURE OF MY ASSIGNMENT

1.    I have been retained, through my employer, Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants ("HM"), on behalf of Plaintiffs in this matter by Class Counsel, Robbins Geller Rudman & Dowd LLP, to provide expert opinions regarding Anadarko Petroleum Corporation's ("Anadarko" or the "Company") accounting for, and disclosure of, costs incurred in connection with the Company's offshore Shenandoah exploration project ("Shenandoah") during the respective annual and interim financial reporting periods ended December 31, 2014 through March 31, 2017 (the "Relevant Period").[1]

2.    In connection with my assignment, I have been asked to assume that Plaintiffs will establish each of the following:

   a.    As of December 31, 2014 and throughout the Relevant Period, it was unlikely that the completed stratigraphic exploration well referred to as Shenandoah-3 ("Shen-3") would be used as an injection or other type of service well in the development phase of the Shenandoah project ("Condition 1").

   b.    The findings of the Company's Shen-3 exploration wellbore, together with its findings of its prior wellbores, resulted in a material reduction to the estimated possible resources within the Shenandoah field as of Anadarko's Q4 2014 financial reporting period ("Condition 2").

   c.    By December 31, 2015, there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable ("Condition 3").

3.    Assuming these conditions, Class Counsel has asked me to opine on each of the following:

---

[1] I understand that the case Class Period extends from February 20, 2015 through May 2, 2017, inclusive. The "Relevant Period" as used above pertains to the respective annual and interim financial reporting periods at issue in this matter. In this regard, Anadarko released its 2014 Annual Report on Form 10-K, including its related financial statements, on February 20, 2015 and its Q1 2017 Quarterly Report on Form 10-Q including its related financial statements, on May 2, 2017.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 1**

**CONFIDENTIAL**

a. Whether the assumed conditions as of December 31, 2014 (*i.e.*, Conditions 1 and 2) would impact the accounting treatment for the costs of drilling Shen-3 under GAAP, as consistently applied?

b. In consideration of Conditions 1 and 2, whether Anadarko's accounting for the costs of drilling Shen-3 complied with GAAP, as consistently applied during the Relevant Period?

c. Whether the accounting treatment for the costs of drilling Shen-3 under GAAP change if in contrast to Condition 1, there was a reasonable possibility that Shen-3 could have future use as an injection well or other type of service well in the development phase of the Shenandoah Project?

d. Whether the assumed Condition 3 would impact the accounting treatment for the exploration costs, including leasehold rights and drilling costs, relating to the Shenandoah project under GAAP, as consistently applied?

e. In consideration of Condition 3, whether Anadarko's accounting for the Shenandoah project-related assets complied with GAAP as of and during the respective annual and interim periods between December 31, 2015 and 2016?

4. I am performing this expert witness engagement in accordance with the American Institute of Certified Public Accountants' ("AICPA") *Statement on Standards for Forensic Services*. These standards require me to be impartial, intellectually honest, and free of conflicts of interest. As a testifying expert providing forensic services, I am also bound by the AICPA's professional standards, including the duty to act with integrity and objectivity.

5. Consistent with those requirements, my opinions, are my present opinions and are based on the information I have considered to date. These opinions are further based on my knowledge, training, education, and experience, as well as the various evidence cited in this report. This evidence is of the type that would ordinarily be relied on by an expert in accounting and financial reporting matters. Evidence includes historical information and relevant expert testimony about the performance of the Shenandoah field, including its borewells, during the Relevant Period. During this engagement, I have considered certain

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 2**

**CONFIDENTIAL**

documents. These documents are identified in **Exhibit A** and in the body and footnotes of this report.

6.    In my work I have been assisted by others in my firm who have acted under my direction and control. However, the opinions in this report are my own. I recognize that I am an expert witness, not a witness of fact. My understanding of the relevant facts comes from the documents and testimony that I have considered.

7.    This report should not be construed as expressing opinions on matters of law, which are outside my expertise and are for the Court to determine. However, to the extent I have interpreted contracts, court cases or other evidence, these interpretations necessarily reflect my understanding thereof from an accounting and auditing perspective.

8.    I understand that this report may be made available to other parties in this litigation, to their counsel and experts, as well as to the Court. It has been prepared for use in this action. In all other respects, this report is confidential. It should not be used, reproduced, or circulated for any other purpose, in whole or in part, without my prior written consent.

9.    HM is being compensated for my services at $870 per hour. This compensation is not contingent on the outcome of this matter or the conclusions that I reach.

## II.    SUMMARY OF OPINIONS

10.    This report is based on the evidence I have reviewed to date. I understand that additional information may become available, including but not limited to relevant opinions and analyses by the parties' experts. As a result, I may modify my opinions based on additional evidence. I also reserve the right to change my opinions in the event that Conditions 1 through 3 above are modified.

11.    Based on my review and analysis of the information currently available to me, as well as my professional experience, I have formed the following opinions in this matter:

    a.    Pursuant to the "Successful Efforts Method" of accounting for exploratory drilling costs, Anadarko was required to expense the cost of drilling Shen-3 no later than as of

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 3**

**CONFIDENTIAL**

and for the year ended December 31, 2014, given that Shen-3 found no hydrocarbons[2] and the wellbore's unlikely use as an injection or other service well;

b. Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3 related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP;

c. Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015;

d. Anadarko's Q3 2016 assertion that the continued capitalization of Shen-3 prior to September 30, 2016 was acceptable because a "reasonable possibility" existed that the wellbore would be used as an injection well or sidetrack well is flawed and unsupported in GAAP;

e. Given that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, Anadarko was further required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015;

f. Anadarko repeatedly failed to expense and properly disclose Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs during each of the respective annual and/or quarterly periods between December 31, 2015 and December 31, 2016 in violation of GAAP and SEC accounting-related reporting rules; and

---

[2] For purposes of this report, the term "hydrocarbon" is being used to be synonymous with "oil and natural gas." Notably, GAAP uses the term "Reserves" to mean the "estimated remaining quantities of oil and gas and related substances anticipated to be economically producible." ASC Master Glossary. As the absence of hydrocarbon reflects the absence of oil, this condition further reflects the absence of "reserves" under GAAP. As times in this report, I use or reference these terms (*i.e.*, hydrocarbons, oil, reserves) to convey the same underlying resources.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**　　　　　　　　**Page 4**

**CONFIDENTIAL**

g. Anadarko's Shenandoah project-related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2015 and December 31, 2016.

12. The basis for these opinions are described below in Section V of this report.

## III. QUALIFICATIONS

13. My expert qualifications, including my testimony in the last four years and the publications I have authored in the past ten years, are described in greater detail in my curriculum vitae, attached as **Exhibit B**. My prior experience and education provide me with the appropriate qualifications to provide opinions in this matter.

14. I am a Certified Public Accountant ("CPA"), licensed in the State of California, and a Partner in Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants in San Francisco, California. I have been a CPA continuously since 1970. My work in the accounting profession includes more than 50 years of continuous experience as an auditor or as a consultant. I have supervised and participated in audits, or the review of audits of companies' financial statements. I served as the engagement partner or concurring partner on more than 100 audits between 1975 and 1995. The largest engagement that I supervised was the audit of a public company with more than 100 subsidiaries operating throughout the world.

15. I have also provided accounting and/or auditing consulting services on more than 750 complex litigation matters. Many of these have required an extensive analysis and application of relevant GAAP, Securities and Exchange Commission ("SEC") financial reporting requirements, U.S. Generally Accepted Auditing Standards ("GAAS"), and Public Company Accounting Oversight Board ("PCAOB") Standards. I have also testified on accounting issues where the accounting standards were International Financial Reporting Standards ("IFRS"), Canadian GAAP, UK GAAP, Australian GAAP and Korean GAAP. I have performed these analyses and provided testimony for clients that include large and small companies in the private and public sector, as well as for various state and federal agencies (e.g., the Federal Deposition Insurance Corporation, Federal Home Loan Mortgage Corporation, SEC, U.S. Department of Justice, the PCAOB, Resolution Trust

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 5**

**CONFIDENTIAL**

Corporation, California Department of Insurance, various Attorneys General of nineteen states, and the Department of Economic Development, an agency of the British government).

16.    My experience includes the review of financial records of entities across a diverse range of industries including oil and gas companies. My consulting or expert witness experience has involved companies with operations in multiple locations in the United States, as well as in many other countries. The companies whose financial statements I have analyzed have included accounting for and disclosure of oil exploration and development costs, including those with offshore operations in the Gulf of Mexico. I have also personally owned interests in entities with working interests in oil and gas wells in Texas, Louisiana, and Oklahoma.

17.    From 1976 through today, I have testified and been admitted as an expert in more than 125 trials and arbitrations and given more than 225 depositions. These cases were generally in state and federal courts in the United States. I have also testified in trials in Canada, Guam, the United Kingdom, Australia, and the International Court of Justice in the Netherlands.

18.    I am a member of the California Society of Certified Public Accountants ("CalCPA"). I have served on its statewide Litigation Services Steering Committee since 1990 and I was its Chair during its 2002/2004 fiscal year terms. At that time, this Steering Committee provided guidance to the more than 800 members of its four Operating Sections: (1) Business Valuation; (2) Economic Damages; (3) Fraud; and (4) Family Law. For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section. I served as Chair of the 28,000-member CalCPA during its 2004/2005 fiscal year term and in 2009, I received CalCPA's Distinguished Service Award for a career of "extraordinary and distinguished service to the profession."

19.    I am a member of the AICPA. The AICPA had a national Forensic and Litigation Services Committee ("FLSC") (formerly the Litigation and Dispute Resolution Subcommittee). From 1998 until July of 2001, I served as one of the nine members of this national committee. The FLSC oversaw and provided guidance to the AICPA's then, 340,000 members relating to litigation consulting and dispute resolution. The FLSC also provided

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**              **Page 6**

**CONFIDENTIAL**

guidance and supervision to its subcommittees, which included the Subcommittee on Economic Damages. I served as Chairperson of the Subcommittee on Economic Damages from 1999 to July 2001.

20.     From October 2003 until October 2011, I was a member of the AICPA's Governing Council. Under Rule 203 of the Code of Professional Conduct of the AICPA, this Council is the body that has the authority to designate which accounting principles constitute GAAP.

21.     From August 2008 until October 2011, I served on the AICPA's Forensic and Valuation Services Executive Committee. This nine-person committee is the AICPA's standards setting body for CPAs performing forensic and valuation services. I have also been designated by the AICPA as a CFF ("Certified in Financial Forensics").

## IV.     BACKGROUND RELEVANT TO MY OPINIONS

22.     Anadarko Petroleum Corporation is an oil and gas exploration and production company. During the Relevant Period, Anadarko's exploration and production portfolio included assets and related plays in (i) the United States, (ii) the Gulf of Mexico, and (iii) other international locations.[3]

23.     During the Relevant Period, Anadarko's securities were publicly traded under the ticker symbol "APC" on the New York Stock Exchange. As a publicly traded entity, Anadarko was required to file periodic financial information with the SEC.

24.     The predicate for SEC reporting requirements applicable to public companies like Anadarko is that "[c]ompanies offering securities for sale to the public must tell the truth about their business" and "everyone should be treated fairly and **have access to certain facts about investments**."[4] To achieve this objective, the SEC requires public companies "**to regularly disclose significant financial and other information so investors have the**

---

[3] Anadarko 2014 Form 10-K, p. 2; Anadarko 2017 Form 10-K, p. 4.

[4] *What We Do, Protecting Investors*, U.S. Securities Exchange Commission, https://www.sec.gov/about/what-we-do#section1 (accessed November 7, 2022) (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 7**

**CONFIDENTIAL**

**timely, accurate, and complete information they need to make confident and informed decisions about when or where to invest**."[5]

### A.  ANADARKO'S FINANCIAL STATEMENTS WERE REQUIRED TO COMPLY WITH GAAP, INCLUDING EXPLICIT OIL AND GAS INDUSTRY-RELATED ACCOUNTING GUIDANCE

25.    Anadarko, including its executive management, was responsible for issuing the Company's financial statements in accordance with GAAP.[6] Rule 4-01 of SEC's Regulation S-X specifically states that "financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."[7]

26.    The use of GAAP brings consistency, conformity, and over time, comparability to financial reporting.[8] It includes not only broad guidelines of general application, but also detailed practices and procedures.[9] Those conventions, rules, and procedures provide a standard by which to measure financial presentations. Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and is contained within the FASB's accounting standards codification ("ASC" or the "Codification"). Rules and interpretive releases of the SEC under the authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.[10]

27.    Of particular relevance to matters at issue, as an oil and gas exploration and production company, relevant GAAP included industry-specific accounting standards established under ASC 932, *Extractive Activities – Oil and Gas* ("ASC 932"). Amongst other provisions, ASC 932 addresses accounting and reporting for industry-specific property,

---

[5] *What We Do, Protecting Investors*, U.S. Securities Exchange Commission, https://www.sec.gov/about/what-we-do#section1 accessed November 7, 2022) (emphasis added).

[6] PCAOB AU §110.03.

[7] 17 CFR § 210.4-01(a)(1).

[8] Federal Trade Commission, Informal Staff Advisory Opinion 02-4.

[9] PCAOB AU §411.02.

[10] ASC 105-10-05-01.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 8**

**CONFIDENTIAL**

plant, and equipment in the oil and gas industry, including wells and related equipment and facilities.[11]

28. Anadarko's management repeatedly acknowledged its responsibility for preparing the Company's financial statements in accordance with GAAP. In this regard, Anadarko asserted that each of its financial statements filed with the SEC during the Relevant Period were "prepared in conformity with [GAAP]."[12]

29. In addition, Anadarko's Chairman of the Board, President and Chief Executive Officer, R. A. Walker, and Executive Vice President, Finance and Chief Financial Officer, Robert G. Gwin, certified that the Company's financial statements and other financial information included in Anadarko's respective Annual and Quarterly Reports filed with the SEC during the Relevant Period "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Anadarko] as of, and for, the periods presented."[13]

30. Management further acknowledged its responsibility for "the fair presentation, in accordance with U.S. generally accepted accounting principles, of the consolidated

---

[11] ASC 932-360. Note: "wells and related equipment and facilities" is defined under GAAP as follows:

Wells and related equipment and facilities are often referred to in the oil and gas industry as lease and well equipment even though, technically, the property may have been acquired other than by a lease. The costs include those incurred to:

a. Drill and equip those exploratory wells and exploratory-type stratigraphic test wells that have found proved reserves

b. Obtain access to proved reserves and provide facilities for extracting, treating, gathering, and storing the oil and gas, including the drilling and equipping of development wells and development-type stratigraphic test wells (whether those wells are successful or unsuccessful) and service wells.

[12] Anadarko 2014 Form 10-K, p. 93; Anadarko 2015 Form 10-K, p. 91; Anadarko 2016 Form 10-K, p. 91; Anadarko Q1 2015 Form 10-Q, p. 7; Anadarko Q2 2015 Form 10-Q, p. 7; Anadarko Q3 2015 Form 10-Q, p. 7; Anadarko Q1 2016 Form 10-Q, p. 7; Anadarko Q2 2016 Form 10-Q, p. 7; Anadarko Q3 2016 Form 10-Q, p. 7; Anadarko Q1 2017 Form 10-Q, p. 8.

[13] Anadarko 2014 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko 2015 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko 2016 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko Q1 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q2 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q3 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q1 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q2 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q3 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q1 2017 Form 10-Q, Exhibits 31(i) and 31(ii).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 9**

**CONFIDENTIAL**

financial statements, including disclosures, schedules, and interim financial information and all representations contained therein" to its external auditors, KPMG LLP.[14] In this regard, Mr. Walker, Mr. Gwin and Anadarko's Vice President, Chief Accounting Officer, and Controller, Chris Champion, represented to KPMG LPP that Anadarko's respective consolidated annual and interim financial statements were "fairly presented in conformity with U.S. GAAP."[15] Of further relevance, Anadarko represented the following with respect to its accounting for "exploratory drilling work in process" and "dry hole expense" during the Relevant Period:

> Based on current development plans and existing lease lives at [Date], the Company has evaluated its unproved property in accordance with FASB Topic ASC 932, Extractive Activities ~ Oil and Gas, and concluded that no additional impairment is necessary. …
>
> \*          \*          \*
>
> We have reviewed the status of exploratory drilling work in progress through the date of this letter and appropriately recorded dry hole expense

---

[14] *See*, *e.g.*, Anadarko Engagement Letter dated March 30, 2015, APC-01699536 at 9631; Anadarko Engagement Letter dated March 22, 2016, APC-01396003 at 6043; Anadarko Management Representation Letter dated February 20, 2015, APC-01751288 at 1303, Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8367. **Note:** Despite any inference to the contrary as a result of KPMG's audits and its unqualified audit opinions, Anadarko management was solely responsible for the fair presentation of its financial statements. In this regard, professional auditing standards recognize that because an entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management, the auditor's knowledge of such matters and internal control is limited to that acquired during an audit. In this regard, PCAOB auditing standards recognize that an auditor is unable to provide absolute assurance that a company's financial statements are free of material misstatement. As such, even if KPMG's audits during the Relevant Period were performed in accordance with PCAOB auditing standards (an opinion which I am not offering), those same standards explicitly recognize that "a properly planned and performed audit may not detect a material misstatement." PCAOB AS §1001, 1015.

[15] *See*, *e.g.*, Anadarko Management Representation Letter dated May 4, 2015, APC-01699536 at 9642; Anadarko Management Representation Letter dated July 28, 2015, APC-01699656; Anadarko Management Representation Letter dated May 2, 2016, APC-01396003 at 6046; Anadarko Management Representation Letter dated July 26, 2016, APC-01396065 at 6065; Anadarko Management Representation Letter dated October 31, 2016, KPMG_APC_eA_0007566 at 7566; Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8355; Anadarko Management Representation Letter dated May 2, 2017, KPMG_APC_0027263 at 7428.

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 10**

**CONFIDENTIAL**

> … in accordance with FASB ASC Topic 932, *Extractive Activities – Oil and Gas* ["ASC 932"].[16]

31.    As described further below, ASC 932 includes relevant GAAP for the accounting matters at issue in this case. Although certain amendments to ASC 932 have been adopted, Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, as issued in 1977 ("FAS 19"), serves as the primary source for relevant codified accounting standards applicable to Anadarko.[17]

### B.  OVERVIEW OF THE SHENANDOAH PROJECT

32.    During 2008, Anadarko participated in oil exploration activities within the Shenandoah basin located in the Gulf of Mexico. In early 2009, the Company announced the results of its initial discovery exploration well, Shenandoah-1 ("Shen-1"). Following certain regulatory delays, Anadarko continued its Shenandoah exploration activities during 2012. In March 2013, the Company announced the results from its second exploration well, Shenandoah-2 ("Shen-2"), including the following disclosure:

> The Company-operated Shenandoah-2 well (30% working interest) reached total depth in January 2013, encountering more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary reservoirs. Similar to the initial Shenandoah discovery, well log and pressure data from the Shenandoah-2 well indicated excellent-quality reservoir and fluid properties. The targeted pay sands were full of oil with no oil-water contact.[18]

---

[16] Anadarko Management Representation Letter dated February 20, 2015, APC-01751288 at 1296, and 1301 (also notes: "The Company has accounted for its oil and gas producing activities in accordance with FASB ASC 932, *Extractive Activities - the Oil and Gas.*"); Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8362-8363, 8365. *See also* Anadarko Management Representation Letter dated May 4, 2015, APC-01699536 at 9649; Anadarko Management Representation Letter dated July 28, 2015, APC-01699656 at 9663; Anadarko Management Representation Letter dated May 2, 2016, APC-01396003 at 6053; Anadarko Management Representation Letter dated July 26, 2016, APC-01396065 at 6073; Anadarko Management Representation Letter dated October 31, 2016, KPMG_APC_eA_0007566 at 7574; Anadarko Management Representation Letter dated May 2, 2017, KPMG_APC_0027263 at 7436. **Note:** The first noted paragraph appeared in both the February 20, 2015 and February 17, 2017 representation letters, while the second paragraph appeared in all cited representation letters.

[17] *See*, *e.g.*, Reserve and Resources Manual, APC-00001289.

[18] Anadarko 2013 Form 10-K, p. 9.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 11**

**CONFIDENTIAL**

33. During 2014 and the remainder of the Relevant Period, the Company continued to undertake exploration activities within the Shenandoah basin, including drilling. In this regard, Anadarko drilled various additional exploratory-type wells including Shen-3 (spud in Q2 2014), Shenandoah-4 (spud in Q2 2015), Shenandoah-5 (spud in Q1 2016) and Shenandoah-6 (spud in Q4 2016).[19]

34. Anadarko's working interest in the Shenandoah exploration project varied between 30% and 33% during the Relevant Period. In this regard, Anadarko was one of several partners participating in these exploration activities. These partners included ConocoPhillips Company ("Conoco" or "COP") and Marathon Oil Corporation ("Marathon"). Anadarko was the Operator while Conoco, Marathon and the other partners were partners in the joint venture.[20]

35. Anadarko had recorded and reported suspended well costs and other exploration costs associated with the Shenandoah basin project on its respective balance sheets included within the Relevant Period. These amounts ranged in value from between $684.1 million and $786.6 million of Shenandoah related assets within its balance sheet December 31, 2014 and December 31, 2016.[21]

36. As of March 31, 2017, Anadarko wrote off costs totaling $901.5 million associated with its Shenandoah exploration project, including suspended well costs, non-producing leasehold costs and other related amounts. In connection with its Q1 2017 financial statements, Anadarko made certain disclosures in connection with this accounting treatment, including the following:

---

[19] Anadarko 2014 Form 10-K, p. 9; Anadarko 2015 Form 10-K, p. 10; Anadarko 2016 Form 10-K, p. 11.

[20] Deposition of Ernest Leyendecker, 211:16-23 and 224:14-20.

[21] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 12**

**CONFIDENTIAL**

During the three months ended March 31, 2017, the Company expensed suspended exploratory well costs of $435 million related to the Shenandoah project in the Gulf of Mexico, including $267 million previously capitalized for a period greater than one year. The Shenandoah-6 appraisal well and subsequent sidetrack, which completed appraisal activities in April 2017, did not encounter the oil-water contact in the eastern portion of the field. Given the results of this well and the present commodity-price environment, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs.

*          *          *

The Company recognized $532 million of impairments of unproved Gulf of Mexico properties during the three months ended March 31, 2017, of which $467 million related to the Shenandoah project. The unproved property balance related to the Shenandoah project originated from the purchase price allocated to Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006.[22]

## V.    BASES FOR MY OPINIONS

37. As stated above, based on my review and analysis of the information currently available to me, as well as my professional experience and the assumed Conditions set forth above by Plaintiffs, I have formed the following opinions in this matter:

   a. Pursuant to the "Successful Efforts Method" of accounting for exploratory drilling costs, Anadarko was required to expense the cost of drilling Shen-3 no later than as of and for the year ended December 31, 2014, given that Shen-3 found no hydrocarbons and the wellbore's unlikely use as an injection or other service well;

   b. Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3-related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP;

   c. Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015;

---

[22] Anadarko Q1 2017 Form 10-Q, pp. 12-13.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 13**

CONFIDENTIAL

d.  Anadarko's Q3 2016 assertion that the continued capitalization of Shen-3 prior to September 30, 2016 was acceptable because a "reasonable possibility" existed that the wellbore would be used as an injection well or sidetrack well is flawed and unsupported in GAAP;

e.  Given that by December 31, 2015, there was substantial doubt that the Shenandoah project would be economically viable, Anadarko was further required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015;

f.  Anadarko repeatedly failed to expense and disclose Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs during each of the respective annual and/or quarterly periods between December 31, 2015, and December 31, 2016, in violation of GAAP; and

g.  Anadarko's Shenandoah project-related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2015, and December 31, 2016.

38.  The bases for each of these opinions are described hereafter.

A.  **GAAP REQUIRED THAT ANADARKO EXPENSE SHEN-3 DRILLING COSTS FOLLOWING THE DETERMINATION THAT SHEN-3 FOUND NO HYDROCARBONS AND WAS UNLIKELY TO BE USED AS A SERVICE WELL AS PART OF A SHENANDOAH DEVELOPMENT PHASE**

39.  Relevant GAAP requires that the capitalized cost of drilling exploratory wells[23] and exploratory-type stratigraphic wells[24] be immediately expensed once it is determined that

---

[23] GAAP defines an "exploratory well" as "a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir. Generally, an exploratory well is any well that is not a development well, a service well, or a stratigraphic test well." ASC Master Glossary.

[24] GAAP defines a "stratigraphic test well" as "a drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition. Such wells customarily are drilled without the intention of being completed for hydrocarbon production. This classification also includes tests identified as core tests and all types of expendable holes related to hydrocarbon exploration. Stratigraphic tests are classified as *exploratory-type* if not drilled in a proved area or *development-type* if drilled in a proved area." ASC Master Glossary.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 14**

**CONFIDENTIAL**

the completed well finds no hydrocarbons. Evidence reflects that the completed stratigraphic exploration well, Shen-3, found no hydrocarbons prior to the release of the Company's 2014 Annual Report on Form 10-K (February 20, 2015). Indeed, Shen-3 was contemporaneously described by Anadarko employees and Shenandoah business partners as a "wet well" or "dry hole" (*i.e.*, no hydrocarbons were found).[25] Accordingly, Anadarko was required to expense the cost of drilling Shen-3 within the Company's annual and quarterly period ended December 31, 2014, as detailed below.[26]

40.    Anadarko's required expensing of Shen-3 drilling costs under GAAP is further supported by the Company's unlikely use of Shen-3 as an injection well (*i.e.*, Condition 1). In this regard, costs that do not relate to probable future economic benefit are normally not capitalized under GAAP during the Relevant Period.[27] As described further below and consistent with Condition 1, I am not aware of contemporaneous objective information demonstrating that as of the filing date, February 20, 2015, of Anadarko's Form 10-K for its December 31, 2014 financial statements, Shen-3's use as an injection well was more than a remote possibility.

    1.    ***It was Evident that Prior to the Issuance of Anadarko's 2014 Annual Report Shen-3 Found No Hydrocarbons***

41.    Information available during the Relevant Period demonstrates that Shen-3 found no hydrocarbons. This determination was evident prior to the issuance of Anadarko's 2014 Annual Report on February 20, 2015. For example:

    a.    The poor results of the Shen-3 drilling effort appear to have been evident to Anadarko as early as November 2014. For example, in November 24, 2014 Jake Ramsey, Anadarko's Senior Staff Geologist, emailed Tim Trautman, Exploration Gulf of Mexico ("GOM") Manager, noting a proposed conceptual Shenandoah Project Timeline

---

[25] Deposition of Patrick McGrievy; 149:5-21; Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[26] ASC 932-360-25-18; ASC 932-360-35-18–21.

[27] FASB Statement of Financial Accounting Concepts No. 6, ¶25; *see also* FAS 19, ¶143.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 15**

CONFIDENTIAL

presented to project partners in consideration of the "[b]ad news" received from the drilling of Shen-3.[28]

b.  Learning in December 2014 that the drilling cost for Shen-3 would be capitalized as suspended well costs, Louis Williams, Director-Expenditure Accounting,[29] appropriately inquired of Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations, as to the basis for suspending the cost. Specifically, Mr. Williams asked whether Shen-3's continued capitalization was "because they found reserves?"[30] Mr. Williams would subsequently learn and document that Shen-3 "failed to find hydrocarbons within the well-bore."[31]

c.  Having plugged the Shen-3 well in January 2015,[32] Ms. Green drafted a memo asserting that the well was successful because it helped "to determine the extent of the reservoir." However, critical, and contrary to the required capitalization conditions

---

[28] Email from Jake Ramsey dated November 24, 2014, APC-00147963. Paul Chandler, Anadarko's Project Geological Advisor (Operations Eastern Gulf of Mexico), would acknowledge during testimony that if Shen-3 was determined to be all wet in the upper and lower Wilcox, it would be the "worst-case scenario." *See* Deposition of Paul Chandler, 275:3-276:13; Exhibit 222, Phased Development with an Early Production Test Minimum Size Analysis dated October 2, 2014.

[29] APC Organizational Chart, APC-00003195 at 3200.

[30] Email from Louis Williams dated December 4, 2014, APC-00001801.

[31] Email from Louis Williams dated January 5, 2015 with attached memo dated December 29, 2014, APC-00001803, APC-00001804 at 1804. While Mr. Williams further purported that Shen-3 "provided data which allowed additional reserves to be identified," evidence available does not demonstrate that "additional reserves" were identified as part of the Shen-3 drilling. In fact, evidence reflects that as a result of Shen-3, significantly less MMBOE (Millions of Barrels of Oil Equivalent) were estimated to exist within the Shenandoah Project area. *See*, *e.g.*, email dated November 22, 2014 with attached Shenandoah Resource Estimate, APC-00617381, APC-00617383; Exhibit 197, Shenandoah Appraisal Program January 2015 Update & Recommendation (a PowerPoint presentation dated January 2015 showing MMBOE ranging from 780 – 1060 (P90 – P10) which was down significantly from the MMBOE estimate following Shen-2 of approximately 950 – 1450 at P90 and P10, respectively).

[32] Email from Jim Kunning dated December 23, 2014, APC-00152617; Email from Pamala Johnson dated January 8, 2015, ANACOP00000354 at 354; Offshore Exposure – Dec 2014_Final_Suspended & Drilling, APC-00156333 ("rig released early Jan 2015").

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 16**

**CONFIDENTIAL**

under GAAP, Ms. Green noted that "[t]he Shendandoah-3 found sands that were non-hydrocarbon bearing and were filled with water."[33]

d.  Despite asserting that Shen-3 provided "valuable information,"[34] Ernie Leyendecker, Anadarko's Senior Vice President GOM Exploration, acknowledged internally that Shen-3 was in fact, "a wet well."[35]

e.  In apparent recognition that Shen-3 was not "the success case," but rather a "dry hole case" as a result of "encountering wet sands" as described in Anadarko's April 8, 2014 Shen-3 Authorization for Expenditure ("AFE") and communications, two of Anadarko's Shenandoah project partners, including Conoco (its partner with a percentage interest in the project equal to Anadarko)[36] and Marathon, recognized the need to write off Shen-3 related drilling costs as of December 31, 2014. Specifically:[37]

1.  Jeff Pachman, Anadarko's Project Land Advisor, conveyed Conoco's accounting position to various Anadarko employees that "because the [Shen-3] **well found no hydrocarbons and has no future utility, the cost will be written off as a dry hole**."[38] Consistent with these communications, Conoco disclosed the following in its 2014 annual report on Form 10-K: "The results of the first Shenandoah appraisal well were announced in 2013 and confirmed Shenandoah

---

[33] Email from Louis Williams dated January 5, 2015, with attached memo dated December 29, 2014, APC-00001803, APC-00001804 at 1804; *see also* email from Michael Cieslak dated January 6, 2015, APC-00001863.

[34] Deposition of Ernest Leyendecker, 154:6-11.

[35] Email from Jeff Pachman dated February 12, 2015, APC-00001791 at 1791.

[36] In its AFE dated April 8, 2014, Anadarko, Conoco and Marathon held partnership interests in the Shenandoah Prospect of 30%, 30% and 10%, respectively while Cobalt held a 20% interest, APC-00005095.

[37] See Conoco's characterization of Shen-3 as a dry hole in its emails dated January 8, 2005 at ANACOP00000354. I am aware that Anadarko's other Shenandoah partner, Cobalt International Energy Inc. ("Cobalt") did not expense Shen-3 well costs as of December 31, 2014. However, the evidence I have reviewed, including Cobalt's 2014 Annual Report on Form 10-K does not contradict the determination that no hydrocarbons were found in Shen-3 and that Shen-3 was therefore deemed to be a wet well (*i.e.*, a dry hole. Cobalt 2014 Form 10-K, p. 5.

[38] Email from Diane Sease dated January 7, 2015, APC-00001795 at 1795 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 17**

CONFIDENTIAL

as a significant oil discovery. **The second Shenandoah down dip appraisal well was spud in 2014 and expensed as a dry hole**."[39]

2.   Similar communications were conveyed to Anadarko by its Shenandoah partner, Marathon. On January 28, 2015, Marathon's Vice President, Controller and Chief Accounting Officer, Gary Wilson, emailed Cathy Douglas, Anadarko's Chief Accounting Officer, the following note, informing Ms. Douglas of Marathon's plan to expense Shen-3's drilling cost:

> I wanted to let you know that **based on our interpretation of ASC 932 we have decided to expense the most recent Shenandoah appraisal well**.
>
> There will be a single line in our earnings release referencing the well in the context of our total exploration expense for the quarter.[40]

Consistent with this communication, Marathon disclosed within its 2014 Annual Report on Form 10-K that "[t]he second appraisal well was spud in late May 2014 and the well costs incurred through December 31, 2014 were expensed in the fourth quarter of 2014."[41]

f.   On May 9, 2016, on behalf of one of Anadarko's Gulf of Mexico development team Senior Staff Reservoir Engineer, Lea Frye, Minces PLLC sent a letter to the SEC regarding alleged "Violations of Law by Anadarko."[42] In addition to expressing other concerns regarding the Company's Shenandoah project, the letter noted that "Shen 3

---

[39] Conoco 2014 Form 10-K, p. 8 (emphasis added). *See also* email from Teri Flinner, Conoco's GOM Principal Exploration Landman dated January 22, 2015 Re "Shenandoah-WR 52#2 (Shen-3), APC-00001791-1792 (emphasis added) ("Please be advised that ConocoPhillips Company will include the following statement in ConocoPhillip's fourth quarter and full-year 2014 earnings report expected to follow our conference call that will be held on Jan. 29th. 'After evaluation, **the company expensed the Shenandoah appraisal well as non-commercial**.'").

[40] Email from Gary Wilson dated January 28, 2015, APC-00001866.

[41] Marathon 2014 Form 10-K, p. 8. Note: Ms. Green further testified she never received information about these communications from ConocoPhillips or Marathon or their respective contemporaneous decision to write off Shen-3. (Deposition of Catherine Green, 85:13-86:15; 118:25-119:16).

[42] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3306-3329.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 18**

CONFIDENTIAL

was a 'wet well' that did not reveal the presence of hydrocarbons (oil and gas)."[43]

Specifically, on behalf of Ms. Frye, Minces PLLC observed the following:

> Following the success of the Shen 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen-3 was also located in Walker Ridge (Block 52), it was quickly apparent that Shen 3 did not have the promise of Shen 2. **Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).**[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would accept distorted findings and projections based on the success of Shen 2. However, Shen-3 was nothing like Shen 2.
>
> **Even though Shen 3 was a wet well, the exploration team described it as successful in terms similar to those used to describe Shen 2**. They did this in part by redefining the criteria by which resource capacity is projected. Aware that Shen 3 had the same sands (porous rock structure that can hold recoverable oil) that were present in Shen 2, the exploration team analogized Shen 3's resource projections to those of Shen 2. In doing this, they ignored the findings of Ms. Frye and other engineers, even though these persons' expertise is superior to theirs and even though the exploration team's projections were in contravention of Anadarko's published standards. …[44]
>
> [10] A "wet well" is often referred to in the oil and gas industry as a "dry hole."

g.  In response to assertions in this letter and other information, outside consultants hired by the Company repeatedly affirmed that Shen-3 was indeed a "wet well or "dry hole."[45]

---

[43] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[44] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[45] Norton Rose Fulbright Report, APC-00002563 at 2642, 2645, 2758, and 2802.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 19**

**CONFIDENTIAL**

h.  Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations,[46] and Patrick McGrievy, Anadarko's former Deepwater Gulf of Mexico General Manager, both testified that Shen-3 did not contain any hydrocarbons.[47]

2.  ***The Successful Efforts Method of Accounting Required that Anadarko Expense the Cost of Drilling Exploratory Well and Exploratory-Type Stratigraphic Wells, Including Shen-3, When No Hydrocarbons Were Found***

a)  The "Successful Efforts" Method of Accounting Permitted the Capitalization of Certain Anadarko Exploration Costs But Was Intended to Highlight Failures During the Search for Oil By Expensing Costs That Do Not Result in an Identifiable Future Benefit

42.  GAAP required that Anadarko account for oil and gas exploration and development costs using one of the following distinct accounting methodologies: (i) the full cost method, or (ii) the successful efforts method.[48] During the Relevant Period, Anadarko's policy was to apply the successful efforts method of accounting.[49]

---

[46] Ms. Green testified that the "predominant basis" Shen-3 costs were suspended and capitalized was because of her belief that "the information from Shen 3 increased the overall resource estimate" of Shenandoah. However, Ms. Green further acknowledged that upon review, Shenenadoah-3 did not increase the overall resource estimate of the Shenandoah project. (Deposition of Catherine Green 92:24-94:19). This is consistent with Condition 2 (*i.e.*, that Shen-3 materially reduced the likely reserves within the Shenandoah field) and the information available during Anadarko's Q4 2014 financial reporting period cited below beginning at paragraph 83 reflecting that as a result of Shen-3, Anadarko's estimated oil reserves in the Shenandoah area actually decreased.

[47] Deposition of Catherine Green, 70:24-71:71:8 ("Q. So Shenandoah did not contain hydrocarbons; correct – I'm sorry – A. Correct. Q. – Shenandoah 3 did not contain hydrocarbons; correct? A. Correct. Q. So, in other words, no oil was discovered by Shenandoah 3; correct? A. There were – there was no oil in the wellbore of Shenandoah 3."); Deposition of Patrick McGrievy; 149:5-21 ("Q. And once Shen 3 Tded, which completed, it was found that it was – it was all wet; right? A. There was no hydrocarbons on the log – on the log, right. … THE WITNESS: There was no hydrocarbons on the log to speak of. Q. Otherwise, it could be called a wet well? A. Yeah, it could be. Yeah, you could term it a wet well. Q. And the well results from Shen 3 which found no hydrocarbons resulted in a significant downward revision to the resource size of Shenandoah 3? A. Yep. Yes, it would.").

[48] ASC 932-10-S99. Note: The FASB has expressed its "preference for" the successful efforts method of accounting. SFAS No. 25, *Suspension of Certain Accounting Requirements for Oil and Gas Producing Companies – An Amendment of FASB Statement No. 19*.

[49] *See, e.g.*, AB 20-5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829; Anadarko 2014 Form 10-K, p. 95; Anadarko 2017 Form 10-K, p. 97.

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 20**

**CONFIDENTIAL**

43.    Under the full cost method, companies are generally able to capitalize all costs incurred in exploring for, acquiring, and developing oil reserves.[50] For example, capitalization of the cost of drilling exploration wells and exploratory-type stratigraphic wells is permitted irrespective of whether a well is successful under the full cost method of accounting.[51]

44.    In its original 1977 Basis for Conclusion upon issuance of relevant GAAP (*i.e.*, FAS 19), the FASB observed that "[e]stablishing a direct cause-and-effect relationship **between costs incurred and specific reserves discovered is not relevant to full costing**."[52] The FASB further observed that because the full cost method permits the capitalization of costs relating to unsuccessful property acquisitions and unsuccessful exploratory activities along with the costs of successful acquisitions and exploratory activities, "**full costing tends to obscure failure and risk**."[53]

45.    Conversely, "only those exploration costs[54] and development costs[55] that relate directly to specific oil and gas reserves are capitalized under the successful effort method."[56] Costs that do not relate directly to specific reserves are expensed.[57]

46.    In establishing this GAAP, the FASB recognized that a direct relationship exists between (i) costs incurred, and (ii) the discovery of oil reserves, under the successful efforts

---

[50] ASC 932-10-S99; ASC 932-360-S99.

[51] ASC 932-10-S99; ASC 932-360-S99; AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified.*

[52] FAS 19, ¶102 (emphasis added).

[53] FAS 19, ¶151 (emphasis added).

[54] Exploration costs are defined in part under GAAP as "[c]osts incurred in identifying areas that may warrant examination and in examining specific areas that are considered to have prospects of containing oil and gas reserves, including costs of drilling exploratory wells and exploratory-type stratigraphic test wells exploration costs may be incurred both before acquiring the related property (sometimes referred to in part as prospecting costs) and after acquiring the property. ASC 932-10-S99.

[55] Development costs are defined in part under GAAP as "costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and gas." ASC 932-10-S99.

[56] ASC 932-360-25-3.

[57] ASC 932-360-25-3.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 21**

**CONFIDENTIAL**

methodology.[58] Indeed, the FASB further noted that because the **"discovery of oil and gas reserves is a critical event in determining failure or success,"** the successful effort accounting methodology is intended to highlight "failures and the risks involved in the search for oil and gas reserves **by charging to expense costs that are known not to have resulted in identifiable future benefits.**"[59]

47.     Although the successful efforts methodology permits the initial capitalization of certain exploration costs, including the cost of drilling exploration wells and exploratory-type stratigraphic wells,[60] the ongoing capitalization of those costs ultimately depends on whether "proved reserves"[61] are found by the well. Of particular relevance, ASC 932-360-35-18 describes a scenario under the successful efforts accounting method where "**an exploratory-type stratigraphic well may be determined <u>to have found oil and gas reserves,</u> but those reserves cannot be classified as proved when drilling is completed.**"[62] <u>**In such circumstances**</u>, GAAP states that the costs of drilling the well shall only continue to be capitalized if:

---

[58] FAS 19, ¶102.

[59] FAS 19, ¶151 (emphasis added).

[60] ASC 932-360-25-10 (emphasis added) ("The costs of drilling exploratory wells and the costs of drilling exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment, and facilities **pending determination of whether the well has found proved reserves**.").

[61] "**Proved Oil and Gas Reserves**" are defined in part as, "those quantities of oil and gas, which, by analysis of geoscience and engineering data, **can be estimated with reasonable certainty to be economically producible from a given date forward**, from known reservoirs, and under existing economic conditions, operating methods, and government regulation before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether the estimate is a deterministic estimate or probabilistic estimate. … In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons as seen in a well penetration unless geoscience, engineering, or performance data and reliable technology establish a lower contact with reasonable certainty." ASC Master Glossary (emphasis added).

[62] ASC 932-360-35-18 (emphasis added) ("**An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed**. In those cases, the capitalized drilling costs shall continue to be capitalized **if the well has found a sufficient quantity of reserves to justify its completion as a producing well** and the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project. Note that an entity is not required to complete the exploratory or exploratory-type stratigraphic well as a producing well.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 22**

**CONFIDENTIAL**

> a. "the well has found a sufficient quantity of reserves to justify its completion as a producing well"; and
>
> b. "the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project."[63]

48. Therefore, an exploratory-type stratigraphic well that is determined **not** to have found **any** oil and gas reserves (*i.e.*, a "dry hole" or "wet well")[64] **is required to be expensed under GAAP**.[65] That is, absent the identification of any oil reserves, the proved reserves threshold could never be satisfied, and the cost of exploratory drilling must be expensed. In this regard, the FASB has observed that "costs be charged to expense as soon as a determination is made that proved reserves have not been found."[66] Consistent with this

---

[63] ASC 932-360-35-18.

[64] *See, e.g.,* Norman Rose Fullbright Report, APC-00002563 at 2645, 2802; Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[65] *See also* AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified,* 4.12-4.16 and 9.42 (emphasis added) ("**If an exploratory well or exploratory-type stratigraphic test well is in progress at the end of a period and the well is determined not to have found reserves before the financial statements for that period are issued, the costs incurred through the end of the period, net of any salvage value, are charged to expense for that period**, in accordance with FASB ASC 932-360-40-10 […] 9.42 Under successful efforts accounting, costs incurred in drilling exploratory wells that are determined to be dry holes should be expensed."); 2.78 ("If the well is deemed to not contain adequate reserves to more than cover the costs to complete the well and the future production costs, it will likely be declared a "dry hole" and will be abandoned.").

*See also* Deloitte Oil and Gas, *Accounting, Financial Reporting, and Tax Update*, January 2016, p. 2 ("Under the successful-efforts method, costs related to the successful identification of new reserves may be capitalized while costs related to unsuccessful exploration efforts (e.g., drilling efforts that result in a dry hole) would be immediately recorded on the income statement.").

[66] FAS 19, ¶198; *See also* AB 20-5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829 at 1829 (emphasis added) ("The initially capitalized costs of drilling exploratory wells that do not find proved reserves are expensed (net of any salvage value, as defined in the Accounting Bulletin 20.7) **when determination is made that no proved reserves can be attributed as a result of such drilling**."); FASB Staff Position, FAS 19-1: *Accounting for Suspended Well Costs* (emphasis added) ("In certain circumstances, **an exploratory well finds reserves** but those reserves cannot be classified as proved when drilling is completed. … Paragraphs 31–34 of Statement 19 provide guidance on whether exploratory well costs can continue to be capitalized **when the well finds reserves but those reserves cannot be classified** as proved when drilling is completed. If reserves cannot be classified as proved in an area requiring a major capital expenditure, paragraphs 31(a) and 34 of Statement 19 require that the cost be carried as an asset provided that (a) there have been sufficient reserves found to justify completion as a

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 23**

**CONFIDENTIAL**

understanding, Anadarko asserted in its 2014 Annual Report on Form 10-K that under the successful efforts method, exploratory costs "associated with **a well discovering hydrocarbons are initially capitalized, or suspended, pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling**."[67]

      b)  <u>Anadarko's Contemporaneous Authorization for Expenditure Reflects that Shen-3 Was Drilled for Exploratory Purposes</u>

49.    Evidence reflects that the Shen-3 well was drilled for exploratory purposes. For example, in Anadarko's April 8, 2014 AFE, provided to various Shenandoah project partners, stated that the Shen-3 drilling "Type" was "EXPLORATORY."[68] In other examples, (i) the Company's December 2014 draft suspended well accounting analysis explicitly described Shen-3 as meeting the definition of an "exploratory stratigraphic test well,"[69] and (ii) KPMG's recurring suspended well cost memoranda during the Relevant Period through Q2 2016, described capitalized Shen-3 well costs as being "exploratory assets."[70]

50.    The classification of Shen-3 as exploratory in nature has important significance under GAAP. Exploration costs, including the cost of drilling exploration wells and exploratory-type stratigraphic wells, must comply with the successful effort method accounting guidance set forth above. Indeed, consistent with the successful effort accounting concepts

---

producing well if the required capital expenditure is made, and (b) drilling of the additional exploratory wells is under way or firmly planned for the near future. If either of those two criteria is not met, **the enterprise must expense the exploratory well costs**.").

[67] Anadarko 2014 Form 10-K, p. 79.

[68] Letter to Shenandoah Partners AFE No. 2087315 WR 52 No. 2 dated April 8, 2014, APC-00005093 at 5095.

[69] Email from Michael Cieslak dated January 6, 2015, APC-00001863 at 1864.

[70] GG.4.A.8.05 Suspended Well Costs Memo Period-end 12-31-2014, KPMG_APC_eA_0002511; Q1GG.15 Suspended Well Costs Memo Period-end 3-31-2015, KPMG_APC_eA_0003262; Q2.GG.13 Suspended Well Costs Memo Period-end 6-30-2015, KPMG_APC_eA_0003349; Q3.GG.13 Suspended Well Costs Memo Period-end 9-30-15, KPMG_APC_eA_0003451; GG.4.A.8.10 Suspended Well Costs Memo Period-end 12-31-2015, KPMG_APC_eA_0006079; GG.4.A.8.10 Suspended Well Costs Memo Period-end 3-31-2016, KPMG_APC_eA_0007100.

CONFIDENTIAL

described above, Anadarko noted in its April 8, 2014 Letter to its Shenandoah partners that the Shen-3 "success case" equated to encountering oil:

> Please note that **the "dry hole case" equates to encountering wet sands and the "success case" equates to encountering oil** via LWD, mud logs or other tools used while drillng through the objective section.[71]

c) Exploratory Well and Exploratory-Type Stratigraphic Well Costs Are Required To Be Assessed On Their Own Under GAAP

51. Importantly, accounting for an exploration well (and an exploratory-type stratigraphic well) must be evaluated on its own under GAAP. That is, the success of a specific well in finding oil reserves should not be based on whether another, separate and distinct well previously found oil within a larger project area. In this regard, the FASB observed:

> **An exploratory well must be assessed on its own**, and **the direct discovery of oil and gas reserves can be the sole determinant of whether future benefits exist** and, therefore, whether an asset should be recognized.[72]

52. Consistent with this understanding, the guidance established under ASC 932-360-35-18 is specifically worded in the context of evaluating the continued capitalization of "the well" or "an exploratory well." Thus, as noted below, the continued asset capitalization of "an exploratory well or an exploratory-type stratigraphic well," subject to finding oil, is not written in the context of finding oil in an overall project area (*e.g.*, the Shenandoah project, including the Shenandoah 1 and 2 wellbores), rather it is specific:

> **An exploratory well** or **an exploratory-type stratigraphic well** may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed. In those cases, the capitalized drilling costs shall continue to be capitalized if **the well** has

---

[71] Letter to Shenandoah Partners AFE No. 2087315 WR 52 No. 2 dated April 8, 2014, APC-00005093 at 5094.

[72] FAS 19, ¶31 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**　　　　**Page 25**

**CONFIDENTIAL**

found a sufficient quantity of reserves to justify its completion as a producing well …[73]

53.     Although a separate criterion exists in ASC 932-360-35-18 requiring an entity to assess the economic and operating viability of the project overall, that criterion becomes irrelevant if an individual well fails to find oil reserves. To incorrectly assume the requirement was specific to the project overall and not the individual well, Anadarko would have satisfied the requirement prior to spudding Shen-3 based on the prior period Shen-1 and Shen-2 results. This flawed assumption is directly inconsistent with the successful effort methodology which, as noted above, was intended to highlight failures during the search for oil by expensing costs that do not result in an identifiable future benefit. Suspending (capitalizing) such costs would obscure failure and risk (violating GAAP) by converting Anadarko's accounting policy for this well to its having adopted the full cost method of accounting, contrary to its stated use of the successful efforts method of accounting, (*see* paragraphs 42-44 above).

54.     In addition to its disclosed policy cited above in paragraph 48, Anadarko's applied accounting practices during the Relevant Period reflect an understanding that exploration wells and exploratory-type stratigraphic wells, similar to Shen-3, were required to be evaluated individually in assessing whether capitalization of suspended well costs under GAAP was appropriate. Indeed, Anadarko's internal accounting policy A.B. No 20.5, *Well Classification and Disposition of Suspended Well Costs*, included illustrative examples requiring that exploratory wells be assessed individually, and expensed when a related well is dry (*i.e.*, Examples 1 and 4 of Exhibit I).[74]

---

[73] ASC 932-360-35-18 (emphasis added). *See also, e.g.*, Overview of Oil and Gas Accounting & PSC Accounting, Budi Hartono, Ernst & Young LLP, p. 12 ("Under US GAAP, an appraisal well is treated exactly the same as an exploration well and should be written-off if unsuccessful, even the very same field or reservoir is determined to be successful and developed."); FAS 19 ¶201 ("The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs not continue to be carried as assets indefinitely if stratigraphic test drilling activity in the area has ceased or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well.").

[74] A.B. No 20.5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829 at 1838-1841.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 26**

**CONFIDENTIAL**

55. Consistent with this understanding, Anadarko repeatedly wrote off drilling costs for individual wells, despite the respective wells being located within a larger project area where oil reserves had previously been discovered. For example:

a. In connection with its Coronado oil exploration project, Anadarko undertook multiple drilling efforts that resulted in capitalized suspended costs through June 30, 2014. During Q2 2014, the Company determined that one of its related wells was a "dry hole" where no reserves were identified. Although the well was located within the Coronado play, the Company recognized the need to, and in fact did, expense those costs associated with the unsuccessful well. At the same time, Anadarko continued to capitalize other suspended exploration well costs incurred in connection with successful efforts within the Coronado area.[75]

b. During the same reporting period, similar dry hole accounting expenses were recorded in connection with an unsuccessful "dry hole" well located in Anadarko's Yucatan project area. While the individual dry hole well costs were expensed, the Company continued to capitalize other suspended well costs (*i.e.*, not determined to be dry holes) associated with previous successful exploration wells located in the same project area.[76]

c. During Q3 2016, Anadarko expensed certain specific unsuccessful well efforts during Q3 2016 within its Tubarao Tigre and Mozambique exploration project areas. While the individual dry hole well costs were expensed, the Company continued to capitalize other exploratory well costs (*i.e.*, not determined to be dry holes) in these respective exploration project areas.[77]

56. In fact, Anadarko's, albeit non-timely, write-off of Shen-3 during Q3 2016 despite the Company's continued capitalization of other wellbores (*e.g.*, Shen-1, Shen-2, Shen-4 and

---

[75] Q2 2014 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0003043 at 3046-3047.

[76] Q2 2014 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0003043 at 3047-3048.

[77] Q3 2016 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0007469 at 7472-7474.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**    **Page 27**

**CONFIDENTIAL**

Shen-5) demonstrates that wells are to be assessed individually under the successful efforts method and ASC 932-360.[78] This accounting treatment is further consistent with the testimony of Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations,[79] who affirmed that the determination of whether you should suspend the well cost "is done on a well-by-well basis."[80]

   d) <u>GAAP Required Anadarko to Immediately Expense Exploratory Wells and Exploratory-Type Stratigraphic Wells When It Was Determined That No Hydrocarbons Were Found as of December 31, 2014</u>

57. Information reflects that Anadarko capitalized approximately $64 million of suspended costs of drilling Shen-3 as of December 31, 2014.[81] Given the supporting information demonstrating that Shen-3 found no oil, these suspended costs were required to be expensed under the aforementioned GAAP. As this information appears evident, no later than the filing date of Anadarko's 2014 annual financial statements on Form 10-K, the Shen-3 related write-off expense and disclosure of this $64 million dry hole expense was required no later than December 31, 2014. In this regard, the expensing of Shen-3 was necessary and consistent with GAAP requirements under the successful effort method to highlight failures and risks involved in exploration of the Company's Shenandoah project.

58. Indeed, in addition to acknowledging that the Shen-3 was a "wet well" or "dry hole," as described above, Anadarko conceded in a November 10, 2016 memo that the well "was unsuccessful under ASC 932-360-25-18."[82] Stated differently, Anadarko inherently

---

[78] Q3 2016 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0007469 at 7470-7471.

[79] APC Organizational Chart, APC-0003195 at 3202.

[80] Deposition of Catherine Green, 83:7-14 ("Going back to my initial question, though, this analysis is done on a well-by-well basis; correct? A. Yes, whether you should ca- -- whether you should capitalize -- continue to suspend the well cost is done on a well-by-well basis, subject to also the sufficient progress criteria for the overall project.").

[81] Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333.

[82] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 28**

CONFIDENTIAL

acknowledged that it lacked a reasonable and appropriate basis under ASC 932-360-25 to capitalize the Shen-3 exploratory-type stratigraphic well costs during 2014.

3.   *The Unlikely Use of Shen-3 As An Injection Well Further Supports Anadarko's Requirement Under GAAP to Expense Shen-3 Drilling Costs When No Hydrocarbons Were Found*

59.   As discussed above, the FASB recognized the general concept that costs that do not relate to probable future economic benefit are normally not capitalized during the Relevant Period. Beyond the principal failure of Anadarko to find hydrocarbons at Shen-3, the well's unlikely use as an injection well (Condition 1) further demonstrates the remote likelihood that Shen-3 would provide the Company with future economic benefits. The evidence that I have seen produced by the Company only cites to speculation that the Shen-3 well bore may be used as a water injection well or other service well and not to any evidence reflecting a study or analyses resulting in a contemptuous conclusion that such use was likely.[83]

B.   <u>ANADARKO'S Q3 2016 ASSERTION THAT CONTINUED CAPITALIZATION OF SHEN-3 WAS ACCEPTABLE BECAUSE A "REASONABLE POSSIBILITY" EXISTED THAT THE WELL WOULD BE USED AS AN INJECTION WELL OR SIDETRACK WELL IS FLAWED AND UNSUPPORTED IN GAAP</u>

60.   As noted above in paragraph 58, Anadarko internally acknowledged that Shen-3 was "unsuccessful" and therefore, did not satisfy the specific capitalization requirements established in ASC 932-360-25-18 for exploratory-type stratigraphic well costs. However, the Company further asserted that because a "reasonable possibility" existed that the well would be used as an injection well, sidetrack well, or development well, capitalization of Shen-3 in 2014 through Q3 2016 was appropriate.[84] This assertion, even if true, has no basis under GAAP and is fundamentally flawed.

1.   *The Company Acknowledged That Shen-3 Well Costs Were Not Exploration Costs that Could Be Capitalized under ASC 932-360-25-18*

---

[83] Deposition of Ernest Leyendecker, 91:8–95:12, 176:15-182:3, and 196:02-202:4.

[84] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 29**

**CONFIDENTIAL**

61. Given that Shen-3 found no hydrocarbons (*i.e.*, Section V.A.1), the Shen-3 exploratory-stratigraphic well drilling costs were not capitalizable under applicable GAAP as of December 31, 2014. Indeed, the Company affirmed during Q3 2016 that:

   a. The "Shenandoah-3 well was drilled as an exploratory stratigraphic test well"; and

   b. The Shen-3 well was "unsuccessful" under ASC 932-360-25-18.[85]

62. As a result, the Company correctly concluded in 2016 that its Shen-3 well costs could **not** be capitalized pursuant to the specifically provided GAAP to which an exploratory-type stratigraphic well relates (*e.g.*, ASC 932-360-25-18; ASC 932-360-35-18). This is significant because under GAAP, companies, including Anadarko, are required to first consider Codification guidance that is specific to a particular transaction or event (*e.g.*, the costs incurred when drilling an exploratory-type stratigraphic well) when determining how to account for the transactions or events.[86] Only in the absence of specific guidance, may companies refer to accounting principles for "similar" transactions or events within a source of authoritative GAAP.[87] Absent specific guidance within the relevant codification, a company should look to nonauthoritative accounting guidance outside the Codification.[88] However, because specific Codification guidance did exist for exploratory-type stratigraphic wells (ASC 932-360-25-18; ASC 932-360-35-18), Anadarko was required to apply it.

   2. ***The Company Acknowledged That Shen-3 Well Costs Were Not Development Costs that Could Be Capitalized under ASC 932-360-25-14***

63. Referencing Shen-3's purpose as "an exploratory stratigraphic test well," Anadarko further acknowledged during Q3 2016 that Shen-3 related drilling costs were not "development

---

[85] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

[86] ASC 105-10-05-02.

[87] ASC 105-10-05-02.

[88] ASC 105-10-05-03.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 30**

CONFIDENTIAL

costs," as contemplated by ASC 932-360-25-14.[89] I agree with this conclusion.[90] Because ASC 932-360-25-14 provides the primary accounting guidance for the initial recognition (and capitalization) of **development** costs, the Shen-3 exploratory-stratigraphic well drilling costs were **not** capitalizable thereunder.[91]

64. This is also important considering that GAAP includes the costs of drilling injection, development wells and other service wells within its definition of "development costs."[92] Therefore, a reasonable possibility that Shen-3 might be used as an injection well, even if objectively supportable, is not relevant to whether Anadarko could capitalize its related drilling costs based on the Company's implicit acknowledgement that capitalization for

---

[89] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566; *see also* Deposition of Catherine Green, 47:4-17 ("Q. Was Shenandoah 3 an exploratory well? A. Yes. Q. Accordingly, Shenandoah 3 was not a development well; correct? A. Correct. Q. And this determination was made prior to Shenandoah 3 being spud; correct? A. Yes. Q. So Shenandoah 3 costs were associated with exploration costs; correct? A. Yes. Q. And Shenandoah 3 costs were not associated with development costs; correct? A. Correct.").

[90] ASC 932-360; *see also* AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified*, 4.17-4.18 ("4.17 Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering, and storing the oil and gas are capitalized. All costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and are capitalized, whether the well is successful or dry. … Because development dry holes are capitalized and exploratory dry holes are expensed, **the distinction between them is extremely important and should be made by the company prior to drilling**."); FAS 19, ¶¶203-205 ("[T]here is an important difference between exploratory dry holes and development dry holes. The purpose of an exploratory well is to search for oil and gas. The existence of future benefits is not known until the well is drilled. Future benefits depend on whether reserves are found.").

[91] ASC 932-360-25-14 ("Development costs shall be capitalized as part of the cost of an entity's wells and related equipment and facilities. Thus, all costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and shall be capitalized, whether the well is successful or unsuccessful. Costs of drilling those wells and costs of constructing equipment and facilities shall be included in the entity's uncompleted wells, equipment, and facilities until drilling or construction is completed.").

[92] ASC 932-360-25-12 and 13 (emphasis added) ("Development costs are incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering, and storing the oil and gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities (see paragraph 932-360-25-16) and other costs of development activities, are costs incurred to . . . [d]rill and equip **development wells**, development-type stratigraphic test wells, and **service wells** . . . ."); *see also* ASC Master Glossary (emphasis added) ("A **service well** is a well drilled or completed for the purpose of supporting production in an existing field. Wells in this class are drilled for the following specific purposes: **gas injection (natural gas, propane, butane, or flue gas), water injection, steam injection, air injection**, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.").

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 31**

**CONFIDENTIAL**

Shen-3 as development cost under ASC 932-360-25-14 was inappropriate, because it was an exploratory well.

3.    *The Company's Q3 2016 Accounting Position To Justify the Suspension of Shen-3 Costs Until Q3 2016 Is Unsupported*

65.    Instead of applying directly relevant GAAP as required as of Q4 2014, and without referencing alternative supporting accounting standards in the Codification, the Company continued to suspend Shen-3 well costs until Q3 2016. Although Shen-3 well costs were written off as a dry hole as of September 30, 2016, to justify its capitalization of Shen-3 well costs through Q2 2016, Anadarko documented that the Shen-3 well costs were, more generally, "exploration costs" that could be capitalized under the successful efforts method.[93] More specifically, the Company noted that given Shen-3's possible future use as an injection well in the unproved Shenandoah project, related costs could (1) be considered exploration costs, and (2) those costs could provide future benefit to Anadarko during Shenandoah's development phase.[94]

66.    Beyond the overarching failings described above, including conflicting, relevant GAAP precluding the capitalization of Shen-3, Anadarko's subsequently documented accounting argument (in Q3 2016) is flawed because of the following additional issues:

a.    No specific basis existed in GAAP to support Anadarko's flawed accounting conclusion that Shen-3 costs could be suspended if a reasonable possibility existed that the well could be used as an injection well at the unproved Shenandoah project area;

---

[93] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

[94] *See, e.g.,* Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0565; Demand Letter Investigation updated January 20, 2017, KPMG_APC_eA_0009644.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 32**

**CONFIDENTIAL**

b.  The "reasonable possibility" threshold inherent in the Company's assumption, even if true, fails to satisfy the FASB's conceptual framework definition of an asset (*i.e.*, a "probable" future economic benefit).[95]

c.  Anadarko subsequently asserted that the Company's Chief Accounting Officer, Cathy Douglas, "relied upon the injection well capability of Shenandoah-3 as the predominant reason for suspending the well costs at year-end 2014."[96] However, I have not seen contemporaneous objective evidence demonstrating that a "reasonable possibility"[97] existed that Shen-3 could be used as an injection well or a development well as of December 31, 2014. Instead, I have only seen references which amount to speculation or general lack of confidence that Shen-3 could be used as an injection well or development well. For example:

1.  A sentence included in the Company's Q4 2014 draft suspended well cost memo pertaining to Shen-3, noting only the following sentence reflecting that management was evaluating whether Shen-3 **might** have future utility as an injection well, **assuming** Shenandoah moved to the development phase:

    > Management **is also evaluating** future utility of this well-bore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands.[98]

---

[95] FASB Statement of Financial Accounting Concepts No. 6, ¶25. ("Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."); *see also* FAS 19, ¶143. ("In the presently accepted financial accounting framework, an asset is an economic resource that is expected to provide future benefits and nonmonetary assets generally are accounted for at the cost to acquire or construct them. Costs that do not relate directly to specific assets having identifiable future benefits normally are not capitalized—no matter how vital those costs may be to the ongoing operations of the enterprise. If costs do not give rise to an asset with identifiable future benefits, they are charged to expense or recognized as a loss.").

[96] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0565.

[97] Under GAAP, "reasonably possible" is defined as "more than a remote but less than likely." ASC Master Glossary.

[98] Email from Michael Cieslak dated January 6, 2015, APC-00001863 at 1864. *see also* email from Time Trautman dated December 29, 2014, ANACOP00025913.

---

**CONFIDENTIAL**

2.  As noted above, on January 7, 2015, Jeff Pachman, Anadarko's Project Land Advisor, further conveyed Conoco's accounting position to various Company employees that "because the [Shen-3] **well found no hydrocarbons and has no future utility, the cost will be written off as a dry hole**."[99]

3.  Consistent with this understanding, on January 8, 2015, Anadarko's partner, Conoco's Deepwater Asset Development team, in connection with its determination to dry hole expense Shen-3, internally notified employees that Shen-3 was "fully water-wet," and was not likely to be considered as a future sidetrack well:

    > Data from both the original and bypass well bores confirmed that the well did encounter reservoir quality sand but **was fully water-wet.** The WR52-2 was P&A'd under a Temporary Abandonment classification but meets the criteria for Permanent Abandonment. The Temporary classification was used to allow the flexibility to re-enter the well for an up-dip sidetrack. There is no current plan to re-enter the WR52-2 and it is believed that if the operator is successful in the next appraisal well a sidetrack of WR52-2 would **not be considered in the near future or likely at all.**[100]

4.  In a January 23, 2015 email to Marathon's Controller and CAO, Gary Wilson, Ms. Douglas communicated that Anadarko "**will be assessing** the future utility of the wellbore" as a "possible sidetrack, injector, etc."[101] This again indicates that no substantive analysis as to Shen-3's possible use as an injection or development well had occurred at Anadarko. Indeed, as discussed above, Marathon recognized Shen-3 to be a dry hole for accounting purposes in Q4 2014.

5.  In a February 12, 2015 email, Mr. Leyendecker stated, without reference to underlying support, that Shen-3 was "**potentially useable** as a future water

---

[99] Email from Diane Sease dated January 7, 2015, APC-00001795-1796 at 1795 (emphasis added).

[100] Email from Pamala Johnson dated January 8, 2015, ANACOP00000354-0355 at 354 (emphasis added).

[101] Email from Cathy Douglas dated January 23, 2015, APC-00001867-1868 at 1867 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 34**

**CONFIDENTIAL**

injection well for pressure maintenance."[102] However, while acknowledging internal Anadarko communications on or before February 2, 2015 that "'Shen-3 cannot be utilized as a water injector given its current design,'" Mr. Leyendecker further testified that he did not recall seeing any "in-depth drilling engineering analysis that said [Shen-3] could be used as an injector well."[103] Moreover, after reading from internal communications from Mr. Trautman noting that "re-entry" of Shen-3 "'would be risky (mechanically),'" Mr. Leyendecker further testified to his understanding in February 2015 that Shen-3 could not be sidetracked.[104]

67. While an internal analysis and memo does appear to have been performed and prepared by Anadarko regarding the use of Shen-3 as an injection or development well, it does not appear to have occurred until Q3 2016. Therein, the Company concluded that Shen-3 had a "low probability of becoming a water injection well conversion." Specifically, during 2016, Mr. Williams wrote about the Company's efforts to understand the utility of Shenandoah 3 as a future water injection well and its conclusion, stating in part:

> [T]he most recent concept selection work suggests that the Shenandoah #3 wellbore (WR 52-2) is not in an optimal location as a water injector and for waterflood oil recovery. This is despite the fact that an east-west trending fault, potentially isolating the Shen 3 well from a large updip waterflood area, was identified in Q3, 2014 [sic] not invoked in the model. Currently, the Shenandoah G&G team has seismic evidence (although not with certainty and approximated to be 50% probable) that an east-west trending fault does exist north of the Shenandoah 3 wellbore which may inhibit the waterflood front from influencing and increasing oil recovery in up-dip producing wells. As a result, the Shenandoah 3 is currently not being considered a candidate for water injection well conversion if the project moves forward to the sanctioning (FID) phase.
>
>       \*          \*          \*
>
>     In summary, with the latest results of the ongoing subsurface waterflood studies and the mechanical challenges of converting this well to

---

[102] Email from Jeff Pachman dated February 12, 2015, APC-00001791-1792 at 1791 (emphasis added); *see also* Deposition of Patrick McGrievy, 173:22-175:5.

[103] Deposition of Ernest Leyendecker, 196:02-202:4; Email from Chip Oudin dated February 2, 2015, APC-00001928.

[104] Deposition of Ernest Leyendecker, 91:8-95:12; Email from Tim Trautman dated January 29, 2015, APC-00158152.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**        **Page 35**

**CONFIDENTIAL**

a viable waterflood injection well, the wellbore is considered to have a low probability of becoming a water injection well conversion.[105]

68.    In connection with this analysis, Anadarko wrote-off Shen-3 as a dry hole during Q3 2016 asserting that a reasonable possibility no longer existed that Shen-3 could be used as an injection well. However, this write-off was untimely. Anadarko's documented assertion that capitalization of Shen-3 between Q4 2014 and Q2 2016 was acceptable because a "reasonable possibility" existed that the well would be used an injection well was not supported by an appropriate analysis, inconsistent with the documents and testimony referenced above in paragraph 66 and contradicted by relevant GAAP.

C.    **ANADARKO REPEATEDLY FAILED TO EXPENSE AND DISCLOSE MILLIONS OF DOLLARS IN SHEN-3-RELATED DRY HOLE EXPENSES DURING EACH OF THE RESPECTIVE FINANCIAL REPORTING PERIODS BETWEEN DECEMBER 31, 2014 AND JUNE 30, 2015, IN VIOLATION OF GAAP**

69.    Anadarko's continued capitalization of Shen-3 violated GAAP. Specifically, from the financial reporting periods between December 31, 2014 and June 30, 2016, Anadarko improperly capitalized approximately $63.6 million of suspended drilling costs relating to Shen-3.[106]

1.    *Anadarko's Overstatement and Disclosure of Shen-3 Suspended Well Costs Were Material*

70.    As set forth below, the Company's related misstatement was material to each of Anadarko's respective financial reporting periods beginning December 31, 2014 and ended September 30, 2016. In this regard, Anadarko's recurring misstatement exceeded well-established SEC quantitative materiality example benchmarks (*i.e.*, 5% of an item). Qualitatively, the Company's misstatements and related disclosures: (i) allowed Anadarko to report pre-tax profits instead of losses during 2014, and/or (ii) pertained to an exploration project that was announced to have a potentially significant role in the Company's operations and profitability. In this regard, Anadarko regularly asserted the importance of Shenandoah in

---

[105] Memo and attachments, APC-01737346-7348.

[106] Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 36**

**CONFIDENTIAL**

the Gulf of Mexico, characterizing the Shenandoah Basin as an approximate "$2-$4 Billion Net Opportunity" during 2014.[107]

71.    GAAP and SEC disclosure requirements discussed above apply to financial reporting requirements that are "material" to Anadarko's financial statement users.[108] SEC Rule 12b-2 defines "material" as information for "which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities registered."[109] In 1999, the SEC staff issued Staff Accounting Bulletin No. 99, Materiality ("SAB 99"). SAB 99, codified under GAAP at ASC 250-10-S99, which provides further guidance with respect to materiality and states that a misstatement or omission in financial statements is material if "there is a substantial likelihood that a reasonable person would consider it important:"[110]

> [T]he accounting literature is in substance identical to the formulations used by the courts in interpreting the federal securities laws. **The Supreme Court has held that a fact is material if there is – a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available [fn 27]** …
>
> In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. … **Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important**.
>
> [FN]27 TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988). As the Supreme Court has noted, determinations of materiality require 'delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts

---

[107] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

[108] 17 CFR §240.12b-20.

[109] 17 CFR §240.12b-2.

[110] ASC 250-10-S99.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 37**

CONFIDENTIAL

and the significance of those inferences to him. […]' TSC Industries, 426 U.S. at 450.[111]

72.    ASC 250-10-S99 further notes **that an assessment of materiality requires an evaluation of both quantitative and qualitative factors**.[112] As discussed below, quantitative and qualitative factors demonstrate that Anadarko's recurring misstatements and related disclosure omissions were material under GAAP.

   a)   Quantitative Factors Reflect That Anadarko's Failure to Properly Write-off Shen-3 drilling Costs to Dry Hole Expense Was Material

73.    Quantitatively, SEC guidance acknowledges the practice of applying a "rule of thumb" quantitative threshold (*e.g.*, 5% of an item) to provide a "preliminary" basis for evaluating materiality. For example, ASC 250-10-S99 states:

> **The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that - without considering all relevant circumstances - a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material**. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. **But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality**; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.
>
> \*          \*          \*
>
> **Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material**.[113]

74.    Anadarko's misstatements and related disclosure omissions within the Company's relevant financial statements repeatedly exceeded this 5% threshold. For example, the proper inclusion and disclosure of Shen-3 related dry hole expense as of December 31, 2014 would have negatively impacted Anadarko's respectively reported annual Income (Loss) before taxes and disclosed dry hole expense by an amount much greater than 5%.

---

[111] ASC 250-10-S99 (emphasis added).

[112] ASC 250-10-S99 (emphasis added).

[113] ASC 250-10-S99 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 38**

**CONFIDENTIAL**

75.   Moreover, given the Company's repeated failure to correct its Shen-3 related misstatement until Q3 2016, GAAP requires that a quantitative materiality assessment be conducted using both a rollover method and an iron curtain approach.[114] As stated in footnote 114, (i) the rollover approach quantifies a misstatement based on the amount of the error originating in the current period income statement, and (ii) the iron curtain approach quantifies a misstatement based on the effects of correcting the misstatement existing in the balance sheet at the end of the respective current period, irrespective of the misstatements year(s) of origination. As reflected in the table below, Anadarko's misstatement exceeded 5% of the following relevant disclosed amounts (*i.e.*, Income (loss) before taxes, Suspended well costs, and Dry hole expense) for one or more of these criteria using both the rollover approach (*e.g.*, Q4 2014, FY 2014 impact, Q3 2016), and the iron curtain approach (*e.g.*, Q1 2015 through Q2 2016):[115]

---

[114] The SEC and codified GAAP recognize that the most commonly used in practice to accumulate and quantify misstatements are generally referred to as the "rollover" and "iron curtain" approaches. The rollover approach quantifies a misstatement based on the amount of the error originating in the current period income statement. Thus, this approach ignores the effects of correcting the portion of the current period balance sheet misstatement that originated in prior periods. The iron curtain approach quantifies a misstatement based on the effects of correcting the misstatement existing in the balance sheet at the end of the current period, irrespective of the misstatements year(s) of origination. SEC guidance further states that a registrant's financial statement would require adjustment when either of the rollover or iron curtain approaches result in quantifying a misstatement that is material, after considering all relevant quantitative and qualitative factors:

> The staff believes registrants must quantify the impact of correcting all misstatements, including both the carryover and reversing effects of prior year misstatements, on the current year financial statements. The staff believes that this can be accomplished by quantifying an error under both the rollover and iron curtain approaches as described above and by evaluating the error measured under each approach. **Thus, a registrant's financial statements would require adjustment when either approach results in quantifying a misstatement that is material,** after considering all relevant quantitative and qualitative factors.

> ASC 250-10-S99 (emphasis added).

[115] **Note:** Pursuant to required use of the iron curtain and rollover methods, these calculations evaluate Anadarko's ongoing failure to expense Shen-3 and related misstatement across the various periods presented. These percentages were calculated using Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333; 2015.03.31 Q1.GG.10SW AGING AND NET CHANGES - 04.20, KPMG_APC_0021079; 2015.07.14 Q2.GG.10 SW AGING, KPMG_APC_0009967; 2015.10.14 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0003445; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.03.31 Q1.GG.10 SW AGING AND

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 39**

**CONFIDENTIAL**

| Percentage Impact of Misstatements on Various Financial Metrics | | | | | |
|---|---|---|---|---|---|
| | Q4 2014 | FY 2014 | Q1 2015 | Q2 2015 | Q3 2015 |
| Income (Loss) Before Income Taxes | 14.1% | 117.9% | 1.4% | 34.8% | 2.1% |
| Suspended Exploratory Well Costs | 4.2% | 4.2% | 4.2% | 3.8% | 5.8% |
| Dry Hole Expense | 27.1% | 8.4% | 229.0% | 495.4% | 7.9% |
| | Q4 2015 | FY 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
| Income (Loss) Before Income Taxes | 2.9% | 0.7% | 4.6% | 6.9% | 6.3% |
| Suspended Exploratory Well Costs | 5.7% | 5.7% | 5.7% | 5.1% | 5.5% |
| Dry Hole Expense | 33.1% | 6.1% | 580.0% | 1276.0% | 31.4% |

b)  Qualitative Factors Further Demonstrate That Anadarko's's Failure to Properly Account for and Disclose Shen-3 Drilling Costs Was Material

76. While the assessment of quantitative factors is necessary and provides a preliminary basis for establishing the materiality of Anadarko's misstatements and disclosure omissions, the consideration of qualitative factors further supports that conclusion. In this regard, ASC 250-10-S99 recognizes that the evaluation of qualitative factors is an integral component of a materiality analysis. For example, the SEC Staff has stated that qualitative factors may render a quantitatively small misstatement material:

> [I]f qualitative factors can cause small errors to be material, can qualitative factors cause large errors to be not material? With the benefit of hindsight, it's pretty clear that the answer is yes.[116]

77. ASC 250-10-S99 identifies several considerations that may render material quantitatively small misstatements, including the following examples:

a.  "whether the misstatement changes a loss into income or visa versa";

---

NET CHANGE, KPMG_APC_eA_0007094; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; GG.4.G.3.40 9-30-2016 Dry Hole Expense, KPMG_APC_eA_0008256 and reported financial statement amounts included in Anadarko's 2014 Form 10-K; Current Report on Form 8-K filed February 2, 2015, Q1 2015 Form 10-Q; Q2 2015 Form 10-Q; Q3 2015 Form 10-Q; 2015 Form 10-K; Current Report on Form 8-K filed February 1, 2016; Q1 2016 Form 10-Q; Q2 2016 Form 10-Q; Q3 2016 Form 10-Q.

[116] Todd E. Hardiman, Associate Chief Accountant, SEC Division of Corporation Finance, "Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments," December 11, 2007.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 40**

CONFIDENTIAL

b.  "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability"; and

c.  "whether the misstatement has the effect of increasing management's compensation."[117]

78.  These qualitative considerations further support my opinion that Anadarko's failure to properly expense and disclose suspended Shen-3 drilling costs was material. For example, the Company's failure to properly recognize Shen-3 costs as a dry hole expense during the year ended December 31, 2014 allowed Anadarko to report income before taxes. If these costs had been expensed during 2014, Anadarko would have reported a net loss before taxes.

79.  Moreover, given Anadarko's asserted potential significance of the Shenandoah project, including Shen-3, on the Company's future operations and profitability, Anadarko's disclosures asserting the success of Shen-3, despite it being a dry hole, further supports the materiality of Anadarko's misstatement and related disclosure omissions.[118] Indeed, Robert Gwin, Anadarko's former Chief Financial Officer and President, acknowledged the Company's stock price increased following the discovery of Shen-2 and internal communications speculating that Anadarko's stock would exceed $100 per share because of the Shenandoah basin project.[119]

---

[117] ASC 250-10-S99.

[118] ASC 250-10-S99 ("Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material. When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.").

[119] Ex. 441; Deposition of Robert Gwin, 77:18-79:15 ("Q And one of the headlines that they deem important for that day related to the Shenandoah results, Shenandoah 2 results; correct? A I have to go back down. I know it says something about ConocoPhillips. Yes, that's correct. Q And ConocoPhillips was a partner on the Shenandoah prospect; right? A That's correct. Q And so after you received this briefing, Chuck Meloy responded to -- replied all with a jubilant response; right? A Yes, he did. Q It was, 'Booyah and thumbs up to our exploration team once again'? A Yes. Q That was referring to the news at

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 41**

**CONFIDENTIAL**

80. In this regard, the importance of both Shenandoah and Shen-3 were repeatedly communicated by Anadarko's management and others. For example:

   a. As early as February 2013, Anadarko's management characterized Shenandoah as a "**big exploration**" project, noting further that it was "**very encouraged**" by what the Company was seeing.[120]

   b. In May 2013, Mr. Walker observed that "[a]ccelerating the value of the newly discovered Shenandoah Basin" was "**critical**" given that it was "**one of the company's largest discoveries ever in the Gulf of Mexico**."[121]

   c. Weeks later, Frank Patterson, Anadarko's Senior Vice President of Exploration, similarly observed that "[i]n the Gulf of Mexico, Ernie [Leyendecker] is very excited about the Gulf of Mexico. How can you not get excited when you start the year with a well, the Shenandoah appraisal well, where you have over 1,000 feet of pay. **Shenandoah could end up being one of the largest discoveries in the Gulf of Mexico, we don't know. We have appraisal work that we have to do so we're pretty excited about that**."[122]

   d. Expressing continued excitement about Shenandoah in the Company's Q2 2013 earnings call, Robert Daniels, Anadarko's Executive Vice President - International &

---

Shenandoah; right? A Yes. It appears to be. Chuck ran our development organization and so he was congratulating exploration organization on their success with that well. And Al Walker responds with a 'I will second that. We are on our way to three digits.' And what do you -- what did you understand Al Walker's email to refer to? A I don't know. I wouldn't speculate. I don't remember getting the email even though I was clearly on it and then I responded to everyone congratulations as well obviously. Q And his reference -- Mr. Walker's reference to three digits, do you understand that to be the stock price? A It could have been, yes. I don't know where our stock was trading at that time. So I don't know that it was. It could have been. Q It's a reasonable assumption; right? A I think it's reasonable. Q And so Al Walker is saying that the good exploration news from Shenandoah meant that the Anadarko stock price was on its way to over $100 per share? A I think it's reasonable to assume that, but again, I don't know what he's specifically referring to. Q It's a reasonable conclusion? A I think as I already stated, it's reasonable.").

[120] Shareholder/Analyst Call, February 20, 2013 (emphasis added).

[121] Q1 2013 Earnings Call, May 7, 2013, p. 5 (emphasis added).

[122] Company Conference Presentation, May 22, 2013, p. 8 (emphasis added).

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 42**

**CONFIDENTIAL**

Deepwater Exploration, stated that Anadarko was "excited about the whole Shenandoah mini-basin. **We have the big discovery at Shenandoah**."[123]

e.  When further asked by an analyst in September 2013 whether a third well would be drilled in Shenandoah, Mr. Walker stated: "**You bet**. **We will be looking at a lot of things in Shenandoah. We're pretty excited, as you might imagine, with 1,000 feet of pay**."[124] More generally, Mr. Walker expressed his excitement about the Company's future given the Gulf of Mexico, including Shenandoah, noting that:

> [W]e've come out of this with some very significant results. And I think you've heard us talk a lot about the Shenandoah-2 recently. And I think Shenandoah and that whole mini basin is something that Ernie Leyendecker and our Gulf of Mexico exploration folks are just delighted and very excited about. We had about 1,000 feet of pay in the second Shenandoah well. We also had around 400 feet of pay in the Coronado well, and in the Yucatan well, we were at about 120 feet of pay.
> Now we're the only company that's in all 3 of these. So we have a bit of a unique view of what this basin might be able to provide in the future.[125]

f.  In late 2013, when asked about future prospects that support the Company's cash flows, Mr. Gwin conveyed that Shenandoah stood out:

> Shenandoah, I think, is one that's easy to look at and say if you saw what we did with Lucius and that Lucius spar I showed you, we're building an identical spar. We designed it once and we're building it twice for Heidelberg. **If we were to look at what's the kind of the most attractive next step here, even though, obviously, there's a lot of additional work to do, Shenandoah stands out**.[126]

---

[123] Q2 2013 Earnings Call, July 30, 2013, p. 8 (emphasis added).

[124] Company Conference Presentation, September 12, 2013, p. 1 (emphasis added).

[125] Company Conference Presentation, September 12, 2013, p. 8 (emphasis added).

[126] Company Conference Presentation, September 12, 2013, p. 13 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 43**

CONFIDENTIAL

g.  In November 2013, Mr. Leyendecker described Shenandoah as "one of the most exciting things" that he has "done" and "seen" in his career. He expressed this excitement in terms of being for both the "industry and for Anadarko."[127]

h.  Mr. Daniels described the Company's next exploratory steps, including its desire to find oil/water contact in February 2014, noting:

> Of course, the 2013 appraisal well found 1,000 feet of pay and no oil/water contact, so we're going to be trying to push the oil/water contact out and look at the aerial extent of these reservoirs, which we do think are very are [sic] aerial-extensive based on the drilling we've done in here.[128]

i.  During its March 2014 investor conference presentation, the Company described the Shenandoah Basin as a "$2-$4 Billion Net Opportunity."[129]

j.  Anadarko's management continued to reference the success of Shenandoah during its May 2014 conferences calls, describing the basin as "being quite a sizable potential producer"[130] and "one of the best-looking logs … seen in a long time, big, thick, thousand foot-type of pay."[131]

k.  In October 2014, Mr. Daniels publicly recognized the specific importance of Shen-3 to the Shenandoah project stating in part that Anadarko was "still excited about the Shenandoah Basin," and that "**Shenandoah 3 is going to be real key for us**."[132] Less than one month later, Mr. Daniels reiterated his excitement about Shenandoah, noting further that the drilling of Shen-3 was almost complete and the Company would provide an update on the results during its next conference call.[133]

---

[127] Company Conference Presentation, November 22, 2013, p. 7 (emphasis added).

[128] Q4 2013 Earnings Call, February 4, 2014, p. 16.

[129] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

[130] Q1 2014 Earnings Call, May 6, 2014, p. 12.

[131] Company Conference Presentation, May 20, 2014, p. 8.

[132] Q3 2014 Earnings Call, October 29, 2014, p. 9 (emphasis added).

[133] Company Conference Presentation, November 13, 2014, p. 7.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 44**

**CONFIDENTIAL**

81.    While the drilling results became evident during the Company's Q4 2014 financial reporting period, Anadarko's failure to write off its "unsuccessful" Shen-3 drilling costs as dry hole expense was a significant failure, especially in consideration of the aforementioned positive expectations of the Shenandoah project. Of further significance was Anadarko's other 2014 disclosures that did not explicitly acknowledge that Shen-3 was a dry hole or wet well.[134] Instead, Anadarko disclosed the favorable outcome of its Shen-3 well, characterizing it as a "very successful appraisal well,"[135] and in March 2015 generally noted that Shenandoah was "[a]dvancing [t]oward [d]evelopment."[136]

82.    More specifically, following Anadarko's Q4 2014 earnings release and operations report (which contained positive and incorrect statements regarding Shenandoah, particularly about finding 50% more resources rather than actually finding less, see for example paragraph 41, and its related footnotes),[137] BofA Merrill Lynch's Investment Researcher, Douglas Blyth Leggate, referenced Anadarko's report regarding Shenandoah, including Shen-3, and inquired about the Company's plans for project development.[138] In response,

---

[134] Q4 and Full Year 2014 Earnings Call, February 3, 2015, Anadarko Current Report on Form 8-K, February 2, 2015, Anadarko 2014 Form 10-K.

[135] 2015 Earnings Guidance Update Call, March 3, 2015, p. 12 ("Let's look at some more details of a couple of our focus areas, starting in the deepwater Gulf of Mexico. We're excited about the advancement at Shenandoah. We pushed down-dip on Shenandoah 3, searching for the oil-water contact, looking for reservoir continuity and quality and to get a core in the down-dip portions of the reservoir. This was a very successful appraisal well.").

[136] 2015 Anadarko Investor Conference Call Presentation, March 3, 2015, p. 47.

[137] Fourth-Quarter 2014 Operations Report dated February 2, 2015, APC-00002814-2830 at 2825 ("Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range."); Current Report on Form 8-K dated February 2, 2015 ("Appraisal activity offshore Côte d'Ivoire at the Paon discovery and in the Gulf of Mexico at the Shenandoah discovery continued to validate the company's geologic models around these apparent commercial discoveries.")

[138] Q4 and Full Year 2014 Earnings Call, February 3, 2015, p. 7.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 45**

**CONFIDENTIAL**

on February 3, 2015, Mr. Daniels conveyed management's excitement at Shenandoah and the "very good" project results:

> **At Shenandoah, start there, we're so excited about what we're seeing there. We've got very good results for what we set out to do at the most recent appraisal well.** If you remember, that appraisal well was several miles away and about 1,500 feet down dip of the #2. I guess 2.3 miles to the east and 1,500 feet down dip. And we were looking to see if we could establish oil-water contacts at that location, so we knew we'd be very far down dip and close to that. We wanted to look at the lateral sand and the reservoir continuity. We wanted to look at the quality of the sands in that area because as we get down closer to the oil-water contact, we have to get an idea about the drive mechanism. And would we have an effective water drive and -- for a recovery. We had a model that we would see potential interval expansion as we moved off structure. And then we wanted to get pressure data to show pressure continuity into the other #2 well. **So overall, we're looking to understand the oil in place better and the potential recovery mechanisms.** And if you look at the results, we really did all of that. We have excellent lateral sand continuity. The packages are all present. They're very well correlatable, they've expanded. So that model of expansion did work out. **We ended up with about 1,470 feet of gross sand section versus 1,000 feet that we had in the #2 well. The oil-water contacts were not encountered in the well. But based on the pressure data, we were able to project those up. So we got a much better handle on the oil in place and that has expanded with more confidence on it**. **So that was a very positive thing. Reservoir quality was good, so that gives us a lot of confidence on the potential for the water drive. So we've got a lot more confidence on our geologic model on the eastern side.**[139]

83.    Anadarko reiterated its Shen-3 well results in its 2014 Annual Report on Form 10-K.[140] Notably, these and other disclosures (*e.g.*, managements' disclosed assertion that the Shenandoah basin represented a $2-$4 billion net opportunity)[141] are in contrast to the "bad

---

[139] Q4 and Full Year 2014 Earnings Call, February 3, 2015, p. 8 (emphasis added).

[140] Anadarko 2014 Form 10-K, p. 9 ("The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.").

[141] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 46**

CONFIDENTIAL

news," "unsuccessful," "wet well," and "dry hole" characterizations of Shen-3 noted above beginning at paragraph 41. Moreover, these disclosures were inconsistent with information reflecting that as a result of Shen-3, Anadarko's estimated gross oil reserves in the Shenandoah area actually decreased from a mean 1200 MMBOE after drilling Shen #2, to a mean of between 740 MMBOE (with fault) and 920 MMBOE (without fault) (a 23% to 38% decrease in estimated oil reserves).[142]

84.    In this regard, Patrick McGrievy, Anadarko's former Deepwater Gulf of Mexico General Manager, testified that based on the preliminary results from Shen-3, there were concerns regarding Shenandoah's size and commerciality.[143] Mr. McGrievy further testified that the findings from Shen-3 resulted in a significant downward revision to the resource size of Shenandoah.[144]

---

[142] Email from Jake Ramsey with Attached Resource Estimate dated November 22, 2014, APC-00617381; Shenandoah Resource Estimate APC-00617383. *See also* email from Pat McGrievy dated January 26, 2015, APC-00863988-3989.

[143] Deposition of Patrick McGrievy, 147:15-149:4 ("And Lea Frye's e-mail on October 1st, 2014, says, 'Dan from COP called me' -- is that ConocoPhillips? A. Yes, it is. Q. – 'and wanted to chat. Based on Shen 1 pressures and the new interpreted raft areas COP is concerned. He has run some volume sensitivities with new maps and OWC variance and is seeing in place volumes basically cut in half. They are very concerned about size and commerciality.' [As read] Does that refresh your recollection about what ConocoPhillips' concerns were around this time? A. Yes. Q. And so at this point, based on preliminary results from Shen 3, they were concerned about Shenandoah's size and commerciality? A. Yes. Q. And they were seeing the volumes being cut in half? A. Evidently so, as per Lea Frye, right. … Q. And do you have any reason to doubt that she conveyed to you the same concerns that Lea relayed in this e-mail? A. I don't have any reason to believe otherwise, no. Q. And that's -- that's generally your recollection, that ConocoPhillips was concerned at this point in time once preliminary results came from Shen 3? A. Yeah, I think so.").

[144] Deposition of Patrick McGrievy, 149:17-150:14 ("Q. And the well results from Shen 3 which found no hydrocarbons resulted in a significant downward revision to the resource size of Shenandoah 3? A. Yep. Yes, it would have. Q. So ConocoPhillips had to about cut in half internally -- internally. At the development team, was it also cut in half? A. Can you re- -- repeat the question again? I'm sorry. Q. So just reading this and referring to the volumes being cut in half -- A. Right. Q. -- that was ConocoPhillips' view. Was that also the view of the development team? A. I don't recall specifically on what volumes or how much we cut our volumes back by. It could have been. Q. But it was -- A. I just don't recall. Q. -- it was a significant revision? A. It was a large revision, yeah, downward.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 47**

**CONFIDENTIAL**

85.   Also, reflecting on the sensitivity and importance of avoiding making negative comments about the Shenandoah Basin, Anadarko's CEO, Robert Walker[145] and its CFO, Robert Gwin,[146] avoided, in earnings calls or other disclosures, that Shen-3:

   a.   Was a wet well.

   b.   Reduced the resource range (MMBOE).

   c.   Had technological challenges.

   d.   Execution risk.

   e.   A major fault.

86.   The Shen-3 results and the associated reduction in resource estimates was further significant considering that management's bonus were affected by performance goals that included consideration of MMBOE sales and related reserves (representing an aggregate performance goal weighting factor ranging from 45% - 50%).[147] Although the Shenandoah basin project, including Shen-3, was exploratory in nature and in fact, a dry hole, the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well to extract oil resources that could impact management performance goals and related compensation in the future.[148] In this

---

[145] Deposition of Robert Walker, *e.g.*, 172:13 – 175:18, and 193:6 – 193:25.

[146] Deposition of Robert Gwin, *e.g.*, 130:19-131:8, 137:16-139:3, 142:22-144:3, 188:17-25, 213:2-16, 228:21-239:71.

[147] *See, e.g.,* Proxy Statement on Form Schedule 14A, March 18, 2016, 42-45; Proxy Statement on Form Schedule 14A, March 23, 2015, 44-46.

[148] *See also* Deposition of Lea Frye, 20:25-21:15 ("So could you restate -- given what we've talked about, could you restate what the exploration bonus was based on in your experience? A It was based on meeting or exceeding meeting a particular value of MMBOE or millions of barrels of oil equivalent found in a particular year. Q And who set the target for the exploration unit in terms of the MMBOE that were to be found in a particular year? A I would not know who all was involved, but it would have been a higher level of management that set that. Q And who was management at that point in time for exploration? A There was Bob Daniels was senior VP, I believe, if the title is correct.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**     **Page 48**

**CONFIDENTIAL**

regard, materiality evaluations under relevant accounting guidance requires a consideration of the "total mix" of information made available.

87.    In consideration of both the quantitative and qualitative factors described above, the Company's failure to properly recognize and disclose the aforementioned unsuccessful findings associated with the Shen-3 dry hole was material to each of the respective financial reporting periods beginning December 31, 2014 and ended September 30, 2016.

**D.  GAAP REQUIRED ANADARKO TO IMPAIR AND EXPENSE, ASSETS CAPITALIZED IN CONNECTION WITH THE SHENANDOAH BASIN PROJECT WHEN SUBSTANTIAL DOUBT ABOUT THE PROJECT'S ECONOMIC VIABILITY EXISTED**

88.    In addition to having capitalized suspended drilling costs associated with Shen-3, Anadarko capitalized other exploration costs associated with the Shenandoah basin project during the Relevant Period. These amounts included non-producing leasehold ("NPLH") costs, the suspended well costs associated with other exploration-type wells (*i.e.*, Shen-1, Shen-2, Shen-4, Shen-5, etc.), and other related costs. These collective amounts ranged from approximately $769.9 million and $786.6 million between December 31, 2015 and December 31, 2016.[149]

89.    Relevant GAAP applicable to unproven properties and exploratory wells, including the Company's Shenandoah project, required that Anadarko periodically assess whether such properties (and related assets) were impaired during the Relevant Period.[150] As described below, GAAP required that Anadarko impair and expense, Shenandoah basin project assets when "substantial doubt" about the project's economic viability existed (*i.e.*, by December 31, 2015 as noted in Condition 3). This requirement is consistent with the understanding that unsuccessful exploration efforts be immediately recorded on the income statement as

---

[149] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

[150] ASC 932-360-35.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 49**

**CONFIDENTIAL**

an expense, as discussed in greater detail hereafter.[151] It is further consistent with the Company's actual write off of all related Shenandoah basin project costs (*i.e.*, approximately, $901.6 million) during the quarter ended March 31, 2017, when internal Anadarko documents reflect that the project was "economically challenged" and the "prevailing viewpoint is that there is little commercial or subsurface value to be gained through continued bi-annual appraisal drilling operations at Shenandoah, currently required for lease maintenance operations."[152]

> 1. ***The Required Impairment of Shenandoah Completed Exploration Wells and Exploratory-Type Stratigraphic Well Costs***

90. As of the respective financial reporting periods ended between December 31, 2015 and 2016, Anadarko had capitalized suspended exploratory wells and stratigraphic exploratory-type wells costs of between $252.6 million and $261.5 million as set forth below:

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Suspended Well Costs | $260.2 | $261.5 | $259.8 | $252.6 | $255.2 |

91. ASC 932-360-35 required Anadarko to evaluate its progress in assessing reserves for those wells that had not been written off as dry holes (*e.g.*, Shen-1, Shen-2, etc.).[153] As set forth in the ASC guidance, to the extent that Anadarko failed (1) to make sufficient progress in assessing each specific well's reserves and the economic and operating viability of the project,[154] **or** (2) **when information obtained raised substantial doubt about the economic or operational viability of the Shenandoah project overall**, the Company was

---

[151] *See, e.g.,* Deloitte Oil and Gas, *Accounting, Financial Reporting, and Tax Update*, January 2016, p.2.

[152] Shenandoah Exploration and Development Teams Memo to Executive Committee Re: Recommendation to Proceed with Issuance of SOP at Shenandoah dated April 24, 2017, APC-01283759.

[153] ASC-932-360-35-13 and 18-20.

[154] FASB Staff Position, FAS 19-1 ("The FASB staff believes that exploratory well costs should continue to be capitalized provided the well has found a sufficient quantity of reserves to justify its completion as a producing well and the enterprise is making sufficient progress assessing the reserves and the economic and operating viability of the project."); ASC 932-360-35-19 ("All relevant facts and circumstances shall be evaluated when determining whether an entity is making sufficient progress on assessing the reserves and the economic and operating viability of the project.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 50**

CONFIDENTIAL

required to expense capitalized costs associated with its respective wells, net of its salvage value, if any:

> If the sufficient progress criteria (see paragraphs 932-360-35-18 through 35-20) is not met, or **if an entity obtains information that raises substantial doubt about the economic or operational viability of the project, the exploratory well or exploratory-type stratigraphic well shall be assumed to be impaired and its costs, net of any salvage value, shall be charged to expense**.[155]

92.   Consistent with these requirements, the Company disclosed in its 2015 and 2016 financial statements, that if "… information becomes available that raises substantial doubt as to the economic or operational viability" of a project, including Shenandoah, "the associated costs will be expensed at that time."[156]

93.   Pursuant to the understanding that Plaintiffs will establish that by December 31, 2015 there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable (*i.e.*, Condition 3), Shenandoah-related assets were impaired under the relevant GAAP set forth above. In this regard and as explicitly stated within ASC 932-360-35-13, all suspended well costs associated with the Shenandoah Basin Project (*i.e.*, see paragraph 90 above) were required to be expensed, net of any salvage value, beginning as of December 31, 2015.

### 2. *The Required Impairment of Other Capitalized Costs Associated with The Shenandoah Basin Project*

94.   As of the respective financial reporting periods ended between December 31, 2015 and 2016, Anadarko had also capitalized the following other costs which the Company directly attributed to the exploratory Shenandoah basin project:

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Non-Producing Leasehold Asset | $462.7 | $462.7 | $458.4 | $458.4 | $458.4 |

---

[155] ASC 932-360-35-11 and 13 (emphasis added).

[156] Anadarko 2015 Form 10-K, p. 103; Anadarko 2016 Form 10-K, p. 105. *See also* Deposition of Catherine Green 42:17-21 ("Yes. If there's substantial doubt about the economic and commercial viability of the project, the well cost or the well costs, if there are multiple suspended wells, should be charged to expense.").

**CONFIDENTIAL**

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Capitalized Interest | $46.9 | $54.0 | $61.7 | $68.0 | $69.0 |
| Asset Retirement Obligations | $0.0 | $0.0 | $0.0 | $0.0 | $4.0 |
| **Total** | **$509.6** | **$516.7** | **$520.1** | **$526.4** | **$531.4** |

95.    Anadarko was required to assess whether these unproved property-related[157] assets were also impaired.[158] Given that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, a probable economic benefit relating to Shenandoah did not exist to support the continued capitalization of related project exploration costs.

96.    Specifically, the term "substantial doubt" is described in GAAP to exist when a condition becomes "probable" or is "likely" to occur.[159] In the parlance of GAAP, Condition 3 reflects an understanding that the Shenandoah basin project was not likely to be economically viable and therefore, the economic viability of Shenandoah basin project was remote.[160]

97.    Given Condition 3, it is therefore unlikely that any additional exploratory efforts and costs undertaken by Anadarko would cause the Shenandoah basin project to become economically viable. Indeed, while Anadarko incurred additional exploratory costs

---

[157] Unproved properties are properties with no proved reserves. ASC Master Glossary.

[158] ASC-932-360-35-11.

[159] ASC Master Glossary (emphasis added) ("**Substantial doubt** about an entity's ability to continue as a going concern **exists when conditions and events, considered in the aggregate, indicate that it is probable** that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued (or within one year after the date that the financial statements are available to be issued when applicable). The term probable is used consistently with its use in Topic 450 on contingencies. … Probable [meaning] [t]he future event or events are likely to occur.").

[160] GAAP establishes three measures of probability under ASC Topic 450: (1) probable, (2) reasonably possible, and (3) remote. As defined above, probable is generally defined as "likely to occur." Reasonably possible reflects a likelihood that is "more than remote but is less than likely." Remote is generally defined to mean a "slight" likelihood of occurrence. ASC Master Glossary. Consistent with the characterization above, Anadarko disclosed that the Shenandoah wells were expensed during 2017 "as it was no longer reasonably possible that the wellbore could be used in the development of the project." Anadarko 2017 Form 10-K, p. 109.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 52**

**CONFIDENTIAL**

subsequent to December 31, 2015,[161] the related activities did not alter management's ultimate conclusion during the financial reporting period ended March 31, 2017, that its Shenandoah-related capitalized costs, including its NPLH assets, were fully impaired. Accordingly, pursuant to a determination that the Shenandoah basin project was not likely to be economically viable by December 31, 2015, GAAP required that Anadarko impair and expense other Shenandoah-related capitalized costs, including its NPLH assets.

98.    As discussed above, the Company's accounting treatment during Q1 2017 is consistent with this conclusion. Specifically, given the determination that the Shenandoah project was "economically challenged" and the "prevailing viewpoint [wa]s that there [wa]s little commercial or subsurface value to be gained through continued bi-annual appraisal drilling operations at Shenandoah, currently required for lease maintenance operations,"[162] Anadarko fully expensed all Shenandoah's related assets as impaired under GAAP.[163]

99.    Anadarko's external auditors similarly noted the following in connection with the Company's Q1 2017 write off of $902 million in Shenandoah-related suspended well costs, NPLH assets and capitalized interest:[164]

> [T]he entire [suspended well cost] balance of the Shenandoah prospect was written off to dry hole in Q1 2017 as **the play was determined to be uneconomical and the Company's partners elected to not continue with exploration and development**. …[165]
>
> *          *          *
>
> **[T]he Company and its partners lacked the management commitment to continue the exploration in the overall Shenandoah**

---

[161] Evidence reflects that leases pertaining to the Shenandoah basin project would expire upon Anadarko's failure to undertake drilling activities within specified time parameters. *See, e.g.,* Deposition of Deposition of Lea Frye, 34:9-21 and 215:17-216:13; Deposition of Patrick McGrievy, 122:7-126:20; Email from Pat McGrievy dated 4/2/2014, APC-00004967 at 4967.

[162] Shenandoah Exploration and Development Teams Memo to Executive Committee Re: Recommendation to Proceed with Issuance of SOP at Shenandoah dated April 24, 2017, APC-01283759.

[163] *See, e.g.,* Anadarko Q1 2017 Form 10-Q, p. 13.

[164] GG.41 3-31-2017 DRY HOLE EXPENSE MEMO, KPMG_APC_eA_0008471; Q1.GG.33.A Q1 3-31-2017 NPLH IMPAIR MEMO, KPMG_APC_eA_0008461.

[165] GG.4.A.8.05 12-31-2017 SUSPENDED WELLS MEMO, KPMG_APC_eA_0009163 at 9185 (emphasis added). *See also* GG.41 3-31-2017 DRY HOLE EXPENSE MEMO, KPMG_APC_eA_0008471.

**CONFIDENTIAL**

**area. Given these considerations, KPMG notes it is not unreasonable or inappropriate for the entire balance of the leases above to be expensed through NPLH impairment.**[166]

100. Indeed, Ms. Green testified that the Company's lack of commitment to continue exploring the Shenandoah area referenced by KPMG above directly resulted from the "substantial doubts" about the economic viability of Shenandoah:

> Q. And management was not committed because it had substantial doubts about the economic viability of Shenandoah; correct?
>
> THE WITNESS: At March 31st, 2017, yes.[167]

3. *Information Available is Consistent with The Understanding That There Was Substantial Doubt that the Shenandoah Basin Project (as a whole) Would Be Economically Viable*

101. While the opinions expressed in this report are based on the above noted conditions described above in paragraph 2, including Condition 3, I have reviewed the following information that is consistent with the conclusion that by December 31, 2015, there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable:

a. As early as October 2014, Anadarko's partner, ConocoPhillips communicated to Lea Frye, Anadarko's Senior Staff Reservoir Engineer for the Company's operations in the Eastern Gulf of Mexico, that Conoco had basically cut its estimated oil volumes in half following additional interpretations of the Shenandoah basin.[168] As a result, Conoco further noted that it was "very concerned" about the size and commerciality of the Shenandoah project.[169]

b. Darrell Hollek, Anadarko's Senior Vice President of Deepwater Operations in the Gulf of Mexico, testified that a general guideline and hurdle utilized for consideration of

---

[166] Q1.GG.33.A Q1 3-31-2017 NPLH IMPAIR MEMO, KPMG_APC_eA_0008461 at 8462 (emphasis added).

[167] Deposition of Catherine Green, 146:24-147:8.

[168] Exhibit 259, Email from Lea Frye dated October 2, 2014, APC-00013459 at 3459.

[169] Exhibit 259, Email from Lea Frye dated October 2, 2014, APC-00013459 at 3459.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**            **Page 54**

CONFIDENTIAL

whether to transition an exploratory project like Shenandoah to commercial development was a PIR10 factor of .30.[170] The following evidence reflects a PIR 10 factor less than .30:

1.  In March 2015, Ms. Frye, developed and circulated an economic analysis for the Shenandoah project reflecting PIR10 measures below .30 and in several instances, negative amounts.[171] Only assuming a 10% probability ("P10") and an $85 price per barrel of crude oil, did the PIR10 measure exceed .30.[172] Notably, during March 2015, the closing price of crude oil ranged from $43.46 to $51.53, well below the $85 price per barrel supporting a PIR10 above .30.[173] In that same chart, the PIR10 measure at $60 per barrel was .13 while a 50% PIR was -01.

2.  In a January 2016 email, Pat McGrievy circulated recommended economics associated with the Shenandoah basin project.[174] As conveyed in both the email and the attached economic summary slides, Mr. McGrievy identified and recommended a "risked PIR of .22," well below the .30 threshold above at $60 per barrel:[175]

---

[170] Deposition of Darrell Hollek, 53:6-54:4 ("There's a reference here to what commercial development would require to generate to generate a 'PIR 10=0.30.' Do you see that? A. Yeah. Q. And was a PIR 10 of .30 generally a threshold for Anadarko to consider a prospect commercial? A. I don't remember exactly, that -- but that may have been a minimum threshold. Q. And would that have been set forth in any policies? A. I wouldn't say a policy; maybe a general guideline. Q. Do you recall what the document was called? A. No, I don't. Q. But in practice, you recall that .3 was generally considered the threshold? A. I believe that was sort of a hurdle rate. THE COURT REPORTER: A what rate; hurdle rate? THE WITNESS: Yes. Basically an economic threshold to be even considered.")

[171] Exhibit 300, Email from Lea Frye dated March 23, 2015, APC-00025532-5533.

[172] Exhibit 300, Email from Lea Frye dated March 23, 2015, APC-00025532-5533.

[173] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[174] Exhibit 269, Email from Pat McGrievy dated January 19, 2016, APC-00060382-0383.

[175] Exhibit 269, Email from Pat McGrievy dated January 19, 2016, APC-00060382-0383.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 55**

**CONFIDENTIAL**

| Case Description | | Invest $60/bbl | |
|---|---|---|---|
| | | Net AT NPV10 ($MM) | AT PIR10 |
| Zero Contingency | Risked Mean | 237 | 0.28 |
| | Unrisked Mean | 283 | 0.30 |
| Facility Only Contingency | Risked Mean | 182 | 0.19 |
| | Unrisked Mean | 221 | 0.21 |
| Recommended Contingency | Risked Mean | 174 | 0.18 |
| | Unrisked Mean | 212 | 0.20 |
| Recommended Contingency (20K Well Rates) | Risked Mean | 191 | 0.20 |
| | Unrisked Mean | 232 | 0.22 |
| Recommended Contingency (20K Well Rates Optimized) | Risked Mean | 208 | 0.22 |
| | Unrisked Mean | 250 | 0.24 |

3. Notably, while the above analysis assumed a $60 price per barrel (bbl) of crude oil, the actual price of crude oil at the end of 2015 averaged less than $40/bbl.[176] Indeed the average price of crude oil would not equal or exceed $60/bbl until late December 2017.[177]

c. By December 2016, prior to the Q1 2017 write-off of Shenandoah related assets, Anadarko's Controller, Chris Champion appeared to have communicated that such a write down of Shenandoah assets was "imminent."[178] Consistent with this amount, the Company's disclosed 12%-14% annual oil growth rate for the five future years ended 2020, assumed that no investment in Shenandoah would be made.[179]

---

[176] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[177] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[178] Email from Pat McGrievy dated March 31, 2017, APC-00307805. *See also* Deposition of Patrick McGrievy, 271:13-272:2 (emphasis added) ("Q. Could you -- could you read the next sentence, please? A. 'I understand, talking with Luis, that Chris Champion did set the stage with some of the executive team in 2016' -- 'December, 2016 to let them know that a fairly substantial write-down at Shenandoah would be imminent in 2017.' **Q. So to the best of your understanding, the executive team was apprised as of the end of 2016, that there would be a write-off or a write-down at Shenandoah in 2017? A. That's what Chris Champion told me. Q. Do you have any reason to doubt that was true? A. No, I really don't**.").

[179] Anadarko Form 8-K, January 31, 2017; Email from Darrell Hollek dated December 15, 2016, APC-00290058.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                **Page 56**

CONFIDENTIAL

E. **ANADARKO REPEATEDLY FAILED TO EXPENSE AND PROPERLY DISCLOSE SHENANDOAH-RELATED SUSPENDED WELL COSTS, LEASEHOLD COSTS AND OTHER CAPITALIZED COSTS DURING EACH OF THE RESPECTIVE ANNUAL AND QUARTERLY FINANCIAL REPORTING PERIODS ENDED BETWEEN DECEMBER 31, 2015 AND 2016 IN VIOLATION OF GAAP AND SEC ACCOUNTING-RELATED REPORTING RULES**

102. Given that by December 31, 2015, there was substantial doubt that the Shenandoah project would be economically viable (*i.e.*, Condition 3), Anadarko's continued capitalization of Shenandoah-related assets beginning as of December 31, 2015 through the financial reporting period ended December 31, 2016, violated GAAP. Specifically, from the financial reporting periods between December 31, 2015 and December 31, 2016, Anadarko improperly reported between $769.8 million and $786.6 million of Shenandoah related assets within its balance sheet.[180] These assets included each of the above noted amounts:[181]

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Non-Producing Leasehold Asset | $462.7 | $462.7 | $458.4 | $458.4 | $458.4 |
| Suspended Well Costs | $260.2 | $261.5 | $259.8 | $252.6 | $255.2 |
| Capitalized Interest | $46.9 | $54.0 | $61.7 | $68.0 | $69.0 |
| Asset Retirement Obligations | $0.0 | $0.0 | $0.0 | $0.0 | $4.0 |
| **Total** | **$769.8** | **$778.2** | **$779.9** | **$779.0** | **$786.6** |

---

[180] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

[181] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 57**

**CONFIDENTIAL**

103. As discussed hereafter, Anadarko's related overstatement of Shenandoah's related assets beginning December 31, 2015 and corresponding disclosure omissions were material to the Company's respective financial statements filed on Forms 10-K and 10-Q.

    1. ***Anadarko's Overstatement of Shenandoah's Suspended Well Costs and Non-Producing Leasehold Assets and Other Related Assets and Corresponding Disclosure Omissions Beginning December 31, 2015 Were Material***

104. The Company's related misstatement and disclosure omissions were material to each of Anadarko's respective financial reporting periods beginning December 31, 2015 and ended December 31, 2016. In this regard, Anadarko's recurring misstatement exceeded well-established SEC quantitative materiality example benchmarks (*i.e.*, 5% of an item).

105. For example, Anadarko's misstatement exceeded 5% of the following relevant disclosed amounts (*i.e.*, Revenue, Oil and condensate sales, Operating income (loss), and Income (loss) before taxes) using both the rollover approach (*e.g.*, FY 2015), and the iron curtain approach (*e.g.*, Q1 2016 through FY 2016):[182]

| Percentage Impact of Misstatements on Various Financial Metrics | | | | | | |
|---|---|---|---|---|---|---|
| | **FY 2015** | **Q1 2016** | **Q2 2016** | **Q3 2016** | **Q4 2016** | **FY 2016** |
| Total Revenue and Other | 9% | 46% | 41% | 41% | 33% | 10% |
| Oil and condensate sales | 14% | 92% | 69% | 63% | 54% | 17% |
| Operating Income (Loss) | 9% | 90% | 235% | 98% | 129% | 30% |
| Income (Loss) Before Taxes | 8% | 56% | 84% | 77% | 152% | 21% |

---

[182] **Note:** Pursuant to required use of the iron curtain and rollover methods, these calculations evaluate Anadarko's ongoing failure to expense Shenandoah-related suspended well costs and unproved property costs, including the unrelated misstatement across the various periods presented. Note that as Shen-3 well costs were not expensed until Q3 2016, the misstatement percentages included such costs during FY2015 through Q2 2016. These percentages were calculated using Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333; 2015.04.20 Q1.GG.10SW AGING AND NET CHANGES - 04.20, KPMG_APC_0021079; 2015.07.14 Q2.GG.10 SW AGING, KPMG_APC_0009967; 2015.10.14 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0003445; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; September 30, 2016 Dry Hole Expense, KPMG_APC_eA_0008256 and reported financial statement amounts included in Anadarko's 2014 Form 10-K; Current Report on Form 8-K filed February 2, 2015, Q1 2015 Form 10-Q; Q2 2015 Form 10-Q; Q3 2015 Form 10-Q; 2015 Form 10-K; Current Report on Form 8-K filed February 1, 2016; Q1 2016 Form 10-Q; Q2 2016 Form 10-Q; Q3 2016 Form 10-Q.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**    **Page 58**

**CONFIDENTIAL**

106.   As noted above, while the assessment of quantitative factors is necessary and provides a preliminary basis for establishing the materiality of Anadarko's misstatements and disclosure omissions, the consideration of qualitative factors further supports my opinion that the Company's Shenandoah-related misstatements were material. Moreover, qualitative factors do not override the conclusion that Anadarko's misstatements were material quantitatively, and thus material for financial reporting purposes.[183]

107.   For example, the misstatement concerned a portion of Anadarko's business (its oil exploration and development segments) that had a significant role in the Company's current and future operations or profitability. A discussed above beginning in paragraph 80, Anadarko repeatedly asserted the potential significance of the Shenandoah project on the Company's future operations and profitability. Prior to the to the end of Q1 2017, Anadarko continued to assert the success of certain wells and the implicit possibility of future economic benefit of its Shenandoah-related investments. The relevance of these statements to the Company's future operations and profitability further supports the materiality of Anadarko's misstatement and related disclosure omissions.

108.   Specifically, in addition to the disclosures through December 31, 2014 described above and after December 31, 2015, in contrast to Condition 3, Anadarko continued to emphasize the significance of Shenandoah in the Company's earnings releases and other disclosures. For example:

   a.   On February 2, 2016, Mr. Daniels asserted Anadarko's contentment with the results of Shenandoah-4 and the "high expectations" the Company had for Shenandoah-5:

> **We're very pleased with it**. We also were able to get about 550 feet of core. That's important for planning what that development could look like. So that's going to be analyzed, turned over to the reservoir engineers as they put together a scenario for how we might develop that.

---

[183] I have considered relevant qualitative factors, including those specifically listed in ASC 250-10-S99 that are described as "considerations that may well render material a quantitatively small misstatement of a financial statement item" when making this determination.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 59**

**CONFIDENTIAL**

> At the same time, we're looking at **drilling Shenandoah 5.** … **We have high expectations for it,** but we need to drill the well and see. That's what appraisal is all about.
>
> Meanwhile, the guys are taking all the information that we obtained from this, rolling it into conceptual planning as to what resources we may be able to recover, how much it might cost, those types of things. As Al said, we're a long ways from sanction at this point. **If Shenandoah-5 is successful, we may move even farther to the east with a Shenandoah-6, but of course that will be all dependent on what happens at Shenandoah-5.**[184]

b.  Two weeks later, Mr. Daniels reiterated the Company's prior successful wells and the advancement being made on the Shenandoah project by Anadarko, asserting:

> On Shenandoah, I don't think that we have a price deck right now that says it would be economic at this because right now, you're still in cost deflation, whether it's on drilling rigs, whether it's on construction cost and your services. … We're planning on appraising it this year, the Shenandoah #5 well will be drilled and that will be off to the east, again, trying to prove lateral extent, that kind of thing. **We did appraise it last year. We had successful wells, 620 feet of pay in that. So we still are advancing the project, but we're a ways away from a sanction at Shenandoah.**[185]

c.  On May 11, 2016 Mr. Leyendecker EVP of Exploration affirmed that Anadarko was continuing to praise the Company's "**fantastic Shenandoah discovery**."[186]

d.  On May 24, 2016 Shandell Szabo, Anadarko's former Onshore Exploration Manager and Director of Investor Relations, characterized Shenandoah as "the finest lower-tertiary discovery to date in the Gulf of Mexico" and commented on its potential:

> I think when you look at Shenandoah, **it goes without saying that it is the finest lower-tertiary discovery to date in the Gulf of Mexico**. And I say that because of a few reasons. When you're looking at these resource, potentially, you look at a couple of things: One, you look at thickness; two, you look at area; and then three, recovery factor.

---

[184] Q4 2015 Earnings Call, February 2, 2016, p. 9 (emphasis added).

[185] Anadarko Conference Presentation, February 24, 2016, p. 8 (emphasis added).

[186] Anadarko Conference Presentation, May 11, 2016, p. 7 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**         **Page 60**

**CONFIDENTIAL**

And when you look at this log, and you can see that hundred foot scale bar on there. That's 1,000 feet of sand full of hydrocarbons. So that's one. It's extremely thick.

Two, when you look at the scale across those blacks, and you can see the northern part there, this spans 9 miles. Those are 3-mile blocks. So you're talking about something that has a lot of area, which is really the biggest driving factor when you talk about size.

And then the last thing is the recovery of this. And so this particular discovery has Miocene-like properties, which means that the reservoir quality is very good. You're looking at [indiscernible] up to 25% here. You're looking at permeabilities in the 100 millidarcy range. Some of the individual sand sees 300, 400 millidarcy perm.

And then the last thing you look at is the fluid properties. It's very light oil out here.

**So from the overall discovery, it's got everything that you're looking for**. We just -- as Bob mentioned, we just finished -- we're just about to finish up the #5 well, so we can't reveal exactly what's going on there. But what I would say is that it looks a whole heck of a lot like the log that you're looking at right here. And when you look at where that falls on that cross section, you can see the #5 well up there on that cross section. So you can see that lighter green color, we're going to be able to turn that dark green. So the lighter green on there is the probable and the darker green is the proven. **And so we're going to have the ability for that large area over there to go ahead and say, "Yes, that's proven." That's tremendous for us**.[187]

e.  On June 28, 2016, Anadarko's President Robert Gwin, affirmed the Company's excitement following Shenandoah-5, including Anadarko's resulting "enthusiasm" for Shenandoah as a "tremendous resource potential:"

[W]e're very excited to be working toward completing the Shenandoah #5 well. Some of you may have heard some comments we've made in the past there. I don't have the log here, the #2 appraisal well, which had over 1,000 feet of net pay that we announced I think it was now a couple of years ago. **But Shenandoah-5, at least in the uphole sections, we talked about the fact that it looked a lot like Shenandoah-2. A lot of enthusiasm around our activities here because of Shen-5**. The results of Shen-5 have put as in a position where we clearly expect to drill Shen-6 later this year and

---

[187] Anadarko Conference Presentation, May 24, 2016, p. 9 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**      **Page 61**

CONFIDENTIAL

continue with an appraisal program there … **Something like a Shenandoah is obviously tremendous resource potential, but the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue**.[188]

    f.   On September 14, 2016, Mr. Gwin reiterated his excitement and referred to Shenandoah as a "great opportunity" for the company:

> The real advantages is the infrastructure and capacity of that infrastructure. And so a lot of people focus on, well, when are we going to see greenfield development and at what price, et cetera, and **we still got a great opportunity at the Shenandoah we're excited about**. And so we ask ourselves those questions all the time, right? We're working at answering it. **But you don't need material commodity price improvement to make money in the Gulf of Mexico**. We're doing it at strip and we think we can continue to do it at strip for a long time to come.[189]

109.   The write-off of Anadarko's Shenandoah suspended costs described in paragraph 102 above would have also had a pervasive impact on other aspects of Anadarko's disclosures within its Annual and Quarterly Reports on Forms 10-K and 10-Q, during the periods between December 31, 2015 and December 31, 2016. These additional disclosures are seen in Anadarko's Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") as called for under Item 303 of Regulation S-K[190] in its Q1 2017

---

[188] Anadarko Conference Presentation, June 28, 2016, p. 9 (emphasis added).

[189] Anadarko Conference Presentation, September 14, 2016, p. 9 (emphasis added).

[190] Item 303 of Regulation S-K (Item 303) requires public companies to include a discussion of the results of operations, liquidity, and other information necessary to an understanding of the registrant's financial condition. This discussion is presented in a single section referred to as Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A). The MD&A section is expected to provide "material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant. SEC Release No. 33-6835. Amongst other disclosures, the SEC's Regulation S-K Item 303 required the following accounting-related MD&A disclosures for annual period: (1) Item 303(a): The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations…Where in the registrant's judgment a discussion of segment information and/or of other subdivisions (e.g., geographic areas) of the registrant's business would be appropriate to an understanding of such business, the discussion shall focus on each relevant, reportable segment and/or other subdivision of the business and on the registrant as a whole." and (2) Item 303(a)(3)(i): "Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**       **Page 62**

CONFIDENTIAL

Quarterly Report on Form 10-Q and its 2017 Annual Report on Form 10-K. In those Forms filed with the SEC, Anadarko's management explained the significant increases in the Company's dry hole expense and impairment of unproved properties.[191] As a result of the misstatements at issue, similar Shenandoah-specific disclosures should have been presented in Anadarko's MD&A's included in the Company's respective Forms 10-K and 10-Q filed for those financial reporting periods between December 31, 2015 and December 31, 2016. However, as the suspended costs were not properly expensed as discussed above, these disclosures required under Item 303 of Regulation S-K were improperly omitted from the Company's respective annual and quarterly reports.

110. Given the quantitative significance of the misstatements described above, as further supported by the indicated significance of the Shenandoah basin project as made evident by the Company's aforementioned statements and disclosures, Anadarko's failure to impair and expense related project costs as of and between December 31, 2015 and December 31, 2016, was material.

Respectfully submitted November 9, 2022,

D. Paul Regan, CPA/CFF

---

to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations." Item 303(c) requires similar disclosures for interim (quarterly) periods. *See also* SEC Release No. 33-8350, SEC Financial Reporting Manual §9220.

[191] Anadarko 2017 Form 10-K, pp. 66-67; Anadarko Q1 2017 Form 10-Q, p. 37.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 63**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

I have relied on all of the documents cited in my report, including the text and footnotes therein. In addition to these documents, I have also listed below other documents that I considered in preparing my report.

**Relativity Documents**
As part of my assignment, I was given access to electronic databases (i.e. Relativity Platform) containing relevant information including documents produced by defendants and third-parties.

**Bates Stamped Documents (beginning bates only):**
ANACOP00000354
ANACOP00025913
APC-00001289
APC-00001791
APC-00001795
APC-00001801
APC-00001803
APC-00001829
APC-00001863
APC-00001866
APC-00001867
APC-00001928
APC-00002563
APC-00002814
APC-00003195
APC-00004967
APC-00005093
APC-00005094
APC-00005095
APC-00009644
APC-00013459
APC-00025532
APC-00060382
APC-00147963
APC-00152617
APC-00156333
APC-00158152
APC-00290058
APC-00307805
APC-00572955
APC-00617381
APC-00617383
APC-00863988

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**        **Page 1 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

APC-01283759
APC-01396003
APC-01396065
APC-01699536
APC-01699656
APC-01720564
APC-01737346
APC-01751288
KPMG_APC_0008143
KPMG_APC_0009967
KPMG_APC_0021079
KPMG_APC_0027263
KPMG_APC_eA_0002511
KPMG_APC_eA_0002531
KPMG_APC_eA_0002543
KPMG_APC_eA_0003043
KPMG_APC_eA_0003262
KPMG_APC_eA_0003349
KPMG_APC_eA_0003445
KPMG_APC_eA_0003451
KPMG_APC_eA_0006079
KPMG_APC_eA_0006098
KPMG_APC_eA_0007094
KPMG_APC_eA_0007100
KPMG_APC_eA_0007189
KPMG_APC_eA_0007376
KPMG_APC_eA_0007469
KPMG_APC_eA_0007566
KPMG_APC_eA_0007983
KPMG_APC_eA_0008256
KPMG_APC_eA_0008355
KPMG_APC_eA_0008461
KPMG_APC_eA_0008471
KPMG_APC_eA_0009163

**SEC Filings**
Anadarko 2007-2017 Annual Reports on Form 10-K and Exhibits
Anadarko Current Report on Form 8-K dated January 31, 2017
Anadarko Current Report on Form 8-K dated February 1, 2016
Anadarko Current Report on Form 8-K, February 2, 2015
Anadarko Proxy Statement on Form Def 14A, March 18, 2016
Anadarko Proxy Statement on Form Def 14A, March 23, 2015

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**          **Page 2 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

Anadarko Q1 2012 - Q3 2017 Quarterly Reports on Form 10-Q and Exhibits
Cobalt 2014 Annual Report on Form 10-K
Conoco 2014 Annual Report on Form 10-K
Marathon 2014 Annual Report on Form 10-K

**Anadarko Transcripts & Presentations**
2014 Anadarko Investor Conference Presentation, March 4, 2014
2015 Anadarko Investor Conference Call Presentation, March 3, 2015
Anadarko Conference Presentation, February 24, 2016
Anadarko Conference Presentation, June 28, 2016
Anadarko Conference Presentation, May 11, 2016
Anadarko Conference Presentation, May 24, 2016
Anadarko Conference Presentation, September 14, 2016
Company Conference Presentation, May 20, 2014
Company Conference Presentation, May 22, 2013
Company Conference Presentation, November 13, 2014
Company Conference Presentation, November 22, 2013
Company Conference Presentation, September 12, 2013
Earnings Guidance Update Call, March 3, 2015
Q1 2013 Earnings Call, May 7, 2013
Q1 2014 Earnings Call, May 6, 2014
Q2 2013 Earnings Call, July 30, 2013
Q3 2014 Earnings Call, October 29, 2014
Q4 2013 Earnings Call, February 4, 2014
Q4 2015 Earnings Call, February 2, 2016
Q4 and Full Year 2014 Earnings Call, February 3, 2015
Shareholder/Analyst Call, February 20, 2013

**Accounting and Auditing Guidance, SEC Rules and Related**
17 CFR § 210.12b-2
17 CFR § 210.12b-20
17 CFR § 210.4-01
AICPA Audit and Accounting Guide, Entities with Oil and Gas Producing Activities – Clarified (Updated As of January 1, 2014)
AICPA Statement on Standards for Forensic Services
ASC Master Glossary
ASC Topic 105 - Generally Accepted Accounting Principles
ASC Topic 250 - Accounting Changes and Error Corrections
ASC Topic 360 - Property, Plant, and Equipment
ASC Topic 450 - Contingencies
ASC Topic 932 - Extracting Activities - Oil and Gas
Deloitte Oil and Gas, Accounting, Financial Reporting, and Tax Update, January 2016

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**          **Page 3 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

FASB Accounting Concept Statement No. 6
FASB Accounting Standards Codification (ASC) Topic 105
FASB FAS No. 25, Suspension of Certain Accounting Requirements for Oil and Gas Producing
Companies - An Amendment of FASB Statement No. 19
FASB Staff Position, FAS 19-1: Accounting for Suspended Well Costs
FASB Statement of Financial Accounting Standards (FAS) No. 19, Financial Accounting and Reporting
by Oil and Gas Producing Companies
Federal Trade Commission, Informal Staff Advisory Opinion 02-4
PCAOB AS 1001, Responsibilities and Functions of the Independent Auditor
PCAOB AS 1015, Due Professional Care in the Performance of Work
PCAOB AU 110, Responsibilities and Functions of the Independent Auditor
PCAOB AU 411, The Meaning of Present Fairly in Conformity With Generally Accepted Accounting
SEC Regulation S-K, Item 303
SEC Financial Reporting Manual, updated as of August 25, 2015, Topic 9 - Management's Discussion
and Analysis of Financial Position and Results of Operations (MD&A), 9200 General requirements
SEC Release No. 33-8350
SEC Release No. 33-6835
SEC Securities Act Release No. 6349
SEC Staff Accounting Bulletin No. 108
SEC Staff Accounting Bulletin No. 99
Todd E. Hardiman, Associate Chief Accountant, SEC Division of Corporation Finance, "Remarks before
the 2007 AICPA National Conference on Current SEC and PCAOB Developments," December 11, 2007

**Deposition(s) and Exhibits**
Deposition of Catherine Green and Exhibits
Deposition of Darrell Hollek and Exhibits
Deposition of Ernest Leyendecker and Exhibits
Deposition of Lea Frye and Exhibits
Deposition of Patrick McGrievy and Exhibits
Deposition of Paul Chandler and Exhibits
Deposition of R.A. Walker and Exhibits
Deposition of Robert Gwin and Exhibits

**Miscellaneous Documents (Articles, other written works, etc.)**
Amended Complaint, No. 4:20-cv-00576 (S.D. Tx.).
Stipulation Concerning Expert Discovery, September 27, 2022
https://finance.yahoo.com/quote/CL%3DF
https://www.sec.gov/about/what-we-do#section1 (accessed November 7, 2022)

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**    **Page 4 of 4**

CURRICULUM VITAE



**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Employment & Education

| | |
|---|---|
| 2012 – Present | Hemming Morse, LLP |
| | **Certified Public Accountants, Forensic and Financial Consultants** |
| | Chairperson, 2012-2016 |
| | Partner, since 2012 |
| | |
| 1975 – 2011 | Hemming Morse, LLP |
| | **Certified Public Accountants, Forensic and Financial Consultants** |
| | Chairman of the Board, 2001-2011 |
| | President, 2001-2009 |
| | Director-in-charge of the firm's Litigation and Forensic Consulting Practice, 1975-2006 |
| | |
| 2006 | Stanford Law School |
| | Executive Education - Directors' College |
| | |
| 1979 | Golden Gate University, San Francisco |
| | M.S. Accounting |
| | |
| 1973 – 1975 | Regan & Skelton, CPAs |
| | Partner |
| | |
| 1970 – 2018 | Taught or attended at least 80 hours of qualified continuing education courses in each 2 year period in order to renew CPA license |
| | |
| 1968 – 1973 | Peat, Marwick, Mitchell & Co., CPAs |
| | |
| 1968 | University of San Francisco |
| | B.S. Accounting (Accounting Specialist) |

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Professional & Service Affiliations

- **Certified Public Accountant,** State of California
  - Since 1970

- **American Institute of Certified Public Accountants**
  - Since 1970
  - Council Member, 2003-2011
  - Member, Forensic & Valuation Services Executive Committee, 2008-2011
  - Member, Litigation and Dispute Resolution Services Subcommittee, 1998-2001
  - Chair of National Economic Damages Committee, 1999-2001
  - National Computer Audit Subcommittee of the Auditing Standards Board, past member

- **California Society of Certified Public Accountants Distinguished Service Award,** 2009

- **Certified in Financial Forensics**
  - Since 2008

- **California CPA Education Foundation**
  - Board of Trustees, 1997-2003
  - President, 2001-2002
  - First Vice President, 2000-2001
  - Treasurer, 1999-2000

- **California Society of Certified Public Accountants, Board of Directors,** 2001-2006
  - Council, since 2001
  - Chair, 2004-2005
  - First Vice President, 2003-2004

- **California Society of Certified Public Accountants,** Litigation Consulting and Dispute Resolution Services Common Interest Member
  - Steering Committee, since 1990
  - Chair, 2002-2004
  - Vice President, 2000-2002

- **California Society of Certified Public Accountants,** State Economic Damages Section
  - Chair, 1996-1998
  - Member, since 1995

- **California Society of Certified Public Accountants, Quality Control Committee,** past member

- **California Society of Certified Public Accountants, Litigation Services Conference Chair,** 1990

- **California Society of Certified Public Accountants, Advanced Litigation Forum Planning Committee,** 1991-1993; 1995 and 1997
  – Chair, 1993 and 1997

- **California Society of Certified Public Accountants, Computer Show and Conference Chair,** 1985

- **California Society of Certified Public Accountants, Economic Damages Conference Planning Committee,** 2000

- **American Arbitration Association's National Panel of Arbitrators,** 1983-1996



**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

# D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Professional & Service Affiliations continued

- **Western Association of Accounting Firms Audit and Accounting Committee**
  – Chairman, 1980-1982
  – Audit and Accounting Manuals, Editor, 1979-1982

- **CPA Computer Report,** Editorial Board, 1984-1987

- **Board of Trustees,** Golden Gate University, 2002-2013
  – Audit Committee member, since 2005
  – Audit Committee Chair, 2005-2008

- **Board of Trustees,** Jesuit School of Theology at Berkeley, 2002-present
  – Audit Committee member and Chair, 2004-2011

- **International Display Works, Inc.,**
  – Board of Directors, 2004-2006
  – Audit Committee member, 2005-2006

- **Solar Power, Inc.,**
  – Board of Directors, 2006-2010
  – Audit Committee Chair, 2006-2010

- **Catholic Charities CYO of the Archdiocese of San Francisco**
  – Board of Directors, 2009-present
  – Audit Committee Chair, since 2009

- **Town of Hillsborough**
  – Council Member, 1998-2010
  – Mayor, 2002-2004
  – Vice Mayor, 2000-2002
  – Commissioner of Finance, 1998-2002; 2004-2010
  – Financial Advisory Committee, since 2011

- **Hillsborough City School District**
  – Board of Trustees
  – Trustee, 1985-1995
  – President, 1986-87; 1993-94

- **Hillsborough Recreation Commission,** 1989-1993; 1998-2010
  – President, 1990-1993

- **Citizen of the Year,** 1995
  Town of Hillsborough, California

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

# D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Courses Written and Presented

### AICPA & California Society of CPAs

- "Candid Advice on Expert Witness Best Practices" California Society of CPAs, Fraud and Forensics Virtual Conference, 2022

- "Fraudulent Financial Reporting and Accountants' Malpractice" California Society of CPAs, 4N6: Forensics and Fraud Virtual Conference, 2021

- "Economic Damages: Common Frameworks By Industry & Claim Type" AICPA National Forensic Accounting Conference, Boston, MA, 2010

- "Fraud Prevention and Detection" California Society of CPAs, Business and Industry Conference, Los Angeles and San Francisco, CA, 2004

- "Trigon Insurance Co. v. United States" California Society of CPAs, Economic Damages Litigation Section, San Francisco, CA, 2003

- "Issues Re: Revenue Recognition" California Society of CPAs, Litigation Sections Steering Committee, Burlingame, CA, 2003

- "Trashing Drafts - A Standard Practice or a Dangerous Proposition?" California Society of CPAs, Advanced Business Litigation Institute, Palm Springs, CA, 2003

- "Aggressive Accounting & The Games People Play" AICPA Webcast, co-author, NJ, 2003

- "Mistakes Made in the Work Product" California Society of CPAs, Litigation Services Conference, Irvine, CA, 2002

- "Complex Litigation/Accounting Malpractice" AICPA National Fraud Conference, Las Vegas, NV, 2002

- "Ethics, Taxes and Financial Reporting" California Society of CPAs, San Francisco, CA, 2002

- "Expert Disqualifications" California Society of CPAs, Advanced Economic Damages and Business Valuation Conference, Palm Springs, CA, 2001

- "Financial Statement Fraud" California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 2000

- "Quantifying Losses" AICPA National Fraud Conference, Las Vegas, NV, 2000

- "Electronic Work Product-Discovery Issues" California Society of CPAs, Economic Damages Conference for Business Trial Lawyers & Experts, Los Angeles, CA, 1999

- "The CPA's Role in Construction Damages" AICPA National Advanced Litigation Conference, Atlanta, GA, 1999

- "Significant Frauds of our Time" AICPA National Fraud Conference, Las Vegas, NV, 1998

# HEMMING | MORSE
### FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Courses Written and Presented continued

#### AICPA & California Society of CPAs continued

- "Daubert and the CPA Expert" California Society of CPAs, Advanced Economic Damage Conference, San Francisco, CA, 1998

- "The Accountant in Fraud Investigations" California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 1997

- "Rule 26 Reports,""The Auditor and Fraud," and "Challenging Questions" California Society of CPAs, Advanced Litigation Forum, Palm Springs, CA, 1996

- "Distinguishing Between Litigation and Attest Engagements" California Society of CPAs, Advanced Litigation Forum, San Diego, CA, 1995

- "Miniscribe Trial Binder" California Society of CPAs, Advanced Litigation Forum, Monterey, CA, 1993; Litigation Consulting Services Committee, Puerto Vallarta, MX, 1993; Litigation Consulting Services Committee, San Francisco, CA, 1994

- "Lost Profits" California Society of CPAs, Litigation Services Conference, San Francisco and Los Angeles, CA, 1991

- "Opportunities Update: "A Discussion of Disruption Claims" California Society of CPAs, Litigation Consulting Conference, Los Angeles, CA, 1990

- "Construction Damages" AICPA, Second Annual Conference on CPA's Role in Litigation Services, Dallas, TX and Washington, DC, 1990

#### Selected Others

- "Fraudulent Financial Reporting and Accountant's Malpractice" San Francisco State University, 2019

- "The Fraud Triangle - Where Were the Gatekeepers" United States District Court, Northern District Historical Society, San Francisco, CA, 2012

- "Introduction of Financial Forensic Accounting" Golden Gate University, Adjunct Professor, 2009-present

- "Reporting in Litigation Engagements" "Wage & Hour Litigation" Golden Gate University, 2009

- "Intellectual Property Damages" Federal Bureau of Investigation, Quantico, VA, 2001

- "Alternative Dispute Resolution Techniques and Strategies for the Small and Emerging Contractor" American Bar Association, Fourth Annual Construction Institute, 1995

- "Fundamentals of Forensic Accounting" Georgetown University, Washington, DC, 1994

# HEMMING | MORSE
### FORENSIC & FINANCIAL CONSULTANTS

SAN MATEO OFFICE
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Courses Written and Presented continued

#### Selected Others continued

- "Proving and Pricing Delay and Disruption Claims" Andrews Conference - Fourth Annual Construction Litigation Superconference, San Francisco, CA, 1989

- "The Auditor in Court" State of California, Government Auditors, 1989

- "Pricing Construction Claims" Thelen, Marrin, Johnson & Bridges, 1988

- "Dollars and Sense: Building Your Damages Case & Surviving a Daubert Challenge" San Francisco Trial Lawyers Association, Litigation Practice, San Francisco, CA, 2007

- "Winning Strategies for the Financial Side of Your Damages Case" Construction Infrastructure Summit, Phoenix, AZ, 2007

### Publications

- "Our Roots Run Deep" California CPA Magazine, August 2004

- "Expert Witnesses: Do They Have to Keep Draft Reports?" California CPA Magazine, May 2004

- "Revenue Recognition: Now, Later or Never?" California CPA Magazine, September 2003

- AICPA Litigation Services and Applicable Professional Standards Consulting Services Special Report 03-1 (Contributing author)

- Litigation Services Handbook, "The Role of the Accountant as Expert Witness," published by John Wiley & Sons, Chapter 16, "Litigation Consulting: Construction Claims"

- Litigation Support Report Writing, published by John Wiley & Sons, Chapter 15, "Construction Claims"

- Member of the Editorial Board and author of various articles for the California Society of CPAs' Litigation and Dispute Resolution Services Section's quarterly publication (since summer 1996)

- Outlook Magazine, Winter 1985 - Computer Show and Conference Survey

- "California CPA Computer Show and Conference," CPA Computer Report, September 1985

- "Direct and Cross Examination of Experts," co-author of case study presented by University of California Hastings Litigation Advocacy Program

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Testimony (Presented in the Last Four Years)

#### Trial

- **Doug Ridley and Sherry Shen v. Rancho Palma Grande HOA (2022),** Superior Court of California, Santa Clara County, Case No. 19CV349909

- **Port of Ridgefield vs. Union Pacific Railroad Company (2018)** U.S. District Court Western District of Washington at Tacoma, Case No. 3:14-CV-06024-RBL

#### Deposition

- **Lehigh Southwest Cement Company v. James Hardie Building Products (2019) (2022),** Superior Court of California, Shasta County, Case No. 191110

- **Doug Ridley and Sherry Shen v. Rancho Palma Grande HOA (2022),** Superior Court of California, Santa Clara County, Case No. 19CV349909

- **Snow Covered Capital, LLC v. William Weidner et al. (2021)** United States District Court, District of Nevada Case No.: 2:19-cv-00595—JAD-NJK

- **Strathclyde Pension Fund, v. Bank OZK and George Gleason (2021),** United States District Court, Eastern District of Arkansas, Central Division Case No. 4:18-cv-00793-DPM

- **In re: Teva Securities Litigation (2021)** U.S. District Court, District of Connecticut Case No. 3:17-cv-00558 SRU

- **Strathclyde Pension Fund, et al. v Bank OZK, et al. (2021)** U.S. District Court, Eastern District of Arkansas Case No. 4:18-cv-00793-DPM

- **In re: Novo Nordisk Securities Litigation (2021)** U.S. District Court, District of New Jersey Case No. 3:17-CV-209-BRM-LHG

- **246 Atherton Avenue LLC v. Trais Fluors LLC (2019)** Superior Court of California, San Mateo County Case No. 16-CIV-02957

- **The Regents of the University of California v. Paul S. Aisen, et al. (2019)** Superior Court of California, San Diego County, Case No. 37-2015-00022082-CU-BT-CTL

- **Mark Smilovits, et al. v First Solar, Inc., et al. (2019)** U.S. District Court District of Arizona Case No. 2:12-cv-00555-DGC

- **Robert Pestoni v. Linda Sereni (2018)** JAMS, Ref No. 1100090112

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Deposition continued

- **Port of Ridgefield vs. Union Pacific Railroad Company (2018)** U.S. District Court Western District of Washington at Tacoma, Case No. 3:14-CV-06024-RBL

- **Layton Construction Co., Inc. v. Mint Development, L.P. et al. (2018)** Superior Court of California County of San Francisco, Case No. CGC-15-549603

### Arbitration

- **Robert Pestoni v. Linda Sereni (2018)**
  JAMS, Ref No. 1100090112