# EXHIBIT 1

<u>**EXPERT REPORT OF PETER KELLER**</u>

November 9, 2022

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Exhibit
505**

## Table of Contents

1.  Introduction ........................................................................................................................... 4

    1.1.  Qualifications .................................................................................................................. 4

    1.2.  Executive Summary ....................................................................................................... 5

    1.3.  Assignment and Summary of Conclusions ................................................................ 6

2.  Required and Voluntary Disclosures Are Reflected in Efficient Market Prices .................. 9

    2.1.  Market Efficiency ........................................................................................................... 9

    2.2.  Public Information ........................................................................................................ 10

    2.3.  Methodology for Identifying Relevant Disclosures and Commentary from Market Participants ..................................................................................................................... 12

3.  Background on the Shenandoah Field ....................................................................................... 14

4.  Investors' Understanding of Anadarko's Industry and Business ....................................... 24

    4.1.  Offshore Oil and Gas Exploration and Development ............................................ 24

    4.2.  Anadarko ........................................................................................................................ 40

5.  Publicly Disclosed Information Regarding Shenandoah ...................................................... 55

    5.1.  Anadarko's Pre-Class Period Statements about the Projected Value and Size of Shenandoah Project ....................................................................................................... 55

    5.2.  Anadarko's Statements During the Class Period ..................................................... 76

## Tables of Figures

Figure 1. Key Shenandoah Events with APC Stock Price and WTI Spot Price .............................. 14

Figure 2. May 2016 Map Prepared by Anadarko ............................................................................ 18

Figure 3. Placement and Status of Shenandoah Appraisal Wells in May 2016 ............................ 19

Figure 4. Ultra Deepwater Drillship Dayrate and Marketed Utilization ........................................ 29

Figure 5. Anadarko's Global Exploration and Production Activities as of February 17, 2017 ................................................................................................................................. 42

Figure 6. Anadarko's U.S. Onshore Exploration and Production Activities as of February 17, 2017 ................................................................................................................ 44

Figure 7. Anadarko's GoM Offshore Exploration and Production Activities as of February 17, 2017 ................................................................................................................ 45

Figure 8. Portion of Anadarko's Valuation Attributed to Shenandoah ........................................ 50

Figure 9. Reproduced Slide: Building Upon Momentum in 2012 ...................................................... 58

Figure 10. Reproduced Slide: Industry-Leading Exploration Success Again in 2013 .................... 59

Figure 11. Reproduced Slide: Shenandoah Basin: ~$2 - 4 Billion Net Opportunity ...................... 60

Figure 12. Reproduced Slide: Continuous Mega-Project Pipeline Delivering Results................... 85

Figure 13. Graphic from Anadarko's Q4 2014 Operations Report...................................................... 89

Figure 14. Slide from March 3, 2015 Capital Program and Guidance Call Presentation ............... 95

Figure 15. Slide from May 24, 2016 UBS Global Oil and Gas Conference ..................................... 109

Figure 16. Graphic from Anadarko's October 27, 2015 Operations Report.................................... 114

# 1. Introduction

## 1.1.    Qualifications

1.    I am a Managing Director at Berkeley Research Group, an expert services firm that specializes in economic and financial analysis.

2.    I have been involved in financing oil and gas companies and their exploration activities since 1978. My experience includes decades as a commercial banker and over 15 years as a manager of oil and gas direct investment portfolios for a number of large institutional investors, including pension funds and college/university endowments.

3.    During that period I managed significant investments offshore in the Gulf of Mexico ("GoM"), primarily for various pension funds of General Motors.

4.    My career spans a number of cycles in what has always been a capital-intensive industry that is subject to significant volatility in commodity prices, oilfield service costs, and basic supply and demand.

5.    I also had direct experience with Anadarko Petroleum, a commercial banking client of the Bank of New York/BNY Mellon, as I was the head of the bank's Energy Division which covered all banking relationships in the exploration and production, oilfield services, midstream, refining & marketing and pipeline sectors (as well as the utility sector encompassing nuclear, fossil & renewable generation, and transmission & distribution).

6.    I earned a bachelor's degree in history, environmental studies, and economics from Williams College in Williamstown, Massachusetts, and have completed courses at the Graduate School of Business Administration at New York University.

7.      I am being compensated for my work on this matter at an hourly rate of $665, including for any testimony I may provide in this matter.  My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

8.      My qualifications and testimony from the last four years are summarized in Appendix A.

9.      The materials upon which I have relied are listed in Appendix B.

## 1.2.      Executive Summary

10.      In February 2009, Anadarko announced that a discovery well in the Shenandoah deepwater oil field in the Gulf of Mexico, referred to herein as Shen-1, had encountered oil.[1]

11.      A group of firms partnered with each other to assess the quality, extent, and accessibility of oil in the Shenandoah field, and to develop a plan for extracting oil should economic conditions prove sufficiently favorable. As of January 27, 2014, these partners and their ownership interests were Anadarko (30%); ConocoPhillips (30%); Cobalt International Energy (20%); Venari Resources LLC (10%); and Marathon Oil Corporation (10%) (the "Shenandoah Partners").[2]

12.      Anadarko and the Shenandoah Partners would drill five additional wells, which I refer to as Shen-2 through Shen-6, to appraise the field.

13.      Anadarko ultimately decided not to sanction the Shenandoah field. On May 2, 2017, after market close, Anadarko announced that they were taking a $467 million impairment charge

---

[1] Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009 (APC-01338356).

[2] Cowen and Company, "Anadarko Petroleum Corporation Initiating Coverage: Initiation: Maximizing NAV Through Portfolio Management," January 27, 2014 (ANADARKO_00000074). These ownership interests changed at various times during the class period.

for the unproved property balance related to the Shenandoah project and expensing $435 million in exploratory drilling costs for Shenandoah, including $267 million previously capitalized for a period greater than one year.[3]

14.    Plaintiffs filed suit, alleging, among other things, that Anadarko and four Anadarko executives[4] (collectively "Defendants") "engaged in a fraudulent scheme through various means and methods that operated as a deception on the investing public concerning the size and commercial viability of the Shenandoah project."[5] The class period covers February 20, 2015, through May 2, 2017 (the "Class Period").[6]

## 1.3.    Assignment and Summary of Conclusions

15.    I have been asked by Cravath, Swaine & Moore, counsel for Defendants, to analyze the information known to the market about Shenandoah before, during and after the Class Period. In particular, I have been asked to examine disclosures made by Anadarko and the Shenandoah Partners, as well as commentary from market participants and public press, to analyze, based on my experience, what information concerning Shenandoah was in the market both before and during the Class Period. In doing so, I examine how sophisticated and professional investors in the oil and gas industry (referred to herein simply as "investors") understood the statements Plaintiffs allege are misleading, including based on

---

[3] Anadarko Petroleum Corporation, Q1 2017 10-Q, May 2, 2017, pp. 12-13.

[4] R.A. Walker, Anadarko's Chairman, President, and Chief Executive Officer; Robert G. Gwin, Anadarko's Executive VP of Finance and CFO from May 2013 to November 2018; Robert P. Daniels, Anadarko's Executive VP of International and Deepwater Exploration from May 2013 until December 2016; and Earnest A. Leyendecker, III, Senior VP of Exploration – Gulf of Mexico from February 2014 until April 2015 and Senior VP of International Exploration and Executive VP of International & Deepwater Exploration from August 23, 2016 through October 4, 2017. (Amended Complaint ¶¶ 17-20.)

[5] Amended Complaint ¶ 5(a)-(f).

[6] *Id.* ¶ 1.

additional information publicly available to investors. I understand that this report will be used, among other ways, in support of Defendants' truth-on-the-market defense.

16. Based on this review, and my experience as a commercial banker and manager of oil and gas direct investment portfolios, I find that:

   a. Investors understand that appraisal drilling is a high-risk business subject to uncertainty, and that any decision to invest in and develop an oil field depends on many factors, including the results from each appraisal well, cost of development, prevailing oil prices, and position within the company's entire portfolio.

   b. Investors did not understand Anadarko's pre-Class Period statements as constituting a resource estimate of Shenandoah. Rather, investors at that time understood that Shenandoah was promising but not a sure thing, as Anadarko consistently and properly disclosed that the appraisal was in an early stage or ongoing and that the company needed to perform additional testing and analysis to quantify the resource range.

   c. During the Class Period, the market was aware that:

      i. Anadarko had not made a final decision to develop Shenandoah, and any such decision would be based on multiple factors, such as the price of oil, cost of development, and the potential of Shenandoah compared to the rest of Anadarko's portfolio;

      ii. developing Shenandoah required 20,000 psi technology, which had not been used in any previous developments;

      iii. the Shenandoah prospect was geologically complex and faulted;

      iv. after the drilling of Shen-3 that it did not encounter hydrocarbons;

v.  after the drilling of the original hole at Shen-4 that it encountered salt;

vi. the appraisal wells after Shen-2, with the exception of Shen-5, encountered less oil pay than Shen-2, indicating that the resource size might be smaller than originally hoped;

vii. Anadarko would not develop Shenandoah in the commodity price environment existing from early 2016 through the end of the Class Period;

viii.  after the drilling of Shen-4, any decision to develop Shenandoah depended on the information gathered from Shen-5 and Shen-6; and

ix. after the drilling of Shen-5, any decision to develop Shenandoah depended on the information gathered from Shen-6.

17.    In the remainder of this report, I expand upon and explain the basis for these conclusions.

a.  In Section 2, I review general concepts of market efficiency, the type of information that public companies, such as Anadarko, disclose to the market and how it is done, and my methodology for reviewing relevant market disclosures.

b.  In Section 3, I provide background information on the Shenandoah field, including a timeline of its exploration and appraisal.

c.  In Section 4, I describe the industry for offshore oil & gas exploration and development, and I describe Anadarko's business.

With these background items in place, in Section 5, I review Plaintiffs' allegations in this matter and the related information that was disclosed to the market. I first review disclosures from before the Class Period, followed by disclosures from within the Class Period, and present my conclusions with respect to each type of allegation.

## 2. Required and Voluntary Disclosures Are Reflected in Efficient Market Prices

### 2.1.      Market Efficiency

18.     Plaintiffs contend that Anadarko securities traded in an efficient market during the Class Period.[7] For the purposes of this report, I do not dispute that assertion and assume that the market for Anadarko securities during regular trading hours was efficient.

19.     Widely accepted financial theory posits that credible publicly available information, regardless of source, is reflected in the prices of securities that trade actively in public markets. The market for the company's stock is viewed as efficient when the price of the stock is able to quickly reflect new information about the company. As Professor Damodaran of New York University points out, reaction of stock prices to new information is "instantaneous" in an efficient market.[8] In a widely used textbook, Professors Brealey, Myers and Allen describe an efficient market as one in which "prices reflect all the information that can be acquired by painstaking analysis of the company and the economy."[9]

20.     In an efficient market, a company's stock price reflects the totality of information publicly available from all resources regarding the company's expected future earnings or cash flows. Typical sources of company information include, for example:

---

[7] *See, e.g.*, Expert Report of Bjorn I. Steinholt, CFA, *In re: Anadarko Petroleum Corporation Securities Litigation*, Civ. Action No. 4:20-cv-00576 (S.D. Tex.), dated October 1, 2021, ¶ 9.

[8] Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, Wiley, 2nd edition, p. 131.

[9] Richard A. Brealey, Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, 12th edition, p. 332.

a.  The company's own disclosures, including SEC filings, press releases, conference calls;

b.  Disclosures by partners on the same projects;

c.  Analyst reports; and

d.  Media coverage, such as news articles.

21.  Only new information that materially changes the market's view on the company's expected future earnings or cash flows would significantly affect the stock price.[10] Other information such as the replacement of a director on the board may be new but is generally treated as immaterial by the market and would not significantly affect the stock price.

## 2.2.    Public Information

22.  Publicly traded companies, such as Anadarko was prior to August 8, 2019, are required by law to disclose certain information to the public.

23.  For example, Anadarko is required by the U.S. Securities and Exchange Commission ("SEC") to submit an annual report of the company's operational results in Form 10-K and quarterly results in Form 10-Q. In such filings, a publicly traded company like Anadarko is required to, among other things, provide a description of its business and report financial performance in standardized forms of financial statements. The company is also required to discuss the risk factors faced by the company and explain its business results and any significant matters. Major developments or events that occur outside the standard reporting

---

[10]  BMO, "How does breaking news affect markets?," May 5, 2020, p. 1, https://www.bmo.com/main/personal/investments/learning-centre/how-breaking-news-affects-markets/#:~:text=When%20breaking%20news%20comes%20in,price%20movements%20following%20the%20news.

cycle are can be disclosed by filing a Form 8-K. A company can also make voluntary disclosures about its business.[11]

24.  Company management may also provide additional information on earning calls. During these earnings calls, company management usually provides background on company financial results and responds to specific questions raised by sophisticated equity research analysts covering the industry and the company. Typically, transcripts of these calls are promptly made available to the public.[12] In addition, company managers from the oil & gas industry often participate in industry conferences and present on specific matters.

25.  The market also incorporates information from other market participants. This includes reports from securities analysts, who review and analyze public information to offer guidance to investors regarding specific companies and industries. Investors then use this information to make trading decisions, and the information is rapidly incorporated into a company's stock price.[13]

26.  General news and press outlets can also provide information to the investing public. This can include news outlets, magazines and similar sources.

---

[11]  SEC, "Exchange Act Reporting and Registration," April 28, 2022, https://www.sec.gov/education/smallbusiness/goingpublic/exchangeactreporting; SEC, "Form 10K," t.Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k.

[12]  The Street, "What Is an Earnings Call? Definition, Frequency & Importance," June 30, 2022, https://www.thestreet.com/dictionary/e/earnings-call.

[13]  Corporate Finance Institute, "Equity Research Report," October 4, 2022, https://corporatefinanceinstitute.com/resources/valuation/equity-research-report/.

27.    Finally, the Shenandoah Partners provided important information to the market. The Partners made disclosures and released information about the Shenandoah development, which were incorporated into the market's understanding of Shenandoah.

## 2.3.    Methodology for Identifying Relevant Disclosures and Commentary from Market Participants

28.    Given the substantial volume of documents that contain or discuss disclosures related to Shenandoah, I relied on various searches to identify relevant content, which I then considered in forming my opinions. I reviewed the following documents using these searches or by reviewing the source in full:

a.   The Amended Complaint.

b.   Source documents for each of the disclosures Plaintiffs allege to be misleading. These include, for example, conference call transcripts, SEC filings, and conference presentations.[14]

c.   SEC filings from Anadarko and other publicly traded Shenandoah Partners, including ConocoPhillips, Cobalt and Marathon Oil, filed during and up to 2 years before the class period.

d.   Equity research reports from analysts that cover publicly traded Shenandoah Partners. This documentation includes over 400 reports published by approximately 30 different equity analysts.

---

[14] Depending on the source, some transcripts attribute statements to the incorrect individuals. While they may identify the incorrect individuals, I assume that the content is complete and substantively accurate.

e.  Over 20 news articles that mention Anadarko, other Shenandoah Partners, or the Shenandoah wells published during and up to 6 years before the class period.

f.  Documents produced in this matter by Plaintiffs' investment managers including, but not limited to, Janus Henderson Group plc, Fidelity, Lord Abbett & Co. LLC, Wellington, and Atalanta Sosnoff Capital.

## 3. Background on the Shenandoah Field

29.    As the focus of Plaintiffs' allegations relate to Anadarko's interest in Shenandoah, which during the Class Period was one of Anadarko's deepwater assets in the Gulf of Mexico, I provide my understanding of Shenandoah in this section. Figure 1 below shows the movement of Anadarko's stock price and WTI spot price, i.e., the price for immediate delivery of West Texas Intermediate grade oil, with the key events related to Shenandoah from 2009 through the end of the Class Period.

**Figure 1. Key Shenandoah Events with APC Stock Price and WTI Spot Price**

30.    On February 4, 2009, Anadarko announced the Shenandoah discovery well, located in Walker Ridge block 52, encountered net oil pay approaching 300 feet in the Wilcox

formation. [15] In the announcement, Bob Daniels, then Anadarko's Sr. Vice President, Worldwide Exploration, was quoted:

> "This has been a remarkable week, with back-to-back deepwater discoveries in the Gulf of Mexico. . . . Initial data indicates the Shenandoah discovery has reservoir properties that appear to be of much higher quality than industry has seen previously in the emerging Lower-Tertiary play. The success of this well and our recent Heidelberg discovery further confirms the value of Anadarko's extensive acreage position and our capability in exploring proven and emerging deepwater basins worldwide."[16]

31. After drilling the exploratory well, Anadarko proceeded to drill its first appraisal well, Shen-2. In March 2013, Anadarko announced that Shen-2 had encountered "more than 1,000 net feet of oil pay":

> "Anadarko Petroleum Corporation (NYSE: APC) today announced its Shenandoah-2 well in the deepwater Gulf of Mexico encountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs. 'The successful Shenandoah-2 well marks one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries,' said Bob Daniels, Anadarko Sr. Vice President Deepwater and International Exploration. 'With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico.' The Shenandoah-2 well, located in Walker Ridge block 51, was drilled to a total depth of 31,405 feet in approximately 5,800 feet of water, more than 1 mile southwest and approximately 1,700 feet structurally down-dip from the Shenandoah-1 discovery. Similar to the initial Shenandoah discovery well, log and pressure data from the Shenandoah-2 well indicate excellent-quality reservoir and fluid properties. The well was drilled to test the down-dip extent

---

[15] Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, p. 1 (APC-01335462).

[16] *Id.*

of the accumulation, and the targeted sands were full to base with no oil-water contact. "We are incorporating the information obtained from Shenandoah-2 into our planning and anticipate further appraisal drilling to advance this potentially giant project," Daniels added. Anadarko is the operator of the Shenandoah-2 well and the previously announced Shenandoah-1 discovery well, located in Walker Ridge block 52, with a 30-percent working interest."[17]

32.    Anadarko then drilled the Shen-3 appraisal well. On January 29, 2015, one of the Shenandoah Partners, ConocoPhillips, stated that it had expensed Shen-3 as a "dry hole."[18]

33.    On February 2, 2015, Anadarko described the results of its second appraisal well, Shen-3, in its 2014 Operations Report:

"Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range. Planning is currently underway for the next appraisal well, which the company expects to spud in the 2nd quarter of 2015."[19]

34.    Anadarko announced the results of the next appraisal well, Shen-4, approximately a year later. On February 2, 2016, during its 4Q 2015 earnings call, Anadarko described the Shen-4 appraisal as follows:

Robert G. Gwin, CEO: "Yes, this is Bob. So we just finished the Shenandoah 4 appraisal wells located out to the west of our previous activities. We found over

---

[17] Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay", March 20, 2013, pp. 1-2, http://finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html?soc_src=social-sh&soc_trk=ma.

[18] ConocoPhillips, Q4 2014 Earnings Call Transcript, January 29, 2015, pp. 5, 13–15.

[19] Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015, p. 12.

620 feet of high-quality oil play in that well. We're very pleased with it. We also were able to get about 550 feet of core that's important for planning what that development could look like. So that's going to be analyzed, turned over to the reservoir engineers as they put together a scenario for how we might develop that. At the same time, we're looking at drilling Shenandoah 5. We think that's a well that's required. It's off to the East. It'd be kind of between Shenandoah 3 and the original Shenandoah 1, up dip of Shenandoah 3, which was a wet well that encountered very, very good sands, kind of gave us a down-dip limit on the eastern side. So that well should spud here in this first quarter. We have high expectations for it. But we need to drill the well and say, that's what appraisal is all about. Meanwhile, the guys are taking all the information that we obtained from this, rolling it into conceptual planning as to what resources we may be able to recover, how much it might cost, those types of things. And as Al said, we're a long ways from sanction at this point. If Shenandoah 5 is successful, we may move even farther to the east with the Shenandoah 6, but of course, that'll be all dependent on what happens to Shenandoah 5."[20]

35.    In July 2016, Anadarko described the results of Shen-5, which encountered more than 1,040 net feet of pay and extended the field further east:

"The Shenandoah appraisal program continues to deliver promising results with the Shenandoah-5 well encountering more than 1,040 net feet TVT of pay, extending the field further east. The company will spud the Shenandoah-6 appraisal well later this year in an attempt to find the oil water contact. The quality and thickness of the reservoir combined with the excellent fluid properties make Shenandoah a unique Lower Tertiary opportunity."[21]

36.    In July 2016, Marathon Oil announced that they would sell their 10% stake in the Shenandoah project. As part of the preferential-right process on Marathon Oil's sale of its 10% interest, Anadarko announced that they increased their working interest in Shenandoah to 33%.[22]

---

[20] Anadarko Petroleum Corporation, Q4 2015 Earnings Call Transcript, February 2, 2016, pp. 9-10.

[21] Anadarko Petroleum Corporation, Q2 2016 Operations Report, July 26, 2016, p. 2.

[22] *Id.* p. 9.

37.     In its Q3 2016 10-Q, Anadarko announced that they had expensed $64 million related to a Shenandoah well because "it was no longer reasonably possible that the wellbore would be used in the development of the project if a final investment decision is reached."[23]

38.     In 4Q 2016, Anadarko spud Shen-6 to establish the oil-water contact on the eastern flank of the field. Figure 2 below shows Anadarko's assets in the Shenandoah basin, including the Shenandoah project. Figure 3 shows the placement of the appraisal wells within Shenandoah and the status of the appraisal wells as of May 2016.

**Figure 2. May 2016 Map Prepared by Anadarko[24]**



---

[23] Anadarko Petroleum Corporation, Q3 2016 10-Q, October 31, 2016, p. 11. Cobalt expensed costs associated with Shen-3 in its 2016 10-K. It had incurred dry holes expenses, part of which were attributable to the Shen-3 well because "it [was] no longer reasonably possible that the wellbore could be used in the development of the project, should a final investment decision be reached". Cobalt International Energy Inc., 2016 10-K, March 14, 2017, p. 68.

[24]  Anadarko Petroleum Corporation, UBS Global Oil and Gas Conference Slides, May 24, 2016, p. 10.

**Figure 3. Placement and Status of Shenandoah Appraisal Wells in May 2016**[25]



39.   On May 2, 2017, Anadarko disclosed that they had suspended further appraisal activities on the Shenandoah project, taken a $467 million impairment for the unproved property balance related to the Shenandoah project, and expensed $435 million in exploratory drilling costs. Anadarko made the following disclosures in the Form 10-Q:

"Impairments during the three months ended March 31, 2017, were primarily related to oil and gas properties in the Gulf of Mexico due to lower forecasted commodity prices and a U.S. onshore midstream property due to a reduced throughput fee as a result of a producer's bankruptcy.

**Impairments of Unproved Properties** Impairments of unproved properties are included in exploration expense in the Company's Consolidated Statements of Income. The Company recognized $532 million of impairments of unproved Gulf of Mexico properties during the three months ended March 31, 2017, of which $467 million related to the Shenandoah project. The unproved property balance related to the Shenandoah project originated from the purchase price allocated to Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006. For additional details on the Shenandoah project, see Note 5—Suspended Exploratory Well Costs.

---

[25] *Id.*

### 5. Suspended Exploratory Well Costs

The Company's suspended exploratory well costs were $1.1 billion at March 31, 2017, and $1.2 billion at December 31, 2016. Projects with suspended exploratory well costs include wells that have sufficient reserves to justify completion as a producing well and sufficient progress is being made in assessing the reserves and the economic and operating viability of the project. If additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time.

During the three months ended March 31, 2017, the Company expensed suspended exploratory well costs of $435 million related to the Shenandoah project in the Gulf of Mexico, including $267 million previously capitalized for a period greater than one year. The Shenandoah-6 appraisal well and subsequent sidetrack, which completed appraisal activities in April 2017, did not encounter the oil-water contact in the eastern portion of the field. Given the results of this well and the present commodity-price environment, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs."[26]

40.   Following Anadarko's disclosure that they had suspended further appraisal activities on the Shenandoah project, R.A. Walker, Anadarko's Chairman and CEO, and an analyst for Drexel Hamilton had the following exchange:

Robert Lee Christensen, Drexel Hamilton, LLC, Research Division: "I just followed with interest Shenandoah all these years and the delineation, and I simply can appreciate the accounting convention and rules. But you have poked a lot of holes out there. You put a lot of science on it. What would you be walking away from in the way of probable and possible reserves from what you've gleaned to date off of a bunch of years of exploration? What are we talking about here?"

---

[26] Anadarko Petroleum Corporation, Q1 2017 10-Q, May 2, 2017, pp. 12-13.

R. A. Walker, Chairman & CEO: "Robert it's an understandable question for which I've got to tell you, I couldn't begin to answer that simply because with this juncture, all we have is drilling results. We've not estimated what we believe to be probable or possible recoveries simply because the things we've been doing to date have been more along the lines of just science associated. We're trying to understand the reservoir better. And I think given the information we gave you in certainly this ops report and those before, you can appreciate the fact that it will be very difficult cost for us to estimate that given where we are in the drilling process, and certainly in the campaign associated with understanding that better."[27]

41. The discussion continued into Q2, with Walker further explaining that Anadarko "continue[ed] to look for opportunities with it [Shenandoah]" and that the "decision there was driven by accounting convention and not economics."[28]

42. In April 2018, Anadarko relinquished its interest in Shenandoah. LLOG Exploration Offshore LLC replaced Anadarko as the operator of Shenandoah. LLOG, Navitas Petroleum US and Beacon Offshore Energy, and Venari Resources LLC formed a partnership for development.[29]

43. Beacon Offshore Energy is the current operator of Shenandoah, with BOE II Exploration, ShenHai (a wholly owned subsidiary of Navitas Petroleum) and HEQ Deepwater as partners. In October 2020, Navitas described Shenandoah as having "[h]ighly attractive economics" and "[p]roven and appraised – FID ready."[30] In August 2021, Navitas called

---

[27] Anadarko Petroleum Corporation, Q1 2017 Earnings Call Transcript, May 3, 2017, pp. 23-24.

[28] Anadarko Petroleum Corporation, Q2 2017 Earnings Call Transcript, July 25, 2017, p. 18.

[29] Global Newswire LLOG Exploration Company, L.L.C., "LLOG Exploration Named Operator of Shenandoah Discovery in Gulf of Mexico," April 26, 2018, p. 1.

[30] Navitas Petroleum, Investor Presentation, October 2020, p. 12.

Shenandoah "[t]he [g]ame [c]hanger," and projected a $1.398 billion discounted cash flow value for its share alone.[31]

44. The current partners estimated that developing Shenandoah would cost $1.8 billon. Drilling is expected to begin in the second half of 2022, with the first oil anticipated in the fourth quarter of 2024.[32] According to the most recent Fleet Status Report from Transocean (July 25, 2022), the newbuild Deepwater Atlas was scheduled to commence drilling operations for Beacon in October 2022 at a day-rate of $315,000 through July 2023.[33]

45. Reports about the current development of Shenandoah credit technological advances—in particular, the 20,000 psi (i.e., 20K) technology—which Anadarko indicated early in its exploration of Shenandoah would be necessary.[34] The 20K technology, which allows the safe drilling of high-pressure wells, eliminates "significant cost barriers." [35] Beacon

---

[31] Navitas Petroleum, Investor Presentation, August 2021, pp. 4, 5.

[32] NS Energy, "Shenandoah Field Development," p. 1.

[33] Transocean, "Transocean Ltd. Provides Quarterly Fleet Status Report," July 25, 2022, p. 4.

[34] Anna Kachkova, E&P Newsletter, "Shenandoah to Help Push Deepwater Boundaries," February 8, 2022, pp. 2-3, hartenergy.com/ep/exclusives/shenandoah-help-push-deepwater-boundaries-198655 ("The arrival of 20,000-psi drillships onto the market in the coming years means that Shenandoah can now move forward, more than a decade after oil was first discovered at the site by a former operator."); *see also* Offshore Technology, "Shenandoah Deepwater Oil Field, Gulf of Mexico, October 24, 2019, https://www.offshore-technology.com/projects/shenandoah-deepwater-oil-field/. In a November 2014 presentation, Jim Raney, Director of Engineering & Technology at Anadarko, discussed the development concepts and challenges in a 20,000 psi development for the Gulf of Mexico. Anadarko Petroleum Corporation, "Developing Industry Solution for 20,000 psi Subsea Developments," November 19, 2014.

[35] Anna Kachkova, E&P Newsletter, "Shenandoah to Help Push Deepwater Boundaries," February 8, 2022, p. 4, hartenergy.com/ep/exclusives/shenandoah-help-push-deepwater-boundaries-198655 ("[S]ignificant cost barriers have been eliminated with the introduction of the technology required to safely drill and complete these high-pressure wells.").

purportedly sanctioned Shenandoah when it believed the technology, which had been developed over the prior ten years, was ready.[36]

---

[36] *Id.* ("The Beacon team believed, at the time of sanctioning its Shenandoah project, that the technology was ready, having been developed over the past 10 years.").

# 4. Investors' Understanding of Anadarko's Industry and Business

46.   In this section, I assess what investors understand about the offshore oil and gas business. This provides a background for understanding Anadarko's disclosures about Shenandoah and the totality of information available to investors.

## 4.1.   Offshore Oil and Gas Exploration and Development

### 4.1.1.  Investors understand that appraisal wells are drilled to gather information.

47.   Investors understand that the exploration process begins with identifying an initial oil discovery. Oil companies begin the process by conducting geologic surveys of an area in an effort to determine if there might be oil or gas deposits in a given area.[37] Once a company identifies a potential area of interest, it may attempt to secure a lease or multiple leases covering the area. Companies may then drill a discovery well, sometimes referred to as an exploratory well, in search of new, undiscovered and unproved reservoirs.

48.   If the initial discovery well yields logs that indicate hydrocarbons in potentially economical volumes, then appraisal or delineation wells are drilled to help define the areal extent, characteristics, and quality of the potential reservoir. Oil companies need information gleaned from appraisal wells to confirm the areal extent of a reservoir, including mapping potential faults; the quality of the reservoir, which involves assessing permeability & porosity; and the commercial viability of a field, which is tied to the cost and timetable of constructing platforms and production facilities, and the location relative to other infrastructure, such as pipelines, tiebacks, and treatment facilities.

---

[37] Diamond Offshore, "Offshore Drilling Basics," p. 1.

49.  Drilling multiple appraisal wells is particularly important in geologically complex regions that have not been well defined by nearby existing production or analogy, i.e., the presence of other producing wells in the area that provide information on potential reservoirs, or by high quality seismic data. Drilling multiple wells is also important if the target formations are sub-salt, as at Shenandoah, as salt distorts soundwaves and thus affects the seismic readings.

50.  Investors understand that during the appraisal process, oil companies create internal resource estimates. Resource estimates from petroleum engineers include subjective determinations and are subject to significant revision, both upwards and downwards, as engineers learn additional information during the appraisal process. In geologically complex regions, as at Shenandoah, multiple appraisal wells may be necessary to give the operator enough certainty of potentially recoverable reserves to justify the decision to proceed with the significant expenditures needed for well completion, development, and construction of platforms and other production facilities.

51.  It is common for operators not to release resource ranges for a specific prospect during the appraisal process. Anadarko, for its part, has explained that they do not disclose certain speculative information early in the appraisal process: "When we make announcements of a discovery, we rarely come out with a resource range. We like to keep our resource range about where we were in the exploration phase. We don't have enough data now to come out and say, oh, it's this big with one well. We have enough deepwater experience in our hip pocket that says, okay, one well is an awesome feat. I mean, having pay on a log is really incredible. But really the proof in the pudding in the deepwater is all about areal extent,

and it's got to be quite large. So we don't really come out with a number as we drill the first well."[38]

52.   Anadarko does, however, release the results of its appraisal wells and any net pay encountered in those wells: "We also come out on wells, and we give net feet of pay. We don't give gross feet of pay. We don't give gross column, except in certain circumstances to talk about the potential height of a hydrocarbon column. But we give net pay numbers. And these net pay numbers are pretty scrutinized. These are deepwater type of rock qualities. And we throw out things that don't really meet the deepwater rock qualification. We also talk about a recoverable resource when we actually give out a range. And we talk about a recoverable resource within our expectations of what our recovery factors are and only resources that are on our block."[39]

53.   Investors understand that resource estimates are distinct from estimates of proved reserves. Unlike resource estimates, proved reserves are those reserves claimed to have a reasonable certainty (normally at least 90% confidence) of being recoverable under existing economic and political conditions, with existing technology. [40] Proved reserves are booked in accordance with standards from the Society of Petroleum Engineers ("SPE") and requirements from the SEC.[41] Oil companies publish their estimates of proved reserves in their annual financial filings.

---

[38] Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012, p. 44.

[39] *Id.* pp. 44–45.

[40] Society of Petroleum Engineers, "Guidelines for the Evaluation of Petroleum Reserves and Resources," 2001, p. 45.

[41] Securities and Exchange Commission, 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08] RIN 3235-AK00, "Modernization Of Oil And Gas Reporting," pp. 10 (footnote 15), 25-33.

### 4.1.2. Investors understand that oil and gas companies invest a significant amount of money to understand and appraise an oil discovery.

54.    Investors understand that offshore projects, especially in deep waters, require significant upfront capital investment. Development costs to drill delineation, production and possibly injection wells, construct production facilities, install a platform and so on can be in the range of $3 - $5 billion.[42]

55.    Investors also under that exploration wells cost millions of dollars to drill. For instance, on October 28, 2015, Anadarko noted that they were looking to reduce costs for deepwater Gulf of Mexico drilling, noting that the Heidelberg well in a nearby reservoir had hit "record costs for [them of] less than $100 million"[43] With respect to Shenandoah specifically, Wood Mackenzie estimated that the cost associated with Shen-1 were approximately $215 million and later drilling costs totaled over $800 million.[44]

56.    If a company decides to invest in a project, the company will incur even more costs. The production platforms that are suitable for offshore environment include: fixed platforms, compliant tower, tension leg platforms, floating production system, subsea system, and Floating Production, Storage & Offloading System ("FPSO"), etc.[45] These platforms can involve investments on the order of $1 billion.[46]

---

[42] Mark J. Kaiser, "A Review of Exploration, Development, and Production Cost Offshore Newfoundland", January 3, 2021; *see also* Coastal Review, "An Offshore Timeline," June 10, 2015, pp. 2-3, https://coastalreview.org/2015/06/an-offshore-timeline/.

[43] Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 9.

[44] Wood Mackenzie, "Shenandoah (WR 52) Asset Report," April 11, 2017, pp. 11–12 (APC-00095798).

[45] NOIA, "The Basics of Offshore Oil & Gas," pp. 3-4.

[46] Coastal Review, "An Offshore Timeline," June 10, 2015, p. 2, https://coastalreview.org/2015/06/an-offshore-timeline/.

57.    The most significant costs of drilling - after incurring lease acquisition costs, shooting high-resolution 3D seismic, and performing in-house geological and geophysical work - is the day-rate of the specialized dynamically positioned drillships that are capable of drilling deep wells (>20,000 feet) in deep water (>5,000 feet). Given the cyclical nature of the exploration and production business, these day-rates can vary significantly, as seen in Figure 4 below.[47] Financing for most new-builds is secured by full-payout contracts for investment-grade rated and financially secure counterparties, which includes companies such as Anadarko, ExxonMobil, BP, Shell, and Total. Day-rates for sixth-generation high-spec floaters in 2013 reached as high as $678,000.[48] In the 2020 COVID trough, day-rates for sixth- and seventh-generation floaters fell to as low as $155,000.[49]

58.    Figure 4 shows the volatility in high-spec day-rates over the period from September 2019-July 2022.

---

[47] Noble Corp and Maersk Drilling, "Noble Corporation and Maersk Drilling Announce Agreement to Combine," November 10, 2021, p. 17.

[48] TransOcean, "Quarterly Fleet Status Report," October 16, 2013, p. 2.

[49] TransOcean, "Quarterly Fleet Status Report," July 15, 2020, p. 2.

**Figure 4. Ultra Deepwater Drillship Dayrate and Marketed Utilization[50]**



### 4.1.3. Investors understand that oil and gas companies must invest a significant amount of time to understand and appraise an oil discovery.

59.    It is not unusual for a timeline from lease of a field to production to vary from four to ten

years. This can be due to factors such as "the water depth at the lease location, the drilling

---

[50] Noble Corp and Maersk Drilling, "Noble Corporation and Maersk Drilling Announce Agreement to Combine", November 10, 2021, p. 17.

depth needed to reach the target reservoir, the distance from shore and from infrastructure, the geological characteristics of the reservoir and complexity of production facilities design."[51]

60.     The general timeline for exploration and production can include:

a.   Six months to a year for application and approval of a lease of a target field.

b.   One year for preliminary geological investigation and identification of areas of interest for additional seismic data acquisition.

c.   One year to two years to acquire and to process seismic data and identify drillable prospects.

d.   One year or more to contract and schedule a drilling rig.

e.   Six to 10 months for drilling and completion of an exploratory well.

f.   Six months to a year for follow-up evaluation of drilling results, which can include drilling a sidetrack well. Multiple exploration/appraisal wells may be needed, which further increases the time needed for evaluation of the project.

g.   Another two to three years for additional delineation drilling, and formulation of a plan for reservoir development if the results of exploratory and appraisal wells conclude with a commercially viable finding and lead to an investment decision. During this time, the company works on pre-permit studies, permitting and design and procurement for production facilities, including surface and subsurface equipment and systems.

---

[51] Coastal Review, "An Offshore Timeline," June 10, 2015, p. 2, https://coastalreview.org/2015/06/an-offshore-timeline/.

  h. One year or more for facilities installation.

  i. One to two additional years for development drilling. During this period, the company also works on design, permitting, engineering, procurement and installation of a pipeline or offshore mooring system to bring the production to market.[52]

61. Exploration projects may take even longer and even after many years may not be sanctioned. For example, in the case of Mozambique, Anadarko announced on February 18, 2010, that the Windjammer exploration well in the frontier Rovuma Basin offshore of Mozambique had reached an intermediate casing point and encountered more than 480 net feet of natural gas pay in high-quality reservoir sands, with a gross column of more than 1,200 feet.[53] Over nine years later, on June 18, 2019, Anadarko and its co-venturers announced a FID on the Area 1 Mozambique LNG project.[54] Later that year, in September 2019, Total announced the closing of the acquisition of Anadarko's 26.5% operated interest in the Mozambique project, which is expected to come into production by 2024, 14 years after the exploration well encountered natural gas pay.[55]

---

[52] *Id.*

[53] Offshore, "Anadarko succeeds with Windjammer offshore Mozambique," February 18, 2010, https://www.offshore-mag.com/drilling-completion/article/16796105/anadarko-succeeds-with-windjammer-offshore-mozambique

[54] Anadarko Petroleum Corporation, "Anadarko Announces Mozambique LNG Final Investment Decision," June 18, 2019.

[55] Reuters, "Total aiming for two additional LNG trains in Mozambique LNG", November 5, 2019, p. 2, https://www.reuters.com/article/total-mozambique-lng/total-aiming-for-two-additional-lng-trains-in-mozambique-lng-idUSL8N27L69L.

### 4.1.4. Investors understand that oil and gas production, especially deepwater exploration, is risky and faces substantial uncertainties.

62.     The oil and gas business is, by its nature, characterized by significant risks including environmental risks and exposure, regulatory risks, litigation risks and the technical challenges of economically extracting hydrocarbons from deep and/or complex geologic formations. This is more pronounced for deepwater exploratory drilling, and even more so for drilling that targets deep sub-salt horizons where even advanced 3D seismic has significant limitations. There is significant uncertainty as to the likelihood of drilling success and the economics of full-scale development, the development timetable, and the ultimate project value, if any.

63.     The oil and gas sector is capital-intensive; as such, it is highly dependent on access to both equity and debt capital markets and to financing from industry and other joint venture partners. Further, the oil and gas sector is, like most commodity businesses, exposed to significant market volatility in prices for oil, gas and natural gas liquids. Price volatility impacts not only current and future revenues but also underlying reserve recovery potential, as fields are produced to their economic limits, the point in time when operating expenses exceed revenues.

64.     Long-term price forecasts also impact a decision to invest in a given project. Deepwater exploration is characterized by long development timelines from initial deployment of capital and initiation of revenues.

### 4.1.5. Investors understand that exploration in deepwater Gulf of Mexico presents additional challenges.

65.     Although most offshore platforms in the Gulf of Mexico have been in shallow waters, deepwater exploration and production have played an increasingly important role in the oil and gas industry. One industry commentator observes:

"Over the past two decades, comparatively, production from shallow waters of the [Gulf of Mexico] declined by 77% for crude oil and 92% for natural gas, while production from deep waters increased significantly over the same period, with oil production increasing by nearly 200%. In 2019, 91% of the crude oil and 70% of the natural gas produced in the [Gulf of Mexico] came from deep waters."[56]

66. Offshore oil and gas production is more challenging than land-based installations due to the remote and harsher environment, as offshore exploration and appraisals take place far under the ocean. Several hundred meters of the ocean water adds pressure, which increases the expense and time needed for oil or gas extraction.

67. As water depths increase, risks tend to increase. The probability of finding hydrocarbons in deepwater exploration in a reasonably mature area is in the range of 30% to 40%; the probability of finding hydrocarbon in sufficient quantity for a commercially viable production is even lower at around 10% to 20%.[57] In other words, the discovery of hydrocarbons does not necessarily mean that a company will proceed with development and production.

68. With offshore exploration and production, the risks associated with operational safety and environmental breaches also increase.[58] In case of a blowout or a major spill, offshore clean-ups and remediations require a significant amount of capital.

---

[56] Ulziitushig Batbuyan, "Deepwater Plays Against Rising Risks: The U.S. Gulf of Mexico," March 18, 2021, https://www.sustainalytics.com/esg-research/resource/investors-esg-blog/deepwater-plays-against-rising-risks-the-u.s.-gulf-of-mexico.

[57] Rafael Sandrea & Peter Stark, "Deepwater Oil Exploration in the Gulf of Mexico," July 2020, p. 1.

[58] Ulziitushig Batbuyan, "Deepwater Plays Against Rising Risks: The U.S. Gulf of Mexico," March 18, 2021, https://www.sustainalytics.com/esg-research/resource/investors-esg-blog/deepwater-plays-against-rising-risks-the-u.s.-gulf-of-mexico.

69. The deepwater Gulf of Mexico is a geologically complex environment with multiple subsurface faults that can limit the recovery of reserves. In particular, the Lower Tertiary sands, where Shenandoah is located, were first developed in early 2000s and represent one of the most expensive to drill because of its depth and complexity.[59] A McKinsey & Company study found that exploration activities in the deepwater Gulf of Mexico for the period from 2008 to 2017 had the lowest probability of discovery compared to developments at other regions.[60] McKinsey further noted that although exploration of Lower Tertiary (i.e., Paleogene) led to large size discoveries, most of the discoveries were not developed as of mid-2018 as a result of the complexity of the reservoir and the uncertainty of the economics.[61]

70. In a June 26, 2013 release, Deutsche Bank Securities outlined many of the challenges of the deepwater drilling in the Gulf of Mexico Lower Tertiary, which includes Shenandoah, noting that "[c]ommercial development of the Wilcox remains difficult with discoveries in water depths over 10,000ft to the sea floor and high bottom hole pressures (20,000+ PSI) and temperatures (200+ Fahrenheit)."[62] They added that development in the Gulf of Mexico Lower Tertiary had been "slow to date, as the industry has wrestled with the technical and economic challenges of developing a relatively lower quality reservoir . . . at temperature/pressure regimes at the limit of industry capabilities."[63] Deutsche Bank then

---

[59] The Way Ahead, "Emerging Plays Boost Economic Attractiveness of Deepwater Gulf of Mexico," January 14, 2013, jpt.spe.org/twa/emerging-plays-boost-economic-attractiveness-deepwater-gulf-mexico.

[60] Kassia Yanosek & Matt Rogers, McKinsey & Company, "Unlocking future growth for deepwater in the Gulf of Mexico," July 13, 2018, https://www.mckinsey.com/industries/oil-and-gas/our-insights/unlocking-future-growth-for-deepwater-in-the-gulf-of-mexico.

[61] *Id.*

[62] Deutsche Bank Securities, "Get Onboard with the Inboard: Rise of the Lower Tertiary 2.0," June 26, 2013, p. 4 (DEUTSCHE0005118).

[63] *Id.* p. 5.

listed the "primary development challenges" facing the region, including difficulties with "[s]ubsalt imaging," resulting from the "significant salt canopy" that "impact[s] reservoir imaging and seismic quality," as well as "[h]igh pressure riser systems," which would "push the limits of technical capabilities for the industry."[64] Deutsche Bank continued, "Both Shenandoah and North Platte are major discoveries by any measure even though there is considerable uncertainty around development options for both at their early stages due to remote locations, extreme well and water depths, and few analogue fields in the Lower Tertiary Play. However, the large quantity of pay encountered via the latest Shenandoah appraisal well (1 ,000 feet), indicates huge potential for development."[65]

### 4.1.6. Investors understand that the terms "dry hole" and "wet well" can refer to a well that did not encounter hydrocarbons, but the decision to record a dry hole expense is based on company-level accounting policy.

71. During the exploration and appraisal process, it is not uncommon for a company to drill a well that does not encounter hydrocarbons. Sometimes, but not always, these wells are referred to as "dry holes" or "wet wells," which colloquially connote a lack of hydrocarbons. More specifically, a "wet well" is generally understood to mean that the company encountered water; while there is lack of hydrocarbons, there is a possibility of encountering hydrocarbons via a sidetrack, or the well may have other utility. A dry hole is generally understood to have no future utility, although it can still provide useful data about a prospect.

72. Investors also understand that after an exploration company incurs costs in connection with an appraisal well, it must determine whether to suspend or expense well costs. In particular, a company may charge the costs of a well to their "dry hole" expense account when

---

[64] *Id.*

[65] *Id.* p. 9.

appropriate under their interpretation of applicable accounting standards. What constitutes a "dry hole expense" for accounting purposes is typically defined and disclosed by the exploration company in its SEC filings. Investors understand that exploration companies involved in a joint venture, such as the Shenandoah Partners, make independent accounting determinations based on their own interpretation of well results, applicable accounting standards, and individual accounting policies and, accordingly, may reach different determinations regarding whether and when it is appropriate to write off well costs as a dry hole expense.

### 4.1.7. Investors understand that deepwater exploration will result in dry holes and millions of dollars in dry hole expenses every year.

73. Investors understand that exploratory drilling in general involves a substantial risk of dry holes or failure to find commercial quantities of hydrocarbons.[66] Investors understand that exploration companies often drill holes that do not encounter commercially productive quantities of hydrocarbons, particularly in deep sea, sub-salt areas like the Gulf of Mexico.

74. Investors nonetheless understand that "dry holes" can provide important information. As Daniels said during a March 13, 2012 Investor Conference: "We're also learning from every well that we drill out here, and you'll see this post-appraisal loop as we go on through. So when we make a capital investment, that's not just to say, oh, it's a dry hole, let's forget it and move on. It's to say, we invested our shareholders' money to learn something about this area that could lead us either to success here or to success on the next opportunity. So we constantly are learning. Everything we do based on science and economics. Economics

---

[66] *See, e.g.*, Anadarko Petroleum Corporation, 2014 10-K, February 20, 2015, p. 42.

may not be science, but we marry the two. But the science goes into the identification of the opportunities and the evaluation of the risk/reward profile."[67]

75.    Investors understand that oil exploration companies like Anadarko will expense millions of dollars in dry hole costs each year. Each year during the Class Period, Anadarko had dry hole expenses totaling hundreds of millions of dollars and took hundreds of millions of dollars in impairments on unproved proprieties.[68] Investors understand that dry hole expenses and impairments are a necessary part of deepwater exploration drilling.

## 4.1.8. Investors understand that many exploration projects may not result in a final investment decision.

76.    In making a final investment decision ("FID"), i.e., a determination whether to convert the field to production, oil companies consider multiple variables, including the amount of potential resources predicted from the data gathered from exploratory wells, level of commodity pricing, cost of development including oil field services cost (which include costs associated with drillers, wireline, pipe/mud suppliers), competing demands for company capital resources, etc. Until the FID is made, there can be no certainty that the project will go forward. Given the long and complicated process from discovery to production, initial exploratory success does not ensure that development is justified.

77.    Many exploratory wells that discover hydrocarbons, even those followed by multiple appraisal wells that similarly discover hydrocarbons, do not justify the significant subsequent commitments needed to monetize resources.

---

[67] Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012, p. 39.

[68] Anadarko Petroleum Corporation, FY 2016 10-K, February 17, 2017, p. 63.

78.    Oil and gas exploration companies and their investors do not focus narrowly on the size of the potential resources without also considering the cost of the development. Significant resources combined with high development costs and an extended timeframe to extraction could still result in a rational decision not to proceed—or at least postpone—development.

79.    Price volatility impacts not only current & future revenues but underlying reserve recovery potential as fields are produced to their economic limits, the point in time when operating expenses exceed revenues. Thus, in periods of declining oil prices the volume of economically recoverable reserves declines. Long-term price forecasts also impact final investment decisions on the infrastructure needed to monetize reserves.

80.    As Deutsche Bank commented in January 2014:

       "The success of the shift to unconventional oil in the US is the key contributor to the fear surrounding the sustainability of commodity price. Non-OPEC supply growth has supplanted the market's focus on demand growth. For the US E&Ps the situation is even more acute as light oil supply growth is contributing to volatility in regional pricing. The level of complexity is high, with an increasing importance of incremental infrastructure adds, regional pricing benchmarks (reduced relevance of WTI as a benchmark), and downstream demand trends. The barriers to entry for non-energy focused investors are rising, an opportunity for some, but not good for fund flows into the sector, in our view."[69]

81.    Similarly, in January 2015, immediately before the start of the Class Period, Deutsche Bank noted:

       "E&P managements are confronted with one key decision point - to develop (drill ahead) or suspend activity (drop rigs). To date, the industry has acted rationally to lower commodity price (cash flows) reducing lower productivity capital (exploration, marginal activity) and high grading the resource base.

---

[69] Deutsche Bank Securities, "Climbing the Wall of Worry. Not Just Yet," January 6, 2014, p. 2 (DEUTSCHE0005704).

Without a drastic change in drilling costs (likely faster than the service industry will or can concede) economics at $50/bbl WTI will be challenged in all but the very best areas of major US oil plays. High grading is a natural outcome of rationing capital, the downside of which will be the consumption of highly economic projects at a cyclical low in commodity price (and returns). As a result, E&P capex guidance will be a moving target for some time with a justified reticence by producers to guide with full clarity on a trough commodity price without the benefit of trough service cost assumptions."[70]

82. As described in further detail in the following sections, the oil industry faced significant hurdles during the Class Period. After the close of the Class Period, analyst commentary remarked on the challenging state of the oil and gas industry:

"Energy stocks have been the worst performing sector YTD as both prompt and longer-term oil prices have declined on concerns about robust US shale growth, and equities have priced in lower longer-term oil price outlooks. Coming into 2017, we estimate E&P valuations reflected a recovery in WTI oil prices to $65/Bbl, well above the back of the futures curve at that time of $56/Bbl. In other words, the stocks were expecting a sharp oil price rally that did not materialize. By the end of 1Q, we estimate the sector was reflecting a much lower normalized oil price of $55/Bbl, still above the back end of the futures curve of $51/Bbl at the end of March with the weakness in crude oil driven by concerns that E&Ps robust longer term oil growth outlooks would inhibit any material drawdown in high oil inventories. Despite seasonal declines in US crude and product inventories building less than historical levels during 2Q combined with OPEC extending its production cut agreement by 9 months through March 2018, oil prices continue to slide with the back end of the futures curve now at $49/Bbl and stocks discounting a recovery to $52/Bbl."[71]

"Deepwater markets are in the midst of a very long transition This is the most challenging environment the deepwater drilling industry has ever faced. Over the past three years, the industry has endured an unusually severe decline in rig fixtures, an unprecedented wave of early contract terminations, and a sizeable withdrawal of customers. The supply demand imbalance is unlike

---

[70] Deutsche Bank Securities, "2015 Capex - A Moving Target," January 6, 2015, p. 1 (DEUTSCHE0007429).

[71] UBS, "Oil & Gas Exploration and Production Lowering Near and Medium Term Oil Price Forecasts; Risk/Reward Favors SMID-Caps", June 7, 2017, pp. 4-5 (UBS00070725).

anything the industry has ever experienced. Balance sheets are being tested, pricing tactics are fierce, and rigs are being scrapped at a record pace. After all is said and done, the earnings power of the industry has diminished severely and companies are seeking ways to reestablish themselves in the value chain."[72]

83.    Investors understand that the commodity price environment is vital for determining whether a company would make a FID.[73]

## 4.2.    Anadarko

### 4.2.1.  Investors understood that as one of the largest independent exploration & production companies, Anadarko had a large and diversified asset base.

84.    During the Class Period, Anadarko was one of the largest operators in the deepwater Gulf of Mexico with a significant leasehold base and well recognized technical expertise.

85.    Commentary from industry analysts show that Anadarko had a strong technical team with recognized expertise and a track record of success:

   a.   Anadarko is "particularly skilled at exploration, with significant success over time. They have been able to sell a lot of discoveries as well. . . . [T]here remains significant value due to their exploration skillset."[74]

   b.   "The Company has one of the best exploration track record[s] in global energy landscape with frontier exploration successes in West Africa (Ghana, Ivory Coast), East Africa (Mozambique) and Gulf of Mexico. The Deepwater exposure also enables the Company to pursue tie back strategy to monetize small stranded discoveries. Tie back

---

[72] Deutsche Bank Securities, "Not Business as Usual," October 9, 2017, p. 36 (DEUTSCHE0010209).

[73] See Declaration of N. Barrett, Janus Henderson ¶ 7.

[74] FMR Research, "CFO in-house. Under appreciated potential. Top Pick. '1'," June 3, 2016, p. 30 (FIAM-ANAD-000002_0030).

strategy is most applicable in GoM that allows management to leverage existing infrastructure build out."[75]

c. "Long Cycle assets: These include Deepwater resource assets in GoM and in Africa. Anadarko has been one of the very few companies which has had exploration success. This success has enabled the Company to build a tier 1 deepwater global footprint. . . . Managers are focused on returns and profitable growth. The Company during the past decade has been successful in monetizing long dated discoveries and pulled forward the value of these discoveries."[76]

d. "Best in class portfolio management with a balanced portfolio of both onshore unconventional oil and gas assets, GOM, and International projects. Ability to start returning cash to shareholders though increased dividends and/or share repurchases as cash flows outpace spending over the next few years. Ownership of mineral rights in Rockies significantly elevates drilling returns. Top tier GOM deepwater success rate above 70% in 2013."[77]

86.   Anadarko's assets were not characterized by significant/excessive risk concentration in any individual fields/basins/regions. Figure 5 below shows that as of February 2017, Anadarko had development and production activities throughout the world.

---

[75] FMR Research, "Management is taking right steps to unlock shareholder value. Quality franchise trading at significant discount to intrinsic value. Initiate with a buy '2' rating," July 25, 2016, p. 32 (FIAM-ANAD-000002).

[76] *Id.* p. 34.

[77] Cowen and Company, "Anadarko Petroleum Corporation Overhang Lifted; Tronox Settlement A Positive," April 4, 2014, p. 2 (ANADARKO_00000043).

**Figure 5. Anadarko's Global Exploration and Production Activities as of February 17, 2017**[78]



87.    In its 2016 10-K, dated February 17, 2017, Anadarko described its operations as follows:

"***Overview*** Anadarko's U.S. operations include oil and natural-gas exploration and production in the U.S. onshore, deepwater Gulf of Mexico, and Alaska. The Company's U.S. operations accounted for 89% of sales volumes and 80% of sales revenues during 2016 and 90% of proved reserves at year-end 2016."[79]

"***U.S. Onshore.*** Anadarko's U.S. onshore properties include oil and natural-gas plays located in Colorado, Texas, Utah, Wyoming, Pennsylvania, Louisiana, and Kansas, where the Company operates approximately 12,700 wells and owns interests in approximately 3,500 nonoperated wells."[80]

---

[78] Anadarko Petroleum Corporation, 2016 10-K, February 17, 2017, p. 6.

[79] *Id.* p. 7.

[80] *Id.*

Page **43**

\*\*\*

*"Gulf of Mexico* Including the GOM Acquisition described below, as of December 31, 2016, Anadarko owns an average working interest of 70% in 327 blocks in the Gulf of Mexico, operates 10 active floating platforms, and holds interests in 39 fields. The Company continued an active deepwater development and appraisal program in the Gulf of Mexico during 2016 as it continues to take advantage of existing infrastructure to cost-effectively develop known resources."[81]

\*\*\*

*"[International] Overview* Anadarko's international operations include oil, natural-gas, and NGLs production and development in Algeria and Ghana, along with activities in Mozambique, where the Company continues to make progress towards a final investment decision on an LNG development. The Company also has exploration acreage in Colombia, Côte d'Ivoire, Mozambique, and other countries. International locations accounted for 11% of Anadarko's sales volumes and 20% of sales revenues during 2016 and 10% of proved reserves at yearend 2016. In 2017, the Company expects to focus its exploration and appraisal activity in Côte d'Ivoire and Colombia."[82]

88.  Figure 6 below shows Anadarko's U.S. onshore assets, which reflected the largest driver of its revenue during the Class Period, as of February 17, 2017.

---

[81] *Id.* p. 9.

[82] *Id.* p. 12.

**Figure 6. Anadarko's U.S. Onshore Exploration and Production Activities as of February 17, 2017**[83]



89.    Shenandoah was one of Anadarko's assets in the GoM, as shown in Figure 7 below.

---

[83] *Id.* p. 7.

**Figure 7. Anadarko's GoM Offshore Exploration and Production Activities as of February 17, 2017[84]**



90.   Anadarko was among the largest independent producers in the deepwater Gulf of Mexico with an extensive track record and broadly recognized technical expertise in the area.[85]  Its Gulf of Mexico assets were spread over multiple fields and included significant working interest partners, offering additional technical expertise and risk-mitigation. Investors understood that investments in Shenandoah would be impacted by developments in the rest of the Gulf of Mexico, as they would be able to leverage existing infrastructure and take advantage of tiebacks.

91.   Shenandoah was a potentially important asset but not a key driver in Anadarko equity valuation. Shenandoah was one of many higher-risk and higher-potential Gulf of Mexico

---

[84] *Id.* p. 9.

[85] See the discussion on Anadarko's Business above.

prospects and represented a small portion of Anadarko's asset base. For example, in its 2014 10K, which was released on the first day of the Class Period, Anadarko described its appraisal activities in the Gulf of Mexico, which included the Coronado and Yucatan discoveries:

> "Appraisal: Shenandoah Basin The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range. Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015.
>
> An appraisal well at the Coronado discovery (35% working interest) reached total depth during the second quarter of 2014 and did not find the Lower Miocene objective and was plugged and abandoned.
>
> During the third quarter of 2014, the first appraisal well of the Yucatan discovery (25% working interest) was drilled down-dip of the original discovery, and found approximately 57 gross feet of pay in Lower Tertiary oil-bearing sands. The Yucatan discovery is located approximately three miles south of the Shenandoah discovery. "[86]

92.   In early 2016, analysts estimated opportunities of approximately $5-15 billion from Anadarko's Gulf of Mexico assets, exclusive of Shenandoah, because of subsea tiebacks, a

---

[86] Anadarko Petroleum Corporation, 2014 10-K, February 20, 2015, p. 9.

process of connecting new discoveries to existing production.[87] Analysts also noted other appraisal activities in the Gulf of Mexico:

a.  BMO Capital Markets: "Anadarko expects to spend $2.8 billion (excluding WES) in 2016, which is a 50% reduction from 2015. While we'll have to wait until March 1 for details, shorter-cycle capex is expected to be reduced as a percentage of the total budget. Based on the analysis above, we estimate $1.3-1.4 billion will be spent on U.S. onshore activity, which represents a 60% Y/Y reduction. We expect the GOM to see the least reduction due to subsea tieback opportunities at Caesar/Tonga and four of the five deepwater rigs being focused here. Anadarko noted that these opportunities have a $5-15Boe F&D with returns that remains strong at current commodity prices. Also, Heidelberg and Shenandoah will continue to see activity. We expect international capex to be down 40% Y/Y, with minimal spending in Mozambique and a reduction in Ghana as TEN achieves first oil in 3Ql6."[88]

b.  Barclays: "The company plans to allocate $400 million of its $700 million GOM budget to development and the remaining amount of the budget to exploration/appraisals. Total production is expected to decline 12% in the Gulf. APC has two tiebacks planned for both its K2 complex and its Caesar/Tonga asset, one tie-back planned for Lucius and potential tie-backs for Warrior and Phobos. Two appraisal wells will be drilled at Shenandoah and one at Phobos. One exploration well is planned at Warrior."[89]

---

[87] See BMO Capital Markets, "Markets Playing in the 2016 Sandbox Ahead of March," February 3, 2016, p. 3 (APC-01327135); Barclays, "APC Provides Detail on 50% Capex Cut and Flat Expected Oil Volumes; 2016 Asset Monetization Plan Increased to $2-3 Billion," March 1, 2016, p. 2 (APC-01327279).

[88] BMO Capital Markets, "Markets Playing in the 2016 Sandbox Ahead of March," February 3, 2016, p. 3 (APC-01327135).

[89] Barclays, "APC Provides Detail on 50% Capex Cut and Flat Expected Oil Volumes; 2016 Asset Monetization Plan Increased to $2-3 Billion," March 1, 2016, p. 2 (APC-01327279).

93.     Further in March 2017, Deutsche Bank explained the following activities in the Gulf of Mexico:

> "Planned development consists of 7 tiebacks (-2 rigs) and 1 platform rig well (Holstein) driving development spend of $960mm ($600mm drilling and $360mm in facilities/maintenance). Expects to maintain production (130 Mbo/d and 160 Mboe/d through 2019) and generate $1 Bn in FCF per year through 2021 at $55/$3 WTI/HH. Plans to drill 5-6 exploration and appraisal wells in 2017 with potential nearterm tiebacks (Calpurnia-1, Warrior-2, and Phobos-3) representing half while Shenandoah 6, Shenandoah-6 ST, and Coronado 3 will further advance appraisal efforts in the Shenandoah Basin. Shenandoah-6 ST is currently drilling."[90]

94.     At various times throughout the Class Period, analysts estimated the value of Anadarko's interest in Shenandoah based on information available at the time. For example, in a research report dated July 29, 2015, UBS assigned a value of approximately $2.75/share to Shenandoah in its net asset value ("NAV") estimate of $118/share for Anadarko.[91] This estimated value of Shenandoah represented approximately 2.33% of the total value of Anadarko at the time.

95.     Similarly, JP Morgan performed a valuation of Anadarko using a NAV approach in a report dated May 4, 2016. However, JP Morgan did not "give value for Shenandoah in [their] NAV given uncertainty around the project," stating that "[Anadarko] indicated there is some apparent faulting in the structure that wasn't encountered in the seismic. As a result, the

---

[90] Deutsche Bank Securities, "Anadarko Petroleum Corp. Being Resource-Full Above All Else?," March 8, 2017, p. 3 (APC-01334146).

[91] UBS, "Strong 2Q EPS/CFPS Beat; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015, pp. 2, 11 (UBS00015972). Net asset value or NAV reflects the differences of a company's assets and liabilities. Analysts often apply a NAV approach to value exploration and production companies by assigning a value to individual assets and liabilities and then aggregate the components to derive a NAV value for the whole company.

company plans to drill more appraisal wells to make sure there is not additional compartmentalization across the field."[92]

96.    Likewise, in a research report dated February 5, 2017, Goldman Sachs valued the Shenandoah project at around $0.50 to $0.75 per share, based on Goldman Sachs' internal reserve estimate of 775 million barrels of oil equivalent, a $9 billion development cost and a project breakeven oil price of $45-50/bbl. That compares to a NAV of $69 per share for Anadarko, and hence reflects approximately 1.1% of the total value of the company.[93]

97.    I found at least 314 reports from 22 analysts, including UBS, JP Morgan and Goldman Sachs published 314 reports during the Class Period that applied a NAV approach to estimate the value of Anadarko.[94] Most of these reports did not provide a value for Shenandoah because they either assigned no value to Shenandoah or did not value Shenandoah separately from the other unproven assets. This suggests that Shenandoah was not a sufficiently significant or certain portion of Anadarko's asset base to merit separate valuation attention from these analysts. However, 8 analysts in 32 reports did provide a non-zero value for Shenandoah. Those values of Shenandoah represent 1.1 % to 3.7% of Anadarko's total NAV.[95] Figure 8 below charts the portion of Anadarko's valuation the eight analysts attributed to Shenandoah. These valuations further suggest that Shenandoah was viewed by analysts as only a small part of Anadarko's asset base. Importantly, the valuations also suggest that

---

[92] JP Morgan, "Anadarko Petroleum More Positives Than Negatives, But a Few Chinks in the Armor," May 4, 2016, p. 1 (APC-01328858).

[93] Goldman Sachs, "Anadarko Petroleum Corp. (APC) Unappreciated GOM production profile to drive the next leg up; Buy", February 5, 2017, p. 14–15 (GS-002754).

[94] List of relevant Analyst Reports is included in Appendix B to my report.

[95] Sources are listed in Appendix B to my report.

analysts attributed an increasingly smaller value to Shenandoah as the appraisal prospect progressed.

**Figure 8. Portion of Anadarko's Valuation Attributed to Shenandoah[96]**

98.    One of Plaintiffs' investment managers, Fidelity, did not assign any value to Shenandoah, and the ultimate write-off of Shenandoah did not affect Fidelity's valuation of Anadarko:

> "Shenandoah in the GOM was written off, as the most recent appraisal well didn't find oil, in part due to operational issues with drilling the well. This project was already going to be tough to get over the finish line, and with a smaller reservoir they've stepped away from it. Still own the blocks, but unlikely it will proceed at this point. Disappointing, but not too surprising - I was not assuming anything in my production forecast."[97]

---

[96] Analyst reports by Bank of America Merrill Lynch, Evercore, Goldman Sachs, Imperial Capital, Morgan Stanley, RBC, UBS, and Wolfe Research from February 20, 2015 to May 2, 2017.

[97] FMR Research, "Operations good w/ strong outlook, val'n compelling but in sentiment purgatory," May 8, 2017, p. 42 (FIAM-ANAD-000002).

99.   Another one of Plaintiffs' investment managers, Janus Henderson, noted that it invested in Anadarko based on its overall business, not any single oil field.[98]

### 4.2.2. Investors understood that Anadarko engaged in active portfolio management to drive value, and that this could include selling, rather than developing, exploration assets.

100.  Long before the start of the Class Period, investors understood that Anadarko engaged in active portfolio management to maximize value for its shareholders. Anadarko repeatedly emphasized this message during investor conferences and earnings calls, often referring to asset sales as "monetizations."

101.  For instance, during a March 2012 investor conference, Daniels described their "active" appraisal program:

> "All levels understanding exploration – not just the risk, which is key. You have to understand what the risks are, but you also have to balance that out against the rewards. And a lot of times, people think about exploration risk. Exploration means risk and reward, and we're trying to balance that. And there's a very, very good understanding not just at the senior level – all levels of the organization that that's the balance we're trying to optimize around so that we get the maximum reward for the least amount of risk.
>
> We're very future-focused. You're going to see an awful lot of attention to what's going to happen in 2012. Where we spend an awful lot of our time on is what are we going to be drilling in 2013 and 2014, and how do we bring those forward, and also how do we evaluate, as efficiently as possible, the discoveries we've made so that we can roll those into Chuck's world and that they can work their magic on the developments.
>
> And then driven towards that value realization, and you've seen examples of that, whether it's through monetizations, whether it's through [joint ventures ("JVs")], whether it's through exploration sell-downs. But we do that all the

---

[98] Declaration of N. Barrett, Janus Henderson ¶ 5.

time, and we're driven towards making sure, when we create value by finding something, that then we realize the value for our shareholders.

. . .

The standardized risk assessment and consistent economic evaluation – another group that I have in the exploration team is called our Exploration Engineering Group. They're very key to how we evaluate our portfolio and the decisions that we make in that they're engineers that are embedded in the entire exploration organization, reporting up to a common structure. And what that allows is commonality of assessment, whether it's timing, cost, resources, deliverability, all of the things that go into a full economic assessment. And then you marry that with a risk assessment of the subsurface, which is based on the Rose methodology, which is embedded through the entire organization. It allows you to then be able to compare, as best you possibly can, a prospect in Brazil versus a prospect in Mozambique versus a prospect in the deepwater Gulf of Mexico and looking at that risk/reward profile and what does it mean for our shareholders at Anadarko."[99]

102. In May 2013, when asked about forthcoming monetizations, Walker emphasized that at Anadarko they were "very active managers of [their] portfolios."[100] Gwin added, "There's a variety of these types of things that we continue to work on. And we'll continue to try to fine-tune the portfolio of things that don't work quite as well for us, attractive assets but might fit better in somebody else's portfolio, and then we'll continue to focus our capital and attention on the things that are our highest points of opportunity."[101]

103. During a March 2014 investor conference, Walker continued on this, explaining two selloffs in the Gulf of Mexico that improved Anadarko's balance sheet:

"Monetizations in our portfolio will continue. I mean that in the sense that we're always constantly like many of you who run money in the room looking to

---

[99] Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012, pp. 39-40.

[100] Anadarko Petroleum Corporation, Q1 2013 Earnings Call Transcript, May 7, 2013, p. 13.

[101] *Id.*

improve our portfolio and not be static in the way in which we think about what is in our portfolio. This approach really allows us to accelerate what we think about with respect to the velocity of our portfolio; that change is really, really important, that accelerating the cash, whether it's a long cycle investment, short or something that we see as an investment that may or may not be something that we'll want to take to development really allows that acceleration, that velocity of that cash to come forward. A lot of that help is also reduced execution risk. And we're going to talk a little bit about that as well.

If you think about Lucius and Heidelberg, two great examples where we had taken two great discoveries, put them into the development, and we sold down enough working interest to be able to have somebody else pay the D of the F&D, and be able to have a very attractive rate of return and a meaningful impact for the production and reserves for our own balance shee[t]. So we reduced the risk, improved our optionality associated with it and frankly in some ways it simplified our equity story."[102]

104. When asked about monetizations and how, "given the success of Shenandoah," Anadarko was "thinking about non-operated working interest in the Gulf of Mexico," Gwin declined to give out information on specific assets but emphasized that the "key" was that Anadarko "will make those decisions based upon continuing refinements in [its] model."[103] He added, "We'll continue to re-optimize the portfolio, and if there are places where, and maybe it's in a place like Shenandoah. But we've shown the ability to do it onshore in the U.S., and in the deepwater, and internationally. We've done it through carry structures fairly creatively, and we've been able to do it with just straight monetizations like we are with Pinedale/Jonah and in Mozambique. So I think the comment is one in general to say, we're not done managing this way, but a lot of it's going to matter about – Al talked about lots of things we

---

[102] Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, p. 5.

[103] *Id.* p. 18.

can't predict today. As things evolve we're going to continue to try to position ourselves most efficiently, and then we'll take advantage of it in the market."[104]

105. Anadarko's message regarding its portfolio monetization was consistent: They were committed to exploring prospects but would determine whether to develop or sell those prospects depending both on the prospect and how it fit within its portfolio.

---

[104] *Id.* p. 19.

# 5. Publicly Disclosed Information Regarding Shenandoah

106. In this section, I review Plaintiffs' allegations with respect to Anadarko's Shenandoah disclosures as specified in the Amended Complaint. While I do not explicitly address all statements in the Amended Complaint, particularly where the allegedly misleading nature of the statement is unclear, I address each general category of statement. I analyze how investors understood the Shenandoah project given the totality of information in the market. Recognizing that markets assimilate information from all credible sources, I review Anadarko's statements, related disclosures made by the other Shenandoah Partners, as well as comments about these disclosures from equity research analysts, investment managers, and news outlets.

107. Based on this review, I find that Plaintiffs' allegations either reflect a misunderstanding of how investors understood these statements or ignore other information in the market. By the time of the alleged corrective disclosure, investors were aware of the difficulties that made sanctioning Shenandoah less attractive. The write-off thus did not result from risks and difficulties known to Anadarko that they had failed to disclose.

## 5.1.    Anadarko's Pre-Class Period Statements about the Projected Value and Size of Shenandoah Project

### 5.1.1. Overview:

108. Plaintiffs assert that Anadarko made several statements prior to the start of the Class Period that inflated the value of Shenandoah. In this section, I analyze how investors interpreted these statements. I also analyze additional statements that Anadarko and the Shenandoah Partners made about the Shenandoah project around this time, as well as statements from market participants. This review is intended to assess what investors understood about the Shenandoah development prior to the start of the Class Period.

### 5.1.2. Plaintiffs' Allegations:

109. I understand Plaintiffs to be pursuing an "inflation-maintenance theory."[105] Plaintiffs cite four pre-Class Period statements Defendants made over the course of five years—February 2009 through March 2014—that they contend contained "inflated numbers" about the size of the Shenandoah resource that "duped" the market.[106] Plaintiffs allege that "Defendants [dug] [t]hemselves a [h]ole in [h]ailing Shenandoah as a [m]ulti-[b]illion [d]ollar [o]pportunity,"[107] and that "the data collected from the Shenandoah wells proved that Defendants' public characterization of Shenandoah as a '~$2 - $4 Billion Net Opportunity' was vastly overstated and required a significant downward adjustment."[108] Plaintiffs further allege that "Defendants never corrected their projected value and size of Shenandoah project during the Class Period."[109]

110. In support of their theory, Plaintiffs first cite to Defendants' February 2009 announcement of the Shen-1 discovery well, which stated, "The Shenandoah discovery well, located in Walker Ridge block 52, encountered net oil pay approaching 300 feet in the Wilcox formation."[110] The press release quoted Daniels as saying, "This has been a remarkable week, with back-to-back deepwater discoveries in the Gulf of Mexico . . .. Initial data indicates the Shenandoah discovery has reservoir properties that appear to be of much

---

[105] Reply in Support of Motion to Certify Class, p. 3 (citing Amended Complaint ¶ 151).

[106] Amended Complaint pp. 10–12. Plaintiffs also take issue with two pre-Class Period statements about Shen-3. As these do not appear to go to their "inflation-maintenance theory," they are discussed *infra* Section 5.2.3.

[107] *Id.* p. 10.

[108] *Id.* ¶ 36.

[109] *Id.* ¶ 36.

[110] Anadarko Petroleum Corporation, "Anadarko announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, p. 1 (APC-01335462).

higher quality than [the] industry has seen previously in the emerging Lower-Tertiary play. The success of this well and our recent Heidelberg discovery further confirms the value of Anadarko's extensive acreage position and our capability in exploring proven and emerging deepwater basins worldwide."[111]

111. Second, Plaintiffs cite to a March 13, 2012 investor relations conference call, alleging that "Anadarko boasted of an exploration goal of delivering 'over 800' million barrels of oil equivalents ('MMBOE')." [112] Plaintiffs contend that "Shenandoah alone constituted approximately one-third of the projected resources to meet that goal, which at that time would have made it the third largest resource ever found in the Gulf of Mexico."[113] The slide at issue is:

---

[111] *Id.*

[112] Amended Complaint ¶ 31.

[113] *Id.*

**Figure 9. Reproduced Slide: Building Upon Momentum in 2012**[114]



112. Third, Plaintiffs identify a statement from Daniels in an Anadarko press release dated March 19, 2013, announcing the outcome of Shen-2. Plaintiffs contend that Daniels "touted favorable results"[115] of Shen-2:

> "The successful Shenandoah-2 well marks one of the Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by [the] industry in Lower Tertiary discoveries . . . With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, Anadarko is strategically

---

[114] Anadarko Petroleum Corporation, Investor Conference Presentation, March 13, 2012, p. 98.

[115] Amended Complaint ¶ 32.

positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico."[116]

113.    Fourth, Plaintiffs identify statements in an Anadarko investor presentation dated March 4, 2014, which includes a slide stating Anadarko had "900+ MMBOE Net Discovered Resource," "a third" of which the Amended Complaint claims "was attributable to Shenandoah," and a slide that described the Shenandoah basin as a "~$2 - $4 Billion Net Opportunity."[117] The slides at issue are:

**Figure 10. Reproduced Slide: Industry-Leading Exploration Success Again in 2013**[118]



---

[116] *Id.* ¶ 32.

[117] *Id.* ¶ 34.

[118] Anadarko Petroleum Corporation, Investor Conference Slides, March 4, 2014, p. 74.

**Figure 11. Reproduced Slide: Shenandoah Basin: ~$2 - 4 Billion Net Opportunity[119]**



### 5.1.3. Summary of Conclusions

114. **Conclusion A: Investors did not view Anadarko's February 2009 announcement about the Shenandoah discovery well as an estimate of the projected value and size of Shenandoah.**

115. **Conclusion B: Investors did not view Anadarko's March 13, 2012 statement regarding Anadarko's goal of delivering 800+ MMBOE Net Risked Resources in 2012 as an estimate of the projected value and size of Shenandoah.**

---

[119] *Id.* p. 83.

116. **Conclusion C: Investors did not view Anadarko's March 2013 statement announcing the results of Shen-2 as an estimate of the projected value and size of Shenandoah.**

117. **Conclusion D: Investors did not view Anadarko's March 4, 2014 statement about Anadarko's "900+ MMBOE Net Discovered Resources" and the Shenandoah Basin constituting a "~$2 - $4 Billion Net Opportunity" as an estimate of the projected value and size of Shenandoah.**

### 5.1.4. Support for Conclusions

118. **Conclusion A: Investors did not view Anadarko's February 2009 announcement about the Shenandoah discovery well as an estimate of the projected value and size of Shenandoah.**

119. When Anadarko announced the Shen-1 discovery well, they stated that it "encountered net oil pay approaching 300 feet in the Wilcox formation," and that "[i]nitial data indicates the Shenandoah discovery has reservoir properties that appear to be of much higher quality than [the] industry has seen previously in the emerging Lower-Tertiary pay."[120]

120. As explained *supra* in section 4.1.1, investors understood that a discovery well is only the first step toward appraising any given resource. This process, which could take upwards of a decade, involves a significant amount of time and capital, and may not ultimately result in a FID.

121. Investors did not understand the announcement of Shen-1, which discussed net pay and reservoir properties, as a resource range. As Anadarko noted in the press release

---

[120] Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, p. 1 (APC-01335462).

announcing the well, "Anadarko and the co-owners of the discovery are evaluating the well results and the next steps toward future appraisal activity." [121] As such, investors understood that Shen-1 was a promising discovery but was not guaranteed, and that Anadarko needed to go through the appraisal process in order to understand and size the resource. Investors did not understand that the results of a single discovery well could have confirmed a large, economically productive resource.

122. **Conclusion B: Investors did not view Anadarko's March 13, 2012 statement regarding Anadarko's goal of delivering 800+ MMBOE Net Risked Resources in 2012 as an estimate of the projected value and size of Shenandoah.**

123. The slide at issue is entitled "Building Upon Momentum in 2012" and contains the statement: "Deliver 800+ MMBOE of Net Risked Resources." Risked resources means that the applicable reported volumes or revenues have been adjusted based on the chance of commerciality of such resources.[122] In the context of this slide, I understand net risked resources to reflect risked resources (resources multiplied by a probability estimate) net of Anadarko's (then) 30% working interest.[123]

124. Investors understood that the 800+ MMBOE Net Risked Resource estimate was Anadarko's goal across its entire portfolio for 2012. As Daniels explained during the March 13 investor call, "2012, if you look at what the program looks like, this year we're going to be over 800 million barrels of net risked resources. This is the target we put out there . . . Because of the success we've had, because of the significant numbers of appraisal wells we have to do and

---

[121] *Id.*

[122] Canadian Securities Administrators, CSA Staff Notice 51-324 – Revised Glossary to NI 51-101 Standards of Disclosure for Oil and Gas Activities, December 4, 2014, p. 15 https://www.osc.ca/sites/default/files/pdfs/irps/csa_20141204_51-324_51-101-glossary.pdf

[123] *Id.* p. 10.

the de-risking of the additional exploration opportunities, we feel comfortable putting out an 800 million barrel resource number as our target for that $1.4 billion investment."[124]

125.  While Plaintiffs contend that "Shenandoah alone constituted approximately one-third of the projected resources to meet that goal,"[125] I have not seen any evidence that suggests that Anadarko made that representation. My review of the presentations and associated transcripts did not identify any suggestion that Anadarko attributed one third of that estimate to Shenandoah.

126.  Investors did not attribute any significant portion of the 800+ MMBOE goal to the Shenandoah appraisal project. As discussed in Section 4.2.1, Shenandoah constituted only a small portion of Anadarko's portfolio. Moreover, at this point, only the Shenandoah discovery well had been drilled. Shenandoah is listed in the presentation as a "discover[y] [u]nder [a]ppraisal,"[126] and "Shenandoah appraisal" is listed as one of Anadarko's planned activities for 2012.[127] As such, investors did not attribute any significant portion—let alone one third—of the 800+ MMBOE to Shenandoah.

127.  **Conclusion C: Investors did not view Anadarko's March 2013 statement announcing the results of Shen-2 as an estimate of the projected value and size of Shenandoah.**

128.  Plaintiffs take issue with Anadarko's statement announcing the results of the Shen-2 appraisal well. While investors understood that the more than 1,000 net feet of oil pay—a

---

[124] Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012, p. 37.

[125] Amended Complaint ¶ 31.

[126] Anadarko Petroleum Corporation, Investor Conference Presentation, March 13, 2012, p. 100.

[127] *Id.* p. 107.

fact Plaintiffs do not allege is false—was a promising discovery, the announcement did not speak to the size of the resource as a whole.

129.   Investors understood that there would be additional appraisal drilling following Shen-2. As such, investors did not interpret Anadarko sharing the results of Shen-2 as the company estimating or projecting the size of Shenandoah to any reasonable degree. Indeed, Daniels stated during the investor call that Anadarko was "incorporating the information obtained from Shenandoah-2 into [its] planning and anticipate[ed] further appraisal drilling to advance this potentially giant project."[128]

130.   Investors also understood from the announcement that Anadarko's potential success in the deepwater Gulf of Mexico would be based in part on its ownership of multiple prospects. Daniels said, "With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico."[129] Investors understood that the Shenandoah Basin, not the Shenandoah project alone, was an area with the "potential to become one of the most prolific new areas in the deepwater Gulf of Mexico," depending on the appraisal results in Shenandoah and other nearby projects. [130]

131.   Investors understood that the appraisal program was in its early stages, and that any development would depend on the findings of the appraisal program, cost of development, and macroeconomic factors such as the price of oil. Anadarko repeatedly disclosed in its

---

[128] Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay," March 20, 2013, p. 1, http://www.finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html.

[129] *Id.*

[130] *Id.*

SEC filings that development would depend on the price of oil. In its Q1 2013 10-Q, for instance, Anadarko wrote, "The Company's most significant market risk relates to prices for natural gas, crude oil, and NGLs. Management expects energy prices to remain volatile and unpredictable. As energy prices decline or rise significantly, revenues and cash flows are likewise affected. In addition, a non-cash write-down of the Company's oil and gas properties or goodwill may be required if commodity prices experience a significant decline."[131] Anadarko made these disclosures both before and throughout the Class Period.

132. After announcing the results of Shen-2, Anadarko continued emphasizing to investors that the project was in its early stages. On May 7, 2013, during Anadarko's Q1 2013 earnings call, Walker and Daniels explained that Shenandoah was still in the appraisal stage. Daniels remarked that "Shenandoah obviously needs additional drilling."[132] He noted that they were "waiting on the Yucatan results," which were "really key for the overall Shenandoah/Yucatan area."[133] On the same earnings call, an analyst with Bank of America Merrill Lynch, asked Robert Lawler, Anadarko's VP of International & Deepwater Operations, whether it was "too early to really think about development options" in Shenandoah. Lawler made clear that Shenandoah was still in its early stages and appraisal had not been completed, remarking that the analyst's "comment is exactly right," that "[i]t's very early, and we're looking forward to the appraisal program."[134]

133. The Shenandoah Partners similarly echoed that the project was in its early stages. In its Q2 2013 earnings call, Cobalt's CEO Joseph Bryant made remarks that demonstrated that the Shenandoah Partners were still assessing Shenandoah and needed to "drill another

---

[131] Anadarko Petroleum Corporation, Q1 2013 10-Q, May 6, 2013, p. 41.

[132] Anadarko Petroleum Corporation, Q1 2013 Earnings Call Transcript, May 7, 2013, p. 7.

[133] *Id.* p. 5.

[134] *Id.* p. 10.

appraisal well," projected for late 2013 or even 2014.[135] He stated that Cobalt "certainly doe[s] have views, pre-drill and post-drill" about Shenandoah but "d[id not] know that that's going to end up that way," [136] emphasizing that, "the great thing about this business is people drill wells, then they prove themselves right or wrong" and "at the end of the day, what we've got to do at Shenandoah is drill another appraisal well."[137] Bryant made clear that the Shenandoah Partners still needed to "find out how deep that oil column goes on that Shenandoah structure."[138]

134. During its April 25, 2013 earnings call, ConocoPhillips also emphasized that it was too early in the project to even give a timeline for production. On the call, Paul Cheng, a Senior Vice President at Barclays Capital, Inc., described Shenandoah as a "monster well" and asked, "[g]iven it's so great in terms of the size" what the timeline for production would be, predicting "at least another two years for [an] additional appraisal well." [139]  Matthew Fox, Executive Vice President of Exploration and Production at ConocoPhillips, responded, "We're still working on that, Paul. It's a good question and we're in the middle of working out the timeline and the appraisal request for that well. So it's too early to give you a timeline for that."[140]

135. Comments from equity analysts around March 2013 reflect that while some analysts speculated about the resource size—resulting in a wide range of estimated sizes—Anadarko itself did not publicly provide a possible resource range. It was common for

---

[135] Cobalt International Energy Inc., Q2 2013 Earnings Call Transcript, July 30, 2013, p. 19.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] ConocoPhillips, Q1 2013 Earnings Call Transcript, April 25, 2013, p. 15.

[140] *Id.*

analysts to take the limited information provided by Anadarko and the Shenandoah Partners and create their own models and assumptions. These were inherently speculative and vary across analysts, as was the case here.

a.  JP Morgan: JP Morgan noted that in releasing the Shen-2 data, "APC has not provided an overall estimated resource size."[141]

b.  Credit Suisse: "Our base case seems too conservative. Despite being in the lower tertiary, APC believes Shenandoah has higher quality reservoir characteristics more typical of the Miocene. Our base case, which now appears conservative given the size of the oil column in the appraisal well, estimated a discovery at Shenandoah could be worth $1.70 per APC share based on the company's 30% working interest, 340 MMBoe of recoverable reserves, $3.3 billion of development costs, initial production in late 2017, and a $90/bbl long-term oil price (Brent). For Shenandoah, a resource range of at least 400 to 550 MMBoe appears more appropriate. The initial discovery well, which was drilled up dip, encountered 300 net feet of pay. Assuming the appraisal area encompasses roughly 4,000 to 5,000 acres, we believe the market will initially assign a resource range of 400 to 550 MMBoe."[142]

c.  Barclays: "Shenandoah appraisal well encounters 1000+ net pay; We speculate size of discovery could be 300-1700 mmboe gross, perhaps worth $5-25 per share . . . The appraisal well at the Shenandoah discovery encountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs and marks one of Anadarko's largest Gulf of Mexico discoveries. The Shenandoah-2 well was drilled 1.3

---

[141] JP Morgan, "Anadarko Petroleum More Success in the Deepwater GoM; Shenandoah-2 Encounters >1,000 Net Feet of Oil Pay and No Oil-Water Contact – ALERT," March 20, 2013, p. 1 (APC-00572780).

[142] Credit Suisse, "Shenandoah: A Doozy of a Discovery Indeed," March 20, 2013, p. 1 (CS_000058).

miles southwest and approximately 1,700 feet structurally down-dip from the discovery well which encountered 300+ feet of net pay back in 2009. Anadarko reported that the targeted sands were full to base with no oil-water contact and that the log and pressure data from the well indicate excellent quality reservoir and fluid properties (much higher quality than previously encountered by industry Lower Tertiary discoveries)."[143]

d.  Capital One: "APC, along with partners CIE and MRO, announced extraordinary Shenandoah-2 well results yesterday in what appears to be a game changing discovery in deepwater GOM. Shenandoah-2, which tested the down-dip extent of the previous Shenandoah discovery well (2009 discovery logged 300+ net feet of pay), encountered more than 1,000 net feet of oil pay in high-quality Lower-Tertiary aged reservoirs, marking one of the largest discoveries ever in GOM. As a result, we are increasing our gross 2P estimate to 900 MMboe for Shenandoah (we estimate a range of 800 - 1,000 MMboe) from a previously conservative 225 MMboe expectation. Increased resource estimate at $12/boe pricing adds $4/ share to APC (30% WI), $2.90/share to CIE (20% WI), and $1/share to MRO (10% WI). This exciting story is far from over as we await results from 2 other wells in the Shenandoah mini-basin with Yucatan (RDS operated, APC 15% WI) and Coronado (CVX operated, APC 15% WI) results expected any day now. News of this Lower-Tertiary success also a positive read through for CIE, which has identified 10 additional lower tertiary prospects."[144]

e.  Credit Suisse: "Recalibrating 'blue sky' potential of Shenandoah. In our note last week, we highlighted 'blue sky' potential of $4.00 per APC share (excluding

---

[143] Barclays, "Anadarko Petroleum (APC) – Shenandoah appraisal well encounters 1000+ net pay; We speculate size of discovery could be 300-1700 mmboe gross, perhaps worth $5-25 per share," March 20, 2013, p. 1.

[144] Capital One, "APC Announces Major GOM Discovery," March 20, 2013, p. 1.

Coronado/Yucatan) if the Shenandoah discovery approached 650 MMBoe. As the first appraisal well encountered in excess of 1,000 feet of net pay and no oil water contact, Shenandoah could be one of the largest discoveries ever drilled in the GoM, with a resource range approaching 1 BBoe."[145]

136. **Conclusion D: Investors did not view Anadarko's March 4, 2014 statements about Anadarko's "900+ MMBOE Net Discovered Resources" and the Shenandoah Basin constituting a "~$2 - $4 Billion Net Opportunity" as an estimate of the projected value and size of Shenandoah.**

137. Plaintiffs first take issue with Anadarko's statement about "900+ MMBOE Net Discovered Resources," a "third of which" they claim "was attributable to Shenandoah." [146] Net Discovered Resources are equal to gross discoverable resources times the probability of development.[147]

138. While Plaintiffs again claim that Shenandoah accounted for one-third of this net discovered resources figure, neither the presentation nor the call transcript suggests Anadarko made this representation. I am not aware of any other instances in which Anadarko may have made this representation.

139. Plaintiffs also take issue with Anadarko listing Shenandoah Basin as a "~$2 to $4 billion net opportunity."[148] Plaintiffs claim the "public characterization of Shenandoah as a '~$2 - $4

---

[145] Credit Suisse, "Anadarko Petroleum Corp. Shenandoah: A Doozy of a Discovery Indeed," March 20, 2013, p. 2, (CS_0000588).

[146] Amended Complaint ¶ 34.

[147] Canadian Securities Administrators, CSA Staff Notice 51-324 – Revised Glossary to NI 51-101 Standards of Disclosure for Oil and Gas Activities, December 4, 2014, p. 10, https://www.osc.ca/sites/default/files/pdfs/irps/csa_20141204_51-324_51-101-glossary.pdf

[148] Anadarko Petroleum Corporation, Investor Conference Slides, March 4, 2014, p. 83.

Billion Net Opportunity' was vastly overstated and required a significant downward adjustment."[149]

140. Investors understood that any potential development would depend on further appraisal, the cost of development, external conditions such as the price of oil, and how the investment would fit into Anadarko's existing portfolio. Anadarko explained as much during its March 2014 investor conference. Daniels, who had been promoted to Executive Vice President, International and Deepwater Exploration, described the role of the Exploration Engineering Group at Anadarko as "value creation": "When we go out and we find something, we create value. When we do a lot of it, it gives us a lot of optionality. What are we going to do with this value? Are we going to take it to full production? Are we going to bring in a partner? Are we going to monetize it? The more success we have in the exploration world, the more value we create and the more we have options as we go forward."[150] He went further: "We go out and we make discoveries. . . So we drill the wells, test our ideas. If we have success, we've just enhanced that value. And then as we appraise it we decide, what are we going to do with this? And that's where we can provide that optionality to realize and enhance the value within the portfolio. That's our business, our role."[151]

141. Daniels emphasized that exploration value creation is based on a balanced portfolio, which can be impacted by changing conditions and commodity pricing, among other things. He highlighted that Anadarko "optimize[s] [its] portfolio all the time": "We have to have a deep portfolio just like the development team has to have a deep portfolio of opportunities, because that gives you the flexibility to respond to changing conditions, to changing risk, pricing, whatever it may be. The more choices you have in that portfolio of quality, the

---

[149] Amended Complaint ¶ 36.

[150] Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, p. 42.

[151] *Id.*

better you're going to be able to allocate capital and the better your success rate's going to be."[152]

142. Daniels continued by describing the exploration process, which begins with drilling exploration wells. If the wells are successful, Anadarko would "optimize" and "test it." [153] Daniels explained that one of the ways that Anadarko "optimize[s] and reduce[s] risk would be [to] acquire data, apply technology." [154] He acknowledged that they could incur "a lot of dollars" to assess and if those prospects did not appear to be economically favorable, ultimately Anadarko might "get those out of the portfolio."[155] He explained, "Every time we drill appraisal, we're reducing risk. We're getting more confidence on the resource size. So how they move through the portfolio with the additional information that's gained from every subsequent activity is how we get to that value realization."[156] Projects are "continuously in motion."[157]

143. With this in mind, investors understood that the slide listing the Shenandoah Basin as a "~$2 - $4 Billion Net Opportunity" was not an estimate of the size and value of Shenandoah. Investors understood this number—which is notably an estimate for the entire Shenandoah Basin, not solely the Shenandoah appraisal project—to be a highly preliminary and speculative estimate subject to substantial revisions depending on the findings of future

---

[152] *Id.* p. 43.

[153] *Id.* p. 44.

[154] *Id.* p. 46.

[155] *Id.*

[156] *Id.*

[157] *Id.*

appraisal wells, technological development, and commodity pricing, among other factors. Investors understood that this was an opportunity and potential outcome.

144.   In speaking about this slide, Daniels explained that it described the potential value creation of the Shenandoah Basin, which was early in the appraisal process with many unknowns. He described the Shenandoah Basin in broad terms: "This is where a lot of focus on the appraisal is happening, three big discoveries out there. We have a working interest in all of them. We're the only company that does. We're going to be the operator of two of them at Shenandoah and Coronado and if you go back through time and look at the maps you'll notice that the Coronado working interest has gone up."[158] Daniels explained that they "have a substantial interest in all of these," and that "we just think it's the greatest thing in the world when you can go in at low interest, spend money to make a discovery and then for very little money actually increase your interest in that discovery and have the potential to the upside."[159] He further explained that the $2 to $4 billion figure was based on Anadarko's success in all three fields: "We think that controlling both Coronado and Shenandoah as an operator will give us a lot more optionality and flexibility and we plan to drill these three, the two that are drilling, one more in Shenandoah and potentially get one more in 2014, so a lot of activity. We're going to have a lot of knowledge post this drilling and you can already see on a net risk basis we think our ownership position **in the entire basin is a $2 billion to $4 billion opportunity.** That's on a risk basis. That's what we have in our portfolio model."[160] In saying this, Anadarko made clear that Shenandoah was in the early stages of appraisal and that any estimates were preliminary.

---

[158] *Id.* p. 48.

[159] *Id.*

[160] *Id.* (emphasis added)

145. Daniels also highlighted potential challenges of the region, however, explaining that its discoveries in the Shenandoah Basin were "sub-salt," and required "seismic acquisition and imaging in very, very complex structural regimes."[161]

146. During the same call, Jim Kleckner, Executive Vice President-International and Deepwater Operations, declined to directly answer a question about the development plan for the Shenandoah and Phobos projects, saying, "Some of those projects are in the early stages of appraisal, and we have more work to do out there to quantify the resource ranges and come up with the proper development solutions once we see commercial resource opportunity."[162] In other words, Kleckner made clear that the Shenandoah Partners needed to do more appraisal wells to understand the resource range and had not yet, at that time, determined that Shenandoah would be profitable.

147. Anadarko continued this message as they described Shenandoah over the following months. On April 7, 2014, Leyendecker gave a presentation about exploration in the Gulf of Mexico at the American Association of Petroleum Geologists ("AAPG") Annual Convention and Exhibition. He reiterated his view that the Shenandoah Basin was a $2 to $4 billion dollar opportunity but cautioned that that it was "not quite ready for primetime," that it was "premature" to talk about the opportunity in detail, and that they needed "a couple of more penetrations" before they could do so. [163]

148. On May 6, 2014, Anadarko hosted a Q1 2014 earnings call during which an analyst from Jefferies, LLC, asked Daniels to expand upon Leyendecker's comments at the AAPG event,

---

[161] *Id.*

[162] *Id.* p. 40

[163] American Association of Petroleum Geologists, Discovery Thinking: The Gulf of Mexico Advantage, April 7. 2014, https://www.aapg.org/videos/discovery-thinking/articleid/37096/ernie-leyendecker-discovery-thinking-the-gulf-of-mexico-advantage.

including the timing for Shenandoah. Daniels responded that "Ernie was right, the Shenandoah mini-basin is a very significant discovery for us and has a great deal of potential there[, b]ut we have a lot of work to do to get [the Shenandoah mini-basin] potential actually defined," including drilling a second appraisal well that would aid in determining "the overall resource size of just the Shenandoah field." [164] He also stated that the "second appraisal well is going to be focused on trying to define the oil water contact, start pushing it down dip and looking at the lateral continuity of those sands," which would give Anadarko "a much better handle on what the overall resource size of just the Shenandoah field is."[165]

149. Then, during Anadarko's October 29, 2014 earnings call, a research analyst asked how the well results from Yucatan, another field in the Shenandoah Basin, impacted Anadarko's thoughts on the Shenandoah Basin more broadly. Bob Daniels noted in his response that Shenandoah "may not have a huge oil accumulation," but would provide important information: "Shenandoah is going to be key in that while we may not have a huge oil accumulation there, it's real important to see what the reservoirs look like as we move across the field to make sure we have good continuity of reservoirs and that they're in pressure communication. So we'll be getting - trying to find the oil-water contact, try to get good pressure data, and we'll be taking . . . a pull core out of that well after we penetrate the lower - or the objective section. So a lot of work still to do. We're still excited about the Shenandoah Basin, the 3 -- Shenandoah 3 is going to be real key to us."[166]

150. Anadarko was not the only partner in the project cautioning that it was still in its early stages. For instance, Cobalt similarly emphasized that no development had been

---

[164] Anadarko Petroleum Corporation, Q1 2014 Earnings Call Transcript, May 6, 2014, p. 12.

[165] *Id.* pp. 12-13.

[166] Anadarko Petroleum Corporation, Q3 2014 Earnings Call Transcript, October 29, 2014, p. 9.

sanctioned, saying that the "Shenandoah project is in the early stages of the project development life-cycle and will require substantial additional evaluation and analysis prior to the preparation of a development plan and seeking formal project sanction."[167]

151. Market participants understood that more appraisal wells would be drilled, and that development had not been sanctioned:

a. Capital One: "APC sees 5-7% CAGR production growth looking out through 2020 and that excludes deepwater projects like Shenandoah and Phobos which have not yet been sanctioned. The growth rate would also be higher in a sustained >$4.50 gas environment as gas development drilling would be ramped higher, but APC doesn't foresee that." [168]

b. Jefferies: "On the exploration front, APC will look to build upon the Shenandoah Basin success achieved in '13. Appraisal activity will continue in '14 at the Coronado, Yucatan and Shenandoah discoveries as part of the 6 – 8 well GoM program in '14."[169]

c. Guggenheim: "Anadarko continues to outperform industry peers on the exploration front, recording a 67% Deepwater exploration/appraisal success rate in 2013, including top-10 discoveries at Orea and Coronado. . . In the Shenandoah Basin, APC will drill 3-4 appraisal wells following recent discoveries at Shenandoah (30% WI), Coronado (35% WI), and Yucatan (25% WI)."[170]

---

[167] Cobalt International Energy Inc., 2014 10-K, February 23, 2015, p. 5.

[168] Capital One, "APC Analyst Day Recap," March 6, 2014, pp. 1-2.

[169] Jefferies, "Anadarko (APC) Ops Update Untarnished By Tronox So Far," March 5, 2014, p. 6.

[170] Guggenheim, "APC – BUY – 2014 Analyst Day Highlights Robust and Option-Rich Upstream Portfolio; Raising PT to $110," March 5, 2014, p. 6.

152. In sum, investors understood Anadarko's statements to be early statements on the potential of a resource based on only a few wells. Investors understood that these statements did not provide an actual estimate on the resource size of Shenandoah.

## 5.2.    Anadarko's Statements During the Class Period

### 5.2.1. Overview

153. Plaintiffs allege that Defendants "ma[de], issue[d], and disseminate[d] statements that omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."[171]

154. Specifically, Plaintiffs allege that Defendants omitted that:

"(a) credible test results and analysis indicated Shenandoah was much smaller and less commercially viable than Defendants had previously and continued to indicate;

(b) the Senior Reservoir Engineer for the Shenandoah resource had determined the reliability of test results and analysis that indicated the Shenandoah resource was much smaller and less commercially viable than Defendants had publicly indicated;

(c) the fluid quality from the Shenandoah appraisal wells was poor;

(d) Anadarko's RCT had determined the reliability of test results and analysis that indicated Shenandoah was much smaller and less commercially viable than publicly indicated;

(e) Anadarko incentivized exaggerated resource assessments by offering bonuses to its exploration team based on preliminary assessments without validation by the development team or the RCT and without a claw-back for assessments later shown to be exaggerated;

---

[171] Amended Complaint ¶ 94.

(f) Defendants had actively suppressed the truth about Shenandoah through a campaign of retaliation against and harassment of the Senior Reservoir Engineer Frye to set an example for others who were considering speaking the truth about Shenandoah;

(g) Shen 3 was a dry hole;

(h) Shen 4 confirmed massive salt deposits that would obstruct or prevent access to deposits;

(i) Shen 4 indicated a much smaller size resource than Defendants had described after Shen 2;

(j) Leyendecker prohibited employees from using accurate maps that would reveal faulting and other significant shortcomings in the Shenandoah resource;

(k) Anadarko had defied its own internal policies and procedures by, among other things, disregarding the findings and recommendations of the RCT; and

(l) Anadarko's plan for extracting oil from Shenandoah was one that no one had ever successfully deployed."[172]

155. Plaintiffs highlight several statements that they contend are misleading. In this section, I analyze how, in light of the industry knowledge, investors understood the allegedly misleading statements, Anadarko's other statements, the Shenandoah Partners' statements and comments made by market participants. As noted previously, I do not address every statement, but rather consider them in general groups.

---

[172] *Id.* ¶ 95.

### 5.2.2.  Allegations Related to 20K Technology

#### 5.2.2.1.        *Plaintiffs' Allegations*

156. Plaintiffs contend that Anadarko concealed that its "plan for extracting oil from Shenandoah was one that no one had ever successfully deployed."[173] I understand Plaintiffs to be referencing the 20,000 psi wellheads, often referred to as "20K wellheads" or "20K technology," required to withstand the pressure of the Shenandoah region.

#### 5.2.2.2.        *Summary of Conclusions:*

157. **Conclusion A: Investors were aware that 20K technology was still being developed.**

158. **Conclusion B: Investors understood that developing Shenandoah required 20K technology and that delays in developing that technology would impact if and when Anadarko and the Shenandoah Partners would develop the prospect.**

#### 5.2.2.3.        *Support for Conclusions.*

159. **Conclusion A: Investors were aware that 20K technology was still being developed.**

160. As noted above, Deutsche Bank highlighted on June 26, 2013 that "[c]ommercial development of the Wilcox remains difficult with discoveries in water depths over 10,000ft to the sea floor and high bottom hole pressures (20,000+ PSI) and temperatures (200+ Fahrenheit)."[174] It added that development in the Gulf of Mexico Lower Tertiary had been "slow to date, as the industry has wrestled with the technical and economic challenges of

---

[173] *Id.* ¶ 95 (l).

[174] Deutsche Bank Securities, "Get Onboard with the Inboard: Rise of the Lower Tertiary 2.0," June 26, 2013, p. 4. (DEUTSCHE005118).

developing a relatively lower quality reservoir . . . at temperature/pressure at the limit of industry capabilities."[175]

161.   The media also reported on the state of 20K technology. In describing 20K technology, an article from an offshore oil and gas industry magazine published on December 1, 2015 stated that "new 20K control systems require a new approach to specification, acquisition, operation and maintenance procedures. . . OEMs [original equipment manufacturers] may need to implement changes to material characteristics and design parameters to mitigate the weight increase, but the increase in size also impacts the BOP [blowout preventer] control system in terms of control fluid pressure, flow rate, and volumetric capacity. Additional sensors and software will be required to monitor and control the more complex system. . . The design impact extends to other equipment on the rig that interfaces with the BOP, including the riser system, choke manifold, tensioners, riser handling, BOP handling, pressure testing equipment, and contingency systems such as capping stacks."[176] The article also noted that "[t]he 20K BOP is now an integrated system of equipment, controls and supporting infrastructure. Ensuring this new system meets the safety and performance requirements of the drilling campaign requires a new approach to the processes that define the way equipment is operated and maintained, as well as the competencies and skills of individuals in charge of the equipment."[177]

162.   It was also known that BP was "pursuing Project 20K to develop subsea equipment that can withstand Lower Tertiary pressures of 20,000psi and temperatures as high as 350°-400°F."[178]

---

[175] *Id.* p. 5.

[176] Offshore Engineer, "Preparing for a successful 20K BOP campaign," December 1, 2015, pp. 1–2.

[177] *Id.* p. 2.

[178] Offshore Engineer, "Spotlight on the Gulf," May 1, 2015, p. 2.

163. Anadarko itself publicly acknowledged the early state of 20K technology and assembled a team of experts, the 20A Project, to develop and monitor manufacturing of technology that could withstand the 20,000 psi pressures in the Gulf of Mexico.[179] In a November 2014 presentation, Jim Raney, Director of Engineering & Technology at Anadarko, discussed Anadarko's 20A Project and the development concepts and challenges in a 20,000 psi development for the Gulf of Mexico, specifically noting that Shenandoah had pressures "greater than 15K psi," meaning that it would require 20K technology.[180]

164. **Conclusion B: Investors understood that developing Shenandoah required 20K technology and that delays in developing that technology would impact if and when Anadarko and the Shenandoah Partners would develop the prospect.**

165. Investors were well aware prior to the start of the Class Period that Shenandoah required 20K technology, which was not available at the time. Anadarko openly acknowledged this fact. For instance, during a February 3, 2015 investor call, Jim Kleckner stated that Anadarko was "launching a basis of design for different types of development options" for Shenandoah.[181] He also explained that Anadarko was "incorporating a joint industry projects [sic] to look at the pressure regimes that we'll be operating in . . . [a]nd looking at

---

[179] Anadarko Petroleum Corporation, "Developing Industry Solution for 20,000 psi Subsea Developments," November 19, 2014, slide 5.

[180] *See* Society of Petroleum Engineers – Gulf Coast Section, "Development of a 20,000 psi Drilling, Completion, Intervention, Subsea & Subsurface Equipment in 60,000 ft. water depth in the GoM," November 19, 2014, for the event description; Anadarko Petroleum Corporation, "Developing Industry Solution for 20,000 psi Subsea Developments," November 19, 2014, slide 3, https://www.spegcs.org/media/files/files/b06de440/2014-11-19_20A_HPHT_Presentation_Jim_Raney.pdf. Anadarko referred to the 20K technology development project as the 20A Project.

[181] Anadarko Petroleum, Q4 2014 Earnings Call Transcript, February 3, 2015, p. 8.

20,000 PSI systems for handling the pressures we anticipate encountering in the reservoir."[182]

166. On June 10, 2015, a news article reported that Anadarko was "seeking a drillship with a 20K BOP stack and [had] invited several drilling rig contractors to bid on the job," and that "[i]nterested rig contractors [were] understood to be in discussion with various shipyards regarding possible construction options. If the project [went] forward, rig delivery would be in 2019, at the earliest."[183]

167. On July 6, 2015, Jefferies wrote that "Shenandoah [d]evelopment [was] [u]nlikely [n]ear [t]erm, [b]ut [p]rovides [l]ong-[t]erm [p]otential," explaining, "While we believe Shenandoah could be one of the largest GOM discoveries, we currently give no credit in our RAAV due to needed improvements in drilling technology (new build drillships with dual 20k PSI BOPs), which are unlikely to be available in the near-term."[184]

168. The following year, on May 3, 2016, during Anadarko's Q1 2016 earnings call, Daniels explained the need to continue the appraisal program, rather than transition to development, based, in part, on the "technically challenging environment from a pressure standpoint."[185] Later that day, in assessing Anadarko's and Cobalt's earnings releases, an analyst from Morgan Stanley noted, "CIE and APC highlight Shenandoah risks, development hurdles . . . Beyond faulting, high reservoir pressure and associated need for

---

[182] *Id.*

[183] Offshore, "Lower oil prices begin to take toll on Gulf drilling," June 10, 2015, https://www.offshore-mag.com/drilling-completion/article/16758375/lower-oil-prices-begin-to-take-toll-on-gulf-drilling.

[184] Jefferies, "Oil & Gas Exploration & Production Reduce Nat Gas Price Outlook, Remain Constructive; Upgrade APC, NBL, EOG," July 6, 2015, p. 6 (APC-01319911).

[185] Anadarko Petroleum Corporation, Q1 2016 Earnings Call Transcript, May 3, 2016, p. 8.

20kpsi equipment (which industry is in the process of standardizing) add to the development challenges."[186]

169. On September 13, 2016, a news article reported that the development of Shenandoah would need "a rig with a 20K psi BOP should the project move to the development phase," suggesting that it would be a "step-change for the industry, as the standard BOP on most high-specification floaters today is a 15K BOP."[187]

170. As these reports show, there is no basis to say that Anadarko "omitted" that its "plan for extracting oil from Shenandoah was one that no one had ever successfully deployed."[188] Rather, Anadarko made clear that the Shenandoah project required 20K technology and its development hinged on the availability of this technology. Investors understood during the Class Period that the development of 20K technology might delay any development of Shenandoah.

### 5.2.3. Allegations about Shen-3

#### 5.2.3.1.    *Plaintiffs' Allegations:*

171. Plaintiffs allege that, in discussing the second appraisal well, Shen-3, Anadarko discussed "positive aspects of the Shenandoah resource while concealing negative ones," including that Shen-3 was a dry hole.[189]

---

[186] Morgan Stanley, "Cobalt International Energy Inc: Headwinds Accumulate," May 3, 2016, p. 2 (FIAM-ANAD-003626).

[187] Offshore, "Deepwater development in Golden Triangle down but not out," September 13, 2016, https://www.offshore-mag.com/deepwater/article/16754724/deepwater-development-in-golden-triangle-down-but-not-out.

[188] Amended Complaint ¶ 95(l).

[189] *Id.* ¶¶ 97, 138.

172. Two of the statements about Shen-3 with which Plaintiffs take issue occurred before the start of the Class Period. First, in Anadarko's February 2, 2015 Operations Report, Anadarko described the Shen-3 appraisal results as follows:

> "Shenandoah: Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range. Planning is currently underway for the next appraisal well, which the company expects to spud in the 2nd quarter of 2015."[190]

173. Second, during a February 3, 2015 investor call, Plaintiffs allege that "Daniels described Shen-3 in glowing terms, claiming there was 1,500 feet of 'excellent' sand continuity."[191]

174. The remaining statements about Shen-3 in the Amended Complaint did occur during the Class Period. Plaintiffs allege that the Class Period began on February 20, 2015, when Anadarko filed its 2014 10-K. In the 10-K, Anadarko stated:

> "Shenandoah Basin: The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the

---

[190] Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015, p. 12.

[191] Anadarko Petroleum Corporation, 2014 10-K, p. 9; *see* Amended Complaint ¶ 52.

resource range. Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015."[192]

175. Plaintiffs contend that "[t]he 2014 10-K also contained 14 pages of detailed risk factors without disclosing that such risks had already materialized as to the Shenandoah resource, including 'the risk that we will not encounter commercially productive oil or natural-gas reservoirs' and 'exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons.'"[193]

176. Plaintiffs further take issue with Anadarko's March 3, 2015 press release "announcing Anadarko's '2015 initial capital expectations and guidance,'" which "stated that 'Anadarko continues to advance existing discoveries at Shenandoah in the Gulf of Mexico,'" and that Anadarko had a "high-quality portfolio of opportunities, strong balance sheet and efficient capital allocation to preserve value and maintain flexibility."[194]

177. Plaintiffs point to statements made during Anadarko's 2015 capital program and guidance conference call. Plaintiffs allege that "Daniels touted the 'successful appraisal' of Shen-3," calling it a "very successful appraisal well."[195] Plaintiffs point to a slide from a presentation Anadarko showed during this same call. The slide is entitled "Continuous Mega-Project Pipeline Delivering Results," and is reproduced below. Plaintiffs claim that Defendants "touted Shenandoah as a 'High-Margin' project in the Company's 'Mega-Project Pipeline.'"[196]

---

[192] Amended Complaint ¶ 97.

[193] *Id.* ¶ 98.

[194] *Id.* ¶ 101.

[195] *Id.* ¶ 102.

[196] *Id.* ¶ 103.

**Figure 12. Reproduced Slide: Continuous Mega-Project Pipeline Delivering Results[197]**



#### *5.2.3.2.     Summary of Conclusions*

178. **Conclusion A: Investors understood from Anadarko's *pre-Class Period* statements that the Shen-3 well did not encounter hydrocarbons.**

179. **Conclusion B: Investors understood from Anadarko's statements during the Class Period that the Shen-3 well did not encounter hydrocarbons.**

180. **Conclusion C: Investors understood from the Shenandoah Partners' statements about Shen-3 that the well did not encounter hydrocarbons.**

181. **Conclusion D: Evidence shows that investors understood that Shen-3 did not encounter hydrocarbons, (2) reduced the areal extent of the hydrocarbon bearing portion of the**

---

[197] Anadarko Petroleum, Capital Program and Guidance Call Presentation, March 3, 2015, p. 41.

reservoir, and (3) while Anadarko did not release a resource range, Shen-3 likely reduced the potential resources.

182. **Conclusion E: The market understood that, even after Shen-3, Anadarko and the partners needed to drill additional appraisal wells in order to understand the Shenandoah resource potential.**

183. **Conclusion F: At several points throughout the Class Period, Anadarko disclosed that Shen-3 did not encounter hydrocarbons.**

### 5.2.3.3.      *Support for Conclusions*

184. **Conclusion A: Investors understood from Anadarko's *pre-Class Period* statements that the Shen-3 well did not encounter hydrocarbons.**

185. Plaintiffs do not point to any instances in which Anadarko said that Shen-3 encountered hydrocarbons, nor am I aware of any such statements.

186. Based on my experience, investors in the oil and gas industry understood from Anadarko's statements about Shen-3 from before the Class Period even started that the well did not encounter hydrocarbons.

187. On February 2, 2015, Anadarko issues a Press Release with its Q4 2014 and full-year results, which stated, "Appraisal activity offshore Côte d'Ivoire at the Paon discovery and in the Gulf of Mexico at the Shenandoah discovery continued to validate the company's geologic models around these apparent commercial discoveries." [198] With the press release,

---

[198] Anadarko Petroleum Corporation, Form 8-K, February 2, 2015, p. 3.

Anadarko also released its Operations Report. That Operations Report included the following description of Shenandoah:

> "Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/water contacts based on pressure data and reduced the uncertainty of the resource range.
>
> Planning is currently underway for the next appraisal well, which the company expects to spud in the 2nd quarter of 2015."[199]

188. Notably, the announcements—while noting that Shen-2 encountered over 1,000 feet of net oil pay—did not attribute any net oil pay to Shen-3. As noted in section 4.1.1, Daniels previously explained that Anadarko announces any net pay when announcing well results: "We also come out on wells, and we give net feet of pay. We don't give gross feet of pay. We don't give gross column, except in certain circumstances to talk about the potential height of a hydrocarbon column. But we give net pay numbers."[200] Anadarko consistently announced net pay for wells that encountered hydrocarbons. For instance, in announcing the results of the first two wells on the project, Anadarko announced the net pay it had encountered. In its press release announcing Shen-1, Anadarko stated that the discovery well "encountered net oil pay approaching 300 feet in the Wilcox formation." [201] In announcing the results of Shen-2, Anadarko stated that it "encountered more than 1,000 net

---

[199] Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015, p. 12.

[200] Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012, p. 37.

[201] Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, p. 1 (APC-01338356).

feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs." [202] More fundamentally, because encountering hydrocarbons is a major finding in any well and the ultimate goal is to encounter commercially productive quantities of hydrocarbons in a given prospect, an investor would expect for an oil company to announce the net pay it encountered when it disclosed the final results of any exploration or appraisal well. Accordingly, because Anadarko did not include the net pay encountered in announcing the results of Shen-3, investors understood from this announcement that Shen-3 did not discover hydrocarbons.[203]

189.   In addition, the Operations Report included a graphic showing that the Shen-3 well location was not located within the green shading associated with the hydrocarbon-bearing portion of the Shenandoah reservoir:

---

[202] Anadarko Petroleum Corporation, "Anadarko Announces Shenandoah Appraisal Encounters More than 1,000 Feet of Net Pay," March 19, 2013 (APC-00572655); *see* Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay", March 20, 2013, p. 1, http://www.finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html.

[203] Investors understand that the fact that there is excellent sand quality, by itself, means little in terms of being able to ultimately develop a well. Depth and lateral space are needed to justify the development. This is why multiple wells are drilled: to determine the width of the reservoir and the potential recoverable reserves. Even if all appraisal wells show excellent sand quality but there is a lack of continuity among the wells then resource recovery would be more constrained.

**Figure 13. Graphic from Anadarko's Q4 2014 Operations Report[204]**



190. For comparison, earlier graphics, such as the one used in the March 4, 2014 presentation listing the Shenandoah basin as a "~$2 - $4 Billion Net Opportunity" (Figure 11, above), showed the then-upcoming Shen-3 well location to be within the hydrocarbon-bearing portion of the Shenandoah reservoir. These images indicated to viewers that while

191. Anadarko initially believed Shen-3 would be at or near the edge of the hydrocarbon-bearing portion of the Shenandoah reservoir, but it was not. Investors understood that this meant it did not encounter hydrocarbons.

---

[204] Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015, p. 12.

192. Anadarko's statements during its February 3, 2015 Earnings Call further made clear that while Shen-3 did not encounter hydrocarbons, Anadarko viewed Shen-3 as successful because of the information it provided. [205]

193. During Anadarko's Earnings Call Douglas Leggate of Bank of America - Merrill Lynch, asked if Anadarko would speak to the "potential scale" and "potential development schedule" of Shenandoah. Walker responded that it was "a little early" for those discussions. Daniels then explained that they got "very good results for what we set out to do at the most recent appraisal well."[206] He detailed the well objectives, explaining that they were "looking to see if we could establish oil-water contacts at that location," "wanted to look at the lateral sand and the reservoir continuity," "[w]anted to look at the quality of the sands in that area," and "wanted to get pressure data to show pressure continuity into the other #2 well."[207] He then explained that the results showed Anadarko did achieve those goals:

> "And if you look at the results, we really did all of that. We have excellent lateral sand continuity. The packages are all present. They're very well correlatable, they've expanded. So that model of expansion did work out. We ended up with about 1,470 feet of gross sand section versus 1,000 feet that we had in the #2 well. The oil-water contacts were not encountered in the well. But based on the pressure data, we were able to project those up. So we got a much better handle on the oil in place and that has expanded with more confidence on it. So that was a very positive thing. Reservoir quality was good, so that gives us a lot of confidence on the potential for the water drive. So we've got a lot more confidence on our geologic model on the eastern side. On our structural interpretation, we've gotten a high point over there. And then that potential for

---

[205] Anadarko Petroleum, Q4 2014 Earnings Call Transcript, February 3, 2015, p. 8.

[206] *Id.* pp. 7-8.

[207] *Id.* pp. 7-8.

the active water drive and a much higher confidence level and where oil-water contacts for the field lie."[208]

194. Daniels then provided the goals of the next appraisal well and additional work that needed to be done:

> "So as we move forward, we're looking at an additional appraisal well this year that will be to . . . the west of the #2 well to test the western portion with the same sorts of objectives, lateral sand continuity. But this one, we'll not be searching for the oil-water contact as much because we think we got a fairly good handle on that now. So we're looking at sand continuity, reservoir quality. We're talking about potentially getting a core in it, so we have a core in the reservoir section. Whereas we did get a core in the most recent well in the water section, which will give us a lot of good information. That well should spud in the second half of the year. And then based on these results and the upcoming well, the development team are already doing conceptual work."[209]

195. Kleckner added that they had substantial work to do regarding a potential development plan, but that the information from Shen-3 was helpful in progressing the project: "We've taken the full bypass core and we're working our reservoir simulation models right now to fully understand and characterize the sand quality, as Bob said. And we're also launching a basis of design for different types of development options. We're also incorporating a joint industry projects to look at the pressure regimes that we'll be operating in. And looking at 20,000 PSI systems for handling the pressures we anticipate encountering in the reservoir. So from a[n] evaluation and scoping standpoint, the work is progressing very well, and we'll wait to see what the results of the follow-on appraisal wells fully indicate for our resource size."[210]

---

[208] *Id.* p. 8.

[209] *Id.*

[210] *Id.*

196. During the question and answer portion of the call, a question asked by an analyst, Charles Arthur Meade of Johnson Rice & Company, LLC, about the Operations Report's graphic of Shenandoah (Figure 13, above), makes clear that investors understood Shen-3 did not encounter hydrocarbons. Meade, picking up on the difference between the image of Shenandoah in the Operations Report and Anadarko's earlier releases, as well as the implications of those images, i.e., that Shen-3 had not encountered the hydrocarbon-bearing portion of the reservoir and that might therefore decrease internal resource estimates, asked:

> "If I could go back to the -- to some of the Shenandoah comments. It's -- I'm not sure if I'm interpreting this correctly. But I look at the -- your cartoon that you had previously -- and the cartoon you guys put in your operations report subsequent to this #3 appraisal well, and it looks like perhaps maybe you were surprised by how far down dip that you intersected that section. And I understand there's a lot of positive things you learned. But it seems to me that maybe the upper end of your reserve distribution would be curtailed by this result. And I'm just kind of looking to see if I'm right in that or get more color there."[211]

197. Daniels confirmed the well results reduced Anadarko's projections of the areal extent of the hydrocarbon-bearing portion of the reservoir and likely lowered their high-end resource estimates:

> "Yes, Charles, Bob again. After we drilled the Yucatan #2 well, we realized that there was a velocity. The section that gave us a velocity problem in the Oligocene and Upper Eocene, which we then rolled into our planning for the #3 well. And with that, we actually deviated the well to the North and West to try to get closer to where we would anticipate the oil-water contact. We also got some pressure data down at the Yucatan that we could project across without a lot of confidence. And so we did deviate to the northeast to get closer to that. With the -- section was present, which meant that we were about 300 feet lower than what we anticipated, which is nothing at these depths. So we actually felt

---

[211] *Id.* p. 11.

like it came in pretty darn close to prognosis. And then the sand expanded. So at the lower levels, we were farther down dip because of the sand expansion, which we did anticipate as we went in. So as to the upper end of the range, you may be right that just the aerial extent based on, not just this well, but the information from Yucatan, pulled us in a little bit on that side of the structure. But it's not a very significant reduction in the upper end, and we still think this is a very -- has the potential to be a very large field."[212]

198. **Conclusion B: Investors understood from Anadarko's statements during the Class Period that the Shen-3 well did not encounter hydrocarbons.**

199. The Class Period begins with Anadarko's discussion of the Shen-3 results in its 10-K. The 10-K simply repeats the language from the February 2015 Operations Report, which, as discussed above, indicated that there were no hydrocarbons.

200. The additional statements Anadarko made in the following months confirmed that Anadarko viewed the well as successful because of the information the well provided—not because it encountered hydrocarbons.

201. During the March 3, 2015 Capital Program and Guidance Call, Daniels called Shen-3 a "very successful appraisal well."[213] But this, on its own, did not cause investors to believe that Shen-3 encountered hydrocarbons. Investors also understand there is a difference between the concepts of geological or technical success versus economic success. Many wells that encounter oil or gas are a "technical success" in that they encounter hydrocarbons. However, some wells that fail to encounter hydrocarbons, like Shen-3, uncover relevant, important data. For instance, wells that do not encounter hydrocarbons can help define the areal extent of a reservoir and can help locate faults and other potential reservoir properties. Economic success for the project, on the other hand, depends on multiple factors: (i)

---

[212] *Id.* p. 12.

[213] *Id.*

volumes of recoverable hydrocarbons, (ii) the costs of drilling and installing the required production facilities, also a function of proximity to existing facilities, (iii) availability of internal and external capital, (iv) other opportunities available to the operator which may take capital away from a project (high-grading of opportunities), and (v) prevailing and predicted commodity pricing.

202.   Moreover, the context of Daniels' statement is key: Daniels immediately explained why he viewed Shenandoah as successful, saying "We pushed down-dip on Shenandoah 3, searching for the oil-water contact, looking for reservoir continuity and quality and to get a core in the down-dip portions of the reservoir. This was a very successful appraisal well. In 2015, we'll drill northwest of the Shenandoah #2 well with our Shenandoah 4. This will be to extend the field to the west, an up-dip, and to obtain a core of the oil leg for our development planning."[214]

203.   During this presentation, Anadarko presented a set of slides. Plaintiffs allege that Anadarko's slide entitled "Continuous Mega-Project Pipeline Delivering Results" was misleading. (Figure 12, above.) But this would also not indicate that Shen-3 encountered hydrocarbon or was near a FID. While Plaintiffs characterize this as Defendants "tout[ing] Shenandoah as a 'High-Margin' project in the Company's 'Mega-Project Pipeline,'"[215] the slide clearly differentiates "[g]rowing [l]ong-[l]ife, [h]igh-[m]argin [o]il [p]roduction"— which would not include the Shenandoah appraisal project—from "[a]ppraising [n]ext-[g]eneration [p]rojects." Investors did not understand Shenandoah, an early-stage appraisal project, to be producing oil or achieving any margins, let alone high margins.

---

[214] *Id.*

[215] Amended Complaint ¶ 103.

204.   More importantly, Anadarko included an image that, like the one in the Operations Report, indicated that Shen-3 did not encounter hydrocarbons.

**Figure 14. Slide from March 3, 2015 Capital Program and Guidance Call Presentation[216]**



205.   **Conclusion C: Investors understood from the Shenandoah Partners' statements about Shen-3 that the well did not encounter hydrocarbons.**

206.   Several Shenandoah Partners wrote off Shen-3 in January or February 2015:

a.   On January 29, 2015, ConocoPhillips stated that it had "some dry hole costs related to the Shenandoah appraisal well that [it] wrote off." [217] On February 24, 2015,

---

[216] Anadarko Petroleum Corporation, Capital Program and Guidance Call Presentation, March 3, 2015, p. 47.

[217] ConocoPhillips, Q4 2014 Earnings Call Transcript, January 29, 2015, p. 13.

ConocoPhillips disclosed that "[t]he second Shenandoah down dip appraisal well was spud in 2014 and expensed as a dry hole."[218]

b.  On February 18, 2015, Marathon Oil announced that costs related to the "second Shenandoah appraisal well in the Gulf of Mexico were included in exploration expense during the quarter."[219]

c.  On February 23, 2015, Cobalt disclosed that Shen-3 was a "dry well." Cobalt defined a "dry well" as "an appraisal or development well that proves to be incapable of producing either oil or gas in sufficient quantities to justify completion as an oil or gas well."[220] A dry well is in contrast to a "productive well," *i.e.*, a "well[] that ha[s] been drilled to the targeted depth and prove[s], in [Cobalt's] opinion, to be capable of producing either oil or gas" in commercial quantities.[221]

207.  Investors understood from these announcements that Shen-3 did not encounter hydrocarbons.

208.  Like Anadarko, Cobalt viewed Shen-3 as successful. Joseph Bryan, Chairman and CEO of Cobalt, described Shen-3 as "a highly successful appraisal well."[222] When asked about any hydrocarbon encountered in the well, James Painter, Executive Vice President, Execution and Appraisal, said, "I think we can say . . . [w]e did meet all of our pre-drill expectations. What we were looking for was looking to see what the down-dip sand quality was, the

---

[218] ConocoPhillips, 2014 10-K, February 24, 2015, p. 8.

[219] Marathon Oil Corporation, 8-K, February 18, 2015, p. 12.

[220] Cobalt International Energy Inc., 2014 10-K, February 23, 2015, pp. 12-13.

[221] *Id.*

[222] Cobalt International Energy Inc., Q4 2014 Earnings Call Transcript, February 23, 2015, p. 6.

thickness, the capability about sand to produce, all of the things we were looking for were all met and what we were looking to accomplish with that appraisal well."[223]

209. Because Cobalt did not disclose that Shen-3 encountered any hydrocarbons, investors would understand that there were none.

210. **Conclusion D: Evidence shows that investors understood that Shen-3 (1) did not encounter hydrocarbons, (2) reduced the areal extent of the hydrocarbon bearing portion of the reservoir, and (3) likely reduced the potential resources.**

211. Evidence shows that market participants understood that the Shen-3 well was wet. This is particularly clear based on releases from Wood Mackenzie. Wood Mackenzie, sometimes referred to as "WoodMac," is an energy analytics company. During the Class Period, market participants such as investment firms could subscribe to Wood Mackenzie for industry, company, and asset-specific data. Investors used the reserve estimates Wood Mackenzie generated.[224] Several analysts, including one of Plaintiffs' own investment managers, produced Wood Mackenzie reports in this litigation.[225]

212. In February 2015, Wood Mackenzie published its asset report on Shenandoah. Wood Mackenzie's February 2015 Shenandoah asset report described the results of Shen-3: "In January 2015 it was announced that the well did not discover the oil/water contact

---

[223] *Id.* p. 5.

[224] *See, e.g.*, Deutsche Bank, "Exploration Day Takeaways. NBL & APC Highlights," June 25, 2012 (DEUTSCHE0001176); Credit Suisse, "Anadarko Petroleum Corp: Equity dilution vs deal gains/shale acceleration," September 12, 2016 (CS_0000177); Citi, "E&P Sector Update As Summer Wraps Up," September 11, 2015 (CITI004017).

[225] *See, e.g.*, Morgan Stanley, "Anadarko Petroleum Corp, Still Running Faster than the Bear," October 28, 2015 (MS_ANADARKO_000061); Wood Mackenzie, "Pre-FID oil projects, Global breakeven analysis and cost curves," July 2015 (FIAM-ANAD-004939).

downdip, and additional appraisal drilling will take place later in the year."[226]  In its report, Wood Mackenzie added, "There is considerable uncertainty around development options for Shenandoah at this early stage of appraisal, due to its remote location, extreme well and water depths, and few analogue fields in the Lower Tertiary Play."[227]

213.  In a February 11, 2015 report, Wood Mackenzie highlighted what it considered "[l]imited appraisal success" Anadarko was experienced in the Gulf of Mexico: "Appraisal drilling in 2014 had limited success. Results from Coronado and Yucatan were disappointing. Anadarko terminated its leases at Coronado soon after the appraisal was completed in November. . . . The second appraisal well at Shenandoah was completed in late-2014 and the company announced in early-2015 that it came up dry. However, the well was testing the lateral limit of the reservoir and the results are not indicative of a large setback at the field."[228]

214.  Analyst reports from before the Class Period confirm that market participants understood (1) that Shen-3 did not encounter hydrocarbons, (2) reduced the areal extent of the hydrocarbon bearing portion of the reservoir, and (3) likely reduced the potential resources. Many analysts explicitly noted that Anadarko did not release a resource range.

   a.  Morgan Stanley: "Shenandoah-3 encountered 1,470ft of reservoir sand and data should enable projection of oil/water contact. The appraisal also 'reduced the uncertainty of the

---

[226] Wood Mackenzie, "Shenandoah (WR 52) Asset Report," February 2015, p. 2 (APC-00053691).

[227] *Id.*

[228] Wood Mackenzie, "Deepwater Gulf of Mexico Upstream: 2014 in review," February 2015, p. 4 (APC-00161729).

resource range' which was not disclosed (MSe at 600Mmboe implying ~$712MM, $1.40/sh net to APC). Shenandoah-4 to be spud in 2Q15."[229]

b.  Capital One: "ConocoPhillips reported last Thurs that the 2nd appraisal well at Shenandoah was a dry hole. . . . The unsuccessful well likely condemns at least some of the southeastern flank of the structure's aerial extent. Operator APC will next drill a 3rd appraisal well to test the western flank. We have been carrying Shenandoah as a 1 billion boe discovery in our APC model (300 MMboe net to APC's 30% WI, worth ~$3.6B or ~$7 per share). While it still could ultimately be that large, we think it's prudent to cut our resource estimate in half for now to 500 MMboe. We are thus cutting our NAV by $3 to $99."[230]

c.  Johnson Rice & Company: "The latest Shenandoah appraisal well delivered a bit of a surprise, coming in 1,500 ft. down dip and wet versus the Shenandoah #2 to the west; the result appears to have shifted the geologic interpretation of the basin a bit, as seen in Figures 1 and 2 below, and the upside case for the accumulation has likely been trimmed a good deal."[231]  The images that Johnson Rice & Company showed included the new graphic from the operations report and an older graphic showing a larger potential hydrocarbon field.

---

[229] Morgan Stanley, "4Q14 Misses but on Non-Cash," February 2, 2015, pp. 1-2.

[230] Capital One, "Morning Energy Summary," February 2, 2015, p. 2 (APC-01319907).

[231] Johnson Rice & Company, "Sales Note: 4Q14 Results Mixed, Few Clues About 2015 Plans," February 2, 2015, p. 2.

d.  KLR Group: "The Shenandoah-3 appraisal, ~1,500' down dip and ~2.3 miles east of the Shenandoah-2 appraisal, did not encounter hydrocarbons though found ~1,470' of well-developed wet reservoir sands."[232]

e.  Tuohy Brothers Energy: "GOM development continues apace with the non-pay Shenandoah result an aggressive delineation well that was fully within APC expectations."[233]

215.  While Anadarko—consistent with its stated practice of declining to release resource ranges at early stages of the project given the amount of uncertainty in those ranges and the likelihood they would substantially change over the appraisal process—did not give out resource estimates, these reports make clear that analysts understood from Anadarko's and the Shenandoah Partners' statements that Shen-3 likely decreased the potential size of the resource.[234]

---

[232] KLR Group, "KLR Morning Brief," February 3, 2015, p. 1 (LAZARD-ANADARKO_0030830).

[233] Tuohy Brothers Investment Research, Inc., "Tuohy Brothers Energy Note," February 3, 2015 (LAZARD-ANADARKO_0030861).

[234] I am aware that in a February 5, 2015 report, Jefferies stated, "In 3Q14 and 4Q14, APC announced results of the second and third Shenandoah appraisal well, both of which encountered more than 1,000 feet of net oil pay (as did the first appraisal well)." Jefferies, "Oil & Gas Exploration & Production Things Done Changed; Initiating on Oil & Gas E&Ps," February 5, 2015, p. 298 (ANADARK0_00000888). However, this report is clearly incorrect, as Anadarko (a) did not release any Shenandoah well results in 3Q14 and 4Q14, (b) had not released any results from the third Shenandoah appraisal well, i.e., Shen-4, which it had not even been spud, and (c) never suggested that it encountered 1,000 feet of net oil pay in three wells. It is also internally inconsistent, as it later says that "the Shenandoah #3 appraisal well is currently being drilled in a 1.5 mile down-dip step-out, and results are expected in early 2015." Jefferies, "Oil & Gas Exploration & Production Things Done Changed; Initiating on Oil & Gas E&Ps," February 5, 2015, p. 410 (ANADARK0_00000888). This pre-Class Period report, which has several clear errors, does not change my opinion that investors understood Shen-3 did not encounter oil. Indeed, Jeffries released a company note on Marathon Oil several weeks later acknowledging that Marathon had written of the "2nd Shenandoah appraisal," i.e., Shen-3. Jefferies, "Company Note: Marathon Oil: Balancing the Equation," February 20, 2015 (APC-01420615).

216. Investors also understood that Anadarko viewed Shen-3 as successful because it provided helpful information on the reservoir—not because it encountered hydrocarbons:

a. RBC: "Shenandoah 3 appraisal well was drilled, but unlike ConocoPhillips (COP), APC viewed the well as a success. APC never planned to use the well as a producer, but used it as a geologic step-out well to test the down-dip and find the oil-water contact."[235]

b. TPH: "Shenandoah-3 dry hole (E&P $569) -A clear negative for a field that was called potentially the biggest in the US GoM. 2nd appraisal well was spudded in late May and reported as dry yesterday by COP. Well was 2.5 miles east and down-dip from the Shenandoah-2 well, which encountered >1,000 net feet of high-quality oil pay, in the Lower Tertiary. Original 2009 well hit 300ft of net pay in the Wilcox. Still plans for a further appraisal well later this year. . . . APC is tendering for an 8th gen. 20k PSI, new-build rig for the Lower Tertiary for '18/'19 delivery – we suspect this may now get put on hold."[236]

c. TPH: "Shenandoah-3 appraisal update (E&P $577)- Our initial assessment on Friday of the Shenandoah-3 appraisal well likely too harsh as the primary intent of this 2.5 mile step out was to determine the oil water contact. While well helps define boundaries of the field, unlikely to diminish the enormous resource potential and quality of reservoir that Shenandoah represents. Expect more color over the coming days as companies report."[237]

---

[235] RBC Capital Markets, "APC- 4Q14 EPS Miss, but strong operation CFPS beat," February 2, 2015, p. 1 (RBCCM00003437).

[236] Tudor Pickering Holt Energy, "Refiner thoughts; initial earnings takeaways," January 30, 2015, p. 2 (APC-00159003).

[237] Tudor Pickering Holt Energy, "Completion delays, Shenandoah-3 update, Natural gas production, Oil production, Oil refining weekly, Weekly rig," February 2, 2015, p. 1 (APC-00349727).

217. At least one article in Upstream Online, a leading energy news source, indicated that Anadarko viewed Shen-3 positively even though it did not encounter oil.

    a. In a February 13, 2015 article, Upstream Online reported that Shen-3 "left many observers scratching their heads" as ConocoPhillips expensed the appraisal probe, which "[s]ome analysts took that to mean the well was a bust, but Anadarko executives cast it in a much more positive light."[238] The article then continued that Daniels had explained that they were "excited about what we are seeing there" because "the company wanted to gauge the sand continuity and possible down-dip thickening of the reservoir," "establish an oil-water contact" and "better understand the reservoir quality and potential recovery mechanism."[239] Quoting Daniels, the article noted, "If you look at the results, we really did all of that."[240] The article further noted, again quoting Daniels: "Daniels did acknowledge that recent results probably reduce the upper end of the aerial extent of Shenandoah, 'but it is not a very significant reduction.'"[241] The article further noted that any initial estimates about the Shenandoah basin would be doubtful because of "disappointing" appraisals at Coronado.

218. Analyst reports during the Class Period continue to reflect that investors understood that Shen-3 did not encounter hydrocarbons and that the resource range, which Anadarko did not provide, likely decreased.

---

[238] Upstream Online, "Anadarko mulling over its options at Shenandoah," February 13, 2015, upstreamonline.com/weekly/anadarko-mulling-over-its-options-at-shenandoah/1-1-1009805.

[239] *Id.*

[240] *Id.*

[241] *Id.*

a.  ITG: In speaking about Cobalt, ITG wrote: "The Shenandoah #3 appraisal well reached TD and encountered 'the same well-developed reservoir sands 1,500 feet downdip and 2.3 miles east of Shenandoah #2.' Notably, the release states, 'The well also enabled the projection of oil/water contacts based on pressure data and reduced the uncertainty of the resource range.' We interpret the sentence as meaning the well was drilled below the oil/water contact. While we are encouraged that the well confirms the continuity of high-quality reservoir, the failure to encounter a hydrocarbon column suggests a smaller (3P?) potential resource. A fourth appraisal well is expected to commence later in 2015."[242]

b.  ITG: "APC's March 3 presentation helped resolve uncertainty around the Shenandoah development in the Gulf of Mexico. Partner CIA, in its Feb. 23 release, said the Shenandoah #3 appraisal well evaluated the same reservoir sands 1,500 feed town-dip and 2.3 miles east of Shenandoah #2. It went on to say it found an expanded geologic reservoir section and confirmed good reservoir qualities. The company made no mention, however, of hydrocarbons. The March 3, 2015, APC presentation (Slide 47) [i.e., Figure 14, above] resolved the matter, clearly positioning the well below the oil-water contact."[243]

---

[242] ITG Investment Research, "Appraisal Drilling, Possible Farm-out Dominate 2015 Agenda," February 23, 2015, p.1 (FIAM-ANAD-006965).

[243] ITG Investment Research, Daily Top and Bottom Performers by Market Cap, March 6, 2015, p. 2 (FIAM-ANAD-006125).

    c.  UBS projected a resource range potential of 720 MMBoe, as compared to its pre-Shen-3 estimate of 800 MMBoe.[244]

    d.  UBS: "Following its 2013 discovery at the Shenandoah-2 appraisal well[,] . . . APC completed its second appraisal well (Shenandoah-3) during 4Q. The well enabled projection of preliminary oil/water contact, increasing confidence in the ultimate resource potential (though no resource range was provided)."[245]

    e.  UBS: "APC completed its second appraisal well (Shenandoah-3) during 4Q. The well enabled projection of preliminary oil/water contact, increasing confidence in the ultimate resource potential (though no resource range was provided)."[246]

219.  **Conclusion E: Investors understood that, even after Shen-3, Anadarko and the partners needed to drill additional appraisal wells in order to understand the Shenandoah resource potential.**

220.  Anadarko made several statements around the time that it released the results of the Shen-3 well that make clear that while the well provided important information, there was still substantial work to be done to understand the size and quality of the resource. For instance, as noted above, during a February 3, 2015 investor call, Kleckner stated that "from a[n] evaluation and scoping standpoint, the work is progressing very well" but that they had to

---

[244] *Compare* UBS, "Anadarko Petroleum Corp.: Preview of Anadarko Petroleum's Analyst Day," February 24, 2014, p. 7, (UBS_0000555) *with* UBS, "Anadarko Petroleum Corp. Strong 2Q EPS/CFPS Beat; Raising Estimates on Higher 2015 Oil Production Guidance, July 29, 2015," p. 11, (UBS00015972)

[245] UBS, "Anadarko Petroleum Corp. Strong 1.Q CFPS Beat; Raises 20:15 Volume Guidance but Trims Capex Budget," May 5, 2015, p. 9 (UBS_0000791).

[246] UBS, "Anadarko Petroleum (Buy): Strong 2Q EPS/CFPS Beal; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015, pp. 6-8 (UBS00015972).

"wait to see what the results of the follow-on appraisal wells fully indicate for our resource size."[247]

221.  Later, during an earnings call on May 5, 2015, Daniels noted that "there's an awful lot of work that's gone into defining what data we still need to get to that FID decision and the Shenandoah-4 is focused on really moving us and advancing us in that direction. I think we're planning on getting a core there in the oil column. We're going to be up dip to the 1,000-feet of pay that we had, and so that will really help with some of the modeling going forward." [248]   Daniels emphasized that Anadarko was "looking at deliverability and connectivity," which "gives you a lot more confidence than in what your actual development plan should be, and how economic the field could be." [249] He stated that with both Shen-4 and Shen-5, Anadarko was "going to have a real step-up in [its] knowledge."[250] With that information and "the integration of the development teams doing the pre-development work, we're going to be in a very good position to make the call as to whether we want to advance towards the FID, do an additional appraisal well, whatever it may be, based on the results of these wells."[251] He noted that they were "looking for reservoir continuity," "fluid," and to "just really confirm the overall oil in place volumes that we have there, so that we can then really start rolling that into development planning."[252]

---

[247] Anadarko Petroleum Corporation Q4 2014 Earnings Call Transcript, February 3, 2015, p. 8 (emphasis added).

[248] Anadarko Petroleum Corporation, Q1 2015 Earnings Call Transcript, May 5, 2015, p. 12.

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] *Id.*

222. Analysts commented that additional appraisal was required and that any additional development would depend on the results of the appraisal process:

   a. Simmons & Company: "APC's appraisal well drilled increased confidence in identifying the development plan and water drive for recovery. Another appraisal well will be drilled later this year testing the eastern extent."[253]

   b. UBS: "The company plans to spud a third appraisal well in 2015 to further delineate the areal extent of the discovery (UBSe720 MMBoe), after which it should be able to dictate the pace of development (implying production will likely not begin until 2019-20)."[254]

   c. GMP: "Planning is under way for the third appraisal well, Shenandoah-4, which is anticipated to spud during Q2:15. The well is designed to confirm the lateral sand quality, continuity and stratigraphy of reservoirs found in Shenandoah-2, which encountered >1,000 net feet of oil pay in Lower Tertiary-aged reservoirs."[255]

223. In subsequent months, Anadarko continued to emphasize that Shenandoah was in the early stages of development. During a May 20, 2015 UBS Global Oil and Gas Conference, Gwin stated that there was "[n]ot a lot to add on Shenandoah today other than to mention we are drilling an appraisal well there and we continue to move that project toward development in the future. We have a high working interest across our portfolio. We've got seven facilities out here. By having that kind of breadth of facilities, by having good project development expertise and a strong exploration capability, the Gulf of Mexico becomes a

---

[253] Simmons & Company, "Anadarko Petroleum Corp.: Q4 Earnings Review," February 4, 2015, p. 3 (PIPER_SANDLER-0003287).

[254] UBS, "Anadarko Petroleum Corp. Strong 1.Q CFPS Beat; Raises 20:15 Volume Guidance but Trims Capex Budget," May 5, 2015, p. 9 (UBS_0000791).

[255] GMP, "Anadarko Petroleum Corp. Q1:15 update: And the word of 2015 is 'Ephemeralization,'" May 5, 2015, p. 4 (FIAM-ANAD-008563).

place where our core skills create a competitive advantage, where we've been able to drive very profitable and increasing the oilier operations here over time."[256] Investors understood that Anadarko was working to appraise Shenandoah and develop its portfolio in the Gulf of Mexico.

224. Analysts understood that Shenandoah needed additional appraisal and technological development.

a.  After the May 20, 2015 UBS call, Jefferies noted that "Shenandoah [d]evelopment" was "[u]nlikely [n]ear [t]erm, [b]ut [p]rovides [l]ong-[t]erm [p]otential," explaining, "While we believe Shenandoah could be one of the largest GOM discoveries, we currently give no credit in our RAAV due to needed improvements in drilling technology (new build drillships with dual 20k PSI BOPs), which are unlikely to be available in the near-term."[257]

b.  Later, in July 2015, Capital One stated: "Appraisal drilling is ongoing in deepwater GOM, as APC is currently drilling its second well at Yeti (37.5% WI) and the fourth well at Shenandoah (APC 30% WI). Mgmt believes a 5th well will likely be required at Shenandoah to round out the appraisal process and get more visibility on the total recoverable resource."[258]

---

[256] Anadarko Petroleum Corporation, UBS Global Oil & Gas Conference Transcript, May 20, 2015, p. 6.

[257] Jefferies, "Oil & Gas Exploration & Production Reduce Nat Gas Price Outlook, Rema in Constructive; Upgrade APC, NBL, EOG," July 6, 2015, p. 6 (APC-01319911).

[258] Capital One, "APC Update," September 16, 2015, p. 2 (APC-01323978).

225. **Conclusion F: At several points throughout the Class Period, Anadarko disclosed that Shen-3 did not encounter hydrocarbons.**

226. Anadarko made several additional references throughout the Class Period to Shen-3 lacking hydrocarbons. During Anadarko's Q4 2015 Earnings Call, Anadarko stated that Shen-5 would be drilled "between Shenandoah 3 and the original Shenandoah 1, up dip of Shenandoah 3, which was a wet well that encountered very, very good sands, kind of gave us a down-dip limit on the eastern side."[259] Investors understood that describing a well as "wet" meant that the well did not encounter hydrocarbons.

227. Later, during a May 24, 2016 UBS Global Oil and Gas Conference (discussed in further detail below), Anadarko presented a graphic clearly showing that Shen-3 did not encounter hydrocarbons. In the cross-section, Shen-3 is listed as drilling into yellow, rather than the light or dark green that indicated "proven oil" or "projected oil," respectively.[260]

---

[259] Anadarko Petroleum Corporation, Q4 2015 Earnings Call Transcript, February 2, 2016, p. 10.

[260] Anadarko Petroleum Corporation, UBS Global Oil & Gas Conference Presentation, May 24, 2016, p. 10.

**Figure 15. Slide from May 24, 2016 UBS Global Oil and Gas Conference[261]**



228. By October 2016, Anadarko expensed Shen-3. Specifically, Anadarko announced that it had expensed, in October 2016, "$64 million related to a Shenandoah well in the Gulf of Mexico . . . as it was no longer reasonably possible that the wellbore would be used in the development of the project if a final investment decision is reached."[262] Given the timing of the write-off and public comments on Shen-4 and Shen-5, i.e., the fact they encountered significant amounts of oil, investors understood that this correlated to Shen-3. Investors understood that writing off Shen-3 as a dry hole further confirmed that it did not encounter oil and was no longer reasonably part of the development plan.

---

[261] *Id.*

[262] Anadarko Petroleum Corporation, Q3 2016 10-Q, October 31, 2016, p. 11.

### 5.2.4. Allegations about Shen-4

#### *5.2.4.1.        Plaintiffs' Allegations*

229.  Plaintiffs allege that Defendants "exaggerated the findings associated with the Shen 4 appraisal well drilled in 2015, when in fact it was well known throughout the Company, including the management team, that the results were disastrous."[263] Plaintiffs further assert that Shen-4 "was 'garbage' and suffered major problems, including misleading mapping" and "salt deposits."[264]

230.  Plaintiffs contend that Defendants "reiterated prior exaggerated estimates about the size and economic promise of Shenandoah."[265] For instance, they allege that Gwin "claimed that Shen 4 had identified even more oil, pushing the known depth of oil down by an additional 400 feet, stating that 'we didn't establish an oil water contact here, so that tells us there's more down below us' and 'we're very encouraged with what we saw, and it was well within the range of expectation of what we had put out there.'"[266] Similarly, Plaintiffs point to an October 28, 2015 statement allegedly from Walker "respond[ing] to a Deutsche Bank inquiry about Shenandoah's resource range and appraisal wells as follows: 'Yes, on the resource range, we're right where we thought. We always do a probabilistic resource range. We're still in that range with the results of the well.'"[267] Plaintiffs call the Shen-4 sidetrack well, which encountered 600+ feet of oil, "an objectively smaller resource than Shen 2. . . mandate[ing] a downward adjustment to Shenandoah's size estimates."[268] Plaintiffs further

---

[263] Amended Complaint ¶ 53.

[264] *Id.* ¶¶ 54--55.

[265] *Id.* ¶ 59.

[266] *Id.* Plaintiffs incorrectly attribute this quote to Gwin.

[267] *Id.* ¶ 112. Plaintiffs incorrectly attribute this quote to Gwin.

[268] *Id.* ¶¶ 57-58.

allege that the original hole encountered "massive salt deposits (or faults) that blocked oil extraction," which Plaintiffs claim "mandated a reduction in the estimated size of the Shenandoah resource."[269]

231. Plaintiffs also take issue with positive statements Anadarko made about Shenandoah, including that it was moving the project "towards development in the future," [270] "[a]chiev[ing] large-scale project milestones in the Gulf of Mexico,"[271] and that "longer-dated projects [such as Shenandoah]" were "worthy of spending capital, expecting that oil [was] not going to be at \$30 for the rest of our life."[272] Moreover, Plaintiffs contend that Anadarko "continued to tout the 'high quality' of Shen 4 without disclosing the use of outdated and misleading maps, and simultaneously touted plans to start drilling more wells to the East, dubbed Shen 5 and 'Shenandoah-6' ('Shen-6')." [273]

### 5.2.4.2. *Summary of Conclusions:*

232. **Conclusion A: Investors understood from Anadarko's statements that the original Shen-4 hole encountered salt and that the sidetrack encountered less pay than Shen-2.**

233. **Conclusion B: Investors did not view Defendants' statements about the Shen-4 results as confirming any particular resource range.**

---

[269] *Id.* ¶ 55.

[270] *Id.* ¶ 106.

[271] *Id.* ¶ 107.

[272] *Id.* ¶ 114.

[273] *Id.* ¶ 70.

234. **Conclusion C: Investors understood after Shen-4 that any FID would depend on the information gathered from Shen-5 and Shen-6, as Anadarko needed to better understand the size and quality on the East side of the prospect.**

235. **Conclusion D: After the results of Shen-4 were released, investors understood that Anadarko was unlikely to invest in Shenandoah at then-prevailing oil prices.**

236. **Conclusion E: By no later than May 2016, investors understood that there was faulting in the Shenandoah basin, including faulting between Shen-2 and Shen-3, and between Shen-2 and Shen-4, which required Anadarko to continue drilling to understand the asset.**

### 5.2.4.3.    *Support for Conclusions:*

237. **Conclusion A: Investors understood from Anadarko's statements that the original Shen-4 hole encountered salt and that the sidetrack encountered less pay than Shen-2.**

238. Plaintiffs contend that Shen-4 was "garbage" and had "disastrous" results because it encountered salt deposits, and was an "objectively smaller resource than Shen 2," which Defendants concealed.[274]

239. I am not aware of any statements from Anadarko claiming that Shen-4 and Shen-2 encountered similar net pay. Rather, it is undisputed that Anadarko released the results of both wells—that Shen-2 encountered at least 1,000 net feet of pay[275] and the first sidetrack

---

[274] *Id.* ¶¶ 53–55, 57.

[275] *See, e.g.*, Anadarko Petroleum Corporation, Q1 2013 10-Q, May 6, 2013, p. 26.

at Shen-4 encountered 620 net feet of pay.[276] Investors thus understood that the Shen-4 sidetrack encountered less pay than Shen-2.

240.  Investors also understood that the original Shen-4 hole encountered salt. Anadarko's public statements show that, while Anadarko often used the term "Shen-4" to refer to the entire series of penetrations, it disclosed that the net pay it encountered was from a sidetrack.[277] For example, during an earnings call on October 28, 2015, Daniels described the Shen-4 well results, saying that the original well "established where the basin edge was" and the sidetrack "got the 622 feet of pay."[278]

241.  Just the day prior, Anadarko indicated in its Q3 2015 Operations Report that the original hole at Shen-4 was on the edge of the basin and salt.[279] Investors thus understood that the original hole, in establishing where the basin edge was, probably encountered salt.

---

[276] Anadarko Petroleum Corporation, 2015 10-K, February 17, 2016, p. 10Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 7.

[277] Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 7.

[278] *Id.*

[279] Anadarko Petroleum Corporation, Q3 2015 Operations Report, October 27, 2015, p. 13.

**Figure 16. Graphic from Anadarko's October 27, 2015 Operations Report[280]**



242. The fact that Anadarko sidetracked the well also indicated that the original Shen-4 hole encountered salt. There are two common reasons for sidetracking a wellbore. If a bit or other downhole equipment becomes stuck in the wellbore and fishing is unsuccessful, a sidetrack allows drilling to continue around the obstruction without drilling an entirely new well. Similarly, if the wellbore encounters issues (faulting, etc.), a sidetrack allows the operator to use a portion of the initial wellbore, saving costs, then kicking out directionally so that the rest of the well deviates in the direction of what is hoped to be a more desirable target. Investors understood that the latter reason was at issue here, in light of Anadarko's statement that the original hole had "established where the basin edge was."[281]

---

[280] *Id.*

[281] Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 7.

243. Later, during a May 24, 2016 UBS Global Oil and Gas Conference, Anadarko showed a graphic clearly indicating that Shen-4 drilled into the salt that bounded the reservoir to the west. [282] (See Figure 15, above.) Market participants circulated this image, with Morgan Stanley, for example, using this image in its report later that year.[283]

244. **Conclusion B: Investors did not view Defendants' statements about the Shen-4 results as confirming any particular resource range.**

245. Plaintiffs take issue with two statements that they claim "reiterated prior exaggerated estimates about the size and economic promise of Shenandoah."[284] As explained above, however, none of the statements that Plaintiffs contend constitute resource estimates would have been viewed as such. As a result, investors did not understand these additional allegedly misleading statements to be confirming any particular resource range.

246. The first allegedly misleading statement is a statement, which Plaintiffs attribute to Gwin saying Anadarko was "very encouraged with what [they] saw and it was well within the range of expectation of what [they] had put out there."[285] The exchange, in full context, proceeded as follows:

> Evan Calio, Morgan Stanley, Research Division: "[C]ongrats on the Shenandoah appraisal. Can you discuss how the results compare to predrill expectations or comments on reservoir quality and then go forward plans?"
>
> Daniels: "Yes, thanks, Evan, for the congratulations. The team is doing [a] really good job on that and we're real pleased with it. We got 622 feet of pay. What

---

[282] Anadarko Petroleum Corporation, UBS Global Oil and Gas Conference Presentation, May 24, 2016, p. 10

[283] Morgan Stanley, "Notes From The Road: Top Pick Affirmation," October 11, 2016, p. 8 (MS_ANADARKO_000135).

[284] Amended Complaint ¶ 59.

[285] Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 7.

we ended up doing was we tested up to the north with trying to find out where the basin edge was. And the first well -- established where the basin edge was. Then we came in and drilled to the south with the sidetrack and got the 622 feet of pay. It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty -- well, looks comparable to everything else we found out. That's a very good reservoir quality. We're still in the early stages of that evaluation. We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well, and that's to establish the reservoir quality in the oil column, which will roll directly into our development planning. So it's very important to get that core and we're just in the process of it. So that's going to give us a much better handle on all fluid properties, all the reservoir properties. But we pushed the lowest known oil down about 400 feet. As I mentioned, we didn't establish an oil-water contact here, so that's -- tells us there's more down below us. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. But we're very encouraged with what we saw and it was well within the range of expectation of what we had put out there." [286]

247. Investors understood the phrase "range of expectation" to refer to Anadarko's objectives and expectations for the well, as established by and based on all of the information gathered pre-drill, including the Shen-3 results. In other words, investors did not compare this statement to the expectations after Shen-1 or Shen-2 alone. Other oil companies used similar terms such as "pre-drill expectations" to explain this concept. For instance, James H. Painter, Cobalt's Executive Vice President, Execution and Appraisal, had noted that Shen-3 met "all of our pre-drill expectations," explaining, "What we were looking for was looking to see what the down-dip sand quality was, the thickness, the capability about sand to produce, all of the things we were looking for were all met and what we were looking to accomplish with that appraisal well." [287] Similarly, investors understood Daniels as

---

[286] *Id.*

[287] Cobalt International Energy Inc., Q4 2014 Earnings Call Transcript, February 23, 2015, p. 13.

confirming that Anadarko generally met their objectives and was pleased with the well results.

248.    The second allegedly misleading statement is from Daniels saying that "[o]n the res[ource] range, we're right in where we thought. We always do a probabilistic resource range. We're still in that range with the results of the well."[288] Investors understand that in the appraisal process, companies often use a probabilistic resource range, which is updated as the company gains additional information about a resource. Investors understand that companies change their probabilistic resource ranges when they receive additional well data. Therefore, investors understood Daniels to be saying that Anadarko remained within the post-Shen-3/pre-Shen-4 resource range, i.e., the range at the time of drilling Shen-4. Investors did not understand Daniels's statement to mean that the range did not change at all or that Anadarko remained within the range as they had predicted it immediately after drilling Shen-1 or Shen-2.

249.    In addition, immediately after saying that Anadarko was "right in where we thought" on a resource range, Daniels noted that they were still understanding the data: "We still have to establish to a water contact over here. So you still have uncertainties associated with that. As to FID and whether or not we need additional wells, I think these discussions are ongoing, but I think we also need to get all the data in and really incorporate that into our thinking as to, okay, what do we have here for sure, what we now have uncertainties around and what does that mean for additional activities."[289] He also cautioned that it was "too early to say on whether there needs to be an additional well" and that any "predevelopment work leading to an FID . . . would come after" Anadarko felt it had "all

---

[288] Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015, p. 18.

[289] *Id.*

the data that [it] need[ed]." [290] In my review of market participant reactions to these statements in the 12 days following these disclosures, i.e., the time prior to Anadarko's next public presentation on November 11, 2015,[291] I did not identify any commentary referencing a resource range disclosed by Anadarko.

250. **Conclusion C: Investors understood after Shen-4 that any FID would depend on the information gathered from Shen-5 and Shen-6, as Anadarko needed to better understand the size and quality on the East side of the prospect.**

251. Investors understood that Anadarko needed to drill additional appraisal wells to understand the size of the Shenandoah field, and that any FID would depend on the information learned from Shen-5 and Shen-6. While Plaintiffs claim that Defendants "touted plans to start drilling more wells to the East," [292] investors understood the need to drill more appraisal wells to mean that Anadarko and the other Shenandoah Partners did not have a sufficient understanding of the resource to make a final investment decision. Investors understood that appraisal wells require a significant capital investment and hold significant risk and may not ultimately lead to a final investment decision.

252. Anadarko made this clear to investors in the months after releasing the Shen-4 results. In particular, Anadarko repeatedly emphasized that it did not know the extent of resources on the eastern side of the prospect and needed to drill Shen-5, and potentially Shen-6, to gain this information. During a February 2, 2016 earnings call, Gwin said, "At the same time, we're looking at drilling Shenandoah 5. We think that's a well that's required. It's off to the East. It'd be kind of between Shenandoah 3 and the original Shenandoah 1, up dip of

---

[290] *Id.* pp 18-19.

[291] Anadarko presented at the Jefferies Energy Conference on November 11, 2015.

[292] Amended Complaint ¶ 70.

Shenandoah 3, which was a wet well that encountered very, very good sands, kind of gave us a down-dip limit on the eastern side. So that well should spud here in this first quarter. We have high expectations for it. But we need to drill the well and say, that's what appraisal is all about. Meanwhile, the guys are taking all the information that we obtained from this, rolling it into conceptual planning as to what resources we may be able to recover, how much it might cost, those types of things. And as Al said, we're a long ways from sanction at this point. If Shenandoah 5 is successful, we may move even farther to the east with the Shenandoah 6, but of course, that'll be all dependent on what happens to Shenandoah 5."[293]

253. A few weeks later, on February 24, 2016, Daniels again emphasized the need for the Shen-5 results to prove hydrocarbons on the east side: "The Shenandoah Number 5 well will be drilled, and that'll be off to the east, again, trying to prove lateral extent, that kind of thing. We did appraise it last year. We had a successful well, 620 feet of pay in that. So, we still are advancing the project, but we're a ways away from a sanction at Shenandoah."[294]

254. As discussed in section 4.1.5, investors understood that the Gulf of Mexico was geologically complex, so the Shenandoah field may be faulted or may not have as large of an areal extent as initially hoped. Anadarko representatives repeatedly emphasized the lack of knowledge regarding the lateral extent of the eastern side of the field, indicating that there may be fewer or no hydrocarbons than expected in those areas, which could be attributable to faulting or compartmentalization.

255. Anadarko's partners made similarly cautious statements. For instance, Marathon Oil similarly cautioned that while Shen-4 provided "excellent" results, they were "still very

[293] Anadarko Petroleum Corporation, Q4 2015 Earnings Call Transcript, February 2, 2016, p. 10.

[294] Anadarko Petroleum Corporation, Credit Suisse Energy Summit Transcript, February 24, 2016, p. 6.

much early in the appraisal phase" and had not "reached an investment decision."[295] It further recognized that doing so would require it to weigh the potential investment against others in its portfolio, stating, "Ultimately, it will need to compete for capital allocation head-to-head with the rest of our opportunities."[296] On February 22, 2016, Cobalt released its 2015 10-K which reiterated that the "Shenandoah field is in the early stages of the project development life-cycle and will require substantial additional evaluation, appraisal drilling, and analysis prior to the preparation of a development plan and seeking formal project sanction."[297]

256.   **Conclusion D: After the results of Shen-4 were released, investors understood that Anadarko was unlikely to invest in Shenandoah at then-prevailing oil prices.**

257.   In 2015 and early 2016, investors understood that while Anadarko was continuing to appraise the Shenandoah prospect to understand the potential field size, investing in Shenandoah would require higher oil prices to be commercialized.

258.   During a February 2, 2016 earnings call, Anadarko discussed the macroeconomic environment. Walker began by highlighting the "uncertain price environment [they] anticipated as [they] entered 2015," during which oil prices ultimately "fell by almost 50%."[298] Walker emphasized that, as a company, Anadarko was working to put themselves in a position to "manage through the market's uncertainty and volatility" they predicted "in the coming years."[299] He indicated that unstable gas prices could cause them to sell

---

[295] Marathon Oil Corporation, Q3 2015 Earnings Call Transcript, November 5, 2015, p. 11.

[296] *Id.*

[297] Cobalt International Energy Inc., 2015 10-K, February 22, 2016, p. 5.

[298] Anadarko Petroleum Corporation, Q4 2015 Earnings Call Transcript, February 2, 2016, p. 4.

[299] *Id.*

certain assets, as they would be "actively managing [their] portfolio this year and ha[d] other monetizations identified, which w[ould] be pursued through the course of the year."[300] Later during the call, Gwin emphasized that he thought the existing oil price environment would "probably be protracted," stating that "until we see events stabilize and we see oil prices, in particular, take on [a] new supply/demand dynamic than is currently in the market or anticipated in the near future, we will continue to be a very cautious investor in this environment. . . . So it's for those reasons that I think we're taking, again, this year and into '17 a very cautious approach."[301]

259. Investors understood that this economic environment would impact any decision to sanction Shenandoah. Walker cautioned that Anadarko would not sanction Shenandoah unless oil prices were higher, saying they were "not drilling with a view that we would develop Shenandoah in a $30 price environment."[302] He added, "[T]aking a final investment decision or sanctioning here is not something that will happen in 2016. . . . [W]hen we do, when we are looking at the commerciality of this particular development, it will be considered as a part of how we think about investing the capital in the development."[303] Walker acknowledged, however, that he felt Shenandoah and other long-term projects "today, are worthy of spending capital, expecting that oil is not going to be at $30 for the rest of our life." [304] He noted that any decision to sanction Shenandoah or other similar projects would require the Shenandoah Partners to "be in an environment which we believe

---

[300] *Id.* p. 5.

[301] *Id.* p. 9.

[302] *Id.*

[303] *Id.*

[304] *Id.* p. 7.

we can recommend to our Board[s] first that we make that investment."[305] Investors understood this to mean there was significant uncertainty about whether to sanction Shenandoah.

260. Market commentary from around this period highlights the difficulties of investing in the region. In September 2015, Wood Mackenzie highlighted that "Final Investment Decision for the next round of Lower Tertiary projects depends on a number of key factors including: 1. Successful appraisal results (North Platte & Shenandoah); 2. development of HP/HT [high pressure and high temperature] equipment and; 3. confidence in a stronger oil price."[306] In a report from the following month, Wood Mackenzie noted that "[s]ustained low oil prices threaten viability of many key projects, which are a linchpin of growth for the region."[307]

261. Comments from analysts make clear that the market understood that the Shenandoah project had not been sanctioned and would not be sanctioned at then-prevailing oil prices.

   a. MUFG: "The company's longer-term exploration and appraisal projects are still focused primarily on the Gulf of Mexico. The most-notable of these projects are the Shenandoah (30% WI, operator) and Yeti (37.5% WI, Statoil operator). Neither of those assets is likely to move into the development stage this year due to the low oil-price environment, in our view."[308]

---

[305] *Id.*

[306] Wood Mackenzie, "The Lower Tertiary play in deepwater GoM: what's at stake?," September 2015, p. 7 (APC-00048674).

[307] Wood Mackenzie, "What might the future hold for oil prices?," October 2015, p. 32 (APC-00651990).

[308] MUFG, "Anadarko Earnings: Discipline, Monetizations to Bridge 2016 Funding Gap; Estimates Revised," February 2, 2016, pp. 2-3 (MUSA00000034).

b.  Janus Henderson: "No plans to FID Shenandoah in a $30 price environment. Appraisal well results are good to date, same with Yeti in GOM."[309]

c.  BMO: "Anadarko is unlikely to FID Shenandoah during 2016, a large project that is estimated to require 25 subsea trees (Quest expects trees to be awarded to FTI in 2018)."[310]

262.  Anadarko continued to caution investors that it would not invest in projects like Shenandoah unless it saw sustained oil prices. In March 2016, Anadarko indicated that development would likely require more than $60 a barrel. Specifically, when asked about what oil prices would be necessary to develop in certain regions, Walker said,

> "There are other assets that would require greenfield infrastructure to be deployed in order to bring that into development that are probably going to require more than $60. So it really depends upon whether or not we can lever off existing infrastructure as part of the development plan or if we have to look for brand-new greenfield infrastructure in order to make that commercialization create an attractive rate of return. And when you have a mix of assets that we do and you think about, in particular, say, the DJ and the Delaware Basin w[h]ere we've made huge capital commitments to be able to control our infrastructure there, it's probably easier for us on the margin to convert things in the production than would be others that don't have the ability to lever that infrastructure. And the same thing is true on the Gulf of Mexico."[311]

263.  Based on information Anadarko shared with the market, investors understood that Shenandoah would not be sanctioned if oil prices remained below $60 a barrel. One of

---

[309] Janus Henderson, "APC: 4Q 15 EPS beat, mgmt commentary constructive on operations and capital management: Call Notes," February 2, 2016, p. 1(JanHen_00012764).

[310] BMO, "Crude Thoughts - E&P Budgets Not Looking Good For OSX," February 10, 2016, p. 1 (FIAM-ANAD-008673).

[311] Anadarko Petroleum Corporation, Guidance Update Call Transcript, March 1, 2016, p. 19.

Plaintiffs' investment managers, Wellington, noted that Shenandoah would not be developed until price of oil was at the $70/bbl level:

"Anadarko (APC,1, $13.3B):

• Don't think activity rises until oil is above $50 . . . what worries us about the macro is the volatility going forward

• Don't see a price where we would increase activity in '16

• Service industry is fragile... 80% of the workers in the 80s never returned and concerned about quality of crews... large customers like APC will have an advantage here as SLB/HAL have to rehire and retrain

• Would look to start hedging above $40/bbl in 2H'16 and 2017 using 3 way collars

• **Not developing greenfield deepwater project like Shenandoah in a $30-$40 world... thinks you need north of $70**[312]

Another Wellington employee noted:

Depending on contract structure and tax regime of the specific geography, some offshore projects can work in the $40s if the geology is good and the project can tie into/amortize existing infrastructure. However, **Anadarko noted that even its large Shenandoah find in the GOM would need $70 oil to justify greenfield economics. Offshore will be challenged for some time, even if the price rebounds above $60-70, because of a prevailing attitude that prices and industry structure are more "fragile" than they used to be.** This comment might be different if I were speaking to majors, but independents are clearly concerned that the new volatility means prices three years out are a total crapshoot, which makes it tough to sanction multi-year deep water developments."[313]

---

[312] Email from M. Vivano, Wellington Management, re: "HW Conf Takeaways for energy," March 24, 2016, p. 7, (WMC-APC-0000646) (emphasis added).

[313] Email from D. Palmer, Wellington Management, re: "HW Conf Takeaways for energy," March 23, 2016, p. 8, (WMC-APC-0000646) (emphasis added).

264. **Conclusion E: By no later than May 2016, investors understood that there was faulting in the Shenandoah basin, including faults between Shen-2 and Shen-3, and between Shen-2 and Shen-4, which required Anadarko to continue drilling to understand the asset.**

265. On May 3, 2016, Anadarko discussed faulting that it had encountered in the Shenandoah basin. While Plaintiffs contend Daniels misled the public in saying they were "not necessarily . . . seeing lots of bad surprises,"[314] the exchange in which he said this reveals that he disclosed potential faulting and compartmentalization, which was delaying their plans to drill additional appraisal wells:

> Douglas George Blyth Leggate, BofA Merrill Lynch: "Okay. My operational follow-up is actually on Shenandoah. . . . So I'm wondering what your thoughts are there . . . when it comes to . . . the fact that we're now 5 appraisal wells in. What are you seeing there that is taking so long to appraise it, if you like? Is it really just scale, something unique to the reservoir that may make it a little bit more challenging to get a sanctioned [ph] decision?" . . .
>
> Daniels: "Yes. Doug, on the wells and the appraisal program, it's partly scale, it's partly -- some of the complexities that we're seeing out there, mostly on the imaging side of it, not necessarily that we're seeing lots of bad surprises. Although we did, through our most recent wells, realize that there are some faults that were poorly to not imaged in some of the seismic data that we're going to have to build into a potential development plan. And so that means that we needed a few more appraisal wells to make sure that there's not any more compartmentalization as we move across. So those are the issues that we're looking at. I'd say it's mostly based around the quality of the image in the sub-salt and making sure that what we're seeing or interpreting is actual reality, and so we're drilling the 5-well now to the west and pushing that downdip quite significantly to prove up of those volumes as we move over. And then with success there, we'd move over even farther to the -- I'm sorry, to the east, and we'd move over even farther to the east with the #6 well. So those are what's happening there. The biggest issue on timing and making sure that we have the data is -- this can be a big development if we move forward with it. And it's

---

[314] Amended Complaint ¶ 121.

going to be an expensive development and you want to know what the well deliverabilities are going to be, what your actual resources range are going to and you want to come up with a solution that actually makes sense for this resource. And it's in a technically challenging environment from a pressure standpoint. So we have to make sure we get it right before we take those final decisions. So that's kind of what we're working on right now."[315]

266. Around this time, Cobalt also expressed caution about the Shenandoah resource size, stating it was not as good as their other assets. During Cobalt's earnings call, Cobalt's CEO Joseph Bryant said that Cobalt "probably would want to spend [their] limited capital over the next several years on [their] – either operated asset like North Platte or in assets that [they felt] pretty good about in Anchor before . . .spend[ing] incremental capital at Shenandoah."[316] He further explained that they did not want to "expose [them]selves" by bidding on Marathon's portion of the field, as that could lead to "a position where [they] couldn't spend that capital on assets that [they] would rank higher than Shenandoah."[317] When asked about how he would "rank the resource size in North Platte, Anchor, Shenandoah from 1 to 3," Bryant responded that "based on what we see today," Cobalt would rank Shenandoah last.[318]

267. Market participants understood that Shenandoah required additional appraisal in part because Anadarko had encountered faulting.

   a. Morgan Stanley: "**CIE and APC highlight Shenandoah risks, development hurdles.** APC started off the day's commentary disclosing that the recent appraisals uncovered some faulting at Shenandoah that was not originally visible on seismic. APC will have

---

[315] Anadarko Petroleum Corporation, Q1 2016 Earnings Call Transcript, May 3, 2016, p. 8.

[316] Cobalt International Energy Inc., Q1 2016 Earnings Call Transcript, May 3, 2016, p. 10

[317] *Id.*

[318] *Id.*

to adjust for faulting in the development plan. APC – *'need[s] a few more appraisal wells to make sure that there's not any more compartmentalization as we move across.'* The faulting adds need for additional appraisals and is likely why APC decided to keep the Shenandoah program with its exploration team (last year talked about transferring it to development team after the first of the two wells to be drilled this year) and why it recently mentioned needing an additional appraisal to be drilled next year (Shenandoah-7). Beyond faulting, high reservoir pressure and associated need for 20kpsi equipment (which industry is in the process of standardizing) add to the development challenges."[319]

b. JP Morgan: "**Challenges at Shenandoah.** APC's appraisal program at its Shenandoah discovery continues, with Shenandoah-5 well currently drilling. APC indicated there is some apparent faulting in the structure that wasn't encountered in the seismic. As a result, the company plans to drill more appraisal wells to make sure there is not additional compartmentalization across the field. While APC is contemplating the exercise of its preferential rights for MRO's 10% stake, it appears that the company would not be interested in materially increasing its stake in the project without additional information, which we view as a negative. As a reminder, we do not give value for Shenandoah in our NAV given uncertainty around the project."[320]

268. Moreover, Plaintiffs' investment managers were clearly aware of Shenandoah's complex structural properties and appraisal uncertainties:

---

[319] Morgan Stanley, "Cobalt International Energy Inc: Headwinds Accumulate," May 3, 2016, p. 2 (FIAM-ANAD-003626).

[320] JP Morgan, "More Positives Than Negatives, But a Few Chinks in the Armor," May 4, 2016, p. 1 (APC-01328858).

a.  Fidelity: In an email from Jefferies to Fidelity discussing the investment proposition of ConocoPhillips, Jefferies noted that "[ConocoPhillips's] deep-water portfolio is somewhat speculative at the moment. MRO demonstrated that the value of Shenandoah is not compelling."[321]

b.  Janus Henderson (in call notes): "Additional appraisal wells needed at Shenandoah d[ue] to some poor seismic imaging. Doesn't necessarily mean the reservoir is bad, but it could me[an] more complex than perceived. Because this could be a big scale development, they don't want to cut corners before they make final decisions. Doesn't sound like they would buy COP's stake in Shenandoah without further drilling data."[322]

c.  Wellington: "**Shenandoah:** incremental data point a negative in our view and need to dig further as the company mentioned updated seismic control, highlighting additional faulting/compartmentalization risk. This is why the company has prudently pushed an aggressive appraisal program to make sure they understand development plans. … Shenandoah: lots of complexity related to imaging which has caused delay, in a technically challenging pressure environment but think it will be a big development - not interested in adding to working interest position without having additional information first."[323]

d.  Janus Henderson also understood as early as in May 2016 that "Long cycle assets such as Shenandoah would not be sanctioned in at \$30/bbl world."[324]

---

[321] Email from J. Gammel, Jeffries, to S. Gupta, Fidelity, April 25, 2016, p. 2 (FIAM-ANAD-003586).

[322] Email from N. Barrett, Janus Henderson, to Equity Research, May 3, 2016, p. 1 (JanHen_00012827).

[323] Email from W. Foley of Wellington to RK Hoffman of Wellington, etc., May 3, 2016, pp. 1-2 (WMC-APC-0000127).

[324] Email from A. Wiley, Factset, to V. Newman, Perkins Janus, May 3, 2016, p. 1, (JanHen_00013193).

e.  Janus Henderson also understood that Shenandoah would not be sanctioned at that time because Anadarko had not "sized the reservoir yet" and was "still drilling a few more wells to gather data."[325]

f.  Janus Henderson understood that there had not been a final decision to commercialize Shenandoah during the Class Period, and that the cost to drill appraisal wells was "higher than anticipated because of complexities associated with drilling in that location."[326]

269.  During a May 24, 2016 UBS Global Oil and Gas Conference, Anadarko again indicated that Shenandoah had encountered faulting. (See Figure 15, above.) Investors understood from this graphic—which as indicated above also showed that Shen-3 did not encounter oil and that the original Shen-4 wellbore drilled into salt—that there was faulting in Shenandoah, including a fault between Shen-2 and Shen-3, as well as between Shen-2 and Shen-4. [327]

### 5.2.5.  Allegations about Shen-5

#### 5.2.5.1.    *Plaintiffs' allegations:*

270.  Plaintiffs allege that Defendants made false and misleading statements about the results of the Shen-5 appraisal well, both during and soon after drilling. Plaintiffs suggest that Defendants knew Shenandoah would not be commercialized yet "touted plans to start drilling more wells to the East, dubbed Shen 5 and [Shen-6]."[328]

---

[325] Janus, "Morgan Stanley E&P & Oil Services Conference Notes," May 12, 2016, p. 2, (JanHen_00020308).

[326] Declaration of N. Barrett, Janus Henderson ¶ 6.

[327] Anadarko Petroleum Corporation, UBS Global Oil & Gas Conference Presentation, May 24, 2016, p. 10.

[328] Amended Complaint ¶ 70.

271. Plaintiffs allege that Anadarko made several false and misleading statements about Shen-5 as it was being drilled. These include statements made by Gwin and Shandell Szabo, Investor Relations Director, during a May 24, 2016 UBS Global Oil and Gas Conference. Gwin and Szabo stated that Shenandoah was a "fantastic basin," they were "excited about the upside and the potential here as [they] move[d] toward development," and that Shenandoah was "the finest lower tertiary discovery to date in the Gulf of Mexico" because of its thickness, area and recovery factor.[329]   Plaintiffs allege that Defendants "continued to tout the economics of the Shenandoah project, with Gwin stating on May 24, 2016: '[Y]ou'd be very excited to take [final investment decision ('FID') in Shenandoah], knowing that the rates of return here would be compelling . . . . I'll call it not just that break-even number, but the number at which you'd really be excited about sanctioning and moving the project forward continues to come down with success. So Shen 5 is a material derisking of what we're doing."[330]

272. Plaintiffs also take issue with statements from Gwin during a June 28, 2016 J.P. Morgan Energy Investor Conference. He stated that Shen-5, "at least in the uphol[e] sections, . . . looked a lot like Shenandoah #2," and that "the results of Shen-5 ha[d] put [Anadarko] in a position where [they] clearly expect[ed] to drill Shen-6 later this year and continue with an appraisal program there beginning – continuing to frame the aerial extent of the reservoir."[331]   Gwin continued, "Clearly, we know we have a lot of column. We know we have very attractive Miocene-like sands and now we need to determine the aerial extent of

---

[329] *Id.* ¶ 124.

[330] *Id.* ¶ 59.

[331] *Id.* ¶ 127.

the reservoir, so that we can move forward with our pre-[FEED] work and begin to conceptualize what a development opportunity would look here." [332]

273. Plaintiffs point to Anadarko's July 2016 announcement that the Shen-5 well "encountered more than 1,040 net feet of oil pay, extending the eastern limits of the field,"[333] as well as Walker's general statements that Anadarko's "portfolio continue[d] to perform exceptionally well," and that the company "continued to significantly reduce [its] cost structure throughout the year,"[334] had "outstanding performance in the Gulf of Mexico," and was "pleased with what [they] saw in the number 5 well."[335]

274. Plaintiffs also take issue with the statements Defendants made after the announcement of the Shen-5 results, including Brad Holly's statement during an August 16, 2016 EnerCom Oil & Gas Conference that the "partnership is excited about Shenandoah"[336] and Gwin's statements at a September 14, 2016 UBS Houston Energy Bus-Less Tour that "we've still got an opportunity at Shenandoah we're excited about."[337]

275. Finally, Plaintiffs point to a statement from Walker during a November 1, 2016 Earnings Call that "there could be a role that Shenandoah or another option like that plays in our portfolio."[338]

---

[332] *Id.* ¶¶ 127-129.

[333] *Id.* ¶ 129; Anadarko Petroleum Corporation, Q2 2016 10-Q, July 26, 2016.

[334] Amended Complaint ¶ 131.

[335] *Id.* ¶¶ 132-133.

[336] *Id.* ¶¶ 134-135.

[337] *Id.*

[338] *Id.* ¶ 136.

### 5.2.5.2.    *Summary of Conclusions:*

276. **Conclusion A: Investors understood that after Shen-5, any FID would depend on the results of Shen-6, the ability to reduce development costs, and commodity prices.**

277. **Conclusion B: Investors understood in late 2016 and early 2017, as Anadarko discussed potential development solutions for Shenandoah, that the prospect would not be developed in the existing economic environment.**

### 5.2.5.3.    *Support for Conclusions:*

278. **Conclusion A: Investors understood that after Shen-5, any FID would depend on the results of Shen-6, the ability to reduce development costs, and commodity prices.**

279. Anadarko representatives made several statements about Shen-5 before officially announcing the results of the well. Investors understood that Shen-5—which ultimately encountered more net pay than the Shen-2 well—was a promising development. However, investors also understood that Anadarko both needed to gain additional information about the resource and reduce development costs, particularly in light of then-prevailing oil prices, before making an investment decision.

280. During the May 24, 2016 UBS Global Oil and Gas Conference, Szabo explained that "the Number 6 well was very dependent on what we saw on the Number 5 well." [339] She continued that, because of the positive results of Shen-5, "what we can say is that we're definitely drilling the Number 6 well." [340] Szabo also made clear that any development would depend on whether Shen-6 encountered the oil-water contact. When asked if Shen-

---

[339] Anadarko Petroleum Corporation, UBS Global Oil and Gas Conference Transcript, May 24, 2016, p. 9.

[340] *Id.* p. 9.

6 would allow them to "determine the size and move towards FID," Szabo responded that without the oil-water contact, "that's really hard for us to be able to say exactly with the ranges." [341] She added that, if they did not find the oil-water contact, "there's the opportunity for one more wellbore" that they might be "forced to drill."[342]

281.   Gwin echoed this when it came to development cost, saying he could not provide an oil price that would allow Anadarko to develop Shenandoah, as they "have to understand the reservoir characteristics better than we do today."[343] During that conference, Gwin declined to provide a definitive oil price and resource size that would lead to a FID and did not promise that they would invest at that time:

> Question: "So how low an oil price could you move forward with Shenandoah? And then also with the Number 6 well, I guess, that spuds in the fourth quarter. If you find oil-water contact, will that be enough to determine the size and move towards FID, if you have any coming out today?"
>
> Gwin: "I can't answer your question on development cost. I can give you some conceptual comments. . . . But, first, we have to know what it is we're developing. And so, first, we have to understand the reservoir characteristics better than we do today. . . . But as we work the Shen-5 information into our model, it's going to change the scope of the development very clearly and it will change where we go with the development from maybe a design standpoint and certainly a scale standpoint. And so, it's a question we have avoided answering because we really don't want to get numbers in people's minds until we know what a development plan actually looks like. What we can tell you is that everything we've been doing brings that number down at which you'd be very excited to take FID knowing that the rates of return here would be compelling. And so, that – I'll call it not just that breakeven number, but the number at which you'd really be excited about sanctioning and moving the project forward, continues to come down with success. So Shen-5 is a material

---

[341] *Id.* p. 11.

[342] *Id.* p. 12.

[343] *Id.*

de-risking of what we're doing. It's also going to be a significant amount of information to work into our models and the work that our engineers are doing around what that development solution looks like.

The goal here is to do it as efficiently as possible to get the best risk-adjusted rates of return. The more we learn, the more well control we have through the wells that are currently being drilled and the to-be drilled well, the more insight we'll have and the better we can answer the question sooner. But today, we just don't know."[344]

282. Analysts understood that while Shen-5 was a promising well, Anadarko and the Shenandoah Partners would be required to gather more information before making a decision on sanctioning.

a. UBS: "[Anadarko] highlighted its Shenandoah discovery is the 'finest lower tertiary discovery to date' (due lo thickness, reservoir quality, light oil, etc.) and plans to spud the Shenandoah-6 appraisal well in 4Q16 in order to establish oil-water contact which would give indication of true resource size; while Shenandoah-5 is approaching TD, the preliminary logs seem to be similarly encouraging as Shenandoah-2 in terms of thickness (~1,000 feet) and reservoir quality (Miocene-like)."[345]

b. Wolfe Research: "Anadarko with an update on Shenandoah - We thought commentary on Shenandoah about the necessity of additional appraisal wells to better define any additional compartmentalization on APC's 1Q16 conference call, following divestiture by Marathon of its 10% stake for what we thought a low price, was perceived net bearishly by the street, which in general is just hoping to get to the point of discussion around potential development options to better define future value from the discovery.

---

[344] *Id.* pp. 11-12.

[345] UBS, "UBS Global Oil and Gas Conference- DAY 1 Research Highlights," May 24, 2016, p. 2 (JanHen_00022609).

At the point of the 1Q16 call the company was drilling the Shenandoah-5 appraisal and pushing down-dip significantly to prove up volumes. APC effectively confirmed success at the Shenandoah-5 appraisal at a conference last week, with the company stating that it will now spud the Shenandoah-6 appraisal to the east in 4Q16. The Shenandoah-6 well will be pushing further down the structure to define the point of oil-water contact."[346]

c. Jefferies: "While APC didn't go as far as to reveal results for its operated Shenandoah #5 well (as it nears TD), the company stated that the data seen is likely to confirm previous thoughts on size and scale of the discovery. APC confirmed that the previously planned sixth well will definitely go forward (spuds in 4Q16), with the goal of the well to find the oil/water contact point. APC has also exercised its preferential right to purchase additional interest in Shenandoah (due to MRO's announced sale of its interest in the asset)."[347]

d. Bank of America: "[D]iscussion with management around its flagship Shenandoah discovery in the US GoM that has yet to receive sanction, suggests many investors have at least haircut and sometimes zeroed associated value, with similar treatment of other unsanctioned projects such as Paon in Ghana. . . . In March 2013, Anadarko announced the result of an appraisal well at its Shenandoah discovery. . . . Since then, another four wells had been drilled, revealing the structure to be large, but faulted with sub-salt imaging difficulties slowing management's ability to determine commerciality without further appraisal drilling. With completion of the #5 well, our discussions with

---

[346] Wolfe Research, "Large-Cap E&P: Target Depth - Royals and Yoga ... Nope," May 31, 2016, p. 6 (WOLFE_0003742).

[347] Jefferies, "Anadarko Petroleum (APC) Thoughts from Investor Meetings; Capital Efficient Hub and Spoke Model," June 1, 2016, p. 1 (JEFF00007322).

management suggest that Shenandoah is now back on the front burner and potentially the next major development in the US GoM. While additional appraisal drilling will continue with Shenandoah #6 expected towards year end, where the objective is to determine an oil water contact helping close in on the discoveries ultimate scale that we believe still lies between 500mm and 1 bn boe. . . . We base our assessment of Shenandoah in the lower half of our resource estimate at about 750mm boe. . . . Our commodity assumptions are consistent with our house view that assumes Brent pricing of $80 from 2019. While we acknowledge this may be premature we also believe Anadarko is closing in on a commercial development of what it has already described as one of the largest discovery in the US Gulf of Mexico. As a minimum we suggest that management's recent commentary suggests the value is certainly not zero—but our discussions with many investors around the extended appraisal time line leads us to believe that associated value has either been haircut or zeroed in many analysts models."[348]

283.  Around this time, Anadarko continued to emphasize that any development would depend not only on the results of the appraisal wells but also the price of oil and potential development costs. For instance, during a J.P. Morgan Energy Equity Investor Conference on June 28, 2016, Gwin responded to a question about a price range for oil needed to make deepwater drilling "economically viable." Gwin stated that the answer "varies with the opportunity." [349] However, he continued, "Something like a Shenandoah is obviously a tremendous resource potential. But the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue,

---

[348] Bank of America Merrill Lynch, "Anadarko Petroleum Corp. Tales from the road: the case for regaining the valuation premium: raising PO to $95," June 21, 2016, pp. 6, 11 (APC-01329468).

[349] Anadarko Petroleum Corporation, J.P. Morgan Energy Equity Investor Conference Transcript, June 28, 2016, p. 9.

because we have Coronado and Yucatan at the same mini basin that are tremendous kind of in situ tieback opportunities for the future." He further stated that while at "recent oil prices . . . you are starting to look economic to something that's in that PV-10 breakeven standpoint, but obviously you wouldn't pursue economics in the Gulf of Mexico for a 10% rate of return. We have to focus on risk adjusted rates of return, and accordingly, we're going to have to see something at a higher commodity price."[350]

284. Investors understood that development of Shenandoah would be challenged in the then-current environment. Companies are expected to only take on value-adding projects, meaning that the investment is expected to have positive net present value. It is also common for companies to have a target rate of return, *i.e.*, a hurdle rate, and would consider proceeding with an investment only when the expected rate of the return from the investment is higher than the hurdle rate. Given the significant risks of deep-water exploration, companies typically look for high expected returns, well beyond the breakeven point. In my experience, they might require returns of 20-to-25 percent or more. The Oil & Gas journal reports hurdle rates for deepwater oil of 18 percent,[351] and Wood Mackenzie indicates internal rates of return of 15 percent.[352]

285. Investors understood that multiple factors affect the expected rate of return and, accordingly, the development plan. These factors include (i) estimated recoverable volumes of hydrocarbons, (ii) projected commodity prices over timeframes as long as 20 years, (iii) the time frames for both incurring capital expenditures and production factors that affect present value, (iv) costs of production facilities (the FEED study attempts to reduce

---

[350] *Id.*

[351] Conglin Xu, "Change in risk preferences," Oil & Gas Journal, February 4, 2019, https://www.ogj.com/pipelines-transportation/lng/article/17222710/change-in-risk-preferences.

[352] Wood Mackenzie, "The Rising Hurdles for Investment in Upstream," April 30, 2021.

these costs), and (v) alternatives for APC capital. Investors thus understood that even if Shenandoah offers potential economic promise, another project could be prioritized ahead of Shenandoah in Anadarko's capital-expenditure hierarchy.

286.  After Anadarko announced the results of Shen-5 in late July 2016, it continued to make clear that they needed additional information from Shen-6—including that Shen-6 needed to encounter the oil-water contact—before making any decisions.

287.  On the July 27, 2016 earnings call, Gwin discussed the results of Shen-5, but stated that the company was still in "the appraisal mode" and needed "to get the rest of the information in front of [them]":

> "With your question of what else it's going to take, we really have to see what the #6 tells us. If the #6 comes in as we project with the oil-water contacts, we'll probably need to then do a sidetrack out of that, try to go up dip, get in a full oil column in that. And -- so the ultimate planning has to be after #6. We've got a lot of work that's going on right now though related to how we might develop this field. But again, we're still in the appraisal mode, and so we need to get the rest of the information in front of us."[353]

288.  During that call, Evan Calio, a Morgan Stanley research analyst, asked about Anadarko's investment in Shenandoah immediately after discussing with Walker how high oil prices could impact development in another region.[354] Walker and Hollek made clear that Anadarko was still appraising Shenandoah and that it was concerned about development costs, but that it was hopeful that advances in technology could improve the prospects. The exchange went as follows:

> Calio: "Moving offshore, which also [dove]tails, I think, with your oil price outlook. You reported positive appraisal results in Shenandoah-5 with 6

---

[353] Anadarko Petroleum Corporation, Q2 2016 Earnings Call Transcript, July 27, 2016, pp. 6-7.

[354] *Id.* p. 6.

upcoming. I mean, post 6, what else do you need here to reach FID, either from appraisal or technical information gathered or from an oil price environment to again to get FID?"

Gwin: "Yes, Evan, we were real pleased with what we saw in the #5 well. Not surprised, but we were very pleased to see it come in as we had predicted it would; 1,040-plus feet of pay. We're about 0.5 mile east of the #2 well, and then we're going to move farther east and down dip with the #6. With your question of what else it's going to take, we really have to see what the #6 tells us. If the #6 comes in as we project with the oil-water contacts, we'll probably need to then do a sidetrack out of that, try to go up dip, get in a full oil column in that. And -- so the ultimate planning has to be after #6. We've got a lot of work that's going on right now though related to how we might develop this field. But again, we're still in the appraisal mode, and so we need to get the rest of the information in front of us…."

Calio: "Yes. I was just going to say -- I was just trying to understand. It sounds like it's a longer-term project as it fits in your portfolio as you -- lots of invested capital and now a 33% interest. Is that kind of the right way to think about when this -- when you're developing here? I know it's obviously past dependent on appraisal information?"

Hollek: "Well, I think all things Bob just gave you are going to be kind of ingredients. That's going to be important to understand. I'd point to Mad Dog, which I believe BP has publicly discussed the fact they're going to take a decision on this year, and they've indicated that sanctioning is likely. And I think there's just a couple of takeaways from that, not necessarily that they're related to Shenandoah. One is they reduced the production solution cost from $20 billion to $8 billion, so that helps with the economics. And two, they think they've got an estimated ultimate recovery that's pretty significant. And so the EUR combined with a lower cost probably gives you a threshold for price that would not have been anticipated a few years ago for sanctioning. So we're hopeful that some of those ingredients will work into our favor as that decision comes to us over the next couple of years."[355]

289. Market participants understood after the results of Shen-5 were released that the true size of Shenandoah was unknown at the time and further appraisal was needed before

---

[355] Anadarko Petroleum Corporation, Anadarko Q2 2016 Earnings Call Transcript, July 27, 2016, pp. 6-7.

Anadarko would make an investment decision. They also were aware that any investment would depend on the costs of development and commodity prices.

a.   Citi: "Results from the Shenandoah-5 appraisal well . . . that spud during Q1'16 are likely to be disclosed and could help to confirm and extend the reservoir's boundaries. Mgmt. believes that a sixth Shenandoah well on the reservoir's eastern edge is needed before it can reach a FID."[356]

b.   JP Morgan: "The Shenandoah-5 appraisal well encountered 1,040 net feet of pay, which was similar to the Shenandoah-2 well. The company also raised its interest in the project to 33% by participating in a preferential-rights process. APC should spud Shenandoah-6 later in '16, with hopes of moving the project into the development queue."[357]

c.   Cowen: "In regards to APC's Gulf of Mexico acreage, Shenandoah continues to be the catalyst for growth going forward. The company increased its working interest in the play to 33% and grew its portfolio through a preferential-rights process that is expected to add significant upside. Anadarko continues to appraise the resource potential of this acreage and should spud its 6th well test by year-end."[358]

---

[356] Citi, "E&P Second Quarter 2016 Earnings Preview," July 15, 2016, p. 31 (CITI005249).

[357] JP Morgan, "Anadarko Petroleum U.S. Onshore Strength Outweighs Known Production Hiccup at Jubilee; Stock Reaction - Positive – ALERT," July 26, 2016, p. 2 (JPMS 000361).

[358] Cowen and Company, "Anadarko Petroleum Corporation 2Q16 Earnings Review: Prepared for $60/bbl," July 27, 2016, p. 3 (ANADARKO_00000113).

d.  Societe Generale: "In the GOM, APC purchased MRO's working interest in Shenandoah (so now 33%), and announced 1,040' of net oil play in the #5 appraisal well. A sixth Shenandoah well should spud by year end to seek the oil water contact."[359]

e.  Raymond James: "In addition to current production opportunities, Anadarko continues to impress in the exploration department, as the company encountered more than 1,040 net feet of oil pay at the Shenandoah-5 appraisal well. While the company has not yet released a resource estimate, we would anticipate such an estimate following the upcoming sixth appraisal well."[360]

f.  Goldman Sachs: "Shenandoah appraisal favorable. While Shenandoah startup remains years away, a 1K'+ oil column and lack of establishing oil-water contact seen in the fifth appraisal well (testing eastern portion) are positive."[361]

g.  Wolfe Research: "Shenandoah getting to development? - Massive Gulf of Mexico discovery Shenandoah-5, which was meant to test for oil-water contact at the eastern limit of the field, ended up encountering 1,040 net feet of pay, which drove the decision to spud the -6 appraisal well vs testing eastern extent and quantifying full resource potential. We think a decision around plans will come shortly after -6 results are evaluated."[362]

---

[359] Societe Generale, "Anadarko Petroleum Corp Cost effective volume delivery. Adjusted 2Q16 loss less than forecast. FY16 volume target +0.7%," July 27, 2016, p. 1 (APC-01329989).

[360] Raymond James, "Anadarko Beats on Strong Pricing; Gulf of Mexico Impresses," July 27, 2016, p. 1 (APC-01329989).

[361] Goldman Sachs, "Anadarko Petroleum Corp. (APC) Execution, asset sales should help allay Street concerns; Buy," July 27, 2016, p. 1 (GS-002562).

[362] Wolfe Research, "ANADARKO PETROLEUM If you'll be my bodyguard ...," July 27, 2016, p. 1 (WOLFE_0002945).

h.  Macquarie Research: "Strong Shenandoah Result but Hurdles Remain: The result from the Shenandoah-5 well likely increases the resource potential of the discovery. This could benefit the ultimate economics of the project. However, challenges still remain in lowering the cost of the project, especially given the high pressure for completions. The project will need to compete for capital in a constrained crude oil price environment, which means some innovation will need to take place without compromising safety."[363]

i.  Morgan Stanley: "Shenandoah-5 appraisal intersected 1,040ft of net pay, comparable to the Shenandoah-2's *'more than 1,000ft'* with in-line fluid and reservoir properties. This was welcome good news after recent disappointments. Shenandoah-6 will be spud prior to year end, and will step out even further to the east, looking for oil-water contact. On the call listen for conditions needed for sanction, including threshold crude price level. We expect Shenandoah to be viable in a ~$60/bl world."[364]

j.  UBS: "The 4th appraisal well, Shenandoah-5, encountered > 1,040 net feet of pay (even thicker than the 1,001 feet in the #2 well), extending the resource in the central-to-eastern limits of the field. The partners plan to run a production liner and secure the well for future production operations. This should address recent investor concerns that the field was compartmentalized and would need a very high oil price to be commercial. The Shenandoah-6 well will spud in 4Q16 and seek to establish oil-water contact which would give indication of a true resource size; this should enable it to determine resource

---

[363] Macquarie Research, "Anadarko Petroleum Evaluating a Running Start into '17," July 27, 2016, p. 1 (APC-01329982).

[364] Morgan Stanley, "Anadarko Petroleum Corp 2Q16: Strong Start," July 27, 2016, p. 2 (MS_ANADARKO_000105).

size and progress towards a final investment decision, with first production roughly three years later."[365]

k. Simmons & Company: "Next step is to see Shenandoah 6 well results (testing to find the oil water contact). Shenandoah 6 well spuds later this year. FID is not imminent. APC has much more appraisal work ahead and wants to drive project costs lower to enhance well economics."[366]

290. Similarly, Plaintiffs' investment managers understood that a sanctioning decision would not be made until after Shen-6 was drilled and would depend on the pricing environment.

a. For instance, in its Q2 2016 summary and earnings call notes, Janus Henderson noted: "The Shenandoah #5 well had positive results, extending the field to the east. . . . APC bought into a proportional interest of MRO's Shenandoah stake that was available for sale. APC now has a 33% stake in the project. The Shenandoah #5 well encountered 1,040ft of net pay, a positive data point. . . . For Shenandoah, well #5 delivered positive results. Need to see what well #6 delivers before they can make a sanctioning decision."[367]

b. In November 2016, Janus Henderson wrote that no sanction decision had been made as of November 2016 and that Shenandoah would not be taken to development at then-prevailing oil prices: "Shenandoah - once they understand it better, they can move

---

[365] UBS, "Anadarko Petroleum Corp. APC 2Q Beats, Raises Production Guidance, and Boosts Divestiture Target," July 27, 2016, pp. 8-9, 12-13 (UBS_0001260).

[366] Simmons & Company, "Anadarko Petroleum Corp. (APC) Q2'16 Earnings Review: Improving Balance Sheet Through Divestitures," July 28, 2016, p. 1 (PIPER_SANDLER-0003791).

[367] Email from N. Barrett, Janus, to Janus Equity Research re: Anadarko Petroleum (APC): 2Q16 EPS of -$0.60 vs. Consensus of -$0.80, 2Q16 CFPS of $1.31 vs. Consensus of $1.17, July 27, 2016, pp. 1-2 (JanHen_00012802).

forward. Won't take it to development at $45. Will be 1 to 1.5 years before they do anything, likely."[368]

c.  Fidelity, another one of Plaintiffs' investment managers, produced a July 2016 presentation from Wood Mackenzie entitled Pre-FID oil projects in this litigation. In the presentation, one slide noted that "[i]f prices remain around $50/bbl then most major projects are at risk of deferral or cancellation without further cost deflation."[369] That same slide included a graphic listing Shenandoah as having a start-up date around 2021, with a breakeven price hovering around $90 to $100/bbl.[370]

291.    Anadarko continued to discuss its efforts to continue to appraise the field and explore development solutions throughout late 2016. In its Third-Quarter Operations Report dated October 31, 2016, Anadarko made clear that the commerciality of Shenandoah was still being determined:

> "After completing operations on the Warrior exploration well, the rig is scheduled to drill the Shenandoah-6 appraisal well. This appraisal well is designed to establish the oil-water contact on the eastern flank of the field and further quantify the resource potential. Anadarko and its partners are continuing to work toward determining the commerciality of the Shenandoah field. The company has chosen a Semisubmersible concept to support the potential development as part of these efforts. The FEED engineering on the Semi will continue, while Anadarko continues appraisal drilling to further delineate the opportunity before making a future sanctioning decision."[371]

---

[368] Email from Noah Barrett of Janus to Janus Equity Research and Energy Notes, etc., November 21, 2016, (JanHen_00024541).

[369] Wood Mackenzie, "Pre-FID oil projects: Global breakeven analysis and cost curves," July 2016, p. 9, (FIAM-ANAD-004939).

[370] *Id.*

[371] Anadarko Petroleum Corporation, Q3 2016 Operations Report, October 31, 2016, p. 8.

292. The purpose of FEED engineering—which stands for "front-end engineering and design"—is to develop the most cost-efficient production facilities specific to a given field. Investors understood that Anadarko was making an effort to find development solutions for the field, but, as Anadarko continued to emphasize, still needed additional information from appraisal drilling to decide whether to sanction the project.

293. Investors understood that while Anadarko was making efforts to find a development solution, it faced other development challenges, such as the need for 20K technology, and still needed additional information on the resource size.

   a. JP Morgan: "The Shenandoah-6 appraisal well is designed to establish the oil-water contact on eastern flank of the field and help quantify the resource potential of the discovery. APC and its partners are evaluating a semisubmersible development concept at Shenandoah for future development."[372]

   b. UBS: "At the Shenandoah prospect (33% wi), APC plans to spud the Shenandoah-6 appraisal well which is expected to establish the oil-water contact on the eastern flank of the field and further quantify the full resource potential. The 4th appraisal well, Shenandoah-5, encountered > 1,040 net feet of pay (even thicker than the 1,001 feet in the #2 well), extending the resource in the central-to-eastern limits of the field. The partners plan to run a production liner and secure the well for future production operations. This should address recent investor concerns that the field was compartmentalized and would need a very high oil price to be commercial. The Shenandoah-6 well will spud by YE16 and seek to establish oil-water contact which would give indication of a true resource size; this should enable it to determine resource

---

[372] JP Morgan, "3Q16 Flash; Upside Results and Portfolio Management Success; Going Out in Style – ALERT," October 31, 2016, p. 2 (APC-01331310).

size and progress towards a final investment decision, with first production roughly three years later. However, the challenge at Shenandoah is learning how to operate in a high pressure environment (20,000 pounds per square inch) so no timing was given on project sanction. While APC continues to evaluate the commerciality of the Shenandoah fields, it has chosen a Semisubmersible concept to support the potential development with FEED engineering ongoing."[373]

c. Ladenburg Thalmann: "Shenandoah: Walker Ridge 51/52/53 (APC 33% WI): APC is preparing to spud the Shenandoah-6 appraisal well, which is designed to establish the oil-water contact on the eastern flank of the field and further quantify the field's resource potential in order to help determine its commerciality. APC's fifth Shenandoah appraisal well encountered 1,040+ net feet of oil pay and expanded the eastern extent of the field."[374]

294. **Conclusion B: Investors understood in late 2016 and early 2017, as Anadarko discussed potential development solutions for Shenandoah, that the prospect would not be developed in the existing economic environment.**

295. In late 2016 and early 2017, Anadarko continued to emphasize that development in Shenandoah would be difficult, both because of the challenging macroeconomic conditions and the cost of any potential Shenandoah development. Anadarko representatives continued to focus on the company's portfolio management, which could include selling assets and/or diverting resources to more productive assets.

---

[373] UBS, "Anadarko Petroleum Corp. APC Delivers 3Q CFPS/Production Beat and Raises 2016 Volume and Asset Sale Guidance," October 31, 2016, pp. 12-13, (UBS00061686) (emphasis added).

[374] Ladenburg Thalmann, "Anadarko Petroleum Corporation Initiating Coverage with Buy Rating and $85 Price Target," December 19, 2016, p. 5 (LADENBURG0000023) (emphasis added).

296.  For instance, Anadarko emphasized that it would need to adjust to a "volatile" environment, as demonstrated by fluctuating oil prices at the time (see Figure 1, above).[375] On August 16, 2016, Brad Holly, Senior Vice President for Rocky Mountain Region, noted that, even though Anadarko was "excited about Shenandoah," the company was nonetheless "working on successfully navigating a very volatile environment" and would do that by "maintaining [its] financial discipline and investing within cash flows."[376] He emphasized that it would "reduce capital spend and cost structure as [it needed] to stay within that cash flow," maintain its "very active portfolio management," and "continue to be flexible and move money around the globe where we think it makes the most sense."[377] Holly stated that Anadarko would "focus [its] Gulf of Mexico play around [its] current facilities for subsea tiebacks" as part of its efforts to "well position[] [itself] during the downturn." [378] He concluded: "We're positioning the Company to come out of this downturn with abundant liquidity to safeguard against future volatility. We expect exceptional operating results and flexible deployment of our capital, and we'll continue to invest in our future with mid- and long- cycle projects to take advantage of the market conditions when they change."[379]

297.  Anadarko continued to express caution about Shenandoah's development throughout late 2016. During Anadarko's November 1, 2016, 3Q 2016 Earnings Call with investors and

---

[375] *See* Anadarko Petroleum Corporation, Q1 2016 10-Q, May 2, 2016, p. 48 ("The Company's most significant market risk relates to prices for oil, natural gas, and NGLS. Management expects energy prices to remain unpredictable and potentially volatile.").

[376] EnerCom, Inc., EnerCom Oil & Gas Conference Transcript, August 16, 2016, p. 5.

[377] *Id.*

[378] *Id.* pp. 5-6.

[379]*Id.* p. 6.

analysts, Hollek explained that Anadarko was "far from making an FID decision today" on Shenandoah, highlighting that they needed the results of Shen-6. Walker continued:

> "I think it'd be fair to say that as we contemplate sanctioning Shenandoah, we will be mindful of what we can do on the margin with the capital. And it will be an allocation like it would be for anything where we're looking at what the rate of return is as well as the cash-on-cash return.
>
> A lot of times our industry is very focused on rate of return and not cash-on cash because, as everybody knows on this call, it's great to have an internal rate of return that's 50%, but if you get the cash back in the year, and you're pretty much done, that's a hard treadmill to continue. So we want a cocktail or a mix that gives us really good rates of return with really good cash-on-cash characteristics.
>
> So there could be a role that Shenandoah or another option like that plays in our portfolio. So I don't want to leave people with the view that allocation of capital is purely an IRR-driven derivative. Consequently, we have a portfolio to run, and we will consider whether or not at the time of sanctioning, it makes sense to commercially develop Shenandoah along with our partners or not."[380]

298.   Similarly, during a November 17, 2016 Bank of America Merrill Lynch Global Energy Conference, Al Walker spoke about the difficult macroeconomic environment and suggested that Shenandoah would not be sanctioned unless oil prices were higher. He noted that deepwater projects like Shenandoah would not be sanctioned at below $70 a barrel, saying, "I do believe today it will take more than $70 most likely before we see greenfield projects and deepwater basins around the world."[381]

299.   He then explained that development in the Gulf of Mexico was facing significant challenges:

---

[380] Anadarko Petroleum Corporation, Q3 2016 Earnings Call Transcript, November 1, 2016, pp. 17-18.

[381] Anadarko Petroleum Corp, Bank of America Merrill Lynch Global Energy Conference Transcript, November 17, 2016, p. 3.

"Now, moving into the Gulf of Mexico, I think you've heard us talk a lot this year and even going into last about tiebacks. And it's not that tiebacks all of sudden became in vogue. We've always had them in our portfolio. When oil was $100, we were probably as a company exploring more than we're developing and we weren't necessarily looking at these tiebacks in the same way we might when it's hard today to take an exploration prospect with the rig that is out of market and promote and partner. As typical in our industry, when you put a prospect together, particularly if you have a high working interest, you want to put it together in a way where you can promote some of it out, we get carried on the front-end of the drilling. Well, in the Gulf of Mexico that has pretty much come to a halt. Anybody that's still active in the Gulf of Mexico is unlikely to take a non-op position in somebody else's prospect, because they've got plenty of reasons to want to keep that money in their own pocket, on their own operated prospects. So we started looking really aggressively at our tiebacks and you've seen us do a number of things."[382]

300.  Finally, Walker added that they were in an "uncertain period, meaning a period where it's unlikely we're going to see a lot of development of new infrastructure in the Gulf of Mexico."[383]

301.  Investors understood that deepwater projects like Shenandoah were unlikely to reach sanction in the then prevailing commodity price environment.

   a.  Fidelity, one of Plaintiffs' investment managers, noted the struggling state of the industry, particularly in the Gulf of Mexico:

   "Some interesting contrasts from meetings in Houston recently with companies involved in deepwater, throughout the value chain. There are pockets of significant (and surprising) health. But they remain few and far between, and very much confined to a few players. The overall backdrop remains challenged. No change to our outlook for oil supply from the trip, or the view that we need to be very selective with our investments with deepwater exposure. Gained

---

[382] *Id.* p. 6.

[383] *Id.* p. 7.

more conviction post the trip in APC. Continue to avoid offshore drillers, and OSV's. FTI looks less attractive post the trip as well.

...

This brings us to the negative element of Deepwater - new projects. There is very little appetite here, and what projects are under consideration have unique circumstances. These include Mad Dog 2 which is a hybrid green/brown-field BP has been working on for years, and has reworked and downsized. APC has made no decision on Shenandoah, but it is a large discovery, and one with an expiration date where if they don't proceed in roughly the next 18 months they will forfeit the asset. FTI is also close to being award their first integrated project award with Technip, but sizing is likely small and repeatability is questionable. Beyond projects already being worked on, there is essentially no appetite to undertake the exploration programs necessary to support future greenfields.

There are a wide variety of decisions and changes to make, which means the process will take quite some time. It is really hard to see a scenario where deepwater comes roaring back, until there is a price signal of $70+, likely spurred in part by significant declines in the existing deepwater production base that tightens the aggregate oil S/ D balance.

Furthermore, even if a project is ostensibly economic at today's strip, greenfield deepwater projects are still billions of dollars, and take years to execute. That adds to the risk profile of greenfield developments as well. There is of course the possibility of project delays and cost over-runs in the execution phase as well. All of that adds up to the hesitancy we observed around greenfields despite some optically attractive cost reductions. Those cost reductions however are clear benefits to the economics of tie-backs, in conjunction with their lower risk and shorter cycle time."[384]

b.  Similarly, Deutsche Bank noted, "Once the dominant driver of oil growth and capital budgets, the collapse in crude price and rise of US shale have led to the market

---

[384] Fidelity, "Deepwater => Down, but not out. (But also not growing)," October 10, 2016, p. 40 (FIAM-ANAD-000002).

pronouncing the deepwater as uncompetitive and largely dead (or at least on life support)."[385]

### 5.2.6. Allegations about Shen-6

#### 5.2.6.1.    *Plaintiffs' Allegations:*

302. Plaintiffs point to two allegedly misleading statements made after Shen-6 was spud. First, during a February 1, 2017 Q4 2016 Earnings Call, Ernie Leyendecker stated that they had found over 1,000 feet of pay in the Shen-5 well and were drilling Shen-6, which was "designed ultimately to be kept as a keeper, and potentially be a producible well ultimately one day when we see ourselves as a final solution for the field."[386] Second, Anadarko's 2016 Form 10-K, filed February 17, 2017, states that Anadarko was "continuing to work toward determining the commerciality of the Shenandoah field."[387]

#### 5.2.6.2.    *Summary of Conclusions:*

303. **Conclusion A: During early 2017, investors understood that any FID would depend on the results of Shen-6, the ability to lower costs, and the price of oil.**

304. **Conclusion B: Investors understood before Anadarko's alleged corrective disclosure that Shen-6 was wet.**

---

[385] Deutsche Bank, "Is the Deepwater Dead? F.I.T.T. for investors, Are There Signs of Hope on Deepwater's Horizon?", October 13, 2016, p. 1 (DEUTSCHE0009774).

[386] Amended Complaint ¶ 137.

[387] *Id.* ¶ 138.

### 5.2.6.3.    *Support for Conclusions:*

305. **Conclusion A: During early 2017, investors understood that any FID would depend on the results of Shen-6, the ability to lower costs, and the price of oil.**

306. After it encountered significant pay at Shen-5, Anadarko spud Shen-6. On January 31, 2017, Anadarko released its Operations Report for Q4 2016. It noted that Shen-6 was spud in December and was "designed to establish the oil-water contact on the eastern flank of the field and further quantify the resource potential." [388] It described the potential development plan, adding, "The FEED engineering on a semi-submersible development concept is ongoing as Anadarko continues appraisal drilling to delineate the opportunity."[389]

307. In early 2017, Anadarko discussed the additional appraisal work that they were doing with Shen-6. During a February 2017 Earnings Call, Leyendecker highlighted the structural complexities of the Shenandoah resource and their lack of knowledge regarding the extent of the resource on the East side of Shenandoah, saying, "As we drilled through the -- past the #2, 3 and 4 wells and learned about a little bit of the complexities, structural complexities, on the feature, we felt we needed some more comfort around the resource in place towards the east as well as trying to penetrate the physical oil-water contact." [390] Leyendecker further noted the reasons for drilling Shen-6: "So the number six well we're drilling today is designed really to test part of the eastern side of the field for reservoir continuity as well as cut some oil-water contacts, which we haven't physically done yet. So we're hopeful, of course, that the well will penetrate those. I can also share with you that

---

[388] Anadarko Petroleum Corporation, Q4 2016 Operations Report, January 31, 2017, p. 10.

[389] *Id.*

[390] Anadarko Petroleum Corporation, Q4 2016 Earnings Call Transcript, February 1, 2017, p. 15.

the well is designed ultimately to be kept as a keeper, and potentially be a producible well ultimately one day when we see ourselves as a final solution for the field."[391]

308.  A "keeper well" is one that the operator hopes to use for production. Yet, as observed, deepwater exploration is risky with many uncertainties and operators face an iterative process to get to sanction. An operator could reasonably consider a well to be a "keeper" at one point in time only to have later additional delineation drilling result in a downgrading of estimated recoverable reserves. Here, Leyendecker emphasized that Anadarko was "hopeful" that Shen-6 would penetrate the oil-water contact, which others at Anadarko had already clarified was required for any potential investment decision.[392] Investors would understand that a "keeper well" would not guarantee sanction, as any FID would still depend upon the commodity-price environment and expected economics of a given development.

309.  During the same call, Hollek similarly expressed that they were still "trying to understand our path to sanction" and were "still learning on Shenandoah itself." [393] He highlighted the difficulties in developing the region, noting that there were "multiple Wilcox reservoirs" in Shenandoah, "[s]o each and every one of them may have a separate oil-water contact, and they're likely not connected vertically." [394] He added that they were "treating them

---

[391] *Id.*

[392] *Id.*; *see also* UBS, UBS Global Oil and Gas Conference Transcript, May 24, 2016, pp. 11-12 ("Without that contact, that's really hard for us to be able to say exactly with the ranges and the fact that we're in that basin, it's going to be really important for us to be able to do that."); Anadarko Petroleum Corporation, Q2 2016 Earnings Call Transcript, July 27, 2016, pp. 6-7.

[393] Anadarko Petroleum Corporation, Q4 2016 Earnings Call Transcript, February 1, 2017, p. 15.

[394] *Id.* pp. 15-16.

independently" and had to "really understand each and every one of the reservoir flow units there." [395]

310.    Commodity prices around this time, discussed in previous sections, continued to worry investors. For instance, in January 2017, Wood Mackenzie indicated that they "believe[d] the region is going to pause in the near future and wait for the cost structure and the long-term view on oil prices to stabilize before embarking on large, capex-heavy projects again."[396] Wood Mackenzie noted that Shenandoah had thus far "produced encouraging results," but "assume[d]" that it would "undergo additional appraisal drilling in 2017 prior to receiving FID" and cautioned that "negative results may result in a bleaker outlook" for Shenandoah and the "Inboard Lower Tertiary as a whole."[397]

311.    Market participants acknowledged the difficulties Anadarko was having at Shenandoah and the challenging commodity price environment:

> "Shenandoah (Gulf of Mexico) - We expect management to announce[] results from the Shenandoah-6 appraisal well over the next few months. We believe positive results will allow Anadarko to move ahead with the development of the discovery."[398]

> "Shenandoah: $50/bbl breakeven; further clarity on project economics and timing to drive greater credit. Based on our conversations with investors, they remain concerned on the potential value and timing of the Shenandoah discovery in Gulf of Mexico."[399]

---

[395] *Id.*

[396] Wood Mackenzie, "Deepwater GoM: 5 things to look for in 2017," January 17, 2017, p. 2 (APC-00294820).

[397] *Id.* pp. 1–2.

[398] Goldman Sachs, "Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017, p. 4 (GS-002754).

[399] *Id.* p. 14.

"APC indicated that major Gulf of Mexico greenfield projects like Shenandoah (our target assumes $1/shr) is unlikely to get final approval in a $50-$55 per bbl environment."[400]

312.    Prudent management does not greenlight investments that are projected as "breakeven" or marginal. As such, investors understood that oil prices needed to be above $50 per barrel for Anadarko to consider sanctioning Shenandoah.

313.    In its February 17, 2017 10-K, Anadarko released additional information that cautioned the market that it might write off Shenandoah. In its February 2016 10-K, Anadarko had disclosed the risk that its "drilling activities may not be productive," as "[d]rilling for oil and natural gas involves numerous risks, including the risk that we will not encounter commercially productive oil or natural-gas reservoirs."[401] In its 2016 10-K, Anadarko added the following to that section:

"As of December 31, 2016, we had $1.7 billion in suspended well and associated non-producing leasehold costs related to 11 U.S. offshore and international exploration projects, which includes approximately $800 million related to our Shenandoah project in the Gulf of Mexico. Certain of these future exploration and appraisal drilling activities may not be successful and, if unsuccessful, could result in a material adverse effect on our future results of operations and financial condition. While all drilling, whether developmental or exploratory, involves these risks, exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons. Because of the percentage of our capital budget devoted to higher-risk exploratory projects, it is likely that we will continue to experience significant exploration and dry hole expenses."

---

[400] Goldman Sachs, "Anadarko Petroleum Corp. (APC): Mgmt meeting highlights focus on E&P/midstream growth; Buy," March 24, 2017, p. 1 (FIAM-ANAD-009181).

[401] Anadarko Petroleum Corporation, 2015 10-K, February 17, 2016, p. 43.

314. Investors understood Anadarko's decision to highlight the risk of the Gulf of Mexico, coupled with the other cautionary language from the company, as an indication that Anadarko had less confidence in the path forward at Shenandoah.

315. In February 2017, some market participants similarly noted a decline in confidence, expecting a Suspension of Production or potential operational challenges that would delay sanctioning:

   a. Goldman Sachs: "1H 2017: APC plans to spud the Shenandoah #6 appraisal well in late 2016 which it expects to find the oil-water contact. Management believes Shenandoah #6 appraisal well will help determine the next stage of the project. With its 3Q 2016 operations update, APC stated it has chosen a semi-submersible concept to support the potential development as part of these efforts. The FEED on a potential semi-submersible will continue, while the company continues appraisal drilling to further delineate the opportunity before making a future sanctioning decision. The primary terms on certain leases covering the Shenandoah project expired in 2014 but are being held by continuous operations on the Shenandoah project, meaning that the operators cannot discontinue operations at Shenandoah for more than 180 days or such leases will terminate. We expect that APC will eventually file for approval of a Suspension of Production in order to preserve its acreage."[402]

   b. UBS: "At the Shenandoah prospect (33% w.i), APC spud the Shendandoah-6 appraisal well in December and seeks to establish oil-water contact on the eastern flank of the field which would give indication of a true resource size; this should enable it to determine resource size and progress towards a final investment decision, with first

---

[402] Goldman Sachs, "Anadarko Petroleum Corp. (APC) Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017, p. -15 (GS-002754).

production roughly three years later. However, the challenge at Shenandoah is learning how to operate in a high pressure environment (20,000 pounds per square inch) so no timing was given on project sanction. While APC continues to evaluate the commerciality of the Shenandoah fields, it has chosen a Semisubmersible concept to support the potential development with FEED engineering ongoing."[403]

316.  Some market participants also lowered their potential range estimates for Shenandoah.

a.  UBS: In February 2014, UBS projected 800 MMBOE,[404] in July 2015 it projected 720 MMBOE,[405] and in February 2017, it projected 400 MMBOE.[406]

317.   **Conclusion B: Investors understood before Anadarko's alleged corrective disclosure that Shen-6 was wet.**

318.  In February, investors were aware that Shen-6 reached total depth and the partners began drilling a sidetrack well. In its February 21, 2017 10-K, ConocoPhillips explained, "Appraisal drilling continued in 2016 with the fifth Shenandoah well reaching total depth in the third quarter. In February 2017, the sixth Shenandoah well, Shenandoah WR52-3, reached total depth. Drilling of a sidetrack well from Shenandoah WR52-3 also commenced in February."[407]

---

[403] UBS, "Anadarko Petroleum Corp. 4Q Cash Flow and Production Beat Expectations; Focus Shifts to Investor Call on March 8th," February 1, 2017, p. 11 (APC-01333349).

[404] UBS, "Anadarko Petroleum Corp. Preview of Anadarko Petroleum's Analyst Day," February 24, 2014, p. 7 (UBS_0000555).

[405] UBS, "Anadarko Petroleum Corp. Strong 2Q EPS/CFPS Beat; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015, p. 11 (UBS00015972).

[406] UBS, "Anadarko Petroleum Corp. 4Q Cash Flow and Production Beat Expectations; Focus Shifts to Investor Call on March 8th," February 1, 2017, p. 11 (APC-01333349).

[407] ConocoPhillips, 2016 10-K, February 21, 2017, p. 7.

319. During its March 14, 2017 Q4 2016 earnings call, Cobalt discussed Shen-6 encountering water, which "by definition makes [Shenandoah] a bit smaller."[408] Cobalt explained that they were sidetracking Shen-6 looking to identify water contacts. It stated that Shenandoah remained "a good size," as indicated by the large discovery at Shen-5, but that its size was not "as good" as other assets it had in its portfolio.[409]

320. Market participants understood that Shen-6 was a wet well as early as March 2017.

   a. Morgan Stanley: "Shenandoah-6 appraisal ... 'encountered wet Wilcox sands' and is being sidetracked to locate oil water contact. Pre-FEED work is ongoing."[410]

   b. TPH: "Assets in GoM: expected timeline of when you'd expect to FID the 3 projects; Shenandoah, what's the significance with the wet appraisal? . . . Shenandoah slightly smaller than others. Previous appraisals suggested the field was big enough to develop. Now testing the flanks, so to find water there is not a surprise. Now drilling another sidetrack to find the oil-water contact. Still buyers out there. Still have appraisal to do on the western side of the field."[411]

321. Before market open on May 2, 2017, ConocoPhillips disclosed in a press release that "[f]irst-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico."[412] Therefore, investors were

---

[408] Cobalt International Energy Inc., Q4 2016 Earnings Call Transcript, March 14, 2017, p. 15.

[409] *Id.* p. 10.

[410] Morgan Stanley, "Cobalt International Energy Inc: Discovering GOM Asset Value in 2017," March 14, 2017, p. 338, (STEINHOLT_0009493).

[411] Tudor Pickering Holt Energy, "TPH Research: Cobalt Energy Q4'16 earnings call notes," March 14, 2017, p. 4 (FIAM-ANAD-007649).

[412] ConocoPhillips, "ConocoPhillips Reports First-Quarter 2017 Results; On Track to Deliver 2017 Operating Plan and Accelerate Value Proposition," BusinessWire, 07:00 EST, May 2, 2017, p. 23 (AQD_0010466).

aware that one of the Shenandoah Partners wrote off the Shen-6 dry hole costs before Anadarko disclosed the write-off after market close on May 2, 2017. [413] Given Anadarko's repeated emphasis on needing to find the oil-water contact with Shen-6, investors understood that Shen-6 being a dry hole meant that Anadarko was unlikely to sanction Shenandoah.

### 5.2.7.  Reaction to Alleged Corrective Disclosure

#### *5.2.7.1.       Plaintiffs' Allegations:*

322.  Plaintiffs allege that "[t]hroughout the Class Period, Defendants concealed the impairment of Shenandoah even after internal assessments called into serious doubt its economic and/or operational viability" and that, "[o]n May 2, 2017, Defendants filed the 1Q 2017 10-Q, disclosing that Anadarko had 'suspended further appraisal activities' on the Shenandoah project and had taken a $467 million impairment for the purchase price of the leases and a $435 million charge for previously capitalized Shenandoah exploratory drilling costs."[414] Plaintiffs contend that "Anadarko's decision to abandon Shenandoah after years of touting it as 'one of the biggest finds ever' validated the analysis that Frye and others provided years earlier."[415]

---

[413] Anadarko Petroleum Corporation, Q1 2017 10-Q, May 2, 2017, p. 13.

[414] Amended Complaint ¶¶ 82-83.

[415] *Id.* ¶ 84.

### 5.2.7.2.        *Summary of Conclusions:*

323. **Conclusion A: Market participants' reactions to Anadarko's decision to suspend Shenandoah reflect that investors understood before the write-off that Anadarko was unlikely to sanction Shen-6.**

### 5.2.7.3.        *Support for Conclusions:*

324. **Conclusion A: Market participants' reactions to Anadarko's decision to suspend Shenandoah reflect that investors understood before the write-off that Anadarko was unlikely to sanction Shen-6.**

325. Anadarko reported in its Q1 2017 10-Q that the decision to take the impairment and write-off was to satisfy accounting requirements based on the results of Shen-6 and the then-current level of commodity price: "Given the results of this well and the present commodity-price environment, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs."[416]

326. During the Q1 2017 earnings call on May 3, 2017, Walker, explained that Anadarko would not move forward with a development like Shenandoah in an oil price environment of $50 to $60 a barrel, and that "the actions [Anadarko] took there were driven by the accounting

---

[416] Anadarko Petroleum Corporation, Q1 2017 10-Q, May 2, 2017, p. 13.

methodology"[417] and should be "divorced, if you will, from the way in which [Anadarko was] looking at it operationally."[418]

327.   On that call, Leyendecker explained the results of the Shen-6 well, saying, "We drilled the original well, which was designed to drill through the oil water contacts, and we did not see the oil water contacts in the well, so we backed up, and we sidetracked the well again towards the number 5 well where we had over 1,000 feet of pay looking for those oil water contacts again. And unfortunately, we did not get to completely prosecute the well to TD. We ran into some mechanical hold problems. We did see a partial section. So it was also inconclusive. And the challenges we've been having out there really are all related to try to image the structural fabric, and it's been one of our difficulties as we drill wells, we've found some surprises, some of them negative and some of them positive." [419] Leyendecker explained that in light of the difficulties they had faced, "[they] felt it was appropriate really to stop and evaluate what [the] path forward would be."[420] He continued: "I think as we look at it today, it's probably a little premature to talk about what the next steps are and that path forward as we're still thinking through what those options are today."[421] He repeated: "We're under under continuous operations under the terms and leases because they've expired. So it requires us to conduct another operation within that period. So we'll be looking . . . at what our options are between now and that period, which is later this year." [422]

---

[417] Anadarko Petroleum Corporation, Q1 2017 Earnings Call Transcript, May 3, 2017, p. 6.

[418]*Id.* p. 11.

[419] *Id.* p. 10.

[420] *Id*.

[421] *Id*.

[422] *Id.* p. 18.

328.   Market participants' comments reflected that the write-off was not surprising given information that was previously disclosed.

a.   JP Morgan: "As previously highlighted by its partners, the Shenandoah-6 appraisal well designed to test the oil-water contact on the eastern edge of the field was unsuccessful, and APC has decided to suspend appraisal activity at the field."[423]

b.   Evercore: "Transitions in E&P are challenging, and in many ways 1H17 was likely to prove the apex of the transition for APC. Integrating disparate assets in the Gulf of Mexico (a challenging operating environment, particularly when energy investors crave predictability), completing major asset divestitures which muddle a clear view of the go forward asset base, and transitioning to growth from the core of the US onshore (Delaware) where big growth off a small base will be needed to drive corporate level results were the hurdles. Add to this headlines and fears surrounding a tragic residential explosion two weeks ago in CO that saw APC preemptively shut-in legacy production in the region, a bumpy 2Q oil guide driven by outages and tie-ins in the GoM, and a massive (not completely unexpected) write down at Shenandoah all suggest 1Q was likely a perfect storm of negatives for the stock…Today's update included several notable datapoints in the GoM, including the integration of FCX, strong performance from Caesar/Tonga, and success at Calpurnia. While we (and the street) had viewed as heavily risked, APC announced the Shenandoah-6 appraisal well did not encounter the oil-water contact and recorded a one-time GoM-related impairment of over \$500mm (\$467mm Shenandoah)."[424]

---

[423] JP Morgan, "1Q17 Flash: Unfortunately, It's Deja Vu All Over Again; Stock Reaction Mixed – ALERT," May 2, 2017, p. 2 (JPMS 000018).

[424] Evercore, "In the Teeth of the Transition, 1Q Outlook Poses Challenges to the Thesis," May 3, 2017, pp. 1–2, (FIAM-ANAD-009246).

   c.  Goldman Sachs: "Tie-back opportunity from existing infrastructure in Gulf of Mexico remains robust; greenfield Shenandoah development unlikely. APC continues to see robust performance from wells that can be tied-back to existing infrastructure in GOM. APC continues to enhance GOM tie-back opportunity: (1) Calpurnia exploration well encountered 60 net feet of oil pay; and (2) APC successfully bid on 16 blocks near existing platforms. Following unfavorable result from the Shenandoah well, APC is unlikely to pursue development of the project at current oil prices (**consistent with previous commentary**)."[425]

   d.  Cowen: "Shenandoah-6 appraisal well and subsequent sidetrack did not encounter oil-water contact on eastern portion of the field. APC has currently suspended appraisal activity and wrote down the entire Shenandoah prospect which notably impacted 2Q17 EPS. We did not give APC any value for Shenandoah in our model. Focus in GOM now turns to tiebacks in our view."[426]

329.  This includes one of Plaintiffs' investment managers, Fidelity, which noted that the write-off was not surprising, as the project was "already going to be tough to get over the finish line":

> "Shenandoah in the GOM was written off, as the most recent appraisal well didn't find oil, in part due to operational issues with drilling the well. This project was already going to be tough to get over the finish line, and with a smaller reservoir they've stepped away from it. Still own the blocks, but

---

[425] Goldman Sachs, "Anadarko Petroleum Corp. (APC) On track to meet 2017 outlook; lower asset sale proceeds negative," May 3, 2017, p. 1 (GS-002675) (emphasis added).

[426] Cowen and Company, "Anadarko Petroleum Corporation Q1 17 Earnings at a Glance," May 2, 2017, p. 1, (ANADARKO_00000176).

unlikely it will proceed at this point. Disappointing, but not too surprising - I was not assuming anything in my production forecast."[427]

Dated:  November 9, 2022

_____

Peter Keller

---

[427] Fidelity, "Operations good w/ strong outlook, val'n compelling but in sentiment purgatory," May 8, 2017 (FIAM-ANAD-000002).

# Appendix A

**Curriculum Vitae**



## PETER W. KELLER
BERKELEY RESEARCH GROUP, LLC
810 Seventh Avenue, 41st Floor; New York, NY 10019

Direct: 646.651.4735
Mobile: 914.523.8680
pkeller@thinkbrg.com

### SUMMARY

Experienced energy professional involved in oil & gas finance since 1978 and utility/power finance since 2003. Strong skills in transaction negotiation, origination and structuring in both the institutional and corporate banking sectors. Arranged/participated in transactions across the energy spectrum from E&P, midstream, refining & pipeline to nuclear, fossil & renewable generation, to electric transmission & distribution.  Strategic advisor to numerous investor owned utilities across the United States.  Headed the team responsible for a majority of BNY Mellon's investment grade debt capital markets business. Deep background in industry analysis, policy support, risk management, relationship management and marketing.

Active in various national organizations including the American Gas Association, the Edison Electric Institute, the Nuclear Energy Institute/Institute of Nuclear Power Operations Senior Executive Leadership Program, the Nuclear Decommissioning Trust Conference, the Nuclear Energy Institute and the Utility Pension Fund Study Group.  A speaker at industry conferences, workshops and hearings.  Drove significant growth over many years across BNY Mellon's largest portfolio outside of financial institutions; successful as a team leader and as the relationship lead on a number of franchise relationships.

### EXPERIENCE

**BERKELEY RESEARCH GROUP, LLC, New York, NY**                                 **2015 - present**
**Managing Director - Energy**
Joined BRG in 2015 as part of the firm's expansion of its energy practice.  Work includes strategic advisory on energy financing, transactional advisory, asset/portfolio optimization, project evaluation/implementation, risk assessment and mitigation, climate risk/energy transition assessments, regulatory support/testimony and expert witness/litigation support.

**THE BANK OF NEW YORK / BNY MELLON, New York, NY**                              **1998 - 2014**
**Managing Director, Energy Group Head    (2007-2014)**
Oversight of a $7.4 billion portfolio comprised of the Bank's franchise energy relationships across the U.S.  including oil & gas & midstream & oilfield serve and essentially all investor owned public utilities and the TVA. Significant portfolio revenues based on credit/capital markets/syndication income and a broadly diversified group of product cross-sells.  Management responsibility for a team of senior relationship officers and analytical, marketing and support staff.  Responsibilities included strategic planning, general management, credit oversight/approval, marketing initiatives, divisional budgeting and risk analyses. Responsible for BNY Mellon's activities in the Nuclear Decommissioning Trust (NDT) sector and coordinated the Bank's sponsorship of the annual Nuclear Decommissioning Trust Conference.  BNY Mellon was the first bank to structure an NDT, has a dominant position as an NDT trustee and manages a significant portfolio of NDT assets.

**Managing Director, Energy Division Head    (2005-2007)**
Energy East and West Divisions consolidated into a single division under my management.  Consolidated group included over 130 relationships in the public utility, oil & gas, oilfield service, refining & marketing, petrochemical and mining sectors.  Managed a team of ten relationship officers and support staff.  Responsibilities included strategic planning, general management, credit oversight/approval, marketing initiatives, divisional budgeting and risk analyses.

**Managing Director, Energy East Division Head    (2004-2005)**
Promoted from Vice President to Managing Director, responsibilities as noted below.

**Vice President, Energy East Division Head    (2003-2004)**
Promoted to assume management of the Bank's Energy East Division, which included over 65 relationships in the public utility, oil & gas, refining & marketing and mining sectors generating revenues in excess of $40 million annually.  Managed a team of four relationship officers and support staff.

**Vice President, Oil & Gas Division    (1998-2003)**
Hired to expand the bank's relationships in the exploration and production sector; also active in the oilfield service and pipeline/diversified sectors.  Focus on reserve-based lending and longer-term non-recourse asset financing.

**RPI INSTITUTIONAL SERVICES, INC., New York, NY                                1981 - 1998**
**Principal**
RPI provided investment management and advisory services to corporate pension funds and university endowments.  As a principal I managed discretionary and non-discretionary accounts handling all phases of locating, evaluating, negotiating, and structuring direct oilfield investments.  Originated complex financing for numerous acquisitions, primarily in the offshore Gulf of Mexico, from international major oil companies.

In addition, was a principal in RPI's predecessor firm, Resource Programs, Inc., that advised a broad range of investment bank, commercial bank, brokerage, insurance company and corporate clients on oil and gas direct investments.  In that role, managed the field review activities of petroleum engineers, geologists and accountants and provided detailed reports on the technical and administrative capabilities of companies reviewed for our clients.

**MIDLANTIC NATIONAL BANK, Newark, NJ                                1975-1981**
**Corporate Banking Officer**
Corporate lender in the National Division of the Corporate Bank, responsible for all clients and prospects in the Midwest U.S. (Minneapolis east through Ohio). Participated in formulating and implementing the bank's Energy Lending Program which involved developing and expanding a portfolio of reserve-based credit facilities with clients in Texas, Colorado and Oklahoma.  Traveled extensively and generated significant expansion in relationships.  Organized and conducted the bank's annual in-house credit training program in years 1977-1979 (a twelve to fifteen week classroom course in financial analysis and commercial lending).

**BRG | ENERGY & CLIMATE**

## LITIGATION/ARBITRATION CONSULTING

Georgia Firefighters' Pension Fund, et al v. Anadarko Petroleum, R.A Walker, Robert G. Gwin, Robert P. Daniels and Ernest A. Leyendecker.  Expert witness reports, rebuttal, depositions.
July 2021 -

SPM NAM, et al v. SM Energy.  Expert witness reports, rebuttals, deposition preparation for testimony.
October 2019 – November 2020

LCT Capital, LLC v. NGL Energy Partners LP and NGL Energy Holdings, LLC.  Expert witness reports, rebuttal reports, deposition & testimony.
May 2017 - June 2018, July 2021 -

Michael Christopher v. ArcLight Capital Holdings, LLC, et al. JAMS Arbitration. Deposition.
October 2016.

## EDUCATION

Williams College, Williamstown, Massachusetts
1975 - BA, History / Environmental Studies / Economics

New York University, New York, New York
Courses at the Graduate School of Business Administration

## AFFILIATIONS

President of the Board - Episcopal Charities of New York
Advisory Committee Member & Grants Policy Committee Chair- Episcopal Charities of New York

Task Force for Puerto Rico and the Caribbean Recovery
Episcopal Diocese of New York

Member
Priory of The Most Venerable Order of St. John

Joint Civilian Orientation Conference, JCOC 83

Marine Corps Executive Forum

Chair of the Search Committee
Former Member of the Vestry
Treasurer
Member of the Investment Committee
St. Matthew's Episcopal Church, Bedford, New York

Member of the Bedell Fund Commission
Foundation established to strengthen the Episcopal Church through funding of major capital projects and clergy support

Member,
Former President, Bedford Village Chowder & Marching
Not-for-profit community organization supporting community youth organizations and activities and providing college scholarships in Bedford, New York

Former Member of the Vestry
Clerk of the Vestry
The Church of St. Mary the Virgin, Chappaqua, New York

Trustee Emeritus
Former Treasurer
Hebron Academy, Hebron, Maine

Former Class Agent
Capital Campaign Special Gifts Committee Member
Williams College, Williamstown, Massachusetts

4



## Peter Keller Structured Financings BNY/BNY Mellon

| | | |
|---|---|---|
| **Burlington Resources** | **Lost Creek Gathering Company** | **2000** |
| | $66MM 10 year non-recourse financing, backed by a ship-or pay contract, of a 122 mile pipeline to connect the Madden Field in WY to the CIG mainline. | |
| **Coastal Corp.** | **Aruba Coker Trust** | **2000** |
| | $359MM 7.5 year securitized synthetic lease financing for the installation of a delayed coker at the Aruba refinery | |
| **Coastal Oil & Gas** | **Santa Rita Capital (Coastal Oil & Gas and The University of Texas)** | **1999** |
| | $350MM 6 year non-recourse volumetric production payment, supported by Texas reserves of Coastal Corporation. | |
| **El Paso Corp.** | **Mustang Investors, LLC** | **2002** |
| | $970MM 5 year off balance sheet, minority interest, tax driven financing in a bankruptcy remote SPV formed to monetize certain pipeline and financial assets of El Paso | |
| **Murphy Oil Corp.** | **MOCL/CMB SPV** | **2001** |
| | $575MM 5 year amortizing structured financing, involving a forward sales contract supporting Murphy's acquisition of Beau Canada Exploration, Ltd. | |
| **Ocean Energy, Inc.** | **Ocean Gantor Trust** | **2001** |
| | $137MM 5 year lese financing of a (at the time the largest ever) spar-based floating production platform at Nansen/East Breaks Block 602 in the deepwater Gulf of Mexico | |
| **TOSCO Corp.** | **Tosco Trust 2000-E** | **2000** |
| | $600MM 5 year special purpose grantor trust financing the acquisition of 391 Exxon/Mobil stations from Exxon (to satisfy DOJ issues connected to Exxon's acquisition of Mobil). | |
| **Transocean Sedco Forex** | **Discoverer Enterprise Hull Financing** | **1999** |
| | $290MM non-recourse hull financing for a fifth generation double hulled dynamically positioned, dual derrick deepwater drillship, backed by 10 year full-payout lease from BP Americas | |
| **Valero Energy Corp.** | **Valero Coker Trust** | **2002** |
| | $290MM 6 year synthetic lease financing the installation of a delayed coker at Valero's Texas City, TX | |

## Peter Keller Reserve Based Borrowing Base Financings BNY/BNY Mellon

| | | |
|---|---|---|
| **Cabot Oil & Gas** | end date reflects transition to balance sheet loan | 1998-2003 |
| **EEX Corp.** | acquired by Newfield Exploration in 2003 | 2000-2003 |
| **Forest Oil** | end date reflects transition to balance sheet loan, subs merged with Sabine | 2000-2004 |
| **Houston Exploration** | sub. of Brooklyn Union Gas, acquired by Forest Oil in 2007 | 1999-2002 |
| **Newfield Exploration** | end date reflects transition to balance sheet loan | 2000-2003 |
| **Westport Resources** | acquired by Kerr-McGee in 2004 | 2001-2004 |

## Peter Keller Institutional Acquisitions/Project Financings RPI Institutional Services

Institutional investors in RPI-originated transactions: Bard College, Frigidare Pension Trust, GE Investment Corp., GMAMCo, General Motors Hourly Employes Trust, General Motors Salaried Employes Trust, Owens-Illinois Pension Trust, The University of Texas System

| Seller | Assets/Fields | |
|---|---|---|
| **Amoco** | Port Hudson Field | 1993 |
| **ARCO** | Chandeleur Sound Block 25, 99 well offshore package | 1989 |
| | Chandeleur Sound Blocks 40 & 41 offshore package | 1994 |
| **Chevron** | Main Pass Block 35, originally 134 wells | 1993 |
| **Chevron** | Main Pass block extension | 1994 |
| **Chevron** | South Bosco, multiple onshore fields | 1993 |
| **Chevron** | Black Bay Complex, 8 fields, 90 wells | 1992 |
| **Various** | Anschutz Ranch East | 1994 |
| | Midway-Sunset | |
| | South Pass, multiple blocks | |
| | Spraberry Package | |
| **W&T Offshore** | West Delta 30 Field, Producing Property/Seismic Delineated Exploration | 1994 |

# Prior Testimony of Peter Keller

1.  SPM NAM, et al v. SM Energy. Expert witness reports, rebuttals, deposition preparation for testimony (October 2019 – November 2020)

2.  LCT Capital, LLC v. NGL Energy Partners LP and NGL Energy Holdings, LLC. Expert witness reports, rebuttal reports, deposition & testimony (May 2017 - June 2018, July 2021-ongoing)

3.  Michael Christopher v. ArcLight Capital Holdings, LLC, et al. JAMS Arbitration. Deposition (October 2016).

# Appendix B - Materials Relied Upon

## 1. Pleadings

1.     Amended Complaint

## 2. Expert Reports

2.     Expert Report of Bjorn I. Steinholt, CFA, dated October 1, 2021

## 3. Securities and Exchange Commission Filings

### 3.1.     Anadarko Petroleum Corporation

3.     Anadarko Petroleum Corporation, Q1 2013 10-Q, May 6, 2013
4.     Anadarko Petroleum Corporation, 2014 10-K, February 20, 2015
5.     Anadarko Petroleum Corporation, 2015 10-K, February 17, 2016
6.     Anadarko Petroleum Corporation, Q1 2016 10-Q, May 2, 2016
7.     Anadarko Petroleum Corporation, Q2 2016 10-Q, July 26, 2016
8.     Anadarko Petroleum Corporation, Q3 2016 10-Q, October 31, 2016
9.     Anadarko Petroleum Corporation, 2016 10-K, February 17, 2017
10.    Anadarko Petroleum Corporation, Q1 2017 10-Q, May 2, 2017

### 3.2.     Other Shenandoah Partners

11.    Cobalt International Energy Inc., 2014 10-K, February 23, 2015
12.    Cobalt International Energy Inc., 2015 10-K, February 22, 2016
13.    Cobalt International Energy Inc., 2016 10-K, March 14, 2017
14.    ConocoPhillips, 2014 10-K, February 24, 2015
15.    ConocoPhillips, 2016 10-K, February 21, 2017
16.    Marathon Oil Corporation, 8-K, February 18, 2015

# 4. Investor Conference Transcript/Presentation

## 4.1.    Anadarko Petroleum Corporation

17.   Anadarko Petroleum Corporation, Presentation, March 12, 2012
18.   Anadarko Petroleum Corporation, Investor Conference Transcript, March 13, 2012
19.   Anadarko Petroleum Corporation, Q1 2013 Earnings Call Transcript, May 7, 2013
20.   Anadarko Petroleum Corporation, Investor Conference Slides, March 4, 2014
21.   Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014
22.   Anadarko Petroleum Corporation, Q1 2014 Earnings Call Transcript, May 6, 2014
23.   Anadarko Petroleum Corporation, Q3 2014 Earnings Call Transcript, October 29, 2014
24.   Anadarko Petroleum Corporation, "Developing Industry Solution for 20,000 psi Subsea Developments," November 19, 2014, https://www.spegcs.org/media/files/files/b06de440/2014-11-19_20A_HPHT_Presentation_Jim_Raney.pdf
25.   Anadarko Petroleum Corporation, Q4 2014 Earnings Call Transcript, February 3, 2015
26.   Anadarko Petroleum Corporation, Capital Program and Guidance Call Slides, March 3, 2015
27.   Anadarko Petroleum Corporation, Capital Program and Guidance Call Transcript, March 3, 2015
28.   Anadarko Petroleum Corporation, Q1 2015 Earnings Call Transcript, May 5, 2015
29.   Anadarko Petroleum Company, UBS Global Oil & Gas Conference Transcript, May 20, 2015
30.   Anadarko Petroleum Corporation, Q3 2015 Earnings Call Transcript, October 28, 2015
31.   Anadarko Petroleum Corporation, Q4 2015 Earnings Call Transcript, February 2, 2016
32.   Anadarko Petroleum Corporation, Credit Suisse Energy Summit Transcript, February 24, 2016
33.   Anadarko Petroleum Corporation, Guidance Update Call, March 1, 2016
34.   Anadarko Petroleum Corporation, Q1 2016 Earnings Call Transcript, May 3, 2016
35.   UBS, UBS Global Oil and Gas Conference Transcript, May 24, 2016
36.   Anadarko Petroleum Corporation, UBS Global Oil & Gas Conference Presentation, May 24, 2016
37.   Anadarko Petroleum Corporation, J.P. Morgan Energy Equity Investor Conference Transcript, June 28, 2016
38.   Anadarko Petroleum Corporation, Q2 2016 Earnings Call Transcript, July 27, 2016
39.   EnerCom, Inc., EnerCom Oil & Gas Conference Transcript, August 16, 2016
40.   Anadarko Petroleum Corporation, Q3 2016 Earnings Call Transcript, November 1, 2016
41.   Anadarko Petroleum Corp, Bank of America Merrill Lynch Global Energy Conference Transcript, November 17, 2016
42.   Anadarko Petroleum Corporation, Q4 2016 Earnings Call Transcript, February 1, 2017

43.    Anadarko Petroleum Corporation, Q1 2017 Earnings Call Transcript, May 3, 2017
44.    Anadarko Petroleum Corporation, Q2 2017 Earnings Call Transcript, July 25, 2017

### 4.2.      Other Shenandoah Partners

45.    Cobalt International Energy Inc., Q4 2014 Earnings Call Transcript, February 23, 2015
46.    Cobalt International Energy Inc., Q4 2016 Earnings Call Transcript, March 14, 2017
47.    Cobalt International Energy Inc., Q1 2016 Earnings Call Transcript, May 3, 2016
48.    Cobalt International Energy Inc., Q2 2013 Earnings Call Transcript, July 30, 2013
49.    ConocoPhillips, Q4 2014 Earnings Call Transcript, January 29, 2015
50.    ConocoPhillips, Q1 2013 Earnings Call Transcript, April 25, 2013
51.    Marathon Oil Corporation, Q3 2015 Earnings Call Transcript, November 5, 2015

# 5. Operations Reports

52.    Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015
53.    Anadarko Petroleum Corporation, Q3 2015 Operations Report, October 27, 2015
54.    Anadarko Petroleum Corporation, Q2 2016 Operations Report, July 26, 2016
55.    Anadarko Petroleum Corporation, Q3 2016 Operations Report, October 31, 2016
56.    Anadarko Petroleum Corporation, Q4 2016 Operations Report, January 31, 2017

# 6. Analyst Reports

57.    Bank of America Merrill Lynch, "Anadarko Petroleum Corp. Tales from the road: the case for regaining the valuation premium: raising PO to $95," June 21, 2016 (APC-01329468)
58.    Barclays, "Anadarko Petroleum (APC) – Shenandoah appraisal well encounters 1000+ net pay; We speculate size of discovery could be 300-1700 mmboe gross, perhaps worth $5-25 per share," March 20, 2013
59.    Barclays, "APC Provides Detail on 50% Capex Cut and Flat Expected Oil Volumes; 2016 Asset Monetization Plan Increased to $2-3 Billion," March 1, 2016, (APC-01327279)
60.    BMO Capital Markets, "Markets Playing in the 2016 Sandbox Ahead of March," February 3, 2016, (APC-01327135)
61.    BMO, "Crude Thoughts - E&P Budgets Not Looking Good For OSX," February 10, 2016, (FIAM-ANAD-008673)
62.    BMO, "How does breaking news affect markets?," May 5, 2020, https://www.bmo.com/main/personal/investments/learning-centre/how-breaking-news-affects-

markets/#:~:text=When%20breaking%20news%20comes%20in,price%20movements%20following%20the%20news

63.   Capital One, "APC Analyst Day Recap," March 6, 2014

64.   Capital One, "APC Announces Major GOM Discovery," March 20, 2013

65.   Capital One, "APC Update," September 16, 2015, (APC-01323978)

66.   Capital One, "Morning Energy Summary," February 2, 2015 (APC-01319907)

67.   Citi, "E&P Second Quarter 2016 Earnings Preview," July 15, 2016, (CITI005249)

68.   Citi, "E&P Sector Update As Summer Wraps Up," September 11, 2015 (CITI004017)

69.   Cowen & Co, "Anadarko Petroleum Corporation Overhang Lifted; Tronox Settlement A Positive," April 4, 2014 (ANADARKO_00000043)

70.   Cowen and Company, "Anadarko Petroleum Corporation Initiating Coverage: Initiation: Maximizing NAV Through Portfolio Management," January 27, 2014 (ANADARKO_00000074)

71.   Cowen and Company, "Anadarko Petroleum Corporation 2Q16 Earnings Review: Prepared for $60/bbl," July 27, 2016 (ANADARKO_00000113)

72.   Cowen and Company, "Anadarko Petroleum Corporation Q1 17 Earnings at a Glance," May 2, 2017 (ANADARKO_00000176)

73.   Credit Suisse, "Anadarko Petroleum Corp. Shenandoah: A Doozy of a Discovery Indeed," March 20, 2013 (CS_0000588)

74.   Credit Suisse, "Anadarko Petroleum Corp: Equity dilution vs deal gains/shale acceleration," September 12, 2016 (CS_0000177)

75.   Credit Suisse, "Shenandoah: A Doozy of a Discovery Indeed," March 20, 2013 (CS_000058)

76.   Deutsche Bank Securities, "2015 Capex - A Moving Target", January 6, 2015 (DEUTSCHE0007429)

77.   Deutsche Bank Securities, "Anadarko Petroleum Corp. Being Resource-Full Above All Else?," March 8, 2017 (APC-01334146)

78.   Deutsche Bank Securities, "Climbing the Wall of Worry. Not Just Yet," January 6, 2014 (DEUTSCHE0005704)

79.   Deutsche Bank Securities, "Get Onboard with the Inboard: Rise of the Lower Tertiary 2.0," June 26, 2013 (DEUTSCHE0005118)

80.   Deutsche Bank Securities, "Get Onboard with the Inboard: Rise of the Lower Tertiary 2.0," June 26, 2013 (DEUTSCHE0005118)

81.   Deutsche Bank Securities, "Not Business as Usual," October 9, 2017 (DEUTSCHE0010209)

82.   Deutsche Bank, "Exploration Day Takeaways. NBL & APC Highlights," June 25, 2012 (DEUTSCHE0001176)

83.   Deutsche Bank, "Is the Deepwater Dead? F.I.T.T. for investors, Are There Signs of Hope on Deepwater's Horizon?", October 13, 2016 (DEUTSCHE0009774)

84.   Evercore, "In the Teeth of the Transition, 1Q Outlook Poses Challenges to the Thesis," May 3, 2017 (FIAM-ANAD-009246)

85. GMP, "Anadarko Petroleum Corp. Q1:15 update: And the word of 2015 is 'Ephemeralization,'" May 5, 2015 (FIAM-ANAD-008563)

86. Goldman Sachs, "Anadarko Petroleum Corp. (APC) Execution, asset sales should help allay Street concerns; Buy," July 27, 2016 (GS-002562)

87. Goldman Sachs, "Anadarko Petroleum Corp. (APC) On track to meet 2017 outlook; lower asset sale proceeds negative," May 3, 2017 (GS-002675)

88. Goldman Sachs, "Anadarko Petroleum Corp. (APC) Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017 (GS-002754)

89. Goldman Sachs, "Anadarko Petroleum Corp. (APC): Mgmt meeting highlights focus on E&P/midstream growth; Buy," March 24, 2017 (FIAM-ANAD-009181)

90. Goldman Sachs, "Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017 (GS-002754)

91. Guggenheim, "APC - BUY - 2014 Analyst Day Highlights Robust and Option-Rich Upstream Portfolio; Raising PT to $110," March 5, 2014

92. ITG Investment Research, "Appraisal Drilling, Possible Farm-out Dominate 2015 Agenda," February 23, 2015 (FIAM-ANAD-006965)

93. ITG Investment Research, Daily Top and Bottom Performers by Market Cap, March 6, 2015 (FIAM-ANAD-006125)

94. Jefferies, "Anadarko (APC) Ops Update Untarnished By Tronox So Far," March 5, 2014

95. Jefferies, "Anadarko Petroleum (APC) Thoughts from Investor Meetings; Capital Efficient Hub and Spoke Model," June 1, 2016 (JEFF00007322)

96. Jefferies, "Company Note: Marathon Oil: Balancing the Equation," February 20, 2015 (APC-01420615)

97. Jefferies, "Oil & Gas Exploration & Production Reduce Nat Gas Price Outlook, Rema in Constructive; Upgrade APC, NBL, EOG," July 6, 2015 (APC-01319911)

98. Jefferies, "Oil & Gas Exploration & Production Things Done Changed; Initiating on Oil & Gas E&Ps," February 5, 2015 (ANADARK0_00000888)

99. Johnson Rice & Company, "Sales Note: 4Q14 Results Mixed, Few Clues About 2015 Plans," February 2, 2015

100. JP Morgan, "1Q17 Flash: Unfortunately, It's Deja Vu All Over Again; Stock Reaction Mixed – ALERT," May 2, 2017 (JPMS 000018)

101. JP Morgan, "3Q16 Flash; Upside Results and Portfolio Management Success; Going Out in Style – ALERT," October 31, 2016 (APC-01331310)

102. JP Morgan, "Anadarko Petroleum More Positives Than Negatives, But a Few Chinks in the Armor," May 4, 2016 (APC-01328858)

103. JP Morgan, "Anadarko Petroleum More Success in the Deepwater GoM; Shenandoah-2 Encounters >1,000 Net Feet of Oil Pay and No Oil-Water Contact – ALERT," March 20, 2013 (APC-00572780)

104. JP Morgan, "Anadarko Petroleum U.S. Onshore Strength Outweighs Known Production Hiccup at Jubilee; Stock Reaction - Positive – ALERT," July 26, 2016 (JPMS 000361)

105. JP Morgan, "More Positives Than Negatives, But a Few Chinks in the Armor," May 4, 2016 (APC-01328858)

106. KLR Group, "KLR Morning Brief," February 3, 2015 (LAZARD-ANADARKO_0030830)

107. Ladenburg Thalmann, "Anadarko Petroleum Corporation Initiating Coverage with Buy Rating and $85 Price Target," December 19, 2016 (LADENBURG0000023)

108. Macquarie Research, "Anadarko Petroleum Evaluating a Running Start into '17," July 27, 2016 (APC-01329982).

109. Morgan Stanley, "4Q14 Misses but on Non-Cash," February 2, 2015

110. Morgan Stanley, "Anadarko Petroleum Corp 2Q16: Strong Start," July 27, 2016 (MS_ANADARKO_000105)

111. Morgan Stanley, "Anadarko Petroleum Corp, Still Running Faster than the Bear," October, 28, 2015 (MS_ANADARKO_000061)

112. Morgan Stanley, "Cobalt International Energy Inc: Discovering GOM Asset Value in 2017," March 14, 2017 (STEINHOLT_0009493)

113. Morgan Stanley, "Cobalt International Energy Inc: Headwinds Accumulate," May 3, 2016 (FIAM-ANAD-003626)

114. Morgan Stanley, "Notes From The Road: Top Pick Affirmation," October 11, 2016 (MS_ANADARKO_000135)

115. MUFG, "Anadarko Earnings: Discipline, Monetizations to Bridge 2016 Funding Gap; Estimates Revised," February 2, 2016 (MUSA00000034)

116. Raymond James, "Anadarko Beats on Strong Pricing; Gulf of Mexico Impresses," July 27, 2016 (APC-01329989)

117. RBC Capital Markets, "APC- 4Q14 EPS Miss, but strong operation CFPS beat," February 2, 2015 (RBCCM00003437)

118. Simmons & Company, "Anadarko Petroleum Corp. (APC) Q2'16 Earnings Review: Improving Balance Sheet Through Divestitures," July 28, 2016 (PIPER_SANDLER-0003791)

119. Simmons & Company, "Anadarko Petroleum Corp.: Q4 Earnings Review," February 4, 2015 (PIPER_SANDLER-0003287)

120. Societe Generale, "Anadarko Petroleum Corp Cost effective volume delivery. Adjusted 2Q16 loss less than forecast. FY16 volume target +0.7%," July 27, 2016 (APC-01329989)

121. Tudor Pickering Holt Energy, "Completion delays, Shenandoah-3 update, Natural gas production, Oil production, Oil refining weekly, Weekly rig," February 2, 2015 (APC-00349727)

122. Tudor Pickering Holt Energy, "Refiner thoughts; initial earnings takeaways," January 30, 2015 (APC-00159003)

123. Tudor Pickering Holt Energy, "TPH Research: Cobalt Energy Q4'16 earnings call notes," March 14, 2017 (FIAM-ANAD-007649)

124. UBS, "Anadarko Petroleum (Buy): Strong 2Q EPS/CFPS Beal; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015 (UBS00015972)

125. UBS, "Anadarko Petroleum Corp. 4Q Cash Flow and Production Beat Expectations; Focus Shifts to Investor Call on March 8th," February 1, 2017 (UBS_0001492)

126. UBS, "Anadarko Petroleum Corp. APC 2Q Beats, Raises Production Guidance, and Boosts Divestiture Target," July 27, 2016 (UBS_0001260)

127. UBS, "Anadarko Petroleum Corp. APC Delivers 3Q CFPS/Production Beat and Raises 2016 Volume and Asset Sale Guidance," October 31, 2016 (UBS00061686)

128. UBS, "Anadarko Petroleum Corp. Preview of Anadarko Petroleum's Analyst Day," February 24, 2014 (UBS_0000555)

129. UBS, "Anadarko Petroleum Corp. Strong 1.Q CFPS Beat; Raises 20:15 Volume Guidance but Trims Capex Budget," May 5, 2015 (UBS_0000791)

130. UBS, "Anadarko Petroleum Corp. Strong 2Q EPS/CFPS Beat; Raising Estimates on Higher 2015 Oil Production Guidance, July 29, 2015," (UBS00015972)

131. UBS, "Oil & Gas Exploration and Production Lowering Near and Medium Term Oil Price Forecasts; Risk/Reward Favors SMID-Caps", June 7, 2017 (UBS00070725)

132. UBS, "Strong 2Q EPS/CFPS Beat; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015 (UBS00015972)

133. UBS, "UBS Global Oil and Gas Conference- DAY 1 Research Highlights," May 24, 2016 (JanHen_00022609)

134. Wolfe Research, "ANADARKO PETROLEUM If you'll be my bodyguard ...," July 27, 2016 (WOLFE_0002945)

135. Wolfe Research, "Large-Cap E&P: Target Depth - Royals and Yoga ... Nope," May 31, 2016 (WOLFE_0003742)

136. Wood Mackenzie, "Deepwater GoM: 5 things to look for in 2017," January 17, 2017 (APC-00294820)

137. Wood Mackenzie, "Deepwater Gulf of Mexico Upstream: 2014 in review," February 2015 (APC-00161729)

138. Wood Mackenzie, "Pre-FID oil projects, Global breakeven analysis and cost curves," July 2015 (FIAM-ANAD-004939)

139. Wood Mackenzie, "Shenandoah (WR 52) Asset Report," February 2015 (APC-00053691)

140. Wood Mackenzie, "The Lower Tertiary play in deepwater GoM: what's at stake?", September 2015 (APC-00048674)

141. Wood Mackenzie, "The Rising Hurdles for Investment in Upstream," April 30, 2021

142. Wood Mackenzie, "What might the future hold for oil prices?," October 2015 (APC-00651990)

## 6.1.    Analyst Reports cited in Figure 8

143. Bank of America Merril Lynch, "Anadarko Petroleum Corp. Tales from the road: exploration is back," June 26, 2015 (BOFAS_APC-000527)

144. Evercore, "Oil & Gas Exploration & Production; Initiation of Coverage," June 1, 2015 (APC-01322467)

145. Goldman Sachs, "Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017 (GS-002754)

146. Imperial Capital, "Initiating Coverage with Anadarko," April 9, 2015 (IC-000001)

147. Imperial Capital, "Strong 2Q Results, but More Importantly, APC's Continuum of Choices to Explore for and Develop Large, Long-Term Oil Projects Shined Through, and Our Bigger Investment Thesis Remains Valid and on Track-Maintaining Our Outperform Rating; Lowering Price Target to $109 from $117," August 4, 2015 (IC-000022)

148. Morgan Stanley, "Anadarko Petroleum Corp NAm Shines, Positioned to Lead in Recovery," March 3, 2015 (MS_ANADARKO_000033)

149. RBC, "Anadarko Petroleum Corp. The Plan Has Come Together," March 16, 2017 (APC-01334517)

150. UBS, "Anadarko Petroleum (Buy): Strong 2Q EPS/CFPS Beal; Raising Estimates on Higher 2015 Oil Production Guidance," July 29, 2015 (JanHen_00035968)

151. UBS, "Anadarko Petroleum Corp. 3Q CFPS Beats on Lower Costs; Modestly Raises Divestiture Adjusted Production Guidance," October 28, 2015 (APC-01348555)

152. UBS, "Anadarko Petroleum Corp. APC 2Q Beats, Raises Production Guidance, and Boosts Divestiture Target," July 27, 2016 (APC-01330003)

153. UBS, "Anadarko Petroleum Corp. APC Delivers 3Q CFPS/Production Beat and Raises 2016 Volume and Asset Sale Guidance," October 31, 2016 (APC-01331333)

154. UBS, "Anadarko Petroleum Corp. Solid 4Q Beat and Surprisingly Low 2016 Capex Outlook Partly Address Investor Concerns," February 1, 2016 (APC-01326665)

155. UBS, "Anadarko Petroleum Corp. Strong 1Q CFPS Beat; Raises 2015 Volume Guidance but Trims Capex Budget," May 5, 2015 (APC-01322002)

156. UBS, "APC 4Q Call Highlights," February 1, 2017 (LA-APCSUB-011562)

157. Wolfe Research, "Anadarko Petroleum (APC - $39.26 - Outperform) Beware the ides, welcome the kalends," February 2, 2016 (WOLFE_0002261)

158. Wolfe Research, "Anadarko Petroleum (APC - $40.111 - Outperform) ," March 1, 2016 (WOLFE_0003469)

159. Wolfe Research, "Anadarko Petroleum (APC - $50.110 - Outperform) APC no evil, hear no evil, speak no evil," May 3, 2016 (WOLFE_0003715)

160. Wolfe Research, "Anadarko Petroleum (APC - $53.80 - Outperform) If you'll be my bodyguard …," July 27, 2016 (WOLFE_0002945)

161. Wolfe Research, "Anadarko Petroleum (APC - $57.59 - Outperform) Double down, swagger up," September 13, 2016 (JanHen_00025814)

162. Wolfe Research, "Anadarko Petroleum (APC - $59.95 - Outperform) When I'm weak, I draw strength from you," November 1, 2016 (WOLFE_0003784)

163. Wolfe Research, "Anadarko Petroleum (APC - $62.82 - Outperform) Mr. Misunderstood (I understand)," March 13, 2017 (WOLFE_0003515)

164. Wolfe Research, "Anadarko Petroleum (APC - $65.55 - Outperform) Anadarko before the dawn," October 28, 2015 (WOLFE_0004263)

165. Wolfe Research, "Anadarko Petroleum (APC - $68.36 - Outperform) You can't (AP)C me ... give me my money in stacks," February 1, 2017 (WOLFE_0002205)

166. Wolfe Research, "Anadarko Petroleum (APC - $69.73 - Outperform) Reset, redeploy, rerate ... assuming you deliver," January 1, 2017 (WOLFE_0002367)

167. Wolfe Research, "Anadarko Petroleum (APC - $69.73 - Outperform) Wolverine Top Pick - Reset, redeploy, rerate ...assuming you deliver," December 30, 2016 (WOLFE_0002475)

168. Wolfe Research, "Anadarko Petroleum (APC - $71.49 - Outperform) Resetting the bar," January 12, 2017 (WOLFE_0002375)

169. Wolfe Research, "Anadarko Petroleum (APC - $76.28 - Outperform) I met a Sheik from Main Street," July 29, 2015 (WOLFE_0002952)

170. Wolfe Research, "Anadarko Petroleum (APC - $82.78- Outperform) I've had a couple of requests to start singing, but I won't," March 4, 2015 (WOLFE_0003548)

171. Wolfe Research, "Anadarko Petroleum (APC - $89.32 - Outperform) We're not going to replace them, we're going to reload," May 5, 2015 (APC-01322038)

172. Wolfe Research, "Anadarko Petroleum (APC- $ 84.23 - Outperform) Not perfect, but everybody loves it ... Capex Call Preview," March 2, 2015 (WOLFE_0003521)

173. Wolfe Research, "Anadarko Petroleum (APC -$36.21-Outperform) ' ... without the need to issue equity'," February 24, 2016 (APC-01327252)

174. Wolfe Research, "US Large-Cap E&P 2016 Outlook The Three Thirds: The Bad, The Worse, and The Ugly," January 14, 2016 (WOLFE_0002380)

## 6.2.    Analyst Reports reviewed for Net Asset Value of Anadarko

175. BMO Capital Markets, "Anadarko Petroleum APC-NYSE Rating: Market Perform Total Return: 14%," April 3, 2017 (ANADARKO-BMOCMC-000143)

176. BMO Capital Markets, "Anadarko Petroleum Slow Start in 2017; Long-Term Outlook little Changed; Resource Potential Raised," March 8, 2017 (ANADARKO-BMOCMC-000128)

177. BMO Capital Markets, "Anadarko Petroleum The Three D's; Delaware, Delaware, Delaware," February 2, 2017 (ANADARKO-BMOCMC-000121)

178. BMO Capital Markets, "Eagle Ford Proceeds Below Expectations, but Increases Dry Powder," January 13, 2017 (APC-01332622)

179. BMO Capital Markets, "Refining Estimates Post Guidance Call; Reviewing Mozambique DCF Model," March 13, 2017 (ANADARKO-BMOCMC-000134)

180. Capital One, "APC 1Q Follow- Up," May 3, 2016 (APC-01328706)

181. Capital One, "APC 1Q Follow-Up," May 6, 2015 (ACP-01322027)

182. Capital One, "APC 1Q Quick Take," May 5, 2015 (ACP-01320977)

183. Capital One, "APC 2Q Follow-Up," July 30, 2015 (ACP-01323496)

184. Capital One, "APC 2Q Quick Take," July 29, 2015 (ACP-01323212)

185. Capital One, "APC 3Q Follow-Up," October 29, 2015 (ACP-01324880)

186. Capital One, "APC 3Q Post-Call Comments," October 28, 2015 (ACP-01324667)

187. Capital One, "APC Awards EPC Contracts for Mozambique," May 18, 2015 (ACP-01322083)

188. Capital One, "APC Investor Call Follow-Up," March 4, 2015 (APC-01320123)

189. Capital One, "APC Ops Update," December 16, 2016 (APC-01331808)

190. Capital One, "APC Ordered to Pay $160MM CWA Penalty," December 1, 2015 (ACP-01325303)

191. Capital One, "APC Update," March 26, 2015 (ACP-01320456)

192. Capital One, "APC Update," September 16, 2015 (ACP-01323978)

193. Capital One, "APC: Asset Sale and Company Update," July 7, 2015 (ACP-01322408)

194. Capital One, "APC: Could Mozambique Investor Fret Turn to Investor Delight?," June 29, 2016 (APC-01329298)

195. Capital One, "APC: Yeti 'Nother Deepwater GOM Discovery," April 10, 2015 (ACP-01320568)

196. Capital One, "Morning Energy Summary," June 4, 2015 (ACP-01322213)

197. Cowen & Co, "Initiation: Data Drives S-T Moves; Fundamentals Determine L-T Value," April 27, 2015 (ANADARKO0001)

198. Credit Suisse, "A Better Plan for $40's Oil," October 29, 2015 (CS-0000230)

199. Credit Suisse, "Anadarko Petroleum Corp. (APC) Laying the Ground Work for longer Term Growth," March 8, 2017 (CS-0000065)

200. Credit Suisse, "Anadarko Petroleum Corp. (APC) Less GoM and NatGas Than We Modeled, Resource Raised," March 7, 2017 (CS-0000076)

201. Credit Suisse, "Anadarko Petroleum Corp. 10 for 10: 10 Somewhat Interesting Observations from the 10-K," March 25, 2015 (CS-0000293)

202. Credit Suisse, "Anadarko Petroleum Corp. Capital Productivity (Tick), Now We Just Need Commodities to co-operate," July 30, 2015 (CS-0000237)

203. Credit Suisse, "Anadarko Petroleum Corp. Re-Evaluating the Portfolio, TP to $56/sh," November 12, 2015 (ACP-01325443)

204. Credit Suisse, "Increasing TP On GoM Acquisition, Delaware & DJ Basin Acceleration," September 13, 2016 (CS-0000166)

205. Credit Suisse, "Management Outperforming Our Macro Fears," November 2, 2016 (CS-0000148)

206. Deutsche Bank, "Anadarko Petroleum Being Resource-Full Above All Else?," March 8, 2017 (APC-01334146)

207. Deutsche Bank, "Anadarko Petroleum Corp. Being Resource-Full Above All Else? ," March 8, 2017 (DEUTSCHE0010010)

208. Deutsche Bank, "Anadarko Petroleum Corp. You Can't Always Get What You Want ... You Get What You Need," January 31, 2017 (DEUTSCHE0010040)

209. Deutsche Bank, "Diversified Drivers of Differentiated Growth: Upgrade to Buy," October 13, 2016 (APC-01331063)

210. Deutsche Bank, "Houston Takeaways," December 15, 2015 (APC-01325654)
211. Deutsche Bank, "Houston Takeaways," December 16, 2015 (DEUTSCHE0008038)
212. Deutsche Bank, "Near-term Visibility Improved; Lingering Concerns Remain," February 1, 2016 (ACP-01326392)
213. Deutsche Bank, "Previewing APC's 2017 Outlook," March 6, 2017 (APC-01333987)
214. Deutsche Bank, "Rolling in the Deep-Water GoM," September 13, 2016 (APC-01330571)
215. Deutsche Bank, "You Can't Always Get What You Want. .. You Get What You Need," February 1, 2017 (APC-01333190)
216. Evercore, "A Big Ship, Turning to Growth," October 31, 2016 (APC-01331287)
217. Evercore, "A Brighter 2017 Outlook Not Without Challenges," January 6, 2017 (APC-01332262)
218. Evercore, "Anadarko Petroleum Bull Market Darling - Finding its Way at $50/bbl," October 27, 2015 (ACP-01324620)
219. Evercore, "Anadarko Petroleum Evercore ISI E&P: Volatility Returns Dealflow Continues," September 19, 2016 (APC-01330936)
220. Evercore, "Anadarko Petroleum laying out a Differentiated 2016 Path," March 1, 2016 (APC-01327390)
221. Evercore, "Clearing the Air for 2016," February 1, 2016 (ACP-01326442)
222. Evercore, "Coming Through the Fog," February 1, 2017 (APC-01333209)
223. Evercore, "De-Leveraging at a Reasonable Price," September 12, 2016 (APC-01330491)
224. Evercore, "Evercore ISI E&P: Bullish Set Up - If Only the Commodity Would Cooperate," November 16, 2015 (ACP-01325265)
225. Evercore, "Executing to Plan," December 21, 2016 (APC-01331872)
226. Evercore, "Managing the Trough APC Reports In-line 2Q; Focus Shifts. to 2H16," July 26, 2016 (APC-01329771)
227. Evercore, "Sifting Through the Rubble M&A Post Mortem at APC - Exposes Some Vulnerabilities," November 12, 2015 (ACP-01325200)
228. Evercore, "Strong Story Setting a Lower 2017 Bar," March 8, 2017 (APC-01334166)
229. Evercore, "Working Through the Game Plan," January 27, 2016 (ACP-01326314)
230. Global Hunter Securities, "Anadarko Petroleum Corp. Getting better not bigger," March 4, 2015 (APC-01320165)
231. Global Hunter Securities, "APC Post Q1 Strategy: Price Target and Estimates Update," May 19, 2015 (ACP-01322094)
232. Global Hunter Securities, "APC Post Q2 Strategy: Price Target and Estimates Update," August 13, 2015 (ACP-01323518)
233. GMP, "Anadarko Petroleum 2015 analyst day: Walking the talk," March 4, 2015 (ACP-01320201)
234. GMP, "Anadarko Petroleum Q2:15 update: DUC Dynasty coming up," July 29, 2015 (ACP-01323237)

235. GMP, "Q1:15 update: And the word of 2015 is "Ephemeralization"," May 5, 2015 (ACP-01320994)

236. Goldman Sachs, "Houston trip: Focus on' 17 strategy, self-help; Buy EOG/CRZO/APC," September 30, 2016 (APC-01330888)

237. Goldman Sachs, "Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017 (GS-002754)

238. Guggenheim, "1Q EPS Previews: APC, AR, CHK, CLR, RRC, RSPP," April 8, 2015 (ACP-01320585)

239. Guggenheim, "A Different Kind of Holiday Sale - Updating APC, CHK, ECR," December 22, 2016 (APC-01331990)

240. Guggenheim, "APC - BUY - Looking Like the Best House on the Block," March 4, 2015 (APC-01320171)

241. Guggenheim, "APC - BUY - Opportunities to Accelerate Growth WIth Manageable Leverage," January 13, 2017 (APC-01332604)

242. Guggenheim, "APC - Clean, Lean Growth Machine," January 31, 2017 (APC-01333065)

243. Guggenheim, "APC - NEUTRAL - De-Levering Takes Priority," March 1, 2016 (APC-01327410)

244. Guggenheim, "APC - Neutral - Lower Outspend Expected in 4Q; Waiting on More Concrete 2016 Plan," December 17, 2015 (ACP-01325742)

245. Guggenheim, "APC - NEUTRAL - Quick Take: APC Approached APA, According to Press Reports," November 10, 2015 (ACP-01325172)

246. Guggenheim, "APC - NEUTRAL - Updating NAV Estimate with 10K Data Ahead of March 1 Guidance," February 23, 2016 (APC-01327228)

247. Guggenheim, "APC- Expected 2017E Outspend Declines, but More Needed; Lowering PT," July 24, 2016 (APC-01329593)

248. Guggenheim, "APC- NEUTRAL- Oil Growth Could Improve Sentiment," October 31, 2016 (APC-01331300)

249. Guggenheim, "APC- NEUTRAL-Wary of Offshore-for-Onshore Deals Except This One; Raising NAV toS64," September 13, 2016 (APC-01330590)

250. Guggenheim, "Here Comes the Rain Again: 2Q Catalysts and EPS Previews," July 14, 2015 (ACP-01323266)

251. Guggenheim, "Identifying "Rate-of-Change" Candidates in the Second Half," August 17, 2016 (APC-01330601)

252. Guggenheim, "Model Updates: Refreshing Estimates to Reflect Updated Natural Gas Deck," March 14, 2016 (APC-01328288)

253. Guggenheim, "Ranking Resource Upside - Delaware Has the 'Torque'," August 10, 2016 (APC-01330184)

254. Guggenheim, "Revising EPS Estimates Across Our Coverage to Reflect Updated Commodity Prices," December 21, 2015 (ACP-01326466)

255. Guggenheim, "Supply Fears Overblown as Oil Approaches $50; Raising WPX PT to $11 from $8 and Updating Earnings Estimates," May 17, 2016 (APC-01329302)

256. Guggenheim, "The Math of the Aftermath: Best Prepared are COG, EOG, GPOR, NFX, RSPP," October 2, 2015 (ACP-01324427)

257. Guggenheim, "Updating Models Across Coverage Universe to Reflect Updated Commodity Deck," February 22, 2016 (APC-01327694)

258. Guggenheim, "Upgrading AR and OAS to BUY…And More," March 16, 2017 (APC-01334841)

259. Guggenheim, "Upgrading RRC and SM to BUY from NEUTRAL, Downgrading APC to NEUTRAL; Updates for AR, COG, SWN, WLL," November 2, 2015 (ACP-01325109)

260. Jefferies, "Anadarko Petroleum (APC) Quiet 1 Q Update, Low Decay," May 2, 2016 (APC-01328598)

261. JP Morgan, "3Q16 Preview; Solid Results Likely Given GoM Tailwind; Portfolio Management is Key 2H16 Catalyst," October 6, 2016 (JPMS000053)

262. JP Morgan, "Anadarko Petroleum 3Q17 Earnings Preview Part II; Updating Estimates Primarily for Hurricane Nate," October 18, 2016 (JPMS000087)

263. JP Morgan, "Anadarko Petroleum 3Q17 Preview: Getting Back on Track; Modest Upside Potential to 3Q 17 Oil and CFPS," October 2, 2016 (JPMS000074)

264. JP Morgan, "Anadarko Petroleum Bump in the Road; Lowering 2017 Production Forecasts; Long-Term Thesis Still Intact," March 2, 2017 (APC-01333843)

265. JP Morgan, "Anadarko Petroleum Feedback from Recent Upgrade; Addressing the Bears on Jubilee and Heidelberg Production Issues," April 21, 2016 (JPMS000171)

266. JP Morgan, "Anadarko Petroleum Feedback from Recent Upgrade; Addressing the Bears on Jubilee and Heidelberg Production lssues," April 21, 2016 (APC-01328528)

267. JP Morgan, "Anadarko Petroleum Initiate at Neutral; Sidelines for Now on LNG 'Air Pocket'," December 9, 2015 (JPMS000207)

268. JP Morgan, "Anadarko Petroleum Inside the Corner Suite with European Roadshow Takeaways; Confidence Grows on Relative Re-Rating Potential," September 27, 2016 (JPMS000244)

269. JP Morgan, "Anadarko Petroleum Model Update," July 29, 2016 (APC-01330079)

270. JP Morgan, "Anadarko Petroleum Model Update," November 23, 2016 (JPMS000301)

271. JP Morgan, "Anadarko Petroleum Q216 Results Likely a Mixed Bag, But Appear Discounted in the Shares," July 21, 2016 (JPMS000329)

272. JP Morgan, "Anadarko Petroleum Repositioning Recommendations Post Rally; Downgrade EPE and SWN; Upgrade APC and AR," April 15, 2016 (APC-01328133)

273. JP Morgan, "Anadarko Petroleum Solid 4Q16 Results on GoM Strength; Focus Shifts toUnlocking More Earnings Power by Flexing Balance Sheet - ALERT," January 31, 2017 (JPMS000342)

274. JP Morgan, "Anadarko Petroleum With Volume Guide in Rear View Mirror, Focus Shifts to Unique Oil Growth Runaway and Plans for War Chest," March 7, 2017 (APC-01334113)

275. JP Morgan, "APC Joins Oil Growth Club by Taking the Road Less Traveled; Raise Price Target of 70," September 15, 2016 (APC-01330767)

276. JP Morgan, "E&P Learnings from Earnings Back From The Brink," May 13, 2016 (APC-01329013)

277. JP Morgan, "More Positive Than Negatives, but a Few Chinks in the Armor," May 4, 2016 (APC-01328858)

278. Morgan Stanley, "Anadarko Petroleum Corp 1Q15 Results: Delivering More for Less," May 4, 2015 (MS_ANADARKO_000044)

279. Morgan Stanley, "Anadarko Petroleum Corp 2Q15 Beat: Running Faster than the Bear," July 28, 2015 (MS_ANADARKO_000052)

280. Morgan Stanley, "Anadarko Petroleum Corp 2Q16: Strong Start," July 27, 2016 (MS_ANADARKO_000105)

281. Morgan Stanley, "Anadarko Petroleum Corp 3Q16: Treat.," November 1, 2016 (MS_ANADARKO_000151)

282. Morgan Stanley, "Anadarko Petroleum Corp 4Q15 Beats on Costs; Hit to 2016 Capex," February 2, 2016 (MS_ANADARKO_000071)

283. Morgan Stanley, "Anadarko Petroleum Corp 4Q16: Quiet Quarter," February 1, 2017 (MS_ANADARKO_000187)

284. Morgan Stanley, "Anadarko Petroleum Corp Accelerating," December 16, 2016 (MS_ANADARKO_000162)

285. Morgan Stanley, "Anadarko Petroleum Corp Capex & Balance Sheet Management Further Defined," March 1, 2016 (MS_ANADARKO_000087)

286. Morgan Stanley, "Anadarko Petroleum Corp Colorado Uncertainty," April 27, 2017 (MS_ANADARKO_000209)

287. Morgan Stanley, "Anadarko Petroleum Corp Cutting The Tail," January 13, 2017 (MS_ANADARKO_000180)

288. Morgan Stanley, "Anadarko Petroleum Corp Looking Forward to 2018," March 8, 2017 (MS_ANADARKO_000199)

289. Morgan Stanley, "Anadarko Petroleum Corp Mining Full-Cycle Value," September 13, 2016 (MS_ANADARKO_000118)

290. Morgan Stanley, "Anadarko Petroleum Corp No Issuance Here," February 24, 2016 (MS_ANADARKO_000080)

291. Morgan Stanley, "Anadarko Petroleum Corp Notes From The Road: Top Pick Affirmation," October 11, 2016 (MS_ANADARKO_000135)

292. Morgan Stanley, "Anadarko Petroleum Corp Uneventful yet Robust 1Q16," May 3, 2016 (MS_ANADARKO_000095)

293. MUFG, " Anadarko Petroleum Tempered Optimism Returns; Estimates Changed," March 3, 2016 (MUSA00000063)

294. MUFG, "Anadarko Petroleum Anadarko Earnings: Discipline, Monetizations to Bridge2016 Funding Gap; Estimates Revised," February 2, 2016 (MUSA00000034)

295. MUFG, "Anadarko Petroleum APC Cuts Dividend; 2016E Funding Gap Satisfied," February 9, 2016 (MUSA00000042)

296. MUFG, "Anadarko Petroleum Asset Monetizations Offer Some Relief," February 25, 2016 (MUSA00000049)

297. MUFG, "Anadarko Petroleum Building a Loving (and Ward) System Key to Delaware Growth Plans," March 9, 2017 (MUSA00000140)

298. MUFG, "Anadarko Petroleum 'D Aggressive D D Aggressive'," February 1, 2017 (MUSA00000131)

299. MUFG, "Anadarko Petroleum Deep Water Gulf of Mexico Cash Flow Expected to Support Onshore Development," September 14, 2016 (MUSA00000100)

300. MUFG, "Anadarko Petroleum Downgrade to Neutral, Due for a Pause," January 19, 2017 (MUSA00000121)

301. MUFG, "Anadarko Petroleum Long Cycle Success Builds Base for Future," May 2, 2016 (MUSA00000073)

302. MUFG, "Anadarko Petroleum Offshore Offense, Onshore Defense; Estimates Revised," March 2, 2016 (MUSA00000054)

303. MUFG, "Anadarko Petroleum Repositioning Portfolio from Gas to Oil; Ests. Revised," November 1, 2016 (MUSA00000111)

304. MUFG, "Anadarko Petroleum Tempered Optimism -- Right Approach; Estimated Raised," August 1, 2016 (MUSA00000086)

305. MUFG, "Anadarko Petroleum Tempered Optimism Returns; Estimates Changed," May 3, 2016 (MUSA00000063)

306. MUFG, "Anadarko Petroleum Withdraw from the Bank of Western Gas," June 14, 2016 (MUSA00000078)

307. MUFG, "Anadarko Petroleum: Stressing the Model," December 29, 2015 (MUSA00000027)

308. MUFG, "April Price-Deck Update," April 20, 2016 (APC-01328456)

309. MUFG, "Autumn Price Outlook Update," October 14, 2016 (APC-01331080)

310. MUFG, "For 2017, Long Delaware and Natural Gas Equities," January 19, 2017 (APC-01332685)

311. MUFG, "Initiating Coverage of Anadarko Petroleum With an Overweight Rating, Price Target of $70," December 1, 2015 (ACP-01325412)

312. MUFG, "Initiating Coverage of Anadarko Petroleum With an Overweight Rating, Price Target of $70," December 8, 2015 (MUSA00000001)

313. MUFG, "Price Deck Update; Ratings, Price Targets, Estimates Changed," January 29, 2016 (ACP-01326325)

314. RBC, "Anadarko Petroleum Corp. 2017 Capital Budget and Guidance Preview," March 3, 2017 (APC-01333899)

315. RBC, "Anadarko Petroleum Corp. A Pipeline for Growth," July 29, 2015 (ACP-01323345)

316. RBC, "Anadarko Petroleum Corp. Eagleford Sale Heightens Value Shift in the 3 Ds," January 13, 2017 (APC-01332651)

317. RBC, "Anadarko Petroleum Corp. Getting More for a little less," May 6, 2015 (ACP-01322060)

318. RBC, "Anadarko Petroleum Corp. It's Only just Begun," December 16, 2016 (APC-01331826)

319. RBC, "Anadarko Petroleum Corp. Marching to the Beat of Its Own Drum," September 13, 2016 (APC-01330758)

320. RBC, "Anadarko Petroleum Corp. Model Update for Improved Performance," December 22, 2015 (ACP-01325830)

321. RBC, "Anadarko Petroleum Corp. Onshore Oil Growth Assets Outperform," October 28, 2015 (ACP-01324727)

322. RBC, "Anadarko Petroleum Corp. Outlook Better in '3-D'," November 1, 2016 (APC-01331471)

323. RBC, "Anadarko Petroleum Corp. Patiently Waiting for a Better Macro," May 6, 2016 (APC-01328922)

324. RBC, "Anadarko Petroleum Corp. Ready and Waiting," August 10, 2016 (APC-01330219)

325. RBC, "Anadarko Petroleum Corp. Ridding the Portfolio of Gas," December 21, 2016 (APC-01331902)

326. RBC, "Anadarko Petroleum Corp. Seeds Already Sprouting for 2016," March 2, 2016 (APC-01327598)

327. RBC, "Anadarko Petroleum Corp. Spring Forward in March," February 1, 2017 (APC-01333315)

328. RBC, "Anadarko Petroleum Corp. Strong Tailwinds in 2016," February 2, 2016 (APC-01326783)

329. RBC, "Anadarko Petroleum Corp.Market Focus May Be Elsewhere," May 2, 2017 (APC-01334917)

330. RBC, "US Research at a glance August 11, 2016," August 11, 2016 (APC-01330276)

331. Scotia Howard Weil, "Anadarko Petroleum $50.09 (FS): Takeaways from 1Q16 Results; Increasing Price Target to $75," May 4, 2016 (APC-01328890)

332. Scotia Howard Weil, "Anadarko Petroleum Corporation Closes Deepwater Acquisition, Increases 5-Year Oil CAGR," December 16, 2016 (APC-01331835)

333. Scotia Howard Weil, "Anadarko Petroleum Corporation Releases '17 Production/Capex, Recent Weakness a Buying Opportunity," March 8, 2017 (APC-01334239)

334. Scotia Howard Weil, "Anadarko Petroleum Corporation Reports 4016 Cash Flow Beat; Outlook Remains Unchanged," February 1, 2017 (APC-01333324)

335. Scotia Howard Weil, "Anadarko Petroleum Corporation Sells Eagle Ford for $2.3 Billion," January 13, 2017 (APC-01332666)

336. Scotia Howard Weil, "Anadarko Petroleum Corporation Sells Marcellus Assets for $1.24B," December 22, 2016 (APC-01332019)

337. Scotia Howard Weil, "Scotia Howard Weil Conference Thoughts; 4Q16 E&P Takeaway: Growth Re-ignites Oversupply Concerns," March 27, 2017 (APC-01334664)

338. Seaport Global, "APC Post Q2:16 Strategy: Price Target and Estimates Update," August 30, 2016 (APC-01330430)

339. Seaport Global, "APC Post Q4 Strategy: Price Target and Estimates Update," March 30, 2016 (APC-01327956)

340. Seaport Global, "Rating, Price Target and Estimates Update," December 9, 2016 (APC-01331688)

341. Simmons & Company , "Anadarko Petroleum Corp. (APC) First Look at Official '16 Guidance," March 1, 2016 (APC-01327421)

342. Simmons & Company , "Anadarko Petroleum Corp. (APC) Partner Sells Down Shenandoah Working Interest," April 11, 2016 (APC-01328072)

343. Simmons & Company , "Anadarko Petroleum Corp. (APC) Q1'16 Review," May 12, 2016 (APC-01328957)

344. Simmons & Company , "Anadarko Petroleum Corp. (APC) Q2'16 Earnings Review: Improving Balance Sheet Through Divestitures," July 28, 2016

345. Simmons & Company , "Anadarko Petroleum Corp. (APC) Q2'16 Update - Assuming Coverage with OW Rating and $64 Price Target," June 9, 2016 (APC-01329234)

346. Simmons & Company , "Anadarko Petroleum Corp. (APC) Q3'16 Earnings Review: Continued Operational Success," November 4, 2016 (APC-01331553)

347. Simmons & Company , "Anadarko Petroleum Corp. (APC) Q3'16 Update: Attractive Valuation--Waiting on Catalysts," September 8, 2016 (APC-01330468)

348. Simmons & Company , "Anadarko Petroleum Corp. (APC) Updating Model for GOM Acquisition," September 16, 2016 (APC-01330787)

349. Simmons & Company, "Anadarko Petroleum Corp.: Announces ~$1.3B in Monetizations," February 25, 2016 (APC-01327275)

350. Simmons & Company, "Anadarko Petroleum Corp.: FY'15 Capital Guidance," March 4, 2015 (ACP-01320184)

351. Simmons & Company, "Anadarko Petroleum Corp.: Q2'15 Update," June 18, 2015 (PIPER_SANDLER-0003349)

352. Simmons & Company, "Anadarko Petroleum Corp.: Q3'15 Earnings Review," October 30, 2015 (ACP-01324940)

353. Simmons & Company, "Anadarko Petroleum Corp.: Q3'15 Quick Look," October 27, 2015 (PIPER_SANDLER-0003481)

354. Simmons & Company, "Anadarko Petroleum Corp.: Q3'15 Quick Look," September 25, 2015 (PIPER_SANDLER-0003532)

355. Simmons & Company, "Anadarko Petroleum Corp.: Q4'15 Quick Look," February 1, 2016 (APC-01326606)

356. Simmons & Company, "Anadarko Petroleum Corp.: Quarterly Update," March 30, 2015 (ACP-01320484)

357. UBS, "Anadarko Petroleum Corp. 1Q16 EPS, CFPS, and Production a Modest Beat; More Asset Sales Further Improve Liquidity," May 2, 2016 (APC-01328651)

358. UBS, "Anadarko Petroleum Corp. 2017 Guidance Near UBSe But Trimming 2018-19E CFPS; APC Raises Delaware and DJ Resource Base," March 5, 2017 (APC-01333929)

359. UBS, "Anadarko Petroleum Corp. Acquiring FCF-Generating GoM Assets at Attractive Price Enabling Higher US Onshore Activity/Growth," September 13, 2016 (LA-APCSUB-003448)

360. UBS, "Anadarko Petroleum Corp. Anadarko Investor Can Addresses Liquidity /Credit Concerns," March 1, 2016 (APC-01327429)

361. UBS, "Anadarko Petroleum Corp. Eagle Ford Sale Price In Line; Sharpens Portfolio Focus ... But What to Do with Large Cash Balance?," January 12, 2017 (APC-01332515)

362. UBS, "Anadarko Petroleum Corp. ENI's Sale of Stake in Mozambique Provides Valuation Marker for APC; Slightly Reducing NAV," March 9, 2017 (APC-01334330)

363. UBS, "Anadarko Petroleum Corp. Highlights frorn Anadarko's Investor Call," March 3, 2015 (APC-01320106)

364. UBS, "Anadarko Petroleum Corp. Highlights frorn Meetings with Management," September 25, 2015 (ACP-01324084)

365. UBS, "Anadarko Petroleum Corp. Implications of APC' s Failed All-Stock Offer to Acquire APA," November 11, 2015 (ACP-01325190)

366. UBS, "Anadarko Petroleum Corp. Preview of Anadarko Petroleum' s Investor Call," March 1, 2017 (APC-01333811)

367. UBS, "Anadarko Petroleum Corp. Preview of Anadarko Petroleum's Investor Call," February 23, 2016 (APC-01327202)

368. UBS, "Anadarko Petroleum Corp. Preview of March 3 Investor Call," February 24, 2015 (APC-01320036)

369. UBS, "Anadarko Petroleum Corp. Raises Long Term Growth Rate and Discloses Deepwater GoM Discovery," December 15, 2016 (APC-01331763)

370. UBS, "Anadarko Petroleum Corp. Success at Heidelberg Appraisal," December 2, 2016 (APC-01331681)

371. UBS, "Oil & Gas Exploration and Production Lowering Near-Term & Normalized Oil and Gas Price Forecasts; Downgrading UPL and WLL," January 12, 2016 (ACP-01326116)

372. UBS, "Oil & Gas Exploration and Production Lowering Near-Term & Normalized Oil Price Forecasts; Downgrading DNR to Sell," September 7, 2015 (ACP-01323762)

373. Wells Fargo, "APC: 3D Experience-Raising 2018 Growth Targets Reiterate Outperform," February 21, 2017 (APC-01333558)

374. Wells Fargo, "APC: 4Q Earnings, 2016 Budget, And Reserves," February 1, 2016 (APC-01326694)

375. Wells Fargo, "APC: Back In The Driver Seat," September 22, 2016 (APC-01330824)

376. Wells Fargo, "APC: Conference Call Notes," May 3, 2016 (APC-01328827)

377. Wells Fargo, "APC: Conference Call Summary," July 27, 2016 (APC-01330038)

378. Wells Fargo, "APC: Guidance Call Notes," March 1, 2016 (APC-01327452)

379. Wells Fargo, "APC: Model Update," April 22, 2016 (APC-01328545)

380. Wells Fargo, "APC: Model Update," December 22, 2016 (APC-01332039)

381. Wells Fargo, "APC: Model Update," February 6, 2017 (APC-01333450)

382. Wells Fargo, "APC: Model Update," March 8, 2017 (APC-01334246)

383. Wells Fargo, "APC: Model Update," November 2, 2016 (APC-01331520)

384. Wells Fargo, "APC: Model Update," September 15, 2016 (APC-01330781)

385. Wells Fargo, "APC: Monetizing WGP Stake-Positive," June 4, 2015 (ACP-01322242)

386. Wells Fargo, "APC: Positive - Strong Production - Cash Position Builds," January 31, 2017 (APC-01333156)

387. Wells Fargo, "APC: Positive-Ops Strong, CFPS and EPS Beat," July 26, 2016 (APC-01329880)

388. Wells Fargo, "APC: Q4 Earnings Call Notes And Takeaways," February 2, 2016 (APC-01326864)

389. Wells Fargo, "APC: Raising Estimates For Q2 2015 Actuals And 10-Q Filing," July 29, 2015 (ACP-01323414)

390. Wells Fargo, "APC: Reflecting Q4 Update In Model," December 17, 2015 (ACP-01325757)

391. Wells Fargo, "APC: Roadshow Takeaways; "Mowing the Grass" in Wattenberg," May 29, 2015 (ACP-01322169)

392. Wells Fargo, "APC: Survive and Thrive: Updating Estimates for 2015 Guidance," March 4, 2015 (ACP-01320188)

393. Wells Fargo, "APC: Updated Earnings for Q3 Earnings Release," October 29, 2015 (ACP-01324900)

394. Wells Fargo, "APC: Updating Estimates For Q1 2015 Results," May 5, 2015 (ACP-01322022)

395. Wells Fargo, "APC: Updating Model For Reduced Dividend," February 10, 2016 (APC-01327129)

396. Wells Fargo, "E&P: Adjusting Estimates and Valuation Ranges," April 21, 2015 (ACP-01320647)

397. Wells Fargo, "E&P: Downgrading APC, SRCI, and XOG," May 2, 2017 (APC-01320016)

398. Wells Fargo, "Summary - Morning Packet," February 1, 2017 (LA-APCSUB-013033)

399. Wolfe Research, "Anadarko Petroleum (APC - $84.98 - Outperform) I met a sheik from Mozambique - corrected PT $107," May 19, 2015 (WOLFE_0003624)

400. Wolfe Research, "Birthday Sankey The Week Ahead and Weekly Recap," February 26, 2017 (WOLFE_0001009)

401. Wolfe Research, "Global LNG – Frozen Raising CVX, cutting XOM, on 2015-2020 LNG view," June 22, 2015 (WOLFE_0003262)

402. Wolfe Research, "GLOBAL OIL & GAS 1Q EARNINGS SEASON Cash me ousside ... how 'bout dah?," April 16, 2017 (WOLFE_0001452)

403. Wolfe Research, "Global Oil & Gas 4Q Earnings Season Much has been given us, and much will rightfully be expected from us," January 19, 2017 (WOLFE_0002460)

404. Wolfe Research, "Global Oil & Gas Is this the real life? Is this just 3Q Preview & Update," October 13, 2016 (WOLFE_0004039)

405. Wolfe Research, "Global Oil & Gas Looking forward to the Christmas Party," June 23, 2015 (WOLFE_0002846)

406. Wolfe Research, "Global Oil A Third, A Third, A Third," October 8, 2015 (WOLFE_0004432)

407. Wolfe Research, "Global Oil Q: What price of oil is discounted in the stocks? A:," September 7, 2016 (WOLFE_0004873)

408. Wolfe Research, "Global Oil The path of sound credence is through the thick forest of skepticism," December 12, 2016 (WOLFE_0001954)

409. Wolfe Research, "Global Oil You beta, you beta, you bet," September 29, 2016 (WOLFE_0000601)

410. Wolfe Research, "Hallow'een'een Sankey The Week Ahead and Weekly Recap," October 30, 2016 (WOLFE_0004351)

411. Wolfe Research, "HESS CORP. (HES - $77.91 - Outperform) Hold it a little while," April 30, 2015 (WOLFE_0000016)

412. Wolfe Research, "Integrateds and Large Cap E&P A third, a third, a third - sliced, diced, and minced," February 9, 2016 (WOLFE_0002349)

413. Wolfe Research, "Large Cap US E&P 1Q "EARNINGS" When the rich wage war, it is the poor who die," April 12, 2016 (WOLFE_0001430)

414. Wolfe Research, "Large-Cap E&P - Target Depth 2Q recap - Differentiated outlooks for quality names," August 15, 2016 (WOLFE_0001643)

415. Wolfe Research, "Large-Cap E&P - Target Depth Apache in the Delaware - Tonto, jump on it...," September 6, 2016 (WOLFE_0004857)

416. Wolfe Research, "Large-Cap E&P - Target Depth APC - Dude got Mojo Back - missed you!," September 19, 2016 (WOLFE_0004584)

417. Wolfe Research, "Large-Cap E&P - Target Depth APC - Questions into March guidance call," February 6, 2017 (WOLFE_0002336)

418. Wolfe Research, "Large-Cap E&P - Target Depth Bakken up the HES truck; and eager for earnings - a look-ahead," May 1, 2017 (WOLFE_0003569)

419. Wolfe Research, "Large-Cap E&P - Target Depth COP - Back on duty, unconventional overview," October 24, 2016 (WOLFE_0004239)

420. Wolfe Research, "Large-Cap E&P - Target Depth COP - I see a red door and I want it painted black," November 14, 2016 (WOLFE_0003836)

421. Wolfe Research, "Large-Cap E&P - Target Depth Devon Energy- Gas at $3.00 ... (re)frackin the whip?," September 26, 2016 (WOLFE_0004719)

422. Wolfe Research, "Large-Cap E&P - Target Depth Don't look back in anger: 3Q compendium," October 31, 2016 (WOLFE_0004391)

423. Wolfe Research, "Large-Cap E&P - Target Depth DVN - Stack spacing pilots and 10k' laterals," January 23, 2017 (WOLFE_0002581)

424. Wolfe Research, "Large-Cap E&P - Target Depth Earnings and ops updates," February 21, 2017 (WOLFE_0000949)

425. Wolfe Research, "Large-Cap E&P - Target Depth EBITDAx / cash flow sensitivities update - out to 2019," March 27, 2017 (WOLFE_0001157)

426. Wolfe Research, "Large-Cap E&P - Target Depth EOG Eagle Ford EOR - an AAPL Slider," March 20, 2017 (WOLFE_0001125)

427. Wolfe Research, "Large-Cap E&P - Target Depth Focus APC - Mr Misunderstood ... one day you'll lead the charge," April 24, 2017 (WOLFE_0001470)

428. Wolfe Research, "Large-Cap E&P - Target Depth Great date! HESM is going to get the check, thanks," April 10, 2017 (WOLFE_0001416)

429. Wolfe Research, "Large-Cap E&P - Target Depth Guyana - Multi-FPSO potential and implications for HES," March 6, 2017 (WOLFE_0003556)

430. Wolfe Research, "Large-Cap E&P - Target Depth Houston means I'm one day closer to you," July 18, 2016 (WOLFE_0002815)

431. Wolfe Research, "Large-Cap E&P - Target Depth Inflation! HES Bakken costs & unconventional cost challenges," January 30, 2017 (WOLFE_0002647)

432. Wolfe Research, "Large-Cap E&P - Target Depth I've been thinking too much …," December 19, 2016 (WOLFE_0001979)

433. Wolfe Research, "Large-Cap E&P - Target Depth Liza Liza," July 11, 2016 (WOLFE_0002715)

434. Wolfe Research, "Large-Cap E&P - Target Depth Liza, Payara, and Snoek oh my," January 17, 2017 (WOLFE_0002447)

435. Wolfe Research, "Large-Cap E&P - Target Depth Murphy: Duvernay ... or yay? Nay for now.," August 29, 2016 (WOLFE_0000542)

436. Wolfe Research, "Large-Cap E&P - Target Depth NBL -A little Leviathan, a little Delaware ... where to?," November 21, 2016 (WOLFE_0003945)

437. Wolfe Research, "Large-Cap E&P - Target Depth NBL deeds that are concealed are most esteemed," October 10, 2016 (WOLFE_0004026)

438. Wolfe Research, "Large-Cap E&P - Target Depth NGL overview- Cash flow tailwind through 2018," February 27, 2017 (WOLFE_0002274)

439. Wolfe Research, "Large-Cap E&P - Target Depth One step closer to the hedge," December 13, 2016 (WOLFE_0001966)

440. Wolfe Research, "Large-Cap E&P - Target Depth OPEC to Texas: "Drill baby drill!"," October 3, 2016 (WOLFE_0004336)

441. Wolfe Research, "Large-Cap E&P - Target Depth OPEC to Wolfe: drill baby drill into the corporate analysis," December 5, 2016 (WOLFE_0002178)

442. Wolfe Research, "Large-Cap E&P - Target Depth Over the Hedge: E&Ps crude oil hedging update," April 3, 2017 (WOLFE_0001486)

443. Wolfe Research, "Large-Cap E&P - Target Depth PXD - Evaluating NA V upside on the road to a million a day," February 13, 2017 (WOLFE_0000928)

444. Wolfe Research, "Large-Cap E&P - Target Depth Stacks on stacks," June 27, 2016 (WOLFE_0003333)

445. Wolfe Research, "Large-Cap E&P - Target Depth To 2017 and beyond – Upgrade Large-Cap E&P to Overweight," January 3, 2017 (WOLFE_0002633)

446. Wolfe Research, "Large-Cap E&P - Target Depth Toolkit update - EBITDA & Cash Flow Sensitivities," August 22, 2016 (WOLFE_0001768)

447. Wolfe Research, "Large-Cap E&P - Target Depth Upgrade MRO, Downgrade Oxy, the Fox and the Hare," January 9, 2017 (WOLFE_0002698)

448. Wolfe Research, "Large-Cap E&P - Target Depth Ups and Downs," September 12, 2016 (WOLFE_0004508)

449. Wolfe Research, "Large-Cap E&P - Target Depth What to watch and who to follow for Q3 EPS season," October 17, 2016 (WOLFE_0004165)

450. Wolfe Research, "Large-Cap E&P - Target Depth Wolverines and Independence," July 5, 2016 (WOLFE_0003021)

451. Wolfe Research, "Large-Cap E&P Target Depth - Big Oil and Big Data, Midland focus," June 20, 2016 (WOLFE_0003247)

452. Wolfe Research, "Large-Cap E&P Target Depth - Focus: Leviathan, GoM, Divestitures," June 13, 2016 (WOLFE_0003125)

453. Wolfe Research, "Large-Cap E&P Target Depth - New periodical Large Cap E&P focused," May 24, 2016 (WOLFE_0003649)

454. Wolfe Research, "Large-Cap E&P Target Depth - Noble Midstream," June 6, 2016 (WOLFE_0003446)

455. Wolfe Research, "Large-Cap E&P Target Depth - Royals and Yoga ... Nope," May 31, 2016 (WOLFE_0003742)

456. Wolfe Research, "Moving Sankeys The Week Ahead and Weekly Recap," November 6, 2016 (WOLFE_0003974)

457. Wolfe Research, "Oil & Gas A Third, A Third, A Third, World War; Model updates," December 15, 2015 (WOLFE_0000375)

458. Wolfe Research, "San Fran Sankey The Week Ahead and Weekly Recap," December 11, 2016 (WOLFE_0000798)

459. Wolfe Research, "Sankey Sankey The Week Ahead and Weekly Recap," December 18, 2016 (WOLFE_0000837)

460. Wolfe Research, "Sector Earnings Update Can't escape the truth and the fact is …," July 14, 2016 (WOLFE_0002731)

461. Wolfe Research, "Snowday Sankey The Week Ahead and Weekly Recap," February 12, 2017 (WOLFE_0002212)

462. Wolfe Research, "Sonntag Sankey The Week Ahead and Weekly Recap," December 4, 2016 (WOLFE_0002132)

463. Wolfe Research, "Sun D.C. Sankey The Week Ahead and Weekly Recap," February 19, 2017 (WOLFE_0000962)

464. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," April 23, 2017 (WOLFE_0001325)

465. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," April 30, 2017 (WOLFE_0001499)

466. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," April 9, 2017 (WOLFE_0001245)

467. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," August 14, 2016 (WOLFE_0001609)

468. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," August 21, 2016 (WOLFE_0001719)

469. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," August 7, 2016 (WOLFE_0001853)

470. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," January 15, 2017 (WOLFE_0002410)

471. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," January 29, 2017 (WOLFE_0002594)

472. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," January 8, 2017 (WOLFE_0002661)

473. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," March 12, 2017 (WOLFE_0003474)

474. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," March 19, 2017 (WOLFE_0001086)

475. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," March 26, 2017 (WOLFE_0001169)

476. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," March 5, 2017 (WOLFE_0001047)

477. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," November 13, 2016 (WOLFE_0003797)

478. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," November 20, 2016 (WOLFE_0000744)

479. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," October 2, 2016 (WOLFE_0000609)

480. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," October 9, 2016 (WOLFE_0000651)

481. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," September 11, 2016 (WOLFE_0000555)

482. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," September 25, 2016 (WOLFE_0004683)

483. Wolfe Research, "Sunday Sankey The Week Ahead and Weekly Recap," September 4, 2016 (WOLFE_0004792)

484. Wolfe Research, "Sunday Sankgreen The Week Ahead and Weekly Recap," October 23, 2016 (WOLFE_0000697)

485. Wolfe Research, "Superbowl Sankey The Week Ahead and Weekly Recap," February 5, 2017 (WOLFE_0002295)

486. Wolfe Research, "The Invisible Hand Efficient markets: oil positioning in US equities," June 29, 2015 (WOLFE_0000081)

487. Wolfe Research, "US Natural Gas What we obtain too cheap, we esteem too lightly," September 21, 2015 (WOLFE_0000229)

488. Wolfe Research, "Vacay Sankey The Week Ahead and Weekly Recap," April 2, 2017 (WOLFE_0001207)

# 7. Investment Manager Documents

489. Email from A. Wiley, Factset, to V. Newman, Perkins Janus, May 3, 2016 (JanHen_00013193)

490. Email from D. Palmer, Wellington Management, re: "HW Conf Takeaways for energy," March 23, 2016 (WMC-APC-0000646)

491. Email from J. Gammel, Jeffries, to S. Gupta, Fidelity, April 25, 2016 (FIAM-ANAD-003586)

492. Email from M. Vivano, Wellington Management, re: "HW Conf Takeaways for energy," March 24, 2016 (WMC-APC-0000646)

493. Email from N. Barrett, Janus Henderson, to Equity Research, May 3, 2016 (JanHen_00012827)

494. Email from N. Barrett, Janus, to Janus Equity Research re: Anadarko Petroleum (APC): 2Q16 EPS of -$0.60 vs. Consensus of -$0.80, 2Q16 CFPS of $1.31 vs. Consensus of $1.17, July 27, 2016 (JanHen_00012802)

495. Email from Noah Barrett of Janus to Janus Equity Research and Energy Notes, etc., November 21, 2016 (JanHen_00024541)

496. Email from W. Foley of Wellington to RK Hoffman of Wellington, etc., May 3, 2016 (WMC-APC-0000127)

497. Fidelity, "Deepwater => Down, but not out. (But also not growing)," October 10, 2016 (FIAM-ANAD-000002)

498. Fidelity, "Operations good w/ strong outlook, val'n compelling but in sentiment purgatory," May 8, 2017 (FIAM-ANAD-000002)

499. FMR Research, "CFO in-house. Under appreciated potential. Top Pick. '1'," June 3, 2016 (FIAM-ANAD-000002_0030)

500. FMR Research, "Management is taking right steps to unlock shareholder value. Quality franchise trading at significant discount to intrinsic value. Initiate with a buy '2' rating," July 25, 2016 (FIAM-ANAD-000002)

501. FMR Research, "Operations good w/ strong outlook, val'n compelling but in sentiment purgatory," May 8, 2017 (FIAM-ANAD-000002)

502. Janus Henderson, "APC: 4Q 15 EPS beat, mgmt commentary constructive on operations and capital management: Call Notes," February 2, 2016 (JanHen_00012764)

503.  Janus Henderson, "Morgan Stanley E&P & Oil Services Conference Notes," May 12, 2016 (JanHen_00020308)

504.  Declaration of Noah Barrett, Janus Henderson, dated November 2, 2022

505.  Tuohy Brothers Investment Research, Inc., "Tuohy Brothers Energy Note," February 3, 2015 (LAZARD-ANADARKO_0030861)

# 8. Industry Documents

506.  American Association of Petroleum Geologists, Discovery Thinking: The Gulf of Mexico Advantage, April 7. 2014, https://www.aapg.org/videos/discovery-thinking/articleid/37096/ernie-leyendecker-discovery-thinking-the-gulf-of-mexico-advantage

507.  Canadian Securities Administrators, CSA Staff Notice 51-324 – Revised Glossary to NI 51-101 Standards of Disclosure for Oil and Gas Activities, December 4, 2014, https://www.osc.ca/sites/default/files/pdfs/irps/csa_20141204_51-324_51-101-glossary.pdf

508.  Coastal Review, "An Offshore Timeline," June 10, 2015, https://coastalreview.org/2015/06/an-offshore-timeline/

509.  Conglin Xu, "Change in risk preferences," Oil & Gas Journal, February 4, 2019, https://www.ogj.com/pipelines-transportation/lng/article/17222710/change-in-risk-preferences

510.  Corporate Finance Institute, "Equity Research Report," October 4, 2022, https://corporatefinanceinstitute.com/resources/valuation/equity-research-report/

511.  Diamond Offshore, "Offshore Drilling Basics"

512.  Mark J. Kaiser, "A Review of Exploration, Development, and Production Cost Offshore Newfoundland", January 3, 2021

513.  Navitas Petroleum, Investor Presentation, August 2021

514.  Navitas Petroleum, Investor Presentation, October 2020

515.  NOIA, "The Basics of Offshore Oil & Gas," pp. 3-4.

516.  Offshore Engineer, "Preparing for a successful 20K BOP campaign," December 1, 2015

517.  Offshore Engineer, "Spotlight on the Gulf," May 1, 2015

518.  Offshore Technology, "Shenandoah Deepwater Oil Field, Gulf of Mexico, October 24, 2019, https://www.offshore-technology.com/projects/shenandoah-deepwater-oil-field/

519.  Offshore, "Deepwater development in Golden Triangle down but not out," September 13, 2016, https://www.offshore-mag.com/deepwater/article/16754724/deepwater-development-in-golden-triangle-down-but-not-out

520.  Offshore, "Lower oil prices begin to take toll on Gulf drilling," June 10, 2015, https://www.offshore-mag.com/drilling-completion/article/16758375/lower-oil-prices-begin-to-take-toll-on-gulf-drilling

521.  Rafael Sandrea & Peter Stark, "Deepwater Oil Exploration in the Gulf of Mexico," July 2020

522. SEC, "Exchange Act Reporting and Registration," April 28, 2022, https://www.sec.gov/education/smallbusiness/goingpublic/exchangeactreporting

523. SEC, "Form 10K," t.Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k

524. Securities and Exchange Commission, 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08] RIN 3235-AK00, "Modernization Of Oil And Gas Reporting"

525. Society of Petroleum Engineers – Gulf Coast Section, "Development of a 20,000 psi Drilling, Completion, Intervention, Subsea & Subsurface Equipment in 60,000 ft. water depth in the GoM," November 19, 2014

526. Society of Petroleum Engineers, "Guidelines for the Evaluation of Petroleum Reserves and Resources," 2001

527. The Street, "What Is an Earnings Call? Definition, Frequency & Importance," June 30, 2022, https://www.thestreet.com/dictionary/e/earnings-call

528. TransOcean, "Quarterly Fleet Status Report," July 15, 2020

529. TransOcean, "Quarterly Fleet Status Report," October 16, 2013

530. Transocean, "Transocean Ltd. Provides Quarterly Fleet Status Report," July 25, 2022

531. Ulziitushig Batbuyan, "Deepwater Plays Against Rising Risks: The U.S. Gulf of Mexico," March 18, 2021, https://www.sustainalytics.com/esg-research/resource/investors-esg-blog/deepwater-plays-against-rising-risks-the-u.s.-gulf-of-mexico

# 9. Academic Literature

532. Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, Wiley, 2nd edition, p. 131

533. Richard A. Brealey, Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, 12th edition, p. 332.

# 10.  News Article

534. Anadarko Petroleum Company, "Anadarko Announces Deepwater Gulf of Mexico Discovery," February 2, 2009 (APC-01338356)

535. Anadarko Petroleum Corporation, "Anadarko announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009 (APC-01335462)

536. Anadarko Petroleum Corporation, Press Release, February 2, 2015

537. Anadarko Petroleum Corporation, "Anadarko Announces Mozambique LNG Final Investment Decision," June 18, 2019.

538. Anna Kachkova, E&P Newsletter, "Shenandoah to Help Push Deepwater Boundaries,", February 8, 2022, hartenergy.com/ep/exclusives/shenandoah-help-push-deepwater-boundaries-198655

539. ConocoPhillips, "ConocoPhillips Reports First-Quarter 2017 Results; On Track to Deliver 2017 Operating Plan and Accelerate Value Proposition," BusinessWire, 07:00 EST, May 2, 2017, (AQD_0010466).

540. Global Newswire LLOG Exploration Company, L.L.C., "LLOG Exploration Named Operator of Shenandoah Discovery in Gulf of Mexico," April 26, 2018

541. Kassia Yanosek & Matt Rogers, McKinsey & Company, "Unlocking future growth for deepwater in the Gulf of Mexico," July 13, 2018, https://www.mckinsey.com/industries/oil-and-gas/our-insights/unlocking-future-growth-for-deepwater-in-the-gulf-of-mexico

542. Noble Corp and Maersk Drilling, "Noble Corporation and Maersk Drilling Announce Agreement to Combine", November 10, 2021

543. NS Energy, "Shenandoah Field Development"

544. Offshore, "Anadarko succeeds with Windjammer offshore Mozambique," February 18, 2010, https://www.offshore-mag.com/drilling-completion/article/16796105/anadarko-succeeds-with-windjammer-offshore-mozambique

545. Reuters, "Total aiming for two additional LNG trains in Mozambique LNG", November 5, 2019, p. 2.

546. The Way Ahead, "Emerging Plays Boost Economic Attractiveness of Deepwater Gulf of Mexico," January 14, 2013, jpt.spe.org/twa/emerging-plays-boost-economic-attractiveness-deepwater-gulf-mexico

547. Upstream Online, "Anadarko mulling over its options at Shenandoah," February 13, 2015, upstreamonline.com/weekly/anadarko-mulling-over-its-options-at-shenandoah/1-1-1009805

548. Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay", March 20, 2013, http://www.finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html.

# EXHIBIT 2

## EXPERT REBUTTAL REPORT OF PETER KELLER

January 25, 2023

**CONFIDENTIAL**

## Table of Contents

1.  Introduction ................................................................................................................... 3

 1.1.  Qualifications ........................................................................................................ 3

 1.2.  Assignment and Summary of Conclusions ...................................................... 3

2.  Rebuttal to the Merrill Report ........................................................................................ 5

3.  Rebuttal to the Steinholt Report .................................................................................. 23

4.  Rebuttal to the Regan Report ...................................................................................... 36

## Table of Figures

Figure 1. Relevant Portion of Slide from May 24, 2016 Presentation .................................. 18

Figure 2. RBC NAV from March 2017 ................................................................................... 21

# 1. Introduction

## 1.1.    Qualifications

1.    I submitted a report for this matter on November 9, 2022 (my "Affirmative Report").  In that report I describe my qualifications, which have not meaningfully changed as of my submission of this rebuttal report.  I have appended my qualifications to this report as Appendix A.

2.    My hourly rate remains $665 per hour.  My fee is not contingent on my opinions or the outcome of this litigation.

3.    The materials upon which I have relied are listed in Appendix B.

## 1.2.    Assignment and Summary of Conclusions

4.    I submitted my Affirmative Report on November 9, 2022, in support of Defendants' truth-on-the-market defense.  I have been asked by Cravath, Swaine & Moore, counsel for Defendants, to consider certain statements or opinions regarding public statements in reports submitted on November 9, 2022, by Plaintiffs' geology expert, Robert Merrill (the "Merrill Report"), Plaintiffs' damages expert, Bjorn Steinholt (the "Steinholt Report"), and Plaintiffs' accounting expert, D. Paul Regan (the "Regan Report").

5.    First, I address the Merrill Report.  I discuss how observations in the Merrill Report support the conclusion in my Affirmative Report that investors would have understood Shenandoah to be a geologically complex and high-risk drilling environment.  Dr. Merrill confirms that it was widely known that Shenandoah is structurally complex, which can create challenges for designing a commercial development plan.  I also respond to assertions in the Merrill Report that certain statements were allegedly misleading.  I explain

that Merrill mischaracterizes the nature of these statements; when read in context, these statements were not misleading to investors.

6. Second, I respond to assertions in the Steinholt Report that certain statements were allegedly misleading because Anadarko omitted information and explain why the statements were not misleading to investors. Specifically, Steinholt takes statements out of context, fails to conduct a thorough analysis of Anadarko's public statements, and exaggerates the importance of disclosing detailed information about the Shenandoah appraisal project. In fact, Mr. Steinholt testified that he did not evaluate the materiality of the pressure data from Shen-3, characterizing the issue as too technical for him.[1]

7. Third, I respond to Mr. Regan's conclusion that Anadarko's alleged failure to properly account for and expense the cost of drilling Shen-3 as of December 31, 2014, was material. I do so from the perspective of investors. Specifically, I explain that the decision to write off a particular well depends on internal company policy, which differs among companies, and that investors are concerned with whether a field will be developed as opposed to the accounting decision regarding one of many appraisal wells. I also demonstrate that the statements about Shenandoah highlighted in the Regan Report were not misleading.

8. As detailed in the below sections, the Merrill, Steinholt, and Regan Reports fail to show that Anadarko improperly withheld information or communicated information that misled investors with respect to the status and expectations of Shenandoah.

9. Based on my review, there is nothing in Dr. Merrill's, Mr. Steinholt's or Mr. Regan's reports that changes my prior conclusions.

---

[1] Deposition of Bjorn Steinholt, December 21, 2022, 76:9–77:11.

## 2. Rebuttal to the Merrill Report

10. **Conclusion A:  The Merrill Report confirms that investors understood that deepwater drilling involves a significant amount of uncertainty and that Shenandoah in particular was geologically complex and high-risk.**

11. Deepwater drilling is a high-risk business subject to significant uncertainty, and any decision to invest in and develop an oil field depends on many factors, including the results from each appraisal well, prevailing costs of development, prevailing oil prices, developing technology, and any asset's position within the company's entire portfolio.  Investors understood this to be particularly true of Shenandoah, which was geologically complex and had a high-risk drilling environment as an offshore, deepwater field in the Gulf of Mexico.

12. In my Affirmative Report, I stated: "[I]nvestors understand that oil and gas production, especially deep-water exploration, is risky and faces substantial uncertainties" and that "exploration in deepwater Gulf of Mexico presents additional challenges" because of its depth and complexity.[2]  In particular, I noted that "[t]he deepwater Gulf of Mexico is a geologically complex environment with multiple subsurface faults that can limit the recovery of reserves . . . so the Shenandoah field may be faulted or may not have as large of an areal extent as initially hoped."[3]

13. In discussing the region, Dr. Merrill confirms that it is commonly known that the region is structurally complex, which can create challenges for designing a commercial development plan:

---

[2] Affirmative Report § 4.1.4; ¶ 69.

[3] *Id.* ¶¶ 69, 254.

a.  "The Shen wells drilled by Anadarko were in water depths of about 5,700 feet to subsurface depths exceeding 30,000 feet.  High temperatures and high pressures make drilling in this environment difficult, and drilling costs are high."[4]

b.  "Today, we find sedimentary subbasins isolated by vertical salt diapirs feeding the salt canopy.  Shen is one of these subbasins.  In these subbasins, one would expect to find variable sediment thickness across the basin away from turbidite channels, lateral pinching out of individual sands, faults, fractures, and deformation bands caused by differential movement within the sediment column."[5]  Dr. Merrill testified that he would know that Shenandoah is one of these subbasins based on his general "regional understanding of the geology of the Gulf of Mexico" alone.[6]

c.  "This trend is in the 'Deepwater GOM,' a geological province characterized by complex structures caused by rapid sediment deposition and mobile salt intrusions.  With sediment loading, salt from deep in the basin flowed vertically and spreads laterally, forming the Sigsbee salt canopy, which now blankets the Subsalt province.  The interaction of these two features creates complex petroleum systems[.]"[7]  Dr. Merrill testified that his "regional knowledge would have expected complex structures" in the Shenandoah field.[8]

d.  "As a geologist, I would expect that in the geologic environment dominated by salt evacuation basins such as the Shen basin, vertical salt movement through salt feeders

---

[4] Merrill Report ¶ 24.

[5] *Id.* ¶ 29.

[6] Deposition of Robert Merrill, December 7, 2022, 94:17-95:1.

[7] Merrill Report ¶ 30.

[8] Deposition of Robert Merrill, December 7, 2022, 99:10-11.

and subsequent development of a salt canopy would fracture the existing rock volume beneath the salt canopy. The expected result would be dominated by radial faults away from the salt feeders and possibly some concentric faults caused by salt canopy expansion." [9] Dr. Merrill testified that this understanding was "based upon [his] understanding of the regional geology" as well as his "understanding of [] evaporite sequences." [10]

e. "Thinning on the basin margin, away from the main sediment pathway, suggests stratigraphic variability is likely, as the sand beds accumulate on the margin of the central depositional axis. . . . [T]he sands deposited in turbidite fans have significant changes in thickness over relatively short distances. Projecting sand thickness to an undrilled location is highly uncertain in this environment. Because of the periodic nature of turbidite deposits, intervening shales serve as vertical seals to hydrocarbon migration, and lateral bed pinch-outs serve as potential traps. A trap essentially prevents oil from moving from one reservoir to another. The resulting compartmentalization requires more wells and makes it more costly to extract oil. These are fundamental principles that senior management at Anadarko would have been aware of at the time. Accordingly, Anadarko ignored this fundamental principle resulting in inaccurate assumptions about the subsurface." [11]

f. "The total cost of injection and production wells at Shen was critical because of the high cost to drill and complete wells in the subsalt, high temperature, and high-pressure environment. It is not unusual for recognized structural complexity in a project to

---

[9] Merrill Report ¶ 32.

[10] Deposition of Robert Merrill, December 7, 2022, 101:8-12.

[11] Merrill Report ¶ 35.

increase with time in a given field because seismic data improves, and newly drilled wells intersect faults and fractures."[12]

14.    As the Merrill Report confirms, it was publicly known that the region would have faulting; the appraisal process was designed to test the extent of faulting.  While investors would not have expected to obtain highly detailed, confidential data derived from appraisal drilling, they would have understood that a Gulf of Mexico project like Shenandoah would have uncertainties that would be revealed through the appraisal process.  As discussed in my Affirmative Report, at each step, Anadarko affirmatively disclosed that it did not have enough information to reach a final investment decision.[13]

15.    **Conclusion B:  Investors understood that the statements about the Shenandoah basin being a "$2-$4 billion opportunity" constituted a highly preliminary estimate that could be affected by the appraisal.**

16.    Dr. Merrill opines that Anadarko made "exaggerated statements about Shen's likelihood of successful development, resource size, and value"[14] by citing two presentations in March and April 2014 that estimated the Shenandoah basin was a "$2-$4 billion opportunity."[15] Dr. Merrill contends this estimate "set the public's perception, including [his own], that [Shen] was a new 'giant' field."[16]

17.    As explained in paragraphs 136-152 of my Affirmative Report, investors did not understand the statements about "$2-$4 billion opportunity" to confirm any particular resource size.

---

[12] *Id.* ¶ 39.

[13] For example, see Affirmative Report ¶¶ 203, 221, 249, 252, 281, 288.

[14] Merrill Report ¶ 27.

[15] *Id.* ¶ 21.

[16] *Id.*

Rather, investors understood that Anadarko was still early in the appraisal process. Mr. Daniels explained this, stating: "So there's a lot of resources there [in the Shenandoah basin], a lot of work needs to be done to commercialize that and to come forward with a path but we think it's certainly one of the larger discovery areas in the Gulf of Mexico."[17]

18. Making the basin commercial would depend upon the results of the appraisal process for all three prospects, as well as building a development plan. On May 6, 2014, when asked about Leyendecker's statements at the AAPG event, Bob Daniels explained that "the Shenandoah mini-basin is a very significant discovery for us and has a great deal of potential there. But we have a lot of work to do to get that potential actually defined and then to put development plans around how we will bring the value forward to that."[18] He continued that they needed to roll together data from wells being drilled at Coronado, Yucatan, and Shenandoah "into our thinking about how we would bring this field forward" and "how this overall complex would be developed."[19]

19. Dr. Merrill does not cite to evidence that suggests that investors understood "$2-$4 billion opportunity" to be anything other than a preliminary estimate that must be verified through then-subsequent appraisal work.

20. **Conclusion C: Investors understood before the start of the Class Period that the estimate of "$2-$4 billion opportunity" was no longer valid, given that this estimate applied to the**

---

[17] Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, p. 52 (APC-01753577).

[18] Anadarko Petroleum Corporation, Q1 2014 Earnings Call Transcript, May 6, 2014, p. 13 (APC-01751460 at 472).

[19] *Id.*

**whole Shenandoah basin, and following this statement, the Shenandoah basin's Coronado and Yucatan projects proved disappointing.**

21.    The estimate of "$2-$4 billion opportunity" applied to the whole Shenandoah basin.  As explained below, by the beginning of the Class Period, following further appraisal results and disclosures about Yucatan and Coronado, investors would have understood that the estimate of "$2-$4 billion opportunity" for the Shenandoah basin was outdated.  The preliminary estimate of the opportunity and any development plan would need to be adjusted in light of results indicating smaller reservoirs in these two prospects.

22.    As the Merrill Report recognizes, the estimate of "$2-$4 billion opportunity" applied to the whole Shenandoah basin. [20]  However, during his subsequent deposition, Dr. Merrill suggested that it was unclear whether the estimate applied to the basin or only the Shenandoah field.[21]  Dr. Merrill's testimony notwithstanding, Anadarko's reference to the basin is unambiguous.  The March 2014 investor conference presentation clearly states, "Shenandoah Basin: ~$2 - $4 Billion Net Opportunity."[22]  The presentation during the April AAPG conference states, "Shenandoah Basin: Potential Giant Resource." [23]  When describing the "$2-$4 billion opportunity," Mr. Leyendecker discussed why they "like the

---

[20] Merrill Report ¶ 21 ("Anadarko indicated the Shen *basin* was a $2-$4 billion opportunity." (emphasis added)).

[21] Deposition of Robert Merrill, December 7, 2022, 51:16-52:16.

[22] Anadarko Petroleum Company, Investor Conference Presentation, March 4, 2014, p. 83 (APC-01753996).

[23] American Association of Petroleum Geologists, "Discovery Thinking: The Gulf of Mexico Advantage," April 7, 2014, https://www.aapg.org/videos/discovery-thinking/articleid/37096/ernie-leyendecker-discovery-thinking-the-gulf-of-mexico-advantage.

Shenandoah Basin so well."[24]  Furthermore, both presentations specifically identified the Coronado and Yucatan fields in addition to the Shen field on that same slide.[25]

23.   Dr. Merrill appears to suggest that the distinction between "basin" and "field" was irrelevant because "Yucatan and Coronado were not going to be commercial."[26]  Aside from having no basis in the slide at issue, Dr. Merrill's explanation relies on facts that were not known in March or April 2014, when both Yucatan and Coronado were still being appraised.[27]

24.   Dr. Merrill does not address how the early results of those appraisals, which were released after this statement but before the start of the Class Period, made the "$2-$4 billion opportunity" estimate stale.

25.   First, in July 2014, Anadarko announced disappointing results at Coronado: "An appraisal well at the Coronado discovery reached total depth and did not find the Lower Miocene objective present."[28]  Investors understood that this impacted the outlook for the basin more broadly.  For example, during the July 2014 earnings call, an analyst asked Anadarko whether the results of its most recent appraisal well at Coronado had "any implications for

[24] *Id*, at 26:45.

[25] Anadarko Petroleum Company, Investor Conference Presentation, March 4, 2014, p. 83 (APC-01753996); American Association of Petroleum Geologists, "Discovery Thinking: The Gulf of Mexico Advantage," April 7, 2014, https://www.aapg.org/videos/discovery-thinking/articleid/37096/ernie-leyendecker-discovery-thinking-the-gulf-of-mexico-advantage.

[26] Deposition of Robert Merrill, December 7, 2022, 69:6-11.

[27] Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, p. 48 (APC-01753577) ("We presently have wells drilling at Coronado—an appraisal well and at Yucatan—an appraisal and then we will in the second quarter spud the second Shenandoah appraisal well.").

[28] Anadarko Petroleum Company, Q2 2014 Operations Report, July 29, 2014, p. 12.

the wider Shenandoah connectivity pieces."[29]  Gwin responded by stating that they "didn't find the sand at all," were considering a path forward, and were incorporating information into their broader plans for the basin.[30]  During that same conference, an analyst noted that Coronado "seem[ed] noncommercial."[31]  In October 2014, ConocoPhillips decided to stop appraising the Coronado prospect.  Matthew Fox, ConocoPhillips' Executive Vice President of Exploration and Production, said, "I mean, the original discovery well was very encouraging, but the first appraisal well that we drilled was intended to establish what the overall size was, and it was disappointing."[32]  ConocoPhillips' announcement came months after Anadarko's statement regarding the Shenandoah basin's potential.

26.    Second, by October 2014, Yucatan also proved disappointing.  The first appraisal well encountered "approximately 57 gross feet of pay"[33] and oil-water contact, suggesting a smaller reservoir.[34]  Anadarko's Q4 2014 Operations Report showed a significantly reduced reservoir estimate for Yucatan, with the appraisal well in a separate lease block from the now-estimated reservoir.[35]

27.    Anadarko had long discussed how its ownership in all three fields would be beneficial, and how it could achieve synergies from developing all three fields together.  For example, Mr. Daniels explained that "controlling both Coronado and Shenandoah as an operator will

---

[29] Anadarko Petroleum Corporation, FQ2 2014 Earnings Call Transcript, July 30, 2014, p. 11.

[30] *Id*.

[31] *Id.*

[32] ConocoPhillips, Q3 2014 Earnings Call Transcript, October 30, 2014, p. 12.

[33] Anadarko Petroleum Company, Form 10-K for the Fiscal Year Period ended December 31, 2014, filed on February 20, 2015, p. 9 (APC-01751751).

[34] Anadarko Petroleum Corporation, Q2 2015 Earnings Call Transcript, July 29, 2015, p. 9.

[35] Anadarko Petroleum Company, Q2 2014 Operations Report, February 2, 2015, p. 12.

give [Anadarko] a lot more optionality and flexibility."[36]  Other statements about synergies follow:

a.  Arun Jayaram, JP Morgan Securities: "Ex tieback opportunities, which obviously work at a lower oil price, for deepwater drilling, what sort of price range do you think you need to kind of make that economically viable?  Thanks."

    Bob Gwin: "Yeah.  Great question, and I won't answer it directly, because frankly, the answer varies, varies with the opportunity.  Something like a Shenandoah is obviously a tremendous resource potential.  But the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue, because we have Coronado and Yucatan at the same mini basin that are tremendous kind of in situ tieback opportunities for the future."[37]

b.  John Powell Herrlin: "And then one for Bob Daniels on Shenandoah.  How are you able to finagle a higher working interest [in Coronado]?"

    Bob Daniels: "John, when you get into partnerships like this, especially when you have a 3 discovery complex and people have different interests on them, some people see the overall development differently.  And so we were able to pay a disproportionate amount of the next appraisal well like Coronado to pick up that extra 20%.  And we're very pleased to take that and also to take over the operatorship because we see a lot of

---

[36] Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, p. 48.

[37] Anadarko Petroleum Corporation, J.P. Morgan Energy Equity Investor Conference Transcript, June 28, 2016, p. 9 (APC-01753717).

synergies with Shenandoah and Coronado together, and we also see the potential at Coronado is very significant."[38]

28.    Market participants likewise made statements that demonstrated their understanding that Yucatan and Coronado and the synergies associated with developing these fields together with the Shenandoah field represented meaningful opportunities.  Examples follow:

a.    Guggenheim: "Shenandoah Basin – Upcoming catalysts in the Gulf of Mexico include the Yucatan well in the Shenandoah Basin. With the successful Shenandoah appraisal well (1000 ft of net pay) and recently announced Coronado results (400 ft of pay), success at Yucatan could indicate the potential for the entire basin to be one continuous reservoir. Pending these results (which we expect in the next few weeks), future drilling may be directed towards appraisal of the three separate discoveries or perhaps a well (or two) towards the center of the basin to test lateral continuity and development options for the basin as a whole. If ultimately successful, the Shenandoah basin could prove to be one of the largest discoveries in GOM history."[39]

b.    Global Hunter Securities: "Takeaway: Mild positive. Following Shenandoah (300 to 1,000 net feet of pay) and Coronado (400 net feet of pay) this is APC's third discovery in the GOM deepwater already in 2013; Phobos doesn't look as massive as these first two, but represents an encouraging trend.  Proximity to Lucius would mean cost savings if/when Phobos comes to development.  Meanwhile, Yucatan should be down in 4-6 weeks – the well is testing the opposite side of the syncline that already showed

---

[38] Anadarko Petroleum Corporation, Q3 2013 Earnings Call Transcript, November 5, 2013, p. 17.

[39] Guggenheim, "APC – BUY - Increasing Price Target to $115 on Multiple Exploration and Development Catalysts," April 1, 2013, p. 2.

pay on the northern flank at Shenandoah.  Should Yucatan be full to the spill point, it could comprise a potentially massive structure alongside Shenandoah."[40]

29.    Dr. Merrill does not address how these changes impacted the "$2-$4 billion opportunity" estimate.  Anadarko's reminders about the early stage of the appraisal process proved prescient.  The subsequent disappointment from Yucatan and Coronado would render the preliminary opportunity estimate stale by the beginning of the Class Period.

30.    Finally, my review of analyst reports and commentary shows that analysts did not focus on or mention the estimate of "$2-$4 billion opportunity" either before or during the Class Period.

31.    **Conclusion D:  Dr. Merrill mischaracterizes Ms. Szabo's statements regarding Shen's "Miocene-like properties" and the "proven" and "probable" oil at Shenandoah and fails to show that her discussion of Shenandoah was misleading.**

32.    Dr. Merrill takes issue with statements Shandell Szabo made during a May 24, 2016 UBS Global Oil and Gas Conference.  First, he contends that Szabo "held out Shen as having excellent reservoir and fluid qualities to the public," because Szabo described "Shen as having 'Miocene-like properties, which means that the reservoir quality is very good."[41] He quotes Ms. Szabo:

> You're looking at porosities of up to 25% here.  You're looking at permeabilities in the 100 millidarcy range.  Some of the individual sands see 300, 400 millidarcies perm.  And then the last thing you look at is the fluid property,

---

[40] Global Hunter Securities, "Another GOM success at Phobos," April 25, 2013, p. 1.

[41] Merrill Report ¶ 95.

since it's very light oil out here.  So from the overall discovery, it's got everything that you're looking for.[42]

33.    Dr. Merrill takes issue with Ms. Szabo estimating "porosities of up to 25%," contending that "the data showed the average porosity for Shen-2, Shen-3, and Shen-4 ST-1 was 20%."[43]  He also states that "Shen posed serious challenges as to tar and AOP."[44]

34.    Dr. Merrill's observation about porosities fails to identify an inconsistency between Ms. Szabo's estimate and "the data."  Ms. Szabo's estimate is for the high end of a range ("porosities of up to 25%") while Dr. Merrill compares this high-end estimate to an average ("the data showed the average porosity […] was 20%").  What Dr. Merrill suggests is an inconsistency is merely an improper comparison by Dr. Merrill.  Market participants would recognize that "up to" signals the top end of a range, not an average.

35.    In addition, even if market participants understood from Ms. Szabo's statement that Shenandoah had average porosity of 25%—as opposed to "up to" 25%—this is not the type of difference that would meaningfully alter investors' view on the field's potential.  25% porosity versus 20% porosity is not enough of a difference to either confirm commerciality or condemn the project.  Notably, Dr. Merrill fails to cite any evidence of the weight that market participants placed on this statement, including how it influenced their view of Shenandoah's prospects.

36.    Second, Dr. Merrill contends that "Ms. Szabo implied that there are proven and probable reserves in the Shen field" even though "the Shen wells with oil and natural gas indications

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

were not flow tested and could not be classified as 'proven' oil and gas reserves during the Class Period."[45]  Dr. Merrill quotes Ms. Szabo:

> "[Y]ou can see the number five well up there on that cross-section, so you can see that lighter green color – we're going to be able to turn that dark green. So the lighter green on there is the **probable**, and the darker green is the **proven**, and so we're going to have the ability for that large area over there to go ahead and say, yes, that's **proven**, so that's tremendous for us."[46]

37.    Dr. Merrill then comments:

> Under the SPE reserves classification, **Proven** (on production – 1P), **Probable** (under development-2P), and **Possible** (planned for development-3P) refer to Discovered Commercial Reserves. On the other hand, resources are referred to as **Contingent Resources**, or Discovered Resources (development-pending, on hold, or not viable), and **Prospective Resources** (undiscovered). The use of **Proven** and **Probable** in the statement suggests that wells have flowed, been tested, and are under development, which overstates the confidence in the resource potential of Shen.[47]

38.    To start, Ms. Szabo did not use the SPE technical terms "proven reserves" or "probable reserves."  She instead discussed "Proven Oil" and "Projected Oil," terms shown on the slide she was presenting, which I have copied below as Figure 1.

---

[45] *Id.* ¶ 96.

[46] *Id.* (emphasis in original).

[47]*Id.* (emphasis in original).

**Figure 1. Relevant Portion of Slide from May 24, 2016 Presentation**



39.  The term "Proven Oil" is distinct from the SPE technical term "Proven Reserves," just as "Projected Oil" is distinct from the SPE technical term "Probable Reserves." While "Proven Oil" indicates that it has been proven that oil has been discovered in the well, it suggests nothing about the commerciality of the well.

40.  Additionally, while Dr. Merrill suggests that Ms. Szabo's use of the terms "proven" and "probable" conveyed that the Shen field had met SPE reserves classification standards for demonstrating that the wells had "proven reserves" or "probable reserves," market participants would have readily recognized that Ms. Szabo was not making such a claim. The SPE standards for "proven reserves" and "probable reserves" require that "wells . . . are under development,"[48] as Dr. Merrill indicates, yet Shenandoah was not yet under development, as market participants were aware. Indeed, Dr. Merrill testified that he had "no indications" that the field might be under development as of May 2016, the time of Ms.

---

[48] *Id.*

Szabo's comments.[49] In fact, as of May 24, 2016, none of the Shenandoah appraisal wells had been completed, meaning casing had not been set and then perforated so that oil and gas can flow into production tubing.[50] Investors would therefore understand that no "proven reserves" or "probable reserves," under the SPE definition of these terms, could be booked.

41. I addressed SPE definitions and requirements in paragraph 53 of my Affirmative Report, where I stated:

> Investors understand that resource estimates are distinct from estimates of proved reserves. Unlike resource estimates, proved reserves are those reserves claimed to have a reasonable certainty (normally at least 90% confidence) of being recoverable under existing economic and political conditions, with existing technology. Proved reserves are booked in accordance with standards from the Society of Petroleum Engineers ("SPE") and requirements from the SEC.

42. At no point did Anadarko suggest that the wells were under development.[51] Indeed, after every well, Anadarko noted that additional work was needed before the company would determine whether or not to proceed with development. Even after some appraisal wells found high oil pay, the company continued to explore the field.

43. Further, as noted above, proved reserves are those that are "recoverable under existing economic and political conditions, with existing technology." Yet, both commodity prices and the state of development technology were moving targets. As I observed in my Affirmative Report, throughout the Class Period, oil prices were generally weak, having

---

[49] Deposition of Robert Merrill, December 7, 2022, 197:15-25.

[50] C. Mark Pearson, Coloradans for Responsible Energy Development, "The Seven Steps of Oil and Natural Gas Extraction," https://www.cred.org/seven-steps-of-oil-and-natural-gas-extraction/.

[51] Merrill Report ¶ 96.

declined from a monthly peak of over $133/bbl in July 2008 to $50.58 in February 2015 at the beginning of the Class Period and to $48.48 in May 2017 by the end of the Class Period.[52]

44.    In addition, it was well known in the industry that there were significant technological challenges to drilling, completing, and producing wells in a 20,000 psi environment.  Only one well—Chevron's Anchor field, appraisal completed October 2015, final investment decision December 2019[53]—has been successfully completed at 20,000 psi, and Beacon's resumption of drilling at Shenandoah was delayed as it waited delivery of a new Transocean drillship and BOP with 20,000 psi capabilities, which were projected to become available in Q3 2022.[54]

45.    Finally, in my searches of analyst commentary, I have not seen any evidence that suggests that the investors had understood Ms. Szabo's statements to mean that Shenandoah had "proven reserves" or "probable reserves."  Indeed, in analyzing Anadarko's asset base, neither Anadarko nor analysts categorized Shenandoah as having proven or probable assets.  For example, the below analysis by RBC shows that they understood that no resources at Shenandoah were "proved," with Shenandoah listed under "Risked Undeveloped Upside."

---

[52] Affirmative Report, p. 14, Figure 1 (calculated as the monthly average using the daily WTI data).

[53] Businesswire, "Chevron Announces the Successful Appraisal of the Anchor Discovery in the Deepwater Gulf of Mexico," October 29, 2015; Chevron, "Chevron Sanctions Anchor Project in the Deepwater U.S. Gulf of Mexico," December 12, 2019.

[54] Offshore, Shenandoah gets the go-ahead in the deepwater Gulf of Mexico, August 26, 2021.

**Figure 2. RBC NAV from March 2017[55]**

## Net Asset Valuation

Exhibit 2: RBC NAV Assessment of Anadarko Petroleum

| Proved Reserves & Other Assets | | | | |
|---|---|---|---|---|
| Proved Assets | MMboe | $MM's | $/Share | $/boe |
| PDP-USA | 756 | $9,720 | $17.48 | $12.86 |
| PUD-USA | 315 | 2,519 | 4.53 | 8.00 |
| PDP-Intl | 166 | 2,575 | 4.63 | 15.50 |
| PUD-Intl | 14 | 330 | 0.59 | 23.58 |
| Adjusted Net Debt | | (11,206) | (20.15) | |
| Total Other Assets Incl WGP, APC Midstream, & Minerals | | 12,644 | 22.73 | |
| Open Hedge Value | | 0 | 0.00 | |
| **Proved Net Asset Value** | 1,251 | $16,584 | $29.82 | $13.26 |
| **Proved Less PUD Value** | 922 | $13,734 | $24.69 | $14.90 |

| Risked Undeveloped Upside | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Area | Acreage* | Haircut | Spacing | Wells | EUR | MMboe | $MM's | $/Share | $/boe | $/Acre |
| Mozambique (East Africa) | 318,000 | 50% | | | | 1,987 | $1,598 | $2.87 | $0.80 | $5,024 |
| DJ Basin (Core) | 255,256 | 30% | 60 | 3,233 | 550 | 1,433 | 9,240 | 16.61 | 6.45 | 36,200 |
| DJ Basin (Extended) | 432,979 | 75% | 160 | 740 | 325 | 139 | 885 | 1.59 | 6.35 | 2,043 |
| Wolfcamp A | 214,741 | 20% | 160 | 5,300 | 1,200 | 2,062 | 12,803 | 23.02 | 6.21 | 59,619 |
| Wolfcamp B, C, D | 234,028 | 50% | 160 | 2,407 | 1,000 | 780 | 1,347 | 2.42 | 1.73 | 5,755 |
| Bone Spring-Leonard | 211,675 | 50% | 320 | 1,089 | 750 | 265 | 639 | 1.15 | 2.41 | 3,020 |
| Eaglebine/GNB/GRB/Alaska | | | | | | 590 | 944 | 1.70 | 1.60 | |
| Gulf of Mexico (Tieback) | | | | | | 138 | 2,349 | 4.22 | 17.01 | |
| Shenandoah (GOM) | | | | | | 213 | 953 | 1.71 | 4.47 | |
| GOM Exploration and Unbooked | | | | | | 711 | 2,710 | 4.87 | 3.81 | |
| West Africa | | | | | | 700 | 1,085 | 1.95 | 1.55 | |
| Colombia | | | | | | 250 | 294 | 0.53 | 1.18 | |
| Brazil (Wahoo) | | | | | | 71 | 148 | 0.27 | 2.07 | |
| International PUDS | | | | | | 11 | 186 | 0.33 | 17.69 | |
| Other Global Upside | | | | | | 500 | 350 | 0.63 | 0.70 | |
| **Risked Undeveloped Upside** | | | | | | 9,850 | $35,529 | $63.88 | $3.61 | |
| *Net undeveloped acreage assessment* | | | | | | | | | | |

| Proved + Risked Unbooked NAV | | | | 10,772 | $49,264 | $88.57 | $4.57 |
|---|---|---|---|---|---|---|---|

46. RBC's net asset valuation is consistent with other analysts' characterizations of Shenandoah throughout the Class Period. At paragraph 97 of my Affirmative Report, I explained:

> I found at least 314 reports from 22 analysts, including UBS, JP Morgan and Goldman Sachs published … during the Class Period that applied a NAV approach to estimate the value of Anadarko. Most of these reports did not

---

[55] RBC Capital Markets, "Anadarko Petroleum Corp. The Plan Has Come Together," March 16, 2017, p. 3 (APC-01334517).

provide a value for Shenandoah because they either assigned no value to Shenandoah or did not value Shenandoah separately from the other unproven assets.[56]

47. **Conclusion E:  Dr. Merrill mischaracterizes the write-off, incorrectly asserting that Anadarko "abandoned Shen as non-commercial."**

48. Dr. Merrill mischaracterizes the nature of the write-off, stating that "Anadarko abandoned Shen as non-commercial after management had touted it to the public as one of the largest and most valuable discoveries in the Deep Gulf of Mexico."[57]  This is a mischaracterization of Anadarko's actions and investors' understanding of those actions.

49. As an initial matter, Anadarko did not "abandon" Shenandoah in May 2017.  At paragraphs 325-327 of my Affirmative Report, I showed how Anadarko explained that its decision to take the impairment and write-off was to satisfy accounting requirements based on the results of Shen-6 and the then-current level of commodity price.  However, it maintained its working interest in the project as it considered a path forward.

50. Indeed, during his deposition, Dr. Merrill admitted it would be speculation to conclude that Anadarko wrote off Shenandoah as non-commercial: "What I mean there is that Anadarko decided not to develop it because—and why they decided not to develop it, I can't say. Probably had something—and I can speculate, but I'm not going to speculate as to why they exited. . . .  They wouldn't have abandoned it if they thought it was commercial."[58]

51. More importantly, it is not accurate to say that Shenandoah was "non-commercial," particularly without recognizing the importance of the commodity price environment.  At

---

[56] Affirmative Report ¶ 97.

[57] Merrill Report ¶ 97.

[58] Deposition of Robert Merrill, December 7, 2022, 76:15--19.

paragraphs 43-45 of my Affirmative Report, I explained how the current development of Shenandoah confirms that it could be commercially viable in the right commodity pricing environment and with the advancement of drilling technology.

52.   Importantly, as explained in my Affirmative Report, investors were not surprised by the write-off. At paragraphs 328-329 of my Affirmative Report, I identified market participants' comments, which showed that the write-off was not surprising given the information that was previously disclosed. Before the write-off, multiple analyst reports questioned the viability in the then-deteriorating oil markets, with, for example, a Goldman Sachs report projecting "breakeven oil price of $45-50/bbl"[59] and Wood Mackenzie identifying internal rates of return of 15%, well beyond mere breakeven, for deepwater drilling.[60] Dr. Merrill fails to consider any of this evidence in assessing the relevance of the public's understanding of the Shenandoah appraisal project.

## 3. Rebuttal to the Steinholt Report

53.   Mr. Steinholt opines that "Plaintiffs allege that Defendants made public statements leading up to and during the Class Period about Shen that they failed to correct and concealed . . . material facts necessary not to make their statements misleading."[61] Below, I review the relevant background, statements, and/or investor understanding related to each purported non-disclosure Mr. Steinholt identifies.[62]

---

[59] Affirmative Report ¶ 96 (citing Goldman Sachs, "Anadarko Petroleum Corp. (APC) Unappreciated GOM production profile to drive the next leg up; Buy," February 5, 2017, p. 15 (GS-002754)).

[60] *Id.* ¶ 284 (citing Wood Mackenzie, "The Rising Hurdles for Investment in Upstream," April 30, 2021, p. 1).

[61] Steinholt Report ¶ 28.

[62] *Id.* ¶¶ 28, 29.

54.  **Conclusion A:  Anadarko did not disclose a resource range to the public, and investors would have understood how the post-Shen-2 wells would have affected Shenandoah's resource size.**

55.  Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[e]ach well post-Shen-2 reflected a significantly reduced Shen's resource size, falling below the range of expectations and rendering Shen uncommercial."[63]  I demonstrated in my Affirmative Report that, consistent with its prior practice and industry norms, Anadarko did not disclose a resource range.  However, Anadarko did disclose important information about well results and its plan forward.  These statements indicated to investors that Shenandoah was smaller than originally expected and faced challenges with faulting that might impact the development plan.  Importantly, Anadarko also repeatedly disclosed that it needed to conduct additional appraisal to understand the resource.

56.  At paragraphs 50-53 of my Affirmative Report, I explained that it is common for operators not to release resource ranges for a specific prospect during the appraisal process, and that Anadarko did not release a resource range for Shenandoah.

57.  At paragraph 16.c.vi of my Affirmative Report, I explained how investors understood that "the appraisal wells after Shen-2, with the exception of Shen-5, encountered less oil pay than Shen-2, indicating that the full resource size might be smaller than originally hoped."

58.  At paragraphs 210-215 and 218 of my Affirmative Report, I explained how investors and analysts understood that Shen-3 did not encounter hydrocarbons, reduced the areal extent

---

[63] *Id.* ¶ 28(a).

of the hydrocarbon bearing portion of the reservoir, and likely reduced the potential resources.

59.    At paragraphs 237-243 of my Affirmative Report, I explained how investors understood from Anadarko's statements that the original Shen-4 well encountered salt and that the sidetrack encountered less pay than Shen-2.

60.    At paragraphs 279-291 of my Affirmative Report, I explained how investors understood that Shen-5, which ultimately encountered more net pay than Shen-2, was a promising development.  However, I also explained that investors understood that Anadarko still needed to gain additional information about the resource size and find ways to reduce development costs, particularly due to then-prevailing low oil prices, before making an investment decision.

61.    At paragraphs 317-320 of my Affirmative Report, I explained how investors and other market participants understood that Shen-6 was a wet well.

62.    Mr. Steinholt's blanket statement that Anadarko did not disclose the resource size does not change any of the opinions in my Affirmative Report.  Given Anadarko's practices, investors would not expect Anadarko to release any internal estimate of resource range during the appraisal process.  Investors would also understand that any internal estimates of the resource range based on results of the appraisal wells were highly preliminary and subject to change as Anadarko learned additional information.  Anadarko did release tangible well results, such as sand quality, depth, oil-water contact, and porosity,[64] which

---

[64] For example, see Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay," March 19, 2013, https://finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html; Anadarko Petroleum Company, UBS Global Oil and Gas Conference Transcript, May 24, 2016, pp. 8-9 (APC-01753704).

allowed investors to gain helpful information on the characteristics and economic potential of Shenandoah.

63.    **Conclusion B:  Investors understood that the Gulf of Mexico was structurally complex and that there was faulting and compartmentalization in the Shenandoah basin.**

64.    Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[f]ault compartmentalization posed a serious risk to Shen's commercial viability and producible resource size[.]"[65]

65.    At paragraph 69 of my Affirmative Report, I explained that prior to the Class Period, the Gulf of Mexico was recognized as structurally complex, at least in part due to its faults. Moreover, as discussed above, even Dr. Merrill acknowledges that this complexity was publicly known.  Dr. Merrill also observed that a project's structural complexity increases as it progresses.  He said that "[i]t is not unusual for recognized structural complexity in a project to increase with time in a given field because seismic data improves, and newly drilled wells intersect faults and fractures."[66]  In other words, it is well known that there is faulting in the Gulf of Mexico, and investors in the industry would not have expected the field to be devoid of any faults.

66.    At paragraphs 264-269 of my Affirmative Report, I explained that by no later than May 2016, investors understood that there was faulting and compartmentalization in the Shenandoah basin.  This included faults between Shen-2 and Shen-3, and between Shen-2 and Shen-4.  Discovery of these faults required Anadarko to continue drilling to better understand the asset.

---

[65] Steinholt Report ¶ 28(b).

[66] Merrill Report ¶ 39.

67.  The purpose of an appraisal project is to understand the reservoir and determine if there is a feasible development solution. Investors would not have expected to know about every fault in the reservoir; they are more concerned with the feasibility of development.

68.  **Conclusion C:  Because Anadarko's resource range was not disclosed publicly, investors would not have been misled by any alleged inaccuracies in its range.  Furthermore, it was generally understood by investors that the region was geologically complex.**

69.  Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "Anadarko's resource range for Shen did not adequately reflect its structural uncertainties and sand thickness variability[.]"[67]  This allegation overlooks that Anadarko did not disclose a resource range for Shenandoah.  Accordingly, any alleged inaccuracies in its internal resource range would not have affected investor expectations for the project.

70.  At paragraphs 50-53 of my Affirmative Report, I explained that it is common for operators not to release resource ranges for a specific prospect during the appraisal process and that Anadarko did not do so for Shenandoah.  Opting to not disclose a resource estimate for Shenandoah is consistent with industry norms and Anadarko's stated practice of declining to release resource ranges at early stages of a project.

71.  Setting aside whether investor expectations would be affected by alleged inaccuracies in an undisclosed resource range, Anadarko's disclosures made clear that the region was geologically complex.  At paragraph 145 of my Affirmative Report, I explained that during the March 2014 investor conference, Mr. Daniels highlighted potential challenges of the

---

[67] Steinholt Report ¶ 28(c).

region, including that Anadarko's discoveries in the Shenandoah basin were "sub-salt" and required "seismic acquisition and imaging in very, very complex structural regimes."

72. Likewise, at paragraph 254 of my Affirmative Report, I explained that, aside from any statements from Anadarko, investors would have independently understood that the Gulf of Mexico was geologically complex, so the Shenandoah field may be faulted and thus may not have as large of an areal extent as initially hoped. I further explained how "Anadarko representatives repeatedly emphasized [their] lack of knowledge regarding the lateral extent of the eastern side of the field, indicating that there may be fewer or no hydrocarbons than expected in those areas, which could be attributable to faulting or compartmentalization."

73. Finally, at paragraph 307 of my Affirmative Report, I explained that during a February 2017 Earnings Call, Mr. Leyendecker highlighted the structural complexities of the Shenandoah field and Anadarko's lack of knowledge regarding the extent of the resource on the east side of Shenandoah.

74. Mr. Steinholt's claim does not consider the public statements that Anadarko made about not disclosing the resource range.

75. **Conclusion D: Investors would understand that projection of oil-water contacts would neither confirm nor condemn the commerciality of Shen. Furthermore, there was already substantial uncertainty around Shen's commerciality following the drilling of Shen-3.**

76. Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[p]ressure data from Shen-3 did not allow for the reliable projection of oil-water

contacts[.]"[68]  However, investors would not expect to know the degree of "reliab[ility]" with which Anadarko could "project[]" oil-water contacts.  The use of pressure data to project oil-water contacts is an engineering detail and beyond the scope of what most investors would focus on in assessing Shenandoah's commercial prospects.  Pressure data was also only one measure of many that Anadarko's internal technical team would consider in assessing the prospect.  More fundamentally, investors would understand that reliable projection of oil-water contact in one appraisal well would neither confirm the commerciality of Shenandoah nor condemn it.

77.    In addition, following Shen-3's drilling, investors understood there was substantial uncertainty around Shenandoah's commerciality, given that, for example, Anadarko's publicly traded partners wrote off the well as a "dry hole."  Any limitations of the pressure data from Shen-3 were in addition to other sources of uncertainty around Shenandoah's commerciality.  Investors recognized this uncertainty at least in part because Anadarko did not end its appraisal process after drilling Shen-3; rather, Anadarko announced that it would need to drill additional appraisal wells to better understand Shenandoah's resource potential.  As I described in paragraphs 62-70 of my Affirmative Report, investors understood that deepwater exploration is highly risky and faces substantial uncertainties, and more so in deepwater Gulf of Mexico because it is a complex environment with multiple subsurface faults that can limit the recovery of reserves.

78.    Mr. Steinholt's report does not analyze how knowing the projection of oil-water contacts would have meaningfully affected investors' view on Shenandoah.  In fact, Mr. Steinholt testified that he did not evaluate the materiality of the particular issues he raised in his

---

[68] *Id.* ¶ 28(d).

report, including pressure data from Shen-3, characterizing the issues as "too technical for [him]."[69]

79. **Conclusion E:  Investors would have understood that asphaltene would be mitigated as part of any development plan and that, in Shenandoah, asphaltene deposition properties were relatively insignificant.**

80. Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[t]he asphaltene deposition properties of the Shenandoah crude oils had multiple negative impacts on commercial viability[.]"[70]  However, as the Merrill Report makes clear, it was well known that Shenandoah was geologically complex.[71]  It was also known that there was a risk of asphaltene and that there were ways to mitigate that risk. [72] As such, investors understand that asphaltene is a potential challenge that may arise in geologically complex areas such as the Gulf of Mexico, and they would not expect to receive information about every detail of the reservoir.

81. In its reporting on each appraisal well, Anadarko emphasized that more information must be gathered before it could reach a final investment decision. [73] In addition, investors understood that just as important as geological questions was the price of oil—the primary driver of commerciality—and this had been deteriorating.  Measured against these factors,

---

[69] Deposition of Bjorn Steinholt, December 21, 2022, 76:13-78:19.

[70] Steinholt Report ¶ 28(e).

[71] Merrill Report ¶¶ 24, 29, 30, 32, 35, 39.

[72] See Abotaleb Abdelazim, et al., "Successful approach to mitigate the asphaltenes precipitation problems in ESP oil wells," Journal of Petroleum Exploration and Production Technology (2022), p. 737, https://doi.org/10.1007/s13202-021-01335-7.

[73] For example, see Affirmative Report ¶¶ 203, 221, 249, 252, 281; p. 139.

any concerns about how Shenandoah's asphaltene deposition properties might be mitigated were immaterial.

82.   The relative insignificance of Shenandoah's asphaltene deposition properties is evidenced by Beacon resuming operations.  With today's pricing environment and advances in technology, Beacon appears confident enough of commercial viability to commit an estimated $1.8 billion to develop Shenandoah. [74] Beacon's decision to proceed with development, even with Shenandoah's asphaltene deposition properties, demonstrates why investors properly focus on other issues when assessing commerciality.

83.   **Conclusion F:  Investors would have understood that information coming out of Shen-3 and Shen-4 would have resulted in a reduced resource range.**

84.   Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[r]esults from Shen-3 and Shen-4 resulted in a resource reduction of 64%, despite both wells being described as successful[.]" [75] However, any reduction to Anadarko's internal estimate of Shenandoah's resource range would not have affected investor expectations given that Anadarko did not disclose its resource range, as detailed in Section 3, Conclusion C above, and in my Affirmative Report at paragraphs 50-53.

85.   Moreover, even though Anadarko did not have a practice of disclosing resource ranges at early stages, investors understood that key information coming out of Shen-3 and Shen-4 drillings would have resulted in a reduced resource range.

---

[74] NS Energy, "Shenandoah Field Development," p. 1 (APC-01753939).; Offshore Engineer, Hunting's Titanium Stress Joints for Beacon Offshore Energy's Shenandoah Project, August 16, 2022.

[75] Steinholt Report ¶ 28.

86.   At paragraphs 210-215 and 218 of my Affirmative Report, I showed that investors and analysts understood that Shen-3 did not encounter hydrocarbons, reduced the areal extent of the hydrocarbon bearing portion of the reservoir, and therefore, likely reduced the potential resources.

87.   In terms of Shen-3 "being described as successful," at paragraphs 216-217 of my Affirmative Report, I explained how investors understood that Anadarko viewed Shen-3 as successful because it provided helpful information about the reservoir.

88.   At paragraphs 237-243 of my Affirmative Report, I showed that investors understood from Anadarko's statements that the original Shen-4 well encountered salt and that the sidetrack encountered less pay than Shen-2.

89.   At paragraphs 244-249 of my Affirmative Report, I showed that investors did not view Defendants' statements about the Shen-4 results as confirming any particular resource range.

90.   At paragraphs 250-255 of my Affirmative Report, I showed that investors understood after Shen-4 that any final investment decision would depend on the information gathered from Shen-5 and Shen-6, as Anadarko needed to better understand the size and quality on the east side of the prospect.

91.   At paragraphs 264-269 of my Affirmative Report, I showed that investors understood that there was faulting in the Shenandoah basin by no later than May 2016, and that this faulting required Anadarko to continue drilling to understand the asset.   In addition to understanding that there was a fault between Shen-2 and Shen-3 and between Shen-2 and Shen-4, investors also understood that the original Shen-4 wellbore drilled into salt.

92.   **Conclusion G:  Anadarko did not disclose a resource range and, therefore, investors would not expect to be apprised of how that undisclosed resource range is affected by internal disagreements.**

93.   Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "[a]n internal audit of Shen by Anadarko's RCT resulted in a significant downward adjustment to the resource size."[76]

94.   This allegation overlooks that Anadarko did not disclose a resource range for Shenandoah. As I have explained in Section 3, Conclusions C and F above, and in my Affirmative Report at paragraphs 50-53, Anadarko did not release a resource range for Shenandoah, and it is common for operators not to do so during the appraisal process. Accordingly, any downward adjustments to its resource range resulting from an internal audit or any other factor would not have affected investor expectations for the project.

95.   Additionally, investors would not expect to hear about internal disagreements, which are expected in the appraisal process; rather, investors would expect to learn about progress toward a final investment decision.  Investors who had never been provided a resource range would not expect to be apprised of how that undisclosed resource range is affected by the resolution of internal disagreements.

96.   **Conclusion H:  Investors understood that Anadarko conducted the appraisal process to understand the commerciality of Shenandoah, which depended on a number of factors.**

---

[76] *Id*. ¶ 28(g).

**They also understood that any final investment decision would be based on the results of Shen-5 and Shen-6.**

97.    Mr. Steinholt states that one of the "material facts" that Plaintiffs allege Anadarko concealed is that "Shen was more likely than not uncommercial after the results of Shen-3, and certainly not commercially viable after Shen-4[.]"[77]

98.    Mr. Steinholt does not provide a basis for this determination.  However, that Beacon is developing Shenandoah today demonstrates that Shenandoah is viewed as "commercially viable" in the current macroeconomic environment.  To the extent Mr. Steinholt suggests that Shenandoah was not commercial in the then-existing environment, Anadarko disclosed that it would not sanction Shenandoah at then-prevailing oil prices.

99.    Investors understood that Anadarko conducted the appraisal process to understand the commerciality of Shenandoah.  Commerciality would depend on many things, including the quality of the reservoir, cost of development, macroeconomic factors such as the price of oil, and how investment in Shenandoah fit within Anadarko's broader portfolio.

100.    At paragraphs 250-255 of my Affirmative Report, I explained how investors understood after Shen-4 that any final investment decision would depend on the information gathered from Shen-5 and Shen-6, as Anadarko needed to better understand the size and quality on the east side of the prospect.  As discussed above, at paragraphs 264-269 of my Affirmative Report, I showed that investors understood that there was faulting in the Shenandoah basin by no later than May 2016, and that this faulting required Anadarko to continue drilling to understand the asset.  In addition to understanding that there was a fault between Shen-2

---

[77] *Id*. ¶ 28(j).

and Shen-3 and between Shen-2 and Shen-4, investors also understood that the original Shen-4 wellbore drilled into salt.

101. At paragraphs 256-263 of my Affirmative Report, I explained that after the results of Shen-4 were released, investors understood that Anadarko was unlikely to invest in Shenandoah at then-prevailing oil prices. However, investors also understood that more appraisal work was needed, which required time and allowed for the possibility that oil prices would rise and the development of technology would advance.

102. Mr. Steinholt's statement that Anadarko concealed that Shenandoah was not commercially viable is not supported by any evidence and is in direct conflict with the current development occurring at Shenandoah. My review of Anadarko's and the partners' public statements, as well as market commentary, indicates that investors understood that Shenandoah faced challenges, particularly after Shen-4, but that Anadarko and the partners needed to continue to appraise the resource to decide whether or not to sanction the project.

103. **Conclusion I:  Mr. Steinholt mischaracterizes the alleged corrective disclosure.**

104. Mr. Steinholt states that "the alleged truth, *i.e.*, the lack of commercial viability of the Shenandoah project, was disclosed after the market had closed on May 2, 2017, as part of the Company's Q1 2017 announcement, including the suspension of appraisal activities in the Shenandoah and the associated $902 million write-off and expenses."[78]  Like Dr. Merrill, Mr. Steinholt mischaracterizes the alleged corrective disclosure.

105. At paragraphs 325-327 of my Affirmative Report, I showed how Anadarko explained that its decision to take the impairment and write-off was to satisfy accounting requirements

---

[78] *Id*. ¶ 29.

based on the results of Shen-6 and the then-current level of commodity price. Further, as analysts cited by Mr. Steinholt explain, Anadarko was assessing a path forward and had not concluded that Shen was, as Mr. Steinholt contends, not commercially viable.[79]

106. As discussed in paragraphs 43-45 above, Shenandoah could be commercially viable in the right commodity pricing environment and with the advancement of drilling technology. Furthermore, at paragraphs 328-329 of my Affirmative Report and as noted above, I identified market participants' comments, which showed that the write-off was not surprising given the information that was previously disclosed. Rather, investors understood that the write-off was to satisfy accounting requirements based on the results of Shen-6.

## 4. Rebuttal to the Regan Report

107. **Conclusion A:  The Regan Report fails to account for the context of Anadarko's pre-Shen-3 statements.**

108. Mr. Regan opines that "given Anadarko's asserted potential significance of the Shenandoah project, including Shen-3, on the Company's future operations and profitability, Anadarko's disclosures asserting the success of Shen-3, despite it being a dry hole, further

---

[79] Raymond James, "1Q17 Quick Take: Anadarko Reports Solid First Quarter," May 2, 2017, p. 1 (APC-01553905) ("On the offshore front, the company met some difficulties in the Shenandoah field, with its latest appraisal failing to encounter the oil-water contact in the eastern portion of the field. As such, the company has suspended appraisal activity in the field while it evaluates the path forward."); RBC Capital Markets, "Market Focus May Be Elsewhere," May 2, 2017, p. 1 (APC-01379628) ("We think APC remains committed to evaluating the potential of this project but does not have definitive plans at this time."); UBS, "Anadarko Petroleum Corp. Large Exploration Expense Drives 1Q17 EPS/CFPS Miss but EBITDX Beats; Maintains 2017 Guidance," May 3, 2017, p. 8, (UBS00071254) ("APC has currently suspended appraisal activity while it evaluates the path forward, including monetizing the field or abandoning it as economics are marginal at current oil prices.").

supports the materiality of Anadarko's misstatement and related disclosure omissions."[80] In doing so, he relies upon several of Anadarko's public statements.

109. In support, Mr. Regan first opines that "the importance of both Shenandoah and Shen-3 were repeatedly communicated by Anadarko's management and others."[81]  Mr. Regan quotes various Anadarko employees regarding their excitement and optimism over discovering Shenandoah.  For example, he quotes Anadarko's management describing Shenandoah as a "big exploration" project and saying they were "very encouraged."[82]  He quotes Frank Patterson of Anadarko as saying, "Shenandoah could end up being one of the largest discoveries in the Gulf of Mexico, we don't know" and that they are "pretty excited."[83]  Elsewhere, for example, he quotes Robert Daniels saying, "[w]e have the big discovery at Shenandoah."[84]

110. As of October 2014, only Shen-1 and Shen-2 had been drilled, both with encouraging results.  At that time, the prevailing outlook on commodity pricing was promising.  However, even after encouraging results from Shen-1 and Shen-2, investors were aware that deepwater wells drilled to 30,000 feet in high-pressure, sub-salt environments represented high-risk prospects.  As I explained in my Affirmative Report, there is significant uncertainty as to the likelihood of drilling success and the economics of full-scale development in this environment, and this is especially true in the Gulf of Mexico.[85]  Investors understood that the results of Shen-1 and Shen-2 did not necessarily mean that there would be an final

---

[80] Regan Report ¶ 79.

[81] *Id.* ¶ 80.

[82] *Id.* ¶ 80(a).

[83] *Id.* ¶ 80(c).

[84] *Id.* ¶ 80(d).

[85] Affirmative Report ¶¶ 62-70.

investment decision.[86]  Investors understood that the appraisal program was in its early stages, and that any development would depend on the findings of the appraisal program, cost of development, and macroeconomic factors such as the price of oil, as emphasized by Anadarko in its public statements.[87]

111.  Mr. Regan's analysis is flawed because he fails to put these statements into the context of a large-scale, long-term appraisal project.   Investors would not have understood these statements as a guarantee.

112.  **Conclusion B:   The Regan Report fails to recognize that investors understood that the decision to write off a particular well depends on the internal policy and that different companies apply different standards.  Here, investors understood that Shen-3 was a dry hole.**

113.  Mr. Regan suggests that the decision not to write off Shen-3 caused Anadarko's financial statements to be materially misstated because Anadarko's action was in conflict with some of the other partners' disclosures:

> Of further significance was Anadarko's other 2014 disclosures that *did not explicitly acknowledge that Shen-3 was a dry hole or wet well*.  Instead, Anadarko disclosed the favorable outcome of its Shen-3 well, characterizing it as a '*very successful appraisal well*,' and in March 2015 generally noted that Shenandoah was '[a]dvancing [t]oward [d]evelopment.[88] (emphasis added).

114.   Mr. Regan then comments on an investment researcher's inquiry about the Company's plans for project development and Mr. Daniels' response which, according to Mr. Regan,

---

[86] *Id.* ¶¶ 118-121, 128-135.

[87] *Id.*

[88] Regan Report ¶ 81.

"conveyed management's excite[ment] at Shenandoah and the 'very good' project results."[89]  Mr. Regan asserts that Mr. Daniels' response and Anadarko management's prior expressions of encouragement over Shen-3 were "in contrast to the 'bad news,' 'unsuccessful,' 'wet well,' and 'dry hole' characterizations of Shen-3[.]"[90]  He also contends that Anadarko executives avoided certain characterizations of Shen-3—namely that it was a wet well, reduced the resource range, and had "technological challenges," "execution risk," and a "major fault."[91]

115.  Mr. Regan's materiality analysis is flawed because Mr. Regan fails to recognize the basic premise that investors' understanding of the Shenandoah project was based on all of the information available in the market, including the partners' accounting decisions.  He also fails to understand that, based on the totality of information in the market, investors understood that Shen-3 did not encounter hydrocarbons—the reason he claims it should have been immediately expensed.

116.  At paragraphs 71-72 of my Affirmative Report, I explained that investors understand that the decision to record a dry hole expense is based on company-level accounting policy. Investors understand that exploration companies involved in a joint venture, such as the Shenandoah Partners, make independent accounting determinations based on their own interpretation of well results, applicable accounting standards, and individual accounting policies and, accordingly, may reach different determinations regarding whether and when it is appropriate to write off well costs as a dry hole expense.

---

[89] *Id.* ¶ 82.

[90] *Id.* ¶ 83.

[91] *Id.* ¶ 85.

117. At paragraphs 184-218 of my Affirmative Report, I explained that investors understood that Shen-3 was a dry hole. Several Shenandoah Partners wrote off Shen-3 as a dry hole in January or February 2015. It was also clear based on statements from Anadarko itself and market participants, like analysts and energy news sources, that investors understood that Shen-3 did not encounter hydrocarbons.

118. In my Affirmative Report, and as summarized above, I described how investors understood results from Shen-3 and statements about the well being "successful." Briefly, investors understood Shen-3 was a dry hole at least in part because Anadarko's partners described it this way and expensed the drilling costs. They also understood that Anadarko viewed the well as successful because it helped define the reservoir, or, as quoted by Mr. Regan, it provided "a much better handle on the oil in place."[92]

119. However, in addition to describing how Shen-3 was successful, Anadarko continued to inform market participants that additional appraisal drilling would be necessary before development could be sanctioned. In addition to hearing expressions of optimism and observing Anadarko's and its partners' willingness to proceed with the project, investors also were aware of the "dry hole" characterizations that Mr. Regan has identified.[93] These characterizations provided them with a balanced understanding of the potential upside and downside coming out of Shen-3 and Shen-4.

120. As the above demonstrates, Mr. Regan's materiality analysis fails to account for the fact that the partners' accounting decisions affected the market's understanding of Shenandoah. He also fails to consider how investors understood Anadarko's own statements about Shen-3.

---

[92] Affirmative Report ¶ 193.

[93] *Id.*

Most importantly, with all the information in the market, investors understood that Shen-3 did not find oil—the fact Mr. Regan suggests Anadarko failed to disclose.

121. **Conclusion C:  The Regan Report's materiality analysis fails to recognize that investors care about whether the project will be developed, not the accounting decision on one particular appraisal well.  Ultimately, whether Anadarko develops Shenandoah does not depend on whether it expenses Shen-3.**

122. The Regan Report does not explain why investors would care about the accounting decision for a particular well when the underlying facts that are relevant to that accounting decision are public and available to investors.

123. As explained in my Affirmative Report, investors understand that oil and gas companies must invest a significant amount of time and money to understand and appraise an oil discovery.[94]  Investors understand that in the course of this appraisal process, it is not uncommon for a company to drill a well that does not encounter hydrocarbons.[95]  Investors also understand that after an exploration company incurs costs associated with an appraisal well, it must determine whether to suspend or expense well costs based on company-level accounting policy.[96]  Furthermore, investors understand that exploration companies may expense millions of dollars in dry hole costs each year, given the substantial risk of dry holes in exploratory drilling, and that this is a necessary part of deepwater exploration drilling.[97]

---

[94] *Id.* ¶¶ 54-61.

[95] *Id.* ¶¶ 71-75.

[96] *Id.*

[97] *Id.*

124. At issue here are sunk costs, i.e., costs of wells that have already been drilled. The issue is whether it is appropriate that Anadarko suspended, rather than immediately expensed, those costs. But as Plaintiffs' other expert Mr. Steinholt opines, "From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of those cash flows."[98] Investors are concerned with the overall decision of whether, following the appraisal process, the company will ultimately invest in the project. This decision depends on well results throughout the project, not on the accounting decision of whether to expense a particular well. Thus, while investors are concerned with the results of a well, they are not concerned with the question of whether to suspend those costs pending further appraisal or immediately expense those costs.

125. In addition, investors—particularly those who are aware that Anadarko's partners had expensed Shen-3 and called it a dry hole—would not consider it material that Anadarko chose not to expense Shen-3 given that they make investment decisions based on the company's expected performance. The Regan Report contends that "the proper inclusion and disclosure of Shen-3 related dry hole expense as of December 31, 2014 would have negatively impacted Anadarko's respectively reported annual Income (Loss) before taxes and disclosed dry hole expense by an amount much greater than 5%."[99] Mr. Regan clarified his point at deposition when he was asked "if that number [exploratory well costs] is 5 percent off, a reasonable investor might change his or her invest decision based on that?" He responded: "I think that's – that's part of the total mix of information that may be

---

[98] Steinholt Report ¶ 49.

[99] Regan Report ¶ 74.

important to a reasonable person reviewing the financial statements. I don't think you can look at one percentage; you need to look at the total mix."[100]

126. Mr. Regan's statement that "[y]ou need to look at the total mix" of information is correct. That total mix, as noted, includes the understanding that Anadarko's partners expensed the well and called it a dry hole. Yet another write-off by Anadarko, in addition to those of its partners, would provide no incremental value to an investor's understanding of Shenandoah's expected commerciality. In addition, investors are concerned with how the total mix of information affects projections of future profitability for not only a single well or even an entire field, but the company as a whole. In my Affirmative Report, I reported that "I found at least 314 reports from 22 analysts, including UBS, JP Morgan and Goldman Sachs published … during the Class Period that applied a NAV [net asset value] approach to estimate the value of Anadarko."[101] Only a small number of those reports identified a non-zero value for Shenandoah, and those reports indicated a range of values that represented only 1.1% to 3.7% of Anadarko's total net asset value.[102] This range applies to the value of the Shenandoah project as a whole—not the decision to expense a single well— and still falls short of the 5% threshold on the metric that investors are most concerned about: company value. The total cost of Shen-3, $66 million, was not material against Anadarko's multi-billion-dollar market cap.

---

[100] Deposition of Paul Regan January 20, 2023, 124:10-124:20.

[101] Affirmative Report ¶ 97.

[102] *Id*.

127. **Conclusion D: The Regan Report improperly interprets finding "50% more … sands" as "50% more resources."**

128. The Regan Report contends that Anadarko's Q4 2014 earnings release and operations report "contained positive and incorrect statements regarding Shenandoah, particularly about finding 50% more resources rather than actually finding less."[103]

129. As an initial matter, the Regan Report is factually wrong.  The Q4 2014 Operations Report did not state that Anadarko found "50% more resources," but instead stated that "[t]he Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands[.]"[104]

130. My review of analyst reports and commentary finds no suggestion that investors would have interpreted the statement "50% more … sands" as meaning "50% more resources." Investors understood that Anadarko had reported net pay for its previous wells Shen-1 and Shen-2, but it did not do so for Shen-3, instead commenting on the amount of sands discovered.   Anadarko's Q4 2014 Operations Report emphasizes this difference by juxtaposing the two measures in the same sentence—discovery of "sands" by Shen-3 as compared to "1,000 feet of net oil pay" discovered by Shen-2.[105]  By disclosing that it encountered 50% more sands, without any discussion of net pay, Anadarko indicated that it did not encounter oil in those sands.  To the extent the Regan Report suggests that

---

[103] Regan Report ¶ 82, n. 137.

[104] Anadarko Q4 2014 Operations Report, February 2, 2015 (APC-00002814-2830).

[105] *Id.* ("The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands.").

Anadarko disclosed a 50% increase in the resource *range*—something that Anadarko did not disclose at all—I find no support for that proposition.

131. **Conclusion E:    The Regan Report ignores disclosures Anadarko made regarding challenges encountered during the Shenandoah appraisal process.**

132. Mr. Regan states that "[p]rior to the . . . end of Q1 2017, Anadarko continued to assert the success of certain wells and the implicit possibility of future economic benefit of its Shenandoah-related investments."[106]  The statements Mr. Regan quotes from this period— before drilling of Shen-6 was completed—again provide investors with a balanced understanding of Shenandoah's upside potential and downside risks as known at the time.

133. For example, he quotes Mr. Daniels as stating, "[w]e have high expectations" for Shen-5 even though "we need to drill the well and see," adding "[t]hat's what appraisal is all about."[107]  He also quotes Mr. Daniels emphasizing that Anadarko had much more to learn through the appraisal process: "[W]e're a long ways from sanction at this point.   If Shenandoah-5 is successful, we may move even farther to the east with a Shenandoah-6, but of course that will be all dependent on what happens at Shenandoah-5."[108]

134. Mr. Regan also quotes Mr. Daniels shortly thereafter, again emphasizing downsides and unknowns.  For example, he quotes Mr. Daniels as stating, "I don't think that we have a price deck right now that says it would be economic" and "we still are advancing the project, but we're a ways away from a sanction at Shenandoah."[109]

---

[106] Regan Report ¶ 107.

[107] *Id.* ¶ 108(a).

[108] *Id.*

[109] *Id.* ¶ 108(b).

135. Mr. Regan quotes Mr. Leyendecker referencing the "fantastic Shenandoah discovery."[110] Mr. Leyendecker said this on May 11, 2016, during the drilling of Shen-5 which ultimately found over 1,000 feet of net pay.

136. Mr. Regan quotes Ms. Szabo, as did Dr. Merrill, offering her opinion: "I think when you look at Shenandoah, it goes without saying that it is the finest lower-tertiary discovery to date in the Gulf of Mexico."[111] In addition to offering her opinion, she cautioned that "we're just about to finish up the #5 well, so we can't reveal exactly what's going on there."[112] Despite that caution, it would turn out that, as noted, Shen-5 would find over 1,000 feet of net pay.[113]

137. Mr. Regan quotes Mr. Gwin during the drilling of Shen-5 expressing "enthusiasm" and calling Shenandoah "a tremendous resource potential."[114] As noted, findings from Shen-5 validated this enthusiasm. At the same time, Mr. Gwin also emphasized that appraisal work would be ongoing even after Shen-5: "The results of Shen-5 have put as [sic] in a position where we clearly expect to drill Shen-6 later this year and continue with an appraisal program there." [115] He also emphasized the variation in how potential development might ultimately play out: "Something like a Shenandoah is obviously

---

[110] *Id.* ¶ 108(c).

[111] *Id.* ¶ 108(d).

[112] *Id.* ¶ 108(d).

[113] Anadarko Petroleum Corporation, FQ4 2016 Earnings Call Transcript, February 1, 2017, p. 15 (APC-01751627).

[114] Regan Report ¶ 108(e).

[115] *Id.*

tremendous resource potential, but the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue."[116]

138.    Investors would understand from these statements that while Shen-5 was expected to provide encouraging results, which it ultimately did with over 1,000 feet of net pay, Anadarko was still far from reaching a final investment decision, and considerable uncertainty remained around sanctioning.   As described in my Affirmative Report, investors were aware that Shen-4 encountered salt and that the sidetrack encountered less pay than Shen-2.   They were also aware that there was faulting in the Shenandoah basin. Investors further understood that after the results of Shen-4 were released, Anadarko was unlikely to invest in Shenandoah at then-prevailing oil prices.   Commentary from analysts demonstrates an understanding that the Shenandoah project had not been sanctioned and would not be sanctioned at the oil prices at that time.

Dated: January 25, 2023

---

[116] *Id.*

# Appendix A

**Curriculum Vitae**



<div align="center">

**PETER W. KELLER**

BERKELEY RESEARCH GROUP, LLC

810 Seventh Avenue, 41st Floor; New York, NY 10019

Direct: 646.651.4735

Mobile: 914.523.8680

pkeller@thinkbrg.com

</div>

<div align="center">

**SUMMARY**

</div>

Experienced energy professional involved in oil & gas finance since 1978 and utility/power finance since 2003. Strong skills in transaction negotiation, origination and structuring in both the institutional and corporate banking sectors. Arranged/participated in transactions across the energy spectrum from E&P, midstream, refining & pipeline to nuclear, fossil & renewable generation, to electric transmission & distribution.  Strategic advisor to numerous investor owned utilities across the United States.  Headed the team responsible for a majority of BNY Mellon's investment grade debt capital markets business. Deep background in industry analysis, policy support, risk management, relationship management and marketing.

Active in various national organizations including the American Gas Association, the Edison Electric Institute, the Nuclear Energy Institute/Institute of Nuclear Power Operations Senior Executive Leadership Program, the Nuclear Decommissioning Trust Conference, the Nuclear Energy Institute and the Utility Pension Fund Study Group.  A speaker at industry conferences, workshops and hearings.  Drove significant growth over many years across BNY Mellon's largest portfolio outside of financial institutions; successful as a team leader and as the relationship lead on a number of franchise relationships.

<div align="center">

**EXPERIENCE**

</div>

**BERKELEY RESEARCH GROUP, LLC, New York, NY**                    **2015 - present**
**Managing Director - Energy**
Joined BRG in 2015 as part of the firm's expansion of its energy practice.  Work includes strategic advisory on energy financing, transactional advisory, asset/portfolio optimization, project evaluation/implementation, risk assessment and mitigation, climate risk/energy transition assessments, regulatory support/testimony and expert witness/litigation support.

**THE BANK OF NEW YORK / BNY MELLON, New York, NY**                    **1998 - 2014**
**Managing Director, Energy Group Head   (2007-2014)**
Oversight of a $7.4 billion portfolio comprised of the Bank's franchise energy relationships across the U.S.  including oil & gas & midstream & oilfield serve and essentially all investor owned public utilities and the TVA. Significant portfolio revenues based on credit/capital markets/syndication income and a broadly diversified group of product cross-sells.  Management responsibility for a team of senior relationship officers and analytical, marketing and support staff.   Responsibilities included strategic planning, general management, credit oversight/approval, marketing initiatives, divisional budgeting and risk analyses. Responsible for BNY Mellon's activities in the Nuclear Decommissioning Trust (NDT) sector and coordinated the Bank's sponsorship of the annual Nuclear Decommissioning Trust Conference.  BNY Mellon was the first bank to structure an NDT, has a dominant position as an NDT trustee and manages a significant portfolio of NDT assets.

**BRG | ENERGY & CLIMATE**

**Managing Director, Energy Division Head    (2005-2007)**
Energy East and West Divisions consolidated into a single division under my management.  Consolidated group included over 130 relationships in the public utility, oil & gas, oilfield service, refining & marketing, petrochemical and mining sectors.  Managed a team of ten relationship officers and support staff.  Responsibilities included strategic planning, general management, credit oversight/approval, marketing initiatives, divisional budgeting and risk analyses.

**Managing Director, Energy East Division Head    (2004-2005)**
Promoted from Vice President to Managing Director, responsibilities as noted below.

**Vice President, Energy East Division Head    (2003-2004)**
Promoted to assume management of the Bank's Energy East Division, which included over 65 relationships in the public utility, oil & gas, refining & marketing and mining sectors generating revenues in excess of $40 million annually.  Managed a team of four relationship officers and support staff.

**Vice President, Oil & Gas Division    (1998-2003)**
Hired to expand the bank's relationships in the exploration and production sector; also active in the oilfield service and pipeline/diversified sectors.  Focus on reserve-based lending and longer-term non-recourse asset financing.

**RPI INSTITUTIONAL SERVICES, INC., New York, NY**                                **1981 - 1998**
**Principal**
RPI provided investment management and advisory services to corporate pension funds and university endowments.  As a principal I managed discretionary and non-discretionary accounts handling all phases of locating, evaluating, negotiating, and structuring direct oilfield investments.  Originated complex financing for numerous acquisitions, primarily in the offshore Gulf of Mexico, from international major oil companies.

In addition, was a principal in RPI's predecessor firm, Resource Programs, Inc., that advised a broad range of investment bank, commercial bank, brokerage, insurance company and corporate clients on oil and gas direct investments.  In that role, managed the field review activities of petroleum engineers, geologists and accountants and provided detailed reports on the technical and administrative capabilities of companies reviewed for our clients.

**MIDLANTIC NATIONAL BANK, Newark, NJ**                                **1975-1981**
**Corporate Banking Officer**
Corporate lender in the National Division of the Corporate Bank, responsible for all clients and prospects in the Midwest U.S. (Minneapolis east through Ohio). Participated in formulating and implementing the bank's Energy Lending Program which involved developing and expanding a portfolio of reserve-based credit facilities with clients in Texas, Colorado and Oklahoma.  Traveled extensively and generated significant expansion in relationships.  Organized and conducted the bank's annual in-house credit training program in years 1977-1979 (a twelve to fifteen week classroom course in financial analysis and commercial lending).

**BRG | ENERGY & CLIMATE**

## LITIGATION/ARBITRATION CONSULTING

Georgia Firefighters' Pension Fund, et al v. Anadarko Petroleum, R.A Walker, Robert G. Gwin, Robert P. Daniels and Ernest A. Leyendecker.  Expert witness reports, rebuttal, depositions.
July 2021 -

SPM NAM, et al v. SM Energy.  Expert witness reports, rebuttals, deposition preparation for testimony.
October 2019 – November 2020

LCT Capital, LLC v. NGL Energy Partners LP and NGL Energy Holdings, LLC.  Expert witness reports, rebuttal reports, deposition & testimony.
May 2017 - June 2018, July 2021 -

Michael Christopher v. ArcLight Capital Holdings, LLC, et al. JAMS Arbitration. Deposition.
October 2016.

### EDUCATION

Williams College, Williamstown, Massachusetts
1975 - BA, History / Environmental Studies / Economics

New York University, New York, New York
Courses at the Graduate School of Business Administration

### AFFILIATIONS

President of the Board - Episcopal Charities of New York
Advisory Committee Member & Grants Policy Committee Chair- Episcopal Charities of New York

Task Force for Puerto Rico and the Caribbean Recovery
Episcopal Diocese of New York

Member
Priory of The Most Venerable Order of St. John

Joint Civilian Orientation Conference, JCOC 83

Marine Corps Executive Forum

Chair of the Search Committee
Former Member of the Vestry
Treasurer
Member of the Investment Committee
St. Matthew's Episcopal Church, Bedford, New York

3

Member of the Bedell Fund Commission
Foundation established to strengthen the Episcopal Church through funding of major capital projects and clergy support

Member,
Former President, Bedford Village Chowder & Marching
Not-for-profit community organization supporting community youth organizations and activities and providing college scholarships in Bedford, New York

Former Member of the Vestry
Clerk of the Vestry
The Church of St. Mary the Virgin, Chappaqua, New York

Trustee Emeritus
Former Treasurer
Hebron Academy, Hebron, Maine

Former Class Agent
Capital Campaign Special Gifts Committee Member
Williams College, Williamstown, Massachusetts

4



## Peter Keller Structured Financings BNY/BNY Mellon

| | | |
|---|---|---|
| **Burlington Resources** | **Lost Creek Gathering Company** | **2000** |
| | $66MM 10 year non-recourse financing, backed by a ship-or pay contract, of a 122 mile pipeline to connect the Madden Field in WY to the CIG mainline. | |
| **Coastal Corp.** | **Aruba Coker Trust** | **2000** |
| | $359MM 7.5 year securitized synthetic lease financing for the installation of a delayed coker at the Aruba refinery | |
| **Coastal Oil & Gas** | **Santa Rita Capital (Coastal Oil & Gas and The University of Texas)** | **1999** |
| | $350MM 6 year non-recourse volumetric production payment, supported by Texas reserves of Coastal Corporation. | |
| **El Paso Corp.** | **Mustang Investors, LLC** | **2002** |
| | $970MM 5 year off balance sheet, minority interest, tax driven financing in a bankruptcy remote SPV formed to monetize certain pipeline and financial assets of El Paso | |
| **Murphy Oil Corp.** | **MOCL/CMB SPV** | **2001** |
| | $575MM 5 year amortizing structured financing, involving a forward sales contract supporting Murphy's acquisition of Beau Canada Exploration, Ltd. | |
| **Ocean Energy, Inc.** | **Ocean Gantor Trust** | **2001** |
| | $137MM 5 year lese financing of a (at the time the largest ever) spar-based floating production platform at Nansen/East Breaks Block 602 in the deepwater Gulf of Mexico | |
| **TOSCO Corp.** | **Tosco Trust 2000-E** | **2000** |
| | $600MM 5 year special purpose grantor trust financing the acquisition of 391 Exxon/Mobil stations from Exxon (to satisfy DOJ issues connected to Exxon's acquisition of Mobil). | |
| **Transocean Sedco Forex** | **Discoverer Enterprise Hull Financing** | **1999** |
| | $290MM non-recourse hull financing for a fifth generation double hulled dynamically positioned, dual derrick deepwater drillship, backed by 10 year full-payout lease from BP Americas | |
| **Valero Energy Corp.** | **Valero Coker Trust** | **2002** |
| | $290MM 6 year synthetic lease financing the installation of a delayed coker at Valero's Texas City, TX | |

## Peter Keller Reserve Based Borrowing Base Financings BNY/BNY Mellon

| | | |
|---|---|---|
| **Cabot Oil & Gas** | end date reflects transition to balance sheet loan | 1998-2003 |
| **EEX Corp.** | acquired by Newfield Exploration in 2003 | 2000-2003 |
| **Forest Oil** | end date reflects transition to balance sheet loan, subs merged with Sabine | 2000-2004 |
| **Houston Exploration** | sub. of Brooklyn Union Gas, acquired by Forest Oil in 2007 | 1999-2002 |
| **Newfield Exploration** | end date reflects transition to balance sheet loan | 2000-2003 |
| **Westport Resources** | acquired by Kerr-McGee in 2004 | 2001-2004 |

## Peter Keller Institutional Acquisitions/Project Financings RPI Institutional Services

Institutional investors in RPI-originated transactions: Bard College, Frigidare Pension Trust, GE Investment Corp., GMAMCo, General Motors Hourly Employes Trust, General Motors Salaried Employes Trust, Owens-Illinois Pension Trust, The University of Texas System

| Seller | Assets/Fields | |
|---|---|---|
| **Amoco** | Port Hudson Field | 1993 |
| **ARCO** | Chandeleur Sound Block 25, 99 well offshore package | 1989 |
| | Chandeleur Sound Blocks 40 & 41 offshore package | 1994 |
| **Chevron** | Main Pass Block 35, originally 134 wells | 1993 |
| **Chevron** | Main Pass block extension | 1994 |
| **Chevron** | South Bosco, multiple onshore fields | 1993 |
| **Chevron** | Black Bay Complex,  8 fields, 90 wells | 1992 |
| **Various** | Anschutz Ranch East | 1994 |
| | Midway-Sunset | |
| | South Pass, multiple blocks | |
| | Spraberry Package | |
| **W&T Offshore** | West Delta 30 Field, Producing Property/Seismic Delineated Exploration | 1994 |

# Prior Testimony of Peter Keller

1.  SPM NAM, et al v. SM Energy. Expert witness reports, rebuttals, deposition preparation for testimony (October 2019 – November 2020)

2.  LCT Capital, LLC v. NGL Energy Partners LP and NGL Energy Holdings, LLC. Expert witness reports, rebuttal reports, deposition & testimony (May 2017 - June 2018, July 2021-ongoing)

3.  Michael Christopher v. ArcLight Capital Holdings, LLC, et al. JAMS Arbitration. Deposition (October 2016).

# Appendix B - Materials Relied Upon

## 1. Expert Reports

1.    Expert Report of Peter Keller, November 9, 2022
2.    Expert Report of Bjorn I. Steinholt, CFA, November 9, 2022
3.    Expert Report of Robert Merrill, Ph.D., November 9, 2022
4.    Expert Report of D. Paul Regan, CPA/CFF, November 9, 2022

## 2. Depositions

5.    Deposition of Bjorn Steinholt, December 21, 2022
6.    Deposition of Robert Merrill, December 7, 2022
7.    Deposition of Paul Regan, January 20, 2023

## 3. Securities and Exchange Commission Filings

### 3.1.    Anadarko Petroleum Corporation

8.    Anadarko Petroleum Corporation, 2014 10-K, February 20, 2015 (APC-01751751)

## 4. Investor Conference Transcript/Presentation

### 4.1.    Anadarko Petroleum Corporation

9.    Anadarko Petroleum Corporation, Q3 2013 Earnings Call Transcript, November 5, 2013
10.    Anadarko Petroleum Corporation, Investor Conference Transcript, March 4, 2014, (APC-01753577)
11.    Anadarko Petroleum Company, Investor Conference Presentation, March 4, 2014, (APC-01753996)
12.    Anadarko Petroleum Corporation, Q1 2014 Earnings Call Transcript, May 6, 2014 (APC-01751460)
13.    Anadarko Petroleum Corporation, FQ2 2014 Earnings Call Transcript, July 30, 2014
14.    Anadarko Petroleum Corporation, FQ2 2015 Earnings Call Transcript, July 29, 2015
15.    Anadarko Petroleum Corporation, Investor Conference Transcript, October 28, 2015 (APC-01751438)

16.    Anadarko Petroleum Company, UBS Global Oil and Gas Conference Transcript, May 24, 2016 (APC-01753704)

17.    Anadarko Petroleum Corporation, J.P. Morgan Energy Equity Investor Conference Transcript, June 28, 2016 (APC-01753717)

18.    Anadarko Petroleum Corporation, FQ4 2016 Earnings Call Transcript, February 1, 2017, (APC-01751627)

### 4.2.    Other Shenandoah Partners

19.    ConocoPhillips, Q3 2014 Earnings Call Transcript, October 30, 2014

# 5. Operations Reports

20.    Anadarko Petroleum Corporation, Q2 2014 Operations Report, July 29, 2014

21.    Anadarko Petroleum Corporation, Q4 2014 Operations Report, February 2, 2015, (APC-00002814-2830)

# 6. Analyst Reports

22.    Guggenheim, "APC – BUY - Increasing Price Target to $115 on Multiple Exploration and Development Catalysts," April 1, 2013

23.    Global Hunter Securities, "Another GOM success at Phobos," April 25, 2013

24.    RBC Capital Markets, "Anadarko Petroleum Corp. The Plan Has Come Together," March 16, 2017, p.3 (APC-01334517)

25.    Raymond James, "1Q17 Quick Take: Anadarko Reports Solid First Quarter," May 2, 2017, (APC-01553905)

26.    RBC Capital Markets, "Market Focus May Be Elsewhere," May 2, 2017, (APC-01379628)

27.    UBS, "Anadarko Petroleum Corp. Large Exploration Expense Drives 1Q17 EPS/CFPS Miss but EBITDX Beats; Maintains 2017 Guidance," May 3, 2017, (UBS00071254)

# 7. Industry Documents

28.    American Association of Petroleum Geologists, "Discovery Thinking: The Gulf of Mexico Advantage," April 7, 2014, https://www.aapg.org/videos/discovery-thinking/articleid/37096/ernie-leyendecker-discovery-thinking-the-gulf-of-mexico-advantage

29. C. Mark Pearson, Coloradans for Responsible Energy Development, "The Seven Steps of Oil and Natural Gas Extraction," https://www.cred.org/seven-steps-of-oil-and-natural-gas-extraction/

30. NS Energy, "Shenandoah Field Development," (APC-01753939)

31. Offshore, Shenandoah gets the go-ahead in the deepwater Gulf of Mexico, August 26, 2021.

32. Offshore Engineer, Hunting's Titanium Stress Joints for Beacon Offshore Energy's Shenandoah Project, August 16, 2022

# 8. Academic Literature

33. Abotaleb Abdelazim, et al., "Successful approach to mitigate the asphaltenes precipitation problems in ESP oil wells," Journal of Petroleum Exploration and Production Technology (2022), https://doi.org/10.1007/s13202-021-01335-7

# 9. News Article

34. Yahoo Finance, "Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay," March 19, 2013, https://finance.yahoo.com/news/anadarko-announces-shenandoah-appraisal-well-200500390.html

35. Businesswire, "Chevron Announces the Successful Appraisal of the Anchor Discovery in the Deepwater Gulf of Mexico," October 29, 2015

36. Chevron, "Chevron Sanctions Anchor Project in the Deepwater U.S. Gulf of Mexico," December 12, 2019

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM          ) Civil Action No.

CORPORATION SECURITIES            ) 4:20-cv-00576

LITIGATION                        )

_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

PETER KELLER

Tuesday, January 17, 2023

Remotely Testifying from Hilton Head, South Carolina

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5630979

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_____ )

Virtual videoconference video-recorded deposition of PETER KELLER, remotely testifying from Hilton Head, South Carolina, on Tuesday, January 17, 2023, pursuant to the stipulations of counsel thereof, before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

Page 2

REMOTE APPEARANCES OF COUNSEL: (CONTINUED)

For Defendants:

SHIPLEY SNELL & MONTGOMERY

BY: GEORGE SHIPLEY, ESQ.

712 Main Street, Suite 1400

Houston, Texas 77002

713.652.5920

gshipley@shipleysnell.com

Also Present:

KALLIE GALLAGHER, Andarko

JOHN MACDONELL, Video Operator

Page 4

REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

For Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP

BY: RACHEL JENSEN, ESQ.

BY: RAPHAELLA FRIEDMAN, ESQ.

BY: FRANCISCO MEJIA, ESQ.

655 West Broadway

San Diego, California 92101

rjensen@rgrdlaw.com

rfriedman@rgrdlaw.com

fmejia@rgrdlaw.com

For Defendant and the Witness:

CRAVATH, SWAINE & MOORE

BY: BENJAMIN GRUENSTEIN, ESQ.

BY: LAUREN PHILLIPS, ESQ.

BY: CHIZOBA UKAIRO, ESQ.

825 8th Avenue

New York, New York 10019

bgruenstein@cravath.com

lphillips@cravath.com

cukairo@cravath.com

Page 3

INDEX OF EXAMINATION

WITNESS: PETER KELLER

| EXAMINATION | PAGE |
|---|---|
| BY MS. JENSEN: | 10 |

Page 5

2 (Pages 2 - 5)

INDEX OF EXHIBITS

KELLER DEPOSITION EXHIBITS                PAGE

Exhibit 505   "Expert Report of Peter          44
Keller, November 9, 2022";
199 pages

Exhibit 506   "Third Quarter 2015,            111
Operations Report, October
27, 2015"; Bates nos.
JanHen_00014482 through
'14499

Exhibit 507   "Declaration of Noah           119
Barrett"; 3 pages

Exhibit 508   "Goldman Sachs Company         127
Update:  Anadarko Petroleum
Corp."; Bates nos. GS-002754
through '2784

Exhibit 509   "4Q14 results recap:           136
'preserve
value, don't chase growth'";
Bates nos. BOFAS_APC-000488
through '498

Page 6

INDEX OF EXHIBITS (CONTINUED)

KELLER DEPOSITION EXHIBITS                PAGE

Exhibit 514   Lazard Asset Management        210
document; Bates nos.
L00000080 through '81

--o0o--

Page 8

INDEX OF EXHIBITS (CONTINUED)

KELLER DEPOSITION EXHIBITS                PAGE

Exhibit 510   RBC Capital Markets            151
"October 28, 2015
Anadarko Petroleum Corp.
Onshore Oil Growth Assets
Outperform"; Bates nos.
RBCCM00000150 through '157

Exhibit 511   Imperial Capital "Anadarko     158
Petroleum Corp. 1
(APC: $88.90 Outperform; $117
PT)"; Bates nos. IC-000001
through '21

Exhibit 512   "Anadarko Petroleum Corp       183
Stock at 10 month low, cash
represents 20% of market
value.  Headline risk
overdone"; Bates nos. SG_PROD
068976; 21 pages

Exhibit 513   Simmons & Company document;    187
Bates nos. APC-01329241
through '9247

Page 7

Remotely Testifying from Hilton Head, South Carolina

Tuesday, January 17, 2023; 11:05 a.m., EST

--o0o--

THE VIDEOGRAPHER:  Okay.  And we're on the record.                    11:05:50

It's 11:05 a.m., Eastern Time, on January 17th, 2023.

This is the deposition of Peter Keller.  We're here in the matter of Anadarko Petroleum Corporation Securities Litigation.            11:06:05

I'm John Macdonell, the videographer with Veritext.

Before the reporter swears the witness, would counsel please identify themselves, beginning with the noticing attorney, please.           11:06:13

MS. JENSEN:  Good morning.  Rachel Jensen from Robbins Geller Rudman & Dowd on behalf of the Plaintiffs.

And with me today are Raphael Friedman, and, also, Francisco Mejia should be joining us.      11:06:27

MR. GRUENSTEIN:  Good morning.  Benjamin Gruenstein of Cravath, Swaine & Moore for the Defendants.

And with me are Lauren Phillips and Chizoba Ukairo of my firm, as well as George Shipley   11:06:46

Page 9

3 (Pages 6 - 9)

of Shipley & Snell, and Kallie Gallagher of Occidental.

PETER KELLER, having been duly administered an oath over videoconference as stipulated by all counsel, was examined and testified as follows:

MS. JENSEN: Okay. Just a reminder, we'll have everyone go off video, except for the -- the taking attorney. 11:07:23

EXAMINATION

BY MS. JENSEN:

Q. Okay. Good morning, Mr. Keller. 11:07:30

A. Good morning.

Q. Where are you physically located today?

A. I'm in Hilton Head, South Caroline.

Q. And is anybody else in the room with you today? 11:07:44

A. No.

Q. Do you have any documents in reach?

A. I have my expert report.

Q. And is that your expert report dated November 9th, 2022? 11:07:52

Page 10

A. Yes, it -- yes, it is.

Q. And have you removed from reach all technology not being used for purposes of this deposition right now?

A. I have. 11:08:04

Q. And do you understand that you are not to communicate with anyone except for myself while we're on the record today?

A. Yes, I do.

Q. Okay. 11:08:13
Have you ever had your deposition taken before?

A. Yes, I have.

Q. How many times?

A. Three or four times. 11:08:19

Q. And in what -- what occasion did you have to have your deposition taken before?

A. As an expert in several proceedings. One in Wilmington, Delaware, one in Harris County, Texas. 11:08:38

Q. And the Harris County, Texas, case, is that the SPM --

A. Ma'am, yes -- yes. Yes, it is.

Q. And what did that case concern?

A. It concerned a dispute between SPM, being 11:08:47

Page 11

multiple subsidiaries, affiliates of Schlumberger, against an oil company, SM Energy.

Q. And on whose behalf were you retained?

A. I was retained on behalf of SPM, Schlumberger. 11:09:13

Q. And what was the nature of your opinion in that case, if any?

A. The nature of my opinion was that the valuation parameters used by SM Energy were incorrect to the detriment of Schlumberger and affiliates. 11:09:25

Q. And what was the nature of the investment?

A. Schlumberger, as is sometimes common in the industry, rather than providing services for fees, provided services in exchange for ownership interests in wells being drilled by SME. 11:09:44

Q. And what was the nature of the wells being drilled in that case?

A. They were oil and gas wells in the Dakotas. 11:10:06

Q. Onshore?

A. Onshore, yes, yep.

Q. What was the outcome of that case?

A. It was settled.

Q. You mentioned a case in Delaware. Was 11:10:14

Page 12

that the LCT Cap case, or Capital case --

A. Yes. Yes -- yes, it is, yep.

Q. Okay. And in that case, you represented NGL or were retained on their behalf?

A. That is correct. 11:10:31

Q. And what was the nature of your opinion in that case?

A. The nature -- my opinion in that case was that the fees earned by LCT should have been on the order of -- of a million to $2 million versus a claim of $45 million. 11:10:43

Q. And specific- -- that did not involve the valuation of a -- an oil and gas asset; correct?

A. No. It was a fee in connection with acquisition of an oil and gas asset. 11:11:05

Q. What was the resolution of that case, if there has been one?

A. There was a resolution with a jury trial finding damages in the amount of a -- a million and a half dollars for LCT, but then assessing punitives. 11:11:22
That verdict was eventually thrown out, and it is now scheduled for retrial in February of 2023.

THE COURT REPORTER: Excuse me, Counsel. 11:11:38

Page 13

4 (Pages 10 - 13)

I'm going to admit somebody, Mr. Mejia.

MS. JENSEN: Okay.

BY MS. JENSEN:

Q. So it's going for retrial next month?

A. That is correct, yes.    11:11:47

Q. And you were retained on behalf of the defense in that case?

A. Yes, I am.

Q. And I believe you said -- was there a third case?    11:11:56

A. There -- there were several arbitrations. ArcLight Capital was one. Yes.

Q. Is that Michael Christopher versus ArcLight Capital?

A. That is correct, yeah.    11:12:12

Q. And on whose behalf were you retained in that case?

A. On behalf of ArcLight Capital, the defendant.

Q. And what was the nature of your opinion in  11:12:24 that case?

A. The nature of my opinion in that case was that Mr. Christopher was not, in fact, entitled to the damages he was seeking from ArcLight.

Q. And what were the damages he was seeking?    11:12:37

Page 14

A. He had claimed that he, by virtue of employment, had earned an interest in certain of the properties that ArcLight had acquired or was managing.

Q. What was the resolution of that case, if  11:12:52 any?

A. I don't know the final resolution. It was settled, and I did not see the settlement documents.

Q. Any other depositions?

A. Not within the past decade, no.    11:13:10

Q. Did you prepare -- prepare for this deposition today?

A. I did.

Q. And what did you do to prepare for the deposition?    11:13:24

A. I re-read my report since it was issued several months ago.

Q. Anything else?

A. Re-read it and, you know, kind of looked at some of the attachments and supporting documents,  11:13:38 yes.

Discussed with counsel the housekeeping details for today.

Q. So you met with counsel in preparation for your deposition?    11:13:51

Page 15

A. I did.

Q. For how long?

A. I think it was probably an hour on Friday, the 13th, and about that same amount of time yesterday.    11:14:02

Q. So you re-reviewed your dep- -- your report in preparation for today. Is there anything in your report that you'd like to withdraw or modify?

A. There is not.    11:14:22

Q. Anything you believe to be incorrect?

A. No.

Q. So you stand by your report in its entirety?

A. Yes, I do.    11:14:32

Q. Is there any further work you intend to do?

A. I am working on some rebuttal report on behalf of Cravath.

Q. And what is the nature of your rebuttal    11:14:47 report?

A. Rebuttal report to several of the experts that Plaintiffs have retained.

Q. Rebuttal to whom?

A. Merrill, Regan, and Steinhold.    11:15:00

Page 16

Q. So do you intend to offer opinions other than what you state in your report, your November 9, 2022, report?

(Simultaneous speaking.)

(Interruption in audio/video.)    11:15:31

THE COURT REPORTER: I'm sorry, there was some talking over. November?

BY MS. JENSEN:

Q. 9th, 2022, report.

A. I'm rebutting certain statements, but I  11:15:38 found the expert reports largely supported of -- supportive of the opinions in my November report.

Q. So that doesn't answer my question.

My question was, do you intend to offer additional opinions other than what's set forth in  11:15:54 your November 9th, 2022 --

A. Yeah. Yes, I do.

Q. -- report?

A. Yes.

Q. And what are those opinions?    11:16:03

A. That report has not been finalized yet. I'm still working on it.

Q. And so you don't know?

A. I -- I don't -- it's not final yet, no, I don't.    11:16:12

Page 17

5 (Pages 14 - 17)

Q. When were you retained in this case?
A. I was retained in August of 2021.
Q. And you used to work with Anadarko as a banking client of yours; correct?
A. That is correct, yes.          11:16:57
Q. For -- for how long?
A. I led the oil and gas division at the Bank of New York until 2014 so my -- my banking relationships would have ended really around 2008 after BNY bought Mellon Financial.          11:17:09
Q. And how many years up until that point?
A. 2000 -- 1998 through 2007 or '08.
Q. So about 20 years?
A. No. That would be --
Q. I'm sorry, about ten years?          11:17:31
A. Yes, that's correct.
Q. Apologies.
A. No, that's fine.
Q. Anadarko was a large client?
A. They were, you know, one of -- it was a $7 billion portfolio I ran, so it was one of a hundred clients in the portfolio.          11:17:39
Q. And where do they rank as a $7 billion portfolio in -- in your clients?
A. I think our typical exposure to Anadarko          11:17:53

Page 18

was on the order of a hundred to a hundred and a quarter. At the time, they purchased in 2006 Kerr-McGee and Western Gas, we stepped up in our bridge financing of a couple hundred million dollars additional, but that was paid down pretty quickly          11:18:13 with capital markets proceeds.
Q. So we may be talking about two different things. Anadarko was also a -- a banking client of yours; correct?
A. Yes. So they're -- they're typical          11:18:22 exposure was on the order of 100 to $125 million in a book of $7 billion.
Q. So could you describe the nature of the relationship with Anadarko in this time period of 1998 to 2008?          11:18:42
A. Yes. Typical commercial banking relationship. We were a lender, i.e., a participant in a general working capital line of credit that Anadarko had. In addition, we were a capital markets bank, meaning we would participate in the          11:18:58 sale of debt securities on their behalf. And we also managed a portion of their pension fund.
Q. In the course of that relationship, were you involved in the valuation of any of Anadarko's oil and gas assets?          11:19:26

Page 19

A. Not asset specific, if you will, but as an example when they purchased Kerr-McGee, we looked at the underlying asset value before we financed the transaction.
Q. Over the course of that decade, how much          11:19:48 money approximately did Anadarko bring into the bank as a client?
A. I -- I would have to look back and see. I mean, it varied from year to year. Typical revolving credits, you get a fee for your          11:20:06 commitment. So, you know, hundreds of thousand of dollars a year and then a -- a bigger fee on something like a bridge loan.
Q. Okay. Could you add all that up and give me an estimate?          11:20:18
A. I can give you top of -- top of my head estimate, if it's -- if -- if at the max it was 200,000 bucks a year times ten years, it would be 2 million bucks, but -- give or take.
Q. So a million dollars from Anadarko as a          11:20:37 client while you were at the bank?
A. That's generally correct, yeah.
Q. And -- and do you know any of the individual defendants in this case?
A. I know two of them.          11:20:49

Page 20

Q. And who's that?
A. Al Walker and Bob Gwin.
Q. And in what capacity do you know them?
A. I first met Al Walker when he was the chief financial officer. So as the CFO, he would          11:21:05 have been a principal contact at Anadarko. He then moved up to become CEO when Jim Hackett retired and Bob Gwin became CFO. So I -- I dealt with them as principal contacts in a banking relationship.
Q. And did you know either Walker or Gwin in          11:21:25 any other capacity?
A. I did not, no.
Q. You ever worked with Occidental before?
A. I have not directly worked with Occidental. People -- relationship managers who          11:21:40 worked for me handled Occidental, but I -- I never had any real contact with Oxy.
Q. So Occidental was also a -- a client of the bank?
A. Yes, it was.          11:21:52
Q. How many hours have you spent on this case?
A. I'm going to estimate probably 100 to 200 hours. I -- I don't have my sheets in front of me but a significant amount of time, obviously,          11:22:19

Page 21

6 (Pages 18 - 21)

since we've gone on, since August of 2021.

Q. And how much time did you spend on your report?

A. Oh, my report would be the bulk of that.

Q. And how much have you been paid so far by defendants in the case?

A. Me personally or my firm?

Q. Either. Both.

A. My personal time is something in the order of -- I'm going to guess again, $150,000. And associates of mine at the firm, staff support, I would say roughly about the same amount.

Q. So you had supporting staff work with you on the report?

A. Yes, I have had.

Q. Did you have help drafting your report?

A. I wrote the report. Did -- I worked on edits with staff members, yes.

Q. Did staff write any portion of your report?

A. When you say "wrote," they edited portions for clarity, yes. And citations, they -- they did an awful lot of the citation work.

Q. Beyond staff, did anybody else help you edit your report?

Page 22

A. I sent certain drafts to the lawyers at Cravath.

Q. And did they edit your report?

A. They made some suggestions as to clarity and -- and -- and chronology.

Q. So the answer is yes; correct?

A. Yes.

Q. What percentage of your work now is as a testifying expert?

A. It fluctuates. I mean, sometimes this is my principal work. Other times, I'm engaged in other things, as strategic advisor to a number of utility and power players.

Q. Okay. At -- at this point --

A. Right now, the last two weeks, this has been -- the bulk of my time has been working on this -- this case and on the NGL/LCT case.

Q. So currently, the bulk of your work is as --

A. Yes.

Q. -- a testifying expert; correct?

A. That is -- that is correct.

Q. Have your opinions ever been admitted by a court in a securities fraud case?

A. In a securities fraud case? I don't

Page 23

believe so. And I'm differentiating between securities fraud and damages, so...

Q. Are you offering any legal opinions in this matter?

A. I am not.

Q. You're not a lawyer; correct?

A. I am not a lawyer; no.

Q. You're not a securities law expert?

A. I am not; no.

Q. And do you hold yourself out as a -- a market efficiency expert?

A. Yes, I've done an awful lot of market efficiency work.

Q. And what relevant credent- -- credentials do you have to be a market efficiency expert?

A. 40 years in this industry, both as -- as an institutional investment manager, where I managed assets on behalf of a number of large pension funds and university, college endowments and as commercial banker, where I had to look at market valuations prior to signing off on exposure -- large exposures to oil and gas and utility and power companies.

Q. Maybe you misunderstood my question, I said market efficiency expert.

A. Yes, yes.

Page 24

Q. Okay. And so, that's the --

A. I think those are -- I think those are intertwined.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, excuse me, one person at a time, please.

THE WITNESS: Yes, sorry.

BY MS. JENSEN:

Q. Okay. So -- so that's the relevant experience you believe you have to be a market efficiency expert?

A. It is.

Q. Do you -- are you a chartered financial analyst?

A. I am not.

Q. Do you have an MBA?

A. I do not.

Q. And, in fact, the highest level of education you have is a Bachelors degree in history, environmental studies and economics; correct?

A. That is correct.

Q. That was 1975?

A. Yes.

Q. No postgraduate degrees?

Page 25

7 (Pages 22 - 25)

A. No degrees.

Q. Do you hold any current licenses?

A. I do not.

Q. And you're not an accountant; correct?

A. I am not.                    11:27:18

Q. Not an auditor?

A. I am not.

Q. Are you offering an opinion whether the market for Anadarko's stock was efficient?

A. Yes.                         11:27:43

Q. And that information was immediately impounded into the market price?

A. That is my belief and opinion, yes.

Q. And what's the -- what's the basis for that opinion?                     11:27:55

A. The basis is looking at historical movements in the stock price versus disclosures made by Anadarko and other parties.

Q. Did you undertake an event study?

A. I did not.                   11:28:10

Q. How do you define market efficiency?

A. I define market efficiency as a market taking into account evaluation, events transpiring at a company and the macro environment.

Q. In your report, you cite Brealey, Myers, 11:28:32

Page 26

and Allen; correct?

A. I do.

Q. And you're aware that after the quote that you have on page -- or paragraph 19, that it goes on to refer to the "strong form of market efficiency"? 11:28:46

A. Mm-hmm.

Q. And that's a definition that you use for your report?

A. I would have to reread that to -- to know how much I relied on that.            11:28:58

Q. Okay. Well, let's take this separately. So the -- the version of market efficiency that you are relying on for your report is the strong form of market efficiency; correct?

A. Yes.                         11:29:11

Q. Do you know what the Grossman-Stiglitz Paradox is?

A. Not that I recall, no.

Q. If information was instantaneously impounded into the stock price, there'd be 11:29:38 no make -- there'd be no way to make profits on the information; correct?

A. On a -- a specific piece of information, yes.

Q. And so, you're opining that Anadarko's 11:29:49

Page 27

stock price reflected the totality of information at any point in time?

A. Generally speaking, yes.

Q. Does that include opinions?

A. Can you be more specific, please.    11:30:04

Q. Do you know the difference between a fact and an opinion?

A. I do.

Q. And so, under your definition of market efficiency, the -- the strong form of market    11:30:19 efficiency, does that include opinions?

A. In totality, if you're speaking of opinions of, say, analysts, I think those are reflected, yes.

Q. And what if there are conflicting    11:30:33 opinions?

A. Then one has to synthesize those opinions.

Q. So how do you decide which opinion is reflected in the stock price?

A. I'm not -- as I said, you would synthesize 11:30:46 them. Some are material, some are irrelevant, some are specifically applicable to the situation.

Q. And what's your methodology for -- for determining which opinion, if conflicting, was impounded in the stock price?           11:31:07

Page 28

A. I'm hesitating only because when you say "which opinion," there are, for instance, in this case, hundreds of analysts reviewing Anadarko and giving reports and opinions. So there's, you know, a plethora of information out there, which an 11:31:30 investor has to sift through, where the market has to kind of get a consensus view.

Q. So -- but my question is a little different. So what if --

A. Okay.                        11:31:42

Q. -- analysts disagree, which do you choose as the -- the correct one as reflected in the stock price?

MR. GRUENSTEIN: Objection. Form. You can answer, if you understand it.    11:31:58

THE WITNESS: I -- I'm not sure I fully understand it. I will say that obviously there are lots of opinions out there. Some are relevant, some are irrelevant.

BY MS. JENSEN:                      11:32:10

Q. And the ones that agree with you, those are the relevant ones?

A. No.

Q. So how do you choose between conflicting opinions?                     11:32:17

Page 29

8 (Pages 26 - 29)

MR. GRUENSTEIN: Objection.

THE WITNESS: How do I choose between conflicting opinions? I think you -- you come to some sort of a consensus, if you will. There are -- you know, obviously it's axiomatic that in any    11:32:40 transaction where there is a buyer there's also a seller. So clearly different people have different ideas about value, current value versus future value. Otherwise, a buyer could never find -- a seller could never find a buyer. So it doesn't    11:32:57 surprise me that some analysts bullish, and some analysts are bearish.

BY MS. JENSEN:

Q. And so which one is reflected in the stock price at any given point?    11:33:05

A. Something that's in the middle would be my opinion.

Q. And what's that based on?

A. What I would think a sophisticated investor looks for is -- that level of granularity I    11:33:20 don't think is of real concern to an investor. You're looking at sort of the consensus view, not the granularity of what one person said at one point in time.

Q. And so -- and you agree that analysts can    11:33:34

Page 30

disagree; correct?

A. Yes, I do.

Q. In your report you talk about credible publicly available information being reflected in the price of publicly traded stock. What is your    11:33:45 definition of "credible"?

A. SEC filings, 8-Ks, Ks and Qs, investor presentations, press releases.

Q. And why are those credible?

A. Well, they're subject -- generally subject    11:34:02 to certain standards of disclosure of -- of honesty and truthfulness in the terms of SEC filings. And when I say "credible," I'm talking about, you know, investor conferences, statements by significant company employees as opposed to an individual stock    11:34:25 picker, for instance. So things that are in the public domain, things that are filed with the SEC I have a presumption of truthfulness.

Q. In a securities fraud case like this, you also have a presumption of truthfulness?    11:34:39

A. I do.

Q. Is credibility a binary determination?

A. Can you expand, please.

Q. Well, it's credible or not, is that your view?    11:34:55

Page 31

A. I think different people could have different opinions on the validity or credibility of information.

Q. Is the source an important factor for credibility?    11:35:15

A. Yes, it -- to me, it is, yes.

Q. And the source is a subjective determination, is it not?

A. The credibility of the source?

Q. Yes.    11:35:28

A. I would only restate what I said before. Something that's done in a public forum, a press release or an SEC filing, to me is -- would be more credible than what one individual stock picker says he thinks something's worth.    11:35:49

Q. And generally, the company that -- that owns the asset, would they be a more credible source than commentators in the market?

A. It would depend on the commentator. There are investment banks with very deep research teams    11:36:18 that do an awful lot of granular work. There are other sources that are more seat of the pants. So it depends on the effort and time devoted to the situation.

Q. And the commentators that you were -- or    11:36:32

Page 32

the investment banks that you referenced, is BofA one of those commentators that you think is credible?

A. Yes, it is.

Q. How about Goldman Sachs?    11:36:48

A. Yes, I would consider Goldman credible.

Q. When assessing credibility, would it be important to distinguish between fact and opinion?

A. Yes. To me fact trump -- fact trumps opinion, yes.    11:37:45

Q. Did you distinguish between facts and opinions in your discussion of publicly available information?

A. I believe I did.

Q. Can you point me to an instance in your    11:37:53 report where you did so?

A. Can I point you to a specific instance? I -- if you want to guide me, fine. I -- I mean, it's a 150-page report. Do I know the specific situation? I -- not off the top of my head, no.    11:38:07

Q. So you can't name one instance in your report where you distinguish between facts and opinions sitting here?

A. There are -- there are many. Can I show the ci- -- citation off the top of my head? No, I    11:38:19

Page 33

9 (Pages 30 - 33)

cannot.

Q. So the answer is -- is no?

MR. GRUENSTEIN: Objection.

THE WITNESS: If you would like to point to an example, I can -- I can --    11:38:30

BY MS. JENSEN:

Q. No. I'm asking --

A. -- definitely --

Q. -- you -- I'm asking you to point to an example.    11:38:36

A. I can -- I -- I can read through a 164-page report and find examples, if you'd like.

Q. Okay.

A. Would you like me to do --

Q. So sitting -- sitting here right now, even    11:38:47 though you just re- -- re-reviewed your report, you can't point me to an instance where you distinguished between facts and opinion; correct.

A. Can I point to a specific citation? Not off the top of my head, no.    11:39:00

Q. In this case are you offering an opinion that defendants' allegedly misleading statements were not misleading to investors?

A. That is correct.

Q. And are you offering an opinion that    11:39:21

Page 34

defendants' alleged omissions were legally immaterial?

A. Yes, I am.

Q. Are you offering a legal opinion that the truth was on the market before the close of market    11:39:36 on May 2nd, 2020 -- '17?

A. I'm offering an investors's opinion, not a legal opinion, as I'm not a lawyer.

Q. Do you believe that with your report you've proven the defendants' truth-on-the-market    11:39:50 defense?

A. I do.

MR. GRUENSTEIN: Objection. Calls for a legal conclusion.

BY MS. JENSEN:    11:39:59

Q. Are you offering an opinion that the existence of defendants' fraudulent scheme was publicly known before the close of market on May 2nd, 2017?

MR. GRUENSTEIN: Objection. Assume a fact    11:40:10 not in evidence.

THE WITNESS: I dispute the notion of the existence of a fraudulent scheme, yes.

BY MS. JENSEN:

Q. Are you opining that the existence of a    11:40:27

Page 35

whistleblower complaint by Shenandoah's lead reservoir engineer at Anadarko was publicly known at any time during the class period?

A. I did not opine on the whistleblower complaint.    11:40:43

Q. Not one way or the other; correct?

A. That's correct.

Q. And you're not opining that it was publicly known during the class period; correct?

A. That's correct.    11:40:51

Q. And I take it you're not opining that Anadarko's decision to suspend its appraisal of Shenandoah was publicly known before the close of market on May 2nd, 2017?

A. Can you repeat that, please.    11:41:03

Q. I take it you're not opining that Anadarko's decision to suspend its appraisal of Shenandoah was publicly known before close of market on May 2nd, 2017?

A. I have opined that there were many risks    11:41:18 to moving ahead and that that was well known.

Q. You're not answering my question. My question is: Are you opining that Anadarko's decision to suspend its appraisal of Shenandoah was publicly known before close of market on May 2nd,    11:41:35

Page 36

2- -- May 2nd, 2017?

A. It was first disclosed as a fact by Conoco in its write-off. Okay, yes, correct.

Q. Do you mean Anadarko? You said Conoco.

A. Well, Conoco announced the write-off    11:41:53 before Anadar- -- the day before Anadarko was suspended.

Q. Okay. So you're saying that ConocoPhillips said it -- that appraisal activities were being suspended at Shenandoah before close of    11:42:02 market on May 2nd, 2017?

Is that your testimony?

A. That's -- that's my recollection, yes.

Q. That's your testimony?

A. That's my recollection, yes.    11:42:11

Q. Under oath?

A. Yes.

Q. And if that's not the case, you would be incorrect; yes?

A. I can double check the dates. The class    11:42:21 period ended on May 2nd. Conoco announced the day before Anadarko announced suspension that it was writing off its investments in Shenandoah. So I believe that's the day before. May 2nd, May 3rd. I -- you know, I -- I'd have to relook.    11:42:39

Page 37

10 (Pages 34 - 37)

Q. So your testimony under oath is that ConocoPhillips disclosed to the market that Anadarko was suspending appraisal activities at Shenandoah before Anadarko did?

A. Conoco announced it was writing off its investment in -- in Shenandoah. And then my recollection is the next day, Anadarko announced it was suspending activities at Shenandoah.

Q. So -- so, Mr. Keller, I'd like for you just to think on the question that I'm asking.

A. Yeah.

Q. Focus my question and answer my question.

Okay. So my question is very simple. It is that are you opining that the market knew Anadarko was suspending appraisal activities at Shenandoah before Anadarko disclosed that post market close on May 2nd, 2017?

A. The market knew that a 30 percent working interest owner in the field had written it off. So, yes, I would say the market knew the before Anadarko announced that Conoco had written off its investment in Shenandoah.

Q. So your testimony is that Conoco wrote off its entire Shenandoah investment before Anadarko announced it was suspending appraisal activities at

Page 38

Shenandoah?

A. It -- it -- the next day, that's correct.

Q. And if you're incorrect, then your opinion would also be incorrect; yes?

MR. GRUENSTEIN: Objection.

THE WITNESS: I -- I don't think that differentiation is material. It's a matter of 12 hours one way or the other. Conoco announced and Anoco suspe- -- and Anadarko suspended.

BY MS. JENSEN:

Q. In this case are you offering an opinion on loss causation?

A. Not as such, no.

Q. Are you offering an opinion on damages?

A. No.

Q. Did you receive any inside information about Shenandoah during the class period from Anadarko or any of the partners?

A. I did not, no.

Q. Were you an investor at Anadarko during the class period?

A. I was not.

Q. Any other Shenandoah partner?

A. I was not, no.

Q. Did you follow Shenandoah at the time?

Page 39

A. I followed developments, yes.

Q. And how did you do so?

A. Again, I ran the energy group at a large bank, and so as a result I followed developments in the industry. From a macro standpoint, pricing trends, and from a development standpoint, emerging trends and emerging research place [verbatim].

Q. And during what time frame?

A. During my entire period at the Bank of New York. So from 1998 through of May of 2014.

Q. So you followed it through May of 2014; is that right?

A. Well, I said during my period at the bank. I continue to follow it. I -- I still do energy consulting work, so I -- I continue to follow the industry, yes.

Q. And how did you follow it after May of 2014?

A. I look at press releases. I follow common -- I've got a screen of common stock prices of major oil and gas companies to see developments. I dial into investor calls for major oil companies.

Q. So were you on any earnings calls for Anadarko relating --

A. I don't --

Page 40

Q. -- to Shenandoah?

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry --

THE WITNESS: I do not --

THE COURT REPORTER: Wait. Mr. Keller, if you can wait for the full question. I didn't get it, please.

THE WITNESS: Sure. Sorry.

I don't believe that I dialled into any Anadarko earnings calls during this period, no.

BY MS. JENSEN:

Q. Anything else that you did to follow Shenandoah?

A. I have a number of screens that give me updates on the industry, a -- a number of investment banks I get to research, and entities like S&P Global which I subscribe to that I get industry updates and flash briefings for major developments.

Q. And which briefings did you get that related to Shenandoah?

A. I -- I couldn't recall any specific briefing on Shenandoah. Again, it was one field in a big company with multiple prospects around the globe.

Page 41

11 (Pages 38 - 41)

Q. So you don't recall any briefings about Shenandoah?

A. I recall knowing of the Shenandoah discovery. But, again, I don't think it was ever more than, you know, a percent or two of Anadarko.

So I didn't follow it on that level of granularity. I just looked at, you know, are there emerging trends in the deepwater Gulf that could be interesting.

Q. Have you ever been an investor in Anadarko?

A. I was many years prior to this. At the Bank of New York, division heads we're not allowed to own individual stocks.

So I -- you know, certainly from the time I started running the energy group, I -- I had to get rid of any individual stockholdings.

So if I had owned Anadarko, it would have been before 2003 or '4.

Q. How about Occidental stock?

A. No, I never owned Occidental stock.

Q. And marathon?

A. Never -- Marathon was a banking client. I never owned equity in them, no.

Q. Cobalt?

Page 42

A. No.

Q. Your report says that you managed significant investments offshore in the Gulf of Mexico.

A. That is correct.

Q. Which -- which offshore projects --

A. Offshore -- Offshore Gulf of Mexico. I bought a number of properties on behalf of principally General Motors and various of its pension plans. So there were multiple fields in the -- in the Gulf of Mexico.

Q. What fields?

A. Off the top of my head, Chandeleur Sound, which is a field we bought from --

THE COURT REPORTER: I'm sorry, Chandler? I didn't hear you.

THE WITNESS: Chan- -- Chandeleur, C-H-A-N-D-E-L-E-U-R, Sound, which is a field we bought from -- from Arco on behalf of our institutional clients.

Black Bay Complex, which is a field that we bought from Chevron. South Bayou Field, again, a Chevron acquisition. Mystic Bayou Field, also a Chevron acquisition. And some blocks from W&T Offshore in the Gulf of Mexico.

Page 43

BY MS. JENSEN:

Q. Any others?

A. To the best of my recollection, those are -- those are the significant fields. We also had a lot of onshore fields for institutional clients, but General Motors is primarily focused in the offshore.

Q. Okay. In your own words, what was your assignment in the case?

A. My assignment was to review the complaints as filed and to opine on truth of the market, whether information was out in the market, whether disclosures by Anadarko were truthful or misleading, and also to talk about the general chronology and time frame of deepwater exploration.

Q. What was in the market at the time is a factual ques- -- question; correct?

A. That is correct, yes.

Q. And your analysis was based on documents in the record?

A. That is correct, yes.

Q. Okay. Mr. Keller, you should be able to see what has been marked as Exhibit 505.

(Keller Deposition Exhibit 505 was marked electronically.)

Page 44

THE WITNESS: Okay. Let me call it up here.

Open with. Okay. It's coming up now.

Okay. This is my report, yes.

BY MS. JENSEN:

Q. Okay. And specifically this is your November 9th, 2022 --

A. That is --

Q. -- report?

THE COURT REPORTER: I'm sorry --

THE WITNESS: That is correct.

THE COURT REPORTER: One at a time, please.

THE WITNESS: Yes, my November 9th, 2022, report.

BY MS. JENSEN:

Q. Okay. And near the end of this document is Appendix B.

A. Yes.

Q. And that is all the materials that you relied in forming your opinions; correct?

A. That is correct.

Q. And did you personally review all these documents?

A. I believe that I did. There were a lot of

Page 45

12 (Pages 42 - 45)

documents.

Q. So if a document formed the basis for your opinion, you would have listed it in this appendix; correct?

A. That was my intention. Now, whether out 11:54:26 of 548 documents something did not make it, but I cross-referenced what I had reviewed and what was in my files, so I believe this is inclusive, yes.

Q. And did you also cite the documents that you relied on for particular opinions in the 11:54:46 relevant section of your report?

A. Yes, the report is heavily footnoted.

Q. In addition to the documents in Appendix B, did you review any other documents?

A. Not that I recall, no. 11:55:01

Q. So you haven't read any deposition transcripts in this case?

A. Not in formulating this report, no.

Q. And you didn't review any of the internal communications at the company? 11:55:22

A. Not in formulating this report. As I mentioned earlier, I'm in -- in process of working on a rebuttal report.

Q. But you didn't review any of the internal communications in forming your opinions in this 11:55:39

Page 46

report; correct?

A. I believe that's correct.

Q. Did you review the whistleblower complaint?

A. I did see the whistleblower complaint, 11:55:51 yes.

Q. But it's not listed in your Appendix B, so you didn't consider it in forming your opinions?

A. I did not. I -- I retrieved that on my own when I first read the Complaint. 11:56:06

Q. Besides looking at documents, what, if any, analysis did you perform?

A. The documents helped inform my opinion. An awful of lot what I did was based on 40-plus years of personal experience in this field. 11:56:28

So I reviewed documents, but I also relied on my own experiences as a -- as an oil and gas banker and as an oil and gas investor.

Q. Okay. By my -- my question's a little different. 11:56:38

Mr. Keller, it's what additional analysis, if any, did you perform?

A. Well, I crossed the reasonableness of -- of various of the documents that I read. So company disclosures versus company investor presentations 11:56:51

Page 47

versus bank/analyst presentations or reports.

Q. You didn't perform an -- an event study; correct?

A. I did not, no.

Q. You didn't perform any other economic 11:57:08 analysis?

A. I did not.

Q. You say in your report that you understand "this report will be used, among other ways, in support of Defendants' truth-on-the-market defense." 11:57:18

We talked about the truth-on-the-market defense a little bit.

What are the other ways that your report will be used?

A. I -- I believe that's it. I know that 11:57:29 Cravath has retained other experts in this case.

Q. But that's not answering my question.

You said "among other ways." What are the "other ways" in which your report will be used?

A. I think truth of the market. I'm sorry, 11:57:43 yeah, I think that's why I was retained.

Q. Okay. So no other ways that your report will be used, to your knowledge?

A. Not to my knowledge, no.

Q. Mr. Keller, do you agree that for an 11:58:01

Page 48

opinion to be reliable, it needs to be the product of a reliable methodology?

A. I do.

Q. And a reliable methodology that can be tested? 11:58:12

A. I do.

Q. A methodology that can be replicated?

A. I do.

Q. Can you cite any peer-reviewed literature that your methodology is based on? 11:58:25

A. Can I cite peer-review method- -- literature? I -- I -- not off the top of my head, I cannot, no.

Q. Have you published any peer-reviewed literature about your methodology on in this case? 11:58:47

A. I have not.

Q. Has your work in this case been subject to peer reviewed?

A. It has been subject reviewed by colleagues of mine at BRG and by the folks at Cravath. Outside 11:58:55 of that, no, no one else has seen this report.

Q. And when you're referring to BRG, you're talking about the staff?

A. That's correct.

Q. The staff that helped you with citations; 11:59:09

Page 49

13 (Pages 46 - 49)

correct?

A. More than that. I had several senior staffers who -- who assisted in this assignment.

Q. And who's that?

A. Eric Ma- -- Madsen, who is a -- a managing director of BRG in -- in Los Angeles. And Keming Liang, who's a -- an M.D. in China and Los Angeles.

Q. Can you spell their names for the record.

A. Yes. Keming, K-E-M-I-N-G. Let me give you the correct spelling of his last name so I don't botch it. There are three principal people I'm going to re- -- refer you to now.

So -- excuse me. L-I-A-N-G; K-E-M, L-I-A-N-G, Keming. Eric Madsen, M-A-D-S-E-N. And the third person, who's sort of intermediate staff level, is a Caroline Iannacone, I-A-N-N-A-C-O-N-E, in our New York office.

Q. And they're all part of your offices; correct?

A. They all are employees of BRG, that's correct, yes.

Q. Now, what tests did you perform to assure yourself that your opinions were correct?

A. I performed multiple tests. I looked at movements of Anadarko stock price and correlating

Page 50

that to movements of West Texas Intermediate Crude, which is a typical metric in looking at E&P company stock prices is to correlate them to underlying commodity prices, which tend to be the most significant driver in equity prices.

I looked at movements in the stock price over time. So I graphed out Anadarko's underlying equity price from 2009 through 2019. And then looked at various disclosures during the period that I was examining.

Q. And how did that assure yourself that your opinions were correct?

A. Well, a couple of points. Number one, the -- the graphs of APC stock price versus WTI are -- are very much in sync, i.e., going down as oil prices go down, going up as oil prices recover. I -- I looked at many of the i-banks' analysts covering Anadarko to see if there was any undue concentration in assets, and -- and it -- it is my belief, actually my opinion, that there was no undue concentration. Anadarko had a large portfolio spread around the globe. No single asset accounted for a disproportionate share of the company's asset base, and accordingly, a disproportionate share of valuation. So to me, Anadarko performed the way one

Page 51

would expect a large --

THE COURT REPORTER: I'm sorry.

THE WITNESS: -- diversified --

THE COURT REPORTER: Could you slow down?

THE WITNESS: -- company --

THE COURT REPORTER: Anadarko performed, I'm sorry?

THE WITNESS: The -- the way one would expect, the way I would expect a large diversified E&P company to perform.

THE COURT REPORTER: I'm going to ask you to slow down, please, just a little bit, sir. Thank you.

THE WITNESS: I'm sorry. Yeah, sure.

BY MS. JENSEN:

Q. And that -- that goes to your market efficiency opinion?

A. Yes, it does.

Q. Any others?

A. That would be a principal metric, yes.

Q. Any other tests that you performed?

A. As I said, looking at -- at movements if they correlated with disclosures in the marketplace.

Q. And that relates to your market efficiency opinion; correct?

Page 52

A. It relates to market efficiency and overlaying that with macro analyses by various investment banks or consultants. There was a Wood Mac report as an example that tries to correlate which large projects would be economic in the then-prevailing oil and gas pricing environment. And it was reasonably bearish in what projects would go to FID in a $50-a-barrel price environment.

Q. And where is that cited?

A. I will have to look up that citation. I -- I -- it is cited and it's a July 2016 Wood Mac report and I -- I -- I'm going to have to look at the citation. I -- I -- I recall it, but I don't have the exact citation at my -- at my hands.

Again, a number -- there were a number of reports during this period, all of which are footnoted about, you know, various banks attributing value to Anadarko and to Shen specifically, you know, during this time period that I've got a graph which lists NAV during the time period. I think it ranged -- Shenandoah ranged from 1 percent to 5 percent or something. It was never a significant -- and this is a graph on page 50. It was never -- never a significant component of Anadarko's overall net asset value.

Page 53

14 (Pages 50 - 53)

Q. How -- how much value would 5 percent of Anadarko's market cap equate to?

A. Well, Anadarko's market cap varied pretty significant over this time with the oil and gas prices. But obviously if it was -- if it was a -- a couple billion dollars when it was an $80 billion market cap, it's -- it's, you know, twelfth or something. If it was a couple billion dollars and it was a $15 million -- billion dollar market cap, it's -- it's obviously more.

But this was never a booked asset. It was always potential upside. But clearly, no oil and gas asset ever has any value until an FID is made. So oil on the ground has no value unless there are wells drilled, a platform set, and production commences. So this was -- by the admission of essentially every analyst, this was potential upside, but there were never booked reserves associated with this field.

Q. So it's --

A. Which is the norm.

Q. It's your opinion that they're -- that investors ascribe zero value to Shenandoah; that's your testimony?

A. Hard value, that is correct, it was

Page 54

potential upside but unquantified. And multiple statements by company executives of their period said it was too early to tell. Additional wells needed to be drilled. It was promising but clearly, no value until you make an FID.

Q. So your opinion relies or turns on the fact that in your view no investor believed Shenandoah had value for Anadarko; correct?

A. No.

MR. GRUENSTEIN: Objection.

THE WITNESS: That's not correct. That's not correct. There was not quantifiable value. There was reason to believe there was upside potential, but it was not a quantified value.

BY MS. JENSEN:

Q. And -- and your testimony relies on investors agreeing with you; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: It is -- was the consensus of the street, which is a conglomeration of sophisticated investors. And it has been my experience in I said -- as I said, 40 years in the business that until you have taken certain steps to meet SEC and SPEE requirements, there are no booked reserves. There is no asset on the balance sheet

Page 55

until certain things take place, and they never took place in this case.

BY MS. JENSEN:

Q. In this case you're offering opinion about what investors in Anadarko common stock understood about Shenandoah during the class period; correct?

A. That is correct.

Q. And in forming that opinion, did you survey Anadarko investors about what they understood?

A. I sur- -- did -- individual investors? I surveyed analysts who followed the company. And I --

Q. Did you iss- -- issue --

A. -- talked to individual investors --

THE COURT REPORTER: I'm sorry.

BY MS. JENSEN:

Q. Did you iss- -- you issued a survey to analysts?

A. I did not issue a survey to analysts. I reviewed analyst reports.

Q. Did you survey any Anadarko investors?

A. I did not.

Q. Did you talk to any Anadarko investors?

A. I did not.

Page 56

Q. And you're not claiming to --

MR. GRUENSTEIN: I don't know if when do you think a good time to break will be.

MS. JENSEN: Yeah, so give me a few more minutes.

BY MS. JENSEN:

Q. Mr. Keller, you don't claim to have any special powers of mind reading, do you?

A. I wish I did. I -- no.

Q. You reference investors up front in your -- well, you reference investors in your report. But up front you limit that definition to sophisticated and professional; correct?

A. Yes.

Q. And what is your definition of a sophisticated investor?

A. It's an investor who is generally knowledgeable about the way markets works and does a certain level of due diligence.

Q. Is there any peer report -- peer-reviewed literature that you can point me to that supports your definition?

A. Not that I can point you to, no. This is anecdotal on my experience.

Q. It's just anecdotal -- anecdotal; correct?

Page 57

15 (Pages 54 - 57)

A. That's correct, yes.

MS. JENSEN: Okay. We can go ahead and take a quick break.

THE VIDEOGRAPHER: Okay. We're off the record. It's 12:09 p.m.    12:09:36

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 12:22 p.m.

BY MS. JENSEN:

Q. Okay. Mr. Keller, in your report you also reference professional investors; correct?    12:22:52

A. I -- I don't recall that, but that's entirely possible.

Q. Well, that's how you're -- that's how you're defining investors for purposes of your report; correct?    12:23:09

A. That's a little more granular than I recall, but that could be correct. I -- I talk about investors, sophisticated investors. I don't recall using professional investors, but if you say I did, I'm sure I did.    12:23:32

Q. So are your opinions limited to sophisticated investors, then?

A. Not exclusively, no. I think I may have used those terms interchangeably. Sophisticated --    12:23:41

Page 58

I don't -- again, I don't recall using professional investors. I'm not sure. That's a term of art, I guess.

Q. So they're the same in your mind?

A. Professional vers- -- investors versus sophisticated?    12:23:49

Q. Yes.

A. Yeah, I mean, I guess I would think a professional investor is somebody whose only job is investing, whereas an awful lot of us are investors outside of our professional work. So that's the distinction I would make.    12:24:01

Q. And is there a peer-reviewed definition of what a professional investor is?

A. Not that I'm aware of, no. I'm using it colloquially.    12:24:15

Q. Colloquially to -- to mean what, someone who works full time investing?

A. Yeah, I -- I would -- in my mind to me, a professional investor would be someone whose job is investing, so an investment manager at a pension fund, an investment manager at a company, as opposed to most investors actually are -- have other jobs and invest their retirement, their -- their, you know, personal assets, but that's not their    12:24:29    12:24:41

Page 59

principal employment.

Q. Okay. So all professional investors are not sophisticated investors; correct?

A. I'd almost turn that on its head. I would think -- if you use my definition of a professional investor as someone who that's their principal job, I would say those are more likely to be sophisticated whereas a -- a -- a retail investor on the street might be less sophisticated. So I -- I would actually think the opposite. A professional investor is likely someone who spends the bulk of his or her time in the markets.    12:25:07    12:25:21

Q. So those collapse upon each other, then?

A. I'm not sure what you mean by "collapse upon each other."    12:25:35

Q. Well, are all professional investors sophisticated investors?

A. Yes, I -- I think that's -- that's correct. I think a professional investor is more likely to be sophisticated than a retail investor.    12:25:42

Q. Okay. So why have two different categories?

A. You know, you raised the question. I'm not sure -- I'm not sure the point of your question.

Q. So why have two different categories?    12:25:58

Page 60

A. I'm -- I -- I'm not certain. As I said, I don't recall using professional investors. You say I did, so I'm sure I did. But I -- I'm not sure I made that distinction or intended to make that distinction.    12:26:17

Q. So in -- in your mind, your -- your analysis here is limited to sophisticated investors; correct?

A. Yes.

Q. You understand that a class of Anadarko common stock investors has been certified in this case?    12:26:27

A. I do.

Q. And do you understand that two of the Plaintiffs are class representatives?    12:26:35

A. I -- I do. Yes, I do.

Q. Which -- which Plaintiffs are class reps?

A. Well, the -- when I first got involved, the only named Plaintiffs -- Plaintiff was the Georgia Firefighters' Pension Fund.    12:26:53

Q. When did you get retained?

A. August of 2001 -- 2021. Excuse me.

Q. Okay. So it's your testimony that at that point it was only the Georgia Firefighters involved?

A. Well, Georgia Firefighters -- I'm -- I'm    12:27:08

Page 61

16 (Pages 58 - 61)

not -- again, I'm not certain the class was certified at that point. I know there were several motions to certify the class. My -- all my files list this as Georgia Firefighters' Pension Fund, et al., v Anadarko and the -- and the three named individuals.

So I -- I've -- I've always referred to it as the Georgia Firefighters versus Anadarko case. I know there were class motions later.

Q. So do you know who the class representatives are in this case?

A. I -- not off -- I can't tell you, no.

Q. Are you including what the class representatives understood when you talk about what investors understood about Shenandoah in your opinion?

A. Yes. Well, let me clarify. Initially, as I said, when I first started, it was Georgia Firefighters. I knew that that was a plaintiff that was an institutional investor and that had asset managers, including at least one oil and gas investment manager.

Q. Have you ever heard of the class representative Norfolk?

A. Can you say that -- can you spell it,

Page 62

please.

Q. N-O-R-F-O-L-K.

A. Oh, like the railroad. I -- I know the rail- -- I know Norfolk. I don't know -- it could be Norfolk, Virginia. I -- I'm -- I'm not sure what Norfolk it is.

Q. Okay. So you're not aware of any class rep in this case that's Norfolk?

A. I'm not.

Q. How about Ironworkers?

A. I've seen that name. They're a union, I believe.

Q. And what do you think Ironworkers is in this case?

A. I believe it's a -- a -- a union of -- of ironworkers, a trade union.

Q. Are all class members included in your definition of investors?

A. I -- I can't say that because I don't -- as I said, I -- at least I don't recall all class members. I knew the initial -- initial plaintiff. And I'm not sure I have seen a comprehensive list of all class members. I know it -- it was a broad class, is my understanding.

Q. What percentage of the class is included

Page 63

in your definition of investors?

A. Well, I'm assuming in -- assuming. Class certification, I would think all of the class members are investors or they wouldn't have been certified as part of this class. That's an assumption I'm making.

Q. So you're including all class members when you say what investors understood?

A. Yes.

Q. Does your definition of investors include retail investors?

A. It -- it could. As I said, I don't know the full extent of the class.

Q. Sitting here, you don't know what class has been certified in this case; correct?

A. I don't know the full extent of that class, that's correct, yes.

Q. In your definition of investors, are you including the class representatives' investment managers?

A. Am I including them, or am I opining that the investors were -- in fact, received advice and counsel from the investment managers, which, as I -- I was formerly an institutional investment manager, so I'm assuming that un- -- unless it's a

Page 64

nondiscretionary account, the investors make decisions with input from the investment managers.

But the investment managers, unless they've got discretion, don't make the final decision.

Q. So is that a yes or a no?

A. It's I'm not certain. I don't know whether these asset managers who are -- I -- I have managed both discretionary and nondiscretionary accounts, and there's a significant difference between those two types of accounts.

Q. So you don't know whether the class representatives' investment managers are included in your definition of investors; is that right?

A. If they were discretionary accounts, I would -- I would say they are. If they're nondiscretionary accounts, I'd say they're not.

Q. But you don't know one way or the other; correct?

A. I -- I don't know. Yeah, that's correct.

Q. Are you including market commentators that were not investors in your definition of investors?

A. Are you speaking of analysts?

Q. Yes, among others.

A. Did I read -- well, let me just restate

Page 65

17 (Pages 62 - 65)

this.

In general, when analysts or i-banks make recommendations, usually at the end of that recommendation there is a disclosure as to whether or not they're currently long in the security that they're recommending or opining on.

Did I in every case look at those footnotes to see if the analyst or the i-bank at that time was long or short or just opining, I -- I did not, no.

Q. So your answer is, you don't -- you don't know?

A. I -- I could -- I could not say definitively across every one, that's correct, yes.

Q. So as to investors, name all the investors that you intend to include when you say what they understood about Shenandoah.

A. I can't name all the investors.

Q. Okay. Well, which -- which ones can you name?

A. Well, initially the Georgia Firefighters' Pension Fund, which I -- I would -- again, with -- with institutions, I would differentiate between the institution making the investment and the underlying investors, who would be, by my definition, retail

Page 66

investors.

So I'd expect that the underlying investors would know less -- i.e. the retail investors would know less than -- than the Pension Fund and/or its asset manager.

Q. Okay. So you named Georgia Firefighters. Any other investors that you're including --

A. That's the name I focused on --

Q. -- as to what they understood?

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, I didn't hear.

THE WITNESS: Excuse me.

That's the name I fo- -- focused on, that's correct.

BY MS. JENSEN:

Q. Right.

And that -- that's the only one you -- you can name; correct?

A. At this point, that's correct, yes.

Q. So is it your opinion that all the investors that fall within your definition of sophisticated agree how to interpret information

Page 67

such as an earnings release?

A. Do all investors? I'd say there are varying levels of expertise in capability.

Q. Okay. So do sophisticated ex- -- sophisticated investors of the same levels of expertise, do they interpret all publicly available information exactly the same?

A. No, not exactly the same.

Q. So what makes you the --

A. There are --

Q. -- what makes you an expert in what investors understood?

A. Well, I have banked and invested in this sector for 40 years, so I -- I -- I would say I have a good understanding of what is material or -- or what is germane to an investor and a differentiation between investing in a small single asset or a couple asset sort of entity and investing in a large diversified entity like Anadarko where no one asset is -- is a key driver of asset valuation or of future earnings potential.

Q. And it's your opinion that all sophisticated investors understood information about Anadarko exactly the way you do?

A. Yes.

Page 68

Q. And if a -- an investor disagrees with you, are they included in the definition of a sophisticated investor in your opinion?

A. I -- I'm certain there are investors who would disagree with me.

Q. So in -- in that instance, are they included in your definition for purposes of your report?

A. Yes. There -- there can be sophisticated investors who do not agree with my opinions. So the answer's yes.

Q. Do you know any guidelines followed by securities analysts when writing reports?

A. Do I know guidelines?

Q. Yes.

A. Yeah. I mean, I -- as I've said, I was a banker for many years. I know -- I know expectations about -- about -- about truth, about full disclosure, about, you know, ever since SEC adopted FT, the requirement to fully disclose information and to disclose information that's truthful.

Q. Any other guidelines?

A. Certainly when any investor or when I personally as a banker looked at companies, one

Page 69

18 (Pages 66 - 69)

tends to focus on significant value drivers on -- on materiality. Not in the legal definition of materiality, but a -- a company such as Anadarko has got literally thousands of wells around the globe, some of which are germane and material to an investor.

But the level of granularity is not -- you wouldn't analyze assets at that level of granularity. It would be impossible.

Q. So are you aware of guidelines regarding the -- the differentiation between fact and opinion?

A. Yeah. When -- when I read analyst reports, they will often differentiate and say, "This is my opinion" as opposed -- I mean, they'll state facts and then state an opinion based on those facts. An opinion is --

Q. Okay. But my question is different.

Are you --

A. Okay.

Q. -- aware of any guidelines for securities analysts when writing reports with respect to opinion versus fact?

A. Only that there's truthful disclosure. Can I can cite specific guidelines, I cannot.

Q. But you -- sitting here right now, you

Page 70

can't -- you can't cite any guideline?

A. That's correct. That's correct.

Q. It's important to distinguish between fact and opinions; correct?

A. Absolutely.

Q. And why is that?

A. Everyone's entitled to their own opinion, but you're not entitled to your own facts. Facts are facts. They're demonstrable. They're verifiable. They're consistent, if you will.

Opinions are colored by subjective -- subjective views.

Q. In your report, do you ever cite an analyst's opinion as opposed to fact as evidence of what investors understood?

A. Opinions are driven by facts, so an analyst would look at the fact situation.

For -- for instance, an analyst's recommendation -- typical buy/sell/hold recommendations, those are opinions driven by the underlying facts.

So you can and often do have various banks or analysts -- one analyst having a buy on a stock, somebody else having a sell, somebody else having a hold. Those buy, sell, or holds are opinions that

Page 71

are based on a synthesis of the underlying facts.

Q. And so you cited analyst opinions as opposed to fact as evidence of what investors understood in your report; correct?

A. Both, that's correct, yes.

Q. How did you decide which analyst reports to cite and which not to cite?

A. I -- as I've said, I think I looked at something like 400 analyst opinions. I looked at ones that seemed to be more specific.

I did a search based on Shenandoah because an awful lot of the analyst reports I looked at were higher level, didn't talk about specific assets, and -- and, accordingly, were not as significant to me in forming my opinions.

Some of the other analysts were specifically focused on value attributable to the Shenandoah Basin or the Shenandoah Field or the Gulf of Mexico in general, since Anadarko had such a broad range of assets.

Q. And did you include in your report analysts who disagreed with your opinions?

A. I -- I -- I would say I did not find analysts who significantly disagreed with my opinions.

Page 72

Over the course of this class period, Anadarko made repeated observations that more work needed to be done, that they weren't near FID yet.

And analysts, did they refine their valuations, they did because that's why one drills wells, to get information. One never drills an initial well in search of a dry hole. So those migrated over time, but based on the facts as presented by drilling.

Q. So it's your -- your testimony that no analysts disagree with the opinions in your report?

A. I would say that's correct, yes.

Q. And if you're not correct, then your opinion would be wrong; right?

MR. GRUENSTEIN: Objection.

THE WITNESS: I don't think that's true. It would depend on the specifics of the analysts that you're talking about.

BY MS. JENSEN:

Q. Would you consider changing your opinion if there was an analyst who disagreed with your respective opinions?

A. It would be very unlikely because as I mentioned at the outset, Shenandoah was never a major portion of Anadarko's asset valuation.

Page 73

19 (Pages 70 - 73)

Q. So you wouldn't change your opinion if there was evidence that analysts disagreed with you?

A. I would say the analysts would have to demonstrate to me that that disagreement was significant and would -- would have driven value of their APC stock, and I don't believe that was ever the case.

Q. So you're saying that you would not change your opinion; is that right?

MR. GRUENSTEIN: Objection.

THE WITNESS: I'm not aware of any information that would make me change my opinion.

BY MS. JENSEN:

Q. Did you cite any sophisticated investors in your report?

A. I would say the majority of the analysts that I reference or that I either footnoted or referenced were, in fact, sophisticated investors. There was large, broadly diversified street involvement in Anadarko and in the sector as a whole.

Q. So are you saying that all the analysts that you cited in your report were sophisticated investors?

A. I would say that's true.

Page 74

Q. And so -- and you know for a fact that they were investors; is that right?

A. No. I've said earlier to you, I did not review the -- every footnote to every analyst report to see if at the time that report was issued, the analyst at the bank was long or short in a security.

Q. So sitting here, you don't know one way or the other?

A. Some were long, and some were -- some were not invested.

Q. You can't --

A. But can I --

Q. You can't name --

A. No, I --

Q. -- any sitting here?

A. No.

Q. So to characterize an understanding as shared by investors, you needed every possible piece of information to inform your decision; right?

A. I needed every relevant piece of information. That's correct.

Q. And you already testified that you did not survey investors; correct?

A. I did not survey investors.

Q. And you did not includes all the news

Page 75

reports during the relevant time; correct?

A. When you say -- certainly I could not have included all the news reports. I did a keyword search for Shenandoah, for Anadarko, for Gulf of Mexico. There were thousands of things that did not reference any of those three items.

Q. When you say "keyword search," where did you do -- or I guess across what body of documents did you do such a search?

A. I -- I did searches in general. On the internet my team did searches through -- through typical search sites, LexisNexis and others looking for hits, S&P, Moody's, looking for hits on Shenandoah and Anadarko.

Q. Did you search Bloomberg?

A. Yes.

Q. And you're aware, then, that there were 5,000 media accounts on Bloomberg during the class period about Anadarko?

A. 5,000 media accounts?

Q. Yeah.

A. I -- I -- I couldn't say whether that's true or not.

Q. You didn't review 5,000 media accounts; correct?

Page 76

A. I certainly -- I certainly did not, no.

Q. And you'd need to review all the analyst reports to inform your decision as well; correct?

A. I would not say all of the analyst reports. That's likely a physical impossibility. I -- I reviewed many analyst reports.

Q. How many?

A. Hundreds.

Q. Can you be more specific?

A. Not -- not without going back and looking at notes, no.

Q. And you're aware --

A. I think my --

Q. You're aware that --

A. I'm sorry.

Q. -- there were over a thousand reports during the class period?

A. Does not surprise me.

Q. But you -- you did not read all of those reports; correct?

A. I did not, no.

Q. You reviewed reports from 30 analysts?

A. Give or take, yes.

Q. Are you aware of how many analysts were covering Anadarko during the class period?

Page 77

20 (Pages 74 - 77)

A. I'm not aware of how many. I am aware that when you say "analysts," that would run the gamut from people like Goldman Sachs to smaller shops like Seeking Alpha that -- that are not particularly either credible or have broad exposure. 12:46:15 So when I look at the major i-banks, they would tend to have sector-specific analysts working in the oil and gas business, and to me that makes them more credible because they have technical experience and background. 12:46:32

Q. So some analysts you decided were not credible; correct?

A. Some analysts I didn't attempt to review because I didn't view them as having particular insights into the market, that's correct. 12:46:44

Q. And how did you determine whether they had insights into the market?

A. There are certain banks that have traditionally been big players in the oil and gas sector. I know they have analysts who follow 12:46:57 companies closely. I know they have broad pools of assets that they manage. And then there are small boutique shops that tend to be much smaller but tend to be industry focused.

So there have always been in Denver and in 12:47:11

Page 78

Houston and in New York some smaller investment advisors or asset managers or analysts who exclusively focus on the E&P business. So it's looking at credentials and looking at history.

Q. Okay. But you -- you decided whether 12:47:30 you -- you found an an- -- a particular analyst to be credi- -- credible; correct?

A. Yeah. I -- I would say -- I would say that's correct.

Q. Did you follow any authoritative source in 12:47:43 determining which analysts were credible and which weren't?

A. I would say not an authoritative source. It's based on my experience over decades in the business -- 12:47:58

Q. So --

A. -- who's a good coverage, yeah.

Q. So -- right.

So and "good coverage" is a subjective term; correct? 12:48:01

A. That is very -- definitely subjective, yes.

Q. And are you aware that there were some 40-odd analysts covering Anadarko during the time?

A. Yes. 12:48:19

Page 79

Q. And that -- and there were other analysts that covered other Shenandoah partners?

A. Yes, that's correct.

Q. So you did not review analyst reports by all the analysts that were covering Anadarko or the 12:48:33 partners; correct?

A. I'm sure I did not review every single analyst report, that's correct.

Q. Did you review all the documents that were produced by investment managers in this case? 12:48:51

A. I'm certain that I did not.

Q. Did you review all the documents produced by the plaintiffs in this case?

A. Again, I'm quite certain I did not. I reviewed documents that were presented to me by 12:49:09 counsel for the defendants. And my team and I sourced additional documents. But I couldn't tell you I reviewed everything that was in the mark- -- everything that was out there, no.

Q. And did you -- you personally search 12:49:30 documents in the production database in the case?

A. I did, yes.

Q. And which documents did you review in that database?

A. To the best of my knowledge, the -- the 12:49:42

Page 80

list in Appendix B is complete list of the documents that I reviewed and relied upon. There were documents that I opened and found to be not focused on Anadarko or Shenandoah. It's not uncommon for the big banks to issue a general industry update 12:50:02 that had nothing specific about Anadarko or about Shenandoah. And those I did not spend any time on.

Q. So if a particular document didn't have any specific reference to Shenandoah, it was not relevant to your analysis; correct? 12:50:15

A. I'd only caveat that -- that by saying if it listed the author's then-prevailing price deck, I may have looked at Goldman's price deck for 2016 even though it didn't reference Anadarko or Shenandoah because that would be a macro driver. 12:50:37

Q. Any others other than the Goldman's price deck for 2016?

A. Well, yes. I mean, as I said, as I opened documents, if I saw anything that looked germane to me about the macro environment, I would look at it 12:50:52 even if -- even if it didn't reference Anadarko or Shenandoah. In general, you know, I -- I used to keep pretty close tabs on what major bank's price decks were as they'd be updated quarterly or semiannual. So in most cases I kind of had a sense 12:51:12

Page 81

21 (Pages 78 - 81)

of what the street's emphasis on the oil and gas prices was or what the NYMEX features were for -- for oil and gas prices going forward.

Q. You're -- you're referencing oil prices; right?                    12:51:23

A. Oil and gas prices, that's correct, yes.

Q. So for the -- the analysts, are you aware that there were approximately 20,000 documents totaling over 200,000 pages in this case?

A. It does not surprise me.                    12:51:41

Q. You reviewed, as you said, only a few hun- -- only a few hundred; correct?

A. That is correct, yes.

Q. Okay. Sitting here, can you name the investment managers for the class representatives?                    12:52:22

A. I am aware that Fidelity was an investment manager. I believe Janus Henderson was an investment manager. Those are the two names that come to mind without going back and looking.

Q. Who was Fidelity an investment manager                    12:52:39 for?

A. I believe Fidelity was investment manager for the Georgia Firefighters' Pension Fund.

Q. And Georgia Firefighters is not a class representative in this case; correct?                    12:52:49

Page 82

A. That, I can't answer. I thought they were. They were initially. So if they were removed later, it's --

Q. So that's your -- your testimony is that Georgia Firefighters was appointed as a class                    12:53:03 representative in this case by the Court?

A. They were the initial plaintiff is my understanding. I don't have a list of the final class representatives. So I can't answer that.

Q. And so besides Janus, what other                    12:53:22 investment managers for the class representatives are you aware of?

A. Well, I -- I -- I'd say I can't answer that question since I just said -- said to you I couldn't tell you the full list of class                    12:53:38 representatives. So for me to tell who represented a group, I can't identify, you know, that's meaningful.

Q. Okay. All the opinions you intend to offer in this case are set forth in your summary of                    12:54:00 opinions in paragraph 16 of your report; correct?

A. That is correct, yes.

Q. You aren't opining that the defendants did not engage in a fraudulent scheme; correct?

A. I'm not opining on a negative, no. My --                    12:54:22

Page 83

my opinion is that the information that was out there was not misleading. Maybe they're flip sides of the same coin.

Q. So let's step back. The statements, beyond the statements, are you opining that the                    12:54:42 defendants did not engage in a fraudulent scheme in this case?

A. Yes. I don't believe there was a fraudulent sche- -- scheme.

Q. And are you opining that defendants did                    12:54:52 not engage in any deceptive business practices?

A. Yes.

Q. As to the allegedly misleading statements, are all of the statements you intend to opine on included in your report?                    12:55:13

MR. GRUENSTEIN: Objection.

THE WITNESS: With -- with the caveat that, as I mentioned earlier, I'm in the process of compiling a rebuttal report which will address other issues.                    12:55:33

BY MS. JENSEN:

Q. So let's just focus on your report.

A. Right, right.

Q. So the -- for purposes of your November 9th, 2022, report --                    12:55:37

Page 84

A. Yes.

Q. -- all of the allegedly misleading statements that you opine on are contained within your report; correct?

A. That is correct.                    12:55:47

Q. So fair to say, then, that you're not offering an opinion about the risk factor statements that are alleged to be misleading?

A. My opinion is that the risk -- risks involved in Shenandoah were fully disclosed.                    12:56:08

Q. But that's not my question, Mr. Keller. Just focus on my question.

So the allegedly misleading risk factor statements, are you opining on that as part of your report?                    12:56:26

A. I do not believe there were risk statements, that's correct -- I -- that there were misleading risk statements.

Q. Okay. So show me in your report where you address whether or not the risk factor statements                    12:56:35 were misleading.

A. Without going to a specific page, after every well, Anadarko clearly stated that additional appraisal activity was necessary, that they were not yet near a point to make an FID, that this was a                    12:56:53

Page 85

22 (Pages 82 - 85)

complex reservoir, and they needed more information before they could move forward.

So I think this is consistent throughout my report that they needed to confirm the areal extent of the reservoir, they couldn't proceed to development yet. And, again, throughout the class period. In 2015, I recall Anadarko disclosing that they still were seeking a drill ship that had 20,000 psi capability. So at every well announcement, there was a clear statement that they were not near an FID and additional information had to be developed before they could proceed further.

MS. JENSEN: Move to strike as nonresponsive.

BY MS. JENSEN:

Q. Mr. Keller, show me in your report where you address the risk factor statements.

A. If you want to go to my -- just flip to paragraph 50, under investors understand that during the appraisal process they create internal resource estimates, that this is a process: exploration well, successful move to first appraisal well, move to second, third, fourth, and fifth in this case.

Q. Mr. Keller, I -- I'm sorry, I'm going to stop you --

Page 86

A. Okay. Okay.

Q. Because you're not -- you're not addressing --

A. Okay.

MR. GRUENSTEIN: No, no, no.

BY MS. JENSEN:

Q. -- the question.

MR. GRUENSTEIN: No, no, no. You're not allowed to stop him in the middle of an answer. Mr. Keller, you can finish the answer. Then Rachel can ask a question.

THE WITNESS: I -- I think I finished. You -- go ahead.

BY MS. JENSEN:

Q. Okay.

A. Direct me a little --

Q. So --

A. -- more clearly.

Q. -- where in paragraph 50 do you recite the risk factor statement?

A. Let me go back to paragraph 16, then. "appraisal drilling is a high-risk business."

Q. Okay. So -- so that -- that's your -- that -- that's the part of your report that addresses the risk factor statements during the

Page 87

class period?

A. It's in multiple spots. I mean, if -- if you want to give me a minute, I'll -- I'll find us a more specific citation. I mean, I've addressed the allegations and the information provided by Anadarko. And --

Q. Mr. Keller, maybe we can -- maybe we can do it this way. If you address the risk factor statements in your report, it would be there; right?

A. That's correct.

Q. Okay. So is it -- is it also fair to say that you are not offering an opinion about the accounting statements in this report?

A. I'm not an accountant, and there's a separate accounting expert.

Q. And who is that?

A. I -- I don't know that expert. I've not reviewed that person's report. I just know there's a separate accounting expert.

Q. Okay. Turn to paragraph 154.

A. Okay. Mm-hmm, I'm there.
I'm at 154.

Q. Good. I'm getting there.
Okay. All right.
Paragraph 154, you have a list of

Page 88

plaintiffs' alleged omissions here; correct?

A. That's correct, yes. Yes.

Q. And of these omissions, your report addresses (g), (h), and (l); correct?

A. That's correct.

Q. And it does not address the other alleged omissions; correct?

A. I believe that's correct.

Q. Now, you opine in your report that investors understood appraisal as a high-risk business; is that right?

A. That's correct.

Q. And what's your basis for opining that all investors understood the business the same way as you set forth in your report?

A. Drilling the well in almost 6,000 feet of water to 31,000 feet is a well that would have been unimaginable ten years ago. It is high risk because the simple physics of penetrating zones miles below the earth crust are significant. Anadarko had disclosed many times that we needed advances in technology. 20,000 psi blowout preventer. So, again, I -- I think any investor in the oil and gas business realizes that drilling is risky, ocean drilling is riskier, and deepwater subsalt drilling

Page 89

23 (Pages 86 - 89)

is even riskier. So these, to -- to my mind, are well known risks that an investor can and should have been aware of.

Q. Now, how does a sophisticated investor define high risk?    13:02:22

A. If you want a specific number, I mean, to me, again, this is my -- my speaking something that's, you know, a 10 to 15 percent probability of success is high risk. And there's a gradation from drilling into blanket sands where you've got a high    13:02:43 probability of completion and commerciality, and then drilling in deepwater untested horizons such as Shenandoah where there are geologic risks. They're a huge capital risk because this is a, you know, decade-long process, so huge risks associated with    13:02:59 drilling, financing, and developing. This is -- this is -- these are risks that to my mind are well known by investors.

Q. So sophisticated investors believed there was a 10 to 15 percent probability of success; is    13:03:12 that -- that right?

A. I'm not saying -- I -- I define that as my definition of high risk. I -- I think a sophisticated investor -- well, let -- let me differentiate this.    13:03:25

Page 90

None of these investors who were investing in Shenandoah was not a single-asset investment. They were investing in a company where Shenandoah was a very small percentage of the overall company prospects.    13:03:42

So success at Anadarko or failure was not a key driver. So if this was a 10 or 20 percent probability of success, it added upside and had some downside risk, but this was not an asset that was key to the company's valuation under any scenario.    13:03:54

MS. JENSEN: So, Mr. Keller, I -- I'm going to move that to strike -- I'm going to move to strike as unresponsive.

BY MS. JENSEN:

Q. My question was simply, so do -- so do    13:04:05 sophisticated investors believe there was a 10 to 15 percent probability of success?

A. I did -- I -- I will not say that. I will say sophisticated investors understand that deepwater subsalt drilling is a high-risk endeavor.    13:04:16

Q. And so no -- no percentage --

A. I won't put a number on that.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry.

Page 91

THE WITNESS: No.

THE COURT REPORTER: Wait. One -- can we slow down a little bit? I'm getting talking over.

BY MS. JENSEN:

Q. So there's no percentage that you can put    13:04:26 on that; right?

A. I would say it would vary by investor.

Q. And some investors have different appetites for risk; isn't that right?

A. That's absolutely true.    13:04:45

Q. So some buy while others sell?

A. It's always the case, yes.

Q. You ever heard, the phrase, "high risk equals high reward"?

A. I have.    13:04:56

Q. So when the risk gets high, the potential reward is also high; correct?

A. The potential reward, that's the key, potential.

Q. So fair to say that an investor would want    13:05:05 to be compensated for the high risk so the potential reward is also high?

A. I would be a little more focused than that. The investor is buying a -- a derivative instrument, a common stock in a big company. I    13:05:22

Page 92

would say the company would expect that. The hurdle rate for something like this, at the company level [verbatim]. And it's the company investing the money would be higher. Anadarko's invested money in Shenandoah. The investors are investing money in    13:05:50 Anadarko common stock. Those are two very different sort of risk paradigms.

Q. And who is in a better position to assess the risk, Anadarko or the investor?

A. Anadarko.    13:05:48

Q. And when it's risky, it's even important to have accurate information about what those risks are; correct?

A. Absolutely.

Q. And, again, the operator is in a better    13:05:57 position than the investors to know what those risks are?

A. That's correct.

Q. Now, your report cites hurdle rates for deepwater oil of 18 percent. So just using that as    13:06:10 a -- in a hypothetical, if Anadarko was to invest 1 billion, it would expect to earn at least 150 million to $180 million each year in profits?

A. Well, it's not a straight line. Oil and gas production is never a straight line. Investment    13:06:31

Page 93

24 (Pages 90 - 93)

precedes revenues by as much as a decade. So it's not -- the calculation's a little bit more complex than that.

Q. But the point remains that Anadarko would expect to receive a profit on that investment; 13:06:45 correct?

A. If your hurdle was 18 percent, you'd assu- -- you would assume, or it's axiomatic that the internal rate of return on that project is 18 percent, that's correct. It's not straight line, 13:07:01 but that is correct. The math is correct.

MS. JENSEN: Okay. Why don't we go ahead and take a quick break.

THE VIDEOGRAPHER: All right. We're off the record. It's 1:07 p.m. 13:07:23

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 1:28 p.m.

BY MS. JENSEN:

Q. Okay. Mr. Keller, would you please turn 13:28:58 to page 50 of your report.

A. Yes, I will.

Yes.

Q. Okay. And there's a figure eight here; correct? 13:29:17

Page 94

A. That's correct.

Q. And the figure eight is a portion of Anadarko's valuation attributed to Shenandoah; is that right?

A. That is correct. 13:29:23

Q. Now, did you include all analysts and investment managers who attributed a portion of Anadarko's valuation to Shenandoah in this figure?

A. I believe I did. I know there was some that attributed no value to Shenandoah. 13:29:41

Q. So my question is, did you include all of them that attributed a portion of Anadarko's valuation to Shenandoah?

A. All that I was aware of, that's correct.

Q. Now, you do have references to Credit 13:29:56 Suisse in your report; correct?

A. Yes, I do.

Q. And Credit Suisse also attributed a portion of Anadarko's valuation to Shenandoah; is that correct? 13:30:10

A. That -- that could be correct, yes.

Q. Oh.

A. I don't -- I don't recall.

Q. You also mention Capital One in your report? 13:30:16

Page 95

A. I do.

Q. And Capital One also attributed a portion of Anadarko's valuation to Shenandoah; correct?

A. If -- if you say so?

Q. So you don't know whether this list is 13:30:27 complete; is that right?

A. It -- it is possible that there are analysts that I did not capture, that's correct, yes.

Q. Okay. Now, did you look at the investment 13:30:40 managers in the case to see if they attributed a portion of Anadarko's valuation to Shenandoah?

A. As I mentioned to you, I knew that Fidelity was an asset manager. I did not look specifically at asset managers, no. I just looked 13:30:59 at the broader universe.

Q. Okay. And you're -- you're aware that Fidelity is not an investment manager for one of the class representatives; correct?

A. I -- I am after you told me, yes. 13:31:09

Q. Okay. You don't mention Sar- -- Sarasin here; correct?

A. Not that I recall, no.

Q. Okay. Do you have any reason to doubt that class representative Norfolk's investment 13:31:18

Page 96

manager, Sarasin, had Shenandoah in their NAV at 2.28 billion or $4 per share as of April 2 -- 2017?

A. If -- if you say so, I'll take your word for it. I -- I don't know that.

Q. You have no reason to doubt that; correct? 13:31:42

A. No, no. I believe you're telling me the truth.

Q. In fact, you don't mention Sarasin anywhere in your report; do you?

A. I don't recall that I do. I don't believe 13:32:02 I do, no.

Q. And you also didn't include Lazard?

A. Lazard.

Q. Lazard, thank you.

A. At all or on this graph? I don't have 13:32:16 them on this graph, certainly.

Q. Do you mention them at all throughout your report?

A. I'm very particular with Lazard, and I -- I can't tell you for sure whether I mention then at 13:32:29 all or not. They're certainly a major bank.

Q. And so, you do note Janus Henderson here under the -- under this figure eight. And you note that it "invested on the Anadarko based on its overall business, not any single field." [As read] 13:32:47

Page 97

25 (Pages 94 - 97)

Correct?

A. That's correct. That is correct.

Q. So Anadarko's business is confined to the oil industry; correct?

A. Yes, it is, yeah.

Q. Yeah. So its assets are primarily oil fields?

A. They are primarily oil and gas fields; that's correct.

Q. And --

A. And associated production facilities, yeah.

Q. And one of those assets, oil fields during the class period, included Shenandoah; correct?

A. No, one of those prospects included Shenandoah. It was not an oil field because it was not in production. It was not developed.

Q. It was one of the assets of the Anadarko at the time; correct?

A. It was a prospect; that's correct.

Q. It was an asset at the time; correct?

A. I'm not trying to split hairs, but they had capitalized costs related to Anadarko -- or excuse me, related to Shenandoah. There were no reserves related to Shenandoah. There were no

Page 98

facilities related to Shenandoah. There was leasehold acquisition cost, G and G cost, and drilling cost. So yes, an asset, yes, okay, fine.

Q. Now, you opine that investors did not understand Anadarko's pre-class period statements as a resource estimate for Shen; is that correct?

A. That is correct.

Q. And what is your basis for opining that all investors understood the statements the same way as you did?

A. Well, on two things. Number one, Anadarko, as a matter of process, did not disclose resource ranges. It disclosed net pay when it drove wells. So it did not disclose resource ranges. And in many cases throughout this long process from 2009 to 2017, various representatives made it clear that they needed additional information before they could proceed to develop, which is a precursor to booking assets.

Q. So that's your basis for opining that all investors understood the statements the same way as you did?

A. Can you clarify that again if you would, please.

Q. Is that -- are there any other bases for

Page 99

saying that all investors understood the statements the same way you did?

A. In totality, I would say that's true. Any one individual statement could people have interpreted it differently, yes, but I think the totality of the statements is supportive of my opinions.

Q. And you didn't survey any investors; correct?

A. That is correct.

Q. And you didn't speak to any investors; correct?

A. That is -- that is correct.

Q. Now, as part of this opinion, you say that Anadarko consistently and properly disclosed different aspects of the appraisal; is that correct?

A. That is correct.

Q. And off -- are you offering a legal opinion about the sufficiency of Anadarko's disclosures about Shenandoah?

A. I'm not offering a legal opinion, no.

Q. Does it matter what the company knew internally to determine whether its public statements were proper?

A. Does -- does it matter?

Page 100

Q. Yes.

A. I'm not sure -- I'm not sure what your question is getting at.

Q. You don't understand the question?

A. No, I don't.

Q. So -- so you're making -- let's back up for a second. So earlier you testified that you did not review any internal documents to form your opinions; correct?

A. Correct.

Q. And so, you didn't review any internal documents to determine what the company knew about Shenandoah; correct?

A. That is correct.

Q. And so, you can't opine about whether Anadarko properly disclosed aspects of the appraisal of Shenandoah if you don't know what the company knew at the time; correct?

A. In any appraisal, I'm interested in what the company consensus view is. So I would expect from my decades of experience that internally, different engineers, geologists, geophysicists might have different opinions. What's conveyed to the street, what's conveyed in investor presentations or earnings calls, wouldn't -- would -- would and

Page 101

26 (Pages 98 - 101)

should be the company consensus view, which would be generally the midpoint of -- of various opinions within a company.

Q. And --

A. That's been my experience.    13:37:26

Q. And you don't know whether it was a consensus review -- you don't know whether it was a consensus view because you didn't return -- you didn't review any of the internal documents; correct?    13:37:38

A. I'm -- that's fine, yes. I'm -- I'm assuming the statements that the company made were consensus -- were -- was the company's viewpoint on the then current situation, yes.

Q. So you're -- you're assuming that all of    13:37:47 the statements by the company were true and accurate?

A. Yes, I am.

Q. And that's goes for all your opinions; correct?    13:37:56

A. They were true and accurate based on the information known at the time. Yes, that's correct.

Q. And you don't know what the company actually knew because you didn't look at any -- any of the internal documents; correct?    13:38:06

Page 102

A. If the company was making public statements at odds with the facts, I would suspect that would be a cause for SEC action, not just a -- a shareholder lawsuit.

Q. Is it --    13:38:24

A. I do not -- I have no -- no reason to believe they were making misleading -- false and misleading statements to the public.

Q. But you also have no basis to say that they were true and accurate, do you?    13:38:35

A. I start with the assumption that public statements in SEC filings are true and accurate; that's correct.

Q. You don't just start there, you also end there; correct?    13:38:53

A. That's correct.

Q. Okay. And so, Mr. Keller, is it your opinion that Anadarko gave no indication of the size of Shenandoah leading up to and during the class period?    13:39:06

A. They, at several junctures, talked about potential size. Although, in an ambiguous way, there is a slide at an investor conference that talked about about to 2 to $4 billion opportunity, but it was for the Shenandoah basin, not for the    13:39:25

Page 103

Shenandoah field.

Q. Is -- is that it? That's the only -- that's the only reference, the size?

A. They talked about encouraging results, but the only -- only dollar quantified estimate I recall    13:39:38 was that 2 to $4 billion in an investor presentation.

Q. And what about -- what about resource size, any indication on the resource size?

A. They would, after the drilling of their    13:39:51 well, talk about net pay and talk about sand quality but not reserves, per se.

Q. The Shenandoah 2 press release referred to Shenandoah being one of Anadarko's largest oil discoveries in the -- the Gulf of Mexico; correct?    13:40:06

A. That's correct.

Q. And it also referred to Shenandoah as a potentially giant project; correct?

A. With the keyword being "potentially," yes.

Q. And also with the word "giant"?    13:40:23

A. Yes, "potentially giant," correct.

Q. And giant has a --

A. Potentially nothing.

   (Simultaneous speaking.)

   (Interruption in audio/video.)    13:40:31

Page 104

   THE COURT REPORTER: I'm sorry, can you start your question over, please.

BY MS. JENSEN:

Q. And "giant" has a specific definition in the context of the oil and gas industry; correct?    13:40:35

A. Giant's a relative term.

Q. And so, is it your testimony that a giant field is a relative term?

A. Well, again, they didn't say "giant field." They just said "potentially giant field."    13:40:53

Q. And a giant field has a well known definition in the industry; correct?

A. I would say that is not correct. For a small comp- -- for a small company, a field could be giant to them, whereas it would not be giant to    13:41:10 Exxon or to Chevron or to -- to Total.

Q. So you've never heard of the term "giant field"?

A. Yeah, I've heard it used many times.

Q. And you're aware then that giant field    13:41:23 refers to an oil field that has 500 MMBOE net or recoverable; correct?

A. So I've heard that phraseology before, yes.

Q. And that is well understood in the    13:41:35

Page 105

27 (Pages 102 - 105)

industry; correct?

A. I -- I'd say a general parameter, yes.

Q. So when Anadarko used the term "giant field," the market understood that Anadarko was describing Shenandoah as having more than 500 million barrels of oil recoverable; correct?    13:41:53

A. No, not correct.

Q. Okay. And what is that based on?

A. So "potentially giant field." So if one were to say there's 500 million barrels of oil in a field, it doesn't mean it's necessarily producible. If the costs or the timeframe or the political climate were such that -- there are many large fields that are never developed because they're not economic. There are many smaller fields that are developed because the economics are different. So size alone does not determine whether a field is developed.    13:42:09    13:42:27

Q. But that's not my question, Mr Keller. I was asking about size.    13:42:37

A. Right.

Q. And so, is it your testimony under oath that investors did not take any meaning away from the term "giant field"?

A. To go back to your initial question, you    13:42:45

Page 106

said "producible," I believe is what I heard you say.

Q. Recoverable.

A. 500 million --

Q. Recoverable.    13:42:54

A. Recoverable. That's not the same thing. 500 million barrels in the ground is not 500 million barrels recoverable.

Q. So my question is, is it your testimony under oath that no investor took from Anadarko's reference to "giant field" the meaning that it meant possibly more than 500 million barrels?    13:43:04

MR. GRUENSTEIN: Objection.

THE WITNESS: Investors very well could have interpreted that as 500 million barrels in the ground, not necessarily recoverable, not necessarily commercially producible.    13:43:25

BY MS. JENSEN:

Q. Well, the definition of a giant field is 500 MMBOE recoverable; correct?    13:43:35

A. I don't believe that's correct. It's 500 MMBOE, but again, recoverables can depend on cost, it's going to depend on production, expenses, it's going to depend on commodity prices. So I --

Q. So after 40 --    13:43:51

Page 107

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry --

BY MS. JENSEN:

Q. So after 40 years in the industry, you don't know whether a giant field means recoverable?    13:43:53

A. Well, at -- at a point in time, but that's always a moving target because the key drivers of economics are volumes, times costs, times commodity prices. So 500 million barrels, that could be a true statement, and it could be recoverable at a $100 price environment, and it could very well not be recoverable in a $40 price environment.    13:44:10

So could -- could it have been a true statement at the point in time when it was made? Yes, it could have been. Does that necessarily mean it will be produced? It does not.    13:44:26

Q. So would you consider bank -- BofA as a sophisticated investor?

A. I would.    13:44:43

Q. And do -- you have no reason to dispute that BofA after the Shenandoah 2 announcement said that management has taken the rare step of describing Shenandoah as a potential giant, meaning possibly more than 500 million barrels?    13:44:55

Page 108

A. I don't dispute that statement. They also said additional drilling was necessary.

MS. JENSEN: I'm going to move to strike that as -- as nonresponsive.

BY MS. JENSEN:    13:45:09

Q. So you do then understand that -- that Bank of America took management statements about Shenandoah as meaning Shenandoah possibly had more than 500 million barrels recoverable?

A. Yes.    13:45:30

Q. Now, we talked about Sarasin earlier. This is an investment manager for class representative Norfolk that you mentioned nowhere in your report; correct?

A. That is correct.    13:45:46

Q. And they -- they produced documents in this matter; correct?

A. That may be correct. I don't know. I can't answer that.

Q. Did you review them?    13:45:54

A. Not to the best of my recollection.

Q. And so, you have no reason to dispute then that Sarasin also -- also understood from Anadarko management that Shen is a giant field, which means 500 plus million barrels; correct?    13:46:20

Page 109

28 (Pages 106 - 109)

A. Yes, I believe I -- I'll take your word for it.

Q. And do you have any reason to dispute that internally at Anadarko company personnel understood the term "giant" to mean 500 million barrels recoverable?    13:46:43

A. I would -- I'd be happy to say that, yes.

Q. In fact, Anadarko continued to describe Shenandoah as a giant during the class period; correct?    13:47:06

A. Potentially giant with additional drilling necessary.

Q. So it's your testimony that Anadarko always said that it was only potentially a giant?

A. It is my opinion, and it is my testimony    13:47:19 that after the drilling of every well, Anadarko commented that additional appraisal drilling was necessary and that they were not near a final investment decision.

MS. JENSEN: I'm going to move to strike    13:47:33 as unresponsive.

BY MS. JENSEN:

Q. Is it your testimony that Anadarko -- is it your testimony that Anadarko only said it was potentially a giant?    13:47:44

Page 110

A. It may have used other -- other adjectives, but it was not a developed field, yes.

Q. Well, in referencing giant, it did all -- not always say potential; correct?

A. Until a field is developed, it's always    13:47:57 potential. There is no production until a field is developed. It doesn't matter how big the resource size is, unless you spend the money, it's not developed. It's not -- it's just potential.

Q. Just give me one second.    13:48:23

Okay, Mr. Keller, you should be able to see what's been marked as Exhibit 506.

(Keller Deposition Exhibit 506 was marked electronically.)

THE WITNESS: Okay. Bear with me. I'm    13:49:28 trying to navigate back. I'm stuck on 505. So let me just navigate to 506.

MS. JENSEN: Do you need assistance?

THE WITNESS: I just don't want to -- I don't want to go back. Let me just --    13:49:42

MS. JENSEN: I think you may -- let's go ahead and go off the record.

THE VIDEOGRAPHER: Okay. We're off the record. It's 1:49 p.m.

(Discussion off the record.)    14:00:24

Page 111

THE VIDEOGRAPHER: We're back on the record. It's 2:01 p.m.

BY MS. JENSEN:

Q. Okay. Mr. Keller, do you see what's been marked as Exhibit 506?    14:01:18

A. I do see this, yes.

Q. Okay. And for the record, this is JanHen_00014482.

Okay. Will you scroll -- actually, before you scroll, do you see the title of this document?    14:01:32

A. I do, yes.

Q. Okay. And what does this document appear to be?

A. This appears to be a Third-Quarter Operations Report dated October 27th, 2015.    14:01:41

Q. For Anadarko?

A. That is correct, yes.

Q. Okay. If you turn to the first page of the document, after the cover page --

A. Yes.    14:01:56

Q. -- there is a heading that says "Third-Quarter 2015 Highlights."

Do you see that?

A. I do.

Q. Okay. And do you see there is several    14:02:03

Page 112

different subheadings, and there's a heading on the right-hand side of the page that says "Creating Option Value With Exploration."

A. I do see that.

Q. Do you see that?    14:02:19

A. Yes, I do.

Q. Okay. And could you read into the record that paragraph.

A. Yes.

"During the quarter, Anadarko drilled a    14:02:27 successful appraisal well at Shenandoah in the Gulf of Mexico. This well encountered more than 620 feet of oil" -- "net feet of oil pay and continued to progress the giant oil discovery towards development." [As read]    14:02:45

Q. And do you have an understanding of what well they're talking about?

A. This would be -- looking at that, I believe this would be Shen 4.

Q. Okay. And do you see the reference to    14:02:54 "giant oil discovery" there?

A. I do, yes.

Q. And it doesn't say the word "potential" before it, does it?

A. No, it does not.    14:03:08

Page 113

29 (Pages 110 - 113)

Q. Okay. All right. You can put that away.

Now, the -- in -- in market -- or at least some investors took the results of Shen 5 with its 500 million barrels recoverable to be of sufficient commercial scale to develop; correct?

A. Some did. I would only add that Shen 5 took place just about the time that oil prices troughed.

Q. Are we talking about two different things, because I was talking about --

A. Shen 5, you said.

Q. Oh, I -- I apologize. I misspoke. I intended to say Shen 2.

A. Oh, Shen 2, okay, yeah. Yeah, okay.

Q. Okay. So you agree with that statement?

A. Yeah, I -- Shen 2 encountered over 1,000 feet of net pay, yeah.

Q. Now, turning to your opinion regarding the March 4th, 2014, statement about the 2 to 4 billion net opportunity, what is your basis for opining that all investors understood that statement in the -- exactly the same way as you do?

MR. GRUENSTEIN: Objection.

THE WITNESS: Well, the math that accompany that presentation show the field that it

Page 114

was clear -- show the basis rather. It was clearly the basin, not the field.

BY MS. JENSEN:

Q. You're not opining, however, that the investors took no meaning about the value from that statement with regard to Shenandoah?

A. It's a point in time statement.

Q. But that's not my -- that's not my question, Mr. Value -- Mr. Keller, excuse me.

You're -- you're not opining that investors took nothing away from that statement about the value of Shenandoah --

A. I'm not opining --

Q. -- are you?

A. No, I'm not.

Q. Okay.

A. It was an encouraging time of the development of Shenandoah.

Q. Now, you also opine that investors understood throughout the class period that Anadarko had not made a final decision to develop Shenandoah; is that right?

A. That is correct.

Q. And so, implicit in that opinion is the assumption that Anadarko had not made a final

Page 115

decision whether or not to develop Shenandoah throughout that same time period; correct?

A. That is correct.

Q. And if your assumption is wrong, would you reconsider your opinion?

A. I don't believe my assumption's wrong.

Q. What if it was?

A. That's a hypothetical.

Q. And -- and so, you -- would you have the same opinion even if your assumption was wrong?

A. The facts don't bear out that hypothetical, I don't believe.

Q. Have you looked at any internal documents about when Anadarko decided not to develop Shen?

A. I -- I've looked at their statements that after four, they needed five and after five, they needed six.

Q. You haven't looked at any internal documents about --

A. No.

Q. -- their decisionmaking process?

A. No. No, I haven't.

What the market knew was that they needed five, and then they needed six.

Q. And so, the market believed Anadarko when

Page 116

it said it needed the results of Shenandoah to decide whether or not to develop -- develop the field; correct?

A. You just said Shenandoah. They needed the results of five and then the results of six. That's correct.

Q. So the market believed Anadarko when it said it needed the results of Shenandoah 6 to decide whether or not to develop the field; correct?

A. I believe that's correct. After five, it said they needed six.

Q. And so you're taking those statements at face value; correct?

A. I am.

Q. And so if the evidence showed that senior management had decided not to develop Shenandoah before the end of the class periods, then -- then investors would have been mistaken in their understanding; correct?

A. If they made a definitive decision not to develop, I would say that's correct.

Q. Is it your opinion that all material adverse information known by Anadarko about Shenandoah during the class period was known to investors?

Page 117

30 (Pages 114 - 117)

A. I -- I could not say all.

Q. And you couldn't say all because you haven't read any internal --

A. That's correct.

Q. -- Anadarko documents?

A. That's -- that's correct, yes.

Q. If Defendants have admitted in this case that they didn't disclose certain adverse facts, you don't have any reason to dispute that testimony, do you?

A. I -- I don't -- I don't know what you're ta- -- I don't know what facts you're talking about.

Q. So if the Defendants in their depositions have admitted that they didn't disclose certain adverse facts, you don't have any reason to dispute that deposition testimony under oath, do you?

A. I don't have any reason to dispute it, no. I have no knowledge of it, so I can't dispute it.

Q. Now, in your report, you cited a declaration by Noah Barrett.

Do you know who he is?

A. I don't recall at this point in time. I wrote that three months ago -- or two and a half months ago.

Q. But you cited his declaration because you

Page 118

thought he was a credible source of information?

A. I'm going to assume that's true. I don't -- I don't recall it at this point in time.

Q. You -- you don't have any idea whether he's a credible source or not?

A. I would be unlikely to cite someone who I did not believe was credible.

Q. And you said earlier that you didn't find some analysts cred- -- credible because they didn't have enough sophistication.

Is that about right?

A. I don't believe I said I didn't find them credible. I said I didn't rely on and didn't cite certain -- I didn't cite every analyst whose report I read, that's correct.

Q. But you -- you only cited sources that you found credible?

A. That is correct.

Q. Okay. Mr. Keller, you should be able to see what has been marked as Exhibit 507.

(Keller Deposition Exhibit 507 was marked electronically.)

THE WITNESS: Let's see if I have better luck this time.

All right. I got it. Yes. Okay.

Page 119

BY MS. JENSEN:

Q. Have you seen this document before?

A. I'm having to look a little closer. Let me zoom in. I can't read it.

I don't have a recollection of this document. It's entirely possible I -- that I read it. I don't recall this specific document.

Q. Okay. If you scroll down to the bottom of the document, do you see this to be a declaration of Noah Barrett that is --

A. I do, ye- -- yes. Yeah, I see where the declaration is, yes.

Q. Okay -- dated January 12th, 2023?

A. Yes.

Q. Okay.

A. I certainly have not seen anything from January of 2023, that's correct. That was --

Q. Okay. Okay.

A. That would have been last Thursday.

Q. So -- and -- and sitting here, you don't know who Noah Barrett is?

A. Well, I see he's an analyst at Janus.

Q. Okay.

A. But I -- yeah.

Q. All right.

Page 120

And as an analyst at -- at Janus -- and he is an analyst that you cited in your report; correct?

A. Yeah. Yeah.

Q. Okay. And in his declaration here, he states, at paragraph number 5, "Throughout the Class Period, I was unaware of the existence of any whistleblower complaint involving" Shenandoah -- "Anadarko or Shenandoah or any allegation that Anadarko public disclosures misrepresented or omitted material information about Shenandoah."

A. Did I read that, yes.

Q. You don't have any reason -- you don't have any reason --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, I didn't hear what the witness said.

THE WITNESS: I have no reason to doubt that that's what he's saying, I believe, in --

BY MS. JENSEN:

Q. Right.

And as an analyst who is following Anadarko and Shenandoah at the time, you have no reason to dispute this testimony?

Page 121

31 (Pages 118 - 121)

A. I do not, no.

Q. Okay. And turning to paragraph 6, it states, "During the Class Period, I do not recall being aware of any allegation that fault compartmentalization, small-scale faulting, tar, and asphaltene onset pressures jeopardize commer-" -- "Shenandoah's commercial viability. I also do not recall being aware of any allegation that Shenandoah's producible resource size shrank substantially with each appraisal well after Shenandoah 2 and over" -- by over half during the course of the Class Period." [As read]

Do you see that?

A. I do.

Q. Okay. You have no reason to dispute that testimony?

A. It's his sworn testimony. I would -- I believe it's truthful.

Q. Okay. And so you're -- you're not opining that the information contained in paragraphs 5 and 6 of his declaration were known and understood by all investors, are you?

A. No. But I am aware of Janus's declaration that it was investing in Anadarko based on the overall company, not on -- based on individual

Page 122

fields.

MS. JENSEN: I'm going to move to strike as unresponsive everything after "no."

THE WITNESS: Fine. Fine. Okay.

BY MS. JENSEN:

Q. All right.

You also -- you can set that aside.

You also have an opinion about the 20-kpsi technology in your report; is that right?

A. That's correct.

Q. Okay. Now, you -- you are not an engineer; correct?

A. I'm not, no.

Q. Also not a technology expert?

A. Well, I've got decades of experience in the offshore. So I'm not -- am I a degreed engineer, no. Have I done an awful lot of work involving oil drilling, yes, I have.

Q. So you -- do you hold yourself out as an engineering expert?

A. No, I do not.

Q. Okay. Now, the 20-kpsi tech was not a reason listed by Anadarko in writing off Shenandoah; correct?

A. Not specifically, no, it was not.

Page 123

Q. It -- it wasn't -- it wasn't cited as a reason for writ- -- writing off Shenandoah; correct?

A. It was not cited as a reason.

Q. And -- and you didn't review any internal documents to figure out why Anadarko wrote off Shenandoah; correct?

A. Not internal documents, no, I did not.

As early as June of 2015 Anadarko had said it needed 20-k technology, though. The market was aware of that.

Q. That wasn't my question, Mr. Keller.

A. Okay. Fine. Fine.

Q. Okay. All right.

Moving to Shenandoah 3. Okay. Sorry, just give -- give me a quick second here.

A. Take your time.

Q. Okay. All right.

So in your report you have a -- an eight-paragraph summary discussing Anadarko's -- oh, gosh, I'm sorry, hold on one second. I apologize.

A. You're fine.

Q. Okay. All right.

So you -- you spend quite a -- a bit of time in your report discussing Shenandoah 3.

Is it your opinion that all investors

Page 124

understood the information about Anadarko's statements about Shenandoah 3 exactly as you describe it in your summaries?

A. It is.

Q. And what is the basis for saying that all investors understood this information exactly as you did?

A. On -- in -- in January of 2015, shortly after the well finished drilling, Conoco publicly announced it was writing off Shen 3, dispensing it.

Q. And that's -- and so do you take from that that all investors understood that Shenandoah 3 was a dry hole?

A. Yes.

Q. Okay. And so is it your testimony that all sophisticated investors understood Shenandoah 3 was a dry hole?

A. I would say all sophisticated investors that cared to look at the details knew it was a dry hole.

Were there investors who didn't focus on Shenandoah for a period of time, that's potentially true, yeah.

Q. Okay. So --

A. The market knew this was a dry hole.

Page 125

32 (Pages 122 - 125)

Q. And you -- you --

A. Did every --

Q. -- you agree that it's not --

A. Go ahead. I'm sorry.

Q. You agree that some sophisticated investors did not understand Shen 3 to be a dry hole; correct?

A. Given that this was one well in one prospect, are there investors who didn't focus on Shenandoah, that is entirely possible.

Q. Okay. So you're saying that for a sophisticated investor to disagree with you meant they weren't paying attention?

A. The news was in the market. It had been publicly disclosed by a 30 percent working interest owner of the well.

THE COURT REPORTER: I'm sorry. "It had been disclosed by a 30 percent" what?

THE WITNESS: Working interest owner of the well, that being ConocoPhillips.

BY MS. JENSEN:

Q. Did you find any evidence that sophisticated investors did not understand it this way?

A. I did not.

Page 126

Q. And you -- you say that you looked at Goldman Sachs' reports; correct?

A. I looked at a number of reports, yes.

Q. Okay. You should be able to see what has been marked as Exhibit 508.

A. Okay. Let me go back.

(Keller Deposition Exhibit 508 was marked electronically.)

BY MS. JENSEN:

Q. And, for the record, this is a Bates stamp document with the Bates starting GS-002754.

A. I've got to go back in. It didn't -- didn't pop up as 508. Let me reload.

There we go, 508.

Okay. This is a Goldman research report dated February 5th of 2017; is that corr- -- yeah, '17, yes.

Yes, I've got it.

Q. Okay. And Goldman Sachs is a source that you cite in your report; correct?

A. That is correct.

Q. Okay. And, in fact, you cite this very report in your --

A. I do. Yes, I do.

Q. Okay. Will you turn to page 15?

Page 127

A. Bear with me. It's refreshing. Hold on.

Okay. I'm at page 15 now, yes.

Q. Okay. So would you read the second bullet there?

A. The second bullet. You want me to read it?

Q. Yeah.

A. I mean out loud?

Q. Yeah.

A. Okay. Yeah.

"2Q 2014: The Shenandoah #3 appraisal well and evaluated the same well-developed reservoir sands" that -- "1500" -- "sands 1500 feet down-dip and 2.3 miles east of the first appraisal well. This well found an expanded geologic reservoir section, confirmed excellent reservoir qualities, delineated the potential oil-water contacts of the field. The Shenandoah #3 appraisal well found 490 feet of net pay." [As read]

Q. Okay. So -- and you cite this very report in your report as evidence of what investors understood about Shenandoah; correct?

A. I do. The net pay is -- is an error by Goldman.

Q. So it's fair to say that not all investors

Page 128

understood Shenan 3 a -- Shenandoah 3 was a dry hole; correct?

A. This -- this is in 2017. So this is after 4, 5, and 6 were drilled. This -- this is simply -- well, no, no. Excuse me. Excuse me.

Some of the confusion here results from calling -- like the Number -- some people call the Number 1 appraisal well, which it was -- the first well is a discovery -- Number 1 appraisal well as Shen 2.

I think the confusion here is Shen 3 -- it's the third appraisal well, but it's Shen 4. Yeah, Shen 3 encountered no net pay.

Q. Okay. But that's not --

A. The company never said it encountered net pay.

Q. Okay. But you'll agree that some investors --

A. Goldman sa- -- Goldman says that --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry --

THE WITNESS: -- that's correct.

THE COURT REPORTER: -- I can't -- one person at a time, please.

Page 129

33 (Pages 126 - 129)

THE WITNESS:  I will agree, yes.

BY MS. JENSEN:

Q.  Okay.  I think it got garbled, Mr. Keller; so, unfortunately, we have to repeat this.

So you'll agree that -- that some investors understood Shenandoah did encounter hydrocarbons; correct?

MR. GRUENSTEIN:  Objection.

THE WITNESS:  I would agree that the Goldman report says this, but it's an error.  And, in fact, well before this report was -- was released, parties had disclosed that this was a dry hole or that this was -- was not productive or not producing.

MS. JENSEN:  I'm going to move to strike everything after "this."

THE WITNESS:  Okay.  Okay.  Fine.

BY MS. JENSEN:

Q.  Okay.  Goldman Sachs wasn't the only one; correct?

A.  The only one attributing net pay to 3?

Q.  Yeah.

A.  I don't recall whether -- people attributing net pay to 3.

Q.  Jefferies did; correct?

Page 130

A.  If you say so.  I'm saying I don't recall that.

Q.  Okay.  Lazard did?

A.  Again, I'll take your word for it even though a 30 percent working interest owner had written off the well.

Q.  Lazard is a sophisticated investor; correct?

A.  They are indeed.

Q.  So as part of its announcement about Shen 3, Anadarko did not describe it as a dry hole, did they?

A.  That is correct, they did not.

Q.  Instead, Shenandoah -- I mean, instead, Anadarko described Shenandoah 3 as finding 50 percent more of the same sands?

A.  It did.

Q.  And also said that pressure data confirmed the oil-water contacts across the field?

A.  Yes, it did.

Q.  Now, you referenced earlier ConocoPhillips' accounting decision with respect to Shen 3.

ConocoPhillips wasn't the operator of Shenandoah; right?

Page 131

A.  That is correct.

Q.  Anadarko was?

A.  That is correct.

Q.  As the operator, Anadarko had more control over the appraisal process; correct?

A.  That is correct, yes.

Q.  And as the operator, investors tended to listen more to Anadarko than the passive partners?

A.  I would say that depends.

Q.  Well, you found evidence of that, didn't you, in the record?

A.  Would -- yes, I do.  And I would also not characterize Conoco as a passive partner.

Q.  It was not the operator; correct?

A.  There's a difference.

Q.  Okay.  But you're agreeing it's not the operator?

A.  It's certainly not the operator, yes.

Q.  And do you agree that each Shenandoah partner made independent accounting determinations with respect to the various Shen wells?

A.  Yes, I do.

Q.  Okay.  So Anadarko investors wouldn't necessarily credit ConocoPhillips' accounting decisions for Anadarko information; correct?

Page 132

A.  That is correct.

Q.  Anadarko also did not say that the resource size reduced with the results of Shenandoah 3, did it?

A.  It did not.  It also did not attribute any net pay to 3.

MS. JENSEN:  Strike after "It did not."

BY MS. JENSEN:

Q.  And certainly didn't disclose that Shen 3 reduced the size of the prospect by 50 to -- sorry, 25 to 50 percent; correct?

A.  It said additional drilling was necessary.

Q.  In answer to my question, did it disclose that Shenandoah --

A.  It did not, no.

Q.  Thank you.

Now, in your report you opine that investors understood the results of Shenandoah 3 resulted in a smaller resource; correct?

A.  Yes.

Q.  And what is your basis for saying that all investors understood the results of Shen 3 the same exact way that you interpreted that information?

A.  Shen 3 was drilled to test the areal extent of the reservoir.  It was the far eastern

Page 133

34 (Pages 130 - 133)

side of the -- of the field, and it did not encounter any net pay.

Q. My question's a little different.

What's the basis for saying all investors understood the information the same exact way you did?    14:30:06

A. Because you had a fourth data point that showed no reservoir --

MR. GRUENSTEIN: Objection.

(Simultaneous speaking.)    14:30:16

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, one second. Because you had a what?

THE WITNESS: -- a fourth data point, i.e. Shen 3, that showed no net pay on the eastern flank    14:30:21 of the field.

BY MS. JENSEN:

Q. And if there was evidence that investors thought differently than you did, would you change your opinion?    14:30:31

A. The facts are the facts, and there was, in fact, no net pay in Shen 3. So I'm not sure what you're telling me investors could tell me.

Q. So it doesn't matter what I put in front of you, you're not going to change your opinion?    14:30:47

Page 134

MR. GRUENSTEIN: Objection.

THE WITNESS: The facts are there was no net pay at Shen 3.

BY MS. JENSEN:

Q. And as we just saw, some investors thought    14:30:54 there was; correct?

A. Some --

MR. GRUENSTEIN: Objection.

THE WITNESS: -- investors in a report written well after 4 and 5 were drilled misstated    14:31:04 something. This is a '17 report from Goldman, which was -- would have been after Shen 4 or 5 and 6 were drilled. So, again, I'm not sure of the relevance of it.

BY MS. JENSEN:    14:31:18

Q. So if investors thought that, with the results of Shenandoah 3, Shenandoah got bigger, would that change your opinion?

A. There would be no basis to think that.

Q. And so -- so it wouldn't change your    14:31:32 opinion?

A. You -- you couldn't present me a fact situation that supported that.

Q. Okay. Now, BofA, again, is a -- a source that you cite throughout your report; correct?    14:31:46

Page 135

A. Yes, a large bank.

Q. And a credible source?

A. In general, yes.

Q. A sophisticated investor; correct?

A. Yes.    14:32:00

Q. Okay. You should be able to see what's been marked as Exhibit 509.

(Keller Deposition Exhibit 509 was marked electronically.)

THE WITNESS: Okay. Hold on one second.    14:33:00

Oops, one moment.

BY MS. JENSEN:

Q. And while you're pulling that up, for the record --

A. I have 509.    14:33:30

Q. -- this is B- -- this is a -- a document bearing the Bates stamp BOFAS_APC-000488.

A. I've got it now, yes.

Q. Okay. Is this one of the documents that you reviewed in -- in forming your opinions?    14:33:44

A. I did review this document to the best of my recollection, yeah.

Q. Okay. If you'd turn to page 4.

A. Okay.

Q. There's a series of bullets.    14:33:55

Page 136

A. I'm sorry. Going there.

Okay. There we go. Got you.

Q. So the fifth bullet down --

A. Yes.

Q. -- do you see the heading "Shenandoah gets    14:34:09 bigger"?

A. I do see that, yes.

Q. And this is dated February 3rd, 2015; correct?

A. Yes. Yes.    14:34:18

Q. And so this is right after the results of Shen 3 are announced?

A. That's correct.

Q. And -- and Bank of America, Merrill Lynch, its highlight here is that "Shenandoah gets bigger";    14:34:31 right?

A. I do see that, yes.

Q. And you left this one out of your report; correct?

A. I don't think I cited this; but, again,    14:34:38 unlike any other well, there was no discussion by Anadarko of net pay at Shen 3.

THE COURT REPORTER: I'm sorry. There's -- wait, wait, wait. Please slow down. Unlike --    14:34:43

Page 137

35 (Pages 134 - 137)

THE WITNESS: No discussion of -- I'm sorry. No discussion of net pay at Shen 3.

BY MS. JENSEN:

Q. So when you say that investors understood Shenandoah got smaller as a result of Shen 3, apparently you did not include Bank of America, Merrill Lynch, in that opinion; is that correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I certainly didn't include this quote, that's correct.

BY MS. JENSEN:

Q. Are you aware that the company failed to write off Shenandoah 3 at the time because its own accounting department thought that Shenandoah 3 increased the resource size?

A. I am aware of that, yes, I am.

Q. And did you review those documents in forming your opinions?

A. I --

MR. GRUENSTEIN: Objection.

THE WITNESS: I'm not sure which document you're talking about. I am aware that Conoco expensed and Anadarko did not.

BY MS. JENSEN:

Q. But my question was different.

Page 138

Are you aware that the company failed to write off Shenandoah because its own accounting department thought that Shenandoah increased the resource size?

A. Different people have different interpretations.

Q. And so do you think that Shenandoah -- Anadarko's accounting department was unreasonable or not credible in it interpretation of the announcement of Shenandoah 3?

MR. GRUENSTEIN: Objection. Foundation.

THE WITNESS: Yeah, I have no basis to -- to -- to answer that.

BY MS. JENSEN:

Q. You didn't review those documents?

A. Not to the best of my recollection, no.

Q. So you really -- you have no idea, one way or the other?

MR. GRUENSTEIN: Objection.

THE WITNESS: I know what the public disclosures were, which is distinct from what internal discussions may have taken place.

MR. GRUENSTEIN: Rachel, if there's a good point to take a five-minute break --

MS. JENSEN: Yep, we can go ahead and take

Page 139

a five-minute break.

THE VIDEOGRAPHER: Go off the record?

Okay. Off the record; it's 2:37 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 12- -- 2:51 p.m.

BY MS. JENSEN:

Q. Okay. Mr. Keller, earlier in your testimony you mentioned two staffers who worked with you to check cites and so forth in your complaint. That's Eric Madsen and Keming Liang?

A. Yes.

Q. Okay. And both of those worked at Compass Lexicon; correct?

A. Before they joined BRG, that's correct, yes.

Q. All right.

And Compass Lexicon is the same company where Defendants' expert Dr. Allen Ferrell works; correct?

A. I believe that's correct, yes.

Q. Okay. So in your report, you opined that investors understood after Shen 3 Anadarko needed to drill additional appraisal wells to understand the Shenandoah resource potential; correct?

Page 140

A. Yes.

Q. And what's the basis for saying all investors understood this, the same way that you interpreted the information?

A. Again, I -- I would not say "all investors." I would say the market understood it based on repeated public comments by Anadarko management.

Q. So you're conceding that not all investors understood the information that way; correct?

A. I could never make a statement about all investors, that's correct. I'm talking about the market, what the market knew.

Q. Okay. And you're not saying that all sophisticated investors understood the -- the -- that the same way you did?

A. Again, I would not use the word "all," that's correct.

Q. So -- I mean, because you -- you -- it would be speculation on your part to opine on what investors understood about Shenandoah through the class period; correct?

A. Yes.

Q. Now, did you -- in -- in reaching this opinion, did you review any internal documents to

Page 141

36 (Pages 138 - 141)

confirm that this is what Anadarko and the partners actually thought at the time?

A. I -- I did not. Having been in this business a long time, the partners signed AFEs and committed funds, so I'm making the assumption they 14:53:38 were in agreement with the operator --

Q. So your opinion --

A. -- or they would have gone non-consent.

Q. So an assumption in your opinion is that that is what actually -- what Anadarko and the 14:53:49 partners actually thought at the time; correct?

A. They did not go nonconsent, that's correct?

Q. And are -- are you aware that ConocoPhillip [verbatim] was trying to sell its 14:54:01 interests after Shenandoah 3?

A. That's a normal part of portfolio optimization. It does not surprise me at all.

Q. But my question is different. Are you aware of that fact? 14:54:14

A. I am not certain that I was aware of that fact. I was aware Conoco was reevaluating strategic priorities.

Q. Okay. So -- but you'll agree with me you have no basis to dispute that ConocoPhillips was 14:54:26

Page 142

starting to --

A. I have no basis, that's --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry -- 14:54:33

THE WITNESS: -- that's correct.

BY MS. JENSEN:

Q. Okay. Yeah, just wait until I finish my question. I know it's --

A. I'm sorry. 14:54:36

Q. No, it's -- it's okay. It's not always easy to know when I'm done with my question, so I give you that. But just -- yeah, we'll try to stay out of each other's way.

A. Yep. 14:54:47

Q. So let me just ask it again so that the record is clear. So you have no reason to dispute that after Shenandoah 3, ConocoPhillips was trying to sell its interests in Shenandoah? 14:54:58

A. Was exploring the possibility, I would agree, yes.

Q. Okay. And so if it was trying to sell its interests, then you don't know that She- -- that ConocoPhillips needed additional wells to understand 14:55:12

Page 143

the resource potential?

A. I do know that ConocoPhillips did not go nonconsent on 4, 5, or 6.

Q. But that's not my question. And, actually, I'm not sure that's a correct statement 14:55:27 either.

But if ConocoPhillips was trying to get out of Shenandoah, then you have no reason to be- -- to believe that ConocoPhillips thought it needed to drill additional appraisal wells to understand the 14:55:41 resource potential?

MR. GRUENSTEIN: Objection.

THE WITNESS: I don't agree with the characterization "trying to get out of."

BY MS. JENSEN: 14:55:49

Q. Okay. Okay. But have you reviewed any internal documents from ConocoPhillips about --

A. I have not.

Q. -- what it was trying to do?

A. No. 14:55:58

Q. Okay. So just assume for purposes of this question that ConocoPhillips was exploring how to exit from Shenandoah after Shenandoah 3. In that instance, you'll agree with me that ConocoPhillips didn't need additional appraisal 14:56:11

Page 144

wells to understand the Shenandoah resource potential?

MR. GRUENSTEIN: Objection.

THE WITNESS: I would not necessarily agree. 14:56:24

BY MS. JENSEN:

Q. You -- you don't have enough information to agree or disagree, do you?

A. That's correct.

Q. Okay. You opined that after the results 14:56:32 of Shen 3 were released, investors understood Anadarko was unlikely to invest in Shenandoah at then-prevailing oil prices; right?

A. I would not say just at then-prevailing prices. With what was known at that time, yes, 14:56:57 that's correct. It's not merely a pricing issue.

Q. Okay. So do you want to amend your opinions that refer to "then-prevailing oil prices," then?

A. No. Then-prevailing oil prices were a 14:57:32 driver, but the decision to proceed is a function of oil prices, plus reserve potential, plus development and costs. There are three main inputs into that decision.

Q. Okay. But you do refer in your opinions 14:57:59

Page 145

37 (Pages 142 - 145)

to then-prevailing oil prices; correct?

A. Yes. Yes. That was a -- that's certainly a negative, yes.

Q. What is your opinion -- what is the basis for saying that all investors understood this    14:58:12 information the same way as you interpreted it?

A. Again, I am not saying all investors. I'm saying the market interpreted this, that in a declining price environment, the volume of reserves necessary and/or the cost to install a platform    14:58:28 would need to change to justify investments, all things being equal.

Q. And if the company had told the market that it didn't believe its -- its exploration was being hurt by oil -- lower oil prices, would you    14:58:56 change your opinion?

MR. GRUENSTEIN: Objection.

THE WITNESS: I would say everyone in the market knew that exploration was impacted by lower oil prices. This is --    14:59:08

BY MS. JENSEN:

Q. And --

A. -- again --

Q. And so just --

A. -- the driver.    14:59:12

Page 146

Q. So if -- and -- but if the company told the market that lower oil prices would not hurt its exploration, would you change your opinion?

A. If the company said lower -- lower oil -- and I -- I -- I'd -- I'd -- I can't quite understand    14:59:33 that scenario. A commodity-focused entity saying oil prices didn't have any impact, that -- that simply doesn't make sense to me.

Q. So are you disputing that the company told the market it didn't believe that its exploration    14:59:56 was hurt by lower oil prices?

A. Well, no, I'm not disputing that because obviously at this point, this is a field that wasn't going to come on production for several years. So it isn't current oil prices. It's the projection of    15:00:11 oil prices at the time production commences. Those are two very different time frames.

Q. Right.

Because the then-prevailing oil prices were not what was projected into the future;    15:00:23 correct?

A. That is correct.

Q. And, in fact, Anadarko didn't use spot pricing, did it?

A. Few people use spot pricing. You use a    15:00:36

Page 147

strip or a consensus on forward prices, that's correct.

Q. Which looks at future prices?

A. That's the strip, and that's what forwards are, yeah.    15:00:48

Q. And at the time the under- -- using strip prices, the prices of oil were expected to go up; correct?

A. They were.

Q. So, for example, Bank of America had the    15:01:21 Brent price of oil at $80 a barrel in 2019; correct?

A. I believe that's correct, yes. I don't have that number in front of me, but that sounds reasonable.

Q. And -- and the market didn't expect for    15:01:37 Shenandoah to come online before then, did it?

A. The market did not expect that, no.

Q. Okay. In your report you also opine that investors understood the Shen 4 encountered salt; correct?    15:02:13

A. That is correct, yes.

Q. And what's the basis for opining that all investors understood that the same way you did?

A. Again, not all investors, but the market, this was disclosed.    15:02:23

Page 148

Q. And where was it disclosed?

A. In -- in public announcements after Shen 4 was drilled. So this would have been -- let's see, it -- the Shen 4, my recollection, was finalized at the end of 2015, so results were known beginning    15:02:38 2016-ish. I -- I do know -- I -- I recall that in an earnings call after Shen 4, the company said Shen 5 would be necessary.

Q. Okay. But that's a different question than what I asked.    15:02:58

Can you point me to one statement by the company that used the word "salt"?

A. I -- I can't right now, no. No.

Q. And, in fact, the company never said the word "salt" --    15:03:11

A. Okay. Fine. We knew we were drilling subsalt. So that's fine, yeah.

Q. Any analyst report talk about Shenandoah 4 hitting salt?

A. Not that I recall, no.    15:03:24

Q. An- -- any investor?

A. Not that I recall, no.

Q. And the company also didn't disclose that Shen 4 hitting salt reduced the resource size by a third; correct?    15:03:40

Page 149

38 (Pages 146 - 149)

A.  They -- they did not disclose that, no. They did not make that statement.

Q.  Okay.  And no statement that Shenandoah reduced the areal extent of the reservoir by more than 900 acres?          15:03:49

MR. GRUENSTEIN:  Objection.

THE WITNESS:  Not a specific -- not that I recall, no.

BY MS. JENSEN:

Q.  And, in fact, some investors understood --  15:04:07 or misunderstood that Shenandoah 4 actually increased the resource size; correct?

A.  So- -- I can't speak to what some investors -- what an investor could have said.  I do know the Shen 4 was drilled on the western side of  15:04:26 the reservoir and was certainly not as -- as encouraging as Shen 5 proved to be.

Q.  You cite RBC in your report?

A.  I do.

Q.  And that's a credible source?          15:04:38

A.  They are, yes.

Q.  A sophisticated investor?

A.  It's a -- a major bank, an investment bank, yes.

Q.  Okay.  You should be able to see what has  15:05:12

Page 150

been marked as Exhibit 510.

(Keller Deposition Exhibit 510 was marked electronically.)

THE WITNESS:  I'm going to.  It's not up yet.  Give me a second.  I'm on 509.  There's 510  15:05:25 just came up.

Okay.  I got it now.

BY MS. JENSEN:

Q.  Okay.  So for the record, this is a document that bears the Bates stamp RBCCM00000150.  15:05:47

Have you seen this document before?

A.  I believe I have, yes.

Q.  Is this a document that's cited in your report?

A.  I believe it is.          15:06:06

Q.  And you didn't cite it for this proposition, did you?

A.  I don't recall.  I reviewed hundreds of reports, so...

Q.  Well, if it was relevant to this question,  15:06:16 you would have of course cited it in your report; correct?

A.  I would hope so.

Q.  So you -- turn down -- so the -- on the first page there is a heading in blue that says "Key  15:06:35

Page 151

points."

Do you see that?

A.  I do see it, yes.

Q.  And the second-to-the-last paragraph --

A.  "Continued success" --          15:06:46

THE COURT REPORTER:  I'm sorry.

BY MS. JENSEN:

Q.  Yes.

THE COURT REPORTER:  One at a time, please.          15:06:50

BY MS. JENSEN:

Q.  Okay.  Could you read that par- -- paragraph, please.

A.  Yes.  "Continued success in development projects" -- "projects in the Gulf of Mexico.  The  15:06:57 fourth Shenandoah appraisal well successfully encountered more than 620 net feet of oil pay, extending the lowest known oil column downdip.  This could portend increasing the resource potential in the basin.  Additionally, first oil at the  15:07:14 Heidelberg pro-" -- "project is expected in 2016." [As read]

Q.  So this report doesn't mention anything about salt; correct?

A.  My recollection is that the initial well  15:07:26

Page 152

encountered salt and that the net pay was encountered in the sidetrack, two different wellbores.

Q.  Okay.  This one doesn't mention anything about salt; correct?          15:07:41

A.  It does not.  But the -- the wellbore it's mentioning was 620 feet of net pay.  I don't believe encountered any salt.  That was a -- a sidetrack.

Q.  Okay.  But it doesn't mention anything about the initial results of the well being salt;  15:07:56 correct?

A.  I -- not that I read, no, it does not.

Q.  Yeah.

It also doesn't say that it reduced the resource size?          15:08:05

A.  It does not say that, no.

Q.  Okay.  And, in fact, it says that it portended the increase of the resource potential?

MR. GRUENSTEIN:  Objection.

THE WITNESS:  It portended.          15:08:18

BY MS. JENSEN:

Q.  Right.  That's what I said; right?

A.  I -- no, no.  I'm -- I'm agreeing.  It says --

Q.  Oh.          15:08:26

Page 153

39 (Pages 150 - 153)

Veritext Legal Solutions
866 299-5127

A. -- portended.

Q. Okay.

A. Which does not mean it confirmed. It portended. It was a data point.

Q. Well, portend means to be a sign; correct?    15:08:33

A. Well -- well, it -- it -- again, it's potential. Portend, an increasing resource potential, again, potential. And at the same time Anadarko said it needed to drill 5 after drilling 4.

Q. And so it's a sign of something likely to    15:08:52 happen; correct? Do I need to get a dictionary out?

A. No, you don't need to get --

MR. GRUENSTEIN: Objection.

THE WITNESS: -- dictionary out.

BY MS. JENSEN:    15:09:06

Q. You'll agree with me; right?

THE WITNESS: It portends. I'll agree it says --

THE COURT REPORTER: I'm sorry.

THE WITNESS: -- portend --    15:09:08

THE COURT REPORTER: One person -- wait --

THE WITNESS: -- potential.

THE COURT REPORTER: Hold on. Can we slow down?

MS. JENSEN: Okay.

Page 154

THE COURT REPORTER: There's multiple people --

THE WITNESS: Yes.

THE COURT REPORTER: -- speaking.

THE WITNESS: It portends potential, I    15:09:09 would agree that that's what it says, yes.

BY MS. JENSEN:

Q. Okay. Thank you.

Okay. You also opine in your report that investors did not view defendant statements about    15:09:20 Shen 4 results as confirming any particular resource range.

What's the basis for saying all investors understood this information the same way as you did?

A. Once again, I'm not saying all investors.    15:09:33 I'm saying the market understood this because Anadarko definitively stated it needed to drill 5. It did not yet have enough information to sanction this project.

Q. Did you talk to any investors about what    15:09:47 they understood this to mean?

A. I did not.

Q. You don't say in this the market, you say investors; correct?

A. Okay. I'm using the two interchangeably.    15:09:57

Page 155

You're saying all investors. I'm differentiating to your all investors and my investors.

Q. Okay. So did you speak to any investors to confirm that that's the way they understood this information?    15:10:14

A. I did not.

Q. And in this portion of your report, you do not cite any investors, do you?

A. No. I said -- I'm speaking of the market. I'm using the market and investors interchangeably.    15:10:22

Q. But you don't cite any investors in your --

A. That's correct.

Q. -- report.

A. I do not.

THE COURT REPORTER: Sorry. Wait.

THE WITNESS: That's corr- --

THE COURT REPORTER: If we can wait --

BY MS. JENSEN:

Q. You also don't cite any analysts in this    15:10:31 section of your report, do you?

A. Not that I recall.

Q. So you don't have any support for this opinion other than your own interpretation; correct?

MR. GRUENSTEIN: Objection.    15:10:44

Page 156

THE WITNESS: And Anadarko's statement that it needed additional information before moving forward.

BY MS. JENSEN:

Q. Which you credit as true; correct?    15:10:51

A. I do.

Q. And the market understood that Anadarko was drilling Shen 5 just to confirm its ultimate size; correct?

A. To get additional information to confirm    15:11:36 the size of the reservoir, that's correct.

Q. But it was just confirming its ultimate size; correct?

A. I'm not sure the -- the point you're making.    15:11:49

Q. Do you know Imperial Capital?

A. I know the name.

Q. And you cite it in your report; correct?

A. Yes, I do.

Q. So it's a credible source?    15:11:59

A. I believe them to be credible.

Q. Okay. A sophisticated investor?

A. I would agree.

Q. Okay. You should be able to see what has been marked as Exhibit 511.    15:12:52

Page 157

40 (Pages 154 - 157)

Veritext Legal Solutions
866 299-5127

(Keller Deposition Exhibit 511 was marked electronically.)

THE WITNESS: Okay. Hold on. Coming up. I've got it.

BY MS. JENSEN:                    15:13:10

Q. And did you review this report in forming your opinions?

A. I believe that I reviewed it.

Q. And, in fact, you cite this in your report?                    15:13:23

A. Yes, I believe that's correct.

Q. And so you've reviewed what Imperial Capital said about Shenandoah at this time?

A. I would have to refresh my memory.

Q. So if you look at page 7.                    15:13:35

A. Okay. I'm scrolling.

Q. And for the record, this document --

A. I'm at page 7, yes.

Q. Okay. Good.

Now, for the record, this document bears    15:14:01 the Bates stamp IC-000001.

Okay. So you're on page 7 now?

A. I am on page 7, yes.

Q. Okay. And it refers to, if you look down the page, to APC's mega-projects.                    15:14:16

Page 158

A. Yes.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, mega what?

MS. JENSEN: Projects.                    15:14:26

BY MS. JENSEN:

Q. And you see that according to Imperial Capital, those mega-projects "include the potential +1.0 billion barrel Shenandoah discovery in the U.S. Gulf of Mexico perhaps one of the largest oil fields    15:14:45 found in the last -- past five years in the U.S. deepwater"?

A. Yes.

Q. And so it's parroting the terminology that the company used with one of the largest oil fields?    15:15:02

A. Potentially.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: Was there an objection?                    15:15:11

MR. GRUENSTEIN: Yes.

BY MS. JENSEN:

Q. Okay. If you turn back now to page 3.

A. Okay. Going there.

Okay.                    15:15:25

Page 159

Q. Okay. So the page has at the top the heading "Rationale"?

A. Yes, I'm at page 3.

Q. Okay. And you see if you scroll down the page, APC also has some next generation mega-pro- --    15:15:37

A. Yes.

Q. -- -jects?

"Advancing quickly."

And that refers the same projects as we just saw on the page prior --                    15:15:44

A. Yes.

Q. -- to that?

A. Yes.

Q. Okay. And it says here, "They just need an appraisal well or two"?                    15:15:52

A. Yes, I read that.

Q. Okay. And it says, also, "The giant Shenandoah oil field in the deep-water Gulf of Mexico will go forward, in our opinion, as APC is just confirming its ultimate size with the next    15:16:06 (4th) well to design facilities." [As read]

A. I read that, yes.

Q. And so are they talking about the 4th or the 5th?

A. They are talking -- this says here the    15:16:18

Page 160

4th.

Q. And so is that Shen 4, or is that Shen 5?

A. I believe this is Shen 4.

Q. Okay. So the market understood that with Shen 4, Anadarko was just confor- -- confirming its    15:16:30 ultimate size; correct?

A. I don't agree with that characterization.

Q. Well --

A. This is Imperial saying in our opinion, APC is just confirming. Anadarko, on contrast, had    15:16:42 said it needed to drill 5 and 6. So this is Imperial's opinion. This is not the market's opinion.

Q. Okay. How do you differentiate between the two?                    15:16:53

A. Imperial is one bank out of a larger universe. So Imperial thinks this to be true. I would assume that they have reasonable basis to believe it's true. But Anadarko, the operator in possession of more information than Imperial, said    15:17:09 it still did not have enough information to sanction and needed to drill 5, and then needed to drill 6.

Q. So are --

A. This is a process.

Q. Okay. So even though this is a source    15:17:19

Page 161

41 (Pages 158 - 161)

that you cite as credible and you've agreed it's a sophisticated investor, this is -- you don't credit this opinion?

MR. GRUENSTEIN: Objection. Compound.

THE WITNESS: I'm saying it's an opinion.    15:17:35

BY MS. JENSEN:

Q. And did this --

A. Sub --

Q. Did you factor --

A. Sub --                15:17:41

Q. -- this opinion into --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, did you have -- I didn't -- could you start over, please.    15:17:46

BY MS. JENSEN:

Q. Did you consider this report when you were forming your opinion?

A. I read this report and took it as one -- one entity's opinion. But I certainly gave more    15:17:56 weight to the fact that the operator said it needed additional information before it could move forward.

Q. So this is referring to Shen 4, and at least one sophisticated investor believes Anadarko is simply confirming its ultimate size; correct?    15:18:22

Page 162

A. Anadarko never said that. This -- Imperial Capital says this, correct.

Q. Right. And that's what I'm referring to.

A. Yeah, yeah.

Q. Okay. And so on a conference call after    15:18:31 Shen 4, defendant Daniel said we're in the same range; correct?

A. I believe that's correct.

Q. And that was important to the market because that was what sophisticated investors wanted    15:18:46 to know from Shen 4?

MR. GRUENSTEIN: Objection.

THE WITNESS: Again, I'd only caveat that by saying range of reserves does not necessar-- large reserves are not necessarily producible.    15:19:05 There are lots of big reserves that are never produced because the costs are too high relative to the potential value. So reserves -- the existence of reserves does not necessarily mean they will be developed.    15:19:19

BY MS. JENSEN:

Q. But with that caveat, otherwise you agree; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I agree with -- I -- repeat    15:19:25

Page 163

your statement, please, before I can agree or disagree.

BY MS. JENSEN:

Q. But that's what the market was looking for with Shen 4 to confirm the size of Shenandoah?    15:19:33

A. No --

MR. GRUENSTEIN: Object --

THE WITNESS: -- I didn't -- I don't agree with that. That's what -- that's what one analyst, one bank was saying, whereas others were saying    15:19:42 they -- it was still too early.

BY MS. JENSEN:

Q. Okay. But you'll agree with me that at least one sophisticated investor --

A. I would agree that Imperial said this,    15:19:51 yes.

Q. Okay.

MR. GRUENSTEIN: Peter, just let -- let Rachel finish her question.

THE WITNESS: I'm sorry. Yeah.    15:19:59

MS. JENSEN: So eager to answer my questions. Okay.

BY MS. JENSEN:

Q. Okay. In your report you also opine that investors understood after Shen 4 that any FID would    15:20:38

Page 164

depend on the information gathered from Shen 5 and Shen 6 as Anadarko --

A. Correct.

Q. -- could better understand the size and quality on the east side of the prospect; co- --    15:20:50 correct?

A. Correct. Yes.

Q. And what's the basis for your opinion that investors understood this information exactly as you did?    15:21:04

A. Repeated statements by the company that they needed to drill 5 and 6 before they could commit capital to develop the field.

Q. You don't -- you -- you didn't survey -- survey any investors --    15:21:18

A. I did not.

Q. -- for this opinion?

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, I did --    15:21:24 for this what?

BY MS. JENSEN:

Q. Opinion.

A. I did not.

Q. And, in fact, you don't cite any investors    15:21:32

Page 165

42 (Pages 162 - 165)

for this opinion, do you?

A. I cite public statements by the company about what was necessary to advance the project.

Q. But that's not answering my question. You don't cite any investors, do you?

A. You've asked me repeatedly; and, no, I have not cited any individual investor. I'm citing what the market was aware of.

Q. So you don't have any reason to believe that investors understood this information exactly as you did; correct?

A. My opinion is the market understood this, and could you find an investor that had a different opinion, I'm certain that you could. But the market understood what was necessary to advance this project.

Q. Okay. And, in fact, in this section you don't cite any source other than the company; correct?

A. That is correct.

Q. And you're assuming with this opinion that Anadarko, its internal decision-making was what it said to the market; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I would say correct because

Page 166

Anadarko controls the capital investment. And without capital investment in a platform, there will be no development; there will be no reserves, that's correct.

BY MS. JENSEN:

Q. And you're assuming that Anadarko's decision depended on the results of both Shen 5 and Shen 6?

A. That was their statement, and I believe it to be true, yes.

Q. And if it is incorrect, then your opinion would be ba- -- would be based on a faulty assumption; correct?

A. It's a statement of intention. I don't know how you would prove that to be false. They said it was dependent on 5, and they drilled 5 and spent significant money. Then they drilled 6 and spent significant money. So it wasn't just a statement. It was a statement followed by dedication of significant capital.

Q. And you didn't review any internal documents to determine when Anadarko made its decision to write off Shenandoah, did you?

A. I -- I did not, no.

Q. So you have no idea whether Anadarko based

Page 167

its decision on results of Shenandoah 5 or 6; correct?

A. I have an opinion.

Q. Do you have any information for that opinion, or you're just going to go ahead and make that opinion?

A. I have --

MR. GRUENSTEIN: Objection.

THE WITNESS: -- an opinion based on the fact that Anadarko comitted a significant part of its capital budget to the drilling of two additional wells.

BY MS. JENSEN:

Q. But you haven't looked at any internal documents?

A. That's correct.

Q. So you don't know what the decision turned on; correct?

A. I am taking their statements as true.

MS. JENSEN: Okay. Let's go off the record.

THE VIDEOGRAPHER: We're off the record? Okay.

Off the record. It's 3:24 p.m.

(Short recess taken.)

Page 168

THE VIDEOGRAPHER: We're back on the record. It's 3:49 p.m.

BY MS. JENSEN:

Q. Okay. Welcome back, Mr. Keller. Now, your report at paragraph 90 talks about how, "Investors understood that investments in Shenandoah would be impacted by develop- -- developments in the rest of the Gulf of Mexico, as Anadarko [sic] would be able to leverage existing infrastructure and take advantage of tiebacks"; correct?

A. That's correct.

Q. Is -- another way of saying that is brownfield; correct?

A. Not brownfield. I'm talking about subsea tieback, so you can spread capital cost over multiple fields.

Q. Well, taking advantage of existing infrastructure; right?

A. Yeah, yeah.

Q. And so taking advantage of existing infrastructure is one form of brownfield; correct?

A. I guess you can say that. Brownfield's a little incongruence when you're talking about deepwater. But I -- I get your drift, yeah.

Q. Right. In other words, it's being able to

Page 169

43 (Pages 166 - 169)

use existing infrastructure and not creating everything from scratch?

A. Correct.

Q. Okay. And you're aware that the company said in September of 2016 that Anadarko didn't need material commodity price improvements to make money in the Gulf of Mexico; correct?

A. I am aware of that, yes.

Q. That's an instance at which the company referred to strip pricing which refers to future pricing of oil, not --

A. Correct.

Q. -- the then-prevailing pricing of oil; correct?

A. Correct.

Q. Okay.

A. Not spot price, yeah.

Q. Okay. You also opine that by no later than May 2016, investors understood there was faulting in the Shenandoah basin, including between Shen 2 and Shen 3 and between Shen 2 and Shen 4; correct?

A. Can repeat the date, please.

Q. May 2016.

A. By May -- May of 2016, yeah, okay.

Page 170

She- -- Shen 4 was completed, that's correct. Shen 4 was done, yeah.

Q. Okay. And so you'll -- you'll concede there was no statement before May 2016; correct?

A. That there was no statement on faulting?

Q. Yes.

A. I -- I don't recall.

Q. If there was, you would have included it in your report; correct?

A. I would expect myself to have done that, yes.

But I -- I don't recall that there was a statement. That's all I'm saying.

Q. You don't recall there was a statement before May of 2016; correct?

A. Correct.

Q. Okay. And you understand that a whistleblower complaint had been launched with the company by this date; correct?

A. I was.

Q. You weren't aware at the time, were you?

A. At -- at what time?

Q. In May of 2016.

A. No. No, certainly not.

Q. You only became aware of that as part of

Page 171

this ligation?

A. That is correct, yes.

Q. And by this time frame of May 2016, Anadarko was aware of small-scale faulting at the scale of 300 to 400 feet; correct?

A. By May of 2016, yes, they had drilled 3 and 4, so they had some information about faulting.

Q. That's not -- that's not my question.

My question is that they were re aware of small-scale faulting at the scale of 300 to 400 feet?

A. I don't recall the exact scale. They were aware of faulting, so I don't recall exact -- exact scale.

Q. Okay. And so are you aware that at the time Anadarko was aware of small-scale faulting?

A. I don't -- I don't recall.

Q. Okay. And are you aware that by this time, the company had concerns that Shenandoah may be a busted-up reservoir?

A. Generally, yes.

Q. And the -- that piece, the busted-up reservoir, that was not disclosed to the market; correct?

MR. GRUENSTEIN: Objection.

Page 172

THE WITNESS: I don't believe it was in its one factor.

BY MS. JENSEN:

Q. Now, the statement from the company in May of 2013 blamed poor seismic imaging; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: Seismic is generally degraded subsalt, that's correct.

BY MS. JENSEN:

Q. Right. And -- and they blamed -- they blamed it on poor seismic imaging; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: That's my recollection, yes.

BY MS. JENSEN:

Q. But faults were known internally at the company long before then; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: It's a re- -- it's a region characterized by faulting. Exact location generally is not known with certainty until there are penetration [verbatim].

BY MS. JENSEN:

Q. And the company specifically held out Shenandoah as above average for the region; correct?

MR. GRUENSTEIN: Objection.

Page 173

44 (Pages 170 - 173)

THE WITNESS: I believe that's -- statements were made to that effect, yes.

BY MS. JENSEN:

Q. And nowhere in the statement in May of 2016 did the company disclose that it had known    15:55:01 years before that about faulting in -- in Shenandoah; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: That region of the gulf was generally acknowledged to be subject to faulting.    15:55:17

BY MS. JENSEN:

Q. But, yeah. I -- so, Mr. Keller, I don't want to go round and round on this because we could just go --

A. Yeah, understand.    15:55:27

Q. Okay. So if you could answer my question, because you've already answered that question, we've gone around on that one.

A. Okay.

Q. So -- so my -- my question to you was to    15:55:36 nowhere in that statement did the company disclose to them nine years before that about faulting in Shenandoah; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I believe that's correct.    15:55:51

Page 174

BY MS. JENSEN:

Q. And in that statement the company also said that it was -- it needed to include the faulting in its development plan?

A. Different geologists and geophysicists had    15:56:04 different interpretations of the data.

MS. JENSEN: I'm going to strike that as nonresponsive. That has nothing to do with the question I asked.

BY MS. JENSEN:    15:56:23

Q. Did -- the -- the company also said it needed to include that in its development plan; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: That would be a factor    15:56:30 included, yeah.

BY MS. JENSEN:

Q. Right. In other words, it inferred that Shenandoah's still on track for development; right?

MR. GRUENSTEIN: Objection.    15:56:36

THE WITNESS: It was still on track until Shenandoah 6.

BY MS. JENSEN:

Q. And that's what your opinion's based on; right?    15:56:49

Page 175

A. Yes, ma'am. Yes, it is.

Q. Okay. And nowhere in that statement did it -- did the company say that faulting had rendered Shenandoah uncommercial; correct?

A. Faulting per se does not do that.    15:57:02

Q. And so they didn't say that; right?

A. That's correct.

Q. Okay. It also didn't say that senior management had already decided against developing Shenandoah as the operator; right?    15:57:16

A. Correct.

Q. All right. Bear with me here for a second -- a moment.

Okay. So paragraph 266 you talk about    15:57:54 what Cobalt said around this time?

A. I'm going to the citation. 266?

Q. Yes. And just to orient you, that is on page 126.

A. Okay. I'm there now.    15:58:28

Q. Okay. So nothing in that paragraph mentions faulting; correct?

A. I'm reading the paragraph now.

I do not see any mention of faulting, no.

Q. Okay. And you don't cite any other    15:58:47

Page 176

company statement that uses the word "faulting"; correct?

A. I don't believe I do.

Q. In your paragraph 268, you say that "Plaintiffs' investment managers were clearly aware    15:59:11 of Shenandoah's complex structural properties and appraisal uncertainties." What's the basis for this statement?

A. You have corrected me today. My -- the basis of the statements by Fidelity, Janus and    15:59:24 Wellington, who you -- I did not realize until today when you told me that they were not in fact IMs to the plaintiffs.

Q. For the class reps, that's right.

A. Yeah, excuse me, the class reps. Excuse    15:59:36 me, yes. Yes.

Q. Except for -- and I just want to make sure we're clear, except for Janus?

A. Yeah, okay. Excuse me, yes. Yeah.

Q. Yeah. And so, then the only basis for    15:59:48 your statement here is the paragraph -- let's see, 268 b?

A. 268 b, as in "boy"?

Q. Yeah.

A. Okay. I read it.    16:00:12

Page 177

45 (Pages 174 - 177)

Q. Okay. So that's what I'm saying. So -- so taking out the other entities, that is the basis for this paragraph; correct?

A. I would say yes.

Q. And 268 b does not have the word "fault" in it, does it?

A. No.

Q. And it also says that it doesn't necessarily mean the reservoir is bad; correct?

A. That is correct.

Complexity is often a function of faulting, though. A complex reservoir is one that's not continuous or not interconnected with good communication.

Q. It's not synonymous, but it can be used for?

A. That is correct.

Q. But again, just to reiterate, the -- that -- that quote does not mention --

A. I don't see faulting in that quote; that's correct.

Q. Okay. And so, just to reiterate, there's no other company statement that said there was faulting; correct?

A. I'd have to refresh myself. I think

Page 178

Anadarko had discussed faulting it had encountered when it was drilling.

Q. The May 26 statement; right?

A. I believe even earlier. I believe on May 3rd, Anadarko talked about faulting.

Q. Well, that's the one we talked about before.

A. Okay, yeah. Yeah, I'm sorry, you said May 26th. I thought you were talking about something else. Yeah, okay, fine.

Q. Okay. So -- but that was the only time that the company mentioned faulting; correct?

A. Well, May 20 -- the -- the UBS conference sales had mentioned faulting.

Q. Well, they didn't say it anywhere during the conference, did they?

A. I would have to refresh myself. My recollection was that they did talk about faulting.

Q. But if they didn't, then would you change your opinions?

A. I don't know --

MR. GRUENSTEIN: Objection.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, could you

Page 179

start -- could you repeat.

BY MS. JENSEN:

Q. So that was not part of the --

MR. GRUENSTEIN: Let him answer the question.

BY MS. JENSEN:

Q. So you didn't rely on --

MR. GRUENSTEIN: No. No. There was a question that was pending. I objected, and he can answer.

Do you have the question, Peter?

THE WITNESS: No. Can you repeat the question, please.

BY MS. JENSEN:

Q. If they didn't, would that change your opinion?

A. Again, can you -- if they didn't what?

Q. If they didn't mention the word "faulting" at the UBS conference, would that change your opinion?

A. Again, faulting is -- is just one component.

Q. Okay. But you're not contending that they said the word "fault" at that conference; correct?

A. As I said, I'd -- I'd have to refresh my

Page 180

recollection. I -- I don't recall if they specifically used the word "faulting."

Q. In fact, they did not use the word "faulting."

MR. GRUENSTEIN: Objection.

BY MS. JENSEN:

Q. Right. Sitting here today, you don't know that they used that word?

A. My recollection the graphic from that UBS conference included a line that would indicate a fault.

Q. But they didn't say the word "fault"; correct?

A. I'd -- I'd have to read the transcript again. Looking at the graphic, I would say I see fault.

Q. Well, but it doesn't say the word "fault"; does it?

A. Okay, okay, fine.

Q. And there's not a key that says fault; correct?

A. There's not a key that says fault; that's correct.

Q. In fact, after the write-off, analysts said that it appeared to be much more

Page 181

46 (Pages 178 - 181)

**Page 182**

compartmentalized than they had thought; correct?

A. Compartmentalization is a result of faulting. But you can have compartmentalization with a thick pay zone and/or high permeability and prosody and still high commerciality. So, again, faulting and compartmentalization is one function, as is permeability, porocity, reservoir drive, and depth of the productive horizon.

Q. Okay. So Mr. Keller, if you could just focus on my question.

A. Yep, I'm trying to.

Q. I know. We'll get through this, I promise, if you can just focus on my question. So your answer had nothing to do with my question. My question was: After the write-off, did analysts say that Shenandoah appeared to be much more compartmentalized than they had thought during the class period?

A. I think there were analysts at multiple times that said this was a complex -- a rise in complex reservoir, not just after the -- not just after the write-off, but during the development and during the drilling appraisal.

Q. So are you denying that analysts said that after the write-off it appeared --

**Page 183**

A. No, I'm not deny- -- I'm not denying it.

Q. Okay.

MR. GRUENSTEIN: Peter, just wait for the question --

THE WITNESS: Sorry.

MR. GRUENSTEIN: -- to --

THE WITNESS: Yeah.

BY MS. JENSEN:

Q. So Société Générale is one of the analysts that you cite in your report; correct?

A. SocGen, yes. Yep.

Q. Did you review the reports that were produced by Société Générale?

A. I reviewed the reports that I footnoted.

Q. And so, if they pertained to your opinions, you would have cited in your report; correct?

A. I would have attempted to. Again, did I see every single report, I'm not sure that I did.

Q. Okay. So I have marked what's -- what we're identifying here as Exhibit 512.

(Keller Deposition Exhibit 512 was marked electronically.)

A. Okay. One moment.

Q. And for the record, this is a document

**Page 184**

bears the Bates stamp SG_PROD 068976.

A. Okay. I'm there.

Q. Okay. Have you reviewed this report before?

A. I believe I have.

Q. Okay. And then you'll recognize when I point you to the direct -- the portion of the report, that refers to compartmentalized structure, that this was one of the analysts that said post write-off that Shenandoah was more compartmentalized than first thought; correct?

A. I'm -- I'm reading through it now.

Q. If you need me to point you to the --

A. Yeah, if you can point me to --

Q. Sure.

A. That would save us some time.

Q. Okay. So page 10.

A. Okay. Yes, I read that, yes.

Q. So analysts did comment that after the write-off, it appeared Shenandoah was much more compartmentalized than first thought; right?

A. Yes, I mean, the drilling of an additional dry hole shows lack of continuity of reservoir, so that's correct, yes.

Q. Well, it doesn't refer in that sentence

**Page 185**

the Shenandoah 6; does it?

A. No. But you will recall that after 4, they said they needed 5. After 5, they said they needed 6, and 6 did not confirm what they were looking for. So then the decision was made to -- to stop.

Q. Again, you haven't reviewed any internal documents to know --

A. That's correct.

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, wait. I didn't hear the full question.

THE WITNESS: I have not reviewed internal documents.

BY MS. JENSEN:

Q. I mean, if you want to just answer "correct" to all my questions going forward, that's fine, Mr. Keller. I'd be alright with that. I'm not sure your --

A. No, I'll wait -- I'll wait for your questions. I'm sorry.

MR. GRUENSTEIN: If he doesn't wait for the answer, just saying "correct" won't help you very much either.

MS. JENSEN: That's a good point, Touche.

BY MS. JENSEN:

Q. Okay. Your report talks about Shenandoah 5; correct?

A. That is correct.

Q. And in your report, you acknowledge that the market thought Shenandoah 5 was a promising development; correct?

A. That's correct.

Q. In fact, Shenandoah 5 had more net pay than Shenandoah 2; right?

A. Yes, it did, yes.

Q. And so, the market understood, did it not, that Shenandoah 5 resulted in a -- an increase in the resource size?

A. I don't think that's necessarily true. It was a positive data point, but that still needed to drill an additional well.

Q. So is it your testimony that no investors thought that Shenandoah 5 increased the resource size of Shenandoah?

A. Some might have, some might not have. If you recall, Shen 5 was located in between 1 and 2, not in the flanks, so it did not expand the areal extent.

Page 186

Q. So I marked what's been identified as Exhibit 513, which for the record, is APC-01329 --

A. Going to it now -- mm-hmm.

Q. -- 41 -- I'm sorry, Mr. Keller, just let me finish the Bates number so that the record is clear.

So this is a document that bears the Bates stamp APC-01329241.

(Keller Deposition Exhibit 513 was marked electronically.)

BY MS. JENSEN:

Q. Can you see this document?

A. I just pulled it up, yes.

Q. Okay.

A. I've got it.

Q. Okay. And are you familiar with Simmons & Company?

A. Matt Simmons was a well regarded analyst, yep.

Q. And -- and so, you would -- you would regard Simmons as a sophisticated investor?

A. As a knowledgeable oil and gas investor, yes, I would.

Q. As a sophisticated investor?

A. Yes.

Page 187

Q. Okay. Now, if you turned to page 3.

A. Okay. I'm going there now.

Yes.

Q. Okay. And you'll see there's a discussion of Shenandoah?

A. I'm searching for it now on page 3. I'm sorry, here we -- again -- yes, I'm sorry, I've got it now.

Q. Okay. It's somewhat small, so you may need to zoom in.

A. I got -- that's what I was doing. Yeah.

Q. Okay. Okay.

So in approximately the -- it's like a little below the middle of the paragraph, do you see the sentence, "While the company" -- referring to Anadarko -- "has not changed its resource estimate, it appears likely that this has upside to its prior 500 MMboe EUR estimate."

Do you see that?

A. Yes.

Q. Okay. And the reference to the 500 million barrels UR -- I'm sorry, EUR estimate, that's what we were talking about earlier --

A. Yes.

Q. -- with respect to giant field; correct?

Page 188

A. Ultimate recoverables; that's correct.

Q. Yeah. So that refreshes your recollection that giant field refers to 500 MMboe --

A. Yes.

Q. -- EUR?

A. Yes.

Q. Okay. So that -- that's not gross, that's recoverable --

A. Estimated --

Q. -- right?

A. -- ultimate -- yes.

Q. Okay. So based on this report, the sophisticated -- at least one sophisticated investor believed that Shenandoah likely increased the resource size above the company's giant field estimate; correct?

A. Well, this would have been after 4, but before 5, if I'm looking at the date correctly, this is June of '16. And 5 didn't -- 5 was drilling in June of '16. It hadn't reached total depth yet.

Q. Okay. Well, do you see right after that, the -- it says, "At this juncture APC has shared that the pay zone is as large as 1,000"?

A. Yes.

Q. What well do you think that's referring

Page 189

48 (Pages 186 - 189)

to?

A. Shen 5.

Q. Okay. And areal extent of 5 -- of -- sorry, strike that.

Has an "areal extent of 9 miles (three blocks)." Is that --

A. Yes.

Q. -- an increase in what the areal extent was up until that point?

A. Well, it's hard for me to say definitively because, as I said, Shen 5 was between 1 and 2, it wasn't on the flank. Shen 4 was western flank, Shen 3 was eastern flank. So that would increase the areal extent. Shen 5 is in the middle, almost midpoint between 1 and 2. So it's confirming good pay in the middle, but I -- I don't know that it necessarily increases the areal extent because you already had 1 and 2 down and penetrated.

Q. Okay. And it says that it "has Miocene like rock prop" -- "properties" --

A. Yes, yes.

Q. And -- and that was intended to say it was a -- above the average for GOM; correct?

A. Yes, yes.

Q. Okay. And certainly it doesn't appear

Page 190

that Simmons, as a sophisticated investor, thought that Shenandoah 5 resulted in a significant reduction of Shenandoah resource size --

A. No, I thought --

Q. -- correct?

A. -- Shenandoah 5 was a good well.

Q. Yeah. And so, it's your opinion that it increased the resource size?

A. Potential resource size, but again, until you make an FID, nothing is recoverable, it's estimated ultimate recoverables, but until you make FID, you can't make anything.

Q. Well, certainly Anadarko didn't disclose to the market that Shenandoah resulted in a significant reduction of the resource size; correct?

MR. GRUENSTEIN: Objection. Shen --

THE WITNESS: No --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, I didn't hear some of that. Can you please repeat the objection.

MR. GRUENSTEIN: I said Shen 5. Ms. Jensen said Shenandoah resulted in a significant reduction.

Page 191

MS. JENSEN: Okay. Thank you for clarifying.

BY MS. JENSEN:

Q. Correct? I'm sorry. You've already -- you've already answered the question.

A. Fine, fine.

Q. Okay. The company didn't disclose that Shen 5 hit tar; correct?

A. Not to the best of my knowledge, no.

Q. Okay. You also opine that after Shen 5 -- strike that.

You also opine that investors understood that after Shen 5, any FID would depend on the results of Shen 6 --

A. That's correct.

Q. -- the ability to reduce --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry?

BY MS. JENSEN:

Q. The ability to reduce development costs and commodity prices; correct?

A. Correct.

Q. Now, you're assuming that Anadarko made its decision to write down Shenandoah at least in

Page 192

part based on Shen 6 results; correct?

A. That is correct.

Q. And if they had decided already, prior to the results of Shen 6, would that change your opinion?

MR. GRUENSTEIN: Objection.

THE WITNESS: I'm not aware that any such decision was ever made.

BY MS. JENSEN:

Q. Right. So -- so that's an assumption you're making. So if your assumption was faulty, your opinion would also be incorrect; right?

MR. GRUENSTEIN: Objection.

THE WITNESS: I'm sorry, again?

BY MS. JENSEN:

Q. So --

MR. GRUENSTEIN: I said objection, but you can answer.

THE WITNESS: Oh, okay. If they had made that decision prior to the drilling of Shen 6, then their statements about it being dependent on Shen 6 would have been inaccurate, so yes.

BY MS. JENSEN:

Q. You also opine that investors understood in late 2016 and early 2017, as Anadarko discussed

Page 193

49 (Pages 190 - 193)

potential development solutions for Shenandoah, that the prospect would not be developed in the existing economic environment; correct?

A. Yes.

Q. And what does the "existing economic environment" mean?

A. That then prevailing estimates of future oil and gas prices and the then expected costs of development.

Q. Okay. So the then prevailing estimates of future oil and gas prices, are you referring -- what timeframe are you referring to?

A. I -- I didn't specify a time period. It's, you know, intermediate to longer term. You're -- you -- you're forced to make a go/no-go decision based on estimates, of course, you don't have a crystal ball as to oil and gas prices. They were doing a feed study to try to bring down the cost of development, but there are multiple variables, and you've got to do it based on the best available information recognizing it's incomplete at that time.

Q. So intermediate to long term; right, and as you testified earlier, Shenandoah was not expected to be online prior to 2019; correct?

Page 194

A. That is correct, yes.

Q. And the 2019 prices at the time were estimated to be $80 a barrel; correct?

A. There was a wide range depending on who you -- who you talked to. And as oil prices trended downward and during the class period, which they did, I mean, they -- they troughed in about the middle of the class period, people's future expectations came down somewhat. So yeah, it was -- it was a range.

Q. But the Brent oil pricing for 2019 was $80 a barrel; correct?

A. I don't have that in front of me, but --

Q. If that's --

A. -- order of magnitude.

Q. Yeah, if that's what's in your report, you have no reason to dispute it?

A. No, I don't.

Q. Okay.

A. I am aware that during this same time period, Wood Mac, which is a fairly highly regarded company, thought the break even for Shenandoah was closer to $100 -- $100 a barrel.

Q. And what time period are you talking about?

Page 195

A. I think the Wood Mac report, if my recollection is correct, was middle of 2016.

Q. Okay. So but that was also a -- an opinion; correct?

A. That -- that is correct. Of course, yeah.

Q. And opinions vary; correct?

A. Yes, they do.

Q. And, in fact, the company never said it would take $100 a barrel to develop Shen, did they?

A. No. My recollection is the company said it couldn't state a price at which it would proceed. There were still too many variables.

Q. And the company also said in September of 2016 that they didn't need material commodity price improvement to make money with the GOM for Shenandoah; correct?

A. At what -- I'm sorry, what date again?

Q. It was September 2016.

A. So before 5 or 6 were drilled, or before 5 or 6 were known; correct?

Q. Before -- I would say that's before 6 is known.

A. Before 6 is known, yeah.

Q. Yeah.

A. So I believe they made that statement, but

Page 196

they also said that they needed 6 before they could proceed, independent of pricing.

Q. So in -- in forming your opinion about the existing economic environment, you -- you don't cite any investors, that they understood it that way; correct?

A. That they understood it what way? Excuse me, can you elaborate?

Q. That -- that Anadarko would not develop Shenandoah in the existing economic environment.

A. Did I cite any investors?

Q. Right.

A. Well, I would -- I would call Wood Mac an investor, and they -- they said it would take $100 oil. I don't think -- Anadarko did not make that statement, but there were other people that I -- I recall JPMorgan, I think, saying this was breakeven at 60. So -- so there was a range of people giving different prices at which this would clear the market.

Anadarko did not, but some investors did or some analysts did.

Q. So you're not saying all investors understood that; right?

A. I've never said anything about all

Page 197

50 (Pages 194 - 197)

investors. No, that's correct.

Q. When you said "Wood Mac," do you mean Wood Mackenzie?

A. I'm sorry, yes, Wood Mackenzie.

Q. Can you point me to the paragraph where 16:25:49 you cite that report?

A. Not without doing some hunting, I couldn't. I remember -- I remember the report but exactly what page it appears on, let me look for a minute.                16:26:08

I'm -- I'm still hunting. Excuse me.

I'm getting there.

I'm looking at 142, but I've got a little mismatch in my notes here. Hold on.

Q. Sorry, what notes?            16:28:03

A. Well, I'm looking at -- at my Exhibit B.

Q. Mm-hmm.

A. I'm just trying to find what page Wood Mac appears on.

My Exhibit B doesn't cite by -- does not 16:28:52 cross reference to footnote number. That's what I'm trying to find.

The Wood Mac reports that I referred to are Items 136 through 142 in Exhibit B, but I don't have -- global breakeven analysis and cost curves 16:29:10

Page 198

pre-FID private. And -- and I don't -- it doesn't tie to the footnotes. I'm sorry.

Do you want to go off for a minute while I look for it, because I --

Q. Yeah, that's fine. Let's go off the 16:29:57 record.

THE VIDEOGRAPHER: We're off the record. It's 4:29 p.m.

(Off the record.)

THE VIDEOGRAPHER: We're back on the 16:32:36 record. It's 4:32 p.m.

THE WITNESS: Okay. The first Wood Mac report I cited appears on page 144. This would be at 290 c. Wood Mac entitled, "Pre-FID Oil Projects in This Litigation."            16:33:17

"[I]f prices remain around $50/bbl, most major projects are at risk of deferral or cancellation without further cost deflation. That same slide included a graphic listing Shenandoah as having" --            16:33:40

THE COURT REPORTER: Can you slow down, please, sir.

THE WITNESS: I'm sorry.

"That same slide included a graphic listing Shenandoah as having a start-up date around 16:33:43

Page 199

2021, with breakeven pricing hovering around 90 to $100/bbl." [As read]

Second citation is the Wood Mac report from 2017. This appears on page 154. Actually, 153 and 154.                16:34:14

And, again, "In January 2017, Wood Mackenzie indicated they believed the region is going to pause in the near future, wait for the cost structure and long-term view on oil prices to stabilize before embarking on large, capex-heavy 16:34:46 projects again. Shenandoah has thus far 'produced encouraging results' but it 'assumed' that it would 'undergo additional appraisal drilling in 2017 prior to receiving FID' and cautioned that 'negative results may result in a bleaker outlook' for 16:35:06 Shenandoah and the 'Inboard Lower Tertiary as a whole.'" [As read]

That's page 154, paragraph 310.

BY MS. JENSEN:

Q. Okay. Thank you.            16:35:21

Okay. So, let's take this piece by piece. So July 2016, that report with its breakeven was one investor's opinion about the breakeven price; correct?

A. That is correct.            16:35:40

Page 200

Q. And other investor -- investor's discrete; correct?

A. And other -- yeah, there's a range of expectations from different investors; that's correct.                16:35:56

Q. And, in fact, another report that you cited in your report from Deutsche Bank had Shenandoah break even at $46; correct?

A. That's correct. Yep.

Q. So do you credit one of their opinions 16:36:12 more than the other?

A. No. I'm simply saying that that uncertainty adds to risk. Uncertainty as to future product prices and uncertainty as to at what price this gets sanctioned.            16:36:46

Q. And the -- the company hadn't said what that price would be?

A. That is correct. They had not said.

Q. Okay. Now, turning to paragraph 310, you read from a sentence about Shenandoah, and its 16:37:04 assumption as of January 2017 was that it would have additional appraisal drilling in 2017 prior to receiving FID; correct?

A. That is correct.

Q. And is that a reference to Shenandoah 6? 16:37:22

Page 201

51 (Pages 198 - 201)

A. Yes, it is.

Q. Okay. Now, Shenandoah Saba [verbatim] had also said there may be a Shen 7; correct?

A. I don't recall that.

Q. You have no reason to dispute that; right? 16:37:38

A. I don't. I don't recall it though.

Q. Okay. But the company never said Shen 6 was the end of the line, did it?

A. It said continuation would be dependent on 5 and then on 6. I never heard mention of 7, so no. 16:37:55

Q. In other words, it -- it didn't say that was going to be the end of its appraisal program?

A. That -- that is correct.

Q. The Mac -- I'm sorry, Wood Mac report that you were just quoting from, it talks about if there 16:38:27 were negative results, then it would be a bleak -- bleaker outlook; is that right?

A. That's what Wood Mac said, that's correct, yeah.

Q. As in it would be more negative than it 16:38:43 was as that time?

A. That's how I interpret "bleaker," yes.

Q. Okay. Now, Anadarko never told the market it had no intentions of developing Shenandoah before the write-down; correct? 16:39:02

Page 202

A. It said it needed furtherance of a once -- flipsides [verbatim] of the coin, it said it needed additional information from 6 before it could move forward. The inverse of that was, you know, if they didn't get information, 6 wouldn't be moving forward 16:39:20 yet.

Q. Well, the company also mentioned the possible Shenandoah 7; correct?

A. As I said, I don't recall that.

Q. And you have no reason to dispute that? 16:39:28

A. I do not.

MR. GRUENSTEIN: Objection.

BY MS. JENSEN:

Q. And if that's true, then the inference is not there; correct? 16:39:36

A. Well, that was -- that was dependent on a qualitative assessment, a qualitative and quantitative assessment of 6, which we now know was a dry hole.

Q. That's not exactly my question though. If 16:39:54 the company --

A. Okay, restate it, if you would, please.

Q. Sure, of course.

So if the company said that there may be a Shen 7, then there is no inference to be taken that 16:40:02

Page 203

Shen 6 was end of the line?

A. I'll agree with that.

Q. Are the only choices for an oil company to develop an oil field or a write-off entirely?

A. There -- there's something of a ticking 16:40:17 clock, if you will. You can't -- you can't suspend activities forever. There -- there are accounting issues. There are also lease expiration issues.

Q. A company could also sell its working interest; right? 16:40:36

A. Yes, yes, of course it could, yes.

Q. And, in fact, one of the Shen partners did just that; right?

A. Marathon exited and Anadarko exercised its preference, that's correct. 16:40:48

Q. And so, it made money on Shenandoah without developing it; correct?

A. I can't tell you if that's correct or not. I don't know what they received versus what they had expended. They -- my recollection is, Marathon sold 16:41:03 in July of '16, so they would have sold after Shen 4, but before Shen 5, so I'm not sure what they had expensed and what they received. So I don't know whether they made money or not.

Q. You'll -- you'll agree, though, that 16:41:21

Page 204

whatever that number was, it was north of 0?

A. Presumably.

Q. You think they sold it for less than $0?

A. I don't think -- no. I don't -- no. Yes, I -- I agree it's more than 0, I don't know what it 16:41:32 was then.

Q. Okay, okay.

A. Point taken.

Q. In fact, there's -- your report talks about other ways of monetizing -- monetizing assets; 16:41:41 right?

A. That's correct, yeah.

Q. Okay. So, for example, paragraph 10 talks about asset sale -- sales, paragraph 140 talks about different options that companies have; right? 16:41:52

A. Yeah, yeah, throughout this period, Anadarko at one point bought all of McMoRan's interest in the Gulf of Mexico. They sold other interests. So that's sort of dynamic portfolio optimization. At the right price, everything is for 16:42:12 sale. At the right price, you want to buy everything.

Q. That's right. So in other words, investors didn't think it was develop or bust; right? 16:42:21

Page 205

52 (Pages 202 - 205)

A. That is correct.

Q. Okay. In your report, you opine that investors understood before Anadarko's alleged corrective disclosure that Shenandoah 6 was wet; is that right?

A. That's correct.

Q. The company had told the market that it was sidetracking Shen 6; right?

A. That's right.

Q. And the market didn't know the results of Shen 6's sidetrack before the corrective disclosure by Anadarko; correct?

A. That's my recollection.

Q. Likewise, Anadarko's decision to suspend Shenandoah appraisal was not known before the corrective disclosure; correct?

A. That is correct.

Q. And the write-down in the amount of $902 million was also not disclosed to the market prior to the corrective disclosure; correct?

A. That is correct.

Q. Now, in the wake of the corrective disclosure, some so- -- sophisticated investors said that the news was surprising; correct?

A. Some said it was not surprising, and some

Page 206

were surprised.

Q. So in answer to my question, some sophisticated investors said they were surprised; correct?

A. I -- I -- I suspect that's true. I don't recall any of those statements. I recall people saying it's disappointing but not surprising. But I -- I --

Q. If -- if you had -- if you had reviewed documents where sophisticated investors said it was surprising, would that change your opinion?

MR. GRUENSTEIN: Objection.

THE WITNESS: An attentive investor to my mind would have heard -- go back a minute. The discovery well was a discovery well. The second well was the most successful well to date. So we had two good wells, then a dry hole. Then 4 is a so-so well, 5 is a good well, and 6 is a dry hole.

So if one followed the chronology here, I don't think people should have been shocked at the ultimate decision.

BY MS. JENSEN:

Q. And that's -- that's just your interpretation; correct?

Page 207

A. That -- that is correct. That's my interpretation.

Q. In fact, class representatives' investment manager Lazard was surprised; right?

A. I -- I -- I don't recall it, but I'm not -- I -- I -- I don't dispute it, no.

Q. You're not surprised to hear that Lazard was surprised, are you?

A. It -- it would not shock me to hear that one or more investment managers did not expect this write-off to happen, no. That's --

Q. Not just any investment managers, the investment managers for the class representatives in this case.

A. I'd say any investment manager, because I -- I didn't -- as I said, since I didn't know the class representatives, I did not know that Lazard represented a class representative -- or was an asset manager for a class. Since I didn't know that, I can just say that Lazard -- am I shocked that Lazard was surprised, no, that happens.

As we -- as we know from subsequent investments, Beacon and Navitas are drilling as we speak. So there are people that --

(Simultaneous speaking.)

Page 208

(Interruption in audio/video.)

THE COURT REPORTER: Can you say that again? "As we know from subsequent investments"?

THE WITNESS: -- subsequent developments, Beacon and Navitas are developing Shenandoah as we speak.

And a final investment decision for $1.8 billion was made last August, so there is -- there are smart oil and gas investors who think that there is still very significant potential here.

BY MS. JENSEN:

Q. And did at the time; right?

A. No, not -- I would not necessarily say they did at the time.

Q. Okay. Let's --

A. But at the time we did not have the current drill ship that's working there. We did not have the current oil prices. So a number of factors have changed since the decision in May of 2017.

Q. Okay. Well, let's -- let's get to what's happening at Shenandoah now. A little bit later, that's not --

A. Fine. I'm -- I'm sorry. I didn't mean to jump the gun.

Q. You're -- you're -- you're not -- yeah,

Page 209

53 (Pages 206 - 209)

you're -- you're going on a rant about something I'm not asking you about.

A. Fine. Fine.

Q. So let's -- let's look at Exhibit 514, which, for the record, is a document with the Bates stamp L00000080.

(Keller Deposition Exhibit 514 was marked electronically.)

BY MS. JENSEN:

Q. Can you see this document?

A. I'm opening it now. Hold on.

Yes, I've opened it now.

Q. Okay. And if you go down the page, below the "COMMENTS" --

A. Yes, I see it.

Q. Yeah.

-- so the third bullet there, could you read that into the record, please.

A. "Deepwater Gulf of Mexico has shifted from being a positive to a problem. The decision to impair Shenandoah (to the tune of $1 billion) was surprising given that APC had already drilled five appraisal wells. While APC has not yet decided to relinquish the leases, it appears that management has little confidence that the project will move

Page 210

forward. This in turns removes an expected source of future production (and cash flow), and it raises questions about APC's ability to find new tie-back developments for its significant infrastructure in the Gulf. Unexpectedly, CEO Al Walker opined on the call that 'at'" 40 to 60 -- excuse me, "'50 to 60 dollar oil, the Gulf of'" -- "'Gulf of Mexico development is a challenge.' Worrying given that it is sub-50 today,'" end of paragraph. [As read]

Q. Okay. Thank you.

So, again, this -- this is Lazard that's writing this; correct?

A. That is correct.

Q. No reason to doubt that that is the class representatives' investment manager?

A. As you say.

Q. And no reason to dispute that this was the class representatives' investment manager's reaction after the write-off of --

A. No. I -- I've -- I've just read it, yep.

Q. Okay. Other analysts that you cite in your report were also surprised by the news of the write-off; correct?

A. It -- it was disappointing news, but I think they were cautioned in this direction by the

Page 211

statements made after 4 and after 5, that they needed additional drilling, that it was dependent on 6, and 6 was dry. So that certainly was a -- a bad data point in a deteriorating environment.

MS. JENSEN: Okay. I'm going to move to strike as nonresponsive.

BY MS. JENSEN:

Q. You are aware --

A. Fine.

Q. -- that other analysts also?

A. Yes.

Q. -- were surprised?

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry. One second.

THE WITNESS: Some other analysts were surprised.

BY MS. JENSEN:

Q. Including Wolfe Research?

A. I don't recall Wolfe specifically, but I do recall other analysts did not expect this write-down.

Q. And you didn't cite them in your report; correct?

Page 212

A. I didn't cite everything in my report, that's correct.

Q. Well, these ones went against your opinion; correct?

MR. GRUENSTEIN: Objection.

BY MS. JENSEN:

Q. You didn't cite these analysts who disagreed with your opinion; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I believe the decision that Anadarko made was based on the facts known at the time. So I -- again, I -- I mean, it -- did other people have a different opinion, yes.

The fact that someone else is taking over the lease just shows you that there is a current belief that this is a -- a valuable asset.

BY MS. JENSEN:

Q. And so you just disagree with them; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I stated elsewhere in the report that the decision to proceed is a function of not just any individual prospect, but other opportunities available to the investors, so-called high grading of a portfolio and a risk appetite.

Page 213

54 (Pages 210 - 213)

So in a capital constrained world, you might have a resource that some people find valuable and a resource that you simply feel you've got other opportunities that are economically more attractive.

MS. JENSEN: So, again, nonresponsive. 16:52:09

BY MS. JENSEN:

Q. So Wolfe Re- -- Research, for example, they found the Shenandoah write-down to be a negative surprise -- surprise, and -- and you just disagree with them; right? 16:52:21

MR. GRUENSTEIN: Objection. Compound.

THE WITNESS: One investor disagreed with that -- if -- if you're telling me that that was Wolfe's opinion, yes. That -- that one encountered Anadarko and what a number of other 16:52:38 people felt [verbatim].

BY MS. JENSEN:

Q. And so you just disagree with Wolfe; correct?

MR. GRUENSTEIN: Objection. 16:52:43

BY MS. JENSEN:

Q. It's just a difference of opinion; right?

A. That's fine, yes.

Q. So since there's differing opinions on this, isn't the best way to determine the reaction 16:52:58

Page 214

to the corrective disclosure an event study of the stock decline?

MR. GRUENSTEIN: Objection.

THE WITNESS: That's one approach and might be the preferred approach if this was a -- a 16:53:13 very significant part of Anadarko's operations, which it was not.

BY MS. JENSEN:

Q. You didn't perform an event study --

A. I did not. I did not. 16:53:25

Q. Now, I think you were eager to mention Navitas earlier.

Navitas was not involved until after the class period; correct?

A. That is correct. 16:53:46

Q. And when did Navitas become a partner?

A. I believe that the Beacon, which is a Blackstone vehicle, Beacon and Navitas I believe became involved in 2018 or 2019. I'd have to refresh my memory of the exact date. 16:54:06

Q. And Navitas is not the operator; correct?

A. They may have assumed -- initially I believe Beacon Off- -- Offshore was the operator. Navitas may have assumed operatorship. I -- I -- I'd -- I'd have to refresh my memory. 16:54:20

Page 215

Q. Isn't Beacon the operator?

A. Beacon was the operator, and I think Navitas acquired -- Blackstone had several investment vehicles in this asset.

And my recollection, without going back to 16:54:32 notes not in my report, is that Navitas subsequently bought out one of the Blackstone partnerships and has a bigger working interest in Beacon now.

So I'd -- I'd have to confirm who the current operator is. I think it was Navitas that 16:54:52 made the FID.

Q. Well, paragraph 43 says that Beacon is the current operator.

Do you --

A. Okay. 16:54:57

Q. -- disagree with your report?

A. No. No, I -- I don't disagree, but -- yeah. Okay. Fine.

Q. Now, in your report you only cite documents from Navitas; correct? 16:55:05

A. If -- if -- again, I'm not looking at that particular paragraph. That may be true. You know, they're all partners in the same well.

Q. But -- but you only cited documents from Navitas even though there is multiple partners; 16:55:24

Page 216

correct?

A. I -- I -- I believe that's correct, yes.

Q. And you only cite investor presentations; right?

A. I -- I can't recall exactly what I cited. 16:55:33 I've looked in the trade press and in trade periodicals about -- to -- to follow developments. Obviously this is well past the class period, so I've just been keeping tabs on what's happening at Shenandoah. 16:55:51

Q. I'm just looking at your -- your notes here. Do you have any reason to dispute that you only cited investor --

A. No, I -- I don't know if --

(Simultaneous speaking.) 16:55:59

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry. Excuse me. I didn't get the rest of the question.

BY MS. JENSEN:

Q. -- investor presentations. 16:56:03

A. I have no reason to -- to dispute that, no.

Q. Okay. In other words, that's Navitas's dog-and-pony show about Shenandoah to potential investors and investors; correct? 16:56:19

Page 217

55 (Pages 214 - 217)

MR. GRUENSTEIN: Objection.

THE WITNESS: I don't know that it was to potential investors. I -- I couldn't tell you right now who the audience was of that presentation.

BY MS. JENSEN:                                          16:56:27

Q. But they are entitled "Investor Con-" -- "Presentations"; right?

A. Yes. Yeah.

Q. You don't cite any internal documents from Navitas?                                          16:56:35

A. No. I've -- I've never met the Navitas people.

Q. Right.

And so you don't know what they internally think about Shenandoah; correct?        16:56:41

A. I know that they're committing capital to it, so that gives me a -- a -- a sense of what they think about it.

Q. And Navitas isn't traded on the New York Stock Exchange; correct?                    16:56:55

A. No. It's an Israeli company.

Q. And Israeli companies aren't subject to the same disclosure requirements; correct?

MR. GRUENSTEIN: Objection.

THE WITNESS: I -- I don't have spec- --    16:57:03

Page 218

specific knowledge about Israeli disclosure requirements, no.

BY MS. JENSEN:

Q. You're not an expert in Israeli disclosure obligations?                                          16:57:12

A. I have to admit I'm not.

Q. Okay.

MS. JENSEN: Okay. Let's go ahead and take a quick break.

THE VIDEOGRAPHER: Okay. Off the record.    16:57:18 It's 4:57 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 5:06 p.m.

MS. JENSEN: Okay. Mr. Keller, I have no    17:06:23 more questions for you today.

THE WITNESS: Oh, you kept me waiting there.

MS. JENSEN: I did. I kept you in suspense. We're all done now.                    17:06:32

THE WITNESS: Okay.

MR. GRUENSTEIN: Okay. Nothing from me.

Let's go off the record.

Thank you.

THE VIDEOGRAPHER: Okay. Off the record.    17:06:37

Page 219

It's 5:06 p.m.

(Proceedings concluded, 5:06 p.m., on January 17, 2023.)

Page 220

JURAT

I, PETER KELLER, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken remotely via videoconference on Tuesday, January 17, 2023; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this _____ day of _____2023, at
_____.


                    _____
                    PETER KELLER

Page 221

56 (Pages 218 - 221)

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely via videoconference and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original t_____ a federal case, before _____ngs, review of the transcr_____ested.

In witr_____to subscribed m_____

Dated:  1/20/

Hanna Kim
CLR, CSR No. 13083

Page 222

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Dep. Date: JANUARY 17, 2023

Deponent:  PETER KELLER

CORRECTIONS:

Pg.  Ln.   Now Reads   Should Read   Reason

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

___  ___   _____   _____ _____

_____

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____, 2023.

_____

(Notary Public) MY COMMISSION

EXPIRES:_____

Page 223

57 (Pages 222 - 223)

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------------------x


In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION


------------------------------------------------------x


**CONFIDENTIAL**


REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ALLEN FERRELL, Ph.D.

Thursday, March 2, 2023


Reported By: Lynne Ledanois, CSR 6811

Job No. 5772235

Page 1

Q How many times? 1:51PM
A So in your question are we referring to all four reports going back to 2021 or are we talking about just this report?
Q That's a good clarification. I understand 1:51PM that they build on each other. So let's just take it for this report.
A I do remember talking with counsel, maybe I think that was -- besides the 30 to 40-minute conversation I mentioned before, I don't have a 1:52PM recollection of talking with counsel for a good long while. I'm sure we had a call about the assignment in Paragraph 16, but that's my best recollection.
Q Obviously there were conversations earlier on when you were formulating earlier reports as 1:52PM well; correct?
A Yes.
Q Now you've referred to your assignment in Paragraph 16 and in Paragraph 16 you referenced materials in Appendix 2. 1:52PM
So are all of the documents that you considered in forming your opinions listed in Appendix 2 with the exception of the May 3rd, 2017 earnings transcript call -- or call transcript, sorry? 1:53PM

A Well, no. In the sense that Footnote 32, I 1:53PM say I incorporate by reference my other reports.
Q Okay. So when -- okay. But your Paragraph 16 only refers to the review of the materials in Appendix 2; correct? 1:53PM
A It does mention Appendix 2 and I also say incorporate by reference my other work.
Q Okay. So beside the documents that were listed in your various reports, as you said earlier or testified earlier, you didn't review any other 1:53PM documents other than the May 3rd, 2017 earnings call transcript?
A Yes, that was an omission by accident. I believe that's accurate.
In addition to the two -- I can't remember 1:53PM whether the deposition transcripts by Mr. Steinholt are listed or not, but whether they are or not, I did review those.
Q Okay.
A I do cite to his deposition. I just don't 1:54PM remember -- I did review those.
Q Okay. So besides Mr. Steinholt's deposition transcript, you did not review any other depositions in the case; correct?
A I don't believe any others were cited or 1:54PM

listed. 1:54PM
Q And you didn't review any of the internal communications of the company in forming your opinions?
A If it's not listed, it was not considered in 1:54PM forming my opinion.
Q Now, are all of the opinions that you intend to offer at trial set forth in Paragraph 16 of your January 25th, 2023 report?
A Well, these are the principal conclusions. 1:54PM Obviously I have analyses and subconclusions in the report itself. And I've also referenced the fact that I am incorporating by reference my other work in this matter.
Q Okay. So the principal conclusions are 1:54PM listed there and as I understand it, that includes Mr. Bjorn Steinholt's opinion about the materiality of the alleged misstatements as flawed?
A Again, these are the principal conclusions for this report. Obviously there is a lot of analyses 1:55PM and points that I make in conjunction with that. But yes, the --
Q I used the same verbiage that you just did.
A Okay. So it is true that Part A is talking 1:55PM

about his opinion concerning materiality. 1:55PM
Q Right. So my question was that's one of your principal conclusions.
You also have listed here that Mr. Steinholt failed to reliably demonstrate the 1:55PM May 3rd, 2017 price decline is caused by the correction to the alleged misstatements?
A Correct.
Q And then also that Mr. Steinholt did not demonstrate damages could be reliably estimated? So 1:55PM those are your principal conclusions in the case?
A Yes, with respect to the January 25th report, that's correct.
Q Now, are you offering an opinion that the market for Anadarko common stock was efficient? 1:56PM
A I accept that. I'm not disputing the efficiency of the market.
Q You're assuming it?
A Yes.
Q And now, when you assume market 1:56PM efficiency, are you embracing a strong form of market efficiency?
A No, it's -- efficiency in this context means semi-strong efficiency.
Q It would be a mistake to call -- to 1:56PM

embrace the strong form of market efficiency at this 1:56PM point; right?

A   I just don't think that's relevant here.

Q   I mean, that would be an incorrect form of market efficiency to espouse in a securities fraud 1:56PM case; right?

A   I just -- I've never seen that.  When I say the word "efficiency," I mean semi-strong efficiency.

Q   And that's the correct standard, more or less; correct? 1:56PM

A   I'm not opining legally, but when I use the term "efficiency," I mean semi-strong efficiency.

Q   That's the accepted version of efficiency in these types of cases; correct?

A   I believe that's accurate. 1:57PM

Q   Now, do you opine that information was immediately impounded into the marketplace for Anadarko common stock?

A   So the definition of semi-strong is all public information is, quote, quickly impounded. 1:57PM  Typically, although not inevitably, quickly means it's usually measured by reference to a close-to-close window.

Q   Did you undertake any event study analysis to determine how quickly information was impounded 1:57PM

Page 26

into the price of the Anadarko stock? 1:57PM

A   I did do an efficiency analysis where I used close-to-close for answering that question.

Q   And what did you conclude?

A   Well, as reflected -- I just want to be 1:57PM specific here.  So I'm referring to the appendix, the header which is "Analysis of Market Efficiency Factors Based on the Factors/Methodology Steinholt Applied to Anadarko."  I do have there some of that 1:58PM study results and that is on a close-to-close basis.

Q   Are you offering a truth-on-the-market opinion in this case?

A   I am a little hesitant because I know the meaning of truth of the market has a -- you have to 1:58PM define to me what you mean legally by "truth of the market."

Q   Are you offering a legal opinion that the truth was on the market in this case?

A   Not offering a legal opinion. 1:59PM

Q   Are you offering any other type of opinion that the truth was in the market in this case?

A   I mean, I want to be careful here.  Obviously I looked at the so-called corrective disclosures in the total informational environment and 1:59PM

Page 27

I analyze it in that context. 1:59PM  I guess that's how would I frame how I think about what information was available and what was not.

Q   Are you intending to testify on behalf of 1:59PM the defendants in this case that the truth was in the market?

A   I would use the framing I have in the January -- in my January 25th report, which is focused on analyzing in various ways the so-called corrective 1:59PM disclosure.  I also, obviously I should add to that answer, do the upfront as well, which is the misrepresentation dates.

Q   But nowhere in your report, as far as I 2:00PM can find, do you reference truth on the market, do you?

A   That's a legal doctrine, so I wouldn't invoke directly a legal doctrine personally.

Q   Are you offering an opinion that the 2:00PM existence of the alleged fraudulent scheme was publicly known before market close on May 2nd, 2017?

A   That's not how I would frame my opinion.

Q   So the answer is no?

A   It's not how I would frame it.  That 2:00PM

Page 28

statement can have different meanings.  I certainly 2:00PM analyzed whether the corrective information as identified by Mr. Steinholt caused a negative stock price reaction, in conjunction with looking at the upfront events that resulted, so that's how I would 2:00PM frame it.

Q   Let's take it piece by piece.  Are you opining that there was no fraudulent scheme?

A   I'm not opining that.  That's a liability question. 2:01PM

Q   And are you opining that it was known in the market that the defendants had engaged in a fraudulent scheme at the end of the class period?

A   I'm not providing the opinion that the market knew that there was a fraudulent scheme. 2:01PM That's not how I would frame things.

Q   Are you offering an opinion that the existence of a whistleblower complaint by Anadarko's lead reservoir engineer at Anadarko was publicly known at any time during the class period? 2:01PM

A   I don't think I talk about the whistleblower in my report, no.

Q   And are you opining that Anadarko's decision to suspend its appraisal of Shenandoah was publicly known before market closed on May 2nd, 2:01PM

Page 29

8 (Pages 26 - 29)

CONFIDENTIAL

good night.                                    8:38PM

THE VIDEOGRAPHER:  Off the record.  It's 8:38 p.m.

(Proceedings concluded at 8:38 p.m.)

Page 230

NAME OF CASE: In re Anadarka Securities Litigation
DATE OF DEPOSITION: 3/2/23
NAME OF WITNESS: Allen Ferrell
Reason codes:
    1. To clarify the record.
    2. To conform to the facts.
    3. To correct transcription errors.
Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

_____
Signature of Deponent

Page 232

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.
Dated: March 6, 2023

*Lynne Marie Ledanois*
LYNNE MARIE LEDANOIS
CSR No. 6811

Page 231

59 (Pages 230 - 232)