**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576 |
| | District Judge Charles R. Eskridge III |
| | CLASS ACTION |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

STATEMENT OF ISSUES ................................................................................................. 4

NATURE AND STAGE OF PROCEEDINGS .................................................................... 4

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................... 5

I.     BACKGROUND ..................................................................................................... 5

II.    EXPLORATION AND DEVELOPMENT ............................................................... 6

III.   THE SHENANDOAH APPRAISAL ........................................................................ 7

       A.    Shen-1 and Shen-2 ....................................................................................... 7

       B.    Shen-3 ........................................................................................................... 7

       C.    Shen-4 ........................................................................................................... 9

       D.    Shen-5 ........................................................................................................... 9

       E.    Shen-6 ......................................................................................................... 11

       F.    Post-Shen-6 ................................................................................................. 13

       G.    Lea Frye ...................................................................................................... 13

       H.    Current Shenandoah Development .............................................................. 14

ARGUMENT .................................................................................................................... 15

I.     LEGAL STANDARDS ......................................................................................... 15

       A.    Summary Judgment .................................................................................... 15

       B.    Rule 10b-5 ................................................................................................... 16

       C.    Summary of Argument ............................................................................... 16

II.    PLAINTIFFS' "LACK OF COMMERCIAL VIABILITY" THEORY IS
       UNSUPPORTED BY THE EVIDENCE. ............................................................. 17

III.     PLAINTIFFS' "CONCEALMENT OF NEGATIVE INFORMATION"
          THEORY FAILS. ................................................................................................ 20

          A.     Plaintiffs' "Concealment of Negative Information" Theory Conflicts
                  With Their Damages Theory. ................................................................... 20

          B.     Plaintiffs' "Concealment of Negative Information" Theory Relies on
                  a Misconception of Defendants' Disclosure Duties Under Rule
                  10b-5. ....................................................................................................... 21

IV.      PLAINTIFFS CANNOT OTHERWISE ESTABLISH AN ACTIONABLE
          MISSTATEMENT. ............................................................................................... 25

          A.     Statements of Corporate Optimism ......................................................... 25

          B.     Industry-Wide Risk Factors .................................................................... 26

          C.     Accounting Policies and Decisions ......................................................... 28

V.       PLAINTIFFS CANNOT PROVE SCHEME LIABILITY/DECEPTIVE
          BUSINESS CONDUCT. ....................................................................................... 30

VI.      PLAINTIFFS CANNOT PROVE LOSS CAUSATION. ...................................... 31

          A.     The Alleged Corrective Disclosure Is Not Related to the Alleged
                  Misstatements or Allegedly Fraudulent Conduct. ................................... 32

          B.     Plaintiffs Cannot Show that Anadarko's Stock Price Decline Was
                  Caused by the Alleged Corrective Disclosure of Past Misstatements
                  or Misconduct. ......................................................................................... 35

VII.     PLAINTIFFS CANNOT DEMONSTRATE THAT DEFENDANTS
          ACTED WITH SCIENTER. .................................................................................. 36

VIII.    PLAINTIFFS' SECTION 20(a) CLAIM FAILS. ................................................. 40

CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................................. 39

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ................................................................................. 31

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................... 21

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ........................................................................... 27

*Boudreaux v. Swift Transp. Co., Inc.*,
402 F.3d 536 (5th Cir. 2005) ................................................................................. 15

*Broad v. Rockwell Int'l Corp.*,
642 F.2d 929 (5th Cir. 1981) ................................................................................. 36

*Callinan v. Lexicon Pharms., Inc.*,
479 F. Supp. 3d 379 (S.D. Tex. 2020) .................................................................. 26

*Cooperman v. Individual, Inc.*,
171 F.3d 43 (1st Cir. 1999) ................................................................................... 25

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
579 F. Supp. 3d 933 (S.D. Tex. 2022) .................................................................. 29

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................... 35

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .................................................................................. 29

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) .................................................................................. 29

*Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014) ...................................................................... 27

iii

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
99 F.4th 770 (5th Cir. 2024) ......................................................................... 4

*Godchaux v. Conveying Techs., Inc.*,
846 F.2d 306 (5th Cir. 1988) ...................................................................... 29

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ....................................................... 8, 30, 34, 35

*Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*,
344 F.3d 753 (8th Cir. 2003) ...................................................................... 18

*Guzman v. Allstate Assurance Co.*,
18 F.4th 157 (5th Cir. 2021) ....................................................................... 24

*In re: BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) .......................................31, 32, 34, 35

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ......................................................... 26

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................... 21, 23, 25

*In re Compaq Sec. Litig.*,
848 F. Supp. 1307 (S.D. Tex. 1993) ............................................................ 15

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ......................................................... 28

*In re Enron Corp. Secs. Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................... 31

*In re Fannie Mae Sec. Litig.*,
905 F. Supp. 2d 63 (D.D.C. 2012) ............................................................... 39

*In re IMAX Sec. Litig.*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008)........................................................... 39

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ......................................................... 40

*In re KeySpan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) .......................................................... 39

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) ............... 26

*Jackson v. Gautreaux*,
    3 F.4th 182 (5th Cir. 2021) ....................................................................................... 18

*Kane v. Madge Networks N.V.*,
    2000 WL 33208116 (N.D. Cal. May 26, 2000), *aff'd sub nom. Kane v. Zisapel*,
    32 F. App'x 905 (9th Cir. 2002) ......................................................................... 22, 23

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) ..................................................................................... 15

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ..................................................................................................... 30

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ..................................................................................... 18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ................................................................................................... 28

*Marlin v. Moody Nat'l Bank, N.A.*,
    248 F. App'x 534 (5th Cir. 2007) ............................................................................... 38

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ...................................................................................... 35

*Miller v. Asensio & Co.*,
    364 F.3d 223 (4th Cir. 2004) ..................................................................................... 21

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ............................................................................... 19, 26

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ..................................................................................... 38

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of
    Comm.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ............................................................. 25, 29, 37

*Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) ............................................................................... 28

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ................................................................ 32

*Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA) Inc.*,
  482 F.3d 372 (5th Cir. 2007) ................................................................ 30

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ............................................................ 26, 36

*Salinger v. Projectavision, Inc.*,
  934 F. Supp. 1402 (S.D.N.Y. 1996) ...................................................... 37

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977) ............................................................................... 30

*Scott v. Harris*,
  550 U.S. 372 (2007) ............................................................................... 19

*SEC v. Narayan*,
  2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ................................. 30, 31

*SEC v. Rio Tinto plc*,
  41 F.4th 47 (2d Cir. 2022) .................................................................... 30

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ................................................................................. 29

*Small Ventures USA, L.P. v. Rizvi Traverse Mgmt., LLC*,
  2014 WL 3535339 (S.D. Tex. July 16, 2014) ....................................... 16

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) .............................................. 19, 22, 36, 40

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008) ............................................................................... 32

*Tuchman v. DSC Commc'ns Corp.*,
  14 F.3d 1061 (5th Cir. 1994) ................................................................ 39

*United States v. Finnerty*,
  553 F.3d 143 (2d Cir. 2008) ................................................................. 30

**Statutes, Codes & Rules**

15 U.S.C. § 78bb(a)(1) ............................................................................................... 20

Rule 10b-5 .......................................................................................................... *passim*

17 C.F.R. § 229.303 .................................................................................................... 28

17 C.F.R. § 240.10b-5(b) ....................................................................................... 19, 22

Fed. R. Civ. P. 56(c) ................................................................................................... 15

**INTRODUCTION**

This  lawsuit ironically accuses Defendants of concealing "the alleged truth – the lack of commercial viability of the Shenandoah project," (*see* Ex. 19 (November 9, 2022 Expert Report of Bjorn Steinholt ("Nov. 9, 2022 Steinholt Rpt.")) ¶ 27; Ex. 21 (Expert Report of Lyndon Pittinger ("Pittinger Rpt.")) ¶ 11(j)),[1] despite the reality that Shenandoah is not only viable, but currently contains "the largest producing wells in all of North America, not just in the Gulf"[2] and is "a world-class, proven and well-appraised oil and gas field."[3]  Indeed, the Shenandoah oil field, put into commercial production in 2025, has exceeded "all regional ramp-up benchmarks," "set a new performance standard for deepwater operations," and despite the "extreme operational challenges" presented by its location (the Gulf of Mexico), has "push[ed] the boundaries of materials science and chemical engineering" to deliver "exceptional results."[4]  "Shenandoah is not just notable;

---

[1] Citations to Exhibits are to the Exhibits to the Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment filed contemporaneously with this motion.

[2] *U.S. Gulf Output Set to Rise as Beacon Offshore Brings Historic Wells Online*, World Oil (Nov. 24, 2025), https://www.worldoil.com/news/2025/11/24/u-s-gulf-output-set-to-rise-as-beacon-offshore-brings-historic-wells-online/.

[3] *Shenandoah*, Navitas Petroleum, https://www.navitaspet.com/project/shenandoah/ (last visited May 31, 2026).

[4] *Unlocking Ultra-High-Pressure Reserves*, Clariant (Feb. 5, 2026), https://www.clariant.com/en/Corporate/Blog/2026-Blog-Posts/02/Clariant-Oil-Services.

it's exceptional for ultra-deepwater development in terms of depth, ramp-up speed, and well productivity."[5]

This successful production did not happen overnight. Oil exploration is risky, and the Gulf of Mexico presents even greater challenges, including complex deep-water geology and high costs of operating in deep-water environments. It took years of appraisal, by numerous partnered oil companies, before a decision to develop Shenandoah was reached in 2021, and then an additional several years before production. It is this highly successful oil field—which took years and billions of dollars invested to develop—that Plaintiffs allege was commercially *unviable*.

Not only are Plaintiffs wrong about Shenandoah's commercial potential, but they have no viable theory of liability. Plaintiffs offer two alternative theories—one with a corresponding damages model but no supporting evidence, and the other with no corresponding damages model and no record support.

*First*, Plaintiffs disclaim a materialization-of-the-risk theory and assert that Defendants concealed Shenandoah's commercially unviability at the outset of the Class Period. But there is no evidence that Defendants deemed Shenandoah unviable at the start of the Class Period. Plaintiffs' own expert and star fact witness both acknowledged that Anadarko did not reach a final investment decision on Shenandoah until receiving Shen-6's results at the end of the Class Period.

---

[5] *Id.*

*Second*, Plaintiffs alternatively assert that Defendants concealed information during the Class Period that "each subsequent well reduced Anadarko's operative resource range," "ultimately rendering the field commercially unviable." (Ex. 21 (Pittinger Rpt.) ¶ 11(c).) That theory also lacks record support. The undisputed facts show that throughout the Class Period, Defendants made truthful statements about Shenandoah's ongoing appraisal in a notoriously challenging region and, alongside Anadarko's Partners, poured hundreds of millions of dollars into its exploration. Moreover, even if Plaintiffs could point to evidence in the record supporting this theory, they would still be unable to prove their claims, as this theory is entirely inconsistent with their damages model—which assumes Defendants knew at the outset of the Class Period what they subsequently concealed.

Ultimately, Plaintiffs may disagree with Defendants' business judgment decisions but cannot establish that Defendants fraudulently misrepresented the commercial viability of what has become the most successful oil field in the Gulf of Mexico. The alleged corrective disclosure—announcing Shen-6's disappointing results and Defendants' decision to suspend appraisal as a result—merely bore out Defendants' repeated warnings that *Anadarko's* commercialization of Shenandoah would be determined by Shen-6's results and commodity prices. While Anadarko chose to end its participation in the project, the appraisal work it conducted allowed other companies to go on to achieve enormous success in a notoriously challenging environment. With no legally sufficient theory to show Defendants committed securities fraud in their appraisal of Shenandoah, Plaintiffs' claims fail, and Defendants are entitled to summary judgment.

3

## STATEMENT OF ISSUES

1.    Whether summary judgment should be entered for Defendants on Plaintiffs' Rule 10b-5 claims, because the evidence does not support Plaintiffs' theory of liability, Plaintiffs' damages model is limited to a theory with no basis in the record, and Plaintiffs fail to otherwise establish an actionable misstatement.

2.    Whether summary judgment should be entered for Defendants on Plaintiffs' scheme liability claims because Plaintiffs have no evidence of deceptive or manipulative acts.

3.    Whether summary judgment should be entered for Defendants because Plaintiffs cannot establish loss causation.

4.    Whether summary judgment should be entered for Defendants because Plaintiffs cannot prove scienter.

5.    Whether summary judgment should be entered for Defendants on Plaintiffs' Section 20(a) claim.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs commenced this action in February 2020 and amended their complaint on August 17, 2020.  (Dkt. 55.)  Defendants' motion to dismiss the amended complaint was denied on January 19, 2021.  (Dkt. 63.)

On September 28, 2022, the Court granted class certification.  (Dkt. 141.)  After the Fifth Circuit vacated that class certification order, *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774-75 (5th Cir. 2024), the parties submitted further class certification briefing and the Court held an evidentiary hearing.  On March 10,

4

2026, the Court certified the class and denied the class certification *Daubert* motions. (Dkt. 302.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    BACKGROUND

Anadarko was a multi-billion-dollar oil and gas company engaged in oil exploration and development projects worldwide.  (Ex. 67 at -755, -804.)[6]  Among Anadarko's exploration projects was the Shenandoah prospect, located in the Gulf of Mexico, an especially "challenging environment" for oil and gas exploration.  (Ex. 21 (Pittinger Rpt.) ¶ 14.)  Shenandoah well depths were "as deep as 32,500 ft"—thousands of feet below sea level and beneath a "very thick layer of salt."  (*Id.*)  The salt canopy alone was 20,000 feet thick—taller than Mt. Fuji, which stands at 12,388 feet.  (Ex. 24 (Expert Report of Rocco Detomo, Jr. ("DeTomo Rpt.")) ¶ 146 & fig.9.)

Anadarko entered into an operating agreement with Cobalt International Energy, ConocoPhillips, and Marathon Oil (and later, Venari Resources) (together, the "Partners"). (Ex. 28 at -083.)  As the operator, Anadarko was responsible for planning and conducting drilling operations, but all Partners shared in the expenses and independently assessed data from every appraisal well.  (Ex. 55 at -546; Ex. 2 (Dep. of Carlotta Chernoff ("Chernoff Tr.")) 36:1-37:19.)  Appraisal wells are intended "to acquire information about the resource" to decide whether "to proceed with a commercially viable development," known as a final investment decision ("FID"), "or exit at a reasonable cost if the resource appears

---

[6] References to "Ex." are to the exhibits accompanying the Rosenberg Declaration.

not viable." (Ex. 21 (Pittinger Rpt.) ¶ 16.) Whether Anadarko reached FID for a project depended on the resource's size and quality, the cost of development, and external factors like oil prices. (*Id.* ¶¶ 167, 171-72, 228.)

## II.    EXPLORATION AND DEVELOPMENT

Of particular relevance to this litigation are Anadarko's Exploration and Development teams. The teams had distinct duties. Exploration's goal was to determine "how big [the field] could be" and "find[] new places to drill, new prospects." (Ex. 7 (Dep. of Darrell Hollek ("Hollek Tr.")) 105:15-16; Ex. 5 (Dep. of Robert Strickling ("Strickling Tr.")) 73:15-17.) Development was tasked with "putting in developments and producing oil for gas," including determining whether Anadarko "[had] enough to spend the money needed to develop" its discoveries. (Ex. 5 (Strickling Tr.) 73:18-19; Ex. 7 (Hollek Tr.) 105:16-18.)

Based on their independent assessments of the data, the teams each calculated estimated resource ranges. (*See* Ex. 4 (Dep. of Chris Camden ("Camden Tr.")) 192:15-193:11.) In line with customary practice, Anadarko did not publicly disclose estimated resource ranges. (*See* Ex. 12 (Dep. of Al Walker ("Walker Tr.")) 174:18-23; *accord* Ex. 8 (Dep. of Ernie Leyendecker ("Leyendecker Tr.")) 135:18-23.) The teams also reached their own interpretations of Shenandoah's potential faulting. (Ex. 18 (Expert Report of Robert Merrill ("Merrill Rpt.")) ¶ 66.) Faults are underground fractures, which sometimes impede oil movement. (Ex. 21 (Pittinger Rpt.) ¶ 20.) Mapping faults is challenging in regions like Shenandoah because it is extremely difficult to interpret seismic data miles

6

beneath the ocean floor under massive salt structures; Anadarko's Partners also produced their own (different) maps based on the same data.  (*Id.* ¶¶ 54-55, 118.)

## III.    THE SHENANDOAH APPRAISAL

### A.    Shen-1 and Shen-2

In 2009, Anadarko announced the results of the Shen-1 discovery well, which encountered approximately 300 feet of net oil pay, demonstrating there was oil.  (Ex. 63.) In 2013, the Partners announced the results of Shen-2—the first appraisal well—which encountered over 1,000 feet of net pay, making it one of Anadarko's largest discoveries in the Gulf of Mexico.  (Ex. 64 at -655.)  While promising, Anadarko cautioned it was "very early" in the appraisal process and "obviously need[ed] additional drilling."  (Ex. 65 at -689, -691, -694.)

### B.    Shen-3

In May 2014, Anadarko began drilling, or "spud," the Shen-3 appraisal well. (Ex. 61.)  Shen-3 was designed to test sand continuity, find the oil-water contact, and test pressure connectivity with Shen-2.  (Ex. 29 at -093.)  Shen-3 drilled into water, not oil. (Ex. 31 at -096.)  However, the results achieved Anadarko's objectives:  Anadarko and its Partners used Shen-3 pressure data to project oil-water contact across the reservoir.  (Ex. 30 at -426-27); Ex. 5 (Strickling Tr.) 63:5-9; Ex. 4 (Camden Tr.) 222:7-224:17; Ex. 18 (Merrill Rpt.) ¶ 82.)  Based on Shen-3 data, Exploration included a north-south fault in its internal map and presented this interpretation to the Partners.  (Ex. 30 at -386.)  Anadarko also revised its internal resource estimates to 780-1060 or 565-940 millions of barrels of oil-equivalent ("MMBOE"), depending on faulting assumptions.  (Ex. 32 at -588.)  Under

either estimate, as Plaintiffs' experts acknowledge, Shenandoah had potential to be a "giant" resource (*i.e.*, over 500 MMBOE).  (*See* Ex. 22 (January 25, 2023 Expert Report of Bjorn Steinholt ("Jan. 25, 2023 Steinholt Rpt.")) ¶ 29 ("giant" commonly refers to a resource over than 500 MMboe).)

On January 29, 2015, ConocoPhillips announced Shen-3 was a "dry hole," a term used to refer to a well that does not encounter oil.  (Ex. 66 at -879; Ex. 21 (Pittinger Rpt.) ¶ 17(c) & p. 144; *see also* Ex. 68 at 8 (expensing Shen-3).)  On February 2, 2015, after ConocoPhillips announced Shen-3 was a dry hole—a fact investors understood, *see Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 n.6 (5th Cir. 2004) (in an efficient market, "all public information concerning a company is known to the market and reflected in the market price")—Anadarko issued its quarterly reports.  Unlike in its announcements of Shen-1 and Shen-2, Anadarko did not attribute any oil to Shen-3.  Rather, Anadarko disclosed it had encountered "approximately 50% … more of the same well-developed reservoir sands" found in Shen-2.  (Ex. 33 at -397.)

The Class Period began on February 20, 2015, when Anadarko reiterated Shen-3's results in its FY 2014 10-K.  (*See* Am. Compl. ¶ 97; Ex. 67.)

In February 2016, Anadarko referred publicly to Shen-3 as a "wet well," meaning it encountered no oil (Ex. 81 at -426),[7] and in Q3 2016, Anadarko revised its accounting

---

[7] A "dry hole" and a "wet well" are both terms used to refer to a well that does not encounter oil.  (Ex. 20 (Keller Rpt.) ¶ 71.)

treatment to expense Shen-3 costs (Ex. 46 at -134; Ex. 95 at 11 (Anadarko Q3 2016 10-Q announcing decision)).[8]

### C.    Shen-4

To test the western side of the field, Anadarko and the Partners approved another appraisal well, Shen-4, for up to $213.7 million (Anadarko committed up to $64.1 million). (Ex. 34 at -648, -651.)  The Partners spud Shen-4 in May 2015.  (Ex. 61.)  After the original wellbore drilled into salt, the Partners drilled a sidetrack extending from the original wellbore, which encountered over 620 feet of oil.  (Ex. 78 at -494.)  Anadarko proposed a second sidetrack, but it encountered drilling problems and was abandoned.  (Ex. 37.)  In October 2015, Anadarko disclosed the Shen-4 original well "established where the basin edge was" and that the sidetrack encountered 622 feet of oil (Ex. 79 at -914).   Under industry convention, "establish[ing]" the "basin edge" in this context meant encountering salt.  (Ex. 13 (Dep. of Robert Gwin ("Gwin Tr.")) 182:22-183:2; Ex. 18 (Merrill Rpt.) ¶ 44).

### D.    Shen-5

Management of the project within Anadarko transitioned from Exploration to Development post-Shen-4.  (Ex. 21 (Pittinger Rpt.) ¶ 256.)  In January 2016, the teams met with the Risk Consistency Team to reconcile their analyses about Shenandoah's potential

---

[8] Anadarko did not initially expense the well because its accounting policy did not require wells to be expensed solely because they did not encounter oil.  (Ex. 9 ((Dep. of Catherine Anne Green ("Green Tr.")) 81:25-84:13.)  Anadarko's auditor, KPMG, reviewed Anadarko's treatment of Shen-3 and found it consistent with GAAP.  (Ex. 27 at -514; Ex. 14 (Dep. of Mark Zajac ("Zajac Tr.")) 66:19-70:7.)

resource size and develop a joint resource estimate.  (Ex. 4 (Camden Tr.) 192:13-193:11; Ex. 38 at -563.)  They arrived at a joint range between 185 and 693 MMBOE, with a mean of 426 MMBOE.  (*Id.* at -564 at slides 1-2.)

Anadarko and the Partners decided, and told investors, that they needed to drill Shen-5 and an additional appraisal well, Shen-6, before making a FID, *i.e.*, deciding whether to sanction the project.  (Ex. 36; Ex. 81.)  On February 1, 2016, in Anadarko's presentation to the Partners, Development estimated Shenandoah's overall likelihood of success at 88.2% but noted that commercializing Shenandoah "likely requires success at Shen 5  & Shen 6."    (Ex. 39  at -099  at slides  2,  10.)    Pat McGrievy, Manager of Development, testified that Anadarko "viewed this field as definitely very viable commercial[ly] going forward" at this time (Ex. 6 (Dep. of Patrick McGrievy ("McGrievy Tr.")) 285:14-16), and that if Shen-5 and Shen-6 had been successful, the project would have been "very economic and proceeded to go forward" (*id.* at 288:18-289:10).  Even Lea Frye, discussed further below, testified that Shen-5 was viewed as "a key well in determining whether or not [Shenandoah was] going to be a major oil producing hub." (Ex. 10 (Dep. of Lea Frye ("Frye Tr.")) 205:21-206:4, 207:6-18.)  Frye testified: "If Shen 5 ha[d] success … we would then drill Shen 6," and depending on those results, would "continue forward to that decision point."  (*Id.* at 291:16-292:6.)

On February 2, 2016, Anadarko told investors that it was "a long ways from sanction," and "[i]f Shenandoah 5 is successful, [Anadarko] may move even farther to the east with the Shenandoah 6, but of course, that'll be all dependent on what happens to

10

Shenandoah 5." (Ex. 81 at -426.)  The Partners authorized Shen-5 costs up to $210 million dollars, with Anadarko's working interest amounting to $63 million.  (Ex. 62 at -729.)

Shen-5 was spud in March 2016 and drilled as a "keeper well"—a more expensive well design that could be used to drill for oil once production began.  (*Id.* at -728; Ex. 21 (Pittinger Rpt.) ¶ 18 ex.2; Ex. 24 (Detomo Rpt.) ¶ 110.)  In July 2016, Anadarko announced that Shen-5 had encountered over 1,040 feet of oil and extended the eastern limit of the field.  (Ex. 90 at -005.)

### E.    Shen-6

In October 2016, the Partners approved Shen-6, including drilling costs over $157 million, with Anadarko contributing approximately $52 million.  (Ex. 45 at -104.)

The Partners spud Shen-6 in December 2016.  (Ex. 53 at -102.)  Shen-6 was also drilled as a keeper well, indicating that someone on Development was "seeing something from the reservoir that gave them encouragement that we were on our way to a commercial capability."  (Ex. 12 (Walker Tr.) 216:1-6.)

On February 7, 2017, Shen-6 was determined to be a dry hole.  (Ex. 50.)  Still, Anadarko continued to assess the field's economics.  On February 13, 2017, the Shenandoah Subsurface Team sent a memo to Ernest Leyendecker, Executive Vice President, International and Deepwater Exploration, summarizing Shen-6's results and recommending an immediate sidetrack to better define oil-water contacts and refine resource estimates.  (Ex. 48 at -954-55.)  The following day, Anadarko approved almost $46 million for the sidetrack.  (Ex. 49.)

On May 2, 2017, after the Shen-6 sidetrack encountered wet sands and no oil, Anadarko announced that "[g]iven the results of [Shen-6] and the present commodity-price environment," it had "currently suspended further appraisal activities." (Ex. 52 at -555; Ex. 99 at -126.) On that basis, it expensed exploratory well costs of $435 million and took a $467 million impairment charge. (*Id.* at -150.) Around this time, oil prices were about $50 a barrel and expected to remain at that price for the next three to seven years. (Ex. 23 (Expert Report of Noam Berk ("Berk Rpt.")) ¶ 28 & fig.A.) These prices were well below prices Anadarko had told the market it considered appropriate for development. *(See* Ex. 47 at -409 (November 2016 statement that prices would need to exceed "$70 most likely before we see greenfield projects and deepwater basins around the world"); Ex. 51 (March 2017 analysis noting Anadarko's indication that projects like Shenandoah were "unlikely to get final approval in a $50-$55 per [barrel] environment"); Ex. 43 at -947 (July 2016 Wood Mackenzie presentation noting Shenandoah's breakeven price was between $90 and $100 per [barrel] and "[i]f prices remain around $50/[barrel] then most major projects are at risk of deferral or cancellation without further cost deflation").)

Also on May 2, 2017, Colorado investigators announced that a fatal April 2017 explosion in Firestone, Colorado was caused by an abandoned pipeline running from an Anadarko well. (Ex. 15 (Expert Report of Allen Ferrell ("Ferrell Rpt.")) ¶ 14.) That same day, the Colorado Governor responded by ordering oil and gas companies statewide to inspect and test gas flowlines within 1,000 feet of occupied buildings. (*Id.*) Anadarko, as the largest oil and gas producer in Colorado at the time, responded by shutting down 3,000

wells and announcing it would cooperate with ongoing investigations. (*Id.* ¶¶ 14, 65.) In response to the widely-reported increased regulatory burden associated with Firestone, Wells Fargo issued a report downgrading Colorado oil and gas operators, including Anadarko. (*Id.* ¶ 65.)

After Anadarko announced news of the Firestone investigation and Anadarko's 10-Q results, its stock dropped 7.7% on May 3, 2017. (Ex. 19 (Nov. 9, 2022 Steinholt Rpt.) ¶ 99.)

### F.    Post-Shen-6

Although Anadarko considered an exit strategy (Ex. 6 (McGrievy Tr.) 211:23-212:5), it never decided to pursue one at Shenandoah until after receiving Shen-6's results (Ex. 11 (Dep. of James Kleckner ("Kleckner Tr."))) 162:12-19).

In September 2017, Anadarko considered drilling Shen-7 (Ex. 56), and submitted a request to the Partners (Ex. 57 at -946). Cobalt and Venari approved it, but ConocoPhillips did not. (Ex. 58.) On December 12, 2017, Anadarko stated it would withdraw from the operating agreement. (Ex. 59 at -345.)

### G.    Lea Frye

In early 2016, Frye—a senior staff reservoir engineer—learned of Anadarko's forthcoming involuntary layoffs with severance pay. (Ex. 10 (Frye Tr.) 23:15-18, 246:6-11, 247:1-5.) Frye wrote to Human Resources and requested to be laid off, explaining that, "[w]ithout wanting to go into details," she "[felt] that working at Anadarko is no longer a positive for [her]." (*Id.* at 247:12-248:18.) Human Resources responded that "there is no voluntary severance program," but that it would consider her request. (*Id.* at 249:3-13.)

13

Frye also informed her supervisor, McGrievy, but did not recall disclosing the reason for the request. (*Id.* at 249:16-21; 250:3-18.) Frye was not selected to participate in the layoffs. (*Id.* at 252:5-8.) After learning of this decision on March 10, 2016, Frye left work and did not come back, notifying Anadarko the next day that she would be taking FMLA leave. (*Id.* at 253:20-25, 255:17-256:13.)

On April 20, 2016, Frye's counsel sent Anadarko a letter claiming that Anadarko had engaged in securities fraud and demanding payment in exchange for Frye's silence. (Ex. 40 at -028.) After Anadarko did not provide that payment, on May 9, 2016, Frye sent the SEC a letter alleging securities fraud and insider trading. (Ex. 41 at -325-26.) Frye resigned on May 19, 2016. (Ex. 42.)

### H.     Current Shenandoah Development

On August 25, 2021, Beacon Offshore ("Beacon") and its partners reached FID at Shenandoah. (Ex. 60 at -546.) As Plaintiffs' own expert notes, oil production estimates under current ownership indicated about 387 MMBOE, which was "remarkably similar" to Anadarko's post-Shen-5 resource estimates. (Ex. 23 (Berk Rpt.) ¶ 38.) On October 10, 2025, Beacon announced that production had "reached the targeted rate of 100,000 [barrels of oil per day]", which "underscore[d] the capability of the Shenandoah system."[9] Beacon has reported that the Shenandoah wells "are the largest producing wells in all of North

---

[9] *Shenandoah Field Reaches 100,000 bpd Milestone in Deepwater U.S. Gulf*, World Oil (Oct. 10, 2025), https://worldoil.com/news/2025/10/10/shenandoah-field-reaches-100-000-bpd-milestone-in-deepwater-u-s-gulf/.

America, not just in the Gulf."[10]    Similarly, Navitas Petroleum—one of the current Shenandoah partners—describes Shenandoah as "a world-class, proven and well-appraised oil and gas field in the deepwater US Gulf of America."[11]

## ARGUMENT

### I.    LEGAL STANDARDS

#### A.    Summary Judgment

Summary judgment is appropriate if a party establishes there is no genuine dispute of material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  The moving party "bears the burden to establish that its opponent has failed to raise a genuine issue of material fact."  *In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1312-13 (S.D. Tex. 1993) (citation omitted).

The burden then shifts to the non-movant to demonstrate that summary judgment is inappropriate.  *Id.*  To satisfy that burden, the non-movant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation marks omitted).

---

[10] *U.S. Gulf Output Set to Rise as Beacon Offshore Brings Historic Wells Online*, *supra* note 2.

[11] *Shenandoah*, *supra* note 3.

**B.** **Rule 10b-5**

To establish a Rule 10b-5(b) claim, Plaintiffs must prove: "(1) defendants made a material misrepresentation or omission; (2) defendants acted with scienter; (3) a connection to the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and plaintiff's loss." *Small Ventures USA, L.P. v. Rizvi Traverse Mgmt., LLC*, 2014 WL 3535339, at *3 (S.D. Tex. July 16, 2014).

To establish a scheme liability claim under Rules 10b-5(a) and (c), Plaintiffs must prove: "(1) defendants committed a deceptive or manipulative act; (2) defendants acted with scienter; (3) the act affected the market for securities or was otherwise in connection with their purchase or sale; and (4) defendants' actions caused plaintiff's injuries." *Id.*

**C.** **Summary of Argument**

The Court should issue summary judgment for Defendants on all claims. *First*, Plaintiffs cannot prove falsity for their Rule 10b-5 claims. There is no evidence to support Plaintiffs' theory that Defendants concealed Shenandoah's lack of commercial viability from the outset of the Class Period. (Section II.) Plaintiffs' alternative theory that Defendants concealed negative information during Shenandoah's appraisal that increased the risk of Shenandoah's commercial unviability over the course of the Class Period is inconsistent with their damages model and misunderstands Rule 10b-5's disclosure obligations. (Section III.) Moreover, the alleged misstatements are otherwise inactionable because they are (1) statements of corporate optimism; (2) industry-wide risk factors; or (3) accurate descriptions of accounting policies and decisions. (Section IV.)

16

*Second*, Plaintiffs' scheme liability claims fail because Plaintiffs cannot prove that Defendants engaged in deceptive or manipulative conduct.  (Section V.)

*Third*, Plaintiffs cannot prove loss causation because the May 2017 disclosure is not related to the alleged misrepresentations and, consequently, Plaintiffs cannot establish that Anadarko's stock drop was caused by that alleged corrective disclosure.  (Section VI.)

*Fourth*, Plaintiffs cannot prove scienter because there is no evidence that Defendants knew Shenandoah was commercially unviable at the outset of the Class Period, and evidence of any purported internal disagreement and unremarkable executive compensation are insufficient.  (Section VII.)

*Fifth*, Plaintiffs' control person liability claims fail because they cannot establish a primary violation.  (Section VIII.)

## II.    PLAINTIFFS' "LACK OF COMMERCIAL VIABILITY" THEORY IS UNSUPPORTED BY THE EVIDENCE.

The course of this litigation and Plaintiffs' own damages model have limited Plaintiffs to a single theory on summary judgment:  that Defendants knew Shenandoah was commercially unviable at the outset of the Class Period and made misstatements to maintain Anadarko's inflated stock price.  This theory is belied by the record.  There is no evidence that Defendants deemed Shenandoah uncommercial at the start of the Class Period.

That Plaintiffs' theory of liability is so circumscribed follows inescapably from Plaintiffs' class certification briefing and damages model.  To survive class certification, Plaintiffs disclaimed a materialization-of-the-risk theory, which the Fifth Circuit has

deemed insufficient for class-wide determination. (*See* Dkt. 96 at 8-9, Dkt. 302 at 23 ("Plaintiff doesn't assert that Defendants underrepresented an *unrealized* risk. It instead asserts that certain risks had *in fact* materialized.").) *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015).

Plaintiffs' damages expert, Bjorn Steinholt, further narrowed this theory through his expert report, which is Plaintiffs' only proof of damages and thus limits Plaintiffs' theories of liability. *See Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003). Steinholt assumes that Defendants concealed "the alleged truth – the lack of commercial viability of the Shenandoah project." (*See* Ex. 19 (Nov. 9, 2022 Steinholt Rpt.) ¶ 27.) Because he assumes that all the inflation of the stock price began at the start of the Class Period and then remained constant throughout the Class Period, his damages model reflects a theory in which the "alleged truth" of Shenandoah's commercial unviability materialized at the outset of the Class Period. (*See* Ex. 1 (November 17, 2021 Dep. of Bjorn Steinholt ("Nov. 17, 2021 Steinholt Tr.")) 66:7-16, 71:13-21.)

Because Plaintiffs may not advance a theory of liability inconsistent with their damages theory, and Steinholt provides Plaintiffs' sole damages model, *see Grp. Health Plan*, 344 F.3d at 761, Plaintiffs are confined to this theory, *see Jackson v. Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021) (plaintiffs may not add new theories of liability on summary judgment). This is fatal: The undisputed evidence does not support that Defendants deemed Shenandoah uncommercial at the start of the Class Period, and

18

Plaintiffs therefore cannot establish falsity. Instead, the record shows that Anadarko actively appraised Shenandoah throughout the Class Period.

A statement is actionable under Rule 10b-5 only if it is materially false or misleading when made. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001). Plaintiffs claiming that omitted facts rendered affirmative statements misleading must prove that those facts were "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 374 (5th Cir. 2004) (no liability if plaintiffs "fail to explain how these statements were false or misleading due to material omissions when they were made").

Plaintiffs cannot carry this burden. It is undisputed that Anadarko and the Partners poured hundreds of millions into appraisal throughout the Class Period to acquire information about Shenandoah and decide whether Anadarko was a commercially viable development. (Statement of Undisputed Material Facts ("SUMF") § I.) The three wells drilled during the Class Period cost Anadarko over $196 million alone, and two were designed as more costly "keeper" wells so they could be used to drill for oil once production began. (*Id.* §§ III.C-E.) Today, active Shenandoah production *confirms* Anadarko's belief throughout the Class Period: that Shenandoah had the potential to be commercially viable. (*Id.* § III.H.) *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (on summary judgment, court should reject explanations "blatantly contradicted by the record, so that no reasonable jury could believe it").

19

Even Plaintiffs' experts and star witness—Lea Frye—agree.  (*See* Ex. 104 (Dep. of Robert Merrill ("Merrill Tr.")) 63:16-21 (Shen's commercial viability "was unknown at any time during the class period"); Ex. 10 (Frye Tr.) 291:16-292:6 (whether Anadarko "would continue forward to [FID]" depended on Shen-5's and Shen-6's success).)  Absent any support in the record, summary judgment for Defendants should issue on this theory.

**III.    PLAINTIFFS' "CONCEALMENT OF NEGATIVE INFORMATION" THEORY FAILS.**

Though Plaintiffs should be limited to the theory that Defendants knew Shenandoah was commercially unviable at the start of the Class Period, *see* Section II, Plaintiffs' liability expert appears to advance a different theory:  that over the course of the Class Period, Defendants downplayed negative information during Shenandoah's appraisal that increased Shenandoah's risk of commercial failure.  (*See* Ex. 21 (Pittinger Rpt.) ¶ 11(c).) Under this theory, "[a]fter Shen-2, each subsequent well reduced Anadarko's operative resource range for the Shen field"—that is, the likelihood that Shenandoah would be commercial—and "ultimately render[ed] the field commercially unviable." *Id.*

The Court should find this theory foreclosed for the reasons discussed in Section II. But even if considered on the merits, this theory conflicts with Plaintiffs' damages model and demands disclosure of information beyond what Rule 10b-5 requires.  Summary judgment for Defendants is therefore warranted.

**A.    Plaintiffs' "Concealment of Negative Information" Theory Conflicts With Their Damages Theory.**

Under the securities laws, plaintiffs cannot recover damages "in excess of the actual damages to that person on account of the act complained of."  15 U.S.C. § 78bb(a)(1).

"[T]he amount of recoverable 'damages may not be determined by mere speculation or guess.'" *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 231 (4th Cir. 2004) (citation omitted).

As detailed in the accompanying motion to exclude Steinholt's opinion, Plaintiffs' sole evidence of damages—Steinholt's damages model—is inconsistent with the theory that Shenandoah's commercial viability changed over the course of the Class Period.[12] (Ex. 19 (Nov. 9, 2022 Steinholt Rpt.) ¶ 106.)  Steinholt's model assumes a constant level of inflation (with a single increase tied to Anadarko's increased stake in Shenandoah, not any alleged fraud).  The assumption that all fraud-related inflation entered the market *at the start* of the Class Period conflicts with the theory that Shenandoah's increasing risk of failure occurred *during* the Class Period.  Indeed, had Steinholt wished to model the growing risk that Shenandoah would not be commercially viable, he could not have assumed constant inflation.  Plaintiffs therefore have no non-speculative measure of damages to support their theory.

### B.    Plaintiffs' "Concealment of Negative Information" Theory Relies on a Misconception of Defendants' Disclosure Duties Under Rule 10b-5.

Plaintiffs' alternative theory also misapprehends Rule 10b-5's disclosure obligations.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n.17 (1988).  Nor is disclosure required "simply because it may be relevant or of interest to a reasonable investor." *In re Braskem S.A. Sec.*

---

[12] Defendants are submitting an accompanying motion to exclude Steinholt's testimony because it is inconsistent with Plaintiffs' other expert's opinion that the risk of Shenandoah's failed commercialization increased over the course of Shenandoah's appraisal.

*Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (citation and internal quotation marks omitted).    Omissions are actionable only if—and Plaintiffs must explain how—the allegedly omitted facts were "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."    17 C.F.R. § 240.10b-5(b); *see also Southland Sec. Corp.*, 365 F.3d at 374.

Plaintiffs contend that when Defendants disclosed certain tangible Shenandoah appraisal results, such as net feet of oil and sand quality, they should have also included other details, such as the technicalities of Defendants' extraction plan and internal resource and faulting projections.    These omissions, according to Plaintiffs, concealed Shenandoah's falling commercial potential.    (Am. Compl. ¶¶ 95(a), (b), (i), (j), (l); *see* Stmts. 1, 5-6, 8, 12, 15-19, 21, 24, 26-27, 29-31, 33, 35, 37, 40-42, 45-46.[13])    But without evidence that the statements shared with investors were rendered misleading by the omission of such facts, this theory fails.    The alleged misstatements offer no specifics about Shenandoah's projected size, fault mapping, or Anadarko's extraction plans.    (*See* Ex. 12 (Walker Tr.) 174:18-23 ("[W]e don't give resource ranges to expectations…. [W]e just never did."); *accord* Ex. 8 (Leyendecker Tr.) 135:18-23.)    Anadarko therefore had no obligation to disclose to investors its estimates of Shenandoah's resource size when that information was never shared with the public in the first place.    *See Kane v. Madge Networks N.V.*, 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000) ("[G]eneral positive

---

[13] Citations to "Stmt." reference the numbered alleged misstatements in the Amended Complaint, listed in Appendix A to this brief.

statements do not give rise to a duty to disclose the details of internal corporate disputes."), *aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002); *Braskem*, 246 F. Supp. 3d at 752-53 (collecting cases finding no duty to report SEC investigation or improper business practices and noting that "a corporation, by reporting its income, does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct").

Contrary to Plaintiffs' theory, Defendants continued to believe Shenandoah could be developed even as they learned what Plaintiffs characterize as purportedly negative information about the field throughout the Class Period.  Leading up to Shen-5, Development estimated Shenandoah's overall likelihood of success at 88.2%; Shen-5 and Shen-6 were both drilled as keeper wells; and even after the close of the Class Period, Defendants weighed the possibility of drilling another well.  (SUMF §§ III.D, F.)

Moreover, to the extent Exploration and Development arrived at alternative resource estimates, there was nothing fraudulent about Anadarko's exercise of its business judgment to choose one of those estimates to present to the Partners.  As a member of Development explained, Anadarko wanted to present a unified front, and in any case, the record shows Anadarko did in fact share alternative fault maps with the Partners on occasion.  (*See* Ex. 3 (Dep. of Chip Oudin III ("Oudin Tr.")) 225:18-226:14 (Anadarko presented Exploration's maps to its partners, as Exploration had control of the project then); *see also* Ex. 2 (Chernoff Tr.) 76:22-79:1 (ConocoPhillips's Shenandoah team lead recalling that Anadarko had explained it was presenting Exploration's fault map but that Anadarko had

23

generated other possible interpretations, which "was not inconsistent with how ConocoPhillips viewed" the data); Ex. 35 (Anadarko sharing alternative fault maps).)

Finally, Plaintiffs also claim that Anadarko's statements were misleading because they did not disclose the alleged retaliation against Frye, but the record is devoid of any evidence of retaliation. (Am. Compl. ¶ 95(f).) Frye's resignation letter states she was subject to "abuse and retaliatory behavior," but this conclusory statement is supported only by Frye's speculation that some co-workers were not returning her calls. (Ex. 42.) This is insufficient to create a genuine dispute of fact, especially as Frye conceded she did not "recall anything that Mr. Leyendecker did with respect to Shenandoah in the 12-month period prior to" May 18, 2016—the date of her resignation letter. (Ex. 10 (Frye Tr.) 266:19-24; Ex. 42.) *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) (self-serving evidence must offer facts that are "particularized, not vague or conclusory"). Taken in the light most favorable to Plaintiffs, the only non-conclusory evidence shows that Anadarko did not grant Frye's request to participate in a round of involuntary layoffs. (Ex. 10 (Frye Tr.) 252:5-8.)[14] But Frye herself admitted that when she submitted her request, she told Anadarko that she "didn't want to go into details" and did not recall explaining to her supervisor that concerns about Shenandoah motivated her

---

[14] Plaintiffs make much of a February 19, 2014 meeting in which Leyendecker told Frye in a "[g]ruff" tone, "You don't know anything. I've worked the Gulf of Mexico longer than you have." (Ex. 10 (Frye Tr.) 43:24-48:16.) This conduct does not amount to retaliation, but even if it did, it falls outside the Class Period so cannot support Plaintiffs' claims.

request.   (*Id.* at 248:13-251:4.)   No reasonable jury could conclude that Anadarko's decision to *continue* employing Frye amounted to retaliation.

In short, Plaintiffs' theory is nothing more than a quibble over Anadarko's business judgment decision to inform investors of tangible appraisal results, such as Shenandoah's sand quality and depth, and ultimately not move forward with the Shenandoah development—despite the fact that other oil and gas companies are successfully producing from Shenandoah today.   But a "fundamental disagreement with Defendants' business judgments" cannot sustain a securities claim.   *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010); *see also Cooperman v. Individual, Inc.*, 171 F.3d 43, 51 (1st Cir. 1999) ("Disclosure of the business strategy supported by a majority of the directors did not obligate defendants also to disclose information about the extent to which each individual Board member supported that model."); *Braskem*, 246 Supp. 3d at 752 (disclosure not required just because a reasonable investor would find omitted fact relevant or interesting).

## IV.   PLAINTIFFS CANNOT OTHERWISE ESTABLISH AN ACTIONABLE MISSTATEMENT.

Plaintiffs' claims independently fail because the alleged misstatements are inactionable statements of corporate optimism, industry-wide risk factor disclosures, or truthful statements about accounting policies and decisions.

### A.   Statements of Corporate Optimism

Many of Plaintiffs' alleged misstatements constitute inactionable statements of corporate optimism or "puffery," including descriptors such as "fantastic" and a "success."

25

(*See* Stmts. 4-6, 8-16, 18-21, 24-25, 27-34, 38-39, 41-44.)    "[G]eneralized positive statements about a company's progress are not a basis for liability."  *Nathenson*, 267 F.3d at 419.  These statements—some of which do not even mention Shenandoah—are not material to reasonable investors, who are "too sophisticated to rely on vague expressions of optimism rather than specific facts."  *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012).  Where, as here, defendants make "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects," those statements are inactionable.  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 898 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) ("[r]emarkable progress" was "puffery" because "[w]hether that progress was 'remarkable' is not subject to objective proof and is not material"); *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 418 (S.D. Tex. 2020) (citation omitted) ("as a matter of law," "success" "is not a statement of fact, but is instead puffery").[15]

## B.    Industry-Wide Risk Factors

Anadarko's disclosures of certain risks—that it may not "encounter commercially productive oil" and "exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons"—are inactionable industry-wide risk factors. (*See* Stmts. 2, 22.)  "Risk disclosures like the ones accompanying 10–Qs and other SEC

---

[15] These statements also were not false, as evidenced by current statements issued by Beacon and others describing Shenandoah as "world-class" and "the largest producing wells in all of North America."  *See* Section III.H.

26

filings are inherently *prospective* in nature" and "not meant to educate investors on what harms are currently affecting the company." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (emphasis in original). Thus, those cautionary statements "are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *Id.* (citation and internal quotation marks omitted). This principle holds particularly true when the alleged misrepresentation is part of "a boilerplate list of risks affecting an industry as a whole." *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 914 (E.D. La. 2014).

Here, no reasonable investor would view these "risk factors" as statements "meant to educate investors on what harms are currently affecting the company."[16] *Bondali*, 620 F. App'x at 491. Moreover, they are not Anadarko-specific but are inherent in the "industry as a whole" for "[d]rilling for oil and natural gas" and "exploratory drilling." (Ex. 67 at -794; Ex. 82 at -187.) *See Bulmahn*, 53 F. Supp. 3d at 915 (operating risks listed in company prospectus that applied to the "oil and natural gas business" rather than the particular company were inactionable because "[n]o reasonable investor would interpret this list as an assurance").

Plaintiffs' attempt to base Rule 10b-5 liability on Anadarko's alleged violation of SEC Regulation S-K Item 303 likewise fails. (*See* Am. Compl. ¶¶ 142-45.) Item 303

---

[16] Moreover, Anadarko had not determined Shenandoah's commercial viability at the time of the disclosures. *See* Section II.

27

requires management to discuss the company's financial condition and results of operations.   17 C.F.R. § 229.303.   According to Plaintiffs, Defendants should have disclosed by the end of 2014—*before* the Class Period—that "internal Company engineering and exploration assessments of the Shenandoah exploration data had called into substantial doubt its value and economic viability." (Am. Compl. ¶ 142.)  This alleged omission predates the Class Period and therefore cannot serve as a basis for liability.  Moreover, Item 303 does not "establish a duty to disclose that may give rise to liability under § 10(b)." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 632 n.63 (S.D. Tex. 2003); *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262, 265 (2024).

### C.   Accounting Policies and Decisions

Anadarko's statements describing its accounting practices—including when to expense or suspend well costs—are not actionable.  (*See* Stmts. 3, 7, 23, 36, 47.)  Plaintiffs do not dispute the existence of these policies, most of which simply reflect the relevant accounting standards.  (*See* Ex. 26 (Anadarko bulletin describing company's "policy for determining the well classifications and disposition of suspended well costs").)  To the extent Plaintiffs allege Anadarko violated the accounting policies, that would not render false or misleading statements that Anadarko had these policies in place.  *See Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (statements that "describe internal processes and procedures" were not false and misleading because the policies, "although they failed to function correctly in this

28

instance, nevertheless existed"); *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 579 F. Supp. 3d 933, 948 (S.D. Tex. 2022) (statements of policy "cannot be reasonably read as promises or guarantees to investors of complete compliance").

Plaintiffs' disagreement with Anadarko's accounting decisions regarding Shen-3 and the Shenandoah project as a whole is likewise inactionable. (*See, e.g.*, Am. Compl. ¶¶ 4, 81-82.) "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) (citation and quotation marks omitted). GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management." *Godchaux v. Conveying Techs., Inc.*, 846 F.2d 306, 315 (5th Cir. 1988) (citation and quotation marks omitted). Accordingly, Plaintiffs' "[d]issatisfaction with [Anadarko's] … approach to accounting" cannot form the basis of their Rule 10b-5 claims. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024); *see also Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 302-03 (when considering alleged GAAP violations, "reasonable disagreements and deference to business judgment" are permissible due to "the flexibility in interpreting GAAP and financial reporting requirements" (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995))).

Further, Plaintiffs' claim that Defendants should have written off Shen-3's expenses earlier was not even a live issue at the end of the Class Period, and thus inactionable. (Am. Compl. ¶¶ 4, 50-52.) Defendants wrote off those expenses in Q3 2016—months before the

alleged corrective disclosure in May 2017.  (*See, e.g.*, Ex. 95 at 11 (November 1, 2016 Anadarko Q3 2016 10-Q announcing decision).)  "[A] stock's price will not change upon the release of confirmatory information, i.e., information already known to the market." *Greenberg*, 364 F.3d at 663.

## V.    PLAINTIFFS CANNOT PROVE SCHEME LIABILITY/DECEPTIVE BUSINESS CONDUCT.

The Court should also grant summary judgment on Plaintiffs' scheme liability claims.  To establish scheme liability, "a plaintiff must prove that 'the defendant … engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.'"  *SEC v. Narayan*, 2017 WL 4652063, at *4 (N.D. Tex. Aug. 28, 2017) (citation omitted) (alteration in original); *see also United States v. Finnerty*, 553 F.3d 143, 148 (2d Cir. 2008) (deceptive conduct "irreducibly entails some act that gives the victim a false impression"); *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA) Inc.*, 482 F.3d 372, 388 (5th Cir. 2007) ("manipulative" practices are those "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity" (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977))).

Plaintiffs cannot rely solely on a defendant's alleged misstatements and omissions, which "can form part of a scheme liability claim" but alone are insufficient to establish a violation of Rule 10b-5(a) and (c).  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022); *see id.* at 53 (discussing *Lorenzo v. SEC*, 587 U.S. 71 (2019)).  Rather, plaintiffs must allege something more—for example, "[m]arket manipulation, employment of a manipulative

30

device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports." *Narayan*, 2017 WL 4652063, at *10 (no scheme liability where complaint did not allege any action "directed towards investors" or "for the purposes of elevating stock prices or appearing more profitable") (quoting *In re Enron Corp. Secs. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 579 (S.D. Tex. 2002)).

Plaintiffs simply have not established evidence of deceptive or misleading conduct. As discussed in Section III.B, Anadarko's decision to on some occasions present to its Partners only one of its teams' alternative fault maps amounts only to inactionable business judgment decisions. Nor have Plaintiffs adduced any evidence showing that the alleged retaliation against Frye amounted to deceptive or manipulative conduct either.

## VI.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION.

Each of Plaintiffs' claims independently fail because they cannot establish loss causation. "Loss causation requires proof of a causal connection between a misstatement and a subsequent decline in a stock's price." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009). Plaintiffs must show: (1) that the stock price decline followed a corrective disclosure—that is, a "disclosure of negative truthful information that was related to the allegedly false, non-confirmatory positive statement made earlier"; and (2) that it is "more probable than not that … this negative statement, and not other unrelated negative statements … caused a significant amount of the decline." *In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *20 (S.D. Tex. May 31, 2016) (quoting

31

*Flowserve Corp.*, 572 F.3d at 228-29).  Plaintiffs must show loss causation to prevail on each of their claims.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008).

### A.    The Alleged Corrective Disclosure Is Not Related to the Alleged Misstatements or Allegedly Fraudulent Conduct.

Plaintiffs cannot satisfy the first prong of the loss causation inquiry because the single corrective disclosure they identify is not related to the information allegedly hidden by the alleged prior misstatements and fraudulent conduct.  While a corrective disclosure need not "precisely mirror the earlier misrepresentation," it must at minimum "reveal[] the fraud, or at least some aspect of the fraud, to the market."  *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (citation omitted).  When a disclosure does not explicitly reveal the alleged fraud, Plaintiffs "must provide evidence that the market understood the link between the indirect disclosure and the earlier misrepresentation."  *In re: BP*, 2016 WL 3090779, at *27.

Plaintiffs' alleged corrective disclosure is Anadarko's May 2, 2017 statement in its Form 10-Q: "The Shenandoah-6 appraisal well and subsequent sidetrack, which completed appraisal activities in April 2017, did not encounter the oil-water contact in the eastern portion of the field.  *Given the results of this well and the present commodity-price environment*, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs." (Ex. 99 at -126 (emphasis added).)

32

That Anadarko elected to suspend appraisal in light of Shen-6's disappointing results was in line with its prior public statements.  Defendants repeatedly had informed investors that Shen-6's results would determine Anadarko's FID.  (*See* Ex. 92 at -835-36 (July 27, 2016 statement that "[w]ith your question of what else it's going to take, we really have to see what the #6 tells us…. [T]he ultimate planning has to be after #6…. [W]e're still in the appraisal mode, and so we need to get the rest of the information in front of us."); Ex. 96 at -889.)  Plaintiffs cannot point to contrary evidence.  Even Frye agreed that reaching FID on Shenandoah was contingent on Shen-5 and Shen-6's results.  (SUMF § III.D.)

The market was also aware that Anadarko's FID hinged on oil prices.  Anadarko had previously disclosed that its "most significant market risk relate[d] to prices for natural gas, oil, and [natural gas liquids]," and it "expect[ed] energy prices to remain unpredictable and potentially volatile."  (Ex. 72 at -622; *see also* Ex. 91 at -210.)  The company had also explained this risk would influence its decision on Shenandoah.  (SUMF § III.E.)

What the May 2, 2017 disclosure did not do is unveil some years-long fraudulent scheme in which Defendants concealed Shenandoah's lack of commercial viability.  For example, Anadarko's decision to suspend appraisal based on Shen-6 does not, as Plaintiffs allege, reveal that 18 months earlier, Anadarko was displeased with Shen-4's sidetrack results (Am. Compl. ¶ 110), or that 14 months earlier, Defendants did not believe the project was "worthy of spending capital" or that they were not "still … advancing the project," despite consistently being clear they were "ways away from a sanction at

33

Shenandoah" (*id.* ¶¶ 114, 119 (emphasis omitted)).  Indeed, analysts understood the results of Shen-6 and the sidetrack as "putting the scale of the field in doubt" and, thus, leading to the write-off.  (Ex. 54 at -923.)  And Anadarko had repeatedly warned that FID depended on Shen-5 and Shen-6 results.  (SUMF § III.D.)  Had Anadarko misled investors about the likelihood that Shen-6 would encounter oil or the extent to which FID rested on Shen-6's results, the May 2017 disclosure might have corrected those misrepresentations.  But that is not Plaintiffs' claim.

The alleged corrective disclosure also does not relate to any of the alleged conduct underlying Plaintiffs' scheme liability claim.  (*See* Am. Compl. ¶¶ 5(g)-(s).)  It did not reveal, for example, that Defendants had taken steps, including through Anadarko's fault mapping decisions, to conceal true resource size estimates—estimates that were never disclosed in the first place.  And no reasonable investor would have understood the disclosure to reveal anything about Lea Frye.

Courts in this district have expressly rejected similar attempts to broadly define "relevant truth" as "any 'truth that was obscured by the fraud, [including] instances where … a broader relevant truth follows from a misrepresentation because of the message that the statement conveys.'"  *See In re: BP*, 2016 WL 3090779, at *21, *26 (plaintiffs failed to establish loss causation as to *flow rate* misrepresentations by identifying a corrective disclosure regarding the *duration of the spill*); *Greenberg*, 364 F.3d at 667-69 (disclosure revealing negative information concerning defendants' router interoperability and projected revenue drops was not a corrective disclosure regarding alleged misstatements

34

relating to router speed).  Without a showing "that the allegedly false, positive information was related to the negative information" revealed in the corrective disclosure, Plaintiffs' claims fail.  *Greenberg*, 364 F.3d at 667.

> **B.** **Plaintiffs Cannot Show that Anadarko's Stock Price Decline Was Caused by the Alleged Corrective Disclosure of Past Misstatements or Misconduct.**

Plaintiffs' claims also fail because they lack evidence that the alleged corrective disclosure caused the drop in stock price.  Plaintiffs cannot satisfy loss causation by showing only that misstatements "artificially inflate[d] the stock price"; they must prove the corrective disclosure "cause[d] a *decrease* in the previously-inflated stock price."  *In re: BP*, 2016 WL 3090779, at *28; *see also Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342 (2005) (requiring plaintiffs to establish "a causal connection between the material misrepresentation and the loss").

The Court's class certification decision—finding that Defendants did not show the alleged fraud had no impact on Anadarko's stock price—does not foreclose a finding that Plaintiffs, at this stage, cannot show loss causation.  Unlike at class certification, it is Plaintiffs' burden on summary judgment to show that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss."  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007).  Yet Plaintiffs' attempt to disaggregate the impacts of the Firestone explosion in Colorado and Anadarko's May 2, 2017 disclosures fails.  As Plaintiffs' own expert acknowledges, both the news about the fatal Firestone explosion in Colorado and the May disclosures were released after

35

hours on May 2, 2017 and within the span of about an hour. (Dkt. 284 at 250:8-14; Ex. 16 (February 2, 2022 Expert Report of Bjorn Steinholt) ¶ 38.)   Steinholt attempts to disaggregate the fall in Anadarko's stock price purportedly attributable to the Shenandoah disclosures from that attributable to the Firestone news but does so using a flawed event study.   The event study does not control for news affecting the broader industry as it removed the industry index Steinholt acknowledged was appropriate. (Dkt. 237 at 8; Dkt. 237-1, Ex. A, ¶ 35.)   Nor can the impact of the Firestone news be captured by Steinholt's regression model because the explosion was a one-time event. (Dkt. 237 at 8; Dkt. 237-1, Ex. A, ¶ 36.)

## VII. PLAINTIFFS CANNOT DEMONSTRATE THAT DEFENDANTS ACTED WITH SCIENTER.

Summary judgment is independently warranted because Plaintiffs cannot prove scienter on any of their claims.  To establish scienter, Plaintiffs must demonstrate that each Individual Defendant acted with "intent to deceive, manipulate, or defraud," or "severe recklessness." *Rosenzweig*, 332 F.3d at 866; *Southland*, 365 F.3d at 364-65.  Severe recklessness extends only to "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).

As discussed in Section II.A, the evidence contradicts Plaintiffs' theory that Defendants believed Shenandoah was unviable at the outset of the Class Period.[17] No reasonable jury could conclude that Anadarko invested hundreds of millions in Shenandoah's appraisal while knowing it was commercially unviable. (*See* SUMF § III.D.) Moreover, to the extent Anadarko executives reached alternative interpretations of appraisal data, "[o]rdinary disagreements among executives about internal company administration do[] not raise a strong inference of fraud." *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1415 (S.D.N.Y. 1996); *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 303 ("fundamental disagreements with Defendants' business judgments" do not make for actionable securities claims). That Exploration and Development, faced with "poor" seismic data that made for "very, very difficult interpretation" requiring "multiple hypotheses" (Ex. 3 (Oudin Tr.) 219:7-21), reached alternative conclusions does not amount to evidence of fraud. The teams took separate approaches by design—Exploration "took the full range of resources" and Development "tended to focus on what they could quantify as a reserve" (Ex. 5 (Strickling Tr.) 85:3-8)— and this difference was not unusual at Anadarko or comparable companies (*see* Ex. 3 (Oudin Tr.) 221:16-223:10 (at Anadarko and other companies, development teams

---

[17] In fact, there is no evidence that Defendants at any point in time believed the project was unviable. Their decision to suspend their own appraisal activities reflects a business decision; as Anadarko announced on May 2, 2017, it suspended appraisal activity in part because of oil prices, and even after suspending appraisal activities, Anadarko remained on the project for some time. (SUMF § III.F.) Plaintiffs point to no evidence that Defendants knew the field could not be developed, and indeed it has been since developed very successfully.

typically take a more conservative approach than exploration teams)).  Indeed, differences of interpretation existed between Anadarko's Partners as well.  (*See id.* at 219:22-220:23.) That Anadarko and the Partners each obtained their own data and each elected to pour money into exploration *after* engaging in the purportedly fraudulent statements only undermines scienter.  And the fact Anadarko and the Partners elected to spend additional money on Shen-5 and Shen-6 so that they could be "keeper" wells only demonstrates their genuine belief at that time that Shenandoah had the potential to be viable.  (*See* SUMF § III.C-E.)

Plaintiffs' expert speculates that Defendants knew Shenandoah was commercially unviable during the Class Period, but expert testimony opining on Defendants' or third parties' knowledge or beliefs is inadmissible.[18]  *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007).  That Anadarko eventually suspended appraisal of Shenandoah likewise does not supply the requisite intent.  The securities laws proscribe pleading fraud by hindsight, so even taking as true Plaintiffs' theory that Anadarko should have suspended appraisal earlier, "poor business judgment—even if attributable to monetary incentives"—does not establish scienter.  *Owens v. Jastrow*, 789 F.3d 529, 544-45 (5th Cir. 2015) (citation omitted).  This is especially so given Anadarko's repeated warnings to investors throughout the Class Period that further appraisal was necessary before a sanctioning decision.  (*See, e.g.*, Ex. 73 at -491; SUMF § III.D.)

---

[18] Defendants are filing an accompanying *Daubert* motion on this basis.

38

Finally, Plaintiffs cannot prove scienter by pointing to evidence of the Individual Defendants' stock sales or compensation. "Only insider trading in suspicious amounts or at suspicious times is probative of scienter." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002). Each of the Individual Defendants *increased* their interest in Anadarko stock during the Class Period, which is "inconsistent with a fraudulent intent." (Ex. 25 (Expert Report of Kevin Murphy ("Murphy Rpt."))) at 28, 30.) *In re Fannie Mae Sec. Litig.*, 905 F. Supp. 2d 63, 78 (D.D.C. 2012); *accord In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84 (E.D.N.Y. 2003). And only one Individual Defendant, Daniels, sold any shares during the Class Period—and not on his own behalf, but for his ex-wife, who held the economic interest in those options per a divorce decree. (Ex. 25 (Murphy Rpt.) at 28.) This cannot establish scienter.

The Individual Defendants' compensation likewise does not support fraudulent intent. If incentive compensation, including golden parachutes or other performance-based payment structures, were sufficient evidence of scienter, "executives of virtually every corporation in the United States would be subject to fraud allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 479-80 (S.D.N.Y. 2008). Moreover, Plaintiffs' allegations concerning purported golden parachutes that were not awarded until April 2019 cannot serve as evidence of motive for statements and conduct that was corrected *nearly two years earlier*. (Ex. 100.)

39

## VIII.  PLAINTIFFS' SECTION 20(a) CLAIM FAILS.

To establish a Section 20(a) violation, "a plaintiff must show (1) an underlying, primary violation of § 10(b) of the Exchange Act and Rule 10b-5 and (2) direct or indirect control of the violator by the defendant." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 841 (S.D. Tex. 2016); *Southland*, 365 F.3d at 383.  Because Plaintiffs cannot show a primary violation, their Section 20(a) claim fails.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request the Court enter summary judgment for Defendants.

Dated:  June 1, 2026

Respectfully submitted,

/s/ Kevin J. Orsini

**CRAVATH, SWAINE & MOORE LLP**

Kevin Orsini (*pro hac vice*)
Lauren Rosenberg (*pro hac vice*)
Melissa Syring (*pro hac vice*)
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
korsini@cravath.com
lrosenberg@cravath.com
msyring@cravath.com

**SHIPLEY SNELL MONTGOMERY LLP**

George T. Shipley
State Bar No. 18267100
Federal ID No. 02118
712 Main Street, Suite 1400
Houston, TX 77002
Telephone: (713) 652-5920
Facsimile: (713) 652-3057
gshipley@shipleysnell.com

*Attorneys for Defendants*

41

## CERTIFICATE OF CONFERENCE

In accordance with Rule 17(a) of Your Honor's Court Procedures, I hereby certify that  counsel for Defendants has conferred with Plaintiffs' counsel regarding this Motion on May 29, 2026.  Counsel for Plaintiffs have advised that they oppose this Motion.

Dated:  June 1, 2026

/s/ Kevin J. Orsini
Kevin J. Orsini

43

## CERTIFICATION OF WORD COUNT

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 9,999 words, exclusive of the caption, the table of contents, the table of abbreviations, the table of authorities and the signature block.

Dated: June 1, 2026

/s/ Kevin J. Orsini
Kevin J. Orsini

43

## CERTIFICATE OF SERVICE

I certify that on June 1, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:  June 1, 2026

/s/ Kevin J. Orsini
Kevin J. Orsini

44