# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| IN RE: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Case No. 4:20-cv-576 |
|  | District Judge Charles R. Eskridge III |
|  | CLASS ACTION |

## <u>DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' DAMAGES EXPERT, BJORN I. STEINHOLT</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF ISSUES .................................................................................................. 3

APPLICABLE LEGAL STANDARDS ............................................................................. 3

FACTUAL BACKGROUND ............................................................................................... 4

NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 5

ARGUMENT ...................................................................................................................... 5

I.      Steinholt's Opinion Is Unreliable Because It Conflicts with the Testimony
of Plaintiffs' Expert Lyndon Pittinger. ................................................................ 6

II.     Steinholt's Damages Methodology Is Unreliable Because It Conflicts with
His Report's Assumptions. ................................................................................... 9

III.    Steinholt's Damages Model Also Fails to Disaggregate the Effect of the
Firestone News from the Purported Effect of the Alleged Corrective
Disclosure. ........................................................................................................ 10

CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................. 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................................................ 3

*Diggs v. Citigroup, Inc.*,
   551 F. App'x 762 (5th Cir. 2014) ....................................................................... 1

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   801 F. Supp. 3d 330 (S.D.N.Y. 2025)................................................................. 8

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ............................................................................... 5

*Knight v. Kirby Inland Marine Inc.*,
   482 F.3d 347 (5th Cir. 2007) .......................................................................... 3, 9

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................ 3

*Numatics, Inc. v. Balluff, Inc.*,
   66 F. Supp. 3d 934 (E.D. Mich. 2014)................................................................ 9

**Statutes & Rules**

Fed. R. Evid. 702............................................................................................................ 3

## PRELIMINARY STATEMENT

Plaintiffs' only evidence of damages—the expert testimony of Bjorn I. Steinholt—is inconsistent with the undisputed evidence and Plaintiffs' liability theory, as Steinholt assumes price inflation remained constant throughout the Class Period.  This assumption conflicts not only with Plaintiffs' theory of the case, but also with the opinion of another of Plaintiffs' experts, petroleum engineer Lyndon Pittinger, and even Steinholt's own factual assumptions.  Thus, Steinholt's methodology is unreliable because it "does not apply to the specific facts of the case." *Diggs v. Citigroup, Inc.*, 551 F. App'x 762, 765 (5th Cir. 2014).

Steinholt proposes a methodology that assumes constant inflation throughout the Class Period, with a minor increase in the middle due to Anadarko's increase in its working interest from 30% to 33% on July 27, 2016.  However, Pittinger opines that the commercial viability of Shenandoah *decreased* during the Class Period.  Specifically, he opines that as of roughly one month after the start of the Class Period, it was "more likely than not" that Shenandoah was not commercially viable.  (Ex. 21 (Expert Report of L. Pittinger ("Pittinger Rpt.")) ¶ 11(h).[1])  Pittinger further opines that after Shen-4, and by December 31, 2015, approximately 10 months into the Class Period, Shenandoah was *not* commercially viable.  (*Id.* ¶ 11(j).)  This is not merely a semantic difference.  Steinholt testified that, according to Pittinger, Shenandoah could have had a probability of being up

---

[1] Citations to Exhibits are to the Exhibits to the Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment filed contemporaneously with this motion.

to 50% commercially viable until after Shen-4, at which point it allegedly became non-viable. (*See* Ex. 106 (December 21, 2022 Dep. of Bjorn Steinholt ("Dec. 21, 2022 Steinholt Tr.")) 52:7-53:12.) Moreover, even Steinholt's report itself assumes two distinct periods of differing risk within the Class Period. (Ex. 19 (November 9, 2022 Expert Report of Bjorn Steinholt ("Steinholt Rpt.")) ¶ 28(j).) Thus, according to Steinholt and Pittinger, shareholders who bought Anadarko stock during the early part of the Class Period (prior to December 31, 2015) did so when there was a less-than-certain risk that Shenandoah would be non-commercial, whereas other stockholders who purchased their shares later in the Class Period allegedly did so when it was *certain* the project was not commercially viable.

These two periods carry different levels of risk, and any appropriate damages model must account for how those differences would impact the overall pattern of inflation. Or, stated differently, if the risk that Shenandoah would not be commercially viable changed over the Class Period, the value of Shenandoah to investors must also have changed and, correspondingly, the alleged inflation in the stock price must have changed. Steinholt's report rests on the illogical premise that investors would have paid exactly the same amount for Anadarko's stock, regardless of whether they purchased when it was only *likely* that the project was unviable versus *certain* that the project was unviable. Steinholt's assumption of constant inflation, therefore, does not fit the facts of the case that Plaintiffs themselves now assert. Accordingly, his opinion should be excluded.

2

## STATEMENT OF ISSUES

1. Whether Steinholt's loss causation and damages opinion should be excluded under Federal Rule of Evidence 702 and *Daubert* because Steinholt does not reliably model damages consistent with the conclusions reached by another of Plaintiffs' experts, as well as Steinholt's own factual assumptions.

2. Whether Steinholt's loss causation and damages opinion should be excluded under Federal Rule of Evidence 702 and *Daubert* because Steinholt fails to disaggregate the effect of the Firestone news from the purported effect of the alleged corrective disclosure.

## APPLICABLE LEGAL STANDARDS

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on district courts to ensure that proffered expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). Expert testimony is admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The Fifth Circuit has further explained that "[r]eliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid,'" and "[r]elevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 589, 592-93).

3

## FACTUAL BACKGROUND

Plaintiffs allege that "Defendants engaged in a fraudulent scheme by multiple methods and means and made misleading statements during the Class Period that concealed the alleged truth – the lack of commercial viability of the Shenandoah project." (Ex. 19 (Steinholt Rpt.) ¶ 27.)  Plaintiffs contend, and Steinholt's damages model assumes, that "the alleged truth, *i.e.*, the lack of commercial viability of the Shenandoah project, was disclosed after the market had closed on May 2, 2017, as part of the Company's 1Q2017 announcement, including the suspension of appraisal activities in the Shenandoah and the associated $902 million write-off and expenses." (*Id.* ¶ 29.)

Steinholt's damages model is based on the drop in Anadarko's stock on May 3, 2017, immediately after the alleged truth was revealed, and Steinholt assumes that the residual decline on May 3, 2017 accurately quantifies the price impact of any alleged fraud for the entirety of the Class Period.  Specifically, Steinholt ran a regression model focusing on May 3, 2017, and opines that the residual return of -3.42% reflects the fraud-related impact of the revelation of the alleged truth. (*Id.* ¶¶ 105-06.)  The inflation is meant to reflect the difference between the stock price and the true value reflecting the alleged truth. (*Id.* ¶ 103.)  Steinholt assumes that the inflation is constant for the entire Class Period, notwithstanding changes in the information Anadarko obtained and processed about the Shenandoah appraisal over the course of the Class Period, as well as other factors, such as the price of oil, and the alleged misstatements by Anadarko. (*Id.* ¶ 14(d).)  Steinholt estimates the inflation to be $1.75 per share from February 21, 2015, to July 26, 2016, and $1.92 per share from July 27, 2016, to May 2, 2017. (*Id.*)  The increase in the second half

4

of the Class Period is based solely on Anadarko's acquisition of an additional 3% interest in Shenandoah on July 26, 2016.  (*Id.* ¶ 106.)

## NATURE AND STAGE OF THE PROCEEDINGS

On November 9, 2022, Plaintiffs disclosed Steinholt's expert report on loss causation and damages.  On January 25, 2023, Plaintiffs disclosed Steinholt's expert rebuttal report, which purports to respond to the opinions of Defendants' industry expert, Peter Keller.  Steinholt was deposed with respect to these reports on December 21, 2022 and March 13, 2023.

## ARGUMENT

In a 10b-5 damages model, a "key question [is] how that inflation entered the stock or, more aptly, *when*."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 255 (2d Cir. 2016) (emphasis in original).  Steinholt assumes that all of the inflation entered at the beginning of the Class Period—and all at once.  Specifically, according to Steinholt, the artificial inflation entered on February 21, 2015 "following the first misrepresentation, which was the filing of the 10-K.  At that point in time, that's when you get an inflation, which is the difference between the stock price and the true value reflecting the alleged truth."  (Ex. 106 (Dec. 21, 2022 Steinholt Tr.) 66:7-16.)    Although Plaintiffs allege subsequent misstatements, under Steinholt's damages model, those later alleged misstatements do not "add to the inflation," but simply maintain it.  (*Id.* at 70:13-21.)  Indeed, Steinholt opines that "inflation during the Class Period is flat, except for one step up" when Anadarko increased its working interest in the project.  (*Id.* at 71:13-72:21.)  In short, Steinholt's damages model is premised on the notion that all of the inflation—the difference between

5

the stock price and the true value reflecting "the alleged truth, *i.e.*, the lack of commercial viability of the Shenandoah project, [which] was disclosed after the market had closed on May 2, 2017"—entered the stock price all at once and all at the outset of the Class Period. (Ex. 19 (Steinholt Rpt.) ¶ 29.)

As discussed in Defendants' motion for summary judgment, there is not a shred of evidence to support Plaintiffs' theory that Defendants knew Shenandoah was not commercially viable at the outset of the Class Period—the only theory of liability that fits with Steinholt's damages model.  Moreover, Steinholt's loss causation and damages opinion directly contradicts Plaintiffs' liability expert—Pittinger—who opines that the likelihood of commercial viability *changed* over the course of the Class Period, in direct contradiction to Steinholt's assumption of *constant* inflation.  Pittinger opines that "[a]fter Shen-2, each subsequent well reduced Anadarko's operative resource range for the Shen field"—that is, the likelihood that Shenandoah would be commercial—and "ultimately render[ed] the field commercially unviable."  (*See* Ex. 21 (Pittinger Rpt.) ¶ 11(c).) Specifically, Pittinger opines that the likelihood of commercial unviability changed from "more likely than not" as of April 2015 to "not commercially viable" as of December 31, 2015.  (*Id.* ¶¶ 11(h)-(j).)  Steinholt's methodology, however, does not (and cannot) support this theory nor the theory's underlying factual assumptions.

## I.    Steinholt's Opinion Is Unreliable Because It Conflicts with the Testimony of Plaintiffs' Expert Lyndon Pittinger.

The Court should exclude Steinholt's damages opinion as unreliable because his model conflicts with Pittinger's testimony about Shenandoah's commercial viability.

6

*First*, Pittinger has proffered the opinion that from April 2015—over one month after the start of the Class Period—it was "more likely than not that Shen was commercially unviable." (*Id.* ¶ 11(h).) Even putting aside the roughly one-month difference between the start of the Class Period and April 2015, Pittinger does not opine that Shenandoah was *not* commercially viable at this time, but rather that it was "more likely than not" unviable. (*Id.*; *see also* Ex. 106 (Dec. 21, 2022 Steinholt Tr.) 52:7-53:4 (explaining that "most likely not commercially viable" could mean up to a 50% probability of commercial viability).)

*Second*, Pittinger testified that "[a]fter Shen-4, and by December 31, 2015, Anadarko senior management understood that Shen was not commercially viable." (Ex. 21 (Pittinger Rpt.) ¶ 11(j); *see also id.* ¶ 329 (opining that "Anadarko personnel and management knew that Shen was . . . unviable with reasonable certainty after Shen-4"); *id.* ¶ 11(j) ("[I]t was known *with reasonable certainty* that the corporate PIR threshold rendered Shen commercially unviable at that time") (emphasis added).) Steinholt testified that he understood this to mean that Shenandoah was "certainly not commercially viable" at this point. (Ex. 106 (Dec. 21, 2022 Steinholt Tr.) 53:5-12.) Steinholt also conceded that there is a difference between those periods: "not being commercially viable is different than . . . more likely than not uncommercial." (Ex. 110 (March 13, 2023 Dep. of Bjorn Steinholt ("Mar. 13, 2023 Steinholt Tr.")) 78:21-79:19 ("Q. But would you agree that 'was not commercially viable' is a lower likelihood of commercial viability than 'unlikely to be commercially viable'? . . . A. I think the text -- I think it speaks for itself. I mean, not being commercially viable is different than whatever the term was, more likely than not uncommercial. . . . Q. And it's different in the sense that it's a lower likelihood of

7

commercial viability, when you say 'was not commercially viable.' Right? . . . A. Yes, I mean, very bad went to worse, yes. I mean, it's not -- but, you know.").)  In other words, there was a reduction in commercial viability during the Class Period—after Shen-4, by December 31, 2015.

As Steinholt acknowledges, "the value of an investment is based on the expected future cash flows of that investment, including the timing and *associated risk* of those cash flows."  (Ex. 19 (Steinholt Rpt.) ¶ 5 n.1 (emphasis added).)  It must be the case that as the risk that Shenandoah would not be commercially viable changed (as Pittinger opines), the value of Shenandoah changed and, correspondingly, the alleged inflation in the stock price changed.  But Steinholt does not make any corresponding adjustment to the inflation—or associated risk of the project—in his damages model.  Steinholt's damages methodology is thus squarely at odds with Pittinger's opinion.  Such "[f]undamental disagreements between a party's own experts . . . warrant exclusion." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 462 n.162 (S.D.N.Y. 2025).

At trial, "any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (citation and internal quotation marks omitted).  Because Steinholt does not account for the change in commercial viability that Pittinger identifies, his methodology inflates damages for class members who purchased Anadarko stock earlier in the Class Period.  Steinholt's damages model should accordingly be excluded as unreliable.

8

II.    **Steinholt's Damages Methodology Is Unreliable Because It Conflicts with His Report's Assumptions.**

Steinholt's assumption of constant inflation is also inconsistent with Steinholt's own recognition that the risk of commercial viability changed within the Class Period.

One of the key "material facts" supporting Steinholt's opinion is that "Shen was *more likely than not* uncommercial after the results of Shen-3, and *certainly not* commercially viable after Shen-4." (Ex. 19 (Steinholt Rpt.) ¶ 28(j) (emphases added).) In calculating his damages model, Steinholt also assumes that "[e]ach well post-Shen-2 reflected a significantly reduced Shen's resource size." (*Id.* ¶ 28(a).) Thus, Steinholt's own report states that he assumed varying degrees of risk throughout the Class Period.

By Steinholt's own admission, "the riskier the investment is, the less valuable a dollar five years from now would be" from the perspective of an investor. (Ex. 110 (Mar. 13, 2023 Steinholt Tr.) 10:1-7.) An appropriate damages model would account for how the differences in Shenandoah's value would impact the overall pattern of inflation throughout the Class Period. Steinholt's model fails to do. Instead, Steinholt assumes constant inflation as opposed to a reduction in the commercial viability over the course of the Class Period. Because Steinholt does not account for the change in commercial viability that his own report identifies, his methodology should be excluded as unreliable. *See Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 940 (E.D. Mich. 2014) (expert must "appropriately 'fit[]' the facts of the case into the theories and methods he or she espouses"); *Knight*, 482 F.3d at 355 ("The reliability analysis applies to all aspects of an

expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.").

### III. Steinholt's Damages Model Also Fails to Disaggregate the Effect of the Firestone News from the Purported Effect of the Alleged Corrective Disclosure.

Steinholt's damages model should be excluded on the independent basis that it cannot reliably disaggregate the decrease in Anadarko's stock price purportedly attributable to the Shenandoah disclosures from the decrease attributable to unrelated news regarding an April 2017 fatal home explosion in Firestone, Colorado. (*See* Defendants' Motion for Summary Judgment, Statement of Undisputed Material Facts § III.E.) More specifically, because Steinholt's event study removes the oil industry index, it does not control for news affecting the broader oil industry. (Ex. 111 (June 12, 2024 Expert Report of Allen Ferrell ("June 12, 2024 Ferrell Rpt.")) ¶ 35.) Moreover, the effect of the Firestone news—a one-time event—cannot be accurately captured by Steinholt's model based on historical trading data. (*Id.* ¶ 36.) While the Court previously addressed similar arguments (*see* ECF Nos. 111; 237; 302), Defendants respectfully submit that Steinholt should be excluded on this independent basis.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude the damages testimony of Plaintiffs' proffered expert Bjorn I. Steinholt.

10

Dated:  June 1, 2026                Respectfully submitted,


                                    */s/ Kevin J. Orsini*
                                    **CRAVATH, SWAINE & MOORE LLP**
                                    Kevin J. Orsini (*pro hac vice*)
                                    Lauren M. Rosenberg (*pro hac vice*)
                                    Melissa Syring (*pro hac vice*)
                                    Two Manhattan West
                                    375 Ninth Avenue
                                    New York, NY 10001
                                    Telephone: (212) 474-1000
                                    Facsimile: (212) 474-3700
                                    korsini@cravath.com
                                    lrosenberg@cravath.com
                                    msyring@cravath.com

                                    **SHIPLEY SNELL MONTGOMERY
                                    LLP**
                                    George T. Shipley
                                    State Bar No. 18267100
                                    Federal ID No. 02118
                                    712 Main Street, Suite 1400
                                    Houston, TX 77002
                                    Telephone: (713) 652-5920
                                    Facsimile: (713) 652-3057
                                    gshipley@shipleysnell.com

                                    *Attorneys for Defendants*

11

## <u>CERTIFICATE OF CONFERENCE</u>

In accordance with Rule 17(a) of the Court's Court Procedures, I hereby certify that counsel for Defendants conferred with Plaintiffs' counsel regarding this Motion on May 29, 2026.  Counsel for Plaintiffs have advised that Plaintiffs oppose this Motion.

Dated:  June 1, 2026

*/s/ Kevin J. Orsini*
Kevin J. Orsini

## <u>CERTIFICATION OF WORD COUNT</u>

In accordance with Rule 18(c) of the Court's Court Procedures, I hereby certify that this document contains 2,656 words, exclusive of the caption, the table of contents, the table of authorities, and the signature block.

Dated:  June 1, 2026

*/s/ Kevin J. Orsini*
Kevin J. Orsini

13

## CERTIFICATE OF SERVICE

I certify that on June 1, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:  June 1, 2026

/s/ *Kevin J. Orsini*
Kevin J. Orsini