# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------x

GEORGIA FIREFIGHTERS' PENSION

FUND, individually and on Behalf

of All Others Similarly Situated,

                    Plaintiff,

                              Case No.

 v.                        4:20-cv-576


ANADARKO PETROLEUM CORPORATION,

R.A. WALKER, ROBERT G. GWIN, ROBERT

P. DANIELS, and ERNEST A.

LEYENDECKER, III,

                    Defendants.

------------------------------------------x

                    November 17, 2021

                    10:00 a.m.


        VIDEOTAPED VIRTUAL DEPOSITION of BJORN

STEINHOLT, an Expert Witness in the above entitled

matter, pursuant to Notice, before Stephen J.

Moore, a Registered Professional Reporter,

Certified Realtime Reporter and Notary Public of

the State of New York.

BJORN STEINHOLT

representations and then you would, if it was worth zero, then it's easy, because then it's the value of the Shenandoah field less zero.

Q    And if it's not -- if it was not economically unviable during the entire class period, then how would you measure damages?

A    Well, it's the same thing.

You know, you have to make an analysis, you have to do the analysis of it.

But it starts with the price decline and -- because that is where investors would have lost money as a result of the corrective disclosure.

But I mean, this was an oil field that was valued all the time by securities analysts, and what I was opining was that yeah, there are methodologies for doing so.

The company itself had their own valuation performed of the oil field, and so in terms of the methodology to do so, that's available.

When it comes to actually doing it, yeah, I mean, you -- you know, you know,

BJORN STEINHOLT

it's a lot more complex, obviously, it's a lot more difficult, and you actually have to do the work.

It not something you can sit at a deposition and do it on the top of your head.

And it's particularly difficult to do it when you don't even know what they will be able to prove at trial.

Q    But, if the -- if the asset was somewhat economically viable, let's say, but the allegation is that it was -- the extent of economic viability was misrepresented, then isn't the value of the asset a probablistic determination based on the likelihood that it will be developed versus the likelihood that it will not be developed?

A    In terms of the models, you can either -- there are two ways of doing this type of model.

You can either do it expected future cash flows or you can do like a best case scenario and then discount it with what you're saying, which is like what is the probability of actually reaching it and so on,

BJORN STEINHOLT

which is a different way of doing the same thing.

I mean, the expert has to sit down and figure out, given the facts that's available to the expert, what is the best way of doing it.

Q     I'm asking these questions really relating to -- it relates to paragraph 56 of your report, where you talk about inflation ribbons.

And you talk about, on page 27, you talk about "inflation ribbons from multiple partial disclosures of the alleged truth."

Do you see that?

A     Yes.

Q     And then on 28 you talk about "multiple misleading statements and/or omissions may or may not also result in multiple inflation ribbons."

Can you explain what you mean by that statement?  In particular what you mean by "may or may not result in multiple inflation ribbons"?

A     Yeah, in terms of what you were

BJORN STEINHOLT

just discussing, again, you always start with the price decline, you always have to do that analysis.  These are not competing analyses, it's part of an overall analysis.

And then the question is well, that inflation, when did it start?  Okay.

So let's say that when you go through the misrepresentations, and then you can do, you know, an analysis that may -- that can incorporate whatever the facts are, you know, whatever you have discovered in terms of actually looking at all of the evidence that you have available.

And then you can come up with perhaps a different valuation of the -- of the Shenandoah Oil Field.

Or you may find out that well, listen, you guys, Plaintiffs alleged that from February of 2015 everything was known, but you know, I don't think so.

I think that, in fact, at that point in time what they stated publicly was pretty much the same as what they knew internally, in which case you would have zero

Page 68

BJORN STEINHOLT

inflation during this period of time up until, you know, some other point in time that may be the starting point of the inflation.

Again, I'm not sure -- I haven't, you know, analyzed damages in this case.

What I am just showing you are the different methodologies that experts use in order to, or the framework, it's one framework, but the different tools that analysts use, and which happen to be the same tools that are used -- it's not only used by experts in securities litigation, it's the same tools that are used by analysts and are discussed in analyst reports.

And it's then up to the expert then to look at all of the evidence and come up with the best estimate of damages.

But the methodology itself, it's not as if the methodology that one has to use is at dispute in terms of -- in class action securities litigations.

There is going to be a lot of arguments with respect to the inputs, and

BJORN STEINHOLT

Defendant is going to say it's unreliable and Plaintiffs' expert is going to say no, this is good and so on, and that will be litigated.

But the methodology is, the various methodology is available, and that's what I was discussing in this section.

Q    And do you, based on your review of the Complaint and your understanding of the Plaintiffs' theory of liability, do you understand that is the theory, that there was inflation after each misstatement, or that there was zero inflation during the class period?

A    Well, from a damage expert's point of view, it's irrelevant what Plaintiffs allege with respect to the inflation, it's up to the expert to determine what the inflation is.

So I would discard any economic claims that are being made in the Complaint and I would look at it myself.

And if I think it's zero, it's zero, it doesn't matter what they say in the Complaint.

BJORN STEINHOLT

Q      Right.

And if there -- let's say you do find inflation throughout the class period, can you explain what -- what causes that inflation?

And maybe I am -- that's a little bit unclear, but let me ask the question a slightly different way.

If there is a misstatement or an omission, how does that lead to an inflation during the class period?

A      Well, if the misrepresentation concealed the truth, and the truth would have resulted in a stock price that's lower than actual stock price, then that inflation is directly linked to the misrepresentation.

Q      Right.  But I guess what I'm asking is let's -- let's start from the beginning here, which is that the allegation, this allegation relates to a project, an appraisal project that's being considered over the course of a number of years, right?

You understand that to be the facts of the case?

A      Yes.

Page 71

BJORN STEINHOLT

Q      And at a certain point during the class period, there is a representation by the company about Shen 3, but in reality Plaintiffs say that's a misrepresentation, because Shen 3 was actually a dry hole.

If that misrepresentation leads to an inflation, is it the case that it led to an inflation because the public thinks the likelihood of the Shenandoah project being successful is, you know, let's say X, but in reality, because of this alleged misrepresentation, the likelihood of it being a success is, you know, X minus 10 percent?

MR. FORGE:   I'm going to object. I've been as patient as I could possibly be.  He's told you about every way imaginable that he hasn't been engaged to do a damages analysis, and this is so far beyond the scope of what we are supposed to be discussing, and that last question was unintelligible.

So I'm going to object based on the question being vague and also that it's getting harassing.

BJORN STEINHOLT

MR. GRUENSTEIN:  Okay, well, I don't really agree with either one, but if the witness can answer the question.

A      The confusing part was that it appeared to me that you were saying that the inflation was a result of the truth not being disclosed, and then the question then turned around well, how do you know that that was caused by the misrepresentation.

So I -- so I'm just --

Q      Maybe the question was confusing.

What I'm asking, and this does relate to your opinion about the damages model, so I don't see why this is out of bounds in any way, but I will just ask the question.

Given that this was an appraisal project, would the inflation in the situation I hypothesized, would it be a result of the market believing that the likelihood of the project being a success was higher than it actually was?

A      I have no clue how the inflation was arrived at.

BJORN STEINHOLT

So, you know, I -- and it seems to me that you are getting into factual issues that have to be analyzed in the greater context.

And so I don't really know how to answer that question.

Q    Well, I mean, look, in your report you talk about inflation ribbons from misstatements.

And I guess what I'm trying to understand is why would a misstatement result in an inflation?

A    Oh, well, that is simple.

Q    Yeah?

A    I can answer that question.

Q    Okay.

A    So, if you're misrepresenting something like that, like the value of something, let's just talk about you're representing that the Shenandoah Oil Field is worth X when it's not, it's worth X minus Y.

Then, you know, you have effectively created an inflation equal to Y, right?

# Exhibit 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

CARLOTTA CHERNOFF

Thursday, June 16, 2022

Remotely Testifying from Anchorage, Alaska

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5235607

Page 1

different layers of rock was the part of the geologic stratigraphy that had the right characteristics to be potentially an oil reservoir, and in this case it was.  And in this case it was also filled with oil; and so, therefore, made for a    09:10:32 producible reservoir.

Sorry, I'm not always the best at explaining the technical to non- --

Q.   No --

A.   -- -technical.                                    09:10:45

Q.   -- not at all.

So Shenandoah was -- was an oil field that was during your time being appraised for commercial development; is that right?

A.   That is correct.                                 09:10:59

Q.   Did you attend the weekly conference calls when they occurred?

A.   Most times, yes.  But sometimes I had conflicting meetings, and I did not.

Q.   And if you were unable to attend, was    09:11:21 there somebody else from ConocoPhillips that attended in your stead?

A.   The technical team members who were involved in evaluating the data for ConocoPhillips would attend the -- the conference call.    09:11:33

Page 34

Q. Were the -- any of the meetings or calls, to the best of your recollection, minuted?

A. I'm sorry, could you repeat that, please.

Q. Sure.

Were -- were minutes or notes taken of        09:11:53
those meetings?

A. Oh. I don't know. I don't recall.

Q. Did ConocoPhillips keep notes of the various meetings?

A. No. We did not keep a formal meeting log.   09:12:18

Q. Who chaired partner meetings for the Shenandoah project?

A. So if the partner meeting was being hosted by the exploration team, then generally Ti- -- Tim Trautman chaired those meetings. If they were being   09:12:44 hosted by the development team, then generally Pat McGrievy chaired those meetings.

Q. And do you recall approximately the time frame when it shifted from Tim to Pat?

A. So it was around the time that we were        09:13:06 either drilling or finishing drilling the Shen 3. So it was for- -- they were transitioning again, forming the development team and transitioning the work around the time of the Shen 3 wells -- I recall correctly [verbatim].                                  09:13:47

Page 35

Q.   What were the differences between being the operator of the project and being a partner?  So in this instance, the difference between the role that Anadarko played in Shenandoah versus ConocoPhillips?   09:13:59

A.   Could you clarify in -- in reference to what?

Q.   Okay.  So, for example, who among the partnership issued requests for funding?

A.   So as operator, it was Anadarko's   09:14:14 respons- -- responsibility to cost an activity and then issue requests for funding to the other nonoperated partners.

Q.   Are those colloquially called AFE requests?   09:14:33

A.   They are.  Authority for funding -- or for -- sorry.  Authority for expenditure.

Q.   Maybe it's not colloquially, it's more of the acronym --

A.   Yeah.   09:14:43

Q.   -- which there might be many in your business.

A.   That is correct.

Q.   And did Anadarko as the -- the operator also have control over the direction of the project?   09:14:55

Page 36

A.    So they were responsible for proposing what path the project should take and -- and ensuring that the right work was being done in support of progressing the project down that path.

Q.    And what was the mechanism by which the    09:15:12 partners could express a disagreement with the proposed path?

A.    So there were a number of mechanisms. Through partner meetings, we were able to respond to and -- and comment on their technical work and their    09:15:37 representations of the direction they were taking the project.  We were able to share our technical work.  So ConocoPhillips independently did their own assessment, which was why we had a -- a full-time team committed to it.  Likewise, the other partners    09:15:53 had technical teams that were doing their own assessments, and they shared their views of the characterization of the opportunity and how they thought it should be developed.

ConocoPhillips could choose not to    09:16:07 participate in an activity.  So they could look -- do -- do what is called nonconsent an AFE.  And they had the opportunity to, you know, elevate to other levels of management and have discussions about, you know, what alternatives might be that -- that    09:16:25

Page 37

Anadarko should be considering. So we -- we used several mechanisms which were communication at multiple levels, utilizing the existing structure of the partner meetings. And then we had available to us the possibility to nonconsent a request for                    09:16:43 expenditure.

Q. And through the course of your involvement in the Shenandoah project, did ConocoPhillips ever exercise its nonconsent to an AFE?

A. In -- in my recollection, I know that we    09:16:57 nonconsented the sidetrack on the Shenandoah 4 well.

Q. So I'd like to pause there just for a moment to fill in some of the detail. So the nomenclature for the various wells with Shenandoah are -- are somewhat inconsistent in the record       09:17:22 because there was a -- an initial exploration or discovery well that you referred to earlier; right? And that was --

A. That is correct.

Q. And that was referred to oftentimes as     09:17:35 Shen 1?

A. I -- I think that after we moved into appraisal, yes, folks would -- would either call it the exploration well or Shen 1 or refer to it as its official name. And -- and I don't recall the          09:17:50

Page 38

official name, but it would have had some

relationship to the Walker Ridge block number that

it was drilled in.

Q.    And so it had various names accordingly.
And when you got to the first appraisal well, that        09:18:05

was sometimes referred to as the Shen Appraisal 1

well; correct?

A.    Correct.

Q.    But it was also referred to as Shen 2?

A.    That is correct.                                     09:18:20

Q.    And that was approximately in February of

2013?

A.    That is correct.

Q.    Okay.  And so you referred a little bit

earlier, at the beginning, actually, to -- to         09:18:37

Shen 3.  And so Shen 3 could be referred to as

either the Shenandoah Number 2 appraisal well or

Shen 3; right?

A.    Yes.

Q.    Okay.  And that was drilled in              09:18:54

approximately November 2014?

A.    I don't know the exact dates, but that

sounds right.

Q.    Okay.  And then you just referred to a

Shenandoah sidetrack.  So there was -- after -- I'm    09:19:09

Page 39

it states -- and, again, I'm just filling in the words.  But, "east-west and north-south trending faults," it has in the paren- -- parentheses, "(ConocoPhillips '14)."

And so my question is similar to the last one:                                                          10:30:03

Do you have any reason to doubt that as of 2014, ConocoPhillips had interpreted both east-west and north-south trending faults in Shenandoah?

MR. SLIFKIN:  Object to the form.          10:30:27

THE WITNESS:  Again, I don't have a clear memory of the timing when different interpretations were provided; and so, I also don't have a clear memory of that not being the case.

BY MS. JENSEN:                                            10:30:48

Q.   Is your recollection that other partners had also found -- strike that.

Is it your recollection that other partners had also interpreted faults in Shenandoah as of 2013, 2014?                                                10:31:00

A.   I don't have a recollection that ties to specific time of when other partners showed structurally complex or faulted interpretations.

Q.   Do you have any reason to doubt that they had found such -- or had interpreted such faults as     10:31:21

Veritext Legal Solutions
866 299-5127

of the 2013/2014 time frame?

A.   I don't.

MR. BRYANT:  Object to the form.

BY MS. JENSEN:

Q.   There's a reference here to "(APC Ops)."    10:31:37

Do you know what that refers to?

A.   I do not.

Q.   We had talked earlier about the APC, or Anadarko Exploration team and you also referred to a development team.    10:31:58

A.   Yes.

Q.   Do you have an understanding as to whether ops was in the development team or I -- I -- that was clumsily stated.

Was APS [verbatim] Ops, synonymous with    10:32:13 the development team for Anadarko?

A.   I don't know how Anadarko used the term "APC Ops," and what that actually referred to.

Q.   Is it your recollection that the development team for Anadarko also found faults in    10:32:33 the Shenandoah oil field in 2013 or 2014?

MR. BRYANT:  Object to the form.

THE WITNESS:  Again, I don't have a good recollection of timing when different interpretations were presented or discussed.    10:32:52

Page 75

MS. JENSEN: Mitchell, what's -- you're interjecting a number of objections here. What was your objection to the last question?

MR. BRYANT: She's already testified that she disagrees with the use of the word "found" in relation faulting. It's an interpretive process.

10:33:05

MS. JENSEN: Okay. So if -- if -- if I just inserted the -- the word "interpreted" as opposed to "fault," that would eliminate your objection?

10:33:25

MR. BRYANT: To that question, yeah.

MS. JENSEN: Okay. Just -- okay. Then I will ask it again without counsel's objection.

BY MS. JENSEN:

Q. Is it your recollection that the development team for Anadarko also interpreted faults in the Shenandoah oil field in 2013 or 2014?

10:33:36

A. Again, my -- my memory or recollection, I can't tell you specific time frame when different interpretations were -- were presented to us or discussed.

10:33:57

Q. You do, however, have a recollection that the Anadarko development team interpreted faults in the Shenandoah oil field?

A. I do. I remember verbal conversations

10:34:12

Page 76

about different interpretations that included faults and -- and interpretations that were without faults.

Q. And who were the conversations with about the interpretations that had faults?

A. I personally recall having a conversation with Chip Oudin.  10:34:32

Q. And who's Chip Oudin?

A. He was a geophysicist for the Anadarko development team.

Q. And do you recall the time frame for that discussion?  10:34:47

A. I do not.

Q. And what was the substance of the conversation?

A. The substance of the conversation was that they, like ConocoPhillips, carried multiple interpretations.  And he personally, in interpreting the data, had seen different possible interpretations similar to our geophysicists.  And he was helping to explain to me that Anadarko had other interpretations than the one that we saw presented to us and -- verbally confirming that, you know, he appreciated seeing other partners had alternative interpretations.  10:34:57  10:35:17

Q. And when you say "he was helping to  10:35:38

Page 77

explain to me that Anadarko had other interpretations than the one we saw presented to us," just to clarify the statement that you just made, are you saying that Anadarko had other interpretations than the one that Anadarko    10:36:00 Exploration presented to the partnership?

A.    That is correct.    The -- the only interpretation we saw presented to us was the one that was expressed, to me, had been generated by the exploration team.    10:36:18

Q.    And Chip Oudin was saying that Anadarko internally had -- had maps with interpretations that included faults?

A.    Chip communicated that they -- they recognized multiple interpretations.    That was not    10:36:37 inconsistent with how ConocoPhillips viewed this. There were multiple ways to interpret the same data we all had.

Q.    And when you say "they," are you now talking about the Anadarko development team?    10:36:54

A.    Yes.    Thank you for clarifying.    The -- the development team and -- and Chip working for the development team was communicating that he and the development team had reflected multiple interpretations in -- in their evaluation of the    10:37:06

Veritext Legal Solutions
866 299-5127

data.

Q.   We've talked a little bit about the development team today.  Besides Chip, who was on the development team at that time?

A.   So I remember interacting mostly with the   10:37:22 technical team.  So Lea Frye was the technical lead, and I believe she reported to Pat McGrievy who was, in essence, my counterpart on the development side. She had working with her Chip Oudin who was a geophysicist.  I believe Paul Chandler was a   10:37:45 geologist.  And then I cannot reme- -- remember the name of the full-time reservoir engineer.  There were multiple other specialists that I met at various times at meetings, but I don't remember any of their names.   10:38:04

Q.   Okay.  So I'd like to direct your attention to Slide 5.

A.   Okay.

Q.   Do you recognize this slide?

A.   I don't specifically recognize this, other   10:38:38 than this appears to be a color version of the black-and-white slide you showed me previously.

Q.   And so the black-and-white slide that we looked at previously was from July of 2013?

A.   I'll take your word for that because I --   10:39:10

Page 79

I don't have that exhibit up right now.

Q.   So the -- the record will reflect whether I've stated that correctly or not.

In any event, this appears to be from a partner meeting in September 2013?                          10:39:23

A.   It is annotated that it was from a partner meeting in September 2013.

Q.   So do you take this to mean that this would have been a slide that ConocoPhillips shared at a partner meeting in September 2013?               10:39:41

A.   Again, since it's on a ConocoPhillips slide template, I would take that to be a ConocoPhillips slide.  So I have no reason to say otherwise, but I have no recollection of presenting this.                                                         10:40:02

Q.   I'd like to --

A.   This --

Q.   Oh, go ahead.

A.   I was going to say this was -- I -- I have no recollection of presenting this specific slide.    10:40:08

Q.   Turning to the next slide, do you recognize this map?

A.   I don't have a specific recollection of this.  But looking at the annotation, I see it's from Venari.  I recall Venari presenting their       10:40:33

Veritext Legal Solutions
866 299-5127

# Exhibit 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

CHARLES "CHIP" F. OUDIN, III

Thursday, June 30, 2022

Remotely Testifying from The Woodlands, Texas

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5267938

Page 1

resolved, to six-hz data at 30,000' beneath 20,000' of salt where getting the structural picture correct is the biggest challenge," were you referring to challenges associated with the Shenandoah project?

A.   Yes, I was.

Q.   And can you explain what those challenges were?

A.   The primary challenge was imaging, trying to, one, identify the reflectors associated with the reservoir interval and those around the reservoir interval and imaging them from a seismic processing standpoint so that they represented a true and accurate portrayal of the subsurface.

Q.   Can you explain that, perhaps, in slightly more layman's terms; what was difficult about imaging this area?

A.   At Shenandoah and in the Walker Ridge area around here and some of the areas around Walker Ridge, you had very thick undulating layers of salt. In the case of Shenandoah, it was approximately 20,000 feet, and is a very, very difficult layer to get sound waves through, so as to get reflections that can be processed into an accurate representation on seismic data of what's going on down there.

Page 217

Acquisition was tough.  As you can see, we were involved in different processing streams throughout the course of my involvement on this project.  It was very expensive.  It was very time-consuming.  And very often the results you got were inaccurate.

Q.   What do you mean when you say "acquisition was tough"?  Acquisition of what?

A.   Acquisition of the seismic data.  In the case for the coil data, you've probably seen that reference out here, was done by a boat traveling in circles.  The data was acquired.  It was preprocessed with super computers, oftentimes onboard the boats that were acquiring it.  Then it was shipped back to the vendors' onshore buildings and was further processed into workable images that we, the interpreters, could work with and render subsurface interpretations.

Q.   And did these features of the Shenandoah basin present a challenge to you, as you say here?

A.   Yes, very much so.

Q.   And a challenge to what aspect of the job that you were doing?

A.   Identifying the reservoirs, identifying the faults, identifying the structure.  Very often

Page 218

we would drill a well -- if we were within 500 feet of our prognosed depth for certain markers, we considered it a success, which given my previous job, we were accurate to within 25 to 30 feet, as opposed to looking at accuracies in the hundreds of feet at Shenandoah.

Q.   You referred to yourself as an interpreter.  What do you mean by that?

A.   As an interpreter, I look at the seismic data, and I try to determine as best I can what is going on in the subsurface.  I make the maps.  I determine the structure, any complexities that may be down there, and all things associated with the subsurface.

Q.   And did the features that you were -- that you described here as the biggest challenge, did they affect your ability to interpret?

A.   Very much so.  I referred to poor data areas and areas of a very, very difficult interpretation that in my opinion required multiple hypotheses.

When I first started on this project, I was fascinated at the various interpretations five different oil companies would get from the same data.  And I thought I would have the right

Veritext Legal Solutions
866 299-5127

interpretation, but I didn't have a monopoly on interpretation and I was the new kid on the block.

Q.    What do you mean by "a monopoly on interpretation"?

A.    Basically saying that my interpretation of this data is the correct one.

Q.    And did you know with any certainty whether your interpretation of the data was the correct one?

A.    No, I did not.

Q.    You mentioned the partners as well as the exploration team.  Would their work have been affected by the challenges that you've described, as well?

MS. JENSEN:  Objection.  Calls for speculation.

BY MR. GRUENSTEIN:

Q.    You may answer.

A.    I can answer?

Q.    Sure.

A.    Yes.  They would have -- they would have had the same challenges I had, which oftentimes, as we saw, resulted in a variety of interpretation.

Q.    You mention that you noticed this at the beginning of the project.  Did these challenges go

Page 220

away during the course of the project?

A.  We got better over the course of my time with our understanding of what we thought was going on, but the imaging overall did not get better.  It was still a challenge, especially around the perimeter of the field on the west and the north and the northeast sides.

Q.  You mention further down in this -- in the paragraph, "Politics, as always, are always an issue, but in this case politics is internal."  [As read]

What did you mean by "politics"?

A.  Differences between exploration and development, ways of looking at things.

Q.  What are you referring to?

A.  Throughout my career, development or operations groups have been more conservative, generally looking at low cases.  And exploration groups, as is their nature, have been far more optimistic and are looking at the upside more than the development group is.

It's been that way at every company I ever worked.  It just seemed like when I came to work on Shenandoah, the exploration and development groups were like two different companies.  And that was

Page 221

something I had experienced when I first started with BP back in 1988.

I don't know if that answers your question, but that's the way it felt.

Q. Sure. And when you say felt like two companies, what do you mean by that?

A. The outfits had their own way of doing things, their own way of looking at things, thinking of things, and oftentimes treated the other with a little bit of disdain.

Q. Was one side necessarily right and the other side necessarily wrong about how they thought about things?

A. Early on in the project with the limited well control, no.

MS. JENSEN: A- -- apologies. I -- I had objected to vague.

BY MR. GRUENSTEIN:

Q. But I'm as- -- I'm asking a little bit more generally. You -- you say that exploration sometimes look [verbatim] at things in one way and development sometimes looks at problems in another way.

Is one methodology necessarily right, and is the other methodology necessarily wrong?

Veritext Legal Solutions
866 299-5127

A.   No.

MS. JENSEN:   Same objection.

BY MR. GRUENSTEIN:

Q.   Why do you say that?

A.   Because until you get more data to prove or disprove your interpretation, it's still an interpretation.   And unless you're arrogant enough to think that what you're doing is the way and the only way, I think there's room for every interpretation out there.

Q.   Did you think when you were -- started working on Shenandoah that your way was the only way to look at the data?

A.   I want to say no.   But perhaps my arrogance was a little too strong, and I thought I knew what I was seeing and trying to make other people see what I saw.   But in the end -- and I've said this before to a lot of the lawyers associated with this investigation -- I don't have a monopoly on interpretation.

Q.   When you say you don't have a monopoly on interpretation, does that mean that other views could have been correct?

MS. JENSEN:   Objection.   Calls for speculation.   Vague.

Page 223

THE WITNESS:  I am a believer in multiple working hypotheses such that no single interpretation is necessarily right or wrong at any given point.  So, yeah, I -- there's room for lots of interpretation.

BY MR. GRUENSTEIN:

Q.   You said that you said this to multiple or a number of lawyers in this investigation.

Does that include Rachel Jensen?

A.   Yes, it does.

Q.   When did you speak to Rachel Jensen prior to today?

A.   Our first Zoom interaction was in, I believe, January of 20- -- 2022.  A subsequent phone call in May of 2022.  I'll have to double-check my dates.  Was also part of the communication.

Q.   Do you know, roughly, how long you spoke to her for?

A.   On the Zoom call, I want to say approximately an hour, give or take.  On the telephone call, it was shorter, on the order of 15 to 25 minutes.  I don't recall.

Q.   And you said there could be multiple interpretations.  Did the partners in this case have multiple interpretations when you started off with

Page 224

Shenandoah?

MS. JENSEN:  Objection.  Vague.

THE WITNESS:  Based on the maps that I saw from their previous or prior presentations, many of which we looked at earlier, yes, they did have various and multiple interpretations.

BY MR. GRUENSTEIN:

Q.  Okay.  And you also testified that exploration and development had different interpretations at the outset of the project; correct?

A.  Yes.

Q.  And do you understand why it was communicated to you that there should be one set of maps presented from Anadarko?

A.  I do.

Q.  And what is the reason?

A.  With any dealings with partners, as a company, especially as an operator, you want to present a unified front.  You want to present consistency within so as not to seem disorganized or weak or fractured, especially as an operator.  We were an operator.  Exploration was in control.  I was the new kid on the block.  But if you're going to go forward, presenting to partners with a unified

Page 225

inter- -- front or interpretation, you're going to use the one that has been around the most, or at least has long -- has been -- been around for the longest time period.  And that was exploration's.  They had been working the project since before 2009.

Q.    You said exploration was in control.

What did you mean by that?

A.    The decisions at the time, and I'm referring to 2014, were controlled by the exploration group.  And the interpretation aspect of it was being generated by Beth Kendall and Jake Ramsey.  And while we may have had disagreements with them or some differences of opinion, it was their -- it was their project.  And, again, I'd like to consider myself a good soldier despite how frustrating it was during the latter half of 2014.

Q.    And why do you -- why do you say it was frustrating?

A.    Because I was the one coming up with a different interpretation, and I was the one whose interpretation was not being considered.

Q.    Did that get better after 2014?

A.    It did.  There was an evolution within the project, which came about with better communication and more wells, more data.  And as it evolved,

Page 226

things started to change, and our group started to get more involved, which was gratifying towards the end.

Q.    When you say not -- you know, that your views weren't considered, do you know that they weren't actually considered, or just that they weren't agreed with?

A.    I don't know.

Q.    We saw some e-mails where you started having discussions with partners where you sent your mapping.

Were you having discussions, kind of informal discussions, with people at the partners about your views and concerns?

A.    Informal, off-the-record discussions? Yes.

Q.    Approximately when did that start?

A.    As I men- -- as I mentioned, I'm fuzzy with dates.  But I want to say that started in the fourth quarter, probably, of 2014 in conversations with my counterparts at ConocoPhillips, Venari, and Cobalt.

Q.    A little further down in the e-mail we're looking at, 107, you say, "It's the same old battle of trying to live up to published expectations."

Page 227

What did you mean by "published expectations"?

MS. JENSEN:  Objection.  Asked and answered.

BY MR. GRUENSTEIN:

Q.   If you recall.

A.   I don't recall.

Q.   You als- -- you were asked the question, "Was the development team under pressure to live up to those published expectations," and you answered, "Yes."

What did you mean by that, pressure to live up to published expectations?

MS. JENSEN:  I believe that was asked and answered as well.

THE WITNESS:  I'm trying to remember, and drawing blank.

It's a way of taking bad data and not necessarily acknowledging it, and taking good data and applying it as best you can.  But regarding published expectations, nobody wants to see a field that, especially with a well that's got a thousand feet of oil in it, get diminished.

BY MR. GRUENSTEIN:

Q.   I'm going to move on to what we will mark

Page 228

# Exhibit 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

CHRIS CAMDEN

Thursday, July 14, 2022

Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5303669

Page 1

then we have to have the units be a volume.  So we have a -- a -- algorithms and processes to be able to estimate or calculate the -- the volume of oil in the rock.  And we do it -- we describe it as barrels per acre-foot.  So an acre in aerial extent and foot      17:00:26 in thickness.  That gives us a -- a way to calculate volumetrically how much oil's down there.

Q.   And -- and so, was that something that you were in -- in charge of calculating?  And by that I mean, the -- the thickness, for example?      17:00:49

A.   No.  I was responsible for the more -- so in -- on this -- what we can see on the screen here, so third column of data, which is called primary recovery efficiency, that is a subset of the barrel per acre-foot that we're talking about.  And so, I      17:01:11 focused on the primary recovery efficiency column, probably, the others, too.  But the petrophysicist would help us with the porosity and hydrocarbons saturation columns, the first two columns.  So the main column I was putting in here was primary      17:01:32 recovery efficiency.

Q.   Okay.  So the -- the last paragraph of your e-mail here, it says, "I do have WIW wells in the Peep case."  [As read]

What does -- what does that mean?      17:02:08

Page 190

A.   So -- those are water injection wells, so I guess I repeated the wells.  And that just was describing to Robert that I have included the cost of drilling water injection wells for pressure maintenance.

17:02:27

Q.   Okay.  And the -- so the cost of those wells is included in the PEEP software?

A.   Correct.

Q.   When it says, "The 24 wells I've quoted in the" -- "the" work -- "the spreadsheet is the number of OP's only" [as read], is -- what does "OP" mean?

17:02:48

A.   Oil producers.

Q.   Okay.  So -- and had Robert asked you to take a look at the development team's MMRA?

A.   I -- I don't remember who asked.  Someone did.

17:03:10

Q.   Do you recall in what context you were asked to look at the development numbers?

A.   No, not specifically.

Q.   Was it in one of the exploration team meetings?

17:03:37

A.   I -- I don't remember.

Q.   What was -- was it -- who decided to call RCT?  Was that the development team?

A.   I actually don't remember whose idea it

17:03:56

Page 191

was.  If -- if it was a -- a -- a group idea or an individual person, I don't remember.

Q.    And -- and you don't recall who -- who the individual is?

A.    No, I -- I -- I can't remember the genesis    17:04:14 of the idea.

Q.    Okay.  Was it Pat McGrievy?

A.    I -- I don't remember.  I really don't.

Q.    Was it -- was the genesis of it that the development team felt like they were getting    17:04:35 pressure to increase their numbers?

A.    Not -- no, I don't remember that at all.

Q.    Did -- do you recall any discussions about why the RCT was getting involved at this point?

A.    Well, as -- as you heard and you've seen    17:04:52 on the documents, there was a difference of opinion on the volumes between what development was calculating and what exploration was calculating.

And the -- the RCT exists for that very reason, to -- to evaluate our methodologies and our    17:05:11 assumptions and try to validate either one -- one group's work over the other or to suggest some additional ways to look at it.

So the minute we have -- we -- we realize we've got a difference in -- in either methodology    17:05:39

Page 192

or the volumes, then we need to bring RCT in.

That's -- that's -- that's why they're there.

Q.    Right.

But there had been a -- a difference in --
in the opinions of -- or there had been a difference    17:05:55
in the resource range for development and the
exploration team for quite a while by then?

A.    Correct.    But the -- one -- one -- one of
the great catalysts for that is when you get a new
well with new information, then both teams are going    17:06:10
to evaluate that information.

Q.    Right.

And so did you attend that RCT meeting
that occurred after -- after the voice mail and then
this e-mail that you sent to Robert Strickling?    17:06:25

A.    You know, I don't have any memory of it,
so I -- I can't say for sure that I did.

Q.    Do you recall that as a result of that
meeting there was a downward adjustment to the
exploration resource range?    17:06:43

A.    Not specifically, no, I don't remember
that.  I -- I don't remember the timing.  I know
that -- that we had numerous -- not just one or two,
but numerous meetings where we were working through
our evaluations.    17:07:09

Page 193

Q.   You mean with the RCT?

A.   No, internal, in -- within development -- or within exploration.

Q.   Okay.  So let's just stick with this RCT review, which was the subject of my question.                    17:07:29

So as a result of that RCT review, there was a downward adjustment to the exploration resource range; right?

A.   I don't --

MR. GRUENSTEIN:  Objection.                    17:07:45

THE WITNESS:  -- remember.

BY MS. JENSEN:

Q.   You can't recall, one way or the other?

A.   I -- I can't recall.

Q.   Okay.                    17:07:58

MS. JENSEN:  Let's go ahead and put up Tab 39.

(Camden Deposition Exhibit 172 was marked electronically.)

THE WITNESS:  Okay.  I have it.                    17:08:31

BY MS. JENSEN:

Q.   Okay.  We have marked as Exhibit 172 a document bears the Bates stamp APC-'220561.

Mr. Camden, do you recognize this document?                    17:08:53

Page 194

A.   I do.

Q.   Is this one of the documents that you reviewed in preparation for today?

A.   I think so.

Q.   And does this appear to be a true and accurate copy of an e-mail at the top that you exchanged with Chip Oudin on January 14, 2016, and e-mails below between yourself and folks from the exploration and development teams?     17:09:02

A.   Yes, it is.     17:09:27

Q.   Okay.  And is the context of this e-mail a follow-up from the RCT review that occurred in January of 2016?

A.   Yes.

Q.   And does this -- and this is -- this is what you said in the aftermath of that meeting, "this" being the January 13th e-mail that you sent?     17:09:41

A.   Yeah, I'm -- I'm just trying to verify, this was after that RCT meeting because I -- I don't -- I don't remember the -- the RCT meeting itself.     17:10:11

Q.   And do you recall that as a result of that meeting there was an agreement on joint distribution with a mean of 425 MMBOE?

A.   I don't remember that, but that's     17:10:31

Page 195

the numbers in here, but, you know, anything north of about a hundred million barrels is -- is pretty much world class, and we still had an enormous resource in place that we had discovered.  So it -- it didn't -- it was still huge.                17:55:56

Q.   What -- what does it mean to you for a well to be successful -- an appraisal well to be successful?

A.   Well, of course, you know, first off, it has to be, you know, something that we've drilled    17:56:09 safely, so we didn't have any, you know, issues with personnel safety.

Second, of course, we want to be environmentally responsible.  So if we could drill a well that we drilled it safely without any incidents    17:56:25 or any reason, we didn't have any environmental issues, that would be a successful well.

As far as gathering data, every well gathers data.  So we were able to drill the well safely, no environmental issues.  We gathered a    17:56:38 bunch of data that we were able to use to refine our estimates.

So, you know, the -- this -- sometimes wells don't even go down.  You have to junk them, and you don't get anything out of them.  That would    17:56:52

Page 220

be an unsuccessful well.

Q.   How about information about the sands?

A.   Oh, it was -- it -- I mean, this was -- this was very encouraging, because when we drilled the well, of course, we were not sure what the sands were going to do as we stepped out away from the Number 2 well, and -- and they thickened up considerably, which is that's a great sign because any estimates that we were doing from the new -- Number 2 well, we didn't make any assumptions that the sand would thicken at all.

So once we drilled the Number 3 well, we found an even thicker sand pile, so it -- it was encouraging that the sands didn't thin out or, you know, somehow go away.

Q.   And from all of those perspectives, did you have a view as to whether Shen 3 was a successful appraisal well?

A.   Well, I mean, that was always considered a successful appraisal well.  It -- it was a disappointing result in oil, but it was a successful appraisal well.  But appraisal -- the appraisal programs are designed to eventually find out where the reservoir isn't.

Q.   Tell me a little bit about the -- what you

17:57:06

17:57:20

17:57:38

17:57:53

17:58:07

Page 221

learned about oil-water contacts.

A.   Well, in -- in this --

MS. JENSEN:   Objection.  Objection.

Vague.

BY MR. GRUENSTEIN:                          17:58:20

Q.   Go ahead.

A.   Okay.  So in this one, we did not penetrate an oil-water contact, but we were able to use the density of the water and the pressures of the water to project back up towards the Number 2   17:58:34 well and infer an estimated oil-water contact.

Q.   So what -- what do -- what do you mean by "project" --

A.   Well --

Q.   -- in this context?                   17:58:50

A.   -- the -- the -- the -- so the water density is different than oil density.  So you can take the slope of the water density line and project it, sort of up dip until you hit -- intersected this slope of the up-dip oil projection, and the       17:59:08 intersection of those two would give you the inverted oil-water contact.

Q.   Okay.  And when you use "inferred," are you using it in the same way as "projected"?

A.   Projected or estimated.  I mean, oil-water   17:59:24

Page 222

contacts are almost always estimated early on because you don't have the good fortune of drilling a well right exactly in the oil-water contact.

Q.   And do you draw a distinction in your mind between establishing the oil-water contact and projecting the oil-water contact?          17:59:38

A.   Oh, absolutely.  Establishing would be, you actually penetrated it, and you can see it on a log and you can take samples and -- you know, in the oil column and in the water column and know exactly          17:59:50 where the water contact is -- oil-water contact is.

If you've projected it or inferred it, then it's still an estimate.

Q.   And to what extent were you able to use MDT pressure data in the projecting of oil-water          18:00:04 contacts?

A.   Yeah, I mean that's -- that's --

MS. JENSEN:  Vague.  Vague.

Go ahead.

THE WITNESS:  So that's imperative because          18:00:15 the -- you have to establish a pressure gradient through the sand in order to be able to project it. So that's the only data you can use is if you have multiple pressure points in the sand to establish a gradient, which you can then project back towards          18:00:33

Page 223

the oil column.

BY MR. GRUENSTEIN:

Q.    So, Ms. Jensen asked you the following question, and you gave the following answer.

She said, "Anadarko never got a good handle on the OWCs outside of the Shen 2 fault block, did they?"

And you said, "Correct."

What did you mean by that?

A.    Well, I would define a good handle as I actually have penetrated the contacts, and I know exactly where the oil-water contact is.

If I'm projecting using pressure data, then it doesn't give us the ideal confidence to do our well placement because we might start drilling development wells and end up placing one in the water column because we haven't defined it exactly.

Q.    I want to now introduce one document into evidence [verbatim].  And let me see what exhibit number this will be.

MR. GRUENSTEIN:  Am I correct that it will be 178?

MS. JENSEN:  I believe it's 178.

MR. GRUENSTEIN:  Okay.  Thank you.

(Camden Deposition Exhibit 178 was marked

Page 224

electronically.)

THE WITNESS:  Is that a new one or did we --

BY MR. GRUENSTEIN:

Q.  We're -- we're going to put a new one up.    18:02:03

A.  Okay.

Q.  This is something Ben and I discussed and he knows what to put up.

A.  One moment.

Q.  It's a PowerPoint presentation.    18:02:08

A.  Hmm, my little scroll bar went away again.

Q.  Well, as you're -- as you're finding it, I will read the Bates number into the record.

MR. GRUENSTEIN:  It's APC-01166304.

And it is a PowerPoint entitled    18:02:50 "Shenandoah Fault Block Resource Assessment, 1/27/2016."

BY MR. GRUENSTEIN:

Q.  Do you remember -- do you recognize this presentation?    18:03:08

A.  I have not been able to get --

Q.  Oh, I'm sorry.  Got it.

A.  I -- you know, we have so many documents open, I'm reluctant to close any to make that one expose.  It's off the screen, and I don't have a    18:03:19

Page 225

scroll bar anymore for some reason.  I just tried a couple of things to minimize it.

MR. GRUENSTEIN:  Let's go off the record 'til you find it.

THE VIDEOGRAPHER:  All right.                    18:03:32

We're going off the record.  The time is 6:03 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We're back on the record.  It's 6:06 p.m.                              18:06:24

Go ahead.

BY MR. GRUENSTEIN:

Q.   Mr. Camden, I'm showing you what's been marked Exhibit 178.  It's a slide deck entitled "Shenandoah Fault Black Re-" -- "Fault Block          18:06:35 Resource Assessment," January 27, 2016.

Do you recognize this presentation?

A.   Yes.

Q.   And what is it?

A.   This was some sensitivities that we did on   18:06:51 various fault block models to just determine what the resource ranges could be under various sensitivities.

Q.   Okay.  When you say "sensitivities," what are you referring to?                                 18:07:12

Page 226

# Exhibit 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

_____
                              )
In re ANADARKO PETROLEUM      )
CORPORATION SECURITIES        )Civil Action No.
LITIGATION                    )4:20-cv-00576
                              )
_____)

CORRECTED TRANSCRIPT

VIDEOTAPED REMOTE DEPOSITION OF ROBERT STRICKLING

Deponent testifying from Owenton, Kentucky

Thursday, July 21, 2022

Volume I

Stenographically Reported By:

Melissa M. Villagran, RPR

CSR No. 12543

Job No. 5306719

PAGES 1 - 234

Page 1

have to keep it on your books until you get

production, and then you're going to have to

depreciate it as a -- as you would any other capital

investment.

Q   And you said until you get production; is     12:55:08

that right?

A   Yes.

Q   And you told me that you understood that Shen

3 would not be a producing well, correct?

A   Yes.  Shen 3 would not be a producing well,     12:55:18

unless it was successfully sidetracked to a

different location.  As it -- as it sat there, yes,

it would not be a producing well.

Q   Okay.

So when you -- when you tell me that you     12:55:31

would capitalize until you got production, what do

you -- what do you mean by that?

A   Well, it's -- an individual well is part of

an overall development.  You don't -- you -- you --

you capitalize your investments and then write them     12:55:46

off against production, as opposed to just expensing

everything as you spend it.

Q   But you had the option to expense Shen 3,

correct?

A   I believe we could have, yes.     12:56:04

Page 61

Q   And you understand that when a well is a dry hole, it should be expensed, correct?

MS. ROSENBERG:  Objection to form.

THE DEPONENT:  I -- no.  I understand that if a well is part of a dry prospect project, you   12:56:13 expense it.

BY MR. DROSMAN:

Q   In other words, if all of Shenandoah was dry, then you would have to expense --

A   Yes.   12:56:25

Q   -- Shen 3; is that right?

A   Because you have nothing -- you would have nothing to depreciate it against.

Q   Okay.

But because there were other wells in   12:56:31 Shenandoah that had oil, you didn't believe you needed to capitalize Shen 3, despite the fact that it would not be a producing well, correct?

A   Because it was potentially part of an overall development, that's correct, we didn't expense that   12:56:45 particular well bore.

Q   And that was the basis that the three of you decided not to expense Shen 3; is that correct?

MS. ROSENBERG:  Objection to form.

THE DEPONENT:  Again, I'll go back to our --   12:56:55

Page 62

our accounting person recommended that we capitalize it because it's a successful appraisal well, and we agreed.

BY MR. DROSMAN:

Q    When you say "it was a successful appraisal    12:57:10
well," what do you mean by that?

A    I mean we drilled a well, and it showed us that we had down-dip sands and lateral continuity. Helped us define the field.

Q    But you knew that Shen 3 wouldn't be a    12:57:24
producing well, right?

A    As it stands today, Shen -- as it was -- sorry.  As it was -- at that point, without some sort of additional drilling, yes, it would not be a producing well.    12:57:37

Q    Okay.

Does it comply with accounting standards to capitalize a well when it's a dry hole, despite the fact that it's in a field that otherwise may produce oil?    12:57:51

MS. ROSENBERG:  Objection to form.

THE DEPONENT:  I'm not an accountant, and I can't answer that, but yes, I assume our accountant would know that.

MR. DROSMAN:  Why don't we turn to what I'll    12:58:05

Page 63

mark as Plaintiff's Exhibit 11 for identification.

(Exhibit 181 was marked for identification and is attached hereto.)

BY MR. DROSMAN:                                             12:58:40

Q   Okay.

You can go ahead and refresh your browser, and you should have Plaintiff's Exhibit 181 in front of you.

MR. DROSMAN:  And while you're looking at   12:58:45 Plaintiff's Exhibit 181, I'm just going to note for the record that it is a two-page e-mail string bearing Bates numbers APC-401795 to 1796.

BY MR. DROSMAN:

Q   And just let me know when you've had a chance   12:59:03 to review Plaintiff's Exhibit 182 -- or 181.  I apologize.

Have you had a chance to review the document?

A   I have.

Q   Okay.                                                12:59:43

Do you recognize this particular e-mail string?

A   No, I don't.  I mean, I don't remember it.

Q   Do you see that the e-mail second to the top is from Jeff Pachman?                                       12:59:59

Page 64

A    Yes.

Q    And it's dated January 7, 2015, correct?

A    Yes.

Q    And it's to you, Diane Sease, Pat McGrievy, and Tim Trautman, right?                    01:00:11

A    Correct.

Q    And the subject is "FW," forward, "Shenandoah WR52 #2 Accounting."

Do you see that?

A    Yes.                                           01:00:21

Q    And it looks like the e-mail from Pat McGrievy below that is the same e-mail that we saw in Plaintiff's Exhibit 180.

Do you see that?

A    Yes, I do.                                     01:00:32

Q    Okay.

But the text from Mr. Pachman is new to this particular exhibit, correct?

A    Correct.

Q    And Mr. Pachman wrote to you and others (as    01:00:39
read):

"FYI.

"Spoke with my counterpart this

morning about a few things at

Shenandoah and just wanted to pass    01:00:50

Page 65

MR. DROSMAN:  You know what, you're right.  I apologize.  Let me -- let me show you -- why don't we table Exhibit 182, and I'll show you Exhibit 183 instead, which I think -- believe is what I just introduced or just discussed.                    01:06:41

(Exhibit 183 was marked for identification and is attached hereto.)

MR. DROSMAN:  Okay.

Plaintiff's Exhibit 183 consists of the            01:07:01 e-mail and PowerPoint presentation attachment that I just read the Bates numbers for.

BY MR. DROSMAN:

Q   And let me know if you recognize this particular e-mail and attachment.                       01:07:16

Have you had a chance to review the document, Mr. Strickling?

A   I'm doing it right at the moment.

Q   Okay.

Just let me know when you are through.            01:08:32

A   Okay.

Q   Okay.

Do you recognize this e-mail and attachment?

A   This specific e-mail, probably not, but the topic, yes.                                          01:09:55

Page 71

Q   Okay.

Do you understand that you received this e-mail; is that correct?

A   Yes.

Q   On or about February 18, 2014, right?                01:10:01

A   That's correct.

Q   And you received it from Lea Frye; is that correct?

A   Yes.

Q   And the subject was "2014-02_Kleckner_rev            01:10:09
1.ppts," correct?

A   Yes.

Q   Which is really just the title of the PowerPoint document that's attached, correct?

A   Correct.                                             01:10:23

Q   And this is a PowerPoint document for presentation to Mr. Kleckner; is that right?

A   Yes.

Q   Okay.

Is this a true and accurate copy of the                01:10:32
e-mail and attachment that you received on or about February 18, 2014 from Ms. Frye?

A   I don't know, because it's missing parts, but it could have been a preliminary one.

Q   I'll represent to you that this was how your       01:10:51

Page 72

counsel produced this e-mail and attachment to us.

A    Okay.

Q    Is there any reason to believe that it is not a true and accurate copy?

A    No.                                                    01:11:08

Q    And Ms. Frye, who is she?

A    She would have been the reservoir engineer in development or producing department assigned to Shenandoah.

Q    Okay.                                                  01:11:27

And development is distinct from exploration, correct?

A    Yes.

Q    What's the difference between the two?

A    We answer to two different management          01:11:37
structures.  We're focused on finding new places to drill, new prospects, new basins to open up.

And development is focused on actually putting in developments and producing oil for gas.

Q    And did you understand to whom Ms. Frye       01:11:53
reported?

A    Yes.  She reports to development.

I use development and producing interchangeably, by the way.

Q    Okay.                                                 01:12:07

Page 73

Is development also called deterministic?

A   Is development also called deterministic?

Q   Correct.

A   I don't understand the question.  Is development called deterministic?

01:12:17

Q   Yeah.  Go ahead and turn to page 8 of the presentation, the attachment.

A   Okay.

Q   Are you on that page?

And do you see it says, "Deterministic Case Assumptions" on that page?

01:12:40

A   Yes.

Q   And that refers to development's case assumptions, correct?

MS. ROSENBERG:  Objection to form.

01:12:51

THE DEPONENT:  In the context here, yeah, I believe so.

BY MR. DROSMAN:

Q   Let's turn back to the first page of the document, Plaintiff's Exhibit 182 -- 183.  And it reads (as read):

01:12:59

"Changed to the $95 pricing and will let you know what Darrell is thinking tomorrow after we show him our assumptions.  If he wants to show

01:13:13

Page 74

the exploration economics, I will make sure we have you and Blakeley at the meeting."

Do you see that?

A   Yes.                                                  01:13:20

Q   And you understand that "Darrell" refers to Darrell Holleck, right?

A   That's correct.

Q   And he was the senior V.P. of deepwater America operations, correct?                                  01:13:30

A   Senior V.P. at this point?  I'm not sure.  Or if he -- no, I believe he answered to Kleckner.  I don't --

Q   And Mr. Kleckner was --

A   I don't know if he was the senior V.P. at     01:13:46 this point or not.

Q   Okay.

And you said he reported to Mr. Kleckner; is that right?

A   Well, again, I -- I'm not certain when the    01:13:56 changes took place, but I'm -- I'm thinking that Holleck wasn't senior V.P. at this point.

Q   Was Mr. Holleck on the executive committee?

A   He wouldn't have been if he wasn't the senior V.P. at this point.                                       01:14:13

Page 75

We are back on the record at 1:56 p.m., and this is the beginning of Media Unit No. 2.

Go ahead, please.

BY MR. DROSMAN:

Q   Mr. Strickling, before we broke, we were    01:56:50
talking about the different sets of economics for
Shenandoah for development versus exploration.

Do you recall that?

A   Yes.

Q   Okay.    01:57:05

And you didn't want to show two different
sets of economics for Shenandoah, correct?

A   That -- that's correct.

Q   Okay.

Why is that?    01:57:13

A   Because that would just be confusing for
anyone watching the -- watching the presentation.

Q   And so what was your suggestion with respect
to showing a single set?

A   Well, I would assume we would have gone with    01:57:32
our economics, but I believe development went with
their own on this particular presentation.

Q   In other words, you would assume that
exploration's economics would have been shown to
Mr. Kleckner and Mr. Holleck?    01:57:54

Page 83

A   Yes.  And they could have -- and development could have run a -- a sensitivity on it or said, here's something that we're looking at, but they would have had to frame it as a -- just a -- just a scoping study.

01:58:08

Q   Why did --

A   Because it's still an exploration prospect at this time.

Q   Why did you want to show exploration's economics for Shenandoah over development's?

01:58:17

A   Because it's an exploration project, it hasn't been turned over to development at the moment, and we -- we do exploration resource economics, and they tend to focus on reserves, SEC-mandated reserves.

01:58:35

Q   When was the project turned over -- the Shenandoah project turned over to development?

A   I don't think it was ever officially turned over to development.  That's why we were still drilling appraisal lines.

01:58:52

It's our job to help define -- or it's our job in exploration to define the size of the field.

Q   And did you --

A   And development comes -- comes in early to get a heads-up so they know what's coming to them

01:59:03

Page 84

later on.

Q   Okay.

So throughout 2014, I take it, that you believed that exploration's economics for Shenandoah were more accurate than development's; is that fair?    01:59:17

A   More accurate, no.  Just different.  Ours took the full range of resources, and they tended to focus on what they could quantify as a reserve.

Q   You told me that you thought it made sense to show Mr. Kleckner and Mr. Holleck exploration's    01:59:33 economics for Shenandoah rather than development's, right?

A   I would have assumed we would have shown ours, and ours should have been the official economics until it was turned over to development.    01:59:52

Because in -- in an -- in an ideal case, we would work with development.  Things that they knew more about, like costing out an exact platform, they would pass the data back to us.

But to do a complete distribution of what the    02:00:08 prospect might mean, that's -- that's still in exploration's purview.

Q   So it would make sense to show management exploration's numbers and not development's; is that fair?    02:00:24

Page 85

A    Right, at this point, yes.

Q    Okay.

And throughout 2014, would that -- would that have made sense?

MS. ROSENBERG:  Objection to form.          02:00:28

THE DEPONENT:  It would just depend on as the data becomes available, the two numbers should actually collapse together, based on how much oil we think we found.

BY MR. DROSMAN:                              02:00:42

Q    And if they don't collapse together, what's the solution?

A    We need more data.

Q    Whose numbers do you go with?

A    If we haven't turned it over to development   02:00:50 yet, it would be ours.

Q    And you told me that you didn't turn it over to development, at least during 2014, correct?

A    Yes.  Development was involved, but it was still in our shop, because we were still drilling   02:01:08 exploration wells -- I mean, sorry, appraisal wells.

(Exhibit 184 was marked for

identification and is attached

hereto.)

///                                          02:01:20

Page 86

BY MR. DROSMAN:

Q   Okay.

I'm going to show you what has been marked as Plaintiff's Exhibit 184 for identification.  And that should be up on -- in your browser now, if you   02:01:30 want to refresh it.

MR. DROSMAN:  And for the record, Plaintiff's Exhibit 184 consists of a single-page e-mail bearing Bates No. APC-00609741.

BY MR. DROSMAN:                                          02:01:46

Q   And just let me know when you've had a chance to take a look at it.

A   Okay.

Q   Do you recognize this e-mail?

A   Yes.                                                02:02:28

Q   Why do you recognize it?

A   Why?  Just it was -- that meeting was rather important, because it came back that -- that they had shown a very different number than we had shown.

Q   When you say "that meeting," what are you   02:02:48 referring to?

A   The one where they went over it with Kleckner.

Q   And when you say "the one they went over," who -- who's "they" in that sentence?                  02:02:57

Page 87

# Exhibit 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM          ) Civil Action No.

CORPORATION SECURITIES            ) 4:20-cv-00576

LITIGATION                        )

_____ )


VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

PATRICK McGRIEVY


Wednesday, August 24, 2022

Remotely Testifying from Houston, Texas


Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5344464

Page 1

pre-" -- "would anticipate that our spending pace will change." [As read]

Q. Okay. Thank you.

A. Mm-hmm.

Q. So your reference there to the barrels in place, that referred to the gross barrels?                    16:33:52

A. That's correct.

Q. As -- as opposed to -- so that's the amount of oil that you think is in the ground as opposed to what you can retrieve; right?                    16:34:07

A. That's correct.

Q. And so, the results of Shen 4 were a loss of, essentially, one-third of the projected oil; right?

A. Yes, about a billion barrels, almost a billion barrels.                    16:34:20

Q. And you wanted Mike and Jennie to keep a tight lid on these results because it was a negative imp- -- -- a negative outcome; right?

A. It was in the negative outcome, but it was also preliminary data that we were using, so I don't like information to get out that's its preliminary. I just don't want them to start thinking about what they need -- need to do next.                    16:34:37

Q. And, in fact, the -- the TD was in salt;                    16:34:52

Page 209

right?

A.   Yes, it was.

Q.   And that was a negative piece of information; right?

A.   It certainly wasn't positive, yeah.          16:35:00

Q.   And -- and you say here this is a negative piece of information?

A.   Right.

Q.   And so, you were worried about word getting out to the partners?          16:35:14

A.   I was -- no, I think it was more so worried about just being preliminary information and things can get twisted, e-mails sent around.  And I prefer to make sure we have a concrete estimate before we actually go out with numbers like this,          16:35:33 because it was disappointing.

Q.   And -- and that --

A.   And it would just -- and that would include our -- our partners as well.

     I'm sorry.          16:35:40

Q.   Okay.  And, in fact, given that the results were that it drilled into salt, it did have a profound view on how Shenandoah was viewed going forward, didn't it?

A.   From what -- who's perspective?          16:35:54

Page 210

Q.   From the company's perspective.

A.   Okay.

Yes, I -- I assume that it did, yes.

Q.   And it continued to cast serious doubt on the commerciality of Shenandoah; right?                16:36:13

MR. GRUENSTEIN:  Objection.

THE WITNESS:  It was -- it was a disappointing result.

BY MS. JENSEN:

Q.   And it was the loss of one-third of the        16:36:23 resource range, at least preliminary?

A.   That's -- that's accurate.

Q.   So Lea responds to this e-mail, and in her e-mail -- I'm sorry.

So the -- the sequence of events is that        16:36:43 Jennie forwards this to Lea.  E-mails are like that. And Lea responds to Jennie.  And in her e-mail, she says, "Think about exit strategy and what that looks like."  [As read]

(Interruption in audio/video.)                  16:37:05

THE COURT REPORTER:  One second, please.

BY MS. JENSEN:

Q.   About this time, there was internal thinking on an exit strategy and what that would look like with respect to the Shenandoah prospect;      16:37:15

Page 211

right?

A.   Yes.   Looking at other options, I would say -- I would say that exit strategy might be a little harsh.   I think it was looking at other potential options.   It was an optionality exercise.    16:37:32

Q.   And Lea's words were "exit strategy"; right?

A.   You can call it that.   You can call it an -- an optionality exercise too, looking at other options.    16:37:42

Q.   Sure.   But that's what her e-mail said, was "exit strategy"?

A.   Yes, that's what she -- the way she termed it.

Q.   Okay.   And also was contemplating what we    16:37:49 may -- might be prepared to show Bob and -- and Jim. And what's your understanding of who Bob and Jim are in this context?

A.   Probably Bob Daniels and Jim Kleckner, that would be my -- certainly Jim Kleckner and maybe    16:38:08 Bob Daniels, I would suspect.

Q.   And was there, in fact, a presentation after this to Bob and Jim about what exit strategies might look like?

A.   Yes, I do recall one.   Yeah.    16:38:18

Page 212

Q.   And was it also presented to the executive committee?

A.   I don't recall whether we pro- -- prod- -- produced it to them or not.  It's -- but I'm certain we gave it to Jim Kleckner.                    16:38:34

Q.   And you would expect for Jim Kleckner to advise the executive committee that there was a -- a contemplation of an exit strategy at this point?

A.   An optionality strategy.  I like to call it that.  I would hope so, yes.                    16:38:52

Q.   It's functionally the same thing?

A.   It's not.

Q.   Okay.  Well, exit strategy was the verbiage here.

After Shen 4, the development team                    16:39:01
presented on the Shenandoah prospect to the executive committee; right?

A.   Probably so, yes.

Q.   And after the results of Shen 4, the executive committee lost interest in developing                    16:39:25
Shenandoah as an operator; right?

A.   What time frame was that?  Can you --

Q.   Post Shen 4, early 20- -- 2016.

A.   Yeah, there was -- there was talk about it, right.                    16:39:42

Page 213

Q.   And the CEO, Al Walker, didn't want to continue to develop Shenandoah as an operator after Shen 4; right?

A.   I thought it was later than that, but, you know, I -- I would call it being later than 2015, but maybe I'm wrong.  But I -- I -- it's going to --                16:40:05

Q.   Or early -- or early 2016?

A.   Okay.  Probably so, yeah.

Q.   Just returning to optionality.  An optionality study would include an exit strategy; right?                16:40:20

A.   Yes, it would.

Q.   Okay.  Do you recall after Shenandoah 4, you coordinated an RCT review of Shenandoah?

A.   I didn't coordinate it.  I suggested it be done.                16:40:38

Q.   Okay.

A.   Yeah, I didn't coordinate it.

Q.   All right.

Who coordinated it?                16:40:45

A.   It would have been the RCT leader, which I think was Matt.  I don't recall his last name, but he was actually the RCT manager.  But I suggested it be done between exploration and development.

Q.   Was it Matt Morris?                16:41:02

Page 214

because we didn't -- we did not develop those maps.

Q.   Okay.  You were asked a question where Ms. Jen- -- Ms. Jensen referred to the unfaulted maps that were ethically questionable.

Were you saying that the maps themselves    18:46:57 were question- -- ethically questionable for exploration to present or just for you to present them, since you didn't actually prepare them?

MS. JENSEN:  Objection.  Leading. Compound.  And asked and answered.    18:47:07

THE WITNESS:  What I was suggesting was that it wasn't good for me to support them because they were not the development maps.  The exploration team should be presenting their own information, their own data.    18:47:23

BY MR. GRUENSTEIN:

Q.   So as to address the objection that Ms. Jensen had, I'll -- I'll just ask the question again.

Were you suggesting that it would be    18:47:31 unethical for the exploration team to be presenting these maps?

A.   No.

MS. JENSEN:  Objection.  Asked and answered.    18:47:41

Page 283

BY MR. GRUENSTEIN:

Q. I want to look at Exhibit 271. And in particular, I believe it's Slide 11 that Ms. Jensen was asking you questions about. Oh, no. I'm sorry. It was Slide 9.                                                   18:48:11

So, again, I'm showing you 271 and Slide 9 in the attachment.

Again, can you explain what the "200 MBOE" refers to?

A. The 200 MBOE, it's 200 million barrels, by                                                             18:48:29 the way. It's not 200,000 barrels. It should be 200 million barrels. That's the economic limit for Shenandoah, given the input parameters for the PEEP economic case. It does not --

THE COURT REPORTER: What case? What                                                                        18:48:50 economic case?

THE WITNESS: The -- the PEEP, P-E-E-P, economic case that was generated. It does not infer that the size of the field at the time is 200 million barrels. All that tells us is that that's                                 18:49:00 what we need to achieve for a standalone spar facility with the given oil price of $60 per barrel.

Q. And then on the tree diagram above that, it says, "Success, 88.2%; Fail, 11.8%."

What does that refer to?                                                                                   18:49:22

Page 284

A.    What that refers to is the reserve resource distribution that they used to understand what the chance of success would be and what the chance of failure would be, given the investment of a standalone spar cost.                                        18:49:40

So at this point in time, they were using that resource distribution that's alluded to in another slide in this particular presentation.  And it's an 88 percent probability of success and, essentially, a 12 percent probability of failure at    18:49:55 the --

Q.    And what does it mean?  Oh, I'm sorry.  Go ahead.

A.    I'm just saying at the time, we viewed this field as definitely very viable commercial        18:50:01 going forward.  That's what that's inferring.

Q.    And when you say "88.2 percent success," can you explain what that means?

A.    That means that we have a probability of a -- a standalone spar facility development going    18:50:14 forward --

Q.    Okay.

A.    -- 88 percent probability that we'll have a successful field development.

Q.    Once development took over control of the    18:50:26

Page 285

project, did you have any -- did you have a view as to the potential success of this field?

A.    We -- we set the clock, I guess, it's -- would be the way to put it.  We -- we threw out exploration's numbers and we started using our own.    18:50:47 So, yeah, we still felt really good about potential chances of successful development as per this slide.

Q.    And why did you end up doing -- drilling a Shen 5 and a Shen 6?

A.    Because we needed to understand the    18:51:02 resources in those particular areas to be able to move forward with a successful development.  We needed to understand.  We hadn't -- we hadn't reached material volumes to achieve a -- a -- an economic prospect at that point in time.  So we    18:51:20 needed to continue to drill and appraise.

Q.    Okay.  During -- during your testimony, you were asked questions about the phrase "exit strategy."  And you said that you preferred the word "optionality."    18:51:33

Why do you prefer optionality to exit strategy?

A.    Well, I would say that every -- every project has a -- has an ex- -- should have an ex- -- exit -- exit strategy, but -- and given context of    18:51:46

Page 286

the presentation here, what we wanted to illustrate was that there's plenty of upside in this field to be able to reach a -- an economic project going forward.

And so, in that flavor, we felt like we 18:52:00 could go forward with what we felt like we had in those resource distributions.

Q. And during this presentation, were you recommending that the company exit Shenandoah?

A. We did not recommend that. We just wanted 18:52:14 to make sure that they -- that they understood it -- it is an option. We have multiple options going forward, big -- big, medium, small cases, and then, of course, the exit strategy.

Q. Let's look at Slide 14. 18:52:28

And what does this slide show where it discusses "Shen 5 success" and "Shen 6 success"?

A. So let me just start. The current proven resources that had been established were somewhere around 30 to 70 million barrels of oil equivalents. 18:52:57 That -- that's on a net basis, by the way. So the gross was 200 million barrels.

And after Shen 5, what we would have projected in the success case was the resources moving up to 500 million barrels or about 70 to 180 18:53:14

Page 287

million barrels net.

And then up to -- after Shen 6, in a success case, that resource could have been as large as 2.2 million barrels of oil equivalents or on a net basis, 315 to 800 million barrels of                    18:53:30 equivalents.

Q.   And if -- if both of those, Shen 5 and Shen 6, had been successful, would the Shenandoah project have been successful?

MS. JENSEN:  Objection.  Leading.                    18:53:45

THE WITNESS:  Yes, that is -- it would have been successful because if you look at the Shen 6 and you recall the 200 million barrel of oil equivalent threshold, the 315 to 800 million barrels of oil equivalents would have been well within that    18:54:00 range of commerciality.

BY MR. GRUENSTEIN:

Q.   Did you know before you drilled Shen 5 and Shen 6 what the results would have been?

A.   Of course not.                    18:54:08

Q.   And -- and, again, if the results had been positive, as shown here on these slides, how successful would the Shenandoah project have been?

MS. JENSEN:  Objection.  Calls for speculation.                    18:54:24

Page 288

THE WITNESS:  Depending upon where you were on that distribution of 315 to 800 million barrels of oil equivalents, certainly on the 800 mill- -- million barrel equivalent, it would have been a very, very, very successful case.  And 315 would be a -- be a good outcome, but -- but not -- certainly not as good as a -- a great outcome like it would be at an 800 million barrel.  But anywhere within that distribution, it would have been very economic and proceeded to go forward with.

18:54:39

18:54:48

MR. GRUENSTEIN:  Okay.  I have no further questions.

MS. JENSEN:  Okay.  We're going to take a quick break.  So I'd say five minutes.

THE VIDEOGRAPHER:  Going off the record, 6:54 p.m.

18:55:02

(Short recess taken.)

THE VIDEOGRAPHER:  Back on record, 7:25 p.m.

FURTHER EXAMINATION

19:26:18

BY MS. JENSEN:

Q.  Okay.  Mr. McGrievy, could you turn back to Exhibit 116, please.

A.  Okay.

Q.  And could you please turn to the third

19:26:42

Page 289

e-mail down on this string.  This is an e-mail from you to Darrell Hollek and on November 17, 2014.

And could you read into the record your e-mail starting with "We also have to come to terms with."                                                    19:27:04

A.   "We also have to come to terms with an internal map that both exploration and development can support as they still show acknowledgement of faulting; this, however, will not be deliverable for some time.  It's hard to go to partner meetings with   19:27:20 a straight face and not acknowledge faulting when all of our partners externally share the same concerns."  [As read]

Q.   And the "they" in this -- in the portion of the e-mail that you just read is exploration;   19:27:37 correct?

A.   That's correct.

Q.   And it was hard to keep a -- a straight face regardless of whether exploration was presenting a map with no faulting or development   19:27:52 was; correct?

A.   The inference there is that we didn't support their maps because we developed our own, and they, in turn, developed their own as well, so...

Q.   Well, that's -- that's not exactly the   19:28:08

Page 290

question I asked, Mr. McGrievy.

My question was:  It was hard to go to partner meetings with a straight face, no matter whether it was exploration presenting it or development; correct?                          19:28:18

A.   That's correct, yeah.

Q.   Okay.  Mr. Gruenstein asked some questions of Exhibit 271.  Could we turn back to that, please.

While you're doing that, I just want to confirm that all of the -- the documents that          19:28:44 Mr. Gruenstein asked you about were documents that you went over with him in preparation for the deposition; correct?

A.   I've seen this, yes.

Q.   Okay.  And this is one of the documents    19:28:52 that you went over with Mr. Gruenstein in preparation for today?

A.   I believe so, yes.

Q.   So the context for this presentation that was being given, was -- this was right after it --    19:29:06 the project was formally turned over to the development side of the house; correct?

A.   I think so, yes.

Q.   And so, this was a time at which the development team was trying to make a case for Shen;   19:29:26

Page 291

# Exhibit 7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM    ) Civil Action No.

CORPORATION SECURITIES      ) 4:20-cv-00576

LITIGATION                  )

_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

DARRELL HOLLEK

Thursday, September 1, 2022

Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5378973

Page 1

the record.  It's 1:32 p.m.

(Hollek Deposition Exhibit 287 was marked

electronically.)

BY MS. JENSEN:

Q.   Okay.  I've marked as Exhibit 287 a          13:33:26

document that bears the Bates stamp APC '609755.

A.   Let me catch up here.

I see it.

Q.   Do you see it?

A.   Yeah, I -- I have it.                         13:33:42

Q.   Okay.  Great.

So the e-mail starts the same as the one

we just saw, and then there is additional e-mails.

And my first question will be whether it

appears to be a true and accurate copy of an e-mail    13:33:55

between yourself and David Janise at the top.

A.   Okay.  I've read it.  It looks accurate.

Q.   Okay.  And could you, first of all, tell

me who David Janise is?

A.   He may have been my planner at that point.   13:34:46

Again, they come in and out, but he may have been my

planner at that point, sort of my right-hand guy to

pull stuff together.

Q.   Is -- is it kind of as a -- an executive

secretary or chief of staff type of role?           13:35:04

Page 103

A.   Yes.   Yes.

Q.   Okay.  And so he's -- he's not a scientist on the team?

A.   No.  He would have been a planner.  He's a reservoir engineer by degree.                    13:35:14

Q.   Okay.  I see.  All right.

So could you read your e-mail, please.

A.   "Start from Jim's e-mail below.  Appears we need to pull this together in short order. Unfortunately, much of our future is based on       13:35:32 Ernie's view of exploration opportunities.  I think we need to work through costs of doing business, regulations, skilled work force, 20K technology, and what does Gulf of Mexico mean to us, maintaining conventional expertise, feedstock for                  13:35:49 International." [As read]

Q.   Okay.  That -- that's -- that's good.

And your reference there to "Unfortunately, much of our future is based on Ernie's view of exploration opportunities," you're    13:35:59 referring to Ernie Leyendecker -- Ernie Leyendecker?

A.   Yes.

Q.   And you disagreed sometimes with Ernie Leyendecker's perspective on the exploration's opportunities?                                       13:36:13

Page 104

A.   Disagree, I don't know that I disagree. It was just important for -- because he was the feedstock to development.  So whatever came out of exploration, that is our future.

So we develop it.  We know what it is.   13:36:23 And then beyond that, we have to look at what's coming our way from exploration.

Q.   And sometimes his views were overly optimistic; right?

A.   I wouldn't say necessarily.  We've missed   13:36:35 developments on the upside and the downside.

Q.   The ex- -- the exploration it's -- it's well known had different drivers from the development team; right?

A.   Well, yes, their job is to try to figure   13:36:49 how big it could be, and ours is to try to find out do we have enough to spend the money needed to develop it.

Q.   And sometimes -- well, strike that.

And -- and based on the drivers,   13:37:03 exploration was known to have more optimistic numbers generally; right?

A.   I think exploration everywhere is more optimistic than development.

Q.   And in this instance, exploration at   13:37:16

Page 105

Anadarko was more optimistic?

A.   I don't know that they're more optimistic other than they're making their decisions off fewer data points, and so they can only be so accurate.

And, yes, they're going to err on the high   13:37:35 side in terms of this is how big it could be, but additional wells that development comes up with is what helps narrows it down to a better picture.

And sometimes that number can grow beyond what they have.   13:37:51

Q.   And senior management looked to the development side for a reality check on these prospects; right?

A.   To make sure we have enough to make it economic.   13:38:03

What happens in many of these fields, over the years, they'll actually get a lot bigger.  But when we make a development decision, we have to make sure we have enough to make sure we make economic hurdles.   13:38:17

Q.   Right.

And so senior management looked to the development perspective to -- to balance out the optimism of exploration; right?

A.   Well, again, development's not always   13:38:23

Page 106

right.  Sometimes it turns out to be twice as big as we thought.  And that's a good thing.

Q.   So -- so just focusing on my question, but senior management looked to the development to have -- to -- to balance out what could sometimes be   13:38:36 an optimistic view by exploration; right?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  They -- they looked to us to be able to book reserves.  And, therefore, that's a more stringent definition of -- of booking.   13:38:50

BY MS. JENSEN:

Q.   And throughout the Shenandoah project, the development team did provide their views to senior management; correct?

A.   Yes.   13:39:02

Q.   And it was important to you to make sure that senior management had all the relevant information to make a good decision on Shenandoah; right?

MS. ROSENBERG:  Objection to form.   13:39:13

THE WITNESS:  Yeah, from time to time, we'd give them updates.  But early on in the project, it's, again, driven by the exploration thoughts.

So development may have had their   13:39:22

Page 107

# Exhibit 8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM            ) Civil Action No.

CORPORATION SECURITIES              ) 4:20-cv-00576

LITIGATION                          )

_____ )


VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

DEPOSITION OF ERNEST A. LEYENDECKER, III


Thursday, September 22, 2022

Remotely Testifying from Houston, Texas


Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5378982

Page 1

Q.    You understand that it actually lowered the resource range for the Shenandoah oil field, don't you?

A.    It reduced the uncertainty of the range, yes, that's correct.

13:40:05

Q.    Now, my question was, you understand that the Shenandoah 3 well actually lowered the resource range for the Shenandoah oil field; correct?

A.    No.  It reduced the uncertainty of the range.

13:40:14

Q.    By lowering the range; right, sir?

A.    It reduced the uncertainty, a statistical distribution of the potential outcomes of the discovery.

Q.    Okay.  Did the Shenandoah 3 well increase the resource range for the Shenandoah oil field or decrease the resource range?

13:40:24

A.    No.  It reduced the statistical uncertainty.

Q.    I'm not asking about the uncertainty, sir. I'm asking you about the resource range.

13:40:36

Did the Shenandoah -- -doah 3 well increase your estimation of the resource range for the Shenandoah oil field or decrease your estimation of the resource range for the Shenandoah oil field?

13:40:48

Page 133

A.    Which -- which particular part of the distribution?

Q.    The resource range, sir.  The amount of resources that you believed the --

A.    The range --                                    13:41:01

Q.    P10 --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER:  I'm sorry.  One second.  I'm sorry.  There was some talking over.

MR. DROSMAN:  Sure.

THE COURT REPORTER:  Could you please repeat.

MR. DROSMAN:  Sure.

BY MR. DROSMAN:                                      13:41:09

Q.    The mean, sir.

A.    Oh --

Q.    It was the mean --

A.    I would have to see -- I would believe it reduced the mean of the distribution, yes --    13:41:15

Q.    Okay.

A.    -- which reduced the uncertainty of the -- of the range, yes.

Q.    Okay.  So to be complete, you'd want to tell investors that it reduced the mean, wouldn't    13:41:26

Page 134

you, reduced the range --

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER:  I'm sorry.  Excuse me.  One second.  If we can finish the question and    13:41:35 then the answer, because I'm getting talking over.

Thank you.

THE WITNESS:  I'm sorry, Dan.  Go ahead.

BY MR. DROSMAN:

Q.  Sure.    13:41:38

To be complete, sir, you would want to make sure to tell investors that the Shenandoah 3 oil field reduced the resource range for the entire field, wouldn't, you, sir?

A.  No, sir.  I -- I -- I wanted to    13:41:52 disclose -- I was considering we should disclose that -- that we reduce the uncertainty.

We, to my know- -- I, to my knowledge, don't ever recall disclosing to investors a -- a range or a number for Shenandoah.  We talk -- we    13:42:09 always talk about the range of possibilities and the distribution.  And so the uncertainty is reduced, which does change the range.

Q.  But the range got lower; right?

A.  To -- I'm sorry, what's the question?    13:42:26

Page 135

Q.    The range got lower, didn't it?

A.    The range, yes, it cha- -- it changed.

Q.    It would -- it decreased; right?  You don't want to say that word; right?  But it did decrease, didn't it?                                    13:42:39

A.    I believe the mean probably decreased.  I don't have that fact in my head today, but I don't ever recall telling investors what the resource range was or how big Shenandoah might potentially -- you know, how big it was.                             13:42:55

We -- we didn't -- and I don't -- I didn't disclose that.  We didn't ever disclose that.  It's to my knowledge.

Q.    Oh, I know that, sir.

I'm asking you about that right here,      13:43:04 where you wouldn't have had to disclose the range in order to tell investors that Shenandoah 3 decreased the resource range for the Shenandoah field; right?

A.    I'm sorry, can you say that again to make sure I understand what you're asking?         13:43:18

Q.    You would not have had to disclose what the range was in order to tell investors that the resource range had decreased after the Shenandoah 3 well was drilled?

A.    That's fair.                               13:43:36

Page 136

Q.    Okay.  And that's not in this disclosure, is it, sir?

A.    This is not the disclosure.  This is -- this is a -- an exchange of -- of what we might put in the disclosure.                                    13:43:50

Q.    It's your suggestion, your proposed modification of the 10-K language, isn't it?

A.    It's just -- it's a proposed modification --

Q.    Okay.                                          13:43:58

A.    -- correct.

Q.    You didn't in- -- go ahead.

A.    No, I was just going to say, it is a proposed modification.  I -- I don't recall what was finally put in this 10-K.  I'm -- I'm sure it must   13:44:07 be somewhere here.  But I -- I don't have that, and I don't have -- I don't recall what the final language was put in there.

But, yes, it's an option to discuss the uncertainty of the range, but we didn't -- we didn't   13:44:20 ever talk about the -- the range of resources.  This was still, you know, an appraisal process.

Q.    You could have proposed modifying the 10-K language to simply let investors know that Shen 3 -- that -- that the results of Shen 3 had decreased the   13:44:40

Page 137

# Exhibit 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_____ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

DEPOSITION OF CATHERINE ANNE GREEN

Wednesday, September 28, 2022

Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5421322

Page 1

from Mr. Burton incorrect information; correct?

MR. WYLLY: Objection.

THE WITNESS: I believe there was misunderstanding in the communication between For- -- between Forrest and I, where I believed that the resource estimates had increased.    11:54:51

BY MS. ROSSI:

Q. Okay. The third sentence in the analysis section states, "Therefore, it is appropriate to continue capitalization of this well cost as spend" -- "as suspended well cost, pending the determination of proved reserves for the Shenandoah project"; correct?    11:55:24

A. Correct.

Q. However, the accounting bulletin in Exhibit 332 that we've been discussing, that pertains to wells; correct?    11:55:40

A. Yes.

Q. So the determination whether to continue to capitalize a well, is made about -- on a well-by-well basis; correct?    11:55:58

A. So when the well is drilled, yes, there's an evaluation as to whether to capitalize that specific well cost subject to then the ongoing consideration of whether there's sufficient progress    11:56:14

Page 79

being made in the overall project.

Q.   But the policy in 332 does not apply to the entire project field or area; correct?

A.   No, it does, based on the paragraph that talks about sometimes when a well is drilled, 11:56:40 additional drilling may need to occur before you can have proved reserves.

Q.   If we can go back to that exhibit, so let's go back to 332.  Let me know when you're back there.   11:57:12

A.   Okay.

Q.   Okay.  So looking at Exhibit 332, on the first page, under the "policy" heading in about the middle of the paragraph, it states, "All exploratory well costs are initially capitalized as incurred 11:57:25 pending the determination of whether the well has found proved reserves"; correct?

A.   Yes, but as I've stated, there's also a section in here that says sometimes a well finds reserves, but those reserves cannot be classified as 11:57:47 proved when the drilling is completed.  That's on page 5.

Q.   We can go to page 5 where you're talking about, which is under the "exploratory wells" heading, and it's that third paragraph under that 11:58:07

Page 80

heading.

A.   Mm-hmm.

Q.   And then it states, "In those cases, the capitalized exploratory well costs shall continue to be capitalized as WIP if the well has found a    11:58:17 sufficient quantity of reserves to justify its completion as a producing well and the Company is making sufficient progress assessing the reserves and the economic and operating viability of the project."   [As read]    11:58:32

Correct?  I skipped the parentheses.  I apologize.  But is that your understanding of this accounting bulletin, what I just read --

A.   As it pertains to a stratigraphic test well, it's -- it is a hypothetical discussion around    11:58:56 whether the well has found a sufficient quantity to justify its completion as a producing well.  That's a hypothetical economic decision.

Q.   Right.  It is made on a well-by-well basis --    11:59:08

A.   Yes.

Q.   -- the determination.

Not on a project basis?

A.   Repeat your question, please.

Q.   So the -- the policy requires that    11:59:24

Veritext Legal Solutions
866 299-5127

reserves need to be found in the well, not on a project basis?

A.   Our interpretation, the way we applied this for exploratory stratigraphic wells that were non-hydrocarbon bearing, was based on the information that was provided by that well -- by that well and the overall impact that that had on the resources or the reserves that would be booked at FID.

Q.   Based on the well?

A.   Based on the information from the well.

Q.   Okay.  And this is the same -- this is the same standard under ASC 932-360; correct?

A.   Yes.  Yeah, 932-360-25-18, I believe it is where -- let me find that.

Q.   So it's in 932-360-25-10.

A.   I'm looking at 25-18 for the stratigraphic test well, though.  Well, had it not been simply a stratigraphic test well, which is sort of a hypothetical of what -- what information did you gather from the well, and would that justify completion of a well.

Q.   Okay.  But that's not in Anadarko's policy in Exhibit 332; correct?

A.   Well, our policy gen- -- our policy

11:59:41

11:59:54

12:00:25

12:00:59

12:01:13

Page 82

generally wouldn't touch on every single element of the GAAP associated with that, but certainly that was -- that was -- we applied GAAP, and we applied this particular section to -- to wells that were stratigraphic test wells in the limited instances where there were not hydrocarbons in the wellbore.

Q.    Going back to my initial question, though, this analysis is done on a well-by-well basis; correct?

A.    Yes, whether you should ca- -- whether you should capitalize -- continue to suspend the well cost is done on a well-by-well basis, subject to also the sufficient progress criteria for the overall project.

Q.    But that's only if the well finds proved reserves; correct?

A.    No, because in the examples that we talked about, you're not finding proved reserves because you need to do additional work to determine whether you have an economically viable project.

Q.    But looking back at Exhibit 332, at that same paragraph, it says, "In certain circumstances, an exploratory well finds reserves, but those reserves cannot be classified as proved when drilling is completed."

Page 83

And as you testified, that's the first step?

A.    That is -- that is the first criteria, yes, that if there are reserves in the wellbore that justify its completion, yes, you would continue capitalization.  The interpretation that we had at Anadarko was for exploratory-type stratigraphic wells whether -- where there were not hydrocarbons in the wellbore, and it happened in limited circumstances, we would also consider was there substantive positive evidence gained in the information we got from drilling that well related to the overall project.

MS. ROSSI:  Okay.  I'm going to move to strike, Ms. Green, your response after "capitalized."

BY MS. ROSSI:

Q.    Was Shenandoah 3 ever going to be a producing well?

A.    No.

Q.    Okay.

A.    Or not to my knowledge, I should say.

Q.    Okay.  If we can go back to Exhibit 338. And this is your memorandum titled, "Suspended Well Accounting Analysis - Shenandoah 3"; correct?

Page 84

A.    Yes.

Q.    Was this memorandum sent to Cathy Douglas?

A.    I sent the memo to Louis Williams, I believe based on a request and an understanding that Cathy had asked for it to further some discussions    12:04:26 that she was going to be having.  That's my understanding at the time.  I don't have the e-mails where it was sent to Cathy, but my understanding was that it going to Cathy.

Q.    Who is Cathy Douglas?    12:04:39

A.    She was the chief accounting officer at Anadarko, in -- at yearend 2014.

Q.    Were you aware that Cathy Douglas exchanged e-mails with the chief accounting officer of Marathon in December of 2014?    12:04:54

A.    Not in 2014 or 2015, I was not aware of that.

Q.    But were you made aware of that later?

A.    Yes.

Q.    Do you recall what Cathy Douglas and the    12:05:03 chief accounting officer of Marathon discussed in that e-mail?

A.    I didn't see the e-mail.  But based on information I was provided, was that Cathy was relying on the future utility of the wellbore for    12:05:20

Page 85

suspension of the well cost.

Q.   And despite Cathy Douglas' e-mail to Marathon, Marathon still expensed Shenandoah 3 in 2014; correct?

A.   I'm not familiar with what Marathon's accounting treatment for Shen 3 was.                    12:05:40

Q.   You did not look at your partners' accounting treatment of wells during the course of the Shenandoah project?

A.   I don't specifically recall looking at specific -- what specific partners may have done and, you know, and what that basis might have been.                    12:05:52

Q.   Are you aware that ConocoPhillips also expensed Shenandoah 3?

A.   Not specifically, I don't recall.                    12:06:07

Q.   Do you recall partners expensing Shenandoah 3, not just these -- who these specific partners were?

A.   It's hard for me to say back in the beginning of the 2015 period or yearend 2014, whether I was aware of that or not.  I don't recall.                    12:06:28

MS. ROSSI:  Okay.  I am going to introduce another exhibit.

(Green Deposition Exhibit 339 was marked electronically.)                    12:07:10

Page 86

# Exhibit 10

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

-------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

-------------------------------------------------------x


**\*\*CONFIDENTIAL\*\***


REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

LEA FRYE

Friday, October 7, 2022


Reported By: Lynne Ledanois, CSR 6811

Job No. 142789

Page 1

talked about, could you restate what the exploration 10:25AM

bonus was based on in your experience?

A    It was based on meeting or exceeding meeting

a particular value of MMBOE or millions of barrels of

oil equivalent found in a particular year. 10:25AM

Q    And who set the target for the exploration

unit in terms of the MMBOE that were to be found in

a particular year?

A    I would not know who all was involved, but

it would have been a higher level of management that 10:25AM

set that.

Q    And who was management at that point in

time for exploration?

A    There was Bob Daniels was senior VP, I

believe, if the title is correct. 10:26AM

And then beneath we would have had Stuart

Strife over Gulf of Mexico.

Q    How did you learn that there was a bonus

for exploration if the unit met the particular

amount of MMBOE in a particular year? 10:26AM

A    Because I benefited from it on a particular

project.

Q    How was the target tracked?  Let me

retract that question and let me try to ask it

slightly better. 10:27AM

Page 21