CONFIDENTIAL

Did the personnel in exploration track the   10:27AM
progress toward the goal for a particular year?

A   Yes.

Q   How was it tracked?

A   An individual on the exploration engineering 10:27AM
team was in charge of keeping that information.

Q   Can you be more specific?  In the case
that you said you benefited from the bonus, who on
your team tracked that information?

A   I'm trying to go back.  It would have been   10:27AM
the planning -- they called that a planning engineer
for the team.  I do not recall who was in that role at
that time because it changed periodically.

Q   In 2012 were you promoted into another
role at Anadarko?                                        10:28AM

A   Sounds correct.

Q   And what was your title when you were
promoted in 2012?

A   I don't remember what the exact titles were
again.                                                   10:29AM

Q   Does senior staff reservoir engineer sound
about right?

A   That sounds right.

Q   Were you still working in the exploration
unit?                                                    10:29AM

Page 22

CONFIDENTIAL

A    I believe so, yes.                                    10:29AM

Q    And were you working in the deepwater eastern part of the Gulf of Mexico still at that point?

A    Yes.                                                 10:29AM

Q    Did you move into the operations department at some point while you were at Anadarko?

A    Yes.

Q    And when approximately was that?

A    I'm sorry, I don't remember exact dates.            10:30AM
But it would have been after I worked the deepwater Gulf of Mexico exploration.

Yes.  The dates blur together.  Sorry, I'm bad with dates.

Q    And did you serve as a senior reservoir            10:30AM
engineer for Gulf of Mexico operations until you left the company in May of 2016?

A    Senior staff reservoir engineer, yes.

Q    By the time you left Anadarko in 2016, how many years approximately of experience did you have    10:30AM
as reservoir engineer on oil and gas prospects?

A    Around 15.

Q    During your time at Anadarko, did you receive employee reviews?

A    Yes, I did.                                         10:31AM

Page 23

CONFIDENTIAL

Q    Generally did you receive favorable or    10:31AM
unfavorable reviews?

A    Favorable.

MS. JENSEN:  I'm going to mark an exhibit.
So just stand by for a moment.    10:31AM

Q    You should be able to see now in your
Exhibit Share feature --

A    Okay.  I have to alt tab over to it.  One
second.

MS. JENSEN:  Okay.  This is a document    10:32AM
that's been previously marked as Exhibit 252.  For
the record, this is a document that bears the Bates
stamp APC-00771595.

Q    And, Ms. Frye, for your orientation
purposes, I'm going to refer to documents both by    10:32AM
exhibit numbers and also often what's called a Bates
stamp number.  And that number is reflected by a
prefix and string of numbers at the lower right-hand
side of the document.

Can you see both the exhibit stamp and    10:33AM
what's called a Bates number in the lower right-hand
side of this document?

A    Oh, okay.  Yes, now I can.

Q    Ms. Frye, do you recognize this document?
You can take a moment to scroll through if you need    10:33AM

Page 24

CONFIDENTIAL

to.                                                    10:33AM

    A    Yes, let me please review quickly.

         Yes.  Do I tab back to you or continue to
read my document?

    Q    Why don't you go ahead and stay with the    10:34AM
document and that's fine.

         So does this appear to be a true and
accurate copy of your 2014 performance review at
Anadarko?

    A    Yes.                                         10:34AM

    Q    Based on looking at this document and
presumably your prior familiarity with it, were you
routinely rated as exceptional in your employee
reviews?

    A    In my recollection, yes.                     10:34AM

    Q    I would like you to take a look at the
second page of this document.

         Do you see there is a heading at the top
with a black box around it that says "Integrity and
Trust"?                                               10:35AM

    A    Yes.

    Q    Do you see that you were rated by Pat
McGrievy as exceptional?

    A    Yes, I do.

    Q    Was Pat McGrievy your supervisor at the      10:35AM

                                          Page 25

CONFIDENTIAL

You pool historical data, actual fields in -- in the industry you have access to this information that you can look at what other fields of similar characteristics or in similar locations to where you're evaluating to see what they've actually produced and/or projected to produce. 11:01AM

And you use that to check how your distribution for your project you're bringing forward sits. Does it make sense against what has happened in the past? 11:01AM

If it doesn't, you need to revisit what you have already incorporated and make it make sense with what has happened historically.

Q    Could you explain the last highlighting in that same box, what that means? It's a reference to a mean. 11:02AM

A    "The mean is the best single value in a portfolio and decision analysis."

Q    Could you explain that? So to non-engineers, can you explain what that means? 11:02AM

A    Yes. The mean is a statistical value and it is in the world of what we were talking about previously, it is estimated using the P50, the P90 and the P10 value. It's called a Swanson's mean for the purposes of estimating that mean value. 11:03AM

Page 41

CONFIDENTIAL

That is the value used when doing economic    11:03AM
analysis and looking at your portfolio in a greater
view, looking at the whole portfolio and seeing how
each project matches up.

Q    So I believe you testified that this    11:03AM
training provided to you best practices at the time;
is that right?

A    Correct.

Q    And did you follow these best practices in
developing your economic model for Shenandoah?    11:03AM

A    Yes, I did.

Q    Did you collaborate with anybody else in
working up your economic model for Shenandoah?

A    Yes, I collaborated with Paul and Chip on
coming up with the resource distribution because their 11:03AM
input was very important on how to best define that
resource.

And then that resource is utilized in the
economic model.

Q    So you testified earlier that Paul was a    11:04AM
geologist and Chip was a geophysicist.

Would it be fair to say that your economic
model was an interdisciplinary collaboration?

A    Yes, that's fair to say.

Q    Did you also talk to scientists in the    11:04AM

Page 42

CONFIDENTIAL

exploration department?                                    11:04AM

A    We talk to them about data.  We were asked specifically to come up with our own valuation separately.

Q    So in spring of 2014, you're getting up to    11:05AM speed on Shenandoah; is that correct?

A    Yes, correct.

Q    So I want to go back in time now.  So put yourself back in time.  I would like to talk to you about a meeting that occurred in February of 2014.    11:05AM

MS. JENSEN:  I'm going to mark an exhibit.

(Exhibit 346 was marked for identification by the court reporter.)

BY MS. JENSEN:

Q    Okay.  Ms. Frye, you should be able to see    11:05AM now what's been marked as Exhibit 346.

MS. JENSEN:  For the record, this is a document that bears the Bates stamp FRYE1939.

THE WITNESS:  Yes, I see it.

BY MS. JENSEN:                                            11:06AM

Q    Do you recognize this document?

A    It looks like a meeting invite.  Yes, I recognize it.

Q    Is this a meeting invite for a meeting that occurred on February 19, 2014?                    11:06AM

Page 43

CONFIDENTIAL

A    Yes.                                              11:06AM

Q    And what was the purpose of the meeting?

A    I had been asked, as is stated in this document, to present a development base case economics with a tornado chart for sensitivity at this meeting.    11:07AM

Q    And so does "base case economics" mean the economic model that you were working on at the time?

A    Correct.

Q    And it states that it's "Preparations for Upcoming E&P Offsite."                                     11:07AM

What does that mean?

A    E stands for exploration and P stands for production.  And the higher managers would meet at offsites to discuss what they wanted to look at for the year and things like projects that they want to    11:07AM focus on and understand how much money they want to allocate to certain areas and certain projects for any one year.

Q    So were you asked to present at this meeting?                                                         11:08AM

A    Which meeting are you referring to?

Q    The February 19th, 2014 meeting.

A    Yes, I was asked to do that at that meeting.

Q    And where was this meeting held physically?                                                        11:08AM

Page 44

CONFIDENTIAL

A    It was on the floor that I -- I worked on in development, which was the ninth floor of the tower, and it was called a 9069 war room.    11:08AM

Q    That's a conference room?

A    It's a conference room, yes.    11:08AM

Q    Okay.  You can set that aside for a moment.

A    Okay.

Q    So I'd like you to tell us what you can remember about this meeting.  And I can walk you through it.    11:08AM

So you go to this conference room and you walk in.  Is anybody else there?

A    Yes.

Q    Who's there?    11:09AM

A    My boss, Pat McGrievy.  His boss, Darrell Hollek.  Our planning engineer for offshore development Gulf of Mexico, David Janise, the manager, he was the manager of that team.

Ernie Leyendecker, who was in charge of    11:09AM
the deepwater Gulf of Mexico exploration.  And David -- I'm spacing on the last name -- he would have been the engineering manager for the exploration engineers.  The name is Blakeley.
That's it, David Blakeley.    11:10AM

Page 45

CONFIDENTIAL

Q    Was David O'Brien there as well?    11:10AM

A    Yes, David O'Brien as well.    He would have been David Blakeley's boss at that time.    I don't remember the exact title.

Q    Take yourself back to that war room.    11:10AM

A    Mm-hmm.

Q    Where are you sitting relative to the others?

A    As you enter the door, I would have been on that side of the table on what I would say is the    11:10AM right-hand side of the table.    My boss was a few chairs down from me on the same side of the table.

Darrell Hollek would have been at the very end of the table as the senior individual in that room.    11:11AM

And across from me was David Blakeley and Ernie Leyendecker on the other side of the table. That would be the left-hand side.

I know David Janise and David O'Brien, too many Davids, were close to Darrell.    I don't    11:11AM remember which side of the table they were on, but they were located close to him, one on one side and one on the other.

Q    Is it a small conference room or a large conference room or somewhere between?    11:12AM

Page 46

CONFIDENTIAL

A    I'd say medium for what we utilized in the    11:12AM
company.   Roughly maybe 12 to 15 chairs around a
table.

Q    And describe in your own words what
happens at this meeting.    11:12AM

A    I was asked to present the economics our
team had put together and used and it was Chip and
Paul.

I don't recall if did I an actual
presentation or if it was done on paper.   But it    11:12AM
would have been one of those two.   So everybody
could see what I was referring to.

And I walked through what our valuation
was and walked through the tornado chart.

For reference, a tornado chart is looking    11:13AM
at values that may impact your economics positively
or negatively.   An easy example would be price.

If you change the price of the commodity,
which the commodity we were working with is oil, you
would have a higher price and a lower price and see    11:13AM
how that impacts that base case and how that looks.

I would have done several different
factors.   I don't remember or recall which ones I
did for that particular meeting.

Q    So you present the base case and per your    11:13AM

Page 47

CONFIDENTIAL

testimony earlier, this is based on best practices; 11:14AM
correct?

A    Correct.

Q    And you present the base case, and what is
the reaction? 11:14AM

A    Ernie Leyendecker spoke up and said -- I
remember this vividly because it's not something you
expect to happen in a meeting that is a professional
meeting -- he said, "You don't know anything.  I've
worked the Gulf of Mexico longer than you have." 11:14AM
     And then made reference to this being as
good as Troika, which is another field in the
deepwater Gulf of Mexico.

Q    What is Ernie's tone of voice when he's
saying this? 11:15AM

A    Gruff and meant to be demeaning.

Q    Did you feel demeaned?

A    I did.

Q    Have you ever been in a situation before
when you were just doing your job and someone 11:15AM
reacted to you that way?

A    Once previously, yes.

Q    And when was that?

A    It was in a meeting with -- when I worked in
exploration and we were meeting with a development 11:15AM

Page 48

CONFIDENTIAL

team over a different project, so it was a project    11:15AM

that I had worked that was in actual discovery and we

were handing it over to development.

The manager of that development team did

get -- I don't remember exact words in this one    11:16AM

because that was, oh, goodness, some time in 2009 or

2010, a long time ago.

And I remember that he was very adamant

and talked down in that meeting to our evaluation.

And I remember the G&G manager that I worked with    11:16AM

and my manager were in that meeting and they

basically told him he shouldn't do that in -- I

don't remember the exact words.

Q    So Ernie makes these comments to you in a

way that was demeaning.  And did you feel    11:17AM

humiliated?

A    Yes.

Q    What is going through your head as Ernie

is demeaning you in front of your colleagues?

A    I just didn't feel it was warranted given I    11:17AM

was asked to view this and we used the best science we

knew at the time to come up with an evaluation we

thought was fair.

Why was I being berated for doing my job?

Q    And so in this prior experience you had,    11:17AM

Page 49

CONFIDENTIAL

you said that your manager spoke up.  In this                11:17AM

instance Pat McGrievy was your manager; right?

A    Correct.

Q    Did he speak up and defend you?

A    No.                                                      11:18AM

Q    Did anybody speak up and tell Ernie that

was inappropriate?

A    No.

Q    And so what did you take away from that

experience?                                                  11:18AM

A    That it was accepted within the company.

Q    What was?

A    To allow behavior that should not be

presented in that kind of environment.

Q    So let's step back for a moment.           11:18AM

At this point in time in February of 2014,

are you still learning about Shenandoah?

A    Yes, there was a lot of information.

Q    Were you following what the information

was leading you to; in other words, were you just   11:18AM

following the data?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  Yes, I was --

BY MS. JENSEN:

Q    I know, the objections, it gets hard.  You   11:19AM

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

going about another hour.  Why don't we take a quick    5:12PM

break.

THE WITNESS:

MS. JENSEN: Okay.  How long?

MS. ROSENBERG:  Let's go off the record.    5:12PM

THE VIDEOGRAPHER:  We're going off the

record.  The time is 5:12 p.m.  This is the end of

Media Unit Number 6.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the    5:24PM

record at 5:27 p.m.  This is the beginning of Media

Unit Number 7.  Go ahead.

BY MS. ROSENBERG:

Q    Ms. Frye, are you familiar with the term

"AFE"?                                                 5:24PM

A    Yes.

Q    Can you explain what that is?

A    It's a shortness for authority for

expenditure.

Q    How is it used in connection with oil    5:24PM

drilling?

A    A cost estimate was put together and that is

the evaluation of the cost that we would use for a

particular wellbore.

THE REPORTER:  You're fading out a lot.    5:25PM

Page 203

CONFIDENTIAL

So if you could keep your voice up, I appreciate it.    5:25PM

THE WITNESS:  Sorry.

BY MS. ROSENBERG:

Q    Is it fair to say that it's essentially a document asking for money to drill a well?    5:25PM

A    That's a fair statement.

Q    And Anadarko had to submit an AFE to its own management to get authorization for that drilling; correct?

MS. JENSEN:  Objection, form.    5:25PM

THE WITNESS:  They had to submit it up through the chain for approval.

BY MS. JENSEN:

Q    Anadarko also as operator had to submit an AFE to partners to get their approval to drill a    5:26PM well as well -- let me rephrase that.

Anadarko also had to submit an AFE to partners to obtain their own authorizations to drill; correct?

MS. JENSEN:  Objection, form.    5:26PM

THE WITNESS:  AFE was given to partners and they did whatever they did internally, I cannot speak to.

BY MS. ROSENBERG:

Q    You were involved in submitting the AFE    5:26PM

Page 204

CONFIDENTIAL

for Shen 5; correct?                                          5:26PM

A    Correct.

MS. ROSENBERG:  Let me show you what's been marked as Exhibit 362, which is an email chain and attachment beginning -- bearing Bates Number    5:27PM APC-00222712.

(Exhibit 362 was marked for identification by the court reporter.)

BY MS. ROSENBERG:

Q    Do you see that?                                    5:27PM

A    I have the document, yes.

Q    Do you recognize this?

A    This looks like an email that says that the AFE was approved, in particular this says Walker Ridge 51 Number 4.                                        5:27PM

Q    Is Walker Ridge 51 Number 4 Shen 5?

A    That's correct.

Q    You're listed as the originator and project manager; correct?

A    Correct.                                           5:27PM

Q    And so you were the one who was ultimately responsible for preparing this AFE; right?

A    I'll clarify on that.  I was not responsible for providing the cost estimates.  That was the responsibility of others in the drilling department to    5:28PM

Page 205

CONFIDENTIAL

provide me with cost.                                         5:28PM

As far as initiating it into a system internally and entering the information, I was responsible for doing that, correct.

Q   And do you see that there is an attachment    5:28PM
to this email that begins with an executive summary and then has a few further slides?

A   Yes.

Q   Did you prepare this slide, the executive summary?                                                5:28PM

A   That slide would have been prepared with the whole development team including Pat McGrievy as our supervisor.

Q   So you would have participated with the development team in creating these slides?          5:29PM

A   Correct.

Q   The first bullet point there says, "Shenandoah is an Anadarko-operated 2008 Wilcox oil discovery, located in the northwestern area of Walker Ridge in Blocks WR 51, 52 and 53, with the    5:29PM potential to be a major oil producing hub for APC."

Do you see that?

A   Yes.

Q   You agreed with that statement at the time; correct?                                         5:29PM

Page 206

CONFIDENTIAL

A    That is in conjunction with a larger presentation which does not have all of this presentation included in here.  And that presentation was presented to the executive committee, including Al Walker, prior to this submission for the AFE.

And in that presentation we talked about Shenandoah 5 is going to be a key well in determining whether or not this is going to be a major oil producing hub for APC or not.

Q    So you thought that drilling Shen 5 was important to assess whether Shenandoah would be a major oil producing hub for APC?

MS. JENSEN:  Objection, misstates the testimony.

THE WITNESS:  As I said previously, we're evaluating if we felt the economics and the resources determined whether we would go forward with the development or not.

BY MS. ROSENBERG:

Q    In the second bullet it begins, "In order to reduce reservoir side uncertainty, and to hold the lease, the Shenandoah predevelopment team's recommendation is to drill the WR 51 Number 4 (Shenandoah Number 5) appraisal well at a 30 percent working interest, along with our partners."

Page 207

CONFIDENTIAL

Do you see that?                                        5:31PM

A    Yes.

Q    And that was the recommendation; right?

A    That was the recommendation.

Q    And then there's some discussion about the      5:31PM
specifics of exactly where it was going to be
drilled.

At the very bottom of the bullet, do you
see the last sentence?  It says, "This well will
also be designed as a 'keeper well', rather than an    5:31PM
expendable well to save on future development
costs."

MS. JENSEN:  Objection, the document
speaks for itself.

THE WITNESS:  That's what it states.       5:32PM

BY MS. ROSENBERG:

Q    Can you explain what a keeper well is?

A    As we -- as I mention earlier in the
presentation that Shenandoah was different in that we
required the 20K technology.  We called a well that    5:32PM
was going to have the wellhead that met those
requirements, the plan as part of doing this well was
to have that technology ready in case this well was a
successful well so we wouldn't have to spend money to
abandon it and hopefully be able to use it in a        5:32PM

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

development.                                                    5:32PM

          That's what the keeper well would be is if
that technology for that wellhead was ready and it
was accepted internally to be BOEM, which they were
the ones that controlled the regulatory requirements    5:33PM
on that.

     Q    So your hope was that if the technology
was ready and Shen 5 was a successful well, it could
be used in a potential development?

     A    If the result of Shen 5 made us feel that we    5:33PM
had enough reserves to go forward with development,
yes.

     Q    Now, the third bullet on the page says,
"The dry hole AFE cost for this well, expected to
spud in March 2016 on the Diamond Ocean Black Hawk,    5:34PM
is $210 million (gross) which equates to $63 million
(net) to APC."

          Do you see that?

     A    I'm sorry, I accidentally closed that
document.  Which document was it again?                 5:34PM

     Q    That's okay.  Exhibit 362.

     A    Okay.  362.  What page are we on?

     Q    It's the third page the slide titled
"Executive Summary."

     A    Okay.  The third paragraph?                   5:34PM

Page 209

CONFIDENTIAL

A    One was in college and the other was in high   6:37PM school and she stayed in Houston because of where she was in high school.  She did join us for summers and breaks whenever possible.

Q    So even more than I'm sure this was a big   6:37PM decision for your family to move to Colorado especially if you were moving without your daughter; right?

A    Yes, it was not an easy decision.

Q    There was a lot of discussion about it?   6:37PM

A    Around the move to Colorado, yes.

Q    And why did you decide to move to Colorado?

A    Quite frankly, my husband and myself and two of the three children love mountains and we vacationed   6:37PM there a lot and that was the place that brought us happiness and that's where we wanted to be.

Q    When did you begin discussing the possibility of a move to Colorado?

A    Not till after -- and I wouldn't know dates,   6:38PM but it would have been after the SEC letter, likely even after I met with the board and Anadarko at their request.

Q    Your husband had his own business in Texas; right?   6:38PM

Page 244

CONFIDENTIAL

A    Yes.                                                6:38PM

Q    Bealer Management Consulting, does that ring a bell?

A    Oh, at one point.  He had since not been doing that for many years.                              6:39PM

Q    So he hadn't been working at Bealer Management Consulting for a while?

A    Yes, prior to -- I don't remember the exact date either, but it had been several years before I left the company.                                          6:39PM

Q    You mentioned that you contacted Mr. Minces at some point; right?

A    Correct.

Q    When was that?

A    It was early 2016 when, after all of that    6:39PM had happened and I was at that point in time really concerned about what was going on with the Shenandoah project and that my name would be associated with a project that was being miscommunicated on purpose, misleading our investors.                              6:39PM

Q    Mr. Minces is an employment attorney; right?

A    Correct.

MR. MINCES:  Objection, form.

BY MS. ROSENBERG:                                      6:40PM

Page 245

CONFIDENTIAL

Q    And had you previously -- and obviously    6:40PM
don't get into details if the answer is yes.  But
had you previously had any engagements with
Mr. Minces?

A    No.    6:40PM

Q    You learned that there was going to be a
round of involuntary layoffs at Anadarko in February
of 2016; right?

MR. MINCES:  Objection, form.

THE WITNESS:  I don't remember the exact    6:40PM
time frame.  It was early 2016, though.

BY MS. ROSENBERG:

Q    In early 2016, you learned there was going
to be a round of involuntary layoffs at Anadarko;
right?    6:40PM

A    I assume that's the correct date, but yes.

Q    Is that sometimes referred to as a
reduction in force?

A    Yes.

Q    How did you hear about the layoffs?    6:41PM

A    Through the communication via email from
somebody in the company.  I don't recall who.

Q    Did the company tell its employees that
there was going to be a large involuntary layoff?

A    Yes.    6:41PM

Page 246

CONFIDENTIAL

Q    You were aware that Anadarko would provide　6:41PM

a severance payment to anyone who was laid off;

right?

MR. MINCES:  Objection, form.

THE WITNESS:  Correct.　6:41PM

BY MS. ROSENBERG:

Q    Was that told to employees by the company

when they announced the involuntary layoffs?

A    I don't want to guess, so I can't answer

with honesty that I know exactly how it was　6:42PM

communicated.

Q    In any event, you contacted human

resources and asked to be included in the

involuntary layoff pool; right?

A    Yes, I did.　6:42PM

Q    Was that on or about February 19th of

2016?

A    Sounds roughly around the time.

Q    Let me show you an exhibit.

MS. ROSENBERG:  Okay.  I've introduced as　6:42PM

Exhibit 365 an email chain between you and Dalon

Schuckman dated February 19th, 2016 with a Bates

stamp APC-00670780.

(Exhibit 365 was marked for identification

by the court reporter.)　11:33AM

Page 247

CONFIDENTIAL

BY MS. ROSENBERG:

Q    Do you recognize this?

A    Yes, I do.

Q    And who is Mr. Dalon Schuckman?

A    He would be an HR representative and there    6:43PM
were several throughout the company and they would
assign certain representatives to certain portions of
the company.

So he might have been assigned to the
deepwater Gulf of Mexico development, for example.    6:44PM

(Reporter clarification.)

BY MS. ROSENBERG:

Q    You wrote to Mr. Schuckman, "I feel that
working at Anadarko is no longer a positive for me.
Without wanting to go into details, I believe that    6:44PM
it would be in the best interest of all parties if
Anadarko were to include me in the involuntary
layoff pool."

Do you see that?

A    Yes, I do.    6:44PM

Q    And Mr. Schuckman responded almost
immediately; right?

A    It appears by the time stamp it was pretty
prompt, 15 minutes maybe.

Q    And he copies Pat McGrievy, your    6:44PM

Page 248

CONFIDENTIAL

supervisor; right?    6:44PM

A    Correct.

Q    And Mr. Schuckman writes, "Lea, thank you for making me aware of your desire to be selected for separation and to receive a severance package as 6:45PM part of the recently announced staff reductions."

"As has been posted in the Q&A documents on Insider, there is no voluntary severance program. However, the company will be considering a number of factors when making staff reductions and your 6:45PM request for separation may be considered by the company in its complete discretion when making these determinations."

Do you see that?

A    Yes, I see that.    6:45PM

Q    Did you speak with your supervisor, Pat McGrievy, about your desire to be included in the involuntary layoff?

A    If I recall, I called him to make him aware that I had contacted Mr. Schuckman with a request to 6:45PM be included.

Q    You told Mr. Schuckman that you didn't want to go  into details; correct?

A    Correct.

Q    Did you provide any details to    6:46PM

Page 249

CONFIDENTIAL

Mr. McGrievy?                                               6:46PM

A    No, I did not.

Q    Do you recall what you told Mr. McGrievy about why you wanted to be included in the involuntary layoff pool?                                      6:46PM

A    I do not recall exactly what I said, no.

Q    Did you express at the time to him any concern -- withdrawn.

Did you express to him in any way that the reason you wanted to be included in the involuntary layoff was because of concerns you had with Shenandoah?                                         6:46PM

MS. JENSEN:   Objection to the form.

THE WITNESS:   I don't recall exactly what I said, honestly.                                              6:46PM

BY MS. ROSENBERG:

Q    But you don't recall saying that?

A    I don't recall saying that either.

Q    You respected Mr. McGrievy; right?

A    Yes.                                                   6:47PM

Q    You had a good working relationship?

MS. JENSEN:   Vague as to time.

BY MS. ROSENBERG:

Q    You can answer.

A    Yes.                                                   6:47PM

Page 250

CONFIDENTIAL

BY MS. ROSENBERG:                                                    6:47PM

    Q    Mr. McGrievy had given you positive employee reviews; right?

    A    Correct.

    Q    You were also aware when you worked at    6:47PM
Anadarko that there was an anonymous hotline that could be used to submit complaints about suspected wrongdoing; correct?

        MS. JENSEN:  Objection to the form, vague.

        THE WITNESS:  I'll clarify, yes, there was    6:47PM
a hotline.

BY MS. ROSENBERG:

    Q    You were aware of it?

    A    I was aware of it, but I will clarify that there had been very many -- I won't say very many, I    6:48PM
don't know how to say it.

        But I had heard through the grapevine that the hotline was not necessarily acting in favor of the person that was reporting to the hotline.

    Q    You did not submit a call or a complaint    6:48PM
to the hotline; right?

    A    I did not because I did not have faith in the company with the behaviors that I continued to have seen that they would act on my behalf anonymously.                                                    6:48PM

Page 251

CONFIDENTIAL

Q     You were also aware that the company had     6:48PM
an ethics and compliance group that could receive
complaints as well; right?

A     Actually, no, I was not aware of that.

Q     Now, you were later told that you would     6:49PM
not -- that you had not been selected to participate
in the involuntary layoff; correct?

A     Correct.

Q     Do you recall when that was?

A     It would have been the day of the voluntary     6:49PM
layoff.  Whatever date that was, I don't recall.

Q     How were you notified?

A     Pat McGrievy would have come to my office
and told me I was not included.

Q     Did Mr. McGrievy explain why you were not     6:50PM
included?

A     He would have explained at a high level that
they did not include me for reasons that the company
wanted to keep me.  Not specifics.

Q     The company wanted to keep you on the     6:50PM
development team?

A     Yes.

MR. MINCES:  Objection, form.

MS. ROSENBERG:  Let me show you a
document.     6:50PM

Page 252

CONFIDENTIAL

Exhibit 367 does not have a Bates number.    6:51PM
It's an article entitled "Anadarko Cuts 1,000 Jobs
as It Idles Drilling Rigs, Sells Assets," dated
March 10, 2016.

(Exhibit 367 was marked for identification    6:51PM
by the court reporter.)

BY MS. ROSENBERG:

Q    Do you see this, Ms. Frye?

A    Yes, I do.

Q    Does this refresh your recollection about    6:51PM
the date that you were notified about the reduction
in force?

A    This article implies that it would have been
on the date of March 10th.

Q    Now, did you ever --    6:51PM

MS. JENSEN:  I just want to caution the
witness if you've never seen this document before,
don't speculate.

BY MS. ROSENBERG:

Q    Let me ask it this way:  After you were    6:52PM
told that you were not going to be included in the
reduction in force, did you ever return to work?

A    I recall leaving early that day because I
was upset.  I do not recall coming back to that office
after that.    6:52PM

Page 253

CONFIDENTIAL

Q    Let me show you another document.                    6:52PM

While that's loading, let me just try to clarify one thing.

I know you testified that you contacted Mr. Minces in early 2016.  I recognize you may not    6:53PM know the date exactly.

When you sent the email to human resources asking to participate in the involuntary layoff, had you already spoken with Mr. Minces?

MR. MINCES:  Objection, form.                            6:53PM

THE WITNESS:  Yes.

BY MS. ROSENBERG:

Q    Do you recall if that's a guiding point how soon -- how long prior to that you had been in contact with Mr. Minces?                                    6:53PM

MR. MINCES:  Objection, form.

THE WITNESS:  Can you say that one more time?

BY MS. ROSENBERG:

Q    Sure.  Let me try it a different way.              6:54PM

Using the February 19, 2016 email as a guiding point, do you know whether you had retained Mr. Minces or contacted him a day prior or a week prior or a month prior, anything helpful?

MR. MINCES:  Objection, confusing and                    6:54PM

Page 254

CONFIDENTIAL

asked and answered.                                        6:54PM

THE WITNESS:  I do not recall exactly.

It does not help.

BY MS. ROSENBERG:

Q    Some time prior?                                      6:54PM

A    Some time prior.

MR. MINCES:  Same objection.

BY MS. ROSENBERG:

Q    Do you know whether you contacted

Mr. Minces before or after you were told that             6:54PM

Anadarko would be instituting an involuntary layoff

program?

MR. MINCES:  Objection, asked and

answered.

THE WITNESS:  As I stated previously, I     6:54PM

cannot recall.

MS. ROSENBERG:  Exhibit 368 is an email

chain bearing Bates Number APC-00357989 and it

begins with an email from Scot Bealer dated

March 11th, 2016 entitled "Lea Frye request for          6:55PM

leave."

(Exhibit 368 was marked for identification

by the court reporter.)

BY MS. ROSENBERG:

Q    Do you recognize this document?                       6:56PM

Page 255

CONFIDENTIAL

A     Yes.                                              6:56PM

Q     And Scot Bealer is your husband; is that right?

A     Correct.

Q     And so Mr. Bealer was notifying Anadarko     6:56PM
that you were taking FMLA leave as of March 11th; right?

A     Correct.

Q     That was the day after you learned that you were not selected to participate in the     6:56PM
involuntary layoff?

      MR. MINCES:   Objection, form.

      THE WITNESS:   That matches the dates, yes.

BY MS. ROSENBERG:

Q     While you are on FMLA leave, your lawyer     6:57PM
submitted a letter to Anadarko's general counsel; right?

A     Sounds --

      MR. MINCES:   Objection, form, vague.

BY MS. ROSENBERG:                                        6:57PM

Q     Do you recall that there was a letter submitted to Anadarko's general counsel?

A     Yes.

Q     What was your understanding of that letter?                                               6:57PM

Page 256

MR. MINCES:  Objection to form.  If you're   6:57PM

going to ask her about the letter, you should put

the letter in front of her.

MS. ROSENBERG:  I will.  I'm just loading

it.                                              6:57PM

THE WITNESS:  I'll wait for the letter to

be loaded.

MS. ROSENBERG:  Exhibit 369 is a letter

dated April 20th, 2016 from David Minces to Amanda

McMillian listed there as senior VP, general       6:58PM

counsel, corporate secretary and chief compliance

officer at Anadarko.

(Exhibit 369 was marked for identification

by the court reporter.)

BY MS. ROSENBERG:

Q    Do you see that?

A    I see it, yes.

Q    Is this the letter that -- was this letter

submitted by Mr. Minces on your behalf?

A    Yes.                                         6:58PM

Q    Did you review the letter before it was

submitted to Ms. McMillian?

A    I reviewed versions of this letter, yes.

Q    It made many of the same allegations

regarding Shenandoah that were included in the     6:58PM

Page 257

CONFIDENTIAL

May 9th letter to the SEC that we've been          6:58PM

discussing; right?

     A    Yes, it appears it does.

          MS. JENSEN:  I'll point out for the record

that this appears to be a settlement demand, which       6:59PM

would be covered as an offer of compromise, so the

transcript should be treated accordingly and this

exhibit as well.

BY MS. ROSENBERG:

     Q    If you look at the last page of the        6:59PM

letter -- well, sorry.

          If you look at Page 27 of 31, which ends

in the Bates stamp 562, it's entitled "Settlement

Demand."

          Do you see that?                           6:59PM

     A    Yes, I do.

     Q    On the bottom of the second paragraph it

says, "The following are Ms. Frye's demands."

          Do you see that?

     A    Yes, I do.                                 7:00PM

     Q    And Number 1 on the list was a lump sum

payment of $940,325; right?

     A    That's what it reads, yes.

     Q    Nearly a million dollars?

     A    Yes.                                       7:00PM

Page 258

CONFIDENTIAL

MS. ROSENBERG:  Obviously we object,                7:11PM

Rachel, and we can discuss this after the

deposition.

Q    Are you aware that there was an internal

investigation launched by the company, Ms. Frye?      7:11PM

A    I'm not aware.

Q    Let's take a look at Exhibit 354.

A    354?

Q    Yes.

A    Yes.                                             7:12PM

Q    That's the resignation letter that you

sent sense to Mr. Schuckman on May 18th, 2016;

right?

A    Correct.

Q    In the second paragraph you write, "Over      7:12PM

the last 18 months, Ernie Leyendecker pushed forward

a portrait of the Shenandoah project that was beyond

optimistic and in doing so violated nearly aspect of

our internal reporting and ethics guidelines."

Do you see that?                                       7:12PM

A    Yes, I do.

Q    Do you still stand behind that?

A    I still stand behind our internal ethics and

guidelines were violated in what was presented and no

corrections to the public were ever made about the    7:12PM

Page 264

CONFIDENTIAL

size of Shenandoah being smaller than what the    7:13PM

glorious terms were presented early in the project to

investor relations.

Q    You discussed earlier that Mr. Leyendecker

was promoted to a position in international    7:13PM

exploration; right?

A    I believe you reminded me of that.

Q    And I believe you were not sure

approximately the exact date.

Does April 2015 sound about right?    7:13PM

MR. MINCES:  Objection, form.

THE WITNESS:  I would not know the date.

BY MS. ROSENBERG:

Q    You didn't have any interaction with

Mr. Leyendecker about Shenandoah after he was    7:13PM

promoted; right?

MS. JENSEN:  Objection, misstates

testimony.

THE WITNESS:  Not that I recall.

BY MS. ROSENBERG:    7:13PM

Q    When you say "over the last 18 months,"

what basis do you have for that?

MR. MINCES:  Objection, form.  The letter

is not written by the witness.  So it

mischaracterizes the evidence.    7:14PM

Page 265

CONFIDENTIAL

MS. ROSENBERG:  Mr. Minces, it's signed    7:14PM
"Respectfully, Lea Frye," with a signature.

MR. MINCES:  Sorry, I withdraw.  You're on
the resignation letter.  My apologies.  I withdraw
the objection.    7:14PM

BY MS. ROSENBERG:

    Q    Did you write this letter, Ms. Frye?

    A    Yes, I wrote this letter.

    Q    What basis did you have for saying "over
the last 18 months"?    7:14PM

    A    After reviewing all the investor
presentations and some of the phone conversations,
Ernie Leyendecker was involved in several of those
over the time frame of Shenandoah.  I can't say
specifically which dates without looking at every    7:14PM
single one.

        But I recall that there was multiple times
he spoke to the project.

    Q    Do you recall anything that
Mr. Leyendecker did with respect to Shenandoah in    7:15PM
the 12-month period prior to your letter?

        MS. JENSEN:  Objection, asked and
answered.

        THE WITNESS:  I don't recall.

BY MS. ROSENBERG:    7:15PM

Page 266

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Q    Now, when you left the company, you had     7:15PM

owned your house in Texas; is that right?

A    Yes.

Q    And when you moved to Colorado, did you

sell your home?                                           7:15PM

A    We did.

Q    Do you recall when you put your home on

the market?

MS. JENSEN:  Laura, this is really going

beyond the scope.  I don't see any possible      7:16PM

relevance.

MR. MINCES:  Can we also get a time check?

I don't want to be a total stickler, but by my math,

I thing we're at the limit or close to it.  I'm

curious how much time the lawyers have left with the     7:16PM

witness.

MS. ROSENBERG:  I'm almost finished, just

a few minutes left.

MS. JENSEN:  We object to the questions

about the witness's personal dealings that have     7:16PM

nothing to do with Anadarko.

THE VIDEOGRAPHER:  This is the

videographer.  So there is until like 7:21.  Okay?

MS. ROSENBERG:  Thank you.

MS. JENSEN:  Objection, harassing.     7:16PM

Page 267

CONFIDENTIAL

BY MS. ROSENBERG:                                    7:16PM

Q    Ms. Frye, the question was just:  When did you first list your home for sale?

MS. JENSEN:  Same objection, harassing. This is beyond the scope.                    7:17PM

MR. MINCES:  Objection, form.

BY MS. ROSENBERG:

Q    You can answer.

A    I don't know the date.

Q    Was it in 2015?                               7:17PM

MR. MINCES:  Objection, form, asked and answered.

THE WITNESS:  2015?

BY MS. ROSENBERG:

Q    Yes.                                          7:17PM

A    I don't recall.

Q    Is the address of your home 24 Split Rock Road, Spring, Texas?

MS. JENSEN:  Same objections, harassing.

THE WITNESS:  That was the address.               7:17PM

BY MS. ROSENBERG:

Q    Do you have any reason to dispute that it was listed for sale in November of 2015?

MR. MINCES:  Objection, asked and answered.                                        7:17PM

Page 268

CONFIDENTIAL

THE VIDEOGRAPHER:  We are back on the   8:12PM
record at 8:12 p.m. and this is the beginning of
Media Unit Number 10.  Go ahead.

                    FURTHER EXAMINATION

BY MS. ROSENBERG:                                 8:13PM

Q    Ms. Frye, do you still have Exhibit 371 in
front of you?

A    Hold on, let me check.

     I don't, but I can open it.  Would you
like me to?                                       8:13PM

Q    Yes, thank you.

A    It is open.

Q    This is the Shen 5 appraisal well proposal
dated February 1st, 2016; right?

A    Correct.                                     8:13PM

Q    Ms. Jensen asked you some questions about
the structure map on Slide 5.

     Do you recall that?

A    Yes.

Q    With all of the information known at this    8:13PM
time, the recommendation was to drill Shen 5;
correct?

     MR. MINCES:  Objection asked and answered.

     THE WITNESS:  I'll return back to my
previous testimony that, remember, we were on a   8:14PM

                                                  Page 289

CONFIDENTIAL

180-day clock, we had to either commence operations    8:14PM

or we would lose the leases without defining is

there commercial hydrocarbons to go to development

or not, so we were bringing this well forward for

those purposes.    8:14PM

BY MS. ROSENBERG:

    Q    You believed that that was the right thing

to do to move the project closer to a minimum

economic field size for sanctioning; right?

        MR. MINCES:  Same objection.    8:14PM

        THE WITNESS:  I'll clarify that it was the

right thing to do to definitively define do we or do

we not go forward with the development.

BY MS. ROSENBERG:

    Q    And if you take a look at Slide 14.    8:14PM

    A    Yes.

    Q    Ms. Jensen asked you some questions about

the strategic opportunities listed at the bottom of

that chart.

        Do you see that?    8:15PM

    A    Yes.

    Q    There's also a timeline there, 2016, 2017,

2018.

        Do you see that?

    A    Yes, I do.    8:15PM

Page 290

CONFIDENTIAL

Q   And there is an orange star in mid 2018; 8:15PM
is that fair?

A   Yes, roughly that time frame.

Q   And below that it's listed SOP/FID; right?

A   Correct. 8:15PM

Q   What does that mean?

A   FID is an acronym for final investment decision.  I'm blanking on what SOP stands for.  There was many acronyms; I cannot recall that particular one. 8:16PM

Q   Is it suspension of production?

A   That fits with it, but I don't remember.

Q   But FID definitely stands for final investment decision?

A   Yes, I do recall that one, yes. 8:16PM

Q   And so at this time, is it fair to say that you're targeting a decision about whether to go forward with the final investment decision in mid 2018?

MR. MINCES:  Objection, form. 8:16PM

THE WITNESS:  I'll point out on the timeline there are multiple wells and what's implied with this timeline is drill Shen 5.  If Shen 5 has success in the amount of new hydrocarbon proven probable, a new hydrocarbon potential distribution 8:17PM

Page 291

CONFIDENTIAL

in a sufficient manner, we would then drill Shen 6.    8:17PM

And then the next sort of call-out is upon success at Shen 6 which has deemed at that point we felt there were sufficient hydrocarbons to move forward, we would continue forward to that decision    8:17PM point.

I know this is a simplified slide, so that is inferred and that would have been discussed in words at the meeting, if that makes sense.

BY MS. ROSENBERG:    8:17PM

Q    So the ultimate decision about whether to sanction the project would depend not only on Shen 5 but also on Shen 6 and if those were being successful, you anticipated a decision likely in 2018; is that fair?    8:18PM

A    Likely --

MS. JENSEN:  Objection.

THE WITNESS:  -- in early '18.

BY MS. ROSENBERG:

Q    Ms. Jensen asked you a few questions about    8:18PM your motivations for filing your letter to the SEC. I believe you said you felt it was the right thing to do; is that right?

A    Yes, that's correct.

Q    You also told Anadarko that if they paid a    8:18PM

Page 292

CONFIDENTIAL

lump sum payment, you would go away quietly and        8:18PM

confidentially; right?

        MS. JENSEN:  Objection, misstates the

evidence.

        THE WITNESS:  That was prior to filing        8:19PM

with the SEC.

BY MS. ROSENBERG:

    Q    And Anadarko did not pay you that lump sum

payment?

        MR. MINCES:  Objection, asked and        8:19PM

answered.  We've covered all of this.

        THE WITNESS:  As I stated earlier, no, I

did not receive any money.

        MS. ROSENBERG:  Nothing further.  Thank

you.                                                    8:19PM

        THE WITNESS:  Thank you.

        MS. JENSEN:  We can go off the record.

        THE VIDEOGRAPHER:  For the day or just for

now?

        MS. JENSEN:  For the day.        8:19PM

        MS. ROSENBERG:  For the day.

        THE VIDEOGRAPHER:  We are off the record.

The time is 8:19 p.m.  This ends the testimony given

by Lea Frye.

        The total number of media used was ten and    8:19PM

Page 293

CONFIDENTIAL

will be retained by Veritext Legal Solutions.                8:19PM

(Proceedings concluded at 8:19 p.m.)

Page 294

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

------------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

JAMES KLECKNER

Friday, October 14, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 5421318

Page 1

They also included looking at strategies

that could enhance Anadarko's growth trajectory by

looking at major acquisitions or divestments in key

business units.

Q    And how did Shenandoah fit into that

process?

MS. JENSEN:  Objection, vague.

THE WITNESS:  Shenandoah fit into that

project just like any other project we had.  A file

was created based off of multiple scenarios and an

expected outcome case.  And it was run in the

portfolio as a project that we went forward with and

invested in.

It was run as a project that we sold down

interest or promoted.  Then it was run as a project

we didn't go forward in.

So very much like many other investment

opportunities where we're pulling in and pulling out

and varying investment opportunities to determine

what the optimal output is.

BY MS. ROSENBERG:

Q    Now, you referred -- there was some slides

earlier and Ms. Jensen asked you some questions that

referred to the term "exit strategy" for Shenandoah.

So can you explain why Anadarko would have

Page 160

discussions about, quote/unquote, exit strategy    4:01PM

while the appraisal program was still ongoing?

    A    Yes.

            MS. JENSEN:  Objection to form.

            THE WITNESS:  As the portfolio model    4:01PM

changes with time and, for instance, as new

opportunities evolve such as the U.S. onshore

unconventional plays, we had three very strong

performing onshore plays that were low risk, high

economic return that were demanding more capital to    4:01PM

fund.

            And as that became more clearly modeled in

the portfolio over months and months and in this

case years, the allocation of capital needed to go

to those types of projects that would add superior    4:02PM

returns and superior investment opportunities.

            So we continually looked at what scenarios

were there that we could allocate more resources to

projects like that that were far superior than other

ones and that was the goal of the executive    4:02PM

committee was to allocate people and capital

resources to deliver the best return for

shareholders.

            And we did that continuously.  And that

could mean advancing some projects or looking at    4:02PM

Page 161

exit strategy in other projects.                          4:02PM

BY MS. ROSENBERG:

    Q    Did Anadarko determine at any time while
you were at the company that Shenandoah was not
going to be commercial viable?                            4:02PM

         MS. JENSEN:  Objection to the extent it
calls for speculation.

         THE WITNESS:  No.  I left in 2016 in
August and I believe that was through Shen 5, and
Shen 6 was still to be drilled.                           4:02PM

BY MS. ROSENBERG:

    Q    Did Anadarko ever decide to pursue an exit
strategy for Shenandoah while you were at the
company?

         MS. JENSEN:  Objection, asked and          4:03PM
answered.

         THE WITNESS:  We discussed exit
strategies, but we never decided to pursue an exit
strategy.

BY MS. ROSENBERG:                                         4:03PM

    Q    You mentioned that you left the company
after Shen 5 but before Shen 6 was drilled; is that
right?

    A    Yes, I would need to go back and look at the
date exactly that Shen 5 was completed.                   4:03PM

Page 162

Q    Did you have any involvement in the AFE   4:03PM
for the Shen 5 well?

A    Yes.

MS. JENSEN:  Objection, vague.

BY MS. ROSENBERG:                                          4:03PM

Q    Can you explain what an AFE is?

A    Application for expenditure.

Q    And what involvement did you have in the
AFE for the Shen 5 well?

A    The project was moving -- I should say the   4:04PM
overall scope of Shenandoah had been transitioning
from the exploration into the development team and in
the organization I was leading at the time, we had the
operations development teams for all of the Gulf of
Mexico.                                                    4:04PM

So the team -- the development team under
Darrell Hollek initiated the AFE and it came up
through my organization, my final approval before Al
Walker's versus prior to that, exploration up
through Bob Daniels.                                       4:04PM

Q    And was an AFE for Shen 5 also submitted
to the Shenandoah partners?

A    Yes.

Q    And were you involved in that process as
well?                                                      4:04PM

Page 163

A    Not directly.                                        4:05PM

Q    Do you remember what the reaction was from the Shenandoah partners to the AFE for Shen 5?

MS. JENSEN:  Objection, calls for speculation.  He just testified that he wasn't        4:05PM involved.

THE WITNESS:  We obtained approval.  There was no -- I don't recall any controversy at all.

BY MS. ROSENBERG:

Q    You were asked a few questions about           4:05PM reserves.  I believe Ms. Jensen used the term "reserves."

Did Anadarko ever book reserves for Shenandoah?

A    No.                                               4:05PM

Q    And the charts that you were shown earlier today showing amounts of millions of barrels of oil equivalent, are those resource estimates internal?

MS. JENSEN:  Objection, vague, leading.

THE WITNESS:  We never released -- or I           4:05PM shouldn't say never, but we as a principle did not release resource ranges about any projects that were, you know, highly on the front end of expiration.

We did release information such as STOIP,        4:06PM

Page 164

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

-------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

-------------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ROBERT ALVIN WALKER

Thursday, October 20, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 5378979

Page 1

sands that led to 2 billion barrels of production.

Q   You told me that you don't see any mention of Shenandoah 3 in the October 27th, 2015 press release; correct?

A   I see one sentence related to the third appraisal well at Shenandoah.

Q   You understand the third appraisal refers to Shenandoah 4; correct?

A   I believe that to be the case based upon our prior discussion.  I can't say I can tell you that from a factual reading of that sentence, but that's the only well that's referenced in this press release.

Q   So I take it if Shen 3 wasn't mentioned in this press release, the company never told investors in this press release that Shen 3 was wet; correct?

A   I don't recall what we told them during the earnings call.  The press release is not an all-encompassing body of information.

The following earnings call, which included Q&A, there may have been more and likely were more discussions about the success to date and what we believed to be the potential of the Shenandoah area.

But this press release only relates to the well that's referenced here.

Page 172

MR. DROSMAN:  Move to strike as nonresponsive.

Q   I'll ask the question again.  Actually, I'll reread it to you.

So I take it if Shen 3 was not mentioned in this press release, the company never told investors in this press release that Shen 3 was wet; correct?

A   Can you tell me when Shen 3 was concluded and could it have been in a prior quarter so, therefore, it would have been irrelevant to this quarter?

Q   Sir, I ask the questions.  Okay?  And my question is --

A   I understand.  I'm just telling you it could have been that that well was drilled in the prior quarter and it wouldn't have been reported in this quarter.

I can only tell you based upon what I see is the reference to the well that was drilled and completed during the quarter.

Q   So my question is:  So I take it if Shen 3 was not mentioned in this press release, the company never told investors in this press release that Shen 3 was wet; correct or incorrect?

Page 173

A    The well may have been drilled in a prior quarter.  I don't know and don't recall in the earnings call that followed the press release the discussion that included all of the success or lack thereof to date.  I would be happy to look at that, but I don't recall it.

Again, the press release is not intended to be the only communication with an investor.

MR. DROSMAN:  Move to strike as nonresponsive.

Q    Did the company tell investors in this press release that the resource range had been reduced because of the discovery of a north/south fault?

A    I don't recall during the earnings call what we may have included in the commentary associated with it.

But discussing resource ranges, I'm sure you've heard others previously say that we don't give resource ranges to expectations.  So, therefore, not -- in this case it would be typical that we wouldn't discuss resource ranges because we just never did.

MR. DROSMAN:  Move to strike as unresponsive.

Page 174

Q   Did the company tell investors in this press release that the resource range had been reduced because of the discovery of the north/south fault?

A   In this press release, is that the question?

Q   Yes.

A   I don't see evidence of that in this press release, no.

Q   Did the company tell investors in this press release that Shenandoah had technical challenges?

A   Well, but that would be any well has technical challenges.

Q   Did the company tell investors in this press release that Shenandoah had technical challenges?

A   No, because every well has technical challenges.

MR. DROSMAN:  Move to strike everything after no as nonresponsive.

Q   Did the company tell investors in this press release that Shenandoah had potential execution risk?

A   No, that would be a given for an investor to understand that during an exploratory evaluation

Page 175

period.

MR. DROSMAN:  Move to strike everything after "no" as nonresponsive.

Q    Were you told that after this press release that investors had lots of questions about Shenandoah from analysts?

A    I don't recall that.

Q    I'm going to show you what's already been marked as Plaintiff's 386 for identification.

If you refresh your browser, you should be able to see Plaintiff's Exhibit 386.  Let me know when you see a document bearing an exhibit sticker.

A    I have it.  This is from -- pardon me, this is a note from Chris Champion to Debbie Murphy.

Q    I would like to direct your attention to the bottom email.  Do you see it's from John Colglazier, sir?

A    Correct.

Q    It's dated October 27th, 2015; right?

A    Correct.

Q    And you received this particular email, didn't you?

A    It would appear as such, yes.

Q    And the subject was "Tonight's calls."

Do you see that?

Page 176

were going to use the wellbore from to produce.
That's why it's called a keeper well.

Q   I'm just asking you:  Who in development told you that --

A   I don't recall -- I don't recall.

I'm sure the person that prepared the AFE might have had some idea.  If you want to go back over the AFE and see who's on it, they would have been the people proposing the keeper well.

Q   Was Shen 3 drilled as a keeper well?

A   No.  It was in the exploration stage and a smaller, cheaper diameter pipe would have been drilled.

Something about the information here, there was a basis by which they drilled these as keeper wells, which would suggest the developer team had some confidence that we could be actually leading into a development that was commercial.  Otherwise, we wouldn't have proposed them as a keeper well.

MR. DROSMAN:  Move to strike everything after "no" as nonresponsive.

Q   Did you review the AFE for Shen 5?

A   I don't recall.  I do see from here this was reviewed by the entire executive committee, which

Page 214

apparently from, again, the slide it looks like both 5 and 6 were proposed as keeper wells, design wells.

So by definition if we all looked at it, we all were considering the fact that these were more expensive wells to drill as keeper wells.

Q   Did you approve the AFE for Shen 5?

A   I don't recall.

Q   You told me it would be very unusual for you to approve an AFE; correct?

A   It would be unusual, it wouldn't be -- it would be typical from the standpoint if we were over budget on a well, it may require me to have to approve it.

Typically the amount of capital that was delegated down whether it was exploration and development and being sufficient to drill a well, it's only if there was additional drilling calls, days on location, something exceeded the original AFE that was approved by someone else.

But typically we get into environments where we're looking at these kinds of expenses. This would have been a broader discussion with the entire executive committee to be sure that we all were in agreement that we had something that makes sense.

Page 215

So here the fact that someone in the development team is proposing a keeper well for 5 and 6, they are obviously seeing something from the reservoir that gave them encouragement that we were on our way to a commercial capability with the reservoir.

MR. DROSMAN: Move to strike --

THE WITNESS: Again, I would defer to the people who wrote the AFE and tell you that obviously the people writing the AFE who had signed the AFE must have had some intellectual appreciation for why they were at this point moving from exploration wells to keeper wells.

MR. DROSMAN: Move to strike everything after "it would be unusual" as nonresponsive.

I'm going to show you the next exhibit.

I'm showing you what's been marked as Plaintiff's Exhibit 421 for identification. If you refresh your browser, it should be available to you.

(Exhibit 421 was marked for identification by the court reporter.)

THE WITNESS: I've got it.

BY MR. DROSMAN:

Q You see that Plaintiff's Exhibit 421 has a heading "Authorization for Expenditure" on it;

Page 216

correct?

A   I do see that, yes.

Q   You see that the heading -- the project name is Walker Ridge 51 Number 4.

Do you see that?

A   I do.

Q   Do you understand that to be Shen 5?

A   I believe that to be Shen 5.  Again, as our prior conversation, there's nothing on the AFE that points to it being Shen 5.

Q   And you understand that you approved this particular AFE, didn't you?

A   The document says I approved it, but when I go to the signature block, I don't see anywhere where it was approved and executed.

But this document in its -- on its face would look like it had come to me -- it was recommended and it had to come to me for approval and that was done on February 1st of 2016.

Q   When you say "that was done," you mean you approved the Shen 5 AFE on February 1st, 2016?

A   No, I'm saying that's what this document would lead you to believe.

Q   Do you have any reason to believe that you did not approve the Shen 5 AFE on February 1st,

2016?

A    The only thing that gives me rise to a question is I don't know why this was not -- shown in the signature block's execution.

Staying with the AFE if you want for a minute, you can see the people there on the project team being both exploration and development people. These are the people that prepared the AFE.  These are the people that proposed this well as a keeper well.

MR. DROSMAN:  Move to strike as nonresponsive.

Let's go ahead and take a break.  It's been about an hour and 40 minutes.

THE VIDEOGRAPHER:  We're off the record. It's 4:37 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  It's 4:53 p.m.

MR. DROSMAN:  I'm going to show you what's been marked as Plaintiff's Exhibit 422 for identification.

(Exhibit 422 was marked for identification by the court reporter.)

BY MR. DROSMAN:

Page 218

# Exhibit 13

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

------------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ROBERT G. GWIN

Wednesday, October 26, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 5378978

Page 1

CONFIDENTIAL

Yes, if I scroll down, it says I was a      3:29PM
participant.

Q   Okay.  And you also spoke at this call as
well; right?

A   I don't remember it.  We have to review it      3:30PM
to know.  If you want, I'll take a moment and see if I
can validate that.

Q   Sure.  How about you --

A   As I mentioned earlier, I didn't speak on
all of the calls.                                      3:30PM

And what is interesting to me here that
I'm struggling with is it identifies both Jim
Hackett and Al Walker as chairman and CEO of
Anadarko participated on the call.

So if that was true that Al and Jim were      3:30PM
both on it, it wouldn't make sense relative to the
date.  So I think there is an error here with regard
to corporate participants unless for some reason Jim
was involved at that stage.

Q   Sure.  Let's look at Page 5.                  3:30PM

A   Okay.

Q   And you were listed as a speaker here?

A   Okay.  We're talking Page 5 of the PDF;
right?  Because I don't see page numbers on the actual
document.  But maybe it's just --                      3:31PM

Page 180

Q   Too faint.  I think this is an instance    3:31PM
where it coincides.

A   Good.  I see where it's referring to me
leading off saying, "Thanks, Evan."

Q   Right.  Okay.  What I would like for you   3:31PM
to read what it says you said and tell me whether
you disagree with any of it.

A   Perhaps to save us time, I'm happy to read
it.  But just looking at it, I think it's -- I don't
think it's me doing the talking, that they get it      3:31PM
wrong from time to time figuring out who was actually
talking.

But if a question was made on exploration,
it would have been Bob Daniels, not Bob Gwin that
was responding to it.  I think it's fair to say this   3:31PM
wasn't me despite what Reuters says here.

I don't ever recall talking about topics
like reservoirs and drilling activity and stuff.
That's why we have the experts on the call.  So I
deal with the financial questions on these calls or    3:32PM
the strategic or those kinds of questions.

Q   Okay.  Looking at this -- the content of
this, is it your testimony that you were not the
speaker?

A   That's my testimony.                        3:32PM

Page 181

CONFIDENTIAL

Q    Okay.  As to the content that was set forth here, do you have any reason to dispute that that was said, whether it was you or somebody else at Anadarko?    3:32PM

A    I don't know.  Let me read it.    3:32PM

Did you want me to read it out loud or is there -- because I need to read it to be able to answer that question, I guess.

Q    Why don't you go ahead and read it -- you can read it out loud, that's fine.  Actually, let's conserve time, so let's not do that.    3:32PM

Just read it to yourself and tell me whether you have any reason to doubt that was said on the call.

A    Yes, this clearly was not me speaking, but I don't have any reason to believe that what was said was inaccurate or -- you know, it reads to me like it's the type of context that we seek to provide on our activities.    3:34PM

Q    On earnings calls; right?    3:34PM

A    Yes.

Q    Okay.  Now, anywhere in this statement is there a disclosure that Shen 4 drilled into salt?

A    Yes, there is.  I mean, just based on I'll call it industry convention, I think where it says    3:34PM

Page 182

CONFIDENTIAL

"trying to find out where the basin edge was, and the    3:34PM

first well established where the basin edge was."

So --

Q    Does it say the word "salt"?

A    I don't think it needs to make clear it's    3:34PM

the meaning of the words.  But no, the word "salt,"

those words or that word is not here, but --

Q    The word "salt" does not appear; correct?

A    I don't think it's relevant whether or not

the word "salt" appears for the language to be clear,    3:35PM

but no, the word "salt" is not here.

Q    And it also doesn't disclose that Shen 4

found small-scale faulting?

A    I don't see that listed anywhere here in the

language.  But I also don't know that that is -- that    3:35PM

that's an accurate statement.

Q    Assuming it's accurate, it's not

disclosed; right?

A    It's not in this language in this particular

response in this document.  I haven't read the rest of    3:35PM

this document.  I don't know if it was discussed in

some other way.

Q    It's not discussed here?

A    Not in this response that I presume Bob

Daniels made to the question.    3:36PM

Page 183

CONFIDENTIAL

Q    It also doesn't disclose that there was a     3:36PM
significant downward adjustment to the resource,
range, does it?

A    It's not listed in this response.  Those
questions weren't asked, so it appears that the     3:36PM
response was related to the question that was asked.

Q    It doesn't disclose that the range post
Shen 4 was not in the P10 to P90 range of the Shen 2
results; right?

A    It doesn't say anything about Shen 2.     3:36PM

Q    It doesn't say anything about the fact
that the Shen 4 results were not in the range that
Shen 2 was; right?

A    Yes, not -- it doesn't say anything because
it's not a relevant fact to the Shen 4 results.     3:36PM

Q    It doesn't say that; right?  It does not
say anything about the downward adjustment of Shen
due to Shen 4?

A    As I mentioned -- as I said, it doesn't say
anything there because it's not relevant to the facts     3:37PM
about Shen 4.

Q    That's not what I'm asking you to decide
what is relevant.  I'm just asking you to confirm.
It is not disclosed --

A    You have an answer.  Yes, I said it twice,     3:37PM

Page 184

CONFIDENTIAL

it's clearly not in this response in this document.    3:37PM

Q    If you turn to Page 22.

A    Okay.

Q    You were listed as a speaker on Page 22?

A    Let me look at the topic.  If they got it    3:38PM
wrong once, they certainly could have again.

Yes, this doesn't look like -- it looks to
misidentify me again.  Most likely I would presume
Bob Daniels was the speaker.

Q    And the content that is attributed here,    3:38PM
could you read it to yourself and see if you have
any reason to dispute that that was stated by any
Anadarko representative on the call?

A    Okay.  I've read it.

Q    Okay.    3:39PM

A    What was the question?  I'm sorry.

Q    After reading it, do you have any reason
to doubt that that was stated by an Anadarko
representative on the earnings call?

A    No, I have no reason to doubt it.  I always    3:39PM
take these with a grain of salt slightly because if
they misidentify the speaker, does that mean they got
all the text correct?  I don't know, but there is no
reason to doubt it.

Q    There's nothing that jumps out at you?    3:39PM

Page 185

# Exhibit 14

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

In re ANADARKO PETROLEUM        ) Civil Action No.

CORPORATION SECURITIES          ) 4:20-cv-00576

LITIGATION                      )

_____ )


VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

DEPOSITION OF MARK L. ZAJAK

Wednesday, November 2, 2022

Remotely Testifying from Houston, Texas


Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5466667


PAGES 1 - 187

Page 1

2016 audits?

A.   Yes.

Q.   And what were the sources of the evidence that KPMG relied upon to make a sufficient progress assessment?                                                    11:59:18

A.   Do you mind if I just review this section for a moment?

Q.   Please go ahead.

A.   (Witness reviews).

Excuse me.  One second.                                    11:59:55

I'm back.  Sorry about that.

Daniel, might you repeat your question.

Q.   Yeah.

What were the sources of evidence that KPMG rely upon to make this sufficient assessment --   12:00:13 sufficient progress assessment?

A.   A few things.  One would be the accounting records produced by property accounting.  It would be operational reports produced by operational management, and inquiries and assessments of future   12:00:29 drilling plans, any executed ASCs and things of that sort.

Q.   And was the source of all of that information, Anadarko?

A.   I believe so, yes.                                    12:00:48

Page 64

Q.   Did KPMG also rely on information from Anadarko as to whether a dry hole had been drilled?

A.   That's the information they provided to us, yes.

Q.   And why would it have been important for   12:01:32 KPMG to know whether or not a dry hole had been drilled?

A.   As it relates to suspended wells?  Let me clarify, please.

Q.   Yes, as it relates to suspended well   12:01:48 costs, as we're discussing in this work paper.

A.   Okay.  It may or may not matter.  If the initial well that was drilled found sufficient quantities of -- of resources to justify continued appraisal of the project, whether subsequent wells   12:02:10 are or are not a dry hole, may or may not matter.

Q.   And why is that?

A.   When you -- when you look at a project that's rather significant and in deep water and, you know, very -- very deep under the ground, there's   12:02:36 only so much you can do from the surface to understand a formation.  And so, you know, drilling a --

(Interruption in audio/video.)

THE COURT REPORTER:  I'm sorry, drilling a   12:02:47

Page 65

what well?

THE WITNESS:  A single one well, you'll find resources, but that in itself is insufficient information typically to con- -- to produce from that well and to invest the capital necessary to do    12:03:02 so.  And so, the company or a company would undertake appraisal wells to understand the reservoir and to gain information about how best to exploit and develop the field.

BY MR. SOMMERS:                                              12:03:35

Q.   And is it correct that the procedures undertaken by KPMG in connection with the suspended well cost analysis are fully documented in this work paper on pages '512 and '513?

A.   I believe so, yes.                                     12:03:52

Q.   If you can look on page '514, you see a number of paragraphs with lower case Roman numerals.

A.   Yes.

Q.   Okay.  And if you can turn to the paragraph that has the letter V and has a heading,    12:04:40 "Q4 Justification"?

A.   Mm-hmm.

Q.   And what is the significance of that phrase, "Q4 Justification"?

A.   The company had capitalized Shen 3 as a    12:04:57

Page 66

suspended well.  And it's documenting management's assessment and conclusions to justify the capitalization of the Shen 3 well.

Q.   And so, does the text in this paragraph identify the audit evidence that would justify Anadarko in continuing to suspend costs associated with Shen 3?

MR. McINTYRE:  Object to the form.

THE WITNESS:  Let me read, please.

(Witness reviews).

It -- it does.

BY MR. SOMMERS:

Q.   And this section of KPMG's work paper identifies the evidence showing activities that are indicative of sufficient progress per FASB 932-360-35; is that right?

A.   Yes.

Q.   And if there was audit evidence that came to KPMG's attention that was inconsistent with sufficient progress, would that evidence be documented in this section of the work paper?

A.   We would consider all evidence germane to the question.

Q.   And if there was evidence that was inconsistent, would that be documented?

12:05:21

12:05:44

12:05:53

12:06:10

12:06:28

Page 67

A.   Yes, typically, we would assess all information.

Q.   And in this paragraph about midway through, it's written, "Per the Q4 Operations report, the approximately 1.5 times more of the same well-developed reservoir that Shenandoah-2 well found.  The well confirmed" -- well, let me stop there at the word "found."

Do you see that?

A.   I -- I see the sentences, yes.

Q.   And what was the significance of that piece of audit -- audit evidence that was memorialized in the work paper?

A.   It -- it communicated that Shen 3 added value and knowledge to the overall Shenandoah project.

Q.   And was that information indicative of sufficient progress being made to justify Anadarko continuing to suspend costs associated with Shen 3?

A.   You may need to clarify your question. That is a justification for capitalization of Shen 3.  The justification for, as you say, sufficient progress is based on management's intent to continue drilling and funding capital for the project primarily.

Page 68

Q.   So the -- the -- is it correct that the language that I read into the record supported Anadarko's accounting decision to suspend the costs with respect to Shen 3?

A.   Yes.                                          12:08:19

Q.   Was KPMG aware of any evidence that was inconsistent with that statement at the time that this work paper was drafted?

A.   Not to my knowledge.

Q.   And it -- again, if KPMG was aware of any   12:08:34 contrary evidence, that contrary evidence would have been included in this work paper; correct?

A.   Normally, yes.

Q.   Okay.  And the -- the next sentence in that same paragraph states, "The well confirmed the   12:08:55 sand dispositional environment, lateral sand continuity, reservoir qualities and down-dip thickening."   [As read]

Do you see that?

A.   I do.                                        12:09:08

Q.   And what, if anything, was the significance of that audit evidence?

A.   I -- I read that to mean that -- that, you know, Shen 1 provided some information that -- that told management about the reservoir that Shen 2   12:09:25

Page 69

continued to tell information about the nature of the geological formation and the underlying reserves.

Q.   And did this audit evidence support Anadarko's accounting decision to suspend costs with respect to Shen 3?   12:09:41

A.   Yes.

Q.   And what was the source of the information in the language I read into the record?

A.   It's noted in the paragraph from the -- the operational report.   12:10:00

Q.   And was that a document provided to KPMG by Anadarko?

A.   I believe it to be a report that's generated by the operations area of Anadarko.  They may even place it -- make it publicly available.   12:10:19

Q.   Okay.

MR. SOMMERS:  Let me have marked as the next exhibit, a document which says "Operations Report" on the top of it.  And it has production numbers APC-00002814.   12:10:35

(Zajac Deposition Exhibit 486 was marked electronically.)

MS. BASSIOUNY:  That document has been introduced as Exhibit 486.  It's loading now, so.   12:10:59

Page 70

BY MR. SOMMERS:

Q.   Do you have that document in front of you, 486?

A.   No, it's not pulling up.

Q.   Okay.                                    12:11:37

A.   Just -- it may be --

MS. BASSIOUNY:  It's -- it's -- it'll load -- it should load right now.

THE WITNESS:  Okay.

Okay, I have it.  I'm pulling it up now.    12:11:51

BY MR. SOMMERS:

Q.   Okay.  And my first question to you will be whether you recognize it.

A.   Generally speaking, yes.  But not the specifics.                                  12:12:02

Q.   And -- and what do you recognize it to be?

A.   Well, the title is the "Fourth-Quarter Operations Report."

Q.   Okay.  And if you can turn to the page with production numbers that end in '825, the    12:12:19 internal page is -- number is 12.  At the top of the doc -- the page, it says "Gulf of Mexico."

A.   Okay.

Q.   And you'll see on the left side, there's a heading that says, "Exploration/Appraisal of    12:12:40

Page 71

Shenandoah, Walker Ridge," and then there's a bullet point paragraph.

Do you see that paragraph?

A. Yes.

Q. Read -- reading that paragraph to    12:12:52 yourself, does that refresh your recollection that this document was the source of the information that we were discussing that was included in the Q4 justification in the prior marked exhibit, 485?

A. Yes, the words -- the words are parallel.    12:13:14

Q. And do you believe that you saw this document at the time that the 485 was being prepared?

A. I honestly can't recall.

Q. Okay. And you would agree, would you not,    12:13:37 that nowhere in the paragraph that we were discussing in 486, it -- does it say that Shen 3 was a dry hole; correct?

A. Let me just quickly read it, please.

(Witness reviews.)    12:14:23

Correct.

Q. Going back, if you can, to 485, can you pull that back up.

A. I'm there.

Q. And where we were reading, where it    12:15:22

Page 72

# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| GEORGIA FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : Civil Action No. 4:20-cv-00576 |
| | : |
| | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| ANADARKO PETROLEUM CORPORATION, R.A. WALKER, ROBERT G. GWIN, ROBERT P. DANIELS, and ERNEST A. LEYENDECKER, III, | : |
| | : |
| | : |
| | : |
| Defendants. | : |
| | : |

**EXPERT REPORT OF ALLEN FERRELL, PH.D.**

**December 10, 2021**

# TABLE OF CONTENTS

I.  Qualification ........................................................................................................... 2

II.  Background ............................................................................................................. 3

III.  Plaintiffs' Allegations and the Steinholt Report .................................................. 7

IV.  Assignment and Summary of Opinions ................................................................ 8

V.  Scientific Foundations for Price Impact Analysis ............................................. 10

VI.  Analysis of Alleged Misstatement Dates ........................................................... 16

VII.  Analysis of the Alleged Corrective Disclosure Date ......................................... 26

VIII.  The Economic Nature of the Disclosures ........................................................... 36

IX.  Mr. Steinholt's Statements Regarding His Ability To Calculate Class-Wide
Damages In This Case ........................................................................................ 40

## I.    Qualification

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, and a member of the editorial board of the Journal of Financial Perspectives. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of securities matters. My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.    I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,250, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

2

5.     The materials I have considered are listed in **Appendix B**.

6.     This report is subject to change or modification should additional relevant information become available which bears on the analysis, opinions, or conclusions contained herein. I may also seek to respond to opinions or analyses proffered by other experts. I further reserve the right to amend or supplement this report on instruction of counsel or as a result of any motion or court order that may impact the nature or scope of claims and issues in this litigation. I may also prepare illustrative exhibits based on the contents of this report if I am called upon to testify at trial.

## II.    Background

7.     Anadarko Petroleum Corporation ("Anadarko" or the "Company") was one of "the world's largest independent exploration and production companies."[1] As of May 2, 2017, Anadarko had a market capitalization (i.e., Anadarko share price multiplied by its shares outstanding) of $31 billion.[2] The Company also reported revenues of $7.9 billion in 2016 and assets of $45 billion as of March 31, 2017.[3]

8.     Anadarko had a large portfolio of assets. As of the end of 2016, it had U.S. onshore assets in the lower 48 states and Alaska, "where the Company operate[d] approximately 12,700 wells and own[ed] interests in approximately 3,500 nonoperated wells."[4] Anadarko also had exploration and production activities internationally, including in Algeria, Ghana, Mozambique, Colombia, and Côte d'Ivoire.[5] In addition, as of December 31, 2016, "Anadarko own[ed] an average working interest of 70% in 327 blocks in the Gulf of Mexico, operat[ed] 10 active floating platforms, and h[eld] interests in 39 fields."[6]

---

[1] Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at p. 4.

[2] ©2021 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business.

[3] Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at p. 86 & Anadarko Petroleum Corporation, Form 10-Q, March 31, 2017 at p. 5.

[4] Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at pp. 4 & 7.

[5] Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at p. 4.

[6] Anadarko Petroleum Corporacion, Form 10-K, December 31, 2016 at p. 9.

9.     One of those 39 fields in the Gulf of Mexico was Shenandoah.[7] On February 4, 2009, Anadarko announced that "[t]he Shenandoah discovery well … encountered net oil pay" and that "Anadarko and the co-owners of the discovery are evaluating the well results and the next steps toward future appraisal activity."[8, 9] Following this discovery, Anadarko subsequently drilled five appraisal wells in Shenandoah. Anadarko began drilling Shenandoah-2 ("Shen-2") in 2Q 2012, Shenandoah-3 ("Shen-3") in 2Q 2014, Shenandoah-4 ("Shen-4") in 2Q 2015, Shenandoah-5 ("Shen-5") in 1Q 2016, and Shenandoah-6 ("Shen-6") in 4Q 2016.[10]

10.     By way of background, below I articulate certain basic facts about oil and gas exploration and production. These facts were publicly available to any market participant or observer, such as me.[11] Before reaching the development stage of an oil field (i.e., when oil is actually produced), exploratory wells are drilled followed by appraisal wells. The Shenandoah "discovery well" discussed above is an exploratory well and, as pointed out earlier, Shen-2 through Shen-6 were appraisal wells. While exploration drilling is "carried out to determine whether hydrocarbons are present in a particular area or structure," an appraisal well is drilled "to determine the physical extent and likely production rate of a field."[12] The information from drilling an appraisal well is used to determine "the most efficient way of developing a discovery or whether it makes economic sense to drill at all."[13] Appraisal wells have a higher chance of

---

[7] Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at p. 9.

[8] "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," *Business Wire*, February 4, 2009 (7:28 AM).

[9] All timestamps throughout the report are in Eastern time unless otherwise specified.

[10] "Cobalt International Energy, Inc. Announces Second Quarter 2012 Results and Successful Cameia #2 Appraisal Well Offshore Angola," *Business Wire*, July 31, 2012; Anadarko Petroleum Corporation, Form 10-K, December 31, 2014 at p. 9; Anadarko Petroleum Corporation, Form 10-K, December 31, 2015 at p. 10; Anadarko Petroleum Corporation, Form 10-K, December 31, 2016 at p. 11.

[11] I am not an oil and gas exploration industry expert and my discussion of this topic is a non-technical one.

[12] Colorado Oil and Gas Conservation Commission Glossary of Oil and Gas Terms, https://cogcc.state.co.us/COGIS_Help/glossary.htm (last accessed December 9, 2021).

[13] "Back-to-basics: A guide to the different types of wells used by oil & gas companies," *Value the Markets*, September 11, 2019, https://www.valuethemarkets.com/analysis/back-to-basics-a-guide-to-the-different-types-of-wells-used-by-oil-gas-companies (last accessed December 9, 2021).

4

finding hydrocarbons (i.e., not a "dry hole") and are more expensive than exploration wells.[14] The chance of success of an appraisal wells depends on the probabilities of several risk elements and "if any of the elements fail then we have an unsuccessful appraisal well."[15] The Shenandoah project had two dry holes (Shen-3 and Shen-6) and three that found oil (Shen-2, Shen-4, and Shen-5).[16]

11.    In light of the Shenandoah project's riskiness, some analysts assigned a low to zero value to Shenandoah. For example, in a report dated July 6, 2015, despite acknowledging that "Shenandoah could be one of the largest GOM [Gulf of Mexico] discoveries," a Jefferies analyst gave "no credit" to Shenandoah in their "Risk-Adjusted Asset Value."[17]

12.    In addition, throughout the purported Class Period, Anadarko disclosed that, at then-prevailing oil prices, it was not going to sanction (i.e., would not develop) the Shenandoah project. For example, on April 12, 2016, a Wellington analyst (i.e., a buy-side analyst) noted:

---

[14] "Back-to-basics: A guide to the different types of wells used by oil & gas companies," *Value the Markets*, September 11, 2019 accessed at https://www.valuethemarkets.com/analysis/back-to-basics-a-guide-to-the-different-types-of-wells-used-by-oil-gas-companies; Schlumberger Oilfield Glossary, https://glossary.oilfield.slb.com/en/Terms/d/dry_hole.aspx (last accessed December 9, 2021) (defining "dry hole" as a "wellbore that has not encountered hydrocarbons in economically producible quantities.").

[15] A. Foum, "Risking Appraisal and Development Wells within Oil and Gas Fields," July 16, 2018, https://www.linkedin.com/pulse/risking-appraisal-development-wells-within-oil-gas-fields-alan-foum/ (last accessed December 9, 2021). The risk elements mentioned in the article are SCV (structure, contact, and volume), reservoir presence, reservoir effectiveness, hydrocarbon charge, and trap effectiveness.

[16] Anadarko 2013 Form 10-K, at p. 9 ("Similar to the initial Shenandoah discovery, well log and pressure data from the Shenandoah-2 well indicated excellent-quality reservoir and fluid properties. The targeted pay sands were full of oil with no oil-water contact."); ConocoPhillips 4Q 2014 Earnings Call Transcript, January 29, 2015 ("… some dry hole costs related to the Shenandoah appraisal well that we wrote off as well ….");"Morning Energy Summary," Capital One, February 2, 2015, FIAM--ANAD-005012, at 5013 ("ConocoPhillips reported last Thurs that the 2nd appraisal well at Shenandoah was a dry hole."); "Anadarko Announces Third-Quarter 2015 Results," Anadarko Press Release, October 27, 2015; Anadarko Petroleum Corporation, Form 10-K, December 31, 2015 at p. 10; "Anadarko Announces Second-Quarter 2016 Results," Anadarko Press Release, July 26, 2016; "ConocoPhillips Reports First-Quarter 2017 Results; On Track to Delivery 2017 Operating Plan and Accelerate Value Proposition," ConocoPhillips Press Release, May 2, 2017 (7:00 AM) ("First-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico.").

[17] "Oil & Gas Exploration & Production Reduce Nat Gas Price Outlook, Remain Constructive; Upgrade APC, NBL, EOG," Jefferies, July 6, 2015, JanHen_00035055, at 5055 ("While we believe Shenandoah could be one of the largest GOM discoveries, we currently give no credit in our RAAV [Risk-Adjusted Asset Value] due to needed improvements in drilling technology (new build drillships with dual 20k PSI BOPs), which are unlikely to be available in the near-term."). *See infra* ¶ 69 for more examples.

"The operator [Anadarko] is on record saying they wouldn't sanction [Shenandoah] until oil was back in the $70's given where costs are today."[18]

13.    Ultimately, Anadarko announced the suspension of appraisal activity in Shenandoah in its 1Q 2017 earnings release and 1Q 2017 Form 10-Q after market close on May 2, 2017. Specifically, on May 2, 2017 at 4:16 PM, Anadarko issued a press release noting that it "recently completed drilling operations at the Shenandoah-6 appraisal and sidetrack well, which did not encounter the oil-water contact in the eastern portion of the field" and that the "company has currently suspended appraisal activity in the field while it evaluates the path forward."[19] Then, a few minutes later at 4:26 PM, Anadarko filed its 1Q 2017 Form 10-Q with the SEC.[20] In that Form 10-Q, Anadarko disclosed that "[d]uring the three months ended March 31, 2017, the Company expensed suspended exploratory well costs of $435 million related to the Shenandoah project in the Gulf of Mexico" and that it would recognize $467 million of impairments related to the Shenandoah project.[21]

14.    Shortly after the filing of its Form 10-Q, news that linked a cut abandoned gas flow line leading from an Anadarko well to a fatal house explosion in Firestone, Colorado was disclosed. At 4:51 PM on May 2, 2017, the *Denver Post* reported that fire investigators found a fatal house explosion on April 17, 2017 in Firestone, Colorado was caused by odorless gas seeping from a cut-off underground pipeline running from an Anadarko well into the house.[22] Soon after the firefighters released their report, then Colorado Governor John Hickenlooper ordered oil and gas companies statewide to inspect and pressure-test oil and gas flowlines within

---

[18] Email from Mark N. Viviano at Wellington dated April 12, 2016 re "Marathon (MRO,1,$8B): great WY sale but negative Shenandoah comp for APC/CIE, WMC-APC-0000317, at 0321. *See infra* ¶ 70 for more examples.

[19] "Anadarko Announces First-Quarter 2017 Results," Anadarko Press Release, May 2, 2017 (4:16 PM).

[20] Timestamp per SEC.gov, https://www.sec.gov/Archives/edgar/data/0000773910/000077391017000033/0000773910-17-000033-index.htm (last accessed December 9, 2021).

[21] Anadarko Petroleum Corporation Form 10-Q, March 31, 2017, at pp. 13 & 37.

[22] "Deadly Firestone explosion caused by odorless gas leaking from cut gas flow pipeline," *Denver Post*, May 2, 2017 (4:51 PM).

1,000 feet of occupied buildings.[23] Related to this incident, Anadarko shut down 3,000 of its older, vertical oil and gas wells in northeastern Colorado as a precaution.[24] In response to this news, at 5:18 PM, Anadarko issued a statement that it would "continue to cooperate fully with all ongoing investigations" and that it would "continue to work with the Colorado Oil and Gas Conservation Commission (COGCC) on additional steps or actions the agency deems necessary."[25] Analysts had an adverse reaction to this news. For example, a Macquarie analyst noted that "[t]he findings of the Firestone investigation are a clear negative for Anadarko" and that "Colorado is already one of the most stringently regulated states in the nation in respect to energy and is likely to see increased pressure following this incident."[26] One analyst estimated that at a cost of $100,000 per well, the total remediation cost alone could be $140 million.[27]

## III.    Plaintiffs' Allegations and the Steinholt Report

15.    Plaintiffs filed this lawsuit on behalf of purchasers of Anadarko common stock from February 20, 2015 through May 2, 2017 (the purported "Class Period") alleging that, "[l]eading up to and throughout the Class Period, Defendants engaged in a fraudulent scheme through various means and methods that operated as a deception on the investing public concerning the size and commercial viability of the Shenandoah project and a whistleblower complaint about Defendants' multi-billion dollar securities fraud."[28] Plaintiffs claim that the "lack of commercial viability of the Shenandoah project was first revealed to the market in Anadarko's 1Q 2017 Form 10-Q," which was filed after market close on May 2, 2017.[29] Specifically, Plaintiffs claim that Anadarko's announcement that it was writing off $435 million

---

[23] "Deadly Firestone explosion caused by odorless gas leaking from cut gas flow pipeline," *Denver Post*, May 2, 2017 (4:51 PM).

[24] "Deadly Firestone explosion caused by odorless gas leaking from cut gas flow pipeline," *Denver Post*, May 2, 2017 (4:51 PM).

[25] "Anadarko Issues Statement Regarding Firestone Accident," Anadarko Press Release, May 2, 2017 (5:18 PM).

[26] "Where do we go from here?," Macquarie Research, May 3, 2017, at pp.1-2.

[27] "Colorado is Not Macondo," Credit Suisse, May 3, 2017.

[28] Amended Complaint for Violations of The Federal Securities Laws, No. 4:20-vc-00576, U.S. District Court, Southern District of Texas, Houston Division, filed August 17, 2020 ("Complaint") at ¶ 29.

[29] Complaint ¶ 152.

in expensed suspended exploratory well costs and taking a $467 million impairment of the Shenandoah asset revealed Shenandoah's "lack of commercial viability" to the market.[30]

16.    Plaintiffs submitted the expert report of Bjorn I. Steinholt, CFA, dated October 1, 2021 ("Steinholt Report"). In that report, Mr. Steinholt concludes that "the market in which Anadarko common stock traded throughout the Class Period was impersonal, open, well developed, and efficient in that the market prices quickly responded to incorporate and reflect new, material information as it became publicly available" and "it was reasonable for investors to rely on the integrity of the market prices of Anadarko's common stock throughout the Class Period as reflecting all publicly available information about the Company."[31] As part of his analysis, Mr. Steinholt claims "to assess 'cause and effect' relating to Company-specific information" by examining "Anadarko's price reactions following the alleged corrective disclosure after the market closed on May 2, 2017."[32] Mr. Steinholt finds that "[f]ollowing Anadarko's May 2, 2017 disclosure about Shenandoah, Anadarko's stock price declined … $4.33 per share, or 7.69%" on May 3, 2017 and that this price decline "was statistically significant at the 1% level."[33] Mr. Steinholt also opines that "class-wide damages can be calculated in this case using the event-study damages framework."[34]

## IV.    Assignment and Summary of Opinions

17.    I was asked by Cravath, Swaine & Moore LLP, counsel for Defendants, to analyze whether the alleged misstatements identified in the Complaint and their purported correction with the revelation of the alleged truth had a price impact on Anadarko's stock price. I have also been asked to consider Mr. Steinholt's statements regarding his claimed ability to calculate class-wide damages in this case. In performing this task, I have been assisted by staff at Compass Lexecon. Based on my review of the materials in **Appendix B**, I have formed the following opinions:

---

[30] Complaint ¶ 152.

[31] Steinholt Report, ¶ 9.

[32] Steinholt Report, ¶ 41-42.

[33] Steinholt Report, ¶ 44.

[34] Steinholt Report, ¶ 10.

8

a. On 18 out of the 21 alleged misstatement dates identified in the Complaint,[35] there was no statistically significant price increase.[36] On the remaining three alleged misstatement dates, the Shenandoah disclosures on these dates were stale and, as such, assuming markets are efficient, I would not expect Anadarko's stock price to react to these Shenandoah disclosures.[37] Moreover, on these three dates, market commentators attributed Anadarko's stock price increase to factors unrelated to Shenandoah.[38]

b. There is no reliable economic basis to conclude that the alleged Anadarko May 2, 2017 corrective disclosures about Shenandoah had a price impact on Anadarko's stock price. Specifically:

    i. Anadarko's disclosure after market close on May 2, 2017 that Shen-6 was a dry hole was previously disclosed by ConocoPhillips, a partner of Anadarko in Shenandoah with a similar percentage of ownership in the project, before market open on May 2, 2017.[39] On May 2, 2017, both ConocoPhillips's and Anadarko's stock price reactions were not statistically significant.[40] This indicates that the disclosure that Shen-6 was a dry hole could not have had an impact on Anadarko's stock price on May 2, 2017.

    ii. Similarly, Anadarko's disclosures of the suspension of appraisal activity at Shenandoah and the impairment of the value of Shenandoah did not result in a statistically significant price reaction by ConocoPhillips's stock price on May 3, 2017 or when ConocoPhillips itself disclosed similar information on May 5, 2017.[41] This indicates that the Shenandoah disclosures could not have had an impact on Anadarko's stock price on May 3, 2017.

    iii. The disclosure about a fire and explosion related to an Anadarko well in Firestone, Colorado explains Anadarko's price decline on May 3, 2017. Market commentary and the price declines on May 3, 2017 of the stock prices of the other oil firms that operated in Colorado, which were also affected by the new Colorado

---

[35] Complaint ¶¶ 97-141.

[36] *See* **Table 1**.

[37] Two of Plaintiffs' claims on these dates are mistaken. *Infra* ¶¶ 36 & 38.

[38] *Infra* ¶¶ 36-50.

[39] "ConocoPhillips Reports First-Quarter 2017 Results; On Track to Deliver 2017 Operating Plan and Accelerate Value Proposition," *Business Wire*, May 2, 2017 (7:00 AM).

[40] *See* **Table 2**.

[41] *See* **Table 3** and **4**.

9

inspection and testing mandate, explain Anadarko's price decline on May 3, 2017.[42]

c.   The lack of price impact of the alleged misstatements as well as the alleged corrective disclosure is consistent with the economic nature of the disclosures. As discussed earlier, Anadarko's disclosures throughout the purported Class Period as well as contemporaneous market participant commentary reveal that the market was aware of the inherent riskiness of the appraisal stage of the project. Moreover, even if successful, the Shenandoah project's economic viability was dependent on oil prices, which were not at levels that would have made the project viable when the alleged misstatements and the alleged corrective disclosure were made.[43]

d.   With regards to Mr. Steinholt's statements regarding his ability to calculate class-wide damages in this case, Mr. Steinholt has stated that he will use the same approach (his "event-study damages framework") to damages regardless of whether the theory of liability is a (i) materialization of an undisclosed risk or (ii) the company knew from the outset that Shenandoah was not viable (i.e., the risk of failure was a certainty).[44] Indeed, Mr. Steinholt testified that it was irrelevant for him to know what Plaintiff's theory of liability is.[45] How his "event study damages framework" applies to two very different theories concerning what constitutes corrective information (information concerning the undisclosed risk of failure versus information that the project was going to fail with certainty) is left entirely unexplained.

18.   I elaborate on the above opinions in the rest of this report.

## V.   Scientific Foundations for Price Impact Analysis

19.   I will begin by providing an overview of stock price behavior and efficient markets before turning to the appropriate analytical framework for conducting a price impact analysis.

### A. Stock Price Behavior and Efficient Markets

20.   In an efficient market, finance theory dictates that stock prices reflect the expected future cash flows of a company.[46] These expectations are influenced by market,

---

[42] *Infra* ¶¶ 64-66.

[43] *Infra* ¶¶ 70-72.

[44] Virtual Deposition of Bjorn Steinholt, November 17, 2021 ("Steinholt Dep. Tr.") 60:11-61:9.

[45] Steinholt Dep. Tr. 69:8-17.

[46] R. Brealey and S. Myers, 2003, *Principles of Corporate Finance* (McGraw-Hill/Irwin), pp. 60-61.

10

industry, and company-specific factors. In an efficient market, stock prices reflect the total mix of publicly available information regarding these expected future cash flows.[47] Publicly available information containing such value-relevant information can encompass everything from a company's public SEC filings to newspaper articles.

21.    A central tenet of the efficient market hypothesis is that as new information becomes public, stock prices "quickly and fully" reflect that information.[48] Therefore, only disclosures of information that significantly alter the total mix of publicly available information impact the price of a stock. Only new public information will necessitate a revision of the company's expected future cash flows and the risk thereof and, hence, result in a changed stock price. In other words, only new information is "news" in an efficient market, as previously known or expected information would have already been incorporated into the stock price of a security in an efficient market.[49] Moreover, in an efficient market, new relevant information would be expected to impact any company to which such information is value relevant, regardless of who released the information.[50]

22.    The academic literature has explored how "quickly" new information is "fully" reflected in the stock price in an efficient market. Numerous academic studies indicate that an efficient market's reaction to new events is immediate and unbiased.[51] As stated in the Steinholt Report, Anadarko common stock traded in an efficient market during the purported Class

---

[47] R. Brealey, S. Myers, and A. Marcus, 2004, *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin, p. 165.

[48] C. Jones, 2013, *Investments: Analysis and Management.* John Wiley & Sons, Inc. p. 320.

[49] *See, e.g.,* E. Elton, M. Gruber, S. Brown, and W. Goetzmann, 2003, *Modern Portfolio Theory and Investment Analysis,* John Wiley & Sons, Inc. p. 403.

[50] *See., e.g.,* G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation," Journal of Law and Economics, Vol. 24, 129-135.

[51] *See, e.g.,* S.P. Kothari, 2001, "Capital Markets Research in Accounting," *Journal of Accounting and Economics,* Vol. 31, 105-231; L. Ederington, and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* Vol. 30, 117-134; J. Busse and T.C. Green, 2002, "Market Efficiency in Real Time," *Journal of Financial Economics.* Vol. 65, 415-437; N. Visaltanachoti and T. Yang, 2010, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance,* Vol. 34, 594-605; A. Černý, 2004, "Stock Market Integration and the Speed of Information Transmission," Working Papers Series – Charles University, 1-25.

11

Period.[52] For the purposes of my analysis, I have assumed that Anadarko common stock traded in an efficient market during the purported Class Period.

23.    There is a widely used and generally accepted statistical framework known as an event study for testing whether there was, in fact, a stock price movement associated with the disclosure of new value-relevant public information.[53] An event study controls for market and industry effects (estimated with the use of market and industry indices) on the stock price, thereby isolating the portion of the stock price movement that is company-specific (the "abnormal return").[54]

24.    The event study examines whether the observed abnormal, or company-specific, return of a stock over a given time interval (i.e., "event window") is outside the range of typical random stock price fluctuations observed for that stock.[55] An event window that compares the closing price on the prior day to the closing price on the day on which the new information was disclosed is typical.[56] The Steinholt Report filed by Plaintiffs likewise uses this typical market-close to market-close time window for the event study conducted therein.[57]

25.    If the abnormal return falls outside the range that accounts for the typical random stock price fluctuations (i.e., a "confidence interval"), it is considered to be statistically significant. If the stock price movement is indistinguishable from random price fluctuations (i.e., falls within the confidence interval), the movement is fully explainable by movements in the

---

[52] Steinholt Report, ¶ 9.

[53] *See, e.g.,* A. Ferrell and A. Saha, 2007, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* Vol. 63, 163-186.

[54] *See, e.g.,* R. Weil, et al., 2007, *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc., Appendix A, p. 18.

[55] To control for market and industry effects, a regression analysis is employed in order to predict the company's stock return based on the observed market and industry returns. The residual return is then the difference between the company's actual stock return and the return predicted by the regression model. *See, e.g.,* R. Weil, et al., 2007, *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc., Appendix A, p. 19.

[56] A different event window than the typical close-to-close window may be appropriate depending on the facts and circumstances, such as an event window that runs from market-close to market-open. *See, e.g.,* L. Ederington and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* Vol. 30, 117-134.

[57] Steinholt Report, Exhibit D.

market and industry and cannot be attributed to the new company-specific information announced on the event date.[58] An abnormal return is typically considered "statistically significant" in an event study if it lies outside the 95% confidence interval (i.e., lies outside the range that accounts for 95% of random price fluctuations).[59] An abnormal return that falls outside of the 95% confidence interval is considered to be significant at the 5% level.

26.    In order to test whether an observed abnormal return is significant at the 5% level, a "t-statistic" is calculated by dividing the abnormal return by the standard error of the regression.[60] The probability of observing a given t-statistic by random market fluctuations is then measured. This probability is known as a "p-value." The lower the p-value, the less likely it is that the price movement is a result of random market fluctuations. Thus, it is when the p-value is 5% (i.e., 0.05) or less that the abnormal return is considered statistically significant. In conducting his event studies on the dates he studied, Mr. Steinholt likewise used 5% as the applicable standard.[61]

27.    The analysis of stock price behavior does not end with a finding of a statistically significant abnormal return from an event study. Suppose that an event study finds a statistically significant abnormal return that is contemporaneous with a public disclosure of firm-specific information. In order to attribute the stock price movement to the public disclosure, there is still another crucial step in the analysis. As one textbook explains:

> An event study can tell us that something happened, but it can't tell us *why*. To explain positive or negative abnormal returns, we must closely examine the events and institutions involved…The event study technique does not eliminate the need to assess cause through deductive reasoning; it only…helps delineate what needs to be explained.[62]

---

[58] *See, e.g.,* C. Corrado, 2011, "Event Studies: A methodology review," *Accounting and Finance,* Vol. 51, 209-211.

[59] Using a 95% confidence interval for determining statistical significance is a standard metric for event studies. *See* Federal Judicial Center, 2011, *Reference Manual on Scientific Evidence,* National Academies Press, 2011, 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.").

[60] *See, e.g.,* J. Wooldridge, 2013, *Introductory Econometrics: A Modern Approach,* Cengage Learning, 130.

[61] Steinholt Report, ¶ 41.

[62] R. Gilson and B. Black, 1995, *The Law and Finance of Corporate Acquisitions,* Foundation Press, 221 (emphasis in original).

28.    For example, if the particular disclosure at issue was simply repeating information already known to the market, a researcher could not attribute, consistent with efficient markets, an abnormal return – regardless of whether it happens to be statistically significant – to such a disclosure. Disclosures that simply repeat information already known to the market or that pertain to matters that are irrelevant to market participants would not cause a revision in the company's expected future cash flows or the risks thereof and, hence, would not affect its stock price.

29.    Another example is when there are multiple pieces of information disclosed contemporaneously on a day when an event study finds a statistically significant price movement. In such cases, an event study analysis alone cannot determine which piece of information was value-relevant. Moreover, even when there are multiple pieces of value-relevant information, an event study analysis cannot parse out the price impact of the multiple pieces of information.

## B.  Price Impact and the Alleged Truth

30.    The price impact inquiry is focused on stock price reactions to a particular type of disclosure: the alleged truth. Specifically, the price impact inquiry consists of analyzing the following hypothetical: if the company had revealed to the market the alleged truth – rather than concealing it by making the alleged misstatements – would such a disclosure have resulted in a stock price movement? If so, the alleged misstatements have price impact. It is crucial to emphasize that the "alleged truth" that could and should have been disclosed earlier – the focal point of the price impact inquiry – is a function of Plaintiffs' theory of liability. Once the truth that had been allegedly misstated and concealed has been identified by Plaintiffs, a financial economist can then apply the scientific framework discussed above, including event study analysis, to test for price impact.

31.    To apply the scientific framework discussed above to this question, the standard approach then is to analyze the stock price behavior when the alleged misstatements and disclosures actually occurred. If the alleged misstatements in fact caused the market to view the company more favorably than before (and presumably more favorably than if it had been told the alleged truth that was being concealed), then one would expect to observe a positive and statistically significant abnormal return on these dates. In a similar vein, a researcher should

14

analyze stock price behavior when the alleged truth was actually disclosed (the "corrective disclosures").

### C. Price Impact of Shenandoah Disclosures on Anadarko and Price Reaction of ConocoPhillips

32.    In this case, we have an additional method to test whether Shenandoah disclosures had a price impact on Anadarko's stock – ConocoPhillips's stock price reaction on the dates of the Shenandoah disclosures. During the Class Period, Anadarko and ConocoPhillips had similar working interests in Shenandoah. Anadarko had a 30% working interest in Shenandoah at the start of the purported Class Period, but its ownership later increased to 33% on July 27, 2016 and remained at that level through the end of the purported Class Period.[63] By comparison, ConocoPhillips had a 30% working interest in Shenandoah during the entire purported Class Period.[64] Therefore, given Anadarko's and ConocoPhillips's similar level of ownership in Shenandoah, I would expect new value-relevant Shenandoah information to affect both Anadarko and ConocoPhillips. Consistent with this, Mr. Steinholt testified that one can look at the price reaction of ConocoPhillips to determine whether disclosures related to Shenandoah would affect Anadarko.[65] In light of the above, in my analysis of alleged misstatement dates and alleged corrective disclosures below, I use the price reaction, if any, of ConocoPhillips as an additional test of whether new value-relevant information related to Shenandoah would have a price impact on Anadarko.

33.    I will now apply the scientific framework discussed above to assess whether there was a price impact on Anadarko's common stock price associated with the alleged misstatements. I will do so in two steps. First, I will assess whether the alleged misstatements in the Complaint caused a price impact when made by analyzing whether they caused positive and statistically significant abnormal returns on those dates. Second, I will assess whether the alleged

---

[63] Anadarko Petroleum Corporation SEC Form 10-K, December 31, 2013 at p. 9 & Anadarko Petroleum Corporation SEC Form 10-K, December 31, 2016 at p. 11.

[64] ConocoPhillips SEC Form 10-K, December 31, 2014 at p. 8 & ConocoPhillips SEC Form 10-K, December 31, 2016 at p. 7.

[65] Steinholt Dep. Tr. 13:15-21 ("Q: You said that the corrective disclosure here was unexpected. What's your basis for saying that?" A: "It's by reading analyst reports, by reading or by looking at the rection by other partners, Cobalt and Conoco Philips [*sic*].").

15

corrective disclosure concerning Shenandoah that supposedly revealed the truth caused a price impact at the time it was made.

## VI.   Analysis of Alleged Misstatement Dates

34.   Plaintiffs identified 21 alleged misstatement dates in the Complaint. **Table 1** below details the results of the event study regression analysis for each of the alleged misstatement dates. Specifically, it reports for each alleged misstatement date Anadarko's abnormal return, the associated t-statistic, and whether the abnormal return is statistically significant at the 5% level (i.e., whether the absolute value of the t-statistic is greater than or equal to 1.96).

**Table 1**
**Regression Results for Alleged Misstatements**

| | Timestamp [A] | Event [B] | Statistics [C] | Results [D] |
|---|---|---|---|---|
| 1 | 02/20/15 4:35 PM (Price Reaction Date: 02/23/15) | Anadarko files 2014 Form 10-K. (Complaint ¶¶ 97-99) | Abnormal Return<br>t-Statistic<br>Positive and Stat. Significant? | 0.63%<br>0.48<br>No |
| 2 | 03/03/15 8:50 AM (Price Reaction Date: 03/03/15) | Anadarko issues capital expectations and guidance press release and hosts 2015 capital program and guidance conference call with investors and analysts. (Complaint ¶¶ 101-103) | Abnormal Return<br>t-Statistic<br>Positive and Stat. Significant? | 0.39%<br>0.30<br>No |
| 3 | 5/4/15 4:22 PM (Price Reaction Date: 5/5/15)<br><br>5/5/15 9:00 AM (Price Reaction Date: 5/5/15) | Anadarko files 1Q 2015 Form 10-Q. (Complaint ¶ 104)<br><br>Anadarko hosts 1Q 2015 earnings call. (Complaint ¶ 105) | Abnormal Return<br>t-Statistic<br>Positive and Stat. Significant? | -2.20%<br>-2.31<br>No |
| 4 | 5/20/15 9:30 AM (Price Reaction Date: 5/2015) | Anadarko hosts the UBS Global Oil and Gas Conference. (Complaint ¶ 106) | Abnormal Return<br>t-Statistic<br>Positive and Stat. Significant? | -0.73%<br>-0.77<br>No |
| 5 | 7/28/15 4:05 PM (Price Reaction Date: 7/29/15) | Anadarko issues 2Q 2015 press release. (Complaint ¶ 107) | Abnormal Return<br>t-Statistic<br>Positive and Stat. Significant? | 2.98%<br>3.44<br>Yes |

| | | | | |
|---|---|---|---|---|
| | 7/29/15 9:00 AM (Price Reaction Date: 7/29/15) | Anadarko hosts 2Q 2015 earnings call. (Complaint ¶ 108) | | |
| 6 | 10/27/15 4:05 PM (Price Reaction Date: 10/28/15) | Anadarko issues 3Q 2015 press release. (Complaint ¶ 109) | Abnormal Return t-Statistic Positive and Stat. Significant? | -2.67% -2.98 No |
| | 10/28/15 9:00 AM (Price Reaction Date: 10/28/15) | Anadarko 3Q 2015 earnings call. (Complaint ¶¶ 110-112) | | |
| 7 | 11/11/15 10:18 AM (Price Reaction Date: 11/11/15) | Anadarko hosts call with investors and analysts. (Complaint ¶ 113) | Abnormal Return t-Statistic Positive and Stat. Significant? | -0.00% -0.00 No |
| 8 | 2/2/16 9:00 AM (Price Reaction Date: 2/2/16) | Anadarko hosts 4Q 2015 earnings call. (Complaint ¶ 114) | Abnormal Return t-Statistic Positive and Stat. Significant? | 7.36% 5.53 Yes |
| 9 | 2/17/16 6:29 AM Price Reaction Date: 2/17/16) | Anadarko files 2015 Form 10-K. (Complaint ¶¶ 115-118) | Abnormal Return t-Statistic Positive and Stat. Significant? | -0.10% -0.07 No |
| 10 | 2/24/16 10:40 AM (Price Reaction Date: 2/24/16) | Credit Suisse Energy Summit with investors and analysts. (Complaint ¶ 119) | Abnormal Return t-Statistic Positive and Stat. Significant? | -0.46% -0.31 No |
| 11 | 3/1/16 8:50 AM (Price Reaction Date: 3/1/16) | Anadarko issues 2016 initial capital expectations and guidance press release. (Complaint ¶ 120) | Abnormal Return t-Statistic Positive and Stat. Significant? | 3.91% 2.58 Yes |
| 12 | 5/3/16 9:00 AM (Price Reaction Date: 5/3/16) | Anadarko hosts 1Q 2016 earnings call. (Complaint ¶ 121) | Abnormal Return t-Statistic Positive and Stat. Significant? | 0.74% 0.45 No |
| 13 | 5/11/16 9:00 AM (Price Reaction Date: 5/11/16) | Citi Global Energy & Utilities Conference with investors and analysts. (Complaint ¶ 123) | Abnormal Return t-Statistic Positive and Stat. Significant? | 1.21% 0.72 No |

| 14 | 5/24/16 1:55 PM (Price Reaction Date: 5/24/16) | UBS Global Oil and Gas Conference with investors and analysts. (Complaint ¶¶ 124-126) | Abnormal Return t-Statistic Positive and Stat. Significant? | 0.61% 0.36 No |
|---|---|---|---|---|
| 15 | 6/28/16 9:40 AM (Price Reaction Date: 6/28/16) | JPMorgan Inaugural Energy Conference with investors and analysts. (Complaint ¶¶ 127-128) | Abnormal Return t-Statistic Positive and Stat. Significant? | -0.89% -0.52 No |
| 16 | 7/26/16 4:05 PM (Price Reaction Date: 7/27/16) | Anadarko issues 2Q 2016 press release. (Complaint ¶ 131) | Abnormal Return t-Statistic Positive and Stat. Significant? | 0.08% 0.05 No |
|  | 7/26/16 4:54 PM (Price Reaction Date: 7/27/16) | Anadarko files 2Q 2016 Form 10-Q. (Complaint ¶¶ 129-130). |  |  |
|  | 7/27/2016 9:00 AM (Price Reaction Date: 7/27/16) | Anadarko hosts 2Q 2016 conference call. (Complaint ¶¶ 132-133) |  |  |
| 17 | 8/16/16 4:45 PM (Price Reaction Date: 8/17/16) | EnerCom Oil & Gas Conference with investors and analysts. (Complaint ¶ 134) | Abnormal Return t-Statistic Positive and Stat. Significant? | 0.13% 0.07 No |
| 18 | 9/14/16 12:00 PM (Price Reaction Date: 9/14/16) | UBS Houston Energy Bus-Less Tour with investors and analysts. (Complaint ¶ 135) | Abnormal Return t-Statistic Positive and Stat. Significant? | -1.56% -0.89 No |
| 19 | 11/01/16 9:00 AM (Price Reaction Date: 11/01/16) | Anadarko hosts 3Q 2016 earnings call with investors and analysts. (Complaint ¶ 136) | Abnormal Return t-Statistic Positive and Stat. Significant? | 1.54% 0.88 No |
| 20 | 2/01/17 9:00 AM (Price Reaction Date: 2/1/17) | Anadarko hosts 4Q 2016 earnings call with investors and analysts. (Complaint ¶ 137) | Abnormal Return t-Statistic Positive and Stat. Significant? | -1.02% -0.68 No |
| 21 | 2/17/17 6:35 AM (Price Reaction Date: 2/17/17) | Anadarko files 2016 Form 10-K. (Complaint ¶¶ 138-140) | Abnormal Return t-Statistic Positive and Stat. Significant? | 0.24% 0.17 No |

Sources: Complaint, ¶¶ 97-99, 101-121, 123-140; Ferrell Report Appendix D. The sources for date and timestamp information are listed in Appendix B.

35.    As the table above shows, on 18 out of the 21 dates, Anadarko's stock price did not increase by a statistically significant amount. On the three dates when Anadarko's stock price

18

did increase by a statistically significant amount, I find that those stock price increases were attributed to factors unrelated to Shenandoah. I discuss each of these three dates with statistically significant price increases in turn below.

### A. July 28, 2015

36. Plaintiffs claim that Anadarko's press release on July 28, 2015 after market close contained the alleged misstatement that Anadarko had "[a]chieved large-scale project milestones in the Gulf of Mexico."[66] However, this sentence does not refer to Shenandoah, but rather to Lucius, a different Gulf of Mexico facility. In the same press release, Anadarko disclosed that Lucius "achieved name-plate capacity of 80,000 BOPD with production stabilizing during the quarter."[67] The only reference to Shenandoah in this press release appears two paragraphs later, with a paragraph about Anadarko's Mozambique liquefied natural gas project in between.[68] Therefore, Plaintiffs' claim is mistaken.

37. Plaintiffs also claim that Anadarko's press release contained the alleged misstatement that "Anadarko spud its third appraisal well in the Shenandoah field."[69] However, investors were already aware that Anadarko planned to drill its third appraisal well during 2Q 2015. For example, in Anadarko's 2014 Form 10-K, the Company stated: "Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015."[70] Assuming an efficient market, Anadarko's stock would not react to the disclosure of this stale or expected information.

38. Plaintiffs also claim that Anadarko's statement during a July 29, 2015 2Q 2015 conference call contained the alleged misstatement that "Coronado is part of the Shenandoah mini-basin. We've got a discovery there that we have appraised. So we think we've got a pretty good handle on what it is. We recently picked up our blocks again; we had some expiries that we had to put back in, and then picked them back up. That's going to stay that way until we have a

---

[66] Complaint ¶ 107 & **Table 1**.

[67] "Anadarko Announces Second-Quarter 2015 Results," *PR Newswire*, July 28, 2015 (4:05 PM).

[68] "Anadarko Announces Second-Quarter 2015 Results," *PR Newswire*, July 28, 2015 (4:05 PM).

[69] Complaint ¶ 107.

[70] Complaint ¶ 97.

19

Shenandoah development put in place, because we see it as a tie-back through that facility."[71] However, this alleged misstatement does not refer to the Shenandoah project, but rather to Coronado, a different appraisal project located in the Shenandoah basin. In its 2013 Form 10-K, Anadarko stated: "In the Shenandoah basin in Walker Ridge, discoveries were successfully drilled at Coronado (35% working interest)."[72] Therefore, Plaintiffs' claim is mistaken.

39.    As further confirmation of this result, I evaluated the price impact of the alleged Shenandoah misstatements by analyzing whether such statements had a price impact on ConocoPhillips, which did not have other firm-specific, value relevant news on this date. ConocoPhillips had a 30% interest in the Shenandoah project and, thus, value-relevant Shenandoah news would impact both Anadarko's stock price as well as ConocoPhillips's stock price.[73] However, my event study finds that ConocoPhillips's stock did not have a statistically significant price increase on this date, which demonstrates the lack of a price impact of the alleged Shenandoah misstatements on Anadarko's stock.

40.    I also reviewed available analyst reports on Anadarko to determine whether the alleged misstatements could have had a price impact on Anadarko's stock.[74] I reviewed 30 reports (issued by 26 different analyst firms, including 17 analyst firms identified by Mr. Steinholt) on Anadarko published after the alleged misstatement during July 28-29, 2015 and found that Shenandoah was not mentioned in 22 of the 30 analyst reports (73%).[75] In the

---

[71] Complaint ¶ 108

[72] Anadarko Petroleum Corporation SEC Form 10-K, December 31, 2013 at p. 9.

[73] ConocoPhillips had a 30% interest and Anadarko had a 33% interest. ConocoPhillips Form 10-K, December 31, 2016 at p. 7 & Anadarko Petroleum Corporation Form 10-K, December 31, 2016 at p. 11.

[74] Mr. Steinholt specifically identifies 27 analyst firms in his report. Steinholt Report, ¶27. For my review of analyst reports published during July 28-29, 2015 (as well as February 2-3 and March 1-2, 2016 discussed below), I obtained Anadarko reports from the Capital IQ, FactSet, Refinitiv and Eikon databases published by the analyst firms identified by Mr. Steinholt. I then supplemented this set with additional reports available from these databases (i.e., issued by analyst firms not identified by Mr. Steinholt) and with reports provided to me by counsel for Defendants that were not available from these databases (e.g., Goldman Sachs analyst reports). The reports I reviewed are listed in **Appendix B**.

[75] The analyst firms that published reports during July 28-29, 2015 that do not mention Shenandoah are Atlantic Equities; Barclays Capital, Inc.; Bernstein; BMO Capital Markets; Capital One; CFRA Equity Research; Evercore ISI; Goldman Sachs; Guggenheim Securities; Johnson & Rice; Morgan Stanley; Morningstar; Oppenheimer; Raymond James & Associates; RBC Capital Markets (4 Reports); Scotiabank; Simmons & Company (Piper Sandler); and Wells Fargo Securities, LLC (2 reports).

20

remaining eight reports (27%), none of the analysts mentioned Shenandoah when adjusting estimates or price targets.[76] I also reviewed the analyst commentary within these reports and found that analysts overwhelmingly reported that Anadarko exceeded earnings, oil production, and cash flow expectations during the quarter, rather than the alleged misstatements. For example, a Wells Fargo analyst that did not mention Shenandoah stated "Takeaway: Positive. Strong quarter big EPS beat on crude production and lower expenses."[77] Likewise, an Atlantic Equities analyst that did not mention Shenandoah reported: "Strength in domestic oil output…driven by the Lucius and Wattenberg projects allied to good cost control helped push results ahead of guidance and consensus."[78] Similarly, an RBC analyst that did not mention Shenandoah stated that they "expect APC shares to trade higher due to the strong cash flow and operational update."[79] In addition, a Barclays analyst that did not mention Shenandoah noted that they "believe investors will react positively to Anadarko's 2Q15 earnings and operational update."[80]

41.    I also searched for press articles related to Anadarko on July 28-29, 2015.[81] Based on my review of these news articles, I did not find articles that attributed Anadarko's price increase on July 29, 2015 to the alleged misstatement. I did however find press articles that reported that Anadarko's strong earnings and production report, rather than the alleged misstatements related to Shenandoah, were the reasons behind the price increase on July 29, 2015. For example, *The Financial Times* reported: "Investors pushed shares of Anadarko Petroleum higher after the US oil and gas company reported an unexpected profit in the second

---

[76] The analyst firms that published reports during July 28-29, 2015 that mention Shenandoah are: Bank of America Merrill Lynch; Cowen and Company; Deutsche Bank; Global Hunter Securities; GMP Securities; Societe Generale; UBS; and Wolfe Research.

[77] "APC: Positive—Strong Crude Production, Lower Expenses," Wells Fargo, July 28, 2015, APC-00186483, at 6483.

[78] "Strong US oil output and good cost control, Atlantic Equities," July 29, 2015.

[79] "APC – 2Q15 Earnings Beat; Oil Production Outlook Increased," RBC Capital Markets, July 28, 2015 (5:33 PM), JanHen_00040613, at 0613.

[80] "APC: Strong Beat Driven by Liquids Volumes," Barclays, July 28, 2015, APC-00186477, at 6477.

[81] Specifically, I searched the Lexis-Nexis and Factiva databases for news articles with "Anadarko" in the headline and lead paragraph.

quarter, amid the protracted drop in crude prices, by boosting oil production but keeping operating costs low."[82]

42.    Given the above, the price movement in Anadarko's stock cannot be ascribed to the alleged misstatements on this date.

### B.  February 2, 2016

43.    Plaintiffs claim that Anadarko made the following misstatement in its February 2, 2016 earnings call: "These other longer-dated projects [such as Shenandoah], we believe today are worthy of spending capital, expecting that oil is not going to be at $30 for the rest of our life" (bracketed text is part of original quote).[83] Investors were already aware that Anadarko planned to invest in longer-dated projects despite low oil prices. On October 28, 2015, the company had stated: "Given the challenging supply and demand fundamentals and continued uncertainty around sustainably longer oil prices -- sustainably higher oil prices, you can expect us to see continued investment in higher percentage longer cycle opportunities, such as exploration, where we achieved some very encouraging early results offshore Colombia as well as success delineating our activities at Shenandoah."[84] Assuming an efficient market, Anadarko's stock would not react to the disclosure of this stale or expected information.

44.    Similar to the July 28, 2015 alleged misstatements, I evaluated the price impact of the alleged misstatement on this date by analyzing whether this misstatement had a price impact on ConocoPhillips, which did not have other firm-specific, value relevant news on this date. My event study finds that ConocoPhillips's stock did not have a statistically significant price increase on this date, which demonstrates the lack of a price impact of the alleged Shenandoah misstatement on Anadarko's stock.

45.    I also reviewed available analyst reports on Anadarko to determine whether the alleged misstatement could have had a price impact on Anadarko's stock. I reviewed 24 reports (issued by 20 different analyst firms, including 13 analyst firms identified by Mr. Steinholt) on Anadarko published after the alleged misstatement during February 2-3, 2016 and found that

---

[82] "Anadarko jumps after earnings surprise," *Financial Times*, July 29, 2015 (2:05 PM).

[83] Complaint ¶ 114.

[84] Anadarko Petroleum FQ3 2015 Earnings Call Transcript, October 28, 2015.

Shenandoah was not even mentioned in 14 of 24 analyst reports (58%).[85] In the remaining 10 reports (42%), none of the analysts mentioned Shenandoah when adjusting estimates or price targets.[86] I also reviewed the analyst commentary within these reports and found that analysts focused on Anadarko performance in the preceding quarter, rather than the alleged misstatements. For example, a Barclays analyst wrote that "[w]e expect a positive reaction to Anadarko's 4Q15 earnings release and operational update. APC posted earnings and cash flow numbers that were above both Barclays' and consensus."[87] Similarly, a Jefferies analyst wrote: "Positive initial take on 4Q release on better than expected EPS on higher volumes and lower costs."[88] Likewise, a Capital One analyst stated: "Positive. 4Q results were solid, and more importantly, APC's preliminary CAPEX guidance of $2.8B is much closer to our $2.5B est than the Street's $4.5B est, so the projected outspend should be significantly lower than most expect. This should be welcome news."[89]

46.     I also searched for press articles related to Anadarko on February 2-3, 2016.[90] Based on my review of these news articles, I did not find articles that attributed Anadarko's price increase on February 2, 2016 to the alleged misstatement. I did however find press articles that reported that Anadarko's earnings report, rather than the alleged misstatement, can explain the price increase on February 2, 2016. For example, as *Reuters News* explained: "Shares of [Anadarko] rose 2.8 percent to $29.30 in Tuesday afternoon trading after the dividend comments assuaged concerns about Anadarko's cash management. The company also posted better-than-

---

[85] The analyst firms that published reports during February 2-3, 2016 that do not mention Shenandoah are: Atlantic Equities; CFRA Equity Research (2 reports); Goldman Sachs; Guggenheim Securities LLC Macquarie Research; Morningstar; Raymond James & Associates; RBC Capital Markets; Scotiabank Global Banking and Market; Simmons & Company (Piper Sandler) (2 reports); Wells Fargo Securities, LLC (2 Reports).

[86] The analyst firms that published reports during February 2-3, 2016 that mention Shenandoah are: Barclays Capital, Inc; BMO Capital Markets; Bank of America Merrill Lynch; Credit Suisse; Johnson & Rice; MUFG Securities Americas Inc; Societe Generale; UBS (2 reports); and Wolfe Research.

[87] "APC Cuts 2016 Budget 50% vs. 2015. Will Discuss 2016 Outlook on Conference Call Tomorrow, but Detailed Guidance to Come March 1st," Barclays, February 1, 2016.

[88] "Solid Q4 Operating Results, Prelim Capex Down 50%," Jefferies, February 1, 2016, JEFF00007303, at 7303.

[89] "APC 4Q A Quick Take," Capital One, February 2, 2016.

[90] Specifically, I searched the Lexis-Nexis and Factiva databases for news articles with "Anadarko" in the headline and lead paragraph.

23

expected results late on Monday."[91] Additionally, *TheStreet.com* reported: "Anadarko Petroleum Corp. shares are rallying 4.26% to $39.88 in after-hours trading Monday following the company's fourth quarter fiscal 2015 earnings results reported today after the closing bell. During the latest quarter, the company reported a loss of 57 cents a share, better than Wall Street's expectations of a loss of $1.09 a share."[92]

47.    Given the above, the price movement in Anadarko's stock cannot be ascribed to the alleged misstatement on this date.

## C. March 1, 2016

48.    Plaintiffs claim that Anadarko's press release on March 1, 2016 before the market open contained the alleged misstatement that Anadarko "plans to advance existing discoveries through appraisal activities at Shenandoah."[93] Investors were already aware that Anadarko planned to "advance" with appraisals of Shenandoah. On February 24, 2016, Anadarko stated that "we still are advancing the project, but we're a ways away from a sanction at Shenandoah."[94] Assuming an efficient market, Anadarko's stock would not react to the disclosure of this stale information. As further evidence, ConocoPhillips's stock did not have a statistically significant price increase on this date, which demonstrates the lack of a price impact of the alleged Shenandoah misstatement on Anadarko's stock.

49.    I also reviewed available analyst reports on Anadarko to determine whether the alleged misstatement could have had a price impact on Anadarko's stock. I reviewed 25 reports (issued by 22 different analyst firms, including 17 analyst firms identified by Mr. Steinholt) on Anadarko published after the alleged misstatement during March 1-2, 2016 and found that Shenandoah was not even mentioned in 17 of 25 analyst reports (68%).[95] In the remaining eight

---

[91] "UPDATE 1-Anadarko says it may cut dividend due to high yield," *Reuters News*, February 2, 2016 (2:21 PM).

[92] "Anadarko Petroleum (APC) Stock Pops in After-Hours Trading on Improving Quarterly Earnings, *The Street.com*, February 1, 2016 (4:30 PM).

[93] Complaint ¶120.

[94] Anadarko Petroleum Company Conference Presentation, February 24, 2016.

[95] The analyst firms that published reports during March 1-2, 2016 that do not mention Shenandoah are: Acquisdata; Cowen and Company (2 reports); Deutsche Bank; Guggenheim Securities LLC; Jefferies; Johnson & Rice; Macquarie Research; Morgan Stanley; Morningstar; MUFG Securities Americas Inc.;

24

reports (32%), none of the analysts mentioned Shenandoah when adjusting estimates or price targets.[96] I also reviewed the analyst commentary within these reports and found that analysts focused on Anadarko's capital program for 2016, rather than the alleged misstatement. For example, a Capital One analyst stated: "APC's official '16 guidance & investor call this morning offered few surprises, but mgmt did reiterate the company has no plans or need to issue new equity and it essentially upsized the asset sale/monetization program to $2.0B - $3.0B vs $1.3B already announced so far this year."[97] Likewise, a Johnson Rice analyst explained that "[w]ith the major parameters of 2016 guidance already disclosed, one of the most important things Anadarko did with its guidance call was put another punctuation mark on its declaration that they did not see a need to raise equity in the near term.[98]

50.    I also searched for press articles related to Anadarko on March 1-2, 2016.[99] Based on my review of these news articles, I did not find articles that attributed Anadarko's price increase on March 1, 2016 to the alleged misstatement. I did however find press articles that reported that Anadarko's earnings report, rather than the alleged misstatement, can explain the price increase on March 1, 2016. For example, *TheStreet.com* reported that "Anadarko Petroleum stock is rising 6.38% to $40.37 in afternoon trading on Tuesday, as the oil and gas producer plans to reduce 2016 capital spending by roughly half."[100] Also, *Benzinga* reported that "[s]hares

---

RBC Capital Markets (2 reports); Simmons & Company (Piper Sandler); Societe Generale; and Wells Fargo Securities, LLC (2 reports).

[96] The analyst firms that published reports during March 1-2, 2016 that mention Shenandoah are: Barclays Capital, Inc; Bank of America Merrill Lynch; Capital One; Credit Suisse; Evercore ISI; Scotiabank Global Banking and Market; UBS and Wolfe Research.

[97] "APC: '16 Guidance and Investor Call Recap," Capital One Securities, March 1, 2016, FIAM-ANAD-008678, at 8678.

[98] "Targeting $700MM to $1.5B in Add'l Asset Sales, Building Liquidity into 2H16," Johnson Rice & Company, March 2, 2016.

[99] Specifically, I searched the Lexis-Nexis and Factiva databases for news articles with "Anadarko" in the headline and lead paragraph.

[100] "Anadarko Petroleum (APC) Stock Surges, Slashes Capital Budget by Half," *TheStreet.com*, March 1, 2016 (1:16 PM).

of Anadarko Petroleum Corporation (NYSE: APC) were trading higher by nearly 5 percent Tuesday afternoon after the company announced its 2016 capital program."[101]

51.    Given the above, the price movement in Anadarko's stock cannot be ascribed to the alleged Shenandoah misstatement on this date.

## VII.    Analysis of the Alleged Corrective Disclosure Date

52.    I will now analyze whether the alleged corrective disclosures concerning Shenandoah caused a negative price impact. Consistent with the scientific framework I described at the beginning of my report, my analysis consists of both assessing whether a disclosure is value-relevant new public information and, moreover, whether there was in fact a negative statistically significant abnormal return associated with such a disclosure. I find no reliable economic evidence that the alleged corrective disclosures concerning Shenandoah had a price impact on Anadarko's stock.

53.    Before delving into my analysis, I first address Mr. Steinholt's claim that he "examined Anadarko's price reactions following the alleged corrective disclosure after the market closed on May 2, 2017" and found the "May 3, 2017 residual decline in Anadarko's stock price was statistically significant at the 1% level,"[102] suggesting that the alleged corrective disclosure concerning Shenandoah had a price impact. Mr. Steinholt seems to have backtracked at his deposition when he testified that he was actually not referring specifically to the Shenandoah disclosures but he was "referring to the totality of the information disclosed in that particular day."[103] In any case, Mr. Steinholt's analysis is flawed. Mr. Steinholt assumed in his report that all of the information contained in the alleged corrective disclosures concerning Shenandoah was new. But at his deposition, Mr. Steinholt testified he was aware that the disclosure that Shen-6 was a dry hole was not new, as it had been disclosed earlier by ConocoPhillips.[104] Mr. Steinholt also testified that he was aware that the disclosures about the

---

[101] "Investors Are Bullish On Anadarko Petroleum Following 2016 Capital Program," *Benzinga*, March 1, 2016 (7:53 PM).

[102] Steinholt Report, ¶¶ 42 & 44.

[103] Steinholt Dep. Tr. 47:17-19.

[104] Steinholt Dep. Tr. 51:18-20 ("If your point is that Conoco Philips [*sic*] had some reference to the Shenandoah number 6, well, I'm aware of that....").

26

suspension of appraisal activity at Shenandoah and the impairment of the value of Shenandoah would have a similar impact on ConocoPhillips,[105] yet he failed to take that into consideration. Similarly, Mr. Steinholt testified that he was aware that the news linking an Anadarko well to a house explosion in Colorado that was also disclosed after market close on May 2, 2017 would have a similar impact on Noble Energy, yet again he failed to take that into consideration.[106] In short, Mr. Steinholt's suggestion that the alleged corrective disclosures had a price impact is flawed.

54.    Now I turn to discussing the three pieces of Shenandoah information disclosed by Anadarko after market close on May 2, 2017: (1) that Shen-6 was a dry hole; (2) that Anadarko was suspending appraisal activity at Shenandoah; and (3) that Anadarko was taking an impairment charge related to the Shenandoah project.[107, 108] With respect to the disclosure that Shen-6 was a dry hole, this information was stale as of May 3, 2017 as ConocoPhillips had disclosed before market open on the previous day that "[f]irst-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico."[109, 110] On the day the information regarding Shen-6 was disclosed, Anadarko's stock price did not have a statistically significant price change.[111] *See* **Table 2**. The above demonstrates that Anadarko's subsequent disclosure that Shen-6 was a dry hole did not

---

[105] Steinholt Dep. Tr. 13:15-21.

[106] Steinholt Dep. Tr. 28:8-12.

[107] "*Anadarko Pete 1Q Loss/Shr 58c > APC," Dow Jones Institutional News, May 2, 2017 (4:16 PM); Anadarko Petroleum Corporation Form 10-Q, March 31, 2017 at p. 37.

[108] In his deposition, Mr. Steinholt testified that he didn't think the alleged corrective disclosures concerning Shenandoah was particularly complex and that it would have been incorporated into the stock price within one day. *See* Steinholt Dep. Tr. 12:22-13:5.

[109] "ConocoPhillips Reports First-Quarter 2017 Results; On Track to Deliver 2017 Operating Plan and Accelerate Value Proposition," *Business Wire*, May 2, 2017 (7:00 AM).

[110] Anadarko and ConocoPhillips had similar stakes in the Shenandoah project. ConocoPhillips had a 30% interest and Anadarko had a 33% interest. ConocoPhillips Form 10-K, December 31, 2016 at p. 7 & Anadarko Petroleum Corporation Form 10-K, December 31, 2016 at p. 11.

[111] Mr. Steinholt acknowledged in deposition testimony that ConocoPhillips did not have a statistically significant price decline on May 2, 2017. Steinholt Dep. Tr. 16:3-23 ("Q. Right, but just sitting here today, do you know what the Conoco Philips [*sic*] stock price rection was on the day of the Anadarko corrective disclosure? … A … I don't think there was a statistically significant price decline on either of those two days … when Conoco Philips [*sic*] announced their first quarter earnings or when Anadarko announced their first quarter earnings.").

27

have a price impact on Anadarko's stock on May 3, 2017, assuming Anadarko's stock traded in an efficient market as Mr. Steinholt claims.

**Table 2**
**Stock Price Reaction of Anadarko, ConocoPhillips, and Cobalt on May 2, 2017**

|  |  | Anadarko | ConocoPhillips | Cobalt |
|---|---|---|---|---|
| Raw Return | [A] | -0.69% | -1.64% | -4.40% |
| Predicted Return[1] | [B] | -1.00% | -0.89% | -2.45% |
| Abnormal Return | [C = A – B] | 0.31% | -0.75% | -1.95% |
| t-Statistic | [D] | 0.28 | -0.68 | -0.35 |
| Statistically Significant?[2] | [E] | No | No | No |

Notes: (1) Ferrell Report Appendix D. (2) Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

55.    Moreover, analysts following Anadarko also reported that Anadarko's Shenandoah dry hole disclosure after market close on May 2, 2017 was stale. For example, a JPMorgan analyst noted: "As previously highlighted by its partners, the Shenandoah-6 appraisal well designed to test the oil-water contact on the eastern edge of the field was unsuccessful, and APC has decided to suspend appraisal activity at the field."[112] Similarly, an Evercore analyst described it as "a massive (not completely unexpected) write down at Shenandoah."[113] In an efficient market, if there was a price impact on Anadarko's stock related to the disclosure that Shen-6 was a dry hole, one would observe such a price reaction on May 2, 2017, not May 3, 2017. Yet, as **Table 2** shows, Anadarko's stock did not have a statistically significant price change on May 2, 2017. In addition, the table also reflects that both ConocoPhillips and Cobalt, another partner of Anadarko in Shenandoah, also did not have statistically significant price changes on May 2, 2017.[114]

56.    With respect to Anadarko's disclosures regarding the suspension of appraisal activity at Shenandoah and the impairment of the value of Shenandoah, the price impact, if any,

---

[112] "1Q17 Flash: Unfortunately, It's Déjà Vu All Over Again; Stock Reaction Mixed – ALERT," J.P. Morgan, May 2, 2017, FIAM-ANAD-009291, at 9292.

[113] "In the Teeth of the Transition, 1Q Outlook Poses Challenges to the Thesis," Evercore ISI, May 3, 2017, APC-00737551 at 7551.

[114] The methodology for the Anadarko, ConocoPhillips, and Cobalt event studies are described in **Appendix D**.

28

of these disclosures would have been observed on May 3, 2017. As **Table 3** shows, Anadarko had a statistically significant price decline on that day. However, as discussed above, there were multiple pieces of news that were disclosed contemporaneously by Anadarko, including news unrelated to the Shenandoah project.

**Table 3**
**Stock Price Reaction of Anadarko, ConocoPhillips, and Cobalt on May 3, 2017**

|  |  | Anadarko | ConocoPhillips | Cobalt |
|---|---|---|---|---|
| Raw Return | [A] | -7.69% | 0.81% | -11.38% |
| Predicted Return[1] | [B] | 0.21% | 0.10% | 0.12% |
| Abnormal Return | [C = A – B] | -7.91% | 0.71% | -11.26% |
| t-Statistic | [D] | -7.11 | 0.64 | -2.01 |
| Statistically Significant?[2] | [E] | Yes | No | Yes |

Notes: (1) Ferrell Report Appendix D. (2) Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

57.    In order to properly assess the price impact of Anadarko's disclosures regarding the suspension of appraisal activity at Shenandoah and the impairment of the value of Shenandoah, I analyzed the price movement of ConocoPhillips, which did not have other firm-specific value-relevant news on May 3, 2017. As the table above shows, there was no statistically significant price change in ConocoPhillips's stock price on May 3, 2017, which demonstrates the lack of a price impact of the alleged corrective disclosures on Anadarko's stock.[115] **Appendix C** presents the data on the nine factors Mr. Steinholt used to test the market efficiency of Anadarko as applied to ConocoPhillips. Based on this data, Mr. Steinholt's methodology would have concluded that ConocoPhillips's common stock would have traded in an efficient market during the purported Class Period.

---

[115] Mr. Steinholt acknowledged in deposition testimony that ConocoPhillips did not have a statistically significant price decline on May 3, 2017. Steinholt Dep. 16:3-23 ("Q. Right, but just sitting here today, do you know what the Conoco Philips [*sic*] stock price rection was on the day of the Anadarko corrective disclosure? ... A ... I don't think there was a statistically significant price decline on either of those two days ... when Conoco Philips [*sic*] announced their first quarter earnings or when Anadarko announced their first quarter earnings.").

29

58.   I also reviewed analyst reports and news articles on Cobalt to identify firm-specific news that could have had a price impact on Cobalt's stock price on May 3, 2017.[116] I found that leading up to the May 2, 2017 alleged corrective disclosures concerning Shenandoah, Cobalt was experiencing near-term liquidity constraints, was at risk of being delisted from the New York Stock Exchange, and its ability to continue as a going concern was in doubt.[117, 118] Cobalt's most-recent Form 10-K filed March 14, 2017 contained a going concern opinion from Cobalt's auditor stating that "[t]he Company has near-term liquidity constraints that raises substantial doubt about its ability to continue as a going concern."[119] Also on March 14, 2017, Cobalt announced plans to sell its 20% interest in Shenandoah and announced plans to open a virtual data room for such a purpose.[120] Following this disclosure, a Deutsche Bank analyst noted that the company was opening a "data room for Shenandoah…to address liquidity/funding concerns".[121] On April 26, 2017, one week prior to the alleged corrective disclosures about Shenandoah on May 2, 2017, Cobalt restructured its debt, giving noteholders "about 50 cents on the dollar for their old notes," further demonstrating Cobalt's continued liquidity issues.[122] On May 2, 2017, one day prior to the alleged corrective disclosure, Cobalt's stock price was trading at $0.37 per share, which implies a market capitalization of $167 million, or 1/189th of the size of Anadarko's $31.4 billion market capitalization.[123]

---

[116] Cobalt had a 20% working interest at Shenandoah. Cobalt International Energy, Inc. Form 10-K, December 31, 2016 ("Cobalt 2016 Form 10-K") at p. 6.

[117] Cobalt 2016 Form 10-K, at p. 55. In its 2016 Form 10-K, Cobalt also disclosed that it was out of compliance with the New York Stock Exchange's ("NYSE") minimum share price requirement because the average closing price of its common stock had fallen below $1.00 per share over a period of 30 consecutive days, and therefore was at risk of being delisted from the NYSE.

[118] While Cobalt may technically pass Mr. Steinholt's factors for market efficiency, it is also true that Cobalt was experiencing significant near term liquidity constraints, was at risk of being delisted from the New York Stock Exchange, and its ability continue as a going concern was in doubt.

[119] Cobalt 2016 Form 10-K, at F-4.

[120] "Cobalt International Energy Plans to Sell 20% Interest In Shenandoah Oil Field, Offshore Gulf of Mexico," *Marketline*, March 14, 2017; Cobalt International Energy, Inc. FQ4 2016 Earnings Call Transcripts, March 14, 2017.

[121] "Love the One You're With," Deutsche Bank, March 14, 2017, FIAM-ANAD-007658, at 7658.

[122] "Cobalt International Energy Noteholders Take a Little for a Lot in Debt Exchange," *TheStreet.com*, April 26, 2017.

[123] ©2021 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business.