669.   Morningstar, August 01, 2016
670.   MUFG, August 01, 2016
671.   Argus, August 03, 2016
672.   Evercore, August 07, 2016
673.   Acquisdata, August 10, 2016
674.   Guggenheim, August 10, 2016
675.   RBC, August 10, 2016
676.   RBC, August 11, 2016
677.   Jefferies, August 15, 2016
678.   Guggenheim, August 17, 2016
679.   Macquarie, August 23, 2016
680.   RBC, August 23, 2016
681.   Morningstar, August 24, 2016
682.   Morningstar, August 25, 2016
683.   Morningstar, August 26, 2016
684.   Morningstar, August 29, 2016
685.   Societe Generale, August 29, 2016
686.   Seaport, August 30, 2016
687.   Seaport, September 07, 2016
688.   Cowen, September 08, 2016
689.   Piper Sandler, September 08, 2016
690.   Simmons, September 08, 2016
691.   Credit Suisse, September 12, 2016
692.   Barclays, September 12, 2016
693.   Barclays (2), September 12, 2016
694.   Credit Suisse, September 12, 2016
695.   Credit Suisse (2), September 12, 2016
696.   Evercore, September 12, 2016
697.   Piper Sandler, September 12, 2016
698.   RBC, September 12, 2016
699.   UBS, September 12, 2016
700.   BMO, September 13, 2016
701.   BoA, September 13, 2016
702.   Capital One, September 13, 2016
703.   Capital One (2), September 13, 2016
704.   CFRA, September 13, 2016
705.   Credit Suisse, September 13, 2016
706.   Deutsche Bank, September 13, 2016
707.   Goldman Sachs, September 13, 2016
708.   Guggenheim, September 13, 2016
709.   Johnson Rice, September 13, 2016
710.   Macquarie, September 13, 2016
711.   Morgan Stanley, September 13, 2016

712. Morningstar, September 13, 2016
713. Piper Sandler, September 13, 2016
714. Raymond James, September 13, 2016
715. RBC, September 13, 2016
716. Scotia Bank, September 13, 2016
717. Seaport, September 13, 2016
718. Simmons, September 13, 2016
719. Societe Generale, September 13, 2016
720. Wolfe, September 13, 2016
721. MUFG, September 14, 2016
722. BMO, September 15, 2016
723. JPMorgan, September 15, 2016
724. Wells Fargo, September 15, 2016
725. BoA, September 16, 2016
726. Piper Sandler, September 16, 2016
727. Simmons, September 16, 2016
728. Evercore, September 19, 2016
729. KLR Group, September 19, 2016
730. Wells Fargo, September 22, 2016
731. JPMorgan, September 27, 2016
732. Argus, September 28, 2016
733. Morningstar, September 28, 2016
734. Morningstar, September 29, 2016
735. Goldman Sachs, September 30, 2016
736. Guggenheim, September 30, 2016
737. Barclays, October 04, 2016
738. RBC, October 05, 2016
739. BMO, October 06, 2016
740. Cowen, October 06, 2016
741. JPMorgan, October 06, 2016
742. Piper Sandler, October 06, 2016
743. Scotia Bank, October 06, 2016
744. Societe Generale, October 07, 2016
745. Morgan Stanley, October 11, 2016
746. Deutsche Bank, October 13, 2016
747. Capital One, October 14, 2016
748. Evercore, October 14, 2016
749. MUFG, October 14, 2016
750. Cowen, October 19, 2016
751. Capital One, October 20, 2016
752. Nomura, October 26, 2016
753. Barclays, October 27, 2016
754. Deutsche Bank, October 27, 2016

755. Guggenheim, October 27, 2016
756. RBC, October 27, 2016
757. Capital One, October 28, 2016
758. RBC, October 28, 2016
759. Barclays, October 31, 2016
760. Barclays (2), October 31, 2016
761. BMO, October 31, 2016
762. BoA, October 31, 2016
763. Cowen, October 31, 2016
764. Credit Suisse, October 31, 2016
765. Deutsche Bank, October 31, 2016
766. Evercore, October 31, 2016
767. Goldman Sachs, October 31, 2016
768. Guggenheim, October 31, 2016
769. Johnson Rice, October 31, 2016
770. JPMorgan, October 31, 2016
771. Piper Sandler, October 31, 2016
772. Raymond James, October 31, 2016
773. RBC, October 31, 2016
774. Simmons, October 31, 2016
775. UBS, October 31, 2016
776. Atlantic, November 01, 2016
777. Capital One, November 01, 2016
778. CFRA Equity, November 01, 2016
779. Deutsche Bank, November 01, 2016
780. Goldman, November 01, 2016
781. Johnson Rice, November 01, 2016
782. KLR Group, November 01, 2016
783. Macquarie, November 01, 2016
784. Morgan Stanley, November 01, 2016
785. MUFG, November 01, 2016
786. Raymond James, November 01, 2016
787. RBC, November 01, 2016
788. Seaport, November 01, 2016
789. Societe Generale, November 01, 2016
790. Barclays, November 02, 2016
791. Credit Suisse, November 02, 2016
792. Credit Suisse (2), November 02, 2016
793. Morningstar, November 02, 2016
794. Wells Fargo, November 02, 2016
795. Wolfe, November 02, 2016
796. Piper Sandler, November 04, 2016
797. Simmons, November 04, 2016

24

798.    Capital One, November 09, 2016
799.    BMO, November 11, 2016
800.    Guggenheim, November 11, 2016
801.    Morningstar, November 11, 2016
802.    Societe Generale, November 15, 2016
803.    Argus, November 18, 2016
804.    JPMorgan, November 23, 2016
805.    RBC, November 30, 2016
806.    Evercore, December 01, 2016
807.    Morningstar, December 01, 2016
808.    UBS, December 02, 2016
809.    Seaport Global, December 09, 2016
810.    Morningstar, December 13, 2016
811.    Morningstar (2), December 13, 2016
812.    Morningstar (3), December 13, 2016
813.    BoA, December 15, 2016
814.    Cowen, December 15, 2016
815.    JPMorgan, December 15, 2016
816.    Piper Sandler, December 15, 2016
817.    RBC, December 15, 2016
818.    Simmons, December 15, 2016
819.    UBS, December 15, 2016
820.    Capital One, December 16, 2016
821.    Deutsche Bank, December 16, 2016
822.    Johnson Rice, December 16, 2016
823.    Morgan Stanley, December 16, 2016
824.    RBC, December 16, 2016
825.    Scotia, December 16, 2016
826.    Seaport Global, December 16, 2016
827.    CFRA Equity, December 19, 2016
828.    Ladenburg Thalmann, December 19, 2016
829.    Macquarie, December 19, 2016
830.    Barclays, December 21, 2016
831.    BMO, December 21, 2016
832.    BoA, December 21, 2016
833.    Deutsche Bank, December 21, 2016
834.    Evercore, December 21, 2016
835.    Johnson Rice, December 21, 2016
836.    RBC, December 21, 2016
837.    RBC (2), December 21, 2016
838.    UBS, December 21, 2016
839.    Barclays, December 22, 2016
840.    Capital One, December 22, 2016

25

841.    Deutsche Bank, December 22, 2016
842.    Global Hunter, December 22, 2016
843.    Guggenheim, December 22, 2016
844.    Ladenburg Thalmann, December 22, 2016
845.    Macquarie, December 22, 2016
846.    Morgan Stanley, December 22, 2016
847.    RBC, December 22, 2016
848.    Scotia, December 22, 2016
849.    Seaport, December 22, 2016
850.    Wells Fargo, December 22, 2016
851.    Wolfe, January 01, 2017
852.    JPMorgan, January 03, 2017
853.    Raymond James, January 03, 2017
854.    Cowen, January 06, 2017
855.    Evercore, January 06, 2017
856.    BMO, January 11, 2017
857.    Societe Generale, January 11, 2017
858.    Barclays, January 12, 2017
859.    Barclays (2), January 12, 2017
860.    BoA, January 12, 2017
861.    Cowen, January 12, 2017
862.    Piper Sandler, January 12, 2017
863.    RBC, January 12, 2017
864.    UBS, January 12, 2017
865.    Wolfe, January 12, 2017
866.    BMO, January 13, 2017
867.    Capital One, January 13, 2017
868.    CFRA, January 13, 2017
869.    Evercore, January 13, 2017
870.    Evercore (2), January 13, 2017
871.    Guggenheim, January 13, 2017
872.    Johnson Rice, January 13, 2017
873.    JPMorgan, January 13, 2017
874.    Ladenburg, January 13, 2017
875.    Ladenburg (2), January 13, 2017
876.    Morgan Stanley, January 13, 2017
877.    Raymond James, January 13, 2017
878.    RBC, January 13, 2017
879.    RBC (2), January 13, 2017
880.    RBC (3), January 13, 2017
881.    Scotia, January 13, 2017
882.    Seaport, January 13, 2017
883.    Societe Generale, January 13, 2017

884. Macquarie, January 17, 2017
885. MUFG, January 19, 2017
886. MUFG (2), January 19, 2017
887. Nomura, January 19, 2017
888. Barclays, January 23, 2017
889. Credit Suisse, January 24, 2017
890. Cowen, January 25, 2017
891. Barclays, January 26, 2017
892. Morgan Stanley, January 26, 2017
893. Evercore, January 27, 2017
894. Evercore, January 28, 2017
895. RBC, January 29, 2017
896. Johnson Rice, January 30, 2017
897. Barclays, January 31, 2017
898. Barclays (2), January 31, 2017
899. BMO, January 31, 2017
900. Cowen, January 31, 2017
901. Credit Suisse, January 31, 2017
902. Deutsche Bank, January 31, 2017
903. Goldman Sachs, January 31, 2017
904. Guggenheim, January 31, 2017
905. Johnson Rice, January 31, 2017
906. JP Morgan (2), January 31, 2017
907. JPMorgan, January 31, 2017
908. Piper Sandler, January 31, 2017
909. Raymond James, January 31, 2017
910. RBC, January 31, 2017
911. Simmons, January 31, 2017
912. Wells Fargo, January 31, 2017
913. Atlantic, February 01, 2017
914. BoA, February 01, 2017
915. Capital One, February 01, 2017
916. CFRA, February 01, 2017
917. Cowen, February 01, 2017
918. Credit Suisse, February 01, 2017
919. Deutsche Bank, February 01, 2017
920. Evercore, February 01, 2017
921. Goldman Sachs, February 01, 2017
922. KLR Group, February 01, 2017
923. Ladenburg, February 01, 2017
924. Ladenburg (2), February 01, 2017
925. Morgan Stanley, February 01, 2017
926. MUFG, February 01, 2017

27

927.  Piper Sandler, February 01, 2017
928.  Piper Sandler (2), February 01, 2017
929.  Raymond James, February 01, 2017
930.  RBC, February 01, 2017
931.  Scotia, February 01, 2017
932.  Seaport, February 01, 2017
933.  Simmons, February 01, 2017
934.  Simmons (2), February 01, 2017
935.  Societe Generale, February 01, 2017
936.  UBS, February 01, 2017
937.  Wolfe, February 01, 2017
938.  Barclays, February 02, 2017
939.  BMO Capital Markets, February 02, 2017
940.  Johnson Rice, February 02, 2017
941.  Ladenburg, February 02, 2017
942.  Morningstar, February 02, 2017
943.  RBC, February 02, 2017
944.  CFRA Equity, February 03, 2017
945.  Goldman Sachs, February 05, 2017
946.  Morningstar, February 06, 2017
947.  Wells Fargo, February 06, 2017
948.  Acquisdata, February 07, 2017
949.  Ladenburg, February 07, 2017
950.  Bernstein, February 08, 2017
951.  Morningstar, February 11, 2017
952.  Evercore, February 13, 2017
953.  Argus, February 17, 2017
954.  Evercore, February 17, 2017
955.  Wells Fargo, February 21, 2017
956.  Morningstar, February 22, 2017
957.  Validea, February 24, 2017
958.  Credit Suisse, February 26, 2017
959.  UBS, March 01, 2017
960.  Barclays, March 02, 2017
961.  Cowen, March 02, 2017
962.  Evercore, March 02, 2017
963.  JPMorgan, March 02, 2017
964.  Cowen, March 03, 2017
965.  Morgan Stanley, March 03, 2017
966.  RBC, March 03, 2017
967.  BoA, March 05, 2017
968.  UBS, March 05, 2017
969.  Cowen, March 06, 2017

28

970.   Deutsche Bank, March 06, 2017
971.   Raymond James, March 06, 2017
972.   Barclays, March 07, 2017
973.   Barclays (2), March 07, 2017
974.   BoA, March 07, 2017
975.   Cowen, March 07, 2017
976.   Credit Suisse, March 07, 2017
977.   Goldman Sachs, March 07, 2017
978.   Johnson Rice, March 07, 2017
979.   JPMorgan, March 07, 2017
980.   Piper Sandler, March 07, 2017
981.   RBC, March 07, 2017
982.   Seaport, March 07, 2017
983.   Wells Fargo, March 07, 2017
984.   BMO, March 08, 2017
985.   Credit Suisse, March 08, 2017
986.   Deutsche Bank, March 08, 2017
987.   Evercore, March 08, 2017
988.   Evercore (2), March 08, 2017
989.   Goldman Sachs, March 08, 2017
990.   Guggenheim, March 08, 2017
991.   Ladenburg, March 08, 2017
992.   Macquarie, March 08, 2017
993.   Morgan Stanley, March 08, 2017
994.   Scotia, March 08, 2017
995.   Societe Generale, March 08, 2017
996.   Wells Fargo, March 08, 2017
997.   Barclays, March 09, 2017
998.   Credit Suisse, March 09, 2017
999.   Deutsche Bank, March 09, 2017
1000.   KLR Group, March 09, 2017
1001.   Ladenburg Thalmann, March 09, 2017
1002.   MUFG, March 09, 2017
1003.   Raymond James, March 09, 2017
1004.   UBS, March 09, 2017
1005.   Evercore, March 10, 2017
1006.   Scotiabank, March 10, 2017
1007.   BMO Capital Markets, March 13, 2017
1008.   BoA, March 13, 2017
1009.   Cowen, March 13, 2017
1010.   Cowen (2), March 13, 2017
1011.   Wolfe, March 13, 2017
1012.   Guggenheim, March 16, 2017

1013. RBC, March 16, 2017
1014. Barclays, March 17, 2017
1015. RBC, March 17, 2017
1016. Macquarie, March 20, 2017
1017. Argus, March 24, 2017
1018. Goldman Sachs, March 24, 2017
1019. Macquarie, March 27, 2017
1020. Scotiabank, March 27, 2017
1021. Morningstar, March 28, 2017
1022. Morningstar, March 29, 2017
1023. Capital One, March 30, 2017
1024. Cowen`, March 30, 2017
1025. Credit Suisse, March 30, 2017
1026. Seaport Global, March 31, 2017
1027. BMO Capital Markets, April 03, 2017
1028. Seaport Global, April 18, 2017
1029. Societe Generale, April 26, 2017
1030. Capital One, April 27, 2017
1031. Evercore, April 27, 2017
1032. JPMorgan, April 27, 2017
1033. Morgan Stanley, April 27, 2017
1034. Wells Fargo, April 27, 2017
1035. Cowen, April 30, 2017
1036. RBC, May 01, 2017
1037. Aquisdata, May 02, 2017
1038. Barclays, May 02, 2017
1039. Barclays (2), May 02, 2017
1040. Bernstein, May 02, 2017
1041. BMO, May 02, 2017
1042. BoA, May 02, 2017
1043. Cowen, May 02, 2017
1044. Credit Suisse, May 02, 2017
1045. Johnson Rice, May 02, 2017
1046. JPMorgan, May 02, 2017
1047. Raymond James, May 02, 2017
1048. RBC, May 02, 2017
1049. RBC (2), May 02, 2017
1050. Atlantic Equities, May 03, 2017
1051. Capital One, May 03, 2017
1052. CFRA, May 03, 2017
1053. Credit Suisse, May 03, 2017
1054. Deutsche Bank, May 03, 2017
1055. Evercore, May 03, 2017

1056.   Goldman Sachs, May 03, 2017
1057.   Guggenheim, May 03, 2017
1058.   Ladenburg, May 03, 2017
1059.   Macquarie, May 03, 2017
1060.   Morgan Stanley, May 03, 2017
1061.   Raymond James, May 03, 2017
1062.   Scotia, May 03, 2017
1063.   Societe Generale, May 03, 2017
1064.   UBS, May 03, 2017
1065.   Wolfe, May 03, 2017
1066.   Barclays, May 04, 2017
1067.   CFRA Equity, May 04, 2017
1068.   KLR Group, May 04, 2017
1069.   Ladenburg, May 04, 2017
1070.   MUFG, May 04, 2017
1071.   Wells Fargo, May 05, 2017


All other documents and sources cited in the report and appendices.

**Appendix C**

**Analysis of Market Efficiency Factors Based On the Factors/Methodology Steinholt Applied to Anadarko**

| Steinholt Factor | Factor | Anadarko | ConocoPhillips | Cobalt | Noble Energy | Extraction Oil and Gas | PDC Energy | SRC Energy |
|---|---|---|---|---|---|---|---|---|
| Trading on NYSE/NASDAQ | [1] | Trades on NYSE | Trades on NYSE | Trades on NYSE | Trades on NASDAQ | Trades on NASDAQ | Trades on NASDAQ | Trades on NYSE |
| Average Weekly Trading Volume | [2] | 5% | 4% | 6% | 5% | 4% | 13% | 10% |
| Analyst Coverage | [3] | Over 600 analyst reports and over 5,000 news articles on Bloomberg. | Over 700 analyst reports and over 10,000 news articles on Bloomberg. | Over 200 analyst reports and over 600 news articles on Bloomberg. | Over 900 analyst reports and over 4,000 news articles on Bloomberg. | 64 analyst reports and over 1,200 news articles on Bloomberg. | Over 500 analyst reports and over 2,100 news articles on Bloomberg. | Over 400 analyst reports and over 2,100 news articles on Bloomberg. |
| Liquidity Providers and Institutional Investors | [4] | (1) 150 liquidity providers with 41 with volume of at least 1 million shares and (2) Institutions owned at least 86% of shares and more than 1,800 institutional investors owned more than 440 million shares. | (1) 180 liquidity providers with 43 with volume of at least 1 million shares and (2) Institutions owned at least 65% of shares and more than 2,500 institutional investors owned more than 800 million shares. | (1) 130 liquidity providers with 28 with volume of at least 1 million shares and (2) Institutions owned at least 95% of shares and more than 500 institutions owned more than 28 million shares. | (1) 160 liquidity providers with 30 with volume of at least 1 million shares and (2) Institutions owned at least 94% of shares and more than 1,100 institutional investors owned more than 366 million shares. | (1) 110 liquidity providers with 13 with volume of at least 1 million shares and (2) Institutions owned at least 71% of shares and more than 170 institutional investors owned more than 120 million shares. | (1) 160 liquidity providers with 29 with volume of at least 1 million shares and (2) Institutions owned at least 107% of shares and more than 600 institutions owned more than 45 million shares. | (1) 75 liquidity providers with 6 with volume of at least 1 million shares and (2) Institutions owned at least 77% of shares and more than 400 institutions owned more than 80 million shares. |
| Eligibility to file S-3 | [5] | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on August 12, 2016. | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on May 13, 2015 | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on December 22, 2016 | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on February 17, 2016 | (1) Not an SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates. (3) Did not file Form S-3 during purported Class Period. | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on March 18, 2015 | (1) SEC reporting company for at least 12 months; (2) Had $75 million in voting stock held by non-affiliates; (3) Filed S-3 on September 11, 2015 |
| Market, Industry, and Company-Specific Information Incorporated Into Stock Price | [6] | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 5 out of 9 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 3 out of 9 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 4 out of 9 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 5 out of 9 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 1 out of 2 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 4 out of 8 financial release dates are statistically significant at the 5% level. | (1) One-factor regression of market index over purported Class Period shows market index is statistically significant at 5% level; (2) One-factor regression of industry index over purported Class Period shows industry index is statistically significant at 5% level; (3) 4 out of 8 financial release dates are statistically significant at the 5% level. |
| Market Capitalization | [7] | $15 billion to $50 billion. | $39 billion to $85 billion. | $167 million to $4.6 billion. | $11 billion to $21 billion. | $2.6 billion to $3.5 billion. | $1.6 billion to $4.6 billion. | $607 million to $2 billion. |
| Bid-Ask Spread | [8] | $0.02 per share or 0.02% of closing price. | $0.01 per share or 0.02% of closing price. | $0.13 per share or 0.34% of closing price. | $0.01 per share or 0.03% of closing price. | N/A | $0.02 per share or 0.04% of closing price. | $0.01 per share or 0.13% of closing price. |
| Float | [9] | 500 million shares. | 1.2 billion shares. | 23 million shares. | 355 million shares. | N/A | 35 million shares. | 83 million shares. |

1

**Analysis of Market Efficiency Factors Based On the Factors/Methodology Steinholt Applied to Anadarko**

Notes and sources:

The above analysis is based on data from February 20, 2015 through May 2, 2017, except for Extraction Oil & Gas which starts on October 11, 2016 (i.e., the date of its initial public offering).  *See*  "Extraction Oil & Gas, Inc. Prices Initial Public Offering," Extraction Oil & Gas, Inc. Press Release, October 11, 2016.

[1]: Exchange listing per company Form 10-Ks filed from February 20, 2015 to May 2, 2017 with the SEC.

[2]: Steinholt Report, ¶ 25. Per Steinholt Report Exhibit D, average weekly share turnover is calculated from average daily share turnover from February 20, 2017 through May 2, 2017 multiplied by five. Volume data per ©2021CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu; Bloomberg L.P.

[3]: Steinholt Report, ¶ 28. Number of analyst reports per S&P Capital IQ. Number of news articles per Bloomberg function CN.

[4]: Steinholt Report, ¶¶ 32-33. Number of liquidity providers per Bloomberg function BAS. Institutional holdings data from March 31, 2015 to March 31, 2017 per Thomson Financial.

[5]: Steinholt Report, ¶ 35. Each company's Form S-3 filing date per SEC EDGAR database. Extraction Oil & Gas completed its IPO in October, 2016 and filed its S-3 on May 14, 2018. *See* "Extraction Oil & Gas, Inc. Prices Initial Public Offering," Extraction Oil & Gas, Inc. Press Release, October 11, 2016; Extraction Oil & Gas, Inc., Form S-3, May 14, 2018.

[6]: Steinholt Report, ¶¶ 39-41. Company, S&P 500 Index, and industry index returns per ©2021CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu. Description of the industry indices and financial release dates per Ferrell Report Appendix D. For the "financial release" dates, Mr. Steinholt finds that the cumulative probability of finding at least 5 out of 9 dates being statistically significant at the 5% level using a binomial distribution is 1 in more than 30,000, which exceeds his benchmark of 1 out of 20. Steinholt Report, ¶ 41 and note 55. Using Mr. Steinholt's methodology, the cumulative probability is 1 out of 120 for ConocoPhillips, 1 out of 1,556 for Cobalt, 1 out of 30,100 for Noble, 1 out of 10 for Extraction Oil & Gas, and 1 out of 2,690 for both PDC Energy and SRC Energy.

[7]: Steinholt Report, ¶ 47. Market capitalization data per ©2021CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu; Bloomberg

[8]: Steinholt Report, ¶ 49. Bid-ask spread data per Bloomberg L.P.

[9]: Steinholt Report, ¶ 51. Float data per Bloomberg L.P.

2

**Appendix D**

**Description of Regression Models**

1.      I describe the event study methodology and report the results of my event study for Anadarko, ConocoPhillips, Cobalt, Noble Energy, PDC Energy, SRC Energy, and Extraction Oil & Gas in the text of my report. In this appendix, I describe the regression model and estimation period I use for each of these firms.

A.  Regression Model for Anadarko, ConocoPhillips, and Cobalt

2.      Mr. Steinholt uses a two-factor regression model of Anadarko's returns with the S&P 500 Index as the market index and an equal-weighted index of Anadarko's peers as the industry index.[1] To minimize potential issues that may arise in the choice of regression model and estimation period, I apply Mr. Steinholt's methodology to Anadarko, ConocoPhillips, and Cobalt with one change. In deposition testimony, Mr. Steinholt appears to suggest that if his analysis took into account the alleged fraud he would have not included ConocoPhillips in his peer group. Accordingly, while I also use the S&P 500 Index as the market index for all three of my regression models, I modify Mr. Steinholt's Peer Group by removing ConocoPhillips to exclude the potential effect of the alleged fraud on the peer group returns.[2] In particular, I constructed an equal-weighted portfolio consisting of the returns of Apache Corporation, Chesapeake Energy Corporation, Chevron Corporation, Devon Energy Corporation, EOG Resources, Inc., Hess Corporation, Marathon Oil Corporation, Noble Energy, Inc., Occidental Petroleum Corporation, and Pioneer Natural Resources Company (i.e., "Modified Steinholt Peer Group").[3] I use the Modified Steinholt Peer Group as my industry index for all three regression models. The results of my event study are qualitatively similar and, therefore, the conclusions I draw are the same regardless of whether ConocoPhillips is included or excluded from the industry index.[4]

---

[1] Steinholt Report, ¶ 37.

[2] Steinholt Dep. Tr. 15:2-8 & 25:17-22.

[3] Mr. Steinholt lists the members of his peer group in Steinholt Report Exhibit D, note 2.

[4] As explained below, I also removed Noble from the Steinholt Peer Group when performing an event study on the companies that operate in Colorado (i.e., "Modified Steinholt Peer Group Excluding Noble"). The results of my event study on May 2, 3, 5, and 8, 2017 for Anadarko, ConocoPhillips, and Cobalt using that Modified Steinholt Peer Group Excluding Noble are qualitatively similar to the results

1

3.      Following Mr. Steinholt's methodology for the estimation period, I use 252 trading days prior to each event date after the exclusion of the company's "financial release" dates (i.e., the estimation period always has 252 observations). For Anadarko, I excluded the same "financial release" dates as Mr. Steinholt. Specifically, I excluded the following dates: May 6, 2014, July 30, 2014, October 29, 2014, February 3, 2015, May 5, 2015, July 29, 2015, October 28, 2015, February 2, 2016, May 3, 2016, July 27, 2016, November 1, 2016, February 1, 2017, and May 3, 2017. For ConocoPhillips, I excluded the following "financial release" dates: May 1, 2014, July 31, 2014, October 30, 2014, January 29, 2015, April 30, 2015, July 30, 2015, October 29, 2015, February 4, 2016, April 28, 2016, July 28, 2016, October 27, 2016, February 2, 2017, and May 2, 2017. For Cobalt, I excluded the following "financial release" dates: February 27, 2014, May 1, 2014, August 5, 2014, November 4, 2014, February 23, 2015, May 5, 2015, August 4, 2015, November 3, 2015, February 22, 2016, May 3, 2016, August 2, 2016, November 1, 2016, and March 14, 2017.

B.  <u>Regression Models for Noble Energy, PDC Energy, SRC Energy, and Extraction Oil & Gas</u>

4.      Similar to the above, I apply Mr. Steinholt's methodology to Noble Energy, PDC Energy, SRC Energy, and Extraction Oil & Gas but made some changes. In deposition testimony, Mr. Steinholt appears to suggest that if his analysis took into account the alleged fraud he would have not included ConocoPhillips in his peer group.[5] Also in his deposition, Mr. Steinholt identified Noble Energy as one of the companies that was impacted by the news about the fire and explosion in Firestone, Colorado.[6] Accordingly, while I also use the S&P 500 Index as the market index for all of my regression models, I modify Mr. Steinholt's Peer Group by removing both ConocoPhillips and Noble to exclude the potential effects of the alleged fraud and news of the fire and explosion in Firestone, Colorado on the peer group returns. In particular, I constructed an equal-weighted portfolio consisting of the returns of Apache Corporation, Chesapeake Energy Corporation, Chevron Corporation, Devon Energy Corporation, EOG Resources, Inc., Hess Corporation, Marathon Oil Corporation, Occidental Petroleum

---

of using the Modified Steinholt Peer Group and, therefore, the conclusions I draw are the same regardless of whether I exclude Noble from the Modified Steinholt Peer Group or not.

[5] Steinholt Dep. Tr. 15:2-8 & 25:17-22.

[6] Steinholt Dep. Tr. 28:8-10.

Corporation, and Pioneer Natural Resources Company as the "Modified Steinholt Peer Group Excluding Noble".[7] I use the Modified Steinholt Peer Group Excluding Noble as my industry index for all four regression models. The results of my event study are qualitatively similar and, therefore, the conclusions I draw are the same whether or not one excludes ConocoPhillips and Noble from the industry index.

5.      Following Mr. Steinholt's methodology for the estimation period, I use 252 trading days prior to May 3, 2017 after the exclusion of the company's "financial release" dates (i.e., the estimation period always has 252 observations) for Noble Energy, PDC Energy, and SRC Energy. Because it completed its IPO on October 12, 2016, I used an estimation period from October 13, 2016 to May 2, 2017 for Extraction Oil & Gas. Then, I excluded the respective "financial release" dates of each firm from the estimation period. For Noble Energy, I excluded the following "financial release" dates: April 24, 2014, July 24, 2014, October 28, 2014, February 19, 2015, May 5, 2015, August 3, 2015, November 2, 2015, February 17, 2016, May 4, 2016, August 3, 2016, November 2, 2016, February 14, 2017, and May 2, 2017. For PDC Energy, I excluded the following "financial release" dates: February 20, 2014, May 6, 2014, August 8, 2014, November 6, 2014, February 19, 2015, May 7, 2015, August 10, 2015, November 5, 2015, February 22, 2016, May 6, 2016, August 9, 2016, November 3, 2016, and February 28, 2017. For SRC Energy, I excluded the following "financial release" dates: April 4, 2014, July 9, 2014, October 28, 2014, January 9, 2015, April 9, 2015, July 9, 2015, October 16, 2015, January 8, 2016, May 4, 2016, August 5, 2016, November 4, 2016, and February 24, 2017. For Extraction Oil & Gas, I excluded the following "financial release" dates: November 8, 2016 and March 14, 2017.

---

[7] Mr. Steinholt lists the members of his peer group in Steinholt Report Exhibit D, note 2.

3

# Exhibit 16

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGIA FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 4:20-cv-00576 |
| Plaintiff, | § § § | |
| v. | § § | |
| ANADARKO PETROLEUM CORPORATION, *et al.*, | § § § | |
| Defendants. | § § § § | |

EXPERT REBUTTAL REPORT OF BJORN I. STEINHOLT, CFA

**TABLE OF CONTENTS**

**Page**

I.      BACKGROUND ...........................................................................................................1

II.     SUMMARY OF THE FERRELL REPORT .........................................................2

III.    THE ECONOMIC EVIDENCE DEMONSTRATES PRICE IMPACT ............................6

        A.      Dr. Ferrell's mischaracterization of the Steinholt Report........................................8

        B.      ConocoPhillips' May 2, 2017 Shenandoah-6 dry hole expense does not
                provide any additional insight into Shenandoah price impact..............................11

        C.      ConocoPhillips' price reactions on May 3, 2017 and May 5, 2017, do not
                provide any additional insight into Shenandoah price impact..............................15

        D.      Cobalt May 3, 2017 price reaction demonstrates price impact.............................19

        E.      Dr. Ferrell's analysis of the Firestone explosion includes old information
                disclosed a week earlier, on April 26, 2017.........................................................21

        F.      Dr. Ferrell's analysis of the Firestone explosion is incomplete and ignores
                evidence that demonstrates Shenandoah price impact...........................................24

        G.      Dr. Ferrell's analysis of Colorado peers identifies a confounding factor,
                but not an absence of Shenandoah price impact ...................................................25

        H.      Event study controlling for the Firestone explosion demonstrates
                Shenandoah price impact ......................................................................................27

IV.     DR. FERRELL'S CRITICISMS OF THE DAMAGES METHODOLOGY RELY
        ON MISCHARACTERIZATIONS OF MY EVENT STUDY FRAMEWORK
        AND LEAD PLAINTIFF'S THEORY OF LIABILITY ................................................30

V.      CONCLUSION....................................................................................................30

## I.    BACKGROUND

1.    On October 1, 2021, I submitted an expert report in this case in support of class certification that included various analyses demonstrating that new and material information about Anadarko Petroleum Corporation's ("Anadarko" or the "Company"; together with the individual defendants, "Defendants") common stock during the period from February 20, 2015 through May 2, 2017, inclusive (the "Class Period"), was widely disseminated to the market, analyzed by market participants, and traded on, causing the information to be quickly reflected in the Company's stock price.[1]  Specifically, I concluded that (a) the market in which Anadarko's common stock traded throughout the Class Period was impersonal, open, well developed, and efficient in that the prices reflected new, material information as it became publicly available, and that, therefore, (b) it was reasonable for investors to rely on the integrity of the market price of Anadarko's common stock during the Class Period as reflecting the publicly available information.[2]  Furthermore, I also concluded that class-wide damages can be calculated in this case using the widely accepted event study methodology, and, if necessary, fundamental valuation principles.[3]

2.    On November 17, 2021, I was deposed by Defendants' counsel in this matter (the "Steinholt Deposition").

3.    I have now been asked to review and discuss an expert report submitted by Defendants' expert Allen Ferrell, Ph.D., dated December 10, 2021 ("Ferrell Report").

4.    This report is based on the information I have reviewed to date.  I understand that discovery is still ongoing and that additional information may become available.  As a result, I

---

[1]   Expert Report of Bjorn Steinholt, CFA, dated October 1, 2021 (the "Steinholt Report"), ¶¶19-52, 60.

[2]   *Id.*, ¶60.

[3]   *Id.*, ¶¶53-59, 61.

reserve the right to amend, refine, or modify my opinion and report, including in the event any additional information or analysis becomes available to me.

## II.    SUMMARY OF THE FERRELL REPORT

5.    In his report, Dr. Ferrell does not dispute my opinion that the market for Anadarko's common stock during the Class Period was efficient.  This was the primary focus and opinion in the Steinholt Report.  In fact, Dr. Ferrell states:

> As stated in the Steinholt Report, Anadarko common stock traded in an efficient market during the purported Class Period.  For the purposes of my analysis, I have assumed that Anadarko common stock traded in an efficient market during the purported Class Period.[4]

6.    Unlike my report, Dr. Ferrell's primary focus is on price impact.  First, he opines that on "18 out of the 21 alleged misstatement dates identified in the Complaint, there was no statistically significant price increase," and that on the remaining three alleged misstatement dates, "the Shenandoah disclosures on these dates were stale," so that he "would not expect Anadarko's stock price to react to these Shenandoah disclosures."[5]  This observation is fully consistent with Lead Plaintiff's theory that Defendants concealed the truth through a variety of methods and means, including by "omitt[ing] material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading," and that "Defendants' omissions of material facts caused Anadarko shares to trade at artificially inflated prices during the Class Period."[6]  More specifically, it is my understanding that, under Lead Plaintiff's theory, Anadarko's stock price was maintained at an artificially inflated level during the Class Period by concealing

---

[4]    Ferrell Report, ¶22.

[5]    Ferrell Report, ¶17.a.

[6]    Amended Complaint for Violations of the Federal Securities Laws, dated August 17, 2020 (the "Complaint"), ¶94.

the alleged truth and, thereby, preventing Anadarko's stock price from declining as a result of a disclosure of the alleged truth.[7]

7.      Second, Dr. Ferrell opines that there "is no reliable economic basis to conclude that the alleged Anadarko May 2, 2017 corrective disclosures about Shenandoah had a price impact on Anadarko's stock price."[8] Dr. Ferrell's argument relies on the "appeal to ignorance" fallacy, which experts sometimes use to try to shift the burden of proof onto the opposing party.[9]  In other words, the purported absence of a "reliable economic basis" demonstrating price impact is used as proof that there is no price impact.  However, Dr. Ferrell did not provide an economic analysis to prove the extent, if any, to which Anadarko's May 3, 2017, price decline was caused by other non-fraud related factors, commonly referred to as confounding factors.  Moreover, Dr. Ferrell ignored economic evidence that clearly demonstrates price impact relating to Anadarko's May 2, 2017, Shenandoah disclosures (the alleged "Corrective Disclosure"), including the following evidence discussed in greater detail below:[10]

- The suspension of Shenandoah and corresponding $902 million in write-offs was new, economically material information that, in an efficient market, would be expected to significantly impact Anadarko's stock price.

- Analyst downgrades and price impact for Shenandoah partner Cobalt's stock price relating to Anadarko's Corrective Disclosure.

- Anadarko's stock price declined 4.1% in after-market trading on May 2, 2017, after the Corrective Disclosure, but before the lone confounding factor identified by Dr. Ferrell.

---

[7]   *Id.*, ¶95.

[8]   Ferrell Report, ¶17.b.

[9]   https://iep.utm.edu/fallacy/#AppealtoIgnorance ("The Fallacy of Appeal to Ignorance …: Not knowing that a certain statement is true is taken to be a proof that it is false.").

[10]   Ferrell Report, ¶17.

- An event study that specifically controls for the confounding factor identified by Dr. Ferrell demonstrates that Anadarko's stock price decline on May 3, 2017, was statistically significant, and, thereby, affirmatively demonstrates price impact.

8.    Third, Dr. Ferrell claims that the purported "lack of price impact … is consistent with the economic nature of the disclosures," because the "market was aware of the inherent riskiness of the appraisal stage of the project."[11]   However, during the Class Period, Anadarko valued the Shenandoah asset at $467 million on its balance sheet (meaning that the Company's future cash flows from this asset was expected to, at a minimum, support this value), and capitalized the drilling costs (meaning that the drilling costs were expected to be expensed against additional future profits), with a book value approaching $900 million before the write-off.[12]   On May 2, 2017, the Company suspended further appraisal work on Shenandoah, resulting in writing off the Shenandoah asset and expensing all drilling costs, totaling $902 million in write-offs.  This demonstrates that Anadarko itself (prior to the write-off) had assigned a substantial economic value to the Shenandoah asset, which logically would have had some negative impact on Anadarko's stock price during the Class Period if the project was suspended and written off (as was the case at the end of the Class Period).

---

[11]   *Id.*, ¶17.c.

[12]   Anadarko Form 10-K, filed with the SEC on February 17, 2017, at 76 ("Under the successful efforts method of accounting, exploratory drilling costs are initially capitalized pending the determination of proved reserves. If proved reserves are found, drilling costs remain capitalized and are classified as proved properties. For exploratory wells that find reserves that cannot be classified as proved when drilling is completed, costs continue to be capitalized as suspended exploratory drilling costs if there have been sufficient reserves found to justify completion as a producing well and sufficient progress is being made in assessing the reserves and the economic and operating viability of the project."); APC-00734803-04 (Shenandoah book value as of March 31, 2017).

9.      Fourth, Dr. Ferrell incorrectly claims that "Mr. Steinholt testified that it was irrelevant for him to know what Plaintiff's theory of liability is,"[13] and that, therefore, how my event study framework applies to different theories "is left entirely unexplained."[14]  Dr. Ferrell misquotes my testimony, which was about a damage expert's role in independently assessing the existence and/or magnitude of inflation, irrespective of the complaint's allegations.[15]  Further, the specific theory of liability he claims I have not sufficiently addressed is one that Dr. Ferrell made up himself, *i.e.*, the "materialization of an undisclosed risk" theory of liability.[16]  Dr. Ferrell's theory is not found anywhere in the Complaint.  In fact, the actual allegation in the Complaint is that Defendants failed to disclose that the "risks had already materialized as to the Shenandoah resource."[17]  Furthermore, Dr. Ferrell does not explain why my framework based on the widely accepted event study methodology (refined by fundamental valuation tools, if necessary) could not be used to estimate the impact of a particular risk materializing.  As such, Dr. Ferrell's criticism should be disregarded.

---

[13]   Ferrell Report, ¶17.d.

[14]   *Id.*, ¶17.d.

[15]   Steinholt Deposition at 69:15-25 ("Well, from a damage expert's point of view, it's irrelevant what Plaintiffs allege with respect to the inflation, it's up to the expert to determine what the inflation is.  So I would discard any economic claims that are being made in the Complaint and I would look at it myself. And if I think it's zero, it's zero, it doesn't matter what they say in the Complaint.").

[16]   Ferrell Report, ¶17.d.

[17]   Complaint, ¶¶98, 116.

### III.    THE ECONOMIC EVIDENCE DEMONSTRATES PRICE IMPACT

10.    In this case, there is no disagreement that Anadarko's common stock traded in an efficient market.[18] Furthermore, there is no dispute that, in "an efficient market, new and material information is quickly incorporated into the stock price."[19] While Dr. Ferrell uses the term "value-relevant," instead of material, these two terms are used interchangeably by experts in securities cases and simply mean that the information had future cash flow implications given that the value of an investment equals the present value of the investment's future cash flows.[20]

11.    The Corrective Disclosure in this case is Anadarko's suspension of further appraisal work on Shenandoah due to lack of commercial viability, resulting in an impairment charge of $467 million and the write-off of $435 million of exploratory well costs, totaling $902 million.[21] This disclosure was value-relevant (*i.e.*, had negative future cash flow implications). Specifically, it meant that Anadarko no longer expected the future cash flows from the Shenandoah asset to support (a) the $467 million value of the Shenandoah asset on its balance sheet, or (b) the capitalization of up to $435 million in exploratory well costs. Consequently, in an efficient market, if this value-relevant information was new when it was disclosed, then it would have had an impact on Anadarko's stock price. As part of my event study, I examined the available evidence and

---

[18]    Ferrell Report, ¶22 ("As stated in the Steinholt Report, Anadarko common stock traded in an efficient market during the purported Class Period. For the purposes of my analysis, I have assumed that Anadarko common stock traded in an efficient market during the purported Class Period.").

[19]    Steinholt Report, ¶12; Ferrell Report, ¶21 ("in an efficient market, new relevant information would be expected to impact any company to which such information is value relevant").

[20]    Steinholt Report, ¶7 fn. 7 ("From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of those cash flows. Material information, therefore, is information that impacts the future cash flows or the timing or riskiness of the future cash flows.").

[21]    Complaint, ¶152.

concluded that the suspension of further appraisal work on (and write-off of) Shenandoah was, indeed, disclosed, for the first time, after the market closed on May 2, 2017.

12. While Dr. Ferrell states that he conducted several event studies, as described, none was actually designed to address whether the Corrective Disclosure caused a statistically significant price decline in Anadarko's stock price. Instead, Dr. Ferrell focused on information related to an April 17, 2017 explosion in Firestone, Colorado, resulting in an April 26, 2017 disclosure (after the market closed) that Anadarko was shutting down 3,000 wells and news coverage that increased investors' regulatory concerns in Colorado, including additional news coverage on May 2 and May 3 of 2017.[22] At most, Dr. Ferrell identified a contributing or confounding factor; however, he failed to perform any event study to determine the extent, if any, to which that contributing or confounding factor explained Anadarko's price decline. I have now performed the appropriate event study to answer that question, discussed below, and even after controlling for the Firestone explosion news identified by Dr. Ferrell, Anadarko's 3.9% abnormal price decline on May 3, 2017, was still statistically significant at the 1% level (a more stringent benchmark than the 5% level used by Dr. Ferrell), thereby providing affirmative evidence of Shenandoah price impact in this case.[23] This is consistent with the fact that Anadarko's stock price declined 4.1% in after-market trading on May 2, 2017, after the Corrective Disclosure, but before the first confounding factor identified by Dr. Ferrell.

---

[22] Ferrell Report, ¶65 & Figure 1.

[23] Dr. Ferrell's 95% confidence interval corresponds to statistical significance at the 5% level, and a 99% confidence interval would correspond to statistical significance at the 1% level. *Id.*, ¶25.

A.       **Dr. Ferrell's mischaracterization of the Steinholt Report**

13.       In the Steinholt Report, I analyzed whether the market for Anadarko's common stock was efficient, as defined by the *Cammer* and *Krogman* factors.[24]   One of these factors, *Cammer* factor 5, states that "'it would be helpful'" to show "'a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'"[25]   For *Cammer* factor 5, I performed several analyses, including one in which I conducted an event study showing that the stock price decline following the Corrective Disclosure was statistically significant, consistent with what one would expect in an efficient market.[26]   That analysis was one piece of one of the factors I considered when concluding that Anadarko's common stock traded in an efficient market.   However, this was an analysis of market efficiency in the context of *Cammer* factor 5, not a materiality, loss causation, or full-blown price impact analysis.[27]

14.       To make sure that it was understood that my event study was performed in the context of analyzing market efficiency, which would not require me to isolate the fraud-related component of the price decline, I even explained that "I used these companies to construct a Peer Group for the purposes of analyzing market efficiency," and that "it may be necessary to modify the Peer Group slightly for the purpose of isolating the fraud-related component of a price

---

[24]   Steinholt Report, ¶¶12-51.

[25]   *Id.*, ¶36 (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989)).

[26]   *Id.*, ¶¶43-44.

[27]   As explained by *Cammer* (also cited in the Steinholt Report): "'As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price. However, as mentioned, such a showing . . . would be difficult because it would require exploration of materiality and causation issues. . . . [P]laintiffs will not be required to delve into such issues at this early stage.'"  *Id.*, ¶20 fn. 23 (quoting *Cammer*, 711 F. Supp. at 1291-92).

movement."[28]  At my deposition, I reiterated that that "I did not perform a price impact analysis,"[29] and again explained that my analysis related to the "totality of the information disclosed," which "included Shenandoah, but … I haven't analyzed loss causation [and] I haven't performed a price impact analysis."[30]

15.    Dr. Ferrell incorrectly claims that "Mr. Steinholt's suggestion that the alleged corrective disclosures had a price impact is flawed."[31]  Based on the false premise that my initial analysis focused on price impact, Dr. Ferrell then incorrectly states that my deposition testimony (*supra*, ¶14) amounted to "backtrack[ing]," even though it simply expanded on my analysis in the Steinholt Report (*id.*).[32]

16.    Dr. Ferrell also incorrectly states that the Steinholt Report "assumed" that "all of the information contained in the alleged corrective disclosures concerning Shenandoah was new," but that I then "testified [that I] was aware that the disclosure that Shen-6 was a dry hole was not new."[33]  But there is no reference to the Shen-6 appraisal well in the Steinholt Report.  Rather, the Steinholt Report referenced Anadarko's 1Q2017 announcement generally, and then specifically the new information relating to "the Company disclos[ing] that it had suspended further appraisal activities at Shenandoah, taking a $467 million impairment charge and expensing $435 million

---

[28]  *Id.*, ¶37 fn. 50.

[29]  Steinholt Deposition at 46:2-3.

[30]  *Id.* at 47:17-23.

[31]  Ferrell Report, ¶53.

[32]  *Id.*

[33]  *Id.*

related to the project."[34] This specific information about Anadarko suspending further appraisal activities in the Shenandoah, which represents the Corrective Disclosure, was indeed new.

17.    Dr. Ferrell continues by incorrectly claiming that I testified that "the disclosures about the suspension of appraisal activity at Shenandoah and the impairment of the value of Shenandoah would have a similar impact on ConocoPhillips."[35]  This is a mischaracterization of my testimony and is obviously not true because ConocoPhillips, among other things, was a much larger oil company with much less at stake regarding Shenandoah than the operator Anadarko. This is also reflected in the fact that ConocoPhillips' write-off was much smaller.  Regardless, to support his incorrect statement, Dr. Ferrell references a portion of my deposition testimony where I explain that reviewing events relating to the Shenandoah partners such as ConocoPhillips and Cobalt can be helpful in determining whether the Corrective Disclosure was "unexpected."[36] When asked to explain the relevance of looking at the "reaction" of ConocoPhillips, in this context, I explained that: "Well, for instance, ConocoPhillips had to revise their own earnings as a result of what was disclosed by Anadarko.  Had they known that the prior day, they would have already incorporated that into their own write-down."[37]  In other words, the "reaction" by ConocoPhillips to the Corrective Disclosure (revising their own earnings disclosed just hours earlier) is evidence that the information disclosed by Anadarko was new or "unexpected" even to ConocoPhillips.

[34]    Steinholt Report, ¶43.

[35]    Ferrell Report, ¶53.

[36]    Steinholt Deposition at 13:15-21 ("Q[:] You said that the corrective disclosure here was unexpected. What's your basis for saying that? A[:] It's by reading analyst reports, by reading or by looking at the reaction by the other partners, Cobalt and ConocoPhillips.").

[37]    *Id.* at 14:5-10.

18.     Dr. Ferrell then incorrectly states that "Mr. Steinholt testified that he was aware that the news linking an Anadarko well to a house explosion in Colorado that was also disclosed after market close on May 2, 2017 would have a similar impact on Noble Energy, yet again he failed to take that into consideration."[38]  First, the link between the so-called Firestone explosion and the Anadarko well located 200 feet from the house that burned down was first disclosed after the market closed on April 26, 2017, when Anadarko announced it was shutting down 3,000 wells as a result.[39]  Following this disclosure, on April 27, 2017, Anadarko's stock price declined 4.7%.[40]  Second, for the purpose of my market efficiency opinion, it was not necessary for me to estimate how much of Anadarko's stock price decline on May 3, 2017, was attributable to new information regarding Shenandoah versus any new information regarding the Firestone explosion.

19.     In short, any reference by Dr. Ferrell to any analysis by me in the Steinholt Report purportedly related to Shenandoah price impact should be ignored because "I did not perform a price impact analysis."[41]  I performed an analysis of market efficiency, and my opinion that Anadarko stock traded in an efficient market throughout the Class Period is not in dispute.

**B.    ConocoPhillips' May 2, 2017 Shenandoah-6 dry hole expense does not provide any additional insight into Shenandoah price impact**

20.     Dr. Ferrell's price-impact analysis is flawed because, among other things, his opinion is based on conflating (a) ConocoPhillips taking $101 million in dry hole expenses, which

---

[38]   Ferrell Report, ¶53.

[39]   April 26, 2017, Bloomberg, "Anadarko Shuts Vertical Wells in Colorado After Home Explosion" ("Anadarko Petroleum Corp. is shutting 3,000 vertical wells across northeast Colorado following a home explosion in the town of Firestone earlier this month.… The blast happened on April 17 in a home 200 feet from where Anadarko operates a vertical well that was drilled by a previous explorer in 1993, The Woodlands, Texas-based company said.").

[40]   Steinholt Report, Exhibit D at 14.

[41]   Steinholt Deposition at 46:2-3.

included the Shenandoah-6 well,[42] with (b) Anadarko's disclosure that it had suspended further appraisal activities at Shenandoah altogether, resulting in a $467 million impairment charge and expensing $435 million related to the project, totaling $902 million.[43] According to Dr. Ferrell:

> Anadarko's disclosure after market close on May 2, 2017 that Shen-6 was a dry hole was previously disclosed by ConocoPhillips, a partner of Anadarko in Shenandoah with a similar percentage of ownership in the project, before market open on May 2, 2017. On May 2, 2017, both ConocoPhillips's and Anadarko's stock price reactions were not statistically significant. This indicates that the disclosure that Shen-6 was a dry hole could not have had an impact on Anadarko's stock price on May 2, 2017.[44]

21.     First, the May 2, 2017 ConocoPhillips statement regarding Shenandoah was limited to the following sentence: "First-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico."[45] A $101 million expense – **90% less** than Anadarko's $902 million Shenandoah write-off – would not be expected to cause a statistically significant price decline in ConocoPhillips' stock price given that the impact ($101 million) represented only 0.2% of its market capitalization[46] ($58.74 billion on May 1, 2017), or an impact of only $0.08 per share. More specifically, for information to have a statistically significant impact on ConocoPhillips' stock price, using Dr. Ferrell's own event study in Table 2, it would have to cause ConocoPhillips' stock price to change by at least 2.16%,[47] or

---

[42]   Ferrell Report, ¶17.b.1. & fn. 39.

[43]   Steinholt Report, ¶43 & fn. 60-61.

[44]   Ferrell Report, ¶17.b.1.

[45]   ConocoPhillips Form 8-K, Exhibit 99.1, filed with the SEC before the market opened on May 2, 2017.

[46]   Market capitalization is the number of shares outstanding multiplied by the stock price. ($101 million/$58,740 million = 0.2%).

[47]   For information to have a statistically significant impact on ConocoPhillips' stock price, using Dr. Ferrell's event study in Table 2, the new information would have to cause ConocoPhillips' stock price to change by 2.16% ((-0.75% abnormal return) / (-0.68 t-statistic) * (1.96 statistically

$1.03 per share,[48] or have a $1.27 billion impact on its market capitalization.[49]  A dry hole expense that, at most, would have a pre-tax $101 million impact on earnings, or $0.08 per share, is significantly less than the $1.27 billion, or $1.03 per share, needed to meet Dr. Ferrell's benchmark for statistical significance.  In fact, investors would have to value the information at more than 10 times the expense amount itself for its impact to be detectable by Dr. Ferrell's event study.

22.    Second, and even more important, the failure of the Shenandoah-6 appraisal well may be related, but still very different than the new information regarding Anadarko's abandonment of Shenandoah altogether due to its lack of commercial viability, resulting in an Anadarko impairment charge of $467 million and the write-off of $435 million of exploratory well costs, totaling $902 million, disclosed after the market closed on May 2, 2017.[50]  The $902 million write-off alone represented 2.9% of Anadarko's $31.54 billion market capitalization, or $1.61 per share.[51]  Assuming that investors valued the information similarly, this is sufficiently large to be detected by a properly designed event study in this case, as I demonstrate below.

23.    It should be noted that, for the Shenandoah to be worthwhile exploring, the future expected cash flows from the project would have to exceed the exploration costs and provide Anadarko with a sufficient internal rate of return.  Furthermore, the value of Shenandoah, if sanctioned (i.e., developed), would be much greater than the value used by Anadarko for

significant benchmark) = 2.16%), or $1.03 per share (ConocoPhillips' $47.48 per share closing price * 2.16), or have an impact on its market capitalization of $1.27 billion (ConocoPhillips' $58.735 market capitalization * 2.16%).

[48]    (ConocoPhillips' $47.48 per share closing price * 2.16% = $1.03 per share).

[49]    (ConocoPhillips' $58.735 billion market capitalization * 2.16% = $1.27 billion).

[50]    Steinholt Report, ¶43 & fn. 60-61.

[51]    ($902 million write-off/Anadarko's $31,540 million market capitalization = 2.9%).

accounting purposes.   According to KLR Group, a "sanctioned Shenandoah development constitutes approximately $5 per share of incremental fair value."[52]   While oil prices could have factored into the timing and sanctioning price, that's a different decision than a full write-down. The Complaint here also alleges Anadarko assured investors in the fall of 2016: "'you don't need material commodity price improvement to make money in the Gulf of Mexico.'"[53]   Further, the WTI oil price on May 3, 2017, of $47.82 per barrel, was slightly higher than the average during the Class Period of $46.66 per barrel, and much higher than the low during the Class Period (February 11, 2016) of $26.21 per barrel.   Prior to write-off, Anadarko was projecting higher oil prices,[54] and one year after the end of the Class Period (May 3, 2018), the WTI price was $68.43 per barrel.

24.     Third, Dr. Ferrell also failed to demonstrate that ConocoPhillips' mention of the failure of the Shenandoah-6 appraisal well represented new information, the very premise of his analysis of the ConocoPhillips May 2, 2017 price reaction.   In this respect, it is important to make a distinction between (a) the Shenandoah-6 appraisal well being dry, information which may have been publicly known prior to the ConocoPhillips May 2, 2017 disclosure, and (b) the Shenandoah-6 sidetrack well being dry, which, as far as I can tell, had not been disclosed prior to the Corrective Disclosure. A May 3, 2017 Cowen analyst report stated that "Anadarko put out disappointing news yesterday afternoon with respect to Shenandoah," but also explained that the "fact that the

---

[52]   March 9, 2017, KLR Group analyst report, "Slightly Higher Oil Composition Offsets Higher Operating Expense."

[53]   Complaint, ¶135; *see also id.*, ¶¶79, 126-128.

[54]   APC-00092709.

appraisal well was a disappointment became apparent in March," while the "sidetrack well results is new news and we believe [the sidetrack well being dry] will be a disappointment."[55]

25.     For the above reasons, Dr. Ferrell's analysis of ConocoPhillips' May 2, 2017, Shenandoah-6 announcement provides no further insights as to whether the Corrective Disclosure impacted Anadarko's stock price on May 3, 2017.

**C.     ConocoPhillips' price reactions on May 3, 2017 and May 5, 2017, do not provide any additional insight into Shenandoah price impact**

26.     Dr. Ferrell claims that, "given Anadarko's and ConocoPhillips's similar level of ownership in Shenandoah, I would expect new value-relevant Shenandoah information to affect both Anadarko and ConocoPhillips."[56] Dr. Ferrell is incorrect.  Instead of providing any economic analysis to support his claim, Dr. Ferrell mischaracterizes my deposition testimony, incorrectly claiming that, "[c]onsistent with this, Mr. Steinholt testified that one can look at the price reaction of ConocoPhillips to determine whether disclosures related to Shenandoah would affect Anadarko."[57] That was not my testimony as it is obviously not true, given that ConocoPhillips, among other things, was a much larger oil company with much less at stake regarding Shenandoah than the operator Anadarko.  At my deposition, I addressed a different issue, that reviewing events relating to ConocoPhillips (as well as Cobalt) can be helpful in determining whether the Anadarko Shenandoah disclosure at the end of the  Class Period was "unexpected."[58] When asked to explain the relevance of looking at the "reaction" of ConocoPhillips, in this context, I explained that:

---

[55]  May 3, 2017, Cowen & Co. analyst report, "Shenandoah Results A Negative."

[56]  Ferrell Report, ¶32.

[57]  *Id*.

[58]  Steinholt Deposition at 13:15-21 ("Q[:] You said that the corrective disclosure here was unexpected. What's your basis for saying that? A[:] It's by reading analyst reports, by reading or by looking at the reaction by the other partners, Cobalt and ConocoPhillips.").

"Well, for instance, ConocoPhillips had to revise their own earnings as a result of what was disclosed by Anadarko. Had they known that the prior day, they would have already incorporated that into their own write-down."[59]  In fact, on May 4, 2017, ConocoPhillips issued a press release entitled: "ConocoPhillips Provides Update to First-Quarter 2017 Results **Based on Subsequent Partner Disclosures** and Information."[60]  In other words, the "reaction" by ConocoPhillips to the Corrective Disclosure (revising their own earnings disclosed just hours earlier) is evidence that the information disclosed by Anadarko was new or "unexpected" information even to ConocoPhillips, a Shenandoah partner.

27.    To understand why Shenandoah was not as important to ConocoPhillips as to the operator Anadarko, it is helpful to go back to July 16, 2015, when ConocoPhillips announced "that it intend[ed] to reduce future deepwater exploration spending, with the most significant reductions coming from the operated Gulf of Mexico program."[61]  Following its impairment charge for Shenandoah, announced after the market closed on May 4, 2017, ConocoPhillips reported that its exit from deepwater exploration was essentially completed.[62]  Anadarko, on the other hand, was very involved in deepwater exploration and, as one analyst stated, the Shenandoah write-off "does take away from APC's premium for exploration, which is gone, and no longer in our price

---

[59]  *Id.* at 14:5-10.

[60]  May 4, 2017, ConocoPhillips Press Release, "ConocoPhillips Provides Update to First-Quarter 2017 Results Based on Subsequent Partner Disclosures and Information" (emphasis added).

[61]  July 16, 2015, ConocoPhillips Press Release, "ConocoPhillips Announces Dividend Increase and Reductions in Future Deepwater Exploration Spending."

[62]  May 4, 2017, ConocoPhillips Press Release, "ConocoPhillips Provides Update to First-Quarter 2017 Results Based on Subsequent Partner Disclosures and Information" ("Following this impairment, the company has no remaining material exposure related to its previously announced exit from deepwater exploration.").

target."[63]  While ConocoPhillips' working interest (30%) was almost as high as that of Anadarko

(33%), Anadarko had an operating interest and substantial control over the project, which resulted

in a "control premium," *i.e*, greater value as a result of being able to make decisions in line with

one's investment objective.[64]  The difference between the respective economic interests was also

reflected in the different impairment charges for ConocoPhillips versus Anadarko.   While

ConocoPhillips' Shenandoah leasehold impairment amounted to only $51 million, Anadarko's

impairment charge related to Shenandoah was $467 million.  Furthermore, ConocoPhillips was a

much larger company with a much larger market capitalization ($58.7 billion) versus Anadarko

($31.7 billion).[65]  Based on the above, the impact of the Corrective Disclosure would have been

expected to be significantly less for ConocoPhillips than it was for Anadarko.

28.    On May 4, 2017, ConocoPhillips updated its 1Q2017 results based on the new

information regarding Shenandoah disclosed by Anadarko after market on May 2, 2017 (*i.e.*, the

Corrective Disclosure).[66]  ConocoPhillips' update included an additional pre-tax dry hole expense

of $242 million and a leasehold impairment of $51 million, totaling $293 million.  However, a

$293 million expense would not be expected to cause a statistically significant price decline in

ConocoPhillips' stock price given that the impact ($293 million) represented only about 0.5% of

---

[63]   May 3, 2017, Wolfe Research analyst report, "Mr. Misunderstood – Always left out, never fit in."

[64]   Jerald E. Pinto, Elaine Henry, Thomas R. Robinson & John D. Stove, *Equity Asset Valuation*, John Wiley & Sons, 26 (2d ed. 2010) ("The value of a stock investment that would give an investor a controlling position will generally reflect a control premium; that is, it will be higher than a valuation produced by a generic quantitative valuation expression that did not explicitly model such a premium.").

[65]   Source: Bloomberg, as of May 1, 2017.

[66]   May 4, 2017, ConocoPhillips Press Release, "ConocoPhillips Provides Update to First-Quarter 2017 Results Based on Subsequent Partner Disclosures and Information."

its market capitalization ($56.8 billion on May 4, 2017), or an impact of only $0.24 per share.[67] More specifically, for information to have a statistically significant impact on ConocoPhillips' stock price, using Dr. Ferrell's event study in Table 4, the new information would have to cause ConocoPhillips' stock price to change by at least 2.18%,[68] or $1.00 per share,[69] or have a $1.24 billion impact on its market capitalization.[70]  A Shenandoah pre-tax expense of $293 million, or $0.26 per share, is significantly less than the $1.24 billion, or $1.00 per share, needed for the impact to meet Dr. Ferrell's benchmark for statistical significance.

29.    Instead of recognizing the above economic reality, Dr. Ferrell analyzes ConocoPhillips' May 5, 2017 price decline, finds that price decline is not statistically significant, and opines that this somehow "indicates that the Shenandoah disclosures could not have had an impact on Anadarko's stock price on May 3, 2017."[71]  This flawed economic rationale is based, in part, on his incorrect premise that, "[i]f the stock price movement is [not statistically significant], the movement is fully explainable by movements in the market and industry and cannot be attributed to the new company-specific information announced on the event date."[72]  This is not true.  In this case, the $293 million write-off represented 0.5% of ConocoPhillips' market

---

[67]  For information to have a statistically significant impact on ConocoPhillips' stock price, using Dr. Ferrell's event study in Table 4, the new information would have to cause ConocoPhillips' stock price to change by 2.18% ((-0.59% abnormal return) / (-0.53 t-statistic) * (1.96 statistically significant benchmark) = 2.18%), or $1.00 per share (ConocoPhillips' $45.92 per share closing price * 2.18%), or have an impact on its market capitalization of $1.24 billion (ConocoPhillips' $56.8 market capitalization * 2.18%).

[68]  (-0.59% abnormal return/-0.53 t-statistic*1.96 statistically significant benchmark = 2.18%).

[69]  (ConocoPhillips' $45.92 per share closing price * 2.18% = $1.00 per share).

[70]  (ConocoPhillips' $56.8 billion market capitalization * 2.18% = $1.24 billion).

[71]  Ferrell Report, ¶¶17.b.ii., 61 & Table 4.

[72]  *Id.*, ¶25.

capitalization, and Dr. Ferrell's estimated abnormal return (or company-specific return, *i.e.*, ConocoPhillips' return net of market and industry factors) was even greater at negative 0.6%.[73] There is no economic basis for Dr. Ferrell's claim that the ConocoPhillips' 0.6% company-specific stock price decline on May 5, 2017, "cannot be attributed to" a write-off that represented 0.5% of its market capitalization because the decline was not statistically significant, and conclude that it therefore was "fully explainable by movements in the market and industry."[74]

30.    In short, Dr. Ferrell (a) analyzes ConocoPhillips' stock price decline on May 3, 2017 (following the Corrective Disclosure) and on May 5, 2017 (following ConocoPhillips' disclosure in response to the Corrective Disclosure), (b) finds that ConocoPhillips' stock price movements on these days were not statistically significant, and (c) incorrectly concludes that "[t]his indicates that the Shenandoah disclosures could not have had an impact on Anadarko's stock price on May 3, 2017."[75]  Dr. Ferrell's opinion is incorrect for the reasons explained above, because he, among other things, failed to consider that the gross ***and*** relative economic impact was far greater for the smaller Anadarko than on ConocoPhillips, a much larger company. Consequently, the analysis performed by Dr. Ferrell regarding ConocoPhillips' price reactions on May 3, 2017 and May 5, 2017, is flawed, should not be relied upon, and provides no additional insight as to whether the Corrective Disclosure impacted Anadarko's stock price on May 3, 2017.

### D.    Cobalt May 3, 2017 price reaction demonstrates price impact

31.    In contrast to ConocoPhillips, a more relevant Shenandoah partner to analyze is Cobalt.  Despite having a smaller working interest in Shenandoah (20%) than ConocoPhillips (30%), Cobalt was a much smaller oil company with a market capitalization at the beginning of

---

[73]   *Id.*, Table 4.

[74]   *Id.*, ¶25.

[75]   *Id.*, ¶17.b.ii.