May of less than $200 million, so that any price impact on Cobalt's stock price would be more easily observable. While Cobalt was in financial distress, meaning that its stock price reaction would be muted as the downside for any stock is limited to $0 per share, the Corrective Disclosure, if new and material, would still be expected to have some impact on Cobalt's stock price. Consistent with this expectation, on May 3, 2017, Bloomberg reported that "Cobalt International Energy [was] cut to sell from neutral at Citi as Anadarko noted in its 1Q release suspension of further appraisal work at Shenandoah."[76] Also on May 3, 2017, Bernstein reportedly cut its target price for Cobalt from $2.00 per share to $1.20 per share, citing "Anadarko's disclosures effectively halting development of the Shenandoah field."[77] Furthermore, a May 3, 2017, Cowen analyst report similarly noted that "[w]e and our equity colleague … who covers Anadarko, both believe that Anadarko put out disappointing news yesterday afternoon with respect to Shenandoah,"[78] and in a later analyst report on August 8, 2017, Cowen further explained that "[p]ost operator Anadarko's write-down to the [Shenandoah] project in its Q1 results, we (and the market) had been ascribing little value here."[79]

32.    According to Dr. Ferrell's own event study, Cobalt's abnormal (or company-specific) return on May 3, 2017, *i.e.*, following Anadarko's Corrective Disclosure, was negative 11.3%, and statistically significant.[80] This is affirmative evidence that Cobalt investors viewed Anadarko's suspension of further appraisal of the Shenandoah asset as new and material (or value-

---

[76] May 3, 2017, Bloomberg, "Cobalt Intl Cut at Citi as Anadarko Suspends Shenandoah Work."

[77] APC-00737640.

[78] May 3, 2017, Cowen & Co. analyst report, "Shenandoah Results A Negative."

[79] August 8, 2017, Cowen & Co. analyst report, "Uncertainties Remain Post Q2."

[80] Ferrell Report, Table 3.

relevant) information, and that this information quickly became reflected in Cobalt's stock price. It also supports my opinion that this new and material information negatively impacted Anadarko's stock price.

33.    Dr. Ferrell states that he "reviewed analyst reports and news articles on Cobalt to identify firm-specific news that could have had a price impact on Cobalt's stock price on May 3, 2017."[81]  However, the only analyst/media report cited by him that involved new information on May 3, 2017, is the same Bloomberg article that I referenced above, which stated, in part: "APC's Shenandoah-6 appraisal results and choice to write-down investment will make it unlikely CIE will be able to execute any 'material' sale of its interest anytime soon."[82]  In other words, the only new information on May 3, 2017, cited by Dr. Ferrell is the Bloomberg article discussing an analyst report that stated that the Corrective Disclosure impacted the value of the Shenandoah asset, and that this therefore also impacted Cobalt.  Consequently, Dr. Ferrell's own analysis supports my opinion that this new and material information also had a negative impact on Anadarko's stock price.

**E.    Dr. Ferrell's analysis of the Firestone explosion includes old information disclosed a week earlier, on April 26, 2017**

34.    As part of his price impact analysis, Dr. Ferrell focuses on the Firestone explosion, which he summarizes as follows:

> Shortly after the filing of [Anadarko's] Form 10-Q, news that linked a cut abandoned gas flow line leading from an Anadarko well to a fatal house explosion in Firestone, Colorado was disclosed.  At 4:51 PM on May 2, 2017, the *Denver Post* reported that fire investigators found a fatal house explosion on April 17, 2017 in Firestone, Colorado was caused by odorless gas seeping from a cut-off underground pipeline running from an Anadarko well into the house.  Soon after the firefighters released their report, then Colorado Governor John Hickenlooper ordered oil and gas companies statewide to inspect and pressure-test oil and gas flowlines within 1,000 feet of occupied buildings.  Related to this incident,

---

[81]  *Id.*, ¶58.

[82]  May 3, 2017, Bloomberg, "Cobalt Intl Cut at Citi as Anadarko Suspends Shenandoah Work."

Anadarko shut down 3,000 of its older, vertical oil and gas wells in northeastern Colorado as a precaution. In response to this news, at 5:18 PM, Anadarko issued a statement that it would "continue to cooperate fully with all ongoing investigations" and that it would "continue to work with the Colorado Oil and Gas Conservation Commission (COGCC) on additional steps or actions the agency deems necessary." Analysts had an adverse reaction to this news. For example, a Macquarie analyst noted that "[t]he findings of the Firestone investigation are a clear negative for Anadarko" and that "Colorado is already one of the most stringently regulated states in the nation in respect to energy and is likely to see increased pressure following this incident." One analyst estimated that at a cost of $100,000 per well, the total remediation cost alone could be $140 million.[83]

35.     The above summary in the Ferrell Report is misleading. May 2, 2017 was not the first time Anadarko had been connected to an April 17, 2012 fatal house explosion in Firestone, Colorado. While Dr. Ferrell listed sources from only May 2, 2017 and May 3, 2017, the link between the Firestone explosion and Anadarko had been disclosed days earlier – after the market closed on April 26, 2017, including a press release in which Anadarko disclosed one of its wells was only 200 feet from the home and that the Company had unilaterally decided to shut down 3,000 vertical wells.[84]   As such, investors were informed, after the market closed on April 26, 2017 – a full week before May 3, 2017, that the Company (a) operated the well closest to, and was thus

---

[83]   Ferrell Report, ¶14.

[84]   April 26, 2017, Anadarko Press Release, "Anadarko Issues Statement Regarding Colorado Operations" ("While there is still much that is not yet known regarding the potential contributing factors, Anadarko operates an older vertical well that was drilled by a previous operator in 1993 and is located approximately 200 feet from where the home was recently built. As such, the company has been working cooperatively with fire officials and state regulatory agencies in their investigations since the time of the accident."); *see also id*. ("While these events remain under active investigation and much remains to be determined, in an abundance of caution, since the company operates more than 3,000 producing vertical wells of the same vintage, it has taken proactive measures to shut in all vertical wells across the counties in northeast Colorado where it operates. The wells will remain shut in until the company's field personnel can conduct additional inspections and testing of the associated equipment, such as facilities and underground lines associated with each wellhead. Particular focus is being placed on areas where housing and commercial developments are occurring in close proximity to existing infrastructure. The wells will not be restarted until each has undergone and passed these additional inspections. Anadarko currently anticipates the process will take two to four weeks, depending on weather. The wells currently account for total production of about 13,000 net barrels of oil equivalent per day.").

the most likely cause of, the explosion; (b) would experience some impact from the Firestone explosion, including the Company's results for 2Q2017 due to the 3,000 wells shut in; and, most importantly, (c) that the Firestone explosion could result in additional Colorado energy regulation, which would impact other Colorado companies as well.

36.     Following the April 26, 2017 disclosure, an Evercore analyst report opined that the "value implication directly associated with the shut-in production and any physical remediation is likely immaterial for APC," but also noted broader concerns regarding the Colorado regulatory environment and noted that "DJ basin exposed peers underperformed today on sympathy (NBL, SRC, XOG, PDCE)."[85]  Wells Fargo also opined that the specific impact on Anadarko was "not that meaningful," but that the potential impact on the Colorado regulatory environment had other DJ producers "feel[ing] some pressure resulting from this incident includ[ing] NBL and PDCE and to a lesser extent XOG and SRCI."[86]  Finally, in an April 27, 2017 note, Tudor Pickering stated that the wells represent a tiny fraction of Anadarko's oil and natural-gas output, but the blast raises the risk of tougher regulation for the industry.[87]  While the specific Anadarko impact from the Firestone explosion was limited, the incident resulted in significant concerns regarding Colorado's overall energy regulatory environment back in April 2017 that not only impacted Anadarko, but also other companies operating there.

37.     Dr. Ferrell also cites to a potential $140 million in remediation costs as a result of Colorado regulatory scrutiny.   However, this is significantly less than the $902 million in

---

[85]   April 27, 2017, Evercore analyst report, "APC Colorado Shut-ins."

[86]   April 27, 2017, Wells Fargo analyst report, "APC: Statement On Colorado Explosion."

[87]   May 2, 2017, Bloomberg at 4:43 p.m., "Anadarko Profit Misses Estimates Even as Driller Boosts Output."

Shenandoah write-offs and would also impact other operators in Colorado, *i.e.*, this impact can be controlled for using a properly constructed event study, as I will demonstrate below.

> **F.      Dr. Ferrell's analysis of the Firestone explosion is incomplete and ignores evidence that demonstrates Shenandoah price impact**

38.      Dr. Ferrell's chronology of the events after the market closed on May 2, 2017, is incomplete. Dr. Ferrell correctly notes that Anadarko issued its 1Q2017 results at ***4:16 p.m.***, which included the Corrective Disclosure – lower than expected earnings due to the Shenandoah write-offs, as well as a specific disclosure explaining that the Company was suspending its appraisal activity for the Shenandoah.[88]  However, he ignores a Bloomberg report 8 minutes later at ***4:24 p.m.*** with the headline "Anadarko 1Q Adjusted Loss Per Share Wider Than Est.; Shares fall," stating that "[s]hares down 3.5% since earnings release."[89]  He also ignores a May 2, 2017 Bloomberg article issued at ***4:43 p.m.*** stating that "[Anadarko] reported a loss that missed estimates despite sales volumes that surged 20 percent," and that the ***Anadarko shares "dropped 4.1 percent in after-hours trading as of 4:42 p.m.*** in New York."[90]  Again, this Anadarko price decline occurred after the Company's ***4:16 p.m.*** earnings release on May 2, 2017.[91]  This earnings

---

[88]   Ferrell Report, ¶13.

[89]   May 2, 2017, Bloomberg at 4:24 p.m., "Anadarko 1Q Adjusted Loss Per Share Wider Than Est.; Shares Fall."

[90]   May 2, 2017, Bloomberg at 4:43 p.m., "Anadarko Profit Misses Estimates Even as Driller Boosts Output."  Investopedia.com, "Premarket and After-Hours Trading on the NYSE and the Nasdaq" ("The stock market, or technically speaking, the U.S. stock market exchanges—particularly the New York Stock Exchange (NYSE) and Nasdaq—are, typically, open between 9:30 a.m. and 4 p.m. Eastern Time (ET). However, with the adoption of new technology and increased demand for trading, these hours have been extended to include what is known as pre-market and after-hours trading.  Some of the most important market moves can take place outside the NYSE and Nasdaq's regular trading sessions.").

[91]   Ferrell Report, ¶13; May 2, 2017, Anadarko Press Release at 4:16 p.m., "Anadarko Announces First-Quarter 2017 Results."

release disclosed that the Company's 1Q2017 losses far exceeded expectations, and these losses were the result of the Shenandoah write-off.[92]   However, the decline in Anadarko's stock price *occurred before the first Firestone* news identified by Dr. Ferrell, a Denver Post article published at *4:51 p.m*.[93]   Consequently, *the Firestone news identified by Dr. Ferrell could not have caused the earlier 4.1% decline in Anadarko's stock price.*

### G.   Dr. Ferrell's analysis of Colorado peers identifies a confounding factor, but not an absence of Shenandoah price impact

39.    Dr. Ferrell notes that Colorado Governor John Hickenlooper "ordered oil and gas companies statewide to inspect and pressure-test oil and gas flowlines within 1,000 feet of occupied buildings."[94]   Again, a more restrictive Colorado energy regulatory environment was something analysts had expressed concerns about for Colorado operators, including Anadarko, since April 2017.[95]   In fact, I already testified to this issue at my deposition, which Dr. Ferrell cites

---

[92]   May 3, 2017, UBS analyst report, "Large Exploration Expense Drives 1Q17 EPS/CFPS Miss but EBITDX Beats; Maintains 2017 Guidance" ("Clean 1Q EPS (loss) of ($0.60) was much wider than UBSe of ($0.28) & consensus of ($0.24) with the miss vs. UBSe driven entirely by a much higher than expected exploration expense due to the dry hole at Shenandoah-6 (impacting EPS by >$0.30/share).").

[93]   Ferrell Report, ¶14 fn. 22.

[94]   *Id.*, ¶14 fn. 23.

[95]   May 2, 2017, Bloomberg at 4:43 pm, "Anadarko Profit Misses Estimates Even as Driller Boosts Output" ("Shares dropped last week [April 27, 2017] after the company said it would close 3,000 Colorado wells as part of an investigation into a deadly house explosion earlier in April. The wells represent a tiny fraction of Anadarko's oil and natural-gas output, but the blast raises the risk of tougher regulation for the industry, analysts at Houston investment bank Tudor Pickering Holt & Co. said in an April 27 note.").

in his report.[96]   Dr. Ferrell correctly observes that other companies exposed to the Colorado regulatory environment experienced declines in their respective stock prices on May 3, 2017.[97]

40.     The above ends the usefulness of Dr. Ferrell's Firestone analysis, however, because he then, based on his incomplete analysis of the other Colorado operators, incorrectly concludes that "the news about the fire and explosion in Firestone, Colorado explains Anadarko's price decline on May 3, 2017."[98]  While his analysis of the other Colorado operators may indicate that the Firestone explosion's potential impact on the Colorado regulatory environment could be a contributing/confounding factor in this case, it does not mean, therefore, that it "explains Anadarko's price decline on May 3, 2017," only that it may explain a portion of it, if at all.  Below I perform a proper event study to account for news relating to the Firestone explosion.

41.     Dr. Ferrell also states that Anadarko's production guidance was "seen as disappointing by some analysts," but he did not perform any economic analyses to demonstrate that this "disappointment" materially impacted Anadarko's stock price.[99]  Nor did he provide any insights into how the purported "disappointment" regarding Anadarko's production guidance could have explained any portion of Anadarko's May 3, 2017 price decline given that he already concluded that "the fire and explosion in Firestone, Colorado explain[ed] Anadarko's price decline on May 3, 2017."[100]  Nor did Dr. Ferrell explain why his discussion about the production guidance

---

[96]   Ferrell Report, ¶165 fn. 137 ("In his deposition, Mr. Steinholt indicated that 'changes to the regulatory environment would not only impact Anadarko, it would impact all the companies doing business in Colorado.'") (quoting Steinholt Deposition at 29:8-11); *id.*, ¶165 fn. 138 ("In his deposition, Mr. Steinholt acknowledged that Noble 'probably was impacted by the Firestone issue.'") (quoting Steinholt Deposition at 28:8-10).

[97]   *Id.*, Figure 1.

[98]   *Id.*, ¶66.

[99]   *Id.*, ¶67.

[100]  *Id.*, ¶66.

ignored the fact that the Company's overall guidance for FY2017 was unchanged (*infra*, fn. 104). In other words, Dr. Ferrell did not provide any economic analysis demonstrating that the production guidance represents a material confounding factor that should be accounted for in a price impact analysis.

### H.   Event study controlling for the Firestone explosion demonstrates Shenandoah price impact

42.   Dr. Ferrell states that "[t]here is a widely used and generally accepted statistical framework known as an event study for testing whether there was, in fact, a stock price movement associated with the disclosure of new value-relevant public information."[101]   However, he did not actually perform an event analysis to quantify the impact, if any, of the Corrective Disclosure on Anadarko's stock price on May 3, 2017.  Consequently, I do so below.

43.   First, the event in this case is the Corrective Disclosure of Anadarko's suspension of further appraisal work on Shenandoah, resulting in an impairment charge of $467 million and the write-off of $435 million of exploratory well costs, totaling $902 million, which was part of the Company's earnings announcement disclosed shortly after the market closed on May 2, 2017.[102]   There is evidence of a 4.1% price decline immediately after that announcement in after-market trading on May 2, 2017 (*see supra*, ¶38).  However, the event study is based on daily trading data, analyzing the difference between the May 2, 2017 closing price and the May 3, 2017 closing price.  Thus, because the Corrective Disclosure occurred after the market closed on May 2, 2017, I measure the price impact on May 3, 2017.

---

[101]  *Id.*, ¶23.

[102]  Complaint, ¶152; May 2, 2017, Anadarko Press Release, "Anadarko Announces First-Quarter 2017 Results"; Anadarko Form 10-Q for 1Q2017, filed with the SEC on May 2, 2107; May 3, 2017 conference call prior to market open.

44.     Second, the S&P 500 was used as a proxy for the market factors, and a Peer Group index of the Colorado peer companies identified by Dr. Ferrell was used as a proxy for the industry (the "Colorado Peer Group").[103]  The Colorado Peer Group was specifically designed to make sure that factors related to increased regulatory concerns in Colorado as a result of the Firestone explosion were reflected and accounted for in the index.  In addition to information related to Shenandoah and Firestone, Anadarko also reported core 1Q2017 performance (excluding Shenandoah) that was generally "in-line" with expectations, and provided guidance for the full year 2017 that was unchanged.[104]  Consequently, it is my opinion that, in the aggregate, the 1Q2017 results reported (excluding Shenandoah) and the Company's guidance, would not be expected to materially impact Anadarko's stock price on May 3, 2017.  Nor did Dr. Ferrell identify any potentially material confounding factor, other than the Firestone issue, that would need to be accounted for in the event study.

45.     To test whether my event study actually accounted for the Firestone issue as intended, I first analyzed Anadarko's stock price decline following Anadarko's Firestone disclosure after the market closed on April 26, 2017.  In the Steinholt Report, when analyzing market efficiency, using oil companies identified by Anadarko in the Peer Group, the Company's

---

[103] The Colorado Peer Group included the following three of the four companies Dr. Ferrell specifically identified as being impacted by the Firestone explosion, equally weighted: Noble Energy, PDC Energy, and SRC Energy.  Ferrell Report, Figure 1.  Extraction O&G was not included as it only went public in October 2016, and therefore did not have sufficient trading data for the one-year (252-trading days) control period prior to April 27, 2017.  Including Extraction O&G for a shorter control period would not have changed the determination of statistical significance.

[104] May 2, 2017, RBC Capital Markets analyst report, "Market Focus May Be Elsewhere" ("Core results look good but results at Shenandoah and the well incident in the DJ could cause some market concern.…  2017 Guidance maintained. There were no material changes to the $4.5-4.7 billion capital budget and 644-655 Mboe/d production guidance.").

stock price reaction on April 27, 2017, was statistically significant at the 5% level.[105]  However, using the companies in the Colorado Peer Group significantly reduces the abnormal return so that the April 27, 2017 price decline is no longer statistically significant at the 5% level.[106]  In other words, the event study now controls for the Firestone issue as it was designed to do.

46.     Here, the Corrective Disclosure occurred after the market closed on May 2, 2017, meaning that the relevant price impact would be captured in the closing price on May 3, 2017. Replacing the original Peer Group with the Colorado Peer Group reduces the abnormal return, but the May 3, 2017 price decline is ***still*** statistically significant at the 1% level (*i.e.*, a higher benchmark than the 5% level used by Dr. Ferrell).[107]  Moreover, the estimated abnormal return of 3.89% is less than the 4.1% decline immediately following the Corrective Disclosure ***but prior to the Firestone disclosure*** on May 2, 2017 in the Denver Post article identified by Dr. Ferrell.[108]  In other words, even after specifically controlling for the only potential material confounding factor Dr. Ferrell identifies (Firestone), Anadarko's stock price decline on May 3, 2017, was still highly statistically significant.  The result of this event study represents clear and affirmative evidence that the Corrective Disclosure had price impact.

---

[105]  Steinholt Report, ¶37 & fn. 50; *id.*, Exhibit D at 14.  Anadarko's raw return was -4.74%; its predicted return was -2.07%; its abnormal return was -2.66%; its t-statistic was -2.43; which is statistically significant at the 5% level.

[106]  Anadarko's raw return was -4.74%; its predicted return was -2.84%; its abnormal return was -1.89%; its t-statistic was -1.45; which is not statistically significant at the 5% level.

[107]  Anadarko's May 3, 2017 raw return was -7.69%; its predicted return was -3.81%; its abnormal return was -3.89%; its t-statistic was -2.97; which is statistically significant at the 1% level.

[108]  *Supra*, ¶38.

## IV. DR. FERRELL'S CRITICISMS OF THE DAMAGES METHODOLOGY RELY ON MISCHARACTERIZATIONS OF MY EVENT STUDY FRAMEWORK AND LEAD PLAINTIFF'S THEORY OF LIABILITY

47.    Dr. Ferrell incorrectly claims that "Mr. Steinholt testified that it was irrelevant for him to know what Plaintiff's theory of liability is,"[109] and that, therefore, how my event study framework applies to different theories "is left entirely unexplained."[110]  The specific theory of liability he claims I have not sufficiently addressed is one that Dr. Ferrell made up himself, the "materialization of an undisclosed risk" theory of liability.[111]  Dr. Ferrell's theory is not found anywhere in the Complaint.  In fact, the actual allegation in the Complaint is that Defendants failed to disclose that the "risks had already materialized as to the Shenandoah resource."[112] Furthermore, Dr. Ferrell failed to explain why my framework based on the event study, refined by fundamental valuation tools, if necessary, could not be used to estimate the impact of a particular risk materializing, even if one was to accept his supposition.  Dr. Ferrell's criticism is baseless and thus should be disregarded.

## V. CONCLUSION

48.    Based on my review and analysis of the available information, as explained in greater detail above, it is my opinion that the Corrective Disclosure in this case negatively impacted

---

[109] Ferrell Report, ¶17.d.  To support his mischaracterization that it is "irrelevant" to me what Lead Plaintiff's theory of liability is, he cites my deposition testimony in which I simply explained that independent experts make up their own minds regarding the existence or magnitude of any inflation.  Steinholt Deposition at 69:15-25 ("Well, from a damage expert's point of view, it's irrelevant what Plaintiffs allege with respect to the inflation, it's up to the expert to determine what the inflation is.  So I would discard any economic claims that are being made in the Complaint and I would look at it myself. And if I think it's zero, it's zero, it doesn't matter what they say in the Complaint.").

[110] Ferrell Report, ¶17.d.

[111] *Id*.

[112] Complaint, ¶¶98, 116.

the price of Anadarko's common stock at the end of the Class Period. Among other things, my opinion is supported by the following:

- The suspension of Shenandoah and corresponding $902 million in write-offs was new, economically material information that, in an efficient market, would be expected to significantly impact Anadarko's stock price.

- Analyst downgrades and price impact for Shenandoah partner Cobalt's stock price relating to Anadarko's Corrective Disclosure.

- Anadarko's stock price declined 4.1% in after-market trading on May 2, 2017, after the Corrective Disclosure, but before the lone confounding factor identified by Dr. Ferrell.

- An event study that specifically controls for the confounding factor identified by Dr. Ferrell demonstrates that Anadarko's stock price decline on May 3, 2017, was statistically significant, and, thereby, affirmatively demonstrates price impact.

49.     Furthermore, it remains my opinion as set forth in the Steinholt Report that, based on my experience as a damages expert and consultant in numerous other securities fraud cases similar to this one, class-wide damages can be calculated using the widely accepted event-study methodology, refined by fundamental valuation tools if necessary.

Executed this 2nd day of February, 2022.

Respectfully submitted,

Bjorn I. Steinholt, CFA

-31-

# Exhibit 17

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| **IN RE ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION** | Civil Action No. 4:20-cv-00576 |

**EXPERT REPORT**

**of**

**D. PAUL REGAN, CPA/CFF**

**NOVEMBER 9, 2022**

CONFIDENTIAL

TABLE OF CONTENTS

I.    THE NATURE OF MY ASSIGNMENT ................................................................1

II.   SUMMARY OF OPINIONS .................................................................................3

III.  QUALIFICATIONS ..............................................................................................5

IV.   BACKGROUND RELEVANT TO MY OPINIONS.............................................7

    A.    ANADARKO'S FINANCIAL STATEMENTS WERE REQUIRED TO COMPLY WITH GAAP, INCLUDING EXPLICIT OIL AND GAS INDUSTRY-RELATED ACCOUNTING GUIDANCE ................................................................8

    B.    OVERVIEW OF THE SHENANDOAH PROJECT.............................................11

V.    BASES FOR MY OPINIONS .............................................................................13

    A.    GAAP REQUIRED THAT ANADARKO EXPENSE SHEN-3 DRILLING COSTS FOLLOWING THE DETERMINATION THAT SHEN-3 FOUND NO HYDROCARBONS AND WAS UNLIKELY TO BE USED AS A SERVICE WELL AS PART OF A SHENANDOAH DEVELOPMENT PHASE ......................................14

        1.    It was Evident that Prior to the Issuance of Anadarko's 2014 Annual Report Shen-3 Found No Hydrocarbons ......................................15

        2.    The Successful Efforts Method of Accounting Required that Anadarko Expense the Cost of Drilling Exploratory Well and Exploratory-Type Stratigraphic Wells, Including Shen-3, When No Hydrocarbons Were Found ........................................20

        3.    The Unlikely Use of Shen-3 As An Injection Well Further Supports Anadarko's Requirement Under GAAP to Expense Shen-3 Drilling Costs When No Hydrocarbons Were Found ..............................................29

    B.    ANADARKO'S Q3 2016 ASSERTION THAT CONTINUED CAPITALIZATION OF SHEN-3 WAS ACCEPTABLE BECAUSE A "REASONABLE POSSIBILITY" EXISTED THAT THE WELL WOULD BE USED AS AN INJECTION WELL OR SIDETRACK WELL IS FLAWED AND UNSUPPORTED IN GAAP ................................29

        1.    The Company Acknowledged That Shen-3 Well Costs Were Not Exploration Costs that Could Be Capitalized under ASC 932-360-25-18 ..............................................29

        2.    The Company Acknowledged That Shen-3 Well Costs Were Not Development Costs that Could Be Capitalized under ASC 932-360-25-14 ..............................................30

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**

CONFIDENTIAL

3.    The Company's Q3 2016 Accounting Position To Justify the Suspension of Shen-3 Costs Until Q3 2016 Is Unsupported....................32

C.    ANADARKO REPEATEDLY FAILED TO EXPENSE AND DISCLOSE MILLIONS OF DOLLARS IN SHEN-3-RELATED DRY HOLE EXPENSES DURING EACH OF THE RESPECTIVE FINANCIAL REPORTING PERIODS BETWEEN DECEMBER 31, 2014 AND JUNE 30, 2015, IN VIOLATION OF GAAP .................................................36

1.    Anadarko's Overstatement and Disclosure of Shen-3 Suspended Well Costs Were Material ...........................................................36

D.    GAAP REQUIRED ANADARKO TO IMPAIR AND EXPENSE, ASSETS CAPITALIZED IN CONNECTION WITH THE SHENANDOAH BASIN PROJECT WHEN SUBSTANTIAL DOUBT ABOUT THE PROJECT'S ECONOMIC VIABILITY EXISTED ........................................................................................................49

1.    The Required Impairment of Shenandoah Completed Exploration Wells and Exploratory-Type Stratigraphic Well Costs .............................50

2.    The Required Impairment of Other Capitalized Costs Associated with The Shenandoah Basin Project ..........................................51

3.    Information Available is Consistent with The Understanding That There Was Substantial Doubt that the Shenandoah Basin Project (as a whole) Would Be Economically Viable ............................................54

E.    ANADARKO REPEATEDLY FAILED TO EXPENSE AND PROPERLY DISCLOSE SHENANDOAH-RELATED SUSPENDED WELL COSTS, LEASEHOLD COSTS AND OTHER CAPITALIZED COSTS DURING EACH OF THE RESPECTIVE ANNUAL AND QUARTERLY FINANCIAL REPORTING PERIODS ENDED BETWEEN DECEMBER 31, 2015 AND 2016 IN VIOLATION OF GAAP AND SEC ACCOUNTING-RELATED REPORTING RULES..........................................57

1.    Anadarko's Overstatement of Shenandoah's Suspended Well Costs and Non-Producing Leasehold Assets and Other Related Assets and Corresponding Disclosure Omissions Beginning December 31, 2015 Were Material..................................................................58

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**

CONFIDENTIAL

## I.    THE NATURE OF MY ASSIGNMENT

1.    I have been retained, through my employer, Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants ("HM"), on behalf of Plaintiffs in this matter by Class Counsel, Robbins Geller Rudman & Dowd LLP, to provide expert opinions regarding Anadarko Petroleum Corporation's ("Anadarko" or the "Company") accounting for, and disclosure of, costs incurred in connection with the Company's offshore Shenandoah exploration project ("Shenandoah") during the respective annual and interim financial reporting periods ended December 31, 2014 through March 31, 2017 (the "Relevant Period").[1]

2.    In connection with my assignment, I have been asked to assume that Plaintiffs will establish each of the following:

a.    As of December 31, 2014 and throughout the Relevant Period, it was unlikely that the completed stratigraphic exploration well referred to as Shenandoah-3 ("Shen-3") would be used as an injection or other type of service well in the development phase of the Shenandoah project ("Condition 1").

b.    The findings of the Company's Shen-3 exploration wellbore, together with its findings of its prior wellbores, resulted in a material reduction to the estimated possible resources within the Shenandoah field as of Anadarko's Q4 2014 financial reporting period ("Condition 2").

c.    By December 31, 2015, there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable ("Condition 3").

3.    Assuming these conditions, Class Counsel has asked me to opine on each of the following:

---

[1] I understand that the case Class Period extends from February 20, 2015 through May 2, 2017, inclusive. The "Relevant Period" as used above pertains to the respective annual and interim financial reporting periods at issue in this matter. In this regard, Anadarko released its 2014 Annual Report on Form 10-K, including its related financial statements, on February 20, 2015 and its Q1 2017 Quarterly Report on Form 10-Q including its related financial statements, on May 2, 2017.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 1**

**CONFIDENTIAL**

    a.   Whether the assumed conditions as of December 31, 2014 (*i.e.*, Conditions 1 and 2) would impact the accounting treatment for the costs of drilling Shen-3 under GAAP, as consistently applied?

    b.   In consideration of Conditions 1 and 2, whether Anadarko's accounting for the costs of drilling Shen-3 complied with GAAP, as consistently applied during the Relevant Period?

    c.   Whether the accounting treatment for the costs of drilling Shen-3 under GAAP change if in contrast to Condition 1, there was a reasonable possibility that Shen-3 could have future use as an injection well or other type of service well in the development phase of the Shenandoah Project?

    d.   Whether the assumed Condition 3 would impact the accounting treatment for the exploration costs, including leasehold rights and drilling costs, relating to the Shenandoah project under GAAP, as consistently applied?

    e.   In consideration of Condition 3, whether Anadarko's accounting for the Shenandoah project-related assets complied with GAAP as of and during the respective annual and interim periods between December 31, 2015 and 2016?

4.    I am performing this expert witness engagement in accordance with the American Institute of Certified Public Accountants' ("AICPA") *Statement on Standards for Forensic Services*. These standards require me to be impartial, intellectually honest, and free of conflicts of interest. As a testifying expert providing forensic services, I am also bound by the AICPA's professional standards, including the duty to act with integrity and objectivity.

5.    Consistent with those requirements, my opinions, are my present opinions and are based on the information I have considered to date. These opinions are further based on my knowledge, training, education, and experience, as well as the various evidence cited in this report. This evidence is of the type that would ordinarily be relied on by an expert in accounting and financial reporting matters. Evidence includes historical information and relevant expert testimony about the performance of the Shenandoah field, including its borewells, during the Relevant Period. During this engagement, I have considered certain

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 2**

CONFIDENTIAL

documents. These documents are identified in **Exhibit A** and in the body and footnotes of this report.

6.    In my work I have been assisted by others in my firm who have acted under my direction and control. However, the opinions in this report are my own. I recognize that I am an expert witness, not a witness of fact. My understanding of the relevant facts comes from the documents and testimony that I have considered.

7.    This report should not be construed as expressing opinions on matters of law, which are outside my expertise and are for the Court to determine. However, to the extent I have interpreted contracts, court cases or other evidence, these interpretations necessarily reflect my understanding thereof from an accounting and auditing perspective.

8.    I understand that this report may be made available to other parties in this litigation, to their counsel and experts, as well as to the Court. It has been prepared for use in this action. In all other respects, this report is confidential. It should not be used, reproduced, or circulated for any other purpose, in whole or in part, without my prior written consent.

9.    HM is being compensated for my services at $870 per hour. This compensation is not contingent on the outcome of this matter or the conclusions that I reach.

## II.    SUMMARY OF OPINIONS

10.    This report is based on the evidence I have reviewed to date. I understand that additional information may become available, including but not limited to relevant opinions and analyses by the parties' experts. As a result, I may modify my opinions based on additional evidence. I also reserve the right to change my opinions in the event that Conditions 1 through 3 above are modified.

11.    Based on my review and analysis of the information currently available to me, as well as my professional experience, I have formed the following opinions in this matter:

    a.    Pursuant to the "Successful Efforts Method" of accounting for exploratory drilling costs, Anadarko was required to expense the cost of drilling Shen-3 no later than as of

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**      **Page 3**

**CONFIDENTIAL**

and for the year ended December 31, 2014, given that Shen-3 found no hydrocarbons[2] and the wellbore's unlikely use as an injection or other service well;

b.  Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3 related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP;

c.  Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015;

d.  Anadarko's Q3 2016 assertion that the continued capitalization of Shen-3 prior to September 30, 2016 was acceptable because a "reasonable possibility" existed that the wellbore would be used as an injection well or sidetrack well is flawed and unsupported in GAAP;

e.  Given that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, Anadarko was further required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015;

f.  Anadarko repeatedly failed to expense and properly disclose Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs during each of the respective annual and/or quarterly periods between December 31, 2015 and December 31, 2016 in violation of GAAP and SEC accounting-related reporting rules; and

---

[2] For purposes of this report, the term "hydrocarbon" is being used to be synonymous with "oil and natural gas." Notably, GAAP uses the term "Reserves" to mean the "estimated remaining quantities of oil and gas and related substances anticipated to be economically producible." ASC Master Glossary. As the absence of hydrocarbon reflects the absence of oil, this condition further reflects the absence of "reserves" under GAAP. As times in this report, I use or reference these terms (*i.e.*, hydrocarbons, oil, reserves) to convey the same underlying resources.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 4**

CONFIDENTIAL

g.  Anadarko's Shenandoah project-related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2015 and December 31, 2016.

12.  The basis for these opinions are described below in Section V of this report.

## III.   QUALIFICATIONS

13.  My expert qualifications, including my testimony in the last four years and the publications I have authored in the past ten years, are described in greater detail in my curriculum vitae, attached as **Exhibit B**. My prior experience and education provide me with the appropriate qualifications to provide opinions in this matter.

14.  I am a Certified Public Accountant ("CPA"), licensed in the State of California, and a Partner in Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants in San Francisco, California. I have been a CPA continuously since 1970. My work in the accounting profession includes more than 50 years of continuous experience as an auditor or as a consultant. I have supervised and participated in audits, or the review of audits of companies' financial statements. I served as the engagement partner or concurring partner on more than 100 audits between 1975 and 1995. The largest engagement that I supervised was the audit of a public company with more than 100 subsidiaries operating throughout the world.

15.  I have also provided accounting and/or auditing consulting services on more than 750 complex litigation matters. Many of these have required an extensive analysis and application of relevant GAAP, Securities and Exchange Commission ("SEC") financial reporting requirements, U.S. Generally Accepted Auditing Standards ("GAAS"), and Public Company Accounting Oversight Board ("PCAOB") Standards. I have also testified on accounting issues where the accounting standards were International Financial Reporting Standards ("IFRS"), Canadian GAAP, UK GAAP, Australian GAAP and Korean GAAP. I have performed these analyses and provided testimony for clients that include large and small companies in the private and public sector, as well as for various state and federal agencies (e.g., the Federal Deposition Insurance Corporation, Federal Home Loan Mortgage Corporation, SEC, U.S. Department of Justice, the PCAOB, Resolution Trust

**CONFIDENTIAL**

Corporation, California Department of Insurance, various Attorneys General of nineteen states, and the Department of Economic Development, an agency of the British government).

16. My experience includes the review of financial records of entities across a diverse range of industries including oil and gas companies. My consulting or expert witness experience has involved companies with operations in multiple locations in the United States, as well as in many other countries. The companies whose financial statements I have analyzed have included accounting for and disclosure of oil exploration and development costs, including those with offshore operations in the Gulf of Mexico. I have also personally owned interests in entities with working interests in oil and gas wells in Texas, Louisiana, and Oklahoma.

17. From 1976 through today, I have testified and been admitted as an expert in more than 125 trials and arbitrations and given more than 225 depositions. These cases were generally in state and federal courts in the United States. I have also testified in trials in Canada, Guam, the United Kingdom, Australia, and the International Court of Justice in the Netherlands.

18. I am a member of the California Society of Certified Public Accountants ("CalCPA"). I have served on its statewide Litigation Services Steering Committee since 1990 and I was its Chair during its 2002/2004 fiscal year terms. At that time, this Steering Committee provided guidance to the more than 800 members of its four Operating Sections: (1) Business Valuation; (2) Economic Damages; (3) Fraud; and (4) Family Law. For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section. I served as Chair of the 28,000-member CalCPA during its 2004/2005 fiscal year term and in 2009, I received CalCPA's Distinguished Service Award for a career of "extraordinary and distinguished service to the profession."

19. I am a member of the AICPA. The AICPA had a national Forensic and Litigation Services Committee ("FLSC") (formerly the Litigation and Dispute Resolution Subcommittee). From 1998 until July of 2001, I served as one of the nine members of this national committee. The FLSC oversaw and provided guidance to the AICPA's then, 340,000 members relating to litigation consulting and dispute resolution. The FLSC also provided

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 6**

CONFIDENTIAL

guidance and supervision to its subcommittees, which included the Subcommittee on Economic Damages. I served as Chairperson of the Subcommittee on Economic Damages from 1999 to July 2001.

20.   From October 2003 until October 2011, I was a member of the AICPA's Governing Council. Under Rule 203 of the Code of Professional Conduct of the AICPA, this Council is the body that has the authority to designate which accounting principles constitute GAAP.

21.   From August 2008 until October 2011, I served on the AICPA's Forensic and Valuation Services Executive Committee. This nine-person committee is the AICPA's standards setting body for CPAs performing forensic and valuation services. I have also been designated by the AICPA as a CFF ("Certified in Financial Forensics").

## IV.    BACKGROUND RELEVANT TO MY OPINIONS

22.   Anadarko Petroleum Corporation is an oil and gas exploration and production company. During the Relevant Period, Anadarko's exploration and production portfolio included assets and related plays in (i) the United States, (ii) the Gulf of Mexico, and (iii) other international locations.[3]

23.   During the Relevant Period, Anadarko's securities were publicly traded under the ticker symbol "APC" on the New York Stock Exchange. As a publicly traded entity, Anadarko was required to file periodic financial information with the SEC.

24.   The predicate for SEC reporting requirements applicable to public companies like Anadarko is that "[c]ompanies offering securities for sale to the public must tell the truth about their business" and "everyone should be treated fairly and **have access to certain facts about investments**."[4] To achieve this objective, the SEC requires public companies "**to regularly disclose significant financial and other information so investors have the**

---

[3] Anadarko 2014 Form 10-K, p. 2; Anadarko 2017 Form 10-K, p. 4.

[4] *What We Do, Protecting Investors*, U.S. Securities Exchange Commission, https://www.sec.gov/about/what-we-do#section1 (accessed November 7, 2022) (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 7**

CONFIDENTIAL

**timely, accurate, and complete information they need to make confident and informed decisions about when or where to invest**."[5]

## A. ANADARKO'S FINANCIAL STATEMENTS WERE REQUIRED TO COMPLY WITH GAAP, INCLUDING EXPLICIT OIL AND GAS INDUSTRY-RELATED ACCOUNTING GUIDANCE

25.    Anadarko, including its executive management, was responsible for issuing the Company's financial statements in accordance with GAAP.[6] Rule 4-01 of SEC's Regulation S-X specifically states that "financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."[7]

26.    The use of GAAP brings consistency, conformity, and over time, comparability to financial reporting.[8] It includes not only broad guidelines of general application, but also detailed practices and procedures.[9] Those conventions, rules, and procedures provide a standard by which to measure financial presentations. Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and is contained within the FASB's accounting standards codification ("ASC" or the "Codification"). Rules and interpretive releases of the SEC under the authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.[10]

27.    Of particular relevance to matters at issue, as an oil and gas exploration and production company, relevant GAAP included industry-specific accounting standards established under ASC 932, *Extractive Activities – Oil and Gas* ("ASC 932"). Amongst other provisions, ASC 932 addresses accounting and reporting for industry-specific property,

---

[5] *What We Do, Protecting Investors*, U.S. Securities Exchange Commission, https://www.sec.gov/about/what-we-do#section1 accessed November 7, 2022) (emphasis added).

[6] PCAOB AU §110.03.

[7] 17 CFR § 210.4-01(a)(1).

[8] Federal Trade Commission, Informal Staff Advisory Opinion 02-4.

[9] PCAOB AU §411.02.

[10] ASC 105-10-05-01.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 8**

CONFIDENTIAL

plant, and equipment in the oil and gas industry, including wells and related equipment and facilities.[11]

28. Anadarko's management repeatedly acknowledged its responsibility for preparing the Company's financial statements in accordance with GAAP. In this regard, Anadarko asserted that each of its financial statements filed with the SEC during the Relevant Period were "prepared in conformity with [GAAP]."[12]

29. In addition, Anadarko's Chairman of the Board, President and Chief Executive Officer, R. A. Walker, and Executive Vice President, Finance and Chief Financial Officer, Robert G. Gwin, certified that the Company's financial statements and other financial information included in Anadarko's respective Annual and Quarterly Reports filed with the SEC during the Relevant Period "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Anadarko] as of, and for, the periods presented."[13]

30. Management further acknowledged its responsibility for "the fair presentation, in accordance with U.S. generally accepted accounting principles, of the consolidated

---

[11] ASC 932-360. Note: "wells and related equipment and facilities" is defined under GAAP as follows:

Wells and related equipment and facilities are often referred to in the oil and gas industry as lease and well equipment even though, technically, the property may have been acquired other than by a lease. The costs include those incurred to:

a. Drill and equip those exploratory wells and exploratory-type stratigraphic test wells that have found proved reserves

b. Obtain access to proved reserves and provide facilities for extracting, treating, gathering, and storing the oil and gas, including the drilling and equipping of development wells and development-type stratigraphic test wells (whether those wells are successful or unsuccessful) and service wells.

[12] Anadarko 2014 Form 10-K, p. 93; Anadarko 2015 Form 10-K, p. 91; Anadarko 2016 Form 10-K, p. 91; Anadarko Q1 2015 Form 10-Q, p. 7; Anadarko Q2 2015 Form 10-Q, p. 7; Anadarko Q3 2015 Form 10-Q, p. 7; Anadarko Q1 2016 Form 10-Q, p. 7; Anadarko Q2 2016 Form 10-Q, p. 7; Anadarko Q3 2016 Form 10-Q, p. 7; Anadarko Q1 2017 Form 10-Q, p. 8.

[13] Anadarko 2014 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko 2015 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko 2016 Form 10-K, Exhibits 31(i) and 31(ii); Anadarko Q1 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q2 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q3 2015 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q1 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q2 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q3 2016 Form 10-Q, Exhibits 31(i) and 31(ii); Anadarko Q1 2017 Form 10-Q, Exhibits 31(i) and 31(ii).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 9**

**CONFIDENTIAL**

financial statements, including disclosures, schedules, and interim financial information and all representations contained therein" to its external auditors, KPMG LLP.[14] In this regard, Mr. Walker, Mr. Gwin and Anadarko's Vice President, Chief Accounting Officer, and Controller, Chris Champion, represented to KPMG LPP that Anadarko's respective consolidated annual and interim financial statements were "fairly presented in conformity with U.S. GAAP."[15] Of further relevance, Anadarko represented the following with respect to its accounting for "exploratory drilling work in process" and "dry hole expense" during the Relevant Period:

> Based on current development plans and existing lease lives at [Date], the Company has evaluated its unproved property in accordance with FASB Topic ASC 932, Extractive Activities ~ Oil and Gas, and concluded that no additional impairment is necessary. …
>
> *            *            *
>
> We have reviewed the status of exploratory drilling work in progress through the date of this letter and appropriately recorded dry hole expense

---

[14] *See*, *e.g.*, Anadarko Engagement Letter dated March 30, 2015, APC-01699536 at 9631; Anadarko Engagement Letter dated March 22, 2016, APC-01396003 at 6043; Anadarko Management Representation Letter dated February 20, 2015, APC-01751288 at 1303, Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8367. **Note:** Despite any inference to the contrary as a result of KPMG's audits and its unqualified audit opinions, Anadarko management was solely responsible for the fair presentation of its financial statements. In this regard, professional auditing standards recognize that because an entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management, the auditor's knowledge of such matters and internal control is limited to that acquired during an audit. In this regard, PCAOB auditing standards recognize that an auditor is unable to provide absolute assurance that a company's financial statements are free of material misstatement. As such, even if KPMG's audits during the Relevant Period were performed in accordance with PCAOB auditing standards (an opinion which I am not offering), those same standards explicitly recognize that "a properly planned and performed audit may not detect a material misstatement." PCAOB AS §1001, 1015.

[15] *See*, *e.g.*, Anadarko Management Representation Letter dated May 4, 2015, APC-01699536 at 9642; Anadarko Management Representation Letter dated July 28, 2015, APC-01699656; Anadarko Management Representation Letter dated May 2, 2016, APC-01396003 at 6046; Anadarko Management Representation Letter dated July 26, 2016, APC-01396065 at 6065; Anadarko Management Representation Letter dated October 31, 2016, KPMG_APC_eA_0007566 at 7566; Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8355; Anadarko Management Representation Letter dated May 2, 2017, KPMG_APC_0027263 at 7428.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**              **Page 10**

**CONFIDENTIAL**

> … in accordance with FASB ASC Topic 932, *Extractive Activities – Oil and Gas* ["ASC 932"].[16]

31.    As described further below, ASC 932 includes relevant GAAP for the accounting matters at issue in this case. Although certain amendments to ASC 932 have been adopted, Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies*, as issued in 1977 ("FAS 19"), serves as the primary source for relevant codified accounting standards applicable to Anadarko.[17]

### B.    OVERVIEW OF THE SHENANDOAH PROJECT

32.    During 2008, Anadarko participated in oil exploration activities within the Shenandoah basin located in the Gulf of Mexico. In early 2009, the Company announced the results of its initial discovery exploration well, Shenandoah-1 ("Shen-1"). Following certain regulatory delays, Anadarko continued its Shenandoah exploration activities during 2012. In March 2013, the Company announced the results from its second exploration well, Shenandoah-2 ("Shen-2"), including the following disclosure:

> The Company-operated Shenandoah-2 well (30% working interest) reached total depth in January 2013, encountering more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary reservoirs. Similar to the initial Shenandoah discovery, well log and pressure data from the Shenandoah-2 well indicated excellent-quality reservoir and fluid properties. The targeted pay sands were full of oil with no oil-water contact.[18]

---

[16] Anadarko Management Representation Letter dated February 20, 2015, APC-01751288 at 1296, and 1301 (also notes: "The Company has accounted for its oil and gas producing activities in accordance with FASB ASC 932, *Extractive Activities - the Oil and Gas*."); Anadarko Management Representation Letter dated February 17, 2017, KPMG_APC_eA_0008355 at 8362-8363, 8365. *See also* Anadarko Management Representation Letter dated May 4, 2015, APC-01699536 at 9649; Anadarko Management Representation Letter dated July 28, 2015, APC-01699656 at 9663; Anadarko Management Representation Letter dated May 2, 2016, APC-01396003 at 6053; Anadarko Management Representation Letter dated July 26, 2016, APC-01396065 at 6073; Anadarko Management Representation Letter dated October 31, 2016, KPMG_APC_eA_0007566 at 7574; Anadarko Management Representation Letter dated May 2, 2017, KPMG_APC_0027263 at 7436. **Note:** The first noted paragraph appeared in both the February 20, 2015 and February 17, 2017 representation letters, while the second paragraph appeared in all cited representation letters.

[17] *See*, *e.g.*, Reserve and Resources Manual, APC-00001289.

[18] Anadarko 2013 Form 10-K, p. 9.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 11**

CONFIDENTIAL

33.    During 2014 and the remainder of the Relevant Period, the Company continued to undertake exploration activities within the Shenandoah basin, including drilling. In this regard, Anadarko drilled various additional exploratory-type wells including Shen-3 (spud in Q2 2014), Shenandoah-4 (spud in Q2 2015), Shenandoah-5 (spud in Q1 2016) and Shenandoah-6 (spud in Q4 2016).[19]

34.    Anadarko's working interest in the Shenandoah exploration project varied between 30% and 33% during the Relevant Period. In this regard, Anadarko was one of several partners participating in these exploration activities. These partners included ConocoPhillips Company ("Conoco" or "COP") and Marathon Oil Corporation ("Marathon"). Anadarko was the Operator while Conoco, Marathon and the other partners were partners in the joint venture.[20]

35.    Anadarko had recorded and reported suspended well costs and other exploration costs associated with the Shenandoah basin project on its respective balance sheets included within the Relevant Period. These amounts ranged in value from between $684.1 million and $786.6 million of Shenandoah related assets within its balance sheet December 31, 2014 and December 31, 2016.[21]

36.    As of March 31, 2017, Anadarko wrote off costs totaling $901.5 million associated with its Shenandoah exploration project, including suspended well costs, non-producing leasehold costs and other related amounts. In connection with its Q1 2017 financial statements, Anadarko made certain disclosures in connection with this accounting treatment, including the following:

---

[19] Anadarko 2014 Form 10-K, p. 9; Anadarko 2015 Form 10-K, p. 10; Anadarko 2016 Form 10-K, p. 11.

[20] Deposition of Ernest Leyendecker, 211:16-23 and 224:14-20.

[21] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

CONFIDENTIAL

During the three months ended March 31, 2017, the Company expensed suspended exploratory well costs of $435 million related to the Shenandoah project in the Gulf of Mexico, including $267 million previously capitalized for a period greater than one year. The Shenandoah-6 appraisal well and subsequent sidetrack, which completed appraisal activities in April 2017, did not encounter the oil-water contact in the eastern portion of the field. Given the results of this well and the present commodity-price environment, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs.

\*  \*  \*

The Company recognized $532 million of impairments of unproved Gulf of Mexico properties during the three months ended March 31, 2017, of which $467 million related to the Shenandoah project. The unproved property balance related to the Shenandoah project originated from the purchase price allocated to Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006.[22]

## V.    BASES FOR MY OPINIONS

37.    As stated above, based on my review and analysis of the information currently available to me, as well as my professional experience and the assumed Conditions set forth above by Plaintiffs, I have formed the following opinions in this matter:

a.    Pursuant to the "Successful Efforts Method" of accounting for exploratory drilling costs, Anadarko was required to expense the cost of drilling Shen-3 no later than as of and for the year ended December 31, 2014, given that Shen-3 found no hydrocarbons and the wellbore's unlikely use as an injection or other service well;

b.    Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3-related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP;

c.    Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015;

---

[22] Anadarko Q1 2017 Form 10-Q, pp. 12-13.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 13**

CONFIDENTIAL

d.  Anadarko's Q3 2016 assertion that the continued capitalization of Shen-3 prior to September 30, 2016 was acceptable because a "reasonable possibility" existed that the wellbore would be used as an injection well or sidetrack well is flawed and unsupported in GAAP;

e.  Given that by December 31, 2015, there was substantial doubt that the Shenandoah project would be economically viable, Anadarko was further required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015;

f.  Anadarko repeatedly failed to expense and disclose Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs during each of the respective annual and/or quarterly periods between December 31, 2015, and December 31, 2016, in violation of GAAP; and

g.  Anadarko's Shenandoah project-related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2015, and December 31, 2016.

38.  The bases for each of these opinions are described hereafter.

**A.  GAAP REQUIRED THAT ANADARKO EXPENSE SHEN-3 DRILLING COSTS FOLLOWING THE DETERMINATION THAT SHEN-3 FOUND NO HYDROCARBONS AND WAS UNLIKELY TO BE USED AS A SERVICE WELL AS PART OF A SHENANDOAH DEVELOPMENT PHASE**

39.  Relevant GAAP requires that the capitalized cost of drilling exploratory wells[23] and exploratory-type stratigraphic wells[24] be immediately expensed once it is determined that

---

[23] GAAP defines an "exploratory well" as "a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir. Generally, an exploratory well is any well that is not a development well, a service well, or a stratigraphic test well." ASC Master Glossary.

[24] GAAP defines a "stratigraphic test well" as "a drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition. Such wells customarily are drilled without the intention of being completed for hydrocarbon production. This classification also includes tests identified as core tests and all types of expendable holes related to hydrocarbon exploration. Stratigraphic tests are classified as *exploratory-type* if not drilled in a proved area or *development-type* if drilled in a proved area." ASC Master Glossary.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 14**

CONFIDENTIAL

the completed well finds no hydrocarbons. Evidence reflects that the completed stratigraphic exploration well, Shen-3, found no hydrocarbons prior to the release of the Company's 2014 Annual Report on Form 10-K (February 20, 2015). Indeed, Shen-3 was contemporaneously described by Anadarko employees and Shenandoah business partners as a "wet well" or "dry hole" (*i.e.*, no hydrocarbons were found).[25] Accordingly, Anadarko was required to expense the cost of drilling Shen-3 within the Company's annual and quarterly period ended December 31, 2014, as detailed below.[26]

40.    Anadarko's required expensing of Shen-3 drilling costs under GAAP is further supported by the Company's unlikely use of Shen-3 as an injection well (*i.e.*, Condition 1). In this regard, costs that do not relate to probable future economic benefit are normally not capitalized under GAAP during the Relevant Period.[27] As described further below and consistent with Condition 1, I am not aware of contemporaneous objective information demonstrating that as of the filing date, February 20, 2015, of Anadarko's Form 10-K for its December 31, 2014 financial statements, Shen-3's use as an injection well was more than a remote possibility.

1.    ***It was Evident that Prior to the Issuance of Anadarko's 2014 Annual Report Shen-3 Found No Hydrocarbons***

41.    Information available during the Relevant Period demonstrates that Shen-3 found no hydrocarbons. This determination was evident prior to the issuance of Anadarko's 2014 Annual Report on February 20, 2015. For example:

a.    The poor results of the Shen-3 drilling effort appear to have been evident to Anadarko as early as November 2014. For example, in November 24, 2014 Jake Ramsey, Anadarko's Senior Staff Geologist, emailed Tim Trautman, Exploration Gulf of Mexico ("GOM") Manager, noting a proposed conceptual Shenandoah Project Timeline

---

[25] Deposition of Patrick McGrievy; 149:5-21; Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[26] ASC 932-360-25-18; ASC 932-360-35-18–21.

[27] FASB Statement of Financial Accounting Concepts No. 6, ¶25; *see also* FAS 19, ¶143.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 15**

CONFIDENTIAL

presented to project partners in consideration of the "[b]ad news" received from the drilling of Shen-3.[28]

b.  Learning in December 2014 that the drilling cost for Shen-3 would be capitalized as suspended well costs, Louis Williams, Director-Expenditure Accounting,[29] appropriately inquired of Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations, as to the basis for suspending the cost. Specifically, Mr. Williams asked whether Shen-3's continued capitalization was "because they found reserves?"[30] Mr. Williams would subsequently learn and document that Shen-3 "failed to find hydrocarbons within the well-bore."[31]

c.  Having plugged the Shen-3 well in January 2015,[32] Ms. Green drafted a memo asserting that the well was successful because it helped "to determine the extent of the reservoir." However, critical, and contrary to the required capitalization conditions

---

[28] Email from Jake Ramsey dated November 24, 2014, APC-00147963. Paul Chandler, Anadarko's Project Geological Advisor (Operations Eastern Gulf of Mexico), would acknowledge during testimony that if Shen-3 was determined to be all wet in the upper and lower Wilcox, it would be the "worst-case scenario." *See* Deposition of Paul Chandler, 275:3-276:13; Exhibit 222, Phased Development with an Early Production Test Minimum Size Analysis dated October 2, 2014.

[29] APC Organizational Chart, APC-00003195 at 3200.

[30] Email from Louis Williams dated December 4, 2014, APC-00001801.

[31] Email from Louis Williams dated January 5, 2015 with attached memo dated December 29, 2014, APC-00001803, APC-00001804 at 1804. While Mr. Williams further purported that Shen-3 "provided data which allowed additional reserves to be identified," evidence available does not demonstrate that "additional reserves" were identified as part of the Shen-3 drilling. In fact, evidence reflects that as a result of Shen-3, significantly less MMBOE (Millions of Barrels of Oil Equivalent) were estimated to exist within the Shenandoah Project area. *See*, *e.g.*, email dated November 22, 2014 with attached Shenandoah Resource Estimate, APC-00617381, APC-00617383; Exhibit 197, Shenandoah Appraisal Program January 2015 Update & Recommendation (a PowerPoint presentation dated January 2015 showing MMBOE ranging from 780 – 1060 (P90 – P10) which was down significantly from the MMBOE estimate following Shen-2 of approximately 950 – 1450 at P90 and P10, respectively).

[32] Email from Jim Kunning dated December 23, 2014, APC-00152617; Email from Pamala Johnson dated January 8, 2015, ANACOP00000354 at 354; Offshore Exposure – Dec 2014_Final_Suspended & Drilling, APC-00156333 ("rig released early Jan 2015").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 16**

**CONFIDENTIAL**

under GAAP, Ms. Green noted that "[t]he Shendandoah-3 found sands that were non-hydrocarbon bearing and were filled with water."[33]

d.  Despite asserting that Shen-3 provided "valuable information,"[34] Ernie Leyendecker, Anadarko's Senior Vice President GOM Exploration, acknowledged internally that Shen-3 was in fact, "a wet well."[35]

e.  In apparent recognition that Shen-3 was not "the success case," but rather a "dry hole case" as a result of "encountering wet sands" as described in Anadarko's April 8, 2014 Shen-3 Authorization for Expenditure ("AFE") and communications, two of Anadarko's Shenandoah project partners, including Conoco (its partner with a percentage interest in the project equal to Anadarko)[36] and Marathon, recognized the need to write off Shen-3 related drilling costs as of December 31, 2014. Specifically:[37]

   1.  Jeff Pachman, Anadarko's Project Land Advisor, conveyed Conoco's accounting position to various Anadarko employees that "because the [Shen-3] **well found no hydrocarbons and has no future utility, the cost will be written off as a dry hole**."[38] Consistent with these communications, Conoco disclosed the following in its 2014 annual report on Form 10-K: "The results of the first Shenandoah appraisal well were announced in 2013 and confirmed Shenandoah

---

[33] Email from Louis Williams dated January 5, 2015, with attached memo dated December 29, 2014, APC-00001803, APC-00001804 at 1804; *see also* email from Michael Cieslak dated January 6, 2015, APC-00001863.

[34] Deposition of Ernest Leyendecker, 154:6-11.

[35] Email from Jeff Pachman dated February 12, 2015, APC-00001791 at 1791.

[36] In its AFE dated April 8, 2014, Anadarko, Conoco and Marathon held partnership interests in the Shenandoah Prospect of 30%, 30% and 10%, respectively while Cobalt held a 20% interest, APC-00005095.

[37] See Conoco's characterization of Shen-3 as a dry hole in its emails dated January 8, 2005 at ANACOP00000354. I am aware that Anadarko's other Shenandoah partner, Cobalt International Energy Inc. ("Cobalt") did not expense Shen-3 well costs as of December 31, 2014. However, the evidence I have reviewed, including Cobalt's 2014 Annual Report on Form 10-K does not contradict the determination that no hydrocarbons were found in Shen-3 and that Shen-3 was therefore deemed to be a wet well (*i.e.*, a dry hole. Cobalt 2014 Form 10-K, p. 5.

[38] Email from Diane Sease dated January 7, 2015, APC-00001795 at 1795 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 17**

**CONFIDENTIAL**

as a significant oil discovery. **The second Shenandoah down dip appraisal well was spud in 2014 and expensed as a dry hole**."[39]

2.  Similar communications were conveyed to Anadarko by its Shenandoah partner, Marathon. On January 28, 2015, Marathon's Vice President, Controller and Chief Accounting Officer, Gary Wilson, emailed Cathy Douglas, Anadarko's Chief Accounting Officer, the following note, informing Ms. Douglas of Marathon's plan to expense Shen-3's drilling cost:

> I wanted to let you know that **based on our interpretation of ASC 932 we have decided to expense the most recent Shenandoah appraisal well**.
>
> There will be a single line in our earnings release referencing the well in the context of our total exploration expense for the quarter.[40]

Consistent with this communication, Marathon disclosed within its 2014 Annual Report on Form 10-K that "[t]he second appraisal well was spud in late May 2014 and the well costs incurred through December 31, 2014 were expensed in the fourth quarter of 2014."[41]

f.  On May 9, 2016, on behalf of one of Anadarko's Gulf of Mexico development team Senior Staff Reservoir Engineer, Lea Frye, Minces PLLC sent a letter to the SEC regarding alleged "Violations of Law by Anadarko."[42] In addition to expressing other concerns regarding the Company's Shenandoah project, the letter noted that "Shen 3

---

[39] Conoco 2014 Form 10-K, p. 8 (emphasis added). *See also* email from Teri Flinner, Conoco's GOM Principal Exploration Landman dated January 22, 2015 Re "Shenandoah-WR 52#2 (Shen-3), APC-00001791-1792 (emphasis added) ("Please be advised that ConocoPhillips Company will include the following statement in ConocoPhillip's fourth quarter and full-year 2014 earnings report expected to follow our conference call that will be held on Jan. 29th. 'After evaluation, **the company expensed the Shenandoah appraisal well as non-commercial**.'").

[40] Email from Gary Wilson dated January 28, 2015, APC-00001866.

[41] Marathon 2014 Form 10-K, p. 8. Note: Ms. Green further testified she never received information about these communications from ConocoPhillips or Marathon or their respective contemporaneous decision to write off Shen-3. (Deposition of Catherine Green, 85:13-86:15; 118:25-119:16).

[42] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3306-3329.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 18**

**CONFIDENTIAL**

was a 'wet well' that did not reveal the presence of hydrocarbons (oil and gas)."[43]

Specifically, on behalf of Ms. Frye, Minces PLLC observed the following:

> Following the success of the Shen 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen-3 was also located in Walker Ridge (Block 52), it was quickly apparent that Shen 3 did not have the promise of Shen 2. **Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).**[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would accept distorted findings and projections based on the success of Shen 2. However, Shen-3 was nothing like Shen 2.
>
> **Even though Shen 3 was a wet well, the exploration team described it as successful in terms similar to those used to describe Shen 2**. They did this in part by redefining the criteria by which resource capacity is projected. Aware that Shen 3 had the same sands (porous rock structure that can hold recoverable oil) that were present in Shen 2, the exploration team analogized Shen 3's resource projections to those of Shen 2. In doing this, they ignored the findings of Ms. Frye and other engineers, even though these persons' expertise is superior to theirs and even though the exploration team's projections were in contravention of Anadarko's published standards. …[44]
>
> [10] A "wet well" is often referred to in the oil and gas industry as a "dry hole."

g.   In response to assertions in this letter and other information, outside consultants hired by the Company repeatedly affirmed that Shen-3 was indeed a "wet well or "dry hole."[45]

---

[43] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[44] Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[45] Norton Rose Fulbright Report, APC-00002563 at 2642, 2645, 2758, and 2802.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 19**

**CONFIDENTIAL**

    h.   Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations,[46] and Patrick McGrievy, Anadarko's former Deepwater Gulf of Mexico General Manager, both testified that Shen-3 did not contain any hydrocarbons.[47]

    2.   ***The Successful Efforts Method of Accounting Required that Anadarko Expense the Cost of Drilling Exploratory Well and Exploratory-Type Stratigraphic Wells, Including Shen-3, When No Hydrocarbons Were Found***

        a)   <u>The "Successful Efforts" Method of Accounting Permitted the Capitalization of Certain Anadarko Exploration Costs But Was Intended to Highlight Failures During the Search for Oil By Expensing Costs That Do Not Result in an Identifiable Future Benefit</u>

42.    GAAP required that Anadarko account for oil and gas exploration and development costs using one of the following distinct accounting methodologies: (i) the full cost method, or (ii) the successful efforts method.[48] During the Relevant Period, Anadarko's policy was to apply the successful efforts method of accounting.[49]

---

[46] Ms. Green testified that the "predominant basis" Shen-3 costs were suspended and capitalized was because of her belief that "the information from Shen 3 increased the overall resource estimate" of Shenandoah. However, Ms. Green further acknowledged that upon review, Shenenadoah-3 did not increase the overall resource estimate of the Shenandoah project. (Deposition of Catherine Green 92:24-94:19). This is consistent with Condition 2 (*i.e.*, that Shen-3 materially reduced the likely reserves within the Shenandoah field) and the information available during Anadarko's Q4 2014 financial reporting period cited below beginning at paragraph 83 reflecting that as a result of Shen-3, Anadarko's estimated oil reserves in the Shenandoah area actually decreased.

[47] Deposition of Catherine Green, 70:24-71:71:8 ("Q. So Shenandoah did not contain hydrocarbons; correct – I'm sorry – A. Correct. Q. – Shenandoah 3 did not contain hydrocarbons; correct? A. Correct. Q. So, in other words, no oil was discovered by Shenandoah 3; correct? A. There were – there was no oil in the wellbore of Shenandoah 3."); Deposition of Patrick McGrievy; 149:5-21 ("Q. And once Shen 3 Tded, which completed, it was found that it was – it was all wet; right? A. There was no hydrocarbons on the log – on the log, right. … THE WITNESS: There was no hydrocarbons on the log to speak of. Q. Otherwise, it could be called a wet well? A. Yeah, it could be. Yeah, you could term it a wet well. Q. And the well results from Shen 3 which found no hydrocarbons resulted in a significant downward revision to the resource size of Shenandoah 3? A. Yep. Yes, it would.").

[48] ASC 932-10-S99. Note: The FASB has expressed its "preference for" the successful efforts method of accounting. SFAS No. 25, *Suspension of Certain Accounting Requirements for Oil and Gas Producing Companies – An Amendment of FASB Statement No. 19*.

[49] *See, e.g.,* AB 20-5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829; Anadarko 2014 Form 10-K, p. 95; Anadarko 2017 Form 10-K, p. 97.

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**         **Page 20**

**CONFIDENTIAL**

43.    Under the full cost method, companies are generally able to capitalize all costs incurred in exploring for, acquiring, and developing oil reserves.[50] For example, capitalization of the cost of drilling exploration wells and exploratory-type stratigraphic wells is permitted irrespective of whether a well is successful under the full cost method of accounting.[51]

44.    In its original 1977 Basis for Conclusion upon issuance of relevant GAAP (*i.e.*, FAS 19), the FASB observed that "[e]stablishing a direct cause-and-effect relationship **between costs incurred and specific reserves discovered is not relevant to full costing**."[52] The FASB further observed that because the full cost method permits the capitalization of costs relating to unsuccessful property acquisitions and unsuccessful exploratory activities along with the costs of successful acquisitions and exploratory activities, "**full costing tends to obscure failure and risk**."[53]

45.    Conversely, "only those exploration costs[54] and development costs[55] that relate directly to specific oil and gas reserves are capitalized under the successful effort method."[56] Costs that do not relate directly to specific reserves are expensed.[57]

46.    In establishing this GAAP, the FASB recognized that a direct relationship exists between (i) costs incurred, and (ii) the discovery of oil reserves, under the successful efforts

---

[50] ASC 932-10-S99; ASC 932-360-S99.

[51] ASC 932-10-S99; ASC 932-360-S99; AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified.*

[52] FAS 19, ¶102 (emphasis added).

[53] FAS 19, ¶151 (emphasis added).

[54] Exploration costs are defined in part under GAAP as "[c]osts incurred in identifying areas that may warrant examination and in examining specific areas that are considered to have prospects of containing oil and gas reserves, including costs of drilling exploratory wells and exploratory-type stratigraphic test wells exploration costs may be incurred both before acquiring the related property (sometimes referred to in part as prospecting costs) and after acquiring the property. ASC 932-10-S99.

[55] Development costs are defined in part under GAAP as "costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and gas." ASC 932-10-S99.

[56] ASC 932-360-25-3.

[57] ASC 932-360-25-3.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 21**

CONFIDENTIAL

methodology.[58] Indeed, the FASB further noted that because the **"discovery of oil and gas reserves is a critical event in determining failure or success,"** the successful effort accounting methodology is intended to highlight "failures and the risks involved in the search for oil and gas reserves **by charging to expense costs that are known not to have resulted in identifiable future benefits.**"[59]

47.    Although the successful efforts methodology permits the initial capitalization of certain exploration costs, including the cost of drilling exploration wells and exploratory-type stratigraphic wells,[60] the ongoing capitalization of those costs ultimately depends on whether "proved reserves"[61] are found by the well. Of particular relevance, ASC 932-360-35-18 describes a scenario under the successful efforts accounting method where "**an exploratory-type stratigraphic well may be determined <u>to have found oil and gas reserves</u>, but those reserves cannot be classified as proved when drilling is completed**."[62] <u>**In such circumstances**</u>, GAAP states that the costs of drilling the well shall only continue to be capitalized if:

---

[58] FAS 19, ¶102.

[59] FAS 19, ¶151 (emphasis added).

[60] ASC 932-360-25-10 (emphasis added) ("The costs of drilling exploratory wells and the costs of drilling exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment, and facilities **pending determination of whether the well has found proved reserves**.").

[61] "**Proved Oil and Gas Reserves**" are defined in part as, "those quantities of oil and gas, which, by analysis of geoscience and engineering data, **can be estimated with reasonable certainty to be economically producible from a given date forward**, from known reservoirs, and under existing economic conditions, operating methods, and government regulation before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether the estimate is a deterministic estimate or probabilistic estimate. … In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons as seen in a well penetration unless geoscience, engineering, or performance data and reliable technology: establish a lower contact with reasonable certainty." ASC Master Glossary (emphasis added).

[62] ASC 932-360-35-18 (emphasis added) ("**An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed**. In those cases, the capitalized drilling costs shall continue to be capitalized **if the well has found a sufficient quantity of reserves to justify its completion as a producing well** and the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project. Note that an entity is not required to complete the exploratory or exploratory-type stratigraphic well as a producing well.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**    **Page 22**

CONFIDENTIAL

    a.   "the well has found a sufficient quantity of reserves to justify its completion as a producing well"; and

    b.   "the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project."[63]

48.    Therefore, an exploratory-type stratigraphic well that is determined **not** to have found **any** oil and gas reserves (*i.e.*, a "dry hole" or "wet well")[64] **is required to be expensed under GAAP**.[65] That is, absent the identification of any oil reserves, the proved reserves threshold could never be satisfied, and the cost of exploratory drilling must be expensed. In this regard, the FASB has observed that "costs be charged to expense as soon as a determination is made that proved reserves have not been found."[66] Consistent with this

---

[63] ASC 932-360-35-18.

[64] *See, e.g.,* Norman Rose Fullbright Report, APC-00002563 at 2645, 2802; Exhibit 355, Minces PLLC Letter to the SEC dated May 9, 2016, APC-00113302 at 3314.

[65] *See also* AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified,* 4.12-4.16 and 9.42 (emphasis added) ("**If an exploratory well or exploratory-type stratigraphic test well is in progress at the end of a period and the well is determined not to have found reserves before the financial statements for that period are issued, the costs incurred through the end of the period, net of any salvage value, are charged to expense for that period**, in accordance with FASB ASC 932-360-40-10 […] 9.42 Under successful efforts accounting, costs incurred in drilling exploratory wells that are determined to be dry holes should be expensed."); 2.78 ("If the well is deemed to not contain adequate reserves to more than cover the costs to complete the well and the future production costs, it will likely be declared a "dry hole" and will be abandoned.").

*See also* Deloitte Oil and Gas, *Accounting, Financial Reporting, and Tax Update*, January 2016, p. 2 ("Under the successful-efforts method, costs related to the successful identification of new reserves may be capitalized while costs related to unsuccessful exploration efforts (e.g., drilling efforts that result in a dry hole) would be immediately recorded on the income statement.").

[66] FAS 19, ¶198; *See also* AB 20-5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829 at 1829 (emphasis added) ("The initially capitalized costs of drilling exploratory wells that do not find proved reserves are expensed (net of any salvage value, as defined in the Accounting Bulletin 20.7) **when determination is made that no proved reserves can be attributed as a result of such drilling**."); FASB Staff Position, FAS 19-1: *Accounting for Suspended Well Costs* (emphasis added) ("In certain circumstances, **an exploratory well finds reserves** but those reserves cannot be classified as proved when drilling is completed. … Paragraphs 31–34 of Statement 19 provide guidance on whether exploratory well costs can continue to be capitalized **when the well finds reserves but those reserves cannot be classified** as proved when drilling is completed. If reserves cannot be classified as proved in an area requiring a major capital expenditure, paragraphs 31(a) and 34 of Statement 19 require that the cost be carried as an asset provided that (a) there have been sufficient reserves found to justify completion as a

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**       **Page 23**