CONFIDENTIAL

understanding, Anadarko asserted in its 2014 Annual Report on Form 10-K that under the successful efforts method, exploratory costs "associated with **a well discovering hydrocarbons are initially capitalized, or suspended, pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling**."[67]

  b)  Anadarko's Contemporaneous Authorization for Expenditure Reflects that Shen-3 Was Drilled for Exploratory Purposes

49.  Evidence reflects that the Shen-3 well was drilled for exploratory purposes. For example, in Anadarko's April 8, 2014 AFE, provided to various Shenandoah project partners, stated that the Shen-3 drilling "Type" was "EXPLORATORY."[68] In other examples, (i) the Company's December 2014 draft suspended well accounting analysis explicitly described Shen-3 as meeting the definition of an "exploratory stratigraphic test well,"[69] and (ii) KPMG's recurring suspended well cost memoranda during the Relevant Period through Q2 2016, described capitalized Shen-3 well costs as being "exploratory assets."[70]

50.  The classification of Shen-3 as exploratory in nature has important significance under GAAP. Exploration costs, including the cost of drilling exploration wells and exploratory-type stratigraphic wells, must comply with the successful effort method accounting guidance set forth above. Indeed, consistent with the successful effort accounting concepts

---

producing well if the required capital expenditure is made, and (b) drilling of the additional exploratory wells is under way or firmly planned for the near future. If either of those two criteria is not met, **the enterprise must expense the exploratory well costs**.").

[67] Anadarko 2014 Form 10-K, p. 79.

[68] Letter to Shenandoah Partners AFE No. 2087315 WR 52 No. 2 dated April 8, 2014, APC-00005093 at 5095.

[69] Email from Michael Cieslak dated January 6, 2015, APC-00001863 at 1864.

[70] GG.4.A.8.05 Suspended Well Costs Memo Period-end 12-31-2014, KPMG_APC_eA_0002511; Q1GG.15 Suspended Well Costs Memo Period-end 3-31-2015, KPMG_APC_eA_0003262; Q2.GG.13 Suspended Well Costs Memo Period-end 6-30-2015, KPMG_APC_eA_0003349; Q3.GG.13 Suspended Well Costs Memo Period-end 9-30-15, KPMG_APC_eA_0003451; GG.4.A.8.10 Suspended Well Costs Memo Period-end 12-31-2015, KPMG_APC_eA_0006079; GG.4.A.8.10 Suspended Well Costs Memo Period-end 3-31-2016, KPMG_APC_eA_0007100.

CONFIDENTIAL

described above, Anadarko noted in its April 8, 2014 Letter to its Shenandoah partners that the Shen-3 "success case" equated to encountering oil:

> Please note that **the "dry hole case" equates to encountering wet sands and the "success case" equates to encountering oil** via LWD, mud logs or other tools used while drillng through the objective section.[71]

c) Exploratory Well and Exploratory-Type Stratigraphic Well Costs Are Required To Be Assessed On Their Own Under GAAP

51.   Importantly, accounting for an exploration well (and an exploratory-type stratigraphic well) must be evaluated on its own under GAAP. That is, the success of a specific well in finding oil reserves should not be based on whether another, separate and distinct well previously found oil within a larger project area. In this regard, the FASB observed:

> **An exploratory well must be assessed on its own**, and **the direct discovery of oil and gas reserves can be the sole determinant of whether future benefits exist** and, therefore, whether an asset should be recognized.[72]

52.   Consistent with this understanding, the guidance established under ASC 932-360-35-18 is specifically worded in the context of evaluating the continued capitalization of "the well" or "an exploratory well." Thus, as noted below, the continued asset capitalization of "an exploratory well or an exploratory-type stratigraphic well," subject to finding oil, is <u>not</u> written in the context of finding oil in an overall project area (*e.g.*, the Shenandoah project, including the Shenandoah 1 and 2 wellbores), rather it is specific:

> <u>**An exploratory well**</u> or <u>**an exploratory-type stratigraphic well**</u> may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed. In those cases, the capitalized drilling costs shall continue to be capitalized if <u>**the well**</u> has

---

[71] Letter to Shenandoah Partners AFE No. 2087315 WR 52 No. 2 dated April 8, 2014, APC-00005093 at 5094.

[72] FAS 19, ¶31 (emphasis added).

**CONFIDENTIAL**

found a sufficient quantity of reserves to justify its completion as a producing well …[73]

53.    Although a separate criterion exists in ASC 932-360-35-18 requiring an entity to assess the economic and operating viability of the project overall, that criterion becomes irrelevant if an individual well fails to find oil reserves. To incorrectly assume the requirement was specific to the project overall and not the individual well, Anadarko would have satisfied the requirement prior to spudding Shen-3 based on the prior period Shen-1 and Shen-2 results. This flawed assumption is directly inconsistent with the successful effort methodology which, as noted above, was intended to highlight failures during the search for oil by expensing costs that do not result in an identifiable future benefit. Suspending (capitalizing) such costs would obscure failure and risk (violating GAAP) by converting Anadarko's accounting policy for this well to its having adopted the full cost method of accounting, contrary to its stated use of the successful efforts method of accounting, (*see* paragraphs 42-44 above).

54.    In addition to its disclosed policy cited above in paragraph 48, Anadarko's applied accounting practices during the Relevant Period reflect an understanding that exploration wells and exploratory-type stratigraphic wells, similar to Shen-3, were required to be evaluated individually in assessing whether capitalization of suspended well costs under GAAP was appropriate. Indeed, Anadarko's internal accounting policy A.B. No 20.5, *Well Classification and Disposition of Suspended Well Costs*, included illustrative examples requiring that exploratory wells be assessed individually, and expensed when a related well is dry (*i.e.*, Examples 1 and 4 of Exhibit I).[74]

---

[73] ASC 932-360-35-18 (emphasis added). *See also, e.g.*, Overview of Oil and Gas Accounting & PSC Accounting, Budi Hartono, Ernst & Young LLP, p. 12 ("Under US GAAP, an appraisal well is treated exactly the same as an exploration well and should be written-off if unsuccessful, even the very same field or reservoir is determined to be successful and developed."); FAS 19 ¶201 ("The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs not continue to be carried as assets indefinitely if stratigraphic test drilling activity in the area has ceased or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well.").

[74] A.B. No 20.5, *Well Classification and Disposition of Suspended Well Costs*, APC-00001829 at 1838-1841.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 26**

CONFIDENTIAL

55. Consistent with this understanding, Anadarko repeatedly wrote off drilling costs for individual wells, despite the respective wells being located within a larger project area where oil reserves had previously been discovered. For example:

    a. In connection with its Coronado oil exploration project, Anadarko undertook multiple drilling efforts that resulted in capitalized suspended costs through June 30, 2014. During Q2 2014, the Company determined that one of its related wells was a "dry hole" where no reserves were identified. Although the well was located within the Coronado play, the Company recognized the need to, and in fact did, expense those costs associated with the unsuccessful well. At the same time, Anadarko continued to capitalize other suspended exploration well costs incurred in connection with successful efforts within the Coronado area.[75]

    b. During the same reporting period, similar dry hole accounting expenses were recorded in connection with an unsuccessful "dry hole" well located in Anadarko's Yucatan project area. While the individual dry hole well costs were expensed, the Company continued to capitalize other suspended well costs (*i.e.*, not determined to be dry holes) associated with previous successful exploration wells located in the same project area.[76]

    c. During Q3 2016, Anadarko expensed certain specific unsuccessful well efforts during Q3 2016 within its Tubarao Tigre and Mozambique exploration project areas. While the individual dry hole well costs were expensed, the Company continued to capitalize other exploratory well costs (*i.e.*, not determined to be dry holes) in these respective exploration project areas.[77]

56. In fact, Anadarko's, albeit non-timely, write-off of Shen-3 during Q3 2016 despite the Company's continued capitalization of other wellbores (*e.g.*, Shen-1, Shen-2, Shen-4 and

---

[75] Q2 2014 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0003043 at 3046-3047.

[76] Q2 2014 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0003043 at 3047-3048.

[77] Q3 2016 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0007469 at 7472-7474.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 27**

**CONFIDENTIAL**

Shen-5) demonstrates that wells are to be assessed individually under the successful efforts method and ASC 932-360.[78] This accounting treatment is further consistent with the testimony of Catherine Green, Accounting Manager-Property Accounting and Asset Retirement Obligations,[79] who affirmed that the determination of whether you should suspend the well cost "is done on a well-by-well basis."[80]

    d)  <u>GAAP Required Anadarko to Immediately Expense Exploratory Wells and Exploratory-Type Stratigraphic Wells When It Was Determined That No Hydrocarbons Were Found as of December 31, 2014</u>

57.    Information reflects that Anadarko capitalized approximately $64 million of suspended costs of drilling Shen-3 as of December 31, 2014.[81] Given the supporting information demonstrating that Shen-3 found no oil, these suspended costs were required to be expensed under the aforementioned GAAP. As this information appears evident, no later than the filing date of Anadarko's 2014 annual financial statements on Form 10-K, the Shen-3 related write-off expense and disclosure of this $64 million dry hole expense was required no later than December 31, 2014. In this regard, the expensing of Shen-3 was necessary and consistent with GAAP requirements under the successful effort method to highlight failures and risks involved in exploration of the Company's Shenandoah project.

58.    Indeed, in addition to acknowledging that the Shen-3 was a "wet well" or "dry hole," as described above, Anadarko conceded in a November 10, 2016 memo that the well "was unsuccessful under ASC 932-360-25-18."[82] Stated differently, Anadarko inherently

---

[78] Q3 2016 Exploration Expense Testwork Memo – Dry Hole Expense, KPMG_APC_eA_0007469 at 7470-7471.

[79] APC Organizational Chart, APC-0003195 at 3202.

[80] Deposition of Catherine Green, 83:7-14 ("Going back to my initial question, though, this analysis is done on a well-by-well basis; correct? A. Yes, whether you should ca- -- whether you should capitalize -- continue to suspend the well cost is done on a well-by-well basis, subject to also the sufficient progress criteria for the overall project.").

[81] Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333.

[82] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**       **Page 28**

CONFIDENTIAL

acknowledged that it lacked a reasonable and appropriate basis under ASC 932-360-25 to capitalize the Shen-3 exploratory-type stratigraphic well costs during 2014.

3.  *The Unlikely Use of Shen-3 As An Injection Well Further Supports Anadarko's Requirement Under GAAP to Expense Shen-3 Drilling Costs When No Hydrocarbons Were Found*

59.  As discussed above, the FASB recognized the general concept that costs that do not relate to probable future economic benefit are normally not capitalized during the Relevant Period. Beyond the principal failure of Anadarko to find hydrocarbons at Shen-3, the well's unlikely use as an injection well (Condition 1) further demonstrates the remote likelihood that Shen-3 would provide the Company with future economic benefits. The evidence that I have seen produced by the Company only cites to speculation that the Shen-3 well bore may be used as a water injection well or other service well and not to any evidence reflecting a study or analyses resulting in a contemptuous conclusion that such use was likely.[83]

**B.  ANADARKO'S Q3 2016 ASSERTION THAT CONTINUED CAPITALIZATION OF SHEN-3 WAS ACCEPTABLE BECAUSE A "REASONABLE POSSIBILITY" EXISTED THAT THE WELL WOULD BE USED AS AN INJECTION WELL OR SIDETRACK WELL IS FLAWED AND UNSUPPORTED IN GAAP**

60.  As noted above in paragraph 58, Anadarko internally acknowledged that Shen-3 was "unsuccessful" and therefore, did not satisfy the specific capitalization requirements established in ASC 932-360-25-18 for exploratory-type stratigraphic well costs. However, the Company further asserted that because a "reasonable possibility" existed that the well would be used as an injection well, sidetrack well, or development well, capitalization of Shen-3 in 2014 through Q3 2016 was appropriate.[84] This assertion, even if true, has no basis under GAAP and is fundamentally flawed.

1.  *The Company Acknowledged That Shen-3 Well Costs Were Not Exploration Costs that Could Be Capitalized under ASC 932-360-25-18*

---

[83] Deposition of Ernest Leyendecker, 91:8–95:12, 176:15-182:3, and 196:02-202:4.

[84] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 29**

CONFIDENTIAL

61.    Given that Shen-3 found no hydrocarbons (*i.e.*, Section V.A.1), the Shen-3 exploratory-stratigraphic well drilling costs were not capitalizable under applicable GAAP as of December 31, 2014. Indeed, the Company affirmed during Q3 2016 that:

    a.    The "Shenandoah-3 well was drilled as an exploratory stratigraphic test well"; and

    b.    The Shen-3 well was "unsuccessful" under ASC 932-360-25-18.[85]

62.    As a result, the Company correctly concluded in 2016 that its Shen-3 well costs could **not** be capitalized pursuant to the specifically provided GAAP to which an exploratory-type stratigraphic well relates (*e.g.*, ASC 932-360-25-18; ASC 932-360-35-18). This is significant because under GAAP, companies, including Anadarko, are required to first consider Codification guidance that is specific to a particular transaction or event (*e.g.*, the costs incurred when drilling an exploratory-type stratigraphic well) when determining how to account for the transactions or events.[86] Only in the absence of specific guidance, may companies refer to accounting principles for "similar" transactions or events within a source of authoritative GAAP.[87] Absent specific guidance within the relevant codification, a company should look to nonauthoritative accounting guidance outside the Codification.[88] However, because specific Codification guidance did exist for exploratory-type stratigraphic wells (ASC 932-360-25-18; ASC 932-360-35-18), Anadarko was required to apply it.

    2.    ***The Company Acknowledged That Shen-3 Well Costs Were Not Development Costs that Could Be Capitalized under ASC 932-360-25-14***

63.    Referencing Shen-3's purpose as "an exploratory stratigraphic test well," Anadarko further acknowledged during Q3 2016 that Shen-3 related drilling costs were not "development

---

[85] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

[86] ASC 105-10-05-02.

[87] ASC 105-10-05-02.

[88] ASC 105-10-05-03.

CONFIDENTIAL

costs," as contemplated by ASC 932-360-25-14.[89] I agree with this conclusion.[90] Because ASC 932-360-25-14 provides the primary accounting guidance for the initial recognition (and capitalization) of **development** costs, the Shen-3 exploratory-stratigraphic well drilling costs were **not** capitalizable thereunder.[91]

64.    This is also important considering that GAAP includes the costs of drilling injection, development wells and other service wells within its definition of "development costs."[92] Therefore, a reasonable possibility that Shen-3 might be used as an injection well, even if objectively supportable, is not relevant to whether Anadarko could capitalize its related drilling costs based on the Company's implicit acknowledgement that capitalization for

---

[89] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566; *see also* Deposition of Catherine Green, 47:4-17 ("Q. Was Shenandoah 3 an exploratory well? A. Yes. Q. Accordingly, Shenandoah 3 was not a development well; correct? A. Correct. Q. And this determination was made prior to Shenandoah 3 being spud; correct? A. Yes. Q. So Shenandoah 3 costs were associated with exploration costs; correct? A. Yes. Q. And Shenandoah 3 costs were not associated with development costs; correct? A. Correct.").

[90] ASC 932-360; *see also* AICPA Audit and Accounting Guide, *Entities with Oil and Gas Producing Activities – Clarified*, 4.17-4.18 ("4.17 Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering, and storing the oil and gas are capitalized. All costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and are capitalized, whether the well is successful or dry. … Because development dry holes are capitalized and exploratory dry holes are expensed, **the distinction between them is extremely important and should be made by the company prior to drilling**."); FAS 19, ¶¶203-205 ("[T]here is an important difference between exploratory dry holes and development dry holes. The purpose of an exploratory well is to search for oil and gas. The existence of future benefits is not known until the well is drilled. Future benefits depend on whether reserves are found.").

[91] ASC 932-360-25-14 ("Development costs shall be capitalized as part of the cost of an entity's wells and related equipment and facilities. Thus, all costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and shall be capitalized, whether the well is successful or unsuccessful. Costs of drilling those wells and costs of constructing equipment and facilities shall be included in the entity's uncompleted wells, equipment, and facilities until drilling or construction is completed.").

[92] ASC 932-360-25-12 and 13 (emphasis added) ("Development costs are incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering, and storing the oil and gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities (see paragraph 932-360-25-16) and other costs of development activities, are costs incurred to . . . [d]rill and equip **development wells**, development-type stratigraphic test wells, and **service wells** . . . ."); *see also* ASC Master Glossary (emphasis added) ("A **service well** is a well drilled or completed for the purpose of supporting production in an existing field. Wells in this class are drilled for the following specific purposes: **gas injection (natural gas, propane, butane, or flue gas), water injection, steam injection, air injection**, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.").

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 31**

CONFIDENTIAL

Shen-3 as development cost under ASC 932-360-25-14 was inappropriate, because it was an exploratory well.

### 3. *The Company's Q3 2016 Accounting Position To Justify the Suspension of Shen-3 Costs Until Q3 2016 Is Unsupported*

65. Instead of applying directly relevant GAAP as required as of Q4 2014, and without referencing alternative supporting accounting standards in the Codification, the Company continued to suspend Shen-3 well costs until Q3 2016. Although Shen-3 well costs were written off as a dry hole as of September 30, 2016, to justify its capitalization of Shen-3 well costs through Q2 2016, Anadarko documented that the Shen-3 well costs were, more generally, "exploration costs" that could be capitalized under the successful efforts method.[93] More specifically, the Company noted that given Shen-3's possible future use as an injection well in the unproved Shenandoah project, related costs could (1) be considered exploration costs, and (2) those costs could provide future benefit to Anadarko during Shenandoah's development phase.[94]

66. Beyond the overarching failings described above, including conflicting, relevant GAAP precluding the capitalization of Shen-3, Anadarko's subsequently documented accounting argument (in Q3 2016) is flawed because of the following additional issues:

   a. No specific basis existed in GAAP to support Anadarko's flawed accounting conclusion that Shen-3 costs could be suspended if a reasonable possibility existed that the well could be used as an injection well at the unproved Shenandoah project area;

---

[93] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0566.

[94] *See, e.g.,* Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0565; Demand Letter Investigation updated January 20, 2017, KPMG_APC_eA_0009644.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**              **Page 32**

CONFIDENTIAL

b. The "reasonable possibility" threshold inherent in the Company's assumption, even if true, fails to satisfy the FASB's conceptual framework definition of an asset (*i.e.*, a "probable" future economic benefit).[95]

c. Anadarko subsequently asserted that the Company's Chief Accounting Officer, Cathy Douglas, "relied upon the injection well capability of Shenandoah-3 as the predominant reason for suspending the well costs at year-end 2014."[96] However, I have not seen contemporaneous objective evidence demonstrating that a "reasonable possibility"[97] existed that Shen-3 could be used as an injection well or a development well as of December 31, 2014. Instead, I have only seen references which amount to speculation or general lack of confidence that Shen-3 could be used as an injection well or development well. For example:

1. A sentence included in the Company's Q4 2014 draft suspended well cost memo pertaining to Shen-3, noting only the following sentence reflecting that management was evaluating whether Shen-3 **might** have future utility as an injection well, **assuming** Shenandoah moved to the development phase:

    > Management **is also evaluating** future utility of this well-bore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands.[98]

---

[95] FASB Statement of Financial Accounting Concepts No. 6, ¶25. ("Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."); *see also* FAS 19, ¶143. ("In the presently accepted financial accounting framework, an asset is an economic resource that is expected to provide future benefits and nonmonetary assets generally are accounted for at the cost to acquire or construct them. Costs that do not relate directly to specific assets having identifiable future benefits normally are not capitalized—no matter how vital those costs may be to the ongoing operations of the enterprise. If costs do not give rise to an asset with identifiable future benefits, they are charged to expense or recognized as a loss.").

[96] Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis dated November 10, 2016, APC-01720564 at 0565.

[97] Under GAAP, "reasonably possible" is defined as "more than a remote but less than likely." ASC Master Glossary.

[98] Email from Michael Cieslak dated January 6, 2015, APC-00001863 at 1864. *see also* email from Time Trautman dated December 29, 2014, ANACOP00025913.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 33**

CONFIDENTIAL

2.  As noted above, on January 7, 2015, Jeff Pachman, Anadarko's Project Land Advisor, further conveyed Conoco's accounting position to various Company employees that "because the [Shen-3] **well found no hydrocarbons and has no future utility, the cost will be written off as a dry hole**."[99]

3.  Consistent with this understanding, on January 8, 2015, Anadarko's partner, Conoco's Deepwater Asset Development team, in connection with its determination to dry hole expense Shen-3, internally notified employees that Shen-3 was "fully water-wet," and was not likely to be considered as a future sidetrack well:

    > Data from both the original and bypass well bores confirmed that the well did encounter reservoir quality sand but **was fully water-wet.** The WR52-2 was P&A'd under a Temporary Abandonment classification but meets the criteria for Permanent Abandonment. The Temporary classification was used to allow the flexibility to re-enter the well for an up-dip sidetrack. There is no current plan to re-enter the WR52-2 and it is believed that if the operator is successful in the next appraisal well a sidetrack of WR52-2 would **not be considered in the near future or likely at all.**[100]

4.  In a January 23, 2015 email to Marathon's Controller and CAO, Gary Wilson, Ms. Douglas communicated that Anadarko "**will be assessing** the future utility of the wellbore" as a "possible sidetrack, injector, etc."[101] This again indicates that no substantive analysis as to Shen-3's possible use as an injection or development well had occurred at Anadarko. Indeed, as discussed above, Marathon recognized Shen-3 to be a dry hole for accounting purposes in Q4 2014.

5.  In a February 12, 2015 email, Mr. Leyendecker stated, without reference to underlying support, that Shen-3 was "**potentially useable** as a future water

---

[99] Email from Diane Sease dated January 7, 2015, APC-00001795-1796 at 1795 (emphasis added).

[100] Email from Pamala Johnson dated January 8, 2015, ANACOP00000354-0355 at 354 (emphasis added).

[101] Email from Cathy Douglas dated January 23, 2015, APC-00001867-1868 at 1867 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 34**

CONFIDENTIAL

injection well for pressure maintenance."[102] However, while acknowledging internal Anadarko communications on or before February 2, 2015 that "'Shen-3 cannot be utilized as a water injector given its current design,'" Mr. Leyendecker further testified that he did not recall seeing any "in-depth drilling engineering analysis that said [Shen-3] could be used as an injector well."[103] Moreover, after reading from internal communications from Mr. Trautman noting that "re-entry" of Shen-3 "'would be risky (mechanically),'" Mr. Leyendecker further testified to his understanding in February 2015 that Shen-3 could not be sidetracked.[104]

67.    While an internal analysis and memo does appear to have been performed and prepared by Anadarko regarding the use of Shen-3 as an injection or development well, it does not appear to have occurred until Q3 2016. Therein, the Company concluded that Shen-3 had a "low probability of becoming a water injection well conversion." Specifically, during 2016, Mr. Williams wrote about the Company's efforts to understand the utility of Shenandoah 3 as a future water injection well and its conclusion, stating in part:

> [T]he most recent concept selection work suggests that the Shenandoah #3 wellbore (WR 52-2) is not in an optimal location as a water injector and for waterflood oil recovery. This is despite the fact that an east-west trending fault, potentially isolating the Shen 3 well from a large updip waterflood area, was identified in Q3, 2014 [sic] not invoked in the model. Currently, the Shenandoah G&G team has seismic evidence (although not with certainty and approximated to be 50% probable) that an east-west trending fault does exist north of the Shenandoah 3 wellbore which may inhibit the waterflood front from influencing and increasing oil recovery in up-dip producing wells. As a result, the Shenandoah 3 is currently not being considered a candidate for water injection well conversion if the project moves forward to the sanctioning (FID) phase.
>
> *        *        *
>
> In summary, with the latest results of the ongoing subsurface waterflood studies and the mechanical challenges of converting this well to

---

[102] Email from Jeff Pachman dated February 12, 2015, APC-00001791-1792 at 1791 (emphasis added); *see also* Deposition of Patrick McGrievy, 173:22-175:5.

[103] Deposition of Ernest Leyendecker, 196:02-202:4; Email from Chip Oudin dated February 2, 2015, APC-00001928.

[104] Deposition of Ernest Leyendecker, 91:8-95:12; Email from Tim Trautman dated January 29, 2015, APC-00158152.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 35**

a viable waterflood injection well, the wellbore is considered to have a low probability of becoming a water injection well conversion.[105]

68.  In connection with this analysis, Anadarko wrote-off Shen-3 as a dry hole during Q3 2016 asserting that a reasonable possibility no longer existed that Shen-3 could be used as an injection well. However, this write-off was untimely. Anadarko's documented assertion that capitalization of Shen-3 between Q4 2014 and Q2 2016 was acceptable because a "reasonable possibility" existed that the well would be used an injection well was not supported by an appropriate analysis, inconsistent with the documents and testimony referenced above in paragraph 66 and contradicted by relevant GAAP.

**C.  ANADARKO REPEATEDLY FAILED TO EXPENSE AND DISCLOSE MILLIONS OF DOLLARS IN SHEN-3-RELATED DRY HOLE EXPENSES DURING EACH OF THE RESPECTIVE FINANCIAL REPORTING PERIODS BETWEEN DECEMBER 31, 2014 AND JUNE 30, 2015, IN VIOLATION OF GAAP**

69.  Anadarko's continued capitalization of Shen-3 violated GAAP. Specifically, from the financial reporting periods between December 31, 2014 and June 30, 2016, Anadarko improperly capitalized approximately $63.6 million of suspended drilling costs relating to Shen-3.[106]

1.  *Anadarko's Overstatement and Disclosure of Shen-3 Suspended Well Costs Were Material*

70.  As set forth below, the Company's related misstatement was material to each of Anadarko's respective financial reporting periods beginning December 31, 2014 and ended September 30, 2016. In this regard, Anadarko's recurring misstatement exceeded well-established SEC quantitative materiality example benchmarks (*i.e.*, 5% of an item). Qualitatively, the Company's misstatements and related disclosures: (i) allowed Anadarko to report pre-tax profits instead of losses during 2014, and/or (ii) pertained to an exploration project that was announced to have a potentially significant role in the Company's operations and profitability. In this regard, Anadarko regularly asserted the importance of Shenandoah in

---

[105] Memo and attachments, APC-01737346-7348.

[106] Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 36**

CONFIDENTIAL

the Gulf of Mexico, characterizing the Shenandoah Basin as an approximate "$2-$4 Billion Net Opportunity" during 2014.[107]

71.  GAAP and SEC disclosure requirements discussed above apply to financial reporting requirements that are "material" to Anadarko's financial statement users.[108] SEC Rule 12b-2 defines "material" as information for "which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities registered."[109] In 1999, the SEC staff issued Staff Accounting Bulletin No. 99, Materiality ("SAB 99"). SAB 99, codified under GAAP at ASC 250-10-S99, which provides further guidance with respect to materiality and states that a misstatement or omission in financial statements is material if "there is a substantial likelihood that a reasonable person would consider it important:"[110]

> [T]he accounting literature is in substance identical to the formulations used by the courts in interpreting the federal securities laws. **The Supreme Court has held that a fact is material if there is – a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available [fn 27]** …
>
> In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. … **Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important**.
>
> [FN]27 TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988). As the Supreme Court has noted, determinations of materiality require 'delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts

---

[107] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

[108] 17 CFR §240.12b-20.

[109] 17 CFR §240.12b-2.

[110] ASC 250-10-S99.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 37**

CONFIDENTIAL

and the significance of those inferences to him. […]' TSC Industries, 426 U.S. at 450.[111]

72. ASC 250-10-S99 further notes **that an assessment of materiality requires an evaluation of both quantitative and qualitative factors**.[112] As discussed below, quantitative and qualitative factors demonstrate that Anadarko's recurring misstatements and related disclosure omissions were material under GAAP.

    a) <u>Quantitative Factors Reflect That Anadarko's Failure to Properly Write-off Shen-3 drilling Costs to Dry Hole Expense Was Material</u>

73. Quantitatively, SEC guidance acknowledges the practice of applying a "rule of thumb" quantitative threshold (*e.g.*, 5% of an item) to provide a "preliminary" basis for evaluating materiality. For example, ASC 250-10-S99 states:

> **The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that - without considering all relevant circumstances - a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material**. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. **But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality**; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.
>
>       \*          \*          \*
>
> **Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material**.[113]

74. Anadarko's misstatements and related disclosure omissions within the Company's relevant financial statements repeatedly exceeded this 5% threshold. For example, the proper inclusion and disclosure of Shen-3 related dry hole expense as of December 31, 2014 would have negatively impacted Anadarko's respectively reported annual Income (Loss) before taxes and disclosed dry hole expense by an amount much greater than 5%.

---

[111] ASC 250-10-S99 (emphasis added).

[112] ASC 250-10-S99 (emphasis added).

[113] ASC 250-10-S99 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 38**

**CONFIDENTIAL**

75.   Moreover, given the Company's repeated failure to correct its Shen-3 related misstatement until Q3 2016, GAAP requires that a quantitative materiality assessment be conducted using both a rollover method and an iron curtain approach.[114] As stated in footnote 114, (i) the rollover approach quantifies a misstatement based on the amount of the error originating in the current period income statement, and (ii) the iron curtain approach quantifies a misstatement based on the effects of correcting the misstatement existing in the balance sheet at the end of the respective current period, irrespective of the misstatements year(s) of origination. As reflected in the table below, Anadarko's misstatement exceeded 5% of the following relevant disclosed amounts (*i.e.*, Income (loss) before taxes, Suspended well costs, and Dry hole expense) for one or more of these criteria using both the rollover approach (*e.g.*, Q4 2014, FY 2014 impact, Q3 2016), and the iron curtain approach (*e.g.*, Q1 2015 through Q2 2016):[115]

---

[114] The SEC and codified GAAP recognize that the most commonly used in practice to accumulate and quantify misstatements are generally referred to as the "rollover" and "iron curtain" approaches. The rollover approach quantifies a misstatement based on the amount of the error originating in the current period income statement. Thus, this approach ignores the effects of correcting the portion of the current period balance sheet misstatement that originated in prior periods. The iron curtain approach quantifies a misstatement based on the effects of correcting the misstatement existing in the balance sheet at the end of the current period, irrespective of the misstatements year(s) of origination. SEC guidance further states that a registrant's financial statement would require adjustment when either of the rollover or iron curtain approaches result in quantifying a misstatement that is material, after considering all relevant quantitative and qualitative factors:

> The staff believes registrants must quantify the impact of correcting all misstatements, including both the carryover and reversing effects of prior year misstatements, on the current year financial statements. The staff believes that this can be accomplished by quantifying an error under both the rollover and iron curtain approaches as described above and by evaluating the error measured under each approach. **Thus, a registrant's financial statements would require adjustment when either approach results in quantifying a misstatement that is material,** after considering all relevant quantitative and qualitative factors.

> ASC 250-10-S99 (emphasis added).

[115] **Note:** Pursuant to required use of the iron curtain and rollover methods, these calculations evaluate Anadarko's ongoing failure to expense Shen-3 and related misstatement across the various periods presented. These percentages were calculated using Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333; 2015.03.31 Q1.GG.10SW AGING AND NET CHANGES - 04.20, KPMG_APC_0021079; 2015.07.14 Q2.GG.10 SW AGING, KPMG_APC_0009967; 2015.10.14 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0003445; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.03.31 Q1.GG.10 SW AGING AND

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 39**

**CONFIDENTIAL**

| Percentage Impact of Misstatements on Various Financial Metrics | | | | | |
|---|---|---|---|---|---|
| | Q4 2014 | FY 2014 | Q1 2015 | Q2 2015 | Q3 2015 |
| Income (Loss) Before Income Taxes | 14.1% | 117.9% | 1.4% | 34.8% | 2.1% |
| Suspended Exploratory Well Costs | 4.2% | 4.2% | 4.2% | 3.8% | 5.8% |
| Dry Hole Expense | 27.1% | 8.4% | 229.0% | 495.4% | 7.9% |
| | Q4 2015 | FY 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
| Income (Loss) Before Income Taxes | 2.9% | 0.7% | 4.6% | 6.9% | 6.3% |
| Suspended Exploratory Well Costs | 5.7% | 5.7% | 5.7% | 5.1% | 5.5% |
| Dry Hole Expense | 33.1% | 6.1% | 580.0% | 1276.0% | 31.4% |

b)  Qualitative Factors Further Demonstrate That Anadarko's's Failure to Properly Account for and Disclose Shen-3 Drilling Costs Was Material

76.    While the assessment of quantitative factors is necessary and provides a preliminary basis for establishing the materiality of Anadarko's misstatements and disclosure omissions, the consideration of qualitative factors further supports that conclusion. In this regard, ASC 250-10-S99 recognizes that the evaluation of qualitative factors is an integral component of a materiality analysis. For example, the SEC Staff has stated that qualitative factors may render a quantitatively small misstatement material:

> [I]f qualitative factors can cause small errors to be material, can qualitative factors cause large errors to be not material? With the benefit of hindsight, it's pretty clear that the answer is yes.[116]

77.    ASC 250-10-S99 identifies several considerations that may render material quantitatively small misstatements, including the following examples:

a.    "whether the misstatement changes a loss into income or visa versa";

---

NET CHANGE, KPMG_APC_eA_0007094; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; GG.4.G.3.40 9-30-2016 Dry Hole Expense, KPMG_APC_eA_0008256 and reported financial statement amounts included in Anadarko's 2014 Form 10-K; Current Report on Form 8-K filed February 2, 2015, Q1 2015 Form 10-Q; Q2 2015 Form 10-Q; Q3 2015 Form 10-Q; 2015 Form 10-K; Current Report on Form 8-K filed February 1, 2016; Q1 2016 Form 10-Q; Q2 2016 Form 10-Q; Q3 2016 Form 10-Q.

[116] Todd E. Hardiman, Associate Chief Accountant, SEC Division of Corporation Finance, "Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments," December 11, 2007.

CONFIDENTIAL

b.  "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability"; and

c.  "whether the misstatement has the effect of increasing management's compensation."[117]

78.  These qualitative considerations further support my opinion that Anadarko's failure to properly expense and disclose suspended Shen-3 drilling costs was material. For example, the Company's failure to properly recognize Shen-3 costs as a dry hole expense during the year ended December 31, 2014 allowed Anadarko to report income before taxes. If these costs had been expensed during 2014, Anadarko would have reported a net loss before taxes.

79.  Moreover, given Anadarko's asserted potential significance of the Shenandoah project, including Shen-3, on the Company's future operations and profitability, Anadarko's disclosures asserting the success of Shen-3, despite it being a dry hole, further supports the materiality of Anadarko's misstatement and related disclosure omissions.[118] Indeed, Robert Gwin, Anadarko's former Chief Financial Officer and President, acknowledged the Company's stock price increased following the discovery of Shen-2 and internal communications speculating that Anadarko's stock would exceed $100 per share because of the Shenandoah basin project.[119]

---

[117] ASC 250-10-S99.

[118] ASC 250-10-S99 ("Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material. When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.").

[119] Ex. 441; Deposition of Robert Gwin, 77:18-79:15 ("Q And one of the headlines that they deem important for that day related to the Shenandoah results, Shenandoah 2 results; correct? A I have to go back down. I know it says something about ConocoPhillips. Yes, that's correct. Q And ConocoPhillips was a partner on the Shenandoah prospect; right? A That's correct. Q And so after you received this briefing, Chuck Meloy responded to -- replied all with a jubilant response; right? A Yes, he did. Q It was, 'Booyah and thumbs up to our exploration team once again'? A Yes. Q That was referring to the news at

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 41**

CONFIDENTIAL

80.    In this regard, the importance of both Shenandoah and Shen-3 were repeatedly communicated by Anadarko's management and others. For example:

a.    As early as February 2013, Anadarko's management characterized Shenandoah as a "**big exploration**" project, noting further that it was "**very encouraged**" by what the Company was seeing.[120]

b.    In May 2013, Mr. Walker observed that "[a]ccelerating the value of the newly discovered Shenandoah Basin" was "**critical**" given that it was "**one of the company's largest discoveries ever in the Gulf of Mexico**."[121]

c.    Weeks later, Frank Patterson, Anadarko's Senior Vice President of Exploration, similarly observed that "[i]n the Gulf of Mexico, Ernie [Leyendecker] is very excited about the Gulf of Mexico. How can you not get excited when you start the year with a well, the Shenandoah appraisal well, where you have over 1,000 feet of pay. **Shenandoah could end up being one of the largest discoveries in the Gulf of Mexico, we don't know. We have appraisal work that we have to do so we're pretty excited about that**."[122]

d.    Expressing continued excitement about Shenandoah in the Company's Q2 2013 earnings call, Robert Daniels, Anadarko's Executive Vice President - International &

---

Shenandoah; right? A Yes. It appears to be. Chuck ran our development organization and so he was congratulating exploration organization on their success with that well. And Al Walker responds with a 'I will second that. We are on our way to three digits.' And what do you -- what did you understand Al Walker's email to refer to? A I don't know. I wouldn't speculate. I don't remember getting the email even though I was clearly on it and then I responded to everyone congratulations as well obviously. Q And his reference -- Mr. Walker's reference to three digits, do you understand that to be the stock price? A It could have been, yes. I don't know where our stock was trading at that time. So I don't know that it was. It could have been. Q It's a reasonable assumption; right? A I think it's reasonable. Q And so Al Walker is saying that the good exploration news from Shenandoah meant that the Anadarko stock price was on its way to over $100 per share? A I think it's reasonable to assume that, but again, I don't know what he's specifically referring to. Q It's a reasonable conclusion? A I think as I already stated, it's reasonable.").

[120] Shareholder/Analyst Call, February 20, 2013 (emphasis added).

[121] Q1 2013 Earnings Call, May 7, 2013, p. 5 (emphasis added).

[122] Company Conference Presentation, May 22, 2013, p. 8 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 42**

CONFIDENTIAL

Deepwater Exploration, stated that Anadarko was "excited about the whole Shenandoah mini-basin. **We have the big discovery at Shenandoah**."[123]

e.  When further asked by an analyst in September 2013 whether a third well would be drilled in Shenandoah, Mr. Walker stated: "**You bet**. **We will be looking at a lot of things in Shenandoah. We're pretty excited, as you might imagine, with 1,000 feet of pay**."[124] More generally, Mr. Walker expressed his excitement about the Company's future given the Gulf of Mexico, including Shenandoah, noting that:

> [W]e've come out of this with some very significant results. And I think you've heard us talk a lot about the Shenandoah-2 recently. And I think Shenandoah and that whole mini basin is something that Ernie Leyendecker and our Gulf of Mexico exploration folks are just delighted and very excited about. We had about 1,000 feet of pay in the second Shenandoah well. We also had around 400 feet of pay in the Coronado well, and in the Yucatan well, we were at about 120 feet of pay.
> Now we're the only company that's in all 3 of these. So we have a bit of a unique view of what this basin might be able to provide in the future.[125]

f.  In late 2013, when asked about future prospects that support the Company's cash flows, Mr. Gwin conveyed that Shenandoah stood out:

> Shenandoah, I think, is one that's easy to look at and say if you saw what we did with Lucius and that Lucius spar I showed you, we're building an identical spar. We designed it once and we're building it twice for Heidelberg. **If we were to look at what's the kind of the most attractive next step here, even though, obviously, there's a lot of additional work to do, Shenandoah stands out**.[126]

---

[123] Q2 2013 Earnings Call, July 30, 2013, p. 8 (emphasis added).

[124] Company Conference Presentation, September 12, 2013, p. 1 (emphasis added).

[125] Company Conference Presentation, September 12, 2013, p. 8 (emphasis added).

[126] Company Conference Presentation, September 12, 2013, p. 13 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 43**

CONFIDENTIAL

g.  In November 2013, Mr. Leyendecker described Shenandoah as "one of the most exciting things" that he has "done" and "seen" in his career. He expressed this excitement in terms of being for both the "industry and for Anadarko."[127]

h.  Mr. Daniels described the Company's next exploratory steps, including its desire to find oil/water contact in February 2014, noting:

> Of course, the 2013 appraisal well found 1,000 feet of pay and no oil/water contact, so we're going to be trying to push the oil/water contact out and look at the aerial extent of these reservoirs, which we do think are very are [sic] aerial-extensive based on the drilling we've done in here.[128]

i.  During its March 2014 investor conference presentation, the Company described the Shenandoah Basin as a "$2-$4 Billion Net Opportunity."[129]

j.  Anadarko's management continued to reference the success of Shenandoah during its May 2014 conferences calls, describing the basin as "being quite a sizable potential producer"[130] and "one of the best-looking logs … seen in a long time, big, thick, thousand foot-type of pay."[131]

k.  In October 2014, Mr. Daniels publicly recognized the specific importance of Shen-3 to the Shenandoah project stating in part that Anadarko was "still excited about the Shenandoah Basin," and that "**Shenandoah 3 is going to be real key for us**."[132] Less than one month later, Mr. Daniels reiterated his excitement about Shenandoah, noting further that the drilling of Shen-3 was almost complete and the Company would provide an update on the results during its next conference call.[133]

---

[127] Company Conference Presentation, November 22, 2013, p. 7 (emphasis added).

[128] Q4 2013 Earnings Call, February 4, 2014, p. 16.

[129] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

[130] Q1 2014 Earnings Call, May 6, 2014, p. 12.

[131] Company Conference Presentation, May 20, 2014, p. 8.

[132] Q3 2014 Earnings Call, October 29, 2014, p. 9 (emphasis added).

[133] Company Conference Presentation, November 13, 2014, p. 7.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**     **Page 44**

**CONFIDENTIAL**

81.   While the drilling results became evident during the Company's Q4 2014 financial reporting period, Anadarko's failure to write off its "unsuccessful" Shen-3 drilling costs as dry hole expense was a significant failure, especially in consideration of the aforementioned positive expectations of the Shenandoah project. Of further significance was Anadarko's other 2014 disclosures that did not explicitly acknowledge that Shen-3 was a dry hole or wet well.[134] Instead, Anadarko disclosed the favorable outcome of its Shen-3 well, characterizing it as a "very successful appraisal well,"[135] and in March 2015 generally noted that Shenandoah was "[a]dvancing [t]oward [d]evelopment."[136]

82.   More specifically, following Anadarko's Q4 2014 earnings release and operations report (which contained positive and incorrect statements regarding Shenandoah, particularly about finding 50% more resources rather than actually finding less, see for example paragraph 41, and its related footnotes),[137] BofA Merrill Lynch's Investment Researcher, Douglas Blyth Leggate, referenced Anadarko's report regarding Shenandoah, including Shen-3, and inquired about the Company's plans for project development.[138] In response,

---

[134] Q4 and Full Year 2014 Earnings Call, February 3, 2015, Anadarko Current Report on Form 8-K, February 2, 2015, Anadarko 2014 Form 10-K.

[135] 2015 Earnings Guidance Update Call, March 3, 2015, p. 12 ("Let's look at some more details of a couple of our focus areas, starting in the deepwater Gulf of Mexico. We're excited about the advancement at Shenandoah. We pushed down-dip on Shenandoah 3, searching for the oil-water contact, looking for reservoir continuity and quality and to get a core in the down-dip portions of the reservoir. This was a very successful appraisal well.").

[136] 2015 Anadarko Investor Conference Call Presentation, March 3, 2015, p. 47.

[137] Fourth-Quarter 2014 Operations Report dated February 2, 2015, APC-00002814-2830 at 2825 ("Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range."); Current Report on Form 8-K dated February 2, 2015 ("Appraisal activity offshore Côte d'Ivoire at the Paon discovery and in the Gulf of Mexico at the Shenandoah discovery continued to validate the company's geologic models around these apparent commercial discoveries.")

[138] Q4 and Full Year 2014 Earnings Call, February 3, 2015, p. 7.

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 45**

CONFIDENTIAL

on February 3, 2015, Mr. Daniels conveyed management's excitement at Shenandoah and the "very good" project results:

> **At Shenandoah, start there, we're so excited about what we're seeing there. We've got very good results for what we set out to do at the most recent appraisal well.** If you remember, that appraisal well was several miles away and about 1,500 feet down dip of the #2. I guess 2.3 miles to the east and 1,500 feet down dip. And we were looking to see if we could establish oil-water contacts at that location, so we knew we'd be very far down dip and close to that. We wanted to look at the lateral sand and the reservoir continuity. We wanted to look at the quality of the sands in that area because as we get down closer to the oil-water contact, we have to get an idea about the drive mechanism. And would we have an effective water drive and -- for a recovery. We had a model that we would see potential interval expansion as we moved off structure. And then we wanted to get pressure data to show pressure continuity into the other #2 well. **So overall, we're looking to understand the oil in place better and the potential recovery mechanisms.** And if you look at the results, we really did all of that. We have excellent lateral sand continuity. The packages are all present. They're very well correlatable, they've expanded. So that model of expansion did work out. **We ended up with about 1,470 feet of gross sand section versus 1,000 feet that we had in the #2 well. The oil-water contacts were not encountered in the well. But based on the pressure data, we were able to project those up. So we got a much better handle on the oil in place and that has expanded with more confidence on it.** So that was a very positive thing. Reservoir quality was good, so that gives us a lot of confidence on the potential for the water drive. So we've got a lot more confidence on our geologic model on the eastern side.[139]

83. Anadarko reiterated its Shen-3 well results in its 2014 Annual Report on Form 10-K.[140] Notably, these and other disclosures (*e.g.*, managements' disclosed assertion that the Shenandoah basin represented a $2-$4 billion net opportunity)[141] are in contrast to the "bad

---

[139] Q4 and Full Year 2014 Earnings Call, February 3, 2015, p. 8 (emphasis added).

[140] Anadarko 2014 Form 10-K, p. 9 ("The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.").

[141] 2014 Anadarko Investor Conference Presentation, March 4, 2014, p. 83.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 46**

CONFIDENTIAL

news," "unsuccessful," "wet well," and "dry hole" characterizations of Shen-3 noted above beginning at paragraph 41. Moreover, these disclosures were inconsistent with information reflecting that as a result of Shen-3, Anadarko's estimated gross oil reserves in the Shenandoah area actually decreased from a mean 1200 MMBOE after drilling Shen #2, to a mean of between 740 MMBOE (with fault) and 920 MMBOE (without fault) (a 23% to 38% decrease in estimated oil reserves).[142]

84.    In this regard, Patrick McGrievy, Anadarko's former Deepwater Gulf of Mexico General Manager, testified that based on the preliminary results from Shen-3, there were concerns regarding Shenandoah's size and commerciality.[143] Mr. McGrievy further testified that the findings from Shen-3 resulted in a significant downward revision to the resource size of Shenandoah.[144]

---

[142] Email from Jake Ramsey with Attached Resource Estimate dated November 22, 2014, APC-00617381; Shenandoah Resource Estimate APC-00617383. *See also* email from Pat McGrievy dated January 26, 2015, APC-00863988-3989.

[143] Deposition of Patrick McGrievy, 147:15-149:4 ("And Lea Frye's e-mail on October 1st, 2014, says, 'Dan from COP called me' -- is that ConocoPhillips? A. Yes, it is. Q. – 'and wanted to chat. Based on Shen 1 pressures and the new interpreted raft areas COP is concerned. He has run some volume sensitivities with new maps and OWC variance and is seeing in place volumes basically cut in half. They are very concerned about size and commerciality.' [As read] Does that refresh your recollection about what ConocoPhillips' concerns were around this time? A. Yes. Q. And so at this point, based on preliminary results from Shen 3, they were concerned about Shenandoah's size and commerciality? A. Yes. Q. And they were seeing the volumes being cut in half? A. Evidently so, as per Lea Frye, right. … Q. And do you have any reason to doubt that she conveyed to you the same concerns that Lea relayed in this e-mail? A. I don't have any reason to believe otherwise, no. Q. And that's -- that's generally your recollection, that ConocoPhillips was concerned at this point in time once preliminary results came from Shen 3? A. Yeah, I think so.").

[144] Deposition of Patrick McGrievy, 149:17-150:14 ("Q. And the well results from Shen 3 which found no hydrocarbons resulted in a significant downward revision to the resource size of Shenandoah 3? A. Yep. Yes, it would have. Q. So ConocoPhillips had to about cut in half internally -- internally. At the development team, was it also cut in half? A. Can you re- -- repeat the question again? I'm sorry. Q. So just reading this and referring to the volumes being cut in half -- A. Right. Q. -- that was ConocoPhillips' view. Was that also the view of the development team? A. I don't recall specifically on what volumes or how much we cut our volumes back by. It could have been. Q. But it was -- A. I just don't recall. Q. -- it was a significant revision? A. It was a large revision, yeah, downward.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 47**

**CONFIDENTIAL**

85.   Also, reflecting on the sensitivity and importance of avoiding making negative comments about the Shenandoah Basin, Anadarko's CEO, Robert Walker[145] and its CFO, Robert Gwin,[146] avoided, in earnings calls or other disclosures, that Shen-3:

    a.   Was a wet well.

    b.   Reduced the resource range (MMBOE).

    c.   Had technological challenges.

    d.   Execution risk.

    e.   A major fault.

86.   The Shen-3 results and the associated reduction in resource estimates was further significant considering that management's bonus were affected by performance goals that included consideration of MMBOE sales and related reserves (representing an aggregate performance goal weighting factor ranging from 45% - 50%).[147] Although the Shenandoah basin project, including Shen-3, was exploratory in nature and in fact, a dry hole, the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well to extract oil resources that could impact management performance goals and related compensation in the future.[148] In this

---

[145] Deposition of Robert Walker, *e.g.*, 172:13 – 175:18, and 193:6 – 193:25.

[146] Deposition of Robert Gwin, *e.g.*, 130:19-131:8, 137:16-139:3, 142:22-144:3, 188:17-25, 213:2-16, 228:21-239:71.

[147] *See, e.g.,* Proxy Statement on Form Schedule 14A, March 18, 2016, 42-45; Proxy Statement on Form Schedule 14A, March 23, 2015, 44-46.

[148] *See also* Deposition of Lea Frye, 20:25-21:15 ("So could you restate -- given what we've talked about, could you restate what the exploration bonus was based on in your experience? A It was based on meeting or exceeding meeting a particular value of MMBOE or millions of barrels of oil equivalent found in a particular year. Q And who set the target for the exploration unit in terms of the MMBOE that were to be found in a particular year? A I would not know who all was involved, but it would have been a higher level of management that set that. Q And who was management at that point in time for exploration? A There was Bob Daniels was senior VP, I believe, if the title is correct.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 48**

**CONFIDENTIAL**

regard, materiality evaluations under relevant accounting guidance requires a consideration of the "total mix" of information made available.

87.   In consideration of both the quantitative and qualitative factors described above, the Company's failure to properly recognize and disclose the aforementioned unsuccessful findings associated with the Shen-3 dry hole was material to each of the respective financial reporting periods beginning December 31, 2014 and ended September 30, 2016.

> **D.   GAAP REQUIRED ANADARKO TO IMPAIR AND EXPENSE, ASSETS CAPITALIZED IN CONNECTION WITH THE SHENANDOAH BASIN PROJECT WHEN SUBSTANTIAL DOUBT ABOUT THE PROJECT'S ECONOMIC VIABILITY EXISTED**

88.   In addition to having capitalized suspended drilling costs associated with Shen-3, Anadarko capitalized other exploration costs associated with the Shenandoah basin project during the Relevant Period. These amounts included non-producing leasehold ("NPLH") costs, the suspended well costs associated with other exploration-type wells (*i.e.*, Shen-1, Shen-2, Shen-4, Shen-5, etc.), and other related costs. These collective amounts ranged from approximately $769.9 million and $786.6 million between December 31, 2015 and December 31, 2016.[149]

89.   Relevant GAAP applicable to unproven properties and exploratory wells, including the Company's Shenandoah project, required that Anadarko periodically assess whether such properties (and related assets) were impaired during the Relevant Period.[150] As described below, GAAP required that Anadarko impair and expense, Shenandoah basin project assets when "substantial doubt" about the project's economic viability existed (*i.e.*, by December 31, 2015 as noted in Condition 3). This requirement is consistent with the understanding that unsuccessful exploration efforts be immediately recorded on the income statement as

---

[149] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

[150] ASC 932-360-35.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 49**

**CONFIDENTIAL**

an expense, as discussed in greater detail hereafter.[151] It is further consistent with the Company's actual write off of all related Shenandoah basin project costs (*i.e.*, approximately, $901.6 million) during the quarter ended March 31, 2017, when internal Anadarko documents reflect that the project was "economically challenged" and the "prevailing viewpoint is that there is little commercial or subsurface value to be gained through continued bi-annual appraisal drilling operations at Shenandoah, currently required for lease maintenance operations."[152]

1.   ***The Required Impairment of Shenandoah Completed Exploration Wells and Exploratory-Type Stratigraphic Well Costs***

90.   As of the respective financial reporting periods ended between December 31, 2015 and 2016, Anadarko had capitalized suspended exploratory wells and stratigraphic exploratory-type wells costs of between $252.6 million and $261.5 million as set forth below:

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Suspended Well Costs | $260.2 | $261.5 | $259.8 | $252.6 | $255.2 |

91.   ASC 932-360-35 required Anadarko to evaluate its progress in assessing reserves for those wells that had not been written off as dry holes (*e.g.*, Shen-1, Shen-2, etc.).[153] As set forth in the ASC guidance, to the extent that Anadarko failed (1) to make sufficient progress in assessing each specific well's reserves and the economic and operating viability of the project,[154] **or** (2) **when information obtained raised substantial doubt about the economic or operational viability of the Shenandoah project overall**, the Company was

---

[151] *See, e.g.,* Deloitte Oil and Gas, *Accounting, Financial Reporting, and Tax Update*, January 2016, p.2.

[152] Shenandoah Exploration and Development Teams Memo to Executive Committee Re: Recommendation to Proceed with Issuance of SOP at Shenandoah dated April 24, 2017, APC-01283759.

[153] ASC-932-360-35-13 and 18-20.

[154] FASB Staff Position, FAS 19-1 ("The FASB staff believes that exploratory well costs should continue to be capitalized provided the well has found a sufficient quantity of reserves to justify its completion as a producing well and the enterprise is making sufficient progress assessing the reserves and the economic and operating viability of the project."); ASC 932-360-35-19 ("All relevant facts and circumstances shall be evaluated when determining whether an entity is making sufficient progress on assessing the reserves and the economic and operating viability of the project.").

CONFIDENTIAL

required to expense capitalized costs associated with its respective wells, net of its salvage value, if any:

> If the sufficient progress criteria (see paragraphs 932-360-35-18 through 35-20) is not met, or **if an entity obtains information that raises substantial doubt about the economic or operational viability of the project, the exploratory well or exploratory-type stratigraphic well shall be assumed to be impaired and its costs, net of any salvage value, shall be charged to expense.**[155]

92.    Consistent with these requirements, the Company disclosed in its 2015 and 2016 financial statements, that if "… information becomes available that raises substantial doubt as to the economic or operational viability" of a project, including Shenandoah, "the associated costs will be expensed at that time."[156]

93.    Pursuant to the understanding that Plaintiffs will establish that by December 31, 2015 there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable (*i.e.*, Condition 3), Shenandoah-related assets were impaired under the relevant GAAP set forth above. In this regard and as explicitly stated within ASC 932-360-35-13, all suspended well costs associated with the Shenandoah Basin Project (*i.e.*, see paragraph 90 above) were required to be expensed, net of any salvage value, beginning as of December 31, 2015.

### 2. *The Required Impairment of Other Capitalized Costs Associated with The Shenandoah Basin Project*

94.    As of the respective financial reporting periods ended between December 31, 2015 and 2016, Anadarko had also capitalized the following other costs which the Company directly attributed to the exploratory Shenandoah basin project:

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Non-Producing Leasehold Asset | $462.7 | $462.7 | $458.4 | $458.4 | $458.4 |

---

[155] ASC 932-360-35-11 and 13 (emphasis added).

[156] Anadarko 2015 Form 10-K, p. 103; Anadarko 2016 Form 10-K, p. 105. *See also* Deposition of Catherine Green 42:17-21 ("Yes. If there's substantial doubt about the economic and commercial viability of the project, the well cost or the well costs, if there are multiple suspended wells, should be charged to expense.").

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 51**

CONFIDENTIAL

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Capitalized Interest | $46.9 | $54.0 | $61.7 | $68.0 | $69.0 |
| Asset Retirement Obligations | $0.0 | $0.0 | $0.0 | $0.0 | $4.0 |
| **Total** | **$509.6** | **$516.7** | **$520.1** | **$526.4** | **$531.4** |

95.    Anadarko was required to assess whether these unproved property-related[157] assets were also impaired.[158] Given that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, a probable economic benefit relating to Shenandoah did not exist to support the continued capitalization of related project exploration costs.

96.    Specifically, the term "substantial doubt" is described in GAAP to exist when a condition becomes "probable" or is "likely" to occur.[159] In the parlance of GAAP, Condition 3 reflects an understanding that the Shenandoah basin project was not likely to be economically viable and therefore, the economic viability of Shenandoah basin project was remote.[160]

97.    Given Condition 3, it is therefore unlikely that any additional exploratory efforts and costs undertaken by Anadarko would cause the Shenandoah basin project to become economically viable. Indeed, while Anadarko incurred additional exploratory costs

---

[157] Unproved properties are properties with no proved reserves. ASC Master Glossary.

[158] ASC-932-360-35-11.

[159] ASC Master Glossary (emphasis added) ("**Substantial doubt** about an entity's ability to continue as a going concern **exists when conditions and events, considered in the aggregate, indicate that it is probable** that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued (or within one year after the date that the financial statements are available to be issued when applicable). The term probable is used consistently with its use in Topic 450 on contingencies. … Probable [meaning] [t]he future event or events are likely to occur.").

[160] GAAP establishes three measures of probability under ASC Topic 450: (1) probable, (2) reasonably possible, and (3) remote. As defined above, probable is generally defined as "likely to occur." Reasonably possible reflects a likelihood that is "more than remote but is less than likely." Remote is generally defined to mean a "slight" likelihood of occurrence. ASC Master Glossary. Consistent with the characterization above, Anadarko disclosed that the Shenandoah wells were expensed during 2017 "as it was no longer reasonably possible that the wellbore could be used in the development of the project." Anadarko 2017 Form 10-K, p. 109.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 52**

CONFIDENTIAL

subsequent to December 31, 2015,[161] the related activities did not alter management's ultimate conclusion during the financial reporting period ended March 31, 2017, that its Shenandoah-related capitalized costs, including its NPLH assets, were fully impaired. Accordingly, pursuant to a determination that the Shenandoah basin project was not likely to be economically viable by December 31, 2015, GAAP required that Anadarko impair and expense other Shenandoah-related capitalized costs, including its NPLH assets.

98.    As discussed above, the Company's accounting treatment during Q1 2017 is consistent with this conclusion. Specifically, given the determination that the Shenandoah project was "economically challenged" and the "prevailing viewpoint [wa]s that there [wa]s little commercial or subsurface value to be gained through continued bi-annual appraisal drilling operations at Shenandoah, currently required for lease maintenance operations,"[162] Anadarko fully expensed all Shenandoah's related assets as impaired under GAAP.[163]

99.    Anadarko's external auditors similarly noted the following in connection with the Company's Q1 2017 write off of $902 million in Shenandoah-related suspended well costs, NPLH assets and capitalized interest:[164]

> [T]he entire [suspended well cost] balance of the Shenandoah prospect was written off to dry hole in Q1 2017 as **the play was determined to be uneconomical and the Company's partners elected to not continue with exploration and development**. …[165]
> \*              \*              \*
> **[T]he Company and its partners lacked the management commitment to continue the exploration in the overall Shenandoah**

---

[161] Evidence reflects that leases pertaining to the Shenandoah basin project would expire upon Anadarko's failure to undertake drilling activities within specified time parameters. *See, e.g.,* Deposition of Deposition of Lea Frye, 34:9-21 and 215:17-216:13; Deposition of Patrick McGrievy, 122:7-126:20; Email from Pat McGrievy dated 4/2/2014, APC-00004967 at 4967.

[162] Shenandoah Exploration and Development Teams Memo to Executive Committee Re: Recommendation to Proceed with Issuance of SOP at Shenandoah dated April 24, 2017, APC-01283759.

[163] *See, e.g.,* Anadarko Q1 2017 Form 10-Q, p. 13.

[164] GG.41 3-31-2017 DRY HOLE EXPENSE MEMO, KPMG_APC_eA_0008471; Q1.GG.33.A Q1 3-31-2017 NPLH IMPAIR MEMO, KPMG_APC_eA_0008461.

[165] GG.4.A.8.05 12-31-2017 SUSPENDED WELLS MEMO, KPMG_APC_eA_0009163 at 9185 (emphasis added). *See also* GG.41 3-31-2017 DRY HOLE EXPENSE MEMO, KPMG_APC_eA_0008471.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022          Page 53**

CONFIDENTIAL

> area. **Given these considerations, KPMG notes it is not unreasonable or inappropriate for the entire balance of the leases above to be expensed through NPLH impairment.**[166]

100. Indeed, Ms. Green testified that the Company's lack of commitment to continue exploring the Shenandoah area referenced by KPMG above directly resulted from the "substantial doubts" about the economic viability of Shenandoah:

> Q. And management was not committed because it had substantial doubts about the economic viability of Shenandoah; correct?
>
> THE WITNESS: At March 31st, 2017, yes.[167]

3. *Information Available is Consistent with The Understanding That There Was Substantial Doubt that the Shenandoah Basin Project (as a whole) Would Be Economically Viable*

101. While the opinions expressed in this report are based on the above noted conditions described above in paragraph 2, including Condition 3, I have reviewed the following information that is consistent with the conclusion that by December 31, 2015, there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable:

a. As early as October 2014, Anadarko's partner, ConocoPhillips communicated to Lea Frye, Anadarko's Senior Staff Reservoir Engineer for the Company's operations in the Eastern Gulf of Mexico, that Conoco had basically cut its estimated oil volumes in half following additional interpretations of the Shenandoah basin.[168] As a result, Conoco further noted that it was "very concerned" about the size and commerciality of the Shenandoah project.[169]

b. Darrell Hollek, Anadarko's Senior Vice President of Deepwater Operations in the Gulf of Mexico, testified that a general guideline and hurdle utilized for consideration of

---

[166] Q1.GG.33.A Q1 3-31-2017 NPLH IMPAIR MEMO, KPMG_APC_eA_0008461 at 8462 (emphasis added).

[167] Deposition of Catherine Green, 146:24-147:8.

[168] Exhibit 259, Email from Lea Frye dated October 2, 2014, APC-00013459 at 3459.

[169] Exhibit 259, Email from Lea Frye dated October 2, 2014, APC-00013459 at 3459.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 54**

CONFIDENTIAL

whether to transition an exploratory project like Shenandoah to commercial development was a PIR10 factor of .30.[170] The following evidence reflects a PIR 10 factor less than .30:

1. In March 2015, Ms. Frye, developed and circulated an economic analysis for the Shenandoah project reflecting PIR10 measures below .30 and in several instances, negative amounts.[171] Only assuming a 10% probability ("P10") and an $85 price per barrel of crude oil, did the PIR10 measure exceed .30.[172] Notably, during March 2015, the closing price of crude oil ranged from $43.46 to $51.53, well below the $85 price per barrel supporting a PIR10 above .30.[173] In that same chart, the PIR10 measure at $60 per barrel was .13 while a 50% PIR was -01.

2. In a January 2016 email, Pat McGrievy circulated recommended economics associated with the Shenandoah basin project.[174] As conveyed in both the email and the attached economic summary slides, Mr. McGrievy identified and recommended a "risked PIR of .22," well below the .30 threshold above at $60 per barrel:[175]

---

[170] Deposition of Darrell Hollek, 53:6-54:4 ("There's a reference here to what commercial development would require to generate to generate a 'PIR 10=0.30.' Do you see that? A. Yeah. Q. And was a PIR 10 of .30 generally a threshold for Anadarko to consider a prospect commercial? A. I don't remember exactly, that -- but that may have been a minimum threshold. Q. And would that have been set forth in any policies? A. I wouldn't say a policy; maybe a general guideline. Q. Do you recall what the document was called? A. No, I don't. Q. But in practice, you recall that .3 was generally considered the threshold? A. I believe that was sort of a hurdle rate. THE COURT REPORTER: A what rate; hurdle rate? THE WITNESS: Yes. Basically an economic threshold to be even considered.")

[171] Exhibit 300, Email from Lea Frye dated March 23, 2015, APC-00025532-5533.

[172] Exhibit 300, Email from Lea Frye dated March 23, 2015, APC-00025532-5533.

[173] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[174] Exhibit 269, Email from Pat McGrievy dated January 19, 2016, APC-00060382-0383.

[175] Exhibit 269, Email from Pat McGrievy dated January 19, 2016, APC-00060382-0383.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 55**

**CONFIDENTIAL**

| Case Description | | Invest $60/bbl | |
| --- | --- | --- | --- |
| | | Net AT NPV10 ($MM) | AT PIR10 |
| Zero Contingency | Risked Mean | 237 | 0.28 |
| | Unrisked Mean | 283 | 0.30 |
| Facility Only Contingency | Risked Mean | 182 | 0.19 |
| | Unrisked Mean | 221 | 0.21 |
| Recommended Contingency | Risked Mean | 174 | 0.18 |
| | Unrisked Mean | 212 | 0.20 |
| Recommended Contingency (20K Well Rates) | Risked Mean | 191 | 0.20 |
| | Unrisked Mean | 232 | 0.22 |
| Recommended Contingency (20K Well Rates Optimized) | Risked Mean | 208 | 0.22 |
| | Unrisked Mean | 250 | 0.24 |

3. Notably, while the above analysis assumed a $60 price per barrel (bbl) of crude oil, the actual price of crude oil at the end of 2015 averaged less than $40/bbl.[176] Indeed the average price of crude oil would not equal or exceed $60/bbl until late December 2017.[177]

c. By December 2016, prior to the Q1 2017 write-off of Shenandoah related assets, Anadarko's Controller, Chris Champion appeared to have communicated that such a write down of Shenandoah assets was "imminent."[178] Consistent with this amount, the Company's disclosed 12%-14% annual oil growth rate for the five future years ended 2020, assumed that no investment in Shenandoah would be made.[179]

---

[176] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[177] https://finance.yahoo.com/quote/CL%3DF/history?period1=1419984000&period2=1514678400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[178] Email from Pat McGrievy dated March 31, 2017, APC-00307805. *See also* Deposition of Patrick McGrievy, 271:13-272:2 (emphasis added) ("Q. Could you -- could you read the next sentence, please? A. 'I understand, talking with Luis, that Chris Champion did set the stage with some of the executive team in 2016' -- 'December, 2016 to let them know that a fairly substantial write-down at Shenandoah would be imminent in 2017.' **Q. So to the best of your understanding, the executive team was apprised as of the end of 2016, that there would be a write-off or a write-down at Shenandoah in 2017? A. That's what Chris Champion told me. Q. Do you have any reason to doubt that was true? A. No, I really don't**.").

[179] Anadarko Form 8-K, January 31, 2017; Email from Darrell Hollek dated December 15, 2016, APC-00290058.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 56**

CONFIDENTIAL

E.  **ANADARKO REPEATEDLY FAILED TO EXPENSE AND PROPERLY DISCLOSE SHENANDOAH-RELATED SUSPENDED WELL COSTS, LEASEHOLD COSTS AND OTHER CAPITALIZED COSTS DURING EACH OF THE RESPECTIVE ANNUAL AND QUARTERLY FINANCIAL REPORTING PERIODS ENDED BETWEEN DECEMBER 31, 2015 AND 2016 IN VIOLATION OF GAAP AND SEC ACCOUNTING-RELATED REPORTING RULES**

102.  Given that by December 31, 2015, there was substantial doubt that the Shenandoah project would be economically viable (*i.e.*, Condition 3), Anadarko's continued capitalization of Shenandoah-related assets beginning as of December 31, 2015 through the financial reporting period ended December 31, 2016, violated GAAP. Specifically, from the financial reporting periods between December 31, 2015 and December 31, 2016, Anadarko improperly reported between $769.8 million and $786.6 million of Shenandoah related assets within its balance sheet.[180] These assets included each of the above noted amounts:[181]

| $ in millions | 12/31/15 | 3/31/16 | 6/30/16 | 9/30/16 | 12/31/16 |
|---|---|---|---|---|---|
| Non-Producing Leasehold Asset | $462.7 | $462.7 | $458.4 | $458.4 | $458.4 |
| Suspended Well Costs | $260.2 | $261.5 | $259.8 | $252.6 | $255.2 |
| Capitalized Interest | $46.9 | $54.0 | $61.7 | $68.0 | $69.0 |
| Asset Retirement Obligations | $0.0 | $0.0 | $0.0 | $0.0 | $4.0 |
| **Total** | **$769.8** | **$778.2** | **$779.9** | **$779.0** | **$786.6** |

---

[180] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

[181] 2016.12.31 GG.4.A.8.10 SW AGIGING AND NET CHANGE, KPMG_APC_0008143; 2016.09.30 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007376; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.12.31 GG.4.B.1.10 NPLH ROLLFORWARD, KPMG_APC_eA_0007983; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2014.12.31 GG.4.B.1.10 Q4 NPLH ROLLFORWARD, KPMG_APC_eA_0002543; 2014.12.31 GG.4.A.8.10 SW AGING, KPMG_APC_eA_0002531.

CONFIDENTIAL

103. As discussed hereafter, Anadarko's related overstatement of Shenandoah's related assets beginning December 31, 2015 and corresponding disclosure omissions were material to the Company's respective financial statements filed on Forms 10-K and 10-Q.

1. ***Anadarko's Overstatement of Shenandoah's Suspended Well Costs and Non-Producing Leasehold Assets and Other Related Assets and Corresponding Disclosure Omissions Beginning December 31, 2015 Were Material***

104. The Company's related misstatement and disclosure omissions were material to each of Anadarko's respective financial reporting periods beginning December 31, 2015 and ended December 31, 2016. In this regard, Anadarko's recurring misstatement exceeded well-established SEC quantitative materiality example benchmarks (*i.e.*, 5% of an item).

105. For example, Anadarko's misstatement exceeded 5% of the following relevant disclosed amounts (*i.e.*, Revenue, Oil and condensate sales, Operating income (loss), and Income (loss) before taxes) using both the rollover approach (*e.g.*, FY 2015), and the iron curtain approach (*e.g.*, Q1 2016 through FY 2016):[182]

| Percentage Impact of Misstatements on Various Financial Metrics | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | FY 2016 |
| Total Revenue and Other | 9% | 46% | 41% | 41% | 33% | 10% |
| Oil and condensate sales | 14% | 92% | 69% | 63% | 54% | 17% |
| Operating Income (Loss) | 9% | 90% | 235% | 98% | 129% | 30% |
| Income (Loss) Before Taxes | 8% | 56% | 84% | 77% | 152% | 21% |

---

[182] **Note:** Pursuant to required use of the iron curtain and rollover methods, these calculations evaluate Anadarko's ongoing failure to expense Shenandoah-related suspended well costs and unproved property costs, including the unrelated misstatement across the various periods presented. Note that as Shen-3 well costs were not expensed until Q3 2016, the misstatement percentages included such costs during FY2015 through Q2 2016. These percentages were calculated using Offshore Exposure - Dec 2014_Final_Suspended & Drilling, APC-00156333; 2015.04.20 Q1.GG.10SW AGING AND NET CHANGES - 04.20, KPMG_APC_0021079; 2015.07.14 Q2.GG.10 SW AGING, KPMG_APC_0009967; 2015.10.14 Q3.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0003445; 2016.01.19 GG.4.A.8.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0006098; 2016.03.31 Q1.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007094; 2016.06.30 Q2.GG.10 SW AGING AND NET CHANGE, KPMG_APC_eA_0007189; September 30, 2016 Dry Hole Expense, KPMG_APC_eA_0008256 and reported financial statement amounts included in Anadarko's 2014 Form 10-K; Current Report on Form 8-K filed February 2, 2015, Q1 2015 Form 10-Q; Q2 2015 Form 10-Q; Q3 2015 Form 10-Q; 2015 Form 10-K; Current Report on Form 8-K filed February 1, 2016; Q1 2016 Form 10-Q; Q2 2016 Form 10-Q; Q3 2016 Form 10-Q.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 58**

CONFIDENTIAL

106. As noted above, while the assessment of quantitative factors is necessary and provides a preliminary basis for establishing the materiality of Anadarko's misstatements and disclosure omissions, the consideration of qualitative factors further supports my opinion that the Company's Shenandoah-related misstatements were material. Moreover, qualitative factors do not override the conclusion that Anadarko's misstatements were material quantitatively, and thus material for financial reporting purposes.[183]

107. For example, the misstatement concerned a portion of Anadarko's business (its oil exploration and development segments) that had a significant role in the Company's current and future operations or profitability. A discussed above beginning in paragraph 80, Anadarko repeatedly asserted the potential significance of the Shenandoah project on the Company's future operations and profitability. Prior to the to the end of Q1 2017, Anadarko continued to assert the success of certain wells and the implicit possibility of future economic benefit of its Shenandoah-related investments. The relevance of these statements to the Company's future operations and profitability further supports the materiality of Anadarko's misstatement and related disclosure omissions.

108. Specifically, in addition to the disclosures through December 31, 2014 described above and after December 31, 2015, in contrast to Condition 3, Anadarko continued to emphasize the significance of Shenandoah in the Company's earnings releases and other disclosures. For example:

    a. On February 2, 2016, Mr. Daniels asserted Anadarko's contentment with the results of Shenandoah-4 and the "high expectations" the Company had for Shenandoah-5:

    > **We're very pleased with it**. We also were able to get about 550 feet of core. That's important for planning what that development could look like. So that's going to be analyzed, turned over to the reservoir engineers as they put together a scenario for how we might develop that.

---

[183] I have considered relevant qualitative factors, including those specifically listed in ASC 250-10-S99 that are described as "considerations that may well render material a quantitatively small misstatement of a financial statement item" when making this determination.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**                    **Page 59**

CONFIDENTIAL

> At the same time, we're looking at **drilling Shenandoah 5.** … **We have high expectations for it,** but we need to drill the well and see. That's what appraisal is all about.
>
> Meanwhile, the guys are taking all the information that we obtained from this, rolling it into conceptual planning as to what resources we may be able to recover, how much it might cost, those types of things. As Al said, we're a long ways from sanction at this point. **If Shenandoah-5 is successful, we may move even farther to the east with a Shenandoah-6, but of course that will be all dependent on what happens at Shenandoah-5.**[184]

b.  Two weeks later, Mr. Daniels reiterated the Company's prior successful wells and the advancement being made on the Shenandoah project by Anadarko, asserting:

> On Shenandoah, I don't think that we have a price deck right now that says it would be economic at this because right now, you're still in cost deflation, whether it's on drilling rigs, whether it's on construction cost and your services. … We're planning on appraising it this year, the Shenandoah #5 well will be drilled and that will be off to the east, again, trying to prove lateral extent, that kind of thing. **We did appraise it last year. We had successful wells, 620 feet of pay in that. So we still are advancing the project, but we're a ways away from a sanction at Shenandoah.**[185]

c.  On May 11, 2016 Mr. Leyendecker EVP of Exploration affirmed that Anadarko was continuing to praise the Company's "**fantastic Shenandoah discovery.**"[186]

d.  On May 24, 2016 Shandell Szabo, Anadarko's former Onshore Exploration Manager and Director of Investor Relations, characterized Shenandoah as "the finest lower-tertiary discovery to date in the Gulf of Mexico" and commented on its potential:

> I think when you look at Shenandoah, **it goes without saying that it is the finest lower-tertiary discovery to date in the Gulf of Mexico**. And I say that because of a few reasons. When you're looking at these resource, potentially, you look at a couple of things: One, you look at thickness; two, you look at area; and then three, recovery factor.

---

[184] Q4 2015 Earnings Call, February 2, 2016, p. 9 (emphasis added).

[185] Anadarko Conference Presentation, February 24, 2016, p. 8 (emphasis added).

[186] Anadarko Conference Presentation, May 11, 2016, p. 7 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 60**

CONFIDENTIAL

And when you look at this log, and you can see that hundred foot scale bar on there. That's 1,000 feet of sand full of hydrocarbons. So that's one. It's extremely thick.

Two, when you look at the scale across those blacks, and you can see the northern part there, this spans 9 miles. Those are 3-mile blocks. So you're talking about something that has a lot of area, which is really the biggest driving factor when you talk about size.

And then the last thing is the recovery of this. And so this particular discovery has Miocene-like properties, which means that the reservoir quality is very good. You're looking at [indiscernible] up to 25% here. You're looking at permeabilities in the 100 millidarcy range. Some of the individual sand sees 300, 400 millidarcy perm.

And then the last thing you look at is the fluid properties. It's very light oil out here.

**So from the overall discovery, it's got everything that you're looking for**. We just -- as Bob mentioned, we just finished -- we're just about to finish up the #5 well, so we can't reveal exactly what's going on there. But what I would say is that it looks a whole heck of a lot like the log that you're looking at right here. And when you look at where that falls on that cross section, you can see the #5 well up there on that cross section. So you can see that lighter green color, we're going to be able to turn that dark green. So the lighter green on there is the probable and the darker green is the proven. **And so we're going to have the ability for that large area over there to go ahead and say, "Yes, that's proven." That's tremendous for us**.[187]

e.  On June 28, 2016, Anadarko's President Robert Gwin, affirmed the Company's excitement following Shenandoah-5, including Anadarko's resulting "enthusiasm" for Shenandoah as a "tremendous resource potential:"

[W]e're very excited to be working toward completing the Shenandoah #5 well. Some of you may have heard some comments we've made in the past there. I don't have the log here, the #2 appraisal well, which had over 1,000 feet of net pay that we announced I think it was now a couple of years ago. **But Shenandoah-5, at least in the uphole sections, we talked about the fact that it looked a lot like Shenandoah-2. A lot of enthusiasm around our activities here because of Shen-5**. The results of Shen-5 have put as in a position where we clearly expect to drill Shen-6 later this year and

---

[187] Anadarko Conference Presentation, May 24, 2016, p. 9 (emphasis added).

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 61**

CONFIDENTIAL

continue with an appraisal program there … **Something like a Shenandoah is obviously tremendous resource potential, but the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue**.[188]

f.  On September 14, 2016, Mr. Gwin reiterated his excitement and referred to Shenandoah as a "great opportunity" for the company:

> The real advantages is the infrastructure and capacity of that infrastructure. And so a lot of people focus on, well, when are we going to see greenfield development and at what price, et cetera, and **we still got a great opportunity at the Shenandoah we're excited about**. And so we ask ourselves those questions all the time, right? We're working at answering it. **But you don't need material commodity price improvement to make money in the Gulf of Mexico**. We're doing it at strip and we think we can continue to do it at strip for a long time to come.[189]

109.  The write-off of Anadarko's Shenandoah suspended costs described in paragraph 102 above would have also had a pervasive impact on other aspects of Anadarko's disclosures within its Annual and Quarterly Reports on Forms 10-K and 10-Q, during the periods between December 31, 2015 and December 31, 2016. These additional disclosures are seen in Anadarko's Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") as called for under Item 303 of Regulation S-K[190] in its Q1 2017

---

[188] Anadarko Conference Presentation, June 28, 2016, p. 9 (emphasis added).

[189] Anadarko Conference Presentation, September 14, 2016, p. 9 (emphasis added).

[190] Item 303 of Regulation S-K (Item 303) requires public companies to include a discussion of the results of operations, liquidity, and other information necessary to an understanding of the registrant's financial condition. This discussion is presented in a single section referred to as Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A). The MD&A section is expected to provide "material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant. SEC Release No. 33-6835. Amongst other disclosures, the SEC's Regulation S-K Item 303 required the following accounting-related MD&A disclosures for annual period: (1) Item 303(a): The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations…Where in the registrant's judgment a discussion of segment information and/or of other subdivisions (e.g., geographic areas) of the registrant's business would be appropriate to an understanding of such business, the discussion shall focus on each relevant, reportable segment and/or other subdivision of the business and on the registrant as a whole." and (2) Item 303(a)(3)(i): "Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent

---

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**            **Page 62**

CONFIDENTIAL

Quarterly Report on Form 10-Q and its 2017 Annual Report on Form 10-K. In those Forms filed with the SEC, Anadarko's management explained the significant increases in the Company's dry hole expense and impairment of unproved properties.[191] As a result of the misstatements at issue, similar Shenandoah-specific disclosures should have been presented in Anadarko's MD&A's included in the Company's respective Forms 10-K and 10-Q filed for those financial reporting periods between December 31, 2015 and December 31, 2016. However, as the suspended costs were not properly expensed as discussed above, these disclosures required under Item 303 of Regulation S-K were improperly omitted from the Company's respective annual and quarterly reports.

110. Given the quantitative significance of the misstatements described above, as further supported by the indicated significance of the Shenandoah basin project as made evident by the Company's aforementioned statements and disclosures, Anadarko's failure to impair and expense related project costs as of and between December 31, 2015 and December 31, 2016, was material.

Respectfully submitted November 9, 2022,

D. Paul Regan, CPA/CFF

---

to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations." Item 303(c) requires similar disclosures for interim (quarterly) periods. *See also* SEC Release No. 33-8350, SEC Financial Reporting Manual §9220.

[191] Anadarko 2017 Form 10-K, pp. 66-67; Anadarko Q1 2017 Form 10-Q, p. 37.

**Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022**          **Page 63**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

I have relied on all of the documents cited in my report, including the text and footnotes therein. In addition to these documents, I have also listed below other documents that I considered in preparing my report.

**Relativity Documents**
As part of my assignment, I was given access to electronic databases (i.e. Relativity Platform) containing relevant information including documents produced by defendants and third-parties.

**Bates Stamped Documents (beginning bates only):**
ANACOP00000354
ANACOP00025913
APC-00001289
APC-00001791
APC-00001795
APC-00001801
APC-00001803
APC-00001829
APC-00001863
APC-00001866
APC-00001867
APC-00001928
APC-00002563
APC-00002814
APC-00003195
APC-00004967
APC-00005093
APC-00005094
APC-00005095
APC-00009644
APC-00013459
APC-00025532
APC-00060382
APC-00147963
APC-00152617
APC-00156333
APC-00158152
APC-00290058
APC-00307805
APC-00572955
APC-00617381
APC-00617383
APC-00863988

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**    **Page 1 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

APC-01283759
APC-01396003
APC-01396065
APC-01699536
APC-01699656
APC-01720564
APC-01737346
APC-01751288
KPMG_APC_0008143
KPMG_APC_0009967
KPMG_APC_0021079
KPMG_APC_0027263
KPMG_APC_eA_0002511
KPMG_APC_eA_0002531
KPMG_APC_eA_0002543
KPMG_APC_eA_0003043
KPMG_APC_eA_0003262
KPMG_APC_eA_0003349
KPMG_APC_eA_0003445
KPMG_APC_eA_0003451
KPMG_APC_eA_0006079
KPMG_APC_eA_0006098
KPMG_APC_eA_0007094
KPMG_APC_eA_0007100
KPMG_APC_eA_0007189
KPMG_APC_eA_0007376
KPMG_APC_eA_0007469
KPMG_APC_eA_0007566
KPMG_APC_eA_0007983
KPMG_APC_eA_0008256
KPMG_APC_eA_0008355
KPMG_APC_eA_0008461
KPMG_APC_eA_0008471
KPMG_APC_eA_0009163

**SEC Filings**
Anadarko 2007-2017 Annual Reports on Form 10-K and Exhibits
Anadarko Current Report on Form 8-K dated January 31, 2017
Anadarko Current Report on Form 8-K dated February 1, 2016
Anadarko Current Report on Form 8-K, February 2, 2015
Anadarko Proxy Statement on Form Def 14A, March 18, 2016
Anadarko Proxy Statement on Form Def 14A, March 23, 2015

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**          **Page 2 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

Anadarko Q1 2012 - Q3 2017 Quarterly Reports on Form 10-Q and Exhibits
Cobalt 2014 Annual Report on Form 10-K
Conoco 2014 Annual Report on Form 10-K
Marathon 2014 Annual Report on Form 10-K

**Anadarko Transcripts & Presentations**
2014 Anadarko Investor Conference Presentation, March 4, 2014
2015 Anadarko Investor Conference Call Presentation, March 3, 2015
Anadarko Conference Presentation, February 24, 2016
Anadarko Conference Presentation, June 28, 2016
Anadarko Conference Presentation, May 11, 2016
Anadarko Conference Presentation, May 24, 2016
Anadarko Conference Presentation, September 14, 2016
Company Conference Presentation, May 20, 2014
Company Conference Presentation, May 22, 2013
Company Conference Presentation, November 13, 2014
Company Conference Presentation, November 22, 2013
Company Conference Presentation, September 12, 2013
Earnings Guidance Update Call, March 3, 2015
Q1 2013 Earnings Call, May 7, 2013
Q1 2014 Earnings Call, May 6, 2014
Q2 2013 Earnings Call, July 30, 2013
Q3 2014 Earnings Call, October 29, 2014
Q4 2013 Earnings Call, February 4, 2014
Q4 2015 Earnings Call, February 2, 2016
Q4 and Full Year 2014 Earnings Call, February 3, 2015
Shareholder/Analyst Call, February 20, 2013

**Accounting and Auditing Guidance, SEC Rules and Related**
17 CFR § 210.12b-2
17 CFR § 210.12b-20
17 CFR § 210.4-01
AICPA Audit and Accounting Guide, Entities with Oil and Gas Producing Activities – Clarified (Updated As of January 1, 2014)
AICPA Statement on Standards for Forensic Services
ASC Master Glossary
ASC Topic 105 - Generally Accepted Accounting Principles
ASC Topic 250 - Accounting Changes and Error Corrections
ASC Topic 360 - Property, Plant, and Equipment
ASC Topic 450 - Contingencies
ASC Topic 932 - Extracting Activities - Oil and Gas
Deloitte Oil and Gas, Accounting, Financial Reporting, and Tax Update, January 2016

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**          **Page 3 of 4**

**Exhibit A - Documents and Other Information Considered in Forming Opinions**
**Confidential**

FASB Accounting Concept Statement No. 6
FASB Accounting Standards Codification (ASC) Topic 105
FASB FAS No. 25, Suspension of Certain Accounting Requirements for Oil and Gas Producing
Companies - An Amendment of FASB Statement No. 19
FASB Staff Position, FAS 19-1: Accounting for Suspended Well Costs
FASB Statement of Financial Accounting Standards (FAS) No. 19, Financial Accounting and Reporting
by Oil and Gas Producing Companies
Federal Trade Commission, Informal Staff Advisory Opinion 02-4
PCAOB AS 1001, Responsibilities and Functions of the Independent Auditor
PCAOB AS 1015, Due Professional Care in the Performance of Work
PCAOB AU 110, Responsibilities and Functions of the Independent Auditor
PCAOB AU 411, The Meaning of Present Fairly in Conformity With Generally Accepted Accounting
SEC Regulation S-K, Item 303
SEC Financial Reporting Manual, updated as of August 25, 2015, Topic 9 - Management's Discussion
and Analysis of Financial Position and Results of Operations (MD&A), 9200 General requirements
SEC Release No. 33-8350
SEC Release No. 33-6835
SEC Securities Act Release No. 6349
SEC Staff Accounting Bulletin No. 108
SEC Staff Accounting Bulletin No. 99
Todd E. Hardiman, Associate Chief Accountant, SEC Division of Corporation Finance, "Remarks before
the 2007 AICPA National Conference on Current SEC and PCAOB Developments," December 11, 2007

**Deposition(s) and Exhibits**
Deposition of Catherine Green and Exhibits
Deposition of Darrell Hollek and Exhibits
Deposition of Ernest Leyendecker and Exhibits
Deposition of Lea Frye and Exhibits
Deposition of Patrick McGrievy and Exhibits
Deposition of Paul Chandler and Exhibits
Deposition of R.A. Walker and Exhibits
Deposition of Robert Gwin and Exhibits

**Miscellaneous Documents (Articles, other written works, etc.)**
Amended Complaint, No. 4:20-cv-00576 (S.D. Tx.).
Stipulation Concerning Expert Discovery, September 27, 2022
https://finance.yahoo.com/quote/CL%3DF
https://www.sec.gov/about/what-we-do#section1 (accessed November 7, 2022)

**Exhibit A to Expert Report of D. Paul Regan CPA/CFF dated November 9, 2022**        **Page 4 of 4**



**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

# D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Employment & Education

| | |
|---|---|
| 2012 – Present | **Hemming Morse, LLP**<br>**Certified Public Accountants, Forensic and Financial Consultants**<br>Chairperson, 2012-2016<br>Partner, since 2012 |
| 1975 – 2011 | **Hemming Morse, LLP**<br>**Certified Public Accountants, Forensic and Financial Consultants**<br>Chairman of the Board, 2001-2011<br>President, 2001-2009<br>Director-in-charge of the firm's Litigation and Forensic Consulting Practice, 1975-2006 |
| 2006 | **Stanford Law School**<br>Executive Education - Directors' College |
| 1979 | **Golden Gate University, San Francisco**<br>M.S. Accounting |
| 1973 – 1975 | **Regan & Skelton, CPAs**<br>Partner |
| 1970 – 2018 | Taught or attended at least 80 hours of qualified continuing education courses in each 2 year period in order to renew CPA license |
| 1968 – 1973 | **Peat, Marwick, Mitchell & Co., CPAs** |
| 1968 | **University of San Francisco**<br>B.S. Accounting (Accounting Specialist) |

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Professional & Service Affiliations

- **Certified Public Accountant,** State of California
  - Since 1970

- **American Institute of Certified Public Accountants**
  - Since 1970
  - Council Member, 2003-2011
  - Member, Forensic & Valuation Services Executive Committee, 2008-2011
  - Member, Litigation and Dispute Resolution Services Subcommittee, 1998-2001
  - Chair of National Economic Damages Committee, 1999-2001
  - National Computer Audit Subcommittee of the Auditing Standards Board, past member

- **California Society of Certified Public Accountants Distinguished Service Award,** 2009

- **Certified in Financial Forensics**
  - Since 2008

- **California CPA Education Foundation**
  - Board of Trustees, 1997-2003
  - President, 2001-2002
  - First Vice President, 2000-2001
  - Treasurer, 1999-2000

- **California Society of Certified Public Accountants, Board of Directors,** 2001-2006
  - Council, since 2001
  - Chair, 2004-2005
  - First Vice President, 2003-2004

- **California Society of Certified Public Accountants,** Litigation Consulting and Dispute Resolution Services Common Interest Member
  - Steering Committee, since 1990
  - Chair, 2002-2004
  - Vice President, 2000-2002

- **California Society of Certified Public Accountants,** State Economic Damages Section
  - Chair, 1996-1998
  - Member, since 1995

- **California Society of Certified Public Accountants, Quality Control Committee,** past member

- **California Society of Certified Public Accountants, Litigation Services Conference Chair,** 1990

- **California Society of Certified Public Accountants, Advanced Litigation Forum Planning Committee,** 1991-1993; 1995 and 1997
  - Chair, 1993 and 1997

- **California Society of Certified Public Accountants, Computer Show and Conference Chair,** 1985

- **California Society of Certified Public Accountants, Economic Damages Conference Planning Committee,** 2000

- **American Arbitration Association's National Panel of Arbitrators,** 1983-1996



# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Professional & Service Affiliations continued

■ **Western Association of Accounting Firms Audit and Accounting Committee**
  – Chairman, 1980-1982
  – Audit and Accounting Manuals, Editor, 1979-1982

■ **CPA Computer Report,** Editorial Board, 1984-1987

■ **Board of Trustees,** Golden Gate University, 2002-2013
  – Audit Committee member, since 2005
  – Audit Committee Chair, 2005-2008

■ **Board of Trustees,** Jesuit School of Theology at Berkeley, 2002-present
  – Audit Committee member and Chair, 2004-2011

■ **International Display Works, Inc.,**
  – Board of Directors, 2004-2006
  – Audit Committee member, 2005-2006

■ **Solar Power, Inc.,**
  – Board of Directors, 2006-2010
  – Audit Committee Chair, 2006-2010

■ **Catholic Charities CYO of the Archdiocese of San Francisco**
  – Board of Directors, 2009-present
  – Audit Committee Chair, since 2009

■ **Town of Hillsborough**
  – Council Member, 1998-2010
  – Mayor, 2002-2004
  – Vice Mayor, 2000-2002
  – Commissioner of Finance, 1998-2002; 2004-2010
  – Financial Advisory Committee, since 2011

■ **Hillsborough City School District**
  – Board of Trustees
  – Trustee, 1985-1995
  – President, 1986-87; 1993-94

■ **Hillsborough Recreation Commission,** 1989-1993; 1998-2010
  – President, 1990-1993

■ **Citizen of the Year,** 1995
  Town of Hillsborough, California



**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

# D. PAUL REGAN, CPA/CFF

HEMMING.COM

## Courses Written and Presented

### AICPA & California Society of CPAs

- "Candid Advice on Expert Witness Best Practices" California Society of CPAs, Fraud and Forensics Virtual Conference, 2022

- "Fraudulent Financial Reporting and Accountants' Malpractice" California Society of CPAs, 4N6: Forensics and Fraud Virtual Conference, 2021

- "Economic Damages: Common Frameworks By Industry & Claim Type" AICPA National Forensic Accounting Conference, Boston, MA, 2010

- "Fraud Prevention and Detection" California Society of CPAs, Business and Industry Conference, Los Angeles and San Francisco, CA, 2004

- "Trigon Insurance Co. v. United States" California Society of CPAs, Economic Damages Litigation Section, San Francisco, CA, 2003

- "Issues Re: Revenue Recognition" California Society of CPAs, Litigation Sections Steering Committee, Burlingame, CA, 2003

- "Trashing Drafts - A Standard Practice or a Dangerous Proposition?" California Society of CPAs, Advanced Business Litigation Institute, Palm Springs, CA, 2003

- "Aggressive Accounting & The Games People Play" AICPA Webcast, co-author, NJ, 2003

- "Mistakes Made in the Work Product" California Society of CPAs, Litigation Services Conference, Irvine, CA, 2002

- "Complex Litigation/Accounting Malpractice" AICPA National Fraud Conference, Las Vegas, NV, 2002

- "Ethics, Taxes and Financial Reporting" California Society of CPAs, San Francisco, CA, 2002

- "Expert Disqualifications" California Society of CPAs, Advanced Economic Damages and Business Valuation Conference, Palm Springs, CA, 2001

- "Financial Statement Fraud" California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 2000

- "Quantifying Losses" AICPA National Fraud Conference, Las Vegas, NV, 2000

- "Electronic Work Product-Discovery Issues" California Society of CPAs, Economic Damages Conference for Business Trial Lawyers & Experts, Los Angeles, CA, 1999

- "The CPA's Role in Construction Damages" AICPA National Advanced Litigation Conference, Atlanta, GA, 1999

- "Significant Frauds of our Time" AICPA National Fraud Conference, Las Vegas, NV, 1998



**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

# D. PAUL REGAN, CPA/CFF

## Courses Written and Presented continued

### AICPA & California Society of CPAs continued

- "Daubert and the CPA Expert" California Society of CPAs, Advanced Economic Damage Conference, San Francisco, CA, 1998

- "The Accountant in Fraud Investigations" California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 1997

- "Rule 26 Reports,""The Auditor and Fraud," and "Challenging Questions" California Society of CPAs, Advanced Litigation Forum, Palm Springs, CA, 1996

- "Distinguishing Between Litigation and Attest Engagements" California Society of CPAs, Advanced Litigation Forum, San Diego, CA, 1995

- "Miniscribe Trial Binder" California Society of CPAs, Advanced Litigation Forum, Monterey, CA, 1993; Litigation Consulting Services Committee, Puerto Vallarta, MX, 1993; Litigation Consulting Services Committee, San Francisco, CA, 1994

- "Lost Profits" California Society of CPAs, Litigation Services Conference, San Francisco and Los Angeles, CA, 1991

- "Opportunities Update: "A Discussion of Disruption Claims" California Society of CPAs, Litigation Consulting Conference, Los Angeles, CA, 1990

- "Construction Damages" AICPA, Second Annual Conference on CPA's Role in Litigation Services, Dallas, TX and Washington, DC, 1990

### Selected Others

- "Fraudulent Financial Reporting and Accountant's Malpractice" San Francisco State University, 2019

- "The Fraud Triangle - Where Were the Gatekeepers" United States District Court, Northern District Historical Society, San Francisco, CA, 2012

- "Introduction of Financial Forensic Accounting" Golden Gate University, Adjunct Professor, 2009-present

- "Reporting in Litigation Engagements" "Wage & Hour Litigation" Golden Gate University, 2009

- "Intellectual Property Damages" Federal Bureau of Investigation, Quantico, VA, 2001

- "Alternative Dispute Resolution Techniques and Strategies for the Small and Emerging Contractor" American Bar Association, Fourth Annual Construction Institute, 1995

- "Fundamentals of Forensic Accounting" Georgetown University, Washington, DC, 1994

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Courses Written and Presented continued

#### Selected Others continued

- "Proving and Pricing Delay and Disruption Claims" Andrews Conference - Fourth Annual Construction Litigation Superconference, San Francisco, CA, 1989

- "The Auditor in Court" State of California, Government Auditors, 1989

- "Pricing Construction Claims" Thelen, Marrin, Johnson & Bridges, 1988

- "Dollars and Sense: Building Your Damages Case & Surviving a Daubert Challenge" San Francisco Trial Lawyers Association, Litigation Practice, San Francisco, CA, 2007

- "Winning Strategies for the Financial Side of Your Damages Case" Construction Infrastructure Summit, Phoenix, AZ, 2007

### Publications

- "Our Roots Run Deep" California CPA Magazine, August 2004

- "Expert Witnesses: Do They Have to Keep Draft Reports?" California CPA Magazine, May 2004

- "Revenue Recognition: Now, Later or Never?" California CPA Magazine, September 2003

- AICPA Litigation Services and Applicable Professional Standards Consulting Services Special Report 03-1 (Contributing author)

- Litigation Services Handbook, "The Role of the Accountant as Expert Witness," published by John Wiley & Sons, Chapter 16, "Litigation Consulting: Construction Claims"

- Litigation Support Report Writing, published by John Wiley & Sons, Chapter 15, "Construction Claims"

- Member of the Editorial Board and author of various articles for the California Society of CPAs' Litigation and Dispute Resolution Services Section's quarterly publication (since summer 1996)

- Outlook Magazine, Winter 1985 - Computer Show and Conference Survey

- "California CPA Computer Show and Conference," CPA Computer Report, September 1985

- "Direct and Cross Examination of Experts," co-author of case study presented by University of California Hastings Litigation Advocacy Program



# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Testimony (Presented in the Last Four Years)

#### Trial

- **Doug Ridley and Sherry Shen v. Rancho Palma Grande HOA (2022),** Superior Court of California, Santa Clara County, Case No. 19CV349909

- **Port of Ridgefield vs. Union Pacific Railroad Company (2018)** U.S. District Court Western District of Washington at Tacoma, Case No. 3:14-CV-06024-RBL

#### Deposition

- **Lehigh Southwest Cement Company v. James Hardie Building Products (2019) (2022),** Superior Court of California, Shasta County, Case No. 191110

- **Doug Ridley and Sherry Shen v. Rancho Palma Grande HOA (2022),** Superior Court of California, Santa Clara County, Case No. 19CV349909

- **Snow Covered Capital, LLC v. William Weidner et al. (2021)** United States District Court, District of Nevada Case No.: 2:19-cv-00595—JAD-NJK

- **Strathclyde Pension Fund, v. Bank OZK and George Gleason (2021),** United States District Court, Eastern District of Arkansas, Central Division Case No. 4:18-cv-00793-DPM

- **In re: Teva Securities Litigation (2021)** U.S. District Court, District of Connecticut Case No. 3:17-cv-00558 SRU

- **Strathclyde Pension Fund, et al. v Bank OZK, et al. (2021)** U.S. District Court, Eastern District of Arkansas Case No. 4:18-cv-00793-DPM

- **In re: Novo Nordisk Securities Litigation (2021)** U.S. District Court, District of New Jersey Case No. 3:17-CV-209-BRM-LHG

- **246 Atherton Avenue LLC v. Trais Fluors LLC (2019)** Superior Court of California, San Mateo County Case No. 16-CIV-02957

- **The Regents of the University of California v. Paul S. Aisen, et al. (2019)** Superior Court of California, San Diego County, Case No. 37-2015-00022082-CU-BT-CTL

- **Mark Smilovits, et al. v First Solar, Inc., et al. (2019)** U.S. District Court District of Arizona Case No. 2:12-cv-00555-DGC

- **Robert Pestoni v. Linda Sereni (2018)** JAMS, Ref No. 1100090112



**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000

## D. PAUL REGAN, CPA/CFF

HEMMING.COM

### Deposition continued

- **Port of Ridgefield vs. Union Pacific Railroad Company (2018)** U.S. District Court Western District of Washington at Tacoma, Case No. 3:14-CV-06024-RBL

- **Layton Construction Co., Inc. v. Mint Development, L.P. et al. (2018)** Superior Court of California County of San Francisco, Case No. CGC-15-549603

### Arbitration

- **Robert Pestoni v. Linda Sereni (2018)**
  JAMS, Ref No. 1100090112

# Exhibit 18

CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | § § § § § | Civil Action No. 4:20-cv-00576 |
| | | <u>CLASS ACTION</u> |
| | | The Honorable Charles R. Eskridge III |

**EXPERT REPORT OF ROBERT MERRILL, Ph.D.**
**NOVEMBER 9, 2022**

CONFIDENTIAL

## I.    NATURE OF THE ENGAGEMENT

1.    I have been engaged by Robbins Geller Rudman & Dowd LLP ("Class Counsel"), through Ammonite Resources Company, to provide expert opinions regarding geoscientific considerations relating to Anadarko Petroleum Corporation's ("Anadarko" or "Company") Shenandoah ("Shen") exploration project during the Class Period of February 20, 2015, through May 2, 2017, inclusive.  My report is submitted solely for use in this case.

2.    It is my understanding that Plaintiffs in this case allege that, leading up to and during the Class Period, Defendant Anadarko and its former executives R.A. Walker ("Walker"), Robert G. Gwin ("Gwin"), Robert P. Daniels ("Daniels"), and Ernest A. Leyendecker, III ("Leyendecker") (collectively, "Defendants") misled the investing public about the commercial viability and producible resource size of the Shen oil prospect in the deepwater Gulf of Mexico ("GOM").

3.    I have been asked by Class Counsel to analyze the scientific and technical data in the record about Shen in order to assist the fact finder in understanding the evidence and opine about the adverse information known to Defendants, leading up to and during the Class Period, about Shen's commercial viability and producible resource size.

4.    I have extensive experience as a geologist and geotechnical expert in oil and gas exploration and production, including experience in the deepwater GOM at both the technical and managerial levels, as detailed below and in Appendix I.  During the Class Period, it was industry practice to use an interdisciplinary team of geologists, geophysicists, and petroleum engineers for oil and gas exploration and appraisal.  Anadarko followed this practice with respect to the Shen discovery.  To simulate industry practice and Anadarko's specific practice, Class Counsel retained both myself and Lyndon Pittinger, a petroleum engineer, to opine on different aspects of Shen's appraisal and assessment.  Mr. Pittinger and I examined much of the same factual information, as happens in the real world, because such an appraisal requires a collaboration of an interdisciplinary

- 1 -

CONFIDENTIAL

team.  I have reviewed Mr. Pittinger's work, and our reports contain many cross-references. However, the opinions expressed herein concerning the geoscience of Shen are my own.

5.      I have prepared this report to state my opinions, describe the bases for those opinions, disclose the facts and data considered in reaching my opinions, and make other appropriate disclosures.  My analyses, opinions, and conclusions are based on my work through the date of this report and informed by my education, knowledge, and 48-years of experience in the oil and gas industry.[1]  A listing of materials I considered as of the date of this report is contained in Appendix II, as well as the citations presented in this report.  This information is of the type that would ordinarily be relied on by a geologist and geotechnical expert.  I reserve the right to prepare illustrative exhibits based on the contents of this report if I am called to testify at trial.

6.      I am being compensated for my services at my usual hourly rate of $450/hour.  This compensation is entirely independent of the outcome of the litigation and is not contingent upon my opinions and conclusions in the case.

7.      This report is subject to change or modification should additional relevant information become available.  I may review, evaluate, and analyze additional data, facts, or information as they become available.  I may also seek to respond to opinions or analyses proffered by other experts in this case.  I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me; on the instruction of counsel; or as a result of any motion or court order that may alter the nature or scope of the claims and issues in the case or at trial.  Therefore, the analyses and opinions described herein may be subject to change based upon additional information that becomes available or other developments that occur.

---

[1]   In addition to documents referenced in this report and attached appendices, I relied on my education, background, skills, and experience, including a body of knowledge derived from numerous other sources not specifically identified herein.

CONFIDENTIAL

## II.    QUALIFICATIONS

8.    I have 48 years of oil and gas industry experience in domestic and international exploration and staff positions for various companies, including American Stratigraphic Company, Cities Service Company, Occidental, Unocal, and Samson.  I have been involved in the exploration of a variety of onshore and offshore basins worldwide, including extensional basins, fold and thrust belts, and foreland basins, both from a regional context and individual prospect generation.  I have experience in exploration and acquisition in GOM and other areas in North America; and internationally, including Australia, Argentina, Brazil, and Colombia in South America; Thailand, Malaysia, and Indonesia in Southeast Asia; Russia, Kazakhstan, and Azerbaijan in Central Asia; the North Sea; and Central Europe.

9.    I have experience generating and evaluating oil and gas prospects in both conventional and unconventional clastic reservoirs, including fractured reservoirs, tight gas sands, and carbonates.  In addition, I have utilized probabilistic methods for prospect evaluation and reserves estimation and used this information for comprehensive portfolio management.  As the Chief Geologist for Spirit Energy, a division of Unocal Corporation, I focused on opportunities in GOM from 1989 to 2000.  As the Chief Geologist, I managed geological quality assurance on all exploration and development projects in the $600 million capital program, mentored geology professionals, ensured training needs were identified and met, and oversaw geotechnical specialties. Oversight included understanding the geological risk, uncertainty, and resource estimates of prospects in the evolving deepwater GOM play.  With similar responsibilities at Samson Companies as Technical Manager of Geology, between 2000 and 2005, I managed geological quality assurance for both the onshore U.S. and the offshore GOM.

10.    In 2005, I formed Catheart Energy Inc., an independent exploration and consulting company, to pursue conventional and unconventional oil and gas opportunities.  I also maintain a

CONFIDENTIAL

consulting practice focused on evaluating exploration portfolios.  As a consultant for private equity investors, I have evaluated exploration portfolios, the resource estimates, and the risk and uncertainty associated with those portfolios.  The evaluations included several deepwater GOM prospects and portfolios.

11.     I have a Ph.D. in Geology from Arizona State University; received an M.S. in Geology from Arizona State University; and a B.A. in Geology from Colby College, Waterville, Maine.  I am a Fellow of the Geological Society of America, and a Fellow of the Geological Society of London.  In addition, I have served on committees for the American Geological Institute and the board of the Houston Geological Society.  I have served as the President and Secretary of the American Institute of Professional Geologists.

12.     I am the past editor of the American Association of Petroleum Geologists Bulletin (2019-2022); editor of the Gulf Coast Association of Geological Societies Journal, and serve on the Society of Exploration Geophysicists Geoscientists without Borders Technical Committee.  I am co-editor of the Giant Fields of the Decade (2000-2010); Giant Fields of the Decade (1990-2000); and the Giant Fields of the Decade (2010-2020), and I edited Source and Migration Processes and Techniques for Evaluation.  I have written numerous publications and internal company reports on regional tectonics, petroleum potential, oil and gas geochemistry, and analysis of petroleum reserves.  Additionally, I have presented numerous papers on exploration potential, exploration and development of fractured reservoirs, and exploration risk and reserves analysis.

13.     A copy of my curriculum vitae and a list of publications authored in the past ten years are attached as Appendix I.

- 4 -

CONFIDENTIAL

### III.    MATERIALS CONSIDERED

14.    To undertake my work in this case, Class Counsel provided me online access to the extensive database of documents produced by Anadarko and third parties in this case.[2] My database search included relevant geological, geophysical, engineering, and risk assessment information. My investigation included an examination of email correspondence among Anadarko personnel and Shen partners. I also searched online for published technical documentation regarding analog fields in deepwater GOM.

15.    A listing of materials I considered as of the date of this report is contained in Appendix II, as well as the citations presented in this report. I reserve the right to prepare illustrative exhibits based on the contents of this report if I am called to testify at trial.

### IV.    SUMMARY OF OPINIONS

16.    This report is based on the evidence I have reviewed to date. I understand that additional information may become available, including but not limited to relevant opinions and analyses by the parties' experts. As a result, I reserve the right to modify my opinions based on such additional information.

17.    Based on my review of the information currently available to me, as well as my education, background, skills, and 48 years of experience in the oil and gas industry, I have formed the opinions below.

18.    Leading up to and during the Class Period,

   (a)    Shen's resource size shrank substantially with each well post-Shen-2 and fell below the range of expectations for the prospect post-Shen-2;

   (b)    Anadarko's resource range for Shen did not adequately reflect its structural uncertainties and sand thickness variability in the Wilcox turbidite fans;

---

[2]    Many of the documents produced by Anadarko and other entities in this litigation are subject to the Protective Order for which I have executed Exhibit A.

CONFIDENTIAL

(c)     Compartmentalization and faulting posed a serious risk to Shen's producible resource size and commercial viability;

(d)     Pressure data could not be used to reliably project OWCs across the Shen field following the results of Shen-3;

(e)     Tar posed a serious risk to the commercial viability of Shen;

(f)     Anadarko designated unsuccessful Shen wells as successful ones;

(g)     Anadarko's Shen resource estimates, field structure and mapping, and reservoir characteristics were overly optimistic based on the internal data.

19.     I elaborate on the above opinions in the rest of the report. As stated above, I reserve the right to modify or supplement these opinions.

## V.     INTRODUCTION TO SHEN

20.     Oil and gas exploration companies, like Anadarko, are in the business of locating hydrocarbons to extract profitably from the earth for sale on the energy market. Geoscientists at oil and gas companies use multiple geological and geophysical data types to search for potential locations to drill an exploratory well. If an exploratory well finds hydrocarbons, more wells may be drilled to evaluate the commercial viability of the discovery. Geologists, geophysicists, and reservoir engineers work together to assess a prospect's producible resource size and commerciality. Appraising an oil prospect is a highly technical enterprise. Accordingly, I have included a Glossary of Oilfield Terms.

21.     Leading up to the Class Period, Anadarko created the public perception that Shen was one of the largest commercial oil-field discoveries in deepwater GOM. Following the drilling of the first appraisal well, Shen-2, in March 2013, Anadarko indicated the Shen basin was a $2-$4 billion opportunity. This announcement set the public's perception, including myself, that this was a new "giant" field. It was considered so significant that Defendant Ernie Leyendecker was invited to speak at the American Association of Petroleum Geologists Discovery Thinking Forum on the Shen

CONFIDENTIAL

discovery at the 2014 AAPG annual convention, where he talked about the very large resource that Anadarko had at Shen (Appendix IV).

22.     Throughout the Class Period, Anadarko continued to reinforce the public perception that Shen was a "giant" oil field, describing each new well as successful, even if no hydrocarbons were found, and telling the market that Shen was right within the range of expectations, even as its "resource" size shrank with each well and commerciality was in doubt due to compartmentalization from faulting, tar, and other factors.  The evidence demonstrates that throughout the Class Period, Anadarko personnel warned management about the complexity of the Shen geological structure and how that impacted resource estimates as the appraisal drilling progressed.  By the end of the Class Period, the resource potential was known to be a fraction of what the public had been led to believe. Anadarko wrote off Shen in May 2017 after presenting it to the public as one of the most significant discoveries in GOM and relinquished its interest in the field in 2018.

23.     I use the term "resource" to describe Shen in this case rather than "reserves" because the Shen wells with oil and natural gas indications were not flow tested and could not be classified as "proven" oil and gas reserves during the Class Period.  Estimates of producible resource size involve estimating parameters to calculate the volume of hydrocarbons, including accumulation area, net pay, porosity, hydrocarbon saturation, and hydrocarbon recovery factor.  Seismic mapping determines the accumulation area.  Net pay, porosity, hydrocarbon saturation, and recovery factor are estimated from wells drilled into the target formation, here, that's called the "Wilcox Formation" at Shen.  The Wilcox Formation is divided into the Upper Wilcox and Lower Wilcox. Additionally, Anadarko divided the Upper Wilcox into Zones "1," "2," and "3," and the Lower Wilcox into zones "A," "B," "C," "D," and "E."

CONFIDENTIAL

24.    The Shen wells drilled by Anadarko were in water depths of about 5,700 feet to subsurface depths exceeding 30,000 feet.  High temperatures and high pressures make drilling in this environment difficult, and drilling costs are high.  The Shen-1 discovery well (WR52 #1) drilled in 2009 encountered 236 ft of oil pay, and the Upper Wilcox was faulted out.  Shen-2 (WR #2), announced in January 2013, encountered 1,002 feet of oil pay in what Anadarko identified as eight zones.  The Yucatan #1 well was drilled in the second quarter of 2013 in the Shen basin and encountered 120 feet of oil pay.  The data from Yucatan #1 negatively impacted the resource estimates for Shen.  Shen-3 (WR52 #2) was completed in November 2014 and encountered no oil and gas in the Wilcox sandstones.  A Shen-3 bypass core was taken in December 2014 in the Wilcox sandstone to characterize the Wilcox.  Deformation bands were identified in the core. Shen-4 (WR51 #3) penetrated the salt in the third quarter of 2015, encountering no reservoir.   Shen-4 was sidetracked twice.  The first sidetrack encountered 626 feet of net oil pay, and the Upper Wilcox was faulted out.  Four faults were identified in the Lower Wilcox C zone.  In the second sidetrack a bypass core was acquired with 473 feet of net oil pay in the well bore.  Faults were identified in the Lower Wilcox A zone.  Final operations were completed in January 2016.  Shen-5 (WR 51 #4) was completed in August 2016 and encountered 1,043 feet of net oil pay and encountered a 22 feet tar zone in the Lower Wilcox C zone.  Shen-6 (WR52 #3), including a bypass core, was completed in February 2017 and found no hydrocarbons.  Anadarko abandoned the Shen project in 2017 as non-commercial after presenting its discovery as one of the most significant discoveries in the Gulf of Mexico.  The company relinquished its interest in the field in 2018.  Table 1 shows the Shen well operations and their timeline.

CONFIDENTIAL

| | Well name | Well Number | Status | Spud Date | Completion Date | Comments |
|---|---|---|---|---|---|---|
| Shen-1 | Shenandoah #1 | WR52 #1, BP #1 | 236' net pay | 2008 | 2009 | Upper Wilcox faulted out; 4 faults in LWC |
| Shen-2 | Shenandoah #2 | WR51 #2 | 1002' net pay | 9/17/2012 | 3/13/2013 | Upper Wilcox present; Fault/fractures at top of Wilcox |
| Shen-3 | Shenandoah #3 | WR52 #2 | Dry | 5/29/2014 | 12/7/2014 | |
| | | Bypass Core | | | | Deformation bands |
| Shen-4 | Shenandoah #4 | WR51 #3 | Dry | 5/26/2015 | 9/8/2015 | Wilcox absent; penetrated salt |
| | | WR52 #3 ST-1 | 626' net pay | 9/8/2015 | 10/26/2015 | Upper Wilcox faulted out; 4 faults in LWC |
| | | Bypass Core | 473' net pay | 10/26/2015 | 12/21/2015 | Faults in LWA |
| Shen-5 | Shenandoah #5 | WR51 #4 | 1043' net pay | 3/14/2016 | 8/14/2016 | 22' Tar in LWC |
| Shen-6 | Shenandoah #6 | WR52 #3 | Dry | 12/16/2016 | 2/7/2017 | |
| | | WR52 #3 ST-1 | Dry | 2/19/2017 | 2/26/2017 | Tar in UW3 |
| | | Bypass Core | | 3/8/2017 | 3/20/2017 | |

**Table 1.** *Shen Wells (2008-2016)[3]*

25.    Figure 1 below is a 2017 seismic depth structure map that shows the locations for the Shen wells plotted on a Lower Wilcox E-zone structure map. In other words, the map shows the shape of the Lower Wilcox E-zone beneath the earth's surface using contour lines of equal elevation. The Lower Wilcox E-zone is one of several Wilcox zones identified by Anadarko geoscientists, and equivalent zones, under different names, were identified by Anadarko's partners in the Shen project.

---

[3]    In oil and gas field parlance, "dry" refers to a well that encountered no hydrocarbons, only water. Another term is "wet" well.

CONFIDENTIAL



**Figure 1**. *Depth structure map of Shen Lower Wilcox E-zone. (APC-01286239, slide 19)*

26.    Figure 2 below illustrates how Anadarko's resource estimates changed overtime, with a mean gross resource potential of 110 MMBOE before the discovery well was drilled to a high of 1200 MMBOE following Shen-2 in 2013, then revised downward after each subsequent well. After Shen6, the mean was reduced to 207 MMBOE.[4]

---

[4]    APC-00090253, slide 5 (March 1, 2017).

CONFIDENTIAL



**Figure 2**. *Shen resource estimates from 2008 to January 2016.  (APC-01373814, slide 98)*

27.    During the relevant time period, Anadarko operated Shen with partners ConocoPhillips, Cobalt, Marathon, and Venari.  Initially, Anadarko's exploration group mapped Shen as an unfaulted, homoclinal, southward-dipping structure on the north side of the basin. Anadarko clung to this overly simplistic structural picture, despite ample evidence of faulting and compartmentalization, leading to exaggerated statements about Shen's likelihood of successful development, resource size, and value.

28.    Many different individuals were involved in the management and technical evaluation of Shen at Anadarko, including a joint team of geoscientists and engineers in the exploration and development departments.  A list of key people and their respective titles at Anadarko during the Class Period is found in Table 2 below.

| Table 2. Persons Involved in Anadarko Management and Technical Evaluation of Shen | |
|---|---|
| Walker, Al | Chief Executive Officer |
| Gwin, Bob | Executive Vice President of Finance and CFO |
| Kleckner, Jim | Executive Vice President, Deepwater and International Development |
| Hollek, Darrell | Senior Vice President, Deepwater and International Development |

- 11 -

CONFIDENTIAL

| *Table 2*. *Persons Involved in Anadarko Management and Technical Evaluation of Shen* | |
|---|---|
| Holly, Brad | Senior Vice President, Operations – Rockies |
| Daniels, Bob | Executive Vice President, Exploration |
| Leyendecker, Ernie | Vice President, Gulf of Mexico Exploration |
| David Blakeley | Manager, Gulf of Mexico Exploration Engineering |
| Trautman, Tim | Geological and Geophysical Manager, Exploration |
| Ramsey, Jake | Geologist, Exploration |
| Johnson, Breck | Geologist, Exploration |
| Kendall, Beth | Geophysicist, Exploration |
| Szabo, Shandell | Director of Investor Relations |
| Strickland, Robert | Reservoir Engineer supporting Exploration |
| Camden, Chris | Reservoir Engineer supporting Exploration |
| McGrievy, Pat | General Manager, Development |
| Browning, Brad | Development |
| Frye, Lea | Reservoir Engineer, Development |
| Arnold Rodriquez | Geophysicist, Development |
| Oudin, Chip | Geophysicist, Development |
| Noll, Christian | Geologist, Development |
| Chandler, Paul | Geologist, Development |
| Shotts, Doug | Risk Consistency Team (RCT ) |

## VI.    RELEVANT GEOLOGICAL BACKGROUND

29.    The Wilcox Formation, which constitutes the reservoir sands at Shen, was deposited at the base of the continental slope by turbidite flows.  Turbidite sediment flows follow channels between structures created by salt movement.  A turbidite deposit consists of a thick channel deposit, and sediment thins laterally from this channel, causing the sand to pinch out laterally.  Turbidite events are periodic, so shales accumulated during the quiet periods between events, vertically isolating sandstone deposits.  As sediment accumulated, upward-flowing salt deforms the margins of the deposit.  As the salt substrate moved laterally and vertically, the overlying sediment distorted, causing faults and fractures.  Today, we find sedimentary subbasins isolated by vertical salt diapirs

- 12 -

CONFIDENTIAL

feeding the salt canopy.  Shen is one of these subbasins.  In these subbasins, one would expect to find variable sediment thickness across the basin away from turbidite channels, lateral pinching out of individual sands, faults, fractures, and deformation bands caused by differential movement within the sediment column.

30.    Shen is located in the Walker Ridge protraction area, Blocks 51 and 52, about 160 miles south of the Louisiana coastline at a water depth of about 5,750 feet.  The project is in what is known as the "Subsalt province" due to the overlying salt canopy, specifically, the "Wilcox Trend" for the Wilcox Formation reservoir rock.  This trend is in the "Deepwater GOM," a geological province characterized by complex structures caused by rapid sediment deposition and mobile salt intrusions.  With sediment loading, salt from deep in the basin flowed vertically and spreads laterally, forming the Sigsbee salt canopy, which now blankets the Subsalt province.  The interaction of these two features creates complex petroleum systems, as illustrated in Figure 3 by Weimer *et al.*, 2017, p. 966.[5]  The Wilcox sediments are below the Lower Miocene.

---

[5]    Paul Weimer, *et al.*, 2017, "An overview of the petroleum systems of the northern deep-water Gulf of Mexico," *American Assoc. of Petroleum Geologists*, v. 101, no. 7, at 941-993.

CONFIDENTIAL



**Figure 3**. *Regional seismic profile across GOM's Walker Ridge-Keathley Canyon. Approximate age of key horizons shown. J=Jurassic; K=Cretaceous; Pa=Paleocene; Ol=Oligocene; LM=lower Miocene; MM=middle Miocene; UM=Upper Miocene; Pl=Pliocene; Pe=Pleistocene.*

31.     To understand the complex petroleum structures in this environment, it is important to have a geological understanding of the salt's movement and how that created the salt canopy, salt diapirs, and the Shen basin itself.  The discovery Shen-1 well was completed in February 2009 with a total depth of about 30,000 feet in the Shen basin.  Figure 4 depicts an arbitrary seismic line across the Shen basin, and illustrates that salt has moved upward from below the "Mesozoic thick" and the salt canopy overlies the basin's sediments.  The salt is primarily halite (NaCl) "that is mechanically weak and flows like a fluid, even at geologically rapid strain rates" (Hudec and Jackson, 2007).[6] The salt is less dense than the overlying carbonate rocks and clastic sediments, and is inherently unstable with loading.  The overburden pressure from accumulating deposits causes the salt body to flow laterally, away from the sediment loading, then vertically.  Sediment deformation caused by vertically migrating faults creates faults in the sediment.  When the salt meets an overlying resistant bed, it spreads laterally, forming the canopy.

---

[6]    Michael R. Hudec & Martin P.A. Jackson, 2007, "Terra infirma: Understanding salt tectonics," *Earth Science Reviews*, v. 82, no. 1, at 1-28.

CONFIDENTIAL



***Figure 4**. Arbitrary seismic line across the Shen basin. Black dots indicate a "salt weld" where flowage removed all the salt. (APC-00084015, slide 5 (October 2016))*

32.     As the salt moves laterally, the overlying sediment collapses differentially. The basin formed by this collapse, such as the Shen basin, becomes a locus for sediment deposition. Sediments from the North American continent were carried across the continental shelf and deposited in these intraslope basins as turbidite deposits, as illustrated in Figure 5. As a geologist, I would expect that in the geologic environment dominated by salt evacuation basins such as the Shen basin, vertical salt movement through salt feeders and subsequent development of a salt canopy would fracture the existing rock volume beneath the salt canopy. The expected result would be dominated by radial faults away from the salt feeders and possibly some concentric faults caused by salt canopy expansion.

CONFIDENTIAL



**Figure 5**. *Schematic cross section demonstrating the depositional history of a sub-basin in the sub-salt province. Adapted from Shumaker, et al., 2014.[7]*

33.     Sediments from the north, carried by turbidity currents, accumulated in the deeper parts of the basin, thinning on the basin flanks and away from the turbidite channels. The continued upward movement of salt caused faults and fractures in the sediments, and the salt canopy developed as the salt spread laterally. Figure 6A is a thickness map (isochore) of the Upper Wilcox 3 zone, and Figure 6B is sketch of a typical turbidite fan. Purple colors on the map are areas where the Wilcox zone is less than 1,000 ft thick, and the light blue colors indicate a thickness of over 1,500 ft. Lateral thinning of the turbidite lobes creates pinchouts of potential reservoir sands.

34.     Turbidite deposits are thickest in the axis of the deposit, and individual lobes develop laterally off the axis. For example, the Shen-2 well is positioned near the main channel of the turbidite lobes in the thickest part of the Lower Wilcox accumulation. The 2013 Anadarko isochore map, Figure 6A, suggests that the main turbidite channel flowed from the northwest to the southeast. The lobe elements give lateral stratigraphic complexity to the deposit as the deposits thin laterally

---

[7]     Adapted from Niven Shumaker, *et al.*, 2014, "Kinematic linkage between minibasin welds and extreme overpressure in the deepwater Gulf of Mexico," *Interpretation*, v. 2, no. 1, at 75.

CONFIDENTIAL

away from the main channel towards the basin margins.  The Venari isopach map in Figure 7 depicts this thinning because the main sediment pathway into the basin is from the northwest of the basin. Sediment lobes accumulate on the margin of the central depositional axis.  Interbedded sands and shales create stratigraphic variability towards the turbidite deposit margin and the edge of the basin.

35.    Thinning on the basin margin, away from the main sediment pathway, suggests stratigraphic variability is likely, as the sand beds accumulate on the margin of the central depositional axis.  As indicated in Figures 6 and 7, the sands deposited in turbidite fans have significant changes in thickness over relatively short distances.  Projecting sand thickness to an undrilled location is highly uncertain in this environment.  Because of the periodic nature of turbidite deposits, intervening shales serve as vertical seals to hydrocarbon migration, and lateral bed pinch-outs serve as potential traps.  A trap essentially prevents oil from moving from one reservoir to another.  The resulting compartmentalization requires more wells and makes it more costly to extract oil.  These are fundamental principles that senior management at Anadarko would have been aware of at the time.  Accordingly, Anadarko ignored this fundamental principle resulting in inaccurate assumptions about the subsurface.



CONFIDENTIAL



***Figure 6A****.  Isochore map from seismic showing the thickness of the lower Wilcox.  Blue colors indicate thick sediments.  The red line is a possible axis of sediment deposition.  (APC-00001505, slide 14 (September 2013))*

***Figure 6B****.  Sketch of a typical turbidite deposit, an analog to the Wilcox sandstone sedimentation. (APC-01286239, slide 24 (June 2017))*

CONFIDENTIAL



***Figure 7****. Venari Wilcox 3 to Cretaceous Isopach map April 13, 2016. (APC-00073579, slide 12)*

## VII.    RISK ASSESSMENTS

36.    Geoscientists consider several factors to assess an oil prospect's uncertainty, including the factors below from available geological and geophysical data, and assign each factor a confidence level between 0% and 100%.  Peter R. Rose (1992) first considered three elements to describe the chance that a well finds hydrocarbons: reservoir presence, hydrocarbon charge, and sealed closure.[8]  Subsequently, he added two additional parameters: containment and migration.[9] Multiplying the percentages together, assuming independence, results in the probability of "geologic success" (Pg).  Pg is an input to the Multi-Method Risk Analysis (MMRA) software developed by

---

[8]    Peter R. Rose, 1992, "Chance of Success and Its Use in Petroleum Exploration," *The Business of Petroleum Exploration*, Ch. 7, Part II, at 74.

[9]    Peter R. Rose, 2000, "Exploration Economics, Risk Analysis, and Prospect Evaluation," Course Notes, Rose & Associates, LLP, at 175.

CONFIDENTIAL

Rose and Associates L.L.P. and used by Anadarko for probabilistic resource assessment. After discovery and appraisal wells indicate sufficient oil and gas resources for commercial development, the reservoir characteristics dominate the risk profile. Such factors include:

(a)    Is there an adequate source rock available to generate hydrocarbons, and when were the hydrocarbons generated?

(b)    Was a hydrocarbon trap present when hydrocarbons migrated?

(c)    Is there a reservoir rock present at the drill site and of sufficient quality to produce hydrocarbons?

(d)    Is there a trap present to ensure closure, and how reliable is the map, including data quality?

(e)    Traps require containment, top, bottom, and an effective lateral seal. Are these factors present?

## VIII.    RESOURCE ASSESSMENT

37.    Hydrocarbon volume depends on the porosity (pore space percentage), accumulation area, hydrocarbon saturation, net reservoir feet, and recovery efficiency. Resource estimates refer to the volume of hydrocarbons that the reservoir can hold and economically recover. Resource estimates may be probabilistic, expressed as a range of uncertainty from P90 to P10, or deterministic, expressed as a single value. In this case, the joint Shen team comprised of both exploration and pre-development personnel, each team calculated independent probabilistic or deterministic resource estimates.

38.    Several tools are available within the industry to make these resource estimates. For example, the Multi-Mode Risk Assessment tool (MMRA) of Rose and Associates is one of the most common and was used by Anadarko personnel on the Shen project. With the MMRA, according to Anadarko's conventions, a P90 accumulation means a 90% chance that an accumulation will equal or exceed that value. In other words, P90 is the smallest resource volume used in an analysis. P10 suggests that there is only a 10% chance of the accumulation exceeding that volume; it is the largest

- 20 -

CONFIDENTIAL

resource volume in an analysis. A standard check for a probability distribution is to examine the absolute minimum P99 and the absolute maximum P1 to determine if the predicted P1 and P99 values are reasonable. In addition, the probability function calculates the median (P50) and mean expected resource. Industry experience gives ranges of the P10/P90 ratio, which measures geologic uncertainty or risk. The P10/P90 ratio is commonly accepted by companies using the MMRA software as a measure of resource uncertainty. In other words, a prospect in a producing basin, but a new trend is expected to have a P10-P90 ratio of 45-129. A prospect in an established trend is expected to have a P10-P90 ratio between 10 and 45. The list below is arranged from least certain to most certain, as published by Rose and Associates, LLP.

      (a)     Frontier prospect (no production in the basin) P10/P90 = 120-650

      (b)     Rank wildcat (producing basin, but a new trend) P10/P90 = 45-120

      (c)     Prospect in the same trend P10/P90 = 10-45

      (d)     Close in/Drill Deeper (Nearby production) P10/P90 = 5-10

      (e)     Development (Established production in the field) P10/P90 = 2-7

39.     Recovery efficiency is a critical parameter in resource calculation. Recovery efficiency measures how easily hydrocarbons flow through the rock and depends on the reservoir's permeability and compartmentalization or flow barriers. Reservoir compartmentalization and flow barriers that affect oil and gas recovery are manifested as faults, deformation zones in cores and image logs, stratigraphic variability, and formation pressure data. Fault planes can be barriers to flow, limiting the effective drainage areas of production wells and preventing pressure support between injection wells, aquifers, and production wells. Faults displace the rock on either side of the fault plane. Small faults may be below the resolution of the seismic data. Faults may prevent fluid flow from the downthrown side to the same reservoir on the upthrown side. Deformation along the fault plane may impede fluid flow. Faults can significantly impact appraising feasibility by reducing

- 21 -

CONFIDENTIAL

the volume of oil each well can be expected to produce and by increasing the number of production and injection wells required to recover the desired amount of oil. The total cost of injection and production wells at Shen was critical because of the high cost to drill and complete wells in the subsalt, high temperature, and high-pressure environment. It is not unusual for recognized structural complexity in a project to increase with time in a given field because seismic data improves, and newly drilled wells intersect faults and fractures. Figure 8 illustrates how seismic data can identify faults that compartmentalize the Shen basin Wilcox reservoirs.



***Figure 8****. SW-NE seismic line in the Shen project illustrating the updip trap at the "updip weld." The breaks in the reflectors below the Wilcox sands are faults that extend upward through the Wilcox sedimentary layers. The dashed lines are discontinuities interpreted as faults. The comment in the lower left is from Chip Oudin, highlighting his disagreement with the "official" interpretation. (APC-00011019, slide 10 (August 2014)*

CONFIDENTIAL

40.    Given the uncertainty in the Shen project mapped area and the potential variability of sand thickness in the turbidite fans of the Wilcox as described above, the P10/P90 ratios determined by the resource estimates of the exploration team were much narrower than industry experience suggests.  In 2008, prior to drilling Shen-1, the calculated P10/P90 ratio was 6. From industry experience, the predicted uncertainty for a Trend Wildcat Well, as the exploration team classified this, should have been 10-45.  Following the completion of the Shen-2 well, individual Wilcox zones had P10/P90 ratios between 2.8 and 6.0; most were 3.0 or less, typical level of uncertainty for development projects, not appraisal projects.  Because the uncertainty in the updip areal extent as imaged in the seismic, no well penetrations of the oil-water contact, with only two well penetrations, in my experience, I would expect such an appraisal project to have a P10/P90 ratio between 10 and 45, not 2.8-6.0. It is also apparent that Anadarko's exploration team, using MMRA, did not use the standard check of P1 and P99 for either the input parameters or the resource distribution.  If the P1 and P99 were scrutinized, the team should have recognized potential issues with the distributions used in the MMRA.  In addition, with the separation of Shen-2 and Shen-3 by a fault, the field's oil-water contact or maximum size is questionable.  Resource estimates should have decreased because Shen-3 did not contain hydrocarbons and showed fault separation and/or compartmentalization of the prospect.  Management had access to the exploration team's resource ranges, and it should have been a red flag as to the unreliability of the resource range for Shen.  Further, evidence indicates significant internal dissent by geoscientists and engineers on the joint Shen team from the pre-development department about the resource estimates by exploration management beginning in February 2014.

## IX.    COMPARTMENTALIZATION AND FAULTING

41.    The combination of lateral stratigraphic variability, faulting, and fracturing within and on the basin's margins generates complex fluid flow paths within the sediment column, creating a

CONFIDENTIAL

significant issue for oil and gas field development. A hydrocarbon trap is formed by an impermeable boundary across which hydrocarbons cannot migrate. Typical hydrocarbon traps in the GOM Subsalt Province include stratigraphic traps, where sediment pinches out laterally against faults and in anticlinal structures. Additional challenges in this complex environment include: 1) drilling through the thick, allochthonous salt canopy, 2) abrupt and unpredictable pressure changes at the base of salt, 3) high temperatures, 4) high pressures, 5) biodegraded oil or tar, and 6) creating asphaltenes that are a production issue. A 2018 study[10] in the Keathley Canyon and Walker Ridge area found that the five Wilcox units in Tiber Field showed no vertical communication across the field. At Tiber Field, four units were in lateral communication except where faults isolate portions of the structure.

42.    Faults break an oil and gas field into compartments that affect per-well recovery, requiring more wells and increasing costs. Compartmentalization due to faulting can significantly impact the commerciality of a prospect.

43.    Faults significantly contribute to complex fluid flow paths in a reservoir because vertical movement often decreases permeability by shear and dilation in the fault zone, and fault displacement of reservoir beds changes fluid flow paths. Figure 9 from an onshore outcrop shows typical features associated with a fault. The fault zone is typically a zone of crushed rock along a single fault. Slickensides are polished and striated rock surfaces that result from friction along a fault and are diagnostic of fault movement. In his deposition, Paul Chandler noted that the wellsite geologist reported slickensides in drill cuttings from the Shen-4 ST#1 on November 11, 2015.[11] The

---

[10]    William F. Morrison, 2018, "Vertical and Lateral Hydraulic Connectivity of the Wilcox Formation for Tiber Field and the Outbound Structural Province of Keathley Canyon and Walker Ridge, Northern Gulf of Mexico," University of New Orleans Theses and Dissertations, at 2569, https://scholarworks.uno.edu/td/2569.

[11]    July 28, 2022 Deposition Transcript of Paul Chandler at 188:9-189:25.

CONFIDENTIAL

damage zone or "deformation band" that extends is caused by small differential movements in the rock, thus, decreasing permeability.



**Figure 9**. *Outcrop showing features of typical fault zone. A. Faulted outcrop. B. Slickensides, Fault Zone, and Damage Zone. C. Slickensides on the fault plane.*

44.     Therefore, it is critical to recognize the presence of faults because of their influence on compartmentalization. As noted previously, Shen is a homoclinal structure on the north side of the basin with beds dipping from north to south, as shown in Figure 1. The trap type is called a "three-way closure against the base of salt," which is a typical trap in the northern GOM. The updip contact with impermeable salt forms the trap, and the lateral edges of the hydrocarbon accumulation trap are formed by structure, stratigraphic pinch-out, or against salt.

45.     In assessing oil prospects, geoscientists on the multi-disciplinary teams create "maps" of the field, which includes faulting. Quality checking seismic maps is an iterative process using well results (if available), seismic data, and maps. An interpreter correlates formation top depths from well data to the seismic data's horizon picks. Such a correlation validates the seismic horizon pick used to make a map on that horizon.

CONFIDENTIAL

46.    For years, Anadarko's exploration group "mapped" Shen as an unfaulted, homoclinal, southward-dipping structure on the north side of the basin.  This overly simplistic portrayal of the resource was used to make overly optimistic statements about the resource range and oil-water contacts during the Class Period, contrary to the geoscientific data.  The impact of faulting on the feasibility of developing Shen was the most important uncertainty that Anadarko was responsible for addressing as the operator.

47.    Based on my review, substantial evidence existed early on of significant faulting at Shen. The geology and geoscience revealed that: (1) MDT pressures indicated that OWC's could not be extrapolated across the field; (2) pressure breaks were indicating a completely broken field; and (3) there was increasing evidence of a sealing fault from seismic imaging and the OBMI data.  This made Shen more difficult and expensive to appraise while also portending bad news for recoverable oil and associated economics.  For example, Doug Shotts' August 19, 2014 presentation concluded that the combination of heavy north-south faulting combined with mild east-west faulting might reduce the recovery factor to 5% and by -81% for a given volume of oil in place compared to the unfaulted base case. [12]

48.    Anadarko was aware of potential faulting at Shen before the Class Period began. [13] For example, by the Spring of 2014, Anadarko geoscientist Arnold Rodriquez had mapped the Shen area with a significant number of faults cutting the prospect. [14]  This demonstrates that Anadarko was aware of faults in Shen that, in my expert opinion, would impact the development plan. Additionally, partner communications identified faults and potential fault compartments by the Spring of 2014.

---

[12]    June 29, 2022 Deposition Transcript of Doug Shotts at 68:10-69:19.

[13]    Deposition Ex. 395; *see also* Deposition Ex. 251.

[14]    APC-00822587, slides 3-4.

- 26 -

CONFIDENTIAL

49.    On March 26, 2014, Rodriguez warned McGrievy and Frye that there were probably more faults than he was able to map given the current seismic imaging quality:

> *Subject: Shenandoah Upper Wilcox Structure*
>
> *Mapping update with the current volume. This is the faulted version and realize that there probably are more faults than I am able to map with the current seismic imaging.*[15]

50.    On March 31, 2014, Browning responded to Rodriguez's recent structural and fault interpretation. Browning made an important point that faults with small offsets can be sealing, given the potential for deformation banding in 50 mD permeability rock. When fault offset exceeds the gross thickness of the sands, the result will generally be that the fault seals, forming a no-flow barrier with sand on shale contact across the fault. Where fault offset is less than the sand thickness, sand-on-sand contact may or may not be sealing. Deformation banding is where rock is crushed from pressure and movement along the fault, reducing its permeability and potentially causing the fault to seal, even when sand is juxtaposed against sand. Given the noise in the seismic data, Browning also questioned whether the reservoir is "completely broken up" or is it an artifact of noisy data.

> *The pink fault is anchored on a deep event with significant offset, but looks to be dying shallow.*
>
> *The red fault looks to have significant offset, but only through one horizon.*
>
> *Really, **none of the shallow faults completely offset the Wilcox section. But with deformation banding in 50 md rock, small faults might create drainage compartments**.*
>
> *There's a lot of noise swinging through the data. **Is the reservoir completely broken up by faulting or noisy data?***
>
> *I wonder if we'll know which is the case until a good number of wells are on production.*
>
> *But certainly, **if we get more pressure breaks between appraisal wells, we'll have our answer**.*[16]

---

[15]    APC-00004757 (March 26, 2014).

CONFIDENTIAL

51.    Browning then questioned whether the reservoir was broken up or just noisy data.  In addition, Browning made a very important statement that should have been revisited by Anadarko professionals and management after each appraisal well regarding the significance of "pressure breaks" between wells.  Each time a new appraisal well proved to be isolated from its neighbors, this added a significant negative finding establishing fault compartmentalization.

52.    Rodriguez responded in the same email chain with the comment that he thought the reservoir was completely broken up as Browning had speculated.

> The interpretation is not completed and some faults have not been fully assessed from the interpretation standpoint.  In general, the pink fault on the seismic is approximately 150-220' fault as observed with this 'raw' version of processed seismic.
>
> **I think the reservoir is completely broken as you put it**.  I want to have the team with Van to look at the effect of mother salt evacuation from the area of the sediment entry point, to and along the axis of Wilcox deposition.
>
> There may be two sets of faults.  Large faults were active during deposition (syn-depositional), and the numerous smaller scale faults 50-100' are all post depositional or formed primarily to fill the hole formed by the evacuated deep mother salt.[17]

53.    An email exchange dated April 1, 2014 shows how important fault interpretation was to determining future appraisal well locations.  Ramsey, with exploration, was included in the exchange with Browning quoted as follows:

> If the "Pink" fault seals, the oil-water contact in the S3 fault block is independent from the S2 fault block.
>
> If we receive Yucatan pressure data in the aquifer, we should have an estimated oil-water contact based on gradients from S2, but it will not necessarily be relevant for the S3 fault block.

---

[16]   APC-00004880 (March 31, 2014) (emphasis added).

[17]   *Id.* (emphasis added).

CONFIDENTIAL

*If we find that the estimated contact is above the planned S3 penetration, intentionally drilling a wet S3 test will do nothing to definitely test the large S3 fault block.*

*We cannot assume there is oil above us at S3. (In K2 for example, the north fault block is HC charged in the M14 but the south fault block is wet.)*

*With effectively only one well in our reservoir, I think confirming HC pore volume is still our first priority. Testing aquifer properties might be important, but only after confirming commercial OIP.*

*I believe the sensible approach is to not "finalize" the S3 bottom-hole location until we have data from Yucatan. And if the projected contact is at a level between S2 and S3, we should move S3's BHL to target above this notional OWC.*[18]

54.    The pink fault is depicted in Figure 10, which was part of a presentation by Rodriguez subtitled "Complexly Faulted Model."[19] Colored lines depict faults in the seismic cross section, and white linear features depict faults in the colored structure map.

---

[18]    APC-00004964 (April 1, 2014).

[19]    APC-00117313, slides 2 & 4 (April 1, 2014). File attached to APC-00117310 referenced below.

CONFIDENTIAL



*Figure 10*: *Seismic Cross Section With Faults*.

55.     Figure 11 from the same presentation shows Rodriguez's interpretation of the fault structure at the top of the UW1 horizon, providing outlines of the S2 and S3 fault blocks.  Faults are shown as white linear features.  This same structure map[20] with development's interpretation of faulting was presented to Kleckner on or after April 3, 2014, based on the file name.

---

[20]   APC-01676709 (April 3, 2014) (file name "2014-02_Kleckner_final.pptx").

CONFIDENTIAL



*Figure 11. Development's Upper Wilcox 1 Structure Map.*

56.     On April 1, 2014, Browning responded to Strickling, in exploration, sharing the "Complexly Faulted Model" and mentioned that each fault block may have its own unique OWC and that each fault block will need to be tested with a well.

> *Arnold is picking a number of faults, (as have our partners I believe). I can get you linked access to Arnold's map if you'd like.*
>
> *I'm suggesting that there is a "possibility" that the up-coming Yucatan pressure data will indicate that our planned drill location will be wet.*
>
> *It's just one possible scenario. Other possibilities are that Yucatan aquifer pressures will indicate that Shenandoah is filled to spill; or if Yucatan is full-to-base it may not have any bearing on Shenandoah's contact, (although it might establish a new highest possible water level for Shenandoah).*
>
> *I'm just trying to encourage discussion on how we might use the information to our advantage. If Arnold's structural interpretation has any validity, **we can't assume other fault blocks have the same OWC. We have to test each fault block with a well, (starting with the biggest)**. If our projection when we spud S3 is that it will be drilling into the aquifer, I argue that it's not the optimum use of appraisal dollars.*

- 31 -

CONFIDENTIAL

*I've been told that Shenandoah wells cannot be sidetracked. If that's the case, and we anticipate drilling a wet well, I suggest we "modify on the fly."*[21]

57.    Ramsey responded to Browning about the lack of consensus around the impact of faulting on the structural interpretation, and that considerable information will be necessary for the various parties to converge on their interpretation.

*Thanks Brad. I'll check with Jim Kunning on IF the well has any bottom hole flexibility available.*

*An important data point to consider though, is the raw lack of structural consensus (internally and externally) that currently exists at Shenandoah. I have seen eight different maps of Shenandoah from six different companies (two different maps internally), and the only similarity between the 8 is the overall 3-way shape. Attached are the maps from our Shen partners, that were traded several months ago. Unfortunately at the pace I am observing, we will likely not have a consistent map between all respective mappers, until a whole lot more data comes to light (final and consistent seismic to start, pressure data, FLAIR/geochemistry, and possibly even production PTA). Given all the structural uncertainties we currently have with everyone involved, I think it will be a very hard task to persuade a majority of parties (internally and externally) to modify the current bottom hole location of Shen-3, based purely on the Yucatan pressure data. I'll personally be looking at it hard and weighing the options appropriately, but I am mindful of the very complex dance that will ensue.*

***With all that said though, if any north-south faulting exists that could potentially compartmentalize Shenandoah, it would represent the largest risk element to appropriately appraising this project**. It's my opinion, that we should come to a consensus internally, on the probability of any potential faulting at Shenandoah, and particularly regarding the "pink" fault. **We're using the same data, we're all on the same APC GOM team, so there should be no real reason we can't reach a consensus. If we are aligned internally, then we will be able to make the appropriate appraisal decisions as operator**.*[22]

58.    An example of a differing partner interpretation is ConocoPhillips' interpretation showing extensive east-west faulting in the top of the Wilcox structure map,[23] shown in Figure 12. The faults are shown as dark curvilinear features.

---

[21]    APC-00117310 (April 1, 2014).

[22]    APC-00117318 (April 1, 2014) (emphasis added).

[23]    APC-00117345 (contained in file APC-00117344 (July 31, 2013)).

CONFIDENTIAL



**Figure 12**. *ConocoPhillips Structure Map*.

59.     Ramsey made a very important statement regarding the importance of fault compartmentalization in apprising the Shen field, stating that "*if any north-south faulting exists that could potentially compartmentalize Shenandoah, **it would represent the largest risk element to appropriately appraising this project**.*"[24]   Ramsey forwarded this exchange to Trautman, his manager in exploration, and included the following comment: "*Paints a good picture on their value of the north south fault trending down the center of Shenandoah and how it impacts THEIR forward planning.*"[25]  This statement indicates that the threat of faulting was not a concern of exploration, and only the development team considered it in their well planning logic.  The emphasis of capitalizing "THEIR" appears to dismiss the risk of faulting, representing faulting as development's

---

[24]   APC-0117333 (April 1, 2014) (emphasis added).

[25]   *Id.*

CONFIDENTIAL

concern and not exploration's concern.  As a joint team, planning an appraisal program and evaluating project commerciality, compartmentalization by faulting impacts the number of wells and, ultimately, the capital investment required to produce the hydrocarbons.  Accordingly, it should have been both team's concern.

60.      The same day, Browning wrote to McGrievy that "it would be a huge mistake to go to project sanctioning assuming that our largest mapped fault block, (S3), has the same oil-water contact as the S2 fault block."[26]

61.      Nevertheless, Anadarko exploration management continued to require the use of a simple, unfaulted, laterally continuous structural model.  Despite evidence of faulting, adherence to a best-case scenario led to highly optimistic public statements that exaggerated the likelihood of successful development, resource size, and value.  No later than August 2014, the pre-development personnel on Shen objected to the "no-fault" model used by exploration and identified evidence of a fault in Shen-2.  My experience exploring the Gulf of Mexico leads me to conclude that the development team's structural interpretation of Shen, with faults, was more credible than the exploration team's homoclinal structure interpretation.  Their interpretation was confirmed as subsequent wells intersected faults showing associated fault compartmentalization.  In 2014, Leyendecker criticized the development team's maps.  Even in his deposition, Leyendecker admitted he did not include seismic data in his review of the alternative maps, and thus his review was incomplete.[27]

62.      Figure 13 shows the change in mapping between the completion of Shen-1 and Shen-3. After drilling Shen-2, the development team mapped faults throughout the Shen prospect,

---

[26]    APC-00004967 (April 1, 2014).

[27]    September 22, 2022 Deposition Transcript of Ernest A. Leyendecker, III at 232:23-24.

CONFIDENTIAL

including a fault separating the Shen-2 (WR-51#2) fault block and the eastern fault block containing

Shen-1 (WR52 #1) and Shen3 (WR52 #2) wells (Figure 11).



**Figure 13**. *Comparison of Anadarko's (A) November 2010 map of the Shen prospect and the (B) December 2014 map. Shen-4 is 3789' northwest of Shen-2 and 879' updip. Shen-3 is 12,400' east of Shen-2 and 1518' downdip. (APC-00076459, slides 2 & 9 (June 2016))*

63.     Anadarko had four partners in Shen: Cobalt, ConocoPhillips, Marathon, and Venari.

Partners can function as project peer reviewers and provide a sounding board for scientific ideas.

This is in addition to internal peer review, which the "Quality Assurance Team" often facilitates, or

CONFIDENTIAL

in this case, the RCT. As to Shen, Anadarko's exploration team ignored the development team's concerns and partner interpretations.

64.    Figure 14A is a schematic cross-section Anadarko presented to the partners at a December 14, 2014, partner meeting. The cross-section line is oriented north-south with the Shen-1, Shen-2 and Shen-3 projected onto the cross-section.[28] There is a single fault on the cross-section; that fault separates Shen-1 from the other two wells. The accompanying structure map shows the line of the cross-section. If one connects the three well locations, the cross-section crosses a line of mismatched contours. The contour interval in this map (Figure 14B) is 250 feet. A careful examination of this map indicates as much as two contours difference across the line. That difference represents 500 ft – such a dislocation is a fault. The cross-section should have a second fault between Shen-1 and Shen-2; similarly, the cross-section requires a fault between Shen-2 and Shen-3.

---

[28]   APC-00001146, slides 53 & 54 (December 2014 Partners Meeting).

CONFIDENTIAL



**Figure 14A**. *This schematic cross-section of Shenandoah Field was presented in December 2014. (APC-00001146, slide 53 (December 2014 Partners Meeting))*



**Figure 14B**. *The N-S white cross-section line is shown below the cross-section. Wells are projected onto the north-south line, although the actual line of section crosses the indicated fault separating the east and west sides of the prospect. (APC-00001146, slide 54 (December 2014 Partners Meeting))*

65.    Figure 16 compares Shen structural interpretations from Anadarko and its partners.

Figures 15A and 15B, Anadarko maps, compare the 2014 exploration" no-fault" map and a

CONFIDENTIAL

development "faulted" map. A March 2015 PowerPoint[29] prepared for a partner meeting compares partner interpretations of the Shen prospect. Anadarko's map showed a NW-SE fault separating Shen-2 and Shen-3 (Figure 16(A)). ConocoPhillips separated the Shen-1 well from the downdip area with an E-W curvilinear fault and shows radial faults separating five fault blocks (Figure 16(C)). Cobalt separated Shen-1 from the remainder of the field with a curvilinear E-W fault and homoclinal dip south of the fault (Figure 16(D)). Marathon map showed homoclinal south dip (Figure 16(B)). Interestingly, Marathon recognized the possibility of fault compartments in a map presented in April 2014 (Figure 17). The Venari interpretation before the drilling of Shen-3, indicated radial faulting impacting the prospect and breaks the prospect into five compartments (Figure 16(F)). The radial faults on the Venari map most closely resemble expected faulting against a salt dome or feeder. Finally, curvilinear faults suggest compression from the north rather than extension typical of salt domes. In this case, the curvilinear faults a likely caused by the southward expansion of the salt canopy. Additionally, radial faults align with breaks in the underlying Cretaceous carbonate formation. As early as August 2014, coherency mapping of the Upper Wilcox shows lineaments that are likely faults (Figure 18).

---

[29]  APC-0086446.

CONFIDENTIAL



*Figure 15A*.  *APC seismic depth structure map by exploration of the top of Upper Wilcox "2" August 2013.  The "no-fault" interpretation persisted into the Class Period, See Figures 10 B and 19. (APC-0147988, slide 18)*



*Figure 15B*.  *Arnold Rodriquez Shen – Upper Wilcox – 1 structure map (3-26-2014) Note the many faults near Shen-1 and Shen-2 locations.  (APC-00822578, slide 4)*

CONFIDENTIAL



*Figure 16*. *Shen partnership map comparison: Similarities and Differences. (APC-00868446, slide 6)*



*Figure 17*. *Marathon possible fault compartments using segments April 2014. (APC-00147988, slide 8)*

- 40 -

CONFIDENTIAL



**Figure 18.** *Anadarko Seismic coherence (Dip attribute) map, top U. Wilcox August 2014 (APC-00648353, slide 4)*

66.    Despite evidence presented by partners as well as Anadarko's development group, the Anadarko exploration team continued to use a homoclinal dip map (Figure 19) and influenced the "official" Anadarko position. The public Anadarko resource assessment was based on these maps showing no faults (Figure 19). However, as early as August 2014, the development group used a map with many faults to plan the appraisal and development program (Figure 20). In the September 9, 2015 budget review, the issue of compartmentalization was highlighted by presenting both the exploration "no-fault" pre-Shen-4 map and the development 2014 map.[30]

---

[30]    APC-00193551, slides 12-14.

CONFIDENTIAL



*Figure 19*.  *Anadarko exploration team Upper Wilcox seismic depth structure map November 2014. (APC-00148608, slide 1)*



*Figure 20. Anadarko Approximate Top Wilcox seismic depth structure map August 2014 presented by Chip Oudin, Anadarko Development. (APC-00648353, slide 1).*

67.    In January 2014, Lea Frye, a reservoir engineer, moved from the Eastern Gulf of Mexico development group to lead the Shen pre-development group.  Her assignment was to

CONFIDENTIAL

evaluate development scenarios incorporating resource size and recovery uncertainty to maximize the value of the Shen discovery.  Ms. Frye played a key role in the evaluation of Shen.  Her professional concern about the differences between Anadarko's public announcements regarding Shen and what was known internally led to a "whistleblower" complaint to the Securities and Exchange Commission in Spring 2016.

68.     The development team identified the risk of faulting early on.  A new seismic interpretation called a "dip attribute" map (Figure 20), coupled with core and well log data, began to clearly demonstrate the risk of reservoir compartmentalization.  Figure 17 documents that partner Marathon recognized the risk of compartmentalization as early as April 2014.  Despite partner interpretations containing faults and fault compartments in the seismic data and internal, development team interpretations, Figure 19 shows that the exploration team ignored the risk of faulting and fault compartmentalization.  However, Anadarko continued to use resource estimate results in their public statements attributed to a single map showing a homoclinal, south-dipping structure with an updip trap against salt.

69.     Shortly after being assigned to the Shen project, Lea Frye presented economics for a two-spar development scenario in which she described the "Remaining Uncertainty and Impact."  Anadarko management adhered to the exploration interpretation for much of the class period, ignoring the uncertainties and impacts listed in the presentation slide[31] (Figure 21).

70.     Before the February 19, 2014 meeting, an email chain dated February 18, 2014, between David Blakeley, Manager, Gulf of Mexico Engineering, and Robert Strickling, reservoir

---

[31]   APC-01674681, slide 9 (February 19, 2014, Economics of two-spar development).

CONFIDENTIAL

engineer supporting exploration, illustrates the beginning of efforts to suppress more conservative data interpretations:[32]

> David Blakeley: *"I saw Pat in the partner meeting.  He said that Lea is coming up with economics with a PIR of < 4 for Shenandoah.  Has she shared her assumptions with you?"*
>
> Robert Strickling: *"Not yet.  She is supposed to come up after the partner meeting."*
>
> David Blakeley: *"Ok.  We need to keep from delivering a message to Kleckner that Shenandoah is a marginal project by being overly conservative on assumptions."*
>
> Robert Strickling: *"Review the economic assumptions with Lea . . . .  Recovery factor is 20% instead of our 25% even though water injection is assumed. Platforms cost twice as much as Frank's sheet estimates.  Wells are constrained by drawdown limits.  Overall there are fewer wells since re-completions are assumed.  However, no learning curve is applied to drilling costs so their total cost for drilling is about the same as ours.  LOE is twice what were are using.  Downtime for wells and facilities is accounted for by reducing the overall production profile not a schedule.  So it is pretty much what we expected.  Lea had made slides with our economics and assumptions but I said she probably didn't want to present those to prevent disagreements over assumptions."*

71.      Exploration continued to insist on a single interpretation with no faulting, while development continued to have serious concerns.  Shen-3 was completed in 2014, and encountered no hydrocarbons.  In an April 2014 partner meeting, ConocoPhillips recognized lineations at the top of the EO6 horizon (a Wilcox mapping horizon), and the equivalent Anadarko map by Chip Oudin closely approximated ConocoPhillips' map. These lineations were likely related to faults.  A May 13, 2015, presentation titled "Shenandoah Project Overview," authored by Patrick McGrievy,[33] documented seismic interpretation differences between exploration, development, and Anadarko's partners (Figure 22).

---

[32]   APC-00603676 (February 18, 2014).

[33]   APC-00001683, slide 14 (May 13, 2015).

CONFIDENTIAL



**Figure 21**. *Lea Frye's "Remaining Uncertainty and Impact" slide presented on February 19, 2014.*

72.    In my expert opinion, the lack of faulting in the exploration maps should have raised issues. Faulting creates compartments bounded by faults and associated deformation that individual wells must drain. However, a structure with no faulting eliminates the compartments, and larger areas are drained, resulting in an optimistic resource determination. The development team recognized potential faults in 2013, shortly after the completion of Shen-2[34], which cuts the "simple" structure into two areas and showed mapped faults (Figure 19). In the Shen-2 well, OBMI (Oil-based Microimager) data suggested a fault existed near the top of the Wilcox, fractures in the Wilcox, and a possible fault near the base of the Wilcox. Paul Chandler was asked in his deposition: "*And it's helpful to look at OBMI data and compare them against seismic data, right?*" He testified: "*Yes. The OBMI data, of course, was run in the bore hole of whatever well that they were talking about here. And if you can find breaks in the rock, based on the OBMI data, that corresponds to a*

---

[34]    APC-00001071, slides 6-9 (OBMI Faults and Fractures).

- 45 -

CONFIDENTIAL

*seismic interpretation of a fault, then that might give you more confidence that what you are seeing seismically really is a fault and not some seismic artifact.*"[35]  The OBMI data were presented in 2013 after completion of the Shen-2 well in March 2013.

73.     There was continuing pressure to have one version of the map in August 2014, as evidenced in an email from Tim Trautman to Pat McGrievy.[36]  In November 2014, an email from Patrick McGrievy to Darrell Hollek on the Shen-3 OWC wrote: "*It's hard to go to partner meetings with a straight face and not acknowledge faulting when all of our partners externally share the same concerns.*"[37]  In a "Shenandoah Project Overview" on May 13, 2015, McGrievy clearly documented the development teams' dissent from the exploration team's outdated maps (Figure 19).  This dissent was never conveyed to the public.  Instead, Anadarko presented overly optimistic interpretations of the Shen discovery without disclosing the dissent based on best practices and the scientific data.

---

[35]  July 28, 2022 Deposition Transcript of Paul Chandler at 86:5-14.

[36]  APC-00000770 (August 18, 2014 email from Tim Trautman to Pat McGrievy: "Make sure APC is presenting only one set of structure maps to partners.").

[37]  APC-00147547 (November 17, 2014).

CONFIDENTIAL



**Figure 22**.  *Depth structure maps of the Shen discovery by the exploration team, development team, and partners Cobalt and ConocoPhillips.  (APC-00001683, slide 14 (May 13, 2015))*

74.     The implications of this omission are significant.  First, the Shen-1 block is recognized as a separate fault block from Shen-2 and Shen-3. Shen-2 and Shen-3 are also in separate fault blocks.  Anadarko management conveyed to the public that Shen-3 was a successful well when it discovered the water leg in the field.  Shen-2 found only oil-saturated sands and did not penetrate the oil-water contact, what Anadarko personnel internally called the "worst case scenario."[38] Mapping shows Shen-2 is in a separate fault block, implying a different pressure regime from Shen-3.  It is incorrect to define an oil-water contact using pressures measured in the two wells separated by a fault and likely not in communication.  Fault separation of the wells also raises the risk associated with producing the Shen resource.  Additional wells are required to drain each compartment of its hydrocarbons.

---

[38]    *See* July 28, 2022 Deposition Transcript of Paul Chandler at 276:10-13.

CONFIDENTIAL

75.    One of the reasons exploration justified not mapping faults was due to poor seismic data, but other types of data also evidenced faulting, including OBMI data and MDT pressure data.

76.    For example, a partner meeting[39] was held on August 18, 2014, to discuss faults identified by wireline logs, such as dipmeter and Oil-Based Micro Imaging (OBMI) logs. In Shen-1 BP2, four faults were identified with the strongest in the LWC sand, along with 51 fractures. None of these faults were identified in the seismic data. In Shen-2, three faults were identified and "*1 fault found at the top of Wilcox (29,006' MD) corresponds to a seismic interpreted fault*" along with 6 fractures. These findings are significant because they established early recognition of faulting based on wellbore measurements and that most faults were not apparent in the seismic data, but were evident from other data available at the time. In my expert opinion, with seven faults identified in the first two wells, exploration's insistence on an unfaulted structure map directly contradicts this evidence.

77.    As to the MDT pressure data, results from Yucatan-1 and Yucatan-2 MDT pressures[40] shown in Figure 23 below provided information about the potential for faults to seal and cause compartmentalization in the Wilcox. First, Yucatan-1 MDT pressures in the LWA water zone are 180 psi lower than in the overlying oil zone, definitive evidence for an isolating fault intersected by the wellbore. Exploration geologist Ramsey concurred[41] that this pressure shift was fault related. Second, the Yucatan-1 water pressures below the fault are 40-60 psi higher than the pressure gradient established by the water-bearing zones in Yucatan-2, again proving fault compartmentalization laterally between the wells. In my expert opinion, with Yucatan-1 isolated from Yucatan-2 in the water leg, Shen pressures could follow a similar pattern and be isolated from

---

[39]   APC-01677015, slides 9 & 14 (August 18, 2014).

[40]   APC-00132687 (July 26, 2014) (plot on slide 6, cross-section slide 3).

[41]   APC-00131414 (July 1, 2014).

CONFIDENTIAL

Shen wells. Therefore, trying to establish Shen OWCs from Yucatan-2 pressures was likely unreliable.



*Figure 23: Yucatan MDT Pressure Profile.*

78.    The cross-section from the same presentation shows the relative positions of the Yucatan and Shen wells in Figure 24 below.



*Figure 24: Yucatan to Shen Cross Section.*

79.     In addition, MDT surveys in Shen-1 indicated pressure compartmentalization vertically in the well.  The oil samples from each zone varied in measured density and gas content, supporting a degree of vertical compartmentalization.  MDT pressures in Shen-2, drilled in 2013, showed that the difference between Shen-1 and Shen-2 pressures in the Wilcox sands was about 180 – 250 psi, suggesting pressure compartmentalization.  In Shen-2 (Figure 25), MDT surveys indicated five pressure gradients, and fluid densities in each compartment confirmed vertical stratal unit separation.[42]  Such compartments may be stratigraphic.  In other words, each sand is sealed by an

---

[42]   APC-00001505, slides 20-22.

CONFIDENTIAL

overlying shale, so there is no vertical communication between sands. Faults also produce similar lateral effects.

80.    Formation pressures are also used to infer the depth of oil-water contacts (OWC) when the pressure gradients of the oil column and underlying water column are known. The intersection of the oil column gradient and water column gradient is defined as the free-water level,[43] a close approximation to the OWC in moderate to high permeability rock. When no OWC is encountered in a well, the pressure gradient of the water column must be based on results from another downdip well. The critical issue is that the downdip water column must be in pressure continuity with the updip oil column to establish the OWC. Sealing faults between the water and oil leg prevent such pressure continuity; lateral continuity of the sands is also a critical factor in assessing whether a well provides useful information about the depth of OWC's.

81.    Figure 26 shows that the water leg of Shen-3 lined up with Shen-1, not Shen-2, and thus could not be used to project OWCs across the field based on Anadarko's Shen-2 field model. As Jake Ramsey, the geologist on the exploration team, admitted, such facts would not allow the projection of OWCs and suggested east-west compartmentalization at Shen.[44] Nevertheless, Anadarko told the public that Shen3 "*validate[d] the company's geologic models*" and "*enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.*"

---

[43]    The free water level is the depth at which the capillary pressure of the oil and water phase are equal. An OWC is defined as the depth at which the oil becomes the dominant flowing phase, which can occur above the free-water level in lower permeability formations.

[44]    *See* APC-00013451; *see also* Figure 14B.

CONFIDENTIAL



***Figure 25**. Shen-2 pressure gradients in Wilcox sands. (APC-00001505, slide 21 (September 2013))*



***Figure 26**. Shen#1-Shen#3 Water Sands MTD Pressures Plot. (Deposition Ex. 227, slide 28)*

82.    Shen-3 was positioned to test the position of the OWC but encountered no hydrocarbons.  MDT pressure data were used to estimate OWCs in each sand.  After Shen-3 found

CONFIDENTIAL

no hydrocarbons, the estimated OWC was placed at a subsea elevation of -30,510 ft across the entire structure. The lowest known oil (LKO) was about 1,105 ft (-29,045 ft subsea) above the projected OWC. The area above the projected OWC was used to calculate resource estimates, but as the development team geologist Paul Chandler observed, the "*o/w projection . . . is not definitive at al[l]*" but would require a "*well to prove that*" as "*Shen-3 has proved up very little.*"[45] A sealing fault between the Shen-2 and Shen-3 wells would make such an OWC projection invalid. The development team recognized the potential effect of such a fault in 2014 and found evidence that the exploration team had as well, as Chip Oudin observed in an email to the development team: "*You know, I just got into the Exploration Seisworks project across Shenandoah, and the main fault that potentially separates Shen-2 from the rest of the world (trending NW-SE, down-to-the-southwest, possibly intersecting Shen-2 at the bottom of the well) has already been mapped, at least twice. Someone needs to explain to me why it's never shown up on any Expl [Exploration] maps.*"[46] Paul Chandler responded: *"The smoking gun??"*[47] The map presented in December 2014 (Fig. 13B) clearly shows this fault.

83.     Likewise, by January 2015, the development team had mapped an east-west trending fault just north of Shen-3. Figure 27 shows a seismic line[48] running NNW to SSE through the Shen-3 location. Given the potential for this fault to seal, Shen-3 was not located effectively to be an

---

[45]   APC-00617135.

[46]   APC-00852630 (November 25, 2014).

[47]   *Id.*

[48]   APC-00863560 (January 19, 2015).

injection well and provide pressure maintenance to up-dip production wells to the north, as was understood internally at the Company at the time.[49]



**Figure 27**. *Seismic line with interpreted fault north of Shen-3. Interpreted Fault North of Shen-3.*

84.      Chip Oudin cataloged several concerns about the project that he and development team members had expressed pre- and post-Shen-3 drilling in document APC-00020023, dated January 2015, summarized below and attached as Appendix III. The exploration team apparently ignored these concerns, which Oudin remarked remained salient even in 2017. In a 2017 email Oudin highlights this: *"Interesting reading from Jan. 2015, before Shen-4 was drilled. Funny to see old thoughts and concepts."*

---

[49]   *See, e.g.*, July 28, 2022 Deposition Transcript of Paul Chandler at 147:20-150:11; APC-00001928.

CONFIDENTIAL

(a)     Is the current Seismic imaging sufficient to define the structure and the reservoir? Seismic depth processing had not accurately predicted the base of salt and had to be adjusted to the well data. Seismic evidence of a fault between the Yucatan structure and Shen suggested that more faults were likely.

(b)     Compartmentalization was mainly due to faulting, but also noted, from the well evidence that variable sand thicknesses imply the potential for stratigraphic pinchouts.

(c)     At least two fluid types were collected in Shen-1 and Shen-2. Although it was inferred from pressure data, no oil-water contact was penetrated by the first three wells except for the Lower Wilcox A and C in Shen-1.

85.     Seismic interpretation differences were addressed in maps included in the McGrievy presentation dated May 13, 2015. Faults were noted in the Shen-3 BP-1 core, confirming potential compartmentalization. Also, in the presentation, MDT interpretations suggested that the accumulation was divided into an East and West block. September 9, 2015, Shen project Update & Preliminary Budget Review[50] includes the recognition that there was a potential asphaltene issue that could affect production, documented differences in fault interpretation between exploration and development, and indicated the reduced area of hydrocarbon accumulation from the results of Shen-4. MMRA interpretation based on this division suggested a mean resource of about 400 MMBOE.

86.     Additional seismic mapping and the drilling of Shen-4 revealed small-scale faulting in the Shen geologic structure. Geophysical mapping (Figure 28) noted several faults oriented NW-SE closely related to the lineations in the dip attribute map (coherence map), Figure 22, confirming that the "lineations" were faults as recognized by the development team. The results of Shen-4 found significant evidence for faults summarized by Paul Chandler in (APC-01180902, slide 48).

---

[50]   APC-00193551.

CONFIDENTIAL

These faults are present in the March 2016 Paul Chandler PowerPoint cross-section shown in Figure 29.  The list below highlights the evidence of faulting.

- Faults interpreted from wireline logs: NGI, RT Scanner, Density Image, BARS.

- Paleontology data indicated the Upper Wilcox Sands in Shen-2 are missing in Shen-4.

- Lower Wilcox Sands correlated to Shen-2, Upper Wilcox Sands missing.

- Lower Wilcox Sand pressures were different between Shen-4 ST and Shen-2.

- Slickenslides in the cuttings and cores indicated faults.

- Deformation bands were identified in the core.

- The fault zone was not a single plane and could be a cluster of parallel faults or a zone of crushed rock along a single fault.

CONFIDENTIAL



***Figure 28***. *Seismic map on top of the Upper Wilcox 2 sand in the northern Shen basin. Green stars are the locations of drilled wells. The black star indicates the location of the proposed Shen-5 well. (APC-01180902, slide 5 (March 2016, Paul Chandler PowerPoint))*

CONFIDENTIAL



*Figure 29*. *West-East schematic cross-section of the Shen basin from Shen-4 to Shen-3. Key learnings from the Shen-4 well are indicated. The proposed Shen-5 and Shen-6 locations had not been drilled when this cross-section was made. (APC-01180902, slide 5 (March 2016))*

87.     Indeed, Paul Chandler observed that the fact Shen-4 potentially eliminated the entire Upper Wilcox in the reserve model was a "huge implication at stake."[51]

88.     The fault and deformation bands identified in Shen-4 and the mapping further confirmed the likely compartmentalization of the Upper Wilcox suggested by previous wells. The development team assembled evidence that the Shen structure was not a simple homoclinal structure but that the structure was compartmentalized. These compartments or barriers would likely reduce hydrocarbon recovery factors.

89.     The potential for North-South faulting impacted the uncertainty in resource size because the Shen structure is elongated along an East-West axis with sealing North-South faulting, each potential fault block would need to be tested, and extrapolations of oil and aquifer gradients located miles apart would be invalid to determine the depth of OWC's. Figures 30, 31, and 32

---

[51]    July 28, 2022 Deposition Transcript of Paul Chandler at 190:1-194:23; APC-00054087.

CONFIDENTIAL

resulted from interpreting 2016 reprocessed seismic data and clearly show fault compartmentalization.

90.     The impact of flow barriers increased in importance with the finding that asphaltene dropout pressures ("AOP"s) were relatively high.[52]  Wellbore pressure maintenance is required by substantial aquifer support or water injection to prevent the premature dropout of asphaltenes in the reservoir.  Asphaltenes negatively impact crude oil production because they may precipitate out in the reservoir, seriously decreasing the production rate.

91.     The combination of fault compartments and lower hydrocarbon recovery seriously impacts ultimate hydrocarbon recovery.  The lower hydrocarbon recovery is caused because of the dropout of asphaltenes in the reservoir as pressures drop during production.  Additionally, faults cut out significant portions of the Wilcox.

92.     Completed in August 2016, Shen-5 drilled in what Anadarko and partners considered the eastern block (Figure 32).  The well drilled through the expected fault, confirming it to be in the eastern block.  The well was cored, and well logs determined over 1,040 ft of net hydrocarbon pay in the Upper and Lower Wilcox zones.  Pressure data indicated varying fluid composition and vertical pressure variation, similar to previous wells.  Additionally, two tar zones were noted in the Shen-5 Lower Wilcox C zone.  In total, there was about 22 feet of tar.  Such tars form by water-washing and biodegradation in the reservoir and form flow barriers.  Tars were also noted in the Shen-4 ST2, a negative fact that Anadarko kept quiet about, even with partners.[53]  Anadarko's statements about Shen5 were in terms of the feet of pay, focusing on the magnitude of pay, and ignored compartmentalization and production issues that typically decrease resources per well and production.

---

[52]   APC-00193551, slide 3.

[53]   APC-00253714.

CONFIDENTIAL

93.    Shen-6 followed Shen-5 and encountered no hydrocarbons; it was a wet well; the sidetrack targeting OWC's downdip from Shen-5 was wet and in a different fault block from Shen-5. The highest known water in the Lower Wilcox E was at -31,319[54] ft subsea, and the eastern OWC was raised to -30,400 ft based on pressure data. With the drilling of Shen-5 and Shen-6, it was clear that each fault compartment had separate OWC's for each of the Wilcox zones (Figure 30). Following Shen-6, Anadarko recognized several remaining uncertainties. The location of the salt weld and the trap affected the structure's northern and western edges. Additionally, there was still some uncertainty in the OWC and how Shen-1 fit into the structural picture.

94.    The 2016 reprocessed seismic solved the Shen-1 structural issue, indicating it was a rafted or trapped sedimentary block with the trap for the Shen-1 sands being the updip weld (Figure 27). It also clearly defined the faults that had been the focus of the exploration team/development team disagreement, as shown in Figure 29. Wireline logs, including OBMI, indications of fractures, faults, and deformation bands in cores, and seismic confirm the field's faults and potential flow barriers, compartmentalizing the field and significantly reducing the resource potential from the original exploration team estimates. However, a map in a March 2016 presentation, "Shenandoah: An Appraisal Update"[55] (Figure 28), indicated a likely reverse fault just north of Shen-3. With Anadarko's focus on compartmentalization in the western part of the structure and the Shen-3 dry hole, the Easternmost fault block still showed no faults.[56] Anadarko wrote off the Shen field in its entirety after the close of the market on May 2, 2017.

---

[54]   APC-01286239, slide 19 (June 2017).

[55]   APC-01180902.

[56]   APC-00091671, slide 20 (April 4, 2017).

CONFIDENTIAL



***Figure 30***.  *Depth structure map of the Lower Wilcox E zone after 2016 reprocessing.  Note the many faults and OWCs for the individual compartments.  (APC-01286239, slide 19 (June 2017))*



***Figure 31***.  *Depth structure map of the Upper Wilcox 2 sand interpreted from the 2016 reprocessed seismic.  (APC-021286239, slide 49 (June 2017))*

CONFIDENTIAL



***Figure 32****. Seismic line well tie across Shen field - Shen-4ST/Shen-2/Shen-5/Shen-6ST/Shen-6/Shen-1 showing interpreted faults.  (APC-01286239, slide 46 (June 2017))*

## X.    ADDITIONAL RESERVOIR ISSUES

95.    Anadarko held out Shen as having excellent reservoir and fluid qualities to the public. For example, at a May 24, 2016, UBS Global Oil and Gas Conference ("UBS Conference"), Anadarko's representative Shandell Szabo described Shen as having *"Miocene-like properties, which means that the reservoir quality is very good.  You're looking at porosities of up to 25% here. You're looking at permeabilities in the 100 millidarcy range.  Some of the individual sands see 300, 400 millidarcies perm.  And then the last thing you look at is the fluid property, since it's very light oil out here.  So from the overall discovery, it's got everything that you're looking for."*[57]  But the data showed the average porosity for Shen-2, Shen-3, and Shen-4 ST-1 was 20%.[58]  Further, as discussed above, Shen posed serious challenges as to tar and AOP.

---

[57]  May 24, 2016, Transcript of the Anadarko Petroleum Corp at UBS Global Oil and Gas Conference

[58]  APC-00001146, slide 10, APC-00065685, slide 9, APC-00592612, slide 9.

CONFIDENTIAL

96.    As mentioned above, my report uses the term "resource" to describe Shen in this case rather than "reserves" because the Shen wells with oil and natural gas indications were not flow tested and could not be classified as "proven" oil and gas reserves during the Class Period.  Yet at the same UBS Conference, Ms. Szabo implied that there are proven and probable reserves in the Shen field: *"[Y]ou can see the number five well up there on that cross-section, so you can see that lighter green color – we're going to be able to turn that dark green.  So the lighter green on there is the **probable**, and the darker green is the **proven**, and so we're going to have the ability for that large area over there to go ahead and say, yes, that's **proven**, so that's tremendous for us."*[59]  Under the SPE reserves classification, **Proven** (on production – 1P), **Probable** (under development-2P), and **Possible** (planned for development-3P) refer to Discovered Commercial Reserves. On the other hand, resources are referred to as **Contingent Resources**, or Discovered Resources (development-pending, on hold, or not viable), and **Prospective Resources** (undiscovered).  The use of **Proven** and **Probable** in the statement suggests that wells have flowed, been tested, and are under development, which overstates the confidence in the resource potential of Shen.

## XI.    SUMMARY AND CONCLUSION

97.    Known risks and uncertainties about Shen leading up to and during the Class Period contradicted Anadarko's rosy public statements, including significant evidence of compartmentalization and faulting, a shrinking resource, and other key risks.  Exploration mapping of Shen with no faults and vigorous dissent from the pre-development team were red flags for management.  Yet, even after the Risk Consistency Team ("RCT") internal audit resulted in a significant downward adjustment to Shen's resource size and increased resource uncertainty (Fig. 2), exploration continued to use the larger resource estimates.  Additionally, the Company failed to

---

[59]    May 24, 2016, Transcript of the Anadarko Petroleum Corp at UBS Global Oil and Gas Conference (emphasis added).