# Exhibit 25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re ANADARKO PETROLEUM CORPORATE SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 4:20-cv-00576<br><br><br>REBUTTAL REPORT OF KEVIN J. MURPHY |

# Rebuttal Report of Kevin J. Murphy

1.  **Introduction** .................................................................................................................................1

2.  **Summary of Opinions** .................................................................................................................4

3.  **Executive Compensation at Anadarko Petroleum** ...................................................................5

    3.1.  Overview.................................................................................................................................5
    3.2.  Annual Bonuses (AIP) ...........................................................................................................6
    3.3.  Restricted Stock Units (RSUs)...............................................................................................8
    3.4.  Non-Qualified Stock Options (NQSOs) .................................................................................9
    3.5.  Performance Units (PUs) .......................................................................................................9

4.  **Stock Ownership and Trading Patterns for Named Defendants, 2014-2018** .......................11

    4.1.  Mr. Walker..........................................................................................................................11
    4.2.  Mr. Gwin.............................................................................................................................12
    4.3.  Mr. Daniels .........................................................................................................................13
    4.4.  Mr. Leyendecker .................................................................................................................14

5.  **Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?** ..........................................................................................................15

    5.1.  Annual Bonuses (AIP) .........................................................................................................16
    5.2.  Restricted Stock Units (RSUs).............................................................................................17
    5.3.  Non-Qualified Stock Options (NQSOs) ...............................................................................19
    5.4.  Performance Units (PUs) .....................................................................................................21
    5.5.  Summary ..............................................................................................................................25

6.  **Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activities?** ..........................................................................................................25

    6.1.  Mr. Walker..........................................................................................................................26
    6.2.  Mr. Gwin.............................................................................................................................27
    6.3.  Mr. Daniels .........................................................................................................................28
    6.4.  Mr. Leyendecker .................................................................................................................29
    6.5.  Summary ..............................................................................................................................30

7.  **Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko management?** .............................................................................................................................31

8.  **Did the alleged inflation increase the payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?** .................................................................................35

9.  **Author's Statement and Qualifications** ..................................................................................37

**Exhibit A: Curriculum Vitae** ..........................................................................................................62

**Exhibit B: Testifying Experience in the Last Five Years** .............................................................76

**Exhibit C: Materials Considered in Producing this Report** .........................................................77

## Rebuttal Report of Kevin J. Murphy

### 1. Introduction

In its Form 10-Q filed after market close on May 2, 2017, Anadarko Petroleum Corporation ("Anadarko") reported its first-quarter financials for 2017. In that filing, Anadarko disclosed that it had suspended further appraisal activities of the Shenandoah oil prospect.[1] In their Amended Complaint (the "Complaint"), Plaintiffs allege that Anadarko executives Robert "Al" Walker ("Mr. Walker"), Robert G. Gwin ("Mr. Gwin"), Robert P. Daniels ("Mr. Daniels") and Ernest A. Leyendecker, III ("Mr. Leyendecker") (collectively, the "Named Defendants") made false and misleading statements to conceal that Shenandoah was not commercially viable from February 20, 2015 to May 2, 2017 (the "Class Period"). Among approximately 20 other allegedly false and misleading statements, Plaintiffs allege that Anadarko knew but failed to disclose that the "Shen-3" appraisal well was a "dry hole" since at least February 20, 2015 (the start of the "Class Period"), and as a consequence failed to expense the exploratory well costs until the third quarter of 2016.[2]

As a result of the alleged misstatements (the "alleged fraud"), Plaintiffs' expert Bjorn I. Steinholt ("Mr. Steinholt") contends that the price of Anadarko's common shares was artificially inflated by $1.75 per share from February 23, 2015 through July 26, 2016, and by $1.92 per share from July 27, 2016 through May 2, 2017.[3] In addition, Plaintiffs' expert

---

[1] Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017, Note 5 (p. 13).

[2] Amended Complaint, August 17, 2020, ¶¶ 4, 97-139; Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016, p. 11.

[3] Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022 (the "Steinholt Report"), ¶¶ 105-106 and Exhibit D. Mr. Steinholt contends that the price of Anadarko shares was correct on February 20, 2015, and May 3, 2017 (the beginning and ending of the Class Period, respectively).

D. Paul Regan ("Mr. Regan") drew a connection between executive bonuses and the alleged delay in expensing suspended exploratory well costs.[4] Plaintiffs also contend that the Named Defendants benefited from the alleged fraud through golden parachute payments received in connection with the August 2019 acquisition of Anadarko by Occidental Petroleum Corporation ("Occidental").[5]

I, Kevin J. Murphy, have been retained by Cravath, Swaine & Moore LLP, counsel for Anadarko and the Named Defendants, to assess Plaintiffs' assertions that the Named Defendants stood to benefit financially from the alleged fraud. In particular, I have been asked to analyze and assess:

- whether the Named Defendants benefited financially from the alleged stock-price inflation through increased compensation;

- whether the Named Defendants benefited financially from the alleged stock-price inflation through their trading activity;

- whether the alleged misstatements with respect to Shen-3 increased the bonus awards to Named Defendants; and

- whether the alleged inflation in Anadarko's stock prices during the Class Period increased the amounts received by the Named Defendants in connection with the acquisition by Occidental.

As described in detail in Section 9 below, I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I am a recognized expert on executive compensation, and have written more than fifty articles, case studies, books, and book chapters relating to compensation and incentives in organizations. I have served as a compensation consultant on issues related to CEO pay for many public and private companies,

---

[4]    Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022 (the "Regan Report") ¶¶ 77(c), 86.
[5]    Complaint, ¶¶ 5(s), 9, 150.

and I have provided expert testimony related to executive compensation to Congress, the Court of Chancery of the State of Delaware, and in other federal and state Courts.

I am being compensated for my work on this matter at my customary billing rate of $1,200 per hour. While the opinions expressed herein are entirely my own, I have been assisted in this matter by staff of a research firm, Compass Lexecon, who worked under my direction and supervision. My compensation, and that of Compass Lexecon, is neither contingent nor dependent on the outcome of this matter. The conclusions in this report are my own.

My report proceeds as follows. My opinions are briefly summarized in Section 2. In Section 3, I describe Anadarko's executive compensation practices and policies, focusing on components potentially impacted by the alleged fraud. Section 4 describes the stock ownership and trading activities for the Named Defendants from 2014–2018 (*i.e.*, from the calendar-year before the Class Period to the calendar-year after the Class Period). Sections 5–8 provide my opinions related to the four bullet points above, respectively. My qualifications are described in Section 9, "Author's Statement and Qualifications," and I have attached my curriculum vitae at the end of this report as Exhibit A. A list of cases in which I have testified or given depositions within the last five years is attached as Exhibit B. In performing my analysis, I have relied upon materials produced in this case and other publicly available information. A list of the materials upon which I have relied in forming my opinions in this report is attached as Exhibit C.

I reserve the right to amend this report to reflect any additional information obtained after the submission of this report. I also reserve the right to supplement this report to address additional issues raised by Plaintiffs' experts in the pending litigation.

## 2. Summary of Opinions

### 2.1. Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?

- No. The Named Defendants did not benefit financially from the alleged inflation through increased compensation. In fact, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 or $1.92 per share lower during the Class Period.

### 2.2. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activity?

- No. I find no evidence that trades by Named Defendants were "in suspicious amounts or at suspicious times" during the Class Period.[6] In fact, I find no evidence that the Named Defendants sold shares during the Class Period when prices were allegedly inflated, but instead kept reinvesting vested Restricted Stock Units ("RSUs") and exercised options into Anadarko, and (in the case of Mr. Walker) made large open-market purchases of Anadarko shares just after the Class Period.

- In addition, I find relevant the fact that Anadarko increased its working interest in the Shenandoah project from 30% to 33% at a time when Named Defendants allegedly had inside information that the project was a failure. This increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

### 2.3. Did the alleged misstatements with respect to Shen-3 increase bonus awards to Anadarko top executives?

- No. In fact, I find that expensing the Shen-3 cost in 2014 rather than in 2016 would have had no effect on 2014 executive bonuses but would have increased 2016 executive bonuses.

---

[6] I understand that the Fifth Circuit has found that trading "in suspicious amounts or at suspicious times" may be suggestive of scienter. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). Such suspicious trades include trades that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (citing *In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)). My assessments with respect to suspicious timing or amount of trading are from the perspective of my expertise in economics and are not legal opinions.

- In addition, I note that Anadarko's bonus structure for top executives does not include anything related to unproved reserves.

*2.4. Did the alleged stock-price inflation increase the golden parachute payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?*

- No. I estimate that the Named Defendants would have realized approximately $1.3 million in additional payouts in connection with the Occidental acquisition *absent* the alleged inflation, across all pay components.

## 3.  Executive Compensation at Anadarko Petroleum

### 3.1. Overview

Anadarko's executive compensation plans and policies are described in detail in Anadarko's DEF 14A or "Proxy Statements" issued each March in advance of the annual meeting of shareholders. As emphasized in every Proxy Statement from 2010 through 2019, executive compensation at Anadarko is established and administered by the Compensation and Benefits Committee (the "Committee") consisting solely of independent outside directors. The Committee has overall responsibility for approving and evaluating Anadarko's director and officer compensation plans, policies, and programs. Since 2011, the Committee has been assisted by its independent executive compensation consultant, Frederick W. Cook & Company, Inc.[7]

As described in the Compensation Discussion and Analysis section of each Proxy Statement, executive compensation at Anadarko consists of three primary components: base salary, annual bonus, and long-term incentives in the form of Restricted Stock Units ("RSUs"),

---

[7]  Prior to 2011, the Committee's outside consultant was Hewitt Associates LLC; it briefly retained Meridian Compensation Partners, LLC in late 2010 after its separation from Hewitt. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011, p. 34.

Non-Qualified Stock Options ("NQSOs"), and Performance Units ("PUs"), as described in detail below.[8] Table 1 summarizes the 2014–2018 target compensation for the Named Defendants. As shown in the table, target compensation for Mr. Walker, Mr. Gwin, and Mr. Daniels did not change from the calendar-year before the Class Period to the calendar-year after the Class Period, and Mr. Leyendecker's target compensation changed only upon his promotion to Executive Vice President ("EVP") in August 2016. Target Bonuses are defined as a percentage of Base Salary (130% for Mr. Walker and 95% for EVPs). Target Equity awards are expressed in dollars and are allocated across PUs, RSUs, and NQSOs based on predetermined percentages.[9] Since 2015, EVPs and above have received 50% of their equity compensation in PUs, and 25% each in RSUs and NQSOs.

### 3.2. Annual Bonuses (AIP)

Bonuses under Anadarko's Annual Incentive Plan ("AIP") are determined by the following formula:[10]



Each February, Anadarko's Compensation Committee (the "Committee") meets to approve the specific performance measures that determine the AIP Performance Score for the current

---

[8]    While not relevant to my opinions and analyses, Anadarko executives also participated in qualified and non-qualified pension and deferred-compensation programs.

[9]    The target equity percentages are reported in the Proxy Statements. The Total Target Equity amounts in Table 1 differ slightly from the amounts reported in Anadarko's proxy statements because the latter is based on finalized accounting values under ASC Topic 718. The targets in Table 1 are derived from various sources, including APC-00779479 at 527; APC-00786269 at 275; APC-00771156 at 156; APC-00790771 at 777, 788; APC-00790250 at 256, 267.

[10]   *See*, *e.g.*, Anadarko Petroleum Corporation DEF14A Proxy Statement filed March 17, 2017, p. 43.

year and to certify performance results for the prior year.[11] Table 2 summarizes the performance measures and weights used for the AIP Performance Score from 2014–2018, generally consisting of the following: *operational measures* tied to proved reserves and sales volumes (in million barrels of oil equivalents, or "MMBOE"),[12] *financial measures* (*e.g.*, capital expenditures, controllable cash costs), and *safety measures* (*e.g.*, Total Recordable Incident Rate).

Each performance measure in Table 2 is measured against a target performance goal also approved by the Committee at its February meeting. The performance goals are based on Anadarko's annual capital budget, which in turn is based on a company-wide portfolio evaluation effort led by the company's Corporate Planning team with multiple reviews by both executive management and the Board of Directors.[13] The Committee approves the associated AIP performance goals to align with the short- and long-term strategic objectives of the budget. The Committee then monitors progress during the year, reserving the right to adjust the goals based on various internal and external factors that might arise during the year. In addition, the Committee can use its discretion to *reduce* (but not increase) the year-end AIP Performance Score. Payouts under the AIP are capped at 200% of each executive's Target Bonus.

---

[11] *See*, *e.g.,* Minutes from the Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471); February 8, 2016 (APC-00783560-573); February 8, 2017 (APC-00787943 at 944-952); February 12, 2019 (APC-00790975 at 976-984).

[12] As defined by the Financial Accounting Foundation, proved oil and gas reserves include only quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible (*see* Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022). Notably, Anadarko did not book any reserves in connection with the Shenandoah prospect during the Class Period (*see* Deposition of Charles F. Oudin, III dated June 30, 2022, 243:7-11).

[13] The budget process and the determination of the AIP performance measures and goals is described in the Compensation Discussion and Analysis of each DEF 14A (Proxy) Statement.

Table 3 shows the actual payouts under the AIP for Anadarko's Named Executive Officers (or "NEOs," defined as the executive officers named in proxy statements) from 2014–2018. The actual bonus received by any NEO is determined by multiplying the NEO's Target Bonus by the Final AIP Bonus percentage. For example, Mr. Walker's 2014 bonus was $2,551,900, which is 151% of his Target Bonus (which in turn is 130% of his $1.3 million base salary). As shown in the table, the Committee used its discretion to reduce bonuses by 86.5% in 2015, and by 7.6% in 2017. No NEO received an individual performance adjustment from 2014 to 2018.

### 3.3. Restricted Stock Units (RSUs)

As shown in Table 1, 25% of the equity pay for Anadarko EVPs or higher is conveyed in the form of RSUs, which vest equally over three years beginning one year from the grant date. The number of RSUs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the closing price of Anadarko common stock on the grant date.

Upon vesting, the market value of the Anadarko shares associated with the RSUs is considered ordinary taxable income to the recipient. To satisfy the tax obligations, Anadarko reduces the number of RSUs subject to the applicable vesting period by the number of RSUs equal to the applicable withholding taxes, resulting in the distribution of net shares to the participant.[14] Dividends on RSUs are accrued and reinvested quarterly in additional shares of Anadarko common stock and paid, less applicable withholding taxes, upon vesting.

---

[14] *See* APC-00776406 at 419 (2014); APC-00780428 at 444 (2015); APC-00786209 at 217 (2016); APC-00790250 at 259 (2017); APC-00790771 at 780 (2018). The shares withheld by Anadarko are noted by the Transaction Code "F" in the Form 4s of the Named Defendants.

### 3.4. Non-Qualified Stock Options (NQSOs)

Stock options give the recipient the right, but not the obligation, to purchase shares at a predetermined "exercise price" over a predetermined period. Stock options for Anadarko executives—comprising 25% of the equity pay for Anadarko CEO and EVPs from 2014 through 2018—have a term of seven years and are granted with an exercise price equal to the closing stock price on the grant date.[15] The number of NQSOs granted to each executive in each year is determined by dividing 25% of that executive's Target Equity Award by the calculated value per option as of the grant date.[16]

Anadarko stock options become exercisable over three years, beginning one year from the grant date. When options are exercised, the difference between the stock price on the exercise date and the exercise price is considered taxable ordinary income to the recipient. Under Anadarko's Stock Option plans, employees exercising options can deliver cash or use shares of Company stock for full or partial payment of the exercise price and the minimum tax withholding due upon exercise.[17]

### 3.5. Performance Units (PUs)

Anadarko's Performance Unit plan is a cash plan where the payoffs are based on both Anadarko's stock price and its Total Shareholder Return ("TSR").[18] In particular, in each year

---

[15]  Senior Vice Presidents ("SVPs"), including Mr. Leyendecker prior to his August 2016 promotion to EVP, had a Target NQSO Percentage of 35% in 2014 and 2015. *See* APC-00789245 at 286.

[16]  These values differ slightly from the ASC 718 values reported in the proxy statements.

[17]  *See* APC-00776406 at 418 (2014); APC-00780428 at 443 (2015); APC-00786209 at 215 (2016); APC-00790250 at 257 (2017); APC-00790771 at 778 (2018).

[18]  For purposes of PU vesting, TSR for Anadarko and its 11 peers is defined as the average closing stock price for the last 30 trading days of the performance period *minus* the average closing stock price for the 30 trading days preceding the beginning of the performance period *plus* dividends per share over the performance period, all divided by the average closing stock price for the 30 trading days preceding the beginning of the performance period *See* APC-00776406 at 420 (2014); APC-00780428 at 445 (2015); APC-00786209 at 219 (2016); APC-00790250 at 261 (2017); APC-00790771 at 782 (2018).

each executive is granted a "target number" of PUs. Each PU conveys the right for the participant to receive the cash value of one share of Anadarko stock, but the number of PUs conveyed depends on Anadarko's TSR rank relative to the TSR realized by eleven peer companies. Table 4 shows the payoff levels under Anadarko's PU plan, reflecting differences for grants made before November 2014 and in or after November 2014. In both time periods, executives will receive the cash value of 200% of target PUs if Anadarko is at the top of the 12-firm cohort (*i.e.*, Anadarko plus 11 peers), and will receive nothing if Anadarko is ranked among the bottom three of the cohort.

Half (50%) of the grants before November 2014 were based on two-year TSR performance, and the remaining 50% were based on three-year TSR performance; grants made in November 2014 or after are based only on three-year TSR performance. Grants are typically made in late October or early November, with the performance period commencing on the following January 1st.[19] For example, the three-year performance period for the grant made on November 6, 2014 is January 1, 2015 through December 31, 2017.[20]

The target number of PUs granted to each executive (EVP and above) is determined by dividing 50% of the Target Equity Award by the value of each PU, which in turn is calculated using a Monte Carlo estimation that takes into account the payoff structure in Table 4 and the relative probabilities (and associated stock prices) of ending up at each performance rank.[21] Given the convexity inherent in Table 4 (*e.g.*, more PUs are granted when stock prices are

---

[19] The only exception for the Named Defendants with unvested PUs from 2014–2018 was a special grant to Mr. Walker made on May 15, 2012 in connection with his appointment as Anadarko's President and CEO. Half of this grant vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2014, while the other half vested based on Anadarko's relative TSR ranking from May 15, 2012 to May 14, 2015. *See* Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 23, 2015, p. 50 and Anadarko Petroleum Corporation DEF14A Proxy Statement, filed March 18, 2016, p. 51.

[20] *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 62.

[21] *See* APC-00789245 at 253.

higher), the per-unit value of each PU granted from 2014 to 2018 averages about 10% higher than the grant-date stock price.[22] Accordingly, the target number of PUs granted each year (representing 50% of the Target Equity Award) will be somewhat less than twice the target number of RSUs granted each year (representing 25% of the Target Equity Award).

### 4. Stock Ownership and Trading Patterns for Named Defendants, 2014-2018

#### 4.1. Mr. Walker

Figure 1 depicts Mr. Walker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including shares held indirectly in an LLC. In August 2014, six months prior to the Class Period, Mr. Walker exercised 62,200 options from his November 2007 grant due to expire in November 2014, selling all the shares acquired (including shares sold to pay the exercise price and taxes).[23] The same month, he also exercised 182,900 options from his November 2008 grant due to expire in November 2015, again selling all shares acquired.[24] Mr. Walker did not exercise any other options from 2014–2018, and also retained all vesting RSUs beyond those that Anadarko withheld for tax purposes.[25] Mr. Walker sold no Anadarko shares during the Class Period, and his only other transaction between 2014 and 2018 was an open market purchase of 19,300 Anadarko shares on May 17, 2017, two weeks after the end of the Class Period.[26]

---

[22] As with stock options, the PU values used by the Committee in finalizing grants differ slightly from the ASC 718 values reported in the proxy statements.

[23] R. A. Walker Form 4 filed August 8, 2014.

[24] R. A. Walker Form 4 filed August 8, 2014.

[25] Options granted to Mr. Walker in November 2009, November 2010, and November 2011 expired out-of-the-money (*i.e.*, the exercise price exceeded Anadarko's stock price on the expiration date, and therefore expired unexercised).

[26] R. A. Walker Form 4 filed May 17, 2017.

Under Anadarko's Stock Ownership Guidelines for Non-Management Directors and Executive Officers ("Stock Ownership Guidelines"), Mr. Walker (as Anadarko's CEO) is required to hold six times his base salary in Anadarko shares or RSUs.[27] Based on his $1.3 million base salary from 2014–2018, Mr. Walker was therefore required to hold $7.8 million in shares or RSUs.[28] Figure 2 shows the value of Mr. Walker's shares and RSUs, where (consistent with the Stock Ownership Guidelines) the value is defined as Mr. Walker's shares (or RSUs) multiplied by the average daily stock price over the preceding year. As evident from the figure, Mr. Walker's ownership significantly exceeded his ownership requirements throughout the depicted time period.

### 4.2. Mr. Gwin

Figure 3 depicts Mr. Gwin's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through December 2018, including Anadarko shares held in his 401(k) Plan. In August 2014, Mr. Gwin exercised all remaining options from his soon-to-expire November 2007 and March 2008 grants, selling all the shares acquired (including those used to pay the exercise price and taxes).[29] Mr. Gwin also exercised remaining options from his November 2008 grant in October 2015 (a month before expiration), and the remaining options from his March 2009 grant in February 2016 (a day before expiration), *retaining* all the net shares acquired (after Anadarko withheld enough shares to pay the exercise price and taxes).[30] He also retained all net shares acquired when RSUs vested. Beyond these transactions,

---

[27]  *See*, *e.g.,* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 57.

[28]  To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[29]  Robert G. Gwin Form 4 filed August 8, 2014.

[30]  Robert G. Gwin Form 4s filed October 9, 2015 and March 2, 2016, indicating shares withheld by Anadarko by Transaction Code "F".

Mr. Gwin's only other transactions from 2014 to 2018 were November 2017 transfers of 57,064 Anadarko shares and 2018 RSUs (upon vesting) to his ex-wife pursuant to a domestic relations order; these transfers occurred after the Class Period.[31] Mr. Gwin did not sell or transfer any Anadarko shares during the Class Period.

Under Anadarko's Stock Ownership Guidelines, Mr. Gwin (like other EVPs) was required to hold three times his base salary in Anadarko shares or RSUs. Based on his $750,000 base salary from 2014–2018, Mr. Gwin was therefore required to hold $2,250,000 in shares or RSUs.[32] Figure 4 shows the value of Mr. Gwin's shares and RSUs, where value is again defined based on the average daily stock price over the preceding year. As evident from the figure, Mr. Gwin's ownership significantly exceeded his required ownership throughout the depicted time period, even after the sizable November 2017 transfers to his ex-wife.

### 4.3. Mr. Daniels

Figure 5 depicts Mr. Daniels' holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement in December 2016, including Anadarko shares held in his family's Limited Partnership and his 401(k) Plan. Pursuant to a divorce decree, Mr. Daniels exercised and sold soon-to-expire options in both April 2014 and March 2015 at his ex-wife's request.[33] In May 2014 (prior to the Class Period), he exercised and sold options, and additionally sold 10,000 Anadarko shares he held directly.[34] In October 2015, Mr. Daniels exercised soon-to-expire options, retaining all net shares acquired (after Anadarko

---

[31] Robert G. Gwin Form 4 filed November 8, 2017.

[32] To mitigate short-term fluctuations in Anadarko stock prices, compliance under the Stock Ownership Guidelines is based on the trailing 52-week daily average stock price.

[33] Robert P. Daniels Form 4s filed April 11, 2014 and March 24, 2015. Both Form 4s note that Mr. Daniels "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."

[34] Robert P. Daniels Form 4 filed May 22, 2014.

withheld enough shares to pay the exercise price and taxes).[35] He retained all net shares acquired upon vesting of RSUs, and had no other transactions prior to his retirement effective December 30, 2016. Excluding the transaction connected to his divorce decree, he did not sell any Anadarko shares from the beginning of the Class Period through his retirement.

As an EVP, Mr. Daniels was required to hold three times his $700,000 base salary in Anadarko shares or RSUs. As shown in Figure 6, Mr. Daniels' ownership significantly exceeded his required ownership from 2014 through his retirement in December 2016.

### 4.4. Mr. Leyendecker

Figure 7 depicts Mr. Leyendecker's holdings of Anadarko shares, unvested RSUs, and stock options from January 2014 through his retirement on June 1, 2018. Data from August 2016 onward (when Mr. Leyendecker was appointed as EVP) are based on required public disclosures of ownership and changes in ownership.[36] Between January 2014 and his retirement in June 2018, Mr. Leyendecker never sold shares or exercised options, and retained all shares acquired upon RSU vesting net of shares withheld by Anadarko to satisfy tax obligations.[37] Upon his retirement in June 2018, Mr. Leyendecker's outstanding RSUs became fully vested and converted into Anadarko shares.[38]

While a Senior Vice President ("SVP"), Mr. Leyendecker was required (under the Stock Ownership Guidelines) to hold shares and RSUs worth 2.5 times his Base Salary (which

---

[35] Robert P. Daniels Form 4s filed October 16, 2015, indicating shares withheld by Anadarko by Transaction Code F.

[36] Data for common stock holdings prior to August 2016 are less reliable. *See* footnote to Figure 7.

[37] The depicted declines in outstanding options in March and May 2017 are due to options granted in March and May 2010 that expired out-of-the-money and were canceled.

[38] *See* Ernest A. Leyendecker, III Form 4 filed June 5, 2018.

increased from $400,000 to $420,000 in January 2015).[39] Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary). As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required under the Guidelines.

5. **Did Named Defendants benefit financially from the alleged stock-price inflation through increased compensation?**

Shares of Anadarko common stock closed at $51.95 on May 3, 2017, down 7.69% from the closing price of $56.28 on the previous day. In his report, Mr. Steinholt contends that $1.92 of Anadarko's $4.33 share-price decline on that day was based on its disclosure that it was expensing suspended exploratory well costs in connection with the Shenandoah project.[40] Mr. Steinholt opines that Anadarko's share price was artificially inflated by $1.92 per share from July 27, 2016 through May 2, 2017, and by $1.75 per share from February 23, 2015 (the first trading day following the first alleged misleading statement) through July 26, 2016.[41] Mr. Steinholt's change in the alleged inflation on July 27, 2016 was based on Anadarko's

---

[39] *See* APC-00775517 at 520 showing salary $400,000 as of June 30, 2014, and APC-00784847 showing salary of $420,000 by year-end 2014 and again in 2015, and APC-00783757 at 784 showing 2016 salary (as SVP) of $420,000 prior to promotion.

[40] Steinholt Report, ¶ 99. To be clear, it is *not* my opinion that $1.92 of the May 3, 2017 price drop is attributable to the Shenandoah disclosure.

[41] Steinholt Report, ¶ 14(d) and footnote 5: "Because the Class Period began with an alleged misleading statement made after the market closed on [Friday] February 20, 2015, the first day with inflation as a result of that misleading statement would be the next day, [Saturday] February 21, 2015."

disclosure that it had increased its working interest in the Shenandoah project from 30% to 33%.[42]

In this section, I take Mr. Steinholt's alleged inflation as given, and ask whether the Named Defendants would have benefited from the $1.75 or $1.92 per share inflation from February 23, 2015 through May 2, 2017 in the form of increased realized compensation. I focus on the components of compensation that are directly or indirectly affected by Anadarko's stock price.

### 5.1. Annual Bonuses (AIP)

As discussed in Section 3.2, bonuses under Anadarko's AIP are based on a variety of operational, financial, and safety performance measures approved by the Committee each year. In 2015 (and only in 2015), the Committee introduced relative TSR as one of the performance measures, making up 5% of the overall AIP Performance Score. Like the PU Plan, the TSR component in the AIP plan was based on Anadarko's TSR among its cohort (Anadarko plus its eleven peers). The contribution to the AIP Performance Score is summarized in Table 5. If Anadarko's 2015 TSR ranked first among the cohort, for example, the AIP Performance Score would be 13.75 percentage points higher than if it ranked twelfth.

Table 6 shows the 2015 TSR performance for Anadarko and its eleven peer firms, where TSR is based on the 30-day average stock price prior to the beginning and at the end of the year, plus dividends.[43] As shown in the table, Anadarko's TSR for 2015 was -33.6%, which ranked ninth among the cohort, earning the Anadarko executives 2.5% towards their AIP

---

[42]   Steinholt Report, ¶ 106 and footnote 129, showing that $1.75 equals $1.92 × (.30/.33). Mr. Steinholt does not explain why Anadarko would increase its working interest in the project if the top executives believed that Anadarko was not or was not likely to be commercially viable.

[43]   The peer group is identified in Anadarko's DEF 14A (Proxy) Statement filed March 18, 2016, p. 40.

Performance Score.[44] Absent the alleged inflation (*i.e.*, reducing Anadarko's closing price by $1.75), Anadarko's TSR for 2015 would have been -35.7%, which would still have been ranked ninth in the twelve-firm cohort.[45] Therefore, as evident from Table 6, the alleged inflation affected neither the AIP Performance Score nor the ultimate AIP payout. In any case, and as described in Table 3, the Committee ultimately used its discretion to reduce the 2015 AIP Performance Score from 196.5% to 110.0%.

Overall, it is my opinion that the Named Defendants would not have benefited from the alleged inflation through their AIP payouts during the Class Period, and in fact the AIP payouts would have remained the same under the alleged inflation (the "Steinholt Stock Prices").

### 5.2. Restricted Stock Units (RSUs)

As discussed above in Section 3.3, the number of RSUs granted to each Named Defendant is determined by multiplying the Target RSU Award and dividing by the stock price on the grant date.[46] Since the dollar value of the grant is fixed, lower grant-date stock prices imply more RSUs, while higher grant-date stock prices imply fewer RSUs. The Anadarko Named Defendants received two RSU grants during the Class Period. Mr. Steinholt contends that the October 26, 2015 grant was made when the $69.00 stock price was artificially inflated by $1.75, while the November 10, 2016 grant was made when the $61.87 stock price was artificially inflated by $1.92.

---

[44] Similar to the PU Plan, TSR for the AIP is measured based on 30-day average stock prices at the end of the year ($53.54) and the beginning of the year ($82.20). Dividends during the year totaled $1.08, yielding a TSR of ($53.54 + $1.08- $82.20)/$82.20 = -33.6%.

[45] Absent the alleged inflation, Anadarko's TRS would be ($53.54 - $1.75 + $1.08- $82.20)/$82.20 = -35.68%.

[46] The Target RSU Award is calculated as the Target Equity Award multiplied by the Target RSU Percentage (which was 25% for all Named Defendants between 2014 and 2018; *see* Table 1).

Table 7 compares the RSU awards made at the actual grant-date stock prices to the RSU awards that would have been made absent the Steinholt Stock Price.[47] As shown in the table, the Named Defendants in total would have received 2,046 *more* RSUs under the Steinholt Stock Price in the October 2015 grant, and would have received 2,336 *more* RSUs under the Steinholt Stock Price in the November 2016 grant.

Table 8 provides my analysis of the value upon vesting of the additional RSUs that would have been granted absent the alleged inflation. To be conservative, I exclude dividend equivalents that would have been paid on these RSUs as of vesting. The values for RSUs vesting on October 26, 2016 are based on the Steinholt Stock Price (*i.e.*, the actual $60.90 closing price minus $1.92) and the value for RSUs vesting on August 8, 2019 are based on the $72.50 per share merger consideration; all other values are based on Anadarko closing stock prices on vesting dates.[48] The vesting dates for Mr. Walker and Mr. Gwin are straightforward, since they continued as Section 16 reporting employees until the Occidental acquisition. The vesting dates for Mr. Leyendecker are also straightforward, since all unvested RSUs vested upon his departure in June 2018.[49] For Mr. Daniels, I assume his unvested RSUs were forfeited upon his voluntary retirement.[50]

As shown in Table 8, the additional 4,382 RSUs earned by the Named Defendants in the absence of alleged inflation would have an aggregate vesting value of $241,098 (not counting dividend equivalents). Therefore, it is my opinion that the Named Defendants did not benefit

---

[47]  The "RSU Award at Actual Stock Price" differs slightly from the actual grant reported in Anadarko's Proxy Statement due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

[48]  Upon the merger, each RSU was converted into $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or $72.50 in total. *See* Anadarko Petroleum Corporation DEFM14A Statement filed July 11, 2019 ("Merger Proxy"), p. 80.

[49]  *See* Ernest A. Leyendecker III Form 4 filed June 5, 2018.

[50]  *See* APC-00780428 at 444.

from the alleged inflation through their RSU grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.3. Non-Qualified Stock Options (NQSOs)

As discussed above in Section 3.4, the number of NQSOs granted to each Named Defendant is determined by dividing the Target NQSO Award by the per-unit value for each option. Since the dollar value of the NQSO Award is fixed, lower grant-date stock prices (as alleged by Mr. Steinholt) imply that more options will be granted at lower exercise prices. Thus, the Named Defendants would have been better off under the Steinholt Stock Prices.

The Named Defendants received stock options in October 2015 at an exercise price of $69.00 per share, and in November 2016 at an exercise price of $61.87 per share. Table 9 compares the option grants actually made during the Class Period to those that would have been made under the Steinholt Stock Prices. Since the value of an at-the-money option is proportional to the stock price,[51] the option value at the Steinholt Stock Price is calculated as the option value at the actual price multiplied by the ratio of the Steinholt Stock Price to the actual stock price.[52] The "NQSO Award at Steinholt Stock Price" is then calculated as the Target NQSO Award divided by the Option Value at Steinholt Stock Price.

As shown in Table 9, the Named Defendants received 311,217 options at an exercise price of $69.00 per share in October 2015, and 222,229 options at an exercise price of $61.87 per share in November 2016. Absent the alleged inflation, the Named Defendants would have received 319,316 options at an exercise price of $67.25 per share in October 2015 (+8,099

---

[51]  *See* Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (1985), Eq. (1) on p. 19.

[52]  Using Mr. Walker's 2015 grant as an example, $17.948 × ($67.25/$69.00) = $17.493.

options), and 229,346 options at an exercise price of $59.95 per share in November 2016 (+7,117 options).

Table 10 compares the ultimate gains-upon-exercise for the Named Defendants with and without the assumed inflation. Quantifying the ultimate gains of the options absent the alleged inflation for Mr. Walker and Mr. Gwin is straightforward, since SEC disclosures confirm they held the options from the 2015 and 2016 grants until August 8, 2019, when they were effectively exercised for the merger consideration of $72.50/share.[53] As shown in Table 10, Mr. Walker's options would have been worth an additional $609,017 absent the alleged inflation, while Mr. Gwin's options would have been worth an additional $244,186.

For Mr. Daniels, I assume that (1) his unvested options were forfeited upon his retirement in December 2016; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction in August 2019.[54] One third of Mr. Daniels' 2015 NQSO grant of 63,393 options (as reported) or 65,043 (absent the alleged inflation) would have been vested upon his retirement. As shown in Table 10, Mr. Daniels' options would have been worth an additional $39,867 absent the alleged inflation.

Similarly for Mr. Leyendecker, I assume that (1) his unvested options were forfeited upon his retirement in June 2018; (2) he was allowed 36 months to exercise his vested options; and (3) he indeed held his exercisable options until the Occidental transaction.[55] Two thirds of

---

[53]  Upon the merger, each in-the-money Anadarko stock option was cashed out based on the cash value of the merger consideration ($59.00 in cash per-share plus the cash value of .2934 shares of Occidental common stock on the day prior to closing, or $13.50). *See* Merger Proxy, p. 79.

[54]  Termination provisions under voluntary resignation (including retirement) provides for unvested options to be forfeited, and vested options (if retirement eligible) to have 36 months to exercise. *See* APC-00779578 at 634. Mr. Daniels could have exercised his options prior to the Occidental transaction at prices higher or lower than the merger consideration.

[55]  *See* note 54, *supra*. The Merger Proxy confirms that Mr. Leyendecker's vested options were cashed out in the transaction. *See* Merger Proxy, p. 80.

Mr. Leyendecker's 2015 NQSO grant of 31,209 options (as reported) or 32,021 (absent the alleged inflation) would have been vested upon his retirement, and one-third of his 2016 grant of 30,780 options (as reported) or 31,766 (absent alleged inflation) would have been vested. As shown in Table 10, Mr. Leyendecker's options would have been worth an additional $63,081 absent the alleged inflation.

In aggregate across grants and executives, Table 10 shows that the options granted to the Named Defendants during the Class Period would have been worth an additional $956,152 absent the alleged inflation. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their NQSO grants during the Class Period, and in fact would have been better off under the Steinholt Stock Prices.

### 5.4. Performance Units (PUs)

As discussed above in Section 3.5, Anadarko's PU plan is a cash plan where the payoffs are based on both Anadarko's stock price and its TSR-ranking compared to eleven industry peers. The payout from the PU plans is based on the number of shares earned (determined by the relative TSR) and Anadarko's closing stock price when the units are cashed out (generally Anadarko's closing price on the 15th business day after the Performance Period).[56] Several PU grants are potentially affected by the alleged inflation in Anadarko stock prices, including:

1. *Grants made prior to the Class Period where the Performance Period ends during the Class Period.* In these instances, the alleged inflation artificially raises Anadarko's TSR, which could artificially raise its ranking among its cohort and, thus, increase the number of units earned. In addition, the stock price when the PUs are converted to cash would also be artificially inflated, leading to larger cash payouts;

2. *Grants made during the Class Period where the Performance Period ends after the Class Period.* Since the target number of PUs granted is determined by multiplying the fixed-dollar Target PU Award and dividing by the PU per-unit value (which moves with the

---

[56] *See, e.g.*, APC-00790250 at 264-265. Formally, the value is calculated based on Anadarko's stock price on the date the Committee certifies the performance results and approves the payouts.

stock price) on the grant date,[57] the target number of PUs would be higher absent the alleged inflation. In addition, the alleged inflation artificially lowers Anadarko's TSR which could artificially lower its ranking among its cohort and, thus, decrease the number of units earned and lead to lower cash payments.

The Named Defendants unambiguously gain from the alleged inflation for PU grants in Group 1 above, and unambiguously lose from the alleged inflation for PU grants in Group 2.[58] Whether the Named Defendants would financially benefit from the alleged inflation therefore depends on the relative gains and losses.

Table 11 identifies the PU Grants potentially impacted by the alleged inflation. The table shows the Grant Date, the Performance Period, the TSR rank as reported in the proxies, the TSR rank in the absence of the alleged inflation, the alleged inflation in the final stock price used to determine cash payouts (*i.e.*, $1.75 or $1.92 for grants with Performance Periods ending during the Class Period) and the difference in the Award Value earned in the absence of the alleged inflation. The number in parentheses next to the rank is the payout percentage from Table 4.

The top panel (Group 1) shows that the absence of the alleged inflation would not change Anadarko's TSR ranking among its peers in any grant except for the 2013 grant with the two-year Performance Period, where Anadarko's rank absent the alleged inflation would have slipped from #7 to #8 and its payout percentage would have fallen from 92% of target to 72% of target. The four Named Defendants had a combined November 2013 target PU award of 85,112 PUs, to be split evenly between grants with two-year and three-year Performance

---

[57] The Target PU Award is calculated as the Target Equity Award multiplied by the Target PU Percentage (which was 40% for Mr. Leyendecker in 2014 and 2015 and 50% in 2016 and 2017, and 50% for all other Named Defendants between 2014 and 2018; *see* Table 1).

[58] Note that I am excluding grants made before that Class Period where the Performance Period ends after the Class Period (*e.g.*, the November 2014 grant) since the alleged inflation would not affect such grants; I also need not consider grants with Performance Periods either entirely before or entirely after the Class Period. Also, there were no grants where the Performance Period both began and ended during the Class Period.

Periods.[59] The Named Defendants earned 39,151.5 PUs from the two-year portion of this grant, worth approximately $1,389,095 based on the $35.48 stock price on the payout date.[60] However, in the absence of the alleged inflation, they would have only received 30,640.3 PUs (72% of target rather than 92%), and the cash-out value would be based on the Steinholt Stock Price of $33.73 (i.e., the closing price less $1.75), yielding $1,033,497. Thus, as shown in Table 11, the Named Defendants would have been $355,598 *worse off* with respect to this PU grant in the absence of the alleged inflation.

For the other PU grants in Group 1 in Table 11, the alleged inflation would not affect the number of PUs earned, but would rather affect only the settlement price when cashed out. In the absence of inflation, grants with Performance Periods ending in 2015 would have a settlement price $1.75 lower, while grants with Performance Periods ending in 2016 would have a settlement price $1.92 lower. The aggregate difference in payouts for the Named Defendants in the absence of inflation is therefore calculated as the aggregate PU target multiplied by the payout percentage (in parentheses in Table 11) multiplied by the inflation at payout (*i.e.*, $1.75 or $1.92).[61]

For the Group 2 grants in Table 11, the ultimate award would potentially change absent the alleged inflation for two reasons: (1) the reduced Steinholt Stock Price on the grant date would increase the number of target PUs granted; and (2) the reduced Steinholt Stock Price on

---

[59]  Target PU grants for 2013 for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014, p. 48. *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant.

[60]  That is, $50\% \times (81,112) \times 92\% = 39,151.5$ PUs, multiplied by Anadarko's closing stock price of $35.48 on the January 22, 2016 settlement date.

[61]  Target PU grants for Mr. Walker, Mr. Gwin, and Mr. Daniels are reported in Anadarko Petroleum Corporation DEF 14A (Proxy) Statements filed March 25, 2013 (p. 51) and March 21, 2014 (p. 48). *See* APC-00784847 for Mr. Leyendecker's target PU 2013 grant. Mr. Leyendecker's 2012 PU Target is inferred from the PUs vesting in 2015 (APC-00784868 at 881) less the number of PUs vesting in 2015 from the 2013 PU grant (APC-00784868 at 883).

the grant date would increase Anadarko's TSR over the Performance Period. For (1), I estimate that the Target 2015 PU grant for the Named Defendants would have increased from 149,384 to 153,126 PUs, while the Target 2016 PU grant would have increased from 129,091 to 132,716 PUs.[62] For (2), I find that starting with the Steinholt Stock Prices increases Anadarko's 3-year TSR for the October 2015 grant from -3.60% to -0.32%, which increases Anadarko's rank among its cohort from 8th to 7th, which in turn increases the ultimate award from 60% of Target to 80% of Target.

The Named Defendants earned 75,869 units from October 2015 grant, worth approximately $3,480,861 based on the $45.88 stock price on the payout date.[63] However, in the absence of the alleged inflation, they would have received 103,692 PUs, yielding $4,757,393.[64] The Named Defendants would therefore have received cash payments of $1,276,531 more from the October 2015 grant.

As per the Occidental Merger Agreement, unvested PUs held as the transaction were deemed to be earned at 200% of target and cashed out at a fixed price of $76.00 per PU.[65] Accordingly, the Named Defendants earned 239,308.7 PUs from the November 2016 grant, cashed out at $18,187,459. Absent the alleged inflation, the Named Defendants would have earned 246,029.5 PUs with a cash-out value of $18,698,239. Thus, absent the alleged inflation,

---

[62]  I assume that the value per Performance Unit is equal to the value implied in the Proxy Statements (Total PU Value divided by target units) less the alleged inflation (*i.e.*, $1.75 for Class Period grants before July 27, 2016 and $1.92 after).

[63]  Target 2015 PU awards for Mr. Walker, Mr. Gwin, Mr. Daniels, and Mr. Leyendecker were 77,548, 31,096, 31,795, and 8,945 respectively (Anadarko Petroleum Corporation DEF 14A Statement filed March 23, 2018; APC-0078847). Upon certification on January 19, 2019 (when Anadarko's stock price closed at $45.88), Mr. Walker and Mr. Gwin received 60% of their target, Mr. Daniels received 60% of one-third of his target (since he served only 12 of the 36-month of the Performance Period), and Mr. Leyendecker received 60% of 29/36th (since he served only 29 of the 36-month of the Performance Period).

[64]  As described in the prior footnote, the award value assumes the proration of Mr. Daniels' and Mr. Leyendecker's award.

[65]  *See* Merger Proxy, p. 81.

the Named Defendants would have received cash payments of $510,781 more from the November 2016 grant.

Table 12 summarizes the change in PU payouts to each Named Defendant in the absence of the alleged inflation. All Defendants would have been better off under the Steinholt Stock Prices than the actual prices. Therefore, it is my opinion that the Named Defendants did not benefit from the alleged inflation through their PU grants.

### 5.5. Summary

Table 13 summarizes my findings of how the Named Defendants compensation would be impacted absent the alleged inflation in Anadarko stock prices. Overall, I find that each Named Defendant would have been better off financially if Anadarko's stock price had been $1.75 per share lower from February 23, 2015 to July 26, 2016, and $1.92 per share lower from July 27, 2016 to May 2, 2017. Collectively, the Named Defendants would have realized nearly $2.5 million more absent the alleged inflation. It is therefore my opinion that the Named Defendants did not benefit financially from the alleged inflation through increased compensation.

## 6. Did Named Defendants benefit financially from the alleged stock-price inflation through their trading activities?

Trading by executives that is "out of line with prior trading practices or at times calculated to maximize personal profit" may be indicia of scienter.[66] For example, an insider, aware of material inside information about their company's stock price, may sell shares when

---

[66]  *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 435 (5th Cir. 2002).

they know the market price is too high, and purchase shares when they know the market price is too low.[67] Plaintiffs and Mr. Steinholt allege that, beginning on February 20, 2015, Defendants "defrauded investors by various means and methods concerning the commercial viability and producible resource size of Shenandoah", allegedly inflating Anadarko's stock until the alleged truth was revealed on May 2, 2017.[68]

Under Plaintiffs' theory of the case, we would expect to see that the Named Defendants actively sold Anadarko shares during the Class Period, by selling shares owned directly and shares acquired through the exercise of stock options or the vesting of RSUs. In fact, as I document in this section, the Named Defendants did not sell any direct shares during the Class Period, retained all shares from vesting RSUs (except for those withheld by Anadarko for tax purposes), and generally retained all shares acquired through option exercises (except for shares used to pay the exercise price and to satisfy tax obligations, including shares withheld by Anadarko).[69]

### 6.1. Mr. Walker

As shown in Figure 1, Mr. Walker did not sell shares or exercise options during the Class Period. When his RSUs vested in May 2015, November 2015, October 2016, and November 2016 he transferred only the shares required to satisfy tax obligations, retaining the remaining

---

[67] There is a robust academic literature analyzing how informed insider trading allows insiders to profit from their information advantage (*e.g.*, Seyhun (1986); Fishman and Hagerty (1992); Bettis et al. (2000); Jagolinzer et al. (2011); Agrawal and Nasser (2012); Kraft et al. (2014); Lee et al. (2014); Agrawal and Cooper (2015); Aitken et al. (2015); Hillier et al. (2015)).

[68] Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated October 1, 2021, at 1; Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022, at 51:1-21.

[69] As noted in Section 4.3, the only exception was options/shares exercised/sold by Mr. Daniels at his ex-wife's request and pursuant to a divorce decree.

shares and dividend equivalents.[70] Overall, there is no evidence of suspicious trading activity by Mr. Walker during the Class Period. The fact that Mr. Walker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 2, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his direct shareholdings increased by 45,632 shares during the Class Period, in addition to an increase of 8,155 RSUs and 218,576 NQSOs.

### 6.2. Mr. Gwin

As shown in Figure 3, Mr. Gwin exercised options at two points during the Class Period, but did not sell the shares acquired during the Class Period. On October 7, 2015, he exercised 78,600 options set to expire on November 4, 2015, retaining 22,408 shares after Anadarko withheld 56,192 shares to finance the exercise price and taxes.[71] He did not sell the shares acquired upon exercise during the Class Period, and therefore could not have taken advantage of any alleged inflation. Mr. Gwin also exercised options on February 29, 2016, exercising 66,200 options set to expire the following day. Again, Mr. Gwin retained all net shares after those withheld by Anadarko to pay exercise prices and taxes.[72] Similarly, when his RSUs vested in November 2015, October 2016, and November 2016 he retained all net shares after those withheld by Anadarko to satisfy tax obligations.[73] Mr. Gwin had no other stock transactions during the Class Period.

---

[70] *See* R. A. Walker Form 4s filed May 19, 2015, November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Walker's Form 4s.

[71] Robert G. Gwin Form 4 filed October 9, 2015.

[72] Robert G. Gwin Form 4 filed March 2, 2016.

[73] Robert G. Gwin Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Gwin's Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Gwin during the Class Period. The fact that Mr. Gwin did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 4, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly and in his 401(k) increased by 41,918 shares during the Class Period, in addition to an increase of 6,438 RSUs and 69,588 NQSOs.

### 6.3. Mr. Daniels

As shown in Figure 5, Mr. Daniels exercised options at two points during the Class Period. On March 20, 2015, Mr. Daniels exercised 38,449 options from his 2008 and 2009 grants, immediately selling all the shares acquired. In his Form 4 filed on March 24, Mr. Daniels explains that he "had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercised/sold these options/shares at her request."[74] In my opinion, Mr. Daniels did not personally benefit from this exercise during the Class Period.[75]

Mr. Daniels also exercised 30,841 options on October 14-15, 2015, retaining all shares net of those withheld by Anadarko to pay the exercise price and taxes.[76] He sold no other shares during the Class Period prior to his December 2016 retirement, and retained all shares (net of those withheld by Anadarko to satisfy tax obligations) when his RSUs vested in November 2015, October 2016, and November 2016.[77]

---

[74] Robert P. Daniels Form 4 filed March 24, 2015.

[75] Mr. Daniels' ex-wife may have benefited by as much as $65,536 before taxes (37,449 shares × $1.75 alleged inflation) more than she would have received absent the alleged inflation.

[76] Robert P. Daniels Form 4 filed October 16, 2015. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4.

[77] Robert P. Daniels Form 4s filed November 9, 2015, October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Daniels' Form 4s.

Overall, there is no evidence of suspicious trading activity by Mr. Daniels from the beginning of the Class Period through his December 2016 retirement.[78] The fact that Mr. Daniels did not sell shares during the Class Period (beyond those related to his divorce decree) is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 6, he was in full compliance with the guidelines before, during, and after the Class Period. Indeed, his holdings held directly, in his family's LP, and in his 401(k) increased by 26,335 shares during the Class Period.[79]

### 6.4. Mr. Leyendecker

As shown in Figure 7, Mr. Leyendecker did not exercise any options or sell any shares during the Class Period. When his RSUs vested in November 2015, October 2016, and November 2016, he retained all shares and dividend equivalents except for the shares withheld by Anadarko to satisfy tax obligations.[80] As discussed in Section 4.4, Mr. Leyendecker had three years to increase his holdings to $1,725,000 (*i.e.*, three times his new $575,000 Base Salary) following his promotion to EVP in August 2016. As shown in Figure 8, Mr. Leyendecker was in compliance with Anadarko's Stock Ownership Guidelines at all times, and in fact reached $1,725,000 in holdings more than two-and-a-half years before required

---

[78]   I understand that a whistleblower letter from a former Anadarko employee, Lea Frye, asserts that a May 21, 2014 transaction in stock by Mr. Daniels, which she characterizes as a sale of "61,379 shares of his Anadarko stock (transaction of approximately $6.143 million)" might constitute insider trading (Exhibit 355 to Deposition of Lea Frye dated October 7, 2022). As noted in Section 4.3 above, Mr. Daniels indeed exercised 51,379 options and sold the shares acquired on this day, and additionally sold 10,000 Anadarko shares held directly (*see* Robert P. Daniels Form 4 filed May 22, 2014). These transactions predate the Class Period, prior to which it is not alleged that Anadarko's share price was inflated. Notably, Ms. Frye traded in Anadarko stock within a few days of Daniels' trade, asserting that she did not possess any knowledge which would be considered insider information regarding current Anadarko activities (Deposition of Lea Frye dated October 7, 2022, at 236:23-240:22; *see also* Exhibit 364 to that Deposition).

[79]   Mr. Daniels' RSUs and NQSOs declined near his retirement, primarily reflecting that (because of his pending retirement) he did not receive grants of RSUs and NQSOs in November 2016.

[80]   Ernest A. Leyendecker III Form 4s filed October 27, 2016, and November 7, 2016. The shares withheld by Anadarko for tax purposes are noted by the Transaction Code "F" in Mr. Leyendecker's Form 4s

under the Guidelines. Therefore, his "lack" of trading over this period is not explained by Anadarko's Stock Ownership Guidelines.

Overall, there is no evidence of suspicious trading activity by Mr. Leyendecker during the Class Period. The fact that Mr. Leyendecker did not sell shares during the Class Period is not explained by Anadarko's Stock Ownership Guidelines since, as is clear from Figure 8, he was in compliance with the guidelines before, during, and after the Class Period.[81] Indeed, his direct holdings increased by 5,574 shares during the Class Period, in addition to an increase of 6,777 RSUs and 53,161 NQSOs.

### 6.5. Summary

In summary, there is no evidence of suspicious trading by the Named Defendants during the Class Period. Indeed, rather than actively selling shares to exploit the alleged inflation in Anadarko stock, the Named Defendants kept reinvesting vested RSUs and exercised options into Anadarko, and collectively and individually *increased* their holdings of Anadarko shares. Notably, the Named Defendants were among the shareholders who lost money when Anadarko's stock prices fell by $4.33 on May 3, 2017. In particular, Mr. Walker's 265,418 shares and 81,495 RSUs fell by $1,502,142 on May 3, Mr. Gwin's 112,476 shares and 32,659 RSUs fell by $628,435, and Mr. Leyendecker's 17,441 shares and 15,304 RSUs fell by $141,786.

Finally, in addition to analyzing the trading activity of the Named Defendants, it is relevant to also analyze the trading-related activity of their employer. The Complaint alleges

---

[81] While Mr. Leyendecker was technically in compliance with the Stock Ownership Guidelines between August 2016 and October 2016 (since he had three years to increase his holdings to 3 times his base salary), he was nonetheless prohibited during this period under the Guidelines from selling shares upon the exercise of options or the vesting of RSUs. *See* Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 56.

that the Named Defendants led Anadarko's day-to-day operations, "monitored and/or oversaw the Shenandoah project" and "were the persons with ultimate responsibility for directing and managing the Company's business, operations, and communications to investors."[82] If Plaintiffs' allegations as to responsibilities are correct, the Named Defendants were logically involved in the July 26, 2016 decision to increase Anadarko's working interest in the Shenandoah project from 30% to 33%.[83] If Anadarko's stock was indeed inflated as suggested by Mr. Steinholt, this increased working interest would negatively impact the post-Class Period value of the Named Defendants' stock holdings and the vesting value of their equity-based compensation.

## 7. Did the alleged misstatement with respect to Shen-3 impact bonus awards to Anadarko management?

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014 (and reported in Anadarko's 10-K for fiscal year 2014) instead of in the third quarter of 2016 (as actually reported in Anadarko's 10-Q filed on October 31, 2016) once Anadarko concluded it was a dry hole.[84] Mr. Regan further argues that even "quantitatively small misstatements" can be considered material if "the misstatement has the effect of increasing management's compensation".[85] He then contends that:

> "The Shen-3 results and the associated reduction in resource estimates was
> further significant considering that management's bonus[es] were affected by
> performance goals that included consideration of MMBOE sales and related

---

[82]  Complaint, ¶ 149(a).
[83]  Steinholt Report, ¶ 106.
[84]  Regan Report, ¶ 11(a).
[85]  Regan Report, ¶ 77 (c).

*reserves (representing an aggregate of performance goal weighting factor ranging from 42% – 50%). Although the Shenandoah basin project, including Shen-3, was exploratory in nature and in fact, a dry hole, the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well to extract oil resources that could impact management performance goals and related compensation in the future."*[86]

Mr. Regan's emphasis on "performance goals that included consideration of MMBOE sales and related reserves" in the above quote seems irrelevant, since Anadarko never booked any reserves in connection with the Shen-3 well or the Shenandoah prospect more broadly.[87] Moreover, as discussed in Section 3.2 and as evident from Table 2, there are no AIP performance measures related to unproved reserves or resource targets.[88] In addition, the Committee did not make any Individual Performance adjustments to AIP bonuses from 2014--2018 related to unproved reserves (and in fact did not make any individual adjustments at all).

Beyond making some general allusions to Anadarko's management bonus plans, Mr. Regan provides no analysis of how and to what extent bonuses might be impacted by the decision of when to expense drilling costs associated with Shen-3. Indeed, during his deposition Mr. Regan admitted that he did not know whether expensing Shen-3 or not would impact bonus awards.[89] Ultimately, analyzing these impacts requires a nuanced understanding of how such expenses effect AIP performance measures and subsequent bonuses.

---

[86]  Regan Report, ¶ 86.

[87]  *See* Deposition of Charles F. Oudin, III dated June 30, 2022, at 243:7-11.

[88]  *See* also Deposition of Robert P. Daniels dated October 13, 2022, at 40:19-42:18.

[89]  *See* Deposition of Paul Regan dated January 20, 2023, at 129:4-23.

As shown in Table 2, AIP bonuses in 2014 were based on sales volumes and reserve additions (weighted 50%), capital expenditures (weighted 20%), and a safety measure (weighted 10%). None of these measures is directly impacted by exploratory drilling expenses. Moreover, the fifth measure, EBITDAX/BOE (weighted 20%), is defined as "earnings before interest, taxes, depreciation, depletion, amortization, and *exploration expenses* divided by sales volume for the year" (emphasis added).[90] Investopedia defines the exploration expense component of EBITDAX as follows:

> *"Exploration costs are the costs an oil or gas company incurs while searching for oil or gas to drill. Exploration costs include the cost of researching appropriate places to drill and the cost of actually drilling. Exploration costs are recognized in the financial statements as exploration, abandonment, and dry hole costs."*[91]

Mr. Regan opines that the $64 million in Shen-3 expenses should have been expensed by the fourth quarter of 2014. While such expensing would have reduced Anadarko's reported net earnings, it would not have reduced Anadarko's EBITDAX and therefore would not have reduced 2014 bonuses under the AIP.

In contrast, by 2016 Anadarko had introduced "Controllable Cash Costs" as an AIP performance measure with a 25% weight (*see* Table 2).[92] Notably, Controllable Cash Costs includes suspended exploratory well costs that are "subsequently reclassified to exploration expense for accounting purposes."[93] If Anadarko had expensed the $64 million drilling costs

---

[90]    Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015, p. 47.
[91]    https://www.investopedia.com/terms/e/ebitdax.asp, accessed on January 23, 2023.
[92]    Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 41.
[93]    Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 43.

for Shen-3 in 2014 rather than 2016, its Controllable Cash Costs for 2016 would be reduced by $64 million, or $0.22 per BOE.[94]

As reported in its 2017 Proxy Statement, Anadarko's Target Controllable Cash Costs (after mid-year adjustments for certain divestitures) was $13.56/BOE, which at target would contribute 25% to the AIP Performance Score.[95] Anadarko's reported 2016 Controllable Cash Costs was $12.70/BOE, resulting in a contribution of 44.8% to the final AIP Performance Score.[96] Internal documents confirm that the relation between Controllable Cash Costs per BOE and the 2016 AIP contribution is linear, up to a maximum contribution to the final AIP Performance Score of 50% (*i.e.*, 200% of 25%).[97] This linearity allows me to determine that a $0.22 reduction in the Cash Cost per BOE corresponds to an increase in this component's contribution to the AIP Performance Score from 44.8% to 49.9%, or a difference of 5.1%.[98] This 5.1% increase in the AIP Performance Score (caused by shifting the $64 million in expenses to 2014) would have increased Mr. Walker's 2016 AIP bonus by $86,190, Mr. Gwin's bonus by $36,338, and Mr. Leyendecker's by $20,579.[99]

---

[94]   Calculation based on 2016 sales volume of 290 MMBOE (s*ee* Anadarko Petroleum Corporation Form 10-K filed February 15, 2017, p. 19).

[95]   Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[96]   Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, p. 42.

[97]   APC-00782204 at 212.

[98]   In particular, if a $0.86 decrease in Controllable Cash Costs/BOE (from $13.56 to $12.70) corresponds to an increase in payout contribution by 19.8%, we can derive that each dollar reduction in Controllable Cash Costs/BOE increases payout contribution by 23 percentage points. Multiplying 23% by $0.22 suggest an increase in the AIP Performance Score of 5.1 percentage points.

[99]   Results based on increasing 2016 AIP awards from 158% of target to 163.1% of target (Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017, pp. 43). The Committee determined that Mr. Daniels was not eligible for a 2016 AIP payout, since his retirement date preceded the date of the actual payout (*see* APC-00787898 at 906).

To summarize, it is my opinion that expensing Shen-3 drilling expenses in 2014 rather than 2016—as proposed by Mr. Regan—would have not changed 2014 AIP bonuses for the Named Defendants, but would have significantly increased their 2016 AIP bonuses.

**8. Did the alleged inflation increase the payments to the Named Defendants in connection with the August 2019 acquisition by Occidental?**

In connection with the Occidental acquisition in August 2019, several departing Anadarko executives (including Mr. Walker and Mr. Gwin) became eligible for certain benefits, including:

- Conversion of Anadarko RSU awards (including dividend equivalents) into equivalent Occidental restricted stock/cash unit awards, vesting according to their original schedule;[100]

- Immediate vesting and cash-out of all outstanding Anadarko stock options, at the merger consideration price of about $72.50;[101]

- Each Anadarko PU award immediately vested and converted into the right to receive cash equal to 200% of the target award multiplied by $76/unit.[102]

In addition, upon their departure within three years following the acquisition, Mr. Walker and Mr. Gwin would each receive a multiple of the sum of their respective salary and bonus (2.5 times for Mr. Walker, and 2.9 times for Mr. Gwin), continuation of medical and other benefits for three years, outplacement services, and service-credits related to Anadarko's retirement and savings plans.

---

[100] *See* Merger Proxy, pp. 12, 80.

[101] *See* Merger Proxy, pp. 12, 79. As discussed before, the merger consideration was $59.00 in cash plus the cash value of .2934 shares of Occidental common stock on the day prior to closing ($46.00 on August 7, 2019), or about $72.50 in total.

[102] *See* Merger Proxy, pp. 12, 81.

*Confidential*                                                                 *Kevin J. Murphy • 35*

In the Complaint, Plaintiffs repeatedly emphasize so-called "golden parachute" payments received by Anadarko executives in connection with the Occidental acquisition.[103] Plaintiffs provide no account of how an alleged fraud that was revealed in May 2017 could have impacted compensation in relation to Occidental's late 2019 acquisition of Anadarko.

As discussed at length in Section 5, because of the fixed dollar equity grants, the Named Defendants would have received more RSUs, more PUs, and more NQSOs during the Class Period absent the alleged inflation. For continuing Named Defendants Walker and Gwin, one third of the additional RSUs granted in November 2016 would still be unvested as of the Occidental transaction, as would all of the November 2016 PUs (since the relevant Performance Period was set to end in December 2019, after the transaction). Similarly, unexercised stock options issued in October 2016 and November 2017 would remain outstanding upon the transaction.

Table 14 summarizes the additional amounts the Named Defendants *would* have received in connection with the Occidental acquisition absent the alleged inflation. The amounts are taken directly from Table 8 (RSUs), Table 10 (NQSOs), and Table 12 (PUs), and reflects the value of the additional equity at the $72.50 merger consideration (for RSUs and NQSOs) or $76.00 (for PUs). Across all pay components, I estimate that the Named Defendants would have realized approximately $1.5 million in additional payouts absent the alleged inflation.

In sum, the alleged inflation would continue to cost Named Defendants even in connection with the Occidental acquisition.

---

[103] *See, e.g.*, Complaint ¶¶ 5(s), 9, 150, and 156. Significantly, Mr. Daniels and Mr. Leyendecker had retired well before the acquisition, though Mr. Leyendecker still had outstanding Anadarko PUs and stock options that were cashed out in the transaction. *See* Merger Proxy, pp. 79-81. The foregoing discussion is accordingly limited to Mr. Walker and Mr. Gwin.

## 9. Author's Statement and Qualifications

I hold the Kenneth L. Trefftzs Chair in Finance at the University of Southern California Marshall School of Business. I have been a Full Professor of the Department of Finance and Business Economics at the USC Marshall School since 1995, and I currently serve as Department Chairman. I also hold a joint appointment in the USC School of Law (as Professor of Business, Economics and Law). I previously served as Department Chairman from 2003 to 2004, and as the Marshall School's Vice Dean of Faculty and Academic Affairs from 2004 to 2007. From 1991 to 1995, I was an Associate Professor of Business Administration at the Harvard Business School, and from 1983 to 1991, I was an Assistant and Associate Professor at the University of Rochester's William E. Simon Graduate School of Business Administration.

I received a Ph.D. in Economics from the University of Chicago in 1984, where my honors included a National Science Foundation Fellowship, a Milton Friedman Fund Fellowship, and a Social Science Foundation Dissertation Fellowship. I also have an M.A. in Economics from the University of Chicago, and a B.A. degree (summa cum laude) from the University of California, Los Angeles. I am a member of Phi Beta Kappa, the American Economic Association, and the American Finance Association. I am an associate editor of the *Journal of Financial Economics,* a former associate editor of the *Journal of Accounting and Economics* and the *Journal of Corporate Finance,* and I serve as referee to over thirty professional and academic journals. I am the former chairman of the Academic Research Committee of WorldAtWork (formerly the American Compensation Association). My curriculum vitae is attached at the end of this report.

I am a recognized expert on executive compensation, and I have written and published extensively on issues related to executive compensation, beginning with my 1984 dissertation. During 1992 and 1993, I conducted annual surveys of executive compensation practices in the 1,000 largest U.S. corporations. These surveys, sponsored by the United Shareholders Association, were used extensively by institutional investors and large shareholders in evaluating and comparing the effectiveness of compensation policies. I also advised the SEC in formulating its 1992 disclosure rules for top management pay, and I was a prominent member of the 1992 and 2003 National Association of Corporate Directors' Blue Ribbon Commissions on Executive Compensation, which issued reports calling for the overhaul of CEO pay practices. In 2009, I served as advisor to the U. S. Treasury's Special Master of Executive Compensation, charged with approving the level and structure of compensation for companies receiving "special assistance" from the U.S. government.

I have written more than fifty articles, cases, books, and book chapters relating to compensation and incentives in organizations. Results from my research on executive compensation have been widely cited in the press (including the *Wall Street Journal, New York Times*, *Washington Post*, *Los Angeles Times*, *Chicago Tribune*, *USA Today*, *Economist*, *Fortune*, *Forbes*, *Business Week*, and *Time*) and on national television (including CNN and CBS news). I have offered testimony relating to executive compensation to the U.S. House of Representatives Financial Services Committee and the TARP Congressional Oversight Panel, and given speeches and presentations on compensation and incentives to a variety of academic and practitioner audiences, including the Conference Board, the American Compensation Association, and the Board of Governors of the Federal Reserve.

My university teaching encompasses a wide variety of courses at the undergraduate, MBA, Ph.D., and executive levels. At USC, I have taught undergraduate, MBA, and Ph.D. courses in economics and corporate finance and have developed and taught undergraduate and MBA courses on compensation, incentives, and corporate governance. At Harvard, I taught courses on compensation and incentives in organizations, human resource management, and on the coordination, control, and management of organizations. At Rochester and Chicago, I taught undergraduate courses in microeconomics, MBA and executive courses in microeconomics and pricing policies, MBA and Ph.D. courses in organizational theory, and Ph.D. courses in price theory. I also developed and taught a course in the Economics of Human Resource Management, with a primary focus on compensation for top-level managers.

I have testified as an expert witness in multiple proceedings in federal and state courts. I have consulted with organizations and conducted research on compensation and incentives in professional partnerships and corporations. I spent the 1994–1995 academic year on leave from Harvard as the Visiting Scholar and Consultant at Towers Perrin (now Willis Towers Watson), a major benefits and compensation consulting firm, where my activities included making formal presentations and leading roundtable discussions on executive compensation to clients nationwide, as well as being involved in a variety of consulting engagements.

Kevin J. Murphy
January 25, 2023

**Table 1    Target Compensation for Named Defendants, 2014 – 2018**

| Year | Salary Rate | Target Bonus (% of Salary) | Target Equity | Allocation of Target Equity | | |
|---|---|---|---|---|---|---|
| | | | | Performance Units (PUs) | Restricted Stock Units (RSUs) | Non-Qualified Stock Options (NQSOs) |
| *Robert A. Walker (Chairman, President, and CEO)* | | | | | | |
| 2014 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2015 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2016 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2017 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| 2018 | $1,300,000 | 130% | $11,100,000 | 50% | 25% | 25% |
| *Robert G. Gwin (EVP and CFO)* | | | | | | |
| 2014 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2015 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2016 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2017 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| 2018 | $750,000 | 95% | $4,450,000 | 50% | 25% | 25% |
| *Robert P. Daniels (Until 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2015 | $700,000 | 95% | $4,550,000 | 50% | 25% | 25% |
| 2016 | $700,000 | 95% | — | — | — | — |
| *Ernest A. Leyendecker, III (After 8/2016: EVP, International and Deepwater Exploration)* | | | | | | |
| 2014 (SVP) | $400,000 | 80% | $1,500,000 | 40% | 25% | 35% |
| 2015 (SVP) | $420,000 | 80% | $1,600,000 | 40% | 25% | 35% |
| 2016 (SVP) | $420,000 | 80% | — | — | — | — |
| 2016 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |
| 2017 (EVP) | $575,000 | 95% | $2,500,000 | 50% | 25% | 25% |

Note:    Data from annual proxy statements and "tally sheets" (APC-00789245 at 294-313 (2014); APC-00779479 at 530-550 (2015); APC-00784849-867 (2016); APC-01727486 at 531-548 (2018)). Mr. Leyendecker's compensation is inferred from several documents, including APC-00784868 at 881-883; APC-00785266 at 279-280; APC-00786269 at 275; APC-00790225 at 230. Target equity awards differ slightly from ASC 718 grant-date accounting values reported in the proxy statements.

**Table 2   Performance Measures and Weights in Anadarko AIP Plan, 2014 – 2018**

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| *Operational* | | | | | |
| Reserve Additions (MMBOE) | 25% | 20% | 20% | 15% | |
| Reserve Additions Growth per DAS | | | | | 20% |
| Sales Volumes (MMBOE) | 25% | 10% | 20% | 20% | |
| Sales Volume Growth per DAS | | | | | 20% |
| Company-Operated Base Sales Volume (MMBOE) | | 15% | | | |
| *Financial* | | | | | |
| Capital Expenditures ($ mil) | 20% | 10% | 25% | 15% | |
| EBITDAX/BOE ($/BOE) | 20% | 15% | | | |
| Controllable Cash Costs ($/BOE) | | 15% | 25% | 15% | 20% |
| Cash Operating Income ($/BOE) | | | | 25% | |
| Cash-Flow ROIC | | | | | 20% |
| Relative One-Year TSR | | 5% | | | |
| *Safety* | | | | | |
| Total Recordable Incident Rate (TRIR) | 10% | 10% | 10% | 10% | 10% |
| Level 3 Incidents | | | | | 10% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 3    Payouts for Named Executive Officers under AIP Plan, 2014 – 2018**

| Year | Initial AIP Performance Score | Discretionary AIP Score Adjustment | Individual Performance Adjustment | Final AIP Bonus |
|---|---|---|---|---|
| 2014 | 151.0% | 0% | 0% | 151.0% |
| 2015 | 196.5% | -86.5% | 0% | 110.0% |
| 2016 | 158.0% | 0% | 0% | 158.0% |
| 2017 | 92.6% | -7.6% | 0% | 85.0% |
| 2018 | 150.0% | 0% | 0% | 150.0% |

Note:  Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 4     Payout Levels under Performance Unit Plan**

| Relative TSR Ranking | Payout Level (before 11/2014) | Payout Level (11/2014 and later) |
|:---:|:---:|:---:|
| 1 | 200% | 200% |
| 2 | 182% | 182% |
| 3 | 164% | 164% |
| 4 | 146% | 146% |
| 5 | 128% | 128% |
| 6 | 110% | 100% |
| 7 | 92% | 80% |
| 8 | 72% | 60% |
| 9 | 54% | 40% |
| 10 | 0% | 0% |
| 11 | 0% | 0% |
| 12 | 0% | 0% |

Note:   Data from "Compensation Discussion and Analysis" section in each annual Proxy Statement.

**Table 5    Schedule for TSR Component of 2015 AIP Plan**

| Relative TSR Ranking | Score for TRS Component | Contribution to 5% of AIP Performance Score |
|:---:|:---:|:---:|
| 1 | 275% | 13.75% |
| 2 | 240% | 12.00% |
| 3 | 205% | 10.25% |
| 4 | 170% | 8.50% |
| 5 | 135% | 6.75% |
| 6 | 100% | 5.00% |
| 7 | 83% | 4.15% |
| 8 | 67% | 3.35% |
| 9 | 50% | 2.50% |
| 10 | 33% | 1.65% |
| 11 | 17% | 0.85% |
| 12 | 0% | 0.00% |

Note:    APC-00779578 at 619; Anadarko Petroleum Corporation DEF 14 (Proxy) Statement filed March 18, 2016.

**Table 6     Anadarko's Share-Price Performance vs. Peers, 2015**

| Company | Beginning Average Price | Ending Average Price | Dividends During Period | Total Shareholder Return (TSR) | Rank |
|---|---|---|---|---|---|
| Pioneer Natural Resources | $149.63 | $136.52 | $0.08 | -8.7% | 1 |
| Occidental Petroleum | $81.02 | $70.51 | $2.97 | -9.3% | 2 |
| Chevron | $111.20 | $90.24 | $4.28 | -15.0% | 3 |
| EOG Resources | $92.42 | $77.44 | $0.67 | -15.5% | 4 |
| ConocoPhillips | $68.65 | $50.15 | $2.94 | -22.7% | 5 |
| Apache | $64.29 | $46.14 | $1.00 | -26.7% | 6 |
| Hess | $74.82 | $53.64 | $1.00 | -27.0% | 7 |
| Noble Energy | $49.91 | $34.07 | $0.72 | -30.3% | 8 |
| *Anadarko Petroleum* | *$82.20* | *$53.54* | *$1.08* | *-33.6%* | *9* |
| Devon Energy | $60.19 | $37.25 | $0.96 | -36.5% | 10 |
| Marathon Oil | $29.10 | $15.13 | $0.68 | -45.7% | 11 |
| Chesapeake Energy | $20.04 | $4.64 | $0.18 | -76.0% | 12 |

Note:  Anadarko's 2015 Peers from Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016, p. 40; price and dividend data from CRSP. Beginning Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2015; Ending Average Price defined as average closing stock price for the 30 trading days prior to January 1, 2016. Total Shareholder Return (TSR) defined as (Ending Price – Beginning Price + Dividends) divided by Beginning Price.

**Table 7    RSU Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Actual Stock Price | Steinholt Stock Price | Target RSU Award | RSU Award at Actual Stock Price | RSU Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $69.00 | $67.25 | $2,775,000 | 40,217 | 41,264 | +1,047 |
| Gwin | $69.00 | $67.25 | $1,112,500 | 16,123 | 16,543 | +420 |
| Daniels | $69.00 | $67.25 | $1,137,500 | 16,486 | 16,914 | +428 |
| Leyendecker | $69.00 | $67.25 | $400,000 | 5,797 | 5,948 | +151 |
| *Total:* | | | *$5,425,000* | *78,623* | *80,669* | *+2,046* |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $61.87 | $59.95 | $2,775,000 | 44,852 | 46,289 | +1,437 |
| Gwin | $61.87 | $59.95 | $1,112,500 | 17,981 | 18,557 | +576 |
| Leyendecker | $61.87 | $59.95 | $625,000 | 10,102 | 10,425 | +323 |
| *Total:* | | | *$4,512,500* | *72,935* | *75,271* | *+2,336* |

Note:  Data from Table 1; Steinholt Report, Exhibit D; CRSP. Target RSU Awards are calculated based on the Total Equity Award and Target RSU Percentage in Table 1. Actual RSU awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 8    Vesting Value of Additional RSUs Granted under Steinholt Stock Prices**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Additional October 2015 RSU Grant under Steinholt Prices* | 1,047 | 420 | 428 | 151 | 2,046 |
| Vesting October 26, 2016 ($58.98) | $20,584 | $8,257 | $8,414 | $2,969 | $40,224 |
| Vesting October 26, 2017 ($47.69) | $16,644 | $6,677 |  | $2,400 | $25,721 |
| Vesting June 1, 2018 ($71.05) |  |  |  | $3,576 | $3,576 |
| Vesting October 26, 2018 ($58.84) | $20,535 | $8,238 |  |  | $28,773 |
| Total from October 2015 Grant: | $57,763 | $23,171 | $8,414 | $8,945 | $98,294 |
| *Additional November 2016 RSU Grant under Steinholt Prices* | 1,437 | 576 |  | 323 | 2,336 |
| Vesting November 10, 2017 ($51.11) | $24,482 | $9,813 |  | $5,503 | $39,798 |
| Vesting June 1, 2018 ($71.05) |  |  |  | $15,299 | $15,299 |
| Vesting November 10, 2018 ($58.21) | $27,883 | $11,176 |  |  | $39,059 |
| Vesting August 8, 2019 ($72.50) | $34,728 | $13,920 |  |  | $48,648 |
| *Total from November 2016 Grant:* | $87,092 | $34,909 |  | $20,802 | $142,803 |
| *Total from both Grants:* | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |

Note:  Data from Table 7; Form 4 filings; Proxy Statements; Steinholt Report, Exhibit D; Merger Proxy; CRSP. Table shows the value of the additional RSUs that would have been granted absent the alleged inflation in stock prices. Values are based on Anadarko closing stock prices on each vesting date, except for October 26, 2016 (during the Class Period) when values are based on the Steinholt Stock Price (the actual closing price of $60.90 minus the alleged inflation of $1.92), and for August 8, 2019 when values are based on the $72.50 per share merger consideration. Amounts exclude the value of dividend equivalents that would have been paid upon vesting.

**Table 9     NQSO Grants under Actual and Steinholt Stock Prices during Class Period**

| Executive | Option Value at Actual Stock Price | Option Value at Steinholt Stock Price | Target NQSO Award | NQSO Award at Actual Stock Price | NQSO Award at Steinholt Stock Price | Difference |
|---|---|---|---|---|---|---|
| *October 26, 2015 Grant* | | | | | | |
| Walker | $17.948 | $17.49 | $2,775,000 | 154,615 | 158,638 | 4,023 |
| Gwin | $17.944 | $17.49 | $1,112,500 | 62,000 | 63,613 | 1,613 |
| Daniels | $17.944 | $17.49 | $1,137,500 | 63,393 | 65,043 | 1,650 |
| Leyendecker | $17.944 | $17.49 | $560,000 | 31,209 | 32,021 | 812 |
| *Total:* | | | *$5,585,000* | *311,217* | *319,316* | 8,099 |
| *November 10, 2016 Grant* | | | | | | |
| Walker | $20.306 | $19.676 | $2,775,000 | 136,661 | 141,038 | 4,377 |
| Gwin | $20.306 | $19.675 | $1,112,500 | 54,788 | 56,543 | 1,755 |
| Leyendecker | $20.305 | $19.675 | $625,000 | 30,780 | 31,766 | 986 |
| *Total:* | | | *$4,512,500* | 222,229 | 229,346 | 7,117 |

Note:  Data from Table 1; Proxy Statements; Form 4 filings; Steinholt Report, Exhibit D. Target NQSO Awards are calculated based on the Total Equity Award and Target NQSO Percentage in Table 1. Actual NQSO awards differ slightly from those reported in Anadarko Proxy Statements due to rounding and (in some cases) differing reliance on ASC 718 accounting values.

**Table 10   NQSO Exercises under Actual and Steinholt Stock Prices during Class Period**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| *Actual October 2015 NQSO Grant* | 154,615 | 62,000 | 21,131 | 20,806 | 258,552 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 | $72.50 |
| Exercise Price | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 |
| Gain from Exercise | $541,153 | $217,000 | $73,959 | $72,821 | $904,932 |
| *Actual November 2016 NQSO Grant* | 136,661 | 54,788 | — | 10,260 | 201,709 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 | $72.50 |
| Exercise Price | $61.87 | $61.87 | — | $61.87 | $61.87 |
| Gain from Exercise | $1,452,706 | $582,396 |  | $109,064 | $2,144,167 |
| *Steinholt October 2015 NQSO Grant* | 158,638 | 63,613 | 21,681 | 21,347 | 265,279 |
| Stock Price at Exercise | $72.50 | $72.50 | $72.50 | $72.50 |  |
| Exercise Price | $67.25 | $67.25 | $67.25 | $67.25 |  |
| Gain from Exercise | $832,850 | $333,968 | $113,825 | $112,074 | $1,392,717 |
| *Steinholt November 2016 NQSO Grant* | 141,038 | 56,543 | — | 10,589 | 208,170 |
| Stock Price at Exercise | $72.50 | $72.50 | — | $72.50 |  |
| Exercise Price | $59.95 | $59.95 | — | $59.95 |  |
| Gain from Exercise | $1,770,027 | $709,615 |  | $132,892 | $2,612,534 |
| *Net gain using Steinholt Stock Prices* | *$609,017* | *$244,186* | *$39,867* | *$63,081* | *$956,152* |

Note:  Data from Table 9; Form 4 filings; Steinholt Report, Exhibit D; Merger Proxy. Mr. Walker's and Mr. Gwin's options were effectively fully vested and exercised upon the Occidental acquisition on August 8, 2019 at the merger consideration of $72.50. I assume that Mr. Daniels and Mr. Leyendecker held the options vested as of their retirements until the merger.

**Table 11  Performance Unit Grants Impacted by Alleged Inflation**

| Grant Date | Performance Period | Reported Rank (Payout as % of Target) | Rank Absent Alleged Inflation | Inflation at Payout | Change in Award Value Absent Alleged Inflation |
|---|---|---|---|---|---|
| *GROUP 1: PU Grants Before Class Period with Performance Periods ending During Class Period* | | | | | |
| 5/15/2012 | 5/15/2012 – 5/14/2015 | 5 (128%) | 5 (128%) | –$1.75 | ($11,769) |
| 11/5/2012 | 1/1/2013 – 12/31/2015 | 8 (72%) | 8 (72%) | –$1.75 | ($39,616) |
| 11/6/2013 | 1/1/2014 – 12/31/2015 | 7 (92%) | 8 (72%) | –$1.75 | ($355,598) |
| 11/6/2013 | 1/1/2014 – 12/31/2016 | 5 (128%) | 5 (128%) | –$1.92 | ($104,588) |
| *GROUP 2: PU Grants During Class Period with Performance Periods ending After Class Period* | | | | | |
| 10/26/15 | 1/1/2016 – 12/31/2018 | 8 (60%) | 7 (80%) | $0 | $1,276,531 |
| 11/10/16 | 1/1/2017 – 12/31/2019 | (200%) | (200%) | $0 | $510,781 |
| | | | | *Total:* | $1,275,741 |

Note:  Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 12   Change in PU Payouts to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| 5/15/2012 (3-Yr) | ($11,769) |  |  |  | ($11,769) |
| 11/5/2012 (3-Yr) | ($21,632) | ($7,710) | ($7,915) | ($2,359) | ($39,616) |
| 11/6/2013 (2-Yr) | ($183,815) | ($73,382) | ($75,045) | ($23,355) | ($355,598) |
| 11/6/2013 (3-Yr) | ($54,065) | ($21,583) | ($22,072) | ($6,869) | ($104,588) |
| 10/26/15 (3-Yr) | $782,871 | $313,924 | $106,993 | $72,744 | $1,276,531 |
| 11/10/16 (3-Yr) | $338,879 | $135,859 | 0 | $36,043 | $510,781 |
| Total: | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |

Note:  Data from Proxy Statements; Steinholt Report, Exhibit D; APC-00780428; APC-00786209; APC-00784868; APC00784847; CRSP; Bloomberg. Table assumes that Mr. Daniels and Mr. Leyendecker both received prorated payouts at the end of the Performance Period, based on actual performance and the number of months worked during the Performance Period. *See* APC-00780428 at 445-447 (2015 grant); APC-00786209 at 219-221 (2016 grant).

**Table 13   Summary of Changes in Compensation to Named Defendants Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Base Salary | $0 | $0 | $0 | $0 | $0 |
| TSR Component of AIP | $0 | $0 | $0 | $0 | $0 |
| Restricted Stock Units | $144,855 | $58,081 | $8,414 | $29,748 | $241,098 |
| Stock Options | $609,017 | $244,186 | $39,867 | $63,076 | $956,147 |
| Performance Units | $850,469 | $347,107 | $1,961 | $76,203 | $1,275,741 |
| Total: | $1,604,341 | $649,374 | $50,242 | $169,032 | $2,472,990 |

Sources:  Tables 8, Table 10, Table 12.

**Table 14  Summary of Additional Amounts Named Defendants Would Receive in the Occidental Transaction Absent the Alleged Inflation**

|  | Walker | Gwin | Daniels | Leyendecker | Total |
|---|---|---|---|---|---|
| Restricted Stock Units (Table 8) | $34,728 | $13,920 | $0 | $0 | $48,648 |
| Stock Options (Table 10) | $609,017 | $244,186 | $39,867 | $63,081 | $956,152 |
| Performance Units (Table 12) | $338,879 | $135,859 | $0 | $36,043 | $510,781 |
| Total: | $982,624 | $393,965 | $39,867 | $99,124 | $1,515,580 |

Sources: Tables 8; Table 10; Table 12

**Figure 1    Mr. Walker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s.

**Figure 2    Mr. Walker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Walker's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As CEO, Mr. Walker is required to hold six times his $1.3 million Base Salary in Anadarko shares or RSUs.

**Figure 3    Mr. Gwin's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Shares include Anadarko shares held in his 401(k) plan.

**Figure 4   Mr. Gwin's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Gwin's Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Gwin is required to hold three times his $750,000 Base Salary in Anadarko shares or RSUs.

**Figure 5   Mr. Daniels' Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:   Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Shares include Anadarko shares held in his family Limited Partnership and his 401(k) plan. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert P. Daniels dated October 13, 2022 at p. 32).

**Figure 6    Mr. Daniels' Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements and Mr. Daniels' Form 4s. Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an EVP, Mr. Daniels is required to hold three times his $700,000 Base Salary in Anadarko shares or RSUs. Mr. Daniels stepped down as EVP in August 2016 and retired from Anadarko in December 2016 (*see* Deposition of Robert Daniels, October 13, 2022 at p. 32).

**Figure 7     Mr. Leyendecker's Holdings of Anadarko's Shares, RSUs, and Options, 2014 – 2018**



Note:     Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions. I have been unable to reconcile a difference of 450 Anadarko shares prior to August 2016 and have incorporated those shares in the chart above to a vesting event in November 2015.

**Figure 8    Mr. Leyendecker's Share Value vs. Ownership Guidelines, 2014 – 2018**



Note:    Data are as of the end of each calendar month and are based on data from Anadarko Proxy Statements, Mr. Leyendecker's Form 3 and Form 4s, and various internal documents. Data before August 2016 (when Mr. Leyendecker became a Section 16 executive subject to public Form 4 disclosures) are based on various Anadarko and Leyendecker self-reporting "snap-shots" of ownership positions.  Value is defined based on shares (or RSUs) held multiplied by the average daily stock price over the preceding year. As an SVP through August 2016, Mr. Leyendecker was required to hold 2.5 times his Base Salary (which increased from $400,000 to $420,000 in January 2015) in Anadarko shares or RSUs. Upon his promotion to EVP in August 2016, Mr. Leyendecker had three years to increase his holdings of shares and RSUs to $1,725,000 (*i.e.*, three times the $575.000 Base Salary he earned upon his promotion).

# Exhibit A: Curriculum Vitae

**KEVIN JAMES MURPHY**

**Resume**
January 2023

**Address**    Marshall School of Business
Finance and Business Economics
University of Southern California
Los Angeles, CA 90089-1422
*email: kjmurphy@usc.edu*
*website: www.marshall.usc.edu/faculty/directory/kjmurphy*

**Telephone**    (213) 740-6553

**Current Positions**

Kenneth L. Trefftzs Chair in Finance, Marshall School of Business, University of Southern California, 2006 -
Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2020 -
Professor of Finance and Business Economics, Marshall School of Business, University of Southern California, 1995 -
Professor of Business and Law (courtesy), Gould School of Law, University of Southern California, 2001 -

**Previous Positions**

Vice Dean for Faculty and Academic Affairs, Marshall School of Business, University of Southern California, 2004 - 2007
E. Morgan Stanley Chair in Business Administration, Marshall School of Business, University of Southern California, 2002 - 2005
Department Chair, Finance and Business Economics, Marshall School of Business, University of Southern California, 2003 - 2004
Visiting Scholar and Consultant, Towers Perrin, Boston, MA, 1994 - 1995
Associate Professor, Graduate School of Business Administration, Harvard University, 1991 - 1995
Associate Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1989 - 1991.
Assistant Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1983 - 1989.
Marvin Bower Fellow, Graduate School of Business Administration, Harvard University, 1987-1988.

**Education**

University of Chicago, Ph.D. (Economics), 1984.
University of Chicago, M.A. (Economics), 1981.
University of California, Los Angeles, B.A. (Economics) (Summa Cum Laude), 1979.

**Thesis**

"Ability, Performance, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts"

**Teaching Experience**

University of Southern California, Marshall School of Business, 1995-. Undergraduate, MBA, and Ph.D. courses in financial policies, economics, corporate control, compensation, incentives, and corporate governance.
Harvard University, Graduate School of Business Administration, 1991-1995. Graduate courses in compensation and incentives, human resource management, and coordination, control, and the management of organizations.
University of Rochester, William E. Simon Graduate School of Business Administration, 1984-1991. Graduate courses in compensation and human resource management, organization theory, economics, advanced price theory, and pricing policies.
University of Chicago, Department of Economics, 1981-83. Undergraduate courses in price theory.

**Fellowships, Scholarships, Academic Honors**

Drexel University award for Outstanding Contribution to Research in Corporate Governance, 2013

Marvin Bower Fellowship, Harvard University, 1987-88.

AT&T Faculty Fellowship, University of Rochester, 1986-87.

Social Science Research Council Dissertation Fellowship, 1983-84.

PEW Teaching Fellowship, University of Chicago, 1981-83.

Milton Friedman Fund Fellowship, University of Chicago, 1979-83.

National Science Foundation Fellowship, 1979-82.

Regents Scholarship, UCLA, 1977-79.

Department Scholar (Economics), UCLA, 1978-79.

Phi Beta Kappa, 1979.

**Other Activities**

Associate Editor, *Journal of Financial Economics*, 1992-2021.

Associate Editor, *Journal of Accounting and Economics*, 1988-2006.

Associate Editor, *Journal of Corporate Finance*, 1993-2010.

Associate Editor, *Economic Bulletin*, 2001-2003.

Expert, U.S. Department of Treasury, Office of the Special Master for Executive Compensation, 2009.

Board Member, Scleroderma Foundation (Southern California Chapter), 2008-2011.

Chairman, Academic Research Committee, American Compensation Association, 1997 - 1999.

Research Advisory Board, American Compensation Association, 1997 - 1999.

Chairman, Research Advisory Panel, American Compensation Association, 1995 - 1997.

Program Committee, American Economic Association Meetings, 2000-2001.

Program Committee, *Journal of Financial Economics* Corporate Governance Conference, 2000.

Program Committee, Western Finance Association Conference, 1996, 1997.

Program Committee, American Finance Association Meetings, 1998, 2003.

University of Southern California, Academic Senate, 2011-2015 (Executive Committee 2012-2015); Professional Conflict of Interest Committee, 2013-; Provost's Interdisciplinary Professor Committee, 2007-2013; Deans of Faculty Council, 2004-2007; Academic Leadership Committee, 2004-2006; Probationary Deadlines Committee, 2004-2006; Provost Advisory Committee, 2003-2004.

University of Southern California, Marshall School of Business, Faculty Council 2011-; Faculty Consultative Committee, 2001-2003. Strategic Planning Steering Group (co-chairman), 1999-2000; Research Committee, 1997-1998; Budget Advisory Committee, 1998-1999; STAR Committee, 1998-1999; Space Utilization Task Force, 1998-; MBA Quality of Life Committee, 1997.

University of Southern California, Marshall School of Business, Finance and Business Economics, Faculty recruiting co-chairman, 1995-1999, 2011-2012; APR Committee 2001-2003; 2007-2012.

William E. Simon Graduate School of Business Administration, University of Rochester, Area Coordinator for Applied Economics and Organizations and Markets, 1985-1991; Ph.D. Committee, 1984-1987, 1988-1991; Committee on Computing and Data Bases, 1990–1991.

Referee for Professional Journals: *Academy of Management Journal; Accounting Review; Administrative Science Quarterly; American Economic Review; American Journal of Sociology; Canadian Journal of Economics; Econometrica; Economic Inquiry; The Economic Journal; Economic Policy Review (NY Fed); Financial Management; Industrial and Labor Relations Review; Industrial Relations; Journal of Accounting and Economics; Journal of Accounting, Auditing, and Finance; Journal of Accounting and Public Policy; Journal of Business; Journal of Economics and Business; Journal of Finance; Journal of Financial and Quantitative Analysis; Journal of Financial Economics; Journal of Institutional and Theoretical Economics; Journal of Labor Economics; Journal of Law & Economics; Journal of Law, Economics, and Organization; Journal of Management Studies; Journal of Monetary Economics; Journal of Political Economy; Journal of Risk and Insurance; Management Science; Managerial and Decision Economics; National Tax Journal; Pacific-Basin Finance Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Business; Rand Journal of Economics; Review of Economics and Statistics; Review of Financial Studies; Review of Quantitative Finance and Economics; Strategic Management Journal;* and the National Science Foundation.

Advisory Board, *Business Month*, 1990-1991.

Member, American Economic Association, 1981-present.

Member, Society of Labor Economists, 1995-2007.

Member, American Finance Association, 1995-present.

Member, WorldAtWork (formerly American Compensation Association), 1995-2002.

Member, Task Force on Executive Compensation, American Compensation Association, 1984-1985.

Commissioner, National Association of Corporate Directors Blue Ribbon Commission on Executive Compensation, 1992, 2003.

**Publications: Professional Articles**

Baker, George, Robert Gibbons, and Kevin J. Murphy, "From Incentives to Control to Adaptation: Exploring Interactions Between Formal and Relational Governance." *Journal of Institutional and Theoretical Economics* (Forthcoming 2023).

Dial, Jay and Kevin J. Murphy, "Downsizing and Value Creation at General Dynamics: A PE-like Solution for Industries that Must Shrink," *Journal of Applied Corporate Finance*, Vol. 33(3) (Summer 2021).

Barron, Daniel, Robert Gibbons, Ricard Gil and Kevin J. Murphy, "Relational Adaptation Under Reel Authority." *Management Science* 66(5) (May 2020) 1868-1889.

Murphy, Kevin J. and Tatiana Sandino, "Compensation Consultants and the Level, Composition and Complexity of CEO Pay" *The Accounting Review* 95(1) (January 2020) 311-341.

Murphy, Kevin J. and Michael C. Jensen, "The Politics of Pay: The Unintended Consequences of Regulating Executive Compensation." *Journal of Law, Finance, and Accounting* 3(2) (2018) 189-242.

Murphy, Kevin J., "Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences," *European Financial Management* 19(4) (2013) 631-657.

Fernandes, Nuno, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "Are US CEOs Paid More? New International Evidence." *Review of Financial Studies* 26(2) (2013), 323-367.

Murphy, Kevin J., "Executive Compensation: Where we are, and how we got there," in George Constantinides, Milton Harris, and René Stulz (eds.), *Handbook of the Economics of Finance*. Elsevier Science North Holland (2013) Chapter 4: 211-356.

Conyon, Martin J., Nuno Fernandes, Miguel A. Ferreira, Pedro Matos, and Kevin J. Murphy, "The Executive Compensation Controversy: A Transatlantic Analysis" in Tito Boeri, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Packages: Productivity, Profits, and Pay,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013) Part I: 8-115.

Murphy, Kevin J., "Pay, Politics, and the Financial Crisis" in Alan Blinder, Andrew Lo and Robert Solow (eds.), *Economic Lessons from the Financial Crisis*. Russell Sage Foundation (2012).

Murphy, Kevin J., "The Politics of Pay: A Legislative History of Executive Compensation," in Jennifer Hill and Randall Thomas (eds.), *Research Handbook on Executive Pay,* Edward Elgar Publishers (2012).

Murphy, Kevin J. and Tatiana Sandino, "Executive Pay and "Independent" Compensation Consultants," *Journal of Accounting & Economics* 49(3) (April 2010): pp. 247-262.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Strategic Alliances: Bridges Between 'Islands of Conscious Power'," *Journal of the Japanese and International Economies,* 22(2) (June 2008) 146-163.

Lowry, Michelle and Kevin J. Murphy, "Executive Stock Options and IPO Underpricing," *Journal of Financial Economics* 85 (2007) 39-65.

Murphy, Kevin J. and Ján Zábojník, "CEO pay and appointments: A market-based explanation for recent trends," *American Economic Review Papers and Proceedings,* (May 2004).

**Publications: Professional Articles (continued)**

Hall, Brian J. and Kevin J. Murphy, "The Trouble with Stock Options," *Journal of Economic Perspectives*, Vol. 17(3), (Summer 2003).

Murphy, Kevin J., "Stock-Based Pay in New Economy firms," *Journal of Accounting and Economics*, Vol 34 (2003): 129-147.

Murphy, Kevin J., "Explaining Executive Compensation: Managerial Power versus the Perceived Cost of Stock Options," *University of Chicago Law Review*, Vol. 69(3) (Summer 2002): 847-869.

Hall, Brian J. and Kevin J. Murphy, "Stock Options for Undiversified Executives," *Journal of Accounting and Economics*, Vol 33(1) (February 2002): 3-42.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Contracts and the Theory of the Firm," *Quarterly Journal of Economics,* Vol. 117 (February 2002): 39-84.

    Reprinted in
    C. Ménard (ed.), *The International Library of the New Institutional Economics*, (Forthcoming 2004): Edward Elgar Publishing, Ltd.

Conyon, Martin J. and Kevin J. Murphy, "Stock-Based Executive Compensation," in J. McCahery, P. Moerland, T. Raaijmakers, and L. Renneboog, ed., *Corporate Governance Regimes: Convergence and Diversity*, Oxford University Press (2002), Chapter 26: 625-646.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Bringing the Market Inside the Firm?" *American Economic Review Papers and Proceedings,* Vol 92(2) (May 2001): 212-18.

Murphy, Kevin J., "Performance Standards in Incentive Contracts," *Journal of Accounting and Economics*, Vol. 30 (3) (December 2000): 245-78.

Conyon, Martin J. and Kevin J. Murphy, "The Prince and the Pauper? CEO Pay in the US and UK," *Economic Journal* Vol 110 (November 2000): F640-71.

    Reprinted in
    van Frederikslust, R. A. I, J. S. Ang, and S. Sudarsanam (eds), *Corporate Governance and Corporate Finance: a European Perspective*. Routledge (2007)

Hall, Brian J. and Kevin J. Murphy, "Optimal Exercise Prices for Executive Stock Options," *American Economic Review Papers and Proceedings,* Vol 90(2) (May 2000): 209-214.

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Informal Authority in Organizations," *Journal of Law, Economics, and Organizations* Vol. 15(1) (April 1999): 56-73.

Murphy, Kevin J., "Executive Compensation," in Orley Ashenfelter and David Card (eds.), *Handbook of Labor Economics*, Vol. 3b, Elsevier Science North Holland (1999), Chapter 38: 2485-2563.

Murphy, Kevin J., "Executive Compensation and the Modern Industrial Revolution," *International Journal of Industrial Organization*, Vol. 15(4) (July 1997): 417-25.

Murphy, Kevin J., "Reporting Choice and the 1992 Proxy Disclosure Rules," *Journal of Accounting, Auditing, and Finance*, Vol. 11(3) (Summer 1996): 497-515.

Dial, Jay and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics*, Vol. 37(3) (March 1995): 261-314.

Murphy, Kevin J., "Politics, Economics, and Executive Compensation," *University of Cincinnati Law Review*, Volume 63, No. 2 (Winter 1995): 713-748.

**Publications: Professional Articles (continued)**

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Subjective Performance Measures in Optimal Incentive Contracts," *Quarterly Journal of Economics*, Vol. 109(4) (November 1994): 1125-56.

Murphy, Kevin J. and Jerold L. Zimmerman, "Financial Performance Surrounding CEO Turnover," *Journal of Accounting and Economics*, Vol. 16 (1993): 273-315.
Reprinted in
K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 2 (1999): 377-419 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Does Executive Compensation Affect Investment?" *Journal of Applied Corporate Finance*, Vol. 5(2) (Summer 1992).

Gibbons, Robert and Kevin J. Murphy, "Optimal Incentive Contracts in the Presence of Career Concerns: Theory and Evidence," *Journal of Political Economy*, Vol. 100(3) (June 1992): 468-505.

Reprinted in
K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation*, Vol. 1 (1999): 515-52 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Performance Measurement and Appraisal: Motivating Managers to Identify and Reward Performance," *Performance Measurement, Evaluation, and Incentives*, edited by William J. Bruns, Jr. (Harvard Business School Press, Boston, 1992).

Reprinted in
*Employment Relations Today*, Vol. 20, No. 1 (Spring, 1993).

Jensen, Michael C. and Kevin J. Murphy, "CEO Incentives: It's Not *How Much* You Pay, But *How*", *Harvard Business Review*, (May/June, 1990).

Reprinted in:
M. Jensen, *Foundations of Organizational Strategy* (1998): 270-98, *Harvard University Press*;
*Journal of Applied Corporate Finance*, Vol. 3(3) (Fall 1990).

Jensen, Michael C. and Kevin J. Murphy, "Performance Pay and Top-Management Incentives" *Journal of Political Economy*, Vol. 98(2) (April 1990): 225-64.

Reprinted in:
M. Jensen, *Foundations of Organizational Strategy* (1998): 229-69, *Harvard University Press*.

K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 236-75 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;

K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 260-299, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Gibbons, Robert and Kevin J. Murphy, "Relative Performance Evaluation for Chief Executive Officers", *Industrial and Labor Relations Review*, Vol. 43, No. 3 (February 1990): 30S-51S.

Reprinted in:
R. G. Ehrenberg (ed.), *Do Compensation Policies Matter?* 1990, ILR Press-Cornell, Ithaca NY;
K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 392-413, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

**Publications: Professional Articles (continued)**

Baker, George, Michael C. Jensen, and Kevin J. Murphy "Compensation and Incentives: Practice vs. Theory," *Journal of Finance*, Vol. 43(3) (July 1988): 593-616.

Reprinted in:
M. Jensen, *Foundations of Organizational Strategy* (1998), *Harvard University Press*.

K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 121-44 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106.

Murphy, Kevin J., "Incentives, Learning, and Compensation: A Theoretical and Empirical Investigation of Managerial Labor Contracts," *Rand Journal of Economics*, Vol. 17(1) (Spring 1986): 59-76.

Reprinted in:
K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 417-34, Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 103.

Murphy, Kevin J., "Top Executives Are Worth Every Nickel They Get," *Harvard Business Review*, Vol. 64(2) (March/April 1986).

Reprinted in:
L. Newton and M. Ford (eds.), *Taking Sides*, 2nd edition, edited by Lisa H. Newton and Maureen M. Ford (Dushkin Publishing Group, Inc., Guilford CT, 1992).

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42.

Reprinted in:
O. Ashenfelter and K. F. Hallock (eds.) *Labor Economics*, Vol. 2 (Edward Elgar Publishing: 1995);

K. Keasey, S. Thompson, and M. Wright (eds.), *Corporate Governance*, Vol. 3, Governance mechanisms Part 2 (1999): 204-35 Elgar Reference Collection, International Library of Critical Writings in Economics, vol. 106;

K. Hallock and K. Murphy (eds.), *The Economics of Executive Compensation* , Vol. 1 (1999): 204-35, Elgar Reference Collection, International Library of Critical Writings in Economics.

**Books**

Boeri, Tito, Claudio Lucifora, and Kevin J. Murphy (eds.), *Executive Remuneration and Employee Performance-Related Pay: A Transatlantic Perspective,* Fondazione Rodolfo Debenedetti Series, Oxford University Press (2013).

Hallock, Kevin F. and Kevin J. Murphy (co-editors), *The Economics of Executive Compensation*, Edward Elgar Publishing, 1999.

**Comments, Cases, and Other Articles**

Kevin J. Murphy, "Executive Pay Restrictions for TARP Recipients: An Assessment," Testimony to the Congressional Oversight Panel, October 21, 2010.

Kevin J. Murphy, Congressional Testimony on Compensation Structure and Systemic Risk, June 11, 2009.

Hall, Brian J. and Kevin J. Murphy, "Expensing will improve compensation decisions," *Boston Globe*, October 6, 2002.

Hall, Brian J. and Kevin J. Murphy, "Option Value Does Not Equal Option Cost," *WorldatWork Journal*, 10(2), 2001.

Hallock, Kevin F. and Kevin J. Murphy, "The Economics of Executive Compensation: Introduction," in *The Economics of Executive Compensation* (K. Murphy and K. Hallock, eds.), Edward Elgar Publishing, 1999.

Murphy, Kevin J., "Executive Stock Options: An Economist's Perspective," in *Stock Options*, American Compensation Association, 1998.

Murphy, Kevin J., "Disney Offers a Model for Executive Compensation," *Los Angeles Business Journal*, June 23, 1997.

Murphy, Kevin J., "CEO Pay and Downsizing: The Social Consequences," in *CEO Pay: A Comprehensive Look*, American Compensation Association, 1997.

Jensen, Michael C. and Kevin J. Murphy, "Compensation at Lexerd Systems," Harvard Business Case 494-066 (April 1994).

Murphy, Kevin J., "Executive Compensation in Corporate America 1993," United Shareholders Association, (Nov. 1993).

Murphy, Kevin J., "Executive Compensation in Corporate America 1992," United Shareholders Association, (Dec. 1992).

Murphy, Kevin J. and Jay Dial, "Compensation and Strategy and General Dynamics (A), (B)," Harvard Business Cases 9-494-048 and 9-494-049 (October 1993).

Murphy, Kevin J., "Merck & Co., Inc. (A), (B), (C)," Harvard Business Cases 9-491-005, 9-491-006, and 9-491-007 (November, 1991).

Jensen, Michael C. and Kevin J. Murphy, "A New Survey of Executive Compensation: Full Survey and Technical Appendix to 'CEO Incentives — It's Not *How* Much You Pay but *How*," Simon School of Business, University of Rochester (June 1990).

Murphy, Kevin J., "The Control and Performance of State-Owned Enterprises: Comment," in *Privatization and State-Owned Enterprises*, edited by Paul MacAvoy, W. T. Stanbury, George Yarrow, and Richard J. Zeckhauser (Kluwer Academic Publishers, Boston, 1989): 59-68.

Murphy, Kevin J., "Is Executive Compensation Related to Company Performance?" *Rochester Management Review* (1985).

Jensen, Michael C. and Kevin J. Murphy, "Beware the Self-Serving Critics" *New York Times* (May 20, 1984).

**Unpublished Papers**

Murphy, Kevin J. and Marshall D. Vance, "Debunking Diversification: Evidence from Employee Stock Option Exercises" (March 2020)

Lee, Joonil, Sunghan Lee, Kevin J. Murphy, and Peter S. H. Oh, "Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay." (October 2021)

Lee, Joonil, Kevin J. Murphy, Peter S. H. Oh, and Marshall D. Vance, "CEO Inside Debt and Corporate Investment." (December 2020)

Baker, George, Robert Gibbons, and Kevin J. Murphy, "Relational Adaptation." (December 2011)

Murphy, Kevin J. and Ján Zábojník, "Managerial Capital and the Market for CEOs" University of Southern California (August 2007).

Murphy, Kevin J. and Paul Oyer, "Discretion in Executive Incentive Contracts," University of Southern California (January 2004).

Murphy, Kevin J. and Karen E. Van Nuys, "Governance, Behavior, and Performance of State and Corporate Pension Funds," Harvard University (September 1994).

Murphy, Kevin J., "Executive Compensation in Regulated Firms," William E. Simon Graduate School of Business Administration, University of Rochester (April 1987).


**Consulting and Expert Witness Activities**

Law Firms:
Bartlit Beck Herman Palenchar & Scott; Foley & Lardner; Gibson, Dunn & Crutcher; Girard and Green; Goodwin Procter LLP; Greenberg, Glusker; Kirkland & Ellis; Irell & Manella; Laski & Gordon; Latham & Watkins; Milberg Weiss; Morgan Lewis & Bockius; Munger, Tolles & Olson; Nixon and Peabody; O'Melveny & Myers LLP; Orrick, Herrington & Sutcliffe; Pillsbury Winthrop; Seyfarth Shaw LLP; Sheppard Mullin Richter & Hampton LLP; Simpson Thacher & Bartlett; Skadden, Arps, Slate, Meagher & Flom; Steptoe & Johnson; Swaab Attorneys (Sydney, Australia); Tanenbaum Keale LLP; Teadle (C. Tucker); Wheeler Trigg O'Donnell LLP; Williams & Connolly; Willkie Farr & Gallagher; Wilson Sonsini Goodrich & Rosati; Winston & Strawn.

Economic Litigation Firms:
Analysis Group; Chicago Partners; CRA International; Compass Lexecon; Cornerstone Research; Econalytics; LECG, Navigant.

Consulting Clients:
Arthur D. Little, Inc.; AT&T; Atlantic Richfield Corporation; Axos Financial, Inc.; Bristol-Myers Company; British Petroleum; California Franchise Tax Board; California Franchise Tax Board; CalPers; Casa Cuervo, S.A. de C.V.; Cemex; Chatham Technologies Inc.; Gannett Co.; Genzyme; Grupo Reforma; GTE; Hunt Oil Company; Internal Revenue Service; Kay and Associates, Inc.; Life Technologies; Management Compensation Group; Merck & Co; the State of Michigan; Moody's Inc.; Nellie Mae; Pulsar; Remington Oil and Gas Corporation; Residence Mutual Insurance Company; Selbert Perkins Design; TCL Beatrice; Towers Perrin; University of Pennsylvania; VectorMAX; Western Mutual Insurance.

**Papers and Speeches Presented (1991–Present)**

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Panel on "Executive Pay during Covid," University of Miami, Miami FL, November 13, 2020.
– Panel on "The Role of Corporate Governance amidst the Covid-19 Pandemic," Drexel University, Philadelphia PA, April 17, 2020.
– Principles of Executive Pay Roundtable, Aspen Institute, New York, NY, November 6, 2019
– Overview and Research Session, "Executive Compensation: The Politics of Pay," Financial Management Association Annual Meeting, Boston, MA, October 12, 2017.
– Keynote Speech, "Explaining CEO Pay," 10th International Conference on Asia-Pacific Financial Markets, Seoul, South Korea, December 5, 2015.
– "Earnings Management and Executive Pay: Are Options to Blame?" Korean Capital Market Research Center, Seoul, South Korea, December 4, 2015
– "Explaining CEO Pay," Federal Reserve Bank of New York, September 15, 2015.
– "Paying for Performance: Metrics, Maladies and Mistakes," CFO Roundtable, March 5, 2015.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 14, 2014.
– "Measuring CEO Performance: Metrics, Maladies and Mistakes," West Coast Chairs Roundtable, November 3, 2014.
– Panelist, Equilar Executive Compensation Summit, Coronado, CA, June 17, 2014.
– Keynote Speech, "Explaining CEO Pay," Ackerman Conference on Corporate Governance, Bar Ilan University, Ramat Gan, Israel, December 15, 2013.
– Roundtable on Incentive Pay for Bankers, Board of Governors, U.S. Federal Reserve, Washington DC, November 19, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 15, 2013.
– Keynote Speech, "Explaining CEO Pay," CEO, Boards and other High Potentials, Institute for Financial Research, Stockholm School of Economics, Stockholm, Sweden, October 16, 2013.
– Keynote Speech, "Explaining CEO Pay," Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 24, 2013.
– Keynote Speech, "Explaining CEO Pay," Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 6, 2013.
– Keynote Speech, "Explaining CEO Pay," Claremont College, May 6, 2013.
– Keynote Speech, "Explaining CEO Pay," 6th Annual Conference on Corporate Governance, Drexel University, April 5, 2013.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 9, 2012.
– Executive Compensation Workshop, Swedish Remuneration Academy, Stockholm, Sweden, September 25-26, 2012.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 28, 2011.
– Equilar Executive Compensation Summit, Carlsbad, CA, June 14, 2011.
– NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
– X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, October 26, 2010
– Testimony to the Congressional Oversight Panel, Washington, DC, October 21, 2010
– Risk Conference, Federal Reserve Bank of Chicago, Chicago, Il, April 7, 2010
– Corporate Governance Summit, University of Southern California, Los Angeles, CA, November 13, 2009
– Testimony to the U.S. House of Representatives, Committee on Financial Services, Hearing on "Compensation Structure and Systemic Risk," Washington, DC, June 11, 2009
– Conference on Financial Innovation, Owen Graduate School of Management, Vanderbilt University, October 17, 2008
– Executive Compensation Workshop: Rethinking Pay for Performance, U.C. Berkeley Law School, September 26, 2008
– Weil Gotshal & Manges Roundtable, Yale Law School, May 4, 2007

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

– Corporate Governance Summit, University of Southern California, Los Angeles, CA, March 23, 2007
– Corporate Governance Conference, University of Melbourne School of Law, Melbourne, Victoria, Australia, March 15, 2007
– Chief Financial Officer Forum, University of Washington, Seattle, WA, February 7, 2007
– Conference Board Executive Pay Conference, New York City, NY, September 27, 2006
– Fireside Talk, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006
– 125 Celebration, University of Southern California, Los Angeles, CA, October 7, 2005.
– Corporate Governance Conference, London School of Economics, London, UK, November 4, 2004.
– Challenges to Executive Compensation Conference, University of Zurich, Zurich, Switzerland, November 2, 2004.
– Academic Advisory Board, Wells Capital Management, San Francisco, CA, May 25, 2004.
– Executive Session, European Science Days, Steyr, Austria, July 16 , 2003.
– The Economist Human Resource Roundtable, New York, NY, June 5, 2003.
– Corporate Governance Conference, Wilmington, DE, April 9, 2003.
– Annual Meeting, Center for Effective Organizations, Marina del Rey, CA, April 24, 2003.
– Executive Compensation Workshop, Harvard Business School, Boston, MA, October 10, 2002.
– Special Board of Directors Meeting, Genzyme Inc., Cambridge, MA, October 2, 2002.
– Option Workshop, California Public Employees' Retirement System, Sacramento CA, June 17, 2002.
– American Economic Association Annual Meetings, New Orleans, LA, January 7, 2001.
– Princeton/Cornell Conference on Labor Policy, Ithaca, NY, October 7, 2000.
– University of Illinois, Northbrook, IL, October 6, 2000.
– United States Department of Justice, Washington, D.C., September 27, 2000
– Singapore Institute of Directors, September 13, 2000.
– Corporate Governance and Value Creation Conference, National University of Singapore, September 12, 2000.
– Young Presidents Organization, Los Angeles, CA, November 12, 1998.
– Keynote Speech, Executive Compensation Forum, American Compensation Association, Chicago IL, September 24, 1998.
– Towers Perrin Training Session, London, UK, June 22-24, 1998.
– Institute of Management Accountants, Los Angeles, CA, March 27, 1998.
– Executive Compensation Seminar, The Conference Board, San Diego, CA, March 11, 1998.
– Executive Briefing Seminars and Roundtables, Irvine, CA (Oct. 29, 1997), Woodland Hills (Nov. 4, 1997), Los Angeles, CA (Nov. 5, 1997)
– Conference on Executive Compensation and Shareholder Value, New York University Stern School of Business, October 24, 1997.
– Board of Governors of the Federal Reserve, Washington, DC. October 23, 1997.
– Committee on Corporate Governance, TIAA-CREFF, Stanford, CA. June 27, 1997.
– Executive Compensation Seminar, The Conference Board, Chicago, IL, June 4, 1997.
– Society of Human Resource Managers, Marina del Rey, CA, April 30, 1997.
– Financial Management Association Meetings, New Orleans, LA, October 10, 1996.
– International Business Machines, Armonk, NY, September 13, 1996.
– Bristol-Myers-Squibb Corporation, New York City, NY, September 11, 1996.
– American Enterprise Institute, Washington DC, July 22, 1996.
– USC Center for Effective Organizations sponsors meeting, Newport Beach, CA, May 8, 1996.
– Corporate Governance Seminar, University of Toronto Law School, Toronto, CA, Dec. 8, 1995
– Yale Finance Institute, Woodstock, VT, October 23, 1995
– Oil Industry Roundtable, Colorado Springs, CO, September 21, 1995
– Corporate Governance Seminar, London School of Economics, London, MA, June 15, 1995
— Executive Briefing Seminars and Roundtables, Dallas TX (Sept. 14, 1994), Chicago IL (Nov. 17, 1994), Philadelphia PA (Jan. 3, 1995) Washington DC (Feb. 1, 1995), Richmond VA (Feb. 2, 1995), Irvine CA (March 6, 1995), Boston MA (March 9, 1995), Minneapolis MN (Dec. 15, 1994), Atlanta GA (April 26, 1995)
– Merck Corporation, White House Station, NJ, June 19, 1995

Speeches, Panel Discussions, and Corporate Presentations on Executive Compensation

–   Chubb Corporation, NJ, March 30, 1995
–   Bristol-Myers-Squibb Corporation, New York City, NY, February 10, 1995
–   Prudential Corporation, Newark, NJ, January 24, 1995
–   Mead Corporation, Dayton, OH, September 14, 1994
–   Procter & Gamble, Cincinnati, OH, September 14, 1994–        International Business Machines, Armonk, NY, September 8, 1994
–   AT&T, Basking Ridge, NJ, August 11, 1994
–   Philip Morris, New York, NY, August 9, 1994
–   General Motors, New York, NY, August 9, 1994
–   Conference on Management Compensation, Strategy, and Firm Performance, Humboldt-University, Berlin, Germany, June 13, 1994.
–   Human Resource Executive Association, Cincinnati, OH, March 16, 1994.
–   Corporate Law Symposium, University of Cincinnati Law School, Cincinnati, March 18, 1994.
–   Executive Compensation Training Session, Towers Perrin, Leesburg, VA, October 7, 1993.
–   SEC and Financial Reporting Institute Conference, Pasadena, CA, May 27, 1993.
–   NASDAQ Regional Conference, Atlanta, GA, May 25, 1993.
–   NASDAQ Regional Conference, Dallas, TX, May 24, 1993.
–   Management Conference, University of Chicago Graduate School of Business, Chicago, Illinois, April 28, 1993.
–   National Investor Relations Institute—Chicago Chapter, Chicago, Illinois, April 7, 1993.
–   National Association of Corporate Directors, Waltham, MA, March 23, 1993.
–   Conference on Managerial Pay and Corporate Performance, March 20, 1993.
–   Shadow SEC, Washington, D.C., November 9, 1992.
–   American Enterprise Institute, Washington, D.C., October 21, 1992.
–   MCG/NACD Seminar on Executive Compensation, San Francisco, CA, May 5, 1992.
–   Security and Exchange Commission Conference on Corporate Governance, Washington, D.C., March 19, 1992.
–   MCG/NACD Seminar on the Compensation Committee in the 1990s, New York, NY, December 12, 1991.
–   United Shareholders Association, Washington, D.C., November 15, 1991.
–   Olin Business School, Washington University, St. Louis, MO, September 26, 1991.
–   Human Resources Management Association of Chicago, Chicago, IL, March 14, 1991.

"Compensating with Style: The Role of Compensation-Committee Experience on CEO Pay"
–   McGill Accounting Research Conference, McGill University, Montreal, Canada, May 28, 2021.
–   Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 12, 2021.

"Debunking Diversification: Evidence from Employee Stock Option Exercises"
–   Ackerman Corporate Governance Conference, Bar Ilan University, Tel Aviv, Israel December 16, 2019.
–   Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 16, 2019.
–   BI Corporate Governance Conference, BI Norwegian Business School, Oslo, Norway, May 24, 2019.

"The Politics of Pay"
–   Securities and Exchange Commission, Washington DC, October 24, 2018.
–   Journal of Law, Finance, and Accounting Conference, Hong Kong Polytechnic University, Hong Kong, June 9, 2017.
–   Vanderbilt Law & Business Conference, Nashville, TN. October 14, 2011.

"Regulating Banking Bonuses in the European Union: A Case Study in Unintended Consequences"
–   European Financial Management Association Annual Meeting, Reading UK, June 27, 2013.


"CEO Inside Debt and Corporate Investment"
–   Finance Seminar, Gies College of Business, University of Illinois, Champaign, IL, April 18, 2019.
–   2016 Corporate Governance Conference, LeBow College of Business, Drexel University, Philadelphia, PA, April 15, 2016.
–   Finance Seminar, Freeman School of Business, Tulane University, New Orleans LA, April 1, 2016.

"Relational Adaptation under Reel Authority"
–   Strategy Seminar, Rotman School of Business, University of Toronto, Toronto, ON, November 9, 2017.
–   Microeconomics Seminar, Economics Department, Queens University, Kingston, ON, October 20, 2016.
–   Finance Seminar, Jesse Jones School of Business, Rice University, October 23, 2015.
–   Finance, Organizations, and Markets Conference, University of Chicago Booth School of Business, October 15,

2015.
– Brown-Bag Seminar, Marshall School of Business, University of Southern California, October 22, 2014.

"Compensation Consultants and the Level, Composition, and Complexity of CEO Pay"
– Securities and Exchange Commission, Washington DC, October 23, 2018.
– Accounting Workshop, McGill University Desautels School of Business, September 14, 2018.
– Labor Workshop, School of Industrial and Labor Relations, Cornell University, April 23, 2018.
– Finance Workshop, R. H. Smith School of Business, University of Maryland, October 10, 2014.
– Finance and Accounting Workshop, Edwin L. Cox School of Business, Southern Methodist University, August 29, 2014.

"Executive Compensation: Where We Are, and How We Got There"
– Accounting for Accounting in Economics Conference, Laboratory for Aggregate Economics and Finance, Santa Barbara, CA, November 8, 2013.
– Finance Seminar, Copenhagen Business School, Copenhagen, Denmark. June 1, 2012.
– Finance Seminar, BI Norwegian Business School, Oslo, Norway. May 30, 2012.
– Helsinki Finance Seminar, Aalto University, Helsinki, Finland. May 28, 2012.
– Workshop on Executive Compensation and Corporate Governance, Erasmus University, Rotterdam, Netherlands. May 25, 2012.
– Finance Seminar, Louisiana State University E. J. Ourso College of Business, Baton Rouge, LA. April 20, 2012.

"Pay, Politics, and the Financial Crisis"
– KAIST CEO Forum, Seoul, South Korea, December 4, 2015
– Twenty Years after Cadbury, Ten Years after Sarbanes-Oxley: Challenges of Corporate Governance, University of Bath, Bath, UK, June 25, 2013.
– Mini Conference on Executive Compensation, Hong Kong Polytechnic University, June 7, 2013.
– Finance Seminar, University of Colorado Leeds School of Business, April 6, 2012.
– Finance Seminar, University of Michigan Ross School of Business, December 16, 2011.
– Conference on Economic Lessons from the Financial Crisis, Russell Sage Foundation, New York City, September 9, 2011.

"Are US CEOs *Still* Paid More?"
– Jindal School of Management, University of Texas - Dallas, Richardson, TX, November 4, 2011.
– Kelley School of Business, University of Indiana, Bloomington, IN, April 29, 2011.
– NOVA Finance Center Conference on Executive Compensation, Lisbon, Portugal, March 15, 2011.
– X Madrid Finance Workshop on Executive Compensation, Madrid, Spain, March 11, 2011.
– American Finance Association Annual Meetings, Denver, CO, January 8, 2011.

"Executive Pay and 'Independent' Compensation Consultants"
– Finance Seminar, Board of Governors, Federal Reserve, Washington D.C., June 9, 2009.
– Oliver E. Williamson Seminar on Institutional Analysis, Haas Business School, University of California, Berkeley, May 7, 2009.
– Interdisciplinary Seminar, Case Western University, April 1, 2009

"The Executive Compensation Controversy: A Transatlantic Analysis"
– Conference on "Productivity, Profits and Pay," Cagliari, Sardinia Italy May 29, 2010.
– Faculty Seminar, Said Business School, Oxford University, May 25, 2010.

"Executive Stock Options and IPO Underpricing"
– Financial Seminar, University of Washington, Seattle, WA, February 7, 2007
– Law and Economics Seminar, Yale Law School, November 16, 2006.
– Research Seminar, Federal Reserve Bank of New York, New York, NY, June 15, 2006.
– Finance Seminar, Amos Tuck School of Business, Dartmouth University, Hanover, NH, May 18, 2006.
– Finance Seminar, Harvard Business School, Boston MA, April 6, 2005.

"The Trouble with Stock Options"
– Finance Seminar, University of Oregon, Eugene, OR, May 16, 2003.
– Conference on Work and Productivity, European Science Days, Steyr, Austria, July 18 , 2003.

"Managerial Capital and the Market for CEOs" (with Ján Zábojník)
– Labor Economcs/Industrial Relations Seminar, Princeton University, Princeton, NJ, November 17, 2004.
– Corporate Governance and Financial Reporting Conference, Napa, CA, April 3, 2004.

– American Economic Association Annual Meetings, Washington DC, January 5, 2003.


"Discretion in Executive Incentive Contracts"
– Information, Markets, and Organizations Conference, Harvard Business School, June 21, 2004
– Finance Seminar, Arizona State University, Tempe, AZ, October 26, 2002.
– Finance Seminar, DePaul University, Chicago, IL, September 17, 2002.
– National Bureau of Economic Research, Corporate Finance Seminars, August 1, 2002
– Personnel Economics Conference, Stanford Institute of Theoretical Economics, Stanford University, Palo Alto, CA, June 21, 2002.
– CLEO Workshop, University of Southern California School of Law, Los Angeles, CA, July 2, 2001.
– American Economic Association Annual Meetings, New Orleans, LA, January 6, 2001.

"Stock Options for Undiversified Executives"
– Law and Business Conference, Vanderbilt University Law School, March 22, 2002.
– Accounting Workshop, Stanford Graduate School of Business, Palo Alto, CA, October 17, 2001.
– Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Management, Cambridge, MA October 11, 2001
– Corporate Governance Conference, Journal of Financial Economics and Tuck Business School, Dartmouth College, Hanover, NH, July 7, 2000
– European Summer Symposium on Economic Theory, Gerzensee, Switzerland, July 11, 2000

"Optimal Exercise Prices for Executive Stock Options"
– American Economic Association meetings, Boston, MA, January 5, 2000.

"The Prince and the Pauper: CEO Pay in the US and UK"

– Research Seminar, IZA Institute for Labor Studies, Bonn, Germany, July 20, 1999.
– Conference on Convergence and Diversity in Corporate Governance Regimes and Capital Markets, Tilburg University, Eindhoven, Netherlands, November 5, 1999.

"Performance Standards in Incentive Contracts"
– Theory of Organizations Workshop, Graduate School of Business, University of Chicago, Chicago, IL May 15, 2000.
– Labor and Population Seminar, Department of Economics, University of California, Los Angeles, March 7, 2000.
– Business Law and Economics Seminar, Olin School of Business, Washington University, St. Louis, September 30, 1999.
– Accounting and Finance Joint Seminar, Graduate School of Business Administration, University of Michigan, Ann Arbor, September 24, 1999.
– Accounting Seminar, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, May 27, 1999.
– Finance Seminar, Lunquist School of Management, University of Oregon, Eugene, Oregon, April 2, 1999.Corporate Finance Seminar, Yale School of Management, Yale University, March 26, 1999.
– Finance Seminar, Graduate School of Management, University of California, Irvine, December 2, 1998.
– Joint Microeconomics and Finance Seminar, Marshall School of Business, University of Southern California, October 23, 1998.
– Finance Seminar, Stern School of Business, New York University, New York, October 21, 1998.
– Joint Management and Strategy and Accounting Seminar, Kellogg Graduate School of Management, Northwestern University, Evanston, IL, October 14, 1998.
– Economics Seminar, Claremont Graduate School, Claremont, CA, September 30, 1998.
– Finance Seminar, University of Warwick, Warwick, UK, July 18, 1998.
– UCI-UCLA-USC Finance Conference, Ojai, CA, May 14, 1998.
– Society of Labor Economists Meetings, San Francisco, CA, May 1, 1998.
– Economics of Organizations Workshop, Harvard Business School and MIT Sloan School of Business, February 19, 1998
– Finance Workshop, Kenan-Flagler Business School, Univ. of North Carolina, October 21, 1997.
– Academy of Management Symposium, Vancouver, B.C., August 7, 1995

"Relational Contracts and the Theory of the Firm"

– Finance Workshop, Tuck Business School, Dartmouth College, Hanover, NH, December 3, 1996.
– Finance and Economics Workshop, Jesse Jones School of Business, Rice University, Houston, TX, November 15,

1996.
– Economics, Finance, and Strategy Workshop, Marshall School of Business, University of Southern California, November 1, 1996.
– Industrial Organization Workshop, Economics Department, University of California at Los Angeles, October 18, 1996.
– Finance and Economics Workshop, Graduate School of Business, Columbia University, New York, NY, September 14, 1996.
– American Law and Economics Association Conference, Chicago, IL, May 11, 1996.
– Atlanta Financial Forum, Goizueta School of Business, Emory University, Atlanta, GA, May 3, 1996.
– Finance Workshop, School of Business, Texas A&M, College Station, TX, April 26, 1996.

"Executive Compensation"
– Workshop on Corporate Governance; Contracts and Managerial Incentives, Humbodlt University, Berlin, Germany, July 2, 1998.
– Handbook of Labor Economics Conference, Princeton University, Princeton, NJ, September 6, 1997.

"Incentives, Downsizing, and Value Creation at General Dynamics"
– Finance Seminar, Marshall School of Business, University of Southern California, January 13, 1995.
– Harvard Business School, Boston, MA, October 1, 1995.
– American Economic Association Meetings, Boston, MA, January 4, 1994.

"Subjective Performance Measures in Optimal Incentive Contracts"
– Applied Economics Workshop, Laval University, Quebec City, Canada, April 8, 1993.
– Applied Microeconomics Workshop, Graduate School of Business, Columbia University, New York, NY, February 3, 1993.
– Finance Workshop, Graduate School of Business, University of Indiana, Bloomington, IN, December 11, 1992.
– Conference on Compensation and Incentives, Montreal, Canada, June 13, 1992.

"Financial Performance Surrounding CEO Turnover"
– Applied Economics Seminar, University of Delaware, April 29, 1992.
– Finance Seminar, Graduate School of Business Administration, University of Texas, Austin, TX, May 8, 1992.
– Organizational Behavior Work-in-Progress Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, December 2, 1991.
– Conference on Managerial Incentives and Corporate Performance, University of Rochester, Rochester, NY, November 1-2, 1991.

"Governance, Behavior, and Performance of State and Corporate Pension Funds"
– Pension Conference, Miami University, Oxford, Ohio, June 3, 1994
– Finance Workshop, Graduate School of Business, University of Texas, Austin, TX, May 6, 1994.
– Faculty Research Seminar, Owen Graduate School of Management, Nashville, TN, April 26, 1994.
– Research Seminar, Faculty of Management, University of Toronto, Toronto, Ontario, April 4, 1994.
– Faculty Research Seminar, University of Cincinnati Law School, Cincinnati, OH, March 17, 1994.
– Finance Seminar, University of Cincinnati Business School, Cincinnati, OH, March 16, 1994.
– Finance Workshop, Ohio State University, Columbus, OH, March 11, 1994.
– Economics and Legal Organizations Workshop, Economics Department and Graduate School of Business, University of Chicago, Chicago, IL, March 3, 1994.
– Baker West Seminar, Graduate School of Business Administration, Harvard University, Boston, MA, February 28, 1994.
– Applied Economics Workshop, Economics Department, Cornell University, Ithaca, New York, February 23, 1994.
– Applied Economics Workshop, Economics Department, Clemson University, Clemson, South Carolina, February 4, 1994.
– Organizations and Markets Workshop, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY, December 16, 1993.
– Finance Workshop, Smeal College of Business Administration, Pennsylvania State University, State College, PA, December 10, 1993.
– Organizational Behavior and Theory of the Firm Workshop, Graduate School of Business Administration, Harvard University, Boston, MA, November 15, 1993.
– Finance Workshop, Boston College, Brookline, MA, November 12, 1993.
– Economics Workshop, Miami University, Oxford, Ohio, October 22, 1993
– Applied Economics Workshop, Marshall School of Business, University of Southern California, October 16, 1993.

**Exhibit B: Testifying Experience in the Last Five Years**

I have testified as an expert at trial or by deposition in the following cases within the preceding five years:

1. Richard J. Tornetta v. Elon Musk, et al.
   Testimony: November 18, 2022
   Deposition: September 19, 2021
   C.A. No. 2018-0408-JRS
   Delaware Chancery Court

2. In re Mindbody, Inc. Stockholder Litigation.
   Testimony: March 7, 2022
   Deposition: January 20, 2022
   C.A. No. 2019-0442-KSJM
   Delaware Chancery Court

3. Larry A. Lawson v. Spirit Aerosystems
   Testimony: June 17, 2021
   Deposition: August 7, 2020
   Case No. 6:18-CV-01100-EFM-ADM
   United States District Court for the District of Kansas

4. In re the Marriage of Clarke v. Clarke
   Deposition: August 6, 2020
   Case No. RID1601464
   Superior Court of the State of California, County of Riverside

5. Laborers' Local #231 Pension Fund vs. Rory J. Cowan, et al.
   Deposition: July 31, 2019
   Case No. 1:17-cv-00478-CFC
   United States District Court, District of Delaware

6. Gadeco, LLC, et al. vs Jack J. Grynberg, et al.
   Testimony: June 12, 2019
   Deposition: September 11, 2017
   Case No. 2016CV030959
   District Court, Arapahoe County, Colorado

7. In re the Marriage of Bunting vs. Bunting
   Testimony: June 12, 2018
   Case No. 15D000711
   Superior Court of the State of California, County of Orange

8. Priority Posting & Publishing, Inc. vs The California Franchise Tax Board
   Testimony: June 6, 2018
   Case No. CGC-15-544791
   Superior Court of the State of California, County of San Francisco

**Exhibit C: Materials Considered in Producing this Report**

**Legal Pleadings, Expert Reports and Court Documents**

Amended Complaint for Violations of Federal Securities Laws, August 17, 2020
Expert Report of Bjorn I. Steinholt, CFA dated November 9, 2022
Expert Report of D. Paul Regan, CPA/CFF dated November 9, 2022
*In Re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)
*Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002)
Motion for Class Certification and Memorandum of Law in Support, ECF No. 86, dated
    October 1, 2021

**Depositions and Exhibits**

Deposition of Charles F. Oudin, III dated June 30, 2022 (with Exhibits)
Deposition of David Blakeley, dated August 19, 2022 (with Exhibits)
Deposition of Ernest A. Leyendecker, III, dated September 22, 2022 (with Exhibits)
Deposition of Lea Frye, dated October 7, 2022 (with Exhibits)
Deposition of Robert Daniels, dated October 13, 2022 (with Exhibits)
Deposition of Robert Alvin Walker, dated October 20, 2022 (with Exhibits)
Deposition of Robert G. Gwin, dated October 26, 2022 (with Exhibits)
Deposition of Bjorn I. Steinholt, CFA dated December 21, 2022 (with Exhibits)
Deposition of Paul Regan, dated January 20, 2023 (with Exhibits)
Deposition of Sean Boyle, November 9, 2021 (with Exhibits)
Deposition of Chris Camden, July 14, 2022 (with Exhibits)
Deposition of James Kleckner, October 14, 2022 (with Exhibits)
Deposition of Patrick McGrievy, August 24, 2022 (with Exhibits)
Deposition of Robert Strickling, July 21, 2022 (with Exhibits)
Deposition of John Schmidt, June 1, 2022 (with Exhibits)
Deposition of Darrell Hollek, September 1, 2022 (with Exhibits)
Deposition of Shandell Szabo, October 28, 2022 (with Exhibits)
Deposition of Mark Zajac, November 2, 2022 (with Exhibits)

**Board and Committee Minutes**

Anadarko Petroleum Corporation Meeting of the Board of Directors (07/26/2013 Draft), May
    13 & 14, 2013 (APC-00584025-039; APC-00584041-055; APC-00584057-071)
Anadarko Petroleum Corporation Meeting of the Board of Directors, May 13 & 14, 2013
    (APC-00772672-686)
Anadarko Petroleum Corporation Approval of Minutes for May 13 & 14, 2013, May 20,
    2013, May 28, 2013, and June 14, 2013 (07/31/2013 drafts) (APC-00772520-548)
Anadarko Petroleum Corporation Risk Council Meeting Agenda and Meeting Materials,
    January 28, 2014 (APC-00596519-565)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 10, 2014 (APC-00775465-471)

Anadarko Petroleum Corporation Shenandoah Integrated Partner Meeting, April 30, 2014 (APC-00690371-442)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 (APC-00789245-316)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 28, 2014 and November 6, 2014 (APC-00776406-424)

Anadarko Petroleum Corporation Risk Council Meeting Discussion Materials, January 21, 2015 (APC-00611028-077)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 27, 2015 (APC-00778129-244; APC-00778263-385)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 21, 2015 (APC-00779479-550)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Agenda and Meeting Materials, October 26, 2015 (APC-00779578-647)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, October 21, 2015 and October 26, 2015 (APC-00780428-448)

Anadarko Petroleum Corporation Meeting of the Board of Directors (12/22/2015 Draft), November 2 & 3, 2015 (APC-00667005-014)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2016 (APC-00783560-572)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, May 9, 2016 (APC-01452536)

Anadarko Petroleum Corporation Regular Meeting of the Compensation and Benefits Committee of the Board of Directors, July 26, 2016 (APC-00783757-870)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee Meeting Minutes, July 26, 2016, August 19, 2016 and October 24, 2016 (APC-00785266-283)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, October 24, 2016 (APC-00784922-999)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 10, 2016 (APC-00786209-223; APC-00786269-284)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, February 8, 2017 and March 13, 2017 (APC-00787943-952)

Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits Committee of the Board of Directors, March 13, 2017 (APC-00787342)

Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits Committee of the Board of Directors, November 14, 2017 (APC-00790250-267)

Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
     Benefits Committee Agenda and Meeting Materials, October 25, 2018 (APC-
     01727486-548)
Anadarko Petroleum Corporation Special Telephonic Meeting of the Compensation and
     Benefits Committee Agenda (APC-00771149)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
     Committee of the Board of Directors, November 14, 2018 (APC-00790771-786)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
     Committee of the Board of Directors, November 15, 2018 (APC-00790787-788)
Anadarko Petroleum Corporation Scheduled Meeting of the Compensation and Benefits
     Committee of the Board of Directors, February 12, 2019, March 14, 2019, April 10,
     2019 and April 11, 2019 (APC-00790975-986)
Anadarko Petroleum Corporation Special Meeting of the Compensation and Benefits
     Committee of the Board of Directors, April 10, 2019 (APC-00790956-967)


**Other Bates-stamped Documents**

ANACOP00000001
ANACOP00000400
ANACOP00000485
ANACOP00000536
ANACOP00001235
APC-00001146
APC-00003844
APC-00011019
APC-00015880
APC-00016935
APC-00017295
APC-00021089
APC-00022603
APC-00028226
APC-00100713
APC-00129328
APC-00129328
APC-00148012
APC-00170332
APC-00175650
APC-00346806
APC-00358392
APC-00564433
APC-00570424
APC-00570526
APC-00570642

APC-00571115
APC-00583654
APC-00584025
APC-00584041
APC-00584057
APC-00584245
APC-00590807
APC-00592109
APC-00593995
APC-00596519
APC-00599188
APC-00611028
APC-00618360
APC-00633494
APC-00634041
APC-00634058
APC-00634183
APC-00634206
APC-00634268
APC-00639341
APC-00639483
APC-00639546
APC-00650760
APC-00664216
APC-00664217
APC-00667005
APC-00673040
APC-00673190
APC-00679074
APC-00690371
APC-00713302
APC-00718272
APC-00755169
APC-00755204
APC-00771148
APC-00771149
APC-00771156
APC-00771173
APC-00771208
APC-00771357
APC-00771473
APC-00772520
APC-00772672
APC-00773377

APC-00775014
APC-00775107
APC-00775206
APC-00775243
APC-00775465
APC-00775502
APC-00775517
APC-00775633
APC-00775866
APC-00775892
APC-00775926
APC-00776181
APC-00776400
APC-00776406
APC-00776506
APC-00776775
APC-00777028
APC-00777034
APC-00777235
APC-00777329
APC-00777428
APC-00777528
APC-00777567
APC-00777611
APC-00777809
APC-00778050
APC-00778059
APC-00778075
APC-00778093
APC-00778123
APC-00778129
APC-00778263
APC-00778824
APC-00779065
APC-00779449
APC-00779469
APC-00779479
APC-00779578
APC-00780285
APC-00780289
APC-00780408
APC-00780418
APC-00780428
APC-00780449

APC-00781025
APC-00781236
APC-00781345
APC-00781455
APC-00781459
APC-00782108
APC-00782124
APC-00782136
APC-00782162
APC-00782204
APC-00782215
APC-00782330
APC-00783560
APC-00783757
APC-00784849
APC-00784868
APC-00784888
APC-00784918
APC-00784922
APC-00785122
APC-00785266
APC-00785301
APC-00785303
APC-00785868
APC-00785882
APC-00786056
APC-00786209
APC-00786241
APC-00786269
APC-00786285
APC-00786817
APC-00787155
APC-00787246
APC-00787342
APC-00787898
APC-00787943
APC-00787955
APC-00788457
APC-00788472
APC-00788515
APC-00789146
APC-00789245
APC-00789317
APC-00790225

APC-00790250
APC-00790664
APC-00790771
APC-00790793
APC-00790956
APC-00790975
APC-00790987
APC-00790994
APC-00791188
APC-00825104
APC-01170568
APC-01227135
APC-01323609
APC-01333637
APC-01340182
APC-01340189
APC-01340190
APC-01381739
APC-01413339
APC-01413845
APC-01433117
APC-01433355
APC-01439197
APC-01452536
APC-01549864
APC-01678952
APC-01716332
APC-01720982
APC-01721074
APC-01721174
APC-01721804
APC-01721899
APC-01723224
APC-01723384
APC-01723477
APC-01723568
APC-01723659
APC-01723761
APC-01723863
APC-01723999
APC-01724000
APC-01724002
APC-01724214
APC-01724426

APC-01725455
APC-01725562
APC-01725797
APC-01726188
APC-01726402
APC-01727482
APC-01727485
APC-01727486
JanHen_00005019
JanHen_00035898


## SEC Filings

Anadarko Petroleum Corporation DEFM14A (Merger Proxy) Statement filed July 11, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2019
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2018
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 17, 2017
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 18, 2016
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2015
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 21, 2014
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2013
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 23, 2012
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 25, 2011
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 26, 2010
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 29, 2009
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 31, 2008
Anadarko Petroleum Corporation DEF 14A (Proxy) Statement filed March 27, 2007

Anadarko Petroleum Corporation Form 10-K filed February 14, 2019
Anadarko Petroleum Corporation Form 10-K filed February 15, 2018
Anadarko Petroleum Corporation Form 10-K filed February 15, 2017
Anadarko Petroleum Corporation Form 10-K filed February 17, 2016
Anadarko Petroleum Corporation Form 10-K filed February 20, 2015
Anadarko Petroleum Corporation Form 10-K filed February 28, 2014
Anadarko Petroleum Corporation Form 10-K filed February 19, 2013
Anadarko Petroleum Corporation Form 10-K filed February 21, 2012
Anadarko Petroleum Corporation Form 10-K filed February 23, 2011
Anadarko Petroleum Corporation Form 10-K filed February 23, 2010

Anadarko Petroleum Corporation Form 10-Q filed July 30, 2019
Anadarko Petroleum Corporation Form 10-Q filed May 8, 2019
Anadarko Petroleum Corporation Form 10-Q filed October 30, 2018
Anadarko Petroleum Corporation Form 10-Q filed July 31, 2018
Anadarko Petroleum Corporation Form 10-Q filed May 1, 2018
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2017

Anadarko Petroleum Corporation Form 10-Q filed July 24, 2017
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2017
Anadarko Petroleum Corporation Form 10-Q filed October 31, 2016
Anadarko Petroleum Corporation Form 10-Q filed July 26, 2016
Anadarko Petroleum Corporation Form 10-Q filed May 2, 2016
Anadarko Petroleum Corporation Form 10-Q filed October 27, 2015
Anadarko Petroleum Corporation Form 10-Q filed July 28, 2015
Anadarko Petroleum Corporation Form 10-Q filed May 4, 2015
Anadarko Petroleum Corporation Form 10-Q filed October 28, 2014
Anadarko Petroleum Corporation Form 10-Q filed July 29, 2014
Anadarko Petroleum Corporation Form 10-Q filed May 5, 2014

ConocoPhillips DEF 14A (Proxy) Statement filed March 30, 2020
EOG Resources, Inc. DEF 14A filed March 15, 2018

Robert P. Daniels Form 4 filed November 7, 2016
Robert P. Daniels Form 4 filed October 27, 2016
Robert P. Daniels Form 4 filed November 9, 2015
Robert P. Daniels Form 4 filed October 28, 2015
Robert P. Daniels Form 4 filed October 16, 2015
Robert P. Daniels Form 4 filed March 24, 2015
Robert P. Daniels Form 4 filed November 10, 2014
Robert P. Daniels Form 4 filed November 6, 2014
Robert P. Daniels Form 4 filed May 22, 2014
Robert P. Daniels Form 4 filed April 11, 2014
Robert P. Daniels Form 4 filed November 12, 2013
Robert P. Daniels Form 4 filed November 7, 2013
Robert P. Daniels Form 4 filed July 3, 2013
Robert P. Daniels Form 4 filed February 13, 2013
Robert P. Daniels Form 4 filed November 13, 2012
Robert P. Daniels Form 4 filed November 7, 2012
Robert P. Daniels Form 4 filed March 16, 2012
Robert P. Daniels Form 4 filed December 2, 2011
Robert P. Daniels Form 4 filed November 14, 2011
Robert P. Daniels Form 4 filed November 10, 2011

R. A. Walker Form 4 filed August 9, 2019
R. A. Walker Form 4 filed November 16, 2018
R. A. Walker Form 4 filed November 14, 2018
R. A. Walker Form 4 filed October 30, 2018
R. A. Walker Form 4 filed November 16, 2017
R. A. Walker Form 4 filed November 14, 2017
R. A. Walker Form 4 filed November 8, 2017
R. A. Walker Form 4 filed October 30, 2017
R. A. Walker Form 4 filed May 17, 2017
R. A. Walker Form 4 filed November 15, 2016

R. A. Walker Form 4 filed November 7, 2016
R. A. Walker Form 4 filed October 27, 2016
R. A. Walker Form 4 filed November 9, 2015
R. A. Walker Form 4 filed October 28, 2015
R. A. Walker Form 4 filed May 19, 2015
R. A. Walker Form 4 filed November 10, 2014
R. A. Walker Form 4 filed November 6, 2014
R. A. Walker Form 4 filed August 8, 2014
R. A. Walker Form 4 filed May 16, 2014
R. A. Walker Form 4 filed November 15, 2013

Robert G. Gwin Form 4 filed August 9, 2019
Robert G. Gwin Form 4 filed November 16, 2018
Robert G. Gwin Form 4 filed November 14, 2018
Robert G. Gwin Form 4 filed October 30, 2018
Robert G. Gwin Form 4 filed November 16, 2017
Robert G. Gwin Form 4 filed November 14, 2017
Robert G. Gwin Form 4 filed November 8, 2017
Robert G. Gwin Form 4 filed October 30, 2017
Robert G. Gwin Form 4 filed November 15, 2016
Robert G. Gwin Form 4 filed November 7, 2016
Robert G. Gwin Form 4 filed October 27, 2016
Robert G. Gwin Form 4 filed March 2, 2016
Robert G. Gwin Form 4 filed November 9, 2015
Robert G. Gwin Form 4 filed October 28, 2015
Robert G. Gwin Form 4 filed October 9, 2015
Robert G. Gwin Form 4 filed November 10, 2014
Robert G. Gwin Form 4 filed November 6, 2014
Robert G. Gwin Form 4 filed August 8, 2014
Robert G. Gwin Form 4 filed November 21, 2013

Ernest A. Leyendecker III Form 4 filed June 5, 2018
Ernest A. Leyendecker III Form 4 filed November 16, 2017
Ernest A. Leyendecker III Form 4 filed November 14, 2017
Ernest A. Leyendecker III Form 4 filed November 8, 2017
Ernest A. Leyendecker III Form 4 filed October 30, 2017
Ernest A. Leyendecker III Form 4 filed November 15, 2016
Ernest A. Leyendecker III Form 4 filed November 7, 2016
Ernest A. Leyendecker III Form 4 filed October 27, 2016
Ernest A. Leyendecker III Form 3 filed September 1, 2016

## Other Documents

Agrawal, Anup, and Tommy Cooper, "Insider Trading Before Accounting Scandals,"
        *Journal of Corporate Finance*, Vol. 34 (2015): 169-190

Agrawal, Anup, and Tareque Nasser, "Insider Trading in Takeover Targets," *Journal of Corporate Finance*, Vol. 18 (2012): 598-625

Aitken, Michael, Douglas Cumming, and Feng Zhan, "Exchange Trading Rules, Surveillance and Suspected Insider Trading," *Journal of Corporate Finance*, Vol. 34 (2015): 311-330

Bettis, J. C., J.L. Coles, and M. L. Lemmon, "Corporate Policies Restricting Trading by Insiders," *Journal of Financial Economics*, Vol. 57 (2000): 191-220

Fishman, Michael J., and Kathleen M. Hagerty, "Insider Trading and the Efficiency of Stock Prices," *RAND Journal of Economics*, Vol. 23, No. 1 (Spring 1992): 106-122

Hillier, David, Adriana Korczak, and Pitor Korczak, "The Impact of Personal Attributes on Corporate Insider Trading," *Journal of Corporate Finance*, Vol. 30 (2015): 150-167

Jagolinzer, Alan D., David F. Larcker, and Daniel J. Taylor, "Corporate Governance and the Information Content of Insider Trades," *Journal of Accounting Research*, Vol. 49, No. 5 (December 2011): 1249-1274

Kraft, Anastasia, Bong Soo Lee, and Kerstin Lopatta, "Management Earnings Forecasts, Insider Trading, and Information Asymmetry," *Journal of Corporate Finance*, Vol. 26 (2014): 96-123

Lee, Inmoo, Michael Lemmon, Yan Li, and John M. Sequeira, "Do Voluntary Corporate Restrictions on Insider Trading Eliminate Informed Insider Trading?" *Journal of Corporate Finance*, Vol. 29 (2014): 158-178

Murphy, Kevin J., "Corporate Performance and Managerial Remuneration: An Empirical Analysis," *Journal of Accounting and Economics*, Vol. 7 (April 1985): 11-42

Master Glossary – Proved Oil and Gas Reserves, Financial Accounting Foundation, 2022

Seyhun, H. Nejat, "Insiders' Profits, Costs of Trading, and Market Efficiency," *Journal of Financial Economics*, Vol. 16 (1986): 189-212

**Data Sources**

Bloomberg, L.P.

2022 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business

# Exhibit 26

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

## Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS

### PURPOSE

This accounting bulletin provides the policy for determining the well classifications and disposition of suspended well costs for financial accounting purposes.  The policy applies to Anadarko Petroleum Corporation and its consolidated subsidiaries (collectively, "Anadarko" or the "Company"). The terms 'suspended well costs' and 'work in progress' are used in this bulletin interchangeably to refer to the initially capitalized costs of drilling and completing wells pending the determination of whether **proved reserves** have been found.

### POLICY

Anadarko uses the successful efforts method of accounting for oil and gas exploration and development activities.  Under this method, costs associated with drilling and equipping **development wells** and **exploratory wells** that result in **proved reserve** additions are capitalized.  All **exploratory well** costs are initially capitalized as incurred pending the determination of whether the well has found **proved reserves**.  The initially capitalized costs of drilling **exploratory wells** that do not find **proved reserves** are expensed (net of any salvage value, as defined in the Accounting Bulletin 20.7) when determination is made that no proved reserves can be attributed as a result of such drilling.  The capitalized costs of drilling **exploratory wells** that do find **proved reserves** continue to be capitalized, subject to depreciation and allowance for impairment.

As part of each quarter-end close, representatives from the Accounting and Exploration and Operations departments shall review the status of all **exploratory wells** in progress to verify that well costs are recorded in Anadarko's financial statements in accordance with this policy. Quarterly review of **exploratory wells** in progress shall involve senior management from the Property Accounting, International Accounting, as well as the Exploration and Operations Departments.  Status of wells in progress shall continue to be monitored after the end of the calendar quarter and until Anadarko's annual report on Form 10-K, quarterly report on Form 10-Q, or another Security and Exchange Commission (SEC) report containing annual or quarterly financial statements filed with the SEC, and information obtained after the balance sheet date through the date of the filing shall be considered for adjustments in the financial statements included in such filing.  Previously issued financial statements shall not be retroactively revised to account for information that became known after the financial statements for that period have been filed with the SEC.

*Questions regarding application of this Accounting Bulletin should be addressed to the Department Manager responsible for its application or Accounting Policy and Research.*

APC-00113426

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

## DEFINITIONS

**Exploratory well:**  An exploratory well is a well that is not a **development well**, a **service well**, or a **stratigraphic test well** as those terms are defined below.

**Development well:** A well drilled within the proved area of an oil or gas reservoir to the depth of a stratigraphic horizon known to be productive.

**Field:**  Area consisting of a single **reservoir** or multiple **reservoirs** all grouped on or related to the same individual or similar geological structural feature and/or stratigraphic condition.

- o   There may be two or more **reservoirs** in a field which are separated vertically by intervening impervious strata, or laterally by local geologic barriers, or by both.

- o   **Reservoirs** that are associated by being in overlapping or adjacent fields may be treated as a single or common operational field.

- o   "Structural feature" and "stratigraphic condition" are intended to identify localized geological features as opposed to the broader terms of basins, trends, provinces, plays, areas-of-interest, etc.

**Proved area:** That part of a property to which **proved reserves** have been specifically attributed.

**Proved reserves:** Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known **reservoirs** under existing economic and operating conditions, i.e. as of the date the estimate is made.  **Reservoirs** are considered proved if economic producibility is supported by either actual production or conclusive formation tests.

**Reservoir:**  A porous and permeable underground formation containing a natural accumulation of producible oil or gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

**Service well:** A well drilled, completed or re-completed for the purpose of supporting production in an existing **field**.  Wells in this class are drilled for the following specific purposes: gas injection (natural gas, propane, butane, carbon dioxide, flue gas, etc.), water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.

APC-00113427

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**Stratigraphic test well:** A drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition.  Such wells customarily are drilled without the intention of being completed for hydrocarbon production.  This classification also includes tests identified as core tests and all types of expendable holes related to hydrocarbon exploration.  Stratigraphic test wells are classified as follows:

1.  Exploratory-type stratigraphic test well: A stratigraphic test well not drilled in a **proved area**.
2.  Development-type stratigraphic test well.  A stratigraphic test well drilled in a **proved area**.

## PROCEDURES

### I.    Well Classification

Wells shall be classified as either **exploratory** or **development** on or before the spud date and may not be reclassified based upon information received or discovered after that date, except as provided below and demonstrated in examples presented in Exhibit I to this Accounting Bulletin.

A well shall be classified as **exploratory** if the well is drilled to find oil and gas in an unproved area, to find a new **reservoir** in a **field** found to be productive in another **reservoir**, or to extend a known **reservoir**.  An exploratory well is a well drilled to an intended location or locations to which no SEC-defined **proved reserves** could have been assigned based on information available prior to the well having been spud.

A well shall be classified as **development** if the well is drilled to an intended location or locations to which SEC-defined **proved reserves** can be specifically attributed based on information available prior to the spud date.  For purposes of classifying a well as **exploratory** or **development**, consideration of whether the well is drilled to access **proved reserves** shall be based on whether subject reserves meet SEC guidelines for classifying reserves as **proved**, rather than whether **proved reserves** have been booked in the Company's reserve system at that time. For non-operated wells, the operator's classification of a planned well shall not be relied upon *solely* to determine well classification for the Company's purposes.  Classification of wells as **development** or **exploratory** shall be evidenced by the AFE request(s).  Interpretative questions concerning reserve definitions and well classifications should be referred to the Reservoir Engineering Manager.

If a development well is spud to produce from a proved undeveloped area and, prior to reaching the intended horizon, a new stratigraphic horizon is found and the well is completed to produce

Original Issue                                                                      Page 3 of 12

 **Accounting Bulletin**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

from that horizon, the well shall be classified as an **exploratory well**, assuming the well was not drilled to the originally intended horizon after discovering new reserves.

Supplemental examples relative to determining well classification are provided in Exhibit I to this Accounting Bulletin.

## II.    Exploratory Wells

Pending the determination of whether a well has discovered **proved reserves**, all costs associated with drilling **exploratory** wells and **exploratory-type stratigraphic test wells** are capitalized and are classified as uncompleted wells, equipment and facilities (work in progress [WIP], or assets under construction [AUC]).   If an **exploratory well** has discovered **proved reserves**, the costs continue to be capitalized, but are reclassified from WIP to *wells, related equipment and facilities* when the well is capable of producing.   However, if no **proved reserves** are found, the capitalized well costs less any salvage value are charged to exploration expense.

Completion costs associated with wells that are initially classified as **exploratory** are classified as either **exploratory** or **development** depending on when determination of the well as successful is made.   If the determination is made prior to incurring completion costs, then those costs are classified as **development**, otherwise, they are classified as **exploratory**.

In certain circumstances, an **exploratory** well finds reserves but those reserves cannot be classified as **proved** when drilling is completed. For example, after reserves are found, the Company may be required to obtain additional geological information, government approvals, or sales contracts, before the reserves can be classified as **proved**. In those cases, the capitalized **exploratory** well costs shall continue to be capitalized as WIP if the well has found a sufficient quantity of reserves to justify its completion as a producing well (although it is not required that the well be completed as a producing well) and the Company is making *sufficient progress* assessing the reserves and the economic and operating viability of the project. For this purpose, a project may include more than one **exploratory well** or **exploratory-type stratigraphic well** if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure).

Whether the Company is making sufficient progress assessing reserves and the economic and operating viability of the project is a matter of judgment.   In making this determination, the following shall be considered indicators that the Company is making sufficient progress. However, all relevant facts and circumstances shall be evaluated and no single indicator is determinative.

Original Issue                                                                                          Page 4 of 12

APC-00113429

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

a.  Commitment of project personnel who are at the appropriate levels and who have the appropriate skills;
b.  Costs are being incurred to assess the reserves and their potential development;
c.  An assessment process covering the economic, legal, political, and environmental aspects of the potential development is in progress;
d.  Existence (or active negotiations) of sales contracts with customers for the oil and gas;
e.  Existence (or active negotiations) of agreements with governments, lenders, and venture partners;
f.  Outstanding requests for proposals for development of any required facilities;
g.  Existence of firm plans, established timetables, or contractual commitments, which may include seismic testing and drilling of additional **exploratory wells**;
h.  Progress is being made on contractual arrangements that will permit future development;
i.  Identification of existing transportation and other infrastructure that is or will be available for the project (subject to negotiations for use).

If the Company has not engaged in substantial activities to assess the reserves or the development of the project in a reasonable period of time after the drilling of the well is completed or activities have been suspended, any capitalized costs associated with that well shall be expensed, net of any salvage value. After a reasonable period of time, the planning of future activities without engaging in substantial activities is not sufficient to continue the capitalization of **exploratory well** or **exploratory-type stratigraphic well** costs. However, brief interruptions in activities required to assess the reserves or the project, or other delays resulting from governmental or other third-party evaluation of a proposed project, do not require capitalized **exploratory well** or **exploratory-type stratigraphic well** costs to be expensed.  If costs of an **exploratory well** are expensed based on cessation of substantial activities, and activities resume at a later date, costs previously expensed shall not be reinstated.

To continue deferral of capitalized **exploratory well** costs (including **exploratory-type stratigraphic test wells**) as WIP beyond one year from the completion of drilling, justification by the respective asset management or exploration team of the economic and operating viability of the project as described in the preceding paragraphs is required.  All instances of **exploratory well** cost deferral beyond one year from the date the drilling was completed (as determined by the date the rig is released) must be approved by the Chief Accounting Officer and Senior VP, Worldwide Exploration.  If conditions for continuing capitalization in WIP as described above are not met, the **exploratory well** costs are assumed to be impaired and shall be charged to exploration expense, net of any salvage value.

As part of each quarter-end close, the Accounting, Exploration and Operations departments shall review the status of all **exploratory wells** in progress as of quarter-end to verify that well costs are recorded in Anadarko's financial statements in accordance with this policy.  Quarterly review

APC-00113430

 **Accounting Bulletin**

Title   **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

of **exploratory wells** in progress shall include senior management from the Property Accounting, International Accounting and Exploration Departments.

If an **exploratory well** is in progress at the end of an accounting period and a determination is made after period-end but before the financial statements for the period are issued (generally within 60 days of year end and 40 days of quarter end) that the well did not find **proved reserves**, the costs incurred through the end of the period, net of any salvage value, shall be charged to expense for that period.  For example, for an **exploratory well** in progress as of December 31, 2007 declared to be dry on February 1, 2008, costs incurred through December 31 shall be expensed in 2007 income statement (assuming 2007 annual report on Form 10-K has not been filed with the SEC as of that date). The amount charged to expense should include costs incurred during the current period (2007 in the example above), as well as costs that were incurred and capitalized in prior periods.  Costs incurred subsequent to the balance sheet date shall be charged to expense when incurred (in the example above, costs incurred after December 31, 2007 would be expensed in 2008).  Previously issued financial statements shall not be retroactively revised to account for information that became known after the financial statements had been filed with the SEC.  The Senior VP, Worldwide Exploration, or designee, shall communicate **exploratory wells** determined to be dry after quarter end, but before financial statements are filed with the SEC, to the Chief Accounting Officer, regardless of the magnitude of cumulative costs incurred through quarter end.

### III.    Development Wells

All costs associated with drilling, completing and equipping **development wells, service wells** and **development-type stratigraphic test wells** are classified as uncompleted wells, equipment and facilities (WIP) until the drilling and/or facilities construction is completed.  Once the drilling and/or facilities construction are completed and the wells are ready for production, the associated costs are reclassified to *wells, related equipment and facilities*.  This includes costs related to drilling, completing and equipping unsuccessful **development, service** and **development-type stratigraphic test wells** (development dry holes).  The capitalized costs classified as *wells, related equipment and facilities* shall be amortized on a unit-of production basis as indicated in Accounting Bulletin 20.7.  Development dry holes are capitalized and classified in the same manner as productive wells, subject to an overall impairment test for the respective impairment unit, performed following the guidance in Accounting Bulletin 20.8.

APC-00113431

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

## IV.     Dual-Purpose Wells

If a well is drilled within a **proved area** of an oil or gas **reservoir** with the intent to penetrate a **proved** stratigraphic horizon and to continue deeper into unproved strata, the costs to drill to the **proved** horizon shall be accounted for as **development well** costs.  The incremental cost to drill deeper to the unproved horizon shall be accounted for as **exploratory well** costs.  The well must be designed and drilled with the intent and capability of being completed in the **proved** horizon in order to qualify as a dual-purpose well.  However, the well does not have to be completed in the **proved** horizon in order for the drilling costs to that horizon to be accounted for as **development well** costs.  The re-entry of an existing well bore, either producing or non-producing, for re-completion to an unproved **exploratory** horizon is classified as an **exploratory** project, regardless of the original classification of the existing well bore.

## V.     Wells Not Completed due to Mechanical Failures

If a well (**development**, **exploratory**, service, sidetrack, etc.) cannot be completed due to mechanical difficulties and a new well is drilled to the same horizon, under certain circumstances the cost of the original well may be deferred as WIP until the replacement well is completed.  The replacement well must be designed and drilled with the intent and capability of being completed in the horizon intended for the original well in order to continue cost deferral of the original well costs.  If a decision is made to continue to defer the costs of the original well in WIP, such costs are then considered part of the cost of the replacement well and are ultimately capitalized (if the replacement well is a **development well** or successful **exploratory well**) or expensed (if the replacement well is an unsuccessful **exploratory well**).  Continuing deferral of well costs in WIP for wells not completed due to mechanical failures is subject to approval by Assistant Controller responsible for Property Accounting.

If the original well is abandoned due to mechanical failures and another well is not drilled to the same horizon, the cost of the original well is capitalized if it was a **development well** or expensed if it was an **exploratory well**.

Examples demonstrating classification of wells as **development** or **exploratory** in a **reservoir** development program are included in Exhibit I.

**EXHIBIT INDEX**
   I.     Reservoir Development Well Classification

Original Issue                                                                                     Page 7 of 12

APC-00113432

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**CROSS-REFERENCES**

Accounting Bulletin No. 20.7, "Depreciation of Properties and Equipment"
Accounting Bulletin No. 20.8, "Impairment Tests for Long-Lived Assets in Use"
Financial Accounting Standards Board Statement of Financial Accounting Standards No. 19,
   "Financial Accounting and Reporting by Oil and Gas Producing Companies"

---

Bruce Busmire
Chief Accounting Officer

APC-00113433

 **Accounting Bulletin**

A.B. No 20.5
Date: July 1, 2007

Title  **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

<u>**Exhibit I**</u>

**Reservoir Development Well Classification**

**Example 1**



A discovery well (**exploratory**) is drilled on **Site D** and establishes **Site D** and offset **Sites C and E** as proved areas.  Next, an offset **development** well is drilled on **Site E**, becomes a producing well and establishes offset **Site F** as a proved area.  Next, an offset **development** well is drilled on **Site F**, becomes a producing well, but does not establish **Site G** as a proved area. Then a step-out, **exploratory** well is drilled on **Site B** (an unproved site) and establishes **Sites B and A** as proved areas.  Next, an offset **development** well is drilled on **Site C** and becomes a producing well.  Then an offset, **development** well is drilled on **Site A**.  The well is dry and is plugged.  Costs of the well on Site A are capitalized as development costs.  Finally, an offset **exploratory** well is drilled on **Site G**.  The well is dry and is plugged.  Costs of the well on Site G are expensed.

Original Issue                                                                 Page 9 of 12

APC-00113434

 **Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

Title  **WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**Example 2**



Assume **Pay Zone A** is a **proved area** and **Pay Zone B** is an **unproved area**. An **exploratory** well is drilled with the intent to evaluate reserves in **Pay Zone B**. Proved reserves are not found, the well is plugged back and produced from Pay Zone A. When the original plan to develop Pay Zone B is abandoned, a new **development** AFE should be established to plug back and complete the well from **Pay Zone A**. The allocated share of costs to drill to Pay Zone A and the completion costs are capitalized as development well costs and incremental costs to drill to and plug back Pay Zone B are expensed as exploratory dry hole costs. Such treatment will likely require transferring costs between cost centers after the well is completed, since, based on the original designation of the well as an exploratory well targeting unproved Pay Zone B, costs to drill to Pay Zone A before continuing to Pay Zone B would have been initially categorized as exploratory well costs.

However, if the original plan is successful and proved reserves are associated with Pay Zone B, the entire cost of drilling the well will remain capitalized as successful exploratory well costs, subject to future depreciation and impairment evaluation.

Alternatively, if the original plan is to complete the well at Pay Zone A, then drill deeper to explore for reserves from Pay Zone B, costs to drill to **Pay Zone A** would be categorized as **development** and incremental costs to drill to **Pay Zone B** would be categorized as **exploratory**.

Original Issue                                                              Page 10 of 12

APC-00113435

 **Accounting Bulletin**

**Title　WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

**Example 3**

Using the same image as in Example 2, assume **Pay Zone A** is an **unproved area** and **Pay Zone B** is a **proved area**. A **development** well is drilled with the intent to produce from **Pay Zone B**. Unexpectedly, proved reserves from Pay Zone A are found. The well is completed and produces from Pay Zone A only. The well is reclassified to an exploratory well and costs are reclassified from WIP to wells, related equipment and facilities as successful exploratory well costs.

**Example 4**



Offshore **exploratory** well at **Site A** is drilled, finding proved reserves and establishing Site C as a proved area (but not Site B). A **development** sidetrack well is drilled at **Site C** and is

Original Issue　　　　　　　　　　　　　　　　　　　　Page 11 of 12

APC-00113436



**Accounting Bulletin**

**A.B. No 20.5**
**Date: July 1, 2007**

**Title   WELL CLASSIFICATION AND DISPOSITION OF SUSPENDED WELL COSTS**

completed as a producing well.  An offset **exploratory** sidetrack well is drilled at **Site B**.  The well is dry and is plugged.  Costs of the well on Site B are expensed.  For well count purposes, this is considered one well with multiple penetrations.

Original Issue                                                                                    Page 12 of 12

APC-00113437

# Exhibit 27



| Client | | Period-end |
|---|---|---|
| Anadarko Petroleum Corporation | | 12/31/2014 |

| Prepared by | Date | W/P reference |
|---|---|---|
| Maggie Zahr | 1/15/2014 | **GG.4.A.8.05** |

**Purpose**
The purpose of this work paper is to test the Company's suspended well costs as of 12/31/2014 for completeness, accuracy, and presentation, in support of the completeness, accuracy, valuation, and presentation of PP&E (specifically AUC).

**Background**
KPMG notes that suspended well costs are costs that have been incurred for drilling activities and are currently suspended pending evaluation. These costs are in the exploratory assets under construction (AUC) account until a final determination is made. KPMG notes that these wells are not being depleted while in the AUC account.

FASB 932-360-35 provides the following guidance on the Sufficient Progress Assessment of wells in suspended status:

> 35-18 An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed. In those cases, the capitalized drilling costs shall continue to be capitalized if the well has found a sufficient quantity of reserves to justify its completion as a producing well and the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project. Note that an entity is not required to complete the exploratory or exploratory-type stratigraphic well as a producing well. For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure).

> 35-19 All relevant facts and circumstances shall be evaluated when determining whether an entity is making sufficient progress on assessing the reserves and the economic and operating viability of the project. The following are some indicators, among others, that an entity is making sufficient progress (see the following paragraph). No single indicator is determinative. An entity shall evaluate indicators in conjunction with all other relevant facts and circumstances. These indicators include:

>     a) Commitment of project personnel who are at the appropriate levels and who have the appropriate skills

>     b) Costs that are being incurred to assess the reserves and their potential development

>     c) An assessment process covering the economic, legal, political, and environmental aspects of the potential development is in progress

>     d) Existence (or active negotiations) of sales contracts with customers for the oil and gas

>     e) Existence (or active negotiations) of agreements with governments, lenders, and venture partners

>     f) Outstanding requests for proposals for development of any required facilities

>     g) Existence of firm plans, established timetables, or contractual commitments, which may include seismic testing and drilling of additional exploratory wells

>     h) Progress that is being made on contractual arrangements that will permit future development

>     i) Identification of existing transportation and other infrastructure that is or will be available for the project (subject to negotiations for use).

> Long delays in the assessment or development plan (whether anticipated or unexpected) may raise doubts about whether the entity is making sufficient progress to continue the capitalization of exploratory well or exploratory-type stratigraphic well costs after the completion of drilling. The longer the assessment process for the reserves and the project, the more difficult it is to conclude that the

CONFIDENTIAL

entity is making sufficient progress to continue the capitalization of those exploratory well or exploratory-type stratigraphic well costs.

35-20 If an entity has not engaged in substantial activities to assess the reserves or the development of the project in a reasonable period of time after the drilling of the well is completed or activities have been suspended, any capitalized costs associated with that well shall be expensed net of any salvage value. After a reasonable period of time, the planning of future activities without engaging in substantial activities shall not be sufficient to continue the capitalization of exploratory well or exploratory-type stratigraphic well costs. However, brief interruptions in activities required to assess the reserves or the project, or other delays resulting from governmental or other third-party evaluation of a proposed project, do not require capitalized exploratory well or exploratory-type stratigraphic well costs to be expensed.

### Relevant Controls

KPMG performed a walkthrough of the Domestic Exploratory AUC process and tests of design over key controls at **2.11.G.1.65.A-B**. KPMG also documented international non-flowcharted controls at **2.11.G.1.80**. TOEs were also performed in the **3.1.G.1 series**.

4740 - Quarterly meetings are held with Operations to discuss status of exploratory wells.

Int. 2 - International Accounting holds Quarterly meetings with Operations to discuss status of exploratory wells and NPLH.

### Procedures

1. KPMG obtained a detailed listing of Domestic Onshore and Offshore, and International suspended wells and their associated balances as of 12/31/2014. Please see the Domestic and International suspended wells rollforward at **GG.4.A.8.20** and **GG.4.A.8.15**, respectively.

2. As of 12/31/14, KPMG selected all suspended wells and combined plays that had more than $50 million (1/3 of PM) of costs in total for projects and specifically identified other items based on professional judgment. Per KSP, minimum sample size to test was 12, ad KPMG tested 14. As such, further samples were not selected.

3. For the suspended wells that were selected (per step #2 above), KPMG inquired of operations and corroboratively inquired with accounting to determine if sufficient progress is being made to assess the reserves and the economic and operating viability of the project to support management's view that these well costs should remain suspended as of 12/31/2014. In addition, KPMG performed the following:

   a. Obtained and read press releases throughout the year including those that publicly announced successful wells.

   b. Reviewed operations reports throughout the year that are also public information for successful well announcements as well as drill plans that the Company has made public.

   c. Confirmed with operations the inclusion of drill plans for the suspended wells within the proposed 2014 and 2015 budgets. Please see more detailed information for the suspended wells and their expected drilling dates in the tickmark explanations below.

   d. While evaluating the Company's justifications for continued suspense, KPMG additionally noted the following factors (refer to **G.1.65.A-B and G.1.80** for additional documentation over the Domestic Exploratory AUC and International processes):

      i. The suspended wells aging (**GG.4.A.8.10**) is reviewed by operations. In specific, the schedule is prepared by accounting and sent for review to operations twice. In the first review, the schedule is sent to the operational planning teams to verify that the list is accurate. After any adjustments are made, it is then signed by the operational vice presidents. KPMG obtains a signed version of the aging each quarter. KPMG verified that the Q4 domestic aging report was approved by Danny Brown (VP, Operations) on 2/6/2015 and by Doug Hazlett (VP, Exploration) on 2/10/2015, Charles Griffie (General Manager, US Onshore Exploration and Production) on 2/10/2015, Brad Holly (SVP, Operations) on 2/3/2015, Louis Williams ((Director, Expenditure Accounting) on 2/5/2015, Chris Campbell (Director, International

Page [
PAGE ]

                                                      KPMG_APC_eA_0002512

        Accounting) on 2/5/2015, and Chuck Meloy (EVP, US Onshore Exploration and Production) on 2/11/2015.

    ii.  For all plays, the Company has salaried operational staff dedicated to working on the projects. This demonstrates the Company's commitment to continue exploring the area.

    iii.  The Company's operations continues to review all exploratory AUC wells (including those not in suspense – e.g. still drilling as of 12/31/2014) and provides feedback to accounting if a well is deemed to be dry based on events that have occurred after the report date but before the report is filed. Please dry hole testwork at **GG.4.G.3**.

See items selected for further explanation below. See complete listing of Suspended Well Balances as of 12/31/2014 at **GG.4.A.8.15-20.**

**Tickmark Explanations** (See Tickmarks at **GG.4.A.8.10**):

*Domestic*

A.  **Shenandoah (Offshore) - $193.19 million (GG.4.A.8.10)**

  a.  Background

    i.  In February 2009, the Company publicly announced an oil discovery at its Shenandoah discovery well located in the Walker Ridge block 52 in the Deepwater Gulf of Mexico. The discovery well encountered net oil pay approaching 300 feet in the Wilcox formation in the Lower-Tertiary play.

  b.  Associated AFEs

    i.  SHENANDOAH - WALKER RIDGE 52 001 (AFE 2064247 - $62.2 million)

      1.  Successful well, requires appraisal.

    ii.  SHENANDOAH - WALKER RIDGE 51 001 (AFE 2064209 - $18.9 million)

      1.  Original well abandoned due to mechanical issues from a poor cement job. Redrill SPUD on 9/16/14 on AFE 2077304 (successful appraisal). SPUD Q2 2012 and suspended Q1 2013. KPMG notes that the Company has capitalized this cost as the target of AFE 2077304 (see below), which is the same as this abandoned AFE. As such, KPMG notes that the costs of drilling this well (or twin well) are simply unexpected additional costs to get a well drilled to the target.

    iii.  SHENANDOAH - WALKER RIDGE 51 002 (AFE 2077304 - $45.8 million)

      1.  Successful well, requires additional appraisal.

    iv.  SHENANDOAH - WALKER RIDGE 51 002 BP01 (AFE 2081976 - $2.5 million)

      1.  Bypass to conduct 3D vertical seismic profile for successful well SPUD Q3 2012 and suspended Q1 2013

    v.  SHENANDOAH #3 – WALKER RIDGE 52 002 (AFE 2087315 - $55.0 million)

      1.  Successful appraisal well to determine extent of reservoir. Temporary abandoned operation complete; rig released early January 2015

    vi.  SHENANDOAH #3 – WALKER RIDGE 52 002 BP01 (AFE 2105981 - $8.6 million)

      1.  Coring operation complete; rig released early January 2015

  c.  Current Justification for Suspended Status

CONFIDENTIAL

KPMG_APC_eA_0002513

i. *PY Q4 Justification*: KPMG inquired of Justin Lime (Planning Manager) and noted that as of Q1 2014, there was currently an appraisal well being drilled with an expected completion date of Q2 2014.

ii. *Q1 Justification*: KPMG inspected the suspended wells rollforward (**GG.4.A.8.15**) and Domestic Exposure Report (PPE PBC 9) and noted that there were no wells actively drilling for the Shenandoah play (as noted in the Q4 justification). KPMG inquired of Catherine Green (Accounting Manager) and noted that Justin Lime was referring to active drilling on Coronado play. Both the Shenandoah and Coronado plays are located in the Walker Ridge area. Specific to the Shenandoah play, per the Domestic Exposure Report, the Company added $341 thousand in pre-drill costs for the play in Q1 2014, with an expected spud date in Q4 2014. Per further inquiry with Catherine Green (Accounting Manager) the Shenandoah #3 appraisal well was scheduled to be spud on June 1st by the Diamond Ocean BlackHawk. The Shenandoah #4 appraisal well is scheduled to be spud Q1 2015. The drilling time for both wells was expected to be more than 150 days. Pre-development AFEs had also been approved during Q1 2014 for development and testing for completion of the Shenandoah wells and subsea production systems.

iii. *Q2 Justification*: KPMG noted that per the Domestic Exposure Report (PPE PBC 9), the Shenandoah 3 well was currently drilling with an expected rig release in late November. The well had accumulated $7.9 million in costs as of 6/30/2014. That activity was consistent with the plans noted in the Q1 justification above.

iv. *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), Shenandoah well #3 is associated with AFE #2087315 for Walker Ridge 52 002 and was actively drilling. It had a balance of $30.5 million as of 9/30/2014 (an increase of $22.6 million from its 6/30/2014 balance of $7.9 million). KPMG notes that once operations on Shenandoah #3 cease, the Company has 180 days to resume operations in order to hold the lease; otherwise the lease will expire. The rig is expected to be released in late November.

v. *Q4 Justification:* Per the Domestic Exposure Report (PBC PPE 9), Shenandoah well #3 is associated with AFE #2087315 for Walker Ridge 52 002 and was actively drilling at 12/31/14. It had a balance of $55 million as of 12/31/2014 (an increase of $24.5 million from its 9/30/2014 balance of $30.5 million). KPMG inquired as to the plans for Shenandoah #3 and notes that the rig was released from Shenandoah #3 on 1/2/2015. Per the Q4 Operations report, the approximately 1.5 times more of the same well-developed reservoir that the Shenandoah-2 well found. The well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. It also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range. KPMG inquired of the Company's further plans and noted that Shenandoah #4 is on the rig schedule beginning 6/21/2015 and is scheduled to utilize the rig for ~150 days. Shenandoah #5 is on the rig schedule for late 2015. KPMG notes that Anadarko is the operator of the wells at the Shenandoah oil field and holds a 30% interest. ConocoPhillips holds 40%, Cobalt holds 20%, and Marathon holds 10%[1].

vi. *Conclusion as of Q4:* KPMG noted that the activities mentioned above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development. In addition, established timelines for continued plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates. KPMG will continue to monitor the situation for updates.

**B. Wolfcamp (Southern) - $73.26 million (GG.4.A.8.10)**

a. Background

---

[1] http://www.subseaiq.com/data/Project.aspx?project_id=743

CONFIDENTIAL                                                    KPMG_APC_eA_0002514

      i.  KPMG notes that the Wolfcamp Play is located in West Texas in the Delaware Basin. The play is made up of a number of smaller wells that frequently flow through suspended status to developed in a short period of time.

b.  Associated AFEs

      i.  WHEAT TRUST 1-52 1H (AFE 2094610 - $5.9 million)

           1.  Spud 4/11/2014 and suspended Q2 2014. Well fractured in October 2014 and online in Q1 2015.

      ii.  WHEAT TRUST 1-52 3H (AFE 2094609 - $4.9 million)

           1.  Spud 5/11/2014 and suspended Q2 2014. Well fractured in November 2014 and online in Q1 2015.

      iii.  WHEAT TRUST 1-52 5H (AFE 2094611 -  $9.2 million)

           1.  Spud 5/11/2014 and suspended Q2 2014. Well fractured in November 2014 and online in Q1 2015.

      iv.  WHEAT TRUST 1-52 7H (AFE 2094613 -  $4.2 million)

           1.  Spud 5/16/2014 and suspended Q2 2014. Well fractured in December 2014

      v.  HALEY JE 28-33 3H (AFE  2091444- $4.1 million)

           1.  Spud 8/5/2014 and suspended Q3 2014. To be fractured and online in Q2 2015.

      vi.  CODY 56-3-9 1H (AFE  2092358- $3.5 million)

           1.  Spud 8/10/2014 and suspended Q3 2014. Well fractured in November 2014 and online in Q1 2015.

      vii.  TETON 56-2-39 1H (AFE 2098389 - $2.5 million)

           1.  Spud 6/22/2014 and suspended Q3 2014. To be fractured and online in Q1 2015.

      viii.  CASPER 57-1-47 1H (AFE  2093563 - $4.3 million)

           1.  Spud 6/15/2014 and suspended Q3 2014. Well fractured in November 2014 and online in Q1 2015.

      ix.  GREYBULL 55-4-9 1H (AFE  2093796 - $4.4 million)

           1.  Spud 7/31/2014 and suspended Q3 2014. Well fractured in November 2014 and online in Q1 2015.

      x.  KAYCEE 57-3-41 1H (AFE  2093798  - $2.0 million)

           1.  Spud 7/30/2014 and suspended Q3 2014. To be fractured in Q1 2015 and online in Q2 2015.

      xi.  WINGHEAD 56-2-29 1H (AFE  2097334 - $4.0 million)

           1.  Spud 7/28/2014 and suspended Q3 2014. Well fractured in October 2014 and to be online in Q2 2015.

      xii.  BIG HORN 56-2-9 1H (AFE 2097337 - $0.2 million)

           1.  Suspended Q3 2014. To be fractured and online in Q1 2015.

      xiii.  WINGHEAD 57-2-13 1H (AFE  2097510  - $1.9 million)

           1.  Spud 9/26/2014 and suspended Q3 2014. To be fractured in 2016

      xiv.  COVINGTON 34-224 5H (AFE 2097512 - $9.3 million)

           1.  Spud 8/10/2014 and suspended Q3 2014. Well fractured December 2014 and to be online Q1 2015.

Page [
PAGE ]

KPMG_APC_eA_0002515

xv.   WINGHEAD 56-2-43 2H (AFE 2097798 - $3.1 million)

1. Spud 8/26/2014 and suspended Q3 2014. Well fractured December 2014 and to be online Q2 2015.

xvi.   BANNER 57-1-21 1H (AFE 2098029 - $1.9 million)

1. Spud 10/25/2014 and suspended Q4 2014. To be fractured Q1 2015 and online Q4 2015.

xvii.   REED TRUST 55-1-46 1H (AFE 2098623 - $4.2 million)

1. Spud 9/3/2014 and suspended Q3 2014. Well fractured in December 2014.

xviii.   BOLANDER 33-95 1H (AFE 2099163 - $2.9 million)

1. Spud 9/28/2014 and suspended Q3 2014. To be fractured Q1 2015 and online Q2 2015.

c.   Current Justification for Suspended Status

i.   *Note: The Wolfcamp Play first came into scope in Q2 2014.*

ii.   *Q2 Justification*: KPMG noted the Wolfcamp Play has a lot of smaller well activity that enters and leaves suspended status fairly quickly. All 9 wells in the Wolfcamp play that were suspended in Q4 2012 were transferred to developed (total balance of $32.9 million), as seen in the domestic suspended wells rollforward at **GG.4.A.8.20**. The "oldest" wells in suspense for the play as of 6/30/2014 were both SPUD and suspended in Q1 2014, as noted above. Per the Domestic Exposure Report (PPE PBC 9), of the 18 wells in suspended status, two wells are pending first production before being transferred over to developed. The remaining wells were all expected to be fractured later in 2014.

iii.   *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 22 wells in the area. One well (COOPERSMITH 34-139 2H, AFE 2091418) was pending booking reserves, and the other 21 wells were in suspense as seen in the Suspended Wells Rollforward at **GG.4.A.8.20**. The individual balances of these Wolfcamp wells is relatively small as these are cheaper onshore wells, and the aggregate amount of the wells in suspense totaled $51.9 million. Thirteen of these wells were suspended in Q3 2014, while the remaining 8 had been suspended in Q2 2014. KPMG also notes that ten wells were transferred during Q3 in the amount of $32.7 million. Per the Exposure Report, all 21 of the Wolfcamp wells in suspense are either currently being completed or are awaiting completion. They will be fractured in Q4 2014 or at the beginning of 2015, and they will be brought online in the respective subsequent quarter.

iv.   *Q4 Justification:* KPMG notes that of the 21 wells that were in suspense in Q3, four wells in the amount of $17.1 million were transferred to developed property during Q4. The other 17 wells remained in suspense through Q4, and per the Q4 Domestic Exposure Report (PBC PPE 9) the aggregate balance of these wells totaled $73.3 million. In addition to these 17 wells, one well (BANNER 57-1-21 1H, AFE 2098029) entered into suspense during Q4 2014 as seen on the suspended wells rollforward at **GG.4.A.8.20.** Also, work began on one new well (SARATOGA 54-4-13 1H, AFE 2092357) and was noted as being in the pre-drill phase (e.g. not suspended). As such, there was a total of 19 wells associated with the play in Q4, 18 of which were in suspense.

Per the Q4 Domestic Exposure Report, the 18 wells that were in suspense in Q4 were all set to be fractured in either Q4 2014 or in the first half of 2015. Of these 18 wells in suspense, 16 wells are expected to be online by Q2 2015, while the other two are expected to be online by Q4 2015.

KPMG notes that the Company has continued to focus on the Wolfcamp play. Per the Q4 2014 Operations Report, the Company expanded its leasehold by 10,000 net acres in Q4 2014. In addition, the Company acquired Nuevo Midstream assets in order to expand key infrastructure and facilitate future growth in the basin. (Refer to

Page [
PAGE ]

CONFIDENTIAL

KPMG_APC_eA_0002516

additional discussion over Nuevo Acquisition at **EE.4.5**.) KPMG notes that these actions in addition to the continued exploratory and developmental drilling in the region show that the Company is committed to the area.

In terms of 3rd party interest in the area, Pioneer Natural Resources is the operator that holds the largest acreage in the play, holding 825,000 gross acres, and operating more than 7000 producing wells[2]. Pioneer estimates that the Wolfcamp oil field contains more than 75 billion barrels of oil equivalent, placing it as the largest oil field in the country and the second largest in the world[3]. Pioneer, EOG Resources, and Apache Corporation have been operating in the region for years and have developed production rates that are four times higher than production by new producers who are just entering the play[4]. KPMG also notes that in 2014, ExxonMobil continuously expanded its acreage in the region through several purchases that took place throughout the year. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

v. *Conclusion as of Q4:* KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development; and firm plans and established timetables exist for completion of the existing suspended wells. KPMG will continue to monitor the situation for updates.

**C. Deep Powder River (Onshore – Rockies) - $18.14 million (GG.4.A.8.10)**

a. Note: KPMG scoped this play in for Q4 2014 given the fact that the proved property portion of the play is under consideration for impairment purposes (see **GG.4.E.1.10, 12, and 16**).

b. Background

    i. The first Deep Powder River wells were SPUD in late 2012 and early 2013 and started entering suspended status in Q1 2013. The area is made up of a number of smaller wells that flow quickly through suspended status as they are completed and brought online. The Deep Powder River wells are primarily operated by the Company and are in the Rockies region.

c. Associated AFEs

    i. MOJAVE FED 4277-23-31F-H (AFE 2065201 – $9.2 million)

        1. Spud 11/22/2013 and suspended Q1 2014. Well had operational issues during completion. May attempt to fish the stuck coil in 2015. If unsuccessful, will potentially plug and abandon.

    ii. TMFU 4577-15-44SH-H (AFE 2074974 – $7.4 million)

        1. Spud 8/26/2013 and suspended Q1 2014. Well is now producing and will book reserves in Q1 2015.

    iii. ROCHELLE 11-33-69 A 1H (AFE 2090747 – $1.3 million)

        1. Spud 9/7/2013 and suspended Q4 2014. Well is waiting on completion.

    iv. ROCHELLE 11-33-69 A 1H (AFE 2107080 – $0.3 million)

        1. Spud 9/7/2013 and suspended Q4 2014. Well is waiting on completion.

d. Current Justification for Suspended Status

    i. *PY Justification*: KPMG notes that the Mojave Fed 4227-27-44F-H was completed and placed into suspense in Q4 2013. The Trinity Fee 3367-7 11N-H and E21N-H wells were spud 11/22/2013 and 11/23/2013 respectively. These wells are

---

[2] http://www.ogj.com/articles/uogr/print/volume-2/issue-3/permian-operators-increasingly-target-shale-as-new-technology-rejuvenates-legacy-oil-field.html
[3] http://www.pxd.com/operations/permian-basin
[4] http://fuelfix.com/blog/2014/06/11/wolfcamp-shale-layers-could-put-play-among-most-profitable/

Page [
PAGE ]

KPMG_APC_eA_0002517

anticipated to be complete in 2014. KPMG additionally notes that the SHAWNEE STATE 3269-4-31H well was transferred to final asset, thereby providing additional evidence of the viability of the play.

ii. *Q1 Justification*: KPMG notes that the Company placed 13 new wells ($59.9 million) into the PRB Deep DU. Of the total PRB Deep DU balance, 7 wells (59.4 million) were complete and were expected to transfer to depreciable assets once reserves were booked for Q2 2014 (reserves are recorded on a quarter lag). Another 9 wells ($30.4 million) were waiting on completion (all were added into suspense in Q1 2014). As of 3/31/2014, the Company had 4 AFEs ($4.6 million) in pre-drill or active drilling status. Additionally, as seen on the rollforward at **GG.4.A.8.20**, the TRINITY FEE 3468-17-31F-H (AFE 2071030 - $10.2 million as of 12/31/2013) was transferred to developed in Q1 2014.

iii. *Q2 Justification*: KPMG noted that per the domestic suspended wells rollforward at **GG.4.A.8.20**, 4 wells (TRINITY FEE 3468-17-31F-H, SIMBA FED 4778-20-44SX-H, MOJAVE STATE 4377-16-11F-H, and SHAWNEE FEE 3368-26-11N-H) were transferred to developed in Q2 2014 at a value of $47.8 million. Three wells were added to suspended status in Q2 2014 (as noted above). Per the Domestic Exposure Report (PPE PBC 9), of the 17 AFEs in suspended status as of 6/30/2014, 13 were complete and were just pending the recording of reserves in the second half of 2014 before being transferred to developed. Two wells in suspended status had encountered mechanical issues with further work anticipated for 2015. The last two wells (both added to suspense in Q2 2014) were pending completion work.

iv. *Q3 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 7 wells in Deep Powder River area. One well (TMFU 4577-22-41SH-H, AFE 2080194) is in the pre-drill phase; one well (SHAWNEE FEE 3368-28-E14N-H, AFE 2084626) is currently drilling; and the other six wells are in suspense as seen on the rollforward at **GG.4.A.8.20**. The aggregate amount of the six onshore wells in suspense totaled $43.8 million. One of these wells had been suspended in Q2 2013, while the remaining five were suspended in Q1 and Q2 2014. KPMG also notes that during Q3 ten wells were transferred from suspended wells to proved property in the amount of $65.9 million. Per the Exposure Report, four of the six wells in suspense were producing and just pending the recording of reserves Q4 2014 or in Q1 2015.

v. *Q4 Justification*: Per the Domestic Exposure Report (PBC PPE 9), there were a total of 7 wells in Deep Powder River area. One well (TMFU 4577-22-41SH-H, AFE 2080194) remained in the pre-drill phase from Q3; two wells are currently drilling (SHAWNEE FEE 3368-28-E14N-H, AFE 2084626 and SHAWNEE FEE 3368-28-W14N-H, AFE 2095920); the other four wells were in suspense as seen on the Suspended Wells Rollforward at **GG.4.A.8.20**. The aggregate amount of the six onshore wells in suspense totaled $22.9 million. KPMG also notes that in Q4 three wells (NBV of $20.4 million) were transferred from suspended wells to proved property. Per the exposure report, two of the wells in suspense were waiting on completion while one was pending booking of reserves in Q1 2015 before being transferred to proved. As noted at **GG.4.E.1.16**, the Company anticipates spending ~$76 million in the PRB Deep area for 9 operated wells unless prices stay low, in which the program would be deferred to 2016/2017. At 12/31/2014, the portfolio value was estimated between $324 million to $452 million based on the potential for 90+ MMBOE, more than enough to cover the $18.4 million in suspended wells and $191.1 million in proved properties. The Company also is in discussion to two partners into the area and farm out a significant portion of their northern acreage for ~$30-$45 million. The Company also has budgeted in spending another $15 million on acreage in 2015 in addition to their budgeted capital on the drilling program.

In terms of other 3rd party interest, major players in the region include EOG Resources (which considers the Powder River its new core focus area), SM Energy, and Chesapeake Energy Corporation[5]. KPMG further notes that while Chesapeake

---

[5] http://www.oilandgasinvestor.com/powder-river-basin-759791

Page [
PAGE ]

KPMG_APC_eA_0002518

divested noncore assets in its portfolio during 2014, it emphasized that it intends to grow its operations in the Powder River play, and it entered into a complex deal to swap properties with oil company RKI in order to obtain additional leases in the Powder River Basin. Several private companies including Samson Resources, Anchutz, and Helis Oil & Gas are also actively drilling in the Powder River Basin. KPMG further notes that production in Powder River Basin rebounded from its low point of 38,000 barrels/day in 2009 to 78,000 barrels/day during Q1 2014. As such, several companies expanded their presence in the region this year: Devon Energy increased its production by 21% in the region, and companies EOG Resolute Energy, MDU Resources, and WPX Energy made plans to increasing their drilling and investments[6]. In addition, new infrastructure is aiding efforts to grow operations in the region as a new oil rail terminal, Black Thunder, has been built in Campbell County, Wyoming, to transport materials and crude oil. In addition, in September 2014, Enterprise Partners LP proposed a 1200 mile pipeline that would pass through Wyoming and Colorado, picking up crude oil pumped from the Powder River and DJ Basins, en route to the nation's Cushing central oil facility in Oklahoma[7]. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

vi. *Conclusion as of Q4:* KPMG notes that the activities noted above were indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development and plans with established plans with firm timetables exist. KPMG will continue to monitor the situation for updates.

**D.  Resolution (Onshore – Rockies) - $6.29 million (GG.4.A.8.10)**

a. Note: KPMG scoped this play in for Q4 2014 given the fact that the proved property portion of the play is under consideration for impairment purposes (see **GG.4.E.1.10, 12, and 16**).

b. Background

   i. In 2014, the Wattenberg DU was split into two DUs – Wattenberg and Resolution. The Company determined that the use of two DUs more would more appropriately group operations considerations. Refer to Wattenberg DU Split Memo at **GG.4.D.3.50** for detailed explanation.

c. Associated AFEs

   i. BULL CANYON 508-0607H (AFE 2102999 – $2.2 million)

      1. Suspended in Q4 2014. Well completed, and reserves to be booked in Q1 2015.

   ii. DURHAM 530-0719H (AFE 2104082 – $1.1 million)

      1. Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

   iii. DURHAM 526-0719H (AFE 2104204 – $1.1 million)

      1. Suspended in Q4 2014. Well completed, and reserves to be booked in Q1 2015.

   iv. JUBILEE 523-2128H (AFE 2104808 – $0.4 million)

      1. Spud 9/18/2014 and suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

   v. JUBILEE 515-2128H (AFE 2104810 – $0.6 million)

---

[6] http://www.naturalgasintel.com/articles/99712-fracking-revitalizing-powder-river-oil-production-eia-says
[7] http://www.bizjournals.com/denver/blog/earth_to_power/2014/09/enterprise-proposes-crude-oil-pipeline-from-north.html?page=all

Page [
PAGE ]

KPMG_APC_eA_0002519

          1.   Spud 9/13/2014 and suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

    vi.   JUBILEE 521-2128H (AFE 2104811 – $0.5 million)

          1.   Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

    vii.   JUBILEE 117-2128H (AFE 2104812 – $0.5 million)

          1.   Suspended in Q4 2014. Waiting on completion. Reserves to be booked Q1 2015.

d.   Current Justification for Suspended Status

    i.   *Note: The Resolution Play first came into as a separate DU from the Wattenberg DU in Q3 2014. In Q3 2014, there were 12 wells associated with the Resolution play as noted per the Q3 Domestic Exposure Report (PBC PPE 9). All 12 wells were in suspense at 9/30/14 and had a total AUC balance of 36.1 million*

    ii.   *Q4 Justification:* Of 12 wells ($36.0 million) that were suspended in Q3 2014, all were transferred to proved in Q4 2014 as evidenced on the Domestic Suspended Wells Rollforward at **GG.4.A.8.20**. In Q4, 8 new wells were added per the Q4 Domestic Exposure Report (PBC PPE9). All 8 wells were expected to have developed reserves added by Q1 2015, with 5 of them also needing additional completion procedures.

KPMG notes that the Resolution wells are located in Laramie County on the Niobrara Shale, which has experienced a surge of production in 2014 as a result of horizontal drilling and hydraulic fracturing technologies. In May of 2014, the monthly production of the region surpassed 300,000 barrels, which is significantly higher than the monthly average of about 119,000 barrels that Laramie County had recorded during the previous two years[8]. During only the first half of 2014, the state of Wyoming received nearly 350 permit applications to drill in Laramie County. This number of applications more than doubled the total number of 147 applications that were filed throughout the whole year of 2013[9]. While Anadarko is the largest producer of the Niobrara Shale, other major producers include Noble Energy, Encana, and EOG Resources. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

As noted at **GG.4.E.1.16**, the Company has allocated a budget of $270 million for Resolution. It will be the second highest funded asset in the region behind Wattenberg. In 2015, 96 wells are planned to be drilled, 96 operated by EOG, 6 by APC, and 6 from other operators.

    iii.   *Conclusion as of Q4:* KPMG notes that the activities noted above were indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development and plans with established plans with firm timetables exist. KPMG will continue to monitor the situation for updates.

E.   **Alaska - $33.00 million (GG.4.A.8.10)**

    a.   Background

        i.   The Company's Alaskan wells are located on the Colville River unit (commonly referred to as Alpine) and are operated by ConocoPhillips[10]. Alpine has no permanent road connecting it to other infrastructure, and as such, an ice road is built in the winter to connect the area to other regions and move in supplies for the rest of the operating year[1]. In December 2011, ConocoPhillips was awarded a permit to construct a gravel road, bridge, and pipeline crossing over the Colville River for

---

[8] http://www.wyomingnews.com/articles/2014/07/12/news/01top_07-12-14.txt#.VNQH-J3F-fI
[9] http://www.wyomingnews.com/articles/2014/07/12/news/01top_07-12-14.txt#.VNQH-J3F-fI
[10] http://alaska.conocophillips.com/who-we-are/alaska-operations/Pages/alpine.aspx

Page [
PAGE ]

development of the CD5 field[1]. Engineering and planning took place throughout 2013, and construction began in 2014 and continue through 2015, with first production expected in late 2015[1].

    b. Associated AFEs

        i. CHAR #1 (AFE 2017287 – $5.2 million)

            1. Spud 2/12/2008 and suspended Q2 2008. Successful well with ongoing development plans and studies to optimize the drilling center, the number of wells for development, and the surface facilities

        ii. PIONEER 1 (AFE 2029301 – $4.8 million)

            1. Spud 3/12/2009 and suspended Q2 2009. Reserves found but no pipeline exists to produce or add PUDs. Is planned to be co-developed along with the Rendezvous discovery. Pioneer development is scheduled to follow CD5 development

        iii. RENDEZVOUS 3 (AFE 2092672 – $7.6 million)

            1. Suspended Q1 2014. Successful appraisal well drilled and tested during Q1 and Q2 2014. Results support moving forward with development, and conceptual development planning is underway

        iv. FLAT TOP 1 (AFE 2094150 – $4.9 million)

            1. Suspended Q2 2014. Successful exploration well drilled in Q1 and Q2 2014. Follow up offsetting appraisal work is planned in the future.

        v. CASSIN #1 EXPLORATION WELL (AFE 2079389 – $5.8 million)

            1. Spud 3/2/2013 and suspended Q1 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

        vi. CASSIN 6 (AFE 2082557 – $2.7 million)

            1. Spud 3/30/2013 and suspended Q2 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

        vii. CASSIN # 1 COMPLETION & TESTING (AFE 2083038 – $2.0 million)

            1. Spud 3/2/2013 and suspended Q1 2013. Oil discovery; drilled to retain unit; shut-in waiting on infrastructure estimated 2019

    c. Current Justification for Suspended Status

        i. *Q4 Justification:* Per the Domestic Exposure Report (PBC PPE 9), the Company's seven Alaska wells were all being held in suspense as of Q4 2014. Operations in Alaska are currently in progress to construct the infrastructure needed to continue drilling these wells, and KPMG notes that throughout 2014, construction on the CD-5 field continued[11]. Per inquiry of Property Accounting, KPMG notes that, while the Company's Cassin wells #1 and #6 are not located on the CD-5 field (otherwise referred to as the Alpine West development), their progress is linked to progress made on the CD-5 development as these wells will be completed after the CD-5 infrastructure has been constructed. Property Accounting additionally noted that Cassin wells #1 and #6 are exploration wells and were both new oil discoveries in 2014. As such, data analysis of these wells is ongoing. In the coming years, appraisal wells may be drilled on these discoveries. Property Accounted noted that full development of the wells is set to be in 2019 after the infrastructure on the nearby CD-5 fields has been completed.

        In terms of 3rd party interest in the area, KPMG notes that 15 oil companies are registered with the Alaska Oil & Gas Association (which represents the majority of

---

[11] http://alaska.conocophillips.com/who-we-are/Pages/projects.aspx and http://alaska.conocophillips.com/Documents/Fact_Sheet_CD5_Construction_final.pdf

Page [
PAGE ]

oil/gas companies operating in the state), including Apache Corporation, BP, Chevron, Eni, ExxonMobil, Shell, Statoil, Tesoro, and XTO Energy. In 2014, the largest trend throughout the Alaskan fields was the arrival of smaller companies such as Caelus Energy and Miller Energy Resources. KPMG notes that the Colville River unit (where Anadarko assets are located) is neighbored by several units (such as the Kuparuk River unit and Tofkat unit), which are prospects that are being heavily developed as part of a three-company $450 million consortium to expand exploration operations in the region[12]. The three parties to the consortium are Thyssen Petroleum North Slope Development LLC, JK Tech Holdings Ltd., and MEP Alaska LLC. Their plans include developing infrastructure in the region, constructing a 15,000 barrel/day processing facility, and establishing three production wells to begin drilling in 2015. As such, KPMG notes that even if the Company were to decide to exit the area, given the extensive 3rd party interest in the area, they would likely be able to recover their investment.

ii. *Conclusion as of Q4:* KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development. In addition, established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

F. **Samurai (Green Canyon – Offshore) - $30.61 million (GG.4.A.8.10)**

    a. Associated AFEs

        i. GREEN CANYON 432 001 (AFE 2064250 – $30.6 million)

            1. Spud 3/18/2009 and suspended Q2 2009

    b. Current Justification for Suspended Status

        i. *Q4 Justification:* KPMG notes that the Samurai play is operated by Murphy oil. A sidetrack appraisal well is expected to be drilled in 2016. KPMG notes that the lease term is not set to expire until May 2018 (**GG.4.B.5.12**). KPMG notes that given that the Company has over 3 years until lease expiration, even if they hold off on drilling in 2015, they can hold out and wait for prices to become more favorable.

        ii. *Conclusion as of Q4:* KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

G. **Yucatan (Offshore) - $40.3 million (GG.4.A.8.10)**

    a. Background

        i. The Yucatan wells are operated by Shell and are part of the Walker Ridge Exploration area. The Walker Ridge Exploration area also includes Coronado and Shenandoah. The Yucatan exploratory wells were spud in July 2013 and suspended in Q3 2013. Per the Q2 2013 earnings release, the Yucatan wells encountered more than 120 net feet of oil pay.

    b. Associated AFEs

        i. WALKER RIDGE 95 001 (AFE 2073454 – $34.9 million)

            1. Spud 7/21/2012 and suspended Q3 2013

        ii. WALKER RIDGE 95 001 YUCATAN NORTH EVALUATION (AFE 2086040 - $5.4 million)

            1. Spud 7/21/2012 and suspended Q3 2013

--------

[12] http://www.petroleumnews.com/pdfarch/Prod14.pdf

Page [<br>PAGE ]

CONFIDENTIAL    KPMG_APC_eA_0002522

c.  Current Justification for Suspended Status

i.  *Q4 Justification*: Per the Domestic Exposure Report (PBC PPE 9), two wells associated with the Yucatan play were in suspense as of 12/31/2014. On each well, operations had encountered more than 120 net feet of oil pay, and the Walker Ridge 95 001 Evaluation well required appraisal drilling. KPMG inquired of Property Accounting regarding current activity in the play, and Property indicated that Shell (the operator of the wells) is currently evaluating next steps for the play. KPMG notes that the lease term for block 95 is valid through October 2017 (**GG.4.B.5.12**). KPMG notes that given that the Company has nearly 3 years until lease expiration, even if they hold off on drilling in 2015, they can hold out and wait for prices to become more favorable.

ii.  *Conclusion as of Q4:* KPMG notes that the activities noted above are indicative of sufficient progress per FASB 932-360-35 as established timelines for continued development activity and plans to bring wells online provide further evidence of continued activity taking place on the wells as costs and. KPMG will continue to monitor the situation for updates.

*International*

As seen on the International suspended wells rollforward at **GG.4.A.8.15**, a large portion of the International suspended wells balance has been suspended for more than one year. KPMG notes that international projects tend to have an elevated level of risk due to the economic, legal, political, and environmental aspects of the potential development in progress. As such, and as common in the industry, the Company will enter into a potential area of development with joint venture partners in order to mitigate the associated risks mentioned above. KPMG considered this in our evaluation noted below as a majority of the wells meeting our scope involved delays due to governmental approval as well as collaboration amongst the joint venture partners as to the potential development of the respective areas under exploration.

**H.  Ghana Wells- $228.2 million (GG.4.A.8.15)**

a.  Country Overview

The Company's Ghana operations take place in the West Cape Three Points and Deepwater Tano blocks. These blocks are located next to each other geographically (spanning a distance of approximately 40 miles East to West at the furthest points). The Company has worked with the Ghanaian Ministry of Energy to group several of their discoveries into single appraisal areas in the hopes of maximizing efficiencies in development. Akasa, Teak, and Mahogany are grouped into a single appraisal area (MTA), as are Tweneboa, Enyenra/OWO, and Ntomme (TEN). KPMG notes that the Company's discussions with the Ghanaian Ministry of Energy (MoE) over plans for production significantly slowed down with the passing of the Ghanaian president (John Dramani Mahama) in July 2012 as the Ghanaian president appoints the Energy Minister. Ghana's vice president, John Dramani Mahama, served as interim president and was formally elected in December 2012. This lead to the appointment of Emmanuel Armah Kofi Buah as the new Energy minister in January 2013, and normal development discussions commenced in resulting in moving the TEN assets into the development phase in Q2 2013.

b.  Mahogany, Teak, Akasa - $214.8 million (Please see International Suspended Wells roll forward at **GG.4.A.8.15**, TM B for AFE list and individual amounts)

i.  *Background*: MTA is located in the West Cape Three Points (WCTP) block. The Mahogony 3, 4, 2Deep, and 5 wells were successful exploration wells drilled during 2009 and 2010. Teak 1, 2, and 3 were drilled and deemed successful in 2011. The Akasa 1 well were drilled and declared successful in 201. Development plans and negotiations with the government were delayed for these wells due to the 2012 government hiatus (as noted in the overall background section) as well as the Company focusing efforts on development of the TEN assets after the hiatus ceased. In Q3 2013, the MoE granted an extension of the appraisal period for the area through 5/31/2014, and this was further extended to 12/31/2014 in Q1 2014. Additionally, the Akasa 2 well was declared successful in Q4 2013. Kosmos is the operator in the WCTP area.

Page [
PAGE ]

ii. *Current Justification for Suspended Status:*

1. *PY Q4 Justification:* Per the International Exploration Exposure report, the Akasa 2 well was drilled in Q4 2013 and declared successful. Further, the partnership and the MOE came to an agreement for the MTA area that will extend the appraisal period for the Mahogany wells to 12/31/2014. The documents (Memorandum of Understanding for MTA) were with the MoE awaiting signatures as of 12/31/2013. KPMG inquired of Justin Lime (Planning Manager) and noted that the MoE signed the documents on 1/14/2014 (which extended the appraisal period to 12/31/2014). The current year appraisal activities planned included: additional drilling on the J-24 well in late Q1 2014 to assess sands deeper below the Jubilee unit, placing gauges on the Mahogany M-3 well, interpreting seismic data acquired from the Teak wells, and acquiring and evaluating gauge data from the Akasa 1 well.

2. *Q1 Justification:* As noted in the Q4 2013 justification, the MoE extended the appraisal period to 12/31/2014 in early Q1 2014. Per Q1 2014 the International Exploration Exposure report, the J-24 tail well was completed (with an appraisal tail into the Mahogany sands). Gauges were installed on Mahogany 3. Seismic data was acquired and was being interpreted over the Teak area. Additionally, pressure readings from the Akasa 1 well were expected to be taken to assist in the evaluation of development plans in Akasa.

3. *Q2 Justification:* Per the Q2 International Exploration Exposure report, pressure readings from the Akasa 1 well were expected to occur in Q3 2014 and seismic data was still being interpreted over the Teak area.

4. *Q3 Justification:* Per the Q3 International Exploration Exposure report, 2014 appraisal activities include a seismic acquisition program that was completed in Q2 and covered the TEN and Wawa areas. Processing the seismic data began in Q3, and the Exposure Report notes that regulatory authorities verbally agreed to extend the appraisal deadline from 7/17/2014 to 2/10/2016. The report also notes that the gauge installation and pressure readings from Akasa 1 well have been pushed back a quarter and will now take place in Q4 2014.

5. *Q4 Justification:* Per the Q4 International Exploration Exposure report, the Company is preparing a declaration of commerciality notification that will be presented to the government in Q1 2015. The declaration evidences intent to develop wells and bring them to production. In 2015, appraisal activities will include evaluation of the TEN/Wawa seismic data obtained from the 2014 program.

   KPMG notes that the Company has existing proved properties in other areas (Jubliee) of Ghana. As noted in the impairment questionnaire memo at **GG.4.E.1.10**, for the YTD 12/31/2014, with average oil prices of $102.63, the Company recognized margins of $90.73. KPMG notes even this margin were decreased by $50 (to reflect lower oil prices) that would leave a margin of $40.73 which leaves significant room even if the MTA negotiations with the government yield less favorable operating situations (e.g. more local taxes). Given these factors, KPMG does not consider it likely that the Company will walk away from negotiations with the Ghana government over MTA development unless significant and unreasonable requests are made during negotiation.

6. KPMG noted that these activities are indicative of sufficient progress per FASB 932-360-35 plans exist with established timetables and there are outstanding proposals for development of the area. KPMG will continue to monitor the situation for updates.

**I.   Brazil Wells - $594.86 million (GG.4.A.8.15)**

Page [
PAGE ]

KPMG_APC_eA_0002524

a.   Wahoo (BMC 30) Wells - $300 million (Please see International Suspended Wells roll forward at **GG.4.A.8.15**, TM I, for AFE list and individual amounts).

  i.   *Background*: On 9/30/2008, Anadarko publicly announced the pre-salt discovery at the Wahoo prospect offshore Brazil in the Campos Basin. The Wahoo #2 well was declared successful in Q4 2009.  In Q3 2010, the Company completed DSTs on the Wahoo and Wahoo 2 wells.  Wahoo #4 was completed and declared successful in Q4 2012, with Wahoo #5 following in Q3 2013.  The evaluation phase for the BMC-30 block expires November 2015.

  ii.   *Current Justification for Suspended Status*:

   1.   *PY Q4 Justification*: KPMG notes that per the Q4 2013 International Exploration Exposure report, the partnership was scheduled to submit an appraisal plan (PAD) in June 2014.  Additionally, seismic data was being reprocessed.  KPMG inquired of Justin Lime (Planning Manager) and noted that BMC-30 had been moved to the development team (as opposed to the explorations team).  Core analysis was being performed on Wahoo #4 and Wahoo #5 and the feasibility of commercial development is being evaluated.

   2.   *Q1 Justification*: KPMG notes that per the Q1 2014 International Exploration Exposure report, 2014 appraisal activities included the development and technology teams working on geo-modeling and simulation studies.  Reprocessing of seismic data for BMC-30 was 90% complete.  The development team was moving forward with the subsurface evaluation and evaluation of potential field development concepts.  The partnership was on target to submit the Appraisal Plan (PAD) in June 2014.  FEED studies for the most likely development concepts were expected to begin in Q2 2014.

   3.   *Q2 Justification*: KPMG noted that per the Q2 2014 International Exploration Exposure report, seismic data reprocessing on BMC-30 and 32 is complete and remapping is underway.  Additionally, the Company met with the ANP on 6/27/2014 and proposed the next firm activities to be conducted under the appraisal plan. Including pre-FEED evaluation of four development concepts in the second half of 2014 and FEED evaluation of the preferred alternative in the first half of 2015.  As of 6/30/2014 there were approximately $4.5 million of pre-development / evaluation costs still in progress (not in suspense).  KPMG additionally noted that per an article in the Oil & Gas Journal, Maersk (a partner in the BMC-30 joint venture) had written down $1.7 billion in investments in Wahoo (BMC-30) and Itaipu (BMC-32).  The Wahoo and Itaipu fields are expected to hold significant potential resources, but were assessed by Maersk to have lower value than originally anticipated.  Maersk still expects the partnership to present commercially viable development plans.  The article stated that Maersk had purchased interests in Wahoo, Itaipu, and Polvo from SK Energy Co. Ltd. For $2.4 Billion in 2011. Maersk is also divesting its interest in the producing Polvo field (the Company has no producing assets in Brazil).  KPMG noted the Company is the Operator in BMC-30 and consistent with the O&GJ article, the Company presented development plans on 6/27/2014, as noted above.

   4.   *Q3 Justification*: Per the Q3 2014 International Exploration Exposure report, seismic data remapping has continued throughout Q3. KPMG inquired for further details and noted per Darrell Havill (International Accounting Manager), the Company is scheduled to meet with ANP in November 2014 to discuss the evaluation of the Appraisal Plan on BMC-30. Based on feedback from ANP, the Company expects that the submittal of the recommended appraisal plan will be in Q1 2015.

Page [
PAGE ]

5. *Q4 Justification*: Per the Q4 2014 International Exploration Exposure report, the Company completed its pre-FEED evaluation of four development concepts and determined it will pursue further evaluation of two of the development concepts. The evaluation will conclude in Q1 2015 and the Partnership will determine the development plan in the first half of 2015 so that operations can be sanctioned in the second half of the year.

KPMG further notes that the Partnership met with the ANP on October 29, 2014, and presented a revised appraisal plan for BMC-30. The Partnership presented its plan for conducting a long term test on BMC-30, and per inquiry of Darrell Havill (International Accounting Manager) noted that the ANP was receptive to this plan. The Partnership is set to meet again with the ANP in September 2015 to present their current go-forward plans at that time.

6. KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 plans exist with established timetables and there are outstanding proposals for development of the area KPMG will continue to monitor the situation for updates.

b. Itaipu (BMC 32) Wells - $293.2 million (Please see International Suspended Wells roll forward at **GG.4.A.8.15**, TM I, for AFE list and individual amounts)

i. *Background*: Itaipu BMC-32 was declared successful in Q1 2010. Itaipu 2 followed in Q4 2011, along with a DST on the Itaipu in Q3 2012, and Itaipu 3 in Q2 2013. The evaluation phase on the block expires in December 2014. BP is operator on the BMC-32 project.

ii. *Current Justification for Suspended Status:*

1. *PY Q4 Justification*: KPMG notes that per the Q4 2013 International Exploration Exposure report, seismic data was being reprocessed for BMC-32. A unitization subcommittee was expected to take place in Q1 2014 with an objective of proposing a plan for formal unitization notification with supporting evidence of common shared reservoir with the Whale Park Pre-Salt field. Per Justin Lime (Planning Manager), BP was the operator of the project on BMC-32. They were currently working on unitization agreement negotiations with the government.

2. *Q1 Justification*: KPMG notes that per the Q1 2014 International Exploration Exposure report, reprocessing of the BMC-32 data was approximately 90% complete and was expected to be finalized in Q2 2014. The ANP (the Brazilian National Petroleum Agency) had not yet made a ruling on the notification of unitization and as of 4/24/2014 there was no established deadline on when the ruling would occur.

3. *Q2 Justification*: KPMG notes that per the Q2 2014 International Exploration Exposure report, seismic data reprocessing on BMC-30 and 32 is complete and remapping is underway. The ANP has still not yet made a ruling on the notification of unitization and no established deadline exists as of 7/23/2014. KPMG additionally notes that per an article in the Oil & Gas Journal, Maersk (a partner in the BMC-30 joint venture) had written down $1.7 billion in investments in Wahoo (BMC-30) and Itaipu (BMC-32). The Wahoo and Itaipu fields are expected to hold significant potential resources, but were assessed by Maersk to have lower value than originally anticipated. Maersk still expects the partnership to present commercially viable development plans. Maersk is also divesting its interest in the producing Polvo field (the Company has no producing assets in Brazil). The article stated that Maersk had purchased interests in Wahoo, Itaipu, and Polvo from SK Energy Co. Ltd. For $2.4 Billion in 2011. KPMG notes that BP is the Operator of the BMC-32 block. KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 as there are

Page [
PAGE ]

outstanding proposals for appraisal/development of the area. KPMG will continue to monitor the situation for updates.

4. *Q3 Justification*: Per the Q3 2014 International Exploration Exposure report, seismic data remapping has continued throughout Q3. KPMG notes that per the Q3 2014 International Exploration Exposure report, the ANP has still not yet made a ruling on the notification of unitization and no established deadline exists as of 9/30/2014. KPMG inquired of Darrell Havill (International Accounting Manager) for further details and noted that a deadline for ANP to respond to the unitization claim had been set and is mid-November 2014.

5. *Q4 Justification*: Per the Q4 2014 International Exploration Exposure report, pre-FEED and FEED studies are still underway to determine options for developing blocks in the region. These studies will determine commercial development options for the Itaipu prospect. Per inquiry of International Accounting, KPMG notes that Petrobas responded to the ANP in November 2014 with a counter proposal, and that Petrobas, the ANP, and the Partnership are actively negotiating the unitization of the Whale Park Field. Following Petrobas's November response, the Partnership will present additional data to support its unitization claims. Darrell Havill (International Accounting Manager) noted that as of 12/31/2014, the Partnership is working on submitting an appraisal plan to the ANP, which will be presented by the end of the Evaluation Phase in December 2015.

6. KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 as there are outstanding proposals for appraisal/development of the area. KPMG will continue to monitor the situation for updates.

**J. Tunisia Wells - $75.9 million (GG.4.A.8.15)**

a. Tunisia - $75.9 million (Please see International Suspended Wells rollforward at **GG.4.A.8.15**, TM K, for AFE list and individual amounts)

i. *Background*: The Company entered the Tunisia Onshore BEKS block in Q4 2011. BEKS #1 well was declared successful in Q3 2013 and the RFA #1 was declared successful in Q4 2013.

ii. *Current Justification for Suspended Status*:

1. *PY Q4 Justification:* Per the Q4 2013 International Exploration Exposure report, the RSA 1 well was completed in Q4 2013 and declared successful. 2014 appraisal activities were to include analysis and integration of the information obtained from the two exploration wells into the company's database. Planning for a shale well and an extended flow test to occur in 2015 will also be initiated in 2014. KPMG inquired of Justin Lime (Planning Manager) and noted that geological interpretation and analysis work was currently being performed.

2. *Q1 Justification:* Per the Q1 2014 International Exploration Exposure report, the 2014 appraisal activities were unchanged (integration of data from two wells into the Company's database and planning for a shale well). The planning for a shale well and an extended test flow had started.

3. *Q2 Justification:* Per the Q2 2014 International Exploration Exposure report, the 2014 appraisal activities were unchanged (integration of data from two wells into the Company's database and planning for a shale well). The planning for a shale well and extended flow test was still ongoing, and the extended flow test was expected to occur in 2015. BEKS#3 was currently in progress (e.g. not suspended), incurring pre-drill / evaluation

Page [
PAGE ]

KPMG_APC_eA_0002527

costs. As of 6/30/2013, there were a total of $150 thousand in costs incurred for BEKS#3.

4. *Q3 Justification:* Per the Q3 2014 International Exploration Exposure report, 2014 appraisal activities continued throughout Q3. These activities include the integration of data from two wells into the Company's database and planning for a shale well. KPMG inquired of Darrel Havill (International Accounting Manager) and noted that the sub-surface analysis activities have been completed, and preparations to execute the drilling program are on-going. Operations now expects that the multi-well drilling program will take place in 2016.

5. *Q4 Justification:* Per the Q4 International Exploration Exposure Report, planning is underway for a multi-well drilling and testing program to occur in Q4 2015. The Company had approximately $183 thousand in pre-drill costs associated with this anticipated drilling and testing program as of 12/31/2014. KPMG inquired of Darrel Havill (International Accounting Manager) and noted that the blocks in Tunisia will not expire until May 2016. KPMG will continue to monitor progress on the block in 2015.

6. KPMG notes that these activities are indicative of sufficient progress as per FASB 932-360-35 as costs are being incurred to assess the reserves, and firm plans exist with established timetables.

**K. Cote d'Ivoire - $71.3 million (GG.4.A.8.15)**

a. Paon #1 - $71.0 million (Please see International Suspended Wells rollforward at **GG.4.A.8.15**, TM A, for AFE list and individual amounts)

i. *Background*: The Company owns interests in five offshore blocks and is currently appraising the Paon discovery (block CI-103).

ii. *Current Justification for Suspended Status*:

1. **Note:** Cote d'Ivorie first came into scope in Q4 2014.

*Q4 Justification:* Per the Q4 2014 International Exploration Exposure report, the Morue well (block 516) was drilled in Q3 and was unsuccessful, and the Saumon (block 515) well was drilled in Q4 and was unsuccessful (see **GG.4.G.3**). In Q1 2015, the Company will evaluate information obtained from the Morue and Saumon operations to determine activities for the remainder of 2015. In addition, Paon well #1 was drilled and announced as a light oil discovery in Q2 2014, and Paon wells #3 and #4 were declared successful in Q4 2014. Paon well #5 is expected to be drilled in late 2015. As blocks 515 and 516 are set to expire in January 2015, KPMG inquired of Darrell Havill (International Accounting Manager) and noted that the Partnership has applied for a six month extension to allow sufficient time to continue appraisal work and to obtain and analyze data from the Morue and Saumon well operations. As of 2/17/2015, the Partnership and the Cote d'Ivorie government were actively negotiating the proposed commercial term changes and extension to the appraisal period. Darrell noted that the parties are expected to reach an agreement on the terms by the end of Q2 2015.

In addition, Darrell noted that drilling on block 528 is set to occur in late 2015. This block was awarded to the Company in Q3 2013 along with block 529. A 3D seismic program on the blocks was completed in Q2 2014, and appraisal activity is expected to be completed in Q2 2015.

2. KPMG notes that these activities are indicative of sufficient progress as per FASB 932-360-35 as costs are being incurred to assess the reserves, and

Page [
PAGE ]

KPMG_APC_eA_0002528

firm plans exist with established timetables.  KPMG will continue to monitor the situation.

**L.  Mozambique - $72.0 million (GG.4.A.8.15)**

   a.  Orca wells #1, 2, 3, 4 - $44.3 million and Tubarao Tigre - $27.7 million (Please see International Suspended Wells rollforward at **GG.4.A.8.15**, TM I and TM J), for AFE list and individual amounts).

   i.  *Background*: The Company began drilling in the offshore area of Mozambique (Rovuma Basin) in 2010.  The Company now operates both onshore and offshore wells and is developing an onshore LNG plant.  In Q1 2014, the Company sold 10% of its interest in its Mozambique Offshore Area 1 operations, effectively writing down its NBV to zero (testwork at **GG.4.A.6.100**).  All costs noted below have been incurred subsequent to 2/28/2014.

   ii.  *Current Justification for Suspended Status*:

   1.  **Note:** Mozambique first came into scope in Q4 2014.

   2.  *Q4 Justification:* KPMG notes that operations in Mozambique are currently ongoing both onshore and offshore. KPMG also notes that for the Orca natural gas field, additional discoveries were made in 2013, and the estimated recoverable resource range increased from 35 to 65+ Tcf to a new range of 50 to 70+ Tcf[13].

   In addition, per the Q4 2014 International Exploration Exposure report, Orca #1 was declared successful in April 2013, and Orca #2 and #3 were completed in Q1 2014 and declared successful. Orca #4 was completed in Q4 2014 and declared successful. In addition, Tubarao Tigre #1 was completed in Q2 2014 and declared successful. KPMG notes that Tubarao Tigre is an offshore well related to the Mozambique LNG project that is currently underway. Once constructed, the LNG facilities will include storage units, shipping vessels, and subsea pipelines to transport natural gas from offshore wells to the onshore facilities[14].  On 1/20/2015, the Tubarao Tigre #2 well was completed and also deemed to be successful.  The well was actively drilling at 12/31/2014 and had a balance of $13.8 million.

   3.  KPMG notes that these activities are indicative of sufficient progress per FASB 932-360-35 and firm plans exist with established timetables. KPMG will continue to monitor the situation.

**Plays Removed from Scope in Q4 2014**

**A.  Coronado (Offshore)**

   a.  KPMG notes at 9/30/2014, the Coronado play had $59.5 million in suspended well costs.  The lease on the block was set to expire on 11/15/2014 and the Company was working on extending the lease so that they could continue appraising the area.  Given the sudden oil and price drops in Q4 2014, the Company determined that it would let the lease expire on 11/11/2014 and took the well costs and NPLH to expense.  See dry hole testwork at **GG.4.G.3**.

**Conclusion**

Based on the procedures performed, KPMG notes that the Company's suspended wells balance as of 12/31/2014 appears to be complete, accurate, and presented fairly.

_____

[13] https://www.anadarko.com/Operations/Pages/LNGOffshoreArea1.aspx
[14] https://www.anadarko.com/Operations/Pages/LNGOffshoreArea1.aspx

CONFIDENTIAL                                                                                   KPMG_APC_eA_0002529

# Exhibit 28

**RATIFICATION, JOINDER AND THIRD AMENDMENT OF OPERATING AGREEMENT**

This Ratification, Joinder and Third Amendment of Operating Agreement ("Amendment") dated effective April 1, 2014, is made by and among Cobalt International Energy, L.P. ("Cobalt"), a Delaware limited partnership, Marathon Oil Company ("MOC"), an Ohio corporation, ConocoPhillips Company ("COPC"), a Delaware corporation, Venari Offshore LLC (formerly known as Venari Resources LLC) ("Venari"), a Delaware limited liability company, Anadarko Petroleum Corporation ("Anadarko"), a Delaware corporation, and Anadarko US Offshore Corporation ("AUOC"), a Delaware corporation. The parties herein may be individually referred to as "Party" or collectively as the "Parties".

Recitals

Whereas COPC and Anadarko (successor in interest to Anadarko E&P Company, LP) entered into that certain Operating Agreement, Shenandoah Prospect, effective April 1, 2008 ("Agreement") covering Walker Ridge Blocks 8, 51 and 52 ("Contract Area");

Whereas pursuant to that certain Participation Agreement dated May 7, 2008 between COPC and Cobalt, COPC assigned an undivided 20% record title interest in the Contract Area to Cobalt, effective May 1, 2008;

Whereas pursuant to that certain Participation Agreement dated July 17, 2008 between COPC and MOC, COPC assigned an undivided 10% record title interest in the Contract Area to MOC, effective June 1, 2008;

Whereas pursuant to that certain Ratification, Joinder and First Amendment of Operating Agreement between Cobalt, MOC, COPC and Anadarko, Cobalt and MOC joined and ratified the Agreement and the Agreement was amended to reflect such joinder and interest of the parties accordingly;

Whereas pursuant to that certain Second Amendment of Operating Agreement dated August 23, 2011 between Cobalt, MOC, COPC and Anadarko, the Contract Area was amended to exclude Lease OCS-G 20259 Walker Ridge Block 8 which had since expired and Article 11.5(c) was amended to provide additional time for the conclusion of Appraisal Operations;

Whereas Anadarko has assigned all of its undivided 30% record title interest in the Contract Area to AUOC, a wholly owned indirect subsidiary of Anadarko, effective October 1, 2011;

Whereas pursuant to that certain Participation Agreement dated October 2, 2012 between COPC and Venari, COPC assigned an undivided 10% record title interest in the Contract Area to Venari, effective June 1, 2012;

Whereas the Parties desire that AUOC and Venari join and ratify the Agreement and that the Agreement be amended to reflect such joinder and interest of the Parties as hereinafter provided;

Whereas the Parties desire to amend the Contract Area to include Lease OCS-G 28148 Walker Ridge Block 53 (North Half);

Page [ PAGE ] of [ NUMPAGES ]

Confidential

ANACOP00003083

Whereas the Bureau of Safety and Environmental Enforcement, effective April 1, 2014, has approved the formation of an exploratory federal unit covering and affecting all of the Contract Area, as amended herein, and the associated OCS Leases (the "Unit Area");

Whereas the Parties desire to adopt, effective May 1, 2014, the Agreement as the Unit Operating Agreement to govern the Unit Area, subject to the amendments set forth herein; and

Whereas inasmuch as the Agreement currently does not (i) contemplate the concept of Anadarko, as a non-working interest owner in the Leases, acting in the capacity as an affiliate operator of the Unit Area; nor (ii) adequately includes provisions to facilitate the purchasing, ordering, procuring, fabricating and/or contracting for long lead items envisioned for use in or associated with the operation of the Unit Area, the Parties desire, by virtue of this Amendment, to amend the Agreement to address these issues.

<u>Ratification, Joinder and Amendments</u>

Now, therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, together with the mutual covenants, conditions and obligations contained herein, the Parties do hereby amend the Agreement insofar and only insofar as described herein:

1.      Effective October 1, 2011, AUOC does hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, and agrees to perform its proportionate duties, covenants and obligations thereunder and takes cognizance of all of the terms and provisions thereof.

2.      Effective June 1, 2012, Venari does hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, and agrees to perform its proportionate duties, covenants and obligations thereunder and takes cognizance of all of the terms and provisions thereof.

3.      Effective May 1, 2014, the Parties hereby expressly ratify, join, approve, adopt and confirm all of the terms and provisions of the Agreement, including this Amendment, as the Unit Operating Agreement for the Walker Ridge Block 51 Unit and agree to perform their proportionate duties, covenants and obligations thereunder and take cognizance of all of the terms and provisions thereof.

4.      The Parties agree to delete Exhibit "A" to the Agreement in its entirety and replace it with Attachment 1 attached hereto and made a part hereof.

5.      All references in the Agreement to "Operating Agreement" shall be amended to read "Unit Operating Agreement".

6.      Article 2.3 (Agreement) is revised to read as provided below:

"**<u>Agreement</u>**:  This Unit Operating Agreement, together with its attached Exhibits."

7.      Article 2.10 (definition of *Contract Area*) is revised to read as provided below and all references to "Contract Area" in the Agreement shall read "Unit Area":

"**<u>Unit Area</u>**:  The OCS Leases or portions thereof, listed on Exhibit 'A'."

Confidential

ANACOP00003084

8.      Article 2.21 (definition of *Election, Elect, Elects, Elected, Electing*) is hereby automatically revised to read as follows:

> "**Election, Elect, Elects, Elected, Electing**:  A response or deemed response by a Working Interest Owner to a proposal requiring approval under Article 8.2.2 (*Approval by Election*), or the act by a Working Interest Owner of responding to a proposal requiring approval under Article 8.2.2 (*Approval by Election*).  Under no circumstances shall an Affiliate Operator have a right to make an Election under this Agreement."

9.      Article 2.33 is hereby automatically revised to read as provided below and all references to "MMS" in the Agreement shall read "BOEM":

> "**BOEM**:  The Bureau of Ocean Energy Management of the Department of Interior and/or the Bureau of Safety and Environmental Enforcement of the Department of Interior, and any predecessor or successor agencies."

10.     Article 2.41 (definition of *Operator*) is hereby automatically revised to incorporate the following sentence at the end of the Article:

> "Wherever Operator is used in this Agreement it shall read 'Operator or Affiliate Operator, as applicable', for the purposes of distinguishing between the rights and obligations of the Working Interest Owners and the rights and obligations of the Affiliate Operator, if applicable, to conduct activities and operations pursuant to this Agreement, under the direction of the Working Interest Owners and as BOEM approved Operator."

11.     Article 2.56 (definition of *Vote, Votes, Voted, Voting*) is hereby automatically revised to read as follows:

> "**Vote, Votes, Voted, Voting**:  A response or deemed response by a Working Interest Owner to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*), or the act of a Working Interest Owner of responding to a proposal requiring approval under Article 8.2.1 (*Approval by Vote*).  Under no circumstances shall an Affiliate Operator have a right to Vote on any proposal."

12.     Add the following definitions as new Articles 2.60, 2.61, and 2.62:

> "2.60  **Affiliate Operator**:  A Party who does not own a Working Interest under this Agreement, who is an Affiliate of a Working Interest Owner to this Agreement, and who, subject to the approval of BOEM, is named by the Working Interest Owners to conduct activities and operations on behalf of, and under the direction of the Working Interest Owners.

> 2.61  **Operator's Affiliate**:  A Working Interest Owner which is an Affiliate of the Operator.  If there is not a Party to this Agreement who is an Operator's Affiliate and/or the Operator is a Working Interest Owner, all references to Operator's Affiliate within this Agreement shall be read as "Operator".

> 2.62  **Working Interest Owner**:  A Party who owns a record title leasehold interest and/or operating rights interest in and to a Lease.  Under no circumstances shall an Affiliate Operator be a Working Interest Owner under this Agreement."

Confidential                                                                 ANACOP00003085

13.    Article 4.1 (*Designation of Operator*) is hereby automatically revised to read as follows:

"**Designation of the Operator**:  Anadarko Petroleum Corporation is designated the Affiliate Operator of the Unit Area and shall conduct all operations within the Unit Area for the Joint Account of the Working Interest Owners.   The Parties shall promptly execute and file all documents required by the BOEM in connection with the designation of Anadarko as Affiliate Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed otherwise by all the Working Interest Owners, the Operator shall be classified as the designated applicant for oil spill financial responsibility purposes, and each Non-Operating Party shall promptly execute the appropriate documentation reflecting that classification and promptly provide that documentation to the Operator for filing with the BOEM. Anadarko hereby undertakes and covenants with each of the other Parties to observe, perform, discharge and be bound by all the liabilities, duties and obligations of the Affiliate Operator under this Agreement. Anadarko's only rights, benefits, liabilities and obligations under this Agreement and the Leases shall be as Affiliate Operator.  Anadarko shall have no right to Vote or make an Election under the Agreement and has zero (0) percent record title under or operating rights to the Leases.  In no event shall Anadarko have a Working Interest or Participating Interest Share in relation to any operation carried out under this Agreement nor be deemed to have acquired a Working Interest or a Participating Interest Share directly or indirectly as a result of being Affiliate Operator under this Agreement.  In addition, during the time that Anadarko is serving as Affiliate Operator:

(a)  the Affiliate Operator shall not have the right to exercise preferential rights, or exercise any other rights or take any other action reserved by or intended for the owner of a Working Interest;

(b)  the Affiliate Operator shall have the same confidentiality obligations as the other Parties;

(c)  all references to "Operator" in the Agreement which contemplate Operator's (i) ownership, encumbrance, assignment or other disposition of its Working Interest in the Unit Area or (ii) participation or non-participation in, Election or Vote regarding activities or operations taken pursuant to this Agreement shall be amended to read "Operator's Affiliate";

(d)  similarly, all references to "Parties" in the Agreement which contemplate those actions and circumstances set forth in subsection (c) of this Article 4.1 shall be amended to read "Working Interest Owners";

(e)  for purposes of Exhibit C (*Accounting Procedure*), any labor, materials, equipment and facilities provided by the Affiliate Operator shall be treated as being provided by the Operator's Affiliate and records pertaining to all such charges shall be available for audit by Non-Operating Parties;

(f)  except as expressly provided otherwise in the Agreement, Affiliate Operator shall be considered a "Party" to the Agreement in all other circumstances.  Notwithstanding any other provision of this Agreement, Affiliate Operator is considered a "Party" under Article 22.5;

(g)  Anadarko's rights hereunder are personal and Anadarko shall have no right to transfer or assign, whether by operation of law or otherwise, its operatorship hereunder and any attempt to do so shall be void *ab initio*;

(h)  If the Affiliate Operator is removed for cause, then Operator's Affiliate shall not have the right to succeed as Operator; and

(i)  If the Operator's Affiliate assigns or transfers any of its Working Interest and the assignment or transfer reduces its Working Interest to less than 80% of the next largest Working Interest of a Non-Operating Party, whether accomplished by a single assignment or multiple assignments, then Affiliate Operator shall have been deemed to have resigned with no action required by the other Parties other than selection of a Successor Operator."

Confidential

ANACOP00003086

(j)  Amend Paragraph 5.6 of Exhibit "I" (Memorandum of Operating Agreement and Financing Statement) of the Operating Agreement to read as follows:

"5.6 Operator's Affiliate grants to Non-Operators a lien, mortgage, pledge and security interest equivalent to that granted to Operator as described in Paragraphs 5.1 and 5.2 above, to secure payment by Operator's Affiliate, of its share of costs when due, and any liabilities incurred or amounts owed by Affiliate Operator hereunder."

14.  Anadarko does hereby ratify, join, approve, adopt, confirm and is made a party to the Agreement as Affiliate Operator.  Anadarko does hereby accept and agree to be bound by all of the terms and provisions of the Agreement as Affiliate Operator.

15.  Add the following as a new Article 6.2.2.5:

"**6.2.2.5  Supplemental AFE for Cost Overruns on All Other AFEs**:  The Permitted Over-expenditure for all other AFEs is an amount equal to ten percent (10%) of the original approved AFE or ten million dollars ($10,000,000), whichever is less."

16.  Add the following as a new Article 6.2.4:

"**6.2.4  Long Lead AFEs**:

In order to facilitate the timely and orderly commencement of any single activity or operation that is anticipated to be proposed under Article 11 (*Appraisal Operations),* Article 12 (*Development Plan*), including any activity or operation that is proposed prior to the submission of a Fabrication AFE, Article 13 (*Development Operations*), or Article 14 (*Facilities and Gathering Systems*), the Operator may submit an AFE ("Long Lead AFE") to the other Parties for advance activities or the advance commitments for, or purchases of, equipment, materials, and/or other services (collectively "Long Lead Items") which are commercially reasonable and necessary to assist in the timely preparation and completion of an anticipated activity or operation.  A Long Lead AFE proposal shall include information on the Long Lead Items to be undertaken or purchased with the estimated costs, estimate of any cancellation fees, and a justification which shall include the description and estimated timing of the activity or operation that will utilize the Long Lead Items. Approval of a Long Lead AFE shall not constitute a Vote or Election on the subsequently proposed activity or operation described in the Long Lead AFE justification. Each Long Lead AFE shall require approval by the Parties, as follows:

(a)  Subject to Paragraph (b) below, each Long Lead AFE shall require approval by Vote pursuant to Article 8.2.2 (*Approval by Vote*).

(b)  After the cumulative estimated Cost of those Long Lead AFEs submitted for (i) the acquisition of Long Lead Items for a Development System; or (ii) preliminary activities related to the fabrication, transportation or installation of a Development System ("Long Lead Development System AFEs") exceed $200,000,000, excluding supplemental AFEs to previously approved Long Lead Development System AFEs, the approval of new Long Lead Development System AFEs requires an affirmative Vote by two (2) or more Parties with a combined Voting interest of sixty-one percent (61%) or more.

**6.2.4.1  Timely Operations and Non-Consent of Long Lead AFEs**:  At such time as a Long Lead AFE has been approved by Vote, the Operator shall proceed with the advance commitments or acquisition of the equipment, materials, and/or services authorized

Confidential

ANACOP00003087

thereunder for the benefit of the Participating Parties within one hundred twenty (120) days from the date upon which the last applicable Vote to participate may be made. If the Long Lead AFE activity has not been commenced within the one hundred twenty (120) day period, the proposal and approval shall be deemed withdrawn with the effect as if the proposal and Vote approval had never occurred. Activity on a Long Lead AFE shall be deemed to have commenced on the date when the first contract is let or the first purchase is made of equipment, materials, and/or services authorized by the Long Lead AFE.

Unless otherwise provided in this Agreement, each Non-Participating Party in a Long Lead AFE and/or its supplement(s), if applicable, shall retain the right to participate in any subsequently proposed activity or operation described in the Long Lead AFE justification, subject to the reimbursement to the Participating Parties in the Long Lead AFE that assumed a portion of the Non-Participating Interest Share of an amount equal to two hundred percent (200%) of the Non-Participating Interest Share of Costs incurred pursuant to the Long Lead AFE in the manner described hereafter. In the event a Non-Participating Party in a Long Lead AFE subsequently Elects, as prescribed in this Agreement, to participate in the activity and/or operation described in the Long Lead AFE justification, the Operator shall initially invoice said Long Lead AFE Non-Participating Party for one hundred percent (100%) of the Non-Participating Interest Share of the Costs incurred pursuant to the Long Lead AFE within thirty (30) days from the date of the last applicable day to Elect to participate in the activity or operation described in the Long Lead AFE justification. Thereafter, once the invoice is paid by said Party pursuant to Exhibit "C", the Operator will credit the accounts of the Long Lead AFE Participating Parties in the proportion that each Long Lead AFE Participating Party Elected to assume of the Non-Participating Interest Share in the Long Lead AFE within thirty (30) days of its receipt of the reimbursement. Within thirty (30) days of the commencement of the activity or operation the Long Lead AFE Non-Participating Party Elected to participate in, the Operator shall invoice the Long Lead AFE Non-Participating Party for the remaining one hundred percent (100%) of the Long Lead AFE Non-Participating Interest Share of Costs incurred (or firmly committed under executed contracts for such equipment, materials, and/or services) pursuant to the Long Lead AFE prior to its Election to participate in the associated activity or operation. Within thirty (30) days of its receipt of the reimbursement, the Operator will credit the accounts of the Long Lead AFE Participating Parties in the proportion that each Long Lead AFE Participating Party Elected to assume of the Long Lead AFE Non-Participating Interest Share in the Long Lead AFE.

If a Non-Participating Party in a Long Lead AFE also Elects not to participate in the subsequently proposed activity or operation described in the Long Lead AFE justification, the two hundred percent (200%) reimbursement referenced above shall not apply, but the Costs incurred pursuant to the Long Lead AFE, and any supplements thereto, shall be included in the calculations of the recoupment of the proposed activity or operation as set out in Article 16 (*Non-Consent Operations*).

**6.2.4.2 Subsequently Proposed Operations and/or Activities Utilizing Long Lead Equipment, Materials, and/or Services**: If a Party who participated in a Long Lead AFE becomes a Non-Participating Party (sometimes hereinafter referred to as a "Subsequent Non-Participating Party") in the approved activity or operation described in the Long Lead AFE justification, the Operator shall reimburse the Subsequent Non-Participating Party its Participating Interest Share of the Costs incurred pursuant to that Long Lead AFE, and any supplements thereto in the manner described hereafter. In the

Confidential    ANACOP00003088

event a Party who participated in a Long Lead AFE becomes a Subsequent Non-Participating Party in the approved activity or operation that utilizes the equipment, materials and/or services obtained and/or procured via the Long Lead AFE, the Operator shall invoice the Participating Parties in the subsequent activity or operation for their share of the reimbursement in the proportion that each Participating Party in the subsequent activity or operation Elected to assume of the Subsequent Non-Participating Party's share in the subsequent activity or operation within thirty (30) days of the commencement of the approved activity or operation and credit the account of each Subsequent Non-Participating Party in said approved activity or operation within thirty (30) days of its receipt of the reimbursement.  However, the Subsequent Non-Participating Party's share of those Costs shall be included in the calculation of the applicable recoupment for the activity or operation as set out in Article 16 (*Non-Consent Operations*).

**6.2.4.3 <u>Participation in a Long Lead AFE and Non-Consent Fabrication AFE</u>**: Notwithstanding anything to the contrary in this Agreement, any Party electing to participate in a Long Lead AFE for any activity or operation proposed under Article 12 (*Development Plan*) prior to the issuance of the Fabrication AFE for the Development System who subsequently elects not to participate in such Fabrication AFE, or any AFE for which such Non-Participating Party's non-participation Election would result in the forfeiture of its right, title and interest in and to the Unit Area as provided in Article 16.2 (*Acreage Forfeiture Provision*) or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), shall be entitled to and receive, although still subject to forfeiture of such Non-Participating Party's Working Interest in the Prospect Area as prescribed in Article 12.8 (*Assignment of Interest*), Article 16.2 (*Acreage Forfeiture Provision*), or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), as applicable, reimbursement for its Participating Interest share of the Costs incurred pursuant to the Long Lead AFE, and any supplements thereto.  Such reimbursement shall be the responsibility of the Participating Parties in the Fabrication AFE, or the AFE for which such Non-Participating Party's non-participation Election resulted in the forfeiture of its right, title and interest in and to the Unit Area as provided in Article 16.2 (*Acreage Forfeiture Provision*) or Article 16.4.1 (*Acreage Forfeiture in the Entire Unit Area*), and shall be made by the Operator to such Non-Participating Party in the Fabrication AFE in the manner set forth in Article 6.2.4.2 (*Subsequently Proposed Operations and/or Activities Utilizing Long Lead Equipment, Materials, and/or Services*).

**6.2.4.4 Disposition of Items Associated with a Long Lead AFE**:  If the activity or operation described in the justification of an approved Long Lead AFE is not proposed under this Agreement, or if proposed and approved, such approved activity or operation is not timely commenced in accordance with this Agreement, any such Long Lead Item(s) purchased, procured and/or obtained, if applicable, under the approved Long Lead AFE shall be disposed of by the Operator pursuant to and in accordance with Article IV of Exhibit "C" (*Accounting Procedure*) and Article 18.3 (*Disposal of Surplus Materials*); provided, however, for purposes of this Article 6.2.4.4, a long lead operation shall be deemed to have been timely commenced in the event such operation is commenced within eighteen (18) months from the date of approval of such Long Lead

Page [ PAGE ] of [ NUMPAGES ]

ANACOP00003089

AFE and provided, further, that if the long lead operation is delayed for reasons beyond the control of the Operator a reasonable extension shall be afforded the Operator in such instance.

17.    Article 8.6.3 (b) (*Other AFE Related Operations*) is hereby revised to read as follows:

(b)AFE of $20,000,000 or more but less than $50,000,000; response will be made within forty-five (45) days after receipt of said proposal.

18.    Article 8.6.3 (c) (*Other AFE Related Operations*) is hereby revised to read as follows:

(c)  AFE of $50,000,000 or more; response will be made within sixty (60) days after receipt of said proposal.

19.    Delete Article 12.8 Pre-Development AFEs in its entirety.

<u>Miscellaneous</u>

20.    This Amendment shall be binding upon the undersigned Parties and their respective heirs, successors and assigns.  Capitalized terms not otherwise defined herein shall have the same meaning as in the Agreement.

21.    This Amendment may be executed in any number of counterparts for filing with applicable governmental agencies and recording.  Each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one Amendment.

22.    Except as amended herein, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect as written therein.

23.    This Amendment shall be effective as of May 1, 2014, unless specifically provided otherwise herein.

WITNESSES:                                        Cobalt International Energy, L.P.

_____          By:    _____
                                                  Name:
_____          Title:
                                                  Date:   _____

WITNESSES:                                        Marathon Oil Company

_____          By:    _____
                                                  Name:
_____          Title:
                                                  Date:   _____

Confidential                                                                    ANACOP00003090

WITNESSES:                                    ConocoPhillips Company

_____                       By:      _____
                                              Name:        Jim M. Higgins
_____                       Title:       Attorney-in-Fact
                                              Date:    _____


WITNESSES:                                    Venari Offshore LLC

_____                       By:      _____
                                              Name:
_____                       Title:
                                              Date:    _____


WITNESSES:                                    Anadarko Petroleum Corporation

_____                       By:      _____
                                              Name:        Jim W. Bryan
_____                       Title:       Agent and Attorney-in-Fact
                                              Date:    _____


WITNESSES:                                    Anadarko US Offshore Corporation

_____                       By:      _____
                                              Name:        Jim W. Bryan
_____                       Title:       Agent and Attorney-in-Fact
                                              Date:    _____

Confidential                                                              ANACOP00003091

## ACKNOWLEDGEMENTS

STATE OF TEXAS          )
                                       )

COUNTY OF HARRIS     )

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Cobalt International Energy, L.P., a Delaware limited partnership, on the day and year therein mentioned and as the act and deed of said limited partnership, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ____ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS          )
                                       )

COUNTY OF HARRIS     )

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Marathon Oil Company, an Ohio Corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ____ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS          )
                                       )

COUNTY OF HARRIS     )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim M. Higgins, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Attorney-in-Fact for ConocoPhillips Company, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ____ _ day of _____, 2014.

_____
Notary Public in and for the State of Texas

My Commission Expires:_____

Confidential

ANACOP00003092

STATE OF TEXAS    )
            )
COUNTY OF HARRIS   )

    BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as _____ for Venari Offshore LLC, a Delaware limited liability company, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

            _____
            Notary Public in and for the State of Texas

My Commission Expires:_____


STATE OF TEXAS    )
            )
COUNTY OF MONTGOMERY )

    BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim W. Bryan, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Agent and Attorney-in-Fact for Anadarko Petroleum Corporation, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

            _____
            Notary Public in and for the State of Texas

My Commission Expires:_____

STATE OF TEXAS    )
            )
COUNTY OF MONTOGOMERY )

    BEFORE ME, the undersigned Notary Public, on this day personally appeared Jim W. Bryan, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she, being fully authorized to do so, executed and delivered same as Agent and Attorney-in-Fact for Anadarko US Offshore Corporation, a Delaware corporation, on the day and year therein mentioned and as the act and deed of said corporation, for the purpose and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ _ day of _____, 2014.

            _____
            Notary Public in and for the State of Texas

My Commission Expires:_____

Confidential

ANACOP00003093

**Attachment 1**

**Attached to and made a part of that certain Ratification, Joinder and Third Amendment
of Operating Agreement, dated effective May 1, 2014, by and between
Cobalt International Energy, L.P., Marathon Oil Company, ConocoPhillips Company, Venari
Resources LLC, Anadarko Petroleum Corporation, and Anadarko US Offshore Corporation**

**Amended Exhibit "A"**

Attached to and made a part of that certain Unit Operating Agreement
dated effective May 1, 2014 by and between
ConocoPhillips Company and Anadarko E&P Company LP

**DESCRIPTION OF UNIT AREA, LEASES, WORKING INTEREST OF THE PARTIES, AND
REPRESENTATIVES**

**I.      DESCRIPTION OF PROPSPECT AREAS AND LEASES:**

| OCS-G No. | Area | Block | Expiration Date |
|---|---|---|---|
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2014 |
| 28148 | Walker Ridge | 53 (N/2) | April 30, 2016 |

**II.      WORKING INTEREST OF THE PARTIES:**

| | |
|---|---|
| ConocoPhillips Company | 30.00%* |
| Anadarko US Offshore Corporation | 30.00%* |
| Cobalt International Energy, L.P. | 20.00%* |
| Marathon Oil Company | 10.00%* |
| Venari Offshore LLC | 10.00%* |

**III.      EXISITNG OVERRIDING ROYALTY INTERESTS:**

(a)      Lease OCS-G 31938 Walker Ridge Block 51 & Lease OCS-G 25232 Walker Ridge Block 52:

|  | **Gross** | **Net** | |
|---|---|---|---|
| *Exxon Mobil Corporation | 1.50% | ConocoPhillips | 0.45% |
| | | AUOC | 0.45% |
| | | Cobalt | 0.30% |
| | | Marathon | 0.15% |
| | | Venari | 0.15% |
| *Nexen Petroleum Offshore U.S.A. Inc. | 0.50% | ConocoPhillips | 0.15% |
| | | AUOC | 0.15% |
| | | Cobalt | 0.10% |

Confidential

ANACOP00003094

|  |  |
|---|---|
| Marathon | 0.05% |
| Venari | 0.05% |

For reference, please see (i) that certain Letter Agreement dated March 26, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Exxon Mobil Corporation; (ii) that certain Letter Agreement dated March 31, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Nexen Petroleum Offshore U.S.A. Inc.; (iii) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Exxon Mobil Corporation, as Assignee; (iv) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between ConocoPhillips Company, as Assignor, and Exxon Mobil Corporation, as Assignee; (v) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008, by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee; and (vi) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between ConocoPhillips Company, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee.

(b)    Lease OCS-G 28148 Walker Ridge Block 53 (North Half)

|  | Gross | Net | |
|---|---|---|---|
| Hunt Oil Company | 3.0% | ConocoPhillips | 0.90% |
|  |  | AUOC | 0.90% |
|  |  | Cobalt | 0.60% |
|  |  | Marathon | 0.30% |
|  |  | Venari | 0.30% |

For reference, please see that certain Assignment of Overriding Royalty Interest by and between Anadarko Offshore US Corporation, as Assignor, and Hunt Oil Company, as Assignee, dated effective February 1, 2013.

IV.    **OPERATOR:** Anadarko Petroleum Corporation

V.    **ADDRESSES, CONTACT INFORMATION AND PARTY REPRESENTATIVES:**

| | **ConocoPhillips Company** | **Anadarko Petroleum Corporation** |
|---|---|---|
| Mail: | P.O. Box 2197<br>Houston, TX 77252 | P.O. Box 1330<br>Houston, TX 77251-1330 |
| Office: | 600 North Dairy Ashford<br>Dubai, 3018<br>Houston, TX 77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone: | (281) 293-3139 | (832) 636-8831 |
| Facsimile: | (281) 293-6171 | (832) 636-8059 |

Confidential    ANACOP00003095

| **Cobalt International Energy, L.P.** | **Marathon Oil Company** |
|---|---|
| Mail: 920 Memorial City Way<br>Suite 100<br>Houston, TX 77024 | P.O. Box 3128<br>Houston, TX 77253 |
| Office: 920 Memorial City Way<br>Suite 100<br>Houston, TX 77024 | 5555 San Felipe Rd.<br>Houston, TX 77056 |
| Attn: Lynne Hackedorn – Vice President<br>Government/Public Affairs & Land | Brad L. Dowdell – Land Manager |
| Telephone: (713) 579-9115 | (713) 296-3215 |
| Facsimile: (731) 579-9196 | (713) 296-4209 |

| **Anadarko US Offshore Corporation** | **Venari Offshore LLC** |
|---|---|
| Mail: P.O. Box 1330<br>Houston, TX 77251-1330 | 5847 San Felipe Street, Suite 4675<br>Houston, TX 77057 |
| Office: 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 | |
| Attn: Jim W. Bryan – Director, Land GOM | Scott Cornwell |
| Telephone: (832) 636-8831 | (713) 266-5474 |
| Facsimile: (832) 636-8059 | (713) 266-2330 |

**END OF EXHIBIT "A"**

Confidential                                                          ANACOP00003096

# Exhibit 29

MAIN (832) 636-1000

1201 LAKE ROBBINS DR. • THE WOODLANDS, TEXAS 77380

P.O. BOX 1330 • HOUSTON, TX 77251-1330

ANADARKO PETROLEUM CORPORATION

April 8, 2014

**Anadarko**

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:   Jim Higgins/Teri Flinner
Fax:    281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:   Ben Davis
Fax:    713-579-9196

Marathon Oil Company
5555 San Felipe Road
Houston, TX 77056
Attn:   Brad Dowdell/Dan Hamrick
Fax:    713-296-4209

Venari Offshore LLC
1080 Eldridge Parkway, Suite 1100
Houston, TX 77077
Attn:   Scott Cornwell/Joe Ross
Fax:    713-266-2330

RE:     Shenandoah Prospect
        Anadarko AFE No. 2087315
        Lease OCS-G 25232 Walker Ridge Block 52 #2 Well
        Down-dip Appraisal Well – Lease Maintenance Operation

Gentlemen:

Enclosed herewith for your review and approval is Anadarko AFE No. 2087315 in the gross (100%) amount of $225,165,000, wherein Anadarko proposes drilling, logging, evaluating and abandoning the Walker Ridge Block 52 #2 Well (WR 52 #2).  The WR 52 #2 is a down-dip Appraisal Well (estimated to be 800'-900' structurally down-dip) to the full-to-base Walker Ridge Block 51 #2 Well (WR 51 #2) that was drilled and abandoned approximately 12,800' to the west of the proposed surface location of the WR 52 #2. The WR 52 #2 is proposed as a straight hole from an approximate surface location of 5,133' FNL & 6,896' FEL of Block 52 and to be drilled to a total depth of 33,000' MD/TVD with the primary geological objective targets being the stratigraphic equivalent of those certain oil-filled Upper (Upper Wilcox 1, 2 and 3) and Lower Wilcox (Lower Wilcox A, B, C, D and E) Sands encountered in the WR 51 #2.

The primary purpose(s) of the WR 52 #2 is to (a) test the lateral continuity of the pay sands encountered in the WR 51 #2; (b) attempt to find/encounter the oil/water contact(s); and (c) attempt to establish pressure connectivity (through MDT's) to the pay sands seen in the WR 51 #2.

The Objective Depth criteria for the WR 52 #2 is the shallower of:

(i)     The stratigraphic equivalent of the Top of the Cretaceous (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of 31,315' MD/TVD in the WR 51 #2); or

(ii)    A total MD/TVD of 33,000'.

CONFIDENTIAL

The logging and evaluation program is incorporated in the estimated Cost and is detailed on the attached wellbore schematic. Please note that the "dry hole case" equates to encountering wet sands and the "success case" equates to encountering oil via LWD, mud logs or other tools used while drilling through the objective section.

The proposed well will be drilled with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a new-build, state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Diamond Ocean Blackhawk is $550,000 and is anticipated to be delivered to Anadarko for drilling the WR 52 #2 on or about mid-to-late May 2014.

The attached AFE number (AFE No. 2087315) was originally submitted by Anadarko (and approved by partners in July 2013) as a Pre-Drill AFE in the gross (100%) amount of $800,000 to cover estimated pre-drill costs associated with the WR 52 #2. Administratively, this Pre-Drill AFE has been converted to a Drill AFE.

Under the Shenandoah OA/UOA, as amended, Appraisal Operations have contractually concluded (Article 11.5). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the WR 52 #2 is deemed an Appraisal Operation. Moreover, since the WR 52 #2 is an activity/operation necessary to maintain Lease OCS-G 25232 Walker Ridge Block 52, the WR 52 #2 is not only an Appraisal Operation, but it is also a lease maintenance operation, subject, in particular, to Article 16.4.2 of the OA, and for which a Vote does not apply.

In conjunction with the formation of the Walker Ridge Block 51 Unit, the WR 52 #2 will be a Unit well/operation, and pursuant to the "Ratification, Joinder and Third Amendment of Operating Agreement", executed by the Shenandoah partners effective April 1, 2014, the WR 52 #2 will be governed by the UOA accordingly.

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic detailing, in particular, the well design and projected casing/liner settings; (ii) an estimated pore pressure (to depth) plot; and (iii) an estimated days versus depth plot (in dollars). As a reminder from the February 18, 2014 Partner Meeting, the current well design will not afford the drilling of a geologic sidetrack as a subsequent operation.

Pursuant to Article 8.6.1, each Party has thirty (30) days from receipt of this proposal to make its participation election as to same. Should you have any questions or need anything further, please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

CONFIDENTIAL

APC-00005094



## Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622  AFE No.: 2087315  Type: DE – DRILLING – EXPLORATORY

Well #/Name: 1H302300/WALKER RIDGE 52 002  Field: 0990 WILDCAT (EXPL)

Country: USA  State/Province: NORTHERN GUL  County: WALKER RIDGE

Prospect:  Surface Loc: 60812 52

Target Zone: WILCOX 9300  Bottom Hole Loc: 60812 52

Project Depth:

Project Name: WALKER RIDGE 52 002

Project Description: DRILL AND EVALUATE WALKER RIDGE 52 002, SHENANDOAH PROSPECT

| Working Interest Owners | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE CORP. | | 0.30000000 | $67,549,500 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $67,549,500 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $45,033,000 |
| MARATHON OIL CO | | 0.10000000 | $22,516,500 |
| VENARI OFFSHORE LLC | | 0.10000000 | $22,516,500 |
| TOTAL | | | $225,165,000 |

| | PDE | DRL.DHC | TOTAL |
|---|---|---|---|
| ORIGINAL | $800,000 | $224,365.000 | $225,165,000 |
| TOTAL | $800,000 | $224,365.000 | $225,165,000 |

Please mark your election in the box below

☐ Election to Participate

☐ Election to Non-Consent

APPROVED BY:_____  PRINTED NAME:_____

COMPANY NAME:_____  DATE:_____/_____/_____

CONFIDENTIAL                                    APC-00005095



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

**Company Code:** 622

**AFE No:** 2087315    **AFE Type:** DE - DRILLING - EXPLORATORY

**Well #/Name:** 1H302300 / WALKER RIDGE 52 002

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 80012300 | Drilling & Wellwork Consulting Services | $200,000 | $0 | $200,000 | $0 | $200,000 |
| 80017060 | Environmental Consulting Services | $50,000 | $0 | $50,000 | $0 | $50,000 |
| 80011050 | Legal Services & Fees | $50,000 | $0 | $50,000 | $0 | $50,000 |
| 80010160 | Surveying | $500,000 | $0 | $500,000 | $0 | $500,000 |
| | Total PDE | $800,000 | $0 | $800,000 | $0 | $800,000 |
| 80012410 | Casing > 30 in (>76.17 cm) | $383,675 | $0 | $0 | $383,675 | $383,675 |
| 80012370 | Casing 12.0-15.99 in. (30.46-40.61 cm) | $3,417,119 | $0 | $0 | $3,417,119 | $3,417,119 |
| 80012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $2,033,493 | $0 | $0 | $2,033,493 | $2,033,493 |
| 80012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $2,306,872 | $0 | $0 | $2,306,872 | $2,306,872 |
| 80012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $550,377 | $0 | $0 | $550,377 | $550,377 |
| 80012350 | Casing 7.0-8.99 in. (17.76-22.83 cm) | $374,075 | $0 | $0 | $374,075 | $374,075 |
| 80012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $1,570,101 | $0 | $0 | $1,570,101 | $1,570,101 |
| 80015240 | Casinghead | $800,000 | $0 | $0 | $800,000 | $800,000 |
| 80012010 | Contract Drilling | $103,050,000 | $0 | $103,050,000 | $0 | $103,050,000 |
| 80012020 | Directional Drilling Services | $4,581,500 | $0 | $4,581,500 | $0 | $4,581,500 |
| 80012060 | Downhole Rental Equipment | $7,386,500 | $0 | $7,386,500 | $0 | $7,386,500 |
| 80012040 | Drill Bits | $1,900,000 | $0 | $1,900,000 | $0 | $1,900,000 |
| 80012290 | Drilling & Wellwork Contract On Site Sup | $1,402,500 | $0 | $1,402,500 | $0 | $1,402,500 |
| 80012050 | Drilling & Wellwork Fuel | $8,415,000 | $0 | $8,415,000 | $0 | $8,415,000 |
| 80012330 | Drilling & Wellwork Misc Services | $4,675,000 | $0 | $4,675,000 | $0 | $4,675,000 |
| 80012080 | Drilling & Wellwork Mud & Chemicals | $9,350,000 | $0 | $9,350,000 | $0 | $9,350,000 |
| 80012070 | Drilling & Wellwork Surface Equip Rental | $4,675,000 | $0 | $4,675,000 | $0 | $4,675,000 |
| 80012320 | Drilling & Wellwork/G&G Meals & Entertai | $1,000 | $0 | $1,000 | $0 | $1,000 |
| 80012310 | Drilling & Wellwork/G&G Travel & Lodging | $35,000 | $0 | $35,000 | $0 | $35,000 |
| 80012160 | Fishing Tools and Services | $100,000 | $0 | $100,000 | $0 | $100,000 |
| 80012440 | Liner Hanger | $690,000 | $0 | $0 | $690,000 | $690,000 |
| 80012170 | Misc Drilling and Wellwork Consumables | $500,000 | $0 | $500,000 | $0 | $500,000 |
| 80012120 | Mud Logging | $5,610,000 | $0 | $5,610,000 | $0 | $5,610,000 |
| 80012110 | Open Hole Logging | $14,301,000 | $0 | $14,301,000 | $0 | $14,301,000 |
| 80031050 | Overhead Billed - System Calculated | $16,137,288 | $0 | $16,137,288 | $0 | $16,137,288 |
| 80012090 | Primary Cementing | $3,820,000 | $0 | $3,820,000 | $0 | $3,820,000 |
| 80012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 80014000 | Road & Location | $150,000 | $0 | $150,000 | $0 | $150,000 |
| 80025010 | Shore Base/Staging Area Expenses | $280,500 | $0 | $280,500 | $0 | $280,500 |
| 80025070 | Telephone & Communications | $374,000 | $0 | $374,000 | $0 | $374,000 |
| 80024000 | Transportation/Freight Air | $1,870,000 | $0 | $1,870,000 | $0 | $1,870,000 |
| 80024020 | Transportation/Freight Ground | $1,870,000 | $0 | $1,870,000 | $0 | $1,870,000 |
| 80024010 | Transportation/Freight Marine | $21,505,000 | $0 | $21,505,000 | $0 | $21,505,000 |
| $224,365,000 | Total DRL.DHC | $224,365,000 | $0 | $212,239,288 | $12,125,712 | $224,365,000 |
| TOTAL | | $225,165,000 | $0 | $213,039,288 | $12,125,712 | $225,165,000 |

CONFIDENTIAL

APC-00005096



# Shenandoah III Prospect

APC-00005097



Confidential

**Walker Ridge 52 #2**
**Drilling Plan Summary**
SL: WR 52 "K"  [5,874' WD]



CONFIDENTIAL

APC-00005100



CONFIDENTIAL