# Exhibit 31



**Petroleum Corporation**

Inter-Office Correspondence

December 29, 2014

TO:          File

FROM:        Property Accounting

SUBJECT:     Suspended Well Accounting Analysis – Shenandoah -3

---

**Summary**

The Walker Ridge 52 #2 (Shenandoah-3) well is located approximately 2.5 miles east and structurally down-dip from the Shenandoah-2 appraisal well, which encountered more than 1,000 net feet of oil pay in the Lower-Tertiary (Wilcox). The primary objectives of the Shenandoah-3 well were to confirm the Upper and Lower Wilcox sand systems and drill structurally down-dip of the Shenandoah Appraisal #1 (Shenandoah-2) to determine oil-water contacts.

The Shenandoah-3 found sands that were non-hydrocarbon bearing and were filled with water. Pressure data collected in this appraisal well can be used to project an oil/water contact between the discovery and appraisal well and since the projected oil/water contact is close to the appraisal well, the data suggests a higher confidence (and therefore increase) in the resources of the field. This is considered a successful appraisal well to determine the extent of the reservoir. Coring operations are currently underway. Management is also evaluating future utility of this well-bore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands.

**Analysis**

The Shenandoah-3 well meets the definition of an exploratory stratigraphic test well. While hydrocarbons were not found in this well-bore, geologic, fluid and pressure data obtained from this well has raised the confidence level of the resources of the field and has contributed to the ongoing development of the Shenandoah project. Therefore, it is appropriate to continue capitalization of this well cost as suspended well cost, pending the determination of proved reserves for the Shenandoah project. Anadarko continues to make progress assessing the resources and economic and operational viability of the Shenandoah project. The next appraisal well, to be drilled to the west of the original discovery well, is planned to spud in April 2015.

**Authoritative Guidance**

*Stratigraphic Test Wells (ASC 932-360-25-17)*

**25-17** Stratigraphic test wells are drilled to obtain information. They are not normally intended to be completed for hydrocarbon production and are customarily abandoned after drilling is completed and the information is obtained. Normally, stratigraphic test wells are drilled offshore to determine whether an offshore property contains sufficient reserves to justify the cost of constructing and installing a production platform and to determine where to locate such a platform.

**25-18** Stratigraphic test wells are divided into two types—exploratory-type and development-type—and the standards of accounting for the two types parallel the accounting for exploratory wells and development wells, respectively. Thus, an exploratory-type stratigraphic test well is accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditure before production could begin. The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to

APC002096
**Confidential Treatment Requested Under FOIA**

the condition that those costs shall not continue to be carried as assets if the enterprise is not making sufficient progress assessing the reserves and the economic and operating viability of the project or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well. Thus if an exploratory-type stratigraphic test well discovers reserves that are classified as proved and facilities are to be installed to produce those reserves, the cost of the exploratory-type stratigraphic test well is accounted for as part of the cost of the facilities even though the particular well itself may be abandoned.

APC002097
Confidential Treatment Requested Under FOIA

# Exhibit 32

# GOM Exploration Engineering Activity Report – 1/7/15

## *NEXT WEEK:  KEY EVENTS & DECISION POINTS*

**Camden:**
- Shenandoah #3: Rig off location 2 January 2015
  - Updated Shen basin OWC projections.
  - Preparing to update EC on well results
  - Updated Shen Area MMRA. Resources changed due to inclusion of major N-S fault
- Shenandoah #4:
  - EP prepared and submitted to BSEE by end of this week.
  - AFE preparation underway for completion end of Jan
- Shen-Cor-Tan Area Resources Update Effort:
  - Updating MMRA's for Portfolio submission this week. Will review with Ernie Thurs
  - Shen Area new MMRA's completed. Finalizing Coronado & Yucatan MMRA minor adj's
  - Shenandoah Resources Distribution

| Shenandoah Resources Distribution | P90 | P50 | Mean | P10 |
|---|---|---|---|---|
| Post Drill Shen #2 | 950 | 1180 | 1200 | 1470 |
| Post Drill Shen #3 (No Fault) | 780 | 910 | 920 | 1060 |
| Post Drill Shen #3 (Fault) | 565 | 725 | 740 | 940 |

- Yucatan Economics – Updated and submitted.
- Shenandoah Economics – Breakeven Price Calcs. $34.50/bbl yields NPV=$0. $50/bbl yields P/I 0.30.
- Phobos mini-sim –Sathish and Carla for Technology are working.
  - First pass results goal Jan 22
  - Review meeting with Carla set for Thurs 8th

**Gauthier:**
- Yeti (Statoil operated): – Spud on 12/26 in WD, PTD=26,003' MD/25,575' TVD, AFE= $114MM DHC, $128MM success, APC carried to 114$MM
  - Current depth 10,127' tvd/md, $20.87MM cum cost
  - LOT at 22" shoe (9,481') to 11.5ppg, enter TOS @ 10,050', currently POOH looking for washout.
- Mile High – Created prospect specific inventory case to replace the type case placeholder. These numbers will change again once the G&G team has the 3D evaluated and we are able to update the prospect size estimate in Q1. MMRA based on the 2010 size estimate, revised reservoir properties and chance of success.
  - Geologic Resource 30-240-1915, Mean 690, Pg 13.6%
  - New NPV= $128MM and PIR10= 0.51
- Lambeau – Updated inventory case to reflect updated MMRA (changed from a multizone MMRA to a single zone MMRA).
  - MMRA changed from (P90-P50-P10, Mean) 21-88-267, 124, Pg 75.8% to 21-82-335, 136, Pg 51.8%.
  - NPV $224MM, PIR 0.4
- Penguin – (No Update) The G&G team is reviewing.

**Pilati:**
- Thunderdel (operated); Own 100% WI
  - Closed deal with BP in Dec 2014; assigned operatorship and control 90% of mapped prospect (10% open)
  - Meeting with team Jan 20th; to discuss path forward.
- Coral  (Statoil operated): Uncaptured – Looking at deal
  - West GOM team looked at prospect 10/30/14; Geo team looking at seismic data 12/10;
  - Team agreed on moving forward with evaluation using APC MMRA (much larger than Statoil's resource range) 1/6/15
  - Will finalize and set up development plan and economics by Jan 14th.
- Thalassa: (operated) Own 100% WI; looking to sell down 50%
  - Working with team to put together sales presentation for first/second quarter.  Likely partners are those involved in Gunnison (tie back option); Nexen and/or Talos

- Opal:

CONFIDENTIAL                                                                                 APC-00153588

- o Completed multiple development sensitivities and ran gas case economics. Minimum commercial field size is 2 TCF (geologic mean 1.4 TCF). Ran deterministic gas price sensitivities on geologic mean.
  - o AFE preparation to be completed Jan 14th (ANORM well has already been set up).
  - o Met with Bill to review final Opal presentation 1/7, plan to present to Ernie next week.
  - o Final Air Permits received for BlackHawk 12/31, will need to stack test engines upon arrival to Trinidad.
- Goldenye (Hess Operates Block) APC 50% Hess 50%
  - o New prospect West GOM team is looking at, finalized MMRA 1/6, will work up development case and economics by 1/15


**Burlin:**
- Peep:
  - o Working with the Prospect Inventory cases ~ Rolling forward the evaluation & report dates to 1/1/2105. This has been completed.
- Prospect Inventory:
  - o Updating the database with the latest economics ~ which include all the changes that were made during portfolio planning (along with the new evaluation dates). Goal is to have this complete by the end of the week so that the planning group may pull prospect counts for the QBR next week.
- Worldwide Exploration Bubble Plot
  - o A request was made by the International group to get our data updated for a presentation to Bob Daniels this afternoon. I sent in a request for them to remove Ballymore from their presentation and NOT to show that in the meeting. I also sent in the updates for Lambeau (Lisa made changes this morning and I had already pulled the data).

CONFIDENTIAL                                                                                                    APC-00153589

# Exhibit 33

# FOURTH-QUARTER 2014 | OPERATIONS REPORT | FEBRUARY 2, 2015



**INVESTOR RELATIONS**

**John Colglazier**
Senior Vice President
832/636-2306

**Robin Fielder**
Director
832/636-1462

**Jeremy Smith**
Director
832/636-1544

4th Quarter and Full-Year Highlights ............ 2

Overview ................................................. 3

Rockies .................................................. 4

Southern & Appalachia ............................ 7

Gulf of Mexico ....................................... 10

International & Frontier ............................ 13

Deepwater Rig Schedule ......................... 16

Glossary of Abbreviations ....................... 17

APC-01752386

# FOURTH-QUARTER 2014 AND FULL-YEAR HIGHLIGHTS



## U.S. ONSHORE DRIVES GROWTH*

Anadarko's U.S. onshore achieved record sales volumes in the quarter, averaging 673,000 BOE/d, an increase of more than 82,000 BOE/d from the 4th quarter of 2013. Production in the Wattenberg field and Eagleford Shale drove U.S. onshore liquids growth, including a 52% year-over-year increase in oil volumes to approximately 165,000 BOPD in the 4th quarter.

For the full year, Anadarko's U.S. onshore assets delivered sales volumes of approximately 657,000 BOE/d, an increase of approximately 92,000 BOE/d over the prior year, equating to a 16% growth rate.

Since 2009, the U.S. onshore has grown total sales volumes by approximately 95%. The company has more than tripled liquid sales volumes over the same period while continuing to decrease its LOE per BOE.



*All volumes discussed exclude production associated with Pinedale/Jonah to provide a "same-store" sales comparison. "Same-store" sales volumes are intended to present performance of Anadarko's continuing asset base, giving effect to recent divestitures.*

## MONETIZATIONS ACCELERATE VALUE

In 2014, the company generated more than $2.5 billion from monetizations. Anadarko high-graded its Permian position in the 4th quarter by divesting more than 7,100 net non-core acres in the Midland Basin and used the proceeds to acquire nearly 10,000 net acres in the Delaware Basin adjacent to its core Wolfcamp Shale position.

## MEGA-PROJECTS ADVANCE

Anadarko achieved first oil at its Lucius development in the 1st quarter of 2015, just over three years after sanction. The 80,000-BOPD facility is Anadarko's largest truss spar completed to date.

The 80,000-BOPD Heidelberg spar and TEN development also made significant progress during the quarter. The topsides of the Heidelberg spar are more than 70% complete, while the TEN development is approximately 50% complete. Both mega-projects are on track to achieve first oil in 2016.

The Mozambican government gazetted a Decree Law prior to year end. Also in the quarter, Anadarko and its partners continued to secure additional non-binding HOAs for long-term LNG sales, bringing total HOAs secured to more than 8 MMTPA.

Gas export from the Jubilee field in Ghana commenced in the quarter, which will enable increased oil production from the field in the future.

*CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS*

*This presentation contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. While Anadarko believes that its expectations are based on reasonable assumptions as and when made, no assurance can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results, or other expectations expressed in this presentation, including Anadarko's ability to finalize year-end reserves, achieve its production targets, including anticipated growth rates, timely complete and commercially operate the projects and drilling prospects identified in this presentation, successfully plan, secure necessary government approvals, finance, build, and operate the necessary infrastructure and LNG park, and achieve its production and budget expectations on its mega projects. Other factors that could impact any forward-looking statements are described in "Risk Factors" in the company's 2013 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and other public filings and press releases. Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date hereof. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

APC-01752387

FOURTH-QUARTER 2014

# OVERVIEW



## SALES VOLUMES*

Fourth-quarter sales volumes totaled a record 79 MMBOE, or 854,000 BOE/d, which was at the high end of quarterly guidance. The company reported liquids sales volumes of approximately 429,000 Bbl/d, 70% of which were oil.

Full-year divestiture-adjusted sales volumes averaged 838,000 BOE/d, an 11% increase over 2013.

## CAPITAL

Fourth-quarter capital investments of $2.0 billion, which excludes capital investments associated with WES, were favorable to guidance.

For the full year, Anadarko capital investments of $8.44 billion were also favorable to guidance. This amount excludes $0.7 billion of capital investments incurred by WES and $123 million of property acquisitions.

Anadarko operated an average of 37 U.S. onshore rigs during the quarter which was a decrease of 19 rigs from the 4th quarter of 2013.

## RESERVES

Anadarko replaced more than 160% of its production in 2014 by organically adding 503 million BOE of proved reserves, before the effects of price revisions, at competitive costs.



The company ended the year with estimated proved reserves of 2.86 billion BOE, with 69% being proved developed and comprised of 49% liquids.

## SALES VOLUMES

| | 4Q14 Oil | 4Q14 NGLs | 4Q14 Gas | 4Q14 | 4Q13 Oil | 4Q13 NGLs | 4Q13 Gas | 4Q13 |
|---|---|---|---|---|---|---|---|---|
| | MBOPD | MBbl/d | MMcf/d | MMBOE | MBOPD | MBbl/d | MMcf/d | MMBOE |
| Rockies | 108 | 59 | 1,221 | 34 | 70 | 43 | 1,227 | 29 |
| Southern & Appalachia | 57 | 54 | 1,149 | 28 | 38 | 47 | 1,126 | 25 |
| **Lower 48** | **165** | **113** | **2,370** | **62** | **108** | **90** | **2,353** | **54** |
| Alaska | 8 | - | - | 1 | 11 | - | 1 | 1 |
| Gulf of Mexico | 47 | 6 | 179 | 8 | 47 | 6 | 208 | 8 |
| **Total U.S.** | **220** | **119** | **2,549** | **71** | **166** | **96** | **2,562** | **63** |
| International | 80 | 10 | - | 8 | 90 | - | - | 8 |
| **Same-Store Sales** | **300** | **129** | **2,549** | **79** | **256** | **96** | **2,562** | **71** |
| Pinedale/Jonah & China** | - | - | - | - | 9 | 4 | 81 | 3 |
| **Total Company** | **300** | **129** | **2,549** | **79** | **265** | **100** | **2,643** | **74** |

## CAPITAL INVESTMENTS

| | 4Q14 |
|---|---|
| | $MM |
| Rockies | 746 |
| Southern & Appalachia | 712 |
| **Lower 48** | **1,458** |
| Alaska | 24 |
| Gulf of Mexico | 175 |
| **Total U.S.** | **1,657** |
| International | 157 |
| Midstream*** | 277 |
| Capitalized Items/Other | 78 |
| **Total Company** | **2,169** |

*All volumes discussed exclude production associated with Pinedale/Jonah and China to provide a "same-store" sales comparison. "Same-store" sales volumes are intended to present performance of Anadarko's continuing asset base, giving effect to recent divestitures.
**The Pinedale/Jonah divestiture closed in 1Q14, and the China Subsidiary divestiture closed in 3Q14.

*** Includes WES capital investments of ~$206MM.

APC-01752388

FOURTH-QUARTER 2014

# ROCKIES





Anadarko's Rockies assets delivered sales volumes averaging 371,000 BOE/d during the 4th quarter, a 17% increase over the same period in 2013. Total same-store sales oil volumes increased by 54% from the 4th quarter of 2013, highlighted by a more than 34,000-Bbl/d increase from the Wattenberg field.

The company averaged 13 operated rigs and drilled 104 wells in the 4th quarter, with the majority of the activity taking place in the liquids-rich Wattenberg field.



- APC Land Grant Minerals
- APC Acreage
- Plant

## SALES VOLUMES

| | 4Q14 Oil MBOPD | 4Q14 NGLs MBbl/d | 4Q14 Gas MMcf/d | 4Q14 MBOE/d | 4Q13 Oil MBOPD | 4Q13 NGLs MBbl/d | 4Q13 Gas MMcf/d | 4Q13 MBOE/d |
|---|---|---|---|---|---|---|---|---|
| Wattenberg | 85 | 43 | 400 | 195 | 51 | 19 | 278 | 116 |
| Greater Natural Buttes | 3 | 11 | 380 | 77 | 3 | 13 | 457 | 92 |
| Powder River Basin | 2 | - | 212 | 37 | 1 | - | 242 | 41 |
| Wamsutter | 2 | 5 | 108 | 25 | 2 | 7 | 113 | 28 |
| EOR | 14 | - | 1 | 14 | 13 | - | 1 | 13 |
| Other | 2 | - | 120 | 23 | - | 4 | 136 | 27 |
| **Same-Store Sales** | 108 | 59 | 1,221 | 371 | 70 | 43 | 1,227 | 317 |
| Pinedale/Jonah* | - | - | - | - | 1 | 4 | 81 | 19 |
| **Total** | **108** | **59** | **1,221** | **371** | 71 | 47 | 1,308 | 336 |

## CAPITAL INVESTMENTS / AVERAGE RIG ACTIVITY

| | 4Q14 $MM | 4Q14 Operated | 3Q14 Operated |
|---|---|---|---|
| Wattenberg | 596 | 12 | 12 |
| Greater Natural Buttes | 30 | 1 | 1 |
| Powder River Basin | 22 | - | - |
| Wamsutter | 2 | - | - |
| EOR | 39 | - | - |
| Other | 57 | - | - |
| **Total** | **746** | **13** | 13 |

*The Pinedale/Jonah divestiture closed in 1Q14.

 

APC-01752389

# ROCKIES





## Wattenberg:

- The Wattenberg field averaged approximately 195,000 BOE/d of net sales volumes during the 4th quarter, an increase of 78,000 BOE/d or 67% from the 4th quarter of 2013.

- The company operated an average of 12 horizontal rigs and drilled 82 wells (115 type-well equivalents) during the quarter.

- The company's operated horizontal program continued to deliver outstanding performance, averaging approximately 148,000 BOE/d, an increase of 126% from the 4th quarter of 2013. Anadarko's growth was supported by continued optimization of locations and drilling and completion techniques.

- To facilitate future growth, the company added 85 MMcf/d of field compression in the quarter, bringing the total field compression added in 2014 to more than 300 MMcf/d. The company expects to add approximately 200 MMcf/d of field compression in 2015 to maintain system pressures and keep pace with expected production increases.

- Construction continued on phase II of the Lancaster cryogenic plant in the quarter, including the setting of most of the major equipment and the demethanizer tower. The project was approximately 85% complete at year -end and is on track for commissioning in mid-2015.

- During the quarter, Lancaster entered ethane rejection, which, though reducing NGL yield, increased total product revenue.



Wattenberg Operated HZ Net Sales Volumes



Optimization Drives Performance

 
APC-01752390

# ROCKIES

**Anadarko**

## EOR:

- Anadarko's EOR projects averaged approximately 14,000 BOPD in net sales volumes during the quarter, an increase of 9% from the 4th quarter of 2013.

## Greater Natural Buttes:

- The company operated one rig in the quarter and drilled 20 wells.

## Laramie County, Wyoming:

- Anadarko owns more than 100,000 mineral-interest acres in this emerging liquids-rich play.

- To date, the company has participated in more than 70 wells testing the Niobrara and Codell formations. Results from 19 producing wells remain strong with initial production rates averaging approximately 1,000 BOE/d.

## MINERAL-INTEREST OWNERSHIP

In 2014, the company recorded revenues totaling approximately $775 million from its mineral-interest ownership in the Rockies, Southern & Appalachian regions and the Gulf of Mexico. Activity along Anadarko's Land Grant position in the Rockies drove the increase from approximately $675 million recorded in 2013, as Anadarko and other operators continued evaluating liquids-rich resource opportunities in the region.

 

APC-01752391

# SOUTHERN & APPALACHIA





During the 4th quarter, the Southern & Appalachia region delivered sales volumes of approximately 302,000 BOE/d, an 11% increase from the 4th quarter of 2013. Total liquids volumes increased approximately 29% from the 4th quarter of 2013, highlighted by a more than 21,000-Bbl/d increase in the Eagleford Shale.

The company averaged 24 operated rigs and spud 141 wells in the quarter. In the region, company records were achieved in drilling, spud-to-rig-release times, cost-per-foot and water recycling.



## SALES VOLUMES

|  | 4Q14 Oil MBOPD | 4Q14 NGLs MBbl/d | 4Q14 Gas MMcf/d | 4Q14 MBOE/d | 4Q13 Oil MBOPD | 4Q13 NGLs MBbl/d | 4Q13 Gas MMcf/d | 4Q13 MBOE/d |
|---|---|---|---|---|---|---|---|---|
| Eagleford | 33 | 25 | 143 | 82 | 19 | 18 | 99 | 54 |
| Delaware Basin | 14 | 5 | 49 | 27 | 9 | 4 | 42 | 20 |
| E. Texas/N. Louisiana | 2 | 17 | 240 | 60 | 2 | 18 | 233 | 59 |
| Chalk/Eaglebine | 6 | 3 | 21 | 12 | 5 | 3 | 24 | 12 |
| Marcellus | - | - | 546 | 91 | - | - | 565 | 94 |
| Bossier | - | - | 73 | 12 | - | - | 79 | 13 |
| Hugoton | - | 2 | 35 | 8 | - | 2 | 38 | 8 |
| Ozona | - | 2 | 22 | 6 | - | 2 | 24 | 6 |
| Other | 2 | - | 20 | 4 | 3 | - | 22 | 7 |
| **Total** | **57** | **54** | **1,149** | **302** | **38** | **47** | **1,126** | **273** |

## CAPITAL INVESTMENTS / AVERAGE RIG ACTIVITY

|  | CAPITAL INVESTMENTS 4Q14 $MM | AVERAGE RIG ACTIVITY 4Q14 Operated | AVERAGE RIG ACTIVITY 3Q14 Operated |
|---|---|---|---|
| Eagleford | 246 | 8 | 8 |
| Delaware Basin | 338 | 9 | 9 |
| E. Texas/N. Louisiana | 67 | 5 | 5 |
| Chalk/Eaglebine | 8 | 1 | 1 |
| Marcellus | 31 | 1 | 1 |
| Bossier | 3 | - | - |
| Hugoton | 1 | - | - |
| Ozona | 1 | - | - |
| Other | 17 | - | - |
| **Total** | **712** | **24** | **24** |

 

APC-01752392

# SOUTHERN & APPALACHIA



## Delaware Basin:

- Anadarko's net sales volumes for the quarter averaged approximately 27,000 BOE/d, a 33% increase from the 4th quarter of 2013. Total liquids volumes averaged nearly 19,000 Bbl/d, a 42% increase from the 4th quarter of 2013.

- The company averaged nine operated rigs in the Delaware Basin in the quarter.

- Anadarko continued to evaluate its Wolfcamp Shale position in the quarter. In 2014, the company spud 83 Wolfcamp Shale wells and brought 32 wells on line.

- The company expanded its leasehold in the basin during the quarter with the acquisition of 10,000 net acres in the southeast portion of its Wolfcamp Shale position.

- To date, Anadarko has recycled nearly 2 million barrels of produced water for use in its completion operations and is continuing to expand its water infrastructure and recycling programs in line with development.

- Following WES's closing of the Nuevo Midstream acquisition in the quarter, Anadarko began integrating its operated midstream assets to facilitate future development activities.

## Eaglebine:

- Sales volumes in the quarter averaged more than 2,300 BOE/d, an increase of 334% from the 4th quarter of 2013.

- The company averaged one operated rig during the quarter.

**Gross Acres ~610,000**
**Net Acres ~255,000**

APC Acreage ☐
Farm-in Acreage ■
APC Acreage Position

Peak 30-Day 2014
Wolfcamp A
Results
Gross Processed BOE/d

 

APC-01752393

# SOUTHERN & APPALACHIA





## Eagleford:

- During the quarter, the company achieved a gross-processed-production record of 250,000 BOE/d. Anadarko's net sales volumes averaged approximately 82,000 BOE/d in the quarter, a 54% increase from the 4th quarter of 2013. Total liquids volumes averaged more than 58,000 Bbl/d, a 58% increase from the 4th quarter of 2013.

- The company spud 87 wells utilizing eight operated rigs and brought 88 wells on line in the quarter.

- The company continued its focus on efficiencies in the Eagleford, reducing drilling-cycle times to 7.6 days from 8.4 days in the 4th quarter of 2013 and reducing the cost-per-foot to an all-time low of $89.

## East Texas/North Louisiana:

- The company's net sales volumes averaged approximately 60,000 BOE/d. Total liquids sales volumes averaged approximately 20,000 Bbl/d.

- The company averaged five operated rigs and brought 12 wells on line in the quarter.

## Marcellus:

- The company achieved a gross-operated production record of 699 MMcf/d in the quarter.





APC-01752394

# GULF OF MEXICO



During the 4th quarter, Anadarko's Gulf of Mexico region averaged sales volumes of approximately 83,000 BOE/d, approximately 64% of which were high-margin liquids.



| | 4Q14 Oil | 4Q14 NGLs | 4Q14 Gas | 4Q14 | 4Q13 Oil | 4Q13 NGLs | 4Q13 Gas | 4Q13 |
|---|---|---|---|---|---|---|---|---|
| | MBOPD | MBbl/d | MMcf/d | MBOE/d | MBOPD | MBbl/d | MMcf/d | MBOE/d |
| Total | 47 | 6 | 179 | 83 | 47 | 6 | 208 | 88 |

SALES VOLUMES*

*Includes the impact of weather-related downtime.

Map legend:
- APC WI Block
- APC Discovery
- Planned Drilling
- APC WI Facilities

Map labels: Blind Faith, Independence Hub, Conger, Baldpate, Samurai, Nansen, Power Play, Caesar/Tonga, Tahiti, K2 Complex, Boomvang, Gunnison, Constitution, Heidelberg, Shenandoah, Yeti, Yucatan, Lucius, Phobos

APC-01752395

# GULF OF MEXICO



## DEVELOPMENT

### Lucius:
KEATHLEY CANYON 874/875/918/919 (APC WI 23.8%)

- Lucius achieved first oil from the first of six initial development wells in the 1st quarter of 2015. The fabrication and installation of Lucius required more than 10.5 million man hours, which was achieved with industry-leading safety performance. At peak construction, more than 560 workers were involved in installing and commissioning the facility offshore.

- The company will continue to ramp production towards facility capacity.

### Caesar/Tonga:
GREEN CANYON 683/726/727/770 (APC WI 33.75%)

- During the quarter, completion operations continued on the fifth Caesar/Tonga well, which is expected to be brought on line in the 1st quarter of 2015.

- A sixth Caesar/Tonga infill well is scheduled to spud in the first half of 2015.

### Heidelberg:
GREEN CANYON 859/860/903/904/948 (APC WI 31.5%)

- Heidelberg remains on track for first oil in 2016.

- Fabrication of the main topsides module is currently ahead of schedule and was more than 70% complete at the close of the quarter.

- The drilling of two development wells continued in the quarter, while installation operations for flowlines, export lines and suction piles commenced.



*Heidelberg Topsides Construction, Ingleside, Texas*

### K2 Complex:

- The company expects to begin sidetrack operations on the GC 562 #5 into an up-dip Miocene target in the 1st quarter of 2015. Production is expected in the second half of 2015.

### Independence Hub:

- Net production averaged 101 MMcf/d during the quarter.

 

APC-01752396

# GULF OF MEXICO



## EXPLORATION/APPRAISAL

### Shenandoah:

WALKER RIDGE 51, 52 AND 53 (APC WI 30%, OPERATOR)

- Drilling of the second Shenandoah appraisal well, Shenandoah-3, concluded in the quarter. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil/ water contacts based on pressure data, and reduced the uncertainty of the resource range.

- Planning is currently underway for the next appraisal well, which the company expects to spud in the 2nd quarter of 2015.

### Yeti:

WALKER RIDGE 117, 157, 158, 159, 160 (APC WI 37.5%)

- The Yeti exploration well was spud prior to year end. The well is in approximately 5,890 feet of water in Walker Ridge block 160 and is currently drilling toward a total vertical depth of 25,575 feet. The well will test a Miocene, sub-salt, three-way closure approximately 20-miles southeast of Anadarko's operated Heidelberg development.





★ APC Discovery
● Successful Appraisal
△ Planned Drilling


APC-01752397

# INTERNATIONAL & FRONTIER





*El Merk in Algeria*

During the 4th quarter, the International and Frontier region sales volumes averaged approximately 98,000 Bbl/d.

The Mozambican government gazetted a Decree Law in the quarter, while additional non-binding HOAs for long-term LNG sales were reached prior to year-end.

| SALES VOLUMES | | |
|---|---|---|
| | 4Q14 MBbl/d | 4Q13 MBbl/d |
| Alaska | 8 | 11 |
| Algeria* | 80 | 62 |
| Brazil | - | - |
| Ghana/W. Africa* | 10 | 28 |
| Mozambique | - | - |
| Other | - | - |
| **Same-Store Sales** | 98 | 101 |
| China* | - | 8 |
| **Total** | **98** | **109** |

*Quarterly sales volumes are influenced by size, timing and scheduling of tanker liftings.

| CAPITAL INVESTMENTS | |
|---|---|
| | 4Q14 $MM |
| Alaska | 24 |
| Algeria | 18 |
| Brazil | 1 |
| Ghana/W. Africa | 50 |
| Mozambique | 87 |
| Other | 1 |
| **Total** | **181** |

APC-01752398

# INTERNATIONAL & FRONTIER



## DEVELOPMENT

### Alaska:

- Gross production from the Colville River Unit averaged approximately 39,000 BOPD during the quarter. A drilling rig is continuing to work in the Alpine field on an extension well to the southwest.

### Algeria:

- In the quarter, Algeria gross production averaged approximately 386,000 BOE/d as the El Merk facility continued to produce at plateau rates.

### Ghana:

- Gross production at the Jubilee field averaged approximately 100,000 BOPD during the quarter. Gas export commenced in November, and commissioning of the onshore natural gas processing facility is ongoing. In 2015, gas export is expected to increase enabling oil production from the field to rise towards field plateau.

- Construction on the TEN development was approximately 50% complete at the close of the quarter. The 80,000-BOPD project remains on schedule for first oil in mid 2016. The partnership was drilling the last of the initial ten development wells in the quarter.

### Mozambique:

**OFFSHORE AREA 1 (APC WI 26.5%, OPERATOR)**

- In December, the Mozambican government gazetted a Decree Law. This marked an important step toward establishing a project-wide legal and contractual framework that is expected to deliver a level of stability enabling continued equity investments by the partnership and potential access to significant, limited-recourse project finance capital.

- Additional non-binding HOAs for long-term LNG sales were reached in the quarter, bringing the cumulative total to more than 8 MMTPA at year end.

- Significant progress was made in the receipt of letters-of-intent for financial support from potential lenders.

- The partnership continued the evaluation of onshore LNG contractor bids during the quarter in preparation for contractor selection in 2015.



*Jubilee Field in Ghana*

 

APC-01752399

# INTERNATIONAL & FRONTIER

## EXPLORATION/APPRAISAL

### Colombia:

FUERTE NORTE, FUERTE SUR, PURPLE ANGEL, COL 5 AND URA 4 (APC WI 50%, OPERATOR)

- Anadarko's two initial prospects have been selected for the 2015 exploration program offshore Colombia. The Calasu prospect is a large four-way structure on the north end of the block complex. It will have multiple potential targets and, with success, would de-risk several adjacent structures on the block. The Kronos prospect is located in the southern area of the block complex and will test a large structure associated with the frontal area of a large thrust complex. As with Calasu, success here would de-risk multiple identified prospects.

- The Bolette Dolphin drillship was mobilized to Colombia in the quarter. Once the drillship arrives, it will topset the Kronos well and then begin operations on the Calasu prospect.

### Côte d'Ivoire:

BLOCK CI-103 (APC WI 65%, OPERATOR)

- During the quarter, drilling results of the Paon discovery continued to be encouraging. The Paon-3AR was drilled 3.7-miles down-dip to the discovery well and encountered more than 94 feet of pay. The well established an oil/water contact and appears to be in communication with the Paon-1X. As a result of the success, the drilling of the Paon-4A was accelerated. The well, located six miles east of the Paon-3AR, penetrated more than 37 feet of pay in the target section and defined the eastern extent of the reservoir. Based on the successful drilling program to date, the partnership and the government are currently discussing additional appraisal drilling activity for 2015, which would include a drill stem test.

BLOCK CI-515 (APC WI 45%, OPERATOR)

- During the 4th quarter, the Saumon prospect was drilled to test a well-developed Cretaceous sand system trapped against a basin margin fault. Although thick, high-quality sands were encountered in the target interval, the well did not encounter hydrocarbons.



*Côte d'Ivoire  4th Quarter 2014 Drilling Activity*

### Mozambique:

OFFSHORE AREA 1 (APC WI 26.5%, OPERATOR)

- Appraisal activity continued on the Orca discovery during the quarter. The Orca #4 well was completed and encountered natural gas pay in two reservoirs. Further analysis is under way to define future appraisal needs as well as a potential optimum development scenario.

- The Tubarão Tigre #2 was drilling at the close of the quarter. This is the first appraisal well to the 2014 discovery.

ONSHORE ROVUMA (APC WI 35.7%, OPERATOR)

- During the quarter, the company completed the Tembo well and evaluation operations. The well encountered natural gas and condensate in one of the Cretaceous reservoirs. Post-drill evaluations are under way to determine if additional exploration activity is warranted within the prospect area.

- The second well in the program, the Kifaru prospect, was spud in the 1st quarter of 2015. Kifaru will test Miocene, Oligocene and Paleocene natural gas targets near the future site of Anadarko's planned LNG facility.

 
APC-01752400

# DEEPWATER RIG SCHEDULE



| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Ensco 8500 | ▓ | | | | |
| Ensco 8506 | ▓ | | | | |
| Ocean BlackHawk | ▓ | ▓ | ▓ | ▓ | ▓ |
| Ocean BlackHornet | ▓ | ▓ | ▓ | ▓ | ▓ |
| Belford Dolphin | ▓ | ▓ | | | |
| Bolette Dolphin | ▓ | ▓ | ▓ | ▓ | |
| Noble Bob Douglas | ▓ | ▓ | ▓ | | |
| Rowan Resolute | ▓ | ▓ | ▓ | ▓ | |



*Ocean BlackHornet Drillship*



*Bolette Dolphin Drillship*

 

APC-01752401

# GLOSSARY OF ABBREVIATIONS



- **APC:** Anadarko Petroleum Corporation

- **Bbl:** Barrels

- **Bbl/d:** Barrels of Liquids per Day

- **BOE:** Barrels of Oil Equivalent

- **BOE/d:** Barrels of Oil Equivalent per Day

- **BOPD:** Barrels of Oil per Day

- **EOR:** Enhanced Oil Recovery

- **HOA:** Heads of Agreement

- **HZ:** Horizontal

- **IP:** Initial Production

- **LOE:** Lease Operating Expense

- **LNG:** Liquefied Natural Gas

- **MBbl/d:** Thousand Barrels per Day

- **MBOE/d:** Thousand Barrels of Oil Equivalent per Day

- **MBOPD:** Thousand Barrels of Oil per Day

- **MM:** Million

- **MMBOE:** Million Barrels of Oil Equivalent

- **MMTPA:** Million Tonnes Per Annum

- **MMcf:** Million Cubic Feet

- **MMcf/d:** Million Cubic Feet per Day

- **NGL:** Natural Gas Liquid

- **TEN:** Tweneboa, Enyenra and Ntomme

- **WES:** Western Gas Partners, LP (NYSE: WES)

- **WI:** Working Interest

APC-01752402

# Exhibit 34

1201 LAKE ROBBINS DRIVE • THE WOODLANDS, TEXAS 77380
P. O. BOX 1330 • HOUSTON, TEXAS 77251-1330 • TEL (832) 636-1000


US Offshore Corporation

February 9, 2015

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:   Jim Higgins/Teri Flinner
Fax:   281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:   Ben Davis
Fax:   713-579-9196

Marathon Oil Company
5555 San Felipe Road
Houston, TX 77056
Attn:   Brad Dowdell/Dan Hamrick
Fax:   713-296-4209

Venari Offshore LLC
1080 Eldridge Parkway, Suite 1100
Houston, TX 77077
Attn:   Scott Cornwell/Joe Ross
Fax:   713-266-2330

RE:   Shenandoah Prospect
      Anadarko AFE No. 2104486
      Lease OCS-G 31938 Walker Ridge Block 51 #3 Well
      Lease Maintenance Operation

Gentlemen:

Enclosed for your review and approval is Anadarko AFE No. 2104486 in which Anadarko proposes drilling, logging, evaluating and abandoning the Walker Ridge Block 51 #3 Well (WR 51 #3 – commonly referred to as the Shen 4) for an estimated gross (100%) cost of $213,741,413. The WR 51 #3 is an Appraisal Well positioned to test the western side of the Shenandoah structure in hopes of penetrating an oil column similar to that encountered in the WR 51 #2 (commonly referred to as the Shen 2) which found approximately 1,000' of full-to-base net oil pay in several sands (said sands are referred to by Anadarko as the Upper Wilcox 1, 2 and 3, and the Lower Wilcox, A, B, C, D and E). The WR 51 #3 is proposed as a directional well and will be drilled from EP surface Location "G", from a permitted (APD) X&Y coordinate of X=2,100,390.38' and Y=9,767,200.55' being approximately 6,329' FEL and 6,080' FNL of Block 51. The proposed bottom-hole location of the WR 51 #3 is X=2,098,605.91' and Y=9,768,082.88' projected to be approximately 7,726' FWL and 5,197' FNL of Block 51.

Although the WR 51 #3 is proposed to a total depth of approximately 31,025' TVD (31,446' MD), the Objective Depth, as prescribed in the Shenandoah UOA, is the shallower of:

(i)     The stratigraphic equivalent of the Top of the Cretaceous (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of 31,315' MD/TVD in the WR 51 #2); or
(ii)    A depth of 31,025' TVD.

A SUBSIDIARY OF ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL                                    APC-00022648

The logging and evaluation program is incorporated in the estimated Cost and is detailed on the attached wellbore schematic.

The proposed well is currently planned to be drilled with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Diamond Ocean Blackhawk is approximately $525,000 and is anticipated to be delivered to Anadarko for drilling the WR 51 #3 on or about mid-to-late June 2015 after completing operations at K-2.

The well design of the WR 51 #3 will enable the drilling of a geologic sidetrack, but the ultimate determination can only be made once we reach/near Objective Depth. For example, if we have to run the 9-7/8" scab liner [like we did on the WR 52 #2 (Shen 3)], then the ability to sidetrack thereafter would likely not be possible. Although Anadarko is hopeful the well can be drilled in such a way that would facilitate a long reach, downdip sidetrack, please be advised, however, due to rig scheduling and managing the 180-day continuous operations clock, Anadarko is not currently considering proposing and/or drilling such sidetrack as a subsequent operation while the Ocean Blackhawk is on location, as contemplated in Article 11.2 of the Shenandoah UOA, and thus, plans to release the rig, and thereafter, consider re-entering and sidetracking at a later date. In the meantime, Anadarko will work up a preliminary well plan and cost for a geologic sidetrack and forward that information to you for future reference and planning.

As we collectively share the desire to acquire a Shenandoah oil-saturated core and have discussed the possibility of doing so in this well after drilling and logging to Objective Depth, Anadarko will continue to contemplate a by-pass core and work-up the associated preliminary cost and details as to same and forward that to you for future reference and planning. However, the results of the WR 51 #3 as well as Anadarko's rig situation and scheduling issues after reaching Objective Depth will be critical factors in determining the desire and/or timing of proposing a by-pass core while on location.

The attached AFE number (AFE No. 2104486) was originally submitted by Anadarko (and approved by partners in October 2014) as a Pre-Drill AFE in the gross (100%) amount of $750,000 to cover estimated pre-drill costs associated with the WR 51 #3. Administratively, this Pre-Drill AFE has been converted to a Drill AFE.

Under the Shenandoah UOA, as amended, Appraisal Operations have contractually concluded pursuant to Article 11.5(b). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the WR 51 #3 is deemed an Appraisal Operation. Moreover, since the WR 51 #3 is a Unit activity/operation necessary to maintain Lease OCS-G 25232 Walker Ridge Block 52, the WR 51 #3 is not only an Appraisal Operation (for which a Vote does not apply), but it is also a lease maintenance operation and subject to Article 16.4.2 (Acreage Forfeiture in a Portion of a Contract Area) of the UOA.

CONFIDENTIAL

APC-00022649

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures and the anticipated evaluation program; and (ii) an estimated days versus depth plot (both in dollars and in days).

Pursuant to Article 8.6.1, each Party has thirty (30) days from receipt of this proposal to make its participation election as to same.

Anadarko plans to schedule a Pre-Spud meeting of the participating parties in and around May. In the meantime, should you have any questions or comments or need any additional information, please don't hesitate contacting me at (832) 636-3170.


Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

CONFIDENTIAL

APC-00022650



## Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622          AFE No.: 2104486                        AFE Type: DE – DRILLING-
                EXPLORATORY

Midstream Capital Type:                          Future Allocation Required: NO

Well #/Name:  1J046700 / WALKER RIDGE 51 003  Field: 0990 WILDCAT (EXPLORATN)

Country: USA                  State/Province: NORTHERN GUL  County: WALKER RIDGE

AFE Project Manager: Tim Trautman                  AFE Coordinator: Jake Ramsey

Hierarchy Area: WALKER RIDGE EXPLORATION          Project Name: SHENANDOAH

Project Description:

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORPORATION | X | 0.00000000 | $0 |
| Anadarko US Offshore Corporation | | 0.30000000 | $64,122,423.90 |
| ConocoPhillips Company | | 0.30000000 | $64,122,423.90 |
| Marathon Oil Company | | 0.10000000 | $21,374,141.30 |
| Cobalt International Energy LP | | 0.20000000 | $42,748,282.60 |
| Venari Offshore LLC | | 0.10000000 | $21,374,141.30 |
| TOTAL | | 1.00000000 | $213,741,413.00 |

**Please mark your election in the box below**

☐  Election to Participate

☐  Election to Non-Consent

APPROVED BY:_____        PRINTED NAME:_____

COMPANY NAME:_____        DATE:_____/_____/_____

CONFIDENTIAL                                                                APC-00022651

# Anadarko
## Petroleum Corporation

### AUTHORIZATION FOR EXPENDITURE

Company Code:    622

Well #/Name:    1J046700/WALKER RIDGE 51 003

AFE No: 2104486

AFE Type: DE - DRILLING - EXPLORATION

**GROSS DETAIL COST ESTIMATE**

| Cost Element | Description | Current Amount | Supplement | Intangiblie | Tangible | Total |
|---|---|---|---|---|---|---|
| 80012410 | Casing >30 in (>76.17 cm) | $390,134 | $0 | $0 | $390,134 | $390,134 |
| 80012370 | Casing 12.0 -15.99 in. (30.46-40.61 cm) | $3,736,410 | $0 | $0 | $3,736,410 | $3,736,410 |
| 80012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $3,759,268 | $0 | $0 | $3,759,268 | $3,759,268 |
| 80012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $1,074,461 | $0 | $0 | $1,074,461 | $1,074,461 |
| 80012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $413,665 | $0 | $0 | $413,665 | $413,665 |
| 80012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $705,350 | $0 | $0 | $705,350 | $705,350 |
| 80015240 | Casinghead | $750,000 | $0 | $0 | $750,000 | $750,000 |
| 80012000 | Rig Mobilization & Demobilization | $15,119,962 | $0 | $15,119,962 | $0 | $15,119,962 |
| 80012010 | Contract Drilling | $91,762,828 | $0 | $91,762,828 | $0 | $91,762,828 |
| 80012020 | Directional Drilling Services | $2,796,112 | $0 | $2,796,112 | $0 | $2,796,112 |
| 80012060 | Downhole Rental Equipment | $5,294,764 | $0 | $5,294,764 | $0 | $5,294,764 |
| 80012040 | Drill Bits | $850,000 | $0 | $850,000 | $0 | $850,000 |
| 80012050 | Drilling and Wellwork Fuel | $7,160,000 | $0 | $7,160,000 | $0 | $7,160,000 |
| 80012330 | Drilling and Wellwork Misc. Services | $6,639,248 | $0 | $6,639,248 | $0 | $6,639,248 |
| 80012080 | Drilling Mud & Chemicals | $10,457,280 | $0 | $10,457,280 | $0 | $10,457,280 |
| 80012070 | Drilling & Wellwork Surface Equip Rental | $6,702,544 | $0 | $6,702,544 | $0 | $6,702,544 |
| 80012300 | Drilling & Wellwork Consulting Services | $30,000 | $0 | $30,000 | $0 | $30,000 |
| 80012290 | Drilling & Wellwork Contract On Stie Sup | $3,028,910 | $0 | $3,028,910 | $0 | $3,028,910 |
| 80017000 | Environmental/Regulatory Studies and Plans | $4,000,000 | $0 | $4,000,000 | $0 | $4,000,000 |
| 80017030 | Environmental Waste Disposal | $264,000 | $0 | $264,000 | $0 | $264,000 |
| 80017070 | Environmental/Reg Permits, Licenses & Fees | $192,000 | $0 | $192,000 | $0 | $192,000 |
| 80012160 | Fishing Tools & Service | $699,600 | $0 | $699,600 | $0 | $699,600 |
| 80012440 | Liner Hanger | $250,000 | $0 | $0 | $250,000 | $250,000 |
| 80012430 | Casing Accessories | $650,000 | $0 | $650,000 | $0 | $650,000 |
| 80012540 | Mud Line Hanger Systems | $200,000 | $0 | $200,000 | $0 | $200,000 |
| 80012550 | Misc. Tangible Downhole Equipment | $180,000 | $0 | $0 | $180,000 | $180,000 |
| 80012170 | Misc. Drilling Consumables | $575,520 | $0 | $575,520 | $0 | $575,520 |
| 80012120 | Mud Logging | $2,663,944 | $0 | $2,663,944 | $0 | $2,663,944 |
| 80012230 | Cased Hole Logs, E-line + Slickline Ops | $320,760 | $0 | $320,760 | $0 | $320,760 |
| 80012110 | Open Hole Logging | $11,438,000 | $0 | $11,438,000 | $0 | $11,438,000 |
| 80012090 | Primary Cementing | $3,433,592 | $0 | $3,433,592 | $0 | $3,433,592 |
| 80012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 80025010 | Shore Base/Staging Area Expenses | $352,000 | $0 | $352,000 | $0 | $352,000 |
| 80025070 | Telephone & Communications | $264,000 | $0 | $264,000 | $0 | $264,000 |
| 80024000 | Transportation/Freight Air | $4,030,400 | $0 | $4,030,400 | $0 | $4,030,400 |
| 80024020 | Transportation/Freight Ground | $308,880 | $0 | $308,880 | $0 | $308,880 |
| 80042010 | Transportation/Freight Marine | $22,499,700 | $0 | $22,499,700 | $0 | $22,499,700 |
| 80025020 | Offshore Living & Camp/Housing Expenses | $498,080 | $0 | $498,080 | $0 | $498,080 |

CONFIDENTIAL



APC-00022653



WR 51 #3

CONFIDENTIAL

APC-00022654

# Exhibit 35

**From:**     "Oudin, Chip" <Chip.Oudin@anadarko.com>
**To:**        "Unger, Layla" <Layla.Unger@conocophillips.com>
**Subject:**  RE: Thanks
**Sent:**     Wed, 6 May 2015 21:33:35 +0000

Layla,
Always a pleasure getting together with you guys.  No feedback from B & J, but they're probably getting ready for tomorrow in Dallas with Venari. With the project still in Exploration's shop, Paul and I still get off relatively easy, but we felt that you guys characterized the project very well, and COP has done a great deal of work addressing assorted issues that we feel need to be addressed.  So thank you! Take care of Jason….he did not look very comfortable yesterday, and the car ride back could not have been fun for him.
Cheers,
Chip

---

**From:** Unger, Layla [mailto:Layla.Unger@conocophillips.com]
**Sent:** Wednesday, May 06, 2015 4:18 PM
**To:** Oudin, Chip
**Subject:** RE: Thanks

Thanks Chip for the slides – so interesting to get a chance you see your working interpretations! I like em.
I too will be interested to see how the minutes get written up. Any idea how Beth and Jake felt about the session once we left? How about you guys? I agree with you 100% that the point of representing uncertainty going into a development is to understand what a range of potential outcomes could be. Not to say "well we don't know so we'll make it super simple" which is basically what Jake has said to me before.
Good news on the approvals – here we go again!
Layla

---

**From:** Oudin, Chip [mailto:Chip.Oudin@anadarko.com]
**Sent:** Tuesday, May 05, 2015 3:33 PM
**To:** Unger, Layla; Blackburn, John P; Stein, Jason A
**Subject:** [EXTERNAL]Thanks

Thanks for coming in today for the workshop.  I'll be curious to see how the minutes get written up, but I thought it was a productive get-together.  The more we can assess and accept what we know versus what we don't know, the better we'll all be on this project.
We received approval today from BOEM for the WR51 E, F, and G locations, so now it's onward to spud (whenever that will be, but I'm guessing soon!)
Attached for J&J is a set of snapshots of my alternative-interpretation, unofficial maps (uninterpolated, uncorrected, work versions) from Rev8 FINAL2 enh dataset.  Horizon names are on the upper border; fourth map is your "Top Sand" level, which sits between Beth's Upper Wilcox 2 & 3 horizons.  I'm just getting started with Lower Wilcox C, so early apologies for its appearance, but it is on same peak as yours, I think.  I showed some of these to Jason and Thomas; you can see from the structural changes, in strike and dip, why I think faulting might be significant on both sides of the Shen-2 well, and if you believe the NE-SW trending DTSE fault on the northwest, near the Shen-4 well.

Click here for Anadarko's Electronic Mail Disclaimer

APC001133
**Confidential Treatment Requested Under FOIA**

# Exhibit 36

**To:** Bryan, Jim[Jim.Bryan@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Tue 12/8/2015 2:46:08 PM Coordinated Universal Time
**Subject:** FW: Shenandoah Prospect-Project Schedule

FYI

**From:** Ben Davis [mailto:Ben.Davis@cobaltintl.com]
**Sent:** Tuesday, December 08, 2015 8:11 AM
**To:** Pachman, Jeff
**Subject:** Shenandoah Prospect-Project Schedule

Jeff,

This is not good news at all.

Where do you think we will be, spending wise, when, and if, we get to sanction after Shenandoah 6 ST?  Probably ~$2 billion?

Just between the two of us, this will not help us talk up the utility of the proposed Shenandoah 4 ST.

I believe that we will all be making some difficult decisions going forward.

Ben

-----Original Message-----
From: McGrievy, Pat [mailto:Pat.McGrievy@anadarko.com]
Sent: Monday, December 07, 2015 5:27 PM
To: Dana Cleland
Cc: Tule, Jenifer; Frye, Lea; Walz, Gregg; Kavanagh, Ryan; Prosser, Wendy
Subject: Re: Project Schedule - overall

Hi Dana, the project team is currently working on the completion of a revised schedule and will share it with the partnership in our 4Q partnership meeting on December, 16th. I can share with you the fact that SOP and sanction will slip into Q1, 2018 as a result of the somewhat disappointing results of the multiple SHEN 4 well penetrations and our firm belief that appraisal will require the SHEN 5 & 6 wells with a possible sidetrack in one or both wells to achieve sanction. Although the SOP and sanction dates have moved 4 or 5 months to the right since we last reviewed it with the partnership,we believe that other Optimizations within our schedule will effectively neutralize the impact on the first oil date. I am not at liberty at this time to provide specifics on how we will be able to hold our first production date, but should be able to share the drivers at our partner meeting next Wednesday.

I hope this helps you, Pat

Patrick McGrievy
Anadarko Petroleum Corp
General Mgr - USGOM
Wk phone/ (832) 636-3973
Cell phone (281) 798-4483

On Dec 7, 2015, at 11:20 AM, Dana Cleland <dana.cleland@cobaltintl.com<mailto:dana.cleland@cobaltintl.com>> wrote:

Pat,
Do you have a schedule similar to this that shows your latest view to first oil for the wet tree concepts?  I have the detailed schedules from Jenifer from our "select" meetings, but was looking for something more at a summary level.

Thanks,
Dana

<Picture (Device Independent Bitmap) 1.jpg>

Click here for Anadarko's Electronic Mail Disclaimer<http://www.anadarko.com/notices/Pages/Electronic-Mail-Disclaimer.aspx>

CONFIDENTIAL

APC-00214429



Shenadoah Wet Tree Semi Option High Level Execution Schedule

APC-00214430

# Exhibit 37

**To:** Ben Davis[Ben.Davis@cobaltintl.com]; jross@venari.net[jross@venari.net]; scornwell@venari.net[scornwell@venari.net]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Mon 1/4/2016 4:21:13 PM Coordinated Universal Time
**Subject:** FW: DIRECTIONAL PLAN FOR ST03
**Attachment:** 8x11_WR051 003 ST03BP00 Rev1_JN_02Jan16 Proposal.pdf
**Attachment:** ATT00001.htm
**Attachment:** WR051 003 ST03BP00 Rev1_JN_02Jan16 Proposal Geodetic Report.xlsx
**Attachment:** ATT00002.htm

---

In accordance with Article 11.1.4 of the Shenandoah UOA, in particular, Article 11.1.4(b), Anadarko has made the decision to plug and abandon the ST2 wellbore.

Anadarko has formulated a revised Well Plan (ST3) in such a way that will get us approximately 500' laterally away from the trouble zone, closer to the ST1 which we know did not encounter this issue/zone. This revised Well Plan is for the ST3 and would be deemed, under the Shenandoah UOA, a substitute well for which Cobalt and Venari would each be afforded an election, respectively. Although not internally finalized, a ST3 AFE would likely resemble, from an estimated cost perspective, the ST2 AFE ($51MM).

It is highly likely Anadarko would secure internal approval to fund its current working interest share (70%) of a ST3, but in this instance, will likely only make an internal recommendation to do so if both Cobalt and Venari were supportive of same.

Attached is the directional plan for the ST3. Please review and advise *ASAP* if your company would likely support an AFE for the ST3. If so, an AFE would be formally submitted for your review and election.

Call with any questions. Thanks.

CONFIDENTIAL

# Exhibit 38

**To:** McGrievy, Pat[Pat.McGrievy@anadarko.com]
**Cc:** Oudin, Chip[Chip.Oudin@anadarko.com]; Chandler, Paul[Paul.Chandler@anadarko.com]; Prosser, Wendy[Wendy.Prosser@anadarko.com]
**From:** Frye, Lea[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=VBL604]
**Sent:** Wed 1/13/2016 7:40:50 PM Coordinated Universal Time
**Subject:** Final Resource Distribution
**Attachment:** 01-13-2016_Joint_Expl_Dev_Resource_.pptx

Pat,

Please find attached the joint exploration and development resource distribution and MMRA summary. The two groups met this morning and came to agreement on the Multi-zone Method derived resources. This was a comprise between the two groups on methodology and on the low side of the distribution. While the exploration group still believes the low side is too low and the development group stills believes the low side is too high, we agreed to go forward with the Multi-zone Method of combining two MMRAs, one for the West side of the field and one for the East side of the field, and applying some risk that the East side of Shenandoah could fail entirely. Over all, we are pleased with the end result.

Lea

CONFIDENTIAL

APC-00663563



**Shenandoah Un-Risked Geolgic Resource Estimates**

| Recoverable Resource | Prospect Aggregate Geologic | | | Prospect Aggregate Commercial | | |
|---|---|---|---|---|---|---|
| Thresholds | Zone and Prospect level thresholds NEVER applied. | | | Zone Thresholds disabled. Prospect Threshold applied (167 MMBO / 200 BCF) | | |
| Product | Liquids | Gas | Equivalent | Liquids | Gas | Equivalent |
| Units | MMBO | BCF | MMBOE | MMBO | BCF | MMBOE |
| P99 | 75.955 | 90.244 | 90.996 | 173.506 | 204.656 | 207.618 |
| P90 | 154.764 | 182.451 | 185.174 | 220.041 | 259.194 | 263.249 |
| Mode | 266.331 | 312.598 | 318.345 | 264.686 | 310.755 | 316.433 |
| P50 | 340.220 | 400.443 | 406.948 | 362.517 | 426.457 | 433.584 |
| Mean (P99->P01)* | 356.635 | 418.990 | 426.467 | 385.685 | 453.015 | 461.188 |
| P10 | 580.335 | 679.648 | 693.582 | 599.641 | 701.484 | 716.549 |
| P01 | 876.075 | 1,022.584 | 1,046.506 | 891.432 | 1,040.218 | 1,064.798 |
| Chance | NA | NA | 100.0% | NA | NA | 88.2% |
| Chance>=Mean** | NA | NA | 45.7% | NA | NA | 38.9% |
| Percentile sorting | Sorted | Sorted | Sorted | Sorted | Sorted | Sorted |
| Details | Number of Zones: 2 Zone Chance Dependency: FULLY INDEPENDENT | | | Chance trigger: Total HC Equivalent Resources: BOTH phases | | |

# Exhibit 39

**To:** Walker, Al[Al.Walker@anadarko.com]; Reeves, Bobby[Bobby.Reeves@anadarko.com]; Gwin, Robert[Robert.Gwin@anadarko.com]; Ingram, Mitch[mitch.ingram@anadarko.com]; Daniels, Bob[Bob.Daniels@anadarko.com]; Hollek, Darrell[Darrell.Hollek@anadarko.com]; Kleckner, Jim[Jim.Kleckner@anadarko.com]
**Cc:** Bevers, Tracie[Tracie.Bevers@anadarko.com]; Black, Emelie[Emelie.Black@anadarko.com]; Kirchhofer, Ruth[Ruth.Kirchhofer@anadarko.com]; Rising, Janis [Janis.Rising@anadarko.com]; Sanchez, Candice[Candice.Sanchez@anadarko.com]
**From:** Rodriguez, Susie[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=KXN075]
**Sent:** Sun 1/31/2016 11:51:13 PM Coordinated Universal Time
**Subject:** Shenandoah Pre-read Material for EC Review
**Attachment:** Shen5_approval_ review_EC_preRead.pptx

Please find the Shenandoah pre-read attached for tomorrow's EC Meeting.

Thank you and have a great evening,

*Susie Rodriguez*

Sr. Executive Assistant to Jim Kleckner
EVP, International & Deepwater Operations
*Anadarko Petroleum Corporation*
*1201 Lake Robbins Dr.*
*The Woodlands, TX 77380*
832-636-8484

CONFIDENTIAL

APC-00223098



# Shenandoah 5, WR 51 #4 Appraisal Well Proposal (Pre-read)

### February 1st, 2016



- **AFE Cost of $210 MM to drill & Evaluate East Flank of Shenandoah Structure**

- **Well Appraisal Findings and Future Appraisal Assumptions:**
  - Shen 4ST & bypass wells reveal additional Structural Complexity on West Flank
  - Achieving commercial threshold likely requires success at Shen 5 & Shen 6; designed as "Keeper" wells
  - ST keeper well tentatively scheduled for Q4, 2017; chance for deferral
  - Extends SOP to early Q2, 2018 or possibly later

# Shenandoah Appraisal Plan

## Shen 5 Drilled as a Vertical Well (Keeper Well)

- Establish existence of Upper & Lower Wilcox pay
- Determine pressure connectivity
- Extend known resources to the east

.

## Shen 5 Success Next Operation

## Shen 6 drilled as a vertical well

- Establish presence of water contact or extends LKO
- Extend field limits further to the east
- Further establish proven area of reservoir
- Potential Sidetrack to the north for keeper well design

# Shenandoah WR 51 #4 Well Recommendation

## Drill 600' Updip to the Shenandoah #2 (WR 51 #2) testing the central area of the reservoir

- AFE = $210 MM Gross, APC net at 30% = 63 MM
- Shenandoah Partnership: APC=30%, COP=30%, Cobalt=20%, Marathon-10%, Venari=10%
- Well anticipated to spud by March 2016 with the Diamond BlackHawk (APC Operated)

## Primary Objectives

- Extend Wilcox proven reservoirs to the east
- Confirm fault model by pressures relative to Shen 2 and Shen1
- Move project closer to a minimum economic field size for sanctioning



A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N



Structural Cross Section
Across Shenandoah Field Area

Index Map

ANADARKO PETROLEUM CORPORATION

NW

NE

**Shen 4   Shen 4ST**     **Shen 2**     **Prop. Shen 5**     **Shen 1**     **EP L Loc. - Shen 6**     **Shen 3**

WR51 ANA #3   WR51 ANA #3ST1     WR 51 ANA #2     PROP WR 51-E     WR 52 ANA #1BP2     PROP WR 52-L     WR 52 ANA #2 FINAL

Base of Salt

Oligocene Carb. Marker

Top Eocene

Top Upper Wilcox\Base Marls

Upper Wilcox 1

Upper Wilcox 2

Upper Wilcox 3

Lower Wilcox A

Lower Wilcox B

Lower Wilcox C

Lower Wilcox D

Lower Wilcox E

Top Cretaceous

Salt Stock

TD 31,296'

TD 32,105'

TD 31,405'

**28684' MD**

**30719' MD**

PTD 31,100'

??

TD 30,040'

PTD 31,889'

Base of Salt

Oligocene Carb. Marker

Top Eocene

Top Upper Wilcox\Base Marls

Upper Wilcox 2

Upper Wilcox 3

Lower Wilcox A

Lower Wilcox B

Lower Wilcox C

Lower Wilcox D

Lower Wilcox E

Top Cretaceous

Top Upper Wilcox\Base Marls

Top Lower Wilcox

Top Cretaceous

TD 33,226'

**MD Logs**

**Vertical scale: 1" = 200'**



# Shen-4ST1 to Shen-2 to Shen-5 to Shen-6 to Shen-3

# Stand-alone Development Assumptions

## Assumptions

- **30 Year Field Life (well life 25 yrs.)**

- **1st Oil July 2021**

- **Facility (Spar):**
  - Oil Production: 100K BOPD
  - Gas Production: 120 MMCFD
  - Water Production: 100K BWPD
  - Liquid Production: 120K BLP

## Targeted Zones Phased Development:

- **Phase 1: (all cases)**
  - 4 wells and one flow loop

- **Phase 2: (P50 and P10 only)**
  - 6 additional wells and another flow loop (10 wells total)

- **No Injection**

- **Uptime = 95%**



Targeted Zones

# Decision Tree (100 MPOD Spar No Injection)



# Capital Summary



Gross Un-risked Capital Spend

Capital Split
P50 and P10 Example

# Pre-drill WR 51 #4 Economic Summary
## (Stand-alone Spar Development)

## Risked and Un-risked Mean (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | Mean Gross EUR (MMBOE) | $P_c$ |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | | |
| Risked Mean | 208 | 0.22 | 15.38 | 478 | 0.48 | 16.07 | 412.6 | 88.2% |
| Unrisked Mean | 250 | 0.24 | 15.18 | 557 | 0.50 | 15.87 | 468.0 | 100% |

*Increased facilities costs at $80 oil (market driven)

**In the success case at WR 51 #4 (Shen-5), APC could prove additional resources moving this project toward a sanction decision. The size of the prize is characterized by the current un-risked P10 case below.**

## Un-risked P10 (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | Gross EUR (MMBOE) | $P_c$ |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | | |
| Unrisked P10 | 656 | 0.62 | 9.90 | 1,098 | 0.99 | 10.35 | 717 | 100% |

*Increased facilities costs at $80 oil (market driven)

# Exhibit 40



**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

April 20, 2016

Ms. Amanda M. McMillian
Senior VP, General Counsel, Corporate Secretary and Chief Compliance Officer
Anadarko Petroleum Company
1201 Lake Robbins Drive
The Woodlands, Texas 77380

    Re:    Lea Frye | Sarbanes-Oxley/Dodd-Frank Settlement Demand

Dear Ms. McMillian:

Our law firm represents Lea Frye, who has been placed in a very difficult position by Anadarko Petroleum Company ("Anadarko") through no fault of her own. Ms. Frye has asked to be included in the recent layoffs, but her requests were rejected. Now, she feels trapped, and she has asked us to write to you to explain why she is no longer willing to remain quiet about violations of law that have affected her and threaten to harm many others.

This letter is lengthy in order to provide Anadarko with enough information to make an informed decision about how best to proceed. Ms. Frye is currently on FMLA leave as a result of job-related anxiety and depression. She prefers to resolve this matter and move on with her life while she remains on leave. Accordingly, a deadline for resolution is provided and time is of the essence.

## OVERVIEW

This letter is necessary because in recent years, Lea Frye has witnessed an ongoing pattern of corporate fraud at the highest levels of Anadarko. As the size and dollar value of this fraud has grown, Ms. Frye has become increasingly uncomfortable and has realized that if she remains silent, she risks being perceived as a participant. She is unwilling to do that and has asked us to write in hopes that a resolution can be reached without the need for litigation or an SEC investigation.

Since joining Anadarko in October 2005, Ms. Frye has consistently proven herself to be an exemplary performer. She and other Reservoir Engineers provide reservoir engineering support for Anadarko's deepwater development teams in the Gulf of Mexico. More specifically, Ms. Frye's team provides data that is then ostensibly used to provide economic evaluations of prospective resources to determine whether to move a project forward to production or not.

6750 West Loop South, Suite 616 | Bellaire, TX 77401 | (t): 346-701-8563 | (f): 713-583-9795
www.mincespllc.com

CONFIDENTIAL

AAC-00000002

Ms. Amanda M. McMillian
April 20, 2016
Page 2 of 31

In 2014, Ms. Frye began to work on evaluating the Shenandoah discovery, which is located in Walker Ridge in the Gulf of Mexico. At this time, the Shenandoah project still resided with Anadarko's exploration team for funding of appraisal wells targeted to better define resource potential.

During this period, Ms. Frye and others on the development team furnished data that was ignored and/or manipulated by exploration executives in order to paint a rosy outlook for investors, partners and the general public regarding the Shenandoah project. Economic projections were made with selective disregard for the hard data and scientific analysis Ms. Frye and others are paid to provide. The result is what has now become a billion dollar fraud that Ms. Frye intends to stop before it harms her, colleagues and potentially shareholders and the general public.

As you consider the facts, keep in mind that this is not a demand letter written by a subpar employee with an axe to grind or a job to save. In fact, the opposite is true. Every one of Ms. Frye's performance evaluations proves that her work always meets and often exceeds expectations.[1] She loves the work she does and has formed close relationships with many of her peers, which is among the reasons she elected to seek a resolution without the collateral damage that will result if this litigation and an SEC investigation prove necessary.

## TIMELINE OF EVENTS

### A. Anadarko's pledged allegiance to SEC guidelines

In 2009, the SEC promulgated new rules that govern the reporting of oil and gas reserves. Aware of the strict nature of these rules, Anadarko CEO James T. Hackett's introductory statement in Anadarko's 2012 Reserves and Resources Manual includes the following assurance:

> The Anadarko Petroleum Corporation (Anadarko) Reserves and Resources Manual is provided as a comprehensive reference guide to assist company personnel and ensure accuracy and consistency in estimating and reporting Anadarko's oil and natural gas Reserves and potential Resources. The manual contains federal guidance and our company policies for properly estimating and assigning Proved, Probable, and Possible Reserves, as well as Contingent Resources.

---

[1] For example, in her 2014 and 2015 evaluations, Ms. Frye received an overall score of A1 (usually exceeds but always meets performance standards). *See* Exhibit 5. In 2012, she received an E1—a rare feat that illustrates unusual excellence. Ms. Frye has never once been disciplined for misconduct, rules violations or any performance deficiency.

CONFIDENTIAL

Following these policies, procedures and guidelines, will provide confidence to managers, technical staff, controllers, investors and government agencies that Anadarko's reported Reserves and Resources represent our best estimates in compliance with the appropriate rules and regulations. It is Anadarko's policy to strictly adhere to the U.S. Securities and Exchange Commission (SEC) regulations and SEC staff interpretations for all estimates of Proved, Probable, and Possible Reserves. ... As SEC guidance is not provided for Contingent and Prospective Resources except indirectly, the Society of Petroleum Engineers (SPE) 2007 Petroleum Resources Management System (PRMS) guidelines are utilized unless SEC guidelines take precedence.[2]

The above statements in the Manual are important. Expressly, they promise strict compliance, which inspires confidence in investors and government agencies who trust and rely on the integrity and accuracy with which Anadarko estimates and reports its reserves and potential resources. Implicitly, the verbiage in the Manual acknowledges the potential for abuse and fraud arising from overstating resources and reserves. However, while Mr. Hackett's sentiment pledges transparency and fidelity to the law, Ms. Frye has seen the opposite, as discussed below.

### B. New oil discovered in Walker Ridge 51 and 52

In 2009, Anadarko announced a new oil discovery in the area known as Walker Ridge 51 and 52. The Shenandoah 1 well found a section of porous rock (referred to in industry lingo as "reservoir sand") that for a vertical depth of around 300 feet contained oil that could be recovered. This was accurately reported to the public as an encouraging find.

### C. The Shen 2 well

Following the success of Shenandoah 1, surveys of the surrounding area indicated geological features that could contain oil in this area in significant quantities, enough to justify drilling a second exploratory well that became known as Shenandoah 2 ("Shen 2"). This well—located in Walker Ridge, Block 51— was also a success, prompting Vice President of International and Deepwater Exploration Bob Daniels to describe it as "one of Anadarko's largest oil discoveries in the Gulf of Mexico" attributing the success of the well to rock and fluid properties that were "of much higher quality than previously encountered by the industry in Lower Tertiary discoveries."[3]

---

[2]    *See* Exhibit 2, Reserves and Resources Manual (2012).

[3]    Press Release, Anadarko, Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay (Mar. 19, 2013) (on file with author).

CONFIDENTIAL                                                                      AAC-00000004

### D. Exploration goal: 800+ MBOE

In March 2013, Anadarko held an investor relations conference. During the investor relations conference call, those in attendance were informed of the exploration goal of delivering "800+ Million Barrels of Oil Equivalents (MMBOE)."[4] This statement is significant not because it is evidence of wrongdoing but rather because it created internal pressure and therefore an incentive to exaggerate.

### E. Shen 2 and the March 19, 2013 Press Release

On March 19, 2013, Anadarko issued a press release about the results from its Shen 2 well. The well encountered recoverable oil over 1000 feet vertically of the rock formation they were drilling into.

While this was a very good result for a single well, Anadarko executives claimed "Net Risked Resources" (360 MMBOE) that were overly optimistic. To justify that number, they had to "draw a small fault" around the Shen 1 well, claim the wells were not connected, and then further assume that the vast majority of the geological structure thought to contain oil would be identical to what had been found in the Shen 2 well. This approach was inconsistent with sound science.

Geological faults are important features in oil exploration, since the amount of oil found (and the ability to extract that oil) can change dramatically when a fault line is encountered. In this case, there was no geological evidence to suggest a fault. Nevertheless, a decision was made by Anadarko executives to draw a fault line around the Shen 1 well to indicate a small area where the oil was only 300 feet deep.

The calculated purpose of this exercise was to justify *assuming* that the rest of the feature had uniformly deep oil deposits. Intriguingly, completed geological survey work suggested numerous other faults throughout the structure, yet no mention of those faults was made. The significance of this becomes clear after considering the events that followed.

### F. January 2014: Lea Frye asked to help develop field

In January 2014, Ms. Frye moved from the Eastern Gulf Of Mexico Development group to lead the Shenandoah Pre-Development group, which reported to Pat McGrievy. Her role was to coordinate subsurface efforts with facility efforts to evaluate multiple development scenarios incorporating uncertainty in resource size

---

[4]    *See* Exhibit 3, slide show prospectus entitled "2012 Anadarko Investor Conference: Delivering Differentiating Value," slide 100.

CONFIDENTIAL    AAC-00000005

and recovery, based on different drive mechanisms. At the time, the project was still in the appraisal phase and was being funded by the exploration team.

Among the tasks assigned to Ms. Frye, one was to run economics. Thus, in anticipation of an upcoming meeting to discuss the project, Executive Vice President of Deepwater and International Development Jim Kleckner asked Ms. Frye to develop an economic model that summarized the development team's view of the Shenandoah prospect for an offsite development and exploration meeting.

Specifically, Ms. Frye was asked to focus on current perceived value and any associated risks to that value for Shenandoah. The goal was to use her model to assist the Executive Committee in establishing budgets for the following year, in order to maximize shareholder value.

### G. The February 2014 meeting

On February 19, 2014, a meeting was convened. Along with Ms. Frye, the following people attended the meeting:

- Darrell Hollek (Senior VP Gulf of Mexico and International Development)[5]
- Ernie Leyendecker (VP Gulf of Mexico Exploration)[6]
- David Blakeley (Manager Gulf of Mexico Exploration Engineering)
- David O'Brien (Business Advisor)[7]
- Pat McGrievy (General Manager, DWGOM)

During the meeting, Ms. Frye presented the economics based on all known information about the field. The information she provided was derived by utilizing industry best practice modeling and sensitivity analysis, with input from multiple team members on the integrated project team.

Certain executives did not like Ms. Frye's feedback, even though her findings were developed utilizing best estimates for oil in place, recovery and costs to develop the field. When it was clear that Ms. Frye's feedback did not mirror the overly optimistic claims made by the exploration side of the business, Vice President of Exploration Ernie Leyendecker became noticeably agitated. He viciously berated

---

[5]    Mr. Hollek's current title is Senior Vice President, On Shore Development.

[6]    Mr. Leyendecker has since been promoted to Senior VP, International Deepwater Exploration.

[7]    Mr. O'Brien has since been promoted to the position of General Manager, Delaware Basin - Growth & Technology.

CONFIDENTIAL

AAC-00000006

Ms. Frye during the meeting because her findings were inconsistent with the narrative he preferred. He directed the following derisive remarks at Ms. Frye:

- "You do not know anything"

- "I have worked the Gulf of Mexico longer than you"

- "This is the best field ever ... it is as good as Troika"

These statements were at odds with the hard data, and Ms. Frye's methods were sound. As an engineer, Mr. Leyendecker should have known this. As a reminder, Ms. Frye had been recruited to the project *because* of her expertise. After her input and analysis was minimized, Ms. Frye left the meeting questioning whether the objective of the exploration team was to ascertain reliable data or simply maintain their preconceived, unsupportable assessments of value.

The February 19, 2014 meeting was Ms. Frye's first knowledge of a developing culture within Anadarko's exploration team. Mr. Leyendecker and other executives did not want to hear anything about the Shenandoah project that did not align with their desired outcome.

During the months that followed, it became increasingly clear that leaders of the exploration team did not want Ms. Frye to talk about obstacles such as faulting, lower than ideal recovery factors and increased technology costs because these rather fundamental considerations—if accounted for honestly—would reduce value.

## H. March 4, 2014: Inflated numbers published to shareholders

Ms. Frye's discomfort grew when Anadarko's exploration team ignored scientific data and known facts in exchange for optimistic projections that were published in contravention of accepted principles.

On March 4, 2014, shareholders were presented with inflated information about Anadarko's exploration successes in 2013. For example, the slide show used during the 2014 Investor Conference provided a forecast that was far too optimistic given the science. Slides 74 and 75 approximated "900+ MMBOE in net discovered resources," even though that figure was predicated in part on the grossly overstated Shenandoah resource.[8] True and correct copies of slides 74 and 75 are pasted on the following page.

---

[8]     *See* Exhibit 4, slide show prospectus entitled "2014 Anadarko Investor Conference: Driving Exploration Value Creation," slides 74-75.

## Slide 74

# Industry-Leading Exploration Success Again in 2013

- 67% Deepwater Exploration/Appraisal Success
- 900+ MMBOE Net Discovered Resources
- ~1.5 BBOE Net Resources to Development



Top-10 Deepwater Discoveries*  #5 Orca  #7 Coronado

## Slide 75

- Consistent Outperformance vs. Industry Average



AAC-00000008

Slide 83 is also misleading. It quantifies the size of the exaggeration in dollar figures, advising investors that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity."[9] The following is a cut and paste of that representation:

## Slide 83



Misrepresentations such as this were not innocent. By March 2014, Ms. Frye had spent significant time working with exploration staff to demonstrate how proper use of modeling the available geological information required far lower projections of recoverable oil. She explained why numerous faults crossing the geological feature indicated that, without further appraisal wells, assuming such a large quantity of recoverable oil was inconsistent with scientific data and therefore inappropriate.

Numerous internal documents incriminate Anadarko, some of which are attached to this letter and others of which are not but can be easily accessed. If this matter is not resolved, the SEC will not need to delve too deeply into the data in order to figure out what happened.

---

[9]     See Exhibit 4, slide 83. The overstated value was worsened by Anadarko's understatement of the net capital required to develop the resource. A few months later in 2014, the development team valued the Shenandoah resource at $1.1 billion. Thus, the exploration team's inflated value was an overstatement ranging from 82% (at $2 billion) and 264% (at $4 billion).

CONFIDENTIAL                                                                 AAC-00000009

## I. Shen 3

Following the success of the Shenandoah 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen 3 was also located in Walker Ridge (Block 52), it was quickly apparent that Shen 3 did not have the promise of Shen 2. Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would likely accept distorted findings and projections based on the success of Shen 2. What the general public and the SEC do not know is that Shen 3 is nothing like Shen 2.

Even though Shen 3 was a wet well, the exploration team described it as successful in terms similar to those used to describe Shen 2. They did this in part by redefining the criteria by which resource capacity is projected. Aware that Shen 3 had the same sands (porous rock structure that can hold recoverable oil) that were present in Shen 2, the exploration team analogized Shen 3's resource projections to those of Shen 2. In doing this, they ignored the findings of Ms. Frye and other engineers, even though these persons' expertise is superior to theirs and even though ignoring material facts is inconsistent with both the law and Anadarko's published standards.

The calculated strategy of the exploration team can be accurately described as "piggybacking." This was achieved by deliberately manipulating the facts (and more specifically what was and was not known about Shen 3) and redefining the criteria for optimism when the facts did not match the desired narrative. For example, the exploration team defined oil-water contacts by incorrectly using pressure data obtained from Shen 2 and Shen 3 even though Shen 3 was two miles away from Shen 2, and seismic data indicates a discontinuity (faulting) between the wells that renders projections of oil-water contacts flimsy and unscientific. The development team pointed this out, but their feedback was ignored.

As the exploration team knows, even reliable pressure data is not by itself a definitive indicator of resources. The farther apart two wells are, the less likely the resources in one are cause for optimism in the other. Additionally, while pressure data is one indicator of what is in the well, such data must be considered in conjunction with other mitigating factors.

When projecting the resources in Shen 3, the exploration team looked at pressure data in a vacuum, even though legitimate projections require consideration of all relevant data. For example, Ms. Frye and other development team members identified a rather obvious fault between Shen 2 and Shen 3 that was visible in oil-

---

[10] As you know, a "wet well" is often referred to in the oil and gas industry as a "dry hole."

CONFIDENTIAL                                                    AAC-00000010

based microimaging (OBMI). Executives on the exploration team ignored this and then made overly optimistic resource projections as if this information did not exist. In reality, the proven existence of this fault meant that oil-water contacts could not be extrapolated from data obtained from Shen 2 and Shen 3.[11] Rather, all that could be confirmed from the data in Shen 3 was the highest known water point for the Shen 3 fault block and a lowest known oil point for the Shen 2 fault block.[12] The extrapolation simply ignored the fault, and in doing so overstated the size of the resource in the Walker Ridge Basin.

### J. Shen 4

As with Shen 3, the anticipated size of the Shenandoah 4 ("Shen 4") resource was exaggerated beyond what the science supports.

#### (1) Walker Ridge 51 #3

The well involved multiple penetrations for diagnostic purposes. The first was Walker Ridge 51 #3. This penetration revealed salt, with no discernible sand. Salt is a rock structure that can never yield oil. Further, a portion of the area previously defined as hydrocarbon-bearing is no longer there. Accordingly, the reported size of the resource must necessarily shrink as a matter of established science.

#### (2) Sidetrack well (Walker Ridge 51 #3 ST #1)

The purpose of a sidetrack well is to gain a broader understanding of the size of the resource. Here, the sidetrack well was drilled in order to get away from the salt in the original well in hopes of finding hydrocarbon-bearing sands.

The well did find hydrocarbon in the range of 600+ vertical feet. While still significant, the well was not equivalent to the 1,000 vertical feet seen in the Shen 2 well, which was utilized by exploration to characterize the thickness over the entire Shenandoah area. To overcome this inconvenient obstacle, the mapping was manipulated in order to exaggerate the size of the resource. In other words, the resource-bearing area was overstated by manipulating the mapped area to minimize the impact of the salt encountered by the first penetration. The thickness over the area was still assumed to be analogous to Shen 2, even though only 600 vertical feet was seen in the sidetrack well.

---

[11]    Accurately extrapolating oil-water contact requires evaluation of data within the same fault block.

[12]    This approach was inconsistent with not only guidance provided by the Society of Petroleum Engineers but also SEC regulations as to projecting contacts across fault blocks without well control when defining "proven" or "P90 resources."

CONFIDENTIAL                                                                                                       AAC-00000011

**(3) Bypass Well: Walker Ridge 51 #3 BP #1**

Immediately after the sidetrack, the well was by-passed in order to capture whole core (essentially a core sample) over the hydrocarbon sands. The Walker Ridge bypass well revealed missing sands and a thinner overall section (vertically) than the sidetrack well, which is 200-300 feet away. Why is this significant? Because the proximity of the wells supports the likelihood of thinning (a reduced thickness of the sands (in height)). Thus, it was impossible to legitimately apply the 1000-foot measure across the entire area because of the known differences in thickness.

### K. August 12, 2014: Additional confirmation of faulting

On August 12, 2014, Geological Advisor Paul Chandler provided well log data to the exploration group establishing that faulting exists. He specifically identified a fault in Shen 2 (WR 51 32) that was located above all of the pay zones, while discussing the faulting and fracturing evidence from OBMI data. As explained below, this information was summarily ignored.

### L. August 18, 2014: Leyendecker directive to ignore the faults

On August 18, 2014, emails were exchanged regarding the method by which faulting would be represented in the Shenandoah project going forward. The most notable part of this email exchange was Mr. Leyendecker's "adamant" insistence (as reported by Pat McGrievy and Tim Trautman) that, no maps were to be used that revealed faulting during meetings about the amount of oil that could be recovered from the Shenandoah project.[13] Astonished, members of the development team expressed discomfort with this approach because it concealed highly relevant data.

Mr. Leyendecker's directive was an active suppression of internal data regarding the true size of the Shenandoah resource. This was disturbing for several reasons. First, the SEC prescribes standards regarding the use of defined pressure data to define oil-water contact, and Anadarko's internal standards mirror those of the SEC. Second, Mr. Leyendecker was advocating the deliberate improper analysis of faulting in a way that would skew the data in favor of perceived profitability.

---

[13]     See Exhibit 7, email exchange dated August 18, 2014.

CONFIDENTIAL

AAC-00000012

Ms. Amanda M. McMillian
April 20, 2016
Page 12 of 31

The first diagram below illustrates the *correct* use of SEC defined pressure data when defining oil-water contact. Note that the blank spaces separated by faulting cannot be deemed to have established resources based on current SEC rules.

**Correct Use of SEC Defined Pressure Data to Define Oil Water Contact**



The second diagram illustrates the manner in which Mr. Leyendecker ordered the resource to be mapped. This was a directive to mislead, which violated SEC rules.

**Incorrect Use of SEC Defined Pressure Data to Define Oil Water Contact**



CONFIDENTIAL

AAC-00000013

By communicating that he was "adamant" about his approach to mapping, Mr. Leyendecker chilled people into silent adherence. To avoid any lingering doubt, he and others made repeated references to the mandate that only one map could be shown during presentations.[14] The development team's map (which was consistent with SEC requirements) was prohibited in favor of the exploration group's map, which showed no faults. This suppressed the truth, which was that the Shenandoah project could not produce the volume of oil the exploration team had projected.

### M. February 2-3, 2015: Operations Report and investor call with Daniels

On February 2, 2015 the Operations Report was published. An investor call followed a day later. During that call, Senior Vice President of Exploration Bob Daniels described the recently completed Shen 3 well in glowing terms. In characterizing it as a successful appraisal well, he described over 1,500 feet of "quality sand."

This representation was stunning. The truth is that Shen 3 was a dry hole, and Mr. Daniels had at least constructive knowledge of this. No oil was found, and any claims that Shen 3 helped confirm prior assumptions made from Shen 2 could not be supported by sound science. Once again, a preponderance of internal information confirmed that the message given to shareholders regarding recoverable oil was inaccurate and misleading.

### N. February 17, 2015: Leyendecker continues to massage the message

On February 17, 2015 Mr. Leyendecker canceled a scheduled presentation to be given by Doug Shott (an internal expert not on the exploration team). The reason? He believed the Shott report included "unfavorable" news about the Shenandoah project. In truth, "unfavorable" was a synonym for "real." Mr. Leyendecker did not want the truth about the project to be revealed because it belied numerous, prior representations about the size (and attendant value) of the Shenandoah resource.

### O. October 28, 2015: Q3 earnings call perpetuates unfounded optimism

The exaggerations continued during the Q3 earnings call. When discussing the Shenandoah project (following the completion of Shen 4), Al Walker and Bob Daniels represented that Shen 4 had found even more oil, pushing the known depth of oil down by more than 400 feet. They reiterated their overly optimistic projections, which had since been disproved by information provided by the development team. In fact, they went so far as to claim that the exploration team had now *increased* its assumptions of recoverable oil from the field.

---

[14]     See Exhibit 7, email exchange dated August 18, 2014.

CONFIDENTIAL                                                    AAC-00000014

Ms. Amanda M. McMillian
April 20, 2016
Page 14 of 31

The actual results were in stark contrast to the representations made to shareholders during the earnings call. In addition to being a dry hole, the initial well at Shen 4 also encountered salt. This meant that (1) they were completely out of the formation where oil might be found; and (2) the size of the formation that could hold oil was smaller than originally thought. While a second bore drilled from the Shen 4 sidetrack did locate oil, it was a much smaller amount than the amount found in the Shen 2 well. On top of all this, the Shen 4 well found clear evidence of multiple fault zones. Of course, these were not mentioned during the earnings call.

Any competent reservoir engineer or petroleum geologist knows the above data must be accounted for when determining the amount of oil that can be recovered from a formation. However, Anadarko executives sold a different story with their exaggerated projections. This was inconsistent with the transparency the company has repeatedly promised to shareholders and the general public.

### P. RCT feedback requested

During the process of evaluating Shen 4, it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data. This prompted an evaluation by Anadarko's Risk Consistency Team (RCT), which exists in part to prevent "salesmanship and overly optimistic evaluations of exploration prospects."[15] A stated goal of the RCT is to "minimize personal bias" of those involved in exploration efforts in order to "characterize the subsurface risk and potential of leads and prospects in a consistent manner."[16] With regard to the Shenandoah project, RCT intervention was long overdue.

The feedback from the RCT confirmed the dramatic overstatement of the Shenandoah resource. It was agreed that the exploration team and the development team would work toward a joint representation of the mean number. Thereafter, an agreed-upon mean number was established: 425 MMBOE.

In January 2016, Chris Camden circulated a chart, which illustrates the liberties taken by the exploration team. Note that their most *conservative* estimate of mean MMBOE was higher than the development team's most *aggressive* estimate, even though Ms. Frye and others had repeatedly explained why a downward adjustment to the size of the Shenandoah resource was necessary.[17] Here is the chart:

---

[15]   Dean Hennings, *The Power of the Portfolio*, 9 GEOEXPROM 6 (2013), *available at* http://www.geoexpro.com/articles/2013/06/the-power-of-the-portfolio.

[16]   *Id.*

[17]   As the chart also illustrates, the mean resource size advocated by the exploration team was 755 MBOE, which is startling given the data known to Mr. Leyendecker, Mr. Daniels and others in January 2016.

CONFIDENTIAL                                                    AAC-00000015

Ms. Amanda M. McMillian
April 20, 2016
Page 15 of 31

## Shenandoah Resource Estimates - Post Shen



After 425 MMBOE was agreed upon as the appropriate mean, Mr. Leyendecker, Mr. Daniels, Mr. Trautman and other Anadarko executives knew they were legally obligated to align their reporting with the scientific data. Unfortunately, Anadarko continued to publish an exaggerated resources mean at the insistence of Mr. Daniels.

The chart on the next page—prepared by the exploration team—is an example. As it illustrates, the mean resource size proposed by the RCT was rejected in favor of the inflated mean of 550 MMBOE (a 29.4% exaggeration). Notably, this chart was prepared on January 27, 2016, just *two weeks* after the RCT explained why 425 MMBOE should be the reported mean number going forward.

CONFIDENTIAL

AAC-00000016

Resource Ranges



**Shenandoah Resource Estimates - Post Shen #4**

### Q. Ms. Frye speaks up

Ms. Frye was appalled to learn that Mr. Daniels and others were simply ignoring the RCT feedback and abandoning the agreed-upon mean of 425 MMBOE. She refused to be complicit and made this clear in late January 2016, when she aptly told Mr. McGrievy, "It's wrong."

### R. The size and scope of the Shenandoah misrepresentations

By sizing the Shenandoah resource at 550 MMBOE, Mr. Leyendecker, Mr. Daniels and other Anadarko executives represented to shareholders, investors, partners, the SEC and the general public that the Shenandoah field was the third richest resource *ever* discovered in the Gulf of Mexico.[18] Worse yet, they continued to do this even after the science flatly disproved such a representation.

It is impossible to calculate the monetary effect of the years-long overstatement of the Shenandoah resource. What we do know is that an overstatement by 125 MMBOE amounts to a $5 billion exaggeration at today's depressed oil prices. Further, important questions remain. How much did Anadarko profit as a result of its misrepresentations? How did this effect stock prices and investor confidence?

---

[18]   The only discoveries involving more than 550 MBOE were the Mars and Ursa fields.

   AAC-00000017

While we are not capable of ascertaining the answers to these questions, the SEC will surely seek those answers if an investigation proves necessary.

## S. Anadarko's compensation structure rewards resource exaggerations

Historically, a large part of investor value creation at Anadarko has come through conversion of exploration discoveries to shareholder value through monetization and/or conversion of discoveries to producing assets. This has led to the publication of annual exploration goals to the investor community.

Exaggerations and fuzzy math are actually incentivized by Anadarko's compensation structure. Exploration executives and their team members receive bonuses based on the *published* resource size and the related effect of such publications on the investor community. In other words, the bonus compensation paid to Mr. Leyendecker, Mr. Daniels and others is not deferred until after it is established that their optimistic projections were accurate. Executives receive their bonuses regardless of whether those projections pan out.

Here, there was a direct relationship between the exaggerated size of the Shenandoah resource and the compensation of those involved. Numerous individuals on the exploration team were rewarded with promotions despite their role in misleading the public. Below are examples:

| Name | Career trajectory |
|------|-------------------|
| Ernie Leyendecker | Promoted to Senior Vice President, Exploration (Gulf of Mexico) |
| David Blakeley | Promoted to Director of Exploration Engineering |
| Robert Strickling | Promoted to Reservoir Engineering Manager (Gulf of Mexico) |
| Jake Ramsey | Promoted to Manager Exploration (Regional Team) |
| Beth Kendall | Promoted to Distinguished Geophysical Advisor |

CONFIDENTIAL

AAC-00000018

### T. False representations have not been corrected

Anadarko has compounded its potential liability by never squarely addressing the overstated size and value of the Shenandoah field. The motivation for remaining silent is obvious: the price of Anadarko stock is trading at less than half the value it was a year ago, and now is not an ideal time to inform the world that information provided to shareholders about the Shen 3 and Shen 4 wells was exaggerated rather dramatically for several years.

Statements made during the October 28, 2015 earnings call illustrates that deliberate silence and vague reassurances remain the preferred approach. Below are excerpts from a question-and-answer session between the investment community and Anadarko executives Al Walker (CEO) and Bob Daniels (Executive Vice President):

<u>Statements made by CEO Al Walker</u>

Q:    Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans?

A:    ... It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. ... we pushed the lowest known oil down about 400 feet. ... But we're very encouraged with what we saw and *it was all well within the range of expectation of what we had put out there.* [19]

<u>Statements made by Executive Vice President Bob Daniels</u>[20]

Q:    And then maybe if I could do one quick follow up and you may not have anything to add on Shenandoah, but post the recent appraisal, any thoughts on resource range there at Shenandoah?

A:    On the resource range, *we're riding right where we thought.* We always do a probabilistic resource range. *We're still in that range with the results of the well.* [21]

---

[19]    *See* Exhibit 6, transcript from October 28, 2015 earnings call.

[20]    Mr. Daniels is the Vice President of International and Deepwater Exploration.

[21]    *See* Exhibit 6, transcript from October 28, 2015 earnings call.

CONFIDENTIAL                                    AAC-00000019

Mr. Walker's statements were false. He knew the size of the Shenandoah resource was not actually "all well within range of the expectation of what we had put out there" because his internal experts had repeatedly told him about many factors that would limit the size of the resource. Likewise, Mr. Daniels had actual knowledge that they were not actually "still in that range" when he falsely reassured the investment community.

## LEGAL STANDARDS

### A. The Sarbanes-Oxley Act

#### (1) Overview

The Sarbanes-Oxley Act was the first statute to provide specific whistleblower protection against employer retaliation based on the reporting of not only securities fraud but also corporate fraud generally.[22] The statute's stated purpose was to "protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes."

Since SOX became law, whistleblowers have been protected from retaliation if they provide information to (1) a federal or law enforcement agency; (2) a member or committee of Congress; or (3) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover or terminate misconduct).[23] The phrase "supervisory authority" has been broadly construed,[24] as has the galaxy of persons with authority to "investigate, discover, or terminate misconduct."[25]

#### (2) Protected activity

The Sarbanes-Oxley Act protects reports of information that employees "reasonably believe" to be in violation of the law.[26] The "reasonable belief" standard is met by reported violations of "any rule or regulation of the SEC." Proving actual fraud

---

[22]    *See, e.g., Sylvester v. Parexel Int'l LLC,* ARB 07-123 (ARB May 25, 2011)

[23]    *See* 18 U.S.C. § 1514A(a).

[24]    *See, e.g., Gonzalez v. Colonial Bank,* 2004-SOX039 (ALJ Aug. 20, 2004).

[25]    *See, e.g., Smith v. Hewlett-Packard,* ARB No. 06-064 (ARB Apr. 29, 2008); *Jayaraj v. Pro-Pharmaceuticals, Inc.,* 2003-SOX-32 (ALJ Feb. 11, 2005); *Deremer v. Gulfmark Offshore, Inc.,* 2006-SOX-2 (ALJ June 29, 2007).

[26]    While SOX does not define "reasonable belief," Senator Patrick Leay (D-Vt.)—who was instrumental in the enactment of SOX—has noted that "[t]he threshold [for reasonable belief] is intended to include *all* good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence." (italics added for emphasis)

CONFIDENTIAL                                                    AAC-00000020

against shareholders is not a requirement.[27] Rather, SOX provides that the whistleblowing employee need only show that her belief of fraud is reasonable and that a reasonable person in her position would have believed the conduct constituted a violation. This is not an onerous burden.[28]

The breadth of SOX coverage also extends to reported violations of wrongdoing about which the employer is already aware.[29] Thus, protected activity can be a report of a fraud that has already occurred, a fraud that is ongoing or a fraud the complaining person believes is likely to occur.[30]

As the Administrative Review Board (ARB) has acknowledged, a narrower construction would defeat the intent of the Act and whistleblower law in general, which is aimed in part at preventing a fraud from ever occurring.[31] As such, the reach of SOX is wide-ranging and inclusive, and companies who presume that an employee's complaint is not protected by SOX do so at their peril.[32]

## B. The Dodd-Frank Act

### (1) Overview and legislative intent

The Dodd-Frank Act ("DFA") dramatically increased the risk of corporate fraud and malfeasance. In addition to protecting individuals who provide the SEC with "information relating to a violation of the securities laws,"[33] the statute also protects whistleblowers who initiate, testify or assist in any investigation relating to disclosures that are "required or protected" by SOX, the Securities Exchange Act of 1934 or any other law, rule or regulation of the SEC.[34] The purpose of the DFA was to "motivate those with knowledge to come forward and assist the Government to

---

[27]  *Brown v. Lockheed Martin*, ARB No. 10-050, ALJ No. 2008-SOX-049 (ARB Feb. 28, 2011).

[28]  *See, e.g., Allen v. Administrative Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008); *Inman v. Fannie Mae*, ARB No. 08-060, ALJ No. 2007-SOX-47 (ARB June 28, 2011); *Allen v. Administrative Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008)(SOX "objective reasonableness" standard is analogous to the objective reasonableness standard in Title VII).

[29]  *Allen v. DOL*, 514 F.3d 468 (5th Cir. 2008).

[30]  *See, e.g., Allen v. DOL*, 514 F.3d 468 (5th Cir. 2008); *Sylvester v. Parexel Int'l LLC*, ARB 07-123 (ARB May 25, 2011).

[31]  *See e.g., Getman v. Southwest Securities, Inc.*, 2003-SOX-8 at 20 n.8 (ALJ Feb. 2, 2004), rev'd on other grounds, 2005 WL 4888992 (ARB July 29, 2005); *Prioleau v. Sikorsky Aircraft Corp.*, ARB No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011).

[32]  *See, e.g., Hemphill v. Celanese Corp.*, 2010 WL 2473845 (N.D. Tex. 2010); *Prioleau v. Sikorsky Aircraft Corp.*, ARB No. 10-060, ALJ No. 2010-SOX-3 (ARB Nov. 9, 2011).

[33]  15 U.S.C. § 78u-6(a)(6).

[34]  17 C.F.R. § 21F(h)(1)(A).

CONFIDENTIAL

identify and prosecute persons who have violated securities laws and recover money for victims of financial fraud."[35]

### (2) Additional remedies

The DFA authorizes harsh remedies aimed at motivating compliance and incentivizing whistleblowers. While SOX allows recovery of back pay, the DFA whistleblower-protection provision entitles a prevailing whistleblower to recover two times back pay.[36]

### (3) Longer limitations period

The DFA extended the time frame within which whistleblower claims can be asserted. It expanded the SOX limitations period from 90 days to 180 days. More worrisome for companies is that a DFA claimant has a deadline of six years after the date the retaliation occurs or three years after the date "facts material to the right of action are known or reasonably should have been known to the employee," with a maximum limitations period of ten years.[37] These protections virtually eliminate the previously significant risk of time-barred claims.

### (4) Jury trial and no requirement to exhaust remedies

The DFA does not require claimants to exhaust administrative remedies. Whereas SOX whistleblowers must complain to the Department of Labor, DFA plaintiffs can simply file a lawsuit in federal court, where they are entitled to a jury trial.[38]

### (5) Bounty program for whistleblowers

Section 922 of the DFA entitles whistleblowers to recover monetary awards if they provide information that leads to $1 million or more in criminal and civil proceedings.[39] The goal of the bounty program is "to motivate those with inside knowledge to come forward and assist the Government to identify and prosecute persons who have violated securities laws and recover money for victims of financial fraud."[40]

---

[35]    S. Rep. No. 111-176 at 110-112 (2010).

[36]    *Compare* 15 U.S.C. § 78u–6(h)(1)(C), *with* 18 U.S.C. § 1514A(c)(2). The enabling regulations of the whistleblower program took effect on August 12, 2011 and are codified at 17 C.F.R. parts 240 and 249.

[37]    *Compare* 15 U.S.C. § 78u–6(h)(1)(B)(iii) *with* 18 U.S.C. § 1514A(b)(2)(D).

[38]    *See* 15 U.S.C. § 78u–6(h).

[39]    *See* 15 U.S.C.A. § 78u-6 (2010) (authorizing recovery of between 10% and 30% of the total recovery).

[40]    S. Rep. No. 111-176 at 110-112 (2010).

CONFIDENTIAL                                                                  AAC-00000022

Incentives are necessary because whistleblowers can uncover what audits cannot, and it has become increasingly clear that incentives are a vital component of protecting the public. Insiders with a high degree of sophistication and a sound moral compass can unearth fraud in ways that outsiders cannot. For example, during the Madoff investigation, it was noted that tips from whistleblowers are "13 times more effective than external audits" at uncovering "fraud schemes in public companies."[41]

### (6) DFA's protected activity standard

Generally, a heightened standard for protected activity would be embraced by employers. However, the Fifth Circuit's narrow reading of protected activity may have the effect of motivating employees to skip internal reports and go directly to the SEC.

In *Asadi v. GE Energy*, the Fifth Circuit read the DFA whistleblower provision to apply only to individuals who report a securities violation to the SEC. Since Asadi's complaints were only made within the company, he was not protected, and summary judgment was affirmed.[12] This reading of the law should concern employers because it encourages employees to make their first report of perceived fraud or other violations to the SEC.

### C. Rule 10b-5 Violations

### (1) Rule prohibits material misrepresentations and omissions

A common form of securities fraud is the misrepresentation of a material fact by either act or omission. The controlling statute is 17 C.F.R. §240.10b-5, commonly referred to as "Rule 10b-5," which forms the basis for many investor-led securities fraud lawsuits. Here is the key language:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or

---

[41]    *Id.*

[12]    720 F.3d 620 (5th Cir. 2013).

                                                    AAC-00000023

would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The term "material" refers to information about which the average investor should be informed before buying or selling a security. Although the code does not provide examples, facts generally considered to be material include the risks associated with a particular investment and statements about the company's health.

### (2) Anadarko violated Rule 10b-5

Here, the exploration team violated Rule 10b-5 on a massive scale by repeatedly overstating the size of the Shenandoah resource. Underneath this global violation was a years-long series of misrepresentations and omissions of material fact. Along the way, they demonstrated an intent to mislead by hiding faults, ignoring science, ignoring RCT feedback and even attempting to silence and intimidate those who spoke up, such as Ms. Frye. Collectively, this sequence of events proves scienter.

Here is one example, from page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. *The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.*

The italicized excerpt was a misstatement of fact. As already discussed, the exploration team defined oil-water contacts in Shen 3 in disregard of established scientific principles. Shen 3 was two miles away from Shen 2, and seismic data showed faulting between the wells. Given this, oil-water contact could not be projected. Yet it was, and Anadarko published it as fact. This statement alone would draw significant scrutiny from the SEC, and any investigation will confirm that the exploration team knowingly misled the public.

### (3) Role of resources in share price proves materiality

It is no secret that resources and reserves are among the metrics that drive Anadarko's share price. When they characterized the Shenandoah resources as the third-largest resource ever found in the Gulf of Mexico, Mr. Leyendecker, Mr. Daniels and others on the exploration team knew the effect their representations would have on the investment community. Their manipulations of the verbiage and mapping used in reference to the Shenandoah resource was an effort to mislead the public into believing that the Shenandoah resource (and therefore Anadarko) were more robust than the science established. As Shell found out the hard way, the consequences for such actions are severe.

CONFIDENTIAL

### D. The Shell Case

Roughly a decade ago, Shell paid a penalty of $120 million after an SEC investigation revealed a pattern of misrepresentations.[43] There is no telling what Shell paid to repair the collateral damage.[44]

The investigation was triggered by Shell's "overstatement of proved reserves," along with its "delay in correcting the overstatement."[45] The SEC also took note of "the lack of effective internal controls over the reserves estimation and reporting process."[46] The evidence established that Shell ignored repeated warnings that proved reserves had been overstated by unrealistic production forecasts. Instead of making the necessary adjustments, Shell attempted to "manage" the information flow by manipulating the data.[47]

While there are certainly differences, there are also similarities between the predicament Shell faced in 2003 and the potential liabilities created by Anadarko's exploration executives. Just as Shell overstated reserves, Anadarko has overstated the size of the Shenandoah resource.

We understand that reserves and resources are different, but as Anadarko's Reserves and Resources Manual indicates, both can affect share price, and both are subject to potential SEC scrutiny. This is why the Manual notes that reporting on reserves *and resources* should represent "best estimates in compliance with the appropriate rules and regulations" of not only the SEC but also the Society of Petroleum Engineers.[48] When reporting about the Shenandoah resource, Anadarko failed to meet these standards.

---

[43] *See S.E.C. v. Royal Dutch Petroleum Company and The "Shell" Transport and Trading Co., p.l.c.*, H-04-3359 (S.D. Tex.) (Aug. 24, 2004).

[44] For example, Shell was required to commit $5 million to developing and implementing a comprehensive internal compliance program, with SEC oversight thereafter.

[45] Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[46] *Id.*

[47] *Id.*

[48] *See* Exhibit 2, Reserves and Resources Manual (2012).

CONFIDENTIAL

AAC-00000025

There are other similarities in both scienter and scope. For example, the SEC concluded that Shell had overstated proved reserves by 4.47 billion barrels of hydrocarbon reserves (approximately 23%).[49] Here, Anadarko has overstated the Shenandoah resource size by 125 MMBOE, which amounts to a 29.4% exaggeration.[50] Shell was deemed to have overstated future cash flows by approximately $6.6 billion.[51] Similarly, after the development team valued the Shenandoah resource at $1.1 billion in 2014, Anadarko then published the value range as a "$2-4 billion net opportunity." This range was 82% higher than reality at the low end ($2 billion) and 264% higher than reality at the high end ($4 billion).

We mention the Shell case because it illustrates the potential consequences of a government investigation. The SEC takes no prisoners. The Shell case involved considerable public scrutiny, and this was deliberate. SEC administrators made it known that deterring future misrepresentations requires "a strong enforcement response" and "significant civil penalties."[52] Further, the investigation will not necessarily stop once Anadarko is punished. As the SEC pointed out during the Shell case, a complete investigation requires "focus on, among other things, the people responsible."[53] As you know, individuals are not immune from liability.

### IMPACT ON LEA FRYE'S LIFE

Until joining the Shenandoah project, Lea Frye loved her job. She was happy at work and happy at home. This all changed when Ms. Frye had to decide between being an accomplice to unlawful activity and working in an uncomfortable environment. While others may have been able to leave it all at the office, Ms. Frye could not.

---

[49] Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[50] As a reminder, Anadarko continued to use the inflated figure of 550 MMBOE as recently as January 27, 2016, immediately after the RCT had completed its analysis and then concluded that 425 MMBOE should be the operative figure based on the applicable data.

[51] Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[52] Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[53] Id.

CONFIDENTIAL

Originally, Ms. Frye assumed those involved in the Shenandoah project would reverse course and do the right thing if she continued to redirect them to the science. Regrettably, this did not happen. Instead, the opposite was true: the more assertive Ms. Frye became, the more those above her tried to intimidate her into quiet obsequiousness. She was attacked, berated, ignored, ordered to use phony maps and excluded from meetings.

## A. Health problems

The stress at work was compounded by stress at home. Ms. Frye gained 35 pounds and endured constant pain in her back and neck. She could no longer get consistent, restful sleep, in part because of work-related anxiety and fear and in part because of physical discomfort.

All of this led to depression and damage to Ms. Frye's most important relationships. She would come home exhausted—not from arduous work or long hours, but rather from the weight and fatigue of wondering when the other shoe might drop and what life might look like when that happens. Her teenage son began to struggle academically and became angry, withdrawn and depressed himself as he watched his mother's overall well-being deteriorate. Her marriage suffered, and tensions grew to a point that her husband ultimately cornered her to ask "what is it going to take to get my wife back?"

## B. Layoff request refused; medical care required

Aware of recent mass layoffs company-wide, Ms. Frye asked to be included in the layoffs in hopes of simply moving on with her life and getting out of a toxic environment. On February 19, 2016, she notified both Anadarko HR personnel and Pat McGrievy that it would be in the best interest of both Ms. Frye and the company if she could be included in the next layoff. A few weeks later, the next round of layoffs was announced, and Ms. Frye was not included.

In March 2016, it became clear that Ms. Frye needed medical care. Her physician diagnosed work-related stress, anxiety and depression and recommended FMLA leave. [54] Since then, Ms. Frye has realized that (1) there is no reason to believe that Anadarko plans to take steps to remedy the issues discussed in this letter; and (2) she has the opportunity to give Anadarko the chance to stop future fraud without taking the kind of scorched earth approach the whistleblower statutes encourage.

---

[54]     Currently on FMLA leave; expires on April 29, 2016.

CONFIDENTIAL

AAC-00000027

Ms. Amanda M. McMillian
April 20, 2016
Page 27 of 31

### SETTLEMENT DEMAND

Mr. Leyendecker, Mr. Daniels and others have exposed Anadarko to massive liability by touting numbers that equate to a five-run home run. As the legislative history of the DFA recognizes, "whistleblowers often face the difficult choice between telling the truth and the risk of committing 'career suicide.'"[55] Ms. Frye has a firsthand understanding of this predicament.

To be clear, Ms. Frye is not resigning. Rather, she is demanding severance pay and other benefits as part of an agreed separation that will enable her to leave Anadarko, repair the damage done to her life and transition into a new job and perhaps a new career. While her desire to refrain from filing an SEC complaint may not undo the harm done to shareholders, Ms. Frye hopes this letter will deter future misrepresentations and protect her colleagues from the unenviable situation she has endured. Following are Ms. Frye's demands:

1) A lump sum payment of $940,325.00, which includes a component for attorney's fees; [56]

2) A paragraph in the separation agreement promising no future misrepresentations regarding the Shenandoah resource;

3) Internal personnel records characterizing her departure from Anadarko as a resignation (she is glad to provide a resignation letter);

4) A short letter recommending Ms. Frye to prospective employers with agreed-upon verbiage;

5) Agreed language in the separation agreement providing that any confidentiality and non-disparagement provisions are mutually applicable to Ms. Frye and management-level employees of Anadarko;

6) The company's assurance that it will not contest Ms. Frye's unemployment claim should she elect to seek unemployment benefits from the Texas Workforce Commission;

---

[55]  S. Rep. No. 111-176 at 110-112 (2010).

[56]  The sum demanded is not arbitrary. It was calculated by adding the following: (1) basic severance pay of $179,172 (calculated in accordance with Anadarko's Severance Plan); (2) the dollar value of Ms. Frye's unvested stock awards ($55,000); (3) Ms. Frye's prorated 2016 AIP bonus ($14,916); (4) the estimated COBRA subsidy for six months ($8,000); (5) compensatory damages in the amount of Ms. Frye's severance pay ($179,172); (6) two years front pay at Ms. Frye's current rate of pay ($340,000); and (7) attorney's fees in the amount of $164,065.

CONFIDENTIAL

7) A mutual release, with indemnity to Ms. Frye for all liability arising from the acts and omissions described in this letter; and

8) Assistance in helping Ms. Frye obtain a lump sum payout of her vested pension plan (valued at approximately $236,993 in October 2015).[57]

Between now and May 6, 2016, Anadarko will have the opportunity to resolve this dispute quietly and confidentially,[58] without collateral damage. If a resolution is reached, Mrs. Frye will refrain from filing the lawsuit and will sign a separation agreement that includes a full and final release of all claims.

While Ms. Frye suspects that contacting the SEC and pursuing a bounty would be more lucrative, that is not her preferred approach. She has no desire to take action that will harm friends, coworkers and the company at large. Despite her miserable experience during the past few years, Ms. Frye respects Anadarko and hopes to avoid doing collateral damage to the company during a difficult economic period. Also, she hates the spotlight and has no desire to provide sound bites during the inevitable feeding frenzy that will begin once the media realizes the size and significance of the matters discussed in this letter.

ANALYSIS OF ANADARKO'S OPTIONS

Since much of our firm's practice is devoted to representing companies, we understand that Anadarko will not relish the prospect of paying a significant sum to resolve this case. However, this approach is the best business decision because the other options have no upside and entail exponentially more risk.

## A. Ms. Frye's return to work

Ms. Frye found her working environment intolerable before she retained our law firm. If she is forced to return to work now, it will be worse because there can be no trust. She will be a pariah, and she knows this is unavoidable. While her bosses may be coached to refrain from overt retaliation, Ms. Frye knows she will be detested. Further, and perhaps more critically from Anadarko's perspective, she will continue to have access to information that may later prove to be a liability if the SEC does investigate. Thus, Ms. Frye's return to work following FMLA leave is a dangerous prospect for Anadarko and a miserable, unhealthy prospect for her.

---

[57]    For obvious ERISA reasons, this sum is not considered to be part of the settlement demand.

[58]    Since Ms. Frye seeks an expeditious resolution, she has not informed coworkers or anybody else that she has retained counsel or sent this demand letter. She has also not disclosed her intended departure from the company.

                                                   AAC-00000029

## B. A return to work followed by a termination

We suspect Anadarko is too sophisticated to terminate Ms. Frye shortly after she returns to work.[59] She has a spotless record, will be returning from FMLA leave and has just engaged in protected activity. Regardless, since we cannot rule out such a scenario, a discussion of the consequences of such an approach is warranted.

Any firing will add to Ms. Frye's claims under both SOX and the DFA. A firing will incentivize her to notify the SEC and seek a bounty that will far exceed the amount demanded. Should that occur, Anadarko will be adverse to Ms. Frye and the SEC at the same time and will have no opportunity a "win" for a host of reasons:

- Ms. Frye has engaged in protected activity. She opposed actions she believed in good faith to be unlawful based on her training, education and experience, and disclosures made by employees concerning reasonably perceived violations of SEC rules governing internal control standards can constitute protected conduct under SOX.

- Since engaging in protected activity, Ms. Frye has been berated in the presence of her peers, subjected to derogatory comments, harassment, intimidation and veiled threats (from Mr. Leyendecker and Mr. Trautman) and has been excluded from meetings she should have been invited to attend.[60]

- In recent months, roughly 1,000 Anadarko employees have been laid off. Ms. Frye asked to be put on a layoff list, and her request was rejected.[61] If she is now "laid off" after Anadarko receives this letter, an inference of retaliation will be logical (unless her layoff is the product of an agreed separation on terms Ms. Frye proposes).

- The causation standard for SOX claims is preponderance of the evidence that protected activity was a "contributing factor." The ARB has expressly rejected efforts to impose higher standards such as "significant," "motivating," "substantial" or "predominant."

---

[59]    In addition to her protected activity at work, this letter is also a form of protected activity.

[60]    As you are aware, the DFA also protects employees from demotions and suspensions along with more subtle and amorphous forms of retaliation such as threats, harassment, blacklisting, discipline and intimidation. Even adverse actions that are "indirect" can violate the anti-retaliation provision.

[61]    We are not suggesting that not being laid off is an adverse action. However, a layoff that closely follows this demand letter will clearly satisfy the criteria for an adverse action, particularly since Ms. Frye's prior requests to be laid off were summarily rejected.

CONFIDENTIAL                                                                AAC-00000030

- SOX authorizes Ms. Frye to recover "special damages" for emotional distress, impaired reputation, personal humiliation and other non-economic harm, and these damages are uncapped. Following recent SOX trials in other states, juries have awarded $1.6 million (New York) and $6 million (California).

- If Ms. Frye is required to pursue her claims, those forced to give depositions will include Bob Daniels, Ernie Leyendecker, Tim Trautman, David Blakeley, Robert Strickling, Beth Kendall and Jake Ramsey. Such depositions will expose Anadarko to significant ongoing liability that exceeds the scope of Ms. Frye's claims.

## C. Risks of an SEC investigation

If this matter cannot be resolved and an SEC investigation ensues, Anadarko has significant cause for concern. As you know, the SEC need not limit the scope of its investigation into Ms. Frye's specific allegations. Thus, the inquiry could grow to whatever extent the SEC decides is necessary. Ms. Frye and others on the development team will have little difficulty pointing the SEC in the right direction, and records attached to this letter will provide a helpful starting point.

Further, the potential for shareholder claims looms. As you know, parties who bring a successful 10b-5 claim are entitled to "actual damages," which can include the amount of the original investment. Considering that many investors likely purchased their shares high only to see them depreciate in value, this would not be an ideal time for the public to learn that those shares may have been overvalued by misrepresentations.[62] Now more than ever, the general public believes that large-scale corporate fraud is more common than previously imagined. As you are no doubt aware, perceptions such as this can be more dangerous than reality, and the damage done by an investigation will be done long before its outcome is determined.

Since we know you understand these risks, we will not belabor this discussion.

## D. Benefits of a resolution

The benefits of a confidential severance agreement are obvious. Ms. Frye will refrain from initiating any form of litigation and will not initiate an SEC investigation. If she had intended that approach, she would have done so already and would not have insisted on sending a 31-page letter that revealed Anadarko's

---

[62]    In any litigation (including cases initiated by shareholders), Ms. Frye would be a dual-capacity witness (fact witness and non-retained expert) because she has unique and specialized knowledge that could assist the trier of fact. *See* FED. R. EVID. 702.

CONFIDENTIAL

AAC-00000031

wrongdoing (and her legal arguments) in granular detail. She insisted on a measured approach that places the ball squarely in Anadarko's court.

There is no question that Ms. Frye hopes to deter future misrepresentations without litigation or government intervention. She wants to move on with her life, start anew, get healthy and focus on her family. She has no desire to do more harm to anybody than is necessary. However, please do not mistake any of this for weakness. Ms. Frye has made clear that if a resolution is not reached, she is prepared to place her trust in the SEC and our courts.

## LITIGATION HOLD REQUEST

As we have made clear, Ms. Frye hopes to avoid litigation. However, since it is unclear whether this is realistic, she requests that Anadarko take all steps necessary to ensure that relevant evidence is preserved. To that end, a litigation hold letter is attached as Exhibit 1 to this letter. It specifically identifies the categories of documents and information that Anadarko must take affirmative steps to preserve. This obligation encompasses but is not limited to email communications and other electronic data in its native format.

## CONCLUSION

Despite recent events, we know that Anadarko has an excellent reputation and a history of doing right by its employees and shareholders. Ms. Frye has fond memories of most of her employment with Anadarko and holds the company and many of her coworkers in high regard. However, the liability in this situation is clear, and the laws implicated are unforgiving. The exposure is significant, and a number of collateral risks can be avoided by a sound business decision.

We look forward to your response on or before 3:00 p.m. (Central Standard Time) on May 6, 2016 and hope your leadership team will treat this matter with the seriousness it clearly warrants.

Very truly yours,

David M. Minces

CONFIDENTIAL

AAC-00000032