# Exhibit 41



**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

May 9, 2016

Andrew Ceresney, Director          Mr. Shamoil Shipchandler
SEC Office of the Whistleblower    Regional Director
100 F Street NE                    801 Cherry Street
Mail Stop 5631                     Suite 1900, Unit 18
Washington, DC 20549               Fort Worth, TX 76102

Re:  Lea Frye | Summary of Dodd-Frank Act Violations by Anadarko

Dear Mr. Ceresney and Mr. Shipchandler:

I am writing on behalf of my client, Lea Frye. Attached to this letter is a lengthy letter summarizing the specific ways that Anadarko executives have violated the Dodd-Frank Act. Below is a summary of the contents of the letter in hopes that the more detailed letter will be an easier read once you have a summary of its contents.

## EXECUTIVE SUMMARY

What follows is a classic case of company executives achieving financial gains through the manipulation and falsification of information provided to shareholders. The evidence provided in the attached letter is detailed and specific, utilizing original source documents and emails to build a case that we believe demands the attention of the Commission.

The source documents are full of industry and company-specific lingo, as well as complicated scientific terminology. However, Ms. Frye is committed to helping the Commission understand that terminology and its significance with regard to Anadarko's actions, and the attached letter is a starting point. Because of her education, training, experience and insider knowledge, Ms. Frye is willing and able to provide context regarding the roles of those involved (and their agendas) and guide the Commission to the location and sources of additional evidence.

Anadarko Petroleum Corporation ("Anadarko") is recognized in the oil and gas industry for its expertise on the exploration side of the business. As with other exploration companies, Anadarko places a premium on developing "Resources," which is the industry term used to describe new oil and gas finds that have not yet been developed into "Proven Reserves." As you are no doubt aware, resources are a key measure that investors use to calculate the expected financial return of the company. In general, changes in stated resources lead directly to changes in the price of the exploration company's stock.

6750 West Loop South, Suite 616 | Bellaire, TX 77401 | (t): 346-701-8563 | (f): 713-583-9795
www.mincespllc.com

CONFIDENTIAL                                                     APC-00113302

Because of the importance of resources to investors, there are very clear and specific industry guidelines that mandate the manner in which resources must be assessed and calculated. Aware of this and hoping to convey a commitment to law-abiding transparency, Anadarko publishes its own guidelines on the reporting of resources, with an obvious goal of assuring investors that they can have confidence in the accuracy and scrupulousness with which Anadarko reports on its resources.

For the past two years, this has not happened. As the attached letter explains in detail, Ms. Frye is aware of many examples in which Anadarko intentionally disregarded the applicable guidelines. The effect was a years-long overstatement of resources by several billion dollars. Ms. Frye has the specific information that proves this, as the attached letter discusses in more detail.

## A. Anadarko's reporting on the Shenandoah Basin project

In 2013, Anadarko drilled an exploratory in the Shenandoah Basin that was nicknamed "Shen 2". It was a follow-up to the modestly encouraging "Shen 1" well, which found approximately 300 feet of oil-bearing deposits in the same geological formation.

The Shen 2 well was by all standards a very good well, in that it found oil deposits that were over 1000 feet thick. However, the Exploration Vice President in charge of the project (Ernie Leyendecker) decided, based on this single well, to announce that Anadarko had just made one of the largest new oil discoveries ever made in the Gulf of Mexico. He justified this proclamation by claiming that the entire large surrounding area (often referred to as "The Shenandoah Basin") was expected to be as good as or better than the well that was just drilled.

Mr. Leyendecker's staff produced an analysis determining that the company had added approximately 1200 million gross barrels of oil equivalents (MMBOE, explained in detail below). This unsupportable optimism was then incorporated into materials that Senior Vice President of Exploration Bob Daniels delivered to investors in many different venues and formats. Unfortunately, as we describe in detail, this valuation was essentially a sham, and the supporting analysis violated most of the guidelines in place for accurate reporting of resources.

## B. Internal feedback ignored

Those who reported to Mr. Leyendecker and supported the inflated numbers were typically promoted. Those (such as Ms. Frye) who honestly evaluated the data, adhered to the applicable protocols for estimating the resource value (which led to far more modest projections) and spoke up were bullied, intimidated, and shut out of meetings that they were supposed to attend.

CONFIDENTIAL

APC-00113303

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 07/25/17 Page 3 of 107

When individuals (including but not limited to Ms. Frye) from other parts of the company were vocal about the need to report more accurately about the Shenandoah resource, Anadarko's RCT team was enlisted. This team consists of experts from other parts of the company that review the methods used to report on resources. In other words, they serve an internal audit function, and they were specifically asked to examine the Shenandoah project and more specifically the size of the Shenandoah resource. Their feedback was also ignored.

After reviewing the available geological data that Anadarko possessed, the RCT team was very clear in finding that the resource claims made by exploration executives needed a significant downward adjustment. While internal estimates of the find have since been lowered—with additional data from subsequent wells continuing to indicate a much smaller potential for the basin—Anadarko has never gone back to investors to correct the initial inflated values that were represented to the public. In fact, in subsequent investor calls, Senior Vice President of Exploration Bob Daniels has done the opposite, reassuring investors with statements indicating that in terms of Shenandoah, "everything was still coming in according to our initial estimates." This and other examples are discussed in chronological fashion in the attached letter, which is amply supported by internal Anadarko documents and publicly-available information.

## C. Insider trading suspected

It also warrants mention that since the announcement of the Shen 2 well results, Senior Vice President of Exploration Bob Daniels has sold over $12 million of his Anadarko stock (NYSE: APC). He should be well aware of the internal evidence that the field is not likely to be nearly as valuable as he has stated to shareholders, yet he has clearly profited from selling stock to buyers who were not privy to these facts. The stock sales of Ernie Leyendecker are not publicly available, but we suspect that he too has profited from selling Anadarko stock at just the right time with the benefit of inside information. Accordingly, we hope the Commission will investigate this.

## D. Effect on Lea Frye's life

The events of the past two years have taken a considerable toll on Ms. Frye and her family. Repeatedly, she tried to get Anadarko to follow ethical procedures. The stress at work was compounded by stress at home. Ms. Frye gained 35 pounds and endured constant pain in her back and neck. She could no longer get consistent, restful sleep, in part because of work-related anxiety and fear and in part because of physical discomfort.

CONFIDENTIAL

APC-00113304

All of this led to depression and damage to Ms. Frye's most important relationships. She would come home from work exhausted—not from arduous work or long hours, but rather from the weight and fatigue of wondering when the other shoe might drop and what life might look like when that happens. Her teenage son began to struggle academically and became angry, withdrawn and depressed himself as he watched his mother's overall well-being deteriorate. Her marriage suffered, and tensions grew to a point that her husband ultimately cornered her to ask "What is it going to take to get my wife back?"

Ms. Frye is currently on extended medical leave as a result of depression and anxiety. However, her condition is improving, and she is ready to expose the truth.

### E. In-person meeting requested

While much evidence is presented in the attached letter, Ms. Frye would appreciate the chance to provide the Commission with her personal narrative, and she will gladly be a resource who can provide investigators with the questions to ask and the names of the people who should answer them. She can tell you where to find evidence and who will validate the data she has provided. If the Commission will allow it, Ms. Frye can make its job easier and help prevent others from being harmed by Anadarko's fraud. To that end, we would appreciate the chance to meet with Commission investigators as soon as possible.

We appreciate your attention to the information Ms. Frye has provided, and we ask that you look into this situation with the utmost urgency.

Respectfully,

David M. Minces

CONFIDENTIAL

APC-00113305



**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

May 9, 2016

Andrew Ceresney, Director
SEC Office of the Whistleblower
100 F Street NE
Mail Stop 5631
Washington, DC 20549

Mr. Shamoil Shipchandler
Regional Director
801 Cherry Street
Suite 1900, Unit 18
Fort Worth, TX 76102

Re: Lea Frye | Violations of Law by Anadarko

Dear Mr. Ceresney and Mr. Shipchandler:

I am writing on behalf of my client, Lea Frye, who has been placed in a very difficult position by Anadarko Petroleum Company ("Anadarko") through no fault of her own. Ms. Frye has felt trapped in a difficult predicament, and she is no longer willing to remain quiet about violations of law that have affected her life and career and threaten to harm many others.

This letter is lengthy in order to provide the Commission with sufficient information to perform a targeted investigation.

### OVERVIEW

In recent years, Lea Frye has witnessed an ongoing pattern of corporate fraud at the highest levels of Anadarko. As the size and dollar value of this fraud has grown, Ms. Frye has become increasingly uncomfortable and has realized that if she remains silent, she risks being perceived as a participant. Accordingly, she has asked us to write in hopes that the Commission will conduct a thorough investigation.

Since joining Anadarko in October 2005, Ms. Frye has consistently proven herself to be an exemplary performer. She and other Reservoir Engineers provide reservoir engineering support for Anadarko's deepwater development teams in the Gulf of Mexico. More specifically, Ms. Frye's team provides data that is then ostensibly used to provide economic evaluations of prospective resources to determine whether to move a project forward to production or not.

In 2014, Ms. Frye began to work on evaluating the Shenandoah discovery, which is located in Walker Ridge in the Gulf of Mexico. At this time, the Shenandoah project still resided with Anadarko's exploration team for funding of appraisal wells targeted to better define resource potential.

6750 West Loop South, Suite 616 | Bellaire, TX 77401 | (t): 346-701-8563 | (f): 713-583-9795
www.mincespllc.com

CONFIDENTIAL

APC-00113306

During this period, Ms. Frye and others on the development team furnished data that was ignored and/or manipulated by exploration executives in order to paint a rosy outlook for investors, partners and the general public regarding the Shenandoah project. Economic projections were made with selective disregard for the hard data and scientific analysis Ms. Frye and others are paid to provide. The result is what has now become a large-scale fraud that Ms. Frye intends to stop before significant harm is done.

As you consider the facts, please know that this is not a letter written by a subpar employee with an axe to grind or a job to save. In fact, the opposite is true. Ms. Frye is a stellar employee, and this cannot be legitimately disputed. Every one of her performance evaluations proves that her work always meets and often exceeds expectations.[1] Regrettably, Anadarko sought her expertise and then buried her findings because those findings were inconsistent with the desired narrative.

<center>TIMELINE OF EVENTS</center>

## A. Anadarko's pledged allegiance to accurate reporting

Anadarko's 2012 Reserves and Resources Manual promises strict adherence to the laws that govern the reporting of oils and gas reserves and resources. The following excerpt is noteworthy:

> The Anadarko Petroleum Corporation (Anadarko) Reserves and Resources Manual is provided as a comprehensive reference guide to assist company personnel and ensure accuracy and consistency in estimating and reporting Anadarko's oil and natural gas Reserves and potential Resources. The manual contains federal guidance and our company policies for properly estimating and assigning Proved, Probable, and Possible Reserves, as well as Contingent Resources. Following these policies, procedures and guidelines, will provide confidence to managers, technical staff, controllers, investors and government agencies that Anadarko's reported Reserves and Resources represent our best estimates in compliance with the appropriate rules and regulations. It is Anadarko's policy to strictly adhere to the U.S. Securities and Exchange Commission (SEC) regulations and SEC staff interpretations for all estimates of Proved, Probable, and Possible Reserves. ... As SEC guidance is not provided for Contingent and

---

[1] For example, in her 2014 and 2015 evaluations, Ms. Frye received an overall score of A1 (usually exceeds but always meets performance standards). *See* Exhibit 5. In 2012, she received an E1—a rare feat that illustrates unusual excellence. Ms. Frye has never once been disciplined for misconduct, rules violations or any performance deficiency.

APC-00113307

Prospective Resources except indirectly, the Society of Petroleum Engineers (SPE) 2007 Petroleum Resources Management System (PRMS) guidelines are utilized unless SEC guidelines take precedence.[2]

The above statements in the Manual are important because they promise that Anadarko will report about its reserves and resources with the kind of integrity, accuracy and transparency the law requires.

## B. New oil discovered in Walker Ridge 51 and 52

In 2009, Anadarko announced a new oil discovery in the area known as Walker Ridge 51 and 52. The Shenandoah 1 well ("Shen 1") found a section of porous rock (referred to in industry lingo as "reservoir sand") that for a vertical depth of around 300 feet contained oil that could be recovered. This was accurately reported to the public as an encouraging find.

## C. The Shen 2 well

Following the success of Shen 1, surveys of the surrounding area indicated geological features that could contain oil in this area in significant quantities, so a second exploratory well was drilled that became known as Shenandoah 2 ("Shen 2"). This well—located in Walker Ridge, Block 51—was also a success, prompting Vice President of Deepwater and International Exploration Bob Daniels to describe it as "one of Anadarko's largest oil discoveries in the Gulf of Mexico," the success of the well was attributed to rock and fluid properties that were "of much higher quality than previously encountered by the industry in Lower Tertiary discoveries."[3]

## D. Exploration goal: 800+ MMBOE

In March 2013, Anadarko held an investor relations conference. During the investor relations conference call, those in attendance were informed of the exploration goal of delivering "800+ Million Barrels of Oil Equivalents (MMBOE)."[4] This statement is significant not because it is evidence of wrongdoing but rather because it created internal pressure and therefore an incentive to exaggerate.

---

[2] *See* Exhibit 2, Reserves and Resources Manual (2012).

[3] Press Release, Anadarko, Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay (Mar. 19, 2013) (on file with author).

[4] *See* Exhibit 3, Delivering Differentiating Value (Mar. 13, 2012), p. 7 ("Creating Value Through Exploration").

CONFIDENTIAL

APC-00113308

### E. Shen 2 and the March 19, 2013 Press Release (Shen 2)

On March 19, 2013, Anadarko issued a press release about the results of its Shen 2 well: recoverable oil over 1000 feet vertically of the rock formation.

While this was a very good result for a single well, Anadarko executives claimed "Net Risked Resources" (~300 MMBOE) that were overly optimistic. To justify that number, they had to "draw a small fault" around the Shen 1 well, claim the wells were not connected, and then further assume that the vast majority of the geological structure thought to contain oil would be identical to what had been found in the Shen 2 well. This approach was inconsistent with sound science.

Geological faults are important features in oil exploration, since the amount of oil found (and the ability to extract that oil) can change dramatically when a fault line is encountered. In this case, there was no geological evidence to suggest a fault. Nevertheless, Anadarko executives decided to draw a fault line around the Shen 1 well to indicate a small area where the oil was only 300 feet deep.

The calculated purpose of this exercise was to justify *assuming* that the rest of the feature had uniformly deep oil deposits. Intriguingly, completed geological survey work suggested numerous other faults throughout the structure, yet no mention of those faults was made. The significance of this becomes clear after considering the events that followed.

### F. January 2014: Lea Frye asked to help develop field

In January 2014, Ms. Frye moved from the Eastern Gulf Of Mexico Development group to lead the Shenandoah Pre-Development group, which reported to Pat McGrievy. Her role was to coordinate subsurface efforts with facility efforts to evaluate multiple development scenarios incorporating uncertainty in resource size and recovery, based on different drive mechanisms. At the time, the project was still in the appraisal phase and was being funded by the exploration team.

Among the tasks assigned to Ms. Frye was to run economics. Thus, in anticipation of an upcoming meeting to discuss the project, Executive Vice President of Deepwater and International Development Jim Kleckner asked Ms. Frye to develop an economic model that summarized the development team's view of the Shenandoah prospect for an offsite development and exploration meeting.

Specifically, Ms. Frye was asked to focus on current perceived value and any associated risks to that value for Shenandoah. The goal was to use her model to assist the Executive Committee in establishing budgets for the following year, in order to maximize shareholder value.

CONFIDENTIAL

### G. The February 2014 meeting

On February 19, 2014, a meeting was convened. Along with Ms. Frye, the following people attended the meeting:

- Darrell Hollek (Senior VP Gulf of Mexico and International Development)[5]
- Ernie Leyendecker (VP Gulf of Mexico Exploration)[6]
- David Blakeley (Manager Gulf of Mexico Exploration Engineering)
- David O'Brien (Business Advisor)[7]
- Pat McGrievy (General Manager, DWGOM)

During the meeting, Ms. Frye presented the economics based on all known information about the field. The information she provided was derived by utilizing industry best practice modeling and sensitivity analysis, with input from multiple team members on the integrated project team. Her analysis indicated that the available resources were likely much smaller than exploration was claiming.

Some did not like Ms. Frye's feedback, even though her findings were developed utilizing best estimates for oil in place, recovery and costs to develop the field. Her feedback did not mirror the overly optimistic claims made by the exploration side of the business, so Mr. Leyendecker became visibly agitated. He viciously berated Ms. Frye during the meeting because her findings were inconsistent with the optimistic message he preferred. He directed the following derisive remarks at Ms. Frye:

- "You do not know anything."
- "I have worked the Gulf of Mexico longer than you."
- "This is the best field ever. . . . it is as good as Troika."

Ms. Frye's methods were sound, and these statements were at odds with the hard data. As an engineer, Mr. Leyendecker should have known this. As a reminder, Ms. Frye had been recruited to the Shenandoah project *because* of her expertise.

---

[5]    Mr. Hollek's current title is Senior Vice President, On Shore Development.

[6]    Mr. Leyendecker has since been promoted to Senior Vice President, International Deepwater Exploration.

[7]    Mr. O'Brien has since been promoted to the position of General Manager, Delaware Basin–Growth & Technology.

CONFIDENTIAL

APC-00113310

The February 19, 2014 meeting was Ms. Frye's first knowledge of a developing culture within Anadarko's exploration team. Mr. Leyendecker and other executives did not want to hear anything about the Shenandoah project that did not align with their desired outcome.

During the ensuing months, it became clear that leaders of the exploration team did not want Ms. Frye to talk about obstacles such as faulting, lower than ideal recovery factors and increased technology costs because these rather fundamental considerations—if accounted for honestly—would reduce value projections.

### H. March 4, 2014: Inflated numbers published to shareholders

On March 4, 2014, shareholders were presented with inflated information about Anadarko's exploration successes in 2013. For example, the slide show used during the 2014 Investor Conference provided a forecast that was far too optimistic given the science. Slides 74 and 75 approximated "900+ MMBOE in net discovered resources," even though that figure was predicated in part on the grossly overstated Shenandoah resource.[8] True and correct copies of slides 74 and 75 are pasted below and on the following page:

## Slide 74



---

[8]    *See* Exhibit 4, prospectus entitled "2014 Anadarko Investor Conference," slides 74-75.

CONFIDENTIAL

APC-00113311

## Slide 75



**Consistent Outperformance vs. Industry Average**

Slide 83 from the March 2014 presentation to shareholders was also misleading. It quantified the size of the exaggeration in dollar figures, advising investors that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity."[9] A cut and paste of Slide 83 is pasted on the following page.

---

[9]     *See* Exhibit 4, slide 83.

CONFIDENTIAL

## Slide 83



A few months after the March 2014 Investor Conference, the development team valued the Shenandoah resource at $1.1 billion. Thus, the exploration team's inflated value was an overstatement ranging from 82% (at $2 billion) to 264% (at $4 billion). Further, the overstated value was compounded by Anadarko's understatement of the net capital required to develop the resource.

Misrepresentations such as this were not innocent. By March 2014, Ms. Frye had spent significant time working with exploration staff to demonstrate how proper use of modeling the available geological information required far lower projections of recoverable oil. She explained why faults crossing the geological feature indicated that without further appraisal wells, assuming such a large quantity of recoverable oil was inconsistent with scientific data and therefore inappropriate.

Numerous internal documents incriminate Anadarko, some of which are attached to this letter and others of which are not but can be provided by Ms. Frye and/or obtained from Anadarko.

CONFIDENTIAL

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 09/25/17 Page 23 of 107

## I. Shen 3

Following the success of the Shen 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen 3 was also located in Walker Ridge (Block 52), it was quickly apparent that Shen 3 did not have the promise of Shen 2. Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would accept distorted findings and projections based on the success of Shen 2. However, Shen 3 was nothing like Shen 2.

Even though Shen 3 was a wet well, the exploration team described it as successful in terms similar to those used to describe Shen 2. They did this in part by redefining the criteria by which resource capacity is projected. Aware that Shen 3 had the same sands (porous rock structure that can hold recoverable oil) that were present in Shen 2, the exploration team analogized Shen 3's resource projections to those of Shen 2. In doing this, they ignored the findings of Ms. Frye and other engineers, even though these persons' expertise is superior to theirs and even though the exploration team's projections were in contravention of Anadarko's published standards.

The calculated strategy of the exploration team can be accurately described as "piggybacking." They deliberately manipulated the facts (and more specifically what *was* and *was not* known about Shen 3) and redefined the criteria for optimism when the facts did not match the desired outcome. For example, the exploration team defined oil-water contacts by incorrectly using pressure data obtained from Shen 2 and Shen 3 even though Shen 3 was two miles away from Shen 2, and seismic data indicates a discontinuity (faulting) between the wells that renders projections of oil-water contacts flimsy and unscientific. The development team (primarily Ms. Frye) pointed this out, but their feedback was ignored.

As the exploration team knows, even reliable pressure data is not by itself a definitive indicator of resources. The farther apart two wells are, the less likely the resources in one are cause for optimism in the other. Additionally, while pressure data is one indicator of what is in the well, such data must be considered in conjunction with other mitigating factors.

When projecting the resources in Shen 3, the exploration team looked at pressure data in a vacuum, even though legitimate projections require consideration of all relevant data. For example, Ms. Frye and other development team members identified a rather obvious fault between Shen 2 and Shen 3 that was visible in oil-based microimaging (OBMI). Executives on the exploration team ignored this and then made overly optimistic resource projections as if this information did not exist.

---

[10] A "wet well" is often referred to in the oil and gas industry as a "dry hole."

CONFIDENTIAL

APC-00113314

In reality, the proven existence of this fault meant that oil-water contacts could not be extrapolated from data obtained from Shen 2 and Shen 3.[11] Rather, all that could be confirmed from the data in Shen 3 was the highest known water point for the Shen 3 fault block and a lowest known oil point for the Shen 2 fault block.[12] The unlawful, unscientific extrapolation simply ignored the fault, and in doing so overstated the size of the resource in the Walker Ridge Basin.

## J. Shen 4

As with Shen 3, the anticipated size of the Shenandoah 4 ("Shen 4") resource was exaggerated beyond what the science supports. This well was started in the middle of 2015, and drilling was completed at the end of the year.

### (1) Walker Ridge 51 #3

The well involved multiple penetrations for diagnostic purposes. The first was Walker Ridge 51, #3. This penetration revealed salt, with no discernible sand. Salt is a rock structure that can never yield oil. Further, a portion of the area previously defined as hydrocarbon-bearing is no longer there. Accordingly, the reported size of the resource must necessarily shrink as a matter of established science.

### (2) Sidetrack well (Walker Ridge 51 #3 ST #1)

The purpose of a sidetrack well is to gain a broader understanding of the size of the resource. Here, the sidetrack well was drilled in order to get away from the salt in the original well in hopes of finding hydrocarbon-bearing sands.

The well did find hydrocarbon in the range of 600+ vertical feet. While still significant, the well was not equivalent to the 1,000 vertical feet seen in Shen 2 well, which was utilized by exploration to characterize the thickness over the entire Shenandoah area. To overcome this inconvenient obstacle, the mapping was manipulated in order to exaggerate the size of the resource. In other words, the resource-bearing area was overstated by manipulating the mapped area to minimize area impact of the salt encountered by the first penetration and thickness over the area was still assumed to be analogous to Shen 2, even though only 600 vertical feet was seen in the sidetrack well.

---

[11] Accurately extrapolating oil-water contact requires evaluation of data within the same fault block.

[12] This approach was inconsistent with not only guidance provided by the Society of Petroleum Engineers but also Commission regulations as to projecting contacts across fault blocks without well control when defining "proven" or "P90 resources."

CONFIDENTIAL

APC-00113315

**(3) Bypass Well: Walker Ridge 51 #3 BP #1**

Immediately after the sidetrack, the well was by-passed in order to capture whole core (essentially a core sample) over the hydrocarbon sands. The Walker Ridge bypass well revealed missing sands and a thinner overall section (vertically) than the sidetrack well, which is 200-300 feet away. Why is this significant? Because the proximity of the wells supports the likelihood of thinning (a reduced thickness of the sands (in height)). Thus, it was impossible to legitimately apply the 1000-foot measure across the entire area because of the known differences in thickness.

### K. August 12, 2014: Additional confirmation of faulting

On August 12, 2014, Geological Advisor Paul Chandler provided well log data to the exploration group establishing that faulting exists. He specifically identified a fault in Shen 2 (WR 51 32) that was located above all of the pay zones, while discussing the faulting and fracturing evidence from OBMI data. As explained below, this information was summarily ignored.

### L. August 18, 2014: Leyendecker directive to ignore the faults

On August 18, 2014, emails were exchanged regarding the method by which faulting would be represented in the Shenandoah project going forward. The most notable part of this email exchange was Mr. Leyendecker's "adamant" insistence (as reported by Pat McGrievy and Geological and Geophysical (G&G) Manager Tim Trautman) that no maps were to be used that revealed faulting during meetings about the amount of oil that could be recovered from the Shenandoah project.[13] Astonished, members of the development team expressed discomfort with this approach because it concealed highly relevant data.

Mr. Leyendecker's directive was an active suppression of internal data regarding the true size of the Shenandoah resource. This was disturbing for several reasons. First, the Commission prescribes standards regarding the use of defined pressure data to define oil-water contact, and Anadarko's internal standards mirror those standards. Second, Mr. Leyendecker was advocating the deliberate improper analysis of faulting in a way that skewed the data in favor of perceived profitability.

The first diagram on the following page illustrates the *correct* use of defined pressure data when defining oil-water contact. Note that the blank spaces separated by faulting cannot be deemed to have established resources based on current Commission rules.

---

[13]     *See* Exhibit 7, email exchange dated August 18, 2014.

CONFIDENTIAL

APC-00113316

SEC Office of the Whistleblower
May 9, 2016
Page 12 of 24

**Correct Use of SEC Defined Pressure Data to Define Oil Water Contact**



The diagram below illustrates the manner in which Mr. Leyendecker ordered the resource to be mapped. This directive to mislead violated Commission rules because it assumed the presence of resources across fault lines.

**Incorrect Use of SEC Defined Pressure Data to Define Oil Water Contact**



APC-00113317

Case 4:20-cv-00576 Document 322-23 Filed 06/29/26 in TXSD Page 18 of 867

By communicating that he was "adamant" about his approach to mapping, Mr. Leyendecker chilled people into silent adherence. To avoid any lingering doubt, he and others made repeated references to the mandate that only one map could be shown during presentations.[14] The development team's map (which was consistent with Commission requirements) was prohibited in favor of the exploration group's map, which showed no faults other than the small fault isolating Shen 1. This suppressed the truth, which was that the Shenandoah project could not produce the volume of oil the exploration team publicly projected.

### M. February 2-3, 2015: Operations Report and investor call with Daniels

On February 2, 2015 the Operations Report was published. An investor call followed a day later. During that call, Senior Vice President of Exploration Bob Daniels described the recently completed Shen 3 well in glowing terms. In characterizing it as a successful appraisal well, he described over 1,500 feet of "quality sand."

This representation was stunning. The truth is that Shen 3 was a dry hole, and Mr. Daniels had at least constructive knowledge of this. No oil was found, and any claims that Shen 3 helped confirm prior assumptions made from Shen 2 could not be supported by sound science. Once again, a preponderance of internal information confirmed that the message given to shareholders regarding recoverable oil was inaccurate and misleading.

### N. February 17, 2015: Leyendecker continues to massage the message

On February 17, 2015 Mr. Leyendecker canceled a scheduled presentation to be given by Doug Shott (an internal expert not on the exploration team). The reason? He believed Mr. Shott's report included "unfavorable" news about the Shenandoah project. In truth, "unfavorable" was a synonym for "real." Mr. Leyendecker did not want the truth about the project to be revealed because it belied numerous, prior representations about the size (and attendant value) of the Shenandoah resource.

### O. October 28, 2015: Q3 earnings call perpetuates unfounded optimism

The exaggerations continued during the Q3 earnings call. When discussing the Shenandoah project (following the completion of Shen 4), CEO Al Walker and EVP Bob Daniels represented that Shen 4 had located even more oil, pushing the known depth of oil down by more than 400 feet. They reiterated their overly optimistic projections, which had already been disproved by information provided by the development team.

---

[14] *See* Exhibit 7, email exchange dated August 18, 2014.

CONFIDENTIAL                                                    APC-00113318

The actual results were in stark contrast to the representations made to shareholders during the earnings call. In addition to being a dry hole, the initial well at Shen 4 also encountered salt. This meant that (1) they were completely out of the formation where oil might be found; and (2) the size of the formation that could hold oil was smaller than originally thought. While a second bore drilled from the Shen 4 sidetrack did locate oil, it was a much smaller amount than the amount found in the Shen 2 well. On top of all this, the Shen 4 well found clear evidence of multiple fault zones. Of course, these were not mentioned during the earnings call.

Any competent reservoir engineer or petroleum geologist knows the above data must be accounted for when determining amount of oil that can be recovered from a formation. However, Anadarko executives sold a different story with their exaggerated projections.

## P. RCT feedback requested

During the process of evaluating Shen 4, it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data. This prompted an evaluation by Anadarko's Risk Consistency Team (RCT), which exists in part to prevent "salesmanship and overly optimistic evaluations of exploration prospects."[15] A stated goal of the RCT is to "minimize personal bias" of those involved in exploration efforts in order to "characterize the subsurface risk and potential of leads and prospects in a consistent manner."[16] With regard to the Shenandoah project, RCT intervention was long overdue.

The feedback from the RCT confirmed the dramatic overstatement of the Shenandoah resource. Thereafter, it was agreed that the exploration team and the development team would work toward a joint representation of the mean number, and an agreed-upon mean number was established: 425 MMBOE.

In January 2016, Chris Camden circulated a chart (pasted on the following page) that illustrates the liberties taken by the exploration team.

---

[15] Dean Hennings, *The Power of the Portfolio*, 9 GEOEXPROM 6 (2013), *available at* http://www.geoexpro.com/articles/2013/06/the-power-of-the-portfolio.

[16] *Id.*

CONFIDENTIAL

APC-00113319

Note in the chart below that the Exploration team's most *conservative* estimate of mean MMBOE was higher than the development team's most *aggressive* estimate, even though Ms. Frye and others had repeatedly explained why a downward adjustment to the size of the Shenandoah resource was necessary.[17]



**Shenandoah Resource Estimates – Post Shen**

After 425 MMBOE was agreed upon as the appropriate mean, Mr. Leyendecker, Mr. Daniels, Mr. Trautman and other Anadarko executives knew they were legally obligated to align their reporting with the scientific data. However, Anadarko continued to publish an exaggerated resource mean at the insistence of Mr. Daniels.

The chart on the next page—prepared by the exploration team—is an example. As it illustrates, the mean resource size proposed by the RCT was rejected in favor of the inflated mean of 550 MMBOE (a 29.4% exaggeration). Notably, this chart was prepared on January 27, 2016, just *two weeks* after 425 MMBOE was the appropriate mean.

---

[17] As the chart also illustrates, the mean resource size advocated by the exploration team was 755 MBOE, which is startling given the data known to Mr. Leyendecker, Mr. Daniels and others in January 2016.

CONFIDENTIAL

## Resource Ranges



### Q. Ms. Frye speaks up

Ms. Frye was appalled to learn that Mr. Daniels and others were simply ignoring the RCT feedback and abandoning the agreed-upon mean of 425 MMBOE. She refused to be complicit and made this clear in late January 2016, when she aptly told Mr. McGrievy, "It's wrong."

### R. The size and scope of the Shenandoah misrepresentations

By sizing the Shenandoah resource at 550 MMBOE, Mr. Leyendecker, Mr. Daniels and other Anadarko executives represented to the public that the Shenandoah field was the third richest resource *ever* discovered in the Gulf of Mexico.[18] Worse yet, they continued to do this even after the science flatly disproved such a representation.

It is impossible to calculate the monetary effect of the years-long overstatement of the Shenandoah resource. What we do know is that an overstatement by 125 MMBOE amounts to a $5 billion exaggeration at today's depressed oil prices. Further, important questions remain.

---

[18] The only deep-water fields discovered to date involving more than 550 MBOE were the Mars-Ursa and the Tahiti/Caesar/Tonga fields.

CONFIDENTIAL

APC-00113321

How much did Anadarko profit as a result of its misrepresentations? How did this effect stock prices and investor confidence? While we are not capable of ascertaining the answers to these questions, we hope the Commission will seek those answers.

## S. Anadarko's compensation structure rewards resource exaggerations

Historically, a large part of investor value creation at Anadarko has come through conversion of exploration discoveries to shareholder value through monetization and/or conversion of discoveries to producing assets. This has led to the publication of annual exploration goals to the investor community.

Exaggerations and fuzzy math are actually incentivized by Anadarko's compensation structure. Exploration executives and their team members receive bonuses based on the *published* resource size and the related effect of such publications on the investor community. In other words, the bonus compensation paid to Mr. Leyendecker, Mr. Daniels and others is not deferred until after it is established that their optimistic projections were accurate. Executives receive their bonuses regardless of whether those projections pan out.

Here, there was a direct relationship between the exaggerated size of the Shenandoah resource and the compensation of those involved. Numerous individuals on the exploration team were rewarded with promotions despite their role in misleading the public. Below are examples:

| Name | Career trajectory |
|---|---|
| Ernie Leyendecker | Promoted to Senior Vice President, Exploration (Gulf of Mexico) |
| David Blakeley | Promoted to Director of Exploration Engineering |
| Robert Strickling | Promoted to Reservoir Engineering Manager (Gulf of Mexico) |
| Jake Ramsey | Promoted to Manager Exploration (Regional Team) |
| Beth Kendall | Promoted to Distinguished Geophysical Advisor |

CONFIDENTIAL

APC-00113322

Case 4:17-cv-02289   Document 2-1 *SEALED*   Filed in TXSD on 09/25/17   Page 22 of 107

SEC Office of the Whistleblower
May 9, 2016
Page 18 of 24

### T. False representations have not been corrected

Anadarko has compounded its potential liability by never squarely addressing the overstated size and value of the Shenandoah field. The motivation for remaining silent is obvious: the price of Anadarko stock is trading at less than half the value it was a year ago, and now is not an ideal time to inform the world that information provided to shareholders about the Shen 3 and Shen 4 wells was exaggerated rather dramatically for several years.

Statements made during the October 28, 2015 earnings call illustrate that deliberate silence and vague reassurances remain the preferred approach. Below are excerpts from a question-and-answer session between the investment community and Anadarko executives Al Walker (CEO) and Bob Daniels (Executive Vice President):

<u>Statements made by CEO Al Walker</u>

Q:     Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans?

A:     . . . It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. . . . we pushed the lowest known oil down about 400 feet. . .. But we're very encouraged with what we saw and *it was all well within the range of expectation of what we had put out there.* [19]

<u>Statements made by Executive Vice President Bob Daniels</u>[20]

Q:     And then maybe if I could do one quick follow up and you may not have anything to add on Shenandoah, but post the recent appraisal, any thoughts on resource range there at Shenandoah?

A:     On the resource range, *we're riding right where we thought.* We always do a probabilistic resource range. *We're still in that range with the results of the well.* [21]

The above statements were false. Mr. Walker knew the size of the Shenandoah resource was not actually "all well within range of the expectation of what we had put out there" because his internal experts had repeatedly told him about many

---

[19]     *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

[20]     Mr. Daniels is the Vice President of International and Deepwater Exploration.

[21]     *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

CONFIDENTIAL

APC-00113323

factors that would limit the size of the resource. Likewise, Mr. Daniels had actual knowledge that they were not actually "still in that range" when he falsely reassured the investment community.

## U. Rule 10b-5 Violations

### (1) Anadarko violated Rule 10b-5

The exploration team violated Rule 10b-5 on a massive scale by repeatedly overstating the size of the Shenandoah resource. Underneath this global violation was a years-long series of misrepresentations and omissions of material fact. Along the way, they demonstrated an intent to mislead by hiding faults, ignoring science, ignoring RCT feedback and even attempting to silence and intimidate those who spoke up, such as Ms. Frye. Collectively, this sequence of events proves scienter.

Here is one example, from page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. *The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.*

The italicized excerpt was a misstatement of fact. As already discussed, the exploration team defined oil-water contacts in Shen 3 in disregard of established scientific principles. Shen 3 was two miles away from Shen 2, and seismic data showed faulting between the wells. Given this, oil-water contact could not be projected. Yet it was, and Anadarko published it as fact and in doing so knowingly misled the public.

### (2) Role of resources in share price proves materiality

It is no secret that resources and reserves are among the metrics that drive Anadarko's share price. When they characterized the Shenandoah resources as the third-largest resource ever found in the Gulf of Mexico, Mr. Leyendecker, Mr. Daniels and others on the exploration team knew the effect their representations would have on the investment community. Their manipulations of the verbiage and mapping used in reference to the Shenandoah resource was an effort to mislead the public into believing that Shenandoah (and therefore Anadarko) was more robust than the science established.

CONFIDENTIAL

APC-00113324

## V. Significance of overstating reserves

We understand that reserves and resources are different, but as Anadarko's Reserves and Resources Manual indicates, both can affect share price. This is why the Anadarko Manual notes that reporting on reserves *and resources* should represent "best estimates in compliance with the appropriate rules and regulations" of not only the Commission but also the Society of Petroleum Engineers.[22] When reporting about the Shenandoah resource, Anadarko failed to meet these standards.

There are similarities between Anadarko's overstatement of reserves and the manner in which Shell overstated reserves more than a decade ago. For example, the Commission concluded that Shell overstated proved reserves by 4.47 billion barrels of hydrocarbon reserves (approximately 23%).[23] Here, Anadarko has overstated the Shenandoah resource size by 125 MMBOE, which amounts to a 29.4% exaggeration.[24] Shell was deemed to have overstated future cash flows by approximately $6.6 billion.[25] Here, the development team valued the Shenandoah resource at $1.1 billion in 2014, yet Anadarko published the value range as a "$2-4 billion net opportunity." This range was 82% higher than reality at the low end ($2 billion) and 264% higher than reality at the high end ($4 billion).

## W. Insider trading suspected

It warrants mention Senior Vice President of Exploration Bob Daniels sold more than $6 million of his Anadarko stock (APC) roughly two months after Anadarko published false optimism about the size of the Shenandoah resource. In other words, he was selling at a time when all messages to the public were that now was the time to buy. On the following page is a timeline of the key events:

---

[22]  *See* Exhibit 2, Reserves and Resources Manual (2012).

[23]  Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[24]  As a reminder, Anadarko continued to use the inflated figure of 550 MMBOE as recently as January 27, 2016, immediately after the RCT had completed its analysis and then concluded that 425 MMBOE should be the operative figure based on the applicable data.

[25]  Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

CONFIDENTIAL

APC-00113325

| | |
|---|---|
| **February 19, 2014:** | During a meeting involving Mr. Leyendecker, Ms. Frye and others on the Development and Exploration teams, Ms. Frye presents the economics and explains the underlying science, which indicates the Shenandoah resource should be valued at $1.1 billion.[26] Mr. Leyendecker berates Ms. Frye, then describes the Shenandoah basin as "the best field ever." |
| **March 4, 2014:** | Unabashed optimism during the Investor Conference. Shareholders are told (in a slide show) that Anadarko has discovered "900+ MMBOE in net resources,"[27] which includes the Shenandoah resource, which is described as a "$2-$4 billion dollar net opportunity."[28] |
| **May 21, 2014:** | Senior Vice President of Exploration Bob Daniels sells 61,379 shares of his Anadarko stock (transaction of approximately $6.143 million).[29] |

When Mr. Daniels sold more than $6 million of his stock, he must have known that (1) the Shenandoah resource was a factor in the share price; and (2) the size of the Shenandoah resource had been overstated. The public did not and could not know the latter. This, we suspect that Mr. Daniels' trade was on the basis of material nonpublic information relating to Anadarko stock (APC). We understand that Rule 10b-5(c) includes affirmative defenses, and we cannot honestly assess those based on information currently available. Thus, we ask the Commission to further investigate.[30]

## X. Litigation hold already requested

Ms. Frye has served Anadarko with a very detailed litigation hold request that specifically identifies the categories of documents and information that Anadarko

---

[26]     Ms. Frye is happy to further explain this.

[27]     *See* Exhibit 4, slide 83.

[28]     *Id.*

[29]     This information is publicly available and was obtained from a public source.

[30]     The stock sales of Ernie Leyendecker of Senior Vice President, Exploration (Gulf of Mexico)) are not publicly available, but we suspect that he too may have profited by selling Anadarko stock at just the right time with the benefit of inside information. Accordingly, we hope the Commission will also investigate his transactions.

APC-00113326

should take affirmative steps to preserve. The letter identifying the documents that should be preserved is attached as <u>Exhibit 1</u> to this letter.

## Y. List of key witnesses

Below is a list of 19 current and former Anadarko employees who can verify the facts included in this letter. Some of these people have nothing to hide and are likely to immediately tell the truth. Others have much to lose and may lie. A summary of each person's role, relevant knowledge and culpability is provided.

1) **Chip Oudin.** Geophysicist, Development. Feels strongly that Exploration was overstating resources. Pointed out numerous flaws in Exploration team's methodology.

2) **Paul Chandler.** Geologist, Development. Pointed out numerous errors in Exploration team's methodology. Clearly stated that their resource statements were incorrect.

3) **Tim Trautman.** Geological and Geophysical (G&G) Manager, Exploration. Responsible for risking and sizing of resources. Reported directly to Ernie Leyendecker and was at times Mr. Leyendecker's designated messenger. Manager of Beth Kendall, Jake Ramsey, and Breck Johnson. Mr. Trautman and his subordinates should have used appropriate techniques (defined by Anadarko Risk Consistency Team (RCT)) to understand the size of the Shenandoah resource, but they collectively ignored procedures to support Mr. Leyendecker's claim of a spectacular find. Some benefited handsomely with promotions and (presumably) large bonuses.

4) **Matt Morris.** Member of the RCT who told the Exploration group that (1) they were absolutely incorrect in their methodology; and (2) they were significantly overstating the size of the Shenandoah resource.

5) **Jake Ramsey.** Exploration Geologist who reported to Mr. Leyendecker; subsequently promoted.

6) **Breck Johnson.** Exploration Geologist who reported to Mr. Leyendecker; replaced Jake Ramsey when Mr. Ramsey was promoted.

7) **Christian Noll.** Geologist, Development. Attended meeting with RCT regarding Shenandoah resource size. Can verify that exploration methodology was incorrect and that value of Shenandoah resource was overstated.

CONFIDENTIAL

8) **Pat McGrievy.** General Manager, Development side. Lea Frye's manager. Knows the truth but not the type to speak up.

9) **Tom Bergesser.** Former member of RCT; now works in Exploration. Attended RCT meeting in which Exploration team was told to change its methodology and reduce the projected value of the Shenandoah resource.

10) **Tim Fausnaut.** Geophysics Manager, Geophysical Technology. Former member of RCT who evaluated value projections. Attended meeting in which RCT told Exploration team to reduce projected value of Shenandoah resource.

11) **Robert Strickling.** Reservoir Engineer who supported the Shenandoah exploration. Directly responsible for the economic evaluation of the project and for providing net resources information to senior management. Recently promoted.

12) **Chris Camden.** Replaced Robert Strickling when Mr. Strickling was promoted. Now Engineer for Exploration team.

13) **Darrell Hollek.** Former Senior Vice President, Gulf of Mexico and International Development. Now Senior Vice President, On-Shore Development. His team knew the Exploration was overstating values, but he did nothing to stop it.

14) **Jim Kleckner.** Executive Vice President, Deepwater and International Development. Darrell Hollek's boss; took some interest in understanding the information the Development team (including Ms. Frye) was trying to bring forward about the Shenandoah project.

15) **Al Walker.** Chief Executive Officer. Perhaps misled by those below him, but communicated incorrect info directly to shareholders. Knew or should have known size of the Shenandoah resource was being repeatedly overstated.

16) **Bob Daniels.** Executive Vice President, Exploration. Communicated directly to shareholders and the general public; heavily invested in meeting net resource goals. Repeatedly overstated resource size and provided vague reassurances when the message should have been to reduce expectations. Did not adjust expectations to match the science, which clearly showed lower expected recoverable amounts of oil.

17) **Ernie Leyendecker.** Former Vice President, Gulf of Mexico Exploration. Since promoted to Senior Vice President, International Deepwater Exploration. He was the primary driver of overstating potential resources on the Shenandoah project. Abused Ms. Frye and others below him who spoke up. Concealed some facts and distorted others for his own gain in used car salesman fashion.

CONFIDENTIAL                                                      APC-00113328

18) **David Blakeley.** Manager, Gulf of Mexico Exploration Engineering. Now Director of all Exploration engineering. His group is responsible for reporting the Net Risk Resources Discovered (i.e., the amount of oil that is likely to be recoverable). His support of the overstated values likely garnered Mr. Leyendecker's support and his own recent promotion.

19) **Beth Kendall.** Geophysicist. Ms. Kendall was promoted during the Shenandoah project. Aware of the fact the resource size was exaggerated.

## CONCLUSION

Anadarko executives have put Ms. Frye in an impossible position. As the legislative history of the Dodd-Frank Act recognizes, "whistleblowers often face the difficult choice between telling the truth and the risk of committing 'career suicide.'"[31] This is exactly how Ms. Frye has felt during the past two years. Accordingly, Ms. Frye asks the Commission to take all action necessary to deter Anadarko from forcing other hard-working, honest people like her to either remain silent or find a new employer and perhaps a new career.[32]

Ms. Frye and I would like to meet with someone from the Fort Worth office as soon as possible. When you meet Ms. Frye, I think you will find her to be sincere, credible and quite informed, and her ability to explain the data is compelling. Further, there is additional evidence that she can either provide or describe for the Commission that was not attached to this letter because we did not want to make it more complicated or voluminous than it already is.

Respectfully,

David M. Minces

---

[31]    S. Rep. No. 111-176 at 110-112 (2010).

[32]    While Ms. Frye is certain that Anadarko has overstated the Shenandoah resource, she suspects there are other ongoing exploration projects in which Anadarko executives have engaged in similar misrepresentations. She is glad to provide whatever information she has and can direct the Commission to others who may have knowledge about other projects.

CONFIDENTIAL

APC-00113329

Case 4:17-cv-02289   Document 2-1 *SEALED*   Filed in TXSD on 09/25/17   Page 29 of 107

# EXHIBIT 1

CONFIDENTIAL

APC-00113330



**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

April 20, 2016

Ms. Amanda M. McMillian
Senior VP, General Counsel, Corporate Secretary and Chief Compliance Officer
Anadarko Petroleum Company
1201 Lake Robbins Drive
The Woodlands, Texas 77380

 Re: Lea Frye | Request for Litigation Hold

Dear Ms. McMillian:

This letter is intended as formal notice of your legal duty to take steps to preserve all documents and electronic data (including but not limited to email) relating to Ms. Frye's potential claims.

In order to ensure that relevant data is preserved, we ask that you issue an internal "litigation hold" and refrain from destroying or disposing of any computer, server or other device that houses potentially relevant data. Likewise, we request that you suspend any document destruction policies and practices that might otherwise lead to the destruction of potentially relevant electronic data. This is not merely an obligation to refrain from destroying evidence. Rather, you have an affirmative legal duty to take all measures reasonably necessary to safeguard all documents and information that could relate to any of Ms. Frye's claims. Your counsel will be familiar with the importance of these obligations and the steps needed to comply.

In particular, we request that you preserve each category of data enumerated below. Please note that this list is not intended to be exclusive or exhaustive.

Please be sure to preserve the following data. For clarify, the term "data" as used below is intended to include and encompass paper documents and electronically stored data (of all kinds, including emails) in its native format. Unless otherwise stated, we ask that Anadarko preserve all items and categories of items listed below dating back to January 1, 2012:

 1) All personnel records of Lea Frye, including but not limited to her raises, bonuses, commendations and performance evaluations.

 2) All data relating to Ms. Frye's health condition and the specific conditions that necessitated her current leave.

6750 West Loop South, Suite 616 | Bellaire, TX 77401 | (t): 346-701-8563 | (f): 713-583-9795
www.mincespllc.com

CONFIDENTIAL

APC-00113331

Ms. Amanda M. McMillian
April 20, 2016
Page 2 of 14

3) All data relating to Ms. Frye's FMLA leave.

4) All data relating to any request Ms. Frye made to be included in recent layoffs and/or the reason(s) such requests were denied.

5) All data relating to the date Ms. Frye's physician has recommended that she return to work.

6) All data relating to any discussions among human resources personnel, managers and/or persons with supervisory authority over Ms. Frye that relate in any way to her alleged performance deficiencies or the possibility of terminating her employment for any reason.

7) All data relating to the reservoir engineering support provided by Ms. Frye and Reservoir Engineers in conjunction with the Shenandoah project.

8) All economic evaluations and/or projections of prospective resources and related data provided by Ms. Frye and/or others on the development team that relate in any way to the Shenandoah project.

9) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with SEC requirements.

10) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with Anadarko's Reserves and Resources Manual.

11) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with applicable Petroleum Resources Management System (PRMS) guidelines.

12) All data showing or relating to the findings of the Shenandoah 1 well.

13) All data showing or relating to the vertical depth at which the Shenandoah 1 well revealed oil could be recovered.

14) All data showing or relating to the findings of the Shenandoah 2 well.

15) All data showing or relating to the vertical depth at which the Shenandoah 2 well revealed oil could be recovered.

CONFIDENTIAL

APC-00113332

16) All data showing or relating to the findings of the Shenandoah 3 well.

17) All data showing or relating to the vertical depth at which the Shenandoah 3 well revealed oil could be recovered.

18) All data showing or relating to the findings of the Shenandoah 4 well.

19) All data showing or relating to the vertical depth at which the Shenandoah 4 well revealed oil could be recovered.

20) All data showing or relating to the reasons Anadarko explained during its March 2013 investor relations conference that one of its 2013 goals was to deliver "800+ Million Barrels of Oil Equivalents (MMBOE)."

21) All data relied upon in support of the representations made in the slide show presented to investors during the March 2013 investor relations conference.

22) All data relied upon in support of the representation in the March 19, 2013 press release that 360 MMBOE was an accurate figure for Net Risked Resources.

23) All data showing or relating to extrapolations considered and/or made regarding the Shen 2 well based on characteristics and/or properties found in the Shen 1 well.

24) All data showing or relating to the presence or absence of faulting in or around the Shen 1 well.

25) All data showing or relating to the presence or absence of faulting in or around the Shen 2 well.

26) All data showing or relating to the presence or absence of faulting in or around the Shen 3 well.

27) All data showing or relating to the presence or absence of faulting in or around the Shen 4 well.

28) All data showing or relating to the reason(s) Lea Frye was asked to help develop the Shenandoah field.

29) All data showing the persons involved in the decision to ask Lea Frye to help develop the Shenandoah field, including but not limited to data indicating why they wanted Ms. Frye to assist and the specific input given by those involved in making this decision.

CONFIDENTIAL

APC-00113333

Ms. Amanda M. McMillian
April 20, 2016
Page 4 of 14

30) All emails that Ernie Leyendecker sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

31) All emails that Darrell Hollek sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

32) All emails that David Blakeley sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

33) All emails that David O'Brien sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

34) All emails that Pat McGrievy sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

35) All emails that Tim Trautman sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

36) All emails that Jim Kleckner sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

37) All data showing any economic forecast and/or model Ms. Frye created, prepared or discussed regarding the Shenandoah project or any portion of the Shenandoah project, regardless of whether such economic forecast or model was complete or incomplete and regardless of whether such forecast or model was considered formal, informal, accepted, rejected, relied upon or not relied upon.

38) All data relating to any request that Ms. Frye focus on current perceived value and/or associated risks to that value for the Shenandoah project or any portion of the Shenandoah project.

39) All documents created for or during the February 19, 2014 meeting about the Shenandoah project that was attended by Ms. Frye, Ernie Leyendecker, Darrell Hollek, David Blakeley, David O'Brien and Pat McGrievy, regardless of who authored or prepared such data.

CONFIDENTIAL                                                                                          APC-00113334

Ms. Amanda M. McMillian
April 20, 2016
Page 5 of 14

40) All feedback and analysis provided by Ms. Frye relating to the Shenandoah field.

41) All data provided and/or reviewed by Ms. Frye relating to industry best practice modeling and sensitivity analysis in connection with the Shenandoah project.

42) All data provided and/or reviewed by persons other than Ms. Frye relating to industry best practice modeling and sensitivity analysis in connection with the Shenandoah project.

43) All data provided and/or reviewed by Ms. Frye that related to estimates for oil in place, recovery and costs to develop the Shenandoah field.

44) All emails sent by Ernie Leyendecker that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

45) All emails sent by Darrell Hollek that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

46) All emails sent by David Blakeley that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

47) All emails sent by David O'Brien that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

48) All emails sent by Pat McGrievy that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

49) All emails sent by Tim Trautman that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

50) All emails sent by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

51) All emails sent by Robert Strickling that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

52) All emails sent by Jake Ramsey that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

53) All emails sent by Beth Kendall that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

CONFIDENTIAL

APC-00113335

54) All emails sent by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

55) All emails received by Ernie Leyendecker that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

56) All emails received by Darrell Hollek that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

57) All emails received by David Blakeley that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

58) All emails received by David O'Brien that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

59) All emails received by Pat McGrievy that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

60) All emails received by Tim Trautman that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

61) All emails received by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

62) All emails received by Robert Strickling that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

63) All emails received by Jake Ramsey that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

64) All emails received by Beth Kendall that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

65) All emails that Lea Frye sent to Ernie Leyendecker, Darrell Hollek, David Blakeley, David O'Brien, Pat McGrievy, Tim Trautman, Jim Kleckner, Robert Strickling, Jake Ramsey and/or Beth Kendall that discuss or relate to the Shenandoah project.

66) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's exploration team.

67) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's development team.

CONFIDENTIAL

APC-00113336

68) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's Risk Consistency Team ("RCT").

69) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's exploration team.

70) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's development team.

71) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's RCT.

72) All data showing or relating to recovery factors in connection with the Shenandoah resource (or any part thereof).

73) All data showing or relating to technology costs in connection with the Shenandoah resource (or any part thereof).

74) All data showing or relating to faulting in connection with the Shenandoah resource (or any part thereof).

75) The slide show used during the March 2014 Investor Conference.

76) All data relied upon in support of the approximation of "900+ MMBOE in net discovered resources," which was made on slide 74 of the slide show provided during the March 2014 Investor Conference (slide entitled "Industry-Leading Exploration Success Again in 2013."[1]

---

[1] See Exhibit 4 to demand letter dated April 20, 2016.

CONFIDENTIAL

Ms. Amanda M. McMillian
April 20, 2016
Page 8 of 14

77) All data relied upon in support of the representation that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity," as stated on slide 83 of the slide show provided during the March 2014 Investor Conference (slide entitled "Shenandoah Basin: ~$2-$4 Billion Net Opportunity."[2]

78) All data showing any proposed value of the Shenandoah resource by Anadarko's development team.

79) All data showing a proposed valuation of the Shenandoah resource at $1.1 billion, regardless of the person(s) who proposed such a valuation.

80) All data relating to the effect or anticipated effect that faults crossing the geological feature would or may have on the projections of oil on the Shenandoah basin.

81) All data in which it was shown or alleged that the Shenandoah 3 well ("Shen 3") was a "wet well."

82) All data in which it was shown or suggesting that Shen 3 did not reveal the presence of hydrocarbons.

83) All data showing and/or suggesting that the Shenandoah well revealed the presence of hydrocarbons.

84) All data showing and/or suggesting that oil-water contacts were defined by using pressure data obtained from Shen 2 and Shen 3.

85) All data identifying, specifying and/or approximating the distance (in miles) between Shen 2 and Shen 3.

86) All data showing and/or suggesting that a discontinuity (faulting) between Shen 2 and Shen 3.

87) All data showing and/or identifying the presence or absence of faulting between Shen 2 and Shen 3.

88) All data showing the presence or absence of faults in Shen 1, based on oil-based microimaging (OBMI).

89) All data showing the presence or absence of faults in Shen 2, based on oil-based microimaging (OBMI).

---

[2]     *Id.*

CONFIDENTIAL

APC-00113338

90) All data showing the presence or absence of faults in Shen 3, based on oil-based microimaging (OBMI).

91) All data showing the presence or absence of faults in Shen 4, based on oil-based microimaging (OBMI).

92) All data showing or relating to the manner in which oil-water contacts in any Shenandoah well were extrapolated from findings by any other Shenandoah well.

93) All data showing or relating to the manner in which the highest known water point in any Shenandoah well was extrapolated from findings by any other Shenandoah well.

94) All data showing or relating to the manner in which the lowest known oil point in any Shenandoah well was extrapolated from findings by any other Shenandoah well.

95) All data showing or suggesting the presence or absence of salt in any part of Shen 4.

96) All data showing or suggesting the presence or absence of sand in any part of Shen 4.

97) All data showing the presence or absence of hydrocarbons in any part of Shen 4.

98) All mapping and proposed mapping relating to Shen 4, regardless of whether such mapping was accepted or rejected, and regardless of whether such mapping was accepted or rejected.

99) All data showing the range (in vertical feet) that revealed the presence of hydrocarbons in Shen 4.

100) All data showing or discussing the reason(s) a sidetrack well was drilled in Shen 4.

101) All data showing or discussing the reason(s) a bypass well was drilled in Shen 4.

102) All data showing or discussing the data obtained from the bypass well in Shen 4.

103) All data showing or discussing the data obtained from the sidetrack well in Shen 4.

CONFIDENTIAL

APC-00113339

Ms. Amanda M. McMillian
April 20, 2016
Page 10 of 14

104) All well log data relating to Shen 1.

105) All well log data relating to Shen 2.

106) All well log data relating to Shen 3.

107) All well log data relating to Shen 4.

108) All geologic data provided by Paul Chandler relating to any other aspect and/or portion of the Shenandoah project.

109) The well log data Geological Advisor Paul Chandler provided to Ernie Leyendecker and others in advance of the meeting that was scheduled for August 12, 2014 but did not go forward as scheduled.

110) All data provided or discussed by Paul Chandler that discussed faulting.

111) All data provided or discussed by Paul Chandler that discussed any fault in Shen 2.

112) All data provided or discussed by Paul Chandler that discussed OBMI data.

113) All emails dated August 18, 2014 that relate to the method by which faulting would be represented in the Shenandoah project going forward, including but not limited to those sent or received by Ernie Leyendecker, Pat McGrievy and Tim Trautman).

114) All data showing or relating to any directive given by Ernie Leyendecker, Pat McGrievy or Tim Trautman that related to the maps that would and/or would not be used to represent the Shenandoah resource (or any part thereof), including but not limited to maps that showed the presence or absence of faulting.

115) All data relied upon to support the projections and representations made in the February 2, 2015 Operations Report.

116) All emails exchanged that discuss or relate to the February 2, 2015 Operations report, regardless of whether such emails were sent before or after the issuance of the Report, and regardless of whether such emails discussed the final version of the Report or an earlier draft/iteration of the Report that was superseded by the final Report.

CONFIDENTIAL

APC-00113340

Ms. Amanda M. McMillian
April 20, 2016
Page 11 of 14

117) All data relied upon to support the projections and representations made by Senior Vice President of Exploration Bob Daniels during the February 3, 2015 investor call.

118) All data relied upon to support the representation that Shen 3 revealed more than 1,500 feet of "quality sand," as stated by Senior Vice President of Exploration Bob Daniels during the February 3, 2015 investor call.

119) Data showing the substance of the presentation Doug Shott was originally scheduled to give on February 17, 2015, including (if applicable) any slide shows, handouts or other materials Mr. Shott planned to show, rely on or distribute during the presentation.

120) All data showing or relating to the reasons Doug Shott's presentation scheduled for February 17, 2015 did not go forward on the scheduled date.

121) All data that identifies or tends to identify the person(s) who made the decision to cancel or postpone the presentation (by Doug Shott) that was originally scheduled for February 17, 2015.

122) All emails that discuss and/or relate to the presentation (by Doug Shott) or the subject matter of the presentation that was originally scheduled for February 17, 2015 but did not go forward as scheduled, regardless of whether such emails were sent before or after February 17, 2015, and regardless of who sent such emails.

123) All data relied upon to support the projections and representations made during the October 28, 2015 earnings call.

124) All data that supported the representation (made during the October 28, 2015 earnings call) that Shen 4 had found more oil, pushing the known depth of oil down by more than 400 feet.

125) All data revealing the presence or absence of salt in Shen 4.

126) All data provided to, reviewed by or provided by Anadarko's RCT that related to the mean size of the Shenandoah resource.

127) All emails sent to and/or received by any member of Anadarko's RCT that related in any way to the mean size of the Shenandoah resource or the method by which that mean size should be determined.

CONFIDENTIAL                                                      APC-00113341

Ms. Amanda M. McMillian
April 20, 2016
Page 12 of 14

128) All data in which reference is made to the Shenandoah resource having a mean size or projected mean size of 425 MMBOE.

129) All data in which reference is made to the Shenandoah resource having a mean size or projected mean size of 550 MMBOE.

130) All data that shows, tends to show or relates to the effect of the Shenandoah resource and/or representations about the Shenandoah resource on Anadarko's share price.

131) All data that shows, tends to show or relates to the gross revenue (of Anadarko) that can be attributed in whole or in part to the Shenandoah resource.

132) All data that shows, tends to show or relates to the profits (of Anadarko) that can be attributed in whole or in part to the Shenandoah resource.

133) Anadarko's annual exploration goals for the year 2013, and the data relied upon in support of such goals.

134) Anadarko's annual exploration goals for the year 2014, and the data relied upon in support of such goals.

135) Anadarko's annual exploration goals for the year 2015, and the data relied upon in support of such goals.

136) Anadarko's annual exploration goals for the year 2016, and the data relied upon in support of such goals.

137) The dollar amount in total bonuses received by Ernie Leyendecker for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

138) All promotions received by Ernie Leyendecker since 2012 and the underlying data upon which such promotions were based.

139) The dollar amount in total bonuses received by David Blakeley for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

140) All promotions received by David Blakeley since 2012 and the underlying data upon which such promotions were based.

CONFIDENTIAL

APC-00113342

141) The dollar amount in total bonuses received by Robert Strickling for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

142) All promotions received by Robert Strickling since 2012 and the underlying data upon which such promotions were based.

143) The dollar amount in total bonuses received by Jake Ramsey for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

144) All promotions received by Jake Ramsey since 2012 and the underlying data upon which such promotions were based.

145) The dollar amount in total bonuses received by Beth Kendall for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

146) All promotions received by Beth Kendall since 2012 and the underlying data upon which such promotions were based.

147) The dollar amount in total bonuses received by Darrel Hollek for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

148) All promotions received by Darrel Hollek since 2012 and the underlying data upon which such promotions were based.

149) The dollar amount in total bonuses received by David O'Brien for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

150) All promotions received by David O'Brien since 2012 and the underlying data upon which such promotions were based.

151) The dollar amount in total bonuses received by Pat McGrievy for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

152) All promotions received by Pat McGrievy since 2012 and the underlying data upon which such promotions were based.

153) The dollar amount in total bonuses received by Tim Trautman for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

CONFIDENTIAL

APC-00113343

154) All promotions received by Tim Trautman since 2012 and the underlying data upon which such promotions were based.

155) All data supporting the excerpt below, found on page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.

156) All non-privileged data illustrating Anadarko's efforts to issue and comply with a litigation hold and all additional efforts to preserve the data and categories of data identified in this letter.

157) All computers and other devices used to create and/or save any data or category of data identified in this letter.

As a reminder, the use of the term "data" in the preceding list is intended to encompass *both* hard copies of documents and electronically stored information such as email, text messages and social media communications of any kind.

Please instruct all persons who may possess relevant data to preserve such data in its native, electronically stored format, even if the they or Anadarko have paper copies of those same items. As you know, the obligation to preserve evidence is serious, and their failure to do so could result in a variety of undesirable consequences. We have given similar instructions to our client.

We thank you in advance for your cooperation.

Respectfully,

David M. Minces

CONFIDENTIAL

APC-00113344

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 09/25/17 Page 44 of 107

# EXHIBIT 2

CONFIDENTIAL

APC-00113345



# Reserves and Resources Manual

# 2012

"This Reserves and Resources Manual should be considered the confidential and proprietary property of Anadarko Petroleum Corporation. Any unauthorized distribution, review, dissemination or copying of the Reserves and Resources Manual is strictly prohibited."

CONFIDENTIAL

APC-00113346

**SECTION 1: CHIEF EXECUTIVE OFFICER – INTRODUCTORY LETTER**

## WORLDWIDE RESERVES AND RESOURCES INSTRUCTIONS

The Anadarko Petroleum Corporation (Anadarko) Reserves and Resources Manual is provided as a comprehensive reference guide to assist company personnel and ensure accuracy and consistency in estimating and reporting Anadarko's oil and natural gas Reserves and potential Resources. The manual contains federal guidance and our company policies for properly estimating and assigning Proved, Probable, and Possible Reserves, as well as Contingent Resources. Following these policies, procedures and guidelines, will provide confidence to managers, technical staff, controllers, investors and government agencies that Anadarko's reported Reserves and Resources represent our best estimates in compliance with the appropriate rules and regulations. It is Anadarko's policy to strictly adhere to the U.S. Securities and Exchange Commission (SEC) regulations and SEC staff interpretations for all estimates of Proved, Probable, and Possible Reserves. Accordingly, this manual incorporates the new SEC Final Rule: Modernization of Oil & Gas Reserves Reporting, adopted and approved in 2009. As SEC guidance is not provided for Contingent and Prospective Resources except indirectly, the Society of Petroleum Engineers (SPE) 2007 Petroleum Resources Management System (PRMS) guidelines are utilized unless SEC guidelines take precedence.

We understand that no set of guidelines can possibly cover every Reserves and Resources booking situation; therefore, we expect to continually update this manual as more information and interpretation is made available from the SEC. Any questions about SEC booking issues or other booking issues, after appropriate discussion within asset teams, should be referred to the Corporate Reserves Manager (CRM) for discussion and resolution. In some cases, at the discretion of the CRM, it may be prudent to request outside third-party review or audit to help identify the most appropriate solution.

The new SEC guidelines stress the importance of maintaining clear and complete documentation. Therefore, it is very important to Anadarko and its stakeholders that we maintain an accurate, complete and well-documented Reserves and Resources database. Consistent with our corporate values, including our commitment to act with the highest ethical standards, every employee who is charged with estimating, booking, reviewing or quoting Anadarko Reserves and Resources volumes is expected to know and understand the information in this reference guide and to apply the company's policies properly.

*James T. Hackett*                                                          5/20/10

**James T. Hackett**                                                    Date

Chairman and Chief Executive Officer

CONFIDENTIAL                                                                APC-00113347

Case 4:20-cv-00576 Document 322-23 Filed 06/29/26 in TXSD Page 48 of 867

# EXHIBIT 3

CONFIDENTIAL

APC-00113348

CONFIDENTIAL



www.anadarko.com | NYSE: APC

2012 ANADARKO INVESTOR CONFERENCE

INVESTOR RELATIONS CONTACTS:

John Colglazier
Vice President
832/636-2306

Clay Gaspar
Manager
832/636-2541

Wayne Rodrigs
Manager
832/636-2305

# Delivering Differentiating Value

## Bob Daniels
## SVP, Worldwide Exploration

March 13, 2012

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 07/25/17 Page 48 of 107

APC-00113349

CONFIDENTIAL

www.anadarko.com | NYSE: APC

# Creating Value Through Exploration

- ## 4+ BBOE Net Discovered Resources 2004 - 2011
  - *$7.5 Billion Exploration Capital*
  - *$8 Billion Exploration Monetizations*



**2018**
- *Mozambique*

**2017**
- *Shenandoah*
- *Vito*

**2016**
- *Heidelberg*
- *MTAB Complex*

**2015**
- *TEN Complex*

**2014**
- *Lucius*

**2012**
- *Caesar/Tonga*
- *El Merk*

*And* ... **Transitioning Discoveries Into $25+ Billion of Value**

### DISCOVERIES UNDER APPRAISAL

| | |
|---|---|
| Heidelberg | Mozambique |
| Itaipu | Shenandoah |
| Itauna | TEN |
| MTAB | Vito |
| Mercury | Wahoo |

*Sanctioned*
*Appraising*

*Notional First Sales Date*

Anadarko Petroleum Corporation

100

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 49 of 107

APC-00113350

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 09/25/17 Page 90 of 107

# EXHIBIT 4

CONFIDENTIAL

APC-00113351

CONFIDENTIAL



# 2014 ANADARKO INVESTOR CONFERENCE



NYSE: APC | www.anadarko.com

**INVESTOR RELATIONS**

**John Colglazier**
Senior Vice President
832/636-2306

**Jeremy Smith**
Director
832/636-1544

**Bill Tedesco**
Manager
832/636-3375

# Driving Exploration Value Creation

Bob Daniels
EVP, International & Deepwater Exploration

March 4, 2014

APC-00113352

CONFIDENTIAL

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 52 of 107

APC-00113353

NYSE: APC | www.anadarko.com

# Driving Exploration Value Creation

- **Identify and Capture Value-Creation Opportunities**
- **Create Value Through Commercial Discoveries**
- **Provide Optionality to Realize and Enhance Value**



ANADARKO PETROLEUM CORPORATION

73

CONFIDENTIAL

NYSE: APC | www.anadarko.com

# Industry-Leading Exploration Success Again in 2013

- 67% Deepwater Exploration/Appraisal Success
- 900+ MMBOE Net Discovered Resources
- ~1.5 BBOE Net Resources to Development



Top-10 Deepwater Discoveries*

#5 Orca

#7 Coronado

| Deepwater Discoveries | Appraising | Developing |
|---|---|---|
| C Coronado | C Coronado | C Heidelberg |
| C Yucatan | C Shenandoah | C Lucius |
| C Phobos | C Paon | C TEN |
| C Mozambique | C Mozambique | C Mozambique |

* IHS Energy, January 2014

 ANADARKO PETROLEUM CORPORATION

74

APC-00113354

CONFIDENTIAL

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 54 of 107

NYSE: APC | www.anadarko.com

# Shenandoah Basin: ~$2 - $4 Billion Net Opportunity

- **Emerging Giant Resource**

- **Significant Value Creation**
  - Less than $300 Million Net Investment Through 2013

- **Excellent Transmissibility**
  - Permeability
  - Thickness
  - Fluid Viscosity

- **Strategic and Expanding Position in Basin**

- **2014 Planned Activity**
  - Drill 3 - 4 Appraisal Wells



Shenandoah 30% WI

Coronado 35% WI

Yucatan 25% WI (Pending)

WALKER RIDGE

Shenandoah Basin

| | |
|---|---|
| APC WI Block | |
| APC Discovery | ★ |
| Planned Drilling | ▲ |
| Oil Field | ● |
| Salt | ○ |


ANADARKO PETROLEUM CORPORATION

83

APC-00113355

# EXHIBIT 5

CONFIDENTIAL

APC-00113356

CONFIDENTIAL

**Anadarko** Petroleum Corporation

## 2009 Performance Planning & Review

| Employee Name: Lea Frye | Job Title: Sr Reservoir Engineer | Supervisor's Name:     Brad Berg |
|---|---|---|
| Employee ID:  124188 | Department: Exploration Engineering | Next Level Supervisor: David O'Brien |

**Step 1: Goals** - Your goals should be specific, measurable, attainable, realistic and time-bound.  Your goals should be aligned with both corporate and department goals.

**EXCEEDS EXPECTATIONS:** Usually exceeds and consistently meets all relevant performance standards.

**MEETS EXPECTATIONS:** Consistently meets and sometimes exceeds all relevant performance standards.

**NEEDS IMPROVEMENT:** Often falls short of and sometimes meets performance standards.

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| Support the greater GOM exploration team drill ready inventory goal by building a drill ready inventory for the Western GOM area. | Mature 2-4 prospects to drill ready status by the end of 2009. | ▇▇▇ | 1 | 1 |
| Maintain and replenish GOM exploration prospect inventory with economic quality prospects through lease sales, trades and/or other deals. | ▇▇▇ | Portfolio planning – Coordinated and presented GOM portfolio planning submission for the year 2009. | 2 | 1 |
| Analyze production trends in the shelf and deepwater productive intervals in support of the regional team goal to find the next new exploration play in the GOM. | ▇▇▇ | ▇▇▇ | 1 | 1 |

APC-00113357

**Anadarko**
Petroleum Corporation

## 2009 Performance Planning & Review

CONFIDENTIAL

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 07/25/17 Page 57 of 107

APC-00113358

| | | | | |
|---|---|---|---|---|
| | | ████████████████ | | |
| Obtain a greater knowledge of the reservoir engineers' role in the operations and analysis of exploration wells during the drilling and post drill phases of the prospect cycle. | Timely communication of key well operations. Stewardship of the pressure and fluid program from acquisition to interpretation. Application of knowledge gained toward reserves, risking, and recommendations for future operations as part of the post drill review. | ████████████████ | 2 | 1 |
| Work with GOM peers to document some economic standards to ensure consistency and comparability between GOM prospects in prospect inventory. | Document and present GOM economic standardization process to peers by end of first quarter 2009. Develop capital and production spreadsheet which applies economic standards for use by GOM engineers incorporating standards by year end 2009. | Collaborated with peers to develop and document some economic standards for the different GOM play types to ensure consinstancey in economic cases between the GOM engineers. Early in the year I presernted a complilation of the work including the economic summary template and GOM project scheduler.<br><br>Economic Summary Template - Continue to maintain the economic summary tool which links to PEEP reports. This tool ensures accuracy and consistency in economic summary sheets as well as saves engineers time filling them out. I shared this tool with Lower 48 and International.<br><br>GOM Project Scheduler - Developed a usable template incorporating GOM economic standards to schedule capital, production and reserves that | 2 | 1 |

CONFIDENTIAL

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 58 of 107

## 2009 Performance Planning & Review

| | | can be copied into PEEP for speed and | | |
|---|---|---|---|---|
| | | ████████████████████ | | |
| Work with greater GOM exploration team to secure GOM JV. | Prepare and present individual prospects reserves, risking and economics to potential partners by end of second quarter. Assist in running combined JV economics for negations of deal terms. | Using the work completed previously for the regional project, I develop reservoir parameters distributions for the different MMRA hydrocarbon yield inputs to be presented to JV partners. Jointly presented reservoir input data, and economic assumption information for each of the exploration prospects at the JV meeting. I also handled the roll up of the JV economics, with sensitivities, for JV partners and for internal reviews. | 1 | 1 |
| | | **Overall Goal Rating** | 1.5 | 1 |

**Step 2: Values** - Assess each of the following values according to the scale below.

| Values Scale | ████ | Exceptional | ████ | Acceptable | ████ | Needs Improvement |
|---|---|---|---|---|---|---|

| Value | Comments (Only complete this section if NI) | Self Assessment (E, A, or NI) | Manager Assessment (E, A, or NI) |
|---|---|---|---|
| Integrity and Trust | | E | E |
| Servant Leadership | | A | E |
| People and Passion | | A | A |
| Commercial Focus | | E | E |
| Open Communication | | A | A |
| **Overall Value Rating** | | A | A |

Step 3: Combined Year-End Rating - Determine the alpha and numeric rating for goals and values.

APC-00113359

CONFIDENTIAL

**Anadarko**
Petroleum Corporation

## 2009 Performance Planning & Review

Combined Year-end Rating

**Step 4: Development Plan** – Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the 2009 performance planning process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| Communication Skills | Effective Communication in a Demanding Work Environment | 10/27/09 |
| | | |

**Step 5: Performance Planning Signatures** -The supervisor, employee, and next level supervisor's signature are required. After the performance meeting the employee being assessed may add comments to the final assessment form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

**Supervisor's Signature**                     Date: 2/2/2010

**Supervisor's Comments:** Lea was a tremendous contributer to the GOM team in 2009. Early in the year, Lea took on the reservoir engineering responsibilities for the ██████ and did an excellent job preparing the well to drill, and later logging and evaluating the results. She was also a member of the team that discovered ████ a project that was pulled together in record time and turned out to be one of the most valuable GOM discoveries that APC has made in recent years. Lea continues to impress me with her technical abilities, her desire to understand the issues most leveraging to our program, and her strong work ethic (which was tested repeatedly during the pressure testing and fluid sampling of our numerous successful wells in 2009). Lea is continuing to work with the New Plays team to identify the next great opportunity in the GOM, and I look forward to her contributions in 2010.

**Employee's Signature**                     Date:

**Employee's Comments:**

**Next Level Supervisor's Signature**                     Date:

**Next Level Supervisor's Comments:**

1/13/2009

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 59 of 107

APC-00113360

**Anadarko**
Petroleum Corporation

## 2011 Performance Review Process Form

| Employee Name: Lea Frye | Job Title: Staff Reservoir Engineer | Supervisor's Name: David Blakeley |
|---|---|---|
| Employee ID: 124188 | Department: Exploration-Gulf of Mexico | Next Level Supervisor: David O'Brien |

**Step 1: Core Values** - Assess each of the following core values according to the scale below.

| Values Scale | E | Exceptional | A | Acceptable | N | Needs Development |
|---|---|---|---|---|---|---|
| **Core Value** | | Comments (Required for N) | | | Self Assessment (E, A, or N) | Manager Assessment (E, A, or N) |
| Integrity and Trust | | | | | E | E |
| Servant Leadership | | | | | A | A |
| People and Passion | | | | | E | E |
| Commercial Focus | | | | | A | A |
| Open Communication | | | | | A | A |
| | | | Overall Core Value Rating | | A | A |

**Step 2: Goals** - Your goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

| 1 | **EXCEEDS EXPECTATIONS:** Usually exceeds and consistently meets all relevant performance standards. | 2 | **MEETS EXPECTATIONS:** Consistently meets and sometimes exceeds all relevant performance standards. | 3 | **NEEDS DEVELOPMENT:** Often falls short of and sometimes meets performance standards. |
|---|---|---|---|---|---|

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| Prepare to resume Work in the GOM | Prepare and Submit EP's for all 2011 & 2012 planned wells.<br><br>Submit APD's when EP's are approved.<br><br>Move permitted wells through AFE approval process in a timely manner. Support rig scheduling and tendering activities | ███████████ | 1 | 1 |
| Commercial Advisor/Portfolio Management | Provide consistent and timely economic analysis for all GOM investment decisions<br><br>*Provide Economic Analysis of all trades<br><br>Ensure prospect inventory is up to date as new timing and cost data emerge in the GOMs/farm-outs/farm-ins | Provided economic updates to reservoir tech and portfolio planning group throughout the year as new cost and/or geologic interpretations arose.<br><br>Collaborated with team members in execution of the portfolio planning updates for both April and December. | 2 | 2 |
| Replenish Leasehold | Prepare for APC's "virtual lease sale" in 2011 and the 2011\12 BOEMRE lease sales<br><br>Seek to expand prospect inventory | ███████████ | 1.5 | 1 |

CONFIDENTIAL

APC-00113361

CONFIDENTIAL

**Anadarko**
Petroleum Corporation

## 2011 Performance Review Process Form

| | | | | | |
|---|---|---|---|---|---|
| | | through creative deals and trades into other operator's prospects in high priority plays | ███████████████ | | |
| | | | Provided companies and/or partners with development costing scenarios for these projects when requested. | | |
| Operational Support | | Provide operational support for all GOM exploration well activates<br><br>Maintain cost containment by providing value of information analyses | No wells in the GOM this year; provided some assistance with an MDT job for the international engineering group in January. | 2 | 2 |
| Other | | Support and encourage "One GOM" culture through weekly communications with Development team management and staff.<br>Continue to support regional projects | ███████████████ | 1 | 1 |
| | | | Supplied production maps and analog field data for the Regional Teams "Cretaceous Knowledge Share" poster session. | | |
| Personal | | Provide data support to team members and Knowledge Share with peers | Assisted with November 9th Spill Drill.<br><br>Provided GOM deepwater EURs to exploration engineering group for analog comparison/study.<br><br>Showed onshore exploration group the utility of PEEP Monte Carlo add on VMC.<br><br>Helped project teams with the BOWD | 1 | 1 |

APC-00113362

**2011 Performance Review Process Form**

documentation which is part of the required SEMS process. Results:

| | | Overall Goal Rating | 1.25 | 1 |

**Step 3: Combined Year-End Rating** – Determine the alpha and numeric rating for goals and core values.

| | Self Assessment | Manager Assessment |
|---|---|---|
| Combined Year-End Rating | 1.25 A | A1 |

**Step 4: Development Plan** – Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| WCD Software | Merlin/Avalon software- WCD / Merlin/Avalon user conference | 3/29 & 10/17 |
| Safety/Regulatory Training | SEMS 151 Training and Live Safe Training | 4/7 & 7/21 |
| Spill Drill Training | Attended training for Spill Drill | 11/3 |

**Step 5: Performance Review Signatures** – The employee, supervisor, and next level supervisor's signature are required. After the performance review meeting, the employee being assessed may add comments to his/her Performance Review Form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

**Employee's Signature** _[signature]_   Date: 1/18/12

Employee's Comments: While it was a frustrating year from a drilling standpoint, it was a productive year getting ready for the next round. I enjoyed working with everyone + learning so much from my peers + colleagues. I will miss you all!!

**Supervisor's Signature** _Daniel Blakely_   Date: 1/12/12

Supervisor's Comments:

Great job - Thanks for the extra effort and initiative needed to re-start the Gom

**Next Level Supervisor's Signature** _D.P. O'B._   Date: 1/12/2012

Next Level Supervisor's Comments: YOUR EXTRA EFFORT STAYING FOCUSED IN 2011 IS APPRECIATED BY ME AND YOUR TEAM. BEST OF LUCK IN 2012 WITH YOUR NEW CHALLENGES!

CONFIDENTIAL

APC-0011363

CONFIDENTIAL

**Anadarko**
Petroleum Corporation

## 2012 Performance Review Process Form

| Employee Name: Lea Frye | Job Title: Staff Reservoir Engineer | Supervisor's Name: Alan O'Donnell |
|---|---|---|
| Employee ID: 124188 | Department: Mississippi Canyon | Next Level Supervisor: Darrell Hollek |

**Step 1: Core Values** - Assess each of the following core values according to the scale below.

| Values Scale | E | Exceptional | | A | Acceptable | | N | Needs Development |
|---|---|---|---|---|---|---|---|---|

| Core Value | Comments (Required for N) | Self Assessment (E, A, or N) | Manager Assessment (E, A, or N) |
|---|---|---|---|
| Integrity and Trust | Goes the extra mile to ensure accuracy. Established great credibility with partners through productivity work at ▮▮▮▮▮ | E | E |
| Servant Leadership | Did much more that asked during Spill Drills. Always takes time to help others. | A | E |
| People and Passion | | A | A |
| Commercial Focus | Played a key role in strategy for ▮▮▮▮▮▮▮▮▮▮ | E | E |
| Open Communication | Has a large sphere of influence the helps her achieve results. Well respected. | E | E |
| | Overall Core Value Rating | E | E |

**Step 2: Goals** - Your goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

| 1 | EXCEEDS EXPECTATIONS: Usually exceeds and consistently meets all relevant performance standards. | 2 | MEETS EXPECTATIONS: Consistently meets and sometimes exceeds all relevant performance standards. | 3 | NEEDS DEVELOPMENT: Often falls short of and sometimes meets performance standards. |
|---|---|---|---|---|---|

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ | 2 | 2 |

APC-00113364

## 2012 Performance Review Process Form

CONFIDENTIAL

APC-00113365

## 2012 Performance Review Process Form

CONFIDENTIAL

in addition, Lea has gained high credibility with partners which has in turn improved our communications.>

<Lea supported the team effectively on this.>

Case 4:17-cv-02289 Document 2-1 *SEALED* Filed in TXSD on 07/25/17 Page 65 of 107

APC-00113366

**2012 Performance Review Process Form**

CONFIDENTIAL

Case 4:17-cv-02289    Document 2-1 *SEALED*    Filed in TXSD on 07/25/17    Page 66 of 107

APC-00113367

| | | | | |
|---|---|---|---|---|
| | | 5+ presentations to Management and partners.> | | |
| ▆▆▆▆▆▆ | Assist operations and completions groups with abandonment planning and execution.<br><br>▆▆▆▆▆▆<br><br>Manage SEC reserves based on path forward(Ongoing) | Abandonment: Received BSEE and BOEMRE approval for the abandonment of the last 5 dry tree wells.<br><br>▆▆▆▆▆▆ | 1 | 1 |
| Other: Personal | Organize EGOM file structure and reduce duplicated files and efforts for greater team (by 4Q).<br>ALinks: Simplify and standardize engineering routine tasks like SEC, portfolio, budget and forecasting to develop the same products for all the fields (by year end). Document and submit to ALinks any tool and or process developed along the way (Goal -2 to 3 ALinks submittals).<br>Actively participate and assist in developing spill drill best practices and procedures for flow team (Ongoing). | EGOM Processes: Made progress toward a common budget, forecasting reserve tool for the EGOM fields.(Ongoing)<br><br>Spill Drill: Participated as deputy for past two in house spill drills for the flow calculations team. Helping to organize and document data needs, data transfer and best practices for future spill drill (Ongoing).<br><br>▆▆▆▆▆▆<br><br>Took on mentoring/training role for EGOM engineer New Hire in August 2012 (Ongoing).<br><Lea met her Alinks and EGOM processes goals very well. In this years spill drills she went far above and | 1 | 1 |

## 2012 Performance Review Process Form

| | | beyond what was required of her in participation and coordination of the Flow Calculation portion of the Flow Engineering Team.  She was a major contributor to the FET strategy, work flow, and data integrity.  She also took charge of the Flow Calc Group during the fall drill and drove them to results when a clash of strong personalities threatened to sidetrack the undermine the objectives. Lea has also done an excellent  job in mentoring our new Res Engr> | | |
|---|---|---|---|---|
| | | **Overall Goal Rating** | 1 | 1 |

**Step 3:  Combined Year-End Rating** - Determine the alpha and numeric rating for goals and core values.

| | Self Assessment | Manager Assessment |
|---|---|---|
| **Combined Year-End Rating** | E1 | E1 |

**Step 4:  Development Plan** – Review and identify skills and behaviors needed to effectively meet goals.  The Development Plan is completed as part of the Performance Review Process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| PTA and RTA | Fekete Harmony and Ecrin software (Pressure Transient Analysis) - In house experts (Cordill, Browning) and in house 1/2 day training with both still need to go to a PTA 1 week Ecrin course next year | Harmony - 2/13 Ecrin - 7/20 |
| Nexus | Simulation software - In house experts and on the job training  (Beecher and Dobbs) | Ongoing |
| Training | TecPlot Training (1 Day). Completed 11/8; Petrolook Training (1/2 day) Completed 7/23; Attended Gemini Solutions User conference (1Day); RAMP - Ongoing weekly meetings focused on petro physics and core analysis; On-line Incident Command 100 & 200 | Techplot 11/18 Petrolook 7/23 Gemini User Confernce 10/22 ICS 100 & 200 YE |

**Step 5: Performance Review Signatures** ~ The employee, supervisor, and next level supervisor's signature are required. After the performance review meeting, the employee being assessed may add comments to his/her Performance Review Form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

CONFIDENTIAL

Case 4:17-cv-02289   Document 2-1 *SEALED*   Filed in TXSD on 07/25/17   Page 67 of 107

APC-00113368

CONFIDENTIAL

**Anadarko**
Petroleum Corporation

## 2012 Performance Review Process Form

| Employee's Signature | Date: 1/23/2013 |
|---|---|

**Employee's Comments:**

Good Feedback, looking Forward to another good year

| Supervisor's Signature  R.M.O.Deel | Date: 1/23/13 |
|---|---|

**Supervisor's Comments:** Lea distinguished herself this year by taking strong initiative (focusing the Flow Calculation Team during the Fall GOM spill drill), doing excellent analytical work ▓▓▓▓ She did this plus field surveillance, budgeting, and portfolio while being the sole Reservoir Engineer in the group for 7 months out of the year. In August she also took on the extra burden of mentoring a new hire RE. Lea is has a fantastic work ethic and has a broad sphere of influence.

An areas to focus on is to listen for understanding. Many times you can talk over someone that is trying to tell you something important.

| Next Level Supervisor's Signature | Date: 1/28/2013 |
|---|---|

**Next Level Supervisor's Comments:**

Case 4:17-cv-02289   Document 2-1 *SEALED*   Filed in TXSD on 07/25/17   Page 68 of 107

APC-00113369

# Anadarko 2013 Performance Review Process
## Form for Lea Frye



| Employee Information | |
|---|---|
| Name: | Lea |
| Last Name: | Frye |
| Position Title: | Sr Staff Reservoir Engineer |
| Org Unit ID: | Eastern GOM (10000266) |
| Supervisor: | Danny Hart |
| HRBP: | Dalon Schuckman |
| Grade: | 88 |

### Confirmation of Mid-Year Discussion

☑ Select checkbox when mid-year discussion has occurred.

Date 07/30/2013

### Values

**Commercial Focus**

**Rating by Danny Hart:**                    **Rating by Lea Frye:**

**Supervisor Rating\*:** E - Exceptional       **Employee Rating\*:** E - Exceptional

**Comments by Mike Ferfon:**
Strong commercial focus demonstrated in a role that has this as it's primary objective within a DW GOM asset team.  Your work on pushing ███████████████████████████████████ is commendable.

**Comments by Lea Frye:**
I have a strong track record of doing my very best, as well as bringing out the best in both people and teams.  Consider the team interactions and work done around the ████████ project. Not only did I maintain the highest standards for my own work, but I spent a considerable effort helping the others I was working with to also perform at the same high level. The fact that others come to me for help and advice on a regular basis demonstrates the level of knowledge sharing I am known for. I am always keeping the big picture in mind when completing any evaluation, and incorporate that into my analysis.

**Comments by Darrell Hollek:**
*No comments*

**Comments by Dalon Schuckman:**
*No comments*

**Integrity and Trust**

**Rating by Danny Hart:**                    **Rating by Lea Frye:**

**Supervisor Rating\*:** E - Exceptional       **Employee Rating\*:** E - Exceptional

**Comments by Lea Frye:**
This one is simple. I have been here eight years, and am well known throughout the company. For that entire time I have always upheld the highest standards in business integrity and ethics. I am known as someone who gets things done and done on time. Prioritizing is the key, and when I prioritize I always take in to account internal and/or external deadlines and potential value impact to the company.

**Comments by Mike Ferfon:**
You work with a high level of integrity and I alkways trust that you are putting in your best effort on projects.

**Comments by Darrell Hollek:**
*No comments*

**Comments by Dalon Schuckman:**
*No comments*

**Open Communication**

CONFIDENTIAL                                                                    APC-00113370

**Rating by Danny Hart:**

Supervisor Rating*: A - Acceptable

**Rating by Lea Frye:**

Employee Rating*: A - Acceptable

**Comments by Lea Frye:**
I try hard to practice this skill as I have found that teams work better with open communication and that more is usually accomplished with face to face communication whenever possible. I make it a point to visit with people I work with frequently and with other peers to discuss technical matters. While I have not perfected this skill, I do feel accomplished at communication with my co-workers and peers as people often visit me for advice and guidance.

**Comments by Mike Ferfon:**
Open Communication is important in the DW RE role as it is a natural nexus for workflows to converge and be driven from. You are a very consistent communicator in meetings and with your direct as well as indirect coworkers. One item to possibly have awareness of is how you make your points and opinions in very rare instances where it can be abrupt. Smoothing out that delivery can allow more focus on the content of what you are saying.

**Comments by Darrell Hollek:**
*No comments*
**Comments by Dalon Schuckman:**
*No comments*


**People and Passion**

**Rating by Danny Hart:**

Supervisor Rating*: A - Acceptable

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Comments by Lea Frye:**
I come to work to get things done, and I expect that should be evident to those who work with and around me. I push hard, and work every day to do better than the day before. Part of what drives me is to keep learning to do better, and frankly the challenge of all the unknowns on every project we do is a big driver for me. I enjoy the learning part of this job, and take every opportunity I can to improve my knowledge and skills.

One thing that I think is very unique about me is that I have forged very good working relationships with individuals in virtually every segment of our company. I have found that people differ quite a bit, and by taking note of what is important to different individuals, I can relate to them better, be a better work partner, and motivate them to do their best work. In my mentoring roles, I am trying to pass this along, as it can do a lot to improve performance of the various work teams that we all participate in.

**Comments by Mike Ferfon:**
Your passion for your work is evident and consistent.
**Comments by Darrell Hollek:**
*No comments*
**Comments by Dalon Schuckman:**
*No comments*


**Servant Leadership**

**Rating by Danny Hart:**

Supervisor Rating*: A - Acceptable

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Comments by Lea Frye:**
My starting point is that I work very hard to do what people ask or need me to do. I feel strongly that before I can ask others to perform at their highest level, I need to be demonstrating that by my own work. From there, I am not afraid to ask, or to expect others to also perform at a high level. On a regular basis, I share what I know with others, even when the help they need is not related to my direct work. I have experience in multiple areas of the company, and am still considered a resource to many of the people in those areas. This practice has also helped at times when I need assistance from the other segments of the company, and I feel that people will go out of their way to assist me when

CONFIDENTIAL

APC-00113371

needed do in a large part to their appreciation to my style of helping others.

This expands further to the idea of working in teams. People know that I trust them and their expertise to do their jobs well, and they also know that I expect it of them. They also know that they can rely on me to deliver on my side. I respect the opinions and input of others, but I am not afraid to stand up for things I feel are important, or critical to project success. My approach is to credit others as much as possible, and by helping others to succeed at their roles, to help guide the team to succeed in accomplishing great things for the company

**Comments by Mike Ferfon:**
High expectations come with the Sr Staff Engineering position in this Value and it speaks high of you to have achieved this level on the early end. Good examples of you giving credit to your team members and other groups for contributions directly related to your work was recognized. Also, be aware to credit those before you as well when it is due. Your recent initiative of making the region aware of the intricacies and timing issues associated with getting an approved EP through the BOEMRE is commendable.

**Comments by Darrell Hollek:**
*No comments*

**Comments by Dalon Schuckman:**
*No comments*

---

## Goals

**Goal Name:**
███████████████████████████████

**Goal Description:**

**Measurement Source:**
Target budget forecast (2013: 4.3 Net MBOED); Target budget Capex (2013: 17.2 Net MM);

| Status: | Start: | Due: |
|---|---|---|
| On Target | 07/01/2013 | 10/31/2013 |

**Rating by Danny Hart:**                          **Rating by Lea Frye:**

**Supervisor Rating\*:** 2 - Meets Expectations       **Employee Rating\*:** 2 - Meets Expectations

**Comments by Lea Frye:**
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**Comments by Mike Ferfon:**
████████████████████████████████████████████
████████████████████████████████████████████

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
████████████████████████████████████████████

**Goal Description:**

**Measurement Source:**
Obtain final internal AFE approval by 3Q. Assist with EP and APD approval process as needed with a YE spud target.

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**                          **Rating by Lea Frye:**

**Supervisor Rating\*:** 2 - Meets Expectations       **Employee Rating\*:** 1 - Exceeds Expectations

CONFIDENTIAL

APC-00113372

**Comments by Lea Frye:**

██████████████████████████████████████████████████████████████

**Comments by Mike Ferfon:**

██████████████████████████████████████████████████████████████

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Alink submittals:
**Goal Description:**
**Measurement Source:**
minimum of 3 submittals with a stretch of 5 submittals

| Status: | Start: | Due: |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**                                **Rating by Lea Frye:**
Supervisor Rating*: 2 - Meets Expectations              Employee Rating*: 2 - Meets Expectations

**Comments by Lea Frye:**
Year to date I have submitted two quality A-links topics which many peers have commented on as easy to follow and understand while still delivery a key message or learning. One of theses topics received a certificate of appreciation for "featured content" in February. I still am on target to meet my goal of three submittal, as I have another presentation in works to highlight the EPA air permitting requirements and the impact on timing and drilling operations for those project East of the 87.5 degree longitude.

**Comments by Mike Ferfon:**
These contributions are very educational and valuable to the corporation for transfer of knowledge. Keep up the great work in this area.

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Training:
**Goal Description:**
**Measurement Source:**
Re certify for water survival, Nexus software training, SPE or OTC conference attendance and time permitting Kappa software training and/or Nautilus course.

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**                                **Rating by Lea Frye:**
Supervisor Rating*: 2 - Meets Expectations              Employee Rating*: 2 - Meets Expectations

**Comments by Lea Frye:**
Completed Nexus Training (3/25-3/29); Offshore Water Survival (8/16) and Nautilus Course (6/17 -6/26)

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
████████████████████
**Goal Description:**
████████████████████████████████████████████████████████████████

**Measurement Source:**
████████████████████████████████████████████

| Status: | Start: | Due: |
|---|---|---|
|  | 07/01/2013 | 10/31/2013 |

CONFIDENTIAL

APC-00113373

Rating by Danny Hart:

Supervisor Rating*: 1 – Exceeds Expectations

Rating by Lea Frye:

Employee Rating*: 1 – Exceeds Expectations

Comments by Lea Frye:

███████████████████████████████

Comments by Mike Ferfon:
I really appreciated the level of scrutiny with which you approached this evaluation with the team, breaking down the value proposition into components that made it easy to see what the inherent risks were versus the reward. This work provided a nice buffer of comfort when it came time to sign the hefty AFE for Phase 3.

Comments by Danny Hart:
No comments

Goal Name:
████████████████████████

Goal Description:
Measurement Source:
████████████████████████

| Status: | Start: | Due: |
|---|---|---|
| Will Not Meet | 01/01/2013 | 12/31/2013 |

Rating by Danny Hart:

Supervisor Rating*: 2 – Meets Expectations

Rating by Lea Frye:

Employee Rating*: 2 – Meets Expectations

Comments by Lea Frye:
Other higher priority worked pushed this goal to the back burner. However, progress has been made toward ████████████████████████

Comments by Mike Ferfon:
Understandable on the priorities.  One thing to consider for these types of evaluations is that even if there is not a final product from the G&G staff, a basic, high level analysis can still be framed up that might be essential in directing your colleagues thinking on the interpretation side.  Early RE input can be beneficial whenever possible.

Comments by Danny Hart:
No comments

Goal Name:
Mentoring

Goal Description:
Continue to mentor new hire reservoir engineer; focusing mainly on application of technical skills in EGOM, assisting with software knowledge training and most emphases on everyday processes for EGOM base production and new developments. ████████████████████████

Measurement Source:
Quality of work performed by mentoree

| Status: | Start: | Due: |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

Rating by Danny Hart:

Supervisor Rating*: 2 – Meets Expectations

Rating by Lea Frye:

Employee Rating*: 1 – Exceeds Expectations

Comments by Lea Frye:
My main focus on mentoring was processes, fundamentals of software, where to find needed data and introduction to in house experts. My mentoree is performing high quality work and making relationships with our in house experts to help guide the work.  Not only have I mentored within our EGOM group but I have also mentored other GOM engineers throughout the year.  Early in the year I held a mini PEEP training session for a few of the new reservoir engineers and I have helped some of the less experienced engineers by acting as a sounding board for their technical work.

Comments by Mike Ferfon:

CONFIDENTIAL                                                                                    APC-00113374

Thanks for your contributions here. I know the GOM Leadership Team sees this as essential for the Sr Staff level and your efforts are recognized.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
WCD Team Advisor
**Goal Description:**
Advise WCD team with the development of WCD best practices and work flows.
**Measurement Source:**
Advise WCD team with the development of WCD best practices and work flows.

| Status: | Start: | Due: |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**  **Rating by Lea Frye:**
**Supervisor Rating\*: 2 - Meets Expectations**  **Employee Rating\*: 2 - Meets Expectations**

**Comments by Lea Frye:**
Continue to advise worst case discharge team with recommended work flows utilizing the Gemini Solutions software. Assisted early in the year with recommended data capture and data quality to be used in the calculations which is part of the final recommended WCD work flow rolled out to all GOM engineers.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Flow Engineering Team
**Goal Description:**
Actively participate and assist in developing spill drill best practices and procedures for flow team (Ongoing).
**Measurement Source:**

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**  **Rating by Lea Frye:**
**Supervisor Rating\*: 2 - Meets Expectations**  **Employee Rating\*: 2 - Meets Expectations**

**Comments by Lea Frye:**
Participated in the annual exercise required for the flow engineers team. This exercise took place on 11/5/2013.
**Comments by Mike Ferfon:**
Thanks for your continued participation in this process which is essential to us continuing to operate in the GOM.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
AFE clean up
**Goal Description:**
Close out old AFEs and supplement as needed for all EGOM assets.
**Measurement Source:**
Close out old AFEs and supplement as needed for all EGOM assets.

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**  **Rating by Lea Frye:**
**Supervisor Rating\*: 2 - Meets Expectations**  **Employee Rating\*: 2 - Meets Expectations**

**Comments by Lea Frye:**
With the help of our engineering tech, my colleague and I have all EGOM AFEs with compliance for supplement guidelines and closed all outdated AFEs to prevent additional charges form hitting them with out being notified. This effort has made cost tracking manageable for our team and those that will follow.


**Comments by Danny Hart:**
*No comments*

**Goal Name:**
████████████████████████████████

CONFIDENTIAL

APC-00113375

**Goal Description:**

███████████████████████████████████████

**Measurement Source:**

███████████████████████████████████████

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**                                    **Rating by Lea Frye:**

**Supervisor Rating\*: 1 - Exceeds Expectations**            **Employee Rating\*: 1 - Exceeds Expectations**

**Comments by Lea Frye:**

███████████████████████████████████████

**Comments by Mike Ferfon:**
One of your main strengths is in driving processes and this was clearly on display here. We can now comfortably promise options to idle rig slots with at least 3 almost drill ready prospects for 2014.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Miscellaneous
**Goal Description:**
Capture of accomplishments not in original goals
**Measurement Source:**

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**                                    **Rating by Lea Frye:**

**Supervisor Rating\*: 2 - Meets Expectations**              **Employee Rating\*: 1 - Exceeds Expectations**

**Comments by Lea Frye:**

███████████████████████████████████████

**Comments by Mike Ferfon:**
Thanks for your contributions with this initiative. It is always good to shine light on what best practices should be.

**Comments by Danny Hart:**
*No comments*

**Individual Development Activities**

**Combined Year-End Rating**

CONFIDENTIAL                                                                          APC-00113376

Combined Year-End Rating A2 - Acceptable/Meets Expectations

Section Comments:
**Comments by Mike Ferfon:**
Lea had a very strong year coming off the heals of a well deserved promotion to Sr Staff Engineer where the bar is raised significantly. Her strengths are clearly in consistent solid work ethic, driving processes, and in project evaluations. One thing to consider is to continue to add technical tools to the toolbox in application to grass roots technical analysis. Your consistent, methodical approach to your work is a primary reason I recommended you for the Shenendoah assignment where I feel you will bring even more value.

CONFIDENTIAL

APC-00113377

# Anadarko 2014 Performance Review Process Form for Lea Frye



## Employee Information

**Year-End Instructions:**
Employee must rate each value and goal listed in the sections below. Use the comment fields to give detailed examples.
Supervisor must rate each individual goal and value and must select an overall rating and enter overall comments. Supervisor may use the comment fields for individual goals and values as needed.
Click here for more information on the Performance Review Process.

|  |  |
|---|---|
| Name: | Lea |
| Last Name: | Frye |
| Position Title: | Sr Staff Reservoir Engineer |
| Org Unit ID: | Operations Eastern Gulf of Mexico (10000259) |
| Supervisor: | Pat McGrievy |
| HRBP: | Dalon Schuckman |
| Grade: | 88 |

## Values

Review each of the core values below.

For more information, click here - Core Values Expected Behaviors Guide.

## Commercial Focus

**Rating by Pat McGrievy:**

Supervisor Rating*: E - Exceptional

Supervisor Comments:

Lea has demonstrated her commercial focus time and time again through her engineering and economic work on the Shenandoah project and also reflected in the GOM studies such

███████████████████████████████

clearly the lead when it comes to coordinating the efforts of the Shenandoah Team. She continues to be very holistic in her thought process and understands the big knobs that drive the commercial solutions and ultimate decisions. She consistently challenges the status quo and is a highly respected "big picture" thinker. I have a high regard for Lea and her commercial skill sets.

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

Employee Comments:
I am always keeping the big picture in mind and encouraging team members to the same. Anticipating what comes next and planning ahead for the decision that will be required is important and something I do well. The decisions we make are not always straight forward as many factors influence the outcome, so I endeavor to understand all the risks and the rewards and way them against each other before recommending a course of action on all projects I work.

---

CONFIDENTIAL     APC-00113378

**Integrity and Trust**

**Rating by Pat McGrievy:**

Supervisor Rating*: E - Exceptional

**Supervisor Comments:**

SInce joining the Foldbelt Team in late 2013 as subsurface team lead for Shenandoah, Lea has developed a strong professional relationship with both her fellow Foldbelt Team and her Shenandoah subsurface project for which she leads. Lea plans her business well & sets priorities and everyone on the immediate and extended Shenandoah team knows their responsibility and how they can impact the project. She is a trusted technical contributor who readily helps others get organized; laying out goals, objectives and largely corriographing each internal and external partnership meeeting that she organizes and participates. She produces positive value-added results under just about any situation that she's dealt. She tells the truth no matter circumstances-she has exceptional judgement on how/when to present sensitive material.

.

She continues to establish herself amongst her peers to be reliable, conscientious and one with high moral standards. She has clearly earned the trust and respect of her peers and extended Shenandoah team.

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Employee Comments:**
I have always upheld the highest standards in business integrity and ethics. I am known as an individual whom speaks truthfully based on the knowledge at hand and who is willing to admit to my errors. I will not be swayed to bend the truth to fit a purpose. I am known as someone who gets things done and done on time.

**Open Communication**

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea relates well to others as demonstrated by the broad spectrum of potentially challenging and opinionated personalities (drilling, completions, project engineers) that she works with on the Shenandoah surface and subsurface teams on a routine basis. She effectively articulates opinions/ideas to all audience types and is always timely in her delivery of information to others. She also listens appropriately to others opinions. She is effective at providing the right lelvel of information based on the audience and eagerly seeks others opinions and knowledge to ensure that their sentiments are heard and well-understood..

**Rating by Lea Frye:**

Employee Rating*: A - Acceptable

**Employee Comments:**
I continue to practice this skill as I have found that teams work better with open communication. On my current project, I have orchestrated a multi-discipline team meeting held weekly to promote face to face communication. While it is not always easy to keep the peace, the communication has helped each discipline to see how decisions impact each other and learn to compromise for the greater good. These meetings have also served as a great avenue on practicing how to communicate effectively in preparation for partner meetings. While I have not mastered all these skills I feel I have made progress toward being a role model for others.

CONFIDENTIAL                                                    APC-00113379

## People and Passion

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea has a quick action for results (no matter the timeframe). Readily volunteers for opportunities beyond her primary job (i.e. ███████████████████ Subject Expert for A-Links) . She has an energy toward challenges-take on many "process improvement" tasks for the benefit of the team.

In addition, she effectively builds and maintains respectful and positive working relationships with her immediate and extended teams. She treats people fairly and has a passion for her work and for the success of the team and for the company. Lea has a strong personality, however, (which is good as she readiliy stands for what she believes) and obviously has a real passion for her work, but at times her outspoken passion may be construed by others to be slightly condescending at times.

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Employee Comments:**

My passion for my work is evident in the work product delivered. I strive to improve in every aspect from technical to business acumen and relationships with my peers. I push hard, and work every day to do better than the day before. Part of what drives me is pride in a job well done as well as a pure thirst for unraveling the mysteries of the subsurface world.

Working relationships are important to me, I strive to build and grow relationships based on honesty and trust. I enjoy learning what motivates individuals and harnessing this knowledge to achieve great things as a team.

## Servant Leadership

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea acts in the company's best interest over her own personal interests. She generally makes others feel valuable. She assesses her peers individual motivator's to get the best results and she can easily relate to any team member regardless of personality differences. Humility- always shares credit, uses "we" & "us". She usually uses clear/strategic judgement on picking her battles and "calling in favors". Request of her colleagues usually come first, no matter what extra effort that may call for in completing tasks on/before the deadline.

**Rating by Lea Frye:**

Employee Rating*: A - Acceptable

**Employee Comments:**

I work hard to anticipate what people need from and me to deliver an accurate timely product. I strive to perform at my highest level always and have found that by doing so this motivates other to do the same. I make every attempt to give time help others, even when the help they need is not related to my direct work.

I respect the opinions and input of others, but I am not afraid to stand up for things I feel are important, or critical to project success. My approach is to credit others as much as possible, and by helping others to succeed at their roles, to help guide the team to succeed in accomplishing great things for the company.

## Goals

Goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

**Goal Name:** High Rate Well Initiative

███████████████████████████████████████████████

**Measurement Source:** Phase 1: 3rd Quarter 2014
Phase 2: YE 2014
Phase 3: 2015

**Status:** On Target   **Start:**   **Due:**
                         01/01/2014  12/31/2014

**Progress:**
Phase 1: Need to set review with asset managers, make suggested changes and roll out to GOM. Set review for Late August/early September.

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**

Despite the fact that the delivery of this objective has been slightly delayed to a Q1, 2015 roll-out, the results of the GOM high rate well Study and tool development is a vaulable element and tool for reservoir and production engineers to effectively manage thier

**Rating by Lea Frye:**

Employee Rating*: 2 - Meets Expectations

**Employee Comments:**

███████████████████████████████████

*Anadarko 2014 Performance Review Process Form for Lea Frye*

*Page 3 of 8*

CONFIDENTIAL



respective wells going forward. Historically, many wells in the GOM have developed skin damage, and in some cases, catostrophic failure due to mis-managemant. This tool will be useful as leading guidance for prudent decision making and well maintenance.

Lea has been very busy as her time has been consumed with effectively managing the Shenandoah technical team as well as directing the study of the high rate well initiative. Her ability to go above and beyond in delivering is very commendable and highly-appreciated by management.

**Goal Name:** Shenandoah Basin Appraisal Well Data Capture
**Goal Description:** Assist exploration counterparts to ensure quality data capture from next appraisal operations. Coordinate with internal and external experts on recommended analyses to be performed on fluid and rock data collected. Incorporate results in to parametric studies to narrow uncertainty ranges on in place and recoverable resources.
**Measurement Source:** Capture pertinent fluid, pressure, log and rock data for analyses. Timing: Linked to TD of WR 52 #2 Well

**Status:** On Target    **Start:**       **Due:**
                         01/01/2014  12/31/2014

**Progress:**
Working on by-pass core AFE approvals; Interacting with exploration counterparts on data requirements.

| **Rating by Pat McGrievy:** | **Rating by Lea Frye:** |
| --- | --- |
| Supervisor Rating*: 2 - Meets Expectations | Employee Rating*: 2 - Meets Expectations |
| **Supervisor Comments:**<br>Lea has been the point for both the exploration and development teams for data gathering (fluids and core data) and collaborating with other technical experts such as Nikhil Joshi (FA) and Jonn Cromb (completions needs), among many other disciplines, to ensure that all disciplines requirements are achieved to move the project forward. Lea also periodically consults with Brad Browning, who has a wealth of experience on data gathering and management. | **Employee Comments:**<br>Coordinating and prioritizing whole core data requirements with Shenandoah team members to ensure adequate core captured to cover all data needs and core testing requirements are known and understood by all parties. AFE support documentation for the whole core acquisition has been prepared for submittal awaiting final whole core cost estimates. Final coring costs not expected until entire section seen and core points selected by greater team.<br>Collaborating with exploration counterparts on data needs for the development team from the MDT program. Based on collaboration efforts, a total of six coated single phase bottles will be run to further define if H2S is present or not. The presence of H2S, even in small amounts, has a big design impact at these pressures and if bottles are not coated H2S will be scavenged. In addition, I have offered my time to assist exploration with the MDT acquisition expected to happen before year end. |

**Goal Name:** Shenandoah Feasibility Studies
**Goal Description:** Coordinate subsurface efforts with facility efforts to evaluate multiple development scenarios incorporating uncertainty in resource size and drive mechanism. The objective of the feasibility studies is to define the following for each concept; complete risk assessment, strategic business fit, potential returns and identify any/all technology gaps. Work with facility project team to evaluate pre-screening development concepts in advance of Concept Select phase.
**Measurement Source:** Complete evaluation of each concept and final delivery of feasibility results (internal and to partners) by 4Q 2014.

**Status:** On Target    **Start:**       **Due:**
                         01/01/2014  10/31/2014

**Progress:**
Two out of eight deliverables complete to date. Five deliverables will be complete post partner meeting late August and the last will be complete by year end.

| **Rating by Pat McGrievy:** | **Rating by Lea Frye:** |
| --- | --- |
| Supervisor Rating*: 1 - Exceeds Expectations | Employee Rating*: 1 - Exceeds Expectations |
| **Supervisor Comments:**<br><br>Lea has worked effectively with the facility project and subsurface teams to help define a variety of reasonable pre-screening development scenarios, whether it be an EPS solution or a large Semi-sub. Her work in completing the economic evaluation of each concept has helped to determine the viablity of each opportunity. Additionally, a risk assessment workshop, conducted in July, 2014 helped the prject team to understand the technical gaps associated with each of these development concepts and has helped to | **Employee Comments:**<br>Lead parametric studies to evaluate multiple development scenarios incorporating uncertainty in resource size, well deliverability and drive mechanism. As part of the feasibility studies the team evaluated each concept for a strategic business fit, potential returns and identification of risks and technology gaps to be better defined entering in to concept select. This work in conjunction with the facilities project team hasled to recommendation to drop the large semi case as a production host and has added a phased early production test concept to be further evaluated going in to 2015. |

CONFIDENTIAL                                                                          APC-00113381

define solutions to de-risk each of the identified technical risks. These findings were shared with members of the EC. Currently, the team is working on a phased approach as a leading concept that will include an early production dry tree or wet tree system to understand the short and long term productivity of the Wilcox and also the FA and completion designs that will drive the follow-up development.

Additionally, I kicked off several studies to support efforts to evaluate and define drilling risks, pressure support feasibility and completion risks through a full 3D geo- mechanics study and a quick look geo-mechanics study. Moreover, a more detailed geo-chem study and additional fluid studies are under way to reduce uncertainty in recovery and deliverability due to fluids.

Lastly, I have compiled and submitted 6 out of 8 of the subsurface deliverables tied to the feasibility studies, with completion of the last two expected by year end.

**Goal Name:** Inter Disciplinary Communication

**Goal Description:** Participate and attend monthly EXP and DEV meetings. Influence next appraisal well placement based on parametric studies. Collaborate and work with all key disciplines (drilling, completions, production, 20 K technology group and facilities) to ensure data transfer and communication.

**Measurement Source:** On going through out the project

**Status:** On Target  **Start:** 01/01/2014  **Due:** 12/31/2014

**Progress:**
Internal surface/subsurface meetings have been a great avenue for communication among the team. This has spurred many great ideas and discussion around focus for the project.

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**
Lea has demonstrated strong leadership skills in the technical management and advancement of this project. She has done a real good job of keeping the technical staff aligned with her weekly luncheon technical staff meetings with both the the Shenandoah subsurface and project-related teams. without this meeting, internal alignment would've been difficult. Her strengths in these meeting settings are her ability to keep the meetings on point and to force discussions and solutions on some of the more challenging and contentious issues such as completion practices and flow assurance. Her effective work relations with the exploration team has also reaped benefits in influencing appraisal well locations. The Shenandoah project team maintains communication with the exploration team through monthly technical meetings and bi-lateral communication to apraisa both teams on project advancements and plans forward. Again, Lea usually has the lead on the development side for these meetings.

**Rating by Lea Frye:**

Employee Rating*: 1 - Exceeds Expectations

**Employee Comments:**
Openly communicating with exploration team about development team work and resulting subsurface interpretations. Several formal and informal meetings were held to share our thoughts and ideas around the subsurface uncertainties as related to appraisal and data capture and the potential impact on sanction timing. Led basin pressure interpretation meeting which ultimately led to the current appraisal well bottom hole location which was deviated to target a structurally higher position than the original starlight-hole location.

Organize weekly surface/subsurface meetings held to transfer knowledge and generate discussion between disciplines. These meetings have been an effective means of identifying key decisions points, key risks and potential gaps in technology and/or studies. Furthermore, the meetings lead to two workshops geared toward defining a dry tree base case and a wet tree base case for comparative purposes along with key sensitivities/differences to be explored in order gain alignment amongst the team as the project prepares to move from feasibility studies to concept select. This alignment will better define the path forward as we move through 2015 and make some major decisions that will work toward narrowing down to a single development concept for concept select.

**Goal Name:** Partner Meetings

**Goal Description:** Coordinate initial April 2 and all subsequent quarterly subsurface partner meetings. Coordinate partner alignment kick-off meeting scheduled for late April. Responsible for presentation content for subsurface parametric studies as well as updates on other on-going studies to keep partners informed and aligned. Maintain collaboration with partners throughout all project phases. Utilize Live Link as a tool to share and communicate with partners.

**Measurement Source:** Quarterly Meeting through 4Q 2014. Feedback from team and partners on delivery of presentations and collaboration.

**Status:** On Target  **Start:** 01/01/2014  **Due:** 12/31/2014

**Progress:**
Continue to collaborate with partners on development ideas and leverage their expertise/manpower as needed to satisfy project needs.
On target to complete all quarterly partner meetings by December.

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**
Lea has lead or has helped to coordinate each of the quarterly partner meetings (subsurface and surface-facility project meetings) throughout the 2014 evaluation period. She also routinely communicates, interfaces and collaborates with her technical counterparts with the other company's which make up the Shenandoah partnership. Her

**Rating by Lea Frye:**

Employee Rating*: 1 - Exceeds Expectations

**Employee Comments:**
Coordinate agendas and partner presentation material for all partner meetings. This is an important role as partners expect clear, concise and timely communication about the project. To date, Anadarko has hosted six partner meetings with great success. Partners have been very complimentary of the meetings and the progression of the project

*Anadarko 2014 Performance Review Process Form for Lea Frye*

CONFIDENTIAL

APC-00113382

ability to manage these meetings on the techncal level and provide the proper level if information to the partnership has been commended by many who have attended these meetings. This perhaps is the most time-consuming and most important role for Lea. She has conducted herslf quite well in meeting management skills and has demonstrated her leadership skills amongst her peers. The most recent meeting, held in November was a two day partner alignment workshop and the feedback from the partnership was very good. Despite the complexity of this project and the potential for misalignment, I'm very pleased with where this project is headed and it can be directly related to the work that Lea has done and

through the feasibility stage. Anadarko will host two workshops mid-November to gain alignment with partners going in to concept select early in 2015 carrying two main development concepts to be compared. The project team has prepared for this with the two internal workshops held on 10/23 and 10/27.

---

Goal Name: Progress Shenandoah Discovery

**Goal Description:** Goal is to work project to sanction point in late 2016: Work collectively with facility project team, 20K project team, exploration team, internal stakeholders (drilling, completions, FA) and external stakeholders (partnership and BSEE) to progress project in parallel with the appraisal drilling phase to concept select phase and ultimately to sanction in late 2016.

Key 2014 focus areas for project will be the completion of Ph1 & Ph2 subsurface parametric studies; concept select screening studies; initiation of the development of 20K technologies; 20K rig contract commitment; operational and technology maturation (identify and address key challenges for drilling, completions, FA, etc.); collaboration with APC Exploration to influence appraisal planning; and maintain subsurface geo-modeling and dynamic modeling alignment with partnership through routine communication and periodic subsurface partnership meetings. **Measurement Source:** Complete concept screening process in Q3, 2014 and parametric studies phases 1 & 2 by Q4, 2014. Formalize IPT by end of Q4, 2014.

**Status:** Off Target   **Start:**   **Due:**
01/01/2014   12/31/2014

**Progress:**
Phase 2 parametric studies and IPT formalization may slip into 1Q 2015 based on current outlook. Concept screening and Phase I parametric studies on target.

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| Supervisor Rating*: 1 - Exceeds Expectations | Employee Rating*: 2 - Meets Expectations |

**Supervisor Comments:**

Lea has done a very admirable job of progressing and directing the multiple teams that make up the Senandoah project. This arguably is the most complex and challenging projects in the history of APC from all angles. The major complexitties of the project include the deep Wilcox formation with potential compartmentization, FA and pressure maintenance challenges; the 20A initiative with the requirement of new technology development in D&C and subsea design; regulatory challenges from a commingliing perspective; the development of a first of a kind EPS solution; mutiple parnerships with diverse agendas; and further challenged by the 180 day clock and the requirement to run in paralell with the exploration team influencing the location(s) of the nextg appraisal wells.

Despite the litany on challenges of this project, Lea has been essentially been flying solo as a reservoir engineer, managing and directing traffic for her counterparts on the Shenandaoh team. She has done a very commendable job for the Shenandoah project.

**Employee Comments:**
The project team and the 20A team have maintained momentum throughout the year targeting sanction in 2016 and first oil in 2019. Alignment was achieved internally between the 20A team and project team around roles and responsibilities in support of the Shenandoah project. Quarterly subsurface and IPT partner meetings have been scheduled to ensure alignment with partners.

Based on the reservoir uncertainties identified in the Phase I parametric study work it was decided to push Phase 2 parametric studies and IPT formation back to January 2015 after the results com ein from the current drill well. This would allow the results from the well to be incorporated in to Phase 2 parametric studies going forward and a natural transition from appraise stage to concept select stage. The shift in timing to date has not impacted the project timeline. Work is still progressing in parallel between the 20A team and the project teams to better define schedule risks going into 2015. Adjustment to the timeline will continually be examined to ensure schedule and subsurface risks are adequately satisfied before committing to a field development plan.

---

**Individual Development Activities**

Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

CONFIDENTIAL

APC-00113383

**Category: Development Activities**
Development Activity Name: In-House Formal Training
**Value :** Open Communication,
People and Passion,
Servant Leadership
**Description :** Attend the following courses: Project Management, Livelink training and ACES training if available this year
**Measurement Source :** Complete by 3Q 2014
**Start:** 01/01/2014      **End :** 12/31/2014      **Status :** On Target
**Progress :**

| **Supervisor Comments:** | **Employee Comments:** |
|---|---|
| Lea has successfully completed these needed training courses. | Goal Meet |

**Category: Development Activities**
Development Activity Name: Training/Conference
**Value :** Commercial Focus
**Description :** Attend Formation Damage Course, OTC , internal reservoir characterization meetings and other conferences or training opportunities of interest and applicability as time permits.
**Measurement Source :** Complete by 4Q 2014
**Start:** 01/01/2014      **End :** 12/31/2014      **Status :** On Target
**Progress :**

| **Supervisor Comments:** | **Employee Comments:** |
|---|---|
| Lea has completed the formation damage seminar which proved to be valuable in her work on the high rate well initiative. | Goal Meet |

## Combined Year-End Rating

Determine the alpha and numeric rating for goals and core values.

**Combined Year-End Rating A1 - Acceptable/Exceeds Expectations**

**Section Comments:**

| **Supervisor Overall Comments:** | **Employee Overall Comments:** *No comments* |
|---|---|
| As her rating indicates (A1), Lea had a very strong year in a leadership capacity as the team lead at Shenandoah. Her strengths are her ability to skillfully and diplomatically drive processes and people without collateral damage; effectively manage her project work and reliably meet deadlines; and consistently exude strong work ethic for which she is a role model. Lea's ability to effectively manage and progress the Shenandoah project to its current state, is highly commendable given the various strong personalities and the many obstructions that have been encountered in 2014. I'm confident that she will continue to function at this high level in 2015. I'm feel fortunate to have her on my team. | |

## Signatures

The employee's signature indicates the employee and supervisor have had the performance discussion.

| Manager: | *Pat McGrievy* | *01/26/2015* |
|---|---|---|
| | Pat McGrievy | |
| Employee: | *Lea Frye* | *01/27/2015* |
| | Lea Frye | |

CONFIDENTIAL      APC-00113384

**Section Comments:**

| Supervisor Signature Comments: | Employee Signature Comments: |
| --- | --- |
| *No comments* | 2014 was a great year full of new learning opportunities for me as the subsurface lead for the Shenandoah development team. I have grown in strength in my knowledge of deep-water developments through the interactions I have had with my peers, the facilities team and the 20A team. A special thank you for the support of my colleagues and my supervisor as we faced many challenges in 2014. I am proud of the work accomplished by all involved and look forward to 2015. |

CONFIDENTIAL                                                                APC-00113385

# Anadarko 2015 Performance Review Process Form for Lea Frye



## Employee Information

**Year-End Instructions:**
Employee must rate each value and goal listed in the sections below. Use the comment fields to give detailed examples.
Supervisor must rate each individual goal and value and must select an overall rating and enter overall comments. Supervisor may use the comment fields for individual goals and values as needed.
Click here for more information on the Performance Review Process.

|  |  |
|---|---|
| Name: | Lea |
| Last Name: | Frye |
| Position Title: | Sr Staff Reservoir Engineer |
| Org Unit ID: | Operations Eastern Gulf of Mexico (10000259) |
| Supervisor: | Pat McGrievy |
| HRBP: | Dalon Schuckman |
| Grade: | 88 |

## Values

Review each of the core values below.

For more information, click here - Core Values Expected Behaviors Guide.

## Commercial Focus

**Rating by Pat McGrievy:**

**Supervisor Rating\*:** E - Exceptional

**Supervisor Comments:**
Year in and year out, Lea continues to demonstrate her commercial focus through her engineering and commercial work at Shenandoah, which is unquestionably one of the most complex projects from a number of fronts in Anadarko's portfolio. She's clearly the beacon when it comes to leading and coordinating the technical and commercial efforts of the team. She approaches problems with a strong technical and business decision perspective. She continues to be very holistic in her thought process and understands and has a command on the big knobs that drive the commercial solutions and ultimate decisions. She consistently challenges the status quo with her well respected "big picture" thought process. I have a great deal of respect for Lea's technical and commercial skill sets.

**Comments by Dalon Schuckman:**
*No comments*

**Rating by Lea Frye:**

**Employee Rating\*:** E - Exceptional

**Employee Comments:**
One of my strengths is my ability to keep the big picture in mind. This lends well to my current role on the Shenandoah project team which has a large multi discipline team all working toward a common goal, a sanction decision. This year was more challenging then most given the price environment but as team I feel we have made good choices to continue down the path at a reduced speed.

CONFIDENTIAL

APC-00113386

## Integrity and Trust

**Rating by Pat McGrievy:**

**Supervisor Rating\*: E - Exceptional**

**Supervisor Comments:**
Lea continues to be a very dependable team player for the Shenandoah Team. She is considered to be reliable and conscientious by her peers and one with high moral standards and solid work ethic. Along these same lines, Lea is always one to be direct and truthful and one with a balanced conviction, despite the fact that her opinions and technical positions toward the project may not be of popular opinion.
She consistently delivers high quality results on all of her project work.

**Comments by Dalon Schuckman:**
*No comments*

**Rating by Lea Frye:**

**Employee Rating\*: E - Exceptional**

**Employee Comments:**
I have always upheld the highest standards in business integrity and ethics. I am known as an individual whom speaks truthfully based on the knowledge at hand and who is willing to admit to my errors. I will not be swayed to bend the truth to fit a purpose. I am known as someone who gets things done and done on time.

## Open Communication

**Rating by Pat McGrievy:**

**Supervisor Rating\*: A - Acceptable**

**Supervisor Comments:**
Lea is very confident individual who is not shy about vocalizing her thoughts and opinions internal and external to the team, despite whether or not it is of popular opinion. Her viewpoints, however, are usually spot-on, however. Her technical strengths and influential abilities play well at partnership meetings when positions need to be established.
Her opinions, however, are usually well-balanced. She is usually timely on delivering information to those who need information to make informed decisions. Lea usually practices diplomacy and tact in stressful or confrontational situations and is always one to listen to another person's position before responding with her own opinions. Lea is well-balanced on seeing and respecting other people's positions and opinions.

**Comments by Dalon Schuckman:**
*No comments*

**Rating by Lea Frye:**

**Employee Rating\*: A - Acceptable**

**Employee Comments:**
I strive to foster open communication with my counterparts. Communicaiton is important to me but has always been a skill set that does not come easily. With each interaciton, meeting and presentation I strive to improve and hope that the effort I give shows. I know there is still room for improvement and I will continue to work in this area.

## People and Passion

**Rating by Pat McGrievy:**

**Supervisor Rating\*: N - Needs Development**

**Supervisor Comments:**
Lea consistently demonstrates this value with her fellow colleagues in support of their work and efforts during presentations and reviews. She generally is the one to take the lead in building the strategy and organizing the presentation materials for the team. Lea is also extremely passionate about the success of the projects which she supports, as she does a real good job of working with extended team members as she seeks out and usually obtains the right level of detail and information from them.
Area for Improvement: Lea understands the value of building strong professional relationships and she clearly shows unquestionable passion for the success of the project but on occasion her passion can manifest itself openly visible through frustration and an increased level of temperament. She just needs to take a deep breath and relax in tense situations. This can create results which are counteractive to her intentions.

**Comments by Dalon Schuckman:**
*No comments*

**Rating by Lea Frye:**

**Employee Rating\*: A - Acceptable**

**Employee Comments:**
I come to work to get things done, and I expect that should be evident to those who work with and around me. I push hard, and work every day. Part of what drives me is I enjoy the learning part of this job, and take every opportunity I can to improve my knowledge and skills.

One thing that I think is very unique about me is that I have forged very good working relationships with individuals in virtually every segment of our company. I have found that people differ quite a bit, and by taking note of what is important to different individuals, I can relate to them better, be a better work partner, and motivate them to do their best work.

*Anadarko 2015 Performance Review Process Form for Lea Frye*

CONFIDENTIAL

APC-00113387

## Servant Leadership

**Rating by Pat McGrievy:**

**Supervisor Rating\*:** A - Acceptable

**Supervisor Comments:**
Lea has been a contributor to a number of GOM initiatives in 2015; examples are the GOM Miocene High Rate Potential wells initiative as well as assisting in multiple spill drills as an RE supporting the flow control group. She demonstrated strong mentoring skills with the summer intern, who was on the borderline of a job offer, as well as Wendy Redpath (new RE for Shenandoah) and also Corrie Beard who she helped mentor in Worst Case Discharge processes. She also work quite closely with Nikhil Joshi, who she helped broaden his awareness and skills sets of being an RE. There have been numerous mentorships with other engineers throughout the year. In general, she recognizes the importance of improving the technical qualities of her immediate and extended team members as the project will ultimately benefit from the time she devotes to mentoring the lesser experienced.She also shares opportunities with her peers to present technical and commercial information to senior management. Generally she is very unselfish in this regard. One more point is that she recognizes team successes is demonstrated by her initiation of "after work happy hours" and for the team to relax and reflect on recent wins. .

**Comments by Dalon Schuckman:**
No comments

**Rating by Lea Frye:**

**Employee Rating\*:** A - Acceptable

**Employee Comments:**
I work very hard to do what people ask or need me to do. I feel strongly that before I can ask others to perform at their highest level, I need to be demonstrating that by my own work. From there, I am not afraid to ask, or to expect others to also perform at a high level.
I am willing to help others on projects even when not related to my direct work as I have experience in multiple areas of the company.  This practice has also helped at times when I need assistance from the other segments of the company, and I feel that people will go out of their way to assist me when needed due in a large part to their appreciation to my style of helping others.

## Goals

Goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

**Goal Name:** Shenandoah EP Submittals and Next Appraisal Well
**Goal Description:** Collaborate with G&G, drilling and partners on the placement of the next appraisal well. Ensure next appraisal well meets the objectives of the partnership to determine a minimum size to sanction. Work with G&G, drilling and facilities on selecting multiple future development well locations in additional to next appraisal location across WR 51 & WR 52 blocks targeting potential drill center locations. Run worst case discharge calculations for all potential EP locations as part of the EP submittal.

**Measurement Source:** Hand off of EP documentation to regulatory

**Status:** Not Yet Started        **Start:** 03/05/2015        **Due:** 08/31/2015

**Employee Progress Notes:**
Plan ot share responsibility with another engineer due to work load of other critical timing items.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**

**Supervisor Rating\*:** 2 - Meets Expectations

**Supervisor Comments:**
Unfortunately, we were not able to execute on the preferred Shen 5 L location but this was largely driven by the speed at which the Shen 4 was drilled (80 d actual vs. 150 d. planned). It did not provide the pre-development subsurface team the time to effectively execute on the L location EP. This was further compromised by APC's reduced portfolio of drilling opportunities. I a normal year, we would've found a prospect to insert between Shen 4 and SHen 5, which would've given us time to execute on preferred location.

**Rating by Lea Frye:**

**Employee Rating\*:** 2 - Meets Expectations

**Employee Comments:**
Less progress on this front was made then I would have liked given the workloads associated with the project team. However, the subsurface team has hosted several partner meetings to keep partners informed on progress and request feedback on the next well location options available. Due to the acceleration of the next well on the rig schedule the team prioritized to a single EP location with a targeted submittal to regulatory by 10/1/2015. Actual submittal to regulatory was on 9/30/2015. Additionally, two well locations were worked in detail through completion of a basis of design for submittal to drilling. By year end, it is my goal to mentor our new reservoir engineer on an AFE submittal for the next appraisal well, Shen 5, complete with a recommendation to management.

---

*Anadarko 2015 Performance Review Process Form for Lea Frye*

*Page 3 of 8*

CONFIDENTIAL

APC-00113388

**Goal Name:** Progress Shenandoah Parametric Studies
**Goal Description:** Work with G&G, Petrophysicst, and technology team members to develop geologic models incorporating an updated structural interpretation and depositional environment learnings from the core and rock properties from core analysis. Incorporate facility and flow assurance input into the different field development concepts to be evaluated. Integrate reservoir and development uncertainties in to reservoir modeling as sensitivities and/or stochastic outcomes for economic evaluation.

**Measurement Source:** Completion of an updated geologic model(s) complete with reservoir model outputs/results

**Status:** ▒▒▒▒▒▒▒▒         **Start:** 01/01/2015         **Due:** 10/01/2015

**Employee Progress Notes:**
Defined scope, goals, and timelines. Set up monthly progress meetings. Geo-models under construction 7/2015 and dynamic modeling strategy in place.

**Supervisor Progress Notes - Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 2 - Meets Expectations | **Employee Rating\*:** 2 - Meets Expectations |
| **Supervisor Comments:** | **Employee Comments:** |
| Despite the slight setback in delivery of the geo-modeling effort, the team developed a robust but flexible modeling approach, with multiple deterministic outcomes (12), which was fully endorsed by the partnership. We did lose some time collaborating with partners in multiple workshops including whole core, structural interpretation and facies distribution for design and population of the static model, but the fact remains, if we had not included their input, the model would've been rendered meaningless in their perspective. Again, being on a 180 day clock, we can ill-afford to have partners misalignment and this is just one more thing that we can control. | A large effort, across several disciplines, went toward the development of the new geo-models. The exploration team and the development team hosted several workshops with partners to unify the partnership to a common set of models. This effort was highly praised by the partners and has brought a more unified look at the subsurface picture. Due to the efforts to make a set of models that represent the partnership thinking the targeted completion date of the geo-model slipped back in time. However, given the approach taken on the model, it has lead to a more flexibility in the model to react to new information from the on going appraisal operations. The dynamic model work continued to progress while waiting on the updated geo-model to incorporate network modeling for the development concepts to be evaluated. Completion of work is now targeted for end of 1Q 2016 for incoration in to the economic modeling for concpet select. |

---

**Goal Name:** Inter Disciplinary Communication
**Goal Description:** Collaborate and work with all key disciplines (drilling, completions, production, 20 K technology group and facilities). Use live link and bi-monthly surface/subsurface meetings to ensure data transfer and communication between teams.

**Measurement Source:** Feedback form colleagues

**Status:** ▒▒▒▒▒▒▒▒         **Start:** 01/01/2015         **Due:** 12/31/2015

**Employee Progress Notes:**
Continued dialog on-going through meetings and workshops. Progressing project team understanding of risks and mitigations through communications.

**Supervisor Progress Notes - Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 2 - Meets Expectations | **Employee Rating\*:** 2 - Meets Expectations |
| **Supervisor Comments:** | **Employee Comments:** |
| Lea has done a good job of coordinating the efforts and communicating with drilling, completions and facilities teams, inclusive of 20A. Her weekly luncheon meetings have been very effective at keeping everyone informed on the progress of the team. | Continued to hold surface/subsurface meetings held to transfer knowledge and generate discussion between disciplines. These meetings have been an effective means of identifying key decisions points, key risks and potential gaps in technology and/or studies. |

*Anadarko 2015 Performance Review Process Form for Lea Frye*                                                                 *Page 4 of 8*

CONFIDENTIAL                                                                                                          APC-00113389

**Goal Name:** Partner Meetings

**Goal Description:** Coordinate quarterly subsurface partner meetings and co-coordinate quarterly IPT partner meetings. Responsible for presentation content for subsurface parametric studies as well as updates on other on-going studies to keep partners informed and aligned. Utilize Live Link as a tool to share and communicate with partners. Organize workshops as needed to encourage collaboration with partners throughout all project phases.

**Measurement Source:** Quarterly Meetings through 4Q 2016. Feedback from team and partners on delivery of presentations and collaboration.

**Status:** ▓▓▓▓▓▓▓         **Start:** 03/05/2015         **Due:** 12/31/2015

**Employee Progress Notes:**
Increased amount of partner communication from standard quarterly updates. Great progress has been made on narrowing differences in interpretations between partners.

**Supervisor Progress Notes - Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 1 - Exceeds Expectations | **Employee Rating\*:** 1 - Exceeds Expectations |
| **Supervisor Comments:**<br>Achieving and sustaining partner alignment has been the theme for the Shenandoah team in 2015 and moving forward. The team has accomplished this priority through a litany of meetings and workshops aimed at keeping our partners informed and enabling critical constant collaboration to occur. Success at Shenandoah relies on our ability to effectively communicate throughout the appraisal and pre-development process through the sanction phase. Lea has been extremely effective in coordinating and conducting these meetings and workshops. | **Employee Comments:**<br>In addition to the already scheduled quarterly meetings the project team hosted many workshops with partners through out 2015. I played a large role in setting agendas, coordinating presentation content and maintaining a unified message at the subsurface hosted workshops. I also participated in the leadership team for the concept select workshops led by the facility project manger. The entire project team dedicated a large effort to keeping partners informed in a timely manner and to encourage collaboration with all the workshops. |

CONFIDENTIAL

APC-00113390

**Goal Name:** Progress Shenandoah Discovery

**Goal Description:** Goal is to work project to sanction point in 2017: Work collectively with facility project team, 20K project team, exploration team, internal stakeholders (drilling, completions, FA) and external stakeholders (partnership and BSEE) to progress project in parallel with the appraisal drilling phase to concept select phase and ultimately to sanction in 2017.

Key 2015 focus areas for project will be the completion of Ph2 subsurface parametric studies; completion of concept select studies; progression of 20K technologies; operational and technology maturation (identify and address key challenges for drilling, completions, FA, etc.); collaboration with APC Exploration to influence appraisal data acquisition; and maintain subsurface geo-modeling and dynamic modeling alignment with partnership through routine communication and periodic subsurface partnership meetings.

**Measurement Source:** Progress toward concept select stage by year end 2015.

**Status:** ▮▮▮▮▮▮    **Start:** 01/01/2015    **Due:** 12/31/2015

**Employee Progress Notes:**

**Supervisor Progress Notes – Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 1 - Exceeds Expectations | **Employee Rating\*:** 2 - Meets Expectations |
| **Supervisor Comments:** | **Employee Comments:** |
| Lea continues to an admirable job of progressing and directing the multiple teams that make up the Shenandoah project. This arguably is the most complex and challenging projects in the history of APC from all angles. The major complexities of the project include the deep Wilcox formation with potential compartmentalizing, FA and pressure maintenance challenges; the 20A initiative with the requirement of new technology development in D&C and subsea design; regulatory challenges from a commingling perspective; multiple partnerships with diverse agendas; and further challenged by the 180 day clock and the requirement to run in parallel with the exploration team influencing the location(s) of the next appraisal wells. | While the team has had some bumps along the road, at the end of the day, great strides have been made to keep on path while still making the right decision to delay concept select and sanction based on increased subsurface uncertainty. Phase two of the parametric studies was slow to get started but has progressed significantly through the efforts of all the team members and is on target to reach completion by end of 1Q 2016. A collaborative effort with our exploration counterparts to gather core and fluids from the appraisal wells has and will continue to support addressing key challenges for completions, operations and flow assurance. |
| Lea has done a very commendable job with the Shenandoah project thus far. | |

CONFIDENTIAL    APC-00113391

**Goal Name:** Mentoring
**Goal Description:** Provide mentorship and training to new Shenandoah team members, specifically geared toward a reservoir engineer's roles and responsibilities on the project team. Provide guidance on training and work flows to enable transitioning in to a new role.

**Measurement Source:** Contributions of protégé

**Status:** ▆▆▆▆▆▆    **Start:** 01/30/2015    **Due:** 12/31/2015

**Employee Progress Notes:**
Mentoring a summer intern in addition to an internal role change engineer.

**Supervisor Progress Notes - Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 1 - Exceeds Expectations | **Employee Rating\*:** 1 - Exceeds Expectations |
| **Supervisor Comments:** Lea spent a great deal of her time in 2015 mentoring a number of engineers. She demonstrated strong mentoring skills with the summer intern, who was on the borderline of a job offer, as well as Wendy Redpath (new RE for Shenandoah) whom she is currently developing. Also, Corrie Beard who she helped mentor in Worst Case Discharge assessments and one who has become very helpful to Lea as a result. She also work quite closely with Nikhil Joshi, who she helped broaden his awareness and improved his skills sets as an RE. There have been numerous mentorships with other engineers throughout the year, too numerous to mention. In general, she recognizes the importance of improving the technical qualities of her immediate and extended team members as the project will ultimately benefit from the time she devotes to mentoring the lesser experienced. She also shares opportunities with her peers to present technical and commercial information to senior management. Generally she is very unselfish in this regard. | **Employee Comments:** Official mentor roles for this past year includes a summer intern and a new reservoir engineer on the Shenandoah project. Through the summer intern mentoring, I demonstrated the ability to develop the skills required to deliver results for a complex project and present said material successfully. While I can not take credit for developing all the skills learned and demonstrated by the summer intern, I did provide the intern with all the tools required to be successful which includes utilizing our internal experts. Looking forward to my second mentor opportunity with a new engineer in the group with past production experience. This project will have many opportunities to help teach new skill sets ranging from economics, project management, well operations and data analysis. Current operations has lent the opportunity to introduce MDT operations and fluid analysis protocols this year. |

**Goal Name:** Training
**Goal Description:** Attend either a core and special core analysis course and/or a rock mechanics course. Complete stage 2 project management training. If time permits, attend relavent conference or other training suggested by supervisor for 2015

**Measurement Source:** Completion and implementation of training

**Status:** ▆▆▆▆▆▆    **Start:** 04/20/2015    **Due:** 12/31/2015

**Employee Progress Notes:**
No formal training, have been learning as I go through mentorship of peers on project management and rock mechanics. Did attend OTC and several internal Source Control training sessions.

**Supervisor Progress Notes - Preface comments with your name:**

| Rating by Pat McGrievy: | Rating by Lea Frye: |
|---|---|
| **Supervisor Rating\*:** 3 - Needs Development | **Employee Rating\*:** 2 - Meets Expectations |
| **Supervisor Comments:** Lea's ability to commit and participate in external training classes was challenged by her technical workload in keeping the Shenandoah project on schedule. Non the less, her continued effectiveness as a reservoir engineer depends on spending some time on self development. She should be able to find this time in 2016 as she will have two additional reservoir engineers as support on the Shenandoah Project. | **Employee Comments:** Completed two internal required training modules for the source control team. No external training this year due to time and budget. |

## Individual Development Activities

Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

CONFIDENTIAL    APC-00113392

## Combined Year-End Rating

Determine the alpha and numeric rating for goals and core values.

### Combined Year-End Rating A1 ~ Acceptable/Exceeds Expectations

### Section Comments:

**Supervisor Overall Comments:**
Overall, Lea continues to perform at a high level for the Shenandoah project team. She remains the focal point and coordinator for all technical work relating to the immediate and extended Shenandoah teams. She works well across all disciplines (good technical understanding and drivers of what each team brings to the table) and has built and maintained strong connections with her manager, her counterparts on the drilling, completions, 20A and facility teams as well as the Shenandoah partnership. She has also done quite well in mentoring lesser experienced engineers as evidenced by her work with the summer intern and more recently, getting Wendy Redpath up to speed as an RE on the Shenandoah project. She has clearly earned the technical and professional respect from all who work to support the Shenandoah project.

**Employee Overall Comments:**
*No comments*

## Signatures

The employee's signature indicates the employee and supervisor have had the performance discussion.

Manager: _____
Pat McGrievy

Employee: _____
Lea Frye

### Section Comments:

**Supervisor Signature Comments:** *No comments*

**Employee Signature Comments:**
*No comments*

CONFIDENTIAL

APC-00113393

# EXHIBIT 6

CONFIDENTIAL

APC-00113394

## Seeking Alpha α

# Anadarko Petroleum (APC) Robert Al Walker on Q3 2015 Results - Earnings Call Transcript

Oct. 28, 2015 2:55 PM ET

by: SA Transcripts

I think we've done a pretty darn good job of that since 2007, so it's not just all of a sudden we're waking up and trying to do that in 2016.

**Evan Calio - Morgan Stanley & Co. LLC**

Great, that makes sense. And a second question, if I could. Any guidance on 2016 maintenance CapEx or spend to stay flat, which is likely lower due to efficiencies, drawdowns as well as your offshore startups?

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Well, I think the number that we've been using recently, it's probably still an appropriate number and that's about $2.7 billion in terms of that maintenance number you're looking for and that is still a function of lots of things that are assumptions in that including commodity prices and service costs.

So I would call that a good placeholder number, but I don't think there's a lot of precision around it and I'm not sure anybody could give you a lot of precision at any time, when there's as much volatility in the market as there is.

**Evan Calio - Morgan Stanley & Co. LLC**

That's fair. Congrats on the Shenandoah appraisal. Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans? I'll leave it at that. Thanks.

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Yeah. Thanks, Evan, for the congratulations. Team did a really good job on that and we're real pleased with it. We got 622 feet of pay, what we ended up doing was we tested up to the north with trying to find out where the basin edge was and the first well established where the basin edge was. Then we came in and drilled to the south with a sidetrack and got the 622 feet of pay.

It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. We're still in the early stages of that evaluation. We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well and that's to establish the reservoir quality in the oil column which will roll directly into our development planning.

So it's very important to get that core and we're just in the process of it. That's going to give us a much better handle on all the fluid properties, all the reservoir properties, but we pushed the lowest known oil down about 400 feet. As I mentioned, we didn't establish an oil-water contact here, so that tells us there's more down below us. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. But we're very encouraged with what we saw and it was all well within the range of expectation of what we had put out there.

**Evan Calio - Morgan Stanley & Co. LLC**

Thanks, guys.

**Operator**

CONFIDENTIAL                                                                                          APC-00113395

And our next question comes from Doug Leggate of Bank of America. Please go ahead.

**Doug Leggate - Bank of America Merrill Lynch**

Thanks. Thanks, guys. Good morning.

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Hey. Good morning, Doug. This guy got your last name right.

**Doug Leggate - Bank of America Merrill Lynch**

Yeah, yeah. I thought you're going to comment on my voice, I sound a little husky this morning. So, guys, on the capital allocation for next year, so I get the living within cash flow. But given the very strong performance you seem to be having in the Delaware, how should we think about how you're allocating capital to your core plays? And could you maybe just touch on where you're not spending capital, what the implications are for potentially there's a lot of asset sales that are likely to deliver this quarter?

**Robert Al Walker - Chairman, President & Chief Executive Officer**

CONFIDENTIAL

APC-00113396

Case 4:20-cv-00576 Document 322-23 *SEALED* Filed 06/29/26 in TXSD on 09/25/17 Page 96 of 867

Anadarko Petroleum's (APC) CEO R. A. Walker on Q4 2014 Results - Earnings Call Transcript | Seeking Alpha    3/2014, 7:34 PM

Seeking Alpha<sup>α</sup>

# Anadarko Petroleum's (APC) CEO R. A. Walker on Q4 2014 Results - Earnings Call Transcript

Feb. 3, 2015 3:28 PM ET

by: SA Transcripts

As a result I continue to believe and think it's likely that you are going to see our capital plan evolve through the year based upon the way in which costs sync up with revenue associated with the commodity price environment. Consequently if we get into a much more extended period where we have low commodity prices and we do not have much movement on the service cost side, I think you can anticipate we could very likely drop our capital plans that we come out with to a lower number.

We would achieve that through dropping rigs and not completing wells that we have drilled. So we have a lot of flexibility built into what we are proposing to our Board here and as a result I see the initial capital plan as one that is just a starting point.

### Doug Leggate

I appreciate the answer. I guess my follow-up is hopefully a bit more positive and I guess it seems to me from the ops report the results from Shenandoah and Paon, I guess these are higher profile wells you have. I am just wondering if you are -- the guys are stationed now where you can talk about potential scale in both cases and potential development schedules for those potential assets, but I realize it might be a little early but just order of magnitude and potential timing would be really helpful. Thanks.

### R. A. Walker

Yeah, you bet, it's a little early I think you probably are correct in that comment and Bob and Jim Kleckner respectively can address some of your question more specifically. But I think as it relates to how we take those development I am not concerned today about how we would necessarily do that from a technical standpoint, how it fits into our capital allocation plans in future years. I think of that as little bit more of a coming attraction once we understand better what the costs really are to take those two first lifting or first production.

So why don't we handle the Shenandoah question first and then come back to the Paon question a little bit because I think they do somewhat go hand in hand and Jim needs to add something around what Bob has to say.

### Robert P. Daniels

Hey Doug, good morning. At Shenandoah I'll start there, we are so excited about what we are seeing there. We have got very good results for what we set out to do at the most recent appraisal well. If you remember that appraisal well was several miles away and about 1,500 feet down dip of the number 2, I guess 2.3 miles to the east and 1,500 feet down there. And we are looking to see if we can establish oil water contacts at that location. So we knew it be very far down there and close to that.

We want to look at the lateral sand and the reservoir continuity; we want to look at quality of sands in that area because as we get down closer to oil water contact we have to get an idea about the drive mechanism and would we have an effective water drive then for recovery.

We had a model that we would see potential interval expansion as we move to off structure and then we want to get pressure data to show pressure continuity into the other number 2 well.

So overall we are looking to understand the oil in place better and the potential recovery mechanism. But if you look at the results we really did all of that. We have excellent lateral sand continuity. The packages are all present, they are very well co-relatable. They have expanded, so that model of expansion did work out. We had up to about 1,470 feet of gross sand section versus a 1,000 feet that we

CONFIDENTIAL

APC-00113397

had in the number 2 well. The oil/water contacts were not encountered in the well based on the pressure data we were able to project those up. So we got a much better handle on the oil in place and that has expanded. We have more confidence on it.

So that was a very positive thing. Reservoir quality was good. So that gives us lot of confidence on the potential for the water drive. So we got a lot more confidence on our geologic model and the eastern side of our structural interpretation. We have gotten out pipeline over there. And then the potential for the active water drive and a much higher confidence level on oil/water contacts for the field lie.

CONFIDENTIAL

APC-00113398

# EXHIBIT 7

CONFIDENTIAL

APC-00113399

Case 4:17-cv-02205 Document 2-1 *SEALED* Filed in TXSD on 9/25/17 Page 99 of 107

## Frye, Lea

| | |
|---|---|
| **From:** | McGrievy, Pat |
| **Sent:** | Monday, August 18, 2014 9:12 PM |
| **To:** | Oudin, Chip; Frye, Lea; Chandler, Paul |
| **Subject:** | RE: August Shenandoah Meetings |

I sat down with Tim Trautman this afternoon to talk about presenting alternate interpretations to our partnership and he indicated that Ernie was adamant about showing only one unified APC interpretation but I did get the sense that Tim understood our position and may be willing to negotiate the word-smithing or messaging with our partners as it relates to the modeling work that we are conducting. We may have to lean on COPC to get the message out during the meeting. I think the fact that we are running sensitivities on smaller per well recoveries may suggest to our partners that it could be smaller without actually showing or saying it.

Pat

**From:** Oudin, Chip
**Sent:** Monday, August 18, 2014 11:12 AM
**To:** McGrievy, Pat; Frye, Lea; Chandler, Paul
**Subject:** RE: August Shenandoah Meetings

I will need guidance on #2, as I disagree with the unfaulted tank model as currently carried by Exploration post-Yuc-2 (see attached). Depending on what's been shown, to whom it's been shown, and when it was shown, we may be stuck (politically) between a rock and a hard place. Especially if interested third parties are involved in any of the basin discoveries...

**From:** McGrievy, Pat
**Sent:** Monday, August 18, 2014 10:47 AM
**To:** Oudin, Chip; Frye, Lea; Chandler, Paul
**Subject:** FW: August Shenandoah Meetings

FYI, on bullet #2. I'll get to the bottom of this by EOD if I can get a few minutes of Tim's time. Bullet #4 and #5 also intriguing.

**From:** Trautman, Tim
**Sent:** Monday, August 18, 2014 9:48 AM
**To:** McGrievy, Pat
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** RE: August Shenandoah Meetings

Pat,

Here are the items which we would like to discuss at the meeting this Wednesday.

Items to discuss:

(1) Review development's "key" slides for upcoming Shenandoah partner's meeting
(2) Make sure APC is presenting only one set of structure maps to partners
(3) Revisit coring recommendation criteria (costs, coring intervals, and core footage)

1

CONFIDENTIAL

APC-00113400

(4) Discuss the next Shenandoah appraisal well location (scheduled for 2015) assuming we "find contacts" as projected from Yucatan pressure gradients (and no other surprises from the current drilling well).

(5) What do we do if we cannot get approval for an SOO at Coronado (because we want to keep the rig at Shenandoah for a subsequent coring operation)?  Hopefully, we can reach T.D. on the current well., conduct our FE program, and complete a by-pass coring operation by November 15?

Thanks, Tim

**From:** McGrievy, Pat
**Sent:** Monday, August 11, 2014 9:45 AM
**To:** Trautman, Tim
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** RE: August Shenandoah Meetings

Yes, we can do that.

**From:** Trautman, Tim
**Sent:** Monday, August 11, 2014 9:40 AM
**To:** McGrievy, Pat
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** August Shenandoah Meetings

Pat,

Could your asset team give the Shenandoah exploration team an overview of what you plan to discuss with the partners on August 26 and 28.
Maybe this could be the agenda for our monthly SHENANDOAH meeting scheduled for AUGUST 20.

Thanks, Tim

2

CONFIDENTIAL

# EXHIBIT 8

CONFIDENTIAL

APC-00113402

**Frye, Lea**

| | |
|---|---|
| **From:** | Camden, Chris |
| **Sent:** | Thursday, January 14, 2016 7:48 AM |
| **To:** | Trautman, Tim; Strickling, Robert; McGrievy, Pat |
| **Cc:** | Oudin, Chip; Chandler, Paul; Frye, Lea; Prosser, Wendy; Johnson, Breck; Kendall, Beth |
| **Subject:** | RE: Final Joint Expl & Dev Shenandoah MMRA |

Found a typo on the graph – the Joint Distribution Mean should read 425, not 465. The bar is in the correct place, just had a typo in the text. See below for corrected graph.



Chris

**From:** Camden, Chris
**Sent:** Wednesday, January 13, 2016 4:17 PM
**To:** Trautman, Tim; Strickling, Robert; McGrievy, Pat
**Cc:** Oudin, Chip; Chandler, Paul; Frye, Lea; Prosser, Wendy; Johnson, Breck; Kendall, Beth
**Subject:** Final Joint Expl & Dev Shenandoah MMRA

CONFIDENTIAL

APC-00113403

Folks,

Attached please see our joint Shenandoah Area MMRA on a chart showing its context with previous resource distributions. We had very good effort by the teams to agree (or at least, compromise) on the best methodology and input assumptions. Summary of key points below:

* We modeled the Eastern and Western areas as two separate MMRA's, then Multi-Zoned the two for a full-field distribution
  o Intent was to capture the two areas of the field's different risk profiles and uncertainties
* Main focus of our discussions (and differences) were centered around the P90 areas
  o Both team's members felt strongly about their P90 areas estimation logic
  o Eventually compromised on these numbers, landing on a mid-point number between the two team's desired areas
* Both teams agreed that this next well (#5) should have a significant impact on:
  o Defining P90 volumes
    * Shen #5 success = Post well distribution would look more like the Exploration distribution
    * Shen #5 failure = Post well distribution would feature a P90 more like the Joint Distribution on the low end, and a greatly reduced P1 and P10
  o Determination of if we are at MEFS
  o Understanding OWC's
  o Refining resource estimates associated with Shen #6 location

Please let us know if we need to set up a meeting to review further. At this point, Lea and Wendy are moving forward with refining the economic model using this distribution, for an eventual Shen #5 AFE submission.

2

CONFIDENTIAL

APC-00113404

# Shenandoah Resource Estimates - Post Shen #4



Gross Resources (MMBOE)

Thanks !

**Chris Camden**
Deepwater Exploration Engineering
Anadarko Petroleum Corporation
Direct: 832-636-2861
Cell: 832-217-9360

3

CONFIDENTIAL

APC-00113405

Case 4:17-cv-02289   Document 2-1 *SEALED*   Filed in TXSD on 09/25/17   Page 105 of 107

# EXHIBIT 9

CONFIDENTIAL

APC-00113406

Anadarko Investors

# Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay

HOUSTON, TX -- (MARKETWIRE) -- 03/19/13 -- Anadarko Petroleum Corporation (NYSE: APC) today announced its Shenandoah-2 well in the deepwater Gulf of Mexicoencountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs.

"The successful Shenandoah-2 well marks one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries," said Bob Daniels, Anadarko Sr. Vice President Deepwater and International Exploration. "With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronadowell, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf ofMexico."

The Shenandoah-2 well, located in Walker Ridge block 51, was drilled to a total depth of 31,405 feet in approximately 5,800 feet of water, more than 1 mile southwest and approximately 1,700 feet structurally down-dip from the Shenandoah-1 discovery. Similar to the initial Shenandoah discovery well, log and pressure data from the Shenandoah-2 well indicate excellent-quality reservoir and fluid properties. The well was drilled to test the down-dip extent of the accumulation, and the targeted sands were full to base with no oil-water contact.

"We are incorporating the information obtained from Shenandoah-2 into our planning and anticipate further appraisal drilling to advance this potentially giant project," Daniels added.

Anadarko is the operator of the Shenandoah-2 well and the previously announced Shenandoah-1 discovery well, located in Walker Ridge block 52, with a 30-percent working interest. Other co-owners in Shenandoah are ConocoPhillips (NYSE: COP) with a 30-percent working interest, Cobalt International Energy L.P. (NYSE: CIE) with a 20-percent working interest, Venari Resources LLC with a 10-percent working interest andMarathon Oil Company (NYSE: MRO) with a 10-percent working interest.

Additionally, in the Shenandoah Basin, Anadarko has a 15-percent working interest in both the Coronado well, located in Walker Ridge block 98, and the Yucatan prospect, located in Walker Ridge block 95.

A map of the Shenandoah Basin in the deepwater Gulf of Mexico will be available under the "Media Center/Anadarko News" tab at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2012, the company had approximately 2.56 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visitwww.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to successfully drill, complete, test and produce the wells and prospects identified in this news release. See "Risk Factors" in the company's 2012 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

PDF Attachment Available:http://media.marketwire.com/attachments/201303/58726_APCShenandoahBasinMap3-19-13.pdf

ANADARKO CONTACTS

MEDIA:
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Brian Cain, brian.cain@anadarko.com, 832.636.3404
Christina Ramirez, christina.ramirez@anadarko.com, 832.636.8687

INVESTORS:
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Brian Kuck, brian.kuck@anadarko.com, 832.636.1397
Bill Tedesco, william.tedesco@anadarko.com, 832.636.3375

CONFIDENTIAL

Additional assets available online: Documents (2)

http://investors.anadarko.com/2013-03-18-Anadarko-Announces-Shenandoah-Appraisal-Well-Encounters-More-Than-1-000-Net-Feet-of-Oil-Pay

CONFIDENTIAL

APC-00113408

# Exhibit 42

May 18, 2016

Dear Mr. Dalon Schuckman ,

Last week, Anadarko's counsel pointed out that Anadarko has a zero tolerance policy against retaliation. Anadarko also has clear policies regarding integrity and company ethics, and a very specific policy on reporting reserves and resources. All too often, policies have nothing to do with what is actually happening. Such is the case here.

Over the last 18 months, Ernie Leyendecker pushed forward a portrait of the Shenandoah project that was beyond optimistic and in doing so violated nearly every aspect of our internal reporting and ethics guidelines. My repeated attempts to have the company follow those guidelines and practices and to report the find honestly and realistically were met with abuse and retaliatory behavior. The saddest part to me is that this was observed and tolerated by numerous other managers and executives. For reporting false information to investors, Ernie has been promoted and received large bonuses. Other executives have benefited by selling their stock at inflated prices due to this blatantly false information. Policies are meaningless when no one follows them.

Now, as I contemplate returning to work, I find that many co-workers are not returning my calls, and some are avoiding me. Is this because of a directive, or more subtle message they have received? Is it because I chose to report this to the SEC? At the moment, I have no idea, but it is clear to me that I am no longer welcome at the company I once loved.

I find it disappointing that even when presented with a large amount of very specific evidence, Anadarko's primary response has been defensive maneuvering by lawyers. In fact the only acknowledgement of wrongdoing to date was by one of the UNUM representatives documenting my FMLA leave, who explained that my absence should have resulted in a worker's compensation claim, since my problems were caused by the actions of people at work.

The emotional trauma I have experienced is real, as is the damage that has been done to my family. There has been nothing to indicate that any changes have been or will be made to the workplace that would make me feel safe or even welcome when I return to work. Further, the thought of returning back to the same environment and fighting the same issues (with greater animosity toward me than before) continues to trigger severe anxiety responses. Because of that, and with great sadness, I have come to the realization that I will not be able to return to Anadarko.

Please accept my resignation effective May 19, 2016 and provide me with instructions for transitioning to COBRA coverage. I would like to transfer my pension and 401K, so assistance with that would be appreciated. I would also like to set up a time to retrieve my personal belongings from my office without having to interact with any individuals who are no doubt more antagonistic toward me today than they were before I spoke up about something they know is wrong.

Respectfully,

Lea Frye

cc: Amanda McMillan, Susan Saltzstein, Shauna Clark, DMM

APC002698
Confidential Treatment Requested Under FOIA

# Exhibit 43



**Wood Mackenzie**
A Verisk Analytics Business

# Pre-FID oil projects

Global breakeven analysis and cost curves

July 2016

Trusted commercial intelligence
www.woodmac.com

Confidential

FIAM-ANAD-004939

# Executive summary

**We have updated our comprehensive breakeven analysis of future oil developments comprising of conventional pre-FID (Final Investment Decision) projects and future drilling in US onshore Lower 48 plays. These projects are critical for meeting future demand growth. Since our January 2016 report, we have seen significant changes to the cost curve. Key findings include:**

## 70% of production from future developments is now commercial at US$60/bbl in 2025

This is a marked change from our last update when only half of 2025 production achieved commerciality at $60/bbl. Production from pre-FID projects and US Lower 48 future drilling is now expected to be around 13 million b/d, of which 9 million b/d is from projects which breakeven below $60/bbl. Tight oil makes up around 60% of this and only 20% is from deep and ultra-deepwater

## Deep/ultra-deepwater projects are hit hardest, although cost deflation is evident

The deepwater outlook for Angola and Nigeria has been hardest hit through cancellations and deferrals. US GOM projects remain high on the cost curve and weak project economics could lead to further downgrades/cancellations. Brazil holds its own in the middle of the curve with a weighted average breakeven of $50/bbl due to world-class projects of scale such as Libra

## Since 2009 the advent of tight oil has had the biggest impact on the cost curve

Over half of 2025 production now falls between $35-$55/bbl. Tight oil has lengthened, flattened and lowered the cost curve. An equivalent view from our 2009 dataset shows 6 million b/d was commercial at $75/bbl. Now, the outlook 10 years from our 2016 dataset shows that number has doubled to 12 million b/d

## If prices remain around $50/bbl then most major conventional projects are at risk of deferral or cancellation

Production from most pre-FID projects is required to meet the projected growth in oil demand. Prices are an important factor in providing an incentive to bring enough of these developments onstream to match demand. However, strategic issues beyond breakeven metrics, such as funding and portfolio factors, also play an important role in deciding the viability and timing of new developments.

**Wood Mackenzie**
A Verisk Analytics Business

Confidential

FIAM-ANAD-004940

# Pre-FID projects are crucial to fill 2025 supply gap

Based on our latest Macro Oils market analysis, over 20 million b/d needs to be developed by 2025 to offset production declines and meet the growth in Wood Mackenzie's base-case demand view. Most of this comes from US L48 future drilling and conventional pre-FID projects



Source: Wood Mackenzie Oil Supply Tool and Macro Oils Long Term Outlook H1 2016

Source: Wood Mackenzie Oil Supply Tool and Macro Oils Long Term Outlook H1 2016

3    Trusted commercial intelligence
© Wood Mackenzie

FIAM-ANAD-004941

# 80% of US Lower 48 future drilling is now commercial under $60/bbl but only 55% of conventional projects are

70% of global production in 2025, or nine million b/d, breaks even under $60/bbl. Only 5% of production needs above $80/bbl



**US Lower 48 breakeven bands**

Legend:
- >$90
- $80-$90
- $70-$80
- $60-$70
- $50-$60
- $40-$50
- <$40

Y-axis: Production (million b/d)
X-axis: 2017, 2019, 2021, 2023, 2025, 2027

Source: Wood Mackenzie



**Conventional pre-FID breakeven bands**

Legend:
- >$90
- $80-$90
- $70-$80
- $60-$70
- $50-$60
- $40-$50
- <$40

Y-axis: Production (million b/d)
X-axis: 2017, 2019, 2021, 2023, 2025, 2027

Source: Wood Mackenzie

4   Trusted commercial intelligence
© Wood Mackenzie



Wood **Mackenzie**
A Verisk Analytics Business

Confidential

FIAM-ANAD-004942

# US Lower 48 dominates the low end of the global pre-FID cost curve, while higher cost offshore areas have lost significant volumes

Ultra-deepwater Brazil holds a strong position in the middle of the curve but the majority of deepwater areas remain higher cost and struggle to compete with onshore projects

## Pre-FID and US L48 future drilling cumulative production by breakeven in 2025 – by resource theme

Legend:
- Deepwater
- Shallow water
- Lower 48 Tight oil
- Onshore
- ◇ Weighted average breakeven based on 2025 production

**Y-axis:** Brekeven US$/bbl Brent equivalent

**X-axis:** Cumulative liquids production 2025 (million b/d)

Labels: L48 Bone Spring, L48 Wolfcamp, L48 Mid-Continent SCOOP/STACK, Onshore OPEC, L48 Eagle Ford, L48 other tight oil, Ultra-deepwater Brazil, Canada oil sands, L48 vertical wells, Onshore non-OPEC, Shallow water OPEC, L48 Bakken, Shallow water non-OPEC, Ultra-deepwater non-OPEC, L48 Niobrara, Deepwater Nigeria, Ultra-deepwater Nigeria, Shallow water Europe, Deepwater non-OPEC, Deep/Ultra-deepwater Angola

$60/bbl

Source: Wood Mackenzie onshore breakevens at 10% discount rate, offshore at 15%.

5    Trusted commercial intelligence
© Wood Mackenzie



# Over half of all new 2025 production breaks even at $35-$55/bbl

Tight oil makes up around 60%, while only 20% comes from deep and ultra-deepwater. Nine million b/d is commercial under $60/bbl. Only half a million b/d requires over $80/bbl - half of this is made up of deep and ultra-deepwater while the rest comes from shallow water

**Pre-FID and US L48 future drilling cumulative production by breakeven in 2025 – by individual project**



Source: Wood Mackenzie

Trusted commercial intelligence
© Wood Mackenzie

**Wood Mackenzie**
A Verisk Analytics Business

Confidential

FIAM-ANAD-004944

# Evolution of pre-FID cost curves since 2009

Longer, lower and flatter. Tight oil is the key driver behind this structural change



**Pre-FID cost curves since 2009, rebased to 10 years from dataset vintage**

### Cost curve by resource theme

Cumulative porduction 10 years from dataset (million b/d)

- Tight Oil
- Ultra-deepwater
- Deepwater
- Shallow water
- Oil sands
- Onshore

10 year production peaked in the 2014 dataset at around 14 million b/d. Since then, the pre-FID hopper has shrunk and production is now expected to be around 12 million b/d in 2026. But this is accompanied by an overall lower cost curve

$60/bbl

6 million b/d from the 2009 cost curve would have been commercial at $75/bbl, now that number is closer to $50/bbl

Breakeven (US$/bbl Brent)

2009 dataset (2019 production)
2011 dataset (2021 production)
2014 dataset (2024 production)
2015 dataset (2025 production)
2016 dataset (2026 production)

Source: Wood Mackenzie, not including incremental projects

**Cumulative liquids production 10 years from dataset vintage (million b/d)**

7    Trusted commercial intelligence
© Wood Mackenzie

**Wood Mackenzie**
A Verisk Analytics Business

Confidential

FIAM-ANAD-004945

# US Lower 48 has demonstrated rapid breakeven reductions across the board while providing more supply since the price crash

Deep/ultra-deepwater has been slower to react , significant volumes have been downgraded or deferred and no longer feature on the cost curve but there are also some significant cost reductions

## Lower 48 cost curve migration

## Deep/ultra-deepwater cost curve migration



Source: Wood Mackenzie



Confidential

FIAM-ANAD-004946

# If prices remain around $50/bbl then most major projects are at risk of deferral or cancellation without further cost deflation

However, strategic issues beyond breakeven metrics, such as funding and portfolio factors, also play an important role in deciding the viability and timing of new developments. As does the potential to re-work development plans

## Key conventional pre-FID projects and start up dates – not including US Lower 48



Source: Wood Mackenzie. Onshore breakevens at 10%, offshore at 15%. Includes projects with >200 million bbls commercial liquids reserves, bubble size indicates commercial recoverable liquids reserves

9　Trusted commercial intelligence
© Wood Mackenzie

**Wood Mackenzie**
A Verisk Analytics Business

FIAM-ANAD-004947

# Appendix I: assumptions

- Conventional pre-FID oil projects are those with firm development plans expected to gain development approval over the near term. US tight oil developments are split by sub-play with calculations based on forecasted forward development programmes, excluding current flowing production
- For the breakeven calculation only the liquids price was varied; the price of the minority gas stream was held constant
- Project economics are run on a fully taxed, stand-alone basis using the appropriate fiscal terms for each sector – internal rate of return of 10% for onshore fields and 15% for offshore fields in nominal terms
- As the economics are not run on a full-cycle basis they do not include prior signature bonuses or acreage costs and exploration/appraisal costs. Conversely, potential synergies that can also be significant on a corporate basis are excluded - for example, where sunk finding costs are available for tax offsetting purposes or where project expenditure is not ring-fenced within the fiscal regime
- Wood Mackenzie's inflation rate is 2% from 2017
- Oil prices are expressed in terms of Brent equivalent
- Gas is converted to an oil equivalent figure using a 5.68 mcf = 1 boe conversion factor.



A Verisk Analytics Business

Confidential

FIAM-ANAD-004948

# Disclaimer

Strictly Private & Confidential

- This report has been prepared by Wood Mackenzie Limited. The report is intended solely for the benefit of Wood Mackenzie clients and its contents and conclusions are confidential and may not be disclosed to any other persons or companies without Wood Mackenzie's prior written permission.

- The information upon which this report is based comes from our own experience, knowledge and databases. The opinions expressed in this report are those of Wood Mackenzie. They have been arrived at following careful consideration and enquiry but we do not guarantee their fairness, completeness or accuracy. The opinions, as of this date, are subject to change. We do not accept any liability for your reliance upon them.

11    Trusted commercial intelligence
© Wood Mackenzie

**Wood Mackenzie**
A Verisk Analytics Business

Confidential

FIAM-ANAD-004949

# Exhibit 44

Case 4:20-cv-00576     Document 322-23     Filed 06/29/26 in TXSD     Page 124 of 867



# Shenandoah 6 AFE

9/14/2016

# Recommendation to Drill Shen 6 (WR 52 #3)



- **Team recommends drilling the Shen 6 appraisal well in the Shenandoah field**

- **The objective of Shen 6 is to test the oil/water contacts and to extend known limits of the field to the East**
    - The well will be left in condition to come back for a future up-dip keeper sidetrack

- **Drilling Shen 6 is expected to add ~300 gross acres / ~40 MMBOE recoverable resource to the Shenandoah low side case**

- **The AFE's dry hole cost is $157MM gross / $52MM net at a 33% WI**
    - Scheduled on the Diamond Ocean BlackHawk
    - Cost estimate is based on 117 Days from spud to rig release
    - Spud date 12/16/2016 with high likelihood to move up
    - Cost estimate includes $14MM for MWCC



# Structure Map – LW A

LWA mapped area down to EOWC = 1850 acres

### Key Points & Implications
- Eight productive formations (UW1 through LWE)
- All oil-bearing wells isolated from one another
- OWC's vary between fault blocks
- Uncertainty remains in far east area

# Shenandoah Stratigraphic Cross Section



A N A D A R K O   P E T R O L E U M   C O R P O R A T I O N



# Targeting OWCs with Shen 6 Well

Estimated OWC's for Shen-6
(from Shen-5/Shen-3 pressures):
UW1:   -30,210'
UW2:   -30,280'
UW3:   -30,320'
LWA:   -30,380'
LWB:   -30,350'
LWC:   -30,430'
LWD:   -30,690'
LWE:   -31,050'

**North-South Arbline – Shen-6 Well**
**Wilcox Sands w/ estimated OWC's shown**

Oil Reservoirs expected based on S5 oil/S3 water gradients

ANADARKO PETROLEUM CORPORATION

# Economics – Current Portfolio Case



| | | Risked Mean: 412 MMBOE; $P_c$ = 88.2% (MCFS = 200 MMBOE) | | | |
|---|---|---|---|---|---|
| | | Stress $35 oil, $2 gas | Invest $50 oil, $2.50 gas | Partnership $60 oil, $2.75 gas | Upside $70, $3.50 |
| AT NPV @ 10% (Net) | $MM | -163 | 111 | **291** | 485 |
| AT ROR | % | 6.30 | 12.17 | **15.28** | 18.23 |
| AT 10.0% PIR | M$/M$ | -0.17 | 0.12 | **0.31** | 0.51 |
| AT F&D Cost | ($/BOE) | 12.84 | 12.84 | **12.84** | 12.84 |
| AT LOE Cost | ($/BOE) | 4.46 | 4.46 | **4.46** | 4.46 |
| Total Net Invest | $MM | 1,470 | 1,470 | **1,470** | 1,470 |

**Phase I:**

- 1st production: 8/1/2021

- 4 wells (targeted zones*)

- Natural completion w/IWS

- 1 flow-loop – max rate 80,000 BLPD

**Phase II:**

- 6 additional wells (targeted zones*)

- Natural completion w/IWS

- 1 additional flow-loop

- Field max rate 100,000 BOPD

- 30-Year Field Life

# Exhibit 45

ANADARKO PETROLEUM CORPORATION

OFFICE 713 636-1000
P.O. BOX 1330 • HOUSTON, TEXAS 77251-1330

RECEIVED

SEP 21 2016

ConocoPhillips



September 21, 2016

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn: Lindsay Alaniz/Teri Flinner
Fax: 281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn: Ben Davis
Fax: 713-579-9196

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn: Scott Cornwell/Randy Bennett
Fax: 713-266-2330

RE:   Shenandoah Prospect
      Anadarko AFE No. 2124648
      Lease OCS-G 25232 Walker Ridge Block 52 Well No. 3 (Shen 6 Well)
      Lease Maintenance Operation

Gentlemen:

Enclosed for your review and approval is Anadarko AFE No. 2124648 in which Anadarko proposes drilling, logging, evaluating and abandoning the Walker Ridge Block 52 No. 3 Well, referred to herein as the "Shen 6", for an estimated gross (100%) cost of $157,273,553. The Shen 6 is an Appraisal Well located approximately 5000' east of the Shen 5 and structurally downdip, and is designed, in particular, to (i) extend proven oil pay further eastward; (ii) confirm oil-water contacts or extend lowest-known oil further down-structure; (iii) gather additional well connectivity information; and (iv) move Shenandoah closer to MEFS and/or a sanctioning decision.

The Shen 6 is proposed as a directional well from EP surface Location "L", at an X&Y coordinate of X=2,110,609 and Y=9,768,383 being approximately 4,817' FNL and 3,889' FWL of Block 52 to an estimated up-to-the north bottom-hole X&Y coordinate of X=2,110,609 and Y=9,769,833 being approximately 3,446' FNL and 3,889' FWL of Block 52. The Shen 6 is proposed to be drilled to a total depth of approximately 32,012' TVD/32,302' MD, with the Objective Depth being, as prescribed in the Shenandoah UOA, the shallower of:

(i)    The stratigraphic equivalent of the Top of the Cretaceous with sufficient rat hole (the Top of the Cretaceous is defined as the paleo and lithology marker encountered at a depth of approximately 30,806' TVD/30,888' MD in the WR 51 #4 – Shen 5); or

Confidential

(ii)    A depth of 32,012' TVD.

The logging and evaluation program is incorporated in the estimated Cost and is detailed on the attached wellbore schematic.

The proposed well is currently planned to be drilled with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'.  The current day rate for the Diamond Ocean Blackhawk is approximately $523,000 and is anticipated to be delivered to the Shen 6 participants immediately following operations at Anadarko's Warrior Prospect (GC 563), currently anticipated to occur within the November/December timeframe for mobilization to the proposed location.

Under the Shenandoah UOA, as amended, Appraisal Operations have contractually concluded pursuant to Article 11.5(b).  However, as contemplated in Article 11.6, since a Development Plan has not been approved, the Shen 6 is deemed an Appraisal Operation. Moreover, since the Shen 6 is a Unit activity/operation necessary to maintain the Unit and/or Lease OCS-G 25232 Walker Ridge Block 52 and Lease OCS-G 28148 Walker Ridge Block 53, the Shen 6 is not only an Appraisal Operation (for which a Vote does not apply), but it is also a lease maintenance operation and subject, in particular, to Article 16.4.2 (Acreage Forfeiture in a Portion of a Contract Area) of the UOA.

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures and the anticipated evaluation program; (ii) an estimated days versus depth plot (both in dollars and in days); and (iii) a directional well plan.

Pursuant to Article 8.6.1, each Party has thirty (30) days from receipt of this proposal or on or before October 21, 2016 to make its participation election as to same.  Should you have any questions or need any additional information, please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Sr. Land Advisor

Confidential

ANACOP00002103



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622           AFE No: 2124648            AFE Type: DE - DRILLING - EXPLORATORY
Well #/Name: 1J557400 / WALKER RIDGE 52 003            Field: 0990 WILDCAT (EXPLORATN)
Country: USA          State/Province: NORTHERN C        County: WALKER RIDGE
Prospect:                                              Surface Loc: 60812 52
Target Zone: LOWER WILCOX                              Bottom Hole Loc: 60812 52
Project Depth:

Project Name: WALKER RIDGE 52 003

Project Description: DRILL TO TEST THE LOCATION OF OIL WATER CONTACTS AND TEMPORARILY ABANDON FOR
FUTURE UTILIZATION OF WELLBORE

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE LLC | | 0.33000000 | $51,900,272 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $47,182,066 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $31,454,711 |
| VENARI OFFSHORE LLC | | 0.17000000 | $26,736,504 |
| TOTAL | | 1.00000000 | $157,273,553 |

| | PDE | DRL.DHC | DRL.CNS | Total |
|---|---|---|---|---|
| ORIGINAL | $3,000,000 | $139,436,191 | $14,837,362 | $157,273,553 |
| Total | $3,000,000 | $139,436,191 | $14,837,362 | $157,273,553 |

Please mark your election in the box below

☒ Election to Participate

☐ Election to Non-Consent

APPROVED BY: _____      PRINTED NAME: _MONICA CORELLAN_

COMPANY NAME: _CONOCOPHILLIPS_              DATE: _Oct 20, 2016_



**Petroleum Corporation**

## AUTHORIZATION FOR EXPENDITURE

Company Code:  0622       AFE No:  2124648          AFE Type: DE - DRILLING - EXPLORATORY
Well #/Name:  1J557400 / WALKER RIDGE 52 003

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 0080500100 | Contract Labor- Area/Office | $400,000 | $0 | $400,000 | $0 | $400,000 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $100,000 | $0 | $100,000 | $0 | $100,000 |
| 0080015270 | Misc Mechanical Equipment | $2,500,000 | $0 | $0 | $2,500,000 | $2,500,000 |
| | **Total  PDE** | $3,000,000 | $0 | $500,000 | $2,500,000 | $3,000,000 |
| 0080012230 | Cased Hole Logs & E-line Ops | $26,130 | $0 | $26,130 | $0 | $26,130 |
| 0080012410 | Casing > 30 in (>76.17 cm) | $729,872 | $0 | $0 | $729,872 | $729,872 |
| 0080012370 | Casing 12.0-15.99 in. (30.46-40.61 cm) | $3,652,692 | $0 | $0 | $3,652,692 | $3,652,692 |
| 0080012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $3,702,864 | $0 | $0 | $3,702,864 | $3,702,864 |
| 0080012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $1,058,995 | $0 | $0 | $1,058,995 | $1,058,995 |
| 0080012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $373,492 | $0 | $0 | $373,492 | $373,492 |
| 0080012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $330,399 | $0 | $0 | $330,399 | $330,399 |
| 0080012430 | Casing Accessories | $350,000 | $0 | $0 | $350,000 | $350,000 |
| 0080015240 | Casinghead | $741,551 | $0 | $0 | $741,551 | $741,551 |
| 0080012010 | Contract Drilling | $52,070,340 | $0 | $52,070,340 | $0 | $52,070,340 |
| 0080012020 | Directional Drilling Services | $1,628,787 | $0 | $1,628,787 | $0 | $1,628,787 |
| 0080012060 | Downhole Rental Equipment | $3,023,430 | $0 | $3,023,430 | $0 | $3,023,430 |
| 0080012040 | Drill Bits | $800,000 | $0 | $800,000 | $0 | $800,000 |
| 0080012300 | Drilling & Wellwork Consulting Services | $25,000 | $0 | $25,000 | $0 | $25,000 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $1,243,185 | $0 | $1,243,185 | $0 | $1,243,185 |
| 0080012050 | Drilling & Wellwork Fuel | $3,015,000 | $0 | $3,015,000 | $0 | $3,015,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $3,801,212 | $0 | $3,801,212 | $0 | $3,801,212 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $10,480,265 | $0 | $10,480,265 | $0 | $10,480,265 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $3,831,462 | $0 | $3,831,462 | $0 | $3,831,462 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $128,640 | $0 | $128,640 | $0 | $128,640 |
| 0080017030 | Environmental Waste Disposal | $150,750 | $0 | $150,750 | $0 | $150,750 |
| 0080017000 | Environmental/Regulatory Studies & Plans | $14,000,000 | $0 | $14,000,000 | $0 | $14,000,000 |
| 0080012160 | Fishing Tools and Services | $399,488 | $0 | $399,488 | $0 | $399,488 |
| 0080012440 | Liner Hanger | $250,000 | $0 | $0 | $250,000 | $250,000 |
| 0080025020 | Living & Camp/Housing Expenses | $284,415 | $0 | $284,415 | $0 | $284,415 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $328,635 | $0 | $328,635 | $0 | $328,635 |
| 0080012550 | Misc Tangible Downhole Equipment | $180,000 | $0 | $0 | $180,000 | $180,000 |
| 0080012540 | Mud Line Hanger Systems | $611,742 | $0 | $0 | $611,742 | $611,742 |
| 0080012120 | Mud Logging | $815,000 | $0 | $815,000 | $0 | $815,000 |
| 0080012110 | Open Hole Logging | $8,163,440 | $0 | $8,163,440 | $0 | $8,163,440 |
| 0080031050 | Overhead Billed - System Calculated | $7,317,300 | $0 | $7,317,300 | $0 | $7,317,300 |
| 0080012090 | Primary Cementing | $2,962,195 | $0 | $2,962,195 | $0 | $2,962,195 |
| 0080012000 | Rig Mobilization/Demobilization | $523,320 | $0 | $523,320 | $0 | $523,320 |
| 0080025010 | Shore Base/Staging Area Expenses | $201,000 | $0 | $201,000 | $0 | $201,000 |
| 0080025070 | Telephone & Communications | $150,750 | $0 | $150,750 | $0 | $150,750 |
| 0080024000 | Transportation/Freight Air | $2,301,450 | $0 | $2,301,450 | $0 | $2,301,450 |
| 0080024020 | Transportation/Freight Ground | $176,378 | $0 | $176,378 | $0 | $176,378 |
| 0080024010 | Transportation/Freight Marine | $9,607,012 | $0 | $9,607,012 | $0 | $9,607,012 |
| | **Total  DRL.DHC** | $139,436,191 | $0 | $127,454,584 | $11,981,607 | $139,436,191 |
| 0080012230 | Cased Hole Logs & E-line Ops | $4,160 | $0 | $4,160 | $0 | $4,160 |
| 0080012010 | Contract Drilling | $8,373,120 | $0 | $8,373,120 | $0 | $8,373,120 |

Confidential



Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 0080012060 | Downhole Rental Equipment | $481,342 | $0 | $481,342 | $0 | $481,342 |
| 0080012300 | Drilling & Wellwork Consulting Services | $25,000 | $0 | $25,000 | $0 | $25,000 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $197,920 | $0 | $197,920 | $0 | $197,920 |
| 0080012050 | Drilling & Wellwork Fuel | $480,000 | $0 | $480,000 | $0 | $480,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $605,168 | $0 | $605,168 | $0 | $605,168 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $72,480 | $0 | $72,480 | $0 | $72,480 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $609,984 | $0 | $609,984 | $0 | $609,984 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $20,480 | $0 | $20,480 | $0 | $20,480 |
| 0080017030 | Environmental Waste Disposal | $24,000 | $0 | $24,000 | $0 | $24,000 |
| 0080012160 | Fishing Tools and Services | $63,600 | $0 | $63,600 | $0 | $63,600 |
| 0080025020 | Living & Camp/Housing Expenses | $45,280 | $0 | $45,280 | $0 | $45,280 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $52,320 | $0 | $52,320 | $0 | $52,320 |
| 0080031050 | Overhead Billed - System Calculated | $1,351,766 | $0 | $1,351,766 | $0 | $1,351,766 |
| 0080012090 | Primary Cementing | $200,787 | $0 | $200,787 | $0 | $200,787 |
| 0080012100 | Remedial Cementing | $250,000 | $0 | $250,000 | $0 | $250,000 |
| 0080025010 | Shore Base/Staging Area Expenses | $32,000 | $0 | $32,000 | $0 | $32,000 |
| 0080025070 | Telephone & Communications | $24,000 | $0 | $24,000 | $0 | $24,000 |
| 0080024000 | Transportation/Freight Air | $366,400 | $0 | $366,400 | $0 | $366,400 |
| 0080024020 | Transportation/Freight Ground | $28,080 | $0 | $28,080 | $0 | $28,080 |
| 0080024010 | Transportation/Freight Marine | $1,529,475 | $0 | $1,529,475 | $0 | $1,529,475 |
| | **Total DRL.CNS** | $14,837,362 | $0 | $14,837,362 | $0 | $14,837,362 |
| **TOTAL** | | $157,273,553 | $0 | $142,791,946 | $14,481,607 | $157,273,553 |

Confidential



ANACOP00002107



Confidential

ANACOP00002108



ANACOP00002109



ANACOP00002110

Confidential

# Exhibit 46



**Petroleum Corporation**

Inter-Office Correspondence

November 10, 2016

TO:        Distribution

FROM:      Property Accounting

SUBJECT:   Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis

---

**Background**

In accordance with Accounting Bulletin 20.5, *Well Classification and Disposition of Suspended Well Costs*, as part of each quarter-end close, Property Accounting reviews the status of all exploratory wells in progress to assess whether the well costs are properly recorded.

Drilling of the second Shenandoah appraisal well, the Walker Ridge 52#2 (Shenandoah-3), concluded in Q4 2014. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil-water contact based on pressure data, and reduced the uncertainty of the resource range.

The following analysis documents the original analysis, the current quarter review of the justification for original suspension, and the changes in conditions that occurred during Q3 2016 which resulted in the recognition of dry hole expense on Shenandoah-3.

**Original Accounting Analysis**

Property Accounting reached the conclusion in Q4 2014 to suspend the well costs, despite the fact that the sands encountered were non-hydrocarbon bearing, based on understanding from conversations with Exploration, and a subsequent email dated December 17, 2014, that the well projected the oil-water contact and resulted in higher confidence in, and thus an increase to, the estimated resources for the Shenandoah project.

Per ASC 932-360-25-18:

> *Exploratory stratigraphic test wells are accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditures before production could begin (i.e. paragraph 932-360-25-10). The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs shall not continue to be carried as assets if the enterprise is not making sufficient progress assessing the reserves and the economic and operating viability of the project or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well.*

Property Accounting documented its conclusion to continue capitalization of the well as a suspended well in a memo drafted December 29, 2014. The memo noted that pressure data collected in this appraisal well could be used to project an oil-water contact between the discovery and appraisal well and since the projected oil-water contact was close to the appraisal well, the data suggested a higher confidence (and therefore increase) in the resources of the field. This was considered a successful appraisal well to determine the extent of the reservoir. The memo also noted that while hydrocarbons were not found in this wellbore, geologic, fluid and pressure data obtained from the well raised the confidence level of the

CONFIDENTIAL

**APC002364**
**Confidential Treatment Requested Under FOIA**
APC-00002132

resources of the field and contributed to the ongoing development of the Shenandoah project. Therefore, it was determined to be appropriate to continue capitalization of this well cost as suspended well cost, pending the determination of proved reserves for the Shenandoah project. It was further noted in the same memo, as well as in notes retained in conjunction with the December 17, 2014 quarterly Gulf of Mexico Exploration meeting with Property Accounting, that management was also evaluating future utility of the wellbore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands. However, Property Accounting relied on the presumed increase in the resource estimates as the justification for continued capitalization of the Shenandoah-3 well costs in reaching its accounting conclusions in Q4 2014. No new information came to the attention of Property Accounting during subsequent quarterly discussions with Exploration that indicated the resource estimates decreased following the drilling of the Shenandoah-3 well. Once the well was capitalized on this basis of presumed increase in resource estimates at December 31, 2014, the Property Accounting group monitored the status of the Shenandoah project in its entirety against the sufficient progress criteria of ASC 932-360-35-19, without revisiting the potential future utility of the wellbore until the third quarter of 2016.

**Current Quarter Review of Justification for Suspension**

During the third quarter of 2016, a review by the accounting department of the Shenandoah-3 capitalized costs determined the well did not increase the overall resource estimate of the Shenandoah project, nor was the well a suitable candidate for a sidetrack producer. The review found that the former Chief Accounting Officer (CAO) relied upon the injection well capability of Shenandoah-3 as the predominant reason for suspending the well costs at year-end 2014.

Since the basis for capitalization at year-end 2014 as relied upon by the CAO, i.e. based on its potential future utility as an injection well, differs from the predominant rationale relied upon to support Property Accounting's original analysis, we considered whether it was appropriate that the well was suspended at December 31, 2014 based solely on its potential future utility.

First, we considered whether it was reasonably possible, at year-end 2014, that the Shenandoah-3 well could have had potential future utility as an injection well in the Shenandoah project:
- A February 18, 2014 presentation on the economics of a potential two spar development scenario that contemplates the need for water injection wells.
- The Vice President of Deepwater and International Exploration stated in an email on February 12, 2015 communication that the well is potentially usable as future water injection well.
- On January 23, 2015, email correspondence occurred between the former CAO and the Marathon CAO stating that the basis for suspending the well was related to assessing the future utility of the wellbore as a possible injection well for the field, or as a development well to sidetrack into oil-bearing sands.

Therefore, we conclude that it was reasonably possible, based on facts and circumstances available prior to filing of the 2014 financial statements, that the Shenandoah-3 well could have had potential future development utility as an injection well in the Shenandoah project.

Next, given that the suspended well costs for Shenadoah-3 at December 31, 2014 would have represented costs associated with potential future water injection in the development phase of a project for which final investment decision (FID) had not been made, we considered whether it was appropriate to capitalize development costs in advance of the development stage of a project.

Per ASC 932-360-25-14:
> *Development costs shall be capitalized as part of the cost of an entity's wells and related equipment and facilities. Thus, all costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and shall be capitalized, whether the well is successful or unsuccessful. Costs of drilling those wells and costs of constructing equipment and facilities shall be included in the entity's uncompleted wells, equipment, and facilities until drilling or construction is completed.*

Service wells are defined in the ASC Glossary as:

2

**APC002365**
**Confidential Treatment Requested Under FOIA**

CONFIDENTIAL

APC-00002133

*A service well is a well drilled or completed for the purpose of supporting production in an existing field. Wells in this class are drilled for the following specific purposes: gas injection (natural gas, propane, butane, or flue gas), water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.*

At year-end 2014, as addressed above, it was reasonably possible for the Shenandoah-3 well to have potential future use as a water injection well in the development of the Shenandoah project. A water injection well meets the definition of a service well which would support production in the Shenandoah field. The Shenandoah-3 well was drilled as an exploratory stratigraphic test well. It was not drilled with the original intention of use as a water injection well. Therefore, we do not consider it a development cost that should be capitalized, *whether the well is successful or unsuccessful*, under ASC 932-360-25-14. However, we do believe that given that the well was unsuccessful under ASC 932-360-25-18, it is appropriate to consider whether it is reasonably possible that the wellbore has future utility in the development phase. If it is not reasonably possible that the well has future utility, the costs should be expensed. Anadarko believes, in certain situations, it is appropriate to suspend development costs prior to FID. For instance, the Shenandoah-5 and Shenandoah-6 appraisal wells have been or will be drilled, prior to project sanction, with additional capital expenditures to allow the wells the capability of being producers. Therefore, while the project is still in the appraisal phase, and the costs are considered exploratory costs at the time incurred, we believe it is appropriate and consistent with successful efforts accounting that since such costs would provide future benefit in the actual development stage of the project, it is appropriate to capitalize such costs pending FID, assuming it is reasonably possible the well has future utility. Given the large resource range of the Shenandoah project, even at year-end 2014 after the Shenandoah-3 well was drilled, it was a reasonable judgment to conclude that it was reasonably possible the Shenandoah project would proceed to FID and; accordingly, appropriate to capitalize the Shenandoah-3 well cost until its future utility as a water injection well in the project development was determined. Similarly, information regarding the project development obtained through Q3 2016, including that the Shenandoah-3 well was in the proximity of the currently modeled injection well locations, provided confirming and corroborating evidence that it was reasonable to conclude in the fourth quarter of 2014 that the Shenandoah-3 well could be used in any future development of the field.

**Current Quarter Analysis of Potential Use as a Water Injection Well**

In Anadarko's third quarter 2016 Operations report, the Company announced that it plans to develop the Shenandoah field using a semi-submersible platform if a final investment decision is reached. The semi-submersible platform is being designed for the capability of handling the equipment necessary for water injection. Further, during the third quarter of 2016, development studies of water injection scenarios for the Shenandoah project were substantially advanced based on planning and modeling of optimal locations for injection wells. These subsurface water flood scenarios currently show that the optimal locations of water injection wells are on either side of the Shenandoah-3 well location, but not the specific location of the Shenandoah-3 well. In addition, the company's water injection models do not incorporate a possible east-west trending fault which may inhibit the use of the Shenandoah-3 as a water injector. With the latest results of the ongoing subsurface water flood studies, it was determined in Q3 2016 that it was no longer reasonably possible for the Shenandoah-3 wellbore to be part of the Shenandoah development plan. In addition, given that the wellbore is not in the optimal location, the company will not invest the resources to undertake the multi-month study necessary to determine whether the well meets the mechanical specifications for water injection utilization. Given this determination was made within 21 months from the Shenandoah-3 completion date, the outcome of the studies appear to have been made within a reasonable time frame given the size and scope of the Shenandoah project.

**Conclusion**

Based on the above discussion and analysis, the conclusion made by the former CAO to suspend the Shenandoah-3 well costs at December 31, 2014 given the wellbore's potential utilization for water injection was an appropriate and reasonable application of accounting literature. At September 30, 2016, it is no longer reasonably possible to justify continued capitalization given the low probability of the wellbore's future utilization, and therefore, the suspended well cost of $64MM was taken to dry hole expense in the third quarter.

3

APC002366
**Confidential Treatment Requested Under FOIA**

CONFIDENTIAL                                                                                      APC-00002134

In conjunction with the review performed in Q3 2016, it was determined that approximately $7MM of the $64MM well costs were attributed to a bypass well used for coring activities, and should have been expensed in Q4 2014 as the coring activities bore no future utility. Well costs associated with the bypass well are considered out-of-period and have been reported to Financial Accounting and Reporting for materiality consideration.

**Distribution**
Chris Champion
Louis Williams
Jennifer Edwards
Amanda McMillian
KPMG

4

APC002367
**Confidential Treatment Requested Under FOIA**
CONFIDENTIAL                                                                                          APC-00002135

# Exhibit 47



THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

APC - Anadarko Petroleum Corp at Bank of America Merrill Lynch
Global Energy Conference

EVENT DATE/TIME: NOVEMBER 17, 2016 / 12:30PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited
without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its
affiliated companies.



APC-01751407

# CORPORATE PARTICIPANTS

**Al Walker** *Anadarko Petroleum Corporation - Chairman, President & CEO*

# CONFERENCE CALL PARTICIPANTS

**Doug Leggate** *Bank of America Merrill Lynch - Analyst*

# PRESENTATION

**Doug Leggate** - *Bank of America Merrill Lynch - Analyst*

[I'm Doug Leggate with Bank of America Merrill Lynch here in the US]. Before we get started with the formal session, I wanted to introduce [Mark Malone], who's going to give a little bit of a safety brief on the evacuation procedure from the hotel. Speaker, who I'm sure is known well to everybody Mr. Al Walker, of course is Chairman, President and CEO of Anadarko.

If there was one company that has navigated this volatility of the past year was perhaps I would say the deal of the downturn and I'm not talking about Apache, then it would be Anadarko. So, please join me in welcoming Al to the podium. Thanks Al.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Well, good morning and Doug, thanks for having Anadarko and appreciate you wanting us to be a part of the conference. It's been quite a year. I don't know if you can remember January, I know, I do. January seemed like it was a pretty dark dismal place. Oil went below $30, actually hung out below $28. And then last week, just when you thought you never could believe that you'd see something you couldn't believe, we elected a President that nobody thought would likely be the next President-elect, and it's been a year of a lot of change and you are right, Doug, it's been a year where we've had to think about stuff and maybe ways of going forward we never imagined. I know, whenever I think about talking to our Board or talking to our employees or talking to those that invest in us, it kind seemed like a good place to start is thinking about kind of where we've been in the last couple of years.

In the last couple years, there's definitely some lessons that we all have to take away from it and we have to think a little bit about where is the price of oil going. I know, I was very early in June talking about the fact that I thought we would see a sustained $60 price environment and have a very good shot at that anyway. During 2017, I anticipate we'd see a little better supply and demand tightening through this quarter and it doesn't feel yet absent some artificial means by the OPEC nations to take barrels off the market that we've quite found that magic way of having demand and supply come back in the sync and I expected more of the lower $48 in the US to be a bigger contributor of that now. I know all of you know the numbers as well as the next person that the gap is coming down, but we still seem to be hanging out within that mid $40s price range and maybe in a very stubborn way.

But when you look at -- when you go back to the end of the quarter and you think about where was the forward 12-month strip for oil and gas and I'll even just say use ethane, because ethane is probably the most volatile part of the NGL stream for most of us, because we get into ethane rejection. And the reality is, at the time at [9/30] as well for the forward 12-month at that point as well as Cal 2017, oil hasn't really come off that much and we were on the backside of the preliminary agreement that OPEC nations agreed to in Algiers and we were starting to see at that time some strengthening around the view that oil could be above $50, but the reality is when you look at the Cal strip today for next year, it's $50, maybe $53 previously, gas is still around $3 or thereabout and ethane somewhere in the $0.22, $0.23 a gallon, hadn't changed very much. So while it feels less today than it did at the end of the quarter, the reality is at least the markets are indicating to us that next year looks about the same to them.

So I think you've heard a lot of us talk from time to time about what's it going to take for onshore in particular oil growth to occur. And most people will tell you it really takes $60, some will say $55. What I will say is our industry doesn't really do very well when oil is below $40, and that's kind of an obvious ah, ah thing. And you've seen it through the course of this year in terms of what we've all done to reshape our portfolio, some more aggressively than others to take into account that in a lower priced environment, you're going to have to do some things a little bit different than you do when prices were higher and service calls from a different place. If you look at Anadarko along with others, we've all been pretty aggressive

2

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

APC-01751408

this year, whether it's workforce reductions, whether it's been trying to find efficiencies in our portfolio, whether we've been trying to look at and figure out how to do things a little bit differently. You know in on our case, we've made a fundamental decision of trying to move away from largely natural gas and more into oil and liquids.

We've been a very aggressive seller over the last two years of our natural gas properties when most people didn't feel like we could probably accomplish that. That monetization of natural gas-laden properties and moving into more oil and liquids-rich has certainly caused some concentrations and I'll talk a little bit about a couple of those in a minute, but I think, you see this going on in our industry as well. I mean, I think it's still a very good investment to be in natural gas, it just depends on the size of your denominator. I think for larger companies, it's just harder to be at a sustained scalable enterprise with natural gas. And while I don't hold any more knowledge than any of you do about what Trump Administration is going to do, it does look like coal is coming back into the supply picture for competition with natural gas for electrical generation or other types of fuel use.

So while we thought a few years ago that natural gas having been given sort of that favorite seat at the table, it now appears that coal is coming back for another dinner when we've been asked to leave the room. So I don't know what that's going to do. I can't imagine it's going to do anything positive for natural gas price discovery, but you're not haven't seen prices sell off a lot as a result (inaudible), I guess, it's still a very much a weather-driven price dynamic. And I still think price discovery for natural gas will be largely weather-driven regardless of whether coal comes back into the picture or not.

Between $40 and $50, we sort a hang out, we do okay, certain plays in our portfolio, and particularly, the Delaware Basin and the DJ Basin actually give us a present value TAM of the current strip below $30. So it's not like we're in an essentially and intellectually bankrupt moment to be at $30 and can't make ourself work. And I think our industry has done a pretty good job. As you know, we have operations outside the US and when I visit with Energy Ministers in other countries or Heads of State in other countries, I think they're all pretty amazed at how well the US has been able to navigate the difficulties of having oil go down as much as it has over the last years and the volatility associated with how it moves around since then.

And I think one of the things that is amazing is how flexible our industry was with respect to the cost, whether it was the company's cost or whether it was service cost and how that really played into a picture that none of them anticipated. I think it goes to a lot of the things that many of us take pride with our industry and that is we are very resilient and as a result, we'll figure it out. Now, I would have said and I did say almost two years ago at a Goldman Sachs conference, when asked a question, who's going to survive and who's not. I made the comment and I'll - if you didn't hear it, I'll repeat it. I felt then that we were likely going to see 25% of the independent oil and gas companies either go way or file bankruptcy or emerge as a phoenix. We didn't see that. We've seen a lot, maybe 100, but we haven't seen 25% of the independents of this country go through all of that and it's pretty remarkable how those that didn't go through had been able to sustain themselves. But it's really going to take $50 to $60 I think to find a healthy environment for us to make, not just a good rate of return, but something that I know I talk a lot about, I know, you hear some of my colleagues talk a lot about it. But it's not the internal rate of return that we need between $50 and $60, it's the cash cycling. To use a financial term, it's the cash on cash, how fast we get the cash back and what's it look like. That was probably underestimated. If you take lessons learned in the last two years, whether you are a company or an investor, is just how dramatic that cash cycling got hit and how hard it was without using debt or equity to fund the difference as you couldn't sustain yourself, because you weren't cycling the cash fast enough to reinvest it regardless of what the internal rate of return might have been on the margin.

Now, world of over $60, I'm not sure that's likely we're going to see that on a sustained basis for a while until either demand improves in Asia, in particular, China and to a lesser extent India and Europe gets back on its feet from a demand perspective. I do think you're going to see oil come back into the market whether it's from us or others that might keep oil in the $60s if it ever gets there. I do believe today it will take more than $70 most likely before we see greenfield projects and deepwater basins around the world. So the industry broadly defined is not likely to be investing a lot in new infrastructure and that's pretty important thinking about it longer term. I think, the IEA came out this week talking about, they still see oil demand being strong through 2040, that the oil is not likely to find itself peaking until sometime around that period of time based upon the current supply and demand fundamentals. So, as I think about talking a little bit about things morning, if you don't kind of shape it with, where do we see commodities, what are the commodities do, how do you get yourself ready for it. Many of us are starting to try yourselves prepared for a better price environment. And I think in particular we're certainly in that category. So let's talk a little bit about that.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

APC-01751409

When we do what we do, we think about it as you now hear us often whether we're talking publicly or in private meetings about the 3Ds; the Delaware, the DJ, and the Deepwater Gulf of Mexico. One of the margins that we've seen go away has been our gas well head margin and oil has certainly been a better commodity for us. So as we think about these three particular asset groupings or basins, they really give us a real exposure to oil. And the Freeport-McMoRan oil and gas acquisition aside, we still -- we were focused on this and I'll talk a little more about why that was so important for us and why we liked it so well. But we really were focused at -- with part of that time on the two principal onshore plays. We were shedding our natural gas or dry gas assets onshore, refocusing almost all of our capital onshore to those two assets and are increasingly doing so. I think lot of it is simply, we just get better rates of return. There's more well head margin with oil and at least in our portfolio, I can say this with some confidence, because we modeled it into oblivion. It probably takes $6 dry gas, gas has no associated liquids of any nature before it can compete with our two principal onshore oil provinces being the DJ and the Delaware, because there, at least in the Delaware, we have a very high cut of oil, we have a lesser cut of oil in the DJ. We don't have quite the high cut we have in the Delaware, it's 70%, but a very healthy cut of oil in the DJ as well followed by natural gas liquids and some natural gas.

So $6 gas, I don't believe at age 59, I will see that most likely in the balance of my career and we may see it and as I tell people, if I'm wrong, I'm happy to be wrong, because it just makes our investments in the DJ and the Delaware more valuable for the gas stream that's associated with having to evacuate that natural gas to get to the liquids. So it just didn't seem like as we were thinking about how do we want to compete coming out of this and be a better company, a more competitive company, a more focused company that we could do that with all the natural gas properties. And frankly, they require a lot of capital to maintain, they were very quiet small in terms of just maintenance CapEx, but they weren't likely to feed on capital, they weren't going to be competitive in our portfolio, so therefore they were fallow capital, and as a result, we needed to take that capital, we needed to bring it back in, in the form of cash and reinvest it prudently in those 3Ds. So in some ways, I think what we've seen this year is companies that have really good portfolio management skills, have done a lot during this downturn to get themselves ready for inevitably the upturn, because our industry is cyclical. I don't know if it's going to happen next quarter, next year or in 2018, but our industry will cycle back up. So those are some of the things we've tried to do what I have seen with the industry in general with respect to what's going on the last two years and the lessons learned from it.

I think having the ability to look at the world, think about how do you want to allocate capital is quite important. I always say and particularly in play settings, there's two things that we as executive management have to do, right. We have to create a culture that people feel good that they could work in and it fits their personality and so they like coming to work and we have to allocate capital correctly. And if we allocate capital incorrectly and we have a great place to work, we don't probably do very well. So it still comes back to the fact that you've got to allocate capital correctly as management. If we allocate capital correctly, but nobody likes working there eventually that's going to cause us performance problems. So we really have to get both of those right and I think you've seen a lot of companies in our industry do that. I'm proud to say, I think we've managed through this downturn quite well and are getting ready to come out of it whenever the day is with oil and we will be a less gassy company and I'll go through a couple of these plays and talk a little bit about what I'm seeing, not just with Anadarko, but in general and let's just start with the Delaware Basin.

It is the hottest play in the world right now and you kind of go, why is that. Because I mean we got into it and almost a serendipitous fashion. Years ago, about 10 years ago we were chasing a fairly deep gas play there we called the Haley and by the time we realized few years ago now, just exactly what the basin held with the Wolfcamp, we had about 80 or so wells have been drilled through the Wolfcamp. So we had unlike in the Utica, industry had really good well control. So we actually could see the logs, we could understand the logs before we drilled our first Wolfcamp well as industry to understand what was likely to be in the basin and in an area that industry had up until that point not really focused on. So today we have this multi-stack basin, multi-stack pay horizon as you see in the far right hand part of the graphic, it's huge, it's 8,500 feet, it's got 10 potential zones in it and when people go, how do you pay $40,000 an acre for this stuff. Well, actually, they're paying $40,000 divided by where you think the different plays that are stacked in there are. And if you have a reasonably positive view or constructive view on oil, you can do okay. Some of these are gassier than others, they're not all oily. But it has become quite a phenomenon.

Now we added to and trade around our position to get to a little over 6,000 gross acres that we have today, but we learned early on that we understood kind of where the heart of the core of the play was that we saw from the day that we had just from the wells that we drilled when we were chasing the Haley field, we could see through our own log analysis and petrophysics exactly probably where the best places were likely to be even before we started drilling and several other people did as well. But I'm not going to stand up here and tell you that we had a view, a geologic view about the Wolfcamp A. And as a result, it led us to putting 6,000 acres again. Much of this acreage was really HPP and we added to it

4

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-01751410

constructively. Now industry continues to come into them. Every week you see a new deal. Silver Hill, I guess was the most recent one that was announced and it is pretty impressive the amount of money that's being paid. And [specific] says, how do you pay $40,000 an acre that when in 2013 and 2014, these deals were going for less than $20,000 an acre when oil was over $100. And the reality is we didn't know as much as industry didn't know that much about this play at that time. We had a fairly minimal view beyond a couple of the benches what potential might look like.

So there areas here, they're quite impressive. Now one of the things that's happened over the last year, as certainly as oil prices have come down, is that we've all been able to get our cost down. Our cycling time with our rigs has gone down, the days on location. We've also seen that -- and again this is not just Anadarko, this industry is seeing better EURs. I mean, our EURs are up to a million barrels equivalents per well. So that is really substantially higher than about half of that when we first started giving guidance to what we thought the field might have and well performance look like. The other thing to keep being mindful of and we talked a little bit about this at dinner last night with those that joined us is that in a period of low oil prices, infrastructure is probably not that key. It helps you a little bit and as you know we have our own midstream organization Western Gas, and it helps us in ways that it probably benefits us a little bit because of the way in which we will use third-party money to help build out infrastructure versus using our own. Third-party meaning, you get commitments for people that either to process their gas or gather their the gas and then process the liquid. So we actually pick up a yield stream that's independent of the upstream.

Where this is going to be very, very important to watch is when we get into a period of higher oil prices and the takeaway capacity from the Permian Basin into the Gulf Coast. And if you don't have control over your infrastructure, you're likely to see basis differentials widen out, because it will take a while for industry to build the pipe to get it into the Gulf Coast. And I'll say that's one of the things to just be mindful. As industry when you look at companies in this industry that are taking the time to play this area, controlling your infrastructure, having your ability to evacuate the hydrocarbons plural, not just the gas, not just the natural gas liquids, not just the oil, but all of them is going to be -- could become a real bottleneck for those that are just in the upstream business and don't control their midstream. But this is an impressive play. I mean, this is probably onshore, will turn out to be the largest oilfield in the US when all is said and done.

As you've heard about discoveries and people have talked about things to the south of this area that are little gassier in nature and I don't really know much about that. I will tell you in the core of the core, this is some of the most impressive rock we have in this country that will produce oil for a long time and we're only at the beginning of being able to understand what to do with it. As we like to point out, because of the way in which we got into it, our average cost of the basin is only $500 an acre. And it's really makes it hard for us on the margin to add to our position, when you have the position you already enjoy, but I'm not saying it's impossible, we couldn't find the right opportunity to do a deal that looks smart and it's a right thing to do. And even though this would be one of the areas we would make acquisitions for I think the reality is, as competitive as it is, it's going to be a little more limited in terms of what you're going to see Anadarko do by and large. If we can do things and have some abilities to make sense in ways that I can stand up in front of you and say, this is where I would put my money, we'll do it, otherwise, there would be other places that we'll do that.

But this is just a hot play in many ways and I would not be overly concerned that industry has gotten drunk and as a result fell in the soup. These stacked pay horizons are still for the most part not well understood by industry, we're trying to understand it better. As prices improve, our ability is to continue to do the research here is going be quite attractive. If anything, and I made this comment last night, if anything, being in a lower priced environment in the last two years has really allowed industry to do some of the science around this play that if oil had been $80 or $90 or $100, we probably wouldn't have drilled it as well, we probably wouldn't have produced it as well and we would have lost some of the efficiencies in the process that we've been able to achieve. So in a very Darwinian way, the last two years is probably a newer to the benefit of this play more so than any other in the United States in my opinion.

So let's move over to the other one in our portfolio, and I think the events here recently politically and most of you that know me pretty well, I'm not fairly a political person, so I stay away from politics and comments associated with it and that's just simply getting ballot initiative number 71 or raise the bar passed by the electorate in Colorado last week was very big for the State of Colorado, it was very big for the companies that are there, and in particular, I'd say very big for Noble Energy and Anadarko Petroleum. If you're not familiar with this, this is a ballot initiative that slows down the otherwise very easy process by which ballot initiatives historically have come forward to change the state constitution in Colorado. Essentially, now every states in a district, you have got to receive 2% of that district's signatures in order to be able to bring a ballot initiative forward. So every district in the state, you got to get 2% of the signatures in the state in order to bring it forward and then once it comes on to the ballot for vote, it's got to pass by 55%.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

APC-01751411

Well, in Weld County, you can pretty much guarantee we're at the heart of the Wattenberg Field is, getting a 2% signature in Weld County is going to be quite difficult. If you're in Boulder, quite easy and the prior way in which the constitution could be changed by ballot initiatives was a pretty low mark for getting things done. In fact, Colorado was viewed typically as one of the easiest places to change the state constitution. So as industry now, we go from where we were before, having every two years to figure out how to fight, whatever it's like, there is going to another two year battle to either fight set back or other types of things the environmental left that's trying to slow us down on and it is funny, we had the Governor, who is a democrat, we had both senators, one of them is a democrat and a republican, all in favor of ballot number 71, all in favor of the ballot initiatives that didn't receive enough signatures and yet we were still fighting a pretty stiff headwind because Colorado has the second highest number of independent registered voters in the country. So it's a true purple state in a lot of ways and the decision was really made by maybe about 15% of the electorate in the middle.

So we never took it for granted. As industries, we were trying to make sure we educated the voters on what they were voting for, so that when they went to the polling booth or in Colorado when they mailed their ballot in, because no one goes to a polling booth anymore in Colorado, it's all done by mail, they actually knew what they were voting on. So, now we don't have to worry that we're only going to invest in the areas that are most tied to urban expanse in the Denver area, those are the ones that were likely to be the most sensitive to any setback that would be approved. Consequently, today, I think industry broadly defined, sees the DJ in a much more impressive investable light than we might have even three or four weeks ago when we were hoping to get, raise the bar passed. So I think for Anadarko we'll end up doing more things now. When I was talking earlier, I know, you've heard us say before, we got nine rigs running plus a spudder in the Delaware Basin. We're going to be adding two more rigs in the first quarter. We've now added a third rig in the DJ Basin and we added another completion crew and actually doubled our completion crews in the Delaware. So we are trying to get ready in these two basins for a lot of activity on the belief that oil is going to come up in price. And I'd say in Colorado we've raised the bar, we can now look out and figure out how to most efficiently and effectively develop the acreage that we have there over the time horizon of more than just two years.

So this is a big development for our industry, a big development for the companies there and really a positive for the state, because I think people realized over the last two years in the State of Colorado was, oil prices came down, in municipalities and the school districts were receiving a whole lot less tax revenue from the oil and gas business. And if anything that really helped galvanize the need for ballot initiative 71 or raise the bar to get passed, because those that were on the margins saw what was happening to their schools if we as an industry were being asked to leave, so to speak and now that we as an industry are not being asked to leave, but actually are encouraged to invest, I think this will be a huge positive for our industry, a huge positive for the state. And I think for those of us that play the DJ Basin it now allows us to do a lot of really creative and capital efficient multi-year planning.

Now, moving into the Gulf of Mexico, I think you've heard us talk a lot this year and even going into last about tiebacks. And it's not that tiebacks all of sudden became in vogue. We've always had them in our portfolio. When oil was $100, we were probably as a company exploring more than we're developing and we weren't necessarily looking at these tiebacks in the same way we might when it's hard today to take an exploration prospect with the rig that is out of market and promote and partner. As typical in our industry, when you put a prospect together, particularly if you have a high working interest, you want to put it together in a way where you can promote some of it out, we get carried on the front-end of the drilling. Well, in the Gulf of Mexico that has pretty much come to a halt. Anybody that's still active in the Gulf of Mexico is unlikely to take a non-op position in somebody else's prospect, because they've got plenty of reasons to want to keep that money in their own pocket, on their own operated prospects. So we started looking really aggressively at our tiebacks and you've seen us do a number of things. I think one that was creative that I could point is the deal we did with BP earlier this year and talked about it little in our most recent earnings call and that is where BP had a nice, but not a super discovery a few years ago something called Hopkins, it's about 125 million barrels of discovery. They wanted to come across our constitution platform and asked us to give them a Production Handling Agreement or PHA. We looked at it, we came back and gave them a kind of a door one. Door one was a fairly aggressive PHA and door two was a less aggressive priced PHA that would give us a third on a ground floor basis with no recovery of prior cost position and the operator. So Hopkins, which is now called Constellation is now on operating Anadarko development. BP has two thirds. We'll bring our rig, we'll bring our operations and we'll bring it back across our constitution platform when it produces.

So how did we get there. We had infrastructure that was under-utilized in the area that we could do a tieback. We have a lot of this in our portfolio. Even though while I will tell you in all fairness, Heidelberg has not drilled out the way we had hoped, Lucius has drilled out much better than we had hoped, so sometimes we get it really right and sometimes we get it little wrong. What we do have is an 8,000 barrel a day spud at Heidelberg

6

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

APC-01751412

that's got about 24,000 barrels a day moving across it. So we are looking pretty aggressively there at things we see in the area to tieback into Heidelberg, whether they're our prospects or they're developments of other people and I'll come to it in a minute. But that was one of the attractive things about the Freeport-McMoRan oil and gas deal was not so much that -- I mean, it was great that we bought it four and half times next year's cash flow, it was great that we got it for the lot of the things that we talked about when we announced it with respect to being able to take the free cash flow into the Delaware and DJ basins, but it also gave us three more platforms in the Gulf of Mexico. Only Shell today has more infrastructure than we do.

And I think for this uncertain period, meaning a period where it's unlikely we're going to see a lot of development of new infrastructure in the Gulf of Mexico, our ability to control 10 producing facilities should and/or greatly to our benefit in the years ahead as oil tries to find its new equilibrium. We've had great success at Caesar Tonga with the way the volumes have moved through there. We've also feel quite happy that we've got a lot of the other things we have working. You see us do an exploration well right now called Phobos. Phobos if it's successful, doesn't have to have its own infrastructure. We can tie it back into Lucius producing facility. So we have some things that we're quite happy with, quite proud of, we think the tiebacks is a part of what we're going to do, they actually have better rates of return than the Delaware and the DJ. The cost of tying back into existing infrastructure is very small on the total drilling complete equation. And I think you are going to hear a lot more from us. I think we're uniquely positioned as probably something you're not going to hear a lot of our competitors talking about, and that's the ability to use our infrastructure in the Gulf of Mexico, and actually put capital towards it and have rates return at the end of the day that are actually equal to or better than what they can do onshore.

So we've shown you data before and we'll show you again a little bit about that kind of what we think we can do in the future. I think we're all looking at a future that's based upon at different price of oil, it's not $45, I just think it's impossible for oil to hang out at $45 forever. You've seen and I've seen all the draconian pieces written about the lack of investment by industry and infrastructure, the lack of investment in new development and at some point the price for that could be a very expensive price for the consumer and even some are predicting we will go back to $100 plus oil in the next decade. My only comment to that is, don't know, but it's not going to stay at $45. We've given you and a lot of our peers too given you what we think we can do over a multiyear horizon with our oil growth. And I think that's probably likely to occur at least with names that you have probably more confidence in and it's not just people who are running out models with a lot of big broad assumptions.

I think the monetization program from us is likely by the time we get together with us in March when we do our annual period where we set guidance for the year and provide you a capital plan in and around that Analyst Day. I think it's probably likely that we'll have as much cash sitting on our balance sheet as we expect to have cash flow for next year. When the flexibility associated with that could be quite attractive to us, as we try to figure out how oil is going to pivot and where we want to put more money in and how we want to put more money into the DJ and the Delaware. I think when somebody asked me last night, what's the real constraint associated with the Delaware, at the end of the day it's going to be the service companies and people. So I talked a little bit about the takeaway constraints, but capital is not going to be a constraint. It will be the human capital that will be the constraint as we build out.

As industry in the Delaware, I think we're extremely well positioned for the reasons I talked about, but I do think in our world, the Freeport McMoRan deal, which will hopefully close before quarter-end looks like it's on track to do that, it's unusual to be able to buy something for 1.5 times next year's cash flow and do it with a full equity deal in many ways it was like a synthetic corporate transaction where you buy somebody and take the stock back to the seller. As you saw, when you ran it and if you invested in it, it had incredible accretion features, it's why the book was four times oversubscribed and frankly we could have sold a lot more stock than we did, but we didn't need to. I think we were very pleased with the way in which the whole transaction occurred. We were very pleased by the way in which investors have talked to us subsequently about the deal itself and certainly, Doug's comments this morning, I appreciate. But I just -- I don't know what the next couple years is going to give us. People keep asking me, what will the Trump Administration do to regulate the energy business. And you see all the things I see and I don't have any insight, he is not calling me and asking me what do I think. My hope is that we just don't have any new regulation. If we have no additional regulation from where we are today, I would consider that a win.

I don't know that I'm going to count on being less regulated or a deregulated environment and if that happens to and it does things that I don't see today than I'll be better. We were getting to a point that as an industry and we weren't alone, banking and others were in the same place where we were getting regulated to the point where we really are struggling to make capital plans and understanding kind of how we were going to execute all of them, whether it was EPA with air standards or the way in which the DOI, the Department of Interior is starting to take rules into the

7

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

APC-01751413

fracing on federal lands, it was getting tough. And I don't know exactly what the next administration is going to do. My hope is, if we just see no new regulation, it will be a real positive.

I leave you with this. I think you'll see the OPEC nations reach some sort of production accord here in the next couple of weeks. No one thought they were going to do it in Algiers. I've talked to enough people and I've been out of the country, they seem very committed to this and it just seems like it's not going to take a lot. So, I'll go out and lament, I don't know what the number is going to be, but I think there will be something that comes out of the OPEC meetings that will give us a bit of a lift as we look into 2017 for supply and demand.

Maybe on that cheery note, hopeful note and if there is time, we can take a few questions.

---

**Doug Leggate** - *Bank of America Merrill Lynch - Analyst*

Sure. Thank you, Al.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thank you.

---

**Doug Leggate** - *Bank of America Merrill Lynch - Analyst*

So folks we have a roving microphone for anyone who has any questions. Maybe I'll can kick us off, two quick ones. So first of all, you made two comments (inaudible) and one about the drunken sailor comment. So if oil prices do recover, what do you see the restraint or restrictions on how the US industry responds to a rising oil price? Do we go back to the raising equity outspending cash flow type situation? And the second question was really something you said about your cash balance could be as much as your cash flow next year. I suggest you've got line of sight on non-core asset sales. Can you characterize how you -- where your confidence comes from and what the scale of that will ultimately look like? And obviously, at the back of my mind is the 800-pound gorilla which is Mozambique?

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Okay. Alright. Well, let's hit the first one, I think our industry always learns from its prior periods when oil goes up and then it goes down, you remember the bumper stickers from the early '80s. We didn't quite remember early '80s as well when oil was $100 and I think what we're seeing though this time is in many ways and this may be unique to Anadarko in a way we've run our data. So I don't want to make this a broad industry comment, but we believe at $65, we get the same wellhead margin that we got at $90. That's how much efficiency we've brought as industry into the field, into the way in which we run our companies, how much cost we've taken out, be able to have that kind of a differential in oil price give us the same wellhead margin. But at the end of the day we are price takers in this country, we're not price makers, despite the fact we've been aggregating component to the way in which oil has been determined globally. We are not the shale producers that's going to be the swing producer. I mean, the folks that want to determine the price of oil will be someone other than the US.

I made the comment earlier, Doug, I think human capital more than financial capital will be the constraint to what happens when oil gets under the $60s and we may find ourselves where the service companies just have not had the time to retrain and reposition a workforce that they had let go and if the lessons again from '80s are played out again, probably lose 80% of the people they let go, the 80% of the folks that had been laid off during the course of this year and late last won't come back. So I think that training process will take a while. In my comment about having as much cash on our balance sheet potentially by the March 7th call, in that does not assume that there's any monetization of Mozambique. I'll handle that separately. I'm really looking more at the things that we want to aside on as it relates to properties in the US that we don't see ourselves investing in. I mentioned earlier we see this fallow capital, capital that we want to bring back in as cash and reinvest largely into the 3Ds, from most principally the Delaware Basin being at the top of the list. As I've said and others have said from our Company, the cascade for us or the waterfall is real simple, it's Delaware, DJ, Deepwater Gulf of Mexico.

8

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

APC-01751414

As it relates to Mozambique, I mean, I read with as much interest as you do what's going on with Eni and ExxonMobil and the government. I assume there's probably a deal there somewhere, but there is -- we're just going to have to wait till the day when they announce it. Right now, we're focused with the government on trying to reach agreement on resettlement, there's about 500 families we need to move in the area where we want to build the LNG onshore part. Until we get resettlement approved by the government and by our partners, we really can't do the things we need to step to. So as you've heard us say before, there's several things, gating things that have to occur between here and FID. Resettlement is one, getting a plan development approval is another, doing some of the early works associated with clearing the land once we've accomplished resettlement. And then we've got to have a sales and purchase agreement with a buyer universe that provides us for the project financing. So the reality is, these things not moving at a pace that's real quick and it's not very capital intensive. I said this on our earnings call, I'll repeat it here. I mean, I can't imagine we would sell Mozambique before we get to FID because I can't imagine one is going to pay a price pre-FID that we'd be willing seller for and then post-FID, then we'll look at it. But I think between here and FID, I don't anticipate -- probably, I don't anticipate there is a deal between ExxonMobil and Eni, that it will be a price that's particularly good read through. You got a very distressed seller in Eni that needs cash to put into Egypt. You got a very aggressive buyer in ExxonMobil that typically doesn't overpay. So one thing that I caution you there is that whatever that deal is, whenever it's announced, if it is announced, don't do the read through math. I mean you got a very distressed seller in Eni and a very opportunistic buyer potentially in ExxonMobil.

**Doug Leggate** - *Bank of America Merrill Lynch - Analyst*

Thank you. Any questions from the floor? We have one right here.

# QUESTIONS AND ANSWERS

**Unidentified Audience Member**

Who do you think are potential buyers other than private equities?

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

I've said this in many forums, but I think the buyers for the natural gas properties that we've seen and continue to see are all private equity-backed. And largely because, frankly they have a different time horizon for the way in which they invest and natural gas works in that pretty well. I have not seen a traditional company that you would think of that's publicly traded just to use that term as an example. We haven't seen any of those really showing up seriously in the data rooms that we run. They've been very heavily weighted towards private equity backed management teams.

**Doug Leggate** - *Bank of America Merrill Lynch - Analyst*

Unfortunately folks, we are about out of time. So Al, thanks very much for opening this conference.

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thank you. Appreciate. Good to be here this morning. Thank you again.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

APC-01751415

NOVEMBER 17, 2016 / 12:30PM, APC - Anadarko Petroleum Corp at Bank of America Merrill Lynch Global Energy Conference

---

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2016, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

APC-01751416

# Exhibit 48

# MEMORANDUM

| | | |
|---|---|---|
| TO: | Ernie Leyendecker | DATE: 2/13/2017 |
| FROM: | Shenandoah Subsurface Team | |
| RE: | Project Recommendation: Conduct sidetrack out of the WR52 #3 (Shen #6) appraisal well | |

## Executive Summary:

The Shenandoah Subsurface Team is seeking approval to conduct a sidetrack operation out of the WR52 #3 (Shenandoah #6) appraisal well prior to rig de-mobilization. The AFE dry hole cost, inclusive of the temporary abandonment of the sidetrack, is $45.95 MM (gross) or $15.16 MM (net to Anadarko) based on a working interest of 33.0%. The primary objective of the proposed sidetrack is to refine the resource estimations within the potentially large Shen 5 fault block. Additionally, the outcome of the sidetrack operation should help to provide additional resource size clarity and constrain the number of conceptual development options currently contemplated by the Shenandoah project team. The rig is estimated to go on standby around February 17th, pending approvals for either sidetracking or T&A operations.

## Background & Key Facts:

### WR 52 #3 (Shenandoah #6) Design Objectives & Preliminary Well Results:

The Shenandoah #6 appraisal well was originally designed to (1) test and extend the presence of hydrocarbons in the Wilcox reservoirs to the east of Shen 5; (2) confirm oil/water contacts for the objective reservoirs and potentially extend the LKO down structure; and (3) provide an understanding of connectivity to adjacent wellbores in the area. Additionally, this well was designed to be utilized as a "keeper well" in a future sidetrack operation, pending future project sanctioning.

The WR 52 #3 (Shenandoah #6) reached a TD of 32,047' (MD) or 31,769' (TVD) in only 52 days on February 8th. The well found all major Shenandoah Upper and Lower Wilcox reservoir sands present with exception of the UW1; however, all of the sands were low to prediction and all were found to be water bearing. These results suggest the presence of faulting between the Shenandoah #6 and the Shenandoah #5 well and further suggest a different hydrocarbon pressure regime to the west and/or the absence of an up-dip seal to the east. Although the drilling metrics for the Diamond Ocean Black Hawk were outstanding and the final well cost is expected to come in ~$50MM gross under the original AFE, the subsurface results and the resource implications of Shenandoah #6 have been disappointing. The probability for economic resource potential on the eastern flank of the Shenandoah field has materially diminished. Additionally, the results of Shenandoah #6 clearly demonstrate the challenge in our ability to estimate oil/water contacts and confidently detect reservoir compartmentalization or conversely reservoir continuity for the Shenandoah structure.

### Shen 6 ST Proposal and Objectives:

The Shenandoah development team is seeking approval to sidetrack the WR 52 #3 wellbore approximately 4000' to the W-SW in order to establish the presence of a deeper lowest known oil (LKO) and to potentially define the oil-water contacts within the Shenandoah #5 fault-block. Confirmation of oil/water contacts within this fault block should improve our confidence in resource estimates and column height, establish connectivity in the oil and water columns, and provide tighter constraints in terms of development options for the Shenandoah project team. The key project risks are finding compartmentalization within the

CONFIDENTIAL

APC-00299954

Shenandoah #5 fault block and encountering water-bearing sands throughout the Upper and Lower Wilcox sections, both of which would further reduce the resource estimates of the Shenandoah Field.

The team specifically evaluated sidetrack options down-dip of Shenandoah #5, up-dip of Shenandoah #6, and a short sidetrack to the West (fault block believed to be separating Shen #5 from Shen #6). Oil-in place analysis found a down-dip penetration in the Shenandoah #5 fault block to provide the best benefit to refine resources and constrain further concept solutions for the project. Appendix #1 (Depth structure map of the UW2 sand in the Shenandoah field) shows the Shenandoah #6 sidetrack target with its intent to prove up resource in the Shenandoah #5 fault block and confirm the oil/water contact assumption. Finding the oil/water contact would provide credence to the estimated oil/water contact assumption across the field.

**Shenandoah Partnership Dynamics:**

Anadarko holds a 33% WI in the Shenandoah project and its respective partners are ConocoPhillips (30%), Cobalt (20%) and Venari (17%). In a Shenandoah project partnership meeting held on February 8th, ConocoPhillips and Cobalt indicated their preference to defer the sidetrack operation for a future lease saving event, but more recent discussions suggest that they are now supportive of the sidetrack operation. Since this sidetrack is not deemed a lease preservation event (180-day clock), Anadarko must secure the approval of one partner and 50% WI (notionally Venari) to proceed with the sidetrack operation. The consequences of a non-consenting party include the loss of rights to the Shenandoah #6 sidetrack data and their right to participate in subsequent sidetracking operations, assuming continuous well operations.

The rig is estimated to go on standby around February 17th, pending approvals for either sidetracking or T&A operations. A time-line of events is provided in appendix #2 (Timeline of events post - February 9th).

## Analysis

**Updated Geologic Interpretation and Revised Resource Estimates (Post Shenandoah #6):**

The updated mid-case geologic interpretation shows two new faults separating the Shenandoah #5 from Shenandoah #6 (See Appendix #1). The fault architecture and location are supported by the seismic interpretation and are in line with previously identified faults that have been carried as low confidence faults on the risk matrix. Partners have indicated alignment in the newly revised geologic interpretation. Estimated oil/water contacts are based on pressure measurements from well penetrations in the oil column and with the water pressure gradients from the Shenandoah #3 well applied across the field. In the East, the oil/water contacts are estimated based on the highest known water depths found in Shenandoah #6.

In Q4, 2016, the Shenandoah Partnership approved a 100 MBOPD semi-submersible concept equipped with sufficient weight and deck capacity to expand production capability and allow for future water injection. Although the latest well results seriously challenge a new-built production solution, the team still sees a path to commercial viability with alternate development solutions.

The updated interpretation results in an "in-place" hydrocarbon volume of approximately 1 Billion STB of oil. Preliminary reservoir modeling results lead to economically recoverable reserves in the range of 150 – 250 MMBOE for various deterministic development scenarios. The project team has brought forward early cost estimates for the use of an existing facility (relocation option) to be ~$900MM for a 5-well

2

CONFIDENTIAL

APC-00299955

development. At invest pricing ($50/BO), economic analysis confirms the continued commercial potential and (pending in-depth analysis) the commercial viability of the Shenandoah project. Preliminary economic analysis for a smaller new-build option (60 KBOPD) is slightly challenged with the revised resource estimates but the Shenandoah project team will continue to support the maturation of this concept.

With lease obligations within the 180-day clock, the team still sees the importance to continue work within the previous timeline towards SOP in 2018. Improved certainty around resource and production expectations is paramount to deliver an economic project where production solutions are in line with resource size expectations.

## Conclusion

With the Shenandoah Partnership working within the 180 day clock to maintain the lease, it is prudent to move quickly towards concept select, project sanctioning, and SOP. Taking the immediate opportunity to constrain the resource uncertainty and to provide appropriate guidance for development planning are critical factors in favor of drilling an immediate sidetrack. The Shenandoah Development Team is therefore seeking approval to conduct an immediate sidetracking operation out of the WR52 #3 (Shenandoah #6) appraisal well prior to rig de-mobilization to achieve these goals.

3

CONFIDENTIAL

APC-00299956

## Appendix

**Appendix 1:** Depth structure map of the UW2 sand in the Shenandoah field



**Appendix 2:** Timeline of events post-February 9th

4

# Exhibit 49

**To:** Ramsey, Jake[Jake.Ramsey@anadarko.com]; Tedesco, Bill[William.Tedesco@anadarko.com]; McGrievy, Pat[Pat.McGrievy@anadarko.com]; Scarborough, Liliana [Liliana.Scarborough@anadarko.com]; Hart, Danny[Danny.Hart@anadarko.com]; Abendschein, Bob[Bob.Abendschein@anadarko.com]; Steinberger-Glaser, Anita[Anita.Steinberger-Glaser@anadarko.com]; Gauthier, Lisa[Lisa.Gauthier@anadarko.com]; Prosser, Wendy[Wendy.Prosser@anadarko.com]
**From:** Workflow System[WF-BATCH@Anadarko.com]
**Sent:** Wed 2/15/2017 7:43:17 PM Coordinated Universal Time
**Subject:** AFE Approved - WR52 # 3 (SHEN 6) SIDETRACK

---

Reviewed By:
Steinberger-Glaser, Anita - Shenandoah Dev  02/14/2017
McGrievy, Pat - Foldbelt  02/14/2017
Hart, Danny - Deepwater Americas  02/14/2017
Ramsey, Jake - Exploration GOM Regional  02/14/2017
Abendschein, Bob - Operations Gulf of Mexico  02/15/2017
Tedesco, Bill - Exploration GOM  02/15/2017
Leyendecker, Ernie - International and Deepwater Expl  02/15/2017
-----------------------------
Type of Request:   Original
AFE Number:   2131100
Date Submitted:   02/13/2017
Budget Year:   2017
AFE Type:   Drilling - Exploratory
Cost Center:   WALKER RIDGE 52 003
Company:   Anadarko US Offshore LLC
Operated:   Y
Operator:
Originator:   Scarborough, Liliana
AFE Project Manager:  Steinberger-Glaser, Anita
Approved By:  Leyendecker, Ernie
Working Interest:  33.000000%
Total Gross Cost:  $45,949,235.00
Total Net Cost:  $15,163,247.55
Description:
THE SHENANDOAH SUBSURFACE TEAM IS SEEKING APPROVAL TO CONDUCT A SIDETRACK
OPERATION OUT OF THE WR52 #3 (SHENANDOAH #6) APPRAISAL WELL PRIOR TO RIG
DE-MOBILIZATION. THE AFE DRY HOLE COST, INCLUSIVE OF THE TEMPORARY ABANDONMENT
OF THE SIDETRACK, IS $45.95 MM (GROSS) OR $15.16 MM (NET TO ANADARKO) BASED ON
A WORKING INTEREST OF 33.0%. THE PRIMARY OBJECTIVE OF THE PROPOSED SIDETRACK
IS TO REFINE THE RESOURCE ESTIMATIONS WITHIN THE POTENTIALLY LARGE SHEN 5
FAULT BLOCK. ADDITIONALLY, THE OUTCOME OF THE SIDETRACK OPERATION SHOULD HELP
TO PROVIDE ADDITIONAL RESOURCE SIZE CLARITY AND CONSTRAIN THE NUMBER OF
CONCEPTUAL DEVELOPMENT OPTIONS CURRENTLY CONTEMPLATED BY THE SHENANDOAH
PROJECT TEAM. THE RIG IS ESTIMATED TO GO ON STANDBY AROUND FEBRUARY 17TH,
PENDING APPROVALS FOR EITHER SIDETRACKING OR T&A OPERATIONS.
Comments:
02/14/2017 - McGrievy, Pat:
It is important to conduct the Shen 6 ST now in order to refine the resource ran
ge for the Shenandoah Field and to constrain the number of conceptual developmen
t options for the Shenandoah project.

CONFIDENTIAL

APC-00089435

# Exhibit 50

**To:** Kaye Rasmusson[krasmusson@KPMG.com]; apetry@kpmg.com[apetry@kpmg.com]
**Cc:** Gibson, Elizabeth[Elizabeth.Gibson@anadarko.com]; Williams, Louis[Louis.Williams@anadarko.com]
**From:** Roberts, Jennifer[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=OJH157]
**Sent:** Thur 2/16/2017 9:15:11 PM Coordinated Universal Time
**Subject:** Fwd: Info on Shenandoah #6
**Attachment:** WR 52 #3 AM REPORT 2-15-17.pdf
**Attachment:** ATT00001.htm

Kaye,
See attached and let me know if any further questions.

Sent from my iPhone

Begin forwarded message:

> **From:** "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>
> **Date:** February 16, 2017 at 3:08:27 PM CST
> **To:** "Roberts, Jennifer" <Jennifer.Roberts@anadarko.com>
> **Cc:** "McGrievy, Pat" <Pat.McGrievy@anadarko.com>
> **Subject: Info on Shenandoah #6**

Jennifer,
Here is the information you had requested:

- TD of the well: 32,047.0' MD, 31,768.9 TVD (see the attached latest Drilling Report)
- Date of Dry-hole determination: 2/7/2017

Please let me know if you have any follow-up questions.

Anita

CONFIDENTIAL

# Exhibit 51

**From:** "Singer, Brian" <brian.singer@gs.com>
**To:** <sandeep.gupta@pyramis.com>
**Subject:** GS Energy Research: Anadarko Petroleum Corp. (APC): Mgmt meeting highlights focus on E&P/midstream growth; Buy
**Date:** 2017-03-24 08:48:06 -0400
**Inline-Images:** image001.png; image004.png; image007.png

---

 

Goldman Sachs Global Investment Research

Anadarko Petroleum Corp. (APC): Mgmt meeting highlights focus on E&P/midstream growth; Buy

*Brian Singer, CFA, Umang Choudhary, Caroline Shavel, Nick DeValeria, Sagar Arora*
**Please click above hyperlink to access the full PDF.**

## What's changed
We hosted investor meetings earlier this week with Al Walker, Chairman, President & CEO, Daniel Brown, Vice President, Operations and Robin Fielder, Vice President, Investor Relations.

## Implications
**On track for strong growth.** Management believes it is on track for 15%+ 2017-21 production CAGR (we estimate 18%), largely from Permian/ DJ Basin and aided by lower declines/flat production outlook from Gulf of Mexico. In a $50-$55 per bbl environment, APC plans to invest greater capital to US onshore shale (Permian/DJ Basin), followed by tie-back opportunities to existing deep-water platforms. APC indicated that major Gulf of Mexico greenfield projects like Shenandoah (our target assumes $1/shr) is unlikely to get final approval in a $50-$55 per bbl environment.

**Permian midstream constraints.** APC believes it has midstream solutions (via WES) in place to move oil out of the Permian and is more concerned on gas takeaway capacity to key demand hubs. APC has water solutions in place via its partnership with WES.

**Mozambique LNG on track for final investment decision.** APC continues to make progress with the government on the legal/contractual framework and with LNG customers on long-term sales and purchase agreements. We see potential for FID late this year with potential 2022-23 start-up.

**M&A.** Management believes its current cash position provides flexibility to maintain a stronger balance sheet, outspend cash flow if appropriate or bolster its onshore shale positions via acquisition in the Permian/DJ Basin.

## Valuation
APC trades at 8.7x/7.1x/6.1x 2017E-19E EV/DACF (7.8x/7.0x/6.4x for peers). Our DCF/M&A-based 12-month price target of $86.50 is unchanged.

## Key risks
Commodity volatility, drilling results, costs, government pronouncements.


**Brian Singer**
Goldman, Sachs & Co.
phone: 1-212-902-8259
e-mail: brian.singer@gs.com

Disclosures applicable to research with respect to issuers, if any, mentioned herein are available through your Goldman Sachs representative or at http://www.gs.com/research/hedge.html

Confidential

FIAM-ANAD-009181

# Exhibit 52

**To:** Brown, Danny[Danny.Brown@anadarko.com]; Hollek, Darrell[Darrell.Hollek@anadarko.com]
**Cc:** Abendschein, Bob[Bob.Abendschein@anadarko.com]; Hart, Danny[Danny.Hart@anadarko.com]; Tedesco, Bill[William.Tedesco@anadarko.com]
**From:** McGrievy, Pat[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=QAJ309]
**Sent:** Mon 4/3/2017 12:25:06 AM Coordinated Universal Time
**Subject:** RE: Shen 6ST01 - BP01 - Update 4 - 04.02.17

---

Date: 04.02.17
Report time: 7:00 pm
Days from sidetrack01 BP01 spud: 26
Cost to date: $43.4 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

We remain at a depth of 30,812' MD (30,074' TVD).   Over the course of the last week or so, we have been successful in managing fluid losses. If you recall, we made the decision to stop drilling operations at the current depth and commence openhole logging under drillpipe conveyed logging operations. Unfortunately, to date we have not been successful in getting wireline tools past the tar zone at a depth of approximately 30,700' md. We completed a clean out trip on Friday and attempted a quick entry without drillpipe but were unsuccessful in getting below the tar, yet again. We are currently in the process of making one last drill-pipe assisted wireline operation this evening and through the course of the next day or two.  In either case, this will be the last operation in this wellbore before T&A.

**Current operations:**

Initiated one last run with drill-pipe assisted openhole logging operations late this afternoon. We expect to complete the operation on Tuesday.

**Our operational forward plan:**
Conduct drill-pipe assisted TLC logging operations and then move to T&A phase.

**Subsurface Outlook:**

Unfortunately, If we are unable to obtain NGI or other imaging data below the tar zone, we will not be able to have confidence in the fault orientation and whether or not the Shen 5 will be open or closed off to aquifer energy. This will result in rather significant variation in recover between depletion and aquifer support in our simulation models. Anadarko was preparing to ballot the partnership late this past week to set a 9-3/8" liner to isolate the thief zones and drill ahead to see if we could get into an HC contact and also obtain critical logging information and fault orientation, but the partnership would not support this plan.

**End of report – 04.02.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Saturday, March 25, 2017 5:26 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny; Tedesco, Bill
**Subject:** RE: Shen 6ST01 - BP01 - Update 3 - 03.25.17

Date: 03.25.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 17
Cost to date: $33.8 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

We are currently at a depth of 30,812' MD (30,074' TVD) and have not made any drilling footage progress since the last update on 03.19.17.   Over the course of the last several days the drilling team has been attempting to manage fluid losses and just within the last day or so, the hole is finally staying full under static conditions. Earlier in the week the decision was made to stop drilling operations and commence openhole logging operations under drillpipe conveyed logging operations. A meeting was called with the exploration and development GOM management teams and a consensus decision was made to stop drilling and log the current openhole section.

**Current operations:**

APC-00091554

Fluid losses were contained over the past 24 hr period. Completed tripping operations with BHA and now preparing to conduct BOP test in advance of logging operations.

**Our operational forward plan:**
Complete BOP test and rig up Schlumberger to conduct drillpipe-conveyed (TLC) logging operations over the course of the next several days. The decision to drill ahead will be predicated by the NGI log interpretation and also our ability to drill ahead, given the hydraulics may be challenging with smaller casing (9-3/8" ) which we must set to get the fluid loss problems behind us if in fact the decision is made to drill forward. Although it will be a real challenge, if we can convince with ourselves with a high degree of certainty that we are not in the same FB as the Shen 5 (NGI and pressure data); and we can isolate the fluid loss zone; and we can determine that we can safely drill ahead with reduced ID casing, additional drilling data will be extremely important in understanding the size of the Shen 5 FB and if it is or is not in communication with the aquifer. Otherwise, it makes sense to T&A the well and mobilize the rig so that we can conduct a more rigorous analysis of the current data before we make another recommendation, if at all, with this wellbore.

The current schedule suggests that we will be logging the UW series sometime late Monday evening or early on Tuesday, March 28th.

**Subsurface Outlook:**

We are currently in what we believe to be the top of the UW3 sand. Again, the UW1, UW2 and UW3 have all come in wet at this location. We have observed at least two faults in the by-pass well. The NGI will be instrumental in determining the direction of this faulting.

**End of report – 03.25.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Sunday, March 19, 2017 3:30 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST01 - BP01 - Update 2 - 03.19.17

Date: 03.19.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 12
Cost to date: $27.8 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,812' MD (30,074' SSTVD)
AFE TD: 33,120' MD

**We are currently at a depth of 30,812' MD (30,074' TVD). Over the course of the last 24 hour period, drilling has been extremely slow as we have only made 275' of hole, largely as a result of the fluid loss problems. Although we have had several episodes of excessive fluid losses in the range of 200 bbls/hr over the past 24 hours, the drilling team has successfully managed losses by spotting LCM pills and the hole seems to respond well to these LCM applications. We will continue to drill ahead as the hole dictates. Unfortunately, we have lost communication to the density tool, but at this point the data is not critical and a BHA trip is unwarranted.It's also noteworthy that we encountered tar at a depth of approximately 30,713' (see attachment).**

**Current drilling operations:**

Currently at a drilling depth of 30,812' MD at 2:00 pm this afternoon pumping LCM pill to seal off fluid losses previously estimated to be at ~30% of full returns. They have been fighting fluid losses at this approximate depth since 8:00 am this morning. Since then, Fluid losses have completely diminished and hole remains full at this point. Plans are to monitor and drill ahead.

**Our operational forward plan:**
1. Continue to pump high viscosity fluid loss pills to manage fluid loss and drill ahead.

**Subsurface Outlook:**

We are currently in what we believe to be the top of the UW3 sand. Again, the UW1, UW2 and UW3 have all come in wet at this location. Given the geologic complexities, and despite the fluid loss situation, we feel that it is prudent to continue to drill ahead to see if we can get into an HC column in the Upper Wilcox section and through the LWA and possibly the LWB. It is unlikely that we will encountered H/C's below the LWB. What is clear so far, is that this structure is more complex than originally interpreted due to the evidence of sub-seismic faulting.Again, please note that there is still

CONFIDENTIAL

APC-00091555

some uncertainty on the correlations and subject to revision as we drill deeper into the section.

**End of report – 03.19.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Saturday, March 18, 2017 3:15 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST01 - BP01 - Update 1 - 03.18.17

*Danny and Darrell:*

*In addition to the below report, I've added a newly-generated stratigraphic X-section and a more detailed narrative of the drilling results to date, by Paul Chandler. My view is a high level overview of Paul's comments in the subsurface outlook section.*

*Let me know of you have any questions at this point,*

*Pat*

Date: 03.18.17
Report time: 3:00 pm
Days from sidetrack01 BP01 spud: 11
Cost to date: $26.1 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,537' MD (29,851' SSTVD)

**Reached the 11-7/8" casing setting shoe depth of 31,109' MD (29,458' TVD) on 03.11. Shoe depth was estimated to be ~ 200' above the top of the projected UW1. Over the course of the next five days the rig conducted a BOP test; successfully ran and cemented the 11-7/8" casing liner; and successfully conducted a shoe test of 15.6 EMW. Drilling operations re-initiated drilling operations @ 0800 hrs on 03.17. Over the last 24 hour period, 641' of new hole was drilled from 30,082 to a current depth of 30,713' MD where we began losing fairly large volumes of fluid.**

**Current drilling operations:**

Currently at a drilling depth of 30,713' MD this morning and experiencing mud losses of ~200 bbls per hour; have pulled up into shoe to control losses. It appears that we are at or slightly within the top of the UW3 sand. We do not know if these losses are related to a fault or something else. An 80 lb/bbl pill was spotted on bottom prior to pulling into the shoe to minimize or eliminate hole losses.

**Our operational forward plan:**
1. Pump a high viscosity fluid loss pill and spot it on bottom and monitor losses. If it doesn't stop losses, another pill will follow.
2. If the losses stop, plans are to drill ahead. Otherwise, the mud weight will be cut to 14.5 ppg from a current weight of 14.6 ppg and see how the well responds while drilling ahead. This will give us a 14.8 ppg downhole mud weight, or essentially balanced with the pore pressure in the upper sand.
3. If this plan fails, the plan will be to engage BSEE to determine if, and how far we can drill ahead, assuming that the losses are manageable. This could be 400 feet, or we could request to   drill ahead far enough to get the BHA below the loss zone so that the ECD is slightly reduced lower (more clearance with drill pipe versus drill collars and larger od BHA components).

**Note:** Setting another sting of casing to put the Upper (presumably higher pressure) sand behind pipe would allow us to cut mud weight even more, possibly, but this will be a last resort and there are no guarantees. Historically speaking, problems with losses usually get worse as we drill deeper into the section. We could set a casing string and still end up with an unmanageable drilling margin.

**Subsurface Outlook:**

We are currently correlating to be at the top of the UW3 in this BP01 well and at a similar stratigraphic point as in the ST01 borehole. We have encountered a complete Upper Wilcox section so far (UW1-UW3) but the sands have all come in wet. That said, the Wilcox section drilled so far appears to correlate well with the Shen 5 from the UW1 to the top of the UW3.

This section does appear to be different, stratigraphically speaking, relative to the Shen 6 ST01 well. It's now apparent that the Shen 6ST01 well had a partial missing section of Wilcox (missing the UW1 to near the T/UW2) which is likely explained by faulting. Given the geologic complexities, and despite the fluid loss situation, we feel that it is prudent to continue to drill ahead to see if we can get into an HC column in the Upper Wilcox section

CONFIDENTIAL

APC-00091556

and through the LWA and possibly the LWB. It is unlikely that we will encountered H/C's below the LWB. What is clear so far, is that this structure is more complex than originally interpreted due to the evidence of sub-seismic faulting.Please note that these correlations are still under evaluation by Paul Chandler.

End of report -- 03.18.17

"To say this is a complex is huge understatement. We are dealing with correlations between three wells, the Shen Shen6 BP1, the Shen6 ST1 and the Shen 5. The ST1 and the BP1 are high angle wells that require TVD conversions to mimic the straight hole for the Shen 5. Comparing the shen 6ST to BP wells is best with MD to MD. Anyway, the point is these are all difficult to correlate with tremendous certainty but here is my opinion right now.

I was alarmed yesterday that the Wilcox section we were seeing in the BP1 well looked so different than the ST1 well. The differences were striking. These two boreholes are only a few hundred feet apart so this tells me it is likely a faulting scenario. I was hoping we could get more section drilled before I went out on this limb but unfortunately we did not. I believe the sand seen at 30282' MD in the BP1 is likely the UW1 sand. The actual T/UW2 does not occur until 30,375' MD or so. In fact, the entire Wilcox sand section we have drilled so far correlates pretty good to the Shen 5 -- the ST1 well does not. I also believe the ST1 well is faulted just above the T/UW2 at 30, 370' MD whereby taking out a 100' section which would include the UW1 not seen in the ST1 well. This is not the same fault seen at the bottom hole of that well and the one we think is likely the source of our loss of circulation issue. Where this puts us (if I'm right on all this) is the we are in the top of the UW3 in this BP1 hole just as we appeared to be in the ST1 hole. There is no resistivity spike seen in our well as was the case with the ST1 well but I do now think we are TDed in the same section stratigraphically via the fautling. I can't tell you if our losses are due to the same fault as before or something else but that we are topped into the UW3 just as I think we were in the ST well.

I apologize for the long narrative but there is no easy way to explain all this. I've got to figure out how to get his on a cross section. Of course all the sands we've seen so far have been wet and I still can't explain that too well until we can get deeper --just as before. I'm sure we will discuss this more."

Paul Chandler

Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

**From:** McGrievy, Pat
**Sent:** Sunday, February 26, 2017 8:15 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST - Update 3 - 02.26.17

Date: 02.26.17
Report time: 8:00 pm
Days from sidetrack spud: 9
Cost to date: $7.6 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 30,670' MD (29,910' SSTVD)
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Currently drilling ahead in Upper Wilcox with at a depth of 30,670' MD (~ 29,910' SSTVD.) We initiated drilling operations late Saturday afternoon at a depth of 29,420' MD and have drilled approximately 1,250 ' over the last 26 hrs with controlled drilling ROP's ranging from 40-60 fph with no signs of wellbore instability issues.

**Subsurface Outlook and current work plan (see attached X-Section):**

The well encountered what we believe to be the UW2 at 29,687' SSTVD or about 100' low to prog; unfortunately we are encountering wet sands as we continue to drill deeper into the Upper Wilcox series.Obviously this is a rather significant setback and although we were optimistic on encountering HC's FTB in the Upper Wilcox, we did recognize the possibility of this outcome. Assuming that conditions continue as they are, we plan to drill through the Upper and Lower Wilcox and then run conventional logs and MDT's and conduct MDT fluid and pressure acquisition program. Assuming trouble free drilling operations, we should reach TD sometime Tuesday (02.28). We will be working to understand the STOIP impact as a result of these well results after completion of the MDT program.

End of report -- 02.26.17

Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp

CONFIDENTIAL                                                                                    APC-00091557

The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Thursday, February 23, 2017 11:52 AM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6ST - Update 2 - 02.23.17


Date: 02.23.17
Report time: 11:00 am
Days from sidetrack spud: 5
Cost to date: $4.4 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 29,420' MD
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Well TD is currently 29,420' MD (~ 28,900' SSTVD.) We are preparing to trip the drillstring to conduct a requisite BOP test for the next 24 hrs. Controlled drilling ROP's have ranged from 40-60 fph and there have been no signs of wellbore instability issues.

**Subsurface Outlook and current work plan (see attached X-Section):**

The well depth is currently tracking approximately 50' high to the original prognosis and currently we are through the base of the Eoccene which was the projected next casing point. The Upper Wilcox section is projected to be approximately 530 ' (TVD) below our current depth of 28,970' (TVD). This translates to about 720' of MD drilling before we expect to encounter the UW1, assuming that it is present. The drilling team is reasonably confident that they can drill through the entire Wilcox section and to TD without setting the 11-7/8" pipe.

We expect to be back to drilling on Friday evening or early Saturday morning (02.25). Additionally, we expect to encounter the Wilcox section before the end of the weekend.

**End of report -- 02.23.17**


Patrick McGrievy
GM -- Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Tuesday, February 21, 2017 7:35 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** Shen 6ST - Update 1 - 02.21.17


Gentlemen:

I am restarting the reporting on the Shen 6 with Sidetrack operations which started on 02.18.17. I will continue to report as necessary throughout the drilling and logging operations. All partners have approved the sidetrack operations.

Date: 02.21.17
Report time: 2:00 pm
Days from sidetrack spud: 3
Cost to date: $2.5 MM
AFE ST DHC cost: $45.9 MM
Current Depth: 28,165' MD
AFE TD: 33,290 MD (32,000' TVD)

**Current drilling operations:**

Started on Sidetrack Afe on 02.18.17. Began drilling off cement plug and building angle at 25,488' on 02.19 and currently control drilling at 60 fph with 12.25" x 14" drilling assembly at 28,165 and building angle to 34°. Plan to drill to CP at 29,300' MD.

**Subsurface Outlook and current work plan:**

APC-00091558

Attached is a X-section comparing the Shen 5 and Shen 6 wells with the current Shen 6ST. We are currently drilling in the Oligocene and correlating nicely with both wells. At 60 FPH, we should expect to be at CP #1 (11-7/8" casing section) late tomorrow evening. This will locate us approximately 200' below the base of the Marl section and ~ 200' above the top of the Upper Wilcox (UW2). From there, we will be spending the next several days running and cementing pipe.

**End of report – 02.21.17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Wednesday, February 08, 2017 10:17 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny; Tedesco, Bill; Steinberger-Glaser, Anita
**Subject:** RE: Shen 6 - Update 5 - 02.08.17

Days from spud: 55
Cost to date: $85.7 MM
AFE DHC cost: $154 MM
Current Depth: 32,047' MD
Report time: 9:00 pm

**Current drilling operations:**

TD was called at12 pm on 02.07. Completed C&C on the well and now POOH with drilling assy. Plan to conduct BOP test and proceed with logging operations around mid-day on 02.09. Logging operations are expected to be completed on late Sunday or early Monday, assuming trouble-free operations.

**Subsurface Outlook and current workplan:**

The subsurface team is in the process of revising the structural interpretations on the Upper and Lower Wilcox sands (UW2-LWE) based on the negative (wet) outcome of the Shen 6 throughout the U&L stratigraphic section. Although the sands correlated quite nicely with the Shen 5, they were clearly not in hydraulic communication. Chip and Paul see one or perhaps two parallel (down to the south) faults that appear to separate the Shen 5 from the Shen 6 well. The team is currently working on updating the volumetrics and should have some preliminary results by the end of the day on Thursday (02.09) for review.

**Preliminary Sidetrack Analysis:**

In parallel, the team is working on two sidetracking options to constrain the volumetrics of the field: (option 1) Sidetrack the well to the North to further delineate the eastern flank of the field; or (option 2) sidetrack the well due-west to encounter the Shen 5 FB to understand the OWC's within this FB and to help infer OWC's in a series of FB's in the western flank of the field. Obviously, the Shen 6 has dealt a serious blow to the east flank resources and the team currently views this option as the riskier of the two sidetrack options with minimal column height potential. As a result (as currently mapped), a production take-point to the east is now much less likely. The team will be completing their analysis tomorrow afternoon and will likely recommend a sidetrack well to the west to encounter the Shen 5 FB. Although the results of the logging program will not be completely understood until early next week, we do not see an outcome from this interpretation that will alter the sidetrack recommendation at this point.

**Partnership Opinion on Sidetrack:**

We met with the partnership today on issues relating to project management , host facility options, and the pending design AFE, but we did touch briefly on our opinion to sidetrack the well without mobilization. Our basic argument to the partnership was that we want to constrain the volumes and the host facility options quickly and in a capital efficient manner. Venari openly supported our lead while COPC and Cobalt admitted that it would be a challenge to obtain approvals for an immediate sidetrack. Suffice it to say, we cannot designate this operation as a "lease saving event" since we have satisfied the criteria for 180 days with the Shen 6. As a result, we need 2 and 50% to proceed. I think we can get Cobalt and COPC on board but there's no penalty to recoup in this case, other than the data gathered from the sidetrack well.

**Expedited AFE:**

We expect to receive drilling costs for the proposed sidetrack operation sometime tomorrow afternoon and further we plan to begin AFE preparation on Friday. Ideally, we would like to share the results of our work with the management team late tomorrow afternoon to gain support going into the

APC-00091559

weekend. Our drilling team is estimating that we will need a go-forward decision (be it sidetrack or TxA) by sometime on Monday in order to execute on the program and avoid downtime. We also have to account for the partner approval time which is a 48 hr approval window. Effectively, with approvals on Monday, February 12th the timing will be tight. *Speaking for the team, we can certainly set up a 30 minute review late tomorrow afternoon if each of you have flexibility in your schedules. This will help us to expedite the internal approval process. Additionally, we are working on an EC memo for additional support.*

Please advise if you have questions or need additional information.

Thanks, Pat

**END of REPORT 02-08-17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Tuesday, February 07, 2017 10:46 AM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6 - Update 4 - 02.07.17

**Shen 6 Update - 7 am Tuesday morning report:**

Days from spud: 54
Cost to date: $84 MM
AFE DHC cost: $154 MM
Current Depth: 31,952' MD
Report time: 8:00 am

**Current drilling operations:**

Drilling ahead in just within the top of the Cretaceous section at approximately 31,926' MD with a P-rate of 50'/hr. We expect to be calling TD within the next few hours.

**Subsurface Outlook:**

We completed drilling operations through the entire Upper (UW2, UW3) and Lower Wilcox (LWA through LWE) sand packages early this morning and will drill 150-200' into the Cretaceous in order to get open logging tools down through the LWE sand member. I have attached an updated X-section from Paul Chandler for reference. Although hole problems have historically frequently occurred in the LWC – LWE, we encountered absolutely trouble-free drilling throughout the section.

Currently we are planning a minimal logging program which will include 3 runs (1) NGI borehole imaging tool (fracture and fault detection)/sonic/RT Scanner; (2) Fluid and pressure data acquisition; (3) SWC's. We expect to begin rigging up wireline services sometime Thursday morning. Discussions around sidetracking opportunities (without mobilization) continue as the team will be determining volumetric STOOIP estimates up-dip and to the east. Additionally, there's consideration to sidetrack to the west, into the Shen 5 FB to further define volumetric estimates within this block. Sidetracking operations can be easily be achieved since casing milling operations will not be required. Recommendations will be subject to final well data analysis once we receive and interpret the pressure and fluid data and NGI results.

**END of REPORT 02-06-17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Monday, February 06, 2017 9:00 AM
**To:** Brown, Danny; Hollek, Darrell

CONFIDENTIAL

APC-00091560

**Cc:** Abendschein, Bob; Hart, Danny
**Subject:** RE: Shen 6 - Update 3 - 02.06.17

**Shen 6 Update - 7 am Monday morning report:**

Days from spud: 53
Cost to date: $83 MM
AFE DHC cost: $154 MM
Current Depth: 30,891' MD
Report time: 7:00 am

**Current drilling operations:**

Drilling ahead in the Lower Wilcox B sand at approximately 30,900' MD with a P-rate of 65'/hr (to maintain moderate ECD's). TD in the Cretaceous is expected around ~32,400' MD.

**Subsurface Outlook:**

So far, we have drilled through the UW2, UW3, and LWA and are currently into the LWB with each of the four sands logging wet. Again, the UW1 was not present but this is not a surprise because it does a laterally pervasive sand like the other 7 sands in the U&L Wilcox. I have attached an updated X-section from Paul Chandler for reference.

We are currently control drilling at a p-rate of 65'/hr but there is a chance that we slow down as we drill deeper into the section in order to maintain moderate ECD's. So far, we have not encounter any drilling-related problems in the Wilcox section. Hole problems have historically been encountered in the LWC, LWD and LWE. Taken into consideration the anticipation of reduced P-rates as we drill deeper, we should be completely through the U&L Wilcox by tomorrow morning or early afternoon and TD the well in the Cretaceous (somewhere around 32,400' MD), sometime Tuesday evening.If we drill the entire section wet as we currently expect, we will tentatively continue with a minimal logging program which will include fluid and pressure acquisition and possibly an NGI to analyze fracture and fault detection. Discussions around the possibility of sidetracking up-dip (without mobilization) will be held today subject to final well data analysis once we receive and interpret the pressure and fluid data and also possible NGI results.

**END of REPORT 02-06-17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Sunday, February 05, 2017 8:04 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob
**Subject:** RE: Shen 6 - Update 2 - 02.05.17

**Shen 6 Update - 3pm Sunday afternoon:**

Days from spud: 51
Cost to date: $83 MM
AFE DHC cost: $154 MM
Current Depth: 30,100' md

**Current drilling operations:**

Drilling ahead through Upper Wilcox at a rate of 70'/hr with 12-1/4" slim hole drilling assembly to proposed TD of ~32,400' MD. Could reach TD as early as late Monday evening or Tuesday morning.

**Subsurface Outlook:**

We got back on bottom early Saturday morning and began making hole around noon. We were drilling at approximately 30,100' at report time today (3pm) and so far the results have been quite disappointing. We have drilled through what we believe to be the UW2 and UW3 and both sands appear to be wet. The UW1 was not present but this is not a surprise because it does a laterally pervasive sand like the other 7 sands in the U&L Wilcox. I

CONFIDENTIAL

APC-00091561

have attached an updated X-section for reference.

The UW2 and UW3 have come in somewhere around 185-200' deeper than the pre-drill prediction. This MAY suggest that we are in communication with the original Shen 1 well, but without pressure data it is far too early to definitively say one way or another. We are currently control drilling at 70'/hr without any hole problems at this point. With a 200' correction, we should be completely through the U&L Wilcox and reach the top of the Cretaceous at somewhere around 32,000' MD, late Monday evening or perhaps sometime on Tuesday. If we drill the entire section wet, we will go with a minimal logging program which will include fluid and pressure acquisition and possibly an NGI to analyze fracture and fault detection. This will be discussed with the team tomorrow. We will also be looking at the merits and the possibility of an up-dip sidetrack without a mobilization.

**END of REPORT 02-05-17**

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** McGrievy, Pat
**Sent:** Thursday, February 02, 2017 10:08 PM
**To:** Brown, Danny; Hollek, Darrell
**Cc:** Abendschein, Bob
**Subject:** Shen 6 - Update 1 - 02.02.17

Darrell and Danny, at the request of Bob A., I plan to initiate a daily report for the Shen 6 operations going forward through logging operations and will provide daily updates as necessary. Let me know if you have any questions. Also, I have attached a Paul Chandler x-section to help out on the visuals.

**Editorial: - 02.02.17**

The Shen 6 is drilling extraordinarily well and could easily finish 50 days ahead of the original AFE drilling time of 120 days. The real good news is that it resets the bar on all subsequent development drilling wells (both time and cost) at Shenandoah but it does put more pressure on the drilling schedule. We observed similar outstanding drilling performance on the prior Blackhawk well (Warrior) where we were able to drill, sidetrack and C&S the well for about the same cost as the original AFE dry hole cost. Fortunately or not, we had to sidetrack the Warrior well to get into the HC column and this sidetrack enabled the Shenandoah team to secure the APD and avoid rig downtime. There may be a couple of outcomes (certainly if we encounter the Wilcox (Full to base) where we would sidetrack the well down-dip (without mobilization) to chase the OWC and further constrain our STOIP distribution. There could be other potential outcomes that may lead us to an immediate sidetrack but too many to enumerate at this point. If we don't conduct an immediate sidetrack, we could easily be facing a rig gap subject to securing an APD for the Warrior GC 519 #1. The team is working diligently to mature this well on all fronts but there is still remains significant risk in a rig line gap despite the best efforts of the completions team to quickly mature P&A's as a stop gap.

**Shen 6 Update – 02.02.17**

Days from spud: 48
Cost to date: $79 MM
AFE DHC cost: $154 MM
Current Depth: 28,747' md

**Current drilling operations:**

POOH with 12-1/4 x 14-1/4" drilling assembly to pick up slim hole (12-1/4" drilling assembly) and drill to proposed TD of ~32,400'. May reach TD as early as 02.08.17.

**Subsurface outlook:**

We are currently at a depth of 28, 747' or about 675' above the UW1 at 29,420'. We have drilled through the Oligocene and the Eocene and it appears the well is trending approximately 150' low to the original prognosis. All salt inclusions (several) were benign and caused no problems with drilling operations while drilling the salt section. The well was designed to cut projected OWC's in the UWB but since the well is drilling 150' low to the original projections, we now expect to see the OWC contacts somewhere within the LWA.

We expect to be on bottom drilling ahead sometime this Saturday and with controlled drilling rates of 50'/hr, we expect to be reach TD on Wednesday, February 8th.

**END OF REPORT – 02.02.17**

CONFIDENTIAL

APC-00091562

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

CONFIDENTIAL

APC-00091563

# Exhibit 53

# DEEPWATER GoM EXPLORATION ACTIVITY

*Week Ending 20 April 2017*



*Confidential for Internal Use Only*
*Key Updates on Report are in Red*

## Central GOM Exploration – Jake Ramsey

### Active APC Exploration Drilling:

- **Shenandoah #6 ST1 BP1 (WR 52 #3 ST) :**  BlackHawk; PMD = 33,190', PTVD = 32,000'; Water Depth = 5,900'; APC 33%, COP 30%, Cobalt 20%, Venari 17%; Spud on 12/15/16; Current Depth = 30,891' MD / 30,140' TVD; Original Hole AFE = $105.5 / $154 MM; Sidetrack AFE = $56.1 MM / $45.9 MM; Sidetracked well on Sunday 2-19 below 14" shoe at 25,488' MD; Built ST angle to 35 degrees / 250 azm; Exited salt at 26,875' MD / 26,810' TVD; Encountered downhole losses in Wilcox; Cemented hole back to 28,736' MD and bypassed out of OH; Drilled to 30,109' MD / 28,488'TVD (above Wilcox sands) and set 11 7/8" liner; Drilled ahead and encountered additional losses; Ran pipe conveyed wireline to TD.  Finalized TA operations; Moved off location on Tuesday April 18th.

APC-00312102

Weekly Report — 2 —



Confidential for Internal Use Only

- **Shenandoah (WR51, 52, 53):** APC development team held EVP & VP review of project generals and updated resource ranges on September 14th. Shen 6 spud planned for December 2016.

APC-00312103

Weekly Report                                     - 3 -

*Confidential for Internal Use Only*



CONFIDENTIAL                                                                                           APC-00312104

Weekly Report                                   - 4 -

*Confidential for Internal Use Only*



CONFIDENTIAL

APC-00312105

Weekly Report - 5 -

*Confidential for Internal Use Only*

CONFIDENTIAL

APC-00312106

Weekly Report                            - 6 -

*Confidential for Internal Use Only*

- **Shenandoah (WR 51, 52, N/2 53) – JP:** Shen 6 (ST1) is currently drilling. The scope of the Detailed Engineering Design Work AFE has been changed due to the poor results of the Shen 6, and thus, has been supplemented downward from $50MM to $25MM accordingly. The current plan forecasts a new concept select by mid-year.

Weekly Report                                  - 7 -

*Confidential for Internal Use Only*



CONFIDENTIAL                                                                    APC-00312108

Weekly Report                           - 8 -

*Confidential for Internal Use Only*



CONFIDENTIAL                                                          APC-00312109

# Exhibit 54

3 May 2017 10:32 BST

Company Note | Estimate Changes

Oil & Gas

**ATLANTIC EQUITIES**

# Anadarko

## Shenandoah field write-off overshadows results

**Neutral**

Price Target $72.00

Asset disposals and writedowns added complexity to 1Q earnings. Versus guidance, operating performance was sound but earnings appear soft versus consensus. Optically cash earnings of $1.84/share missed consensus of $1.98. A $1.60/share writedown of Shenandoah was a negative surprise. Separately APC continues to respond to a fatal gas explosion in Colorado linked to one of its well flowlines.

- **Earnings miss in a complex earnings report.** Adjusted EPS of $(0.60) compares with consensus of $(0.23) and adjusted cash earnings of $1.84 were below consensus of $1.98/share. 1Q results were complicated by asset disposals (Eagle Ford/Marcellus) covering ~20% of group volumes, which closed during the quarter. While guidance excluded divestments, some contributors to consensus may have included these assets.

- **Adjusted sales volumes and cost items in line.** Sales volumes (ex divested assets) were 672kboed, equal to the top of the guidance range. Adjusted onshore US output of 398kboed grew 3% QoQ, as Delaware output climbed with a higher rig count (15 rigs running, +9 YoY). Production costs of $3.58/boe were below the guidance range of $3.90-4.10/boe, while other items were broadly in-line. FY17 guidance for total volumes is unchanged and implied guidance on cost items for 2Q-4Q are essentially unchanged. However 1Q tax effects have a knock-on effect on subsequent quarters.

- **Shenandoah write-off.** APC has written-off its Shenandoah project in the deepwater Gulf of Mexico, and taken 1Q charges totalling $1.4bn ($2.52/share pre-tax or $1.60/share post-tax). The move follows an unsuccessful sixth well and subsequent side track which did not find hydrocarbons, putting the scale of the field in doubt. Shenandoah was a high profile discovery which was considered to have potential to be a significant source of new production. Other discoveries reported in the GoM (Calpurnia, Horn Mountain Deep) are modest in scale and will not offset the loss of Shenandoah.

- **Colorado explosion linked to APC well flowline.** Separately to the earnings release, yesterday a Colorado fire dept. report linked a 'cut, abandoned gas flow line', leading from an APC vertical well, to a fatal house explosion outside Denver. The well, drilled by another company in 1993, was acquired by APC in 2014. A statement from APC last night reiterated its commitment to safety, including assessing all 3,000 vertical wells in the area, which it voluntarily shut in following the incident. Volumes affected are ~2% of group output. Of greater importance is community tolerance of oil and gas activities as residential areas spread into existing oil and gas fields.

| Ticker (NYSE) | **APC** |
|---|---|
| Price | **$56.28** |
| Pricing Date / Time | **2 May 2017 / 16:00 ET** |
| Market Capitalisation | **$31,536m** |
| 12 Month Range | **$44.81 - $73.33** |
| YTD Change | **-19.3%** |
| Annualised Dividend | **$0.20** |
| Dividend Yield | **0.4%** |
| S&P500 YTD Change | **6.8%** |

Price Performance Chart

| Y/E Dec | 2015A | 2016A | 2017E |
|---|---|---|---|
| **Diluted Cash Flow/Share ($)** | | | |
| Q1 | 2.95 | 0.96 | 1.25 |
| Q2 | 2.53 | 1.31 | 1.82 |
| Q3 | 1.92 | 1.66 | 2.00 |
| Q4 | 1.59 | 1.93 | 2.17 |
| **FY** | **9.00** | **5.86** | **7.21** |
| **Diluted EPS ($)** | | | |
| Q1 | (0.72) | (1.12) | (0.60) |
| Q2 | 0.01 | (0.60) | (0.27) |
| Q3 | (0.70) | (0.89) | (0.16) |
| Q4 | (0.58) | (0.49) | (0.03) |
| **FY** | **(2.00)** | **(3.09)** | **(1.05)** |
| **P/E (x)** | **(28.1)** | **(18.2)** | **(53.6)** |

[ **IMPORTANT DISCLOSURES ARE INCLUDED AT THE END OF THIS REPORT** ]

Barry MacCarthy
Research Analyst
+44 207 382 2935
b.maccarthy@atlantic-equities.com

APC-01334923

Anadarko

## 1. Shenandoah field write-off overshadows results

Anadarko's sales volumes were 672kboed in 1Q17, excluding contributions from the Eagle Ford and Marcellus. GAAP volumes were 795kboed (Figure 1). FY16 output from the Eagle Ford was 73kboed (9% of total, 36% oil) and the Marcellus contributed 10% of total output (100% gas).

Figure 1:  1Q17 sales volumes: reconciliation from pro-forma to reported volumes

| Item | unit | Output adjusted for disposals | Guidance low end | Guidance high end | Adjusted output vs mid-guidance | Reported output | Consensus (5-9 ests) |
|---|---|---|---|---|---|---|---|
| Total output | kboed | 672 | 656 | 678 | 1% | 795 | 690 |
| **Crude oil** | | | | | | | |
| US | kbld | 255 | 253 | 256 | 0% | 269 | |
| Algeria | kbld | 70 | 70 | 71 | -1% | 70 | |
| Ghana | kbld | 28 | 28 | 29 | -2% | 28 | |
| Total | kbld | 353 | 351 | 356 | 0% | 367 | 360 |
| Natural gas | | | | | | | |
| US | MMscfd | 1,275 | 1,260 | 1,300 | 0% | 1,859 | 1,365 |
| Natural gas liquids | | | | | | | |
| US | kbld | 100 | 96 | 100 | 2% | 112 | |
| Algeria | kbld | 6 | 5 | 7 | 0% | 6 | |
| Total | kbld | 106 | 101 | 107 | 2% | 118 | 106 |

Source:   Company, Bloomberg consensus

We calculate cash earnings of $1.84/share versus consensus of $1.98 (Figure 2). Importantly, we have reversed a $323m ($0.59/share) tax charge on profits from the disposals in our calculation.

Figure 2:   Reconciliation of cash earnings per share to GAAP cash from operations

| $m, except per-share | 1Q17 | 1Q16 |
|---|---|---|
| GAAP net cash from operations | 1,123 | -137 |
| Add back: | | |
| Increase (decrease) in accounts receivable | -68 | -46 |
| (increase) decrease in a/c payable and current liabilities | -395 | 326 |
| Tax on asset sale profits | 323 | 0 |
| Other | 29 | 343 |
| Adjusted cash flow from operations (cash earnings) | 1,012 | 486 |
| Adjusted cash earnings per share | 1.84 | 0.95 |

Source:   Company, Atlantic Equities calculations

The halt of appraisal activity and associated write-down of Shenandoah investments (Figure 3) is likely to be seen as disappointing. Shenandoah was previously described by APC in 2015 as advancing towards development, and a production concept (semi-sub) had been selected. However the recently drilled Shenandoah #6 well and associated sidetrack failed to find hydrocarbons, leading to the abandonment of the project.

APC-01334924

Figure 3:   Shenandoah location



Source:   Company. Yellow area are APC blocks

Shenandoah was discovered in 2009 as part of a wave of sub-salt, lower Tertiary discoveries. What set Shenandoah apart was apparently much higher reservoir quality than other fields of a similar age. The reservoir is at 30,000ft total depth in 5,750 ft of water. Appraisal wells found over 1,000ft of net oil pay, unusually thick for the Gulf of Mexico. However the field is structurally and depositionally complex, requiring much appraisal drilling to fully understand the reservoir dynamics.

Figure 4:   Sales volumes YoY comparison

|  | 1Q16A | 1Q17A | YoY change (%) |
|---|---|---|---|
| **Crude Oil and Condensate Sales Volumes (kbld)** |  |  |  |
| United States | 232 | 269 | 16% |
| Algeria | 65 | 70 | 8% |
| Other | 18 | 28 | 56% |
| Total consolidated operations | 315 | 367 | 17% |
| **Crude Oil and Condensate Realised Prices ($/bl)** |  |  |  |
| United States | 28.04 | 49.23 | 76% |
| Algeria | 34.62 | 53.20 | 54% |
| Other | 32.27 | 53.77 | 67% |
| Consolidated average realized prices | 29.64 | 50.34 | 70% |
|  |  |  |  |
| **US Natural Gas Sales Volumes (MMcfd)** | 2303 | 1,859 | -19% |
| Natural Gas Realised Prices ($/Mcf) | 1.75 | 3.00 | 71% |
|  |  |  |  |
| **US Natural Gas Liquids Sales Volumes (kbld)** | 122 | 112.00 | -8% |
| US Natural Gas Liquids Realized Prices ($/Bbl) | 14.98 | 26.57 | 77% |
|  |  |  |  |
| Total sales, continuing consolidated operations (kboed) | 827 | 795 | -4% |

Source:   Company

APC-01334925

# Anadarko

### Figure 5:   Income statement YoY comparison

| Income statement ($m) | 1Q16A | 1Q17A | YoY change (%) |
|---|---|---|---|
| E&P Revenues | 1394 | 2,454 | 76% |
| Gathering, processing and marketing sales | 240 | 444 | 85% |
| Other | 40 | 869 | nm |
| Expenses: | | | |
| Direct production expenses | 208 | 258 | 24% |
| Oil and gas transportation and other | 242 | 249 | 3% |
| Exploration | 126 | 1085 | 761% |
| Gathering, processing, and marketing | 215 | 351 | 63% |
| General and administrative | 449 | 269 | -40% |
| Depreciation, depletion, and amortization | 1149 | 1115 | -3% |
| Other taxes | 117 | 155 | 32% |
| Impairments | 16 | 373 | 2231% |
| Tax and legal settlements, other | 16 | 22 | nm |
| Total operating expenses | 2538 | 3877 | 53% |
| Operating Income | -864 | -110 | -87% |
| Interest, net of amount capitalized | 220 | 223 | 1% |
| (Gain) loss on commodity derivatives | 297 | -147 | -149% |
| Other non-operating (income) expense, net | 0 | -8 | nm |
| Total other (income) expense | 517 | 68 | -87% |
| | | | |
| Income before Income Taxes | -1381 | -178 | -87% |
| Income Tax Provision (Benefit) | -383 | 97 | -125% |
| Income from Continuing Operations | -998 | -275 | -72% |
| Minorities | 36 | 43 | 19% |
| Net Income | -1034 | -318 | -69% |
| Adjusted net income, continuing operations | -569 | -330 | -42% |

Source:   Company

APC-01334926

Anadarko

## Figure 6: Operating, financial summary

| | 1Q17 | 2Q17E | 3Q17E | 4Q17E | 2016 | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|---|---|---|
| **Production** | | | | | | | | | |
| Oil (kbld) | 367 | 335 | 359 | 384 | 316 | 361 | 409 | 447 | 497 |
| Natural gas (MMscfd) | 1,859 | 1,250 | 1,100 | 1,000 | 2,094 | 1,302 | 1,342 | 1,517 | 1,750 |
| NGLs (kbld) | 118 | 99 | 99 | 101 | 128 | 104 | 105 | 122 | 139 |
| Total production (kboed) | 795 | 642 | 641 | 652 | 793 | 683 | 738 | 822 | 928 |
| | | | | | | | | | |
| **Price benchmarks** | | | | | | | | | |
| Brent oil ($/bl) | 54.60 | 57.00 | 57.00 | 57.00 | 44.87 | 56.40 | 67.00 | 77.00 | 78.50 |
| WTI oil ($/bl) | 51.77 | 55.00 | 55.00 | 55.00 | 43.30 | 54.19 | 65.00 | 75.00 | 76.50 |
| Natural gas (Henry Hub, $/MMBtu) | 3.06 | 3.00 | 3.00 | 3.00 | 2.55 | 3.02 | 3.00 | 3.00 | 3.00 |
| | | | | | | | | | |
| **Price realisations** | | | | | | | | | |
| Oil ($/bl) | 50.34 | 53.19 | 53.09 | 53.02 | 40.23 | 52.41 | 63.10 | 73.04 | 74.46 |
| Natural gas ($/MMBtu) | 3.00 | 2.70 | 2.70 | 2.70 | 2.25 | 2.78 | 2.85 | 2.85 | 2.85 |
| NGLs ($/bl) | 27.17 | 22.49 | 22.49 | 22.47 | 19.87 | 23.63 | 27.04 | 27.79 | 28.04 |
| | | | | | | | | | |
| **Income statement ($m)** | | | | | | | | | |
| E&P Revenues | 2,454 | 2,131 | 2,231 | 2,330 | 7,153 | 9,147 | 11,859 | 14,735 | 16,805 |
| Other revenues | 1,313 | 375 | 423 | 474 | 716 | 2,585 | 1,848 | 1,934 | 2,025 |
| Direct production expenses | -258 | -234 | -236 | -240 | -811 | -968 | -1,100 | -1,285 | -1,500 |
| Transportation, other | -249 | -205 | -207 | -210 | -1,002 | -870 | -989 | -1,145 | -1,349 |
| Exploration | -1,085 | -165 | -165 | -165 | -946 | -1,580 | -1,544 | -1,606 | -1,670 |
| Gathering, processing, marketing | -351 | -255 | -303 | -354 | -1,087 | -1,263 | -1,368 | -1,450 | -1,535 |
| General and administrative | -269 | -263 | -266 | -270 | -1,440 | -1,067 | -1,239 | -1,425 | -1,614 |
| D,D&A | -1,115 | -1,038 | -1,047 | -1,064 | -4,301 | -4,264 | -4,715 | -5,399 | -6,455 |
| Other taxes | -155 | -149 | -156 | -163 | -536 | -623 | -889 | -1,105 | -1,260 |
| Impairments | -373 | 0 | 0 | 0 | -227 | -373 | 0 | 0 | 0 |
| Tax and legal settlements | -22 | 0 | 0 | 0 | -118 | -22 | 0 | 0 | 0 |
| Operating income | -110 | 198 | 275 | 338 | -2,599 | 701 | 1,864 | 3,254 | 3,447 |
| Net interest expense | -223 | -225 | -215 | -200 | -890 | -863 | -806 | -750 | -690 |
| Other | 155 | 0 | 0 | 0 | -340 | 155 | 8 | 8 | 8 |
| Pretax income | -178 | -27 | 60 | 138 | -3,829 | -7 | 1,066 | 2,512 | 2,766 |
| Effective tax rate | 4% | -138% | 108% | 65% | 31% | -2798% | 58% | 49% | 48% |
| Minorities | -43 | -85 | -87 | -66 | 263 | 281 | 295 | 310 | 326 |
| Attributable reported net income/(loss) | -318 | -149 | -92 | -18 | -3,071 | -577 | 156 | 973 | 1,108 |
| Attributable recurrent net income/(loss) | -330 | -149 | -92 | -18 | -1,604 | -589 | 156 | 973 | 1,108 |
| **Recurring EPS (diluted, $)** | **-0.59** | **-0.27** | **-0.16** | **-0.03** | **-3.09** | **-1.05** | **0.28** | **1.71** | **1.93** |
| Share count, weighted diluted (m) | 559 | 559 | 559 | 559 | 522 | 560 | 564 | 570 | 574 |
| | | | | | | | | | |
| **$/boe items** | | | | | | | | | |
| E&P Revenue | 34.3 | 36.5 | 37.8 | 38.9 | 24.6 | 36.7 | 44.0 | 49.1 | 49.5 |
| Direct production expenses | 3.6 | 4.0 | 4.0 | 4.0 | 2.8 | 3.9 | 4.1 | 4.3 | 4.4 |
| Transportation, other | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.7 | 3.8 | 4.0 |
| Exploration | 15.2 | 2.8 | 2.8 | 2.8 | 3.3 | 6.0 | 5.7 | 5.4 | 4.9 |
| General and administrative | 3.8 | 4.5 | 4.5 | 4.5 | 5.0 | 4.3 | 4.6 | 4.8 | 4.8 |
| D,D&A | 16.0 | 17.8 | 17.8 | 17.8 | 14.8 | 17.3 | 17.5 | 18.0 | 19.0 |
| Recurring net income | -4.6 | -2.5 | -1.6 | -0.3 | -5.5 | -2.4 | 0.6 | 3.2 | 3.3 |

Source: Company, Atlantic Equities forecasts

APC-01334927

# Anadarko

**Figure 7: <Insert Figure Title>**

| $m except where noted | 1Q17 | 2Q17E | 3Q17E | 4Q17E | 2016 | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|---|---|---|
| **Discretionary & debt-adjusted cash flow** | | | | | | | | | |
| Net income | -275 | -64 | -5 | 48 | -2808 | -295 | 451 | 1283 | 1434 |
| Depreciation, depletion, and amortization | 1115 | 1038 | 1047 | 1064 | 4301 | 4264 | 4715 | 5399 | 6455 |
| Deferred income taxes | -660 | -56 | -26 | 0 | -1238 | -743 | 31 | 162 | 186 |
| Dry hole expense, unproved writedowns | 1012 | 100 | 100 | 100 | 613 | 1312 | 1366 | 1420 | 1477 |
| Other | -503 | 0 | 0 | 0 | 1735 | -503 | 0 | 0 | 0 |
| Discretionary cash flow | 689 | 1018 | 1116 | 1212 | 2603 | 4035 | 6562 | 8264 | 9553 |
| **Discretionary cash flow per share** | **1.23** | **1.82** | **2.00** | **2.17** | **5.86** | **7.21** | **11.64** | **14.50** | **16.65** |
| *YoY growth* | | | | | *-35%* | *23%* | *61%* | *25%* | *15%* |
| | | | | | | *FY16-FY20 CFPS CAGR:* | | | *30%* |
| Post-tax interest expenses | 145 | 146 | 140 | 130 | 579 | 561 | 524 | 487 | 449 |
| Debt-adjusted discretionary cash flow | 834 | 1164 | 1256 | 1342 | 3182 | 4596 | 7086 | 8752 | 10001 |
| Debt-adjusted discretionary cash flow/share ($) | 1.5 | 2.1 | 2.2 | 2.4 | 7.0 | 8.2 | 12.6 | 15.4 | 17.4 |
| YoY growth (%) | 21% | 31% | 16% | 9% | -31% | 18% | 53% | 22% | 13% |
| | | | | | | | | | |
| Total net cash used in investing activities | 1722 | -1300 | -1300 | -1300 | -3076 | -2178 | -6048 | -6749 | -7648 |
| Cash flow from operations | 1123 | 1223 | 1080 | 1176 | 3000 | 4603 | 6571 | 8210 | 9597 |
| Free cash flow | 2845 | -77 | -220 | -124 | -76 | 2425 | 523 | 1461 | 1949 |
| Dividends | -28 | -28 | -28 | -28 | -104 | -112 | -119 | -126 | -133 |
| | | | | | | | | | |
| **Returns and debt metrics** | | | | | | | | | |
| Net debt | 9495 | 9685 | 10038 | 10229 | 12139 | 10229 | 10193 | 9263 | 7892 |
| Total equity | 11856 | 11679 | 11559 | 11513 | 12212 | 11513 | 11550 | 12397 | 13373 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital Employed | 21351 | 21364 | 21598 | 21742 | 24351 | 21742 | 21743 | 21660 | 21265 |
| Average capital employed | | | | | 25950 | 23047 | 21742 | 21701 | 21462 |
| Adj. operating profit less taxes (NOPLAT) | | | | | -1026 | -28 | 679 | 1460 | 1557 |
| ROACE (%) | | | | | -4% | 0% | 3% | 7% | 7% |
| ROE (%) | | | | | -25% | -5% | 1% | 8% | 8% |
| Net debt/capitalisation (%) | | | | | 50% | 47% | 47% | 43% | 37% |
| | | | | | | | | | |
| Consolidated adjusted EBITDAX | 2575 | 1316 | 1400 | 1501 | 3571 | 6792 | 7902 | 10034 | 11343 |
| Consolidated adjusted EBITDA | 1490 | 1151 | 1235 | 1336 | 2625 | 5212 | 6358 | 8429 | 9673 |
| Net debt/EBITDAX annualised | 0.9 | 1.8 | 1.8 | 1.7 | 3.4 | 1.5 | 1.3 | 0.9 | 0.7 |
| Net debt/EBITDA annualised | 2.0 | 2.5 | 2.3 | 2.2 | 4.6 | 2.0 | 1.6 | 1.1 | 0.8 |

Source: Company, Atlantic Equities forecasts

APC-01334928

Anadarko

## IMPORTANT DISCLOSURES



Rating and Price Target History for: Anadarko (APC US) as of 05-02-2017

### Stocks under the analyst's coverage

Apache (APA), Anadarko (APC), EOG Resources (EOG), Hess (HES), Marathon Oil (MRO), Noble Energy (NBL), Occidental (OXY), Schlumberger (SLB), Baker Hughes (BHI) and Halliburton (HAL).

### Risks

Potential changes to our Neutral rating on Anadarko may arise from, but are not limited to, changes in commodity prices, operating and capital costs, changes in state and federal tax and regulatory changes, modifications in restrictions on hydraulic fracturing, environmental constraints and per-well productivity.

### Consensus Estimates

Consensus estimates have been sourced from Bloomberg.

### ANALYST CERTIFICATION

Barry MacCarthy, hereby certifies that the views expressed in this research report accurately reflects his/her personal views about the subject Security and Issuer as of the date of this report. He/She further certifies that no part of his/her compensation was, is, or will be directly, or indirectly, related to the specific recommendations or views contained in this research report.

No analysts at Atlantic Equities LLP hold shares in companies they follow. No partner or employee of Atlantic Equities LLP, holds shares in the companies under analyst coverage which give rise to an interest which exceeds 1% of the total issued share capital of the company. Atlantic Equities LLP does not act as a market maker in the securities of any company under analyst coverage and does not carry out investment banking or corporate finance business.

### RATING DEFINITIONS

Investment opinions are based on a stock's total return potential relative to those stocks under the analyst's coverage:

"Overweight" stocks are the most attractive stocks under the analyst's coverage over the next 12 months.

"Underweight" stocks are deemed to be particularly unattractive stocks over the next 12 months.

"Neutral" stocks are those stocks which are neither classified as "Overweight" nor "Underweight".

Stocks covered are subject to continuous review. Updates will be provided whenever a change in recommendation is to be made or, at the discretion of the analyst, whenever there is news worth of note. It is anticipated that a report for each company covered will be produced at least once per annum.

Atlantic Equities LLP does not act as a market maker in the securities of any company under analyst coverage and does not carry out investment banking or corporate finance business for any company under analyst coverage.

APC-01334929

# Anadarko

**Issued by Atlantic Equities LLP. Authorized and regulated by the Financial Conduct Authority.**
**25 Copthall Avenue, London EC2R 7BP, United Kingdom**

Atlantic Equities LLP is an independent equities research firm. Atlantic Equities LLP's Code of Ethics contains procedures which employees are required to follow so as to prevent or mitigate any conflicts of interest which may arise. The investment services of Atlantic Equities LLP are only available to professional clients and eligible counterparties as defined by the rules of the FCA. They are not available to retail clients. Accordingly, customers of Atlantic Equities LLP will not benefit from the UK investors compensation scheme. Views expressed herein accurately reflect the views of the relevant analysts with respect to the security, securities or issuer(s) which are the subject of the research. This document is not intended to be an offer or the solicitation of an offer to buy or sell securities and has been prepared exclusively for the use of existing clients of Atlantic Equities LLP. Any recommendations contained in this document must not be relied upon as investment advice based on the recipient's personal circumstances. In the US, it has been prepared for US institutional investors only and such investors wishing to undertake transactions in the securities mentioned in this report should pass orders to FINRA registered firms and not to Atlantic Equities LLP. Whilst all reasonable care has been taken in the preparation of this document, no responsibility can be accepted for the accuracy or completeness of the information herein or upon which opinions herein have been based. Please note the value of investments and the income derived from them may fall as well as rise and you may not receive the original amount invested in return. Where an investment is denominated in a foreign currency, changes in rate of exchange may have an adverse effect on its value, price or income. Unless otherwise specified, charts and statistics are compiled by Atlantic Equities LLP. Where consensus figures are used, these have been sourced from First Call and/or Bloomberg. Atlantic Equities LLP's conflicts of interest policy, its recommendation distribution and other important disclosures are shown on its web-site www.atlantic-equities.com. A list of all recommendations in securities traded on EU regulated markets is located at http://atlantic-equities.com/european-disclosure/european-disclosure.pdf

**Additional information on the securities discussed herein is available on request.**

Registered office: 20-22 Bedford Row, London, WC1R 4JS.

Registered Number OC304696 England and Wales.

APC-01334930

# Exhibit 55

# UNIT OPERATING AGREEMENT

# SHENANDOAH PROSPECT

# WALKER RIDGE BLOCKS

# 51, 52, N/2 53

CONFIDENTIAL

APC-00741533

# OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF – GULF OF MEXICO

This Operating Agreement, effective as of April 1, 2008 (the "Effective Date"), is between **CONOCOPHILLIPS COMPANY** and **ANADARKO E&P COMPANY LP** the signers hereof, herein referred to individually as the "Party" and collectively as the "Parties."

**WHEREAS**, the Parties are owners of one or more Leases, identified in Exhibit "A" *(Description of Leases),* and desire to explore, appraise, develop and operate the Contract Area for the production of Hydrocarbons.

**WHEREAS**, pursuant to Like-Kind Exchange Agreement between the Parties dated April 1, 2008, the Parties herein enter into this Agreement for the exploration, development, production and operation of the Contract Area hence forth from the Effective Date of this Agreement.

**AND WHEREAS**, In the event of a conflict with the terms and provisions of this Agreement and the terms and conditions of said Like Kind Exchange Agreement the terms and conditions of the Like Kind Exchange Agreement shall prevail

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to explore, appraise, develop, and operate the Contract Area according to the following provisions:

### ARTICLE 1 – CONTRACT APPLICATION

1.1  **Application in General:**  This Agreement governs the rights and obligations of the Parties relating without limitation, to the exploration, appraisal, development, operation, production, treatment, gathering and storage of Hydrocarbons.  This Agreement does not apply to the fabrication or installation of export pipelines.

1.2  **Application to Contract Area**:  This Agreement shall apply to the entire Contract Area as defined in Article 2 below.  For purposes of this Agreement,

CONFIDENTIAL

APC-00741534

activities or operations affecting one Lease are considered activities or operations affecting all Leases in the Contract Area. Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Leases comprising the Contract Area, all joint property, and all Hydrocarbons are owned by the Parties according to their respective Working Interests in the Contract Area.

## ARTICLE 2 – DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the initially capitalized terms listed below shall have the following meaning:

2.1 **Additional Testing, Logging, or Coring:** Any testing (excluding Production Testing), coring, or logging that is in addition to that approved by virtue of any previously approved well or subsequent operation.

2.2 **Affiliate:** Any corporation, company, limited liability company, partnership, or other legal entity that:

(a) is owned or controlled by a Party, or

(b) is owned or controlled by any other corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party, or

(c) owns or controls a Party, or

(d) is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

CONFIDENTIAL                                        APC-00741535

**2.3    Agreement:** This Agreement, together with its attached Exhibits.

**2.4    Annual Operating Plan:** The operational plan and estimate of Costs for activities and operations as described in Article 6.4 *(Annual Operating Plan)*.

**2.5    Appraisal Operations:** Any operations (including, but not limited to, operations subsequent to an Appraisal Well reaching its Objective Depth but prior to the attempted or successful completion of such well) conducted under the provisions of Article 11 *(Appraisal Operations)* or Article 12.15.2 *(Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations)*.

**2.6    Appraisal Well:** Any well proposed and drilled as an Appraisal Operation [including, but not limited to, a substitute well for an Appraisal Well abandoned pursuant to Article 11.1.4 *(AFE Overruns and Substitute Well)*].

**2.7    Authorization for Expenditure (AFE):** A written description and Cost estimate of a proposed activity or operation submitted by the Party proposing such activity or operation for the purpose of eliciting the other Party's Vote, Election or written statement, as applicable, on the proposed activity or operation.

**2.8    Complete Recoupment:** The point in time when the Participating Parties have been reimbursed, through Hydrocarbon Recoupment, through Disproportionate Spending, and/or through a lump sum cash settlement, an amount equal to the Non-Participating Party's Non-Participating Interest Share of the Costs of the Non-Consent operation multiplied by the applicable percentage provided for in and in accordance with Article 16 *(Non-Consent Operations)*.

**2.9    Confidential Data:** All proprietary geophysical, geological, geochemical, drilling, or engineering data acquired or derived from operations conducted pursuant to this Agreement and all analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate such data. The term also includes, but is not limited to:

(a)    the terms and provisions of this Agreement, subject to Exhibit "G" ; and

CONFIDENTIAL

APC-00741536

(b)     commercial, contractual or financial information acquired or derived from activities or operations conducted pursuant to this Agreement.

The term excludes "Confidential Information" as that term is defined in Exhibit "G".

**2.10    Contract Area:**  The OCS Leases or portions thereof, listed on Exhibit "A".

**2.11    Cost(s):**  The monetary amount of all expenditures (or indebtedness) incurred by the Operator and the Participating Parties in the conduct of activities and operations, determined pursuant to this Agreement, which are billable to the Joint Account.

**2.12    Deepen or Deepening:**  Any operation to drill an existing well (including sidetracking a well to Deepen or re-entering a well to Deepen) deeper than the Objective Depth previously drilled under an approved AFE.

**2.13    Deeper Drilling:**  The drilling of an Appraisal Well or Development Well below the base of the Deepest Producible Reservoir existing at the time the well is proposed.

**2.14    Deepest Producible Reservoir:**  The Producible Reservoir located deeper than any other Producible Reservoir within the Contract Area as determined at the time a drilling or Deeper Drilling proposal is made.

**2.15    Development Operations:**  Any operations (including, but not limited to, Recompletions, Workovers, the attempted or successful completion of an Exploratory Well or an Appraisal Well, and operations subsequent to a Development Well reaching its Objective Depth) conducted under the provisions of Article 13 *(Development Operations)*.

**2.16    Development Phase:**  The proposals, activities, and operations associated with the design, fabrication, or other acquisition and installation of a Development System.

Page 4 of 191

CONFIDENTIAL                                                                          APC-00741537

**2.17**    **Development Plan:**    The plan for a Development Phase as described in Article 12 *(Development Plan)*.

**2.18**    **Development System:**    A Production System and its associated Facilities.

**2.19**    **Development Well:**    Any well proposed and drilled as a Development Operation [including, but not limited to, a substitute well for a Development Well abandoned pursuant to Article 13.1.5 *(AFE Overruns and Substitute Well)*].

**2.20**    **Disproportionate Spending:**    The payment of the Costs of an activity or operation by a Participating Party in excess of its Participating Interest Share of the Costs of such activity or operation in order to settle an Underinvestment previously incurred by such Participating Party.

**2.21**    **Election, Elect, Elects, Elected, Electing:**    A response or deemed response by a Party to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*.

**2.22**    **Exploratory Operations:**    Any operations (including, but not limited to, operations subsequent to an Exploratory Well reaching its Objective Depth but prior to the attempted or successful completion of such well) conducted under the provisions of Article 10 *(Exploratory Operations)*.

**2.23**    **Exploratory Well:**    Any well proposed and drilled as an Exploratory Operation [including, but not limited to, a substitute well for an Exploratory Well abandoned pursuant to Article 10.1.4 *(AFE Overruns and Substitute Well)*].

**2.24**    **Fabrication AFE:**    The AFE's collectively submitted for the construction, fabrication, or acquisition and installation of a Development System which shall be deemed proposed, and approved or not approved as one AFE.

**2.25**    **Facilities:**    All production equipment beyond the wellhead connections that is installed on or outside the Contract Area pursuant to this Agreement in order to handle or process Hydrocarbon production.  Facilities include, but are not limited

CONFIDENTIAL

APC-00741538

to, injection and disposal wells and the flowlines and gathering lines that transport Hydrocarbons from the wellhead. Facilities exclude (1) Production Systems, (2) pipelines used to transport Hydrocarbons or produced water to shore or to pipeline interconnections located downstream of the Production System, and (3) the facilities to take in kind provided for in Article 15.2 *(Facilities to Take in Kind)*.

2.26 **Final Design AFE:** The AFE submitted to the Parties as part of a Development Plan pursuant to Article 12.4 *(Content of the Development Plan)* which sets forth the Costs of designing the Development System for a Development Phase.

2.27 **Force Majeure:** Any flood, storm, hurricane, loop current/eddy, or other act of God; a fire, loss of well control, oil spill, or other environmental catastrophe; war; civil disturbance; labor dispute; strike; lockout; compliance with any law, order, rule, or regulation; governmental action or delay in granting necessary permits or permit approvals; inability to secure materials or rig; or any other event or cause, whether similar or dissimilar to those enumerated in this definition, that is reasonably beyond the control of the Party claiming the existence of such event or cause.

2.28 **Gross Negligence or Willful Misconduct:** An act, by any person or entity which was intended to cause, or which was in reckless disregard of or wanton indifference to harmful consequences such person or entity knew, or should have known, such act or failure would have on the safety or property of another person or entity not justifiable by any special circumstances, by a Party's corporate officers, regular salaried supervisory staff or non-supervisory staff functioning at an equivalent level but shall not include any error or judgment or mistake made by the aforesaid persons while exercising in good faith any function, authority, or discretion conferred upon them.

2.29 **Hydrocarbon Recoupment:** An amount to be recovered by the Participating Parties from all or a portion of the Non-Participating Interest Share of the proceeds from the sale of future Hydrocarbon production equal to the Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage in Article 16 *(Non-Consent Operations)*.

CONFIDENTIAL                                                    APC-00741539

**2.30**    **Hydrocarbons:**  The oil and gas and associated liquid and gaseous by-products (except helium) that may be produced from a well bore located on the Contract Area.

**2.31**    **Joint Account:**  The account, maintained by the Operator in accordance with the provisions of this Agreement, showing the charges paid and credits received in connection with the activities and operations conducted under this Agreement.

**2.32**    **Lease:**  Each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A" and each future oil and gas lease covering one or more OCS blocks, or portions thereof, included within the Contract Area that is acquired during the term of this Agreement by the Operator and the Non-Operating Parties (including substitutions for or replacements of existing leases).

**2.33**    **MMS:**    The Minerals Management Service, Department of Interior, or its successor agency.

**2.34**    **Non-Consent Operation:**  Except when an activity or operation is approved by Vote and such approval is binding on all the Parties, any activity or operation proposed and approved under this Agreement in which one or more Parties, having the contractual right to do so, Elects or Votes not to participate and where the Participating Parties proceed to conduct the operation at their sole Cost and risk pursuant to Article 16 (*Non-Consent Operations*).

**2.35**    **Non-Operating Party:**  Any Party other than the Operator.

**2.36**    **Non-Participating Party:**  Except when an activity or operation is approved by Vote and such approval is binding on all the Parties, any Party who, having the contractual right to do so, Elects or Votes not to participate in the sharing of the Costs, risks, and benefits (including the rights to Hydrocarbons) of an activity or operation proposed and approved under the terms of this Agreement. The term excludes a Party who does not Vote to participate in a proposed activity or operation, but is nonetheless bound to participate in the proposed activity or operation if it is approved by Vote.

CONFIDENTIAL                                                          APC-00741540

**2.37** **Non-Participating Interest Share:** The percentage of participation in the Costs, risks, and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have had in a proposed activity or operation if all Parties had participated in that proposed activity or operation.

**2.38** **Objective Depth:** For any well, the shallower of the total footage to be drilled (as measured in true vertical subsea depth) or the penetration by the drill bit to the base of the deepest target formation or interval, as such depth and target formation or interval are set forth in the AFE for the well.

**2.39** **OCS:** The Outer Continental Shelf of the Gulf of Mexico.

**2.40** **Offsite Facility(ies):** Structures, facilities, and pipelines that are not owned by the Parties pursuant to this Agreement.

**2.41** **Operator:** The Party identified in Article 4.1 *(Designation of the Operator)* or any successor Operator selected pursuant to Article 4.5 *(Selection of Successor Operator)* and, if applicable, any substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)*.

**2.42** **Overinvested Party:** A Party entitled to receive a portion of an Underinvestment.

**2.43** **Participating Interest Share:** A Participating Party's percentage of participation in:

(a) the Costs and risks (exclusive of Disproportionate Spending) and benefits (including rights to Hydrocarbons) of an activity or operation conducted or

(b) if applicable, interests to be assigned to the Parties

under the terms of this Agreement; that is, the proportion that the Participating Party's Working Interest bears to the total Working Interest of all the Participating Parties (unless a different basis for Cost sharing or assignment has been agreed upon by the Participating Parties).

CONFIDENTIAL

APC-00741541

**2.44  Participating Party:**  Any Party who, having the contractual right to do so, participates in the sharing of:

(a)  the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation, or

(b)  if applicable, the interests to be assigned to the Parties

under the terms of this Agreement.  The term includes a Party who does not Vote to participate in a proposed activity or operation but is nonetheless bound to participate in the proposed activity or operation if it is approved by Vote.

**2.45  Producible Reservoir:**  A Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from, and not in oil or gas communication with, any other Hydrocarbon accumulation.

**2.46  Producible Well:**  A well that:

(a)  is producing Hydrocarbons, or

(b)  meets, the "well producibility criteria" set forth in Title 30 CFR 250.111, or any succeeding order or regulation issued by an appropriate governmental authority, or

(c)  the Participating Parties unanimously agree is a Producible Well.

**2.47  Production System:**  A system to develop and produce Hydrocarbons.  The term includes:

(a)  an offshore surface structure, whether fixed, compliant, or floating;

(b)  an offshore subsea structure or template, whether capable of accommodating one well or multiple wells;

(c)  any combination of the items mentioned in clauses (a) and (b);

CONFIDENTIAL

APC-00741542

(d)   any other type of system designed to develop and produce Hydrocarbons; and

(e)   all associated components of the items mentioned above.

The term excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.48   Production Testing:**  Operations for the controlled flow of Hydrocarbons to the surface for the purpose of measuring flow rates or flowing pressures, or gaining other subsurface data.

**2.49   Project Team:**  A group of employees or contractors of the Participating Parties, or their respective Affiliates, established for the purpose of assisting the Operator in (a) preparing any Development Plan and (b) planning for the design, engineering, fabrication, transportation, and installation, of any Development System.

**2.50   Project Team AFE:**  The AFE submitted for the formation and Costs of the Project Team.

**2.51   Recomplete, Recompleting, Recompletion:**  A Development Operation within a single well bore in which one or more Parties attempt a completion in a Producible Reservoir not then open to production in such well bore.

**2.52   Sidetrack, Sidetracking:**  Any operation to directionally control or intentionally deviate a well so as to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of any operation previously conducted in the well excluding an intentional deviation done to straighten the hole, drill around junk, drill around failed operations, sidetrack to core formations encountered or to overcome other mechanical difficulties.

**2.53   Transfer of Interest:**  Any conveyance, assignment, transfer, farmout, exchange or other disposition of all or a portion of a Party's undivided Working Interest,

CONFIDENTIAL

APC-00741543

except assignments made pursuant to Articles 16.2, 16.4, 17 and 18 of this Agreement.

**2.54**   **Underinvested Party:** A Party with an Underinvestment.

**2.55**   **Underinvestment:** A monetary obligation owed under the terms of this Agreement to be settled under Article 16.9 *(Settlement of Underinvestments)*.

**2.56**   **Vote, Votes, Voted, Voting:** A response or deemed response by a Party to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*.

**2.57**   **Well Plan:** A detailed written description of a proposed Exploratory Well, Appraisal Well, or Development Well, which must include, at a minimum:

    (a)    the surface and target bottomhole locations;

    (b)    the expected spud date and the anticipated time necessary to conclude drilling, evaluation, and/or abandonment operations;

    (c)    the total vertical subsea depth to be drilled, along with the specified Objective Depth (and the target zones to be penetrated);

    (d)    the proposed drilling plan, including the casing program and directional details;

    (e)    details of any coring, logging or other evaluation operations to be conducted; and

    (f)    information concerning the drilling rig to be used, including day rates, water depth rating, and other limitations relevant to the drilling operations to be conducted.

**2.58**   **Working Interest:** The record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage set forth in Exhibit "A"). If a Party's record title interest is different

CONFIDENTIAL

APC-00741544

from its operating rights, the Working Interest of each Party is the interest set forth in Exhibit "A".

**2.59  Workover:** A Development Operation conducted in an existing well, after such well has been completed in one or more Producible Reservoirs, to restore, maintain, or improve production from one or more of those Producible Reservoirs.

# ARTICLE 3 – EXHIBITS

**3.1  Exhibits:** All references in this Agreement to "Exhibits" without further qualification mean the Exhibits listed below and attached to this Agreement. Each Exhibit is made a part of this Agreement, and is deemed incorporated into this Agreement by this reference. If the provisions of any of the Exhibits conflict with any provisions of the body of this Agreement, the provisions of the body of this Agreement prevail, with the exception of Exhibits "D" and "G", which shall prevail over any provision of the body of this Agreement. If the provisions of Exhibit "C" and "G" conflict, the provisions of Exhibit "G" will prevail. If the provisions of Exhibit "C" and "D" conflict, the provisions of Exhibit "D" will prevail.

| | |
|---|---|
| **Exhibit "A"** | Description of Leases, Working Interests of the Parties, Operator and Representatives |
| **Exhibit "B"** | Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Nonsegregated Facilities |
| **Exhibit "F"** | Security Interest Provisions |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Memorandum of Operating Agreement and Financing Statement |

CONFIDENTIAL                                                                            APC-00741545

## ARTICLE 4 – SELECTION OF OPERATOR

4.1    **Designation of the Operator:**  Anadarko E&P Company LP is designated the Operator of the Contract Area and shall conduct all operations within the Contract Area for the Joint Account of the Parties.  This designation of Operator is subject to approval by the MMS and the Parties agree to promptly execute and file such documents as may be required to gain approval of this designation of Operator.

4.2    **Substitute Operator:**  Except for the circumstances set forth in Article 4.2.1 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, if the Operator becomes a Non-Participating Party in a Non-Consent Operation, the Participating Parties may approve by Vote the designation of any Participating Party as the substitute Operator.  The substitute Operator shall serve only (a) for only the Non-Consent Operation and, subject to these limitations, (b) with the same authority, rights, obligations and duties as the Operator.  However, if a Non-Operating Party is the only Participating Party, then the Non-Operating Party that is participating shall be designated substitute Operator for such Non-Consent Operation with no Vote required, unless such Non-Operating Party elects not to accept such designation. In no event shall a Non-Operating Party be designated a substitute Operator against its will. If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties and the Operator, conduct such Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk in accordance with Article 16 *(Non-Consent Operations)*.

4.2.1    **Circumstances Under Which the Operator Must Conduct a Non-Consent Operation:**  If

(a)    a drilling rig is on location and the Operator becomes a Non-Participating Party in a supplemental AFE for an Exploratory Operation, Appraisal Operation or Development Operation or an Exploratory Operation, Appraisal Operation or Development

CONFIDENTIAL                                                      APC-00741546

Operation subsequent to such well reaching its Objective Depth, but prior to release of the drilling rig used to drill such well, or

(b)    the Operator becomes a Non-Participating Party in an operation which is to be conducted from a Development System being operated by the Operator,

the Operator, as a Non-Participating Party, shall conduct such Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk in accordance with Article 16 *(Non-Consent Operations)*.

4.2.2    **Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party:**

When, under Article 4.2 *(Substitute Operator)* or Article 4.2.1 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, the Operator conducts a Non-Consent Operation in which it is a Non-Participating Party, it shall follow the practices and standards set forth in Article 5 *(Rights and Duties of Operator)*; provided, however, the Operator shall not be required to proceed with such Non-Consent Operation unless and until the Participating Parties advance the Costs thereof to the Operator to the end that the Operator need not expend any of its own funds for such Non-Consent Operation.

4.2.3    **Appointment of a Substitute Operator:**  After the expiration of all applicable response periods for the Non-Consent Operation and the selection of a substitute Operator, each Party shall promptly provide the substitute Operator with the appropriate MMS designation of operator forms.  The Operator and the substitute Operator shall coordinate the change of operatorship so as to not interfere with ongoing activities or operations, if any, including, any lease maintenance activities or operations.

4.2.4    **Redesignation of Operator:**  Except for an acreage forfeiture by the Operator in a situation arising under Article 16.2 *(Acreage Forfeiture*

CONFIDENTIAL

APC-00741547

*Provisions*), within thirty (30) days of the conclusion of the Non-Consent Operation, all Parties shall promptly execute and provide the Operator with the appropriate MMS designation of operator forms to return operatorship to the Operator, and thus supersede the Parties' designation of the substitute Operator made pursuant to Article 4.2.3 *(Appointment of a Substitute Operator)*.

**4.3**     **Resignation of Operator:**     The Operator may resign at any time by giving written notice to the Parties; provided, however, the Operator shall not resign during a Force Majeure or an emergency which poses a threat to life, safety, property or the environment. If the Operator ceases to own a Working Interest, the Operator shall be deemed to have resigned without any action on the part of the Non-Operating Parties unless the Operator is resigning because it is transferring its Working Interest to an Affiliate. In such case, the Parties shall designate such Affiliate as the new Operator.

**4.4**     **Removal of Operator:**     The Operator may be removed under the following circumstances.

**4.4.1**     **Removal Upon Partial Assignment:**     If the Operator assigns any portion of its Working Interest (excluding any interest assigned to an Affiliate or as a result of a merger, reorganization, consolidation or sale or other transfer of substantially all of a Party's assets in the Gulf of Mexico) which reduces the Operator's Working Interest to less than eighty percent (80%) of the next largest Working Interest of a Non-Operating Party, whether accomplished by a single assignment or by multiple assignments, then the removal of the Operator shall be approved by Vote.

**4.4.2**     **Removal for Cause by Vote:**     If the Operator commits any of the following acts, the removal of the Operator shall be approved by Vote, excluding the Vote of the Operator or its Affiliates:

CONFIDENTIAL                                                                                      APC-00741548

(a)    the Operator is found liable by a final non-appealable judicial decision or a final decision under binding arbitration for an act of Gross Negligence or Willful Misconduct; or

(b)    the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of written notice of such breach from a Non-Operating Party. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed. The Operator shall not be removed under this Article 4.4.2 if the Operator is able to prove the non-existence of the alleged breach within 30 days after receipt of written notice of such alleged breach; or

(c)    the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of its creditors, commits any act of bankruptcy or seeks relief under laws providing for the relief of debtors; or

(d)    a receiver is appointed for the Operator or for substantially all of its property or affairs.

If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and if a federal bankruptcy court prevents the removal of Operator, all Non-Operating Parties and Operator shall comprise an interim operating committee to operate until Operator has elected to reject or assume this Agreement under the Bankruptcy Code. An election by Operator as a debtor-in-possession or by a trustee in bankruptcy to reject this Agreement shall be deemed to be a resignation by Operator without any action by the Non-Operating Parties, except the selection of a successor.

CONFIDENTIAL

APC-00741549

**4.4.3**    **Timing of Vote to Remove Operator:** A Vote to remove the Operator for any cause provided for in this Article 4.4 shall be taken within ninety (90) days after the Non-Operating Party's actual knowledge of the cause.

**4.5**    **Selection of Successor Operator:** Upon the resignation or removal of the Operator, a successor Operator shall be approved by Vote; provided, however, in the event the resigned or removed Operator is not entitled to Vote, fails to Vote or Votes only to succeed itself, then the successor Operator shall be approved by Vote after excluding the Vote of the resigned or removed Operator. If the Operator assigns all or a part of its Working Interest, then pursuant to Article 4.3 *(Resignation of Operator)* or Article 4.4.1 *(Removal Upon Assignment)* the Party who acquired all or a part of the former Operator's Working Interest shall not be excluded from Voting for a successor Operator. If there are only two Parties to this Agreement when the Operator resigns or is removed, then the Non-Operating Party automatically has the right, but not the obligation, to become Operator. If no Party is willing to become the Operator, this Agreement shall terminate under Article 26.1 *(Term)*.

**4.6**    **Effective Date of Resignation or Removal:** The resignation or removal of the Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period of time is required for the Parties to obtain approval of the designation of the successor Operator by the MMS or at that time when the successor Operator is able to assume the duties of Operator subject to the approval of the MMS whichever occurs first. The outgoing Operator will fully cooperate with the successor Operator in seeking MMS approval of the change of Operator. The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities resulting from its operatorship. The successor Operator shall be entitled to charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship.

**4.7**    **Delivery of Property:** On the effective date of resignation, removal or replacing the Operator at the conclusion of Appraisal Operations, as provided in Article

CONFIDENTIAL

APC-00741550

4.1, the outgoing Operator shall deliver to the successor Operator possession of all items purchased for the Joint Account pursuant to this Agreement, all Hydrocarbons which are not the separate property of a Party, all equipment, materials and appurtenances purchased for the Joint Account pursuant to this Agreement, and all books, records and inventories relating to the Joint Account (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest). The outgoing Operator shall distribute or return all funds related to the Joint Account to the Parties who contributed or are entitled to receive such funds pursuant to the terms of this Agreement. The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of such resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted pursuant to this Agreement, and the successor Operator shall assume all obligations of the Operator under such contracts which are assignable. The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons which are not the separate property of a Party, and such inventory shall be used in the return of and the accounting by the outgoing Operator of the property and the Hydrocarbons which are not the separate property of a Party. Such inventory and audit shall be conducted in accordance with Exhibit "C".

## ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR

5.1    **Exclusive Right to Operate:** Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations pursuant to this Agreement. In performing services under this Agreement for the Non-Operating Parties, the Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except with regard to the selection of the type of activity or operation to be undertaken in accordance with Article 8.2 *(Voting and Election Procedures)* or Articles 8.5 *(Unanimous Agreement)*. The Operator is not the agent or fiduciary of the Non-Operating Parties. Except as provided in Exhibit "G", the number of employees or contractors used by the Operator in conducting activities or operations hereunder, their selection, and the hours of labor and the compensation for services rendered shall be determined by the Operator and all

CONFIDENTIAL    APC-00741551

such employees or contractors shall be the employees or contractors of the Operator. The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the activities or operations provided for in this Agreement.

5.2 **Workmanlike Conduct:** The Operator shall timely commence and conduct all activities or operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances. The Operator shall not be liable to the Non-Operating Parties for losses sustained or liabilities incurred, except as may result from Operator's Gross Negligence or Willful Misconduct. Unless otherwise provided in this Agreement, Operator shall consult with the Non-Operating Parties and keep them all informed of all important matters. Operator shall not be required to conduct an operation under this Agreement that it believes would be unsafe or would endanger persons or property.

5.3 **Drilling and Other Contracts:** The Operator may contract for and employ any drilling units or vessels, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct operations under this Agreement, including the fabrication, construction, and installation of any Production System, Facilities or pipelines. Operator may use its reasonable judgment in contracting for such items under long-term contracts with parties not Affiliated with Operator, and the actual costs incurred by Operator in such long-term contracts shall be chargeable to and paid by the Participating Parties in the affected operation. All drilling shall be conducted by qualified and responsible independent contractors, or at Operator's election, by utilizing Operator-owned or Operator's Affiliate-owned drilling units or vessels or drilling units or vessels under contract to Operator, under competitive drilling contracts. A competitive drilling contract is a contract containing terms, rates and provisions that, when the contract was made, did not exceed those generally prevailing in the Gulf of Mexico for operations involving drilling rigs of an equivalent type, operating in similar environments, water depths and water bottoms, and equipped to the Operator's standard conditions, which are capable of drilling the proposed well(s) or conducting other required operations within the time schedule for the operations to be conducted. The Operator may employ its or its Affiliate's

CONFIDENTIAL

APC-00741552

material, services, equipment, personnel, Operator-owned or Operator's Affiliate-owned drilling units or vessels, Workover rig, snubbing unit, or Production System in the conduct of operations hereunder and charges to the Participating Parties for same shall be made in accordance with Exhibit "C" *(Accounting Procedure)*.  If the Operator's or its Affiliate's materials, services, equipment, personnel, drilling unit or vessel, Workover rig, snubbing unit, or Production System are employed in conducting operations under this Agreement, the terms, rates and provisions for use shall be consistent with then current competitive contracts prevailing in the deepwater Gulf of Mexico.

**5.4** **Liens and Encumbrances:**  The Operator shall endeavor to keep the Leases, Production Systems, Facilities and other equipment purchased for the Joint Account pursuant to this Agreement and any Hydrocarbons free from all liens and encumbrances (except those provided for in Exhibit "F" and those prior agreements affecting the Contract Area listed on Exhibit A) which might arise by reason of the activities or operations conducted under this Agreement.  In the event a lien is placed on the Leases, Production Systems, Facilities or other equipment or any Hydrocarbons, the Operator shall make reasonable efforts to remove such lien.

**5.5** **Records:**  The Operator shall keep accurate books, accounts and records of activities or operations hereunder in compliance with the Accounting Procedure in Exhibit "C".  Unless otherwise provided for in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C".  The Operator shall use good faith efforts to ensure the settlements, billings, and reports rendered to each Party, as provided in this Agreement, are complete and accurate.  The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party.  This provision does not affect a Party's audit rights under this Agreement.  This provision shall also apply to the Non-Operating Parties as to their books, accounts and records that support its charges to any Project Team.

CONFIDENTIAL                                                                                      APC-00741553

**5.6** **Reports to Government Agencies:** The Operator shall make timely reports to all governmental authorities to which it has a duty to make such reports and, upon specific written request, shall furnish copies of such reports to the Participating Parties. The Operator shall provide the Non-Operating Party copies of any notices, orders or directives received from the MMS. As soon as reasonably practicable, the Operator, or a Non-Operating Party if applicable, shall give written notice to the other Parties prior to all meetings with government authorities of which it has notice and which affect the Contract Area or operations under this Agreement.

**5.7** **Information to Participating Parties:** The Operator shall, as soon as reasonably practicable, furnish each Participating Party the following information pertaining to well operations (provided such information was obtained or received by Operator):

(a) copy of the application for permit to drill and all amendments thereto;

(b) drilling and Workover reports, which shall include, but not be limited to, the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs of well operations conducted;

(c) complete report of all core data and analysis;

(d) copies of logs and surveys as run including all digitally recorded data;

(e) copies of well test results, bottomhole pressure surveys, Hydrocarbon analyses or similar information, including any PVT analyses;

(f) copies of reports made to regulatory agencies;

(g) 48 hours advance notice of logging, coring or testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

CONFIDENTIAL

APC-00741554

(h)     upon written request, and if sufficient quantities are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, access to the rig for a Participating Party requesting to inspect and evaluate said cores; and

(k)     samples of Hydrocarbons, if sufficient quantities are available, after performing routine tests.

Upon written request, the Operator shall use reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and risk). The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

**5.8    Completed Well Information:**    Operator shall as soon as reasonably practicable, furnish to each Participating Party the following information pertaining to each completed well:

(a)     monthly report of production and injection;

(b)     copies of routine reports made to regulatory agencies;

(c)     report on the status of wells not producing and not abandoned;

(d)     bottomhole pressure data and surface pressure data;

(e)     composite of all logs run (e.g., TDT, Carbon-Oxygen, Spinner Surveys, Casing Collar, etc.); and

(f)     reports of inventory.

CONFIDENTIAL                                    APC-00741555

**5.9** **Information to Non-Participating Parties:** The Operator shall furnish, as soon as reasonably practicable, to each Non-Participating Party (a) copies of all non-confidential reports made to regulatory agencies, and (b) after Complete Recoupment, if applicable, information specified in Articles 5.7 *(Information to Participating Parties)* and 5.8 *(Completed Well Information).* Prior to Complete Recoupment, a Non-Participating Party shall be entitled to review financial records pertaining to a Non–Consent Operation, to the extent necessary to conduct an audit of the Recoupment account and/or Underinvestment balance. A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles 5.7 and 5.8 above, or in this Article 5.9.

# ARTICLE 6– EXPENDITURES AND ANNUAL OPERATING PLAN

**6.1** **Basis of Charges to the Parties:** Except as otherwise provided, the Operator shall pay all the Costs of all activities and operations, and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest Share, for the Costs of such activities and operations. All charges, credits and accounting for expenditures shall be made pursuant to Exhibit "C". Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

**6.2** **AFEs:** The Operator shall not make any single expenditure or undertake any activity or operation costing three hundred thousand Dollars ($300,000) or more, unless an AFE has been included in a proposal for an activity or operation and such proposal has been approved by Vote, Election or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers authorized under this Agreement. An approved proposal grants the Operator the authority to commit or expend funds on the activity or operation approved in the proposal in accordance with this Agreement for the account of the Participating Parties. For any single expenditure in excess of one hundred thousand Dollars ($100,000), but less than three hundred thousand Dollars ($300,000), the Operator need not submit a proposal and an associated AFE, but shall furnish written information describing the expenditure to each of the Participating Parties. Notwithstanding the foregoing, in the event of an

CONFIDENTIAL

APC-00741556

emergency which poses a threat to life, safety, property or the environment the Operator is empowered to immediately make such expenditures for the Joint Account as, in its opinion as a reasonable and prudent Operator, are necessary to deal with the emergency. The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and action taken and the Costs incurred.

**6.2.1**    **AFE Overrun Notice:** For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with any separate AFE will exceed the original approved AFE or the latest approved supplemental AFE by more than ten (10)% or three hundred thousand dollars ($300,000), whichever is greater, but such over expenditure will not require submission of a supplemental AFE unless otherwise required under Article 6.2.2 (*Supplemental AFEs*); however, such informational AFEs will not be required when supplemental AFEs are required pursuant to Article 6.2.2 (*Supplemental AFEs*).

**6.2.2**    **Supplemental AFEs:** Except as provided in Article 6.2.3 *(Further Operations During a Force Majeure)* if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or its latest approved supplemental AFE will exceed the relevant Permitted Over-expenditure, as defined below, the Operator shall submit a supplemental AFE to the Participating Parties. Subject to Article 8.6.1 *(Well Proposals, Recompletions and Workovers)*, after receipt of the supplemental AFE each Participating Party has the right to make an Election as to its further participation in the approved activity or operation. If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with such supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE. Any Participating Party Electing not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs

CONFIDENTIAL                                                        APC-00741557

expended on the activity or operation exceed the Permitted Over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations (including plugging and abandonment) in the original AFE have been conducted by such time. A Non-Participating Party in a supplemental AFE is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation, except a Hydrocarbon Recoupment premium or an Underinvestment shall only apply to the Costs of the approved activity or operation not borne by such Non-Participating Party. If a supplemental AFE is not approved by Election, the Operator shall conclude the last authorized activity or operation in the well or the project to which the over-expended AFE pertained as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the operation or activity, including any Costs in excess of the Permitted Over-expenditure amount.

6.2.2.1    **Supplemental AFE for Cost Overruns on Wells and Well Operations At Objective Depth:** The Permitted Over-expenditure for the drilling of Exploratory Wells, Appraisal Wells or Development Wells, or operations in such wells subsequent to such wells reaching their Objective Depths, is an amount equal to ten percent (10%) of the original approved AFE for such well or subsequent operation or ten million dollars ($10,000,000), whichever is less.

6.2.2.2    **Supplemental AFE for Cost Overruns on Project Team AFE:** The Permitted Over-expenditure for the Project Team is an amount equal to ten percent (10%) of the original approved Project Team AFE or ten million dollars ($10,000,000), whichever is less.

CONFIDENTIAL                                                                                      APC-00741558

**6.2.2.3** <u>**Supplemental AFE for Cost Overruns on Final Design AFE:**</u>  The Permitted Over-expenditure for the Final Design AFE is an amount equal to ten percent (10%) of the original approved Final Design AFE or ten million dollars ($10,000,000), whichever is less.

**6.2.2.4** <u>**Supplemental AFE for Cost Overruns on Fabrication AFE:**</u> The Permitted Over-expenditure for the Fabrication AFE is an amount equal to ten percent (10%) of the Fabrication AFE or twenty million dollars ($20,000,000), whichever is less.

**6.2.3** <u>**Further Operations During a Force Majeure:**</u>  No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 *(Supplemental AFEs)* during a Force Majeure event or during an emergency which poses a threat to life, safety, property or the environment, but may make an Election not to participate in further activities or operations which are to be conducted after the termination of such Force Majeure or emergency.  Notwithstanding anything herein to the contrary, if Costs arising as a result of Force Majeure or emergency cause the amount of the latest approved AFE to be exceeded by more than the Permitted Over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit a supplemental AFE for the activities or operations which are to be conducted after termination of such Force Majeure or emergency to the Participating Parties in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in such activities or operations which are to be conducted after termination of such Force Majeure or emergency.

**6.3** <u>**Security Rights:**</u> Exhibit "F (LOUISIANA)" applies.

CONFIDENTIAL                                                                                    APC-00741559

### 6.4    Annual Operating Plan

**6.4.1    Effect and Content of Annual Operating Plan:** Beginning with the year following first production and each subsequent year thereafter, the Operator shall develop an Annual Operating Plan.   The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any expenditure or constitute a Vote, Election or unanimous agreement to participate in any specific activity or operation.   To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

**6.4.1.1    Capital Budget**

(a)    a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well (Development, Appraisal, etc.), purpose of well (production, injection, etc.) and estimated Costs;

(b)    capital Workovers, which are defined as any Workover operation conducted to Recomplete a well to a new zone or install artificial lift, listed by well, with their estimated Cost;

(c)    other capital projects requiring a gross expenditure greater than five million dollars ($5,000,000).  The term "capital project" includes addition of new equipment, expansion or upgrades of existing equipment; and

(d)    an estimated total amount (in aggregate) for capital projects.

CONFIDENTIAL                                                                                    APC-00741560

### 6.4.1.2  Expense Budget

(a)   expense Workovers, which are defined as any anticipated Workover operation which is not a capital Workover (such as repair work or reworks within the same zone), listed by well, with their estimated Cost;

(b)   all expense projects requiring a gross expenditure greater than five million dollars ($5,000,000). The term "expense project" includes repair, replacement, inspection and maintenance of existing equipment;

(c)   an estimated total amount (in aggregate) for expense projects; and

(d)   estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

### 6.4.1.3  Operator Forecasts and Informational Items:

(a)   production forecasts;

(b)   injection forecasts;

(c)   fuel gas forecasts;

(d)   scheduled or planned downtime exceeding three (3) days;

(e)   data collection programs;

(f)   any geochemical or geophysical survey(s) or special test(s) which might be contemplated; and

(g)   other areas deemed of significance by the Operator.

CONFIDENTIAL

APC-00741561

**6.4.2** **Submission of Draft Annual Operating Plan:** Beginning in the year in which a Development Plan is approved, and each subsequent year thereafter, the Operator shall develop and submit to the Non-Operating Parties, by July 1, a draft Annual Operating Plan for the next calendar year. The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses and capital expenditures.

**6.4.3** **Review of Draft Annual Operating Plan:** The Non-Operating Parties may provide suggested changes, additions or deletions to the Annual Operating Plan to the Operator and all other Parties in writing prior to August 1 of each year. The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than October 1 of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

## ARTICLE 7 – CONFIDENTIALITY OF DATA

**7.1** **Confidentiality Obligation:** Confidential Data acquired or obtained by any Party shall be kept confidential during the term of this Agreement and for an additional period of two (2) years after the termination of this Agreement, and shall not be disclosed to any third party, unless disclosed under Article 7.1.1 *(Exceptions to Confidentiality)* or Article 7.1.2 *(Permitted Disclosures)*. Each Party shall maintain the secrecy of the Confidential Data, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

**7.1.1** **Exceptions to Confidentiality:** The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

CONFIDENTIAL    APC-00741562

(a) are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party); or

(b) are now or later become available to a Party on a non-confidential basis from a source, other than a Party hereto, that is legally permitted to disclose the item of Confidential Data; or

(c) were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

(d) are independently developed by employees, Affiliate employees, or contractors of a Party who have not had access to the Confidential Data.

**7.1.2** **Permitted Disclosures**: The Operator may disclose items of Confidential Data to third parties as may be necessary to conduct activities and operations pursuant to this Agreement, provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than is set forth in this Agreement (or a lesser period if agreed by all Parties). Notwithstanding anything herein to the contrary and subject to the restrictions that: (a) the Confidential Data shall not be removed from the custody and premises of the disclosing Party, (excepting disclosure made pursuant to (a), (c), (d) and (e) below); and (b) the receiving party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Data:

(a) to any Affiliate of such Party provided such Affiliate is bound by the confidentiality provision contained herein and is not actively engaged in acquiring OCS oil and gas leases in competition with the Parties; or

(b) to any bona fide, financially responsible, prospective assignee of any portion of such Party's Working Interest (including but not

CONFIDENTIAL

APC-00741563

limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets on the OCS); or

(c)    to any potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of such Party and acting in a capacity where such disclosure is essential to such contractor's, consultant's, or outside legal counsel's work; or

(d)    to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or

(e)    to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding). If a Party is required to disclose any Confidential Data under this Article 7.1.2(e), such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy; provided, however, any Confidential Data routinely required to be given the MMS shall not require notice to the Parties. A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed; or

(f)    to an entity desiring to transport or purchase Hydrocarbons produced hereunder for the purpose of making Hydrocarbon reserve estimates and other technical evaluations.

**7.1.3**    **Limited Releases to Offshore Scout Association**: The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings. The Confidential Data that may be disclosed

CONFIDENTIAL                                                                APC-00741564

is limited to information concerning well locations, well operations and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

7.1.4 **Continuing Confidentiality Obligation:** Any Party who ceases to own a Working Interest remains bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement pursuant to Article 7.1 *(Confidentiality Obligation)*.

7.2 **Ownership of Confidential Data:** Except as otherwise provided for in this Article 7, all Confidential Data produced as a result of an activity or operation shall be the property of all Participating Parties in that activity or operation. A Non-Participating Party has no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until Complete Recoupment has taken place, except as provided in Article 5.9.

7.2.1 **Trades of Confidential Data:** Any Participating Party may propose the exchange or trade of any Confidential Data for other similar data or information owned by a third party. Upon approval of said exchange or trade by a Vote of the Participating Parties, such vote shall bind all Participating Parties, and the Operator, or such other Participating Party should the Operator be excluded, shall consummate such exchange or trade with the third party. The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to such exchange or trade.

7.2.2 **Ownership of Non-Consent Data:** After Complete Recoupment has taken place and a Non-Participating Party has become a Participating Party in an activity or operation, such Non-Participating Party shall become an owner of the Confidential Data and information resulting from such activity or operation. Within thirty (30) days of Complete Recoupment, the Operator shall furnish such information to the former Non-Participating Party.

CONFIDENTIAL

APC-00741565

**7.3** **Access to the Lease and Rig**: Except as provided in Article 6.3(b) *(Default)*, each Participating Party shall have the right to attend meetings between the Operator and any contractors designing or constructing the Production System or Facilities specified in the Fabrication AFE as well as access to the construction sites. Except as provided in Article 6.3 (b) *(Default)*, each Participating Party shall have access to any drilling rig, Production System or Facility to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto). Access by the Participating Party to any drilling rig, Production System or Facility serving a Contract Area shall be arranged through the Operator at least forty-eight (48) hours in advance (or, if conditions do not permit, as much advance notice as is reasonably possible). Each Party's access will be at its sole risk and expense and at reasonable times, provided such access does not unreasonably interfere with the operations being conducted at such site.

**7.4** **Development of Proprietary Information and/or Technology**: The ownership, use, treatment and disclosure of any proprietary information or technology including but not limited to drilling technology, production technology, production systems and facilities and their transportation and installation, pipelines, flowlines and offshore oil and gas transportation which are charged to the Joint Account shall be handled in accordance with Exhibit "G".

## ARTICLE 8-APPROVALS AND NOTICES

**8.1** **Classes of Matters**: Action will be taken on a proposed activity or operation only after the procedures and approval requirements set forth in this Agreement have been met. There are four general classes of activities or operations under this Agreement: (a) those requiring approval by Vote, (b) those requiring approval by Election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the Operator.

**8.1.1** **Voting and Electing Interest**: Subject to Article 6.3 (b) *(Default)*, each Party has a Voting interest or an Electing interest equal to its Working Interest or its Participating Interest Share, as applicable.

CONFIDENTIAL                                                                                       APC-00741566

**8.2** **Voting and Election Procedures:** The Parties shall Vote or make an Election on proposals requiring a Vote or Election in the order in which such proposals are submitted, except as specified in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)*. Subject to Article 6.2 *(AFEs)*, after receipt of a notice properly given for an activity or operation requiring a Vote or Election, the Parties entitled to make such Vote or Election (a) may Vote or make an Election in accordance with this Article 8.2 *(Voting and Election Procedures)* and Article 8.7 *(Giving and Receiving Notices and Responses)* or (b) shall be deemed to have Voted or made an Election in accordance with Article 8.6.5 *(Failure to Vote or Make an Election)*.

A Vote or Election to participate in a proposal is evidenced by a Party making a written affirmative response to the proposal or by a Party's execution of the AFE associated with the proposal. Unless otherwise provided in this Agreement, a Vote or Election not to participate in a proposal is evidenced by a Party's written negative response to the proposal, a Party's failure to make a timely written affirmative response to the proposal or timely execute the AFE, or a Party's failure to timely make a subsequent Vote or Election as set forth in Article 8.3 *(Second Opportunity)*.

**8.2.1** **Approval by Vote:** Approval by Vote shall be decided by a Vote of the Parties as follows:

(a)     when one Party or two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of one or more Parties with a Voting interest of fifty-one percent (51%) or more, or if two Parties entitled to Vote have equal Voting interests, the affirmative Vote of all Parties entitled to Vote.

(b)     when more than two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of two (2) or more Parties entitled to Vote with a combined Voting interest of fifty-one percent (51%) or more.

CONFIDENTIAL                                                                            APC-00741567

**8.2.2** **Approval by Election:** When one (1) Party or two (2) Parties are entitled to make an Election, approval by Election shall be decided by an affirmative Election by one or more Parties entitled to make an Election with a combined Electing interest of twenty-five percent (25%) or more. However, in the event there are more than two (2) Parties to this Agreement or more than two (2) Parties entitled to make an Election, approval by Election shall be decided by an affirmative Election by two (2) or more Parties with a combined Electing interest of fifty percent (50%) or more.

**8.3** **Second Opportunity to Participate:** Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by Vote or Election but is not approved by all of the Parties, a Party who Voted or Elected not to participate in the approved activity or operation shall have the right to make a subsequent Vote or Election to participate in the approved activity or operation within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the original Voting or Election results from the Operator; provided however, if a drilling rig is on location and charges are accumulating with respect to such proposed operation, the Election period shall be forty-eight (48) hours inclusive of Saturdays, Sundays, and federal holidays. If a Party does not exercise its right to make a subsequent Vote or Election to participate, it shall be deemed to have Voted or Elected not to participate in the approved activity or operation. If (a) all the Parties entitled to do so make an original Vote or Election or a subsequent Vote or Election to participate in a proposed activity or operation or (b) an approval by Vote is binding on all Parties, then the Operator shall commence the activity or operation in accordance with the applicable timely operations provisions of this Agreement.

**8.4** **Participation by Fewer Than All Parties:** If, after the period in which a Party may make a subsequent Vote or Election to participate, there is at least one Non-Participating Party in the approved activity or operation, each Party who made an original or a subsequent Vote or Election to participate in the approved activity or operation shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the subsequent Voting or Election results,

CONFIDENTIAL

APC-00741568

(a)    limit its participation in the approved activity or operation to its Working Interest share, or

(b)    agree to bear its Participating Interest Share of the approved activity or operation

by written correspondence to the Operator.    Notwithstanding the foregoing, if a drilling rig is on location and charges are accumulating with respect to such proposed operation, the Parties shall respond within forty-eight (48) hours inclusive of Saturdays, Sundays, and federal holidays.    Failure to submit such written correspondence shall be deemed a written correspondence under (a). Once the Parties, who made an original or a subsequent Vote or Election to participate in an approved activity or operation in which there is a Non-Participating Party, agree to bear all of the Costs of the approved activity or operation, the Operator shall commence the activity or operation at the sole Cost and risk of the Participating Parties in accordance with the applicable timely operations provisions of this Agreement.    Notwithstanding the foregoing, the Election periods provided for in Article 10.2.1, 11.2.1 and 13.2.1 shall govern in the event of a conflict.

**8.5    <u>Approval by Unanimous Agreement</u>:**  After receipt of a notice properly given for an activity or operation requiring unanimous agreement, each Party entitled to approve (or disapprove) such activity or operation may indicate its approval or disapproval by providing a written statement in accordance with Article 8.7 *(Giving and Receiving Notices and Responses)*.  Unless otherwise specifically provided, failure of a Party to give its response or approval in accordance with Article 8.7 *(Giving and Receiving Notices and Responses)* is deemed its disapproval.

**8.6    <u>Response Time for Notices</u>:**  After receipt of an AFE or notice pursuant to this Article 8, the Parties may (a) submit their Vote or (b) make an Election or (c) submit a written statement as described in Article 8.5 *(Unanimous Agreement)*, whichever is applicable.  If requested in writing by a Party entitled to (a) submit their Vote or (b) make an Election or (c) submit a written statement on an AFE or notice, the Operator shall give prompt notice of the results of such Voting, Elections or written statements to each Party entitled to Vote or make an Election

CONFIDENTIAL                                                                        APC-00741569

or submit a written statement. Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

**8.6.1** **Well Proposals, Deepening, Sidetrack, Recompletions and Workovers:** When any proposed well, Deepening, Sidetrack, Recompletion or Workover does not require construction or acquisition of a Development System, each Party entitled to Vote or make an Election or submit a written statement as described in Article 8.5 *(Unanimous Agreement),* whichever is applicable, has thirty (30) days (sixty (60) days for the first Exploratory Well) after receipt of the proposal to respond to it. When a drilling rig is on location and standby charges are accumulating and if a Party who is entitled to do so has proposed a substitute well (for which said substitute well is proposed to be commenced while the rig is on location) or a supplemental AFE to a well or a subsequent operation, or a Deepening, Sidetrack, Recompletion or Workover in or through the same well bore in which the previous operation was conducted, a Party entitled to Vote or make an Election or submit a written statement as described in Article 8.5 *(Unanimous Agreement),* has forty-eight (48) hours after receipt of the proposal (exclusive of Saturdays, Sundays and federal holidays) to respond to it. The response times for operations at Objective Depth are set forth in Article 10.2 *(Exploratory Operations at Objective Depth),* *Article* 11.2 *(Appraisal Operations at Objective Depth), and Article* 13.2 *(Development Operations at Objective Depth).*

**8.6.2** **Development System Construction:** Each Party entitled to make an Election on a Fabrication AFE has one hundred and twenty (120) days from the date of its receipt of the Fabrication AFE to make such Election.

**8.6.3** **Other AFE Related Operations:** Except as otherwise provided in Articles 8.6.1 *(Well Proposals, Deepening, Sidetrack, Recompletions and Workovers)* and 8.6.2 *(Development System Construction),* the response time to a proposed activity or operation will depend upon the gross AFE amount. Response times will be as follows:

CONFIDENTIAL

APC-00741570

(a)     AFE of $300,000 or more but less than $20,000,000; response will be made within thirty (30) days after receipt of said proposal.

(b)     AFE of $20,000,000 or more but less than $50,000,000; response will be made within ninety (60) days after receipt of said proposal.

(c)     AFE of $50,000,000 or more; response will be made within one hundred and twenty (120) days after receipt of said proposal.

**8.6.4**     **Other Proposals:**  For all other proposals requiring notice, and any supplemental AFEs other than those subject to Article 8.6.1 *(Well Proposals, Recompletions and Workovers)*, each Party has thirty (30) days after receipt of the proposal to respond to it.

**8.6.5**     **Failure to Vote or Make an Election:**  Unless otherwise specifically provided, failure of a Party to Vote or make an Election, whichever is applicable, within the period required by this Agreement is deemed to be a Vote or Election not to participate.

**8.6.6**     **Suspensions of Operations and Suspensions of Production:**  Anything in Article 8.6 *(Response Time for Notices)* notwithstanding, if the MMS grants a Suspension of Production ("SOP"), a Suspension of Operations ("SOO"), or similar regulatory grant, for all or any part of the Contract Area, and the SOP, SOO, or grant requires the commencement of an activity or operation, prior to the expiration of the period for Voting, making an Election, or submitting a written statement as described in Article 8.5 *(Unanimous Agreement)* for such activity or operation, the Parties shall cast their Votes or make their Elections or submit a written statement on the activity or operation at least fifteen (15) days prior to the commencement date required in the SOO, SOP, or grant.

**8.6.7**     **Standby Costs:**  When an operation has been completed as authorized, or terminated pursuant to this Agreement, Costs incurred pending a Vote or Election on a proposal to conduct another operation

CONFIDENTIAL

APC-00741571

in the well shall be charged to and borne by the Participating Parties in the operation just completed or terminated. All Costs incurred after the final Vote or Election being made or the expiration of the Voting or Election period, whichever occurs first, are the responsibility of the Participating Parties in the subsequent operation. Costs incurred subsequent to the final Vote or Election being made, or expiration of the Voting or Election period, and prior to agreement as to the Participating Interest of the Participating Parties shall be charged to and borne as part of the proposed subsequent operation, but if the proposal is withdrawn, such Costs shall be allocated between the Participating Parties in the proposed subsequent operation in proportion to their respective Working Interest.

8.7    <u>**Giving and Receiving Notices and Responses**</u>: Except as otherwise provided in this Agreement, all notices and responses required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A". A notice is deemed delivered only when received by the Party to whom it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received. "Receipt" of a written notice, means actual delivery of the notice to the Party's address or transmission to the facsimile number set forth in Exhibit "A". A response is deemed delivered when it is deposited in the United States mail, delivered to a courier, transmitted by facsimile transmission, or is personally delivered to a Party.

However, when a drilling rig is on location and charges are accumulating, notices or responses pertaining to operations utilizing such drilling rig shall be given orally or by telephone. "Receipt" of an oral or telephone notice, means actual and immediate communication to the Party to be notified. All telephone or oral notices or responses permitted by this Agreement shall be confirmed immediately thereafter by facsimile transmission. A message left on an answering machine or with an answering service or other third person is not adequate telephone or oral notice or response. If a Party is unavailable to receive a notice or a response is required to be given orally or by telephone, the

CONFIDENTIAL                                                           APC-00741572

notice or response may be delivered by any other method specified in this Article 8.7.

**8.8    Content of Notices:**  A notice requiring a response shall indicate the appropriate response time specified in Article 8.6 *(Response Time for Notices)*.  A well proposal notice shall include the type of well being proposed, i.e., Exploratory Well, Appraisal Well, or Development Well, a Well Plan and an AFE which shall include the Costs of permanently plugging and abandoning the well.  If a proposed activity or operation is subject to Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, the notice shall specify that the proposal is a Lease maintenance activity or operation.

**8.9    Designation of Representatives:**  The names, addresses, and telephone and facsimile numbers of a designated *representative* and alternate for each Party to whom notices or responses shall be directed, are set forth in Exhibit "A".  The designated representative or alternate may be changed by written notice to the other Parties.

**8.10    Meetings:**  Any Party may call a meeting.  Except in an emergency, no meeting shall be called on less than ten (10) days advance notice and such notice shall include a proposed agenda.  The Operator shall be chairman of each meeting and take minutes of each meeting.  Only matters included in the agenda may be Voted on at a meeting unless unanimously agreed to by all the Parties entitled to Vote or make an Election on such additional proposed items.

**8.11    Obligations of Well Participation:**  Subject to Article 6.2 *(AFEs)*, a Participating Party in an Exploratory Well, an Appraisal Well or a Development Well is responsible for its Participating Interest Share of all necessary Costs set forth in the original well AFE, which shall include only the Cost to drill, test (except Production Testing), and log the well to its Objective Depth, or shallower depth if applicable, and to plug and abandon the well.

## ARTICLE 9 – NEWS RELEASES

CONFIDENTIAL                                                                                                    APC-00741573

9.1    **Proposal of News Releases:** Any Party may propose to the other Parties the issuance of a news release to the media concerning activities or operations covered by this Agreement, and such news release shall require approval by Vote.

9.1.1    **Operator's News Release:** The Operator has an exclusive thirty (30) day period, commencing immediately after a proposed news release is not approved by Vote, in which to issue a basic news release to the media. A basic news release does not require approval by Vote and its content is restricted to the following information:

(a)    name of well and water depth

(b)    location of well by area, block, and adjacent state

(c)    lease bonus paid and lease acquisition date

(d)    tested interval(s), if applicable

(e)    test(s) results, if applicable

(f)    participants and percentages of working interest

(g)    acreage controlled.

The Operator will transmit the basic news release to the Non-Operating Parties not less than seventy-two (72) hours (exclusive of Saturdays, Sundays, and federal holidays) before it is to be issued to the media. Any Party may have its name excluded from the proposed basic news release by notifying the Operator of that desire within forty-eight (48) hours of its receipt of the proposed basic news release.

9.1.2    **Non-Operating Party's News Release:** If the Operator does issue a basic news release to the media within its exclusive period set forth in Article 9.1.1 *(Operator's News Release),* any other Participating Party may prepare and issue its own basic news release, using the content guidelines and procedures set forth in Article 9.1.1 *(Operator's News Release),* simultaneously with or following the Operator's basic news

CONFIDENTIAL    APC-00741574

release.  If the Operator does not issue a basic news release to the media within its exclusive period set forth in Article 9.1.1 *(Operator's News Release)*, any other Participating Party may prepare and issue its own basic news release, using the content guidelines and procedures set forth in Article 9.1.1 *(Operator's News Release)*.

**9.2**  **Emergency News Releases:**  In an emergency involving extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the Parties, the Operator may furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction.  The Operator shall promptly notify the Parties of the information furnished in response to the emergency.

# ARTICLE 10 – EXPLORATORY OPERATIONS

**10.1**  **Proposal of an Exploratory Well:**  Any Party may propose the drilling of an Exploratory Well within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all the other Parties.  Any proposal for the drilling of an Exploratory Well requires approval by Election.  Any Non-Participating Party in an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.  If in response to a proposal from a Non-Operating Party, the Operator counter-proposes an alternative Exploratory Operation within thirty (30) days of a proposal by any other Party or Parties, the alternative Exploratory Operation proposed by Operator shall take precedence for consideration over any other proposed Exploration Operation.  If fewer than all Parties Elect to participate in the proposed Exploratory Operation or alternative Exploratory Operation, each Party who originally elected not to participate shall, after receipt of such Election results, make a subsequent Election under Article 8.3, if applicable.  Thereafter, the Participating Parties shall, after receipt of all such Election results, make an Election under Article 8.4.  After all participation elections have been made, the Operator (or substitute Operator) shall commence the approved Exploratory Operation at the sole Cost and risk of the Participating Parties and the remaining proposals shall be deemed withdrawn. A

CONFIDENTIAL

APC-00741575

Non-Participating Party in an Exploratory Operation will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 (Non-Consent Operations).

Any proposal for an Exploratory Operation must include a commitment by the proposing Party to provide access to a suitable drilling unit or vessel capable of drilling the proposed well within the time frames allowed by this Agreement for timely operations. Any proposal that does not include timely access to suitable drilling equipment shall be considered invalid. No Party shall be compelled to provide access to drilling rigs under contract to it by way of a proposal for operations from another Party. Any drilling unit or vessel proposed to be utilized to drill a well on the Contract Area must be capable of operating in environments expected to be encountered on the Contract Area and within the time schedule for the operations to be conducted.

**10.1.1**  **Revision of Well Plan:**  Any revisions to the approved Well Plan or AFE proposed prior to the commencement of actual drilling operations on an Exploratory Well shall require the unanimous agreement of the Participating Parties. In the absence of such unanimous agreement on a proposed revision to the Well Plan or AFE, the latest approved Well Plan and AFE will stand as approved.

**10.1.2**  **Automatic Revision of the Well Plan:**  During the drilling of an Exploratory Well, the Well Plan may be revised by the Operator as is necessary for it to employ prudent oilfield practices or to conduct safe operations, and, except as provided in Article 6.2.2 (Supplemental AFEs), such revisions will not require the approval of the Participating Parties as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE.

**10.1.3**  **Timely Operations:**  Actual drilling operations on an Exploratory Well shall be commenced within two hundred seventy (270) days from the conclusion of the period for the approval of an Exploratory Well, and prior to the expiration/termination deadline (including any extensions thereof granted by the MMS) of the Lease on which the Exploratory Well is being drilled if such Lease is in jeopardy of expiring/terminating.

CONFIDENTIAL                                                                  APC-00741576

In all events, including the occurrence of a Force Majeure, if the Operator does not commence actual drilling operations on an Exploratory Well within two hundred seventy (270) days from the conclusion of the period for the approval of an Exploratory Well, the proposal of an Exploratory Well and its approval will be deemed withdrawn. If an Exploratory Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Exploratory Well will be chargeable to the Participating Parties.

10.1.4    **AFE Overruns and Substitute Well**: Once an Exploratory Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)    any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs )* or

(b)    the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

(c)    the Participating Parties unanimously agree to cease drilling an Exploratory Well before reaching Objective Depth.

If an Exploratory Well is abandoned due to the conditions described under Article 10.1.4(b) or (c), then any Participating Party in the abandoned Exploratory Well may, within one hundred eighty (180) days from the decision to abandon the Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Exploratory Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Exploratory Well. Notwithstanding the provisions of Article 10.4 *(Conclusion of Exploratory Operations)* to the contrary,

CONFIDENTIAL                                    APC-00741577

such substitute well shall be an Exploratory Well. The Well Plan for the substitute Exploratory Well shall be substantially the same as the Well Plan for the abandoned Exploratory Well and shall also take into account those conditions which rendered further drilling of the abandoned Exploratory Well impractical.

Any Non-Participating Party in a substitute Exploratory Well or an approved supplemental AFE for an Exploratory Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* and Article 6.2.2. *(Supplemental AFEs)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation. If a Non-Participating Party in a substitute Exploratory Well was also a Non-Participating Party in the abandoned Exploratory Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Exploratory Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations)*. In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Exploratory Well and the substitute well.

Notwithstanding anything to the contrary in this Agreement, in the event a Non-Operating Participating Party in an Exploratory Well abandoned pursuant to Article 10.1.4(b) or (c) above, proposes a substitute well, in the form of an AFE, while the rig is on location and proposes the substitute well commence drilling operations prior to rig release from the Contract Area, the Operator, at its sole option and discretion, in the event the rig is under a long term contract with the Operator and/or a multi-well/slot contract with the Operator for future wells and has been on location for more than thirty (30) days, shall have the exclusive and unilateral right to release the rig from the Contract Area and not utilize said rig to drill the proposed substitute well. In such event, said substitute well proposal AFE shall have no further force and effect.

CONFIDENTIAL

APC-00741578

**10.2** <u>**Exploratory Operations at Objective Depth**</u>: After an Exploratory Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 10.2, of its proposal to conduct subsequent operations in the well. Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include the associated AFE and the plan for the operation. The Parties entitled to make such Election hereunder are the Participating Parties.

The Operator's proposal shall be for one of the following operations:

(a) conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b) by-pass to core the formations encountered;

(c) Deepen the well to a new Objective Depth (however, if in the Operator's sole opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth);

(d) Sidetrack the well;

(e) conduct Production Testing;

(f) conduct other operations on the well not listed;

(g) temporarily abandon the well; or

(h) permanently plug and abandon the well.

If an Exploratory Well is temporarily abandoned under (g), then any additional operation in such well shall be proposed as a new well operation. A proposal to complete an Exploratory Well which has been temporarily abandoned under (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the

CONFIDENTIAL

APC-00741579

Exploratory Well, then any Participating Party may make a proposal. In such event, the procedures set forth in this Article 10.2 shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

**10.2.1** <u>**Response to Operator's Proposal:**</u> A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with the associated AFE and the plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 10.2 *(Exploratory Operations at Objective Depth)*, and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made. If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*. If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 10.3 *(Permanent Plugging and Abandonment and Cost Allocation)* or Article 18.1 *(Abandonment of Wells)* shall apply to such proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer than All Parties)*, or both, apply to any Election in Article 10.2 *(Exploratory Operations at Objective Depth)*, then the response period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in

CONFIDENTIAL                                                    APC-00741580

**10.2.4** <u>**Non-Participating Parties in Exploratory Operations at Objective**</u> <u>**Depth**</u>:    A Non-Participating Party in an Exploratory Operation at Objective Depth [as provided for in this Article 10.2 *(Exploratory Operations at Objective Depth)*] is subject to Article 16.5.1 *(Non-Consent Exploratory Operations)* and is relieved of the Costs and risks of such Exploratory Operation, except as to its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.1 *(Non-Consent Exploratory Operations)* shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing.   The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing the well bore to core the formations encountered, or Production Testing shall not be entitled to the information resulting from such operation.   A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in any subsequent Deepening and/or Sidetracking and/or any subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**10.2.5** <u>**Participation in a Sidetrack or Deepening by a Non-Participating**</u> <u>**Party in an Exploratory Well at Initial Objective Depth**</u>:    A Non-Participating Party does not have the right to participate (until recoupment) in the Deepening or Sidetracking of an Exploratory Well proposed and conducted pursuant to Article 10.

**10.3** <u>**Permanent Plugging and Abandonment and Cost Allocation**</u>:    The permanent plugging and abandonment of an Exploratory Well which:

(a)        is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 10.1.4 (b), or

(b)        is to be plugged and abandoned in accordance with Article 10.2 *(Exploratory Operations at Objective Depth)*, or

CONFIDENTIAL                                                                APC-00741581

(c)      has been previously temporarily abandoned in accordance with Article 10.2 (*Exploratory Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote. Approval to plug and abandon an Exploratory Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*). If a proposal to plug and abandon an Exploratory Well receives such approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the Exploratory Well. If a rig is on location and a proposal to plug and abandon an Exploratory Well under either Article 10.3(a) or 10.3(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled to make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of the proposal to permanently plug and abandon the well, the Operator may nevertheless proceed to plug and abandon the Exploratory Well and shall notify each Participating Party of that fact. If the proposal to plug and abandon any Exploratory Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon the Exploratory Well and shall notify each Participating Party of that fact.

The Participating Parties in the Exploratory Well AFE shall pay all Costs of plugging and abandoning the Exploratory Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.2 (*Exploratory Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFEs*). The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

**10.4   Conclusion of Exploratory Operations:** Except as provided in Article 10.1.4 (*AFE Overruns and Substitute Well*) after the permanent or temporary

CONFIDENTIAL                                    APC-00741582

abandonment of the first Producible Well and the release of the rig from such Producible Well, Exploratory Operations conclude, and all subsequent operations in the Contract Area are either Appraisal Operations or Development Operations.

# ARTICLE 11 – APPRAISAL OPERATIONS

## 11.1 Proposal of Appraisal Wells:

(a) After the conclusion of Exploratory Operations, any Party may propose the drilling of an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Parties. Each proposed Appraisal Well requires approval by Election. Any Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

(b) If in response to a proposal from a Non-Operating Party, the Operator counter-proposes an alternative Appraisal Operation within thirty (30) days of a proposal by any other Party or Parties, the alternative Appraisal Operation proposed by Operator shall take precedence for consideration over any other proposed Appraisal Operation provided Operator's proposal is approved by Election with a higher cumulative affirmative Election than the proposal made by such Non-Operating Party. If fewer than all Parties Elect to participate in the proposed Appraisal Operation or alternative Appraisal Operation, each Party who originally elected not to participate shall, after receipt of such Election results, make a subsequent Election under Article 8.3, if applicable. Thereafter, the Participating Parties shall, after receipt of all such Election results, make an Election under Article 8.4. After all Participation elections have been made, the Operator (or substitute Operator) shall commence the approved Appraisal Operation at the sole Cost and risk of the Participating Parties and the remaining proposals shall be deemed withdrawn. Any Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*. Any proposal for an Appraisal Operation must include a commitment by the

CONFIDENTIAL                                                                                    APC-00741583

proposing Party to provide access to a suitable drilling unit or vessel capable of drilling the proposed well within the time frames allowed by this Agreement for timely operations. Any proposal that does not include timely access to suitable drilling equipment shall be considered invalid. No Party shall be compelled to provide access to drilling rigs under contract to it by way of a proposal for operations from another Party. Any drilling unit or vessel proposed to be utilized to drill a well on the Contract Area must be capable of operating in environments expected to be encountered on the Contract Area and within the time schedule for the operations to be conducted.

**11.1.1** **Revision of Well Plan:** Any revisions of the Well Plan or AFE for an Appraisal Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.1 *(Revision of Well Plan)*.

**11.1.2** **Automatic Revision of the Well Plan:** The Well Plan for an Appraisal Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Automatic Revision of the Well Plan)*.

**11.1.3** **Timely Operations:** Actual drilling operations on an Appraisal Well shall be commenced within two hundred seventy (270) days from the conclusion of the period for approval of an Appraisal Well, and prior to the expiration/termination deadline (including any extensions thereof granted by the MMS) of the Lease on which the Appraisal Well is being drilled if such Lease is in jeopardy of expiring/terminating. In all events, including the occurrence of a Force Majeure, if the Operator does not commence actual drilling operations on an Appraisal Well within two hundred seventy (270) days from the conclusion of the period for approval of an Appraisal Well, the proposal of an Appraisal Well and its approval will be deemed withdrawn. If an Appraisal Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Appraisal Well will be chargeable to the Participating Parties.

CONFIDENTIAL                                                                    APC-00741584

**11.1.4** **AFE Overruns and Substitute Well:**   Once an Appraisal Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)     any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs )* or

(b)     the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

(c)     the Participating Parties unanimously agree to cease drilling an Appraisal Well before reaching Objective Depth.

If an Appraisal Well is abandoned due to the conditions described under Article 11.1.4(b) or (c), then any Participating Party in the abandoned Appraisal Well may, within one hundred eighty (180) days from the decision to abandon  such Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Appraisal Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Appraisal Well. Notwithstanding any contrary provision of Article 11.5, the substitute well shall be an Appraisal Well. The Well Plan for the substitute Appraisal Well shall be substantially the same as the abandoned Appraisal Well's Well Plan and shall also take into account those conditions which rendered further drilling of the abandoned Appraisal Well impractical.

Any Non-Participating Party in a substitute Appraisal Well or an approved supplemental AFE for an Appraisal Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)*

CONFIDENTIAL                                                                    APC-00741585

and Article 6.2.2. (*Supplemental AFEs*) that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation. If a Non-Participating Party in a substitute Appraisal Well was also a Non-Participating Party in the abandoned Appraisal Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Appraisal Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations)*. In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Appraisal Well and the substitute well.

Notwithstanding anything to the contrary in this Agreement, in the event a Non-Operating Participating Party in an Appraisal Well abandoned pursuant to Article 11.1.4(b) or (c) above, proposes a substitute well while a rig is on location and proposes the substitute well commence drilling operations prior to rig release from the Contract Area, the Operator, at its sole option and discretion, in the event the rig has been on location for more than thirty (30) days, shall have the exclusive and unilateral right to release the rig from the Contract Area and not utilize said rig to drill the proposed substitute well. In such event, said substitute well proposal AFE shall have no further force and effect.

11.2 **Appraisal Operations at Objective Depth:** After an Appraisal Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 11.2, of its proposal to conduct subsequent operations in the well. Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include

CONFIDENTIAL

APC-00741586

the associated AFE and the plan for the operation. The Parties entitled to make such Election hereunder are the Participating Parties.

The Operator's proposal shall be for one of the following operations:

(a)     conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)     by-pass to core the formations encountered;

(c)     Sidetrack the well;

(d)     Deepen the well to a new Objective Depth;

(e)     conduct Production Testing;

(f)     conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

(h)     permanently plug and abandon the well.

If the Appraisal Well is temporarily abandoned under (g), then any additional operation in such well shall be proposed as a new well operation. A proposal to complete an Appraisal Well which has been temporarily abandoned under (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the Appraisal Well, then any Participating Party may make a proposal. In such event, the procedures set forth in this Article 11.2 shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

**11.2.1    Response to Operator's Proposal:** A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate

CONFIDENTIAL                                          APC-00741587

proposal (along with the associated AFE and the plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 11.2 (*Appraisal Operations at Objective Depth*), and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made. If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 11.2.2 (*Response to Highest Priority Proposal*). If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 11.4 (*Permanent Plugging and Abandonment and Cost Allocation*) or Article 18.1 (*Abandonment of Wells*) shall apply to such proposal. If Article 8.3 (*Second Opportunity to Participate*) or Article 8.4 (*Participation by Fewer than All Parties*), or both, apply to any Election in Article 11.2 (*Appraisal Operation at Objective Depth*), then the response period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in Article 11.2 (*Appraisal Operations at Objective Depth*) of the information resulting from the previously approved operation. Notwithstanding anything to the contrary in this Article 11.2, in the event the Operator has a long term and/or multiple-slot-use contract with the drilling rig being utilized, the Operator shall have the right, at its sole option and discretion, to limit the number of geologic Sidetracks performed pursuant to Article 11.2, but in no event shall the Operator

CONFIDENTIAL

APC-00741588

have the right, unless otherwise provided in this Agreement, to limit the number of geologic Sidetracks to less than one (1).

**11.2.2** **Response to Highest Priority Proposal:** If a separate proposal is made, each Party entitled to make an Election hereunder shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 11.2(a) has the highest priority, and Article 11.2(h) has the lowest priority. If different depths or locations are proposed for the same type of operation under Article 11.2 (c), (d) or (e), preference shall be given to the deepest depth, or the location farthest from the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure set forth in Article 11.2 *(Appraisal Operations at Objective Depth)* for any other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

**11.2.3** **Response on Next Highest Priority Proposal:** If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon the Appraisal Well.

**11.2.4** **Non-Participating Parties in Appraisal Operations at Objective Depth:** A Non-Participating Party in an Appraisal Operation at Objective Depth [as provided for in this Article 11.2 *(Appraisal Operations at Objective Depth)*] is subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* and is relieved of the Costs and risks of such Appraisal Operation at Objective Depth, except as to its Participating Interest Share of the Costs of plugging and abandoning

CONFIDENTIAL    APC-00741589

the Appraisal Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.2 *(Non-Consent Appraisal Operations)* shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing. The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing the well bore to core the formations encountered, or Production Testing shall not be entitled to the information resulting from such operation. A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in any subsequent Deepening and/or Sidetracking and/or any subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**11.2.5** **Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth:** A Non-Participating Party does not have the right to participate (until recoupment) in the Deepening or Sidetracking of an Appraisal Well proposed and conducted pursuant to Article 11 (proposed with a rig on location). However, a Non-Participating Party is afforded the right (assuming the requisite approvals have already been obtained) to participate in re-entering a temporarily abandoned Appraisal Well that has been approved to be Deepened or Sidetracked.

**11.3** **Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir:** Any Party may propose an Appraisal Well with an Objective Depth below the Deepest Producible Reservoir, and in response to such well proposal each Party may in writing limit its participation in the drilling of the Appraisal Well to the base of the Deepest Producible Reservoir to be penetrated by the Appraisal Well. A Party who limits its participation in an Appraisal Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling the Appraisal Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party in the Appraisal Well for all depths between

CONFIDENTIAL

APC-00741590

the stratigraphic equivalent of the base of the Deepest Producible Reservoir and the Objective Depth of the Appraisal Well and shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* in regard to operations between those depths. The provisions of Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* and Article 13.3.2 *(Completion Attempts At or Above the Deepest Producible Horizon)* shall also apply to operations that are conducted pursuant to this Article 11.3.

**11.4** **Permanent Plugging and Abandonment and Cost Allocation:** The permanent plugging and abandonment of an Appraisal Well which:

(a)     is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 11.1.4 (b), or

(a)     is to be plugged and abandoned in accordance with Article 11.2 *(Appraisal Operations at Objective Depth)*, or

(b)     has been previously temporarily abandoned in accordance with Article 11.2 *(Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote. Approval to plug and abandon an Appraisal Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon an Appraisal Well receives such approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraisal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.4(a) or 11.4(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of the proposal to permanently plug and abandon the well, the Operator may nevertheless proceed

Page 59 of 191

CONFIDENTIAL                                                                                      APC-00741591

to plug and abandon of the Appraisal Well and shall notify the Participating Parties of that fact. If the proposal to plug and abandon any Appraisal Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon of the Appraisal Well and shall notify the Participating Parties of that fact.

The Participating Parties in the Appraisal Well AFE shall pay all Costs of plugging and abandoning the Appraisal Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Appraisal Operations at Objective Depth)* or Article 6.2.2. *(Supplemental AFEs)*. The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

**11.5** **Conclusion of Appraisal Operations:** Except as provided for in Article 11.6 *(Operations Prior to the Approval of the Development Plan)* and in Article 12.15.2 *(Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations)*, upon the earlier of:

(a) the approval of the conclusion of Appraisal Operations by Vote; or

(b) the point in time when no Appraisal Operation has been approved within a period of twelve (12) months from the rig release (or cessation of operations) from the previous Appraisal Operation; or

(c) twenty-four (24) months from the conclusion of Exploratory Operations, provided no Appraisal Operation has been approved prior to the end of such twenty-four (24) month period,

Appraisal Operations for the ensuing Development Phase shall conclude and all subsequent operations in the Contract Area will be Development Operations for the ensuing Development Phase, including operations on temporarily abandoned Exploratory or Appraisal Wells. However, if an Appraisal Operation is being conducted at the occurrence of either (a), (b) or (c) above, Appraisal Operations

CONFIDENTIAL                                           APC-00741592

for the ensuing Development Phase shall conclude when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned.

**11.6** **Operations Prior to the Approval of the Development Plan:** After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but prior to the approval of a Development Plan for the ensuing Development Phase, any Party may propose the drilling of an additional well as an Appraisal Well. Provided however that, unless the provisions of Article 16.4 *(Non-Consent Operations to Maintain the Contract Area)* apply to such proposed well, such proposal shall require the Vote of the Parties. Any substitute well for and any operations upon reaching Objective Depth, conducted in or through the well bore of such well, shall be deemed Appraisal Operations, and shall be proposed, approved and conducted accordingly.

# ARTICLE 12 – DEVELOPMENT PLAN

**12.1** **Phased Development Plans:** If the results of Exploratory Operations or Appraisal Operations justify the development of one or more Producible Reservoirs within the Contract Area, the Operator may prepare on behalf of the Parties a Development Plan in order to commence the development of the Contract Area. In view of the Costs and scope of each Development Plan for the Contract Area, the Parties may agree to undertake an initial Development Phase and one or more subsequent Development Phases. Each Development Phase will be centered upon the installation of a new Development System for the Contract Area. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be generated, approved and implemented pursuant to this Article 12 *(Development Plan)*.

**12.2** **Project Team Proposal:** For a period of twelve (12) months from the conclusion of Appraisal Operations as provided in (a), (b), or (c) of Article 11.5 *(Conclusion of Appraisal Operations)*, the Operator has the exclusive right to propose the formation of a Project Team and submit a Project Team AFE. If the Operator does not propose the formation of a Project Team and submit a Project Team AFE during its exclusive period, then any Party may propose the formation of a

CONFIDENTIAL

APC-00741593

Project Team and submit a Project Team AFE. The Project Team AFE shall be accompanied by a memorandum describing, in sufficient detail to allow the Parties to make an informed decision concerning their participation in the Project Team, the anticipated scope of the work to be undertaken by the Project Team, including, but not limited to, the estimated type and number of staff required to complete the Project Team's assignment and the estimated duration of the Project Team. The formation and administration of the Project Team will be handled in accordance with Exhibit "G". All Project Team Costs will be handled in accordance with Exhibit "C". No Party may propose the formation of a Project Team and submit a Project Team AFE for a Development Phase until such time as any previously formed Project Team for that Development Phase has terminated in accordance with the provisions of Article 12.2.2 *(Project Team Termination)*.

12.2.1    **Project Team Approval**: A Project Team proposal requires approval by Election. Any Non-Participating Party in the Project Team proposal is subject to Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs, or Development Plan)*.

12.2.2    **Project Team Termination**: A Project Team formed to work on a Development System terminates as provided in Section 3.3 of Exhibit "G".

12.3    **Proposal of a Development Plan**: The Operator has the exclusive right for a period of twelve (12) months from the conclusion of the response period for an approved Project Team proposal to submit a Development Plan for the Parties' review and approval. If no Party submits a Project Team proposal or if no Project Team proposal is approved, then the Operator has the exclusive right to propose a Development Plan for a period of eighteen (18) months following the conclusion of Appraisal Operations as provided in (a), (b) or (c) of Article 11.5 *(Conclusion of Appraisal Operations)*, whichever occurs first.

12.4    **Content of the Development Plan**: A Development Plan proposal shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development System. If a Project Team is

CONFIDENTIAL

APC-00741594

approved and formed pursuant to Article 12.2.1 (*Project Team Approval*), any proposed Development Plan shall be based upon the work and recommendations of the Project Team.  All Development Plans submitted shall include at a minimum the following information:

(a)    **Production System:**  Description of the Development System including:

     (i)    the type of Production System proposed, i.e. tension leg well jacket, floating production system, etc., including the Production System's location, configuration (i.e. number of well slots or subsea tiebacks) and production capacity;

     (ii)    a description of the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline or offtake point servicing the Contract Area;

     (iii)    a projected time schedule for designing, contracting, fabricating, constructing or otherwise acquiring, transporting and installing the Development System;

     (iv)    the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter; and,

     (v)    the estimated Costs of the Development System , not in the form of an AFE;

     (vi)    a description of any proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

     (vii)    a description of the proposed well completion techniques, i.e. dual vs. single;

(b)    **Producible Reservoirs:**  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

CONFIDENTIAL    APC-00741595

(c) **Recoverable Reserves and Production Profile:** An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d) **Pre-drilling Operations:** A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e) **Development Wells:** A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and surface and bottomhole location of each well;

(f) **Tieback Operations:** If the Development Plan requires the tieback or use of Offsite Facilities, a written proposal from the operator of such Offsite Facilities to handle or process Hydrocarbons, to include an estimate of the amount of any tariffs, processing or other fees the operator of such Offsite Facilities proposes to charge the Participating Parties to handle or process Hydrocarbons, and the capacity on the Offsite Facilities for the Hydrocarbons;

(g) **Final Design AFE:** An AFE for the completion of the detailed design of the Development System, including final specifications, blueprints and models with which contractors will be able to formulate their bids on the components of the Development System;

(h) **Field Operating Scheme:** a description of the field operating scheme, its method, requirements, expected frequencies of intervention and Costs;

(i) **Field Abandonment:** a description of field abandonment plan (if applicable); .

(j) **Reservoir Plan:** A reservoir plan which shall provide strategies, objectives, and methods for developing, managing, and depleting each

CONFIDENTIAL

APC-00741596

Producible Reservoir during its producible life and shall include, but not be limited to:

(i) an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

(ii) the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii) a reservoir management and depletion strategy for each Producible Reservoir addressing issues which shall include, but not be limited to:

(A) estimates of oil and gas in place;

(B) reservoir rock and fluid characteristics;

(C) depletion mechanism;

(D) water and gas injection plans and objectives;

(E) reservoir surveillance programs (e.g., cased-hole logging, static pressures, etc.) and their objectives;

(F) well performance goals (e.g., target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets, etc.);

(G) reservoir performance goals (e.g., target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals, etc.); and

(H) other relevant information;

(k) **Disposal Wells:** the estimated Cost of disposal wells, if applicable;

(l) **Hydrocarbon Transmission System:** the type of Hydrocarbon transmission system to be made available to the Participating Parties (e.g., pipeline vs. barge, etc.); and

CONFIDENTIAL

APC-00741597

(m)   **Other Data:** Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Development System provided for in the Development Plan.

**12.5**   **Alternative Development Plans:** If a Development Plan is not timely submitted by the Operator during its exclusive period, or if Operators Development Plan is not approved pursuant to Article 12.6, any Party may submit a Development Plan to the other Parties for approval.

**12.6**   **Approval of Operator's Development Plan Submitted During its Exclusive Period:** The Operator shall have ninety (90) days to obtain the unanimous agreement of the Parties on any Development Plan proposal submitted by the Operator during its exclusive period.

**12.6.1**   **Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period:** If either

(a)   the Operator fails to gain the unanimous agreement of the Parties on the Development Plan it submitted during its exclusive period, or

(b)   the Operator fails to submit a Development Plan during its exclusive period,

the Parties shall have a period of ninety (90) days, commencing with either the expiration of the Operator's exclusive period or its failure to obtain approval of the Development Plan it submitted during its exclusive period, to unanimously agree to the Operator's Development Plan or an alternate Development Plan.

**12.6.2**   **Approval of a Development Plan by Vote:** . If the ninety (90) day period provided in Article 12.6.1 *(Approval of Development Plan after the Conclusion of the Operator's Exclusive Period)* terminates and the Parties still have not unanimously approved a Development Plan, then the Parties shall have a ninety (90) day period in which to approve a

CONFIDENTIAL                                                           APC-00741598

Development Plan by an affirmative vote of 2 or more Parties with a fifty-one (51%) percent voting interest.  No new Development Plans shall be submitted during the last sixty (60) days of this ninety (90) day period.

12.6.3    **Approval of a Development Plan if One is Not Approved by Vote:**  If a Development Plan is not approved as provided in Article 12.6.1 *(Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period)*, or Article 12.6.2 *(Approval of a Development Plan by Vote)* if applicable, and if there was only one Development Plan submitted and such Development Plan received an affirmative vote of at least fifty percent (50%) of the voting interest, such Development Plan shall be deemed approved by the Parties.  If there were two (2) or more Development Plans submitted and one Development Plan received an affirmative vote of at least fifty percent (50%) of the voting interest such Development Plan shall be deemed approved by the Parties.  If two competing Development Plans each received an affirmative vote of fifty percent (50%) voting interest, the Development Plan approved by the Operator shall be deemed approved.  Notwithstanding the foregoing, if the approved Development Plan includes acquisition of usage rights in the proposing Party's, or its Affiliate's, owned or operated production handling facilities, structures, gathering systems or pipelines which were (or are planned to be) acquired outside the scope of this Agreement, then each Party shall negotiate tariff charges with respect to its share of production that utilizes such facilities, structures, gathering systems or pipelines.

12.7    **Approved Development Plan:** By unanimously agreeing or Voting to approve a Development Plan or subsequently Voting to participate in an approved Development Plan under Article 8.3 *(Second Opportunity to Participate),* each Participating Party in an approved Development Plan also agrees or Votes to participate in the Final Design AFE submitted as a part of such approved Development Plan.  Any Non-Participating Party in an approved Development Plan is subject to the provisions of Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs or Development Plan)*.

CONFIDENTIAL                                                                                            APC-00741599

**12.8    Pre-Development AFEs:**    In order to facilitate the early and orderly commencement of a Development Plan, the Operator has the right, prior to the submission of the Fabrication AFE, to submit AFEs ("Pre-Development AFEs") for (a) engineering design studies, (b) the acquisition of long lead-time items, (c) preliminary activities related to the construction, fabrication, acquisition or installation of the Development System, or (d) any other activity or operation, excluding Development Wells, necessary to assist the Operator in the preparation and completion of the Development Plan; provided, however, a Pre-Development AFE may not be submitted for the aforementioned items (b) and (c) until after the selection of a Development System and the initiation of the detailed design for that Development System.    Each Pre-Development AFE requires approval of the Parties by Vote.    Any Non-Participating Party in the Pre-Development AFE is subject to the provisions of Article 16.5.3 *(Non-Consent Project Team Proposals, Pre-Development AFEs, or Development Plan)*.

**12.9    Fabrication AFE:**    Within twelve (12) months from the date on which a Development Plan is approved, the Operator shall submit a Fabrication AFE for the Development System (which conforms to the approved Development Plan) to all Parties for approval by Election.    The Fabrication AFE shall consist of separate Cost estimates for each major component in the construction, fabrication or other acquisition and installation of the Development System identified in the Development Plan.    The Fabrication AFE shall not include any Cost estimates or AFEs for Development Wells.    If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the Development System (which conforms to the approved Development Plan) for approval by Election.

**12.9.1    Approval of a Fabrication AFE:**    By Electing to participate in the Fabrication AFE, each Participating Party shall bear its Participating Interest Share of the Costs and risks of the Development System as set forth in the Fabrication AFE. The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFEs comprising the Fabrication AFE.

CONFIDENTIAL    APC-00741600

**12.10** **Assignment of Interest:** Any Non-Participating Party in the Fabrication AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions).*

**12.11** **Minor Modifications to Development Plans:** In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team. As additional information becomes available to the Operator, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if such minor modifications are both reasonable and prudent. For purposes of this paragraph, a minor modification means

(a)     a modification which does not cause the cumulative estimated Cost of the Final Design AFE to increase by more than twenty percent (20%) or ten million dollars ($10,000,000), whichever is less; or

(b)     a modification which does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than twenty percent (20%) or twenty million dollars ($20,000,000), whichever is less.

If the Operator exercises its discretionary right to make a minor modification for health, safety or environmental reasons or regulatory requirements, the Operator shall give each Participating Party written notice of that fact. A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

**12.12** **Major Modifications to Development Plans:** A major modification shall be deemed to have occurred when:

(a)     the type of Production System, e.g. tension leg well jacket, floating production system, etc., is to be changed; or

(b)     the number of well slots of the Production System is to be changed by at least fifty percent (50%); or

(c)     the type of Hydrocarbon transmission system is changed (e.g., pipeline vs. barge, etc.); or

CONFIDENTIAL

APC-00741601

(d)    the daily production processing capacity of any Facilities is to be changed by at least fifty percent (50%);

(e)    a modification causes the cumulative estimated Cost of the Final Design AFE or the Fabrication AFE to increase by more than the limits set forth in Article 12.11 *(Minor Modifications to Development Plans)*.

**12.12.1**    **Major Modifications to Development Plans Prior to the Approval of the Fabrication AFE:**    Whenever a major modification to a Development Plan is proposed prior to the approval of the Fabrication AFE, the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).  Such major modification shall require the unanimous agreement of the Participating Parties in the Development Plan.  If a major modification to the Development Plan is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.  Such Non-Participating Party has the right for a period of thirty (30) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs).  If such Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities and operations associated with the original Development Plan (and associated AFEs).

**12.12.2**    **Major Modifications to Development Plans after a Party Elects to Participate in the Fabrication AFE:**    Whenever a major modification to a Development Plan is proposed after the approval of a Fabrication AFE and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Fabrication AFE with the proposed modification to the Development Plan (and associated AFEs).  Such major modification shall require the unanimous agreement of the Participating Parties in the Fabrication AFE.  If a major modification to the Development Plan as set forth in

CONFIDENTIAL    APC-00741602

Article 12.12 (a), or Article 12.12 (c) is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Fabrication AFE. Such Non-Participating Party has the right for a period of thirty (30) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If such Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities and operations associated with (a) the original Development Plan (and associated AFEs) if it did not participate in such Development Plan and (b) the Fabrication AFE. Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Fabrication AFE for the initial Development System shall deliver to a Non-Participating Party in the Fabrication AFE for the initial Development System who Elects to participate in a modified Development Plan (and associated AFEs) for the initial Development System an assignment of one hundred percent (100%), of such Non-Participating Party's former Working Interest in the Contract Area, the wells therein and production therefrom. A Non-Participating Party in the Fabrication AFE for a subsequent Development System who Elects to participate in a modified Development Plan (and associated AFEs) for such subsequent Development System shall not be subject to the provisions of Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* in regard to such subsequent Development System. Provided, however, if a major modification to the Development Plan as set forth in Article 12.12 (a) or 12.12 (c) is approved by the Participating Parties:

(a) after the commencement of construction or the acquisition of the Development System, and

(b) after the execution of a bona fide contract providing for the Transfer of Interest of all or a part of the Non-Participating Party's former Working Interest in the Contract Area by a Participating Party to a party

CONFIDENTIAL    APC-00741603

(other than an Affiliate of the assignor) not a Party to this Agreement ("third party") at the time such contract is executed,

the Non-Participating Party shall not have the right to participate in the modified Development Plan.

**12.12.3  Approval of Major Modifications:**  If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan.  In the event a major modification is not approved, the Operator shall continue to implement the Development Plan as it was before the proposed major modification.

**12.13  Termination of a Development Plan:**  A Development Plan terminates if (a) the Fabrication AFE for such Development Plan is not approved by Election, (b) the Participating Parties unanimously agree in writing to terminate the Development Plan, or (c) the construction or acquisition of the Development System is not commenced within the time frame provided in Article 12.14 *(Timely Operations for Development Systems)*.

**12.13.1  Termination Prior to Fabrication AFE Approval:**  The Costs, risks and liabilities associated with a Development Plan, which is terminated prior to its associated Fabrication AFE being approved by Election, shall be borne by the Participating Parties in such Development Plan.

**12.13.2  Termination After Fabrication AFE Approval:**  The Costs, risks and liabilities associated with a Development Plan, which is terminated after its associated Fabrication AFE is approved by Election, shall be borne by the Participating Parties in such Fabrication AFE.

**12.14  Timely Operations for Development Systems:**  The Operator shall commence or cause to be commenced the construction or acquisition of a Development System by the earlier of (a) twelve (12) months from the conclusion of the period for approval of the Fabrication AFE or (b) thirty (30) days prior to the date the Operator is required to commence such construction or acquisition under an

CONFIDENTIAL                                                    APC-00741604

SOO, SOP or Unit Plan. Such construction or acquisition shall be deemed to have commenced on the date the major fabrication contract for the Development System is awarded, or the date the contract for acquiring an existing Development System is executed, whichever is applicable.

**12.15** **Subsequent Development Phases:** At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party in any previous Development Phase may propose a subsequent Development Phase and the installation of a subsequent Development System. Such proposal shall require approval by Vote except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

**12.15.1** **Proposal of a Subsequent Development Phase:** If a subsequent Development Phase is approved, the procedures specified in Article 12.2 *(Project Team Proposal)* and Article 12.2.1 *(Project Team Approval)* shall apply to the proposal of the Project Team, the approval of the Project Team proposal, and the formation of the Project Team for such subsequent Development Phase with the exception however, that the first Producible Well, as identified in Article 12.2.1, shall be replaced with the first Producible Well of such Subsequent Development Phase.

**12.15.2** **Further Appraisal Operations Needed Notwithstanding the Earlier Conclusion of Appraisal Operations:** If an additional well is needed before a Development Plan can be prepared for a subsequent Development Phase, such well shall be proposed and drilled in accordance with the terms of Article 11 *(Appraisal Operations)*, and any Non-Participating Party in such well is subject to the provisions of Article 16.5.2 *(Non-Consent Appraisal Operations)*.

**12.15.3** **Development Plan in a Subsequent Development Phase:** The procedures specified in Articles 12.3 *(Proposal of a Development Plan)*, 12.4 *(Content of the Development Plan)*, 12.5 *(Alternative Development Plans)*, and Article 12.6 *(Approval of Operator's Development Plan Submitted During its Exclusive Period)* shall govern the preparation,

CONFIDENTIAL

APC-00741605

submission, and approval of the Development Plan for a subsequent Development Phase.

**12.15.4** **Fabrication AFE in a Subsequent Development Phase:** The procedures specified in Article 12.9 *(Fabrication AFE)* and Article 12.9.1 *(Approval of a Fabrication AFE)* shall govern the preparation and submission of a Fabrication AFE for a subsequent Development Phase. Any Non-Participating Party in a Fabrication AFE for a subsequent Development Phase is subject to the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* or Article 16.4 *(Non-Consent Operations to Maintain the Lease),* if applicable, and not the provisions of Article 16.2 *(Acreage Forfeiture Provisions).* Although a Non-Participating Party in a Fabrication AFE for a subsequent Development Phase will retain its Working Interest in the Contract Area, it will only be entitled to Hydrocarbon production from a subsequent Development Phase after it has fulfilled the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities).* Such Non-Participating Party shall not unreasonably interfere with any activities or operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Parties in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices). In all events, the sequence and conduct of activities and operations in a subsequent Development Phase shall be controlled by the Participating Parties in the Fabrication AFE for the subsequent Development Phase.

**12.16** **Access to Existing Facilities:** A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase. Such proposal shall require approval by Vote of the Participating Parties in such previous Development Phase and shall include the basic terms under which the access is to be granted, which, if approved, shall be incorporated into a formal Facilities usage agreement. If approved, the proposal shall be binding on all of the Parties.

CONFIDENTIAL                                                                APC-00741606

# ARTICLE 13 – DEVELOPMENT OPERATIONS

**13.1**  **Proposal of Development Wells and Operations:**  It is the intent of the Parties to proceed with the development of the Contract Area in accordance with an approved Development Plan.  Development Wells shall be subject to separate AFEs unless a Development Plan calls for a number of Development Wells to be drilled together in order to set conductor casing or to be pre-drilled together prior to the installation of the Development System, in which case such wells shall be included in a single AFE.

Once a Development Well has been completed and placed on production, the Participating Parties in such well must unanimously agree to allow any Party to conduct a Non-Consent Operation in such well, unless such well becomes incapable of producing in paying quantities.  A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or completion zone in the proposal.

**13.1.1**  **Proposal of Development Wells Included in a Development Plan:**  Subject to Article 13.1 *(Proposal of Development Wells and Operations)*, any Participating Party in a Development Plan and Fabrication AFE may propose the drilling of a Development Well which was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Parties.  Each proposed Development Well that was included in the Development Plan requires approval by Election.  Any Non-Participating Party in a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

**13.1.2**  **Proposal of Development Wells Not Included in a Development Plan:**  Subject to Article 13.1 *(Proposal of Development Wells and Operations)*, any Participating Party in a Development Plan and Fabrication AFE may propose the drilling of a Development Well which was not included in the Development Plan by giving notice of the

CONFIDENTIAL                                                                APC-00741607

proposal (along with the associated AFE and Well Plan) to all of the other Parties. The proposal shall specify that the well was not included in the Development Plan. Each proposed Development Well which was not included in the Development Plan requires approval by Vote. Any Non-Participating Party in a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*.

**13.1.3** **Operator's Counterproposal:** If a Non-Operating Party makes a proposal that was not included in the Development Plan, the Operator shall have the option to:

(a) Vote to approve the operation proposed by the Non-Operating Party as set forth in the Article 13.1.2; or,

(b) Become a Non-Participating Party subject to Article 16.5.4 (Non-Consent Development Operations); or,

(c) Make a counterproposal within the applicable response time, which attempts to satisfy the same or similar objectives (in terms of timing and development of the Contract Area) as would the Non-Operating Party's proposal.

The Operator's counterproposal shall take precedence over any other proposed Development Operation and, if approved, shall have the effect of voiding the Non-Operating Party's proposal. Any Non-Participating Party in the approved Development Operation will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as further specified in Article 16 *(Non-Consent Operations)*. If the Operator's counterproposal is not approved, the Operator may make an Election to participate in the operation proposed by the Non-Operating Party in accordance with Article 13.1.2.

**13.1.4** **Timely Operations:** Actual drilling operations on a Development Well shall be commenced within two hundred seventy (270) days from the

CONFIDENTIAL                                                                APC-00741608

conclusion of the period for the approval of a Development Well; provided, however, if multiple Development Wells are included in a single AFE, operations shall be deemed timely commenced if actual drilling operations are commenced on one such Development Well within two hundred seventy (270) days from expiration of the period for approval of such AFE. Thereafter, Operator shall proceed to drill the remainder of the Development Wells included in the single AFE in a diligent manner. In a like manner, if multiple Development Wells are proposed simultaneously, but on separate AFEs, operations shall be deemed timely commenced if actual drilling operations are commenced on one such Development Well within two hundred seventy (270) days from expiration of the period for approval of such AFEs. Thereafter, Operator shall proceed to drill the remainder of the Development Wells covered by such simultaneously proposed AFE's in a diligent manner. In all events, including the occurrence of a Force Majeure, if the Operator does not timely commence actual drilling operations, the proposal of a Development Well and its approval will be deemed withdrawn. If a Development Well proposal is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Development Well will be chargeable to the Participating Parties.

**13.1.5**    **AFE Overruns and Substitute Well**: Once a Development Well is commenced, the Operator shall drill such well with due diligence to its Objective Depth, subject to

(a)    any supplemental AFEs required pursuant to Article 6.2.2 *(Supplemental AFEs)* or

(b)    the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal pressures, pressured or heaving shale, granite or other practicably impenetrable substances or other similar conditions in the well bore or damage to the well bore which render further well operations impractical, or

CONFIDENTIAL                                    APC-00741609

(c)     the Participating Parties unanimously agree to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.5(b) or (c), then any Participating Party in the abandoned Development Well may, within one hundred eighty (180) days from the decision to abandon such Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all of the other Participating Parties in the abandoned Development Well, and such proposal requires approval by Election of the Participating Parties in the abandoned Development Well. The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well Plan and shall also take into account those conditions which rendered further drilling of the abandoned Development Well impractical.

Any Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* and Article 6.2.2. *(Supplemental AFEs)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation. If a Non-Participating Party in a substitute Development Well was also a Non-Participating Party in the abandoned Development Well for which the substitute well was a replacement, the Hydrocarbon Recoupment amount, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs for both the substitute well and the abandoned Development Well, multiplied by the appropriate percentage set forth in Article 16 *(Non-Consent Operations).* In a like manner, the Non-Participating Party's Underinvestment obligation, if applicable, shall be based on such Party's Non-Participating Interest Share of Costs in conducting operations in both the abandoned Development Well and the substitute well.

CONFIDENTIAL

APC-00741610

**13.2** <u>**Development Operations at Objective Depth**</u>:   After a Development Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election to participate in an operation proposed pursuant to this Article 13.2, of its proposal to conduct subsequent operations in the well.   Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include the associated AFE and the plan for the operation.   The Parties entitled to make such Election hereunder are:

(A)     the Participating Parties, and

(B)     the Non-Participating Parties if the proposal is to Sidetrack or Deepen the well at its initial Objective Depth only, and provided Article 16.4 (*Non-Consent Operations to Maintain Prospect Area*) was not applicable to the drilling of the Development Well.

The Operator's proposal shall be for one of the following operations:

(a)     conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)     complete the well at the Objective Depth in the objective zone or formation;

(c)     Sidetrack the well;

(d)     plug back the well and attempt a completion in a shallower zone or formation;

(e)     Deepen the well to a new Objective Depth;

(f)     conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

CONFIDENTIAL

APC-00741611

(h)    permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt by the Participating Parties of all logs and test results from the Development Well, then any Participating Party may make a proposal. In such event, the procedures set forth in this Article 13.2 *(Development Operations at Objective Depth)* shall be applicable to such proposal and any reference therein to the "Operator's proposal" shall include the first proposal made by a Participating Party hereunder.

**13.2.1**    <u>**Response to Operator's Proposal:**</u> A Participating Party may, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with the associated AFE and the plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the forty-eight (48) hour period for making a separate proposal shall provide the Parties entitled to make an Election hereunder with a copy of any separate proposal so made. If no separate proposal is made, the Parties entitled to make an Election hereunder shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election hereunder shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*. If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* or Article 18.1 *(Abandonment of Wells)* shall apply to such proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer than All Parties)*, or both, apply to any Election in Article 13.2 *(Development Operations at Objective Depth)*, then the response

CONFIDENTIAL    APC-00741612

period in such articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours. Notwithstanding any other provision in this Agreement to the contrary, if one or more operations provided for hereunder are proposed prior to the distribution of information resulting from the previous approved operation, then the response periods set forth above shall not commence until receipt by the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* of the information resulting from the previous approved operation.   Notwithstanding anything to the contrary in Article 13.2, in the event the Operator has a long term and/or multiple-slot-use contract with the drilling rig being utilized, the Operator shall have the right, at its sole option and discretion, to limit the number of geologic Sidetracks performed pursuant to Article 13.2.

**13.2.2**    **Response to Highest Priority Proposal:** If a separate proposal is made, each Party entitled to make an Election hereunder shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well).  Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority.  If different depths or locations are proposed for the same type of operation under Article 13.2(c), (d) or (e), preference shall be given to the shallowest depth (except under Article 13.2(d), preference shall be given to the deepest depth), or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure set forth in this Article 13.2 *(Development Operations at Objective Depth)* for any other proposals for operations in the well bore until such time as the well is completed, temporarily abandoned or permanently abandoned.

CONFIDENTIAL                                                                          APC-00741613

**13.2.3**  **Response on Next Highest Priority Proposal:**  If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 13.2.2 (*Response to Highest Priority Proposal*).  This process will continue until a proposal is approved to either complete the well or temporarily abandon or permanently plug and abandon the Development Well.

**13.2.4**  **Non-Participating Parties in Development Operations:**  A Non-Participating Party in a Development Operation at Objective Depth [as provided for in this Article 13.2 (*Development Operations at Objective Depth*)] is subject to Article 16.5.4 (*Non-Consent Development Operations*) and is relieved of the Costs and risks of such Development Operation at Objective Depth, except as to its Participating Interest Share of the Costs of plugging and abandoning the Development Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. Notwithstanding the foregoing, the provisions of Article 16.5.4 (*Non-Consent Development Operations*) shall not apply if the Non-Consent Operation is to conduct Additional Testing, Coring or Logging, by-pass to core the formations encountered, or to conduct Production Testing. The Party Electing not to participate in such Additional Testing, Coring or Logging, by-passing to core the formations encountered or Production Testing shall not be entitled to the information resulting from such operation.  A Party which Elects not to participate in a Deepening or Sidetracking operation shall not be entitled to participate in subsequent operations in the Deepened or Sidetracked portion of the well until Complete Recoupment.

**13.2.5**  **Participation in a Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth:**  If a Development Well is drilled to its Objective Depth and a Non-Participating Party in the Development Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 13.2 (c) or (e), such former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating

CONFIDENTIAL

APC-00741614

Interest Share of the Costs of such Development Well to its Objective Depth prior to such Sidetracking or Deepening. The original Participating Parties that bore the Non-Participating Interest Share of Costs in the Development Well are Overinvested Parties in that amount. A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in the Development Well from the surface to the Objective Depth until (a) its Underinvestment has been eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. In the event a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Development Well, such former Non-Participating Party shall become an Underinvested Party only with regard to the first such approved Sidetracking or Deepening in which such Party participates.

13.3 **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir:** Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to such well proposal each Party may, in writing, limit its participation in the drilling of the Development Well to the base of the Deepest Producible Reservoir to be penetrated by the Development Well. A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling the Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for all depths between the stratigraphic equivalent of the base of the Deepest Producible Reservoir and the Objective Depth of the Appraisal Well and shall be subject to Article 16.5.4 *(Non-Consent Development Operations)* in regard to operations between those depths.

CONFIDENTIAL

APC-00741615

13.3.1   **Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir**

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 *(Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* or Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a)   **Multiple Completion:** If before drilling of the well commences, all Participating Parties in the well agree that multiple well completions are possible and practicable and that those completions will involve (i) a completion at or above the Deepest Producible Reservoir and (ii) a completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir, that are in excess of the Costs to drill and complete the well in the Deepest Producible Reservoir.

(b)   **Single Completions:** If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well completions are possible, then the first completion shall be at the objective deeper than the Deepest Producible Reservoir. After drilling beyond the Deepest Producible Reservoir, a Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir, and the Participating Parties that bore a portion of the Non-Participating Interest Share of the Costs in the Deeper Drilling on the well are

Page 84 of 191

CONFIDENTIAL

APC-00741616

Underinvested Parties for that amount until the Underinvestment is eliminated under Article 16.9 (*Settlement of Underinvestments*).

After drilling beyond the Deepest Producible Reservoir, upon the first of events (i), (ii), (iii) or (iv) below to occur,

(i)    the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(ii)   the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii)  the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv)   the well is plugged and abandoned prior to an attempted completion at or above the Deepest Producible Reservoir,

the Non-Participating Party in the Deeper Drilling becomes an Underinvested Party in the well in an amount equal to its Participating Interest Share of depreciated Costs (as described below) of drilling the well to the base of the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling that bore a portion of the Non-Participating Interest Share of Costs in the well become Overinvested Parties for that amount until the Underinvestment is eliminated under Article 16.9 (*Settlement of Underinvestments*).

CONFIDENTIAL                                                    APC-00741617

The Underinvestment of the Costs of drilling the well to the base of the Deepest Producible Reservoir will be depreciated at the rate of one-half percent (1/2%) per month from the date the Deeper Drilling commences to the date one of the above events occurs, but that depreciation will not reduce the Underinvestment below forty percent (40%) of the original Underinvestment.

**13.3.2** **Completion Attempts At or Above the Deepest Producible Reservoir:** If an Appraisal Well or a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in such well down to the Deepest Producible Reservoir have the right to utilize the well for completion in a zone at or above the Deepest Producible Reservoir. The Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir pursuant to Article 11.3 (*Appraisal Well Proposals that Include Drilling Below the Deepest Producible Reservoir*) or Article 13.3 (*Development Well Proposals that Include Drilling Below the Deepest Producible Reservoir*) shall have the right to participate in the completion attempt in the zone at or above the Deepest Producible Reservoir. The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its completion in the zone at or above the Deepest Producible Reservoir. If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for the Non-Participating Parties' Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir less any Underinvestments previously paid with respect to such Costs.

**13.4** **Recompletions and Workovers:** Any of the Participating Parties in the subsequent Development Operation, Recompletion or Workover which resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of such Development Well. Each

Page 86 of 191

CONFIDENTIAL    APC-00741618

Recompletion or Workover requires approval by Vote of such Participating Parties. A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* or Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* and is relieved of the Costs and risks of the Recompletion or Workover, except as to its Participating Interest Share of the Costs of plugging and abandoning the Development Well, to the extent such Costs are not increased by subsequent operations in the well in which it is a Non-Participating Party. An Election not to participate in a completion attempt, Recompletion or Workover of a well shall be deemed an Election not to participate in any subsequent Workover operation proposed in such well, or portion thereof, to which the Non-Consent Election applied, that is conducted prior to Complete Recoupment by the Participating Parties.

**13.5** <u>**Permanent Plugging and Abandonment and Cost Allocation:**</u> The permanent plugging and abandonment of a Development Well which:

(a) is to be plugged and abandoned due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 13.1.5 (b), or

(b) is to be plugged and abandoned due in accordance with Article 13.2 *(Development Operations at Objective Depth)*, or

(c) has been previously temporarily abandoned in accordance with Article 13.2 *(Development Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote. Approval to plug and abandon a Development Well which has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon a Development Well receives such approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of the

CONFIDENTIAL

APC-00741619

Development Well. If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5(a) or 13.5(b) does not receive approval by Vote, and no other operation is proposed (and subsequently approved) for the well by a Party entitled make such proposal within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) from receipt of such proposal, the Operator may nevertheless proceed to plug and abandon the Development Well and shall notify the Participating Parties of that fact. If the proposal to abandon any Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon of the Development Well and shall notify the Participating Parties of that fact.

The Participating Parties in the Development Well AFE shall pay all Costs of plugging and abandoning the Development Well, except any increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 *(Development Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*. The Participating Parties in such Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to such Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

**14.1** **Facilities as a Part of Development Plan:** The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbon production. If the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled at Offsite Facilities, the Development Plan shall provide for a Development System designed to utilize Offsite Facilities.

**14.2** **Use of Offsite Facilities:** In the event that excess capacity exists at an Offsite Facility and the approved Development Plan calls for a "tie-back" development of the Contract Area to such Offsite Facility, the Operator will use reasonable

CONFIDENTIAL

APC-00741620

commercial efforts to secure a "Facilities Use and Production Handling Agreement" from the owners of the Offsite Facility for use in handling Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable commercial efforts to secure access to the Offsite Facility on behalf of the Participating Parties in the Development Plan; provided, however, Operator is prohibited from contracting for such excess capacity for its own account for the handling of its production from the Contract Area unless the Participating Parties in the Development Plan have been afforded an opportunity to participate on the same terms and have declined in writing. Participating Parties shall be signatory parties to any such "Facilities Use and Production Handling Agreement" securing access to an Offsite Facility and such access shall be shared proportionately by the signatory Participating Parties on the basis of their Participating Interests in the Development Plan. In the event that such Offsite Facility is owned and operated by the Operator for the Development Plan (provided the Operator is a Participating Party in the Development Plan) and/or its Affiliate solely or jointly with a third party(ies), then, subject to obtaining any required third party concurrence (which such Party shall exercise reasonable commercial efforts to secure), the applicable "Facilities Use and Handling Agreement" shall provide the other Participating Parties in the Development Plan with access to the Offsite Facility under the then prevailing market rates that Operator has offered or would offer third parties for access to its Offsite Facility (in the event there are no prevailing market rates for the Offsite Facility, the then prevailing rates under the same or similar circumstances in the immediate area of the Offsite Facility); provided, however, the Operator shall have no duty to use reasonable efforts (1) to secure priority in such excess capacity for the Participating Parties in the Development Plan over other third parties desiring to utilize the Offsite Facility, or (2) to assure the Participating Parties in the Development Plan of any particular quality of the excess capacity production handling services, whether firm or interruptible. This Article 14.2 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 *(Disposition of Hydrocarbon Production)*.

**14.3** **Use of Development System/Facilities:** The Participating Parties in a Development System have priority access to and utilization of the Facilities

CONFIDENTIAL

APC-00741621

associated with the Development System in order to operate and develop the Contract Area pursuant to an approved Development Plan.

**14.4** **Processing Hydrocarbon Production from Outside the Contract Area:** If processing capacity beyond the requirements of an approved Development Plan is available in the Facilities associated with the Development System, the Participating Parties may unanimously agree to use the Facilities for handling hydrocarbon production from outside the Contract Area. Such use of excess processing capacity in the Development System is subject to the following priority of usage:

(a) First priority to hydrocarbon production from outside the Contract Area, which is owned by all of the Participating Parties in the Development System.

(b) Second priority to hydrocarbon production from outside the Contract Area, which is owned by one or more Participating Parties in the Development System but not by all of them.

(c) Third priority to hydrocarbon production owned by third parties coming from outside the Contract Area.

Any hydrocarbon production coming from outside the Contract Area, which utilizes a Development System, shall be processed under and subject to the terms and conditions of a Facilities Use and Production Handling Agreement unanimously agreed to by the Participating Parties in the Fabrication AFE for the Development System.

**14.5** **Approval of Additional Facilities:** This Article 14.5 shall only apply to Facilities which were not included in an approved Development Plan. Any Participating Party in an approved Development System may propose the installation of additional Facilities beyond those specified in such Development Plan by giving notice to the other Participating Parties (along with the associated AFE) together with information adequate to describe the proposed Facilities. Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote

CONFIDENTIAL

APC-00741622

of the Participating Parties in the Fabrication AFE (and all supplemental AFEs thereto) for the Development System which is to receive additional Facilities. Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Additional Facilities)*

**14.6** **Expansion or Modification of Existing Facilities or Production System:** Subsequent to the installation of Facilities or a Production System described and approved in a Development Plan for the Contract Area, any Participating Party in such Facilities or Production System may propose the expansion or modification of such Facilities or Production System by written notice (along with its associated AFE) to the other Participating Parties in such Facilities or Production System. Such proposal requires the approval by Vote of the Participating Parties in such Facilities or Production System. If approved, such proposal will be binding on all Participating Parties in such Facilities or Production System and the Operator shall commence such expansion or modification at the sole Cost and risk of all of the Participating Parties in such Facilities or Production System unless otherwise agreed.

**14.7** **Additions, Expansion or Modification of Production System or Facilities for Health, Safety or Environmental Reasons:** If a proposal for additional Facilities or a proposal for the expansion or modification of Facilities or a Production System does not receive approval by Vote of the Participating Parties in the Facilities or the Production System, whichever is applicable, and such proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install such additional Facilities or make such expansions or modifications to the Facilities or Production System. If the Operator elects to exercise its discretionary right to make such installations, modifications, or expansions, the Operator shall provide each Participating Party in the Facilities or Production System, whichever is applicable, with written notice of its decision

CONFIDENTIAL    APC-00741623

and the Participating Parties shall be responsible for their Participating Interest Share of Costs resulting from such installations, expansions or modifications.

**14.8** **Repairs of Production System or Facilities:**   The Operator at its sole discretion shall make repairs on the Production System and Facilities as needed to keep the Production System and Facilities in good working order.  No approval by the Parties is required for the Operator to make such repairs.

# ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION.

**15.1** **Duty to Take in Kind:**  Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons, excluding (i) Hydrocarbon production which the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing purposes and (ii) Hydrocarbons which are unavoidably lost.

**15.2** **Facilities to Take in Kind:**  Each Participating Party in the Fabrication AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities and pipelines for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator, the installation and operation of such facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Contract Area.

**15.3** **Failure to Take Oil or Condensate in Kind:**  If any Party fails to take in kind or dispose of its share of the oil or condensate, or both, produced from the Contract Area, the Operator shall have the right, but not the obligation, to either purchase for its own account, sell to others, or otherwise dispose of all or part of such production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate, or if lessor takes its royalty in kind, or if the Leases qualify for royalty relief, settlement for such oil or condensate shall be based on the  price prevailing in the area for oil or condensate of the same kind, gravity and quality reasonably obtainable by the Operator under the circumstances.  The Operator shall have no obligation to obtain a price equal to the price at which its production is sold.  The Operator's

CONFIDENTIAL

APC-00741624

right to take in kind or dispose of a non-taking Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate. All contracts of sale by the Operator of any Party's share of oil or condensate production shall be only for such reasonable periods of time, but in no event shall any contract be for a period in excess of one (1) year. Proceeds of all sales made by the Operator pursuant to this Article 15.3 shall be paid each calendar month to the Parties entitled thereto in time to allow them to make timely payment, without penalty, of lessor's royalty.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

**15.4    Gas Balancing Provision:**  If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled in accordance with Exhibit "D".

**15.5    Expenses of Delivery in Kind:**  Any Cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party.

## ARTICLE 16 – NON-CONSENT OPERATIONS

**16.1    Conduct of Non-Consent Operations:**  Any activity or operation that invokes the provisions of this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths which are reasonable for the Contract Area.  Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

**16.1.1    Costs:**  The Costs of any Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the

CONFIDENTIAL

APC-00741625

Participating Parties). Within one hundred twenty (120) days after the completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of the equipment pertaining thereto or at its option, Operator may submit a detailed statement of monthly billings. The Operator shall furnish to the Parties a monthly statement showing operating, maintenance and other expenses attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the proceeds from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16 *(Non-Consent Operations)*. In accounting for the proceeds from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests. If a portion of the Hydrocarbon production attributable to the Non-Participating Party's relinquished interest is produced and saved or used for operations not subject to this Agreement, but not sold, for the purpose of calculating the Hydrocarbon Recoupment amount, the proceeds attributable to such portion shall be based on the price used to pay Lessor's royalty; provided, however, in the event the Leases qualify for royalty relief or the Lessor takes its royalty in kind, the proceeds attributable to such portion shall be the based on price prevailing in the area for Hydrocarbons of the same kind,.

The calculation of the balance of Hydrocarbon Recoupment shall be accomplished as follows:

Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds from the sale of all Non-Participating Parties' relinquished Hydrocarbons based on the proceeds received for the Operator's share of Hydrocarbons. When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties. The Participating Parties shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-Participating Parties'

CONFIDENTIAL

APC-00741626

relinquished Hydrocarbons. Operator shall revise the payout date using the actual proceeds from the sale of the Non-Participating Party's relinquished Hydrocarbons and administer any subsequent adjustments between the Parties.

16.1.2 **Multiple Completions:** Non-Consent Operations shall not be conducted in any well having multiple completions unless:

(a) each of the multiple completions are owned by the same Parties in the same proportion; or

(b) none of the previous well completions are capable of producing in paying quantities; or

(c) the Participating Parties in the well containing the multiple completions unanimously agree to such Non-Consent Operations.

For the purposes of this Article 16 *(Non-Consent Operations)*, each completion is a separate well.

16.2 **Acreage Forfeiture Provisions:** In view of the significantly greater risks associated with the first Exploratory Well and the Fabrication AFE for the initial Development System, the Participating Parties in the first Exploratory Well or such Fabrication AFE are entitled to an assignment of all of the right, title and interest (including operating rights) in the Contract Area of the Non-Participating Parties in such well or AFE as provided below.

16.2.1 **First Exploratory Well:** The Parties have approved that certain AFE dated April 28, 2008, for the drilling of the Walker Ridge Block 8 No. 1 Well and for purposes herein shall be the first Exploratory Well. If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and

(a) the first Exploratory Well is drilled to its Objective Depth;

(b) the first Exploratory Well is drilled to a depth shallower than its Objective Depth and seventy-five percent (75%) or more of the

CONFIDENTIAL

APC-00741627

total amount of the original AFE for that Exploratory Well is expended; or

(c)     the first Exploratory Well is abandoned under Article 10.1.4 (*AFE Overruns and Substitute Wells*) prior to reaching its Objective Depth and prior to the Participating Parties expending at least seventy-five percent (75%) or more of the original AFE for that Exploratory Well, but the Participating Parties timely commence the drilling of a substitute well, and the cumulative Costs of that Exploratory Well and its substitute well equal or exceed seventy-five percent (75%) of the total amount of the original AFE for the first Exploratory Well;

then within thirty (30) days of notice of the occurrence of either (a), (b), or (c) above, any Non-Participating Party in the first Exploratory Well or its substitute well, as applicable, shall execute and deliver an assignment, effective on the first day of the month in which the well is commenced, of all of its right, title and interest in the Contract Area including property and equipment acquired pursuant to this Agreement to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to such Participating Parties.  If an assignment is made pursuant to this Article 16.2.1, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 (*Participation by Fewer than All Parties*), of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election not to participate in the first Exploratory Well shall be deemed a withdrawal pursuant to Article 17 (*Withdrawal From Agreement*), and the Parties shall be subject to the provisions of Article 17 (*Withdrawal From Agreement*).  After the first Exploratory Well, or its substitute well, has been drilled to the Objective Depth, any Non-Consent Operations performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1 but shall be subject to the Hydrocarbon Recoupment premium set forth in Article 16.5.1 (*Non-Consent*

CONFIDENTIAL                                   APC-00741628

*Exploratory Operations)* except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area).*

**16.2.2** **Fabrication AFE:** Within thirty (30) days of notice of the commencement of construction or acquisition of the initial Development System pursuant to the Fabrication AFE, any Non-Participating Party in such Fabrication AFE shall execute and deliver an assignment, effective on the first day of the month in which the construction or acquisition of the Development System is deemed to have commenced, pursuant to Article 12.14 *(Timely Operations for Development Systems),* of all of its right, title and interest in the Contract Area, including property and equipment acquired pursuant to this Agreement, to the Participating Parties in such Fabrication AFE, with no reimbursement by and at no Cost to such Participating Parties. If an assignment is made pursuant to this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer than All Parties),* of the Non-Participating Party's assigned interest. The Non-Participating Party's Election not to participate in the Fabrication AFE for the initial Development System shall be deemed a withdrawal pursuant to Article 17 *(Withdrawal From Agreement),* and the Parties shall be subject to the provisions of Article 17 *(Withdrawal From Agreement).*

**16.3** **Costs and Liabilities of Prior Operations:** Subject to Article 6.2.2 *(Supplemental AFEs),* a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir).*

**16.4** **Non-Consent Operations to Maintain Contract Area:** If a proposal is made for

CONFIDENTIAL

APC-00741629

(a)    an activity or operation required under a governmental agency order, notice, regulation, or Lease in order to maintain all or any portion of the Contract Area; or

(b)    an activity or operation

(i)    within the final twelve (12) months of the primary term of a Lease which has no Producible Well and such Lease is not held by a unit, SOO or SOP, or

(ii)    within ninety (90) days of the deadline for any activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote or Election or unanimous agreement and such approval or agreement is not obtained within the applicable response period, then, notwithstanding any provisions to the contrary in Article 8 *(Approvals and Notices)*, the proposed activity or operation shall be deemed approved and any Parties who Voted or Elected or agreed by written statement to participate in the proposed activity or operation shall have the right to proceed with the proposed activity or operation at their sole Cost and risk.   However, before such Parties commence such activity or operation, they shall give written notice to the other Parties of their intention to commence the activity or operation.   The other Parties shall have a second opportunity to participate in such activity or operation, in accordance with Article 8.3 *(Second Opportunity to Participate)*.

**16.4.1    Acreage Forfeiture in the Entire Contract Area:**  If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain the entire Contract Area, then each Non-Participating Party in such activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area, including property and equipment acquired pursuant to this Agreement, within thirty (30) days of the

CONFIDENTIAL    APC-00741630

commencement of such activity or operation. Such assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in such activity or operation. Failure to participate in such activity or operation is deemed a withdrawal, and the Parties will be subject to the provisions of Article 17 *(Withdrawal From Agreement)*.

**16.4.2** <u>**Acreage Forfeiture in a Portion of a Contract Area:**</u> If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* in order to maintain a portion of the Contract Area, then each Non-Participating Party in such activity or operation shall relinquish and permanently assign, effective on the date the operation commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area, including property and equipment acquired pursuant to this Agreement, within thirty (30) days of the commencement of such activity or operation. Such assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in such activity or operation. Failure to participate in such activity or operation is deemed a withdrawal as to the affected portion of the Contract Area, and the Parties will be subject to the provisions of Article 17 *(Withdrawal From Agreement)*. Upon MMS approval of such assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Contract Area. If such assignment is to two or more Participating Parties in such activity or operation, then (a) the assigned acreage shall be deemed governed by an operating agreement incorporating identical terms and conditions as contained in this Agreement (unless clearly inappropriate), (b) the execution of the operating agreement by such Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare such operating agreement, and (d) the Participating Parties shall promptly execute it.

CONFIDENTIAL

APC-00741631

**16.4.3**  **Limitations on Acreage Forfeiture:** Notwithstanding the foregoing, if more than one activity or operation is conducted in compliance with Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, any one of which would maintain the entire Contract Area or the affected portion of the Contract Area, a Participating Party in any one of those activities or operations shall not be required to make an assignment pursuant to Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*. In addition, no Party is required to relinquish or assign all or any portion of its Working Interest in the Contract Area if a governmental agency order, notice, regulation, Lease provision, SOO or SOP activity schedule, or unit plan of operation requiring the activity or operation is appealed and successfully overturned.

**16.5**  **Percentage Hydrocarbon Recoupment and Underinvestment for Non-Consent Operations:** Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, upon the timely commencement of any Non-Consent Operation, each Non-Participating Party's Working Interest in the Non-Consent Operation along with its title to that portion of any future Hydrocarbon production set forth in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation as determined pursuant to Article 8.4 *(Participation by Fewer Than All Parties)*. A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Cost of the well operation prior to computation of the Hydrocarbon Recoupment amount for the Non-Consent Operation.

**16.5.1**  **Non-Consent Exploratory Operations:** The Hydrocarbon Recoupment amount for all Exploratory Operations conducted as Non-Consent Operations, except as provided in Article 16.2.1 *(First Exploratory Well)* is the Non-Participating Interest Share of the Costs of the Exploratory Operation multiplied by eight hundred percent (800%).

**16.5.2**  **Non-Consent Appraisal Operations:** The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent

CONFIDENTIAL                                                                                APC-00741632

Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

**16.5.3**  **Non-Consent Project Team Proposals, Pre-Development AFEs or Development Plan:**  A Non-Participating Party in a Project Team proposal, Pre-Development AFE or Development Plan is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount such Party would have paid had it participated in such activity, operation or AFE until the Underinvestment is eliminated in accordance with Article 16.9 *(Settlement of Underinvestments)*.

**16.5.4**  **Non-Consent Development Operations:**  The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Development Operation multiplied by three hundred percent (300%).

**16.5.5**  **Non-Consent Subsequent Development System and Additional Facilities:**  The Hydrocarbon Recoupment amount for a non-consent Fabrication AFE for a subsequent Development System or additional Facilities not included in a Fabrication AFE is the Non-Participating Interest Share of the Cost incurred with respect to such Fabrication AFE or additional Facilities not included in a Fabrication AFE, as the case may be, multiplied by three hundred percent (300%).

**16.5.6**  **Additional Hydrocarbon Recoupment:**  In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)  three hundred percent (300%) of the Non-Participating Interest Share of the Cost of using any Development System already installed pursuant to this Agreement which is needed to service

CONFIDENTIAL

APC-00741633

a well drilled or a Production System or Facilities installed as a Non-Consent Operation; plus

(b)    two hundred percent (200%) of the Non-Participating Interest Share of the Cost of operating expenses (including operating Costs charged pursuant to Article 16.8.3), maintenance Costs, royalties, and severance, gathering and production taxes and other governmental fees based on production.

**16.5.7    Hydrocarbon Recoupment From Production:**    Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

**16.5.7.1 Non-Consent Operations which Discover or Extend a Producible Reservoir:** If a Non-Consent Operation results in the discovery or extension of a Producible Reservoir, Hydrocarbon Recoupment will be taken from one hundred percent (100%) of the Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation is completed and produced, and from fifty percent (50%) of the Non-Participating Party's Participating Interest Share of all Hydrocarbons produced and saved from operations subsequently conducted in the Producible Reservoir discovered or in the extended portion discovered by such Non-Consent Operation.

**16.5.7.2 Non-Consent Operations in an Existing Producible Reservoir:** If a Non-Consent Operation does not result in the discovery or extension of a Producible Reservoir, Hydrocarbon Recoupment will be taken from one hundred percent (100%) of the Non-Participating Interest Share of Hydrocarbons produced and saved from the Non-Consent Operation if the Non-Consent Operation is completed and produced.

CONFIDENTIAL    APC-00741634

**16.5.7.3 <u>Non-Consent Subsequent Development Systems</u>:** If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, Hydrocarbon Recoupment shall be taken from the Non-Participating Party's interest in Hydrocarbons produced and saved as follows:

(a) from one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever is applicable) of Hydrocarbons produced and saved from all Development Operations which are conducted from such subsequent Development System, and

(b) from one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever is applicable) of Hydrocarbons produced and saved from all wells which benefit from injection or disposal wells drilled and/or operated from such subsequent Development System.

**16.6 <u>Restoration of Interests to Non-Participating Party</u>:** Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, a Non-Participating Party's Working Interest shall revert back to the Non-Participating Party, as of 7:00 a.m. of the day after the occurrence of the first of the following events:

(a) the well bore of the Non-Consent Operation does not qualify as a Producible Well on the date the permanent plugging and abandonment of the well concludes; or

(b) Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment from Production)* as result of the Non-Consent Operation permanently ceases prior to Complete Recoupment; or

CONFIDENTIAL

APC-00741635

(c)     the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well or Development Well and such well does not qualify as a Producible Well; or

(d)     upon Complete Recoupment,

and the settlement of the Underinvestment incurred with respect to such well, if any, in accordance with Article 16.9 *(Settlement of Underinvestments)*.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

16.6.1     **Dry Hole Reversion**: If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract Area)*, results in an event set forth in Article 16.6 (a), (b), or (c) and a Non-Participating Party's Working Interest shall revert back to the Non-Participating Party, all well equipment in place as a result of such Non-Consent Operation and all Development Systems fabricated and installed as a result of such Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by such Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties.  Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

16.6.2     **Sidetracking or Deepening a Non-Consent Well**:   If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth)* and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of such well.  If the Participating Parties have recouped a portion, but

CONFIDENTIAL

APC-00741636

not all, of the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party's Underinvestment balance shall be reduced by an amount equal to the amount recouped by the Participating Parties with respect to such Non-Participating Party. The Participating Parties in the original well shall be entitled to achieve Complete Recoupment in accordance with Article 16.5.7.1 or Article 16.5.7.2, whichever is applicable.

**16.7** **Operations From a Non-Consent Subsequent Development System:** A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from such subsequent Development System. If such Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment under Article 16 *(Non-Consent Operations)* for which it is still liable. The Operator shall then distribute to the Participating Parties in the subsequent Development System their share of the payment based on the proportion in which they elected to carry the Non-Participating Interest Share(s). Upon such payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

**16.8** **Allocation of Development System Costs to Non-Consent Operations:** In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in such well or if the Participating Parties' Participating Interest Share in such Production System or Facilities are different from the Participating Interest Shares in such well, the Costs to utilize such Production System or Facilities for such well shall be determined as follows:

**16.8.1** **Investment Charges:**

The Participating Parties in such well shall pay to the Operator, for credit to the owners of the Development System, a one-time usage fee for the right to use the Development System. Such usage fee shall be determined in accordance with Articles 16.8.1(a), 16.8.1(b) and

CONFIDENTIAL    APC-00741637

16.8.1(c) below. However, the following slot and Facility usage fees shall not be assessed to a Participating Party for any Non-Consent well/Operation conducted and performed under an approved Development Plan.

(a)    A fee for slot usage will be determined as follows:

(i)    In the event the well uses a Production System with well slots and such Production System has no Facilities installed on it, the slot usage fee shall be an amount equal to two percent (2%) of the Cost of the Production System. Such fee shall be shared by the owners of the Production System in proportion to their Participating Interest Share in the Production System.

(ii)    In the event the well uses a Production System with well slots and such Production System has Facilities installed on it, the slot usage fee shall be an amount equal to two percent (2%) of the Cost of the Production System attributable to well slots at the time of connection of the Non-Consent Well, determined as follows:

Slot Usage Fee    = two percent (2%) x [(Total Cost of Development System – Any Cost of Facilities Included In the Total Cost of Development System) x Well Slot Area %]

Well Slot Area %    = Deck Space Dedicated to Well Slots divided by (Deck Space Dedicated to Well Slots + Deck Space Dedicated to Facilities)

The Cost of Facilities [as used in Article 16.8.1 (a) and (b)] shall include the Cost of design, material, fabrication, transportation, installation and modifications of such Facilities.

For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by 0.83333% per month, commencing on the first day of the month following the

CONFIDENTIAL

APC-00741638

date the Production System was installed and continuing every month thereafter until the month actual drilling operations on such well is commenced; however, the total Cost of the Production System shall not be reduced by more than forty percent (40%) of the total Production System's Costs. The Cost of additions to the Production System shall be reduced in the same manner commencing the first day of the month after the addition is installed.

If such well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in such well to utilize the Production System slot through which such well was drilled shall terminate unless such Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment. If such substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in such well to utilize the Production System slot through which such well was drilled shall terminate.

No refund or credit of the slot usage fee shall be given or due if a subsequent well operation is conducted through the same system slot or if that Production System slot is restored to a usable condition.

If subsequent Non-Consent Operations (such as Workover, Recompletion, Deepening or Sidetracking operations) are conducted in any wellbore where either all Parties to this agreement participated in the original well drilling costs or a previous Non-Consent Operation was conducted, no slot usage fee shall be charged to the Participating Parties in the subsequent Non-Consent Operation.

The slot usage fee shall not apply to a slot deemed to be "surplus". A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

CONFIDENTIAL

APC-00741639

(b)    The Participating Parties in such well shall pay to the owners of the Facilities a sum equal to that portion of the Total Cost of Facilities which the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities at the time such well is connected. Throughput volume shall be estimated by the Operator using an average daily volume of the first three months of Hydrocarbon production from the Non-Consent Operation.

The "Total Cost of Facilities" [as used in this Article 16.8.1 (b)] shall include the Cost of design, material, fabrication, transportation, installation and modifications of such Facilities plus that portion of the Cost of the Development System attributable to Facilities Area. The Facilities Usage Fee shall be based on the following:

Facilities Usage Fee = Total Cost of Facilities x Throughput Volume of Non-Consent Well divided by Total Design Throughput of Facilities

Total Cost of Facilities = Cost of Facilities + [(Total Cost of Development System – Any Cost of Facilities Included In the Total Cost of Development System) x Facilities Area %]

Facilities Area % = Deck Space Dedicated to Facilities divided by (Deck Space Dedicated to Well Slots + Deck Space Dedicated to Facilities)

For purposes of calculating the Facilities usage fee, the Total Cost of Facilities, shall be reduced by 0.83333% per month, commencing from the first day of the month following the date when the Facilities were installed and continuing every month thereafter until the first day of the month during which production from the Non-Consent Operation is commenced; however, the Total Cost of Facilities shall not be reduced more than forty percent (40%). If modifications, expansions or additions to the

CONFIDENTIAL

APC-00741640

Facilities are made after commencing first production and prior to the connection of the Non-Consent Operation to the Facilities, such Facilities investment shall be reduced in the same manner as described above, from the first day of the month the Facilities modification, expansion or addition is completed until the first day of the month during which production from the Non-Consent Operation is commenced.

If modifications, expansions or additions are made to the Facilities after connection of the Non-Consent Well which benefit the Non-Consent Well, such Costs shall be shared by the Non-Consent Well based on that portion which the throughput volume of the Non-Consent Well bears to the total design throughput volume of the Facilities at the time of completion of such modification, expansion or addition. The Non-Consent Well's throughput volumes shall be determined in the same manner as described above.

(c)     If Hydrocarbon production from the Non-Consent Well is handled through a Subsea Production System owned by all Parties, the Participating Parties shall pay to the owners of the Subsea Production System a sum equal to that portion of the total Cost of such Subsea Production System which one well bears to the total number of wells which the Subsea Production System is designed to accommodate.

**16.8.2** **Payments:** Payment of any usage fee shall not be deemed a purchase of an additional interest in the Production System or Facilities by the Participating Parties. Such payments shall be included in the total amount which the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-Consent Operation pursuant to Article 16.5.6(a).

**16.8.3** **Operating and Maintenance Charges:** The Participating Parties in a well drilled as a Non-Consent Operation shall pay all Costs necessary to connect the well to the Production System and the Facilities. The

CONFIDENTIAL

APC-00741641

expense of operating and maintaining the Production System shall be allocated equally among all active completions served. Subsea Production System operating and maintenance expenses shall be allocated equally among all active subsea well completions served by such Subsea Production system. Operating and Maintenance costs for the Facilities which handle or process production shall be allocated to each well completion in the proportion that the volume throughput of the well completion bears to the total volume throughput of all well completions connected to the Facilities. Operating and maintenance expense for support facilities (e.g., electrical systems and living quarters) shall be allocated based on usage.

**16.9    Settlement of Underinvestments**: Except as provided in Article 16.9.1, upon a Non-Participating Party making a revised Election to participate in a specific proposal/operation, any applicable Underinvestment shall be settled through Disproportionate Spending with the Underinvested Party being responsible for and paying one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated. However, an Underinvestment under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* shall be settled through Disproportionate Spending with the Underinvested Party being responsible for and paying one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs pursuant to this Agreement in which one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated. If any Party is simultaneously both an Underinvested Party and an Overinvested Party under any provision(s) of this Agreement, the Underinvestment shall first be reduced by the amount of the Overinvestment prior to any further settlement of the Underinvestment under this Article 16.9.

CONFIDENTIAL                                                                                     APC-00741642

**16.9.1** **Cash Settlement of Underinvestment:** If the Parties do not plan or propose any further activities or operations pursuant to this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvested amount in cash in accordance with the applicable provisions of Exhibit "C". If Disproportionate Spending within the Contract Area does not eliminate an Underinvestment within two (2) years from the date the Underinvestment is incurred, or upon final accounting and settlement pursuant to this Agreement, or the Underinvested Party or the Overinvested Party withdraws from the Contract Area in accordance with Article 17 *(Withdrawal From Agreement)*, whichever first occurs, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash in accordance with the applicable provisions of Exhibit "C".

# ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

**17.1** **Right to Withdraw:** Subject to the provisions of this Article, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw (the "withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal which shall be at least sixty (60) days, but not more than one hundred eighty (180) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving such written notice to join in the withdrawal are "Other Withdrawing Parties". The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production and all other property and equipment owned under the terms of this Agreement.

CONFIDENTIAL                                                                            APC-00741643

**17.2** **Response to Withdrawal Notice:** Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

    **17.2.1** **Unanimous Withdrawal:** If all the other Parties join in the withdrawal,

        (a)    no assignment of Working Interests shall take place;

        (b)    no further proposals may be made under this Agreement unless agreed by all Parties;

        (c)    the Parties shall abandon all activities and operations within the Contract Area and relinquish all of their Working Interests to the MMS within one hundred eighty (180) days of the conclusion of the thirty (30) day joining period; and

        (d)    notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage)*, the Operator shall:

            (i)    furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within ninety (90) days after the conclusion of the thirty (30) day joining period; and

            (ii)    cease operations and begin to permanently abandon all wells, Production Systems and Facilities in accordance with the abandonment plan.

    **17.2.2** **No Additional Withdrawing Parties:** If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest.

    **17.2.3** **Acceptance of the Withdrawing Parties' Interests:** If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall

CONFIDENTIAL

APC-00741644

submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest. Failure to make such written rejection or acceptance shall be deemed a written acceptance. If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within one hundred twenty (120) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

**17.2.4** **Effects of Withdrawal:** Except as specifically provided elsewhere herein to the contrary, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Contract Area, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties. A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

**17.3** **Limitation Upon and Conditions of Withdrawal:**

**17.3.1** **Prior Expenses:** The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of any Costs of activities, operations, rentals, royalties, taxes, damages or other liability or expense accruing or relating to operations (i) conducted prior to the effective date of the

CONFIDENTIAL

APC-00741645

withdrawal or (ii) approved by the Withdrawing Party and Other Withdrawing Parties prior to the effective date of the withdrawal or (iii) which the Operator has commenced under one of its discretionary powers authorized under this Agreement prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their share of all identifiable Costs set forth above in this Article 17.3.1, and (2) their Participating Interest Share of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities and other material and equipment serving the Contract Area, less their Participating Interest Share of the estimated salvage value of the assets at the time of abandonment, as approved by the Parties by Vote. Such expenses, Costs and salvage value shall be prepared by the Operator in accordance with Exhibit "C". Prior to accomplishing their withdrawal, the Withdrawing Party and Other Withdrawing Parties shall pay to the Operator, for the benefit of the Remaining Parties, the amount of such statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities which they have incurred or which are attributable to them prior to the effective date of the withdrawal. Any liens, charges and other encumbrances which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its or their withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to such liens, charges and other encumbrances).

**17.3.2** **Confidentiality:** The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties any Confidential Data acquired prior to the effective date of the withdrawal.

CONFIDENTIAL                                                                    APC-00741646

**17.3.3** **Emergencies and Force Majeure:** No Party may withdraw during a Force Majeure or emergency which poses a threat to life, safety, property or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 18 – ABANDONMENT AND SALVAGE

**18.1** **Abandonment of Wells:** Any Participating Party may propose the permanent plugging and abandonment of a well which has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the plugging and abandonment of the well. If the plugging and abandonment proposal is unanimously agreed to by the Participating Parties in such well, the well shall be plugged and abandoned in accordance with the applicable regulations at the Cost and risk of the Participating Parties. If the Participating Parties do not unanimously agree to plug and abandon the well, and no proposal to conduct further Development Operations in the well proposed to be abandoned has been made within the response period for the proposed abandonment, the Operator shall prepare an estimate of the Costs of plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C", and each Participating Party desiring to plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its proportionate share of such estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus.

CONFIDENTIAL

APC-00741647

**18.1.1** <u>**Assignment of Interest**</u>**:** Each Party desiring to abandon ("Abandoning Party") a wellbore under Article 18.1 (*Abandonment of Wells*) shall assign to the non-abandoning Party or Parties, effective as of the first day of the month following the last applicable election date for the abandonment proposal, all of its Working Interest insofar only as it pertains to such wellbore, including the equipment used solely in connection with such wellbore, and including Hydrocarbon production from the zone then open to production in the well proposed to be abandoned. Thereafter, the non-abandoning Parties shall own the interest assigned in the proportion that the Participating Interest of each non-abandoning Party bears to the total of their Participating Interests. Any Abandoning Party that delivers such an assignment shall be relieved from any further liability with respect to said well, subject to making the Cost settlement provided for in Article 18.1 (*Abandonment of Wells*), provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Hydrocarbons produced from any other portion of a Contract Area nor in the ownership in any other property and equipment owned by the Parties. Operator shall continue to operate the wellbore, in which such assignment under this Article 18.1.1 has been made, for the account of the non-abandoning Parties.

**18.2** <u>**Abandonment of Facilities and Production Systems**</u>**:** Any Participating Party in a Production System or Facility may propose the abandonment and disposition of such equipment. If such proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of such equipment at the Cost and risk of the Participating Parties. If any Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Production System or Facilities. If all Participating Parties do not approve abandoning and disposing of the Production System or Facilities, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposal of the Production System or Facilities, less the estimated salvage value of the Production System or Facilities, as determined under Exhibit "C", and each Participating Party desiring to abandon and dispose of the Production System or Facilities shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its proportionate share of such estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater

CONFIDENTIAL                                                      APC-00741648

than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus.

18.2.1 **Assignment of Interest**:  Each Party desiring to abandon ("Abandoning Party") a Facility or Production System under Article 18.2 (*Abandonment of Facilities and Production Systems*) shall assign to the non-abandoning Party or Parties, effective as of the first day of the month following the last applicable election date for the abandonment proposal, all of its right, title and interest in the Facility or Production System, including the equipment used solely in connection with such Facility or Production System. Thereafter, the non-abandoning Parties shall own the interest assigned in the proportion that the Participating Interest of each non-abandoning Party bears to the total of their Participating Interests.  Any Abandoning Party that delivers such an assignment shall be relieved from any further future liability with respect to said Facility or Production System, subject  to making the Cost settlement provided for in Article 18.2 (*Abandonment of Facilities and Production Systems*), provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Hydrocarbons produced from any other portion of a Contract Area nor in the ownership in any other property and equipment owned by the Parties.  Operator shall continue to operate the Facility or Production System in which such assignment under this Article 18.2.1 has been made, for the account of the non-abandoning Parties at the rates and charges contemplated by this Agreement, plus any additional cost and charges which may arise as the result of the separate ownership of said Facility or Production System.

18.3 **Disposal of Surplus Material**: Material acquired under this Agreement may be classified as surplus by the Operator when the Operator deems it is no longer needed in present or foreseeable activities or operations.  The Operator shall determine the value and Cost of disposing of the materials in accordance with Exhibit "C".  If the material is classified as junk or if the value, less the Cost of

CONFIDENTIAL

APC-00741649

disposal, is less than or equal to three hundred thousand Dollars ($300,000), the Operator may dispose of the surplus materials in any manner it deems appropriate. If the value, less the Cost of disposal of the surplus material, is greater than three hundred thousand Dollars ($300,000), the Operator shall give written notice thereof to the Parties owning the material, and the surplus material shall be disposed of in accordance with the method of disposal approved by a Vote of the Parties owning the material. Subject to Article 16.6.1 *(Dry Hole Reversion)*, proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of the retirement or disposition of the material.

**18.4** <u>**Abandonment Operations Required by Governmental Authority**</u>: The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds of such abandonment and disposal will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

## <u>ARTICLE 19 – RENTALS, ROYALTIES AND MINIMUM ROYALTIES</u>

**19.1** <u>**Burdens on Hydrocarbon Production**</u>: If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest or other type of burden on Hydrocarbon production other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment under this Agreement of all or a portion of that Party's Working Interest to another party. The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Lease Burden.

**19.1.1** <u>**Subsequently Created Lease Burdens**</u>: Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this

CONFIDENTIAL

APC-00741650

Agreement, creates a Lease Burden, such Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which any Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well pursuant to Article 18.1, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" *(Security Interest Provisions)* will be applicable against such Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F" *(Security Interest Provisions).*

**19.2    Payment of Rentals and Royalties:**    The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely payment of such rentals, all minimum royalties or other similar payments accruing under the terms of the Leases. Upon receipt of proper evidence of such payments and the Operator's invoice for its proportionate share of such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of such payments.  In the event Operator fails to make proper payment of any rental, minimum royalty or other similar payments accruing under the terms of a Lease through mistake or oversight where such payment is required to continue such Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss which results from such non-payment unless such non-payment is due to the Gross Negligence or Willful Misconduct of the Operator.  The loss of a Lease or interest therein which results from the Operator's failure to pay or the Operator's erroneous payment of a rental, minimum royalty or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof.  For production delivered in-kind by the Operator to a Non-Operating Party or to another for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in a

CONFIDENTIAL                                                            APC-00741651

timely manner in order for the Operator to make payments of any minimum royalties due.

**19.2.1**    **Non-Participation in Payments:**    If any Party notifies the other Parties, in writing at least sixty (60) days prior to the date on which such payment is due, of its intention not to pay its share of any rental, minimum royalty or other similar payments, then such Party shall be deemed to have given a withdrawal notice pursuant to Article 17 *(Withdrawal From Agreement)*, which means that such Party must withdraw from the entire Contract Area, not just the Lease on which such payment is due.    Upon this occurrence, the Operator shall make such payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of such payment based on the results of the procedures set forth in Article 17.2 *(Response to Withdrawal Notice)*.

**19.2.2**    **Royalty Payments:**    Each Party shall pay or cause to be paid all royalty and other amounts payable which are based on its share of Hydrocarbon production.    When the Participating Parties are recouping their Costs from a Non-Consent Operation and any applicable premium in accordance with Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)* and its sub-articles, each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.

# ARTICLE 20 – TAXES

**20.1**    **Internal Revenue Provision:**    Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations hereunder do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar

CONFIDENTIAL                                                                APC-00741652

provisions of applicable state laws if for federal income tax purposes this Agreement and the activities and operations hereunder are regarded as a partnership.

**20.2**  **Other Taxes and Assessments:**  The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and assessments levied with respect to activities and operations conducted under this Agreement.  The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator.  The Operator will charge each Party its Working Interest share of all taxes and assessments paid and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements and receipts for such taxes.  The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

**20.2.1**  **Property Taxes:**  The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party.  The Operator shall timely and diligently protest any valuation of the Leases for tax purposes it deems unreasonable.  Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on the Leases at the assessed value of the Leases.  If upon final determination, any additional taxes are due or if any interest or penalty has accrued as a result of such protest, the Operator shall pay such taxes, interest or penalty and charge each Party its Working Interest share of such taxes, interest or penalty in accordance with Exhibit "C".

**20.2.2**  **Production and Severance Taxes:**  Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it receives pursuant to this

CONFIDENTIAL

APC-00741653

Agreement.  Each Party shall upon written request from the Operator, provide evidence that such taxes have been paid.

## ARTICLE 21 – INSURANCE AND BONDS

**21.1**   <u>Insurance</u>:  The Operator shall provide and maintain the insurance coverage specified in Exhibit "B" and charge such Costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

**21.2**   <u>Bonds</u>:  Operator shall obtain and maintain all bonds or financial guarantees required by any applicable law, regulation or rule.  The Costs of such bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of such bond or financial guarantee if Operator provides such bond or guarantee itself and does not engage a third party to do so.  Operator shall require all contractors to obtain and maintain all bonds required by any applicable law, regulation or rule.

## ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

**22.1**   <u>Individual Obligations</u>:  The obligations, duties and liabilities of the Parties are several and not joint or collective; and, except as may be provided in Article 20 *(Taxes)*, nothing contained herein shall be construed as creating a partnership, joint venture, association or other form of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective self-interests.

**22.2**   <u>Notice of Claim or Lawsuit</u>:  If, on account of any matter involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, a claim is made against any Party, or if any party outside of this Agreement files a lawsuit against a Party, or if any Party files a lawsuit, or if a Party receives notice

CONFIDENTIAL

APC-00741654

of a material administrative or judicial hearing or other proceeding, such Party shall give written notice of the claim, lawsuit, hearing or proceeding ("Claim") to the other Parties as soon as reasonably practicable.

22.3    **Settlements:**  The Operator may settle any single claim or lawsuit, or multiple claims or lawsuits arising out of the same incident, involving activities or operations under this Agreement, or affecting the Leases or the Contract Area, if the aggregate expenditure does not exceed three hundred thousand ($300,000) and if the payment is in complete settlement of such claim or lawsuit.  If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or lawsuit pursuant to Article 22.4 (*Defense of Claims and Lawsuits*).

22.4    **Defense of Claims and Lawsuits:**  The Operator shall supervise the handling, conduct, or prosecution of any Claims, involving activities or operations under this Agreement or affecting the Leases or the Contract Area.  Claims may be settled in excess of the amount specified in Article 22.3 (*Settlements*) above if approved by Vote of the Participating Parties in the activity or operation out of which the Claim arose; however, any Party shall have the right to independently settle any Claim or the portion of any Claim which is attributable to its Participating Interest Share alone as long as such settlement does not directly adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge any final judgment, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the selection of such counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which such Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

CONFIDENTIAL

APC-00741655

**22.5    Liability for Damages:**    Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses or Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area which are not covered by or are in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which such liability arises, except that when liability results from the Gross Negligence or Willful Misconduct of a Party, such Party shall be solely responsible for liability resulting from its Gross Negligence or Willful Misconduct.

**22.6    Indemnification for Non-Consent Operations:**    To the extent allowed by law, the Participating Parties will HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND AND INDEMNIFY them against all claims, demands, liabilities, regulatory decrees and liens for environmental pollution and property damage or personal injury, including sickness and death, caused by, arising out of, or incidental to Non-Consent Operations, and any loss and cost suffered by any Non-Participating Party as an incident thereof, except when such loss or cost results from the sole, concurrent, or joint negligence, fault or strict liability of any Non-Participating Party, in which case each Party shall pay or contribute to the settlement or satisfaction of judgment in the proportion that its negligence, fault or strict liability caused or contributed to the incident.    Should any indemnity contained herein be determined to be in violation of law or public policy, said indemnity shall then be enforceable only to the maximum extent allowed by law.

**22.7    Damage to Reservoir, Loss of Reserves and Profits:**    Notwithstanding anything to the contrary in this Agreement, no Party is liable to any other Party for damage to a reservoir, loss of Hydrocarbons, or for loss of profits or for other consequential, business interruption or punitive damages, except if such damage or loss arises from a Party's Gross Negligence or Willful Misconduct in which case the Party's liability shall be limited solely to liability resulting from its Gross Negligence or Willful Misconduct, nor does any Party indemnify any other Party for such damage or loss.

CONFIDENTIAL                                                                                APC-00741656

**22.8**  **Non-Essential Personnel:**  A Non-Operating Party, who requests transportation or access, or both, to a drilling rig, Production System, vessel or any other facility utilized for activities or operations under this Agreement, agrees to HOLD THE OTHER PARTIES HARMLESS AND TO RELEASE, DEFEND AND INDEMNIFY them against (i) all claims, demands and liabilities for property damage y and (ii) all claims, demands and liabilities for any loss or cost suffered by  any Party as an incident thereof, including, but not limited to, sickness and death, caused by, arising out of, or incidental to such transportation or access, or both, INCLUDING CLAIMS, DEMANDS, AND LIABILITIES RESULTING FROM SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT OR STRICT LIABILITY OF THE INDEMNIFIED PARTY, but excluding claims, demands and liabilities resulting from or arising out of the Gross Negligence or Willful Misconduct of the indemnified Party.

**22.9**  **Dispute Resolution Procedure:**  Any claim, controversy or dispute arising out of, relating to or in connection with this Agreement or any activity or operation conducted hereunder, shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

## ARTICLE 23 – CONTRIBUTIONS

**23.1**  **Contributions from Third Parties:**  A "Contribution" means a bottom hole cash contribution, dry hole cash contribution or acreage contribution from third parties as consideration for data from wells or well operations on the Contract Area. This Article 23 does not apply to the following:

(a)  Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling or engineering data from third parties.  Such trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data).*

(b)  Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, loans and other financial arrangements.

CONFIDENTIAL

APC-00741657

(c)    A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

**23.2   Methods of Obtaining Contributions:**  The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation. A Contribution may be obtained in the following ways:

(a)    Any Participating Party in a well or well operation may propose that the Participating Parties in such well or well operation seek a Contribution from a third party towards such well or well operation.

(b)    If a Participating Party in a well or well operation receives a Contribution offer for such well or well operation from a third party, such Party shall notify all other Participating Parties in such well or well operation of the terms of such offer within five (5) days of its receipt of such offer.

**23.3   Counteroffers:**  If a third party makes a counteroffer to the Participating Parties' offer, or if a Participating Party proposes to make a counteroffer to a third party offer, the Operator shall submit the counteroffer to the other Participating Parties.

**23.4   Approval of Contributions:**  Such proposals and the acceptance of an offer or a counteroffer from a third party require the unanimous agreement of the Participating Parties in the well or well operation, who shall respond within thirty (30) days of their receipt of a notice of a Contribution proposal, offer or counteroffer.

**23.5   Cash Contributions:**  If a bottom hole or dry hole cash Contribution is offered and accepted, such cash Contribution shall be paid to the Operator and the Operator shall credit the amount of the cash Contribution against the Costs of such well or well operation to each Participating Party in proportion to its Participating Interest Share. Such cash Contribution shall be deducted from the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount which the Participating Parties are entitled to receive from the Non-Participating Parties in accordance with Article 16 *(Non-Consent Operations)* and from the Underinvestment, if any, attributable to such operation.

CONFIDENTIAL    APC-00741658

**23.6** **Acreage Contributions:** Any acreage Contribution, which is offered and accepted in accordance with this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein. The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Contract Area.

**23.6.1** **Two or More Parties Own 100% of the Acreage Contribution:** If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed governed by an operating agreement incorporating identical terms and conditions as contained in this Agreement (unless clearly inappropriate), (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) once prepared, the Parties participating in the acreage Contribution shall promptly execute the operating agreement.

**23.6.2** **Two or More Parties Own Less Than 100% of the Acreage Contribution:** If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then such Parties shall use reasonable efforts to negotiate and execute with the other working interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

CONFIDENTIAL

APC-00741659

## ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE

24.1 **Transfer of Interest:** Except as provided in 24.1.1, any Transfer of Interest shall be preceded by written notice to the Operator and the other Parties ("the transfer notice"). Subject to the limitations set forth in Article 12.1.2, if the proposed Transfer of Interest includes any Working Interest acquired from a Non-Participating Party pursuant to Article 16.2.2, such Non-Participating Party ("Former Party") shall receive written notice of the proposed Transfer of Interest. Any Transfer of Interest shall be made to a party financially capable of assuming the obligations hereunder. No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights set forth in Exhibit "F" *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of such obligations and liabilities.

24.1.1 **Exceptions to Transfer Notice:** Notwithstanding any provision of this Agreement to the contrary, the transfer notice is not required when a Party is assigning all or an undivided part of its Working Interest to an Affiliate; or a Party is assigning an overriding royalty interest, net profits interest, production payment, etc. to an Affiliate or a Third Party; or a Party assigns substantially all of a Party's assets in the Gulf of Mexico; or a Party proposes to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by such security device), any Production Systems, Facilities or equipment. However, any encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

24.1.2 **Effective Date of Transfer of Interest:** The effective date of any Transfer of Interest shall be at least sixty (60) days but not more than one hundred eighty (180) days after the date of the transfer notice. No Transfer of Interest, other than those provided in Article 24.1.1 *(Exceptions to Prior Written Notice)*, is binding upon the Parties unless and until the assignor or assignee provides all remaining Parties with (i) a photocopy of a fully executed Transfer of Interest, and if required, an

CONFIDENTIAL

APC-00741660

executed MMS Form 1123, "Designation of Operator" and (ii) evidence of receipt of any necessary approval by the MMS. The Parties shall promptly join in such reasonable actions as may be necessary to secure such approvals and shall execute and deliver any and all documents necessary to effect any such Transfer of Interest. Any costs attributable to such a Transfer of Interest are the sole obligation of the assigning Party.

24.1.3    **Minimum Transfer of Interest**: Notwithstanding the prior agreements affecting the Contract Area as described on Exhibit "A", except as otherwise provided in this Agreement, any Transfer of Interest shall cover an undivided Working Interest in the entire Contract Area. No Transfer of Interest to a third party shall be made that is not at least an undivided ten percent (10%) Working Interest in the entire Prospect Contract Area unless unanimous agreement of the Parties is obtained.

24.1.4    **Form of Transfer of Interest**:    Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all of the assigning Party's obligations under this Agreement. Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

24.1.5    **Warranty**:    Any Transfer of Interest, vesting or relinquishment of Working Interest or other interest between the Parties under this Agreement shall be made without warranty of title or any other warranty, express or implied, including, without limitation any warranty as to merchantability, quality, quantity, or fitness for a particular purpose; however all encumbrances made by assignor or known by assignor shall be disclosed to assignee.

24.2    **Preferential Right to Purchase**: Subsequent to reaching the Objective Depth in the first Exploratory Well, any Transfer of Interest shall be subject to the following provisions:

CONFIDENTIAL

APC-00741661

24.2.1 **Notice of Proposed Transfer of Interest:** The transfer notice shall provide full information about the proposed Transfer of Interest, including, but not limited to, the name and address of the prospective assignee (who must be ready, willing, and able to acquire the interest and deliver the stated consideration therefore), the full consideration for the Transfer of Interest and all other terms of the offer.

In the case of a Transfer of Interest that is part of a transaction involving interests outside the Contract Area, or if the proposed Transfer of Interest is structured as a like-kind exchange, the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by such prospective assignee. The provisions of Article 24.2 *(Preferential Right to Purchase)* and its sub-articles shall only apply to the Working Interest which is subject to the Transfer of Interest.

24.2.2 **Exercise of Preferential Right to Purchase:** Within thirty (30) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties. If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered and the non-assigning Parties who wish to exercise their preferential right to purchase do not agree to pay the full consideration for the Transfer of Interest and to accept all of the other terms of the third party offer with respect to the Working Interest subject to the proposed transaction within fifteen (15) days after the thirty (30) period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party shall be free to complete the proposed conveyance on the terms disclosed in the notice. If the other non-assigning Parties agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer, the

CONFIDENTIAL                                                                APC-00741662

assigning Party shall transfer the Working Interest to the non-assigning Parties who exercised their preferential right to purchase in accordance with this Article 24 *(Transfer of Interest and Preferential Right to Purchase)*. If more than one Party elects to acquire the Working Interest offered, then each such Party shall acquire a proportion of the Working Interest offered equal to the ratio its own pre-acquisition Working Interest bears to the total pre-acquisition Working Interests of all acquiring Parties (unless the acquiring Parties agree upon a different ratio). The Transfer of Interest shall be concluded within a reasonable time, but no later than one hundred eighty (180) days after the applicable period in which the non-assigning Parties may exercise their preferential right to purchase.

**24.2.3** **Transfer of Interest Not Affected by the Preferential Right to Purchase:** Article 24.2 shall not apply when a Party proposes to:

(a) mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by such security device), or

(b) dispose of its Working Interest by:

    (i)    (ii)  merger, reorganization or consolidation;

    (iii)  a Transfer of Interest of substantially all of a Party's exploration and production properties in the deepwater Gulf of Mexico;

    (iv)  a Transfer of Interest to an Affiliate, provided there is included in such Transfer of Interest a provision that if for any reason such assignee ceases to be an Affiliate of such Party within two (2) years of the Transfer of Interest, such rights shall be immediately reassigned to the original Party before such assignee ceases to be an Affiliate, and that all rights of the assignee in the Prospect Contract

CONFIDENTIAL

APC-00741663

Area shall terminate if such re-assignment does not take place.

**24.2.4** **Completion of Transfer of Interest:** If the proposed Transfer of Interest is not executed and filed of record with the MMS within one hundred eighty (180) days after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 (*Preferential Right to Purchase*).

## ARTICLE 25 – FORCE MAJEURE

**25.1** **Force Majeure:** If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, then the Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it. Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure. Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement. The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

## ARTICLE 26 – ADMINISTRATIVE PROVISIONS

**26.1** **Term:** This Agreement shall remain in effect so long as any Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities and equipment have been

CONFIDENTIAL

APC-00741664

disposed by the Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement. In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, however the Agreement shall remain in effect until (a) through (d) hereinabove have been completed. Termination of this Agreement shall not relieve a Party of any liability or obligation accrued or incurred before termination and is without prejudice to any continuing confidentiality obligations or other obligations provided in this Agreement.

26.2    **Waiver:** A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance. The failure or delay of any Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

26.3    **Waiver of Right to Partition:** Each Party waives the right to bring an action for partition of its interest in the Contract Area, Production System, Facilities and equipment held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

26.4    **Compliance With Laws and Regulations:** This Agreement, and all activities or operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.

26.4.1    **Applicable Law:** THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO THE FEDERAL LAWS OF THE

CONFIDENTIAL                                                            APC-00741665

UNITED STATES OF AMERICA TO THE EXTENT APPLICABLE, AND TO THE EXTENT STATE LAW MAY BE APPLICABLE, BY THE INTERNAL LAWS OF THE STATE OF LOUISIANA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.

26.4.2    **Severance of Invalid Provisions:**  If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity.   Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void.

26.4.3    **Fair and Equal Employment:** Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated herein by reference.   The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated herein by reference.   In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" attached hereto, pertaining to nonsegregated facilities.

## 26.5    Construction and Interpretation of this Agreement

26.5.1    **Headings for Convenience:**   Except for the definition headings contained in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences and paragraph headings used in this Agreement

CONFIDENTIAL                                                                 APC-00741666

are inserted for convenience only and in no way define or limit the scope or intent of this Agreement.

**26.5.2     Article References:**     Unless specifically indicated otherwise, a reference to an article of this Agreement shall include all of the referenced article and its sub-articles.

**26.5.2     Gender and Number:**     The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof. Reference herein to the singular of a noun or pronoun includes the plural and vice versa.

**26.5.3     Joint Preparation:**     This Agreement shall be deemed for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party or the other as a result of the preparation, submittal, or other event of negotiation, drafting, or execution hereof.

**26.5.4 Integrated Agreement:**     This Agreement and the Like-Kind Exchange Agreement contain the final and entire agreement of the Parties for the matters covered herein and, as such, supersedes all prior written or oral communications and agreements.   This Agreement may not be modified or changed except by written amendment signed by the Parties.   In the event of a conflict between this Agreement and the Like-Kind Exchange Agreement, the   Like-Kind Exchange Agreement shall prevail.   For purposes of a conflict as referenced in the previous sentence, a conflict shall only exist if a statement or concept in said Like Kind Exchange Agreement can not be read to be consistent and/or in conjunction with a statement or concept in this Agreement.

**26.5.5     Binding Effect:**     To the extent assignable hereunder, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land comprising the Contract Area.   This Agreement

CONFIDENTIAL

APC-00741667

does not benefit or create any rights in any person or entity not a Party to this Agreement.

26.5.6 **Further Assurances:** Each Party will take any actions necessary and will sign any documents necessary to implement the terms of this Agreement. Unless otherwise provided in this Agreement, all Parties within (30) days of their receipt of a written request for such documents from a Party shall prepare and execute such documents.

26.5.7 **Counterpart Execution:** This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement, but no Party shall be bound to this Agreement unless and until all Parties have executed a counterpart or the original. This Agreement may also be ratified by a separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement. A ratification shall have the same effect as an execution of this Agreement.

26.6 **Restricted Bidding:** If at any time during the term of this Agreement, more than one of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the Minerals Management Service pursuant to 30 CFR 256.44, then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement.

CONFIDENTIAL

APC-00741668

EXECUTED on the dates set forth below each signature but effective as of April 1, 2008.

**Anadarko E&P Company LP**

By:

Its: Agent & Attorney-in-Fact

Date: May 7, 2008

Witnesses

**ConocoPhillips Company**

By: Jim M. Higgins

Its: Attorney-in-Fact

Date: May 7, 2008

Signature page for that certain Operating Agreement date effective April 1, 2008 between Anadarko E&P Company LP and ConocoPhillips Company covering the following Leases:

OCS-G 20259 WR 8; OCS-G 31938 WR 51; OCS-G 25232 WR 52

370210

CONFIDENTIAL

APC-00741669

Exhibit "A"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

**DESCRIPTION OF PROSPECT AREA, LEASES, WORKING INTEREST OF THE
PARTIES, AND REPRESENTATIVES**

I.    **DESCRIPTION OF PROSPECT AREAS AND LEASES:**

| OCS-G No. | Area | Block | Expiration Date |
|---|---|---|---|
| 20259 | Walker Ridge | 8 | June 30, 2008 |
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2013 |

II.    **WORKING INTEREST OF THE PARTIES:**

ConocoPhillips Company                    70.00%*
Anadarko E&P Company LP                    30.00%*

III.    **EXISTING OVERRIDING ROYALTY INTERESTS:**

*Exxon Mobil Corporation                    1.50% (ConocoPhillips – 1.05%;
                                                            Anadarko 0.45%)

*Nexen Petroleum Offshore U.S.A. Inc.        0.50% (ConocoPhillips – 0.35%;
                                                            Anadarko 0.15%)

For reference, please see (i) that certain Letter Agreement dated March 26, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Exxon Mobil Corporation; (ii) that certain Letter Agreement dated March 31, 2008 by and between Anadarko E&P Company LP, Kerr-McGee Oil & Gas Corporation, ConocoPhillips Company and Nexen Petroleum Offshore U.S.A. Inc.; (iii) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Exxon Mobil Corporation, as Assignee; (iv) that certain Assignment of Overriding Royalty Interest dated effective February 1, 2008 by and between ConocoPhillips Company, as Assignor, and Exxon Mobil Corporation, as Assignee; (v) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between Kerr-McGee Oil & Gas Corporation, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee; and (vi) that certain Assignment of Overriding Royalty Interest, dated effective February 1, 2008, by and between ConocoPhillips Company, as Assignor, and Nexen Petroleum Offshore U.S.A. Inc., as Assignee.

IV.    **OPERATOR:** Anadarko E&P Company LP

JOAEXHIBITA.doc

Page 1 of 2

CONFIDENTIAL                                                                        APC-00741670

## V.    ADRESSES, CONTACT INFORMATION AND PARTY REPRESENTATIVES:

|  | **ConocoPhillips Company** | **Anadarko E&P Company LP** |
|---|---|---|
| Mail: | P. O. Box 2197<br>Houston, TX 77252 | P.O. Box 1330<br>Houston, TX 77251-1330 |
| Office: | 550 Westlake Park Blvd.<br>Three Westlake Park, Suite 3000<br>Houston, TX  77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone:<br>Facsimile: | (832) 486-2039<br>(832) 486-2691 | Telephone:    (832) 636-8831<br>Facsimile:    (832) 636-8059 |

## END OF EXHIBIT "A"

JOAEXHIBITA.doc

CONFIDENTIAL    APC-00741671

## EXHIBIT "B"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

## INSURANCE PROVISIONS

Operator shall carry insurance as follows for the benefit and protection of the Parties to this Agreement:

1.  Insurance which shall comply with all applicable Worker's Compensation and Occupational Disease laws and which shall cover all of Operator's employees performing work. Such insurance must also be endorsed, if applicable, to cover claims under the United States Longshoremen's and Harbor Workers' Compensation Act extended to include the Outer Continental Shelf, the Jones Act, and other maritime law. Employer's Liability Insurance shall be provided with a limit of $1,000,000 per accident.

2.  Operator may include the aforesaid risks under its self-insurance program provided Operator complies with applicable laws and, in such event, Operator shall charge to the Joint Account a premium determined by applying manual insurance rates to the payroll.

3.  Operator shall not be obligated or authorized to obtain or carry on behalf of the Joint Account any additional insurance covering the Parties or the operations to be conducted hereunder without the consent and agreement of all Parties. Each Party individually may acquire at its own expense such insurance as it deems proper to protect itself against claims, losses, or damages arising out of the operations conducted under the Operating Agreement, provided that such insurance shall include a waiver of subrogation against the other Parties in respect of their interests hereunder. All uninsured losses and all damages to jointly owned property shall be borne by the Parties in proportion to their respective cost interests.

4.  Operator shall promptly notify Non-Operating Parties in writing of all losses involving damage to jointly owned property in excess of $300,000.

5.  Operator shall require all contractors engaged in operations under this Agreement to comply with the applicable Worker's Compensation laws and to maintain such other insurance and in such amounts as Operator deems necessary.

6.  In the event fewer than all Parties participate in an operation conducted under the terms of this Agreement, then the insurance requirement and costs, as well as all losses, liabilities, and expenses incurred as the result of such operation, shall be the burden of the Party or Parties participating therein.

Page 1 of 1

CONFIDENTIAL

APC-00741672

# EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008, by and between
ConocoPhillips Company and Anadarko E&P Copmany LP

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning as in the Agreement to which this is attached.

"**Agreement**" shall mean the operating agreement between the Parties to which this Accounting Procedure is attached.

"**Equalized Freight**" shall mean the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest railway receiving point to the property

"**Joint Property**" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"**Joint Operations**" shall mean all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment and restoration of the Joint Property.

"**Joint Account**" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"**Operator**" shall mean the Party designated to conduct the Joint Operations.

"**Non-Operators**" shall mean the Parties to this agreement other than the Operator.

"**Parties**" shall mean legal entities signatory to the Agreement, or their successors or assigns, to which this Accounting Procedure is attached.

"**Supervisors**" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"**Technical Employees**" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"**Personal Expenses**" shall mean travel, temporary living expenses, relocation costs, and other reimbursable expenses of Operator's employees as well as Non-Operator's employees whose costs are chargeable to the Joint Account under Section II.2.A.

"**Material**" shall mean personal property, equipment, supplies, or consumables acquired or held for use on the Joint Property.

"**Controllable Material**" shall mean Material that at the time of acquisition of disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies.

"**Shore Base Facilities**" shall mean onshore support facilities that during drilling, development, maintenance, producing, and abandonment operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services, communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"**Offshore Facilities**" shall mean platforms, productions systems, development systems and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine

1

APC-00741673

docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

**"Project Team"** shall mean employees of the Parties directly assigned to perform work and/or studies as defined under the terms of the Agreement.

**"Affiliate"** shall have the same meaning as in the Agreement.

2.    **Statements and Billings**

    A.    Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be summarized by major Material classification. Intangible drilling costs and audit exceptions shall be separately and clearly identified.

    B.    Non-Operators shall bill the Operator, on a monthly basis, in accordance with the provisions contained herein, for the salaries, wages, payroll burden, and Personal Expenses, if any, of its employees assigned to the Project Team. In a like manner, the Non-Operator shall bill the Operator for such expenses of the Non-Operator's Affiliate employees and/or contractor employees retained by the Non-Operator who are assigned to the Project Team. The Operator shall reimburse the Non-Operators in accordance with Section I, Paragraph 3.B. For the purposes of Paragraphs 3, 4, and 5 of this Section I, the Non-Operator's costs which are billable pursuant to this Agreement shall be considered a Joint Account.

3.    **Advances and Payments by Non-Operators**

    A.    The Operator may require the Non-Operators to advance their share of the estimated cash outlay for the month's operations. Unless otherwise provided in the agreement, any billing for such advance shall be payable within thirty (30) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the excess to subsequent months' billings or advances, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within 15 days of receipt of such written request.

    B.    Each Non-Operator shall pay its proportion of all bills within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the prime rate in effect at JPMorgan Chase Bank, or its successor, plus 2% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws in the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. Interest shall begin accruing on the first day of the month in which the payment was due.

4.    **Adjustments**

    A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) rendered during any calendar year shall conclusively be presumed to be true and correct, with respect to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

    B.    All adjustments initiated by the Parties except those described in (1) through (4) below are limited to the twenty-four month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account

2

CONFIDENTIAL                    APC-00741674

statement or payout status statement, insofar as adjustments pertain to expenditures. Adjustments made beyond the twenty-four month period are limited to the following:

(1) a physical inventory of Controllable Material as provided for in Section V.
(2) an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.
(3) a government/regulatory audit.
(4) working interest ownership or Participating Interest adjustments.

5. Expenditure Audits

A. A Non-Operator, upon written notice to the Operator and other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four 24 month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (Adjustments). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (Adjustments) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on the exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (Advances and Payments by the Parties).

3

CONFIDENTIAL

APC-00741675

C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties.  Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report.  Interest shall be calculated using the rate set forth in Section I.3.B (Advances and Payments by the Parties).

D.  If any Party fails to meet the deadlines in Sections I.5.B or  I.5.C or if any audit issues are outstanding fifteen (15) months after Opeartor receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in Exhibit "H." The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit.  The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting.  The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participates throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position.  A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved

If the audit issues cannot be resolved by negotiation, the dispute shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

E.  This Accounting Procedure contemplates Non-Operators may incur Project Team expenditures that are subsequently billed to the Operator and charged to the Joint Account pursuant to Section I, Paragraph 2.B.  Accordingly, such Non-Operators are required to maintain auditable records supporting such charges.  Regarding such charges, the Operator and/or any other Non-Operators are hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A through 5.D., as pertain to the Non-Operators in audit of the Joint Account.  Conversely in such situation, the Non-Operator being audited is hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D. for the Operator.

6.  **Approval by Parties**
    Where an approval or other agreement of the Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Rentals and Royalties**
    Lease rentals and royalties paid by Operator for the Joint Operations.

2.  **Labor**
    A. (1) Project Team
        All salaries and wages for Operator's employees and/or Non-Operator's employees assigned to the Project Team on a full time basis shall be considered a direct cost and shall be charged to

4

                                                            APC-00741676

the Joint Account. Such employees shall include personnel who are directly engaged in project management, evaluation, design, construction and installation activities regardless of location. Part time Project Team employees and Technical employees not assigned to the Project Team, but working under the direction of the Project Team shall be charged to the Joint Account, based on actual days worked, only when such time involves at least one (1) day or more per month that is devoted to the projects. Contractor and Affiliate charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraphs 5 and 7, respectively.

(2) Labor - Other Operations

The following salaries and wages shall be charged, when employees are not assigned to a Project Team.

    (a)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (b)    Salaries and wages of Operator's employees directly employed on Shore Base Facilities and other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II.

    (c)    Salaries and wages of first level Supervisors in the field.

    (d)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

    (e)    Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.    Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A. of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A. of this Section II. If percentage assessment is used, the rate shall be based on the Operator's or Non-Operator's cost experience, as appropriate.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A .and B. of this Section II.

D.    Personal Expenses, other than relocation expenses, of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A .of this Section II. Relocation costs, consistent with the employer's established policy, are chargeable to the extent the salaries and wages of the person being relocated are chargeable, in accordance with the following:

(1)    For personnel transferred and assigned to a Project Team for a minimum of 12 consecutive months, relocation costs shall be charged to the Joint Account. For personnel assigned to a Project Team for less than 12 consecutive months, relocation costs shall not be chargeable unless agreed to by the Parties pursuant to Section I, Paragraph 6.

(2)    For Operator's field employees and/or First Level Supervisors, relocation costs shall be charged to the Joint Account.

(3)    Relocation costs for Technical Employees not assigned to a Project Team shall not be chargeable to the Joint Account unless approved by the Parties pursuant to Section I, Paragraph 6.

5

CONFIDENTIAL

APC-00741677

Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations such as Alaska or overseas, shall be charged if approved by the Parties pursuant to the provisions in Section I, Paragraph 6.

E.    Training costs as specified in COPAS MFI-35 ("Charging of Training Cost to the Joint Account") for personnel whose salaries and wages are chargable under Section II.2.A. Training charges shall include the wages, salaries, training course cost, and reimbursable travel, meals, and lodging incurred during the training session as specified in COPAS MFI-35. The cost of the training course will be limited to prevailing commercial rates.

F.    Cost of established plans for employees' benefits as described in COPAS MFI-27 determined by applying the employee benefits percent most recently published by COPAS to the chargeable salaries and wages.

G.    Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.(2).(A).

3.    **Material**
Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.    **Transportation**
Except as provided in Section 7.3 of the Agreement, transportation of company labor, contract personnel, and Material necessary for the Joint Operations but subject to the following limitations:
A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.
B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like Material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties, unless agreed to by the Parties.
C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges. Examples of accessorial charges are listed in COPAS MFI-38 ("Material Pricing Manual").

5.    **Services**
The cost of contract services, equipment and utilities used in the conduct of Joint Operations and provided by sources other than the Parties, except for those contract services, equipment and utilities covered by the Section III overhead provisions, or excluded under Paragraph 9 of Section II. The cost of third-party technical services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI- 49 ("Awards to Employees and Contractors").

6.    **Equipment and Facilities Furnished by Operator**
A    Equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such equipment. If an average commercial rate is used to bill the Joint Account,

6

    APC-00741678

Operator shall adequately document and support such rate and periodically review and update the rate.

B.  In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities, including Shore Base and/or Offshore Facilities owned by the Operator, will be charged to the Joint Account at the Operator's actual cost. Such costs are limited to expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed ten percent ( 10 %) per annum. In addition, the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement, to the extent such charges exceed estimated salvage value. Charges for depreciation will no longer be allowable once the equipment has been fully depreciated. Charges shall not exceed the average prevailing commercial rate.

C.  When applicable for Operator owned or leased motor vehicles, Operator may use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates.

7.  **Affiliates**
Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

A.  If any Operator Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team and the charges for such Materials, facilities and services are expected to exceed three hundred thousand dollars ($300,000.00) per annum, as to a given Affiliate, or if such expenditures exceeded said amount during the preceding 12-month period, charges to the Joint Account for such Materials, facilities or services, as to any Affiliate whose charges exceed such threshold, shall be pursuant to written agreement between the Parties. If any Operator Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team and the charges for such Materials, facilities and services are less than or equal to three hundred thousand dollars ($300,000.00), charges for such Materials, facilities or services shall not require prior approval of the Parties and shall not exceed average commerical rates.

B.  If a Non-Operator's Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team, charges shall be considered third-party services as provided in Paragraph 5 of this Section II.

C.  An Affiliate of the Operator or Non-Operator assigned to or working at the request of a Project Team shall be chargeable to the Joint Account as follows:

Any Party planning to utilize Affiliate Materials, facilities or services shall submit a proposal that details such Party's Affiliate Materials, facilities, or services to be provided and the costs/rates charged by such Affiliates, prior to using such Affiliate. Such proposal and costs/rates contained therein shall require the agreement and written approval of the Parties in accordance with the applicable provisions of the Agreement. Once agreed to, such Affiliate costs/rates shall remain in effect for the duration of the AFE/Project, unless revised by the Parties in accordance with Section I, Paragraph 6 of this Accounting Procedure.

Any Party may request adjustments to Affiliate costs or rates at any time it deems appropriate but no more than once per year for a given Affiliate. The Parties shall respond to proposals for revised Affiliate costs or rates within the time prescribed in the Agreement for general voting matters. Approval of proposed Affiliate rates shall be determined in accordance with the provisions of Section I Paragraph 6 and shall not be unreasonably withheld by the Parties.

7

CONFIDENTIAL

APC-00741679

D.  Each Party will make a good faith effort to obtain sufficient evidentiary supporting documentation from its Affiliate and shall maintain auditable records to support all Affiliate charges to the Joint Account. Unless otherwise provided below, such documentation shall be subject to audit in accordance with Section I, Paragraph 5.

If Affiliate charges are based on rates established using a fixed rate basis, the audit of the Affiliate charges shall be limited to verification that the rates charged were as agreed to by the Parties, and that the units or basis to which the rates were applied are correct.

If charges to the Joint Account are based on the Affiliate's actual costs incurred ("Cost Basis"), rather than a fixed rate basis, the Parties agree that the Affiliate's records relating to the Materials, facilities, or services provided by the Affiliates will not be made available for audit by auditors of the other Parties.

If the Cost Basis method is used, the Party charging its Affiliates on a Cost Basis will, if requested, provide an annual certification by its independent public accounting firm that Affiliate charges to the Joint Account relating to Materials, facilities or services provided by the Affiliates are fair and equitable, exlude any element of profit and are consistent in application to all of its activities. If such Party's independent public accounting firm is not an internationally recognized public accounting firm, the other Parites may, at their option, select an internationally recognized firm, subject to the approval of the Party being audited, to perform a review of the Affiliate charges to the Joint Account. The Costs of this review shall be charged to the Joint Account. The Parties requesting the audit may advise the public accountants on the scope of the review, however, the scope shall be limited to that reasonably necessary to confirm that the Affiliate charges to the Joint Account are fair and equitable, exclude any element of profit, and are consistent in application to all of its activities. However, a favorable audit report shall not preclude the other Parties from taking exception to the rate as being in excess of average commercial rates.

8.  **Damages and Losses to Joint Property**
All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except to the extent of those resulting from a Party's Gross Negligence or Willful Misconduct, in which case such Party shall be solely liable.

9.  **Legal Expenses**
Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties.

10.  **Taxes and Permits**
All taxes and permits of every kind and nature assessed or levied upon or in connection with the Joint Property or production therefrom and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, unless the penalties and interest result from Operator's Gross Negligence or Willful Misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11.  **Insurance**
Coverage(s) required to be procured by Operator for the protection of the Parties herein shall be billed to the Joint Account. For Workers' Compensation and Employer's Liability, where Joint Operations are conducted in jurisdictions that permit self-insurance, Operator shall charge Joint

8

CONFIDENTIAL

APC-00741680

Account manual or advisory rates (whichever is applicable) if Operator meets the self-insurance requirements in such jurisdiction. Such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate. In no circumstance shall Operator charge in excess of manual or advisory rates.

12. **Communications**
Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's office. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 6 of this Section II.

13. **Ecological, Environmental and Safety**

(A) Costs incurred
( ) ~~for the benefit of the Joint Property, or~~
( X ) on the Joint Property

resulting from statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations.

(B) Costs incurred
( X ) ~~for the benefit of the Joint Property, or~~
( X ) on the Joint Property

to conduct and/or implement safe operational practices/guidelines as a result of statutory regulations, or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies.

(C) Technical training costs for employees whose time is chargeable under (A) or (B) above regardless of whether training is mandated by statute or regulatory agency is chargeable to the Joint Account.

(D) Subject to Article 6.2 of the Agreement, safety awards in the conduct of Joint Operations

( X ) shall be chargeable to the Joint Account.
( ) ~~shall not be chargeable to the Joint Account.~~

14. **Abandonment and Reclamation**
Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental or other regulatory authority.

15. **Other Expenditures**
Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under Section II.15 shall require the approval of the Parties.

# III. OVERHEAD

9

CONFIDENTIAL                    APC-00741681

A. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

i.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden, and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:
( ) shall be covered by the overhead rates.
(X) shall not be covered by the overhead rates.

ii.  Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden, and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:
( ) shall be covered by the overhead rates.
(X) shall be charged direct to the Joint Account only to the extent such Technical Employees and/or costs of professional consultant services and contract services of technical personnel are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Employees and/or costs of professional consultant services and contract services of technical personnel for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section II.2.A(1) (*Labor – Project Team*), Section II.7 (*Affiliates*) insofar as the Affiiate costs pertain to an authorized Project Team, or Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

1.  **Overhead - Project Team**
To compensate the Operator (or chairing Party if the Operator is a Non-Participating Party) for overhead costs incurred in support of a Project Team, Operator (or charing Party) shall charge a rate of three Percent ( 3.0 %) of the total cost of the Project Team as defined in Section II, Paragraph 2.A(1). Such overhead costs shall include, but shall not be limited to: all personnel not directly chargeable to the Project Team under Section II.2.A, computer equipment and supplies, office space, utilities, office furniture and equipment, cleaning and general housekeeping, office supplies, conference room facilities, facsimile machines, copy machines, telephones and other general costs supporting the Project Team.

2.  **Overhead - Development and Operating**
As compensation for overhead in connection with drilling and producing operations, Operator shall charge on either:
( ) Fixed Rate Basis, Paragraph 2.A., or
( X ) Percentage Basis, Paragraph 2.B.

A.    Overhead - Fixed Rate Basis
(1)    Operator shall charge the Joint Account at the following rates per well per month:
Drilling Well Rate per month $_____(Prorated for less than a full month)
Producing Well Rate per month $_____

(2)    Application of Overhead - Drilling Well Rate shall be as follows:

10

                                              APC-00741682

(a) ~~Charges for drilling wells shall begin on the date drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first. No charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.~~

(b) ~~Charges for wells undergoing any type of workover, recompletion, or abandonment for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.~~

(3) ~~Application of Overhead - Producing Well Rate shall be as follows:~~

(a) ~~An active well completion for any portion of the month shall qualify for a one-well charge for the entire month. An active completion is one which is~~

(1) ~~produced,~~

(2) ~~injected into for recovery or disposal,~~

(3) ~~used to obtain water supply to support production operations,~~

(4) ~~used to maintain pressure in the producing zone, or~~

(5) ~~shut-in oil or gas wells not capable of producing against line pressure or due to market conditions.~~

(b) ~~Each active completion in a multi-completed well in which production is not commingled downhole shall qualify for a one-well charge providing each completion is considered a separate well by the governing regulatory authority.~~

(c) ~~A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when the drilling well rate applies.~~

(d) ~~All wells not meeting the criteria set forth in the Paragraph A.(3) (a), (b), or (c) shall not quality for a producing overhead charge.~~

(4) ~~The well rates shall be adjusted on the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.~~

B.    Overhead -Percentage Basis (exclusive of Project Team costs)

(1)    Operator shall charge the Joint Account at the following rates;

(a)    Development Rate two and one-half percent ( 2.5 %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II, all salvage credits, and all Project Team expenses.

(b)    Operating Rate thirteen percent ( 13 %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for enhanced recovery and all property taxes and any tax and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)    Application of Overhead - Percentage Basis shall be as follows:

(a)    Development shall include all costs in connection with

[1]  drilling, redrilling, plugging back or deepening of any or all wells,

11

CONFIDENTIAL    APC-00741683

[2] workover operations requiring a period of five (5) consecutive work days or more on any or all wells,

[3] preliminary expenditures necessary in preparation for drilling,

[4] expenditures incurred in abandoning when the well is not completed as a producer,

[5] original construction or installation of fixed assets, expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 3 of Section III, or any Project Team expenses.

(b)      Operating shall include all other costs in connection with Joint Operations those subject to Paragraphs 1 and 3 of Section III.

3.      **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $300,000.

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) 4 % of total costs if such costs are more than $100,000 but less than $500,000; plus

(2) 2 % of total costs in excess of $500,000 but less than $1,000,000; plus

(3) 2 % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) 3 % of total costs if such costs are more than $100,000 but less than $500,000; plus

(2) 2 % of total costs in excess of $500,000 but less than $1,000,000; plus

(3) 1 % of total costs in excess of $1,000,000.

C. If Operator charges engineering, design and drafting costs associated with a Major Construction project AFE to a Project Team AFE, the overhead assessment shall be three percent ( 3 %) of total project costs.

Total cost shall mean the gross cost of any one project, but shall exclude Pojrect Team costs that are recorded to a separate Project Team AFE and for wich overhead is charged under Section III.1. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 5, the provisions of this paragraph shall govern.

4. **Overhead - Catastrophe**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or

12

 APC-00741684

shall charge the Joint Account for overhead based on the  rates as set forth in Section III.2.

### 5. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

# IV.  MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option.  Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

### 1.  Direct Purchases

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received.  The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's Gross Negligence or Willful Misconduct.  A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase.  If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

### 2.  Transfers

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material.  Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer.  Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A.  Pricing

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer.  Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation.  When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6 (*Approval by Parties*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

13

APC-00741685

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B *(Freight)*.

    (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

## B. Freight

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

## C. Taxes

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

14

APC-00741686

### D. Condition

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6 (*Approval by Parties*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

15

APC-00741687

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. **Other Pricing Provisions**

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

3. **Disposition Of Surplus**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with Article 18.3 of the Agreement.

4. **Special Pricing Provisions**

A. **Premium Pricing**

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. **Shop-Made Items**

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in

16

CONFIDENTIAL                                                      APC-00741688

Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

### C. Mill Rejects

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Sections IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

### 1. Directed Inventories

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.(*Approval by Parties*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

### 2. Non-Directed Inventories

#### A. Operator Inventories

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

17

 APC-00741689

B. **Non-Operator Inventories**

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory field work.

C. **Special Inventories**

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*) to the extent allowed under the Agreement.

18

CONFIDENTIAL

APC-00741690

EXHIBIT "D"
GAS BALANCING AGREEMENT ("AGREEMENT")

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

1.    **DEFINITIONS**
      The following definitions shall apply to this Agreement:

1.01   "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the price under such agreement equals or exceeds the Published Reference Price, less any applicable transportation or gathering charges.

1.02   "Balancing Area" shall mean all of the acreage and depths subject to the Operating Agreement.

1.03   "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04   "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its delivery from the Balancing Area.

1.05   "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06   "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07   "MMBtu" shall mean one million British Thermal Units. A British thermal unit shall mean the quantity of heat required to raise one-pound avoir dupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08   "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09   "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10   "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11   "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12   "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13   "Published Reference Price" shall mean the Index price published for the applicable geographic area on the transporting pipeline in the first of the production month's edition of *McGraw-Hill's Inside FERC's Gas Market Report* ("*Inside FERC* Index"). In the event that the *Inside FERC* Index ceases to be published, the parties will attempt in good faith to agree on a replacement reference price reflective of the same market reflected by the *Inside FERC* Index. If the parties are unable to agree on a satisfactory replacement reference price within thirty (30) days of commencing negotiations, the matter will be resolved in accordance with the Dispute Resolution Procedures set forth in Exhibit "H" to the Operating Agreement.

1.14   "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.15   "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.16   "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.17   "Winter Period" shall mean the month(s) of November and December in one calendar year and the month(s) of January and February in the succeeding calendar year.

2.    **BALANCING AREA**
      2.1    If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in MMBtu.

      2.2    In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

Page 1 of 5

CONFIDENTIAL                                                                                   APC-00741691

3.    **RIGHT OF PARTIES TO TAKE GAS**

3.1    Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2    Each Party is required to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect as set forth in 30 CFR 250.180, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3    When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4    All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5    Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6    In the event that the Operator determines that a Party has failed to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect as set forth in 30 CFR 250.180, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator shall notify such Party that it has failed to take its Full Share of Current Production, along with the applicable reason(s), as originally stated in Section 3.2, that it is required to take its Full Share of Current Production. If the notified Party does not begin taking its Full Share of Current Production effective the second business day following notification from the Operator, the Operator shall, to the extent practicable, make available to the Underproduced Party(ies) any part of such Party's Full Share of Current Production that such Party fails to take, or the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and will render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the Parties under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Section 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

4.    **IN-KIND BALANCING**

4.1    Effective the first day of any calendar month following at least thirty (30) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying fifty percent (50%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent (50%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas. See Section 13.1 for additional provisions.

4.2    Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent (25%) of its Full Share of Current Production for Makeup Gas during any month of the Winter Period.

5.    **STATEMENT OF GAS BALANCES**

5.1    The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within sixty (60) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the current, total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the current month and cumulative Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No. 24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparations of the statements required hereunder.

CONFIDENTIAL

APC-00741692

5.2    If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. The cost of conducting such audit will be charged to the account of the Party failing to provide the required data.

## 6.    PAYMENTS ON PRODUCTION

6.1    Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

6.2    Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3    In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

## 7.    CASH SETTLEMENTS

7.1    Upon the earlier of; (i) Plugging and abandonment of the last producing interval in the Balancing Area, (ii) the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, (iii) any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, or (iv) all leases in the Balancing Area have expired, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2    Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3    Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

7.4    Subject to Section 13.1, the amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of this Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.

7.5    Subject to Section 13.1, the values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1    For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.

7.6    To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for all Gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the Published Reference Price.

7.7    Interest compounded at the rate of _the U.S. Treasury Bill 13-week discount rate plus three_ percent (3 %) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1, beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8    In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

## 8.    OPERATING COSTS

CONFIDENTIAL

APC-00741693

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

9.    **LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

10.    **AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of six (6) years from the end of the calendar year in which any information to be furnished under Section 5 and 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 10 shall be in addition to those provided for in Section 5.2 of this Agreement.

11.    **MISCELLANEOUS**

11.1    As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

11.2    EACH PARTY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS ALL OTHER PARTIES FROM AND AGAINST ANY AND ALL LIABILITY FOR ANY CLAIMS, WHICH MAY BE ASSERTED BY ANY THIRD PARTY WHICH NOW OR HEREAFTER STANDS IN A CONTRACTUAL RELATIONSHIP WITH SUCH INDEMNIFYING PARTY AND WHICH ARISE OUT OF THE OPERATION OF THIS AGREEMENT OR ANY ACTIVITIES OF SUCH INDEMNIFYING PARTY UNDER THE PROVISIONS OF THIS AGREEMENT, AND DOES FURTHER AGREE TO SAVE THE OTHER PARTIES HARMLESS FROM ALL JUDGMENTS OR DAMAGES SUSTAINED AND COSTS INCURRED IN CONNECTION THEREWITH.

11.3    Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof.

11.4    This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefits of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

11.5    Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

11.6    This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

11.7    In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service based on the quantity of Gas taken for its account (the cumulative method) in accordance with such regulations, insofar as same relate to sales method tax computations.

12.    **ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

12.1    Subject to the provisions of Sections 12.2 and 12.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its

Page 4 of 5

CONFIDENTIAL    APC-00741694

assignee or other transferee to assume its obligations hereunder.

12.2    Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 12.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 12.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least ninety (90) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 12, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 12 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.2 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 12.1 hereof.

12.3    The provisions of this Section 12 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

## 13.    OTHER PROVISIONS

13.1 The Parties agree that the intent of this Gas Balancing Agreement is for each Party to ultimately take or otherwise receive the benefit of its Percentage Interest of the Gas produced from the Balancing Area after satisfaction of royalty obligations over the life of such production. Therefore, in the event royalty relief or lessor take-in-kind or other programs cause changes in the royalty burden affecting Gas produced from the Balancing Area over the life of such production such that the Parties are precluded from achieving that end, Makeup Gas volumes and cash settlement volumes shall be adjusted to ensure that each party receives its Percentage Interest in Gas after satisfaction of royalty obligations. The Operator shall maintain documentation on volumes subject to royalty relief, and each party shall maintain documents with respect to royalty taken in kind to effect this provision.

CONFIDENTIAL

APC-00741695

## EXHIBIT "E"

Attached to and made a part of the Joint Operating Agreement
dated effective June 1, 2006 by and between Newfield Exploration Company and Anadarko
Petroleum Corporation.

## CERTIFICATION OF NONSEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Non-segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 NLAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "Contractor" refers to each Party to this Agreement.

APC-00741696

EXHIBIT "F"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

## ARTICLE 6.3 ET SEQ.
## OPERATING AGREEMENT (Louisiana)

Security Rights; Default; Unpaid Charges; Carved-out Interests.

### 6.3    Security Rights.

a.      Security Rights - Properties Located Offshore Adjacent to the State of Louisiana. In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties herein, the Parties shall have the following security rights:

(i)      Mortgage in Favor of the Operator. Each Non-Operating Party hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by each Non-Operating Party of all financial obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement. To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator herein shall secure the payment of all Costs and other expenses or financial obligations properly charged to such Party, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs. If any Non-Operating Party does not pay such Costs and other expenses or perform its financial obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operating Party's Hydrocarbon production and collect such Costs and other expenses or financial obligations out of the proceeds from the sale of the defaulting Non-Operating Party's share of Hydrocarbon production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operating Party's share of Hydrocarbon production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the

PAGE 1 of 8

CONFIDENTIAL

APC-00741697

amount of Costs and other expenses or financial obligations owed by the defaulting Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operating Party.

The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the financial obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.a.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to this Agreement.

(ii)    <u>Security Interest in Favor of the Operator</u>. To secure the complete and timely performance of and payment by each Non-Operating Party of all financial obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement, each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells

PAGE 2 of 8

CONFIDENTIAL                                                                        APC-00741698

located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers: (A) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area.

PAGE 3 of 8

APC-00741699

(iii)    Mortgage in Favor of the Non-Operating Parties.    The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases; (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area; and (c) all other immovable property or other property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all financial obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-Operating Party herein shall secure the payment of all Costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, Costs, and other expenses or financial obligations at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If the Operator does not pay such Costs and other expenses or perform its financial obligations under this Agreement when due, the Non-Operating Parties shall have the additional right to notify the purchaser or purchasers of the Operator's Hydrocarbon production and collect such Costs and other expenses or financial obligations out of the proceeds from the sale of the Operator's share of Hydrocarbon production until the amount owed has been paid.  The Non-Operating Parties shall have the right to offset the amount owed against the proceeds from the sale of the Operator's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Non-Operating Parties' statement concerning the amount of Costs and other expenses or financial obligations owed by the Operator and payment made to the Non-Operating Parties by any purchaser shall be binding and conclusive as between such purchaser and the Operator.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the financial obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.a.(v) hereof) outstanding and unpaid and that are attributable to or charged against

CONFIDENTIAL                                                                APC-00741700

the interest of the Operator pursuant to this Agreement.

(iv)    Security Interest in Favor of the Non-Operating Parties.  To secure the complete and timely performance of and payment by the Operator of all financial obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or included within the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Contract Area, the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or

PAGE 5 of 8

CONFIDENTIAL

APC-00741701

not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Contract Area.

(v)    <u>Recordation</u>.  To provide evidence of, and to further perfect the Parties' security rights created hereunder, upon request, each Party shall execute and acknowledge the Memorandum of Operating Agreement and Financing Statement (Louisiana) attached as Exhibit "I" (the "Memorandum of Operating Agreement and Financing Statement (Louisiana)") in multiple counterparts as appropriate.  The Parties authorize the Operator to file the Memorandum of Operating Agreement and Financing Statement (Louisiana) in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of the Operator and the Non-Operating Parties to their interests in the Leases or the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement (Louisiana) to a standard UCC-1 in the forms attached as Exhibit "I" to the Agreement for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Upon the acquisition of a leasehold interest in the Contract Area, the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation such a Memorandum of Operating Agreement and Financing Statement (Louisiana) describing such leasehold interest.  Such Memorandum of Operating Agreement and Financing Statement (Louisiana) shall be amended from time to time upon acquisition of additional leasehold interests in the Contract Area, and the Parties shall, within five business days following request by one of the Parties hereto, execute and

PAGE 6 of 8

CONFIDENTIAL                                                                                    APC-00741702

furnish to the requesting Party for recordation any such amendment.

The Memorandum of Operating Agreement and Financing Statement (Louisiana) is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Leases or contained within the Contract Area pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records.

b.    Default.  If any Party does not pay its share of the charges authorized under this Agreement when due or otherwise fails to discharge any of its financial obligations under this Agreement, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default and if the Operator is the Party in default, the applicable notices can be delivered by any Non-Operating Party.  A Party in default shall have no further access to the rig, Production System, Facilities, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with activities or operations hereunder or be allowed to participate in meetings.  A Party in default shall not be entitled to Vote or to make an Election until such time as the defaulting Party is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Working Interest bears to the total non-defaulting Working Interests.  As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Parties to the dispute shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

c.    Unpaid Charges.  If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefore or to otherwise perform any of its financial obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Section 6.3, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay.  If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection at Joint Account expense of the unpaid Costs and other expenses owed by such Participating Party, , and to exercise the mortgage and security rights granted by this Agreement.  The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein. In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Contract Area is located or such other states as such Party may deem appropriate.

PAGE 7 of 8

CONFIDENTIAL                                                                                          APC-00741703

The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and collection costs) and any amounts collected with respect to amounts owed by the nonperforming Party. In the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of Costs in the proportion that its Working Interest bears to the total non-defaulting Working Interests. Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

      d.    <u>Carved-out Interests</u>. Any agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Leases or the Contract Area shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Working Interest is so encumbered does not pay its share of Costs and other expenses authorized under this Agreement or to otherwise perform any of its financial obligations under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Section are insufficient to pay such Costs, expenses, or obligations the security rights provided for in this Section may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Leases or the Contract Area is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Section.

CONFIDENTIAL

APC-00741704

EXHIBIT "G"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

PROJECT TEAM EXHIBIT
(with Technology Sharing Provisions)

## SECTION 1.0 DEFINITIONS

**1.1** **Background Technology and Information:** shall mean any proprietary geophysical, geological, geochemical, drilling, engineering or other similar technical data, information, reports, studies, analysis, models or similar data and documents incorporating such information, which is (a) developed, acquired, owned or controlled by an individual Participating Party as a result of activities outside of the scope of both the Operating Agreement and this Exhibit, or (b) developed, acquired, owned or controlled by an individual Participating Party as a result of activities that are within the scope of either the Operating Agreement or this Exhibit but were conducted as a Non-Consent Operation, and for which the Hydrocarbon Recoupment provisions of Article 16 of the Operating Agreement have not been met, and (c) that is identified and declared as Background Technology and disclosed by a Party or exchanged by the Parties for use by the Project Team.

**1.2** **Confidential Information:** shall mean all Project Technology and Information and Background Technology and Information. Confidential Information does not include "Confidential Data" as that term is defined in the Operating Agreement. To the extent that "Confidential Data" is submitted by a Participating Party for use by the Project Team, such "Confidential Data" continues to be governed solely by the terms of the Operating Agreement.

**1.3** **Operating Agreement:** shall mean that certain Operating Agreement effective April 1, 2008 by and between ConocoPhillips Company and Anadarko E&P Company LP, to which this Exhibit is attached.

**1.4** **Project Manager:** shall mean the designated representative of the chairing Party who will direct, supervise and oversee the work of the Project Team.

**1.5** **Project Technology and Information:** shall mean all proprietary geophysical, geological, geochemical, drilling, engineering or other similar technical data, along with information, reports, studies, analysis, models or similar data and documents that are (a) acquired or developed by the Project Team, or provided to, the Project Team by the Participating Parties and (b) charged to the Joint Account. The provisions of this Exhibit shall not be applicable to "Confidential Data", as that term is defined in the Operating Agreement.

**1.6** **Other Terms:** Except as defined in this Exhibit, capitalized terms used herein shall have

Page 1 of 10

CONFIDENTIAL

APC-00741705

the meanings as defined in the Operating Agreement.

## SECTION 2.0 PROJECT TEAM FORMATION

2.1    **Formation and Staffing of the Project Team:** A Project Team of technical and support personnel may be established pursuant to the terms of Article 12 of the Operating Agreement. The Project Manager shall determine the make-up, size and composition of the Project Team and shall notify the Participating Parties of the positions that may be available on the Project Team, so long as it is within the scope of the approved Project Team project. Each Participating Party may nominate representatives possessing specific backgrounds as identified by the Project Manager to progress the Development Plan. Each Participating Party may nominate members for positions at every level of the Project Team, with the exception of the Project Manager level. Each Participating Party shall have the right, at its discretion, to representation on a Project Team in proportion to its Participating Interest, provided that such representatives are duly qualified. However, a Participating Party shall not be precluded from having more than its respective Participating Interest representation on the Project Team, if approved by the Project Manager and consistent with the needs of the Project Team. The Project Manager must approve actual participation of any individual nominated by a Party for participation on the Project Team, and such approval shall not be unreasonably withheld. In selecting team members, the Project Manager shall give Participating Parties', or their Affiliates', employees preference over contractors, and contractors shall not displace qualified employees as team members.

The Project Manager may dismiss a Project Team member whose performance has become unsatisfactory or if such person has become superfluous to requirements of the Project Team. The Project Manager shall provide to the Party whose member is being dismissed at least one month's written notice, or a shorter period of time as is practical in the case of a serious breach of security, confidentiality, or other of the Project Manager's policies. If a Party, other than the chairing Party, wishes to withdraw from the Project Team any of its representatives, such Party shall provide at least one month's written notice to the Project Manager. If such Party's Project Team member is leaving the employ of such Party, the Project Team member may be withdrawn in such lesser time as may be required by the conditions of employment applicable to that employee.

If the Project Manager decides that a member of the Project Team should be replaced, the Participating Party whose representative is to be replaced shall make arrangements to effect a reassignment of the member in question. The Participating Party whose member was removed shall then be entitled to nominate another person to fill the vacant position on the Project Team. In the event a new position is created on the Project Team, the Project Manager shall notify the Participating Parties. The Participating Parties shall have the right for a period of thirty (30) days after receipt of such notice to nominate a representative to fill such new position. However, selection of the representative shall be at the Project Manager's sole discretion.

2.1.1    **Employee Staff Contribution:** Each Participating Party in the Project Team AFE shall have the right (but not the obligation) to nominate its employees as members

CONFIDENTIAL                                                    APC-00741706

of the Project Team. Nominated employees may include project, technical or support personnel. The individuals nominated for participation by the Participating Parties must have experience commensurate with the position to which they are being nominated, and must meet the needs and objectives of the Project Team as described in the Project Team AFE and scoping memo.

**2.1.2**  **Affiliate and Contract Staff:** The Project Team may utilize the resources of the Participating Parties' Affiliates and contractors (as used in this Exhibit, "contractors" includes "consultants") to carry out the work of the Project Team. Each Participating Party in the Project Team may nominate Affiliate employees or contractors to serve on the Project Team in the place of such Participating Party's employees. The individuals nominated for participation by the Participating Parties must have experience commensurate with the position to which they are being nominated, and must meet the needs and objectives of the Project Team as described in the Project Team AFE and scoping memo.

**2.2**  **Project Manager:** The Project Team shall operate under the direction of the Project Manager, who shall be selected by the chairing Party of the Project Team. The Operator shall be the chairing Party of the Project Team; provided, however, if Operator elects not to participate in the Project Team a chairing Party shall be selected by a vote of a majority in interest of the Participating Parties. The Project Manager shall be responsible for making team assignments and shall be responsible for the overall management and supervision of specific work tasks for the Project Team. The Project Manager shall determine the location(s) where the Project Team work is to be undertaken. The Project Manager shall be responsible for selecting team members from the nominations provided by Participating Parties and dismissing Project Team members as needed in order to accomplish specific tasks or phases of the Project Team. The Project Manager shall also be responsible for determining the need for and selecting outside contractors to perform certain Project Team activities, acquiring supplies and services needed by the Project Team and for instituting rules and procedures for maintaining confidential information. The Project Manager shall also be responsible for making presentations on the work of the Project Team and associated documentation at meetings that are conducted under the Operating Agreement.

**2.3**  **Status of Team Members:** Each employee member of the Project Team (i.e., a Project Team member who is an employee of a Participating Party of its Affiliate) shall remain an employee of its respective company and each Party shall remain responsible for paying or causing to be paid their employees' salaries, benefits and payroll burden as well as maintaining worker's compensation insurance on their employees. Accordingly, each Party will continue to administer or cause to be administered the compensation, benefits, allowances and staff planning of its employees on the Project Team. Each Party retains the right to ultimately direct the details and means by which their employees participate on the Project Team. However, employees who participate on the Project Team will receive team assignments and general supervision from the Project Manager in connection with their day to day work. An individual selected to the Project Team shall, insofar as possible, and consistent with the needs of the Project Team and the individual's employer, serve on the Project Team for the duration of the Project Team. Notwithstanding the above, some Project Team members may be selected for specific tasks or phases of

Page 3 of 10

CONFIDENTIAL

Project Team work after which these team members may be dismissed by the Project Manager.

In the event a contractor of a Participating Party or its Affiliate is a Project Team member, such Participating Party or Affiliate will remain responsible for and will administer such contractor's compensation, unless agreed otherwise by the Project Manager. The Project Manager will administer the compensation of contractors whose services are secured directly by the Integrated Project Team.

**2.4**    **Liability of Project Team Members:** TO THE EXTENT ALLOWED BY LAW, EACH PARTY AGREES TO DEFEND, HOLD HARMLESS AND INDEMNIFY THE OTHER PARTIES FROM AND AGAINST ANY LOSS, DAMAGE, CLAIM SUIT, LIABILITY, JUDGMENT AND EXPENSE (INCLUDING ATTORNEY FEES AND OTHER COSTS OF LITIGATION) FOR ANY PERSONAL INJURY (INCLUDING DEATH) OF ITS REPRESENTATIVES ON THE PROJECT TEAM, WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR STRICT LIABILITY OF ANY OTHER PARTY.

## SECTION 3.0 WORK SCOPE AND DURATION OF PROJECT TEAM

**3.1**    **Work Scope of the Project Team:** The primary objective for forming any Project Team is to pool the talents of the Parties in preparing Development Plans and in planning, design, engineering, fabricating, transportation and installation of a Production System and accompanying Facilities. The proposal of the Development Plan (including the Initial Production System) and commitment of funds thereto shall be handled in accordance with Article 12 *(Development Plan)* of the Operating Agreement. To propose a Project Team, the proposing Party shall provide the other Parties with: (1) a memo describing the anticipated scope of the team's work to be undertaken in reasonable detail such that the other Parties may make an informed decision concerning its participation in the Project Team; (2) a memo describing the type and number of staff required to complete the assignment; and (3) an AFE itemizing the estimated of the Cost of the Project Team, (4) proposed location(s) where Project Team representatives will be housed, a list of goods and services covered by Project Team overhead and the proposed overhead recovery method, if not already agreed to by the Parties, and (5) the estimated duration of the Project Team.

**3.2**    **Reports by the Project Team:** The Project Team shall review the progress of its work with all Participating Parties at least quarterly, and present the results of any studies or planning upon their conclusion. The time and place of the Project Team meetings shall be determined by the Project Manager.

**3.3**    **Duration of the Project Team:** The Project Team shall remain in place until (1) the team has completed the work described in the approved Project Team AFE and scoping memo, or (2) the planning, design, construction, installation and start-up phase of the Production System and accompanying Facilities designed/construction/installed under the direction of such Project Team has been completed, or (3) Project Team work has been terminated by

unanimous approval of the Participating Parties, whichever is the earlier event. Upon dissolution of the Project Team, the Operator shall conduct any further work required for the installation of the Production System and/or Facilities. Any Project Team AFE in progress at the time of the Project Team's dissolution shall continue to be accounted for under the applicable provisions of Exhibit "C", or as otherwise agreed to by the Participating Parties.

## SECTION 4.0 COSTS AND ADMINISTRATION OF THE PROJECT TEAM

4.1 **Project Team Costs:** The costs and expenses for the Project Team shall be charged to the Joint Account pursuant to Exhibit "C", *(Accounting Procedure)* of the Operating Agreement. Each Participating Party in the Project Team shall be responsible for its Participating Interest Share of the Project Team Costs, regardless of its level of employee, Affiliate or contractor participation on the Project Team.

    4.1.1 **Project Team Representative Charges:** Each Participating Party in a Project Team shall recover the Costs of its representatives assigned to the Project Team through charges to the Joint Account under Sections I and II of Exhibit "C" (Accounting Procedure) of the Operating Agreement.

    4.1.2 **Contractors:** The Project Manager may retain the services of such contractors as is reasonably necessary to carry out the studies and tasks assigned to the Project Team. Costs of contractors directly employed by the Project Team shall be charged to the Joint Account under Section II.5 of Exhibit "C" *(Accounting Procedure)* of the Operating Agreement. So long as the Costs of the contractor are within the scope of an approved AFE, the Project Manager's retention of contractors shall not require additional approval by the Participating Parties.

## SECTION 5.0 CONFIDENTIALITY

5.1 **Confidentiality Obligation:** Each Party agrees to maintain as confidential and not to use or disclose to any third party Confidential Information, except as expressly provided hereunder, for a confidentiality period commencing on the date of execution of the Operating Agreement and extending through the later of: (a) two (2) years following the termination of the Project Team work pursuant to Section 3.3 of this Exhibit or (b) termination of the Operating Agreement. After expiration of the confidentiality period the receiving Party's obligations of confidentiality and restrictions on use shall be determined in accordance with Section 6.2 and Subsections 6.2.1 and 6.2.2 of this Exhibit. Each Party agrees to treat the disclosure of the Confidential Information in the same manner as it treats its own confidential information.

    5.1.1 **Identification, Declaration, and Use of Background Technology and Information:** The Parties shall use reasonable, good faith efforts to identify and declare Background Technology and Information that will be utilized by the Project Team prior to establishment of the Project Team. Background Technology and

Page 5 of 10

Information must be identified and declared in writing before it is submitted to the Project Team. The decision to identify, declare, and submit Background Technology and Information to the Project Team is at the sole and absolute discretion of the individual Participating Party possessing such technology or information. A Participating Party designating data as Background Technology and Information is not subject to the confidentiality obligation of this Exhibit or the Operating Agreement as to the identified Background Technology and Information. The Project Manager is responsible for maintaining a list describing all Background Technology and Information (and its ownership). This list will be updated from time to time as the Participating Parties submit such Background Technology and Information.

Nothing in the Operating Agreement or this Exhibit impairs the right of any owner of Background Technology and Information from using, exchanging, disclosing, or otherwise freely dealing with its own Background Technology and Information.

**5.1.2** **Supporting Agreements:** Each Party shall be responsible for insuring that its respective representatives fully abide by all obligations associated with the confidentiality of all information learned as a result of its participation on the Project Team and agrees to convey such information to others in its company, or its Affiliates, on a "need-to-know" basis only. In this regard, there shall be limited reproduction of Project Team-generated data. Upon the Project Manager's request, each Party shall require its respective representatives participating on the Project Team to execute a confidentiality agreement consistent with the confidentiality obligations specified in the Operating Agreement and this Exhibit and shall furnish the other Parties with a copy of same upon request. The Project Manager shall be responsible for securing confidentiality agreements from outside contractor services; provided, however, a Non-Operator represented on the Project Team by a contractor shall remain responsible for securing confidentiality agreements from such contractors.

**5.2** **Exceptions and Permitted Disclosures:** Any Participating Party may disclose Confidential Information to third parties if such disclosure is either an exception to the confidentiality obligation or is a permitted disclosure in the same manner as provided for Confidential Data, pursuant to Article 7.1.1 *(Exceptions to Confidentiality)* or Article 7.1.2 *(Permitted Disclosures)* of the Operating Agreement.

**5.3** **Security Policies:** All Parties' representatives assigned to or working under the direction of the Project Team shall honor Operator's security system and shall treat all information directly or indirectly learned or received by virtue of its participation on the Project Team as confidential in accordance with the provisions of Operator's security policies/procedures, and all revisions thereto that are made prior to termination of this Exhibit. A copy of the security policies/procedures and any revisions thereto shall be made available to the Participating Parties' representatives by the Project Manager for their use during the project. This obligation of confidentiality shall also apply to any other proprietary and confidential information that may relate to matters other than the Contract Area to which Project Team members are exposed by virtue of working in Operator's offices. Operator

CONFIDENTIAL                                                                APC-00741710

will use reasonable efforts to minimize the exposure of Non-Operating Party representatives to the Operator's proprietary and confidential information. In no event shall confidential information be disclosed to a third party without the prior written consent of the Participating Parties except as provided in the Operating Agreement.

5.4    **Subsequent Disclosures:** Following the expiration of the period of confidentiality set forth in Section 5.1 above, each Party may freely use and disclose the Confidential Information without accounting to any other Party, subject only to whatever patent rights, copyright restrictions or confidentiality obligations are owed to third parties. Subject to the obligations of confidentiality set forth herein, each Party has the right to copy, display, publish, distribute and prepare derivative works of all documents, drawings or other writings or materials created or conveyed under this Exhibit, including the rights to license, sell or otherwise transfer such rights.

## SECTION 6.0 USE OF CONFIDENTIAL INFORMATION

6.1    **Receipt of Confidential Information:** Each Party will be entitled to receive the full reports of all technical studies, detail reports, general conclusions, numerical results, and design drawings from all engineering services that are charged to the Joint Account pursuant to an AFE in which it is a Participating Party, whether such information is developed by a Party participating in the Project Team, an Affiliate or by a third party.

6.2    **Right to use Confidential Information:** Subject to the obligation of confidentiality of Section 5, and the obligation of Subsections 6.2.1 and 6.2.2, and subject to the patent rights and copyrights relating to Background Technology and Information of the Parties, each Participating Party may use for its own account (and free of cost) all Confidential Information received or developed by the Project Team under this Agreement. Each Participating Party may disclose Confidential Information to other members of joint ventures or production sharing arrangements in which the Party or its Affiliate has an ownership interest provided the other members agree, in writing, to hold the Confidential Information in confidence and to use it only for the benefit of that joint venture or production sharing arrangement.

6.2.1    **Third Party Limitations:** The Parties acknowledge that various Background Technology may have been received or may be received from third parties under certain restrictions (e.g., that the Party may disclose the third party source information to a co-venturer in a joint venture only under obligations of confidentiality and under restriction to use the information only in connection with the joint venture). Each delivering Party agrees to identify, in writing, any Background Technology subject to third party restrictions and disclose the nature of the restriction to the receiving Party prior to disclosure of the Background Technology. The delivering Party shall secure the receiving Party's acknowledgment of such restrictions prior to transmittal of such third party Background Technology. The receiving Party's acknowledgment constitutes its acceptance of such obligations and restrictions imposed upon disclosure and use of the Background Technology.

CONFIDENTIAL    APC-00741711

**6.2.2** **Proprietary Software:** During the term of the Project Team, a Party may be authorized to use various computer software and programs that are identified as being proprietary to the authorizing Party or its Affiliate. Such proprietary computer software and programs shall not be considered Project Technology and Information and such computer software and programs are not a deliverable under this Agreement. Use of such proprietary software and programs is not a grant of license of any rights outside of this Agreement and the authorizing Party retains all rights to such property. Use of any such proprietary software is only for the purposes and duration of the Project Team, and each Participating Party must destroy or return to the authorizing Party all copies of any such proprietary software upon completion of the Project Team's activities. Computer software and programs which are not proprietary to one of the Parties or its Affiliate, but which were developed by the Project Team, shall be considered Project Technology and Information and joint property of the Participating Parties.

## SECTION 7.0 INVENTIONS, PATENTS AND COPYRIGHTS

**7.1** **Patent Assignment with Right to License and Sublicense:** All inventions, whether patentable or not, that (1) are conceived solely by outside contractors employed for the Joint Account, or conceived jointly among the Participating Parties (each including its respective Affiliates) while working on the Project Team and (2) result from work which has been charged to the Joint Account are assigned to the Party designated as Operator, or the chairing Party if Operator is a Non-Participating Party, as of the date the patent is issued. The Operator, or chairing Party if applicable, grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license to practice under all such patents, including the right to grant sublicenses under such patents to any third party or Affiliate on such other terms and conditions that such Party deems appropriate, without accounting to any other Party.

**7.2** **Patent Assignment and License With Limited Right to Sublicense:** Patents on inventions not covered in Section 7.1, that are conceived or first reduced to practice (actual or constructive), by a Party or its Affiliate, either alone or jointly with any outside contractors or consultants, and as a direct result of work that has been charged to the Joint Account, will be owned by that Party. The Party owning any such patent grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license under all such patents to make, have made, use and have used such invention for such other Party's own business, including any joint venture or production sharing arrangement in which such other Party has an ownership interest. Further, each such other Participating Party has the right to extend these rights to its Affiliates, but may not otherwise sub-license any such patent.

**7.3** **No Commitment to Disclose Technology:** Except as expressly set forth above, nothing in this Exhibit "G" will be deemed to require any Party or Affiliate to grant any licenses under any patents, copyrights or trade secrets to anyone. The scope and content of any Background Technology disclosed under this Agreement will be determined in the sole discretion of the disclosing Party.

CONFIDENTIAL

APC-00741712

## SECTION 8.0 WARRANTIES AND INDEMNITIES

8.1 **Disclaimer of Warranties:** ALL INFORMATION OR TECHNOLOGY DISCLOSED OR RECEIVED BY THE PARTIES HEREUNDER SHALL BE PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED AND EXCLUDED FROM THIS AGREEMENT. IN NO EVENT SHALL A PARTICIPATING PARTY CONVEYING OR DISCLOSING INFORMATION OR TECHNOLOGY BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF INFORMATION OR TECHNOLOGY CONVEYED OR DISCLOSED UNDER THIS EXHIBIT.

8.2 **Indemnities:** Each Party agrees to DEFEND, HOLD HARMLESS AND INDEMNIFY the other Parties from and against any loss, damage, claim, suit, liability, judgment and expense (including attorney fees and other costs of litigation) related to, arising out of, or in connection with its use (including use by others which it authorizes), outside of the Contract Area, of any information or technology disclosed, exchanged under or developed pursuant to this Exhibit.

## SECTION 9.0 MISCELLANEOUS PROVISIONS

9.1 **Export Controls:** Each Party agrees to abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Party hereunder.

9.2 **Independent Research:** Nothing herein shall in any way restrict or impair the right of any Party to conduct its own independent research, development, or design activities even though such activities may parallel or overlap the activities of the Project Team. Any such Party conducting such independent research activities shall be under no obligation pursuant to the Operating Agreement or this Exhibit to disclose any results of independent research to the other Party(ies) or with respect to the use or disposition of the results of independent research, including but not limited to all information and data resulting therefrom. Any Background Technology presently owned and developed by a Party prior to the effective date of the Operating Agreement shall remain the property of that Party

9.3 **Assignability:** A third party (not a Party to this Agreement at the time the Project Team was formed) which acquires a Working Interest in the Contract Area may join the Project Team upon the unanimous approval of the Participating Parties. A new Party joining the Project Team must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit. Such new Party will have all rights, duties and obligations under this Exhibit regarding the use of all Confidential Information exchanged or developed prior to the date it joins the Project Team and during its participation thereunder. However, patent rights received by such new Party hereunder pursuant to Section 7.0 of this Exhibit shall be

CONFIDENTIAL                                                                                   APC-00741713

limited to patents based on developments after the date such Party joins the Project Team. In the event that a Party assigns its entire interest in the Leases, the assigning Party shall have all the rights specified in this Exhibit, including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit "G" relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

**9.4**    **Confidential Information to a Non-Participating Party:**  Any Party to the Operating Agreement who elected not to participate in a Project Team but who receives, upon the satisfaction of the applicable non-consent provisions of Article 16.5.3 of the Operating Agreement, Confidential Data or Confidential Information resulting from the Project Team, shall be subject to all obligations and duties, and shall have all the rights set forth in this Exhibit with respect to confidentiality, restrictions, licensing, sub-licensing, indemnity and export controls.

**9.5**    **Survival of Certain Provisions**:  All provisions of this Exhibit related to the confidentiality and use of information, patents, licensing and sub-licensing, export controls, and indemnity will survive the termination of this Exhibit or the Operating Agreement or both.

CONFIDENTIAL                                                                                                    APC-00741714

EXHIBIT "H"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

DISPUTE RESOLUTION PROCEDURE

**1.    Dispute Resolution Procedure:** Compliance with this Exhibit "H" shall constitute a condition precedent to any Party seeking judicial enforcement of any provisions of this Agreement. Any dispute concerning this Agreement (other than claims by a third party under which a Party hereto is claiming indemnity, and such third party claim is in litigation) shall be resolved under the mediation and binding arbitration procedures of this Exhibit "H". The Parties to the dispute ("Disputing Parties") will first attempt in good faith to resolve all disputes by negotiations between management level persons who have authority to settle the controversy. If any Party believes further negotiations are futile, such Party may initiate the mediation process by so notifying the other Disputing Parties in writing. The Disputing Parties shall then attempt in good faith to resolve the dispute by mediation in the city designated by the Operator, in accordance with the Center for Public Resources Model Procedure for Mediation of Business Disputes, as such procedure may be modified by agreement of the Disputing Parties. The Disputing Parties shall share the costs of mediation services equally and shall each have present at the mediation at least one individual who has authority to settle the dispute. If the dispute has not been resolved pursuant to mediation within ninety (90) days after initiating the mediation process, the dispute shall be resolved through binding arbitration, as follows:

**2.    Selection of Arbitrators:** If any dispute or controversy arises between the Parties out of this Agreement, the alleged breach thereof, or any tort in connection therewith, or out of the refusal to perform the whole or any part thereof, and the Parties are unable to agree with respect to the matter or matters in dispute or controversy, the same shall be submitted to arbitration before a panel of three (3) arbitrators in accordance with the Louisiana Arbitration Law, (La. R.S. 9.4201, et seq.) and the provisions in this Section 2. The panel of arbitrators shall be chosen as follows: Upon the written demand of any of the Disputing Parties and within fifteen (15) days from the date of such demand, each Disputing Party (or group of Disputing Parties) shall name an arbitrator (one (1) for each position) and these two (2) so named shall promptly

CONFIDENTIAL                                    APC-00741715

thereafter choose a third. If a Disputing Party (or group of Disputing Parties) fails to name an arbitrator within fifteen (15) days from such demand, the other Disputing Party (or group of Disputing Parties) shall name the second arbitrator as well as the first, or if the two arbitrators fail within fifteen (15) days from their appointment to agree upon and appoint the third arbitrator, then upon written application by any Party to the dispute, such third arbitrator may be appointed by the senior Judge in active service of the United States District Court for the Western District of Louisiana; and if said Judge shall fail to act, then such third arbitrator shall be appointed by the President of the Center for Public Resources, Inc. The arbitrators selected to act hereunder shall be qualified by education, experience, and training to pass upon the particular matter or matters in dispute.

3.    **Arbitration Proceedings**:   The panel of arbitrators so chosen shall proceed promptly to hear and determine the matter or matters in dispute, after giving the Disputing Parties due notice of hearing and a reasonable opportunity to be heard. The procedure of the arbitration proceedings shall be in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as may be modified by the panel of arbitrators. Unless otherwise determined by the arbitrators, the hearing and presentations of the Parties shall not exceed two days cumulative. All arbitration proceedings hereunder shall be held in the city in which the Operator's office is located, unless the panel of arbitrators determines that another venue is more appropriate. The award of the panel of arbitrators or a majority thereof shall be made within forty-five (45) days after the appointment of the third arbitrator, subject to any reasonable delay due to unforeseen circumstances. In the event the panel or a majority thereof fail to make an award within sixty (60) days after the appointment of the third arbitrator, new arbitrators may, at the election of any Disputing Party, be chosen in like manner as if none had been previously selected.

4.    **Award and Arbitration Expenses**: The award of the arbitrators, or a majority thereof, shall be in writing, determined in accordance with the substantive law as determined in Article 26.4.1 (*Applicable Law*) of the Agreement, and shall be final and binding on the Parties as to the question or questions submitted and the Parties shall abide by such award and perform the conditions thereof. The award of the arbitrators shall be based on the applicable law and facts, the merits of the parties' positions in the controversy or dispute, and the arbitrators' assessment of the fairness and reasonableness of any settlement proposal of any Party. The arbitrators may not award

Page 2 of 4

CONFIDENTIAL                                                  APC-00741716

any punitive or exemplary damages. The award shall not provide or create any rights or benefits in any person or entity which is not a Party to this Agreement, as this Agreement and any arbitration thereunder shall not be construed as a third party beneficiary contract. Unless otherwise determined by the arbitrators, all expenses in connection with such arbitration shall be divided equally between the Disputing Parties, except that the expenses of counsel, witnesses, employees, or other representatives of each Party shall be borne solely by the Party incurring them, and the compensation of any arbitrator named by a Party or group of Parties shall be borne solely by such Party or group of Parties; provided that if court proceedings to stay litigation or compel arbitration are necessary, the Party who unsuccessfully opposes such proceedings shall pay all reasonable associated costs, expenses, and attorneys' fees of such court proceedings. Except as otherwise provided in the immediately preceding sentence, each Party shall bear its own attorneys' fees in connection with any appeal of an arbitration award, or in any other court litigation arising out of this Agreement.

5.    **Confidentiality**:   The arbitrators may, but shall not be required, to explain reasons for the award.  No transcript or other recording shall be made of the arbitration proceedings. Except (i) in connection with a suit for enforcement of the award, (ii) as required by law, court order, or regulation, (iii) when reasonably necessary to explain the terms and conditions of the award to outside attorneys, auditors, and insurers, or (iv) as part of good faith compliance with disclosure obligations under applicable law, the arbitration proceedings, the award, and the Parties' actions in connection with the arbitration are confidential and shall not be disclosed to third parties, and no disclosure of or reference to the arbitration, the award, or of the Parties' statements or actions in connection with the arbitration shall be made to any third party.  All offers, promises, conduct, statements, and evidence, whether oral or written, made in the course of the arbitration by any of the Parties, their agents, employees, experts, or attorneys are confidential.   Such offers, promises, conduct, statements, and evidence shall be considered inadmissible under Rule 408 of the Federal Rules of Evidence and any similar state-law provisions, and shall be inadmissible for any purpose, including impeachment.  However, evidence that is otherwise admissible shall not be rendered inadmissible as a result of its use in the arbitration.

6.    **Enforceability**:  The award of the panel of arbitrators and the obligation to abide by same and perform the conditions thereof shall be enforceable in the Louisiana state district courts in Lafayette Parish, Louisiana, or in any federal court having jurisdiction.

Page 3 of 4

CONFIDENTIAL                                                                 APC-00741717

**7.    Indemnification**:  The provisions of this Exhibit "H" shall not limit the obligation of a Party to defend, indemnify or hold harmless another Party against court proceedings or other claims, loss, damages or expenses as provided elsewhere in Article 22 *(Liability, Claims, and Lawsuits)* of the Agreement.

**8.    Preservation of Rights**:  Notwithstanding the above, any Party may file a complaint for statute of limitations or venue reasons, or seek a preliminary injunction or other provisional judicial relief, if in its sole judgment such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite such actions, the Parties shall continue to try to resolve the dispute by negotiation, mediation, or arbitration as necessary.

CONFIDENTIAL

APC-00741718

EXHIBIT "I"

**Attached to and made a part of that certain Operating Agreement
dated effective April 1, 2008 by and between
ConocoPhillips Company and Anadarko E&P Company LP**

## MEMORANDUM OF OPERATING AGREEMENT
## AND FINANCING STATEMENT

### (LOUISIANA)

**To be filed in the conveyance records and
in the mortgage records and as a non-
standard financing statement in accordance
with Paragraph 6.0 herein.**

1.0   This Memorandum of Operating Agreement and Financing Statement (Louisiana) (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of ConocoPhillips Company, a Delaware Corporation, whose taxpayer identification number is 73-0400345 and whose address is 550 Westlake Park Blvd., Three Westlake Park, Suite 9000, Houston, TX 77079 (the "Operator"), and the undersigned, duly authorized representative of Anadarko E&P Company LP, a Delaware Corporation, whose taxpayer identification number is 73-0739973 and whose address is Anadarko E&P Company LP, 1201 Lake Robbins Drive, Woodlands, TX 77380 (the "Non-Operating Party").

2.0   The Operator and the Non-Operating Parties are parties to that certain Operating Agreement dated April 1, 2008 (the "Operating Agreement") which Operating Agreement provides for the development and production of crude oil, natural gas and associated substances from the OCS blocks, or portions thereof, described in Exhibit "A" of the Operating Agreement and in Attachment "1" to this Memorandum, or covered by the Leases (hereinafter called the "Contract Area") and which designates Anadarko Petroleum Corporation, as the Operator, to conduct such operations for itself and the Non-Operating Parties. All OCS federal oil and gas leases (or portions thereof) described in Exhibit "A" of the Operating Agreement and in Attachment "1" to this Memorandum and any future oil and gas leases covering OCS blocks, or portions thereof, included within the Contract Area that may be acquired by the Operator or any Non-Operating Party (including substitutions for or replacements of existing leases) are hereinafter called the "Leases."

For the purposes of this Memorandum the term "Development Systems" means:

(a)   systems to develop and produce oil and gas and associated liquid and gaseous by-products from a wellbore located on the Contract Area ("Hydrocarbons"), including (i) offshore surface structures, whether fixed, compliant or floating, (ii) offshore subsea structures or templates, whether capable of accommodating one or multiple wells, (iii) any combination of (i) and (ii), (iv) any other type of system designed to develop and produce Hydrocarbons, and (v) all associated components of any of the above, and

(b)   associated production equipment beyond the wellhead connections

Page 1 of 10

CONFIDENTIAL                                                                  APC-00741719

that is installed on or outside the Contract Area pursuant to the Operating Agreement in order to handle or process Hydrocarbon production, including, but not limited to, injection and disposal and disposal wells and the flowlines and gathering lines that transport Hydrocarbons from the wellhead.

**3.0** Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the parties of their respective share of costs and performance of other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, (c) includes non-consent clauses which establish that parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Leases or portions thereof involved in such operations, (d) grants each party to the Operating Agreement the right to take in kind its proportionate share of all oil and gas produced from the Contract Area, and (e) includes a volumetric Gas Balancing Agreement which is attached as Exhibit "D" to the Operating Agreement.

**4.0** The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

**5.0** In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties set forth in the Operating Agreement, the Operator and the Non-Operating Parties hereby agree as follows:

**5.1** Each Non-Operating Party hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

**5.2** Each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof. The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or

CONFIDENTIAL

APC-00741720

the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers (i) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles, and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of such Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Contract Area.

5.3     To the extent susceptible under applicable law, the mortgage and the security interest granted by each Non-Operating Party in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by such Non-Operating Party to the Operator of all of its obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all expenses incurred by the Operator and the Participating Parties for (or on

Page 3 of 10

CONFIDENTIAL                                                    APC-00741721

account of) any and all operations conducted pursuant to the Operating Agreement ("Costs") and other expenses properly charged to such Non-Operating Party together with (1) interest on such indebtedness, Costs, and other expenses at the rate of the U.S. Treasury Bill 13-week discount rate plus three percent (3%) or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.4     This Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana, with the Operator being the secured party and the Non-Operating Parties being the debtors with respect to such filing.

5.5     The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to the Operating Agreement.

5.6     The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.7     The Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases or the Contract Area when

Page 4 of 10

CONFIDENTIAL

APC-00741722

extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers (i) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area.

**5.8** To the extent susceptible under applicable law, the mortgage and the security interest granted by the Operator in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by the Operator to the Non-Operating Parties of all of its obligations and indebtedness of every kind and nature, whether now owed or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all Costs and other expenses properly charged to

CONFIDENTIAL

APC-00741723

the Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate of the U.S. Treasury Bill 13-week discount rate plus three percent (3%) or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.9     For the purposes of the security interest in favor of the Non-Operating Parties, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana, with the Non-Operating Parties being the secured parties and the Operator being the debtor with respect to such filing.

5.10    The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $500,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operating Parties to the Operating Agreement at any time. Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0     To serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operating Parties to their interests in and to the Leases and the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the offshore blocks covered by the Leases or included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0     If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each party to the Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured party under the Uniform Commercial Code. If any Non-Operating Party does not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of such Non-Operating Party's production and collect such indebtedness out of the proceeds from the sale of such Non-Operating Party's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such Non-Operating Party's share of

Page 6 of 10

production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by such Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such Non-Operating Party.

**8.0** Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all parties to the Operating Agreement. Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, at any time prior to the filing of such release and termination instrument, each of the Operator and the Non-Operating Parties shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

**9.0** It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

**10.0** This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

**11.0** A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

**12.0** This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of each Non-Operating Party, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured party, and another filing for the Non-Operating Parties, as secured parties. The respective addresses of the Operator, as both secured party and debtor, and the Non-Operating Parties, as both debtors and secured parties, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

**13.0** The Operator and the Non-Operating Parties hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating

CONFIDENTIAL                                    APC-00741725

Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

**14.0** Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

EXECUTED on the dates set forth below each signature but effective as of the 1st day of March, 2006.

**OPERATOR:**

WITNESSES:

**Anadarko E&P Company LP**

By:_____
Name:_____
Title: _____
Date: _____

**NON-OPERATING PARTY:**

WITNESSES:

**ConocoPhillips Company**

By: _____
Name: David W. Twomey
Title: Attorney-in-Fact
Date: _____

Page 8 of 10

CONFIDENTIAL                                                  APC-00741726

## ACKNOWLEDGMENT

### OPERATOR:

STATE OF: TEXAS

COUNTY OF: MONTGOMERY

On this _____ day of _____, 2007, before me, appeared _____, to me personally known, who, being by me duly sworn, did say that he is the **Agent & Attorney-in-Fact** of **Anadarko E&P Company LP**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

_____
**NOTARY PUBLIC - STATE OF TEXAS**

My Commission expires:

### NON-OPERATING PARTIES:

**STATE OF TEXAS**

**COUNTY OF HARRIS**

On this _____ day of _____, 2006, before me, appeared **David W. Twomey**, to me personally known, who, being by me duly sworn, did say that he is the **Attorney-in-Fact** of **ConocoPhillips Company**, a Delaware corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that _____ acknowledged the instrument to be the free act and deed of the corporation.

_____
**NOTARY PUBLIC - STATE OF TEXAS**

My Commission expires:

CONFIDENTIAL

APC-00741727

## ATTACHMENT "1" TO EXHIBIT "I"

Attached to and made a part of the
Memorandum of Operating Agreement and
Financing Statement (Louisiana) dated
Effective April 1, 2008, by and between
ConocoPhillips Company and Anadarko E&P Company LP

### I.   DESCRIPTION OF LANDS AND LEASES

| OCS-G No. | Area | Block | Expiration Date |
|---|---|---|---|
| 20259 | Walker Ridge | 8 | June 30, 2008 |
| 31938 | Walker Ridge | 51 | November 30, 2017 |
| 25232 | Walker Ridge | 52 | May 31, 2013 |

### II.   OPERATOR

Anadarko E&P Company LP

### IV.   ADDRESSES/NAMES OF REPRESENTATIVES:

|  | ConocoPhillips Company | Anadarko E&P Company LP |
|---|---|---|
| Mail: | P. O. Box 2197<br>Houston, TX 77252 | P.O. Box 1330<br>Houston, TX 77251-1330 |
| Office: | 550 Westlake Park Blvd.<br>Three Westlake Park, Suite 3000<br>Houston, TX 77079 | 1201 Lake Robbins Drive<br>The Woodlands, TX 77380 |
| Attn: | Jim Higgins – Land Manager | Jim W. Bryan – Director, Land GOM |
| Telephone:<br>Facsimile: | (832) 486-2000<br>(832) 486-2691 | Telephone: (832) 636-8831<br>Facsimile: (832) 636-8059 |

Page 10 of 10

CONFIDENTIAL

APC-00741728

# Exhibit 56

**To:** 'Fitzgerald, Michael D'[Michael.D.Fitzgerald@conocophillips.com]; Ben.Davis@cobaltintl.com[Ben.Davis@cobaltintl.com]; Lynne Hackedorn[lynne.hackedorn@cobaltintl.com]; scornwell@venari.net[scornwell@venari.net]; 'Randy Bennett'[rbennett@venari.com]
**Cc:** Meyer, Frank[Frank.Meyer@anadarko.com]; Poole, Andrew[Andrew.Poole@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Thur 9/21/2017 7:36:58 PM Coordinated Universal Time
**Subject:** Shenandoah

As a follow-up to my phone conversation with each of you on Tuesday, as a direct result of the progression and encouraging results of the Gunnison Relocation Concept and its associated economics, the Asset Team's current path forward plan for Shenandoah is as follows:

- Attempt to secure internal approval to fund our 33% WI share of a Grass Roots Keeper Well, the Shen 7, twinning the Shen 2 – hopeful to secure internal approval the week of October 9th;
- The AFE will include the cost to drill and log the Shen 7 to a depth equivalent to the B/C Shale;
- The preliminary estimated cost of the AFE is projected to be $118MM;
- If the Shen 7 is successful, the preliminary estimated cost to set a production liner and T&A is projected to be $21MM;
- If internal approval is secured for the Drill and Log AFE, the AFE will be formally submitted to Partners – hopeful to submit said AFE the week of October 9th;
- Simultaneously, Anadarko would also be submitting a (i) 2018 20A AFE projected to be $13.7MM; (ii) a 2018 IPT AFE projected to be $7MM; and (iii) a Detailed Engineering Design AFE projected to be $22MM;
- Regarding the currently open and approved AFE's, please refer to the most recently provided VOWD (Value of Work Done) Spreadsheet (through August 2017) to review the current status and 2017 year-end projections associated therewith;
- Soon after submitting the foregoing AFE's to Partners, Anadarko will host a Partner Meeting to present and collectively review all details - The Partner Meeting is currently planned for the week of October 16th as a Meeting Notice will soon appear on your calendars.

During the interim, Anadarko's subsurface team will be forwarding your team with the pertinent details associated with the Grass Roots Keeper Shen 7 well. Please feel free to contact me should you have any questions or need any additional information.

CONFIDENTIAL

APC-00328743

# Exhibit 57



Melissa Coleman
Manager, Strategy, Portfolio, Assurance & Deepwater
600 North Dairy Ashford, OA-3036
Houston, Texas 77079
Tel (281) 293-4973
Fax (281) 293-6921

December 6, 2017

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, TX 77380
Attn: Frank Meyer

Re:    Shenandoah Prospect- Shenandoah WR51#5 ("Shen-7") Well AFE
       Anadarko AFE No. 2140195

Dear Mr. Meyer:

This letter is in response to that certain Lease OCS-G 31938 Walker Ridge Block 51 Well No.5 AFE (Anadarko AFE No. 2140195) ("Shen-7 AFE") submitted to ConocoPhillips Company ("COPC"), Cobalt International Energy, L.P. ("Cobalt") and Venari Offshore LLC ("Venari") by Anadarko Petroleum Corporation ("APC") (the "Operator").  Unfortunately, due to lack of clarity surrounding the Operator's forward plan for the project, COPC cannot support the Shen-7 Well AFE.

Following results of the Shenandoah WR52#3 ("Shen-6") and WR52#3ST ("Shen-6ST") wells in the 1st Quarter of 2017, which triggered APC's write down of the book value in its Q1 earnings report, the Operator continued to focus resources on progressing plans for a new build host.  This was despite frequent attempts by COPC, Cobalt and Venari to redirect the Operator's project team to investigate the technical and economic merits of alternative development concepts.  These delays cost the partnership valuable time.

Over the past couple months, the Operator had begun to progress a phased development concept based on relocating and reconditioning the Gunnison SPAR.  Preliminary discussions were very encouraging, but details have yet to be communicated on critical elements of this new plan, including: timeline to achieving alignment on a new single development concept, path forward to a 20 K psi completion rig, details and justification for the well completion strategy, host procurement plans and estimated operating costs.  It was indicated by APC that this information would be provided through a series of meetings and workshops to be completed before new project AFEs were due to be approved, but these meetings have since been cancelled.

Based on these actions, COPC has diminished confidence the Shenandoah project will progress to a viable development solution, and therefore sees significant risk to committing additional capital.  As such, please find attached our non-consent to the Shen-7 Well AFE.

Should you have any questions or concerns please feel free to contact Michael Fitzgerald at (281)293-1690, michael.d.fitzgerald@cop.com, for commercial matters, or the undersigned for technical matters.

Yours very truly,

Melissa Coleman
Manager, Strategy, Portfolio, Assurance & Deepwater

Shen-7 AFE Response- ConocoPhillips Company

CONFIDENTIAL                                                                APC-00336945

ANADARKO PETROLEUM CORPORATION

P.O. BOX 1330 • HOUSTON, TEXAS 77251-1330



November 9, 2017

ConocoPhillips Company
600 N. Dairy Ashford, Suite DU 3018
Houston, TX 77079
Attn:   Lindsay Alaniz/Michael Fitzgerald
Fax:    281-293-6171

Cobalt International Energy, L.P.
920 Memorial City Way, Suite 100
Houston, TX 77024
Attn:   Ben Davis
Fax:    713-579-9196

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn:   Scott Cornwell/Randy Bennett
Fax:    713-266-2330

RE:    Shenandoah Prospect
       Anadarko AFE No. 2140195
       Lease OCS-G 31938 Walker Ridge Block 51 Well No. 5 (Shen 7)
       Unit/Lease Maintenance Operation

Gentlemen:

Enclosed for your review and approval is Anadarko AFE No. 2140195 in which  Anadarko proposes drilling, logging, and evaluating the Walker Ridge Block 51 No. 5 Well, referred to as the "Shen 7", for an estimated gross (100%) cost of $108,040,481. The Shen 7 is targeting previously discovered Upper and Lower Wilcox reservoir sands approximately 150'-350' updip of the WR 51 #2 (Shen 2), with a projected penetration point approximately 600' laterally north-northeast therefrom.

The Shen 7 is proposed as a directional well from the Shen 5 Fault Block to the Shen 2 Fault Block, namely, from EP Location "EEE", at or about an X&Y coordinate of X=2,105,587 and Y=9,768,207' being approximately 1,132' FEL and 5,072' FNL of Block 51 to an estimated bottom-hole X&Y coordinate of X=2,102,991' and Y=9,767,629' being approximately 3,738' FEL and 5,650' FNL of Block 51.  The Shen 7 is proposed to be drilled to a total depth of approximately 30,442' TVD/30,737' MD, with the <u>Objective Depth</u>, as prescribed in the Shenandoah UOA, being the shallower of:

(i)    The base of the Lower Wilcox C Sand with sufficient rat hole (the Lower Wilcox C Sand is defined as the stratigraphic equivalent of that certain sand encountered at a depth of approximately 30,578' TVD/MD in the Shen 2); or

(ii)   A depth of 30,814' TVD.

The anticipated logging and evaluation program at TD currently consists of Density, Neutron, Magnetic Resonance, Spectral Gamma Ray, Elemental Capture Spectroscopy,

CONFIDENTIAL

Tr-axial Resistivity, Sonic Scanner, Quanta Geo (NGI), MDT w/quicksilver for pressures and samples, and possibly rotary cores. Opportunities to combine runs and optimize data collection will be based primarily upon the quality of the LWD data.

Although Anadarko will make a formal recommendation pursuant to Article 11.2 (*Appraisal Operations at Objective Depth*) after the Shen 7 has been drilled to Objective Depth and logged/evaluated, for informational purposes, the current estimated cost to Case & Suspend the well (in addition to the AFE amount prescribed herein) is $5.8MM. Please be reminded, however, any original Participating Party in the Shen 7 shall remain responsible for its participating interest share of any and all Cost (less and except any additional Cost attributable to a non-consent operation) to permanently plug and abandon same.

The proposed well is currently planned to be drilled (utilizing approximately 90 days of rig time) with the Diamond Ocean Blackhawk. The Diamond Ocean Blackhawk is a state of the art, dynamically positioned drillship with dual stack BOP's and is capable of drilling in water depths of up to 12,000' and is capable of drilling to depths of 40,000'. The current day rate for the Blackhawk is approximately $525,000 and is anticipated to be delivered to the Shen 7 participants for mobilization to the proposed location for a March 2018 spud.

Under the Shenandoah UOA, as amended, Appraisal Operations have contractually concluded pursuant to Article 11.5(b). However, as contemplated in Article 11.6, since a Development Plan has not been approved, the Shen 7 is deemed an Appraisal Operation. Moreover, since the Shen 7 is a Unit activity/operation necessary to maintain the entire Unit Area, the Shen 7 is not only an Appraisal Operation (for which a Vote does not apply), but it is also an operation in which any Non-Participating Party is subject to forfeiture pursuant, in particular, to Article 16.4.1 (*Acreage Forfeiture in the entire Unit Area*).

To assist you in your evaluation of this well proposal, enclosed please find (i) a wellbore schematic(s) detailing, in particular, the well design, projected casing/liner settings/pore pressures and the anticipated evaluation program; (ii) an estimated days versus depth plot (both in dollars and in days); and (iii) a directional well plan.

**Pursuant to Article 8.6.1 (*Well Proposals, Deepening, Sidetrack, Recompletions and Workovers*), each Party has thirty (30) days from receipt of this proposal or on or before December 9, 2017 to make its participation election as to same**. Should you have any questions or need any additional information, please don't hesitate contacting me at (832) 636-3170.

Yours very truly,

Jeffrey E. Pachman
Project Land Advisor

CONFIDENTIAL

APC-00336947



## Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

| | | |
|---|---|---|
| **Company Code:** 0622 | **AFE No:** 2140195 | **AFE Type:** DE - DRILLING - EXPLORATORY |
| **Well #/Name:** 1K151500 / WALKER RIDGE 51 005 | | **Field:** 2535 UNNAMED  (MID-CONTIN |
| **Country:** USA | **State/Province:** NORTHERN ( | **County:** WALKER RIDGE |
| **Prospect:** | | **Surface Loc:** 60812 51 |
| **Target Zone:** WILCOX 9300 | | **Bottom Hole Loc:** 60812 51 |

**Project Depth:**

**Project Name:** WALKER RIDGE 51 005

**Project Description:** THE SHENANDOAH TEAM SEEKS INTERNAL APPROVAL IN THE AMOUNT OF $35.6MM NET TO DRILL & LOG THE WR51-5 (SHEN 7) WELL TARGETING PREVIOUSLY DISCOVERED PRODUCTIVE WILCOX RESERVOIR SANDS 150-350 FT UP-DIP OF SHEN 2, WHICH IS A LOCATION 600 FT LATERALLY NNE OF SHEN2. THIS WELL WILL PERPETUATE THE SHENANDOAH LEASES PAST THE CURRENT APRIL 2018 LEASE EXPIRATION FOR ONE YEAR IN ORDER TO FURTHER EVALUATE DEVELOPMENT OPTIONS FOR SHENANDOAH. THE CASE & SUSPEND COST IS ESTIMATED TO BE AN ADDITIONAL $5.8MM NET. THE WELL IS CURRENTLY REFLECTED ON THE RIG-SCHEDULE TO SPUD IN MARCH 2018 WITH OPERATIONS ESTIMATED TO LAST 90 DAYS.

| Working Interest Owner | Operator | WI | Amount |
|---|---|---|---|
| ANADARKO PETROLEUM CORP. | X | 0.00000000 | $0 |
| ANADARKO US OFFSHORE LLC | | 0.33000000 | $35,653,359 |
| CONOCOPHILLIPS COMPANY | | 0.30000000 | $32,412,144 |
| COBALT INTERNATIONAL ENERGY LP | | 0.20000000 | $21,608,096 |
| VENARI OFFSHORE LLC | | 0.17000000 | $18,366,882 |
| TOTAL | | 1.00000000 | $108,040,481 |

| | DRL.DHC | Total |
|---|---|---|
| ORIGINAL | $108,040,481 | $108,040,481 |
| Total | $108,040,481 | $108,040,481 |

## Please mark your election in the box below

☐  Election to Participate

☒  Election to Non-Consent

APPROVED BY: _~Milaina~_

COMPANY NAME: _ConocoPhillips_

PRINTED NAME: _Meena Graham_

DATE: _12/6/2017_

CONFIDENTIAL

APC-00336948

# Anadarko
### Petroleum Corporation

## AUTHORIZATION FOR EXPENDITURE

Company Code: 0622    AFE No: 2140195        AFE Type: DE - DRILLING - EXPLORATORY

Well #/Name: 1K151500 / WALKER RIDGE 51 005

### GROSS DETAIL COST ESTIMATE

| Cost Element | Description | Current Amount | Supplement | Intangible | Tangible | Total |
|---|---|---|---|---|---|---|
| 0080012230 | Cased Hole Logs & E-line Ops | $18,070 | $0 | $18,070 | $0 | $18,070 |
| 0080012410 | Casing > 30 in (>76.17 cm) | $1,115,467 | $0 | $0 | $1,115,467 | $1,115,467 |
| 0080012370 | Casing 12.0-15.99 in. (30.46-40.61 cm) | $3,790,700 | $0 | $0 | $3,790,700 | $3,790,700 |
| 0080012380 | Casing 16.0-19.99 in. (40.62-50.77 cm) | $3,558,500 | $0 | $0 | $3,558,500 | $3,558,500 |
| 0080012390 | Casing 20.0-23.99 in. (50.78-60.93 cm) | $893,200 | $0 | $0 | $893,200 | $893,200 |
| 0080012400 | Casing 24.0-29.99 in. (60.94-76.17 cm) | $564,000 | $0 | $0 | $564,000 | $564,000 |
| 0080012360 | Casing 9.0-11.99 in. (22.84-30.45 cm) | $456,000 | $0 | $0 | $456,000 | $456,000 |
| 0080012430 | Casing Accessories | $350,000 | $0 | $0 | $350,000 | $350,000 |
| 0080012010 | Contract Drilling | $35,847,420 | $0 | $35,847,420 | $0 | $35,847,420 |
| 0080012020 | Directional Drilling Services | $1,209,357 | $0 | $1,209,357 | $0 | $1,209,357 |
| 0080012060 | Downhole Rental Equipment | $2,090,830 | $0 | $2,090,830 | $0 | $2,090,830 |
| 0080012040 | Drill Bits | $700,000 | $0 | $700,000 | $0 | $700,000 |
| 0080012300 | Drilling & Wellwork Consulting Services | $25,000 | $0 | $25,000 | $0 | $25,000 |
| 0080012290 | Drilling & Wellwork Contract On Site Sup | $859,715 | $0 | $859,715 | $0 | $859,715 |
| 0080012050 | Drilling & Wellwork Fuel | $2,085,000 | $0 | $2,085,000 | $0 | $2,085,000 |
| 0080012330 | Drilling & Wellwork Misc Services | $2,628,699 | $0 | $2,628,699 | $0 | $2,628,699 |
| 0080012080 | Drilling & Wellwork Mud & Chemicals | $8,579,835 | $0 | $17,159,670 | $8,579,835 | $8,579,835 |
| 0080012070 | Drilling & Wellwork Surface Equip Rental | $2,649,618 | $0 | $2,649,618 | $0 | $2,649,618 |
| 0080017070 | Environ/Reg Permits, Licenses and Fees | $76,450 | $0 | $76,450 | $0 | $76,450 |
| 0080017030 | Environmental Waste Disposal | $104,250 | $0 | $104,250 | $0 | $104,250 |
| 0080017000 | Environmental/Regulatory Studies & Plans | $14,000,000 | $0 | $14,000,000 | $0 | $14,000,000 |
| 0080012160 | Fishing Tools and Services | $276,263 | $0 | $276,263 | $0 | $276,263 |
| 0080012440 | Liner Hanger | $500,000 | $0 | $0 | $500,000 | $500,000 |
| 0080025020 | Living & Camp/Housing Expenses | $196,685 | $0 | $196,685 | $0 | $196,685 |
| 0080012170 | Misc Drilling and Wellwork Consumables | $227,265 | $0 | $227,265 | $0 | $227,265 |
| 0080012540 | Mud Line Hanger Systems | $454,212 | $0 | $0 | $454,212 | $454,212 |
| 0080012120 | Mud Logging | $607,500 | $0 | $607,500 | $0 | $607,500 |
| 0080012110 | Open Hole Logging | $5,139,560 | $0 | $5,139,560 | $0 | $5,139,560 |
| 0080031050 | Overhead Billed - System Calculated | $6,598,417 | $0 | $6,598,417 | $0 | $6,598,417 |
| 0080012090 | Primary Cementing | $2,573,169 | $0 | $2,573,169 | $0 | $2,573,169 |
| 0080012000 | Rig Mobilization/Demobilization | $523,320 | $0 | $523,320 | $0 | $523,320 |
| 0080025010 | Shore Base/Staging Area Expenses | $139,000 | $0 | $139,000 | $0 | $139,000 |
| 0080015250 | Subsea Wellhead | $741,551 | $0 | $0 | $741,551 | $741,551 |
| 0080025070 | Telephone & Communications | $104,250 | $0 | $104,250 | $0 | $104,250 |
| 0080024000 | Transportation/Freight Air | $1,591,550 | $0 | $1,591,550 | $0 | $1,591,550 |
| 0080024020 | Transportation/Freight Ground | $121,973 | $0 | $121,973 | $0 | $121,973 |
| 0080024010 | Transportation/Freight Marine | $6,643,655 | $0 | $6,643,655 | $0 | $6,643,655 |
| | Total  DRL.DHC | $108,040,481 | $0 | $104,196,686 | $21,003,465 | $108,040,481 |
| TOTAL | | $108,040,481 | $0 | $104,196,686 | $21,003,465 | $108,040,481 |

CONFIDENTIAL

APC-00336949



WR 51 #5 ST00BP00
Shenandoah VII

APC-00336950

CONFIDENTIAL

**Schlumberger**

# WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 Proposal Geodetic Report

## (Def Plan)

**Anadarko Petroleum Corporation**

| | |
|---|---|
| Report Date: | October 24, 2017 - 09:17 AM |
| Client: | Anadarko Petroleum Corporation |
| Field: | Walker Ridge Block 051.052 (Shenandoah) |
| Structure / Slot: | WR051 005 / WR051 005 Shen-7 |
| Well: | OCS-G 31938 005 (Shen-7) |
| Borehole: | ST00BP00 |
| UWI / API#: | Unknown / Unknown |
| Survey Name: | WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |
| Survey Date: | October 24, 2017 |
| Tort / AHD / DDI / ERD Ratio: | 12.795 ° / 2660.268 ft / 4.536 / 0.087 |
| Coordinate Reference System: | NAD27 UTM Zone 15N, US Feet |
| Location Lat / Long: | N 26° 54' 44.31455", W 91° 34' 19.78183" |
| Location Grid N/E Y/X: | N 9768207.800 ftUS, E 2105587.390 ftUS |
| CRS Grid Convergence Angle: | 0.6464 ° |
| Grid Scale Factor: | 0.99984818 |
| Version / Patch: | 2.10.544.0 |

| | |
|---|---|
| Survey / DLS Computation: | Minimum Curvature / Lubinski |
| Vertical Section Azimuth: | 257.434 ° (Grid North) |
| Vertical Section Origin: | 0.000 ft, 0.000 ft |
| TVD Reference Datum: | Rotary Table |
| TVD Reference Elevation: | 92.000 ft above MSL |
| Seabed / Ground Elevation: | 5840.619 ft below MSL |
| Magnetic Declination: | 0.318 ° |
| Total Gravity Field Strength: | 998.3409mgn (9.80665 Based) |
| Gravity Model: | GARM |
| Total Magnetic Field Strength: | 45214.546 nT |
| Magnetic Dip Angle: | 56.246 ° |
| Declination Date: | March 12, 2018 |
| Magnetic Declination Model: | HDGM 2017 |
| North Reference: | Grid North |
| Grid Convergence Used: | 0.5464 ° |
| Total Corr Mag North->Grid North: | -0.3281 ° |
| Local Coord Referenced To: | Well Head |

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (E/W ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tie-In | 0.00 | 0.00 | 0.00 | 0.00 | -92.00 | 0.00 | 0.00 | 0.00 | N/A | 9768207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| MudLine | 5922.62 | 0.00 | 257.43 | 5922.62 | 5840.62 | 0.00 | 0.00 | 0.00 | 0.00 | 9768207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| KOP | 18300.00 | 0.00 | 257.43 | 18300.00 | 18218.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9768207.80 | 2105587.39 | N 26 54 44.31 | W 91 34 19.78 |
| | 18400.00 | 1.50 | 257.43 | 18399.99 | 18317.99 | 1.31 | -0.28 | -1.28 | 1.50 | 9768207.52 | 2105586.11 | N 26 54 44.31 | W 91 34 19.80 |
| | 18500.00 | 3.00 | 257.43 | 18499.91 | 18417.91 | 5.23 | -1.14 | -5.11 | 1.50 | 9768206.66 | 2105582.28 | N 26 54 44.30 | W 91 34 19.84 |
| | 18600.00 | 4.50 | 257.43 | 18599.69 | 18517.69 | 11.77 | -2.56 | -11.49 | 1.50 | 9768205.24 | 2105575.90 | N 26 54 44.29 | W 91 34 19.91 |
| | 18700.00 | 6.00 | 257.43 | 18699.27 | 18617.27 | 20.92 | -4.55 | -20.42 | 1.50 | 9768203.25 | 2105566.97 | N 26 54 44.27 | W 91 34 20.01 |
| | 18800.00 | 7.50 | 257.43 | 18798.57 | 18716.57 | 32.68 | -7.11 | -31.90 | 1.50 | 9768200.69 | 2105555.50 | N 26 54 44.25 | W 91 34 20.14 |
| | 18900.00 | 9.00 | 257.43 | 18897.54 | 18815.54 | 47.03 | -10.23 | -45.90 | 1.50 | 9768197.57 | 2105541.50 | N 26 54 44.22 | W 91 34 20.29 |
| | 19000.00 | 10.50 | 257.43 | 18996.09 | 18914.09 | 63.96 | -13.92 | -62.43 | 1.50 | 9768193.89 | 2105524.97 | N 26 54 44.18 | W 91 34 20.47 |
| | 19100.00 | 12.00 | 257.43 | 19094.16 | 19012.16 | 83.47 | -18.16 | -81.47 | 1.50 | 9768189.64 | 2105505.93 | N 26 54 44.14 | W 91 34 20.68 |
| EOC (Curve-Hold) | 19153.02 | 12.80 | 257.43 | 19145.94 | 19063.94 | 94.85 | -20.64 | -92.58 | 1.50 | 9768187.17 | 2105494.82 | N 26 54 44.12 | W 91 34 20.81 |
| | 19200.00 | 12.80 | 257.43 | 19191.76 | 19109.76 | 105.26 | -22.90 | -102.74 | 0.00 | 9768184.90 | 2105484.67 | N 26 54 44.10 | W 91 34 20.92 |
| | 19300.00 | 12.80 | 257.43 | 19289.28 | 19207.28 | 127.40 | -27.72 | -124.35 | 0.00 | 9768180.09 | 2105463.06 | N 26 54 44.05 | W 91 34 21.16 |
| | 19400.00 | 12.80 | 257.43 | 19386.79 | 19304.79 | 149.55 | -32.54 | -145.97 | 0.00 | 9768175.27 | 2105441.44 | N 26 54 44.01 | W 91 34 21.40 |
| | 19500.00 | 12.80 | 257.43 | 19484.31 | 19402.31 | 171.70 | -37.35 | -167.59 | 0.00 | 9768170.45 | 2105419.83 | N 26 54 43.96 | W 91 34 21.64 |
| | 19600.00 | 12.80 | 257.43 | 19581.83 | 19499.83 | 193.84 | -42.17 | -189.20 | 0.00 | 9768165.63 | 2105398.22 | N 26 54 43.92 | W 91 34 21.88 |
| | 19700.00 | 12.80 | 257.43 | 19679.34 | 19597.34 | 215.99 | -46.99 | -210.82 | 0.00 | 9768160.82 | 2105376.60 | N 26 54 43.87 | W 91 34 22.12 |
| | 19800.00 | 12.80 | 257.43 | 19776.86 | 19694.86 | 238.14 | -51.81 | -232.43 | 0.00 | 9768156.00 | 2105354.99 | N 26 54 43.83 | W 91 34 22.36 |
| | 19900.00 | 12.80 | 257.43 | 19874.38 | 19792.38 | 260.28 | -56.63 | -254.05 | 0.00 | 9768151.18 | 2105333.38 | N 26 54 43.78 | W 91 34 22.60 |
| | 20000.00 | 12.80 | 257.43 | 19971.89 | 19889.89 | 282.43 | -61.44 | -275.67 | 0.00 | 9768146.36 | 2105311.77 | N 26 54 43.74 | W 91 34 22.83 |
| | 20100.00 | 12.80 | 257.43 | 20069.41 | 19987.41 | 304.58 | -66.26 | -297.28 | 0.00 | 9768141.55 | 2105290.15 | N 26 54 43.69 | W 91 34 23.07 |
| | 20200.00 | 12.80 | 257.43 | 20166.93 | 20084.93 | 326.73 | -71.08 | -318.90 | 0.00 | 9768136.73 | 2105268.54 | N 26 54 43.65 | W 91 34 23.31 |
| | 20300.00 | 12.80 | 257.43 | 20264.45 | 20182.45 | 348.87 | -75.90 | -340.52 | 0.00 | 9768131.91 | 2105246.93 | N 26 54 43.60 | W 91 34 23.55 |
| | 20400.00 | 12.80 | 257.43 | 20361.96 | 20279.96 | 371.02 | -80.72 | -362.13 | 0.00 | 9768127.10 | 2105225.31 | N 26 54 43.56 | W 91 34 23.79 |
| | 20500.00 | 12.80 | 257.43 | 20459.48 | 20377.48 | 393.17 | -85.54 | -383.75 | 0.00 | 9768122.28 | 2105203.70 | N 26 54 43.51 | W 91 34 24.03 |
| | 20600.00 | 12.80 | 257.43 | 20557.00 | 20475.00 | 415.31 | -90.35 | -405.36 | 0.00 | 9768117.46 | 2105182.09 | N 26 54 43.47 | W 91 34 24.27 |
| | 20700.00 | 12.80 | 257.43 | 20654.51 | 20572.51 | 437.46 | -95.17 | -426.98 | 0.00 | 9768112.64 | 2105160.47 | N 26 54 43.42 | W 91 34 24.51 |
| | 20800.00 | 12.80 | 257.43 | 20752.03 | 20670.03 | 459.61 | -99.99 | -448.60 | 0.00 | 9768107.83 | 2105138.86 | N 26 54 43.37 | W 91 34 24.75 |
| | 20900.00 | 12.80 | 257.43 | 20849.55 | 20767.55 | 461.75 | -104.61 | -470.21 | 0.00 | 9768103.01 | 2105117.25 | N 26 54 43.33 | W 91 34 24.99 |
| | 21000.00 | 12.80 | 257.43 | 20947.06 | 20865.06 | 503.90 | -109.63 | -491.83 | 0.00 | 9768098.19 | 2105095.64 | N 26 54 43.28 | W 91 34 25.23 |
| | 21100.00 | 12.80 | 257.43 | 21044.58 | 20962.58 | 526.05 | -114.44 | -513.45 | 0.00 | 9768093.37 | 2105074.02 | N 26 54 43.24 | W 91 34 25.47 |
| | 21200.00 | 12.80 | 257.43 | 21142.10 | 21060.10 | 548.19 | -119.26 | -535.06 | 0.00 | 9768088.56 | 2105052.41 | N 26 54 43.19 | W 91 34 25.71 |
| | 21300.00 | 12.80 | 257.43 | 21239.61 | 21157.61 | 570.34 | -124.08 | -556.68 | 0.00 | 9768083.74 | 2105030.80 | N 26 54 43.15 | W 91 34 25.95 |
| | 21400.00 | 12.80 | 257.43 | 21337.13 | 21255.13 | 592.49 | -128.90 | -578.30 | 0.00 | 9768078.92 | 2105009.18 | N 26 54 43.10 | W 91 34 26.19 |

APC-00336951

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S °'") | Longitude (E/W °'") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 21500.00 | 12.80 | 257.43 | 21434.65 | 21352.65 | 614.63 | -133.72 | -599.91 | 0.00 | 9768074.10 | 2104987.57 | 26 54 43.06 N | 91 34 26.42 W |
|  | 21600.00 | 12.80 | 257.43 | 21532.16 | 21450.15 | 635.78 | -138.54 | -621.53 | 0.00 | 9768069.29 | 2104965.96 | 26 54 43.01 N | 91 34 26.65 W |
|  | 21700.00 | 12.80 | 257.43 | 21629.68 | 21547.68 | 658.93 | -143.35 | -643.14 | 0.00 | 9768064.47 | 2104944.35 | 26 54 42.97 N | 91 34 26.90 W |
|  | 21800.00 | 12.80 | 257.43 | 21727.20 | 21645.20 | 681.07 | -148.17 | -664.76 | 0.00 | 9768059.65 | 2104922.73 | 26 54 42.88 N | 91 34 27.14 W |
|  | 21900.00 | 12.80 | 257.43 | 21824.71 | 21742.71 | 703.22 | -152.99 | -686.36 | 0.00 | 9768054.83 | 2104901.12 | 26 54 42.83 N | 91 34 27.38 W |
|  | 22000.00 | 12.80 | 257.43 | 21922.23 | 21840.23 | 725.37 | -157.81 | -707.99 | 0.00 | 9768050.02 | 2104879.51 | 26 54 42.79 N | 91 34 27.62 W |
|  | 22100.00 | 12.80 | 257.43 | 22019.75 | 21937.75 | 747.51 | -162.63 | -729.61 | 0.00 | 9768045.20 | 2104857.89 | 26 54 42.74 N | 91 34 27.86 W |
|  | 22200.00 | 12.80 | 257.43 | 22117.26 | 22035.26 | 769.66 | -167.44 | -751.23 | 0.00 | 9768040.38 | 2104836.28 | 26 54 42.69 N | 91 34 28.10 W |
|  | 22300.00 | 12.80 | 257.43 | 22214.78 | 22132.78 | 791.81 | -172.26 | -772.84 | 0.00 | 9768035.56 | 2104814.67 | 26 54 42.65 N | 91 34 28.34 W |
|  | 22400.00 | 12.80 | 257.43 | 22312.30 | 22230.30 | 813.95 | -177.08 | -794.46 | 0.00 | 9768030.75 | 2104793.05 | 26 54 42.60 N | 91 34 28.58 W |
|  | 22500.00 | 12.80 | 257.43 | 22409.81 | 22327.81 | 835.10 | -181.90 | -816.07 | 0.00 | 9768025.93 | 2104771.44 | 26 54 42.56 N | 91 34 28.82 W |
|  | 22600.00 | 12.80 | 257.43 | 22507.33 | 22425.33 | 858.25 | -186.72 | -837.69 | 0.00 | 9768021.11 | 2104749.83 | 26 54 42.51 N | 91 34 29.06 W |
|  | 22700.00 | 12.80 | 257.43 | 22604.85 | 22522.85 | 880.39 | -191.54 | -859.31 | 0.00 | 9768016.29 | 2104728.22 | 26 54 42.47 N | 91 34 29.30 W |
|  | 22800.00 | 12.80 | 257.43 | 22702.36 | 22620.36 | 902.54 | -196.35 | -880.92 | 0.00 | 9768011.48 | 2104705.60 | 26 54 42.42 N | 91 34 29.54 W |
|  | 22900.00 | 12.80 | 257.43 | 22799.88 | 22717.88 | 924.69 | -201.17 | -902.54 | 0.00 | 9768006.66 | 2104684.99 | 26 54 42.38 N | 91 34 29.78 W |
|  | 23000.00 | 12.80 | 257.43 | 22897.40 | 22815.40 | 946.83 | -205.99 | -924.16 | 0.00 | 9768001.84 | 2104663.38 | 26 54 42.33 N | 91 34 30.02 W |
|  | 23100.00 | 12.80 | 257.43 | 22994.91 | 22912.91 | 968.98 | -210.81 | -945.77 | 0.00 | 9767997.02 | 2104641.76 | 26 54 42.29 N | 91 34 30.25 W |
|  | 23200.00 | 12.80 | 257.43 | 23092.43 | 23010.43 | 991.13 | -215.63 | -967.39 | 0.00 | 9767992.21 | 2104620.15 | 26 54 42.24 N | 91 34 30.49 W |
|  | 23300.00 | 12.80 | 257.43 | 23189.95 | 23107.95 | 1013.27 | -220.44 | -989.00 | 0.00 | 9767987.39 | 2104598.54 | 26 54 42.24 N | 91 34 30.73 W |
|  | 23400.00 | 12.80 | 257.43 | 23287.47 | 23205.47 | 1035.42 | -225.26 | -1010.62 | 0.00 | 9767982.57 | 2104576.92 | 26 54 42.20 N | 91 34 30.97 W |
|  | 23500.00 | 12.80 | 257.43 | 23384.98 | 23302.98 | 1057.57 | -230.08 | -1032.24 | 0.00 | 9767977.76 | 2104555.31 | 26 54 42.15 N | 91 34 31.21 W |
|  | 23600.00 | 12.80 | 257.43 | 23482.50 | 23400.50 | 1079.72 | -234.90 | -1053.85 | 0.00 | 9767972.94 | 2104533.70 | 26 54 42.11 N | 91 34 31.45 W |
|  | 23700.00 | 12.80 | 257.43 | 23580.02 | 23498.02 | 1101.86 | -239.72 | -1075.47 | 0.00 | 9767968.12 | 2104512.09 | 26 54 42.06 N | 91 34 31.69 W |
|  | 23800.00 | 12.80 | 257.43 | 23677.53 | 23595.53 | 1124.01 | -244.53 | -1097.09 | 0.00 | 9767963.30 | 2104490.47 | 26 54 42.02 N | 91 34 31.93 W |
|  | 23900.00 | 12.80 | 257.43 | 23775.05 | 23693.05 | 1146.16 | -249.35 | -1118.70 | 0.00 | 9767958.49 | 2104468.86 | 26 54 41.97 N | 91 34 32.17 W |
|  | 24000.00 | 12.80 | 257.43 | 23872.57 | 23790.57 | 1168.30 | -254.17 | -1140.32 | 0.00 | 9767953.67 | 2104447.25 | 26 54 41.92 N | 91 34 32.41 W |
|  | 24100.00 | 12.80 | 257.43 | 23970.08 | 23888.08 | 1190.45 | -258.99 | -1161.94 | 0.00 | 9767948.85 | 2104425.63 | 26 54 41.88 N | 91 34 32.65 W |
|  | 24200.00 | 12.80 | 257.43 | 24067.60 | 23985.60 | 1212.60 | -263.81 | -1183.55 | 0.00 | 9767944.03 | 2104404.02 | 26 54 41.83 N | 91 34 32.89 W |
|  | 24300.00 | 12.80 | 257.43 | 24165.12 | 24083.12 | 1234.74 | -268.63 | -1205.17 | 0.00 | 9767939.22 | 2104382.41 | 26 54 41.79 N | 91 34 33.13 W |
|  | 24400.00 | 12.80 | 257.43 | 24262.63 | 24180.63 | 1256.89 | -273.44 | -1226.78 | 0.00 | 9767934.40 | 2104360.79 | 26 54 41.74 N | 91 34 33.37 W |
|  | 24500.00 | 12.80 | 257.43 | 24360.15 | 24278.15 | 1279.04 | -278.26 | -1248.40 | 0.00 | 9767929.58 | 2104339.18 | 26 54 41.70 N | 91 34 33.61 W |
|  | 24600.00 | 12.80 | 257.43 | 24457.67 | 24375.67 | 1301.18 | -283.08 | -1270.02 | 0.00 | 9767924.76 | 2104317.57 | 26 54 41.65 N | 91 34 33.85 W |
|  | 24700.00 | 12.80 | 257.43 | 24555.18 | 24473.18 | 1323.33 | -287.90 | -1291.63 | 0.00 | 9767919.95 | 2104295.96 | 26 54 41.61 N | 91 34 34.08 W |
|  | 24800.00 | 12.80 | 257.43 | 24652.70 | 24570.70 | 1345.48 | -292.72 | -1313.25 | 0.00 | 9767915.13 | 2104274.34 | 26 54 41.56 N | 91 34 34.32 W |
|  | 24900.00 | 12.80 | 257.43 | 24750.22 | 24668.22 | 1367.62 | -297.53 | -1334.87 | 0.00 | 9767910.31 | 2104252.73 | 26 54 41.52 N | 91 34 34.56 W |
|  | 25000.00 | 12.80 | 257.43 | 24847.73 | 24765.73 | 1389.77 | -302.35 | -1356.48 | 0.00 | 9767905.49 | 2104231.12 | 26 54 41.47 N | 91 34 34.80 W |
|  | 25100.00 | 12.80 | 257.43 | 24945.25 | 24863.25 | 1411.92 | -307.17 | -1378.10 | 0.00 | 9767900.68 | 2104209.50 | 26 54 41.43 N | 91 34 35.04 W |
|  | 25200.00 | 12.80 | 257.43 | 25042.77 | 24960.77 | 1434.06 | -311.99 | -1399.71 | 0.00 | 9767895.86 | 2104187.89 | 26 54 41.38 N | 91 34 35.28 W |
|  | 25300.00 | 12.80 | 257.43 | 25140.28 | 25058.28 | 1456.21 | -316.81 | -1421.33 | 0.00 | 9767891.04 | 2104166.28 | 26 54 41.34 N | 91 34 35.52 W |
|  | 25400.00 | 12.80 | 257.43 | 25237.80 | 25155.80 | 1478.36 | -321.63 | -1442.95 | 0.00 | 9767886.22 | 2104144.67 | 26 54 41.29 N | 91 34 35.76 W |
|  | 25500.00 | 12.80 | 257.43 | 25335.32 | 25253.32 | 1500.50 | -326.44 | -1464.56 | 0.00 | 9767881.41 | 2104123.05 | 26 54 41.25 N | 91 34 36.00 W |
|  | 25600.00 | 12.80 | 257.43 | 25432.83 | 25350.83 | 1522.65 | -331.26 | -1486.18 | 0.00 | 9767876.59 | 2104101.44 | 26 54 41.20 N | 91 34 36.24 W |
|  | 25700.00 | 12.80 | 257.43 | 25530.35 | 25448.35 | 1544.80 | -336.08 | -1507.80 | 0.00 | 9767871.77 | 2104079.83 | 26 54 41.15 N | 91 34 36.48 W |
|  | 25800.00 | 12.80 | 257.43 | 25627.87 | 25545.87 | 1566.94 | -340.90 | -1529.41 | 0.00 | 9767866.95 | 2104058.21 | 26 54 41.11 N | 91 34 36.72 W |
|  | 25900.00 | 12.80 | 257.43 | 25725.38 | 25643.38 | 1589.09 | -345.72 | -1551.03 | 0.00 | 9767862.14 | 2104036.60 | 26 54 41.06 N | 91 34 36.96 W |
|  | 26000.00 | 12.80 | 257.43 | 25822.90 | 25740.90 | 1611.24 | -350.53 | -1572.64 | 0.00 | 9767857.32 | 2104014.99 | 26 54 41.02 N | 91 34 37.20 W |
|  | 26100.00 | 12.80 | 257.43 | 25920.42 | 25838.42 | 1633.38 | -355.35 | -1594.26 | 0.00 | 9767852.50 | 2103993.37 | 26 54 40.97 N | 91 34 37.44 W |
|  | 26200.00 | 12.80 | 257.43 | 26017.93 | 25935.93 | 1655.53 | -360.17 | -1615.88 | 0.00 | 9767847.68 | 2103971.76 | 26 54 40.93 N | 91 34 37.68 W |
|  | 26300.00 | 12.80 | 257.43 | 26115.45 | 26033.45 | 1677.68 | -364.99 | -1637.49 | 0.00 | 9767842.87 | 2103950.15 | 26 54 40.88 N | 91 34 37.91 W |
|  | 26400.00 | 12.80 | 257.43 | 26212.97 | 26130.97 | 1699.82 | -369.81 | -1659.11 | 0.00 | 9767838.05 | 2103928.54 | 26 54 40.84 N | 91 34 38.15 W |
|  | 26500.00 | 12.80 | 257.43 | 26310.49 | 26228.49 | 1721.97 | -374.63 | -1680.73 | 0.00 | 9767833.23 | 2103906.92 | 26 54 40.79 N | 91 34 38.39 W |
|  | 26600.00 | 12.80 | 257.43 | 26408.00 | 26326.00 | 1744.12 | -379.44 | -1702.34 | 0.00 | 9767828.42 | 2103885.31 | 26 54 40.75 N | 91 34 38.63 W |
|  | 26700.00 | 12.80 | 257.43 | 26505.52 | 26423.52 | 1766.26 | -384.26 | -1723.96 | 0.00 | 9767823.60 | 2103863.70 | 26 54 40.70 N | 91 34 38.87 W |
|  | 26800.00 | 12.80 | 257.43 | 26603.04 | 26521.04 | 1788.41 | -389.08 | -1745.58 | 0.00 | 9767818.78 | 2103842.08 | 26 54 40.66 N | 91 34 39.11 W |
|  | 26900.00 | 12.80 | 257.43 | 26700.55 | 26618.55 | 1810.56 | -393.90 | -1767.19 | 0.00 | 9767813.96 | 2103820.47 | 26 54 40.61 N | 91 34 39.35 W |
|  | 27000.00 | 12.80 | 257.43 | 26798.07 | 26716.07 | 1832.70 | -398.72 | -1788.81 | 0.00 | 9767809.15 | 2103798.86 | 26 54 40.57 N | 91 34 39.59 W |
|  | 27100.00 | 12.80 | 257.43 | 26895.59 | 26813.59 | 1854.85 | -403.53 | -1810.42 | 0.00 | 9767804.33 | 2103777.24 | 26 54 40.52 N | 91 34 39.83 W |
|  | 27200.00 | 12.80 | 257.43 | 26993.10 | 26911.10 | 1877.00 | -408.35 | -1832.04 | 0.00 | 9767799.51 | 2103755.63 | 26 54 40.47 N | 91 34 40.07 W |
|  | 27300.00 | 12.80 | 257.43 | 27090.62 | 27008.62 | 1899.15 | -413.17 | -1853.66 | 0.00 | 9767794.69 | 2103734.02 | 26 54 40.43 N | 91 34 40.31 W |
|  | 27400.00 | 12.80 | 257.43 | 27183.14 | 27106.14 | 1921.29 | -417.99 | -1875.27 | 0.00 | 9767789.88 | 2103712.41 | 26 54 40.38 N | 91 34 40.55 W |
|  | 27500.00 | 12.80 | 257.43 | 27285.65 | 27203.65 | 1943.44 | -422.81 | -1896.89 | 0.00 | 9767785.06 | 2103690.79 | 26 54 40.34 N | 91 34 40.79 W |
|  | 27600.00 | 12.80 | 257.43 | 27383.17 | 27301.17 | 1965.59 | -427.62 | -1918.51 | 0.00 | 9767780.24 | 2103669.18 | 26 54 40.29 N | 91 34 41.03 W |
|  | 27700.00 | 12.80 | 257.43 | 27480.69 | 27398.69 | 1987.73 | -432.44 | -1940.12 | 0.00 | 9767775.42 | 2103647.57 | 26 54 40.25 N | 91 34 41.27 W |
|  | 27800.00 | 12.80 | 257.43 | 27578.20 | 27496.20 | 2009.88 | -437.26 | -1961.74 | 0.00 | 9767770.61 | 2103625.95 | 26 54 40.20 N | 91 34 41.50 W |
|  | 27900.00 | 12.80 | 257.43 | 27675.72 | 27593.72 | 2032.03 | -442.08 | -1983.35 | 0.00 | 9767765.79 | 2103604.34 | 26 54 40.16 N | 91 34 41.74 W |

11/9/2017 3:03 PM   Page 2 of 3

Drilling Office 2.10.544.0    ...\WR051 005\OCS-G 31938 005 (Shen-7)\ST00BP00\WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17

CONFIDENTIAL

APC-00336952

CONFIDENTIAL

| Comments | MD (ft) | Incl (°) | Azim Grid (°) | TVD (ft) | TVDSS (ft) | VSEC (ft) | NS (ft) | EW (ft) | DLS (°/100ft) | Northing (ftUS) | Easting (ftUS) | Latitude (N/S ° ' ") | Longitude (E/W ° ' ") |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 28000.00 | 12.80 | 257.43 | 27773.24 | 27691.24 | 2054.17 | -446.90 | -2004.97 | 0.00 | 9767760.97 | 2103582.73 | N 26 54 40.11 | W 91 34 41.98 |
| | 28100.00 | 12.80 | 257.43 | 27870.75 | 27788.75 | 2076.32 | -451.72 | -2026.59 | 0.00 | 9767755.15 | 2103561.11 | N 26 54 40.07 | W 91 34 42.22 |
| | 28200.00 | 12.80 | 257.43 | 27968.27 | 27886.27 | 2098.47 | -456.53 | -2048.20 | 0.00 | 9767751.34 | 2103539.50 | N 26 54 40.02 | W 91 34 42.46 |
| | 28300.00 | 12.80 | 257.43 | 28065.79 | 27983.79 | 2120.61 | -461.35 | -2069.82 | 0.00 | 9767746.52 | 2103517.89 | N 26 54 39.98 | W 91 34 42.70 |
| | 28400.00 | 12.80 | 257.43 | 28163.30 | 28081.30 | 2142.76 | -466.17 | -2091.44 | 0.00 | 9767741.70 | 2103496.28 | N 26 54 39.93 | W 91 34 42.94 |
| | 28500.00 | 12.80 | 257.43 | 28260.82 | 28178.82 | 2164.91 | -470.99 | -2113.05 | 0.00 | 9767736.88 | 2103474.66 | N 26 54 39.89 | W 91 34 43.18 |
| | 28600.00 | 12.80 | 257.43 | 28358.34 | 28276.34 | 2187.05 | -475.81 | -2134.67 | 0.00 | 9767732.07 | 2103453.05 | N 26 54 39.84 | W 91 34 43.66 |
| | 28700.00 | 12.80 | 257.43 | 28455.85 | 28373.85 | 2209.20 | -480.62 | -2156.28 | 0.00 | 9767727.25 | 2103431.44 | N 26 54 39.80 | W 91 34 43.66 |
| | 28800.00 | 12.80 | 257.43 | 28553.37 | 28471.37 | 2231.35 | -485.44 | -2177.90 | 0.00 | 9767722.43 | 2103409.82 | N 26 54 39.75 | W 91 34 43.90 |
| | 28900.00 | 12.80 | 257.43 | 28650.89 | 28568.69 | 2253.49 | -490.26 | -2199.52 | 0.00 | 9767717.61 | 2103388.21 | N 26 54 39.70 | W 91 34 44.14 |
| | 29000.00 | 12.80 | 257.43 | 28748.40 | 28666.40 | 2275.64 | -495.08 | -2221.13 | 0.00 | 9767712.60 | 2103366.60 | N 26 54 39.66 | W 91 34 44.38 |
| | 29100.00 | 12.80 | 257.43 | 28845.92 | 28763.92 | 2297.79 | -499.90 | -2242.75 | 0.00 | 9767707.98 | 2103344.98 | N 26 54 39.61 | W 91 34 44.62 |
| | 29200.00 | 12.80 | 257.43 | 28943.44 | 28861.44 | 2319.93 | -504.72 | -2264.37 | 0.00 | 9767703.16 | 2103323.37 | N 26 54 39.57 | W 91 34 44.86 |
| | 29300.00 | 12.80 | 257.43 | 29040.95 | 28958.95 | 2342.08 | -509.53 | -2285.98 | 0.00 | 9767698.34 | 2103301.76 | N 26 54 39.52 | W 91 34 45.10 |
| | 29400.00 | 12.80 | 257.43 | 29138.47 | 29056.47 | 2364.23 | -514.35 | -2307.60 | 0.00 | 9767693.53 | 2103280.15 | N 26 54 39.48 | W 91 34 45.33 |
| | 29500.00 | 12.80 | 257.43 | 29235.99 | 29153.99 | 2386.37 | -519.17 | -2329.22 | 0.00 | 9767688.71 | 2103258.53 | N 26 54 39.43 | W 91 34 45.57 |
| | 29600.00 | 12.80 | 257.43 | 29333.51 | 29251.51 | 2408.52 | -523.99 | -2350.83 | 0.00 | 9767683.89 | 2103236.92 | N 26 54 39.38 | W 91 34 45.81 |
| | 29700.00 | 12.80 | 257.43 | 29431.02 | 29349.02 | 2430.67 | -528.81 | -2372.45 | 0.00 | 9767679.08 | 2103215.31 | N 26 54 39.34 | W 91 34 46.05 |
| | 29800.00 | 12.80 | 257.43 | 29528.54 | 29446.54 | 2452.81 | -533.62 | -2394.06 | 0.00 | 9767674.26 | 2103193.69 | N 26 54 39.30 | W 91 34 46.29 |
| | 29900.00 | 12.80 | 257.43 | 29626.06 | 29544.06 | 2474.96 | -538.44 | -2415.68 | 0.00 | 9767669.44 | 2103172.08 | N 26 54 39.25 | W 91 34 46.53 |
| | 30000.00 | 12.80 | 257.43 | 29723.57 | 29641.57 | 2497.11 | -543.26 | -2437.30 | 0.00 | 9767664.62 | 2103150.47 | N 26 54 39.21 | W 91 34 46.77 |
| | 30100.00 | 12.80 | 257.43 | 29821.09 | 29739.09 | 2519.25 | -548.08 | -2458.91 | 0.00 | 9767659.81 | 2103128.86 | N 26 54 39.16 | W 91 34 47.01 |
| | 30200.00 | 12.80 | 257.43 | 29918.61 | 29836.61 | 2541.40 | -552.90 | -2480.53 | 0.00 | 9767654.99 | 2103107.24 | N 26 54 39.12 | W 91 34 47.25 |
| | 30300.00 | 12.80 | 257.43 | 30016.12 | 29934.12 | 2563.55 | -557.72 | -2502.15 | 0.00 | 9767650.17 | 2103085.63 | N 26 54 39.07 | W 91 34 47.49 |
| | 30400.00 | 12.80 | 257.43 | 30113.64 | 30031.64 | 2585.69 | -562.53 | -2523.76 | 0.00 | 9767645.35 | 2103064.02 | N 26 54 39.03 | W 91 34 47.73 |
| | 30500.00 | 12.80 | 257.43 | 30211.16 | 30129.16 | 2607.84 | -567.35 | -2545.38 | 0.00 | 9767640.54 | 2103042.40 | N 26 54 38.98 | W 91 34 47.97 |
| Top LWC | 30511.12 | 12.80 | 257.43 | 30222.00 | 30140.00 | 2610.30 | -567.89 | -2547.78 | 0.00 | 9767640.00 | 2103040.00 | N 26 54 38.97 | W 91 34 47.99 |
| | 30600.00 | 12.80 | 257.43 | 30308.67 | 30226.67 | 2629.99 | -572.17 | -2566.99 | 0.00 | 9767635.72 | 2103020.79 | N 26 54 38.93 | W 91 34 48.21 |
| | 30700.00 | 12.80 | 257.43 | 30406.19 | 30324.19 | 2652.14 | -576.99 | -2588.61 | 0.00 | 9767630.90 | 2102999.18 | N 26 54 38.89 | W 91 34 48.45 |
| TD | 30736.72 | 12.80 | 257.43 | 30442.00 | 30360.00 | 2660.27 | -578.76 | -2596.55 | 0.00 | 9767629.13 | 2102991.24 | N 26 54 38.87 | W 91 34 48.53 |

Survey Type:                    Def Plan

Survey Error Model:             ISCWSA Rev 0 *** 3-D 95.000% Confidence 2.7955 sigma
Survey Program:

| Description | Part | MD From (ft) | MD To (ft) | EOU Freq (ft) | Hole Size (in) | Casing Diameter (in) | Expected Max Inclination (deg) | Survey Tool Type | Borehole / Survey |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 0.000 | 5922.619 | 1/100.000 | 0.000 | 0.000 | | SLB_MWD-STD-FLT-Depth Only | ST00BP00 / WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |
| | 1 | 5922.619 | 30736.722 | 1/100.000 | 30.000 | 30.000 | | SLB_MWD-STD-FLT | ST00BP00 / WR051 005 (Shen-7) ST00BP00 Rev2.0 PH 23Oct17 |

APC-00336953

| DOL (P50) | DEPTH | COST | PHASE |
|---|---|---|---|
| 0 | 5922 | $0.00 | BEGIN WR 52 #3 |
| 1 | 5922 | $14,938,546.30 | TRANSIT |
| 3.5 | 5922 | $19,165,183.05 | MIRU/RIH w/ 42" & TAG ML |
| 4 | 6222 | $19,640,730.80 | JET-IN 42" STRUCTURAL |
| 4.5 | 6222 | $20,116,278.55 | SOAK 42" & POOH |
| 5.5 | 7400 | $21,647,374.05 | DRILL 26" x 32" HOLE SECTION |
| 8.5 | 7400 | $25,427,229.55 | INSTALL 28" CASING |
| 9.5 | 8722 | $26,958,325.05 | DRILL 26" HOLE SECTION |
| 16.5 | 8722 | $35,803,744.56 | INSTALL 22" CASING RUN/TEST RISER & BOPE |
| 19.5 | 14000 | $39,322,031.06 | DRILL 18-1/8" x 21-1/2" HOLE |
| 26.5 | 14000 | $47,600,699.56 | INSTALL 18" CASING |
| 28.5 | 18100 | $50,377,890.56 | DRILL 16-1/2" x 19-1/2" HOLE |
| 35.5 | 18100 | $59,714,059.06 | INSTALL 16" CASING |
| 39.5 | 25000 | $64,413,441.06 | DRILL 14-1/2" x 17-1/2" HOLE |
| 46.5 | 25000 | $75,978,809.57 | INSTALL 14" CASING |
| 50.5 | 28500 | $80,710,191.57 | DRILL TO TOP OF EOCENE |
| 57.5 | 28500 | $88,811,360.07 | INSTALL 11-7/8" |
| 62.5 | 31118 | $94,569,337.57 | DRILL TO TD (BASE OF LWC SAND) |
| 69.5 | 31118 | $105,700,506.07 | FORMATION EVALUATION |
| 76.5 | 31118 | $114,421,674.58 | RUN & CEMENT 10-1/8" |
| 86.5 | 31118 | $125,532,678.00 | TA WELL & RDMO |

CONFIDENTIAL

APC-00336954

# Exhibit 58

**To:** Beard, Corrie[Corrie.Beard@anadarko.com]
**Cc:** McGrievy, Pat[Pat.McGrievy@anadarko.com]
**From:** McGrievy, Pat[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CDB587FF820A4A41A6E3944E832BCE77-MCGRIEVY, P]
**Sent:** Fri 12/8/2017 2:22:29 PM Coordinated Universal Time
**Subject:** RE: BOD Memo - December

---

Corrie,

Oops! This is the e-mail that includes the changes/edits to the BOD memo.

Let me know if you have any edits. As you are fully aware, the Shenandoah project is a political football and the edits below are certainly subject to higher levels of scrutiny.

Pat

Patrick McGrievy
GM – Shenandoah Predevelopment & K2 Producing Assets
Anadarko Petroleum Corp
The Woodlands, TX
(832) 636 3973 (W)
(281) 798 4483 (C)

---

**From:** Beard, Corrie
**Sent:** Wednesday, December 06, 2017 6:22 PM
**To:** McGrievy, Pat <Pat.McGrievy@anadarko.com>
**Subject:** BOD Memo - December

Pat,

The BOD Memo is due early next week and I need your help in updating the verbiage from the October memo below shown below. I did update the K2 production bullet point. Please send me the verbiage that you would like included by noon on Monday. It's amazing how out of the loop I feel with what's going on with these assets after only being out of the group for two months!

- K2
  - · Production averaged ~25,000 BOPD (gross) for November.
  - · Balloting for the approval of the GC 562-6 AFE is due in Mid-December 2017. The well, which is targeting the main field pay sands (M14 and M20), is expected to spud in Q2 2018. The team is also working to mature a subsequent K2 well which is expected to spud in late 2018.

- Warrior
  - · The Warrior appraisal well (GC 519 #1) was spud in April, sidetracked in August and P&A'd in September. The well found 74' of highly dispersed net pays in Middle and Lower Miocene sands. As a result, resources were not sufficient to support future development costs necessary to bring this well to production at this location of the Warrior structure. Meanwhile, development FEED studies to commercialize the GC 563 discovery are likely to commence in 2018.
  - · At the Murphy-operated Samurai (GC 432 & 476) discovery, located ~ 9 miles north of APC's Warrior discovery, APC has elected to non-consent a proposed $58 MM drilling AFE to delineate resources in the Upper and Middle Miocene reservoirs. APC will correspondingly relinquish their 25% working interest in these blocks.

- Shenandoah
  - · Anadarko issued an AFE to the Shenandoah partnership for the drilling of the WR 51 #4 (Shen 7) in November 2018. Venari and CIE have recently elected to approve the AFE, while COPC has elected to non-consent. If the AFE is not fully subscribed by the remaining partnership, the well will not be drilled and will result in lease relinquishment of the Shenandoah blocks (WR 51, WR 52 & WR 53) in April 2018 as a result of the expiration of the 365 day clock.

Thanks,
Corrie Beard
GOM Planning Engineer
Anadarko Petroleum Corporation
O: 832.636.3438 | C: 832.445.4899

CONFIDENTIAL

APC-00754122

# Exhibit 59

**To:** Sanders, Allen[Allen.Sanders@anadarko.com]; Nath, Doug[Doug.Nath@anadarko.com]; McGrievy, Pat[Pat.McGrievy@anadarko.com]; Meyer, Frank[Frank.Meyer@anadarko.com]; Desai, Mita[Mita.Desai@anadarko.com]; Weiss, Victoria[Victoria.Weiss@anadarko.com]
**From:** Pachman, Jeff[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DC65F496763A41EE804969BE6C5F893A-PACHMAN, JE]
**Sent:** Tue 12/12/2017 11:05:55 PM Coordinated Universal Time
**Subject:** FW: Shenandoah - Withdrawal Notice & Anadarko's Election to Withdraw
**Attachment:** 20171212143804063.pdf

FYI

---

**From:** Pachman, Jeff
**Sent:** Tuesday, December 12, 2017 5:05 PM
**To:** 'Lynne Hackedorn' <lynne.hackedorn@cobaltintl.com>; Ben Davis (ben.davis@cobaltintl.com) <ben.davis@cobaltintl.com>; Alaniz, Lindsay M <Lindsay.M.Alaniz@conocophillips.com>; 'Fitzgerald, Michael D' <Michael.D.Fitzgerald@conocophillips.com>; scornwell@venari.net; Randy Bennett <rbennett@venari.com>
**Cc:** Meyer, Frank <Frank.Meyer@anadarko.com>
**Subject:** Shenandoah - Withdrawal Notice & Anadarko's Election to Withdraw


As relayed earlier today via phone and/or voicemail, attached is Anadarko's letter of this date regarding its decision/election at Shenandoah.

CONFIDENTIAL

APC-00754344

ANADARKO PETROLEUM CORPORATION          1201 LAKE ROBBINS DRIVE • HOUSTON, TEXAS 77380
                                        P.O. BOX 1330 • HOUSTON, TEXAS 77251-1300

## DEEPWATER GULF OF MEXICO



December 12, 2017

ConocoPhillips Company                  Cobalt International Energy, L.P.
600 N. Dairy Ashford, Suite DU 3018     920 Memorial City Way, Suite 100
Houston, TX 77079                       Houston, TX 77024
Attn: Lindsay Alaniz/Michael Fitzgerald Attn: Ben Davis
Fax: 281-293-6171                       Fax: 713-579-9196

Venari Offshore LLC
15375 Memorial Drive, Suite 800
Houston, TX 77079
Attn: Scott Cornwell/Randy Bennett
Fax: 713-266-2330

RE:    Shenandoah Prospect
       Withdrawal Notice and Written Notice to Join in the Withdrawal

Gentlemen:

Reference is made to Anadarko AFE No. 2140195, transmitted via proposal letter dated November 9, 2017, in which Anadarko proposed, as an Operation to Maintain Contract Area, the drilling of the Walker Ridge Block 51 No. 5 Well ("Shen 7 AFE").

By letter dated December 6, 2017, ConocoPhillips Company elected not to participate in the Shen 7 AFE. In accordance with Article 8.3 of the Shenandoah UOA (*Second Opportunity to Participate*), ConocoPhillips was provided with a subsequent election to participate in the Shen 7 AFE, as evidenced by that certain Election Results & Notice of Second Opportunity to Participate, dated December 6, 2017. By letter dated also dated December 6, 2017, ConocoPhillips Company made a subsequent election not to participate in the Shen 7 AFE.

Pursuant to Article 16.4.1 of the Shenandoah UOA, failure to participate in an Operation to Maintain Contract Area is deemed a withdrawal, and the Parties will be subject to the provisions of Article 17 of the Shenandoah UOA (*Withdrawal From Agreement*). Anadarko hereby provides notice to the Parties of ConocoPhillips Company's deemed withdrawal ("Withdrawal Notice") from the Shenandoah UOA due to its failure to participate in the Shen 7 AFE, with such withdrawal being effective sixty (60) days from the date of this Withdrawal Notice.

Pursuant to Article 17 of the Shenandoah UOA, within thirty (30) days of the receipt of the Withdrawal Notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator. Due to COP's failure to participate in the Shen 7 AFE and subsequent deemed withdrawal, Anadarko US Offshore LLC and Anadarko Petroleum Corporation hereby provide the other Parties with notice of their election to join in the withdrawal ("Notice to Join Withdrawal") as an Other Withdrawing Party(ies) under the Shenandoah UOA, with such withdrawal being effective sixty (60) days from the date of this Notice to Join Withdrawal.

CONFIDENTIAL                                          APC-00754345

Venari Offshore LLC and Cobalt International Energy, L.P. also have the option to join in the withdrawal, and we respectfully request your election to join in the withdrawal within thirty (30) days of the receipt of this Withdrawal Notice.

In the event that you have any questions or need further information, please do not hesitate to contact Pat McGrievy via telephone at (832) 636-3973.

Very truly yours,

Frank D. Meyer
Land Manager, Gulf of Mexico

CONFIDENTIAL

APC-00754346

# Exhibit 60

# LIONBRIDGE

STATE OF NEW YORK )
)
) ss
COUNTY OF NEW YORK )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Hebrew into English of the attached Navitas Petroleum Annual

Report to December 31, 2021.

Laura Musich, Managing Editor
Lionbridge

Sworn to and subscribed before me

this 15th day of January, 20 23.

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323792
Qualified in New York County
My Commission Expires 04/27/2026

259 W 30th Street, 11th Floor  New York, NY 10001  +1.212.631.7432

APC-01760538



**Navitas Petroleum**

**Limited Partnership**



Annual Report

To December 31,

2021



APC-01760539

# Table of Contents

**Chapter A**    ◈    Description of the Partnership's Business

**Chapter B**    ◈    Board of Directors Report on the State of Affairs of the Partnership

**Chapter C**    ◈    Financial Report for December 31, 2021

**Chapter D**    ◈    Additional Details about the Partnership

**Chapter E**    ◈    Report on the Effectiveness of Internal Control over Financial Reporting and Disclosure



APC-01760540

Chapter A

———————

# Description of

# the Partnership's Business



APC-01760541

## Chapter A - Description of the Partnership's Business

| Section | Subject | Page |
|---|---|---|
| 1 | Description of the general development of the partnership's business | 2 |
| 2 | Field of activity | 4 |
| 3 | Investments in the capital of the partnership and transactions in its securities | 6 |
| 4 | Profit sharing | 4 |
| 5 | Financial information regarding the partnership's field of activity | 8 |
| 6 | General environment and the influence of external factors on the partnership's activity | 8 |
| 7 | Description of the partnership's business by areas of activity | 10 |
| 8 | The partnership's oil properties | 17 |
| 8.1 | Buckskin | 17 |
| 8.2 | Shenandoah | 50 |
| 8.3 | North Yucatan | 82 |
| 8.4 | Denbury Fields | 95 |
| 8.5 | Nachas | 127 |
| 8.6 | Various onshore oil assets | 144 |
| 8.7 | Block 7 | 146 |
| 9 | Ceased activity | 160 |
| 10 | Memorandum of understanding - Sea-Lion Discovery | 160 |
| 11 | Renewable energies | 162 |
| 12 | Products | 163 |
| 13 | Clients | 164 |
| 14 | Marketing and distribution | 164 |
| 15 | Competition | 168 |
| 16 | Seasonality | 164 |
| 17 | Human Capital | 165 |
| 18 | Raw materials and suppliers | 165 |
| 19 | Working capital | 167 |
| 20 | Funding | 167 |
| 21 | Taxation | 168 |
| 22 | Environmental risks and ways of managing them | 168 |
| 23 | Limitations and supervision of partnership activity | 169 |
| 24 | Essential agreements and cooperation agreements | 175 |
| 25 | Legal procedures | 175 |
| 26 | Business objectives and strategy | 176 |
| 27 | Expected development within the coming year | 176 |
| 28 | Risk factors | 177 |
| **Appendices** | | |
| **Appendix of professional terms** | | **183** |

APC-01760542

### 8.2 Shenandoah

The partnership holds, through ShenHai LLC, a subsidiary (holding in concatenation) in full ownership of the partnership (hereinafter in this section: **"ShenHai"** or **"the Project Company"**), 49% of the rights in the Shenandoah oil property in the Gulf of Mexico, USA (hereinafter in this section: **"Shenandoah")"**.

### 8.2.1 General Details

| General details regarding the Shenandoah oil property | |
|---|---|
| Name of Property: | Shenandoah |
| Location: | Maritime property in the Gulf of Mexico, approximately 255 miles south of New Orleans, Louisiana, USA, in the deep waters of the Gulf of Mexico, at a water depth of between 1,770 and 1,920 meters. |
| Area: | The area of each of the licenses is 5,760 acres (about 23.3 square kilometers). The total area of the oil property is about 17,280 acres (about 69.9 square kilometers), and it includes the entire area of licenses No. 31938 and 25232 and most of the area of license 28148 ("**the Licenses**" or "**Shenandoah Licenses**"). |
| Type of the oil property and description of the operations permitted according to this type: | Discovery in development; Permitted operations - exploration, development and production of oil and gas in a defined area of land called Lease. |
| Original grant date of the oil property: | 12.1.2007 - OCS-G 31938 (WR 51 block) 6.1.2003 - OCS-G 25232 (WR 52 block) 5.1.2006 - OCS-G 28148 (WR 53 block) |
| Original expiration date of the oil property: | 11.30.2017 - OCS-G 31938 5.31.2014 - OCS-G 25232 4.30.2016 - OCS-G 28148 |
| Dates on which it was decided to extend the period of the oil property: | In September 2018, it was decided to transfer the licenses to SOP status - see section 8.2.5 hereinafter |
| Current oil property expiration date: | The licenses are held in SOP status - see section 8.2.5 hereinafter |
| Specifying whether there is another option for extending the period of the oil property: | The extension of a license validity beyond its original validity or beyond the granted extension is carried out in one of three main ways: 1. Drilling and/or approved operations at the license area entitles the license holders to an automatic extension of up to one year from the date of operation completion. There are also additional operations (such as seismic surveys, etc.) that can be carried out with a license and for which an extension can be obtained from BSEE. 2. SOP - Suspension of Production, if oil production does not begin from the license during the license period (original or extended), it is possible to obtain approval for a "suspension of production" (SOP). As part of the SOP granting, a mandatory work plan will be determined that includes milestones for the development of the property, from the grant date until the start of production. The extension of the validity of the license based on SOP will not be granted until the date of the start of production according to the work plan, but only for limited periods - usually, about one year each time (that is, not until the start of production). As long as the license holders comply with the work plan, the SOP will be extended for an additional fixed period. As of the date of the report, the SOP has been extended until September 30, 2022. Production - HBP, from the start of commercial production in the license area - the validity of the license is automatically extended up to one year from the end of commercial production. |
| Specifying the name of the operator (Operator): | BOE Exploration & Production, LLC[34] |

---

[34]A full-ownership company owned by Beacon (as defined hereinafter) which is used as an operator as of November 2020.

APC-01760543

## 8.2 Shenandoah

| General details about the Shenandoah oil property | | |
|---|---|---|
| Specifying the names of the direct partners in the oil property and their direct share in the oil property, as well as, to the best of the partnership's knowledge, the names of the holders of controlling interest of the said partners (assuming the implementation of all such agreements as stated hereinafter): | ShenHai LLC.[35], [36] - | 49% |
| | Beacon Offshore Energy Development LLC. [37] | 20.05% |
| | BOE II Shen LLC.[38] | 20% |
| | BOE II Exploration LLC[39] | 10.95% |

| General details regarding the partnership's share in the Shenandoah oil property | |
|---|---|
| In favor of holding a purchased oil property - specifying the date of purchase : | Rights at the rate of 23.1% in the oil assets were purchased on April 5, 2018. Rights at a rate of 30.00% in the oil assets were purchased on November 27, 2019, effective from October 1, 2019. At the time of the FID, 4.1% of the rights in the project were sold to Beacon[40]. |
| Description of the nature and manner of the partnership's holding in the oil property: | Holding of the oil property at a rate of 49% through ShenHai, a subsidiary (holding in concatenation) in full (100%) ownership of the partnership. |
| Specifying the actual share associated with the holders of the partnership's capital rights in the revenues from the oil property: | 38.68% |
| The total share of the holders of the partnership's capital right in the cumulative investment in the oil property during the five years preceding 12.31.2021 (whether it was recognized as an expense or as a property in the financial statements): | Approximately 111,484 thousand Dollars. |

---

[35] A subsidiary (holding in concatenation) in full (100%) ownership of the partnership.

[36] In addition to the aforementioned rights, the partnership holds the southern half of license OCS-G 28148 (WR 53 block ) in the area of the Shenandoah oil property at the rate of 95.44%. The southern half of this license is in the exploration phase and is not included in the existing Shenandoah development plan. To the best of the partnership's knowledge, there are no liabilities upon it.

[37] A private company fully owned by funds of the Blackstone Group (aforementioned and hereinafter: "**Beacon**").

[38] A private company fully owned by HEQ Deepwater. HEQ Deepwater is a dedicated partnership focused on deep-water drilling in the Gulf of Mexico in the US and it is owned by Quantum Energy Partners, a leading and well-known investment fund specializing in oil and gas fields in the US and Houston Energy LP, a company active in the oil and gas field in the Gulf of Mexico in the USA. As informed to the partnership, in August 2021, binding agreements were signed between the parent company of BOE II Shen, LLC (hereinafter: "BOE II Shen") and HEQ Deepwater for the purchase of the shares of BOE II Shen by HEQ Deepwater. In addition, after the purchase of the shares as mentioned above, BOE II Shen sold 10.95% of the rights in the project to a designated company named BOE II Exploration LLC which is fully owned by the parent company of Beacon.

[39] A private company fully owned by Blackstone Group funds.

[40] For details regarding the sale of the rights, see note 12a' to the financial statements.

51

APC-01760544

<u>8.2 Shenandoah</u>

### 8.2.2 **Operations prior to holding the oil property**

Until the partnership won the tender for the purchase of Shenandoah, Cobalt held 20% of the rights in the Shenandoah licenses, while the other partners were: Anadarko Petroleum Corporation (which also served as its operator) - 33%; ConocoPhillips Company - 30% (hereinafter: "**ConocoPhillips**"); Venari-17%.

In February 2018, Anadarko and ConocoPhillips informed the other partners in Shenandoah that they decided to give up their shares in the licenses. In light of the foregoing, it was determined that the aforementioned rights will be transferred to Cobalt and Venari in a proportional manner to their share in the licenses, and that Cobalt will be appointed as an operator in the property. After the aforementioned transfer of the rights, the possession in the property was as follows: Cobalt – 54.05%; Venari- 45.95%.

On April 5, 2018, the Bankruptcy Court of the Southern District of Texas, the Houston Division, USA, issued an order confirming the execution of the sale transaction, including the transfer of the rights in the property to the partnership. In April 2018, the appointment of LLOG as an operator in Shenandoah was also approved.

In September 2018, the Regulator's approval of the SOP request was received, the main parts of which are described hereinafter.

Below is a table that includes, to the best of the partnership's knowledge, a description of material past operations in the oil property, which were carried out before the partnership owned the oil property:

| Part of the project | Identity of the rights holder at the time the action was performed | Period in which the action was performed | Succinct description of the action | Succinct description of the action results |
|---|---|---|---|---|
| Shenandoah | Anadarko | **2017-2008** | • **9 discovery, evaluation and verification wells were drilled at licenses OCS-G 28148 OCS-G 31938 OCS-G 2523\*.**<br>• **Additional 3D seismic information was acquired and the results of appraisal wells were processed**<br>• **A development plan was formed and presented** | A total of approx. 1.8 billion dollars were invested in the property. |

*The discovery well was drilled in 2009, to a total depth of about 9,000 meters and discovered an oil-bearing reservoir layer with a net thickness of about 100 meters. Following the discovery, five additional drillings were carried out for the purpose of verification and evaluation. Two of the drillings were dry, while the other three discovered thicker reservoir layers, with the thickest of them having a net thickness of about 358 meters. The area of the reservoir is estimated at about 14 square kilometers.

### 8.2.3 **The development of the oil property**

The project partners have begun to develop the Shenandoah oil property in accordance with the approved development plan.

APC-01760545

8.2 Shenandoah

### 8.2.4 Work plan compliance

To the best of the General Partner's knowledge, the work plan detailed in the Shenandoah license up to this date was fully implemented.

### 8.2.5 Actual and planned work plan

The licenses in the Shenandoah oil property are in "Suspension of Production" (or "SOP") status, which was initially issued on September 11, 2018, and was extended until September 30, 2022.

Final Investment Decision (FID) and Field Development Plan (FDP)

On August 25, 2021, the project partners[41] received a Final Investment Decision – ("FID") for the development of the Shenandoah project with a total budget (for 100% of the rights in the project) of approximately 1.8 billion dollars.

As part of the FID approval, the project company signed authorizations for expenses (AFE) in the amount of approximately 890 million US dollars, for its share in the project budget, in accordance with a detailed development plan (FDP) for the project, which was approved by the project partners during the month of February 2021, the main points of which are detailed hereinafter:

- The plan includes drilling and completion of four production wells, installation of underwater equipment and pipelines for transmission, control and inspection of the oil and gas from the production wells to the production platform, establishment of a floating production system (FPS) (which is adapted to the production of approximately 100,000 barrels of oil per day, 140 million cubic feet of natural gas per day and 40,000 barrels of production water per day) and the installation of oil and gas export pipelines from the production platform and their connection to an existing main transmission pipeline to the coast. According to the partners, the production platform (FPS) will also be able to handle the production of additional existing and future oil discoveries in the area. The revenue from these additional services is not included at this stage in the projected cash flow.

- The development budget is added to the past cost invested by Shenandoah's previous partners, which amounts to approximately 1.8 billion dollars. This cost includes the execution of 9 exploration, verification and evaluation wells and the acquisition of information for the purpose of evaluating the oil property.

---

[41] For details about the partners, see the table in section 8.2.1 above.

53

APC-01760546

8.2 Shenandoah

Actions and agreements carried out in connection with the project development

In the years 2021 and 2020, actions and agreements were carried out in connection with the development of the project, the main points of which are as follows:

- As part of the evaluations for the development of the Shenandoah project, an early procurement of services and equipment with a long lead time (Long Lead Items) including Subsea Production Trees (wellhead units for underwater production, control and inspection installed above the production wells) were ordered from TechnipFMC.
- On June 30, 2020, the operator entered into an agreement with Transocean[42] to receive drilling and completion services for the four development wells planned in the project. For more details, see the partnership's immediate report from July 2, 2020 (reference number: - 2020-01-070536) whereas the information pertaining to which is presented in the report by way of reference.
- On June 14, 2021, agreements were signed for the construction of oil and gas export pipelines from the production platform to existing transmission pipelines (hereinafter: the **"Agreements"**). The agreements were signed between the operator and the project partners and several suppliers (hereinafter: the **"Suppliers"**). The export pipelines will be established and developed at the expense of the suppliers, and the transmission fees that will be paid to the suppliers during the production period will increase the total production cost per barrel of oil, and this is subject to certain minimum payments established in the agreements. The production rate from Shenandoah, expected according to the resource report, is about 80 thousand barrels of oil per day (for details about the resource report, see section 8.2 10. hereinafter). Following the agreements, the Breakeven cost (which includes the cost of construction and production - Capex + Opex) of the project is expected to be approximately 16 dollars per barrel of oil in relation to the 2P category presented in this report. For further details, see the partnership's immediate report from June 16, 2021 (reference number: 2021-01-039655), the information pertaining to which is presented in the report by way of reference.
- On August 4, 2021, the operator updated that after the completion of an open and competitive process that included several bidders, the operator signed a multi-year contract for the engineering, procurement, and construction (EPC) of a floating production system (FPS) for the project (hereinafter in this section: the **"Installation"**). As informed by the operator, the FPS will be built by the Korean company Hyundai Heavy Industries. Co, Ltd (hereinafter: **"Hyundai"**), the largest shipyard in the world. According to the agreed specifications, the FPS will be of the Semi-Submersible type, 91 meters long, 91 meters wide and 90 meters high. After installation, the handling and production capacity of the FPS is expected to be about 100,000 barrels per day and about 140 MMSCF of gas per day. The planning, construction and installation will be carried out by Hyundai during the 36 months from the date of signing, with the first year being devoted to engineering design. Hyundai is expected to begin construction of the FPS in the third quarter of 2022. After the construction of the

---

[42] A public company traded on the New York Stock Exchange. To the best of the partnership's knowledge, the company is one of the largest drilling companies in the world.

54

APC-01760547

8.2 Shenandoah

>
> After the construction of the FPS is completed, this system will be transported to the US and is expected to be installed over the Shenandoah oil reservoir during the second half of 2024.

- On January 25, 2022, an agreement was signed for the establishment of the production and control systems and the underwater infrastructures of the project (hereinafter: "**The Underwater Systems**") with the Subsea 7 S.A. company[43]. The agreement includes the receipt of planning, procurement, construction and installation services for the underwater systems, which will connect the development wells in the project to the FPS, as well as services related to the installation of the FPS and the construction of the gas export pipeline. The costs involved in the agreement are lower than those budgeted in the development budget (which was approved as detailed above). The agreement is the last substantial agreement for the development of the project, and its signing is one of the conditions for the first withdrawal of the project financing.

The development of the project is progressing according to the plan, according to which, estimated by the operator, production from the project is expected to begin at the end of 2024.

**Warning regarding forward-looking information** - **the estimates above and hereinafter, including in relation to the Breakeven cost, the rate of production from the project, the handling and production capacity of the FPS, the expected dates for the planning, construction and installation of the FPS, the date of the first withdrawal, and the expected date for the start of production of the project constitute forward-looking information within the meaning of the Securities Law. The aforementioned estimates are based on engineering information, estimated data of availability and equipment, economic and other information, and may not materialize or materialize in a significantly different manner if changes and/or delays in a variety of factors apply, as well as if the received estimates change, and/or the operational and technical conditions and /or following changes and/or delays in a variety of factors, including changes in market conditions in general and the oil sector in particular and/or geopolitical changes and/or changes in operational and technical conditions at the oil property and/or following unexpected factors related to the development of oil properties and/or following external factors which are not under the control of the partnership and/or due to various factors that cannot be estimated in advance.**

Funding of the project

On August 1, 2021, the project company, simultaneously with the signing of the other partners in the project, signed a project financing agreement with a consortium of local and foreign banks and financial institutions, led by Societe Generale Bank, for the purpose of financing each of the Shenandoah partners' share of the development costs of the project. According to the financing agreement, ShenHai will be nominated for loans in the total amount of approximately 444 million US dollars, and it will be entitled to increase this amount by approximately 100 million additional US dollars, up to a total amount of approximately 544 million US dollars. The first withdrawal will only be made after the investment of all the capital required for the project and is expected towards the end of 2022.

---

[43] A company incorporated in Luxembourg and traded on the Oslo Stock Exchange.

APC-01760548

8.2 Shenandoah

At the time of receiving the aforementioned FID, all the prerequisites for financial closing (Closing) of the project financing agreements were met.

In November 2021, the partnership exercised its right to increase the amount of project financing by an additional 100 million US dollars. The increase in the amount of the project financing was carried out through the joining of Navitas ShenHai Financing Ltd., a designated company fully owned by the partnership (hereinafter: **"the Designated Company"**) as an additional lender in the consortium of lenders.

The increase in the amount of the aforementioned project financing was carried out by the partnership through the raising of negotiable bonds in the amount of approximately 100 million US dollars (about 330 million NIS) in November 2021, whereas upon the fulfillment of the conditions for release in exchange for the issuance on November 11, 2021, the full proceeds of the issuance (net) were placed as a shareholder loan by the partnership to the designated company, and was used by the designated company for the purpose of joining the consortium of lenders as an additional lender in the project financing agreement of the project company.

Following the joining of the designated company to the consortium of lenders and the provision of its loan to the project company, the amount of project financing, which the project company is entitled to withdraw, increased to a total of approximately 544 million US dollars (hereinafter: **"the Increased Amount of Project Financing"**).

In addition to the increased amount of project financing and the equity in the amount of approximately 311 million US dollars that the partnership deposited for the project company on August 23, 2021, the project company deposited on November 16, 2021 an additional equity in the amount of approximately 60 million US dollars in an escrow account, and thus it completed the deposit of the entire amount of capital required for ShenHai's share in the Shenandoah project development budget and retained its share in the Shenandoah project.

In March 2022, the project company, the partnership, and Societe Generale Bank, in its role as the technical bank of the project financing, entered into a Contingent Equity Support Agreement, within the framework of which the partnership undertook that if required, in the event of deviations in the project budget, the partnership would provide ShenHai with a sum of up to 40 million dollars which will be intended to cover an additional cushion for budget deviations (CERA - Contingent Equity Reserve Account) in the form of a capital investment or an inferior shareholder loan. The signing of this agreement is the main condition remaining for the first withdrawal of the project financing funds.

For details regarding raising capital and debt carried out by the partnership, including the issuance of preferred shares in a subsidiary company and the investment agreement in connection with this issuance, which were used to establish the equity capital as stated above, see section B' of the board of directors' report attached as chapter B' of this report.

For more details regarding the project financing agreements, the commercial agreements and their updates, the increase in the project financing of the Shenandoah project and the completion of the project financing, see note 8(3) to the financial statements.

56

APC-01760549

8.2 Shenandoah

The plan detailed in the table below is the plan defined in the SOP and the schedules that constitute the SOP requirements. For details regarding the estimated total budget for the development of the Shenandoah project, divided by year, see the cash flow report prepared by NSAI hereinafter.

| Period | A concise description of actions performed in practice for the period or of the planned work plan | Estimated total budget for actions approved by the partners at the level of the oil property (in thousands of dollars)[44] | Extent of actual participation of the capital license holders of the budget partnership (in thousands of dollars) |
|---|---|---|---|
| 2019 | • Examination of development alternatives and engineering planning continued <br> • The development and licensing of components required to comply with HPHT (High Pressure, High Temperature) conditions <br> • Contracts were awarded for the engineering design of some of the components that will be required for the development of the project <br> • Equipment with a long lead time was ordered, including the Subsea Production Trees units (subsea production, control and inspection units installed above the production wells), which were ordered from the TechnipFMC company ("**Subsea Systems**"). <br> • A proposed initial development plan (Field Development Plan) was submitted to the partners | 13,643 | 3,377 |
| 2020 | • Signing an agreement with Transocean Ltd for drilling and completion services for the four development wells. <br> • Engineering planning (FEED) stage was promoted | 22,891 | 12,155 |
| 2021 | • Approval of a development plan and acceptance of a final investment decision (FID) for the development of the Shenandoah project <br> • Ordering additional equipment whose delivery time is long (Long Lead Time) to be used in drilling <br> • Signing of the agreement to establish the export pipeline <br> • Signing an agreement to establish the production platform <br> • Starting Hyundai works under the EPC agreement (engineering, procurement, and construction) of the floating production vessel | 168,812 | 82,718 |
| 2022 | • Promotion of the approval procedure for the components required to comply with the HPHT (High Pressure, High Temperature) conditions <br> • Start of drilling operations <br> • Continue establishing the production platform <br> • The start of construction works for the export pipeline | 643,286 | 315,210 |
| 2023 | • Beginning of completion works <br> • Installation of the export pipeline | 504,294 | 247,104 |
| 2024 | • Completion of installation of the export pipeline <br> • Transfer of the production platform to the Gulf of Mexico and installation <br> • Start of production | 391,968 | 192,064 |
| 2025 and beyond | • Deferred payment to the production platform contractor and outstanding payments to contractors | 134,070 | 65,694 |

---

[44] Estimates regarding development plan costs appear in the flow forecast and constitute general estimates only. The budget described in this table refers to the partnership's holdings in the rights of the oil property at the time referred to in the section – at a rate of 23.1% until September 30, 2019, the partnership's holdings in the rights at a rate of 53.1% in Shenandoah as of October 1, 2019, and the partnership's holdings in the rights at a rate of 49% starting on August 25, 2021.

57

APC-01760550

## 8.2 Shenandoah

**Warning regarding forward-looking information** - the aforementioned estimates regarding the planned operations in the oil property, including costs and schedules, and regarding the date of execution of the development works and their completion, as stated above, are forward-looking information within the meaning of the Securities Law, based on estimates provided to the General Partner by the operator of the oil property, among other things, based on engineering, financial and other information received from the operator based on a variety of factors, including the development plan and the timetables for its implementation, obtaining regulatory approvals, estimated data on the availability of equipment, services and costs, as well as on past experience, and they constitute professional estimates and assumptions only for which there is no certainty.

### 8.2.6 Actual participation rate in expenses and revenue related to the oil property

| Participation rate | Percentage | Rate embodied to %100 | Explanations |
|---|---|---|---|
| The rate associated in practice with the holders of the partnership's capital rights in the oil property | 49% | 100% | See the description of the chain holdings in section 8.2.1 above |
| The rate associated in practice with the holders of the partnership's capital rights in the oil property revenues | 38.68% | 78.75% | See calculation in section 8.2.7 hereinafter |
| The rate associated in practice with the holders of the capital rights of the partnership in the expenses associated with exploration, development, or production activities in the oil property | 49% | 100% | See calculation in section 8.2.8 hereinafter |

### 8.2.7 The participation rate in practice of the holders of the capital rights of the partnership in expenses of the development and production of the oil property

| Item | Percentage | Concise explanation of how the royalties or payments are calculated |
|---|---|---|
| Theoretical expenses of an oil property (without the aforementioned royalties) | 49% | |
| The details of payments (derived from expenses) at the level of the oil property: | | |
| The total rate of expenses in practice at the level of the oil property | 100% | |
| The share of the holders of the capital rights of the partnership in the expenses of the oil property (concatenation) | 49% | |
| The total rate in practice of the holders of the partnership's capital rights, in expenses, at the level of the oil property (and before other expenses at the partnership level) | 49% | |
| Details of payments (derived from the expenses) in connection with the oil property and at the partnership level (the percentages below will be calculated according to the proportion of the holders of the capital rights of the partnership in the oil property): | | |
| The rate associated in practice with the holders of the capital rights of the partnership, in the expenses associated with development or production activity in the oil property | 49% | |

APC-01760551

8.2 Shenandoah

### 8.2.8 Remuneration and payments paid during the exploration, development, and production activities in the oil property

| Item | The total rate of the holders of the capital rights of the partnership in investments during this period in the oil property (in thousands of dollars) | Of this, the rate of the holders of the capital rights of the partnership in payments to the federal government in the USA |
|---|---|---|
| Budget actually invested in 2019 | 3,377 | - |
| Budget actually invested in 2020 | 12,155 | - |
| Budget actually invested in 2021 | 82,718 | - |

59

APC-01760552

8.2 Shenandoah

### 8.2.9 Reserves in the Shenandoah oil property
(A) Quantity data

(1) According to a report received by the partnership from NSAI and which was prepared in accordance with the rules of the petroleum resources management system (SPE-PRMS), the oil and natural gas reserves in the oil property as of December 31, 2021, are as detailed below.

| Reserves category | Total in oil assets (Gross) | | | Total share of the partnership (Net)[45] | | | |
|---|---|---|---|---|---|---|---|
| | Natural gas BCF | Oil MMBBL | Total equal value of barrels of oil MMBOE | Natural gas BCF | Natural gas liquids MMBBL | Oil MMBBL | Total equal value of barrels of oil MMBOE |
| Proved Reserves 1P | 140.8 | 120.7 | 144.2 | 40.2 | 6.6 | 45.1 | 58.4 |
| Probable Reserves | 239.1 | 203.7 | 243.6 | 67.5 | 11.2 | 76.4 | 98.9 |
| Total reserves of the 2P type (Proved+Probable Reserves) | 379.9 | 324.4 | 387.8 | 107.7 | 17.8 | 121.5 | 157.3 |
| Possible Reserves | 341.5 | 297.6 | 354.5 | 96.5 | 16.0 | 111.6 | 143.7 |
| Total reserves of the 3P type (Proved+Probable+Possible Reserves) | 721.4 | 622.0 | 742.3 | 204.2 | 33.8 | 233.1 | 300.9 |

(2) In the report, NSAI stated, among other things, a number of assumptions and reservations, including that: (a) the estimates, as is customary in estimating reserves according to the rules of the Petroleum Resources Management System (SPE-PRMS), and they are not risk-adjusted; (b) NSAI did not visit the area of the oil properties and did not check the mechanical operation of the facilities and the wells or their condition; (c) NSAI did not examine possible exposure arising from environmental issues and therefore did not include in the reserves report costs that may arise from such liability; (d) NSAI stated that its estimates in the report are based, among other things, on the assumptions that the properties will be developed in accordance with the existing development plans presented by the operator of the property, that the properties will be operated properly, that no new regulations or regulatory restrictions will apply that will affect the ability of the rights holders to maintain production, and that the actual production data will match its forecasts; (e) NSAI made use of technical and economic information that includes among other things, logs, geological maps, seismic information, and property ownership rights (f) NSAI was provided with all the necessary information for the preparation of the report and NSAI's access was not restricted to any information that it believed was necessary for the preparation of the report (g) as customary in the oil and gas assessments, there are inherent uncertainties in the engineering and geo-physical interpretation, therefore the NSAI conclusions represent, as usual, a professional interpretation

---

[45] For this matter, "Net" means multiplying the total amount of oil and natural gas, as applicable, in the oil property (Gross) by the rate associated in practice with the holders of the capital rights of the partnership in the revenue from the oil property. This definition is also valid for the rest of the reserves' tables in this report.

APC-01760553

8.2 Shenandoah

only; (h) NSAI made use of information received from the partnership, from the operator of the oil property, from public information sources and non-confidential information available to NSAI; (i) NSAI did not examine the contractual rights in the properties.

**Warning regarding forward-looking information - NSAI's estimates regarding the quantities of oil and natural gas reserves in the oil property are forward-looking information within the meaning of the Securities Law. The aforementioned estimates are based, among other things, on geological, geophysical, engineering, and other information received from the drilling and from the operator in the reservoir and are only NSAI's estimates and assumptions and regarding which there is no certainty. The quantities of natural gas and/or oil that will be actively produced may differ from the above estimates and assumptions, among other things, as a result of operational and technical conditions and/or regulatory changes and/or supply and demand conditions in the natural gas and/or oil market and/or commercial conditions and/or as a result of the actual performance of the reservoir. The aforementioned estimates and assumptions may be updated as more information is accumulated and/or as a result of a set of factors related to the oil property and the production of oil and natural gas.**

**Possible Reserves are the additional reserves that are not expected to be produced to the same extent as the Probable Reserves. There is a 10% chance that the quantities that will be produced in practice will be equal to or higher than the quantity of Proved Reserves, along with the quantity of Probable Reserves and along with the quantity of Possible Reserves.**

(B) Capitalized cash flow data

In relation to the calculation of the capitalized cash flow detailed below, it should be noted as follows:

(1) The capitalized flow is calculated according to the partnership's assessment based on the average of oil and gas price forecasts of international bodies that include banks and research bodies taken from the FactSet database[46]: (1) Oil prices - forecasts were taken regarding West Texas Intermediate (WTI) oil prices. The oil price is adjusted to the quality of the oil, to transmission costs and rate differentials, relative to WTI; (2) Gas prices - forecasts were taken regarding Henry Hub natural gas prices. The gas price is adjusted to gas quality, transmission costs and rate differentials.

---

[46] Updated as of the date close to the approval of the report.

APC-01760554

8.2 Shenandoah

Below is a table summarizing the oil and natural gas price forecasts that were used (before adjustments):

| End of period | Oil price Dollar/Barrel | Natural gas price Dollar/MMBTU |
|---|---|---|
| 12.31.2022 | 76.51 | 3.97 |
| 12.31.2023 | 72.27 | 3.55 |
| 12.31.2024 | 68.83 | 3.26 |
| 12.31.2025 | 66.13 | 3.23 |
| Beyond | 66.13 | 3.23 |

(2) The operational costs considered are those assumed by the operator Shenandoah and by NSAI. These costs are intended to include transmission costs, export pipeline costs, pipeline export fees, well overhead expenses and estimates of various costs. Operating costs were divided into costs at the level of field costs, costs per well and costs per production unit. Operating costs are not adjusted for inflation.

(3) The capital expenditures considered for the purpose of preparing the capitalized flow are based on approved expenditures and actual expenditures incurred in the project and include capital expenditures that will be required for the maintenance of the wells, drilling of new wells, various services and production equipment. The capital expenditures provided to NSAI by the operator of the property seem reasonable to it, these costs are not adjusted for inflation.

(4) The abandonment costs considered are estimates provided to NSAI by the operator of the property in accordance with its estimates regarding the cost of abandoning the wells, abandoning the production platform and the production equipment. As defined by the operator, the abandonment costs do not include the utilization of the facilities (Salvage Value) and are not adjusted for inflation.

(5) The actual production rate may be lower or higher than the production rate used to estimate the discounted flow. NSAI did not conduct a sensitivity analysis regarding the production rate of the wells.

(6) In the calculation of the capitalized flow, a tax rate of 21% was considered, the rate of royalties to be paid at the level of the oil property to the federal government, at a rate of 12.5%-16.67%. In addition, a royalty to third parties at a rate of 2% and to the General Partner at a rate of 6% was considered.

APC-01760555

## 8.2 Shenandoah

The capitalized flow has been updated in relation to the capitalized flow included in the reserves report published on October 20, 2021[47] (hereinafter in this section: **"the Previous Reserves Report"**) mainly considering the latest forecast of oil prices and a change in the remaining time for capitalization.

Below is the estimate of the capitalized flow as of 12.31.2021 in thousands of dollars, attributed to the partnership's share of the reserves in the oil property:

---

[47] See the immediate report of the partnership dated October 20, 2021 (reference number: 2021-01-157983), the information according to which is presented in the report by way of reference.

APC-01760556

### 8.2 Shenandoah

| | Total capitalized cash flow from Proved Reserves as of December 31, 2021 (in thousands of dollars in relation to the partnership's share in the oil property) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[48] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
| | | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | - | - | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,554 | 2,999 | 87,376 | (19,226) | (3,349) | (188,956) | - | (124,154) | - | (124,154) | (109,890) | (97,819) | (87,525) | (78,686) |
| 2025 | 30,643 | 35,993 | 1,005,534 | (231,406) | (38,508) | (24,979) | - | 710,641 | (27,468) | 683,174 | 575,890 | 489,328 | 418,799 | 360,818 |
| 2026 | 25,756 | 30,244 | 845,152 | (197,395) | (37,900) | (24,715) | - | 585,142 | (100,249) | 484,893 | 389,283 | 315,735 | 258,478 | 213,414 |
| 2027 | 15,579 | 18,282 | 511,165 | (119,389) | (38,030) | - | - | 353,746 | (66,329) | 287,417 | 219,757 | 170,136 | 133,227 | 105,416 |
| 2028 | 9,439 | 11,070 | 309,702 | (72,336) | (35,204) | - | - | 202,163 | (36,666) | 165,496 | 120,495 | 89,036 | 66,681 | 50,557 |
| 2029 | 5,768 | 6,760 | 189,140 | (44,177) | (34,890) | - | - | 110,073 | (17,324) | 92,749 | 64,314 | 45,362 | 32,496 | 23,612 |
| 2030 | 5,404 | 6,231 | 175,822 | (41,070) | (27,060) | (59,780) | - | 47,911 | (11,223) | 36,688 | 24,229 | 16,312 | 11,178 | 7,783 |
| 2031 | 5,392 | 6,140 | 175,261 | (40,946) | (26,984) | - | - | 107,331 | (17,658) | 89,673 | 56,400 | 36,246 | 23,757 | 15,853 |
| 2032 | 2,520 | 2,854 | 81,870 | (19,128) | (25,884) | (9,800) | - | 27,058 | (5,224) | 21,834 | 13,077 | 8,021 | 5,028 | 3,215 |
| 2033 | 6,034 | 6,909 | 196,196 | (45,834) | (24,951) | (49,980) | - | 75,431 | (20,503) | 54,928 | 31,331 | 18,344 | 10,999 | 6,740 |
| 2034 | 6,047 | 6,940 | 196,669 | (45,943) | (23,836) | - | - | 126,890 | (24,403) | 102,487 | 55,675 | 31,115 | 17,846 | 10,480 |
| 2035 | 3,317 | 3,807 | 107,863 | (25,197) | (23,532) | - | - | 59,134 | (10,553) | 48,581 | 25,134 | 13,408 | 7,356 | 4,140 |
| 2036 | 1,726 | 1,981 | 56,124 | (13,111) | (23,532) | - | - | 19,481 | (2,516) | 16,965 | 8,358 | 4,256 | 2,233 | 1,204 |
| 2037-2038 | 522 | 599 | 16,965 | (3,963) | (11,766) | - | (31,850) | (30,614) | - | (30,614) | (13,653) | (6,321) | (3,028) | (1,497) |
| Total | 120,701 | 140,808 | 3,954,841 | (919,121) | (375,426) | (947,239) | (31,850) | 1,681,205 | (340,118) | 1,341,088 | 897,516 | 593,834 | 379,529 | 224,469 |

---

[48] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760557

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[49] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Total capitalized cash flow after tax | | | |
| 2022 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2024 | 152 | 186 | 5,219 | (1,145) | - | - | - | 4,074 | - | 4,074 | 3,606 | 3,210 | 2,872 | 2,582 |
| 2025 | 1,824 | 2,230 | 60,067 | (13,809) | - | (950) | - | 45,308 | (1,699) | 43,609 | 36,761 | 31,235 | 26,733 | 23,032 |
| 2026 | 6,710 | 7,977 | 220,412 | (51,472) | - | (15,401) | - | 153,539 | (40,403) | 113,137 | 90,829 | 73,668 | 60,309 | 49,794 |
| 2027 | 13,640 | 16,059 | 447,675 | (104,556) | - | (38,958) | - | 304,161 | (67,670) | 236,491 | 180,819 | 139,990 | 109,621 | 86,738 |
| 2028 | 13,972 | 16,587 | 458,902 | (107,167) | (392) | (82,089) | - | 269,254 | (64,379) | 204,875 | 149,166 | 110,221 | 82,547 | 62,587 |
| 2029 | 19,709 | 23,233 | 646,528 | (150,996) | (1,764) | (55,106) | - | 438,662 | (94,854) | 343,808 | 238,401 | 168,151 | 120,457 | 87,525 |
| 2030 | 18,845 | 21,896 | 613,480 | (143,290) | (2,352) | 59,780 | - | 527,618 | (99,569) | 428,049 | 282,681 | 190,320 | 130,410 | 90,809 |
| 2031 | 12,276 | 14,351 | 399,816 | (93,378) | (2,428) | - | - | 304,010 | (62,584) | 241,427 | 151,845 | 97,585 | 63,960 | 42,681 |
| 2032 | 9,562 | 11,165 | 311,407 | (72,731) | (3,528) | 9,800 | - | 244,949 | (49,302) | 195,647 | 117,176 | 71,873 | 45,054 | 28,809 |
| 2033 | 2,251 | 2,708 | 73,493 | (17,158) | (4,461) | 49,980 | - | 101,854 | (14,599) | 87,254 | 49,770 | 29,140 | 17,472 | 10,707 |
| 2034 | 3,183 | 4,208 | 104,764 | (24,429) | (5,576) | (59,780) | - | 14,979 | (10,597) | 4,382 | 2,380 | 1,330 | 763 | 448 |
| 2035 | 6,944 | 8,876 | 227,883 | (53,162) | (5,880) | (79,380) | - | 89,460 | (26,899) | 62,562 | 32,368 | 17,267 | 9,473 | 5,331 |
| 2036 | 20,659 | 24,660 | 674,011 | (157,376) | (5,880) | (40,180) | - | 470,575 | (101,160) | 369,415 | 181,998 | 92,667 | 48,620 | 26,220 |
| 2037-2047 | 73,944 | 84,960 | 2,405,019 | (551,292) | (238,342) | (119,560) | (17,150) | 1,478,676 | (304,369) | 1,174,306 | 510,774 | 231,720 | 109,263 | 53,374 |
| Total | 203,672 | 239,097 | 6,648,676 | (1,541,961) | (270,602) | (371,844) | (17,150) | 4,447,118 | (938,083) | 3,509,035 | 2,028,574 | 1,258,380 | 827,554 | 570,637 |

Table title: Total capitalized cash flow from Probable Reserves as of December 31, 2021 (in thousands of dollars in relation to the partnership's share in the oil property)

---

[49] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760558

## 8.2 Shenandoah

| | Total capitalized cash flow from Proved+Probable Reserves (2P) as of 12.31.2021 (in thousands of dollars in relation to the partnership's share of the oil property) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Oil sales amount (thousands of barrels) | Sales amount (MMCF)[50] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
| | (100% from the oil assets) | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | - | - | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,706 | 3,185 | 92,596 | (20,371) | (3,349) | (188,956) | - | (120,080) | - | (120,080) | (106,284) | (94,609) | (84,653) | (76,104) |
| 2025 | 32,467 | 38,222 | 1,065,601 | (245,215) | (38,508) | (25,928) | - | 755,949 | (29,167) | 726,783 | 612,651 | 520,563 | 445,532 | 383,850 |
| 2026 | 32,466 | 38,221 | 1,065,564 | (248,867) | (37,900) | (40,115) | - | 738,682 | (140,651) | 598,030 | 480,112 | 389,403 | 318,786 | 263,208 |
| 2027 | 29,219 | 34,341 | 958,840 | (223,946) | (38,030) | (38,958) | - | 657,907 | (133,999) | 523,908 | 400,576 | 310,126 | 242,847 | 192,154 |
| 2028 | 23,411 | 27,657 | 768,604 | (179,503) | (35,596) | (82,089) | - | 471,416 | (101,045) | 370,371 | 269,662 | 199,257 | 149,228 | 113,145 |
| 2029 | 25,477 | 29,993 | 835,667 | (195,172) | (36,654) | (55,106) | - | 548,735 | (112,178) | 436,557 | 302,715 | 213,514 | 152,953 | 111,136 |
| 2030 | 24,249 | 28,127 | 789,302 | (184,361) | (29,412) | - | - | 575,529 | (110,792) | 464,737 | 306,910 | 206,633 | 141,588 | 98,592 |
| 2031 | 17,668 | 20,491 | 575,077 | (134,324) | (29,412) | - | - | 411,342 | (80,242) | 331,100 | 208,244 | 133,831 | 87,716 | 58,534 |
| 2032 | 12,082 | 14,019 | 393,277 | (91,859) | (29,412) | - | - | 272,006 | (54,526) | 217,481 | 130,253 | 79,894 | 50,082 | 32,024 |
| 2033 | 8,285 | 9,617 | 269,689 | (62,992) | (29,412) | - | - | 177,285 | (35,103) | 142,183 | 81,101 | 47,484 | 28,471 | 17,447 |
| 2034 | 9,230 | 11,148 | 301,433 | (70,372) | (29,412) | (59,780) | - | 141,869 | (35,001) | 106,869 | 58,055 | 32,446 | 18,609 | 10,928 |
| 2035 | 10,261 | 12,683 | 335,746 | (78,359) | (29,412) | (79,380) | - | 148,594 | (37,452) | 111,142 | 57,502 | 30,676 | 16,828 | 9,471 |
| 2036 | 22,385 | 26,641 | 730,135 | (170,487) | (29,412) | (40,180) | - | 490,056 | (103,676) | 386,380 | 190,356 | 96,922 | 50,853 | 27,424 |
| 2037-2047 | 74,466 | 85,559 | 2,421,984 | (555,255) | (250,108) | (119,560) | (49,000) | 1,448,062 | (304,369) | 1,143,692 | 497,121 | 225,399 | 106,235 | 51,877 |
| Total | 324,372 | 379,905 | 10,603,516 | (2,461,082) | (646,028) | (1,319,082) | (49,000) | 6,128,323 | (1,278,200) | 4,850,123 | 2,926,090 | 1,852,214 | 1,207,083 | 795,106 |

---

[50] The amount of sales includes the sale of natural gas liquids and natural gas.

66

APC-01760559

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) (100% from the oil assets) | Sales amount (MMCF)[51] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Total capitalized cash flow after tax | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
| 2022 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2024 | 30 | 2 | 956 | (225) | - | - | - | 731 | - | 731 | 647 | 576 | 515 | 463 |
| 2025 | 365 | 28 | 10,992 | (2,596) | - | (950) | - | 7,446 | (259) | 7,187 | 6,059 | 5,148 | 4,406 | 3,796 |
| 2026 | 366 | 30 | 11,029 | (2,608) | - | (14,643) | - | (6,221) | (850) | (7,072) | (5,677) | (4,605) | (3,770) | (3,112) |
| 2027 | 2,965 | 3,112 | 96,391 | (22,543) | - | 29,225 | - | 103,073 | (17,609) | 85,465 | 65,346 | 50,591 | 39,616 | 31,346 |
| 2028 | 5,714 | 6,156 | 186,142 | (43,519) | 392 | 32,885 | - | 175,899 | (33,648) | 142,251 | 103,571 | 76,530 | 57,315 | 43,456 |
| 2029 | 3,028 | 3,248 | 98,503 | (23,031) | 1,372 | (36,505) | - | 40,340 | (14,013) | 26,326 | 18,255 | 12,876 | 9,224 | 6,702 |
| 2030 | 5,004 | 6,331 | 164,067 | (38,280) | 1,176 | (73,218) | - | 53,745 | (19,444) | 34,301 | 22,652 | 15,251 | 10,450 | 7,277 |
| 2031 | 13,543 | 16,013 | 441,495 | (103,098) | 98 | (37,591) | - | 300,904 | (64,979) | 235,925 | 148,385 | 95,362 | 62,502 | 41,709 |
| 2032 | 18,528 | 21,220 | 602,471 | (140,743) | (588) | (42,715) | - | 418,424 | (89,904) | 328,520 | 196,757 | 120,686 | 75,652 | 48,375 |
| 2033 | 20,268 | 22,681 | 657,862 | (152,881) | (1,274) | (66,639) | - | 437,068 | (96,323) | 340,746 | 194,361 | 113,797 | 68,232 | 41,812 |
| 2034 | 18,857 | 20,522 | 610,756 | (135,054) | (2,352) | 59,780 | - | 533,129 | (100,613) | 432,517 | 234,959 | 131,314 | 75,312 | 44,228 |
| 2035 | 11,410 | 11,638 | 367,797 | (81,478) | (2,352) | 79,380 | - | 363,346 | (65,293) | 298,053 | 154,203 | 82,264 | 45,129 | 25,398 |
| 2036 | (1,922) | (3,189) | (64,728) | 17,735 | (2,352) | (19,600) | - | (68,945) | 11,634 | (57,311) | (28,235) | (14,376) | (7,543) | (4,068) |
| 2037-2067 | 199,449 | 233,689 | 6,497,195 | (1,508,983) | (550,652) | (179,340) | (14,700) | 4,243,521 | (896,930) | 3,346,591 | 974,288 | 313,510 | 109,989 | 41,570 |
| Total | 297,606 | 341,482 | 9,680,929 | (2,237,304) | (556,533) | (269,931) | (14,700) | 6,602,462 | (1,388,231) | 5,214,231 | 2,085,569 | 998,923 | 547,030 | 328,952 |

---

[51] The amount of sales includes the sale of natural gas liquids and natural gas.

APC-01760560

## 8.2 Shenandoah

| Year | Oil sales amount (thousands of barrels) | Sales amount (MMCF)[52] | Revenues | Royalties to be paid | Operating costs | Development costs | Abandonment and restoration costs | Total cash flow before levy and income tax (capitalized at 0%) | Taxes | Capitalized at 0% | Capitalized at 5% | Capitalized at 10% | Capitalized at 15% | Capitalized at 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (100% from the oil assets) | | | | | | | | | | | | | |
| 2022 | - | - | - | - | - | (331,039) | - | (331,039) | - | (331,039) | (323,083) | (315,675) | (308,755) | (302,272) |
| 2023 | - | - | - | - | - | (257,991) | - | (257,991) | - | (257,991) | (239,800) | (223,651) | (209,238) | (196,309) |
| 2024 | 2,736 | 3,188 | 93,552 | (20,596) | (3,349) | (188,956) | - | (119,349) | - | (119,349) | (105,637) | (94,033) | (84,137) | (75,641) |
| 2025 | 32,832 | 38,251 | 1,076,593 | (247,811) | (38,508) | (26,878) | - | 763,396 | (29,426) | 733,970 | 618,710 | 525,711 | 449,938 | 387,646 |
| 2026 | 32,832 | 38,251 | 1,076,593 | (251,475) | (37,900) | (54,758) | - | 732,460 | (141,502) | 590,959 | 474,434 | 384,798 | 315,017 | 260,096 |
| 2027 | 32,184 | 37,453 | 1,055,231 | (246,488) | (38,030) | (9,733) | - | 760,980 | (151,608) | 609,372 | 465,921 | 360,717 | 282,463 | 223,500 |
| 2028 | 29,125 | 33,813 | 954,746 | (223,022) | (35,204) | (49,204) | - | 647,315 | (134,693) | 512,622 | 373,233 | 275,788 | 206,544 | 156,601 |
| 2029 | 28,505 | 33,241 | 934,171 | (218,203) | (35,282) | (91,611) | - | 589,075 | (126,191) | 462,883 | 320,970 | 226,389 | 162,177 | 117,838 |
| 2030 | 29,254 | 34,458 | 953,369 | (222,641) | (28,236) | (73,218) | - | 629,275 | (130,236) | 499,038 | 329,562 | 221,884 | 152,038 | 105,869 |
| 2031 | 31,211 | 36,504 | 1,016,572 | (237,421) | (29,314) | (37,591) | - | 712,246 | (145,221) | 567,025 | 356,629 | 229,193 | 150,218 | 100,243 |
| 2032 | 30,610 | 35,240 | 995,748 | (232,603) | (30,000) | (42,715) | - | 690,431 | (144,430) | 546,001 | 327,010 | 200,580 | 125,733 | 80,399 |
| 2033 | 28,554 | 32,298 | 927,551 | (215,873) | (30,686) | (66,639) | - | 614,353 | (131,425) | 482,928 | 275,461 | 161,281 | 96,703 | 59,259 |
| 2034 | 28,088 | 31,670 | 912,189 | (205,426) | (31,764) | - | - | 674,999 | (135,613) | 539,385 | 293,014 | 163,760 | 93,921 | 55,156 |
| 2035 | 21,671 | 24,321 | 703,543 | (159,838) | (31,764) | - | - | 511,941 | (102,745) | 409,196 | 211,705 | 112,940 | 61,958 | 34,869 |
| 2036 | 20,463 | 23,452 | 665,407 | (152,752) | (31,764) | (59,780) | - | 421,111 | (92,042) | 329,069 | 162,121 | 82,546 | 43,310 | 23,356 |
| 2037-2067 | 273,915 | 319,248 | 8,919,179 | (2,064,237) | (800,759) | (298,900) | (63,700) | 5,691,582 | (1,201,299) | 4,490,283 | 1,471,409 | 538,909 | 216,224 | 93,448 |
| Total | 621,978 | 721,388 | 20,284,445 | (4,698,386) | (1,202,561) | (1,589,013) | (63,700) | 12,730,785 | (2,666,432) | 10,064,353 | 5,011,660 | 2,851,137 | 1,754,113 | 1,124,058 |

*Total capitalized cash flow from Proved+Probable+Possible Reserves (3P) as of 12.31.2021 (in thousands of dollars in relation to the partnership's share of the oil property)*

---

[52] The amount of sales includes the sale of natural gas liquids and natural gas.

68

APC-01760561

## 8.2 Shenandoah

**Warning** - it will be clarified that capitalized cash flow data, whether calculated with a certain capitalization rate or without a capitalized rate, represents a current value but does not necessarily represent a fair value.

**Warning regarding forward-looking information** - the figures of the capitalized flows as mentioned above are forward-looking information within the meaning of the Securities Law. The above data are based on various assumptions, among them in relation to the quantities of oil, natural gas and natural gas liquids that will be produced, the rate and duration of their sales from the Shenandoah oil property, operating costs, capital expenditures, abandonment costs, royalty rates and sales prices, and regarding which there is no certainty that they will be realized. It should be noted that the quantities of natural gas and/or oil and/or natural gas liquids and/or condensate that will actually be produced, the aforementioned expenses and the aforementioned revenues may differ substantially from the above estimates and hypotheses, among other things, as a result of operational and technical conditions and/or regulatory changes and /or from supply and demand conditions in the natural gas market and/or oil and/or natural gas liquids and/or condensate and/or from the actual performance of the project and/or as a result of actual sales prices and/or as a result of geopolitical changes that will apply.

( C ) Below is a sensitivity analysis for the main parameters that constitute the capitalized cash flow of the reserves in the oil property (the price of oil and gas and the amount of oil and gas sales) for 12.31.2021 (in thousands of dollars), which was performed by the partnership:

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalize d value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A 10% increase in the price of oil and gas | | | | | | A 10% decrease in the price of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,601,496 | 1,091,424 | 743,137 | 497,579 | 319,815 | 1P Proved Reserves (Proved Reserves) | 1,080,679 | 703,580 | 444,484 | 261,422 | 129,059 |
| Probable Reserves (Probable Reserves) | 3,948,131 | 2,276,365 | 1,409,717 | 926,056 | 638,059 | Probable Reserves (Probable Reserves) | 3,069,939 | 1,780,442 | 1,106,489 | 728,373 | 502,468 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,549,627 | 3,367,789 | 2,152,855 | 1,423,636 | 957,874 | Total 2P Reserves (Proved+Probable Reserves) | 4,150,618 | 2,484,022 | 1,550,973 | 989,795 | 631,527 |
| Possible Reserves (Possible Reserves) | 5,854,840 | 2,331,015 | 1,114,524 | 609,970 | 366,711 | Possible Reserves (Possible Reserves) | 4,573,193 | 1,840,021 | 883,230 | 483,983 | 291,076 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 11,404,467 | 5,698,804 | 3,267,378 | 2,033,606 | 1,324,585 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 8,723,812 | 4,324,043 | 2,434,204 | 1,473,778 | 922,603 |
| A 15% increase in the price of oil and gas | | | | | | A 15% decrease in the price of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,731,700 | 1,188,079 | 817,304 | 556,008 | 366,832 | 1P Proved Reserves (Proved Reserves) | 950,475 | 606,611 | 369,809 | 202,368 | 81,354 |
| Probable Reserves (Probable Reserves) | 4,167,679 | 2,400,412 | 1,485,632 | 975,609 | 672,102 | Probable Reserves (Probable Reserves) | 2,850,392 | 1,656,376 | 1,030,544 | 678,783 | 468,384 |

APC-01760562

## 8.2 Shenandoah

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total 2P Reserves (Proved+Probable Reserves) | 5,899,380 | 3,588,491 | 2,302,936 | 1,531,618 | 1,038,934 | Total 2P Reserves (Proved+Probable Reserves) | 3,800,866 | 2,262,988 | 1,400,353 | 881,150 | 549,738 |
| Possible Reserves (Possible Reserves) | 6,175,145 | 2,453,761 | 1,172,361 | 641,486 | 385,642 | Possible Reserves (Possible Reserves) | 4,252,595 | 1,717,235 | 825,381 | 452,459 | 272,137 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 12,074,524 | 6,042,252 | 3,475,297 | 2,173,104 | 1,424,576 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 8,053,461 | 3,980,222 | 2,225,734 | 1,333,609 | 821,875 |
| A 20% increase in the price of oil and gas | | | | | | A 20% decrease in the price of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,861,905 | 1,284,733 | 891,470 | 614,437 | 413,849 | 1P Proved Reserves (Proved Reserves) | 820,270 | 509,643 | 295,134 | 143,314 | 33,649 |
| Probable Reserves (Probable Reserves) | 4,387,127 | 2,524,429 | 1,561,537 | 1,025,159 | 706,144 | Probable Reserves (Probable Reserves) | 2,630,844 | 1,532,308 | 954,597 | 629,191 | 434,299 |
| Total 2P Reserves (Proved+Probable Reserves) | 6,249,032 | 3,809,163 | 2,453,007 | 1,639,597 | 1,119,993 | Total 2P Reserves (Proved+Probable Reserves) | 3,451,114 | 2,041,951 | 1,249,731 | 772,505 | 467,948 |
| Possible Reserves (Possible Reserves) | 6,495,549 | 2,576,537 | 1,230,209 | 673,006 | 404,574 | Possible Reserves (Possible Reserves) | 3,931,997 | 1,594,449 | 767,534 | 420,936 | 253,199 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 12,744,581 | 6,385,700 | 3,683,216 | 2,312,602 | 1,524,567 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 7,383,111 | 3,636,400 | 2,017,265 | 1,193,441 | 721,147 |
| A 10% increase in the sales quantity of oil and gas | | | | | | A 10% decrease in the sales quantity of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,581,182 | 1,076,394 | 731,630 | 488,526 | 312,534 | 1P Proved Reserves (Proved Reserves) | 1,100,993 | 718,638 | 456,039 | 270,533 | 136,403 |
| Probable Reserves (Probable Reserves) | 3,912,485 | 2,256,374 | 1,397,580 | 918,199 | 632,705 | Probable Reserves (Probable Reserves) | 3,105,585 | 1,800,455 | 1,118,661 | 736,274 | 507,870 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,493,668 | 3,332,768 | 2,129,210 | 1,406,724 | 945,239 | Total 2P Reserves (Proved+Probable Reserves) | 4,206,578 | 2,519,094 | 1,574,700 | 1,006,807 | 644,273 |
| Possible Reserves (Possible Reserves) | 5,801,984 | 2,310,817 | 1,105,044 | 604,826 | 363,635 | Possible Reserves (Possible Reserves) | 4,626,096 | 1,860,225 | 892,711 | 489,128 | 294,153 |
| Total 3P Reserves (Proved+Probable+Possible Reserves) | 11,295,652 | 5,643,585 | 3,234,254 | 2,011,551 | 1,308,874 | Total 3P Reserves (Proved+Probable+Possible Reserves) | 8,832,674 | 4,379,319 | 2,467,411 | 1,495,935 | 938,426 |

70

APC-01760563

8.2 Shenandoah

| Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% | Sensitivity / category | Present capitalized value of 0% | Present capitalized value of 5% | Present capitalized value of 10% | Present capitalized value of 15% | Present capitalized value of 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A 15% increase in the sales quantity of oil and gas | | | | | | A 15% decrease in the sales quantity of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,701,230 | 1,165,563 | 800,089 | 542,484 | 355,973 | 1P Proved Reserves (Proved Reserves) | 980,945 | 629,199 | 387,141 | 216,035 | 92,370 |
| Probable Reserves (Probable Reserves) | 4,114,210 | 2,370,397 | 1,467,381 | 963,767 | 664,009 | Probable Reserves (Probable Reserves) | 2,903,860 | 1,686,396 | 1,048,802 | 690,634 | 476,487 |
| Total 2P Reserves (Proved+Probable Reserves) | 5,815,440 | 3,535,960 | 2,267,469 | 1,506,251 | 1,019,982 | Total 2P Reserves (Proved+Probable Reserves) | 3,884,806 | 2,315,595 | 1,435,943 | 906,669 | 568,857 |
| Possible Reserves (Possible Reserves) | 6,095,861 | 2,423,464 | 1,158,142 | 633,771 | 381,027 | Possible Reserves (Possible Reserves) | 4,331,950 | 1,747,541 | 839,603 | 460,176 | 276,754 |
| Total 3P Reserves (Proved+Probable+ Possible Reserves) | 11,911,302 | 5,959,424 | 3,425,611 | 2,140,022 | 1,401,009 | Total 3P Reserves (Proved+Probable+ Possible Reserves) | 8,216,755 | 4,063,136 | 2,275,546 | 1,366,845 | 845,611 |
| A 20% increase in the sales quantity of oil and gas | | | | | | A 20% decrease in the sales quantity of oil and gas | | | | | |
| 1P Proved Reserves (Proved Reserves) | 1,821,277 | 1,254,712 | 868,516 | 596,405 | 399,371 | 1P Proved Reserves (Proved Reserves) | 860,898 | 539,760 | 318,243 | 161,537 | 48,337 |
| Probable Reserves (Probable Reserves) | 4,315,888 | 2,484,425 | 1,537,207 | 1,009,370 | 695,354 | Probable Reserves (Probable Reserves) | 2,702,136 | 1,572,337 | 978,943 | 644,994 | 445,103 |
| Total 2P Reserves (Proved+Probable Reserves) | 6,137,165 | 3,739,137 | 2,405,723 | 1,605,776 | 1,094,725 | Total 2P Reserves (Proved+Probable Reserves) | 3,563,033 | 2,112,097 | 1,297,186 | 806,531 | 493,440 |
| Possible Reserves (Possible Reserves) | 6,389,786 | 2,536,126 | 1,211,245 | 662,717 | 398,420 | Possible Reserves (Possible Reserves) | 4,037,803 | 1,634,856 | 786,495 | 431,224 | 259,354 |
| Total 3P Reserves (Proved+Probable+ Possible Reserves) | 12,526,951 | 6,275,263 | 3,616,969 | 2,268,493 | 1,493,145 | Total 3P Reserves (Proved+Probable+ Possible Reserves) | 7,600,836 | 3,746,953 | 2,083,681 | 1,237,755 | 752,795 |

APC-01760564

8.2 Shenandoah

The partnership declares that all the aforementioned data was compiled in a manner consistent with the rules of the Petroleum Resources Management System (SPE-PRMS).

Appraiser Opinion

Attached to this report is a resource report prepared by NSAI, as of 12/31/2021, as well as NSAI's consent to its inclusion in this report.

Management's Declaration

1. Declaration date: March 17, 2022;
2. Stating the name of the corporation: Navitas Petroleum - Limited Partnership;
3. The person authorized to assess the resources in the partnership, his name and position: Amit Kornhauser, CEO of the General Partner;
4. We hereby confirm that the appraiser was provided with all the data required for the purpose of performing his work;
5. We hereby confirm that no information has come to our attention that indicates an affinity between the appraiser and the partnership;
6. We hereby confirm that, to the best of our knowledge, the resources reported are the best and most recent estimates available to us;
7. We hereby confirm that the data included in this report was prepared according to the professional terms listed in Chapter 7 of the Third Addendum of the Securities Regulations (Details of the Prospectus and Draft Prospectus - Structure and Form), 5729 -1969, and in the meaning given to them in Resources Petroleum Management System (2007) as published by the Association of Petroleum Engineers (SPE), the American Association of Petroleum Geologists (AAPG), the World Petroleum Council (WPC) and the Association of Petroleum Evaluation Engineers (SPEE), as of the date of the report;
8. We hereby confirm that no change has been made to the identity of the appraiser who made the last resource disclosure published by the partnership;
9. We agree to the inclusion of the aforementioned statement in this report.

_____
Amit Kornhauser, CEO of
the General Partner

APC-01760565

APC-01760566





# NAVITAS
## PETROLEUM

## נאוויטס פטרוליום
## שותפות מוגבלת

# דוח שנתי
## ליום 31 בדצמבר
# 2021

APC-01760567

# תוכן עניינים

| פרק א' | ◈ | תיאור עסקי השותפות |
| פרק ב' | ◈ | דוח הדירקטוריון על מצב עניני השותפות |
| פרק ג' | ◈ | דוחות כספיים ליום 31 בדצמבר 2021 |
| פרק ד' | ◈ | פרטים נוספים על השותפות |
| פרק ה' | ◈ | דוח בדבר אפקטיביות הבקרה הפנימית על הדיווח הכספי ועל הגילוי |



פרק א'

# תיאור עסקי השותפות



APC-01760569

## פרק א – תיאור עסקי השותפות

| עמוד | נושא | סעיף |
|---|---|---|
| 2 | תיאור ההתפתחות הכללית של עסקי השותפות | 1 |
| 4 | תחום הפעילות | 2 |
| 6 | השקעות בהון השותפות ועסקאות בניירות הערך שלה | 3 |
| 4 | חלוקת רווחים | 4 |
| 8 | מידע כספי לגבי תחום הפעילות של השותפות | 5 |
| 8 | סביבה כללית והשפעת גורמים חיצונים על פעילות השותפות | 6 |
| 10 | תיאור עסקי השותפות לפי תחומי פעילות | 7 |
| 17 | נכסי הנפט של השותפות | 8 |
| 17 | בקסקין | 8.1 |
| 50 | שננדואה | 8.2 |
| 82 | יוקטן צפון | 8.3 |
| 95 | שדות דנברי | 8.4 |
| 127 | נצ׳ס | 8.5 |
| 144 | נכסי נפט יבשתיים שונים | 8.6 |
| 146 | בלוק 7 | 8.7 |
| 160 | פעילות שהופסקה | 9 |
| 160 | הסכם הבנות – תגלית Sea-Lion | 10 |
| 162 | אנרגיות מתחדשות | 11 |
| 163 | מוצרים | 12 |
| 164 | לקוחות | 13 |
| 164 | שיווק והפצה | 14 |
| 168 | תחרות | 15 |
| 164 | עונתיות | 16 |
| 165 | הון אנושי | 17 |
| 165 | חומרי גלם וספקים | 18 |
| 167 | הון חוזר | 19 |
| 167 | מימון | 20 |
| 168 | מיסוי | 21 |
| 168 | סיכונים סביבתיים ודרכי ניהולם | 22 |
| 169 | מגבלות ופיקוח על פעילות השותפות | 23 |
| 175 | הסכמים מהותיים והסכמי שיתוף פעולה | 24 |
| 175 | הליכים משפטיים | 25 |
| 176 | יעדים ואסטרטגיה עסקית | 26 |
| 176 | צפי להתפתחות בשנה הקרובה | 27 |
| 177 | גורמי סיכון | 28 |
| | נספחים | |
| 183 | נספח מונחים מקצועיים | |

APC-01760570

## 8.2 שננדואה

השותפות מחזיקה באמצעות ShenHai LLC חברה בת (בשרשור) בבעלות מלאה של השותפות (להלן בסעיף זה: "ShenHai" או "**חברת הפרוייקט**"), ב-49% מהזכויות בנכס הנפט שננדואה שבמפרץ מקסיקו, ארה"ב (להלן בסעיף זה: "**שננדואה**").

### 8.2.1 פרטים כלליים

| פרטים כלליים אודות נכס הנפט שננדואה | |
|---|---|
| שם נכס הנפט: | Shenandoah |
| מיקום: | נכס ימי במפרץ מקסיקו, כ-255 מייל דרומית מניו אורלינס, לואיזיאנה, ארה"ב, במים העמוקים של מפרץ מקסיקו, בעומק מים של בין 1,770 ל- 1,920 מטר. |
| שטח: | שטחו של כל אחד מהרישיונות הינו 5,760 אקרים (כ-23.3 קמ"ר).<br><br>שטחו הכולל של נכס הנפט הינו כ-17,280 אקרים (כ-69.9 קמ"ר), והוא כולל את מלוא שטחם של רישיונות מס' 31938 ו- 25232 ואת מרבית שטחו של רישיון 28148 ("**הרישיונות**" או "**רישיונות שננדואה**"). |
| סוג נכס הנפט ותיאור הפעולות המותרות לפי סוג זה: | תגלית בפיתוח;<br><br>פעולות מותרות - חיפושים, פיתוח והפקה של נפט וגז בשטח קרקע מוגדר הנקרא Lease. |
| תאריך הענקה מקורי של נכס הנפט: | OCS-G 31938 (WR 51 block) - 1.12.2007<br>OCS-G 25232 (WR 52 block) - 1.6.2003<br>OCS-G 28148 (WR 53 block) - 1.5.2006 |
| תאריך פקיעה מקורי של נכס הנפט: | OCS-G 31938 - 30.11.2017<br>OCS-G 25232 - 31.5.2014<br>OCS-G 28148 - 30.4.2016 |
| תאריכים שבהם הוחלט על הארכה של תקופת נכס הנפט: | בחודש ספטמבר 2018 הוחלט על העברת הרישיונות לסטטוס SOP - ראו סעיף 8.2.5 להלן |
| תאריך נוכחי לפקיעת נכס הנפט: | הרישיונות מוחזקים בסטטוס SOP - ראו סעיף 8.2.5 להלן |
| ציון האם קיימת אפשרות נוספת להארכת תקופת נכס הנפט: | הארכה של תוקף רישיון מעבר לתקופו המקורי או מעבר להארכה שניתנה, מתבצעת באחת משלוש דרכים עיקריות:<br><br>1. ביצוע קידוח ו/או פעולות מאושרות בשטח הרישיון מזכה את בעלי הרישיון בהארכה אוטומטית של עד שנה ממועד סיום העבודות. ישנן גם עבודות נוספות (דוגמת סקרים סייסמיים וכיו"ב) שניתן לבצע ברישיון ולקבל בגינן אישור הארכה מ-BSEE.<br><br>2. SOP - Suspension of Production, במקרה שלא החלה הפקת נפט מהרישיון בתקופת הרישיון (המקורי או המוארך), ניתן לקבל אישור על "השהיית הפקה" (SOP). במסגרת הענקת ה-SOP תיקבע תכנית עבודה מחייבת הכוללת אבני דרך לפיתוח הנכס, ממועד ההענקה ועד לתחילת הפקה. הארכת תוקף הרישיון על בסיס SOP לא תינתן עד למועד תחילת ההפקה לפי תכנית העבודה, אלא לתקופות קצובות בלבד - לרוב, בנות כשנה בכל פעם (כלומר לא עד לתחילת ההפקה). כל עוד בעלי הרישיון עומדים בתכנית העבודה, ה-SOP יוארך לתקופה קצובה נוספת. נכון למועד הדוח, ה-SOP הוארך עד ליום 30 בספטמבר 2022.<br><br>HBP – הפקה, מעת תחילת הפקה מסחרית בשטח הרישיון – תקפו של הרישיון מוארך אוטומטית עד לשנה מתום הפקה מסחרית. |
| ציון שם המפעיל (Operator): | BOE Exploration & Production, LLC[34] |

---

[34] חברה בבעלותה המלאה של Beacon (כהגדרתה להלן) המשמשת כמפעילה החל מחודש נובמבר 2020.

50

APC-01760571

8.2 שננדואה

| | פרטים כלליים אודות נכס הנפט שננדואה |
|---|---|
| ציון שמות השותפים הישירים בנכס הנפט וחלקם הישיר בנכס הנפט וכן, למיטב ידיעת השותפות, שמות בעלי השליטה בשותפים האמורים (בהנחת מימוש כל ההסכמים כאמור להלן): | ShenHai LLC.[35], [36] -      49% <br> Beacon Offshore Energy Development LLC.[37]   20.05% <br> BOE II Shen LLC.[38]      20% <br> BOE II Exploration LLC[39]      10.95% |

| | פרטים כלליים אודות חלקה של השותפות בנכס הנפט שננדואה |
|---|---|
| בעד החזקה בנכס נפט שנרכש - ציון תאריך הרכישה: | זכויות בשיעור של 23.1% בנכסי הנפט נרכשו ביום 5 באפריל 2018. <br> זכויות בשיעור של 30.00% בנכסי הנפט נרכשו ביום 27 בנובמבר 2019, בתוקף מיום 1 באוקטובר 2019. <br> במועד ה-FID נמכרו ל-Beacon 4.1% מהזכויות בפרוייקט.[40] |
| תיאור מהות ואופן ההחזקה של השותפות בנכס הנפט: | ההחזקה בנכס הנפט בשיעור של 49% באמצעות ShenHai, חברה בת (בשרשור) בבעלות מלאה (100%) של השותפות. |
| ציון החלק בפועל המשויך למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט: | 38.68% |
| סך חלקם של מחזיקי הזכויות ההוניות של השותפות בהשקעה המצטברת בנכס הנפט במהלך חמש השנים שקדמו ליום 31.12.2021 (בין אם הוכרה כהוצאה או כנכס בדוחות הכספיים): | כ- 111,484 אלפי דולר. |

---

[35] חברה בת (בשרשור) בבעלות מלאה (100%) של השותפות.

[36] בנוסף לזכויות האמורות, מחזיקה השותפות בחציו הדרומי של רישיון OCS-G 28148 (WR 53 block) בשטח נכס הנפט בשננדואה בשיעור של 95.44%. חציו הדרומי של רישיון זה נמצא בשלב אקספלורציה ואינו נכלל בתכנית הפיתוח הקיימת של שננדואה. למיטב ידיעת השותפות לא קיימות חבויות בגינו.

[37] חברה פרטית המוחזקת במלואה על ידי קרנות של קבוצת Blackstone (לעיל ולהלן: "Beacon").

[38] חברה פרטית המוחזקת במלואה על ידי HEQ Deepwater. HEQ Deepwater הינה שותפות ייעודית המתמקדת בקידוחים במים העמוקים במפרץ מקסיקו בארה"ב והמוחזקת על ידי Quantum Energy Partners, קרן השקעות מובילה ומוכרת המתמחה בתחום הנפט והגז בארה"ב ו-Houston Energy LP, חברה הפעילה בתחום הנפט והגז במפרץ מקסיקו בארה"ב. כפי שנמסר לשותפות, בחודש באוגוסט 2021 נחתמו הסכמים מחייבים בין חברת האם של BOE II Shen, LLC (להלן: "BOE II Shen") לבין HEQ Deepwater לרכישת מניותיה של BOE II Shen על ידי HEQ Deepwater. בנוסף, לאחר רכישת המניות כאמור לעיל, מכרה BOE II Shen 10.95% מהזכויות בפרוייקט לחברה ייעודית בשם BOE II Exploration LLC, שהינה בבעלות מלאה של חברת האם של Beacon.

[39] חברה פרטית המוחזקת במלואה על ידי קרנות של קבוצת Blackstone.

[40] לפרטים בדבר מכירת הזכויות, ראו באור 12א' לדוחות הכספיים.

51

8.2 שננדואה

### 8.2.2 פעולות טרם ההחזקה בנכס הנפט

עד לזכייתה של השותפות במכרז לרכישת שננדואה, החזיקה Cobalt ב-20% מהזכויות ברישיונות שננדואה, כאשר יתר השותפים היו: Anadarko Petroleum Corporation (אשר שימשה גם כמפעילה) – 33% ; ConocoPhillips Company – 30% (להלן: "**ConocoPhillips**") ; Venari– 17%.

בחודש פברואר 2018, הודיעו Anadarko ו-ConocoPhillips ליתר השותפים בשננדואה, כי החליטו לוותר על חלקן ברישיונות. לאור האמור, נקבע כי הזכויות האמורות יועברו ל-Cobalt ו-Venari באופן פרופורציונאלי לחלקן ברישיונות, וכי Cobalt תמונה כמפעילה בנכס. לאחר העברת הזכויות האמורה, ההחזקה בנכס הייתה כדלקמן: Cobalt – 54.05% ; Venari – 45.95%.

ביום 5 באפריל 2018 ניתן על ידי בית המשפט לענייני פשיטות רגל במחוז הדרומי של טקסס חטיבת יוסטון, ארה"ב, צו המאשר את ביצוע עסקת המכר, לרבות העברת הזכויות בנכס לשותפות. עוד אושר בחודש אפריל 2018 מינויה של LLOG כמפעילה בשננדואה.

בחודש ספטמבר 2018 התקבל אישור הרגולטור לבקשת ה-SOP, אשר עיקריה מתוארים להלן.

להלן טבלה הכוללת, למיטב ידיעת השותפות, תיאור פעולות עבר מהותיות בשטח נכס הנפט, שבוצעו לפני שהשותפות החזיקה בנכס הנפט:

| חלק הפרוייקט | זהות בעל הזכות במועד ביצוע הפעולה | תקופה שבה הפעולה בוצעה | תיאור תמציתי של הפעולה | תיאור תמציתי של תוצאות הפעולה |
|---|---|---|---|---|
| שננדואה | Anadarko | 2008-2017 | • 9 קידוחי תגלית, הערכה ואימות נקדחו ברישיונות OCS-G 28148 OCS-G 31938 OCS-G 2523.* <br> • נרכש מידע סייסמי 3D נוסף ועובדו תוצאות קידוחי הערכה (appraisal wells) <br> • גובשה והוצגה תכנית פיתוח | סה"כ הושקעו בנכס כ-1.8 מיליארד דולר |

\*  קידוח התגלית נקדח בשנת 2009, לעומק כולל של כ-9,000 מטר וגילה שכבת מאגר נושאת נפט בעובי של כ-100 מטר נטו. בעקבות התגלית בוצעו חמישה קידוחים נוספים לטובת אימות והערכה. שניים מהקידוחים היו יבשים ואילו שלושת הנוספים גילו שכבות מאגר עבות יותר, כאשר העבה מביניהן בעובי של כ-358 מטר נטו. שטח המאגר מוערך בכ- 14 קמ"ר.

### 8.2.3 פיתוח נכס הנפט

שותפי הפרוייקט החלו לפתח את נכס הנפט שננדואה בהתאם לתכנית הפיתוח המאושרת.

APC-01760573

8.2 שננדואה

### 8.2.4 עמידה בתכנית עבודה

למיטב ידיעת השותף הכללי, תכנית העבודה המפורטת ברישיון שננדואה עד למועד זה, קוימה במלואה.

### 8.2.5 תכנית עבודה בפועל ומתוכננת

הרישיונות בנכס הנפט שננדואה הינם בסטטוס "השהיית ההפקה" (Suspension of Production, או "**SOP**") אשר ניתן לראשונה ביום 11 בספטמבר 2018, והוארך עד ליום 30 בספטמבר 2022.

<u>קבלת החלטת השקעה (FID) ועיקרי תכנית הפיתוח (FDP)</u>

ביום 25 באוגוסט 2021 קיבלו שותפי הפרויקט[41] החלטת השקעה סופית - Final Investment Decision ("**FID**") לפיתוח פרויקט שננדואה בתקציב כולל (בגין 100% מהזכויות בפרויקט) של כ-1.8 מיליארד דולר.

במסגרת אישור ה-FID, חתמה חברת הפרויקט על הרשאות להוצאות (AFE) בהיקף של כ-890 מיליון דולר ארה"ב, בגין חלקה בתקציב הפרויקט, בהתאם לתכנית פיתוח מפורטת (FDP) לפרויקט, שאושרה על ידי שותפי הפרויקט במהלך חודש פברואר 2021, אשר עיקריה מפורטים להלן:

- התכנית כוללת קידוח והשלמה של ארבע בארות הפקה, התקנת ציוד וצנרת תת ימיים להולכה, שליטה ובקרה של הנפט והגז מבארות ההפקה לפלטפורמת ההפקה, הקמת פלטפורמת הפקה צפה (FPS) (המותאמת להפקה של כ- 100,000 חביות נפט ביום, 140 מליון רגל מעוקב גז טבעי ליום ו-40 אלף חביות מי הפקה ליום) והתקנת צנרות יצוא של הנפט והגז מפלטפורמת ההפקה וחיבורן לצנרת הולכה ראשית קיימת אל החוף. להערכת השותפים פלטפורמת ההפקה (FPS) תוכל לטפל בעתיד גם בהפקה מתגליות נפט נוספות קיימות ועתידיות באזור. ההכנסה משירותים נוספים אלה אינה כלולה בשלב זה בתזרים המזומנים החזוי.

- תקציב הפיתוח מתווסף לעלות העבר שהושקעה על ידי שותפי שננדואה הקודמים המסתכמת לכ-1.8 מיליארד דולר. עלות זו כללה ביצוע של 9 קידוחי אקספלורציה, אימות וההערכה ורכישת מידע לצורך הערכת הערכת נכס הנפט.

---

[41]    לפרטים אודות השותפים, ראו בטבלה בסעיף 8.2.1 לעיל.

APC-01760574

8.2 שננדואה

פעולות והסכמים שבוצעו בקשר עם פיתוח הפרויקט

בשנים 2020 ו-2021 בוצעו פעולות והסכמים בקשר עם פיתוח הפרויקט שעיקרם כדלקמן:

■ במסגרת ההערכות לפיתוח פרויקט שננדואה, בוצע רכש מוקדם של שירותים וציוד בעלי זמן אספקה ארוך (Long Lead Items) לרבות (Subsea Production Trees (יחידות ראש באר לצורך הפקה, שליטה ובקרה תת ימיות המותקנות מעל בארות ההפקה) שהוזמנו מחברת TechnipFMC.

■ ביום 30 ביוני 2020 המפעילה התקשרה בהסכם עם חברת Transocean[42], לקבלת שירותי קדיחה והשלמה של ארבעת בארות הפיתוח המתוכננות בפרויקט. לפרטים נוספים ראו דיווח מיידי של השותפות מיום 2 ביולי 2020 (אסמכתא מספר: -2020 01-070536) אשר המידע על פיו מובא בדרך של הפניה.

■ ביום 14 ביוני 2021 נחתמו הסכמים להקמת צנרות יצוא הנפט והגז מפלטפורמת ההפקה לצנרות הולכה קיימות (להלן: "ההסכמים"). ההסכמים נחתמו בין המפעילה ושותפי הפרויקט לבין מספר ספקים (להלן: "הספקים"). צנרות היצוא יוקמו ויפותחו על חשבונם של הספקים, ודמי ההולכה שישולמו לספקים במהלך תקופת ההפקה יגדילו את עלות ההפקה הכוללת לחבית נפט, וזאת בכפוף לתשלומי מינימום מסויימים שנקבעו בהסכמים. קצב ההפקה משננדואה, הצפוי לפי דוח המשאבים, הינו כ-80 אלף חביות נפט ביום (לפרטים אודות דוח המשאבים ראו סעיף 8.2.10 להלן). בעקבות ההסכמים, עלות ה- Breakeven (הכוללת עלות הקמה והפקה - Capex + Opex) של הפרויקט צפויה לעמוד על כ-16 דולר לחבית נפט ביחס לקטגורית 2P המוצגת בדוח זה. לפרטים נוספים ראו דיווח מיידי של השותפות מיום 16 ביוני 2021 (אסמכתא מספר: 2021-01-039655), אשר המידע על פיו מובא בדרך של הפניה.

■ ביום 4 באוגוסט 2021 עדכנה המפעילה כי לאחר השלמת תהליך פתוח ותחרותי שכלל מספר מציעים, חתמה המפעילה על חוזה רב שנתי להנדסה, רכש ובנייה (EPC) של מערכת הפקה צפה (FPS) לפרויקט (להלן בסעיף זה: "ההתקנה"). כפי שנמסר על ידי המפעילה, ה-FPS ייבנה על ידי החברה הקוריאנית Hyundai Heavy Industries Co, Ltd. (להלן: "**Hyundai**"), המספנה הגדולה בעולם. על פי המפרט המוסכם, ה-FPS תהיה מסוג Semi-Submersible, באורך 91 מטרים, ברוחב 91 מטרים ובגובה 90 מטרים. לאחר ההתקנה, כושר הטיפול וההפקה של ה-FPS צפוי לעמוד על כ-100,000 חביות ליום וכ-140 MMSCF של גז ליום. התכנון, הבניה וההתקנה תבוצע על ידי Hyundai במהלך 36 החודשים ממועד החתימה, כאשר השנה הראשונה תוקדש לתכנון הנדסי. Hyundai צפויה להתחיל בבניית ה-FPS ברבעון השלישי של

_____

[42] חברה ציבורית הנסחרת בבורסת ניו יורק. למיטב ידיעת השותפות, החברה הינה אחת מחברות הקידוחים הגדולות בעולם.

54

8.2 שננדואה

שנת 2022. לאחר השלמת בניית ה-FPS, מערכת זו תועבר לארה"ב וצפויה להיות מותקנת מעל מאגר הנפט שננדואה במהלך החציון השני של שנת 2024.

■ ביום 25 בינואר 2022 נחתם הסכם להקמת מערכות ההפקה והבקרה והתשתיות התת ימיות בפרויקט (להלן: **"המערכות התת-ימיות"**) עם חברת .Subsea 7 S.A[43] ההסכם כולל קבלת שירותי תכנון, רכש, הקמה והתקנה של המערכות התת ימיות, שתחבר את בארות הפיתוח בפרויקט ל-FPS, וכן שירותים בקשר עם התקנת ה-FPS והקמת צנרת ייצוא הגז. העלויות הכרוכות בהסכם הינן נמוכות מאלו שתוקצבו בתקציב הפיתוח (אשר אושר כמפורט לעיל). ההסכם הינו ההסכם המהותי האחרון לפיתוח הפרויקט, והחתימה עליו מהווה התקיימות אחד מהתנאים המתלים למשיכה ראשונה של המימון הפרויקטלי.

פיתוח הפרויקט מתקדם על פי התכנון, אשר לפיו, להערכת המפעילה, ההפקה מהפרויקט צפויה להתחיל בסוף שנת 2024.

**אזהרה בגין מידע צופה פני עתיד - ההערכות לעיל ולהלן, לרבות ביחס לעלות ה-Breakeven, קצב ההפקה מהפרויקט, כושר הטיפול וההפקה של ה-FPS, המועדים הצפויים לתכנון, הבניה וההתקנה של ה- FPS, מועד המשיכה הראשונה, והמועד הצפוי לתחילת ההפקה מהפרויקט מהווה מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. ההערכות הנ"ל מבוססות על מידע הנדסי, נתונים משוערים של זמינות וציוד, מידע כלכלי ואחר, ועשויות שלא להתממש או להתממש באופן שונה מהותית אם יחולו שינויים ו/או עיכובים במגוון גורמים, וכן אם ישתנו ההערכות שנתקבלו, ו/או התנאים התפעוליים והטכניים ו/או בעקבות שינויים ו/או עיכובים במגוון גורמים, לרבות שינויים בתנאי השוק בכלל ובסקטור הנפט בפרט ו/או שינויים גיאופוליטיים ו/או שינויים בתנאים תפעוליים וטכניים בנכס הנפט ו/או בעקבות גורמים בלתי צפויים הקשורים בפיתוח נכסי נפט ו/או בעקבות גורמים חיצוניים שאינם בשליטת השותפות ו/או בעקבות גורמים שונים שלא ניתן להעריכם מראש.**

מימון הפרויקט

ביום 1 באוגוסט 2021 חתמה חברת הפרויקט, במקביל לחתימת השותפות האחרות בפרויקט, על הסכם מימון פרויקטלי עם קונסורציום של בנקים ומוסדות פיננסיים מקומיים וזרים, בהובלת בנק Societe Generale, לצורך מימון חלקה של כל אחת משותפות שננדואה בעלויות הפיתוח של הפרויקט. לפי הסכם המימון, תועמדנה ל-ShenHai הלוואות בסך כולל של כ-444 מיליון דולר ארה"ב, וכן היא תהיה זכאית להגדיל סכום זה בכ-100 מיליון דולר ארה"ב נוספים, עד לסכום כולל של כ-544 מיליון דולר ארה"ב. המשיכה הראשונה תתבצע רק לאחר השקעת כל סך ההון הנדרש לפרויקט, וצפויה לקראת סוף שנת 2022.

---

[43] חברה המאוגדת בלוקסמבורג ונסחרת בבורסת אוסלו.

APC-01760576

8.2 שננדואה

במועד קבלת ה-FID כאמור לעיל, התקיימו כל התנאים המוקדמים לסגירה פיננסית (Closing) של הסכמי המימון הפרויקטלי.

בחודש נובמבר 2021, מימשה השותפות את זכאותה להגדלת סכום המימון הפרויקטלי בכ-100 מיליון דולר ארה"ב נוספים. הגדלת סכום המימון הפרויקטלי בוצעה באמצעות הצטרפותה של נאוויטס שנחי מימון בע"מ, חברה ייעודית בבעלות מלאה של השותפות (להלן: "**החברה הייעודית**") כמלווה נוספת בקונסורציום המלווים.

הגדלת סכום המימון הפרויקטלי כאמור בוצעה על ידי השותפות באמצעות גיוס אג"ח סחיר בהיקף של כ-100 מיליון דולר ארה"ב (כ-330 מיליון ש"ח) בחודש נובמבר 2021, כאשר עם התקיימות התנאים המתלים לשחרור תמורת ההנפקה ביום 11 בנובמבר 2021, הועמדה מלוא תמורת ההנפקה (נטו) כהלוואת בעלים על ידי השותפות לחברה הייעודית, ושימשה את החברה הייעודית לצורך הצטרפותה לקונסורציום המלווים כמלווה נוספת בהסכם המימון הפרויקטלי של חברת הפרויקט.

בעקבות הצטרפות החברה הייעודית לקונסורציום המלווים והעמדת הלוואתה לחברת הפרויקט, גדל סכום המימון הפרויקטלי, שאותו חברת הפרויקט זכאית למשוך, לסך של כ-544 מיליון דולר ארה"ב (להלן: "**סכום המימון הפרויקטלי המוגדל**").

בנוסף לסכום המימון הפרויקטלי המוגדל ולהון עצמי בסך של כ-311 מיליון דולר ארה"ב שהפקידה השותפות עבור חברת הפרויקט ביום 23 באוגוסט 2021, הפקידה חברת הפרויקט ביום 16 בנובמבר 2021 הון עצמי נוסף בהיקף של כ-60 מיליון דולר ארה"ב בחשבון נאמנות, ובכך השלימה את הפקדת כל סכום ההון הנדרש בגין חלקה של ShenHai בתקציב פיתוח פרויקט שננדואה ושמרה על חלקה בפרויקט שננדואה.

בחודש מרץ 2022 התקשרו חברת הפרויקט, השותפות, ובנק Societe Generale בתפקידו כבנק הטכני של המימון הפרויקטלי, בהסכם Contingent Equity Support, במסגרתו התחייבה השותפות כי במידה שתדרש לכך, במקרה של חריגות בתקציב הפרויקט, תעמיד השותפות ל- ShenHai סך של עד 40 מיליון דולר אשר ייעוד לכיסוי כרית נוספת לחריגות בתקציב (CERA - Contingent Equity Reserve Account) בדרך של השקעה הונית או הלוואת בעלים נחותה. החתימה על הסכם זה מהווה התנאי המתלה העיקרי הנותר למשיכה הראשונה של כספי המימון הפרויקטלי.

לפרטים אודות גיוסי הון וחוב שביצעה השותפות לרבות הנפקת מניות בכורה בחברה בת והסכם ההשקעה בקשר להנפקה זו, אשר שימשו להעמדת ההון העצמי כאמור לעיל, ראו בסעיף ב' לדוח הדירקטוריון המצורף כפרק ב' לדוח זה.

לפרטים נוספים אודות הסכמי המימון הפרויקטלי, ההסכמות המסחריות והעדכונים להם, הגדלת המימון הפרויקטלי של פרויקט שננדואה והשלמת מימון הפרויקט, ראו באור 8(3) לדוחות הכספיים.

56

APC-01760577

8.2 שננדואה

התכנית המפורטת בטבלה להלן הינה התכנית שהוגדרה ב-SOP ולוחות הזמנים המהווים את דרישות ה-SOP. לפרטים אודות התקציב הכולל המוערך לפיתוח פרוייקט שננדואה, בחלוקה לפי שנים, ראו דוח התזרים שהוכן על ידי NSAI להלן.

| תקופה | תיאור תמציתי של פעולות שבוצעו בפועל לתקופה או של תכנית העבודה המתוכננת | תקציב כולל משוער לפעולות שאושרו על ידי השותפים ברמת נכס הנפט (באלפי דולר)[44] | היקף השתתפותם בפועל של מחזיקי הרישיונות ההוניים של השותפות בתקציב (באלפי דולר) |
|---|---|---|---|
| 2019 | • נמשכה בחינת חלופות פיתוח ותכנון הנדסי<br>• נמשך פיתוח ורישיון רכיבים הנדרשים לעמידה בתנאי HPHT – לחץ גבוה, טמפרטורה גבוהה (High Pressure, High Temperature)<br>• הוענקו חוזים לתכנון הנדסי של חלק מהרכיבים שיידרשו לפיתוח הפרוייקט<br>• הוזמן ציוד שזמן אספקתו ארוך (Long lead), לרבות יחידות Subsea Production Trees (יחידות הפקה, שליטה ובקרה תת ימיות המותקנות מעל בארות ההפקה), אשר הוזמנו מחברת TechnipFMC ("**מערכות תת ימיות**").<br>• הוגשה תכנית פיתוח ראשונית מוצעת (Field Development Plan) לשותפים | 13,643 | 3,377 |
| 2020 | • חתימה על הסכם עם חברת Transocean Ltd. לקבלת שירותי קדיחה והשלמה של ארבעת קידוחי הפיתוח.<br>• קודם שלב תכנון הנדסי (FEED) | 22,891 | 12,155 |
| 2021 | • אישור תכנית פיתוח וקבלת החלטת השקעה סופית (FID) לפיתוח פרוייקט שננדואה<br>• הזמנת ציוד נוסף שזמן אספקתו ארוך (Long Lead) שישמש בקידוחים<br>• חתימה על הסכם הקמה של צנרת היצוא<br>• חתימה על הסכם להקמת פלטפורמת ההפקה<br>• התחלת עבודות Hyundai תחת הסכם EPC (הנדסה, רכש ובנייה) של אסדת ההפקה הצפה | 168,812 | 82,718 |
| 2022 | • קידום הליך אישור הרכיבים הנדרשים לעמידה בתנאי HPHT – לחץ גבוה, טמפרטורה גבוהה (High Pressure, High Temperature)<br>• תחילת פעולות קידוח<br>• המשך הקמת פלטפורמת ההפקה<br>• תחילת ביצוע עבודות הקמת צנרת היצוא | 643,286 | 315,210 |
| 2023 | • תחילת עבודות השלמה<br>• התקנת צנרת היצוא | 504,294 | 247,104 |
| 2024 | • השלמת התקנת צנרת היצוא<br>• העברת פלטפורמת ההפקה למפרץ מקסיקו והתקנה<br>• תחילת הפקה | 391,968 | 192,064 |
| 2025 ואילך | • תשלום נדחה לקבלן פלטפורמת ההפקה ויתרת תשלומים לקבלנים | 134,070 | 65,694 |

---

[44] הערכות בדבר עלויות פיתוח מופיעות בתחזית התזרים ומהוות הערכות כלליות בלבד. התקציב המתואר בטבלה זו מתייחס להחזקות השותפות בזכויות בנכס הנפט במועד אליו מתייחס הסעיף - שיעור של 23.1% עד ליום 30 בספטמבר 2019, החזקות השותפות בזכויות בשיעור של 53.1% בשננדואה החל מיום 1 באוקטובר 2019 והחזקות השותפות בזכויות בשיעור של 49% החל מיום 25 באוגוסט 2021.

57

APC-01760578

8.2 שננדואה

**אזהרה בגין מידע צופה פני עתיד** - ההערכות דלעיל לעניין הפעולות המתוכננות בנכס הנפט, לרבות עלויות ולוחות זמנים, ולרבות בנוגע למועד ביצוע עבודות הפיתוח והשלמתן, כאמור לעיל, הינן מידע צופה פני עתיד כמשמעו בחוק ניירות ערך, המבוססות על הערכות שנמסרו לשותף הכללי על ידי המפעילה בנכס הנפט, בין היתר על בסיס מידע הנדסי, כלכלי ואחר, שנתקבל מהמפעילה בהתבסס על מגוון גורמים וביניהם, תכנית הפיתוח ולוחות הזמנים ליישומה, קבלת אישורים רגולטוריים, נתונים משוערים של זמינות ציוד, שירותים ועלויות וכן על ניסיון העבר והינן בגדר הערכות והשערות מקצועיות בלבד אשר לגביהן לא קיימת כל ודאות.

8.2.6 **שיעור השתתפות בפועל בהוצאות והכנסות הקשורות בנכס הנפט**

| הסברים | שיעור מגולם ל- 100% | אחוז | שיעור ההשתתפות |
|---|---|---|---|
| ראו תיאור שרשרת החזקות בסעיף 8.2.1 לעיל | 100% | 49% | **השיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות בנכס הנפט** |
| ראו תחשיב בסעיף 8.2.7 להלן | 78.75% | 38.68% | **השיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט** |
| ראו תחשיב בסעיף 8.2.8 להלן | 100% | 49% | **השיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות בהוצאות הכרוכות בפעילות חיפושים, פיתוח או הפקה בנכס הנפט** |

8.2.7 **שיעור ההשתתפות בפועל של מחזיקי הזכויות ההוניות של השותפות בהוצאות הפיתוח וההפקה בנכס הנפט**

| הסבר תמציתי כיצד מחושבים התמלוגים או התשלומים | אחוז | פריט |
|---|---|---|
| | 49% | **הוצאות תיאורטיות של נכס נפט (בלא התמלוגים האמורים)** |
| | | **פירוט התשלומים (הנגזרים מההוצאות) ברמת נכס הנפט:** |
| | 100% | **סה"כ שיעור ההוצאות בפועל ברמת נכס הנפט** |
| | 49% | **שיעורם של מחזיקי הזכויות ההוניות של השותפות בהוצאות נכס הנפט (בשרשור)** |
| | 49% | **סה"כ שיעורם בפועל של מחזיקי הזכויות ההוניות של השותפות, בהוצאות, ברמת נכס הנפט (ולפני תשלומים אחרים ברמת השותפות)** |
| | | **פירוט תשלומים (הנגזרים מההוצאות) בקשר עם נכס הנפט וברמת השותפות (האחוזים להלן יחושבו לפי שיעורם של מחזיקי הזכויות ההוניות של השותפות בנכס הנפט):** |
| | 49% | **השיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות, בהוצאות הכרוכות בפעילות פיתוח או הפקה בנכס הנפט** |

58

APC-01760579

8.2 <u>שננדואה</u>

8.2.8  **תגמולים ותשלומים ששולמו במהלך פעילות החיפוש, הפיתוח וההפקה בנכס הנפט**

| מתוכו, שיעורם של מחזיקי הזכויות ההוניות של השותפות בתשלומים לממשל הפדרלי בארה"ב | סך הכל שיעורם של מחזיקי הזכויות ההוניות של השותפות בהשקעות בתקופה זו בנכס הנפט (באלפי דולר) | פריט |
|:---:|:---:|---:|
| - | 3,377 | **תקציב שהושקע בפועל בשנת 2019** |
| - | 12,155 | **תקציב שהושקע בפועל בשנת 2020** |
| - | 82,718 | **תקציב שהושקע בפועל בשנת 2021** |

APC-01760580

8.2 שננדואה

### 8.2.9 עתודות בנכס הנפט שננדואה

<u>נתוני כמויות</u>   (א)

(1) על פי דוח שקיבלה השותפות מ-NSAI ואשר הוכן בהתאם לכללי המערכת לניהול משאבי פטרוליום (SPE-PRMS), עתודות הנפט והגז הטבעי שבנכס הנפט נכון ליום 31 בדצמבר 2021 הינם כמפורט להלן.

| קטגוריית עתודות | סה"כ בנכסי הנפט (Gross) | | | סה"כ חלק השותפות (Net)[45] | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | גז טבעי BCF | נפט MMBBL | סה"כ בשווה ערך של חביות נפט MMBOE | גז טבעי BCF | נזלי גז טבעי MMBBL | נפט MMBBL | סה"כ בשווה ערך של חביות נפט MMBOE |
| עתודות מוכחות 1P (Proved Reserves) | 140.8 | 120.7 | 144.2 | 40.2 | 6.6 | 45.1 | 58.4 |
| עתודות צפויות (Probable Reserves) | 239.1 | 203.7 | 243.6 | 67.5 | 11.2 | 76.4 | 98.9 |
| סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 379.9 | 324.4 | 387.8 | 107.7 | 17.8 | 121.5 | 157.3 |
| עתודות אפשריות (Possible Reserves) | 341.5 | 297.6 | 354.5 | 96.5 | 16.0 | 111.6 | 143.7 |
| סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 721.4 | 622.0 | 742.3 | 204.2 | 33.8 | 233.1 | 300.9 |

(2) בדוח ציינה NSAI, בין היתר, מספר הנחות והסתייגויות ובכללן כי: (א) ההערכות, כמקובל בהערכת עתודות על פי כללי המערכת לניהול משאבי פטרוליום (SPE-PRMS), ואינן מותאמות לסיכונים; (ב) NSAI לא ביקרה באזור נכסי הנפט ולא בדקה את התפעול המכני של המתקנים והבארות או את מצבם; (ג) NSAI לא בחנה חשיפה אפשרית הנובעת מעניייני איכות הסביבה ועל כן לא כללה בדוח העתודות עלויות שעלולות לנבוע מחבות כאמור; (ד) NSAI ציינה כי ההערכות שלה בדוח מבוססות, בין היתר, על ההנחות שהנכסים יפותחו בהתאם לתכניות הפיתוח הקיימות שהוצגו על ידי מפעילת הנכס, שהנכסים יתופעלו כראוי, שלא יחולו תקנות או מגבלות רגולטוריות חדשות שישפיעו על יכולתם של בעלי הזכויות לשמור על ההפקה, ושנתוני ההפקה בפועל יתאמו את התחזיות שלה; (ה) NSAI עשתה שימוש במידע טכני וכלכלי הכולל, בין היתר, לוגים, מפות גיאולוגיות, מידע סיסמי, וזכויות בעלות בנכסים; (ו) ל-NSAI סופק כל המידע הנחוץ לצורך הכנת הדוח ולא הוגבלה הגישה ל-NSAI לאף מידע אשר היה בדעתה כי הוא הכרחי להכנת הדוח; (ז) כמקובל בהערכות בתחום הנפט והגז, ישנן אי ודאויות מובנות בפרשנות ההנדסית והגאו-פיזית, ולכן מסקנות NSAI מייצגות, כמקובל, פרשנות מקצועית בלבד;

---

[45] לעניין זה, "Net" משמעו מכפלת סה"כ כמות הנפט והגז הטבעי, לפי העניין, בנכס הנפט (Gross) בשיעור המשויך בפועל למחזיקי הזכויות ההוניות של השותפות בהכנסות מנכס הנפט. הגדרה זו תקפה גם ליתר טבלאות העתודות בדיווח זה.

APC-01760581

<div dir="rtl">

8.2 <u>שננדואה</u>

(ח) NSAI עשתה שימוש במידע שהתקבל מהשותפות, מהמפעילה בנכס הנפט, ממקורות מידע פומביים וממידע לא חסוי המצוי בידי NSAI ; (ט) NSAI לא בחנה את הזכויות החוזיות בנכסים.

**<u>אזהרה בגין מידע צופה פני עתיד</u> - הערכות NSAI בדבר כמויות עתודות הנפט והגז הטבעי בנכס הנפט הינן מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. ההערכות לעיל מבוססות, בין היתר, על מידע גיאולוגי, גיאופיסי, הנדסי ואחר, שנתקבל מהקידוחים ומאת המפעילה במאגר, והינן בגדר הערכות והשערות בלבד של NSAI ואשר לגביהן לא קיימת כל ודאות. כמויות הגז הטבעי ו/או הנפט שיופקו בפועל עשויות להיות שונות מהההערכות וההשערות הנ"ל, בין היתר, כתוצאה מתנאים תפעוליים וטכניים ו/או משינויים רגולטוריים ו/או מתנאי היצע וביקוש בשוק הגז הטבעי ו/או הנפט ו/או מתנאים מסחריים ו/או כתוצאה מהביצועים בפועל של המאגר. ההערכות וההשערות הנ"ל עשויות להתעדכן ככל שיצטבר מידע נוסף ו/או כתוצאה ממכלול של גורמים הקשורים בנכס הנפט והפקה של נפט וגז טבעי.**

**רזרבות אפשריות (Possible Reserves) הן הרזרבות הנוספות אשר אינן צפויות להיות מופקות באותה מידה כמו הרזרבות הצפויות ( Probable Reserves) ישנו סיכוי של 10% שהכמויות שיופקו בפועל יהיו שוות או גבוהות מכמות הרזרבות המוכחות (Proved Reserves), בצירוף כמות הרזרבות הצפויות (Probable Reserves) ובצירוף כמות הרזרבות האפשריות (Possible Reserves).**

(ב)    <u>נתוני תזרים מהוון</u>

ביחס לחישוב התזרים המהוון המפורט להלן, יצוין כדלקמן :

(1)    התזרים המהוון חושב לפי הערכת השותפות המבוססת על ממוצע תחזיות מחירי נפט וגז של גופים בינלאומיים הכוללים בנקים וגופי מחקר שנלקחו ממאגר FactSet[46] : (1) מחירי נפט- נלקחו תחזיות לגבי מחירי נפט West Texas Intermediate (WTI). מחיר הנפט מותאם לאיכות הנפט, לעלויות הולכה ולהפרשי שערים, ביחס ל-WTI ; (2) מחירי גז- נלקחו תחזיות לגבי מחירי גז טבעי Henry Hub. מחיר הגז מותאם לאיכות הגז, לעלויות הולכה ולהפרשי שערים.

---

[46] המעודכנים למועד הסמוך לאישור הדוח.

61

</div>

APC-01760582

8.2 <u>שננדואה</u>

להלן טבלה המרכזת את תחזיות מחירי הנפט והגז הטבעי בהם נעשה שימוש (לפני התאמות) :

| סוף תקופה | מחיר נפט דולר/חבית | מחיר גז טבעי דולר/MMBTU |
|---|---|---|
| 31.12.2022 | 76.51 | 3.97 |
| 31.12.2023 | 72.27 | 3.55 |
| 31.12.2024 | 68.83 | 3.26 |
| 31.12.2025 | 66.13 | 3.23 |
| לאחר מכן | 66.13 | 3.23 |

(2) עלויות התפעול שנלקחו בחשבון הן עלויות שהונחו על ידי מפעילת שננדואה ועל ידי NSAI. עלויות אלו נועדו לכלול עלויות הולכה, עלויות צנרות ייצוא, דמי ייצוא בצינור, הוצאות תקורה לבאר ואומדנים של עלויות שונות. עלויות התפעול חולקו לעלויות ברמת עלויות השדה, עלויות לבאר ועלויות ליחידת ייצור. עלויות התפעול אינן מותאמות לשינוי אינפלציה.

(3) ההוצאות ההוניות שנלקחו בחשבון לצורך הכנת התזרים המהוון מבוססות על הוצאות מאושרות והוצאות בפועל שהוצאו בפרויקט וכוללות הוצאות הוניות אשר תידרשנה לתחזוקת הבארות, קדיחת בארות חדשות, שירותים שונים וליצוד הפקה. ההוצאות ההוניות שסופקו ל-NSAI על-ידי המפעילה בנכס נראות סבירות בעיניה, עלויות אלו אינן מותאמות לשינוי אינפלציה.

(4) עלויות נטישה שנלקחו בחשבון הינן הערכות שסופקו ל-NSAI על-ידי המפעילה בנכס בהתאם להערכותיה באשר לעלות נטישת הבארות, נטישת פלטפורמת ההפקה וציוד ההפקה. כפי שהוגדר על ידי המפעילה, עלויות הנטישה אינן כוללות את הניצולת של המתקנים (Salvage Value) ואינן מותאמות לשינוי אינפלציה.

(5) קצב ההפקה בפועל עשוי להיות נמוך או גבוה מקצב ההפקה בו נעשה שימוש לצורך הערכת התזרים המהוון. NSAI לא ערכה ניתוח רגישות ביחס לקצב ההפקה של הבארות.

(6) בחישוב התזרים המהוון נלקח בחשבון מס בשיעור 21%, שיעור התמלוגים שישולמו ברמת נכס הנפט לממשל הפדרלי, בשיעור של 12.5%-16.67%. בנוסף נלקח בחשבון תמלוג על לצדדים שלישיים בשיעור של 2% ולשותף הכללי בשיעור של 6%.

62

APC-01760583

8.2 שנדואה

התזרים המהוון עודכן ביחס לתזרים המהוון שנכלל בדוח העתודות שפורסם בתאריך 20 באוקטובר 2021[47] (להלן בסעיף זה: **"דוח העתודות הקודם"**) בעיקר לאור תחזית עדכנית של מחירי נפט ושינוי ביתרת הזמן להיוון.

להלן הערכת התזרים המהוון נכון ליום 31.12.2021 באלפי דולר, המיוחס לחלקה של השותפות בעתודות שבנכס הנפט:

---

[47] ראו דיווח מיידי של השותפות מיום 20 באוקטובר 2021 (אסמכתא מספר: 2021-01-157983), אשר המידע על פיו מובא בדוח בדרך של הפניה.

APC-01760584

8.2 האודננש

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירת (MMCF) [48] | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (78,686) | (87,525) | (97,819) | (109,890) | (124,154) | - | (124,154) | - | (188,956) | (3,349) | (19,226) | 87,376 | 2,999 | 2,554 | 2024 |
| 360,818 | 418,799 | 489,328 | 575,890 | 683,174 | (27,468) | 710,641 | - | (24,979) | (38,508) | (231,406) | 1,005,534 | 35,993 | 30,643 | 2025 |
| 213,414 | 258,478 | 315,735 | 389,283 | 484,893 | (100,249) | 585,142 | - | (24,715) | (37,900) | (197,395) | 845,152 | 30,244 | 25,756 | 2026 |
| 105,416 | 133,227 | 170,136 | 219,757 | 287,417 | (66,329) | 353,746 | - | - | (38,030) | (119,389) | 511,165 | 18,282 | 15,579 | 2027 |
| 50,557 | 66,681 | 89,036 | 120,495 | 165,496 | (36,666) | 202,163 | - | - | (35,204) | (72,336) | 309,702 | 11,070 | 9,439 | 2028 |
| 23,612 | 32,496 | 45,362 | 64,314 | 92,749 | (17,324) | 110,073 | - | - | (34,890) | (44,177) | 189,140 | 6,760 | 5,768 | 2029 |
| 7,783 | 11,178 | 16,312 | 24,229 | 36,688 | (11,223) | 47,911 | - | (59,780) | (27,060) | (41,070) | 175,822 | 6,231 | 5,404 | 2030 |
| 15,853 | 23,757 | 36,246 | 56,400 | 89,673 | (17,658) | 107,331 | - | - | (26,984) | (40,946) | 175,261 | 6,140 | 5,392 | 2031 |
| 3,215 | 5,028 | 8,021 | 13,077 | 21,834 | (5,224) | 27,058 | - | (9,800) | (25,884) | (19,128) | 81,870 | 2,854 | 2,520 | 2032 |
| 6,740 | 10,999 | 18,344 | 31,331 | 54,928 | (20,503) | 75,431 | - | (49,980) | (24,951) | (45,834) | 196,196 | 6,909 | 6,034 | 2033 |
| 10,480 | 17,846 | 31,115 | 55,675 | 102,487 | (24,403) | 126,890 | - | - | (23,836) | (45,943) | 196,669 | 6,940 | 6,047 | 2034 |
| 4,140 | 7,356 | 13,408 | 25,134 | 48,581 | (10,553) | 59,134 | - | - | (23,532) | (25,197) | 107,863 | 3,807 | 3,317 | 2035 |
| 1,204 | 2,233 | 4,256 | 8,358 | 16,965 | (2,516) | 19,481 | - | - | (23,532) | (13,111) | 56,124 | 1,981 | 1,726 | 2036 |
| (1,497) | (3,028) | (6,321) | (13,653) | (30,614) | - | (30,614) | (31,850) | - | (11,766) | (3,963) | 16,965 | 599 | 522 | 2037-2038 |
| 224,469 | 379,529 | 593,834 | 897,516 | 1,341,088 | (340,118) | 1,681,205 | (31,850) | (947,239) | (375,426) | (919,121) | 3,954,841 | 140,808 | 120,701 | סה"כ |

סה"כ תזרים מהוון מעתדות מוכחות Proved Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

סה"כ תזרים מהוון אחרי מס

[48]   כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

64

APC-01760585

8.2 שנדואה

| | | | | | סה"כ תזרים מהוון אחרי מס | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירות (MMCF) [49] | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2022 |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2023 |
| 2,582 | 2,872 | 3,210 | 3,606 | 4,074 | - | 4,074 | - | - | - | (1,145) | 5,219 | 186 | 152 | 2024 |
| 23,032 | 26,733 | 31,235 | 36,761 | 43,609 | (1,699) | 45,308 | - | (950) | - | (13,809) | 60,067 | 2,230 | 1,824 | 2025 |
| 49,794 | 60,309 | 73,668 | 90,829 | 113,137 | (40,403) | 153,539 | - | (15,401) | - | (51,472) | 220,412 | 7,977 | 6,710 | 2026 |
| 86,738 | 109,621 | 139,990 | 180,819 | 236,491 | (67,670) | 304,161 | - | (38,958) | - | (104,556) | 447,675 | 16,059 | 13,640 | 2027 |
| 62,587 | 82,547 | 110,221 | 149,166 | 204,875 | (64,379) | 269,254 | - | (82,089) | (392) | (107,167) | 458,902 | 16,587 | 13,972 | 2028 |
| 87,525 | 120,457 | 168,151 | 238,401 | 343,808 | (94,854) | 438,662 | - | (55,106) | (1,764) | (150,996) | 646,528 | 23,233 | 19,709 | 2029 |
| 90,809 | 130,410 | 190,320 | 282,681 | 428,049 | (99,569) | 527,618 | - | 59,780 | (2,352) | (143,290) | 613,480 | 21,896 | 18,845 | 2030 |
| 42,681 | 63,960 | 97,585 | 151,845 | 241,427 | (62,584) | 304,010 | - | - | (2,428) | (93,378) | 399,816 | 14,351 | 12,276 | 2031 |
| 28,809 | 45,054 | 71,873 | 117,176 | 195,647 | (49,302) | 244,949 | - | 9,800 | (3,528) | (72,731) | 311,407 | 11,165 | 9,562 | 2032 |
| 10,707 | 17,472 | 29,140 | 49,770 | 87,254 | (14,599) | 101,854 | - | 49,980 | (4,461) | (17,158) | 73,493 | 2,708 | 2,251 | 2033 |
| 448 | 763 | 1,330 | 2,380 | 4,382 | (10,597) | 14,979 | - | (59,780) | (5,576) | (24,429) | 104,764 | 4,208 | 3,183 | 2034 |
| 5,331 | 9,473 | 17,267 | 32,368 | 62,562 | (26,899) | 89,460 | - | (79,380) | (5,880) | (53,162) | 227,883 | 8,876 | 6,944 | 2035 |
| 26,220 | 48,620 | 92,667 | 181,998 | 369,415 | (101,160) | 470,575 | - | (40,180) | (5,880) | (157,376) | 674,011 | 24,660 | 20,659 | 2036 |
| 53,374 | 109,263 | 231,720 | 510,774 | 1,174,306 | (304,369) | 1,478,676 | (17,150) | (119,560) | (238,342) | (551,292) | 2,405,019 | 84,960 | 73,944 | 2037-2047 |
| 570,637 | 827,554 | 1,258,380 | 2,028,574 | 3,509,035 | (938,083) | 4,447,118 | (17,150) | (371,844) | (270,602) | (1,541,961) | 6,648,676 | 239,097 | 203,672 | סה"כ |

סה"כ תזרים מהוון מעותדות צפויות Probable Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

---

[49] כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי

65

APC-01760586

8.2 שנדואה

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירות (MMCF) [50] | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | סה"כ תזרים מהוון אחרי מס | | | | | | | | | | | | |
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (76,104) | (84,653) | (94,609) | (106,284) | (120,080) | - | (120,080) | - | (188,956) | (3,349) | (20,371) | 92,596 | 3,185 | 2,706 | 2024 |
| 383,850 | 445,532 | 520,563 | 612,651 | 726,783 | (29,167) | 755,949 | - | (25,928) | (38,508) | (245,215) | 1,065,601 | 38,222 | 32,467 | 2025 |
| 263,208 | 318,786 | 389,403 | 480,112 | 598,030 | (140,651) | 738,682 | - | (40,115) | (37,900) | (248,867) | 1,065,564 | 38,221 | 32,466 | 2026 |
| 192,154 | 242,847 | 310,126 | 400,576 | 523,908 | (133,999) | 657,907 | - | (38,958) | (38,030) | (223,946) | 958,840 | 34,341 | 29,219 | 2027 |
| 113,145 | 149,228 | 199,257 | 269,662 | 370,371 | (101,045) | 471,416 | - | (82,089) | (35,596) | (179,503) | 768,604 | 27,657 | 23,411 | 2028 |
| 111,136 | 152,953 | 213,514 | 302,715 | 436,557 | (112,178) | 548,735 | - | (55,106) | (36,654) | (195,172) | 835,667 | 29,993 | 25,477 | 2029 |
| 98,592 | 141,588 | 206,633 | 306,910 | 464,737 | (110,792) | 575,529 | - | - | (29,412) | (184,361) | 789,302 | 28,127 | 24,249 | 2030 |
| 58,534 | 87,716 | 133,831 | 208,244 | 331,100 | (80,242) | 411,342 | - | - | (29,412) | (134,324) | 575,077 | 20,491 | 17,668 | 2031 |
| 32,024 | 50,082 | 79,894 | 130,253 | 217,481 | (54,526) | 272,006 | - | - | (29,412) | (91,859) | 393,277 | 14,019 | 12,082 | 2032 |
| 17,447 | 28,471 | 47,484 | 81,101 | 142,183 | (35,103) | 177,285 | - | - | (29,412) | (62,992) | 269,689 | 9,617 | 8,285 | 2033 |
| 10,928 | 18,609 | 32,446 | 58,055 | 106,869 | (35,001) | 141,869 | - | (59,780) | (29,412) | (70,372) | 301,433 | 11,148 | 9,230 | 2034 |
| 9,471 | 16,828 | 30,676 | 57,502 | 111,142 | (37,452) | 148,594 | - | (79,380) | (29,412) | (78,359) | 335,746 | 12,683 | 10,261 | 2035 |
| 27,424 | 50,853 | 96,922 | 190,356 | 386,380 | (103,676) | 490,056 | - | (40,180) | (29,412) | (170,487) | 730,135 | 26,641 | 22,385 | 2036 |
| 51,877 | 106,235 | 225,399 | 497,121 | 1,143,692 | (304,369) | 1,448,062 | (49,000) | (119,560) | (250,108) | (555,255) | 2,421,984 | 85,559 | 74,466 | 2037-2047 |
| 795,106 | 1,207,083 | 1,852,214 | 2,926,090 | 4,850,123 | (1,278,200) | 6,128,323 | (49,000) | (1,319,082) | (646,028) | (2,461,082) | 10,603,516 | 379,905 | 324,372 | סה"כ |

**סה"כ תזרים מהוון מעתדות מוכחות וצפויות (2P) Proved+Probable Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)**

---

[50]  כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

66

APC-01760587

8.2 שנדואה

סה"כ תזרים מהוון מעתדות אפשריות Possible Reserves ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירות (MMCF) [51] | כמות מכירת נפט (אלפי חביות) (100% מנכסי הנפט) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| סה"כ תזרים מהוון אחרי מס | | | | | | | | | | | | | | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2022 |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2023 |
| 463 | 515 | 576 | 647 | 731 | - | 731 | - | - | - | (225) | 956 | 2 | 30 | 2024 |
| 3,796 | 4,406 | 5,148 | 6,059 | 7,187 | (259) | 7,446 | - | (950) | - | (2,596) | 10,992 | 28 | 365 | 2025 |
| (3,112) | (3,770) | (4,605) | (5,677) | (7,072) | (850) | (6,221) | - | (14,643) | - | (2,608) | 11,029 | 30 | 366 | 2026 |
| 31,346 | 39,616 | 50,591 | 65,346 | 85,465 | (17,609) | 103,073 | - | 29,225 | - | (22,543) | 96,391 | 3,112 | 2,965 | 2027 |
| 43,456 | 57,315 | 76,530 | 103,571 | 142,251 | (33,648) | 175,899 | - | 32,885 | 392 | (43,519) | 186,142 | 6,156 | 5,714 | 2028 |
| 6,702 | 9,224 | 12,876 | 18,255 | 26,326 | (14,013) | 40,340 | - | (36,505) | 1,372 | (23,031) | 98,503 | 3,248 | 3,028 | 2029 |
| 7,277 | 10,450 | 15,251 | 22,652 | 34,301 | (19,444) | 53,745 | - | (73,218) | 1,176 | (38,280) | 164,067 | 6,331 | 5,004 | 2030 |
| 41,709 | 62,502 | 95,362 | 148,385 | 235,925 | (64,979) | 300,904 | - | (37,591) | 98 | (103,098) | 441,495 | 16,013 | 13,543 | 2031 |
| 48,375 | 75,652 | 120,686 | 196,757 | 328,520 | (89,904) | 418,424 | - | (42,715) | (588) | (140,743) | 602,471 | 21,220 | 18,528 | 2032 |
| 41,812 | 68,232 | 113,797 | 194,361 | 340,746 | (96,323) | 437,068 | - | (66,639) | (1,274) | (152,881) | 657,862 | 22,681 | 20,268 | 2033 |
| 44,228 | 75,312 | 131,314 | 234,959 | 432,517 | (100,613) | 533,129 | - | 59,780 | (2,352) | (135,054) | 610,756 | 20,522 | 18,857 | 2034 |
| 25,398 | 45,129 | 82,264 | 154,203 | 298,053 | (65,293) | 363,346 | - | 79,380 | (2,352) | (81,478) | 367,797 | 11,638 | 11,410 | 2035 |
| (4,068) | (7,543) | (14,376) | (28,235) | (57,311) | 11,634 | (68,945) | - | (19,600) | (2,352) | 17,735 | (64,728) | (3,189) | (1,922) | 2036 |
| 41,570 | 109,989 | 313,510 | 974,288 | 3,346,591 | (896,930) | 4,243,521 | (14,700) | (179,340) | (550,652) | (1,508,983) | 6,497,195 | 233,689 | 199,449 | 2037-2067 |
| 328,952 | 547,030 | 998,923 | 2,085,569 | 5,214,231 | (1,388,231) | 6,602,462 | (14,700) | (269,931) | (556,533) | (2,237,304) | 9,680,929 | 341,482 | 297,606 | סה"כ |

---

[51] כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

67

APC-01760588

8.2 ‏האודננש

| סה"כ תזרים מהוון אחרי מס | | | | | מסים | סה"כ תזרים לפני היטל ומס הכנסה (מהוון ב-0%) | עלויות נטישה ושיקום | עלויות פיתוח | עלויות הפעלה | תמלוגים שישולמו | הכנסות | כמות מכירות (MMCF) [52] | כמות מכירת נפט (אלפי חביות) | שנה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| מהוון ב-20% | מהוון ב-15% | מהוון ב-10% | מהוון ב-5% | מהוון ב-0% | | | | | | | | | (100% מנכסי הנפט) | |
| (302,272) | (308,755) | (315,675) | (323,083) | (331,039) | - | (331,039) | - | (331,039) | - | - | - | - | - | 2022 |
| (196,309) | (209,238) | (223,651) | (239,800) | (257,991) | - | (257,991) | - | (257,991) | - | - | - | - | - | 2023 |
| (75,641) | (84,137) | (94,033) | (105,637) | (119,349) | - | (119,349) | - | (188,956) | (3,349) | (20,596) | 93,552 | 3,188 | 2,736 | 2024 |
| 387,646 | 449,938 | 525,711 | 618,710 | 733,970 | (29,426) | 763,396 | - | (26,878) | (38,508) | (247,811) | 1,076,593 | 38,251 | 32,832 | 2025 |
| 260,096 | 315,017 | 384,798 | 474,434 | 590,959 | (141,502) | 732,460 | - | (54,758) | (37,900) | (251,475) | 1,076,593 | 38,251 | 32,832 | 2026 |
| 223,500 | 282,463 | 360,717 | 465,921 | 609,372 | (151,608) | 760,980 | - | (9,733) | (38,030) | (246,488) | 1,055,231 | 37,453 | 32,184 | 2027 |
| 156,601 | 206,544 | 275,788 | 373,233 | 512,622 | (134,693) | 647,315 | - | (49,204) | (35,204) | (223,022) | 954,746 | 33,813 | 29,125 | 2028 |
| 117,838 | 162,177 | 226,389 | 320,970 | 462,883 | (126,191) | 589,075 | - | (91,611) | (35,282) | (218,203) | 934,171 | 33,241 | 28,505 | 2029 |
| 105,869 | 152,038 | 221,884 | 329,562 | 499,038 | (130,236) | 629,275 | - | (73,218) | (28,236) | (222,641) | 953,369 | 34,458 | 29,254 | 2030 |
| 100,243 | 150,218 | 229,193 | 356,629 | 567,025 | (145,221) | 712,246 | - | (37,591) | (29,314) | (237,421) | 1,016,572 | 36,504 | 31,211 | 2031 |
| 80,399 | 125,733 | 200,580 | 327,010 | 546,001 | (144,430) | 690,431 | - | (42,715) | (30,000) | (232,603) | 995,748 | 35,240 | 30,610 | 2032 |
| 59,259 | 96,703 | 161,281 | 275,461 | 482,928 | (131,425) | 614,353 | - | (66,639) | (30,686) | (215,873) | 927,551 | 32,298 | 28,554 | 2033 |
| 55,156 | 93,921 | 163,760 | 293,014 | 539,385 | (135,613) | 674,999 | - | - | (31,764) | (205,426) | 912,189 | 31,670 | 28,088 | 2034 |
| 34,869 | 61,958 | 112,940 | 211,705 | 409,196 | (102,745) | 511,941 | - | - | (31,764) | (159,838) | 703,543 | 24,321 | 21,671 | 2035 |
| 23,356 | 43,310 | 82,546 | 162,121 | 329,069 | (92,042) | 421,111 | - | (59,780) | (31,764) | (152,752) | 665,407 | 23,452 | 20,463 | 2036 |
| 93,448 | 216,224 | 538,909 | 1,471,409 | 4,490,283 | (1,201,299) | 5,691,582 | (63,700) | (298,900) | (800,759) | (2,064,237) | 8,919,179 | 319,248 | 273,915 | 2037-2067 |
| 1,124,058 | 1,754,113 | 2,851,137 | 5,011,660 | 10,064,353 | (2,666,432) | 12,730,785 | (63,700) | (1,589,013) | (1,202,561) | (4,698,386) | 20,284,445 | 721,388 | 621,978 | סה"כ |

סה"כ תזרים מהוון מעתדות מוכחות, צפויות ואפשריות Proved+Probable+Possible Reserves (3P) ליום 31.12.2021 (באלפי דולר ביחס לחלקה של השותפות בנכס הנפט)

---

[52] כמות המכירות כוללת מכירת נוזלי גז טבעי וגז טבעי.

APC-01760589

8.2 ‏<u>האודננש</u>

‏<u>אזהרה</u> - יובהר כי נתוני תזרים מהוונים, בין אם חושבו בשיעור היוון מסוים או ללא שיעור היוון מייצגים ערך נוכחי אך לאו דווקא מייצגים שווי הוגן.

‏<u>אזהרה בגין מידע צופה פני עתיד</u> - נתוני התזרימים המהוונים כאמור לעיל הינם מידע צופה פני עתיד כמשמעו בחוק ניירות ערך. הנתונים לעיל מבוססים על הנחות שונות, ביניהן ביחס לכמויות הנפט, הגז הטבעי ונוזלי הגז הטבעי שיופקו, קצב ומשך מכירותיהם מנכס הנפט שנדואה, עלויות תפעוליות, הוצאות הוניות, הוצאות נטישה, שיעורי תמלוגים ומחירי המכירה ואשר לגביהן אין כל וודאות כי יתממשו. יצוין, כי כמויות הגז הטבעי ו/או הנפט ו/או נוזלי הגז הטבעי ו/או הקונדנסט שיופקו בפועל, ההוצאות האמורות וההכנסות האמורות עשויות להיות שונות מהותית מהההערכות וההשערות הנ"ל, בין היתר, כתוצאה מתנאים תפעוליים וטכניים ו/או משינויים רגולטוריים ו/או מתנאי היצע וביקוש בשוק הגז הטבעי ו/או הנפט ו/או נוזלי הגז הטבעי ו/או הקונדנסט ו/או מהביצועים בפועל של הפרויקט ו/או כתוצאה ממחירי המכירה בפועל ו/או כתוצאה משינויים גיאופוליטיים שיחולו.

(ג)     להלן ניתוח רגישות לפרמטרים העיקריים המרכיבים את התזרים המהוון של העתודות בנכס הנפט (מחיר הנפט והגז וכמות מכירות הנפט והגז) ליום 31.12.2021 (באלפי דולר), אשר בוצע על ידי השותפות :

| שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה | שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה |
|---|---|---|---|---|---|---|---|---|---|---|---|
| קיטון במחיר הנפט והגז בשיעור של 10% | | | | | | גידול במחיר הנפט והגז בשיעור של 10% | | | | | |
| 129,059 | 261,422 | 444,484 | 703,580 | 1,080,679 | עתודות מוכחות 1P (Proved Reserves) | 319,815 | 497,579 | 743,137 | 1,091,424 | 1,601,496 | עתודות מוכחות 1P (Proved Reserves) |
| 502,468 | 728,373 | 1,106,489 | 1,780,442 | 3,069,939 | עתודות צפויות (Probable Reserves) | 638,059 | 926,056 | 1,409,717 | 2,276,365 | 3,948,131 | עתודות צפויות (Probable Reserves) |
| 631,527 | 989,795 | 1,550,973 | 2,484,022 | 4,150,618 | סה"כ עתודות מסוג 2P (Proved+Probable Reserves) | 957,874 | 1,423,636 | 2,152,855 | 3,367,789 | 5,549,627 | סה"כ עתודות מסוג 2P (Proved+Probable Reserves) |
| 291,076 | 483,983 | 883,230 | 1,840,021 | 4,573,193 | עתודות אפשריות (Possible Reserves) | 366,711 | 609,970 | 1,114,524 | 2,331,015 | 5,854,840 | עתודות אפשריות (Possible Reserves) |
| 922,603 | 1,473,778 | 2,434,204 | 4,324,043 | 8,723,812 | סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 1,324,585 | 2,033,606 | 3,267,378 | 5,698,804 | 11,404,467 | סה"כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) |
| קיטון במחיר הנפט והגז בשיעור של 15% | | | | | | גידול במחיר הנפט והגז בשיעור של 15% | | | | | |
| 81,354 | 202,368 | 369,809 | 606,611 | 950,475 | עתודות מוכחות 1P (Proved Reserves) | 366,832 | 556,008 | 817,304 | 1,188,079 | 1,731,700 | עתודות מוכחות 1P (Proved Reserves) |
| 468,384 | 678,783 | 1,030,544 | 1,656,376 | 2,850,392 | עתודות צפויות (Probable Reserves) | 672,102 | 975,609 | 1,485,632 | 2,400,412 | 4,167,679 | עתודות צפויות (Probable Reserves) |

69

APC-01760590

8.2 שנדואה

| שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה |
|---|---|---|---|---|---|
| 549,738 | 881,150 | 1,400,353 | 2,262,988 | 3,800,866 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 272,137 | 452,459 | 825,381 | 1,717,235 | 4,252,595 | עתודות אפשריות (Possible Reserves) |
| 821,875 | 1,333,609 | 2,225,734 | 3,980,222 | 8,053,461 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |
| קיטון במחיר הנפט והגז בשיעור של 20% | | | | | |
| 33,649 | 143,314 | 295,134 | 509,643 | 820,270 | עתודות מוכחות 1P (Proved Reserves) |
| 434,299 | 629,191 | 954,597 | 1,532,308 | 2,630,844 | עתודות צפויות (Probable Reserves) |
| 467,948 | 772,505 | 1,249,731 | 2,041,951 | 3,451,114 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 253,199 | 420,936 | 767,534 | 1,594,449 | 3,931,997 | עתודות אפשריות (Possible Reserves) |
| 721,147 | 1,193,441 | 2,017,265 | 3,636,400 | 7,383,111 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |
| קיטון בכמות מכירות הנפט והגז בשיעור של 10% | | | | | |
| 136,403 | 270,533 | 456,039 | 718,638 | 1,100,993 | עתודות מוכחות 1P (Proved Reserves) |
| 507,870 | 736,274 | 1,118,661 | 1,800,455 | 3,105,585 | עתודות צפויות (Probable Reserves) |
| 644,273 | 1,006,807 | 1,574,700 | 2,519,094 | 4,206,578 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 294,153 | 489,128 | 892,711 | 1,860,225 | 4,626,096 | עתודות אפשריות (Possible Reserves) |
| 938,426 | 1,495,935 | 2,467,411 | 4,379,319 | 8,832,674 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |

| שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה |
|---|---|---|---|---|---|
| 1,038,934 | 1,531,618 | 2,302,936 | 3,588,491 | 5,899,380 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 385,642 | 641,486 | 1,172,361 | 2,453,761 | 6,175,145 | עתודות אפשריות (Possible Reserves) |
| 1,424,576 | 2,173,104 | 3,475,297 | 6,042,252 | 12,074,524 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |
| גידול במחיר הנפט והגז בשיעור של 20% | | | | | |
| 413,849 | 614,437 | 891,470 | 1,284,733 | 1,861,905 | עתודות מוכחות 1P (Proved Reserves) |
| 706,144 | 1,025,159 | 1,561,537 | 2,524,429 | 4,387,127 | עתודות צפויות (Probable Reserves) |
| 1,119,993 | 1,639,597 | 2,453,007 | 3,809,163 | 6,249,032 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 404,574 | 673,006 | 1,230,209 | 2,576,537 | 6,495,549 | עתודות אפשריות (Possible Reserves) |
| 1,524,567 | 2,312,602 | 3,683,216 | 6,385,700 | 12,744,581 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |
| גידול בכמות מכירות הנפט והגז בשיעור של 10% | | | | | |
| 312,534 | 488,526 | 731,630 | 1,076,394 | 1,581,182 | עתודות מוכחות 1P (Proved Reserves) |
| 632,705 | 918,199 | 1,397,580 | 2,256,374 | 3,912,485 | עתודות צפויות (Probable Reserves) |
| 945,239 | 1,406,724 | 2,129,210 | 3,332,768 | 5,493,668 | סה"כ עתדות מסוג 2P (Proved+Probable Reserves) |
| 363,635 | 604,826 | 1,105,044 | 2,310,817 | 5,801,984 | עתודות אפשריות (Possible Reserves) |
| 1,308,874 | 2,011,551 | 3,234,254 | 5,643,585 | 11,295,652 | סה"כ עתדות מסוג 3P (Proved+Probable+Possible Reserves) |

APC-01760591

8.2 <u>שננדואה</u>

| שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה | שווי נוכחי בהוון של 20% | שווי נוכחי בהוון של 15% | שווי נוכחי בהוון של 10% | שווי נוכחי בהוון של 5% | שווי נוכחי בהוון של 0% | רגישות / קטגוריה |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | קיטון בכמות מכירות הנפט והגז בשיעור של 15% | | | | | | גידול בכמות מכירות הנפט והגז בשיעור של 15% | | | |
| 92,370 | 216,035 | 387,141 | 629,199 | 980,945 | עתודות מוכחות 1P (Proved Reserves) | 355,973 | 542,484 | 800,089 | 1,165,563 | 1,701,230 | עתודות מוכחות 1P (Proved Reserves) |
| 476,487 | 690,634 | 1,048,802 | 1,686,396 | 2,903,860 | עתודות צפויות (Probable Reserves) | 664,009 | 963,767 | 1,467,381 | 2,370,397 | 4,114,210 | עתודות צפויות (Probable Reserves) |
| 568,857 | 906,669 | 1,435,943 | 2,315,595 | 3,884,806 | סה״כ עתודות מסוג 2P (Proved+Probable Reserves) | 1,019,982 | 1,506,251 | 2,267,469 | 3,535,960 | 5,815,440 | סה״כ עתודות מסוג 2P (Proved+Probable Reserves) |
| 276,754 | 460,176 | 839,603 | 1,747,541 | 4,331,950 | עתודות אפשריות (Possible Reserves) | 381,027 | 633,771 | 1,158,142 | 2,423,464 | 6,095,861 | עתודות אפשריות (Possible Reserves) |
| 845,611 | 1,366,845 | 2,275,546 | 4,063,136 | 8,216,755 | סה״כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 1,401,009 | 2,140,022 | 3,425,611 | 5,959,424 | 11,911,302 | סה״כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) |
| | | קיטון בכמות מכירות הנפט והגז בשיעור של 20% | | | | | | גידול בכמות מכירות הנפט והגז בשיעור של 20% | | | |
| 48,337 | 161,537 | 318,243 | 539,760 | 860,898 | עתודות מוכחות 1P (Proved Reserves) | 399,371 | 596,405 | 868,516 | 1,254,712 | 1,821,277 | עתודות מוכחות 1P (Proved Reserves) |
| 445,103 | 644,994 | 978,943 | 1,572,337 | 2,702,136 | עתודות צפויות (Probable Reserves) | 695,354 | 1,009,370 | 1,537,207 | 2,484,425 | 4,315,888 | עתודות צפויות (Probable Reserves) |
| 493,440 | 806,531 | 1,297,186 | 2,112,097 | 3,563,033 | סה״כ עתודות מסוג 2P (Proved+Probable Reserves) | 1,094,725 | 1,605,776 | 2,405,723 | 3,739,137 | 6,137,165 | סה״כ עתודות מסוג 2P (Proved+Probable Reserves) |
| 259,354 | 431,224 | 786,495 | 1,634,856 | 4,037,803 | עתודות אפשריות (Possible Reserves) | 398,420 | 662,717 | 1,211,245 | 2,536,126 | 6,389,786 | עתודות אפשריות (Possible Reserves) |
| 752,795 | 1,237,755 | 2,083,681 | 3,746,953 | 7,600,836 | סה״כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) | 1,493,145 | 2,268,493 | 3,616,969 | 6,275,263 | 12,526,951 | סה״כ עתודות מסוג 3P (Proved+Probable+Possible Reserves) |

71

APC-01760592

8.2 <u>שנדואה</u>

השותפות מצהירה כי כל הנתונים דלעיל נערכו באופן התואם לכללי המערכת לניהול משאבי פטרוליום (SPE-PRMS).

<u>חוות דעת של המעריך</u>

מצורף לדוח זה דוח משאבים שהוכן על-ידי NSAI, נכון ליום 31.12.2021, וכן הסכמת NSAI להכללתו בדוח זה.

<u>הצהרת הנהלה</u>

1. תאריך ההצהרה: 17 במרץ 2022;

2. ציון שם התאגיד: נאוויטס פטרוליום - שותפות מוגבלת;

3. המוסמך להעריך את המשאבים בשותפות, שמו ותפקידו: עמית קורנהאוזר, מנכ"ל השותף הכללי;

4. הרינו לאשר, כי נמסרו למעריך כל הנתונים הנדרשים לצורך ביצוע עבודתו;

5. הרינו לאשר, כי לא בא לידיעתנו כל מידע המצביע על קיום תלות בין המעריך לבין השותפות;

6. הרינו לאשר, כי למיטב ידיעתנו המשאבים שדווחו הם האומדנים הטובים והעדכניים ביותר הקיימים ברשותנו;

7. הרינו לאשר, כי הנתונים שנכללו בדוח זה נערכו לפי המונחים המקצועיים המנויים בפרק ז' לתוספת השלישית לתקנות ניירות ערך (פרטי התשקיף וטיוטת התשקיף – מבנה וצורה), התשכ"ט-1969, ובמשמעות הנודעת להם ב- (2007) Resources ו- Petroleum Management System כפי שפרסמו איגוד מהנדסי הפטרוליום (SPE), הארגון האמריקאי של גיאולוגים בתחום הפטרוליום (AAPG), המועצה העולמית לפטרוליום (WPC) ואיגוד מהנדסי הערכת הפטרוליום (SPEE), כתוקפם בתאריך הדוח;

8. הרינו לאשר, כי לא נעשה שינוי בזהות המעריך שביצע את הגילוי בדבר המשאבים האחרון שפורסם על-ידי השותפות;

9. הרינו מסכימים להכללת ההצהרה האמורה לעיל בדוח זה.

_____

עמית קורנהאוזר, מנכ"ל

השותף הכללי

72

APC-01760593

# Exhibit 61

| AREA_BLOCK_OPER_WELL# | SHENANDOAH_NAME | API | Status | Drill_Order | Spud_Date | Lease | MD-ft | TVD-ft | WD-ft | KB-ft | X_SL-ft | Y_SL-ft | SL_Grid Coor_System | XY_SL_Source | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WR51_Anadarko_1 | Shenandoah_2 (Original) | 608124007500 | PA | 4 | 6/29/2012 | OCS-G-25232 | 13075 | 13075 | 5838 | 87 | 2104205.66 | 9767107.79 | NAD27_UTM15_GridNorth_USFeet | DDR-DIR | Lost well Due to TD in Salt |
| WR51_Anadarko_2 | Shenandoah_2 (Re-Drill of Original) | 608124007900 | TA | 5 | 9/17/2012 | OCS-G-25232 | 31405 | 31405 | 5837 | 86 | 2103016.93 | 9767039.85 | NAD27_UTM15_GridNorth_USFeet | DDR-DIR | Well developed Willcox - All Sands Filled with Oil to Base |
| WR51_Anadarko_3 | Shenandoah_4 | 608124010100 | SideTracked | 8 | 5/26/2015 | OCS-G-25232 | 31296 | 31024.83 | 5857 | 82 | 2100390.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Appraisal Well in North Western area of field-Initial wellbore encountered early salt stock-Additional salt position compleity |
| WR51_Anadarko_3ST1 | Shenandoah_4ST1 | 608124010101 | SideTracked | 9 | 9/8/2015 | OCS-G-25232 | 32105 | 31802.38 | 5857 | 82 | 2100390.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Sidetrack to south - upper Wilcox missing, no salt |
| WR51_Anadarko_3ST1BP1 | Shenandoah_4ST1BP1 | 608124010102 | SideTracked | 10 | 10/26/2015 | OCS-G-25232 | 31765 | 31591.3 | 5857 | 82 | 2100390.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | Core ByPass in Wlcox Section |
| WR51_Anadarko_3ST2 | Shenandoah_4ST2 | 608124010103 | PA? | 11 | 12/21/2015 | OCS-G-25232 | n/a at this time 022616 | n/a at this time 022616 | 5857 | n/a at this time 022616 | 2100390.36 | 9767200.49 | NAD27_UTM15_GridNorth_USFeet | PLAT-DIR | MRO went NonConsent / Mechanical Drill Problems?? Possible reentry for additional sidetrack |
| WR51_Anadarko_4 | Shenandoah_5 | 608124010900 | Drilling as of 03/22/16 | 12 | 3/14/2016 | OCS-G-31938 | 30770 (Proposed) | n/a at this time 032216 | 5847 | 82 | 2105781.81 | 9768236.81 | NAD27_UTM15_GridNorth_USFeet | PLAT | Well Drilling as of 03/22/2016 |
| WR52_Anadarko_1 | Shenandoah_1 | 608124003400 | SideTracked | 1 | 6/4/2008 | OCS-G-31938 | 16685 | 16684 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | |
| WR52_Anadarko_1BP1 | Shenandoah_1BP1 | 608124003401 | SideTracked | 2 | 7/3/2008 | OCS-G-31938 | 25413 | 25367 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | Small Amount of Pay -Discovery well of field-Encountered salt stringers in apparent reservoir section |
| WR52_Anadarko_1BP2 | Shenandoah_1BP2 | 608124003402 | PA | 3 | 11/11/2008 | OCS-G-31938 | 30039 | 29948 | 5819 | 82 | 2108189.75 | 9771118.35 | NAD27_UTM15_GridNorth_USFeet | Furgo-Chance DDR | |
| WR52_Anadarko_2 | Shenandoah_3 | 608124009300 | SideTracked | 6 | 5/29/2014 | OCS-G-31938 | 33225 | 32807.06 | 5874 | 82 | 2115664.01 | 976847.23 | NAD27_UTM15_GridNorth_USFeet | Fugro-DDR | All Sands wet -DownDip test of eastern part of field-Comparable sands as 51#2 in water leg-Water pressure allowed calculation of OWC at ~30510' |
| WR52_Anadarko_2BP1 | Shenandoah_3BP1 | 608124009301 | PA | 7 | 12/7/2014 | OCS-G-31938 | 31767 | 31407.68 | 5874 | 82 | 2115664.01 | 976847.23 | NAD27_UTM15_GridNorth_USFeet | Fugro-DDR | Core ByPass in Wlcox Section-Note:Well was Deepened from 31239' to 31767' |

# Exhibit 62

# Executive Summary



- Shenandoah is an Anadarko-operated 2008 Wilcox oil discovery, located in the northwestern area of Walker Ridge in blocks WR 51, 52 and 53, with the potential to be a major oil producing hub for APC. There have been multiple penetrations defining the western portion of the discovery, but significant subsurface uncertainty remains, particularly in the central and eastern flank of the field where the largest unproven acreage exists. The main objective for the WR 51 #4 (Shenandoah #5) is to define the structure east of the WR 51 #2 (Shenandoah #2) fault block. APC must also fulfill lease obligations within the 180-day clock, which drives the timing of the spud of this appraisal well.

- In order to reduce reservoir size uncertainty, and to hold the lease, the Shenandoah pre-development team's recommendation is to drill the WR 51 #4 (Shenandoah #5) appraisal well at a 30% working interest, along with our partners (COP 30%, CIE 20%, MRO 10%, and Venari 10%). The well is proposed to be drilled 600' structurally up-dip to the WR 51 #2 (Shenandoah #2), testing the central area of the reservoir. The primary objectives of the WR 51 #4 (Shenandoah #5) are to (1) extend the Wilcox proven reservoirs to the east; (2) confirm fault configuration by pressure analysis, relative to WR 51 #2 (Shenandoah #2) and the discovery well, WR 52 #1 BP2 (Shenandoah #1); and (3) move the project closer to a minimum economic field size (MEFS) for sanctioning. This well will also be designed as a "keeper well", rather than an expendable well to save on future development costs.

- The dry hole AFE cost for this well, expected to spud in March 2016 on the Diamond Ocean Black Hawk, is $210MM (gross) which equates to $63MM (net) to APC. In the success case, APC could prove additional resources ranging from 304 – 665 MMBO STOOIP, which would continue to move the Shenandoah project towards sanction. Below are the risked and un-risked forward looking economics for this project.

## Risked and Un-risked Mean at 30% WI (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | | |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Mean Gross EUR (MMBOE) | Pc |
| Risked Mean | 208 | 0.22 | 15.38 | 478 | 0.48 | 16.07 | 412.6 | 88.2% |
| Unrisked Mean | 250 | 0.24 | 15.18 | 557 | 0.50 | 15.87 | 468.0 | 100% |

*Increased facilities costs at $80 oil (market driven)

CONFIDENTIAL                                                                    APC-00222728

# Shenandoah WR 51 #4 Well Recommendation



## Drill East & 600' Updip to the Shenandoah #2 (WR 51 #2) testing the central area of the reservoir

- AFE = $210 MM Gross, APC net at 30% = $63 MM
- Shenandoah Partnership: APC=30%, COP=30%, Cobalt=20%, Marathon-10%, Venari=10%
- Well anticipated to spud March 1st 2016 with the Diamond BlackHawk (APC Operated)
- Designed as a "keeper" well

## Primary Objectives

- Extend Wilcox proven hydrocarbon bearing reservoirs to the east
- Confirm fault model by pressures relative to Shen 2 and Shen1
- Move project closer to a minimum economic field size for sanctioning

| Block: | WR 51 |
|---|---|
| Water Depth: | 5847' |
| Objective: | U. & L. Wilcox |
| Trap Type: | Salt trapped 3-Way |
| PTD: | 31,100' |
| D.H. Cost: | $210 MM  ($63 MM net) |

ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL

APC-00222729

Structural Cross Section
Across Shenandoah Field Area

Index Map





ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL

APC-00222730

## Shen-4ST1 to Shen-2 to Shen-5 to Shen-6 to Shen-3



Note that WR51-4 Shen-5 penetrates U & L Wilcox high to Shen-2 well and is fault-separated from Shen-2 and Shen-4ST1

ANADARKO PETROLEUM CORPORATION

CONFIDENTIAL

APC-00222731

# Stand-alone Development Assumptions



- **1st Oil July 2021**

- **30 Year Field Life**

- **Facility (Spar):**
  - Oil Production: 100K BOPD
  - Gas Production: 120 MMCFD
  - Water Production: 100K BWPD
  - Liquid Production: 120K BLP

<u>**Targeted Zones Phased Development**</u>:

- **Phase 1: (all cases)**
  - 4 wells and one flow loop

- **Phase 2: (P50 and P10 only)**
  - 6 additional wells and another flow loop (10 wells total)



ANADARKO PETROLEUM CORPORATION

5

CONFIDENTIAL

APC-00222732

# Pre-drill WR 51 #4 Economic Summary
## (Stand-alone Spar Development)


ANADARKO

## Risked and Un-risked Mean (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | | |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Mean Gross EUR (MMBOE) | $P_c$ |
| Risked Mean | 208 | 0.22 | 15.38 | 478 | 0.48 | 16.07 | 412.6 | 88.2% |
| Unrisked Mean | 250 | 0.24 | 15.18 | 557 | 0.50 | 15.87 | 468.0 | 100% |

*Increased facilities costs at $80 oil (market driven)

In the success case at WR 51 #4 (Shen-5), APC could prove additional resources moving this project toward a sanction decision. The size of the prize is characterized by the current un-risked P10 case below.

## Un-risked P10 (2016 forward)

| | Invest $60/bbl | | | Upside $80/bbl | | | | |
|---|---|---|---|---|---|---|---|---|
| | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Net AT NPV10 ($MM) | AT PIR10 | F&D* ($/BOE) | Gross EUR (MMBOE) | $P_c$ |
| Unrisked P10 | 656 | 0.62 | 9.90 | 1,098 | 0.99 | 10.35 | 717 | 100% |

*Increased facilities costs at $80 oil (market driven)

CONFIDENTIAL

APC-00222733



![Anadarko Petroleum Corporation]

# Shenandoah V Prospect

| | |
|---|---|
| **Well:** | Walker Ridge Block 51 #4 "E" |
| | OCS-G 31938 |
| | AFE |
| **Mudline Location:** | Walker Ridge Block 51 (SL:E) |
| | Latitude: 26° 54' 44.6" N |
| | Longitude: 91° 34' 17.6" W |
| | 5,070' FNL & 950' FEL of Block 51 |
| **BHL Location:** | 5,070' FNL & 950' FEL of Block 51 |
| **DIRECTIONAL:** | Straight Hole |
| **OBJECTIVES:** | Wilcox |

| | |
|---|---|
| **Rig:** | Diamond Ocean BlackHawk |
| **RKB to MSL:** | 82' |
| **WD:** | 5,847' |
| **RKB to ML:** | 5,929' |
| **Key:** | BLACK Casing Depths are "As Installed" |
| | Blue Casing Depths are "Planned" |

| | | |
|---|---|---|
| **RKB to ML:** | 5,929' | |
| **18-3/4" HPWH:** | 5,916' | (+13' AML) |
| **36" LPH:** | 5,919' | (+10' AML) |

| MD / BML | HOLE SIZE | CASING & CEMENT | MUD SMW/ESD | LOT OBG/FG |
|---|---|---|---|---|
| MWD/LWD to TD | | | | |
| 6,205' (276' BML) | 42" | Jetted to 276' BM: | | |
| | 26" x 32" Hole | | SW / 10.0 Salt Mud @ 6,606' | |
| TOS +/- 6,661' (+/-732' BML) Possible Inclusion @ +-7,222 MD/TVD | 28" ID = 26.50" | 28" 0.75" Wall, 218.2# X-56 DQ S60/MT | NA | |
| 7,400' (1,471' BML) | | Cement to ML | 10.0/12.1 ppg | |
| Possible Inclusion @ +-7,842-8,480 MD/TVD 16" SA @ 7,929' 18" SA @ 8,429' | 26" Hole | | SW / 10.5 Salt Mud @ 8,929' | |
| | | 22" 1.5" Wall X-80 DQ H-100DM QT/MT (2,953') | | |
| 8,929' (3,000' BML) | 22" ID = 20.00" | 22" 1.0" Wall X-80 DQ S90/MMT (960') Cement to ML | 13.1 ppg FIT 11.4/13.1 ppg | |
| Possible Inclusion @ +-10,442-11,212 MD/TVD | | 14" TB TOC @ 11,000 14" TB HID @ 11,500 14" TB MW TBD ppg | | |
| Possible Inclusion @ +-12,382 MD/TVD | 18-1/8" x 21.5" Hole | | SBM SMW 11.5-12.4 ppg ESD 11.7-12.6 ppg 92% OBG | |
| Possible Suture @ +-13,332-13,662 MD/TVD | | | | |
| 13,800' MD 13,800' TVD (7,871' BML) | 18" Liner ID = 16.75 | 18" 117# HP Q-125 Hyd 511 Cement to 12,300' | 15.0 ppg FIT 13.7/15.0 ppg | |
| Possible Inclusion Zone @ +-14,632 - 16,032' MD/TVD Possible Inclusion Zone @ +-16,762 - 18,662' MD/TVD | | Tieback Casing 14.15", 126.82#, HPQ125 HUNT SLSF (1,900') 14", 115.53#, XHPQ125 HYD 523 (5584') 13.75", 98.58#, HPQ125 HUNT SLSF (5000') | | |
| TOL (Baker Liner hanger @ 18,200') | 16-1/2" x 19" Hole | | SBM SMW 12.5 - 14.3 ppg ESD 12.7 - 14.6 ppg 97% OBG | |
| 14" TB Shoe @ 18,500' MD/TVD 14" TOL @ 18,600' MD/TVD | | 16.15" 119.23# HP Q-125 SLSF 7,929-13,250' (ID 14.704") 16.1" 103.39# HP Q-125 SLSF 13,250-17,900' (ID 14.85") | | |
| 18,900' MD 18,900' TVD (12,971' BML) | 16.15" Liner ID = 14.704, 14.85 & 14.606" | 16.15" 126.91# HP Q-125 HUNT SLSF 17,900-18,900 (ID 14.606") Cement to 15,400' | 15.9 ppg FIT 14.9/15.9 ppg | |
| | | Tieback Casing 10-1/8" 75.9#, HP Q-125 HUNT SLSF (ID = 8.609") 7124' 9-7/8" 62.8#, HP Q-125 HYD 523 (ID = 8.625")1600' Tieback Cemented to 18,200' Tieback HiD @ 18,200' | | |
| | 14-1/2" x 16-1/2" Hole | | SBM SMW 14.3 - 15.1 ppg ESD 14.6 - 15.4 ppg 98% OBG | |
| Possible Inclusion @ +-23,022' MD/TVD Possible Inclusion @ +-23,618' MD/TVD | | | | |
| Possible Inclusion @ +-24,600' MD/TVD 11-7/8" TOL @ 25,480' MD/TVD | | 14", 115.53#, XHPQ125 HUNT SLSF (5,100') | | |
| 25,700' MD 25,700' TVD (19,771' BML) | 14" ID = 12.360" | 14.15", 126.91#, HPQ125 HUNT SLSF (2,000') Cement to 21,500' HID 22,500' | 16.5 ppg FIT 15.7/16.5 ppg | |
| BOS +/- 26,224' MD 26,224' TVD (+/- 20,295' BML) | 12-1/4" x 14" Hole | | SBM SMW 14.7 - 15.7 ppg ESD 14.9 - 16.0 ppg | |
| Lower Miocene 2 - 26,642' MD 26,642' TVD Oligocene - 27,263' MD 27,283' TVD Circ/cementing Ports just above Liner top packer 9-3/8" TOL @ 26,924' MD/TVD | | BOS FG 15.6, OBG 15.8 Target 15.0 ESD exit MW | | |
| 27,224' MD 27,224' TVD (21,295' BML) Oligocene - 27,283' MD 27,283' TVD | 11 7/8" Drilling Liner ID = 10.711" | 11-7/8" 71.8# Q-125 CC Hyd 513 Cement to 26,200' | 15.8 ppg LOT 15.9/15.8 ppg | |
| Eocene - 27,859' MD 27,859' TVD | 10-5/8" x 12-1/4" Hole | | SBM SMW 14.7 - 15.0 ppg ESD 15.0 - 15.3 ppg | |
| 28,250' MD 28,250' TVD (22,321' BML) U WILCOX Marls - 28,354' MD 28,354' TVD U WILCOX 1 - 28,573' MD 28,573' TVD | 9-3/8" Drilling Liner ID = 8.575" | 9-3/8" 39# HP Q-125 Hyd 513 Cement to 27,500' HiD 29,300' | 15.9 ppg LOT 16.0/15.9 ppg | |
| | 8-1/2" Hole | | SBM SMW 14.7 - 15.1 ppg ESD 15.0 - 15.4 ppg | |
| L WILCOX E - 30,395' MD 30,395' TVD Top Cretaceous - 30,719' MD 30,719' TVD | | | | |
| 30,770' MD 30,770' TVD (24,841' BML) | | | NA 16.62/16.35 ppg | |

CONFIDENTIAL                    APC-00222734



CONFIDENTIAL

# Exhibit 63

DOW JONES



**Anadarko Announces Another Deepwater Gulf of Mexico Discovery**

536 words
4 February 2009
07:28 AM
Business Wire
BWR
English
(c) 2009 Business Wire. All Rights Reserved.

HOUSTON - (BUSINESS WIRE) - Anadarko Petroleum Corporation (NYSE:APC) today announced its second deepwater Gulf of Mexico discovery this week. The Shenandoah discovery well, located in Walker Ridge block 52, encountered net oil pay approaching 300 feet in the Wilcox formation.

"This has been a remarkable week, with back-to-back deepwater discoveries in the Gulf of Mexico," said Bob Daniels, Anadarko Sr. Vice President, Worldwide Exploration. "Initial data indicates the Shenandoah discovery has reservoir properties that appear to be of much higher quality than industry has seen previously in the emerging Lower-Tertiary play. The success of this well and our recent Heidelberg discovery further confirms the value of Anadarko's extensive acreage position and our capability in exploring proven and emerging deepwater basins worldwide."

Shenandoah is located in approximately 5,750 feet of water and was drilled to a total depth of about 30,000 feet. Anadarko and the co-owners of the discovery are evaluating the well results and the next steps toward future appraisal activity. Anadarko operates Shenandoah with a 30-percent working interest. Co-owners of the discovery include ConocoPhillips (40-percent working interest), Cobalt International Energy, L.P. (20-percent working interest) and Marathon (10-percent working interest).

Also in the deepwater Gulf of Mexico, Anadarko expects to spud the Vito Middle-Miocene prospect in Mississippi Canyon block 984 and the Samurai Middle- and Lower-Miocene exploration well in Green Canyon block 432 during the first quarter. Anadarko operates these wells with a 20-percent working interest and a 33.33-percent working interest, respectively.

A map of the Shenandoah discovery and Anadarko's additional Lower-Tertiary exploration opportunities in the area is provided under the "Media Center/Anadarko News" tabs at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. For more information about Anadarko, please visit www.anadarko.com.

This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including our ability to successfully drill, complete, test and produce the wells described in this release. See "Risk Factors" in the company's 2007 Annual Report on Form 10-K and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.

Anadarko Media: John Christiansen, 832-636-8736 john.christiansen@anadarko.com Paula Beasley, 832-636-8765 paula.beasley@anadarko.com Matt Carmichael, 832-636-2845 matt.carmichael@anadarko.com Investors: John Colglazier, 832-636-2306 john.colglazier@anadarko.com Chris Campbell, CFA, 832-636-8434 chris.campbell@anadarko.com Danny Hart, 832-636-1355 danny.hart@anadarko.com

Document BWR0000020090204e524004mp

APC-01335462

Page 2 of 2 © 2021 Factiva, Inc. All rights reserved.

APC-01335463

# Exhibit 64



# NEWS

## ANADARKO ANNOUNCES SHENANDOAH APPRAISAL WELL ENCOUNTERS MORE THAN 1,000 NET FEET OF OIL PAY

**HOUSTON**, March 19, 2013 – Anadarko Petroleum Corporation (NYSE: APC) today announced its Shenandoah-2 well in the deepwater Gulf of Mexico encountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs.

"The successful Shenandoah-2 well marks one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries," said Bob Daniels, Anadarko Sr. Vice President Deepwater and International Exploration. "With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico."

The Shenandoah-2 well, located in Walker Ridge block 51, was drilled to a total depth of 31,405 feet in approximately 5,800 feet of water, more than 1 mile southwest and approximately 1,700 feet structurally down-dip from the Shenandoah-1 discovery. Similar to the initial Shenandoah discovery well, log and pressure data from the Shenandoah-2 well indicate excellent-quality reservoir and fluid properties. The well was drilled to test the down-dip extent of the accumulation, and the targeted sands were full to base with no oil-water contact.

"We are incorporating the information obtained from Shenandoah-2 into our planning and anticipate further appraisal drilling to advance this potentially giant project," Daniels added.

Anadarko is the operator of the Shenandoah-2 well and the previously announced Shenandoah-1 discovery well, located in Walker Ridge block 52, with a 30-percent working interest. Other co-owners in Shenandoah are ConocoPhillips (NYSE: COP) with a 30-percent working interest, Cobalt International Energy L.P. (NYSE: CIE) with a 20-percent working interest, Venari Resources LLC with a 10-percent working interest and Marathon Oil Company (NYSE: MRO) with a 10-percent working interest.

CONFIDENTIAL

APC-00572655

Additionally, in the Shenandoah Basin, Anadarko has a 15-percent working interest in both the Coronado well, located in Walker Ridge block 98, and the Yucatan prospect, located in Walker Ridge block 95.

A map of the Shenandoah Basin in the deepwater Gulf of Mexico will be available under the "Media Center/Anadarko News" tab at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2012, the company had approximately 2.56 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to successfully drill, complete, test and produce the wells and prospects identified in this news release. See "Risk Factors" in the company's 2012 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

#        #        #

**ANADARKO CONTACTS**

**MEDIA:**
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Brian Cain, brian.cain@anadarko.com, 832.636.3404
Christina Ramirez, christina.ramirez@anadarko.com, 832.636.8687

**INVESTORS:**
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Brian Kuck, brian.kuck@anadarko.com, 832.636.1397
Bill Tedesco, william.tedesco@anadarko.com, 832.636.3375

CONFIDENTIAL    APC-00572656

# Exhibit 65

S&P Global
Market Intelligence

# Anadarko Petroleum Corporation
# NYSE:APC
# FQ1 2013 Earnings Call Transcripts
## Tuesday, May 07, 2013 2:00 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ1 2013- | | | -FQ2 2013- | -FY 2013- | -FY 2014- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | 0.94 | 1.08 | ▲14.89 | 0.86 | 4.18 | 5.31 |
| Revenue (mm) | 3436.98 | 3893.00 | ▲13.27 | 3427.44 | 15198.01 | 16959.98 |

Currency: USD
Consensus as of May-07-2013 1:15 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| | - EPS NORMALIZED - | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ2 2012 | 0.77 | 0.85 | ▲10.39 % |
| FQ3 2012 | 0.77 | 0.84 | ▲9.09 % |
| FQ4 2012 | 0.72 | 0.91 | ▲26.39 % |
| FQ1 2013 | 0.94 | 1.08 | ▲14.89 % |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

APC-01751685

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ......................................................................................... | 3 |
| Presentation | ......................................................................................... | 4 |
| Question and Answer | ......................................................................................... | 6 |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

APC-01751686

# Call Participants

## EXECUTIVES

**A. Scott Moore**
*Former Senior Vice President of Midstream & Marketing*

**Charles A. Meloy**
*Former Executive Vice President*

**John M. Colglazier**
*Investor Relations Professional*

**R. A. Walker**
*Chairman & CEO*

**Robert Douglas Lawler**
*Former Senior Vice President of International & Deepwater Operations*

**Robert G. Gwin**
*President*

**Robert K. Reeves**
*Former Executive VP & Chief Administrative Officer*

**Robert P. Daniels**
*Former Executive Vice President*

## ANALYSTS

**Arun Jayaram**
*Crédit Suisse AG, Research Division*

**Brian Arthur Singer**
*Goldman Sachs Group Inc., Research Division*

**Charles Arthur Meade**
*Johnson Rice & Company, L.L.C., Research Division*

**David Robert Tameron**
*Wells Fargo Securities, LLC, Research Division*

**David William Kistler**
*Simmons & Company International, Research Division*

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

**Eliot Casper Javanmardi**
*Capital One Securities, Inc., Research Division*

**Joseph Patrick Magner**
*Macquarie Research*

**Ross Payne**
*Wells Fargo Securities, LLC, Research Division*

**Scott Michael Hanold**
*RBC Capital Markets, LLC, Research Division*

**Unknown Analyst**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

APC-01751687

# Presentation

## Operator

Good morning. My name is Steve, and I will be your conference operator today. At this time, I would like to welcome everyone to the Q1 Anadarko Petroleum Corporation Earnings Conference Call. [Operator Instructions] Thank you. I would now like to turn the conference over to your host for today, John Colglazier. Please go ahead, sir.

## John M. Colglazier
*Investor Relations Professional*

Thanks, Steve. Good morning, everyone. We're glad you could join us today for Anadarko's First Quarter 2013 Conference Call. Today's presentation includes forward-looking statements and certain non-GAAP financial measures. A number of factors could cause actual results to differ materially from what we discuss today. We encourage you to read our full disclosure on forward-looking statements and GAAP reconciliations located on our website and attached to last night's earnings release. Also on our website, we provide a comprehensive summary of our global activities in our quarterly operations report. In a moment, we'll turn the call over to Al Walker, who will discuss the company's first quarter results. Al will be joined by certain members of our executive team who will be available to answer questions later in the call. With that, go ahead, Al.

## R. A. Walker
*Chairman & CEO*

Thanks, John. We appreciate everyone taking the time to be with us today. We felt we had an outstanding first quarter, and 2013 is shaping up to be the breakout year for Anadarko that we've talked about. To highlight this, we achieved record sales volumes in Q1. This was led by 16% year-over-year increase in oil sales per day. We announced new monetizations, which exceeded $1.2 billion during the quarter. The most significant was the $860 million deal for Heidelberg. This further enhanced our use of capital in a very tax-efficient manner. We announced the new GOM exploration success, including one of the biggest deepwater oil discoveries in our company's history, and we achieved first oil at the El Merk development in Algeria. And importantly, we generated very strong cash flow and further strengthened the balance sheet.

Our U.S. onshore plays were major contributors to the company's strong first quarter performance, achieving record sales of 565,000 BOE per day, representing a 16% growth versus Q1 '12, and this was against the headwind of ethane rejection, which took away more than 10,000 barrels a day of production.

Before we highlight the strong operating performance we achieved in the Wattenberg and Eagleford, it's worth taking a moment to note the attractive pricing and value we received again this quarter for our crude oil volumes. Our domestic crude oil continues to enjoy a premium pricing relative to WTI due to the fact that most of our production is waterborne benchmarked and the majority of our U.S. onshore production is light to medium quality. And as you can see in the graphic, it's limited in terms of the gas condensate production we actually realized.

The value uplift is clear, as our overall average price is almost $103 per barrel, or $8.60 in average premium to the WTI over the period. The Wattenberg Field continues to be a top performer. Our sales volumes were enhanced by liquids increase of 45% year-over-year. To accelerate value, we tripled the number of horizontal wells drilled in the first quarter of 2013, and we expect to increase this over the course of next year and this year. This asset enjoys the strongest return on capital characteristics in our portfolio, with an expected rate of return exceeding 100%.

The Eagleford Shale is also delivering exceptional results. Total liquids for the quarter increased approximately 60% over the same period in 2012, and we are expanding our takeaway capacity with a 200-million-a-day gas processing plant, which will increase our throughput and yields from the liquids and should come online in the second quarter.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751688

The U.S. onshore is complemented by the advancing development of our global projects. During the quarter, Anadarko and Sonatrach initiated oil production at the El Merk complex in Algeria, where we expect oil volumes throughout the year to build to an exit rate of around 30,000 barrels per day net to Anadarko, as 2 facilities and 3 additional fields are brought online.

In Ghana, gross daily production has averaged 104,000 barrels of oil per day year-to-date, and an expansion of the gas handling capacity at the FPO to enable higher oil volumes is being planned. And we're working with the government, advancing the TEN project.

The Gulf of Mexico developments include the Lucius spar, which recently set sail on schedule from the fabrication yard in Finland for the Gulf of Mexico, and it's 80,000-barrel-a-day twin, the Heidelberg spar, which is now at the front of the queue in the construction yard.

In Mozambique, we have continued to make good progress on all fronts. Of particular note, we achieved our reserve certification for Area 1, supporting initial liquefaction trains associated with Anadarko-operated Prosperidade Complex, and this development remains on track towards achieving first cargoes in 2018.

Exploration continues its industry-leading results. In Mozambique, we had an additional exploration success with the Orca #1 well in Area 1, which encountered approximately 190 feet of natural gas pay in a separate accumulation fully contained within our block. We have 2 appraisal wells now planned to delineate this discovery. And the Orca enhances our development options and flexibility in Mozambique.

In the Gulf of Mexico, we've been very busy, and we've delivered incredible success so far this year. Accelerating the value of the newly discovered Shenandoah Basin is critical. This is one of the company's largest discoveries ever in the Gulf of Mexico. A short distance away in the same basin, we participated in the Coronado discovery, which encountered more than 400 net feet of oil pay, and sidetracked operations are already under way. Additionally, drilling is ongoing at the nearby Yucatan prospect, which is our third exploration well in this new basin. We recently announced the Phobos discovery, which encountered approximately 250 feet of net oil pay in the Lower Tertiary. Further appraisal activity is now being evaluated, and we will incorporate data from the well into our geologic models. Phobos is located about 11 miles south of our Lucius development, which could enhance its economics as future infrastructure is installed. As busy as the first quarter was, we had even more wells drilling and planned during the balance of the year in the Gulf of Mexico.

Operationally, we had another very strong quarter, as detailed in our operations report on our website. If you've had time to review this, you saw us reduce unit costs, improve wellhead margins and deliver operating efficiency across our active plays. Our deep and balanced portfolio enables Anadarko to grow production and reserves with value. Capital allocation in our development portfolio continues to be driven by rate of return, which favors oil and liquid-rich gas opportunities. And despite the current strengthening in the natural gas prices, Anadarko will need to see sustained prices well above the current spot for dry gas opportunities to compete for capital in our portfolio.

Recapping our financial results for the quarter, we generated discretionary cash flow of more than $2 billion, reported net income of $0.91 per fully diluted share, or $1.08 per share, excluding certain items affecting comparability. Our strong cash flow generation and value-accelerating monetizations enabled us to strengthen the balance sheet and improve our leverage ratio to 32%.

The first quarter's results are a great foundation for another outstanding year for our company. And as I said earlier this year, we believe 2013 could be a breakout year for Anadarko. We have a number of exciting things ahead of us throughout the balance of the year: to deliver better than 5% year-over-year sales growth; to receive the court's ruling in the Tronox case, where we remain confident in the merits of our case; continue to be active worldwide in exploration and deliver a portfolio of success similar to prior years; and to continue to realize value via active portfolio management, where select monetizations are going to allow us to reinvest this avoided or realized capital in other parts of our business to achieve growth through value.
With that, we're happy to take questions. And operator, we'll turn it back to you.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751689

# Question and Answer

**Operator**

[Operator Instructions] So your first question comes from the line of Brian Singer with Goldman Sachs.

**Brian Arthur Singer**
*Goldman Sachs Group Inc., Research Division*

Can you expand a little on the comment with regards to Jubilee production, that you expect the gas handling capacity to increase oil volumes into late 2013? Can you just kind of give us an update there on well performance at Jubilee? And then, when you think about where oil volumes can go, is it -- does it get to the 120,000 barrel-a-day capacity and stay there? Or should we expect something above or below?

**R. A. Walker**
*Chairman & CEO*

Sure, you bet. Doug Lawler and I will sort of tag-team you on this one. I think some of what we're talking about there, you'll hear more from the operator, Tullow, but we are very encouraged for the things that we have talked about today that we can point to with respect to how well that field is progressing. And, Doug, you might take just a few minutes and talk specifically about some of the things we're seeing.

**Robert Douglas Lawler**
*Former Senior Vice President of International & Deepwater Operations*

Sure. Brian, as you know, the facility is rated at 120,000 barrels a day. We're currently producing about 110,000 on average. The work that you're describing is to do some topside facility work that will result in giving us some additional gas injection capability. We see that being able to get us up to around 120,000 barrels a day from the 110,000 at present. The current drilling activity, the Phase 1 program, as well as the asset jobs that we've conducted had performed really well. At present, the flow potential from the field is greater than what we can produce through the FPSO right now, and so we have some additional asset stimulation work as well as a few other Phase 1A wells that'll be drilled later this year and into 2014. But we're hopeful that this additional injection capability will get us up to the 120,000. In our forecast for the year, we expect it to be in the 110,000 to 120,000 range as that gets implemented. And the target time for that is targeting in the third quarter.

**Brian Arthur Singer**
*Goldman Sachs Group Inc., Research Division*

Great. And then as a follow-up, your natural gas production has been perhaps surprisingly resilient certainly relative to your guidance and then especially in the price environment. Obviously, this kind of question varies by area. But can you kind of talk to whether -- to what extent this is being driven by backlog reduction in areas such as the Marcellus and where that stands versus greater gas in the production mix in some of your associated gas areas, or just better well performance overall?

**R. A. Walker**
*Chairman & CEO*

You bet. Since most of this is an onshore issue for us, I'm going to ask Chuck Meloy, if he would, to address the question.

**Charles A. Meloy**
*Former Executive Vice President*

Well, Brian, as you've seen, our gas production has been steady to slightly up. Now the -- there's 2 or 3 good reasons for that. The first off is just the Marcellus performance. If you look year-over-year, the growth has been phenomenal. Our sales are up about 71% from prior year, and that's the combination of completing the wells we're drilling and unloading the backlog that was in our non-op position and getting the infrastructure completed in that area. And as all that has come together, you've seen some

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751690

very cost-efficient, low-OpEx-cost, really good margin for gas come online as some of the lowest-cost gas in America. So it's been an exceptional performing asset for us. We've also seen just a really strong performance from the IHUB area, where when we originally came in, we would have -- we had exceeded the Tcf production from that field and the wells have outperformed our expectations and continued to deliver gas that, quite frankly, we didn't see in our curve [ph]. So those 2 and smaller other bits and pieces have added up to a really good story for us.

**Brian Arthur Singer**
*Goldman Sachs Group Inc., Research Division*

And is your Marcellus backlog now at a normal level? Or is it still an abnormal backlog? Where do you see that going?

**Charles A. Meloy**
*Former Executive Vice President*

Well, I'm not sure what normal would be, Brian, but the -- I think we're in a position where we've got it worked down. And Chesapeake in particular has worked theirs down quite considerably. And the addition of infrastructure out there, I think, has had as big of an impact on as just completions. So we're starting to open up the pipes and give us some room to flow, and that's been a big help in our production numbers.

**Operator**

Your next question comes from the line of Scott Hanold with RBC Capital Markets.

**Scott Michael Hanold**
*RBC Capital Markets, LLC, Research Division*

When you look at your success in the Gulf of Mexico, can you talk about how you're looking at shipping around activity? I mean, you're looking to appraise the Shenandoah or Phobos in the near term or by the end of the year. And what potential impact does Raptor have on -- your thoughts of kind of what comes next?

**R. A. Walker**
*Chairman & CEO*

Well, let me take that in part and have Bob Daniels take it in part. I think what you've seen is we continue to have extraordinarily good success, both with exploration and development drilling in the Gulf of Mexico. It's -- you've got Lucius and Heidelberg coming on to the next mega projects from the Gulf of Mexico, with oil production starting next year for Lucius. And as we look at our inventory, I think you can continue to expect that we'll manage that pretty actively just like we have been. And frankly, additional exploration success there is not critical. We're always happy when we have it, obviously, because it gives us more optionality. But I'm going to let Bob address the question of exactly what he sees from an exploration standpoint through this year and next, because we do have a lot of things still to drill. You made reference to one well that is drilling, but we have a lot of other things still planned to drill through the course of this year.

**Robert P. Daniels**
*Former Executive Vice President*

Yes, Scott. Bob here. We've had really, really good success there, and that's a great problem to have with how we're going to appraise these things. Shenandoah obviously needs additional drilling. We plan to get a rig out there before the end of the year to drill the next well on it. We still are awaiting on the Yucatan results just south of us, about 3 to 4 miles south of us. That's going to be really key for the overall Shenandoah-Yucatan area. And then we are drilling an appraisal well over at Coronado, where we're the non-operator. Regarding Raptor, we're not down on that well yet, so we'll have to see what we find. But we're very hopeful we'll need appraisal work there. Again, a good problem to have, and we'll just have to roll it into our overall rig planning based on the results that we see. But we do have Shenandoah scheduled for right at the end of the year to get a rig back on and do another appraisal well there.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751691

**Scott Michael Hanold**
*RBC Capital Markets, LLC, Research Division*

And is there any change to your guys's plans in terms of what you've done in the past with a fair amount of success to potentially monetize some of these successes prior to development? Does that continue to be something you look at in the Gulf?

**Robert P. Daniels**
*Former Executive Vice President*

Absolutely. You've seen what we did at Lucius and what we did at Heidelberg and the value that we were able to realize for those opportunities. So that's a great model. It carries our forward capital and puts a marker as to what the value of these discoveries are.

**Scott Michael Hanold**
*RBC Capital Markets, LLC, Research Division*

Okay. And one final question, if I could. Permian volumes are down a bit in the quarter sequentially. It looks like you guys are still fairly active there yet. Was there a specific reason for that?

**Charles A. Meloy**
*Former Executive Vice President*

Well, the Permian has been a great performer for us. I -- the reason for the down is essentially the transformation in the operatorship on our non-operated position. And those guys are just getting up to highway speed and doing a good job, and they're starting to build up their program and I look for that to reverse pretty quickly.

**Scott Michael Hanold**
*RBC Capital Markets, LLC, Research Division*

Okay. Is that sort of the Chesapeake sales to Chevron and Royal Dutch?

**Charles A. Meloy**
*Former Executive Vice President*

Yes.

**Operator**

Your next question comes from the line of Charles Meade with Johnson Rice.

**Charles Arthur Meade**
*Johnson Rice & Company, L.L.C., Research Division*

On Mozambique, I saw that you had in your operations report that you received the reserve certification from a third party for the Prosperidade complex. But I was curious if you could maybe offer some detail on where that same process is for the Golfinho/Atum complex.

**Robert Douglas Lawler**
*Former Senior Vice President of International & Deepwater Operations*

Sure, Charles. This is Doug Lawler. The -- where we see it at present, we have some additional testing work in working with a third-party consultant there. It's on -- in progress, and we still are very confident in achieving that. The time line we've provided for that is also in 2013. And so along with the success there in this phenomenal exploration discovery, we continue to see progress on the reserve certification necessary to -- for us to move forward.

**Charles Arthur Meade**
*Johnson Rice & Company, L.L.C., Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751692

Okay. And then returning to the Shenandoah mini-basin, this might border on fantastic, but the -- I think when we got the press release from the operator on the Coronado well, I think they just logged it, but they hadn't taken pressures or anything. And I think -- I believe I read that they're side-tracking down-dip there. But I know that's, what is it, 3 blocks, 2 blocks to the east and 1 block to the south. And so it's a long way away from Shenandoah. But have you guys -- presumably, you have a pressure test in that reservoir now. And can you offer any kind of view on whether you're in the same pressure regime as the Shenandoah discovery and whether there's any outside chance that this all could be -- have a common oil-water contact?

**Robert P. Daniels**
*Former Executive Vice President*

Yes, Charles, the Coronado and Shenandoah accumulations don't look like they're going to be connected. The data doesn't really support that. It's a long ways away, and we go through a massive syncline to get our -- to the Coronado prospect. So we are in the process of appraising that down-dip and see what kind of oil leg we have below us. And so we're looking forward to that. I will say that on the Shenandoah/Yucatan complex, which there's about 3- to 4-miles separation, that one very well could be 1 common accumulation, but, of course, we have to get the Yucatan well results and see what it tells us. But structurally and stratigraphically, that one makes a lot more sense than over to Coronado, which is much further away.

**Operator**

Your next question comes from the line of Doug Leggate from Bank of America.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

Al, I wonder if you could share any updates on the monetization process in Mozambique and specifically address how you think the -- any potential tax issues might be tackled as part of the process.

**R. A. Walker**
*Chairman & CEO*

Sure, I'm happy to do that, Doug. Actually, if I can, we'll have Bob Gwin do that, and I'll probably have a comment to wrap up with on that.

**Robert G. Gwin**
*President*

This is Bob. We're really pleased with the indications of interest that we received a few weeks ago. Obviously, we're in discussions and working on the transaction. I think it's fair to say we expect it would be a 2013 transaction after -- a government approval would need to be received after we reach agreement with a potential buyer. As far as taxes go, we will see. Obviously, the tax situation around Cove was fairly obvious. If we were to sell an asset versus a corporate structure here, that tax would be a little bit higher. And so we're looking at our economics and the bids that we received on an after-tax basis rather than a pretax basis. But we'll be working with the government to determine what the ultimate tax owed will be.

**R. A. Walker**
*Chairman & CEO*

Yes. And, Doug, I'd just add we feel like, as we got into this, it would take us a while to come to a conclusion with one of the potential buyers here. And progress so far has been really good, and the indications of interest, as Bob made reference to, were all quite strong, and we're looking forward to bring it to a point where we can talk about it.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

Al, forgive me, but are you -- have you got an exclusive here on this?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751693

**R. A. Walker**
*Chairman & CEO*

No.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

Okay. My follow-up, I don't know who wants to take this, but back to Shenandoah, if I may. I think prior presentations you've shown Shenandoah on a time line out around 2017. I'm just wondering, is it too early to really think about development options here? And if not, could you give us some framework as to what we should be thinking about in terms of when you may bring it up on to production? I'll leave it there.

**Robert Douglas Lawler**
*Former Senior Vice President of International & Deepwater Operations*

This is Doug Lawler. Your comment is exactly right. It's very early, and we're looking forward to the appraisal program. Obviously, it's a very big discovery, and we'll be bringing more information forward as we learn more and study those options to bring it to development.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

Are you thinking about unitized development, Doug? Or would this be as it's still too early to talk about that?

**Robert Douglas Lawler**
*Former Senior Vice President of International & Deepwater Operations*

Still very early, Doug. And I appreciate the question but, at this point, it's just -- it's very early.

**Operator**

Your next question comes from the line of Dave Kistler from Simmons & Co.

**David William Kistler**
*Simmons & Company International, Research Division*

Real quickly, looking at 2Q production guidance, 1Q had a nice jump up from 4Q. Can you guys kind of define what's delineating sort of the drop-off in production?

**R. A. Walker**
*Chairman & CEO*

Yes, I think there's a couple of reasons. I think Chuck will walk you through some of that. I think, Dave, the word of caution I would have is, as best you guys can, try to look at this as a year-to-year rather than a quarter-to-quarter. I know there is some need to do the quarter-to-quarter, but I think as we've continued to address these questions, it seems like almost every quarter we'd certainly guide to something we think we can hit. We see issues out there that we think we're trying to manage around. And I think, as you can fully appreciate, as we think about our business, we don't think about it quite as much quarter-to-quarter as maybe others do.

**Charles A. Meloy**
*Former Executive Vice President*

Yes, Dave, this is Chuck. There are some -- if you go through the announcement that we made, the big issue that we face in second quarter is the fact we had an accelerated lifting in the first quarter, and that's pretty straight math. The other one that we have dealing with -- that we're dealing with currently is we're in the middle of doing the tie-ins down in the Brasada area. And so we'll have quite a bit of downtime associated in our Eagleford production area as we tie in the Brasada plant and the associated facilities in the field together. And that's just going to be an up-and-down deal, and we're going to do it safely and

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751694

carefully, and we're taking a very conservative approach to how we put all that together. And it's just -- it's part of the growing pains we talked about a couple of quarters ago. As we start this infrastructure build-out, you get into these spots from time to time that you incur a lot of down time. And this quarter is going to be one of those as we significantly enhance our infrastructure position and not just the Eagleford but in the Wattenberg and the Permian as well but, to a lesser extent, from production impact.

**David William Kistler**
*Simmons & Company International, Research Division*

Okay, I appreciate that. Then maybe kind of getting back to annual levels, if I look at 1Q CapEx, obviously it comes in at a run rate well below what your targeted full year CapEx is. Can you kind of walk us through the progression of that throughout the year? Or should we be kind of traversing that to the lower end of CapEx?

**R. A. Walker**
*Chairman & CEO*

No, Dave, I think you should expect that we're going to be to the midpoint or the upper end of that range. I wouldn't extrapolate from the first quarter that we're going to underspend for the year. It's just the timing of when we expect those capital plans to actually work their way through into reality. And we still anticipate a fairly strong year of capital spending but not outside of the guidance that we've given you and everybody else. First quarter is just sort of like some other things, just a timing issue and not a lot more than that.

**David William Kistler**
*Simmons & Company International, Research Division*

Perfect. One last one, if I might, just on the Wattenberg. Can you guys give us an update on kind of latest leading-edge, lateral lengths, costs, production associated with those longer lateral spacing? I mean, obviously, that was a home run this quarter, so I'd love to hear any kind of incremental update you have there.

**Charles A. Meloy**
*Former Executive Vice President*

Yes, Dave, I'd probably view it as a grand slam. It's been a wonderful quarter for us. Year-over-year, our production has gone up substantially from -- in the mid-20s, 26,000 barrels a day to 44,000 barrels a day on the oil side, which is a huge uplift. And that's because we're in the middle of doing a lot of optimization work not just with lateral lengths but with spacing, completion design, facility design, putting the big-diameter pipes in the ground that allow us to move these incredible quantities of hydrocarbons that are coming out of these wells and all the infrastructure associated with the Lancaster plant. So we're in the middle of all this. It's a big optimization effort. What we've seen is very similar to what Noble has announced with regard to their pilot test. Longer is better to a degree, and we've seen more and more recovery. There's a pretty straight correlation between lateral length and EUR. And I think that you'll continue to see that there's a natural limit in a risk element that we have to take into account with regard to so much completion drilling in these wells but -- if you get too long. But what we're trying to do is optimize all of those parameters, not just length but the distance between wells, the distance in the number of wells we've put in each section or each unit. And we're in the middle of all that. We feel like it's a little early to come to any conclusions on specifics of that optimization, but we're on the job and we're accelerating the value out of that thing. We're up to 12 rigs now. We started out thinking we'd drill around 300 wells this year. We'll end up drilling around 340. Most of them will be longer laterals than what we originally intended. And so we know the value of this thing. It's immense, and we're on the job to accelerate that value.

**Operator**

Your next question comes from the line of Arun Jayaram from Crédit Suisse.

**Arun Jayaram**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751695

*Crédit Suisse AG, Research Division*

I just wanted to maybe follow up on the Wattenberg. Really strong growth. I think you achieved 113,000 BOEs a day. Al, I was wondering if you can comment. Your guidance for the year was 121,000. Do you see any upside to that number just based on the pace of what we've seen thus far this year?

**R. A. Walker**
*Chairman & CEO*

Well, I'll answer this in part and Chuck will answer it in part. We don't guide to the midpoint of our expectations. We kind of guide to what we think we can achieve. So sure, if we're able to achieve better-than-average results, we should actually achieve better than what we projected. But we also keep in mind that there are things that we have no control over, weather being one of those, mechanical issues being another. So if you can appreciate, we don't try to pull the string too tight when we're looking at guidance, and we like to be able to continue to have the types of results year-over-year that give us good momentum, good confidence around being able to achieve what we say we're going to achieve. So I always expect if things go well, Arun, that we can actually always be in a position of overachieving, but I am always mindful as well that there are things we can't control.

**Charles A. Meloy**
*Former Executive Vice President*

And...

**Arun Jayaram**
*Crédit Suisse AG, Research Division*

I guess just a quick follow-up to that is I'm just saying as you're ahead of plan, at least for -- regarding that guidance, are there any other infrastructure things that we need to think about in the balance of the year that may constrain that growth until you get Lancaster online?

**Charles A. Meloy**
*Former Executive Vice President*

Arun, this is Chuck. We do have -- the Lancaster tie-ins will come in during the fourth quarter. And so we've placed in our guidance a reasonable downtime expectation in the fourth quarter. We're hopeful that during the course of the year, that we can make those tie-ins sort of opportunistically, such that we don't incur all that downtime. That would enhance our volumes for the year. And I think the other thing that's really cool out there is we've now managed to get -- our total water fee is on -- we got water on demand. And so our completion machine is just working fantastically. The guys are doing just a fantastic job of lowering the cost. We saw over $350,000 per well savings in the last quarter with regard to lower water cost, lower water delivery cost and improved completion cost. And so all that's working in our favor, and the drilling folks are doing a fantastic job in improving our drilling efficiency and spud-to-spud time. So the machines are -- is working faster, and that gives us an opportunity to enhance our results. And all that's got to be over-printed [ph] with what else is going on in the field to enable that to be evacuated into the markets. And -- but between the Lancaster plant, the expansion on White Cliffs, the tie-ins at Texas Express, we've got a lot of things -- Front Range Express, sorry -- we have a lot of things going on in the field that's going to interrupt our production at some point, and that's what we're trying to take into account.

**Arun Jayaram**
*Crédit Suisse AG, Research Division*

That's helpful. And just one quick question or clarification on the full year guidance. Al, you did bump the upper end of the guidance by a couple of million barrels, yet you left the bottom end flat. Can you just put that into context? Is that just conservatism? Or any other thing that you're thinking about regarding the bottom end?

**R. A. Walker**
*Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751696

Yes, I think it just goes back to we've taken, through the course of the year, a fairly conservative view on ethane rejection, and that's the reason that we've guided the way we have at this point.

## Operator

Your next question comes from the line of Joe Magner with Macquarie.

## Joseph Patrick Magner
*Macquarie Research*

I'm just curious if you could provide an update on the monetizations that are potentially forthcoming. A couple have been talked about as possibilities, but anything that we should be on the lookout for?

## R. A. Walker
*Chairman & CEO*

Well, I'm going to -- if I can, I'll let -- get -- let Bob Gwin give you a little more color. But I think of all the things we're working on, the one that's got the most immediacy associated with it, we talked about earlier, in Mozambique. But as you can imagine, I made the comment earlier, we're very active managers of our portfolios. That's hardly the only thing we're looking at, at a point in time. So with that, let me turn it over to Bob.

## Robert G. Gwin
*President*

Yes, sure. The only thing I'd add really beyond Mozambique of note is something I mentioned on the investor call back in February, and that is Brazil. Obviously, we continue to work that. It's a bit of a challenge because there's a unitization process or unitization study under way that BP, as the operator of the BM-C-32 block, is negotiating. But nonetheless, we decided it was appropriate to move forward with a potential monetization there. That process is in the really early stages. The timing of completion is going to be unknown because it is a little bit complex due to the unitization and then subsequent need for ANP approval. And so we'd be hopeful to get that done later in 2013, but it's hard for us to drive the time line. It's really just a matter of us proceeding kind of diligently to get that done, and we'll continue to keep the market apprised as it gains a little more shape. Otherwise, there's lots of things that don't rise to the level of mentioning at this point. But as you've seen, things we've done like our OCI deal we did in the first quarter, various sundry, smaller things, our EOR deal that we did with LINN last year. There's a variety of these types of things that we continue to work on. And we'll continue to try to fine-tune the portfolio of things that don't work quite as well for us, attractive assets but might fit better in somebody else's portfolio, and then we'll continue to focus our capital and attention on the things that are our highest points of opportunity.

## Joseph Patrick Magner
*Macquarie Research*

Okay. And then with respect to the Mozambique situation, you touched on reserve certification process. Can you, I guess, update us on where the discussions lie, perhaps not on the detailed level, obviously, but just regarding the pricing dynamics of offtake agreements and what we might expect to see and how we might expect that to play out?

## R. A. Walker
*Chairman & CEO*

Sure. We've got Scott Moore here with us, who runs Marketing globally for Anadarko. And if I could, Scott, why don't you address that?

## A. Scott Moore
*Former Senior Vice President of Midstream & Marketing*

I think we're excited by the interest in the market that we've seen in our Mozambique product. It's a premium product that should deliver a premium price. We do look primarily at oil indexation than the

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751697

pricing, which is well established with the high-quality Asian buyers that we target for a greenfield project like this. And we look forward to working on those structures and hope to talk to you more about it later this year.

**R. A. Walker**
*Chairman & CEO*

Joe, as you might imagine, given the advantages of geography and a lot of other things, the buyer community for LNG coming out of Mozambique is pretty deep.

**Joseph Patrick Magner**
*Macquarie Research*

Okay, there have been some, I guess, some mentions in the media that perhaps there's some linkage to natural gas prices or Henry Hub prices. How is that going to influence the calculation or the pricing schemes?

**R. A. Walker**
*Chairman & CEO*

Yes, I think there are certain utility buyers in Eastern Asia that are looking to try to move away from a completely oil-indexed contract. We're looking at it in terms of what the effective price per Mcf or Mbtu is for us and how that gives us project economics. We certainly are not today -- have not entered into any contracts that would incorporate that, but we've certainly listened to the buyers that they've talked about it. And, Scott, please add anything you'd like.

**A. Scott Moore**
*Former Senior Vice President of Midstream & Marketing*

I think the key for us is we look for things that deliver comparable value, and there are a number of ways that can be accomplished. And we do try and reflect our buyers' concerns, but the value has to work for us as well.

**Operator**

Your next question comes from the line of Ross Payne with Wells Fargo.

**Ross Payne**
*Wells Fargo Securities, LLC, Research Division*

I was just wondering if you could give us any more color on the timing of the Tronox potential settlement, when you think that may occur and if there's any kind of change in what kind of financial impact that may have.

**R. A. Walker**
*Chairman & CEO*

Ross, I wish I had a crystal ball and could give you an accurate prediction. The reality is I don't have one of those or haven't found it in my closet yet. We really don't know when this judge is going to come back. In our most recent Q filing of this week, we reiterated our range of $0 to $1.4 billion. That's our best estimate. We still think the case that we have is very strong, and we think, more likely than not, that we will win. And so, therefore, that's the construction of the range. But the timing of when this judge will make the ruling is very difficult for us to give you any direction on, but I'm going to let Bobby Reeves try.

**Robert K. Reeves**
*Former Executive VP & Chief Administrative Officer*

I think that's right, Al, that look back at our 10-Q, we've not change. We believe it's more likely than not that we will prevail. There is a potential loss range of $0 to $1.4 billion based on our best estimates. We still believe that the evidence of the trial was that Kerr-McGee properly capitalized Tronox when it was IPO-ed and that Kerr-McGee wasn't responsible in any way for the financial struggles or bankruptcy of

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751698

Tronox. And we believe that, that was pointed out clearly in the trial, and we believe that the ruling from the judge should prevail for us and give us the clarity that's right now an uncertainty on our company. So we're looking forward to the ruling.

**Operator**

Your next question comes from the line of David Tameron with Wells Fargo.

**David Robert Tameron**
*Wells Fargo Securities, LLC, Research Division*

The big cash flow generation in the quarter in the balance sheet, obviously it's some placeholder for Tronox or whatever. But can you talk about what your plans are for that free cash flow as that continues? Obviously, you have some big projects, but thinking dividend and any other thing you want to throw out there?

**Robert G. Gwin**
*President*

It's Bob Gwin. Obviously, we're working to preserve the current strength of the balance sheet while we have this uncertainty related to Tronox that was just discussed. As we move forward, we're going to continue to reduce leverage to a degree. We obviously are focused on a strong credit quality and on an appropriate credit quality for the structure of our global business, our exploration business. But as we mentioned a little bit previously, we're going to revisit dividend policy as we go forward if it doesn't take a lot of work to look at our future cash-flow-generating capability and the way that we've focused on monetizing assets and leveraging the use of other people's money in our development dollars. And that leads to some relatively strong cash generation over time, which is the goal of our business model. And when we do that, we'll visit -- revisit the credit quality, do some liability management and make sure the capital structure is optimized for our business model. So it's a work in progress, but I think we'd stay essentially where we are until we get to the other side of the current uncertainty.

**R. A. Walker**
*Chairman & CEO*

And, David, this is Al. I think given the way we've been able to use our cash flow pretty effectively and staying within that with CapEx, as we've continued this, Bob made referenced to the fact of using third-party capital in a lot of our bigger mega project development, our ability in the future to continue to be even more cash efficient and capital efficient should lead us to a good place when we're able to make an announcement on the dividend payout policy.

**David Robert Tameron**
*Wells Fargo Securities, LLC, Research Division*

All right, that's helpful. And then as I think about your big portfolio in the U.S., I imagine there's a lot of plays that you haven't talked about you guys are chasing. And the one that popped up in the last month or so has been this Northeast Colorado play. Can you talk a little bit about what you have out there? And then anything else you want to give us as far as what you're working on in the U.S.?

**Charles A. Meloy**
*Former Executive Vice President*

David, this is Chuck. As we work our -- the U.S. onshore exploration program, you may have noticed, we're investing about $300 million a year in new oil plays. And there's roughly half a dozen of those located around the U.S., and we're exploring and appraising in each one of those. And we haven't released any results. We typically don't until we actually do have a pretty good idea of what we could expect from the plays. And I will say we have some very encouraging early results in several of those, and we look forward to them playing a bigger and more prominent role in our portfolio going forward. And each offers the opportunity to substantially enhance our EBITDA per barrel and value proposition for you guys.

**R. A. Walker**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751699

*Chairman & CEO*

I'm thinking Colorado as well. You probably have seen it, David. We have a very large mineral interest position right in the middle of what looks like to be a new play. And I might ask, if I could, just to see if Chuck will want to comment just a little bit about our acreage position there.

**Charles A. Meloy**
*Former Executive Vice President*

Well, there's been some press about the plays going on in Southeast Colorado on the Arch and the Mississippi -- Mississippian play. And it is right in the middle of our land grant, where we have mineral interest in every other section. And our total acreage position there is approaching 800,000 barrels -- I mean, 800,000 acres net. So it's a very substantial position, and we're well positioned to take advantage of any success that industry would have on the Arch.

**David Robert Tameron**
*Wells Fargo Securities, LLC, Research Division*

All right. And at this point in time, are you waiting for others to prove it up? Or what's -- are you guys active out there in the -- around the Arch?

**Charles A. Meloy**
*Former Executive Vice President*

Well, the advantage of having perpetual mineral positions is you can let others prove up the play, and we've been actively monitoring and engaging in some small farm-outs to encourage activity. And what we've seen so far is very promising. We have permitted wells in the area, but we haven't yet drilled one. And there's a lot of inbound interest on that play, and so I'm -- I feel fairly confident that we'll see some good value realization in the future.

**Operator**

Your next question comes from the line of Eliot Javanmardi of Capital One Southcoast.

**Eliot Casper Javanmardi**
*Capital One Securities, Inc., Research Division*

I believe this question is probably for Chuck. Just I noticed there was significant decline in the CapEx spend onshore while you maintained your growth, and I think it was to the tune of maybe $300 million or so. Just curious, how much of that would you kind of say was associated with coming off of infrastructure spend on any projects you finished as opposed to just the efficiency improvements that you have across-the-board?

**Charles A. Meloy**
*Former Executive Vice President*

Yes, Eliot, great question. There's -- it's some of both. We've actually had some really nice savings in our drilling program. I mentioned earlier like in Wattenberg where we've -- we're saving money on the drilling because we're doing it a little quicker, and we're also saving $350,000 on each completion by changing up our completion design and using slick water-type activities. The -- we also have completed a fair share of our Midstream spend in the first quarter. And although we still have some big projects yet to come online, like Brasada and Lancaster and others in combination with our WES position, our Midstream spend going forward is as -- is tailing off to some degree off the high spend of these big plants. And once we get that in the rearview mirror, we're back to sort of a normal run rate. And the combination of that and the timing of -- or the continuation of the JVs that we have down in the Maverick has just subdued our capital in the first quarter, but we're running 47 rigs in the U.S., we're building 900 million of cryo and we're drilling a bunch of wells and successfully drilling a bunch of wells, most of them horizontal, the vast majority of them horizontal with large completions. And that'll keep our capital spend right up through the rest of the year.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751700

**R. A. Walker**
*Chairman & CEO*

And, Eliot, I know you're absolutely aware of this but just to make a further comment about it. As you've seen this in the past with our Midstream infrastructure, we ultimately will find ourselves selling that to Western Gas and reinvesting that capital either in upstream or in other infrastructure. So even though we've made some big capital commitments in the Midstream, we do sort of have our own -- a way of looking at that and using Western Gas in that capacity, and I think that's worked out very well for us.

**Charles A. Meloy**
*Former Executive Vice President*

And to that end, we sold an asset gathering in the Marcellus to Western Gas earlier this year for almost $500 million, which brought cash back into Anadarko to reinvest in the E&P operations. So it's continuing and working well.

**Eliot Casper Javanmardi**
*Capital One Securities, Inc., Research Division*

Great, I appreciate that. I did see that in the ops report, too, and it was spelled out pretty clearly. Just a quick follow-up. You touched upon this a little bit already with some of the onshore plays. And I'm just curious, do you have any comments on maybe the prospective Powder River and what you got there? And that's it for me.

**Charles A. Meloy**
*Former Executive Vice President*

Yes, Eliot, in the Powder River, we have a very large land position, as you know, over 350,000 net mineral acres up there. And we've been active. We've drilled probably in the order of 20 wells into the deeper section, looking for oil plays. That basin is proving to be very oil prone, particularly the southern end of the basin. And it's an exciting place to play because there's multiple horizons that have paid off. We've been involved in Frontier, Sussex, Shannon and Niobrara exploration to date, and each one of those has some promise. So we're actively moving those forward. We're in appraisal mode in those areas. So it's an exciting area for us, and we're hoping we can put some size and mass around them so we can put our machine to work.

**Operator**

Your next question comes from the line of Alex Heinbruther [ph] from Millennium.

**Unknown Analyst**

Two questions. First, can you comment on the cost structure in the Eagleford like you did in the Wattenberg? And any kind of trends in all-in costs to bring the wells online? And there's been questions to the size of the Phobos structure. I think John told some of the analysts that it was about 8,000-acre structure. And then -- but Mr. Flores [ph] on his call the other day said it was a 10,000- to 15,000-acre structure. So I just hope you can clear that.

**Charles A. Meloy**
*Former Executive Vice President*

I'll -- I'll take the first one. This is Chuck.

The Eagleford is doing quite well. We've continued to drop our drilling times down, and we drilled a whole number of less-than-10-day wells now. And so if you put everything in play and look at the completion cost, we're now drilling, completing and equipping those wells in the order of $5.5 million to $6 million. And the EURs are north of 450. So we've had some really strong economics. On the OpEx side, I think that's a -- it's a great, great story, where our cost structures continue to fall and we're operating the Eagleford for -- in the order of $2 a barrel now. And that's been a great story for us. So you get tremendous margins with the oil production that we have and the gas plant liquids that we recover with

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751701

very rich gas. So the story is good out there, cost structure is good. We're making a really nice return on those wells and I anticipate that will continue and maybe even improve once we get Brasada online, where we can really stabilize production and not have so many ups and downs as we're putting the infrastructure in place. And once we get that field stabilized, I think you'll see some really, really nice gains in our production profile.

**R. A. Walker**
*Chairman & CEO*

Yes. And, Alex, regarding Phobos, the structure is very, very large. It's a big 4-way closure. What we're talking about is what we think we have in the accumulation to our lowest known oil. We think we've got about 8,000 to 9,000 acres in that closure that potentially could be full of hydrocarbons. So I don't know whether that's a difference between what they're saying and us. The other is, of course, different interpretations. You've got different philosophy transforms that could give you different structural interpretations. It's a very, very broad, lower-leaf structure, so it wouldn't take much to change that. But what we see is about 8,000 to 9,000 acres of 4-way closure to our lowest known oil.

**Operator**

[Operator Instructions] And your next question comes from the line of Amir Arif from Stifel.

Okay. And there appears to be...

**R. A. Walker**
*Chairman & CEO*

I'm sorry, go ahead, operator.

**Operator**

Yes. And there appears to be no further questions.

**R. A. Walker**
*Chairman & CEO*

All right. Well, I do want to one more time say thank you to everybody that was with us today. Your management here could not be happier with the first quarter. And I'll say one more time we think 2013 is a breakout year for this company, and the balance of the year looks really exciting. John?

**John M. Colglazier**
*Investor Relations Professional*

Thank you much, and we'll talk to you all later. Thank you.

**R. A. Walker**
*Chairman & CEO*

Thank you.

**Operator**
Ladies and gentlemen, this concludes today's conference call. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

APC-01751702

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

APC-01751703

# Exhibit 66



29-Jan-2015

# ConocoPhillips (COP)

Q4 2014 Earnings Call

Total Pages: 23

Copyright © 2001-2015 FactSet CallStreet, LLC

APC-01753865

# CORPORATE PARTICIPANTS

**Ellen R. DeSanctis**
*VP-Investor Relations & Communications*

**Ryan M. Lance**
*Chairman & Chief Executive Officer*

**Jeff W. Sheets**
*Chief Financial Officer & Executive Vice President*

**Matthew J. Fox**
*Executive Vice President-Exploration & Production*

# OTHER PARTICIPANTS

**Doug Leggate**
*Bank of America Merrill Lynch*

**Doug T. Terreson**
*International Strategy & Investment Group LLC*

**Scott Hanold**
*RBC Capital Markets LLC*

**John P. Herrlin**
*SG Americas Securities LLC*

**Guy A. Baber**
*Simmons & Co. International*

**Blake M. Fernandez**
*Howard Weil, Inc.*

**Paul Y. Cheng**
*Barclays Capital, Inc.*

**Ryan Todd**
*Deutsche Bank Securities, Inc.*

**Edward George Westlake**
*Credit Suisse Securities (USA) LLC (Broker)*

**Alastair R. Syme**
*Citigroup Global Markets Ltd.*

**Roger D. Read**
*Wells Fargo Securities LLC*

**Phil M. Gresh**
*JPMorgan Securities LLC*

APC-01753866

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

# MANAGEMENT DISCUSSION SECTION

**Operator**: Welcome to the Fourth Quarter 2014 ConocoPhillips Earnings Conference Call. My name is Christine and I will be your operator for today's call. At this time all participants are in a listen-only mode. Later we will conduct a question and answer session. Please note that this conference is being recorded.

I will now turn the call over to Ellen DeSanctis, Vice President Investor Relations and Communications. You may begin.

### Ellen R. DeSanctis
*VP-Investor Relations & Communications*

Thanks, Christine, and greetings to everybody. Joining me in the room today are Ryan Lance, our Chairman and CEO; Jeff Sheets, our EVP of finance and Chief Financial Officer, and Matt Fox, our EVP of E&P. Really three quick very administrative points before we launch into our remarks here. We will make some forward-looking statements this morning. The risks and uncertainties in our future performance are covered on page two of today's deck and in our periodic filings with the SEC. This information can also be found on our website.

Next if you haven't done so, save the date for our 2015 Analyst Meeting on April 8 in New York City. We will be providing some additional logistical details on that event soon. And then finally, during Q&A this morning we're going to limit questions to one with a follow-up so we can accommodate the call queue. We appreciate your support there.

So now let me turn the call over to Ryan.

### Ryan M. Lance
*Chairman & Chief Executive Officer*

Thank you, Ellen, and thanks to all our call participants this morning. So I'll start by making a few quick comments about 2014, then I'll jump into our view of 2015 and the actions we're taking to manage through this current period of very low prices.

Of course were also spending a lot of time thinking about the future beyond 2015. It's a bit early to talk about that today but as Ellen mentioned, we'll speak to that in our April Analyst Meeting where we'll be ready to address our longer-term view of the sector and how we're positioned to succeed.

So if you turn to slide four, this is our company-level said/did chart that we show during every quarterly call. Certainly 2014 seems like old news but I think it's important to spend a minute recapping our results for the year.

Operationally we hit our volume targets and achieved 4% year-on-year growth and I think that's a pretty big accomplishment for a company our size. The growth came from the startup of five major projects, ongoing ramp up in the Eagle Ford and the Bakken and a successful turnaround season across our operations. We also discovered two new oil plays in offshore Senegal.

Financially we generated $6.6 billion of adjusted earnings, or $5.30 per share for the year. This includes fourth quarter adjusted earnings of $742 million or $0.60 a share, obviously reflecting weak fourth quarter prices. We

APC-01753867

ended the year with $5.1 billion of cash on the balance sheet and also exceeded our price normalized cash margin growth target with more than an 8% improvement.

On the strategic front we achieved a strong organic reserve replacement ratio of 124%. And by the way, the three-year average organic reserve replacement ratio is 153%.

We completed the final piece of our announced asset disposition program with the closing of the Nigeria sale and we increased our dividend by 5.8%.

That's a quick summary. The key takeaway here is that we did what we said we'd do, not just in 2014, but also over the past three years since the launch as an independent E&P company. We executed our stated plan almost to the letter and in the last quarter, oil and gas prices began their accelerated decline. So let me discuss what that price decline means for our company in 2015, if you'll turn to slide five.

There's a lot of debate right now about the duration of the current low oil prices. But we're assuming that they'll stay low for 2015, and we're taking decisive actions accordingly.

Our actions are driven by our priorities which are unchanged since the time of the spin. The dividend remains our top priority for capital allocation. The next highest priority remains getting to cash flow neutrality in 2017. With these priorities in mind, we're going to use our capital and our balance sheet flexibility to manage through this downturn.

So first, CapEx. This morning we announced a further reduction in 2015 capital to $11.5 billion. That's $2 billion lower than the $13.5 billion that we announced in early December. This means we cut capital by a third relative to 2014 spending. In making these cuts, we're exercising flexibility we've built over the past few years, coring up the portfolio, adding scalable, unconventional inventory with a low cost of supply and executing the vast majority of our major project spending. And that's why we can adjust our capital program while preserving future investment opportunities. And in 2016 you'll see more capital flexibility as additional major project spending continues to roll off. At our revised capital level, we still expect to deliver 2% to 3% growth in 2015 versus 2014.

Now in addition to conserving capital through scope reductions, we're aggressively identifying and capturing cost savings through our supply chain efforts. At this time, our revised $11.5 billion budget anticipates capturing about $500 million of deflation in 2015. Most of this will come from our Lower 48 unconventional business. Now, my management and myself, we review two dozen categories of costs globally every month and we're actively pursuing additional cost reductions for this year and beyond. As one of the largest purchasers of industry goods and services globally, we expect to benefit significantly in future years before any sustained deflationary cycle.

We're also looking beyond supply chain to reduce costs through self-help efforts. As an example, in Europe we recently announced operating costs and G&A reductions and we'll see additional cost reductions that are being implemented across the rest of the company.

In addition to managing OpEx and CapEx, one of the flexibility levers we're prepared to use in 2015 is our balance sheet. We're coming into this cycle in a strong position and that will serve us well. We have cash on hand and a significant capacity that we can use and Jeff will provide more detail on those plans.

So we're taking the 2015 challenge head-on. We're conserving CapEx, we're aggressively pursuing supply chain and self-help cost reductions, we'll utilize our financial capacity as needed. We've adjusted rapidly to avoid jeopardizing our dividend or our ability to achieve cash flow neutrality by 2017. These decisive actions combined with our flexibility should put us in a good stead to manage through this downturn.

APC-01753868

# ConocoPhillips (COP)
Q4 2014 Earnings Call

**Corrected Transcript**
29-Jan-2015

So now let me turn the call over to Jeff and Matt, and then I'll come back for a few closing comments.

## Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

Thanks, Ryan. As Ryan mentioned, our full-year 2014 adjusted earnings were $6.6 billion. Our full-year earnings slide is in the appendix, but I'll quickly cover fourth quarter earnings.

Fourth quarter 2014 adjusted earnings were $742 million or $0.60 a share. Our operational performance was overshadowed by a roughly 20% drop in realized prices compared to prior periods and a previously announced dry hole in Angola.

A segment breakdown of earnings is shown on the lower right with more detail provided in the supplemental data on our website.

There's one special item to note. In the fourth quarter, an agreement to terminate our long-term obligations at the Freeport LNG Terminal took effect. The ins and outs for the income statement and cash flow are shown in the Appendix, but as a result of the transaction, the company anticipates saving about $50 million annually over the next 18 years. So this was a good long-term economic decision.

On slide eight, I'll cover our 2014 production from continuing operations. We achieved two important milestones in 2014, namely hitting our growth targets for production and margin growth. Our production growth for the year excluding Libya was 4% from 1,472 million to 1,532 million BOE per day. The impact from down time and dispositions was small, and compared to last year, our net gross was over 60,000 BOE per day, primarily from liquids, an area with favorable fiscals.

We also achieved our cash margin growth target and that's shown on slide nine.

For 2014, we achieved an 8% cash margin improvement when normalized on 2013 prices. Despite lower prices, we're not going to lose our focus on cash margins and, in fact, it's as important as ever.

Next I'll review our 2014 cash flow waterfall on slide 10. We started the year with $6.5 billion in cash and short-term investments and generated about $16 billion of cash from operating activities. We cashed at about $1.2 billion of net proceeds from dispositions, mostly from Nigeria. Our 2014 capital expenditures were about $17 billion. After accounting for dividends and debt, we ended the year with $5.1 billion in cash.

Next I'll address the balance sheet flexibility we're prepared to exercise in 2015 as needed, so if you'll turn to slide 11. We've consistently spoken in the last several years about our plans to grow at a moderate rate while paying a strong dividend to our shareholders. The growth in our cash flow was moving us to a position where cash from operations would fund our capital and the dividend in 2017 with the shortfalls in cash flows funded largely by asset sale proceeds. With much lower commodity prices, we, like the rest of industry, need to manage in an environment with reduced cash flow. As Ryan mentioned, even with this dramatic downturn, we remain committed to our strong dividend and reaching cash flow neutrality in 2017, and that's true across a wide range of commodity prices.

As Ryan also noted, the first action we've taken is to exercise flexibility in our capital program, which becomes more flexible over the next couple of years. To achieve our priorities, we will also be using our strong balance sheet

APC-01753869

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

capacity, both cash balances and increased borrowings, to provide funding this year and next. So let me tell you how we're thinking about this.

We ended 2015 with $5.1 billion of cash on our balance sheet, and we need about $1 billion of that cash to operate the company. We don't have any issues with trapped cash that prevent us from accessing our cash balances.

We have ready access to the credit markets, and our debt continues to trade at levels between those of A and AA rated companies. The chart on the right shows indicative borrowing rates for any new issuances in today's markets.

For short-term funding, we have a $6 billion of revolving credit facility capacity that can serve as a backstop for the issuance of very low cost commercial paper. We don't have any debt maturities in 2015. As we assess commodity price environments, both in 2015 and for the next few years, we think it's unlikely that we'll need to increase our debt to a level that would cause our credit ratings to slip out of the single A credit rating range, although it could move lower within the A range if we stay at current commodity price environments for a prolonged period. Our current debt-to-capital ratio is about 30%. We're willing to let that rise, if necessary, as we move the company to a balance of cash flows, capital expenditures and dividends in 2017.

So to summarize, we intend to maintain our strong dividend and continue exercising our increasing capital flexibility to move the company to cash flow neutrality in 2017. Our level of capital spending, rate of growth and the level of debt that we maintain will be the variables that will be influenced by commodity prices.

Now I'll turn the call over to Matt for his operational comments

## Matthew J. Fox
*Executive Vice President-Exploration & Production*

Thanks, Jeff. I want to begin my comments with a brief recap of 2014, beginning with a review of our reserves performance. These are preliminary numbers, but we don't expect any material changes from the final reserves that are published in our 10-K.

We started the year with 8.9 billion BOE of reserves. We produced 598 million and added 742 million organically. These additions came primarily from our Lower 48, APME and Canada assets. This resulted in an organic reserves replacement ratio of 124%. We also sold 159 million BOE, mostly from Nigeria, and ended the year then with 8.9 billion barrels of reserves. That represents a total reserve replacement ratio of 97%. Over the past three years, our total reserve replacement has averaged 129%, and that's after selling assets which generated about $14 billion of proceeds.

So let me put this all in perspective. We launched as an E&P three years ago with 8.4 billion barrels of reserves on the books. Over that time, we've produced more than 1.5 billion barrels and sold over 400 million barrels, and yet we'll exit 2014 with 8.9 billion barrels of high-quality reserves on the books. That's pretty impressive for a company of our size.

Now I want to recap the 2014 operational highlights that contributed to our reserve performance and our 4% production growth. As Ryan and Jeff mentioned, we achieved our production growth target both for the fourth quarter and for the year. Our base assets continue to perform well with strong safety performance and successfully completed several major turnarounds across the portfolio. We achieved another strong year in the unconventionals with 35% annual growth in the Eagle Ford and Bakken. We also conducted multiple pilot tests

Copyright © 2001-2015 FactSet CallStreet, LLC

APC-01753870


and progressed exploration and appraisal activity across our whole unconventional portfolio. And as a result of this work, we're confident that we have an extensive, profitable inventory in these plays for many years to come.

We achieved startups of five major projects across the business: Britannia Long-Term Compression in the UK, Foster Creek Phase F in the oil sands and Gumusut, Kebabangan and SNP in Malaysia. And we made significant progress on our largest major projects at APLNG and Surmont 2 in preparation for startup this year.

We saw progress in our deepwater program, in particular with two discoveries in a new working petroleum system, offshore Senegal and we continue the appraisal on our three major discoveries in the Gulf of Mexico.

Yesterday it was announced that we signed an agreement with Chevron and BP to jointly explore and appraise a 24 block area in Keathley Canyon that includes the Tiber and Gila discoveries. This agreement allows our companies to combine our technical strengths and financial resources to achieve efficiency through scale, reduced sub-surface risk and improve the likelihood of commerciality. So this is a great deal for all three parties.

Next I'll review the capital reductions we just announced and the implications for 2015 activities. We'll start from the $13.5 billion capital guidance we issued in December.

We're not reducing our base maintenance capital because we don't want to jeopardize the strength of our base production or the integrity of our assets.

Our development program spending will be lower by about $1.4 billion. Most of this is coming out of Lower 48 unconventionals where we have a lot of flexibility and where there's a sound economic rationale for slowing the pace of development. In 2015, we'll reduce rigs in the lower Eagle Ford and, sorry, in the Lower 48 by over 60% versus 2014. We plan to run six rigs in the Eagle Ford, three in the Bakken and two each in the Permian conventional and unconventional. At these levels we maintain our land position, meet our longer-term rig commitments and can continue to progress key pilot tests. We retain the flexibility to increase activity in these plays if we choose to.

We're also reducing capital for our major projects by deferring final investment decisions in several conventional assets. And just as a reminder, our initial budget of $13.5 billion already reflected a significant reduction in this category compared to 2014 as projects were completed and as we near startup at APLNG and Surmont. We also exercised $300 million of flexibility in our exploration and appraisal spend primarily in the emerging Lower 48 unconventionals.

As Ryan mentioned, our $11.5 billion capital guidance assumes about $500 million of cost deflation. This is what we have a clear line of sight to capture in 2014 but it's early in the year and you can be assured that we have a significant focus on the effort across the whole value chain. In 2016 and 2017 the flexibility of our capital portfolio continues to improve as more major projects are completed and we believe this flexibility combined with a strong base portfolio positions us well for a potentially volatile few years ahead.

Next I'll quickly cover our operational priorities for 2015. We expect to grow production by 2% to 3% from 2014 to 2015 and this includes an expected first quarter production rate of between 1.57 million and 1.61 million barrels per day. Walking through the segments, in Alaska we're focused on progressing our development drilling programs and major projects of CD-5 and drill site 2S. Both projects are expected to start up in the fourth quarter of this year. We intend to sanction the first phase of the Northeast West Sak development, the 1H NEWS project and we'll continue to progress a new rotary rig and new coiled tubing drilling rig to optimize our long-term development drilling inventory in Alaska. But we have decided to defer the final investment decision on the GMT1 project.

APC-01753871

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

 Corrected Transcript
29-Jan-2015

In the onshore Lower 48, unconventional activity will slow across the portfolio relative to 2014. We'll continue to evaluate pilot tests including the Upper Eagle Ford with our triple stack development concept. In the deepwater Gulf of Mexico we'll continue to appraise existing discoveries. We have wells drilling at Gila and Tiber right now and anticipate additional appraisal well drilling in Shenandoah later this year. In Canada we're reducing our conventional and unconventional development drilling activity. Oil sands production from Foster Creek F will continue to ramp up. Surmont 2 is on track for first steam in mid-2015 and we'll commence exploration drilling offshore Nova Scotia later this year.

In Europe, Ekofisk South and Eldfisk II continue to ramp up and we'll continue progress on the Enochdhu and Alder projects. In the Asia-Pacific and Middle East segment APLNG is on track for startup in the middle of the year. We're ramping up Gumusut in Malaysia and we're awaiting third-party pipeline repairs to allow production to ramp up at KBB, which we expect to start in the middle of the year. We'll also complete appraisal at the Barossa field, offshore Australia.

In our Other International segment we'll continue to monitor circumstances in Libya, evaluate result of our recent testing in Poland, begin appraisal work offshore Senegal and continue to execute our exploratory drilling programs in Angola and Colombia.

So we've got another busy year ahead of us and in any price environment, we're committed to safely executing our programs and delivering flexible growth while retaining high-value future options and inventory.

Now I'll turn the call back to Ryan for his closing remarks.

## Ryan M. Lance
*Chairman & Chief Executive Officer*

Thank you, Matt. So let me recap what you've heard today. I think we delivered again in 2014. But certainly that was then; now it's all about 2015 and it's all about flexibility and resilience which we believe we have both.

Our priorities are clear: dividend and cash flow neutrality and we're taking immediate actions to defend them. We're cutting CapEx, capturing cost improvements and exercising our balance sheet if needed. And we're also thinking about the timeframe beyond 2015. We're asking ourselves, what's changed in our industry, if anything, for the longer term? We're testing our portfolio under different scenarios and again, we'll see that we have a resilient portfolio with flexibility to adapt if circumstances warrant.

Now some things might change. But here's what's not going to change. We're going to allocate capital prudently, we'll continue to migrate our portfolio to a lower cost of supply, we'll maintain capital and financial flexibility and we'll pay our shareholders first. That's our formula for creating long-term shareholder value. And I look forward to seeing you and describing that in more detail in April in New York. So with that, now let me turn the call back over to the operator and we'll take some Q&A.

APC-01753872

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

# QUESTION AND ANSWER SECTION

**Operator**: Thank you. We will now begin the question-and-answer session. [Operator Instructions]

And our first question is from Doug Leggate of Bank of America Merrill Lynch. Please go ahead.

### Doug Leggate
*Bank of America Merrill Lynch*

Q

Good morning, everybody. Thanks for taking my questions. Folks, I wonder if I could dig into the cash flow neutrality question a little bit, because obviously the dividend is still a big commitment for you guys. When you separated Phillips, I think Jim, at the time, had talked about a maintenance capital level of around $10 billion to hold production flat. Well, I guess what I'm trying to understand is, to Matt's comment. Obviously that was $100 oil so one assumes that costs are going to drop at some point. But also had a slightly different portfolio and you've had a bunch of new projects come online that are longer life, or will come online, rather. So what is that number today, as it stands today and maybe assuming some cost reductions over time? And I've got a follow-up, please.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

A

So I think, Doug, a number of $9 billion to $10 billion to keep production flat is a good go-by for now. I mean, clearly it's going to be a function of how much deflation we see, that's sustained deflation across the industry. But a number of that sort of magnitude is a good go-by for the time being.

### Doug Leggate
*Bank of America Merrill Lynch*

Q

So when you talk about cash flow neutrality, I don't know if this is either Jeff or Matt, but what commodity deck are you assuming when you think about that for 2017?

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

A

Like the comment that Matt made about capital, that also depends on what kind of cost deflation we see in both capital costs and operating costs. We don't expect that prices are going to maintain at current levels for that period of time, so we would be at cash flow neutrality at some improvement over current price levels but not at a level as high as what we've experienced recently.

### Ryan M. Lance
*Chairman & Chief Executive Officer*

A

So, Doug, what I would say as we see a modestly rising price deck over the course of the next few years but certainly not back to a level that we've seen the last two or three years.

### Doug Leggate
*Bank of America Merrill Lynch*

Q

Got it. My follow-up if I may, Ryan, it's probably one for you or it's really more of a high-level strategy question because we could debate over the years what the market looks for out of Conoco. Your unique offering obviously is the dividend but top line growth for a company of your size is always going to be relatively modest at best. So

Copyright © 2001-2015 FactSet CallStreet, LLC

APC-01753873

when you think about the trade-off between portfolio high grading, bringing new projects on and perhaps monetizing or exiting other areas, with the potential to buy back shares when you do get a windfall of oil prices as we may have just had over the last several years, how do you see the strategic rationale of continuing to pursue top line growth in a volatile oil price environment as opposed to continue as high grading with a very strong yield and the option to buy back stock? I'm just kind of curious as to how this low oil price environment changes your thinking.

Ryan M. Lance
*Chairman & Chief Executive Officer*

Yeah. I think as I look out, we probably should expect with some of the modest growth that we're seeing in demand and really the resiliency that we see in the unconventionals having an impact on the supply, we're going to be in a more volatile world as we go ahead. So as I think about that strategically for the company, we're trying to build a company that has a solid base of legacy assets, low production decline, the things that you can underpin the dividend with over time. So as we bring on the oil sands our legacy assets in Alaska, what we're doing in Europe and the North Sea, what we're building in Asia-Pacific. And then on top of that, we're moving to a lower cost of supply in the portfolio through the addition of the unconventional portfolio that we're developing here in North America.

And that provides us a lot of resilience and flexibility to the capital. So we'll see what the commodity price gives us. We'll protect the dividend first and then with what's left over in the cash flow, we'll fund a capital program that will set the growth that we see coming out of that, because we know the growth is directly related to that capital program. When it comes to share buyback, we'll just assess what we have in terms of capital opportunities in the portfolio. If they're good, strong returns, which we think they're going to be with the unconventional inventory that we have, we'll judge that against the opportunity for share buyback down the road.

**Operator**: Thank you. Our next question is from Doug Terreson of Evercore ISI. Please go ahead.

Doug T. Terreson
*International Strategy & Investment Group LLC*

Good morning, everybody.

Ryan M. Lance
*Chairman & Chief Executive Officer*

Good morning, Doug.

Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

Hi, Doug.

Doug T. Terreson
*International Strategy & Investment Group LLC*

Ryan, one of your competitors indicated today that service calls have not declined as much as might be expected given the decline in oil and gas prices, and while there's always going to be lag effects and different contract durations and other things, I wanted to see if you would elaborate further on what ConocoPhillips has seen in the market and whether service cost lag effects were an important factor in today's reduction in spending or whether it was really lower prices. And then also some of the specific initiatives that you guys are undertaking that led to the $500 million benefit that you talked about a few minutes ago.

APC-01753874

### Ryan M. Lance
*Chairman & Chief Executive Officer*
A

Yeah. Sure, Doug. I can chime in and Matt's even closer to it than I am, so I can let him add some color to it if he would like. But yeah we've – so what we've said is we are seeing reductions as rigs start rolling off, onshore rig rates will be coming down. We're seeing pumping services and some of the commodities, and we're tracking each one of those. We have 20 different categories that we track on the supply chain side, and we're looking at them pretty closely. Now a lot of those are coming to the capital side, some go to the OpEx side. What we said is we've got pretty clear line of sight to the $500 million of reductions that we've factored in, but those are going to continue as this commodity price environment continues into 2015, and depending on the recovery that we see coming into 2016.

We're all over it. We're looking to try to capture as much of that as we can. The interesting sort of piece that you get, all the reductions and the flexibility that we're exercising is in North America, and that's where we expect to see a lot of the first reductions from capturing the deflation. So, I don't know, Matt – I think that's where – we're all over it, Doug, and we're going to get as much as we can out of it and as quickly as we can.

### Doug T. Terreson
*International Strategy & Investment Group LLC*
Q

Sure. Okay. Well thanks a lot, guys.

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*
A

Thank you, Doug.

### Ellen R. DeSanctis
*VP-Investor Relations & Communications*
A

Thanks, Doug.

**Operator**: Thank you. Our next question is from Scott Hanold of RBC Capital Markets. Please go ahead.

### Scott Hanold
*RBC Capital Markets LLC*
Q

Thanks. I'd like to dig into the CapEx and flexibility just a little bit more, and you did cite your maintenance CapEx is around $9 billion to $10 billion. But when you step back and look at major project spend, as I think you cited, you're seeing a reduction in 2016, 2017. Can you give us a sense of what the size of that might be and how much you guys think you need to spend annually on those longer dated projects, whether you have them today or you need to build them for long-term growth opportunities?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*
A

Well as we move from 2015 into 2016, we'll see about $2 billion coming out of our major capital projects CapEx requirements just from Surmont and APLNG. So that's why we're referring to a significant increase in flexibility from 2015 to 2016, and that trend continues. There's several hundred million. It's not billions of barrels as we go from – billions of dollars as we go from 2016 to 2017, but that trend of reducing capital going to major projects and increasing capital going to the flexible low cost of supply and development programs, that's an underlying

APC-01753875

part of the strategy that we've been executing for the past three years, and we're in the middle of that and an adjustment to our overall investment portfolio right now and for the next couple of years.

**Scott Hanold**
*RBC Capital Markets LLC*

Q

Okay. So if I can clarify, if I look at that $11.5 billion 2015 budget, call it you take out $2.5 billion for some of these major projects, and that gets you to somewhat that maintenance capital level?

**Matthew J. Fox**
*Executive Vice President-Exploration & Production*

A

That's a good way of thinking about it. Yeah. That's close enough.

**Scott Hanold**
*RBC Capital Markets LLC*

Q

Okay. I appreciate that. And one follow-up question then. On your rig count reductions, obviously they're pretty meaningful in the U.S. onshore, and when you look at plays like the Bakken, the Eagle Ford and Permian, can you give us then when you're drilling your projects today, and you sit there and look at three, four, and six rig counts, do you assume that these will be economic at current spot prices, strip prices or a better price? And just to give you some context, I know there's a lot of debate whether or not the Bakken is economic today so why should there be any rigs drilling there today?

**Matthew J. Fox**
*Executive Vice President-Exploration & Production*

A

Yeah. So we're in the sweet spot of the Bakken. With the rig rates and the rates that we're getting, it's economic at current conditions, but we're actually taking that all the way down to a three rigs this year. We do have some commitments within some of the units in the Bakken where we have to run some rigs in the Bakken. The Eagle Ford is still very economic even at the current prices. But having said that, it makes more economic sense to defer. So what we're dealing with in the Eagle Ford is that a balance of -- we have some commitments. We need to run probably three rigs to meet commitments on our leasehold. We're also keen to continue to learn in the Eagle Ford because we have a huge inventory there that we could develop over the next couple of decades, and we want to make sure that we're capturing all the learnings.

So we're choosing to continue with some of our pilot tests as we go through 2015. And our expectation is, as some of the capital flexibility appears more into next year, that we're likely to increase our rig counts and take advantage of what may be higher prices but certainly will be deflated costs.

**Operator**: Thank you. Our next question is from John Herrlin of Societe Generale. Please go ahead.

**John P. Herrlin**
*SG Americas Securities LLC*

Q

Yes. Hi. Addressing the services costs another way, are you getting discounts from book rates? Or are you going to be able to get longer-term rates at discount or is it too early regarding fracking rigs, et cetera?

**Matthew J. Fox**
*Executive Vice President-Exploration & Production*

A

APC-01753876

## ConocoPhillips (COP)
Q4 2014 Earnings Call

So there's a mixture of both going on, John. I mean, this isn't a great time to enter any long-term commitments, until we see how the deflation works its way through the system, but we're working with the suppliers. We've got a great relationship with the suppliers and we're looking at across a spectrum of things, influence of capital and operating costs and making judgments every day on what the most prudent thing to do is in terms of contract duration and commitments against the reducing costs that we're seeing.

### John P. Herrlin
*SG Americas Securities LLC*

Q

Okay. Thanks, Matt. One other question. Ryan, you said it's a more volatile world. Given the short cycle nature of shale-based activity, would you ever institute a hedging program in the shales, or just given your size it's not realistic?

### Ryan M. Lance
*Chairman & Chief Executive Officer*

A

Yeah, I think the latter is the case, John. It's our size. We're naturally hedged a bunch across a lot of commodities in the markers. So given our size and where we're at, we don't see that as a useful strategy right now.

### John P. Herrlin
*SG Americas Securities LLC*

Q

Great. Thank you.

### Ellen R. DeSanctis
*VP-Investor Relations & Communications*

A

Thanks, John.

**Operator**: Thank you. Our next question is from Guy Baber of Simmons & Company. Please go ahead.

### Guy A. Baber
*Simmons & Co. International*

Q

Good afternoon everybody.

### Ryan M. Lance
*Chairman & Chief Executive Officer*

A

Hello, Guy.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

A

Hi.

### Guy A. Baber
*Simmons & Co. International*

Q

I had a question on your 2015 production and I was trying to get a better sense of the general trend as we progress through the year, especially for the U.S. unconventional portfolio. So could you help frame for us perhaps what kind of the 2015 exit rate production expectations might be for the Lower 48 on the current capital spending plan? And then any early expectations on 2016 with current rig count levels would be much appreciated, and then I have a follow-up.

APC-01753877

**ConocoPhillips** *(COP)*
Q4 2014 Earnings Call

---

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

Well, Guy, I think you're really trying to focus in on the unconventionals in our portfolio. So to give you a sense of that, we expect our production from the Eagle Ford and Bakken will grow from about 200,000 barrels a day in 2014 to about 225,000 barrels a day in 2015, so somewhere between a 10% and a 15% increase. That production growth is all going to come through the first half of the year. And then if we stay at the rig counts that we said just now, we're going to go into a slow decline in both the Bakken and Eagle Ford. Not a rapid decline, but a slow decline and that's going to continue into early 2016. So where our 2016 average rate will be is going to be a function of the number of rigs we decide to run. And as I said earlier, we do expect to increase our rigs in the Eagle Ford and Bakken in 2016. So production may be flat from 2015 to 2016 but time will tell. So growing production on average, year on year from 2014 to 2015, all of that growth is seen in the early part, in the first half of the year and then a slow decline through the third and fourth quarter.

---

### Guy A. Baber
*Simmons & Co. International*

That's very helpful, Matt. And then my follow-up, I wanted to kind of walk through some of the implications of the lower rig count. And you'd partially addressed this in your prepared comments, Matt, but how do you think about reduced investment levels materially but still retaining the practical ability to quickly flex those activity levels higher if the commodity price improves? And then secondly, can you just address, just with the focus on minimizing spending and maximizing efficiencies, your ability to still continue with some of your experimentation to drive long-term resource upside? I mean, are those plans still going to be in place in the Eagle Ford and the Bakken as well with the lower rig count? Any comments you could provide there would be great.

---

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

Yeah, so the organization that we have in the Lower 48 is flexible enough to bring the rigs down and bring the rigs back up if we want to do that. So that flexibility exists and we're exercising that flexibility now on the way down and we'll be ready to do it on the way back up again. So the organizational flexibility and the relationships with the suppliers and so on, that's all in-hand to go both ways. In terms of the continued experimentation, yeah, we have to choke back somewhat on the pace of learning. We can't do all of the pilot tests that we'd like to do, because you need to be drilling a lot of wells to do some of those. But the critical pilot tests that really have the biggest implications for a long-term resource understanding, we're going to continue with those sort of pilot tests through this downturn because of the implications of the value of that information for the long-term we think is worth continuing to collect.

---

**Operator**: Thank you. Our next question is from Blake Fernandez of Howard Weil. Please go ahead.

---

### Blake M. Fernandez
*Howard Weil, Inc.*

Hey, folks. Good morning. I have a question on slide seven. It looks like you provide the regional breakout of your adjusted earnings, and I hate to put too much emphasis on just one quarter, but it looks like the Lower 48 actually saw a loss compared to the other regions and obviously your cutting CapEx in the Lower 48 as well. I guess my view was that that was one of the main drivers of margin expansion going forward. So could you maybe elaborate a little bit on the economics that you're seeing there compared to the other investment opportunities that you have?

---

APC-01753878

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*



Blake, in the Lower 48 in the fourth quarter, there were around $100 million or so of impairments that happened between, and then also some dry hole costs related to the Shenandoah appraisal well that we wrote off as well, which impacted that loss somewhat. But having said that, it will be a challenging year coming forward for Lower 48 based on the fact that there's still a fairly heavy natural gas waiting in the Lower 48 production. It is, as Matt mentioned, the economics are still there for continued investments that we're making, and those are good cash margin investments. But it is going to be a challenging 2015 at current commodity price levels in the Lower 48.

### Blake M. Fernandez
*Howard Weil, Inc.*

Sure. Understood. Okay. And then the second question is on the commitment to the dividend. I fully appreciate the differentiated strategy and having that as a top priority. But you mentioned debt to cap would increase, and potentially investment grade could go below AA or A. Is there a level that we should think about where you begin to have to rethink that strategy and emphasis on the dividend, whether it be investment grade rating or a certain debt to cap level?

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*



As we mention in our remarks on the calls, we look at a lot of different scenarios that might happen over the next couple years. We think between the capital flexibility that we have, the potential that we could have some level of asset sales in the mix, and the cash balance that we're starting with, that we don't think we're going to be having to face the question of having more borrowings than will take us out of that A credit rating range. And again, that's part of the overall message here is that's baking in the dividend is the first priority for how we're using our cash flow.

**Operator**: Thank you. Our next question is from Paul Cheng of Barclays. Please go ahead.

### Paul Y. Cheng
*Barclays Capital, Inc.*

Hey, guys. Good afternoon. Couple quick questions, if I could. Maybe this is for Matt and Jeff. If you're looking at your supply cost, what percentage, how much of that supply cost is currently under contract longer than two years?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*



Supply costs, you mean like our rigs and so on?

### Paul Y. Cheng
*Barclays Capital, Inc.*

Yeah. Rig or anything that relate to your upstream operation.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

Well in our North America business and certainly in Canada and the Lower 48 there's very, very little that extends beyond one year in terms of rig contracts. Most of them are 30 days. If we move out to the international business,

APC-01753879

there are some in the UK and Alaska and Norway that are on longer-term contracts than that. But typically it's not common for us to have a significant amount of our drilling development-led portfolio constrained by long-term contracts.

### Paul Y. Cheng
*Barclays Capital, Inc.*



So, Matt, should we assume that more than 50% of your supply cost base that you could potentially start seeing cost reduction in a relatively quick timeline?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

Oh, I see what you're getting at. You're looking at the opportunities to get deflation into that?

### Paul Y. Cheng
*Barclays Capital, Inc.*



That's correct. How quickly we would, because if you have a lot of your services under long-term contract and maybe that you can negotiate even though that you're still under contract, but normally that people don't like you to allow that, but so that's why I'm trying to understand how quickly is that saving will be able to pass through?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

We're going to see it most quickly in the onshore North American business, and that's in particular in Canada and the Lower 48. We're not going to see it, for example, in the APLNG project. We're now almost 100% labor costs. We're not likely to see labor costs in Australia decrease over the next year. The same applies really to the Surmont 2 project in Canada where that's all labor just now, and we don't anticipate any significant labor cost reductions over the next few months as we complete the project. So the short answer is that the major projects are going to see limited and slower deflationary forces act on them in the development programs everywhere; but in particular, Canada and Lower 48 are going to see it more quickly.

### Paul Y. Cheng
*Barclays Capital, Inc.*



Okay. Second question, this is for Ryan. Ryan, I understand your priority in protecting dividend. What if, as the industry under stress and as a great opportunity arise and you have to make a choice between making an acquisition but that have to dramatically cut your dividend subsequently to ensure that you have sufficient cash flow going forward, how that choice will be made from your standpoint? I mean how you balance that?

### Ryan M. Lance
*Chairman & Chief Executive Officer*

Well, Paul, it's an interesting scenario to try to think about but it's a tough one to pontificate a little bit over because we're focused on executing the plan that we have. We watch the M&A market, we see the assets that are out there. The issue with M&A and our portfolio is it's got to compete against investments that we have in the portfolio already today, and it's a pretty big hurdle for it to climb over. So I wouldn't speculate on where that might go.

**Operator**: Thank you. Our next question is from Ryan Todd of Deutsche Bank. Please go ahead.

APC-01753880

# ConocoPhillips (COP)
Q4 2014 Earnings Call

### Ryan Todd
*Deutsche Bank Securities, Inc.*

Good, thanks. Good afternoon, gentlemen. Maybe one follow-up on activity levels and balance sheet. I guess as we look forward into 2016, implied on reaching the 2017 cash flow neutrality target even at the current CapEx balance and dividend rate would imply a relatively significant ramp in cash flow potentially from commodity prices into 2017 as is. So what would you need to see I guess in the market either from a cost or from a commodity point of view to actually start adding capital back to the budget as opposed to just letting things play out through 2017?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*



So what we've said is that we're going to allow our capital to be flexible to manage within our cash flow and maintain the dividend. So the capital is going to flex and we have the portfolio to allow that to happen. So when we say that we're going to get to cash flow neutrality in 2017, there's a bunch of different ways that that could transpire. It could transpire through higher prices with more capital and more production or lower prices with less capital and less production growth. So we model all of these scenarios and we're planning to talk more about this, Ryan, when we have our Analyst Day in April.

### Ryan M. Lance
*Chairman & Chief Executive Officer*



The capital, Ryan, is the fly wheel. So again, we start with dividends being the number one priority. We'll fund that out of the cash flow. The growth will come from whatever capital level that we set, and the commodity price and the cash flow informs that and then we're setting that level to make sure that we reach cash flow neutrality by 2017. And as Matt said, across various scenarios of combination of capital and oil price projections, we're focused on getting there in 2017.

### Ryan Todd
*Deutsche Bank Securities, Inc.*



Great. I appreciate the lots of moving pieces in the equation. Just trying to get an idea if there is a level that you would think about that you would have to see at least to actually start putting some money back into the business incrementally from what you have now.

### Ryan M. Lance
*Chairman & Chief Executive Officer*



We won't let cash flow neutrality move out beyond 2017, so I think that's the stake you can put in the ground, Ryan.

### Ryan Todd
*Deutsche Bank Securities, Inc.*

Okay. That's helpful.

### Ryan M. Lance
*Chairman & Chief Executive Officer*



And it could move closer, depending on the commodity price levels and what the market gives us.

APC-01753881

# ConocoPhillips (COP)
Q4 2014 Earnings Call

Corrected Transcript
29-Jan-2015

### Ryan Todd
*Deutsche Bank Securities, Inc.*



That's helpful. And then if I could ask on what you're seeing on the cost environment. I know you've talked a little bit. Am I correct in understanding that the vast majority of the $500 million CapEx cuts that you've implied in the budget to date have come in U.S.? And either way, can you talk a little bit – we have a little bit more visibility I think generally in what we see in the U.S., but can you talk a little bit about what you're seeing globally on costs across deepwater major capital projects, those type of things in the current environment?

### Ryan M. Lance
*Chairman & Chief Executive Officer*



Well I think Matt's tried to address that. We see it'll be slower in the major projects, and those like APLNG and Surmont that have a large labor component, that's going to take a long time to work through the system depending on how long the down cycle is. We do see deepwater floater rigs coming off quite a bit, so the market today is quite a bit less than it was just a couple or a year ago, maybe this time a year ago. So we do see pieces of that. Tubular goods, oil country tubular goods, we see that coming down, and that's a commodity that we use across the world. So where we have development drilling programs and we use workovers and stuff, we see some of that flowing through as well. So it is a by category; it's different by each category, and it's different around the world. And the $500 million that we're talking about is something that we've got pretty clear line of sight on to capture this year, and that will continue into 2016.

**Operator**: Thank you. Our next question is from Edward Westlake of Credit Suisse. Please go ahead.

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*



Yes. Good morning. A good discussion so far, and I'm going to have to stick with CapEx, then ask some smaller questions. Just on the $4.5 billion of major project spend, given that you do have APLNG, heavy oil, and some large projects in Malaysia that are going to finish hopefully at some point in 2015, it might be a help to ask to maybe give us some color as to, just on the existing projects, how might that look in 2016? Forget cost deflation but just the timing of the CapEx cycle.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*



So roughly speaking, we're going to see – well let me give you some specifics. So APLNG will go from something like $1.6 billion this year to $0 next year. Surmont will go from about $800 million this year to about $250 million next year. There, so there's a [ph] few bins (50:44) are high-level and...

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*



Yeah.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

Views of those biggest projects. There are a few projects that are increasing in capital year-on-year. As the Clair Ridge project moves towards closure, we'll see a slight increase in capital there next year, and the same with the Malachi project in Malaysia. But overall, we're going to see something greater than $2 billion coming out of the –

APC-01753882

in the mix between those larger, the biggest projects we're executing coming to an end, and some smaller projects that are already in execution ramping up a bit.

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*

Q

With the cash flow from those, and then that provides more confidence to add back rigs into shale? So I can see how that would...

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

A

Well, actually you make a good point there, Ed, because one of the things about the projects like APLNG and Surmont, for example, is they'll start producing this year, but they won't actually get to peak rates for a full year until 2017. So they're going to be continuing to contribute to growth long after the capital's spent. As the Surmont project takes three years to ramp up, APLNG won't actually get to peak production until sometime early in 2016. The KBB project in Malaysia, we might only get half of year. Despite the fact that the project's complete, we're waiting on this pipeline being repaired. We might only get half a year of production from KBB this year, but we'll get a full year of production in 2015, and so on. So we're happy that these major projects are now getting to completion, not just because we don't have to spend the CapEx, but because now we're going to reap the reward over the next several years of contributing, growing our base production through these long-life – many of them long-life flat production projects.

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*

Q

But...

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

A

But to put a little bit more point on what Matt said as well, if you go back to our Analyst Presentation last April, we talked some numbers about how much cash we can expect to see coming out of APLNG and out of FCCL once those things are up and running, kind of at full rates by 2017. And those are lower numbers at lower commodity prices, but that's still a pretty significant source of cash for us, and that is an important part of the equation of getting to cash flow neutrality in 2017.

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*

Q

And just on APLNG though, just as a follow-up, how will you be treating I guess the CBM drilling costs? Would that be in CapEx or you put that in OpEx, just more of a modeling question? The maintenance CapEx on that project?

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

A

Yeah, the...

### Edward George Westlake
*Credit Suisse Securities (USA) LLC (Broker)*

Q

Which can be quite significant, I think.

APC-01753883

**ConocoPhillips** (COP)
Q4 2014 Earnings Call

■ Corrected Transcript
29-Jan-2015

### Jeff W. Sheets
*Chief Financial Officer & Executive Vice President*

A

Yeah, because of the fact that APLNG is done with equity accounting for, I said, you don't end up seeing the capital expenditures for APLNG or the operating costs for it. You just see contributions in a current state. The contributions in are going in as capital and we'll just see distributions coming back out in the future.

**Operator**: Thank you. Our next question is from Alastair Syme of Citi. Please go ahead.

### Alastair R. Syme
*Citigroup Global Markets Ltd.*

Q

Hello. I wonder if I could ask to what extent in this environment that OpEx and overhead might be the flywheel in terms of that cash neutrality. If you could put some granularity around the comments you made about G&A costs, it would be useful.

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

A

Yeah. And Alastair, yeah, we've talked a lot about capital, but we're equally focused on operating cost here as you'd expect. And just like we're focused across the whole value chain for capital deflation opportunities and capital, same thing's happening in operating costs. First of all, in costs that are externally driven like contract labor, materials and chemicals, and there's some price sensitivity to transportation costs and some of our transportation contracts. So we've got to look inside, too, for self-help reductions, looking at our internal operating costs and G&A. So we're already taking action there. We're going to have no salary increases in 2014. We've got a hiring freeze in place across most of the company. We've already announced plans to reduce head count in Europe that's quite significant. And we're likely to see more head count reductions in other parts of the business as we reassess the implications of lower prices on our future plans. So we have the whole company focused on minimizing our operating costs and we're not going to leave any stone unturned but we're not going to take any measures that reduce the safety or integrity of our assets.

And this is one of the things, Alastair, that we intend to talk about in more detail at the Analyst Day in April, our approach to the operating cost side of the accretion.

### Alastair R. Syme
*Citigroup Global Markets Ltd.*

Q

Could you say how much of your operating cost of supply driven versus internal, what percentage? Roughly?

### Matthew J. Fox
*Executive Vice President-Exploration & Production*

A

I would say it's roughly 30% is internal, company labor, and then the rest is a mixture of transportation costs, contract labor, materials, parts. But about 30% is ConocoPhillips internal employee labor.

### Alastair R. Syme
*Citigroup Global Markets Ltd.*

Q

Thank you very much.

APC-01753884

## ConocoPhillips (COP)
Q4 2014 Earnings Call

---

**Ellen R. DeSanctis**
*VP-Investor Relations & Communications*

A

Thanks, Alastair.

................................................................................................

**Operator**: Thank you. Our next question is from Roger Read of Wells Fargo. Please go ahead.

................................................................................................

**Roger D. Read**
*Wells Fargo Securities LLC*

Q

Yeah, good morning.

................................................................................................

**Ryan M. Lance**
*Chairman & Chief Executive Officer*

A

Hello, Roger.

................................................................................................

**Roger D. Read**
*Wells Fargo Securities LLC*

Q

I guess coming at the OpEx question a slightly different way, we talked a lot about CapEx flexibility. As you think about the cash margin potential here, I mean, I think about the shale play, certainly where they were, probably a little more on the higher cash cost side, certainly looking across the industry. So as you pull back a little bit on your drilling there as we look at some of the projects and probably more of a 2016 than a 2015 impact from APLNG and Surmont, what do think about cash margins as you look into the latter part of 2015 and 2016?

................................................................................................

**Jeff W. Sheets**
*Chief Financial Officer & Executive Vice President*

A

Well, we expect – the absolute level of the cash margin will come down with the commodity prices obviously, but as we look across the portfolio, most of the portfolio is quite resilient to – on a cash break-even basis, is pretty resilient to these prices. So as Matt said, were going to continue to drive operating cost reductions as well as the capital reductions, and while the absolute level of the margin will probably come down, we're still going to try to drive to see those margin improvements over the course of the next couple of years.

................................................................................................

**Roger D. Read**
*Wells Fargo Securities LLC*

Q

Okay. Thanks. And then maybe a better question in April, but as you think about the exploration program here as part of the overall CapEx discipline and keeping the dividend in mind, flexibility obviously on the growth projects, what is the flexibility on exploration? And what is the maybe incentive here, as you mentioned, with lower rig rates to shift things out another six or 12 months where you can?

................................................................................................

**Matthew J. Fox**
*Executive Vice President-Exploration & Production*

A

On the short-term aspect of that question in terms of the flexibility in our exploration spend, there's relatively limited flexibility in the short-term on our conventional exploration activity. We have rigs under contracts, we have agreements in place with governments and partners. So over the next year through 2015, that's why we haven't taken as much as you might expect out of exploration. We've really had to go through the parts of the exploration portfolio that are flexible. So we're going to find that 2015 is actually quite a big year for exploration in Angola, Senegal, Gulf of Mexico, Nova Scotia for example, and Australia. And so then there's a longer-term

---

APC-01753885

question about the role of exploration in the growth of the company, and that's one of the things that we are going to talk about more in the Analyst Day in a couple of months.

**Operator**: Thank you. Our next question...

Ellen R. DeSanctis
*VP-Investor Relations & Communications*

Christine?

**Operator**: Yes?

Ellen R. DeSanctis
*VP-Investor Relations & Communications*

Sorry, Christine. I'm seeing it's the top of the hour we'll take one more question if you don't mind, okay?

**Operator**: Okay. Our last question is from Phil Gresh of JPMorgan. Please go ahead.

Phil M. Gresh
*JPMorgan Securities LLC*

Hey, thanks for sneaking me in. Two quick ones. One is just the budget for this year. Is it fair to say that the $11.5 billion is set in stone at this point absent further deflation given that you have $2 billion rolling off into next year and that $9.5 billion is the core required to spend? So if you cut anymore this year it would be cutting into the meet-it so to speak?

Ryan M. Lance
*Chairman & Chief Executive Officer*

Yes, I think we've got to set the scope that we want to execute with the $11.5 billion. There is some certainty as to how much deflation we'll capture this year. We've added some in; it could be more than that. We're certainly trying to drive to more than that. But yes, we've set the scope associated with what we want to execute on the $11.5 billion.

Phil M. Gresh
*JPMorgan Securities LLC*

Got it. And then just a follow-up just on the asset sales topic, maybe any additional color you could provide around how you might approach a process like that. What parts of the portfolio might be something you'd want to monetize in this type of environment?

Ryan M. Lance
*Chairman & Chief Executive Officer*

Well, we continue to look. I've said we won't have another large announced asset disposition program, but you should expect us every year to be pruning the bottom part of the portfolio. Obviously it gets tougher in this kind of commodity price environment, but we set our new base case, we know what the assets are worth to us internally, and if there's interest out there in certain assets we'll entertain those and look at them. So I think you should expect some modest amount. It'll be tougher over the next couple of years, but there'll still be some pieces of our portfolio that we'll be taking a hard look at.

APC-01753886

# ConocoPhillips (COP)
Q4 2014 Earnings Call

### Phil M. Gresh
*JPMorgan Securities LLC*

Q

So you think you could get $500 million to $1 billion in cash a year out of asset sales? Any kind of target you're thinking about?

### Ryan M. Lance
*Chairman & Chief Executive Officer*

A

I don't really have a target in mind. We'll do what makes sense.

### Phil M. Gresh
*JPMorgan Securities LLC*

Q

Okay, okay. Fair enough. Thanks.

### Ellen R. DeSanctis
*VP-Investor Relations & Communications*

Thanks, Phil. Okay, Christine, why don't you wrap it up here? Thanks, everybody, for your time, and by all means call IR if you have any other additional questions.

**Operator**: Thank you, and thank you, ladies and gentlemen. This concludes today's conference. Thank you for participating. You may now disconnect.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2015 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

APC-01753887

# Exhibit 67



| Company: | ANADARKO PETROLEUM CORP |
| --- | --- |
| Document: | 10-K (FY 2014) · 02/20/2015 |
| Section: | Entire Document |
| File Number: | 001-08968 |
| Pages: | 165 |

4/9/2020 12:30:46 PM

Intelligize, Inc.    info@intelligize.com    1-888-925-8627

APC-01751751

Table of Contents
Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2014**
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to**
**Commission File No. 1-8968**

# ANADARKO PETROLEUM CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **76-0146568** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046**
(Address of principal executive offices)

Registrant's telephone number, including area code **(832) 636-1000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, par value $0.10 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the Company's common stock held by non-affiliates of the registrant on June 30, 2014, was $55.3 billion based on the closing price as reported on the New York Stock Exchange.

The number of shares outstanding of the Company's common stock at January 30, 2015, is shown below:

| **Title of Class** | **Number of Shares Outstanding** |
|---|---|
| Common Stock, par value $0.10 per share | 506,650,285 |

**Documents Incorporated By Reference**

Portions of the Proxy Statement for the Annual Meeting of Stockholders of Anadarko Petroleum Corporation to be held May 12, 2015 (to be filed with the Securities and Exchange Commission prior to April 2, 2015), are incorporated by reference into Part III of this Form 10-K.

Table of Contents

Index to Financial Statements

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| **PART I** | | | |
| Items 1 and 2. | Business and Properties | | 2 |
| | General | | 2 |
| | Oil and Gas Properties and Activities | | 3 |
| | | United States | 4 |
| | | International | 10 |
| | | Proved Reserves | 13 |
| | | Sales Volumes, Prices, and Production Costs | 18 |
| | | Delivery Commitments | 19 |
| | | Properties and Leases | 19 |
| | | Drilling Program | 19 |
| | | Drilling Statistics | 20 |
| | | Productive Wells | 21 |
| | Midstream Properties and Activities | | 21 |
| | Marketing Activities | | 23 |
| | Competition | | 24 |
| | Segment Information | | 24 |
| | Employees | | 24 |
| | Regulatory and Environmental Matters | | 25 |
| | Title to Properties | | 28 |
| | Executive Officers of the Registrant | | 28 |
| Item 1A. | Risk Factors | | 30 |
| Item 1B. | Unresolved Staff Comments | | 43 |
| Item 3. | Legal Proceedings | | 44 |
| Item 4. | Mine Safety Disclosures | | 44 |
| **PART II** | | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 45 |
| Item 6. | Selected Financial Data | | 48 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 49 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 82 |
| Item 8. | Financial Statements and Supplementary Data | | 84 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 158 |
| Item 9A. | Controls and Procedures | | 158 |
| Item 9B. | Other Information | | 158 |
| **PART III** | | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | | 159 |
| Item 11. | Executive Compensation | | 159 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 159 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 159 |
| Item 14. | Principal Accounting Fees and Services | | 159 |
| **PART IV** | | | |
| Item 15. | Exhibits, Financial Statement Schedules | | 160 |

APC-01751753

Table of Contents
Index to Financial Statements

PART I

## Items 1 and 2. Business and Properties

### GENERAL

Anadarko Petroleum Corporation is among the world's largest independent exploration and production companies, with approximately 2.9 billion barrels of oil equivalent (BOE) of proved reserves at December 31, 2014. Anadarko's mission is to deliver a competitive and sustainable rate of return to shareholders by developing, acquiring, and exploring for oil and natural-gas resources vital to the world's health and welfare. Anadarko's asset portfolio is aimed at delivering long-term value to stakeholders by combining a large inventory of development opportunities in the U.S. onshore with high-potential worldwide offshore exploration and development activities.

Anadarko's asset portfolio includes U.S. onshore resource plays in the Rocky Mountains area, the southern United States, the Appalachian basin, and Alaska. The Company is also among the largest independent producers in the deepwater Gulf of Mexico, and has exploration and production activities worldwide, including activities in Mozambique, Algeria, Ghana, Brazil, Colombia, Côte d'Ivoire, Kenya, Liberia, New Zealand, and other countries.

Anadarko is committed to producing energy in a manner that protects the environment and public health. Anadarko's focus is to deliver resources to the world while upholding the Company's core values of integrity and trust, servant leadership, people and passion, commercial focus, and open communication in all business activities.

Anadarko's business segments are managed separately due to distinct operational differences and unique technology, distribution, and marketing requirements. The Company's three reporting segments are as follows:

**Oil and gas exploration and production**-This segment explores for and produces natural gas, oil, condensate, and natural gas liquids (NGLs), and plans for the development and operation of the Company's liquefied natural gas (LNG) project.

**Midstream**-This segment engages in gathering, processing, treating, and transporting Anadarko and third-party oil, natural-gas, and NGLs production. The Company owns and operates gathering, processing, treating, and transportation systems in the United States for natural gas, oil, and NGLs.

**Marketing**-This segment sells much of Anadarko's oil, natural-gas, and NGLs production, as well as third-party purchased volumes. The Company actively markets oil, natural gas, and NGLs in the United States; oil and NGLs internationally; and the anticipated LNG production from Mozambique.

Unless the context otherwise requires, the terms "Anadarko" or "Company" refer to Anadarko Petroleum Corporation and its consolidated subsidiaries. This Annual Report on Form 10-K and the documents incorporated herein by reference contain forward-looking statements based on expectations, estimates, and projections as of the date of this filing. These statements by their nature are subject to risks, uncertainties, and assumptions and are influenced by various factors. As a consequence, actual results may differ materially from those expressed in the forward-looking statements. See *Risk Factors* under Item 1A of this Form 10-K.

2

APC-01751754

Table of Contents
Index to Financial Statements

**Available Information** The Company's corporate headquarters is located at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, and its telephone number is (832) 636-1000. The Company files or furnishes Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, registration statements, or any amendments thereto, and other reports and filings with the Securities and Exchange Commission (SEC). Anadarko provides access free of charge to all of these SEC filings, as soon as reasonably practicable after filing or furnishing, by selecting SEC Filings on its website located at www.anadarko.com. The Company will also make available to any stockholder, without charge, printed copies of its Annual Report on Form 10-K as filed with the SEC. For copies of this report or any other filing, please contact Anadarko Petroleum Corporation, Investor Relations, P.O. Box 1330, Houston, Texas 77251-1330 or call (855) 820-6605, send an email to investor@anadarko.com, or complete an information request on the Company's website at www.anadarko.com, by selecting Investors/Shareholder Resources/Shareholder Services.

The public may read and copy any materials Anadarko files with the SEC at the SEC's Public Reading Room at 100 F Street, N.E., Washington, DC 20549. The public may obtain information on the operation of the Public Reading Room by calling the SEC at 1-800-SEC-0330. The SEC maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers, like Anadarko, that file electronically with the SEC.

## OIL AND GAS PROPERTIES AND ACTIVITIES

The map below illustrates the locations of Anadarko's oil and natural-gas exploration and production operations.



3

Table of Contents
Index to Financial Statements

**United States**

*Overview* Anadarko's U.S. operations include oil and natural-gas exploration and production onshore in the Lower 48 states, the deepwater Gulf of Mexico, and onshore Alaska. The Company's U.S. operations accounted for 89% of total sales volumes during 2014 and 92% of total proved reserves at year-end 2014.

*Rocky Mountains Region* Anadarko's Rocky Mountains Region (Rockies) properties include oil and natural-gas plays located in Colorado, Utah, and Wyoming where the Company operates approximately 14,500 wells and owns an interest in approximately 8,000 nonoperated wells. Anadarko operates fractured-carbonate/shale reservoirs, tight-gas assets, coalbed-methane (CBM) natural-gas assets, and enhanced oil recovery (EOR) projects within the region. The Company also has fee ownership of mineral rights under approximately eight million acres that pass through Colorado, Wyoming, and into Utah (known as the Land Grant). Management considers the Land Grant a significant competitive advantage for Anadarko as it enhances the Company's economic returns from production on Land Grant acreage, offers drilling opportunities for the Company without expiration, and allows the Company to capture royalty revenue from third-party activity on Land Grant acreage. The Company also believes its liquids-rich reservoirs, strong well performance, low development and operating costs, and large expandable midstream infrastructure each provide tangible benefits to the Company.

Activities in the Rockies primarily focus on expanding existing fields to increase production and adding proved reserves through horizontal drilling, infill drilling, and down-spacing operations. The Company focused its 2014 capital investments in areas that offer high liquids yields (liquids-rich areas), which resulted in significant oil production growth. In 2014, total-year Rockies sales volumes increased 10% over 2013, with a 45% or 49 thousand barrels of oil equivalent per day (MBOE/d) increase in liquids volumes. The Company drilled 569 wells and completed 487 wells in the Rockies during 2014. The Company plans to continue its drilling program in 2015, focusing on the Wattenberg field.



4

APC-01751756

Table of Contents
Index to Financial Statements

*Wattenberg* Anadarko operates approximately 5,800 vertical wells and 750 horizontal wells in the Wattenberg field. The field contains the Niobrara and Codell formations, which are naturally fractured formations that hold liquids and natural gas. During 2014, the Company's drilling program focused entirely on horizontal development, drilling 369 horizontal wells. Sales volumes in the Wattenberg field increased 55% compared to 2013, with year-over-year increases of 69% in oil volumes and 79% in total liquids volumes. Horizontal drilling results in the Wattenberg field continue to be strong, with economics that are enhanced by the Land Grant mineral interest, a consolidated core acreage position, and recent enhancements in infrastructure and takeaway capacity.

Major facility and takeaway expansions occurred in 2014. The Lancaster cryogenic plant and Front Range Pipeline (FRP) were commissioned in 2014. The Lancaster cryogenic plant resulted in a field-wide increase in NGLs recoveries and the FRP resulted in access to the premium Mt. Belvieu NGLs market. Gas processing capacity is expected to increase in mid-2015 with the addition of Lancaster II, which is a second 300 million cubic feet per day (MMcf/d) cryogenic processing facility currently under construction. The White Cliffs pipeline expansion was completed in the third quarter of 2014, providing additional oil transportation capacity for the region. Management believes that Anadarko is well-positioned with its oil and NGLs export capacity, which includes transport by pipeline, rail, and truck.

*Greater Natural Buttes* The Greater Natural Buttes area in eastern Utah is one of the Company's major tight-gas assets. The Company utilizes both refrigeration and cryogenic processing facilities in this area to extract NGLs from the natural-gas stream.

The Company operates approximately 2,800 wells in the Greater Natural Buttes area and drilled 133 wells in 2014. The Company operated the field at a reduced activity level for the majority of 2014 due to capital allocation to higher-margin projects.

*Powder River Deep* The Company drilled 10 horizontal wells in the Powder River basin during 2014 as part of a multi-objective horizontal exploration program targeting oil opportunities. The Company has seen encouraging results in the Niobrara and Turner formations. Anadarko controls over 350,000 acres of deep mineral rights within the Powder River basin.

*Coalbed Methane Properties* Anadarko operates approximately 2,300 CBM wells and owns an interest in approximately 2,500 nonoperated CBM wells in the Rockies, primarily located in the Powder River basin in Wyoming and the Helper and Clawson fields in Utah. Anadarko controls over 640,000 acres of shallow rights within the Powder River basin. CBM is natural gas that is generated and stored within coal seams. To produce CBM, water is extracted from the coal seam, resulting in reduced pressure and the release of natural gas, which flows to the wellhead. The Company operated the field at a reduced activity level in 2014 due to capital allocation to higher-margin projects.

*Salt Creek and Monell* During 2014, the Company continued the development of its Rockies EOR assets in the Salt Creek and Monell fields in Wyoming. The Company's EOR operations use carbon dioxide ($CO_2$) to stimulate oil production from mature reservoirs after primary and water-flood recovery methods have been completed. Significant gains in production were achieved in this area due to the Company's ongoing development programs, with oil production rising 10% in 2014. In 2015, the Company plans to continue the management of these fields to enhance $CO_2$ flooding operations.

In 2012, the Company entered into a carried-interest arrangement where a third party agreed to fund $400 million of development costs in exchange for a 23% interest in the Company's EOR development in the Salt Creek field in Wyoming. The funding commitment was completed in 2014.

*Laramie County, Wyoming* Anadarko holds ownership in more than 100,000 mineral-interest acres in this emerging liquids-rich play, targeting the Niobrara and Codell formations in the northern DJ Basin. In 2014, the Company participated in more than 70 nonoperated wells testing the Niobrara and Codell formations. Early results from wells drilled in 2014 are encouraging, as results from the 19 nonoperated wells that are currently producing remain strong with initial 30-day net production averaging approximately 1,000 barrels of oil equivalent per day (BOE/d).

5

APC-01751757

Table of Contents
Index to Financial Statements

*Greater Green River Basin* Anadarko operates over 1,400 wells in the Wamsutter and Moxa fields, which are primarily dry-gas assets. The Company also carries a nonoperated position in 2,600 wells between the two fields. Much of this producing area is in the Land Grant, which improves the economics of projects in the area.

In late 2013, Anadarko acquired additional working interests and became the operator in the Moxa field, increasing the Company's net production by approximately 6,500 BOE/d. In 2014, additional value was realized through reduction in the decline rates and decreasing operating costs.

In January 2014, Anadarko sold its interest in the Pinedale/Jonah assets in Wyoming for $581 million.

*Southern and Appalachia Region* Anadarko's Southern and Appalachia Region properties are primarily located in Texas, Pennsylvania, Louisiana, and Kansas. The region includes the Eagleford shale in South Texas, the Delaware basin in West Texas, the Marcellus shale in north-central Pennsylvania, and the Haynesville shale in East Texas and Louisiana. Operations in these areas are focused on finding and developing both natural gas and liquids from shales, tight sands, and fractured-reservoir plays.

During 2014, the Company continued to focus on liquids-rich opportunities across the region by expanding drilling activity in the emerging Wolfcamp shale play in the Delaware basin and other shale plays, while continuing its existing liquids-rich projects in the Eagleford shale, Delaware basin, and East Texas/North Louisiana plays. The Company has reduced costs and benefited from improved cycle-time efficiencies in both drilling and completion operations across all operating areas in the region.

In 2014, total-year sales volumes in the Southern and Appalachia Region increased 16% over 2013, with a 33% increase in liquids volumes. The Company drilled 589 operated horizontal wells and brought 730 wells online in 2014. In 2015, the Company expects to continue its horizontal drilling program, focusing on the Texas assets.



6

APC-01751758

Table of Contents
Index to Financial Statements

*Eagleford* The Eagleford shale development in South Texas consists of approximately 357,000 gross acres and over 1,100 producing wells. The Company drilled 393 wells, completed 388 wells, and brought 385 wells online generating 47% sales volume growth year over year. Anadarko entered 2014 with 10 drilling rigs and reduced the rig count to eight by the end of 2014 due to outstanding drilling performance. To facilitate additional completion activities, water infrastructure was expanded in 2014, increasing capacity by 75 thousand barrels per day (MBbls/d). The Company continues to test concepts for additional recovery across its acreage position and completed successful tests on two upper-Eagleford shale wells.

*Delaware Basin* Anadarko holds an interest in over 600,000 gross acres in the Delaware basin. Anadarko's 2014 drilling activity primarily targeted the liquids-rich Bone Spring formation, the Avalon shale, and the developing Wolfcamp shale play. In 2014, Anadarko drilled 97 operated wells and participated in 43 nonoperated wells. Significant infrastructure was added, which increased NGLs sales volumes by 82% over 2013. In addition, in November 2014, Western Gas Partners, LP (WES), a consolidated subsidiary of the Company, acquired Nuevo Midstream, LLC (Nuevo), which has gathering and processing assets located in the Delaware basin. The Company had one operated rig drilling in the Bone Spring formation, one operated rig drilling in the Avalon shale, and eight operated rigs drilling in the Wolfcamp shale at year-end 2014.

The successful Wolfcamp shale delineation program continues to deliver encouraging results across the majority of Anadarko's acreage position. Anadarko is testing multiple zones within the Wolfcamp shale and several development concepts including multi-well pads, extended laterals, and horizontal well spacing for increased efficiency. The Company has identified thousands of potential drilling locations in the Wolfcamp formations that are expected to provide substantial opportunity for Anadarko's continued activity in the basin.

*Eaglebine* Anadarko holds 156,000 gross acres in the Eaglebine shale in Southeast Texas, most of which is held by existing Austin Chalk production. In 2014, Anadarko continued to delineate and develop this acreage with a one-rig drilling program. In September 2014, the Company entered into a carried-interest arrangement requiring a third party to fund $442 million of Anadarko's capital costs in exchange for a 34% working interest in the Eaglebine development. Anadarko will remain the operator with an average post-transaction working interest of approximately 51%. This transaction allows the Company to develop this oil opportunity while further enhancing Anadarko's capital efficiency and flexibility. At December 31, 2014, $22 million of the total $442 million obligation had been funded.

*East Texas/North Louisiana* Anadarko holds 293,000 gross acres in East Texas/North Louisiana. Anadarko increased its capital program in the East Texas Carthage area in 2014, targeting a liquids-rich area in the Haynesville shale. In 2014, Anadarko operated six rigs and drilled 52 wells in the Haynesville and Cotton Valley formations. The Company increased sales volumes from the area by 10% year over year.

*Marcellus* The Company holds 654,000 gross acres in the Marcellus shale of the Appalachian basin. During the year, 24 operated horizontal wells were drilled using one rig. Anadarko also participated in drilling an additional 78 nonoperated horizontal wells in 2014. The Company's production in Marcellus continued to improve with sales volumes increasing 12% over 2013.

7

APC-01751759

Table of Contents
Index to Financial Statements

**Gulf of Mexico** In the Gulf of Mexico, Anadarko owns an average 61% working interest in 394 blocks. The Company operates seven active floating platforms and holds interests in 23 producing fields. During 2014, the Company advanced development of the Lucius and Heidelberg projects and continued an active deepwater development and appraisal program in the Gulf of Mexico as it continues to take advantage of its existing infrastructure to accelerate development activities at reduced costs.



The following includes the significant development, exploration, and appraisal activity in the Gulf of Mexico during 2014.

*Development*

*Lucius* The Company realized first production at the Anadarko-operated Lucius Spar in January 2015, bringing on three wells initially and ramping up production with an additional three wells expected to come online during the first quarter of 2015. The successful Lucius project was developed with production startup only three years from sanction and five years from discovery. The 80-MBbls/d spar resides in Keathley Canyon Block 875 with a water depth of 7,100 feet.

A carried-interest arrangement with a third party, entered into in 2012, provided funding for the substantial majority of Anadarko's development capital commitment through first production. Following the carried-interest arrangement and 2014 equity re-determination, the Company holds a 23.8% working interest in Lucius.

*Heidelberg* The Company continues to advance the Anadarko-operated Heidelberg development project, which was sanctioned during the second quarter of 2013. The construction of the 80-MBbls/d spar is progressing on schedule with anticipated start-up in 2016. At December 31, 2014, fabrication of the main topsides module was more than 70% complete and ahead of schedule.

In 2013, the Company entered into a carried-interest arrangement requiring a third party to fund $860 million of capital costs in exchange for a 12.75% working interest in the project. The carry obligation is expected to cover the substantial majority of the Company's expected future capital costs through first production. At December 31, 2014, $386 million of the $860 million obligation had been funded. Anadarko holds a 31.5% working interest in Heidelberg. Development drilling commenced in late 2014 on two development wells.

8

APC-01751760

Table of Contents
Index to Financial Statements

*Caesar/Tonga* At Caesar/Tonga (33.75% working interest), the Company successfully completed a fourth development well (GC 727#2) in the first quarter of 2014, and the well is producing 10 MBbls/d of oil. Anadarko is currently completing a fifth development well (GC 683#2), which is expected to come online during the first quarter of 2015.

*K2* At K2 (41.8% working interest), the GC 562 #5 infill well found 210 feet of oil pay in the Miocene, and the well is being sidetracked for a subsequent completion. The well is expected to come online in the second half of 2015.

*Constitution* At Constitution (100% working interest), the Company executed a successful platform drilling program in 2014, where the A1 well was sidetracked, completed, and brought online producing 3 MBbls/d of oil.

*Vito* In 2014, Anadarko sold its 18.67% working interest in the nonoperated Vito deepwater development, along with several surrounding exploration blocks, for $500 million.

*Exploration*

Three exploration wells were drilled in the Gulf of Mexico during 2014. The Deep Nansen exploration well (35% working interest) targeted Lower Tertiary-aged sediments in a large, four-way structure beneath Anadarko's Nansen field and found non-commercial quantities of hydrocarbons and the well was plugged and abandoned. The evidence of a working petroleum system is being incorporated into potential future activity on the surrounding leasehold. The Bimini exploration well (50% working interest) was drilled in Garden Banks close to existing infrastructure at the Anadarko-operated Power Play field and near the Conger field and Baldpate Platform. The well tested a subsalt Miocene prospect and was plugged and abandoned. The K2 development well was drilled deeper to test the Wilcox potential beneath the existing field in Green Canyon and did not find commercial quantities of hydrocarbons in the Wilcox objective. The K2 well will be sidetracked and completed in a field pay interval. Also, the Yeti exploration well (37.5% nonoperated working interest) was spud prior to year end. The well will test a Miocene sub-salt three-way closure in Walker Ridge.

*Appraisal*

*Shenandoah Basin* The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range. Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015.

An appraisal well at the Coronado discovery (35% working interest) reached total depth during the second quarter of 2014 and did not find the Lower Miocene objective and was plugged and abandoned.

During the third quarter of 2014, the first appraisal well of the Yucatan discovery (25% working interest) was drilled down-dip of the original discovery, and found approximately 57 gross feet of pay in Lower Tertiary oil-bearing sands. The Yucatan discovery is located approximately three miles south of the Shenandoah discovery.

*Alaska* Anadarko's nonoperated oil production and development activity in Alaska is concentrated on the North Slope. Infrastructure construction began in 2013 on the Alpine West satellite development, a 15-to-20-well extension of the Alpine field. Drilling at Alpine West is scheduled to commence in mid-2015 with production anticipated to come online in late 2015 or early 2016.

9

APC-01751761

Table of Contents
Index to Financial Statements

**International**

*Overview* Anadarko's international operations include oil, natural-gas, and NGLs production and development in Mozambique, Algeria, and Ghana. The Company also has exploration acreage in Brazil, Colombia, Côte d'Ivoire, Ghana, Kenya, Liberia, Mozambique, New Zealand, and other countries. International locations accounted for 11% of Anadarko's total sales volumes and 21% of sales revenues during 2014, and 8% of total proved reserves at year-end 2014. In 2015, the Company expects to focus its exploration and appraisal activity in East Africa, Côte d'Ivoire, and Colombia.



*Mozambique* Anadarko operates two blocks (one onshore and one offshore) totaling approximately 5.3 million gross acres at December 31, 2014. From a construction, finance, and marketing perspective, the Company is positioned to commence project execution and deliver first cargoes in the expected 2019 timeframe; however, the pace of this project is dependent upon securing necessary approvals from the government of Mozambique.

*Development* In February 2014, the Company sold a 10% working interest in Offshore Area 1 in Mozambique for $2.64 billion. Anadarko remains the operator of Offshore Area 1 with a working interest of 26.5%.

During 2014, the Company obtained reserves certification from a third party indicating sufficient volumes to support an initial LNG development. The Environmental Impact Assessment was approved by the government of Mozambique. The Company completed front-end engineering and design (FEED) for the onshore liquefaction facilities and the offshore gathering infrastructure and is in the process of selecting the contractor groups for construction. Anadarko and its partners reached non-binding Heads of Agreements for long-term LNG sales to buyers in Asian markets covering in excess of eight million metric tonnes per annum. In December 2014, the Mozambique government published a Decree Law that is sufficient to continue progressing project finance, marketing, and construction and operation of an LNG project. This legislation marks a critical step toward establishing a project-wide legal and contractual framework that delivers a level of fiscal stability enabling continued equity investments by the Company and potential access to significant limited-recourse project finance capital.

10

APC-01751762

Table of Contents
Index to Financial Statements

*Exploration* In the Offshore Area 1, the Tubarão Tigre-1 exploration well was drilled approximately 37 miles south of the Orca-1 discovery well and encountered more than 92 feet of net gas pay in Paleocene sands. The Ouriço do Mar exploration well was drilled 22.5 miles south of the Orca-1 discovery well and tested the potential down-dip extent of the Paleocene reservoirs found in the Orca and Tubarão Tigre discoveries. The well was plugged and abandoned during the third quarter of 2014. Appraisal of the Orca discovery continued with the drilling of three appraisal wells. During the first quarter of 2014, the Orca-2 well encountered 151 feet of Paleocene reservoir sand with the top 26 feet being charged, establishing the gas/water contact for the discovery. The rig moved to the Orca-3 location and encountered 102 net feet of natural-gas pay in the Paleocene. The Orca-4 well reached total depth during the fourth quarter of 2014 encountering natural-gas pay in two reservoirs. At the end of 2014, the rig was located at Tubarão Tigre-2 drilling the first appraisal well associated with the Tubarão Tigre discovery. Data from these wells will be used to further delineate the size of the resource and determine future appraisal activity for the Orca and Tubarão Tigre discoveries.

In the Onshore Rovuma (35.7% working interest), the Anadarko-operated Tembo-1 well completed drilling at the end of the fourth quarter in 2014. The well encountered gas and condensate in one of the Cretaceous reservoirs and post-drill evaluations are underway to determine if additional exploration is warranted within the prospect area. A rig has been mobilized to the second well in the program, Kifaru, which will test Miocene, Oligocene, and Paleocene gas targets near the future LNG facility site.

*Algeria* Anadarko is engaged in production and development operations in Algeria's Sahara Desert in Blocks 404 and 208, which are governed by a Production Sharing Agreement between Anadarko, two other parties, and Sonatrach, the national oil and gas company of Algeria. The Company is responsible for 24.5% of the development and production costs for these blocks. The Company produces oil through the Hassi Berkine South and Ourhoud central processing facilities (CPF) in Block 404 and oil, condensate, and NGLs through the El Merk CPF in Block 208. Gross production through these facilities averaged more than 383 MBbls/d in 2014, and a quarterly net production record of approximately 75 MBOE/d was achieved as all of the fields at the El Merk CPF were increased to full oil production rates. The Company drilled nine development wells in 2014.

*Ghana* Anadarko's production and development activities in Ghana are located offshore in the West Cape Three Points Block and the Deepwater Tano Block.

The Jubilee field (27% nonoperated unit interest), which spans both the West Cape Three Points Block and the Deepwater Tano Block, averaged gross production of 102 MBbls/d of oil in 2014. In the fourth quarter of 2014, a pipeline tie-in was completed and natural-gas exports commenced from the Jubilee field to an onshore gas processing plant. The natural-gas exports are being delivered to satisfy a commitment established in conjunction with the Jubilee development plan and are expected to allow increases in future oil production rates. The Company and its partners are evaluating options to further expand the oil throughput capacity of the floating production, storage, and offloading vessel (FPSO) and expect to submit a full-field development plan for the Jubilee field to the government of Ghana in 2015.

The Jubilee J-24 development well was drilled deeper to evaluate the Mahogany sands below the Jubilee reservoirs. Additional appraisal work was completed in 2014 in the Mahogany and Akasa fields and the data is under evaluation.

In 2013, development commenced on the Tweneboa/Enyenra/Ntomme (TEN) project (19% nonoperated working interest). The project will use an 80-MBbls/d-capacity FPSO for production from subsea wells. Significant progress was made during 2014, including engineering design completion, the successful dry-docking of the FPSO, and drilling of the first nine wells. The project was approximately 50% complete at year-end 2014 and remains on budget and on schedule for first production in 2016.

*China* In August 2014, the Company sold its Chinese subsidiary for $1.075 billion.

11

APC-01751763

Table of Contents
Index to Financial Statements

***Brazil*** Anadarko holds exploration interests in approximately 300,000 gross acres in two offshore blocks located in the Campos basin. At the Wahoo discovery, the Company is evaluating commercialization options by performing pre-FEED and FEED studies.

***Colombia*** During 2014, Anadarko was the high bidder on the COL1, COL 6, and COL 7 blocks. At December 31, 2014, Anadarko controls the exclusive rights to explore or conduct technical evaluation activities on nine blocks, totaling 16 million acres. The COL 1, COL 2, COL 6, and COL 7 blocks are operated at 100% working interest and the remaining blocks are operated at a 50% working interest.

Two initial prospects have been selected for the 2015 exploration drilling program. The Calasu prospect is a large four-way structure on the north end of the Fuerte Norte block. It has multiple targets and success would reduce the risk of several adjacent structures on the block. The Kronos prospect is located in the Fuerte Sur block and will test a large structure associated with the frontal area of a large thrust complex. As with Calasu, success would reduce the risk of multiple prospects. The two-well program commenced in early 2015.

***Côte d'Ivoire*** Anadarko owns an operated working interest in five offshore blocks totaling approximately 1.3 million acres, including CI-515 and CI-516 each with a 45% working interest, CI-103 with a 65% working interest, and CI-528 and CI-529 each with a 90% working interest.

The Company continued appraisal of the Cretaceous Paon discovery in Block CI-103, where the discovery well encountered 100 feet of net pay. The Paon-3AR was drilled 3.7 miles down-dip to the discovery well and encountered more than 94 feet of pay. The well established an oil/water contact and appears to be in communication with the Paon-1X discovery. As a result of the success, the drilling of the Paon-4A was accelerated. The well, located six miles east of the Paon-3AR, penetrated over 37 feet of pay in the target section and defined the eastern extent of the reservoir. During 2014, Anadarko became operator of the block and farmed down a portion of the working interest for a carry on the appraisal activities. Based on the successful drilling program to date, the partnership and the government are currently discussing additional appraisal drilling activity for 2015, which would include a drillstem test.

The Morue prospect in Block CI-516 was drilled and encountered a small accumulation of oil in the well-developed sands in the targeted interval, and was plugged and abandoned as non-commercial.

The Saumon prospect was drilled in Block CI-515 during 2014. The well reached total depth and did not find hydrocarbons. The well was plugged and abandoned.

***Kenya*** Anadarko owns and operates a 45% working interest in five offshore deepwater blocks, encompassing approximately 5.6 million gross acres. An exploration well is currently planned to test a large four-way structure at the Mlima prospect in Block L-11B during 2015.

***Liberia*** Two exploration wells were drilled in Block LB-10 (50% working interest) during 2014. The Anadarko-operated Iroko and Timbo wells both encountered non-commercial quantities of oil in their primary targets and were plugged and abandoned. Post-well evaluation is underway to determine the remaining prospectivity of the block. Anadarko completed a farm down prior to drilling, which covered a majority of the drilling costs for these two wells.

***New Zealand*** Anadarko controls the exclusive rights to explore or conduct technical evaluation activities on four blocks totaling 42 million acres, of which 6.1 million acres are owned under exploration licenses. Anadarko operates a 45% working interest in the Canterbury basin block and a 100% working interest in two Pegasus basin blocks. In the 36 million acre New Caledonia basin block, Anadarko controls a 25% nonoperated working interest. The Caravel prospect reached its total-depth objective in the Canterbury basin block and was plugged and abandoned, having encountered natural gas shows and high-quality reservoir in the primary objective. A seismic acquisition is planned during 2015 on the block.

***Other*** Anadarko also has exploration projects in other overseas, new-venture areas including Tunisia and South Africa.

12

APC-01751764

Table of Contents
Index to Financial Statements

**Proved Reserves**

Estimates of proved reserves volumes owned at year end, net of third-party royalty interests, are presented in billions of cubic feet (Bcf), at a pressure base of 14.73 pounds per square inch for natural gas and in millions of barrels (MMBbls) for oil, condensate, and NGLs. Total volumes are presented in millions of barrels of oil equivalent (MMBOE). For this computation, one barrel is the equivalent of 6,000 cubic feet of natural gas. Shrinkage associated with NGLs has been deducted from the natural-gas reserves volumes. Proved reserves are estimated based on the average beginning-of-month prices during the 12-month period for the respective year.

Disclosures by geographic area include the United States and International. The International geographic area consists of proved reserves located in Algeria and Ghana, which by country and in total represents less than 15% of the Company's total proved reserves. The Company sold its Chinese subsidiary during 2014.

### *Summary of Proved Reserves*

|  | Natural Gas (Bcf) | Oil and Condensate (MMBbls) | NGLs (MMBbls) | Total (MMBOE) |
|---|---|---|---|---|
| **December 31, 2014** |  |  |  |  |
| Proved |  |  |  |  |
| Developed |  |  |  |  |
| United States | 6,635 | 352 | 304 | 1,762 |
| International | 27 | 190 | 13 | 207 |
| Undeveloped |  |  |  |  |
| United States | 2,033 | 352 | 162 | 853 |
| International | 4 | 35 | - | 36 |
| Total proved | 8,699 | 929 | 479 | 2,858 |
|  |  |  |  |  |
| **December 31, 2013** |  |  |  |  |
| Proved |  |  |  |  |
| Developed |  |  |  |  |
| United States | 7,120 | 347 | 268 | 1,801 |
| International | - | 202 | - | 202 |
| Undeveloped |  |  |  |  |
| United States | 2,085 | 245 | 127 | 720 |
| International | - | 57 | 12 | 69 |
| Total proved | 9,205 | 851 | 407 | 2,792 |
|  |  |  |  |  |
| **December 31, 2012** |  |  |  |  |
| Proved |  |  |  |  |
| Developed |  |  |  |  |
| United States | 6,445 | 318 | 283 | 1,675 |
| International | - | 208 | - | 208 |
| Undeveloped |  |  |  |  |
| United States | 1,884 | 193 | 110 | 617 |
| International | - | 48 | 12 | 60 |
| Total proved | 8,329 | 767 | 405 | 2,560 |

The Company's year-end 2014 proved reserves product mix was comparable to the last two years with 51% natural gas, 33% oil and condensate, and 16% NGLs.

13

APC-01751765

Table of Contents
Index to Financial Statements

Anadarko is focused on growth and profitability, and reserves replacement is a key to growth. Future profitability partially depends on commodity prices and the cost of finding and developing oil and gas reserves. Reserves growth can be achieved through successful exploration and development drilling, improved recovery, or acquisition of producing properties.

| MMBOE | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Proved Reserves** | | | |
| January 1 | 2,792 | 2,560 | 2,539 |
| Reserves additions and revisions | | | |
| Discoveries and extensions | 63 | 145 | 82 |
| Infill-drilling additions (1) | 577 | 410 | 383 |
| Drilling-related reserves additions and revisions | 640 | 555 | 465 |
| Other non-price-related revisions (1) | (137) | (40) | (31) |
| Net organic reserves additions | 503 | 515 | 434 |
| Acquisition of proved reserves in place | - | 36 | 4 |
| Price-related revisions (1) | (1) | (23) | (68) |
| Total reserves additions and revisions | 502 | 528 | 370 |
| Sales in place | (124) | (12) | (81) |
| Production | (312) | (284) | (268) |
| December 31 | 2,858 | 2,792 | 2,560 |
| **Proved Developed Reserves** | | | |
| January 1 | 2,003 | 1,883 | 1,811 |
| December 31 | 1,969 | 2,003 | 1,883 |

(1) Combined and reported as revisions of prior estimates in the Company's *Supplemental Information* under Item 8 of this Form 10-K. Reserves bookings related to infill drilling additions are treated as positive revisions. Other non-price-related revisions in 2014 are driven by a reduction of 116 MMBOE in the Wattenberg area primarily associated with the optimization of horizontal drilling locations and the discontinuation of vertical well workover plans.

The Company's estimates of proved developed reserves, proved undeveloped reserves (PUDs), and total proved reserves at December 31, 2014, 2013, and 2012, and changes in proved reserves during the last three years are presented in the *Supplemental Information on Oil and Gas Exploration and Production Activities (Supplemental Information)* under Item 8 of this Form 10-K. Also presented in the *Supplemental Information* are the Company's estimates of future net cash flows and discounted future net cash flows from proved reserves. See *Critical Accounting Estimates* under Item 7 of this Form 10-K for additional information on the Company's proved reserves.

The Company has not yet filed information with a federal authority or agency with respect to its estimated total proved reserves at December 31, 2014. Annually, Anadarko reports gross proved reserves for U.S.-operated properties to the U.S. Department of Energy. These reported reserves are derived from the same database used to estimate and report proved reserves in this Form 10-K.

14

APC-01751766

Table of Contents
Index to Financial Statements

**Changes in PUDs** Changes to PUDs occurring during 2014 are summarized in the table below. Revisions of prior estimates reflect Anadarko's ongoing evaluation of its asset portfolio and include updates to prior PUDs, the addition of new PUDs associated with current development plans, the transfer of PUDs to unproved categories due to development plan changes, and the impact of changes in economic conditions, including changes in commodity prices. The Company's year-end development plans and associated PUDs are consistent with SEC guidelines for PUDs development within five years unless specific circumstances warrant a longer development time horizon.

| *MMBOE* | |
|---|---:|
| PUDs at January 1, 2014 | **789** |
| Revisions of prior estimates | **333** |
| Extensions, discoveries, and other additions | **32** |
| Conversion to developed | **(210)** |
| Sales | **(55)** |
| PUDs at December 31, 2014 | **889** |

**Revisions** In 2014, PUD revisions of 333 MMBOE were primarily related to successful infill drilling in large onshore areas such as Wattenberg in the Rockies and the Eagleford shale in the Southern and Appalachia Region, partially offset by decreases primarily due to development plan updates.

**Extensions, Discoveries, and Other Additions** During 2014, Anadarko added 32 MMBOE of PUDs through extensions, discoveries, and other additions, primarily as a result of successful drilling in the Marcellus and Wolfcamp shale plays in the Southern and Appalachia Region.

**Conversions** In 2014, the Company converted 210 MMBOE, or 27% of total year-end 2013 PUDs, to developed status. Approximately 73% of PUD conversions occurred in U.S. onshore assets, 16% in international assets, and the remaining 11% in Gulf of Mexico assets.

Development activity in the U.S. onshore assets resulted in the conversion of 80 MMBOE in the Southern and Appalachia Region and 72 MMBOE in the Rockies. Ongoing development activity in the Company's Algerian assets resulted in the conversion of 34 MMBOE in 2014. The remaining PUD conversions were associated with development projects in various Gulf of Mexico fields.

Anadarko spent $1.6 billion to develop PUDs in 2014, of which approximately 74% related to U.S. onshore assets, 13% related to Gulf of Mexico assets, and 13% related to international assets.

In 2013, the Company converted 183 MMBOE, or 27% of the total year-end 2012 PUDs, to developed status. Approximately 85% of PUD conversions occurred in U.S. onshore assets, 11% in international assets, and the remaining 4% in Gulf of Mexico assets. Anadarko spent $1.0 billion on PUD development in 2013, of which approximately 70% related to domestic development programs in the Rockies and the Southern and Appalachia Regions, 25% related to development of international projects, and the remaining 5% related to Alaska and Gulf of Mexico development projects.

15

APC-01751767

Table of Contents
Index to Financial Statements

***Development Plans*** The Company annually reviews all PUDs to ensure an appropriate plan for development exists. Typically, U.S. onshore PUDs are converted to developed reserves within five years of the initial proved reserves booking, but projects such as EOR, arctic development, deepwater development, and international programs may take longer. All of the Company's U.S. onshore PUDs at December 31, 2014, were scheduled to be developed within five years, with the exception of the Salt Creek EOR project, the annual development of which is limited by $CO_2$ supply.

At December 31, 2014, the Company had 39 MMBOE of pre-2010 PUDs that remained undeveloped. Approximately 51% of these PUDs are associated with Gulf of Mexico opportunities where longer development times are a result of delays associated with operating in a deepwater environment, including delays associated with the development and adoption of enhanced safety procedures and other regulatory changes following the Deepwater Horizon event.

Another 33% of the Company's pre-2010 PUDs are associated with the Salt Creek EOR single-development project located in the Rockies. Since 2003, Anadarko has invested an average of $90 million per year to develop the Salt Creek EOR project and will continue similar spending levels in the future.

The remaining pre-2010 PUDs are associated with the El Merk development project and are being developed according to an Algerian government-approved plan. Anadarko and its partners achieved initial oil production in 2013 and the El Merk facility reached maximum allowable oil production rates in 2014 when all the fields were brought online and the facility became fully operational.

***Technologies Used in Proved Reserves Estimation*** The Company's 2014 proved reserves additions were based on estimates generated through the integration of relevant geological, engineering, and production data, using technologies that have been demonstrated in the field to yield repeatable and consistent results as defined in the SEC regulations. Data used in these integrated assessments included information obtained directly from the subsurface through wellbores, such as well logs, reservoir core samples, fluid samples, static and dynamic pressure information, production test data, and surveillance and performance information. The data used also included subsurface information obtained through indirect measurements such as seismic data. The tools used to interpret the data included proprietary and commercially available seismic processing software and commercially available reservoir modeling and simulation software. Reservoir parameters from analogous reservoirs were used to increase the quality of and confidence in the reserves estimates when available. The method or combination of methods used to estimate the reserves of each reservoir was based on the unique circumstances of each reservoir and the dataset available at the time of the estimate.

***Internal Controls over Reserves Estimation*** Anadarko's estimates of proved reserves and associated future net cash flows were made solely by the Company's engineers and are the responsibility of management. The Company requires that reserves estimates be made by qualified reserves estimators (QREs), as defined by the Society of Petroleum Engineers' standards. The QREs are assigned to specific assets within the Company's regions. The QREs interact with engineering, land, and geoscience personnel to obtain the necessary data for projecting future production, net cash flows, and ultimate recoverable reserves. Management within each region approves the QREs' reserves estimates. All QREs receive ongoing education on the fundamentals of SEC definitions and reserves reporting through the Company's reserves manual and internal training programs administered by the Corporate Reserves Group (CRG).

The CRG ensures confidence in the Company's reserves estimates by maintaining internal policies for estimating and recording reserves in compliance with applicable SEC definitions and guidance. Compliance with the SEC reserves guidelines is the primary responsibility of Anadarko's CRG.

The CRG is managed through the Company's finance department, which is separate from its operating regions, and is responsible for overseeing internal reserves reviews and approving the Company's reserves estimates. The Director-Reserves Administration and the Corporate Reserves Manager manage the CRG and report to the VP-Corporate Planning. The VP-Corporate Planning reports to the Company's Executive Vice President, Finance and Chief Financial Officer, who in turn reports to the Chairman, President, and Chief Executive Officer. The Governance and Risk Committee of the Company's Board of Directors meets with management, members of the CRG, and the Company's independent petroleum consultants, Miller and Lents, Ltd. (M&L), to discuss the results of procedures and methods reviews as discussed below, as well as other matters and policies related to reserves.

16

APC-01751768

Table of Contents
Index to Financial Statements

   The Company's principal engineer, who is primarily responsible for overseeing the preparation of proved reserves estimates, has over 28 years of experience in the oil and gas industry, including over 14 years as either a reserves estimator or manager. His further professional qualifications include a degree in petroleum engineering, extensive internal and external reserves training, and asset evaluation and management. The principal engineer is a member of the Society of Petroleum Evaluation Engineers and the Society of Petroleum Engineers, where he has been a member for over 28 years. In addition, he is an active participant in industry reserves seminars and professional industry groups.

*Third-Party Procedures and Methods Reviews* M&L reviewed the procedures and methods used by Anadarko's staff in preparing the Company's estimates of proved reserves and future net cash flows at December 31, 2014. The purpose of the review was to determine if the procedures and methods used by Anadarko to estimate its proved reserves are effective and in accordance with the definitions contained in SEC regulations. The procedures and methods reviews by M&L were limited reviews of Anadarko's procedures and methods and do not constitute a complete review, audit, independent estimate, or confirmation of the reasonableness of Anadarko's estimates of proved reserves and future net cash flows.

   The reviews covered 16 fields that included major assets in the United States and Africa, and encompassed approximately 88% of the Company's estimates of proved reserves and associated future net cash flows at December 31, 2014. In each review, Anadarko's technical staff presented M&L with an overview of the data, methods, and assumptions used in estimating its reserves. The data presented included pertinent seismic information, geologic maps, well logs, production tests, material balance calculations, reservoir simulation models, well performance data, operating procedures, and relevant economic criteria.

   Management's intent in retaining M&L to review its procedures and methods is to provide objective third-party input on the Company's procedures and methods and to gather industry information applicable to reserves estimation and reporting processes.

17

APC-01751769

Table of Contents
Index to Financial Statements

**Sales Volumes, Prices, and Production Costs**

The Company's sales volumes were 308 MMBOE for 2014, 285 MMBOE for 2013, and 268 MMBOE for 2012. Production costs are costs to operate and maintain the Company's wells, related equipment, and supporting facilities, including the cost of labor, well service and repair, location maintenance, power and fuel, gathering, processing, transportation, other taxes, and production-related general and administrative costs. Additional information on volumes, prices, and production costs is contained in *Financial Results* under Item 7 of this Form 10-K. Additional detail regarding production costs is contained in the *Supplemental Information* under Item 8 of this Form 10-K. Information on major customers is contained in *Note 20-Segment Information* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K. The following provides the Company's annual sales volumes, average sales prices, and average production costs per BOE for each of the last three years:

| | Sales Volumes | | | | Average Sales Prices [1] | | | Average |
| | Natural Gas (Bcf) | Oil and Condensate (MMBbls) | NGLs (MMBbls) | Barrels of Oil Equivalent (MMBOE) | Natural Gas (Per Mcf) | Oil and Condensate (Per Bbl) | NGLs (Per Bbl) | Production Costs [2] (Per BOE) |
|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | |
| United States | | | | | | | | |
| Greater Natural Buttes | 154 | 1 | 4 | 31 | $ 3.93 | $ 81.74 | $ 39.16 | $ 10.30 |
| Wattenberg | 125 | 27 | 13 | 62 | 4.19 | 87.76 | 36.46 | 8.00 |
| Other United States | 666 | 46 | 26 | 182 | 4.08 | 88.29 | 34.29 | 9.28 |
| Total United States | 945 | 74 | 43 | 275 | 4.07 | 87.99 | 35.48 | 9.11 |
| International | - | 32 | 1 | 33 | - | 99.79 | 56.16 | 8.22 |
| Total | 945 | 106 | 44 | 308 | 4.07 | 91.58 | 36.01 | 9.01 |
| **2013** | | | | | | | | |
| United States | | | | | | | | |
| Greater Natural Buttes | 168 | 1 | 4 | 33 | $ 3.12 | $ 87.46 | $ 41.79 | $ 9.59 |
| Wattenberg | 102 | 16 | 6 | 40 | 3.75 | 94.27 | 41.75 | 8.55 |
| Other United States | 698 | 41 | 23 | 179 | 3.56 | 98.38 | 36.14 | 8.72 |
| Total United States | 968 | 58 | 33 | 252 | 3.50 | 97.02 | 37.97 | 8.81 |
| International | - | 33 | - | 33 | - | 109.15 | - | 9.96 |
| Total | 968 | 91 | 33 | 285 | 3.50 | 101.41 | 37.97 | 8.94 |
| **2012** | | | | | | | | |
| United States | | | | | | | | |
| Greater Natural Buttes | 163 | 1 | 5 | 33 | $ 2.26 | $ 81.34 | $ 40.43 | $ 8.75 |
| Wattenberg | 95 | 12 | 5 | 33 | 3.00 | 92.16 | 40.72 | 8.05 |
| Other United States | 655 | 42 | 20 | 171 | 2.73 | 99.36 | 40.37 | 8.76 |
| Total United States | 913 | 55 | 30 | 237 | 2.68 | 97.46 | 40.44 | 8.66 |
| International | - | 31 | - | 31 | - | 111.11 | - | 10.89 |
| Total | 913 | 86 | 30 | 268 | 2.68 | 102.35 | 40.44 | 8.92 |

Mcf-thousand cubic feet
Bbl-barrel
[1] Excludes the impact of commodity derivatives.
[2] Excludes ad valorem and severance taxes.

APC-01751770

Table of Contents
Index to Financial Statements

**Delivery Commitments**

The Company sells oil and natural gas under a variety of contractual agreements, some of which specify the delivery of fixed and determinable quantities. At December 31, 2014, Anadarko was contractually committed to deliver approximately 874 Bcf of natural gas to various customers in the United States through 2031. These contracts have various expiration dates with approximately 45% of the Company's current commitment to be delivered in 2015, and 70% by 2019. At December 31, 2014, Anadarko also was contractually committed to deliver approximately 9 MMBbls of oil to ports in Algeria and Ghana through 2015. The Company expects to fulfill these delivery commitments with existing proved developed and proved undeveloped reserves.

**Properties and Leases**

The following shows the developed lease, undeveloped lease, and fee mineral acres in which Anadarko held interests at December 31, 2014:

| thousands of acres | Developed Lease | | Undeveloped Lease | | Fee Mineral | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
| United States | | | | | | | | |
| Onshore | 5,069 | 3,314 | 5,203 | 2,140 | 10,313 | 8,472 | 20,585 | 13,926 |
| Offshore | 293 | 139 | 2,079 | 1,401 | - | - | 2,372 | 1,540 |
| Total United States | 5,362 | 3,453 | 7,282 | 3,541 | 10,313 | 8,472 | 22,957 | 15,466 |
| International | 499 | 113 | 56,725 | 39,328 | - | - | 57,224 | 39,441 |
| Total | 5,861 | 3,566 | 64,007 | 42,869 | 10,313 | 8,472 | 80,181 | 54,907 |

At December 31, 2014, the Company had approximately 26 million net undeveloped lease acres scheduled to expire by December 31, 2015, if the Company does not establish production or take any other action to extend the terms. The Company plans to continue the terms of many of these licenses and concession areas through operational or administrative actions and does not expect a significant portion of the Company's net acreage position to expire before such actions occur.

**Drilling Program**

The Company's 2014 drilling program focused on proven and emerging oil and natural-gas basins in the United States (onshore and deepwater Gulf of Mexico) and various international locations. Exploration activity in 2014 consisted of 88 gross completed wells, which included 71 U.S. onshore wells, five Gulf of Mexico wells, and 12 international wells. Development activity in 2014 consisted of 1,268 gross completed wells, which included 1,264 U.S. onshore wells and four Gulf of Mexico wells.

19

APC-01751771

Table of Contents
Index to Financial Statements

**Drilling Statistics**

The following shows the number of oil and gas wells that completed drilling in each of the last three years:

| | Net Exploratory | | | Net Development | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Productive | Dry Holes | Total | Productive | Dry Holes | Total | Total |
| **2014** | | | | | | | |
| United States | 35.6 | 1.6 | 37.2 | 811.4 | 6.0 | 817.4 | 854.6 |
| International | 0.9 | 4.5 | 5.4 | - | - | - | 5.4 |
| Total | 36.5 | 6.1 | 42.6 | 811.4 | 6.0 | 817.4 | 860.0 |
| **2013** | | | | | | | |
| United States | 62.9 | 1.4 | 64.3 | 879.3 | 3.3 | 882.6 | 946.9 |
| International | 0.2 | 3.5 | 3.7 | 5.4 | - | 5.4 | 9.1 |
| Total | 63.1 | 4.9 | 68.0 | 884.7 | 3.3 | 888.0 | 956.0 |
| **2012** | | | | | | | |
| United States | 79.5 | 1.0 | 80.5 | 923.7 | 11.3 | 935.0 | 1,015.5 |
| International | 0.5 | 3.0 | 3.5 | 2.1 | - | 2.1 | 5.6 |
| Total | 80.0 | 4.0 | 84.0 | 925.8 | 11.3 | 937.1 | 1,021.1 |

The following shows the number of wells in the process of drilling or in active completion stages and the number of wells suspended or waiting on completion at December 31, 2014:

| | Wells in the process of drilling or in active completion | | Wells suspended or waiting on completion [1] | |
| --- | --- | --- | --- | --- |
| | Exploration | Development | Exploration | Development |
| **United States** | | | | |
| Gross | 7 | 186 | 60 | 861 |
| Net | 3.8 | 118.6 | 28.2 | 557.9 |
| **International** | | | | |
| Gross | 2 | - | 57 | 19 |
| Net | 0.9 | - | 17.8 | 4.2 |
| **Total** | | | | |
| Gross | 9 | 186 | 117 | 880 |
| Net | 4.7 | 118.6 | 46.0 | 562.1 |

[1] Wells suspended or waiting on completion include exploration and development wells where drilling has occurred, but the wells are awaiting the completion of hydraulic fracturing or other completion activities or the resumption of drilling in the future.

20

APC-01751772

Table of Contents
Index to Financial Statements

**Productive Wells**

At December 31, 2014, the Company's ownership interest in productive wells was as follows:

| | Oil Wells [1] | Gas Wells [1] |
|---|---|---|
| **United States** | | |
| Gross | 4,611 | 28,200 |
| Net | 3,157.9 | 19,271.8 |
| **International** | | |
| Gross | 201 | 4 |
| Net | 36.1 | 1.0 |
| **Total** | | |
| Gross | 4,812 | 28,204 |
| Net | 3,194.0 | 19,272.8 |

[1] Includes wells containing multiple completions as follows:

| | | |
|---|---|---|
| Gross | 245 | 2,862 |
| Net | 216.8 | 2,401.4 |

## MIDSTREAM PROPERTIES AND ACTIVITIES

Anadarko invests in and operates midstream (gathering, processing, treating, and transportation) assets to complement its operations in regions where the Company has oil and natural-gas production. Through ownership and operation of these facilities, the Company improves its ability to manage costs, controls the timing of bringing on new production, and enhances the value received for gathering, processing, treating, and transporting the Company's production. Anadarko's midstream business also provides services to third-party customers, including major and independent producers. Anadarko generates revenues from its midstream activities through a variety of contract structures, including fixed-fee, percent-of-proceeds, and keep-whole agreements. Anadarko's midstream activities include WES, which is a publicly traded limited partnership formed by Anadarko to own, operate, acquire, and develop midstream assets. WES's general partner interest is owned by Western Gas Equity Partners, LP (WGP), a publicly traded consolidated subsidiary formed to own substantially all of the partnership interests in WES previously owned by Anadarko. At December 31, 2014, Anadarko's ownership interest in WGP consisted of an 88.3% limited partner interest and the entire non-economic general partner interest. At December 31, 2014, WGP's ownership interest in WES consisted of a 34.9% limited partner interest, the entire 1.8% general partner interest, and all of the WES incentive distribution rights. At December 31, 2014, Anadarko also owned an 8.3% limited partner interest in WES through other subsidiaries.

At the end of 2014, Anadarko had 41 gathering systems and 38 processing and treating plants located throughout major onshore producing basins in Wyoming, Colorado, Utah, New Mexico, Kansas, Oklahoma, Pennsylvania, and Texas. In 2014, the Company's midstream activity was concentrated in liquids-rich growth areas such as Wattenberg, Greater Natural Buttes, the Delaware basin, the Eagleford shale, and East Texas/North Louisiana plays, as well as in the Marcellus shale dry-gas play. In 2015, the Company plans to continue midstream investments in these core areas.

*Wattenberg* The Company is constructing a second 300-MMcf/d train at its Lancaster cryogenic processing plant, with completion expected in the second quarter of 2015. The plant will support the increasing production from horizontal drilling in the Niobrara development, helping to relieve processing constraints and improve recoveries of NGLs in the basin. Three new compressor stations are scheduled to come online in the first quarter of 2015 with a total capacity of 120 MMcf/d. In addition, the Company is constructing a Central Oil Stabilization Facility (COSF) with an expected completion date of mid-year 2015. The COSF will stabilize oil in a centralized location and will reduce equipment and installation cost at each well pad. Initial planned throughput for the facility is 125 MBbls/d.

21

APC-01751773

Table of Contents
Index to Financial Statements

The Company participates in two long-haul NGL pipeline joint ventures, FRP and Texas Express Pipeline (TEP), which provide access to the Gulf Coast NGLs market. The FRP, which is connected to the Company's Lancaster processing facility, was placed in service in the first quarter of 2014. The FRP extends 435 miles, providing 150 MBbls/d (expandable to 230 MBbls/d) of NGLs takeaway capacity from Weld County, Colorado to Skellytown, Texas. In Skellytown, the FRP connects to other pipelines including the TEP. The TEP extends 593 miles providing 280 MBbls/d (expandable to 400 MBbls/d) of NGLs takeaway capacity to NGLs fractionation and storage facilities in Mont Belvieu, Texas. The Company has ownership interests of 33% in the FRP, 20% in the TEP, and 25% in two NGLs fractionators at Mont Belvieu.

In July 2014, construction of the second pipeline for the White Cliffs Pipeline system was completed and placed in service. This 526-mile dual pipeline system now provides 150 MBbls/d of oil takeaway capacity from Platteville, Colorado to Cushing, Oklahoma. The Company and its joint-venture partners are currently expanding the existing pipeline system to over 200 MBbls/d. The expansion project is scheduled to be completed in mid-2015.

*Greater Natural Buttes* Chipeta's total processing capacity (cryogenic and refrigeration) is approximately one billion cubic feet per day with cryogenic processing capacity exceeding 600 MMcf/d. Chipeta's third-party pipeline interconnect has added over 100 MMcf/d of natural-gas supply to the plant. Optimization projects, including several pipeline-freeze mitigation projects in the gathering system, have continued to improve the Company's reliability and efficiency.

*Wyoming* During the second half of 2014, the Company connected five third-party well locations to the Patrick Draw plant. Initial deliveries are expected in the first quarter of 2015. The Company also constructed a 10-mile pipeline in the Barricade unit to gather and deliver the incremental third-party gas to the Company's Patrick Draw plant for processing. Also, gathering connections and expansions in 2014 increased throughput of the Hilight plant by about 40%.

*Delaware Basin* In 2014, the Company expanded its midstream infrastructure for Bone Spring, Wolfcamp, and Avalon production in the Delaware basin of West Texas, installing a total of 127 miles of oil and gas gathering lines. Also, significant progress was made towards expanding three central production facilities that will add 30 MBbls/d of capacity upon completion in early 2015. Substantial progress was made on a new CGF with a capacity of 24 MMcf/d, which will be completed in early 2015. The Company entered into a joint-venture agreement with a third party to construct a new 200-MMcf/d cryogenic plant located in Loving County, Texas. The new plant will be operated by the third party.

In November 2014, WES acquired Nuevo, which owns and operates gathering and processing assets located in the Delaware basin. Following the acquisition, WES changed the name of Nuevo to Delaware Basin Midstream, LLC (DBM). The assets include a 300-MMcf/d cryogenic gas processing plant. WES is preparing to construct an additional 200-MMcf/d cryogenic unit (Train IV) and progress payments have been made towards the construction of another cryogenic unit (Train V), with both expected to come online in 2016.

*Eagleford* In the Eagleford shale, Anadarko continued the expansion of its infield gathering system with (i) the installation of two new field gas compression facilities, (ii) the addition of incremental compression at Stumberg and Catarina Ranch compressor stations, and the Maverick main central delivery point compression facilities, as well as three other existing field compression facilities, (iii) the completion of approximately 90 miles of gathering pipelines and lateral that connected more than 20 central production facilities, and (iv) enhancements at the main oil-handling facility that increased its reliability and capabilities. The 200-MMcf/d Brasada natural-gas cryogenic processing plant completed its first full year of operations and remains at or near capacity.

22

APC-01751774

Table of Contents
Index to Financial Statements

*East Texas/North Louisiana* In East Texas, the Company continued to expand its midstream infrastructure for Cotton Valley Taylor and Haynesville production in 2014. The high-pressure Haynesville gathering system, and related water and condensate infrastructure, was expanded in the Carthage area to handle the continued growth associated with the liquids-rich Haynesville natural-gas production. Additionally, Anadarko has secured access to 430 MMcf/d of firm-processing capacity for the Company's current and future development in East Texas.

*Marcellus* In the Marcellus shale, Anadarko continued to expand its gathering system in Lycoming County, Pennsylvania. In 2014, the Company connected 44 Anadarko-operated wells and constructed 52 miles of new pipeline. The Seely West trunk line, completed in December 2014, connects the COP 356/357 gathering system and Larry's Creek gathering system to the Seely gathering system and alleviates the need to use third parties to gather natural gas.

*Springfield* In September 2014, the Company sold the Springfield gathering system located in East Texas to a third party.

*San Juan* In April 2014, the Company sold the San Juan gathering system located in New Mexico, Colorado, and Utah along with the San Juan River gas processing plant located in New Mexico to a third party.

The following provides information regarding the Company's midstream assets by geographic regions:

| Area | Asset Type | Miles of Gathering Pipelines | Total Horsepower | 2014 Average Net Throughput (MMcf/d) |
|---|---|---|---|---|
| Rocky Mountains | Gathering, processing, and treating | 11,900 | 1,244,100 | 3,800 |
| Texas | Gathering, processing, and treating | 3,600 | 248,400 | 1,100 |
| Mid-Continent and other | Gathering | 3,300 | 392,200 | 1,100 |
| Total | | 18,800 | 1,884,700 | 6,000 |

## MARKETING ACTIVITIES

The Company's marketing segment actively manages Anadarko's natural-gas, oil, condensate, and NGLs sales, as well as the Company's anticipated LNG sales. In marketing its production, the Company attempts to minimize market-related shut-ins, maximize realized prices, and manage credit-risk exposure. The Company's sales of natural gas, oil, condensate, and NGLs are generally made at market prices for those products at the time of sale. The Company also purchases natural gas, oil, condensate, and NGLs from third parties, primarily near Anadarko's production areas, to aggregate volumes so that the Company is positioned to fully use transportation, storage and fractionation capacity, facilitate efforts to maximize prices received, and minimize balancing issues with customers and pipelines during operational disruptions.

The Company sells its products under a variety of contract structures including indexed, fixed-price, and cost-escalation-based agreements. The Company also engages in limited trading activities for the purpose of generating profits from exposure to changes in market prices of natural gas, oil, condensate, and NGLs. The Company does not engage in market-making practices and limits its marketing activities to natural-gas, oil, NGLs, and LNG commodity contracts. The Company's marketing-risk position is typically a net short position (reflecting agreements to sell natural gas, oil, and NGLs in the future for specific prices) that is offset by the Company's natural long position as a producer (reflecting ownership of underlying natural-gas and oil reserves). See *Commodity-Price Risk* under Item 7A of this Form 10-K.

23

APC-01751775

Table of Contents
Index to Financial Statements

**Natural Gas**  Anadarko markets its natural-gas production to maximize value and to reduce the inherent risks of physical commodity markets. Anadarko's marketing segment offers supply-assurance and limited risk-management services at competitive prices, as well as other services that are tailored to its customers' needs. The Company may also receive a service fee related to the level of reliability and service required by the customer. The Company controls natural-gas firm-transportation capacity that ensures access to downstream markets, which enables the Company to maximize its natural-gas production. This transportation capacity also provides the opportunity to capture incremental value when price differentials between physical locations exist. The Company stores natural gas in contracted storage facilities to minimize operational disruptions to its ongoing operations and to take advantage of seasonal price differentials. Normally, the Company will have forward contracts in place (physical-delivery or financial derivative instruments) to sell stored natural gas at a fixed price.

**Oil, Condensate, and NGLs**  Anadarko's oil, condensate, and NGLs revenues are derived from production in the United States, Algeria, and Ghana. Most of the Company's U.S. oil and NGLs production is sold under contracts with prices based on market indices, adjusted for location, quality, and transportation. Product from Algeria is sold by tanker as Saharan Blend, condensate, refrigerated propane, and refrigerated butane to customers primarily in the Mediterranean area. Saharan Blend is high-quality crude that provides refiners large quantities of premium products such as gasoline, diesel, and jet fuel. Oil from Ghana is sold by tanker as Jubilee Oil to customers around the world. Jubilee Oil is high-quality crude that provides refiners large quantities of premium products such as gasoline, diesel, and jet fuel. Prior to the Company divesting its subsidiary in August 2014, oil from China was sold by tanker as Cao Fei Dian Blend to customers primarily in the Far East markets.

## COMPETITION

The oil and gas business is highly competitive in the exploration for and acquisition of reserves and in the gathering and marketing of oil and gas production. The Company's competitors include national oil companies, major oil and gas companies, independent oil and gas companies, individual producers, gas marketers, and major pipeline companies, as well as participants in other industries supplying energy and fuel to consumers.

## SEGMENT INFORMATION

For additional information on operations by segment, see *Note 20-Segment Information* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K and for additional information on risk associated with international operations, see *Risk Factors* under Item 1A of this Form 10-K.

## EMPLOYEES

The Company had approximately 6,100 employees at December 31, 2014.

24

APC-01751776

Table of Contents
Index to Financial Statements

**REGULATORY AND ENVIRONMENTAL MATTERS**

**Environmental and Occupational Health and Safety Regulations**

Anadarko's business operations are subject to numerous international, provincial, federal, regional, state, tribal, and local environmental and occupational health and safety laws and regulations. The more significant of these existing environmental and occupational health and safety laws and regulations include the following U.S. laws and regulations, as amended from time to time:

- the U.S. Clean Air Act, which restricts the emission of air pollutants from many sources and imposes various pre-construction, monitoring, and reporting requirements

- the U.S. Federal Water Pollution Control Act, also known as the federal Clean Water Act (CWA), which regulates discharges of pollutants from facilities to state and federal waters

- the U.S. Oil Pollution Act of 1990 (OPA), which subjects owners and operators of vessels, onshore facilities, and pipelines, as well as lessees or permittees of areas in which offshore facilities are located, to liability for removal costs and damages arising from an oil spill in waters of the United States

- U.S. Department of the Interior regulations, which relate to offshore oil and natural-gas operations in U.S. waters and impose liability for the cost of pollution cleanup resulting from operations, as well as potential liability for pollution damages

- the Comprehensive Environmental Response, Compensation and Liability Act of 1980, which imposes liability on generators, transporters, and arrangers of hazardous substances at sites where hazardous substance releases have occurred or are threatening to occur

- the U.S. Resource Conservation and Recovery Act, which governs the generation, treatment, storage, transport, and disposal of solid wastes, including hazardous wastes

- the U.S. Safe Drinking Water Act, which ensures the quality of the nation's public drinking water through adoption of drinking water standards and controlling the injection of waste fluids into below-ground formations that may adversely affect drinking water sources

- the U.S. Emergency Planning and Community Right-to-Know Act, which requires facilities to implement a safety hazard communication program and disseminate information to employees, local emergency planning committees, and response departments on toxic chemical uses and inventories

- the U.S. Occupational Safety and Health Act, which establishes workplace standards for the protection of the health and safety of employees, including the implementation of hazard communications programs designed to inform employees about hazardous substances in the workplace, potential harmful effects of these substances, and appropriate control measures

- the Endangered Species Act, which restricts activities that may affect federally identified endangered and threatened species or their habitats through the implementation of operating restrictions or a temporary, seasonal, or permanent ban in affected areas

These laws and regulations, as well as state counterparts, generally restrict the level of pollutants emitted to ambient air, discharges to surface water, and disposals or other releases to surface and below-ground soils and ground water. Failure to comply with these laws and regulations may result in the assessment of sanctions, including administrative, civil, and criminal penalties; the imposition of investigatory, remedial, and corrective action obligations or the incurrence of capital expenditures; the occurrence of delays in the development of projects; and the issuance of injunctions restricting or prohibiting some or all of the Company's activities in a particular area. See *Risk Factors* under Item 1A of this Form 10-K for further discussion on hydraulic fracturing, ozone standards, climate change, including methane or other greenhouse gas emissions, and other regulations relating to environmental protection. The ultimate financial impact arising from environmental laws and regulations is neither clearly known nor determinable as new standards, such as air emission standards and water quality standards, continue to evolve.

25

APC-01751777

Table of Contents
Index to Financial Statements

Many states and foreign countries where the Company operates also have, or are developing, similar environmental laws, regulations, or analogous controls governing many of these same types of activities. While the legal requirements may be similar in form, in some cases the actual implementation of these requirements may impose additional, or more stringent, conditions or controls that can significantly alter or delay the development of a project or substantially increase the cost of doing business. In addition, environmental laws and regulations, including those that may arise to address potential air and water impacts, are expected to continue to have an increasing impact on the Company's operations in the United States and in other countries in which Anadarko operates.

The Company has reviewed its potential responsibilities under both OPA and CWA as they relate to the Deepwater Horizon events.

As of the date of filing this Form 10-K with the SEC, no penalties or fines have been assessed by the federal government against the Company under OPA, CWA, and other similar local, state and federal environmental legislation related to the Deepwater Horizon events. However, in December 2010, the U.S. Department of Justice, on behalf of the United States, filed a civil lawsuit in the U.S. District Court in New Orleans, Louisiana, against several parties, including the Company, seeking (i) an assessment of civil penalties under the CWA in an amount to be determined by the court, and (ii) a declaratory judgment that such parties are jointly and severally liable without limitation under OPA for all removal costs and damages resulting from the Deepwater Horizon events. For additional information, see *Note 17-Contingencies-Deepwater Horizon Events* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

The Company has made and will continue to make operating and capital expenditures, some of which may be material, to comply with environmental and occupational health and safety laws and regulations. These are necessary business costs in the Company's operations and in the oil and natural-gas industry. Although the Company is not fully insured against all environmental and occupational health and safety risks, and the Company's insurance does not cover any penalties or fines that may be issued by a governmental authority, it maintains insurance coverage that it believes is sufficient based on the Company's assessment of insurable risks and consistent with insurance coverage held by other similarly situated industry participants. Nevertheless, it is possible that other developments, such as stricter and more comprehensive environmental and occupational health and safety laws and regulations, as well as claims for damages to property or persons resulting from the Company's operations, could result in substantial costs and liabilities, including administrative, civil, and criminal penalties, to Anadarko. The Company believes that it is in material compliance with existing environmental and occupational health and safety regulations. Further, the Company believes that the cost of maintaining compliance with these existing laws and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.

**Oil Spill-Response Plan**

Domestically, the Company is subject to compliance with the federal Bureau of Safety and Environmental Enforcement (BSEE) regulations, which, among other standards, require every owner or operator of a U.S. offshore lease to prepare and submit for approval an oil spill-response plan prior to conducting any offshore operations. The submitted plan is required to provide a detailed description of actions to be taken in the event of a spill, identify contracted spill-response equipment, materials and trained personnel, and stipulate the time necessary to deploy identified resources in the event of a spill. The BSEE regulations may be amended, resulting in changes to the amount and type of spill-response resources to which an owner or operator must maintain ready access. Accordingly, resources available to the Company may change to satisfy any new regulatory requirements, or to adapt to changes in the Company's operations.

Anadarko has in place and maintains both Regional (Central and Western Gulf of Mexico) and Sub-Regional (Eastern Gulf of Mexico) Oil Spill-Response Plans (Plans) for the Company's Gulf of Mexico operations. The Plans detail procedures for a rapid and effective response to spill events that may occur as a result of Anadarko's operations. The Plans are reviewed at least annually and updated as necessary. Drills are conducted at least annually to test the effectiveness of the Plans and include the participation of spill-response contractors, representatives of Clean Gulf Associates (CGA, a not-for-profit association of production and pipeline companies operating in the Gulf of Mexico contractually engaged by the Company for such matters), and representatives of relevant governmental agencies. The Plans must be approved by the BSEE.

26

APC-01751778

Table of Contents
Index to Financial Statements

As part of the Company's oil spill-response preparedness, and as set forth in the Plans, Anadarko maintains membership in CGA, and has an employee representative on the executive committee of CGA. CGA was created to provide a means of effectively staging response equipment and to provide effective spill-response capability for its member companies operating in the Gulf of Mexico. CGA equipment and capabilities include skimming vessels, barges, boom and dispersants, among others. CGA has executed a support contract with T&T Marine to coordinate bareboat charters and provides for expanded response support. T&T Marine is responsible for inspecting, maintaining, storing, and calling out CGA equipment. T&T Marine has positioned CGA's equipment and materials in a ready state at various staging areas around the Gulf of Mexico. T&T Marine also handles the maintenance and mobilization of CGA non-marine equipment. T&T Marine has service contracts in place with domestic environmental contractors as well as with other companies that provide support services during the execution of spill-response activities.

Anadarko is also a member of the Marine Preservation Association, which provides full access to the Marine Spill Response Corporation (MSRC) cooperative including the Deep Blue enhanced Gulf of Mexico Response capability. In the event of a spill, MSRC stands ready to mobilize all of its equipment and materials. MSRC has a fleet of dedicated Responder Class Oil Spill-Response Vessels (OSRVs), designed and built specifically to recover spilled oil.

MSRC has equipment housed for the Atlantic Region, the Gulf of Mexico Region, the California Region, and the Pacific Northwest Region. Their equipment includes skimmers, OSRVs, fast response vessels, barges, storage bladders, work boats, ocean boom, and dispersant.

The Company has also entered into a contractual commitment to access subsea intervention, containment, capture, and shut-in capacity for deepwater exploration wells. Marine Well Containment Company (MWCC) is open to all oil and gas operators in the Gulf of Mexico and provides members access to oil spill-response equipment and services on a per-well fee basis. Anadarko has an employee representative on the executive committee of MWCC and this employee currently serves as its Chair. MWCC members have access to a containment system that is planned for use in deepwater depths of up to 10,000 feet with containment capacity of 100 MBbls/d of liquids and flare capability for 200 MMcf/d of natural gas.

Anadarko retains geospatial and satellite imagery services through the MDA Corporation (MDA) to provide coverage over the Company's Gulf of Mexico operations. MDA owns and maintains two radar satellites, which provide all-weather surveillance and imagery available to assist in identifying areas of concern on the surface waters of the Gulf of Mexico. The Company has agreements with Waste Management, Inc. and Clean Harbors to assist in the proper disposal of contaminated and hazardous waste soil and debris. In addition, Anadarko has agreements with HDR Engineering, Inc. for assistance with Subsea Dispersant applications. The Company also has agreements with TDI-Brooks International for its scientific research vessels to properly monitor the effectiveness of the dispersant application and the health of the ecosystem. The Company also has agreements with Scientific and Environmental Associates, Inc. (SEA) for assistance with surface-dispersant applications. SEA is a scientific support consulting firm providing subject matter experts, and is renowned for its expertise in surface-dispersion applications and efficacy monitoring.

Anadarko has emergency and oil spill-response plans in place for each of its exploration and operational activities around the globe. Each plan satisfies the requirements of relevant local or national authority, describes the actions the Company will take in the event of an incident, is subject to drills at least annually, and includes reference to external resources that may become necessary in the event of an incident. Included in these external resources is the Company's contract with Oil Spill Response Limited (OSRL), a global emergency and oil spill-response organization headquartered in London.

OSRL has an aircraft available for dispersant application or equipment transport. OSRL also has a number of active recovery boom systems, and a range of booms that can be used for offshore, nearshore, or shoreline responses. In addition, OSRL provides a range of communications equipment, safety equipment, transfer pumps, dispersant application systems, temporary storage equipment, power packs and generators, small inflatable vessels, rigid inflatable boats, work boats, and Fast Response Vessels. OSRL also has a wide range of oiled wildlife equipment in conjunction with the Sea Alarm Foundation.

In addition to Anadarko's membership in or access to CGA, MSRC, OSRL, and MWCC, the Company participates in industry-wide task forces, which are currently studying improvements in both gaining access to and controlling blowouts in subsea environments. Two such task forces are the Subsea Well Control and Containment Task Force, and the Oil Spill Task Force.

27

APC-01751779

Table of Contents
Index to Financial Statements

**TITLE TO PROPERTIES**

As is customary in the oil and gas industry, a preliminary title review is conducted at the time properties believed to be suitable for drilling operations are acquired by the Company. Prior to the commencement of drilling operations, thorough title examinations of the drill site tract are conducted by third-party attorneys and curative work is performed with respect to significant defects, if any, before proceeding with operations. Anadarko believes the title to its leasehold properties is good, defensible, and customary with practices in the oil and gas industry, subject to such exceptions that, in the opinion of legal counsel for the Company, do not materially detract from the use of such properties.

Leasehold properties owned by the Company are subject to royalty, overriding royalty, and other outstanding interests customary in the industry. The properties may be subject to burdens such as liens incident to operating agreements, current taxes, development obligations under oil and gas leases and other encumbrances, easements, and restrictions. Anadarko does not believe any of these burdens will materially interfere with its use of these properties.

**EXECUTIVE OFFICERS OF THE REGISTRANT**

| Name | Age at January 31, 2015 | Position |
|---|---|---|
| R. A. Walker | 57 | Chairman, President and Chief Executive Officer |
| Robert P. Daniels | 56 | Executive Vice President, International and Deepwater Exploration |
| Robert G. Gwin | 51 | Executive Vice President, Finance and Chief Financial Officer |
| James J. Kleckner | 57 | Executive Vice President, International and Deepwater Operations |
| Charles A. Meloy | 54 | Executive Vice President, U.S. Onshore Exploration and Production |
| Robert K. Reeves | 57 | Executive Vice President, General Counsel and Chief Administrative Officer |
| M. Cathy Douglas | 58 | Senior Vice President, Chief Accounting Officer and Controller |

Mr. Walker was named Chairman of the Board of the Company in May 2013, in addition to the role of Chief Executive Officer and director, both of which he assumed in May 2012, and the role of President, which he assumed in February 2010. He previously served as Chief Operating Officer from March 2009 until his appointment as Chief Executive Officer. He served as Senior Vice President, Finance and Chief Financial Officer from September 2005 until March 2009. From August 2007 until March 2013, he served as director of Western Gas Holdings, LLC (WGH), the general partner of WES, and served as its Chairman of the Board from August 2007 to September 2009. Mr. Walker served as a director of Western Gas Equity Holdings, LLC (WGEH), the general partner of WGP, from September 2012 until March 2013. Mr. Walker served as a director of Temple-Inland Inc. from November 2008 to February 2012 and has served as a director of CenterPoint Energy, Inc. since April 2010 and as a director of BOK Financial Corporation since April 2013.

Mr. Daniels was named Executive Vice President, International and Deepwater Exploration in May 2013 and previously served as Senior Vice President, International and Deepwater Exploration since July 2012. Prior to these positions, he served as Senior Vice President, Worldwide Exploration since December 2006 and served as Senior Vice President, Exploration and Production since May 2004. Prior to that position, he served as Vice President, Canada since July 2001. Mr. Daniels also served in various managerial roles in the Exploration Department for Anadarko Algeria Company, LLC. He has worked for the Company since 1985.

Mr. Gwin was named Executive Vice President, Finance and Chief Financial Officer in May 2013 and previously served as Senior Vice President, Finance and Chief Financial Officer since March 2009 and Senior Vice President since March 2008. He also has served as Chairman of the Board of WGH since October 2009 and as a director since August 2007. Additionally, Mr. Gwin has served as Chairman of the Board of WGEH since September 2012, and served as President of WGH from August 2007 to September 2009 and as Chief Executive Officer of WGH from August 2007 to January 2010. He joined Anadarko in January 2006 as Vice President, Finance and Treasurer and served in that capacity until March 2008. He has served as Chairman of the Board of LyondellBasell Industries N.V. since August 2013 and as a director since May 2011.

28

APC-01751780

Table of Contents
Index to Financial Statements

Mr. Kleckner was named Executive Vice President, International and Deepwater Operations in May 2013. Prior to this position, he served as Vice President, Operations for the Rockies region since May 2007. Mr. Kleckner joined Anadarko upon the acquisition of Kerr-McGee Corporation in August 2006. He has held positions of increasing responsibility with Anadarko and Kerr-McGee Corporation, including management roles in the North Sea, South America, China, the Gulf of Mexico and U.S. onshore. Prior to joining Kerr-McGee Corporation, Mr. Kleckner was in the oil and natural-gas industry with Oryx Energy Company and its predecessor, Sun Oil Company.

Mr. Meloy was named Executive Vice President, U.S. Onshore Exploration and Production in May 2013 and previously served as Senior Vice President, U.S. Onshore Exploration and Production since July 2012. Prior to this position, he served as Senior Vice President, Worldwide Operations since December 2006 and served as Senior Vice President, Gulf of Mexico and International Operations since the acquisition of Kerr-McGee Corporation in August 2006. Prior to joining Anadarko, he served Kerr-McGee Corporation as Vice President of Exploration and Production from 2005 to 2006, Vice President of Gulf of Mexico Exploration, Production and Development from 2004 to 2005, Vice President and Managing Director of Kerr-McGee North Sea (U.K.) Limited from 2002 to 2004 and Vice President of Gulf of Mexico Deepwater from 2000 to 2002. Prior to joining Kerr-McGee Corporation, Mr. Meloy was in the oil and natural-gas industry with Oryx Energy Company and its predecessor, Sun Oil Company. Mr. Meloy has served as a director of WGH since February 2009 and as a director of WGEH since September 2012.

Mr. Reeves was named Executive Vice President, General Counsel and Chief Administrative Officer in May 2013 and previously served as Senior Vice President, General Counsel and Chief Administrative Officer since February 2007. He also served as Chief Compliance Officer from July 2012 to May 2013. He served as Corporate Secretary from February 2007 to August 2008. He previously served as Senior Vice President, Corporate Affairs & Law and Chief Governance Officer since 2004. Prior to joining Anadarko, he served as Executive Vice President, Administration and General Counsel of North Sea New Ventures from 2003 to 2004, and as Executive Vice President, General Counsel and Secretary of Ocean Energy, Inc. and its predecessor companies from 1997 to 2003. He has served as a director of Key Energy Services, Inc., a publicly traded oilfield services company, since October 2007, as a director of WGH since August 2007 and as a director of WGEH since September 2012.

Ms. Douglas was named Senior Vice President, Chief Accounting Officer and Controller in May 2013. Prior to this position, she served as Vice President and Chief Accounting Officer since November 2008 and served as Corporate Controller from September 2007 to March 2009 and from March 2013 to May 2013. She served as Assistant Controller from July 2006 to September 2007. She also served as Director, Accounting, Policy and Coordination from October 2006 to September 2007 and Financial Reporting and Policy Manager from January 2003 to October 2006. Ms. Douglas joined Anadarko in 1979.

Officers of Anadarko are elected each year at the first meeting of the Board of Directors following the annual meeting of stockholders, the next of which is expected to occur on May 12, 2015, and hold office until their successors are duly elected and qualified. There are no family relationships between any directors or executive officers of Anadarko.

29

APC-01751781

Table of Contents
Index to Financial Statements

**Item 1A. Risk Factors**

## CAUTIONARY STATEMENT ABOUT FORWARD-LOOKING STATEMENTS

*Unless the context otherwise requires, the terms "Anadarko" and "Company" refer to Anadarko Petroleum Corporation and its consolidated subsidiaries. The Company has made in this report, and may from time to time make in other public filings, press releases, and management discussions, forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, concerning the Company's operations, economic performance, and financial condition. These forward-looking statements include, among other things, information concerning future production and reserves, schedules, plans, timing of development, contributions from oil and gas properties, marketing and midstream activities, and also include those statements preceded by, followed by, or that otherwise include the words "may," "could," "believes," "expects," "anticipates," "intends," "estimates," "projects," "target," "goal," "plans," "objective," "should," "would," "will," "potential," "continue," "forecast," "future," "likely," "outlook," or similar expressions or variations on such expressions. For such statements, the Company claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will be realized. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements whether as a result of new information, future events, or otherwise.*

*These forward-looking statements involve risk and uncertainties. Important factors that could cause actual results to differ materially from the Company's expectations include, but are not limited to, the following risks and uncertainties:*

- *the Company's assumptions about energy markets*
- *production and sales volume levels*
- *reserves levels*
- *operating results*
- *competitive conditions*
- *technology*
- *availability of capital resources, levels of capital expenditures, and other contractual obligations*
- *supply and demand for, the price of, and the commercialization and transporting of natural gas, oil, natural gas liquids (NGLs), and other products or services*
- *volatility in the commodity-futures market*
- *weather*
- *inflation*
- *availability of goods and services, including unexpected changes in costs*
- *drilling risks*
- *processing volumes and pipeline throughput*
- *general economic conditions, either nationally, internationally, or in the jurisdictions in which the Company or its subsidiaries are doing business*
- *the Company's inability to timely obtain or maintain permits or other governmental approvals, including those necessary for drilling and/or development projects*
- *legislative or regulatory changes, including changes relating to hydraulic fracturing; retroactive royalty or production tax regimes; deepwater drilling and permitting regulations; derivatives reform; changes in state, federal, and foreign income taxes; environmental regulation; environmental risks; and liability under federal, state, foreign, and local environmental laws and regulations*

30

APC-01751782

Table of Contents
Index to Financial Statements

- *the ability of BP Exploration & Production Inc. (BP) to meet its indemnification obligations to the Company for Deepwater Horizon events, including, among other things, damage claims arising under the Oil Pollution Act of 1990 (OPA), claims for natural resource damages (NRD) and associated damage-assessment costs, and any claims arising under the Operating Agreement (OA) for the Macondo well, as well as the ability of BP Corporation North America Inc. (BPCNA) and BP p.l.c. to satisfy their guarantees of such indemnification obligations*

- *the impact of remaining claims related to the Deepwater Horizon events, including, but not limited to, fines, penalties, and punitive damages against the Company, for which it is not indemnified by BP*

- *civil or political unrest or acts of terrorism in a region or country*

- *the creditworthiness and performance of the Company's counterparties, including financial institutions, operating partners, and other parties*

- *volatility in the securities, capital, or credit markets and related risks such as general credit, liquidity, and interest-rate risk*

- *the Company's ability to successfully monetize select assets, repay its debt, and the impact of changes in the Company's credit ratings*

- *disruptions in international oil, NGLs, and condensate cargo shipping activities*

- *physical, digital, internal, and external security breaches*

- *supply and demand, technological, political, governmental, and commercial conditions associated with long-term development and production projects in domestic and international locations*

- *other factors discussed below and elsewhere in this Form 10-K, and in the Company's other public filings, press releases, and discussions with Company management*

## RISK FACTORS

*We may be subject to claims and liabilities relating to the Deepwater Horizon events that are not covered by BP's indemnification obligations under our Settlement Agreement with BP, or that result in losses to the Company, notwithstanding BP's indemnification against such losses, as a result of BP's inability to satisfy its indemnification obligations under the Settlement Agreement and BPCNA's and BP p.l.c.'s inability to satisfy their guarantees of BP's indemnification obligations.*

In October 2011, the Company and BP entered into a settlement agreement, mutual releases, and agreement to indemnify relating to the Deepwater Horizon events (Settlement Agreement). Pursuant to the Settlement Agreement, the Company is fully indemnified by BP against all claims, causes of action, losses, costs, expenses, liabilities, damages, or judgments of any kind arising out of the Deepwater Horizon events, related damage claims arising under OPA, NRD claims and assessment costs, and any claims arising under the OA. This indemnification is guaranteed by BPCNA and, in the event that the net worth of BPCNA declines below an agreed-on amount, BP p.l.c. has agreed to become the sole guarantor.

Any failure or inability on the part of BP to satisfy its indemnification obligations under the Settlement Agreement, or on the part of BPCNA or BP p.l.c. to satisfy their respective guarantee obligations, could subject us to significant monetary liability beyond the terms of the Settlement Agreement, which could have a material adverse effect on our business, prospects, results of operations, financial condition, and liquidity. In November 2012, BP settled all criminal and securities claims brought by the United States against BP, with BP agreeing to pay $4.0 billion over five years to the U.S. Department of Justice with respect to the criminal claims and further agreeing to pay another $525 million over three years to the Securities and Exchange Commission (SEC) with respect to the securities claims. In addition, in September 2014, the U.S. District Court in New Orleans, Louisiana (Louisiana District Court) issued its Findings of Fact and Conclusions of Law in the first phase of the Deepwater Horizon trial. The Louisiana District Court found that BP is liable under general maritime law for the blowout, explosion, and oil spill and apportioned 67% of the fault to BP. BP is challenging certain of the Louisiana District Court's findings.

31

APC-01751783

Table of Contents
Index to Financial Statements

Furthermore, in certain instances we may be required to recognize a liability for amounts for which we are indemnified in advance of or in connection with recognizing a receivable from BP for the related indemnity payment. Any such liability recognition without collection of the offsetting receivable could adversely impact our results of operations, our financial condition, and our ability to make borrowings.

Under the Settlement Agreement, BP does not indemnify the Company against penalties and fines, punitive damages, shareholder derivative or securities laws claims, or certain other claims. The adverse resolution of any current or future proceeding related to the Deepwater Horizon events for which we are not indemnified by BP could subject us to significant monetary liability, which could have a material adverse effect on our business, prospects, results of operations, financial condition, and liquidity.

*Oil, natural-gas, and NGLs prices are volatile. A substantial or extended decline in the price of these commodities could adversely affect our financial condition and results of operations.*

Prices for oil, natural gas, and NGLs can fluctuate widely. For example, daily settlement prices for New York Mercantile Exchange (NYMEX) West Texas Intermediate oil ranged from a high of $107.26 per barrel to a low of $53.27 per barrel during 2014. Daily settlement prices for NYMEX Henry Hub natural gas ranged from a high of $6.15 per million British thermal units (MMBtu) to a low of $2.89 per MMBtu during 2014. Our revenues, operating results, cash flows from operations, capital budget, and future growth rates are highly dependent on the prices we receive for our oil, natural gas, and NGLs. The markets for oil, natural gas, and NGLs have been volatile historically and may continue to be volatile in the future. Factors influencing the prices of oil, natural gas, and NGLs are beyond our control. These factors include, but are not limited to, the following:

- domestic and worldwide supply of, and demand for, oil, natural gas, and NGLs
- volatile trading patterns in the commodity-futures markets
- cost of exploring for, developing, producing, transporting, and marketing oil, natural gas, and NGLs
- level of global oil and natural-gas inventories
- weather conditions
- potential U.S. exports of liquefied natural gas, oil, condensate, or NGLs
- ability of the members of the Organization of the Petroleum Exporting Countries (OPEC) and other producing nations to agree to and maintain production levels
- worldwide military and political environment, civil and political unrest in Africa and the Middle East, uncertainty or instability resulting from the escalation or additional outbreak of armed hostilities, or further acts of terrorism in the United States or elsewhere
- effect of worldwide energy conservation and environmental protection efforts
- price and availability of alternative and competing fuels
- price and level of foreign imports of oil, natural gas, and NGLs
- domestic and foreign governmental laws, regulations, and taxes
- proximity to, and capacity of, natural-gas pipelines and other transportation facilities
- general economic conditions worldwide

The long-term effect of these and other factors on the prices of oil, natural gas, and NGLs is uncertain. Prolonged or substantial declines in these commodity prices may have the following effects on our business:

- adversely affecting our financial condition, liquidity, ability to finance planned capital expenditures, and results of operations
- reducing the amount of oil, natural gas, and NGLs that we can produce economically
- causing us to delay or postpone some of our capital projects

32

APC-01751784

Table of Contents
Index to Financial Statements

- reducing our revenues, operating income, or cash flows
- reducing the amounts of our estimated proved oil, natural-gas, and NGLs reserves
- reducing the carrying value of our oil and natural-gas properties
- reducing the standardized measure of discounted future net cash flows relating to oil, natural-gas, and NGLs reserves
- limiting our access to, or increasing the cost of, sources of capital, such as equity and long-term debt

*Our domestic operations are subject to governmental risks that may impact our operations.*

Our domestic operations have been, and at times in the future may be, affected by political developments and are subject to complex federal, provincial, regional, state, tribal, local, and other laws and regulations such as restrictions on production, permitting, changes in taxes, deductions, royalties and other amounts payable to governments or governmental agencies, price or gathering-rate controls, hydraulic fracturing, and environmental protection regulations. To conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals, and certificates from various federal, provincial, regional, state, tribal, and local governmental authorities. We may incur substantial costs to maintain compliance with these existing laws and regulations. Our costs of compliance may increase if existing laws, including environmental and tax laws and regulations, are revised or reinterpreted, or if new laws and regulations become applicable to our operations. For example, from time to time, legislation has been proposed that could adversely affect our business, financial condition, results of operations, or cash flows related to the following:

- *Ozone Standards.* In December 2014, the U.S. Environmental Protection Agency (EPA) published proposed regulations to revise the National Ambient Air Quality Standard for ozone, recommending a standard between 65 to 70 parts per billion (ppb) for both the 8-hour primary and secondary standards protective of public health and public welfare. The current primary and secondary ozone standards are set at 75 ppb. The EPA is also taking comments on whether a 60 ppb standard should be established for the primary standard or whether the existing 75 ppb standard should be retained. If adopted, compliance with such regulations may require the Company to install new equipment to further control emissions and may also cause permitting delays. The EPA currently expects to issue a final rule by October 1, 2015.

- *Reduction of Methane Emissions.* In January 2015, the Obama Administration announced that the EPA is expected to propose in the summer of 2015 and finalize in 2016 new regulations that will regulate methane emissions from the oil and gas sector. The Obama Administration seeks to reduce methane emissions from new and modified infrastructure and equipment in the oil and gas sector, including the drilling of new wells, by up to 45% from 2012 levels by 2025.

- *Climate Change.* A number of state and regional efforts exist that are aimed at tracking or reducing greenhouse gas (GHG) emissions. In addition, the EPA has determined that GHG emissions present a danger to public health and the environment and has adopted regulations that restrict emissions of GHGs under existing provisions of the Clean Air Act. Also, certain of our operations are subject to EPA rules requiring the monitoring and annual reporting of GHG emissions from specified onshore and offshore production sources. We may be required to install "best available control technology" to limit emissions of GHGs from any new or significantly modified facilities that we may seek to construct in the future if they would otherwise emit large volumes of GHGs together with other criteria pollutants.

- *Deficit Reduction or Tax Reform.* Congress may undertake significant deficit reduction or comprehensive tax reform in the coming year. Proposals include provisions that would, if enacted, (i) eliminate the immediate deduction for intangible drilling and development costs, (ii) eliminate the manufacturing deduction for oil and gas qualified production activities, and (iii) eliminate accelerated depreciation for tangible property.

33

APC-01751785

Table of Contents
Index to Financial Statements

*Changes in laws or regulations regarding hydraulic fracturing or other oil and gas operations could increase our costs of doing business, impose additional operating restrictions or delays, and adversely affect our production.*

Hydraulic fracturing is an essential and common practice used to stimulate production of natural gas and oil from dense subsurface rock formations such as shales. We routinely apply hydraulic-fracturing techniques in many of our U.S. onshore oil and natural-gas drilling and completion programs. The process involves the injection of water, sand, and additives under pressure into a targeted subsurface formation to fracture the surrounding rock and stimulate production.

Hydraulic fracturing is regulated by state oil and natural-gas commissions. However, several federal agencies have also asserted regulatory authority over certain aspects of the process. For example, the EPA has issued final Clean Air Act regulations governing performance standards for the oil and gas industry; announced its intent to propose in early 2015 effluent limit guidelines that wastewater from shale gas extraction operations must meet before discharging to a treatment plant; and issued in May 2014 a prepublication of its Advance Notice of Proposed Rulemaking regarding Toxic Substances Control Act reporting of the chemical substances and mixtures used in hydraulic fracturing. Also, in May 2013, the Bureau of Land Management issued a revised proposed rule containing disclosure requirements and other mandates for hydraulic fracturing on federal lands and the agency is expected to promulgate a final rule in early 2015. Also, from time to time, legislation has been introduced, but not enacted, in Congress to provide for federal regulation of hydraulic fracturing and to require disclosure of the chemicals used in the fracturing process. In the event that a new, federal level of legal restrictions relating to the hydraulic-fracturing process is adopted in areas where we operate, we may incur additional costs to comply with such federal requirements that may be significant in nature, and also could become subject to additional permitting requirements and experience added delays or curtailment in the pursuit of exploration, development, or production activities.

Certain states in which we operate, including Colorado, Pennsylvania, Louisiana, Texas, and Wyoming, have adopted, and other states are considering adopting, regulations that could impose new or more stringent permitting, disclosure, or well-construction requirements on hydraulic-fracturing operations or prohibit these operations completely. In addition to state laws, local land use restrictions, such as city ordinances, may restrict or prohibit drilling in general and/or hydraulic fracturing in particular. For example, in exchange for the withdrawal of several initiatives relating to hydraulic fracturing and other oil and gas operations proposed for inclusion on the Colorado state ballot in November 2014, the governor of Colorado created the Task Force on State and Local Regulation of Oil and Gas Operations (Task Force) in September 2014 to make recommendations to the state legislature regarding the responsible development of Colorado's oil and gas resources. Although it is early in the process, it is possible that, as a result of the Task Force's recommendations, Colorado could adopt new policies or legislation relating to oil and natural-gas operations, including measures that would give local governments in Colorado greater authority to limit hydraulic fracturing and other oil and natural-gas operations or require greater distances between well sites and occupied structures. In the event state or local restrictions or prohibitions are adopted in areas where we conduct operations, such as the Wattenberg field in Colorado, we may incur significant costs to comply with such requirements or we may experience delays or curtailment in the pursuit of exploration, development, or production activities, and possibly be limited or precluded in the drilling of wells or in the amounts that we are ultimately able to produce from our reserves. Such costs, delays, restrictions, or prohibitions could have a material adverse effect on our business, prospects, results of operations, financial condition, and liquidity.

In addition to asserting regulatory authority, a number of federal entities are analyzing, or have been requested to review, a variety of environmental issues associated with hydraulic fracturing. In April 2012, President Obama issued an executive order that established a working group for the purpose of coordinating policy, information sharing, and planning among federal agencies and offices regarding "unconventional natural-gas production," including hydraulic fracturing. In December 2012, the EPA issued an initial progress report on a study begun in 2011 of the potential environmental effects of hydraulic fracturing on drinking water and groundwater, with a draft final report expected to be issued for peer review and comment in early 2015. These studies and initiatives, or any future studies, depending on their degree of pursuit and any meaningful results obtained, could spur efforts to further regulate hydraulic fracturing.

34

APC-01751786

Table of Contents
Index to Financial Statements

*Our debt and other financial commitments may limit our financial and operating flexibility.*

Our total debt was $15.1 billion at December 31, 2014. We also have various commitments for leases, drilling contracts, derivative contracts, firm transportation, and purchase obligations for services and products. Our financial commitments could have important consequences to our business including, but not limited to, the following:

- increasing our vulnerability to general adverse economic and industry conditions
- limiting our ability to fund future working capital and capital expenditures, to engage in future acquisitions or development activities, or to otherwise fully realize the value of our assets and opportunities because of the need to dedicate a substantial portion of our cash flows from operations to payments on our debt or to comply with any restrictive terms of our debt
- limiting our flexibility in planning for, or reacting to, changes in the industry in which we operate
- placing us at a competitive disadvantage compared to our competitors that have less debt and/or fewer financial commitments

Additionally, the credit agreements governing our $3.0 billion five-year senior unsecured revolving credit facility and our $2.0 billion 364-day senior unsecured revolving credit facility contain a number of customary covenants, including a financial covenant requiring maintenance of a consolidated indebtedness to total capitalization ratio of no greater than 65%, and limitations on certain secured indebtedness, sale-and-leaseback transactions, and mergers and other fundamental changes. Our ability to meet such covenants may be affected by events beyond our control.

*A downgrade in our credit rating could negatively impact our cost of and ability to access capital.*

As of December 31, 2014, our long-term debt was rated "BBB" with a stable outlook by Standard and Poor's (S&P), "BBB-" with a positive outlook by Fitch Ratings (Fitch), and "Baa3" with a positive outlook by Moody's Investors Service (Moody's). In February 2015, Moody's raised our long-term debt rating to "Baa2" and changed the outlook to stable. Although we are not aware of any current plans of S&P, Fitch, or Moody's to lower their respective ratings on our debt, we cannot be assured that our credit ratings will not be downgraded. A downgrade in our credit ratings could negatively impact our cost of capital or our ability to effectively execute aspects of our strategy. If our credit ratings were downgraded, it could affect our ability to raise debt in the public debt markets and the cost of that new debt could be much higher than our outstanding debt. In addition, a downgrade could affect the Company's requirements to provide financial assurance of its performance under certain contractual arrangements and derivative agreements. See *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

*Our proved reserves are estimates. Any material inaccuracies in our reserves estimates or assumptions underlying our reserves estimates could cause the quantities and net present value of our reserves to be overstated or understated.*

There are numerous uncertainties inherent in estimating quantities of proved reserves, including many factors beyond our control that could cause the quantities and net present value of our reserves to be overstated or understated. The reserves information included or incorporated by reference in this report represents estimates prepared by our internal engineers. The procedures and methods for estimating the reserves by our internal engineers were reviewed by independent petroleum consultants; however, no reserves audit was conducted by these consultants. Estimation of reserves is not an exact science. Estimates of economically recoverable oil and natural-gas reserves and of future net cash flows depend on a number of variable factors and assumptions, any of which may cause actual results to vary considerably from these estimates. These factors and assumptions may include, but are not limited to, the following:

- historical production from an area compared with production from similar producing areas
- assumed effects of regulation by governmental agencies and court rulings
- assumptions concerning future oil and natural-gas prices, future operating costs, and capital expenditures
- estimates of future severance and excise taxes, workover costs, and remedial costs

35

APC-01751787

Table of Contents
Index to Financial Statements

Estimates of reserves based on risk of recovery and estimates of expected future net cash flows prepared by different engineers, or by the same engineers at different times, may vary substantially. Actual production, revenues, and expenditures with respect to our reserves will likely vary from estimates, and the variance may be material. The discounted cash flows included in this report should not be construed as the fair value of the estimated oil, natural-gas, and NGLs reserves attributable to our properties. The estimated discounted future net cash flows from proved reserves are based on the average beginning-of-month prices during the 12-month period for the respective year. Actual future prices and costs may differ materially from the SEC regulation-compliant prices used for purposes of estimating future discounted net cash flows from proved reserves.

*Failure to replace reserves may negatively affect our business.*

Our future success depends on our ability to find, develop, or acquire additional oil and natural-gas reserves that are economically recoverable. Our proved reserves generally decline when reserves are produced, unless we conduct successful exploration or development activities, acquire properties containing proved reserves, or both. We may be unable to find, develop, or acquire additional reserves on an economic basis. Furthermore, if oil and natural-gas prices increase, our costs for finding or acquiring additional reserves could also increase.

*Certain of our undeveloped leasehold acreage is subject to leases that will expire over the next several years unless production is established on units containing the acreage.*

A portion of our leasehold acreage is currently undeveloped. Unless production in sufficient quantities is established on units containing certain of these leases during their terms, the leases will expire. If our leases expire, we will lose our right to develop the related properties. Our drilling plans for these areas are subject to change based on various factors: drilling results, oil and natural-gas prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints, and regulatory approvals.

*Future economic, business, or industry conditions may have a material adverse effect on our results of operations, liquidity, and financial condition.*

During the last few years, concerns over inflation, potential default on U.S. debt, energy costs, geopolitical issues, the availability and cost of credit, and uncertainties with regard to European sovereign debt, have contributed to increased economic uncertainty and diminished expectations for the global economy. Concerns about global economic growth have had a significant adverse impact on global financial markets and commodity prices. Continued concerns could cause demand for petroleum products to diminish or stagnate, which could impact the price at which we can sell our oil, natural gas, and NGLs; affect the ability of our vendors, suppliers, and customers to continue operations; and ultimately adversely impact our results of operations, liquidity, and financial condition.

*Our results of operations could be adversely affected by goodwill impairments.*

As a result of mergers and acquisitions, we had approximately $5.6 billion of goodwill on our Consolidated Balance Sheet at December 31, 2014. Goodwill must be tested at least annually for impairment, and more frequently when circumstances indicate likely impairment. Goodwill is considered impaired to the extent that its carrying amount exceeds its implied fair value. Various factors could lead to an impairment of goodwill, such as the Company's inability to replace the value of its depleting asset base, difficulty or potential delays in obtaining drilling permits, or other adverse events, such as lower oil and natural-gas prices, which could reduce the fair value of the associated reporting unit. An impairment of goodwill could have a substantial negative effect on our profitability.

36

APC-01751788

Table of Contents
Index to Financial Statements

*We are subject to complex laws and regulations relating to environmental protection that can adversely affect the cost, manner, and feasibility of doing business.*

Our operations and properties are subject to numerous federal, provincial, regional, state, tribal, local, and foreign laws and regulations governing the release of pollutants or otherwise relating to environmental protection. These laws and regulations govern the following, among other things:

- issuance of permits in connection with exploration, drilling, production, and midstream activities
- protection of endangered species
- amounts and types of emissions and discharges
- generation, management, and disposition of waste materials
- offshore oil and gas operations and decommissioning of abandoned facilities
- reclamation and abandonment of wells and facility sites
- remediation of contaminated sites

In addition, these laws and regulations may impose substantial liabilities for our failure to comply or for any contamination resulting from our operations, including the assessment of administrative, civil, and criminal penalties; the imposition of investigatory, remedial, and corrective action obligations or the incurrence of capital expenditures; the occurrence of delays in the development of projects; and the issuance of injunctions restricting or prohibiting some or all of our activities in a particular area. Future environmental laws and regulations, such as the restriction against emission of pollutants from previously unregulated activities or the designation of previously unprotected species as threatened or endangered in areas where we operate, such as the sage grouse, may negatively impact our operations. The cost of satisfying these requirements may have an adverse effect on our financial condition, results of operations, or cash flows or could result in limitations on our exploration and production activities, which could have an adverse impact on our ability to develop and produce our reserves. For a description of certain environmental proceedings in which we are involved, see *Legal Proceedings* under Item 3 and *Note 17-Contingencies* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

*We are vulnerable to risks associated with our offshore operations that could negatively impact our operations and financial results.*

We conduct offshore operations in the Gulf of Mexico, Mozambique, Ghana, Brazil, Colombia, Côte d'Ivoire, Kenya, Liberia, New Zealand, and other countries. Our operations and financial results could be significantly impacted by conditions in some of these areas because we are vulnerable to certain unique risks associated with operating offshore, including those relating to the following:

- hurricanes and other adverse weather conditions
- oilfield service costs and availability
- compliance with environmental and other laws and regulations
- terrorist attacks, such as piracy
- remediation and other costs and regulatory changes resulting from oil spills or releases of hazardous materials
- failure of equipment or facilities

In addition, we conduct some of our exploration in deep waters (greater than 1,000 feet) where operations and decommissioning activities are more difficult and costly than in shallower waters. The deep waters in the Gulf of Mexico, as well as international deepwater locations, lack the physical and oilfield service infrastructure present in its shallower waters. As a result, deepwater operations may require significant time between a discovery and the time that we can market our production, thereby increasing the risk involved with these operations.

37

Table of Contents
Index to Financial Statements

Further, production of reserves from reservoirs in the Gulf of Mexico generally declines more rapidly than from reservoirs in many other producing regions of the world. This results in recovery of a relatively higher percentage of reserves from properties in the Gulf of Mexico during the initial few years of production and, as a result, our reserves replacement needs from new prospects may be greater there than for our operations elsewhere. Also, our revenues and return on capital will depend significantly on prices prevailing during these relatively short production periods.

*Additional domestic and international deepwater drilling laws, regulations, and other restrictions; delays in the processing and approval of drilling permits and exploration and oil spill-response plans; and other related developments may have a material adverse effect on our business, financial condition, or results of operations.*

In response to the Deepwater Horizon incident in the Gulf of Mexico in April 2010, the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement, each agencies of the U.S. Department of the Interior, imposed new and more stringent permitting procedures and regulatory safety and performance requirements for new wells to be drilled in federal waters. Compliance with these new and more stringent rules and regulations, in addition to uncertainties or inconsistencies in current decisions and rulings by governmental agencies, delays in the processing and approval of drilling permits and exploration, development, and oil spill-response plans, and possible additional regulatory initiatives could adversely affect or delay new drilling and ongoing development efforts. Among other adverse impacts, these additional measures could delay or disrupt our operations, increase the risk of expired leases due to the time required to develop new technology, result in increased supplemental bonding and costs, and limit activities in certain areas, or cause us to incur penalties, fines, or shut-in production at one or more of our facilities. If similar material spill events were to occur in the future, the United States or other countries could elect to again issue directives to temporarily cease drilling activities and, in any event, may from time to time issue further safety and environmental laws and regulations regarding offshore oil and gas exploration and development. We cannot predict with any certainty the full impact of any new laws or regulations on our drilling operations or on the cost or availability of insurance to cover the risks associated with such operations.

Further, the deepwater Gulf of Mexico (as well as international deepwater locations) lacks the degree of physical and oilfield service infrastructure present in shallower waters. Therefore, despite the Company's oil spill-response capabilities, it may be difficult for us to quickly or effectively execute any contingency plans related to future events similar to the Deepwater Horizon incident.

The matters described above, individually or in the aggregate, could have a material adverse effect on our business, prospects, results of operations, financial condition, and liquidity.

*We operate in foreign countries and are subject to political, economic, and other uncertainties.*

Our operations outside the United States are based primarily in Algeria, Brazil, Colombia, Côte d'Ivoire, Ghana, Kenya, Liberia, Mozambique, and New Zealand. As a result, we face political and economic risks and other uncertainties with respect to our international operations. These risks may include the following, among other things:

- loss of revenue, property, and equipment or delays in operations as a result of hazards such as expropriation, war, piracy, acts of terrorism, insurrection, civil unrest, and other political risks, including tension and confrontations among political parties

- transparency issues in general and, more specifically, the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and other anti-corruption compliance laws and issues

- increases in taxes and governmental royalties

- unilateral renegotiation of contracts by governmental entities

- redefinition of international boundaries or boundary disputes

- difficulties enforcing our rights against a governmental agency because of the doctrine of sovereign immunity and foreign sovereignty over international operations

- changes in laws and policies governing operations of foreign-based companies

38

APC-01751790

Table of Contents
Index to Financial Statements

- foreign-exchange restrictions
- international monetary fluctuations and changes in the relative value of the U.S. dollar as compared to the currencies of other countries in which we conduct business

For example, Ghana and Côte d'Ivoire are engaged in a dispute regarding the international maritime and land boundaries between the two countries. As a result, Côte d'Ivoire claims to be entitled to the maritime area which covers a portion of the Deepwater Tano Block where we are developing the TEN complex. In the event Côte d'Ivoire is successful in its maritime border claims, this development could be materially impacted. Also, Venezuela and Guyana are in a dispute regarding their maritime and land borders in which the two countries have initiated a dialogue. We are unable to ascertain the full impact of this border dispute on future operations in Guyana.

Outbreaks of civil and political unrest and acts of terrorism have occurred in countries in Europe, Africa, and the Middle East, including countries where we conduct operations. Continued or escalated civil and political unrest and acts of terrorism in the countries in which we operate could result in our curtailing operations. In the event that countries in which we operate experience civil or political unrest or acts of terrorism, especially in events where such unrest leads to an unseating of the established government, our operations in such countries could be materially impaired.

Our international operations may also be adversely affected, directly or indirectly, by laws, policies, and regulations of the United States affecting foreign trade and taxation, including U.S. trade sanctions.

Realization of any of the factors listed above could materially and adversely affect the Company's financial condition, results of operations, or cash flows.

*Our commodity-price risk-management and trading activities may prevent us from fully benefiting from price increases and may expose us to other risks.*

To the extent that we engage in commodity-price risk-management activities to protect our cash flows from commodity-price declines, we may be prevented from realizing the full benefits of price increases above the levels of the derivative instruments used to manage price risk. In addition, our commodity-price risk-management and trading activities may expose us to the risk of financial loss in certain circumstances, including instances in which the following occur:

- our production is less than the notional volumes
- a widening of price basis differentials occurs between delivery points for our production and the delivery point assumed in the derivative arrangement
- the counterparties to our hedging or other price-risk management contracts fail to perform under those arrangements
- a sudden unexpected event materially impacts oil, natural-gas, or NGLs prices

*The enactment of derivatives legislation, and the promulgation of regulations pursuant thereto, could have an adverse effect on the Company's ability to use derivative instruments to reduce the effect of commodity-price, interest-rate, and other risks associated with its business.*

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), enacted in 2010, requires the Commodities Futures Trading Commission (CFTC) and the SEC to promulgate rules and regulations establishing federal oversight and regulation of the over-the-counter derivatives market and entities that participate in that market including swap clearing and trade execution requirements. While many rules and regulations have been promulgated and are already in effect, other rules and regulations, including the proposed margin rules, position limits, and commodity clearing requirements, remain to be finalized or effectuated, and therefore, the impact of those rules and regulations on us is uncertain at this time.

39

APC-01751791

Table of Contents
Index to Financial Statements

New or modified rules, regulations, or legal requirements may increase the cost and impact the availability to our counterparties of their hedging and swap positions that they can make available to us, and may further require the counterparties to our derivative instruments to spin off some of their derivative activities to separate entities, which may not be as creditworthy as the current counterparties. In addition, for uncleared swaps, the CFTC or federal banking regulators may require end-users to enter into credit support documentation or post margin collateral. Any changes in the regulations of swaps may result in certain market participants deciding to curtail or cease their derivative activities.

The Dodd-Frank Act, and the rules promulgated thereunder, could (i) significantly increase the cost, or decrease the liquidity, of energy-related derivatives we use to hedge against commodity-price fluctuations (including through requirements to post collateral), (ii) materially alter the terms of derivative contracts, (iii) reduce the availability of derivatives to protect against risks we encounter, and (iv) increase our exposure to less creditworthy counterparties. If we reduce our use of derivatives as a result of the Dodd-Frank Act and applicable rules and regulations, our cash flow may become more volatile and less predictable, which could adversely affect our ability to plan for and fund capital expenditures.

In addition, the European Union and other non-U.S. jurisdictions are implementing regulations with respect to the derivatives market. To the extent the Company transacts with counterparties in foreign jurisdictions, it may become subject to such regulations. At this time, the impact of such regulations is not clear.

*Deterioration in the credit or equity markets could adversely affect us.*

We have exposure to different counterparties. For example, we have entered into transactions with counterparties in the financial services industry, including commercial banks, investment banks, insurance companies, investment funds, and other institutions. These transactions expose us to credit risk in the event of default by our counterparty. Deterioration in the credit markets may impact the credit ratings of our current and potential counterparties and affect their ability to fulfill existing obligations to us and their willingness to enter into future transactions with us. We have exposure to these financial institutions through our derivative transactions. In addition, if any lender under our credit facility is unable to fund its commitment, our liquidity will be reduced by an amount up to the aggregate amount of such lender's commitment under our credit facility. Moreover, to the extent that purchasers of the Company's production rely on access to the credit or equity markets to fund their operations, there is a risk that those purchasers could default in their contractual obligations to the Company if such purchasers were unable to access the credit or equity markets for an extended period of time.

*We are not insured against all of the operating risks to which our business is exposed.*

Our business is subject to all of the operating risks normally associated with the exploration for and production, gathering, processing, and transportation of oil and gas, including blowouts; cratering and fire; environmental hazards, such as gas leaks, oil spills, pipeline and vessel ruptures, and releases of chemicals or other hazardous substances, any of which could result in damage to, or destruction of, oil and natural-gas wells or formations, production facilities, and other property; pollution or other environmental damage; and injury to persons. For protection against financial loss resulting from these operating hazards, we maintain insurance coverage, including insurance coverage for certain physical damage, blowout/loss of control of a well, comprehensive general liability, aviation liability, and worker's compensation and employer's liability. However, our insurance coverage may not be sufficient to cover us against 100% of potential losses arising as a result of the foregoing, and for certain risks, such as political risk, business interruption, war, terrorism, and piracy, for which we have limited or no coverage. In addition, we are not insured against all risks in all aspects of our business, such as hurricanes. The occurrence of a significant event against which we are not fully insured could have a material adverse effect on our financial condition, results of operations, or cash flows.

40

APC-01751792

Table of Contents
Index to Financial Statements

*Material differences between the estimated and actual timing of critical events may affect the completion of and commencement of production from development projects.*

We are involved in several large development projects and the completion of those projects may be delayed beyond our anticipated completion dates. Key factors that may affect the timing and outcome of such projects include the following:

- project approvals by joint-venture partners
- timely issuance of permits and licenses by governmental agencies or legislative and other governmental approvals
- weather conditions
- availability of qualified personnel
- civil and political environment of, and existing infrastructure in, the country or region in which the project is located
- manufacturing and delivery schedules of critical equipment
- commercial arrangements for pipelines and related equipment to transport and market hydrocarbons

Delays and differences between estimated and actual timing of critical events may affect the forward-looking statements related to large development projects and could have a material adverse effect on our results of operations.

*The oil and gas exploration and production industry is very competitive, and some of our exploration and production competitors have greater financial and other resources than we do.*

The oil and gas business is highly competitive in the search for and acquisition of reserves and in the gathering and marketing of oil and gas production. Our competitors include national oil companies, major oil and gas companies, independent oil and gas companies, individual producers, gas marketers, and major pipeline companies, as well as participants in other industries supplying energy and fuel to consumers. Some of our competitors may have greater and more diverse resources on which to draw than we do. If we are not successful in our competition for oil and gas reserves or in our marketing of production, our financial condition and results of operations may be adversely affected.

*The high cost or unavailability of drilling rigs, equipment, supplies, personnel, and other oilfield services could adversely affect our ability to execute our exploration and development plans on a timely basis and within our budget, which could have a material adverse effect on our business, financial condition, or results of operations.*

Our industry is cyclical and, from time to time, there is a shortage of drilling rigs, equipment, supplies, or qualified personnel. During these periods, the costs of rigs, equipment, supplies, and personnel are substantially greater and their availability to us may be limited. Additionally, these services may not be available on commercially reasonable terms. The high cost or unavailability of drilling rigs, equipment, supplies, personnel, and other oilfield services could adversely affect our ability to execute our exploration and development plans on a timely basis and within our budget, which could have a material adverse effect on our business, financial condition, or results of operations.

41

APC-01751793

Table of Contents
Index to Financial Statements

*Our drilling activities may not be productive.*

Drilling for oil and natural gas involves numerous risks, including the risk that we will not encounter commercially productive oil or natural-gas reservoirs. The costs of drilling, completing, and operating wells are often uncertain, and drilling operations may be curtailed, delayed, or canceled as a result of a variety of factors, including the following:

- unexpected drilling conditions
- pressure or irregularities in formations
- equipment failures or accidents
- fires, explosions, blowouts, and surface cratering
- marine risks such as capsizing, collisions, and hurricanes
- difficulty identifying and retaining qualified personnel
- title problems
- other adverse weather conditions
- shortages or delays in the delivery of equipment

Certain of our future drilling activities may not be successful and, if unsuccessful, this failure could have an adverse effect on our future results of operations and financial condition. While all drilling, whether developmental or exploratory, involves these risks, exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons. Because of the percentage of our capital budget devoted to high-risk exploratory projects, it is likely that we will continue to experience significant exploration and dry hole expenses.

*We have limited influence over the activities on properties we do not operate.*

Other companies operate some of the properties in which we have an interest. We have limited ability to influence the operation or future development of these nonoperated properties or the amount of capital expenditures that we are required to fund with respect to them. Our dependence on the operator and other working interest owners for these projects and our limited ability to influence the operation and future development of these properties could materially adversely affect the realization of our targeted returns on capital, lead to unexpected future costs, or adversely affect the timing of activities.

*Our ability to sell our oil, natural gas, and NGLs production could be materially harmed if we fail to obtain adequate services such as transportation.*

The marketability of our production depends in part on the availability, proximity, and capacity of pipeline facilities and tanker transportation. If any pipelines or tankers become unavailable, we would, to the extent possible, be required to find a suitable alternative to transport the oil, natural gas, and NGLs, which could increase our costs and/or reduce the revenues we might obtain from the sale of the oil and gas.

42

APC-01751794

Table of Contents
Index to Financial Statements

*Our business could be negatively affected by security threats, including cybersecurity threats, and other disruptions.*

As an oil and gas producer, we face various security threats, including cybersecurity threats such as attempts to gain unauthorized access to sensitive information or to render data or systems unusable; threats to the security of our facilities and infrastructure or third-party facilities and infrastructure, such as processing plants and pipelines; and threats from terrorist acts. Our implementation of various procedures and controls to monitor and mitigate security threats and to increase security for our information, facilities, and infrastructure may result in increased costs. Moreover, there can be no assurance that such procedures and controls will be sufficient to prevent security breaches from occurring. Cybersecurity attacks in particular are becoming more sophisticated and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and systems, and other electronic security breaches that could lead to disruptions in critical systems, unauthorized release of confidential or otherwise protected information, and corruption of data, which could have an adverse effect on our reputation, financial condition, results of operations, or cash flows.

While we have experienced cybersecurity attacks, we have not suffered any material losses relating to such attacks; however, there is no assurance that we will not suffer such losses in the future. In addition, as cybersecurity threats continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate or remediate any cybersecurity vulnerabilities.

*Provisions in our corporate documents and Delaware law could delay or prevent a change of control of Anadarko, even if that change would be beneficial to our stockholders.*

Our restated certificate of incorporation and by-laws contain provisions that may make a change of control of Anadarko difficult, even if it may be beneficial to our stockholders, including provisions governing the nomination and removal of directors, the prohibition of stockholder action by written consent and regulation of stockholders' ability to bring matters for action before annual stockholder meetings, and the authorization given to our Board of Directors to issue and set the terms of preferred stock.

In addition, Section 203 of the Delaware General Corporation Law imposes restrictions on mergers and other business combinations between us and any holder of 15% or more of our outstanding common stock.

*We may reduce or cease to pay dividends on our common stock.*

We can provide no assurance that we will continue to pay dividends at the current rate or at all. The amount of cash dividends, if any, to be paid in the future will depend on actions taken by our Board of Directors, as well as, our financial condition, results of operations, cash flows, levels of capital and exploration expenditures, future business prospects, expected liquidity needs, and other related matters that our Board of Directors deems relevant.

*The loss of key members of our management team, or difficulty attracting and retaining experienced technical personnel, could reduce our competitiveness and prospects for future success.*

The successful implementation of our strategies and handling of other issues integral to our future success will depend, in part, on our experienced management team. The loss of key members of our management team could have an adverse effect on our business. We do not carry key man insurance. Our exploratory drilling success and the success of other activities integral to our operations will depend, in part, on our ability to attract and retain experienced explorationists, engineers, and other professionals. Competition for such professionals is intense. If we cannot retain our technical personnel or attract additional experienced technical personnel, our ability to compete could be harmed.

## Item 1B. Unresolved Staff Comments

None.

43

APC-01751795

Table of Contents
Index to Financial Statements

## Item 3. Legal Proceedings

**GENERAL** The Company is a defendant in a number of lawsuits and is involved in governmental proceedings and regulatory controls arising in the ordinary course of business, including, but not limited to, personal injury claims; title disputes; tax disputes; royalty claims; contract claims; contamination claims relating to oil and gas production, transportation, and processing; and environmental claims, including claims involving assets owned by acquired companies and claims involving assets previously sold to third parties and no longer a part of the Company's current operations. Anadarko is also subject to various environmental-remediation and reclamation obligations arising from federal, state, and local laws and regulations. While the ultimate outcome and impact on the Company cannot be predicted with certainty, after consideration of recorded expense and liability accruals, management believes that the resolution of pending proceedings will not have a material adverse effect on the Company's financial condition, results of operations, or cash flows.

In September 2013, Anadarko received a Notice of Proposed Penalty Assessment from the Bureau of Safety and Environmental Enforcement (BSEE) as the result of an incident that occurred in February 2012 relating to a drilling rig in the Gulf of Mexico. In the notice, BSEE alleged several violations of certain offshore operational requirements. Anadarko disputed many of the allegations and in October 2014 received a Revised Final Reviewing Officer's Decision from BSEE for a penalty of $70,000.

In June 2014, the EPA alleged that Anadarko was not in compliance with a consent decree entered into by the U.S. District Court for the District of Colorado on March 27, 2008 to resolve certain Clean Air Act violations in Colorado and Utah. Specifically, the EPA alleged violations of the consent decree at three of Anadarko's compressor station facilities located in Utah. In November 2014, Anadarko entered into a joint stipulation with the EPA and agreed to pay a penalty of $599,000.

WGR Operating, LP, a wholly owned subsidiary of the Company, is currently in negotiations with the EPA concerning enforcement for alleged noncompliance with the leak detection and repair requirements of the Clean Air Act at its Granger, Wyoming facilities. Although management cannot predict the outcome of settlement discussions, it is likely a resolution of this matter will result in a fine or penalty in excess of $100,000.

See *Note 17-Contingencies* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K, which is incorporated herein by reference, for a discussion of material legal proceedings to which the Company is a party.

## Item 4. Mine Safety Disclosures

Not applicable.

44

APC-01751796

Table of Contents
Index to Financial Statements

**PART II**

**Item 5.Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**MARKET INFORMATION, HOLDERS, AND DIVIDENDS**

At January 30, 2015, there were approximately 11,400 holders of record of Anadarko common stock. The common stock of Anadarko is traded on the New York Stock Exchange. The following shows information regarding the market price of and dividends declared and paid on the Company's common stock by quarter for 2014 and 2013:

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | |
| Market Price | | | | | | | | |
| High | S | 86.86 | S | 112.06 | S | 113.51 | S | 102.68 |
| Low | S | 77.80 | S | 84.54 | S | 100.40 | S | 71.00 |
| Dividends | S | 0.18 | S | 0.27 | S | 0.27 | S | 0.27 |
| **2013** | | | | | | | | |
| Market Price | | | | | | | | |
| High | $ | 89.20 | $ | 92.18 | $ | 96.75 | $ | 98.47 |
| Low | $ | 74.73 | $ | 78.30 | $ | 86.08 | $ | 73.60 |
| Dividends | $ | 0.09 | $ | 0.09 | $ | 0.18 | $ | 0.18 |

The amount of future common stock dividends will depend on earnings, financial condition, capital requirements, the effect a dividend payment would have on the Company's compliance with its financial covenants, and other factors, and will be determined by the Board of Directors on a quarterly basis. For additional information, see *Liquidity and Capital Resources-Uses of Cash-Common Stock Dividends and Distributions to Noncontrolling Interest Owners* under Item 7 of this Form 10-K.

45

APC-01751797

Table of Contents
Index to Financial Statements

**SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS**

The following sets forth information with respect to the equity compensation plans available to directors, officers, and employees of the Company at December 31, 2014:

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants, and rights | (b) Weighted-average exercise price of outstanding options, warrants, and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column(a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 6,791,018 | $ 69.96 | 21,169,470 |
| Equity compensation plans not approved by security holders | - | - | - |
| Total | 6,791,018 | $ 69.96 | 21,169,470 |

**PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PERSONS**

The following sets forth information with respect to repurchases made by the Company of its shares of common stock during the fourth quarter of 2014:

| Period | Total number of shares purchased [1] | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Approximate dollar value of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| October | 14,821 | $ 92.69 | - | |
| November | 79,151 | $ 92.83 | - | |
| December | 2,084 | $ 77.60 | - | |
| Fourth Quarter 2014 | 96,056 | $ 92.48 | - | $ - |

[1] During the fourth quarter of 2014, all purchased shares related to stock received by the Company for the payment of withholding taxes due on employee stock plan share issuances.

For additional information, see *Note 15-Share-Based Compensation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

46

APC-01751798

Table of Contents
Index to Financial Statements

**PERFORMANCE GRAPH**

*The following performance graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934, each as amended, except to the extent that the Company specifically incorporates it by reference into such filing.*

The following graph compares the cumulative five-year total return to stockholders of Anadarko's common stock relative to the cumulative total returns of the S&P 500 index and a peer group of 11 companies. The companies included in the peer group are Apache Corporation; Chevron Corporation; ConocoPhillips; Devon Energy Corporation; EOG Resources, Inc.; Hess Corporation; Marathon Oil Corporation; Murphy Oil Corporation; Noble Energy, Inc.; Occidental Petroleum Corporation; and Pioneer Natural Resources Company.

**Comparison of 5-Year Cumulative Total Return Among
Anadarko Petroleum Corporation, the S&P 500 Index, and a Peer Group**



Copyright© 2015 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

An investment of $100 (with reinvestment of all dividends) is assumed to have been made in the Company's common stock, in the S&P 500 Index, and in the peer group on December 31, 2009, and its relative performance is tracked through December 31, 2014.

| Fiscal Year Ended December 31 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Anadarko Petroleum Corporation | $ 100.00 | $ 122.78 | $ 123.64 | $ 120.97 | $ 129.92 | $ 136.59 |
| S&P 500 | 100.00 | 115.06 | 117.49 | 136.30 | 180.44 | 205.14 |
| Peer Group | 100.00 | 123.66 | 130.54 | 133.12 | 167.31 | 154.38 |

47

APC-01751799

Table of Contents
Index to Financial Statements

## Item 6. Selected Financial Data

| millions except per-share amounts | Summary Financial Information [1] | | | | |
|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2011 | 2010 |
| Sales Revenues | $ 16,375 | $ 14,867 | $ 13,307 | $ 13,882 | $ 10,842 |
| Gains (Losses) on Divestitures and Other, net | 2,095 | (286) | 104 | 85 | 142 |
| Total Revenues and Other | 18,470 | 14,581 | 13,411 | 13,967 | 10,984 |
| Algeria Exceptional Profits Tax Settlement | - | 33 | (1,797) | - | - |
| Deepwater Horizon Settlement and Related Costs | 97 | 15 | 18 | 3,930 | 15 |
| Operating Income (Loss) | 5,403 | 3,333 | 3,727 | (1,870) | 1,769 |
| Tronox-related Contingent Loss | 4,360 | 850 | (250) | 250 | - |
| Income (Loss) | (1,563) | 941 | 2,445 | (2,568) | 821 |
| Net Income (Loss) Attributable to Common Stockholders | (1,750) | 801 | 2,391 | (2,649) | 761 |
| Per Common Share (amounts attributable to common stockholders) | | | | | |
| Net Income (Loss)-Basic | $ (3.47) | $ 1.58 | $ 4.76 | $ (5.32) | $ 1.53 |
| Net Income (Loss)-Diluted | $ (3.47) | $ 1.58 | $ 4.74 | $ (5.32) | $ 1.52 |
| Dividends | $ 0.99 | $ 0.54 | $ 0.36 | $ 0.36 | $ 0.36 |
| Average Number of Common Shares Outstanding-Basic | 506 | 502 | 500 | 498 | 495 |
| Average Number of Common Shares Outstanding-Diluted | 506 | 505 | 502 | 498 | 497 |
| Cash Provided by Operating Activities | 8,466 | 8,888 | 8,339 | 2,505 | 5,247 |
| Capital Expenditures | $ 9,256 | $ 8,523 | $ 7,311 | $ 6,553 | $ 5,169 |
| Current Portion of Long-term Debt | $ - | $ 500 | $ - | $ 170 | $ 291 |
| Long-term Debt | 15,092 | 13,065 | 13,269 | 15,060 | 12,722 |
| Total Debt | $ 15,092 | $ 13,565 | $ 13,269 | $ 15,230 | $ 13,013 |
| Total Stockholders' Equity | 19,725 | 21,857 | 20,629 | 18,105 | 20,684 |
| Total Assets | $ 61,689 | $ 55,781 | $ 52,589 | $ 51,779 | $ 51,559 |
| Annual Sales Volumes | | | | | |
| Natural Gas (Bcf) | 945 | 968 | 913 | 852 | 829 |
| Oil and Condensate (MMBbls) | 106 | 91 | 86 | 79 | 74 |
| Natural Gas Liquids (MMBbls) | 44 | 33 | 30 | 27 | 23 |
| Total (MMBOE)[2] | 308 | 285 | 268 | 248 | 235 |
| Average Daily Sales Volumes | | | | | |
| Natural Gas (MMcf/d) | 2,589 | 2,652 | 2,495 | 2,334 | 2,272 |
| Oil and Condensate (MBbls/d) | 292 | 248 | 233 | 217 | 201 |
| Natural Gas Liquids (MBbls/d) | 119 | 91 | 83 | 74 | 63 |
| Total (MBOE/d) | 843 | 781 | 732 | 680 | 643 |
| Proved Reserves | | | | | |
| Natural-gas Reserves (Tcf) | 8.7 | 9.2 | 8.3 | 8.4 | 8.1 |
| Oil and Condensate Reserves (MMBbls) | 929 | 851 | 767 | 771 | 749 |
| Natural-gas Liquids Reserves (MMBbls) | 479 | 407 | 405 | 374 | 320 |
| Total Proved Reserves (MMBOE) | 2,858 | 2,792 | 2,560 | 2,539 | 2,422 |
| Number of Employees | 6,100 | 5,700 | 5,200 | 4,800 | 4,400 |

[1]  Consolidated for Anadarko and its subsidiaries. Certain amounts for prior years have been reclassified to conform to the current presentation.
[2]  Natural gas is converted to equivalent barrels at the rate of 6,000 cubic feet of gas per barrel.

Table of Measures

| | |
|---|---|
| Bcf-Billion cubic feet | MBbls/d-Thousand barrels per day |
| MMBbls-Million barrels | MBOE/d-Thousand barrels of oil equivalent per day |
| MMBOE-Million barrels of oil equivalent | Tcf-Trillion cubic feet |
| MMcf/d-Million cubic feet per day | |

48

APC-01751800

Table of Contents
Index to Financial Statements

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion should be read together with the *Consolidated Financial Statements* and the *Notes to Consolidated Financial Statements*, which are included in this report in Item 8, and the information set forth in *Risk Factors* under Item 1A. Unless the context otherwise requires, the terms "Anadarko" and "Company" refer to Anadarko Petroleum Corporation and its consolidated subsidiaries.

**OVERVIEW**

Anadarko met or exceeded its key operational objectives in 2014. The Company increased sales volumes per day by approximately 8% over 2013 and added 502 million barrels of oil equivalent (MMBOE) of proved reserves. The Company ended 2014 with $7.4 billion of cash on hand, full availability of its $5.0 billion senior secured revolving credit facility maturing in September 2015 ($5.0 billion Facility), and access to credit and capital markets as needed.

In January 2015, the Company paid $5.2 billion after the settlement agreement resolving all claims asserted in the Tronox Adversary Proceeding became effective and replaced the $5.0 billion Facility with two new unsecured credit facilities. The Company paid the settlement using cash on hand and borrowings. Management believes that the Company is positioned to continue to satisfy its operational objectives and capital commitments with cash on hand, available borrowing capacity, and cash flows from operations.

**Mission and Strategy**

Anadarko's mission is to deliver a competitive and sustainable rate of return to shareholders by developing, acquiring, and exploring for oil and natural-gas resources vital to the world's health and welfare. Anadarko employs the following strategy to achieve this mission:

- explore in high-potential, proven basins
- identify and commercialize resources
- employ a global business development approach
- ensure financial discipline and flexibility

Exploring in high-potential, proven, and emerging basins worldwide provides the Company with growth opportunities. Anadarko's exploration success has created value by increasing future resource potential, while providing the flexibility to mitigate risk by monetizing discoveries.

Developing a portfolio of primarily unconventional resources provides the Company a stable base of capital-efficient and predictable development opportunities that, in turn, positions the Company for consistent growth at competitive rates.

Anadarko's global business development approach transfers core skills across the globe to assist in the discovery and development of world-class resources that are accretive to the Company's performance. These resources help form an optimized global portfolio where both surface and subsurface risks are actively managed.

A strong balance sheet is essential for the development of the Company's assets, and Anadarko is committed to disciplined investment in its businesses to efficiently manage commodity price cycles. Maintaining financial discipline enables the Company to capitalize on the opportunities afforded by its global portfolio, while allowing the Company to pursue new strategic growth opportunities.

49

APC-01751801

Table of Contents
Index to Financial Statements

Significant 2014 operating and financial activities include the following:

**Overall**

- Anadarko's full-year sales volumes averaged 843 thousand barrels of oil equivalent per day (MBOE/d), representing an 8% increase over 2013.
- Anadarko's liquids sales volumes were 411 thousand barrels per day (MBbls/d), representing a 21% increase over 2013, primarily due to increased sales volumes in the Wattenberg field, the Eagleford shale, and the Delaware basin.
- The Company's overall sales product mix increased to 49% liquids in 2014 compared to 43% in 2013.
- Anadarko and Kerr-McGee Corporation and certain of its subsidiaries entered into a settlement agreement resolving all claims asserted in the Tronox Adversary Proceeding resulting in a payment of $5.2 billion, including interest, in January 2015. See *Note 17-Contingencies-Tronox Litigation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

**U.S. Onshore**

- The Rocky Mountains Region (Rockies) full-year sales volumes averaged 361 MBOE/d, representing a 10% increase over 2013, primarily from the Wattenberg field.
- The Southern and Appalachia Region full-year sales volumes averaged 298 MBOE/d, representing a 16% increase over 2013, primarily from the Marcellus and Eagleford shales, the Delaware basin, and the East Texas/North Louisiana horizontal development.
- Western Gas Partners, LP (WES), a consolidated subsidiary of the Company, acquired Nuevo Midstream, LLC (Nuevo), which owns and operates gathering and processing assets located in the Delaware basin in West Texas, for $1.554 billion. Following the acquisition, WES changed the name of Nuevo to Delaware Basin Midstream, LLC (DBM).
- The Company entered into a carried-interest arrangement that requires a third party to fund $442 million of Anadarko's capital costs in exchange for a 34% working interest in the Eaglebine development, located in Southeast Texas.
- The Company sold its interest in the Pinedale/Jonah assets in Wyoming for $581 million.

**Gulf of Mexico**

- Gulf of Mexico full-year sales volumes averaged 83 MBOE/d, representing a 14% decrease from 2013, primarily due to natural production declines.
- Anadarko's Lucius development project in the deepwater Gulf of Mexico was completed with first oil achieved in January 2015.
- The Company sold its interest in the nonoperated Vito deepwater development, along with several surrounding exploration blocks in the Gulf of Mexico, for $500 million, recognizing a gain of $237 million.

**International**

- International full-year sales volumes averaged 92 MBOE/d, representing a 2% increase from 2013, primarily due to increased sales volumes at El Merk in Algeria.
- Anadarko sold a 10% working interest in Offshore Area 1 in Mozambique for $2.64 billion, recognizing a gain of $1.5 billion.
- Anadarko sold its Chinese subsidiary for $1.075 billion, recognizing a gain of $510 million.
- The Tweneboa/Enyenra/Ntomme (TEN) project in Ghana was approximately 50% complete and nine development wells had been drilled at year end 2014. First oil is expected in 2016.

50

APC-01751802

Table of Contents
Index to Financial Statements

**Financial**

- Anadarko's net loss attributable to common stockholders for 2014 totaled $1.8 billion, which included a $4.360 billion contingent loss related to the Tronox Adversary Proceeding and $836 million of impairment expense primarily related to certain U.S. onshore and Gulf of Mexico properties.
- The Company generated $8.5 billion of cash flow from operations in 2014 and ended 2014 with $7.4 billion of cash on hand.
- Anadarko increased the quarterly dividend paid to its common stockholders from $0.18 per share to $0.27 per share.
- The Company repaid $775 million of Senior Notes that matured in 2014.
- Anadarko entered into a $3.0 billion five-year senior unsecured revolving credit facility, which is expandable to $4.0 billion, and a $2.0 billion 364-day senior unsecured revolving credit facility. These facilities (collectively, the New Credit Facilities) replaced the $5.0 billion Facility upon satisfaction of certain conditions, including the January 2015 settlement payment related to the Tronox Adversary Proceeding.
- Anadarko issued $625 million aggregate principal amount of 3.450% Senior Notes due 2024 and $625 million aggregate principal amount of 4.500% Senior Notes due 2044.
- The Company sold approximately 6 million Western Gas Equity Partners, LP (WGP) common units to the public, raising net proceeds of $335 million.
- WES entered into a five-year $1.2 billion, expandable to $1.5 billion, senior unsecured revolving credit facility maturing in February 2019 (RCF), which amended and restated its then-existing $800 million senior unsecured revolving credit facility.
- WES completed public offerings of $100 million aggregate principal amount of 2.600% Senior Notes due 2018 and $400 million aggregate principal amount of 5.450% Senior Notes due 2044.
- WES issued approximately 10 million common units to the public, raising total net proceeds of $691 million.

The following discussion pertains to Anadarko's results of operations, financial condition, and changes in financial condition. Any increases or decreases "for the year ended December 31, 2014," refer to the comparison of the year ended December 31, 2014, to the year ended December 31, 2013. Similarly, any increases or decreases "for the year ended December 31, 2013," refer to the comparison of the year ended December 31, 2013, to the year ended December 31, 2012. The primary factors that affect the Company's results of operations include commodity prices for natural gas, oil, and natural gas liquids (NGLs); sales volumes; the Company's ability to discover additional reserves; the cost of finding such reserves; and operating costs.

51

APC-01751803

Table of Contents
Index to Financial Statements

**RESULTS OF OPERATIONS**

| *millions except per-share amounts and percentages* | | **2014** | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| **Financial Results** | | | | | | |
| Natural-gas, oil and condensate, and NGLs sales | $ | **15,169** | $ | 13,828 | $ | 12,396 |
| Gathering, processing, and marketing sales | | **1,206** | | 1,039 | | 911 |
| Gains (losses) on divestitures and other, net | | **2,095** | | (286) | | 104 |
| Total revenues and other | | **18,470** | | 14,581 | | 13,411 |
| Costs and expenses (1) | | **13,067** | | 11,248 | | 9,684 |
| Other (income) expense (2) | | **5,349** | | 1,227 | | 162 |
| Income tax expense (benefit) | | **1,617** | | 1,165 | | 1,120 |
| Net income (loss) attributable to common stockholders | $ | **(1,750)** | $ | 801 | $ | 2,391 |
| Net income (loss) per common share attributable to common stockholders-diluted | $ | **(3.47)** | $ | 1.58 | $ | 4.74 |
| Average number of common shares outstanding-diluted | | **506** | | 505 | | 502 |
| | | | | | | |
| **Operating Results** | | | | | | |
| Adjusted EBITDAX (3) | $ | **12,721** | $ | 9,403 | $ | 8,966 |
| Total proved reserves (MMBOE) | | **2,858** | | 2,792 | | 2,560 |
| Annual sales volumes (MMBOE) | | **308** | | 285 | | 268 |
| | | | | | | |
| **Capital Resources and Liquidity** | | | | | | |
| Cash provided by operating activities | $ | **8,466** | $ | 8,888 | $ | 8,339 |
| Capital expenditures | | **9,256** | | 8,523 | | 7,311 |
| Total debt | | **15,092** | | 13,565 | | 13,269 |
| Total equity | $ | **22,318** | $ | 23,650 | $ | 21,882 |
| Debt to total capitalization ratio | | **40.3%** | | 36.5% | | 37.7% |

(1) Includes a credit of $1.8 billion in 2012 for previously recognized expenses related to the favorable resolution of the Algeria exceptional profits tax dispute.

(2) Includes Tronox-related contingent loss of $4.360 billion in 2014, $850 million in 2013, and reversal of the 2011 Tronox-related contingent loss $(250) million in 2012.

(3) See *Operating Results-Segment Analysis-Adjusted EBITDAX* for a description of Adjusted EBITDAX, which is not a U.S. Generally Accepted Accounting Principles (GAAP) measure, and for a reconciliation of Adjusted EBITDAX to income (loss) before income taxes, which is the most directly comparable financial measure presented in accordance with GAAP.

52

APC-01751804

Table of Contents
Index to Financial Statements

**FINANCIAL RESULTS**

| millions | Natural Gas | | Oil and Condensate | | NGLs | | Total | |
|---|---|---|---|---|---|---|---|---|
| 2013 sales revenues | $ | 3,388 | $ | 9,178 | $ | 1,262 | $ | 13,828 |
| Changes associated with prices | | 540 | | (1,046) | | (86) | | (592) |
| Changes associated with sales volumes | | (79) | | 1,616 | | 396 | | 1,933 |
| 2014 sales revenues | $ | 3,849 | $ | 9,748 | $ | 1,572 | $ | 15,169 |
| Increase/(Decrease) vs. 2013 | | 14% | | 6% | | 25% | | 10% |
| | | | | | | | | |
| 2012 sales revenues | $ | 2,444 | $ | 8,728 | $ | 1,224 | $ | 12,396 |
| Changes associated with prices | | 798 | | (85) | | (82) | | 631 |
| Changes associated with sales volumes | | 146 | | 535 | | 120 | | 801 |
| 2013 sales revenues | $ | 3,388 | $ | 9,178 | $ | 1,262 | $ | 13,828 |
| Increase/(Decrease) vs. 2012 | | 39% | | 5% | | 3% | | 12% |

Anadarko's sales revenues increased for the year ended December 31, 2014, primarily due to higher oil and NGLs sales volumes and higher average natural-gas prices, partially offset by lower average oil and NGLs prices and slightly lower natural-gas sales volumes. Total sales revenues increased for the year ended December 31, 2013, primarily due to higher sales volumes for all products and higher average natural-gas prices, partially offset by lower average oil and NGLs prices.

The following provides Anadarko's sales volumes for the years ended December 31, 2014, 2013, and 2012:

| | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| *Barrels of Oil Equivalent* | | | | | |
| *(MMBOE except percentages)* | | | | | |
| United States | 275 | 9% | 252 | 6% | 237 |
| International | 33 | 2 | 33 | 7 | 31 |
| Total barrels of oil equivalent | 308 | 8 | 285 | 6 | 268 |
| *Barrels of Oil Equivalent per Day* | | | | | |
| *(MBOE/d except percentages)* | | | | | |
| United States | 751 | 9% | 691 | 7% | 648 |
| International | 92 | 2 | 90 | 7 | 84 |
| Total barrels of oil equivalent per day | 843 | 8 | 781 | 7 | 732 |

Sales volumes represent actual production volumes adjusted for changes in commodity inventories and natural-gas production volumes provided to a certain government entity to satisfy a commitment established in conjunction with the development plan. Anadarko employs marketing strategies to minimize market-related shut-ins, maximize realized prices, and manage credit-risk exposure. For additional information, see *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K and Other (Income) Expense-(Gains) Losses on Derivatives, net. Production of natural gas, oil, and NGLs is usually not affected by seasonal swings in demand.

53

APC-01751805

Table of Contents
Index to Financial Statements

**Natural-Gas Sales Volumes, Average Prices, and Revenues**

| | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| **United States** | | | | | |
| Sales volumes-Bcf | 945 | (2)% | 968 | 6% | 913 |
| MMcf/d | 2,589 | (2) | 2,652 | 6 | 2,495 |
| Price per Mcf | $ 4.07 | 16 | $ 3.50 | 31 | $ 2.68 |
| Natural-gas sales revenues (millions) | $ 3,849 | 14 | $ 3,388 | 39 | $ 2,444 |

Bcf-billion cubic feet
MMcf/d-million cubic feet per day
Mcf-thousand cubic feet

*Natural-Gas Sales Volumes*

*2014 vs. 2013* The Company's natural-gas sales volumes decreased by 63 MMcf/d.

- Sales volumes decreased by 90 MMcf/d in the Rockies primarily due to the sale of the Company's Pinedale/Jonah assets in January 2014 and natural production declines in the Powder River basin and Greater Natural Buttes. These decreases were partially offset by higher sales volumes in the Wattenberg field due to increased horizontal drilling.
- Sales volumes decreased by 67 MMcf/d in the Gulf of Mexico primarily due to natural production declines.
- Sales volumes for the Southern and Appalachia Region increased by 94 MMcf/d primarily due to infrastructure expansions that allowed the Company to bring wells online in the Marcellus and Eagleford shales, as well as continued horizontal drilling in the liquids-rich East Texas/North Louisiana horizontal development.

*2013 vs. 2012* The Company's natural-gas sales volumes increased by 157 MMcf/d.

- Sales volumes increased by 246 MMcf/d in the Southern and Appalachia Region primarily due to horizontal drilling and infrastructure expansions in the Eagleford and Marcellus shales, as well as new wells drilled in the liquids-rich East Texas/North Louisiana horizontal development.
- Sales volumes decreased by 47 MMcf/d in the Gulf of Mexico primarily due to natural production declines.
- Sales volumes for the Rockies decreased by 42 MMcf/d primarily due to a natural production decline in the Powder River basin, partially offset by higher sales volumes in the Wattenberg field due to increased horizontal drilling.

*Natural-Gas Prices*

*2014 vs. 2013* The average natural-gas price Anadarko received increased primarily due to low industry natural-gas storage levels as a result of colder than average winter temperatures and the associated high residential heating demand in early 2014. In addition, natural-gas prices increased as a result of higher industrial natural-gas demand, reduced natural-gas imports from Canada, and continued strength in exports to Mexico.

*2013 vs. 2012* Anadarko's average natural-gas price received increased as higher-than-normal residential and commercial demand early in 2013 reduced overall industry natural-gas storage below the previous year's record levels. Natural-gas prices were further supported by higher demand in the fourth quarter of 2013, a reduction in natural-gas imports from Canada, and continued strength in exports to Mexico.

54

APC-01751806

Table of Contents
Index to Financial Statements

**Oil and Condensate Sales Volumes, Average Prices, and Revenues**

|  | | 2014 | Inc/(Dec) vs. 2013 | | 2013 | Inc/(Dec) vs. 2012 | | 2012 |
|---|---|---|---|---|---|---|---|---|
| **United States** | | | | | | | | |
| Sales volumes-MMBbls | | 74 | 28% | | 58 | 6% | | 55 |
| MBbls/d | | 203 | 28 | | 158 | 6 | | 149 |
| Price per barrel | $ | 87.99 | (9) | $ | 97.02 | - | $ | 97.46 |
| **International** | | | | | | | | |
| Sales volumes-MMBbls | | 32 | (1)% | | 33 | 7% | | 31 |
| MBbls/d | | 89 | (1) | | 90 | 7 | | 84 |
| Price per barrel | $ | 99.79 | (9) | $ | 109.15 | (2) | $ | 111.11 |
| **Total** | | | | | | | | |
| Sales volumes-MMBbls | | 106 | 18% | | 91 | 6% | | 86 |
| MBbls/d | | 292 | 18 | | 248 | 6 | | 233 |
| Price per barrel | $ | 91.58 | (10) | $ | 101.41 | (1) | $ | 102.35 |
| Oil and condensate sales revenues (millions) | $ | 9,748 | 6 | $ | 9,178 | 5 | $ | 8,728 |

MMBbls-million barrels

***Oil and Condensate Sales Volumes***

*2014 vs. 2013* Anadarko's oil and condensate sales volumes increased by 44 MBbls/d.

- Sales volumes for the Rockies increased by 33 MBbls/d primarily in the Wattenberg field due to increased horizontal drilling.
- Sales volumes for the Southern and Appalachia Region increased by 15 MBbls/d, primarily as a result of increased horizontal drilling and 2013 infrastructure expansion in the Eagleford shale and increased horizontal drilling in the Delaware basin.
- International sales volumes decreased by 1 MBbls/d primarily due to lower sales volumes in China as a result of maintenance downtime and the sale of the Company's Chinese subsidiary and the timing of liftings in Ghana, partially offset by higher sales volumes in Algeria from additional facilities and wells brought online at El Merk.
- Sales volumes in the Gulf of Mexico decreased by 1 MBbls/d primarily due to natural production declines.

*2013 vs. 2012* Anadarko's oil and condensate sales volumes increased by 15 MBbls/d.

- Sales volumes for the Rockies increased by 15 MBbls/d primarily in the Wattenberg field due to increased horizontal drilling.
- Sales volumes for the Southern and Appalachia Region increased by 6 MBbls/d, as a result of horizontal drilling and infrastructure expansions in the Eagleford shale.
- International sales volumes increased by 6 MBbls/d primarily in Ghana as a result of enhanced production due to successful acid stimulations and additional Phase 1A Jubilee wells brought online, as well as timing of cargo liftings.
- Sales volumes in the Gulf of Mexico decreased by 10 MBbls/d primarily due to natural production declines.

***Oil and Condensate Prices***

*2014 vs. 2013* Anadarko's average oil price received decreased as a result of a global oversupply and reduced oil demand resulting from continued economic weakness particularly in late 2014.

*2013 vs. 2012* Anadarko's average oil price received decreased due to slightly lower international oil prices in 2013.

55

Table of Contents
Index to Financial Statements

**Natural-Gas Liquids Sales Volumes, Average Prices, and Revenues**

| | | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|---|
| **United States** | | | | | | |
| Sales volumes-MMBbls | | 43 | 28% | 33 | 10% | 30 |
| MBbls/d | | 116 | 28 | 91 | 10 | 83 |
| Price per barrel | $ | 35.48 | (7) | $ 37.97 | (6) | $ 40.44 |
| **International** | | | | | | |
| Sales volumes-MMBbls | | 1 | NM | - | NM | - |
| MBbls/d | | 3 | NM | - | NM | - |
| Price per barrel | $ | 56.16 | NM | $ - | NM | $ - |
| **Total** | | | | | | |
| Sales volumes-MMBbls | | 44 | 31% | 33 | 10% | 30 |
| MBbls/d | | 119 | 31 | 91 | 10 | 83 |
| Price per barrel | $ | 36.01 | (5) | $ 37.97 | (6) | $ 40.44 |
| Natural-gas liquids sales revenues (millions) | $ | 1,572 | 25 | $ 1,262 | 3 | $ 1,224 |

NM-not meaningful

*NGLs Sales Volumes*

NGLs sales represent revenues from the sale of products derived from the processing of Anadarko's natural-gas production.

*2014 vs. 2013* The Company's NGLs sales volumes increased by 28 MBbls/d.

• Sales volumes in the Rockies increased by 16 MBbls/d primarily in the Wattenberg field due to increased horizontal drilling and the Lancaster plant coming online in April 2014.

• Sales volumes for the Southern and Appalachia Region increased by 10 MBbls/d primarily as a result of increased horizontal drilling and 2013 infrastructure expansion in the Eagleford shale.

• International sales volumes increased by 3 MBbls/d due to the commencement of NGLs sales in 2014 from the Company's El Merk facility in Algeria.

*2013 vs. 2012* Anadarko's NGLs sales volumes increased 8 MBbls/d.

• Sales volumes for the Southern and Appalachia Region increased by 12 MBbls/d as a result of increased horizontal drilling and infrastructure expansion in the Eagleford shale and horizontal drilling in the liquids-rich East Texas/North Louisiana horizontal development.

• Sales volumes in the Rockies decreased by 2 MBbls/d primarily due to ethane rejection in 2013.

• Sales volumes in the Gulf of Mexico decreased by 2 MBbls/d due to natural production declines.

*NGLs Sales Prices*

*2014 vs. 2013* Anadarko's average NGLs price received decreased primarily due to lower prices for butanes and natural gasoline resulting from higher industry production levels and related declines in oil prices.

*2013 vs. 2012* Anadarko's average NGLs price received decreased primarily due to lower prices for ethane and butanes as a result of higher U.S. inventory and production levels.

APC-01751808

Table of Contents
Index to Financial Statements

**Gathering, Processing, and Marketing Margin**

| millions except percentages | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| Gathering, processing, and marketing sales | $ 1,206 | 16% | $ 1,039 | 14% | $ 911 |
| Gathering, processing, and marketing expense | 1,030 | 19 | 869 | 14 | 763 |
| Total gathering, processing, and marketing, net | $ 176 | 4 | $ 170 | 15 | $ 148 |

Gathering and processing sales includes revenue from the sale of NGLs and remaining residue gas extracted from natural gas purchased from third parties and processed by Anadarko, as well as fee revenue earned by providing gathering, processing, compression, and treating services to third parties. Marketing sales include the margin earned from purchasing and selling third-party oil and natural gas. Gathering, processing, and marketing expense includes the cost of third-party natural gas purchased and processed by Anadarko, as well as other operating and transportation expenses related to the Company's costs to perform gathering, processing, and marketing activities.

*2014 vs. 2013* Gathering, processing, and marketing, net increased by $6 million primarily due to higher gathering and processing revenue associated with higher volumes, increased natural-gas prices, and increased infrastructure, partially offset by higher processing and transportation expenses due to the increased volumes.

*2013 vs. 2012* Gathering, processing, and marketing, net increased by $22 million primarily due to higher gathering revenue as a result of increased volumes and higher marketing margins, partially offset by increased transportation expenses due to increased third-party volumes and increased demand fees.

57

APC-01751809

Table of Contents
Index to Financial Statements

**Gains (Losses) on Divestitures and Other, net**

| millions except percentages | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| Gains (losses) on divestitures | $ 1,891 | NM | $ (470) | NM | $ (71) |
| Other | 204 | 11% | 184 | 5% | 175 |
| Total gains (losses) on divestitures and other, net | $ 2,095 | NM | $ (286) | NM | $ 104 |

Gains (losses) on divestitures and other, net includes gains (losses) on divestitures and other operating revenues including minerals sales, earnings from equity investments, and other revenues.

*2014*

- The Company recognized a gain of $1.5 billion related to its divestiture of a 10% working interest in Offshore Area 1 in Mozambique for sales proceeds of $2.64 billion.

- The Company recognized a gain of $510 million associated with the divestiture of its Chinese subsidiary for sales proceeds of $1.075 billion.

- The Company recognized a gain of $237 million associated with the divestiture of its interest in the nonoperated Vito deepwater development, along with several surrounding exploration blocks in the Gulf of Mexico, for sales proceeds of $500 million.

- The Company recognized gains on divestitures of $127 million for certain oil and gas properties in the United States.

- During the fourth quarter of 2014, Anadarko considered certain U.S. onshore oil and gas assets to be held for sale and recognized a $456 million loss. At December 31, 2014, these assets were no longer considered held for sale as the volatility in the current commodity-price environment reduced the probability that these assets would be sold within the next year.

*2013*

- The Company recognized losses on assets held for sale of $704 million, primarily associated with the loss of value of the Pinedale/Jonah assets in Wyoming, which were sold in January 2014 for sale proceeds of $581 million.

- The Company divested its interest in a soda ash joint venture for sales proceeds of $310 million, recognizing a gain of $140 million, while retaining its royalty interest in soda ash mined by the joint venture from the Company's Land Grant. Additional consideration may also be received based on future revenue of the joint venture.

- The Company recognized gains on divestitures of $94 million for certain oil and gas properties in the United States.

*2012*

- The Company recognized losses of $71 million on certain oil and gas properties, primarily related to the sale of oil and gas properties in Indonesia.

See *Note 2-Acquisitions, Divestitures, and Assets Held for Sale* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for additional information on assets held for sale.

58

APC-01751810

Table of Contents
Index to Financial Statements

**Costs and Expenses**

| | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| Oil and gas operating (millions) | $ 1,171 | 7% | $ 1,092 | 12% | $ 976 |
| Oil and gas operating-per BOE | 3.81 | (1) | 3.83 | 5 | 3.65 |
| Oil and gas transportation and other (millions) | 1,184 | 16 | 1,022 | 7 | 955 |
| Oil and gas transportation and other-per BOE | 3.85 | 7 | 3.59 | 1 | 3.57 |

BOE-barrels of oil equivalent

### Oil and Gas Operating Expenses

**2014 vs. 2013** Oil and gas operating expense increased by $79 million primarily due to higher costs associated with increased sales volumes in the Rockies and the Southern and Appalachia Region and increased activity in the Gulf of Mexico. These increases were partially offset by lower expenses due to the sales of the Company's Pinedale/Jonah assets and its China subsidiary. The related costs per BOE decreased by $0.02 due to increased sales volumes, partially offset by the higher costs.

**2013 vs. 2012** Oil and gas operating expenses increased by $116 million primarily due to increased workovers in the Gulf of Mexico, Rockies, and Southern and Appalachia Region; higher expenses in Algeria associated with the start of El Merk production in 2013; and increased costs associated with increased activity in the Rockies and Southern and Appalachia Region. Oil and gas operating expenses per BOE increased by $0.18 primarily due to these higher costs, partially offset by increased sales volumes.

### Oil and Gas Transportation and Other Expenses

**2014 vs. 2013** Oil and gas transportation and other expenses increased by $162 million primarily due to higher gas-gathering and transportation costs primarily attributable to higher volumes related to the growth in the Company's U.S. onshore asset base. Oil and gas transportation and other expenses per BOE increased by $0.26 with the higher costs partially offset by increased sales volumes.

**2013 vs. 2012** Oil and gas transportation and other expenses increased by $67 million primarily due to higher gas-gathering and transportation costs primarily attributable to higher volumes related to the growth in the Company's U.S. onshore asset base. Oil and gas transportation and other expenses per BOE increased by $0.02, with the higher costs partially offset by increased sales volumes.

59

APC-01751811

Table of Contents
Index to Financial Statements

| millions | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| **Exploration Expense** | | | | | | |
| Dry hole expense | $ | **762** | $ | 556 | $ | 440 |
| Impairments of unproved properties | | **483** | | 308 | | 1,104 |
| Geological and geophysical expense | | **168** | | 208 | | 151 |
| Exploration overhead and other | | **226** | | 257 | | 251 |
| Total exploration expense | $ | **1,639** | $ | 1,329 | $ | 1,946 |

*2014 vs. 2013* Exploration expense increased by $310 million.

- Dry hole expense increased by $206 million primarily due to unsuccessful drilling activities expensed in 2014 associated with wells in the Gulf of Mexico, the Rockies, and Mozambique, compared to unsuccessful drilling activities expensed in 2013 associated with wells in Kenya, Sierra Leone, and Côte d'Ivoire.

- Impairments of unproved properties increased by $175 million primarily due to 2014 impairments in the Gulf of Mexico due to lower oil prices, reduction of reserves, and the expiration of certain leases; and impairments in Sierra Leone and certain U.S. onshore oil and gas properties as a result of changes in the Company's drilling plans. Impairments for 2013 included China, Brazil, and a U.S. onshore property as a result of changes in the Company's drilling plans.

- Geological and geophysical expense decreased by $40 million due to lower seismic purchases in the Gulf of Mexico during 2014.

*2013 vs. 2012* Exploration expense decreased by $617 million.

- Impairments of unproved properties decreased by $796 million primarily due to 2012 impairments of $721 million related to Powder River coalbed methane properties primarily as a result of lower natural-gas prices and $124 million related to a Gulf of Mexico natural-gas property that the Company did not expect to develop under the forecasted natural-gas price environment.

- Dry hole expense increased by $116 million primarily due to unsuccessful drilling activities expensed in 2013 associated with wells in the Gulf of Mexico, Sierra Leone, Kenya, Côte d'Ivoire, and New Zealand, compared to unsuccessful drilling activities expensed in 2012 associated with wells in Brazil, Sierra Leone, the Gulf of Mexico, Ghana, and Côte d'Ivoire.

- Geological and geophysical expense increased by $57 million primarily due to 2013 seismic purchases in Colombia and the Gulf of Mexico.

APC-01751812

Table of Contents
Index to Financial Statements

| millions except percentages | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| General and administrative | $ 1,316 | 21% | $ 1,090 | (13)% | $ 1,246 |
| Depreciation, depletion, and amortization | 4,550 | 16 | 3,927 | (1) | 3,964 |
| Other taxes | 1,244 | 16 | 1,077 | (12) | 1,224 |
| Impairments | 836 | 5 | 794 | 104 | 389 |

***General and Administrative Expenses (G&A)***

*2014 vs. 2013* G&A expense increased by $226 million primarily due to higher employee-related expenses of $152 million primarily associated with increased headcount and higher bonus plan expense. In addition, G&A expense increased due to higher legal expenses of $38 million primarily related to the third-party reimbursement of legal expenses associated with the Algeria exceptional profits tax settlement received in 2013 and legal fees related to Tronox, as well as higher consulting fees of $15 million.

*2013 vs. 2012* G&A expense decreased by $156 million due to reduced legal-related expenses of $101 million and lower employee-related expenses of $60 million. The reduced legal-related expenses primarily related to lower 2013 Tronox legal expenses and the 2013 third-party reimbursement of the Company's legal expenses associated with the Algeria exceptional profits tax settlement. The lower employee-related expenses primarily related to the 2012 expense associated with Unit Appreciation Rights (UARs), partially offset by higher 2013 employee-related expenses associated with operational expansions. The UARs were awarded in prior years to certain officers of the general partner of WES, a consolidated subsidiary of Anadarko, pursuant to the Western Gas Holdings, LLC (WGH) Equity Incentive Plan. This expense related to the change in fair value of the UARs upon the initial public offering (IPO) of WGP.

***Depreciation, Depletion, and Amortization (DD&A)***

*2014 vs. 2013* DD&A expense increased by $623 million primarily due to higher sales volumes in 2014, increased asset retirement costs for wells in the Gulf of Mexico, and increased costs associated with additional gathering and processing facilities.

*2013 vs. 2012* DD&A expense decreased by $37 million primarily due to accelerated expense in 2012 associated with the depletion of fields in the Gulf of Mexico, partially offset by higher sales volumes in 2013.

***Other Taxes***

*2014 vs. 2013* Other taxes increased by $167 million.

- Algerian exceptional profits taxes increased by $128 million attributable to higher oil sales volumes and the commencement of NGLs sales in 2014.

- U.S. onshore ad valorem taxes increased by $85 million attributable to increased activity related to U.S. onshore properties.

- Chinese windfall profits tax decreased by $47 million resulting from maintenance downtime in the first half of 2014 and the sale of the Company's Chinese subsidiary in August 2014.

*2013 vs. 2012* Other taxes decreased by $147 million.

- Algerian exceptional profits taxes decreased by $116 million due to a lower Algeria effective tax rate resulting from the resolution of the Algeria exceptional profits tax dispute and lower oil prices.

- Lower sales volumes and oil prices resulted in a $33 million decrease in U.S. production and severance taxes primarily in Alaska.

61

APC-01751813

Table of Contents
Index to Financial Statements

### Impairments

#### 2014

- The Company recognized impairments of $545 million related to certain U.S. onshore oil and gas properties and $276 million related to certain oil and gas properties in the Gulf of Mexico that were impaired primarily due to lower forecasted natural-gas and oil prices.

Declines in commodity prices or negative reserves revisions could result in additional impairments in future periods. See *Note 5-Impairments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for additional information on impairments and *Risk Factors* under Item 1A of this Form 10-K for further discussion on the risks associated with oil, natural-gas, and NGLs prices.

#### 2013

- The Company recognized $562 million due to a reduction in estimated future net cash flows and downward revisions of reserves for certain Gulf of Mexico properties resulting from changes to the Company's development plans.
- The Company recognized $142 million for certain U.S. onshore oil and gas properties and $49 million for related midstream assets due to downward revisions of reserves resulting from changes to the Company's development plans.
- The Company recognized $30 million for certain midstream properties due to a reduction in estimated future cash flows and $11 million related to the Company's Venezuelan cost-method investment due to declines in estimated recoverable value.

#### 2012

- The Company recognized $363 million related to oil and gas exploration and production reporting segment properties located in the United States. These impairments included $259 million related to lower natural-gas prices, $79 million related to downward reserves revisions for a Gulf of Mexico property that was near the end of its economic life, and $25 million for a platform in the Gulf of Mexico.
- The Company recognized impairments of $13 million related to midstream properties and $13 million related to the Company's Venezuelan cost-method investment.

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| Algeria exceptional profits tax settlement | $ - | $ 33 | $ (1,797) |
| Deepwater Horizon settlement and related costs | 97 | 15 | 18 |

### Algeria Exceptional Profits Tax Settlement

In March 2012, Anadarko and Sonatrach resolved the exceptional profits tax dispute. The resolution provided for delivery to the Company of oil valued at $1.7 billion and the elimination of $62 million of previously recorded and unpaid transportation charges. The Company recognized a $1.8 billion credit in the Costs and Expenses section of the Consolidated Statement of Income for 2012 to reflect the effect of this agreement for previously recorded expenses. During 2013, the Company revised its estimate of income tax expense related to the elimination of previously recorded and unpaid transportation charges and recognized a $33 million unfavorable adjustment to the settlement, which was offset by an equivalent income tax benefit also recognized in 2013. At December 31, 2013, the Company had collected all of the $1.7 billion associated with the Algeria exceptional profits tax receivable.

### Deepwater Horizon Settlement and Related Costs

During 2014, the Company recorded a $90 million expense and contingent liability associated with a civil penalty under the Clean Water Act (CWA) related to the Deepwater Horizon event-related claims. In addition, Deepwater Horizon settlement and related costs included legal expenses and related costs associated with the Deepwater Horizon events for 2014, 2013, and 2012. Refer to *Note 17-Contingencies-Deepwater Horizon Events* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for discussion and analysis of these events.

62

APC-01751814

Table of Contents
Index to Financial Statements

**Other (Income) Expense**

| millions except percentages | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| **Interest Expense** | | | | | |
| Current debt, long-term debt, and other | $ 973 | 3% | $ 949 | (1)% | $ 963 |
| Capitalized interest | (201) | 24 | (263) | (19) | (221) |
| Total interest expense | $ 772 | 13 | $ 686 | (8) | $ 742 |

*2014 vs. 2013* Anadarko's interest expense increased by $86 million primarily due to a decrease in capitalized interest of $62 million related to lower construction-in-progress balances for the Mozambique liquefied natural gas project and the completion of certain U.S. pipeline projects in late 2013 and early 2014. In addition, interest expense increased $13 million due to increased long-term debt outstanding during 2014. For additional information, see *Liquidity and Capital Resources* and *Interest-Rate Risk* under Item 7A of this Form 10-K.

*2013 vs. 2012* Anadarko's interest expense decreased by $56 million primarily due to an increase in capitalized interest of $42 million related to higher construction-in-progress balances for long-term capital projects. Additionally, interest expense decreased by $31 million as a result of the repayment of outstanding borrowings during 2012 associated with the $5.0 billion Facility. These decreases were partially offset by $18 million of interest expense for outstanding borrowings primarily related to WES's 4.000% Senior Notes due 2022, which were issued during 2012.

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| **(Gains) Losses on Derivatives, net** | | | |
| (Gains) losses on commodity derivatives, net | $ (589) | $ 141 | $ (387) |
| (Gains) losses on interest-rate and other derivatives, net | 786 | (539) | 61 |
| Total (gains) losses on derivatives, net | $ 197 | $ (398) | $ (326) |

(Gains) losses on derivatives, net represents the changes in fair value of the Company's derivative instruments as a result of changes in commodity prices and interest rates. Anadarko enters into commodity derivatives to manage the risk of changes in the market prices for its anticipated sales of production. In addition, Anadarko enters into interest-rate swaps to fix or float interest rates on existing or anticipated indebtedness to manage exposure to interest-rate changes. For additional information, see *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

63

APC-01751815

Table of Contents
Index to Financial Statements

| millions except percentages | 2014 | Inc/(Dec) vs. 2013 | 2013 | Inc/(Dec) vs. 2012 | 2012 |
|---|---|---|---|---|---|
| **Other (Income) Expense, net** | | | | | |
| Interest income | $ (26) | 37% | $ (19) | 19% | $ (16) |
| Other | 46 | 57 | 108 | NM | 12 |
| Total other (income) expense, net | $ 20 | 78 | $ 89 | NM | $ (4) |

*2014 vs. 2013* In 2013, as a result of a Chapter 11 bankruptcy declaration by a third party, the U.S. Department of the Interior ordered Anadarko to perform the decommissioning of a production facility and related wells, which were previously sold to the third party. During 2013, the Company accrued costs of $117 million to decommission the facility and related wells. During 2014, the Company recognized a $22 million increase in the estimated decommissioning costs. Anadarko completed decommissioning of the production facility in 2014 and expects to complete decommissioning of the wells in 2015. Also, as a result of a prior acquisition, the Company recognized a restoration liability of $50 million in 2013 with respect to a landfill located in California for which the Company was notified that it is a potentially responsible party. In the second quarter of 2013, the Company reversed the $56 million tax indemnification liability associated with the 2006 sale of the Company's Canadian subsidiary. The indemnity was reversed as a result of certain changes to Canadian tax laws.

*2013 vs. 2012* During 2013, the Company recognized a decommissioning charge of $117 million and a restoration liability of $50 million, partially offset by the 2013 reversal of the $56 million tax indemnification liability associated with the 2006 sale of the Company's Canadian subsidiary.

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| Tronox-related contingent loss | $ 4,360 | $ 850 | $ (250) |

In April 2014, Anadarko and Kerr-McGee Corporation and certain of its subsidiaries (collectively, Kerr-McGee) entered into a settlement agreement for $5.15 billion resolving all claims asserted in the Tronox Adversary Proceeding. Anadarko recognized Tronox-related contingent losses of $4.3 billion in 2014, $850 million in 2013, and reversed $250 million in 2012 associated with the Tronox-related contingent loss recognized in 2011. In addition, Anadarko recognized settlement-related interest expense of $60 million during 2014. An aggregate Tronox-related contingent liability of $5.2 billion was included on the Company's Consolidated Balance Sheet at December 31, 2014. In January 2015, the Company paid $5.2 billion after the settlement agreement became effective. See *Note 17-Contingencies-Tronox Litigation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

64

APC-01751816

Table of Contents
Index to Financial Statements

**Income Tax Expense**

| millions except percentages | 2014 | 2013 | 2012 |
|---|---|---|---|
| Income tax expense (benefit) | $ 1,617 | $ 1,165 | $ 1,120 |
| Effective tax rate | 2,994% | 55% | 31% |

*2014* The increase from the 35% U.S. federal statutory rate was primarily attributable to net changes in uncertain tax positions related to the settlement agreement associated with the Tronox Adversary Proceeding, changes in other uncertain tax positions, the tax impact from foreign operations, Algerian exceptional profits taxes, and the non-deductible contingent CWA-penalty accrual. For additional information on income tax rates, see *Note 18-Income Taxes* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

In 2013, the Company recognized a deferred tax benefit of $274 million related to the $850 million loss with respect to the Tronox-related contingent liability. In 2014, the Company recognized an additional deferred tax benefit of $316 million related to the additional $4.360 billion loss with respect to the Tronox-related contingent liability. See *Note 17-Contingencies-Tronox Litigation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

*2013* The increase from the 35% U.S. federal statutory rate was primarily attributable to the tax impact from foreign operations, non-deductible Algerian exceptional profits tax, and deferred tax adjustments.

*2012* The decrease from the 35% U.S. federal statutory rate was primarily attributable to the non-taxable resolution of the Algeria exceptional profits tax dispute. This amount was partially offset by the tax impact from foreign operations and non-deductible Algerian exceptional profits tax.

**Net Income Attributable to Noncontrolling Interests**

The Company's net income attributable to noncontrolling interests of $187 million for the year ended December 31, 2014, $140 million for 2013, and $54 million for 2012, was related to public ownership interests in WES and WGP. Public ownership of WES was 55% at December 31, 2014, 56.4% at December 31, 2013, and 51.8% at December 31, 2012. In December 2012, WGP completed its IPO of approximately 20 million common units representing limited partner interests in WGP at a price of $22.00 per common unit. During 2014, Anadarko sold approximately 6 million WGP common units to the public, raising net proceeds of $335 million. Public ownership of WGP was 11.7% at December 31, 2014, and was 9% at December 31, 2013 and 2012. See *Note 9-Noncontrolling Interests* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

65

APC-01751817

Table of Contents
Index to Financial Statements

**OPERATING RESULTS**

**Segment Analysis-Adjusted EBITDAX** To assess the performance of Anadarko's operating segments, the chief operating decision maker analyzes Adjusted EBITDAX. The Company defines Adjusted EBITDAX as income (loss) before income taxes; exploration expense; DD&A; impairments; interest expense; total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives; and certain items not related to the Company's normal operations, less net income attributable to noncontrolling interests. During the periods presented, items not related to the Company's normal operations included Deepwater Horizon settlement and related costs, Algeria exceptional profits tax settlement, Tronox-related contingent loss, and certain other nonoperating items included in other (income) expense, net. The Company's definition of Adjusted EBITDAX, which is not a GAAP measure, excludes exploration expense as it is not an indicator of operating efficiency for a given reporting period. However, exploration expense is monitored by management as part of costs incurred in exploration and development activities. Similarly, DD&A and impairments are excluded from Adjusted EBITDAX as a measure of segment operating performance because capital expenditures are evaluated at the time capital costs are incurred. Adjusted EBITDAX also excludes interest expense to allow for assessment of segment operating results without regard to Anadarko's financing methods or capital structure. Total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives are excluded from Adjusted EBITDAX because these (gains) losses are not considered a measure of asset operating performance. Finally, net income attributable to noncontrolling interests is excluded from the Company's measure of Adjusted EBITDAX because it represents earnings that are not attributable to the Company's common stockholders.

Management believes that the presentation of Adjusted EBITDAX provides information useful in assessing the Company's financial condition and results of operations and that Adjusted EBITDAX is a widely accepted financial indicator of a company's ability to incur and service debt, fund capital expenditures, and make distributions to stockholders. Adjusted EBITDAX as defined by Anadarko may not be comparable to similarly titled measures used by other companies and should be considered in conjunction with net income (loss) attributable to common stockholders and other performance measures prepared in accordance with GAAP, such as operating income or cash flows from operating activities. Adjusted EBITDAX has important limitations as an analytical tool because it excludes certain items that affect net income (loss) attributable to common stockholders and net cash provided by operating activities. Adjusted EBITDAX should not be considered in isolation or as a substitute for an analysis of Anadarko's results as reported under GAAP. Below is a reconciliation of consolidated Adjusted EBITDAX to income (loss) before income taxes, and consolidated Adjusted EBITDAX by reporting segment.

66

APC-01751818

Table of Contents
Index to Financial Statements

**Adjusted EBITDAX**

| millions except percentages | | 2014 | Inc/(Dec) vs. 2013 | | 2013 | Inc/(Dec) vs. 2012 | | 2012 |
|---|---|---|---|---|---|---|---|---|
| Income (loss) before income taxes | $ | 54 | (97)% | $ | 2,106 | (41)% | $ | 3,565 |
| Exploration expense | | 1,639 | 23 | | 1,329 | (32) | | 1,946 |
| DD&A | | 4,550 | 16 | | 3,927 | (1) | | 3,964 |
| Impairments | | 836 | 5 | | 794 | 104 | | 389 |
| Interest expense | | 772 | 13 | | 686 | (8) | | 742 |
| Total (gains) losses on derivatives, net, less net cash received in settlement of commodity derivatives | | 578 | NM | | (307) | (169) | | 443 |
| Deepwater Horizon settlement and related costs | | 97 | NM | | 15 | (17) | | 18 |
| Algeria exceptional profits tax settlement | | - | (100) | | 33 | 102 | | (1,797) |
| Tronox-related contingent loss | | 4,360 | NM | | 850 | NM | | (250) |
| Certain other nonoperating items | | 22 | (80) | | 110 | NM | | - |
| Less net income attributable to noncontrolling interests | | 187 | 34 | | 140 | 159 | | 54 |
| Consolidated Adjusted EBITDAX | $ | 12,721 | 35 | $ | 9,403 | 5 | $ | 8,966 |
| | | | | | | | | |
| Adjusted EBITDAX by segment | | | | | | | | |
| Oil and gas exploration and production | $ | 12,505 | 35 | $ | 9,238 | 9 | $ | 8,500 |
| Midstream | | 660 | 30 | | 508 | 7 | | 474 |
| Marketing | | (219) | (75) | | (125) | (20) | | (104) |
| Other and intersegment eliminations | | (225) | (3) | | (218) | NM | | 96 |

**Oil and Gas Exploration and Production**

*2014 vs. 2013* The increase in Adjusted EBITDAX was primarily due to net gains on divestitures, higher sales volumes for oil and NGLs, and higher natural-gas prices. These increases were partially offset by lower oil prices, and higher oil and gas transportation expenses and other taxes, which increased as a result of higher sales volumes.

*2013 vs. 2012* The increase in Adjusted EBITDAX was primarily due to higher sales volumes for all products and higher natural-gas prices, partially offset by lower oil and NGLs prices and losses on divestitures primarily related to the Pinedale/Jonah assets in Wyoming.

**Midstream**

*2014 vs. 2013* The increase in Adjusted EBITDAX was primarily due to higher gathering and processing revenue associated with higher volumes and increased natural-gas prices, partially offset by higher processing expenses primarily due to increased volumes.

*2013 vs. 2012* The increase in Adjusted EBITDAX was primarily due to higher gathering revenue as a result of increased volumes.

67

APC-01751819

Table of Contents
Index to Financial Statements

*Marketing*

*2014 vs. 2013* The decrease in Adjusted EBITDAX resulted from lower marketing margins and higher transportation expenses.

*2013 vs. 2012* The decrease in Adjusted EBITDAX resulted from higher transportation expenses due to increased third-party volumes and increased demand fees, partially offset by higher margins primarily associated with natural-gas and NGLs sales.

*Other and Intersegment Eliminations*

Other and intersegment eliminations consists primarily of corporate costs, income from hard minerals investments and royalties, and net cash received in settlement of commodity derivatives.

*2014 vs. 2013* The Adjusted EBITDAX in 2014 was relatively flat compared to the prior year.

*2013 vs. 2012* The increase in Adjusted EBITDAX was primarily due to a decrease in net cash received in settlement of commodity derivatives in 2013, partially offset by 2012 expense associated with the change in the fair value of the general partner UARs in connection with the WGP IPO. The UARs were awarded in prior years to certain officers of the general partner of WES, pursuant to the WGH Equity Incentive Plan.

**Proved Reserves** Anadarko is focused on growth and profitability, and reserves replacement is a key to growth. Future profitability partially depends on commodity prices and the cost of finding and developing oil and gas reserves. Reserves growth can be achieved through successful exploration and development drilling, improved recovery, or acquisition of producing properties. For reserves information, see *Oil and Gas Properties and Activities-Proved Reserves* under Items 1 and 2 of this Form 10-K and the *Supplemental Information on Oil and Gas Exploration and Production Activities* under Item 8 of this Form 10-K.

68

APC-01751820

Table of Contents
Index to Financial Statements

## LIQUIDITY AND CAPITAL RESOURCES

**Overview** Anadarko generates cash needed to fund capital expenditures, debt-service obligations, and dividend payments primarily from operating activities, and enters into debt and equity transactions to maintain its desired capital structure and to finance acquisition opportunities. The Company has a variety of funding sources available, including cash on hand, an asset portfolio that provides ongoing cash-flow-generating capacity, opportunities for liquidity enhancement through divestitures and joint-venture arrangements that reduce future capital expenditures, commercial paper, and the Company's New Credit Facilities. In addition, as of January 2014, an effective registration statement is available to Anadarko covering the sale of up to 40 million WGP common units. These common units were issued to Anadarko in connection with WGP's IPO in December 2012. During 2014, the Company sold 6 million WGP common units and at December 31, 2014, the Company had 34 million units available for sale.

During 2014, the primary source for funding of capital investments was cash flows from operating activities. The Company continuously monitors its liquidity needs, coordinates its capital expenditure program with its expected cash flows and projected debt-repayment schedule, and evaluates available funding alternatives in light of current and expected conditions.

At December 31, 2014, Anadarko had no scheduled debt maturities during the next year. Anadarko's Zero-Coupon Senior Notes due 2036 (Zero Coupons) can be put to the Company in October of each year, in whole or in part, for the then-accreted value, which will be $796 million at the next put date in October 2015. The Zero Coupons are classified as long-term debt on the Company's Consolidated Balance Sheets, as the Company has the ability and intent to refinance these obligations using long-term debt. See *Note 12-Debt and Interest Expense* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for additional information on the Zero Coupons. Anadarko's scheduled 2016 debt maturities are $1.8 billion, exclusive of the Zero Coupons.

Management believes that the Company's liquidity position, asset portfolio, and operating and financial performance provide the necessary financial flexibility to fund the Company's current and long-term operations.

**Tronox Adversary Proceeding Settlement Payment** In April 2014, Anadarko and Kerr-McGee entered into a settlement agreement to resolve all claims asserted in the Tronox Adversary Proceeding for $5.15 billion. In addition, the Company agreed to pay interest on the above amount from April 3, 2014, through the payment of the settlement, with an annual interest rate of 1.5% for the first 180 days and 1.5% plus the one-month LIBOR thereafter. In January 2015, the Company paid $5.2 billion after the settlement agreement became effective. See *Note 17-Contingencies-Tronox Litigation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

69

APC-01751821

Table of Contents
Index to Financial Statements

**Revolving Credit Facilities and Commercial Paper Program** During 2014, the Company maintained the $5.0 billion Facility maturing in September 2015. Obligations incurred under the $5.0 billion Facility, as well as obligations Anadarko has to lenders or their affiliates pursuant to certain derivative instruments as discussed in *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K, were guaranteed by certain of the Company's wholly owned domestic subsidiaries, and were secured by a perfected first-priority security interest in certain exploration and production assets located in the United States and 65% of the capital stock of certain wholly owned foreign subsidiaries. During 2014, the Company had no outstanding borrowings under the $5.0 billion Facility.

In June 2014, Anadarko entered into a $3.0 billion five-year senior unsecured revolving credit facility (Five-Year Facility), which is expandable to $4.0 billion, and a $2.0 billion 364-day senior unsecured revolving credit facility (364-Day Facility). The New Credit Facilities replaced the $5.0 billion Facility upon satisfaction of certain conditions, including the January 2015 settlement payment related to the Tronox Adversary Proceeding. Under the New Credit Facilities, the Company's derivative counterparties no longer maintain security interests in any of the Company's assets. As a result, the Company may be required from time to time to post collateral of cash or letters of credit based on the negotiated terms of the individual derivative agreements.

In January 2015, the Company borrowed $1.5 billion under the 364-Day Facility. Borrowings under the New Credit Facilities generally bear interest under one of two rate options, at Anadarko's election, using either LIBOR (or Euro Interbank Offered Rate in the case of borrowings under the Five-Year Facility denominated in Euro) or an alternate base rate, in each case plus an applicable margin ranging from 0.00% to 1.65% for the Five-Year Facility and 0.00% to 1.675% for the 364-Day Facility. The applicable margin will vary depending on Anadarko's credit ratings.

In January 2015, the Company initiated a commercial paper program, which allows a maximum of $3.0 billion of unsecured commercial paper notes. The maturities of the commercial paper notes vary, but may not exceed 397 days. The commercial paper notes are sold under customary terms in the commercial paper market and are issued either at a discounted price to their principal face value or will bear interest at varying interest rates on a fixed or floating basis. Such discounted price or interest amounts are dependent on market conditions and the ratings assigned to the commercial paper program by credit rating agencies at the time of issuance of the commercial paper notes.

**Financial Covenants** The $5.0 billion Facility contained various customary covenants with which Anadarko had to comply, including, but not limited to, limitations on incurrence of indebtedness, liens on assets, and asset sales. Anadarko was also required to maintain, at the end of each quarter, (i) a Consolidated Leverage Ratio of no more than 4.5 to 1.0 (relative to Consolidated EBITDAX for the most recent period of four calendar quarters), (ii) a ratio of Current Assets to Current Liabilities of no less than 1.0 to 1.0, and (iii) a Collateral Coverage Ratio of no less than 1.75 to 1.0, in each case, as defined in the $5.0 billion Facility. The Collateral Coverage Ratio was the ratio of an annually redetermined value of pledged assets to outstanding loans under the $5.0 billion Facility. Additionally, to borrow from the $5.0 billion Facility, the Collateral Coverage Ratio had to be no less than 1.75 to 1.0 after giving pro forma effect to the requested borrowing.

The covenants contained in certain of the Company's credit agreements provide for a maximum Anadarko debt-to-capitalization ratio of 67%. The covenants do not specifically restrict the payment of dividends; however, the impact of dividends paid on the Company's debt-to-capitalization ratio must be considered to ensure covenant compliance. At December 31, 2014, Anadarko was in compliance with all financial covenants.

The New Credit Facilities contain certain customary affirmative and negative covenants, including a financial covenant requiring maintenance of a consolidated indebtedness to total capitalization ratio of no greater than 65%, and limitations on certain secured indebtedness, sale-and-leaseback transactions, and mergers and other fundamental changes.

70

APC-01751822

Table of Contents
Index to Financial Statements

**WES Funding Sources** Anadarko's consolidated subsidiary, WES, uses cash flows from operations to fund ongoing operations (including capital investments in the ordinary course of business), service its debt, and make distributions to its equity holders. As needed, WES supplements cash generated from its operating activities with proceeds from debt or equity issuances or borrowings under its five-year $1.2 billion senior unsecured revolving credit facility (RCF).

In February 2014, WES entered into the RCF, which amended and restated its then-existing $800 million senior unsecured revolving credit facility. The RCF matures in February 2019 and is expandable to a maximum of $1.5 billion. Borrowings under the RCF bear interest at (i) LIBOR plus an applicable margin ranging from 0.975% to 1.45%, depending on WES's credit rating, or (ii) the greatest of (a) the Wells Fargo Bank, National Association prime rate, (b) the Federal Funds Effective Rate plus 0.50%, or (c) one-month LIBOR plus 1%, plus, in each case, an applicable margin ranging from 0.00% to 0.45%. At December 31, 2014, WES was in compliance with all covenants contained in its RCF, had outstanding borrowings under its RCF of $510 million at an interest rate of 1.47%, and had available borrowing capacity of approximately $677 million ($1.2 billion capacity, less $510 million of outstanding borrowings and $13 million of outstanding letters of credit).

In August 2014, WES filed a registration statement with the Securities and Exchange Commission authorizing the issuance of up to an aggregate of $500 million of common units, in amounts, at prices, and on terms to be determined by market conditions and other factors at the time of the offerings.

**Insurance Coverage and Other Indemnities** Anadarko maintains property and casualty insurance that includes coverage for physical damage to the Company's properties, blowout/control of a well, restoration and redrill, sudden and accidental pollution, third-party liability, workers' compensation and employers' liability, and other risks. Anadarko's insurance coverage includes deductibles that must be met prior to recovery. Additionally, the Company's insurance is subject to exclusions and limitations, and there is no assurance that such coverage will adequately protect the Company against liability or loss from all potential consequences and damages.

The Company's current insurance coverage includes (a) $400 million per occurrence from Oil Insurance Limited (OIL) for physical damage to Anadarko's properties on a replacement cost basis, blowout/control of well, redrill, and sudden and accidental pollution; (b) $700 million per occurrence from the commercial markets for the items described in item (a) above, which is in excess of the OIL coverage and which follows the form of OIL coverage with certain exceptions; (c) $400 million from the commercial markets, which scales to Anadarko's working interest, for third-party liabilities including sudden and accidental pollution and aviation liability; and (d) $275 million for aircraft liability (in addition to the third-party liability limits described in item (c) above). Anadarko does not carry significant coverage for loss of production income from any of the Company's facilities or for any losses that result from the effects of a named windstorm.

The Company's service agreements, including drilling contracts, generally indemnify Anadarko for injuries and death to employees of the service provider and subcontractors hired by the service provider as well as for property damage suffered by the service provider and its contractors. Also, these service agreements generally indemnify Anadarko for pollution originating from the equipment of any contractors or subcontractors hired by the service provider.

71

APC-01751823

Table of Contents
Index to Financial Statements

Following is a discussion of significant sources and uses of cash flows for the three-year period ended December 31, 2014. Forward-looking information related to the Company's liquidity and capital resources is discussed in *Outlook* that follows.

**Sources of Cash**

***Operating Activities*** Anadarko's cash flows from operating activities in 2014 was $8.5 billion compared to $8.9 billion in 2013 and $8.3 billion in 2012. Cash flows from operating activities for 2014 decreased year over year due to $730 million of cash received in 2013 associated with the Algeria exceptional profits tax settlement, a $520 million income tax payment in 2014 associated with the Company's divestiture of a 10% working interest in Offshore Area 1 in Mozambique, lower average oil and NGLs prices, lower natural-gas volumes, higher operating expenses, and the unfavorable impact of changes in working capital items. These decreases were substantially offset by higher average natural-gas prices, higher sales volumes for oil and NGLs, and net cash received in settlement of commodity derivative instruments. Cash flows from operating activities for 2013 increased year over year primarily due to higher sales volumes, higher average natural-gas prices, and the favorable impact of changes in working capital items. These increases were partially offset by lower average oil and NGLs prices and a decrease in cash collected in 2013 associated with the Algeria exceptional profits tax receivable.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuation in commodity prices, the impact of which Anadarko partially mitigates by entering into commodity derivatives. Sales-volume changes also impact cash flow, but historically have not been as volatile as commodity prices. Anadarko's cash flows from operating activities are also impacted by the costs related to continued operations and debt service.

***Investing Activities*** Anadarko received pretax sales proceeds related to property divestiture transactions of $5.0 billion in 2014, $567 million in 2013, and $657 million in 2012. The increase in 2014 was primarily related to the Company's divestitures of a 10% working interest in Offshore Area 1 in Mozambique for $2.64 billion, its Chinese subsidiary for $1.075 billion, its interest in the Pinedale/Jonah assets in Wyoming for $581 million, and its interest in the nonoperated Vito deepwater development, along with several surrounding exploration blocks in the Gulf of Mexico, for $500 million.

***Financing Activities*** During 2014, Anadarko's consolidated subsidiary, WES, borrowed $1.2 billion under its RCF primarily to partially fund its acquisitions of DBM and Anadarko's interests in Texas Express Pipeline LLC, Texas Express Gathering LLC, and Front Range Pipeline LLC and for other general partnership purposes, including the funding of capital expenditures. During 2014, WES completed public offerings of $100 million aggregate principal amount of 2.600% Senior Notes due 2018 and $400 million aggregate principal amount of 5.450% Senior Notes due 2044. These proceeds were used to repay borrowings under WES's RCF and for general partnership purposes. During 2014, WES issued approximately 10 million common units to the public, raising total net proceeds of $691 million. The proceeds were used to partially fund a portion of its DBM acquisition. WES used all the capacity to issue units under the $125 million continuous offering program as of the end of the third quarter of 2014.

During 2014, Anadarko sold approximately 6 million WGP common units to the public, raising net proceeds of $335 million. Also, during 2014, Anadarko completed public offerings of $625 million aggregate principal amount of 3.450% Senior Notes due 2024 and $625 million aggregate principal amount of 4.500% Senior Notes due 2044. These proceeds were used for general corporate purposes.

During 2013, WES borrowed $710 million under its RCF, primarily to fund the 2013 acquisitions of an interest in certain gas-gathering systems located in the Marcellus shale in north-central Pennsylvania and an intrastate pipeline in southwestern Wyoming, and for other general partnership purposes, including the funding of capital expenditures. During 2013, WES also issued approximately 12 million common units to the public, including the $125 million continuous offering program. These offerings raised net proceeds of $725 million, which were primarily used to repay outstanding RCF borrowings and for other general partnership purposes, including funding of WES's capital expenditures. Also in 2013, WES completed a public offering of $250 million aggregate principal amount of 2.600% Senior Notes due 2018, with net proceeds from the offering used to repay outstanding borrowings under its RCF.

APC-01751824

Table of Contents
Index to Financial Statements

During 2012, WES borrowed $374 million under its RCF, primarily to fund the acquisition of certain midstream assets from Anadarko. Also during 2012, WES completed a public offering of $670 million aggregate principal amount of 4.000% Senior Notes due 2022 and issued five million common units to the public, raising net proceeds of $212 million. Proceeds from these public offerings were used to repay outstanding RCF borrowings and for other general partnership purposes, including the funding of capital expenditures.

In December 2012, WGP completed its IPO of approximately 20 million common units representing limited partner interests in WGP at a price of $22.00 per common unit, for net proceeds of $411 million. The proceeds were used by WGP to purchase common and general partner units in WES, and were in turn used by WES for general partnership purposes, including the funding of WES capital expenditures.

**Uses of Cash**

Anadarko invests significant capital to develop, acquire, and explore for oil and natural-gas resources and to expand its midstream infrastructure. The Company also uses cash to fund ongoing operating costs, capital contributions to equity investments, debt repayments, and distributions to its shareholders.

*Capital Expenditures* The following presents the Company's capital expenditures by category:

| millions | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|
| Property acquisitions | | | | | |
| Exploration | $ 283 | $ | 327 | $ | 239 |
| Development | 3 | | 324 | | - |
| Exploration | 1,711 | | 1,970 | | 2,064 |
| Development | 6,715 | | 4,865 | | 4,064 |
| Total oil and gas costs incurred [1] | 8,712 | | 7,486 | | 6,367 |
| Less corporate acquisitions and non-cash property transactions | (1) | | 6 | | 32 |
| Less asset retirement costs | 347 | | 180 | | 98 |
| Less geological and geophysical, exploration overhead, delay rentals expenses, and other expenses | 543 | | 430 | | 401 |
| Total oil and gas capital expenditures | 7,823 | | 6,870 | | 5,836 |
| Gathering, processing, and marketing and other [2] | 1,433 | | 1,653 | | 1,475 |
| Total capital expenditures [1] | $ 9,256 | $ | 8,523 | $ | 7,311 |

[1] Oil and gas costs incurred represent costs related to finding and developing oil and gas reserves. Costs associated with activities of the Company's midstream and marketing reporting segments, LNG facilities costs, and other corporate activities are not included in oil and gas costs incurred. Capital expenditures represent additions to property and equipment excluding corporate acquisitions and non-cash property transactions and asset retirement costs. Capital expenditures and costs incurred are presented on an accrual basis. Additions to properties and equipment and dry hole costs on the Consolidated Statements of Cash Flows include certain adjustments that give effect to the timing of actual cash payments to provide a cash-basis presentation.

[2] Includes WES capital expenditures of $696 million in 2014, $792 million in 2013, and $529 million in 2012.

The Company's capital expenditures increased by 9% for the year ended December 31, 2014, due to increased development drilling primarily in the Wattenberg field of $663 million and in the Eagleford shale of $546 million and to a spar lease buyout of $110 million in the Gulf of Mexico. The increase in the Eagleford shale was primarily due to the 2013 development drilling being funded by a third party as a result of a carried-interest agreement that was fully funded in June 2013. These 2014 increases were partially offset by 2013 acquisitions of certain oil and gas properties and related assets in the Moxa area of Wyoming for $310 million, primarily representing the fair value of the oil and gas properties acquired, and the acquisition of a 33.75% interest in gas-gathering systems located in the Marcellus shale in north-central Pennsylvania from a third party by WES for $135 million.

73

APC-01751825

Table of Contents
Index to Financial Statements

In the third quarter of 2014, the Company entered into a carried-interest arrangement that requires a third party to fund $442 million of Anadarko's capital costs in exchange for a 34% working interest in the Eaglebine development, located in Southeast Texas. The third-party funding is expected to cover Anadarko's future capital costs in the development through 2016. At December 31, 2014, $22 million of the total $442 million obligation had been funded.

The Company's capital spending increased by 17% for the year ended December 31, 2013, due to development drilling onshore and offshore in the United States and acquisitions of oil and gas development properties and domestic onshore plants and gathering systems. In 2013, Anadarko exchanged certain oil and gas properties in the Wattenberg field with a third party to enhance the Company's core acreage position, in which $106 million of capital was incurred. Also in 2013, Anadarko acquired certain oil and gas properties and related assets in the Moxa area of Wyoming for $310 million, primarily representing the fair value of the oil and gas properties acquired. In 2013, WES acquired a 33.75% interest in gas-gathering systems for $135 million and an intrastate pipeline in southwestern Wyoming for $28 million. These increases were offset by lower capital spending associated with decreased exploration drilling in West Africa and U.S. onshore and lower capital requirements to Anadarko related to development projects as a result of the carried-interest arrangements discussed below.

In 2013, the Company entered into a carried-interest arrangement that requires a third party to fund $860 million of Anadarko's capital costs in exchange for a 12.75% working interest in the Heidelberg development, located in the Gulf of Mexico. The third-party funding is expected to cover the substantial majority of Anadarko's expected future capital costs through first production, which is expected to occur by mid-2016. At December 31, 2014, $386 million of the total $860 million obligation had been funded.

In the third quarter of 2012, the Company entered into a carried-interest arrangement that required a third party to fund $556 million of Anadarko's capital costs in exchange for a 7.2% working interest in the Lucius development, located in the Gulf of Mexico. During the second quarter of 2014, as dictated by the Unitization and Participation Agreement, the working interests of all partners in the Lucius development were recalculated. As a result, Anadarko's working interest in the Lucius development was reduced from 27.8% to 23.8% and its capital expenditures were reduced by $44 million due to the re-determination. In addition, the working interest of the third party that participated in the carried-interest arrangement was reduced from 7.2% to 6.2%, which resulted in a reduction in the funding commitment from $556 million to $476 million. The funding commitment, which was fully funded during the second quarter of 2014, covered the substantial majority of the Company's capital costs through first production, which occurred in the fourth quarter of 2014.

***Pension Contributions*** During 2014, the Company made contributions of $106 million to its funded pension plans, $15 million to its unfunded pension plans, and $15 million to its unfunded other postretirement benefit plans, which are included in Operating Activities in the Consolidated Statement of Cash Flows. Contributions to the funded pension plans decreased in 2014 as a result of favorable asset returns in 2013. Contributions made to the unfunded pension plans in 2014 were lower as a result of higher funding in 2013 related to the retirement of the Company's former Chief Executive Officer. The Company expects to contribute $5 million to its funded pension plans, $24 million to its unfunded pension plans, and $16 million to its unfunded other postretirement benefit plans in 2015.

During 2013, the Company made contributions of $123 million to its funded pension plans, $37 million to its unfunded pension plans, and $14 million to its unfunded other postretirement benefit plans. The increase in contributions to the funded pension plans in 2013 resulted from a decrease in the discount rates used for funding purposes.

During 2012, the Company made contributions of $101 million to its funded pension plans, $6 million to its unfunded pension plans, and $19 million to its unfunded other postretirement benefit plans. The decrease in contributions to the funded pension plans in 2012 resulted from an increase in the discount rates used for funding purposes.

74

APC-01751826

Table of Contents
Index to Financial Statements

***Investments*** During 2014, the Company made capital contributions of $167 million related to equity investments, which are included in Other-net under Investing Activities in the Consolidated Statement of Cash Flows. These contributions were primarily associated with joint ventures for a gas processing plant, marine well containment, and pipelines. The Company made capital contributions related to equity investments of $396 million in 2013, which were primarily associated with joint ventures to build the Front Range Pipeline, the Texas Express Pipeline, and two fractionation trains in Mont Belvieu. The Company made capital contributions related to equity investments of $205 million in 2012.

***Debt Retirements and Repayments*** During 2014, Anadarko repaid $775 million of Senior Notes that matured during 2014. Also, WES repaid $650 million of borrowings under its RCF with proceeds from debt and equity offerings, as discussed in *Sources of Cash.* During 2013, WES repaid $710 million of borrowings under its RCF with proceeds from debt and equity offerings. During 2012, the Company repaid the entire $2.5 billion of borrowings under its $5.0 billion Facility, and retired $131 million of 6.125% Senior Notes that matured in March 2012 and $39 million of 5.000% Senior Notes that matured in October 2012. In addition, WES repaid $374 million of borrowings under its RCF.

For additional information on the Company's debt instruments, such as transactions during the period, years of maturity, and interest rates, see *Note 12-Debt and Interest Expense* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

***Common Stock Dividends and Distributions to Noncontrolling Interest Owners*** Anadarko paid dividends to its common stockholders of $505 million in 2014, $274 million in 2013, and $181 million in 2012. The Company increased the quarterly dividend paid to common stockholders from $0.09 per share to $0.18 per share during the third quarter of 2013. During the second quarter of 2014, Anadarko increased the quarterly dividend paid to common stockholders from $0.18 per share to $0.27 per share. Anadarko has paid a dividend to its common stockholders quarterly since becoming a public company in 1986. The amount of future dividends paid to Anadarko common stockholders will be determined by the Board of Directors on a quarterly basis and will depend on earnings, financial conditions, capital requirements, the effect a dividend payment would have on the Company's compliance with relevant financial covenants, and other factors.

WES distributed to its unitholders, other than Anadarko, an aggregate of $175 million in 2014, $130 million in 2013, and $100 million in 2012. WES has made quarterly distributions to its unitholders since its IPO in the second quarter of 2008 and has increased its distribution from $0.30 per common unit for the third quarter of 2008 to $0.70 per common unit for the fourth quarter of 2014 (paid in February 2015).

WGP distributed to its unitholders, other than Anadarko, an aggregate of $24 million during 2014 and $12 million in 2013. WGP declared a cash distribution of $0.31250 per unit for the fourth quarter of 2014 (to be paid in February 2015).

75

APC-01751827

Table of Contents
Index to Financial Statements

**Outlook**

Oil, natural-gas, and NGLs prices can have significant price fluctuations. The Company's revenues, operating results, cash flows from operations, capital spending, and future growth rates are highly dependent on the prices the Company receives for oil, natural gas, and NGLs. During 2014, New York Mercantile Exchange West Texas Intermediate oil prices ranged from a high of $107.26 per barrel to a low of $53.27 per barrel at the end of 2014. The duration and magnitude of the decline in oil prices cannot be predicted.

The Company has a deep portfolio of investment opportunities and the financial strength and operational flexibility to move capital spending from areas focused on near-term production growth to areas focused on longer-term growth where anticipated returns are less sensitive to spot oil and natural-gas prices. The recent decline in oil prices may result in the Company significantly reducing its capital expenditures in 2015 versus 2014. The Company will continue to evaluate the oil and natural-gas price environments and may adjust its capital spending plans as prices fluctuate while maintaining the appropriate liquidity and financial flexibility.

The Company is committed to the execution of its worldwide exploration, appraisal, and development programs. The Company currently plans to allocate approximately 65% of its 2015 capital spending to development activities, 15% to exploration activities, and 20% to gas-gathering and processing activities and other business activities. The Company currently expects its 2015 capital spending by area to be approximately 55% for the U.S. onshore region and Alaska, 10% for the Gulf of Mexico, 20% for Midstream and other, and 15% for International.

Anadarko believes that its cash on hand, available borrowing capacity, and expected level of operating cash flows will be sufficient to fund the Company's projected operational and capital programs for 2015 and continue to meet its other current obligations. The Company's cash on hand is available for use and could be supplemented, as needed, with available borrowing capacity under the New Credit Facilities and the commercial paper program. The Company may also enter into carried-interest arrangements with third parties to fund certain capital expenditures, execute asset divestitures, and sell a portion of the WGP common units that it owns in order to supplement cash flow.

The Company continuously monitors its liquidity needs, coordinates its capital expenditure program with its expected cash flows and projected debt-repayment schedule, and evaluates available funding alternatives in light of current and expected conditions. To reduce commodity-price risk and increase the predictability of 2015 cash flows, Anadarko entered into strategic derivative positions, which cover a portion of its anticipated natural-gas sales volumes for 2015. For details of derivative positions at December 31, 2014, see *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

**Off-Balance-Sheet Arrangements**

Anadarko may enter into off-balance-sheet arrangements and transactions that can give rise to material off-balance-sheet obligations. The Company's material off-balance-sheet arrangements and transactions include operating lease arrangements and undrawn letters of credit. In addition, the Company enters into other contractual agreements in the normal course of business for processing, treating, transportation, and storage of natural gas, oil, and NGLs, as well as for other oil and gas activities as discussed below in *Obligations and Commitments*. Other than the items discussed above, there are no other transactions, arrangements, or other relationships with unconsolidated entities or other persons that are reasonably likely to materially affect Anadarko's liquidity or availability of or requirements for capital resources.

76

APC-01751828

Table of Contents
Index to Financial Statements

**Obligations and Commitments**

The following is a summary of the Company's obligations at December 31, 2014:

| millions | Obligations by Period [1] | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2015 | 2016-2017 | 2018-2019 | 2020 and beyond | Total |
| Total debt | | | | | |
| Principal-long-term borrowings [2] | $         - | $    3,750 | $    1,874 | $   11,063 | $   16,687 |
| Principal-capital lease obligation | - | - | 1 | 20 | 21 |
| Investee entities' debt [3] | - | - | - | 2,853 | 2,853 |
| Interest on borrowings | 876 | 1,647 | 1,219 | 7,907 | 11,649 |
| Interest on capital lease obligations | 2 | 3 | 3 | 15 | 23 |
| Investee entities' interest [3] | 41 | 152 | 199 | 2,574 | 2,966 |
| Operating leases | | | | | |
| Drilling rig commitments | 939 | 1,310 | 460 | 28 | 2,737 |
| Production platforms | 33 | 43 | 43 | 51 | 170 |
| Other | 50 | 72 | 24 | 8 | 154 |
| Asset retirement obligations | 258 | 413 | 180 | 1,202 | 2,053 |
| Midstream and marketing activities | 930 | 1,904 | 1,775 | 2,656 | 7,265 |
| Oil and gas activities | 1,295 | 1,059 | 426 | 400 | 3,180 |
| Derivative liabilities [4] | 43 | 1,200 | - | - | 1,243 |
| Uncertain tax positions, interest, and penalties [5] | 123 | 193 | 5 | 11 | 332 |
| Environmental liabilities | 20 | 19 | 9 | 78 | 126 |
| Other | 40 | 222 | - | - | 262 |
| Total | $    4,650 | $   11,987 | $    6,218 | $   28,866 | $   51,721 |

[1] This table does not include the Tronox-related contingent liability, other litigation-related contingent liabilities, or the Company's pension and postretirement benefit obligations. See *Note 17-Contingencies-Tronox Litigation* and *Note 21-Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

[2] Includes the fully accreted principal amount of the Zero Coupons of approximately $2.4 billion as coming due after 2019. While the Zero Coupons do not mature until 2036, the outstanding Zero Coupons can be put to the Company each October, in whole or in part, for the then-accreted value. The Company could be required to repurchase the outstanding Zero Coupons at $796 million in October 2015 (the next potential put date).

[3] Anadarko has legal right of setoff and intends to net-settle its obligations under each of the notes payable to the investees with the distributable value of its interest in the corresponding investee. Accordingly, the investments and the obligations are presented net on the Consolidated Balance Sheets in other long-term liabilities-other for all periods presented. These notes payable provide for a variable rate of interest, reset quarterly. Therefore, future interest payments presented in the table above are estimated using the forward LIBOR rate curve. Further, the above table does not reflect the preferred return that Anadarko receives on its investment in these entities, which is also LIBOR-based, but with a lower margin than the margin on the associated notes payable. See *Note 10-Equity-Method Investments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

[4] Represents Anadarko's gross derivative liability after taking into account the impacts of netting margin and collateral balances deposited with counterparties. See *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

[5] See *Note 18-Income Taxes* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

77

APC-01751829

Table of Contents
Index to Financial Statements

***Operating Leases*** Operating lease obligations include approximately $2.5 billion related to seven offshore drilling vessels and $208 million related to certain contracts for U.S. onshore drilling rigs. Anadarko manages its access to rigs to support the execution of its drilling strategy over the next several years. Lease payments associated with the drilling of exploratory wells and development wells, net of amounts billed to partners, will initially be capitalized as a component of oil and gas properties, and either depreciated or impaired in future periods or written off as exploration expense. At December 31, 2014, the Company had $324 million in various commitments under non-cancelable operating lease agreements for production platforms and equipment, buildings, facilities, compressors, and aircraft. For additional information, see *Note 16-Commitments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

***Asset Retirement Obligations*** Anadarko is obligated to fund the costs of disposing of long-lived assets upon their abandonment. The majority of Anadarko's asset retirement obligations (AROs) relate to the plugging of wells and the related abandonment of oil and gas properties. The Company's AROs are recorded at estimated fair value, measured by reference to the expected future cash outflows required to satisfy the retirement obligation discounted at the Company's credit-adjusted risk-free interest rate. Revisions to estimated AROs can result from changes in retirement cost estimates, revisions to estimated inflation rates, and changes in the estimated timing of abandonment.

***Midstream and Marketing Activities*** Anadarko has entered into various processing, transportation, storage, and purchase agreements to access markets and provide flexibility to sell its natural gas, oil, and NGLs in certain areas.

***Oil and Gas Activities*** At December 31, 2014, Anadarko had various long-term contractual commitments pertaining to exploration, development, and production activities that extend beyond 2014. The Company has work-related commitments for, among other things, drilling wells, obtaining and processing seismic data, and fulfilling rig commitments. The preceding table includes long-term drilling and work-related commitments of $3.2 billion, comprised of approximately $2.0 billion related to the United States and $1.2 billion related to international locations.

***Environmental Liabilities*** Anadarko is subject to various environmental-remediation and reclamation obligations arising from federal, state, and local laws and regulations. At December 31, 2014, the Company's Consolidated Balance Sheet included a $126 million liability for remediation and reclamation obligations. The Company continually monitors the liability recorded and ongoing remediation and reclamation activities, and believes the amount recorded is appropriate. For additional information on environmental issues, see *Risk Factors* under Item 1A of this Form 10-K.

78

APC-01751830

Table of Contents
Index to Financial Statements

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with GAAP in the United States requires management to make informed judgments and estimates that affect the reported amounts of assets, liabilities, revenues, and expenses. See *Note 1-Summary of Significant Accounting Policies* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for discussion of the Company's significant accounting policies. Changes in facts and circumstances or additional information may result in revised estimates, and actual results may differ from these estimates. Management considers the following to be its most critical accounting estimates that involve judgment. The selection, development, and disclosure of these estimates is discussed with the Company's Audit Committee.

### Proved Reserves

Anadarko estimates its proved oil and gas reserves according to the definition of proved reserves provided by the Securities and Exchange Commission and the Financial Accounting Standards Board (FASB). This definition includes oil, natural gas, and NGLs that geological and engineering data demonstrate with reasonable certainty to be economically producible in future periods from known reservoirs under existing economic conditions, operating methods, government regulations, etc. (at prices and costs as of the date the estimates are made). Prices include consideration of price changes provided only by contractual arrangements, and do not include adjustments based on expected future conditions.

The Company's estimates of proved reserves are made using available geological and reservoir data, as well as production performance data. These estimates are reviewed annually by internal reservoir engineers and revised, either upward or downward, as warranted by additional data. Revisions are necessary due to changes in, among other things, reservoir performance, prices, economic conditions, and governmental restrictions, as well as changes in the expected recovery associated with infill drilling. Decreases in prices, for example, may cause a reduction in some proved reserves due to reaching economic limits at an earlier projected date.

The quantities of estimated proved oil and gas reserves are a significant component of DD&A. A material adverse change in the estimated volumes of proved reserves could have a negative impact on DD&A and could result in property impairments. If the estimates of proved reserves used in the unit-of-production calculations had been lower by five percent across all calculations, DD&A in 2014 would have increased by approximately $210 million.

### Exploratory Costs

Under the successful efforts method of accounting, exploratory costs associated with a well discovering hydrocarbons are initially capitalized, or suspended, pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling. At the end of each quarter, management reviews the status of all suspended exploratory drilling costs in light of ongoing exploration activities, in particular, whether the Company is making sufficient progress in its ongoing exploration and appraisal efforts or, in the case of discoveries requiring government sanctioning, analyzing whether development negotiations are underway and proceeding as planned. If management determines that future appraisal drilling or development activities are unlikely to occur, associated suspended exploratory well costs are expensed. Therefore, at any point in time, the Company may have capitalized costs on its Consolidated Balance Sheets associated with exploratory wells that may be charged to exploration expense in future periods. See *Note 6-Suspended Exploratory Well Costs* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for additional information.

79

APC-01751831

Table of Contents
Index to Financial Statements

**Fair Value**

The Company estimates fair value for long-lived assets for impairment testing, reporting units for goodwill impairment testing when necessary, assets and liabilities acquired in a business combination or exchanged in non-monetary transactions, pension plan assets, and initial measurements of AROs. When the Company is required to measure fair value and there is not a market-observable price for the asset or liability or for a similar asset or liability, the Company uses the cost, income, or market valuation approaches depending on the quality of information available to support management's assumptions. The cost approach is based on management's best estimate of the current asset replacement cost. The income approach is based on management's best assumptions regarding expectations of projected cash flows, and discounts the expected cash flows using a commensurate risk-adjusted discount rate. The market approach is based on management's best assumptions regarding prices and other relevant information from market transactions involving comparable assets. Such evaluations involve significant judgment and the results are based on expected future events or conditions, such as sales prices, estimates of future oil and gas production or throughput, development and operating costs and the timing thereof, future net cash flows, economic and regulatory climates, and other factors, most of which are often outside of management's control. However, assumptions used reflect a market participant's view of long-term prices, costs, and other factors, and are consistent with assumptions used in the Company's business plans and investment decisions.

**Property Impairments**

When circumstances indicate that proved oil and gas properties may be impaired, the expected undiscounted future net cash flows of the asset group are compared to the carrying amount of the asset. If the expected undiscounted future net cash flows, based on our estimate of future oil and natural-gas prices, operating costs, anticipated production from proved reserves and other relevant data, are lower than the carrying amount, the carrying amount is reduced to fair value. Fair value estimates require significant judgment and oil and natural-gas prices are a significant component of the fair-value estimate. Prices have exhibited significant volatility in the past, and the Company expects that volatility to continue in the future.

A long-lived asset other than unproved oil and gas property is evaluated for potential impairment whenever events or changes in circumstances indicate that its carrying value may be greater than its undiscounted future net cash flows. Impairment, if any, is measured as the excess of an asset's carrying amount over its estimated fair value. The Company uses a variety of fair-value measurement techniques as discussed below when market information for the same or similar assets does not exist.

**Goodwill Impairments**

The Company tests goodwill for impairment annually at October 1, or more frequently as circumstances dictate. The first step in assessing whether an impairment of goodwill is necessary is an optional qualitative assessment to determine the likelihood of whether the fair value of the reporting unit is greater than its carrying amount. If the Company concludes that fair value of the reporting unit more than likely exceeds the related carrying amount, then goodwill is not impaired and further testing is not necessary. If the qualitative assessment is not performed or indicates fair value of the reporting unit may be less than its carrying amount, the Company compares the estimated fair value of the reporting unit to which goodwill is assigned to the carrying amount of the associated net assets, including goodwill, and determines whether impairment is necessary.

Because quoted market prices for the Company's reporting units are not available, management applies judgment in determining the estimated fair value of reporting units for purposes of performing goodwill impairment tests, when such tests are necessary. Management uses all available information to make these fair-value estimates, including the present values of expected future cash flows using discount rates commensurate with the risks associated with the assets and observable for the oil and gas exploration and production reporting unit, control premiums and market multiples of earnings before interest, taxes, depreciation, and amortization (EBITDA) for the gathering and processing and transportation reporting units.

80

APC-01751832

Table of Contents
Index to Financial Statements

In estimating the fair value of its oil and gas exploration and production reporting unit, the Company assumes production profiles used in its estimation of reserves that are disclosed in the Company's supplemental oil and gas disclosures, market prices based on the forward price curve for oil and gas at the test date (adjusted for location and quality differentials), capital and operating costs consistent with pricing and expected inflation rates, and discount rates that management believes a market participant would use based upon the risks inherent in Anadarko's operations. Management also includes control premium assumptions based on observable market information regarding how a market participant would value the oil and gas exploration and reporting unit as a whole rather than as individual properties that are part of an oil and gas portfolio.

For the Company's other gathering and processing, WES gathering and processing, and WES transportation reporting units, the Company estimates fair value by applying an estimated multiple to projected EBITDA. The Company considered observable transactions in the market and trading multiples for peers in determining an appropriate multiple to apply against the Company's projected EBITDA for these reporting units.

A lower fair-value estimate in the future for any of these reporting units could result in impairment of goodwill. Factors that could trigger a lower fair-value estimate include commodity-price declines, cost increases, regulatory or political environment changes, and other changes in market conditions such as decreased prices in market-based transactions for similar assets, as well as difficulty or potential delays in obtaining drilling permits or other unanticipated events.

**Environmental Obligations and Other Contingencies**

Management makes judgments and estimates when it establishes liabilities for environmental remediation, litigation, and other contingent matters. Estimates of litigation-related liabilities are based on the facts and circumstances of the individual case and on information currently available to the Company. The extent of information available varies based on the status of the litigation and the Company's evaluation of the claim and legal arguments. In future periods, a number of factors could significantly change the Company's estimate of litigation-related liabilities including discovery activities, briefings filed with the relevant court, rulings from the court in the process or at the conclusion of any trial, and similar cases involving other plaintiffs and defendants that may set or change legal precedent. As events unfold throughout the litigation process, the Company evaluates the available information and may consult with third-party legal counsel to determine whether liability accruals should be established or adjusted.

Estimates of environmental liabilities are based on a variety of matters, including, but not limited to, the stage of investigation, the stage of the remedial design, evaluation of existing remediation technologies, and presently enacted laws and regulations. In future periods, a number of factors could significantly change the Company's estimate of environmental-remediation costs, such as changes in laws and regulations, changes in the interpretation or administration of laws and regulations, revisions to the remedial design, unanticipated construction problems, identification of additional areas or volumes of contaminated soil and groundwater, and changes in costs of labor, equipment, and technology. Consequently, it is not possible for management to reliably estimate the amount and timing of all future expenditures that could arise related to environmental or other contingent matters and actual costs may vary significantly from the Company's estimates. The Company's in-house legal counsel and environmental personnel regularly assess contingent liabilities and, in certain circumstances, consult with third-party legal counsel or consultants to assist in the evaluation of the Company's liability for these contingencies.

81

APC-01751833

Table of Contents
Index to Financial Statements

**Income Taxes**

The amount of income taxes recorded by the Company requires interpretations of complex rules and regulations of various tax jurisdictions throughout the world. The Company has recognized deferred tax assets and liabilities for temporary differences, operating losses, and tax-credit carryforwards. The Company routinely assesses the realizability of its deferred tax assets by analyzing the reversal periods of available net operating loss carryforwards and credit carryforwards, temporary differences in tax assets and liabilities, the availability of tax planning strategies, and estimates of future taxable income and other factors. Estimates of future taxable income are based on assumptions of oil and gas reserves and selling prices that are consistent with the Company's internal business forecasts. If the Company concludes that it is more likely than not that some of the deferred tax assets will not be realized, the tax asset is reduced by a valuation allowance. The Company routinely assesses potential uncertain tax positions and, if required, establishes accruals for such amounts. The accruals for deferred tax assets and liabilities, including deferred state income tax assets and liabilities, are subject to significant judgment by management and are reviewed and adjusted routinely based on changes in facts and circumstances. Although management considers its tax accruals adequate, material changes in these accruals may occur in the future, based on the progress of ongoing tax audits, changes in legislation, and resolution of pending tax matters.

## RECENT ACCOUNTING DEVELOPMENTS

See *Note 1-Summary of Significant Accounting Policies* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K for discussion of recent accounting developments affecting the Company.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

The Company's primary market risks are attributable to fluctuations in energy prices and interest rates. In addition, foreign-currency exchange-rate risk exists due to anticipated foreign-currency-denominated payments and receipts. These risks can affect revenues and cash flows from operating, investing, and financing activities. The Company's risk-management policies provide for the use of derivative instruments to manage these risks. The types of commodity derivative instruments used by the Company include futures, swaps, options, and fixed-price physical-delivery contracts. The volume of commodity derivatives entered into by the Company is governed by risk-management policies and may vary from year to year. Both exchange and over-the-counter traded commodity derivative instruments may be subject to margin-deposit requirements, and the Company may be required from time to time to deposit cash or provide letters of credit with exchange brokers or counterparties to satisfy these margin requirements. For additional information relating to the Company's derivative and financial instruments, see *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

**COMMODITY-PRICE RISK** The Company's most significant market risk relates to prices for natural gas, oil, and NGLs. Management expects energy prices to remain volatile and unpredictable. As energy prices decline or rise significantly, revenues and cash flows are likewise affected. In addition, a non-cash write-down of the Company's oil and gas properties or goodwill may be required if commodity prices experience a significant decline. Below is a sensitivity analysis for the Company's commodity-price-related derivative instruments.

**Derivative Instruments Held for Non-Trading Purposes** The Company had derivative instruments in place to reduce the price risk associated with future production of 356 Bcf of natural gas at December 31, 2014, with a net derivative asset position of $228 million. Based on actual derivative contractual volumes, a 10% increase in natural-gas prices would reduce the fair value of these derivatives by $60 million, while a 10% decrease in natural-gas prices would increase the fair value of these derivatives by $52 million. However, any cash received or paid to settle these derivatives would be substantially offset by the realized sales value of equivalent production. In 2014, the Company terminated or offset then-existing 2015 oil three-way collars with a notional volume of 25 MBbls/d due to lower oil prices, resulting in a cash receipt of $126 million.

82

APC-01751834

Table of Contents
Index to Financial Statements

**Derivative Instruments Held for Trading Purposes** At December 31, 2014, the Company had a net derivative asset position of $28 million (gains of $28 million) on outstanding derivative instruments entered into for trading purposes. Based on actual derivative contractual volumes, a 10% increase or decrease in underlying commodity prices would not materially impact the Company's gains or losses on these derivative instruments.

For additional information regarding the Company's marketing and trading portfolio, see *Marketing Activities* under Items 1 and 2 of this Form 10-K.

**INTEREST-RATE RISK** Any borrowings under the New Credit Facilities, the WES RCF, and the commercial paper program are subject to variable interest rates. The balance of Anadarko's long-term debt on the Company's Consolidated Balance Sheets is subject to fixed interest rates. The Company's $2.9 billion of LIBOR-based obligations, which are presented on the Company's Consolidated Balance Sheets net of preferred investments in two non-controlled entities, give rise to minimal net interest-rate risk because coupons on the related preferred investments are also LIBOR-based. A 10% increase in LIBOR would not impact the Company's interest cost on fixed-rate debt already outstanding, but would affect the fair value of outstanding fixed-rate debt.

At December 31, 2014, the Company had a net derivative liability position of $1.2 billion related to interest-rate swaps. A 10% increase (decrease) in the three-month LIBOR interest-rate curve would increase (decrease) the aggregate fair value of outstanding interest-rate swap agreements by approximately $104 million. However, any change in the interest-rate derivative gain or loss could be substantially offset by actual borrowing costs associated with any future debt issuances or borrowings under the New Credit Facilities and the commercial paper program. For a summary of the Company's outstanding interest-rate derivative positions, see *Note 11-Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K.

**FOREIGN-CURRENCY EXCHANGE-RATE RISK** Anadarko's operating revenues are realized in U.S. dollars, and the predominant portion of Anadarko's capital and operating expenditures are U.S.-dollar-denominated. Exposure to foreign-currency risk generally arises in connection with project-specific contractual arrangements and other commitments. Near-term foreign-currency-denominated expenditures are primarily in euros, Brazilian reais, British pounds sterling, Mozambican meticais, and Colombian pesos. Management periodically enters into various risk-management transactions to mitigate a portion of its exposure to foreign-currency exchange-rate risk.

The Company has risk related to exchange-rate changes applicable to cash held in escrow pending final determination of the Company's Brazilian tax liability for its 2008 divestiture of the Peregrino field offshore Brazil, which is currently under consideration by the Brazilian courts. See *Note 17-Contingencies-Other Litigation* in the *Notes to Consolidated Financial Statements* under Item 8 of this Form 10-K. At December 31, 2014, cash of $128 million was held in escrow. A 10% increase or decrease in the foreign-currency exchange rate would not materially impact the Company's gain or loss related to foreign currency.

83

APC-01751835

**Item 8. Financial Statements and Supplementary Data**

<div align="center">

**ANADARKO PETROLEUM CORPORATION**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

|  | Page |
|---|---|
| Report of Management | 85 |
| Management's Assessment of Internal Control Over Financial Reporting | 85 |
| Reports of Independent Registered Public Accounting Firm | 86 |
| Consolidated Statements of Income for the Three Years Ended December 31, 2014 | 88 |
| Consolidated Statements of Comprehensive Income for the Three Years Ended December 31, 2014 | 89 |
| Consolidated Balance Sheets at December 31, 2014 and 2013 | 90 |
| Consolidated Statements of Equity for the Three Years Ended December 31, 2014 | 91 |
| Consolidated Statements of Cash Flows for the Three Years Ended December 31, 2014 | 92 |
| Notes to Consolidated Financial Statements | 93 |
| Supplemental Information on Oil and Gas Exploration and Production Activities | 145 |
| Supplemental Quarterly Information | 157 |

<div align="center">

84

</div>

APC-01751836

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**

**REPORT OF MANAGEMENT**

Management prepared, and is responsible for, the Consolidated Financial Statements and the other information appearing in this annual report. The Consolidated Financial Statements present fairly the Company's financial condition, results of operations and cash flows in conformity with accounting principles generally accepted in the United States. In preparing its Consolidated Financial Statements, the Company includes amounts that are based on estimates and judgments that Management believes are reasonable under the circumstances. The Company's financial statements have been audited by KPMG LLP, an independent registered public accounting firm appointed by the Audit Committee of the Board of Directors. Management has made available to KPMG LLP all of the Company's financial records and related data, as well as the minutes of the stockholders' and Directors' meetings.

**MANAGEMENT'S ASSESSMENT OF INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance to the Company's Management and Directors regarding the preparation and fair presentation of published financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014. This assessment was based on criteria established in the *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment, we believe that as of December 31, 2014, the Company's internal control over financial reporting was effective based on those criteria. The Company acquired Nuevo Midstream, LLC in November 2014 and management excluded from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, Nuevo Midstream, LLC's internal control over financial reporting associated with total assets of $1.6 billion and total revenues of $12.5 million included in the consolidated financial statements of Anadarko Petroleum Corporation and subsidiaries as of and for the year ended December 31, 2014.

KPMG LLP has issued an attestation report on the Company's internal control over financial reporting as of December 31, 2014.


/s/ R. A. WALKER
_____
R. A. Walker
Chairman, President and Chief Executive Officer


/s/ ROBERT G. GWIN
_____
Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer


February 20, 2015


85

APC-01751837

Table of Contents
Index to Financial Statements

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Anadarko Petroleum Corporation:

We have audited Anadarko Petroleum Corporation's internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Anadarko Petroleum Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Assessment of Internal Control over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Anadarko Petroleum Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Anadarko Petroleum Corporation acquired Nuevo Midstream, LLC in November 2014 and management excluded from its assessment of the effectiveness of Anadarko Petroleum Corporation's internal control over financial reporting as of December 31, 2014, Nuevo Midstream, LLC's internal control over financial reporting associated with total assets of $1.6 billion and total revenues of $12.5 million included in the consolidated financial statements of Anadarko Petroleum Corporation and subsidiaries as of and for the year ended December 31, 2014. Our audit of internal control over financial reporting of Anadarko Petroleum Corporation also excluded an evaluation of the internal control over financial reporting of Nuevo Midstream, LLC.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Anadarko Petroleum Corporation and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, equity, and cash flows for each of the years in the three-year period ended December 31, 2014, and our report dated February 20, 2015 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

Houston, Texas
February 20, 2015

86

APC-01751838

Table of Contents
Index to Financial Statements

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Anadarko Petroleum Corporation:

We have audited the accompanying consolidated balance sheets of Anadarko Petroleum Corporation and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of income, comprehensive income, equity, and cash flows for each of the years in the three-year period ended December 31, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Anadarko Petroleum Corporation and subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2014, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Anadarko Petroleum Corporation's internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 20, 2015 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

Houston, Texas
February 20, 2015

87

APC-01751839

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**CONSOLIDATED STATEMENTS OF INCOME**

| millions except per-share amounts | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 |
| **Revenues and Other** | | | | | | |
| Natural-gas sales | $ | 3,849 | $ | 3,388 | $ | 2,444 |
| Oil and condensate sales | | 9,748 | | 9,178 | | 8,728 |
| Natural-gas liquids sales | | 1,572 | | 1,262 | | 1,224 |
| Gathering, processing, and marketing sales | | 1,206 | | 1,039 | | 911 |
| Gains (losses) on divestitures and other, net | | 2,095 | | (286) | | 104 |
| Total | | 18,470 | | 14,581 | | 13,411 |
| **Costs and Expenses** | | | | | | |
| Oil and gas operating | | 1,171 | | 1,092 | | 976 |
| Oil and gas transportation and other | | 1,184 | | 1,022 | | 955 |
| Exploration | | 1,639 | | 1,329 | | 1,946 |
| Gathering, processing, and marketing | | 1,030 | | 869 | | 763 |
| General and administrative | | 1,316 | | 1,090 | | 1,246 |
| Depreciation, depletion, and amortization | | 4,550 | | 3,927 | | 3,964 |
| Other taxes | | 1,244 | | 1,077 | | 1,224 |
| Impairments | | 836 | | 794 | | 389 |
| Algeria exceptional profits tax settlement | | - | | 33 | | (1,797) |
| Deepwater Horizon settlement and related costs | | 97 | | 15 | | 18 |
| Total | | 13,067 | | 11,248 | | 9,684 |
| **Operating Income (Loss)** | | 5,403 | | 3,333 | | 3,727 |
| **Other (Income) Expense** | | | | | | |
| Interest expense | | 772 | | 686 | | 742 |
| (Gains) losses on derivatives, net | | 197 | | (398) | | (326) |
| Other (income) expense, net | | 20 | | 89 | | (4) |
| Tronox-related contingent loss | | 4,360 | | 850 | | (250) |
| Total | | 5,349 | | 1,227 | | 162 |
| **Income (Loss) Before Income Taxes** | | 54 | | 2,106 | | 3,565 |
| Income tax expense (benefit) | | 1,617 | | 1,165 | | 1,120 |
| **Net Income (Loss)** | | (1,563) | | 941 | | 2,445 |
| Net income attributable to noncontrolling interests | | 187 | | 140 | | 54 |
| **Net Income (Loss) Attributable to Common Stockholders** | $ | (1,750) | $ | 801 | $ | 2,391 |
| | | | | | | |
| **Per Common Share** | | | | | | |
| Net income (loss) attributable to common stockholders-basic | $ | (3.47) | $ | 1.58 | $ | 4.76 |
| Net income (loss) attributable to common stockholders-diluted | $ | (3.47) | $ | 1.58 | $ | 4.74 |
| **Average Number of Common Shares Outstanding-Basic** | | 506 | | 502 | | 500 |
| **Average Number of Common Shares Outstanding-Diluted** | | 506 | | 505 | | 502 |
| Dividends (per Common Share) | $ | 0.99 | $ | 0.54 | $ | 0.36 |

See accompanying Notes to Consolidated Financial Statements.

88

APC-01751840

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| millions | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| **Net Income (Loss)** | $ (1,563) | $ 941 | $ 2,445 |
| **Other Comprehensive Income (Loss)** | | | |
| Adjustments for derivative instruments | | | |
| Reclassification of previously deferred derivative losses to (gains) losses on derivatives, net | 9 | 11 | 12 |
| Income taxes on reclassification of previously deferred derivative losses to (gains) losses on derivatives, net | (3) | (4) | (4) |
| Total adjustments for derivative instruments, net of taxes | 6 | 7 | 8 |
| Adjustments for pension and other postretirement plans | | | |
| Net gain (loss) incurred during period | (405) | 416 | (155) |
| Income taxes on net gain (loss) incurred during period | 149 | (152) | 56 |
| Amortization of net actuarial (gain) loss to general and administrative expense | 27 | 132 | 93 |
| Income taxes on amortization of net actuarial (gain) loss to general and administrative expense | (9) | (49) | (32) |
| Amortization of net prior service (credit) cost to general and administrative expense | - | 1 | 2 |
| Total adjustments for pension and other postretirement plans, net of taxes | (238) | 348 | (36) |
| Total | (232) | 355 | (28) |
| **Comprehensive Income (Loss)** | (1,795) | 1,296 | 2,417 |
| Comprehensive income attributable to noncontrolling interests | 187 | 140 | 54 |
| **Comprehensive Income (Loss) Attributable to Common Stockholders** | $ (1,982) | $ 1,156 | $ 2,363 |

See accompanying Notes to Consolidated Financial Statements.

89

APC-01751841

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, | |
|---|---|---|
| millions | 2014 | 2013 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 7,369 | $ 3,698 |
| Accounts receivable (net of allowance of $7 million and $5 million) | | |
| Customers | 1,118 | 1,481 |
| Others | 1,409 | 1,241 |
| Other current assets | 1,325 | 688 |
| Total | 11,221 | 7,108 |
| **Properties and Equipment** | | |
| Cost | 75,107 | 71,244 |
| Less accumulated depreciation, depletion, and amortization | 33,518 | 30,315 |
| Net properties and equipment | 41,589 | 40,929 |
| **Other Assets** | 2,310 | 2,082 |
| **Goodwill and Other Intangible Assets** | 6,569 | 5,662 |
| **Total Assets** | $ 61,689 | $ 55,781 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable | $ 3,683 | $ 3,530 |
| Current asset retirement obligations | 257 | 409 |
| Accrued expenses | 994 | 1,264 |
| Current portion of long-term debt | - | 500 |
| Deepwater Horizon settlement and related costs | 90 | - |
| Tronox-related contingent liability | 5,210 | - |
| Total | 10,234 | 5,703 |
| **Long-term Debt** | 15,092 | 13,065 |
| **Other Long-term Liabilities** | | |
| Deferred income taxes | 9,249 | 9,245 |
| Asset retirement obligations | 1,796 | 1,613 |
| Tronox-related contingent liability | - | 850 |
| Other | 3,000 | 1,655 |
| Total | 14,045 | 13,363 |
| | | |
| **Equity** | | |
| Stockholders' equity | | |
| Common stock, par value $0.10 per share (1.0 billion shares authorized, 525.9 million and 522.5 million shares issued) | 52 | 52 |
| Paid-in capital | 9,005 | 8,629 |
| Retained earnings | 12,125 | 14,356 |
| Treasury stock (19.3 million and 18.8 million shares) | (940) | (895) |
| Accumulated other comprehensive income (loss) | (517) | (285) |
| **Total Stockholders' Equity** | 19,725 | 21,857 |
| Noncontrolling interests | 2,593 | 1,793 |
| **Total Equity** | 22,318 | 23,650 |
| **Total Liabilities and Equity** | $ 61,689 | $ 55,781 |

See accompanying Notes to Consolidated Financial Statements.

APC-01751842

90

APC-01751843

Table of Contents
Index to Financial Statements

## ANADARKO PETROLEUM CORPORATION
## CONSOLIDATED STATEMENTS OF EQUITY

| millions | | Common Stock | Paid-in Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2011 | $ | 51 | $ 7,851 | $ 11,619 | $ (804) | $ (612) | $ 878 | $ 18,983 |
| Net income (loss) | | - | - | 2,391 | - | - | 54 | 2,445 |
| Common stock issued | | - | 249 | - | - | - | - | 249 |
| Dividends-common stock | | - | - | (181) | - | - | - | (181) |
| Repurchase of common stock | | - | - | - | (37) | - | - | (37) |
| Subsidiary equity transactions | | - | 130 | - | - | - | 417 | 547 |
| Distributions to noncontrolling interest owners | | - | - | - | - | - | (112) | (112) |
| Contributions from noncontrolling interest owners | | - | - | - | - | - | 16 | 16 |
| Reclassification of previously deferred derivative losses to (gains) losses on derivatives, net | | - | - | - | - | 8 | - | 8 |
| Adjustments for pension and other postretirement plans | | - | - | - | - | (36) | - | (36) |
| Balance at December 31, 2012 | | 51 | 8,230 | 13,829 | (841) | (640) | 1,253 | 21,882 |
| Net income (loss) | | - | - | 801 | - | - | 140 | 941 |
| Common stock issued | | 1 | 292 | - | - | - | - | 293 |
| Dividends-common stock | | - | - | (274) | - | - | - | (274) |
| Repurchase of common stock | | - | - | - | (54) | - | - | (54) |
| Subsidiary equity transactions | | - | 107 | - | - | - | 554 | 661 |
| Distributions to noncontrolling interest owners | | - | - | - | - | - | (156) | (156) |
| Contributions from noncontrolling interest owners | | - | - | - | - | - | 2 | 2 |
| Reclassification of previously deferred derivative losses to (gains) losses on derivatives, net | | - | - | - | - | 7 | - | 7 |
| Adjustments for pension and other postretirement plans | | - | - | - | - | 348 | - | 348 |
| Balance at December 31, 2013 | | 52 | 8,629 | 14,356 | (895) | (285) | 1,793 | 23,650 |
| Net income (loss) | | - | - | (1,750) | - | - | 187 | (1,563) |
| Common stock issued | | - | 286 | - | - | - | - | 286 |
| Dividends-common stock | | - | - | (505) | - | - | - | (505) |
| Repurchase of common stock | | - | - | - | (45) | - | - | (45) |
| Subsidiary equity transactions | | - | 90 | 24 | - | - | 829 | 943 |
| Distributions to noncontrolling interest owners | | - | - | - | - | - | (216) | (216) |
| Reclassification of previously deferred derivative losses to (gains) losses on derivatives, net | | - | - | - | - | 6 | - | 6 |
| Adjustments for pension and other postretirement plans | | - | - | - | - | (238) | - | (238) |
| Balance at December 31, 2014 | $ | 52 | $ 9,005 | $ 12,125 | $ (940) | $ (517) | $ 2,593 | $ 22,318 |

See accompanying Notes to Consolidated Financial Statements.

91

APC-01751844

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION
CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *millions* | | **2014** | | 2013 | | 2012 |
| **Cash Flows from Operating Activities** | | | | | | |
| Net income (loss) | $ | **(1,563)** | $ | 941 | $ | 2,445 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities | | | | | | |
| Depreciation, depletion, and amortization | | **4,550** | | 3,927 | | 3,964 |
| Deferred income taxes | | **(105)** | | 90 | | 164 |
| Dry hole expense and impairments of unproved properties | | **1,245** | | 864 | | 1,544 |
| Impairments | | **836** | | 794 | | 389 |
| (Gains) losses on divestitures, net | | **(1,891)** | | 470 | | 71 |
| Total (gains) losses on derivatives, net | | **207** | | (392) | | (308) |
| Operating portion of net cash received (paid) in settlement of derivative instruments | | **371** | | 85 | | 685 |
| Other | | **327** | | 246 | | 232 |
| Changes in assets and liabilities | | | | | | |
| Deepwater Horizon settlement and related costs | | **90** | | (2) | | 24 |
| Algeria exceptional profits tax settlement | | **-** | | 730 | | (791) |
| Tronox-related contingent loss | | **4,360** | | 850 | | (250) |
| (Increase) decrease in accounts receivable | | **103** | | (11) | | 520 |
| Increase (decrease) in accounts payable and accrued expenses | | **7** | | 150 | | (476) |
| Other items-net | | **(71)** | | 146 | | 126 |
| Net cash provided by (used in) operating activities | | **8,466** | | 8,888 | | 8,339 |
| **Cash Flows from Investing Activities** | | | | | | |
| Additions to properties and equipment and dry hole costs | | **(9,508)** | | (7,721) | | (7,242) |
| Acquisition of businesses | | **(1,527)** | | (473) | | - |
| Divestitures of properties and equipment and other assets | | **4,968** | | 567 | | 657 |
| Other-net | | **(405)** | | (589) | | (284) |
| Net cash provided by (used in) investing activities | | **(6,472)** | | (8,216) | | (6,869) |
| **Cash Flows from Financing Activities** | | | | | | |
| Borrowings, net of issuance costs | | **2,879** | | 958 | | 1,042 |
| Repayments of debt | | **(1,425)** | | (710) | | (3,044) |
| Financing portion of net cash paid in settlement of derivative instruments | | **(222)** | | - | | - |
| Increase (decrease) in outstanding checks | | **62** | | (13) | | (69) |
| Dividends paid | | **(505)** | | (274) | | (181) |
| Repurchase of common stock | | **(45)** | | (54) | | (37) |
| Issuance of common stock, including tax benefit on share-based compensation awards | | **121** | | 146 | | 103 |
| Sale of subsidiary units | | **1,026** | | 724 | | 623 |
| Distributions to noncontrolling interest owners | | **(216)** | | (156) | | (112) |
| Contributions from noncontrolling interest owners | | **-** | | 2 | | 16 |
| Net cash provided by (used in) financing activities | | **1,675** | | 623 | | (1,659) |
| **Effect of Exchange Rate Changes on Cash** | | **2** | | (68) | | (37) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | | **3,671** | | 1,227 | | (226) |
| **Cash and Cash Equivalents at Beginning of Period** | | **3,698** | | 2,471 | | 2,697 |
| **Cash and Cash Equivalents at End of Period** | $ | **7,369** | $ | 3,698 | $ | 2,471 |

See accompanying Notes to Consolidated Financial Statements.

APC-01751845

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 1. Summary of Significant Accounting Policies

**General** Anadarko Petroleum Corporation is engaged in the exploration, development, production, and marketing of natural gas, oil, condensate, natural gas liquids (NGLs), and anticipated production of liquefied natural gas (LNG). In addition, the Company engages in the gathering, processing, treating, and transporting of natural gas, oil, and NGLs. The Company also participates in the hard-minerals business through royalty arrangements. Unless the context otherwise requires, the terms "Anadarko" and "Company" refer to Anadarko Petroleum Corporation and its consolidated subsidiaries.

**Basis of Presentation** The Consolidated Financial Statements have been prepared in conformity with accounting principles generally accepted in the United States. The Consolidated Financial Statements include the accounts of Anadarko and entities in which it holds a controlling interest. All intercompany transactions have been eliminated. Undivided interests in oil and natural-gas exploration and production joint ventures are consolidated on a proportionate basis. Investments in non-controlled entities, over which Anadarko has the ability to exercise significant influence over operating and financial policies, are accounted for using the equity method. In applying the equity method of accounting, the investments are initially recognized at cost, and subsequently adjusted for the Company's proportionate share of earnings, losses, and distributions. Other investments are carried at original cost. Investments accounted for using the equity method and cost method are reported as a component of other assets. Certain prior-period amounts have been reclassified to conform to the current-year presentation.

**Use of Estimates** The preparation of financial statements in accordance with generally accepted accounting principles in the United States (GAAP) requires management to make informed judgments and estimates that affect the reported amounts of assets, liabilities, revenues, and expenses. Management evaluates its estimates and related assumptions regularly, including those related to proved reserves; the value of properties and equipment; goodwill; intangible assets; asset retirement obligations; litigation liabilities; environmental liabilities; pension assets, liabilities, and costs; income taxes; and fair values. Changes in facts and circumstances or additional information may result in revised estimates, and actual results may differ from these estimates.

**Fair Value** Fair value is defined as the price that would be received to sell an asset or the price paid to transfer a liability in an orderly transaction between market participants at the measurement date. Inputs used in determining fair value are characterized according to a hierarchy that prioritizes those inputs based on the degree to which they are observable. The three input levels of the fair-value hierarchy are as follows:

**Level 1**-Inputs represent quoted prices in active markets for identical assets or liabilities (for example, exchange-traded commodity derivatives).

**Level 2**-Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly (for example, quoted market prices for similar assets or liabilities in active markets or quoted market prices for identical assets or liabilities in markets not considered to be active, inputs other than quoted prices that are observable for the asset or liability, or market-corroborated inputs).

**Level 3**-Inputs that are not observable from objective sources, such as the Company's internally developed assumptions used in pricing an asset or liability (for example, an estimate of future cash flows used in the Company's internally developed present value of future cash flows model that underlies the fair-value measurement).

In determining fair value, the Company uses observable market data when available, or models that incorporate observable market data. In addition to market information, the Company incorporates transaction-specific details that, in management's judgment, market participants would take into account in measuring fair value.

93

APC-01751846

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

In arriving at fair-value estimates, the Company uses relevant observable inputs available for the valuation technique employed. If a fair-value measurement reflects inputs at multiple levels within the hierarchy, the fair-value measurement is characterized based on the lowest level of input that is significant to the fair-value measurement. For Anadarko, recurring fair-value measurements are performed for interest-rate derivatives, commodity derivatives, and investments in trading securities.

The carrying amount of cash and cash equivalents, accounts receivable, and accounts payable reported on the Consolidated Balance Sheets approximates fair value. The fair value of debt is the estimated amount the Company would have to pay to repurchase its debt, including any premium or discount attributable to the difference between the stated interest rate and market interest rate at each balance sheet date. Debt fair values, as disclosed in *Note 12-Debt and Interest Expense,* are based on quoted market prices for identical instruments, if available, or based on valuations of similar debt instruments.

Non-financial assets and liabilities initially measured at fair value include certain assets and liabilities acquired in a business combination or through a non-monetary exchange transaction, intangible assets, goodwill, asset retirement obligations, exit or disposal costs, and capital lease assets where the present value of lease payments is greater than the fair value of the leased asset.

**Revenues** The Company's natural gas is sold primarily to interstate and intrastate natural-gas pipelines, direct end-users, industrial users, local distribution companies, and natural-gas marketers. Oil and condensate are sold primarily to marketers, gatherers, and refiners. NGLs are sold primarily to direct end-users, refiners, and marketers.

The Company recognizes sales revenues for natural gas, oil and condensate, and NGLs based on the amount of each product sold to purchasers when delivery to the purchaser has occurred and title has transferred. This occurs when product has been delivered to a pipeline or when a tanker lifting has occurred. The Company follows the sales method of accounting for natural-gas production imbalances. If the Company's sales volumes for a well exceed the Company's proportionate share of production from the well, a liability is recognized to the extent that the Company's share of estimated remaining recoverable reserves from the well is insufficient to satisfy this imbalance. No receivables are recorded for those wells on which the Company has taken less than its proportionate share of production.

Anadarko provides gathering, processing, treating, and transporting services pursuant to a variety of contracts. Under these arrangements, the Company receives fees, or retains a percentage of products or a percentage of the proceeds from the sale of products and recognizes revenue at the time the services are performed or product is sold. These revenues are included in gathering, processing, and marketing sales in the Consolidated Statements of Income.

Marketing margins related to the Company's production are included in natural-gas sales, oil and condensate sales, and NGLs sales. Marketing margins related to sales of commodities purchased from third parties and gains and losses on derivatives related to such marketing activities are included in gathering, processing, and marketing sales in the Consolidated Statements of Income.

The Company enters into buy/sell arrangements related to the transportation of a portion of its oil production. Under these arrangements, barrels are sold to a third party at a location-based contract price and subsequently repurchased by the Company at a downstream location. The difference in value between the sale and purchase price represents the transportation fee from the lease or certain gathering locations to more liquid markets. These arrangements are often required by private transporters. These transactions are reported on a net basis and included in oil and gas transportation in the Consolidated Statements of Income.

**Cash Equivalents** The Company considers all highly liquid investments with a maturity of three months or less when purchased to be cash equivalents.

94

APC-01751847

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

**Accounts Receivable and Allowance for Uncollectible Accounts** The Company conducts credit analyses of customers prior to making any sales to new customers or increasing credit for existing customers. Based on these analyses, the Company may require a standby letter of credit or a financial guarantee. The Company charges uncollectible accounts receivable against the allowance for uncollectible accounts when it determines collection will no longer be pursued.

**Inventories** Commodity inventories are stated at the lower of average cost or market.

**Properties and Equipment** Properties and equipment are stated at cost less accumulated depreciation, depletion, and amortization expense (DD&A). Costs of improvements that appreciably improve the efficiency or productive capacity of existing properties or extend their lives are capitalized. Maintenance and repairs are expensed as incurred. Upon retirement or sale, the cost of properties and equipment, net of the related accumulated DD&A, is removed and, if appropriate, gain or loss is recognized in gains (losses) on divestitures and other, net.

*Oil and Gas Properties* The Company applies the successful efforts method of accounting for oil and gas properties. Exploration costs such as exploratory geological and geophysical costs, delay rentals, and exploration overhead are charged against earnings as incurred. If an exploratory well provides evidence to justify potential completion as a producing well, drilling costs associated with the well are initially capitalized, or suspended, pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling. This determination may take longer than one year in certain areas (generally in deepwater and international locations) depending on, among other things, the amount of hydrocarbons discovered, the outcome of planned geological and engineering studies, the need for additional appraisal drilling activities to determine whether the discovery is sufficient to support an economic development plan, and government sanctioning of development activities in certain international locations. At the end of each quarter, management reviews the status of all suspended exploratory well costs in light of ongoing exploration activities-in particular, whether the Company is making sufficient progress in its ongoing exploration and appraisal efforts or, in the case of discoveries requiring government sanctioning, whether development negotiations are underway and proceeding as planned. If management determines that future appraisal drilling or development activities are unlikely to occur, associated suspended exploratory well costs are expensed.

Acquisition costs of unproved properties are periodically assessed for impairment and are transferred to proved oil and gas properties to the extent the costs are associated with successful exploration activities. Significant undeveloped leases are assessed individually for impairment, based on the Company's current exploration plans, and a valuation allowance is provided if impairment is indicated. Unproved oil and gas properties with individually insignificant lease acquisition costs are amortized on a group basis (thereby establishing a valuation allowance) over the average lease terms at rates that provide for full amortization of unsuccessful leases upon lease expiration or abandonment. Costs of expired or abandoned leases are charged against the valuation allowance, while costs of productive leases are transferred to proved oil and gas properties. Costs of maintaining and retaining unproved properties, as well as amortization of individually insignificant leases and impairment of unsuccessful leases, are included in exploration expense in the Consolidated Statements of Income.

95

APC-01751848

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

***Capitalized Interest*** For significant projects, interest is capitalized as part of the historical cost of developing and constructing assets. Significant oil and gas investments in unproved properties, significant exploration and development projects that have not commenced production, significant midstream development activities that are in progress, and investments in equity method affiliates that are undergoing the construction of assets that have not commenced principle operations qualify for interest capitalization. Interest is capitalized until the asset is ready for service. Capitalized interest is determined by multiplying the Company's weighted-average borrowing cost on debt by the average amount of qualifying costs incurred. Once an asset subject to interest capitalization is completed and placed in service, the associated capitalized interest is expensed through depreciation or impairment. See *Note 12-Debt and Interest Expense.*

***Asset Retirement Obligations*** Asset retirement obligations (AROs) associated with the retirement of tangible long-lived assets are recognized as liabilities with an increase to the carrying amounts of the related long-lived assets in the period incurred. The cost of the tangible asset, including the asset retirement cost, is depreciated over the useful life of the asset. AROs are recorded at estimated fair value, measured by reference to the expected future cash outflows required to satisfy the retirement obligations discounted at the Company's credit-adjusted risk-free interest rate. Accretion expense is recognized over time as the discounted liabilities are accreted to their expected settlement value. If estimated future costs of AROs change, an adjustment is recorded to both the asset retirement obligation and the long-lived asset. Revisions to estimated AROs can result from changes in retirement cost estimates, revisions to estimated inflation rates, and changes in the estimated timing of abandonment. See *Note 7-Asset Retirement Obligations.*

***Impairments*** Properties and equipment are reviewed for impairment when facts and circumstances indicate that net book values may not be recoverable. In performing this review, an undiscounted cash flow test is performed at the lowest level for which identifiable cash flows are independent of cash flows from other assets. If the sum of the undiscounted future net cash flows is less than the net book value of the property, an impairment loss is recognized for the excess, if any, of the property's net book value over its estimated fair value. See *Note 5-Impairments.*

***Depreciation, Depletion, and Amortization*** Costs of drilling and equipping successful wells, costs to construct or acquire facilities other than offshore platforms, associated asset retirement costs, and capital lease assets used in oil and gas activities are depreciated using the unit-of-production (UOP) method based on total estimated proved developed oil and gas reserves. Costs of acquiring proved properties, including leasehold acquisition costs transferred from unproved properties and costs to construct or acquire offshore platforms and associated asset retirement costs, are depleted using the UOP method based on total estimated proved developed and undeveloped reserves. Mineral properties are also depleted using the UOP method. All other properties are stated at historical acquisition cost, net of impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 40 years for buildings, and up to 47 years for gathering facilities.

***Goodwill and Other Intangible Assets*** Goodwill is subject to annual impairment testing at October 1 (or more frequent testing as circumstances dictate). Anadarko has allocated goodwill to the following reporting units: oil and gas exploration and production, other gathering and processing, Western Gas Partners, LP (WES) gathering and processing, and WES transportation. Changes in goodwill may result from, among other things, impairments, future acquisitions, or future divestitures. See *Note 8-Goodwill and Other Intangible Assets.*
     Other intangible assets represent contractual rights obtained in connection with business combinations that had favorable contractual terms relative to market at the acquisition date as well as customer-related intangible assets, including customer relationships established by acquired contracts. Other intangible assets are amortized over their estimated useful lives and are assessed for impairment whenever impairment indicators are present. See *Note 8-Goodwill and Other Intangible Assets.*

96

APC-01751849

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

**Derivative Instruments** Anadarko uses derivative instruments to manage its exposure to cash-flow variability from commodity-price and interest-rate risk. Derivatives are carried on the balance sheet at fair value and are included in other current assets, other assets, accrued expenses, or other long-term liabilities, depending on the derivative position and the expected timing of settlement, unless they satisfy the normal purchases and sales exception criteria. Where the Company has the contractual right and intends to net settle, derivative assets and liabilities are reported on a net basis.

Gains and losses on derivative instruments are recognized currently in earnings. Net losses attributable to derivatives previously subject to hedge accounting reside in accumulated other comprehensive income and will be reclassified to earnings in future periods as the economic transactions to which the derivatives relate affect earnings. See *Note 11-Derivative Instruments*.

**Accounts Payable** Accounts payable included liabilities of $388 million at December 31, 2014, and $326 million at December 31, 2013, representing the amount by which checks issued, but not presented to the Company's banks for collection, exceeded balances in applicable bank accounts. Changes in these liabilities are reflected in cash flows from financing activities.

**Legal Contingencies** The Company is subject to legal proceedings, claims, and liabilities that arise in the ordinary course of business. Except for legal contingencies acquired in a business combination, which are recorded at fair value at the time of acquisition, the Company accrues losses associated with legal claims when such losses are probable and reasonably estimable. If the Company determines that a loss is probable and cannot estimate a specific amount for that loss, but can estimate a range of loss, the best estimate within the range is accrued. If no amount within the range is a better estimate than any other, the minimum amount of the range is accrued. Estimates are adjusted as additional information becomes available or circumstances change. Legal defense costs associated with loss contingencies are expensed in the period incurred. See *Note 17-Contingencies*.

**Environmental Contingencies** The Company is subject to various environmental-remediation and reclamation obligations arising from federal, state, and local laws and regulations. Except for environmental contingencies acquired in a business combination, which are recorded at fair value at the time of acquisition, the Company accrues losses associated with environmental obligations when such losses are probable and reasonably estimable. Accruals for estimated environmental losses are recognized no later than at the time the remediation feasibility study, or the evaluation of response options, is complete. These accruals are adjusted as additional information becomes available or circumstances change. Future environmental expenditures are not discounted to their present value. Recoveries of environmental costs from other parties are recorded separately as assets at their undiscounted value when receipt of such recoveries is probable. See *Note 17-Contingencies*.

**Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans** The Company measures pension plan assets at fair value. Defined-benefit plan obligations and costs are actuarially determined, incorporating the use of various assumptions. Critical assumptions for pension and other postretirement plans include the discount rate, the expected long-term rate of return on plan assets (for funded pension plans), the rate of future compensation increases, and the health care cost trend rate (for postretirement plans). Other assumptions involve demographic factors such as retirement age, mortality, and turnover. The Company evaluates and updates its actuarial assumptions at least annually.

The Company amortizes prior service costs (credits) on a straight-line basis over the average remaining service period of employees expected to receive benefits under each plan. Actuarial gains and losses that exceed 10% of the greater of the projected benefit obligation and the market-related value of assets are amortized over the average remaining service period of participating employees expected to receive benefits under each plan. See *Note 21-Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans*.

97

APC-01751850

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

**Noncontrolling Interests** Noncontrolling interests represent third-party ownership in the net assets of the Company's consolidated subsidiaries and are presented as a component of equity. Changes in Anadarko's ownership interests in subsidiaries that do not result in deconsolidation are recognized in equity. See *Note 9-Noncontrolling Interests*.

**Income Taxes** The Company files various U.S. federal, state, and foreign income tax returns. Deferred federal, state, and foreign income taxes are provided on temporary differences between the financial statement carrying amounts of assets and liabilities and their respective tax basis. The Company routinely assesses the realizability of its deferred tax assets. If the Company concludes that it is more likely than not that some of the deferred tax assets will not be realized, the tax asset is reduced by a valuation allowance. The Company recognizes a tax benefit from an uncertain tax position when it is more likely than not that the position will be sustained upon examination, based on the technical merits of the position. The tax benefit recorded is equal to the largest amount that is greater than 50% likely to be realized through final settlement with a taxing authority. Interest and penalties related to unrecognized tax benefits are recognized in income tax expense (benefit). The Company uses the flow-through method to account for its investment tax credits. See *Note 18-Income Taxes*.

**Share-Based Compensation** The Company accounts for share-based compensation at fair value. The Company grants equity-classified awards including stock options and non-vested equity shares (restricted stock awards and units). The Company may also grant equity-classified and liability-classified awards based on a comparison of the Company's total shareholder return (TSR) to the TSR of a predetermined group of peer companies (performance units).
    The fair value of stock option awards is determined using the Black-Scholes option-pricing model. Restricted stock awards and units are valued using the market price of Anadarko common stock. For other share-based compensation awards, fair value is determined using a Monte Carlo simulation or discounted-cash-flow methodology.
    The Company records compensation cost, net of estimated forfeitures, for share-based compensation awards over the requisite service period using the straight-line method. An adjustment is made to compensation cost for any difference between the estimated forfeitures and the actual forfeitures related to the awards. For equity-classified share-based compensation awards, expense is recognized based on the grant-date fair value. For liability-classified share-based compensation awards, expense is recognized for those awards expected to ultimately be paid. The amount of expense reported for liability-classified awards is adjusted for fair-value changes so that the expense recognized for each award is equivalent to the amount to be paid. See *Note 15-Share-Based Compensation*.

**Earnings Per Share** The Company's basic earnings per share (EPS) is computed based on the average number of shares of common stock outstanding for the period and includes the effect of any participating securities as appropriate. Diluted EPS includes the effect of the Company's outstanding stock options, restricted stock awards, restricted stock units, and performance-based stock awards, if the inclusion of these items is dilutive. See *Note 13-Stockholders' Equity*.

**Recently Issued Accounting Standards** The Financial Accounting Standards Board issued Accounting Standards Update (ASU) 2014-09, *Revenue from Contracts with Customers*. This ASU supersedes the revenue recognition requirements in Topic 605, *Revenue Recognition*, and industry-specific guidance in Subtopic 932-605, *Extractive Activities-Oil and Gas-Revenue Recognition*, and requires an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration the entity expects to be entitled to in exchange for those goods or services. This ASU is effective for annual and interim periods beginning in 2017 and is required to be adopted using one of two retrospective application methods, with no early adoption permitted. The Company is currently evaluating the impact of the adoption of this ASU on its consolidated financial statements.

98

APC-01751851

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**1. Summary of Significant Accounting Policies (Continued)**

ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity,* changes the criteria for reporting discontinued operations and requires additional disclosures, both for discontinued operations and for individually significant dispositions and assets classified as held for sale not qualifying as discontinued operations. This ASU is effective beginning in 2015, with early adoption permitted for disposals or for assets classified as held for sale not reported in previously issued financial statements. Anadarko early adopted this ASU on a prospective basis in the first quarter of 2014 with no material impact on the Company's consolidated financial statements.

ASU 2013-11, *Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists,* requires that an unrecognized tax benefit or a portion of an unrecognized tax benefit be presented in the financial statements as a reduction to a deferred tax asset, except in certain circumstances. This ASU is effective for annual and interim periods beginning in 2014. See *Note 18-Income Taxes.*

**2. Acquisitions, Divestitures, and Assets Held for Sale**

**Acquisitions** In November 2014, WES acquired Nuevo Midstream, LLC (Nuevo), which owns and operates gathering and processing assets in the Delaware basin in West Texas, for $1.554 billion. Following the acquisition, WES changed the name of Nuevo to Delaware Basin Midstream, LLC (DBM). This acquisition constitutes a business combination and was accounted for using the acquisition method of accounting. This acquisition aligns the Company's gas gathering and processing capacity with future industry production growth plans in the Delaware basin. The following summarizes the preliminary fair value of assets acquired and liabilities assumed at the acquisition date, pending the acquired entity's final financial statements:

*millions*

| | |
|---|---:|
| Current assets | $ 46 |
| Properties and equipment | 441 |
| Other intangible assets | 836 |
| Accounts payable | (13) |
| Accrued expenses | (25) |
| Deferred income taxes | (1) |
| Asset retirement obligations | (9) |
| Goodwill | 279 |
| Total assets acquired and liabilities assumed | $ 1,554 |

Fair-value measurements of assets acquired and liabilities assumed are based on inputs that are not observable in the market and thus represent Level 3 inputs. The fair value of properties and equipment is based on market and cost approaches. Intangible assets consist of customer contracts, the fair value of which was determined using an income approach. Deferred tax assets (liabilities) represent the tax effects of differences in the tax basis and acquisition-date fair values of assets acquired and liabilities assumed. All of the goodwill related to this acquisition is amortizable for tax purposes. The assets acquired and liabilities assumed are included within the midstream reporting segment.

Results of operations attributable to this acquisition are included in the Company's Consolidated Statements of Income from the date acquired. The amounts of revenue and earnings included in the Company's Consolidated Statement of Income for the year ended December 31, 2014, and the amounts of revenue and earnings that would have been recognized had the acquisition occurred on January 1, 2014, are not material to the Company's Consolidated Statements of Income.

99

APC-01751852

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 2. Acquisitions, Divestitures, and Assets Held for Sale (Continued)

There were no other material acquisitions made during 2014. The following summarizes acquisitions made during 2013:

| millions, except percentages | Percentage Acquired | Cash Paid |
|---|---|---|
| Certain oil and gas properties and related assets in the Moxa area of Wyoming | 100% | $ 310 (1) |
| Gas-gathering systems in the Marcellus shale in north-central Pennsylvania | 33.75% | 135 |
| Joint venture formed to design, construct, and own two fractionators located in Mont Belvieu, Texas | 25% | 78 |
| Intrastate pipeline in southwestern Wyoming | 100% | 28 |

(1) Includes $306 million that represents the fair value of the oil and gas properties acquired.

**Divestitures and Assets Held for Sale** The following summarizes the proceeds received and gains (losses) recognized on divestitures for the years ended December 31:

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| Proceeds received | $ 4,968 | $ 567 | $ 657 |
| Gains (losses) on divestitures, net | 1,891 | (470) | (71) |

*Divestitures* The 2014 proceeds and net gains were primarily related to assets included in the oil and gas exploration and production reporting segment. The Company sold a 10% working interest in Offshore Area 1 in Mozambique for $2.64 billion, recognizing a gain of $1.5 billion. In addition, the Company sold its Chinese subsidiary for $1.075 billion, recognizing a gain of $510 million; sold its interest in the nonoperated Vito deepwater development, along with several surrounding exploration blocks in the Gulf of Mexico, for $500 million, recognizing a gain of $237 million; and sold its interest in the Pinedale/Jonah assets in Wyoming for $581 million. These gains were partially offset by losses of $456 million discussed under *Assets Held for Sale* below.

The 2013 sales proceeds were primarily related to the Company's divestiture of its interests in a soda ash joint venture and certain U.S. onshore and Indonesian oil and gas properties. Net losses were primarily related to the Company's sale of the Pinedale/Jonah assets discussed under *Assets Held for Sale* below, partially offset by the Company's divestiture of its interests in the soda ash joint venture and certain U.S. oil and gas properties. The 2012 sales proceeds were primarily related to U.S. oil and gas properties and net losses were primarily related to Indonesian oil and gas properties.

100

APC-01751853

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**2. Acquisitions, Divestitures, and Assets Held for Sale (Continued)**

*Assets Held for Sale* During the fourth quarter of 2014, Anadarko considered certain U.S. onshore assets from the oil and gas exploration and production reporting segment to be held for sale. These assets were remeasured to their fair value using a market approach and Level 2 fair-value measurement, and the Company recognized a loss of $456 million. Gains and losses on assets held for sale are included in gains (losses) on divestitures and other, net in the Company's Consolidated Statements of Income. Volatility in the current commodity-price environment has reduced the probability that the assets will be sold within one year and the assets are therefore no longer considered held for sale at December 31, 2014. At December 31, 2014, the balances of assets and liabilities associated with assets held for sale were not material.

During the fourth quarter of 2013, the Company began marketing certain other domestic properties from the oil and gas exploration and production reporting segment to redirect its operating activities and capital investments to other areas. These assets were remeasured to their fair value using a market approach and Level 2 fair-value measurement. In 2013, the Company recognized losses of $704 million primarily related to the sale of the Pinedale/Jonah assets in Wyoming, which closed in 2014. At December 31, 2013, the Company's Consolidated Balance Sheets included long-term assets of $616 million and long-term liabilities of $27 million associated with assets held for sale.

**Property Exchange** In 2013, the Company exchanged certain oil and gas properties in the Wattenberg field with a third party. The properties exchanged were measured at the Company's historical net cost with no gain or loss recognized. Anadarko paid $106 million in cash as part of the exchange, which is included as an addition to properties and equipment on the Company's Consolidated Statement of Cash Flows.

**3. Inventories**

The following summarizes the major classes of inventories included in other current assets at December 31:

| millions | 2014 | 2013 |
|---|---|---|
| Oil | $ 133 | $ 88 |
| Natural gas | 27 | 43 |
| NGLs | 83 | 79 |
| Total inventories | $ 243 | $ 210 |

**4. Properties and Equipment**

The following summarizes the cost of properties and equipment by segment at December 31:

| millions | 2014 | 2013 |
|---|---|---|
| Oil and gas exploration and production [1] | $ 63,674 | $ 61,302 |
| Midstream | 8,647 | 7,285 |
| Marketing | - | 9 |
| Other | 2,786 | 2,648 |
| Total properties and equipment | $ 75,107 | $ 71,244 |

[1] Includes costs associated with unproved properties of $5.1 billion at December 31, 2014, and $6.9 billion at December 31, 2013.

101

APC-01751854

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**5. Impairments**

The following summarizes impairments by segment for the years ended December 31:

| millions | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| Oil and gas exploration and production | | | | | | |
| Long-lived assets held for use | | | | | | |
| U.S. onshore properties | $ | 545 | $ | 142 | $ | 259 |
| Gulf of Mexico properties | | 276 | | 562 | | 104 |
| Cost-method investment | | 3 | | 11 | | 13 |
| Midstream | | | | | | |
| Long-lived assets held for use | | 12 | | 79 | | 13 |
| Total impairments | $ | 836 | $ | 794 | $ | 389 |

In 2014, certain U.S. onshore and Gulf of Mexico oil and gas properties were impaired primarily due to lower forecasted natural-gas and oil prices. While the Company's other U.S. onshore oil and gas properties indicated no impairment at December 31, 2014, it is reasonably possible the estimate of undiscounted cash flows related to certain of these properties may change in the near term due to declines in commodity prices and could result in additional property impairments.

In 2013, certain Gulf of Mexico properties were impaired due to a reduction in estimated future net cash flows and downward revisions of reserves resulting from changes to the Company's development plans. Also in 2013, certain U.S. onshore properties and related midstream assets were impaired due to downward revisions of reserves resulting from changes to the Company's development plans. In addition, a midstream property was impaired during 2013 due to a reduction in estimated future cash flows. In 2012, certain U.S. onshore and midstream properties were impaired primarily due to lower natural-gas prices and Gulf of Mexico properties were impaired primarily as a result of downward reserves revisions for a property that was near the end of its economic life. Impairments of the Company's Venezuelan cost-method investment were due to declines in estimated recoverable value.

The following summarizes the post-impairment fair value of the above-described assets, which was measured using the income approach and Level 3 inputs:

| millions | 2014 | | 2013 |
|---|---|---|---|
| Long-lived assets held for use | $ | 731 | $ | 548 |
| Cost-method investment [1] | | 32 | | 32 |

[1] This represents the Company's after-tax net investment.

**Impairments of Unproved Properties**  Impairments of unproved properties are included in exploration expense in the Company's Consolidated Statements of Income. In 2012, the Company recognized a $721 million impairment of unproved Powder River coalbed methane properties primarily due to lower natural-gas prices. Also in 2012, the Company recognized a $124 million impairment of an unproved Gulf of Mexico natural-gas property that the Company did not expect to develop under the forecasted natural-gas price environment.

102

APC-01751855

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

### 6. Suspended Exploratory Well Costs

The following summarizes the changes in suspended exploratory well costs at December 31 for each of the last three years. Additions pending the determination of proved reserves excludes amounts capitalized and subsequently charged to expense within the same year.

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| Balance at January 1 | $ 2,232 | $ 2,062 | $ 1,353 |
| Additions pending the determination of proved reserves | 421 | 848 | 960 |
| Divestitures [1] | (913) | (48) | - |
| Reclassifications to proved properties | (100) | (507) | (129) |
| Charges to exploration expense | (118) | (123) | (122) |
| Balance at December 31 | $ 1,522 | $ 2,232 | $ 2,062 |

[1] Includes $(744) million related to the Company's sale of a 10% working interest in Offshore Area 1 in Mozambique during 2014.

The following summarizes an aging of suspended exploratory well costs by geographic area and the year the costs were suspended at December 31, 2014:

| millions | Total | Year Costs Incurred[1] | | | |
|---|---|---|---|---|---|
| | | 2014 | 2013 | 2012 | 2011 and prior |
| United States-Onshore | $ 164 | $ 131 | $ 17 | $ 5 | $ 11 |
| United States-Offshore | 314 | 78 | 80 | 63 | 93 |
| International | 1,044 | 179 | 271 | 184 | 410 |
| | $ 1,522 | $ 388 | $ 368 | $ 252 | $ 514 |

[1] Excludes additions subsequently reclassified to proved properties within the same year.

Suspended exploratory well costs capitalized for a period greater than one year after completion of drilling were associated with 24 projects at December 31, 2014, primarily located in Brazil, Ghana, and the Gulf of Mexico. Project costs suspended for longer than one year were primarily suspended pending the completion of economic evaluations including, but not limited to, results of additional appraisal drilling, well-test analysis, additional geological and geophysical data, facilities and infrastructure development options, development plan approval, and permitting. Projects with suspended exploratory well costs are those identified by management as exhibiting sufficient quantities of hydrocarbons to justify potential development and where management is actively pursuing efforts to assess whether reserves can be attributed to these projects. If additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time.

103

APC-01751856

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**7. Asset Retirement Obligations**

The majority of Anadarko's AROs relate to the plugging of wells and the related abandonment of oil and gas properties. Revisions in estimated liabilities during the period relate primarily to changes in estimates of asset retirement costs and include, but are not limited to, revisions of estimated inflation rates, changes in property lives, and the expected timing of settlement. The following summarizes changes in the Company's AROs during 2014 and 2013:

| millions | | 2014 | | 2013 |
|---|---|---|---|---|
| Carrying amount of asset retirement obligations at January 1 | $ | 2,022 | $ | 1,885 |
| Liabilities incurred | | 119 | | 182 |
| Property dispositions | | (70) | | (76) |
| Liabilities settled | | (443) | | (162) |
| Accretion expense | | 93 | | 110 |
| Revisions in estimated liabilities | | 332 | | 83 |
| Carrying amount of asset retirement obligations at December 31 | $ | 2,053 | $ | 2,022 |

**8. Goodwill and Other Intangible Assets**

**Goodwill** The Company's 2014 annual impairment assessment of goodwill indicated no impairment. Procedures were also performed in the fourth quarter of 2014 to review any changes in circumstances subsequent to the annual test, including changes in commodity prices. These procedures also indicated no impairment. At December 31, 2014, the Company had $5.6 billion of goodwill allocated to the following reporting units: $5.1 billion to oil and gas exploration and production, $69 million to other gathering and processing, $379 million to WES gathering and processing, and $5 million to WES transportation.

Significant declines in commodity prices, difficulties or potential delays in obtaining drilling permits, or other unanticipated events could result in further goodwill impairment tests in the near term, the results of which may have a material adverse impact on the Company's results of operations.

**Other Intangible Assets** Intangible assets and associated amortization expense were as follows:

| millions | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount | | Amortization Expense |
|---|---|---|---|---|---|---|---|---|
| **December 31, 2014** | | | | | | | | |
| Offshore platform leases | $ | 33 | $ | (29) | $ | 4 | $ | - |
| Customer contracts | | 1,004 | | (15) | | 989 | | 6 |
| | $ | 1,037 | $ | (44) | $ | 993 | $ | 6 |
| **December 31, 2013** | | | | | | | | |
| Offshore platform leases | $ | 60 | $ | (50) | $ | 10 | $ | 3 |
| Customer contracts | | 169 | | (9) | | 160 | | 4 |
| | $ | 229 | $ | (59) | $ | 170 | $ | 7 |

Customer contract intangible assets are primarily related to WES's DBM acquisition in 2014. These contracts are being amortized over 30 years. See *Note 2-Acquisitions, Divestitures, and Assets Held for Sale*. The annual aggregate amortization expense for intangible assets is expected to be $31 million each of the next five years.

104

APC-01751857

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 9. Noncontrolling Interests

In December 2012, Western Gas Equity Partners, LP (WGP), a publicly traded consolidated subsidiary formed to own substantially all of the partnership interests in WES previously owned by Anadarko, completed its initial public offering (IPO) of approximately 20 million common units representing limited partner interests in WGP at a price of $22.00 per common unit, for net proceeds of $411 million. During 2014, Anadarko sold approximately six million WGP common units to the public, raising net proceeds of $335 million. At December 31, 2014, Anadarko's ownership interest in WGP consisted of an 88.3% limited partner interest and the entire non-economic general partner interest. The remaining 11.7% limited partner interest in WGP was owned by the public.

WES, a publicly traded consolidated subsidiary, is a limited partnership formed by Anadarko to own, operate, acquire, and develop midstream assets. WES issued approximately 10 million common units to the public raising net proceeds of $691 million in 2014, approximately 12 million common units to the public raising net proceeds of $725 million in 2013, and approximately 5 million common units to the public raising net proceeds of $212 million in 2012. In addition, WES issued 11 million Class C units to Anadarko in 2014 to partially fund the DBM acquisition. These units will receive distributions in the form of additional Class C units until the end of 2017. At December 31, 2014, WGP's ownership interest in WES consisted of a 34.9% limited partner interest, the entire 1.8% general partner interest, and all of the WES incentive distribution rights. At December 31, 2014, Anadarko also owned an 8.3% limited partner interest in WES through other subsidiaries' ownership of common and Class C units. The remaining 55% limited partner interest in WES was owned by the public.

## 10. Equity-Method Investments

In 2007, Anadarko contributed certain of its oil and gas properties and gathering and processing assets, with an aggregate fair value of $2.9 billion at the time of the contribution, to newly formed unconsolidated entities in exchange for noncontrolling mandatorily redeemable London Interbank Offered Rate (LIBOR) based preferred interests in those entities. The common equity of the investee entities is 95% owned by third parties that also maintain control over the assets. Subsequent to their formation, the investee entities loaned Anadarko an aggregate of $2.9 billion. The Company accounts for its investment in these entities using the equity method of accounting. The carrying amount of these investments was $2.8 billion and the carrying amount of notes payable to affiliates was $2.9 billion at December 31, 2014. Anadarko has legal right of setoff and intends to net settle its obligations under each of the notes payable to the investees with the distributable value of its interest in the corresponding investee. Accordingly, the investments and the obligations are presented net on the Consolidated Balance Sheets in other long-term liabilities-other for all periods presented.

Interest on the notes issued by Anadarko is variable, based on LIBOR, plus a spread that fluctuates with Anadarko's credit rating. The applicable interest rate was 1.24% at December 31, 2014 and December 31, 2013. The note payable agreement contains a covenant that provides for a maximum Anadarko debt-to-capital ratio of 67%. Anadarko was in compliance with this covenant at December 31, 2014. Other (income) expense, net includes interest expense on the notes payable of $36 million in 2014, $37 million in 2013, and $42 million in 2012, and equity earnings from Anadarko's investments in the investee entities of $(45) million in 2014, $(42) million in 2013, and $(43) million in 2012.

105

APC-01751858

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**11. Derivative Instruments**

**Objective and Strategy** The Company uses derivative instruments to manage its exposure to cash-flow variability from commodity-price and interest-rate risks. Futures, swaps, and options are used to manage exposure to commodity-price risk inherent in the Company's oil and natural-gas production and natural-gas processing operations (Oil and Natural-Gas Production/Processing Derivative Activities). Futures contracts and commodity-price swap agreements are used to fix the price of expected future oil and natural-gas sales at major industry trading locations, such as Henry Hub, Louisiana for natural gas and Cushing, Oklahoma or Sullom Voe, Scotland for oil. Basis swaps are periodically used to fix or float the price differential between product prices at one market location versus another. Options are used to establish a floor price, a ceiling price, or a floor and a ceiling price (collar) for expected future oil and natural-gas sales. Derivative instruments are also used to manage commodity-price risk inherent in customer price requirements and to fix margins on the future sale of natural gas and NGLs from the Company's leased storage facilities (Marketing and Trading Derivative Activities).

Interest-rate swaps are used to fix or float interest rates on existing or anticipated indebtedness. The purpose of these instruments is to manage the Company's existing or anticipated exposure to interest-rate changes. The fair value of the Company's current interest-rate swap portfolio increases (decreases) when interest rates increase (decrease).

The Company does not apply hedge accounting to any of its derivative instruments. As a result, gains and losses associated with derivative instruments are recognized currently in earnings. Net derivative losses attributable to derivatives previously subject to hedge accounting reside in accumulated other comprehensive income (loss) and are reclassified to earnings as the transactions to which the derivatives relate are recognized in earnings. See *Note 14-Accumulated Other Comprehensive Income (Loss)*.

**Oil and Natural-Gas Production/Processing Derivative Activities** The natural-gas prices listed below are New York Mercantile Exchange (NYMEX) Henry Hub prices. The following is a summary of the Company's derivative instruments related to natural-gas production/processing derivative activities at December 31, 2014:

|  |  | 2015 Settlement |
| --- | --- | --- |
| **Natural Gas** |  |  |
| Three-Way Collars (thousand MMBtu/d) |  | 635 |
| Average price per MMBtu |  |  |
| Ceiling sold price (call) | $ | 4.76 |
| Floor purchased price (put) | $ | 3.75 |
| Floor sold price (put) | $ | 2.75 |
| Extendable Fixed-Price Contracts (thousand MMBtu/d) [1] |  | 170 |
| Average price per MMBtu | $ | 4.17 |

[1] The extendable fixed-price contracts have a contract term of January 2015 to December 2015 with an option for the counterparty to extend the contract term to December 2016 at the same price.
MMBtu-million British thermal units
MMBtu/d-million British thermal units per day

A three-way collar is a combination of three options: a sold call, a purchased put, and a sold put. The sold call establishes the maximum price that the Company will receive for the contracted commodity volumes. The purchased put establishes the minimum price that the Company will receive for the contracted volumes unless the market price for the commodity falls below the sold put strike price, at which point the minimum price equals the reference price (e.g., NYMEX) plus the excess of the purchased put strike price over the sold put strike price.

In 2014, the Company terminated or offset then-existing 2015 oil three-way collars with a notional volume of 25 thousand barrels per day due to lower oil prices, resulting in a cash receipt of $126 million.

106

APC-01751859

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**11. Derivative Instruments (Continued)**

**Marketing and Trading Derivative Activities** The Company had financial derivative transactions with notional volumes of natural gas totaling 6 billion cubic feet (Bcf) at December 31, 2014, and 16 Bcf at December 31, 2013, that were entered into to mitigate commodity-price risk related to fixed-price purchase and sales contracts and storage activity.

**Interest-Rate Derivatives** Anadarko has outstanding interest-rate swap contracts to manage interest-rate risk associated with anticipated debt issuances. The Company has locked in a fixed interest rate in exchange for a floating interest rate indexed to the three-month LIBOR. These swap instruments include a provision that requires both the termination of the swaps and cash settlement in full at the start of the reference period.

To align the interest-rate swap portfolio with anticipated future debt financing, in 2014 the Company extended the reference-period start dates from June 2014 to September 2016 and adjusted the related fixed interest rates for interest-rate swaps with an aggregate notional principal amount of $1.1 billion, and in 2012 the Company extended the reference-period start dates from October 2012 to September 2016 and adjusted the related fixed interest rates for interest-rate swap agreements with an aggregate notional principal amount of $800 million. In addition, in anticipation of the July 2014 issuance of an aggregate $1.25 billion of Senior Notes, interest-rate swap agreements with an aggregate notional principal amount of $750 million were settled in 2014, resulting in a cash payment of $222 million. Interest-rate swap agreements with an aggregate notional principal amount of $200 million were also settled in October 2012, resulting in a cash payment of $64 million.

Derivative settlements are classified as cash flows from operating activities unless the derivatives contain an other-than-insignificant financing element, in which case the settlements are classified as cash flows from financing activities. As a result of prior extensions of reference-period start dates without settlement of the related interest-rate derivative obligations, the interest-rate derivatives in the Company's portfolio contain an other-than-insignificant financing element and, therefore settlements related to these extended interest-rate derivatives are classified as cash flows from financing activities.

The Company had the following outstanding interest-rate swaps at December 31, 2014:

| *millions except percentages* | Reference Period | | Weighted-Average |
|---|---|---|---|
| **Notional Principal Amount** | **Start** | **End** | **Interest Rate** |
| $   50 | September 2016 | September 2026 | 5.91% |
| $   1,850 | September 2016 | September 2046 | 6.05% |

107

APC-01751860

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**11. Derivative Instruments (Continued)**

**Effect of Derivative Instruments-Balance Sheet** The following summarizes the fair value of the Company's derivative instruments at December 31:

| millions Balance Sheet Classification | Gross Derivative Assets | | Gross Derivative Liabilities | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Commodity derivatives | | | | |
| Other current assets | $ 421 | $ 181 | $ (118) | $ (102) |
| Other assets | 1 | 89 | - | (66) |
| Accrued expenses | 71 | 106 | (114) | (149) |
| Other liabilities | - | 4 | (6) | (15) |
| | 493 | 380 | (238) | (332) |
| Interest-rate and other derivatives | | | | |
| Accrued expenses | - | - | - | (480) |
| Other liabilities | - | - | (1,217) | (174) |
| | - | - | (1,217) | (654) |
| Total derivatives | $ 493 | $ 380 | $ (1,455) | $ (986) |

**Effect of Derivative Instruments-Statement of Income** The following summarizes gains and losses related to derivative instruments:

| millions Classification of (Gain) Loss Recognized | 2014 | 2013 | 2012 |
|---|---|---|---|
| Commodity derivatives | | | |
| Gathering, processing, and marketing sales (1) | $ 10 | $ 6 | $ 18 |
| (Gains) losses on derivatives, net | (589) | 141 | (387) |
| Interest-rate and other derivatives | | | |
| (Gains) losses on derivatives, net | 786 | (539) | 61 |
| Total (gains) losses on derivatives, net | $ 207 | $ (392) | $ (308) |

(1) Represents the effect of Marketing and Trading Derivative Activities.

108

APC-01751861

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**11. Derivative Instruments (Continued)**

**Credit-Risk Considerations** The financial integrity of exchange-traded contracts, which are subject to nominal credit risk, is assured by NYMEX or IntercontinentalExchange, Inc. through systems of financial safeguards and transaction guarantees. Over-the-counter traded swaps, options, and futures contracts expose the Company to counterparty credit risk. The Company monitors the creditworthiness of its counterparties, establishes credit limits according to the Company's credit policies and guidelines, and assesses the impact on fair value of its counterparties' creditworthiness. The Company has the ability to require cash collateral or letters of credit to mitigate its credit-risk exposure. The Company has netting agreements with financial institutions that permit net settlement of gross commodity derivative assets against gross commodity derivative liabilities, and routinely exercises its contractual right to offset gains and losses when settling with derivative counterparties.

In addition, the Company has setoff agreements with certain financial institutions that may be exercised in the event of default and provide for contract termination and net settlement across derivative types. At December 31, 2014, $289 million of the Company's $1.455 billion gross derivative liability balance, and at December 31, 2013, $76 million of the Company's $986 million gross derivative liability balance would have been eligible for setoff against the Company's gross derivative asset balance in the event of default. Other than in the event of default, the Company does not net settle across derivative types.

The Company's derivative instruments are subject to individually negotiated credit provisions that may require collateral of cash or letters of credit depending on the derivative's valuation versus negotiated credit thresholds. These credit thresholds may also require full or partial collateralization or immediate settlement of the Company's obligations if certain credit-risk-related provisions are triggered, such as if the Company's credit rating from major credit rating agencies declined to below investment grade. However, most of the Company's derivative counterparties maintained secured positions at December 31, 2014, with respect to the Company's derivative liabilities under the Company's $5.0 billion senior secured revolving credit facility ($5.0 billion Facility). In January 2015, the Company's $5.0 billion Facility was replaced by new unsecured facilities under which the Company's derivative counterparties no longer maintain security interests in any of the Company's assets. As a result, the Company may be required from time to time to post collateral of cash or letters of credit based on the negotiated terms of the individual derivative agreements. For information on the Company's revolving credit facilities, see *Note 12-Debt and Interest Expense-Anadarko Revolving Credit Facilities and Commercial Paper Program*.

The aggregate fair value of unsecured derivative instruments with credit-risk-related contingent features for which a net liability position existed was $97 million (net of collateral) at December 31, 2014, and $42 million at December 31, 2013. The current portion of these amounts was included in accrued expenses and the long-term portion of these amounts was included in other long-term liabilities-other on the Company's Consolidated Balance Sheets.

109

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 11. Derivative Instruments (Continued)

**Fair Value** Valuations of physical-delivery purchase and sale agreements, over-the-counter financial swaps, and commodity option collars are based on similar transactions observable in active markets and industry-standard models that primarily rely on market-observable inputs. Inputs used to estimate fair value in industry-standard models are categorized as Level 2 inputs because substantially all assumptions and inputs are observable in active markets throughout the full term of the instruments. Inputs used to estimate the fair value of swaps and options include market-price curves; contract terms and prices; credit-risk adjustments; and, for Black-Scholes option valuations, discount factors and implied market volatility.

The following summarizes the fair value of the Company's derivative assets and liabilities, by input level within the fair-value hierarchy:

| millions | Level 1 | | Level 2 | | Level 3 | | Netting [1] | | Collateral | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **December 31, 2014** | | | | | | | | | | | | |
| **Assets** | | | | | | | | | | | | |
| Commodity derivatives | | | | | | | | | | | | |
| Financial institutions | $ | - | $ | 471 | $ | - | $ | (187) | $ | (13) | $ | 271 |
| Other counterparties | | - | | 22 | | - | | (2) | | - | | 20 |
| Total derivative assets | $ | - | $ | 493 | $ | - | $ | (189) | $ | (13) | $ | 291 |
| **Liabilities** | | | | | | | | | | | | |
| Commodity derivatives | | | | | | | | | | | | |
| Financial institutions | $ | - | $ | (234) | $ | - | $ | 187 | $ | 23 | $ | (24) |
| Other counterparties | | - | | (4) | | - | | 2 | | - | | (2) |
| Interest-rate and other derivatives | | - | | (1,217) | | - | | - | | - | | (1,217) |
| Total derivative liabilities | $ | - | $ | (1,455) | $ | - | $ | 189 | $ | 23 | $ | (1,243) |
| | | | | | | | | | | | | |
| **December 31, 2013** | | | | | | | | | | | | |
| **Assets** | | | | | | | | | | | | |
| Commodity derivatives | | | | | | | | | | | | |
| Financial institutions | $ | - | $ | 211 | $ | - | $ | (153) | $ | - | $ | 58 |
| Other counterparties | | - | | 169 | | - | | (126) | | - | | 43 |
| Total derivative assets | $ | - | $ | 380 | $ | - | $ | (279) | $ | - | $ | 101 |
| **Liabilities** | | | | | | | | | | | | |
| Commodity derivatives | | | | | | | | | | | | |
| Financial institutions | $ | - | $ | (200) | $ | - | $ | 153 | $ | 7 | $ | (40) |
| Other counterparties | | - | | (132) | | - | | 126 | | - | | (6) |
| Interest-rate and other derivatives | | - | | (654) | | - | | - | | - | | (654) |
| Total derivative liabilities | $ | - | $ | (986) | $ | - | $ | 279 | $ | 7 | $ | (700) |

[1] Represents the impact of netting commodity derivative assets and liabilities with counterparties where the Company has the contractual right and intends to net settle.

110

APC-01751863

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

### 12. Debt and Interest Expense

**Debt** The Company's outstanding debt is senior unsecured, except for borrowings, if any, under the $5.0 billion Facility. See *Note 10-Equity-Method Investments* for disclosure regarding Anadarko's notes payable related to its ownership of certain noncontrolling mandatorily redeemable interests that are not included in the Company's reported debt balance and do not affect consolidated interest expense. The following summarizes the Company's outstanding debt:

| | December 31, | |
|---|---|---|
| millions | 2014 | 2013 |
| 5.750% Senior Notes due 2014 | $ - | $ 275 |
| 7.625% Senior Notes due 2014 | - | 500 |
| 5.950% Senior Notes due 2016 | 1,750 | 1,750 |
| 6.375% Senior Notes due 2017 | 2,000 | 2,000 |
| 7.050% Debentures due 2018 | 114 | 114 |
| WES 2.600% Senior Notes due 2018 | 350 | 250 |
| 6.950% Senior Notes due 2019 | 300 | 300 |
| 8.700% Senior Notes due 2019 | 600 | 600 |
| WES 5.375% Senior Notes due 2021 | 500 | 500 |
| WES 4.000% Senior Notes due 2022 | 670 | 670 |
| 3.450% Senior Notes due 2024 | 625 | - |
| 6.950% Senior Notes due 2024 | 650 | 650 |
| 7.500% Debentures due 2026 | 112 | 112 |
| 7.000% Debentures due 2027 | 54 | 54 |
| 7.125% Debentures due 2027 | 150 | 150 |
| 6.625% Debentures due 2028 | 17 | 17 |
| 7.150% Debentures due 2028 | 235 | 235 |
| 7.200% Debentures due 2029 | 135 | 135 |
| 7.950% Debentures due 2029 | 117 | 117 |
| 7.500% Senior Notes due 2031 | 900 | 900 |
| 7.875% Senior Notes due 2031 | 500 | 500 |
| Zero-Coupon Senior Notes due 2036 | 2,360 | 2,360 |
| 6.450% Senior Notes due 2036 | 1,750 | 1,750 |
| 7.950% Senior Notes due 2039 | 325 | 325 |
| 6.200% Senior Notes due 2040 | 750 | 750 |
| 4.500% Senior Notes due 2044 | 625 | - |
| WES 5.450% Senior Notes due 2044 | 400 | - |
| 7.730% Debentures due 2096 | 61 | 61 |
| 7.500% Debentures due 2096 | 78 | 78 |
| 7.250% Debentures due 2096 | 49 | 49 |
| WES revolving credit facility | 510 | - |
| Total debt at face value | $ 16,687 | $ 15,202 |
| Net unamortized discounts and premiums (1) | (1,616) | (1,645) |
| Total borrowings | $ 15,071 | $ 13,557 |
| Capital lease obligation | 21 | 8 |
| Less current portion of long-term debt | - | 500 |
| Total long-term debt | $ 15,092 | $ 13,065 |

(1) Unamortized discounts and premiums are amortized over the term of the related debt.

111

APC-01751864

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**12. Debt and Interest Expense (Continued)**

In a 2006 private offering, Anadarko received $500 million of loan proceeds upon issuing the Zero-Coupon Senior Notes due 2036 (Zero Coupons). The Zero Coupons mature in 2036 and have an aggregate principal amount due at maturity of approximately $2.4 billion, reflecting a yield to maturity of 5.24%. The Zero Coupons can be put to the Company in October of each year, in whole or in part, for the then-accreted value of the outstanding Zero Coupons. The accreted value of the outstanding Zero Coupons was $765 million at December 31, 2014. Anadarko's Zero Coupons are classified as long-term debt on the Company's Consolidated Balance Sheets, as the Company has the ability and intent to refinance these obligations using long-term debt.

**Fair Value** The Company uses a market approach to determine the fair value of its fixed-rate debt using observable market data, which results in a Level 2 fair-value measurement. The carrying amount of floating-rate debt approximates fair value as the interest rates are variable and reflective of market rates. The estimated fair value of the Company's total borrowings was $17.4 billion at December 31, 2014, and $15.3 billion at December 31, 2013.

**Debt Activity** The following summarizes the Company's debt activity during 2014 and 2013:

| millions | Carrying Value | Description |
|---|---|---|
| Balance at December 31, 2012 | $ 13,269 | |
| Issuances | 250 | WES 2.600% Senior Notes due 2018 |
| Borrowings | 710 | WES revolving credit facility |
| Repayments | (710) | WES revolving credit facility |
| Other, net | 38 | Amortization of debt discounts and premiums |
| Balance at December 31, 2013 | $ 13,557 | |
| Issuances | **101** | WES 2.600% Senior Notes due 2018 |
| | **394** | WES 5.450% Senior Notes due 2044 |
| | **624** | 3.450% Senior Notes due 2024 |
| | **621** | 4.500% Senior Notes due 2044 |
| Borrowings | **1,160** | WES revolving credit facility |
| Repayments | **(500)** | 7.625% Senior Notes due 2014 |
| | **(275)** | 5.750% Senior Notes due 2014 |
| | **(650)** | WES revolving credit facility |
| Other, net | **39** | Amortization of debt discounts and premiums |
| Balance at December 31, 2014 | $ **15,071** | |

112

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**12. Debt and Interest Expense (Continued)**

***Anadarko Revolving Credit Facilities and Commercial Paper Program*** During 2014, the Company maintained the $5.0 billion Facility maturing in September 2015. Obligations incurred under the $5.0 billion Facility, as well as obligations Anadarko had to lenders or their affiliates pursuant to certain derivative instruments that were supported by the $5.0 billion Facility as discussed in *Note 11-Derivative Instruments*, were guaranteed by certain of the Company's wholly owned domestic subsidiaries, and were secured by a perfected first-priority security interest in certain exploration and production assets located in the United States and 65% of the capital stock of certain wholly owned foreign subsidiaries. During 2014, the Company had no outstanding borrowings under the $5.0 billion Facility.

In June 2014, Anadarko entered into a $3.0 billion five-year senior unsecured revolving credit facility (Five-Year Facility), which is expandable to $4.0 billion, and a $2.0 billion 364-day senior unsecured revolving credit facility (364-Day Facility). The new facilities (collectively, the New Credit Facilities) replaced the $5.0 billion Facility upon satisfaction of certain conditions, including the January 2015 settlement payment related to the Tronox Adversary Proceeding. For additional information, see *Note 17-Contingencies-Tronox Litigation.*

In January 2015, the Company borrowed $1.5 billion under the 364-Day Facility. Borrowings under the New Credit Facilities generally bear interest under one of two rate options, at Anadarko's election, using either LIBOR (or Euro Interbank Offered Rate in the case of borrowings under the Five-Year Facility denominated in Euro) or an alternate base rate, in each case plus an applicable margin ranging from 0.00% to 1.65% for the Five-Year Facility and 0.00% to 1.675% for the 364-Day Facility. The applicable margin will vary depending on Anadarko's credit ratings.

The New Credit Facilities contain certain customary affirmative and negative covenants, including a financial covenant requiring maintenance of a consolidated indebtedness to total capitalization ratio of no greater than 65%, and limitations on certain secured indebtedness, sale-and-leaseback transactions, and mergers and other fundamental changes.

In January 2015, the Company initiated a commercial paper program, which allows a maximum of $3.0 billion of unsecured commercial paper notes. The maturities of the commercial paper notes vary, but may not exceed 397 days. The commercial paper notes are sold under customary terms in the commercial paper market and are issued either at a discounted price to their principal face value or will bear interest at varying interest rates on a fixed or floating basis. Such discounted price or interest amounts are dependent on market conditions and the ratings assigned to the commercial paper program by credit rating agencies at the time of issuance of the commercial paper notes.

***WES Borrowings*** In February 2014, WES amended and restated its then-existing $800 million senior unsecured revolving credit facility by entering into a five-year, $1.2 billion senior unsecured revolving credit facility maturing in February 2019 (RCF), which is expandable to a maximum of $1.5 billion. Borrowings under the RCF bear interest at LIBOR plus an applicable margin ranging from 0.975% to 1.45% depending on WES's credit rating, or the greatest of (i) rates at a margin above the one-month LIBOR, (ii) the federal funds rate, or (iii) prime rates offered by certain designated banks. At December 31, 2014, WES was in compliance with all covenants contained in its RCF, had outstanding borrowings under its RCF of $510 million at an interest rate of 1.47%, and had available borrowing capacity of approximately $677 million ($1.2 billion capacity, less $510 million of outstanding borrowings and $13 million of outstanding letters of credit).

113

APC-01751866

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**12. Debt and Interest Expense (Continued)**

*Scheduled Maturities* Total principal amount of debt maturities for the five years ending December 31, 2019, excluding the potential repayment of the outstanding Zero Coupons that may be put by the holder to the Company annually, were as follows:

| *millions* | Principal Amount of Debt Maturities |
|---|---|
| 2015 | $ - |
| 2016 | 1,750 |
| 2017 | 2,000 |
| 2018 | 464 |
| 2019 | 1,410 |

**Interest Expense** The following summarizes interest expense for the years ended December 31:

| *millions* | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|
| Debt and other | $ 973 | $ | 949 | $ | 963 |
| Capitalized interest | (201) | | (263) | | (221) |
| Total interest expense | $ 772 | $ | 686 | $ | 742 |

114

APC-01751867

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

### 13. Stockholders' Equity

**Common Stock** The following summarizes the changes in the Company's outstanding shares of common stock:

| millions | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Shares of common stock issued** | | | |
| Shares at January 1 | 523 | 519 | 516 |
| Exercise of stock options | 2 | 2 | 1 |
| Issuance of restricted stock | 1 | 2 | 2 |
| Shares at December 31 | 526 | 523 | 519 |
| **Shares of common stock held in treasury** | | | |
| Shares at January 1 | 19 | 18 | 18 |
| Shares received for restricted stock vested and options exercised | - | 1 | - |
| Shares at December 31 | 19 | 19 | 18 |
| Shares of common stock outstanding at December 31 | 507 | 504 | 501 |

The following provides a reconciliation between basic and diluted EPS attributable to common stockholders for the years ended December 31:

| millions except per-share amounts | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| **Net income (loss)** | | | | | | |
| Net income (loss) attributable to common stockholders | $ | (1,750) | $ | 801 | $ | 2,391 |
| Less distributions on participating securities | | 4 | | 2 | | 1 |
| Less undistributed income allocated to participating securities | | - | | 4 | | 14 |
| Basic | $ | (1,754) | $ | 795 | $ | 2,376 |
| Diluted | $ | (1,754) | $ | 795 | $ | 2,376 |
| **Shares** | | | | | | |
| Average number of common shares outstanding-basic | | 506 | | 502 | | 500 |
| Dilutive effect of stock options | | - | | 3 | | 2 |
| Average number of common shares outstanding-diluted | | 506 | | 505 | | 502 |
| Excluded [1] | | 11 | | 4 | | 6 |
| **Net income (loss) per common share** | | | | | | |
| Basic | $ | (3.47) | $ | 1.58 | $ | 4.76 |
| Diluted | $ | (3.47) | $ | 1.58 | $ | 4.74 |
| | | | | | | |
| Dividends per common share | $ | 0.99 | $ | 0.54 | $ | 0.36 |

[1] Inclusion of certain shares would have had an anti-dilutive effect.

115

APC-01751868

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

### 14. Accumulated Other Comprehensive Income (Loss)

The following summarizes the after-tax changes in the balances of accumulated other comprehensive income (loss):

| millions | Interest-rate Derivatives Previously Subject to Hedge Accounting | | Pension and Other Postretirement Plans | | Total | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2013 | $ | (54) | $ | (231) | $ | (285) |
| Other comprehensive income (loss), before reclassifications | | - | | (256) | | (256) |
| Reclassifications to Consolidated Statement of Income | | 6 | | 18 | | 24 |
| Net other comprehensive income (loss) | | 6 | | (238) | | (232) |
| Balance at December 31, 2014 | $ | (48) | $ | (469) | $ | (517) |

### 15. Share-Based Compensation

At December 31, 2014, 21 million shares of the 31 million shares of Anadarko common stock originally authorized for awards under active share-based compensation plans remained available for future issuance. The Company generally issues new shares to satisfy awards under employee share-based payment plans. The number of shares available is reduced by awards granted. The following summarizes share-based compensation expense for the years ended December 31:

| millions | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Restricted stock | $ | 144 | $ | 122 | $ | 103 |
| Stock options | | 21 | | 27 | | 43 |
| Other equity-classified awards | | 1 | | 1 | | 1 |
| Value creation plan | | 136 | | - | | (2) |
| Performance-based unit awards | | 23 | | 4 | | 8 |
| Other performance-based awards | | - | | - | | 165 |
| Other liability-classified awards | | - | | 1 | | 2 |
| Pretax compensation expense | $ | 325 | $ | 155 | $ | 320 |
| Income tax benefit | $ | 120 | $ | 57 | $ | 117 |

Cash flows from financing activities included excess tax benefits related to share-based compensation of $22 million in 2014, $11 million in 2013, and $51 million in 2012. Cash received from stock option exercises was $99 million in 2014, $135 million in 2013, and $52 million in 2012.

116

APC-01751869

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**15. Share-Based Compensation (Continued)**

**Equity-Classified Awards**

***Restricted Stock*** Certain employees may be granted restricted stock in the form of restricted stock awards or restricted stock units. Restricted stock is subject to forfeiture restrictions and cannot be sold, transferred, or disposed of during the restriction period. The holders of restricted stock awards have the same rights as a stockholder of the Company with respect to such shares, including the right to vote and receive dividends or other distributions paid with respect to the shares. A restricted stock unit is equivalent to a restricted stock award except that unit holders do not have the right to vote. Restricted stock vests over service periods ranging from the date of grant up to three years and is not considered issued and outstanding until vested.

Non-employee directors are granted deferred shares, which are also considered restricted stock, that are held in a grantor trust by the Company until payable. Non-employee directors may receive these shares in a lump-sum payment or in annual installments.

The following summarizes the Company's restricted stock activity:

|  | Shares (millions) | Weighted-Average Grant-Date Fair Value (per share) | |
| --- | ---: | --- | ---: |
| Non-vested at January 1, 2014 | 3.22 | $ | 82.53 |
| Granted | 2.05 | $ | 87.42 |
| Vested | (1.52) | $ | 82.35 |
| Forfeited | (0.15) | $ | 84.49 |
| Non-vested at December 31, 2014 | 3.60 | $ | 85.31 |

The weighted-average grant-date fair value per share of restricted stock granted was $84.17 during 2013 and $79.97 during 2012. The total fair value of restricted shares vested was $132 million during 2014, $110 million during 2013, and $105 million during 2012, based on the market price at the vesting date. At December 31, 2014, total unrecognized compensation cost related to restricted stock of $199 million is expected to be recognized over a weighted-average remaining service period of 1.9 years.

117

APC-01751870

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**15. Share-Based Compensation (Continued)**

***Stock Options*** Certain employees may be granted nonqualified options to purchase shares of Anadarko common stock with an exercise price equal to, or greater than, the fair market value of Anadarko common stock on the date of grant. These stock options generally vest over three years from the date of grant and terminate at the earlier of the date of exercise or seven years from the date of grant.

The fair value of stock option awards is determined using the Black-Scholes option-pricing model with the following assumptions:

- *Expected life*-Based on historical exercise behavior.
- *Volatility*-Based on an average of historical volatility over the expected life of an option and the 12-month average implied volatility.
- *Risk-free interest rates*-Based on the U.S. Treasury rate over the expected life of an option.
- *Dividend yield*-Based on a 12-month average dividend yield, taking into account the Company's expected dividend policy over the expected life of an option.
- *Expected forfeiture*-Based on historical forfeiture experience.

The Company used the following weighted-average assumptions to estimate the fair value of stock options granted:

|  | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|
| Weighted-average grant-date fair value | **$** | **23.55** | $ 26.27 | $ | 25.84 |
| Assumptions | | | | | |
| Expected option life-years | | **4.9** | 4.8 | | 4.9 |
| Volatility | | **29.9%** | 33.9% | | 44.2% |
| Risk-free interest rate | | **1.6%** | 1.3% | | 0.7% |
| Dividend yield | | **1.1%** | 0.8% | | 0.5% |

The following summarizes the Company's stock option activity:

|  | Shares (millions) | | Weighted-Average Exercise Price (per share) | Weighted-Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (millions) |
|---|---|---|---|---|---|
| Outstanding at January 1, 2014 | 7.72 | $ | 63.30 | | |
| Granted | 0.95 | $ | 93.34 | | |
| Exercised [1] | (1.85) | $ | 54.03 | | |
| Forfeited or expired | (0.03) | $ | 76.00 | | |
| Outstanding at December 31, 2014 | 6.79 | $ | 69.96 | 3.56 $ | 104.3 |
| Vested or expected to vest at December 31, 2014 | 6.73 | $ | 69.79 | 3.54 $ | 104.2 |
| Exercisable at December 31, 2014 | 4.99 | $ | 62.91 | 2.60 $ | 101.1 |

[1] The total intrinsic value of stock options exercised was $88 million during 2014, $80 million during 2013, and $49 million during 2012, based on the difference between the market price at the exercise date and the exercise price.

At December 31, 2014, total unrecognized compensation cost related to stock options of $40 million is expected to be recognized over a weighted-average remaining service period of 2.2 years.

118

APC-01751871

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**15. Share-Based Compensation (Continued)**

**Liability-Classified Awards**

*Value Creation Plan*  As a part of its employee compensation program, the Company offers an incentive compensation program that provides non-officer employees the opportunity to earn cash bonus awards based on the Company's TSR for the year, compared to the TSR of a predetermined group of peer companies. The Company paid zero during 2014 and 2013 related to the plan and $24 million during 2012. At December 31, 2014, the Company had $137 million outstanding liability attributable to the 2014 performance period.

*Performance-Based Unit Awards*  Certain officers of the Company were provided Performance Unit Award Agreements with two- and three-year performance periods. The vesting of these units is based on comparing the Company's TSR to the TSR of a predetermined group of peer companies over the specified performance period. Each performance unit represents the value of one share of the Company's common stock. At the end of each performance period, the value of the vested performance units, if any, is paid in cash. The Company paid $12 million related to vested performance units in 2014, $15 million in 2013, and $37 million in 2012. At December 31, 2014, the Company's liability under Performance Unit Award Agreements was $26 million, with total unrecognized compensation cost related to these awards of $43 million expected to be recognized over a weighted-average remaining performance period of 2.2 years.

*Other Performance-Based Awards*  Prior to 2011, certain officers of the general partner of WES were awarded general partner Unit Appreciation Rights (UARs) pursuant to the Western Gas Holdings, LLC Equity Incentive Plan. The fair value of the UARs was determined based on the fair value of WES's general partner, as determined by the WGP IPO price. The Company paid $203 million related to the UARs upon the WGP IPO in 2012 in settlement of obligations related to all awards then outstanding.

119

APC-01751872

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**16. Commitments**

**Operating Leases** At December 31, 2014, the Company had $2.7 billion in long-term drilling rig commitments that satisfy operating lease criteria. The Company also had $324 million of various commitments under non-cancelable operating lease agreements for production platforms and equipment, buildings, facilities, compressors, and aircraft. These operating leases expire at various dates through 2026. Certain of these operating leases contain residual value guarantees at the end of the lease term, totaling $53 million at December 31, 2014. No liability has been accrued for residual value guarantees. In addition, these operating leases include options to purchase the leased property during or at the end of the lease term for the fair market value or other specified amount at that time. The following summarizes future minimum lease payments under operating leases at December 31, 2014:

| *millions* | | |
|---|---|---|
| 2015 | $ | 1,022 |
| 2016 | | 833 |
| 2017 | | 592 |
| 2018 | | 324 |
| 2019 | | 203 |
| Later years | | 87 |
| Total future minimum lease payments | $ | 3,061 |

Anadarko has entered into various agreements to secure drilling rigs necessary to support the execution of its drilling plans over the next several years. The table of future minimum lease payments above includes $2.5 billion related to seven offshore drilling vessels and $208 million related to certain contracts for U.S. onshore drilling rigs. Lease payments associated with the drilling of exploratory wells and development wells, net of amounts billed to partners, will initially be capitalized as a component of oil and gas properties, and either depreciated or impaired in future periods or written off as exploration expense.

Total rent expense, net of sublease income and amounts capitalized, amounted to $85 million in 2014, $119 million in 2013, and $136 million in 2012. Total rent expense includes contingent rent expense related to transportation and processing fees of $22 million in 2014, $24 million in 2013, and $28 million in 2012.

**Other Commitments** In the normal course of business, the Company enters into other contractual agreements for processing, treating, transportation, and storage of natural gas, oil, and NGLs, as well as for other oil and gas activities. These agreements expire at various dates through 2036. At December 31, 2014, aggregate future payments under these contracts totaled $10.4 billion, of which $2.2 billion is expected to be paid in 2015, $1.6 billion in 2016, $1.3 billion in 2017, $1.2 billion in 2018, $1.0 billion in 2019, and $3.1 billion thereafter.

APC-01751873

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 17. Contingencies

**Litigation** The Company is a defendant in a number of lawsuits, is involved in governmental proceedings, and is subject to regulatory controls arising in the ordinary course of business, including, but not limited to, personal injury claims; property damage claims; title disputes; tax disputes; royalty claims; contract claims; contamination claims relating to oil and gas production, transportation, and processing; and environmental claims, including claims involving assets owned by acquired companies and claims involving assets previously sold to third parties and no longer a part of the Company's current operations. The Company's Consolidated Balance Sheets include liabilities of $5.3 billion at December 31, 2014, and $854 million at December 31, 2013, for litigation-related contingencies. Anadarko is also subject to various environmental-remediation and reclamation obligations arising from federal, state, and local laws and regulations. While the ultimate outcome and impact on the Company cannot be predicted with certainty, after consideration of recorded expense and liability accruals, management believes that the resolution of pending proceedings will not have a material adverse effect on the Company's consolidated financial condition, results of operations, or cash flows.

**Tronox Litigation** On November 28, 2005, Tronox Incorporated (Tronox), at the time a subsidiary of Kerr-McGee Corporation, completed an IPO and was subsequently spun-off from Kerr-McGee Corporation. In August 2006, Anadarko acquired all of the stock of Kerr-McGee Corporation. In January 2009, Tronox and certain of Tronox's subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York (Bankruptcy Court), which is the court that presided over the Adversary Proceeding (defined below). In May 2009, Tronox and certain of its affiliates filed a lawsuit against Anadarko and Kerr-McGee Corporation and certain of its subsidiaries (collectively, Kerr-McGee) asserting several claims, including claims for actual and constructive fraudulent conveyance (Adversary Proceeding). Tronox alleged, among other things, that it was insolvent or undercapitalized at the date of its IPO and sought, among other things, to recover damages in excess of $18.85 billion from Kerr-McGee and Anadarko, as well as interest and attorneys' fees and costs. In accordance with Tronox's Bankruptcy Court-approved Plan of Reorganization (Plan), the Adversary Proceeding was pursued by a litigation trust (Litigation Trust). Pursuant to the Plan, the Litigation Trust was "deemed substituted" for the Tronox plaintiffs in the Adversary Proceeding. For purposes of this Form 10-K, references to "Tronox" after February 2011 refer to the Litigation Trust.

The U.S. government intervened in the Adversary Proceeding, and in May 2009 asserted separate claims against Anadarko and Kerr-McGee under the Federal Debt Collection Procedures Act (FDCPA Complaint). The Litigation Trust and the U.S. government agreed that the recovery of damages under the Adversary Proceeding, if any, would cover both the Adversary Proceeding and the FDCPA Complaint.

*Liability Accrual* On April 3, 2014, Anadarko and Kerr-McGee entered into a settlement agreement with the Litigation Trust and the U.S. government (in its capacity as plaintiff-intervenor and acting for and on behalf of certain U.S. government agencies) to resolve all claims asserted in the Adversary Proceeding and FDCPA Complaint for $5.15 billion, which represents principal of approximately $3.98 billion plus 6% interest from the filing of the Adversary Proceeding on May 12, 2009, through April 3, 2014. In addition, the Company agreed to pay interest on the above amount from April 3, 2014, through the payment of the settlement, with an annual interest rate of 1.5% for the first 180 days and 1.5% plus the one-month LIBOR thereafter. Under the terms of the settlement agreement, the Litigation Trust, Anadarko, and Kerr-McGee agreed to mutually release all claims that were or could have been asserted in the Adversary Proceeding. The U.S. government (representing federal agencies that filed claims in the Tronox bankruptcy), Anadarko, and Kerr-McGee also provided covenants not to sue each other with respect to certain claims and causes of action. The U.S. government also provided contribution protection from third-party claims seeking reimbursement from Anadarko and certain of its affiliates for the sites identified in the settlement agreement. In January 2015, the Company paid $5.2 billion after the settlement agreement became effective.

121

APC-01751874

Table of Contents

Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

Anadarko recognized Tronox-related contingent losses of $850 million in the fourth quarter of 2013 and $4.3 billion in the first quarter of 2014. In addition, Anadarko recognized settlement-related interest expense of $60 million, included in Tronox-related contingent loss in the Company's Consolidated Statement of Income, during the year ended December 31, 2014, for an aggregate $5.2 billion Tronox-related contingent liability on the Company's Consolidated Balance Sheet at December 31, 2014. For information on the tax effects of the Tronox settlement agreement, see *Note 18-Income Taxes*.

**Deepwater Horizon Events** In April 2010, the Macondo well in the Gulf of Mexico blew out and an explosion occurred on the *Deepwater Horizon* drilling rig, resulting in an oil spill. The well was operated by BP Exploration and Production Inc. (BP) and Anadarko held a 25% nonoperated interest. In October 2011, the Company and BP entered into a settlement agreement, mutual releases, and agreement to indemnify relating to the Deepwater Horizon events (Settlement Agreement), under which the Company paid $4.0 billion in cash and transferred its interest in the Macondo well and the Mississippi Canyon Block 252 (Lease) to BP. Pursuant to the Settlement Agreement, the Company is fully indemnified by BP against all claims, causes of action, losses, costs, expenses, liabilities, damages, or judgments of any kind arising out of the Deepwater Horizon events, related damage claims arising under the Oil Pollution Act of 1990 (OPA), claims for natural resource damages (NRD) and assessment costs, and any claims arising under the Operating Agreement with BP (OA). This indemnification is guaranteed by BP Corporation North America Inc. (BPCNA) and, in the event that the net worth of BPCNA declines below an agreed-upon amount, BP p.l.c. has agreed to become the sole guarantor. Under the Settlement Agreement, BP does not indemnify the Company against penalties and fines, punitive damages, shareholder derivative or securities laws claims, or certain other claims.

*Liability Accrual* Below is a discussion of the Company's current analysis, under applicable accounting guidance, of its potential liability for (i) amounts invoiced by BP under the OA (OA Liabilities), (ii) OPA-related environmental costs, and (iii) other contingent liabilities. Applicable accounting guidance requires the Company to accrue a liability if both (a) it is probable that a liability has been incurred and (b) the amount of that liability can be reasonably estimated.

The Company is fully indemnified by BP against OPA damage claims, NRD claims and assessment costs, and other potential liabilities. The Company may be required to recognize a liability for these amounts in advance of or in connection with recognizing a receivable from BP for the related indemnity payment. In all circumstances, however, the Company expects that any additional indemnified liability that may be recognized by the Company will be subsequently recovered from BP itself or through the guarantees of BPCNA or BP p.l.c. The Company has not recorded a liability for any costs that are subject to indemnification by BP.

*OA Liabilities* Pursuant to the Settlement Agreement, all amounts deemed by BP to have been due under the OA, as well as all future amounts that otherwise would be invoiced to Anadarko under the OA, have been satisfied.

*OPA-Related Environmental Costs* BP, Anadarko, and other parties, including parties that do not own an interest in the Lease, such as the drilling contractor, have received correspondence from the U.S. Coast Guard (USCG) referencing their identification as a "responsible party or guarantor" (RP) under OPA. Under OPA, RPs, including Anadarko, may be jointly and severally liable for costs of well control, spill response, and containment and removal of hydrocarbons, as well as other costs and damage claims related to the spill and spill cleanup. The USCG's identification of Anadarko as an RP arises as a result of Anadarko's status as a co-lessee in the Lease.

Under accounting guidance applicable to environmental liabilities, a liability is presumed probable if the entity is both identified as an RP and associated with the environmental event. The Company's co-lessee status in the Lease at the time of the event and the subsequent identification and treatment of the Company as an RP satisfies these standards and therefore establishes the presumption that the Company's potential environmental liabilities related to the Deepwater Horizon events are probable.

122

APC-01751875

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

As BP funds OPA-related environmental costs, any potential joint and several liability for these costs is satisfied for all RPs, including Anadarko. This bears significance in that once these costs are funded by BP, such costs are no longer analyzed as OPA-related environmental costs, but instead are analyzed as OA Liabilities. As discussed above, Anadarko has settled its OA Liabilities with BP. Thus, potential liability to the Company for OPA-related environmental costs can arise only where BP does not, or otherwise is unable to, fund all of the OPA-related environmental costs. Under this scenario, the joint and several nature of the liability for these costs could cause the Company to recognize a liability for OPA-related environmental costs. However, the Company is fully indemnified by BP against these costs (including guarantees by BPCNA or BP p.l.c.).

*Gross OPA-Related Environmental Cost Estimate* In prior periods through the fourth quarter of 2011, the Company provided an estimated range of gross OPA-related environmental costs for all identified RPs. This estimate was comprised of spill-response costs and OPA damage claims and was derived from cost information received by the Company from BP. The Company no longer receives Deepwater Horizon-related cost and claims data from BP. Accordingly, the OPA-related environmental cost estimate included in BP's public releases is the best data available to the Company.

Based on information included in BP p.l.c.'s public release on February 3, 2015, gross OPA-related environmental costs are estimated to be $11.0 billion, excluding (i) amounts BP has already funded, which constitute settled OA Liabilities; (ii) amounts that in BP's view cannot reasonably be estimated, which include NRD claims and other litigation damages; (iii) non-OPA-related fines and penalties that may be assessed against Anadarko, including assessments under the Clean Water Act (CWA); and (iv) estimated state and local governmental claims, which BP no longer publicly discloses and, as a result, Anadarko cannot estimate. Actual gross OPA-related environmental costs may vary from those estimated by BP p.l.c. in its public releases, perhaps materially from the above estimate.

*Allocable Share of Gross OPA-Related Environmental Costs* Under applicable accounting guidance, the Company is required to estimate its allocable share of gross OPA-related environmental costs. To date, BP has paid all Deepwater Horizon event-related costs, which satisfies the Company's potential liability for these costs. Additionally, BP has repeatedly stated publicly and in congressional testimony that it will continue to pay these costs. BP's funding and public commentary has continued subsequent to the release of BP's own investigation report, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling's final report, and the Deepwater Horizon Joint Investigation Team final report, which the Company considers to be significant positive indications in assessing the likelihood of BP continuing to fund all of these costs. Based on BP's stated intent to continue funding these costs, the Company's assessment of BP's financial ability to continue funding these costs, and the impact of BP's settlements with both of its OA partners, the Company believes the likelihood of BP not continuing to satisfy these claims to be remote. Accordingly, the Company considers zero to be its allocable share of gross OPA-related environmental costs and, consistent with applicable accounting guidance, has not recorded a liability for these amounts.

123

APC-01751876

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

***Penalties and Fines*** These costs include amounts that may be assessed as a result of potential civil and/or criminal penalties under various federal, state, and/or local statutes and/or regulations as a result of the Deepwater Horizon events, including, for example, the CWA, the Outer Continental Shelf Lands Act, the Migratory Bird Treaty Act, and possibly other federal, state, and local laws. The foregoing does not represent an exhaustive list of statutes and regulations that potentially could trigger a penalty or fine assessment against the Company. To date, no penalties or fines have been assessed against the Company. However, in December 2010, the U.S. Department of Justice (DOJ), on behalf of the United States, filed a civil lawsuit in the U.S. District Court in New Orleans, Louisiana (Louisiana District Court) against several parties, including the Company, seeking an assessment of civil penalties under the CWA in an amount to be determined by the Louisiana District Court. In February 2012, the Louisiana District Court entered a declaratory judgment that, as a partial owner of the Macondo well, Anadarko is liable for civil penalties under Section 311 of the CWA. The declaratory judgment, which was affirmed in June 2014 by the U.S. Court of Appeals for the Fifth Circuit (Fifth Circuit), addresses liability only, and does not address the amount of any civil penalty. The assessment of a civil penalty against Anadarko will follow a bench trial, which began in January 2015.

In July 2014, Anadarko filed a motion for rehearing with the Fifth Circuit requesting that the full court sit to reconsider Anadarko's appeal concerning that portion of the February 2012 declaratory judgment which found Anadarko liable for civil penalties under the CWA. In September 2014, Anadarko filed a letter notifying the Fifth Circuit that the Louisiana District Court issued Findings of Fact and Conclusions of Law in the first phase of the Deepwater Horizon trial (Phase I Findings and Conclusions), which included facts that contradict certain key facts assumed by the Fifth Circuit panel in its June 2014 decision. In January 2015, the Fifth Circuit denied the petition for full court reconsideration with six of the thirteen participating justices filing a dissent.

Applicable accounting guidance requires the Company to accrue a liability if it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. The Louisiana District Court's declaratory judgment in February 2012 satisfies the requirement that a liability arising from the future assessment of a civil penalty against Anadarko is probable. In an effort to resolve this matter, the Company made a settlement offer to the DOJ in July 2014 of $90 million and recorded a contingent liability for this amount at June 30, 2014. The Company subsequently engaged in further discussions regarding settlement, but the parties have not been able to reach agreement on either the amount of, or the terms and conditions governing, a settlement. The Company's settlement offer of $90 million remains outstanding and the Company remains open to resolving the matter through settlement discussions. The Company believes that $90 million under a settlement scenario is a better estimate of loss at this time than any other amount. Based on the above accounting guidance, the Company's contingent liability for CWA penalties and fines remains $90 million at December 31, 2014. However, the Company may ultimately incur a liability related to CWA penalties in excess of the current accrued liability.

The actual amount of a CWA penalty is subject to uncertainty, including whether the Company will be able to reach a settlement with the DOJ or will await the Louisiana District Court's opinion following the bench trial. The CWA sets forth subjective criteria to be considered by the court in assessing the magnitude of any CWA penalty, including the degree of fault of the owner. In the Phase I and II trials (defined below) and again for the penalty phase trial in January 2015, the Louisiana District Court ruled that no evidence of Anadarko's alleged culpability or fault may be presented. In addition, in its Phase I Findings and Conclusions, the Louisiana District Court did not allocate any fault to Anadarko. Given the subjective nature of the CWA criteria used to determine penalty assessments and the Louisiana District Court's prior rulings related to culpability and allocation of fault, the Company currently cannot reasonably estimate the amount of any such penalty to be assessed or determine a reasonable range of potential loss if the matter is resolved by the Louisiana District Court following trial. However, given the Company's lack of direct operational involvement in the event, the Louisiana District Court's rulings excluding any evidence of Anadarko's alleged culpability or fault, the Phase I Findings and Conclusions that did not allocate any fault to Anadarko, and the subjective criteria of the CWA, the Company believes that any CWA penalties assessed to it will not materially impact the Company's financial condition, results of operations, or cash flows.

124

APC-01751877

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

Events or factors that could assist the Company in estimating the amount of settlement or potential civil penalty or a range of potential loss related to such penalty include (i) an assessment by the DOJ, (ii) a ruling by a court of competent jurisdiction, or (iii) substantive settlement negotiations between the Company and the DOJ.

As discussed below, numerous Deepwater Horizon event-related civil lawsuits have been filed against BP and other parties, including the Company. Certain state and local governments appealed, or provided indication of a likely appeal of, the Louisiana District Court's decision that only federal law, and not state law, applies to Deepwater Horizon event-related claims. For example, eleven Louisiana Parish District Attorneys appealed that decision to the Fifth Circuit. In February 2014, the Fifth Circuit denied the appeal and upheld the Louisiana District Court's decision. In October 2014, the United States Supreme Court denied the Parish District Attorneys' petition to review the case. While that denial ends further appeal of that decision by the eleven Parish District Attorneys, any other party subject to the decision who has not yet appealed, including private parties who opted out of the BP settlement, the states, and other local governments, may do so after obtaining a final judgment on their damages claims. If any further appeal is taken and is successful, state and/or local laws and regulations could become sources of penalties or fines against the Company.

***Natural Resource Damages*** This category includes future damage claims that may be made by federal and/or state natural resource trustee agencies at the completion of injury assessments and restoration planning. Natural resources generally include land, fish, water, air, wildlife, and other such resources belonging to, managed by, held in trust by, or otherwise controlled by, the federal, state, or local government.

The NRD-assessment process is led by government agencies that act as trustees of natural resources on behalf of the public. Government agencies involved in the process include the Department of Commerce, the Department of the Interior (DOI), and the Department of Defense. These governmental departments, along with the five affected states - Alabama, Florida, Louisiana, Mississippi, and Texas - are referred to as the "Co-Trustees." The Co-Trustees continue to conduct injury assessment and restoration planning.

The DOJ civil lawsuit filed against BP, the Company, and others seeks unspecified damages for injury to federal natural resources. Not all of the Co-Trustees were a party to this lawsuit; however, during the second quarter of 2011, the states of Alabama and Louisiana each filed NRD-related state law claims against the Company in the Louisiana District Court. In November 2011, after ruling that only federal law applies, the Louisiana District Court dismissed all the NRD-related state law claims asserted against the Company by the states of Alabama and Louisiana. In April 2013, the states of Texas and Mississippi filed NRD-related state law claims against the Company, which were consolidated in the federal Multidistrict Litigation (MDL) action before the Louisiana District Court discussed below and are stayed until further order of the Louisiana District Court.

NRD claims are generally sought after the damage assessment and restoration planning is completed, which may take several years. Thus, the Company remains unable to reasonably estimate the magnitude of any NRD claim. The Company anticipates that BP will satisfy any NRD claim, which eliminates any potential liability to Anadarko for such costs. In the event any NRD damage claim is made directly against Anadarko, the Company is fully indemnified by BP against such claims (including guarantees by BPCNA or BP p.l.c.).

***Civil Litigation Damage Claims*** Numerous Deepwater Horizon event-related civil lawsuits have been filed against BP and other parties, including the Company by, among others, fishing, boating, and shrimping enterprises and industry groups; restaurants; commercial and residential property owners; certain rig workers or their families; the States of Alabama, Louisiana, Texas, and Mississippi, and several of their political subdivisions; the DOJ; environmental non-governmental organizations; and certain Mexican states. Many of the lawsuits filed assert various claims of negligence, gross negligence, and violations of several federal and state laws and regulations, including, among others, OPA; the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Air Act; the CWA; and the Endangered Species Act; or challenge existing permits for operations in the Gulf of Mexico. Generally, the plaintiffs are seeking actual damages, punitive damages, declaratory judgment, and/or injunctive relief.

125

APC-01751878

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

This litigation has been consolidated into a federal MDL action pending before Judge Carl Barbier in the Louisiana District Court. In March 2012, BP and the Plaintiffs' Steering Committee (PSC) entered into a settlement agreement to resolve a substantial majority of the economic loss and medical claims stemming from the Deepwater Horizon events, which the Louisiana District Court approved in orders issued in December 2012 and January 2013. Only OPA claims seeking economic loss damages against the Company remain. In addition, other than those who previously appealed unsuccessfully, certain state and local governments have provided indication of a likely appeal of the Louisiana District Court's decision that only federal law, and not state law, applies to Deepwater Horizon event-related claims. Certain Mexican states also have appealed the dismissal of their claims against BP, the Company, and others. The Company, pursuant to the Settlement Agreement, is fully indemnified by BP against losses arising as a result of claims for damages, irrespective of whether such claims are based on federal (including OPA) or state law.

The first phase of the trial in the MDL (Phase I) commenced in February 2013. The PSC, BP, BP America Production Company (BPAP), BP p.l.c., the United States, state and local governments, Halliburton Energy Services, Inc. (Halliburton), and certain subsidiaries of Transocean Ltd. (Transocean) participated in Phase I. Anadarko was excused from participation in Phase I. The issues tried in Phase I included the cause of the blowout and all related events leading up to April 22, 2010, the date the *Deepwater Horizon* sank, as well as allocation of fault. In September 2014, the Louisiana District Court issued its Phase I Findings and Conclusions. The Louisiana District Court found that BP and BPAP, Transocean, and Halliburton, but not Anadarko, are each liable under general maritime law for the blowout, explosion, and oil spill. The court determined that BP's and BPAP's conduct was reckless and that both Transocean's and Halliburton's conduct was negligent. The Louisiana District Court apportioned 67% of the fault to BP and BPAP, 30% to Transocean, and 3% to Halliburton. No fault was allocated to Anadarko. BP is challenging certain of the Louisiana District Court's findings.

The second phase of trial (Phase II) began in September 2013 and in November 2013 the parties rested their Phase II cases. The issues tried in Phase II included spill-source control and quantification of the spill for the period from April 20, 2010, until the well was capped. The Company, the PSC, BP, BPAP, BP p.l.c., the United States, state and local governments, Halliburton, and Transocean participated in Phase II of the trial. In January 2015, the Louisiana District Court issued its Phase II Findings of Fact and Conclusions of Law. The Louisiana District Court found that, for purposes of calculating the maximum possible civil penalty under the CWA, 3.19 million barrels of oil were discharged into the Gulf of Mexico.

The penalty phase of the trial began in January 2015. Post-trial briefs are due in March and April 2015. The trial included Anadarko, BP, and the United States, and will assess findings and penalties under the CWA. In March 2014, the Louisiana District Court ruled that no evidence of Anadarko's alleged culpability or fault could be presented during the penalty phase trial.

The State of Alabama previously brought actions against the Company and other parties for claims arising from the Deepwater Horizon event, including claims for penalties and fines under state environmental laws, which were subsequently dismissed by the Louisiana District Court. The Louisiana District Court has selected this case as its test case for valuing the damages sought by states for claims under federal laws arising from the Deepwater Horizon event. Trial is set for November 2015 and the parties are conducting discovery. The Louisiana District Court's previous rulings apply to Alabama's claims, including the court's decision that only federal law, and not state law, applies; its decision allocating fault and liability among BP and BPAP, Transocean, and Halliburton; and its orders precluding evidence of alleged culpability by Anadarko, leaving only damages to be decided. The Company, pursuant to the Settlement Agreement, is fully indemnified by BP against losses arising as a result of claims for damages.

126

APC-01751879

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

Two separate class-action complaints were filed in June and August 2010, in the New York District Court on behalf of purported purchasers of the Company's stock between June 12, 2009, and June 9, 2010, against Anadarko and certain of its officers. The consolidated action was subsequently transferred to the U.S. District Court for the Southern District of Texas - Houston Division (Texas District Court). The complaints allege causes of action arising pursuant to the Securities Exchange Act of 1934 for purported misstatements and omissions regarding, among other things, the Company's liability related to the Deepwater Horizon events. The plaintiffs seek an unspecified amount of compensatory damages, including interest thereon, as well as litigation fees and costs. In March 2014, the parties reached a settlement in this matter, which was approved by the Texas District Court in September 2014. The settlement was directly funded by the Company's insurers.

***Remaining Liability Outlook*** It is possible that the Company may recognize additional Deepwater Horizon event-related liabilities for potential fines and penalties and certain other claims not covered by the indemnification provisions of the Settlement Agreement; however, the Company does not believe that any potential liability attributable to the foregoing items, individually or in the aggregate, will have a material impact on the Company's financial condition, results of operations, or cash flows. This assessment takes into account certain qualitative factors, including the subjective and fault-based nature of CWA penalties, the Company's indemnification by BP against certain damage claims as discussed above and BP's creditworthiness.

Although the Company is fully indemnified by BP against OPA damage claims, NRD claims and assessment costs, and certain other potential liabilities, the Company may be required to recognize a liability for these amounts in advance of or in connection with recognizing a receivable from BP for the related indemnity payment. In all circumstances, however, the Company expects that any additional indemnified liability that may be recognized by the Company will be subsequently recovered from BP itself or through the guarantees of BPCNA or BP p.l.c.

The Company will continue to monitor the MDL and other legal proceedings discussed above as well as federal investigations related to the Deepwater Horizon events. The Company cannot predict the nature of additional evidence that may be discovered during the course of legal proceedings or the timing of completion of any legal proceedings.

**Deepwater Horizon and Tronox Derivative Claims** In May 2013, an Anadarko shareholder filed a derivative action in the 215th District Court of Harris County, Texas (215th District Court) against Anadarko and certain current and former directors and officers (DWH Derivative Action). The shareholder purported to bring claims on behalf of Anadarko and alleged, among other things, that certain current and former directors and officers breached their fiduciary duty in connection with the Company's investment in the Macondo lease.

In addition, in April 2014, the Company's Board of Directors received a letter from a current shareholder demanding that the Board undertake an independent investigation of certain current and former officers and directors for alleged breach of fiduciary duty related to the Company's April 2014 settlement of the Tronox Adversary Proceeding (Tronox Derivative Demand).

In May 2014, the parties reached an agreement to jointly resolve the DWH Derivative Action and the Tronox Derivative Demand in one settlement. In order to achieve the joint settlement, the petition in the DWH Derivative Action was amended to include the allegations asserted in the Tronox Derivative Demand. In August 2014, the 215th District Court approved the settlement. The settlement did not have a material impact on the Company's financial condition, results of operations, or cash flows.

127

APC-01751880

Table of Contents

Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**17. Contingencies (Continued)**

**Other Litigation** In December 2008, Anadarko sold its interest in the Peregrino heavy-oil field offshore Brazil. The Company is currently litigating a dispute with the Brazilian tax authorities regarding the tax rate applicable to the transaction. Currently, $128 million, the amount of tax originally in dispute, resides in a judicially controlled Brazilian bank account pending final resolution of the matter and is included in other assets on the Company's Consolidated Balance Sheet at December 31, 2014.

In July 2009, the lower judicial court ruled in favor of the Brazilian tax authorities. The Company appealed this decision to the Brazilian Regional courts, which upheld the lower court's ruling in favor of the Brazilian tax authorities in December 2011. In April 2012, the Company filed simultaneous appeals to the Brazilian Superior Court and the Brazilian Supreme Court. The Brazilian Superior Court and the Brazilian Supreme Court have agreed to hear the case and the Company currently is awaiting the setting of initial hearing dates. In August 2013, following a determination by an administrative court in a related matter that the amount of tax in dispute was not calculated properly, the Company filed a petition requesting the withdrawal of a portion of the judicial deposit to the extent it exceeds $42 million, the amount of tax currently in dispute, and any interest on such amount.

The Company believes that it will more likely than not prevail in Brazilian courts. Therefore, no tax liability has been recorded for Peregrino divestiture-related litigation at December 31, 2014. The Company continues to vigorously defend its position in Brazilian courts.

**Guarantees and Indemnifications** The Company provides certain indemnifications in relation to asset dispositions. These indemnifications typically relate to disputes, litigation, or tax matters existing at the date of disposition. In 2013, as a result of a Chapter 11 bankruptcy declaration by a third party, the DOI ordered Anadarko to perform the decommissioning of a production facility and related wells, which were previously sold to the third party. During 2013, the Company accrued costs of $117 million to decommission the production facility and related wells, reported in other (income) expense, net in the Consolidated Statement of Income. During 2014, the Company recognized a $22 million increase in the estimated decommissioning costs. Anadarko completed decommissioning of the production facility in 2014 and expects to complete decommissioning of the wells in 2015. Decommissioning obligations of $114 million were included in accrued expenses on the Consolidated Balance Sheet at December 31, 2014. Actual costs may vary from this estimate; however, the Company does not believe that any such change will materially impact its financial condition, results of operations, or cash flows.

**Environmental Matters** Anadarko is also subject to various environmental-remediation and reclamation obligations arising from federal, state, and local laws and regulations. The Company's Consolidated Balance Sheets include liabilities for remediation and reclamation obligations of $126 million at December 31, 2014 and December 31, 2013. The current portion of these amounts was included in accounts payable and the long-term portion of these amounts was included in other long-term liabilities-other on the Company's Consolidated Balance Sheets. The Company continually monitors remediation and reclamation processes and adjusts its liability for these obligations as necessary.

The Company is one of numerous parties previously notified by the California Department of Toxic Substances Control (DTSC) that, as a result of a prior acquisition, it is a potentially responsible party with respect to a landfill located in West Covina, California. While no agreement is in place with the DTSC, the Company recorded a $50 million restoration liability in 2013 with respect to the site, representing the current estimated obligation, which is included in the Company's liability balance at December 31, 2014. The Company could incur additional obligations if any of the potentially responsible parties are ultimately not able to fund their allocated share of the costs or if the DTSC requires a more costly remedial approach. It is possible that the Company's current estimate of probable loss related to this matter could change, perhaps materially, in the future.

128

APC-01751881

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

### 18. Income Taxes

The following summarizes components of income tax expense (benefit) for the years ended December 31:

| millions | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| Federal | $ | **188** | $ | 113 | $ | 45 |
| State | | **2** | | 42 | | 25 |
| Foreign | | **1,574** | | 873 | | 891 |
| | | **1,764** | | 1,028 | | 961 |
| **Deferred** | | | | | | |
| Federal | | **(389)** | | 94 | | (30) |
| State | | **27** | | (9) | | 115 |
| Foreign | | **215** | | 52 | | 74 |
| | | **(147)** | | 137 | | 159 |
| Total income tax expense (benefit) | $ | **1,617** | $ | 1,165 | $ | 1,120 |

Total income taxes differed from the amounts computed by applying the U.S. federal statutory income tax rate to income (loss) before income taxes. The following summarizes the sources of these differences for the years ended December 31:

| millions except percentages | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Income (loss) before income taxes | | | | | | |
| Domestic | $ | **(3,564)** | $ | 428 | $ | 132 |
| Foreign | | **3,618** | | 1,678 | | 3,433 |
| Total | $ | **54** | $ | 2,106 | $ | 3,565 |
| U.S. federal statutory tax rate | | **35%** | | 35% | | 35% |
| Tax computed at the U.S. federal statutory rate | $ | **19** | $ | 737 | $ | 1,248 |
| Adjustments resulting from | | | | | | |
| State income taxes (net of federal income tax benefit) | | **(11)** | | 23 | | 93 |
| Tax impact from foreign operations | | **62** | | 204 | | 215 |
| Non-deductible Algerian exceptional profits tax | | **193** | | 144 | | 188 |
| Non-taxable Algeria exceptional profits tax settlement | | **-** | | 13 | | (679) |
| Net changes in uncertain tax positions | | **1,427** | | (29) | | 28 |
| Deferred tax adjustments | | **15** | | 76 | | 22 |
| Non-deductible Tronox-related contingent loss | | **(36)** | | 36 | | - |
| Income attributable to noncontrolling interests | | **(66)** | | (48) | | (24) |
| Non-deductible Deepwater Horizon settlement | | **32** | | - | | - |
| Federal manufacturing deduction | | **(27)** | | - | | - |
| Non-deductible goodwill | | **21** | | - | | 15 |
| Other-net | | **(12)** | | 9 | | 14 |
| Total income tax expense (benefit) | $ | **1,617** | $ | 1,165 | $ | 1,120 |
| Effective tax rate | | **2,994%** | | 55% | | 31% |

129

APC-01751882

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**18. Income Taxes (Continued)**

The following summarizes components of total deferred taxes at December 31:

| millions | | 2014 | | 2013 |
|---|---|---|---|---|
| Federal | $ | (7,649) | $ | (8,246) |
| State, net of federal | | (341) | | (332) |
| Foreign | | (537) | | (307) |
| Total deferred taxes | $ | (8,527) | $ | (8,885) |

The following summarizes tax effects of temporary differences that give rise to significant portions of the deferred tax assets (liabilities) at December 31:

| millions | | 2014 | | 2013 |
|---|---|---|---|---|
| Current deferred tax assets | $ | 210 | $ | 412 |
| Settlement agreement related to the Tronox Adversary Proceeding | | 590 | | - |
| Valuation allowances on deferred tax assets not expected to be realized | | (78) | | (52) |
| Net current deferred tax assets | | 722 | | 360 |
| Oil and gas exploration and development operations | | (8,418) | | (8,213) |
| Mineral operations | | (412) | | (410) |
| Midstream and other depreciable properties | | (1,611) | | (1,586) |
| Other | | (351) | | (499) |
| Gross long-term deferred tax liabilities | | (10,792) | | (10,708) |
| Oil and gas exploration and development costs | | 177 | | 94 |
| Net operating loss carryforward | | 558 | | 599 |
| Foreign tax credit carryforward and alternative minimum tax credit carryforward | | 166 | | 325 |
| Other | | 1,428 | | 1,211 |
| Gross long-term deferred tax assets | | 2,329 | | 2,229 |
| Valuation allowances on deferred tax assets not expected to be realized | | (786) | | (766) |
| Net long-term deferred tax assets | | 1,543 | | 1,463 |
| Net long-term deferred tax liabilities | | (9,249) | | (9,245) |
| Total deferred taxes | $ | (8,527) | $ | (8,885) |

Changes to valuation allowances, due to changes in judgment regarding the future realizability of deferred tax assets, were an increase of $2 million in 2013 and $23 million in 2012. There were no changes to valuation allowances due to changes in judgment regarding the future realizability of deferred tax assets in 2014.

The following summarizes changes in the balance of valuation allowances on deferred tax assets:

| millions | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Balance at January 1 | $ | (818) | $ | (922) | $ | (555) |
| Additions | | (59) | | (38) | | (426) |
| Reductions | | 13 | | 142 | | 59 |
| Balance at December 31 | $ | (864) | $ | (818) | $ | (922) |

130

APC-01751883

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**18. Income Taxes (Continued)**

The following summarizes taxes receivable (payable) related to income tax expense (benefit) at December 31:

| Balance Sheet Classification | 2014 | 2013 |
|---|---|---|
| Income taxes receivable | | |
| Accounts receivable-other | $ 93 | $ 66 |
| Other assets | 35 | 35 |
| | 128 | 101 |
| Income taxes (payable) | | |
| Accrued expense | (152) | (82) |
| Total net income taxes receivable (payable) | $ (24) | $ 19 |

Tax carryforwards available for use on future income tax returns at December 31, 2014, were as follows:

| millions | Domestic | Foreign | Expiration |
|---|---|---|---|
| Net operating loss-foreign | $ - | $ 1,165 | 2015 - Indefinite |
| Net operating loss-state | $ 4,477 | $ - | 2015-2034 |
| Foreign tax credits | $ 167 | $ - | 2022-2023 |
| Texas margins tax credit | $ 34 | $ - | 2026 |

Changes in the balance of unrecognized tax benefits excluding interest and penalties on uncertain tax positions were as follows:

| | Assets (Liabilities) | | |
|---|---|---|---|
| millions | 2014 | 2013 | 2012 |
| Balance at January 1 | $ (147) | $ (46) | $ (31) |
| Increases related to prior-year tax positions | (11) | (54) | (17) |
| Decreases related to prior-year tax positions | 39 | 3 | 3 |
| Increases related to current-year tax positions | (1,568) | (72) | (1) |
| Settlements | - | 5 | - |
| Lapse of statute of limitations | - | 17 | - |
| Balance at December 31 | $ (1,687) | $ (147) | $ (46) |

Included in the 2014 ending balance of unrecognized tax benefits presented above are potential benefits of $1.679 billion, of which, if recognized, $1.456 billion would affect the effective tax rate on income, and $188 million would be in the form of tax credits and net operating loss carryforwards that would attract a full valuation allowance. Also included in the 2014 ending balance are benefits of $8 million related to tax positions for which the ultimate deductibility is highly certain, but the timing of such deductibility is uncertain.

131

APC-01751884

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**18. Income Taxes (Continued)**

In 2013, the Company recognized a deferred tax benefit of $274 million related to the $850 million loss for the Tronox-related contingent liability. In 2014, the Company recognized a deferred tax benefit of $316 million related to the additional $4.360 billion loss for the Tronox-related contingent liability. The total deferred tax benefit of $590 million is net of a $1.326 billion uncertain tax position due to the uncertainty related to the deductibility of the settlement payment. This uncertain tax position is presented in deferred income taxes and as a reduction to the associated deferred tax asset. The Company is a participant in the U.S. Internal Revenue Service's (IRS) Compliance Assurance Process and has regular discussions with the IRS concerning the Company's tax positions. Depending on the outcome of such discussions, it is reasonably possible that the amount of the uncertain tax position related to the settlement could change, perhaps materially. See *Note 17-Contingencies-Tronox Litigation.*

Income tax audits and the Company's acquisition and divestiture activity have given rise to tax disputes in U.S. and foreign jurisdictions. See *Note 17-Contingencies-Other Litigation.* The Company estimates that $120 million to $130 million of unrecognized tax benefits related to adjustments to taxable income and credits previously recorded pursuant to the accounting standard for accounting for tax uncertainties will reverse within the next 12 months due to expiration of statutes of limitation and audit settlements. Management does not believe that the final resolution of outstanding tax audits and litigation will have a material adverse effect on the Company's consolidated financial condition, results of operations, or cash flows.

The Company had accrued approximately $9 million of interest related to uncertain tax positions at December 31, 2014, and $8 million at December 31, 2013. The Company recognized interest and penalties in income tax expense (benefit) of $1 million during 2014 and $(20) million during 2013.

Anadarko is subject to audit by tax authorities in the U.S. federal, state, and local tax jurisdictions as well as in various foreign jurisdictions. The Company is currently under routine examination by the IRS for the tax years 2008 through 2014.

The following lists the tax years subject to examination by major tax jurisdiction:

|  | Tax Years |
| --- | --- |
| United States | 2008-2014 |
| Algeria | 2011-2014 |
| Ghana | 2006-2014 |

132

APC-01751885

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**19. Supplemental Cash Flow Information**

The following summarizes cash paid (received) for interest and income taxes, as well as non-cash investing and financing activities for the years ended December 31:

| millions | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Cash paid (received) | | | | | | |
| Interest, net of amounts capitalized | $ | 689 | $ | 627 | $ | 684 |
| Income taxes, net of refunds | | 956 | | 169 | | (300) |
| Non-cash investing activities | | | | | | |
| Fair value of properties and equipment from non-cash transactions | $ | 18 | $ | 62 | $ | 65 |
| Asset retirement cost additions | | 348 | | 297 | | 142 |
| Accruals of property, plant, and equipment | | 1,156 | | 1,446 | | 1,205 |
| Net liabilities assumed or divested in acquisitions and divestitures | | (92) | | (80) | | (34) |
| Non-cash investing and financing activities | | | | | | |
| Capital lease obligation | $ | 13 | $ | 8 | $ | - |
| Floating production, storage, and offloading vessel construction period obligation | | 149 | | 17 | | - |

**20. Segment Information**

Anadarko's business segments are separately managed due to distinct operational differences and unique technology, distribution, and marketing requirements. The Company's three reporting segments are oil and gas exploration and production, midstream, and marketing. The oil and gas exploration and production segment explores for and produces natural gas, oil, condensate, and NGLs, and plans for the development and operation of the Company's LNG project in Mozambique. The midstream segment engages in gathering, processing, treating, and transporting Anadarko and third-party oil, natural-gas, and NGLs production. The midstream reporting segment consists of two operating segments, WES and other midstream, which are aggregated into one reporting segment due to similar financial and operating characteristics. The marketing segment sells much of Anadarko's oil, natural-gas, and NGLs production, as well as third-party purchased volumes.

133

APC-01751886

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**20. Segment Information (Continued)**

To assess the performance of Anadarko's operating segments, the chief operating decision maker analyzes Adjusted EBITDAX. The Company defines Adjusted EBITDAX as income (loss) before income taxes; exploration expense; DD&A; impairments; interest expense; total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives; and certain items not related to the Company's normal operations, less net income attributable to noncontrolling interests. During the periods presented, items not related to the Company's normal operations included Deepwater Horizon settlement and related costs, Algeria exceptional profits tax settlement, Tronox-related contingent loss, and certain other nonoperating items included in other (income) expense, net. The Company's definition of Adjusted EBITDAX excludes exploration expense as it is not an indicator of operating efficiency for a given reporting period. However, exploration expense is monitored by management as part of costs incurred in exploration and development activities. Similarly, DD&A and impairments are excluded from Adjusted EBITDAX as a measure of segment operating performance because capital expenditures are evaluated at the time capital costs are incurred. Adjusted EBITDAX also excludes interest expense to allow for assessment of segment operating results without regard to Anadarko's financing methods or capital structure. Total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives are excluded from Adjusted EBITDAX because these (gains) losses are not considered a measure of asset operating performance. Finally, net income attributable to noncontrolling interests is excluded from the Company's measure of Adjusted EBITDAX because it represents earnings that are not attributable to the Company's common stockholders.

Management believes that the presentation of Adjusted EBITDAX provides information useful in assessing the Company's financial condition and results of operations and that Adjusted EBITDAX is a widely accepted financial indicator of a company's ability to incur and service debt, fund capital expenditures, and make distributions to stockholders. Adjusted EBITDAX as defined by Anadarko may not be comparable to similarly titled measures used by other companies and should be considered in conjunction with net income (loss) attributable to common stockholders and other performance measures, such as operating income or cash flows from operating activities. Below is a reconciliation of consolidated Adjusted EBITDAX to income (loss) before income taxes for the years ended December 31:

| millions | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|
| Income (loss) before income taxes | $ | 54 | $ 2,106 | $ | 3,565 |
| Exploration expense | | 1,639 | 1,329 | | 1,946 |
| DD&A | | 4,550 | 3,927 | | 3,964 |
| Impairments | | 836 | 794 | | 389 |
| Interest expense | | 772 | 686 | | 742 |
| Total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives | | 578 | (307) | | 443 |
| Deepwater Horizon settlement and related costs | | 97 | 15 | | 18 |
| Algeria exceptional profits tax settlement | | - | 33 | | (1,797) |
| Tronox-related contingent loss | | 4,360 | 850 | | (250) |
| Certain other nonoperating items | | 22 | 110 | | - |
| Less net income attributable to noncontrolling interests | | 187 | 140 | | 54 |
| Consolidated Adjusted EBITDAX | $ | 12,721 | $ 9,403 | $ | 8,966 |

134

APC-01751887

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**20. Segment Information (Continued)**

The Company's accounting policies for individual segments are the same as those described in the summary of significant accounting policies, with the following exception: certain intersegment commodity contracts may meet the GAAP definition of a derivative instrument, which would be accounted for at fair value under GAAP. However, Anadarko does not recognize any mark-to-market adjustments on such intersegment arrangements. Additionally, intersegment asset transfers are accounted for at historical cost basis, and do not give rise to gain or loss recognition.

Information presented below as "Other and Intersegment Eliminations" includes corporate costs, results from hard-minerals royalties, and net cash from settlement of commodity derivatives. The following summarizes selected financial information for Anadarko's reporting segments:

| millions | Oil and Gas Exploration & Production | | Midstream | | Marketing | | Other and Intersegment Eliminations | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | | | |
| Sales revenues | $ | 8,603 | $ | 484 | $ | 7,288 | $ | - | $ | 16,375 |
| Intersegment revenues | | 6,225 | | 1,338 | | (6,771) | | (792) | | - |
| Gains (losses) on divestitures and other, net | | 1,893 | | (3) | | - | | 205 | | 2,095 |
| Total revenues and other | | 16,721 | | 1,819 | | 517 | | (587) | | 18,470 |
| Operating costs and expenses [1] | | 4,216 | | 972 | | 740 | | 17 | | 5,945 |
| Net cash from settlement of commodity derivatives | | - | | - | | - | | (377) | | (377) |
| Other (income) expense, net [2] | | - | | - | | - | | (2) | | (2) |
| Net income attributable to noncontrolling interests | | - | | 187 | | - | | - | | 187 |
| Total expenses and other | | 4,216 | | 1,159 | | 740 | | (362) | | 5,753 |
| Total (gains) losses on derivatives, net included in marketing revenue, less net cash from settlement | | - | | - | | 4 | | - | | 4 |
| Adjusted EBITDAX | $ | 12,505 | $ | 660 | $ | (219) | $ | (225) | $ | 12,721 |
| Net properties and equipment | $ | 32,717 | $ | 6,697 | $ | - | $ | 2,175 | $ | 41,589 |
| Capital expenditures | $ | 7,934 | $ | 1,149 | $ | - | $ | 173 | $ | 9,256 |
| Goodwill | $ | 5,123 | $ | 453 | $ | - | $ | - | $ | 5,576 |

[1] Operating costs and expenses excludes exploration expense, DD&A, impairments, Deepwater Horizon settlement and related costs, and Algeria exceptional profits tax settlement since these expenses are excluded from Adjusted EBITDAX.

[2] Other (income) expense, net excludes certain other nonoperating items since these items are excluded from Adjusted EBITDAX.

135

APC-01751888

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

## 20. Segment Information (Continued)

| millions | Oil and Gas Exploration & Production | | Midstream | | Marketing | | Other and Intersegment Eliminations | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2013** | | | | | | | | | | |
| Sales revenues | $ | 7,090 | $ | 387 | $ | 7,390 | $ | - | $ | 14,867 |
| Intersegment revenues | | 6,405 | | 1,105 | | (6,859) | | (651) | | - |
| Gains (losses) on divestitures and other, net | | (622) | | (1) | | - | | 337 | | (286) |
| Total revenues and other | | 12,873 | | 1,491 | | 531 | | (314) | | 14,581 |
| Operating costs and expenses [1] | | 3,635 | | 843 | | 652 | | 20 | | 5,150 |
| Net cash from settlement of commodity derivatives | | - | | - | | - | | (95) | | (95) |
| Other (income) expense, net [2] | | - | | - | | - | | (21) | | (21) |
| Net income attributable to noncontrolling interests | | - | | 140 | | - | | - | | 140 |
| Total expenses and other | | 3,635 | | 983 | | 652 | | (96) | | 5,174 |
| Total (gains) losses on derivatives, net included in marketing revenue, less net cash from settlement | | - | | - | | (4) | | - | | (4) |
| Adjusted EBITDAX | $ | 9,238 | $ | 508 | $ | (125) | $ | (218) | $ | 9,403 |
| Net properties and equipment | $ | 33,409 | $ | 5,408 | $ | 9 | $ | 2,103 | $ | 40,929 |
| Capital expenditures | $ | 7,008 | $ | 1,248 | $ | - | $ | 267 | $ | 8,523 |
| Goodwill | $ | 5,317 | $ | 175 | $ | - | $ | - | $ | 5,492 |
| **2012** | | | | | | | | | | |
| Sales revenues | $ | 6,752 | $ | 325 | $ | 6,230 | $ | - | $ | 13,307 |
| Intersegment revenues | | 5,318 | | 959 | | (5,734) | | (543) | | - |
| Gains (losses) on divestitures and other, net | | (65) | | (8) | | - | | 177 | | 104 |
| Total revenues and other | | 12,005 | | 1,276 | | 496 | | (366) | | 13,411 |
| Operating costs and expenses [1] | | 3,505 | | 748 | | 616 | | 295 | | 5,164 |
| Net cash from settlement of commodity derivatives | | - | | - | | - | | (753) | | (753) |
| Other (income) expense, net | | - | | - | | - | | (4) | | (4) |
| Net income attributable to noncontrolling interests | | - | | 54 | | - | | - | | 54 |
| Total expenses and other | | 3,505 | | 802 | | 616 | | (462) | | 4,461 |
| Total (gains) losses on derivatives, net included in marketing revenue, less net cash from settlement | | - | | - | | 16 | | - | | 16 |
| Adjusted EBITDAX | $ | 8,500 | $ | 474 | $ | (104) | $ | 96 | $ | 8,966 |
| Net properties and equipment | $ | 32,024 | $ | 4,459 | $ | 9 | $ | 1,906 | $ | 38,398 |
| Capital expenditures | $ | 5,906 | $ | 1,250 | $ | - | $ | 155 | $ | 7,311 |
| Goodwill | $ | 5,317 | $ | 175 | $ | - | $ | - | $ | 5,492 |

[1] Operating costs and expenses excludes exploration expense, DD&A, impairments, Deepwater Horizon settlement and related costs, and Algeria exceptional profits tax settlement since these expenses are excluded from Adjusted EBITDAX.
[2] Other (income) expense, net excludes certain other nonoperating items since these items are excluded from Adjusted EBITDAX.

136

APC-01751889

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**20. Segment Information (Continued)**

The following represents Anadarko's sales revenues (based on the origin of the sales) and net properties and equipment by geographic area:

| | Years Ended December 31, | | |
|---|---|---|---|
| millions | 2014 | 2013 | 2012 |
| **Sales Revenues** | | | |
| United States | $ 13,083 | $ 11,290 | $ 9,911 |
| Algeria | 2,435 | 2,184 | 2,182 |
| Other International | 857 | 1,393 | 1,214 |
| Total sales revenues | $ 16,375 | $ 14,867 | $ 13,307 |

| | December 31, | |
|---|---|---|
| millions | 2014 | 2013 |
| **Net Properties and Equipment** | | |
| United States | $ 37,186 | $ 35,486 |
| Algeria | 1,431 | 1,582 |
| Other International | 2,972 | 3,861 |
| Total net properties and equipment | $ 41,589 | $ 40,929 |

**Major Customers** In 2014, there were no sales to individual customers that exceeded 10% of the Company's total sales revenues. Sales to Total S.A. were $2.0 billion in 2013 and $1.9 billion in 2012. These amounts are included in the oil and gas exploration and production reporting segment.

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans**

The Company has contributory and non-contributory defined-benefit pension plans, which include both qualified and supplemental plans. The Company also provides certain health care and life insurance benefits for certain retired employees. Retiree health care benefits are funded by contributions from the retiree, and in certain circumstances, contributions from the Company. The Company's retiree life insurance plan is non-contributory.

While reported benefit obligations exceed the fair value of pension and other postretirement plan assets at December 31, 2014, the Company monitors the status of its funded pension plans to ensure that plan funds are sufficient to continue paying benefits. During 2014, the Company made contributions of $106 million to its funded pension plans, $15 million to its unfunded pension plans, and $15 million to its unfunded other postretirement benefit plans. Contributions to funded plans increase plan assets while contributions to unfunded plans are used to fund current benefit payments. The Company expects to contribute $5 million to its funded pension plans, $24 million to its unfunded pension plans, and $16 million to its unfunded other postretirement benefit plans in 2015.

137

APC-01751890

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

The following sets forth changes in the benefit obligations and fair value of plan assets for the Company's pension and other postretirement benefit plans for the years ended December 31, 2014 and 2013, as well as the funded status of the plans and amounts recognized in the financial statements at December 31, 2014 and 2013:

| millions | Pension Benefits 2014 | | Pension Benefits 2013 | | Other Benefits 2014 | | Other Benefits 2013 | |
|---|---|---|---|---|---|---|---|---|
| **Change in benefit obligation** | | | | | | | | |
| Benefit obligation at beginning of year | $ | 2,158 | $ | 2,297 | $ | 294 | $ | 359 |
| Service cost | | 99 | | 85 | | 7 | | 9 |
| Interest cost | | 99 | | 78 | | 15 | | 14 |
| Actuarial (gain) loss | | 337 | | (156) | | 72 | | (74) |
| Participant contributions | | 1 | | - | | 4 | | 4 |
| Benefit payments | | (159) | | (149) | | (19) | | (18) |
| Foreign-currency exchange-rate changes | | (7) | | 3 | | - | | - |
| Benefit obligation at end of year (1) | $ | 2,528 | $ | 2,158 | $ | 373 | $ | 294 |
| **Change in plan assets** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ | 1,754 | $ | 1,462 | $ | - | $ | - |
| Actual return on plan assets | | 111 | | 278 | | - | | - |
| Employer contributions | | 121 | | 160 | | 15 | | 14 |
| Participant contributions | | 1 | | - | | 4 | | 4 |
| Benefit payments | | (159) | | (149) | | (19) | | (18) |
| Foreign-currency exchange-rate changes | | (10) | | 3 | | - | | - |
| Fair value of plan assets at end of year | $ | 1,818 | $ | 1,754 | $ | - | $ | - |
| Funded status of the plans at end of year | $ | (710) | $ | (404) | $ | (373) | $ | (294) |
| **Total recognized amounts in the balance sheet consist of** | | | | | | | | |
| Other assets | $ | 41 | $ | 37 | $ | - | $ | - |
| Accrued expenses | | (24) | | (19) | | (15) | | (15) |
| Other long-term liabilities-other | | (727) | | (422) | | (358) | | (279) |
| Total | $ | (710) | $ | (404) | $ | (373) | $ | (294) |
| **Total recognized amounts in accumulated other comprehensive income consist of** | | | | | | | | |
| Prior service cost (credit) | $ | (1) | $ | (1) | $ | 2 | $ | 2 |
| Net actuarial (gain) loss | | 740 | | 441 | | 1 | | (78) |
| Total | $ | 739 | $ | 440 | $ | 3 | $ | (76) |

(1) The accumulated benefit obligation for all defined-benefit pension plans was $2.1 billion at December 31, 2014, and $1.8 billion at December 31, 2013.

138

APC-01751891

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

The following summarizes the Company's defined-benefit pension plans with accumulated benefit obligations in excess of plan assets for the years ended December 31:

| millions | | 2014 | | 2013 |
|---|---|---|---|---|
| Projected benefit obligation | $ | 2,403 | $ | 2,047 |
| Accumulated benefit obligation | | 2,024 | | 1,742 |
| Fair value of plan assets | | 1,652 | | 1,606 |

The following summarizes the Company's pension and other postretirement benefit cost and amounts recognized in other comprehensive income (before tax benefit) for the years ended December 31:

| | | Pension Benefits | | | | | Other Benefits | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| millions | | 2014 | | 2013 | | 2012 | 2014 | | 2013 | 2012 |
| **Components of net periodic benefit cost** | | | | | | | | | | |
| Service cost | $ | 99 | $ | 85 | $ | 76 | $ 7 | $ | 9 | $ 9 |
| Interest cost | | 99 | | 78 | | 85 | 15 | | 14 | 16 |
| Expected return on plan assets | | (106) | | (91) | | (91) | - | | - | - |
| Amortization of net actuarial loss (gain) | | 34 | | 118 | | 93 | (7) | | - | - |
| Amortization of net prior service cost (credit) | | - | | - | | - | - | | 1 | 2 |
| Settlement loss | | - | | 14 | | - | - | | - | - |
| Net periodic benefit cost | $ | 126 | $ | 204 | $ | 163 | $ 15 | $ | 24 | $ 27 |
| **Amounts recognized in other comprehensive income (expense)** | | | | | | | | | | |
| Net actuarial gain (loss) | $ | (333) | $ | 342 | $ | (156) | $ (72) | $ | 74 | $ 1 |
| Amortization of net actuarial (gain) loss | | 34 | | 118 | | 93 | (7) | | - | - |
| Amortization of net prior service cost (credit) | | - | | - | | - | - | | 1 | 2 |
| Settlement loss | | - | | 14 | | - | - | | - | - |
| Total amounts recognized in other comprehensive income (expense) | $ | (299) | $ | 474 | $ | (63) | $ (79) | $ | 75 | $ 3 |

In 2015, an estimated $49 million of net actuarial loss for the pension and other postretirement plans will be amortized from accumulated other comprehensive income into net periodic benefit cost.

The following summarizes the weighted-average assumptions used by the Company in determining the pension and other postretirement benefit obligations at December 31:

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Discount rate | 4.00% | 4.75% | 4.25% | 5.25% |
| Rates of increase in compensation levels | 5.25% | 5.00% | 5.25% | 5.25% |

139

APC-01751892

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

Accumulated and projected benefit obligations are measured as the present value of future cash payments. The Company discounts those cash payments using a discount rate that reflects the weighted average of market-observed yields for select high-quality (AA-rated) fixed-income securities with cash flows that correspond to the expected amounts and timing of benefit payments. The discount-rate assumption used by the Company represents an estimate of the interest rate at which the pension and other postretirement benefit obligations could effectively be settled on the measurement date. Assumed rates of compensation increases for active participants vary by age group, with the resulting weighted-average assumed rate (weighted by the plan-level benefit obligation) provided in the preceding table.

The following summarizes the weighted-average assumptions used by the Company in determining the net periodic pension and other postretirement benefit cost:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2014** | 2013 | 2012 | **2014** | 2013 | 2012 |
| Discount rate | **4.75%** | 3.50% | 4.50% | **5.25%** | 4.00% | 4.75% |
| Long-term rate of return on plan assets | **6.75%** | 7.00% | 7.00% | **N/A** | N/A | N/A |
| Rates of increase in compensation levels | **5.00%** | 4.50% | 4.50% | **5.25%** | 4.50% | 4.50% |

At December 31, 2014 and December 31, 2013, an 8.00% annual rate of increase in the per-capita cost of covered health care benefits for the next year was assumed for purposes of measuring other postretirement benefit obligations. This rate is expected to gradually decrease to 5.00% in 2020 and beyond. The assumed health care cost trend rate can have a significant effect on the cost and obligation amounts reported for the health care plan. A 1% change in the assumed health care cost trend rate over the projected period would have the following effects:

| millions | 1% Increase | 1% Decrease |
|---|---|---|
| Effect on total of service and interest cost components | $ 3 | $ (2) |
| Effect on other postretirement benefit obligation | $ 40 | $ (33) |

140

APC-01751893

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

**Plan Assets**

***Investment Policies and Strategies*** The Company has adopted a balanced, diversified investment strategy, with the intent of maximizing returns without exposure to undue risk. Investments are typically made through investment managers across several investment categories (domestic equity securities, international equity securities, fixed-income securities, real estate, hedge funds, and private equity), with selective exposure to Growth/Value investment styles. Performance for each investment is measured relative to the appropriate index benchmark for its category. Target asset-allocation percentages by major category are 45%-55% equity securities, 20%-30% fixed income, and up to 25% in a combination of other investments such as real estate, hedge funds, and private equity. Investment managers have full discretion as to investment decisions regarding funds under their management to the extent permitted within investment guidelines.

Although investment managers may, at their discretion and within investment guidelines, invest in Anadarko securities, there are no direct investments in Anadarko securities included in plan assets. There may be, however, indirect investments in Anadarko securities through the plans' collective fund investments. The expected long-term rate of return on plan assets assumption was determined using the year-end 2014 pension investment balances by asset class and expected long-term asset allocation. The expected return for each asset class reflects capital-market projections formulated using a forward-looking building-block approach, while also taking into account historical return trends and current market conditions. Equity returns generally reflect long-term expectations of real earnings growth, dividend yield, and inflation. Returns on fixed-income securities are generally developed based on expected inflation, real bond yield, and risk spread (as appropriate), adjusted for the expected effect that changing yields have on the rate of return. Other asset-class returns are derived from their relationship to the equity and fixed-income markets.

141

APC-01751894

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

The fair value of the Company's pension plan assets by asset class and input level within the fair-value hierarchy were as follows:

*millions*

| December 31, 2014 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Investments** | | | | |
| Cash and cash equivalents | $ 3 | $ 53 | $ - | $ 56 |
| Fixed income | | | | |
| Mortgage-backed securities | - | 51 | - | 51 |
| U.S. government securities | - | 56 | - | 56 |
| Other fixed-income securities (1) | 48 | 212 | - | 260 |
| Equity securities | | | | |
| Domestic | 446 | 130 | - | 576 |
| International | 124 | 299 | - | 423 |
| Other | | | | |
| Real estate | - | 56 | 94 | 150 |
| Private equity | - | - | 84 | 84 |
| Hedge funds and other alternative strategies | 9 | - | 126 | 135 |
| Other | $ - | $ 30 | $ - | $ 30 |
| Total investments (2) | $ 630 | $ 887 | $ 304 | $ 1,821 |
| **Liabilities** | | | | |
| Hedge funds and other alternative strategies | $ (3) | $ - | $ - | $ (3) |
| Total liabilities | $ (3) | $ - | $ - | $ (3) |
| | | | | |
| **December 31, 2013** | | | | |
| **Investments** | | | | |
| Cash and cash equivalents | $ 17 | $ 80 | $ - | $ 97 |
| Fixed income | | | | |
| Mortgage-backed securities | - | 54 | - | 54 |
| U.S. government securities | - | 52 | - | 52 |
| Other fixed-income securities (1) | 42 | 197 | - | 239 |
| Equity securities | | | | |
| Domestic | 445 | 116 | - | 561 |
| International | 148 | 303 | - | 451 |
| Other | | | | |
| Real estate | - | 47 | 86 | 133 |
| Private equity | - | - | 72 | 72 |
| Hedge funds and other alternative strategies | 31 | - | 79 | 110 |
| Total investments (2) | $ 683 | $ 849 | $ 237 | $ 1,769 |
| **Liabilities** | | | | |
| Hedge funds and other alternative strategies | $ (17) | $ - | $ - | $ (17) |
| Total liabilities | $ (17) | $ - | $ - | $ (17) |

(1) Amounts include investments in diversified fixed-income collective investment funds with exposure to mortgage-backed securities, government-issued securities, corporate debt, and other fixed-income securities.
(2) Amount excludes receivables and payables, primarily related to Level 1 investments.

142

APC-01751895

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

Investments in securities traded in active markets are measured based on quoted prices, which represent Level 1 inputs. Investments based on Level 2 inputs include direct investments in corporate debt and other fixed-income securities, as well as shares of open-end mutual funds or similar investment vehicles that do not have a readily determinable fair value, but are valued at the net asset value per share (NAV). For such funds, the NAV is the value at which investors transact with the fund, and is determined by the fund based on the estimated fair values of the underlying fund assets. Fair value of investments included as Level 3 inputs generally also reflect investments valued at fund NAVs, but, unlike investments characteristic of Level 2 fair-value measurements, such plan assets have significant liquidity restrictions or other features that are not reflected in NAV.

The following summarizes changes in the fair value of investments based on Level 3 inputs:

| millions | Hedge Funds and Other Alternative Strategies | | Private Equity | | Real Estate | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2013 | $ | 77 | $ | 64 | $ | 78 | $ | 219 |
| Acquisitions (dispositions), net | | (6) | | - | | 2 | | (4) |
| Actual return on plan assets | | | | | | | | |
| Relating to assets sold during the reporting period | | 1 | | 4 | | - | | 5 |
| Relating to assets still held at the reporting date | | 7 | | 4 | | 6 | | 17 |
| Balance at December 31, 2013 | $ | 79 | $ | 72 | $ | 86 | $ | 237 |
| Acquisitions (dispositions), net | | 42 | | - | | 2 | | 44 |
| Actual return on plan assets | | | | | | | | |
| Relating to assets sold during the reporting period | | 2 | | 5 | | - | | 7 |
| Relating to assets still held at the reporting date | | 3 | | 7 | | 6 | | 16 |
| Balance at December 31, 2014 | $ | 126 | $ | 84 | $ | 94 | $ | 304 |

***Risks and Uncertainties*** The plan assets include various investment securities that are exposed to various risks, such as interest-rate, credit, and market risks. Due to the level of risk associated with certain investment securities, it is possible that changes in the values of investment securities could significantly impact the plan assets.

The plan assets may include securities with contractual cash flows, such as asset-backed securities, collateralized mortgage obligations, and commercial mortgage-backed securities, including securities backed by subprime mortgage loans. The value, liquidity, and related income of those securities are sensitive to changes in economic conditions, including real estate values, delinquencies or defaults, or both, and may be adversely affected by shifts in the market's perception of the issuers and changes in interest rates.

APC-01751896

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2014, 2013, AND 2012**

**21. Pension Plans, Other Postretirement Benefits, and Defined-Contribution Plans (Continued)**

**Expected Benefit Payments**

The following summarizes estimated benefit payments for the next ten years, including benefit increases due to continuing employee service:

| millions | Pension Benefit Payments | Other Benefit Payments |
|---|---|---|
| 2015 | $ 162 | $ 16 |
| 2016 | 175 | 17 |
| 2017 | 199 | 18 |
| 2018 | 194 | 18 |
| 2019 | 216 | 19 |
| 2020-2024 | 1,192 | 109 |

**Defined-Contribution Plans**  The Company maintains several defined-contribution benefit plans, the most significant of which is the Anadarko Employee Savings Plan (ESP). All regular employees of the Company on its U.S. payroll are eligible to participate in the ESP by making elective contributions that are matched by the Company, subject to certain limitations. The Company recognized expense of $76 million for 2014, $78 million for 2013, and $55 million for 2012, related to these plans.

144

APC-01751897

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

The unaudited supplemental information on oil and gas exploration and production activities for 2014, 2013, and 2012 has been presented in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 932, *Extractive Activities-Oil and Gas* and the Securities and Exchange Commission's final rule, *Modernization of Oil and Gas Reporting*. Disclosures by geographic area include the United States and International. The International geographic area consists of proved reserves located in Algeria and Ghana. The Company sold its Chinese subsidiary during 2014.

**Oil and Gas Reserves**

The following reserves disclosures reflect estimates of proved reserves, proved developed reserves, and proved undeveloped reserves, net of third-party royalty interests, of natural gas, oil, condensate, and natural-gas liquids (NGLs) owned at each year end and changes in proved reserves during each of the last three years. Natural-gas volumes are presented in billions of cubic feet (Bcf) at a pressure base of 14.73 pounds per square inch and volumes for oil, condensate, and NGLs are presented in millions of barrels (MMBbls). Total volumes are presented in millions of barrels of oil equivalent (MMBOE). For this computation, one barrel is the equivalent of 6,000 cubic feet of natural gas. Shrinkage associated with NGLs has been deducted from the natural-gas reserves volumes.

Reserves for international locations are calculated in accordance with the terms of governing agreements. The international reserves include estimated quantities allocated to Anadarko for recovery of costs and income taxes and Anadarko's net equity share after recovery of such costs.

The Company's estimates of proved reserves are made using available geological and reservoir data as well as production performance data. These estimates are reviewed annually by internal reservoir engineers and revised, either upward or downward, as warranted by additional data. The results of infill drilling are treated as positive revisions due to increases to expected recovery. Other revisions are due to changes in, among other things, development plans, reservoir performance, commodity prices, economic conditions, and governmental restrictions.

Prices used to compute the information presented in the following tables are adjusted only for fixed and determinable amounts under provisions in existing contracts. These prices, before adjustments, were $4.35, $3.67, and $2.76 per MMBtu of natural gas and $94.99, $96.78, and $94.71 per barrel of oil for 2014, 2013, and 2012. The benchmark price for NGLs used in the computation, previously the same as that for oil, was converted to a NGLs-specific price of $45.25 per barrel in 2014.

145

APC-01751898

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Oil and Gas Reserves (Continued)**

| | Natural Gas (Bcf) | | | Oil and Condensate (MMBbls) | | |
|---|---|---|---|---|---|---|
| | United States | International | Total | United States | International | Total |
| **Proved Reserves** | | | | | | |
| **December 31, 2011** | 8,365 | - | 8,365 | 536 | 235 | 771 |
| Revisions of prior estimates | 635 | - | 635 | 62 | 52 | 114 |
| Extensions, discoveries, and other additions | 418 | - | 418 | 9 | - | 9 |
| Purchases in place | 26 | - | 26 | - | - | - |
| Sales in place | (199) | - | (199) | (42) | - | (42) |
| Production | (916) | - | (916) | (54) | (31) | (85) |
| **December 31, 2012** | 8,329 | - | 8,329 | 511 | 256 | 767 |
| Revisions of prior estimates | 1,276 | - | 1,276 | 96 | 21 | 117 |
| Extensions, discoveries, and other additions | 416 | - | 416 | 52 | 14 | 66 |
| Purchases in place | 153 | - | 153 | 1 | - | 1 |
| Sales in place | (4) | - | (4) | (10) | - | (10) |
| Production | (965) | - | (965) | (58) | (32) | (90) |
| **December 31, 2013** | 9,205 | - | 9,205 | 592 | 259 | 851 |
| Revisions of prior estimates | 710 | 31 | 741 | 167 | 18 | 185 |
| Extensions, discoveries, and other additions | 196 | - | 196 | 25 | - | 25 |
| Purchases in place | - | - | - | - | - | - |
| Sales in place | (492) | - | (492) | (6) | (17) | (23) |
| Production | (951) | - | (951) | (74) | (35) | (109) |
| **December 31, 2014** | 8,668 | 31 | 8,699 | 704 | 225 | 929 |
| **Proved Developed Reserves** | | | | | | |
| December 31, 2011 | 6,113 | - | 6,113 | 352 | 173 | 525 |
| December 31, 2012 | 6,445 | - | 6,445 | 318 | 208 | 526 |
| December 31, 2013 | 7,120 | - | 7,120 | 347 | 202 | 549 |
| **December 31, 2014** | 6,635 | 27 | 6,662 | 352 | 190 | 542 |
| **Proved Undeveloped Reserves** | | | | | | |
| December 31, 2011 | 2,252 | - | 2,252 | 184 | 62 | 246 |
| December 31, 2012 | 1,884 | - | 1,884 | 193 | 48 | 241 |
| December 31, 2013 | 2,085 | - | 2,085 | 245 | 57 | 302 |
| **December 31, 2014** | 2,033 | 4 | 2,037 | 352 | 35 | 387 |

146

APC-01751899

Table of Contents
Index to Financial Statements

ANADARKO PETROLEUM CORPORATION
SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION
AND PRODUCTION ACTIVITIES
(Unaudited)

**Oil and Gas Reserves (Continued)**

| | NGLs (MMBbls) | | | Total (MMBOE) | | |
|---|---|---|---|---|---|---|
| | United States | International | Total | United States | International | Total |
| **Proved Reserves** | | | | | | |
| **December 31, 2011** | 361 | 13 | 374 | 2,291 | 248 | 2,539 |
| Revisions of prior estimates [1] | 65 | (1) | 64 | 233 | 51 | 284 |
| Extensions, discoveries, and other additions | 3 | - | 3 | 82 | - | 82 |
| Purchases in place | - | - | - | 4 | - | 4 |
| Sales in place | (6) | - | (6) | (81) | - | (81) |
| Production | (30) | - | (30) | (237) | (31) | (268) |
| **December 31, 2012** | 393 | 12 | 405 | 2,292 | 268 | 2,560 |
| Revisions of prior estimates [1] | 17 | - | 17 | 326 | 21 | 347 |
| Extensions, discoveries, and other additions | 10 | - | 10 | 131 | 14 | 145 |
| Purchases in place | 9 | - | 9 | 36 | - | 36 |
| Sales in place | (1) | - | (1) | (12) | - | (12) |
| Production | (33) | - | (33) | (252) | (32) | (284) |
| **December 31, 2013** | 395 | 12 | 407 | 2,521 | 271 | 2,792 |
| Revisions of prior estimates [1] | 129 | 2 | 131 | 414 | 25 | 439 |
| Extensions, discoveries, and other additions | 5 | - | 5 | 63 | - | 63 |
| Purchases in place | - | - | - | - | - | - |
| Sales in place | (19) | - | (19) | (107) | (17) | (124) |
| Production | (44) | (1) | (45) | (276) | (36) | (312) |
| **December 31, 2014** | 466 | 13 | 479 | 2,615 | 243 | 2,858 |
| **Proved Developed Reserves** | | | | | | |
| December 31, 2011 | 267 | - | 267 | 1,638 | 173 | 1,811 |
| December 31, 2012 | 283 | - | 283 | 1,675 | 208 | 1,883 |
| December 31, 2013 | 268 | - | 268 | 1,801 | 202 | 2,003 |
| **December 31, 2014** | 304 | 13 | 317 | 1,762 | 207 | 1,969 |
| **Proved Undeveloped Reserves** | | | | | | |
| December 31, 2011 | 94 | 13 | 107 | 653 | 75 | 728 |
| December 31, 2012 | 110 | 12 | 122 | 617 | 60 | 677 |
| December 31, 2013 | 127 | 12 | 139 | 720 | 69 | 789 |
| **December 31, 2014** | 162 | - | 162 | 853 | 36 | 889 |

[1] Revisions of prior estimates include additions generated by Anadarko's infill drilling programs of 577 MMBOE for 2014, 410 MMBOE for 2013, and 383 MMBOE for 2012.

147

APC-01751900

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

In 2014, Anadarko added 63 MMBOE of proved reserves through extensions and discoveries primarily as a result of successful drilling in the Marcellus and Wolfcamp shale plays. Although shale plays represented only about 17% of the Company's total proved reserves at December 31, 2014, growth in the shale plays contributed 49 MMBOE, or 78%, of the total extensions and discoveries. Total revisions include the effects of new infill drilling, changes in commodity prices and other updates reflecting changes in economic conditions, changes in reservoir performance, and changes to development plans. Total revisions in 2014 resulted in an increase of 439 MMBOE, or 16%, of the beginning-of-year reserves base. These revisions are primarily associated with a 577 MMBOE increase related to successful infill drilling in large onshore areas such as the Wattenberg area and the Eagleford and Haynesville shales. Partially offsetting these positive infill revisions was a net decrease of 138 MMBOE, primarily associated with the optimization of horizontal drilling locations and the discontinuation of vertical well workover plans in the Wattenberg area. In 2014, the Company sold properties or interests in properties containing 69 MMBOE of proved developed reserves and 55 MMBOE of proved undeveloped reserves. Sales included the divestiture of the Company's interest in the Pinedale/Jonah assets in Wyoming, the Company's Chinese subsidiary, and a portion of the Company's working interest in the East Texas Chalk area.

In 2013, Anadarko added 145 MMBOE of proved reserves through extensions and discoveries as the result of successful drilling primarily in the Marcellus shale and the Gulf of Mexico. Although shale plays represented only about 13% of the Company's total proved reserves at December 31, 2013, growth in the shale plays contributed 70 MMBOE, or 48%, of the total extensions and discoveries. Total revisions in 2013 resulted in an increase of 347 MMBOE, or 14%, of the beginning-of-year reserves base. Total 2013 revisions included an increase of 410 MMBOE related to successful infill drilling, primarily in large onshore areas such as Wattenberg, Greater Natural Buttes, and the Eagleford shale, and 30 MMBOE resulting from improved oil and natural-gas prices. Partially offsetting these positive revisions were decreases of 53 MMBbls of NGLs reserves due to lower ethane prices and 40 MMBOE due to other non-price-related revisions primarily in the Rocky Mountains Region (Rockies). In 2013, the Company sold U.S. properties or interests in U.S. properties containing 12 MMBOE of proved undeveloped reserves. Sales were almost exclusively associated with a partial sale of a working interest in the Gulf of Mexico Heidelberg development project. Acquisitions of proved reserves were 36 MMBOE, related to domestic assets almost exclusively in the Rockies.

In 2012, Anadarko added 82 MMBOE of proved reserves through extensions and discoveries as the result of successful drilling in the Marcellus shale and the Gulf of Mexico. Shale plays contributed 66 MMBOE of the total extensions and discoveries in 2012. Total revisions in 2012 were 284 MMBOE or 11% of the beginning-of-year reserves base. Total 2012 revisions included an increase of 383 MMBOE related to successful infill drilling, primarily in Greater Natural Buttes, Wattenberg, and Carthage, and 33 MMBOE resulting from the resolution of the Algeria exceptional profits tax dispute. Partially offsetting these positive revisions were decreases of 68 MMBOE due to lower commodity prices, 56 MMBOE at Wattenberg primarily due to removing reserves associated with the discontinued vertical drilling program, and 8 MMBOE from all other assets. In 2012, the Company sold U.S. properties or interests in U.S. properties containing 81 MMBOE of proved reserves, including 59 MMBOE of proved developed reserves and 22 MMBOE of proved undeveloped reserves. Sales included a portion of the Company's working interests in the Rockies Salt Creek enhanced oil recovery project and the Gulf of Mexico Lucius development project, and asset divestitures in South Texas, West Texas, the Gulf of Mexico, the Rockies, and North Louisiana.

148

APC-01751901

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Capitalized Costs**

Capitalized costs include the cost of properties, equipment, and facilities for oil and natural-gas producing activities. Capitalized costs for proved properties include costs for oil and natural-gas leaseholds where proved reserves have been identified, development wells, and related equipment and facilities, including development wells in progress. Capitalized costs for unproved properties include costs for acquiring oil and gas leaseholds where no proved reserves have been identified, including costs of exploratory wells that are in the process of drilling or in active completion, and costs of exploratory wells suspended or waiting on completion. Capitalized costs associated with activities of the Company's midstream and marketing reporting segments, liquefied natural gas (LNG) facilities costs, and other corporate activities are not included.

| millions | United States | | International | | Total | |
|---|---|---|---|---|---|---|
| **December 31, 2014** | | | | | | |
| Capitalized | | | | | | |
| Unproved properties | $ | 3,858 | $ | 1,291 | $ | 5,149 |
| Proved properties | | 53,545 | | 4,895 | | 58,440 |
| | | 57,403 | | 6,186 | | 63,589 |
| Less accumulated DD&A | | 29,055 | | 1,902 | | 30,957 |
| Net capitalized costs | $ | 28,348 | $ | 4,284 | $ | 32,632 |
| **December 31, 2013** | | | | | | |
| Capitalized | | | | | | |
| Unproved properties | $ | 4,938 | $ | 1,970 | $ | 6,908 |
| Proved properties | | 48,631 | | 5,540 | | 54,171 |
| | | 53,569 | | 7,510 | | 61,079 |
| Less accumulated DD&A | | 25,560 | | 2,333 | | 27,893 |
| Net capitalized costs | $ | 28,009 | $ | 5,177 | $ | 33,186 |

149

APC-01751902

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Costs Incurred in Oil and Gas Property Acquisition, Exploration, and Development**

Amounts reported as costs incurred include both capitalized costs and costs charged to expense when incurred for oil and gas property acquisition, exploration, and development activities. Costs incurred also include new asset retirement obligations established in the current year, as well as increases or decreases to the asset retirement obligations resulting from changes to cost estimates during the year. Exploration costs presented below include the costs of drilling and equipping successful and unsuccessful exploration wells during the year, geological and geophysical expenses, and the costs of retaining undeveloped leaseholds. Development costs include the costs of drilling and equipping development wells, and construction of related production facilities. Costs associated with activities of the Company's midstream and marketing reporting segments, LNG facilities costs, and other corporate activities are not included.

| *millions* | United States | | International | | Total | |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2014** | | | | | | |
| Property acquisitions | | | | | | |
| Unproved | $ | 264 | $ | 19 | $ | 283 |
| Proved | | 3 | | - | | 3 |
| Exploration | | 1,095 | | 616 | | 1,711 |
| Development | | 6,158 | | 557 | | 6,715 |
| Total costs incurred | $ | 7,520 | $ | 1,192 | $ | 8,712 |
| **Year Ended December 31, 2013** | | | | | | |
| Property acquisitions | | | | | | |
| Unproved | $ | 282 | $ | 45 | $ | 327 |
| Proved | | 324 | | - | | 324 |
| Exploration | | 1,031 | | 939 | | 1,970 |
| Development | | 4,421 | | 444 | | 4,865 |
| Total costs incurred | $ | 6,058 | $ | 1,428 | $ | 7,486 |
| **Year Ended December 31, 2012** | | | | | | |
| Property acquisitions | | | | | | |
| Unproved | $ | 224 | $ | 15 | $ | 239 |
| Proved | | - | | - | | - |
| Exploration | | 1,064 | | 1,000 | | 2,064 |
| Development | | 3,592 | | 472 | | 4,064 |
| Total costs incurred | $ | 4,880 | $ | 1,487 | $ | 6,367 |

150

APC-01751903

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Results of Operations**

Results of operations for producing activities consist of all activities within the oil and gas exploration and production reporting segment. Net revenues from production include only the revenues from the production and sale of natural gas, oil, condensate, and NGLs. Gains (losses) on property dispositions represent net gains or losses on sales of oil and gas properties. Production costs are costs to operate and maintain the Company's wells, related equipment, and supporting facilities used in oil and gas operations, including the cost of labor, well service and repair, location maintenance, power and fuel, gathering, processing, transportation, other taxes, and production-related general and administrative costs. Exploration expenses include dry hole costs, leasehold impairments, geological and geophysical expenses, and the costs of retaining unproved leaseholds. Algeria exceptional profits tax settlement represents the Company's resolution of the Algeria exceptional profits tax dispute with Sonatrach, which provided for the transfer of $1.7 billion of oil to the Company over a 12-month period ending in mid-2013. Income tax expense is calculated by applying the current statutory tax rates to the revenues after deducting costs, which include depreciation, depletion, and amortization allowances, after giving effect to permanent differences. The results of operations exclude general office overhead and interest expense attributable to oil and gas activities.

| *millions* | United States | | International | | Total | |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2014** | | | | | | |
| Net revenues from production | | | | | | |
| Third-party sales | $ | 7,425 | $ | 1,518 | $ | 8,943 |
| Sales to consolidated affiliates | | 4,453 | | 1,773 | | 6,226 |
| Gains (losses) on property dispositions | | (91) | | 1,982 | | 1,891 |
| | | 11,787 | | 5,273 | | 17,060 |
| Production costs | | | | | | |
| Oil and gas operating | | 968 | | 203 | | 1,171 |
| Oil and gas transportation and other | | 1,150 | | 33 | | 1,183 |
| Production-related general and administrative expenses | | 394 | | 32 | | 426 |
| Other taxes | | 652 | | 535 | | 1,187 |
| | | 3,164 | | 803 | | 3,967 |
| Exploration expenses | | 1,218 | | 421 | | 1,639 |
| Depreciation, depletion, and amortization | | 3,783 | | 398 | | 4,181 |
| Impairments related to oil and gas properties | | 821 | | - | | 821 |
| Deepwater Horizon settlement and related costs | | 97 | | - | | 97 |
| | | 2,704 | | 3,651 | | 6,355 |
| Income tax expense | | 995 | | 979 | | 1,974 |
| Results of operations | $ | 1,709 | $ | 2,672 | $ | 4,381 |

151

APC-01751904

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Results of Operations (Continued)**

| millions | United States | International | Total |
|---|---|---|---|
| **Year Ended December 31, 2013** | | | |
| Net revenues from production | | | |
| Third-party sales | $ 6,567 | $ 856 | $ 7,423 |
| Sales to consolidated affiliates | 3,685 | 2,720 | 6,405 |
| Gains (losses) on property dispositions | (618) | (3) | (621) |
| | 9,634 | 3,573 | 13,207 |
| Production costs | | | |
| Oil and gas operating | 874 | 218 | 1,092 |
| Oil and gas transportation and other | 998 | 22 | 1,020 |
| Production-related general and administrative expenses | 332 | 5 | 337 |
| Other taxes | 569 | 455 | 1,024 |
| | 2,773 | 700 | 3,473 |
| Exploration expenses | 611 | 718 | 1,329 |
| Depreciation, depletion, and amortization | 3,222 | 399 | 3,621 |
| Impairments related to oil and gas properties | 704 | - | 704 |
| Algeria exceptional profits tax settlement | - | 33 | 33 |
| Deepwater Horizon settlement and related costs | 15 | - | 15 |
| | 2,309 | 1,723 | 4,032 |
| Income tax expense | 845 | 1,005 | 1,850 |
| Results of operations | $ 1,464 | $ 718 | $ 2,182 |
| **Year Ended December 31, 2012** | | | |
| Net revenues from production | | | |
| Third-party sales | $ 6,233 | $ 846 | $ 7,079 |
| Sales to consolidated affiliates | 2,767 | 2,550 | 5,317 |
| Gains (losses) on property dispositions | (16) | (48) | (64) |
| | 8,984 | 3,348 | 12,332 |
| Production costs | | | |
| Oil and gas operating | 786 | 190 | 976 |
| Oil and gas transportation and other | 931 | 22 | 953 |
| Production-related general and administrative expenses | 318 | 18 | 336 |
| Other taxes | 581 | 599 | 1,180 |
| | 2,616 | 829 | 3,445 |
| Exploration expenses | 1,484 | 462 | 1,946 |
| Depreciation, depletion and amortization | 3,320 | 390 | 3,710 |
| Impairments related to oil and gas properties | 364 | - | 364 |
| Algeria exceptional profits tax settlement | - | (1,797) | (1,797) |
| Deepwater Horizon settlement and related costs | 18 | - | 18 |
| | 1,182 | 3,464 | 4,646 |
| Income tax expense | 433 | 943 | 1,376 |
| Results of operations | $ 749 | $ 2,521 | $ 3,270 |

152

APC-01751905

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Standardized Measure of Discounted Future Net Cash Flows**

Estimates of future net cash flows from proved reserves of natural gas, oil, condensate, and NGLs for 2014, 2013, and 2012 are computed based on the average beginning-of-the-month prices during the 12-month period for the respective year. Prices used to compute the information presented in the tables below are adjusted only for fixed and determinable amounts under provisions in existing contracts. These prices, before adjustments, were $4.35, $3.67, and $2.76 per MMBtu of natural gas and $94.99, $96.78, and $94.71 per barrel of oil, for 2014, 2013, and 2012. The benchmark price for NGLs used in the computation, previously the same as that for oil, was converted to a NGLs-specific price of $45.25 per barrel in 2014. Estimated future net cash flows for all periods presented are reduced by estimated future development, production, and abandonment and dismantlement costs based on existing costs, assuming continuation of existing economic conditions, and by estimated future income tax expense. These estimates also include assumptions about the timing of future production of proved reserves, and timing of future development, production costs, and abandonment and dismantlement. Income tax expense, both U.S. and foreign, is calculated by applying the existing statutory tax rates, including any known future changes, to the pretax net cash flows, giving effect to any permanent differences and reduced by the applicable tax basis. The effect of tax credits is considered in determining the income tax expense. The 10% discount factor is prescribed by U.S. Generally Accepted Accounting Principles.

The present value of future net cash flows is not an estimate of the fair value of Anadarko's proved reserves. An estimate of fair value would also take into account, among other things, anticipated changes in future prices and costs, the expected recovery of reserves in excess of proved reserves, and a discount factor more representative of the time value of money and the risks inherent in producing oil and natural gas. Significant changes in estimated reserves volumes or commodity prices could have a material effect on the Company's Consolidated Financial Statements.

153

APC-01751906

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Oil and Gas Reserves**

| *millions* | United States | | International | | Total | |
|---|---|---|---|---|---|---|
| **December 31, 2014** | | | | | | |
| Future cash inflows | $ | 114,384 | $ | 23,795 | $ | 138,179 |
| Future production costs | | 36,390 | | 6,061 | | 42,451 |
| Future development costs | | 14,794 | | 1,356 | | 16,150 |
| Future income tax expenses | | 21,813 | | 6,968 | | 28,781 |
| Future net cash flows | | 41,387 | | 9,410 | | 50,797 |
| 10% annual discount for estimated timing of cash flows | | 17,239 | | 2,898 | | 20,137 |
| Standardized measure of discounted future net cash flows | $ | 24,148 | $ | 6,512 | $ | 30,660 |
| **December 31, 2013** | | | | | | |
| Future cash inflows | $ | 102,765 | $ | 28,454 | $ | 131,219 |
| Future production costs | | 33,271 | | 6,819 | | 40,090 |
| Future development costs | | 12,285 | | 1,501 | | 13,786 |
| Future income tax expenses | | 20,222 | | 8,148 | | 28,370 |
| Future net cash flows | | 36,987 | | 11,986 | | 48,973 |
| 10% annual discount for estimated timing of cash flows | | 15,818 | | 4,049 | | 19,867 |
| Standardized measure of discounted future net cash flows | $ | 21,169 | $ | 7,937 | $ | 29,106 |
| **December 31, 2012** | | | | | | |
| Future cash inflows | $ | 86,129 | $ | 29,268 | $ | 115,397 |
| Future production costs | | 29,356 | | 6,239 | | 35,595 |
| Future development costs | | 9,195 | | 606 | | 9,801 |
| Future income tax expenses | | 16,804 | | 9,035 | | 25,839 |
| Future net cash flows | | 30,774 | | 13,388 | | 44,162 |
| 10% annual discount for estimated timing of cash flows | | 13,236 | | 4,612 | | 17,848 |
| Standardized measure of discounted future net cash flows | $ | 17,538 | $ | 8,776 | $ | 26,314 |

154

APC-01751907

Table of Contents
Index to Financial Statements

### ANADARKO PETROLEUM CORPORATION
### SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION
### AND PRODUCTION ACTIVITIES
### (Unaudited)

**Changes in Standardized Measure of Discounted Future Net Cash Flows
Relating to Proved Oil and Gas Reserves**

| *millions* | United States | | International | | Total | |
|---|---|---|---|---|---|---|
| **2014** | | | | | | |
| Balance at January 1 | $ | 21,169 | $ | 7,937 | $ | 29,106 |
| Sales and transfers of oil and gas produced, net of production costs | | (8,714) | | (2,492) | | (11,206) |
| Net changes in prices and production costs | | (4,046) | | (1,984) | | (6,030) |
| Changes in estimated future development costs | | (4,180) | | (250) | | (4,430) |
| Extensions, discoveries, additions, and improved recovery, less related costs | | 963 | | - | | 963 |
| Development costs incurred during the period | | 2,591 | | 279 | | 2,870 |
| Revisions of previous quantity estimates | | 13,703 | | 1,921 | | 15,624 |
| Purchases of minerals in place | | - | | - | | - |
| Sales of minerals in place | | (591) | | (696) | | (1,287) |
| Accretion of discount | | 3,221 | | 1,341 | | 4,562 |
| Net change in income taxes | | (1,294) | | 549 | | (745) |
| Other | | 1,326 | | (93) | | 1,233 |
| Balance at December 31 | $ | 24,148 | $ | 6,512 | $ | 30,660 |
| **2013** | | | | | | |
| Balance at January 1 | $ | 17,538 | $ | 8,776 | $ | 26,314 |
| Sales and transfers of oil and gas produced, net of production costs | | (7,478) | | (2,881) | | (10,359) |
| Net changes in prices and production costs | | 1,394 | | (1,072) | | 322 |
| Changes in estimated future development costs | | (2,326) | | (193) | | (2,519) |
| Extensions, discoveries, additions, and improved recovery, less related costs | | 2,659 | | (128) | | 2,531 |
| Development costs incurred during the period | | 1,076 | | 193 | | 1,269 |
| Revisions of previous quantity estimates | | 6,526 | | 1,324 | | 7,850 |
| Purchases of minerals in place | | 253 | | - | | 253 |
| Sales of minerals in place | | 284 | | - | | 284 |
| Accretion of discount | | 2,671 | | 1,465 | | 4,136 |
| Net change in income taxes | | (1,865) | | 401 | | (1,464) |
| Other | | 437 | | 52 | | 489 |
| Balance at December 31 | $ | 21,169 | $ | 7,937 | $ | 29,106 |

155

APC-01751908

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL INFORMATION ON OIL AND GAS EXPLORATION**
**AND PRODUCTION ACTIVITIES**
**(Unaudited)**

**Changes in Standardized Measure of Discounted Future Net Cash Flows**
**Relating to Proved Oil and Gas Reserves (Continued)**

| *millions* | United States | International | Total |
|---|---|---|---|
| **2012** | | | |
| Balance at January 1 | $ 20,173 | $ 6,283 | $ 26,456 |
| Sales and transfers of oil and gas produced, net of production costs | (6,384) | (2,571) | (8,955) |
| Net changes in prices and production costs | (7,948) | (391) | (8,339) |
| Changes in estimated future development costs | (744) | (70) | (814) |
| Extensions, discoveries, additions, and improved recovery, less related costs | 963 | - | 963 |
| Development costs incurred during the period | 1,103 | 357 | 1,460 |
| Revisions of previous quantity estimates | 5,026 | 4,390 | 9,416 |
| Purchases of minerals in place | (9) | - | (9) |
| Sales of minerals in place | (763) | - | (763) |
| Accretion of discount | 3,063 | 1,139 | 4,202 |
| Net change in income taxes | 1,285 | (759) | 526 |
| Other | 1,773 | 398 | 2,171 |
| Balance at December 31 | $ 17,538 | $ 8,776 | $ 26,314 |

156

APC-01751909

Table of Contents
Index to Financial Statements

**ANADARKO PETROLEUM CORPORATION**
**SUPPLEMENTAL QUARTERLY INFORMATION**
**(Unaudited)**

**Quarterly Financial Data**

The following summarizes quarterly financial data for 2014 and 2013:

| millions except per-share amounts | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | |
| Sales revenues | $ | 4,338 | $ | 4,385 | $ | 4,230 | $ | 3,422 |
| Gains (losses) on divestitures and other, net | | 1,506 | | 54 | | 780 | | (245) |
| Deepwater Horizon settlement and related costs | | - | | 93 | | 3 | | 1 |
| Operating income (loss) | | 2,975 | | 1,209 | | 1,698 | | (479) |
| Tronox-related contingent loss | | 4,300 | | 19 | | 19 | | 22 |
| Net income (loss) | | (2,626) | | 266 | | 1,147 | | (350) |
| Net income (loss) attributable to noncontrolling interests | | 43 | | 39 | | 60 | | 45 |
| Net income (loss) attributable to common stockholders | | (2,669) | | 227 | | 1,087 | | (395) |
| Earnings per share | | | | | | | | |
| Net income (loss) attributable to common stockholders-basic | $ | (5.30) | $ | 0.45 | $ | 2.13 | $ | (0.78) |
| Net income (loss) attributable to common stockholders-diluted | $ | (5.30) | $ | 0.45 | $ | 2.12 | $ | (0.78) |
| Average number common shares outstanding-basic | | 504 | | 505 | | 506 | | 507 |
| Average number common shares outstanding-diluted | | 504 | | 507 | | 508 | | 507 |
| | | | | | | | | |
| **2013** | | | | | | | | |
| Sales revenues | $ | 3,718 | $ | 3,440 | $ | 3,789 | $ | 3,920 |
| Gains (losses) on divestitures and other, net | | 175 | | 57 | | 64 | | (582) |
| Algeria exceptional profits tax settlement | | 33 | | - | | - | | - |
| Deepwater Horizon settlement and related costs | | 3 | | 4 | | 5 | | 3 |
| Operating income (loss) | | 1,289 | | 1,140 | | 689 | | 215 |
| Tronox-related contingent loss | | - | | - | | - | | 850 |
| Net income (loss) | | 484 | | 959 | | 223 | | (725) |
| Net income attributable to noncontrolling interests | | 24 | | 30 | | 41 | | 45 |
| Net income (loss) attributable to common stockholders | | 460 | | 929 | | 182 | | (770) |
| Earnings per share | | | | | | | | |
| Net income (loss) attributable to common stockholders-basic | $ | 0.91 | $ | 1.84 | $ | 0.36 | $ | (1.53) |
| Net income (loss) attributable to common stockholders-diluted | $ | 0.91 | $ | 1.83 | $ | 0.36 | $ | (1.53) |
| Average number common shares outstanding-basic | | 501 | | 502 | | 503 | | 504 |
| Average number common shares outstanding-diluted | | 503 | | 504 | | 505 | | 504 |

157

APC-01751910

Table of Contents
Index to Financial Statements

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**EVALUATION AND DISCLOSURE CONTROLS AND PROCEDURES**

Anadarko's Chief Executive Officer and Chief Financial Officer performed an evaluation of the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. The Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in reports it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and to ensure that the information required to be disclosed by the Company in reports that it files under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of December 31, 2014.

**MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

See *Management's Assessment of Internal Control Over Financial Reporting* under Item 8 of this Form 10-K.

**ATTESTATION REPORT OF THE REGISTERED PUBLIC ACCOUNTING FIRM**

See *Report of Independent Registered Public Accounting Firm* under Item 8 of this Form 10-K.

**CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**

There were no changes in Anadarko's internal control over financial reporting during the fourth quarter of 2014 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. See *Management's Assessment of Internal Control Over Financial Reporting* under Item 8 of this Form 10-K.

**Item 9B. Other Information**

None.

158

APC-01751911

Table of Contents
Index to Financial Statements

**PART III**

**Item 10. Directors, Executive Officers, and Corporate Governance**

See *Anadarko Board of Directors, Corporate Governance-Committees of the Board, Corporate Governance-Board of Directors,* and *Section 16(a) Beneficial Ownership Reporting Compliance* in the Anadarko Petroleum Corporation Proxy Statement (Proxy Statement), for the Annual Meeting of Stockholders of Anadarko Petroleum Corporation to be held May 12, 2015 (to be filed with the Securities and Exchange Commission prior to April 2, 2015), each of which is incorporated herein by reference.

See list of *Executive Officers of the Registrant* under Items 1 and 2 of this Form 10-K, which is incorporated herein by reference.

The Company's Code of Business Conduct and Ethics and the Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer (Code of Ethics) can be found on the Company's website located at www.anadarko.com/Responsibility/Good-Governance. Any stockholder may request a printed copy of the Code of Ethics by submitting a written request to the Company's Corporate Secretary. If the Company amends the Code of Ethics or grants a waiver, including an implicit waiver, from the Code of Ethics, the Company will disclose the information on its website. The waiver information will remain on the website for at least 12 months after the initial disclosure of such waiver.

**Item 11. Executive Compensation**

See *Corporate Governance-Board of Directors-Compensation and Benefits Committee Interlocks and Insider Participation, Corporate Governance-Board of Directors-Director Compensation, Corporate Governance-Director Compensation Table for 2014, Compensation and Benefits Committee Report on 2014 Executive Compensation, Compensation Discussion and Analysis,* and *Executive Compensation* in the Proxy Statement, each of which is incorporated herein by reference. The Compensation and Benefits Committee Report and related information incorporated by reference herein shall not be deemed "soliciting material" or to be "filed" with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934, each as amended, except to the extent that the Company specifically incorporates it by reference into such filing.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

See *Security Ownership of Certain Beneficial Owners and Management* in the Proxy Statement and *Securities Authorized for Issuance under Equity Compensation Plans* under Item 5 of this Form 10-K, which are incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

See *Corporate Governance-Board of Directors* and *Transactions with Related Persons* in the Proxy Statement, each of which is incorporated herein by reference.

**Item 14. Principal Accounting Fees and Services**

See *Independent Auditor* in the Proxy Statement, which is incorporated herein by reference.

APC-01751912

Table of Contents
Index to Financial Statements

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

**a) EXHIBITS**

The following documents are filed as part of this report or incorporated by reference:

(1)          The Consolidated Financial Statements of Anadarko Petroleum Corporation are listed on the Index to this report, page 84.

(2)          Exhibits not incorporated by reference to a prior filing are designated by an asterisk (*) and are filed herewith or double asterisk (**) and are furnished herewith; all exhibits not so designated are incorporated herein by reference to a prior filing under File Number 1-8968 as indicated.

| Exhibit Number | Description |
| --- | --- |
| 2 (i) | Agreement and Plan of Merger dated as of June 22, 2006, among Anadarko Petroleum Corporation, APC Acquisition Sub, Inc. and Kerr-McGee Corporation, filed as Exhibit 2.2 to Form 8-K filed on June 26, 2006 |
| 3 (i) | Restated Certificate of Incorporation of Anadarko Petroleum Corporation, dated May 21, 2009, filed as Exhibit 3.3 to Form 8-K filed on May 22, 2009 |
| (ii) | By-Laws of Anadarko Petroleum Corporation, amended and restated as of November 6, 2014, filed as Exhibit 3.1 to Form 8-K filed on November 10, 2014 |
| 4 (i) | Trustee Indenture dated as of September 19, 2006, Anadarko Petroleum Corporation to The Bank of New York Trust Company, N.A., filed as Exhibit 4.1 to Form 8-K filed on September 19, 2006 |
| (ii) | Second Supplemental Indenture dated October 4, 2006, among Anadarko Petroleum Corporation, Kerr-McGee Corporation, and Citibank, N.A., filed as Exhibit 4.1 to Form 8-K filed on October 6, 2006 |
| (iii) | Ninth Supplemental Indenture dated October 4, 2006, among Anadarko Petroleum Corporation, Kerr-McGee Corporation, and Citibank, N.A., filed as Exhibit 4.2 to Form 8-K filed on October 6, 2006 |
| (iv) | Officers' Certificate of Anadarko Petroleum Corporation, dated March 2, 2009, establishing the 7.625% Senior Notes due 2014 and the 8.700% Senior Notes due 2019, filed as Exhibit 4.1 to Form 8-K filed on March 6, 2009 |
| (v) | Form of 7.625% Senior Notes due 2014, filed as Exhibit 4.2 to Form 8-K filed on March 6, 2009 |
| (vi) | Form of 8.700% Senior Notes due 2019, filed as Exhibit 4.3 to Form 8-K filed on March 6, 2009 |
| (vii) | Officers' Certificate of Anadarko Petroleum Corporation, dated June 9, 2009, establishing the 5.75% Senior Notes due 2014, the 6.95% Senior Notes due 2019 and the 7.95% Senior Notes due 2039, filed as Exhibit 4.1 to Form 8-K filed on June 12, 2009 |
| (viii) | Form of 5.75% Senior Notes due 2014, filed as Exhibit 4.2 to Form 8-K filed on June 12, 2009 |
| (ix) | Form of 6.95% Senior Notes due 2019, filed as Exhibit 4.3 to Form 8-K filed on June 12, 2009 |
| (x) | Form of 7.95% Senior Notes due 2039, filed as Exhibit 4.4 to Form 8-K filed on June 12, 2009 |
| (xi) | Officers' Certificate of Anadarko Petroleum Corporation dated March 9, 2010, establishing the 6.200% Senior Notes due 2040, filed as Exhibit 4.1 to Form 8-K filed on March 16, 2010 |
| (xii) | Form of 6.200% Senior Notes due 2040, filed as Exhibit 4.2 to Form 8-K filed on March 16, 2010 |
| (xiii) | Officers' Certificate of Anadarko Petroleum Corporation dated August 9, 2010, establishing the 6.375% Senior Notes due 2017, filed as Exhibit 4.1 to Form 8-K filed on August 12, 2010 |

160

APC-01751913

Table of Contents
Index to Financial Statements

| | Exhibit Number | Description |
|---|---|---|
| | 4 (xiv) | Form of 6.375% Senior Notes due 2017, filed as Exhibit 4.2 to Form 8-K filed on August 12, 2010 |
| | (xv) | Officers' Certificate of Anadarko Petroleum Corporation dated July 7, 2014, establishing the 3.45% Senior Notes due 2024 and the 4.50% Senior Notes due 2044, filed as Exhibit 4.1 to Form 8-K filed on July 7, 2014 |
| | (xvi) | Form of 3.45% Senior Notes due 2024, filed as Exhibit 4.2 to Form 8-K filed on July 7, 2014 |
| | (xvii) | Form of 4.50% Senior Notes due 2044, filed as Exhibit 4.3 to Form 8-K filed on July 7, 2014 |
| † | 10 (i) | 1998 Director Stock Plan of Anadarko Petroleum Corporation, effective January 30, 1998, filed as Appendix A to DEF 14A filed on March 16, 1998 |
| † | (ii) | Form of Anadarko Petroleum Corporation 1998 Director Stock Plan Stock Option Agreement, filed as Exhibit 10.1 to Form 8-K filed on November 17, 2005 |
| † | (iii) | Anadarko Petroleum Corporation Amended and Restated 1999 Stock Incentive Plan, filed as Appendix A to DEF 14A filed on March 18, 2005 |
| † | (iv) | Form of Anadarko Petroleum Corporation Executive 1999 Stock Incentive Plan Stock Option Agreement, filed as Exhibit 10.2 to Form 8-K filed on November 17, 2005 |
| † | (v) | Form of Anadarko Petroleum Corporation Non-Executive 1999 Stock Incentive Plan Stock Option Agreement, filed as Exhibit 10.3 to Form 8-K filed on November 17, 2005 |
| † | (vi) | Form of Stock Option Agreement-1999 Stock Incentive Plan (UK Nationals), filed as Exhibit 10.4 to Form 8-K filed on November 17, 2005 |
| † | (vii) | Amendment to Stock Option Agreement Under the Anadarko Petroleum Corporation 1999 Stock Incentive Plan, filed as Exhibit 10.1 to Form 8-K filed on January 23, 2007 |
| † | (viii) | Anadarko Petroleum Corporation 1999 Stock Incentive Plan (Amendment to Performance Unit Agreement), filed as Exhibit 10.3 to Form 8-K filed on November 13, 2007 |
| † | (ix) | Form of Anadarko Petroleum Corporation 1999 Stock Incentive Plan Restricted Stock Agreement, filed as Exhibit 10(b)(xxiv) to Form 10-K for year ended December 31, 1999, filed on March 16, 2000 |
| † | (x) | Form of Anadarko Petroleum Corporation 1999 Stock Incentive Plan Restricted Stock Unit Award Letter, filed as Exhibit 10.1 to Form 8-K filed on November 13, 2007 |
| † | (xi) | The Approved UK Sub-Plan of the Anadarko Petroleum Corporation 1999 Stock Incentive Plan, filed as Exhibit 10(b)(xxiv) to Form 10-K for year ended December 31, 2003, filed on March 4, 2004 |
| † | (xii) | Key Employee Change of Control Contract, filed as Exhibit 10(b)(xxii) to Form 10-K for year ended December 31, 1997, filed on March 18, 1998 |
| † | (xiii) | First Amendment to Anadarko Petroleum Corporation Key Employee Change of Control Contract, filed as Exhibit 10(b) to Form 10-Q for quarter ended September 30, 2000, filed on November 13, 2000 |
| † | (xiv) | Form of Amendment to Anadarko Petroleum Corporation Key Employee Change of Control Contract, filed as Exhibit 10(b)(ii) to Form 10-Q for quarter ended June 30, 2003, filed on August 11, 2003 |
| † | (xv) | Form of Key Employee Change of Control Contract (2011), filed as Exhibit 10(i) to Form 10-Q for quarter ended June 30, 2011, filed on July 27, 2011 |
| † | (xvi) | Letter Agreement regarding Post-Retirement Benefits, dated February 16, 2004-Robert J. Allison, Jr., filed as Exhibit 10(b)(xxxiv) to Form 10-K for year ended December 31, 2003, filed on March 4, 2004 |
| † | (xvii) | Anadarko Petroleum Corporation Savings Restoration Plan (As Amended and Restated Effective January 1, 2007), filed as Exhibit 10(xxii) to Form 10-K for year ended December 31, 2009, filed on February 23, 2010 |

APC-01751914

Table of Contents

Index to Financial Statements

| Exhibit Number | | Description |
|---|---|---|
| †* | 10 (xviii) | First Amendment, dated July 1, 2010, to the Anadarko Petroleum Corporation Savings Restoration Plan (As Amended and Restated Effective January 1, 2007) |
| †* | (xix) | Second Amendment, dated November 30, 2011, to the Anadarko Petroleum Corporation Savings Restoration Plan (As Amended and Restated Effective January 1, 2007) |
| †* | (xx) | Third Amendment, dated December 18, 2014, to the Anadarko Petroleum Corporation Savings Restoration Plan (As Amended and Restated Effective January 1, 2007) |
| † | (xxi) | Anadarko Retirement Restoration Plan (As Amended and Restated Effective as of November 7, 2007), filed as Exhibit 10.2 to Form 8-K filed on November 13, 2007 |
| †* | (xxii) | First Amendment, dated November 30, 2011, to the Anadarko Retirement Restoration Plan (As Amended and Restated Effective January 1, 2007) |
| † | (xxiii) | Anadarko Petroleum Corporation Estate Enhancement Program, filed as Exhibit 10(b)(xxxiv) to Form 10-K for year ended December 31, 1998, filed on March 15, 1999 |
| † | (xxiv) | Estate Enhancement Program Agreement between Anadarko Petroleum Corporation and Eligible Executives, filed as Exhibit 10(b)(xxxv) to Form 10-K for year ended December 31, 1998, filed on March 15, 1999 |
| † | (xxv) | Estate Enhancement Program Agreements effective November 29, 2000, filed as Exhibit 10(b)(xxxxii) to Form 10-K for year ended December 31, 2000, filed on March 15, 2001 |
| † | (xxvi) | Anadarko Petroleum Corporation Management Life Insurance Plan, restated November 1, 2002, filed as Exhibit 10(b)(xxxii) to Form 10-K for year ended December 31, 2002, filed on March 14, 2003 |
| † | (xxvii) | First Amendment to Anadarko Petroleum Corporation Management Life Insurance Plan, effective June 30, 2003, filed as Exhibit 10(b)(xliii) to Form 10-K for year ended December 31, 2003, filed on March 4, 2004 |
| † | (xxviii) | Second Amendment to Anadarko Petroleum Corporation Management Life Insurance Plan, effective January 1, 2008, filed as Exhibit 10(xxix) to Form 10-K for year ended December 31, 2009, filed on February 23, 2010 |
| † | (xxix) | Anadarko Petroleum Corporation Officer Severance Plan, filed as Exhibit 10(b)(iv) to Form 10-Q for quarter ended September 30, 2003, filed on November 12, 2003 |
| † | (xxx) | Form of Termination Agreement and Release of All Claims Under Officer Severance Plan, filed as Exhibit 10(b)(v) to Form 10-Q for quarter ended September 30, 2003, filed on November 12, 2003 |
| † | (xxxi) | Form of Director and Officer Indemnification Agreement, filed as Exhibit 10 to Form 8-K filed on September 3, 2004 |
| | (xxxii) | $5,000,000,000 Revolving Credit Agreement, dated as of September 2, 2010, among Anadarko Petroleum Corporation, as Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent, Bank of America, N.A., DnB NorBank ASA, The Royal Bank of Scotland plc, Société Général, and Wells Fargo Bank, N.A., as Syndication Agents, and the several lenders named therein, filed as Exhibit 10.1 to Form 8-K filed on September 8, 2010 |
| | (xxxiii) | First Amendment to Revolving Credit Agreement, dated as of August 3, 2011, to the Revolving Credit Agreement dated as of September 2, 2010, among Anadarko Petroleum Corporation, as Borrower, JPMorgan Chase Bank, N.A. as Administrative Agent, Bank of America, N.A., DnB Nor Bank ASA, The Royal Bank of Scotland plc, Société Générale, and Wells Fargo Bank, N.A., as co-syndication agents, and each of the Lenders from time to time party thereto, filed as Exhibit 10(i) to Form 10-Q for quarter ended September 30, 2011, filed on October 31, 2011 |

162

APC-01751915

Table of Contents
Index to Financial Statements

| | Exhibit Number | Description |
|---|---|---|
| | 10 (xxxiv) | Second Amendment to Revolving Credit Agreement, dated as of March 26, 2014, to the Revolving Credit Agreement dated as of September 2, 2010, as amended on August 3, 2011, among Anadarko Petroleum Corporation, as Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent, Bank of America, N.A., DnB Nor Bank ASA, The Royal Bank of Scotland plc, Société Générale, and Wells Fargo Bank, N.A., as co-syndication agents, and each of the Lenders from time to time party thereto, filed as Exhibit 10(ii) to Form 10-Q for quarter ended March 31, 2014, filed on May 5, 2014 |
| † | (xxxv) | Anadarko Petroleum Corporation 2008 Omnibus Incentive Compensation Plan, effective as of May 20, 2008, filed as Exhibit 10.1 to Form 8-K filed on May 27, 2008 |
| † | (xxxvi) | Form of Anadarko Petroleum Corporation 2008 Omnibus Incentive Compensation Plan Stock Option Award Agreement, filed as Exhibit 10.3 to Form 8-K filed on November 13, 2009 |
| † | (xxxvii) | Form of Anadarko Petroleum Corporation 2008 Omnibus Incentive Compensation Plan Restricted Stock Unit Award Agreement, filed as Exhibit 10.1 to Form 8-K filed on November 13, 2009 |
| † | (xxxviii) | Form of Anadarko Petroleum Corporation 2008 Omnibus Incentive Compensation Plan Performance Unit Award Agreement, filed as Exhibit 10.2 to Form 8-K filed on November 13, 2009 |
| † | (xxxvix) | Anadarko Petroleum Corporation 2008 Director Compensation Plan, effective as of May 20, 2008, filed as Exhibit 10.2 to Form 8-K filed on May 27, 2008 |
| † | (xl) | Form of Award Letter for Anadarko Petroleum Corporation 2008 Director Compensation Plan, filed as Exhibit 10.3 to Form 8-K filed on May 27, 2008 |
| † | (xli) | Form of Award Letter for Anadarko Petroleum Corporation 2008 Director Compensation Plan (2013), filed as Exhibit 10(i) to Form 10-Q for quarter ended June 30, 2013, filed on July 29, 2013 |
| † | (xlii) | Anadarko Petroleum Corporation Benefits Trust Agreement, amended and restated effective as of November 5, 2008, filed as Exhibit 10(lvi) to Form 10-K for year ended December 31, 2008, filed on February 25, 2009 |
| † | (xliii) | Anadarko Petroleum Corporation Deferred Compensation Plan (as amended and restated effective as of January 1, 2012), filed as Exhibit 10(i) to Form 10-Q for the quarter ended June 30, 2014, filed on July 29, 2014 |
| † | (xliv) | First Amendment, dated December 17, 2013, to the Anadarko Petroleum Corporation Deferred Compensation Plan (as amended and restated effective as of January 1, 2012), filed as Exhibit 10(ii) to Form 10-Q for the quarter ended June 30, 2014, filed on July 29, 2014 |
| | (xlv) | Operating Agreement, dated October 1, 2009, between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator, as ratified by that certain Ratification and Joinder of Operating Agreement, dated December 17, 2009, by and among BP Exploration & Production Inc., Anadarko Petroleum Corporation (as Non-Operator), Anadarko E&P Company LP (as predecessor in interest to Anadarko Petroleum Corporation), and MOEX Offshore 2007 LLC, together with material exhibits, filed as Exhibit 10 to Form 10-Q for quarter ended June 30, 2010, filed on August 3, 2010 |
| | (xlvi) | Confidential Settlement Agreement, Mutual Releases and Agreement to Indemnify, dated October 16, 2011, by and among BP Exploration & Production Inc., Anadarko Petroleum Corporation, Anadarko E&P Company LP, BP Corporation North America Inc. and BP p.l.c., filed as Exhibit 10(xlii) to Form 10-K for year ended December 31, 2011, filed on February 21, 2012 (Portions of this exhibit have been omitted and filed separately with the SEC pursuant to a request for confidential treatment) |
| † | (xlvii) | Severance Agreement between R. A. Walker and Anadarko Petroleum Corporation, dated February 16, 2012, filed as Exhibit 10.2 to Form 8-K filed on February 21, 2012 |
| † | (xlviii) | Time Sharing Agreement between R. A. Walker and Anadarko Petroleum Corporation, dated May 15, 2012, filed as Exhibit 10(ii) to Form 10-Q for quarter ended June 30, 2012, filed on August 8, 2012 |

163

APC-01751916

Table of Contents

Index to Financial Statements

| | Exhibit Number | Description |
|---|---|---|
| † | 10 (xlix) | Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan, effective as of May 15, 2012, filed as Exhibit 10.1 to Form 8-K filed on May 15, 2012 |
| † | (l) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Stock Option Award Agreement, filed as Exhibit 10.2 to Form 8-K filed on May 15, 2012 |
| † | (li) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Restricted Stock Unit Award Agreement, filed as Exhibit 10.3 to Form 8-K filed on May 15, 2012 |
| † | (lii) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Performance Unit Award Agreement, filed as Exhibit 10.4 to Form 8-K filed on May 15, 2012 |
| † | (liii) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Restricted Stock Unit Award Agreement, filed as Exhibit 10.1 to Form 8-K filed on November 9, 2012 |
| † | (liv) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Performance Unit Award Agreement, filed as Exhibit 10.2 to Form 8-K filed on November 9, 2012 |
| † | (lv) | Form of Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan Performance Unit Award Agreement (2014), filed as Exhibit 10.1 to Form 8-K filed on November 10, 2014 |
| † | (lvi) | Form of U.K. Award Letter for Anadarko Petroleum Corporation 2008 Director Compensation Plan, filed as Exhibit 10.5 to Form 8-K filed on May 15, 2012 |
| † | (lvii) | Amended and Restated Performance Unit Award Agreement, effective November 5, 2012, for R. A. Walker, filed as Exhibit 10.3 to Form 8-K filed on November 9, 2012 |
| | (lviii) | Settlement Agreement dated as of April 3, 2014, by and among (1) the Anadarko Litigation Trust, (2) the United States of America in its capacity as plaintiff-intervenor in the Tronox Adversary Proceeding and acting for and on behalf of certain U.S. government agencies and (3) Anadarko Petroleum Corporation, Kerr-McGee Corporation, and certain other subsidiaries, filed as exhibit 10.1 to Form 8-K filed on April 3, 2014 |
| | (lix) | Credit Agreement, dated as of June 17, 2014, among Anadarko Petroleum Corporation, as Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent, Wells Fargo Bank, National Association, as Syndication Agent, Bank of America, N.A., Citibank, N.A., The Royal Bank of Scotland plc, and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Co-Documentation Agents, and the additional lenders party thereto, filed as Exhibit 10.1 to Form 8-K filed on June 23, 2014 |
| | (lx) | First Amendment to Credit Agreement, dated November 14, 2014, among Anadarko Petroleum Corporation, JPMorgan Chase Bank, N.A., as Administrative Agent, and the lenders party thereto, filed as Exhibit 10.1 to Form 8-K filed on November 19, 2014 |
| | (lxi) | 364-Day Revolving Credit Agreement, dated as of June 17, 2014, among Anadarko Petroleum Corporation, as Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent, Wells Fargo Bank, National Association, as Syndication Agent, Bank of America, N.A., Citibank, N.A., The Royal Bank of Scotland plc, and The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Co-Documentation Agents, and the additional lenders party thereto, filed as Exhibit 10.2 to Form 8-K filed on June 23, 2014 |
| | (lxii) | First Amendment to 364-Day Revolving Credit Agreement, dated November 14, 2014, among Anadarko Petroleum Corporation, JPMorgan Chase Bank, N.A., as Administrative Agent, and the lenders party thereto, filed as Exhibit 10.2 to Form 8-K filed on November 19, 2014 |
| * | 12 | Computation of Ratios of Earnings to Fixed Charges and Earnings to Combined Fixed Charges and Preferred Stock Dividends |
| * | 21 | List of Subsidiaries |
| * | 23 (i) | Consent of KPMG LLP |
| * | 23 (ii) | Consent of Miller and Lents, Ltd. |

164

APC-01751917

Table of Contents
Index to Financial Statements

| Exhibit Number | | Description |
|---|---|---|
| * | 24 | Power of Attorney |
| * | 31 (i) | Rule 13a-14(a)/15d-14(a) Certification-Chief Executive Officer |
| * | 31 (ii) | Rule 13a-14(a)/15d-14(a) Certification-Chief Financial Officer |
| ** | 32 | Section 1350 Certifications |
| * | 99 | Report of Miller and Lents, Ltd. |
| * | 101 .INS | XBRL Instance Document |
| * | 101 .SCH | XBRL Schema Document |
| * | 101 .CAL | XBRL Calculation Linkbase Document |
| * | 101 .DEF | XBRL Definition Linkbase Document |
| * | 101 .LAB | XBRL Label Linkbase Document |
| * | 101 .PRE | XBRL Presentation Linkbase Document |

†    Management contracts or compensatory plans or arrangements required to be filed pursuant to Item 15.

The total amount of securities of the registrant authorized under any instrument with respect to long-term debt not filed as an exhibit does not exceed 10% of the total assets of the registrants and its subsidiaries on a consolidated basis. The registrant agrees, upon request of the SEC, to furnish copies of any or all of such instruments to the SEC.

**b) FINANCIAL STATEMENT SCHEDULES**

Financial statement schedules have been omitted because they are not required, not applicable, or the information is included in the Company's Consolidated Financial Statements.

APC-01751918

Table of Contents
Index to Financial Statements

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ANADARKO PETROLEUM CORPORATION

February 20, 2015

By:  /s/ ROBERT G. GWIN
_____

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on February 20, 2015.

| Name and Signature | Title |
| --- | --- |

(i) Principal executive officer and director:

/s/ R. A. WALKER     Chairman, President and Chief Executive Officer
_____
R. A. Walker

(ii) Principal financial officer:

/s/ ROBERT G. GWIN     Executive Vice President, Finance and Chief Financial Officer
_____
Robert G. Gwin

(iii) Principal accounting officer:

/s/ M. CATHY DOUGLAS     Senior Vice President, Chief Accounting Officer and Controller
_____
M. Cathy Douglas

(iv) Directors:*
ANTHONY R. CHASE
KEVIN P. CHILTON
H. PAULETT EBERHART
PETER J. FLUOR
RICHARD L. GEORGE
CHARLES W. GOODYEAR
JOSEPH W. GORDER
JOHN R. GORDON
MARK C. MCKINLEY
ERIC D. MULLINS
_____
* Signed on behalf of each of these persons and on his own behalf:

By: _____
     /s/ ROBERT G. GWIN
     Robert G. Gwin, Attorney-in-Fact

166

APC-01751919

# Exhibit 68

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended December 31, 2014**

**Commission file number 1-5153**

# Marathon Oil Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **25-0996816** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**5555 San Felipe Street, Houston, TX 77056-2723**
(Address of principal executive offices)
**(713) 629-6600**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $1.00 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes R No £

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes £    No R

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes R No £

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes R No £

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. R

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer R Accelerated filer £ Non-accelerated filer £ Smaller reporting company £

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes £ No R

The aggregate market value of Common Stock held by non-affiliates as of June 30, 2014: $26,831 million. This amount is based on the closing price of the registrant's Common Stock on the New York Stock Exchange on that date. Shares of Common Stock held by executive officers and directors of the registrant are not included in the computation. The registrant, solely for the purpose of this required presentation, has deemed its directors and executive officers to be affiliates.

There were 674,944,619 shares of Marathon Oil Corporation Common Stock outstanding as of February 23, 2015.

Documents Incorporated By Reference:
Portions of the registrant's proxy statement relating to its 2015 Annual Meeting of Stockholders, to be filed with the Securities and Exchange Commission pursuant to Regulation 14A under the Securities Exchange Act of 1934, are incorporated by reference to the extent set forth in Part III, Items 10-14 of this report.

*MARATHON OIL CORPORATION*

Unless the context otherwise indicates, references to "Marathon Oil," "we," "our" or "us" in this Annual Report on Form 10-K are references to Marathon Oil Corporation, including its wholly-owned and majority-owned subsidiaries, and its ownership interests in equity method investees (corporate entities, partnerships, limited liability companies and other ventures over which Marathon Oil exerts significant influence by virtue of its ownership interest).

Table of Contents

PART I

| | | |
|---|---|---|
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 25 |
| Item 1B. | Unresolved Staff Comments | 32 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 33 |
| Item 4. | Mine Safety Disclosures | 33 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 36 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 60 |
| Item 8. | Financial Statements and Supplementary Data | 62 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 118 |
| Item 9A. | Controls and Procedures | 118 |
| Item 9B. | Other Information | 118 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 119 |
| Item 11. | Executive Compensation | 119 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 119 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 120 |
| Item 14. | Principal Accounting Fees and Services | 120 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 121 |
| | SIGNATURES | 122 |

**Definitions**

Throughout this report, the following company or industry specific terms and abbreviations are used.

*AECO* - Alberta Energy Company, a Canadian natural gas benchmark price.

*AMPCO* - Atlantic Methanol Production Company LLC, a company located in Equatorial Guinea in which we own a 45 percent equity interest.

*AOSP* - Athabasca Oil Sands Project, an oil sands mining, transportation and upgrading joint venture located in Alberta, Canada, in which we hold a 20 percent non-operated working interest.

*bbl* - One stock tank barrel, which is 42 United States gallons liquid volume.

*bbld* - Barrels per day.

*bboe* - Billion barrels of oil equivalent. Natural gas is converted to a barrel of oil equivalent based on the energy equivalent, which on a dry gas basis is six thousand cubic feet of gas per one barrel of oil equivalent.

*bcf* - Billion cubic feet.

*boe* - Barrels of oil equivalent.

*boed* - Barrels of oil equivalent per day.

*btu* - British thermal unit, an energy equivalence measure.

*Budget* - Our capital, investment and exploration spending budget as made public through a press release.

*DD&A* - Depreciation, depletion and amortization.

*Developed acreage* - The number of acres which are allocated or assignable to producing wells or wells capable of production.

*Development well* - A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

*Downstream business* - The refining, marketing and transportation ("RM&T") operations, spun-off on June 30, 2011 and treated as discontinued operations.

*Dry well* - A well found to be incapable of producing either oil or natural gas in sufficient quantities to justify completion.

*E.G.* - Equatorial Guinea.

*EGHoldings* - Equatorial Guinea LNG Holdings Limited, a liquefied natural gas production company located in E.G. in which we own a 60 percent equity interest.

*EIA* - United States Energy Information Agency.

*EPA* - United States Environmental Protection Agency.

*Exploratory well* - A well drilled to find oil or natural gas in an unproved area or find a new reservoir in a field previously found to be productive in another reservoir.

*FASB* - Financial Accounting Standards Board.

*FPSO* - Floating production, storage and offloading vessel.

*IFRS* - International Financial Reporting Standards.

*Internal Losses* - Production losses attributed to factors that are within our control which can be either planned, such as a planned turnaround, or unplanned, such as equipment failure.

*International E&P* - Our International Exploration and Production ("Int'l E&P") segment which explores for, produces and markets crude oil and condensate, NGLs and natural gas outside of North America and produces and markets products manufactured from natural gas, such as liquefied natural gas and methanol, in E.G.

*IRS* - United States Internal Revenue Service.

*KRG* - Kurdistan Regional Government.

*Light sweet crude* - A crude oil with an American Petroleum Institute ("API") gravity of 38 degrees or more and a sulfur content of less than 0.5 percent.

*LNG* - Liquefied natural gas.

1

*LPG* - Liquefied petroleum gas.

*Liquid hydrocarbons or liquids* - Collectively, crude oil, synthetic crude oil, condensate and natural gas liquids.

*LLS* - Louisiana Light Sweet crude oil, an oil index benchmark price.

*Marathon* - The consolidated company prior to the June 30, 2011 spin-off of the downstream business.

*Marathon Oil* - Marathon Oil Corporation and its consolidated subsidiaries: the company as it exists following the June 30, 2011 spin-off of the downstream business.

*Marathon Petroleum Corporation ("MPC")* - The separate independent company which now owns and operates the downstream business.

*mbbl* - Thousand barrels.

*mbbld* - Thousand barrels per day.

*mboe* - Thousand barrels of oil equivalent.

*mboed* - Thousand barrels of oil equivalent per day.

*mcf* - Thousand cubic feet.

*mmbbl* - Million barrels.

*mmboe* - Million barrels of oil equivalent.

*mmbtu* - Million British thermal units.

*mmcfd* - Million cubic feet per day.

*mmt* - Million metric tonnes.

*mmta* - Million metric tonnes per annum.

*mtd* - Thousand metric tonnes per day.

*Net acres or Net wells* - The sum of the fractional working interests owned by us in gross acres or gross wells.

*NGL or NGLs* - Natural gas liquid or natural gas liquids, which are naturally occurring substances found in natural gas, including ethane, butane, isobutane, propane and natural gasoline, that can be collectively removed from produced natural gas, separated into these substances and sold.

*North America E&P* - Our North America Exploration and Production segment *("N.A. E&P")* which explores for, produces and markets crude oil and condensate, NGLs and natural gas in North America.

*OCI* - Other comprehensive income.

*OECD* - Organization for Economic Cooperation and Development.

*OPEC* - Organization of Petroleum Exporting Countries.

*Operational availability* - A term used to measure the ability of an asset to produce to its maximum capacity over a specified period of time, after consideration of Internal Losses.

*OSM* - Our Oil Sands Mining segment which mines, extracts and transports bitumen from oil sands deposits in Alberta, Canada, and upgrades the bitumen to produce and market synthetic crude oil and vacuum gas oil.

*Productive well* - A well that is not a dry well. Productive wells include producing wells and wells that are mechanically capable of production.

*Proved developed reserves* - Proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods or for which the cost of the required equipment is relatively minor compared to the cost of a new well and through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

*Proved reserves* - Proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves are those quantities of crude oil and condensate, NGLs, natural gas and synthetic crude oil, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations-prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether

2

deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

*Proved undeveloped reserves* - Proved reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion or through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well. Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.

*PSC* - Production sharing contract.

*Quest CCS* - Quest Carbon Capture and Storage project at the AOSP in Alberta, Canada.

*Reserve replacement ratio* - A ratio which measures the amount of proved reserves added to our reserve base during the year relative to the amount of liquid hydrocarbons and natural gas produced.

*Royalty interest* - An interest in an oil or natural gas property entitling the owner to a share of oil or natural gas production free of costs of production.

*SAGE* - United Kingdom Scottish Area Gas Evacuation system composed of a pipeline and processing terminal.

*SAR or SARs* - Stock appreciation right or stock appreciation rights.

*SCOOP* - South Central Oklahoma Oil Province.

*SEC* - United States Securities and Exchange Commission.

*Seismic* - An exploration method of sending energy waves or sound waves into the earth and recording the wave reflections to indicate the type, size, shape and depth of subsurface rock formation (3-D seismic provides three-dimensional pictures and 4-D factors in changes that occurred over time).

*STACK* - Sooner Trend, Anadarko (basin), Canadian (and) Kingfisher (counties).

*Total depth ("TD")* - The bottom of a drilled hole.

*Total proved reserves* - The summation of proved developed reserves and proved undeveloped reserves.

*U.K.* - United Kingdom.

*Undeveloped acreage* - Acreage on which wells have not been drilled or completed to a point that would permit the production of economic quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

*U.S.* - United States of America.

*U.S. GAAP* - Accounting principles generally accepted in the U.S.

*WCS* - Western Canadian Select, an oil index benchmark price.

*Working interest ("WI")* - The interest in a mineral property which gives the owner that share of production from the property. A working interest owner bears that share of the costs of exploration, development and production in return for a share of production. Working interests are sometimes burdened by overriding royalty interest or other interests.

*WTI* - West Texas Intermediate crude oil, an oil index benchmark price.

**Disclosures Regarding Forward-Looking Statements**

This Annual Report on Form 10-K, including Item 1. Business, Item 1A. Risk Factors, Item 3. Legal Proceedings, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 7A. Quantitative and Qualitative Disclosures About Market Risk, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical fact included or incorporated by reference in this report are forward-looking statements, including without limitation statements regarding: our operational, financial and growth strategies, ability to successfully effect those strategies and the expected results therefrom; our 2015 capital, investment and exploration budget and the planned allocation thereof; planned capital expenditures and the impact thereof; planned activities, including drilling plans and projects, planned wells, rig count, inventory, seismic, exploration plans and maintenance activities, and the expected timing and impact thereof; expectations regarding future economic and market conditions and the effects on us thereof; our financial and operational outlook, and ability to fulfill that outlook; our financial position, balance sheet, liquidity and capital resources, and the benefits thereof; resource and asset quality and the expected benefits and performance thereof; reserve estimates and growth expectations; future production and sales expectations, and the drivers thereof; and statements related to enhanced completion designs, downspacing, co-development, high-density pilots, and the expected benefits and results thereof. In addition, many forward-looking statements may be identified by the use of forward-looking terminology such as "anticipates," "believes," "estimates," "expects," "targets," "plans," "projects," "could," "may," "should," "would" or similar words indicating that future outcomes are uncertain. While we believe that our assumptions concerning future events are reasonable, we can give no assurance that these expectations will prove to be correct. A number of factors could cause results to differ materially from those indicated by such forward-looking statements including, but not limited to:

- conditions in the oil and gas industry, including the level of supply or demand for crude oil and condensate, NGLs, natural gas and synthetic crude oil and the impact on the price of crude oil and condensate, NGLs, natural gas and synthetic crude oil;

- changes in political or economic conditions in key operating markets, including international markets;

- the amount of capital available for exploration and development;

- timing of commencing production from new wells;

- drilling rig availability;

- availability of materials and labor;

- the inability to obtain or delay in obtaining necessary government or third-party approvals and permits;

- non-performance by third parties of their contractual obligations;

- unforeseen hazards such as weather conditions, acts of war or terrorist acts and the governmental or military response thereto;

- cyber-attacks adversely affecting our operations;

- changes in safety, health, environmental and other regulations;

- other geological, operating and economic considerations; and

- other factors discussed in Item 1. Business, Item 1A. Risk Factors, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7A. Quantitative and Qualitative Disclosures About Market Risk, and elsewhere in this report.

All forward-looking statements included in this report are based on information available to us on the date of this report. Except as required by law, we assume no duty to revise or update any forward-looking statements whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained throughout this report.

**PART I**

**Item 1. Business**

**General**

Marathon Oil Corporation is a global energy company based in Houston, Texas, with operations in North America, Europe and Africa. Our corporate headquarters are located at 5555 San Felipe Street, Houston, Texas 77056-2723 and our telephone number is (713) 629-6600. Each of our three reportable operating segments is organized based upon both geographic location and the nature of the products and services it offers.

• North America E&P - explores for, produces and markets crude oil and condensate, NGLs and natural gas in North America;

• International E&P - explores for, produces and markets crude oil and condensate, NGLs and natural gas outside of North America and produces and markets products manufactured from natural gas, such as LNG and methanol, in E.G.; and

• Oil Sands Mining - mines, extracts and transports bitumen from oil sands deposits in Alberta, Canada, and upgrades the bitumen to produce and market synthetic crude oil and vacuum gas oil.

We were incorporated in 2001. On June 30, 2011, we completed the spin-off of our downstream business, creating two independent energy companies: Marathon Oil and MPC.

**Strategy and Results Summary**

We have production operations in the U.S., E.G., Canada, the U.K. and Libya. The focus of our U.S. operations is our three core unconventional resource plays: the Eagle Ford, Bakken and Oklahoma Resource Basins. Our exploration prospects are in E.G., Ethiopia, Gabon, Kenya, the Kurdistan Region of Iraq and the U.S, primarily in the Gulf of Mexico. Our strategy is guided by the following seven strategic imperatives ("SI⁷"):

1. Living Our Values

2. Investing in Our People

3. Continuous Improvement in Operational and Capital Efficiency

4. Driving Profitable and Sustainable Growth

5. Rigorous Portfolio Management

6. Quality and Material Resource Capture

7. Delivering Long-Term Shareholder Value

In 2014, we continued to focus on liquid hydrocarbon reserves, realizing substantial increases in our three unconventional resource plays, the Eagle Ford, Bakken and Oklahoma Resource Basins. In 2014, our U.S. operations added 288 mmboe proved reserves, excluding acquisitions, dispositions and production, amounting to an increase of 37 percent over the prior year's ending balance.

For the total company, we ended 2014 with proved reserves of approximately 2,198 mmboe, compared to 2,171 mmboe at the end of 2013. Excluding proved reserves of 106 mmboe related to our Angola and Norway discontinued operations, proved reserves related to continuing operations increased from 2,065 mmboe at the end of 2013 to 2,198 mmboe at the end of 2014 for an increase of 6 percent.

We continually evaluate ways to optimize our portfolio through acquisitions and divestitures. In 2014, we executed two strategic dispositions for aggregate cash proceeds of more than $4 billion. We closed the sale of our Angola assets in the first quarter and our Norway business in the fourth quarter.

During 2014, we repurchased approximately 29 million shares for $1 billion. Our cash additions to property, plant and equipment related to continuing operations were $5.2 billion, primarily funded with cash flow from operations, with more than 70 percent of that related to our Eagle Ford, Bakken and Oklahoma Resource Basins where net sales volumes increased 35 percent year-over-year.

5

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Outlook, for discussion of our 2015 Budget.

The map below shows the locations of our worldwide operations.



## Segment and Geographic Information

For operating segment and geographic financial information, see Item 8. Financial Statements and Supplementary Data - Note 7 to the consolidated financial statements.

In the following discussion regarding our North America E&P, International E&P and Oil Sands Mining segments, references to net wells, acres, sales or investment indicate our ownership interest or share, as the context requires.

## North America E&P Segment

We are engaged in oil and gas exploration, development and/or production activities in the U.S. and Canada.

### *Unconventional Resource Plays*

*Eagle Ford* - As of December 31, 2014, we had approximately 180,000 net acres in the Eagle Ford in south Texas and 954 gross (714 net) operated producing wells, where we have been operating since 2011. During 2014, we reached total depth on 360 gross operated wells and brought 310 gross operated wells to sales, compared to 299 reaching total depth and 307 brought to sales in 2013. Included with the Eagle Ford well counts noted above, were 22 gross operated Austin Chalk wells brought online in 2014 and the first four Upper Eagle Ford wells which were brought online late in the fourth quarter of 2014. Our 2014 average spud-to-TD time was 13 days compared to 12 days in 2013. Our high-density pad drilling continues to average approximately four wells per pad in 2014. This higher pad density and the longer laterals being drilled in 2014 contribute to the slightly higher spud-to-TD time in 2014.

Throughout 2013, we evaluated the potential of downspacing to 40-acre and 60-acre spacing with several pilot programs. Wells drilled in these programs at closer spacing showed improved completion efficiency which helped offset impacts due to tighter well spacing. The continued focus on stimulation design has contributed to incremental improvements in well performance across our area of activity.

Eagle Ford net sales in 2014 were 112 mboed, 65 percent crude oil and condensate, 17 percent NGLs and 18 percent natural gas, compared to 81 mboed in 2013, a 38 percent increase. In 2014, we transported approximately 70 percent of our

6

Eagle Ford production by pipeline and anticipate this to increase to 90 percent in 2015 as additional pipeline capacity is constructed and completed. The ability to transport more barrels by pipeline enables us to improve/optimize price realizations, reduce costs, improve reliability and lessen our environmental footprint.

During 2014, we continued evaluation of the Austin Chalk formation across our Eagle Ford acreage position in south Texas, delineating 18,000 initial Austin Chalk acres and bringing online 22 wells. Initial Austin Chalk production results indicate that the mix of crude oil and condensate, NGLs and natural gas is similar to Eagle Ford condensate wells. We plan to drill 56 to 62 additional gross wells in the Austin Chalk formation in 2015. Co-development of the Austin Chalk and Lower Eagle Ford will leverage the infrastructure investments we have made to support production growth across the Eagle Ford operating area. During the fourth quarter of 2014, the first four Upper Eagle Ford wells were brought online and we spud our first four-well pilot with Austin Chalk, Upper Eagle Ford, and two Lower Eagle Ford wells.

We operate approximately 800 miles of gathering pipeline in the Eagle Ford area. We now have 31 central gathering and treating facilities, with aggregate capacity of more than 460 mboed. We also own and operate the Sugarloaf gathering system, a 37-mile natural gas pipeline through the heart of our acreage in Karnes, Atascosa, and Bee Counties of south Texas.

Approximately 40 percent of our 2015 Budget, $1.4 billion, is allocated to the Eagle Ford. Our drilling plans for 2015 include drilling 141 - 152 net wells (245 - 260 gross, of which we will operate 215 - 225), a decrease of approximately 40 percent over 2014. We anticipate bringing 255 - 275 gross operated wells to sales during 2015.

*Bakken* - We hold approximately 290,000 net acres in the Bakken shale oil play in North Dakota and eastern Montana, where we have been operating since 2006. Since inception, we have continuously sought improvement in efficiency and well performance through optimizing completion techniques. We began high-density spacing pilots in 2014, with each pad comprised of six Middle Bakken formation and six Three Forks first bench formation wells per drilling-spacing unit. We continue to execute an enhanced completion design pilot program, including elevated proppant volumes, hybrid slickwater fracs, increased stages and cemented liners, with 42 of the 55 tests online at the end of 2014.

Our time to drill a well averaged 17 days spud-to-TD in 2014 compared to 15 days in 2013. We reached TD on 83 gross operated wells and brought to sales 67 gross operated wells in 2014 compared to 76 reaching total depth and 77 brought to sales in 2013. We recompleted 35 wells during 2014.

Our net sales from the Bakken shale averaged 51 mboed in 2014, approximately 88 percent crude oil, 6 percent NGLs and 6 percent natural gas, compared to 39 mboed in 2013, a 31 percent increase. In efforts to optimize price realizations, we sell our production in local North Dakota markets and to select purchasers who may elect to transport outside the state.

Approximately 20 percent of our 2015 Budget, $760 million, is allocated to the Bakken. Our 2015 Bakken program includes plans to drill 42 - 53 net wells (100 - 120 gross, of which we will operate 38 - 48). We anticipate bringing 68 - 78 gross operated wells to sales during 2015.

*Oklahoma Resource Basins* - Our primary focus in 2015 will be in the SCOOP and STACK areas. In the SCOOP area we hold approximately 145,000 net acres with rights to the unconventional Woodford, Springer, Granite Wash and other Pennsylvanian sands plays. We also hold approximately 100,000 net acres in the STACK area with rights to the unconventional Woodford, Meramec and other Mississippian plays. These totals include over 50,000 acres added in the SCOOP and STACK areas in 2014. Though not a focus of the 2015 program, we also hold 57,000 net acres in the broader western Oklahoma Granite Wash and other Pennsylvanian sands plays.

In the SCOOP and STACK areas, we reached total depth on 17 gross operated wells and brought 18 gross operated wells to sales in 2014 compared to 10 reaching total depth and nine brought to sales in 2013. A total of nine net non-operated unconventional wells were brought to sales in 2014 compared to three in 2013.

Sales from our Oklahoma Resource Basins in 2014 were primarily from the Anadarko Woodford shale and averaged 18 mboed, approximately 16 percent crude oil, 28 percent NGLs and 56 percent natural gas, compared to 14 mboed in 2013, a 29 percent increase.

Approximately 6 percent of our 2015 Budget, $226 million, is allocated to the Oklahoma Resource Basins. Our drilling plans for the Oklahoma Resource Basins in 2015 include drilling and completing 17 - 20 net wells (41 - 50 gross of which 16 - 20 are company operated wells). We anticipate bringing 18 - 22 gross operated wells to sales during 2015.

See below for discussion of our conventional, primarily natural gas, production operations in Oklahoma.

*Other United States*

*Gulf of Mexico - Production* - On December 31, 2014, we held significant interests in 11 producing fields, four of which are company-operated. Average net sales in 2014 from the Gulf of Mexico were 14 mbbld of liquid hydrocarbons and 16 mmcfd of natural gas, or 17 mboed compared to 19 mboed in 2013. Operational availability for our operated properties was 96 percent, with internal unplanned losses of four percent.

We have a 65 percent operated working interest in the Ewing Bank Block 873 platform which is located 130 miles south of New Orleans, Louisiana. The platform serves as a production hub for the Lobster, Oyster and Arnold fields on Ewing Bank Blocks 873, 917 and 963. The facility also processes third-party production via subsea tie-backs.

We have a 50 percent non-operated working interest in the Petronius field on Viosca Knoll Blocks 786 and 830, located 130 miles southeast of New Orleans, which includes 15 producing wells. The Petronius platform is also capable of providing processing and transportation services to nearby third-party fields.

We hold a 30 percent non-operated working interest in the Neptune field located on Atwater Valley Block 575, 120 miles south off the coast of Louisiana. The development includes seven subsea wells tied back to a stand-alone platform. A new Neptune sidetrack well came online late December 2014.

We have an 18 percent non-operated working interest in the Gunflint field development located on Mississippi Canyon Blocks 948, 949, 992(N/2) and 993(N/2), 90 miles south off the coast of Louisiana. The discovery well was drilled in 2008 and encountered pay in the Middle Miocene reservoirs. Two subsequent appraisal wells were drilled and evaluated in 2012 and 2013. The subsea tie-back development project will continue to progress in 2015, with first oil expected in 2016.

*Gulf of Mexico - Exploration -* We have a 3-year shared contract on the Maersk Valiant drillship and plan to utilize the rig to test prospects in the Gulf of Mexico, including one operated exploration well in 2015. As we evaluate various opportunities for drilling, we may seek partners to further reduce our exploration risk on individual projects.

A deepwater oil discovery on the Shenandoah prospect, located on Walker Ridge Block 52, was drilled in 2009. We own a 10 percent non-operated working interest in this prospect. The first appraisal well on the Shenandoah prospect reached total depth in 2013 and was successful. The second appraisal well was spud in late May 2014 and the well costs incurred through December 31, 2014 were expensed in the fourth quarter of 2014. A third appraisal well is anticipated to spud on Walker Ridge Block 51 in 2015.

In the fourth quarter of 2014, we drilled two exploratory wells in the Gulf of Mexico: one on the Key Largo prospect, located on Walker Ridge Block 578, in which we have a 60 percent working interest and one on the Perseus prospect, located on Desoto Canyon Block, in which we have a 30 percent non-operated working interest. Neither well encountered commercial hydrocarbons and the well costs incurred through December 31, 2014 were charged to dry well expense. We have no further plans to explore either prospect.

*Oklahoma* - We have long-established operated and non-operated conventional production in several Oklahoma fields from which sales averaged 8 mboed in 2014 and 9 mboed in 2013.

*Texas/North Louisiana/New Mexico* - We hold approximately 242,000 net acres in these areas of which approximately 20,000 of the acres are in the Haynesville and Bossier natural gas shale plays. Most of the acreage in these shale plays is held by production. We participated in one gross non-operated well in the Haynesville shale play during 2014. Conventional production was primarily from the Mimms Creek, Pearwood and Haynesville fields in 2014, with net sales averaging 5 mboed in both 2014 and 2013. We also participate in several non-operated Permian Basin fields in west Texas and New Mexico. Net sales from this area averaged 7 mboed in 2014.

*Wyoming* - We have ongoing enhanced oil recovery waterflood projects at the mature Bighorn Basin and Wind River Basin fields and at our 100 percent owned and operated Pitchfork field. We have conventional natural gas operations in the Greater Green River Basin. Operated production at the Powder River Basin field ceased in March 2014, and plug and abandonment activities were substantially complete as of December 31, 2014.

Our Wyoming net sales averaged 16 mbbld of liquid hydrocarbons and 11 mmcfd of natural gas, or 18 mboed, during 2014 compared to 22 mboed in 2013. We drilled 11 gross operated development wells in Wyoming in 2014. In addition, we own and operate the 420-mile Red Butte Pipeline. This crude oil pipeline connects Silvertip Station on the Montana/Wyoming state line to Casper, Wyoming.

8

*Canada*

We hold interests in both operated and non-operated exploration stage oil sand leases in Alberta, Canada, which would be developed using in-situ methods of extraction. These leases cover approximately142,000 gross (54,000 net) acres in four project areas: Namur, in which we hold a 70 percent operated interest; Birchwood, in which we hold a 100 percent operated interest; Ells River, in which we hold a 20 percent non-operated interest; and Saleski in which we hold a 33 percent non-operated interest.

During 2012, we submitted a regulatory application relating to our Canada in-situ assets at Birchwood, for a proposed 12 mbbld steam assisted gravity drainage ("SAGD") demonstration project. We expect to receive regulatory approval for this project by the end of 2015. Upon receiving this approval, we will further evaluate our development plans.

*North America E&P--Acquisitions*

In an asset acquisition that closed August 2014, we added acreage to our Oklahoma Resource Basins at a cost of approximately $80 million before final settlement adjustments.

In the fourth quarter of 2014, we acquired additional acreage in the SCOOP, at a cost of approximately $60 million before final settlement adjustments.

## International E&P Segment

We are engaged in oil and gas exploration, development and/or production activities in E.G., Ethiopia, Gabon, Kenya, the Kurdistan Region of Iraq, Libya and the U.K. We include the results of our natural gas liquefaction operations and methanol production operations in E.G. in our International E&P segment.

*Africa*

*Equatorial Guinea - Production* - We own a 63 percent operated working interest under a PSC in the Alba field which is offshore E.G. During 2014, E.G. net liquid hydrocarbon sales averaged 31 mbbld and net natural gas sales averaged 439 mmcfd, or 104 mboed, compared to 107 mboed in 2013. Operational availability from our company-operated facilities averaged approximately 98 percent in 2014, with internal unplanned losses of one percent. A compression project designed to maintain the production plateau two additional years and extend field life up to eight years is underway and is expected to be operational in 2016.

Dry natural gas from the Alba field, which remains after the condensate and LPG are removed by Alba Plant LLC, as discussed below, is supplied to AMPCO and EGHoldings under long-term contracts at fixed prices. Because of the location and limited local demand for natural gas in E.G., we consider the prices under the contracts with Alba Plant LLC, EGHoldings and AMPCO to be comparable to the price that could be realized from transactions with unrelated parties in this market under the same or similar circumstances. Any dry gas not sold is returned offshore and reinjected into the Alba field for later production.

*Equatorial Guinea - Exploration* - We hold a 63 percent operated working interest in the Deep Luba discovery on the Alba Block and an 80 percent operated working interest in the Corona well on Block D. We plan to develop Block D through a unitization with the Alba field, which is currently being negotiated. We also have an 80 percent operated working interest in exploratory Block A-12 offshore Bioko Island, located immediately west of our operated Alba Field. The Sodalita West #1 exploratory well was spud during 2014 and reached total depth in February 2015. This well did not encounter commercial hydrocarbons and well costs incurred through December 31, 2014 were charged to dry well expense in the fourth quarter of 2014. A second exploratory well and one Alba field infill well are expected to be drilled in 2015.

*Equatorial Guinea - Gas Processing* - We own a 52 percent interest in Alba Plant LLC, an equity method investee, that operates an onshore LPG processing plant located on Bioko Island. Alba field natural gas is processed by the LPG plant. Under a long-term contract at a fixed price per btu, the LPG plant extracts secondary condensate and LPG from the natural gas stream and uses some of the remaining dry natural gas in its operations. During 2014, the gross quantity of natural gas supplied to the LPG production facility was 856 mmcfd, from which 6 mbbld of secondary condensate and 19 mbbld of LPG were produced by Alba Plant LLC.

We also own 60 percent of EGHoldings and 45 percent of AMPCO, both of which are accounted for as equity method investments. EGHoldings operates an LNG production facility and AMPCO operates a methanol plant, both located on Bioko Island. These facilities allow us to monetize natural gas reserves from the Alba field.

EGHoldings' 3.7 mmta LNG production facility sells LNG under a 3.4 mmta, or 460 mmcfd, sales and purchase agreement through 2023. The purchaser under the agreement takes delivery of the LNG on Bioko Island, with pricing linked principally to the Henry Hub index. Gross sales of LNG from this production facility totaled 4 mmta in 2014. Operational availability was 98 percent in 2014, including a planned turnaround, while internal unplanned losses were less than one percent.

9

AMPCO had gross sales totaling 885 mt in 2014. Operational availability for this methanol plant was 90 percent in 2014, and internal unplanned losses were ten percent. Production from the plant is used to supply customers in Europe and the U.S.

*Libya* - We hold a 16 percent non-operated working interest in the Waha concessions, which encompass almost 13 million gross acres located in the Sirte Basin of eastern Libya. Beginning in the third quarter of 2013, our Libya operations were impacted by third-party labor strikes at the Es Sider oil terminal. In early July 2014, Libya's National Oil Corporation rescinded force majeure associated with the third-party labor strikes, and our concession term was extended for slightly more than one year. Although we had five liftings during 2014, in December 2014, Libya's National Oil Corporation once again declared force majeure at Es Sider as disruptions from civil unrest continue. Considerable uncertainty remains around the timing of future production and sales levels. We and our partners in the Waha concessions continue to assess the situation and the condition of our assets in Libya. See Item 8. Financial Statements and Supplementary Data - Note 12 to the consolidated financial statements for additional information about our Libya operations.

*Gabon - Exploration* - We hold a 21.25 percent non-operated working interest in the Diaba License G4-223 and its related permit offshore Gabon, which covers approximately 2.2 million gross (477,000 net) acres. The Diaman-1B well reached total depth in the third quarter of 2013, encountering 160-180 net feet of hydrocarbon pay in the deepwater pre-salt play. Analysis confirmed dry gas accumulation with minor condensate. Multiple additional pre-salt prospects have been identified on this License. In 2014, 3D seismic acquisition was completed in the western part of the block.

In August 2014, we signed an exploration and production sharing contract for Gabon offshore Block G13, which was subsequently re-named Tchicuate. The block, which is located in the pre-salt play offshore Gabon, encompasses 277,000 acres. The seismic program is expected to be completed in the second quarter of 2015, and processing will occur through the remainder of the year. We hold a 100 percent participating interest and operatorship in the block. In the event of development, the Republic of Gabon will assume a 20 percent financed interest in the contract upon commencement of production. The State holds additional rights to participate in the block in the future as a co-investor.

*Kenya - Exploration* - We hold a 50 percent non-operated working interest in Block 9, consisting of approximately 3.9 million gross (1.9 million net) acres in northwest Kenya. The Sala-1 exploration well was spud in February 2014 on the eastern side of Block 9 and made a natural gas discovery in the second quarter of 2014. The well was drilled to a total depth of approximately 10,000 feet, and analysis indicated three zones of interest over a 3,280-foot gross interval which were subsequently drill-stem tested. The Sala-2 appraisal well spud in the third quarter of 2014, but did not encounter commercial hydrocarbons, and the well costs were charged to dry well expense. We hold a 50 percent non-operated working interest in Block 9 with the option to operate any commercial development.

We also hold a 15 percent non-operated working interest in Block 12A, covering approximately 3.8 million gross (566,000 net) acres, which is also located in northwest Kenya. The acquisition of 2D seismic on Block 12A began in 2013 and was completed in 2014. Multiple prospects have been identified and the first exploratory well is anticipated to be drilled in late 2015.

*Ethiopia - Exploration* - We hold a 20 percent non-operated working interest in the onshore South Omo Block in Ethiopia. The concession has an area of approximately 5.4 million gross (1.1 million net) acres. Two wells were drilled on the South Omo Block in 2014: the Shimela-1 well, which reached total depth in May 2014, and the Gardim-1 well, which reached total depth in July 2014. Neither well encountered commercial hydrocarbons and the well costs were charged to dry well expense during 2014.

We have a 50 percent non-operated working interest in the Rift Basin Area Block with approximately 10.5 million gross acres. We began 2D seismic acquisition in the first quarter of 2015 in order to develop prospect inventory for a future drilling program. We have the option to operate if a discovery is made.

*Other* - An outbreak of the Ebola virus has existed in certain regions of West Africa (Guinea, Liberia, Sierra Leone) since late 2013. Although neither E.G. nor any other African country in which we have business activities has been impacted by Ebola to date, our business operations may be adversely affected through travel or other restrictions. We continue to monitor the situation, have enhanced our emergency response plans to address any potential impact, and are working closely with appropriate external parties to maintain business continuity and the health and well-being of our staff.

**Other International**

*United Kingdom* - Net sales from the U.K. averaged 11 mbbld of liquid hydrocarbons and 28 mmcfd of natural gas, or 16 mboed, in 2014 compared to 20 mboed in 2013. Our largest asset in the U.K. sector of the North Sea is the Brae area complex where we are the operator and have a 42 percent working interest in the South, Central, North and West Brae fields and a 39 percent working interest in the East Brae field. The Brae Alpha platform and facilities host the South, Central and West Brae fields. The North Brae and East Brae fields are natural gas condensate fields which are produced via the Brae Bravo and the East Brae platforms, respectively. The East Brae platform also hosts the nearby Braemar field in which we have a 28 percent

10

working interest. Operational availability in 2014 for the Brae complex was 90 percent and internal unplanned losses were nine percent. We brought two South Brae infill wells online late in the second half of 2014 and plan to complete two West Brae subsea wells and one additional South Brae infill well in 2015.

The strategic location of the Brae platforms, along with pipeline and onshore infrastructure, has generated third-party processing and transportation business since 1986. Currently, the operators of 31 third-party fields are contracted to use the Brae system and 72 mboed are being processed or transported through the Brae infrastructure. In addition to generating processing and pipeline tariff revenue, this third-party business optimizes infrastructure usage.

The working interest owners of the Brae area producing assets collectively own a 50 percent non-operated interest in the SAGE system. The SAGE pipeline transports natural gas from the Brae area, and the third-party Beryl area, and has a total wet natural gas capacity of 1.1 bcf per day. The SAGE terminal at St. Fergus in northeast Scotland processes natural gas from the SAGE pipeline as well as approximately 1 bcf per day of third-party natural gas.

We own non-operated working interests in the Foinaven area complex, consisting of a 28 percent working interest in the main Foinaven field, a 47 percent working interest in East Foinaven and a 20 percent working interest in the T35 and T25 fields. The export of Foinaven liquid hydrocarbons is via shuttle tanker from an FPSO to market. All natural gas sales are to the non-operated Magnus platform for use as injection gas.

*Croatia* - We were awarded, as part of a consortium, seven blocks located offshore in the Adriatic Sea, subject to negotiation of a PSC with the Croatian Government. We have a 60 percent interest in the consortium.

*Kurdistan Region of Iraq* - In aggregate, we have approximately 109,000 net acres in the Kurdistan Region of Iraq. We have a 45 percent operated working interest in the Harir block located northeast of Erbil. For a short time in 2014, we suspended certain operations due to security concerns in the region and continue to closely monitor the situation. We also have non-operated interests in two blocks located north-northwest of Erbil: Atrush with 15 percent working interest and Sarsang with 20 percent working interest.

On the non-operated Atrush block, following the successful appraisal program and a declaration of commerciality, the Kurdistan Ministry of Natural Resources approved a plan for field development in September 2013. The development project consists of drilling three production wells and constructing a central processing facility in Phase 1 which provides for a 25-year production period. We expect first production in late 2015 with estimated initial gross production of approximately 30 mbbld of oil. Subject to further drilling and testing results, and partner and government approvals, a potential Phase 2 development could add an additional gross 30 mbbld facility. The Atrush-3 appraisal well, within the potential Phase 2 development area approximately four miles east of existing wells, confirmed the extension of the oil bearing reservoirs in 2013 and has been suspended as a potential future producer.

On the non-operated Sarsang block, the Swara Tika discovery was declared commercial in May 2014 and a field development plan was filed in June 2014. Currently, the East Swara Tika-1 exploration well is being sidetracked up-dip. Discussions are ongoing with the Ministry of Natural Resources to finalize the Swara Tika field development plan.

On the operated Harir block, we spud the Mirawa-2 appraisal well in December 2014 which is expected to reach total depth in the second quarter of 2015. In December 2014, we announced the Jisik-1 discovery and in 2013, the Mirawa-1 discovery. Both the Jisik-1 and Mirawa-1 exploratory wells had discovered multiple stacked oil and natural gas producing zones, and have been suspended for potential future use as producing wells.

### *Acquisitions and Dispositions*

In the fourth quarter of 2014, we closed the sale of our Norway business, including the operated Alvheim FPSO, 10 operated licenses and a number of non-operated licenses on the Norwegian Continental Shelf in the North Sea, with an effective date of January 1, 2014 for proceeds of approximately $2.1 billion.

In the first quarter of 2014, we closed the sales of our 10 percent non-operated working interests in the Production Sharing Contracts and Joint Operating Agreements for Angola Blocks 31 and 32 for aggregate proceeds of approximately $2 billion. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements for additional information about these dispositions, including discontinued operations presentation.

11

**Productive and Drilling Wells**

For our North America E&P and International E&P segments and discontinued operations combined, the following tables set forth gross and net productive wells and service wells as of December 31, 2014, 2013 and 2012 and drilling wells as of December 31, 2014.

| | Productive Wells[a] | | | | Service Wells | | Drilling Wells | |
| | Oil | | Natural Gas | | | | | |
| | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | &sbsp; | | |
| U.S. | 7,058 | 2,919 | 2,246 | 1,023 | 2,638 | 760 | 45 | 25 |
| E.G. | - | - | 16 | 11 | 2 | 1 | - | - |
| Other Africa | 1,071 | 175 | 7 | 1 | 94 | 16 | 3 | 1 |
| Total Africa | 1,071 | 175 | 23 | 12 | 96 | 17 | 3 | 1 |
| Other International | 55 | 20 | 39 | 16 | 24 | 8 | 6 | 2 |
| Total | 8,184 | 3,114 | 2,308 | 1,051 | 2,758 | 785 | 54 | 28 |
| **2013** | | | | | | | | |
| U.S. | 6,632 | 2,568 | 2,763 | 1,482 | 2,349 | 744 | | |
| E.G. | - | - | 16 | 11 | 2 | 1 | | |
| Other Africa | 1,072 | 175 | 7 | 1 | 99 | 16 | | |
| Total Africa | 1,072 | 175 | 23 | 12 | 101 | 17 | | |
| Other International | 77 | 34 | 40 | 16 | 28 | 11 | | |
| Total | 7,781 | 2,777 | 2,826 | 1,510 | 2,478 | 772 | | |
| **2012** | | | | | | | | |
| U.S. | 6,191 | 2,315 | 3,208 | 1,906 | 2,328 | 736 | | |
| E.G. | - | - | 14 | 9 | 4 | 3 | | |
| Other Africa | 1,050 | 171 | 6 | 1 | 101 | 16 | | |
| Total Africa | 1,050 | 171 | 20 | 10 | 105 | 19 | | |
| Other International | 77 | 34 | 40 | 16 | 28 | 11 | | |
| Total | 7,318 | 2,520 | 3,268 | 1,932 | 2,461 | 766 | | |

[a] Of the gross productive wells, wells with multiple completions operated by us totaled 31, 31 and 115 as of December 31, 2014, 2013 and 2012. Information on wells with multiple completions operated by others is unavailable to us.

12

**Drilling Activity**

For our North America E&P and International E&P segments and discontinued operations combined, the following table sets forth, by geographic area, the number of net productive and dry development and exploratory wells completed in each of the last three years.

| | Development | | | | Exploratory | | | | |
| | Oil | Natural Gas | Dry | Total | Oil | Natural Gas | Dry | Total | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 2014** | | | | | | | | | |
| U.S. | 253 | 43 | 1 | 297 | 49 | 19 | 4 | 72 | 369 |
| Africa | 1 | - | - | 1 | - | - | 2 | 2 | 3 |
| Other International | 1 | - | - | 1 | - | - | - | - | 1 |
| Total | 255 | 43 | 1 | 299 | 49 | 19 | 6 | 74 | 373 |
| **Year Ended December 31, 2013** | | | | | | | | | |
| U.S. | 237 | 20 | - | 257 | 73 | 13 | 3 | 89 | 346 |
| Africa | 4 | - | - | 4 | 1 | - | 2 | 3 | 7 |
| Other International | - | - | - | - | - | - | 3 | 3 | 3 |
| Total | 241 | 20 | - | 261 | 74 | 13 | 8 | 95 | 356 |
| **Year Ended December 31, 2012** | | | | | | | | | |
| U.S. | 172 | 21 | 2 | 195 | 117 | 13 | 9 | 139 | 334 |
| Africa | 4 | - | - | 4 | 1 | - | - | 1 | 5 |
| Other International | 3 | - | - | 3 | - | - | - | - | 3 |
| Total | 179 | 21 | 2 | 202 | 118 | 13 | 9 | 140 | 342 |

**Acreage**

We believe we have satisfactory title to our North America E&P and International E&P properties in accordance with standards generally accepted in the industry; nevertheless, we can be involved in title disputes from time to time which may result in litigation. In the case of undeveloped properties, an investigation of record title is made at the time of acquisition. Drilling title opinions are usually prepared before commencement of drilling operations. Our title to properties may be subject to burdens such as royalty, overriding royalty, carried, net profits, working and other similar interests and contractual arrangements customary in the industry. In addition, our interests may be subject to obligations or duties under applicable laws or burdens such as net profits interests, liens related to operating agreements, development obligations or capital commitments under international PSCs or exploration licenses.

The following table sets forth, by geographic area, the gross and net developed and undeveloped acreage held in our North America E&P and International E&P segments combined as of December 31, 2014.

| (In thousands) | Developed | | Undeveloped | | Developed and Undeveloped | |
| | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|
| U.S. | 1,822 | 1,408 | 1,036 | 865 | 2,858 | 2,273 |
| Canada | - | - | 142 | 54 | 142 | 54 |
| Total North America | 1,822 | 1,408 | 1,178 | 919 | 3,000 | 2,327 |
| E.G. | 45 | 29 | 183 | 164 | 228 | 193 |
| Other Africa | 12,909 | 2,108 | 26,145 | 9,612 | 39,054 | 11,720 |
| Total Africa | 12,954 | 2,137 | 26,328 | 9,776 | 39,282 | 11,913 |
| Other International | 94 | 33 | 346 | 110 | 440 | 143 |
| Total | 14,870 | 3,578 | 27,852 | 10,805 | 42,722 | 14,383 |

13

In the ordinary course of business, based on our evaluations of certain geologic trends and prospective economics, we have allowed certain lease acreage to expire and may allow additional acreage to expire in the future. If production is not established or we take no other action to extend the terms of the leases, licenses, or concessions, undeveloped acreage listed in the table below will expire over the next three years. We plan to continue the terms of many of these licenses and concession areas or retain leases through operational or administrative actions.

| | Net Undeveloped Acres Expiring | | |
| | Year Ended December 31, | | |
| (In thousands) | 2015 | 2016 | 2017 |
|---|---|---|---|
| U.S. | 211 | 150 | 94 |
| E.G. | 36 | - | - |
| Other Africa | 1,950 | 1,502 | 1,089 |
| Total Africa | 1,986 | 1,502 | 1,089 |
| Other International | 88 | - | - |
| Total | 2,285 | 1,652 | 1,183 |

**Oil Sands Mining Segment**

We hold a 20 percent non-operated interest in the AOSP, an oil sands mining and upgrading joint venture located in Alberta, Canada. The joint venture produces bitumen from oil sands deposits in the Athabasca region utilizing mining techniques and upgrades the bitumen to synthetic crude oils and vacuum gas oil.

The AOSP's mining and extraction assets are located near Fort McMurray, Alberta, and include the Muskeg River and the Jackpine mines. Gross design capacity of the combined mines is 255,000 (51,000 net to our interest) barrels of bitumen per day. The AOSP operations use established processes to mine oil sands deposits from an open-pit mine, extract the bitumen and upgrade it into synthetic crude oils. Ore is mined using traditional truck and shovel mining techniques. The mined ore passes through primary crushers to reduce the ore chunks in size and is then sent to rotary breakers where the ore chunks are further reduced to smaller particles. The particles are combined with hot water to create slurry. The slurry moves through the extraction process where it separates into sand, clay and bitumen-rich froth. A solvent is added to the bitumen froth to separate out the remaining solids, water and heavy asphaltenes. The solvent washes the sand and produces clean bitumen that is required for the upgrader to run efficiently. The process yields a mixture of solvent and bitumen which is then transported from the mine to the Scotford upgrader via the approximately 300-mile Corridor Pipeline.

The AOSP's Scotford upgrader is located at Fort Saskatchewan, northeast of Edmonton, Alberta. The bitumen is upgraded at Scotford using both hydrotreating and hydroconversion processes to remove sulfur and break the heavy bitumen molecules into lighter products. Blendstocks acquired from outside sources are utilized in the production of our saleable products. The upgrader produces synthetic crude oils and vacuum gas oil. The vacuum gas oil is sold to an affiliate of the operator under a long-term contract at market-related prices, and the other products are sold in the marketplace.

As of December 31, 2014, we own or have rights to participate in developed and undeveloped leases totaling approximately 163,000 gross (33,000 net) acres. The underlying developed leases are held for the duration of the project, with royalties payable to the province of Alberta. Synthetic crude oil sales volumes for 2014 averaged 50 mbbld and net-of-royalty production was 41 mbbld.

In December 2013, a Jackpine mine expansion project received conditional approval from the Canadian government. The project includes additional mining areas, associated processing facilities and infrastructure. The government conditions relate to wildlife, the environment and aboriginal health issues. We will evaluate the potential expansion project and government conditions after infrastructure reliability initiatives are completed.

The governments of Alberta and Canada have agreed to partially fund Quest CCS for $865 million Canadian. In the third quarter of 2012, the Energy and Resources Conservation Board ("ERCB"), Alberta's primary energy regulator at that time, conditionally approved the project and the AOSP partners approved proceeding to construct and operate Quest CCS. Government funding commenced in 2012 and continued as milestones were achieved during the development, construction and operating phases. Failure of the AOSP to meet certain timing, performance and operating objectives may result in repaying some of the government funding. Construction and commissioning of Quest CCS is expected to be completed by late 2015.

14

**Reserves**

*Estimated Reserve Quantities*

Reserves are disclosed by continent and by country if the proved reserves related to any geographic area, on an oil equivalent barrel basis, represent 15 percent or more of our total proved reserves. A geographic area can be an individual country, group of countries within a continent, or a continent. Other International ("Other Int'l"), includes the U.K. and the Kurdistan Region of Iraq. We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014, and both are shown as discontinued operations ("Disc Ops") for all periods presented. Approximately 76 percent of our proved reserves are located in OECD countries.

Our December 31, 2014 proved reserves were calculated using the unweighted average of closing prices for the first day of each month in 2014 within the 12-month period. The 2014 unweighted averages for certain of the benchmark prices were as follows:

- WTI crude oil - $94.99 per bbl

- Henry Hub natural gas - $4.31 per mmbtu

- Brent crude oil - $101.39 per bbl

When determining the December 31, 2014 proved reserves for each property, the benchmark prices listed above were adjusted with price differentials that account for property-specific quality and location differences. Beginning in the second half of 2014, the crude oil benchmarks began to decline and this decline continued into early 2015. In addition, the Henry Hub natural gas benchmark began to decline in late 2014 and continued its decline into 2015. Commodity prices are likely to remain volatile based on global supply and demand and could decline further. The January 2015 benchmark closing prices for the first day of the month were WTI crude oil of $52.69 per bbl, Henry Hub natural gas of $2.99 per mmbtu and Brent crude oil of $55.55 per bbl. Sustained reduced commodity prices could have a material effect on the quantity and future cash flows of our proved reserves. To the extent that we experience a sustained period of reduced commodity prices in 2015, there is a risk that a portion of our proved reserves could be deemed uneconomic and no longer be classified as proved. Estimates of future cash flows associated with proved reserves are based on actual costs of developing and producing the reserves as of the end of the year. The decline in commodity prices experienced in the second half of 2014 has resulted in a reduction in the costs of developing and producing reserves. The impact of sustained reduced commodity prices on future cash flows will be partially offset by the impact of lower costs.

A sustained period of lower commodity prices could also cause us to decrease our near term capital programs and defer investment until prices improve. A shifting of capital expenditures into future periods outside of five years from the initial proved reserve booking could potentially lead to a reduction in proved undeveloped reserves. See Item 1A. Risk Factors for a further discussion of how a substantial extended decline in commodity prices could impact us.

The most significant increase in total proved reserves from 2013 to 2014 related to our U.S. unconventional shale plays, while sales of reserves in place related to our Norway and Angola discontinued operations were the largest decreases in 2014 proved reserves. Excluding discontinued operations, total proved reserves related to continuing operations increased 133 mmboe primarily due to drilling programs in our U.S. unconventional shale plays and additions in E.G. and the Kurdistan Region of Iraq, offset by production. In the U.S., we added 288 mmboe in 2014, excluding purchases and sales of reserves in place and production, amounting to an increase of 37 percent over the 2013 ending balance, mainly due to downspacing, drilling activity and improved well performance. The negative 55 mmboe revision to Canadian synthetic crude oil reserves primarily reflects the impact of technical and price changes on calculated royalty volumes as well as development plan changes in the mineable areas. See Item 8. Financial Statements and Supplementary Data - Supplementary Information on Oil and Gas Producing Activities for more information.

The following tables set forth estimated quantities of our proved crude oil and condensate, NGL, natural gas and synthetic crude oil reserves based upon an unweighted average of closing prices for the first day of each month in the 12-month periods ended December 31, 2014, 2013 and 2012.

15

| December 31, 2014 | North America | | | Africa | | | Other Int'l | Cont Ops | Disc Ops | Total |
| | U.S. | Canada | Total | E.G. | Other | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Proved Developed Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 294 | - | 294 | 30 | 175 | 205 | 19 | 518 | - | 518 |
| Natural gas liquids *(mmbbl)* | 68 | - | 68 | 15 | - | 15 | - | 83 | - | 83 |
| Natural gas *(bcf)* | 575 | - | 575 | 664 | 94 | 758 | 17 | 1,350 | - | 1,350 |
| Synthetic crude oil *(mmbbl)* | - | 644 | 644 | - | - | - | - | 644 | - | 644 |
| Total proved developed reserves *(mmboe)* | 458 | 644 | 1,102 | 155 | 191 | 346 | 22 | 1,470 | - | 1,470 |
| **Proved Undeveloped Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 340 | - | 340 | 27 | 33 | 60 | 10 | 410 | - | 410 |
| Natural gas liquids *(mmbbl)* | 93 | - | 93 | 15 | - | 15 | 1 | 109 | - | 109 |
| Natural gas *(bcf)* | 569 | - | 569 | 541 | 115 | 656 | 5 | 1,230 | - | 1,230 |
| Synthetic crude oil *(mmbbl)* | - | 4 | 4 | - | - | - | - | 4 | - | 4 |
| Total proved undeveloped reserves *(mmboe)* | 528 | 4 | 532 | 133 | 52 | 185 | 11 | 728 | - | 728 |
| **Total Proved Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 634 | - | 634 | 57 | 208 | 265 | 29 | 928 | - | 928 |
| Natural gas liquids *(mmbbl)* | 161 | - | 161 | 30 | - | 30 | 1 | 192 | - | 192 |
| Natural gas *(bcf)* | 1,144 | - | 1,144 | 1,205 | 209 | 1,414 | 22 | 2,580 | - | 2,580 |
| Synthetic crude oil *(mmbbl)* | - | 648 | 648 | - | - | - | - | 648 | - | 648 |
| Total proved reserves *(mmboe)* | 986 | 648 | 1,634 | 288 | 243 | 531 | 33 | 2,198 | - | 2,198 |

| December 31, 2013 | North America | | | Africa | | | Other Int'l | Cont Ops | Disc Ops | Total |
| | U.S. | Canada | Total | E.G. | Other | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Proved Developed Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 241 | - | 241 | 37 | 176 | 213 | 19 | 473 | 77 | 550 |
| Natural gas liquids *(mmbbl)* | 51 | - | 51 | 18 | - | 18 | 1 | 70 | - | 70 |
| Natural gas *(bcf)* | 540 | - | 540 | 823 | 95 | 918 | 21 | 1,479 | 20 | 1,499 |
| Synthetic crude oil *(mmbbl)* | - | 674 | 674 | - | - | - | - | 674 | - | 674 |
| Total proved developed reserves *(mmboe)* | 382 | 674 | 1,056 | 193 | 192 | 385 | 23 | 1,464 | 80 | 1,544 |
| **Proved Undeveloped Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 256 | - | 256 | 27 | 39 | 66 | 6 | 328 | 14 | 342 |
| Natural gas liquids *(mmbbl)* | 68 | - | 68 | 16 | - | 16 | - | 84 | - | 84 |
| Natural gas *(bcf)* | 485 | - | 485 | 497 | 110 | 607 | 7 | 1,099 | 73 | 1,172 |
| Synthetic crude oil *(mmbbl)* | - | 6 | 6 | - | - | - | - | 6 | - | 6 |
| Total proved undeveloped reserves *(mmboe)* | 405 | 6 | 411 | 125 | 57 | 182 | 8 | 601 | 26 | 627 |
| **Total Proved Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 497 | - | 497 | 64 | 215 | 279 | 25 | 801 | 91 | 892 |
| Natural gas liquids *(mmbbl)* | 119 | - | 119 | 34 | - | 34 | 1 | 154 | - | 154 |
| Natural gas *(bcf)* | 1,025 | - | 1,025 | 1,320 | 205 | 1,525 | 28 | 2,578 | 93 | 2,671 |
| Synthetic crude oil *(mmbbl)* | - | 680 | 680 | - | - | - | - | 680 | - | 680 |
| Total proved reserves *(mmboe)* | 787 | 680 | 1,467 | 318 | 249 | 567 | 31 | 2,065 | 106 | 2,171 |

16

| December 31, 2012 | North America | | | Africa | | | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Canada | Total | E.G. | Other | Total | | | | |
| **Proved Developed Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 169 | - | 169 | 45 | 168 | 213 | 20 | 402 | 63 | 465 |
| Natural gas liquids *(mmbbl)* | 29 | - | 29 | 23 | - | 23 | 1 | 53 | - | 53 |
| Natural gas *(bcf)* | 546 | - | 546 | 980 | 99 | 1,079 | 8 | 1,633 | 20 | 1,653 |
| Synthetic crude oil *(mmbbl)* | - | 653 | 653 | - | - | - | - | 653 | - | 653 |
| Total proved developed reserves *(mmboe)* | 289 | 653 | 942 | 231 | 185 | 416 | 22 | 1,380 | 66 | 1,446 |
| **Proved Undeveloped Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 218 | - | 218 | 27 | 41 | 68 | 4 | 290 | 19 | 309 |
| Natural gas liquids *(mmbbl)* | 59 | - | 59 | 15 | - | 15 | - | 74 | - | 74 |
| Natural gas *(bcf)* | 497 | - | 497 | 444 | 110 | 554 | 6 | 1,057 | 69 | 1,126 |
| Synthetic crude oil *(mmbbl)* | - | - | - | - | - | - | - | - | - | - |
| Total proved undeveloped reserves *(mmboe)* | 360 | - | 360 | 116 | 59 | 175 | 5 | 540 | 31 | 571 |
| **Total Proved Reserves** | | | | | | | | | | |
| Crude oil and condensate *(mmbbl)* | 387 | - | 387 | 72 | 209 | 281 | 24 | 692 | 82 | 774 |
| Natural gas liquids *(mmbbl)* | 88 | - | 88 | 38 | - | 38 | 1 | 127 | - | 127 |
| Natural gas *(bcf)* | 1,043 | - | 1,043 | 1,424 | 209 | 1,633 | 14 | 2,690 | 89 | 2,779 |
| Synthetic crude oil *(mmbbl)* | - | 653 | 653 | - | - | - | - | 653 | - | 653 |
| Total proved reserves *(mmboe)* | 649 | 653 | 1,302 | 347 | 244 | 591 | 27 | 1,920 | 97 | 2,017 |

### Preparation of Reserve Estimates

All estimates of reserves are made in compliance with SEC Rule 4-10 of Regulation S-X. Crude oil and condensate, NGL, natural gas and synthetic crude oil reserve estimates are reviewed and approved by our Corporate Reserves Group, which includes our Director of Corporate Reserves and his staff of Reserve Coordinators. Crude oil and condensate, NGL, and natural gas reserve estimates are developed or reviewed by Qualified Reserves Estimators ("QREs"). QREs are engineers or geoscientists who hold at least a Bachelor of Science degree in the appropriate technical field, have a minimum of three years of industry experience with at least one year in reserve estimation and have completed Marathon Oil's QRE training course. Our Corporate Reserves group screens all fields with net proved reserves of 20 mmboe or greater, every year, to determine if a field review will be performed. Any change to proved reserve estimates in excess of 1 mmboe on a total field basis, within a single month, must be approved by a Reserve Coordinator.

Our Director of Corporate Reserves, who reports to our Vice President, Operations Services, has a Bachelor of Science degree in petroleum engineering and is a registered Professional Engineer in the State of Texas. In his 27 years with Marathon Oil, he has held numerous engineering and management positions, including managing our OSM segment. He is a member of the Society of Petroleum Engineers ("SPE") and a former member of the Petroleum Engineering Advisory Council for the University of Texas at Austin.

Estimates of synthetic crude oil reserves are prepared by GLJ Petroleum Consultants ("GLJ") of Calgary, Canada, third-party consultants. Their reports for all years are filed as exhibits to this Annual Report on Form 10-K. The individual responsible for the estimates of our synthetic crude oil reserves has 14 years of experience in petroleum engineering, has conducted surface mineable oil sands evaluations since 2009 and is a registered Practicing Professional Engineer in the Province of Alberta.

### Audits of Estimates

Third-party consultants are engaged to provide independent estimates for fields that comprise 80 percent of our total proved reserves over a rolling four-year period for the purpose of auditing and validating our internal reserve estimates. We exceeded this percentage for the four-year period ended December 31, 2014. We have established a tolerance level of 10 percent such that initial estimates by the third-party consultants for each field are accepted if they are within 10 percent of our internal estimates. Should the third-party consultants' initial analysis fail to reach our tolerance level, both parties re-examine the information provided, request additional data and refine their analysis, if appropriate. This resolution process is continued until both estimates are within 10 percent. In the very limited instances where differences outside the 10 percent tolerance cannot be resolved by year end, a plan to resolve the difference is developed and senior management consent is obtained. The audit process did not result in any significant changes to our reserve estimates for 2014, 2013 or 2012.

17

During 2014, 2013 and 2012, Netherland, Sewell & Associates, Inc. ("NSAI") prepared a certification of the prior year's reserves for the Alba field in E.G. The NSAI summary reports are filed as an exhibit to this Annual Report on Form 10-K. Members of the NSAI team have multiple years of industry experience, having worked for large, international oil and gas companies before joining NSAI. The senior technical advisor has over 35 years of practical experience in petroleum geosciences, with over 15 years experience in the estimation and evaluation of reserves. The second team member has over 10 years of practical experience in petroleum engineering, with 5 years experience in the estimation and evaluation of reserves. Both are registered Professional Engineers in the State of Texas.

Ryder Scott Company ("Ryder Scott") also performed audits of the prior years' reserves of several of our fields in 2014, 2013 and 2012. Their summary reports are filed as exhibits to this Annual Report on Form 10-K. The team lead for Ryder Scott has over 20 years of industry experience, having worked for a major international oil and gas company before joining Ryder Scott. He is a member of SPE, where he served on the Oil and Gas Reserves Committee, and is a registered Professional Engineer in the State of Texas.

***Changes in Proved Undeveloped Reserves***

As of December 31, 2014, 728 mmboe of proved undeveloped reserves were reported, an increase of 101 mmboe from December 31, 2013. The following table shows changes in total proved undeveloped reserves for 2014:

| *(mmboe)* | |
|---|---|
| Beginning of year | 627 |
| Revisions of previous estimates | 1 |
| Improved recovery | 1 |
| Purchases of reserves in place | 4 |
| Extensions, discoveries, and other additions | 227 |
| Dispositions | (29) |
| Transfers to proved developed | (103) |
| End of year | 728 |

Significant additions to proved undeveloped reserves during 2014 included 121 mmboe in the Eagle Ford and 61 mmboe in the Bakken shale plays due to development drilling. Transfers from proved undeveloped to proved developed reserves included 67 mmboe in the Eagle Ford, 26 mmboe in the Bakken and 1 mmboe in the Oklahoma Resource Basins due to development drilling and completions. Costs incurred in 2014, 2013 and 2012 relating to the development of proved undeveloped reserves, were $3,149 million, $2,536 million and $1,995 million.

A total of 102 mmboe was booked as extensions, discoveries or other additions due to the application of reliable technology. Technologies included statistical analysis of production performance, decline curve analysis, pressure and rate transient analysis, reservoir simulation and volumetric analysis. The statistical nature of production performance coupled with highly certain reservoir continuity or quality within the reliable technology areas and sufficient proved undeveloped locations establish the reasonable certainty criteria required for booking proved reserves.

Projects can remain in proved undeveloped reserves for extended periods in certain situations such as large development projects which take more than five years to complete, or the timing of when additional gas compression is needed. Of the 728 mmboe of proved undeveloped reserves at December 31, 2014, 19 percent of the volume is associated with projects that have been included in proved reserves for more than five years. The majority of this volume is related to a compression project in E.G. that was sanctioned by our Board of Directors in 2004. The timing of the installation of compression is being driven by the reservoir performance with this project intended to maintain maximum production levels. Performance of this field since the Board sanctioned the project has far exceeded expectations. Estimates of initial dry gas in place increased by roughly 10 percent between 2004 and 2010. During 2012, the compression project received the approval of the E.G. government, allowing design and planning work to progress towards implementation, with completion expected by mid-2016. The other component of Alba proved undeveloped reserves is an infill well approved in 2013 and to be drilled in the second quarter of 2015.

Proved undeveloped reserves for the North Gialo development, located in the Libyan Sahara desert, were booked for the first time in 2010. This development, which is anticipated to take more than five years to develop, is executed by the operator and encompasses a multi-year drilling program including the design, fabrication and installation of extensive liquid handling and gas recycling facilities. Anecdotal evidence from similar development projects in the region lead to an expected project execution time frame of more than five years from the time the reserves were initially booked. Interruptions associated with the civil unrest in 2011 and third-party labor strikes and civil unrest in 2013-2014 have also extended the project duration.

As of December 31, 2014, future development costs estimated to be required for the development of proved undeveloped crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves related to continuing operations for the years 2015 through 2019 are projected to be $2,915 million, $2,598 million, $2,493 million, $2,669 million and $2,745 million.

18

**Net Production Sold**

| | North America | | | Africa | | | Other Int'l | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Canada | Total | E.G. | Other | Total | | | |
| **Year Ended December 31,** | | | | | | | | | |
| **2014** | | | | | | | | | |
| Crude and condensate *(mbbld)*[a] | 157 | - | 157 | 21 | 7 | 28 | 11 | 48 | 244 |
| Natural gas liquids *(mbbld)* | 29 | - | 29 | 10 | - | 10 | - | - | 39 |
| Natural gas *(mmcfd)*[b] | 310 | - | 310 | 439 | 1 | 440 | 21 | 37 | 808 |
| Synthetic crude oil *(mbbld)*[c] | - | 41 | 41 | - | - | - | - | - | 41 |
| Total production sold *(mboed)* | 238 | 41 | 279 | 104 | 7 | 111 | 15 | 54 | 459 |
| **2013** | | | | | | | | | |
| Crude and condensate *(mbbld)*[a] | 126 | - | 126 | 23 | 24 | 47 | 14 | 81 | 268 |
| Natural gas liquids *(mbbld)* | 23 | - | 23 | 11 | - | 11 | 1 | - | 35 |
| Natural gas *(mmcfd)*[b] | 312 | - | 312 | 442 | 22 | 464 | 25 | 51 | 852 |
| Synthetic crude oil *(mbbld)*[c] | - | 42 | 42 | - | - | - | - | - | 42 |
| Total production sold *(mboed)* | 201 | 42 | 243 | 107 | 27 | 134 | 20 | 89 | 486 |
| **2012** | | | | | | | | | |
| Crude and condensate *(mbbld)*[a] | 96 | - | 96 | 25 | 42 | 67 | 15 | 81 | 259 |
| Natural gas liquids *(mbbld)* | 11 | - | 11 | 11 | - | 11 | 1 | - | 23 |
| Natural gas *(mmcfd)*[b][d] | 358 | - | 358 | 428 | 15 | 443 | 33 | 53 | 887 |
| Synthetic crude oil *(mbbld)*[c] | - | 41 | 41 | - | - | - | - | - | 41 |
| Total production sold *(mboed)* | 166 | 41 | 207 | 108 | 44 | 152 | 21 | 90 | 470 |

[a] The amounts correspond with the basis for fiscal settlements with governments, representing equity tanker liftings and direct deliveries of liquid hydrocarbons.
[b] Excludes volumes acquired from third parties for injection and subsequent resale.
[c] Upgraded bitumen excluding blendstocks.
[d] U.S. natural gas volumes exclude volumes produced in Alaska that were stored for later sale in response to seasonal demand, although our reserves had been reduced by those volumes.

**Average Sales Price per Unit**

| | North America | | | Africa | | | Other Int'l | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|---|
| *(Dollars per unit)* | U.S. | Canada | Total | E.G. | Other | Total | | | |
| **2014** | | | | | | | | | |
| Crude and condensate *(bbl)* | $ 85.25 | $ - | $ 85.25 | $ 81.01 | $ 94.70 | $ 84.48 | $ 94.31 | $ 109.80 | $ 90.37 |
| Natural gas liquids *(bbl)* | 33.42 | - | 33.42 | 1.00 [a] | - | 1.00 | 67.73 | - | 25.25 |
| Natural gas *(mcf)* | 4.57 | - | 4.57 | 0.24 [a] | 3.11 | 0.25 | 8.27 | 9.94 | 2.55 |
| Synthetic crude oil *(bbl)* | - | 83.35 | 83.35 | - | - | - | - | - | 83.35 |
| **2013** | | | | | | | | | |
| Crude and condensate *(bbl)* | $ 94.19 | $ - | $ 94.19 | $ 90.62 | $ 122.92 | $ 107.31 | $ 110.76 | $ 112.36 | $ 102.81 |
| Natural gas liquids *(bbl)* | 35.12 | - | 35.12 | 1.00 [a] | - | 1.00 | 72.14 | - | 24.78 |
| Natural gas *(mcf)* | 3.84 | - | 3.84 | 0.24 [a] | 5.44 | 0.49 | 10.64 | 13.01 | 2.75 |
| Synthetic crude oil *(bbl)* | - | 87.51 | 87.51 | - | - | - | - | - | 87.51 |
| **2012** | | | | | | | | | |
| Crude and condensate *(bbl)* | $ 91.30 | $ - | $ 91.30 | $ 92.56 | $ 127.31 | $ 114.52 | $ 109.50 | $ 116.70 | $ 106.35 |
| Natural gas liquids *(bbl)* | 39.57 | - | 39.57 | 1.00 [a] | - | 1.00 | 78.81 | - | 23.44 |
| Natural gas *(mcf)* | 3.92 | - | 3.92 | 0.24 [a] | 5.76 | 0.43 | 9.72 | 11.15 | 2.80 |
| Synthetic crude oil *(bbl)* | - | 81.72 | 81.72 | - | - | - | - | - | 81.72 |

[a] Primarily represents fixed prices under long-term contracts with Alba Plant LLC, AMPCO and/or EGHoldings, which are equity method investees. We include our share of income from each of these equity method investees in our International E&P Segment.

19

**Average Production Cost per Unit[a]**

| (Dollars per boe) | North America | | | Africa | | | Other Int'l | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Canada | Total | E.G. | Other | Total | | | |
| 2014 | $ 13.34 | $ 46.63 | $ 18.73 | $ 4.03 | N.M. | $ 5.72 | $ 47.06 | $ 8.92 | $ 15.37 |
| 2013 | 13.60 | 55.42 | 20.79 | 2.88 | 7.40 | 3.80 | 38.87 | 8.24 | 14.51 |
| 2012 | 13.61 | 53.61 | 21.51 | 3.59 | 3.57 | 3.59 | 28.33 | 5.55 | 12.98 |

[a] Production, severance and property taxes are excluded; however, shipping and handling as well as other operating expenses are included in the production costs used in this calculation. See Item 8. Financial Statements and Supplementary Data - Supplementary Information on Oil and Gas Producing Activities - Results of Operations for Oil and Gas Production Activities for more information regarding production costs.

N.M. Not meaningful information due to limited sales in 2014.

## Marketing and Midstream

Our operating segments include activities related to the marketing and transportation of substantially all of our liquid hydrocarbon, synthetic crude oil and natural gas production. These activities include the transportation of production to market centers, the sale of commodities to third parties and the storage of production. We balance our various sales, storage and transportation positions in order to aggregate volumes to satisfy transportation commitments and to achieve flexibility within product types and delivery points. Such activities can include the purchase of commodities from third parties for resale.

As discussed previously, we currently own and operate gathering systems and other midstream assets in some of our production areas. We continue to evaluate midstream infrastructure investments in connection with our development plans.

### Delivery Commitments

We have committed to deliver quantities of crude oil and synthetic crude oil to customers under a variety of contracts. As of December 31, 2014, those contracts for fixed and determinable quantities were at variable, market-based pricing and related primarily to liquid hydrocarbon production in the Eagle Ford and Bakken, and OSM synthetic crude oil production. Eagle Ford liquid hydrocarbon production sales commitments range from a minimum of 76 mbbld increasing to 113 mbbld in 2015 through 2018 and 51 mbbld to 65 mbbld in 2019 through 2020. Bakken liquid hydrocarbon production sales commitments of 10 mbbld commence in the fourth quarter of 2016 and expire June 1, 2026. Synthetic crude oil production sales commitments fall under a 3-year agreement for 13.5 mbbld which expires July 2017. Our current production rates, forecasts and proved reserves are sufficient to meet these commitments. All of these contracts provide the options of delivering third-party volumes or paying a monetary shortfall penalty if production is inadequate.

In addition to the sales contracts discussed above, we have entered into numerous agreements for transportation and processing of our equity production. Some of these contracts have volumetric requirements which could require monetary shortfall penalties if our production is inadequate to meet the terms.

## Competition and Market Conditions

Strong competition exists in all sectors of the oil and gas industry and, in particular, in the exploration for and development of new reserves. We compete with major integrated and independent oil and gas companies, as well as national oil companies, for the acquisition of oil and natural gas leases and other properties. Based upon statistics compiled in the "2014 Global Upstream Performance Review" published by IHS Inc., we rank tenth among U.S.-based petroleum companies on the basis of 2013 worldwide liquid hydrocarbon and natural gas production. See Item 1A. Risk Factors for discussion of specific areas in which we compete and related risks.

We also compete with other producers of synthetic crude oil for the sale of our synthetic crude oil to refineries primarily in North America. Additional synthetic crude oil projects are being contemplated by various competitors and, if undertaken and completed, may result in a significant increase in the supply of synthetic crude oil to the market. Because not all refineries are able to process or refine synthetic crude oil in significant volumes, sufficient market demand may not exist at all times to absorb our share of the synthetic crude oil production from the AOSP at economically viable prices.

Our operating results are affected by price changes for liquid hydrocarbons and natural gas, as well as changes in competitive conditions in the markets we serve. Generally, results from oil and gas production and OSM operations benefit from higher liquid hydrocarbons and natural gas prices. Market conditions in the oil and gas industry are cyclical and subject to global economic and political events and new and changing governmental regulations. See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, Overview - Market Conditions for additional discussion of the impact of prices on our operations.

**Environmental, Health and Safety Matters**

The Health, Environmental, Safety and Corporate Responsibility Committee of our Board of Directors is responsible for overseeing our position on public issues, including environmental, health and safety matters. Our Corporate Health, Environment, Safety and Security organization has the responsibility to ensure that our operating organizations maintain environmental compliance systems that support and foster our compliance with applicable laws and regulations. Committees comprised of certain of our officers review our overall performance associated with various environmental compliance programs. We also have a Corporate Emergency Response Team which oversees our response to any major environmental or other emergency incident involving us or any of our properties.

Our businesses are subject to numerous laws and regulations relating to the protection of the environment, health and safety. These laws and regulations include the Occupational Safety and Health Act ("OSHA") with respect to the protection of the health and safety of employees, the Clean Air Act ("CAA") with respect to air emissions, the Federal Water Pollution Control Act (also known as the Clean Water Act ("CWA")) with respect to water discharges, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") with respect to releases and remediation of hazardous substances, the Oil Pollution Act of 1990 ("OPA-90") with respect to oil pollution and response, the National Environmental Policy Act with respect to evaluation of environmental impacts, the Endangered Species Act with respect to the protection of endangered or threatened species, the Resource Conservation and Recovery Act ("RCRA") with respect to solid and hazardous waste treatment, storage and disposal and the U.S. Emergency Planning and Community Right-to-Know Act with respect to the dissemination of information relating to certain chemical inventories. In addition, many other states and countries in which we operate have their own laws dealing with similar matters.

These laws and regulations could result in costs to remediate releases of regulated substances, including crude oil, into the environment, or costs to remediate sites to which we sent regulated substances for disposal. In some cases, these laws can impose strict liability for the entire cost of clean-up on any responsible party without regard to negligence or fault and impose liability on us for the conduct of others (such as prior owners or operators of our assets) or conditions others have caused, or for our acts that complied with all applicable requirements when we performed them. New laws have been enacted and regulations are being adopted by various regulatory agencies on a continuing basis and the costs of compliance with these new rules can only be broadly appraised until their implementation becomes more defined. Based on regulatory trends, particularly with respect to the CAA and its implementing regulations, we have incurred and will continue to incur capital, operating and maintenance, and remediation expenditures as a result of environmental laws and regulations. We believe that substantially all of our competitors must comply with similar environmental laws and regulations. However, the specific impact on each competitor may vary depending on a number of factors, including the age and location of its operating facilities, marketing areas and production processes.

For a discussion of environmental capital expenditures and costs of compliance for air, water, solid waste and remediation, see Item 3. Legal Proceedings and Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Management's Discussion and Analysis of Environmental Matters, Litigation and Contingencies.

*Air and Climate Change*

The EPA proposed a more stringent National Ambient Air Quality Standard (NAAQS) for ozone in December 2014. A more stringent ozone NAAQS could result in additional areas being designated as non-attainment, including areas in which we operate, which may result in an increase in costs for emission controls and requirements for additional monitoring and testing, as well as a more cumbersome permitting process. Although there may be an adverse financial impact (including compliance costs, potential permitting delays and increased regulatory requirements) associated with any regulation or other action by the EPA that lowers the ozone NAAQS, the extent and magnitude of that impact cannot be reliably or accurately estimated due to the present uncertainty regarding any additional measures and how they will be implemented.

In August 2012, the EPA published final New Source Performance Standards ("NSPS") and National Emissions Standards for Hazardous Air Pollutants ("NESHAP") that amended existing NSPS and NESHAP standards for oil and gas facilities as well as created a new NSPS for oil and gas production, transmission and distribution facilities with a compliance deadline of January 1, 2015. While these rules remain in effect, the EPA announced in 2013 that it would reexamine and reissue the rules over the next three years. The EPA has issued updated rules regarding storage tanks and additional rules are expected. In December 2014, the EPA issued finalized additional amendments to these rules that, among other things, distinguished between multiple flowback stages during completion of hydraulically fractured wells and clarified that storage tanks permanently removed from service are not affected by any requirements. Further, in 2012, seven states sued the EPA to compel the agency to make a determination as to whether standards of performance limiting methane emissions from oil and gas sources is appropriate and, if so, to promulgate performance standards for methane emissions from existing oil and gas sources. In April 2014, the EPA released a set of five white papers analyzing methane emissions from the industry, and, based on responses received, announced in early 2015 that it will begin the process of issuing a rule governing methane emissions from the oil and gas industry. If we are unable to comply with air pollution regulations or to obtain permits for emissions associated with our

21

operations, we could be required to forego construction, modification or certain operations. These regulations may also increase compliance costs for some facilities we own or operate, and result in administrative, civil and/or criminal penalties for non-compliance. Obtaining permits may delay the development of our oil and natural gas projects, including the construction and operation of facilities.

In 2010, the EPA promulgated rules that require us to monitor and submit an annual report on our greenhouse gas emissions. Further, state, national and international requirements to reduce greenhouse emissions are being proposed and in some cases promulgated (see discussion above regarding potential methane regulation by EPA). These requirements apply or could apply in countries in which we operate. Potential legislation and regulations pertaining to climate change could also affect our operations. The cost to comply with these laws and regulations cannot be estimated at this time. For additional information, see Item 1A. Risk Factors. As part of our commitment to environmental stewardship, we estimate and publicly report greenhouse gas emissions from our operations. We are working to continuously improve the accuracy and completeness of these estimates. In addition, we continuously strive to improve operational and energy efficiencies through resource and energy conservation where practicable and cost effective.

### *Hydraulic Fracturing*

Hydraulic fracturing is a commonly used process that involves injecting water, sand, and small volumes of chemicals into the wellbore to fracture the hydrocarbon-bearing rock thousands of feet below the surface to facilitate higher flow of hydrocarbons into the wellbore. Hydraulic fracturing has been regulated at the state and local level through permitting and compliance requirements. State and local level initiatives in regions with substantial shale resources have been or may be proposed or implemented to further regulate hydraulic fracturing practices, limit water withdrawals and water use, require disclosure of fracturing fluid constituents, restrict which additives may be used, or implement temporary or permanent bans on hydraulic fracturing. Further, the Bureau of Land Management is expected to issue a rule governing certain hydraulic fracturing practices on lands within their jurisdiction in early 2015. In addition, the U.S. Congress has considered legislation that would require additional regulation affecting the hydraulic fracturing process, including subjecting the process to regulation under the Safe Drinking Water Act. In the first quarter of 2010, the EPA announced its intention to conduct a comprehensive research study on the potential effects that hydraulic fracturing may have on water quality and public health. The EPA issued a progress report in late 2012, and expects to issue a draft report for public comment and peer review in 2015, with a final report expected in 2016.

Increased regulation and attention given to the hydraulic fracturing process could lead to greater opposition to oil and gas activities using hydraulic fracturing techniques. Additional legislation or regulation could also lead to operational delays or increased operating costs in the production of oil and natural gas from the developing shale plays, or could make it more difficult to perform hydraulic fracturing. The adoption of any federal, state or local laws or the implementation of regulations regarding hydraulic fracturing could potentially cause a decrease in the completion of new oil and gas wells and increased compliance costs, which could increase costs of our operations and cause considerable delays in acquiring regulatory approvals to drill and complete wells.

### *Transportation*

A number of state and federal rules apply to the transportation of liquid hydrocarbons. In 2014, the U.S. Department of Transportation ("DOT") proposed a rule relating to testing and classification of liquid hydrocarbons and imposing additional restrictions on the types of rail cars that may be used in certain types of liquid hydrocarbon service. Although our businesses do not own rail cars and purchasers of our liquid hydrocarbons make arrangements for its transportation, such regulations could increase transportation costs which are passed on to Marathon Oil by liquid hydrocarbon purchasers. We anticipate a final rule sometime in 2015. In addition, the Pipeline and Hazardous Materials Safety Administration, a sub-agency of DOT, has proposed or announced the intention to propose various rules related to pipeline transportation of natural gas and/or liquid hydrocarbons. Such regulations could increase the regulatory burden on our businesses where we own or operate pipelines, or could otherwise increase costs to third parties that are passed on to Marathon Oil.

### *Remediation*

The AOSP operations use established processes to mine deposits of bitumen from open-pit mines, extract the bitumen and upgrade it into synthetic crude oils. Tailings are waste products created from the oil sands extraction process which are placed in ponds. The AOSP is required to reclaim its tailings ponds as part of its ongoing reclamation work. The reclamation process uses developing technology and there is an inherent risk that the current process may not be as effective or perform as required in order to meet the approved closure and reclamation plan. The AOSP continues to develop its current reclamation technology and continues to investigate alternate tailings management technologies. In February 2009, the ERCB issued a directive which more clearly defines criteria for managing oil sands tailings. We believe that we are substantially in compliance with the directive at this time. We could incur additional costs if further new regulations are issued or if we fail to comply in a timely manner.

22

*Water*

In 2014, the EPA and the U.S. Army Corps of Engineers published proposed regulations which expand the surface waters that are regulated under the Clean Water Act and its various programs. If finalized as proposed, this expansion will result in additional costs of compliance as well as increased monitoring, recordkeeping, and recording for some of our facilities.

## Concentrations of Credit Risk

We are exposed to credit risk in the event of nonpayment by counterparties, a significant portion of which are concentrated in energy-related industries. The creditworthiness of customers and other counterparties is subject to continuing review, including the use of master netting agreements, where appropriate. For 2014, sales to Shell Oil and its affiliates accounted for approximately 10 percent of our total revenues. For 2013, sales to Statoil, the purchaser of the majority of our Libyan crude oil, accounted for approximately 10 percent of our annual revenues. For 2012, sales to Statoil accounted for approximately 15 percent of our total revenues, while sales to Shell Oil and its affiliates accounted for approximately 12 percent of our annual revenues.

## Trademarks, Patents and Licenses

We currently hold a number of U.S. and foreign patents and have various pending patent applications. Although in the aggregate our trademarks, patents and licenses are important to us, we do not regard any single trademark, patent, license or group of related trademarks, patents or licenses as critical or essential to our business as a whole.

## Employees

We had 3,330 active, full-time employees as of December 31, 2014. We consider labor relations with our employees to be satisfactory. We have not had any work stoppages or strikes pertaining to our employees.

## Executive Officers of the Registrant

The executive officers of Marathon Oil and their ages as of February 1, 2015, are as follows:

| Lee M. Tillman | 53 | President and Chief Executive Officer |
|---|---|---|
| John R. Sult | 55 | Executive Vice President and Chief Financial Officer |
| Sylvia J. Kerrigan | 49 | Executive Vice President, General Counsel and Secretary |
| T. Mitch Little | 51 | Vice President, International and Offshore Production Operations |
| Lance W. Robertson | 42 | Vice President, North America Production Operations |
| Patrick J. Wagner | 50 | Vice President, Corporate Development |
| Gary E. Wilson | 53 | Vice President, Controller and Chief Accounting Officer |

Mr. Tillman was appointed president and chief executive officer in August 2013. Mr. Tillman is also a member of our Board of Directors. Prior to this appointment, Mr. Tillman served as vice president of engineering for ExxonMobil Development Company (a project design and execution company), where he was responsible for all global engineering staff engaged in major project concept selection, front-end design and engineering. Between 2007 and 2010, Mr. Tillman served as North Sea production manager and lead country manager for subsidiaries of ExxonMobil in Stavanger, Norway. Mr. Tillman began his career in the oil and gas industry at Exxon Corporation in 1989 as a research engineer and has extensive operations management and leadership experience.

Mr. Sult was appointed executive vice president and chief financial officer in September 2013. Prior to joining Marathon Oil, Mr. Sult served as executive vice president and chief financial officer of El Paso Corporation (a natural gas provider) from 2010 through 2012, senior vice president and chief financial officer from 2009 to 2010, and senior vice president, chief accounting officer and controller from 2005 to 2009.

Ms. Kerrigan was appointed executive vice president, general counsel and secretary in October 2012, having served as vice president, general counsel and secretary since November 2009. Prior to these appointments, Ms. Kerrigan served as assistant general counsel since January 2003.

Mr. Little was appointed vice president, international and offshore exploration and production operations in September 2013, having served as vice president, international production operations since September 2012. Prior to that, Mr. Little was resident manager for our Norway operations and served as general manager, worldwide drilling and completions. Mr. Little joined Marathon Oil in 1986 and has since held a number of engineering and management positions of increasing responsibility.

Mr. Robertson was appointed vice president, North America production operations in September 2013, having served as vice president, Eagle Ford production operations since October 2012. Mr. Robertson joined Marathon Oil in October 2011 as regional vice president, South Texas/Eagle Ford. Between 2004 and 2011, Mr. Robertson held a number of senior engineering and operations management roles of increasing responsibility with Pioneer Natural Resources Company (an independent oil and gas company) in the U.S. and Canada.

23

Mr. Wagner was appointed vice president, corporate development in April 2014. Prior to joining Marathon Oil, he served as senior vice president, western business unit, for QR Energy LP (an oil and natural gas producer) and the affiliated Quantum Resources Management (a private equity firm), which he joined in early 2012 as vice president, exploitation. Prior to that, Wagner was managing director in Houston for Scotia Waterous, the oil and gas arm of Scotiabank (an international banking services provider), from 2010 to 2012. Before joining Scotia, Wagner was vice president, Gulf of Mexico, for Devon Energy Corp. (an oil and natural gas producer), having joined Devon in 2003 as manager, international exploitation.

Mr. Wilson was appointed vice president, controller and chief accounting officer in October 2014. Prior to joining Marathon Oil, he served in various finance and accounting positions of increasing responsibility at Noble Energy, Inc. (a global exploration and production company) since 2001, including as director corporate accounting from February 2014 through September 2014, director global operations services finance from October 2012 through February 2014, director controls and reporting from April 2011 through September 2012, and international finance manager from September 2009 through March 2011.

## Available Information

Our website is www.marathonoil.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and other reports and filings with the SEC are available free of charge on our website as soon as reasonably practicable after the reports are filed or furnished with the SEC. Information contained on our website is not incorporated into this Annual Report on Form 10-K or our other securities filings. Our filings are also available in hard copy, free of charge, by contacting our Investor Relations office.

The public may read and copy any materials we file with the SEC at its Public Reference Room at 100 F Street, NE, Washington, DC 20549. Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website (www.sec.gov) that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC.

Additionally, we make available free of charge on our website:

- our Code of Business Conduct and Code of Ethics for Senior Financial Officers;

- our Corporate Governance Principles; and

- the charters of our Audit and Finance Committee, Compensation Committee, Corporate Governance and Nominating Committee and Health, Environmental, Safety and Corporate Responsibility Committee.

<div align="center">24</div>

**Item 1A. Risk Factors**

We are subject to various risks and uncertainties in the course of our business. The following summarizes significant risks and uncertainties that may adversely affect our business, financial condition or results of operations. When considering an investment in our securities, you should carefully consider the risk factors included below as well as those matters referenced in the foregoing pages under "Disclosures Regarding Forward-Looking Statements" and other information included and incorporated by reference into this Annual Report on Form 10-K.

**A substantial, extended decline in liquid hydrocarbon or natural gas prices would reduce our operating results and cash flows and could adversely impact our future rate of growth and the carrying value of our assets.**

Prices for crude oil and condensate, NGLs, natural gas and synthetic crude oil fluctuate widely. Our revenues, operating results and future rate of growth are highly dependent on the prices we receive for our crude oil and condensate, NGLs, natural gas and synthetic crude oil. Historically, the markets for crude oil and condensate, NGLs, natural gas and synthetic crude oil have been volatile and may continue to be volatile in the future. For example, beginning in the second half of 2014 and continuing into 2015, the WTI and Brent crude oil benchmarks have substantially declined. In addition, the Henry Hub natural gas benchmark began to decline in late 2014 and continued its decline into 2015. Many of the factors influencing prices of crude oil and condensate, NGLs, natural gas and synthetic crude oil are beyond our control. These factors include:

- worldwide and domestic supplies of and demand for crude oil and condensate, NGLs, natural gas and synthetic crude oil;

- the cost of exploring for, developing and producing crude oil and condensate, NGLs, natural gas and synthetic crude oil;

- the ability of the members of OPEC to agree to and maintain production controls;

- the level of drilling, completion and production activities by other exploration and production companies, and variability therein, in response to market conditions;

- political instability or armed conflict in oil and natural gas producing regions;

- changes in weather patterns and climate;

- natural disasters such as hurricanes and tornadoes;

- the price and availability of alternative and competing forms of energy;

- the effect of conservation efforts;

- epidemics or pandemics;

- technological advances affecting energy consumption and energy supply;

- domestic and foreign governmental regulations and taxes; and

- general economic conditions worldwide.

The long-term effects of these and other factors on the prices of crude oil and condensate, NGLs, natural gas and synthetic crude oil are uncertain. Prolonged or substantial declines in commodity prices could have adverse effects on our business, including:

- reducing the amount of crude oil and condensate, NGLs, natural gas and synthetic crude oil that we can produce economically;

- reducing our revenues, operating income and cash flows;

- causing us to reduce our capital expenditures, or delay or postpone some of our capital projects, resulting in lower production of crude oil and condensate, NGLs, natural gas and synthetic crude oil;

- requiring us to impair the carrying value of our assets;

- reducing the amounts of our estimated proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves that we may produce economically;

- reducing the standardized measure of discounted future net cash flows relating to crude oil and condensate, NGLs, natural gas and synthetic crude oil; and

- limiting our access to sources of capital, such as equity and long-term debt and/or increasing the costs of obtaining such capital.

**A substantial, extended decline in liquid hydrocarbon or natural gas prices could adversely affect the abilities of our counterparties to perform their obligations to us, which could negatively impact our financial results.**

We often enter into arrangements to conduct certain business operations, such as oil and gas exploration and production, oil sands mining or liquid hydrocarbon or natural gas transportation, with partners and other counterparties in order to share risks associated with those operations. In addition, we market our products to a variety of purchasers. If commodity prices remain at or fall below current levels, some of our counterparties may experience liquidity problems and may not be able to meet their financial obligations to us. The inability of our joint venture partners to fund their portion of the costs under our joint venture agreements, or the nonperformance by purchasers, contractors or other counterparties of their obligations to us, could negatively impact our financial results.

**Our offshore operations involve special risks that could negatively impact us.**

Offshore exploration and development operations present technological challenges and operating risks because of the marine environment. Activities in deepwater areas may pose incrementally greater risks because of water depths that limit intervention capability and the physical distance to oilfield service infrastructure and service providers. Environmental remediation and other costs resulting from spills or releases may result in substantial liabilities.

**Estimates of crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves depend on many factors and assumptions, including various assumptions that are based on conditions in existence as of the dates of the estimates. Any material changes in those conditions or other factors affecting those assumptions could impair the quantity and value of our reserves.**

The proved reserve information included in this Annual Report on Form 10-K has been derived from engineering estimates. Estimates of liquid hydrocarbon and natural gas reserves were prepared by our in-house teams of reservoir engineers and geoscience professionals and were reviewed and approved by our Corporate Reserves Group. The synthetic crude oil reserves estimates were prepared by GLJ Petroleum Consultants, a third-party consulting firm experienced in working with oil sands. Reserves were valued based on the unweighted average of closing prices for the first day of each month in the 12-month periods ended December 31, 2014, 2013 and 2012, as well as other conditions in existence at those dates. For 2014, the average of closing prices for the first day of each month in the 12-month period were WTI crude oil of $94.99 per bbl, Henry Hub natural gas of $4.31 per mmbtu and Brent crude oil of $101.39 per bbl. Any significant future price change could have a material effect on the quantity and present value of our proved reserves. The January 2015 benchmark closing prices for the first day of the month were WTI crude oil of $52.69 per bbl, Henry Hub natural gas of $2.99 per mmbtu and Brent crude oil of $55.55 per bbl. To the extent that we experience a sustained period of reduced commodity prices in 2015, there is a risk that a portion of our proved reserves could be deemed uneconomic and no longer be classified as proved. Future reserve revisions could also result from changes in governmental regulation, among other things.

Reserve estimation is a subjective process that involves estimating volumes to be recovered from underground accumulations of crude oil and condensate, NGLs, natural gas and bitumen that cannot be directly measured. (Bitumen is mined and then upgraded into synthetic crude oil.) Estimates of economically producible reserves and of future net cash flows depend on a number of variable factors and assumptions, including:

- location, size and shape of the accumulation as well as fluid, rock and producing characteristics of the accumulation;

- historical production from the area, compared with production from other comparable producing areas;

- volumes of bitumen in-place and various factors affecting the recoverability of bitumen and its conversion into synthetic crude oil such as historical upgrader performance;

- the assumed effects of regulation by governmental agencies;

- assumptions concerning future operating costs, severance and excise taxes, development costs and workover and repair costs; and

- industry economic conditions, levels of cash flows from operations and other operating considerations.

As a result, different petroleum engineers, each using industry-accepted geologic and engineering practices and scientific methods, may produce different estimates of proved reserves and future net cash flows based on the same available data. Because of the subjective nature of such reserve estimates, each of the following items may differ materially from the amounts or other factors estimated:

- the amount and timing of production;

- the revenues and costs associated with that production; and

- the amount and timing of future development expenditures.

26

The discounted future cash flows from our proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves reflected in this Annual Report on Form 10-K should not be considered as the market value of the reserves attributable to our properties. As required by SEC Rule 4-10 of Regulation S-X, the estimated discounted future cash flows from our proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves are based on an unweighted average of closing prices for the first day of each month in the 12-month periods ended December 31, 2014, 2013 and 2012, and costs applicable at the date of the estimate, while actual future prices and costs may be materially higher or lower.

In addition, the 10 percent discount factor required by the applicable rules of the SEC to be used to calculate discounted future cash flows for reporting purposes is not necessarily the most appropriate discount factor based on our cost of capital and the risks associated with our business and the oil and natural gas industry in general.

**If we are unsuccessful in acquiring or finding additional reserves, our future liquid hydrocarbon and natural gas production would decline, thereby reducing our cash flows and results of operations and impairing our financial condition.**

The rate of production from liquid hydrocarbon and natural gas properties generally declines as reserves are depleted. Except to the extent we acquire interests in additional properties containing proved reserves, conduct successful exploration and development activities or, through engineering studies, optimize production performance or identify additional reservoirs not currently producing or secondary recovery reserves, our proved reserves will decline materially as crude oil and condensate, NGLs, natural gas and synthetic crude oil are produced. Accordingly, to the extent we are not successful in replacing the crude oil and condensate, NGLs, natural gas and synthetic crude oil we produce, our future revenues will decline. Creating and maintaining an inventory of prospects for future production depends on many factors, including:

- obtaining rights to explore for, develop and produce crude oil and condensate, NGLs, natural gas and synthetic crude oil in promising areas;

- drilling success;

- the ability to complete long lead-time, capital-intensive projects timely and on budget;

- the ability to find or acquire additional proved reserves at acceptable costs; and

- the ability to fund such activity.

**Future exploration and drilling results are uncertain and involve substantial costs.**

Drilling for crude oil and condensate, NGLs and natural gas involves numerous risks, including the risk that we may not encounter commercially productive liquid hydrocarbon and natural gas reservoirs. The costs of drilling, completing and operating wells are often uncertain, and drilling operations may be curtailed, delayed or canceled as a result of a variety of factors, including:

- unexpected drilling conditions;

- title problems;

- pressure or irregularities in formations;

- equipment failures or accidents;

- fires, explosions, blowouts or surface cratering;

- lack of access to pipelines or other transportation methods; and

- shortages or delays in the availability of services or delivery of equipment.

**If we are unable to complete capital projects at their expected costs and in a timely manner, or if the market conditions assumed in our project economics deteriorate, our business, financial condition, results of operations and cash flows could be materially and adversely affected.**

Delays or cost increases related to capital spending programs involving engineering, procurement and construction of facilities (including improvements and repairs to our existing facilities) could adversely affect our ability to achieve forecasted internal rates of return and operating results. Delays in making required changes or upgrades to our facilities could subject us to fines or penalties as well as affect our ability to supply certain products we produce. Such delays or cost increases may arise as a result of unpredictable factors, many of which are beyond our control, including:

- denial of or delay in receiving requisite regulatory approvals and/or permits;

- unplanned increases in the cost of construction materials or labor;

- disruptions in transportation of components or construction materials;

- increased costs or operational delays resulting from shortages of water;

- adverse weather conditions, natural disasters or other events (such as equipment malfunctions, explosions, fires or spills) affecting our facilities, or those of vendors or suppliers;

- shortages of sufficiently skilled labor, or labor disagreements resulting in unplanned work stoppages;

- market-related increases in a project's debt or equity financing costs; and

- nonperformance by, or disputes with, vendors, suppliers, contractors or subcontractors.

Any one or more of these factors could have a significant impact on our capital projects.

**We may incur substantial capital expenditures and operating costs as a result of compliance with, and/or changes in environmental, health, safety and security laws and regulations, and, as a result, our business, financial condition, results of operations and cash flows could be materially and adversely affected.**

Our businesses are subject to numerous laws, regulations and other requirements relating to the protection of the environment, including those relating to the discharge of materials into the environment such as the venting or flaring of natural gas, waste management, pollution prevention, greenhouse gas emissions and the protection of endangered species as well as laws, regulations, and other requirements relating to public and employee safety and health and to facility security. We have incurred and may continue to incur capital, operating and maintenance, and remediation expenditures as a result of these laws, regulations, and other requirements. To the extent these expenditures, as with all costs, are not ultimately reflected in the prices of our products, our operating results will be adversely affected. The specific impact of these laws, regulations, and other requirements may vary depending on a number of factors, including the age and location of operating facilities and production processes. We may also be required to make material expenditures to modify operations, install pollution control equipment, perform site clean-ups or curtail operations that could materially and adversely affect our business, financial condition, results of operations and cash flows. We may become subject to liabilities that we currently do not anticipate in connection with new, amended or more stringent requirements, stricter interpretations of existing requirements or the future discovery of contamination. In addition, any failure by us to comply with existing or future laws, regulations, and other requirements could result in civil penalties or criminal fines and other enforcement actions against us.

We believe it is likely that the scientific and political attention to issues concerning the extent, causes of and responsibility for climate change will continue, with the potential for further regulations that could affect our operations. Our operations result in these greenhouse gas emissions. Currently, various legislative and regulatory measures to address greenhouse gas emissions (including carbon dioxide, methane and nitrous oxides) are in various phases of review, discussion or implementation in countries where we operate, including the U.S., Canada, and Norway, and the European Union. Internationally, member countries that have ratified the Kyoto Protocol have made additional commitments to reduce greenhouse gas emissions. The U.S. has not ratified the Kyoto protocol, but may do so in the future. The EPA has announced its intention to specifically regulate methane emissions from the oil and gas industry. Finalization of new legislation, regulations or international agreements in the future could result in increased costs to operate and maintain our facilities, capital expenditures to install new emission controls at our facilities, and costs to administer and manage any potential greenhouse gas emissions or carbon trading or tax programs. These costs and capital expenditures could be material. Although uncertain, these developments could increase our costs, reduce the demand for crude oil and condensate, NGLs, natural gas and synthetic crude oil, and create delays in our obtaining air pollution permits for new or modified facilities.

**The potential adoption of federal, state and local legislative and regulatory initiatives related to hydraulic fracturing could result in operating restrictions or delays in the completion of oil and gas wells.**

Hydraulic fracturing is a commonly used process that involves injecting water, sand, and small volumes of chemicals into the wellbore to fracture the hydrocarbon-bearing rock thousands of feet below the surface to facilitate higher flow of hydrocarbons into the wellbore. Federal, state and local-level laws or regulations targeting various aspects of the hydraulic fracturing process are being considered, or have been proposed or implemented. For example, the U.S. Congress has considered legislation that would require additional regulation affecting the hydraulic fracturing process, and may be expected to do so in future legislative sessions. Further, various state and local-level initiatives in regions with substantial shale resources have been or may be proposed or implemented to further regulate hydraulic fracturing practices, limit water withdrawals and water use, require disclosure of fracturing fluid constituents, restrict which additives may be used, or implement temporary or permanent bans on hydraulic fracturing. In addition to such legislative and regulatory proposals, there are also a number of studies and initiatives underway that may lead to additional proposals in the future, such as the EPA research study on the potential effects that hydraulic fracturing may have on water quality and public health.

Increased regulation and attention given to the hydraulic fracturing process could lead to greater opposition, including litigation, to oil and gas activities using hydraulic fracturing techniques. Additional legislation or regulation could also lead to

28

operational delays or increased operating costs in the production of crude oil and condensate, NGLs and natural gas, including from the shale plays, or could make it more difficult to perform hydraulic fracturing. The adoption of any federal, state or local laws or the implementation of regulations regarding hydraulic fracturing could potentially cause a decrease in the completion of new oil and gas wells and increased compliance costs which could increase costs of our operations and cause considerable delays in acquiring regulatory approvals to drill and complete wells.

**Worldwide political and economic developments and changes in law could adversely affect our operations and materially reduce our profitability and cash flows.**

Local political and economic factors in global markets could have a material adverse effect on us. A total of 41 percent of our liquid hydrocarbon and natural gas sales volumes related to continuing operations in 2014 was derived from production outside the U.S. and 55 percent of our proved crude oil and condensate, NGLs and natural gas reserves as of December 31, 2014 were located outside the U.S. All of our synthetic crude oil production and proved reserves are located in Canada. We are, therefore, subject to the political, geographic and economic risks and possible terrorist activities or other armed conflict attendant to doing business within or outside of the U.S. There are many risks associated with operations in countries such as E.G., Angola, Ethiopia, Gabon, Kenya, the Kurdistan Region of Iraq and Libya, and in global markets including:

- changes in governmental policies relating to liquid hydrocarbon or natural gas and taxation;

- other political, economic or diplomatic developments and international monetary fluctuations;

- political and economic instability, war, acts of terrorism, armed conflict and civil disturbances;

- the possibility that a government may seize our property with or without compensation, may attempt to renegotiate or revoke existing contractual arrangements or may impose additional taxes or royalty burdens; and

- fluctuating currency values, hard currency shortages and currency controls.

For the past several years, there have been varying degrees of political instability and public protests, including demonstrations which have been marked by violence and numerous incidences of terrorist acts, within some countries in the Middle East, including Bahrain, Egypt, Iraq, Libya, Syria, Tunisia and Yemen. Some political regimes in these countries are threatened or have changed as a result of such unrest.

If such unrest continues to spread, conflicts could result in civil wars, regional conflicts, and regime changes resulting in governments that are hostile to the U.S. These may have the following results, among others:

- volatility in global crude oil prices which could negatively impact the global economy, resulting in slower economic growth rates and reduced demand for our products;

- negative impact on the world crude oil supply if transportation avenues are disrupted;

- security concerns leading to the prolonged evacuation of our personnel;

- damage to, or the inability to access, production facilities or other operating assets; and

- inability of our service and equipment providers to deliver items necessary for us to conduct our operations.

Continued hostilities in the Middle East and the occurrence or threat of future terrorist attacks, or other armed conflict, could adversely affect the economies of the U.S. and other developed countries. A lower level of economic activity could result in a decline in energy consumption, which could cause our revenues and margins to decline and limit our future growth prospects. These risks could lead to increased volatility in prices for crude oil and condensate, NGLs, natural gas and synthetic crude oil. In addition, these risks could increase instability in the financial and insurance markets and make it more difficult for us to access capital and to obtain the insurance coverage that we consider adequate.

Actions of governments through tax legislation and other changes in law, executive order and commercial restrictions could reduce our operating profitability, both in the U.S. and abroad. The U.S. government can prevent or restrict us from doing business in foreign countries. These restrictions and those of foreign governments have in the past limited our ability to operate in, or gain access to, opportunities in various countries and will continue to do so in the future. Changes in law could also adversely affect our results, including new regulations resulting in higher costs to transport our production by pipeline, rail car, truck or vessel or the adoption of government payment transparency regulations that could require us to disclose competitively sensitive commercial information or that could cause us to violate the non-disclosure laws of other countries.

**Our commodity price risk management may prevent us from fully benefiting from commodity price increases and may expose us to other risks, including counterparty risk.**

To the extent that we engage in price risk management activities to protect ourselves against commodity price declines, we may be prevented from fully realizing the benefits of price increases above the levels of the derivative instruments used to manage price risk. In addition, our hedging arrangements may expose us to the risk of financial loss in certain circumstances, including instances in which the counterparties to our hedging contracts fail to perform under the contracts. See Item 7A. Quantitative and Qualitative Disclosures about Market Risk.

**Our business could be negatively impacted by cyber-attacks targeting our computer and telecommunications systems and infrastructure.**

Our business, like other companies in the oil and gas industry, has become increasingly dependent on digital technologies. Such technologies are integrated into our business operations and used as a part of our liquid hydrocarbon and natural gas production and distribution systems in the U.S. and abroad, including those systems used to transport production to market. Use of the internet and other public networks for communications, services, and storage, including "cloud" computing, exposes users (including our business) to cybersecurity risks. While our information systems and related infrastructure experienced attempted and actual minor breaches of our cybersecurity in the past, we have not suffered any losses or breaches which had a material effect on our business, operations or reputation relating to such attacks; however, there is no assurance that we will not suffer such losses or breaches in the future. As cyber-attacks continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information systems and related infrastructure security vulnerabilities.

**Our operations may be adversely affected by pipeline, rail and other transportation capacity constraints.**

The marketability of our production depends in part on the availability, proximity, and capacity of pipeline facilities, rail cars, trucks and vessels. If any pipelines, rail cars, trucks or vessels become unavailable, we would, to the extent possible, be required to find a suitable alternative to transport our crude oil and condensate, NGLs, natural gas and synthetic crude oil, which could increase the costs and/or reduce the revenues we might obtain from the sale of our production. Both the cost and availability of pipelines, rail cars, trucks, or vessels to transport our crude oil could be adversely impacted by new and expected state or federal regulations relating to transportation of crude oil.

**If we acquire crude oil and natural gas properties, our failure to fully identify existing and potential problems, to accurately estimate reserves, production rates or costs, or to effectively integrate the acquired properties into our operations could materially and adversely affect our business, financial condition and results of operations.**

We typically seek the acquisition of liquid hydrocarbon and natural gas properties. Although we perform reviews of properties to be acquired in a manner that we believe is diligent and consistent with industry practices, reviews of records and properties may not necessarily reveal existing or potential problems, nor may they permit us to become sufficiently familiar with the properties in order to fully assess possible deficiencies and potential problems. Even when problems with a property are identified, we often assume environmental and other risks and liabilities in connection with acquired properties pursuant to the acquisition agreements. Moreover, there are numerous uncertainties inherent in estimating quantities of liquid hydrocarbon and natural gas reserves (as previously discussed), actual future production rates and associated costs with respect to acquired properties. Actual reserves, production rates and costs may vary substantially from those assumed in our estimates. In addition, an acquisition may have a material and adverse effect on our business and results of operations, particularly during the periods in which the operations of the acquired properties are being integrated into our ongoing operations or if we are unable to effectively integrate the acquired properties into our ongoing operations.

**We operate in a highly competitive industry, and many of our competitors are larger and have available resources in excess of our own.**

The oil and gas industry is highly competitive, and many competitors, including major integrated and independent oil and gas companies, as well as national oil companies, are larger and have substantially greater resources at their disposal than we do. We compete with these companies for the acquisition of oil and natural gas leases and other properties. We also compete with these companies for equipment and personnel, including petroleum engineers, geologists, geophysicists and other specialists, required to develop and operate those properties and in the marketing of liquid hydrocarbon and natural gas to end-users. Such competition can significantly increase costs and affect the availability of resources, which could provide our larger competitors a competitive advantage when acquiring equipment, leases and other properties. They may also be able to use their greater resources to attract and retain experienced personnel.

**Many of our major projects and operations are conducted with partners, which may decrease our ability to manage risk.**

We often enter into arrangements to conduct certain business operations, such as oil and gas exploration and production, or oil sands mining, with partners in order to share risks associated with those operations. However, these arrangements also may decrease our ability to manage risks and costs, particularly where we are not the operator. We could have limited influence over and control of the behaviors and performance of these operations. In addition, misconduct, fraud, noncompliance with applicable laws and regulations or improper activities by or on behalf of one or more of our partners could have a significant negative impact on our business and reputation.

**Our operations are subject to business interruptions and casualty losses. We do not insure against all potential losses and therefore we could be seriously harmed by unexpected liabilities and increased costs.**

Our North America E&P and International E&P operations are subject to unplanned occurrences, including blowouts, explosions, fires, loss of well control, spills, hurricanes and other adverse weather, tsunamis, earthquakes, volcanic eruptions or nuclear or other disasters, labor disputes and accidents. Our OSM operations are subject to business interruptions due to breakdown or failure of equipment or processes and unplanned events such as fires, earthquakes, explosions or other interruptions. These same risks can be applied to the third-parties which transport our products from our facilities. A prolonged disruption in the ability of any pipelines, rail cars, trucks, or vessels to transport our production could contribute to a business interruption or increase costs.

Our operations are also subject to the additional hazards of pollution, releases of toxic gas and other environmental hazards and risks. These hazards could result in serious personal injury or loss of human life, significant damage to property and equipment, environmental pollution, impairment of operations and substantial losses to us. Various hazards have adversely affected us in the past, and damages resulting from a catastrophic occurrence in the future involving us or any of our assets or operations may result in our being named as a defendant in one or more lawsuits asserting potentially large claims or in our being assessed potentially substantial fines by governmental authorities. We maintain insurance against many, but not all, potential losses or liabilities arising from operating hazards in amounts that we believe to be prudent. Uninsured losses and liabilities arising from operating hazards could reduce the funds available to us for capital, exploration and investment spending and could have a material adverse effect on our business, financial condition, results of operations and cash flows. Historically, we have maintained insurance coverage for physical damage and resulting business interruption to our major onshore and offshore facilities, with significant self-insured retentions. In the future, we may not be able to maintain or obtain insurance of the type and amount we desire at reasonable rates. As a result of market conditions, premiums and deductibles for certain of our insurance policies have increased substantially and could escalate further. In some instances, certain insurance could become unavailable or available only for reduced amounts of coverage. For example, due to hurricane activity in recent years, the availability of insurance coverage for our offshore facilities for windstorms in the Gulf of Mexico region has been reduced or, in many instances, it is prohibitively expensive. As a result, our exposure to losses from future windstorm activity in the Gulf of Mexico region has increased.

**Litigation by private plaintiffs or government officials could adversely affect our performance.**

We currently are defending litigation and anticipate that we will be required to defend new litigation in the future. The subject matter of such litigation may include releases of hazardous substances from our facilities, privacy laws, antitrust laws or any other laws or regulations that apply to our operations. In some cases the plaintiff or plaintiffs seek alleged damages involving large classes of potential litigants, and may allege damages relating to extended periods of time or other alleged facts and circumstances. If we are not able to successfully defend such claims, they may result in substantial liability. We do not have insurance covering all of these potential liabilities. In addition to substantial liability, litigation may also seek injunctive relief which could have an adverse effect on our future operations.

**In connection with our separation from MPC, MPC agreed to indemnify us for certain liabilities. However, there can be no assurance that the indemnity will be sufficient to protect us against the full amount of such liabilities, or that MPC's ability to satisfy its indemnification obligations will not be impaired in the future.**

Pursuant to the Separation and Distribution Agreement and the Tax Sharing Agreement we entered into with MPC in connection with the spin-off, MPC agreed to indemnify us for certain liabilities. However, third parties could seek to hold us responsible for any of the liabilities that MPC agreed to retain or assume, and there can be no assurance that the indemnification from MPC will be sufficient to protect us against the full amount of such liabilities, or that MPC will be able to fully satisfy its indemnification obligations. In addition, even if we ultimately succeed in recovering from MPC any amounts for which we are held liable, we may be temporarily required to bear these losses ourselves.

**The spin-off could result in substantial tax liability.**

We obtained a private letter ruling from the IRS substantially to the effect that the distribution of shares of MPC common stock in the spin-off qualified as tax free to MPC, us and our stockholders for U.S. federal income tax purposes under Sections

31

355 and 368 and related provisions of the U.S. Internal Revenue Code of 1986, as amended (the "Code"). If the factual assumptions or representations made in the request for the private letter ruling prove to have been inaccurate or incomplete in any material respect, then we will not be able to rely on the ruling. Furthermore, the IRS does not rule on whether a distribution such as the spin-off satisfies certain requirements necessary to obtain tax-free treatment under Section 355 of the Code. Rather, the private letter ruling was based on representations by us that those requirements were satisfied, and any inaccuracy in those representations could invalidate the ruling. In connection with the spin-off, we also obtained an opinion of outside counsel, substantially to the effect that, the distribution of shares of MPC common stock in the spin-off qualified as tax free to MPC, us and our stockholders for U.S. federal income tax purposes under Sections 355 and 368 and related provisions of the Code. The opinion relied on, among other things, the continuing validity of the private letter ruling and various assumptions and representations as to factual matters made by MPC and us which, if inaccurate or incomplete in any material respect, would jeopardize the conclusions reached by such counsel in its opinion. The opinion is not binding on the IRS or the courts, and there can be no assurance that the IRS or the courts would not challenge the conclusions stated in the opinion or that any such challenge would not prevail.

If, notwithstanding receipt of the private letter ruling and opinion of counsel, the spin-off were determined not to qualify under Section 355 of the Code, each U.S. holder of our common stock who received shares of MPC common stock in the spin-off would generally be treated as receiving a taxable distribution of property in an amount equal to the fair market value of the shares of MPC common stock received. That distribution would be taxable to each such stockholder as a dividend to the extent of our accumulated earnings and profits as of the effective date of the spin-off. For each such stockholder, any amount that exceeded those earnings and profits would be treated first as a non-taxable return of capital to the extent of such stockholder's tax basis in its shares of our common stock with any remaining amount being taxed as a capital gain. We would be subject to tax as if we had sold all the outstanding shares of MPC common stock in a taxable sale for their fair market value and would recognize taxable gain in an amount equal to the excess of the fair market value of such shares over our tax basis in such shares.

Under the terms of the Tax Sharing Agreement we entered into with MPC in connection with the spin-off, MPC is generally responsible for any taxes imposed on MPC or us and our subsidiaries in the event that the spin-off and/or certain related transactions were to fail to qualify for tax-free treatment as a result of actions taken, or breaches of representations and warranties made in the Tax Sharing Agreement, by MPC or any of its affiliates. However, if the spin-off and/or certain related transactions were to fail to qualify for tax-free treatment because of actions or failures to act by us or any of our affiliates, we would be responsible for all such taxes.

**We may issue preferred stock whose terms could dilute the voting power or reduce the value of Marathon Oil common stock.**

Our restated certificate of incorporation authorizes us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such preferences, powers and relative, participating, optional and other rights, including preferences over Marathon Oil common stock respecting dividends and distributions, as our Board of Directors generally may determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of Marathon Oil common stock. For example, we could grant holders of preferred stock the right to elect some number of our directors in all events or on the happening of specified events or the right to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we could assign to holders of preferred stock could affect the residual value of the common stock.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

The location and general character of our principal liquid hydrocarbon and natural gas properties, oil sands mining properties and facilities, and other important physical properties have been described by segment under Item 1. Business.

Net crude oil and condensate, NGLs, natural gas, and synthetic crude oil sales volumes are set forth in Item 8. Financial Statements and Supplementary Data - Supplemental Statistics. Estimated net proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves are set forth in Item 8. Financial Statements and Supplementary Data - Supplementary Information on Oil and Gas Producing Activities - Estimated Quantities of Proved Oil and Gas Reserves. The basis for estimating these reserves is discussed in Item 1. Business - Reserves.

**Item 3. Legal Proceedings**

We are defendant in a number of lawsuits arising in the ordinary course of business, including, but not limited to, royalty claims, contract claims and environmental claims. While the ultimate outcome and impact to us cannot be predicted with certainty, we believe that the resolution of these proceedings will not have a material adverse effect on our consolidated financial position, results of operations or cash flows.

*Environmental Proceedings*

The following is a summary of proceedings involving us that were pending or contemplated as of December 31, 2014 under federal and state environmental laws. Except as described herein, it is not possible to predict accurately the ultimate outcome of these matters; however, management's belief set forth in the first paragraph under Legal Proceedings above takes such matters into account.

As of December 31, 2014, we have sites across the country where remediation is being sought under environmental statutes, both federal and state, or where private parties are seeking remediation through discussions or litigation. Based on currently available information, which is in many cases preliminary and incomplete, we have approximately $6 million accrued to address the clean-up and remediation costs connected with these sites.

The projected liability for clean-up and remediation provided in the preceding paragraph is a forward-looking statement. To the extent that our assumptions prove to be inaccurate, future expenditures may differ materially from those stated in the forward-looking statement.

**Item 4. Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

The principal market on which Marathon Oil common stock is traded is the New York Stock Exchange ("NYSE"). As of February 23, 2015, there were 39,772 registered holders of Marathon Oil common stock.

The following table reflects high and low sales prices for Marathon Oil common stock and the related dividend per share by quarter for the past two years:

| (Dollars per share) | 2014 | | | 2013 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | High Price | Low Price | Dividends | High Price | Low Price | Dividends |
| First Quarter | $35.52 | $31.81 | $0.19 | $35.71 | $31.59 | $0.17 |
| Second Quarter | $40.16 | $34.90 | $0.19 | $36.38 | $29.85 | $0.17 |
| Third Quarter | $41.69 | $37.59 | $0.21 | $37.83 | $32.61 | $0.19 |
| Fourth Quarter | $37.13 | $24.80 | $0.21 | $37.93 | $34.06 | $0.19 |
| Full Year | $41.69 | $24.80 | $0.80 | $37.93 | $29.85 | $0.72 |

*Dividends* - Our Board of Directors intends to declare and pay dividends on Marathon Oil common stock based on our financial condition and results of operations, although it has no obligation under Delaware law or the Restated Certificate of Incorporation to do so. In determining our dividend policy, the Board will rely on our consolidated financial statements. Dividends on Marathon Oil common stock are limited to our legally available funds.

The following table provides information about purchases by Marathon Oil and its affiliated purchaser, during the quarter ended December 31, 2014, of equity securities that are registered by Marathon Oil pursuant to Section 12 of the Securities Exchange Act of 1934:

| Period | Column (a) Total Number of Shares Purchased[a] | Column (b) Average Price Paid per Share | Column (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[c] | Column (d) Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs[c] |
| --- | --- | --- | --- | --- |
| 10/01/14 - 10/31/14 | 56,595 | $36.55 | - | $ 1,500,285,529 |
| 11/01/14 - 11/30/14 | 3,699 | $35.12 | - | $ 1,500,285,529 |
| 12/01/14 - 12/31/14 | 39,002 [b] | $26.70 | - | $ 1,500,285,529 |
| Total | 99,296 | $32.63 | - | |

[a]  62,242 shares of restricted stock were delivered by employees to Marathon Oil, upon vesting, to satisfy tax withholding requirements.
[b]  37,054 shares were repurchased in open-market transactions to satisfy the requirements for dividend reinvestment under the Marathon Oil Corporation Dividend Reinvestment and Direct Stock Purchase Plan (the "Dividend Reinvestment Plan") by the plan administrator. Shares needed to meet the requirements of the Dividend Reinvestment Plan may either be purchased in the open market or issued directly by Marathon Oil.
[c]  As of December 31, 2014, we had purchased a total of 121 million common shares under the plan at a cost of $4.7 billion, which includes transaction fees and commissions that are not reported in the table above. Of this total, 29 million shares were acquired at a cost of $1 billion in the first and second quarters of 2014, 14 million shares at a cost of $500 million during the third quarter of 2013, 12 million shares at a cost of $300 million in the third quarter of 2011 and 66 million shares at a cost of $2,922 million prior to the June 30, 2011 spin-off of our downstream business. The remaining share repurchase authorization as of December 31, 2014 is $1.5 billion.

**Item 6. Selected Financial Data**

| (In millions, except per share data) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014[a][b] | | 2013[a][b] | | 2012[a][b] | | 2011[a][b] | | 2010[a][b] |
| **Statement of Income Data** | | | | | | | | | | |
| Revenues | $ | 10,846 | $ | 11,325 | $ | 11,966 | $ | 11,088 | $ | 9,336 |
| Income from continuing operations | | 969 | | 931 | | 856 | | 467 | | 325 |
| Net income | | 3,046 | | 1,753 | | 1,582 | | 2,946 | | 2,568 |
| **Per Share Data** | | | | | | | | | | |
| Basic: | | | | | | | | | | |
| Income from continuing operations | | $1.42 | | $1.32 | | $1.21 | | $0.66 | | $0.46 |
| Net income | | $4.48 | | $2.49 | | $2.24 | | $4.15 | | $3.62 |
| Diluted: | | | | | | | | | | |
| Income from continuing operations | | $1.42 | | $1.31 | | $1.21 | | $0.65 | | $0.46 |
| Net income | | $4.46 | | $2.47 | | $2.23 | | $4.13 | | $3.61 |
| **Statement of Cash Flows Data**[b] | | | | | | | | | | |
| Additions to property, plant and equipment related to continuing operations | $ | 5,160 | $ | 4,443 | $ | 4,361 | $ | 2,767 | $ | 2,917 |
| Dividends paid | | 543 | | 508 | | 480 | | 567 | | 704 |
| Dividends per share | | $0.80 | | $0.72 | | $0.68 | | $0.80 | | $0.99 |
| **Balance Sheet Data as of December 31:** | | | | | | | | | | |
| Total assets | $ | 36,011 | $ | 35,620 | $ | 35,306 | $ | 31,371 | $ | 50,014 |
| Total long-term debt, including capitalized leases | | 5,323 | | 6,394 | | 6,512 | | 4,674 | | 7,601 |

[a]   Includes impairments to producing properties of $132 million, $96 million, $371 million, $310 million and $447 million in 2014, 2013, 2012, 2011 and 2010 (see Item 8. Financial Statements and Supplementary Data - Note 14 to the consolidated financial statements). Includes impairments to unproved properties of $306 million, $572 million and $227 million in 2014, 2013 and 2012 (see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations).

[b]   We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014 (see Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements); and our downstream business was spun-off on June 30, 2011. The applicable periods have been recast to reflect these businesses as discontinued operations.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the information under Item 8. Financial Statements and Supplementary Data and the other financial information found elsewhere in this Form 10-K. The following discussion includes forward-looking statements that involve certain risks and uncertainties. See "Disclosures Regarding Forward-Looking Statements" (immediately prior to Part I) and Item 1A. Risk Factors.*

Each of our segments is organized and managed based upon both geographic location and the nature of the products and services it offers:

- North America E&P - explores for, produces and markets crude oil and condensate, NGLs and natural gas in North America;

- International E&P - explores for, produces and markets crude oil and condensate, NGLs and natural gas outside of North America and produces and markets products manufactured from natural gas, such as LNG and methanol, in E.G.; and

- Oil Sands Mining - mines, extracts and transports bitumen from oil sands deposits in Alberta, Canada, and upgrades the bitumen to produce and market synthetic crude oil and vacuum gas oil.

**Executive Summary**

Marathon Oil delivered against 2014 performance commitments by increasing production by 35 percent in the three core U.S. resource plays. We added 305 mmboe of net proved reserves during the year, of which 296 mmboe were in our North America E&P segment. We executed two strategic dispositions for aggregate cash proceeds of more than $4 billion, closing the sale of our Angola assets in the first quarter and our Norway business in the fourth quarter. We executed share repurchases in the first half of the year worth $1 billion. We ended 2014 with liquidity of $4.9 billion comprised of $2.4 billion of cash and $2.5 billion available through a committed multi-year credit facility. Although commodity prices began a substantial decline in the second half of 2014 which continued into 2015, we believe that we are well positioned to continue to satisfy operational objectives and capital commitments with the cash and cash equivalents on hand, internally generated cash flow from operations and available borrowing capacity.

Significant 2014 operating and financial activities include the following:

- Production from continuing operations, excluding Libya, up 8 percent over last year

- North America E&P net sales volumes averaged 238 mboed, an 18 percent increase over last year

- Production from our U.S. resource plays averaged 181 mboed, a 35 percent increase over last year

  ○ Eagle Ford averaged net sales volumes of 112 mboed, a 38 percent increase

  ○ Bakken averaged net sales volumes of 51 mboed, a 31 percent increase

  ○ Oklahoma Resource Basins averaged net sales volumes of 18 mboed, a 29 percent increase

- Total net proved reserves related to continuing operations increased 6 percent to approximately 2.2 bboe

- Recorded 97 percent average operational availability for our operated assets

- Announced Jisik-1 exploration discovery on the operated Harir Block in the Kurdistan Region of Iraq

- Closed Norway and Angola sales for aggregate cash proceeds of more than $4 billion

- Repurchased 29 million common shares for $1 billion

- Increased quarterly dividend by 11 percent to 21 cents per share in the second quarter

- Increased income from continuing operations per diluted share to $1.42 compared to $1.31 in 2013, by 8 percent

36

**Market Conditions**

Prevailing prices for the crude oil and condensate, NGLs, natural gas and synthetic crude oil that we produce significantly impact our revenues and cash flows. Beginning in the second half of 2014, the crude oil benchmark prices began to decline and this decline continued into early 2015. Crude oil benchmark prices are likely to remain volatile based on global supply and demand and could decline further. In addition, the Henry Hub natural gas benchmark began to decline in late 2014 and continued its decline into 2015. Because both WTI crude oil and Brent crude oil benchmark prices were greater than $90 per barrel for the first nine months of 2014, and the Henry Hub natural gas price decline began in late 2014, the magnitude of these commodity declines is not fully evident in the tables below that report 2014 annual price realizations averages relative to our operating segments. See Item 1A. Risk Factors and Item 7. Management's Discussion and Analysis of Financial Condition, Cash Flows and Liquidity - Critical Accounting Estimates for further discussion of how a substantial extended decline in commodity price changes could impact us.

*North America E&P*

The following table presents our average price realizations and the related benchmarks for crude oil, NGLs and natural gas for 2014, 2013 and 2012:

| | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Average Price Realizations** [a] | | | |
| Crude Oil and Condensate *(per bbl)* | | | |
| Bakken | $81.63 | $90.25 | $83.11 |
| Eagle Ford | 87.99 | 99.69 | 100.14 |
| Oklahoma Resource Basins | 87.15 | 94.84 | 89.26 |
| Other North America [b] | 84.21 | 90.42 | 91.75 |
| Total Crude Oil and Condensate | 85.25 | 94.19 | 91.30 |
| Natural Gas Liquids *(per bbl)* | | | |
| Bakken | $43.25 | $41.60 | $42.35 |
| Eagle Ford | 29.60 | 30.16 | 32.96 |
| Oklahoma Resource Basins | 32.61 | 35.28 | 31.82 |
| Other North America [b] | 51.12 | 55.69 | 52.51 |
| Total Natural Gas Liquids | 33.42 | 35.12 | 39.57 |
| Total Liquid Hydrocarbons *(per bbl)* [c] | | | |
| Bakken | $79.41 | $87.76 | $81.36 |
| Eagle Ford | 75.83 | 84.95 | 88.09 |
| Oklahoma Resource Basins | 50.86 | 50.77 | 49.21 |
| Other North America [b] | 81.88 | 88.16 | 89.03 |
| Total Liquid Hydrocarbons | 77.02 | 85.20 | 85.80 |
| Natural Gas *(per mcf)* | | | |
| Bakken | $5.28 | $3.90 | $3.11 |
| Eagle Ford | 4.43 | 3.67 | 3.03 |
| Oklahoma Resource Basins | 4.49 | 3.78 | 3.05 |
| Other North America [b] | 4.65 | 3.95 | 4.20 |
| Total Natural Gas | 4.57 | 3.84 | 3.92 |
| **Benchmarks** | | | |
| WTI crude oil average of daily prices *(per bbl)* | $92.91 | $98.05 | $94.15 |
| LLS crude oil average of daily prices *(per bbl)*[d] | 96.64 | 107.36 | 111.71 |
| Mont Belvieu NGLs *(per bbl)* [e] | 32.52 | 33.78 | 38.59 |
| Henry Hub natural gas settlement date average (per *mmbtu*) | 4.42 | 3.65 | 2.79 |

[a]  Excludes gains or losses on derivative instruments.
[b]  Includes Gulf of Mexico and other conventional onshore U.S. production, plus Alaska in 2013 and 2012.
[c]  Inclusion of realized gains (losses) on crude oil derivative instruments would have increased (decreased) average liquid hydrocarbon price realizations per barrel by $(0.27) and $0.40 for 2013 and 2012. There were no crude oil derivative instruments for 2014.
[d]  Bloomberg Finance LLP: LLS St. James.
[e]  Bloomberg Finance LLP: Y-grade Mix NGL of 50% ethane, 25% propane, 10% butane, 5% isobutane and 10% natural gasoline.

*Crude oil and condensate* - Our crude oil and condensate price realizations may differ from the benchmark due to the quality and location of the product. Crude oil benchmark prices decreased in 2014 compared to 2013. This price decline continued into 2015 with WTI crude oil and LLS crude oil averaging $47.33 and $48.82 per bbl in January 2015.

*Natural gas liquids* - The majority of our NGL volumes are sold at reference to Mont Belvieu prices. Average Mount Belvieu NGL prices for 2014 were modestly lower than for 2013. Our net NGL sales volumes continue to grow due to development of our U.S. resource plays, increasing 164 percent from 2012 to 2014.

*Natural gas* - A significant portion of our natural gas production in the U.S. is sold at bid-week prices, or first-of-month indices relative to our specific producing areas. Average Henry Hub natural gas settlement prices were higher in 2014 compared to 2013. Henry Hub natural gas settlement prices averaged $3.19 per mmtbu for January 2015.

### International E&P

The following table presents our average price realizations and the related benchmark for crude oil for 2014, 2013 and 2012:

|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Average Price Realizations** | | | |
| Crude Oil and Condensate *(per bbl)* | | | |
| Equatorial Guinea | $81.01 | $90.62 | $92.56 |
| United Kingdom | 94.31 | 110.76 | 109.50 |
| Libya | 94.70 | 122.92 | 127.31 |
| Total Crude Oil and Condensate | 87.23 | 108.18 | 113.61 |
| Natural Gas Liquids *(per bbl)* | | | |
| Equatorial Guinea[a] | $1.00 | $1.00 | $1.00 |
| United Kingdom[b] | 67.73 | 72.14 | 78.81 |
| Total Natural Gas Liquids | 2.46 | 5.24 | 8.32 |
| Total Liquid Hydrocarbons *(per bbl)* | | | |
| Equatorial Guinea | $54.29 | $60.34 | $64.33 |
| United Kingdom | 93.75 | 108.92 | 107.31 |
| Libya | 94.70 | 122.92 | 127.31 |
| Total Liquid Hydrocarbons | 68.98 | 91.04 | 100.02 |
| Natural Gas *(per mcf)* | | | |
| Equatorial Guinea[a] | $0.24 | $0.24 | $0.24 |
| United Kingdom | 8.27 | 10.64 | 9.72 |
| Libya | 3.11 | 5.44 | 5.76 |
| Total Natural Gas | 0.72 | 1.15 | 1.33 |
| **Benchmark** | | | |
| Brent (Europe) crude oil *(per bbl)*[c] | $99.02 | $108.64 | $111.65 |

[a] Primarily represents fixed prices under long-term contracts with Alba Plant LLC, Atlantic Methanol Production Company LLC and Equatorial Guinea LNG Holdings Limited, which are equity method investees. We include our share of income from each of these equity method investees in our International E&P segment.

[b] Related sales volumes one mbbld or less for all periods presented.

[c] Average of monthly prices obtained from EIA website.

*Crude oil and condensate* - Our international crude oil and condensate production is generally sold in relation to the Brent crude oil benchmark. Crude oil benchmark prices decreased in 2014 compared to 2013. This price decline continued into 2015 with Brent crude oil averaging $47.86 per bbl in January 2015.

*Natural gas liquids* and *natural gas* - Our NGL and natural gas sales from E.G. are subject to fixed-price, term contracts, making realized prices in this area less volatile; therefore, our reported average natural gas realized prices for the International E&P segment will not fully track market price movements. Although natural gas prices in Europe tend to be considerably higher than in the U.S., these prices decreased in 2014 compared to 2013.

*Oil Sands Mining*

The Oil Sands Mining segment produces and sells various qualities of synthetic crude oil. Output mix can be impacted by operational reliability or planned unit outages at the mines or upgrader. Sales prices for roughly two-thirds of the normal output mix have historically tracked movements in the WTI crude oil benchmark and one-third have historically tracked movements in the Canadian heavy crude oil benchmark, primarily WCS. Comparing 2014 and 2013, the WCS crude oil discount to WTI crude oil narrowed by $5.97 per barrel. A comparison of 2014 compared to 2013 indicate the WTI crude oil benchmark decreased while the WCS crude oil benchmark slightly increased. However, both WTI and WCS crude oil benchmarks declined in January 2015 with prices averaging $47.33 per bbl and $30.43 per bbl, respectively.

The operating cost structure of our Oil Sands Mining operations is predominantly fixed and therefore many of the costs incurred in times of full operation continue during production downtime. Per-unit costs are sensitive to production rates. Key variable costs are natural gas and diesel fuel, which track commodity markets such as the Canadian Alberta Energy Company ("AECO") natural gas sales index and crude oil prices. As average price realizations are typically at a discount to WTI and the operating cost structure for Oil Sands Mining is predominately fixed, sustained declines in oil prices could result in operating losses.

The following table presents our average price realizations and the related benchmarks that impacted both our revenues and variable costs for 2014, 2013 and 2012:

|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Average Price Realizations** |  |  |  |
| Synthetic Crude Oil *(per bbl)* | $83.35 | $87.51 | $81.72 |
| **Benchmark** |  |  |  |
| WTI crude oil *(per bbl)* | $92.91 | $98.05 | $94.15 |
| WCS crude oil *(per bbl)*[a] | $73.60 | $72.77 | $73.18 |
| AECO natural gas sales index *(per mmbtu)*[b] | $3.99 | $3.08 | $2.39 |

[a] Average of monthly prices based upon average WTI adjusted for differentials unique to western Canada.
[b] Monthly average AECO day ahead index.

**Net Sales Volumes**

Our net sales volumes from continuing operations averaged 415 mboed, 404 mboed and 389 mboed for 2014, 2013 and 2012. As liftings from Libya were sporadic during this 3-year period, a more representative comparison is net sales volumes from continuing operations excluding Libya, which was 408 mboed, 376 mboed and 344 mboed for 2014, 2013 and 2012. The continued ramp up of production from our U.S. resource plays has been the most significant contributor to the increases when comparing results excluding Libya, partially offset by decreases from domestic asset sales and normal production declines. Net sales volumes related to the Angola and Norway discontinued operations averaged 54 mboed, 89 mboed and 90 mboed for 2014, 2013 and 2012, representing 12 percent, 18 percent and 19 percent of total company net sales volumes in those periods.

39

The following table presents North America E&P segment net sales volumes by product and geographic area for 2014, 2013 and 2012:

| | Year Ended December 31, | | |
|---|---|---|---|
| Net Sales Volumes | 2014 | 2013 | 2012 |
| **North America E&P** | | | |
| Crude Oil and Condensate *(mbbld)* | | | |
| Bakken | 45 | 35 | 27 |
| Eagle Ford | 72 | 51 | 23 |
| Oklahoma Resource Basins | 3 | 2 | 1 |
| Other North America[a] | 37 | 38 | 45 |
| Total Crude Oil and Condensate | 157 | 126 | 96 |
| Natural Gas Liquids *(mbbld)* | | | |
| Bakken | 3 | 2 | 1 |
| Eagle Ford | 19 | 14 | 5 |
| Oklahoma Resource Basins | 5 | 4 | 2 |
| Other North America[a] | 2 | 3 | 3 |
| Total Natural Gas Liquids | 29 | 23 | 11 |
| Total Liquid Hydrocarbons *(mbbld)* | | | |
| Bakken | 48 | 37 | 28 |
| Eagle Ford | 91 | 65 | 28 |
| Oklahoma Resource Basins | 8 | 6 | 3 |
| Other North America[a] | 39 | 41 | 48 |
| Total Liquid Hydrocarbons | 186 | 149 | 107 |
| Natural Gas *(mmcfd)* | | | |
| Bakken | 18 | 13 | 8 |
| Eagle Ford | 123 | 94 | 37 |
| Oklahoma Resource Basins | 61 | 48 | 32 |
| Other North America[a] | 108 | 157 | 281 |
| Total Natural Gas | 310 | 312 | 358 |
| Equivalent Barrels *(mboed)* | | | |
| Bakken | 51 | 39 | 29 |
| Eagle Ford | 112 | 81 | 34 |
| Oklahoma Resource Basins | 18 | 14 | 8 |
| Other North America[a] | 57 | 67 | 95 |
| Total North America E&P *(mboed)* | 238 | 201 | 166 |

[a] Includes Gulf of Mexico and other conventional onshore U.S. production, plus Alaska in 2013 and 2012.

North America E&P segment average net sales volumes in 2014 increased 18 percent when compared to 2013. Net liquid hydrocarbon sales volumes increased 37 mbbld in 2014 primarily reflecting continued growth from our three core U.S. resource plays and net natural gas sales volumes decreased 2 mmcfd in 2014 primarily due to the shut-in and exit from Powder River Basin operations and the January 2013 sale of our Alaska assets, partially offset by the increases from the U.S. resource plays.

North America E&P segment average net sales volumes in 2013 increased 21 percent when compared to 2012, primarily due to higher liquid hydrocarbon net sales volumes resulting from ongoing development programs in our three key U.S. resource plays, partially offset by lower natural gas sales volumes, primarily the result of the January 2013 sale of our Alaska assets.

Refer to the Item 1. Business section for additional detail related to net sales volumes by asset.

The following table presents International E&P and OSM segments net sales volumes by product and geographic area for 2014, 2013 and 2012:

| Net Sales Volumes | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| **International E&P** | | | |
| Crude Oil and Condensate *(mbbld)* | | | |
| Equatorial Guinea | 21 | 23 | 25 |
| United Kingdom | 11 | 14 | 15 |
| Libya | 7 | 24 | 42 |
| Total Crude Oil and Condensate | 39 | 61 | 82 |
| Natural Gas Liquids *(mbbld)* | | | |
| Equatorial Guinea | 10 | 11 | 11 |
| United Kingdom | - | 1 | 1 |
| Total Natural Gas Liquids | 10 | 12 | 12 |
| Total Liquid Hydrocarbons *(mbbld)* | | | |
| Equatorial Guinea | 31 | 34 | 36 |
| United Kingdom | 11 | 15 | 16 |
| Libya | 7 | 24 | 42 |
| Total Liquid Hydrocarbons | 49 | 73 | 94 |
| Natural Gas *(mmcfd)* | | | |
| Equatorial Guinea | 439 | 442 | 428 |
| United Kingdom[b] | 28 | 32 | 48 |
| Libya | 1 | 22 | 15 |
| Total Natural Gas | 468 | 496 | 491 |
| Equivalent Barrels *(mboed)* | | | |
| Equatorial Guinea | 104 | 107 | 107 |
| United Kingdom[b] | 16 | 20 | 24 |
| Libya | 7 | 28 | 45 |
| Total International E&P *(mboed)* | 127 | 155 | 176 |
| **Oil Sands Mining** | | | |
| Synthetic Crude Oil *(mbbld)*[c] | 50 | 48 | 47 |
| **Total Continuing Operations *(mboed)*** | 415 | 404 | 389 |
| Discontinued Operations - Angola *(mboed)*[d] | 2 | 10 | - |
| Discontinued Operations - Norway *(mboed)*[d] | 52 | 79 | 90 |
| **Total Company *(mboed)*** | 469 | 493 | 479 |
| **Net Sales Volumes of Equity Method Investees** | | | |
| LNG *(mtd)* | 6,535 | 6,548 | 6,290 |
| Methanol *(mtd)* | 1,092 | 1,249 | 1,298 |

[b] Includes natural gas acquired for injection and subsequent resale of 6 mmcfd, 7 mmcfd and 15 mmcfd for 2014, 2013, and 2012.
[c] Includes blendstocks.
[d] As we closed the sale of our Angola assets and our Norway business during 2014, they are reflected as discontinued operations and excluded from segments in all periods presented.

International E&P segment average net sales volumes in 2014 decreased 18 percent when compared to 2013. We had lower oil sales from Libya in 2014 as a result of third party labor strikes at the Es Sider terminal and ongoing civil unrest. Excluding Libya, net sales volumes decreased 6 percent in 2014 compared to 2013, primarily due to reliability issues and production decline in the U.K. and lower reliability at the non-operated methanol facility in E.G.

International E&P segment average net sales volumes in 2013 decreased 12 percent when compared to 2012 primarily due to lower liquid hydrocarbon net sales volumes in Libya. Excluding Libya, net sales volumes only decreased 3 percent in 2013 when compared to 2012.

Refer to the Item 1. Business section for additional detail related to net sales volumes by asset.

### Oil Sands Mining

Our OSM operations consist of a 20 percent non-operated working interest in the AOSP. Our net synthetic crude oil sales volumes were 50 mbbld in 2014 compared to 48 mbbld in 2013 and 47 mbbld in 2012.

**Consolidated Results of Operations: 2014 compared to 2013**

Consolidated income from continuing operations after income taxes in 2014 was 4 percent higher than 2013 primarily due to increased net sales volumes in the North America E&P segment which were partially offset by lower average price realizations in all segments, as well as lower net sales volumes in the International E&P segment primarily as a result of civil unrest in Libya.

*Sales and other operating revenues, including related party* are summarized by segment in the following table:

| | | Year Ended December 31, | |
|---|---|---|---|
| (In millions) | | 2014 | 2013 |
| **Sales and other operating revenues, including related party** | | | |
| North America E&P | $ | 5,770 $ | 5,068 |
| International E&P | | 1,410 | 2,654 |
| Oil Sands Mining | | 1,556 | 1,576 |
| Segment sales and other operating revenues, including related party | | 8,736 | 9,298 |
| Unrealized loss on crude oil derivative instruments | | - | (52) |
| Sales and other operating revenues, including related party | $ | 8,736 $ | 9,246 |

*North America E&P sales and other operating revenues* increased $702 million from 2013 to 2014 primarily due to higher liquid hydrocarbon net sales volumes resulting from ongoing development programs in the Eagle Ford, Bakken and Oklahoma Resource Basins, partially offset by lower average crude oil price realizations.

The following table displays changes in North America E&P segment sales and other operating revenues by product. Refer to the preceding Market Conditions and Net Sales Volumes sections for additional detail related to average price realizations and net sales.

| | Year Ended December 31, | | Increase (Decrease) Related to | | | Year Ended December 31, |
|---|---|---|---|---|---|---|
| (In millions) | 2013 | | Price Realizations | Net Sales Volumes | | 2014 |
| **North America E&P Price-Volume Analysis** | | | | | | |
| Liquid hydrocarbons | $ | 4,638 | $ (557) $ | 1,159 | $ | 5,240 |
| Natural gas | | 437 | 82 | (3) | | 516 |
| Realized loss on crude oil | | | | | | |
| derivative instruments | | (15) | 15 | | | - |
| Other sales | | 8 | | | | 14 |
| Total | $ | 5,068 | | | $ | 5,770 |

*International E&P sales and other operating revenues* decreased $1,244 million in 2014 from the prior year. This decrease was primarily due to lower liquid hydrocarbon net sales volumes in Libya as a result of civil unrest and lower average price realizations in every location.

The following table displays changes in International E&P segment sales and other operating revenues by product. Refer to the preceding Market Conditions and Net Sales Volumes sections for additional detail related to average price realizations and net sales.

| | Year Ended December 31, | | Increase (Decrease) Related to | | | Year Ended December 31, |
|---|---|---|---|---|---|---|
| (In millions) | 2013 | | Price Realizations | Net Sales Volumes | | 2014 |
| **International E&P Price-Volume Analysis** | | | | | | |
| Liquid hydrocarbons | $ | 2,398 | $ (397) $ | (761) | $ | 1,240 |
| Natural gas | | 209 | (74) | (11) | | 124 |
| Other sales | | 47 | | | | 46 |
| Total | $ | 2,654 | | | $ | 1,410 |

*Oil Sands Mining sales and other operating revenues* decreased $20 million in 2014 from 2013. This decrease was primarily due to lower average price realizations compared to 2013, partially offset by increased net sales volumes in 2014.

42

The following table displays changes in OSM segment sales of synthetic crude oil and other operating revenues. Refer to the preceding Market Conditions and Net Sales Volumes sections for additional detail related to average price realizations and net sales.

| (In millions) | Year Ended December 31, 2013 | | Increase (Decrease) Related to Price Realizations | | Net Sales Volumes | | Year Ended December 31, 2014 | |
|---|---|---|---|---|---|---|---|---|
| **Oil Sands Mining Price-Volume Analysis** | | | | | | | | |
| Synthetic crude oil | $ | 1,542 | $ | (76) | $ | 59 | $ | 1,525 |
| Other sales | | 34 | | | | | | 31 |
| Total | $ | 1,576 | | | | | $ | 1,556 |

*Unrealized gains and losses on crude oil derivative instruments* are included in total sales and other operating revenues but are not allocated to the segments. These crude oil derivative instruments, all of which expired December 2013, had no impact in 2014 compared to a net unrealized loss of $52 million in 2013. See Item 8. Financial Statements and Supplementary Data - Note 15 to the consolidated financial statements for information about our derivative positions.

**Marketing revenues** increased $31 million in 2014 from 2013. The increase in 2014 is primarily due to higher marketing activity levels in both the North America E&P and OSM segments. Marketing activities include the purchase of commodities from third parties for resale, or in order to meet sales contracts, and serve to aggregate volumes in order to satisfy transportation commitments as well as to achieve flexibility within product types and delivery points. Because the volume of marketing activity is based on market dynamics, it can fluctuate from period to period.

**Net loss on disposal of assets** in 2014 primarily includes the pretax loss on the sale of non-core acreage located in the far northwest portion of the Williston Basin. The net loss on disposal of assets in 2013 primarily included pretax losses on the sale of our DJ Basin interests and the conveyance of our Marcellus interests to the operator, offset by pretax gains on the sales of the Neptune gas plant and our remaining assets in Alaska. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements for information about these dispositions.

**Production expenses** increased $90 million in 2014 from 2013 primarily related to increased North America E&P net sales volumes in the Eagle Ford and Bakken. The production expense rate (expense per boe) decreased in North America E&P in 2014 compared to 2013 primarily due to improved operating efficiencies in the Eagle Ford. The expense per boe increased in the International E&P segment due to a subsea power project at our non-operated Foinaven field as well as a turnaround in Brae in the U.K. and a non-recurring riser repair in E.G.

The following table provides production expense rates for each segment:

| ($ per boe) | 2014 | 2013 |
|---|---|---|
| North America E&P | $10.25 | $10.86 |
| International E&P | $8.31 | $6.36 |
| Oil Sands Mining [a] | $44.53 | $46.30 |

[a] Production expense per synthetic crude oil barrel (before royalties) includes production costs, shipping and handling, taxes other than income and insurance costs and excludes pre-development costs.

**Other operating expenses** increased $73 million in 2014 from the prior year, primarily due to increased shipping and handling costs in North America in line with increased sales volumes, as well as the impact of a settlement related to the calculation of the net profits interest payments associated with our Alba Plant equity interests in E.G.

**Marketing expenses** increased $29 million in 2014 from the prior year, consistent with the increase in marketing revenues discussed above.

 **Exploration expenses** decreased $98 million&332;in 2014 from 2013, primarily related to our North America E&P segment as a result of larger non-cash unproved property impairments during 2013 related to Eagle Ford leases that either expired or that we did not expect to drill. These decreases were partially offset by increases in 2014 expenses related to the operated Key Largo, the outside-operated Perseus, the outside-operated second Shenandoah appraisal well in the Gulf of Mexico and our operated Sodalita West #1 exploratory well in E.G.

43

The following table summarizes the components of exploration expenses:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 |
| Unproved property impairments | $ | 306 | $ | 572 |
| Dry well costs | | 317 | | 148 |
| Geological and geophysical | | 85 | | 80 |
| Other | | 85 | | 91 |
| Total exploration expenses | $ | 793 | $ | 891 |

*Depreciation, depletion and amortization* increased $361 million in 2014 from the prior year. Our segments apply the units-of-production method to the majority of their assets, including capitalized asset retirement costs. Increased DD&A expense in 2014 is primarily due to higher North America E&P sales volumes as a result of ongoing development programs over our three U.S. resource plays.

The DD&A rate, which is impacted by changes in reserves, capitalized costs and sales volume mix by field, can also cause changes to our DD&A. The following table provides DD&A rates for each segment:

| *($ per boe)* | 2014 | 2013 |
|---|---|---|
| North America E&P | $26.95 | $26.23 |
| International E&P | $5.79 | $5.86 |
| Oil Sands Mining | $12.07 | $12.39 |

*Impairments* in 2014 included certain Gulf of Mexico properties. Impairments in 2013 primarily related to a second LNG production train in E.G., the Ozona development in the Gulf of Mexico, and our Powder River Basin asset in Wyoming. See Item 8. Financial Statements and Supplementary Data - Note 14 to the consolidated financial statements for information about these impairments.

*Taxes other than income* include production, severance and ad valorem taxes in the U.S., which tend to increase or decrease in relation to sales volumes and revenues, and increased $61 million in 2014 from 2013, consistent with similar increases in the North America E&P segment.

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 |
| Production and severance | $ | 240 | $ | 202 |
| Ad valorem | | 74 | | 61 |
| Other | | 92 | | 82 |
| Total | $ | 406 | $ | 345 |

*Net interest and other* decreased $40 million in 2014 from 2013 primarily due to an increase in capitalized interest and higher net foreign currency gains as well as a dividend received in 2014 from a mutual insurance company of which we are an owner. See Item 8. Financial Statements and Supplementary Data - Note 8 to the consolidated financial statements for more detailed information.

*Provision for income taxes* decreased $1,070 million in 2014 from 2013 primarily due to the decrease in pretax income from higher tax jurisdictions, primarily Libya. The following is an analysis of the effective tax rates for 2014 and 2013.

| | 2014 | 2013 |
|---|---|---|
| Statutory rate applied to income from continuing operations before income taxes | 35% | 35% |
| Effects of foreign operations, including foreign tax credits | (6) | 26 |
| Change in permanent reinvestment assertion | (19) | - |
| Adjustments to valuation allowances | 21 | (1) |
| Other | (2) | 1 |
| Effective income tax rate on continuing operations | 29% | 61% |

The effective income tax rate is influenced by a variety of factors including the geographic and functional sources of income and the relative magnitude of these sources of income. The difference between the total provision and the sum of the amounts allocated to segments appears in the "Corporate and other unallocated items" shown in the reconciliation of segment income to net income below.

44

*Effects of foreign operations* - The effects of foreign operations on our effective tax rate decreased in 2014 as compared to 2013 due to a shift in pretax income mix between high and low tax jurisdictions. This is primarily related to decreased sales in Libya where the tax rate is in excess of 90 percent. Excluding Libya, the effective tax rates on continuing operations for 2014 and 2013 would be 27 percent and 38 percent.

*Change in permanent reinvestment assertion* - In the second quarter of 2014, we reviewed our foreign operations, including the disposition of our Norway business, and concluded that our foreign operations do not have the same level of immediate capital needs as previously expected. Therefore, we no longer intend for previously unremitted foreign earnings associated with our U.K. operations to be permanently reinvested outside the U.S. The U.K. statutory tax rate is in excess of the U.S. statutory tax rate, and therefore, foreign tax credits associated with these earnings exceeds any incremental U.S. tax liabilities.

*Adjustments to valuation allowances* - In 2014, we increased the valuation allowance against foreign tax credits as a result of removing the permanent reinvestment assertion on our U.K. operations since the U.K. statutory tax rate is in excess of the U.S. statutory tax rate. In 2013, valuation allowances decreased primarily due to the disposal of our Indonesian assets.

See Item 8. Financial Statements and Supplementary Data - Note 9 to the consolidated financial statements for further information about income taxes.

**Discontinued operations** is presented net of tax. We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014, and both are reflected as discontinued operations and excluded from the International E&P segment in all periods presented. Included in discontinued operations for 2014 are after-tax gains of $532 million and $976 million related to the dispositions of Angola and Norway, respectively. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements.

Average net sales volumes from Norway were 52 mboed and 79 mboed in 2014 and 2013. Sales volumes decreased in 2014 compared to 2013 primarily as the result of water breakthrough, as anticipated at Volund, as well as natural decline in the remaining fields. Alvheim sales were also impacted in 2014 by severe winter weather during the first quarter which resulted in eight days of curtailed production and again during the third quarter due to planned maintenance and system upgrades on the Alvheim FPSO. In addition, 2014 Norway sales volumes are only reported through the October 15, 2014 close date.

**Segment Results: 2014 compared to 2013**

*Segment income* for 2014 and 2013 is summarized and reconciled to net income in the following table.

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 |
| North America E&P | $ | 693 | $ | 529 |
| International E&P | | 568 | | 758 |
| Oil Sands Mining | | 235 | | 206 |
| Segment income | | 1,496 | | 1,493 |
| Items not allocated to segments, net of income taxes: | | | | |
| Corporate and other unallocated items | | (399) | | (470) |
| Unrealized loss on crude oil derivative instruments | | - | | (33) |
| Net loss on dispositions | | (58) | | (20) |
| Impairments | | (70) | | (39) |
| Income from continuing operations | | 969 | | 931 |
| Discontinued operations | | 2,077 | | 822 |
| Net income | $ | 3,046 | $ | 1,753 |

*North America E&P segment income* increased $164 million in 2014 compared to 2013. The increase was largely due to increased liquid hydrocarbon net sales volumes primarily in the Eagle Ford, Bakken and Oklahoma Resource Basins and lower exploration expenses, partially offset by lower average price realizations.

*International E&P segment income* decreased $190 million in 2014 compared to 2013. The decrease was primarily due to lower liquid hydrocarbon net sales volumes and lower average price realizations partially offset by a decrease in the taxes related to Libya, a high tax jurisdiction. Also, other operating expenses were higher in 2014 primarily due to the impact of a settlement related to the calculation of the net profits interest payments associated with our Alba Plant equity interests in E.G.

*Oil Sands Mining segment income* increased $29 million in 2014 compared to 2013. This increase was primarily a result of higher operating expenses in 2013 related to a turnaround.

**Consolidated Results of Operations: 2013 compared to 2012**

Consolidated income from continuing operations after income taxes in 2013 was 9 percent higher than 2012 primarily due to higher net sales volumes in the North America E&P segment, partially offset by higher exploration expenses and lower net sales volumes as well as lower average price realizations in the International E&P segment.

*Sales and other operating revenues, including related party* are summarized by segment in the following table:

| (In millions) | | Year Ended December 31, 2013 | | Year Ended December 31, 2012 |
|---|---|---|---|---|
| **Sales and other operating revenues, including related party** | | | | |
| North America E&P | $ | 5,068 | $ | 3,944 |
| International E&P | | 2,654 | | 3,719 |
| Oil Sands Mining | | 1,576 | | 1,521 |
| Segment sales and other operating revenues, including related party | | 9,298 | | 9,184 |
| Unrealized gain (loss) on crude oil derivative instruments | | (52) | | 53 |
| Sales and other operating revenues, including related party | $ | 9,246 | $ | 9,237 |

*North America E&P sales and other operating revenues* increased $1,124 million from 2012 to 2013 primarily due to higher liquid hydrocarbon net sales volumes resulting from ongoing development programs in the Eagle Ford, Bakken and Oklahoma Resource Basins, partially offset by lower natural gas net sales volumes, primarily the result of the sale of our Alaska assets in early 2013.

The following table displays changes in North America E&P segment sales and other operating revenues by product. Refer to the preceding Market Conditions and Sales sections for additional detail related to average price realizations and net sales.

| (In millions) | | Year Ended December 31, 2012 | | Increase (Decrease) Related to Price Realizations | | Net Sales Volumes | | Year Ended December 31, 2013 |
|---|---|---|---|---|---|---|---|---|
| **North America E&P Price-Volume Analysis** | | | | | | | | |
| Liquid hydrocarbons | $ | 3,352 | $ | (33) | $ | 1,319 | $ | 4,638 |
| Natural gas | | 513 | | (9) | | (67) | | 437 |
| Realized gain on crude oil derivative instruments | | 17 | | (17) | | | | (15) |
| Other sales | | 62 | | | | | | 8 |
| Total | $ | 3,944 | | | | | $ | 5,068 |

*International E&P sales and other operating revenues* decreased $1,065 million in 2013 from the prior year. This decrease was primarily due to lower liquid hydrocarbon net sales volumes in Libya and lower liquid hydrocarbon average price realizations.

The following table displays changes in International E&P segment sales and other operating revenues by product. Refer to the preceding Market Conditions and Sales sections for additional detail related to average price realizations and net sales.

| (In millions) | | Year Ended December 31, 2012 | | Increase (Decrease) Related to Price Realizations | | Net Sales Volumes | | Year Ended December 31, 2013 |
|---|---|---|---|---|---|---|---|---|
| **International E&P Price-Volume Analysis** | | | | | | | | |
| Liquid hydrocarbons | $ | 3,433 | $ | (237) | $ | (798) | $ | 2,398 |
| Natural gas | | 240 | | (33) | | 2 | | 209 |
| Other sales | | 46 | | | | | | 47 |
| Total | $ | 3,719 | | | | | $ | 2,654 |

46

*Oil Sands Mining sales and other operating revenues* increased $55 million in 2013 from 2012. This increase was primarily due to a higher proportion of net sales volumes related to a premium grade synthetic crude oil and the associated higher average price realizations when compared to 2012. The increase was partially offset by lower feedstock sales in 2013.

The following table displays changes in OSM segment sales of synthetic crude oil and other operating revenues. Refer to the preceding Market Conditions and Sales sections for additional detail related to average price realizations and net sales.

| | Year Ended December 31, | Increase (Decrease) Related to | | Year Ended December 31, |
|---|---|---|---|---|
| *(In millions)* | 2012 | Price Realizations | Net Sales Volumes | 2013 |
| **Oil Sands Mining Price-Volume Analysis** | | | | |
| Synthetic crude oil | $ 1,409 | $ 102 | $ 31 | $ 1,542 |
| Other sales | 112 | | | 34 |
| Total | $ 1,521 | | | $ 1,576 |

*Unrealized gains and losses on crude oil derivative instruments* are included in total sales and other operating revenues but are not allocated to the segments. These crude oil derivative instruments, all of which expired in December 2013, resulted in a $52 million net unrealized loss in 2013 compared to a net unrealized gain of $53 million in 2012. See Item 8. Financial Statements and Supplementary Data - Note 15 to the consolidated financial statements for information about our derivative positions.

*Marketing revenues* decreased $650 million in 2013 from 2012. North America E&P segment marketing activities, which serve to aggregate volumes in order to satisfy transportation commitments as well as to achieve flexibility within product types and delivery points, decreased in 2013 as a result of market dynamics.

*Income from equity method investments* increased $53 million in 2013 from the prior year primarily due to higher LNG average price realizations.

*Net gain (loss) on disposal of assets* in 2013 primarily included pretax losses on the sale of our DJ Basin interests and the conveyance of our Marcellus interests to the operator offset by pretax gains on the sales of the Neptune gas plant and our remaining assets in Alaska. The net gain on disposal of assets in 2012 consisted primarily of a pretax gain on the sale of our interests in several Gulf of Mexico crude oil pipeline systems partially offset by a pretax loss related to our exit from Indonesia. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements for further details about these dispositions.

*Production expenses* increased $77 million in 2013 from 2012 primarily related to increased North America E&P net sales volumes in the Eagle Ford and Bakken, partially offset by decreased International E&P net sales volumes. The production expense rate (expense per boe) decreased in North America E&P in 2013 compared to 2012 primarily due to improved operating efficiencies in the Eagle Ford. The production expense rate (expense per boe) increase in International E&P in 2013 compared to 2012 was primarily due to maintenance and workovers performed in Libya while production was down as a result of third-party labor strikes at the Es Sider terminal during the second half of 2013.

The following table provides production expense rates (expense per boe) for each segment:

| *($ per boe)* | 2013 | 2012 |
|---|---|---|
| North America E&P | $10.86 | $11.59 |
| International E&P | $6.36 | $5.85 |
| Oil Sands Mining [a] | $46.30 | $45.95 |

(a) Production expense per synthetic crude oil barrel (before royalties) includes production costs, shipping and handling, taxes other than income and insurance costs and excludes pre-development costs.

*Marketing expenses* decreased $658 million in 2013 from the prior year, consistent with the decreases in marketing revenues discussed above.

*Exploration expenses* were $206 million higher in 2013 than in 2012, primarily due to larger non-cash unproved property impairments in our North America E&P segment related to Eagle Ford leases that either expired or that we did not expect to drill, partially offset by reduced dry well costs and geological and geophysical costs. Unproved property impairments in 2012 related to Marcellus, Eagle Ford, and Indonesia.

| (In millions) | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| Unproved property impairments | $ | 572 | $ | 227 |
| Dry well costs | | 148 | | 230 |
| Geological and geophysical | | 80 | | 127 |
| Other | | 91 | | 101 |
| Total exploration expenses | $ | 891 | $ | 685 |

*Depreciation, depletion and amortization* increased $492 million in 2013 from the prior year. Our segments apply the units-of-production method to the majority of their assets, including capitalized asset retirement costs. Increased DD&A in 2013 primarily reflects the impact of higher North America E&P sales volumes as well as increased amortization of capitalized asset retirement costs due to revisions of estimates for abandonment obligations in the Gulf of Mexico and the U.K, partially offset by the disposition of our Alaska assets in January 2013. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements for information about the Alaska disposition.

The DD&A rate (expense per boe), which is impacted by changes in reserves, capitalized costs and sales volume mix by field, can also cause changes to our DD&A. A higher 2013 DD&A rate in North America E&P versus 2012 is due to the ongoing development programs in the U.S. resource plays. A higher 2013 DD&A rate in International E&P versus 2012 is due to an increase in estimated abandonment costs in the U.K.

The following table provides DD&A rates for each segment:

| ($ per boe) | 2013 | 2012 |
|---|---|---|
| North America E&P | $26.23 | $23.45 |
| International E&P | $5.86 | $4.96 |
| Oil Sands Mining | $12.39 | $12.57 |

*Impairments* in 2013 primarily related to capitalized costs associated with engineering and feasibility studies for a second LNG production train in E.G., the Ozona development in the Gulf of Mexico and our Powder River Basin asset in Wyoming. Impairments in 2012 were also related to the Ozona development and Powder River Basin. See Item 8. Financial Statements and Supplementary Data - Note 14 to the consolidated financial statements for information about these impairments.

*Taxes other than income* include production, severance and ad valorem taxes in the United States, which tend to increase or decrease in relation to sales volumes and revenues, and increased $102 million in 2013 from 2012. With the increase in North America E&P revenues and net sales volumes, production and severance taxes increased $76 million in 2013 from 2012. In addition, ad valorem taxes were slightly higher because the value of our North America E&P assets has increased with continued acquisitions in the Eagle Ford.

| (In millions) | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| Production and severance | $ | 202 | $ | 126 |
| Ad valorem | | 61 | | 57 |
| Other | | 82 | | 60 |
| Total | $ | 345 | $ | 243 |

*Net interest and other* increased $56 million in 2013 from 2012 primarily due to higher interest expense related to our $2 billion issuance of senior notes in late 2012. See Item 8. Financial Statements and Supplementary Data - Note 8 to the consolidated financial statements for more detailed information.

*Provision for income taxes* decreased $786 million in 2013 from 2012 primarily due to the decrease in pretax income from continuing operations, primarily in Libya, which is a higher tax jurisdiction. The following is an analysis of the effective income tax rates for 2013 and 2012:

|  | 2013 | 2012 |
|---|---|---|
| Statutory rate applied to income from continuing operations before income taxes | 35% | 35% |
| Effects of foreign operations, including foreign tax credits | 26 | 36 |
| Adjustments to valuation allowances | (1) | - |
| Other | 1 | 1 |
| Effective income tax rate on continuing operations | 61% | 72% |

The effective income tax rate is influenced by a variety of factors including the geographic sources of income and the relative magnitude of these sources of income. The difference between the total provision and the sum of the amounts allocated to segments appears in the "Corporate and other unallocated items" shown in the reconciliation of segment income to net income below.

*Effects of foreign operations* - The effects of foreign operations on our effective tax rate decreased in 2013 as compared to 2012, primarily due to decreased sales in Libya during 2013 as a result of third-party labor strikes at the Es Sider oil terminal. Excluding Libya, the effective tax rates on continuing operations for 2013 and 2012 would be 38 percent and 37 percent.

See Item 8. Financial Statements and Supplementary Data - Note 9 to the consolidated financial statements for further information about income taxes.

*Discontinued operations* is presented net of tax. In 2014, we closed the sales of our Angola assets and Norway business; therefore, the Angola and Norway operations are reflected as discontinued operations in all periods presented. See Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements.

Average net sales volumes from Norway were 79 mboed and 90 mboed in 2013 and 2012. Sales volumes decreased in 2013 compared to 2012 primarily as the result of well workovers in 2013 as well as natural decline in the remaining fields.

## Segment Results: 2013 compared to 2012

*Segment income* for 2013 and 2012 is summarized and reconciled to net income in the following table.

|  |  | Year Ended December 31, | | |
|---|---|---|---|---|
| *(In millions)* |  | 2013 | | 2012 |
| North America E&P | $ | 529 | $ | 382 |
| International E&P |  | 758 |  | 895 |
| Oil Sands Mining |  | 206 |  | 171 |
| Segment income |  | 1,493 |  | 1,448 |
| Items not allocated to segments, net of income taxes: |  |  |  |  |
| Corporate and other unallocated items |  | (470) |  | (467) |
| Unrealized gain (loss) on crude oil derivative instruments |  | (33) |  | 34 |
| Net gain (loss) on dispositions |  | (20) |  | 72 |
| Impairments |  | (39) |  | (231) |
| Income from continuing operations |  | 931 |  | 856 |
| Discontinued operations |  | 822 |  | 726 |
| Net income | $ | 1,753 | $ | 1,582 |

*North America E&P segment income* increased $147 million in 2013 compared to 2012. The increase was largely due to increased liquid hydrocarbon net sales volumes primarily in the Eagle Ford, Bakken and Oklahoma Resource Basins, partially offset by higher DD&A associated with the higher sales volumes. Segment income in 2013 was also negatively impacted by the previously discussed higher exploration expenses related to non-cash unproved property impairments and the sale of our Alaska assets.

*International E&P segment income* decreased $137 million in 2013 compared to 2012. The decrease was primarily related to the lower liquid hydrocarbon net sales volumes in Libya and lower average liquid hydrocarbon price realizations, partially offset by lower taxes as a result of decreased pretax income from Libya which is a higher tax jurisdiction.

49

*Oil Sands Mining segment income* increased $35 million in 2013 compared to 2012. This increase was primarily due to a higher proportion of net sales volumes in 2013 related to a premium grade of synthetic crude oil with an average higher corresponding price realization.

**Management's Discussion and Analysis of Financial Condition, Cash Flows and Liquidity**

**Cash Flows**

The following table presents sources and uses of cash and cash equivalents for 2014, 2013 and 2012:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 | | 2012 |
| **Sources of cash and cash equivalents** | | | | | | |
| Continuing operations | $ | 4,736 | $ | 4,388 | $ | 2,874 |
| Discontinued operations | | 751 | | 882 | | 1,143 |
| Disposals of assets | | 3,760 | | 450 | | 467 |
| Borrowings including commercial paper, net | | - | | - | | 2,197 |
| Other | | 214 | | 189 | | 129 |
| Total sources of cash and cash equivalents | $ | 9,461 | $ | 5,909 | $ | 6,810 |
| **Uses of cash and cash equivalents** | | | | | | |
| Acquisitions | $ | (21) | $ | (74) | $ | (1,033) |
| Additions to property, plant and equipment | | (5,160) | | (4,443) | | (4,361) |
| Investing activities of discontinued operations | | (376) | | (550) | | (579) |
| Purchases of common stock | | (1,000) | | (500) | | - |
| Commercial paper, net | | (135) | | (65) | | - |
| Debt repayments | | (68) | | (182) | | (145) |
| Dividends paid | | (543) | | (508) | | (480) |
| Other | | (24) | | (7) | | (21) |
| Total uses of cash and cash equivalents | $ | (7,327) | $ | (6,329) | $ | (6,619) |

While the 2014 commodity benchmark prices were relatively strong for most of the year, beginning in the second half of 2014 these benchmarks began to decline and continued to decline during the early portion of 2015 and remain volatile based on global supply and demand. While we are unable to predict future commodity price movements, if this lower price trend continues, it would negatively impact our cash flows from operating activities.

Cash flows from continuing operations in 2014 were higher than in 2013 due to increased net sales volumes in the North America E&P segment and lower cash tax payments (primarily Libya, a higher tax jurisdiction), partially offset by lower average price realizations in all segments, as well as lower net sales volumes in the International E&P segment. The increase in cash flows from continuing operations in 2013 primarily reflects the increase in North America E&P liquid hydrocarbon net sales volumes on operating income.

Disposals of assets in 2014 primarily reflect the $2 billion aggregate proceeds from the sale of our Angola assets in the first quarter and $2.1 billion proceeds from the sale of our Norway business in the fourth quarter. In 2013, net proceeds were primarily related to the sales of our interests in Alaska, the Neptune gas plant and the DJ Basin. In 2012, net proceeds were primarily from the sales of our interests in several Gulf of Mexico crude oil pipeline systems, a sell-down of our interests in the Harir and Safen blocks in the Kurdistan Region of Iraq and the final collection of proceeds on a 2009 asset sale. Disposition transactions are discussed in further detail in Item 8. Financial Statements and Supplementary Data - Note 5 to the consolidated financial statements.

Additions to property, plant and equipment are our most significant use of cash and cash equivalents. The following table shows capital expenditures related to continuing operations by segment and reconciles to additions to property, plant and equipment as presented in the consolidated statements of cash flows for 2014, 2013 and 2012:

| | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 | | 2012 |
| North America E&P | $ | 4,698 | $ | 3,649 | $ | 3,988 |
| International E&P | | 534 | | 456 | | 235 |
| Oil Sands Mining | | 212 | | 286 | | 188 |
| Corporate | | 51 | | 58 | | 115 |
| Total capital expenditures | | 5,495 | | 4,449 | | 4,526 |
| Change in capital expenditure accrual | | (335) | | (6) | | (165) |
| Additions to property, plant and equipment | $ | 5,160 | $ | 4,443 | $ | 4,361 |

As of December 31, 2014, we had repurchased a total of 121 million common shares at a cost of $4.7 billion, including 29 million shares at a cost of $1 billion in the first six months of 2014 and 14 million shares at a cost of $500 million in the third quarter of 2013.

See Item 8. Financial Statements and Supplementary Data - Note 22 to the consolidated financial statements for discussion of purchases of common stock.

## Liquidity and Capital Resources

Our main sources of liquidity are cash and cash equivalents, internally generated cash flow from operations, continued access to capital markets, our committed revolving credit facility and sales of non-strategic assets. Our working capital requirements are supported by these sources and we may issue commercial paper backed by our $2.5 billion revolving credit facility to meet short-term cash requirements. Because of the alternatives available to us as discussed above and access to capital markets through the shelf registration discussed below, we believe that our short-term and long-term liquidity is adequate to fund not only our current operations, but also our near-term and long-term funding requirements including our capital spending programs, dividend payments, defined benefit plan contributions, repayment of debt maturities and other amounts that may ultimately be paid in connection with contingencies.

At December 31, 2014, we had approximately $4.9 billion of liquidity consisting of $2.4 billion in cash and cash equivalents and $2.5 billion availability under our revolving credit facility. As discussed in more detail below in "Outlook", we are targeting a $3.5 billion Budget for 2015. Based on our projected 2015 cash outlays for our capital program and dividends, we expect to outspend our cash flows from operations for the year. We will be constantly monitoring our available liquidity during 2015 and we have the flexibility to adjust our Budget throughout the year in response to the commodity price environment. We will also continue to drive the fundamentals of expense management, including organizational capacity and operational reliability.

### Capital Resources

*Credit Arrangements and Borrowings*

In May 2014, we amended our $2.5 billion unsecured revolving credit facility and extended the maturity to May 2019. See Note 16 to the consolidated financial statements for additional terms and rates. At December 31, 2014, we had no borrowings against our revolving credit facility and no amounts outstanding under our U.S. commercial paper program that is backed by the revolving credit facility.

At December 31, 2014, we had $6,391 million in long-term debt outstanding, and $1,068 million is due within one year, of which the majority is due in the fourth quarter of 2015. We do not have any triggers on any of our corporate debt that would cause an event of default in the case of a downgrade of our credit ratings.

*Shelf Registration*

We have a universal shelf registration statement filed with the SEC, under which we, as "well-known seasoned issuer" for purposes of SEC rules, have the ability to issue and sell an indeterminate amount of various types of debt and equity securities from time to time.

***Cash-Adjusted Debt-To-Capital Ratio***

Our cash-adjusted debt-to-capital ratio (total debt-minus-cash to total debt-plus-equity-minus-cash) was 16 percent at December 31, 2014 and 25 percent at December 31, 2013.

| *(Dollars in millions)* | 2014 | | 2013 | |
|---|---|---|---|---|
| Commercial paper | $ | - | $ | 135 |
| Long-term debt due within one year | | 1,068 | | 68 |
| Long-term debt | | 5,323 | | 6,394 |
| Total debt | $ | 6,391 | $ | 6,597 |
| Cash | $ | 2,398 | $ | 264 |
| Equity | $ | 21,020 | $ | 19,344 |
| **Calculation** | | | | |
| Total debt | $ | 6,391 | $ | 6,597 |
| Minus cash | | 2,398 | | 264 |
| Total debt minus cash | | 3,993 | | 6,333 |
| Total debt | | 6,391 | | 6,597 |
| Plus equity | | 21,020 | | 19,344 |
| Minus cash | | 2,398 | | 264 |
| Total debt plus equity minus cash | $ | 25,013 | $ | 25,677 |
| Cash-adjusted debt-to-capital ratio | | 16% | | 25% |

***Capital Requirements***

*Capital Spending*

Our approved Budget for 2015 is $3.5 billion. Additional details are discussed below in "Outlook."

*Share Repurchase Program*

The remaining share repurchase authorization as of December 31, 2014 is $1.5 billion.

*Other Expected Cash Outflows*

As of December 31, 2014, $1,068 million of our long-term debt is due in the next twelve months, most of which is due in the fourth quarter of 2015. Dividends of $543 million were paid during 2014 reflecting quarterly dividends of $0.19 per share in the first two quarters of the year and $0.21 per share in the last two quarters. On January 28, 2015, we announced that our Board of Directors had declared a dividend of $0.21 cents per share on Marathon Oil common stock, payable March 10, 2015, to stockholders of record at the close of business on February 18, 2015.

We plan to make contributions of up to $95 million to our funded pension plans during 2015. Cash contributions to be paid from our general assets for the unfunded pension and postretirement plans are expected to be approximately $11 million and $19 million in 2015.

*Contractual Cash Obligations*

The table below provides aggregated information on our consolidated obligations to make future payments under existing contracts as of December 31, 2014.

| (In millions) | | Total | | 2015 | | 2016-2017 | | 2018-2019 | | Later Years |
|---|---|---|---|---|---|---|---|---|---|---|
| Short and long-term debt (includes interest)[a] | $ | 10,102 | $ | 1,363 | $ | 1,272 | $ | 1,508 | $ | 5,959 |
| Lease obligations | | 200 | | 41 | | 61 | | 50 | | 48 |
| Purchase obligations: | | | | | | | | | | |
| Oil and gas activities[b] | | 783 | | 442 | | 218 | | 74 | | 49 |
| Service and materials contracts[c] | | 1,077 | | 166 | | 199 | | 89 | | 623 |
| Transportation and related contracts | | 1,933 | | 222 | | 475 | | 434 | | 802 |
| Drilling rigs and fracturing crews[d] | | 629 | | 422 | | 207 | | - | | - |
| Other | | 192 | | 50 | | 29 | | 30 | | 83 |
| Total purchase obligations | | 4,614 | | 1,302 | | 1,128 | | 627 | | 1,557 |
| Other long-term liabilities reported in the consolidated balance sheet[e] | | 943 | | 133 | | 156 | | 214 | | 440 |
| Total contractual cash obligations[f] | $ | 15,859 | $ | 2,839 | $ | 2,617 | $ | 2,399 | $ | 8,004 |

[a]  Includes anticipated cash payments for interest of $295 million for 2015, $590 million for 2016-2017, $426 million for 2018-2019 and $2,422 million for the remaining years for a total of $3,733 million.

[b]  Oil and gas activities include contracts to acquire property, plant and equipment and commitments for oil and gas exploration such as costs related to contractually obligated exploratory work programs that are expensed immediately.

[c]  Service and materials contracts include contracts to purchase services such as utilities, supplies and various other maintenance and operating services.

[d]  Some contracts may be canceled at an amount less than the contract amount. Were we to elect that option where possible at December 31, 2014 our minimum commitment would be $459 million.

[e]  Primarily includes obligations for pension and other postretirement benefits including medical and life insurance. We have estimated projected funding requirements through 2024. Although unrecognized tax benefits are not a contractual obligation, they are presented in this table because they represent potential demands on our liquidity.

[f]  This table does not include the estimated discounted liability for dismantlement, abandonment and restoration costs of oil and gas properties of $1,958 million. See Item 8. Financial Statements and Supplementary Data - Note 17 to the consolidated financial statements.

## Transactions with Related Parties

We own a 63 percent working interest in the Alba field offshore E.G. Onshore E.G., we own a 52 percent interest in an LPG processing plant, a 60 percent interest in an LNG production facility and a 45 percent interest in a methanol production plant, each through equity method investees. We sell our natural gas from the Alba field to these equity method investees as the feedstock for their production processes.

## Off-Balance Sheet Arrangements

Off-balance sheet arrangements comprise those arrangements that may potentially impact our liquidity, capital resources and results of operations, even though such arrangements are not recorded as liabilities under accounting principles generally accepted in the U.S. Although off-balance sheet arrangements serve a variety of our business purposes, we are not dependent on these arrangements to maintain our liquidity and capital resources, and we are not aware of any circumstances that are reasonably likely to cause the off-balance sheet arrangements to have a material adverse effect on liquidity and capital resources.

We will issue stand alone letters of credit when required by a business partner. Such letters of credit outstanding at December 31, 2014, 2013 and 2012 aggregated $101 million, $119 million, and $139 million. Most of the letters of credit are in support of obligations recorded in the consolidated balance sheet. For example, they are issued to counterparties to insure our payments for outstanding company debt and future abandonment liabilities.

**Outlook**

*Budget*

Our Board of Directors approved a Budget of $3.5 billion for 2015, including capital expenditures of $3.4 billion. With the continued uncertainty in commodity pricing, we have taken decisive action to protect our optionality and position us to be a stronger E&P company in the long term. Our exploration spending has been reduced by more than 50 percent while we continue to focus on our three U.S. resource plays. We are also prepared to exercise further flexibility in our spend levels as pricing and the macro environment warrant. Our Budget is broken down by reportable segment in the table below.

| (In millions) | | 2015 Budget | Percent of Total |
|---|---|---|---|
| North America E&P | $ | 2,885 | 82% |
| International E&P | | 536 | 15% |
| Oil Sands Mining [a] | | 21 | 1% |
| Segment total | | 3,442 | 98% |
| Corporate and other | | 79 | 2% |
| Total capital, investment and exploration spending budget | $ | 3,521 | 100% |

[a]  Represents the net budget after factoring in reimbursements from the Canadian Federal and Provincial government related to the QUEST CCS project.

*North America E&P* - Approximately $2.4 billion of our Budget is allocated to our three core U.S. resource plays. More than $1.4 billion is earmarked for the Eagle Ford, where rig count is expected to drop from 18 in late 2014 to 10 by the end of the second quarter of 2015. Included in Eagle Ford spending is approximately $1 billion for drilling and completions. We plan to spend $760 million in the Bakken in North Dakota. Drilling activity will be reduced to two rigs by the end of the first quarter of 2015, down from seven rigs at the end of 2014. Bakken spending includes approximately $550 million for drilling, completions and recompletions. Spending of $226 million is targeted for the Oklahoma Resource Basins, which will also be down to two rigs by the end of the first quarter of 2015. This includes spending of approximately $200 million for drilling and completions.

*International E&P* - We plan to spend approximately $429 million on our international assets, primarily in E.G., the U.K. and the Kurdistan Region of Iraq.

Approximately $232 million will be spent on a targeted exploration program impacting both the North America E&P and the International E&P segments. The program includes one operated Gulf of Mexico well, participation in a non-operated appraisal well at Shenandoah in the Gulf of Mexico and seismic surveys in Gabon and Ethiopia.

*Oil Sands Mining* - We expect to spend $95 million for sustaining capital projects in the OSM segment. We hold a 20 percent outside-operated interest in the Athabasca Oil Sands Project.

The remainder of our Budget consists of Corporate and Other and is expected to total approximately $79 million, of which $40 million represents capitalized interest on assets under construction.

For information about expected exploration and development activities more specific to individual assets, see Item 1. Business.

*Production Volumes*

We forecast 2015 production available for sale from the combined North America E&P and International E&P segments, excluding Libya, to be 370 to 390 net mboed and the OSM segment to be 35 to 45 net mbbld of synthetic crude oil. We expect our U.S. resource plays to achieve production growth of approximately 20 percent in 2015 over 2014. In addition, we expect total production growth, excluding Libya, of 5 to 7 percent year-over-year.

*Acquisitions and Dispositions*

Excluded from our Budget are the impacts of acquisitions and dispositions not previously announced. We continually evaluate ways to optimize our portfolio through acquisitions and divestitures. In connection with our ongoing portfolio management, future decisions to dispose of assets could result in non-cash impairments in the period such decisions are made.

*Personnel*

In February 2015, we announced a reduction in workforce impacting approximately 350-400 employees. These reductions focus largely on U.S. payroll employees, weighted toward above-the-field and support services personnel, though we will continue to analyze our staffing needs at all levels and in all locations. Affected employees will be eligible for severance benefits.

*Other*

Two exploratory wells: Key Largo in the Gulf of Mexico and Sodalita West #1 in E.G. were deemed unsuccessful in early 2015, with well costs incurred through December 31, 2014 charged to dry well expense. In addition, approximately $45 million in costs related to these wells will be charged to dry well expense in the first quarter of 2015.

## Management's Discussion and Analysis of Environmental Matters, Litigation and Contingencies

We have incurred and may continue to incur substantial capital, operating and maintenance and remediation expenditures as a result of environmental laws and regulations. If these expenditures, as with all costs, are not ultimately reflected in the prices of our products and services, our operating results will be adversely affected. We believe that substantially all of our competitors must comply with similar environmental laws and regulations. However, the specific impact on each competitor may vary depending on a number of factors, including the age and location of its operating facilities, marketing areas and production processes.

Legislation and regulations pertaining to climate change and greenhouse gas emissions have the potential to materially adversely impact our business, financial condition, results of operations and cash flows, including costs of compliance and permitting delays. The extent and magnitude of these adverse impacts cannot be reliably or accurately estimated at this time because specific regulatory and legislative requirements have not been finalized and uncertainty exists with respect to the measures being considered, the costs and the time frames for compliance, and our ability to pass compliance costs on to our customers. For additional information see Item 1A. Risk Factors.

We accrue for environmental remediation activities when the responsibility to remediate is probable and the amount of associated costs can be reasonably estimated. As environmental remediation matters proceed toward ultimate resolution or as additional remediation obligations arise, charges in excess of those previously accrued may be required.

New or expanded environmental requirements, which could increase our environmental costs, may arise in the future. We strive to comply with all legal requirements regarding the environment, but as not all costs are fixed or presently determinable (even under existing legislation) and may be affected by future legislation or regulations, it is not possible to predict all of the ultimate costs of compliance, including remediation costs that may be incurred and penalties that may be imposed.

For more information on environmental regulations that impact us, or could impact us, see Item 1. Business - Environmental, Health and Safety Matters, Item 1A. Risk Factors and Item 3. Legal Proceedings.

## Critical Accounting Estimates

The preparation of financial statements in accordance with accounting principles generally accepted in the U.S. requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the respective reporting periods. Accounting estimates are considered to be critical if (1) the nature of the estimates and assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change, and (2) the impact of the estimates and assumptions on financial condition or operating performance is material. Actual results could differ from the estimates and assumptions used.

*Estimated Quantities of Net Reserves*

The estimation of quantities of net reserves is a highly technical process performed by our engineers for crude oil and condensate, NGLs and natural gas and by outside consultants for synthetic crude oil, which is based upon several underlying assumptions that are subject to change. Estimates of reserves may change, either positively or negatively, as additional information becomes available and as contractual, operational, economic and political conditions change. We evaluate our reserves using drilling results, reservoir performance, seismic interpretation and future plans to develop acreage. The data for a given reservoir may also change substantially over time as a result of numerous factors including, but not limited to, additional development activity, production history and continual reassessment of the viability of production under varying economic conditions. Consequently, material revisions (upward or downward) to existing reserve estimates may occur from time to time. Reserve estimates are based upon an unweighted average of commodity prices in the prior 12-month period, using the closing prices on the first day of each month. Sustained reduced commodity prices could have a material effect on the quantity and present value of our proved reserves and could also cause us to decrease our near term capital programs and defer investment until prices improved. A shifting of capital expenditures into future periods outside of five years from the initial proved reserve booking could potentially lead to a reduction in proved undeveloped reserves. For a discussion of our reserve estimation process, including the use of third-party audits, see Item 1. Business.

We use the successful efforts method of accounting for our oil and gas producing activities. The successful efforts method inherently relies on the estimation of proved crude oil and condensate, NGLs, natural gas and synthetic crude oil reserves.

55

The existence and the estimated amount of reserves affect, among other things, whether certain costs are capitalized or expensed, the amount and timing of costs depreciated, depleted or amortized into net income and the presentation of supplemental information on oil and gas producing activities. Additionally, both the expected future cash flows to be generated by oil and gas producing properties used in testing such properties for impairment and the expected future taxable income available to realize deferred tax assets also rely, in part, on estimates of quantities of net reserves.

Depreciation and depletion of crude oil and condensate, NGLs, natural gas and synthetic crude oil producing properties is determined by the units-of-production method and could change with revisions to estimated proved reserves. Over the past three years, the impact on our depreciation and depletion rate due to revisions of previous reserve estimates has not been significant to any of our segments. However, because we depreciate a majority of our oil and gas properties under the units-of-production method, any reduction in proved reserves could result in an acceleration of future DD&A expense. The following table illustrates, on average, the sensitivity of each segment's units-of-production DD&A per boe and pretax income to a hypothetical five percent change in 2014 proved reserves based on 2014 production.

| (In millions, except per boe) | Impact of a Five Percent Increase in Proved Reserves | | Impact of a Five Percent Decrease in Proved Reserves | |
|---|---|---|---|---|
| | DD&A per boe | Pretax Income | DD&A per boe | Pretax Income |
| North America E&P | $ (1.28) | $ 112 | $ 1.42 | $ (123) |
| International E&P | $ (0.28) | $ 13 | $ 0.30 | $ (14) |
| Oil Sands Mining | $ (0.63) | $ 9 | $ 0.55 | $ (8) |

*Asset Retirement Obligations*

We have material legal, regulatory and contractual obligations to remove and dismantle long-lived assets and to restore land or seabed at the end of oil and gas production operations, including bitumen mining operations. A liability equal to the fair value of such obligations and a corresponding capitalized asset retirement cost are recognized on the balance sheet in the period in which the legal obligation is incurred and a reasonable estimate of fair value can be made. The capitalized asset retirement cost is depreciated using the units-of-production method and the discounted liability is accreted over the period until the obligation is satisfied, the impacts of which are recognized as DD&A in the consolidated statements of income. In many cases, the satisfaction and subsequent discharge of these liabilities is projected to occur many years, or even decades, into the future. Furthermore, the legal, regulatory and contractual requirements often do not provide specific guidance regarding removal practices and the criteria that must be fulfilled when the removal and/or restoration event actually occurs.

Estimates of retirement costs are developed for each property based on numerous factors, such as the scope of the dismantlement, timing of settlement, interpretation of legal, regulatory and contractual requirements, type of production and processing structures, depth of water (if applicable), reservoir characteristics, depth of the reservoir, market demand for equipment, currently available dismantlement and restoration procedures and consultations with construction and engineering professionals. Inflation rates and credit-adjusted-risk-free interest rates are then applied to estimate the fair values of the obligations. To the extent these or other assumptions change after initial recognition of the liability, the fair value estimate is revised and the recognized liability adjusted, with a corresponding adjustment made to the related asset balance or income statement, as appropriate. Changes in estimated asset retirement obligations for late life assets could result in future impairment charges. See Item 8. Financial Statements and Supplementary Data - Note 17 to the consolidated financial statements for disclosures regarding our asset retirement obligation estimates.

An estimate of the sensitivity to net income if other assumptions had been used in recording these liabilities is not practical because of the number of obligations that must be assessed, the number of underlying assumptions and the wide range of possible assumptions.

***Fair Value Estimates***

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. There are three approaches for measuring the fair value of assets and liabilities: the market approach, the income approach and the cost approach, each of which includes multiple valuation techniques. The market approach uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to measure fair value by converting future amounts, such as cash flows or earnings, into a single present value, or range of present values, using current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace the service capacity of an asset. This is often referred to as current replacement cost. The cost approach assumes that the fair value would not exceed what it would cost a market participant to acquire or construct a substitute asset of comparable utility, adjusted for obsolescence.

The fair value accounting standards do not prescribe which valuation technique should be used when measuring fair value and do not prioritize among the techniques. These standards establish a fair value hierarchy that prioritizes the inputs used in applying the various valuation techniques. Inputs broadly refer to the assumptions that market participants use to make pricing decisions, including assumptions about risk. Level 1 inputs are given the highest priority in the fair value hierarchy while Level 3 inputs are given the lowest priority. The three levels of the fair value hierarchy are as follows:

- Level 1 - Observable inputs that reflect unadjusted quoted prices for identical assets or liabilities in active markets as of the measurement date. Active markets are those in which transactions for the asset or liability occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

- Level 2 - Observable market-based inputs or unobservable inputs that are corroborated by market data. These are inputs other than quoted prices in active markets included in Level 1, which are either directly or indirectly observable as of the measurement date.

- Level 3 - Unobservable inputs that are not corroborated by market data and may be used with internally developed methodologies that result in management's best estimate of fair value.

Valuation techniques that maximize the use of observable inputs are favored. Assets and liabilities are classified in their entirety based on the lowest priority level of input that is significant to the fair value measurement. The assessment of the significance of a particular input to the fair value measurement requires judgment and may affect the placement of assets and liabilities within the levels of the fair value hierarchy. See Item 8. Financial Statements and Supplementary Data - Note 14 to the consolidated financial statements for disclosures regarding our fair value measurements.

Significant uses of fair value measurements include:

- impairment assessments of long-lived assets;

- impairment assessments of goodwill;

- allocation of the purchase price paid to acquire businesses to the assets acquired and liabilities assumed; and

- recorded value of derivative instruments.

*Impairment Assessments of Long-Lived Assets and Goodwill*

The need to test long-lived assets and goodwill for impairment can be based on several indicators, including a significant reduction in prices of crude oil and condensate, NGLs, natural gas or synthetic crude oil, unfavorable adjustments to reserves, significant changes in the expected timing of production, other changes to contracts or changes in the regulatory environment in which the property is located.

Long-lived assets in use are assessed for impairment whenever changes in facts and circumstances indicate that the carrying value of the assets may not be recoverable. For purposes of an impairment evaluation, long-lived assets must be grouped at the lowest level for which independent cash flows can be identified, which generally is field-by-field for our North America E&P and International E&P assets and at the project level for OSM assets. If the sum of the undiscounted estimated cash flows from the use of the asset group and its eventual disposition is less than the carrying value of an asset group, the carrying value is written down to the estimated fair value. The substantial decline in commodity prices during the second half of 2014, and the resulting change in future commodity price assumptions, was a triggering event which required us to reassess long-lived assets related to oil and gas producing properties for impairment as of December 31, 2014. We estimated the fair values using an income approach and concluded that no material impairments were required. See Item 8. Financial Statements and Supplementary Data Note 14 to the consolidated financial statements for discussion of impairments recorded in 2014, 2013 and 2012. Future impairments of long-lived assets are possible if management's current assumptions were to change.

Unlike long-lived assets, goodwill must be tested for impairment at least annually, or between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying

amount. Goodwill is tested for impairment at the reporting unit level. After we performed our annual impairment test in April 2014, there was a substantial decline in commodity prices as discussed above. The resulting change in future commodity price assumptions, was a triggering event which required us to reassess our goodwill for impairment as of December 31, 2014. Based on the results of this assessment, we concluded no impairment was required. The calculated fair value of the North America E&P and International E&P reporting units exceeded their respective book values by a significant margin.

Fair value calculated for the purpose of testing our long-lived assets and goodwill for impairment is estimated using the present value of expected future cash flows method and comparative market prices when appropriate. Significant judgment is involved in performing these fair value estimates since the results are based on forecasted assumptions. Significant assumptions include:

- **Future crude oil and condensate, NGLs, natural gas and synthetic crude oil prices.** Our estimates of future prices are based on our analysis of market supply and demand and consideration of market price indicators. Although these commodity prices may experience extreme volatility in any given year, we believe long-term industry prices are driven by global market supply and demand. To estimate supply, we consider numerous factors, including the worldwide resource base, depletion rates, and OPEC production policies. We believe demand is largely driven by global economic factors, such as population and income growth, governmental policies and vehicle stocks. The prices we use in our fair value estimates are consistent with those used in our planning and capital investment reviews. There has been significant volatility in crude oil and condensate, NGLs, natural gas and synthetic crude oil prices and estimates of such future prices are inherently imprecise.

- **Estimated quantities of crude oil and condensate, NGLs, natural gas and synthetic crude oil.** Such quantities are based on a combination of proved and probable reserves such that the combined volumes represent the most likely expectation of recovery.

- **Expected timing of production.** Production forecasts are the outcome of engineer studies which estimate reserves, as well as expected capital development programs. The actual timing of the production could be different than the projection. Cash flows realized later in the projection period are less valuable than those realized earlier due to the time value of money. The expected timing of production that we use in our fair value estimates is consistent with that used in our planning and capital investment reviews.

- **Discount rate commensurate with the risks involved.** We apply a discount rate to our expected cash flows based on a variety of factors, including market and economic conditions, operational risk, regulatory risk and political risk. This discount rate is also compared to recent observable market transactions, if possible. A higher discount rate decreases the net present value of cash flows.

- **Future capital requirements.** Our estimates of future capital requirements are based upon a combination of authorized spending and internal forecasts.

We base our fair value estimates on projected financial information which we believe to be reasonable. However, actual results may differ from these projections. A further sustained decline in commodity prices may cause us to reassess our long-lived assets and goodwill for impairment, and could result in future non-cash impairment charges as a result of such impairment assessments.

An estimate of the sensitivity to net income resulting from impairment calculations is not practicable, given the numerous assumptions (e.g. reserves, pricing and discount rates) that can materially affect our estimates. That is, unfavorable adjustments to some of the above listed assumptions may be offset by favorable adjustments in other assumptions.

*Acquisitions*

In accounting for business combinations, the purchase price paid to acquire a business is allocated to its assets and liabilities based on the estimated fair values of the assets acquired and liabilities assumed as of the date of acquisition. The excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired is recorded as goodwill. A significant amount of judgment is involved in estimating the individual fair values of property, plant and equipment and identifiable intangible assets. The most significant assumptions relate to the estimated fair values allocated to proved and unproved liquid hydrocarbon, natural gas and synthetic crude oil properties. Estimated fair values assigned to assets acquired can have a significant effect on our results of operations in the future. We use all available information to make these fair value determinations and, for certain acquisitions, engage third-party consultants for assistance. During 2014, 2013 and 2012, we completed several business combinations in the Eagle Ford, the purchase prices of which were allocated to the assets acquired and liabilities assumed based on their estimated fair values (see Item 8. Financial Statements and Supplementary Data - Note 4 to the consolidated financial statements).

The fair values used to allocate the purchase price of an acquisition are often estimated using the expected present value of future cash flows method, which requires us to estimate reserves as described above under Estimated Quantities of Net Reserves, project related future cash inflows and outflows and apply an appropriate discount rate. The estimates used in

determining fair values are based on assumptions believed to be reasonable but which are inherently uncertain. Accordingly, actual results may differ from the projected results used to determine fair value.

*Derivatives*

We record all derivative instruments at fair value. Fair value measurements for all our derivative instruments are based on observable market-based inputs that are corroborated by market data and are discussed in Item 8. Financial Statements and Supplementary Data - Note 14 to the consolidated financial statements. Additional information about derivatives and their valuation may be found in Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

***Income Taxes***

We are subject to income taxes in numerous taxing jurisdictions worldwide. Estimates of income taxes to be recorded involve interpretation of complex tax laws and assessment of the effects of foreign taxes on our U.S. federal income taxes.

We have recorded deferred tax assets and liabilities for temporary differences between book basis and tax basis, tax credit carryforwards and operating loss carryforwards. We routinely assess the realizability of our deferred tax assets and reduce such assets by a valuation allowance if it is more likely than not that some portion or all of the deferred tax assets will not be realized. In assessing the need for additional or adjustments to existing valuation allowances, we consider the preponderance of evidence concerning the realization of the deferred tax asset. We must consider any prudent and feasible tax planning strategies that might minimize the amount of deferred tax liabilities recognized or the amount of any valuation allowance recognized against deferred tax assets, if we can implement the strategies and we expect to implement them in the event the forecasted conditions actually occur. Assumptions related to the permanent reinvestment of the earnings of our foreign subsidiaries are reconsidered quarterly to give effect to changes in our portfolio of producing properties and in our tax profile. In the second quarter of 2014, we reviewed our foreign operations, including the disposition of our Norway business, and concluded that our foreign operations do not have the same level of immediate capital needs as previously expected. Therefore, we no longer intend for previously unremitted foreign earnings associated with our U.K. operations to be permanently reinvested outside the U.S.

Our net deferred tax assets, after valuation allowances, are expected to be realized through our future taxable income and the reversal of temporary differences. Numerous judgments and assumptions are inherent in the estimation of future taxable income, including factors such as future operating conditions (particularly as related to prevailing liquid hydrocarbon, natural gas and synthetic crude oil prices) and the assessment of the effects of foreign taxes on our U.S. federal income taxes. The estimates and assumptions used in determining future taxable income are consistent with those used in our planning and capital investment reviews. We consider a combination of reserve categories related to our existing producing properties, as well as estimated quantities of crude oil and condensate, NGLs, natural gas and synthetic crude oil related to undeveloped discoveries if, in our judgment, it is likely that development plans will be approved in the foreseeable future. Assumptions regarding our ability to realize the U.S. federal benefit of foreign tax credits are based on certain estimates concerning future operating conditions (particularly as related to crude oil and condensate, NGLs, natural gas and synthetic crude oil prices), future financial conditions, income generated from foreign sources and our tax profile in the year that such credits may be claimed.

***Pension and Other Postretirement Benefit Obligations***

Accounting for pension and other postretirement benefit obligations involves numerous assumptions, the most significant of which relate to the following:

* the discount rate for measuring the present value of future plan obligations;
* the expected long-term return on plan assets;
* the rate of future increases in compensation levels; and
* health care cost projections.

We develop our demographics and utilize the work of third-party actuaries to assist in the measurement of these obligations. We have selected different discount rates for our U.S. pension plans and our other U.S. postretirement benefit plans due to the different projected benefit payment patterns. In determining the assumed discount rates, our methods include a review of market yields on high-quality corporate debt and use of our third-party actuary's discount rate model. This model calculates an equivalent single discount rate for the projected benefit plan cash flows using a yield curve derived from bond yields. The yield curve represents a series of annualized individual spot discount rates from 0.5 to 99 years. The bonds used are rated AA or higher by a recognized rating agency, only non-callable bonds are included and outlier bonds (bonds that have a yield to maturity that significantly deviates from the average yield within each maturity grouping) are removed. Each issue is required to have at least $250 million par value outstanding. The constructed yield curve is based on those bonds representing the 50 percent highest yielding issuances within each defined maturity group.

59

Of the assumptions used to measure obligations and estimated annual net periodic benefit cost as of December 31, the discount rate has the most significant effect on the periodic benefit cost reported for the plans. The hypothetical impacts of a 0.25 percent change in the discount rates of 3.71 percent for our U.S. pension plans and 4.01 percent for our other U.S. postretirement benefit plans is summarized in the table below:

| | Impact of a 0.25 Percent Increase in Discount Rate | | Impact of a 0.25 Percent Decrease in Discount Rate | |
| --- | --- | --- | --- | --- |
| *(In millions)* | Obligation | Expense | Obligation | Expense |
| U.S. pension plans | $ (35) | $ (4) | $ 37 | $ 4 |
| Other U.S. postretirement benefit plans | $ (7) | $ - | $ 8 | $ - |

The asset rate of return assumption for the funded U.S. plan considers the plan's asset mix (currently targeted at approximately 55 percent equity and 45 percent other fixed income securities), past performance and other factors. Certain components of the asset mix are modeled with various assumptions regarding inflation, debt returns and stock yields. Decreasing the 6.75 percent asset rate of return assumption by 0.25 would not have a significant impact on our defined benefit pension expense.

Compensation change assumptions are based on historical experience, anticipated future management actions and demographics of the benefit plans. Health care cost trend assumptions are developed based on historical cost data, the near-term outlook and an assessment of likely long-term trends.

Item 8. Financial Statements and Supplementary Data - Note 19 to the consolidated financial statements includes detailed information about the assumptions used to calculate the components of our annual defined benefit pension and other postretirement plan expense, as well as the obligations and accumulated other comprehensive income reported on the consolidated balance sheets.

### *Contingent Liabilities*

We accrue contingent liabilities for environmental remediation, tax deficiencies related to operating taxes and litigation claims when such contingencies are probable and estimable. Actual costs can differ from estimates for many reasons. For instance, settlement costs for claims and litigation can vary from estimates based on differing interpretations of laws, opinions on responsibility and assessments of the amount of damages. Similarly, liabilities for environmental remediation may vary from estimates because of changes in laws, regulations and their interpretation, additional information on the extent and nature of site contamination and improvements in technology. Our in-house legal counsel regularly assesses these contingent liabilities. In certain circumstances outside legal counsel is utilized.

We generally record losses related to these types of contingencies as other operating expense or general and administrative expense in the consolidated statements of income, except for tax contingencies unrelated to income taxes, which are recorded as taxes other than income. For additional information on contingent liabilities, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Management's Discussion and Analysis of Environmental Matters, Litigation and Contingencies.

An estimate of the sensitivity to net income if other assumptions had been used in recording these liabilities is not practical because of the number of contingencies that must be assessed, the number of underlying assumptions and the wide range of reasonably possible outcomes, in terms of both the probability of loss and the estimates of such loss.

### Accounting Standards Not Yet Adopted

See Item 8. Financial Statements and Supplementary Data - Note 2 to the consolidated financial statements.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risks related to the volatility of crude oil and condensate, NGL, natural gas and synthetic crude oil prices. We are also exposed to market risks related to changes in interest rates and foreign currency exchange rates. We employ various strategies, including the use of financial derivative instruments, to manage the risks related to these fluctuations. We are at risk for changes in the fair value of all of our derivative instruments; however, such risk should be mitigated by price or rate changes related to the underlying commodity or financial transaction. While the use of derivative instruments could materially affect our results of operations in particular quarterly or annual periods, we believe that the use of these instruments will not have a material adverse effect on our financial position or liquidity.

See Item 8. Financial Statements and Supplementary Data - Notes 14 and 15 to the consolidated financial statements for more information about the fair value measurement of our derivatives, the amounts recorded in our consolidated balance sheets and statements of income and the related notional amounts.

*Commodity Price Risk*

Our strategy is to obtain competitive prices for our products and allow operating results to reflect market price movements dictated by supply and demand. However, management will periodically protect prices on forecasted sales, as deemed appropriate. We may use a variety of commodity derivative instruments, including futures, forwards, swaps and combinations of options, as part of an overall program to manage commodity price risk in our business. Our consolidated results for 2013 and 2012 were impacted by crude oil derivatives related to a portion of our North America E&P crude oil sales, all of which expired in December 2013. There were no crude oil derivatives in 2014.

*Interest Rate Risk*

At December 31, 2014, our portfolio of long-term debt was substantially comprised of fixed rate instruments. We currently manage our exposure to interest rate movements by utilizing interest rate swap agreements that effectively convert a portion of our fixed rate debt to floating interest rate debt. As of December 31, 2014, we had multiple interest rate swap agreements with a total notional of $900 million designated as fair value hedges.

Our sensitivity to interest rate movements and corresponding changes in the fair value of our fixed rate debt portfolio affects our results of operations and cash flows only when we elect to repurchase or otherwise retire fixed-rate debt at prices different than carrying value. Sensitivity analysis of the incremental effect of a hypothetical 10 percent change in interest rates on financial assets and liabilities as of December 31, 2014, is provided in the following table.

| (In millions) | Fair Value | | Incremental Change in Fair Value | |
|---|---|---|---|---|
| Financial assets (liabilities): [a] | | | | |
| Interest rate swap agreements | $ | 8 [b] | $ | 2 |
| Long-term debt, including amounts due within one year | $ | (6,887) [b][c] | $ | (216) |

[a] Fair values of cash and cash equivalents, receivables, commercial paper, accounts payable and accrued interest approximate carrying value and are relatively insensitive to changes in interest rates due to the short-term maturity of the instruments. Accordingly, these instruments are excluded from the table.
[b] Fair value was based on market prices where available, or current borrowing rates for financings with similar terms and maturities.
[c] Excludes capital leases.

*Foreign Currency Exchange Rate Risk*

We may manage our exposure to foreign currency exchange rates by utilizing forward and option contracts. The primary objective of this program is to reduce our exposure to movements in foreign currency exchange rates by locking in such rates. As of December 31, 2014, we had no open derivatives related to foreign currency exchange rates.

*Counterparty Risk*

We are also exposed to financial risk in the event of nonperformance by counterparties. If commodity prices remain at or fall below current levels, some of our counterparties may experience liquidity problems and may not be able to meet their financial obligations to us. We review the creditworthiness of counterparties and use master netting agreements when appropriate.

**Item 8. Financial Statements and Supplementary Data**

**Index**

|  | Page |
|---|---|
| Management's Responsibilities for Financial Statements | 63 |
| Management's Report on Internal Control over Financial Reporting | 63 |
| Report of Independent Registered Public Accounting Firm | 64 |
| Audited Consolidated Financial Statements | |
| Consolidated Statements of Income | 65 |
| Consolidated Statements of Comprehensive Income | 66 |
| Consolidated Balance Sheets | 67 |
| Consolidated Statements of Cash Flows | 68 |
| Consolidated Statements of Stockholders' Equity | 69 |
| Notes to Consolidated Financial Statements | 70 |
| Select Quarterly Financial Data (Unaudited) | 101 |
| Supplementary Information on Oil and Gas Producing Activities (Unaudited) | 102 |
| Supplemental Statistics (Unaudited) | 113 |

***Management's Responsibilities for Financial Statements***

To the Stockholders of Marathon Oil Corporation:

The accompanying consolidated financial statements of Marathon Oil Corporation and its consolidated subsidiaries ("Marathon Oil") are the responsibility of management and have been prepared in conformity with accounting principles generally accepted in the United States. They necessarily include some amounts that are based on best judgments and estimates. The financial information displayed in other sections of this Annual Report on Form 10-K is consistent with these consolidated financial statements.

Marathon Oil seeks to assure the objectivity and integrity of its financial records by careful selection of its managers, by organization arrangements that provide an appropriate division of responsibility and by communications programs aimed at assuring that its policies and methods are understood throughout the organization.

The Board of Directors pursues its oversight role in the area of financial reporting and internal control over financial reporting through its Audit and Finance Committee. This Committee, composed solely of independent directors, regularly meets (jointly and separately) with the independent registered public accounting firm, management and internal auditors to monitor the proper discharge by each of their responsibilities relative to internal accounting controls and the consolidated financial statements.

| /s/ Lee M. Tillman | /s/ John R. Sult |
|---|---|
| *President and Chief Executive Officer* | *Executive Vice President and Chief Financial Officer* |

***Management's Report on Internal Control over Financial Reporting***

To the Stockholders of Marathon Oil Corporation:

Marathon Oil's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13(a) - 15(f) under the Securities Exchange Act of 1934). Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements and even when determined to be effective, can only provide reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

An evaluation of the design and effectiveness of our internal control over financial reporting, based on the 2013 framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, was conducted under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based on the results of this evaluation, Marathon Oil's management concluded that its internal control over financial reporting was effective as of December 31, 2014.

The effectiveness of Marathon Oil's internal control over financial reporting as of December 31, 2014 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

| /s/ Lee M. Tillman | /s/ John R. Sult |
|---|---|
| *President and Chief Executive Officer* | *Executive Vice President and Chief Financial Officer* |

***Report of Independent Registered Public Accounting Firm***

To the Stockholders of Marathon Oil Corporation:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Marathon Oil Corporation and its subsidiaries (the "Company") at December 31, 2014, and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework* - 2013 issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Houston, Texas
March 2, 2015

64

*MARATHON OIL CORPORATION*
*Consolidated Statements of Income*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (In millions, except per share data) | | 2014 | | 2013 | | 2012 |
| **Revenues and other income:** | | | | | | |
| Sales and other operating revenues, including related party | $ | 8,736 | $ | 9,246 | $ | 9,237 |
| Marketing revenues | | 2,110 | | 2,079 | | 2,729 |
| Income from equity method investments | | 424 | | 423 | | 370 |
| Net gain (loss) on disposal of assets | | (90) | | (29) | | 127 |
| Other income | | 78 | | 64 | | 23 |
| Total revenues and other income | | 11,258 | | 11,783 | | 12,486 |
| **Costs and expenses:** | | | | | | |
| Production | | 2,246 | | 2,156 | | 2,079 |
| Marketing, including purchases from related parties | | 2,105 | | 2,076 | | 2,734 |
| Other operating | | 462 | | 389 | | 364 |
| Exploration | | 793 | | 891 | | 685 |
| Depreciation, depletion and amortization | | 2,861 | | 2,500 | | 2,008 |
| Impairments | | 132 | | 96 | | 371 |
| Taxes other than income | | 406 | | 345 | | 243 |
| General and administrative | | 654 | | 659 | | 676 |
| Total costs and expenses | | 9,659 | | 9,112 | | 9,160 |
| **Income from operations** | | 1,599 | | 2,671 | | 3,326 |
| Net interest and other | | (238) | | (278) | | (222) |
| **Income from continuing operations before income taxes** | | 1,361 | | 2,393 | | 3,104 |
| Provision for income taxes | | 392 | | 1,462 | | 2,248 |
| **Income from continuing operations** | | 969 | | 931 | | 856 |
| **Discontinued operations** | | 2,077 | | 822 | | 726 |
| **Net income** | $ | 3,046 | $ | 1,753 | $ | 1,582 |
| **Per Share Data** | | | | | | |
| **Basic:** | | | | | | |
| Income from continuing operations | $ | 1.42 | $ | 1.32 | $ | 1.21 |
| Discontinued operations | $ | 3.06 | $ | 1.17 | $ | 1.03 |
| Net income | $ | 4.48 | $ | 2.49 | $ | 2.24 |
| **Diluted:** | | | | | | |
| Income from continuing operations | $ | 1.42 | $ | 1.31 | $ | 1.21 |
| Discontinued operations | $ | 3.04 | $ | 1.16 | $ | 1.02 |
| Net income | $ | 4.46 | $ | 2.47 | $ | 2.23 |
| **Dividends** | $ | 0.80 | $ | 0.72 | $ | 0.68 |
| **Weighted average shares:** | | | | | | |
| Basic | | 680 | | 705 | | 706 |
| Diluted | | 683 | | 709 | | 710 |

*The accompanying notes are an integral part of these consolidated financial statements.*

65

*MARATHON OIL CORPORATION*
*Consolidated Statements of Comprehensive Income*

| (In millions) | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Net income | $ | 3,046 | $ | 1,753 | $ | 1,582 |
| Other comprehensive income (loss) | | | | | | |
| Postretirement and postemployment plans | | | | | | |
| Change in actuarial loss and other | | (52) | | 300 | | (97) |
| Income tax benefit (provision) | | 25 | | (112) | | 35 |
| Postretirement and postemployment plans, net of tax | | (27) | | 188 | | (62) |
| Derivative hedges | | | | | | |
| Net unrecognized gain | | 1 | | 1 | | 1 |
| Income tax provision | | - | | - | | - |
| Derivative hedges, net of tax | | 1 | | 1 | | 1 |
| Foreign currency translation and other | | | | | | |
| Unrealized gain (loss) | | - | | (3) | | 1 |
| Income tax benefit (provision) | | (1) | | 1 | | (3) |
| Foreign currency translation and other, net of tax | | (1) | | (2) | | (2) |
| Other comprehensive income (loss) | | (27) | | 187 | | (63) |
| Comprehensive income | $ | 3,019 | $ | 1,940 | $ | 1,519 |

*The accompanying notes are an integral part of these consolidated financial statements.*

66

*MARATHON OIL CORPORATION*
*Consolidated Balance Sheets*

| | | December 31, | | |
|---|---|---|---|---|
| *(In millions, except par values and share amounts)* | | 2014 | | 2013 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 2,398 | $ | 264 |
| Receivables, less reserve of $3 and $0 | | 1,729 | | 2,134 |
| Inventories | | 357 | | 364 |
| Other current assets | | 109 | | 213 |
| Total current assets | | 4,593 | | 2,975 |
| Equity method investments | | 1,113 | | 1,201 |
| Property, plant and equipment, less accumulated depreciation, depletion and amortization of $21,884 and $21,895 | | 29,040 | | 28,145 |
| Goodwill | | 459 | | 499 |
| Other noncurrent assets | | 806 | | 2,800 |
| Total assets | $ | 36,011 | $ | 35,620 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Commercial paper | $ | - | $ | 135 |
| Accounts payable | | 2,545 | | 2,206 |
| Payroll and benefits payable | | 191 | | 240 |
| Accrued taxes | | 285 | | 1,445 |
| Other current liabilities | | 290 | | 239 |
| Long-term debt due within one year | | 1,068 | | 68 |
| Total current liabilities | | 4,379 | | 4,333 |
| Long-term debt | | 5,323 | | 6,394 |
| Deferred tax liabilities | | 2,486 | | 2,492 |
| Defined benefit postretirement plan obligations | | 598 | | 604 |
| Asset retirement obligations | | 1,917 | | 2,009 |
| Deferred credits and other liabilities | | 288 | | 444 |
| Total liabilities | | 14,991 | | 16,276 |
| Commitments and contingencies | | | | |
| **Stockholders' Equity** | | | | |
| Preferred stock - no shares issued or outstanding (no par value, 26 million shares authorized) | | - | | - |
| Common stock: | | | | |
| Issued - 770 million shares (par value $1 per share, 1.1 billion shares authorized) | | 770 | | 770 |
| Securities exchangeable into common stock - no shares issued or outstanding (no par value, 29 million shares authorized) | | - | | - |
| Held in treasury, at cost - 95 million and 73 million shares | | (3,642) | | (2,903) |
| Additional paid-in capital | | 6,531 | | 6,592 |
| Retained earnings | | 17,638 | | 15,135 |
| Accumulated other comprehensive loss | | (277) | | (250) |
| Total stockholders' equity | | 21,020 | | 19,344 |
| Total liabilities and stockholders' equity | $ | 36,011 | $ | 35,620 |

*The accompanying notes are an integral part of these consolidated financial statements.*

67

*MARATHON OIL CORPORATION*
*Consolidated Statements of Cash Flows*

| | | Year Ended December 31, | |
|---|---|---|---|
| (In millions) | 2014 | 2013 | 2012 |
| **Increase (decrease) in cash and cash equivalents** | | | |
| **Operating activities:** | | | |
| Net income | $ 3,046 | $ 1,753 | $ 1,582 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Discontinued operations | (2,077) | (822) | (726) |
| Deferred income taxes | 88 | (34) | (34) |
| Depreciation, depletion and amortization | 2,861 | 2,500 | 2,008 |
| Impairments | 132 | 96 | 371 |
| Pension and other postretirement benefits, net | (34) | 45 | (32) |
| Exploratory dry well costs and unproved property impairments | 623 | 720 | 457 |
| Net (gain) loss on disposal of assets | 90 | 29 | (127) |
| Equity method investments, net | 27 | 12 | 11 |
| Changes in: | | | |
| Current receivables | 119 | 217 | (481) |
| Inventories | (11) | (19) | (24) |
| Current accounts payable and accrued liabilities | (33) | (208) | (102) |
| All other operating, net | (95) | 99 | (29) |
| Net cash provided by continuing operations | 4,736 | 4,388 | 2,874 |
| Net cash provided by discontinued operations | 751 | 882 | 1,143 |
| Net cash provided by operating activities | 5,487 | 5,270 | 4,017 |
| **Investing activities:** | | | |
| Acquisitions, net of cash acquired | (21) | (74) | (1,033) |
| Additions to property, plant and equipment | (5,160) | (4,443) | (4,361) |
| Disposal of assets, net of cash transferred to buyer | 3,760 | 450 | 467 |
| Investments - return of capital | 61 | 61 | 57 |
| Investing activities of discontinued operations | (376) | (550) | (579) |
| All other investing, net | (10) | 35 | 10 |
| Net cash used in investing activities | (1,746) | (4,521) | (5,439) |
| **Financing activities:** | | | |
| Commercial paper, net | (135) | (65) | 200 |
| Borrowings | - | - | 1,997 |
| Debt issuance costs | - | - | (21) |
| Debt repayments | (68) | (182) | (145) |
| Purchases of common stock | (1,000) | (500) | - |
| Dividends paid | (543) | (508) | (480) |
| All other financing, net | 153 | 93 | 49 |
| Net cash provided by (used in) financing activities | (1,593) | (1,162) | 1,600 |
| **Effect of exchange rate changes on cash:** | | | |
| Continuing operations | (2) | (3) | 7 |
| Discontinued operations | (12) | (4) | 6 |
| **Net increase (decrease) in cash and cash equivalents** | 2,134 | (420) | 191 |
| **Cash and cash equivalents at beginning of period** | 264 | 684 | 493 |
| **Cash and cash equivalents at end of period** | $ 2,398 | $ 264 | $ 684 |

*The accompanying notes are an integral part of these consolidated financial statements.*

68

## MARATHON OIL CORPORATION
### Consolidated Statements of Stockholders' Equity

| (In millions) | | Total Equity of Marathon Oil Stockholders | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preferred Stock | Common Stock | Securities Exchangeable into Common Stock | Treasury Stock | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Non-controlling Interest | Total Equity |
| **December 31, 2011 Balance** | $ - | $ 770 | $ - | $ (2,716) | $ 6,680 | $ 12,788 | $ (370) | $ 7 | $ 17,159 |
| Shares issued - stock-based compensation | - | - | - | 164 | (75) | - | - | - | 89 |
| Shares repurchased | - | - | - | (8) | - | - | - | - | (8) |
| Stock-based compensation | - | - | - | - | 22 | - | - | - | 22 |
| Net income | - | - | - | - | - | 1,582 | - | - | 1,582 |
| Other comprehensive income | - | - | - | - | - | - | (63) | - | (63) |
| Dividends paid | - | - | - | - | - | (480) | - | - | (480) |
| Purchase of shares from noncontrolling interest | - | - | - | - | - | - | - | (7) | (7) |
| Other | | | | | (11) | | | | (11) |
| **December 31, 2012 Balance** | $ - | $ 770 | $ - | $ (2,560) | $ 6,616 | $ 13,890 | $ (433) | $ - | $ 18,283 |
| Shares issued - stock-based compensation | - | - | - | 170 | (44) | - | - | - | 126 |
| Shares repurchased | - | - | - | (513) | - | - | - | - | (513) |
| Stock-based compensation | - | - | - | - | 20 | - | - | - | 20 |
| Net income | - | - | - | - | - | 1,753 | - | - | 1,753 |
| Other comprehensive loss | - | - | - | - | - | - | 183 | - | 183 |
| Dividends paid | - | - | - | - | - | (508) | - | - | (508) |
| **December 31, 2013 Balance** | $ - | $ 770 | $ - | $ (2,903) | $ 6,592 | $ 15,135 | $ (250) | $ - | $ 19,344 |
| Shares issued - stock-based compensation | - | - | - | 276 | (57) | - | - | - | 219 |
| Shares repurchased | - | - | - | (1,015) | - | - | - | - | (1,015) |
| Stock-based compensation | - | - | - | - | (4) | - | - | - | (4) |
| Net income | - | - | - | - | - | 3,046 | - | - | 3,046 |
| Other comprehensive income | - | - | - | - | - | - | (27) | - | (27) |
| Dividends paid | - | - | - | - | - | (543) | - | - | (543) |
| **December 31, 2014 Balance** | $ - | $ 770 | $ - | $ (3,642) | $ 6,531 | $ 17,638 | $ (277) | $ - | $ 21,020 |

| (Shares in millions) | Preferred Stock | Common Stock | Securities Exchangeable into Common Stock | Treasury Stock |
|---|---|---|---|---|
| **December 31, 2011 Balance** | - | 770 | - | 66 |
| Shares issued - stock-based compensation | - | - | - | (3) |
| **December 31, 2012 Balance** | - | 770 | - | 63 |
| Shares issued - stock-based compensation | - | - | - | (4) |
| Shares repurchased | - | - | - | 14 |
| **December 31, 2013 Balance** | - | 770 | - | 73 |
| Shares issued - stock-based compensation | - | - | - | (7) |
| Shares repurchased | - | - | - | 29 |
| **December 31, 2014 Balance** | - | 770 | - | 95 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

**1. Summary of Principal Accounting Policies**

We are a global energy company engaged in exploration, production and marketing of crude oil and condensate, NGLs and natural gas; as well as production and marketing of products manufactured from natural gas, such as LNG and methanol, in E.G.; and oil sands mining, bitumen transportation and upgrading, and marketing of synthetic crude oil and vacuum gas oil in Canada.

*Principles applied in consolidation* - These consolidated financial statements include the accounts of our majority-owned, controlled subsidiaries. Investments in unincorporated joint ventures and undivided interests in certain operating assets are consolidated on a pro rata basis.

*Equity method investment*s - Investments in entities over which we have significant influence, but not control, are accounted for using the equity method of accounting. This includes entities in which we hold majority ownership but the minority stockholders have substantive participating rights in the investee. Income from equity method investments represents our proportionate share of net income generated by the equity method investees.

Equity method investments are included as noncurrent assets on the consolidated balance sheet. These investments are assessed for impairment whenever changes in the facts and circumstances indicate a loss in value has occurred, if the loss is deemed to be other than temporary. When the loss is deemed to be other than temporary, the carrying value of the equity method investment is written down to fair value, and the amount of the write-down is included in net income. Differences in the basis of the investments and the separate net asset value of the investees, if any, are amortized into net income over the remaining useful lives of the underlying assets, except for the excess related to goodwill.

*Discontinued operations* - Disclosures in this report related to results of operations and cash flows are presented on the basis of continuing operations unless otherwise stated. As a result of the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014 (see Note 5), these businesses are reflected as discontinued operations in all periods presented.

*Use of estimates* - The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the respective reporting periods.

*Foreign currency transactions* - The U.S. dollar is the functional currency of our foreign operating subsidiaries. Foreign currency transaction gains and losses are included in net income.

*Revenue recognition* - Revenues are recognized when products are shipped or services are provided to customers, title is transferred, the sales price is fixed or determinable and collectability is reasonably assured. We follow the sales method of accounting for crude oil and natural gas production imbalances and would recognize a liability if our existing proved reserves were not adequate to cover an imbalance. Imbalances have not been significant in the periods presented.

In the lower 48 states of the U.S., production volumes of crude oil and condensate, NGLs and natural gas are generally sold immediately and transported to market. In international locations, liquid hydrocarbon production volumes may be stored as inventory and sold at a later time. In Canada, mined bitumen is first processed through an upgrader and then sold as synthetic crude oil.

*Cash and cash equivalents* - Cash and cash equivalents include cash on hand and on deposit and investments in highly liquid debt instruments with original maturities of three months or less.

*Accounts receivable* - The majority of our receivables are from joint interest owners in properties we operate or from purchasers of commodities, both of which are recorded at invoiced amounts and do not bear interest. We often have the ability to withhold future revenue disbursements to recover any non-payment of joint interest billings. We conduct credit reviews of commodity purchasers prior to making commodity sales to new customers or increasing credit for existing customers. Based on these reviews, we may require a standby letter of credit or a financial guarantee. Uncollectible accounts receivable are reserved against the allowance for uncollectible accounts when it is determined the receivable will not be collected and the amount of any reserve may be reasonably estimated.

*Inventories* - Crude oil and natural gas inventories are recorded at weighted average cost and carried at the lower of cost or market value. The last-in, first-out ("LIFO") method is used for our U.S. crude oil and natural gas inventories. Materials and supplies inventory consist principally of tubular goods and equipment which are valued at weighted average cost and reviewed periodically for obsolescence or impairment when market conditions indicate.

70

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

We may enter into a contract to sell a particular quantity and quality of crude oil at a specified location and date to a particular counterparty, and simultaneously agree to buy a particular quantity and quality of the same commodity at a specified location on the same or another specified date from the same counterparty. We account for such matching buy/sell arrangements as exchanges of inventory.

***Derivative instruments*** - We may use derivatives to manage a portion of our exposure to commodity price risk, interest rate risk and foreign currency exchange rate risk. All derivative instruments are recorded at fair value. Commodity derivatives and interest rate swaps are reflected on our consolidated balance sheet on a net basis by counterparty, as they are governed by master netting agreements. Cash flows related to derivatives used to manage commodity price risk, foreign currency risk and interest rate risk are classified in operating activities with the underlying transactions. Our derivative instruments contain no significant contingent credit features.

*Fair value hedges* - We may use interest rate swaps to manage our exposure to interest rate risk associated with fixed interest rate debt in our portfolio and foreign currency forwards to manage our exposure to changes in the value of foreign currency denominated tax liabilities. Changes in the fair values of both the hedged item and the related derivative are recognized immediately in net income with an offsetting effect included in the basis of the hedged item. The net effect is to report in net income the extent to which the hedge is not effective in achieving offsetting changes in fair value.

*Derivatives not designated as hedges* - Derivatives that are not designated as hedges may include commodity derivatives used primarily to manage price risk on the forecasted sale of crude oil, natural gas and synthetic crude oil that we produce. Changes in the fair value of derivatives not designated as hedges are recognized immediately in net income.

***Concentrations of credit risk*** - All of our financial instruments, including derivatives, involve elements of credit and market risk. The most significant portion of our credit risk relates to nonperformance by counterparties. The counterparties to our financial instruments consist primarily of major financial institutions and companies within the energy industry. To manage counterparty risk associated with financial instruments, we select and monitor counterparties based on our assessment of their financial strength and on credit ratings, if available. Additionally, we limit the level of exposure with any single counterparty.

***Fair value transfer*** - We recognize transfers between levels of the fair value hierarchy as of the end of the reporting period. If significant transfers occur, they would be disclosed in Note 14 to the consolidated financial statements.

***Property, plant and equipment*** - We use the successful efforts method of accounting for oil and gas producing activities, which include bitumen mining and upgrading.

*Property acquisition costs* - Costs to acquire mineral interests in oil and natural gas properties or in oil sands mines, to drill and equip exploratory wells in progress and those that find proved reserves, to drill and equip development wells and to construct or expand oil sands mines and upgrading facilities are capitalized. Costs to drill exploratory wells that do not find proved reserves, geological and geophysical costs and costs of carrying and retaining unproved properties are expensed. Costs incurred for exploratory wells that find reserves but cannot yet be classified as proved are capitalized if (1) the well has found a sufficient quantity of reserves to justify its completion as a producing well and (2) we are making sufficient progress assessing the reserves and the economic and operating viability of the project. The status of suspended exploratory well costs is monitored continuously and reviewed at least quarterly.

*Depreciation, depletion and amortization* - Capitalized costs to acquire oil and natural gas properties, which include bitumen mining and upgrading facilities, are depreciated and depleted on a units-of-production basis based on estimated proved reserves. Capitalized costs of exploratory wells and development costs are depreciated and depleted on a units-of-production basis based on estimated proved developed reserves. Support equipment and other property, plant and equipment related to oil and gas producing activities, as well as property, plant and equipment unrelated to oil and gas producing activities, are recorded at cost and depreciated on a straight-line basis over the estimated useful lives of the assets as summarized below.

| Type of Asset | Range of Useful Lives |
|---|---|
| Office furniture, equipment and computer hardware | 1 to 15 years |
| Pipelines | 10 to 40 years |
| Plants, facilities, mine equipment and infrastructure | 16 to 40 years |

*Impairments* - We evaluate our oil and gas producing properties, including capitalized costs of exploratory wells, development costs and our bitumen mining and upgrading facilities, for impairment of value whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If the sum of the expected undiscounted future cash flows from the use of the asset and its eventual disposition is less than the carrying amount of the asset, an impairment loss is recognized based on the fair value of the asset. Oil and gas producing properties are reviewed for impairment on a field-by-field basis or, in certain instances, by logical grouping of assets if there is significant shared

71

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

infrastructure. Oil and gas producing properties deemed to be impaired are written down to their fair value, as determined by discounted future net cash flows or, if available, comparable market value. We evaluate our unproved property investment and record impairment based on time or geologic factors. Information such as drilling results, reservoir performance, seismic interpretation or future plans to develop acreage is also considered. When unproved property investments are deemed to be impaired, the expense is reported in exploration expenses.

*Dispositions* - When property, plant and equipment depreciated on an individual basis is sold or otherwise disposed of, any gains or losses are reported in net income. Gains on the disposal of property, plant and equipment are recognized when earned, which is generally at the time of closing. If a loss on disposal is expected, such losses are recognized when the assets are classified as held for sale. Proceeds from the disposal of property, plant and equipment depreciated on a group basis are credited to accumulated depreciation, depletion and amortization with no immediate effect on net income until net book value is reduced to zero.

*Goodwill* - Goodwill represents the excess of the purchase price over the estimated fair value of the net assets acquired in the acquisition of a business. Such goodwill is not amortized, but rather is tested for impairment annually and when events or changes in circumstances indicate that the fair value of a reporting unit with goodwill has been reduced below carrying value. The impairment test requires allocating goodwill and other assets and liabilities to reporting units. The fair value of each reporting unit is determined and compared to the book value of the reporting unit. If the fair value of the reporting unit is less than the book value, including goodwill, then the recorded goodwill is impaired to its implied fair value with a charge to impairments.

*Major maintenance activities* - Costs for planned major maintenance are expensed in the period incurred and can include the costs of contractor repair services, materials and supplies, equipment rentals and our labor costs.

*Environmental costs* - We provide for remediation costs and penalties when the responsibility to remediate is probable and the amount of associated costs can be reasonably estimated. The timing of remediation accruals coincides with completion of a feasibility study or the commitment to a formal plan of action. Remediation liabilities are accrued based on estimates of known environmental exposure and are discounted when the estimated amounts are reasonably fixed or reliably determinable. Environmental expenditures are capitalized only if the costs mitigate or prevent future contamination or if the costs improve the environmental safety or efficiency of the existing assets.

*Asset retirement obligations* - The fair value of asset retirement obligations is recognized in the period in which the obligations are incurred if a reasonable estimate of fair value can be made. Our asset retirement obligations primarily relate to the abandonment of oil and gas producing facilities, which include our bitumen mining facilities. Asset retirement obligations for such facilities include costs to dismantle and relocate or dispose of production platforms, mine assets, gathering systems, wells and related structures and restoration costs of land and seabed, including those leased. Estimates of these costs are developed for each property based on the type of production structure, depth of water, reservoir characteristics, depth of the reservoir, market demand for equipment, currently available procedures and consultations with construction and engineering professionals. Asset retirement obligations have not been recognized for certain of our international oil and gas producing facilities as we currently do not have a legal obligation associated with the retirement of those facilities. Asset retirement obligations have not been recognized for the removal of materials and equipment from or the closure of certain bitumen upgrading assets because the fair value cannot be reasonably estimated since the settlement dates of the obligations are indeterminate.

Inflation rates and credit-adjusted-risk-free interest rates are used to estimate the fair value of asset retirement obligations. Depreciation of capitalized asset retirement costs and accretion of asset retirement obligations are recorded over time. Depreciation is generally determined on a units-of-production basis for oil and gas production facilities, which include our bitumen mining facilities, while accretion escalates over the lives of the assets.

*Deferred income taxes* - Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of assets and liabilities and their tax bases as reported in our filings with the respective taxing authorities. We routinely assess the realizability of our deferred tax assets based on several interrelated factors and reduce such assets by a valuation allowance if it is more likely than not that some portion or all of the deferred tax assets will not be realized. These factors include our expectation to generate sufficient future taxable income including future foreign source income, tax credits, operating loss carryforwards and management's intent regarding the permanent reinvestment of the income from certain foreign subsidiaries.

*Stock-based compensation arrangements* - The fair value of stock options is estimated on the date of grant using the Black-Scholes option pricing model. The model employs various assumptions, based on management's best estimates at the time of grant, which impact the calculation of fair value and ultimately, the amount of expense that is recognized over the life of the stock option award. Of the required assumptions, the expected life of the stock option award and the expected volatility of

72

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

our stock price have the most significant impact on the fair value calculation. We have utilized historical data and analyzed current information which reasonably support these assumptions.

The fair value of our restricted stock awards and common stock units is determined based on the market value of our common stock on the date of grant. Unearned stock-based compensation is charged to stockholders' equity when restricted stock awards are granted.

The fair value of our stock-based performance units is estimated using the Monte Carlo simulation method. Since these awards are settled in cash at the end of a defined performance period, they are classified as a liability and are re-measured quarterly until settlement.

Our stock-based compensation expense is recognized based on management's best estimate of the awards that are expected to vest, using the straight-line attribution method for all service-based awards with a graded vesting feature. If actual forfeiture results are different than expected, adjustments to recognized compensation expense may be required in future periods.

## 2. Accounting Standards

*Not Yet Adopted*

In February 2015, the FASB issued an amendment to the guidance for determining whether an entity is a variable interest entity ("VIE"). The standard does not add or remove any of the five characteristics that determine if an entity is a VIE. However, it does change the manner in which a reporting entity assesses one of the characteristics. In particular, when decision-making over the entity's most significant activities has been outsourced, the standard changes how a reporting entity assesses if the equity holders at risk lack decision making rights. This standard is effective for us for annual periods beginning after December 15, 2015 and early adoption is permitted, including in interim periods. We do not expect the adoption of this standard to have a significant impact on our consolidated results of operations, financial position or cash flows.

In August 2014, the FASB issued an update that requires management to assess an entity's ability to continue as a going concern by incorporating and expanding upon certain principles that are currently in U.S. auditing standards. This standard is effective for us in the first quarter of 2017 and early adoption is permitted. We do not expect the adoption of this standard to have a significant impact on our consolidated results of operations, financial position or cash flows.

In May 2014, the FASB issued an update that supersedes the existing revenue recognition requirements. This standard includes a five-step revenue recognition model to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. Among other things, the standard also eliminates industry-specific revenue guidance, requires enhanced disclosures about revenue, provides guidance for transactions that were not previously addressed comprehensively and improves guidance for multiple-element arrangements. This standard is effective for us in the first quarter of 2017 and should be applied retrospectively to each prior reporting period presented or with the cumulative effect of initially applying the update recognized at the date of initial application. Early adoption is not permitted. We are evaluating the provisions of this accounting standards update and assessing the impact, if any, it may have on our consolidated results of operations, financial position or cash flows.

In April 2014, the FASB issued an amendment to accounting standards that changes the criteria for reporting discontinued operations while enhancing related disclosures. Under the amendment, only disposals representing a strategic shift in operations should be presented as discontinued operations. Those strategic shifts should have a major effect on the organization's operations and financial results. Expanded disclosures about the assets, liabilities, income and expenses of discontinued operations will be required. In addition, disclosure of the pretax income attributable to a disposal of a significant part of an organization that does not qualify for discontinued operations reporting will be made in order to provide users with information about the ongoing trends in an organization's results from continuing operations. The amendments are effective for us in the first quarter of 2015 and early adoption is permitted. We did not elect early adoption of this amendment and do not expect its future adoption to have a significant impact on our consolidated results of operations, financial position or cash flows.

*Recently Adopted*

In June 2013, the FASB ratified the Emerging Issues Task Force consensus which requires that an unrecognized tax benefit (or a portion thereof) be presented as a reduction to a deferred tax asset for an available net operating loss carryforward, a similar tax loss or tax credit carryforward. This accounting standards update was effective for us beginning in the first quarter of 2014 and is required to be applied prospectively. Adoption of this standard did not have a significant impact on our consolidated results of operations, financial position or cash flows.

In February 2013, an accounting standards update was issued to provide guidance for the recognition, measurement and disclosure of obligations resulting from joint and several liability arrangements for which the total amount of the obligation is fixed at the reporting date, except for obligations such as asset retirement and environmental obligations, contingencies,

73

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

guarantees, income taxes and retirement benefits, which are separately addressed within U.S. GAAP. This accounting standards update was effective for us beginning in the first quarter of 2014 and is required to be applied retrospectively. Adoption of this standard did not have a significant impact on our consolidated results of operations, financial position or cash flows.

### 3. Variable Interest Entities

The owners of the AOSP, in which we hold a 20 percent undivided interest, contracted with a wholly owned subsidiary of a publicly traded Canadian limited partnership ("Corridor Pipeline") to provide materials transportation capabilities among the Muskeg River and Jackpine mines, the Scotford upgrader and markets in Edmonton. The contract, originally signed in 1999 by a company we acquired, allows each holder of an undivided interest in the AOSP to ship materials in accordance with its undivided interest. Costs under this contract are accrued and recorded on a monthly basis, with a $3 million current liability recorded at December 31, 2014 and 2013. Under this agreement, the AOSP absorbs all of the operating and capital costs of the pipeline. Currently, no third-party shippers use the pipeline. Should shipments be suspended, by choice or due to force majeure, we remain responsible for the portion of the payments related to our undivided interest for all remaining periods. The contract expires in 2029; however, the shippers can extend its term perpetually. This contract qualifies as a variable interest contractual arrangement and the Corridor Pipeline qualifies as a VIE. We hold a variable interest but are not the primary beneficiary because our shipments are only 20 percent of the total; therefore the Corridor Pipeline is not consolidated by us. Our maximum exposure to loss as a result of our involvement with this VIE is the amount we expect to pay over the contract term, which was $558 million as of December 31, 2014. The liability on our books related to this contract at any given time will reflect amounts due for the immediately previous month's activity, which is substantially less than the maximum exposure over the contract term. We have not provided financial assistance to Corridor Pipeline and we do not have any guarantees of such assistance in the future.

### 4. Acquisitions

#### *2014 - North America E&P*

In an asset acquisition that closed August 2014, we added acreage to the Oklahoma Resource Basins at a cost of approximately $80 million before final settlement adjustments.

In the fourth quarter of 2014, we acquired additional acres in the SCOOP, at a cost of approximately $60 million before final settlement adjustments.

#### *2013 & 2012 - North America E&P*

In July 2013, we acquired additional acreage in the Eagle Ford in a transaction valued at $97 million, including a carried interest of $23 million which was fully satisfied in 2014. The transaction was accounted for as a business combination, with the entire up-front cash consideration of $74 million allocated to property, plant and equipment at the acquisition date.

During 2012, we acquired approximately 25,000 net acres in the core of the Eagle Ford in several transactions accounted for as business combinations. The largest transactions were the acquisitions of Paloma Partners II, LLC, which closed in the second quarter of 2012 for cash consideration of $768 million, and an acquisition of proved and unproved properties that closed in the third quarter of 2012 for cash consideration of $232 million.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

The following table summarizes the amounts allocated to the assets acquired and liabilities assumed based upon their fair values at the acquisition dates:

|  | Closed in Quarter Ended | |
| --- | --- | --- |
| | June 30, | September 30, |
| (In millions) | 2012 | 2012 |
| Current assets: | | |
| Cash | $ 8 | $ - |
| Receivables | 22 | 8 |
| Inventories | 1 | - |
| Total current assets acquired | 31 | 8 |
| Property, plant and equipment | 822 | 248 |
| Total assets acquired | 853 | 256 |
| Current liabilities: | | |
| Accounts payable | 78 | 23 |
| Total current liabilities assumed | 78 | 23 |
| Asset retirement obligations | 7 | 1 |
| Total liabilities assumed | 85 | 24 |
| Net assets acquired | $ 768 | $ 232 |

The fair values of assets acquired and liabilities assumed in each of these business combinations were measured primarily using an income approach, specifically utilizing a discounted cash flow analysis. The estimated fair values were based on significant inputs not observable in the market, and therefore represent Level 3 measurements. Significant inputs included estimated reserve volumes, the expected future production profile, estimated commodity prices and assumptions regarding future operating and development costs and a discount rate of approximately 10 percent. The pro forma impact of these transactions, individually and in the aggregate, is not material to our consolidated statements of income for any periods presented.

## 5. Dispositions

*2014 - International E&P*

In June 2014, we entered into an agreement to sell our Norway business, including the operated Alvheim FPSO, 10 operated licenses and a number of non-operated licenses on the Norwegian Continental Shelf in the North Sea, with an effective date of January 1, 2014. The transaction closed in the fourth quarter of 2014 for proceeds of $2.1 billion, before netting $589 million cash transferred to the buyer. A $976 million after-tax gain on the sale of Norway business was recorded in the fourth quarter of 2014. Included in this after-tax gain is a deferred tax benefit reflecting our ability to utilize foreign tax credits that otherwise would have needed a valuation allowance.

As part of our agreement to sell our Norway business, we agreed to provide customary transition services to the buyer for an initial period of six months from the closing date. The buyer may extend such services for an additional six months if mutually agreed upon. These services include accounting, marketing, information technology and safety. Amounts received for these transition services are not significant to us. We do not exert influence over the operational and financial policies of the Norway business nor do we retain risk associated with this business.

Our Norway business is reflected as discontinued operations in the consolidated statements of income and the consolidated statements of cash flows for all periods presented. Select amounts reported in discontinued operations were as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (In millions) | 2014 | 2013 | 2012 |
| Revenues applicable to discontinued operations | $ 1,981 | $ 3,176 | $ 3,726 |
| Pretax income from discontinued operations | $ 1,693 | $ 2,537 | 3,026 |
| Pretax gain on disposition of discontinued operations | $ 1,406 | $ - | $ - |

75

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

In the first quarter of 2014, we closed the sales of our 10 percent non-operated working interests in the Production Sharing Contracts and Joint Operating Agreements for Angola Blocks 31 and 32 for aggregate proceeds of approximately $2 billion. A $532 million after-tax gain on the sale of our Angola assets was recorded in 2014. Included in this after-tax gain is a deferred tax benefit reflecting our ability to utilize foreign tax credits that otherwise would have needed a valuation allowance.

Our Angola operations are reflected as discontinued operations in the consolidated statements of income and the consolidated statements of cash flows for all periods presented. Select amounts reported in discontinued operations were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions) | 2014 | 2013 | 2012 |
| Revenues applicable to discontinued operations | $ 58 | $ 361 | $ - |
| Pretax income (loss) from discontinued operations | $ 51 | $ 247 | $ (17) |
| Pretax gain on disposition of discontinued operations | $ 426 | $ - | $ - |

Assets held for sale in the December 31, 2013 consolidated balance sheet were related to the Angola Block 31 disposition that was pending at that date and included:

| (In millions) | December 31, 2013 |
|---|---|
| Other current assets | $ 41 |
| Other noncurrent assets | 1,647 |
| Total assets | $ 1,688 |
| Other current liabilities | $ 25 |
| Deferred credits and other liabilities | 43 |
| Total liabilities | $ 68 |

### 2014 - North America E&P

In June 2014, we closed the sale of non-core acreage located in the far northwest portion of the Williston Basin for proceeds of $90 million. A pretax loss of $91 million was recorded in the second quarter of 2014.

### 2013 - International E&P

In the fourth quarter of 2013, we transferred our 45 percent working interest and operatorship in the Safen block in the Kurdistan Region of Iraq at a pretax loss of $17 million.

### 2013 - North America E&P

In June 2013, we closed the sale of our interests in the DJ Basin for proceeds of $19 million. A pretax loss of $114 million was recorded in the second quarter of 2013.

In February 2013, we conveyed our interests in the Marcellus natural gas shale play to the operator. A $43 million pretax loss was recorded in the first quarter of 2013.

In February 2013, we closed the sale of our interest in the Neptune gas plant, located onshore Louisiana, for proceeds of $166 million. A $98 million pretax gain was recorded in the first quarter of 2013.

In January 2013, we closed the sale of our remaining assets in Alaska, for proceeds of $195 million, subject to a six-month escrow of $50 million which was collected in July 2013. After closing adjustments were made in the second quarter of 2013, the pretax gain on this sale was $55 million.

### 2012 - International E&P

In May 2012, we executed agreements to relinquish our operatorship of and participating interests in the Bone Bay and Kumawa exploration licenses in Indonesia. As a result, we reported a $36 million pretax loss on disposal of assets.

### 2012 - North America E&P

In the third quarter of 2012, we sold non-core net undeveloped acres in the Eagle Ford for proceeds of $9 million. A pretax loss of $18 million was recorded.

In January 2012, we closed on the sale of our interests in several Gulf of Mexico crude oil pipeline systems for proceeds of $206 million. This included our equity method interests in Poseidon Oil Pipeline Company, L.L.C. and Odyssey Pipeline

76

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

L.L.C., as well as certain other oil pipeline interests, including the Eugene Island pipeline system. A pretax gain of $166 million was recorded in the first quarter of 2012.

**6. Income per Common Share**

Basic income per share is based on the weighted average number of common shares outstanding. Diluted income per share assumes exercise of stock options in all years and stock appreciation rights in 2013 and 2012, provided the effect is not antidilutive. The per share calculations below exclude 4 million, 5 million and 10 million stock options in 2014, 2013 and 2012 that were antidilutive.

| (In millions, except per share data) | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2014 | | 2013 | | 2012 |
| Income from continuing operations | $ | 969 | $ | 931 | $ | 856 |
| Discontinued operations | | 2,077 | | 822 | | 726 |
| Net income | $ | 3,046 | $ | 1,753 | $ | 1,582 |
| | | | | | | |
| Weighted average common shares outstanding | | 680 | | 705 | | 706 |
| Effect of dilutive securities | | 3 | | 4 | | 4 |
| Weighted average common shares, diluted | | 683 | | 709 | | 710 |
| Per basic share: | | | | | | |
| Income from continuing operations | $ | 1.42 | $ | 1.32 | $ | 1.21 |
| Discontinued operations | $ | 3.06 | $ | 1.17 | $ | 1.03 |
| Net income | $ | 4.48 | $ | 2.49 | $ | 2.24 |
| Per diluted share: | | | | | | |
| Income from continuing operations | $ | 1.42 | $ | 1.31 | $ | 1.21 |
| Discontinued operations | $ | 3.04 | $ | 1.16 | $ | 1.02 |
| Net income | $ | 4.46 | $ | 2.47 | $ | 2.23 |

**7. Segment Information**

We have three reportable operating segments. Each of these segments is organized and managed based upon both geographic location and the nature of the products and services it offers:

- North America E&P ("N.A. E&P") - explores for, produces and markets crude oil and condensate, NGLs and natural gas in North America;

- International E&P ("Int'l E&P") - explores for, produces and markets crude oil and condensate, NGLs and natural gas outside of North America and produces and markets products manufactured from natural gas, such as LNG and methanol, in E.G.; and

- Oil Sands Mining ("OSM") - mines, extracts and transports bitumen from oil sands deposits in Alberta, Canada, and upgrades the bitumen to produce and market synthetic crude oil and vacuum gas oil.

Information regarding assets by segment is not presented because it is not reviewed by the chief operating decision maker ("CODM"). Segment income represents income from continuing operations excluding certain items not allocated to segments, net of income taxes, attributable to the operating segments. Our corporate and operations support general and administrative costs are not allocated to the operating segments. These costs primarily consist of employment costs (including pension effects), professional services, facilities and other costs associated with corporate and operations support activities. Gains or losses on dispositions, certain impairments, unrealized gains or losses on crude oil derivative instruments, or other items that affect comparability (as determined by the CODM) also are not allocated to operating segments.

As discussed in Note 5, we closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014, and both are reflected as discontinued operations and excluded from the International E&P segment in all periods presented.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

| Year Ended December 31, 2014 | | | | | | | | | Not Allocated | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In millions) | | N.A. E&P | | Int'l E&P | | OSM | | to Segments | | | Total | |
| Sales and other operating revenues | $ | 5,770 | $ | 1,410 | $ | 1,556 | $ | | - | $ | 8,736 | |
| Marketing revenues | | 1,839 | | 219 | | 52 | | | - | | 2,110 | |
| Total revenues | | 7,609 | | 1,629 | | 1,608 | | | - | | 10,846 | |
| Income from equity method investments | | - | | 424 | | - | | | - | | 424 | |
| Net gain (loss) on disposal of assets and other income | | 23 | | 57 | | 4 | | | (96) [c] | | (12) | |
| Less: | | | | | | | | | | | | |
| Production expenses | | 891 | | 386 | | 969 | | | - | | 2,246 | |
| Marketing costs | | 1,836 | | 217 | | 52 | | | - | | 2,105 | |
| Exploration expenses | | 608 | | 185 | | - | | | - | | 793 | |
| Depreciation, depletion and amortization | | 2,342 | | 269 | | 206 | | | 44 | | 2,861 | |
| Impairments | | 23 | | - | | - | | | 109 [d] | | 132 | |
| Other expenses [a] | | 473 | | 197 | | 54 | | | 392 [e] | | 1,116 | |
| Taxes other than income | | 385 | | - | | 20 | | | 1 | | 406 | |
| Net interest and other | | - | | - | | - | | | 238 | | 238 | |
| Income tax provision (benefit) | | 381 | | 288 | | 76 | | | (353) | | 392 | |
| Segment income/Income from continuing operations | $ | 693 | $ | 568 | $ | 235 | $ | | (527) | $ | 969 | |
| Capital expenditures [b] | $ | 4,698 | $ | 534 | $ | 212 | $ | | 51 | $ | 5,495 | |

[a]    Includes other operating expenses and general and administrative expenses.
[b]    Includes accruals.
[c]    Primarily related to the sale of non-core acreage from our North America E&P segment (see Note 5).
[d]    Proved property impairments (see Note 14).
[e]    Includes pension settlement loss of $99 million (see Note 19).

| Year Ended December 31, 2013 | | | | | | | | | Not Allocated | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In millions) | | N.A. E&P | | Int'l E&P | | OSM | | to Segments | | | Total | |
| Sales and other operating revenues | $ | 5,068 | $ | 2,654 | $ | 1,576 | $ | | (52) [c] | $ | 9,246 | |
| Marketing revenues | | 1,797 | | 264 | | 18 | | | - | | 2,079 | |
| Total revenues | | 6,865 | | 2,918 | | 1,594 | | | (52) | | 11,325 | |
| Income from equity method investments | | - | | 427 | | - | | | (4) [d] | | 423 | |
| Net gain (loss) on disposal of assets and other income | | 12 | | 50 | | 5 | | | (32) [e] | | 35 | |
| Less: | | | | | | | | | | | | |
| Production expenses | | 797 | | 359 | | 1,000 | | | - | | 2,156 | |
| Marketing costs | | 1,796 | | 262 | | 18 | | | - | | 2,076 | |
| Exploration expenses | | 725 | | 166 | | - | | | - | | 891 | |
| Depreciation, depletion and amortization | | 1,927 | | 331 | | 218 | | | 24 | | 2,500 | |
| Impairments | | 41 | | - | | - | | | 55 [f] | | 96 | |
| Other expenses [a] | | 420 | | 161 | | 66 | | | 401 [g] | | 1,048 | |
| Taxes other than income | | 318 | | - | | 22 | | | 5 | | 345 | |
| Net interest and other | | - | | - | | - | | | 278 | | 278 | |
| Income tax provision (benefit) | | 324 | | 1,358 | | 69 | | | (289) | | 1,462 | |
| Segment income/Income from continuing operations | $ | 529 | $ | 758 | $ | 206 | $ | | (562) | $ | 931 | |
| Capital expenditures [b] | $ | 3,649 | $ | 456 | $ | 286 | $ | | 58 | $ | 4,449 | |

[a] Includes other operating expenses and general and administrative expenses.
[b] Includes accruals.
[c] Unrealized loss on crude oil derivative instruments (see Note 15).
[d] EGHoldings impairment (see Note 14).
[e] Related to the disposal of assets from our North America E&P segment (see Note 5).
[f] Proved property impairments (see Note 14).
[g] Includes pension settlement loss of $45 million (see Note 19).

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

| Year Ended December 31, 2012 | | N.A. E&P | | Int'l E&P | | OSM | | Not Allocated to Segments | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| *(In millions)* | | N.A. E&P | | Int'l E&P | | OSM | | to Segments | | Total |
| Sales and other operating revenues | $ | 3,944 | $ | 3,719 | $ | 1,521 | $ | 53 [c] | $ | 9,237 |
| Marketing revenues | | 2,451 | | 248 | | 30 | | - | | 2,729 |
| Total revenues | | 6,395 | | 3,967 | | 1,551 | | 53 | | 11,966 |
| Income from equity method investments | | 2 | | 368 | | - | | - | | 370 |
| Net gain (loss) on disposal of assets and other income | | 11 | | 21 | | 4 | | 114 [d] | | 150 |
| Less: | | | | | | | | | | |
| Production expenses | | 706 | | 377 | | 996 | | - | | 2,079 |
| Marketing costs | | 2,444 | | 259 | | 31 | | - | | 2,734 |
| Exploration expenses | | 588 | | 97 | | - | | - | | 685 |
| Depreciation, depletion and amortization | | 1,428 | | 318 | | 217 | | 45 | | 2,008 |
| Impairments | | 11 | | - | | - | | 360 [e] | | 371 |
| Other expenses [a] | | 400 | | 116 | | 60 | | 464 [f] | | 1,040 |
| Taxes other than income | | 226 | | - | | 22 | | (5) | | 243 |
| Net interest and other | | - | | - | | - | | 222 | | 222 |
| Income tax provision (benefit) | | 223 | | 2,294 | | 58 | | (327) | | 2,248 |
| Segment income/Income from continuing operations | $ | 382 | $ | 895 | $ | 171 | $ | (592) | $ | 856 |
| Capital expenditures [b] | $ | 3,988 | $ | 235 | $ | 188 | $ | 115 | $ | 4,526 |

[a] Includes other operating expenses and general and administrative expenses.
[b] Includes accruals.
[c] Unrealized gain on crude oil derivative instruments (see Note 15).
[d] Related to the disposal of assets from our North America E&P and International E&P segments (see Note 5).
[e] Proved property impairments (see Note 14).
[f] Includes pension settlement loss of $45 million (see Note 19).

Revenues from external customers are attributed to geographic areas based upon selling location. The following summarizes revenues from external customers by geographic area.

| *(In millions)* | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 | |
| United States | $ | 7,609 | $ | 6,813 | $ | 6,448 | |
| Canada | | 1,608 | | 1,594 | | 1,551 | |
| Libya[a] | | 244 | | 1,106 | | 1,989 | |
| Other international | | 1,385 | | 1,812 | | 1,978 | |
| Total revenues | $ | 10,846 | $ | 11,325 | $ | 11,966 | |

[a] See Note 12 for discussion of Libya operations.

In 2014, sales to Shell Oil and its affiliates accounted for approximately 10 percent of our total revenues. In 2013, Statoil, the purchaser of the majority of our Libyan crude oil, accounted for approximately 10 percent of our total revenues. In 2012, Statoil accounted for approximately 15 percent of our total revenues, while sales to Shell Oil and its affiliates accounted for approximately 12 percent of total revenues.

Revenues by product line were:

| *(In millions)* | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 | |
| Crude oil and condensate | $ | 8,170 | $ | 8,688 | $ | 9,301 | |
| Natural gas liquids | | 371 | | 313 | | 201 | |
| Natural gas | | 693 | | 693 | | 835 | |
| Synthetic crude oil | | 1,525 | | 1,542 | | 1,409 | |
| Other | | 87 | | 89 | | 220 | |
| Total revenues | $ | 10,846 | $ | 11,325 | $ | 11,966 | |

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

The following summarizes certain long-lived assets by geographic area, including property, plant and equipment and equity method investments.

| | | | December 31, | |
|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 |
| United States | $ | 16,518 | $ | 14,635 |
| Canada | | 9,802 | | 9,794 |
| Norway [a] | | - | | 977 |
| Equatorial Guinea | | 1,949 | | 1,977 |
| Other international | | 1,884 | | 1,963 |
| Total long-lived assets | $ | 30,153 | $ | 29,346 |

[a] Decrease in 2014 is due to the previously discussed sale of our Norway business.

## 8. Other Items

*Net interest and other*

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 | 2012 |
| Interest: | | | | | |
| Interest income | $ | 7 | $ | 5 | $ | 12 |
| Interest expense | | (297) | | (299) | (241) |
| Income on interest rate swaps | | 12 | | 9 | 7 |
| Interest capitalized | | 20 | | 12 | 9 |
| Total interest | | (258) | | (273) | (213) |
| Other: | | | | | |
| Net foreign currency gains | | 21 | | 14 | 2 |
| Write off of contingent proceeds | | - | | (4) | - |
| Other | | (1) | | (15) | (11) |
| Total other | | 20 | | (5) | (9) |
| Net interest and other | $ | (238) | $ | (278) | $ | (222) |

*Foreign currency transactions* - Aggregate foreign currency gains were included in the consolidated statements of income as follows:

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 | 2012 |
| Net interest and other | $ | 21 | $ | 14 | $ | 2 |
| Provision for income taxes | | (12) | | (2) | 2 |
| Aggregate foreign currency gains | $ | 9 | $ | 12 | $ | 4 |

## 9. Income Taxes

Income tax provisions (benefits) for continuing operations were:

| | | | Year Ended December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | | | | 2013 | | | | 2012 | | |
| (In millions) | | Current | Deferred | Total | | Current | Deferred | Total | | Current | Deferred | Total |
| Federal | $ | 15 | $ 62 | $ 77 | $ | 83 | $ (47) | $ 36 | $ | (47) | $ 43 | $ (4) |
| State and local | | 8 | (58) | (50) | | 39 | (6) | 33 | | (34) | 48 | 14 |
| Foreign | | 281 | 84 | 365 | | 1,374 | 19 | 1,393 | | 2,363 | (125) | 2,238 |
| Total | $ | 304 | $ 88 | $ 392 | $ | 1,496 | $ (34) | $ 1,462 | $ | 2,282 | $ (34) | $ 2,248 |

80

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

A reconciliation of the federal statutory income tax rate applied to income from continuing operations before income taxes to the provision for income taxes follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Statutory rate applied to income from continuing operations before income taxes | 35% | 35% | 35% |
| Effects of foreign operations, including foreign tax credits | (6) | 26 | 36 |
| Change in permanent reinvestment assertion | (19) | - | - |
| Adjustments to valuation allowances | 21 | (1) | - |
| Other | (2) | 1 | 1 |
| Effective income tax rate on continuing operations | 29% | 61% | 72% |

The effective income tax rate is influenced by a variety of factors including the geographic and functional sources of income and the relative magnitude of these sources of income. The difference between the total provision and the sum of the amounts allocated to segments appears in the "Not Allocated to Segments" column of the tables in Note 7.

*Effects of foreign operations* - The effects of foreign operations on our effective tax rate decreased in 2014 and 2013 as compared to 2012, due to a shift in pretax income mix between high and low tax jurisdictions. This is primarily related to decreased sales in Libya in 2014 and 2013 where the tax rate is in excess of 90 percent. Excluding Libya, the effective tax rates on continuing operations for 2014, 2013 and 2012 would be 27 percent, 38 percent and 37 percent.

*Change in permanent reinvestment assertion* - In the second quarter of 2014, we reviewed our foreign operations, including the disposition of our Norway business, and concluded that our foreign operations do not have the same level of immediate capital needs as previously expected. Therefore, we no longer intend for previously unremitted foreign earnings associated with our U.K. operations to be permanently reinvested outside the U.S. The U.K. statutory tax rate is in excess of the U.S. statutory tax rate and therefore foreign tax credits associated with these earnings exceeds any incremental U.S. tax liabilities.

*Adjustments to valuation allowances* - In 2014, we increased the valuation allowance against foreign tax credits as a result of removing the permanent reinvestment assertion on our U.K. operations since the U.K. statutory tax rate is in excess of the U.S. statutory tax rate per discussion above. In 2013, valuation allowances decreased primarily due to the disposal of our Indonesian assets.

Deferred tax assets and liabilities resulted from the following:

| | Year Ended December 31, | |
| --- | --- | --- |
| *(In millions)* | 2014 | 2013 |
| Deferred tax assets: | | |
| Employee benefits | $ 364 | $ 387 |
| Operating loss carryforwards | 245 | 284 |
| Capital loss carryforwards | 89 | 3 |
| Foreign tax credits | 4,062 | 5,730 |
| Other | 116 | 95 |
| Valuation allowances: | | |
| Federal | (2,775) | (2,997) |
| State, net of federal benefit | (58) | (67) |
| Foreign | (108) | (149) |
| Total deferred tax assets | 1,935 | 3,286 |
| Deferred tax liabilities: | | |
| Property, plant and equipment | 3,737 | 4,018 |
| Investments in subsidiaries and affiliates | 66 | 794 |
| Other | 67 | 67 |
| Total deferred tax liabilities | 3,870 | 4,879 |
| Net deferred tax liabilities | $ 1,935 | $ 1,593 |

*Tax carryforwards* - At December 31, 2014 our operating loss carryforwards included $570 million from Canada that expire in 2029 through 2032, $180 million from the Kurdistan Region of Iraq that expire in 2016 through 2019 and $41 million

81

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

from E.G. that expire in 2017 through 2019. State operating loss carryforwards of $1,293 million expire in 2015 through 2033. Foreign tax credit carryforwards of $3,550 million expire in 2022 through 2024.

*Valuation allowances* - The estimated realizability of the benefit of foreign tax credits is based on certain estimates concerning future operating conditions (particularly as related to prevailing liquid hydrocarbon, natural gas and synthetic crude oil prices), future financial conditions, income generated from foreign sources and our tax profile in the years that such credits may be claimed. Federal valuation allowances decreased $222 million in 2014 primarily due to the sale of our Norway and Angola businesses. Federal valuation allowances increased $930 million and $1,277 million in 2013 and 2012, because it is more likely than not that we will be unable to realize all U.S. benefits on foreign taxes accrued in those years.

Foreign valuation allowances decreased $41 million in 2014 primarily due to the disposal of our Angola assets. Foreign valuation allowances decreased $61 million in 2013 primarily due the disposal of our Indonesian assets. Foreign valuation allowances increased $16 million in 2012 primarily due to deferred tax assets generated in the Kurdistan Region of Iraq, Angola and Indonesia.

Net deferred tax liabilities were classified in the consolidated balance sheets as follows:

| | December 31, | | |
|---|---|---|---|
| (In millions) | 2014 | | 2013 |
| Assets: | | | |
| Other current assets | $ 29 | $ | 53 |
| Other noncurrent assets | 525 | | 847 |
| Liabilities: | | | |
| Other current liabilities | 3 | | 1 |
| Noncurrent deferred tax liabilities | 2,486 | | 2,492 |
| Net deferred tax liabilities | $ 1,935 | $ | 1,593 |

We are continuously undergoing examination of our U.S. federal income tax returns by the IRS. Such audits have been completed through the 2009 tax year. We believe adequate provision has been made for federal income taxes and interest which may become payable for years not yet settled. Further, we are routinely involved in U.S. state income tax audits and foreign jurisdiction tax audits. We believe all other audits will be resolved within the amounts paid and/or provided for these liabilities.

As of December 31, 2014 our income tax returns remain subject to examination in the following major tax jurisdictions for the tax years indicated:

| | |
|---|---|
| United States[a] | 2004-2013 |
| Canada | 2009-2013 |
| Equatorial Guinea | 2007-2013 |
| Libya | 2012-2013 |
| United Kingdom | 2008-2013 |

[a] Includes federal and state jurisdictions.

The following table summarizes the activity in unrecognized tax benefits:

| (In millions) | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|
| Beginning balance | $ 146 | $ | 98 | $ | 157 |
| Additions for tax positions related to the current year | - | | 14 | | - |
| Additions for tax positions of prior years | 11 | | 66 | | 81 |
| Reductions for tax positions of prior years | (68) | | (25) | | (67) |
| Settlements | (9) | | (5) | | (72) |
| Statute of limitations | - | | (2) | | (1) |
| Ending balance | $ 80 | $ | 146 | $ | 98 |

If the unrecognized tax benefits as of December 31, 2014 were recognized, $37 million would affect our effective income tax rate. There were $5 million of uncertain tax positions as of December 31, 2014 for which it is reasonably possible that the amount of unrecognized tax benefits would significantly increase or decrease during the next twelve months.

Interest and penalties are recorded as part of the tax provision and were $6 million, $13 million and $4 million related to unrecognized tax benefits in 2014, 2013 and 2012. As of December 31, 2014 and 2013, $16 million and $15 million of interest and penalties were accrued related to income taxes.

82

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

Pretax income from continuing operations included amounts attributable to foreign sources of $1,180 million, $2,336 million and $3,356 million in 2014, 2013 and 2012.

Undistributed income of certain Canadian foreign subsidiaries at December 31, 2014 amounted to $1,019 million for which no U.S. deferred income tax provision has been recorded because we intend to permanently reinvest such income in our foreign operations. If such income was not permanently reinvested, income tax expense of approximately $357 million would be recorded, not including potential utilization of foreign tax credits.

## 10. Inventories

Inventories of liquid hydrocarbons, natural gas and bitumen are carried at the lower of cost or market value. The LIFO method accounted for 6 percent and 4 percent of total inventory value at December 31, 2014 and 2013. Current acquisition costs were estimated to exceed the LIFO inventory value at December 31, 2014 and 2013 by $20 million and $32 million.

| | | December 31, | | |
|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 |
| Liquid hydrocarbons, natural gas and bitumen | $ | 58 | $ | 55 |
| Supplies and other items | | 299 | | 309 |
| Inventories at cost | $ | 357 | $ | 364 |

## 11. Equity Method Investments and Related Party Transactions

During 2014, 2013 and 2012 only our equity method investees were considered related parties and they included:

• EGHoldings, in which we have a 60 percent noncontrolling interest. EGHoldings is engaged in LNG production activity.

• Alba Plant LLC, in which we have a 52 percent noncontrolling interest. Alba Plant LLC processes LPG.

• AMPCO, in which we have a 45 percent interest. AMPCO is engaged in methanol production activity.

Our equity method investments are summarized in the following table:

| | Ownership as of | December 31, | | |
|---|---|---|---|---|
| *(In millions)* | December 31, 2014 | 2014 | | 2013 |
| EGHoldings | 60% | $ 693 | $ | 748 |
| Alba Plant LLC | 52% | 225 | | 263 |
| AMPCO | 45% | 194 | | 189 |
| Other investments | | 1 | | 1 |
| Total | | $ 1,113 | $ | 1,201 |

Dividends and partnership distributions received from equity method investees (excluding distributions that represented a return of capital previously contributed) were $451 million in 2014, $435 million in 2013 and $381 million in 2012.

83

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

Summarized financial information for equity method investees is as follows:

| (In millions) | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Income data - year: | | | | | | |
| Revenues and other income | $ | 1,349 | $ | 1,444 | $ | 1,330 |
| Income from operations | | 826 | | 849 | | 755 |
| Net income | | 728 | | 727 | | 635 |
| Balance sheet data - December 31: | | | | | | |
| Current assets | $ | 639 | $ | 644 | | |
| Noncurrent assets | | 1,461 | | 1,590 | | |
| Current liabilities | | 371 | | 384 | | |
| Noncurrent liabilities | | 39 | | 33 | | |

Revenues from related parties were $56 million, $55 million and $58 million in 2014, 2013 and 2012, with the majority related to EGHoldings in all years. Purchases from related parties were $207 million, $242 million and $248 million in 2014, 2013 and 2012 with the majority related to Alba Plant LLC in all years.

Current receivables from related parties at December 31, 2014 and 2013, approximately split evenly between EGHoldings and AMPCO, were $31 million, and $30 million. Payables to related parties were $11 million and $20 million at December 31, 2014 and 2013, with the majority related to Alba Plant LLC.

## 12. Property, Plant and Equipment

| | | December 31, | | |
|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 |
| North America E&P | $ | 16,717 | $ | 14,973 |
| International E&P [a] | | 2,741 | | 3,590 |
| Oil Sands Mining | | 9,455 | | 9,447 |
| Corporate | | 127 | | 135 |
| Net property, plant and equipment | $ | 29,040 | $ | 28,145 |

[a] International E&P decrease is due to the sale of our Norway business in the fourth quarter of 2014.

Beginning in the third quarter of 2013, our Libya operations were impacted by third-party labor strikes at the Es Sider oil terminal. In early July 2014, Libya's National Oil Corporation rescinded force majeure associated with the third-party labor strikes, and our concession term was extended for slightly more than one year. Although we had five liftings during 2014, in December 2014, Libya's National Oil Corporation once again declared force majeure at Es Sider as disruptions from civil unrest continue. Considerable uncertainty remains around the timing of future production and sales levels.

As of December 31, 2014, our net property, plant and equipment investment in Libya is approximately $771 million, and total proved reserves (unaudited) in Libya are 243 mmboe. We and our partners in the Waha concessions continue to assess the situation and the condition of our assets in Libya. Our periodic assessment of the carrying value of our net property, plant and equipment in Libya specifically considers the net investment in the assets, the duration of our concessions and the reserves anticipated to be recoverable in future periods. The undiscounted cash flows related to our Libya assets continues to exceed the carrying value of $771 million by a material amount.

84

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

Deferred exploratory well costs were as follows:

| (In millions) | | December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 | |
| Amounts capitalized less than one year after completion of drilling | $ | 484 | $ | 512 | $ | 388 | |
| Amounts capitalized greater than one year after completion of drilling | | 126 | | 281 | | 229 | |
| Total deferred exploratory well costs | $ | 610 | $ | 793 | $ | 617 | |
| Number of projects with costs capitalized greater than one year after completion of drilling | | 3 | | 7 | | 6 | |

| (In millions) | | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|---|
| Beginning balance | $ | 793 | $ | 617 | $ | 704 | |
| Additions | | 808 | | 746 | | 699 | |
| Dry well expense | | (206) | | (147) | | (111) | |
| Transfers to development | | (605) | | (414) | | (629) | |
| Dispositions[a] | | (180) | | (9) | | (46) | |
| Ending balance | $ | 610 | $ | 793 | $ | 617 | |

[a]    We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014.

Exploratory well costs capitalized greater than one year after completion of drilling as of December 31, 2014 are summarized by geographical area below:

| (In millions) | | |
|---|---|---|
| Gabon | $ | 66 |
| E.G. | | 22 |
| Canada | | 38 |
| Total | $ | 126 |

Well costs that have been suspended for longer than one year are associated with three projects. Management believes these projects with suspended exploratory drilling costs exhibit sufficient quantities of hydrocarbons to justify potential development based on current plans.

*Gabon* - The Diaba-1B well reached total depth in the third quarter of 2013. We are analyzing new 3D seismic, integrated with existing technical data, in order to finalize the next steps in the exploration program on the offshore Diaba License.

*E.G.* - The Corona well on Block D offshore E.G. was drilled in 2004, and we acquired an additional interest in the well in 2012. We plan to develop Block D through a unitization with the Alba field, which is currently being negotiated and expected to begin in 2015.

*Canada* - Exploration costs related to our Canadian in-situ assets at Birchwood accumulated 2010 through 2012. In 2012, we submitted a regulatory application for a proposed 12 mbbld SAGD demonstration project. We expect to receive regulatory approval for this project by the end of 2015. Upon receiving this approval, we will further evaluate our development plans.

## 13. Goodwill

Goodwill is tested for impairment on an annual basis as of April 1 each year, or when events or changes in circumstances indicate the fair value of a reporting unit with goodwill may have been reduced below its carrying value. Goodwill is tested for impairment at the reporting unit level. Our reporting units are the same as our reporting segments, of which only North America E&P and International E&P include goodwill. We estimate the fair values of the North America E&P and International E&P reporting units using an income approach. Determining the fair value of a reporting unit requires judgment and the use of significant estimates and assumptions. The discounted cash flows that served as the primary basis for the income approach were based on forecasted assumptions. Key assumptions include: future liquid hydrocarbon and natural gas prices, estimated quantities of liquid hydrocarbon and natural gas proved and probable reserves, expected timing of production, discount rates, future capital requirements and operating expenses and tax rates. These assumptions used to determine fair value estimates are consistent with those that management uses to make business decisions. We believe the estimates and assumptions used in our impairment assessments are reasonable and based on available market information, but variations in any of the assumptions could result in materially different calculations of fair value and determinations of whether or not an impairment is indicated.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

We performed our annual impairment tests during 2014, 2013 and 2012 and no impairment was required. The fair value of each of our reporting units with goodwill exceeded the book value.

The table below displays the allocated beginning goodwill balances by segment along with changes in the carrying amount of goodwill for 2014 and 2013:

| (In millions) | N.A. E&P | | Int'l E&P | | OSM | | Total | |
|---|---|---|---|---|---|---|---|---|
| **2013** | | | | | | | | |
| Beginning balance, gross | $ | 343 | $ | 182 | $ | 1,412 | $ | 1,937 |
| Less: accumulated impairments | | - | | - | | (1,412) | | (1,412) |
| Beginning balance, net | | 343 | | 182 | | - | | 525 |
| Dispositions | | 4 (a) | | (30) | | - | | (26) |
| Ending balance, net | $ | 347 | $ | 152 | $ | - | $ | 499 |
| **2014** | | | | | | | | |
| Beginning balance, gross | $ | 347 | $ | 152 | $ | 1,412 | $ | 1,911 |
| Less: accumulated impairments | | - | | - | | (1,412) | | (1,412) |
| Beginning balance, net | | 347 | | 152 | | - | | 499 |
| Dispositions | | (3) | | (37) | | - | | (40) |
| Ending balance, net | $ | 344 | $ | 115 | $ | - | $ | 459 |

(a) Goodwill related to our Alaska disposition was less than the estimate classified as held for sale in 2012.

After we performed our annual impairment test in April 2014, there was a substantial decline in commodity prices. The resulting change in future commodity price assumptions was a triggering event which required us to reassess our goodwill for impairment as of December 31, 2014. Based on the results of this assessment, we concluded no impairment was required. The fair value of each of our reporting units with goodwill exceeded the book value by a significant amount. A period of sustained reduced commodity prices could result in non-cash impairment charges related to goodwill in future periods.

**14. Fair Value Measurements**

*Fair values - Recurring*

The following tables present assets and liabilities accounted for at fair value on a recurring basis as of December 31, 2014 and 2013 by fair value hierarchy level.

| | December 31, 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (In millions) | Level 1 | | Level 2 | | Level 3 | | Total | |
| Derivative instruments, assets | | | | | | | | |
| Interest rate | $ | - | $ | 8 | $ | - | $ | 8 |
| Derivative instruments, assets | $ | - | $ | 8 | $ | - | $ | 8 |

| | December 31, 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (In millions) | Level 1 | | Level 2 | | Level 3 | | Total | |
| Derivative instruments, assets | | | | | | | | |
| Interest rate | $ | - | $ | 8 | $ | - | $ | 8 |
| Foreign currency | | - | | 2 | | - | | 2 |
| Derivative instruments, assets | $ | - | $ | 10 | $ | - | $ | 10 |
| Derivative instruments, liabilities | | | | | | | | |
| Foreign currency | $ | - | $ | 4 | $ | - | $ | 4 |
| Derivative instruments, liabilities | $ | - | $ | 4 | $ | - | $ | 4 |

Interest rate swaps are measured at fair value with a market approach using actionable broker quotes which are Level 2 inputs. Foreign currency forwards are measured at fair value with a market approach using third-party pricing services, such as Bloomberg L.P., which have been corroborated with data from active markets for similar assets or liabilities, and are Level 2 inputs.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

### Fair values - Nonrecurring

The following table shows the values of assets, by major category, measured at fair value on a nonrecurring basis in periods subsequent to their initial recognition.

| (In millions) | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| | Fair Value | Impairment | Fair Value | Impairment | Fair Value | Impairment |
| Long-lived assets held for use | $ 43 | $ 132 | $ 5 | $ 96 | $ 16 | $ 371 |

The substantial decline in commodity prices during the second half of 2014, and the resulting change in future commodity price assumptions, was a triggering event which required us to reassess long-lived assets related to oil and gas producing properties for impairment as of December 31, 2014. We estimated the fair values using an income approach and concluded that no material impairments were required. A period of sustained reduced commodity prices could result in non-cash impairment charges related to long-lived assets in future periods.

### North America E&P

Long-lived assets held for use - Fair values are measured using an income approach based upon internal estimates of future production levels, prices and discount rate, all of which are Level 3 inputs. Inputs to the fair value measurement include reserve and production estimates made by our reservoir engineers, estimated future commodity prices adjusted for quality and location differentials, and forecasted operating expenses for the remaining estimated life of the reservoir.

In the third quarter of 2014, impairments of $53 million were recorded to Gulf of Mexico properties as a result of estimated abandonment cost and other revisions, to an aggregate fair value of $19 million. In addition, two fields were impaired a total of $47 million to an aggregate fair value of $24 million primarily due to lower forecasted commodity prices.

In the fourth quarter of 2012, declining natural gas prices related to our Powder River Basin asset prompted lower production expectations and reductions in estimated reserves which resulted in an impairment of $73 million. Subsequently, in the first quarter of 2013, as a result of our decision to wind down operations in the Powder River Basin due to poor economics, an additional impairment of $15 million was recorded to write down the assets' remaining value.

During 2012, the Ozona development, offshore Gulf of Mexico, produced toward abandonment pressures, and downward revisions of reserves were taken for an aggregate impairment of $289 million. Ozona production ceased in the first quarter of 2013 and an additional $21 million impairment was recorded. During 2014, we recorded additional impairments of $30 million at Ozona as a result of estimated abandonment cost revisions.

Other impairments of long-lived assets held for use in 2014, 2013 and 2012 were a result of reduced drilling expectations, reductions of estimated reserves or decreased commodity prices.

### International E&P

Long-lived assets held for use - In the fourth quarter of 2013, as a result of E.G.'s natural gas policy related to the country's resources, we elected to cease our efforts to develop a second LNG production train on Bioko Island and recorded a $40 million impairment of all capitalized costs associated with engineering and feasibility studies. In addition, our share of income from EGHoldings included a $4 million impairment related to the same project, reflected in income from equity method investments in the 2013 consolidated statement of income.

### Fair values - Financial instruments

Our current assets and liabilities include financial instruments, the most significant of which are receivables, commercial paper and payables. We believe the carrying values of our receivables, commercial paper and payables approximate fair value. Our fair value assessment incorporates a variety of considerations, including (1) the short-term duration of the instruments, (2) our investment-grade credit rating, and (3) our historical incurrence of and expected future insignificance of bad debt expense, which includes an evaluation of counterparty credit risk.

87

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

The following table summarizes financial instruments, excluding receivables, commercial paper, payables and derivative financial instruments, and their reported fair value by individual balance sheet line item at December 31, 2014 and 2013.

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| (In millions) | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Financial assets | | | | |
| Other noncurrent assets | $ 132 | $ 129 | $ 154 | $ 147 |
| Total financial assets | $ 132 | $ 129 | $ 154 | $ 147 |
| Financial liabilities | | | | |
| Other current liabilities | $ 13 | $ 13 | $ 13 | $ 13 |
| Long-term debt, including current portion[a] | 6,887 | 6,360 | 6,922 | 6,427 |
| Deferred credits and other liabilities | 69 | 68 | 149 | 147 |
| Total financial liabilities | $ 6,969 | $ 6,441 | $ 7,084 | $ 6,587 |

[a] Excludes capital leases.

Fair values of our financial assets included in other noncurrent assets, and of our financial liabilities included in other current liabilities and deferred credits and other liabilities, are measured using an income approach and most inputs are internally generated, which results in a Level 3 classification. Estimated future cash flows are discounted using a rate deemed appropriate to obtain the fair value.

Most of our long-term debt instruments are publicly-traded. A market approach, based upon quotes from major financial institutions, which are Level 2 inputs, is used to measure the fair value of such debt. The fair value of our debt that is not publicly-traded is measured using an income approach. The future debt service payments are discounted using the rate at which we currently expect to borrow. All inputs to this calculation are Level 3.

## 15. Derivatives

For further information regarding the fair value measurement of derivative instruments see Note 14. See Note 1 for discussion of the types of derivatives we use and the reasons for them. All of our interest rate and commodity derivatives are subject to enforceable master netting arrangements or similar agreements under which we may report net amounts. Netting is assessed by counterparty, and as of December 31, 2014 and 2013, there were no offsetting amounts. Positions by contract were all either assets or liabilities. The following tables present the gross fair values of derivative instruments, excluding cash collateral, and the reported net amounts along with where they appear on the consolidated balance sheets as of December 31, 2014 and 2013.

| | December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| (In millions) | Asset | Liability | **Net Asset** | Balance Sheet Location |
| **Fair Value Hedges** | | | - | |
| Interest rate | $ 8 | $ - | $ 8 | Other noncurrent assets |
| Total Designated Hedges | $ 8 | $ - | $ 8 | |

| | December 31, 2013 | | | |
| --- | --- | --- | --- | --- |
| (In millions) | Asset | Liability | **Net Asset** | Balance Sheet Location |
| **Fair Value Hedges** | | | | |
| Interest rate | $ 8 | $ - | $ 8 | Other noncurrent assets |
| Foreign currency | 2 | - | 2 | Other current assets |
| Total Designated Hedges | $ 10 | $ - | $ 10 | |

| | December 31, 2013 | | | |
| --- | --- | --- | --- | --- |
| (In millions) | Asset | Liability | **Net Liability** | Balance Sheet Location |
| **Fair Value Hedges** | | | | |
| Foreign currency | $ - | $ 4 | $ 4 | Other current liabilities |
| Total Designated Hedges | $ - | $ 4 | $ 4 | |

88

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

### Derivatives Designated as Fair Value Hedges

The following table presents by maturity date, information about our interest rate swap agreements, including the weighted average, London Interbank Offer Rate ("LIBOR")-based, floating rate.

| | December 31, 2014 | | December 31, 2013 | |
| | Aggregate Notional Amount | Weighted Average, LIBOR-Based, | Aggregate Notional Amount | Weighted Average, LIBOR-Based, |
| Maturity Dates | (in millions) | Floating Rate | (in millions) | Floating Rate |
|---|---|---|---|---|
| October 2, 2017 | $ 600 | 4.64% | $ 600 | 4.65% |
| March 15, 2018 | $ 300 | 4.49% | $ 300 | 4.50% |

As of December 31, 2013 our foreign currency forwards had an aggregate notional amount of 2,387 million Norwegian Kroner at a weighted average forward rate of 6.060. These forwards hedged the current Norwegian tax liability of the subsidiary that held our Norway business. There were none outstanding at December 31, 2014 as the open positions were transfered to the purchaser of our Norway business upon closing of the sale in the fourth quarter of 2014.

The pretax effect of derivative instruments designated as hedges of fair value in our consolidated statements of income is summarized in the table below. There is no ineffectiveness related to the fair value hedges.

| | | Gain (Loss) | | |
| | | Year Ended December 31, | | |
| (In millions) | Income Statement Location | 2014 | 2013 | 2012 |
|---|---|---|---|---|
| Derivative | | | | |
| Interest rate | Net interest and other | $ - | $ (13) | $ 16 |
| Foreign currency | Discontinued operations | (36) | (44) | (1) |
| Hedged Item | | | | |
| Long-term debt | Net interest and other | $ - | $ 13 | $ (16) |
| Accrued taxes | Discontinued operations | 36 | 44 | 1 |

### Derivatives Not Designated as Hedges

In August 2012, we entered into crude oil derivative instruments related to a portion of our forecasted North America E&P crude oil sales. These commodity derivatives were not designated as hedges and expired in December 2013. We had no crude oil derivative instruments during 2014.

The impact of commodity derivative instruments not designated as hedges appears in sales and other operating revenues in our consolidated statements of income and was a net loss of $67 million in 2013 and a net gain of $70 million in 2012.

### 16. Debt

### Short-term debt

As of December 31, 2014, we had no borrowings against our revolving credit facility, as described below, or under our U.S. commercial paper program that is backed by the revolving credit facility.

### Long-term debt

In May 2014, we amended our $2.5 billion unsecured revolving credit facility (the "Credit Facility"), including an extension of the maturity to May 2019. Terms of this amended Credit Facility include the ability to request two one-year extensions, an option to increase the commitment amount by up to an additional $1.0 billion, subject to the consent of any increasing lenders, and sub-facilities for swing-line loans and letters of credit up to an aggregate amount of $100 million and $500 million. Fees on the unused commitment of each lender range from 8 basis points to 22.5 basis points depending on our credit ratings. Borrowings under the Credit Facility bear interest, at our option, at either (a) an adjusted LIBOR rate plus a margin ranging from 87.5 basis points to 150 basis points depending on our credit ratings or (b) the Base Rate plus a margin ranging from 0 basis points to 50 basis points depending on our credit ratings. Base Rate is defined as a per annum rate equal to the greatest of (a) the prime rate, (b) the federal funds rate plus one-half of one percent or (c) LIBOR for a one-month interest period plus 1 percent.

The Credit Facility contains a covenant that requires our ratio of total debt to total capitalization not to exceed 65 percent as of the last day of each fiscal quarter. If an event of default occurs, the lenders holding more than half of the commitments may terminate the commitments under the Credit Facility and require the immediate repayment of all outstanding borrowings

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

and the cash collateralization of all outstanding letters of credit under the Credit Facility. We are in compliance with this covenant as of December 31, 2014.

The following table details our long-term debt:

| (In millions) | | December 31, 2014 | | December 31, 2013 |
|---|---|---|---|---|
| Senior unsecured notes: | | | | |
| 0.900% notes due 2015[a] | $ | 1,000 | $ | 1,000 |
| 6.000% notes due 2017[a] | | 682 | | 682 |
| 5.900% notes due 2018[a] | | 854 | | 854 |
| 7.500% notes due 2019[a] | | 228 | | 228 |
| 2.800% notes due 2022[a] | | 1,000 | | 1,000 |
| 9.375% notes due 2022 | | 32 | | 32 |
| Series A notes due 2022 | | 3 | | 3 |
| 8.500% notes due 2023 | | 70 | | 70 |
| 8.125% notes due 2023 | | 131 | | 131 |
| 6.800% notes due 2032[a] | | 550 | | 550 |
| 6.600% notes due 2037 | | 750 | | 750 |
| Capital leases: | | | | |
| Capital lease obligation of consolidated subsidiary due 2015 - 2049 | | 9 | | 10 |
| Other obligations: | | | | |
| 4.550% promissory note, semi-annual payments due 2015 | | 68 | | 136 |
| 5.125% obligation relating to revenue bonds due 2037 | | 1,000 | | 1,000 |
| Total[b] | | 6,377 | | 6,446 |
| Unamortized discount | | (8) | | (9) |
| Fair value adjustments[c] | | 22 | | 25 |
| Amounts due within one year | | (1,068) | | (68) |
| Total long-term debt | $ | 5,323 | $ | 6,394 |

[a]   These notes contain a make-whole provision allowing us to repay the debt at a premium to market price.
[b]   In the event of a change in control, as defined in the related agreements, debt obligations totaling $236 million at December 31, 2014 may be declared immediately due and payable.
[c]   See Notes 14 and 15 for information on interest rate swaps.

The following table shows future long-term debt payments:

| (In millions) | | |
|---|---|---|
| 2015 | $ | 1,068 |
| 2016 | | - |
| 2017 | | 682 |
| 2018 | | 854 |
| 2019 | | 228 |
| Thereafter | | 3,545 |
| Total long-term debt, including current portion | $ | 6,377 |

90

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

**17. Asset Retirement Obligations**

The following summarizes the changes in asset retirement obligations:

| (In millions) | | 2014 | | 2013 |
|---|---|---|---|---|
| Beginning balance | $ | 2,096 | $ | 1,783 |
| Incurred, including acquisitions | | 89 | | 84 |
| Settled, including dispositions[a] | | (426) | | (78) |
| Accretion expense (included in depreciation, depletion and amortization) | | 104 | | 106 |
| Revisions to previous estimates | | 95 | | 244 |
| Held for sale | | - | | (43) |
| Ending balance[b] | $ | 1,958 | $ | 2,096 |

[a]    Includes the sale of our Norway business in the fourth quarter of 2014.
[b]    Includes asset retirement obligations of $41 million and $87 million classified as short-term at December 31, 2014 and 2013.

**18. Supplemental Cash Flow Information**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 | | 2012 |
| Net cash provided by operating activities: | | | | | | |
| Interest paid (net of amounts capitalized) | $ | 289 | | 307 | $ | 225 |
| Income taxes paid to taxing authorities [a] | | 1,679 | | 3,904 | | 4,974 |
| Commercial paper, net: | | | | | | |
| Issuances | $ | 2,345 | $ | 10,870 | $ | 13,880 |
| Repayments | | (2,480) | | (10,935) | | (13,680) |
| Commercial paper, net | $ | (135) | $ | (65) | $ | 200 |
| Noncash investing activities, related to continuing operations: | | | | | | |
| Asset retirement costs capitalized | | 151 | | 290 | | 199 |
| Change in capital expenditure accrual | | 335 | | 6 | | 165 |
| Liabilities assumed in acquisitions | | - | | - | | 109 |
| Asset retirement obligations assumed by buyer | | 359 | | 92 | | 8 |
| Debt payments made by United States Steel | | - | | - | | 20 |

[a]    Income taxes paid to taxing authorities includes $1,312 million, $2,270 million and $2,336 million in 2014, 2013, and 2012 related to discontinued operations.

**19. Defined Benefit Postretirement Plans and Defined Contribution Plan**

We have noncontributory defined benefit pension plans covering substantially all domestic employees as well as international employees located in the U.K. Benefits under these plans are based on plan provisions specific to each plan.

We also have defined benefit plans for other postretirement benefits covering our U.S. employees. Health care benefits are provided through comprehensive hospital, surgical and major medical benefit provisions subject to various cost-sharing features. Life insurance benefits are provided to certain retiree beneficiaries. Other postretirement benefits are not funded in advance.

*Obligations and funded status* - The accumulated benefit obligation for all defined benefit pension plans was $1,403 million and $1,359 million as of December 31, 2014 and 2013.

As of December 31, 2014 and 2013, our U.S. plans had accumulated benefit obligations in excess of plan assets. Summary information for these defined benefit pension plans follows.

| | | December 31, | | |
|---|---|---|---|---|
| (In millions) | | 2014 | | 2013 |
| Projected benefit obligation | $ | (894) | $ | (933) |
| Accumulated benefit obligation | | (793) | | (791) |
| Fair value of plan assets | | 574 | | 625 |

91

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

The following summarizes the obligations and funded status for our defined benefit pension and other postretirement plans.

| | | Pension Benefits | | | | | Other Benefits | |
|---|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | | | |
| (In millions) | | U.S. | Int'l | U.S. | Int'l | | 2014 | 2013 |
| **Change in benefit obligations:** | | | | | | | | |
| Beginning balance | $ | 933 | $ 649 | $ 1,146 | $ 565 | $ | 279 | $ 311 |
| Service cost | | 31 | 16 | 33 | 22 | | 3 | 4 |
| Interest cost | | 35 | 27 | 40 | 24 | | 13 | 12 |
| Plan amendment[a] | | - | - | - | - | | (42) | - |
| Actuarial loss (gain)[b] | | 174 | 46 | (140) | 40 | | 42 | (31) |
| Foreign currency exchange rate changes | | - | (39) | - | 11 | | - | - |
| Divestiture[c] | | - | (29) | - | - | | - | - |
| Benefits paid | | (279) | (19) | (146) | (13) | | (16) | (17) |
| Ending balance | $ | 894 | $ 651 | $ 933 | $ 649 | $ | 279 | $ 279 |
| **Change in fair value of plan assets:** | | | | | | | | |
| Beginning balance | $ | 625 | $ 597 | $ 630 | $ 500 | $ | - | $ - |
| Actual return on plan assets | | 59 | 59 | 65 | 74 | | - | - |
| Employer contributions | | 169 | 37 | 76 | 23 | | - | - |
| Foreign currency exchange rate changes | | - | (39) | - | 13 | | - | - |
| Divestiture[c] | | - | (13) | - | - | | - | - |
| Benefits paid | | (279) | (19) | (146) | (13) | | - | - |
| Ending balance | $ | 574 | $ 622 | $ 625 | $ 597 | $ | - | $ - |
| **Funded status of plans at December 31** | $ | (320) | $ (29) | $ (308) | $ (52) | $ | (279) | $ (279) |
| Amounts recognized in the consolidated balance sheets: | | | | | | | | |
| Current liabilities | | (11) | - | (16) | - | | (19) | (19) |
| Noncurrent liabilities | | (309) | (29) | (292) | (52) | | (260) | (260) |
| Accrued benefit cost | $ | (320) | $ (29) | $ (308) | $ (52) | $ | (279) | $ (279) |
| **Pretax amounts in accumulated other comprehensive loss:** | | | | | | | | |
| Net loss (gain) | $ | 283 | $ 91 | $ 262 | $ 59 | $ | 34 | $ (8) |
| Prior service cost (credit) | | 10 | 8 | 15 | 9 | | (41) | (5) |

[a]  Represents a change in plan design related to the health care benefits provided under the postretirement plan.
[b]  Includes the increase in the U.S. pension and postretirement benefit obligations of $13 million and $15 million respectively, due to the adoption of the 2014 mortality table.
[c]  Related to the sale of our Norway business in the fourth quarter of 2014.

92

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

***Components of net periodic benefit cost from continuing operations and other comprehensive (income) loss*** - The following summarizes the net periodic benefit costs and the amounts recognized as other comprehensive (income) loss for our defined benefit pension and other postretirement plans.

| | Pension Benefits | | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | | Year Ended December 31, | | |
| | 2014 | | 2013 | | 2012 | | | | |
| (In millions) | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l | 2014 | 2013 | 2012 |
| Components of net periodic benefit cost: | | | | | | | | | |
| Service cost | $ 31 | $ 16 | $ 33 | $ 17 | $ 31 | $ 15 | $ 3 | $ 4 | $ 4 |
| Interest cost | 35 | 27 | 40 | 23 | 42 | 22 | 13 | 12 | 14 |
| Expected return on plan assets | (34) | (32) | (43) | (24) | (43) | (23) | - | - | - |
| Amortization: | | | | | | | | | |
| - prior service cost (credit) | 5 | 1 | 6 | 1 | 7 | 1 | (6) | (6) | (7) |
| - actuarial loss | 29 | 1 | 43 | 4 | 48 | 4 | - | - | - |
| Net settlement loss[a] | 99 | - | 45 | - | 45 | - | - | - | - |
| Net periodic benefit cost[b] | $ 165 | $ 13 | $ 124 | $ 21 | $ 130 | $ 19 | $ 10 | $ 10 | $ 11 |
| Other changes in plan assets and benefit obligations recognized in other comprehensive (income) loss (pretax): | | | | | | | | | |
| Actuarial loss (gain)[c] | $ 149 | $ 33 | $ (161) | $ (15) | $ 172 | $ 14 | $ 42 | $ (31) | $ 7 |
| Amortization of actuarial (loss) gain | (128) | (1) | (88) | (4) | (93) | (4) | - | - | - |
| Prior service cost (credit) | - | - | - | - | - | 1 | (42) | - | - |
| Amortization of prior service credit (cost) | (5) | (1) | (6) | (1) | (7) | (1) | 6 | 6 | 7 |
| Total recognized in other comprehensive (income) loss | $ 16 | $ 31 | $ (255) | $ (20) | $ 72 | $ 10 | $ 6 | $ (25) | $ 14 |
| Total recognized in net periodic benefit cost and other comprehensive (income) loss | $ 181 | $ 44 | $ (131) | $ 1 | $ 202 | $ 29 | $ 16 | $ (15) | $ 25 |

[a]  Settlement losses are recorded when lump sum payments from a plan in a period exceed the plan's total service and interest costs for the period. Such settlements occurred in one or more of our U.S. pension plans in all periods presented.
[b]  Net periodic benefit cost reflects a calculated market-related value of plan assets which recognizes changes in fair value over three years.
[c]  Includes the impact of the sale of our Norway business in the fourth quarter of 2014.

The estimated net loss and prior service cost for our defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in 2015 are $27 million and $6 million. The estimated net loss and prior service credit for our other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in 2015 are $1 million and $4 million.

***Plan assumptions*** - The following summarizes the assumptions used to determine the benefit obligations at December 31, and net periodic benefit cost for the defined benefit pension and other postretirement plans for 2014, 2013 and 2012.

| | Pension Benefits | | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | | | | |
| (In millions) | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l | 2014 | 2013 | 2012 |
| Weighted average assumptions used to determine benefit obligation: | | | | | | | | | |
| Discount rate | 3.71% | 3.70% | 4.28% | 4.60% | 3.44% | 4.40% | 4.01% | 4.85% | 4.06% |
| Rate of compensation increase | 4.00% | 3.60% | 5.00% | 4.90% | 5.00% | 4.50% | 4.00% | 5.00% | 5.00% |
| Weighted average assumptions used to determine net periodic benefit cost: | | | | | | | | | |
| Discount rate | 3.98% | 4.60% | 3.79% | 4.40% | 4.21% | 4.70% | 4.69% | 4.06% | 4.90% |
| Expected long-term return on plan assets | 6.75% | 5.70% | 7.25% | 4.90% | 7.75% | 5.20% | - | - | - |
| Rate of compensation increase | 5.00% | 4.90% | 5.00% | 4.50% | 5.00% | 4.30% | 5.00% | 5.00% | 5.00% |

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

***Expected long-term return on plan assets***

*U.S. plan* - The expected long-term return on plan assets assumption for our U.S. funded plan is determined based on an asset rate-of-return modeling tool developed by a third-party investment group. The tool utilizes underlying assumptions based on actual returns by asset category and inflation and takes into account our U.S. pension plan's asset allocation to derive an expected long-term rate of return on those assets.

*International plans* - To determine the expected long-term return on plan assets assumption for our international plans, we consider the current level of expected returns on risk-free investments (primarily government bonds), the historical levels of the risk premiums associated with the other applicable asset categories and the expectations for future returns of each asset class. The expected return for each asset category is then weighted based on the actual asset allocation in our international pension plans to develop the overall expected long-term return on plan assets assumption.

***Assumed weighted average health care cost trend rates***

|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| Initial health care trend rate | 6.88% | 6.89% | 7.24% |
| Ultimate trend rate | 5.00% | 5.00% | 5.00% |
| Year ultimate trend rate is reached | 2024 | 2020 | 2019 |

Prior to a recent plan amendment, the assumed health care cost trend rates had a significant effect on the amounts reported for our defined benefit retiree health care plans. After the plan amendment, the employer provided subsidy for post-65 retiree health care coverage will only increase by the consumer price index (not to exceed 4 percent) each year. Company contributions would be funded to a Health Reimbursement Account on the retiree's behalf to subsidize the retiree's cost of obtaining health care benefits through a private exchange. Therefore, a one-percentage-point change in health care cost trend rates would not have a material impact on either the service and interest cost components and the postretirement benefit obligations.

***Plan investment policies and strategies*** - The investment policies for our U.S. and international pension plan assets reflect the funded status of the plans and expectations regarding our future ability to make further contributions. Long-term investment goals are to: (1) manage the assets in accordance with the legal requirements of all applicable laws; (2) produce investment returns which meet or exceed the rates of return achievable in the capital markets while maintaining the risk parameters set by the plan's investment committees and protecting the assets from any erosion of purchasing power; and (3) position the portfolios with a long-term risk/return orientation.

*U.S. plan* - The plan's current targeted asset allocation is comprised of 55 percent equity securities and 45 percent other fixed income securities. Over time, as the plan's funded ratio (as defined by the investment policy) improves, in order to reduce volatility in returns and to better match the plan's liabilities, the allocation to equity securities will decrease while the amount allocated to fixed income securities will increase. The plan's assets are managed by a third-party investment manager. Investment performance and risk is measured and monitored on an ongoing basis through quarterly investment meetings and periodic asset and liability studies.

*International plan* - Our international plan's target asset allocation is comprised of 62.5 percent equity securities and 37.5 percent fixed income securities. The plan assets are invested in eight separate portfolios, mainly pooled fund vehicles, managed by several professional investment managers. The investment managers' performance is measured independently by a third-party asset servicing consulting firm. Overall, investment performance and risk is measured and monitored on an ongoing basis through quarterly investment portfolio reviews and periodic asset and liability studies.

***Fair value measurements*** - Plan assets are measured at fair value. The following provides a description of the valuation techniques employed for each major plan asset class at December 31, 2014 and 2013.

*Cash and cash equivalents* - Cash and cash equivalents are valued using a market approach and are considered Level 1. This investment also includes a cash reserve account (a collective short-term investment fund) that is valued using an income approach and is considered Level 2.

*Equity securities* - Investments in common stock, preferred stock, and real estate investment trusts ("REIT") are valued using a market approach at the closing price reported in an active market and are therefore considered Level 1. Private equity investments include interests in limited partnerships which are valued based on the sum of the estimated fair values of the investments held by each partnership. These private equity investments are considered Level 3.

*Mutual funds* - Investments in mutual funds are valued using a market approach. The shares or units held are traded on the public exchanges and are therefore considered Level 1.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

*Pooled funds* - Investments in pooled funds are valued using a market approach at the net asset value ("NAV") of units held. The various funds consist of either an equity or fixed income investment portfolio with underlying investments held in U.S. and non-U.S. securities. Nearly all of the underlying investments are publicly-traded. The majority of the pooled funds are benchmarked against a relative public index. These are considered Level 2.

*Fixed income securities* - Fixed income securities are valued using a market approach. U.S. treasury notes and exchange traded funds ("ETFs") are valued at the closing price reported in an active market, and are considered Level 1. Corporate bonds and other bonds are valued using calculated yield curves created by models that incorporate various market factors and are considered Level 2. The investment in the commingled fund is valued using the NAV of units held, and is considered Level 2. The commingled fund consists of an equity and fixed income portfolio with underlying investments held in U.S. and non-U.S. securities.

*Other* - Other investments are composed of an international insurance carrier contract and the majority of the underlying investments consist of a mix of non-U.S. publicly traded equity securities valued at the closing price reported in an active market and fixed income securities valued using calculated yield curves. This asset is considered Level 2. The other investments, an unallocated annuity contract, two limited liability companies and real estate are considered Level 3, as inputs to determine fair value are unobservable and significant to the overall fair value measurement.

The following tables present the fair values of our defined benefit pension plan's assets, by level within the fair value hierarchy, as of December 31, 2014 and 2013.

| (In millions) | December 31, 2014 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l |
| Cash and cash equivalents | $ 26 | $ 1 | $ - | $ - | $ - | $ - | $ 26 | $ 1 |
| Equity securities: | | | | | | | | |
| Common and preferred stock[a] | 230 | - | - | - | - | - | 230 | - |
| Private equity | - | - | - | - | 25 | - | 25 | - |
| Mutual and pooled funds[b] | - | 221 | - | 164 | - | - | - | 385 |
| Fixed income securities: | | | | | | | | |
| U.S. treasury notes and ETFs | 33 | - | - | - | - | - | 33 | - |
| Corporate and other bonds[c] | - | - | 190 | - | - | - | 190 | - |
| Commingled and pooled funds[d] | - | - | 40 | 236 | - | - | 40 | 236 |
| Other | - | - | - | - | 30 | - | 30 | - |
| Total investments, at fair value | $ 289 | $ 222 | $ 230 | $ 400 | $ 55 | $ - | $ 574 | $ 622 |

| (In millions) | December 31, 2013 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l | U.S. | Int'l |
| Cash and cash equivalents | $ 19 | $ 1 | $ 1 | $ - | $ - | $ - | $ 20 | $ 1 |
| Equity securities: | | | | | | | | |
| Common and preferred stock[a] | 292 | - | - | - | - | - | 292 | - |
| REIT and private equity | 2 | - | - | - | 23 | - | 25 | - |
| Mutual and pooled funds[b] | - | 219 | - | 186 | - | - | - | 405 |
| Fixed income securities: | | | | | | | | - | - |
| U.S. treasury notes and ETFs | 65 | - | - | - | - | - | 65 | - |
| Corporate and other bonds[c] | - | - | 172 | - | - | - | 172 | - |
| Commingled and pooled funds[d] | - | - | 17 | 178 | - | - | 17 | 178 |
| Other | - | - | - | 13 | 34 | - | 34 | 13 |
| Total investments, at fair value | $ 378 | $ 220 | $ 190 | $ 377 | $ 57 | $ - | $ 625 | $ 597 |

[a]    Primarily investments held in U.S. and non-U.S. common stocks in diverse industries.
[b]    Mutual funds - Primarily investments held in U.S. and non-U.S. common stocks in diverse industries.
Pooled funds - Primarily investments held in non-U.S. publicly traded common stocks in diverse industries.
[c]    Corporate bonds - Primarily investments held in U.S. and non-U.S. corporate bonds in diverse industries.
Other bonds - Primarily consist of securities issued by governmental agencies and municipalities.
[d]    Pooled funds - Primarily investments held in U.S. and non-U.S. publicly traded investment grade government and corporate bonds.

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

The activity during the year ended December 31, 2014 and 2013, for the assets using Level 3 fair value measurements was immaterial.

**Cash flows**

*Estimated future benefit payments* - The following gross benefit payments, which were estimated based on actuarial assumptions applied at December 31, 2014 and reflect expected future services, as appropriate, are to be paid in the years indicated.

| | Pension Benefits | | Other |
|---|---|---|---|
| *(In millions)* | U.S. | Int'l | Benefits |
| 2015 | $ 80 | $ 15 | $ 19 |
| 2016 | 78 | 17 | 19 |
| 2017 | 83 | 19 | 19 |
| 2018 | 79 | 22 | 19 |
| 2019 | 74 | 23 | 19 |
| 2020 through 2024 | 299 | 128 | 93 |

*Contributions to defined benefit plans* - We expect to make contributions to the funded pension plans of up to $95 million in 2015. Cash contributions to be paid from our general assets for the unfunded pension and postretirement plans are expected to be approximately $11 million and $19 million in 2015.

*Contributions to defined contribution plan* - We contribute to a defined contribution plan for eligible employees. Contributions to this plan totaled $24 million, $26 million and $25 million in 2014, 2013 and 2012.

## 20. Incentive Based Compensation

**Description of stock-based compensation plans** - The Marathon Oil Corporation 2012 Incentive Compensation Plan (the "2012 Plan") was approved by our stockholders in April 2012 and authorizes the Compensation Committee of the Board of Directors to grant stock options, SARs, stock awards (including restricted stock and restricted stock unit awards) and performance awards to employees. The 2012 Plan also allows us to provide equity compensation to our non-employee directors. No more than 50 million shares of our common stock may be issued under the 2012 Plan. For stock options and SARs, the number of shares available for issuance under the 2012 Plan will be reduced by one share for each share of our common stock in respect of which the award is granted. For stock awards (including restricted stock and restricted stock unit awards), the number of shares available for issuance under the 2012 Plan will be reduced by 2.41 shares for each share of our common stock in respect of which the award is granted.

Shares subject to awards under the 2012 Plan that are forfeited, are terminated or expire unexercised become available for future grants. In addition, the number of shares of our common stock reserved for issuance under the 2012 Plan will not be increased by shares tendered to satisfy the purchase price of an award, exchanged for other awards or withheld to satisfy tax withholding obligations. Shares issued as a result of awards granted under the 2012 Plan are generally funded out of common stock held in treasury, except to the extent there are insufficient treasury shares, in which case new common shares are issued.

After approval of the 2012 Plan, no new grants were or will be made from the 2007 Incentive Compensation Plan, the 2003 Incentive Compensation Plan (the "2003 Plan"), the Non-Employee Director Stock Plan or the deferred stock benefit provision of the Deferred Compensation Plan for Non-Employee Directors (collectively, the "Prior Plans"). Any awards previously granted under the Prior Plans shall continue to be exercisable in accordance with their original terms and conditions.

**Stock-based awards under the plans**

*Stock options* - We grant stock options under the 2012 Plan and we previously granted stock options under certain of the Prior Plans. Our stock options represent the right to purchase shares of our common stock at its fair market value on the date of grant. In general, our stock options vest ratably over a three-year period and have a maximum term of ten years from the date they are granted.

Prior to 2005, we granted SARs under the 2003 Plan. No SARs have been granted since then and at December 31, 2014 there are no additional SARs outstanding. SARs represent the right to receive shares of common stock equal in value to the excess of the fair market value of shares of common stock on the date the right is exercised over the grant price. In general, SARs vested ratably over a three-year period and have a maximum term of ten years from the date they were granted.

*Restricted stock* - We grant restricted stock and restricted stock units (collectively, "restricted stock awards") under the 2012 Plan and we previously granted such awards under certain of the Prior Plans. The restricted stock awards granted to

96

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

officers generally vest three years from the date of grant, contingent on the recipient's continued employment. We also grant restricted stock to certain non-officer employees and restricted stock units to certain international employees, based on their performance within certain guidelines and for retention purposes. The restricted stock awards to non-officers generally vest ratably over a three-year period, contingent on the recipient's continued employment. Prior to vesting, all restricted stock recipients have the right to vote such stock and receive dividends thereon. The non-vested shares are not transferable and are held by our transfer agent.

*Stock-based performance units* - Beginning in 2013, we grant stock-based performance units to officers under the 2012 Plan. At the grant date, each unit represents the value of one share of our common stock. These units provide a cash payout, based on the value of anywhere from zero to two times the number of units granted, upon the achievement of certain performance goals at the end of a 36-month performance period. The performance goals are tied to our total shareholder return ("TSR") as compared to TSR for a group of peer companies determined by the Compensation Committee of the Board of Directors. Dividend equivalents accrue during the performance period and are paid in cash at the end of the performance period based on the number of shares that would represent the value of the units.

*Common stock units* - We maintain an equity compensation program for our non-employee directors under the 2012 Plan and previously maintained such a program under certain of the Prior Plans. All non-employee directors receive annual grants of common stock units. Common shares will be issued for units granted on or after January 1, 2012 upon completion of board service or three years from the date of grant, whichever is earlier. Those units granted prior to 2012 must be held until completion of board service, at which time the non-employee director will receive common shares. When dividends are paid on our common stock, directors receive dividend equivalents in the form of additional common stock units.

*Total stock-based compensation expense* - Total employee stock-based compensation expense was $70 million, $70 million and $67 million in 2014, 2013 and 2012, while the total related income tax benefits were $25 million, $25 million and $24 million in the same years. In 2014, 2013 and 2012, cash received upon exercise of stock option awards was $136 million, $58 million and $41 million. Tax benefits realized for deductions for stock awards exercised during 2014, 2013 and 2012 totaled $51 million, $36 million and $24 million.

*Stock option awards* - During 2014, 2013 and 2012, we granted stock option awards to both officer and non-officer employees. The weighted average grant date fair value of these awards was based on the following weighted average Black-Scholes assumptions:

| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Exercise price per share | $34.49 | $33.54 | $33.52 |
| Expected annual dividend yield | 2.3% | 2.1% | 2.2% |
| Expected life in years | 5.9 | 6.1 | 5.5 |
| Expected volatility | 38% | 38% | 41% |
| Risk-free interest rate | 1.8% | 1.6% | 1.2% |
| Weighted average grant date fair value of stock option awards granted | $10.50 | $10.25 | $10.86 |

The following is a summary of stock option award activity in 2014.

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Average Intrinsic Value *(in millions)* |
|---|---|---|---|---|
| Outstanding at beginning of year | 18,104,887 | $27.27 | | |
| Granted | 1,935,895 | $34.49 | | |
| Exercised | (5,959,647) | $23.43 | | |
| Canceled | (653,299) | $34.05 | | |
| Outstanding at end of year | 13,427,836 | $29.68 | 5 years | $ 39 |
| Exercisable at end of year | 10,435,751 | $28.39 | 4 years | $ 39 |
| Expected to vest | 2,914,069 | $34.18 | 8 years | $ - |

The intrinsic value of stock option awards exercised during 2014, 2013 and 2012, was $83 million, $35 million and $40 million.

As of December 31, 2014, unrecognized compensation cost related to stock option awards was $18 million, which is expected to be recognized over a weighted average period of two years.

97

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

**Restricted stock awards** - The following is a summary of restricted stock award activity in 2014.

|  | Awards | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested at beginning of year | 4,031,888 | $31.80 |
| Granted | 1,970,880 | $34.98 |
| Vested | (1,845,327) | $30.64 |
| Forfeited | (709,088) | $32.73 |
| Unvested at end of year | 3,448,353 | $34.04 |

The vesting date fair value of restricted stock awards which vested during 2014, 2013 and 2012 was $70 million, $59 million and $36 million. The weighted average grant date fair value of restricted stock awards was $34.04, $31.80, and $29.02 for awards unvested at December 31, 2014, 2013 and 2012.

As of December 31, 2014 there was $82 million of unrecognized compensation cost related to restricted stock awards which is expected to be recognized over a weighted average period of two years.

**Stock-based performance unit awards** - During 2014 and 2013, we granted 221,491 and 353,600 stock-based performance unit awards to officers. At December 31, 2014, there were 276,331 units outstanding.

The key assumptions used in the Monte Carlo simulation to determine the fair value of stock-based performance units granted in 2014 and 2013 were:

|  | 2014 | 2013 |
|---|---|---|
| Valuation date stock price | $28.29 | $28.29 |
| Expected annual dividend yield | 2.9% | 2.9% |
| Expected volatility | 26% | 27% |
| Risk-free interest rate | 0.7% | 0.3% |
| Fair value of stock-based performance units outstanding | $25.06 | $21.06 |

**Cash-based performance unit awards** - Prior to 2013, cash-based performance unit awards were granted to officers that provide a cash payment upon the achievement of certain performance goals at the end of a defined measurement period. The performance goals are tied to our TSR as compared to TSR for a group of peer companies determined by the Compensation Committee of the Board of Directors. The target value of each performance unit is $1, with a maximum payout of $2 per unit, but the actual payout could be anywhere between zero and the maximum. Because performance units are to be settled in cash at the end of the performance period, they are accounted for as liability awards.

During 2012, we granted 12.7 million performance units, all having a 36-month performance period. During the third quarter of 2011, we granted 15 million performance units, a portion of which had a 30-month performance period and a portion of which had an 18-month performance period to reflect the remaining periods of the original 2011 and 2010 performance unit grants outstanding prior to the spin-off. Compensation expense associated with cash-based performance units was $5 million, $9 million and $12 million, in 2014, 2013 and 2012. At December 31, 2014 all performance periods have ended and no additional units will be granted.

98

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

**21. Reclassifications Out of Accumulated Other Comprehensive Loss**

The following table presents a summary of amounts reclassified from accumulated other comprehensive loss to income from continuing operations in their entirety:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions) | 2014 | 2013 | Income Statement Line |
| **Accumulated Other Comprehensive Loss Components** | | | |
| | Income (Expense) | | |
| Postretirement and postemployment plans | | | |
| Amortization of actuarial loss | $ (30) $ | (47) | General and administrative |
| Net settlement loss | (99) | (45) | General and administrative |
| | (129) | (92) | Income from operations |
| | 62 | 34 | Provision for income taxes |
| Other insignificant items, net of tax | (1) | (1) | |
| Total reclassifications for the period | $ (68) $ | (59) | Income from continuing operations |

**22. Stockholders' Equity**

In 2014 we acquired 29 million common shares at a cost of $1 billion under our share repurchase program, initially authorized in 2006, bringing our total repurchases to 121 million common shares at a cost of $4.7 billion. As of December 31, 2014 the total remaining share repurchase authorization was $1.5 billion. Purchases under the program may be in either open market transactions, including block purchases, or in privately negotiated transactions using cash on hand, cash generated from operations, proceeds from potential asset sales or cash from available borrowings to acquire shares. This program may be changed based upon our financial condition or changes in market conditions and is subject to termination prior to completion. The repurchase program does not include specific price targets or timetables.

**23. Leases**

We lease a wide variety of facilities and equipment under operating leases, including land, building space, equipment and vehicles. Most long-term leases include renewal options and, in certain leases, purchase options. Future minimum commitments for capital lease obligations and for operating lease obligations having noncancellable lease terms in excess of one year are as follows:

| (In millions) | Capital Lease Obligations | Operating Lease Obligations |
|---|---|---|
| 2015 | $ 1 | $ 40 |
| 2016 | 1 | 33 |
| 2017 | 1 | 26 |
| 2018 | 1 | 24 |
| 2019 | 1 | 24 |
| Later years | 19 | 32 |
| Sublease rentals | - | (3) |
| Total minimum lease payments | $ 24 | $ 176 |
| Less imputed interest costs | (15) | |
| Present value of net minimum lease payments | $ 9 | |

Operating lease rental expense related to continuing operations was $120 million, $105 million and $98 million in 2014, 2013 and 2012.

99

*MARATHON OIL CORPORATION*
*Notes to Consolidated Financial Statements*

## 24. Commitments and Contingencies

We are a defendant in a number of lawsuits arising in the ordinary course of business, including, but not limited to, royalty claims, contract claims and environmental claims. While the ultimate outcome and impact to us cannot be predicted with certainty, we believe that the resolution of these proceedings will not have a material adverse effect on our consolidated financial position, results of operations or cash flows. Certain of these matters are discussed below.

*Environmental matters* - We are subject to federal, state, local and foreign laws and regulations relating to the environment. These laws generally provide for control of pollutants released into the environment and require responsible parties to undertake remediation of hazardous waste disposal sites. Penalties may be imposed for noncompliance.

At December 31, 2014 and 2013, accrued liabilities for remediation were not significant. It is not presently possible to estimate the ultimate amount of all remediation costs that might be incurred or the penalties that may be imposed.

*Guarantees* - We have entered into a guarantee of a long-term transportation services agreement and a performance guarantee related to asset retirement obligations with aggregate maximum potential undiscounted payments totaling $57 million as of December 31, 2014. Under the terms of these guarantee arrangements, we would be required to perform should the guaranteed party fail to fulfill its obligations under the specified arrangements.

Over the years, we have sold various assets in the normal course of our business. Certain of the related agreements contain performance and general guarantees, including guarantees regarding inaccuracies in representations, warranties, covenants and agreements, and environmental and general indemnifications that require us to perform upon the occurrence of a triggering event or condition. These guarantees and indemnifications are part of the normal course of selling assets. We are typically not able to calculate the maximum potential amount of future payments that could be made under such contractual provisions because of the variability inherent in the guarantees and indemnities. Most often, the nature of the guarantees and indemnities is such that there is no appropriate method for quantifying the exposure because the underlying triggering event has little or no past experience upon which a reasonable prediction of the outcome can be based.

*Contract commitments* - At December 31, 2014 and 2013, contractual commitments to acquire property, plant and equipment totaled $747 million and $1,270 million.

*Other contingencies* - During the second quarter of 2011, the AOSP operator determined the need and developed preliminary plans to address water flow into a previously mined and contained section of the Muskeg River mine. At December 31, 2014, the remaining liability is $24 million.

100

*Select Quarterly Financial Data (Unaudited)*

| (In millions, except per share data) | 2014 | | | | 2013 | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. |
| Revenues | $ 2,690 | $ 2,888 | $ 2,870 | $ 2,398 | $ 2,880 | $ 3,010 | $ 3,000 | $ 2,435 |
| Income (loss) from continuing operations before income taxes | 598 | 511 | 453 | (201) | 608 | 804 | 755 | 226 |
| Income (loss) from continuing operations | 398 | 360 | 304 | (93) | 158 | 241 | 396 | 136 |
| Discontinued operations [a] | 751 | 180 | 127 | 1,019 | 225 | 185 | 173 | 239 |
| Net income | $ 1,149 | $ 540 | $ 431 | $ 926 | $ 383 | $ 426 | $ 569 | $ 375 |
| Income (loss) per share: | | | | | | | | |
| Basic: | | | | | | | | |
| Continuing operations | $0.58 | $0.53 | $0.45 | $(0.14) | $0.22 | $0.34 | $0.56 | $0.20 |
| Discontinued operations [a] | $1.08 | $0.27 | $0.19 | $1.51 | $0.32 | $0.26 | $0.24 | $0.34 |
| Net income | $1.66 | $0.80 | $0.64 | $1.37 | $0.54 | $0.60 | $0.80 | $0.54 |
| Diluted: | | | | | | | | |
| Continuing operations | $0.57 | $0.53 | $0.45 | ($0.14) | $0.22 | $0.34 | $0.56 | $0.20 |
| Discontinued operations [a] | $1.08 | $0.27 | $0.19 | $1.51 | $0.32 | $0.26 | $0.24 | $0.34 |
| Net income | $1.65 | $0.80 | $0.64 | $1.37 | $0.54 | $0.60 | $0.80 | $0.54 |
| Dividends paid per share | $0.19 | $0.19 | $0.21 | $0.21 | $0.17 | $0.17 | $0.19 | $0.19 |

We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014. The Angola assets and Norway business are reflected as discontinued operations in all periods presented.

101

***Supplementary Information on Oil and Gas Producing Activities (Unaudited)***

The supplementary information is disclosed by the following geographic areas: the U.S.; Canada; E.G.; Other Africa, which primarily includes activities in Gabon, Kenya, Ethiopia and Libya; and Other International ("Other Int'l"), which includes the U.K. and the Kurdistan Region of Iraq. We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014, and both are shown as discontinued operations ("Disc Ops") in all periods.

## Estimated Quantities of Proved Oil and Gas Reserves

The estimation of net recoverable quantities of crude oil and condensate, natural gas liquids, natural gas and synthetic crude oil is a highly technical process which is based upon several underlying assumptions that are subject to change. See Item 1A. Risk Factors and Item 7. Management's Discussion and Analysis of Financial Condition, Cash Flows and Liquidity - Critical Accounting Estimates - Estimated Quantities of Net Reserves. For a discussion of our reserve estimation process, including the use of third-party audits, see Item 1. Business - Reserves.

Our December 31, 2014 proved reserves were calculated using the unweighted average of closing prices for the first day of each month in 2014 within the 12-month period. The 2014 unweighted averages for certain of the benchmark prices were as follows:

- WTI crude oil - $94.99 per bbl
- Henry Hub natural gas - $4.31 per mmbtu
- Brent crude oil - $101.39 per bbl

When determining the December 31, 2014 proved reserves for each property, the benchmark prices listed above were adjusted with price differentials that account for property-specific quality and location differences. Beginning in the second half of 2014, the crude oil benchmarks began to decline and this decline continued into early 2015. In addition, the Henry Hub natural gas benchmark began to decline in late 2014 and continued its decline into 2015. Commodity prices are likely to remain volatile based on global supply and demand and could decline further. The January 2015 benchmark closing prices for the first day of the month were WTI crude oil of $52.69 per bbl, Henry Hub natural gas of $2.99 per mmbtu and Brent crude oil of $55.55 per bbl. Sustained reduced commodity prices could have a material effect on the quantity and future cash flows of our proved reserves. To the extent that we experience a sustained period of reduced commodity prices in 2015, there is a risk that a portion of our proved reserves could be deemed uneconomic and no longer be classified as proved. Estimates of future cash flows associated with proved reserves are based on actual costs of developing and producing the reserves as of the end of the year. The decline in commodity prices experienced in the second half of 2014 has resulted in a reduction in the costs of developing and producing reserves. The impact of sustained reduced commodity prices on future cash flows will be partially offset by the impact of lower costs.

A sustained period of lower commodity prices could also cause us to decrease our near term capital programs and defer investment until prices improve. A shifting of capital expenditures into future periods outside of five years from the initial proved reserve booking could potentially lead to a reduction in proved undeveloped reserves. See Item 1A. Risk Factors for a further discussion of how a substantial extended decline in commodity prices could impact us.

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Estimated Quantities of Proved Oil and Gas Reserves (continued)**

| (mmbbl) | U.S. | Canada | E.G.[a] | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Crude oil and condensate** | | | | | | | | |
| **Proved developed and undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | 236 | - | 77 | 222 | 25 | 560 | 89 | 649 |
| Revisions of previous estimates | 7 | - | 4 | (5) | 5 | 11 | 23 | 34 |
| Improved recovery | 2 | - | - | - | - | 2 | - | 2 |
| Purchases of reserves in place | 37 | - | - | - | - | 37 | - | 37 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 140 | - | - | 7 | - | 147 | - | 147 |
| Production | (35) | - | (9) | (15) | (6) | (65) | (30) | (95) |
| End of year - 2012 | 387 | - | 72 | 209 | 24 | 692 | 82 | 774 |
| Revisions of previous estimates | 33 | - | (1) | 12 | 6 | 50 | 19 | 69 |
| Improved recovery | - | - | - | - | - | - | 11 | 11 |
| Purchases of reserves in place | 12 | - | - | - | - | 12 | - | 12 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 112 | - | 1 | 3 | - | 116 | 8 | 124 |
| Production | (46) | - | (8) | (9) | (5) | (68) | (29) | (97) |
| Sales of reserves in place | (1) | - | - | - | - | (1) | - | (1) |
| End of year - 2013 | 497 | - | 64 | 215 | 25 | 801 | 91 | 892 |
| Revisions of previous estimates | 36 | - | (1) | (4) | 1 | 32 | 10 | 42 |
| Improved recovery | 2 | - | - | - | - | 2 | - | 2 |
| Purchases of reserves in place | 6 | - | - | - | - | 6 | - | 6 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 153 | - | 1 | - | 7 | 161 | 3 | 164 |
| Production | (57) | - | (7) | (3) | (4) | (71) | (17) | (88) |
| Sales of reserves in place | (3) | - | - | - | - | (3) | (87) | (90) |
| End of year - 2014 | 634 | - | 57 | 208 | 29 | 928 | - | 928 |
| Proved developed reserves: | | | | | | | | |
| Beginning of year - 2012 | 128 | - | 52 | 179 | 20 | 379 | 64 | 443 |
| End of year - 2012 | 169 | - | 45 | 168 | 20 | 402 | 63 | 465 |
| End of year - 2013 | 241 | - | 37 | 176 | 19 | 473 | 77 | 550 |
| End of year - 2014 | 294 | - | 30 | 175 | 19 | 518 | - | 518 |
| Proved undeveloped reserves: | | | | | | | | |
| Beginning of year - 2012 | 108 | - | 25 | 43 | 5 | 181 | 25 | 206 |
| End of year - 2012 | 218 | - | 27 | 41 | 4 | 290 | 19 | 309 |
| End of year - 2013 | 256 | - | 27 | 39 | 6 | 328 | 14 | 342 |
| End of year - 2014 | 340 | - | 27 | 33 | 10 | 410 | - | 410 |

103

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Estimated Quantities of Proved Oil and Gas Reserves (continued)**

| (mmbbl) | U.S. | Canada | E.G.[a] | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Natural gas liquids** | | | | | | | | |
| **Proved developed and undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | 43 | - | 40 | - | 1 | 84 | - | 84 |
| Revisions of previous estimates | 2 | - | 2 | - | - | 4 | - | 4 |
| Purchases of reserves in place | 15 | - | - | - | - | 15 | - | 15 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 32 | - | - | - | - | 32 | - | 32 |
| Production | (4) | - | (4) | - | - | (8) | - | (8) |
| End of year - 2012 | 88 | - | 38 | - | 1 | 127 | - | 127 |
| Revisions of previous estimates | 13 | - | - | - | - | 13 | - | 13 |
| Purchases of reserves in place | 2 | - | - | - | - | 2 | - | 2 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 25 | - | - | - | - | 25 | - | 25 |
| Production | (9) | - | (4) | - | - | (13) | - | (13) |
| End of year - 2013 | 119 | - | 34 | - | 1 | 154 | - | 154 |
| Revisions of previous estimates | 4 | - | - | - | - | 4 | - | 4 |
| Purchases of reserves in place | 1 | - | - | - | - | 1 | - | 1 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 48 | - | - | - | - | 48 | - | 48 |
| Production | (11) | - | (4) | - | - | (15) | - | (15) |
| Sales of reserves in place | - | - | - | - | - | - | - | - |
| End of year - 2014 | 161 | - | 30 | - | 1 | 192 | - | 192 |
| Proved developed reserves: | | | | | | | | |
| Beginning of year - 2012 | 13 | - | 26 | - | - | 39 | - | 39 |
| End of year - 2012 | 29 | - | 23 | - | 1 | 53 | - | 53 |
| End of year - 2013 | 51 | - | 18 | - | 1 | 70 | - | 70 |
| End of year - 2014 | 68 | - | 15 | - | - | 83 | - | 83 |
| Proved undeveloped reserves: | | | | | | | | |
| Beginning of year - 2012 | 30 | - | 14 | - | 1 | 45 | - | 45 |
| End of year - 2012 | 59 | - | 15 | - | - | 74 | - | 74 |
| End of year - 2013 | 68 | - | 16 | - | - | 84 | - | 84 |
| End of year - 2014 | 93 | - | 15 | - | 1 | 109 | - | 109 |

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Estimated Quantities of Proved Oil and Gas Reserves (continued)**

| (bcf) | U.S. | Canada | E.G.[a] | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Natural gas** | | | | | | | | |
| **Proved developed and undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | 872 | - | 1,571 | 104 | 21 | 2,568 | 98 | 2,666 |
| Revisions of previous estimates | (29) | - | 10 | (1) | 5 | (15) | 10 | (5) |
| Purchases of reserves in place | 105 | - | - | - | - | 105 | - | 105 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 224 | - | - | 111 | - | 335 | - | 335 |
| Production[b] | (129) | - | (157) | (5) | (12) | (303) | (19) | (322) |
| End of year - 2012 | 1,043 | - | 1,424 | 209 | 14 | 2,690 | 89 | 2,779 |
| Revisions of previous estimates | (4) | - | 45 | 4 | 23 | 68 | 20 | 88 |
| Purchases of reserves in place | 13 | - | 3 | - | - | 16 | - | 16 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 163 | - | 9 | - | - | 172 | 3 | 175 |
| Production[b] | (114) | - | (161) | (8) | (9) | (292) | (19) | (311) |
| Sales of reserves in place | (76) | - | - | - | - | (76) | - | (76) |
| End of year - 2013 | 1,025 | - | 1,320 | 205 | 28 | 2,578 | 93 | 2,671 |
| Revisions of previous estimates | (24) | - | 1 | 5 | 2 | (16) | 7 | (9) |
| Purchases of reserves in place | 5 | - | - | - | - | 5 | - | 5 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 290 | - | 44 | - | - | 334 | 2 | 336 |
| Production[b] | (113) | - | (160) | (1) | (8) | (282) | (13) | (295) |
| Sales of reserves in place | (39) | - | - | - | - | (39) | (89) | (128) |
| End of year - 2014 | 1,144 | - | 1,205 | 209 | 22 | 2,580 | - | 2,580 |
| **Proved developed reserves:** | | | | | | | | |
| Beginning of year - 2012 | 551 | - | 1,104 | 104 | 16 | 1,775 | 24 | 1,799 |
| End of year - 2012 | 546 | - | 980 | 99 | 8 | 1,633 | 20 | 1,653 |
| End of year - 2013 | 540 | - | 823 | 95 | 21 | 1,479 | 20 | 1,499 |
| End of year - 2014 | 575 | - | 664 | 94 | 17 | 1,350 | - | 1,350 |
| Proved undeveloped reserves: | | | | | | | | |
| Beginning of year - 2012 | 321 | - | 467 | - | 5 | 793 | 74 | 867 |
| End of year - 2012 | 497 | - | 444 | 110 | 6 | 1,057 | 69 | 1,126 |
| End of year - 2013 | 485 | - | 497 | 110 | 7 | 1,099 | 73 | 1,172 |
| End of year - 2014 | 569 | - | 541 | 115 | 5 | 1,230 | - | 1,230 |

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Estimated Quantities of Proved Oil and Gas Reserves (continued)**

| (mmbbl) | U.S. | Canada | E.G.[a] | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Synthetic crude oil** | | | | | | | | |
| **Proved developed and undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | - | 623 | - | - | - | 623 | - | 623 |
| Revisions of previous estimates | - | 45 | - | - | - | 45 | - | 45 |
| Production | - | (15) | - | - | - | (15) | - | (15) |
| End of year - 2012 | - | 653 | - | - | - | 653 | - | 653 |
| Revisions of previous estimates | - | 36 | - | - | - | 36 | - | 36 |
| Extensions, discoveries and | | | | | | | | |
| other additions | - | 6 | - | - | - | 6 | - | 6 |
| Production | - | (15) | - | - | - | (15) | - | (15) |
| End of year - 2013 | - | 680 | - | - | - | 680 | - | 680 |
| Revisions of previous estimates | - | (55) | - | - | - | (55) | - | (55) |
| Purchases of reserves in place | - | 38 | - | - | - | 38 | - | 38 |
| Production | - | (15) | - | - | - | (15) | - | (15) |
| End of year - 2014 | - | 648 | - | - | - | 648 | - | 648 |
| Proved developed reserves: | | | | | | | | |
| Beginning of year - 2012 | - | 623 | - | - | - | 623 | - | 623 |
| End of year - 2012 | - | 653 | - | - | - | 653 | - | 653 |
| End of year - 2013 | - | 674 | - | - | - | 674 | - | 674 |
| End of year - 2014 | - | 644 | - | - | - | 644 | - | 644 |
| Proved undeveloped reserves: | | | | | | | | |
| End of year - 2013 | - | 6 | - | - | - | 6 | - | 6 |
| End of year - 2014 | - | 4 | - | - | - | 4 | - | 4 |

106

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Estimated Quantities of Proved Oil and Gas Reserves (continued)**

| (mmboe) | U.S. | Canada | E.G.[a] | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Total Proved Reserves** | | | | | | | | |
| **Proved developed and undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | 424 | 623 | 379 | 239 | 29 | 1,694 | 106 | 1,800 |
| Revisions of previous estimates | 5 | 45 | 7 | (5) | 6 | 58 | 24 | 82 |
| Improved recovery | 2 | - | - | - | - | 2 | - | 2 |
| Purchases of reserves in place | 70 | - | - | - | - | 70 | - | 70 |
| Extensions, discoveries and | | | | | | | | |
| other additions | 209 | - | - | 26 | - | 235 | - | 235 |
| Production[b] | (61) | (15) | (39) | (16) | (8) | (139) | (33) | (172) |
| End of year - 2012 | 649 | 653 | 347 | 244 | 27 | 1,920 | 97 | 2,017 |
| Revisions of previous estimates | 45 | 36 | 7 | 12 | 11 | 111 | 21 | 132 |
| Improved recovery | - | - | - | - | - | - | 11 | 11 |
| Purchases of reserves in place | 16 | - | 1 | - | - | 17 | - | 17 |
| Extensions, discoveries and | | | | | | | | - |
| other additions | 164 | 6 | 2 | 3 | - | 175 | 9 | 184 |
| Production[b] | (74) | (15) | (39) | (10) | (7) | (145) | (32) | (177) |
| Sales of reserves in place | (13) | - | - | - | - | (13) | - | (13) |
| End of year - 2013 | 787 | 680 | 318 | 249 | 31 | 2,065 | 106 | 2,171 |
| Revisions of previous estimates | 36 | (55) | - | (3) | - | (22) | 11 | (11) |
| Improved recovery | 2 | - | - | - | - | 2 | - | 2 |
| Purchases of reserves in place | 8 | 38 | - | - | - | 46 | - | 46 |
| Extensions, discoveries and | | | | | | | | - |
| other additions | 250 | - | 8 | - | 7 | 265 | 3 | 268 |
| Production[b] | (87) | (15) | (38) | (3) | (5) | (148) | (19) | (167) |
| Sales of reserves in place | (10) | - | - | - | - | (10) | (101) | (111) |
| End of year - 2014 | 986 | 648 | 288 | 243 | 33 | 2,198 | - | 2,198 |
| **Proved developed reserves:** | | | | | | | | |
| Beginning of year - 2012 | 233 | 623 | 262 | 196 | 23 | 1,337 | 68 | 1,405 |
| End of year - 2012 | 289 | 653 | 231 | 185 | 22 | 1,380 | 66 | 1,446 |
| End of year - 2013 | 382 | 674 | 193 | 192 | 23 | 1,464 | 80 | 1,544 |
| End of year - 2014 | 458 | 644 | 155 | 191 | 22 | 1,470 | - | 1,470 |
| **Proved undeveloped reserves:** | | | | | | | | |
| Beginning of year - 2012 | 191 | - | 117 | 43 | 6 | 357 | 38 | 395 |
| End of year - 2012 | 360 | - | 116 | 59 | 5 | 540 | 31 | 571 |
| End of year - 2013 | 405 | 6 | 125 | 57 | 8 | 601 | 26 | 627 |
| End of year - 2014 | 528 | 4 | 133 | 52 | 11 | 728 | - | 728 |

[a] Consists of estimated reserves from properties governed by production sharing contracts.
[b] Excludes the resale of purchased natural gas used in reservoir management.

The U.S. made the largest contribution to 2012 proved reserves increases, including 70 mmboe in purchases of reserves in place due to acquisitions in the Eagle Ford and 209 mmboe in extensions, discoveries and additions due to drilling programs within our shale plays. In addition, we added 45 mmboe in revisions of previous estimates in Canada due to technical analyses and a royalty change related to lower price realizations.

U.S. proved reserves increases in 2013 from extensions, discoveries and additions of 164 mmboe and revisions of previous estimates of 45 mmboe were the result of drilling programs in our shale plays. Revisions of previous estimates increased 36 mmboe in Canada primarily due to price and cost changes.

U.S. proved reserves increases in 2014 from extensions, discoveries and additions of 250 mmboe were the result of development activity in our U.S. resource plays. The sales of reserves in place related to our Norway and Angola discontinued operations were the largest decreases in 2014 proved reserves. The negative 55 mmboe revision to Canadian synthetic crude oil reserves primarily reflects the impact of technical and price changes on calculated royalty volumes as well as development plan changes in the mineable areas.

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Capitalized Costs and Accumulated Depreciation, Depletion and Amortization**

| (In millions) | | U.S. | | Canada | | E.G. | | Other Africa [a] | | Other Int'l [b] | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Year Ended December 31, | | | | | | |
| 2014 Capitalized Costs: | | | | | | | | | | | | |
| Proved properties | $ | 28,334 | $ | 9,481 | $ | 1,804 | $ | 823 | $ | 5,707 | $ | 46,149 |
| Unproved properties | | 1,861 | | 1,505 | | 64 | | 460 | | 237 | | 4,127 |
| Total | | 30,195 | | 10,986 | | 1,868 | | 1,283 | | 5,944 | | 50,276 |
| Accumulated depreciation, depletion and amortization: | | | | | | | | | | | | |
| Proved properties | | 13,746 | | 1,183 | | 1,010 | | 260 | | 5,075 | | 21,274 |
| Unproved properties | | 189 | | 1 | | - | | - | | 9 | | 199 |
| Total | | 13,935 | | 1,184 | | 1,010 | | 260 | | 5,084 | | 21,473 |
| Net capitalized costs | $ | 16,260 | $ | 9,802 | $ | 858 | $ | 1,023 | $ | 860 | $ | 28,803 |
| 2013 Capitalized Costs: | | | | | | | | | | | | |
| Proved properties | $ | 24,165 | $ | 9,276 | $ | 1,683 | $ | 2,257 | $ | 8,898 | $ | 46,279 |
| Unproved properties | | 2,097 | | 1,508 | | 31 | | 693 | | 510 | | 4,839 |
| Total | | 26,262 | | 10,784 | | 1,714 | | 2,950 | | 9,408 | | 51,118 |
| Accumulated depreciation, depletion and amortization: | | | | | | | | | | | | |
| Proved properties | | 11,568 | | 989 | | 918 | | 307 | | 7,607 | | 21,389 |
| Unproved properties | | 180 | | 1 | | - | | 13 | | 15 | | 209 |
| Total | | 11,748 | | 990 | | 918 | | 320 | | 7,622 | | 21,598 |
| Net capitalized costs | $ | 14,514 | $ | 9,794 | $ | 796 | $ | 2,630 | $ | 1,786 | $ | 29,520 |

[a] 2013 balances include capitalized costs related to Angola.
[b] 2013 balances include capitalized costs related to Norway.

**Costs Incurred for Property Acquisition, Exploration and Development[a]**

| (In millions) | | U.S. | | Canada | | E.G. | | Other Africa | | Other Int'l | | Cont Ops | | Disc Ops | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 31, 2014 | | | | | | | | | | | | | | | | | |
| Property acquisition: | | | | | | | | | | | | | | | | | | |
| Proved | $ | 26 | $ | - | $ | - | $ | - | $ | - | $ | 26 | $ | - | $ | 26 |
| Unproved | | 202 | | 3 | | - | | 53 | | 2 | | 260 | | 1 | | 261 |
| Exploration | | 1,140 | | 4 | | 35 | | 119 | | 119 | | 1,417 | | 6 | | 1,423 |
| Development | | 3,532 | | 196 | | 139 | | 16 | | 94 | | 3,977 | | 418 | | 4,395 |
| Total | $ | 4,900 | $ | 203 | $ | 174 | $ | 188 | $ | 215 | $ | 5,680 | $ | 425 | $ | 6,105 |
| December 31, 2013 | | | | | | | | | | | | | | | | | |
| Property acquisition: | | | | | | | | | | | | | | | | | | |
| Proved | $ | 51 | $ | 30 | $ | 9 | $ | - | $ | - | $ | 90 | $ | - | $ | 90 |
| Unproved | | 157 | | - | | - | | 44 | | 21 | | 222 | | - | | 222 |
| Exploration | | 885 | | 9 | | 4 | | 124 | | 151 | | 1,173 | | 98 | | 1,271 |
| Development | | 2,876 | | 280 | | 84 | | 46 | | 83 | | 3,369 | | 499 | | 3,868 |
| Total | $ | 3,969 | $ | 319 | $ | 97 | $ | 214 | $ | 255 | $ | 4,854 | $ | 597 | $ | 5,451 |
| December 31, 2012 | | | | | | | | | | | | | | | | | |
| Property acquisition: | | | | | | | | | | | | | | | | | | |
| Proved | $ | 756 | $ | - | $ | - | $ | - | $ | 3 | $ | 759 | $ | - | $ | 759 |
| Unproved | | 432 | | - | | 18 | | 63 | | (13) | | 500 | | 5 | | 505 |
| Exploration | | 1,587 | | 31 | | 3 | | 25 | | 165 | | 1,811 | | 45 | | 1,856 |
| Development | | 2,469 | | 195 | | 22 | | 15 | | 164 | | 2,865 | | 662 | | 3,527 |
| Total | $ | 5,244 | $ | 226 | $ | 43 | $ | 103 | $ | 319 | $ | 5,935 | $ | 712 | $ | 6,647 |

[a] Includes costs incurred whether capitalized or expensed.

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Results of Operations for Oil and Gas Producing Activities**

| | U.S. | Canada | E.G. | Other Africa | Other Int'l | Cont Ops | Disc Ops | Total |
|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 2014** | | | | | | | | |
| Revenues and other income: | | | | | | | | |
| Sales | $ 5,754 | $ 1,316 | $ 43 | $ 244 | $ 440 | $ 7,797 | $ 189 | $ 7,986 |
| Transfers | 3 | - | 588 | - | 3 | 594 | 1,848 | 2,442 |
| Other income[a] | (85) | - | - | - | - | (85) | 1,832 | 1,747 |
| Total revenues and other income | 5,672 | 1,316 | 631 | 244 | 443 | 8,306 | 3,869 | 12,175 |
| Expenses: | | | | | | | | |
| Production costs | (1,544) | (803) | (154) | (79) | (253) | (2,833) | (181) | (3,014) |
| Exploration expenses | (607) | (1) | (26) | (103) | (56) | (793) | (5) | (798) |
| Depreciation, depletion and amortization[b] | (2,474) | (206) | (93) | (9) | (115) | (2,897) | (105) | (3,002) |
| Technical support and other | (193) | (15) | (31) | (21) | (14) | (274) | (7) | (281) |
| Total expenses | (4,818) | (1,025) | (304) | (212) | (438) | (6,797) | (298) | (7,095) |
| Results before income taxes | 854 | 291 | 327 | 32 | 5 | 1,509 | 3,571 | 5,080 |
| Income tax provision | (302) | (71) | (117) | (32) | (18) | (540) | (1,496) | (2,036) |
| Results of operations | $ 552 | $ 220 | $ 210 | $ - | $ (13) | $ 969 | $ 2,075 | $ 3,044 |
| **Year Ended December 31, 2013** | | | | | | | | |
| Revenues and other income: | | | | | | | | |
| Sales | $ 5,059 | $ 1,376 | $ 33 | $ 1,106 | $ 687 | $ 8,261 | $ 599 | $ 8,860 |
| Transfers | 3 | - | 715 | - | 6 | 724 | 2,935 | 3,659 |
| Other income[a] | (9) | - | - | - | (8) | (17) | - | (17) |
| Total revenues and other income | 5,053 | 1,376 | 748 | 1,106 | 685 | 8,968 | 3,534 | 12,502 |
| Expenses: | | | | | | | | - |
| Production costs | (1,318) | (867) | (113) | (73) | (271) | (2,642) | (273) | (2,915) |
| Exploration expenses | (717) | (8) | (3) | (65) | (98) | (891) | (107) | (998) |
| Depreciation, depletion and amortization[b] | (1,980) | (218) | (97) | (28) | (151) | (2,474) | (345) | (2,819) |
| Technical support and other | (185) | (21) | (30) | (19) | (15) | (270) | (38) | (308) |
| Total expenses | (4,200) | (1,114) | (243) | (185) | (535) | (6,277) | (763) | (7,040) |
| Results before income taxes | 853 | 262 | 505 | 921 | 150 | 2,691 | 2,771 | 5,462 |
| Income tax provision | (323) | (66) | (182) | (920) | (117) | (1,608) | (1,948) | (3,556) |
| Results of operations | $ 530 | $ 196 | $ 323 | $ 1 | $ 33 | $ 1,083 | $ 823 | $ 1,906 |
| **Year Ended December 31, 2012** | | | | | | | | |
| Revenues and other income: | | | | | | | | |
| Sales | $ 3,879 | $ 1,261 | $ 29 | $ 2,000 | $ 738 | $ 7,907 | $ 97 | $ 8,004 |
| Transfers | 2 | - | 818 | - | - | 820 | 3,601 | 4,421 |
| Other income[a] | (8) | - | - | - | (32) | (40) | - | (40) |
| Total revenues and other income | 3,873 | 1,261 | 847 | 2,000 | 706 | 8,687 | 3,698 | 12,385 |
| Expenses: | | | | | | | | - |
| Production costs | (1,054) | (826) | (141) | (58) | (222) | (2,301) | (188) | (2,489) |
| Exploration expenses | (558) | (30) | (5) | (10) | (82) | (685) | (27) | (712) |
| Depreciation, depletion and amortization[b] | (1,792) | (217) | (95) | (43) | (147) | (2,294) | (470) | (2,764) |
| Technical support and other | (193) | (8) | (5) | (4) | (23) | (233) | (26) | (259) |
| Total expenses | (3,597) | (1,081) | (246) | (115) | (474) | (5,513) | (711) | (6,224) |
| Results before income taxes | 276 | 180 | 601 | 1,885 | 232 | 3,174 | 2,987 | 6,161 |
| Income tax provision | (100) | (45) | (210) | (1,795) | (189) | (2,339) | (2,260) | (4,599) |
| Results of operations | $ 176 | $ 135 | $ 391 | $ 90 | $ 43 | $ 835 | $ 727 | $ 1,562 |

[a] Includes net gain (loss) on dispositions.
[b] Includes long-lived asset impairments.

109

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Results of Operations for Oil and Gas Producing Activities**

The following reconciles results of operations for oil and gas producing activities to segment income:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 | | 2012 |
| Results of operations | $ | 3,044 | $ | 1,906 | $ | 1,562 |
| Discontinued operations | | (2,075) | | (823) | | (727) |
| Results of continuing operations | | 969 | | 1,083 | | 835 |
| Items not included in results of oil and gas operations, net of tax: | | | | | | |
| Marketing income and other non-oil and gas producing related activities | | 73 | | 40 | | 42 |
| Income from equity method investments | | 327 | | 340 | | 309 |
| Items not allocated to segment income, net of tax: | | | | | | |
| Loss on asset dispositions | | 58 | | 20 | | 31 |
| Long-lived asset impairments | | 69 | | 10 | | 231 |
| Segment income | $ | 1,496 | $ | 1,493 | $ | 1,448 |

110

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Reserves**

U.S. GAAP prescribes guidelines for computing the standardized measure of future net cash flows and changes therein relating to estimated proved reserves, giving very specific assumptions to be made such as the use of a 10 percent discount rate and an unweighted average of commodity prices in the prior 12-month period using the closing prices on the first day of each month. These and other required assumptions have not always proved accurate in the past, and other valid assumptions would give rise to substantially different results. This information is not the fair value nor does it represent the expected present value of future cash flows of our crude oil and condensate, natural gas liquid, natural gas and synthetic crude oil reserves.

| (In millions) | U.S. | Canada | E.G. | Other Africa | Other Int'l | Total |
|---|---|---|---|---|---|---|
| **Year Ended December 31, 2014** | | | | | | |
| Future cash inflows | $ 66,307 | $ 55,675 | $ 5,027 | $ 23,803 | $ 3,040 | $ 153,852 |
| Future production and support costs | (19,504) | (34,838) | (1,270) | (803) | (1,452) | (57,867) |
| Future development costs | (14,626) | (9,754) | (259) | (680) | (1,669) | (26,988) |
| Future income tax expenses | (8,124) | (2,190) | (922) | (21,008) | (9) | (32,253) |
| Future net cash flows | $ 24,053 | $ 8,893 | $ 2,576 | $ 1,312 | $ (90) [a] $ | 36,744 |
| 10 percent annual discount for timing of cash flows | (12,138) | (6,613) | (915) | (742) | 221 | (20,187) |
| Standardized measure of discounted future net cash flows- | | | | | | |
| -related to continuing operations | $ 11,915 | $ 2,280 | $ 1,661 | $ 570 | $ 131 | $ 16,557 |
| -related to discontinued operations | $ - | $ - | $ - | $ - | - | - |
| **Year Ended December 31, 2013** | | | | | | |
| Future cash inflows | $ 54,099 | $ 59,585 | $ 5,911 | $ 28,195 | $ 3,178 | $ 150,968 |
| Future production and support costs | (16,774) | (35,954) | (1,619) | (976) | (1,191) | (56,514) |
| Future development costs | (9,685) | (9,694) | (367) | (793) | (1,302) | (21,841) |
| Future income tax expenses | (7,592) | (3,098) | (1,032) | (24,982) | (643) | (37,347) |
| Future net cash flows | $ 20,048 | $ 10,839 | $ 2,893 | $ 1,444 | $ 42 | $ 35,266 |
| 10 percent annual discount for timing of cash flows | (9,940) | (8,300) | (1,084) | (828) | 128 | (20,024) |
| Standardized measure of discounted future net cash flows- | | | | | | |
| -related to continuing operations | $ 10,108 | $ 2,539 | $ 1,809 | $ 616 | $ 170 | $ 15,242 |
| -related to discontinued operations | $ - | $ - | $ - | $ 1,302 | $ 1,228 | $ 2,530 |
| **Year Ended December 31, 2012** | | | | | | |
| Future cash inflows | $ 42,710 | $ 55,171 | $ 6,627 | $ 28,173 | $ 2,897 | $ 135,578 |
| Future production and support costs | (13,765) | (32,131) | (1,829) | (1,015) | (784) | (49,524) |
| Future development costs | (11,104) | (9,350) | (451) | (787) | (1,139) | (22,831) |
| Future income tax expenses | (4,489) | (2,948) | (1,191) | (25,020) | (827) | (34,475) |
| Future net cash flows | $ 13,352 | $ 10,742 | $ 3,156 | $ 1,351 | $ 147 | $ 28,748 |
| 10 percent annual discount for timing of cash flows | (6,956) | (7,842) | (1,178) | (743) | 59 | (16,660) |
| Standardized measure of discounted future net cash flows- | | | | | | |
| -related to continuing operations | $ 6,396 | $ 2,900 | $ 1,978 | $ 608 | $ 206 | $ 12,088 |
| -related to discontinued operations | $ - | $ - | $ - | $ 642 | $ 1,489 | $ 2,131 |

[a]    Future cash flows for Other International reflects the impact of future abandonment costs related to the U.K.

111

*Supplementary Information on Oil and Gas Producing Activities (Unaudited)*

**Changes in the Standardized Measure of Discounted Future Net Cash Flows**

| (In millions) | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 | |
| Sales and transfers of oil and gas produced, net of production and support costs | $ | (5,284) | $ | (6,080) | $ | (9,696) | |
| Net changes in prices and production and support costs related to future production | | (2,688) [b] | | (336) | | 457 | |
| Extensions, discoveries and improved recovery, less related costs | | 3,539 | | 3,415 | | 2,763 | |
| Development costs incurred during the period | | 4,088 | | 3,429 | | 3,197 | |
| Changes in estimated future development costs | | (1,423) | | 898 | | (135) | |
| Revisions of previous quantity estimates[a] | | (3,193) [c] | | 1,330 | | 508 | |
| Net changes in purchases and sales of minerals in place | | (168) | | (229) | | 933 | |
| Accretion of discount | | 3,132 | | 2,657 | | 2,640 | |
| Net change in income taxes | | 3,312 | | (1,930) | | 12 | |
| Net change for the year | | 1,315 | | 3,154 | | 679 | |
| Beginning of the year related to continuing operations | | 15,242 | | 12,088 | | 11,409 | |
| End of the year related to continuing operations | $ | 16,557 | $ | 15,242 | $ | 12,088 | |
| Net change for the year related to discontinued operations | $ | (2,530) | $ | 399 | $ | (242) | |

[a]  Includes amounts resulting from changes in the timing of production.
[b]  Decrease primarily due to lower realized prices related to Other Africa and Other International.
[c]  Decrease mostly due to royalty adjustments on Canadian synthetic crude oil.

112

*MARATHON OIL CORPORATION*
*Supplemental Statistics (Unaudited)*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *(In millions)* | | 2014 | | 2013 | | 2012 |
| **Segment Income** | | | | | | |
| North America E&P | $ | 693 | $ | 529 | $ | 382 |
| International E&P | | 568 | | 758 | | 895 |
| Oil Sands Mining | | 235 | | 206 | | 171 |
| Segment income | | 1,496 | | 1,493 | | 1,448 |
| Items not allocated to segments, net of income taxes | | (527) | | (562) | | (592) |
| Income from continuing operations | | 969 | | 931 | | 856 |
| Discontinued operations[a] | | 2,077 | | 822 | | 726 |
| Net income | $ | 3,046 | $ | 1,753 | $ | 1,582 |
| **Capital Expenditures**[b] | | | | | | |
| North America E&P | $ | 4,698 | $ | 3,649 | $ | 3,988 |
| International E&P | | 534 | | 456 | | 235 |
| Oil Sands Mining | | 212 | | 286 | | 188 |
| Corporate | | 51 | | 58 | | 115 |
| Discontinued operations[a] | | 390 | | 535 | | 605 |
| Total | $ | 5,885 | $ | 4,984 | $ | 5,131 |
| **Exploration Expenses** | | | | | | |
| North America E&P | $ | 608 | $ | 725 | $ | 588 |
| International E&P | | 185 | | 166 | | 97 |
| Total | $ | 793 | $ | 891 | $ | 685 |

[a] We closed the sale of our Angola assets in the first quarter of 2014 and our Norway business in the fourth quarter of 2014. The Angola assets and Norway business are reflected as discontinued operations in all periods presented.

[b] Capital expenditures include accruals.

113

*MARATHON OIL CORPORATION*
*Supplemental Statistics (Unaudited)*

| Net Sales Volumes | 2014 | 2013 | 2012 |
|---|---|---|---|
| **North America E&P** | | | |
| Crude Oil and Condensate *(mbbld)* | | | |
| Bakken | 45 | 35 | 27 |
| Eagle Ford | 72 | 51 | 23 |
| Oklahoma Resource Basins | 3 | 2 | 1 |
| Other North America[c] | 37 | 38 | 45 |
| Total Crude Oil and Condensate | 157 | 126 | 96 |
| Natural Gas Liquids *(mbbld)* | | | |
| Bakken | 3 | 2 | 1 |
| Eagle Ford | 19 | 14 | 5 |
| Oklahoma Resource Basins | 5 | 4 | 2 |
| Other North America[c] | 2 | 3 | 3 |
| Total Natural Gas Liquids | 29 | 23 | 11 |
| Total Liquid Hydrocarbons *(mbbld)* | | | |
| Bakken | 48 | 37 | 28 |
| Eagle Ford | 91 | 65 | 28 |
| Oklahoma Resource Basins | 8 | 6 | 3 |
| Other North America[c] | 39 | 41 | 48 |
| Total Liquid Hydrocarbons | 186 | 149 | 107 |
| Natural Gas *(mmcfd)* | | | |
| Bakken | 18 | 13 | 8 |
| Eagle Ford | 123 | 94 | 37 |
| Oklahoma Resource Basins | 61 | 48 | 32 |
| Other North America[c] | 108 | 157 | 281 |
| Total Natural Gas | 310 | 312 | 358 |
| Equivalent Barrels *(mboed)* | | | |
| Bakken | 51 | 39 | 29 |
| Eagle Ford | 112 | 81 | 34 |
| Oklahoma Resource Basins | 18 | 14 | 8 |
| Other North America[c] | 57 | 67 | 95 |
| Total North America E&P *(mboed)* | 238 | 201 | 166 |

[c] Includes Gulf of Mexico and other conventional onshore U.S. production, plus Alaska in 2013 and 2012.

114

*MARATHON OIL CORPORATION*
*Supplemental Statistics (Unaudited)*

| Net Sales Volumes | 2014 | 2013 | 2012 |
|---|---|---|---|
| **International E&P** | | | |
| Crude Oil and Condensate *(mbbld)* | | | |
| Equatorial Guinea | 21 | 23 | 25 |
| United Kingdom | 11 | 14 | 15 |
| Libya | 7 | 24 | 42 |
| Total Crude Oil and Condensate | 39 | 61 | 82 |
| Natural Gas Liquids *(mbbld)* | | | |
| Equatorial Guinea | 10 | 11 | 11 |
| United Kingdom | - | 1 | 1 |
| Total Natural Gas Liquids | 10 | 12 | 12 |
| Total Liquid Hydrocarbons *(mbbld)* | | | |
| Equatorial Guinea | 31 | 34 | 36 |
| United Kingdom | 11 | 15 | 16 |
| Libya | 7 | 24 | 42 |
| Total Liquid Hydrocarbons | 49 | 73 | 94 |
| Natural Gas *(mmcfd)* | | | |
| Equatorial Guinea | 439 | 442 | 428 |
| United Kingdom[d] | 28 | 32 | 48 |
| Libya | 1 | 22 | 15 |
| Total Natural Gas | 468 | 496 | 491 |
| Equivalent Barrels *(mboed)* | | | |
| Equatorial Guinea | 104 | 107 | 107 |
| United Kingdom[d] | 16 | 20 | 24 |
| Libya | 7 | 28 | 45 |
| Total International E&P *(mboed)* | 127 | 155 | 176 |
| **Oil Sands Mining** | | | |
| Synthetic Crude Oil *(mbbld)*[e] | 50 | 48 | 47 |
| **Total Continuing Operations *(mboed)*** | 415 | 404 | 389 |
| Discontinued Operations - Angola *(mboed)*[a] | 2 | 10 | - |
| Discontinued Operations - Norway *(mboed)*[a] | 52 | 79 | 90 |
| **Total Company *(mboed)*** | 469 | 493 | 479 |
| **Net Sales Volumes of Equity Method Investees** | | | |
| LNG *(mtd)* | 6,535 | 6,548 | 6,290 |
| Methanol *(mtd)* | 1,092 | 1,249 | 1,298 |

[d] Includes natural gas acquired for injection and subsequent resale of 6 mmcfd, 7 mmcfd and 15 mmcfd for 2014, 2013, and 2012.
[e] Includes blendstocks.

*MARATHON OIL CORPORATION*
*Supplemental Statistics (Unaudited)*

| Average Price Realizations [f] | 2014 | 2013 | 2012 |
|---|---|---|---|
| **North America E&P** | | | |
| Crude Oil and Condensate *(per bbl)* | | | |
| Bakken | $81.63 | $90.25 | $83.11 |
| Eagle Ford | 87.99 | 99.69 | 100.14 |
| Oklahoma Resource Basins | 87.15 | 94.84 | 89.26 |
| Other North America[c] | 84.21 | 90.42 | 91.75 |
| Total Crude Oil and Condensate | 85.25 | 94.19 | 91.30 |
| Natural Gas Liquids *(per bbl)* | | | |
| Bakken | $43.25 | $41.60 | $42.35 |
| Eagle Ford | 29.60 | 30.16 | 32.96 |
| Oklahoma Resource Basins | 32.61 | 35.28 | 31.82 |
| Other North America[c] | 51.12 | 55.69 | 52.51 |
| Total Natural Gas Liquids | 33.42 | 35.12 | 39.57 |
| Total Liquid Hydrocarbons *(per bbl)* [f] | | | |
| Bakken | $79.41 | $87.76 | $81.36 |
| Eagle Ford | 75.83 | 84.95 | 88.09 |
| Oklahoma Resource Basins | 50.86 | 50.77 | 49.21 |
| Other North America[c] | 81.88 | 88.16 | 89.03 |
| Total Liquid Hydrocarbons | 77.02 | 85.20 | 85.80 |
| Natural Gas *(per mcf)* | | | |
| Bakken | $5.28 | $3.90 | $3.11 |
| Eagle Ford | 4.43 | 3.67 | 3.03 |
| Oklahoma Resource Basins | 4.49 | 3.78 | 3.05 |
| Other North America[c] | 4.65 | 3.95 | 4.20 |
| Total Natural Gas | 4.57 | 3.84 | 3.92 |

[f]   Excludes gains or losses on derivative instruments.  Inclusion of realized gains (losses) on crude oil derivative instruments would have increased (decreased) average liquid hydrocarbon price realizations per barrel by $(0.27) and $0.40 for 2013 and 2012.  There were no crude oil derivative instruments for 2014.

116

*MARATHON OIL CORPORATION*
*Supplemental Statistics (Unaudited)*

| Average Price Realizations | 2014 | 2013 | 2012 |
|---|---|---|---|
| **International E&P** | | | |
| Crude Oil and Condensate *(per bbl)* | | | |
| Equatorial Guinea | $81.01 | $90.62 | $92.56 |
| United Kingdom | 94.31 | 110.76 | 109.50 |
| Libya | 94.70 | 122.92 | 127.31 |
| Other International | - | - | - |
| Total Crude Oil and Condensate | 87.23 | 108.18 | 113.61 |
| Natural Gas Liquids *(per bbl)* | | | |
| Equatorial Guinea[g] | $1.00 | $1.00 | $1.00 |
| United Kingdom | 67.73 | 72.14 | 78.81 |
| Libya | - | - | - |
| Other International | - | - | - |
| Total Natural Gas Liquids | 2.46 | 5.24 | 8.32 |
| Total Liquid Hydrocarbons *(per bbl)* | | | |
| Equatorial Guinea | $54.29 | $60.34 | $64.33 |
| United Kingdom | 93.75 | 108.92 | 107.31 |
| Libya | 94.70 | 122.92 | 127.31 |
| Other International | - | - | - |
| Total Liquid Hydrocarbons | 68.98 | 91.04 | 100.02 |
| Natural Gas *(per mcf)* | | | |
| Equatorial Guinea[g] | $0.24 | $0.24 | $0.24 |
| United Kingdom | 8.27 | 10.64 | 9.72 |
| Libya | 3.11 | 5.44 | 5.76 |
| Other International | - | - | - |
| Total Natural Gas | 0.72 | 1.15 | 1.33 |
| **Oil Sands Mining** | | | |
| Synthetic Crude Oil *(per bbl)* | $83.35 | $87.51 | $81.72 |
| **Discontinued Operations - Angola *(per boe)*[a]** | 99.82 | 104.77 | - |
| **Discontinued Operations - Norway *(per boe)*[a]** | 104.22 | 109.60 | 111.82 |
| **Total Proved Reserves (at year end)** | | | |
| Crude Oil and Condensate *(mmbbl)* | | | |
| North America E&P | 634 | 497 | 387 |
| International E&P | 294 | 304 | 305 |
| Total Crude Oil and Condensate | 928 | 801 | 692 |
| Natural Gas Liquids *(mmbbl)* | | | |
| North America E&P | 161 | 119 | 88 |
| International E&P | 31 | 35 | 39 |
| Total Natural Gas Liquids | 192 | 154 | 127 |
| Natural Gas *(bcf)* | | | |
| North America E&P | 1,144 | 1,025 | 1,043 |
| International E&P | 1,436 | 1,553 | 1,647 |
| Total Natural Gas | 2,580 | 2,578 | 2,690 |
| Synthetic Crude Oil *(mmbbl)* | | | |
| Oil Sands Mining | 648 | 680 | 653 |
| Total Continuing Operations *(mmboe)* | 2,198 | 2,065 | 1,920 |
| Discontinued Operations *(mmboe)*[a] | - | 106 | 97 |
| Total Proved Reserves *(mmboe)* | 2,198 | 2,171 | 2,017 |

[g]  Primarily represents fixed prices under long-term contracts with Alba Plant LLC, AMPCO and EGHoldings, which are equity method investees. We include our share of income from each of these equity method investees in our International E&P segment.

117

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Disclosure Controls and Procedures**

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. As of the end of the period covered by this Report based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective as of December 31, 2014.

**Management's Annual Report on Internal Control Over Financial Reporting**

See "Management's Report on Internal Control over Financial Reporting" under Item 8 of this Form 10-K.

**Attestation Report of the Registered Public Accounting Firm**

See "Report of Independent Registered Public Accounting Firm" under Item 8 of this Form 10-K.

**Changes in Internal Control Over Financial Reporting**

During the fourth quarter of 2014, there were no changes in our internal control over financial reporting that have materially affected, or were reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

118

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

Information required by this item is incorporated by reference to "Election of Directors," "Corporate Governance-Committees of the Board" and "Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement for the 2015 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of December 31, 2014 (the "2015 Proxy Statement").

See "Executive Officers of the Registrant" under Item 1 of this Form 10-K for information about our executive officers.

Our Code of Business Conduct and the Code of Ethics for Senior Financial Officers are available on our website at www.marathonoil.com.

**Item 11. Executive Compensation**

Information required by this item is incorporated by reference to "Corporate Governance-Compensation Committee Interlocks and Insider Participation," "Compensation Committee Report," "Director Compensation," "Compensation Discussion and Analysis" and "Executive Compensation" in the 2015 Proxy Statement.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Portions of information required by this item are incorporated by reference to "Security Ownership of Certain Beneficial Owners and Management" in the 2015 Proxy Statement.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides information as of December 31, 2014 with respect to shares of Marathon Oil common stock that may be issued under our existing equity compensation plans:

- Marathon Oil Corporation 2012 Incentive Compensation Plan (the "2012 Plan")

- Marathon Oil Corporation 2007 Incentive Compensation Plan (the "2007 Plan") - No additional awards will be granted under this plan.

- Marathon Oil Corporation 2003 Incentive Compensation Plan (the "2003 Plan") - No additional awards will be granted under this plan.

- Deferred Compensation Plan for Non-Employee Directors - No additional awards will be granted under this plan.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights[c] | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 14,453,729 [a] | $29.68 | 45,489,820 [d] |
| Equity compensation plans not approved by stockholders | 20,984 [b] | N/A | - |
| Total | 14,474,713 | N/A | 45,489,820 |

[a] Includes the following:
- 3,237,349 stock options outstanding under the 2012 Plan; 9,106,352 stock options outstanding under the 2007 Plan; 1,084,135 stock options outstanding under the 2003 Plan;
- 355,709 common stock units that have been credited to non-employee directors pursuant to the non-employee director deferred compensation program and the annual director stock award program established under the 2012 Plan, 2007 Plan and 2003 Plan; common stock units credited under the 2012 Plan, 2007 Plan and 2003 Plan were 82,233, 222,215 and 51,261, respectively;
- 670,184 restricted stock units granted to non-officers under the 2012 Plan and 2007 Plan and outstanding as of December 31, 2014.
In addition to the awards reported above 200,444 and 2,577,725 shares of restricted stock were issued and outstanding as of December 31, 2014, but subject to forfeiture restrictions under the 2007 Plan and 2012 Plan, respectively.

[b] Reflects awards of common stock units made to non-employee directors under the Deferred Compensation Plan for Non-Employee Directors prior to April 30, 2003. When a non-employee director leaves the Board, he or she will be issued actual shares of Marathon Oil common stock in place of the common stock units.

[c] The weighted-average exercise prices do not take the restricted stock units or common stock units into account as these awards have no exercise price.

[d] Reflects the shares available for issuance under the 2012 Plan. No more than 18,949,438 of these shares may be issued for awards other than stock options or stock appreciation rights. In addition, shares related to grants that are forfeited, terminated, canceled or expire unexercised shall again immediately become available for issuance.

119

The Deferred Compensation Plan for Non-Employee Directors is our only equity compensation plan that has not been approved by our stockholders. Our authority to make equity grants under this plan was terminated effective April 30, 2003. Under the Deferred Compensation Plan for Non-Employee Directors, all non-employee directors were required to defer half of their annual retainers in the form of common stock units. On the date the retainer would have otherwise been payable to the non-employee director, we credited an unfunded bookkeeping account for each non-employee director with a number of common stock units equal to half of his or her annual retainer divided by the fair market value of our common stock on that date. The ongoing value of each common stock unit equals the market price of a share of our common stock. When the non-employee director leaves the Board, he or she is issued actual shares of our common stock equal to the number of common stock units in his or her account at that time.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

Information required by this item is incorporated by reference to "Transactions with Related Persons," and "Corporate Governance-Director Independence" in the 2015 Proxy Statement.

**Item 14. Principal Accountant Fees and Services**

Information required by this item is incorporated by reference to "Ratification of Independent Auditor for 2015" in the 2015 Proxy Statement.

120

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

**A. Documents Filed as Part of the Report**

1. Financial Statements - See Part II, Item 8. of this Annual Report on Form 10-K.

2. Financial Statement Schedules - Financial statement schedules required under SEC rules but not included in this Annual Report on Form 10-K are omitted because they are not applicable or the required information is contained in the consolidated financial statements or notes thereto.

3. Exhibits - The information required by this Item 15 is incorporated by reference to the Exhibit Index accompanying this Annual Report on Form 10-K.

121

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

March 2, 2015                    MARATHON OIL CORPORATION


By: /s/ GARY E. WILSON

Gary E. Wilson

Vice President, Controller and Chief Accounting Officer

**POWER OF ATTORNEY**

Each person whose signature appears below appoints Lee M. Tillman, John R. Sult, and Gary E. Wilson, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, with full power and authority to each of said attorneys-in-fact and agents to do and perform each and every act whatsoever that is necessary, appropriate or advisable in connection with any or all of the above-described matters and to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on March 2, 2015 on behalf of the registrant and in the capacities indicated.

| <u>Signature</u> | <u>Title</u> |
|---|---|
| /S/ LEE M. TILLMAN | President and Chief Executive Officer and Director |
| Lee M. Tillman | |
| /S/ JOHN R. SULT | Executive Vice President and Chief Financial Officer |
| John R. Sult | |
| /s/ GARY E. WILSON | Vice President, Controller and Chief Accounting Officer |
| Gary E. Wilson | |
| /S/ DENNIS H. REILLEY | Chairman of the Board |
| Dennis H. Reilley | |
| /S/ GREGORY H. BOYCE | Director |
| Gregory H. Boyce | |
| /S/ PIERRE BRONDEAU | Director |
| Pierre Brondeau | |
| /S/ CHADWICK C. DEATON | Director |
| Chadwick C. Deaton | |
| /S/ MARCELA E. DONADIO | Director |
| Marcela E. Donadio | |
| /S/ SHIRLEY ANN JACKSON | Director |
| Shirley Ann Jackson | |
| /S/ PHILIP LADER | Director |
| Philip Lader | |
| /S/ MICHAEL E. J. PHELPS | Director |
| Michael E. J. Phelps | |

Exhibit Index

| Exhibit Number | Exhibit Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date |
| **3** | **Articles of Incorporation and Bylaws** | | | |
| 3.1 | Restated Certificate of Incorporation of Marathon Oil Corporation | 10-Q | 3.1 | 8/8/2013 |
| 3.2 | Amended By-Laws of Marathon Oil Corporation effective February 25, 2014 | 10-K | 3.2 | 2/28/2014 |
| 3.3 | Specimen of Common Stock Certificate | 10-K | 3.3 | 2/28/2014 |
| **4** | **Instruments Defining the Rights of Security Holders, Including Indentures** | | | |
| 4.1 | Indenture, dated as of February 26, 2002, between Marathon Oil Corporation and The Bank of New York Trust Company, N.A., successor in interest to JPMorgan Chase Bank as Trustee, relating to senior debt securities of Marathon Oil Corporation. Pursuant to CFR 229.601(b)(4)(iii), instruments with respect to long-term debt issues have been omitted where the amount of securities authorized under such instruments does not exceed 10 percent of the total consolidated assets of Marathon Oil. Marathon Oil hereby agrees to furnish a copy of any such instrument to the Securities and Exchange Commission upon its request | 10-K | 4.2 | 2/28/2014 |
| **10** | **Material Contracts** | | | |
| 10.1 | Amended and Restated Credit Agreement, dated as of May 28, 2014, among Marathon Oil Corporation, as borrower, The Royal Bank of Scotland plc, as syndication agent, Citibank, N.A., Morgan Stanley Senior Funding, Inc. and The Bank of Nova Scotia, as documentation agents, JPMorgan Chase Bank, N.A., as administrative agent, and certain other financial institutions named therein | 8-K | 4.1 | 6/2/2014 |
| 10.2† | Marathon Oil Corporation 2012 Incentive Compensation Plan | DEF 14A | App. III | 3/8/2012 |
| 10.3† | Form of Marathon Oil Corporation 2012 Incentive Compensation Plan Non-Qualified Stock Option Award Agreement | 8-K | 10.1 | 8/1/2014 |
| 10.4† | Form of Performance Unit Award Agreement 2014 - 2016 Performance Cycle for Section 16 Officers | 10-Q | 10.1 | 5/7/2014 |
| 10.5† | Form of Performance Unit Award Agreement 2014 - 2016 Performance Cycle for Officers | 10-Q | 10.2 | 5/7/2014 |
| 10.6† | Form of Initial CEO Option Grant Agreement granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan | 10-Q | 10.1 | 11/6/2013 |
| 10.7† | Form of CEO Restricted Stock Agreement granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-Q | 10.2 | 11/6/2013 |
| 10.8† | Form of CEO Restricted Stock Award Agreement granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year cliff vesting) | 10-Q | 10.3 | 11/6/2013 |
| 10.9† | Form of Performance Unit Award Agreement (2013-2015 Performance Cycle) for Section 16 Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan | 10-Q | 10.1 | 5/10/2013 |
| 10.10† | Form of Performance Unit Award Agreement (2013-2015 Performance Cycle) for Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan | 10-Q | 10.2 | 5/10/2013 |
| 10.11† | Form of Nonqualified Stock Option Award Agreement for Section 16 Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.5 | 2/22/2013 |

1

| Exhibit Number | Exhibit Description | Incorporated by Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date |
| 10.12† | Form of Nonqualified Stock Option Award Agreement for Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.6 | 2/22/2013 |
| 10.13† | Form of Restricted Stock Award Agreement for Section 16 Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year cliff vesting) | 10-K | 10.7 | 2/22/2013 |
| 10.14† | Form of Restricted Stock Award Agreement for Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year cliff vesting) | 10-K | 10.8 | 2/22/2013 |
| 10.15† | Form of Restricted Stock Award Agreement for Section 16 Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.9 | 2/22/2013 |
| 10.16† | Form of Restricted Stock Award Agreement for Officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.10 | 2/22/2013 |
| 10.17† | Form of Nonqualified Stock Option Award Agreement for non-officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.11 | 2/22/2013 |
| 10.18† | Form of Nonqualified Stock Option Award Agreement for non-officers in Canada granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.12 | 2/22/2013 |
| 10.19† | Form of Restricted Stock Award Agreement for non-officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.13 | 2/22/2013 |
| 10.20† | Form of Restricted Stock Unit Award Agreement for non-officers granted under the Marathon Oil Corporation 2012 Incentive Compensation Plan (3-year prorata vesting) | 10-K | 10.14 | 2/22/2013 |
| 10.21† | Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.5 | 2/29/2012 |
| 10.22† | Form of Nonqualified Stock Option Award Agreement for Officers granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.6 | 2/29/2012 |
| 10.23† | Form of Officer Restricted Stock Award Agreement granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.8 | 2/29/2012 |
| 10.24† | Form of Nonqualified Stock Option Award Agreement for Officers granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.5 | 2/28/2011 |
| 10.25† | Form of Officer Restricted Stock Award Agreement for Section 16 Officers granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.7 | 2/28/2011 |
| 10.26† | Form of Performance Unit Award Agreement (2012-2014 Performance Cycle) granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan. | 10-Q | 10.2 | 5/4/2012 |
| 10.27† | Form of Restricted Stock Award Agreement for Section 16 Officers granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan. | 10-K | 10.27 | 2/26/2010 |
| 10.28† | Form of Nonqualified Stock Option Award Agreement granted under the Marathon Oil Corporation 2007 Incentive Compensation Plan | 10-K | 10.26 | 2/26/2010 |
| 10.29† | Marathon Oil Corporation 2003 Incentive Compensation Plan, Effective January 1, 2003 | 10-K | 10.9 | 2/26/2010 |

2

| Exhibit Number | Exhibit Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date |
| 10.30† | Form of Nonqualified Stock Option Award Agreement for Officers granted under the Marathon Oil Corporation 2003 Incentive Compensation Plan | 10-K | 10.22 | 2/26/2010 |
| 10.31† | Form of Officer Restricted Stock Award Agreement granted under the Marathon Oil Corporation 2003 Incentive Compensation Plan | 10-K | 10.23 | 2/26/2010 |
| 10.32 | Marathon Oil Corporation Deferred Compensation Plan for Non-Employee Directors (Amended and Restated as of January 1, 2012) | 10-Q | 10.3 | 5/7/2014 |
| 10.33† | Marathon Oil Company Deferred Compensation Plan Amended and Restated Effective June 30, 2011 | 10-K | 10.32 | 2/29/2012 |
| 10.34† | Marathon Oil Company Excess Benefit Plan Amended and Restated | 10-K | 10.31 | 2/29/2012 |
| 10.35† | Marathon Oil Corporation 2011 Officer Change in Control Severance Benefits Plan (For Officers Hired or Promoted after October 26, 2011) | 10-Q | 10.4 | 5/4/2012 |
| 10.36*† | Marathon Oil Corporation 2011 Officer Change in Control Severance Benefits Plan (as amended, effective November 1, 2014) | | | |
| 10.37† | Marathon Oil Corporation Policy for Repayment of Annual Cash Bonus Amounts | 10-K | 10.10 | 2/28/2011 |
| 10.38† | Marathon Oil Executive Tax, Estate, and Financial Planning Program, Amended and Restated, Effective January 1, 2009 | 10-K | 10.32 | 2/27/2009 |
| 10.39† | Marathon Oil Corporation Bonus Agreement Upon Commencement of Employment for Lee M. Tillman | 10-Q | 10.4 | 11/6/2013 |
| 10.40 | Tax Sharing Agreement dated as of May 25, 2011 among Marathon Oil Corporation, Marathon Petroleum Corporation and MPC Investment LLC | 8-K | 10.1 | 5/26/2011 |
| 12.1* | Computation of Ratio of Earnings to Fixed Charges | | | |
| 14.1 | Code of Ethics for Senior Financial Officers | 10-K | 14.1 | 2/26/2010 |
| 21.1* | List of Significant Subsidiaries | | | |
| 23.1* | Consent of Independent Registered Public Accounting Firm | | | |
| 23.2* | Consent of GLJ Petroleum Consultants LTD., independent petroleum engineers and geologists | | | |
| 23.3* | Consent of Ryder Scott Company, L.P., independent petroleum engineers and geologists | | | |
| 23.4* | Consent of Netherland, Sewell & Associates, Inc., independent petroleum engineers and geologists | | | |
| 31.1* | Certification of President and Chief Executive Officer pursuant to Rule 13(a)-14 and 15(d)-14 under the Securities Exchange Act of 1934 | | | |
| 31.2* | Certification of Executive Vice President and Chief Financial Officer pursuant to Rule 13(a)-14 and 15(d)-14 under the Securities Exchange Act of 1934 | | | |
| 32.1* | Certification of President and Chief Executive Officer pursuant to 18 U.S.C. Section 1350 | | | |
| 32.2* | Certification of Executive Vice President and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 | | | |
| 99.1* | Report of GLJ Petroleum Consultants LTD., independent petroleum engineers and geologists for 2014 | | | |
| 99.2 | Report of GLJ Petroleum Consultants LTD., independent petroleum engineers and geologists for 2013 | 10-K | 99.1 | 2/28/2014 |
| 99.3 | Report of GLJ Petroleum Consultants LTD., independent petroleum engineers and geologists for 2012 | 10-K | 99.1 | 2/22/2013 |

3

| Exhibit Number | Exhibit Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date |
| 99.4* | Summary report of audits performed by Netherland, Sewell & Associates, Inc., independent petroleum engineers and geologists for 2014 | | | |
| 99.5 | Summary report of audits performed by Netherland, Sewell & Associates, Inc., independent petroleum engineers and geologists for 2013 | 10-K | 99.4 | 2/28/2014 |
| 99.6 | Summary report of audits performed by Netherland, Sewell & Associates, Inc., independent petroleum engineers and geologists for 2012 | 10-K | 99.4 | 2/22/2013 |
| 99.7* | Summary report of audits performed by Ryder Scott Company, L.P., independent petroleum engineers and geologists for 2014 | | | |
| 99.8 | Summary report of audits performed by Ryder Scott Company, L.P., independent petroleum engineers and geologists for 2013 | 10-K | 99.7 | 2/28/2014 |
| 99.9 | Summary report of audits performed by Ryder Scott Company, L.P., independent petroleum engineers and geologists for 2012 | 10-K | 99.6 | 2/22/2013 |
| 101.INS* | XBRL Instance Document | | | |
| 101.SCH* | XBRL Taxonomy Extension Schema | | | |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase | | | |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase | | | |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase | | | |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase | | | |
| * | Filed herewith. | | | |
| ** | Furnished, not filed. | | | |
| † | Management contract or compensatory plan or arrangement. | | | |

4

# Exhibit 69

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): March 3, 2015**

# ANADARKO PETROLEUM CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 1-8968 | 76-0146568 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380-1046**
(Address of principal executive offices)

Registrant's telephone number, including area code **(832) 636-1000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

STEINHOLT_0010436

**Item 7.01  Regulation FD Disclosure.**

On March 3, 2015, Anadarko Petroleum Corporation (Anadarko) announced its 2015 capital budget and provided guidance for 2015. The press release is included in this report as Exhibit 99 and is incorporated herein by reference. This information shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (Exchange Act), or otherwise subject to the liabilities of that section, and is not incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act.

**Item 9.01  Financial Statements and Exhibits.**

(d)  Exhibits.

99  Anadarko Press Release dated March 3, 2015.

STEINHOLT_0010437

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

ANADARKO PETROLEUM CORPORATION
(Registrant)

March 3, 2015

By: /s/ M. CATHY DOUGLAS

M. Cathy Douglas
Senior Vice President, Chief Accounting Officer and Controller

STEINHOLT_0010438

**EXHIBIT INDEX**

**Exhibit No.**      **Description**

99            Anadarko Press Release dated March 3, 2015.

STEINHOLT_0010439

Exhibit 99



# NEWS

## ANADARKO ANNOUNCES 2015 CAPITAL PROGRAM AND GUIDANCE

**HOUSTON**, March 3, 2015 - Anadarko Petroleum Corporation (NYSE: APC) today announced its 2015 initial capital expectations and guidance, concurrent with its 2015 Investor Conference Call.

### 2015 INVESTOR CONFERENCE CALL HIGHLIGHTS

- Anticipates approximately 5-percent year-over-year oil sales-volume growth in 2015, on a divestiture-adjusted basis[1]
- Forecasts improved 2015 liquids product mix of approximately 50 percent, even with the reduction of more than 9 million net barrels of oil equivalent (BOE) of assumed ethane rejection
- Establishes net resources of more than 1 billion BOE in the Wolfcamp Shale
- Achieves first oil at the 80,000-barrels-of-oil-per-day Lucius spar and enhances value through new production-handling agreement
- Announces more than $700 million of asset monetizations to date in 2015

"During 2015, we are confident in our ability to leverage our deep, high-quality portfolio of opportunities, strong balance sheet and efficient capital allocation to preserve value and maintain flexibility," said Anadarko Chairman, President and CEO Al Walker. "Few companies have accomplished operationally what Anadarko has achieved over the last five years; although, in the current market, we believe it is prudent to reduce capital investments and position the company for the future, rather than to pursue year-over-year growth. As a result, we've reduced our initial 2015 capital expectations by approximately 33 percent relative to last year, with plans to reduce our short-cycle U.S. onshore rig activity by 40 percent and defer approximately 125 onshore well completions. We have successfully delivered value during previous challenging commodity-price cycles, and I believe we have the skills, financial capacity and portfolio to deliver in this environment. Our focus continues to be on getting better, not necessarily bigger, while ensuring we are well positioned to accelerate activity as costs become more aligned with commodity prices and returns improve."

STEINHOLT_0010440

2

## 2015 INITIAL SALES-VOLUME AND CAPITAL EXPECTATIONS

### Divestiture-Adjusted[1] Sales-Volume Expectations

| 2014 | 2015 Productive Capacity[2] | 2015 Initial Expectations |
|---|---|---|
| 301 MMBOE | 308 - 314 MMBOE | 295 - 301 MMBOE |

[1] *"Divestiture-Adjusted" sales volumes reflect Anadarko's continuing asset base, giving effect to recent divestitures. For a reconciliation, see the table on page eight attached to this release.*

[2] *"Productive Capacity" is intended to represent what the portfolio could produce within the current 2015 capital budget range if the company did not elect to reject approximately 9 million BOE of ethane and choose to defer approximately 4 million BOE related to reduced U.S. onshore well completions.*

### Initial Capital Expectations ($5.4 - $5.8 Billion)*

| By Cash Cycle | | By Area | |
|---|---|---|---|
| Short Cash Cycle | 55% | U.S. Onshore | 60% |
| Mid Cash Cycle | 30% | Int'l & Deepwater Operations | 22% |
| Long Cash Cycle | 12% | Int'l & Deepwater Exploration | 10% |
| Corporate | 3% | Midstream & Other | 8% |

*\* Does not include capital investments by Western Gas Partners, LP (NYSE: WES); all percentages are approximates.*

## SHORT CASH CYCLE

Anadarko's Wattenberg Horizontal program continues to generate some of the strongest U.S. onshore returns in the industry, primarily as a result of the company's consolidated core acreage position, expansive infrastructure and minerals-interest ownership. The resilient economics of the Wattenberg field continue to make it an attractive place to invest in 2015 as it generates better than 30-percent before-tax rates of return at current strip prices. Additionally, the company plans to allocate capital toward its Eagleford Shale activity which, at current strip prices, generates before-tax rates of return of more than 20 percent.

## MID CASH CYCLE

Anadarko remains committed to investing in assets that are expected to generate significant growth in the next one to three years. Among these assets is the Wolfcamp Shale in the Delaware Basin of West Texas, where the company is applying its proven integrated midstream approach to build the foundation for future growth. As a result of the company's delineation activities to date, Anadarko has established a net resource

STEINHOLT_0010441

estimate of more than 1 billion BOE with more than 5,000 identified drilling locations in the heart of the Wolfcamp Shale oil play. Additionally, Anadarko is leveraging its hub-and-spoke philosophy at its Lucius spar in the deepwater Gulf of Mexico by reaching a new production-handling agreement for the nearby third-party Buckskin/Moccasin project, while continuing to advance development of the Heidelberg and TEN mega projects in the Gulf of Mexico and offshore Ghana, respectively, toward first production in 2016.

## LONG CASH CYCLE

In 2015, Anadarko expects to drill nine to 12 deepwater exploration/appraisal wells focusing on play-opening exploration opportunities in Colombia, Kenya and the Gulf of Mexico. Additionally, Anadarko continues to advance existing discoveries at Shenandoah in the Gulf of Mexico and Paon offshore Côte d'Ivoire toward commerciality, while continuing to progress its Mozambique LNG project.

Four pages of supplemental materials including the company's 2015 initial guidance, updated hedging positions and a reconciliation of divestiture-adjusted sales volumes are provided in the tables attached to this release.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2014, the company had approximately 2.86 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to meet financial and operating guidance; to meet the objectives identified in this news release; to consummate the transaction described in this news release; to execute the 2015 capital program; to drill, develop and commercially operate the drilling prospects identified in this news release; to achieve production and budget expectations on its mega projects; and to successfully plan, secure necessary government approvals, finance, build and operate the necessary structure and an LNG park. See "Risk Factors" in the company's 2014 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

STEINHOLT_0010442

4

*Cautionary Note to Investors: The United States Securities and Exchange Commission ("SEC") permits oil and gas companies, in their filings with the SEC, to disclose only proved, probable and possible reserves that meet the SEC's definitions for such terms. Anadarko uses certain terms in this news release, such as "net resources," "net resource estimate," and similar terms that the SEC's guidelines strictly prohibit Anadarko from including in filings with the SEC. U.S. investors are urged to consider closely the disclosure in Anadarko's Form 10-K for the year ended Dec. 31, 2014, File No. 001-08968, available from Anadarko at www.anadarko.com or by writing Anadarko at: Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380, Attn: Investor Relations. This form may also be obtained by contacting the SEC at 1-800-SEC-0330.*

#        #        #

## ANADARKO CONTACTS

### MEDIA:
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Stephanie Moreland, stephanie.moreland@anadarko.com, 832.636.2912
Christina Ramirez, christina.ramirez@anadarko.com, 832.636.8687

### INVESTORS:
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Robin Fielder, robin.fielder@anadarko.com, 832.636.1462
Jeremy Smith, jeremy.smith@anadarko.com, 832.636.1544

STEINHOLT_0010443

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**March 3, 2015**

| | 1st-Qtr Guidance | | | Full-Year Guidance | | |
|---|---|---|---|---|---|---|
| | Units | | | Units | | |
| **Total Sales Volumes (MMBOE)** | 79 | — | 82 | 295 | — | 301 |
| **Total Sales Volumes (MBOE/d)** | 878 | — | 907 | 808 | — | 826 |
| | | | | | | |
| **Crude Oil (MBbl/d)** | 300 | — | 308 | 285 | — | 293 |
| | | | | | | |
| United States | 206 | — | 210 | 200 | — | 204 |
| Algeria | 66 | — | 68 | 63 | — | 65 |
| Ghana | 28 | — | 30 | 22 | — | 24 |
| | | | | | | |
| **Natural Gas (MMcf/d)** | | | | | | |
| | | | | | | |
| United States | 2,675 | — | 2,725 | 2,425 | — | 2,475 |
| | | | | | | |
| **Natural Gas Liquids (MBbl/d)** | | | | | | |
| | | | | | | |
| United States | 125 | — | 135 | 109 | — | 117 |
| Algeria | 6 | — | 8 | 4 | — | 6 |

| | $ / Unit | | | $ / Unit | | |
|---|---|---|---|---|---|---|
| **Price Differentials vs. NYMEX (w/o hedges)** | | | | | | |
| | | | | | | |
| **Crude Oil ($/Bbl)** | (3.00) | — | (1.00) | (3.00) | — | (1.00) |
| | | | | | | |
| United States | (6.00) | — | (1.00) | (6.00) | — | (1.00) |
| Algeria | 2.00 | — | 5.00 | 2.00 | — | 5.00 |
| Ghana | — | — | 2.00 | — | — | 3.00 |
| | | | | | | |
| **Natural Gas ($/Mcf)** | | | | | | |
| | | | | | | |
| United States | (0.50) | — | (0.25) | (0.60) | — | (0.30) |

STEINHOLT_0010444

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**March 3, 2015**

| | 1st-Qtr Guidance | | | Full-Year Guidance | | |
|---|---|---|---|---|---|---|
| | **$ MM** | | | **$ MM** | | |
| **Other Revenues** | | | | | | |
| Marketing and Gathering Margin | 30 | — | 50 | 140 | — | 160 |
| Minerals and Other | 85 | — | 95 | 310 | — | 330 |
| | | | | | | |
| **Costs and Expenses** | | | | | | |
| | **$ / BOE** | | | **$ / BOE** | | |
| Oil & Gas Direct Operating | 3.80 | — | 4.00 | 3.60 | — | 4.00 |
| Oil & Gas Transportation/Other | 3.50 | — | 3.70 | 3.70 | — | 3.90 |
| Depreciation, Depletion and Amortization | 14.50 | — | 15.00 | 15.25 | — | 15.75 |
| Production Taxes (% of Product Revenue) | 8.0% | — | 9.0% | 8.5% | — | 9.5% |
| | | | | | | |
| | **$ MM** | | | **$ MM** | | |
| | | | | | | |
| General and Administrative | 310 | — | 330 | 1,250 | — | 1,300 |
| Exploration Expense | | | | | | |
| Non-Cash | 80 | — | 100 | 550 | — | 600 |
| Cash | 75 | — | 95 | 375 | — | 400 |
| Interest Expense (net) | 205 | — | 215 | 800 | — | 820 |
| Other (Income) Expense | 40 | — | 50 | 150 | — | 200 |
| | | | | | | |
| **Taxes** | | | | | | |
| Algeria (All current) | 55% | — | 60% | 55% | — | 60% |
| Rest of Company (Expect significant current-tax benefit) | 10% | — | 15% | 25% | — | 30% |
| | | | | | | |
| **Avg. Shares Outstanding (MM)** | | | | | | |
| Basic | 507 | — | 508 | 508 | — | 509 |
| Diluted | 509 | — | 510 | 510 | — | 511 |
| | | | | | | |
| **Capital Investment (Excluding Western Gas Partners, LP)** | **$ MM** | | | **$ MM** | | |
| APC Capital Expenditures | 1,700 | — | 1,900 | 5,400 | — | 5,800 |

STEINHOLT_0010445

7

**Anadarko Petroleum Corporation**
**Commodity Hedge Positions (Excluding Natural Gas Basis)**
**As of March 3, 2015**

| | Volume (Thousand MMBtu/d) | Weighted Average Price per MMBtu | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Floor Sold | | Floor Purchased | | Ceiling Sold |
| **Natural Gas** | | | | | | | |
| **Three-Way Collars** | | | | | | | |
| **2015** | 635 | $ | 2.75 | $ | 3.75 | $ | 4.76 |
| | | | | | | | |
| **Extendable Fixed Price - Financial** | | | | | | | |
| **2015\*** | 170 | $ | 4.17 | | | | |

\*   Includes an option for the counterparty to extend the contract term to December 2016 at the same price.

**Interest-Rate Derivatives**
**As of March 3, 2015**

| Instrument | Notional Amt. | Start Date | Maturity | Rate Paid | Rate Received |
|---|---|---|---|---|---|
| Swap | $50 Million | Sept. 2016 | Sept. 2026 | 5.91% | 3M LIBOR |
| Swap | $1,850 Million | Sept. 2016 | Sept. 2046 | 6.05% | 3M LIBOR |

STEINHOLT_0010446

8

## Anadarko Petroleum Corporation
## Reconciliation of Divestiture-Adjusted Sales Volumes

**Average Daily Sales Volumes**

| | Natural Gas MMcf/d | Crude Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d |
|---|---|---|---|---|
| **Quarter Ended March 31, 2014** | | | | |
| U.S. Onshore | 2,396 | 112 | 92 | 604 |
| Deepwater Gulf of Mexico | 275 | 46 | 6 | 98 |
| International and Alaska | — | 87 | — | 87 |
| Divestiture-Adjusted Sales | 2,671 | 245 | 98 | 789 |
| China, Pinedale/Jonah and EOR | 26 | 25 | 1 | 30 |
| Total | 2,697 | 270 | 99 | 819 |
| **Quarter Ended June 30, 2014** | | | | |
| U.S. Onshore | 2,443 | 134 | 113 | 655 |
| Deepwater Gulf of Mexico | 176 | 41 | 6 | 76 |
| International and Alaska | — | 101 | 1 | 102 |
| Divestiture-Adjusted Sales | 2,619 | 276 | 120 | 833 |
| China, Pinedale/Jonah and EOR | 1 | 15 | — | 15 |
| Total | 2,620 | 291 | 120 | 848 |
| **Quarter Ended Sept. 30, 2014** | | | | |
| U.S. Onshore | 2,339 | 145 | 124 | 659 |
| Deepwater Gulf of Mexico | 154 | 46 | 5 | 77 |
| International and Alaska | — | 98 | 1 | 99 |
| Divestiture-Adjusted Sales | 2,493 | 289 | 130 | 835 |
| China, Pinedale/Jonah and EOR | 1 | 14 | — | 14 |
| Total | 2,494 | 303 | 130 | 849 |
| **Quarter Ended Dec. 31, 2014** | | | | |
| U.S. Onshore | 2,369 | 151 | 113 | 659 |
| Deepwater Gulf of Mexico | 179 | 47 | 6 | 83 |
| International and Alaska | — | 88 | 10 | 98 |
| Divestiture-Adjusted Sales | 2,548 | 286 | 129 | 840 |
| China, Pinedale/Jonah and EOR | 1 | 14 | — | 14 |
| Total | 2,549 | 300 | 129 | 854 |
| **Year Ended Dec. 31, 2014** | | | | |
| U.S. Onshore | 2,386 | 136 | 111 | 644 |
| Deepwater Gulf of Mexico | 196 | 45 | 5 | 83 |
| International and Alaska | — | 94 | 3 | 97 |
| Divestiture-Adjusted Sales | 2,582 | 275 | 119 | 824 |
| China, Pinedale/Jonah and EOR | 7 | 17 | — | 19 |
| Total | 2,589 | 292 | 119 | 843 |

Note: EOR transaction pending

STEINHOLT_0010447

# Exhibit 70

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

APC - Anadarko Petroleum Corp 2015 Capital Program and Guidance Call

EVENT DATE/TIME: MARCH 03, 2015 / 2:00PM GMT

OVERVIEW:

APC provided an update on its 2015 capital program and guidance.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited
without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its
affiliated companies.



## CORPORATE PARTICIPANTS

**John Colglazier** *Anadarko Petroleum Corporation - VP of IR and Communications*

**Al Walker** *Anadarko Petroleum Corporation - Chairman, President & CEO*

**Bob Gwin** *Anadarko Petroleum Corporation - EVP of Finance & CFO*

**Chuck Meloy** *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

**Jim Kleckner** *Anadarko Petroleum Corporation - EVP of International and Deepwater Operations*

**Bob Daniels** *Anadarko Petroleum Corporation - EVP of International and Deepwater Exploration*

## CONFERENCE CALL PARTICIPANTS

**Doug Leggate** *BofA Merrill Lynch - Analyst*

**Brian Singer** *Goldman Sachs - Analyst*

**Subash Chandra** *Guggenheim - Analyst*

**Paul Sankey** *Wolfe Research - Analyst*

**Charles Meade** *Johnson Rice & Company - Analyst*

**Jeffrey Lambujon** *Tudor, Pickering, Holt & Company - Analyst*

**John Herrlin** *Societe Generale - Analyst*

**David Heikkinen** *Heikkinen Energy Advisors - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the APC 2015 capital program and guidance conference call.

(Operator Instructions)

I would now like to turn the conference over to your host for today, to Mr. John Colglazier. You may begin. Sir, you may begin. Your line is open.

---

**John Colglazier** - *Anadarko Petroleum Corporation - VP of IR and Communications*

Where we are discussing our portfolio guidance and key metrics. Over the next hour or so, our executives will provide a review of our deep portfolio, and discuss the decisions and actions taken in the current environment to preserve value and position ourselves for the future. At the end of the presentation, our executive team will be available to take your questions. In a few minutes, I'll turn the call over to Al Walker.

But first, I need to remind you that today's presentation includes forward-looking statements and certain non-GAAP financial measures. And there are a number of factors which could cause actual results to differ materially from what we discuss today. We encourage you to read our full disclosure on forward-looking statements, and the GAAP reconciliations, located on our website and attached to this morning's earnings release -- or news release. With that, I'll turn the call over to Al.

---

2


THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

CONFIDENTIAL

APC-00868401

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thank you, John, and good morning. I would like to thank everyone for taking the time to join us this morning. A few weeks ago, during our earnings call, we discussed our outstanding operating results for 2014. I talked briefly about the outlook for the coming year, and what this means for Anadarko. Today, we look forward to sharing our strategy, objectives, tactics, preserving value and positioning APC for differentiated success in the future. As many of you appreciate, we design our portfolio and capital allocation process to provide strong growth during periods of attractive well economics, and resiliency during those times when our commodity prices and service calls are [outstanding].

Our operating results for the last five years demonstrate we can deliver very attractive growth when our capital can be deployed, the market environment where we expect rates of returns for this objective. And we believe we can distinguish ourselves through the opportunities we see in the current challenging environment, much like we did not so long ago, in late 2008 into 2009. If anything, we understand our industry is cyclical, and our Company and management team have successfully managed downturns before. This time, Anadarko is even in a better position to do so again.

We believe our geographic diversity of our assets, the enhancements we make to our liquids product, and our differentiating approach to capital allocation and portfolio management, really sets us apart. As you can see, the five-year track record is pretty substantial. I have made reference to our successful record in the past, and you can see in the graphic our results support the confidence I've expressed. Our employees have done an incredible job focusing on our objectives and goals and then delivering. I'm proud to say we have consistently met or exceeded each one.

Exceeding 5% to 7% compounded annual growth, exceeding greatly the significant free cash flow objectives we set for ourselves, consistently replacing more than 160% of production at very competitive cost, and continuing exploration success that ranks among the most elite in our business. Throughout this process, we've never been shy about accelerating value when the opportunity is right, monetizing well over $12 billion of value. Our portfolio provides many advantages. In particular, the balance between unconventional and large-scale conventional oil projects in the Deepwater and international.

One of these advantages to our portfolio is a lower inherent base decline of less than 20% that results in lower maintenance capital requirements. Consider the last five years, where we significantly increased our growth, particularly in short cycle oil volumes, continued funding of our longer dated activities, and generated strong free cash flow in each year. In 2015, we estimate maintenance capital to be a little more than $3 billion, which assumes very little in the way of service cost reductions. While we expect service cost will eventually sync up with commodities, we have not assume this to be material in 2015, and expect this impact will more likely be evident in the full-year results of 2016.

This advantage allows flexibility in our capital structure, and allocation of capital, to accelerate short cycle growth in the United States onshore when costs better aligned with commodity prices. Our top-tier activation cost enables tremendous growth, with every $1 billion of growth capital providing almost 35,000 Boe per day in the current growth year. Beyond the depth and the quality of our portfolio and proven track record, a key differentiator for us is our approach to capital allocation. First and foremost, when it comes to allocating capital, we grow organically versus acquisitions. We'll continue to fund long cycle exploration, as we believe this creates tremendous option value for our Company.

Because of our exploration success, we've created an enviable pipeline, adding much in the way of value-added time margin assets with our Deepwater and international projects. Anadarko's US onshore success, and future opportunities, have the ability to flex our capital allocations to preserve or accelerate value. This, of course, depends on well head economics, and Chuck will talk more about this in a few minutes, as we (inaudible) to many of our US assets. I'd like to point out, year over year, our US onshore grew from a base of 565,000 Boe per day in 2013, to more than 657,000 Boe in 2014. That's more than 90,000 Boe of growth, for less than $6 billion, on a divestiture adjusted basis.

This commercial focus sets us apart, and solidifies our position among those capital efficient allocators in the business. We will also establish a competitive edge in a number of other areas: exploration, appraisal and exploitation. Our industry-leading exploration and appraisal success has delivered more than 4 billion Boe of net risk resources to the Company in the last five years, which does not include significant Wattenberg [un-booked] upside, and emerging Wolfcamp shale in the Delaware Basin, just to name a few. Project management has always been one of the most important things we been able to achieve at Anadarko.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us



©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

Our track record of speed and efficiency, and significant value, versus others in the industry, with industry-leading capability, was once again evident by achieving first oil at Lucius just three years from sanction, which you will hear more about this morning. Our ministry. Controlling evacuation and infrastructure are keys to maximizing value of our production. It also facilitates growth, as you can see in our unmatched results at the Wattenberg last year, and will again in the Delaware, as we begin loading that spring in very much the same way. It also ensures our ability to maximize margins, which creates tremendous value through both WES and WGP, which currently has a market value to APC of around $12 billion.

Our mineral interests. The benefits are immense, and even more magnified in today's environment, both in terms of value uplift, capital efficiency and knowledge. I can't think of another company that manages its portfolio the way we do. We have been more proactive in our approach to portfolio management than any company in our industry for the last 10 years, and you can see in the graphic, we've been act managers for the last five years, so delivering the strong operating results, as seen in this graphic. We leverage our exploration through farm-outs, and carries utilizing third-party money, and we do this with our assets, as well. Capital efficient, tax efficient, carried interest on both onshore and offshore, are keys to our success.

These [grids] have enabled us to reduce capital obligations and execution risk, while significantly enhancing project returns. They also provide additional flexibility to reallocate capital to short cycle growth opportunities. Another tactical aspect of our philosophy is the continued high grade of the portfolio. Identifying those opportunities where we see limited growth or value in our equity story. The $12.5 billion of monetization shown in this graphic does not include the more than $3 billion we've received in cash from WES and WGP. You should expect this to continue accelerating value through an active portfolio management.

We have shown, the last five years, we can be very, very good on offense. And we are demonstrating the same tenacity, as we transition to the opportunities the current environment affords us. You'll hear from our executive team this morning, as we discuss the areas of responsibility -- through the areas of their responsibilities, and we have [built] the financial capacity and the work ethic to create value in this very difficult market. We methodically built a portfolio that has tremendous option value and durability. And when commodity prices once again sneak up in cost, we look forward to playing the type of offense we did the last five years, and doing it well. As demonstrated in 2014, our portfolio is capable of tremendous growth.

However, we don't see value in chasing growth in this environment, which is why we are choosing to preserve value over the longer-term. We view our capital allocation process as dynamic. As such, we will slow our growth by reducing our operating rig count. We will differ about 125 completions until costs align with revenues. We will be judicious with capital allocation and economic (inaudible) recover ethane to maximize revenues. This capital allocation results in a strong year-over-year 5% growth and higher value oil volumes. And we believe we are conservative in only embedding cost savings and reductions which we have realized in the first two months of this year.

Just a quick additional note on this slide. A lot of folks have been trying to figure out what our 2015 exit rate will be. And though we expect to be slightly down year over year, the decrease will be comprised of lower margin gas and lower ethane volumes. Our exit rate for oil volumes are anticipated to be relatively flat with the fourth quarter of last year. Regardless of commodity prices, our objectives have always been to be a better company, not necessarily a bigger company. As I wrap up, and before handing off to Bob Gwin, I want to express the confidence that we have in all the things I've mentioned.

We're making the right decisions at the right time to maintain flexibility and preserve value. This environment is changing, and it's challenging. We also think it affords us lots of opportunities, which is why we're going into this with our eyes wide open, and be very focused. Past cycles have shown these are times when companies can differentiate and create value for their shareholders. We're confident we can do that. Bob?

---

**Bob Gwin** - *Anadarko Petroleum Corporation - EVP of Finance & CFO*

Thanks, Al. Good morning, everybody. I'm going to build upon some of Al's comments this morning. I wanted to start off taking a look at the financial position. We finished last year, 2014, in a very strong place, with $7.4 billion of cash on the balance sheet. And as many of you know, we made the payments, the $5.2 billion payment on the Tronox settlement. And with that, and the announced asset sale this morning, we're still going to have approximately $3 billion of cash on a pro forma basis.

4

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Then beyond this cash position, we have a lot of additional liquidity. We have new -- $5 billion of new credit facilities, and a new commercial paper program in place, as afforded to us by our stronger credit ratings. You can see the credit ratings to the right. On a pro forma basis, our net debt-to-cap ratio has been a targeted range. And these -- the upgrade of Moody's in February puts us in a position where these were our strongest credit ratings in over nine years. Our focus on portfolio management and monetizing assets has been a key part of our financial strategy for several years.

And as Al mentioned, we continue that execution into 2015, with over $700 million of divestitures that we've announced this morning. And if you look at this, along with our anticipated cash flows, our 2015 capital program that Al has just announced is fully funded without stretching the balance sheet. I think the key takeaway from this slide is that, with our cash flow, our liquidity, and our ability to monetize assets, Anadarko's 2015 capital program is fully funded. And I want to make it clear that we have no need or plans to access the capital markets this year. We believe we are very well-positioned to manage through the commodity price downturn, even if it becomes protracted.

I'd also like to take a minute to talk about Western Gas and WGP, which are our sponsored MLP. These continue to be fantastic value creators for APC, and for the shareholders and unit holders of all three of these entities. WES's finances its activities independently, through its own debt and equity issuances, which are of course non-dilutive equity issuances to APC's shareholders. And it supports APC's competitive advantage in midstream that Al highlighted, through substantial capital investment. Last year, for instance, WES spent over $725 million on midstream expansion, while APC spent around $350 million.

WES's spending can be organic, like the construction and expansion of the Lancaster facilities, which support the growth in the Wattenberg field. Or they can be opportunistic, like the acquisition of Nuevo Midstream late last year, which will provide a backbone to support future APC Wolfcamp growth that Chuck will talk about momentarily. Beyond the capital that WES invests, through 2014, the MLPs have returned more than $3 billion of cash to APC since the IPO of WES, back in 2008. You can see, in the graphic at the bottom of the page, that this has been through asset sales and distributions that have increased to APC over time.

And last year, through the first sale by APC of some of its position in WGP securities, of which we still own over 88%. And as Al mentioned, importantly, APC owns more than $12 billion of marketable securities, primarily in WGP and some in WES. That, today, is more than a quarter of APC's entire market cap, so it is indeed substantial value, and the model is poised to continue well into the future. So turn to the next slide 17 here, we think the appropriate way to look at the trading value of APC's EMP business is to exclude the WGP and WES value. We've done that on this slide.

Now, the analysis was originally performed by Heikkinen Energy Advisors, and it considered the impact of hedges as part of the enterprise value, and not EBITDA, for evaluation purposes. As you can see, Anadarko's unhedged EBITDA multiple is about the same as the median of the large-cap universe. However, when you appropriately excluded WES and WGP from the calculation, on the far right, Anadarko's trading at more than a one turn discount to its peers, on an apples to apples basis.

So clearly, as you can see on this slide, and the earlier one that showed leverage, both pre and after excluding WES and WGP, in order to properly consider APC relative to its peers, the effects of the successful MLP model need to be removed from the consolidated number, both from an equity and a debt perspective, to get a clear view of how Anadarko compares on an apples to apples basis. In summary, financial discipline has been one of the planks of our strategy for several years. We've strengthened our balance sheet through disciplined capital management for several years, across various market cycles.

We remain committed to preserving that strength and maintaining our solidly investment grade credit ratings. And we have the liquidity and the flexibility to manage through uncertainties like the industry is currently facing. We're going to continue to seek opportunities to enhance value, including evaluating strategic opportunities when they are available to us. And we're going to continue to focus on managing the Company's balance sheet in a responsible and long-term way. Chuck Meloy is here next, to talk about our US onshore business, and I'll be available at the end of the call to answer any questions on my slides. Chuck?

--------------------------------------------------------------------------------

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Thank you, Bob. Listed are the key elements of our 2015 operations play book. I'm very proud of the 2014 results, and our drive to continuously improve all elements of our business. And our safety record reflects our commitments to doing it right. Over the last few years, based upon our

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

APC-00868404

exploration success in the US shales, we built a very large production base in quality assets. This year, we intend to wring the value out of that base production, by leveraging our field engineering teams, our operations technologies, and our integrated business approach.

We maintain the ability to adjust our activities to the commodity markets, either up or down. One of our significant deliverables this year will be to build a foundation for the Wolfcamp to be a major growth -- for Anadarko into the future. I've also listed some of the key elements and competitive advantages of our integrated business approach. And we will speak to most of these, as we move through this presentation. During this portion of the cycle, it has been my experience that flexibility is at a premium. We will be reducing our rig count by 40% during 2015, as compared to the 2014 activities.

As we enter 2015, our contract flexibility shown on the graph will provide us with the capability to accomplish this goal. In addition, we will also defer approximately 125 completions, as Al mentioned. This will leave us with roughly 420 to 440 drilled, but not completed, wells when we exit 2015. This inventory of drilled but not completed wells offers us an opportunity to flex our program, commensurate with the service and commodity markets throughout the year. Our CapEx allocation will continue to be Wattenberg-centric, investing roughly $1.8 billion of the total $3.8 billion in the Wattenberg field.

Although we will invest at a reduced level in the Eagle Ford and the Wolfcamp, as compared to 2014, we will still meet our strategic objectives for these particular assets. We will round out the program with investments in East Texas, midstream and exploration. As I mentioned, the Wattenberg field continues to be one of the more attractive investments in our portfolio, due to its royalty advantage, economies of scale, infrastructure advantage, and a large, high-quality inventory. A brief second to do a shout out, for our team has given this asset a growth rate of greater than 15,000 barrels a quarter during 2014. And as you know, most of that growth was liquids.

This year, we plan to drill roughly 280 Company-operated wells, while averaging eight to nine rigs. We plan to execute about 40% of our completions in the first quarter, and will defer roughly 70 completions out of 2015. This field is a great example of CapEx efficiency, as our drilling footage per rig is about 25% greater now than in 2013, and we see the potential for additional gains in 2015. Currently, market conditions encourage ethane rejections equaling almost 25,000 barrels equivalent per day, just at Wattenberg alone. The combination of fewer rigs, deferring completions, and ethane rejection will slow the growth to roughly 25% year over year, for just the horizontal programs, while still delivering quality economics.

With our competitive infrastructure, we hold the option to flex this plan up or down, depending upon market conditions. 2014 marked the year our teams pushed ahead of the production growth, with significant infrastructure projects. They included the 300 million a day Lancaster I processing plant, expanding the NGL and oil takeaway capacity, and other significant field projects that increased our compression capacity. You can really see the benefit of these projects in the 2014 production growth, as I mentioned in the previous slide. We will follow up this year with more field-level gathering and compression facilities, an oil handling and stabilization facility, and another 300 million cubic feet per day at Lancaster II gas plant.

This should give us the head room on capacity, should the market conditions suggest we should increase our drilling and/or our completion base. Collectively, all of these projects have put us in a really good spot to deliver the immense value this field has to offer. So let's move on to the Delaware Basin. The title of the slide is reflective of what we see in the Delaware. It's big. A game changing asset, with over 1 billion net resource potential added to our corporate mid-cycle portfolio bucket. Our sales and industry have aggressively delineated this play, with approximately 160 rigs running in the basin last year, the lion's share of which were directed at the Wolfcamp.

With over 1 billion barrels net resource of potential, our job this year is to use our proven approach to set this asset up for tremendous growth in the future. We have learned a considerable amount about the Wolfcamp over the last 12 months or so, and feel comfortable with at least four of the benches offering commercial value. We see EURs increasing from East to West, but liquid recoveries increasing from West to East. The early production data implies that there will be 1 million barrel EUR levels in the field. Truly amazing. We will continue to optimize our completions, as we have seen rather dramatic improvements, as we fine-tune the Wolfcamp recipe, while conservatively flowing these wells.

We're very fortunate to have a 600,000 gross acreage position, right in the heart of this oil-rich play, with very low entry cost. We have benefited from our extensive operating infrastructure position in the basin, and as you can see in the graphic, the gathering production and process facilities almost overlap all of our acreage position, which provide a significant commercial advantage. You can trace those facilities from Northwest, where

6


THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868405

the Nuevo plant is located, extensive pipeline infrastructure, shown in red, which is the gas gathering system, all the way down to the Southeast corner, where we have our [bonus] plant.

We've also established connectivity with key markets, which should deliver the best available net-backs for our products. Having this footprint, this early in the game, will deliver significant operational synergies, and will enable the project to deliver its maximum value potential. You might recognize this approach from our very successful execution model that we've done in the Wattenberg field. As I mentioned, with multiple ventures in the Wolfcamp, with 1 billion barrels net resources, and a great head start of enabling infrastructure, we will be pressing ahead with the design and implementation of our field development plan.

Our drilling focus will be on gathering critical information, while meeting our leasehold earning commitments. We should average roughly six rigs for 2015. Our current long-range plan is to have multiple staggered laterals in two to four benches, with high intensity completion technology. We're still working through the early time data, and the production information from our delineation spacing data, and will likely make some decisions on the ultimate development plan during the next 12 to 18 months. With a lot of work to do -- we still have a lot of work to do. But I'm very excited about what this asset will mean to Anadarko, for a long time to come.

Moving on to the Eagle Ford. We recently reached a remarkable production milestone of 0.25 million gross processed barrels of oil equivalent per day, including over 100,000 barrels of oil equivalent per day. This puts us among the lead producers in the southwestern portion of the play. This growth was achieved in just five years of field life, truly a remarkable accomplishment. A few of the other accomplishments of our Eagle Ford team was a record low average drilling cost of $89 a foot in the fourth quarter of 2014. A record well in 4.5 days, from spud to rig release.

We fracked over 6,700 stages during the year. Recycled almost 1 million barrels of water, and installed over 300 artificial [lift] installations. These milestones, and many others, deserve a shout out to our team, the service providers that have worked tirelessly to move this asset forward. Great job, folks. Improvements in completion technology designs have continued to improve the CapEx efficiency of the wells, as you can see the value uplift from 2013 to 2014, on a constant price basis.

Our 2015 program will be roughly half of the 2014 program, focusing on taking advantage of the infrastructure, efficiencies and scale we've created. This map, shown on the slide, illustrates the extensive infrastructure we have deployed in our Eagle Ford assets. You've heard me mention the criticality of infrastructure with each asset, so I want to emphasize the reason we put so much focus on it. A robust infrastructure position reduces [disrupt] traffic and its associated costs, spills, flaring, emissions and overall lifecycle cost, while increasing the safety performance, the runtime, the market flexibility, and the underlying asset value.

Our Eagle Ford position, and the many milestones I mentioned earlier, are a testimony to the integrated business approach we discussed at the beginning of this presentation. So in summary, we put together a top-tier portfolio, including marquee assets in three major horizontal oil shale plays, and two horizontal shale gas plays. We focused on growing our liquids production, and we have really seen the benefit in our realizations on improving our capital efficiency and lifted cost through the last few years. As Al mentioned, 2014 was a landmark year for our business.

It was led by the horizontal Wattenberg program. You can see the amazing growth we generated in 2014 in the table shown here. In 2015, we're going to align our CapEx program with the market realities, grow our liquids year over year while letting our gas volumes decline, all the while holding the options to flex up or down with actual market conditions. Clearly, the growth will come from the three key oily horizontal plays we discussed in detail today. And the hard work of all of our teams, and all of our assets, as we execute our 2015 play book. Thank you for your time, and now I'll pass the podium to Jim Kleckner.

**Jim Kleckner** - *Anadarko Petroleum Corporation - EVP of International and Deepwater Operations*

Chuck provided a good overview of our onshore properties in the lower 48, and I'll cover operations in our international and Deepwater areas. This assets are high-margin, high-quality oil producers. And because of the commercial approach used in our exploration and development process, provide good returns at current commodity prices. Net production of over 180,000 barrels oil equivalent a day expected this year from our fields onshore in Algeria and Alaska, and the deep waters of Ghana and the Gulf of Mexico. The majority of these assets have low decline rates, low operating costs and low maintenance capital requirements.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Our expertise in project management enables us to move our exploration discoveries through appraisal and development quickly and efficiently. And as a result, we will grow our liquid volumes this year and beyond, with two new mega projects scheduled to come online in 2016. Our expectation for capital spend is $1.4 billion this year, and will be focused primarily in high-margin [uphold] properties. And we continually focus on improving performance. Whether it be drilling challenging wells, or building and operating large facilities installed in remote environments, we strive to do it safely and with care and protection of the environment. We also strive to develop these projects quickly and efficiently, to maximize value, and use benchmarking studies to measure our progress.

The independent project analysis groups provides benchmarking services, and has data on more than 1,400 development projects worldwide. 2014 data has been released from IPA. And again, our teams have delivered projects that outperform industry norms on both schedule and capital efficiency. This was accomplished on multiple fronts, and includes developing appraisal strategy that allow a rapid determination of resource size, standardizing technology and equipment that allow us to leverage inventory and skills of our employees and service providers, and strict adherence to disciplined project management.

As you can see on the bottom chart, the Lucius and Heidelberg developments will achieve first production, on average, of just six years from discovery. That is 40% faster than recent and comparative Deepwater development projects in the Gulf of Mexico. There are several projects in various stages of development, and I will go into more detail about them in the upcoming slides. In each case, we're building on previous experience to evaluate resources more efficiently, and utilize development solutions that have proven track records. As you are aware, Lucius came online in January, and is ramping up to full capacity over the next several weeks.

Development drilling continues at our Caesar/Tonga fields, where we have just completed our fifth well, and it is online and flowing. And we are moving towards partnership approval of the second phase of field development, which envisions another four to five wells. These wells are tied back subsea to the Constitution Spar. Infrastructure is in place, so development costs of this space, too, would be relatively low. Heidelberg is the twin to the Lucius spar hole and topside facility, and is a testament to staying with proven design concepts and service providers to eliminate execution risk.

Our experience in Deepwater development, and construction and operations of large facilities, are a good fit for the challenges of the LNG project in Mozambique. We have a history of delivering high-value growth opportunities across the globe, with projects that deliver significant volumes and cash flow. As you can see from the projects highlighted in the upper right, growth has been consistent, and will be so for many years to come. This represents projects in various stages of development, and does not include potential growth from recent discoveries like Shenandoah or Paon or Phobos. We continue to look for ways to accelerate value and leverage our capital investments.

And at Lucius and Heidelberg, value was brought forward by obtaining a carry and development capital, for exchange of working interest. And in Mozambique, we sold the 10% working interest, which collectively accelerated over $3.5 billion of value. I think this is a great illustration of the cash flow generated from our commercial approach to development, and our track record of delivering mega-projects on schedule and within budget. As I mentioned, we achieved first production at Lucius just six weeks ago. This is three years from sanction, and five years from discovery.

And I'd like to congratulate all of our people, and the providers that enabled this project to go forward successfully. It's a job very, very well done. Today, Lucius is flowing at about 35,000 barrels a day, at 43 million cubic feet a day, and will ramp to over 80,000 barrels a day in the next several weeks. The field has six additional wells, which have been drilled, five of which have been completed and tested at rates between 10,000 and 15,000 barrels a day. The wells are completed in the Pliocene with great porosities and permeabilities, and as such, they a very minimal draw down. In fact, they of some of the largest productivity indexes that we've seen through many of our wells in the Gulf of Mexico.

Now, having the facility, and the gas and the oil export lines, gives us first mover advantage in the area. And the partnership assigned process handling agreements for tie backs to the Lucius spar on the South Hadrian, Buckskin and Moccasin fields. These are great value adds, and revenue from the PHAs will recover almost twice the cost of the spar hole and the top sides. In addition, we exchanged a 7.2% working interest in the field for a capital carry of over $550 million, and that established an asset value for Anadarko's interest, at the time, of over $2.7 billion. Payout for our invested capital is anticipated in less than one year from first production.

8


THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

CONFIDENTIAL

APC-00868407

Lucius is great asset, and will generate substantial free cash flow for the years to come. Heidelberg is located in the Green Canyon area south of Caesar/Tonga, in the Constitution spar. The project is on target to deliver first oil in mid-2016, which is, again, only three years from sanction. Construction of the spar hull will begin at the Technip [Bjorn] in Pori, Finland, in late 2012. The hull was transported to Ingleside, Texas, where it is being readied for tow-out and site installation in the coming months. The top sides are being fabricated at Kiewit Offshore Services, at Ingleside, as well, and are about 75% complete. And they are scheduled for installation atop the spar hull later this year.

Development drilling began last year, and we currently have two rigs in the field that will drill a total of six wells in the subsoil Pliocene. And similar to Lucius, we were able to leverage the quality of this project with our higher working interest to obtain capital carry. In exchange for 12 3/4 working interest with Marubeni provided the capital carry of about $860 million. And this established an asset value for Anadarko's interest at the time of $3 billion. Now moving to West Africa, the Jubilee field in Ghana continues to produce at over 100,000 barrels a day. The field has surpassed 125 million barrels cumulative production since starting in 2010.

Gas export to onshore markets in Ghana commenced last quarter, which will enable higher oil production rates in the future, as the producing GR is reduced. We've seen recent production rates as high as 110,000 barrels of oil a day, after successful well asset jobs earlier this year. Work is also underway on debottlenecking projects to reduce gas constraints, and design work is progressing for expanding oil throughput, as expected to further with feed studies in the first half of this year. Jubilee partners plan to submit full field development plans for the Mahogany, Teak and Akasa discoveries to the government of Ghana, at mid-part of this year, as well.

Now adjacent to the Jubilee field are the Tweneboa and Enyenra and Ntomme fields. And these refer to the TEN developments, and like Jubilee, we will use an FPSO size for 80,000 barrels a day to bring this field online in 2016. TEN is expected to bring similar high-margin premium crude oil, like Jubilee. The project has reached the halfway milestone at the end of last year, as achieving cost and schedule expectations. The first 10 wells have been drilled, with results meeting expectations. The installations of subsea infrastructure equipment is expected to begin in midyear.

Algeria, as a core asset in the portfolio, continues to be a strong performer. We initiated production in 1998, and should surpass 2 billion barrels of fuel to production later this year. Our Algerian assets are the largest free cash flow producing assets in the Company, and last year, generated over $1.8 billion of EBITDA. The net production records we set last quarter, as El Merk reached plateau rates, and we exited the year producing approximately 400,000 barrels a day gross production from HBNS, Aru and El Merk fields.

All these fields are characterized by high quality reservoirs, with low operating costs and low maintenance capital requirements. They are outstanding assets. We have delivered three world-class projects in the middle of the Sahara desert, with our El Merk project coming in on budget, with production reserves meeting expectations. Mozambique is a phenomenal value creation opportunity that will create a world-class competitive global LNG supply source. With over 1 million acres, we have discovered 75 Tcf of gross recoverable resources. And our approach is to build an initial development of two LNG trains at 10 million tonnes per annum, and make the facility scalable to over 50 million tonnes per annum.

Several factors give this project cost advantage against other developments. First, the gas is close to shore. Second, there is a natural protected harbor. Third, the reservoir is extremely high-quality. We've had wells out here tested over 100 million cubic feet a day, with excellent connectivity to the main reservoir bodies, allowing us to drill fewer wells. Because the reservoir performance is so good, we are not anticipating the need for offshore compression, and we are progressing a subsea to shore development, which will enable enormous savings, not having to install an offshore platform for compression.

And fourth is our East African location. We've got great proximity to premium Asian markets, which is an important cost consideration, when you think about delivered cost of LNG. We're working with our partnerships, and the government of Mozambique, to bring the first train of LNG to market in 2019. Over the past year, we have advanced key aspects of the project to the point where we have created an ability to begin construction later in 2015. The pace of this is now dependent on getting the remaining government approvals and agreements that are needed. We have made great progress.

Enough reserves have been certified to justify an initial two LNG trains. A decree law was gazetted, which was a very strong signal from the Mozambican government of support for the development of an LNG industry. Competitive feeds for both onshore liquefaction and offshore

9

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868408

gathering systems are now complete, and the [contractor] decision is pending. We have strong support from the Pacific markets, with over 8 million tonnes per annum of non-binding HOAs. And finally, we have received indications of funding commitment for 60% of the required project financing.

So our exploration success, coupled with project management expertise, has created a pipeline of high-quality investment opportunities, through being developed, and will deliver long-life, high-margin oil production for years to come. We have seen good success in the past in the Jubilee, Caesar/Tonga and El Merk fields, and are realizing the ramp-up of production volumes from the Lucius development. We're currently bringing our expertise, our energy and our focus to bear again on the Heidelberg and in Mozambique projects, and are working with our exploration teams to move the next generation of opportunities through appraisal and commercialization.

I'll be happy to take questions later on, but at this point, I will turn it over to Bob Daniels.

-------------------------------------------------------------------------------------------------------------------------------------------------------

**Bob Daniels** - *Anadarko Petroleum Corporation - EVP of International and Deepwater Exploration*

Thanks, Jim, and good morning, everyone. I've talked before about our proven exploration strategy that has yielded an impressive five-year track record. We've delivered over 65% Deepwater success. That's about a 50% uplift over the industry, during that time frame. And over 4 billion barrels of oil equivalent of net discovered resources for the Company. Our strategy is very consistent. We focus on our strengths, as I've mentioned before, Deepwater globally, [plastic] systems that we can take advantage of our seismic imaging expertise.

We base all our decisions on our portfolio, where our opportunities are evaluated against each other. Our risk assessment is very rigorous and consistent, and we're always focused on value creation. We tend to get in early, at a low cost. Examples would be Ghana, Mozambique, some of our Gulf of Mexico plays, now Colombia. We optimize our working interest, and use commercial leverage very effectively. You'll see more of this later. But this mitigates risk, with manages our capital exposure and enhances our returns.

I can't say enough about the talented oil finder we have here at Anadarko. We have a culture of creativity, built on a petroleum system foundation. And we use the appropriate technology application to solve problems. That's the key thing. We look at what problems we have, and what technologies are available to us, and utilize that. So we discover and we advance our discoveries very quickly, as Jim mentioned. The track record of success goes back farther than five years, though. Since 2007, we've had at least one of the top 10 Deepwater discoveries in the world each year, something we're extremely proud of, and speaks to the talent and dedication of our exploration team.

But a successful track record is only significant if it yields value. Let's look at our 10 year value creation scorecard. Since 2005, we have invested $10 billion of capital in exploration. That has yielded 6.5 billion barrels of oil equivalent of net discovered resources. This has paid for our exploration program, and returned cash to Anadarko. Meanwhile, we have monetized part of that for $13 billion, and that's what has paid for our exploration program.

That's -- we did that through farm-outs, sold interests, or sold out. And yet, we retained over 5 billion barrels of oil equivalent resources for the Company, of which 250,000 barrels of oil equivalent per day is producing now. And the value creation continued in 2014, with discoveries in Mozambique. Once we discover things, we drive value realization through successful appraising, as shown in the chart. Or best-in-class developments, such as what Jim was talking about at Lucius, where we had first oil in 2014, and the Heidelberg 10 coming on in 2016, the advancement in Mozambique.

Or value realizing monetization, such as what we did at Mozambique, where we sold 10% gross interest. Or our non-operated discovery veto in the Gulf of Mexico. This is what we do, and it's a great example of driving value creation and creating tremendous optionality for Anadarko. It's also a great measure of the success of our strategy. Consistent with this, we advanced a lot of value-adding activities in 2014, all very consistent with our strategy. We leveraged our success. We utilized about $200 million of funding other people's money through farm-outs, again managing our capital, mitigating our risk and enhancing our portfolio value.

We closed over $3 billion of monetizations, as mentioned before. The non-operative veto prospect in the Gulf of Mexico and Mozambique. We delivered 200 million barrels of net discovered resources to the Company. We doubled our acreage position in Deepwater Colombia, exposing us

10


THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

CONFIDENTIAL

APC-00868409

to numerous play types and significant potential. We had more exploration success at Tubarao Tigre in Mozambique. We had a successful appraisal in Mozambique, and the Gulf of Mexico at Shenandoah, and Cote d'Ivoire at the Paon discovery. And we're starting fast in 2015.

We're drilling in the Gulf of Mexico at our Yeti prospect, a Miocene subsalt target, south of Big Foot. In Colombia, we've spud our first play opening opportunity at Kronos, and are drilling as we speak. And in Mozambique, we successfully completed our Deepwater exploration program. All of our discoveries have been appraised, and we've handed over the entire Deepwater to our operations team. This truly is an active start to what looks to be an exciting 2015 exploration program. Let's look in the details of the 2015 international and Deepwater investment plans.

If you look at the bar chart on the right, we are anticipating about $600 million of capital to be invested in exploration in 2015. About 80% of that will be focused on drilling activities, and the rest will be G&G, which will be large 3-Ds for future opportunities. Our drilling will be focused in Deepwater Americas and Africa. The majority of the wells will be improvement plays, with running room, such as Gulf of Mexico, Cote d'Ivoire or East Africa. And we've got two wells in Colombia, a frontier Deepwater basin, where we have multiple play types and 16 million acres controlled. We also will be acquiring seismic data in New Zealand, and on our new acreage in Colombia, which will set us up for the future.

So the $600 million of investment sets us up for the future with the 3-Ds, allows for 9 to 12 gross exploration and appraisal wells, and targets over 700 million barrels of oil equivalent mean net discovered resources, so a very significant program. Let's look at some more details of a couple of our focus areas, starting in the Deepwater Gulf of Mexico. We're excited about the advancement of Shenandoah. We pushed down dip on Shenandoah-3, searching for the oil/water contact, looking for reservoir continuity and quality, and to get a core in the down dip portions of the reservoir.

This was a very successful appraisal well. In 2015, we will drill Northwest of the Shenandoah number 2 well, with our Shenandoah-4. This will be to extend the field to the West, and up dip, and to obtain a core in the oil lag for our development plannings. Meanwhile, we're also drilling, as I mentioned, at Yeti, which is a Miocene three-way located beneath salt, in a very good neighborhood that we understand. You can see Big Foot to the North, which is producing, and Cascade to the South. And of course, you might remember that we were involved in the original Big Foot discovery, prior to monetizing that asset.

We will follow this up with a prospect called Thorvald in the Gulf of Mexico, again, a subsalt three-way. We also have, in the eastern Gulf of Mexico, a prospect called Opal, an unconfined Miocene fan play, which could be a play opener for the industry. And we have a significant position out there. And then also, we have potential appraisal work at Phobos this year, to understand what we have, and to plan for potential development solutions. Turning to the international, Deepwater exploration, in Cote d'Ivoire, we're advancing toward commerciality at our Paon discovery.

We drilled two wells last year that were very successful. And in 2015, we're planning an appraisal well and a DST, which will test for deliver-ability of the reservoir system, and we will have pressure monitoring in the existing wells, to look for continuity. Colombia, as I mentioned, we have drilling underway. Kronos, which is in the southern portion of our acreage position, is a large three-way structure, and that's drilling as we speak. We will move, after that, to Calasu, a large four-way in the northern portion of the Fuerte blocks, which is a multi-zone four-way structure. We have top-set that, and we will finish as soon as we're done with Kronos.

In the Grand Col area to the north and east of the drilling areas, we have a large 3-D that we're going to be acquiring this year, over the 8 million acres that we acquired recently. We're also going to be drilling in Kenya at Mlima. We have a large four-way structure that is pursuing known reservoirs, up dip, in a proven petroleum system. And Mozambique, we finished our appraisal work at Tubarao Tigre very successfully. We've always leveraged our exploration success, and 2015 is going to be no different.

We identify and capture opportunities early, and we get attractive fiscal terms. We then perform early science, creating value by developing captured ideas into high-quality projects that others would like to participate in. We leverage our reputation, and ensure win-win partnerships. We have a track record of success in value creation, for us and our partners. This has allowed us, in 2014, to bring in about $200 million of outside funding, a 25% uplift in our activity.

And it will continue in 2015, where we're looking again for $200 million in additional funding, much of which is already placed, and will lead to about a 33% uplift in our total activity. And as I said, this is nothing new. It is built into our strategy. Since 2007, we've had just under $2 billion of

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



CONFIDENTIAL

APC-00868410

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

farm-out funding, which has helped manage our capital, lessen our risk profile, and significantly enhance our portfolio value. Truly a competitive advantage.

In conclusion, our track record has demonstrated the success of our strategy, the results it has delivered. And now 2015 is consistent with it, in the present environment. I'm confident that in 2015, you'll see us continued accelerating portfolio value, advancing discovers and pursuing play opening exploration. We will continue to leverage our success, whether through farm-out funding, unique access to opportunities, or preferred partnerships. And we'll continue to provide option value to Anadarko, whether to take discoveries to development, sell down, or sell out, we provide lots of options to create and enhance value.

I've shown you our internal scorecard of the value our exploration team has delivered, but here's a third-party assessment of how Anadarko's exploration has stacked up against our peers. This is from Wood Mac, September 2014, over 35 peer companies, looking at the exploration spend and exploration resources delivered, and the value created. And you can see, number one is Anadarko, against the total peer group. We're very proud of that. So to sum up, we believe in our strategy. It has delivered a significant value. And we're confident that exploration will continue to create value and optionality for Anadarko in 2015 and beyond.

And with that, let me turn it over to Al.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thanks, Bob. And I think we would, at this point, like to turn it to Q&A. And so I believe the first person up is Doug.

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions)

Doug Leggate, Bank of America Merrill Lynch.

---

**Doug Leggate** - *BofA Merrill Lynch - Analyst*

Hi, good morning, Al, can you hear me now?

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Yes, thanks, Doug.

---

**Doug Leggate** - *BofA Merrill Lynch - Analyst*

Excellent, thank you. A couple of quick questions, Al, please. Thanks for all the detail this morning.

Could you be clear on the divestment? In your prepared remarks, has the enhanced oil recovery already been sold, in terms of the volumes? Or can you frame for us, what was the likely timing? And maybe some range of proceeds?

And your answer, if I may, there was some speculation yesterday on the wires that East Texas may be for sale, also. So if you could give us a broad idea about how you're thinking about the portfolio management generally? And I've got a follow-up, please

12

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us


THOMSON REUTERS

APC-00868411

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

I'm going to actually, if I can, have Bob Gwin address some of your question, and tell you that, while we haven't targeted any other assets, particularly East Texas, I think, as you know, from having watched us for several years, we always consider everything in our portfolio. And everything that's in there is something we would manage.

But there is a few things that we would always consider. And there's probably some questions around some things we have, and whether they are for sale or not. But we're pretty clear, in the sense that anything we've got, if we think we've got a pretty good offer on the table from them, we'd consider it.

So as it relates to the assets that we announced this morning, Bob, do you want to address that?

---

**Bob Gwin** - *Anadarko Petroleum Corporation - EVP of Finance & CFO*

Yes, I will touch on that. Doug, without going into a specific number on EOR, I think you can think in terms of that $700 million plus number that we identified, year to date, as representing EOR. We've entered into an agreement that we would expect to close near the end of this quarter. And obviously, we feel good that taking that money, and redeploying it into the 2015 capital budget, to support -- in excess of our cash flow, to support the aggregate spending level, is the right way to spend the money.

Exiting the EOR, in effect, and redeploying into mid-cycle, as you saw one of Al's slides, primarily the Wolfcamp, as well as our exploration program, clearly gives us better growth assets, going forward in an asset that historically hasn't provide much free cash flow. And we think we've achieved full value in the current oil price environment, so we're pretty happy with that sale.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

And Doug, let me add that the 2015 volumes we've given you do not assume anything for EOR.

---

**Bob Gwin** - *Anadarko Petroleum Corporation - EVP of Finance & CFO*

Yes, we have backed that out. And there's a reconciliation in the earnings release, to talk about what we mean from -- or in the announcement this morning -- to talk about what we mean when we say divestiture adjust. So there's a pretty good reconciliation in there.

---

**Doug Leggate** - *BofA Merrill Lynch - Analyst*

Okay. I appreciate the answer. My follow-up is really, if I heard you correctly, your CapEx budget does not assume any service cost reductions. I guess I understand why you are framing it that way.

But can you provide some order of magnitude, as to what you believe might be possible, in terms of your activity? And in the context of your cash flow, do you expect to live within cash flow this year? And I'll leave it there. Thank you.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Yes, you bet. And you are right, in terms of the way you characterized my comment. We have put into our plan those things that we have realized in the first couple of months of the year. Maybe, unlike others, we have not projected what we think service cost savings could be through the course of the year, thinking that's really going to have more of a full-year impact in 2016.

13

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868412

If I can, Chuck will walk you through some of those types of things we're seeing. But what we're trying to do there is simply not be overly aggressive, with respect to how much of our capital intensity could come down, primarily because we don't intend to complete all the wells we are drilling.

I think I made reference to the fact we think we ran 125 completions that we pushed off, until such time that service costs sync up with the commodity environment that we're in. I think that's the right way for us to think about running the railroad.

I think it's the right way to create value, and not pursue growth, where we don't have attractive wellhead margins. And I think it's the best thing for us to do in this environment. We're also trying to just be pretty conservative about what kind of cost -- or contractions in costs -- we may see from the service sector, without getting too ahead of ourselves.

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Doug, this is Chuck. Al pretty much summed it up. We've [added] included what we've captured to date, and -- in our numbers. So that is something we can put in the bag.

The opportunity, I think, still exists to go deeper into the cost-cutting mode. But is very dependent upon how our service providers react to this environment, as well as how we manage our field efficiencies, and those type of things.

So we're working very hard with our providers. We see opportunity. When we capture it, we will certainly take good use of it. Either redeploy it, or put it into the savings bucket for redeployment later.

My sense is that, with our program, the biggest opportunities lie in the completion space, but we'll have to just see how this market plays out. If history is any indicator of how things happen during these environments, there's still some room, but how much is yet to be determined.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

And Doug, your question about free cash flow and CapEx syncing up, depending upon your price deck, our assessment is, is that with the cash associated with the sale of the assets that we announced this morning, we should be about cash flow neutral, with respect to the CapEx plan for the year. But obviously, we could have a lot of improvement on the CapEx side, related to service cost contractions. And we could have some surprises, with respect to the cash flows related to the commodity deck. So our assumption is, is that we should be pretty much flat with CapEx to cash plus cash flow.

---

**Doug Leggate** - *BofA Merrill Lynch - Analyst*

That's what it looks like (inaudible) as well. Thanks very much, Al. Appreciate it.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

You bet.

---

**Operator**

Brian Singer, Goldman Sachs.

---

14

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

**MARCH 03, 2015 / 2:00PM, APC - Anadarko Petroleum Corp 2015 Capital Program and Guidance Call**

**Brian Singer** - *Goldman Sachs - Analyst*

Thank you, good morning.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Hi, Brian.

---

**Brian Singer** - *Goldman Sachs - Analyst*

In slide 27, you referenced how improved completion designs have doubled the value in the Eagle Ford shale, year on year, in 2014. And I wondered if you could talk to, not just in the Eagle Ford, but the entire shale portfolio, how 2015 completions would be different than 2014? And the upside to value you see, year on year, before considering lower services costs?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Yes, Brian, great question. This is Chuck. We've continued to experiment throughout our portfolio, in the various oily assets, particularly, with different completion design, same concentrations, stage spacing, cluster spacing, pump rates. You name it, we've run experiments on it. And we continue to fine-tune the recipes for each of these plays.

And particularly in the Eagle Ford, we've seen the benefit of our spacing tests, which we have -- I think we have come to right-size our spacing, depending upon which portion of the field you are in, which is certainly part of the improvement. We've increased our sand concentrations, which is certainly part of the improvement.

And there is other little things that have continued to increase the value of it. Such as reducing the amount of water, sourcing the water in a better way, really having water available for our frack crews, so that they can pump continuously over a long period of time, which saves the system a lot of money.

So it's a combination of a lot of different things. The same thing happens in the Wolfcamp, in Wattenberg, where first and foremost, we're right-sizing the spacing, and them we are right-sizing the recipe.

---

**Brian Singer** - *Goldman Sachs - Analyst*

And so, in the Eagle Ford, if you double the value in 2015, is that -- in 2014, can 2015 be another double? Or can it be 50%? Or can you provide some perspective as to the trajectory of we're on from a value -- incremental value perspective?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Brian, it's hard to speculate on that. We have some very creative engineers and scientists working on these problems, so I certainly believe there's upside in all of this. To the extent -- what the extent is, I'm not certain.

I would just look at our track record of continuous improvement as something that we hold dear at Anadarko, and work on every day, as indications that we're going to find it. If it's there, we'll find it. And then we'll quickly adopt it into our programs. And I am hopeful that we will continue to see that kind of improvement.

---

15

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

CONFIDENTIAL

APC-00868414

**Brian Singer** - *Goldman Sachs - Analyst*

Great, thanks. And my follow-up is on Mozambique. Can you remind us what your current thoughts are on the overall budget and startup date?

You mentioned, in slide 40, the pace will be dictated by government approval. And I wondered, post the decree law, if you could provide key milestones on that front that are needed to keep startup at 2019, or whenever you think is realistic?

---

**Jim Kleckner** - *Anadarko Petroleum Corporation - EVP of International and Deepwater Operations*

Okay. Yes, let me just outline a few of the requirements that we're working on this year, that we consider to be milestone activities with the government.

One is the final licensing approval of the environmental impact assessment, and the relocation action plan. We are currently working those, and anticipate a response by midyear. The other modifications are to some of the contract terms incorporate the requirements for LNG, and our EPCC contract. And then, as well as gas dedication agreements that we'll need for the government processing of their volumes for the LNG liquification plant.

So those are the primary agreements that we need, moving forward. We haven't finalized evaluations of the EPCC contracts. So we're currently evaluating those. But I would think our pre-feed estimate ranges, for roughly $10 billion of onshore liquification, and $5 billion for offshore development, are still valid estimates of the costs forward.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

If I could add something to that, to put it in perspective, relative to our financial position, and the equity funding requirements associated with the project. If you think in terms of the $15 billion, roughly, that Jim talked about, and I'll use rough math.

You saw on one of his slides, he talked about two-thirds gearing to that -- from a project financing perspective. It leaves around $5 billion of aggregate equity investment, across the ownership group.

Our position, following the sell-down last year, is about one-quarter of that, a little more than one-quarter. Roughly, that's $1.25 billion of equity, net to our interest. And as you may recall, we talked previously about having roughly $1 billion invested in the project, and receiving over $2.1 billion of after-tax proceeds from the sell-down.

So in many ways, we feel like we have de-risked the project, from a financial standpoint, reimbursing ourselves for the cost to date, and then having enough equity, or enough proceeds from that equity sale, left over to fund our equity share, going forward. So we don't anticipate that any equity requirements -- equity funding requirements associated with Mozambique will change the adequacy of our capital to apply to the rest of our portfolio, going forward.

So we feel that, from a macro standpoint, this project is essentially funded. And if we can get things moving forward properly during this year, we are well positioned to fund this without it affecting the rest of our business, or putting an undue capital burden on our model.

---

**Brian Singer** - *Goldman Sachs - Analyst*

Great, thank you very much.

---

**Operator**

Subash Chandra, Guggenheim.

16

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

APC-00868415

**Subash Chandra** - *Guggenheim - Analyst*

Yes, hi, good morning. Thanks for the call. I was curious, I think on slide 21, just putting out the wedges of CapEx. And that other wedge is quite small. When I look at your producing asset base, there is a lot in other.

And so I am curious what the plans are beyond 2015? Do you think these fields become sources of free cash flow? Do they get monetized?

I understand your comments on 2015 monetizations, but -- or do they play a role in decline rate management? And so what are the efforts, in those fields, in that broad category of other fields in 2015, if it's not new drilling?

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Subash, this is Chuck again. Thank you for the question. The other really involves various OBO positions that we have in the Marcellus, for instance. And very small amounts of maintenance capital-type investments in some of our gas assets.

So it's generally a bucket that we put our gas assets into this year, and [Savies],Texas, which still has really good economics. So it's really just a collection of miscellaneous investments that make up the balance, primarily small investments in various gas assets.

**Subash Chandra** - *Guggenheim - Analyst*

Right, but when I think of the assets that they are, they are a pretty large producing base of assets. And if I think of just GNB, and some of the other fields out there, the gassier ones, as well, they all add up.

So is 2015 a year of, take a pass on those, maybe do some work -- maintenance work on the fields? And then renew growth, in a better price environment? Or are some of these fields now in the late phases, and won't see growth, and might see other ways of extracting value?

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Subash, I think you pretty much hit it on the head there with, these are assets that we're going to put on the sideline for a bit, until the investment climate improves. They're fantastic assets. They are very large-scale assets.

You are well aware. Like GNB, for instance, produces over 500 million cubic feet. The Marcellus position is North of 1.5 BCF a day gross. So these are large, chunky assets that still have a considerable amount of development opportunity, when the opportunity arises.

There are all HBP, virtually HBP, and that take a very low maintenance capital requirement to keep them up and running. And we're just going to wait for a better time for these assets. They are certainly key and critical to our portfolio.

They give us a great big gas option, should gas prices improve at some point. And they are -- I think they are legacy assets -- foundational legacy assets for Anadarko. And we will continue to own them, and continue to produce them.

We're going to just wring the value out of them, work the base really hard, as I mentioned during my presentation, so that we minimize the decline rate from them, and just let the market re-equilibrate, give us an opportunity at that time, to (technical difficulty).

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.





THOMSON REUTERS

CONFIDENTIAL

APC-00868416

**Subash Chandra** - *Guggenheim - Analyst*

Thank you. And my follow-up is, in the Wolfcamp, you talked about spacing and some of the developments that you would be working on in 2015. I was just wondering, from the rock itself, what are some of the key unknowns? Or do you feel quite comfortable, from how good the rock looks, and its ability to deliver? And are there questions on, say, rock quality, area by area, or thermal maturities, et cetera?

**Operator**

Paul Sankey, Wolfe Research.

**Paul Sankey** - *Wolfe Research - Analyst*

Hi, good morning, everybody. You've highlighted the success of your monetization strategy. I was wondering if you expect the pace of that to continue this year, in the current price environment? Thanks.

**Operator**

Please stand by. We have lost audio. Please stand by.

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

We are back. We lost you guys for a second there. Sorry about that.

**Paul Sankey** - *Wolfe Research - Analyst*

That's a relief. Did you catch my question?

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

No. We lost you in the middle, we believe, of Chuck answering the question for Subash. I don't know if you heard his answer or not.

**Paul Sankey** - *Wolfe Research - Analyst*

We got nothing. So I will just remind everyone, I was just asking simply, you've been very successful in monetizing assets over the past years. I wondered if you can really maintain that pace, in the current oil price and gas price environment? Thanks.

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Paul, this is Al. Bob Gwin and I will tackle that together.

I think our track record of trying to be proactive with portfolio management will continue, even in an environment maybe that doesn't look as attractive. We still have a lot of assets, I think, that could, in fact, work its way into the monetization process this year. And specifically, I will let Bob talk a little bit more, but I think our track record is one where we have worked this pretty hard, and we will continue to work it pretty hard.

18

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us



©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

CONFIDENTIAL

APC-00868417

**Bob Gwin** - *Anadarko Petroleum Corporation - EVP of Finance & CFO*

Yes, the only thing I would add is that, as you would expect, we have a list of assets, as we come into the year. We have a variety of assets that, over time, have a very strong return potential, and very good economics.

They just may not be attracting capital within our portfolio, going forward. And so we're going to continue to investigate the market environment for selling those assets.

If we don't think there is value there, we don't need to sell the assets. We don't need to move them. And we could certainly have them ready to go when commodity prices improve.

Some things we do, obviously, control, like our large position in WGP. We have -- we're going to continue, of course, to drop assets to Western Gas Partners, over time, which will continue to bring funds back to Anadarko. We're going to be receiving distributions and sale process.

We feel like, from a macro standpoint, cash flowing into Anadarko is going to be available. And then as Bob talked about, working on farm-downs, and these are monetizations, as well.

Working on bringing in partners in our exploration portfolio. And when we take things to development, finding oil, global oil, is something that is in demand. And I think there's always going to be a market for it. It just comes down to price, based upon the commodity price outlook.

So it's a key part of the strategy, and we'll execute as best we can during this environment. And our degree of ultimate activity will be based, really, upon what we find in the market when we are out there.

---

**Paul Sankey** - *Wolfe Research - Analyst*

Great, thanks. And if I could just push through into 2016, can you talk a little bit about how you might handle 2016, if we were still at, let's say, $60 Brent, and $50 TI? I hear that you are going to continue to push on with monetizations, as best you can. But how should we think about where you would take CapEx alone, for what you said about lower service costs not really being in your 2015 numbers? Thanks.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Yes, I think, Paul, the best way to consider that is, when we see the service cost sync up to the commodity environment that we're in, we will go back into an environment where we're willing to grow. As long as service costs are out of sync with the commodity environment, we're going to continue to look for ways to preserve value, and preserve another day when growth becomes an objective again.

If we are right where we are a year from now, and let's just say, ceteris paribus, to everything that we know today is again going to happen in 2016, I would imagine that we'll see a lot of the same comments coming from us in 2016 that we're talking about today. We just don't see any interest, from our standpoint as a management team, to show substantial growth, or much growth at all, into an environment where the wellhead economics don't support it.

---

**Paul Sankey** - *Wolfe Research - Analyst*

Helpful, thank you. And I appreciate the Latin, thanks.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thank you.

19

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868418

**Operator**

(Operator Instructions)

Charles Meade, Johnson Rice.

**Charles Meade** - *Johnson Rice & Company - Analyst*

Good morning, everyone there. If I could ask two questions. I think both of these are follow-ups. Specifically in Colombia -- and I think this gets to the divestiture question -- what is the success leg look like in 2015, if you have a discovery with either of these first two, Calasu or Kronos. I

s that a -- on the success leg, would that be a divestiture candidate in late 2015? Or is it really the kind of thing that you would want to do more drilling, and have a better idea. Because it looks like you have a bunch of prospects there, and we should be more thinking about that as maybe a 2016 candidate?

**Bob Daniels** - *Anadarko Petroleum Corporation - EVP of International and Deepwater Exploration*

Charles, Bob. Really, we need to get the wells down, and see what we have. But our track record has been, we find something, and we appraise it, and figure out what it means to Anadarko. That is the optionality that we talked about.

We want to understand what it means in our portfolio, and what the value was -- could be externally. And then we make the decisions as to whether or not we want to move forward with it, either in the development phase, or farm-down in a development, or whether we divest it all.

So I wouldn't think that you're going to see much in 2015. These -- we just started the wells, and they are going to be done midyear. So that will be the first activities, and then we're going to have to come back in, with success, to appraise and understand what we have.

And we also -- this is not a one-off position. The area we're drilling with Kronos and Calasu, that's 8 million acres. And we have multiple play types in there.

So these wells could actually tell us a lot about what else we have, and what the total potential of the blocks could be. And we would like to then evaluate what that means to Anadarko.

**Charles Meade** - *Johnson Rice & Company - Analyst*

Got it. So Bob, if I understand you, we ought to be expecting more of a Mozambique sell-down, where you sell down on the whole concession, rather than a Gulf of Mexico style, where you would do it on an individual find or prospect?

**Bob Daniels** - *Anadarko Petroleum Corporation - EVP of International and Deepwater Exploration*

Yes, it's very difficult to do it on individual finds. But I think that at this point, we really need to know what we have, because we don't make any decisions ahead of time. We have to understand what it means to Anadarko, and what it would mean from a value standpoint into the market.

**Charles Meade** - *Johnson Rice & Company - Analyst*

Got it. And then if I could switch back to the onshore North America, and just following up a bit on the completions question, particularly in Wattenberg. And Chuck, on your slide 22, I was a little surprised to see that down in the southwest corner of your acreage position, you have a --

20

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

CONFIDENTIAL

APC-00868419

further into the oil leg, you have an EUR of 450, whereas -- I guess my understanding of the field is that your EURs were typically higher, as you got to the center, deeper part of the basin, where it was gassier.

So I wonder, is that a function of the 24 well [for section] spacing test you see there? Or is -- am I on the right track, to be surprised there? Or is that -- what might I be missing?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Charles, good question. The EURs that we show there are just the ones that we have seen recently. And not all the wells -- they do, in fact, increase as you get gassier. We just haven't drilled a whole lot of those wells this year.

So the one in the Southwest quarter, particularly, is an area that didn't have a whole lot of vertical development. So we've had some really nice wells this last year, in 2014.

And that was part of the reason we saw such as a huge growth in the Wattenberg field in 2014, was because these fantastic wells, and the program that we put together in 2014. So it's really not a surprise.

I think you will see variations throughout the field, but so far, so good. Everything looks really good to us.

---

**Charles Meade** - *Johnson Rice & Company - Analyst*

So -- but were they on that tighter well spacing? I guess what I am after, Chuck, is, they're -- industry is not talking a whole lot about, but there's that idea of possible constructive interference? And is that maybe what we are maybe seeing there?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Charles, the way we have put this together, these are generally on our expected well densities of about 12 wells per section. There are a few tighter well spacing tests in each one of these areas. So it's a mix. I'm not avoiding your question; it's just a mixed bag.

---

**Charles Meade** - *Johnson Rice & Company - Analyst*

No, that's great. Thank you.

---

**Operator**

Jeffrey Lambujon, Tudor, Pickering, Holt & Company.

---

**Jeffrey Lambujon** - *Tudor, Pickering, Holt & Company - Analyst*

Good morning. Thanks for taking my questions. I appreciate the detail on the US [onter ops] you all provided. In regards to the Northeast, can you give us an update on how activity there is specifically fits into this year's budget? And how you're thinking about that program, both this year and next?

---

21


THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868420

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Yes, Jeffrey, this is Chuck. We're going to have between zero and one rig running in the Marcellus, and probably heavier on the zero than the one, as we work through the program. Right now, we just don't see the rationale to drill into that differential in the wellhead economics.

We do have some OBO activity planned up in -- the operator is planning activities up further Northeastern Bradford County. It's very small activity, in the order of one to two rigs, as we understand it. So it's not going to be very much.

---

**Jeffrey Lambujon** - *Tudor, Pickering, Holt & Company - Analyst*

Great, thanks. And then on the Delaware EURs provided, do you have the lateral length associated with those? And maybe any updated AFE thoughts there?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Another good question. The numbers that we provided you are those for about a one-section well. Our current expenditures are pretty much associated with single-well remote delineation wells.

So the embedded costs are a little higher than what we anticipate, as we get into development mode. Right now, we're spending between $9 million and $11 million to $12 million, depending upon the specific circumstances, like roads and pipelines, and those kind of things, that are necessary to get the well online.

We see that coming down, as we get a pad orientation, and into full development mode, to the lower end of that, and even lower, possible. We have seen, and we believe there is, benefit in the longer laterals here.

There is more expense in drilling the vertical portion of these wells than we see in the Wattenberg and Eagle Ford. So the longer lateral just spreads that fixed cost over more lateral footage. And -- but we haven't done a whole lot of those, but we have certainly seen the benefit in the few we have done.

---

**Jeffrey Lambujon** - *Tudor, Pickering, Holt & Company - Analyst*

Thanks for the detail.

---

**Operator**

John Herrlin, Societe Generale.

---

**John Herrlin** - *Societe Generale - Analyst*

Hi, two quick ones. Chuck, I think you said that you were deferring 70 Wattenberg wells. What are the other 55 deferrals this year, for onshore?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Yes, John, they are split pretty much evenly between the Eagle Ford and the Permian.

---

22

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

**John Herrlin** - *Societe Generale - Analyst*

Okay, that's fine. Regarding the spending slide in your supplemental, on 21, is the Wolfcamp -- is all that value there what you would classify as mid-cycle? And that's it for me.

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

Yes, I believe so. John, if I understand your question, I think the answer is yes.

---

**John Herrlin** - *Societe Generale - Analyst*

Okay, yes, thank you.

---

**Operator**

David Heikkinen, Heikkinen Energy Advisors

---

**David Heikkinen** - *Heikkinen Energy Advisors - Analyst*

Good morning, guys. Just thinking about 2015 services. How much had you contracted for pressure pumping and rigs this year?

And then, do those contracts roll off next year? Or just trying to think about how that rolls through this year?

---

**Chuck Meloy** - *Anadarko Petroleum Corporation - EVP of US Onshore Exploration and Production*

David, this is Chuck. The way we have contracted most of our completion simulation services was essentially on a pad-by-pad basis. We have contractors with a number of providers that give allocations, so we can essentially take our completion fleet down to zero in a very short time frame. And then we can bring them back on, with additional bidding, if necessary, or activity, as we see fit.

So we are in a really flexible spot at this point, which will give us, I think, the opportunity to realize more savings. But we'll just have to see how the market responds.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

David, could I add, I think you are familiar with what Chuck did in late 2008 and 2009, as related to our onshore activities then. And today, he has really got our onshore situation, I think, about as well prepared for changes in the environment as we could possibly hope for, by keeping all the contracts quite short.

Obviously, we're seeing more capitulation from the rig contract services being provided to date. And that's just what I see from the market.

So we are watching it, and seeing what's there. But I am very pleased with the way in which Chuck has established our contractual support for our activities onshore.

---

**David Heikkinen** - *Heikkinen Energy Advisors - Analyst*

Okay. And then, as your mega projects come online late this year, and in 2016, drives our cash flows higher. Would you invest that cash flow, or lower activity levels? Just trying to think about that push-pull of service costs that you said, and a natural level of growth from the mega projects?

23

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APC-00868422

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

David, if we see higher cash flows from commodity prices, and we don't see the service costs syncing up, my guess is, we will probably not put that into drilling, per se, unless we think the rate of return for the asset is pretty attractive. If we see service costs sync up in a way where we do see really attractive wellhead economics, my guess is, today, our first place to go put that capital to work would be in the Wattenberg field.

It gives us the best rate of return, both from a working interest, as well as the mineral interest perspective. And in addition to the midstream capabilities we have develop there over the last several years.

So if we actually had the ability, whether it's through either improvement in service cost, combined with commodities, to invest additionally through the year, you should anticipate that our belief today is, that would go into the Wattenberg field first.

---

**David Heikkinen** - *Heikkinen Energy Advisors - Analyst*

Okay, thanks.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

You bet.

---

**Operator**

And at this time, we have no other questions in the queue. I'd like to turn the call over to Mr. Al Walker for your final remarks.

---

**Al Walker** - *Anadarko Petroleum Corporation - Chairman, President & CEO*

Thank you, operator. Just a couple of comments here, if I can, to close up with.

The capital plan we laid out for you today, we think, as I mentioned earlier, is fairly neutral, as respect to how that spend syncs up with what we anticipate to be our cash flows, plus the sale proceeds we announced this morning. Largely, this is driven by the fact that we just see ourselves wanting to preserve value, and prepare for the day when commodity prices will sync up with the costs, and we go back and find ourselves in a growth objective.

This environment continues to support, in our mind, good investments in our intermediate and longer-cycle opportunities, as we've seen in prior cycles, particularly in the 2008-2009 period, we created a lot of option value by continuing to invest in our future. And lastly, we have talked about it all morning, and I am just going to end with it and say, you should continue to expect that our activity level, with how we manage our portfolio, will be just as intense in 2015 as it has been in any of the prior years. And we talked about what we've done for 5 years, most recently, as well as over the last 10.

And then we're going to take advantage of whatever this market gives us. And we think by actively managing that portfolio, we can create a lot of shareholder value.

So for those on the call this morning, or those listening in later, we very much appreciate it. Please don't hesitate to give John Colglazier and his staff a call. And we look forward to working with all of you through the course of the year. Thank you.

---

24

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

CONFIDENTIAL

**MARCH 03, 2015 / 2:00PM, APC - Anadarko Petroleum Corp 2015 Capital Program and Guidance Call**

**Operator**

Ladies and gentlemen, this concludes your presentation. You may now disconnect, and enjoy your day.

---

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2015, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

CONFIDENTIAL                                                                                          APC-00868424