**Impairments**

The Company recognized the following impairments:

| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| millions | | 2017 | | 2016 |
| Oil and gas exploration and production | | | | |
| U.S. onshore properties | $ | — | $ | 4 |
| Gulf of Mexico properties | | 204 | | 1 |
| Cost-method investment | | — | | 1 |
| Midstream | | 169 | | 10 |
| Total | $ | 373 | $ | 16 |

Impairments during the three months ended March 31, 2017, were primarily related to oil and gas properties in the Gulf of Mexico due to lower forecasted commodity prices and a U.S. onshore midstream property due to a reduced throughput fee as a result of a producer's bankruptcy.

For further discussion related to impairments, including the potential for future impairments, see *Note 4—Impairments* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

### Other (Income) Expense

The following provides Anadarko's other (income) expense for the three months ended March 31:

| millions | | 2017 | | 2016 |
| --- | --- | --- | --- | --- |
| Interest expense | $ | 223 | $ | 220 |
| (Gains) losses on derivatives, net [1] | | (147) | | 297 |
| Other (income) expense, net | | (8) | | — |
| Total | $ | 68 | $ | 517 |

---

[1]   (Gains) losses on derivatives, net represents the changes in fair value of the Company's derivative instruments as a result of changes in commodity prices and interest rates, contract modifications, and settlements. See *Note 7—Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Item 1 of this Form 10-Q.

### Income Tax Expense (Benefit)

| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| millions except percentages | | 2017 | | 2016 |
| Income tax expense (benefit) | $ | 97 | $ | (383) |
| Income (loss) before income taxes | | (178) | | (1,381) |
| Effective tax rate | | (54)% | | 28% |

The Company reported a loss before income taxes for the three months ended March 31, 2017 and 2016. As a result, items that ordinarily increase or decrease the tax rate will have the opposite effect. The Company's effective tax rate is impacted each year by the relative pre-tax income (loss) earned by the Company's operations in the U.S., Algeria, and the rest of the world. Additionally, state income taxes (net of federal income tax benefit), non-deductible Algerian exceptional profits tax for Algerian income tax purposes, net changes in uncertain tax positions, and pre-tax income allocated to noncontrolling interest typically impact the Company's effective tax rate. The Company's effective tax rate decreased from 28% for three months ended March 31, 2016, to (54)% for the three months ended March 31, 2017, primarily due to the impact from the items discussed above.

For additional information on income taxes, see *Note 9—Income Taxes* in the *Notes to Consolidated Financial Statements* under Item 1 of this Form 10-Q.

38

APC-01752151

## LIQUIDITY AND CAPITAL RESOURCES

| | Three Months Ended March 31, | |
|---|---|---|
| millions | 2017 | 2016 |
| Net cash provided by (used in) operating activities | $ 1,123 | $ (137) |
| Net cash provided by (used in) investing activities | 1,722 | (973) |
| Net cash provided by (used in) financing activities | (198) | 3,119 |

**Overview**  The Company has a variety of funding sources available, including cash, an asset portfolio that provides ongoing cash-flow-generating capacity, opportunities for liquidity enhancement through divestitures and joint-venture arrangements that reduce future capital expenditures, the Company's credit facilities, and access to both debt and equity capital markets. In addition, an effective registration statement is available to Anadarko covering the sale of WGP common units owned by the Company.

During the first quarter of 2017, Anadarko closed on the divestitures of its U.S. onshore Eagleford and Marcellus assets for net proceeds of $2.8 billion. As of March 31, 2017, Anadarko had $5.8 billion of cash plus $5.0 billion of borrowing capacity under its RCFs. Anadarko believes that its current available cash and anticipated operating cash flows will be sufficient to fund the Company's projected 2017 and long-term operational and capital programs. Current available cash provides the flexibility to accelerate activity in the Delaware and DJ basins or acquire bolt-on positions in these core areas. The Company continuously monitors its liquidity position and evaluates available funding alternatives in light of current and expected conditions.

### Operating Activities

One of the primary sources of variability in the Company's cash flows from operating activities is the fluctuation in commodity prices, the impact of which Anadarko partially mitigates by entering into commodity derivatives. Sales volume changes also impact cash flow but historically have not been as volatile as commodity prices. Anadarko's cash flows from operating activities are also impacted by the costs related to operations and interest payments related to the Company's outstanding debt.

Cash provided by operating activities was $1.1 billion for the three months ended March 31, 2017, $1.2 billion higher compared to the same period of 2016. This increase was primarily a result of higher sales revenues in 2017 due to the impact of higher commodity prices and increased oil sales volumes as well as the $159.5 million payment of the Clean Water Act penalty and $79 million related to severance costs in connection with the workforce reduction program in 2016.

39

APC-01752152

**Investing Activities**

*Capital Expenditures*   The following presents the Company's capital expenditures for the three months ended March 31:

| millions | 2017 | 2016 |
|---|---|---|
| Cash Flows from Investing Activities | | |
| Additions to properties and equipment [1] | $ 1,194 | $ 1,022 |
| Adjustments for capital expenditures | | |
| Changes in capital accruals | 58 | (130) |
| Other | 3 | 4 |
| Total capital expenditures [2] | $ 1,255 | $ 896 |

[1] Additions to properties and equipment as presented within Anadarko's cash flows from investing activities include cash payments for cost of properties, equipment, and facilities. The cost of properties includes the initial capitalization of drilling costs associated with all exploratory wells whether or not they were deemed to have a commercially sufficient quantity of proved reserves.

[2] Includes WES capital expenditures of $286 million for the three months ended March 31, 2017, and $140 million for the three months ended March 31, 2016. Capital expenditures exclude the FPSO capital lease asset.

The Company's capital expenditures increased by $359 million for the three months ended March 31, 2017, primarily due to $258 million related to increased U.S. onshore acreage acquisitions and exploration costs in the Gulf of Mexico coupled with increased spending of $154 million related to the development of the Company's midstream assets in the Delaware and DJ basins.

*Property Exchange*   On March 17, 2017, WES acquired a third party's 50% nonoperated interest in the DBJV system in exchange for WES's 33.75% interest in nonoperated Marcellus midstream assets and $155 million in cash. WES funded the cash consideration with cash on hand. After the acquisition, the DBJV system is 100% owned by WES and consolidated by Anadarko. See *Note 3—Acquisitions, Divestitures, and Assets Held for Sale* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

*Carried-Interest Arrangements*   In the third quarter of 2014, the Company entered into a carried-interest arrangement that requires a third party to fund $442 million of Anadarko's capital costs in exchange for a 34% working interest in the Company's Eaglebine development, located in Southeast Texas. The third-party funding is expected to cover Anadarko's future capital costs in the development through 2020. At March 31, 2017, $151 million of the $442 million carry obligation had been funded.

*Divestitures*   During the three months ended March 31, 2017, Anadarko received net proceeds of $2.9 billion from divestitures, primarily related to the sale of the Company's U.S. onshore Eagleford and Marcellus oil and gas assets. See *Note 3—Acquisitions, Divestitures, and Assets Held for Sale* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

40

APC-01752153

Case 4:20-cv-00576    Document 322-31    Filed 06/29/26 in TXSD    Page 4 of 83

**Financing Activities**

| millions except percentages | March 31, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| Anadarko | $ | 12,206 | S | 12,204 |
| WES | | 3,092 | | 3,091 |
| WGP | | 28 | | 28 |
| Total debt | $ | 15,326 | S | 15,323 |
| Total equity | | 15,079 | | 15,497 |
| Debt to total capitalization ratio | | 50.4% | | 49.7% |

*Debt Activity*
*Anadarko RCFs* Anadarko has a $3.0 billion Five-Year Facility that matures in January 2021 and a $2.0 billion 364-Day Facility. In January 2017, the Company extended the maturity date of the 364-Day Facility until January 2018. At March 31, 2017, the Company had no outstanding borrowings under the Five-Year Facility or the 364-Day Facility.

*WES and WGP RCFs* WES has a $1.2 billion RCF that matures in February 2020 and is expandable to $1.5 billion. At March 31, 2017, WES had no outstanding borrowings under its RCF, had outstanding letters of credit of $5 million, and had available borrowing capacity of $1.195 billion.

WGP has a $250 million RCF that matures in March 2019 and is expandable to $500 million, subject to receiving increased or new commitments from lenders and the satisfaction of certain other conditions. At March 31, 2017, WGP had outstanding borrowings under its RCF of $28 million at an interest rate of 2.99% and had available borrowing capacity of $222 million.

For additional information on the Company's RCFs, see *Note 8—Debt* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

*Debt Maturities* At March 31, 2017, Anadarko's scheduled debt maturities during 2017 consisted of $34 million of senior amortizing notes associated with the TEUs. Anadarko's Zero Coupons can be put to the Company in October of each year, in whole or in part, for the then-accreted value, which will be $883 million at the next put date in October 2017.

For additional information on the Company's debt instruments, see *Note 8—Debt* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

*Equity Transactions* WES can issue common units to the public under its $500 million continuous offering program, which allows for an aggregate of $500 million of WES common units. The remaining amount available to be issued under this program was $442 million at March 31, 2017.

During the first quarter of 2016, WES issued 14 million Series A Preferred units to private investors for net proceeds of $440 million. In April 2016, WES issued an additional eight million Series A Preferred units to private investors, pursuant to the full exercise of an option granted in connection with the initial issuance, and raised net proceeds of $248 million.

For additional information on WES Series A Preferred units, see *Note 14—Noncontrolling Interests* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

*Derivative Instruments* For information on derivative instruments, including cash flow treatment, see *Note 7—Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

*Common Stock Dividends* Anadarko paid dividends to its common stockholders of $28 million during the three months ended March 31, 2017, and $25 million during the three months ended March 31, 2016. In response to the commodity-price environment, the Company decreased the quarterly dividend from $0.27 per share to $0.05 per share in February 2016. Anadarko has paid a dividend to its common stockholders quarterly since becoming a public company in 1986.

The amount of future dividends paid to Anadarko common stockholders is determined by the Board on a quarterly basis and is based on the Company's earnings, financial conditions, capital requirements, the effect a dividend payment would have on the Company's compliance with relevant financial covenants, and other factors deemed relevant by the Board.

APC-01752154

***Distributions to Noncontrolling Interest Owners*** Distributions to noncontrolling interest owners primarily relate to the following for the three months ended March 31:

| millions | | 2017 | | 2016 |
|---|---|---|---|---|
| WES distributions to unitholders (excluding Anadarko and WGP) [1] | S | 68 | S | 63 |
| WES distributions to Series A Preferred unitholders [2] | | 15 | | — |
| WGP distributions to unitholders (excluding Anadarko) [3] | | 19 | | 11 |

[1] WES has made quarterly distributions to its unitholders since its IPO in the second quarter of 2008 and has increased its distribution from $0.30 per common unit for the third quarter of 2008 to $0.875 per common unit for the first quarter of 2017 (to be paid in May 2017).

[2] WES has made quarterly distributions of $0.68 per unit, prorated based on issuance date, to its Series A Preferred unitholders since the unit issuances in March and April 2016 (to be paid in May 2017).

[3] WGP has made quarterly distributions to its unitholders since its IPO in December 2012 and has increased its distribution from $0.17875 per common unit for the first quarter of 2013 to $0.49125 per unit for the first quarter of 2017 (to be paid in May 2017).

## RECENT ACCOUNTING DEVELOPMENTS

See *Note 1—Summary of Significant Accounting Policies* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q for discussion of recent accounting developments affecting the Company.

42

APC-01752155

## Item 3. Quantitative and Qualitative Disclosures About Market Risk

The Company's primary market risks are attributable to fluctuations in energy prices and interest rates. These risks can affect revenues and cash flows, and the Company's risk-management policies provide for the use of derivative instruments to manage these risks. The types of commodity derivative instruments used by the Company include futures, swaps, options, and fixed-price physical-delivery contracts. The volume of commodity derivatives entered into by the Company is governed by risk-management policies and may vary from year to year. Both exchange and over-the-counter traded derivative instruments may be subject to margin-deposit requirements, and the Company may be required from time to time to deposit cash or provide letters of credit with exchange brokers or counterparties to satisfy these margin requirements. For additional information relating to the Company's derivative and financial instruments, see *Note 7—Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

**COMMODITY-PRICE RISK** The Company's most significant market risk relates to prices for oil, natural gas, and NGLs. Management expects energy prices to remain unpredictable and potentially volatile. As energy prices decline or rise significantly, revenues and cash flows are likewise affected. In addition, a non-cash write-down of the Company's oil and gas properties or goodwill may be required if commodity prices experience a significant decline. Below is a sensitivity analysis for the Company's commodity-price-related derivative instruments.

**Derivative Instruments Held for Non-Trading Purposes** The Company had derivative instruments in place to reduce the price risk associated with future production of 25 MMBbls of oil and 284 Bcf of natural gas at March 31, 2017, with a net derivative asset position of $4 million. Based on actual derivative contractual volumes, a 10% increase in underlying commodity prices would reduce the fair value of these derivatives by $111 million, while a 10% decrease in underlying commodity prices would increase the fair value of these derivatives by $110 million. However, any cash received or paid to settle these derivatives would be substantially offset by the sales value of production covered by the derivative instruments.

**Derivative Instruments Held for Trading Purposes** At March 31, 2017, the Company had a net derivative asset position of $9 million on outstanding derivative instruments entered into for trading purposes. Based on actual derivative contractual volumes, a 10% increase or decrease in underlying commodity prices would not materially impact the Company's gains or losses on these derivative instruments.

**INTEREST-RATE RISK** Borrowings, if any, under each of the 364-Day Facility, the Five-Year Facility, the WES RCF, and the WGP RCF are subject to variable interest rates. The balance of Anadarko's long-term debt on the Company's Consolidated Balance Sheets has fixed interest rates. The Company has $2.9 billion of LIBOR-based obligations that are presented on the Company's Consolidated Balance Sheets net of preferred investments in two noncontrolled entities. These obligations give rise to minimal net interest-rate risk because coupons on the related preferred investments are also LIBOR-based. While a 10% change in LIBOR would not materially impact the Company's interest cost, it would affect the fair value of outstanding fixed-rate debt.

At March 31, 2017, the Company had a net derivative liability position of $1.3 billion related to interest-rate swaps. A 10% increase (decrease) in the three-month LIBOR interest-rate curve would decrease (increase) the aggregate fair value of outstanding interest-rate swap agreements by $91 million. However, any change in the interest-rate derivative gain or loss could be substantially offset by changes in actual borrowing costs associated with future debt issuances. For a summary of the Company's outstanding interest-rate derivative positions, see *Note 7—Derivative Instruments* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

APC-01752156

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Anadarko's Chief Executive Officer and Chief Financial Officer performed an evaluation of the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (Exchange Act). The Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in reports it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and to ensure that the information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of March 31, 2017.

*Changes in Internal Control over Financial Reporting*

There were no changes in Anadarko's internal control over financial reporting during the first quarter of 2017 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

APC-01752157

## PART II. OTHER INFORMATION

### Item 1.  Legal Proceedings

The Company is a defendant in a number of lawsuits and is involved in governmental proceedings and regulatory controls arising in the ordinary course of business, including personal injury and death claims; title disputes; tax disputes; royalty claims; contract claims; contamination claims relating to oil and gas exploration, development, production, transportation, and processing; and environmental claims, including claims involving assets owned by acquired companies and claims involving assets previously sold to third parties and no longer a part of the Company's current operations. Anadarko is also subject to various environmental-remediation and reclamation obligations arising from federal, state, tribal, and local laws and regulations. While the ultimate outcome and impact on the Company cannot be predicted with certainty, after consideration of recorded expense and liability accruals, management believes that the resolution of pending proceedings will not have a material adverse effect on the Company's financial condition, results of operations, or cash flows.

WGR Operating, LP, a wholly owned subsidiary of the Company, is currently in negotiations with the EPA with respect to alleged noncompliance with the leak detection and repair requirements of the Clean Air Act at its Granger, Wyoming facilities. Although management cannot predict the outcome of settlement discussions, it is likely a resolution of this matter will result in a fine or penalty in excess of $100,000.

Anadarko E&P Onshore LLC, a wholly owned subsidiary of the Company, is currently in negotiations with the Pennsylvania Department of Environmental Protection concerning enforcement over a produced water release in Pennsylvania in 2015. Although management cannot predict the outcome of settlement discussions, it is likely a resolution of this matter will result in a fine or penalty in excess of $100,000.

Kerr-McGee Oil and Gas Onshore, LP, a wholly owned subsidiary of the Company, is currently in negotiations with the State of Colorado's Department of Public Health and Environment with respect to alleged noncompliance with the Colorado Air Quality Control Commission's Regulations. Although management cannot predict the outcome of settlement discussions, it is likely a resolution of this matter will result in a fine or penalty in excess of $100,000.

See *Note 10—Contingencies* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q, which is incorporated herein by reference, for a discussion of material legal matters that have arisen since the filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2016.

### Item 1A.  Risk Factors

There have been no material changes from the risk factors included under Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2016.

### Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds

The following sets forth information with respect to repurchases by the Company of its shares of common stock during the first quarter of 2017:

| Period | Total number of shares purchased [1] | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Approximate dollar value of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| January 1 - 31, 2017 | 21,117 | $  71.08 | — | $  — |
| February 1 - 28, 2017 | 2,968 | $  69.47 | — | $  — |
| March 1 - 31, 2017 | 307,298 | $  62.52 | — | $  — |
| Total | 331,383 | $  63.13 | — | $  — |

[1]  During the first quarter of 2017, all purchased shares related to stock received by the Company for the payment of withholding taxes due on employee share issuances under share-based compensation plans.

45

APC-01752158

**Item 6. Exhibits**

Exhibits designated by an asterisk (*) are filed herewith or double asterisk (**) are furnished herewith; all exhibits not so designated are incorporated herein by reference to a prior filing under File Number 1-8968 as indicated.

| Exhibit Number | | | Description |
|---|---|---|---|
| | 3 | (i) | Restated Certificate of Incorporation of Anadarko Petroleum Corporation, dated May 21, 2009, filed as Exhibit 3.3 to Form 8-K filed on May 22, 2009 |
| | | (ii) | By-Laws of Anadarko Petroleum Corporation, amended and restated as of September 15, 2015, filed as Exhibit 3.1 to Form 8-K filed on September 21, 2015 |
| | 10 | (i) | First Amendment to 364-Day Revolving Credit Agreement, dated January 13, 2017, among Anadarko Petroleum Corporation, JPMorgan Chase Bank, N.A., as administrative agent, and the additional lenders party thereto, filed as Exhibit 10.1 to Form 8-K filed on January 20, 2017 |
| * | 31 | (i) | Rule 13a-14(a)/15d-14(a) Certification—Chief Executive Officer |
| * | 31 | (ii) | Rule 13a-14(a)/15d-14(a) Certification—Chief Financial Officer |
| ** | 32 | | Section 1350 Certifications |
| * | 101 | .INS | XBRL Instance Document |
| * | 101 | .SCH | XBRL Schema Document |
| * | 101 | .CAL | XBRL Calculation Linkbase Document |
| * | 101 | .DEF | XBRL Definition Linkbase Document |
| * | 101 | .LAB | XBRL Label Linkbase Document |
| * | 101 | .PRE | XBRL Presentation Linkbase Document |

46

APC-01752159

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ANADARKO PETROLEUM CORPORATION

(Registrant)

May 2, 2017                     By:  /s/ ROBERT G. GWIN

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

APC-01752160

# Exhibit 100

8-K 1 d678975d8k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Earliest Event Reported: April 11, 2019**

---

# ANADARKO PETROLEUM CORPORATION
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **1-8968** | **76-0146568** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380-1046**
(Address of principal executive offices including Zip Code)

**Registrant's telephone number, including area code (832) 636-1000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☒   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company   ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

**Item 1.01.      Entry Into a Material Definitive Agreement.**

On April 11, 2019, Anadarko Petroleum Corporation ("Anadarko") entered into an Agreement and Plan of Merger (the "Merger Agreement") with Chevron Corporation ("Chevron"), Justify Merger Sub 1 Inc., a direct, wholly-owned subsidiary of Chevron ("Merger Subsidiary 1"), and Justify Merger Sub 2 Inc., a direct, wholly-owned subsidiary of Chevron ("Merger Subsidiary 2").

The Merger Agreement provides that, among other things and subject to the terms and conditions of the Merger Agreement, (1) Merger Subsidiary 1 will be merged with and into Anadarko (the "Merger"), with Anadarko surviving and continuing as the surviving corporation in the Merger as a direct, wholly-owned subsidiary of Chevron and (2) immediately after the effective time of the Merger (the "Effective Time"), Anadarko will be merged with and into Merger Subsidiary 2 (together with the Merger, the "Combination"), with Merger Subsidiary 2 surviving as a direct, wholly-owned subsidiary of Chevron.

At the Effective Time, each outstanding share of common stock of Anadarko (subject to limited exceptions, including shares with respect to which dissenters' rights have been validly exercised in accordance with Delaware law) will be converted into the right to receive $16.25 in cash (without interest), and 0.3869 of a share of common stock of Chevron, plus cash in lieu of any fractional Chevron shares that otherwise would have been issued (the "Merger Consideration").

Pursuant to the Merger Agreement, at the Effective Time, Anadarko employee stock options, restricted stock units and restricted stock will convert into Chevron equity awards of the same category based on the value of the Merger Consideration at closing, Anadarko performance units will vest at closing and convert into the right to receive an amount in cash equal to $65 multiplied by 200% of the target number of shares covered by such performance units as provided in the resolutions of the Compensation and Benefits Committee of the board of directors of Anadarko (the "Compensation and Benefits Committee") adopted as of April 11, 2019, and each Anadarko director deferred share will convert into the right to receive the Merger Consideration.

The board of directors of Anadarko has unanimously approved the Merger Agreement and resolved to recommend the adoption of the Merger Agreement by Anadarko stockholders, who will be asked to vote on the adoption of the Merger Agreement at a special stockholders meeting.

The completion of the Combination is subject to satisfaction or waiver of certain customary mutual closing conditions, including (1) the receipt of the required approval from Anadarko stockholders, (2) the expiration or termination of the waiting period under the Hart-Scott-Rodino Act, as amended (the "HSR Act"), applicable to the Merger, (3) the absence of any order or law prohibiting consummation of the Combination, (4) the effectiveness of the Registration Statement on Form S-4 to be filed by Chevron pursuant to which the shares of Chevron common stock to be issued in connection with the Merger will be registered with the Securities and Exchange Commission (the "SEC") and (5) the authorization for listing on the New York Stock Exchange of the shares of Chevron common stock to be issued in connection with the Merger. The obligation of each party to consummate the Merger is also conditioned upon the other party's representations and warranties being true and correct (subject to certain materiality exceptions) and the other party having performed in all material respects its obligations under the Merger Agreement.

The Merger Agreement contains customary representations and warranties of Anadarko and Chevron relating to their respective businesses, financial statements and public filings, in each case generally subject to customary materiality qualifiers. Additionally, the Merger Agreement provides for customary pre-closing covenants of Anadarko and Chevron, including a covenant of Anadarko relating to conducting its business in the ordinary course, and covenants of each party to refrain from taking certain actions without the other party's consent. Anadarko and Chevron also agreed to use their respective best efforts to cause the Merger to be consummated and to obtain expiration or termination of the waiting period under the HSR Act, subject to certain exceptions, including that Chevron is not required to take or authorize any action that would reasonably be expected to have a material adverse effect (after giving effect to any reasonably expected proceeds of any divestiture or sale of assets) on the financial condition, business, assets or continuing results of operations of Anadarko (or, in the case of actions with respect to Chevron's pre-closing assets, on a company of Anadarko's size).

-2-

The Merger Agreement provides that, during the period from the date of the Merger Agreement until the Effective Time, Anadarko is subject to certain restrictions on its ability to solicit alternative acquisition proposals from third parties and to provide non-public information to third parties and to engage in negotiations with third parties regarding alternative acquisition proposals, subject to customary exceptions. Subject to certain exceptions, Anadarko is required to call a meeting of its stockholders to vote on a proposal to adopt the Merger Agreement and to recommend that its stockholders adopt the Merger Agreement.

The Merger Agreement contains termination rights for each of Anadarko and Chevron, including, among others, (1) if the consummation of the Merger does not occur on or before January 11, 2020, subject to extension to April 11, 2020 for the sole purpose of obtaining U.S. antitrust clearance and (2) subject to certain conditions, if Anadarko wishes to terminate the Merger Agreement to enter into a definitive agreement with respect to a Superior Proposal (as such term is defined in the Merger Agreement). Upon termination of the Merger Agreement under specified circumstances, including the termination by Chevron in the event of a change of recommendation by the board of directors of Anadarko or by Anadarko to enter into a definitive agreement with respect to a Superior Proposal, Anadarko would be required to pay Chevron a termination fee of $1,000,000,000.

The foregoing description of the Merger Agreement and the transactions contemplated thereby in this Current Report on Form 8-K is only a summary and does not purport to be complete and is qualified in its entirety by reference to the full text of the Merger Agreement, a copy of which is filed as Exhibit 2.1 hereto and incorporated by reference herein.

The Merger Agreement has been included to provide investors with information regarding its terms. It is not intended to provide any other factual information about Anadarko or Chevron. The representations, warranties and covenants contained in the Merger Agreement were made only for purposes of the Merger Agreement as of the specific dates therein, were solely for the benefit of the parties to the Merger Agreement, may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries under the Merger Agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of the parties thereto or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in Anadarko's public disclosures.

**Item 5.02.    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 11, 2019, the Compensation and Benefits Committee approved:

- amendments to the Severance Agreement with R.A. Walker, Anadarko's Chairman and Chief Executive Officer, and the Key Employee Change of Control Agreements with the other Anadarko named executive officers to provide that (1) the bonus for the year of termination under such agreement will be calculated on an annualized basis, and (2) the bonus prong of the severance calculation and the bonus for the year of termination will be determined using the higher of (a) the bonus performance percentage for the fiscal year in which an executive's termination of employment occurs and (b) the bonus performance percentage for the most recently completed year prior to the employment termination date;

-3-

- an amendment to Mr. Walker's severance agreement to eliminate the provision that reduces severance based on the number of years remaining until Mr. Walker reaches age 65;

- arrangements with each of Anadarko's named executive officers (other than Mr. Gwin) to make them whole for any negative economic impact resulting from the application of Section 4999 of the Internal Revenue Code in connection with the Merger; and

- payment, immediately prior to the Effective Time (if and as determined by the Compensation and Benefits Committee), to each of Anadarko's named executive officers of a bonus equal to 200% of the executive's target bonus for fiscal year 2019.

The Company's named executive officers are Mr. Walker, Robert G. Gwin, President, Benjamin M. Fink, Executive Vice President, Finance and Chief Financial Officer, Mitchell W. Ingram, Executive Vice President, International, Deepwater and Exploration, Daniel E. Brown, Executive Vice President, U.S. Onshore Operations and Amanda M. McMillian, Executive Vice President and General Counsel. In addition to the foregoing, the fourth paragraph of Item 1.01 is incorporated by reference into this Item 5.02.

**Item 5.03.    Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On April 11, 2019, the board of directors of Anadarko amended and restated Anadarko's By-Laws (the "By-Laws") by adding a new Article XII containing a forum selection provision (the "Amendment"). The Amendment provides that, unless Anadarko consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of Anadarko, (ii) any action asserting a claim for or based on a breach of a fiduciary duty owed by any current or former director or officer or other employee of Anadarko to Anadarko or to Anadarko's stockholders, including a claim alleging the aiding and abetting of such a breach of fiduciary duty, (iii) any action asserting a claim against Anadarko or any current or former director or officer or other employee of Anadarko arising pursuant to any provision of the General Corporation Law of the State of Delaware (the "DGCL") or Anadarko's certificate of incorporation or the By-Laws (as either may be amended from time to time), (iv) any action asserting a claim related to or involving Anadarko that is governed by the internal affairs doctrine, or (v) any action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL shall be a state court within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware).

This summary is qualified in its entirety by reference to the By-Laws, as amended and restated as of April 11, 2019, and filed as Exhibit 3.1 hereto and incorporated by reference herein.

**Item 8.01.    Other Events.**

In light of the pending Merger, Anadarko has indefinitely postponed its 2019 annual meeting of stockholders, which had previously been scheduled for May 14, 2019 and with respect to which Anadarko had previously filed a definitive proxy statement with the SEC on March 29, 2019.

**Item 9.01.    Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description of Exhibit |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of April 11, 2019, by and among Chevron Corporation, Justify Merger Sub 1 Inc., Justify Merger Sub 2 Inc. and Anadarko Petroleum Corporation.† |
| 3.1 | By-Laws of Anadarko Petroleum Corporation, amended and restated as of April 11, 2019. |

† Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant hereby undertakes to furnish supplementally copies of any of the omitted schedules upon request by the SEC.

-4-

**Important Information For Investors And Stockholders**

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended. In connection with the potential transaction, Chevron expects to file a registration statement on Form S-4 with the Securities and Exchange Commission ("SEC") containing a preliminary prospectus of Chevron that also constitutes a preliminary proxy statement of Anadarko. After the registration statement is declared effective Anadarko will mail a definitive proxy statement/prospectus to stockholders of Anadarko. This communication is not a substitute for the proxy statement/prospectus or registration statement or for any other document that Chevron or Anadarko may file with the SEC and send to Anadarko's stockholders in connection with the potential transaction. INVESTORS AND SECURITY HOLDERS OF CHEVRON AND ANADARKO ARE URGED TO READ THE PROXY STATEMENT/PROSPECTUS AND OTHER DOCUMENTS FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Investors and security holders will be able to obtain free copies of the proxy statement/prospectus (when available) and other documents filed with the SEC by Chevron or Anadarko through the website maintained by the SEC at http://www.sec.gov. Copies of the documents filed with the SEC by Chevron will be available free of charge on Chevron's website at http://www.chevron.com/investors and copies of the documents filed with the SEC by Anadarko will be available free of charge on Anadarko's website at http://investors.anadarko.com.

Chevron and Anadarko and certain of their respective directors, certain of their respective executive officers and other members of management and employees may be considered participants in the solicitation of proxies with respect to the potential transaction under the rules of the SEC. Information about the directors and executive officers of Chevron is set forth in its Annual Report on Form 10-K for the year ended December 31, 2018, which was filed with the SEC on February 22, 2019, and its proxy statement for its 2019 annual meeting of stockholders, which was filed with the SEC on April 15, 2019. Information about the directors and executive officers of Anadarko is set forth in its Annual Report on Form 10-K for the year ended December 31, 2018, which was filed with the SEC on February 14, 2019, and its proxy statement for its 2019 annual meeting of stockholders, which was filed with the SEC on March 29, 2019. These documents can be obtained free of charge from the sources indicated above. Additional information regarding the interests of such participants in the solicitation of proxies in respect of the potential transaction will be included in the registration statement and proxy statement/prospectus and other relevant materials to be filed with the SEC when they become available.

-5-

**Cautionary Statement Regarding Forward-Looking Information**

This report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including regarding the proposed transaction. These include the timing, receipt and terms and conditions of any required governmental and regulatory approvals of the proposed transaction that could reduce anticipated benefits or cause the parties to abandon the proposed transaction, the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement, the possibility that stockholders of Anadarko may not adopt the merger agreement, the risk that the parties may not be able to satisfy the conditions to the proposed transaction in a timely manner or at all, risks related to disruption of management time from ongoing business operations due to the proposed transaction, the risk that any announcements relating to the proposed transaction could have adverse effects on the market price of Anadarko's common stock or Chevron's common stock, the risk of any unexpected costs or expenses resulting from the proposed transaction, the risk of any litigation relating to the proposed transaction, the risk that the proposed transaction and its announcement could have an adverse effect on the ability of Anadarko or Chevron to retain customers and retain and hire key personnel and maintain relationships with their suppliers, customers and other business relationships and on their operating results and businesses generally, the risk the pending proposed transaction could distract management of both entities and they will incur substantial costs, the risk that problems may arise in successfully integrating the businesses of the companies, which may result in the combined company not operating as effectively and efficiently as expected, the risk that the combined company may be unable to achieve synergies or other anticipated benefits of the proposed transaction or it may take longer than expected to achieve those synergies or benefits and other important factors that could cause actual results to differ materially from those projected. All such factors are difficult to predict and are beyond Anadarko's control. Additional factors that could cause results to differ materially from those described above can be found in Anadarko's most recent Annual Report on Form 10-K, as it may be updated from time to time by quarterly reports on Form 10-Q and current reports on Form 8-K all of which are available on Anadarko's website at http://investors.anadarko.com/sec-filings and on the SEC's website at http://www.sec.gov, and in Chevron's most recent Annual Report on Form 10-K, as it may be updated from time to time by quarterly reports on Form 10-Q and current reports on Form 8-K all of which are available on Chevron's website at https://www.chevron.com/investors/financial-information#secfilings and on the SEC's website at http://www.sec.gov.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: April 17, 2019

**ANADARKO PETROLEUM CORPORATION**
(Registrant)

By: /s/ Amanda M. McMillian
     Amanda M. McMillian
     Executive Vice President and General Counsel

-7-

# Exhibit 101

Home | Previous Page

U.S. Securities and Exchange Commission

## SEC Staff Accounting Bulletin:
## No. 99 – Materiality

SECURITIES AND EXCHANGE COMMISSION
17 CFR Part 211
[Release No. SAB 99]
Staff Accounting Bulletin No. 99

**AGENCY:** Securities and Exchange Commission

**ACTION:** Publication of Staff Accounting Bulletin

**SUMMARY:** This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.

**DATE:** August 12, 1999

**FOR FURTHER INFORMATION CONTACT:** W. Scott Bayless, Associate Chief Accountant, or Robert E. Burns, Chief Counsel, Office of the Chief Accountant (202-942-4400), or David R. Fredrickson, Office of General Counsel (202-942-0900), Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-1103; electronic addresses: BaylessWS@sec.gov; BurnsR@sec.gov; FredricksonD@sec.gov.

**SUPPLEMENTARY INFORMATION:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

    Jonathan G. Katz

    Secretary

Date: August 12, 1999

---

Part 211 - (AMEND) Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 99 to the table found in Subpart B.

### STAFF ACCOUNTING BULLETIN NO. 99

The staff hereby adds Section M to Topic 1 of the Staff Accounting Bulletin Series. Section M, entitled "Materiality," provides guidance in applying materiality thresholds to the preparation of financial statements filed with the Commission and the performance of audits of those financial statements.

### STAFF ACCOUNTING BULLETINS

### TOPIC 1: FINANCIAL STATEMENTS

\* \* \* \* \*

M. Materiality

**1. Assessing Materiality**

**Facts**: During the course of preparing or auditing year-end financial statements, financial management or the registrant's independent auditor becomes aware of misstatements in a registrant's financial statements. When combined, the misstatements result in a 4% overstatement of net income and a $.02 (4%) overstatement of earnings per share. Because no item in the registrant's consolidated financial statements is misstated by more than 5%, management and the independent auditor conclude that the deviation from generally accepted accounting principles ("GAAP") is immaterial and that the accounting is permissible.[1]

**Question**: Each Statement of Financial Accounting Standards adopted by the Financial Accounting Standards Board ("FASB") states, "The provisions of this Statement need not be applied to immaterial items." In the staff's view, may a registrant or the auditor of its financial statements assume the immateriality of items that fall below a percentage threshold set by management or the auditor to determine whether amounts and items are material to the financial statements?

**Interpretive Response**: No. The staff is aware that certain registrants, over time, have developed quantitative thresholds as "rules of thumb" to assist in the preparation of their financial statements, and that auditors also have used these thresholds in their evaluation of whether items might be considered material to users of a registrant's financial statements. One rule of thumb in particular suggests that the misstatement or omission[2] of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management. The staff reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law.

The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important. In its Statement of Financial Accounting Concepts No. 2, the FASB stated the essence of the concept of materiality as follows:

The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[3]

This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is –

a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. [4]

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality.[5] Court decisions, Commission rules and enforcement actions, and accounting and auditing literature[6] have all considered "qualitative" factors in various contexts.

The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement No. 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view," stating –

The predominant view is that materiality judgments can properly be made only by those who have all the facts. The Board's present position is that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment. [7]

The FASB noted that, in certain limited circumstances, the Commission and other authoritative bodies had issued quantitative materiality guidance, citing as examples guidelines ranging from one to ten percent with respect to a variety of disclosures.[8] And it took account of contradictory studies, one showing a lack of uniformity among auditors on materiality judgments, and another suggesting widespread use of a "rule of thumb" of five to ten percent of net income.[9] The FASB also considered whether an evaluation of materiality could be based solely on anticipating the market's reaction to accounting information.[10]

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions"[11] in favor of an approach that takes into account all the relevant considerations. In so doing, it made clear that –

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.[12]

Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature:

As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.[13]

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate[14]

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

- whether the misstatement changes a loss into income or vice versa

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

- whether the misstatement affects the registrant's compliance with regulatory requirements

- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.[15] Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself "too blunt an instrument to be depended on" in considering whether a fact is material.[16] When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.[17]

For the reasons noted above, the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.[18] While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.[19] The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment

of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole.[20] "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity"[21] is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information - as with materiality generally -

situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.[22]

### *Aggregating and Netting Misstatements*

In determining whether multiple misstatements cause the financial statements to be materially misstated, registrants and the auditors of their financial statements should consider each misstatement separately and the aggregate effect of all misstatements.[23] A registrant and its auditor should evaluate misstatements in light of quantitative and qualitative factors and "consider whether, in relation to individual line item amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole."[24] This requires consideration of -

the significance of an item to a particular entity (for example, inventories to a manufacturing company), the pervasiveness of the misstatement (such as whether it affects the presentation of numerous financial statement items), and the effect of the misstatement on the financial statements taken as a whole ....[25]

Registrants and their auditors first should consider whether each misstatement is material, irrespective of its effect when combined with other misstatements. The literature notes that the analysis should consider whether the misstatement of "individual amounts" causes a material misstatement of the financial statements taken as a whole. As with materiality generally, this analysis requires consideration of both quantitative and qualitative factors.

If the misstatement of an individual amount causes the financial statements as a whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial statement items. To take an obvious example, if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses.

Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.[26]

The staff believes that, in considering the aggregate effect of multiple misstatements on a subtotal or total, registrants and the auditors of their financial statements should exercise particular care when considering whether to offset (or the appropriateness of offsetting) a misstatement of an estimated amount with a misstatement of an item capable of precise measurement. As noted above, assessments of materiality should never be purely mechanical; given the imprecision inherent in estimates, there is by definition a corresponding imprecision in the aggregation of misstatements involving estimates with those that do not involve an estimate.

Registrants and auditors also should consider the effect of misstatements from prior periods on the current financial statements. For example, the auditing literature states,

Matters underlying adjustments proposed by the auditor but not recorded by the entity could potentially cause future financial statements to be materially misstated, even though the auditor has concluded that the adjustments are not material to the current financial statements.[27]

This may be particularly the case where immaterial misstatements recur in several years and the cumulative effect becomes material in the current year.

### 2. Immaterial Misstatements That are Intentional

**Facts**: A registrant's management intentionally has made adjustments to various financial statement items in a manner inconsistent with GAAP. In each accounting period in which such actions were taken, none of the individual adjustments is by itself material, nor is the aggregate effect on the financial statements taken as a whole material for the period. The registrant's earnings "management" has been effected at the direction or acquiescence of management in the belief that any deviations from GAAP have been immaterial and that accordingly the accounting is permissible.

**Question**: In the staff's view, may a registrant make intentional immaterial misstatements in its financial statements?

**Interpretive Response**: No. In certain circumstances, intentional immaterial misstatements are unlawful.

***Considerations of the Books and Records Provisions Under the Exchange Act***

Even if misstatements are immaterial,[28] registrants must comply with Sections 13(b)(2) - (7) of the Securities Exchange Act of 1934 (the "Exchange Act").[29] Under these provisions, each registrant with securities registered pursuant to Section 12 of the Exchange Act,[30] or required to file reports pursuant to Section 15(d),[31] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.[32] In this context, determinations of what constitutes "reasonable assurance" and "reasonable detail" are based not on a "materiality" analysis but on the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs.[33] Accordingly, failure to record accurately immaterial items, in some instances, may result in violations of the securities laws.

The staff recognizes that there is limited authoritative guidance[34] regarding the "reasonableness" standard in Section 13(b)(2) of the Exchange Act. A principal statement of the Commission's policy in this area is set forth in an address given in 1981 by then Chairman Harold M. Williams.[35] In his address, Chairman Williams noted that, like materiality, "reasonableness" is not an "absolute standard of exactitude for corporate records."[36] Unlike materiality, however, "reasonableness" is not solely a measure of the significance of a financial statement item to investors. "Reasonableness," in this context, reflects a judgment as to whether an issuer's failure to correct a known misstatement implicates the purposes underlying the accounting provisions of Sections 13(b)(2) - (7) of the Exchange Act.[37]

In assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate "in reasonable detail," registrants and their auditors should consider, in addition to the factors discussed above concerning an evaluation of a misstatement's potential materiality, the factors set forth below.

- **The significance of the misstatement**. Though the staff does not believe that registrants need to make finely calibrated determinations of significance with respect to immaterial items, plainly it is "reasonable" to treat misstatements whose effects are clearly inconsequential differently than more significant ones.

- **How the misstatement arose**. It is unlikely that it is ever "reasonable" for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as part of an ongoing effort directed by or known to senior management for the purposes of "managing" earnings. On the other hand, insignificant misstatements that arise from the operation of systems or recurring processes in the normal course of business generally will not cause a registrant's books to be inaccurate "in reasonable detail."[38]

- **The cost of correcting the misstatement**. The books and records provisions of the Exchange Act do not require registrants to make major expenditures to correct small misstatements.[39] Conversely, where there is little cost or delay involved in correcting a misstatement, failing to do so is unlikely to be "reasonable."

- **The clarity of authoritative accounting guidance with respect to the misstatement**. Where reasonable minds may differ about the appropriate accounting treatment of a financial statement item, a failure to correct it may not render the registrant's financial statements inaccurate "in reasonable detail." Where, however, there is little ground for reasonable disagreement, the case for leaving a misstatement uncorrected is correspondingly weaker.

There may be other indicators of "reasonableness" that registrants and their auditors may ordinarily consider. Because the judgment is not mechanical, the staff will be inclined to continue to defer to judgments that "allow a business, acting in good faith, to comply with the Act's accounting provisions in an innovative and cost-effective way."[40]

### *The Auditor's Response to Intentional Misstatements*

Section 10A(b) of the Exchange Act requires auditors to take certain actions upon discovery of an "illegal act."[41] The statute specifies that these obligations are triggered "whether or not [the illegal acts are] perceived to have a material effect on the financial statements of the issuer . . . ." Among other things, Section 10A(b)(1) requires the auditor to inform the

appropriate level of management of an illegal act (unless clearly inconsequential) and assure that the registrant's audit committee is "adequately informed" with respect to the illegal act.

As noted, an intentional misstatement of immaterial items in a registrant's financial statements may violate Section 13(b)(2) of the Exchange Act and thus be an illegal act. When such a violation occurs, an auditor must take steps to see that the registrant's audit committee is "adequately informed" about the illegal act. Because Section 10A(b)(1) is triggered regardless of whether an illegal act has a material effect on the registrant's financial statements, where the illegal act consists of a misstatement in the registrant's financial statements, the auditor will be required to report that illegal act to the audit committee irrespective of any "netting" of the misstatements with other financial statement items.

The requirements of Section 10A echo the auditing literature. See, for example, Statement on Auditing Standards No. ("SAS") 54, "Illegal Acts by Clients," and SAS 82, "Consideration of Fraud in a Financial Statement Audit." Pursuant to paragraph 38 of SAS 82, if the auditor determines there is evidence that fraud may exist, the auditor must discuss the matter with the appropriate level of management. The auditor must report directly to the audit committee fraud involving senior management and fraud that causes a material misstatement of the financial statements. Paragraph 4 of SAS 82 states that "misstatements arising from fraudulent financial reporting are intentional misstatements or omissions of amounts or disclosures in financial statements to deceive financial statement users."[42] SAS 82 further states that fraudulent financial reporting may involve falsification or alteration of accounting records; misrepresenting or omitting events, transactions or other information in the financial statements; and the intentional misapplication of accounting principles relating to amounts, classifications, the manner of presentation, or disclosures in the financial statements.[43] The clear implication of SAS 82 is that immaterial misstatements may be fraudulent financial reporting. [44]

Auditors that learn of intentional misstatements may also be required to (1) re-evaluate the degree of audit risk involved in the audit engagement, (2) determine whether to revise the nature, timing, and extent of audit procedures accordingly, and (3) consider whether to resign.[45]

Intentional misstatements also may signal the existence of reportable conditions or material weaknesses in the registrant's system of internal accounting control designed to detect and deter improper accounting and financial reporting.[46] As stated by the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, in its 1987 report,

The tone set by top management - the corporate environment or culture within which financial reporting occurs - is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[47]

An auditor is required to report to a registrant's audit committee any reportable conditions or material weaknesses in a registrant's system of internal accounting control that the auditor discovers in the course of the examination of the registrant's financial statements. [48]

***GAAP Precedence Over Industry Practice***

Some have argued to the staff that registrants should be permitted to follow an industry accounting practice even though that practice is inconsistent with authoritative accounting literature. This situation might occur if a practice is developed when there are few transactions and the accounting results are clearly inconsequential, and that practice never changes despite a subsequent growth in the number or materiality of such transactions. The staff disagrees with this argument. Authoritative literature takes precedence over industry practice that is contrary to GAAP.[49]

### *General Comments*

This SAB is not intended to change current law or guidance in the accounting or auditing literature.[50] This SAB and the authoritative accounting literature cannot specifically address all of the novel and complex business transactions and events that may occur. Accordingly, registrants may account for, and make disclosures about, these transactions and events based on analogies to similar situations or other factors. The staff may not, however, always be persuaded that a registrant's determination is the most appropriate under the circumstances. When disagreements occur after a transaction or an event has been reported, the consequences may be severe for registrants, auditors, and, most importantly, the users of financial statements who have a right to expect consistent accounting and reporting for, and disclosure of, similar transactions and events. The staff, therefore, encourages registrants and auditors to discuss on a timely basis with the staff proposed accounting treatments for, or disclosures about, transactions or events that are not specifically covered by the existing accounting literature.

---

**Footnotes**

1   American Institute of Certified Public Accountants ("AICPA"), Codification of Statements on Auditing Standards ("AU") § 312, "Audit Risk and Materiality in Conducting an Audit," states that the auditor should consider audit risk and materiality both in (a) planning and setting the scope for the audit and (b) evaluating whether the financial statements taken as a whole are fairly presented in all material respects in conformity with generally accepted accounting principles. The purpose of this Staff Accounting Bulletin ("SAB") is to provide guidance to financial management and independent auditors with respect to the evaluation of the materiality of misstatements that are identified in the audit process or preparation of the financial statements (i.e., (b) above). This SAB is not intended to provide definitive guidance for assessing "materiality" in other contexts, such as evaluations of auditor independence, as other factors may apply. There may be other rules that address financial presentation. See, e.g., Rule 2a-4, 17 CFR 270.2a-4, under the Investment Company Act of 1940.

2   As used in this SAB, "misstatement" or "omission" refers to a financial statement assertion that would not be in conformity with GAAP.

3   FASB, Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information ("Concepts Statement No. 2"), 132 (1980). See also Concepts Statement No. 2, Glossary of Terms - Materiality.

4   TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988). As the Supreme Court has noted, determinations of materiality require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him . . . ." TSC Industries, 426 U.S. at 450.

5   See, e.g., Concepts Statement No. 2, 123-124; AU § 312.10 (" . . . materiality judgments are made in light of surrounding circumstances and necessarily involve both quantitative and qualitative considerations."); AU § 312.34 ("Qualitative considerations also influence the auditor in reaching a conclusion as to whether misstatements are material."). As used in the accounting literature and in this SAB, "qualitative" materiality refers to the surrounding circumstances that inform an investor's evaluation of financial statement entries. Whether events may be material to investors for non-financial reasons is a matter not addressed by this SAB.

6   See, e.g., Rule 1-02(o) of Regulation S-X, 17 CFR 210.1-02(o), Rule 405 of Regulation C, 17 CFR 230.405, and Rule 12b-2, 17 CFR 240.12b-2; AU §§ 312.10 - .11, 317.13, 411.04 n. 1, and 508.36; In re Kidder Peabody Securities Litigation, 10 F. Supp. 2d 398 (S.D.N.Y. 1998); Parnes v. Gateway 2000, Inc., 122 F.3d 539 (8th Cir. 1997); In re Westinghouse Securities Litigation, 90 F.3d 696 (3d Cir. 1996); In the Matter of W.R. Grace & Co., Accounting and Auditing Enforcement Release No. ("AAER") 1140 (June 30, 1999); In the Matter of Eugene Gaughan, AAER 1141 (June 30, 1999); In the Matter of Thomas Scanlon, AAER 1142 (June 30, 1999); and In re Sensormatic Electronics Corporation, Sec. Act Rel. No. 7518 (March 25, 1998).

7   Concepts Statement No. 2, 131 (1980).

8   Concepts Statement No. 2, 131 and 166.

9   Concepts Statement No. 2, 167.

10  Concepts Statement No. 2, 168-69.

11  Concepts Statement No. 2, 170.

12  Concepts Statement No. 2, 125.

13  AU § 312.11.

14  As stated in Concepts Statement No. 2, 130:
    Another factor in materiality judgments is the degree of precision that is attainable in estimating the judgment item. The amount of deviation that is considered immaterial may increase as the attainable degree of precision decreases. For example, accounts payable usually can be estimated more accurately than can contingent liabilities arising from litigation or threats of it, and a deviation considered to be material in the first case may be quite trivial in the second. This SAB is not intended to change current law or guidance in the accounting literature regarding accounting estimates. See, e.g., Accounting Principles Board Opinion No. 20, Accounting Changes 10, 11, 31-33 (July 1971).

15  The staff understands that the Big Five Audit Materiality Task Force ("Task Force") was convened in March of 1998 and has made recommendations to the Auditing Standards Board including suggestions regarding communications with audit committees about unadjusted misstatements. See generally Big Five Audit Materiality Task Force, "Materiality in a Financial Statement Audit – Considering Qualitative Factors When Evaluating Audit Findings" (August 1998). The Task Force memorandum is available at www.aicpa.org.

16  See Concepts Statement No. 2, 169.

17  If management does not expect a significant market reaction, a misstatement still may be material and should be evaluated under the criteria discussed in this SAB.

18  Intentional management of earnings and intentional misstatements, as used in this SAB, do not include insignificant errors and omissions that may occur in systems and recurring processes in the normal course of business. See notes 38 and 50 infra.

19 Assessments of materiality should occur not only at year-end, but also during the preparation of each quarterly or interim financial statement. See, e.g., In the Matter of Venator Group, Inc., AAER 1049 (June 29, 1998).

20 See, e.g., In the Matter of W.R. Grace & Co., AAER 1140 (June 30, 1999).

21 AUI § 326.33.

22 Id.

23 The auditing literature notes that the "concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements in conformity with generally accepted accounting principles." AU § 312.03. See also AU § 312.04.

24 AU § 312.34. Quantitative materiality assessments often are made by comparing adjustments to revenues, gross profit, pretax and net income, total assets, stockholders' equity, or individual line items in the financial statements. The particular items in the financial statements to be considered as a basis for the materiality determination depend on the proposed adjustment to be made and other factors, such as those identified in this SAB. For example, an adjustment to inventory that is immaterial to pretax income or net income may be material to the financial statements because it may affect a working capital ratio or cause the registrant to be in default of loan covenants.

25 AU § 508.36.

26 AU § 312.34

27 AU § 380.09.

28 FASB Statements of Financial Accounting Standards ("Standards" or "Statements") generally provide that "[t]he provisions of this Statement need not be applied to immaterial items." This SAB is consistent with that provision of the Statements. In theory, this language is subject to the interpretation that the registrant is free intentionally to set forth immaterial items in financial statements in a manner that plainly would be contrary to GAAP if the misstatement were material. The staff believes that the FASB did not intend this result.

29 15 U.S.C. §§ 78m(b)(2) - (7).

30 15 U.S.C. § 78l.

31 15 U.S.C. § 78o(d).

32 Criminal liability may be imposed if a person knowingly circumvents or knowingly fails to implement a system of internal accounting controls or knowingly falsifies books, records or accounts. 15 U.S.C. §§ 78m(4) and (5). See also Rule 13b2-1 under the Exchange Act, 17 CFR 240.13b2-1, which states, "No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."

33 15 U.S.C. § 78m(b)(7). The books and records provisions of section 13(b) of the Exchange Act originally were passed as part of the Foreign Corrupt Practices Act ("FCPA"). In the conference committee report regarding the 1988 amendments to the FCPA, the committee stated,

The conference committee adopted the prudent man qualification in order to clarify that the current standard does not connote an unrealistic degree of exactitude or precision. The concept of reasonableness of necessity contemplates the weighing of a number of relevant factors, including the costs of compliance.

Cong. Rec. H2116 (daily ed. April 20, 1988).

34 So far as the staff is aware, there is only one judicial decision that discusses Section 13(b)(2) of the Exchange Act in any detail, SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724 (N.D. Ga. 1983), and the courts generally have found that no private right of action exists under the accounting and books and records provisions of the Exchange Act. See e.g., Lamb v. Phillip Morris Inc., 915 F.2d 1024 (6th Cir. 1990) and JS Service Center Corporation v. General Electric Technical Services Company, 937 F. Supp. 216 (S.D.N.Y. 1996).

35 The Commission adopted the address as a formal statement of policy in Securities Exchange Act Release No. 17500 (January 29, 1981), 46 FR 11544 (February 9, 1981), 21 SEC Docket 1466 (February 10, 1981).

36 Id. at 46 FR 11546.

37 Id.

38 For example, the conference report regarding the 1988 amendments to the FCPA stated,

The Conferees intend to codify current Securities and Exchange Commission (SEC) enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct. The amendment adopted by the Conferees [Section 13(b)(4)] accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the FCPA's books and records or accounting provisions. This provision [Section 13(b)(5)] is meant to ensure that criminal penalties would be imposed where acts of commission or omission in keeping books or records or administering accounting controls have the purpose of falsifying books, records or accounts, or of circumventing the accounting controls set forth in the Act. This would include the deliberate falsification of books and records and other conduct calculated to evade the internal accounting controls requirement.

Cong. Rec. H2115 (daily ed. April 20, 1988).

39 As Chairman Williams noted with respect to the internal control provisions of the FCPA, "[t]housands of dollars ordinarily should not be spent conserving hundreds." 46 FR 11546.

40 Id., at 11547.

41 Section 10A(f) defines, for purposes of Section 10A, an "illegal act" as "an act or omission that violates any law, or any rule or regulation having the force of law." This is broader than the definition of an "illegal act" in AU § 317.02, which states, "Illegal acts by clients do not include personal misconduct by the entity's personnel unrelated to their business activities."

42 AU § 316.04. See also AU § 316.03. An unintentional illegal act triggers the same procedures and considerations by the auditor as a fraudulent misstatement if the illegal act has a direct and material effect on the financial statements. See AU §§ 110 n. 1, 316 n. 1, 317.05 and 317.07. Although distinguishing between intentional and unintentional misstatements is often difficult, the auditor must plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatements in either case. See AU § 316 note 3.

43 AU § 316.04. Although the auditor is not required to plan or perform the audit to detect misstatements that are immaterial to the financial statements, SAS 82 requires the auditor to evaluate several fraud "risk factors" that may bring such misstatements to his or her attention. For example, an analysis of fraud risk factors under SAS 82 must include,

among other things, consideration of management's interest in maintaining or increasing the registrant's stock price or earnings trend through the use of unusually aggressive accounting practices, whether management has a practice of committing to analysts or others that it will achieve unduly aggressive or clearly unrealistic forecasts, and the existence of assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties. See AU §§ 316.17a and .17c.

44 AU §§ 316.34 and 316.35, in requiring the auditor to consider whether fraudulent misstatements are material, and in requiring differing responses depending on whether the misstatement is material, make clear that fraud can involve immaterial misstatements. Indeed, a misstatement can be "inconsequential" and still involve fraud.

Under SAS 82, assessing whether misstatements due to fraud are material to the financial statements is a "cumulative process" that should occur both during and at the completion of the audit. SAS 82 further states that this accumulation is primarily a "qualitative matter" based on the auditor's judgment. AU § 316.33. The staff believes that in making these assessments, management and auditors should refer to the discussion in Part 1 of this SAB.

45 AU §§ 316.34 and 316.36. Auditors should document their determinations in accordance with AU §§ 316.37, 319.57, 339, and other appropriate sections.

46 See, e.g., AU § 316.39.

47 Report of the National Commission on Fraudulent Financial Reporting at 32 (October 1987). See also Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (February 8, 1999).

48 AU § 325.02. See also AU § 380.09, which, in discussing matters to be communicated by the auditor to the audit committee, states,

The auditor should inform the audit committee about adjustments arising from the audit that could, in his judgment, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. For purposes of this section, an audit adjustment, whether or not recorded by the entity, is a proposed correction of the financial statements....

49 See AU § 411.05.

50  The FASB Discussion Memorandum, Criteria for Determining Materiality, states that the financial accounting and reporting process considers that "a great deal of the time might be spent during the accounting process considering insignificant matters . . . . If presentations of financial information are to be prepared economically on a timely basis and presented in a concise intelligible form, the concept of materiality is crucial." This SAB is not intended to require that misstatements arising from insignificant errors and omissions (individually and in the aggregate) arising from the normal recurring accounting close processes, such as a clerical error or an adjustment for a missed accounts payable invoice, always be corrected, even if the error is identified in the audit process and known to management. Management and the auditor would need to consider the various factors described elsewhere in this SAB in assessing whether such misstatements are material, need to be corrected to comply with the FCPA, or trigger procedures under Section 10A of the Exchange Act. Because this SAB does not change current law or guidance in the accounting or auditing literature, adherence to the principles described in this SAB should not raise the costs associated with recordkeeping or with audits of financial statements.

*http://www.sec.gov/rules/acctrps/sab99.htm*

# Exhibit 102

**To:** Trautman, Tim[Tim.Trautman@anadarko.com]
**From:** Ramsey, Jake[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=EKD126]
**Sent:** Tue 4/1/2014 10:03:55 PM Coordinated Universal Time
**Subject:** FW: Shenandoah UW-1 Update with Appraisal well Option locations
**Attachment:** Cobalt_Shenandoah Partner meeting 25July13.pdf
**Attachment:** Shenandoah (MRO Map).pdf
**Attachment:** Shenandoah_COP_displays_31_July_2013 to Partners.pdf
**Attachment:** Shenandoah_partner_meeting_July25_2013_Venari_Wilcox2andCretaceous_maps.pptx

Tim,

Just FYI below on email exchange between myself and our development counterparts on Shenandoah. Paints a good picture on their value of the north south fault trending down the center of Shenandoah and how it impacts THEIR forward planning.

I shared with them, the partner structure maps we previously obtained last year. It will be interesting to see Conoco's and Marathon's updated interpretations tomorrow.

Jake

---

**From:** Ramsey, Jake
**Sent:** Tuesday, April 01, 2014 4:58 PM
**To:** Rodriguez, Arnold; Browning, Brad; Frye, Lea; McGrievy, Pat; Chandler, Paul; Butaud, Todd
**Subject:** RE: Shenandoah UW-1 Update with Appraisal well Option locations

Thanks Brad. I'll check with Jim Kunning on IF the well has any bottom hole flexibility available.

An important data point to consider though, is the raw lack of structural consensus (internally and externally) that currently exists at Shenandoah. I have seen eight different maps of Shenandoah from six different companies (two different maps internally), and the only similarity between the 8 is the overall 3-way shape. Attached are the maps from our Shen partners, that were traded several months ago. Unfortunately at the pace I am observing, we will likely not have a consistent map between all respective mappers, until a whole lot more data comes to light (final and consistent seismic to start, pressure data, FLAIR/geochemistry, and possibly even production PTA). Given all the structural uncertainties we currently have with everyone involved, I think it will be a very hard task to persuade a majority of parties (internally and externally) to modify the current bottom hole location of Shen 3, based purely on the Yucatan pressure data. I'll personally be looking at it hard and weighing the options appropriately, but I am mindful of the very complex dance that will ensue.

With all that said though, if any north-south faulting exists that could potentially compartmentalize Shenandoah, it would represent the largest risk element to appropriately appraising this project. It's my opinion, that we should come to a consensus internally, on the probability of any potential faulting at Shenandoah, and particularly regarding the "pink" fault. We're using the same data, we're all on the same APC GOM team, so there should be no real reason we can't reach a consensus. If we are aligned internally, then we will be able to make the appropriate appraisal decisions as operator.

Jake

---

**From:** Rodriguez, Arnold
**Sent:** Tuesday, April 01, 2014 12:40 PM
**To:** Browning, Brad; Frye, Lea; McGrievy, Pat; Chandler, Paul; Butaud, Todd
**Cc:** Ramsey, Jake
**Subject:** RE: Shenandoah UW-1 Update with Appraisal well Option locations

Brad,
I hope we have the flexibility, if necessary, to land the S3 well in the oil column using all the information at our disposal to drive that target.

Thanks,
Arnold

---

**From:** Browning, Brad
**Sent:** Tuesday, April 01, 2014 12:34 PM
**To:** Rodriguez, Arnold; Frye, Lea; McGrievy, Pat; Chandler, Paul; Butaud, Todd
**Cc:** Ramsey, Jake
**Subject:** RE: Shenandoah UW-1 Update with Appraisal well Option locations

**Case for Flexibility in Finalizing the Bottom-hole Location for Appraisal Well S3**
If the "Pink" fault seals, the oil-water contact in the S3 fault block is independent from the S2 fault block.

If we receive Yucatan pressure data in the aquifer, we should have an estimated oil-water contact based on gradients from S2, but it will not necessarily be relevant for the S3 fault block.

If we find that the estimated contact is above the planned S3 penetration, intentionally drilling a wet S3 test will do nothing to definitely test the large S3 fault block.

We cannot assume there is oil above us at S3. (In K2 for example, the north fault block is HC charged in the M14 but the south fault block is wet.)

CONFIDENTIAL

APC-00117333

With effectively only one well in our reservoir, I think confirming HC pore volume is still our first priority. Testing aquifer properties might be important, but only after confirming commercial OIP.

I believe the sensible approach is to not "finalize" the S3 bottom-hole location until we have data from Yucatan. And if the projected contact is at a level between S2 and S3, we should move S3's BHL to target above this notional OWC.

Comments?

Thanks.

Brad

---

**From:** Rodriguez, Arnold
**Sent:** Tuesday, April 01, 2014 11:49 AM
**To:** Frye, Lea; McGrievy, Pat; Chandler, Paul; Browning, Brad; Butaud, Todd
**Subject:** Shenandoah UW-1 Update with Appraisal well Option locations

B:\05_SHENANDOAH_WR51-52-96\08_GEOLOGY\2014_Dev_Mapping\2014-04-01_ShenOnlyDev_UW-1_AppraisalOptions.pptx

Pat,
You had asked for a slide (like#3) that could summarize our options for appraisal pending S3 results.

Arnold

APC-00117334

# Exhibit 103

**To:** Hollek, Darrell[Darrell.Hollek@anadarko.com]
**From:** McGrievy, Pat[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=QAJ309]
**Sent:** Tue 3/24/2015 12:50:43 PM Coordinated Universal Time
**Subject:** RE: 2015_03_Shenandoah_Economics_Update.pptx

Keep in mind that there's still room for some optimization and additional sensitivities:

- Additional commingling strategies which can help to sustain max rates over longer periods of time
- Incorporating the Shen 5 as part of a dry tree or SSTB scenario for Phase 1; it's currently considered a sunk cost appraisal well – $236 MM; this would eliminate the need for one of the dry tree Drill wells at $150 MM. We've resisted this approach since we don't know exactly where the Shen 5 will be placed. It can be run as a sensitivity, however.
- Better definition on asphaltene onset pressures which will impact rates and EUR.

**From:** Hollek, Darrell
**Sent:** Tuesday, March 24, 2015 7:26 AM
**To:** McGrievy, Pat
**Subject:** RE: 2015_03_Shenandoah_Economics_Update.pptx

Interesting. One of the issues I know Chuck still has is that Portfolio still contains Exploration scenario which he knows is different than our runs. Like I told him our numbers are built on the latest assumptions of costs and activities on what we know today.

**From:** McGrievy, Pat
**Sent:** Tuesday, March 24, 2015 7:18 AM
**To:** Hollek, Darrell
**Subject:** RE: 2015_03_Shenandoah_Economics_Update.pptx

Darrell, FYI, Lea also received a request from exploration (Chris Camden) earlier in the day to provide them with our economic dataset. We've provided them with the same dataset as well.

Pat

**From:** Frye, Lea
**Sent:** Monday, March 23, 2015 4:24 PM
**To:** Hollek, Darrell
**Cc:** McGrievy, Pat
**Subject:** 2015_03_Shenandoah_Economics_Update.pptx

Darrell,

As requested, I have attached updated economics for the Phase 1 dry tree option at current invest and upside pricing. I am currently working through Phase 2 dry tree option and the wet tree options and should have updates throughout the week if you are in need.

Regards,

Lea

Sr Staff Reservoir Engineer
**Shenandoah Project**
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Ph: 832-636-1439
Cell: 281-687-9379

APC-00025540

# Exhibit 104

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


- - - - - - - - - - - - - - - - - - -x

IN RE ANADARKO PETROLEUM                    Case No.

CORPORATION SECURITIES LITIGATION        4:20-cv-576

- - - - - - - - - - - - - - - - - - -x



        Remote, videotaped deposition of ROBERT

MERRILL, Ph.D., taken pursuant to Notice, was held via

videoconference, commencing December 7, 2022, at

10:12 a.m. Central Time, on the above date, before

Amanda McCredo, a Court Reporter and Notary Public in

the State of New York.

Page 43

that P10 to P90 ratio should have been in the 10 to 45 range.

Q    And what features of this particular field do you think should have created more uncertainty?

A    Recovery factor, porosity.  Those are the two in terms of the calculation of resource.

Q    Okay.

And why should those have been, in your view, more uncertain?

A    Porosity refers to the volume of hydrocarbons that can be contained.

And if we look at the porosity in the drilled wells now, Shen 3 -- this is before the class period -- Shen 3 porosity is in the 17, 18 percent range.

Shen 2, Shen 4 are closer to 20 percent.

So now we know that there is a porosity difference within that -- within that field.

Considering the recovery factor, we don't know what the recovery factor is going to be. Anadarko was using, I think, 20 to 35 percent recovery factor.

Now, the work of Shotts, in his work with the RCT team and the modeling, suggested that there may be even a 5 percent recovery factor in there.

So that 5 percent recovery factor should have been considered in that distribution.

Q   And about recoverable resources?

A   That -- that recovery factor applies directly to recoverable resources.

Q   Okay.

How about the presence of vaulting, how does that impact the structural uncertainty?

A   Dozens of vaulting reflects on the ability of a well -- actually, I should -- excuse me, let me just back up.

The presence of faulting will compartmentalize the reservoir and impact the drainage area of a particular well.

Q   And why do you view that as -- during the class period, as a structural uncertainty as opposed to a structural certainty?

A   There were maps existing within Anadarko that showed no faults.  When my analysis of the material -- even before the class period, my analysis of the data that was available to me indicated that, in the area of high confidence in the seismic data, there were faults.  And those faults should have extended into the area of lower confidence.

Page 45

Q    And --

A    The presence of faults was documented.

Q    Okay.

And what level of certainty was it documented with?

A    What level of certainty was the resource documented with or the faults?

Q    The faults.

A    My analysis of the data indicated they were faults, absolutely that they were faults.  So let's say I'm 90 percent confident that they were faults.

Q    Okay.

And were the people in development 90 -- at Anadarko 90 percent confident of particular faults?

A    That's pure speculation.  That's complete speculation.  I can't -- I can't say that.

Yes, the development team, Rodriguez and others, did see faults.  As to their certainty, I can't comment.

Q    And again, why do you refer to these as structural uncertainties as opposed to structural certainties?

MS. JENSEN:  Objection; asked and answered.

A    I think I've answered that question.

BY MR. GRUENSTEIN:

Q    Well, why don't you tell me again why -- why is there still uncertainty in the recoverability factor if you think that there were necessarily faults?

A    The uncertainty --

MS. JENSEN:  Objection.

A    The uncertainty is how many faults were there; were those faults sealing, laterally sealing.

BY MR. GRUENSTEIN:

Q    And without knowing answers to those questions, is there still a range of possible outcomes or was there still a range for possible outcomes?

A    There's always a range of possible outcomes.

Q    What do you mean by that?

A    What I mean is that the impact of a particular fault or the impact of multiple faults, how many faults are there.  You recognize in the area of the seismic where there's slightly less confidence in the -- that there is data there.  That portion of the seismic volume.  There's uncertainty in the placement of the faults, where they fit.  So that -- and we're looking at the seismic data.

Well, then when we drill the wells, now we get some certainty in terms of, well, this -- you know, this well penetrated -- this well has a fault in it, this well has a fault in it, that well has a fault in it.

And then you look at Shen 4 and you have two wells very close together and there's significant faulting in the core and log data and well data.

Q   And as you -- or as they continued to drill appraisal wells at Shen, even when they drilled a well, did uncertainty still remain?

A   Uncertainty still remained.

Look at the distance between Shen 2 and Shen 3.  That's 2.3 miles.  How many faults are in between?  There's over -- over a half mile distance between Shen 2 and Shen 4.  How many faults are in between there?  That's the uncertainty.

Q   And how do you answer those questions?

MS. JENSEN:  Objection; vague.

BY MR. GRUENSTEIN:

Q   How does one answer those questions?

A   We're working under uncertainty.  So we have to -- we estimate -- and it gets back to some of the things I mentioned earlier.  Is there a fault

Q    And doesn't that depend in large part about what the upside is going to be at the end as to whether you can produce the field?

MS. JENSEN:  Objection --

A    That's a --

MS. JENSEN:  -- to form.

Again, please pause before you answer.

THE WITNESS:  Right.

A    It all depends upon the amount.  As I've said before, it all depends on how much of a reservoir can be drained by a particular well.

BY MR. GRUENSTEIN:

Q    But the commercial viability, are you referring to the viability for individual wells or for the entire Shenandoah field?

A    The entire Shenandoah field.

Q    And is it your view that as the appraisal project went forward, the commercial viability of the field was decreased?

MS. JENSEN:  Objection; asked and answered.

A    What I would say is between Shen 1 and Shen 2 and Shen 4, it became -- each well indicated that there was likely more disruption of the reservoir than there was from the previous one.  In other words, Shen 4 really demonstrated significant

effects of faulting in that particular fault.  So what happened -- how -- what did the other faults look like?  I can't speak to that.

BY MR. GRUENSTEIN:

Q    Okay.

A    There were no wells through those faults.

Q    And based on that, you think that the resource range should have decreased over time, correct?

A    I didn't say the resource range.

MS. JENSEN:  Objection; foundation.

A    I didn't say resource range.

BY MR. GRUENSTEIN:

Q    What did you say?  Well, let me take that back.

It says -- well, you said in (a) Shen's resource size shrank.

A    That's based on after each individual well was drilled.

Now, if I have -- if I have a project that I can complete with two wells -- and I'm not talking about Shenandoah.  This is strictly outside that -- if I have a project that will produce all of the hydrocarbons with one or two wells, I have not got a large investment.  I could produce those, maybe.

Now, if I have a series of faults in there and it's going to require me to drill five or six wells, and I'm going to produce the same amount of hydrocarbons, it's not as economic as the previous example.

Q    Okay.

So is your opinion that the Shenandoah field became less economic to produce as time progressed?

A    I don't think I'm speaking as to the commercial -- I don't have the numbers in terms of the net present value of this particular field.  I'm talking about the scientific data and the technical data that I've looked at.

Q    Okay.

But you did speak here in terms of commercial viability.  So are you expressing an opinion as to whether Shenandoah was a commercially viable field at any point during the class period?

A    It was unknown at any time during the class period.

Q    Okay.

And why do you say that?

A    We don't know how many wells are going to be drilled, we don't know how much the drainage area

for each well is, we don't know if we needed to have -- if it was a strong water dry or if it was a gas expansion reservoir. There are lots of uncertainties there, and I was not looking at those engineering parameters.

Q    Okay.

What sort of information would you need in order to determine whether Shenandoah was a commercially viable project?

MS. JENSEN:  Objection; beyond the scope. The witness just answered as to the engineering information, and he's just testified that he was looking at the geoscientific data and information.

A    I believe I've answered that. I don't -- I'm not -- I can't answer that question, because I don't have that information and that was not the purpose of my study.

BY MR. GRUENSTEIN:

Q    Okay.

Let's continue on into the section 5, that's introduction to Shen. You say around two-thirds of the way down, "Geologists, geophysicists, and reservoir engineers work together to assess a prospect's resource size and

Page 65

commerciality."

Do you see that?

A    Yes.

Q    So you fit yourself in with geologists?

A    I put myself into the geologist category, yes.

Q    Okay.

And what role would geophysicists and reservoir engineers play in assessing a prospect's producible resource size and commerciality?

A    I think I've said earlier, geophysicists look at the rock property's data and how that affects -- the rock properties and how those rock properties affect the seismic signals.

A simple -- very simple algorithm there would be seismic data is recorded in time in terms of how many seconds.  Rock property -- one rock property -- that is velocity of sound in that rock -- and that's in feet per second.

So if I multiply feet per second times seconds, that's the feet.  So that is the depth conversion process of seismic data by the geophysicists, and they're using the rock properties to do that.

Q    And the reservoir engineers?

that you're not opining that the Shen field was not commercial; is that correct?

A    What I'm saying is --

MS. JENSEN:  Objection.

Hold on a second.  This is beyond the scope.  And just to clarify, that's what Dr. Merrill said previously.

There is a difference, Ben, I think, between what he's opining versus beyond the scope of his report.  I just want to make that clear.

MR. GRUENSTEIN:  Well, I just want to know what "commerciality was in doubt" means.  Since they're words in his report, I think that's within the scope.

A    From my looking at the geological and technical data, it's unclear how many wells were going to be needed to be produced to produce any hydrocarbons.  We had, during the -- by the time -- by the time -- by the end of the class period, there was one well that contained no hydrocarbons.  We had evidence of significant disruption of the reservoir laterally.  We didn't know how these -- how these wells -- the bearing of these wells on -- how many wells ultimately were going to be drilled, what kind

of production systems were going to be required.
All these uncertainties.  As I said, I'm just
looking at the scientific and geological data and
the technical data.

BY MR. GRUENSTEIN:

Q    Okay.  So let's continue going through your
report.

Let's continue in your report --

MS. JENSEN:  And Ben, can we take a break
in five minutes?

MR. GRUENSTEIN:  I think we should be able
to.

MS. JENSEN:  Okay.

BY MR. GRUENSTEIN:

Q    Let's go to page 8.  In paragraph 24
around -- it looks like around 10 lines down, you
say "The data from Yucatan 1 negatively impacted the
resource estimates for Shen."

What's your basis for that?

A    The data in Shen 1 [sic] did not confirm
any connection with Shenandoah.

Q    You mean Yucatan 1?

A    Yucatan 1, I meant, yes.

Q    Okay.

So that negative --

A    And Yucatan 2 certainly confirmed that.

Q    Okay.

So when you say "negatively impact the resource size for Shen," you're meaning -- you mean the Shen field?

A    That would have been the Shen basin at that point.

Q    The Shen basin, okay.

And then at the bottom of the page, the second-to-last sentence is "Anadarko abandoned the Shen project in 2017 as noncommercial after presenting its discovery as one of the most significant discoveries in the Gulf of Mexico."

What do you mean there by "noncommercial"?

A    What I mean there is that Anadarko decided not to develop it because -- and why they decided not to develop it, I can't say.  Probably had something -- and I can speculate, but I'm not going to speculate as to why they exited.

Q    So when you say they abandoned it as noncommercial, you're not attributing any belief to Anadarko that Anadarko thought it was not commercial?

A    They wouldn't have abandoned it if they thought it was commercial.

Q    Are you suggesting that oil companies develop every potentially commercial project?

MS. JENSEN:   Objection; argumentative.

A    All I'm saying is that you can either sell a field or abandon a field.   Anadarko abandoned the field.

BY MR. GRUENSTEIN:

Q    Okay.

And anything more than that would be speculation?

A    Yes.

Q    Okay.

The sound of my papers means that we're kind of moving -- moving apace, so...

You also mentioned in paragraph 24 that four faults were identified in the lower Wilcox C-zone.

Do you know whether -- or at the time that those were identified, was it known what the impact of those would be on the -- on the recoverability of oil?

A    You're talking about the faults in Shen 3, Shen 2, and Shen 4?

Q    I don't know.   I'm looking at the line that says "four faults were identified in the lower

Page 78

Wilcox C-zone."

A     And what line is that?  Okay, I found it. That's in Shen 4.

Q     Right.

A     Let's go back to Shen 4.

Those four faults identified in the Wilcox C-zone indicated significant damage to the formation.  There were damaged zones.  There were the faults, there were the fractures; all of which would affect fluid flow laterally in the formation.

Q     Okay.

And do you know -- did you quantify the impact that that would have on the overall resource range?

A     I did not quantify the impact that would have on the overall resource range.  It just magnified the uncertainty --

Q     Okay.

A     -- in my mind.

Q     And do you know whether the existence of those faults was publicly disclosed?

MS. JENSEN:  Objection to the call -- to the extent it calls for beyond the scope.

A     That is beyond the scope of my report.  I'm looking at the information presented to me.

Page 79

BY MR. GRUENSTEIN:

Q    Okay.

Let's go to paragraph 28.  This is a list of people and their titles.

Where did you get this from?

A    I got this list from the materials that I was provided in the database.

Q    And do you know any of these people?

A    No, I do not.

Q    Based on their titles, would -- is there any way for you to say whether the role you played in the industry was kind of similar to the role that any of these people played?

Again, based on either their titles or what you got to learn about them through your work reviewing emails and deposition transcripts.

A    Okay.  That's --

MS. JENSEN:  Hold on.  Wait.  Hold on a second.

Please, Dr. Merrill, just give me --

THE WITNESS:  I'm trying to figure out what the significance of this is, this question.

MS. JENSEN:  Hold on, because I was going to object that it's vague and compound.

A    I'm a geologist.  I manage geologists and

you're talking about at the top of 45.  I mean, it's titled "Remaining Uncertainty and Impact."

Are you reading this to mean that Lea Frye knew, with certainty, that the fault between Shen 2 and Shen 3 was sealing?

A    Well, first of all, let me go back and address the word "uncertainty" there.  That's a -- that's a term that's been used in the industry and referred to as uncertainty and really it's referring to the risk of a certain statement.

In other words, there is a risk of compartmentalization, and that will affect well count and performance.  In other words, there is a risk there for compartmentalization.  And that's the difference between how I normally use uncertainty and it actually is commonly also referred to as risk.

But as a geologist, I'm used to seeing the word "uncertainty," and obviously Lea Frye is, as well.

Q    So I guess I'm a little confused.

Are you saying that Lea is saying there is a risk of compartmentalization or that --

A    Yes.

Q    Okay.

A    She's saying there is a risk of compartmentalization.  And as an engineer, a reservoir engineer, she's saying if there is risk -- if that risk -- if that risk is actual, that's going to affect my well count and performance of each well that I put into the record.

Q    Right.

So, look, I think you're -- I'm not really sure why you're -- why you needed to correct anything because I think what you said was accurate.

Did anyone at Anadarko determine definitively that the fault between Shen 2 and Shen 3 was sealing?

MS. JENSEN:  I'm going to object to the editorialization.

And Ben, of course, the witness is entitled to clarify testimony.  And particularly with some of the garbled questions that were on this transcript.  So I object to that editorialization.

And, anyway, go ahead, Dr. Merrill.

A    So may I hear your question again?

BY MR. GRUENSTEIN:

Q    Sure.

Did anyone at Anadarko determine

definitively that the fault between Shen 2 and Shen 3 was sealing?

A    There is no way to say definitively that it is sealing.  The probability, because of the displacement along that fault, is that it is sealing.  There is a probability that it's sealing.  But without production data and following the fluid flows through the reservoir, there is no way to definitively say whether it is sealing.

Q    Okay.

Well, when you say there is a probability that it's sealing, what probability are you attributing to it?

A    I would attribute it to a 90 percent probability.

Q    Did anyone at Anadarko attribute a 90 percent probability to the faults being sealing?

A    No one at Anadarko -- the reference was to the likelihood -- the likelihood of sealing.  Nobody assigned a probability.

Q    Did anyone say that it was likely sealing?

MS. JENSEN:  Objection to the extent it calls for speculation.

A    I think I answered that.  And I can't speculate as to how various individuals speculated.

Again, that's a speculation.

BY MR. GRUENSTEIN:

Q   Well, I'm trying to understand your conclusion.  Your conclusion is that there was a 90 percent likelihood that the fault between Shen 2 and Shen 3 was sealing, correct?

A   Yes.

Q   And that is a conclusion that, had you been there, you could have come up with at what point in the story?

A   After the drilling of Shen 3, because I had the seismic data indicating a fault.  I saw faults in Shen 3.  I saw a fault in Shen 2.  So, there are obviously faults.

I knew the -- I knew the displacement based on the structural mapping was larger than the thickness of the reservoir.  Therefore, my conclusion would be that is a sealing fault.

Q   Okay.

And did anyone at Anadarko come up with that conclusion at that same time?

MS. JENSEN:  Objection; asked and answered.

A   I can't speculate on that.

BY MR. GRUENSTEIN:

Q   Okay.

If based on your conclusion there was a sealing fault between Shen 2 and Shen 3, are you opining that Anadarko should not have gone forward with the -- with continuing the appraisal process?

A    That's pure speculation.

Q    Let's go back to where we were, which was on page 46.  I appreciate the clarification.  I don't appreciate Rachel calling my questions garbled.  Maybe they're garbled because of all the objections that are being --

MS. JENSEN:  I don't think so.  I think there were some genuinely garbled questions in there.

But we can move on.

MR. GRUENSTEIN:  Okay.

BY MR. GRUENSTEIN:

Q    In paragraph 46, in the second line, you say "This overly simplistic portrayal of the resource was used to make overly optimistic statements about the resource range and the oil-water context."

Again, are those internal statements?

A    Those are internal statements, yes.  And my interpretation of the geoscientific data suggests that, that they're overly simplistic.

Q    We can go on to the next paragraph.  You say "substantial evidence existed early on of significant faulting at Shen," and then you list out a few things.  The first is MDT pressures indicated that OWC's could not be extrapolated across the field.

What MDT pressures are you talking about?

A    There were -- the MDT tool measures the pressure of individual formations.  And that tool indicated that there were different pressures in Shen 3 and Shen 2.

Q    Okay.

So these were pressures that were identified after the drilling of Shen 3?

A    After the drilling of Shen 2.  They already had pressures from Shen 2.

Q    Right.

But when you're talking here about the oil-water contact, you would need them from both Shen 2 and Shen 3, right?

A    Yes.

Q    "Pressure brakes were indicating a completely broken field."

What are pressure brakes?

A    A pressure break means that there's a

different pressure between two points.  So, in other words, I may have a pressure gradient of .5 in one well -- in one location, and .45 in another and similar depth.

That means that there's a pressure break.

Q    And what -- what do you mean by "a completely broken field"?

A    That means you cannot correlate the sands that those pressures were taken in.

Q    And which -- well, how were these pressures determined?  Was it from drilling or some other process?

A    No, these pressures are taken by a tool and I've got -- MDT is defined in the glossary.  It's called a modular formation test dynamics tester. It's a logging tool to collect pressure and fluid data at various depths in the wellbore after the well is drilled to start the well evaluation program.

Q    Right.

But it's data that is taken out of the well, correct?

A    Correct.

Q    And -- but when you say "completely broken field," you're referring to comparisons being drawn

Page 140

Q    Okay.

And what's the relevance of that, that it's only through one horizon?

A    Okay.  The relevance for that is that the fact that that red fault might be a small fault.

And what he's saying here is that this is a shallow fault that offsets part of the Wilcox session -- section, the Wilcox strata, but the bands -- the deformation banding with 50 millidarcy rock, which is permeability, that deformation banding in 50 millidarcy rock with small faults might create drainage compartments.  In other words, you would have compartmentalization caused by the deformation bands on these small faults.

Q    And how -- what -- what would Anadarko have had to do to get greater certainty on this?

A    I think that's in the final statement that I've got there.  "If we get more pressure breaks between appraisal wells, we'll have our answer."

In other words, if we cannot correlate the pressures between appraisal wells, then, yes, these deformation banding is affecting the connectivity of the reservoir.

Q    Okay.

So, in other words, more drilling would be

Page 141

required?

MS. JENSEN:  Objection --

A    That's up to the --

MS. JENSEN:  -- characterization.

BY MR. GRUENSTEIN:

Q    I'm sorry, I didn't hear the answer.

A    That's up to the engineers.

Q    Okay.

But there's this line that we skipped over that says "There's a lot of noise swinging through the data.  Is the reservoir completely broken up by faulting or noisy data?"

What do you understand that to mean?

A    What I understand that to mean is that the frequency of the data that we're looking at is not as good as -- as it might be if it were a shallower rock.  In other words, the processing did not produce the image that you really would like to have, so you don't have the confidence in, what, the red fault, for instance, that you have in the pink fault because the pink fault has larger offset and that larger offset can be recognized in the seismic.

Q    And can you tell by looking at this -- at this seismic that it's potentially noisy?

A    Yes.  Because all those reflectors, they

don't go straight through.  In other words, the reflectors come and go and the geophysicists has done his best interpretation following a particular zone or reflector in the data.

Q   Let's go to paragraph 58.  You talk about an example of a different partner interpretation as ConocoPhillips' interpretation showing extensive east-west faulting, and then you show the -- you show the seismic on page 33 --

A   Okay.

Q   Or that's not a seismic; that's a map, right?

A   Yeah, that's a map.

Q   All right.

So can you explain how Conoco's interpretation was different than what Anadarko was interpreting?

A   I cannot explain why and can't speculate as to why ConocoPhillips' maps looks why it does.

Q   Okay.

But can you explain how it's different?

A   Well, I can see one radial fault extending, but I do see a number of faults concentric to the updip limit of the Wilcox there.

Q   In a situation like this where there were

Page 143

multiple partners involved, would each company have its own geologist and geophysicist to interpret the data?

MS. JENSEN:  Objection to the extent that it calls for speculation.

A    Well, I think that's entered by the Shen Partnership Mapping Comparison and Bates number 868446 in Figure 16 and 17.

BY MR. GRUENSTEIN:

Q    Okay.  So why don't we go through.

What page are you on?

A    Page 40.

Q    Okay.

So what is this -- what does 16 show?

A    Sixteen is a compilation of various maps by different partners; Anadarko, Marathon, ConocoPhillips, Cobalt, and Venari.

Q    And if you look at the top left, that's the Anadarko map?

A    Top left is the Anadarko map.

Q    And that shows at least a fault between Shen 2 and Shen 3?

A    Yes, it does.

Q    How about Marathon Oil, does that show any faults?

A    Marathon in Figure 17 --

Q    Figure 16.

A    If you look in Figure 16, yes, there are faults within Figure 16.  And B.

They're not lined, but you can tell by where the way the contours meet that there has to be a fault there.

Q    And is that reflected --

A    And that's -- that's reflected in Figure 17.

Q    Okay.

ConocoPhillips, what are we seeing in the lower left as far as faults?

A    We're seeing a fault separation in Shen 3 and Shen 2.  These are radial faults, if you will, coming from the north.  They also show the fault of separation of Shen 1 from Shen 3 -- from the whole field, actually.

Q    Okay.

How about Cobalt?

A    Cobalt, it's very difficult to see in this picture, but there is a northwest-southeast fault within the Cobalt separating Shen 2 and Shen 3.

Q    And Venari?

A    Venari clearly shows faults between Shen 2

seen eight different maps of Shenandoah from six different companies, two different maps internally, and the only similarity between the eight is the overall three-way shape."

Do you know what he was referring to?

A    The overall three-way shape?

Q    Yeah.

A    I assume that refers to the overall shape with the north side being higher than the south side.

Q    Yeah.  And he says "the only similarity between the eight is the overall three-way shape."

Were there a lot of differences between the maps as you looked at them?

MS. JENSEN:  Objection --

A    They all have --

MS. JENSEN:  -- asked and answered.

A    What they're saying is without more well data, as he says later, it would be a hard task to persuade the parties to modify them based purely on -- and he's talking about the position of Shen 3 here.  So this is before the drilling of Shen 3.

Then he goes on to say "if any north-south faulting exists that could potentially compartmentalize Shenandoah, it would represent the

largest risk element to appropriately appraising this project."

BY MR. GRUENSTEIN:

Q    And that means what to you?

A    Was there a question there?

Q    Yeah.  You just offered that sentence, so I said "and that means what you to?"

A    That north-south faultings recognized between Shen 2 and Shen 3 would represent the largest risk element to appropriately appraise the project.

So, saying if we have north-south faulting, we're going to have issues associated with this development program, and that's from -- that's what Jake Ramsey wrote.

Q    And Jake Ramsey was in what --

A    He was a geologist in the exploration project.

Q    So he recognized the concerns about these potential faults, correct?

A    Yes.

Q    And then a little lower down, you talk about Ramsey forwarding this exchange and he writes "Paints a good picture on their value of the north-south fault trending down the center of

Page 148

Shenandoah and how it impacts their forward planning."

How do you get from there to saying that this statement indicates that the threat of faulting was not a concern of exploration?

A    I'm not saying it was not a concern of exploration.  I'm saying that exploration recognized there was a risk element to this project with north-south faulting.  That's what the data says and that's what these statements say.

Q    Right.

But it says this statement indicates that the threat of faulting was not a concern of exploration.

A    If we look at the maps that exploration used through this period -- this time period, they don't have these faults as a sealing -- as a significant fault.

I'm looking at the data now.  All the data -- all the maps that were produced during this time period.

Q    Okay.

But you do recognize -- when you say that Ramsey recognized that if a north-south faulting exists, that could potentially compartmentalize

Shenandoah, it does sound like he recognized the importance of the threat of faulting; is that correct?

A    Yes.    I would like to follow that up with the next statement that Ramsey said in exchange with Trautman it "paints a good picture on their value of north-south faulting trending down the center of Shenandoah and how it -- how it impacts their forward planning."

"Their" is the point.    They're talking, I'm sure -- I'm going to speculate, but I'll leave it up to you what "their forward planning" means because here Ramsey is talking to his manager.

Q    But you recognize that it would be speculation to read into "their" any significance?

A    Speculation for me, yes, because it was not stated.

Q    Okay.

So let's go to 61.    You say in 61 "Anadarko exploration management continued to require the use of a simple, unfaulted, laterally continuous structural model."

Do you mean that exploration management required that exploration use that unmap -- unfaulted map?

MS. JENSEN:  Objection --

A    No.

MS. JENSEN:  -- misstates --

THE WITNESS:  Go ahead, I'm sorry.

MS. JENSEN:  Misstates the report.

A    What I can say is that the exploration group used a simple, unfaulted, laterally continuous model throughout this part of the -- throughout this time period that we're talking about in this paragraph.

BY MR. GRUENSTEIN:

Q    Right.

And who they require -- who else did they require use it?  Or are you just saying that they continued to use this map?

A    They were trying to use a single -- that -- the statement was made -- excuse me.

Well, I don't have the -- I don't have the statement, but at some point it was indicated that Anadarko would use a single map to present to partners and that map was a simple, unfaulted, laterally continuous structure at this point in time.

Q    And do you know what that point in time was?

Page 151

A    This was -- well, here I'd say later.  No later than August 2014 predevelopment personnel on Shen objected to the no-fault model used by exploration and identified as evidence of a fault in Shen 2.

Q    So then you say in the next sentence after where we were -- so the second sentence of 61 -- despite evidence of faulting, adherence to a best-case scenario led to highly optimistic, public statements that exaggerated the likelihood of successful development, resource size, and value.

When you say "public statements," what are you referring to?

A    I refer back to what I said earlier about a 2 to 4 billion opportunity with a thousand feet of pay.

Q    And what is your basis to say that using an unfaulted map is what led Anadarko to make the public statement about 2 to 4 billion dollars?  How do you make that link?

A    Let's go back to Shotts's conclusion from his modeling that there was an 83 percent change in the -- between having a heavily faulted model and an unfaulted base case.

In other words, Shotts's model indicates

Page 152

that, with faults, there's going to be a smaller resource size.

Q    Sorry, just one second.

(Pause in proceeding.)

MS. JENSEN:  Ben, that's fine if you need a minute, but why don't we just go ahead and go off the record.

MR. GRUENSTEIN:  No, that's fine, we can continue.

MS. JENSEN:  Okay, okay.

BY MR. GRUENSTEIN:

Q    Okay.

You then refer, in the next sentence, to the no-fault model used by exploration?

A    Yes.

Q    And what do you understand the no-fault model to be?

A    No-fault model refers to maps that were published or maps that were made by the Anadarko team.  Like this map of the December 2014 partners meeting on page 37, Figure 14b.  That discontinuity was not recognized as a fault at that time by the exploration department.

Q    You say in the next sentence, "My experience exploring the Gulf of Mexico leads me to

conclude that the development team's structural exploration of Shen with faults was more credible than the exploration team's homoclinal structure interpretation."

What specifically in your experience exploring the Gulf of Mexico leads you to conclude that?

A    The expectation that in the subsalt province, I would expect to see faults in the sediment column.

Q    Okay.

And were you under the impression that exploration was saying definitively that there were no faults in this area?

A    Well, in 2014, vice president of exploration Leyendecker criticized the development team's maps for having faults on them.

Q    And at that stage, was it a -- was there a definitive conclusion by exploration that there were no-faults?  Is that how you understood it?

MS. JENSEN:  Asked and answered.

A    I think I've answered that.

BY MR. GRUENSTEIN:

Q    Okay.  I think I have my answer.

I don't know if your -- did you review

Robert Strickling's testimony?

A    Did I review his testimony?

Q    Yeah.

A    Not in detail.

Q    Okay.

So you're not familiar with how he understood "no faults"?

A    No, I'm not familiar how he understood "no faults."

Q    And you're not familiar with how he understood the significance of this map?

MS. JENSEN:  Objection; vague as to time.

Are we talking about at the time of his testimony when he's been prepped for a deposition or at the time?

BY MR. GRUENSTEIN:

Q    Did you understand my question?

A    Well, I think I answered your question about reviewing Strickling's deposition.

Q    Okay.

So you don't understand -- well, you didn't review what his understanding was of "no faults"?

MS. JENSEN:  Objection; vague as to time.

A    I'm not going to speculate as to what his understanding was.

Page 155

BY MR. GRUENSTEIN:

Q    Okay.

Given your experience with the Gulf of Mexico and the extensiveness of faults in this area, would you think that geologists in Anadarko would understand that there likely were faults in the Shen basin?

MS. JENSEN:  Wait, hold on.  Wait, you're asking him to talk about other geologists?

Wait, what -- Ben, what's your question?

BY MR. GRUENSTEIN:

Q    I'll reread the question.

Given your experience with the Gulf of Mexico and the extensiveness of faults in this area, would you think that geologists in Anadarko would understand there likely were faults in the Shen basin?

A    I can speak from my experience.  And any geologist that I was involved with -- that I was involved with, I would assume they'd have the expectation there were faults.  I can't speak to Anadarko's physicians -- geologists.  My expectation of the geologists that I was involved with.

Q    If we go further down in 61, you say about Ernie Leyendecker, "Even in his deposition,

Page 156

Leyendecker admitted he did not include seismic data in his review of the alternative maps, and thus his review was incomplete."

Do you recall that testimony?

A    I do.

Q    And when -- what was your understanding -- well, when you said that he did not include seismic data, what are you referring to?

A    I'm referring to -- I'm referring to looking to evaluate the seismic volume independently and making an independent evaluation of the seismic -- of the interpretation on those maps.

Q    So are you saying that he didn't review the underlying data that went into the seismic or he didn't review the seismic at all?

A    What he is saying -- and I'll repeat -- he did not include the seismic data in his review of the alternative maps.

Q    Okay.

But did he review the interpretation of the seismic data?

A    I can't speak to that.  He didn't respond to that.

Q    Okay.

A    He said he did not include seismic data in

his review.

Q    Okay.

Did you, in the course of your work, review the interpretation of the seismic data?

A    I did not have access to the data -- the seismic data volume.  All I had access to were individual images taken out of that volume and were published in PowerPoints.

Q    Okay.

And would that be the interpretation of the database?

A    That would not be the interpretation of the data.  It would be my impression of the interpretation on the seismic data -- on the seismic image.

Q    Okay.

Well, let me -- let me read you the testimony that you cited where he was asked "Did you consider the seismic data that you reviewed to be sufficient quality to rule out to sub-seismic faulting?"

And he said "I didn't review the seismic data.  I reviewed the -- the interpretation of the seismic data."

So what's your understanding of what he's

Page 159

And what is -- again, what is Mr. Leyendecker saying he looked at?

A    He said he did not include the seismic data in his review.  That's my statement.

Q    Right.  But he reviewed the interpretation of the seismic data.

A    Is that interpretation -- that interpretation was the maps.  That would be interpretation.

Q    Okay.

And what -- and again, so that we're all clear, isn't that what you reviewed, the interpretation of the seismic data?

MS. JENSEN:  Asked and answered.

A    I answered that.  I said I looked at the seismic images that were available.  I did not have access to the data volume to evaluate the data volume.

BY MR. GRUENSTEIN:

Q    Okay.

And -- so you're saying you did not review the interpretation of the seismic data?

A    I reviewed the interpretation that was presented on the seismic lines that were given to me.

Q    What I'm really trying to figure out is do you expect that you reviewed something more than Mr. Leyendecker did.

A    I reviewed the seismic lines that were available to me in the Anadarko documentation.  I reviewed the maps that were available in the Anadarko database.  I reviewed the well data that was in the database.

Q    But you did not review the seismic data?

MS. JENSEN:  Objection; asked and answered.

A    I've already answered that question.

BY MR. GRUENSTEIN:

Q    And the answer is?

MS. JENSEN:  Well, objection; asked and answered.

BY MR. GRUENSTEIN:

Q    And you didn't review the seismic data?

MS. JENSEN:  Ben, now you're harassing the witness.

MR. GRUENSTEIN:  No, I'm just asking for a yes or no.  It's not harassing.  Just say no.

A    Well, I'm not going to give you a yes or no.  I'm telling you that I reviewed the seismic images that were available to me in the Anadarko database.

BY MR. GRUENSTEIN:

Q    Okay.  I think I know the answer then.

MS. JENSEN:  And, Ben, for the record, I'll state that he had access to Anadarko's entire document production.

BY MR. GRUENSTEIN:

Q    When you reviewed Mr. Leyendecker's testimony, did you get a sense of why he disagreed with the -- with developments's and the partners' technical interpretation of the seismic data?

A    That would be entirely speculation.  I'm not going to go there.

Q    Well, I'm just -- the first question is did you review that part of the testimony?

A    Well, I read the whole testimony.

Q    Okay.

A    But I'm not -- but I can't speculate as to why he did what he did.

Q    But do you recall that part of the testimony?

A    But I can't -- I can't speak to why he had his -- how he arrived at his conclusions.

Q    So you can't speak to whether his conclusions were well reasoned, for example?

MS. JENSEN:  Objection --