A     My job --

MS. JENSEN:   -- argumentative.

A     My job in this was to evaluate the geological evidence, the geological data, and the technical data.

BY MR. GRUENSTEIN:

Q     Right.

But you've testified and you included in your report several times about how certain people ignored information, correct?

A     We knew there was -- we could see conflicting information.  Who ignored it, generated it, that's a different question.

Q     Okay.

Well, but you have statements in here, in this report, that exploration ignored certain things.

Right?

A     Exploration continued to use a no-fault map for some time regardless of the knowledge of faults. That's what I could speak to.

Q     And would you not characterize --

A     The fact that -- the fact that they used a map with no faults suggests that they were ignoring the other evidence.

Page 163

Q    But did you review testimony where some of them explained why they rejected that other evidence?

MS. JENSEN:  Objection; vague.

A    Again, that would be speculation on my part as to why -- I'm looking at my understanding of the geologic data and the technical data.

BY MR. GRUENSTEIN:

Q    But why do you assume that they ignored the evidence as opposed to considered it thoroughly and rejected it?

MS. JENSEN:  Objection to form.

A    I can't speak to as to whether they considered it thoroughly and rejected it.

All I can speak to is the evidence, the data that I saw, the information I saw, during much of this early period, showed no faults in the exploration mapping.

BY MR. GRUENSTEIN:

Q    So it sounds like you can't say whether exploration ignored the data or considered it and rejected it?

MS. JENSEN:  Already answered the question.

A    All I can say is what exploration put out there.

Page 164

MR. GRUENSTEIN:  Okay.

Why don't we take a short break.  Maybe until 10 to the hour -- no, we are at 10 to the hour.  The top of the hour.  Ten minutes.

MS. JENSEN:  Yup, let's say 15?

MR. GRUENSTEIN:  Okay.

MS. JENSEN:  Five after.

MR. GRUENSTEIN:  Fine.

THE VIDEOGRAPHER:  We're off -- we're off the record.  The time is 2:51 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 3:08 p.m.

BY MR. GRUENSTEIN:

Q    Okay, welcome back.

Let's go to paragraph 62 -- actually, the Figure 13 after 62.

Are you there?

A    I'm here.

Q    So we discussed earlier, I believe, that this was -- the bottom figure is a map from December 2014, correct?

A    That's correct.

Q    And this -- is it correct it shows the faults between Shen 2 and Shen 3?

A    It's the same map as the one that was produced earlier that I have, figure --

Q    I think it's on 37.

A    Yeah, 37.  Yes.  It's the same map as Figure 37.  That map was presented at the 2014 partners meeting.

And the map shown here -- we're now in June 2016, and it's the same map in terms of the position of the fault.

Q    Right.

June 2016, I think that is -- that was a collection of lots of earlier maps that included A and B.

Does that -- does that comport with your recollection?

A    Let's see.  Let me look at the 76459 versus -- they were different -- they were different documents.

Q    Right.  But the -- I -- the reason I'm saying it is I don't think it's right to say that the bottom one is from 2016 because it's identified as, B, the December 2014 map.

A    I never said it was 2016.  I said it was -- if I said it was 2016, I misspoke.  It's the December 2014 partners meeting.

# Exhibit 105

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

-------------------------------x

IN RE: ANADARKO PETROLEUM          Case No.

CORPORATE SECURITIES LITIGATION   4:20-cv-576

-------------------------------x

December 16, 2022

10:07 a.m. (CST)

REMOTE VIDEOTAPED DEPOSITION

of LYNDON PITTINGER, held at the

above time and date taken before

Erica Ruggieri, RPR, CSR and Notary

Public of The State of New York.

*  *  *

wellbore and produce it to the surface rather than doing one zone by itself.

And those fluids would mix in the wellbore as they came together.

Would isolating each zone for production have a negative impact on the Shenandoah economics?

Yes, isolating individual zones would have a significant impact by one of two factors.  One way to handle it would be to drill individual wells for every zone and that was a significant number of zones.  I would have to have a document in front of me to remind exactly how many zones, but I'll skip to the next paragraph.

Drilling eight wells would not work for every single drainage area -- and drilling eight individual wells would not work for every drainage area across the field.

The other options you would have to -- would have to be to

complete each individual zone and produce it to the end of the life and how that negatively will impact your economics is now you are getting production at a lower rate because you have one zone which is having more than one zone together and it takes a really long time to get that production leading to the important thing.  So that impact -- so that impacts your net present value by discounting the value of the production over a really long time.

"Question:  Was this issue discussed with management?

"Answer:  Yes."

Q.   Do you recall that Ms. Frye also testified that Anadarko believed that Shenandoah 5 was going to be a key well in determining whether the field was going to be a major oil producing hub for APC or not?

A.   That's outside the scope of

my study.

Q.   What's outside?

A.   I reviewed parts of her testimony.  I don't recall her comment about the Shen-5.

Q.   If she believed that Shen-5 was going to determine whether Shenandoah was going to be a major oil producing hub, does that mean that she believed that Shenandoah was a commercially viable field as you define it?

MS. JENSEN:   Objection. Misstates testimony.  Calls for speculation.

A.   That's outside the scope of my study what she believed.

Q.   Well, how about what you believed.  Do you believe that if Shenandoah 5 was successful that Shenandoah could have been a major oil producing hub for Anadarko?

MS. JENSEN:   Objection, foundation.  Objection to the extent it calls for speculation.

A.   In the scope of this report Shenandoah 5 resulted in 140 feet of pay.  Yet a result in the post Shenandoah 5 resource appraisal went down substantially.  It had more compartmentalization, vertical compartmentalization than any well drilled prior to that.  The oil properties were significantly different and the gravity was more viscous and would have resulted in lower recovery factors.

And the LWC zone, the lower Wilcox C zone had 22 feet of tar and that is an extremely important data point because that demonstrates the entering of asphaltene or road tar into the reservoir prior to development so -- and that is not detectable or extremely hard to detect, you know, from well to well.

So, hence, that well proved that there was asphaltene deposition damage in the existing reservoir. In the documents that I have

encountered, reviewed since my expert report I have seen that there was a -- Brett Johnson discussed a zone in the lower Wilcox A sand in Shen-4 that had the log response of a tar zone that has a high resistivity low density response in association with drilling trouble.

So once again, the development of finding tar in LWC zone in Shen-5 was a large negative development despite having a 101,040 feet of net pay.

Q.    Are you aware of why Anadarko drilled Shen-5 and Shen-6?

MS. JENSEN:  Objection, compound.

A.    That's beyond the scope of my report.

Q.    You don't know what Anadarko sought to accomplish by drilling those wells?

MS. JENSEN:  Objection, foundation.  Calls for speculation.

A.    That's beyond the scope of

factors that you are saying were left out, would the mere fact that the PIR was under the corporate threshold be enough for you to opine that Shenandoah was not commercially viable after Shen-4?

MS. JENSEN: Objection, vague. It also misstates the report.

A. In the context of this case they go together. You have a sub-- a subthreshold PIR10 and then you have a -- tremendously important issues that have not been accounted for, the two of those together allow me to have a high degree of confidence that after Shen-4 it was the appraisal of further investment was uneconomic.

Q. Okay. And when you say that you were able to conclude that, you didn't quantify how much lower the PIR should have been had they taken into account all those additional factors, did you?

A. I did not quantify so I did

not have my own economic run.  But in my 30 years of experience of doing economic evaluations it is -- I am certain that inclusion would have made the economic case extremely uneconomic.

Q.   And in your 30 years of experience when someone identifies factors that were not considered as part of a model, do oil companies typically conduct another model that does take into account those factors?

MS. JENSEN:  Objection, foundation.  Objection to the extent it that calls for speculation.

A.   Outside of the scope of my study of what other companies do.

Q.   Okay.  Is it typical for engineers to eyeball a study and say no, that doesn't take into account additional factors without then providing a model as to what those factors should be and how they would

-- how they would influence the model?

MS. JENSEN:   Objection to form.   Foundation.   Misleading.

A.   In my experience, objections might, you know, might occur in review sessions where various people provided input and if someone raised an objection or a concern or requested to change an assumption, they wouldn't necessarily be obligated to come up with their own model.   They could ask the person running that model to revise what they have done.   But I don't think that every assessment has to have its own economic model to be valid, especially when the -- when everything -- when the information is so strongly indicative of downward negative revision -- impacts on the economics.

Q.   Are you opining as to what anyone at Anadarko knew about the

influence of these factors on commercial viability?

MS. JENSEN: Objection, vague.

A. I earlier mentioned the deposition of Lea Frye talking about commingling. When she was asked whether she had discussed commingling with management, she said yes. So I don't think that's for me to opine on. I just -- I look for evidence of who received the information, who is custodian of the information and whether they commented on it or not.

Q. Okay. How important to your opinion is it that the commercial threshold was .3?

A. How important. Well, the commercial threshold is -- well, which economic valuation are you referring to?

Q. Let me ask you perhaps a different way.

When you are opining as to whether Shenandoah was commercially

Page 81

viable, you are looking at whether the evaluations were below a PIR factor of .30, correct?

A.   That's not correct.  I'm looking at whether the PIR10 was below .3 and I'm looking at the basis of what -- of what constituted the model, what were the assumptions and what issues did they include in a reasonable balanced realistic way.

Q.   Okay.  And is .3 a common threshold across the oil and gas industry?

MS. JENSEN:  Objection to the extent that it calls for speculation.  And vague.

A.   That's -- that's outside of my report.

Q.   Okay.  Do you know whether .3 was Anadarko's threshold for all projects?

A.   Let's go to my report.

Q.   Footnote 2, page 4?

A.   Almost there.

MS. JENSEN:  Ben, while we are

waiting for the witness to go to his report, it's been over an hour so I'd like to take a break after this question.

MR. GRUENSTEIN:  Well, maybe after just this set of questions.

A.    Paragraph --

MS. JENSEN:  I'm not sure how long that's going to take so I'd like to take a break.

A.    Paragraph 174, PIR10 is an important concept for understanding Shen's commerciality.  PIR10 stands for Profit to Investment Ratio discounted at 10 percent.  The term is widely used in the petroleum industry as an economic measure of capital efficiency.  The numerator is net present value of estimated cash flows discounted at 10 percent and the denominator is net capital investment, also discounted at 10 percent.  The measure is used for ranking capital performance of a portfolio of investment

from -- was pressure isolated from Shen-4.  Shen-4 -- also Shen-4 sidetrack 1.  Shen-4 sidetrack 1 was pressure isolated from Shen-4 bypass core 1.  Shen-4, Shen-2, Shen-1 were not in pressure -- were in pressure isolation from Shen-5.  Shen-6 was in pressure isolation from Shen-5.

We had considerable amount of evidence for pressure isolation just based on -- and sealing faults based on the degree of pressure isolation.

The paragraph 49 has a quote from Rodriguez in response to that question about broken, let's see, broken up by faulting or noisy data where Rodriguez says:  "I think the reservoir is completely broken as you put it."

Q.   Let's look at paragraph 51 or actually on page 22 there's the seismic data.

A.   Yes.

Q.   Are you qualified to review seismic data?

A.   Could you repeat the question?  One word is critical there.

Q.   Are you qualified to review seismic data?

A.    In the context of this case I'm not qualified to review seismic data but I have been working in an interdisciplinary environment with geophysicists and geologists for my entire career so that part of my professional work is working with geophysicists and understanding the implications of their analysis of the seismic data.

Q.   If you look at paragraph 55 you give an -- you say:  "An example of a differing partner interpretation is COP's interpretation of extensive east-west faulting."  And then there's a map on the next page.

Do you have a sense of why Conoco Phillips was mapping east-west faults when other

companies were mapping north-south faults?

A.    In the context in this case no, I don't understand -- I cannot -- I don't have an explanation for their interp- -- their analysis of the faulting.

Q.    Do you know whether their analysis changed over time?

A.    That's not a -- I just didn't focus on that issue so I don't have any memory to answer that.

Q.    Is it common in offshore projects for interpretations of seismic data to change over time?

A.    Not being a geophysical professional, that's outside the scope of my report.

Q.    In paragraph 56 you say, the last sentence:  "This statement indicates Exploration conscientiously ignored evidence of faulting."

How is it that that statement

indicates that Exploration conscientiously ignored evidence of faulting?

A.    I think the one thing that stands out is the all caps THEIR and that developments work on a north-south fault trending down the center of Shenandoah was their interest and it didn't sound like -- well, I'll stop there.

Q.    Okay, so it's based on the capitalization of that word?

A.    Yes, the emphasis.

Q.    Did you also review Ramsey's testimony about this email?

A.    I have no recollection of reviewing it.  I might have passed over it but I must have missed it.

Q.    Would you think that Ramsey's interpretation of the email would be relevant to considering what Ramsey meant by the email?

MS. JENSEN:   Objection, foundation.  Speculation.  Ben, if you want to put testimony in front

of him, then do it but don't ask in isolation without giving any -- the testimony itself.

A.   That's outside the scope of my report.

Q.   You also say:  "...only the development team considered it in their well planning logic."

So you recognize that development did recognize the impact of faulting on the project?

MS. JENSEN:  Objection, vague as to time.

A.   This whole chapter is my work on trying to describe the -- how Anadarko's faulting model evolved and it focused on -- most of the development there occurred based on Development's work.

Q.   So does that mean that Development recognized the impact of faulting?

A.   I read a quote earlier, paragraph 53 the quote underneath that, Browning says:  "...we can't

assume other fault blocks have the same oil-water contact.  We have to test each fault block with a well, (starting with the biggest)."

He's talking about how unique the properties of each fall block are going to vary and by definition the boundaries of that fault block would be sealing.

Q.   So it sounds like development did recognize the potential impact of faulting; is that correct?

MS. JENSEN:  I'm going to say asked and answered.  Also vague as to time.

A.   In the context of this case I'm not quite sure how expansive you are using the term "recognized."  They were working on identifying fault, possible faults, and whether they fully recognized all the implications is beyond the scope of my report.

Q.   In paragraph 63 you talk

about Kleckner's testimony.  Have you reviewed the entirety of Kleckner's testimony?

A.   I reviewed it quickly. Those transcripts are lengthy so the word "entirety" probably no.

Q.   You say here that:  "He testified that Development's work on fault's compartmentalization was communicated to and understood by senior management."

And then you quote a portion of testimony where you said:  "I think that risk of compartmentalization was well understood by everybody."

How do you get from that sentence to senior management being familiar with Development's work on fault compartmentalization?

A.   The answer is I think this is -- the answer is made by an Executive Committee member.  "I think the risk of compartmentalization was well

understood by everybody."  I think that statement stands on its own.

Q.   And did the work on fault compartmentalization that was done also include how to address the risks -- I'm sorry -- how to mitigate the risks of fault compartmentalization?

A.   Would you repeat the question, please.

Q.   Sure.  You referred to Development's work on fault compartmentalization.  Does that also include work on how to mitigate the risks of fault compartmentalization?

A.   Mitigation of fault compartmentalization is beyond the scope of my report.

Q.   Are there ways to mitigate fault compartmentalization?

A.   My understanding in the context of this case is the most important thing about mitigating fault compartmentalization is to try

great deal of challenges throughout the life of the project.  It was not a highly profitable field.

Q.   But the field was developed?

A.    The field was developed. So faulting doesn't preclude a field from developing.  You have to understand it.  You have to understand the degree of faulting in order to assess whether it can be developed commercially.

Q.   And when you say you heard an instructor talk about Heather, did you work on Heather or just hear the instructor talk about it?

A.    When I was assigned to the North Sea working in the Aberdeen office my main responsibility was working on the Nevis Field, which was a heavily faulted reservoir that was being appraised for development. And I had some assignments to do on the Heather field.  So it wasn't my primary responsibility but I was

Page 122

exposed to it to a fair degree.

Q.   Are you aware of anyone at Anadarko who had the view that the faulting in Shenandoah rendered Shenandoah not commercially viable before Shen-6?

A.   I'm looking for a Browning quote in the report.

I guess I'd return to the quote that I read in paragraph 47 where Browning says:  "But certainly, if we get more pressure breaks between appraisal wells, we'll have our answer."

And that's on, in reference to "we will know which is the case until a good number of wells are on production."

The degree of how broken up the reservoir was with compartmentalization really required producing the field.  So the main risk is extremely difficult to address before you make your main investment.

Q.   And other than this email from Browning, are you aware of anyone at Anadarko who was of the view that Shenandoah should not be appraised because of the risk of faulting?

A.   There's a quote by Chip Oudin after Shen-4.  Paragraph 138. "Serious thought to consider (and I know you didn't think that I was capable of them) [...] how do you go forward with a project sanction when you know your reservoir is compartmentalized but you don't know how big your compartments are?"

Q.   And do you take from that that he believed further appraisal should not happen?

A.   Whether he thought further appraisal should not happen is beyond the scope of my report.  But rereading that quote.  Serious thought to consider I'll leave out the other parentheses.  How do you go forward with a project sanction

when you know your reservoir is compartmentalized and you don't know how big your compartments are.

I think he's identifying the key issue about compartmentalization and how the uncertainty around compartmentalization unfolds when you are primarily restricted to drilling wells rather than production testing.

Q.   Are you aware of any of the partners who were of the view that the faulting resulted in Shenandoah being uncommercial prior to Shen-6?

MS. JENSEN:  Objection to foundation.  Objection to the extent that it calls for speculation.

A.   In the context of this case I do know that Conoco wanted to exit and sell their interest in the Shenandoah project after Shen-3. Let's see, there's a good discussion.

There's a quote from Lea Frye

Page 125

to McGrievy on paragraph 232: "Interesting. Dan from COP called me and wanted to chat. Based on Shen-1 pressures and the new interpretation of rafts across -- rafts areas COP is concerned. He has run volume sensitivities with new maps and oil-water contact variance and is seeing in place volumes basically cut in half. They are concerned about size and commerciality."

Soon after that Conoco approached -- well, I don't know the details. You had Conoco want to leave the project but was unable to dispose of their interest. And you had Marathon who did leave the project.

Q.   Do you know what led Conoco or Marathon to leave the project other than speculation?

A.   You want me to reread the paragraph I just read you?

Q.   No.   Are you saying that

Page 126

that's what led Conoco to try to sell its interest?

A.   The -- seeing the volume of oil in place cut by half is a very, very significant event.

Q.   And are you opining that that's what led Conoco to want to sell its interest?

MS. JENSEN:   Objection, misstates.

A.   I'm not opining why Conoco left.  I am identifying a major development that occurred that was mentioned by Conoco to Anadarko about their interpretation following Shen-3.

Q.   Okay.  Just so the record is clear, you said I'm not opining why Conoco left.  Conoco did not actually leave after Shen-3, did they?

A.   No, they didn't.  They just wanted to leave.

Q.   In paragraph 75, towards the bottom, it's six lines -- or

seven lines from the bottom it says: "Relatively poor seismic imaging below salt at this depth makes it extremely unlikely that all of the barriers isolating the fault blocks could be identified before development plans are made and production begins."

In that sort of situation how does an oil company typically deal with this sort of uncertainty?

MS. JENSEN:   Objection to the extent that it calls for speculation.  Foundation.

A.   That's beyond the scope of my report.

MS. JENSEN:   So Ben, we have been going for about an hour.  Can we take a break?

MR. GRUENSTEIN:   Yes.  Just one second.

Q.   When you say it goes beyond the scope of the report, do you mean that you don't know or you didn't look into it for this report?

Page 128

A.    Could you repeat the question?

Q.    Yeah.  I mean my initial question was what was an oil company -- what does an oil company typically do when there's uncertainty that's a result of poor seismic imaging.  You said it was outside the scope of your report.  But I'm still entitled to ask the question.  So do you not know?

A.    This is in reference to the seismic data and I'm not a geophysicist.  I think there are more appropriate people to ask that question of.  It's outside the scope of my report.

MR. GRUENSTEIN:  Okay.  Why don't we take a break and go off the record.

THE VIDEOGRAPHER:  Standby, please.  The time is 1:29 p.m.  We are going off the record.  This will end media unit number two.  Wait, please.  And we are off the

far off their model was with being able to address the complexity in the field.

And it also shows just how totally unfaulted the eastern section was and how this oil-water contact defining the P90 case and the established, quote/unquote, established oil-water contact based on assuming continuity between Shen-2 and Shen-3 extended all the way up to the east with no interruption.

The complexity of this field, given what had just happened to Shen-4, pressure isolation between two wellbores 300 feet apart, yet we have -- those blocks there, the Walker bridge 52-block, that's three miles across with not a -- a -- no faulting, no disruptions.

Shen-4 bypass core was 300 to 400 feet away from the sidetrack 1. Pressure isolation missing zones, different, even different rock type

Page 176

making up the -- comprising the matrix of the formation.  You have in one side of the field there's tremendous complexity.

Exhibit 33 shows the western side of the field increasing in complexity.  That's what Exploration --

I lost you.  Okay, you are back.

Q.    I'm always here, don't worry.

A.    This is Exploration's admission to help complex the western part of the field is when they are constrained with data.  But unconstrained with data, the entire eastern block is faultless with oil-water contact, full all the way to the eastern side of the structure.  That's the -- I think what he's getting to is now we need to understand the east side of the field.

By analogy on the western side

you have this tremendous level of complexity and on the eastern side this tremendous level of simplicity.

Q. And do you know how they intend to -- how Anadarko intended to understand the east side of the field?

MS. JENSEN: Objection to the extent it calls for speculation.

A. That's speculating and beyond the scope of my report.

Q. You don't think that it drilled Shen-5 and Shen-6 in order to understand the east side of the field?

MS. JENSEN: Are you saying their intention? I'll just object to vague.

A. Could you repeat the question?

Q. Sure. I said that you didn't think that the reason they drilled Shen-5 and Shen-6 was in order to understand the east side of the field?

MS. JENSEN: Objection to the extent it calls for speculation.

A. Their intent is beyond the scope of my report.

Q. Whose intent is beyond the scope of your report?

A. You are asking -- I assume you are asking me about Anadarko because Anadarko is the operator.

Q. Right.

A. Of the operation.

Q. So that's outside the scope of your report?

A. What their thinking and intent, yes, it is.

Q. And how about the people who work at Anadarko, that also outside the scope of your report?

MS. JENSEN: Objection, misleading.

Q. I'll ask the question again. And how about the people who work at Anadarko, was their intent also outside the scope of your report?

A.    What was their intent to do what?  Where Shen-5 and Shen-6 are located, is that the question?

Q.    Yes.

A.    The desires --

MS. JENSEN:  Object to form.

A.    And objectives of where they drilled their wells are beyond -- is beyond the scope of my report.

Q.    Okay.  Let's continue moving through your report.  So let's go to section 6.  It was appraising the Shenandoah resource starting on page 71.

In paragraph 168 you say: "Risk and uncertainties abound when the reservoir is almost six miles below the surface," and then you give some other characteristics.

Do those risks and uncertainties necessarily make a field commercially unviable?

MS. JENSEN:  Objection, foundation.

A.    Rose and Associates

provides a methodology of addressing risks and uncertainties by quantifying the potential range of outcomes and establishing a method by calculating the expected value which is a risk weighted result of many potential outcomes.

Q.   Okay.  So the mere existence of these risks and uncertainties does not necessarily make a field commercially unviable, correct?

A.   Correct.

Q.   And as the company learns more about the risks and uncertainties, can its views on commercial viability change?

MS. JENSEN:  Objection.  Calls for speculation.  Foundation.  What company are we talking about?

MR. GRUENSTEIN:  A company.

MS. JENSEN:  A hypothetical company.  I'll also object to improper hypothetical.

A.   Are you asking, for

example, given what was known after Shen-4 where both the economics are below the PIR and the economic run is leaving out many very severe technical problems with asphalt deposition and reservoir faulting with management saying they value putting zero value on the resource that somehow investments that are deemed, based on the information at the time are uneconomic going forward, that somehow something is going to happen with Shen-5 or 6 to make it economic?

Q.   That was my question from around 15 minutes ago.  But this is a different question.

A.   The basis behind decision analysis, economic -- engineering economics and economics is based on the information at a given time the path or the option -- let's see if I can rephrase this.

If the economics capture the range of potential outcomes and the

Q.    Okay.  But based on your experience in the oil and gas world?

MS. JENSEN:  Same objections. Foundation.  Calls for speculation.

A.    That was beyond the scope of my report.

Q.    Is the PIR10 the only factor that Anadarko would consider in deciding whether to provide funding to a project?

MS. JENSEN:  Objection, vague.

A.    Whether it's the only one is beyond the scope of my report but I get the impression from Hollek's testimony that it was an important one.

Q.    And when you say would not likely receive funding, do you mean even for appraisal?

MS. JENSEN:  I believe that's been asked and answered.

A.    Yeah.  I have said several times today that the Rose and Associates method of quantifying ranges of possible outcomes and

creating an expected value calculation is applicable to Exploration appraisal and development.

Q. I was asking specifically about this line that Shen would now not likely receive funding and I take it that you mean for any of those three?

MS. JENSEN: Asked and answered.

A. Could you repeat your question because --

Q. I think we are all on the same page.

But you said that the PIR10 did drop below .3 at some point, correct?

A. It was below .3 for most of the class period.

Q. And was there an official PIR or did different groups do different analyses?

A. That's beyond the scope of my report. What was deemed official

is beyond the scope.

Q.   Well, when you say -- but you did say that the PIR10 dropped below .3.  You are referring to the one that Lea Frye created, correct?

A.   Yes, Lea Frye presented to a member of the Executive Committee.  So I assume that's representative of information that they are using to make their decisions.

Q.   Do you know whether there were other PIR10s created?

A.   I think there are one-sided, Exhibit 76, Exploration doing their own economics.  But I was unable to find any form where those were discussed or presented so I can't attest to any level of confidence.  There were Exploration -- other groups were doing the economics, but whether they had any influence on the decision-making I was unable to determine from the document production.

Q.   Are you expressing an

opinion as to why Anadarko continued appraising Shen-3 even though Lea Frye's PIR10 dropped below .3?

MS. JENSEN:  Objection, asked and answered.

A.   I'm not expressing an opinion on motivation.

Q.   Have you ever worked on a matter where a project continued to be appraised and the PIR was below the corporate threshold?

MS. JENSEN:  Compound.

A.   The scope of my work was to evaluate the -- Anadarko's data acquisition analysis and findings that they made from their present program on the Shenandoah field.

Q.   Right.  But you are relying on your experience.  I'm entitled to ask about your experience.

MS. JENSEN:  Objection, argumentative.

MR. GRUENSTEIN:  Maybe a little.

A.   I will stick with that's

Page 192

beyond the scope of my report.

Q. Okay. So you are refusing to answer?

MS. JENSEN: He gave you an answer.

A. I gave you an answer. That's outside the scope of my report.

Q. I think it's a refusal to answer.

MR. GRUENSTEIN: Rachel, are you instructing him not to answer?

MS. JENSEN: I didn't give him an instruction.

MR. GRUENSTEIN: Okay.

MS. JENSEN: I do believe he answered your question.

MR. GRUENSTEIN: I don't see an answer other than it's outside the scope of his report, which is not a valid basis not to answer a question.

Q. Are you going to answer the question?

A. It's outside the scope of

Page 193

my report.

Q.    I'll take that as a no.

MR. GRUENSTEIN:  Why don't we take a break and go off the record.

THE VIDEOGRAPHER:  Standby, please.  The time is 3:25.  We are going off the record.  And this will end media unit number three.

(Whereupon, there is a recess in the proceedings.)

THE VIDEOGRAPHER:  The time is 3:48 p.m.  We are back on the record.  This will be the start of media unit number four.

Counsel.

MR. GRUENSTEIN:  Thank you.

Q.    Let's continue to march through the report.  Let's go to page 79 paragraph 187.  Starting on the third line you say:  "In my expert opinion, these P10 and P90 net pay estimates are very optimistic."

Did you do any modeling to determine how optimistic they were?

Page 241

hour, could we take a break?

MR. GRUENSTEIN:  Sure.  How long do you want?

MS. JENSEN:  I'd like 15 minutes.

MR. GRUENSTEIN:  Okay.

THE VIDEOGRAPHER:  Standby, please.  The time is 4:59 p.m.  We are going off the record.  This will end media unit number four.

(Whereupon, there is a recess in the proceedings.)

THE VIDEOGRAPHER:  The time is 5:20 p.m.  We are back on the record.  And this is the start of media unit number five.

Q.  Great.  Now, let's go to paragraph 299.  This is in the section Shenandoah's Viability Was in Serious Doubt At Least By December 2015.

What do you mean by serious doubt?

A.  Serious doubt is not a technical term.  Just there was a

Page 242

lot of doubt expressed, a lot of negative comments.  The comments by Abrevia [ph] about Shenandoah economics being extremely stressed. You have Walker talking about not wanting to take this to Development with a production solution as operator to I see no way we will want to take this to Development today with a production solution. Should Shen-5 drill up successfully, and we need to reconsider this, I'm open to that, but it seems like an unneeded trip to me.

The low comparable sales value established by the Marathon sale -- the Shenandoah development with significant lower economic performance in paragraph 307, the Executive Committee working on future scenarios of company investment and three out of four exclude any Shen project in their forecast or involvement in that scenario -- EC planning session

describing Shen as geologically complex penetrations not in pressure communication and resource side is shrinking with appraisal.

The EC strategy development meeting where they describe Shenandoah as having 0.0 value at $60 per barrel.

The paragraph 311, both scenarios being considered by the Executive Committee and their scenario planning choose not to invest in Shenandoah.

And then McGrievy's email. "I understand, talking with Luis, that Chris Champion did set the stage with some of the executive team in December 2016 to let them know that a fairly substantial write-down at Shenandoah would be imminent in 2017."

That was before any results came in from 2006 -- from Shen-6.

Q. When Walker said: "I see no way we will want to take this to

Development today," is it possible that he was -- that he meant we would not take it to Development today as opposed to at some point in the future?

MS. JENSEN:  Objection, calls for speculation.

A.   That's outside the scope of my report.

Q.   So you don't know one way or the other?

MS. JENSEN:  Objection, mischaracterization.

A.   You're characterizing something I didn't say.  I said that's outside the scope of my report.

Q.   Okay.  And does that mean you are refusing to answer?

A.   It does not mean I'm refusing to answer.  I'm just saying that's outside the scope of my report.

MS. JENSEN:  Objection, argumentative.

Page 245

Q.   Saying it's outside the scope of your report is not an answer to the question.  Are you going to answer the question?

MS. JENSEN:  I'm going to object to the question as calling for speculation.

MR. GRUENSTEIN:  And that's fine.

Q.   If your answer is you can't answer because it calls for speculation, I'm fine with that.

A.   It's outside the scope of my report because it calls for speculation.

Q.   That's a fine answer.

Did you see any documents or review any testimony where anyone explained why Anadarko was continuing to appraise Shenandoah even though its viability was in serious doubt?

MS. JENSEN:  Objection.  I think you've asked this question several times, Ben.  Asked and

Page 246

answered.

A.   Opining on the motivations is beyond the scope of my report and calls for speculation.

Q.   Right.   I'm not -- I'm just asking if you've identified any documents or testimony?

A.   No, I have not.

Q.   If we look at page 126, paragraph 301.   Well, actually let's look at Exhibit 77 above between 300 and 301.

Do you see that slide on top of 126?

A.   Yes, I do.

Q.   It says:   "Shenandoah: Current State.   Resource Uncertainty Remains."

Then the next bullet says: "Requires additional appraisal prior to FID."

Do you understand what that means?

A.   Yes.

Q.   What does it mean?

A.    They are not at the point of FID.  They are not at the final investment decision.  They are not at the final investment decision to proceed with development.

Q.    Okay.  And what does it mean, the next bullet:  "Large potential exists"?

MS. JENSEN:  I'm just going to object to the extent it's asking the witness to speculate.

A.    That's outside the scope of my report because it calls me to speculate on something that I don't understand.  I don't understand given the amount of problems they have with or challenges they had with the density of faulting and asphaltene deposition why they would describe it in such a positive way.

Q.    Unless they would disagree with your assessment, right?

MS. JENSEN:  Objection. Argumentative.

MR. GRUENSTEIN:  A little bit.

Page 248

MS. JENSEN:  Thank you.

Q.   Let's go to 301.  Just hold on one second.  Let's look at 301. And you reference that they are looking at several strategic opportunities; is that correct? Option 1 through Option 4?

A.   Yeah.  The title is "Strategic Opportunities Appraisal Operations."

Q.   Okay.  And what do you understand Option 1 to be?

A.   Continue as is.  Maintain working interest and progress to FID.

Q.   Okay.  So under that scenario they would go to FID?

A.   Progress.

Q.   Okay.

A.   It's unclear what they mean what's involved in how to progress.

Q.   Okay.  What does No. 2 mean?

A.   "Evaluate tie-back/joint development opportunities prior to

not being able to see them both at the same time and I don't have a good enough memory to remember everything on that presentation slide to understand what's being written.

Q. So let me tell you what the question is and then you can toggle back and forth as much as you want. At the bottom of 237 he says: "With what we currently identified as discovery resources, yes. If it was uneconomic at that time. But if you take everything else projected, reserves that could be established by Shen-5 and Shen-6, it would have been wildly economic."

Do you understand what he's saying there?

MS. JENSEN: Objection to the extent it calls for speculation. Also object to asking him questions without all the testimony in front of him but okay.

MR. GRUENSTEIN: The whole

exhibit is in front of him.

MS. JENSEN:  I understand 300 pages of it, yes.

A.    Yes.  I think it would take a considerable amount of time to read this and see the context, the full context of what's being asked.

Q.    Okay.  What were you saying earlier about McGrievy saying that the economics -- about the economics of Shenandoah?

A.    I don't recall making a statement about McGrievy's economics?

Q.    I thought you mentioned earlier when you were going through the litany of evidence about concerns about Shenandoah I think you said there was a McGrievy email that said that the --

A.    Extremely stressed.

Q.    Right.  What was that?

A.    Extremely stressed.

Q.    That the economics were extremely stressed.  How do you

reconcile that email with McGrievy saying here that:  "If you take everything else, projected reserves that could be established by Shen-5 and Shen-6 it would have been wildly economic"?

MS. JENSEN:  Objection, misleading.

A.    Paragraph 258.  "In light of the poor commodity price environment, the overall economics are extremely stressed and we need to focus and need to be reasonably confident in the investment costs that we are assuming for the project."

This is the start of the cost reduction initiative, when he says there the economics are extremely stressed.

Q.    Right.  But even though he's saying the economics are extremely stressed, he's saying here in his testimony that if the reserves -- if the projected

Page 258

reserves that could be established by Shen-5 and Shen-6, then it would have been wildly economic.

MS. JENSEN:  Objection. Misleading.

Q.   So my question is could the economics be extremely stressed and yet the project overall could be extremely economic?

MS. JENSEN:  Objection, misleading.

A.   Remind me what the date is of the presentation that you are -- I can't see the transcript and the presentation at the same time.

MS. JENSEN:  I'll note that, Ben, you are referring to testimony in this case not contemporaneous at the time.  So 2022.

MR. GRUENSTEIN:  Is that an objection?

MS. JENSEN:  Yes.  That's why it's misleading.  Objection, misleading.

MR. GRUENSTEIN:  Okay.

Q.    The presentation was December 17, 2015.

A.    Speculating as to why he made this statement is outside the scope of my report.

Q.    The speculation as to why he made the statement about the stressed economics?

A.    Wild -- wildly economic.

Q.    Okay.  So questions about why he made the comment in his deposition is outside the scope of your report but why he made a comment in a contemporaneous document is not outside the scope of your report?

A.    One, I have just been presented this and I haven't had the opportunity to evaluate it.  I'm also quite concerned about page 237, line 2.  That's the current proven, yes.  That is incorrect.  And I take exception to Shen resources being considered as reserves.  The use of proven is necessarily tied to the

Page 260

term "reserves" as explicitly outlined in the PIR MS guidelines of 2011 which prevailed over this time.

Q.    Okay.  The McGrievy deposition testimony is in your list of documents that you relied on or that you reviewed or considered.  Is this the first time you are seeing this statement to your recollection?

A.    I have no recollection. I've viewed a very, very large amount of documents.  And they're -- I think it's understandable that I can't remember exactly what I have seen.

Q.    How many hours have you spent on this case?  Well, let me ask the question a little differently.  How many hours did you spend prior to the submission of your report?

A.    I don't recall precisely.

Q.    Do you have a general sense, perhaps based on how much you've invoiced?

Page 261

A.    Your question again is hours doing what activity?

Q.    Well, hours spent on this assignment up to the time your report went in.  If there's some other way you want to cut it, I'd be happy to take that answer too.

A.    I did an estimate at one point of how many hours I spent writing the report -- preparing the report.  And that was about 300 hours.

Q.    Okay.  And does that include the analysis you did that went into the report?

A.    That was the preparation of the report.  Did not include the analysis.

Q.    Did anyone assist you with the report?

A.    I had editing support.  I don't have a secretary here.  I do not have a secretary so I needed support with Microsoft Word to prepare this into the final format

# Exhibit 106

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

Case No. 4:20-CV-576

- - - - - - - - - - - - - - - - - - - - -x

IN RE: ANADARKO PETROLEUM CORPORATE

SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - - -x



                              December 21, 2022

                              9:08 a.m. (PST)





    REMOTE VIDEOTAPED DEPOSITION of BJORN

STEINHOLT, an Expert Witness, in the

above-entitled action, held at the above

time and place, taken before Dawn Matera,

a Shorthand Reporter and Notary Public of

the State of New York.

               *      *      *

Shenandoah been commercially developed, in what time frame would the sale of oil have been?

A.    It would have been a few years away, that's my understanding.  But as I sit here right now, I don't know exactly when that would be.

Q.    Okay.  So you reference this document and something that Mr. Walker said.

Do you have any knowledge as to how those expectations with respect to the future price of oil compared to internal Anadarko expectations earlier in the class period?

A.    I do not know.  I don't have any opinions relating to that.  And it's beyond the scope of what I was focusing on.

Q.    Okay.  So to come back you spoke about the alleged truth coming out.  And you said in this case it's the truth with respect to commercial viability.  Are you with me?

A.    Correct.

Q.    And in your understanding, at least, for the purposes of your analysis, what was the truth that came out?

MS. JENSEN:  Objection.  Asked and answered.

A.    Well, the specific alleged truth in this particular case relates to the suspension of appraisal activities at the Shenandoah; as well as the impairment charge that they took at the time; as well as the expenses of the drilling costs, including drilling costs -- some drilling costs that had previously been capitalized.  And as well as, you know, results of the Shen-6 sidetrack well that was dry.

Q.    Okay.  So you say that's the truth with respect to Shenandoah?

A.    No, that is the alleged truth. That is what plaintiffs allege in the complaint.

I am not here -- I am not the paid juror to determine whether or not those allegations are correct or not, but that is information that was fraudulently

concealed.  It was something that the company, you know, that or similar information, is something that the company should have revealed earlier. It's just an alleged truth.  It's in the complaint.

Q.    And for purposes of your analysis, when should that alleged truth have been disclosed to the market?

A.    The misrepresentations relating to the commercial viability of the Shenandoah started on, when they filed the 10-K.  So that was, I think it was after the market closed on February 20th. So it would be on February 21st, 2015. That's where you would have, there would have been some truth.

And my understanding is that the truth at that point in time would have been that the Shenandoah was most likely not commercially viable as of that time.

Q.    When you say most likely, what do you mean by most likely?

A.    Well, that is the determination

of the other experts in this particular case. So most likely means that it is more than 50 percent. That's the way I read it.

Q. Okay. And did that, did that change during the class period, the likelihood of commercial viability?

A. After the Shen-4, the experts concluded, the assumption is that it certainly was not commercially viable after. So it goes from most likely to certainly not commercially viable.

Q. And this analysis of most likely shifting to certainly not, in your understanding, was that known within Anadarko during the class period?

MS. JENSEN: Objection, to the extent that it calls for speculation. Objection, beyond the scope.

A. Could you repeat the question?

Q. Yes. That shift with respect to commercial viability during the class period that you just described to me, from most likely to be -- most likely not commercially viable to certainly not

Page 54

commercially viable.  Are you with me, I am talking about that distinction that you just described?

A.    Correct.

Q.    So that distinction, in your understanding, was that distinction known to folks within Anadarko during the class period?

MS. JENSEN:  Objection. Characterization and beyond the scope.

A.    I don't know what was known internally at Anadarko.  But all I know is that based on the experts' review of the results from the Shen-4, that is what they determined.  That's my understanding.

Q.    And so you haven't done an independent analysis of this.  You're just taking the work and conclusions of other experts; is that fair?

MS. JENSEN:  Objection to the characterization.

A.    Yes, I am.  I have no knowledge of what Shenandoah understood internally.

Q.    Okay.  So you -- do you know

who Lea Frye is?

A.    Yes.  I believe she was the lady who filed a whistleblower complaint.

Q.    Did that whistleblower complaint factor into your analysis at all?

A.    I think it probably factored into -- it may have factored into the other experts' work in this case.  And I am taking my assumptions from them.

So indirectly, you know, maybe it impacted my analysis.  But I am looking at the assumptions that were provided to me.  So I don't know to what extent her whistleblower complaint, you know, factored into these assumptions and consequently how that factored into my analysis, which is based on those assumptions.

Q.    Did you investigate what Ms. Frye's understanding with respect to the commercial viability of the Shenandoah field was during the class period?

A.    No, I did not.

Q.    Do you have any understanding

Page 64

or not there are other issues or other facts or information that was also revealed by the results of that particular well.

Q.    Just to go back to Shen-2 for a moment.  So Shen-2 had a thousand feet of net oil pay, right?

MS. JENSEN:  Objection.

A.    Yes, that is what I recall.  I have it in paragraph 18.  And I don't know if I specifically said that it has a thousand feet of oil pay.  But I am pretty sure that's what it had.

Q.    Well, this is not a trick question.  You can look at your footnote 12, if you want.

A.    Yes, exactly.  Yeah.

Q.    Right.  Okay.  So then -- and that was before the class period, right?

A.    That's correct, yes.

Q.    And in your understanding, is that statement alleged to be either false or misleading?

A.    No, I mean, my understanding is that the class period starts with the

misrepresentation, alleged misrepresentation in the Form 10-K that came out after the market closed on February 20th, 2015. So that is the first alleged misrepresentation that's relevant, for my purposes. You know, they may, you know, this may have been a false statement, too. But I mean for my purposes, you know, I explicitly start my inflation following that filing of Form 10-K.

Q.    So in your opinion, which are the inflationary statements?

A.    Inflationary statements?

Q.    Right.

A.    Well, I mean, I typically call them misrepresentations. The alleged misrepresentations starts with the statement, the representations in the Form 10-K for the year-ended 2014.

Q.    So that's the document that was filed with the SEC on February 20th, 2015; is that right?

A.    Correct, yes. That is the first misrepresentation that I had for

the purposes of establishing when liability starts in this particular case.

Q. Okay. But your opinion has to do with artificial inflation in the stock price, correct?

A. Correct, yes.

Q. And so my question is, in your opinion, when did that artificial inflation start?

A. Well, that started following the first misrepresentation, which was the filing of the 10-K. At that point in time, that's when you get an inflation, which is the difference between the stock price and the true value reflecting the alleged truth.

Q. And again that's February 20th, 2015?

A. Well, it was after the market, so it ends up being February 21st of 2015, yes.

Q. Okay. So I've asked you -- you know, and I am looking at your paragraph 20, just to be clear, right, I assume you have it in front of you?

Page 67

A.    Yes, I do.

Q.    And I was talking to you about paragraph 21, and that's the Shen-4 result.

And then if we go to paragraph 22, that's the Shen-5 results.  And you see there's, you quote an Anadarko announcement on July 26th, 2016 that Shen-5 had encountered more than 1,040 net pay -- net feet of oil pay; do you see that?

A.    That's correct, yes.

Q.    Okay.  And in your understanding, was that a false statement?

A.    It was a misrepresentation. That's my understanding.

Q.    When you say that --

A.    Because it was not -- typically the way that these cases work is that something is or may be false or misleading if it conceals material information that is necessary in order to fully understand the subject.

So with respect to the Shen-5

Page 68

disclosure, the issue there is whether or not this is a full and accurate disclosure of the results up until that point in time.

Q.    Okay.  But, again, my question is a little bit narrower, which is in your understanding for purposes of your analysis, is it actually incorrect that there was 1,040 net feet of oil pay in Shen-5?

MS. JENSEN:  Objection. Misleading.

A.    No, that is not my understanding of their allegations.  I think my understanding of their allegations is that there is more information that should have been disclosed with respect to the results of the Shen-5.

Q.    Okay.  Again, and your understanding is that 1,040 net feet of oil pay, is that a lot or no big deal or what?

MS. JENSEN:  Objection to form.

A.    Well, you're on your fifth well

Page 69

and you have the highest net pay.  So if you just look -- again, if you just look at the number, the number is the highest of all of the wells that had been drilled up until that point in time.  So if you just look at the number, that would seem to be pretty good.

Q.    Okay.  Now, there were a series of misstatements alleged in this matter. Are you familiar with that?

A.    I know that there are a series of misstatements.  So, yes.

MR. SLIFKIN:  Your video is cutting in and out a little bit.  I got something that says my Internet is unstable.

Let's go off the record for a second.

THE VIDEOGRAPHER:  Time is 10:54, and we are going off the record.  Hold on a second.

[Off the record.]

THE VIDEOGRAPHER:  The time is 11:07 a.m., and we are back on the record.

[Discussion held off the record.]

BY MR. SLIFKIN:

Q.    Okay.  I apologize for the technical difficulty.  Let's go back to where we were.

I take it you're familiar with the fact that in the operative complaint in this matter, there is a series of alleged misstatements during the class period?

A.    Yes, I am.

Q.    Okay.  In your opinion, did those alleged misstatements add to the inflation in the price?

A.    Add to the inflation, no.  They are statements that, to my understanding, were false and misleading, because they did not disclose the entire truth as alleged by plaintiffs with respect to the issues that were disclosed.

Q.    Okay.  Did you perform some kind of event study analysis with respect to each of those 21 alleged misstatements?

A.　The initial analysis that I did for market efficiency did look at each day.　But I did not -- I do not recall whether or not any of those days had a statistically significant price increase. But I wouldn't -- given the allegation in this particular case, I wouldn't necessarily expect there to be any increase because it relates to information that was concealed throughout the class period and then was disclosed at the very end of the class period.

Q.　I take it in your analysis inflation during the class period is flat, except for one step up, correct?

A.　Yes.　So the primary analysis that I performed in this particular case, was to quantify the inflation based on the price decline when the alleged truth was disclosed at the end of the class period.

So in other words, very often the best estimate of the impact of disclosing the alleged truth is to see what actually occurred when the alleged

truth was disclosed.  So that's, that's what I did in this particular case.

Q.    Just to go back to my point, inflation is -- withdrawn.

I take it under your analysis there were two separate bands of inflation during the class period.  There is the initial class period and then there is later in the class period, correct?

A.    Correct.  There is an increase because their ownership increased.  In other words, I looked at the price decline at the very end of the class period.  And then I reduced that inflation because during the earlier period, in the class period, the company only owned 30 percent of the Shenandoah as opposed to 33 percent, which was the ownership at the time of the corrective disclosure.

Q.    Can you explain to us why that change in ownership makes a difference for you?

A.    Well, the issue is what the

Page 73

ownership was at the time of the disclosure.  And the more the company would own of Shenandoah, the more the impact would be.

So the question then became, well, what happened during the early period of the class period when they own 30 percent and not 33 percent, shouldn't they -- wouldn't the inflation be less than.  So I made an adjustment to account for that.

Q.    And isn't that because the inflation is premised on expected future cash flows?

A.    Well, the investors make their own determination that is then reflected in the price decline.  And, yes, that would be, I mean, the value of the stock is based on the present value of the future cash flows.  So if you own 30 percent versus 33 percent, there would be some difference there.  So the question is do you make an adjustment or do you not make an adjustment.  And my view was more conservative to make an adjustment.

And that's what I did.

Q.    When you say the future cash flows and you refer to 30 percent, I take it you mean the future cash flows that would be attributable to a 30 percent ownership stake of Shenandoah, right?

A.    Well, there are many factors that, I mean they were the operator. There may be different ways of looking at it.  But I think that in this particular case, that's the numbers that I had, and so I make the adjustment based on the numbers that I had.  And that is the ownership interest that they had.  So that's why I made the adjustment.

Q.    Is it fair to say that the ownership goes from 30 percent to 33 percent, so -- well, let's take it in pieces, the ownership goes from 30 percent to 33 percent, right, at some point in time?

A.    Yes, in the -- yes.

Q.    So what you do is you calculate inflation at a point in time when the ownership is 33 percent, correct?

# Exhibit 107

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - -x

In Re: ANADARKO PETROLEUM                    Civil Action No.

CORPORATION SECURITIES LITIGATION        4:20-cv-00576

- - - - - - - - - - - - - - - - - - - -x

          Remote, videotaped deposition of D. PAUL REGAN, CPA/CFF, taken pursuant to Notice, was held via videoconference, commencing January 20, 2023, at 12:03 p.m. ET, on the above date, before Amanda McCredo, a Court Reporter and Notary Public in the State of New York.

Page 48

question?

MR. DROSMAN:  Objection; vague and ambiguous, calls for speculation.

A    There can be.

For example, if one accountant is making a judgment based upon, say, facts A, B, C, and D, and another bases a judgment on A and C and F, they may -- they may reach a different conclusion.

That's a fairly common problem that I've encountered over the years.

BY MR. GRUENSTEIN:

Q    Why would you say it's a problem?

A    Frequently, a judgment is made based upon incomplete or erroneous information.  Somebody makes a judgment in the absence of considering the appropriate factors that need to be considered when forming that judgment.

Q    Are there instances when two accountants exercising their professional judgment reach different conclusions and both conclusions are reasonable?

MR. DROSMAN:  Objection; calls for speculation, vague and ambiguous.

A    I suspect that there can be situations where that occurs, but my -- in my experience, it's