frequently because both -- both persons are not considering the same facts and circumstances; that they're either incomplete, or they're failing to give appropriate weight to certain factors.

BY MR. GRUENSTEIN:

Q    Are GAAP principles subject to interpretation?

MR. DROSMAN:  Objection; vague and ambiguous.

A    They can be.

BY MR. GRUENSTEIN:

Q    Can two accountants have different interpretations of a GAAP principle and both interpretations be reasonable?

MR. DROSMAN:  Objection; calls for speculation, vague and ambiguous.

A    Yeah, you need to drill into -- in terms of determining reasonableness, you need to drill into the facts and circumstances that were known at the time or knowable at the time and then make an assessment of whether both judgments were reasonable.

BY MR. GRUENSTEIN:

Q    Are there times where the language of a GAAP principle is ambiguous, and two different

accountants will interpret the words differently and both have reasonable interpretations?

MR. DROSMAN: Objection; compound, vague and ambiguous, calls for speculation.

A    Yeah, I don't -- I don't know.  It depends on the bases for the conclusion and the interpretation of GAAP.

Usually the interpretation of GAAP is influenced by the facts and circumstances that are being considered by the person that is attempting to operationalize GAAP.

And whether they did that reasonably is dependent upon what facts they considered and what factors they didn't consider.

BY MR. GRUENSTEIN:

Q    Is FAS 19 considered part of GAAP?

A    Well, it was, and then it was codified into the ASCs in 2009.  And much of its language is incorporated within the ASCs.

Q    What ASC was FAS 19 codified into?

A    For example, 932 is -- much of the language of 932 is taken from FAS 19.

Q    Are there parts of FAS 19 that were not codified into 932?

A    I haven't made that analysis.

Q    In your report, you refer to FAS 19, correct?

A    I do, yes.

Q    If we go to page 11, paragraph 31 --

A    Yes.

Q    -- you say, "Although certain amendments to ASC 932 have been adopted, Statement of Financial Accounting Standards No. 19" -- and then you give the title -- "serves as the primary source for relevant codified accounting standards applicable to Anadarko."

What is your basis for saying that it "serves as the primary source for relevant codified accounting standards applicable to Anadarko"?

A    The footnote references Reserve and Resources Manual, APC-00001289.

And within that document -- which I'm going to pull up --

MR. GRUENSTEIN:  We'll mark that as Exhibit 517.

(APC-00001289 through 1445 was marked as Exhibit 517 for identification, as of this date.)

A    Can I continue?

BY MR. GRUENSTEIN:

Q     Why don't you just give us a minute --

A     Sure.

Q     -- so that we're all looking at the exhibit.

Okay, I have it in front of me.

A     If you go to page 4-1, which is Bates -- the last four digits are 1309.

MR. DROSMAN:  I don't think the Bates numbers on the document you put in correspond to the one that Mr. Regan is using.

MR. GRUENSTEIN:  You're right.  We put in 1829.  So, we'll fix that.

It's now up.  It's Exhibit 517.

Do you have it, Dan?

MR. DROSMAN:  I'm just refreshing my browser.  Thank you.  Hold on one sec.

Yes, I do.  Thanks.

A     So, this document is Anadarko's Reserves and Resource Manual.  It's dated, on the first page, as 2012.  And it's confidential and proprietary property of Anadarko Petroleum.

And on page 4-1, it talks about:

The history of oil and gas rules, starting with the Securities and Exchange Act of 1934;

# Exhibit 108

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: Anadarko Petroleum Corporation Securities Litigation | Case No. 4:20-cv-576 District Judge Charles R. Eskridge III CLASS ACTION |

EXPERT REPORT OF J. RICHARD DIETRICH, PhD

January 25, 2023

CONFIDENTIAL

# Table of Contents

I.      Introduction and Assignment ................................................................................... 1

II.     Qualifications ........................................................................................................... 2

III.    Background .............................................................................................................. 4

      A.  Overview of Anadarko ..................................................................................... 4

      B.  Overview of Offshore Drilling in the Gulf of Mexico ..................................... 4

      C.  Overview of the Shenandoah Project ............................................................... 7

      D.  Overview of Allegations ................................................................................. 11

      E.  Overview of Regan Report .............................................................................. 12

IV.     Summary of Findings and Opinions ...................................................................... 14

V.      Overview of Relevant Accounting Standards ........................................................ 16

      A.  The Financial Accounting and Reporting Environment ................................. 16

      B.  Generally Accepted Accounting Principles .................................................... 18

      C.  Relevant Accounting Standards for Companies in the Oil and Gas Industry .............. 21

            1.  Development of Accounting Standards Relevant to Oil and Gas Exploration and Development .................................................................. 22

            2.  Accounting Standards Applicable to Capitalization of Costs for Shenandoah Appraisal Wells ............................................................... 23

            3.  Accounting Standards Applicable to the Impairment of the Shenandoah Project .......................................................................... 28

VI.     Mr. Regan's Opinions Are Deeply Flawed Because They Disregard Professional Judgment and Presume that There Is Only One Interpretation or Application of GAAP ..................................................................................................................... 29

VII.    Mr. Regan's Opinion that GAAP Required Anadarko to Expense the Cost of Drilling Shen 3 as of December 31, 2014 Is Flawed and Unreliable ............................................. 32

      A.  Anadarko's Decision to Suspend the Shen 3 Well Costs as of December 31, 2014 Was Consistent with GAAP ................................................................. 32

            1.  ASC 932-360-25-10 Establishes that Costs Associated with Stratigraphic Test Wells Are Suspended Pending Determination of Whether Proved Reserves Are Found .......................................................................... 33

            2.  ASC 932-360-25-17 Establishes that Stratigraphic Test Wells Are Drilled to Obtain Information ............................................................... 35

            3.  ASC 932-360-25-3 Also Supports the Initial Suspension of Exploratory Well Costs Pending Additional Information .................................................. 36

CONFIDENTIAL

4. ASC 932-360-35-18 Also Supports the Assessment of the Sufficient Quantity Criterion on the Basis of the Broader Field and Not Simply on the Basis of the Oil in the Well Itself.................................36

5. ASC 932-360-25-18 Itself Is Consistent with This Interpretation of the Sufficient Quantity Criterion ................................38

6. The Decision to Suspend the Costs Associated with Shen 3 as of December 31, 2014 Was Consistent with a Reasonable Interpretation of ASC 932-360 ................................39

B. Anadarko's Decision to Continue to Suspend the Shen 3 Well Costs Was Consistent with GAAP................................42

C. Mr. Regan's Analysis Is Flawed and Unreliable ................................45

1. Mr. Regan's Opinions Are Predicated on an Evaluation of Superseded and Non-Authoritative Guidance................................45

2. Mr. Regan's Opinions Are Predicated on an Incomplete Assessment of ASC 932-360 ................................49

3. Mr. Regan's Analysis Fails to Evaluate the Judgment of Anadarko Accounting Personnel ................................53

4. Mr. Regan Fails to Perform a Thorough Analysis................................59

5. Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals................................63

6. Mr. Regan's Conditions Do Not Require Anadarko to Have Expensed Shen 3 Well Costs as of December 31, 2014................................67

VIII. Mr. Regan's Opinion That Anadarko's Q3 2016 Accounting Determination "Has No Basis Under GAAP" Is Misleading ................................68

A. Mr. Regan Reiterates His Same Flawed Arguments Regarding the Capitalization of Shen 3 Well Costs Under ASC 932-360-25-18................................69

B. Mr. Regan's Opinion Is Predicated on an Evaluation of Superseded and Non-Authoritative Guidance................................70

C. Mr. Regan's Analysis Is Insufficient ................................71

D. Mr. Regan's Analysis Is Biased by Hindsight................................71

E. Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals ................................72

F. Mr. Regan Fails to Establish that GAAP Required Anadarko to Expense Shen 3 Well Costs Prior to September 30, 2016................................75

IX. Mr. Regan Fails to Demonstrate that the Shen 3 Drilling Costs Were Material to Anadarko's Financial Statements ................................75

A. Mr. Regan's Opinion Is Predicated on an Evaluation of Non-Authoritative Guidance ................................76

CONFIDENTIAL

B.  Mr. Regan Failed to Perform a Sufficient Materiality Analysis .................................78

    1.  Mr. Regan's Analysis Fails to Demonstrate the Relevance of the Financial Metrics Evaluated to the Information Needs of Investors ...............78

    2.  Mr. Regan's Analysis Fails to Consider that Information Regarding the Results of Shen 3 Was Available to Investors ................................................80

    3.  Mr. Regan's Qualitative Analysis Is Insufficient ..........................................80

X.  Mr. Regan's Opinion that GAAP Required Anadarko to Impair the Shenandoah Project as of December 31, 2015 Is Flawed and Misleading ........................................... 83

A.  Anadarko's Decision to Impair Shenandoah Project Costs as of Q1 2017 Was Consistent with GAAP ..................................................................................84

    1.  ASC 932-360-35-11 Establishes that Unproved Oil and Gas Properties Must be Assessed Periodically for Impairment ...............................................84

    2.  ASC 932-360-35-13 Establishes that Exploratory-Type Stratigraphic Test Wells Are Assumed to be Impaired if the Sufficient Progress Criterion is Not Met or if There Exists Substantial Doubt About the Economic or Operational Viability of the Exploration Project ..............................................85

    3.  The Decision to Impair the Unproved Property Balance Related to the Shenandoah Project and Expense the Previously-Suspended Well Costs Associated with the Shenandoah Project in Q1 2017 Was Consistent with ASC 932-360 ...................................................................................................86

B.  Mr. Regan's Analysis Is Flawed and Unreliable ..........................................................93

    1.  Mr. Regan's Analysis Is Biased by Hindsight ...............................................93

    2.  Mr. Regan's Analysis Disregards Relevant Information ................................94

    3.  Mr. Regan's Analysis Is Insufficient ............................................................95

    4.  Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals ................................................................100

    5.  Mr. Regan's Opinion Is Predicated on an Assumption.................................102

CONFIDENTIAL

## I.    Introduction and Assignment

1.    I have been retained by Cravath, Swaine & Moore LLP ("Cravath"), counsel for Anadarko Petroleum Corporation, n.k.a. Occidental Petroleum Corporation ("Anadarko"), R.A. Walker, Robert G. Gwin, Robert P. Daniels, and Ernest A. Leyendecker, III (collectively, "Defendants"), as an independent expert witness to provide my opinions regarding Anadarko's accounting treatment for certain well costs and periodic assessments of non-producing leasehold properties for impairment, particularly as applied to Anadarko's deepwater Shenandoah exploration project (the "Shenandoah Project").[1]  I also have been asked to evaluate and respond to certain financial accounting and reporting opinions expressed by D. Paul Regan, CPA/CFF, in his expert report dated November 9, 2022 (the "Regan Report").[2]  Specifically, I have been asked to evaluate Mr. Regan's assessment of the following accounting decisions with respect to the Shenandoah Project:

- Whether Anadarko's decision to suspend the costs associated with the Walker Ridge Block 52 #2 Well (AFE 2087315) ("Shen 3") as of December 31, 2014 was consistent with U.S. generally accepted accounting principles ("GAAP");
- Whether Anadarko's decision to continue to suspend the costs associated with the Shen 3 well until the third quarter of 2016 ("Q3 2016") was consistent with GAAP;
- Whether the Shen 3 well costs were material to Anadarko's financial statements for the year ended December 31, 2014; and
- Whether Anadarko's decision to impair the unproven property asset balance related to the Shenandoah Project and expense the previously suspended well costs associated with the Shenandoah Project as of March 31, 2017 was consistent with GAAP.

2.    In preparing this report, I reviewed publicly-available information as well as pleadings, produced documents, and deposition testimony in this matter to date.  I also have read relevant portions of accounting literature, including authoritative guidance as well as other pertinent

---

[1] Amended Complaint for Violations of the Federal Securities Laws, *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, filed on August 17, 2020 ("Amended Complaint").

[2] To the extent I have not directly addressed herein any individual assertion contained within the Expert Report of D. Paul Regan dated November 9, 2022 (the "Regan Report"), such omission should not be considered evidence that I agree with that assertion or conclusion.

CONFIDENTIAL

materials.  My work is ongoing.  I reserve the right to supplement or modify this report, including the opinions and the bases for these opinions, if new information becomes available.  I also reserve the right to prepare and present demonstrative exhibits if I am called upon to testify in this matter.  Materials that I have relied upon in forming my opinions in this matter are cited throughout this report and listed in **Appendix A**.

3.      I am being compensated at a rate of $800 per hour for my work on this matter.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent upon or based on the outcome of this or any other matter.

## II.      Qualifications

4.      I am a professor emeritus of accounting in the Fisher College of Business at The Ohio State University.  For more than 12 years, from October 2000 to January 2012 and from October 2015 to December 2016, I served as department chair for The Ohio State University's Department of Accounting and Management Information Systems.  I also have held tenured appointments as a professor of accounting at the University of Illinois at Urbana-Champaign and the University of Texas at Austin.

5.      Over the course of my career, I have been involved in standard setting and regulation that affects the professional practice of accounting by publicly traded companies, their accountants and auditors.  From August 1999 to August 2000, I was the academic fellow in the Office of the Chief Accountant at the U.S. Securities and Exchange Commission ("SEC").  In that role, I worked closely with the SEC's Chief Accountant and other staff members on accounting and policy issues, including recognition and measurement of assets, liabilities, revenues, expenses, and restatements.

6.      From January 2007 to December 2008, I was a member of the Standing Advisory Group of the Public Company Accounting Oversight Board ("PCAOB").  The Standing Advisory

CONFIDENTIAL

Group was created to advise the PCAOB on the development of auditing and related professional practice standards.[3]

7.    From September 2015 to March 2019, I served as a member of the Financial Reporting Executive Committee ("FinREC") of the American Institute of Certified Public Accountants ("AICPA").  FinREC interprets GAAP and issues guidance to assist companies and auditors in interpreting and applying GAAP.[4]

8.    Throughout my academic career that spans more than 40 years, I have taught courses across a variety of topics at the undergraduate, masters, and doctoral levels.  Between 2013 and my retirement, I taught courses focusing on financial accounting at both the undergraduate and graduate levels.  Courses included an intermediate financial accounting course that is required for all students who major in accounting at The Ohio State University, an introductory financial accounting course for honors students, and a professional accounting research course for Master of Accounting students.  Additionally, during most of my tenure at The Ohio State University, I taught "Accounting for Decision-Making," a required course for MBA and Executive MBA students that focuses on how accounting is used in the day-to-day practice of general management.

9.    I have served as a consultant or expert witness on more than 20 matters involving accounting and/or auditing issues.  My curriculum vitae is attached as **Appendix B**.  A list of matters in which I have provided expert testimony over the past four years is included as **Appendix C**.

---

[3] The Board convened a Standing Advisory Group to advise the Public Company Accounting Oversight Board ("PCAOB") on the development of auditing and related professional practice standards.  The SAG includes auditors, investors, audit committee members, public company executives, and others.  The Board dissolved the Group on March 29, 2021, with the establishment of the Standards Advisory Group.  See, PCAOB, "Archive –Standing Advisory Group," available at https://pcaobus.org/about/advisory-groups/archive-advisory/standing-advisory-group.
[4] FinREC, formerly known as the Accounting Standards Executive Committee ("AcSEC"), is "a senior committee of the Institute for financial reporting.  It is authorized to make public statements on behalf of the Institute on financial reporting matters without the clearance of either the Council or the board of directors of the Institute and to clear statements of other committees that include references to financial reporting positions.  The mission of FinREC is to determine the Institute's technical policies regarding financial reporting standards and to be the Institute's spokesbody on those matters, with the ultimate purpose of serving the public interest by improving financial reporting."  See, American Institute of Certified Public Accountants ("AICPA"), "Financial Reporting Executive Committee – FinREC," available at https://www.aicpa.org/interestareas/frc/accountingfinancialreporting/finrec.html.

CONFIDENTIAL

## III.    Background

### A.    Overview of Anadarko

10.    Anadarko engages in the exploration, development, production, and marketing of natural gas, oil, condensate, natural gas liquids, and anticipated production of liquefied natural gas.[5] Anadarko was among the world's largest independent oil and gas exploration and production companies as of 2016.[6] Anadarko's asset portfolio includes U.S. onshore resource plays in the Rocky Mountains area, the southern United States, the Appalachian basin, and Alaska.[7] Anadarko is also among the largest independent offshore producers, particularly in the deepwater Gulf of Mexico ("GOM"), and has exploration and production activities internationally.[8]

### B.    Overview of Offshore Drilling in the Gulf of Mexico

11.    Accounting standards relevant to oil and gas exploration and development have long been informed by the practices of the companies engaged in oil and gas exploration and development, and as described in further detail in Section V.C.1, have evolved over time in response to technological and geographical developments in the industry.  Therefore, it is important to understand the history of deepwater offshore drilling and how it differs from more traditional onshore drilling operations when considering the relevant accounting guidance.

12.    During the second half of the 20th century, oil exploration and development expanded from onshore to offshore to deepwater locations, including the outer continental shelf within the

---

[5] See generally, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017.

[6] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 4.  On August 8, 2019, Anadarko was acquired by Occidental Petroleum Corporation.  See, Occidental Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 28, 2020, p. 2.

[7] See, *e.g.*, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, pp. 7–11.

[8] See, *e.g.*, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 4.  As the world's easy-to-reach reserves (*i.e.*, onshore properties) decline with ongoing production, oil and gas companies must increasingly focus exploration efforts on more complex drilling environments, such as offshore, deepwater drilling.  See, Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition ("Petroleum Accounting"), p. 25.  Beginning as early as 2006, Anadarko was focused on developing the Lower Tertiary play in the western GOM.  See, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2006, filed on February 28, 2007, p. 9.  The first production from the deepwater Lower Tertiary play began in 2010.  See, Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019, p. 9.

CONFIDENTIAL

GOM.[9] As oil exploration and development expanded further and further into the GOM, the technology and techniques required to identify and extract oil from offshore fields, including ultra-deepwater fields, evolved significantly.[10]

13.     I understand that the physical activities required for offshore exploration (*i.e.*, deepwater GOM) and production can differ significantly from onshore projects.[11] For instance, while offshore operations employ similar exploration methods as onshore (*e.g.*, seismic surveys), the costs associated with offshore operations are significantly greater than costs associated with onshore operations.[12] Offshore seismic surveys typically are more expensive than those conducted onshore, as they experience significantly higher equipment and operational costs.[13] In addition, platforms and related development wells designed for deepwater offshore reservoirs typically cost hundreds of millions of dollars as compared to the several million dollars for onshore development wells.[14] Offshore exploratory drilling costs also are significantly greater than onshore exploratory drilling costs to similar depths due to the more complex nature of deepwater exploration activities.[15]

---

[9] Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019, pp. 6–7.

[10] Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019, p. 80 ("Because many of the Wilcox reservoirs are typically 20,000+ psi and 30,000+ ft deep, advancements and continuing improvements in high-pressure drilling technology have had to occur in order to explore and develop this geologic trend economically."), p. 52 ( "The GOM has been a crucible for 3-dimensional (3D) seismic acquisition advancements, spurred on by the need for better subsalt imaging capability and larger ships equipped to tow many airgun and streamer arrays.").

[11] Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 452.

[12] Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 453; Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019, p. 69 ("…because of the very deep waters, deep reservoirs, and unexpected pressure regimes, the cost of drilling a well in this environment was enormous. Therefore, to be economic in these conditions, true discoveries would have to be large.").

[13] Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 453.

[14] *E.g.*, for the fiscal year ended December 31, 2015, Anadarko suspended $55 million of exploratory well costs across 18 U.S. onshore projects (*i.e.*, an average of approximately $3.1 million per project) while it suspended $314 million for its portion of exploratory well costs across four U.S. offshore projects (*i.e.*, an average of approximately $78.5 million per project). See, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, p. 103. The offshore amounts represent Anadarko's allocation of the total well costs, and to the extent that there are joint operating agreements in place, these amounts understate the total exploratory well costs. For instance, the initial Authorization for Expenditure ("AFE") submitted by Anadarko to its non-operating partners indicated that the estimated costs of drilling the Shen 3 appraisal well were approximately $225.2 million. See, Exhibit 491, APC-00005093–100 at 093. See also, Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 453.

[15] Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 458.

Page 5

14.    Once an offshore exploratory well has found hydrocarbons (*i.e.*, a discovery is made), considerable efforts must still be undertaken to provide an operator and its partners with adequate information to determine whether to proceed with development.[16] Since offshore exploratory drilling typically is significantly more costly than onshore exploratory drilling, the amount of recoverable resources needed to justify the cost of development is much greater in offshore operations than in onshore operations.[17] Because a single deepwater exploratory well cannot provide sufficient data and information to paint a precise picture of the size, shape, and producibility of the reservoir on its own, offshore operators generally carry out an appraisal program by drilling several evaluation or "appraisal" wells to better assess the probable quantity of adequate recoverable resources needed to justify development (referred to as reaching the final investment decision or "FID" where the project is officially sanctioned).[18] In addition, offshore drilling typically is operationally riskier, due to the difficulty of extracting oil and gas in deepwater environments and because the size of the field may be smaller than expected.[19] Evaluation of these risks typically necessitates obtaining additional information before sanctioning development.[20] The primary objective of appraisal activity on discovered hydrocarbon accumulations is not to find more hydrocarbons, but rather to reduce the uncertainty regarding the hydrocarbon reservoir and to provide information that better informs a decision on the next action.[21] Therefore, appraisal wells are drilled specifically to collect information and samples in order to: 1) reduce uncertainties about the reservoir, particularly as it relates to

---

[16] Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008), pp. 3–4.

[17] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 458.

[18] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 453; Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008), pp. 3–4.  The term "appraisal well" is not defined, and is not used, in GAAP.  Accounting professionals, therefore, must determine how to account for the cost of appraisal wells by analogy to wells that are described in GAAP.  See also, Deposition of Catherine Anne Green, September 28, 2022 ("Green Deposition"), p. 32:21–23 ("Q: What's FID? A: Final investment decision, a decision that you're moving forward with the development.").

[19] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 25.

[20] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 25.

[21] Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008), p. 191.

CONFIDENTIAL

production volume; 2) more accurately assess the potential of the discovery; and 3) inform subsequent development decisions.[22]

### C.  Overview of the Shenandoah Project

15.  When Anadarko acquired Kerr-McGee Corporation ("Kerr-McGee") in 2006 for a purchase price of approximately $16.5 billion (the "Kerr-McGee Transaction"), it obtained the rights to federal lease blocks that contain the Shenandoah field.[23]  Evidence indicates that Anadarko allocated approximately $1.7 billion of the Kerr-McGee Transaction purchase price to Kerr-McGee's GOM exploration properties—which included the yet-to-be-drilled Shenandoah Project—based on an initial estimate that the projects would recover approximately 370 million barrels of oil equivalent ("MMBOE").[24]

16.  Following the Kerr-McGee Transaction, on June 3, 2008, Anadarko spud an initial exploratory well in the Walker Ridge area ("Shen 1"), which was completed on January 22, 2009.[25]  On February 4, 2009, Anadarko announced that Shen 1 encountered approximately 300 feet of net oil pay.[26]

17.  My review of the evidence produced in this matter indicates that, following the initial discovery well, Anadarko implemented an "appraisal program" for the Shenandoah Project by drilling multiple appraisal wells intended to gather information about the size and extent of the field, with the ultimate goal of determining whether sufficient recoverable resources were

---

[22] Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008), pp. 3–4.

[23] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2006, filed on February 28, 2007, pp. 2, 9; APC-00265282–286 at 285 ("Regarding NPLH GOM (KMG) portfolio, none has been transferred to Shenandoah as proved reserves have not been booked.").

[24] APC-01750958–1174 at 1035.  In a business combination, the acquiring entity typically obtains control of all of the acquired entity's assets and assumes all of the acquired entity's liabilities.  Accordingly, GAAP requires the acquiring entity in a business combination to allocate the total purchase price of the acquisition to the identifiable assets acquired and liabilities assumed based on their acquisition-date fair values (a process referred to as the "purchase price allocation").  The estimated acquisition-date fair value of each identifiable asset and liability then becomes the recorded book value of those assets and liabilities.  See, Accounting Standards Codification ("ASC") 805-10-05-4; ASC 805-20-25-1; ASC 805-20-30-1.  As of December 31, 2014, the GOM Exploration and Walker Ridge non-producing leasehold assets (including the Shenandoah Project) had a net book value of $477 million and $93 million, respectively, based on fair value estimates at the time of the Kerr-McGee Transaction.  See, KPMG_APC_eA_0002543.

[25] APC-00653389.

[26] Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, available at http://media.corporate-ir.net/media_files/nys/apc/Shenandoah2-4-09.pdf.  See also, Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. G-20 (Pay is a measure of the depth of "oil- or gas-saturated rock that is capable of producing oil or gas.").

CONFIDENTIAL

present and, if so, how to develop the Shenandoah field. Resources, in this context, are defined as "quantities of oil and gas estimated to exist in naturally occurring accumulations" wherein a portion of the resources may be estimated to be recoverable and another portion may be considered to be unrecoverable.[27]

18.     Given the costly and high-risk nature of oil and gas exploration and development, competitors in the oil and gas industry often combine their capital and expertise in joint operations.[28] Anadarko was the operator of the Shenandoah Project and managed the day-to-day operations.[29] Anadarko worked with a number of non-operating partners over the years while it operated the Shenandoah Project: 1) ConocoPhillips; 2) Cobalt International Energy, L.P. ("Cobalt"); 3) Marathon Oil Corporation ("Marathon"); and 4) Venari Offshore LLC ("Venari") (collectively, the "Partners").[30] Although Anadarko was the operator, the non-operating partners all voted on major decisions affecting the joint operations and, as such, Anadarko did not have control over the joint operation and did not consolidate the joint operation as part of its financial reporting.[31] Accordingly, each partner in the Shenandoah Project accounted for its interest in the project separately for financial reporting purposes and, as a result, may have reached different conclusions in accounting for the project depending on a variety of factors, including different interpretations of geological data and different applications of professional judgment given the facts and circumstances and the relevant GAAP guidance.[32]

19.     Anadarko began drilling the first appraisal well of the Shenandoah Project ("Shen 2") on July 1, 2012, but "encountered mechanical issues due to poor cement job which required it to be junked and abandoned" before re-drilling a substitute well on September 16, 2012.[33] According

---

[27] ASC 932-360-20.

[28] Cost and risk sharing arrangements allow companies to acquire, explore, develop, and produce oil and gas under costly and hazardous conditions, such as the ultra-deepwater drilling in the GOM where drilling depths reach up to 40,000 feet under maximum water depths of up to 12,000 feet and where offshore drilling rigs can cost several hundred million dollars over several years. See, Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 168.

[29] See, e.g., Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2012, filed on February 19, 2013, p. 9; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2013, filed on February 28, 2014, p. 9. See also, Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 173.

[30] Exhibit 491, APC-00005093–100 at 093.

[31] "Undivided interests in oil and natural-gas exploration and production joint ventures are consolidated on a proportionate basis." See, e.g., Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 91.

[32] See, Section V.B.

[33] APC-00653389; APC-00154334–338; APC-00154339.

CONFIDENTIAL

to a letter sent to its Partners on September 12, 2012, Anadarko indicated that the primary objectives of the substitute Shen 2 appraisal well, in addition to "hopefully encountering new pay sands," were to "penetrate the stratigraphic equivalent of the D and E Sands, encountered oil bearing and full-to-base in the [Shen 1 well], and thereafter, determine connectivity (through pressures) between the [Shen 1 well] and the [substitute Shen 2 well]."[34]  On March 19, 2013, Anadarko announced that Shen 2 encountered 1,000 feet of net oil pay.[35]  The costs associated with drilling the Shen 2 appraisal well were initially capitalized (*i.e.*, suspended) pending further appraisal of the project.[36]

20.     Shen 3, the second appraisal well, was subsequently spud down-dip of Shen 2 on May 28, 2014 and completed on November 7, 2014.[37]  According to a letter sent to its Partners on April 8, 2014, Anadarko indicated that the primary purposes of the Shen 3 appraisal well were to test the lateral continuity of the pay sands encountered in Shen 2, attempt to determine the oil/water contacts, and attempt to establish pressure connectivity to the pay sands seen in Shen 2.[38]  It is my understanding that determining the perimeter of a reservoir's oil-water contact provides insight into the areal extent and volume of hydrocarbons within the reservoir (based on the reservoir's size and the depth of the hydrocarbons).[39]  Thus, the objective of the Shen 3 appraisal well was to better understand the size and volume of the recoverable resources at Shenandoah. Although Shen 3 did not encounter hydrocarbons, Anadarko's Q4 2014 Operations Report indicated that it "confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening," "enabled the projection of oil/water contacts based on pressure data," and "reduced the uncertainty of the resource range."[40]  Accordingly, based on various contemporaneous internal documents, Anadarko considered Shen 3 "a successful

---

[34] APC-01741046.

[35] APC-00653389.

[36] APC-00577160; and APC-00577161.  A "capitalized" cost is a cost that is recorded as an asset on an entity's Statement of Financial Position.  A "suspended" cost is recorded as an asset until a subsequent determination is made on whether the cost should continue to be recorded as an asset or should be recorded as an expense.  See Section VII.A.1 for further discussion on the distinction between *capitalization* and *suspension*.  Note that Anadarko recorded these suspended costs within "Properties and Equipment" as "Oil and gas exploration and production." See, *e.g.*, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2013, filed on February 28, 2014, pp. 81, 93, 98, 103, and 105.

[37] APC-00653389; Exhibit 491, APC-00005093-100 at 093.

[38] Exhibit 491, APC-00005093–100 at 093.

[39] Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008), pp. 17, 19–20, 140, 192–193.

[40] APC-00349767–783 at 778.

CONFIDENTIAL

appraisal well."[41]  Costs of drilling the Shen 3 appraisal well were initially suspended in Q4 2014, pending further appraisal of the Shenandoah Project.[42]

21.    On May 25, 2015, Anadarko spud the third Shenandoah appraisal well ("Shen 4"), with drilling continuing through September 7, 2015.[43]  The primary objective of Shen 4 was to test the up-dip extent of the basin.[44]  In September 2015, Anadarko drilled a Shen 4 sidetrack which encountered more than 620 net feet of oil pay.[45]  In December 2015, Anadarko drilled a second Shen 4 sidetrack that was ultimately abandoned in January 2016.[46]  The well costs associated with Shen 4 were partially suspended, pending further appraisal of the project.[47]

22.    A subsequent appraisal well ("Shen 5") was spud in March 2016 and completed in July 2016, with the primary objective to confirm and extend the reservoir boundaries.[48]  Shen 5 encountered over 1,000 feet of net oil pay.[49]  Costs of drilling the Shen 5 appraisal well were suspended, pending further appraisal of the project.[50]  Shen 5 was retrofitted as a future producing well pending a FID (*i.e.*, it was drilled as a "keeper well").[51]

23.    The fifth and final appraisal well ("Shen 6") was spud on December 15, 2016, with the primary objective to test "potential oil-water contacts and down-dip limits of the hydrocarbon column of the Upper and Lower Wilcox within the central-to-eastern flank of the Shenandoah structure."[52]  Drilling activities at Shen 6 (including a sidetrack and a bypass on the sidetrack) were terminated in March 2017 when results indicated faulting within the reservoir.[53]  In

---

[41] See, *e.g.*, Exhibit 490, APC-00001864–865 at 864 ("This is considered a successful appraisal well to determine the extent of the reservoir."); APC-00622586 ("Extremely successful by our standards."); APC-00018993–994 at 993 ("…in case you have not been keeping up with the SHEN 3 coring ops, we had two successful core runs and believe that we have anywhere from 470-490' of core.  Now we have something to work with."); APC-00153489–490 at 489 ("Diane Seas [sic] (whom I've copied) followed up a response to me last week suggesting that it would be capitalized; siting [sic] that it was considered a successful appraisal well and therefore should be classified as capitalized despite the fact that it will not be a producing well."); APC-00153862 ("The well successfully tested the same well developed reservoir sands 1,500' down-dip and 2.3 miles east of the Shenandoah-2 well…").
[42] Exhibit 490, APC-00001864–865; APC-00156333.
[43] APC-00653389.
[44] APC-00220001–004 at 001.
[45] APC-00223043–057 at 052.
[46] APC-00307132–137 at 133–134.
[47] APC-00307132–137 at 134.  Costs associated with deepening the well to a lower target and the second sidetrack well were expensed, while all other costs associated with Shen 4 (including the Shen 4 wellbore itself) were suspended pending further appraisal.
[48] APC-00002563–813 at 579; APC-00223043–057 at 052.
[49] APC-00002563–813 at 579.
[50] APC-00307132–137 at 134.
[51] APC-00307132–137 at 134.
[52] APC-00739080–081 at 081; APC-00307132–137 at 134.
[53] APC-00739080–081 at 081; APC-00091554–563 at 554.

CONFIDENTIAL

addition, Shen 6 did not encounter oil-water contact on the eastern portion of the field, as intended.[54]  According to contemporaneous documentation, these drilling results from Shen 6 "significantly reduced" the estimated recoverable resources for the Shenandoah Project to a level that Anadarko determined did not justify further drilling given the market prices for oil at that time.[55]  Consequently, Anadarko discontinued the Shenandoah appraisal program in the first quarter of 2017.[56]  Anadarko announced in its Q1 2017 Form 10-Q that it expensed $435 million of previously suspended well costs associated with the Shenandoah Project and recognized an impairment charge of $467 million related to non-producing leasehold ("NPLH") assets associated with the Shenandoah Project.[57]

### D.    Overview of Allegations

24.    Plaintiffs in this litigation allege that during the period between February 20, 2015 and May 2, 2017 inclusive (the "Class Period"), Anadarko made various material misrepresentations and omissions regarding the "size and commercial viability" of the Shenandoah Project.[58] Plaintiffs have also made claims concerning Anadarko's accounting decisions with respect to the Shenandoah Project.  Specifically, they claim that costs associated with Shen 3 were improperly suspended in Q4 2014 because the well "did not reveal the presence of oil and gas."[59]

25.    Plaintiffs also claim that Anadarko's decision to take a $467 million impairment charge related to the Shenandoah Project leases and expense $435 million of suspended exploratory well costs related to the Shenandoah Project in the first quarter of 2017 was improper because the

---

[54] APC-00739080–081 at 081.

[55] APC-00739080–081 at 081 ("Property Accounting met with the Shenandoah project team on March 21 and March 30, 2017 and discussed the negative impact of drilling results from the Shenandoah-6 well which did not encounter the oil-water contact in the eastern portion of the field. Drilling activities on the initial wellbore were terminated prior to reaching the targeted depth and subsequently diverted to a sidetrack and then to a bypass on that sidetrack, all of which indicated faulting within the reservoir which significantly reduced the recoverable resources previously estimated for the Shenandoah project. This reduction in estimated recoverable resources has indicated that a new greenfield development of the Shenandoah project would be uneconomic at current market prices.").

[56] Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, p. 13.

[57] Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, pp. 12, 13, 37.  See also, APC-00739080–081 at 081; Exhibit 492, KPMG_APC_eA_0009897–920 at 911; KPMG_APC_eA_0008457.  The net book value of the GOM Exploration and Walker Ridge properties as of January 1, 2017 is based on the Kerr-McGee Transaction purchase price allocation.  See, Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, pp. 12, 37.

[58] Amended Complaint, ¶¶ 1, 29.

[59] Amended Complaint, ¶¶ 4, 50.

CONFIDENTIAL

Shenandoah Project was impaired before Anadarko's decision was announced on May 2, 2017.[60] Specifically, Plaintiffs claim that Anadarko "concealed the impairment of Shenandoah even after internal assessments called into serious doubt [the] economic and/or operational viability" of the project.[61]

### E.     Overview of Regan Report

26.     I understand that Mr. Regan was retained by Plaintiffs in this matter "to provide expert opinions regarding [Anadarko's] accounting for, and disclosure of, costs incurred in connection with the Company's offshore Shenandoah exploration project during the respective annual and interim financial reporting periods ended December 31, 2014 through March 31, 2017."[62]

27.     Based on his analysis as set forth in the Regan Report, Mr. Regan reached the following conclusions related to Anadarko's accounting for the Shen 3 well costs during the period from December 31, 2014 through June 30, 2016:[63]

- "Pursuant to the 'Successful Efforts Method' of accounting for exploratory drilling costs, Anadarko was required to expense the cost of drilling Shen-3 no later than as of and for

---

[60] Amended Complaint, ¶¶ 82–83.

[61] Amended Complaint, ¶¶ 82, 142.

[62] Regan Report, ¶ 1 (internal definitions omitted).  Mr. Regan asserts in his report that "Anadarko had recorded and reported suspended well costs and other exploration costs associated with the Shenandoah basin project on its respective balance sheets included within the Relevant Period."  See, Regan Report, ¶ 35.  I note that the Consolidated Balance Sheets reported by Anadarko in its Form 10-K for the fiscal years ending December 31, 2014, 2015 and 2016 do not include a separate disclosure of the "suspended well costs and other exploration costs associated with the Shenandoah basin project."  See, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 90; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, p. 88; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 88.  Nor are these costs separately disclosed in Note 6 to Anadarko's financial statements, which provides additional information regarding "Suspended Exploratory Well Costs."  While the amounts related to the Shen 3 suspended well costs were included in the amounts disclosed in Anadarko's Consolidated Balance Sheets and associated footnotes during the Class Period, they were not separately disclosed.  See, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 103; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, pp. 102–103; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, pp. 103–105.

[63] Throughout his Report, Mr. Regan makes reference to Anadarko's accounting related to the alleged failure to expense and disclose the Shen 3 suspended well costs during the period between "December 31, 2014 and June 30, 2015."  See, e.g., Regan Report, ¶¶ 11 and 37.  See also, header to Section V.C of the Regan Report.  However, paragraph 69 of the Regan Report states:  "Anadarko's continued capitalization of Shen-3 violated GAAP. Specifically, from the financial reporting periods between December 31, 2014 and **June 30, 2016**, Anadarko improperly capitalized approximately $63.6 million of suspended drilling costs relating to Shen-3." (emphasis added).  For purposes of my analysis, I have assumed that Mr. Regan's opinion is that Anadarko inappropriately failed to expense and disclose the suspended well costs related to the Shen 3 well during the period from December 31, 2014 through June 30, 2016.

CONFIDENTIAL

the year ended December 31, 2014, given that Shen-3 found no hydrocarbons and the wellbore's unlikely use as an injection or other service well;"[64]

- "Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3 related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP;"[65] and

- "Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015."[66]

28.     Mr. Regan reached the following conclusion related to Anadarko's accounting for the Shen 3 well costs as of September 30, 2016: "Anadarko's Q3 2016 assertion that the continued capitalization of Shen-3 prior to September 30, 2016 was acceptable because a 'reasonable possibility' existed that the wellbore would be used as an injection well or sidetrack well is flawed and unsupported in GAAP."[67]

29.     Finally, with respect to Anadarko's accounting for the broader Shenandoah Project, Mr. Regan reached the following conclusions:[68]

- "Given that by December 31, 2015, there was substantial doubt that the Shenandoah basin project would be economically viable, Anadarko was further required to expense Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs no later than December 31, 2015;"

- "Anadarko repeatedly failed to expense and properly disclose Shenandoah-related suspended exploration well costs and capitalized non-producing leasehold costs during each of the respective annual and/or quarterly periods between December 31, 2015 and December 31, 2016 in violation of GAAP and SEC accounting-related reporting rules;" and

- "Anadarko's Shenandoah project-related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2015 and December 31, 2016."

---

[64] Regan Report, ¶ 11 (internal footnote omitted).
[65] Regan Report, ¶ 11.
[66] Regan Report, ¶ 11.
[67] Regan Report, ¶ 11.
[68] Regan Report, ¶ 11.

CONFIDENTIAL

30.    Each of these conclusions is predicated on one or more "Conditions" that Mr. Regan assumes, for purposes of his analysis, will be proven to be true by Plaintiffs:[69]

- "As of December 31, 2014 and throughout the Relevant Period, it was unlikely that the completed stratigraphic exploration well referred to as Shenandoah-3 ('Shen-3') would be used as an injection or other type of service well in the development phase of the Shenandoah project ('Condition 1');"

- "The findings of the Company's Shen-3 exploration wellbore, together with its findings of its prior wellbores, resulted in a material reduction to the estimated possible resources within the Shenandoah field as of Anadarko's Q4 2014 financial reporting period ('Condition 2');" and

- "By December 31, 2015, there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable ('Condition 3')."

31.    Should Plaintiffs fail to establish one or more of these Conditions, Mr. Regan has not stated in his report the impact on his opinions; however, Mr. Regan stated in his report that he "reserve[s] the right to change [his] opinions in the event that Conditions 1 through 3 above are modified."[70]

## IV.    Summary of Findings and Opinions

32.    Based on my knowledge and experience, my review of the Regan Report and underlying analysis, and my analysis of other materials I have reviewed in this matter, my opinions are:

- Mr. Regan fails to acknowledge the role of professional judgment in the application of GAAP. Instead, Mr. Regan asserts that there is only one correct interpretation of GAAP when applied to the facts and circumstances arising from each of Anadarko's exploration activities. Contrary to Mr. Regan's analysis and conclusions, because the application of GAAP requires professional judgment, two independent accountants can evaluate the same facts and circumstances, apply the same guidance to the same set of facts and circumstances, and arrive at two different, reasonable financial reporting determinations based on their own independent evaluations of the relevant guidance and relevant facts

---

[69] Regan Report, ¶ 2.
[70] Regan Report, ¶ 10.

CONFIDENTIAL

and circumstances. Mr. Regan's failure to recognize the role of professional judgment in the application of GAAP renders each of his opinions unreliable.

- Anadarko's decision to suspend the costs associated with the Shen 3 well as of December 31, 2014 was consistent with a reasonable interpretation of the relevant authoritative guidance set forth in Accounting Standards Codification Topic 932, *Extractive Activities – Oil and Gas* ("ASC 932"). Mr. Regan's opinion that Anadarko's accounting for the Shen 3 well costs as of December 31, 2014 violated GAAP is flawed and unreliable because it is not supported with competent and diligent analysis. Specifically, Mr. Regan's opinions are predicated on an evaluation of superseded and non-authoritative guidance as well as an incomplete assessment of relevant GAAP. In addition, Mr. Regan's analysis fails to evaluate the professional judgment of Anadarko financial reporting personnel, fails to assess cited evidence in a rigorous manner, and fails to address the contemporaneous conclusions of other accounting professionals. Ultimately, Mr. Regan's opinions are predicated on assumptions that inappropriately substitute for the professional judgments of accounting professionals at Anadarko. Furthermore, these assumptions fail to establish that Anadarko was required to expense the costs associated with Shen 3 as of December 31, 2014.

- In his evaluation of Anadarko's accounting for the Shen 3 well costs as of September 30, 2016, Mr. Regan continues to refer to superseded and non-authoritative guidance and continues to employ an incomplete assessment of relevant GAAP. In addition, the analysis supporting Mr. Regan's opinion is deficient, biased by hindsight, is not thorough, and fails to address the contemporaneous accounting determinations of other accounting professionals. As a result, Mr. Regan fails to establish that GAAP mandated that Anadarko expense the Shen 3 well costs prior to September 30, 2016.

- Mr. Regan fails to demonstrate that the Shen 3 well costs were material to Anadarko's financial statements. From a conceptual perspective, the framework employed by Mr. Regan to assess materiality is based on non-authoritative guidance concerning accounting misstatements. Mr. Regan's implementation of his materiality analysis is also fundamentally flawed. Specifically, Mr. Regan's analysis fails to incorporate reliable

CONFIDENTIAL

data, fails to address relevant evidence, and fails to establish the relevance of the metrics it calculates.

- Anadarko's decision to impair the Shenandoah Project as of March 31, 2017 was consistent with GAAP. Mr. Regan's opinion that the Shenandoah Project should have been impaired as of December 31, 2015 is biased by hindsight, improperly interprets or ignores relevant information, and fails to address the contemporaneous conclusions of other accounting professionals. Ultimately, Mr. Regan's opinion is predicated on an assumption that inappropriately substitutes for relevant facts and circumstances, and for the professional judgments of accounting professionals at Anadarko. His opinion also is inconsistent with a thorough evaluation of the evidence produced in this matter.

## V.    Overview of Relevant Accounting Standards

### A.    The Financial Accounting and Reporting Environment

33.    As described in more detail below, public companies in the United States operate in a financial accounting and reporting environment that includes: 1) company management; 2) independent public accounting firms that serve as auditors; 3) regulators that provide guidance and oversight such as the SEC and the PCAOB; and 4) the Financial Accounting Standards Board ("FASB"), the standard setting organization that has primary responsibility for establishing and maintaining GAAP. Collectively, these organizations aim to provide meaningful financial information to investors and others.

34.    Management is responsible for preparing financial statements.[71] In preparing financial statements, management is required to follow authoritative accounting standards, referred to as GAAP.[72] GAAP is a set of standards and procedures that guide companies in preparing financial statements so that all public companies follow similar procedures in preparing their statements.[73] Simultaneously, GAAP assists users of financial information by providing a consistent framework for reading and interpreting financial statements.[74]

---

[71] AU Section 110, *Responsibilities and Functions of the Independent Auditor* ("PCAOB Interim Standard AU Section 110").03.
[72] ASC 105-10-10-1.
[73] Financial Accounting Standards Board ("FASB"), "Rules of Procedure," p. 3.
[74] FASB, "Rules of Procedure," pp. 2–3.

CONFIDENTIAL

35.     Public companies are required to have their annual financial statements audited by an independent public accounting firm that, in this role, is referred to as an "auditor."[75]  At the conclusion of an audit, the auditor expresses an opinion as to whether the financial statements are presented fairly, in all material respects, in conformity with GAAP.[76]  Public companies are also required to have their quarterly financial statements reviewed by an independent auditor.[77]  In connection with a quarterly review, the auditor determines whether there are material modifications that should be made to the quarterly financial statements to conform with GAAP.[78]

36.     The SEC is a regulatory body with a "mission of protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation."[79]  All publicly traded companies in the U.S. (referred to generally as "reporting entities" or "SEC registrants") are required to file periodic financial statements, as well as other financial information, with the SEC.[80]  The SEC provides regulations that reporting entities must comply with, including the requirement that all public company financial statements be prepared in conformity with GAAP.[81]  The SEC includes several divisions, including the Division of Corporation Finance, which reviews annual and quarterly filings of public companies, and the Division of Enforcement, which has the authority to investigate and discipline companies, management and independent auditors.[82]

37.     The PCAOB is a regulatory body that sets guidance for auditors and oversees the practice of auditing.[83]  The PCAOB's mission is to "regulate[] the audits of public companies and SEC-registered brokers and dealers in order to protect investors and further the public interest in the preparation of informative, accurate, and independent audit reports."[84]  The PCAOB establishes

---

[75] U.S. Securities and Exchange Commission ("SEC"), "All About Auditors: What Investors Need to Know," June 24, 2002, available at https://www.sec.gov/reportspubs/investor-publications/investorpubsaboutauditors#.
[76] PCAOB Interim Standard AU Section 110.01.
[77] AU Section 722, *Interim Financial Information* ("PCAOB Interim Standard AU Section 722").03.
[78] PCAOB Interim Standard AU Section 722.07.
[79] SEC, "What We Do," available at https://www.sec.gov/about/what-we-do.
[80] SEC, "All About Auditors: What Investors Need to Know," June 24, 2002, available at https://www.sec.gov/reportspubs/investor-publications/investorpubsaboutauditors#; SEC, "What We Do," available at https://www.sec.gov/about/what-we-do.
[81] SEC, "All About Auditors: What Investors Need to Know," June 24, 2002, available at https://www.sec.gov/reportspubs/investor-publications/investorpubsaboutauditors#.
[82] SEC, "Filing Review Process," available at https://www.sec.gov/divisions/corpfin/cffilingreview; SEC, "Division of Enforcement," available at https://www.sec.gov/page/enforcement-section-landing.
[83] PCAOB, "About," available at https://pcaobus.org/about.
[84] PCAOB, "Mission, Vision, and Values," available at https://pcaobus.org/about/mission-vision-values.

CONFIDENTIAL

standards that the independent auditor must follow when auditing financial statements of public companies.[85]  The PCAOB also conducts inspections of independent auditors and has the authority to investigate and discipline independent auditors.[86]

### B.    Generally Accepted Accounting Principles

38.    Since September 2009, the Accounting Standards Codification ("Codification") is "the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied to nongovernmental entities."[87]  In addition, the Codification recognizes "[r]ules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws [as] sources of authoritative GAAP for SEC registrants."[88]  It is important to note that Staff Accounting Bulletins ("SABs") are not rules or interpretive releases of the SEC.[89]  For example, SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99"), published on August 12, 1999, specifically states that "[t]he statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval."[90]  Therefore, SABs are not authoritative.  The FASB also does not recognize Statements of Financial Accounting Standards that it issued prior to the creation of the Codification (such as Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies* ("FAS 19") issued in December 1977), as authoritative, and instead lists them on its website as "superseded

---

[85] PCAOB, "Standards," available at https://pcaobus.org/oversight/standards.

[86] PCAOB, "Basics of Inspections," available at https://pcaobus.org/oversight/inspections/basics-of-inspections; PCAOB, "Enforcement," available at https://pcaobus.org/oversight/enforcement.

[87] ASC 105-10-05-1.  The Codification is effective for interim and annual periods ending after September 15, 2009. See, Financial Accounting Foundation, "FASB Accounting Standards Codification – About the Codification," p. 4 ("The Codification is effective for interim and annual periods ending after September 15, 2009.  All previous level (a)-(d) US GAAP standards issued by a standard setter are superseded.  Level (a)–(d) US GAAP refers to the previous accounting hierarchy. All other accounting literature not included in the Codification will be considered nonauthoritative. See Codification Topic 105, Generally Accepted Accounting Principles, for additional details.").

[88] ASC 105-10-05-1.

[89] The Codification distinguishes SEC Rules and interpretive releases from Staff Accounting Bulletins.  It notes that "Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC Registrants.  In addition to the SEC's rules and interpretive releases, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements…"  See, ASC 105-10-05-1.

[90] SEC Staff Accounting Bulletin No. 99 – Materiality, dated August 12, 1999 ("SAB 99").

CONFIDENTIAL

standards."[91]  Specifically, all non-grandfathered, non-SEC accounting guidance that is not included in the Codification is "superseded and deemed nonauthoritative."[92]

39.      Therefore, any analysis of whether Anadarko's accounting treatment for certain well costs and periodic assessments of non-producing leasehold properties for impairment related to the Shenandoah Project was in conformity with GAAP must be based on the guidance set forth in the Codification.  To provide a consistent financial reporting framework, the Codification provides guidance on how to account for certain transactions and events.[93]  Where the Codification provides direct and applicable guidance, the guidance in the Codification is considered "authoritative."[94]

40.      The FASB sets accounting standards, and thereby revises the Codification, through a "comprehensive and independent process that encourages broad participation, objectively considers all stakeholder views, and is subject to oversight by the Financial Accounting Foundation's Board of Trustees."[95]  This process includes: conducting research, deliberating at public meetings, issuing documents for public comment, and re-deliberating based on comments and research.[96]  The FASB also educates those involved in financial reporting and monitors the implementation of its standards.[97]  Because the Codification is not static, a proper analysis of Anadarko's accounting must refer to GAAP that was applicable when Anadarko prepared its financial statements rather than GAAP in effect at an earlier or later period.  In this Section, I cite guidance in the Codification that was in effect throughout the Class Period and at all times relevant to the accounting addressed in this report.

---

[91] FASB, "Superseded Standards," available at https://fasb.org/page/PageContent?pageId=/reference-library/superseded-standards.html.

[92] ASC 105-10-05-5.

[93] ASC 105-10-05-2.

[94] Accounting literature is categorized into two levels of hierarchy:  1) authoritative, and 2) nonauthoritative.  ASC 105 establishes the Codification as the source of authoritative GAAP recognized by the FASB.  The SEC's rules and interpretive releases under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.  See, ASC 105-10-05-1.  Accounting and financial reporting guidance that is not included in the Codification is nonauthoritative.  Sources of nonauthoritative accounting guidance and literature include FASB Concepts Statements and accounting textbooks, among others.  See, ASC 105-10-05-3.

[95] FASB, "Standard-Setting Process," available at https://www.fasb.org/Page/PageContent?PageId=/about-us/standardsettingprocess.html&isstaticpage=true&bcpath=tff.

[96] FASB, "Standard-Setting Process," available at https://www.fasb.org/Page/PageContent?PageId=/about-us/standardsettingprocess.html&isstaticpage=true&bcpath=tff.

[97] FASB, "Standard-Setting Process," available at https://www.fasb.org/Page/PageContent?PageId=/about-us/standardsettingprocess.html&isstaticpage=true&bcpath=tff.

Page 19

41.     The FASB has recognized that the application of GAAP requires considerable professional judgment and often requires a company's management to exercise discretion when preparing financial statements.[98]  There are several features of financial reporting that necessitate the use of professional judgment.  First, not every transaction or event is addressed directly in GAAP.  While a large body of authoritative literature has been developed over time to establish appropriate accounting guidance for transactions and events, GAAP does not directly address all situations.  Where the Codification does not provide applicable guidance directly, the Codification describes additional steps to determine how to account for such transactions or events.  If the guidance for a transaction or event is not specified within a source of authoritative GAAP for that entity, the Codification states that "an entity shall first consider accounting principles for similar transactions or events within a source of authoritative GAAP for that entity."[99]  Second, there are numerous choices that accountants must make in applying GAAP because it often provides guiding principles rather than specific rules, instructions, or detailed procedures.  As recognized by the FASB, "[t]hose who are unfamiliar with the nature of accounting are often surprised at the large number of choices that accountants are required to make.  Yet choices arise at every turn."[100]  As a result, significant professional judgment may be required to interpret and implement the guidance set forth in GAAP.

42.     In exercising professional judgment, management must be careful to make decisions "based on a critical and reasoned evaluation made in good faith and in a rigorous, thoughtful, and deliberate manner."[101]  In addition, the reasonableness of professional judgment exercised must be evaluated based on the relevant facts and circumstances that were reasonably available to management at the time, rather than information that became available after the fact (*i.e.*, in hindsight).[102]  Management should also demonstrate professional due care in exercising

---

[98] Statement of Financial Accounting Concepts No. 8 ("SFAC No. 8"), *Chapter 1, The Objective of General Purpose Financial Reporting*, ¶ OB11 ("To a large extent, financial reports are based on estimates, judgments, and models rather than exact depictions. The Conceptual Framework establishes the concepts that underlie those estimates, judgments, and models.").  See also, SEC Advisory Committee on Improvements to Financial Reporting, "Final Report of the Advisory Committee on Improvements to Financial Reporting to the United States Securities and Exchange Commission," August 1, 2008 ("CIFR Report"), p. 7 ("The preparation and audit of financial statements have always required the exercise of judgment.").

[99] ASC 105-10-05-2.

[100] Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information* ("SFAC No. 2"), ¶ 8.

[101] CIFR Report, p. 94.

[102] CIFR Report, p. 91 ("The use of hindsight to evaluate a judgment where the relevant facts were not available at the time of the initial release of the financial statements (including interim financial statements) is not appropriate.").

CONFIDENTIAL

professional judgment when applying GAAP by gathering available relevant facts prior to making the judgment.[103]

43.     As a result, in exercising professional judgment, similarly situated professionals may reasonably reach different conclusions about the substantive nature of transactions and the related appropriate financial accounting and reporting practices under GAAP for the same transactions and/or events, while those differing conclusions may nevertheless be supportable, reasonable, and acceptable under GAAP.[104]

## C.     Relevant Accounting Standards for Companies in the Oil and Gas Industry

44.     The authoritative GAAP guidance relating to the accounting for oil and gas producing activities is organized as ASC 932.[105]  ASC 932 governs accounting for all exploration and development activities, including onshore, offshore, and deepwater activities.  ASC 932, Subtopic 360 ("ASC 932-360") addresses the accounting for industry-specific property, plant, and equipment in the oil and gas industry.[106]

45.     The SEC permits reporting entities engaged in oil- and gas-producing activities to choose between two methods to account for their exploration and production operations:  1) the successful efforts method; or 2) the full cost method.  The method chosen dictates the authoritative guidance to be used for capitalization and expensing of exploration and development costs.  Reporting entities such as Anadarko that choose to follow the successful

---

[103] CIFR Report, pp. 91, 94, fn. 157.

[104] CIFR Report, p. 93 ("Judgment, with respect to accounting matters, should be exercised by a person or persons who have the appropriate level of knowledge, experience, and objectivity to form an opinion based on the relevant facts and circumstances within the context provided by applicable accounting standards.  Judgments could differ between knowledgeable, experienced, and objective persons.").

[105] Oil and gas producing activities, defined in ASC 932-360, include the "search for crude oil, including condensate and natural gas liquids, or natural gas in their natural states and original locations." See, ASC 932-10-15-2A.  The FASB updates the Codification to make substantive or technical changes.  For a proper analysis of Anadarko's accounting for transactions and events examined in the Regan Report, it is critically important to refer to GAAP that Anadarko was required to use at the time it prepared its financial statements rather than GAAP that is currently in effect.  Throughout my Report, I cite guidance in the Codification that was in effect at times relevant to the accounting issues in this matter.  Because the focus properly is on GAAP at that time, I employ present tense (e.g., "GAAP provides") rather than past tense (e.g., "GAAP provided").  Thus, a statement that "GAAP provides" should not be interpreted to imply that the quotation appears in the Codification currently, but rather that it appeared in the Codification at times relevant to the proper analysis of the accounting issues addressed.

[106] ASC 932-360-05-1.

CONFIDENTIAL

efforts method must comply with the accounting and financial reporting disclosure requirements set forth in ASC 932.[107]

### 1. Development of Accounting Standards Relevant to Oil and Gas Exploration and Development

46.    Before summarizing the portions of the Codification relevant to the accounting determinations reached by Anadarko at issue in this matter, it is instructive to understand the evolution of accounting guidance related to oil and gas exploration and development, and in particular, how this guidance has both evolved in some respects and failed to evolve in other respects over time in response to the rapid development in technology and techniques employed by firms engaged in oil and gas exploration and development.

47.    In the 1960s, prior to the development of the first deepwater well in the Gulf of Mexico, small- and medium-sized exploration firms embraced the full-cost accounting approach because it typically resulted in higher reported profitability for these firms than what would otherwise be reported under the successful efforts method.[108]  It is my understanding that the higher reported profitability was asserted to enhance the exploration firms' ability to attract capital and expand higher risk exploration efforts outside of areas that had already been developed by larger exploration and development firms.

48.    In July 1977, the FASB published an exposure draft that would have mandated that all oil and gas companies employ the successful efforts method of accounting.[109]  I understand that such a transition was asserted to severely curtail the ability of smaller independent exploration firms to continue higher-risk exploration at a time when energy prices were elevated.  In response to

---

[107] The comprehensive standard for the full cost method is set forth in SEC Regulation S-X Rule 4-10, which is included in the Codification at ASC 932-10-S99.  The full cost method typically is employed by small and medium-sized oil and gas companies.  The full cost method is generally less complex to implement than the successful efforts method.  See, Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 50.

[108] AICPA, "Audit and Accounting Guides: Entities with Oil and Gas Producing Activities – Clarified," August 1, 2018, p. 18.  In 1975, the first deepwater well was drilled in Mississippi Canyon Block 194 in 1,022 feet of water, resulting in the Cognac discovery.  See, Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019, p. 6.

[109] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 50.  In December 1977, the FASB issued Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting for Oil and Gas Producing Companies* ("FAS 19").  See, FAS 19.

CONFIDENTIAL

significant pressure from these industry participants, the SEC abandoned the FASB's proposal and effectively retained the two-approach reporting regime.[110]

49.     Authoritative guidance has continued to evolve in response to developments in the oil and gas industry.  For example, in January 2010, the FASB issued an Accounting Standards Update, in which it noted that, in the three decades since the FASB had issued financial reporting guidance to the oil and gas industry, the industry had experienced "significant changes" and that the updates were intended to "modernize and update the oil and gas disclosure requirements [and related definitions] to align them with current practices and changes in technology."[111]

50.     The evolution of authoritative accounting guidance throughout the 20th century and into the 21st century underscores the extent to which at times guidance lags the development of industry practices and technology.  As a result, industry participants are required to exercise professional judgement when they apply accounting guidance that does not precisely address the evolving practices of the industry.

### 2.  Accounting Standards Applicable to Capitalization of Costs for Shenandoah Appraisal Wells

51.     Starting in 2007 and continuing throughout the duration of the Shenandoah Project, Anadarko followed the successful efforts method of accounting.[112]  Under the successful efforts method of accounting, "[o]nly those exploration costs and development costs that relate directly to specific oil and gas reserves are capitalized; costs that do not relate directly to specific reserves are charged to expense."[113]  ASC 932-360 acknowledges that the successful efforts

---

[110] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, pp. 50–51.

[111] Accounting Standards Update No. 2010-03, p. 1.

[112] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2007, filed on February 29, 2008, p. 2; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2008, filed on February 25, 2009, p. 60; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2009, filed on February 23, 2010, p. 55; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2010, filed on February 23, 2011, p. 74; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2011, filed on February 21, 2012, p. 75; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2012, filed on February 19, 2013, p. 81; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2013, filed on February 28, 2014, p. 80; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 95; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, p. 93; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 93; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 15, 2018, p. 97.

[113] ASC 932-360-25-3.

CONFIDENTIAL

method of accounting "conforms to the traditional concept of the historical cost of an asset."[114] Per ASC 932-360, under the successful efforts method, certain types of costs may be initially capitalized (*i.e.*, suspended) as construction-in-progress (referred to within Anadarko as "assets under construction" or "AUC") pending further information about the existence of future benefits.[115] However, as soon as the additional information becomes available and it is known whether future benefits exist, those suspended costs are either reclassified as an amortizable asset or charged to expense.[116]

52.    Per ASC 932-360, the "expected future benefits" that an entity in the oil and gas industry is attempting to obtain through its acquisition, exploration, and development activities are oil and gas reserves.[117] Reserves are defined as "estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations."[118] In this context, the term "economically producible" means hydrocarbon resources that can generate revenue "that exceeds, or is reasonably expected to exceed, the costs of the operation."[119] Entities in the oil and gas industry generally do not acquire reserves from properties that they own. Instead, they acquire oil and gas leases from the owner of the land (or territory) where the oil and gas deposits are located.[120] Within U.S. territorial waters (such as the GOM), oil and gas operators can acquire mineral leases from either state or federal governments.[121] In the case of the deepwater GOM exploration and production relevant to the Shenandoah Project, the properties were leased to Anadarko and its partners by the federal government.[122]

53.    Accounting for deepwater appraisal projects like Shenandoah is complicated by the fact that many of the unique aspects of deepwater appraisal are not covered directly by ASC 932— which governs accounting for all exploration and development activities, including onshore,

---

[114] ASC 932-360-25-3.
[115] ASC 932-360-25-3.
[116] ASC 932-360-25-3.
[117] ASC 932-360-25-5.
[118] ASC 932-360-20.
[119] ASC 932-360-20.
[120] ASC 932-360-25-5; Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 94.
[121] Brady, Jennings, and Shappard, "Petroleum Accounting: Principles, Procedures and Issues," PwC, 8th Edition, p. 452. In the GOM, state ownership extends for nine miles from shore while the federal government controls the leasing rights beyond that.
[122] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2006, filed on February 28, 2007, pp. 2, 108.

CONFIDENTIAL

offshore and deepwater activities.  For instance, while multiple appraisal wells are almost always required to appraise deepwater discoveries like Shenandoah, ASC 932-360 does not specifically provide guidance for "appraisal wells."  Indeed, the term "appraisal well" does not appear in the Codification.

54.     Rather, ASC 932-360 sets forth guidance for "stratigraphic test wells," which are defined as "a drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition."[123]  According to ASC 932-360, stratigraphic test wells are normally drilled without the intention of being completed for hydrocarbon production and are customarily abandoned after drilling is completed and the information is obtained.[124]  Stratigraphic test wells are generally drilled offshore to determine "whether an offshore property contains sufficient reserves to justify the cost of constructing and installing a production platform and to determine where to locate such a platform."[125]  Stratigraphic test wells are classified as exploratory-type if not drilled in a proved area or as development-type if drilled in a proved area.[126]

55.     The accounting standards for exploratory-type stratigraphic test wells mirror the accounting for exploratory wells.[127]  An exploratory well is defined as "a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir."[128]  For example, the Shen 1 discovery well meets the definition of an exploratory well per ASC 932-360.  ASC 932-360 requires entities to suspend the costs of drilling exploratory wells as part of the entity's in-progress assets (*i.e.*, not subject to depreciation) pending determination of whether proved reserves are found.[129]  Proved oil and gas reserves are defined as "quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating

---

[123] ASC 932-360-20.
[124] ASC 932-360-25-17.
[125] ASC 932-360-25-17.
[126] ASC 932-360-20.  The Codification defines "proved area" as "the part of a property to which proved reserves have been specifically attributed." "Proved oil and gas reserves" are defined by the Codification as "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulation before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether the estimate is a deterministic estimate or probabilistic estimate. […]."  See, ASC 932-360-20.
[127] ASC 932-360-25-18.
[128] ASC 932-10-S99-1.
[129] ASC 932-360-25-10.

CONFIDENTIAL

methods, and government regulation before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether the estimate is a deterministic estimate or probabilistic estimate."[130]

56.    As described above, under the successful efforts method, only exploration costs that relate directly to specific proved oil and gas reserves can be capitalized.[131]  In other words, ASC 932-360 allows entities to initially suspend exploration costs, such as the costs of drilling wells, while it determines whether the well has encountered quantities of oil and gas that can be estimated with reasonable certainty to be economically producible.[132]  Therefore, the costs of drilling exploratory-type stratigraphic test wells are capitalized pending determination of whether proved reserves are found.[133]

57.    The amount of time required to determine whether proved reserves are found can be long, particularly in deepwater offshore operations where multiple appraisal wells are needed to evaluate the size and extent of the field (*i.e.*, the estimated amount of resources) as well as how to best recover or extract those resources from the field.[134]  ASC 932-360 acknowledges that for the purpose of determining whether suspended drilling costs can continue to be capitalized pending the determination of proved reserves, a project "may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure."[135]  Therefore, ASC 932-360 sets forth two criteria for assessing whether the costs of drilling exploratory-type stratigraphic test wells can continue to be carried as assets (*i.e.*, suspended) pending determination of whether proved reserves are found:  1) the quantity of reserves found must justify completion of the well for production had it not been simply a stratigraphic test well (the "Sufficient Quantity" criterion); and 2) the entity must be making

---

[130] ASC 932-360-20.

[131] ASC 932-360-25-3.

[132] ASC 932-360-25-10.

[133] ASC 932-360-25-18; ASC 932-360-25-10; ASC 932-360-20.

[134] The FASB has acknowledged that circumstances faced by oil and gas producing companies have evolved and that exploration activities "are frequently performed in more remote areas, to greater depths, and in more complex geological formations" than the exploration activities that occurred when the FASB first issued accounting standards for oil and gas companies in 1977.  See, FAS 19.  In particular, the originally issued guidance included a provision that stated that the costs of drilling certain exploratory wells cannot be capitalized for longer than one year (*i.e.*, a one-year capitalization period).  The FASB subsequently amended the guidance to clarify that the amount of time required to determine whether proved reserves are found is not limited to a one year period.  See, FASB Staff Position No. FAS 19-1.

[135] ASC 932-360-35-18.

CONFIDENTIAL

"sufficient progress" on assessing the reserves and the economic and operating viability of the project (the "Sufficient Progress" criterion).[136]  When the outcome of the drilling effort is determined, the costs will be re-classified as an asset (subject to depreciation) if proved reserves are found or as an expense if proved reserves are not found.[137]

58.    ASC 932-360 also provides guidance for evaluating whether an entity is making "sufficient progress" in assessing the reserves and the economic and operating viability of the project.  ASC 932-360 states that "all relevant facts and circumstances" must be taken into account and evaluated as a whole, and that no single factor is determinative.[138]  ASC 932-360 provides several indicators that an entity is making sufficient progress, including:

     a.  Commitment of project personnel who are at the appropriate levels and who have the appropriate skills;

     b.  Costs that are being incurred to assess the reserves and their potential development;

     c.  An assessment process covering the economic, legal, political, and environmental aspects of the potential development is in progress;

     d.  Existence (or active negotiations) of agreements with governments, lenders, and venture partners; and

     e.  Existence of firm plans, established timetables, or contractual commitments, which may include seismic testing and drilling of additional exploratory wells.[139]

59.    ASC 932-360 states that if an entity does not meet the Sufficient Progress criterion or it obtains information that raises substantial doubt about the economic or operational viability of the project, "the exploratory well or exploratory-type stratigraphic well shall be assumed to be impaired and its costs, net of any salvage value, shall be charged to expense."[140]

---

[136] ASC 932-360-25-18; ASC 932-360-35-18.

[137] ASC 932-360-35-6; ASC 932-360-35-13; ASC 932-360-35-17.

[138] ASC 932-360-35-19.

[139] ASC 932-360-35-19.

[140] ASC 932-360-35-13.  While the term "substantial doubt" is not specifically defined in the Codification, the term "substantial doubt about an entity's ability to continue as a going concern" is defined as "exist[ing] when conditions and events, considered in the aggregate, indicate that it is probable that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued (or within one year after the date that the financial statements are available to be issued when applicable)."  See, FASB, Master Glossary, "Substantial Doubt about an Entity's Ability to Continue as a Going Concern."

CONFIDENTIAL

### 3. Accounting Standards Applicable to the Impairment of the Shenandoah Project

60.    According to ASC 932-360, the impairment assessment of oil and gas producing properties is typically performed on a "field-by-field basis" or "by logical grouping of assets if there is a significant shared infrastructure" (*e.g.*, a platform).[141]  ASC 932-360 requires entities to periodically assess "unproved properties" (*i.e.*, "properties with no proved reserves") to determine whether they have been impaired.[142]  In addition, ASC 932-360 provides that the impairment assessment must be based on the carrying amount of the asset (or asset group) at the date it is tested for recoverability, and the impairment loss is measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.[143]  If the result of the assessment indicates that the property is impaired, ASC 932-360 requires the entity to recognize the loss by providing a valuation allowance.[144]

61.    In addition, when an unproved property is surrendered, abandoned, or otherwise deemed worthless, ASC 932-360 requires the entity to charge the "capitalized acquisition costs relating thereto . . . against the related allowance for impairment to the extent an allowance has been provided; if the allowance previously provided is inadequate, a loss shall be recognized."[145]

62.    As described above, ASC 932-360 also includes guidance specific to the assessment of "completed exploratory wells" for potential impairment (as opposed to assessment of the broader field for impairment, which is covered by the guidance contained in ASC 932-360-35-8 and 9). Specifically, ASC 932-360-35-13 establishes that a completed exploratory-type stratigraphic well should be assumed to be impaired under two scenarios: 1) the Sufficient Progress criterion is no longer met; or 2) the entity obtains information that raises substantial doubt about the economic or operational viability of the project.[146]

---

[141] ASC 932-360-35-8.

[142] ASC 932-360-35-11.  Unproved properties are defined as "properties with no proved reserves."  See, ASC 932-360-20.

[143] ASC 932-360-35-8.  ASC 932-360 indicates that for individual unproved properties whose acquisition costs are relatively significant, impairment shall be assessed on a property-by-property basis.  See, ASC 932-360-35-11.  The carrying amount (also referred to as the book value) is the amount of an item as recorded in the entity's accounting records and reported in its financial statements.  Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  See, FASB, Master Glossary, "Fair Value."

[144] ASC 932-360-35-11.

[145] ASC 932-360-40-1.

[146] ASC 932-360-35-13.

CONFIDENTIAL

## VI.    Mr. Regan's Opinions Are Deeply Flawed Because They Disregard Professional Judgment and Presume that There Is Only One Interpretation or Application of GAAP

63.    As described in Section V.B, the application of GAAP often requires the application of significant professional judgment and, as a result, two different accountants may reach different conclusions regarding how to account for the same transaction, both of which represent reasonable interpretations of GAAP.  As described in more detail below, this fact has been recognized by standard setters, yet Mr. Regan completely disregards this and instead asserts that his interpretation of the guidance contained in ASC 932-360 is the only correct interpretation.[147] Because he disregards other acceptable interpretations of GAAP, Mr. Regan fails to perform a reliable analysis of Anadarko's accounting determination, rendering his conclusions unreliable.

64.    Staff from the SEC have recognized the necessity of applying professional judgment when arriving at GAAP financial reporting determinations.  For example, in a December 2006 speech, the Deputy Chief Accountant of the SEC noted "there are plenty of places where the accounting literature calls for the consideration of subjective factors" and stated:

> "When the literature says to use a best estimate, or to consider available information, or to assess the likelihood of something occurring, those are all cues to evaluate the information and use judgment, and we must all be comfortable with that. And perhaps most importantly, when a transaction arises for which the literature is unclear, which is bound to happen time and time again, the application of good professional judgment is needed to determine an appropriate accounting model."[148]

65.    In July 2007, the SEC chartered the Advisory Committee on Improvements to Financial Reporting ("CIFR Committee") with a mandate "to examine the U.S. financial reporting system in order to make recommendations intended to increase the usefulness of financial information to investors, while reducing the complexity of the financial reporting system to investors, preparers, and auditors."[149] The CIFR Committee's final report ("CIFR Report") included several important considerations for those who evaluate financial statements, including:

---

[147] Deposition of D. Paul Regan, January 20, 2023 ("Regan Deposition"), pp. 63:1–65:6.  See also, Regan Report, ¶¶ 11, 37.

[148] SEC, "Speech by SEC Staff: Remarks Before the 2006 AICPA National Conference on Current SEC and PCAOB Developments by Scott A. Taub," available at https://www.sec.gov/news/speech/2006/spch121106sat.htm.

[149] CIFR Report, p. 1.

CONFIDENTIAL

- In exercising accounting judgment, accountants must be careful to make decisions "based on a critical and reasoned evaluation made in good faith and in a rigorous, thoughtful, and deliberate manner."[150]

- "The use of hindsight to evaluate a judgment where the relevant facts were not available at the time of the initial release of the financial statements (including interim financial statements) is not appropriate. Determining at what point the relevant facts were known to management, or should have been known, can be difficult, particularly for regulators who are often evaluating these circumstances after substantial time has passed. Therefore, hindsight should be based only on the facts reasonably available at the time the relevant annual or interim financial statements were issued."[151]

- "We believe that those making a judgment should be expected to exercise due care in gathering all of the relevant facts prior to making the judgment."[152]

66.    The CIFR Report also describes factors to consider when evaluating the reasonableness of a judgment. Factors include the following:

- The preparer's analysis of the transaction, including the substance and business purpose of the transaction;

- The material facts reasonably available at the time that the financial statements are issued;

- The preparer's review and analysis of relevant literature, including the relevant underlying principles;

- The level of input from people with an appropriate level of professional expertise;[a]

- The preparer's consideration of known diversity in practice regarding the alternatives or estimates;[b]

- The preparer's consistency of application of alternatives or estimates to similar transactions.[153]

---

[150] CIFR Report, p. 94.
[151] CIFR Report, p. 91 (italics in original, footnotes omitted).
[152] CIFR Report, pp. 91, 94, fn. 157.
[153] CIFR Report, pp. 94–95 (embedded footnotes re-labeled [a] and [b] for clarity).

CONFIDENTIAL

_____

[a] In many cases, input from professional experts would include consultation with a preparer's independent auditors or other competent external parties, such as valuation specialist, actuaries, or counsel.

[b] If there is little diversity in practice, it would be significantly harder to select a different alternative.

67.    The attributes of a critical and reasoned analysis, as set forth in the CIFR Report, are mirrored in the guidance issued by the AICPA related to the responsibilities of members when performing forensic investigations. Specifically, these guidelines establish that members must "[e]xercise due professional care in the performance of professional services."[154]  In its discussion of "due care," the AICPA states that members must "discharge [their] professional responsibilities with competence and diligence."[155]  The AICPA Code of Professional Conduct defines "competence" as "the attainment and maintenance of a level of understanding and knowledge that enables a member to render services with facility and acumen" and diligence as "the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards."[156] Mr. Regan states that his report was prepared in accordance with these standards.[157]

68.    At deposition, Mr. Regan acknowledged the role of professional judgement that is inherent in applying accounting guidance. Specifically, Mr. Regan testified that the application of GAAP requires professional judgment, both in the interpretation of the relevant GAAP guidance as well as in the interpretation of the facts and circumstances to which this guidance is being applied.[158]

69.    Despite recognizing the role of professional judgment, Mr. Regan fails to evaluate the professional judgment of Anadarko financial reporting personnel and, therefore, failed to perform a competent and diligent analysis of Anadarko's accounting determinations. As described in more detail in the following sections, Mr. Regan's analysis fails to address Anadarko's review and analysis of ASC 932-360, input from other parties with expertise in

_____

[154] AICPA, "Statement on Standards for Forensic Services," ¶ 6.
[155] AICPA, "Code of Professional Conduct," § 0.300.060.
[156] AICPA, "Code of Professional Conduct," § 0.300.060.
[157] Regan Report, ¶ 4.
[158] Regan Deposition, pp. 46:25–49:10.

CONFIDENTIAL

financial reporting and GAAP, known diversity in practice, and Anadarko's consistency of application to similar transactions.[159]

70.    Instead of performing such an analysis, Mr. Regan asserts that his interpretation of relevant GAAP (*i.e.*, ASC 932-360) and the related facts and circumstances is the only correct interpretation.[160]  This approach is not only inconsistent with the hallmarks of a competent and diligent analysis, but also with the fundamental tenets of GAAP itself.  Therefore, Mr. Regan's analysis is fundamentally flawed and his conclusions are unreliable.

## VII.    Mr. Regan's Opinion that GAAP Required Anadarko to Expense the Cost of Drilling Shen 3 as of December 31, 2014 Is Flawed and Unreliable

71.    Mr. Regan opines that "Anadarko was required to expense the cost of drilling Shen-3 no later than as of and for the year ended December 31, 2014"[161] and that, as a result, "Anadarko repeatedly failed to expense and disclose millions of dollars of Shen-3 related dry-hole expenses during each of the respective annual and/or quarterly periods between December 31, 2014 and June 30, 2015, in violation of GAAP."[162]  I disagree with each of these opinions.

72.    For each of these opinions, as demonstrated below, Mr. Regan does not evaluate whether GAAP provides more than one reasonable interpretation as applied to the relevant facts and circumstances.  His opinions therefore derive from a flawed analysis of the evidence produced in this matter.  As a result, each of these opinions is flawed and unreliable.  Contrary to Mr. Regan's opinions, my review of the evidence produced in this matter demonstrates that Anadarko's accounting for the Shen 3 well costs is consistent with a reasonable interpretation of GAAP.

### A.    Anadarko's Decision to Suspend the Shen 3 Well Costs as of December 31, 2014 Was Consistent with GAAP

73.    As set forth in Section V.C, ASC 932-360 contains the guidance that is relevant to a determination as to whether costs incurred related to the drilling of an exploratory-type

---

[159] See, Section VII.C.
[160] Regan Report, ¶¶ 11, 37; Regan Deposition, pp. 67:22–72:2.
[161] Regan Report, ¶ 37.
[162] Regan Report, ¶¶ 11, 37.

CONFIDENTIAL

stratigraphic test well should be expensed or suspended upon completion of the drilling of that well, including guidance related to the two criteria that must be satisfied for continued suspension (*i.e.*, the Sufficient Quantity and Sufficient Progress criteria).[163]  Although ASC 932-360-25-18 provides guidance specific to these two criteria, a rigorous, thoughtful and deliberate evaluation of Anadarko's decision to initially suspend Shen 3 well costs must necessarily consider the totality of guidance contained in ASC 932-360.

**1.  ASC 932-360-25-10 Establishes that Costs Associated with Stratigraphic Test Wells Are Suspended Pending Determination of Whether Proved Reserves Are Found**

74.     GAAP related to the initial recognition of costs associated with stratigraphic test wells provides guidance stating that the costs associated with stratigraphic test wells (such as Shen 3) are to be suspended until a determination of whether proved reserves have been found (*i.e.*, generally at FID).  Specifically, ASC 932-360-25-10 states the following:

> "The costs of drilling exploratory wells and the costs of drilling exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment, and facilities pending determination of whether the well has found proved reserves."[164]

75.     ASC 932-360-25-10 contains no additional guidance.  It sets forth no separate criteria for the initial suspension of costs associated with drilling exploratory-type stratigraphic test wells. Instead, it states that the costs associated with exploratory-type stratigraphic test wells are *suspended* pending the final determination of whether *proved reserves* have been found.

76.     Note also that this guidance refers both to "wells" and to "well" in the same sentence. One might conclude that the phrase "pending determination of whether the well has found proved reserves" refers to a single well.  However, in deepwater exploration, a single well will rarely, if ever, find proved reserves.[165]  It is the process of drilling multiple wells to test the reservoir, and then determining whether the oil in the reservoir is economically producible, that allows a company to book (*i.e.*, report) proved reserves.  Therefore, one might reasonably

---

[163] See, Section V.C.

[164] ASC 932-360-25-10.

[165] Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition, p. 453.

CONFIDENTIAL

interpret the phrase as "the costs of drilling … wells shall be capitalized… pending determination of whether the *wells have* found proved reserves." Indeed, the "single well" interpretation would rarely result in capitalization of well costs for any exploratory well drilled in deepwater even if the field is determined to have proved reserves because the determination that proved reserves were found is unlikely to be based on the evidence provided by any single well.[166]

77.     Additionally, it is important to consider the distinction between *capitalization* and *suspension* pertaining to the successful efforts method.  Suspension is an intermediate point between incurring a cost and determining whether that cost qualifies for capitalization as an amortizable asset, at which point the cost is reflected on the balance sheet and is subject to depreciation/amortization.  When a cost is suspended, it is simply held in suspense on the balance sheet until additional information is gathered to inform the determination of whether the cost should be recorded as an amortizable asset on the balance sheet or as an expense on the income statement.

78.     The additional information that will be gathered in the future will determine "whether the well has found proved reserves."[167]  Here, it is important to recognize that the guidance states "proved reserves."  The Codification's definition of "Proved Oil and Gas Reserves" establishes that "proved reserves" are "quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs."[168]  In other words, to have proved reserves there must be a determination that the ability to economically produce the oil is reasonably certain, which requires data learned over the course of the appraisal process.  Moreover, the Codification does not establish that "proved reserves" are limited to the oil that is extracted from an individual well.  Instead, it establishes that "proved reserves" are associated with a reservoir rather than an individual well.  Accordingly, this estimation is made based on data (*i.e.*, information) about a reservoir that may be derived from multiple appraisal wells.[169]

---

[166] Green Deposition, pp. 33:10–22, 44:11–45:20, 83:15–84:13.
[167] ASC 932-360-25-10.
[168] ASC 932-360-20.
[169] ASC 932-360-20.

CONFIDENTIAL

79.     With respect to Anadarko's process, according to the testimony of Catherine Green (a Manager within Anadarko's domestic Property Accounting group from 2011 to 2015), the determination of whether any stratigraphic test well has identified "proved reserves" is not made until sufficient data has been gathered across multiple appraisal wells that enables Anadarko to reach FID with respect to the broader reservoir.[170]

### 2.  ASC 932-360-25-17 Establishes that Stratigraphic Test Wells Are Drilled to Obtain Information

80.     ASC 932-360 states that stratigraphic test wells are drilled for the purpose of obtaining information, and not oil.  Specifically, ASC 932-360-25-17 states:

> "Stratigraphic test wells are drilled to obtain information. They are not normally intended to be completed for hydrocarbon production and are customarily abandoned after drilling is completed and the information is obtained. Normally, stratigraphic test wells are drilled offshore to determine whether an offshore property contains sufficient reserves to justify the cost of constructing and installing a production platform and to determine where to locate such a platform."[171]

81.     This guidance is important because it informs the interpretation of the Sufficient Quantity criterion.  It establishes that stratigraphic test wells are not drilled to obtain oil, but instead to "determine whether an offshore **property** contains sufficient reserves to justify the cost of constructing and installing a production platform and to determine **where to locate such a platform**."[172]  This guidance does not state that the stratigraphic test well is drilled to determine whether the offshore **well** contains sufficient reserves within the well bore itself.

82.     This guidance is consistent with the guidance contained in ASC 932-360-25-10 (described in Section VII.A.1) which establishes that costs associated with exploratory-type stratigraphic test wells are suspended until sufficient information has been gathered to make a determination as to whether proved reserves have been found (*i.e.*, FID).

---

[170] Green Deposition, pp. 17:15–18:18, 31:20–33:22.
[171] ASC 932-360-25-17.
[172] ASC 932-360-25-17 (emphasis added).

CONFIDENTIAL

### 3.  ASC 932-360-25-3 Also Supports the Initial Suspension of Exploratory Well Costs Pending Additional Information

83.    The discussion of the successful efforts accounting method in ASC 932-360 is consistent with the principle that the costs associated with exploratory-type stratigraphic test wells are suspended when incurred.  Specifically, ASC 932-360-25-3 states:

> "Only those exploration costs and development costs that relate directly to specific oil and gas reserves are capitalized; costs that do not relate directly to specific reserves are charged to expense. The successful efforts method of accounting conforms to the traditional concept of the historical cost of an asset. Under the successful efforts method, certain types of costs may be capitalized as construction-in-progress pending further information about the existence of future benefits, but as soon as the additional information becomes available, and it is known whether future benefits exist, those costs are either reclassified as an amortizable asset or charged to expense."[173]

84.    This guidance echoes the guidance in ASC 932-360-25-10 which establishes that costs associated with exploratory-type stratigraphic test wells are initially suspended pending additional information that is necessary to make the determination of whether proved reserves have been identified in sufficient quantity to justify the development of the field (*i.e.*, FID).

### 4.  ASC 932-360-35-18 Also Supports the Assessment of the Sufficient Quantity Criterion on the Basis of the Broader Field and Not Simply on the Basis of the Oil in the Well Itself

85.    ASC 932-360-35-18 provides guidance related to the on-going assessment of suspended well costs and includes discussion related to "whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves", *i.e.*, the assessment of the Sufficient Quantity and Sufficient Progress criteria set forth in ASC 932-360-35-18:

> "An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves, but those reserves cannot be classified as proved when drilling is completed. In those cases, the capitalized drilling costs shall continue to be capitalized if the well has found a sufficient quantity of reserves to justify its completion as a producing well and the entity is making sufficient progress assessing the reserves and the economic and operating viability of the project. Note that an entity is not required to complete the exploratory or exploratory-type stratigraphic well as a producing well. For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or

---

[173] ASC 932-360-25-3.

CONFIDENTIAL

exploratory-type stratigraphic well if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure)."[174]

86.    This portion of the Codification provides additional insight into a reasonable interpretation of the Sufficient Quantity criterion.  Specifically, this guidance explicitly states that "a project may include more than one exploratory well or exploratory-type stratigraphic well."[175]  As a result, an accountant may reasonably conclude that suspended drilling costs shall continue to be suspended pending determination of proved reserves and, if the reserves are intended to be extracted in a single, integrated producing operation, the suspended drilling costs can include the costs of all of the project's exploratory and exploratory-type stratigraphic test wells.[176]  Therefore, it is reasonable to evaluate the Sufficient Quantity criterion set forth in ASC 932-360 on the basis of the reserves identified in the course of the exploratory phase of the drilling project across multiple stratigraphic test wells, provided that the potential proved reserves will be extracted in a single, integrated producing operation.

87.    Furthermore, with respect to the Sufficient Quantity criterion set forth in ASC 932-360-35-18, the guidance states:  "the capitalized drilling costs shall continue to be capitalized if the well has found a sufficient quantity of reserves to justify its completion as a producing well."[177]  A reasonable interpretation of this criterion does not require that the "sufficient quantity" assessment be based solely on the amount of reserves located within the wellbore itself (or retrievable through the exploratory type stratigraphic test well should it be completed as a producing well).  A reasonable interpretation of this language is that it refers to the costs that will necessarily be incurred in the future in order to extract the hydrocarbons that are determined to be located within the reservoir, based on the information obtained through the exploratory type stratigraphic test well, and that those costs must be considered in determining whether the development of the project will generate sufficient revenue to recoup the total costs of the project.  This interpretation is consistent with the language elsewhere in ASC 932-360 (*e.g.*, ASC 932-360-25-10 and ASC 932-360-25-17), as described above, which establishes, among other things, that exploratory type stratigraphic test wells are drilled to obtain information and not oil,

---

[174] ASC 932-360-35-18.
[175] ASC 932-360-35-18.
[176] The FASB refers to this concept as "unit of accounting."  ASC 932-360 provides guidance that can be viewed as providing two distinct units of accounting:  1) a single well, and 2) project (*i.e.*, multiple wells).
[177] ASC 932-360-35-18.

CONFIDENTIAL

and their costs may be suspended pending determination of whether proved reserves are located within the reservoir.

### 5. ASC 932-360-25-18 Itself Is Consistent with This Interpretation of the Sufficient Quantity Criterion

88.     ASC 932-360-25-18, which provides guidance specific to stratigraphic test wells, is consistent with the guidance contained elsewhere in ASC 932-360 (specifically, 25-10, 25-17, 25-3, and 35-18).  ASC 932-360-25-18 states:

> "Stratigraphic test wells are divided into two types—exploratory-type and development-type—and the standards of accounting for the two types parallel the accounting for exploratory wells and development wells, respectively. Thus, an exploratory-type stratigraphic test well is accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditure before production could begin (see paragraph 932-360-25-10). The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs shall not continue to be carried as assets if the entity is not making sufficient progress assessing the reserves and the economic and operating viability of the project or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well. Thus if an exploratory-type stratigraphic test well discovers reserves that are classified as proved and facilities are to be installed to produce those reserves, the cost of the exploratory-type stratigraphic test well is accounted for as part of the cost of the facilities even though the particular well itself may be abandoned. Accounting for the other type of stratigraphic test well—development-type—is identical to accounting for development wells and other development costs generally: capitalize as part of the cost of an entity's wells and related equipment and facilities (as discussed in paragraph 932-360-25-14)."[178]

89.     Note that this guidance explicitly refers to ASC 932-360-25-10 which provides for the initial capitalization (*i.e.*, suspension) of exploratory-type stratigraphic test wells without identifying any criteria for that capitalization.  The guidance also states that "[t]he costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found," *i.e.*, FID, subject to a compound condition involving multiple criteria.[179]  Of these criteria, the "quantity of reserves found" (referred to as the Sufficient Quantity criterion above) requires additional analysis.

---

[178] ASC 932-360-25-18.
[179] ASC 932-360-25-18.

CONFIDENTIAL

90.     With respect to the Sufficient Quantity criterion, ASC 932-360-25-18 states that this criterion is to be applied when determining whether these costs qualify to "continue to be carried as assets."[180]   Again, this guidance relates to costs which have already been suspended and the determination of whether they qualify to "continue to be" carried as assets pending receipt of additional information.   Furthermore, the discussion of the Sufficient Quantity criterion in ASC 932-360-25-18 does not establish that this criterion must be assessed solely based on the oil that is found within a single well bore.   Specifically, the guidance does *not* state "if the quantity of reserves found **in the well** would not justify completion of the well for production."   Therefore, it is reasonable to interpret the Sufficient Quantity criterion as set forth in ASC 932-360-25-18 to be consistent with the guidance in ASC 932-360-35-18, which states that "[f]or purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well."[181]

### 6.   The Decision to Suspend the Costs Associated with Shen 3 as of December 31, 2014 Was Consistent with a Reasonable Interpretation of ASC 932-360

91.     Based on a thorough evaluation of the guidance in ASC 932-360, I find the following conclusions to represent reasonable interpretations of the guidance contained therein:

- Exploratory-type stratigraphic test wells are drilled for the purpose of obtaining information that assists in the determination of whether a reservoir contains sufficient quantities of proved reserves that would justify the development of that reservoir.

- Costs associated with the drilling of exploratory-type stratigraphic test wells may be suspended pending determination of whether proved reserves have been found, subject to the project satisfying the two criteria set forth in ASC 932-360 (*i.e.*, the Sufficient Quantity and the Sufficient Progress criteria).

- With respect to the Sufficient Quantity criterion, the determination of whether sufficient reserves have been identified is not based on the amount of oil found in a specific exploratory-type stratigraphic test well, but rather on the current estimate of recoverable

---

[180] ASC 932-360-25-18.
[181] ASC 932-360-35-18.

CONFIDENTIAL

resources based on the information regarding the reservoir derived from all exploratory wells drilled as of that date.

92.    As applied to an evaluation of the drilling costs associated with Shen 3, there is substantial evidence that the Sufficient Progress criterion was met.  Indeed, my review demonstrates that, as of December 31, 2014, Anadarko was making sufficient progress in assessing the reserves and the economic and operating viability of the Shenandoah Project to satisfy the Sufficient Progress criterion.[182]

93.    With respect to an assessment of the Sufficient Quantity criterion, my review demonstrates that, as of December 31, 2014, the results of Shen 3 provided information that permitted Anadarko to estimate recoverable resources from the Shenandoah project that justified the continuation of the appraisal portion of the project with progress being made towards the development of the project.  For example,

- On December 17, 2014, Ms. Green, Diane Sease (Financial Advisor – Exploration Engineering) and Forrest Burton (Exploration Planning Manager) were among the attendees at a quarterly meeting between members of Anadarko's Property Accounting and Exploration Planning groups ("Q4 2014 Impairment Meeting").[183] Notes from the Q4 2014 Impairment Meeting state that while total depth was reached and the sands encountered were non hydrocarbon-bearing, the Shen 3 appraisal well was considered "successful" because "[p]ressure data collected in the well suggested that the oil/water contact was close to the appraisal well which increases the confidence in the resources of the field."[184]

- On January 2, 2015, Ms. Sease e-mailed various Anadarko employees regarding the accounting treatment for the Shen 3 appraisal well, stating that "it was a successful appraisal well to determine the extent of the reservoir."[185]

- On January 6, 2015, Cheryl Judkins (Financial Reporting Manager) circulated the "Fourth-Quarter 2014 Accounting Issues List," which noted that Shen 3 did not

---

[182] *E.g.*, Anadarko had firm plans to continue the Shenandoah appraisal program by allocating its resources to drilling future appraisal wells and advancing the Shenandoah Project towards FID.  See, APC-00154334–338 at 336; APC-00001813; APC-00349767–783 at 778; APC-00012037; APC-00012384; APC-00147909; APC-00852342–343.

[183] APC-00154334–338 at 334.

[184] APC-00154334–338 at 336.

[185] APC-00152882–883 at 882.

CONFIDENTIAL

encounter hydrocarbons but was considered a successful appraisal well because "the well did provide substantial information about the reservoir."[186]

- On or around February 2, 2015, Anadarko released its Operations Report for the fourth quarter of 2014 ("Q4 2014 Operations Report").[187]  The Q4 2014 Operations Report indicated that the Shen 3 appraisal well "found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands," "confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening," and also "enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range."[188]

- On February 12, 2015, Mr. Leyendecker e-mailed several Anadarko employees, stating, "Yes, [the Shen 3 appraisal well] was a wet well, but extremely valuable information in the normal course of a prudent operator delineating a field's limits. Using industry best practices the well allowed the owners to project the oil-water-contacts and is potentially useable as a future water injection well for pressure maintenance."[189]

94.    In addition, former employees and officers of Anadarko have also consistently testified that Shen 3 provided important information for Anadarko to better understand the extent of the Shenandoah field.  For example, James Kleckner (Executive Vice-President of International Deepwater and a member of Anadarko's Executive Committee until August 2016) recalled that Shen 3 provided "a lot of information about reservoir quality, facies deposition, sand homogeneity, lateral extent" and explained that in an appraisal program, Anadarko's objective was to obtain more information and data.[190]  Specifically, Mr. Kleckner testified that "[e]arly on when there's very limited data, it's very difficult to make broad extrapolations and/or specific

---

[186] APC-01749352–365 at 354.
[187] APC-00349767–783 at 767.
[188] APC-00349767–783 at 778.
[189] APC-00626533–534 at 533.
[190] Deposition of James Kleckner, October 14, 2022 ("Kleckner Deposition"), pp. 17:20–18:22, 90:22–91:15, 92:6–22.

CONFIDENTIAL

determinations. And so Shen 3 was one of several wells that we drilled to try and determine the lateral extent of the reservoir system. So from a standpoint of getting the wells down successfully and obtaining all the information back from the logs, pressure information, it acquired the necessary data set to help us understand more about the extent of the Shenandoah discovery."[191] In addition, Chris Camden (GOM Exploration Engineer) testified that appraisal programs are "designed to eventually find out where the reservoir isn't" and that Shen 3 was always considered a successful appraisal well, despite not finding oil, because of the information it provided helped Anadarko define "where the reservoir isn't as much as where it is," and gave Anadarko "more clarity on the numbers that we should be working with [*i.e.*, the estimated quantities of recoverable resources in the field]."[192]

95.     As a result, in my opinion, Anadarko's decision to suspend the Shen 3 well costs as of December 31, 2014 was reasonable and consistent with GAAP (specifically ASC 932-360), because the information from the Shen 3 appraisal well enabled Anadarko to both better estimate the size of the Shenandoah reservoir and reduce the uncertainty of the quantity of recoverable resources.

### B.     Anadarko's Decision to Continue to Suspend the Shen 3 Well Costs Was Consistent with GAAP

96.     As described above, ASC 932-360 establishes the Sufficient Quantity and Sufficient Progress criteria that must be met for costs associated with drilling an exploratory well or exploratory-type stratigraphic test well to *continue* to be suspended pending determination of proved reserves.[193] ASC 932-360 also recognizes that a period of time may pass between completion of drilling a well and a determination of whether proved reserves have been discovered.[194] This time period can be particularly long in deepwater offshore operations where

---

[191] Kleckner Deposition, p. 92:6–22.
[192] Deposition of Chris Camden, July 14, 2022 ("Camden Deposition"), pp. 23:6–19, 218:11–221:24. See also, Deposition of Ernest A. Leyendecker III, September 22, 2022 ("Leyendecker Deposition"), pp. 167:25–169:14.
[193] ASC 932-360-25-18; ASC 932-360-35-18. Note that Section 25 is the "Recognition" section and "provides guidance on the required criteria, timing, and location (within the financial statements) for recording a particular item in the financial statements." Section 35 is the "Subsequent Measurement" section and "provides guidance on an entity's subsequent measurement and subsequent recognition of an item. Situations that may result in subsequent changes to the carrying amount include impairment, credit losses, fair value adjustments, depreciation and amortization, and so forth." See, General Note for ASC 932-360-25 and ASC 932-360-35.
[194] ASC 932-360-35-18; ASC 932-360-35-20.

CONFIDENTIAL

multiple appraisal wells may be needed to evaluate the scope of recoverable resources of the field.[195]

97.    GAAP recognizes the need to potentially drill multiple stratigraphic test wells (including appraisal wells).  Specifically, ASC 932-360-35-18 explicitly establishes that exploration projects may require multiple wells to be drilled in order to make a determination regarding whether proved reserves are found.[196]  Therefore, in circumstances where more than one appraisal well is required (as was the case with the Shenandoah Project), a reasonable interpretation of ASC 932-360 is that the Sufficient Quantity criterion may be assessed based on the estimated quantities of reserves within the field or project as a whole rather than on an individual well-by-well basis.  Accordingly, in conformity with GAAP, Anadarko reasonably determined to suspend Shen 3 well costs because data obtained from the well informed Anadarko's estimate of oil and gas in the field that would, in time, determine whether Shenandoah would be sanctioned.  For example, Anadarko's contemporaneous mean estimates for gross recoverable resources within the Shenandoah field were approximately 740 to 920 MMBOE; this evidence suggests oil and gas in the field was sufficient for Anadarko to justify continuation of the Shenandoah appraisal project and, potentially for development and production of the field.[197]  As a result, Anadarko continued to satisfy the Sufficient Quantity criterion set forth in ASC 932-360-35-18 for continued suspension of Shen 3 well costs.

98.    In addition, my analysis indicates that Anadarko also continued to satisfy the Sufficient Progress criterion.  For example, Anadarko engaged in a quarterly review process to determine whether suspended well costs continued to qualify for capitalization pending the determination of proved reserves.  This review included quarterly "Impairment Review Meetings" attended by members of Anadarko's Property Accounting and Exploration Planning groups, among others, in which such members assessed the reasonableness of the continued suspension of the suspended well costs such as the Shen 3 costs.  Specifically:

- **2015**: Notes from the Q1 2015 Impairment Review Meeting indicate that Anadarko continued to meet the Sufficient Progress criterion which supported the continued

---

[195] Green Deposition, pp. 44:11–45:20.
[196] ASC 932-360-35-18.
[197] The mean estimates of 740 and 920 MMBOE are based on different fault models.  See, Exhibit 173, APC-00000768–769.

CONFIDENTIAL

suspension of Shen 3 well costs.[198]  The notes also indicate that a determination of whether proved reserves are found in the Shenandoah field would likely not occur until, at earliest, "the end of 2016 as a fifth well [was] needed to appraise the prospect."[199] Notes from the Q2 2015, Q3 2015, and Q4 2015 Impairment Review Meetings indicate that there were no changes to the status of suspended wells in the Shenandoah field and "[a]dditional appraisal drilling is needed before the project is sanctioned."[200]  Notes from the Q4 2015 Impairment Review Meeting further re-iterated that "Shenandoah sanctioning, at earliest, will be towards the end of 2016."[201]

- **2016**: Notes from the Q1 2016 Impairment Review Meeting once again noted "no changes to suspended [Shenandoah] wells," that additional wells would be needed prior to sanctioning the Shenandoah field, and that an additional well following Shen 5 (which had just spud on March 14, 2016) would likely be needed before reaching a determination of whether proved reserves had been found.[202]  Notes from the Q2 2016 Impairment Review Meeting indicated that results of Shen 4 were being evaluated, that additional appraisal drilling was needed prior to determining whether proved reserves had been found, and that there were no changes to the status of Shenandoah suspended well costs.[203]

99.    Therefore, contemporaneous documents indicate that Anadarko was making "sufficient progress on assessing the reserves and the economic and operating viability" of the Shenandoah Project.  Accordingly, Anadarko met both the Sufficient Quantity and Sufficient Progress criteria set forth in ASC 932-360-35-18.  As a result, Anadarko's decision to continue suspending Shen 3 well costs from the first quarter of 2015 through the second quarter of 2016 was reasonable and consistent with GAAP.

---

[198] APC-00171559–564 at 562.
[199] APC-00171559–564 at 562.
[200] APC-00886732–737 at 734; APC-00931740–745 at 742; APC-00356404–408 at 406.
[201] APC-00356404–408 at 407.
[202] APC-01354805–808 at 807.
[203] APC-01364738–742 at 739, 742.

CONFIDENTIAL

### C.    Mr. Regan's Analysis Is Flawed and Unreliable

100.    In reaching his conclusion that Anadarko's accounting for the Shen 3 well costs as of December 31, 2014 violated GAAP, Mr. Regan failed to perform a competent and diligent analysis.  Specifically, he failed to (1) perform a correct analysis based on authoritative GAAP (*i.e.*, ASC 932-360, rather than superseded and non-authoritative guidance); (2) address the professional judgments made by Anadarko financial reporting personnel; (3) evaluate all relevant evidence; and (4) address the contemporaneous conclusions reached by other accounting professionals.  Instead of being based on a competent and diligent analysis, Mr. Regan's opinions are predicated on a series of assumptions that simply ignore the complex and judgmental GAAP financial reporting analysis and resulting conclusions reached by Anadarko.  I discuss each of these flaws in more detail below.

101.    Because of these flaws, Mr. Regan's opinion that Anadarko's accounting for the Shen 3 well costs as of December 31, 2014 violated GAAP is unreliable.

### 1.  Mr. Regan's Opinions Are Predicated on an Evaluation of Superseded and Non-Authoritative Guidance

102.    Mr. Regan's opinion that Anadarko violated GAAP by failing to immediately expense the Shen 3 drilling costs is predicated on accounting guidance that was no longer authoritative (and therefore not GAAP) at the time that Anadarko made its accounting determinations. Therefore, Mr. Regan's opinion is unreliable.

103.    As described previously, management is required to prepare its financial statements in accordance with GAAP.[204]  Recognition that the Codification is the source of authoritative GAAP is an imperative for an entity to comply with SEC regulations. Rule 4-01 of Regulation S-X states: "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."[205]  At deposition, Mr. Regan acknowledged that the Codification is "now the authoritative GAAP" and an assessment of Anadarko's accounting determinations at issue in this matter should evaluate

---

[204] See, Section V.A.
[205] 17 CFR § 210.4-01(a)(1).

CONFIDENTIAL

this guidance.[206]  Also, as described previously, the Codification sometimes is updated to make substantive or technical changes in order to reflect developments in the business and financial reporting environments of issuers.[207]  In order to perform a competent and diligent analysis, Mr. Regan's analysis must include a review and analysis of *relevant* literature.[208]  Any literature that is not part of GAAP as of the date Anadarko reached its accounting determinations at issue in this matter would not be considered "relevant" if, as here, the Codification provides direct guidance, notwithstanding that irrelevant literature has some passages that are similar to (or perhaps even the same as) some passages in the Codification.  Instead, the analysis should be based solely upon an analysis of relevant literature (*i.e.*, GAAP or other guidance as directed by GAAP in effect at the time Anadarko reached its accounting determinations).[209]  This principle is consistent with the AICPA's Statement on Standards for Forensic Services ("AICPA Forensic Standards"), under which Mr. Regan asserted his analysis was performed, which states that a member offering forensic services must "[o]btain sufficient *relevant* data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."[210]

104.    At deposition, Mr. Regan continued to make incorrect assertions with respect to GAAP as well as guidance that is and is not authoritative under GAAP.  For example, Mr. Regan testified that "[t]hose principles which the AICPA council has designated to constitute GAAP, that would be authoritative GAAP."[211]  This statement is incorrect.  As described above, during the Class Period, the FASB has been the standard setting organization that has primary responsibility for establishing and maintaining GAAP.  Mr. Regan further testified "the principles […] that comprise IFRS [and] the AICPA's audit and accounting guides […] constitute[] GAAP."[212]  When asked what his basis was for asserting that the AICPA Accounting and Auditing Guides constitute GAAP, Mr. Regan testified "[i]t's within the umbrella, which is

---

[206] Regan Deposition, pp. 53:18–55:25.

[207] See, Section V.B.

[208] AICPA, "Statement on Standards for Forensic Services," ¶ 6.  See also, CIFR Report, p. 95.

[209] ASC 105-10-05-2 ("If the guidance for a transaction or event is not specified within a source of authoritative GAAP for that entity, an entity shall first consider accounting principles for similar transactions or events within a source of authoritative GAAP for that entity and then consider nonauthoritative guidance from other sources.").

[210] Regan Report, ¶ 4; AICPA, "Statement on Standards for Forensic Services," ¶ 6 (emphasis added).

[211] Regan Deposition, pp. 40:24–41:11.

[212] Regan Deposition, pp. 40:24–41:11 ("Q:  What is your understanding of "authoritative GAAP"? A:  Those principles which the AICPA council has designated to constitute GAAP, that would be authoritative GAAP.  And what that generally is is [sic] the ASCs issued by the FASB, the principles pronounced by the -- that comprise IFRS; the AICPA's audit and accounting guides; AICPA has approximately -- well, a little more than 30 accounting guides that are specific to certain industries and transactions.  That's generally most of the -- of what constitutes GAAP.").

CONFIDENTIAL

frequently looked to under appropriate circumstances."[213]  These statements are false and misrepresent GAAP.  As described above, the FASB has established that the source of authoritative GAAP is the Codification.  The Codification also sets forth sources of "accounting guidance and literature" that it explicitly identifies as "nonauthoritative."[214]  These sources include:  1) practices that are widely recognized and prevalent either generally or in the industry, 2) AICPA Issues Papers, 3) International Financial Reporting Standards of the International Accounting Standards Board, 4) pronouncements of professional associations or regulatory agencies (*e.g.*, AICPA), and 5) Technical Information Service Inquiries and Replies included in AICPA Technical Practice Aids.[215]

105.    Mr. Regan's opinions are not based solely on an analysis of relevant literature.  For example, in his discussion of the "industry-specific accounting standards" in GAAP, Mr. Regan asserts that Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting by Oil and Gas Producing Companies* ("FAS 19") "serves as the primary source for relevant codified accounting standards applicable to Anadarko."[216]  Throughout his analysis of Anadarko's accounting related to the Shen 3 drilling costs as of December 31, 2014, the Regan Report repeatedly refers to FAS 19.  For example, the Regan Report uses this non-authoritative and superseded guidance as support for the following assertions:

- "costs that do not relate to probable future economic benefit are normally not capitalized under GAAP during the Relevant Period."[217]

- "In its original 1977 Basis for Conclusion upon issuance of relevant GAAP (*i.e.*, FAS 19), the FASB observed that '[e]stablishing a direct cause-and-effect relationship between costs incurred and specific reserves discovered is not relevant to full costing.'  The FASB further observed that because the full cost method permits the capitalization of costs relating to unsuccessful property acquisitions and unsuccessful exploratory activities along with the costs of successful acquisitions and exploratory activities, 'full costing tends to obscure failure and risk.'"[218]

---

[213] Regan Deposition, p. 41:12–17.
[214] ASC 105-10-05-3.
[215] ASC 105-10-05-3.
[216] Regan Report, ¶¶ 27, 31.
[217] Regan Report, ¶ 40.
[218] Regan Report, ¶ 44.

CONFIDENTIAL

- "In establishing this GAAP, the FASB recognized that a direct relationship exists between (i) costs incurred, and (ii) the discovery of oil reserves, under the successful efforts methodology.  Indeed, the FASB further noted that because the 'discovery of oil and gas reserves is a critical event in determining failure or success,' the successful effort accounting methodology is intended to highlight 'failures and the risks involved in the search for oil and gas reserves by charging to expense costs that are known not to have resulted in identifiable future benefits.'"[219]

- "That is, absent the identification of any oil reserves, the proved reserves threshold could never be satisfied, and the cost of exploratory drilling must be expensed. In this regard, the FASB has observed that 'costs be charged to expense as soon as a determination is made that proved reserves have not been found.'"[220]

- "Importantly, accounting for an exploration well (and an exploratory-type stratigraphic well) must be evaluated on its own under GAAP.  That is, the success of a specific well in finding oil reserves should not be based on whether another, separate and distinct well previously found oil within a larger project area."[221]

106.     Although several of these assertions may appear in the Codification, others do not. Based on my review of the Regan Report, it is not possible to determine which, if any, of Mr. Regan's opinions are grounded in the Codification.  For example, as noted above, Mr. Regan cites FAS 19 to assert that "full costing tends to obscure failure and risk."[222]  Later in the Regan Report, in support of his assertion that wells should be evaluated on an individual basis, Mr. Regan refers to this concept, stating "successful effort methodology which, **as noted above, was intended to highlight failures during the search for oil** by expensing costs that do not result in an identifiable future benefit. Suspending (capitalizing) such costs would **obscure failure and risk (violating GAAP)**."[223]  Mr. Regan explicitly connects the concept of "failure and risk" as set forth in FAS 19 to GAAP.  However, FAS 19 was not GAAP at the times that Anadarko made its accounting determinations related to the Shen 3 well costs, and therefore is not an appropriate basis on which to evaluate Anadarko's accounting for Shen 3.

---

[219] Regan Report, ¶ 46.
[220] Regan Report, ¶ 48.
[221] Regan Report, ¶ 51.
[222] Regan Report, ¶ 44 (emphasis omitted).
[223] Regan Report, ¶ 53 (emphasis added).

CONFIDENTIAL

107.    At deposition, Mr. Regan conceded that, for purposes of assessing Anadarko's accounting determinations at issue in this matter, Anadarko's financial statements are only required to comply with the guidance as it exists in ASC 932-360.[224]  In order to justify his reliance on FAS 19, Mr. Regan asserted at deposition that, "much of [FAS 19's] language is incorporated [into the Codification]" and, therefore, this language in FAS 19 could be considered authoritative.[225]  However, Mr. Regan also testified that he did not undertake an analysis to determine what portions of the language in FAS 19 were (or were not) codified into ASC 932-360.[226]

108.    As described in Section V.B, reporting entities must prepare their financial statements in accordance with GAAP that is in effect for that reporting period.[227]  GAAP has evolved over time in response to numerous factors, including industry-specific developments such as those experienced within the oil and gas industry in the 45 years since FAS 19 was issued.

### 2. Mr. Regan's Opinions Are Predicated on an Incomplete Assessment of ASC 932-360

109.    In addition to relying on superseded and non-authoritative guidance, Mr. Regan's opinions are predicated on an incomplete evaluation of relevant, authoritative GAAP (*i.e.*, ASC 932-360).  Again, a competent and diligent analysis must be performed in a "rigorous, thoughtful, and deliberate manner."[228]  This principle is also echoed in the AICPA Forensic Standards under which Mr. Regan performed his analysis, which state that a member must "[e]xercise due professional care in the performance of professional services."[229]  In order for an analysis to be performed in a rigorous and reliable manner, it would be necessary for the analysis to consider the totality of the relevant literature, and not simply rely on isolated portions of that

---

[224] Regan Deposition, p. 55:15–25.
[225] Regan Deposition, p. 50:16–19.
[226] Regan Deposition, p. 50:23–25.
[227] The Codification acknowledges that "[c]ertain accounting standards have allowed for the continued application of superseded accounting standards for transactions that have an ongoing effect in an entity's financial statements." Those superseded standards are considered "grandfathered" and remain authoritative for those transactions after establishment of the Codification.  See, ASC 105-10-70-2.  No "grandfathered guidance" is applicable to the accounting determinations at issue in this matter.
[228] CIFR Report, p. 94.
[229] AICPA, "Statement on Standards for Forensic Services," ¶ 6.

CONFIDENTIAL

literature.  As described below, Mr. Regan's analysis fails to evaluate relevant, authoritative GAAP in a rigorous manner.

### a)  Mr. Regan's Analysis of ASC 932-360-25-18 Is Incomplete

110.    Mr. Regan cites ASC 932-360-25-18 extensively.[230]  However, Mr. Regan isolates a portion of this paragraph and fails to address other guidance contained therein.  Specifically, Mr. Regan fails to address the portion of ASC 932-360-25-18 that directly references ASC 932-360-25-10.[231]  As described in Section VII.A.1, the entirety of ASC 932-360-25-10 states:  "The costs of drilling exploratory wells and the costs of drilling exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment, and facilities pending determination of whether the well has found proved reserves."[232]  This guidance does not set forth thresholds or criteria that must be met in order for an exploratory well to be suspended versus immediately expensed.  Therefore, a reasonable interpretation of this guidance, in conjunction with the portion of ASC 932-360-25-18 quoted above, would be that GAAP permits the initial suspension of costs incurred in drilling an exploratory-type stratigraphic test well until a determination is made that the ability to economically produce the estimated reserves is reasonably certain (*i.e.*, "whether the well has found **proved** reserves").[233]

111.    Mr. Regan's evaluation of ASC 932-360-35-18 is similarly incomplete.  While Mr. Regan states that a separate criterion exists in ASC 932-360-35-18 requiring an entity to assess the Sufficient Progress criterion, he claims "that criterion becomes irrelevant if an individual well fails to find oil reserves."[234]  At deposition, Mr. Regan acknowledged that his assessment of ASC 932-360-25-18 is not based on an evaluation of the entirety of the guidance contained therein.  Specifically, Mr. Regan stated that "[Shen 3] was a dry hole.  It wasn't going to find proved reserves. So, we don't get to the rest of the sentence -- we don't get to the rest of [ASC

---

[230] See, *e.g.*, Regan Report, ¶ 39.
[231] ASC 932-360-25-18 ("Stratigraphic test wells are divided into two types—exploratory-type and development-type—and the standards of accounting for the two types parallel the accounting for exploratory wells and development wells, respectively. **Thus, an exploratory-type stratigraphic test well is accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditure before production could begin (see paragraph 932-360-25-10).**" (emphasis added)).
[232] ASC 932-360-25-10.
[233] ASC 932-360-25-10 (emphasis added).
[234] Regan Report, ¶ 53.

CONFIDENTIAL

932-360-25-18] because it did not find proved reserves. It was a dry hole."[235] This testimony contradicts other testimony by Mr. Regan in which he stated that if an exploratory stratigraphic test well does not encounter hydrocarbons, that would not necessarily end the assessment of whether to suspend the costs associated with such a well under ASC 932-360.[236]

112.    In addition, while Mr. Regan acknowledges the portion of ASC 932-360-35-18 related to the Sufficient Quantity and Sufficient Progress criteria, he completely disregards other portions of ASC 932-360-35-18.[237] Specifically, he fails to address the portion of ASC 932-360-35-18 that states: "For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single, integrated producing operation (for example, the producing wells will operate with shared infrastructure)."[238] A reasonable interpretation of this guidance is that a determination of whether to suspend the costs associated with a specific exploratory-type stratigraphic test well need not consider only the results of that specific well, but may consider those results in conjunction with the information obtained from other wells within the field.

### b)  Mr. Regan Fails to Address ASC 932-360-25-17

113.    Among other paragraphs, ASC 932-360-25-17 and ASC 932-360-25-18 discuss "Stratigraphic Test Wells."[239] Mr. Regan cites ASC 932-360-25-18 extensively, but does not mention the guidance contained in ASC 932-360-25-17. As described above, ASC 932-360-25-17 establishes that stratigraphic test wells are drilled to obtain information, rather than for hydrocarbon production, and are normally abandoned after information is obtained.[240] Specifically, ASC 932-360-25-17 establishes that stratigraphic test wells are normally drilled offshore to obtain information necessary to determine whether "an offshore **property** contains

---

[235] Regan Deposition, pp. 63:13–64:18.
[236] Regan Deposition, pp. 71:8–72:2.
[237] Regan Report, ¶ 47.
[238] ASC 932-360-35-18.
[239] ASC 932-360-25-17; ASC 932-360-25-18.
[240] See, Section VII.A.2.  See also, ASC 932-360-25-17.

CONFIDENTIAL

sufficient reserves to justify the cost of constructing and installing a production platform and to determine where to locate such a platform."[241]

114.    A reasonable interpretation of this guidance, which was not addressed by Mr. Regan, is that the success of a stratigraphic test well is evaluated based on the **information** it provides (as opposed to the oil it provides) and what this information suggests regarding the level of reserves contained within the offshore **property** (as opposed to within the wellbore itself).  At deposition, Mr. Regan testified that a stratigraphic exploration well is defined in GAAP as "a well which is designed to acquire knowledge about the wellbore."[242]  This assertion is inconsistent with the guidance set forth in ASC 932-360-25-17, which establishes that stratigraphic test wells are intended to provide information regarding the "offshore property."

115.    Mr. Regan's assertion also demonstrates his failure to appropriately distinguish between exploratory wells and exploratory-type stratigraphic test wells.  Exploratory wells (*e.g.*, Shen 1) are drilled with the intention of finding hydrocarbons.[243]  ASC 932-360 specifically recognizes that an exploratory well is a well that is *not* a stratigraphic test well.[244]  ASC 932-360-25-17 clearly establishes that exploratory-type stratigraphic test wells are intended to obtain information, yet Mr. Regan repeatedly asserts, both in the Regan Report and at deposition, that Shen 3 could only be considered a "successful" well (and thereby qualify for suspension), if it had found hydrocarbons in the wellbore.[245]

116.    The distinction between exploratory wells and exploratory stratigraphic test wells is reflected in the location where Shen 3 was drilled.  As described above, Mr. Camden testified that Shen 3 was drilled in a location "designed to eventually find out where the reservoir isn't."[246]  When asked at deposition how his analysis addressed the location of Shen 3 and its resulting impact on whether the presence of hydrocarbons in the wellbore should determine the success of

---

[241] ASC 932-360-25-17 (emphasis added).

[242] Regan Deposition, p. 26:4–11.

[243] ASC 932-360-20 ("An exploratory well is a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir.").

[244] ASC 932-360-20 ("Generally, an exploratory well is any well that is not a development well, a service well, or a stratigraphic test well.") (emphasis added).

[245] Regan Report, ¶ 50; Regan Deposition, pp. 92:11–93:17.

[246] Camden Deposition, pp. 23:6–19, 218:11–221:24.

CONFIDENTIAL

the well, Mr. Regan testified "[t]hat's not something I -- that went into my interpretation of the facts and circumstances in this case."[247]

### c) Mr. Regan's Analysis of ASC 932-360-25-3 Is Incomplete

117.    Mr. Regan's analysis of ASC 932-360-25-3 also is incomplete.  Specifically, Mr. Regan cites ASC 932-360-25-3 to assert that "'only those exploration costs and development costs that relate directly to specific oil and gas reserves are capitalized under the successful efforts method.' Costs that do not relate directly to specific reserves are expensed."[248]  Again, Mr. Regan cites only a portion of ASC 932-360-25-3.  When the guidance is considered in its totality, it is clear that an alternative interpretation of the guidance is reasonable.  Specifically, the balance of ASC 932-360-25-3 states that "certain types of costs may be capitalized as construction-in-progress **pending further information** about the existence of future benefits, but as soon **as the additional information becomes available**, and it is known whether future benefits exist, those costs are either reclassified as an amortizable asset or charged to expense."[249]  This guidance is consistent with the interpretation of ASC 932-360 set forth above.  That is, costs incurred with an exploratory-type stratigraphic test well may be suspended (*i.e.*, initially capitalized as an asset under construction or in progress) until a determination is made regarding whether to sanction a field.

118.    Because Mr. Regan's analysis fails to consider relevant, authoritative GAAP in a rigorous manner, he has failed to perform a competent and diligent analysis and, therefore, his opinions are unreliable.

### 3.    Mr. Regan's Analysis Fails to Evaluate the Judgment of Anadarko Accounting Personnel

119.    A competent and diligent analysis of Anadarko's accounting determinations must consider Anadarko's analysis of the transaction as well as Anadarko's evaluation of the relevant literature.[250]  This is consistent with the AICPA Forensic Standards, which states that members

---

[247] Regan Deposition, pp. 87:8–89:20.
[248] Regan Report, ¶ 45.  See also, Regan Deposition, pp. 73:14–74:8.
[249] ASC 932-360-25-3 (emphasis added).
[250] CIFR Report, p. 95.

CONFIDENTIAL

must exercise due professional care, obtain sufficient relevant data to afford a reasonable basis, and perform services with integrity and objectivity.[251]  Yet, Mr. Regan fails to evaluate the accounting determinations made by Anadarko financial reporting personnel and, instead, inappropriately substitutes his own judgment.  Mr. Regan's judgment regarding the interpretation of ASC 932-360 (which he asserts to be the *only* interpretation) is unreasonable and inconsistent with other reasonable interpretations of GAAP.[252]

120.    Disclosures included within Anadarko's 10-K filing for the fiscal year ended December 31, 2014 provide insight into the Company's rationale for suspending Shen 3 well costs. Specifically, the 2014 10-K included the following disclosure:

> "The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014.  The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands.  The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. **The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range**.  Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015."[253]

121.    This disclosure is consistent with an internal Anadarko memorandum prepared by the Property Accounting group, dated December 29, 2014, which evaluated the results of the Shen 3 appraisal well and whether the costs associated with the well qualified for suspension under ASC 932-360-25.[254]  Within that memorandum, Property Accounting personnel noted the following regarding the results of the Shen 3 well: "While hydrocarbons were not found in this well-bore, geologic, fluid and pressure data obtained from this well has raised the confidence level of the resources of the field and has contributed to the ongoing development of the Shenandoah project. Therefore, it is appropriate to continue capitalization of this well cost as suspended well cost, pending the determination of proved reserves for the Shenandoah project. Anadarko continues to make progress."[255]  The disclosure also is consistent with notes from the Q4 2014 Impairment

---

[251] AICPA, "Statement on Standards for Forensic Services," ¶¶ 6–7.
[252] Regan Deposition, pp. 62:3–64:18.
[253] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 9 (emphasis added).
[254] Exhibit 490, APC-00001864–865.
[255] Exhibit 490, APC-00001864–865 at 864.

CONFIDENTIAL

Review meeting conducted between Anadarko's Property Accounting group and the Exploration Group, dated December 17, 2014, which include the following regarding the results of the Shen 3 appraisal well: "TD was reached and the sands were non hydro-carbon bearing. This well was drilled to the east of the original discovery well and down-dip to understand the extent of the reservoir. Pressure data collected in the well suggested that the oil/water contact was close to the appraisal well which increases the confidence in the resources of the field. Exploration would like to keep suspended since it was considered successful. Exploration is also evaluating future utility of the wellbore as a sidetrack, injection or development well."[256]

122.    In his analysis, Mr. Regan cites a November 10, 2016 Anadarko memorandum to support his assertion that Anadarko "internally acknowledged that Shen-3 was 'unsuccessful' and therefore, did not satisfy the specific capitalization requirements established in ASC 932-360-25-18."[257]   However, Mr. Regan's discussion of this memorandum is incomplete and misleading. First, he fails to acknowledge that this memorandum is dated almost two years after Anadarko reached its decision to suspend the Shen 3 well costs as of December 31, 2014.  In addition, the November 10, 2016 memorandum refers to the contemporaneous analysis of Shen 3 well costs in December 2014, when the Property Accounting group "reached the conclusion in Q4 2014 to suspend the well costs, despite the fact that the sands encountered were non-hydrocarbon bearing, based on understanding from conversations with Exploration, and a subsequent email dated December 17, 2014, that the well projected the oil-water contact and **resulted in higher confidence in, and thus an increase to, the estimated resources for the Shenandoah project**."[258]   The original analysis contemplated the guidance in ASC 932-360-25-18, and noted the following:

> "Property Accounting documented its conclusion to continue capitalization of the well as a suspended well in a memo drafted December 29, 2014. The memo noted that pressure data collected in this appraisal well could be used to project an oil-water contact between the discovery and appraisal well and since the projected oil-water contact was close to the appraisal well, the data suggested a higher confidence (and therefore increase) in the resources of the field. **This was considered a successful appraisal well to determine the extent of the reservoir**. The memo also noted that while hydrocarbons were not found in this wellbore, geologic, fluid and pressure data obtained from the well raised the confidence level of the resources of the field and contributed to the ongoing development of the

---

[256] APC-00154334–338 at 336.
[257] Regan Report, ¶¶ 58, 60–61.
[258] APC-00002132–135 at 132 (emphasis added).

CONFIDENTIAL

Shenandoah project. Therefore, it was determined to be appropriate to continue capitalization of this well cost as suspended well cost, pending the determination of proved reserves for the Shenandoah project."[259]

123.    Therefore, Mr. Regan fails to acknowledge that the contemporaneous conclusion that Shen 3 was a "successful" appraisal well under ASC 932-360-25-18 was based on Property Accounting's understanding at that time that data from Shen 3 suggested an increase in the estimated resources of the field.[260]  Ms. Green testified that the Property Accounting group later determined that their understanding was incorrect, and that Shen 3 did not specifically increase the estimated resources of the field.  Accordingly, Shen 3 was later determined to be "unsuccessful under ASC 932-360-25-18" given Property Accounting's updated understanding.[261]  As a result, contrary to Mr. Regan's claims, the November 10, 2016 memo's statement that Shen 3 was "unsuccessful under ASC 932-360-25-18" is not evidence that Anadarko affirmed that Shen 3 well costs "were not capitalizable under applicable GAAP as of December 31, 2014," but simply that the estimated resources in the field had not increased.[262]  As described above, GAAP does not require that an exploratory-type stratigraphic test well lead to an increase in the estimated level of resources in the field in order to justify suspending its costs.

124.    Additional evidence produced in this matter demonstrates that Anadarko Property Accounting personnel acknowledged, at the time that the determination was made to suspend the Shen 3 well costs, that the well did not encounter hydrocarbons within the well bore.  Ms. Green testified that encountering hydrocarbons in the well bore was not a requirement for suspension based on the Property Accounting group's interpretation of relevant guidance.  Specifically, Ms. Green testified that the Property Accounting group "had [an] interpretation that was slightly different based on stratigraphic test wells that may not have hydrocarbons in the wellbore. […] [I]n lots of situations, you have an accounting policy that's based on GAAP and has facts and circumstances and different circumstances arise, you may take that offline and consider it an interpretation."[263]

---

[259] APC-00002132–135 at 132–133 (emphasis added).
[260] APC-00002132–135 at 132–133; Green Deposition, pp. 78:12–18, 92:24–93:11.
[261] Green Deposition, p. 102:17–22 ("Q:  Shenandoah 3 was considered unsuccessful under ASC 932-360-25-18 because it was a dry hole; correct?  A:  So at – at third quarter of 2016, when we learned that the resource estimate had decreased, we considered it unsuccessful under paragraph 25-18.").
[262] Regan Report, ¶ 61.
[263] Green Deposition, p. 64:6–23.

CONFIDENTIAL

125.    Mr. Regan's analysis does not address the Property Accounting group's interpretation of ASC 932-360 that encountering oil within the well bore of a deepwater appraisal well is not a requirement for suspension of the costs associated with that appraisal well, much less demonstrate how this interpretation is unreasonable.  Instead, Mr. Regan asserts that the only interpretation of ASC 932-360 precludes the suspension of the costs associated with a deepwater appraisal well (*i.e.*, Shen 3) should hydrocarbons not be found within the well bore of that appraisal well.[264]

126.     Not only does this methodology fail to meet the criteria for a competent and diligent analysis, it also is inconsistent with the facts and circumstances of ultra deepwater drilling.  Ms. Green provided testimony highlighting this inconsistency.  Specifically, Ms. Green was asked whether FAS 19 required the expensing of costs associated with an exploratory well should "proved reserves have not been found as a result of the drilling of that particular well."[265]  In response, Ms. Green testified:

> "I would say that is correct on a -- on a straightforward exploratory onshore well, that's -- that is not necessarily the case directly on an offshore project that requires multiple appraisal wells to determine whether you actually have FID on that project and can record proved reserves for that project. […] I'm just saying that the literal wording of [FAS 19] always -- you know, generally would always apply to an onshore well that is being drilled. However, when you have a significant offshore project, that could require multiple appraisal wells to determine whether you actually can get to prove reserves on it, I'm saying that's where the difference is. […] [Y]ou don't generally drill an initial well in the Gulf of Mexico and initially in a -- in a significant offshore development project and book proved reserves on the basis of that single well alone.  That's – that's the full basis of, you know, the exploration GAAP that we have where it has the -- the two levels of did the well find sufficient reserves to justify its completion, and is the company making sufficient progress towards getting that determination as to whether you would have proved reserves."[266]

127.    Ms. Green's testimony demonstrates another fundamental flaw in Mr. Regan's interpretation of ASC 932-360:  Specifically, Mr. Regan interchangeably uses the terms "hydrocarbons" and "reserves" in his analysis.  While Mr. Regan acknowledges that GAAP defines "reserves" to mean "estimated remaining quantities of oil and gas and related substances anticipated to be economically producible," he improperly states that "the absence of

---

[264] Regan Report, ¶ 48; Regan Deposition, pp. 62:3–64:18.
[265] Green Deposition, p. 32:8–13.
[266] Green Deposition, pp. 32:8–33:22.

CONFIDENTIAL

hydrocarbon reflects…the absence of 'reserves' under GAAP."[267]  Mr. Regan fails to consider that "reserves" is a quantity of hydrocarbons that are anticipated to be *economically producible*, *i.e.*, that justify the cost of exploration and development.  Notably, ASC 932-360 specifically does not state that companies must find hydrocarbons in a particular exploratory well to qualify for capitalization of those associated drilling costs.  Rather, ASC 932-360's use of the term "reserves" or "proved reserves" in place of "hydrocarbons" or "resources" may reasonably be interpreted to suggest that the assessment of whether certain well costs can be suspended is based on more than just whether there are hydrocarbons within an individual wellbore.

128.    This interpretation is also consistent with the technical and economic challenges associated with ultra deepwater drilling, generally, and exploratory-type stratigraphic test wells, specifically.  As described in Section III.B, ultra deepwater exploratory-type stratigraphic test wells (such as Shen 3) cost hundreds of millions of dollars and are typically not drilled with the intention of being oil producing.[268]  The objective of an appraisal program is to obtain information about the size and extent of the reservoir.  Therefore, the purpose of drilling each individual Shenandoah appraisal well was to determine whether sufficient reserves existed in the Shenandoah reservoir as a whole, and not whether reserves existed in any single well bore.  As Ms. Green testified, "you don't generally drill an initial well in the Gulf of Mexico [or] in a significant offshore development project and book proved reserves on the basis of that single well alone."[269]

129.    Anadarko never assessed reserves based on each individual appraisal well in its deepwater exploration projects and it never booked (*i.e.*, reported) reserves for the Shenandoah field during its time as the operator.[270]  For example, Anadarko disclosed that "[p]rojects with suspended exploratory well costs are those identified by management as exhibiting sufficient quantities of hydrocarbons to justify potential development and where management is actively

---

[267] Regan Report, fn. 2.

[268] An exception is Shen 6, which was drilled with the intention of ultimately serving as a development well should the Shenandoah appraisal program conclude with the sanctioning of the Shenandoah field.

[269] Green Deposition, pp. 33:12–16, 79:19–80:7.

[270] Green Deposition, pp. 63:15–64:11, 81:3–82:9; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 15, 2018, p. 67.  Anadarko also disclosed in its financial statements that "[i]f an exploratory well provides evidence to justify potential completion as a producing well, drilling costs associated with the well are initially capitalized, or suspended, pending a determination as to *whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling*." (emphasis added).  See, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 95.

CONFIDENTIAL

pursuing efforts to assess whether reserves can be attributed *to these projects*."[271]  Therefore, under Mr. Regan's interpretation, none of the costs associated with any individual Shenandoah well (Shen 1 through Shen 6) would have qualified for suspension as they did not find "reserves" individually.

### 4.  Mr. Regan Fails to Perform a Thorough Analysis

130.    The rigor of an analysis of Anadarko's accounting determinations is guided by the AICPA Forensic Standards, and in particular, the general standard of due professional care.[272] Mr. Regan's analysis of Anadarko's accounting determinations related to the Shen 3 well costs fails to evaluate the evidence in a rigorous manner, leading to a misleading presentation of the evidence.  As a result, Mr. Regan's analysis fails to meet the requirements of due professional care set forth in the AICPA Forensic Standards, as well as the requirement for an evaluation of an accounting judgment to include sufficient "time and effort spent [considering] the judgment."[273]

131.    For example, as support for his assertion that "poor results of the Shen-3 drilling effort appear to have been evident to Anadarko as early as November 2014," Mr. Regan cites one slide attached to an internal Anadarko e-mail, dated November 24, 2014, which includes a proposed schedule assuming "[b]ad news" from Shen 3.[274]  Mr. Regan's discussion of this e-mail suggests that this was the only proposed schedule prepared and that it was concluded that the results of Shen 3 were "[b]ad news" as of this date.[275]  This is incorrect.  Mr. Regan fails to note that there were other proposed schedules prepared, including one that considered a "Success Shen 3" scenario.[276]  Mr. Regan also fails to note that the very e-mail he cites includes a project timeline with plans to drill Shen 4 as the next appraisal well and Shen 5 as a "keeper" well, demonstrating the commitment of the Partners to the continued development of the Shenandoah Project following the results of Shen 3.

---

[271] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 103 (emphasis added).
[272] AICPA, "Statement on Standards for Forensic Services," ¶ 6.
[273] AICPA, "Statement on Standards for Forensic Services," ¶ 6; CIFR Report, p. 95.
[274] Regan Report, ¶ 41; APC-00147963.
[275] Regan Report, ¶ 41.
[276] APC-00853569.

CONFIDENTIAL

132.    Mr. Regan cites communications among the Partners of the Shenandoah Project to assert that a "dry hole case" in the context of Shen 3 would mean that the well "encounter[ed] wet sands."[277]  Mr. Regan uses this assertion to support his opinion that because Shen 3 encountered "wet sands," it should be considered a "dry hole case" and, therefore, immediately expensed. However, Mr. Regan's discussion of this internal communication is misleading for several reasons.  First, he fails to acknowledge that this communication was not among financial reporting personnel of the Partners and did not relate to financial reporting determinations. Instead, the document Mr. Regan cites is an "Authorization for Expenditure" ("AFE") that proposes to initiate the drilling of Shen 3, and the discussion within the document relates to the proposed drilling costs of the well, not the financial reporting related to the well.[278]  Second, Mr. Regan fails to acknowledge the deposition testimony of, among others, Mr. Leyendecker, who provided testimony related to this specific document cited in the Regan Report.  Specifically, Mr. Leyendecker testified that the "dry hole case" and "success case" terminology included in this document were terms used by drilling personnel within Anadarko to refer to the "cost estimate for drilling."[279]  This testimony is consistent with testimony provided by other Anadarko personnel regarding this specific document, including Mr. Daniels (Executive Vice-President of International and Deepwater Exploration).[280]  Mr. Regan has not addressed this deposition testimony in his analysis.  Finally, Mr. Regan fails to acknowledge that the "success" case scenarios differ among the various AFEs and encountering oil is not always a requirement.  For example, the AFE for the substitute Shen 2 appraisal well indicated that a "success" case "includes encountering correlative D and/or E sands, at a minimum, whether oil bearing or not."[281]  This example underscores the testimony of Anadarko's personnel that the "success case" and "dry hole case" terminology were terms that did not have any bearing on Anadarko's financial reporting under GAAP.

133.    To support his assertion that Shen 3 was known to have encountered no hydrocarbons prior to the issuance of Anadarko's financial statements for the fiscal year ended December 31, 2014, Mr. Regan cites a whistleblower report filed by Lea Frye (a Senior Staff Reservoir

---

[277] Regan Report, ¶ 50.
[278] Exhibit 491, APC-00005093–100.
[279] Leyendecker Deposition, pp. 115:1–117:15.
[280] Deposition of Robert Daniels, October 13, 2022, pp. 29:23–30:4, 72:19–21, 154:10–22.
[281] APC-01741046.

CONFIDENTIAL

Engineer on the Shenandoah Project) in May 2016 and affirmations made by "outside consultants hired by the Company" in response to Ms. Frye's allegations.[282]  However, Mr. Regan fails to demonstrate how this evidence is relevant to the financial reporting determinations made by Anadarko in connection with its financial statements for the fiscal year ended December 31, 2014.  Specifically, he fails to demonstrate what information alleged by Ms. Frye or "affirmed" by the outside consultants was known by Anadarko as of the filing of its financial statements for the fiscal year ended December 31, 2014.

134.    In an attempt to support his assertion that the costs associated with an appraisal well would only qualify for suspension should the individual well encounter sufficient quantities of hydrocarbons to justify its cost, Mr. Regan cites deposition testimony from Ms. Green, which he uses to support the assertion that "wells are to be assessed individually under the successful efforts method and ASC 932-360."[283]  This is misleading and disregards the context and complete testimony of Ms. Green.  Specifically, immediately preceding the portion of testimony cited by Mr. Regan, Ms. Green testified:

> "Q. So the -- the policy requires that reserves need to be found in the well, not on a project basis?
>
> A. Our interpretation, the way we applied this for exploratory stratigraphic wells that were non-hydrocarbon bearing, was based on the information that was provided by that well – by that well and the overall impact that that had on the resources or the reserves that would be booked at FID.
>
> Q. Based on the well?
>
> A. Based on the information from the well."[284]

135.    Immediately following the deposition testimony cited by Mr. Regan, Ms. Green testified as follows:

> "Q. But looking back at Exhibit 332, at that same paragraph, it says, 'In certain circumstances, an exploratory well finds reserves, but those reserves cannot be classified as proved when drilling is completed.' As you testified, that's the first step?
>
> A. That is -- that is the first criteria, yes, that if there are reserves in the wellbore that justify its completion, yes, you would continue capitalization. The interpretation that we had at

---

[282] Regan Report, ¶ 41.
[283] Regan Report, ¶ 56.
[284] Green Deposition, pp. 81:25–82:11.

CONFIDENTIAL

Anadarko was for exploratory-type stratigraphic wells whether -- where there were not hydrocarbons in the wellbore, and it happened in limited circumstances, we would also consider was there substantive positive evidence gained in the information we got from drilling that well related to the overall project."[285]

136.    Contrary to Mr. Regan's suggestion that Ms. Green's testimony supports his interpretation of ASC 932-360, a more thorough review of Ms. Green's testimony (which Mr. Regan failed to present in his analysis) demonstrates the opposite: the interpretation of ASC 932-360 by Anadarko's Property Accounting group did not require that appraisal wells encounter within their own well bores sufficient hydrocarbons to justify their construction costs in order to qualify for suspension.[286]

137.    As support for his assertion that the Sufficient Quantity criterion for determination of whether to suspend the costs associated with appraisal wells should be evaluated on an individual well basis, Mr. Regan cites the expensing of "certain specific unsuccessful well efforts during Q3 2016 within [Anadarko's] Tubarao Tigre and Mozambique exploration project areas."[287] However, Mr. Regan's analysis of these wells fails to correctly evaluate the cited evidence.

138.    Mr. Regan suggests that these wells were expensed because they did not locate sufficient hydrocarbons within their individual well bores to satisfy the Sufficient Quantity criterion, but his report fails to address the actual justification for why these wells were ultimately expensed as of September 30, 2016.  With respect to the Tubarao Tigre wells included in Mr. Regan's analysis, the memorandum Mr. Regan cited makes clear that costs associated with Tubarao Tigre #1 and Tubarao Tigre #2, which were initially suspended in 2014 and 2015, respectively, were both expensed in Q3 2016 due to Anadarko's failure to **continue to** comply with the Sufficient Progress criterion.  KPMG's review memorandum, cited by Mr. Regan, clearly states "in Q3 2016[, Anadarko] determined the wells should be expensed as a result of the Company deciding to delay drilling in the area."[288]  The memorandum further stated "in Q3 2016, in response to the global commodity price decline along with the complexity of the wells, the Company has decided to delay additional drilling activities for both the Tubarao Tigre #1 and #2 wells for

---

[285] Green Deposition, pp. 83:21–84:13
[286] Green Deposition, pp. 81:25–84:13.
[287] Regan Report, ¶ 55.
[288] KPMG_APC_eA_0007469–475 at 473.

CONFIDENTIAL

several years, and possibly more depending on market condition activity."[289]  The memorandum does not address the Sufficient Quantity criterion.

139.     The same memorandum also addressed Anadarko's decision to expense the costs associated with the Orca #4 well as of September 30, 2016.  These costs had been suspended since the drilling of the well in December 2014[290] and were expensed in Q3 2016 because updated geological mapping had determined that Orca #4 was no longer geologically associated with the other Orca wells.[291]  The KPMG memorandum cited by the Regan Report does not indicate that the decision to expense the Orca #4 well was based on its failure to meet the Sufficient Quantity criterion based on an evaluation of the hydrocarbons located in the well bore itself.  Therefore, Mr. Regan's suggestion that these appraisal wells were expensed in Q3 2016 due to their failure to meet the Sufficient Quantity criterion (as interpreted by Mr. Regan) is based on erroneous evaluation of the cited evidence.

### 5.  Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals

140.     In order to perform a competent and diligent analysis of Anadarko's financial reporting determinations related to the Shen 3 appraisal well, as well as to meet the AICPA Forensic Standards, Mr. Regan was required to consider all relevant contemporaneous accounting determinations reached by other accounting professionals.  Mr. Regan's analysis does not do so, and, as a result, his opinions are unreliable.

### a)  Mr. Regan Fails to Reconcile His Opinions with the Professional Judgment of Anadarko's Partner in the Shenandoah Project

141.     As support for his assertion that Anadarko's financial reporting determinations related to the Shen 3 drilling costs violated GAAP, Mr. Regan cites the accounting determinations made by certain Partners to the Shenandoah Project.  Specifically, Mr. Regan states "two of Anadarko's Shenandoah project partners, including Conoco (its partner with a percentage interest in the project equal to Anadarko) and Marathon, recognized the need to write off Shen-3 related

---

[289] KPMG_APC_eA_0007469–475 at 473.
[290] APC-00284670–693 at 678.
[291] KPMG_APC_eA_0007469–475 at 474.

CONFIDENTIAL

drilling costs as of December 31, 2014."[292]  However, Mr. Regan fails to address the accounting determinations reached by another Partner of the Shenandoah Project: Cobalt, which suspended at least a portion of the Shen 3 cost.  The fact that different partners made different accounting determinations suggests that exercising professional judgement could lead to a range of reasonable interpretations of GAAP guidance.

142.     Cobalt, which held a 20% interest in the Shenandoah Project, included the following disclosure in its 2014 Annual Report: "The Shenandoah #3 appraisal well was spud in the second quarter of 2014 and evaluated the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the first appraisal well. This well found an expanded geologic reservoir section, confirmed excellent reservoir qualities and delineated the potential oil-water contacts of the field. Planning is currently underway for another appraisal well, which we expect will be spud in the second quarter of 2015."[293]  In its disclosure of "dry hole expense and impairment" related to its Gulf of Mexico reporting segment, Cobalt disclosed that it expensed approximately $5 million related to the bypass portion of the Shen 3 appraisal well.[294]  Cobalt did not expense costs associated with the remainder of the Shen 3 appraisal well, indicating that, based on the results of the Shen 3 well, Cobalt determined that it was reasonable, under GAAP, to suspend the remaining Shen 3 well costs.[295]  Although the Regan Report acknowledges Cobalt's determination, Mr. Regan does not reconcile this accounting determination, which aligned with Anadarko's, with his opinion that GAAP required Anadarko to expense Shen 3 well costs and that Anadarko's accounting determination therefore violated GAAP.[296]

### b)  Mr. Regan Fails to Address the Work and Related Conclusions of Anadarko's Auditor

143.     As a publicly traded, SEC-registered company, Anadarko is subject to annual audits and quarterly reviews of its consolidated financial statements.[297]  As Anadarko's auditor, KPMG is

---

[292] Regan Report, ¶ 41 (footnotes in original omitted).

[293] Cobalt International Energy, Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 23, 2015, p. 5.

[294] Cobalt International Energy, Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 23, 2015, p. 77.

[295] Cobalt International Energy, Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 23, 2015, p. 77.

[296] Regan Report, fn. 37.  See also, Regan Report, Exhibit A, p. 3.

[297] SEC, "Financial Reporting Manual," § 1110.1.

CONFIDENTIAL

required to conduct its audits and reviews of Anadarko's consolidated financial statements in accordance with generally accepted auditing standards ("GAAS"), which, for public companies, are set by the PCAOB ("PCAOB Standards").[298]  The PCAOB also requires public accounting firms, including KPMG, and their associated persons (referred to generally as "practitioners") to comply with various professional practice standards.[299]

144.    The purpose of an audit of financial statements by the independent auditor "is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."[300]  PCAOB Standards require the auditor to "obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[301]  KPMG's audit included "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements" and "assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation."[302]

145.    KPMG performed audit procedures to test Anadarko's suspended well costs as of December 31, 2014, including the Shen 3 well costs, as documented in the "GG.4.A.8.05 Suspended Well Costs Memo" workpaper dated January 15, 2015.[303]  The purpose of the workpaper was to "test [Anadarko's] suspended well costs as of 12/31/2014 for completeness, accuracy, and presentation, in support of the completeness, accuracy, valuation, and presentation of PP&E (specifically AUC)."[304]  Specifically, KPMG documented that it "inquired as to the plans for Shenandoah #3 and notes that the rig was released from Shenandoah #3 on 1/2/2015.

---

[298] PCAOB, "Standards," available at https://pcaobus.org/oversight/standards; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 87; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, p. 85; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 85; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 15, 2018, p. 88.

[299] PCAOB, "Standards," available at https://pcaobus.org/oversight/standards.

[300] PCAOB Interim Standard AU Section 110.01.

[301] PCAOB Interim Standard AU Section 110.02.

[302] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 87; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016, p. 85; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 85; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 15, 2018, p. 88.

[303] Exhibit 485, KPMG_APC_eA_0002511–529.

[304] Exhibit 485, KPMG_APC_eA_0002511–529 at 511.

CONFIDENTIAL

Per the Q4 Operations report, the approximately 1.5 times more of the same well-developed reservoir that the Shenandoah-2 well found.  The well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening.  It also enabled the projection of oil/water contacts based on pressure data, and reduced the uncertainty of the resource range."[305]  As a result, KPMG concluded, "the activities mentioned above are indicative of sufficient progress per FASB 932-360-35 as costs are being incurred to assess reserves and their potential development."[306]

146.    Mark Zajac, the KPMG partner responsible for KMPG's audits of Anadarko's financial statements during the Class Period, provided deposition testimony in this matter that gives additional insight into the work performed by KPMG and the firm's conclusion regarding the propriety of Anadarko's accounting for the Shen 3 appraisal well as of December 31, 2014.[307]

147.    For example, Mr. Zajac testified as to his interpretation of ASC 932-360 with respect to the implementation of the Sufficient Quantity criterion.  Specifically, Mr. Zajac testified:

"Q. And why would it have been important for KPMG to know whether or not a dry hole had been drilled?

A. As it relates to suspended wells? […] It may or may not matter.  If the initial well that was drilled found sufficient quantities of -- of resources to justify continued appraisal of the project, whether subsequent wells are or are not a dry hole, may or may not matter.

Q. And why is that?

A. When you -- when you look at a project that's rather significant and in deep water and, you know, very -- very deep under the ground, there's only so much you can do from the surface to understand a formation.  And so, you know, drilling a […] single one well, you'll find resources, but that in itself is insufficient information typically to con- -- to produce from that well and to invest the capital necessary to do so.  And so, the company or a company would undertake appraisal wells to understand the reservoir and to gain information about how best to exploit and develop the field."[308]

148.    Mr. Zajac's interpretation of the Sufficient Quantity criterion is consistent with that testified to by Ms. Green in her deposition, and inconsistent with what Mr. Regan purports to be the only interpretation of ASC 932-360.  Specifically, Mr. Zajac testified that, based on his

---

[305] Exhibit 485, KPMG_APC_eA_0002511–529 at 514.
[306] Exhibit 485, KPMG_APC_eA_0002511–529 at 514.
[307] Deposition of Mark L. Zajac, November 2, 2022 ("Zajac Deposition"), pp. 21:11–22:2.
[308] Zajac Deposition, pp. 65:5–66:9.

CONFIDENTIAL

interpretation of the relevant literature (*i.e.*, ASC 932-360), an appraisal well may qualify for initial suspension even if it is determined to be a "dry hole" (*i.e.*, no hydrocarbons are found in the appraisal well bore). Mr. Regan has not addressed the interpretation of ASC 932-360 testified to by either Ms. Green or Mr. Zajac, nor has he addressed how he reconciles his opinion with this contradictory evidence.

### 6. Mr. Regan's Conditions Do Not Require Anadarko to Have Expensed Shen 3 Well Costs as of December 31, 2014

149.    Mr. Regan's opinions regarding Anadarko's purported failure to appropriately expense Shen 3 well costs are predicated on "Condition 1" and "Condition 2" set forth at the beginning of his Report.[309] Specifically, Mr. Regan states "Anadarko's required expensing of Shen-3 drilling costs under GAAP is further supported by […] Condition 1."[310] When summarizing evidence that Mr. Regan purports to establish that "Shen-3 found no hydrocarbons," he cites his "Condition 2."[311]

150.    As an initial matter, it is unclear why Mr. Regan's opinions include these stipulated "Conditions." Each relates to judgmental determinations that would have been evaluated by Anadarko's accounting personnel in the course of financial reporting determinations related to the Shen 3 well (as well as the Shenandoah field more broadly with respect to "Condition 3"). By stipulating to these Conditions, Mr. Regan in effect assumes the answer to a question that Anadarko was required to analyze and answer in order to reach the accounting determinations at issue in this matter. Mr. Regan's reliance on these Conditions means that his analysis disregards the professional judgments made by Anadarko's accounting personnel.

151.    These professional judgments reached by Anadarko's accounting personnel were based on information that was available to the Company at the time its financial statements were issued. Mr. Regan's Conditions are not. For example, Mr. Regan cites deposition testimony

---

[309] Regan Report, ¶ 2 ("In connection with my assignment, I have been asked to assume that Plaintiffs will establish each of the following: a. As of December 31, 2014 and throughout the Relevant Period, it was unlikely that the completed stratigraphic exploration well referred to as Shenandoah-3 ('Shen-3') would be used as an injection or other type of service well in the development phase of the Shenandoah project ('Condition 1'). b. The findings of the Company's Shen-3 exploration wellbore, together with its findings of its prior wellbores, resulted in a material reduction to the estimated possible resources within the Shenandoah field as of Anadarko's Q4 2014 financial reporting period ('Condition 2').").
[310] Regan Report, ¶ 40.
[311] Regan Report, fn. 46.

CONFIDENTIAL

related to a November 2016 Anadarko memorandum as evidence that is "consistent with Condition 2."[312]  It is inappropriate for Mr. Regan to cite this memorandum as support for Condition 2 because the memorandum relates to a period after the relevant accounting determination.  Anadarko reached its decision to suspend the Shen 3 well costs as of December 31, 2014 based on the information that was available to it as of the issuance of those financial statements.  Given that Mr. Regan is opining on the reasonableness of Anadarko's accounting determinations, his analysis must be limited to that information, and not incorporate evidence that was generated after the issuance of the financial statements.

152.    Even if one were to look beyond these fundamental flaws in Mr. Regan's Conditions, neither of Mr. Regan's Conditions are determinative of Anadarko's accounting for the Shen 3 well costs as of December 31, 2014.  As demonstrated above, a reasonable interpretation of ASC 932-360 would not preclude suspension of the costs associated with an appraisal well should that appraisal well not encounter hydrocarbons within the well bore.[313]  Mr. Zajac provided testimony consistent with this interpretation, stating that it "may or may not matter" whether an appraisal well is a dry hole, given the determination of whether to suspend the costs would also need to consider the results of other appraisal wells drilled within the same resource field.[314]  Therefore, the relevance of Mr. Regan's Condition 1 and Condition 2 is unclear.  Mr. Regan has provided no analysis to demonstrate the relevance of either of these Conditions to the determination of whether the suspension of the costs associated with Shen 3 as of December 31, 2014 was consistent with a reasonable interpretation of ASC 932-360.  Accordingly, neither of these Conditions is determinative of whether the costs associated with Shen 3 should have been suspended as of December 31, 2014.

## VIII.   Mr. Regan's Opinion That Anadarko's Q3 2016 Accounting Determination "Has No Basis Under GAAP" Is Misleading

153.    Mr. Regan opines that Anadarko's financial reporting determinations related to the potential utility of Shen 3 as a water injector "has no basis under GAAP and is fundamentally

---

[312] Regan Report, fn. 46; Green Deposition, pp. 92:24–94:19.
[313] See, Section VII.A.
[314] Zajac Deposition, pp. 65:5–66:9 ("It may or may not matter. If the **initial well** that was drilled found sufficient quantities of -- of resources to justify continued appraisal of the project, whether subsequent wells are or are not a dry hole, may or may not matter." (emphasis added)).

CONFIDENTIAL

flawed."[315]   However, Mr. Regan fails to support this opinion with competent and diligent analysis.  As described in more detail in the following section, Mr. Regan's analysis regarding Anadarko's accounting for the Shen 3 well costs as of September 30, 2016 is flawed and unreliable.  Specifically, it reiterates Mr. Regan's same flawed interpretation of ASC 932-360; is predicated on an evaluation of superseded and non-authoritative guidance; is predicated on an incomplete assessment of relevant GAAP; is not supported with thorough analysis; is biased by hindsight; and is not reconciled with the contemporaneous conclusions of other accounting professionals.  Mr. Regan fails to demonstrate that, to conform with GAAP, Anadarko was required to expense the Shen 3 well costs prior to September 30, 2016.

**A.      Mr. Regan Reiterates His Same Flawed Arguments Regarding the Capitalization of Shen 3 Well Costs Under ASC 932-360-25-18**

154.    In his evaluation of Anadarko's accounting for the Shen 3 well costs as of September 30, 2016, Mr. Regan reiterates his interpretation of ASC 932-360 and asserts that his interpretation is the only interpretation of the guidance.[316]

155.    Specifically, Mr. Regan asserts that the Shen 3 well costs "were not capitalizable under applicable GAAP" because "Shen-3 found no hydrocarbons."[317]  As established above in Section VII.A, a reasonable interpretation of ASC 932-360 does not preclude suspension of Shen 3 well costs should hydrocarbons not be found in the well bore.  Again, this interpretation is consistent with testimony provided by other accounting professionals who evaluated the results of the Shen 3 appraisal well and Anadarko's decision to suspend the costs associated with this well until September 30, 2016.[318]

156.    Therefore, Mr. Regan's assessment of Anadarko's accounting for the Shen 3 well costs as of December 31, 2016 is based on the same incomplete assessment of ASC 932-360 that Mr. Regan used to assess Anadarko's accounting for Shen 3 as of December 31, 2014 and the erroneous assertion that this interpretation of ASC 932-360 is the only interpretation.[319]  Again,

---

[315] Regan Report, ¶ 60.
[316] Regan Report, ¶ 39 ("Accordingly, Anadarko **was required to** expense the cost of drilling Shen-3 within the Company's annual and quarterly period ended December 31, 2014, as detailed below." (emphasis added)); Regan Deposition, pp. 62:3–64:18.
[317] Regan Report, ¶ 61.
[318] See, *e.g.*, Zajac Deposition, pp. 65:5–66:9.
[319] Regan Deposition, pp. 62:3–64:18.

CONFIDENTIAL

this incomplete assessment, as well as Mr. Regan's assertion that his interpretation of ASC 932-360 is the only interpretation of the guidance, renders his related opinion unreliable.

### B.    Mr. Regan's Opinion Is Predicated on an Evaluation of Superseded and Non-Authoritative Guidance

157.    As described in Section V.A, registrants are required to prepare their financial statements in accordance with GAAP.[320]  The Codification is the source of authoritative GAAP.  Any assessment of Anadarko's accounting determinations must be based on authoritative GAAP (as set forth in the Codification) as it existed at the time Anadarko issued its financial statements. Even if superseded and non-authoritative guidance contains language that is identical to authoritative GAAP, the Report would need to explain that the cited, non-authoritative guidance is identical to the language in the Codification and an explanation for preferring a non-authoritative source.

158.    As part of his analysis in support of his opinion that Anadarko's accounting for the Shen 3 well costs as of September 30, 2016 had "no basis under GAAP," Mr. Regan cites superseded and non-authoritative guidance.[321]  Although Mr. Regan cites "ASC 932-360" as a whole, Mr. Regan fails to identify specific guidance in ASC 932-360 that establishes his assertion that a well originally intended to be an exploratory well cannot qualify for suspension under ASC 932-360-25-12 through 14.[322]  Rather, Mr. Regan cites an AICPA Audit and Accounting Guide as support for his conclusion that Shen 3 drilling costs did not qualify as development costs under ASC 932-360-25-14.[323]  He also quotes a passage from FAS 19 that notes a distinction between exploratory dry holes and development dry holes.[324]  As described above, neither the AICPA Audit and Accounting Guide nor FAS 19 was authoritative at the time Anadarko reached its accounting determinations at issue in this matter.[325]

---

[320] ASC 105-10-10.
[321] Regan Report, ¶¶ 60, 63, fn. 90.
[322] Regan Report, ¶ 63, fn. 90.
[323] Regan Report, ¶ 63, fn. 90.
[324] Regan Report, fn. 90.
[325] See, Sections V.B and V.C.

CONFIDENTIAL

### C.    Mr. Regan's Analysis Is Insufficient

159.    As support for his assertion that he had not seen "contemporaneous objective evidence demonstrating that a 'reasonable possibility' existed that Shen-3 could be used as an injection well as of December 31, 2014," Mr. Regan cites evidence related to communications from partners to the Shenandoah Project.[326]  However, this demonstrates that Mr. Regan's analysis was not performed in a competent and diligent manner because it fails to address the preparer's (*i.e.*, Anadarko's) analysis of the transaction and instead substitutes the judgments of an external party with no effort to reconcile different conclusions.[327]

160.    Specifically, Mr. Regan cites internal ConocoPhillips communications in which, according to Mr. Regan, ConocoPhillips "internally notified employees that Shen-3 was 'fully water-wet,' and was not likely to be considered as a future sidetrack well."[328]  Mr. Regan's analysis fails to evaluate relevant factual considerations, like the fact that Anadarko was the operator of the project, meaning that it was responsible for designing the development plan, not ConocoPhillips.[329]  Mr. Regan inappropriately implies that the Partners should reach identical accounting determinations.  He fails to recognize that Partners reasonably may reach different accounting determinations based on, among other factors, their independent interpretations of the relevant guidance, their independent judgments regarding the results of the Shen 3 well, and expectations for future use of the well.[330]

### D.    Mr. Regan's Analysis Is Biased by Hindsight

161.    In order for Mr. Regan to perform a competent and diligent analysis, it is necessary for his analysis to consider the "relevant data" that was reasonably available at the time of the at-issue accounting determinations and not to consider data that only became available at a later date.[331]  However, Mr. Regan's analysis of Anadarko's accounting for the Shen 3 well costs as of

---

[326] Regan Report, ¶ 66.
[327] CIFR Report, p. 95.
[328] Regan Report, ¶ 66.
[329] See, *e.g.*, Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2012, filed on February 19, 2013, p. 9; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2013, filed on February 28, 2014, p. 9.
[330] See, *e.g.*, Deposition of Lea Frye, October 7, 2022 ("Frye Deposition"), pp. 160:11–161:13.
[331] AICPA, "Statement on Standards for Forensic Services," ¶ 6; CIFR Report, p. 95.

CONFIDENTIAL

December 31, 2016 inappropriately considers data from subsequent time periods; therefore, his analysis is subject to hindsight.

162.     For example, in further support of his assertion that he "[had] not seen contemporaneous objective evidence demonstrating that a 'reasonable possibility' existed that Shen-3 could be used as an injection well or a development well as of December 31, 2014,"[332] Mr. Regan cites the Q3 2016 analysis prepared by Anadarko related to the suspension of Shen 3 well costs.[333] However, Mr. Regan has not established the relevance of this memorandum to his assessment of whether the capitalization of Shen 3 between Q4 2014 and Q2 2016 was acceptable.[334]

163.     Mr. Regan does not establish that the Q3 2016 memorandum incorporated only information that was available at the time that Anadarko reached its accounting determinations related to the suspension of Shen 3 well costs during the period from Q4 2014 through Q2 2016. Instead, the Q3 2016 memorandum notes that during Q3 2016, a determination was made that the Shenandoah field would be developed using a semi-submersible platform (assuming the field was ultimately sanctioned).[335]  Due to the technical requirements of the semi-submersible platform, it was determined that the optimal locations for water injector wells were no longer at Shen 3, but instead on either side of Shen 3.[336]  Because this determination was not made until Q3 2016, it is inappropriate to use this information (and the related decision regarding the utility of Shen 3 as a service well) as a basis to conclude regarding the propriety of Anadarko's accounting determinations prior to Q3 2016 (*i.e.*, "between Q4 2014 and Q2 2016").[337]

### E.     Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals

164.     In his analysis of Anadarko's accounting for the Shen 3 well costs as of September 30, 2016, Mr. Regan failed to address the conclusions reached by other parties with "an appropriate level of professional expertise."[338]  Specifically, Mr. Regan failed to address the conclusions

---

[332] Regan Report, ¶ 66.
[333] Regan Report, ¶ 67.
[334] Regan Report, ¶ 68.
[335] APC-00002132–135 at 134.
[336] APC-00002132–135 at 134.
[337] Regan Report, ¶ 68.
[338] CIFR Report, p. 95.

CONFIDENTIAL

reached by Anadarko's auditor, KPMG, regarding the accounting for the Shen 3 well costs as of September 30, 2016.

166.    As part of its review of Anadarko's financial statements for the third quarter of 2016, KPMG "perform[ed] review procedures over the completeness, existence and accuracy of [Anadarko's] dry hole expense" for the third quarter of 2016.[339]  In connection with these procedures, KPMG specifically reviewed the dry hole expense associated with the Shenandoah Project which, for Q3 2016, included the costs associated with the Shen 3 well.  This review included an analysis of Anadarko's rationale for the expense as well as an evaluation of "possible impairment in surrounding areas."[340]

166.    At the conclusion of its review procedures related to the expensing of the Shen 3 well costs as of September 30, 2016, KPMG documented the following conclusion regarding the propriety of that accounting determination:

> "KPMG notes that the Shenandoah-3 well was considered exploratory in nature until Q1 2016, at which point, given the overall success of the Shenandoah play, the well was transferred to the Company's developmental team for further analysis.  The Shenandoah-3 well was also a water drive reservoir, and as such required the use of a pressurized water to extract the resources.  Once under the management of the developmental team, the Company began evaluating the results of the exploratory activities, as well as whether or not the water injection technology developed for the Shenandoah-3 well would be applicable for other Shenandoah and Gulf of Mexico wells.  The development team began running various simulations utilizing the seismic information available.  Then during Q3 2016, the development team determined based on their modeling of the well, its results, and the analysis over the water injection that the Shenandoah-3 well would not be used as a water injection site and that it was not economically useful for other wells in the play.  As such, the determination was made to transfer the Shenandoah-3 well to dry hole expense during the 3rd quarter.  KPMG notes that it is not unreasonable for the Company to take 6-8 months of analysis (from the time the well was transferred to the development team in Q1 2016 to the time the decision was made to dry hole in Q3 2016) to determine the economic viability of an offshore well given the depth of the drilling and the inherent uncertainty around deepwater exploratory wells.  KPMG further notes that this timing is

---

[339] KPMG_APC_eA_0007469–475 at 469.
[340] KPMG_APC_eA_0007469–475 at 470.

CONFIDENTIAL

consistent with offshore wells analyzed in prior year audits, and as such [we pass on further review]."[341]

167.    Thus, KPMG concluded and documented in its "Suspended Well Costs Memo," dated October 20, 2016, that "based on the results of Shenandoah-5, the Company determined that it was no longer reasonably possible to use the Shenandoah-3 well in future development plans (*i.e.*, as a water injection site or sidetrack)."[342]

168.    Mr. Zajac provided additional deposition testimony regarding the procedures undertaken by KPMG related to Anadarko's decision to expense the Shen 3 well costs as of September 30, 2016.  Specifically, Mr. Zajac testified that the accounting was discussed within KPMG among at least eight to 10 accounting professionals, including members of the firm's professional practice group (which is typically responsible for consulting on challenging GAAP financial reporting issues encountered by the firm's audit teams), the review partner from the Anadarko audit team, and the firm's office of general counsel.[343]  These internal KPMG discussions included evaluation of whether expensing the Shen 3 well costs as of September 30, 2016 should be recorded as a correction of an error in Anadarko's previously issued financial statements.[344]  As a result of this review, the conclusion of the accounting professionals from KPMG (as Mr. Zajac testified "not just [the conclusion] of the engagement team, but [the conclusion] concurred on by the national office"[345]) was that the expensing of Shen 3 as of September 30, 2016 did not constitute the correction of an error in Anadarko's previously issued financial statements.[346]  This conclusion was reached in January 2017, and I have seen no evidence to suggest that KPMG has changed its assessment regarding Anadarko's accounting for the Shen 3 well costs.[347]

169.    At deposition, Mr. Regan testified that he did not recall that KPMG was "[in agreement] that it was appropriate to capitalize [Shen 3]," but rather that they did not take exception to

---

[341] KPMG_APC_eA_0007469–475 at 471.  I note that, based on its Q3 2016 review procedures related to the expensing of the Shen 3 well costs, KPMG concluded: "given that there is currently drilling in the area and the success of the other Shenandoah wells, KPMG does not consider it unreasonable that the remaining Shenandoah wells were not expensed as dry holes."  I address this conclusion, and Mr. Regan's failure to address this conclusion, in Section X.B.4.

[342] KPMG_APC_eA_0007382–399 at 382, 389.

[343] Zajac Deposition, pp. 145:1–147:6.

[344] Zajac Deposition, pp. 156:18–161:11; Exhibit 496, KPMG_APC_0026442–452.

[345] Zajac Deposition, p. 167:6–25.

[346] Zajac Deposition, p. 167:6–25.

[347] Exhibit 494, KPMG_APC_eA_0009644–668.

CONFIDENTIAL