Anadarko's Q3 2016 accounting for the Shen 3 well "based on materiality."[348]  This assertion is incorrect and contradicted by the deposition testimony of Mr. Zajac of KPMG.

170.    Mr. Regan's analysis did not address KPMG's conclusion and did not provide an explanation as to why its conclusion is not reasonable.  As a result, Mr. Regan failed to perform a competent and diligent analysis and, therefore, his opinions are unreliable.

**F.      Mr. Regan Fails to Establish that GAAP Required Anadarko to Expense Shen 3 Well Costs Prior to September 30, 2016**

171.    Mr. Regan opines that Anadarko's write-off of the Shen 3 well costs as of September 30, 2016 was "untimely."[349]  However, Mr. Regan fails to provide a reliable basis to justify his conclusion.

172.    As set forth above, Mr. Regan's opinion is predicated on an incomplete and erroneous interpretation of relevant GAAP, as well as on an evaluation of superseded guidance that was not authoritative at the time that Anadarko reached its accounting determinations.  In addition, his opinion is not based on thorough analysis.  He failed to limit his analysis to facts that were reasonably available as of the date Anadarko made its accounting determinations, and he failed to reconcile his opinions with the contemporaneous conclusions of other accounting professionals.  Because Mr. Regan failed to perform a competent and diligent analysis of Anadarko's accounting determinations, his opinion that the write-off of the Shen 3 well costs as of September 30, 2016 was "untimely" is unreliable.  As a result, Mr. Regan fails to establish that the Shen 3 well costs did not qualify for suspension through June 30, 2016.

**IX.    Mr. Regan Fails to Demonstrate that the Shen 3 Drilling Costs Were Material to Anadarko's Financial Statements**

173.    Mr. Regan opines that "Anadarko's Shen-3 related accounting errors and disclosure omissions caused the Company's financial statements to be materially misstated as of and for the annual and/or quarterly periods between December 31, 2014 and June 30, 2015."[350]  However,

---

[348] Regan Deposition, pp. 118:21–119:12.
[349] Regan Report, ¶ 68.
[350] Regan Report, ¶ 11.

CONFIDENTIAL

Mr. Regan's analysis in support of this opinion fails to meet the criteria of a competent and diligent analysis.

174.    Specifically, Mr. Regan's analysis is predicated on an evaluation of non-authoritative guidance, is not based on appropriate and reliable assumptions, and is not performed in a thorough manner.  As a result, Mr. Regan's analysis regarding the materiality of the Shen 3 well costs to Anadarko's financial statements is unreliable.

### A.    Mr. Regan's Opinion Is Predicated on an Evaluation of Non-Authoritative Guidance

175.    Prior to evaluating the implementation of Mr. Regan's materiality analysis, it is important to evaluate the guidance underpinning his materiality analysis.  Specifically, Mr. Regan performs his materiality analysis following the guidance contained in SAB 99.[351]  Despite Mr. Regan's claim that SAB 99 is "codified under GAAP at ASC 250-10-S99," SAB 99 is not GAAP.[352] Certain topics in the Codification include "SEC Sections," which are designated by an "S" preceding the Section number and may contain certain SEC rules, regulations, interpretive releases, or staff guidance related to that topic.[353]  These sections, which the FASB states are included for convenience, include both authoritative (*e.g.*, SEC rules) or non-authoritative (*e.g.*, SABs) guidance.[354]  As described below, Mr. Regan's claim that SAB 99 is "codified under GAAP" is incorrect and misleading.

176.    As described previously, SAB 99 specifically states that "[t]he statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval."[355]   Therefore, SAB 99 is not authoritative GAAP and does not establish an authoritative basis to judge materiality for purposes of evaluating financial reporting determinations.  Instead, SAB 99 provides the SEC Staff's view with respect to the evaluation of misstatements that are assessed to be quantitatively immaterial.  As

---

[351] Regan Report, ¶ 71.

[352] Regan Report, ¶ 71. As described previously, SAB 99 specifically states that "[t]he statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval." See, SAB 99.  The Codification establishes that only rules and interpretive releases of the SEC under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.  See, ASC 105-10-05-1.

[353] ASC 105-10-05-4.

[354] ASC 105-10-05-4.

[355] SAB 99.

CONFIDENTIAL

explained in SAB 99, "[t]his staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold."[356]

177.    Materiality determinations are made in a wide variety of financial reporting contexts (*e.g.*, the determination of whether a business combination requires disclosure in the financial statements).  SAB 99 was developed to provide the SEC Staff's interpretation of the concept of materiality with respect to one specific context: the determination of whether a misstatement in the financial statements, which has been determined to be quantitatively immaterial, is material to the financial statements.[357]  Therefore, SAB 99 is often referenced by financial reporting personnel when assessing materiality determinations in that context.  However, it does not provide the authoritative framework that is to be applied in all materiality contexts.  Instead, one should consider the authoritative literature regarding the concept of materiality to appropriately evaluate the materiality of the Shen 3 well costs to Anadarko's financial statements.  Just as SAB 99 is not included in GAAP, materiality is not defined in GAAP.  Notwithstanding its widespread use in accounting determinations, materiality also is a legal concept.[358]  In *TSC Industries v. Northway, Inc*., the Supreme Court held that a fact is material if there is "a substantial likelihood that the … fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[359]

178.    Mr. Regan fails to evaluate whether the purported misstatements in Anadarko's financial statements "would have been viewed by the reasonable investor as having significantly altered

---

[356] SAB 99.

[357] SAB 99.

[358] ASC 105-10-05-6 notes that the "provisions of the Codification need not be applied to immaterial items," but does not establish what is "immaterial" or "material."

[359] See, *TSC Indus.*, *Inc., v. Northway, Inc.,* 426 U.S. 438 (1976), pp. 449–450 (referring to *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)) in which the Supreme Court noted that determinations of materiality require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him...."  In September 2015, the FASB issued a Proposed Amendment to Statement of Financial Accounting Concepts in which the FASB "include[d] a brief summary of the U.S. Supreme Court's definition of materiality because that is the definition that [was] currently observed by the Board."  See, FASB Exposure Draft, "Proposed Amendments to Statement of Financial Accounting Concepts," September 24, 2015, pp. 1–2.  In August 2018, the FASB adopted the following definition of materiality:  "The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."  See, SFAC No. 8, *Chapter 3, Qualitative Characteristics of Useful Financial Information*, ¶ QC11.

CONFIDENTIAL

the 'total mix' of information."  Because Mr. Regan structured his analysis on non-authoritative guidance contained in SAB 99, and failed to recognize that the Supreme Court defined materiality in a ruling that pre-dated Anadarko's accounting determinations at issue in this matter, his analysis is fundamentally flawed.[360]  As a result, his opinion predicated on this analysis (that the Shen 3 well costs were material to Anadarko's December 31, 2014 financial statements) is unreliable.

### B.    Mr. Regan Failed to Perform a Sufficient Materiality Analysis

179.    Irrespective of the fundamental flaw related to his failure to address authoritative guidance regarding materiality, Mr. Regan's materiality analysis is further flawed in its application, resulting in an unreliable conclusion regarding the materiality of the Shen 3 well costs to Anadarko's financial statements as of December 31, 2014.

### 1.  Mr. Regan's Analysis Fails to Demonstrate the Relevance of the Financial Metrics Evaluated to the Information Needs of Investors

180.    In order to perform a competent and diligent analysis, Mr. Regan's materiality analysis must demonstrate a reliable basis for concluding that the financial metrics being evaluated are relevant to the information needs of investors.[361]  However, Mr. Regan's analysis fails to include such a basis.

181.    Mr. Regan applies this 5% threshold to the following line items from Anadarko's financial statements: 1) "Income (Loss) Before Income Taxes," which is included in Anadarko's Consolidated Statements of Income; 2) "Suspended Exploratory Well Costs," which is not a line item in any of Anadarko's financial statements but instead is included in a footnote to the financial statements; and 3) "Dry Hole Expense," which is not a line item in any of Anadarko's financial statements, nor included in the footnotes to the financial statements, but instead is

---

[360] Additionally, in a December 2007 speech on assessing materiality, an Associate Chief Accountant in the SEC's Division of Corporation Finance stated, "…we have to get back to where we should have been all along – the Supreme Court view and its focus on what's important to the reasonable investor."  See, SEC, "Speech by SEC Staff: Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments by Todd E. Hardiman," available at https://www.sec.gov/news/speech/2007/spch121107teh.htm.
[361] CIFR Report, p. 95.

CONFIDENTIAL

presented only within the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of Anadarko's annual (10-K) filing.[362]

182.    Mr. Regan has not provided any discussion of why these are "relevant disclosed amounts."[363] For example, Mr. Regan's analysis includes a comparison to "Dry Hole Expense" despite the fact that this amount is not presented in either Anadarko's financial statements or the associated footnotes.  Nor has Mr. Regan explained why "Income (Loss) Before Income Taxes," which includes for FY 2014 a $4.4 billion charge related to "Tronox-related contingent loss," is relevant.[364] The inclusion of this non-operating and non-recurring charge has the effect of lowering Anadarko's fiscal-year 2014 Income (Loss) Before Income Taxes by almost $4.4B and, thereby, significantly impacting Mr. Regan's measure of quantitative materiality as of December 31, 2014 (as well as the qualitative portion of his materiality analysis).[365]

183.    Similarly, Mr. Regan has failed to explain whether other "relevant disclosed amounts" exist.  For example, his analysis fails to compare the amount Mr. Regan asserts to be inappropriately capitalized to the following metrics, all of which are disclosed within Anadarko's financial statements: 1) Revenue (disclosed in the Consolidated Statements of Income); 2) Operating Income (disclosed in the Consolidated Statements of Income); and 3) Dry hole expense and impairments of unproved properties (disclosed in the Consolidated Statements of Cash Flows).

184.    The following table illustrates the impact on Mr. Regan's assessment of quantitative materiality as of December 31, 2014 if Mr. Regan had chosen to evaluate the impact of the alleged inappropriately capitalized amount against Revenue, Operating Income and Dry hole expense and impairments of unproved properties:

---

[362] Regan Report, ¶ 75.
[363] Regan Report, ¶ 75.
[364] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015, p. 48.
[365] Regan Report, ¶ 78.

CONFIDENTIAL

| Mr. Regan's Analysis | 12/31/2014 |
|---|---|
| *Suspended Shen 3 Costs* | *63.6* |
| Income (Loss) Before Income Taxes | 117.9% |
| Suspended Exploratory Well Costs | 4.2% |
| Dry Hole Expense | 8.4% |
| **Alternative Metrics** | **12/31/2014** |
| *Suspended Shen 3 Costs* | *63.6* |
| Revenue | 0.3% |
| Operating Income (Loss) | 1.2% |
| Dry hole expense and impairments of unproved properties | 5.1% |

185.    As this table demonstrates, when reasonable, alternative metrics are used, an accounting professional reasonably can conclude that the omitted fact would have been viewed by the reasonable investor as not having significantly altered the "total mix" of information made available.  Therefore, an accounting professional can reasonably conclude that the accounting for Shen 3 suspended well costs were not material as of December 31, 2014.

### 2. Mr. Regan's Analysis Fails to Consider that Information Regarding the Results of Shen 3 Was Available to Investors

186.    Even if one were to overlook that Mr. Regan's analysis failed to demonstrate that the presence or absence of hydrocarbons in an individual appraisal well bore is of material importance to investors, the information cited in the Regan Report makes clear that this information was available to investors as of February 2015.

187.    For example, Mr. Regan notes in his report that both ConocoPhillips and Marathon expensed the Shen 3 well costs as of December 31, 2014.[366]  Within its Form 10-K for fiscal year ended December 31, 2014, ConocoPhillips disclosed that the Shen 3 "appraisal well was spud in 2014 and expensed as a dry hole."[367]

### 3. Mr. Regan's Qualitative Analysis Is Insufficient

188.    In order to perform a competent and diligent analysis, as well as to comply with the due care requirements of the AICPA Forensic Standards cited by Mr. Regan, it is necessary that Mr. Regan's opinions be based on analysis that evaluates evidence in a rigorous manner.  However,

---

[366] Regan Report, ¶ 41.e.
[367] ConocoPhillips, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 24, 2015, p. 8.

CONFIDENTIAL

Mr. Regan's opinion that the Shen 3 well costs were material to Anadarko's December 31, 2014 financial statements is not based on a rigorous evaluation of the evidence produced in this matter.

189.    For example, as part of his assessment of qualitative indicators of materiality, Mr. Regan asserts that "Shen-3 results and the associated reduction in resource estimates was [*sic*] further significant considering that management's bonus were [*sic*] affected by performance goals that included consideration of MMBOE sales and related reserves."[368]  Mr. Regan offers no analysis to evaluate how the decision to suspend the Shen 3 drilling costs impacted Anadarko management bonuses.  He has not provided any analysis that shows that there is any connection at all between dry hole expense and "MMBOE sales and related reserves."[369]  Instead, he simply asserts that "the failure to appropriately expense Shen-3 as a dry hole expense indicated an increased possibility that the well could be used as a producing well."[370]

190.    The qualitative factor listed in SAB 99 on which Mr. Regan bases his materiality analysis states "whether the **misstatement** has the **effect** of increasing management's compensation – for example, by **satisfying** requirements for the award of bonuses or other forms of incentive compensation."[371]  Mr. Regan has identified no "effect," nor determined that the failure to expense Shen 3 well costs as of December 31, 2014 "satisf[ied]" requirements of Anadarko management compensation arrangements.  More fundamentally, he also has not demonstrated that failure to expense Shen 3 well costs was a "misstatement," as I established in Section VII.A.

191.    Furthermore, Mr. Regan's analysis of this "qualitative factor" further demonstrates the fundamental flaw in his materiality analysis as described in Section IX.A.  Specifically, Mr. Regan acknowledges in the analysis of this qualitative factor that the financial metric relevant to the compensation of Anadarko's executives included "MMBOE sales and related reserves."[372]  Presumably, these are the metrics that contribute to the determination of the compensation of Anadarko executives and also are metrics that influence decisions that users make on the basis of the financial information of Anadarko.[373]  However, Mr. Regan's quantitative assessment of materiality fails to address these metrics.

---

[368] Regan Report, ¶ 86.
[369] Regan Report, ¶ 86.
[370] Regan Report, ¶ 86.
[371] SAB 99 (emphasis added).
[372] Regan Report, ¶ 86.
[373] SFAC No. 8, *Chapter 3, Qualitative Characteristics of Useful Financial Information*, ¶ QC11.

CONFIDENTIAL

192.    Mr. Regan's qualitative analysis includes discussion of evidence that he purports to be "inconsistent"[374] with "disclosures asserting the success of Shen-3."[375]  However, Mr. Regan's discussion of this "inconsistent" information is misleading.  For example, Mr. Regan asserts that Patrick McGrievy (Deepwater GOM General Manager) "testified that based on the preliminary results from Shen-3, there were concerns regarding Shenandoah's size and commerciality."[376]  First, this statement is misleading because Mr. McGrievy was not testifying regarding concerns on the part of Anadarko management.  Instead, he was testifying regarding concerns on the part of a non-operating partner, ConocoPhillips.[377]  Mr. Regan also fails to address the fact that ConocoPhillips continued to support ongoing appraisal activities for the Shenandoah Project, as evidenced by their agreement to several AFEs that were proposed subsequent to the date of the communications regarding ConocoPhillips' "concerns" (*i.e.*, Shen 4, Shen 5, and Shen 6).[378]  Therefore, the alleged concern that ConocoPhillips had as of the date of this communication fails to demonstrate that ConocoPhillips, much less Anadarko, considered Shen 3 to be "unsuccessful."  Relatedly, it is important to acknowledge that each Partner may have unique interpretations of the results from exploratory-type stratigraphic test wells.  Therefore, it is not reasonable to point to "concerns" expressed by one Partner to assert that disclosures made by another Partner are misleading.[379]

193.    Mr. Regan's qualitative analysis also misrepresents evidence produced in this matter.  For example, Mr. Regan asserts that "Anadarko's Q4 2014 earnings release and operations report […] contained positive and incorrect statements regarding Shenandoah, particularly about finding 50% more resources rather than actually finding less."[380]  This statement is not supported by the document cited by Mr. Regan.  Specifically, Anadarko's Q4 2014 Operations Report, cited in footnote 137 to the Regan Report, does not state that Shen 3 found "50% more resources," but rather that Shen 3 "found approximately 50% (1,470 feet) more of the same well-developed **reservoir sands** 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged

---

[374] Regan Report, ¶ 83.
[375] Regan Report, ¶ 79.
[376] Regan Report, ¶ 84.
[377] Deposition of Patrick McGrievy, August 24, 2022 ("McGrievy Deposition"), pp. 147:9–150:14.
[378] APC-00636521–527; APC-00061952–953; APC-00089442–455.
[379] See, *e.g.*, APC-00029762; APC-00029952; APC-00173231.
[380] Regan Report, ¶ 82.

CONFIDENTIAL

sands."[381]  At deposition, Mr. Regan cited this document multiple times when asserting that Anadarko misrepresented the results of the Shen 3 well to KPMG.[382]  Mr. Regan has not provided a basis for his assertion that a disclosure related to the identified level of "reservoir sands" would be equivalent to a disclosure regarding the identified "resources" of the reservoir.

194.    Because Mr. Regan's materiality analysis fails to evaluate the evidence produced in the matter in a rigorous manner, the opinion based on that analysis (*i.e.*, that the Shen 3 well costs were material to Anadarko's December 31, 2014 financial statements) is unreliable.

## X.    Mr. Regan's Opinion that GAAP Required Anadarko to Impair the Shenandoah Project as of December 31, 2015 Is Flawed and Misleading

195.    On May 1, 2017, Anadarko disclosed in its Q1 2017 10-Q that the negative results obtained upon completion of the Shen 6 appraisal well and subsequent sidetrack, as well as developments in the commodity price environment at that time, led to the Company's decision in April 2017 to discontinue further appraisal activities in the Shenandoah field.[383]  The discontinuation of the Shenandoah appraisal program indicated that Anadarko no longer satisfied a GAAP requirement for continued capitalization of Shenandoah Project costs and, accordingly, approximately $902 million of total impairments were taken in Q1 2017 related to the Shenandoah Project:  1) $467 million impairment charge related to the unproven property asset (*i.e.*, non-producing leasehold properties or "NPLH") balance, and 2) $435 million in previously-suspended exploratory well costs.[384]

196.    Mr. Regan opines that Anadarko should have recorded these impairments as of December 31, 2015.[385]  However, as described in more detail in Section X.B, he fails to support this opinion with a competent and diligent analysis, which renders his opinion unreliable.

---

[381] APC-00349767–783 at 778 (emphasis added).

[382] See, *e.g.*, Regan Deposition, pp. 93:19–94:4.

[383] Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, pp. 12–13.

[384] Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, pp. 12–13; APC-00739080–081.

[385] Regan Report, ¶ 89.

CONFIDENTIAL

**A.     Anadarko's Decision to Impair Shenandoah Project Costs as of Q1 2017 Was Consistent with GAAP**

197.    As described above, authoritative guidance relevant to the assessment of the Shenandoah Project for impairment is contained in ASC 932-360-35.[386]  Based on my review of this guidance, Anadarko's decision to impair the Shenandoah Project as of March 31, 2017 and not as of an earlier period, is consistent with GAAP.

### 1. ASC 932-360-35-11 Establishes that Unproved Oil and Gas Properties Must be Assessed Periodically for Impairment

198.    GAAP provides that long-lived assets be assessed periodically for impairment.[387]  An impairment loss is recognized only if "the carrying amount of a long-lived asset … is not recoverable and exceeds its fair value."[388]  Specific to oil and gas producing properties, ASC 932-360 establishes that the impairment assessment is typically performed on a field-by-field basis or by logical grouping of assets if there is a significant shared infrastructure (*e.g.*, platform).[389]  In addition, under ASC 932, entities are required to periodically assess properties with no proved reserves (*i.e.*, "unproved properties") to determine whether they have been impaired.[390]  The Shenandoah Project is an unproved property and therefore subject to periodic impairment testing. Anadarko's internal accounting policy, "Accounting Bulletin 20.2" regarding "Non-Producing Leasehold Investments" ("A.B. 20.2"), reflects this guidance and states that "[a]ll non-producing leasehold investments shall be either periodically assessed for impairment or subjected to systematic impairment recognition on a group basis."[391]

199.    If the result of the assessment indicates that the property is impaired, ASC 932-360 requires entities to recognize a loss, calculated as the difference between the carrying amount of the asset and its estimated fair value, in the period in which it occurs.[392]  This is consistent with Anadarko's disclosures in its public SEC filings:

---

[386] See, Section V.C.3.
[387] ASC 360-10-35-15.
[388] ASC 360-10-35-17.
[389] ASC 932-360-35-8.
[390] ASC 932-360-35-11.  Unproved properties are defined as "properties with no proved reserves."  See, ASC 932-360-20.
[391] Exhibit 342, APC-00113409–417 at 409.
[392] ASC 932-360-35-8.

CONFIDENTIAL

"Properties and equipment are reviewed for impairment when facts and circumstances indicate that net book values may not be recoverable. In performing this review, an undiscounted cash flow test is performed at the lowest level for which identifiable cash flows are independent of cash flows from other assets. If the sum of the undiscounted future net cash flows is less than the net book value of the property, an impairment loss is recognized for the excess, if any, of the property's net book value over its estimated fair value."[393]

200.    The initial assessment of whether an asset might be impaired requires judgment. ASC 932-360 does not provide examples of impairment indicators; however, Anadarko's internal accounting policy A.B. 20.2 does identify the following factors that should be considered in assessing whether an impairment may be necessary:

- Company's intention to drill on the property;
- Industry activity in the immediate area;
- Other wells (dry or successful) drilled in the immediate area;
- Geological evaluation of the immediate area;
- Lease surrender terms and capital requirements; and
- Other factors deemed relevant by management.[394]

201.    A competent and diligent analysis of whether the Shenandoah Project should have been impaired prior to March 31, 2017 appropriately could include an assessment of these factors.

**2. ASC 932-360-35-13 Establishes that Exploratory-Type Stratigraphic Test Wells Are Assumed to be Impaired if the Sufficient Progress Criterion is Not Met or if There Exists Substantial Doubt About the Economic or Operational Viability of the Exploration Project**

202.    In addition to guidance related to the assessment for impairment of the NPLH asset (*i.e.*, the field), ASC 932-360 also contains guidance related to the evaluation of individual exploratory-type stratigraphic test wells for potential impairment. Specifically, ASC 932-360-35-13 states:

"If the sufficient progress criteria (see paragraphs 932-360-35-18 through 35-20) is not met, or if an entity obtains information that raises substantial doubt about

---

[393] Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017, p. 94.
[394] Exhibit 342, APC-00113409–417 at 415.

CONFIDENTIAL

the economic or operational viability of the project, the exploratory well or exploratory-type stratigraphic well shall be assumed to be impaired and its costs, net of any salvage value, shall be charged to expense."[395]

203.   This guidance establishes that previously-suspended well costs must immediately be expensed when the Sufficient Progress criterion is no longer satisfied, regardless of whether there is substantial doubt about the economic or operational viability of the project.  Therefore, the decision to expense previously suspended exploratory well costs does not establish that there is substantial doubt regarding the economic viability of the field.

### 3. The Decision to Impair the Unproved Property Balance Related to the Shenandoah Project and Expense the Previously-Suspended Well Costs Associated with the Shenandoah Project in Q1 2017 Was Consistent with ASC 932-360

204.   My review of the evidence produced in this matter indicates that Anadarko management's assessment that there were no indications of impairment of the unproved property prior to Q1 2017 was reasonable as the estimated recoverable resources for the Shenandoah field were sufficient to support the NPLH asset values assigned to the Shenandoah Project prior to the results of Shen 6 that became available in March 2017.[396]  In addition, it is clear that Anadarko continued to make sufficient progress towards sanctioning the Shenandoah Project through March 2017, including continued appraisal activities and allocation of resources to the project, which justified the continued suspension of Shenandoah well costs through December 31, 2016.

### a) The Sufficient Progress Criterion Was Satisfied Through December 31, 2016

205.   As described above, ASC 932-360-35-13 establishes that exploratory-type stratigraphic wells are assumed to be impaired (*i.e.*, the previously-suspended well costs must immediately be expensed) when the Sufficient Progress criterion is no longer satisfied *or* when substantial doubt exists about the economic or operational viability of the project.[397]  My review of the documents

---

[395] ASC 932-360-35-13.
[396] KPMG_APC_eA_0008001–005 at 002; APC-00307132–137 at 134.
[397] ASC 932-360-35-13.

CONFIDENTIAL

produced in this matter indicate that the Sufficient Progress criterion was satisfied through December 31, 2016.

206.    For example, Anadarko continued drilling in the Shenandoah field and continued the appraisal program as planned, with the spud of the fifth Shenandoah appraisal well (*i.e.*, Shen 6) on December 15, 2016.[398]  The objective of Shen 6 was to test "potential oil-water contacts and down-dip limits of the hydrocarbon column of the Upper and Lower Wilcox within the central-to-eastern flank of the Shenandoah structure" to assess the resource range.[399]  The drilling of the Shen 6 appraisal well was completed on February 8, 2017, but subsequent results suggested the presence of faulting between the Shen 6 and Shen 5 appraisal wells, which had negative implications on the amount of estimated recoverable resources for the field.[400]  Anadarko then drilled a sidetrack from Shen 6 to confirm oil/water contacts within this fault block to "provide additional resource size clarity and constrain the number of conceptual development options currently contemplated by the Shenandoah project team."[401]  In March 2017, Anadarko drilled a bypass to the sidetrack to "enable the well to be safely drilled to the previously proposed [total depth] and to effectively evaluate the Upper and Lower Tertiary sections."[402]

207.    In addition, contemporaneous notes from the quarterly meeting between members of Anadarko's Property Accounting and Exploration Planning groups also indicate that Anadarko was making sufficient progress with respect to the Shenandoah Project.  Specifically, notes from the meeting on December 20, 2016 ("Q4 2016 Impairment Meeting") state:

> "No changes to suspended wells.  Additional appraisal drilling is needed before the project is sanctioned, and Shenandoah-6 has just started drilling in December.  The well is designed as a test well and expected to have a sidetrack within 180-day clock that will be drilled to serve as a future producer.  The well is expected to be plugged after coring.  Property Accounting discussed treatment of

---

[398] APC-00719562–563 at 563.

[399] APC-00739080–081 at 081; APC-00307132–137 at 134.

[400] APC-01376854–857 at 854–855.  Property Accounting determined the Shen 6 well costs should be accounted for as a dry hole expense.  See, APC-00304205.

[401] APC-01376854–857 at 854.  The results of Shen 6 are further documented in a presentation titled, "Shenandoah #6: Recommendation to Sidetrack down-dip into Shen 5 FB."  See, APC-01271207.  See also, APC-00089442–455 at 443.

[402] APC-00090153–154 at 153.

CONFIDENTIAL

exploration well costs and the portion of the well below the sidetrack (future dry hole expense) is not expected to be reached by December 31."[403]

208.    Contemporaneous documents further indicate that the disappointing results of Shen 6 (including the results of the sidetrack and subsequent bypass to the sidetrack) in March 2017, in conjunction with developments in the commodity price environment at that time, led to Anadarko's decision in early April 2017 to no longer continue the Shenandoah appraisal program.[404]  Anadarko's decision to discontinue the appraisal program suggested that it no longer intended to drill on the leased property, at which point it no longer satisfied the Sufficient Progress criterion.

209.    As a result, it was reasonable and consistent with GAAP for suspended well costs associated with the Shenandoah Project to continue to be carried as assets through December 31, 2016 as long there was not substantial doubt regarding the economic or operational viability of the project at this time.

### b)  Evidence Demonstrates There Was Not Substantial Doubt Regarding the Economic or Operational Viability of the Shenandoah Project Prior to Q1 2017

210.    While GAAP does not specifically define the term "substantial doubt" in this context, GAAP does define "substantial doubt" in the context of an entity's ability to continue as a going concern.[405]  Specifically, "substantial doubt" about an entity's ability to continue as a going concern exists "when conditions and events, considered in the aggregate, indicate that it is probable that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued…."[406]  GAAP states that the term "probable" is used "consistently with its use in Topic 450 on contingencies."[407]  That is, ASC 450 requires a loss contingency to be recorded only if it is both probable and can be reasonably

---

[403] APC-00294937–944 at 937–938.
[404] APC-00739080–081 at 081; Exhibit 492, KPMG_APC_eA_0009897–920 at 911; Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, p. 12; APC-01281886.
[405] FASB, Master Glossary, "Substantial Doubt about an Entity's Ability to Continue as a Going Concern."
[406] FASB, Master Glossary, "Substantial Doubt about an Entity's Ability to Continue as a Going Concern."
[407] FASB, Master Glossary, "Substantial Doubt about an Entity's Ability to Continue as a Going Concern."

CONFIDENTIAL

estimated.[408] ASC 450 acknowledges that the likelihood that a future event or events will result in a loss can range from *remote* to *probable*, and identifies three areas within that range.[409] Each has a specific meaning within GAAP. "Probable" is defined as "likely to occur" and establishes a threshold that is generally considered to denote a high likelihood of occurrence (*i.e.*, 70% or more).[410] Publications by the "Big 4" accounting firms and academic research indicate that, in practice, "probable" often is interpreted as having at least a 70% to 75% chance of occurrence.[411]

211.    Therefore, an evaluation of whether substantial doubt existed about the economic or operational viability of the Shenandoah Project prior to the quarter ended March 31, 2017 should involve a thorough assessment of the information that was contemporaneously available to Anadarko's management regarding the economic and operational viability of the Shenandoah Project at that time, including whether any information existed that rose to the level of creating "substantial doubt" about the commercial viability of the project.

212.    Evidence I have reviewed demonstrates that Anadarko management did not conclude there was substantial doubt regarding the Shenandoah Project until the results of the Shen 6 well and related sidetrack and subsequent bypass to the sidetrack were available in March 2017.[412] For example, in a July 25, 2016 presentation about Shenandoah Project updates to Anadarko's Executive Committee, the sanctioning of the Shenandoah field was still targeted for Q3 2017 and

---

[408] ASC 450-20-25-2 ("An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: a. Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss; b. The amount of loss can be reasonably estimated.").

[409] ASC 450-20-25-1. ASC 450 uses the terms *probable*, *reasonably possible*, and *remote* to identify the three areas within that range, with *probable* being the highest threshold within the range.

[410] ASC 450-20-20; Deloitte, "A Roadmap to Accounting for Contingencies and Loss Recoveries," 2022, pp. 21, 143; Joseph Aharony and Amihud Dotan, "A Comparative Analysis of Auditor, Manager and Financial Analyst Interpretations of SFAS 5 Disclosure Guidelines," *Journal of Business Finance and Accounting* 31, nos. 3–4 (2004), pp. 475–504, p. 487, Table 3.

[411] Deloitte, "A Roadmap to Accounting for Contingencies and Loss Recoveries," 2022, pp. 21, 143; Joseph Aharony and Amihud Dotan, "A Comparative Analysis of Auditor, Manager and Financial Analyst Interpretations of SFAS 5 Disclosure Guidelines," *Journal of Business Finance and Accounting* 31, nos. 3–4 (2004), pp. 475–504, p. 487, Table 3. In this paper, "managers" include CFOs, controllers and other "top financial reporting managers." See also, Harrison, Kenneth and Lawrence Tomassini, "Judging the Probability of a Contingent Loss: An Empirical Study," *Contemporary Accounting Research*, Vol. 5 (2), Spring 1989, pp. 642–648.

[412] I note that while drilling at the Shen 6 appraisal well reached total depth in February 2017, the complete results of Shen 6 were not available until all operations at Shen 6 (including the Shen 6 sidetrack and subsequent bypass to the sidetrack) were completed in late March 2017. See, APC-00091554–563 at 554, 560. I address the evidence cited in Mr. Regan's analysis to support his conclusion that there was substantial doubt as of December 31, 2015 in Section X.B.

CONFIDENTIAL

initiation of extraction of oil was projected for July 2021.[413]  The presentation also highlighted the importance of the Shen 6 appraisal well, noting that the Shen 6 sidetrack was "essential to allow time to execute JOA activities leading up to 2018 FID and SOP Issuance."[414]  Similarly, in an August 2016 presentation to Anadarko's Board of Directors, an update on the Shenandoah Project was provided, which noted that while "current development economics" were challenged, the results of Shen 5 would "improve economics" and the appraisal program was progressing.[415]  A later presentation to the Executive Committee on September 14, 2016 indicated that "FDP preparation and approvals moved out due to Shen 5 timing" which delayed the target date for sanctioning the Shenandoah field from 2017 to early 2018, with the target for initiation of oil extraction moved to Q4 2021.[416]  In addition, this presentation indicated that Anadarko had proposed a budget for the Shenandoah Project from 2016 through 2018, with projected allocation of resources to the Shenandoah Project subsequent to December 31, 2017.[417]

213.    In addition to this contemporaneous documentation, former employees and officers of Anadarko provided testimony establishing that Anadarko did not have substantial doubt regarding the viability of the Shenandoah Project prior to completing its assessment of the Shen 6 results (including the sidetrack and bypass results) in March 2017.  For example, Mr. Kleckner testified that, during his tenure at the Company, Anadarko had not determined at any point that Shenandoah was not going to be commercially viable, nor did it pursue any exit strategies.[418]  Specifically, Mr. Kleckner testified that at the time of his departure in August 2016, Anadarko was still moving forward with the Shenandoah appraisal program and "[t]he company never reached any conclusion that Shenandoah was not economically viable."[419]  Mr. McGrievy also testified that as of February 2016, immediately prior to the spud of Shen 5, "we viewed this field [Shenandoah] as definitely very viable commercial[ly] going forward."[420]  Mr. McGrievy's testimony also is consistent with an e-mail in July 2016 from David Bennett (Financial Advisor)

---

[413] APC-00704026.
[414] APC-00704026.
[415] APC-00784657–769 at 761.
[416] APC-01228541.
[417] APC-01228541.
[418] Kleckner Deposition, p. 162:3–19.
[419] Kleckner Deposition, p. 165:3–14.
[420] McGrievy Deposition, pp. 284:23–285:16; Exhibit 271, APC-00069320–321.

CONFIDENTIAL

stating that "Pat McGrievy estimates the probability of sanctioning at 85%."[421]  Ms. Frye testified that the ultimate decision about whether to sanction the Shenandoah Project would depend on the success of the Shen 5 and Shen 6 appraisal wells, and that if they were successful, the sanctioning decision would likely have occurred in early 2018.[422]  As described above, Shen 5 encountered over 1,000 feet of net oil pay that would improve the economics of the Shenandoah Project.[423]

214.    Therefore, while contemporaneous documents that I have reviewed indicate that there were challenges that existed with respect to the Shenandoah Project prior to Q1 2017, those challenges appear to be consistent with the operational challenges that I understand to exist generally with deepwater exploration projects during the appraisal phase.  I have not seen evidence indicating that those challenges rose to the level of "substantial doubt" about the economic or operational viability of the Shenandoah Project prior to Q1 2017.  As described above, contemporaneous documents indicate that the complete results of Shen 6 in March 2017 and the corresponding decrease in the estimated resources led to substantial doubt about the economic viability of the project.  I note that despite this determination, Anadarko continued to evaluate the next steps for the Shenandoah Project even after it impaired the project.[424]  Specifically, Anadarko acknowledged that its decision to impair the Shenandoah Project was purely an accounting decision "bounded by prescriptive accounting methodology" that did "not reflect [its] position in defining a path forward action to commercialize Shenandoah."[425]

215.    As a result, it was reasonable and consistent with GAAP for suspended well costs associated with the Shenandoah Project to continue to be carried as assets through December 31, 2016.

---

[421] In 2016, Anadarko elected to exercise a portion of its preferred right for Marathon's working interest in Shenandoah.  A portion of the consideration was contingent on Anadarko sanctioning the Shenandoah development. This consideration was required to be recorded as a contingent liability, and the amount was estimated based on the "likelihood of sanctioning."  Property Accounting appears to have confirmed with Mr. McGrievy in or around July 2016 regarding the probability of sanctioning the Shenandoah development.  See, APC-00265282–286 at 283–285.

[422] Frye Deposition, pp. 290:22–292:18.

[423] APC-00002563–813 at 579; APC-00784657–769 at 761.

[424] See, *e.g.*, APC-01167170; APC-00308160; APC-00362397–399; APC-00325494–497.

[425] APC-00737596–597 at 596.  In a presentation dated April 4, 2017 regarding the path forward for the Shenandoah Project, three different strategies were presented: 1) maintain the status quo and progress forward and maintain earliest oil production in 2021; 2) reduce pace and preserve optionality ; and 3) exit basin by relinquishing lease or monetize.  The recommended path forward was to reduce pace and spending while preserving basin optionality, which involved realigning the partnership to more committed GOM players and evaluating other commercial solutions.  See, APC-00091671.

CONFIDENTIAL

### c) The Impairment of the Shenandoah Project in Q1 2017 Was Reasonable Given the Negative Shen 6 Results in March 2017

216.    As described above, in addition to expensing $435 million in previously-suspended exploratory well costs related to the Shenandoah Project, Anadarko also recognized a $467 million impairment charge related to the unproved property asset balance for the Shenandoah Project in Q1 2017.[426]  Contemporaneous documents indicate that Anadarko management's assessment that impairment was necessary in Q1 2017 was based primarily on the results of Shen 6 and the commodity price environment at that time, leading to an estimated fair value associated with the unproved property asset that was less than its carrying cost.

217.    For example, in an e-mail sent on April 6, 2017, Chris Champion (Chief Accounting Officer) indicated to Mr. Leyendecker and Danny Brown (Senior Vice President of International and Deepwater Operations) that "our respective teams have been working closely together to determine the impact of the results of the Shen 6 well on the NPLH and Suspended Well balances" and that in Q1 2017, a "significant portion of the NPLH balances that were allocated to the Shen Project from the Kerr purchase accounting" was going to be written off.[427] Specifically, Mr. Champion explained that "[t]he NPLH is being written down as a result of the negative resource estimate revision post-Shen 6."[428]  In addition, on April 9, 2017, Mr. Bennett asked Jennifer Roberts (a Manager in the Property Accounting group) whether the Shenandoah Project write down was due to "not having enough reserves to support the remaining Kerr McGee purchase price allocation."[429]  In response, Ms. Roberts confirmed that the "NPLH impairment [was] due to recoverability of resources necessary to transfer book value from KMOG [sic] purchase price allocation."[430]

218.    As a result, in my opinion, Anadarko's decision to write down $467 million of unproved property balance in Q1 2017 was reasonable, timely, and consistent with the GAAP requirements prescribed by ASC 932-360.

---

[426] Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017, pp. 12–13; APC-00739080–081.
[427] APC-00091782.
[428] APC-00091782.
[429] APC-00309632–633 at 632.
[430] APC-00309632–633 at 632.

CONFIDENTIAL

### B.    Mr. Regan's Analysis Is Flawed and Unreliable

219.    Mr. Regan opines that Anadarko should have recognized an impairment "when 'substantial doubt' about the [Shenandoah] project's economic viability existed (*i.e.*, by December 31, 2015)."[431]  However, the Regan Report fails to provide a critical and reasoned analysis in support of this conclusion.  Instead, Mr. Regan's analysis inappropriately incorporates data that was not available at the time the at-issue accounting determinations were made and ignores determinations reached by other accounting professionals.  Mr. Regan effectively assumes his conclusion without doing analysis.  His opinion that the Shenandoah Project should have been impaired as of December 31, 2015 is predicated primarily on an assumption that is inconsistent with evidence related to the status of the Shenandoah appraisal program throughout the Class Period.

### 1.  Mr. Regan's Analysis Is Biased by Hindsight

220.    In order to perform a competent and diligent analysis, Mr. Regan's analysis must incorporate "relevant data"[432] that was reasonably available to Anadarko when it reached its accounting determinations related to the impairment of the Shenandoah Project.[433]  Mr. Regan asserts that the Shenandoah Project should have been impaired as of December 31, 2015; his analysis in support of this opinion should be based solely on information that was reasonably available to Anadarko as of the filing of Anadarko's financial statements for the year ended December 31, 2015.

221.    Mr. Regan failed to perform a competent and diligent analysis because his analysis incorporates data that was not reasonably available to Anadarko at the time of the filing of its financial statements for the year ended December 31, 2015.  For example, Mr. Regan asserts that his conclusion that Anadarko was required to impair the Shenandoah Project as of December 31, 2015 is "consistent with the Company's actual write off of all related Shenandoah basin project costs […] during the quarter ended March 31, 2017."[434]  Mr. Regan fails to establish the

---

[431] Regan Report, ¶ 89.
[432] AICPA, "Statement on Standards for Forensic Services," ¶ 6.
[433] CIFR Report, p. 95.
[434] Regan Report, ¶¶ 89, 98.

CONFIDENTIAL

relevance of Anadarko's ultimate decision to impair the Shenandoah Project in 2017 to its earlier accounting determinations.

222.    Mr. Regan repeatedly refers to Anadarko's decision to impair the Shenandoah Project in 2017 as support for his conclusion.  For example, he cites it to support his assertion that "it is therefore unlikely that any additional exploratory efforts and costs undertaken by Anadarko would cause the Shenandoah basin project to become economically viable."[435]  He also refers to KPMG's evaluation of Anadarko's subsequent decision to write-off costs related to the Shenandoah project to support his conclusion.[436]  These observations regarding an accounting determination made in Q1 2017 have no bearing on the accounting judgments reached by Anadarko as of December 31, 2015, and completely disregard the factors that affected the Shenandoah Project between those two points in time (*e.g.*, changes in the commodity pricing environment, and the results of the second Shen 4 sidetrack, the Shen 5 well, and the Shen 6 well).[437]

223.    Because Mr. Regan's analysis is inappropriately predicated on hindsight (*i.e.*, information that was not reasonably available to Anadarko when it reached its own accounting determinations), it is flawed.  Therefore, the conclusions he reaches based on this analysis are unreliable.

## 2.  Mr. Regan's Analysis Disregards Relevant Information

224.    In order to perform a competent and diligent analysis, Mr. Regan's analysis should evaluate all relevant data.  Therefore, in order to opine as to whether "substantial doubt" regarding the economic viability of the Shenandoah Project existed as of December 31, 2015, Mr. Regan's analysis should address the status of the Shenandoah Appraisal program as of December 31, 2015.  Because he fails to perform this analysis, Mr. Regan's analysis is incomplete and his related conclusions are unreliable.

225.    As demonstrated in Section X.A.3, evidence I have reviewed demonstrates that Anadarko had a reasonable basis to conclude that there was not substantial doubt regarding the economic viability of the Shenandoah Project as of December 31, 2015.  As of the filing of Anadarko's

---

[435] Regan Report, ¶ 97.
[436] Regan Report, ¶ 99.
[437] See, Section III.C.

CONFIDENTIAL

December 31, 2015 financial statements, drilling of Shen 4 (including a sidetrack) was complete in September 2015 and, based on the results of this appraisal well, plans were in place for an additional appraisal well (Shen 5) which was to be drilled with the intention of serving as a production well (*i.e.*, a "keeper" well).[438]  Mr. Regan has not provided an explanation for why Anadarko (and its Partners) would continue to invest significant amounts of capital into the Shenandoah Project if, as he asserts, substantial doubt as to the economic viability of the Project existed as of December 31, 2015.

### 3.   Mr. Regan's Analysis Is Insufficient

226.    In support of his conclusion that Anadarko should have impaired the Shenandoah Project as of December 31, 2015, Mr. Regan cites three pieces of evidence that he purports to be "consistent with" Condition 3 (*i.e.*, that "there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable" as of December 31, 2015).[439]  However, the Regan Report fails to present a thorough analysis of this evidence, which renders the related conclusions unreliable.

227.    First, the Regan Report cites an internal Anadarko e-mail from October 2014 that Mr. Regan quotes: "Conoco had basically cut its estimated oil volumes in half following additional interpretations of the Shenandoah basin."[440]  However, the Regan Report fails to provide appropriate context for this communication.  First, this e-mail contains an interpretation of one of the Partners to the Shenandoah Project of the early results of the Shen 3 well, before it was even complete.[441]  The e-mail communication does not provide any insight into the view of Anadarko management regarding the results of the Shen 3 well.  Again, Partners may reach different conclusions, based on their own evaluations of the well results and their own professional judgments, which could result in differing accounting determinations.  Furthermore, this correspondence relates to a reporting period different from the reporting period in which Mr. Regan concludes Anadarko should have recognized an impairment of the Shenandoah Project. Specifically, the communication cited in the Regan Report is dated October 2014, more than a

---

[438] APC-00653389.
[439] Regan Report, ¶ 2.
[440] Regan Report, ¶ 101.
[441] Exhibit 259, APC-00013459–460 at 459.

CONFIDENTIAL

year prior to the period at which Mr. Regan asserts Anadarko should have recorded an impairment.[442]   Therefore, this communication is of questionable relevance to an evaluation of Anadarko's financial reporting determination as of December 31, 2015.   Lastly, the Regan Report has not reconciled its presentation of this communication with the reaction of ConocoPhillips to the impairment recognized by Anadarko in Q1 2017.   Specifically, contemporaneous e-mail communications demonstrate that Anadarko financial reporting personnel received "tremendous pushback from partners" regarding the disclosures Anadarko was preparing related to the impairment of the Shenandoah Project in Q1 2017.[443]   A representative from ConocoPhillips stated that ConocoPhillips was "extremely disappointed with the means by which Anadarko chose to notify the partnership" of Anadarko's decision to impair the Shenandoah Project in Q1 2017 and that ConocoPhillips "currently feel[s] it conveys a message which could easily be misinterpreted with regards to the status of the project and ongoing funding of some elements of the program."[444]   This communication occurred nearly two and a half years after the communication cited in the Regan Report as evidence of impairment and nearly 16 months after Mr. Regan claims Anadarko should have impaired the Shenandoah Project.   In its 10-K for the fiscal year ended December 31, 2017, ConocoPhillips disclosed that it impaired its share of the Shenandoah Project in 2017 "[f]ollowing the suspension of appraisal activity by the operator" in 2017.[445]

228.   The Regan Report also cites various internal Anadarko analyses reporting a "PIR10 measure" that Mr. Regan purports to demonstrate that there existed substantial doubt regarding the economic viability of the Shenandoah Project.   However, Mr. Regan's analysis of these documents is deficient and misleading.   For example,

- Despite Mr. Regan's assertion that a PIR10 value of 0.30 was a "general guideline and hurdle utilized for consideration of whether to transition an exploratory project like Shenandoah to commercial development,"[446] he fails to identify any Anadarko policy documentation that establishes this "hurdle."   Furthermore, Mr. Regan has provided no basis to conclude that a PIR10 value of less than 0.30 would support a conclusion that

---

[442] Exhibit 259, APC-00013459–460 at 459.
[443] APC-00736688–689 at 688.
[444] APC-00736694–695 at 695.
[445] ConocoPhillips, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 20, 2018, p. 6.
[446] Regan Report, ¶ 101.

CONFIDENTIAL

there was "substantial doubt" as that term exists in the relevant authoritative accounting literature.

- Mr. Regan also fails to provide appropriate context in his discussion of the PIR10 analyses, including how they were utilized within Anadarko. PIR10 analyses included various assumptions regarding factors that could ultimately impact the profitability of a project, including oil prices.[447] It was used by Anadarko personnel to evaluate the various elements of risk associated with a specific project at a specific period of time, and to model the impact of different inputs, such as the cost of development and price of oil.[448] I have seen no evidence establishing that these analyses were used by Anadarko to arrive at a decision whether to continue its Shenandoah appraisal program or to ultimately sanction the Shenandoah field.

- Lastly, Mr. Regan's discussion of the evidence he cites is incomplete. Specifically, Mr. Regan includes a table that he purports to show "a 'risked PIR of .22,' well below the .30 threshold above at $60 per barrel."[449] However, Mr. Regan only presents a portion of this table. Specifically, he removed from this table a column that reported the "$P_c$" value for each scenario. According to testimony from Ms. Frye, this value reported the "probability of commerciality."[450] Within the portion of the table not included by Mr. Regan, it is reported that each "risked mean" scenario has an 88.2% "probability of commerciality."[451] Mr. Regan has not reconciled his opinion that the economic viability of the Shenandoah Project was "not probable" with Anadarko's assessment that the "probability of commerciality" of the Shenandoah Project was 88.2% as of the date of this presentation (in or around January 2016).[452] This 88.2% probability of commerciality also exceeds Mr. Regan's interpretation of the "probable" threshold, which he testified he interpreted as 70%.[453] When asked at deposition whether he considered, for purposes of his analysis, the "probability of commerciality" measures included in Anadarko's

---

[447] Kleckner Deposition, p. 153:4–25.
[448] Kleckner Deposition, p. 153:4–25.
[449] Regan Report, ¶ 101.
[450] Frye Deposition, pp. 212:11–213:1.
[451] Exhibit 269, APC-00060382–383 at 383.
[452] Exhibit 269, APC-00060382–383 at 383.
[453] Regan Deposition, p. 137:7–18.

CONFIDENTIAL

analyses, Mr. Regan testified the he "couldn't use it because [he didn't] know what it means."[454]

229.    In addition, Mr. Regan also cites an internal Anadarko e-mail communication that he asserts provides evidence that an impairment of the Shenandoah Project was "imminent" by December 2016.[455]  Specifically, Mr. Regan cites a March 31, 2017 e-mail from Mr. McGrievy regarding an update to the "Q1, 2017 NBV for Shenandoah" in which he states, "I understand, talking with Luis, that Chris Champion did set the stage with some of the executive team in December, 2016 to let them know that a fairly substantial write-down at Shenandoah would be imminent in 2017."[456]  The Regan Report provides no additional analysis of this communication, and fails to address multiple elements of the communication that do not support Mr. Regan's conclusion.  For example,

- This communication is from March 2017 and relates to an event that purportedly occurred in December 2016, almost a year after Mr. Regan opines that Anadarko should have impaired the Shenandoah Project.  The Regan Report fails to establish the relevancy of this communication to the financial reporting determinations made by Anadarko as of December 31, 2015.

- The e-mail is a second- or third-hand account of an event that may or may not have occurred.  Mr. Regan fails to acknowledge that evidence produced in this matter has not corroborated whether Mr. Champion actually met with or discussed any potential impairment for Shenandoah assets with members of the executive team in December 2016.[457]

- Mr. Regan does not address the fact that this purported event is alleged to have taken place prior to the availability of the complete Shen 6 results, which were not available until March 2017.  As described above, an impairment of unproved property or NPLH assets exists when the carrying amount of the asset exceeds its fair value.  The fair value of the Shenandoah Project is in large part driven by the estimated resources of the field, which did not decrease significantly until the complete results of Shen 6

---

[454] Regan Deposition, pp. 151:20–155:10.
[455] Regan Report, ¶ 101.
[456] Exhibit 274, APC-00307805–807 at 805.
[457] McGrievy Deposition, pp. 268:13–272:2.

CONFIDENTIAL

were available in March 2017. Therefore, Mr. Regan fails to demonstrate how this e-mail indicates that the carrying amount of the Shenandoah NPLH exceeded its fair value in December 2016 (much less as of December 31, 2015).

230. Lastly, at deposition, Mr. Regan asserted that there existed "calculations which indicate there's an impairment on the entirety of the Shenandoah project" as of "March of 2015."[458] Specifically, Mr. Regan referred to a memorandum from the Anadarko Exploration and Development teams dated April 24, 2017, that recommended discontinuing appraisal activities at Shenandoah. The memorandum includes a statement that Anadarko's purchase of Marathon's working interest in the Shenandoah Project "provided a 2015 benchmark value of $46MM for Anadarko's 33% W[orking] I[nterest]."[459] However, Mr. Regan failed to perform any substantive analysis of this document. He has not addressed the fact that Anadarko's purchase of Marathon's working interest in the Shenandoah Project did not occur in 2015, but rather in April 2016.[460] Therefore, it is not clear what basis Mr. Regan has to conclude that this transaction establishes substantial doubt regarding the economic viability of the Shenandoah project as of December 31, 2015. More fundamentally, Mr. Regan has not performed any analysis of this document to support his assertion that the Shenandoah Project was impaired in its entirety. For example, he has not demonstrated the extent to which the transaction between Anadarko and Marathon was executed on an arms-length basis and, therefore, provides an estimate of fair market value. Indeed, there is evidence that this transaction was effected under compulsion, and therefore not indicative of fair value.[461] Mr. Regan has also not addressed the fact that Anadarko's acquisition of Marathon's working interest was executed through its preferential rights set forth in the Partners' Joint Operating Agreements, and involved simultaneous transactions with another Partner (Venari).[462] He also has not addressed the fact that the transaction resulted in Anadarko *increasing* its investment and working interest in the Shenandoah project, suggesting that the Company still anticipated that the Shenandoah Project was economically viable in April 2016 (which was corroborated by contemporaneous documents

---

[458] Regan Deposition, pp. 131:8–132:6.
[459] APC-01283759–768 at 761; Regan Deposition, pp. 134:19–135:11.
[460] Offshore Engineer, "Marathon sells Shenandoah stake," available at https://www.oedigital.com/news/449676-marathon-sells-shenandoah-stake.
[461] APC-00229007.
[462] APC-00265282–286; APC-00245433.

CONFIDENTIAL

and testimony of former employees and officers of Anadarko, as described in Section X.A.3). Instead of performing a competent and diligent analysis, Mr. Regan has instead repeatedly cited an amount from a memorandum as support for his assertion.[463]

231.    Because the Mr. Regan fails to evaluate evidence in a thorough manner, the conclusion reached by Mr. Regan based on this evidence (*i.e.*, that they are "consistent" with his assumption that there was substantial doubt regarding the economic viability of the Shenandoah Project) is unreliable.

### 4.    Mr. Regan's Analysis Fails to Address the Contemporaneous Conclusions of Other Accounting Professionals

232.    In addition to failing to reconcile his opinion with the available evidence regarding the status of the Shenandoah Appraisal Program as of December 31, 2015, Mr. Regan also fails to address the contemporaneous conclusions reached by other accounting professionals as of December 31, 2015 (as well as the conclusions reached through the date on which Anadarko ultimately impaired the Shenandoah Project).  Because he failed to address this evidence, Mr. Regan failed to support his opinion with critical and reasoned analysis, rendering his opinion unreliable.

233.    As mentioned previously, throughout the Class Period, KPMG evaluated numerous accounting decisions made by Anadarko with respect to the Shenandoah Project. KPMG concluded that Anadarko's accounting treatment was consistent with GAAP, including multiple evaluations of whether indicators existed that the Shenandoah Project was impaired.  For example,

- As part of its audit of Anadarko's financial statements for the fiscal year ended December 31, 2015, KPMG tested "the completeness and accuracy of [Anadarko's] significant offshore lease list and evaluate[d] the leases for NPLH impairment purposes as of 12/31/2015."[464]  As part of this testing, KPMG noted that it had tested the suspended well cost balance associated with the Shenandoah Project.  In a memorandum documenting this review, KPMG noted that Anadarko's plans for future development of the Shenandoah field (*e.g.*, the planned drilling of Shen 5) were "indicative of sufficient

---

[463] Regan Deposition, pp. 129:24–130:18, 131:8–132:6, 133:22–134:18, 142:23–143:18.
[464] KPMG_APC_eA_0006135.

CONFIDENTIAL

progress per FASB 932-360-35, and firm plans exist[ed] with established timetables for continued exploratory/appraisal drilling."[465] KPMG also noted that Anadarko "continue[d] to incur costs in the area which [was] further indicative of progress."[466]

- In connection with its review of the expensed Shen 3 well costs in Q3 2016, KPMG evaluated whether the expensing of these costs had any implications for the potential impairment of the Shenandoah Project more broadly.  As part of its review procedures, KPMG documented the following: "KPMG inquired of David Janise, General Manager Offshore, who noted that the results of the Shenandoah-3 well does not mean the rest of the overall area is unsuccessful. Rather, the well served to support the Company's development plan of the area. Said another way, given that there is currently drilling in the area and the success of the other Shenandoah wells, KPMG does not consider it unreasonable that the remaining Shenandoah wells were not expensed as dry holes."[467]

- In connection with its Q1 2017 review procedures, KPMG performed a review, in accordance with the guidance set forth in ASC 932-360-35-11, of the Non-Producing Leasehold Impairments recorded by Anadarko.[468]  In a memorandum documenting KPMG's review, KPMG noted that the determination to impair the Shenandoah project in Q1 2017 was based on the "results from the most recent well drilled, the Shenandoah-6 well, [which] reached nonproductive reserves" and, based on these results, "the Company and its partners lacked the management commitment to continue the exploration in the overall Shenandoah area."[469]  As part of its review procedures related to the impairment, KPMG performed an assessment to determine whether the impairment should have been recorded earlier.  Based on this assessment, KPMG concluded "that the timing of the NPLH impairment for GOM Exploration and Walker Ridge was appropriate given the results of the Shenandoah 6 well (dry hole as seen at Ql.GG.41), and the subsequent lack of management commitment to the area" and that "based on the triggering events that occurred, the impairments were recorded in the proper period."[470]

---

[465] KPMG_APC_eA_0006079–096 at 085.
[466] KPMG_APC_eA_0006079–096 at 085.
[467] KPMG_APC_eA_0007469–475 at 471.
[468] KPMG_APC_0009950–953.
[469] Exhibit 343, KPMG_APC_eA_0008461–464 at 462.
[470] KPMG_APC_0009950–953 at 952–953 (emphasis omitted).

Page 101

CONFIDENTIAL

234. Mr. Regan's analysis does not address any of KPMG's conclusions. As such, Mr. Regan fails to perform a critical and reasoned analysis because he fails to address the contemporaneous conclusions of other accounting professionals.

### 5. Mr. Regan's Opinion Is Predicated on an Assumption

235. Ultimately, in place of performing a competent and diligent analysis of the available information, Mr. Regan reached his opinion regarding the timing of the impairment of the Shenandoah Project based on an assumption provided to him.[471] As established above, the Regan Report fails to support this assumption with thorough analysis, and the analysis of the evidence purported to be "consistent" with this assumption fails to establish that the Shenandoah Project should have been impaired as of December 31, 2015.[472]

Respectfully submitted this 25th day of January, 2023

J. Richard Dietrich, PhD

---

[471] Regan Report, ¶ 93 ("**Pursuant to the understanding that Plaintiffs will establish that by December 31, 2015 there was substantial doubt that the Shenandoah basin project (as a whole) would be economically viable (i.e., Condition 3)**, Shenandoah-related assets were impaired under the relevant GAAP set forth above." (emphasis added)).

[472] See, Sections X.B.2 and X.B.3.

CONFIDENTIAL

**Appendix A**

# Documents Relied Upon
## Expert Report of J. Richard Dietrich, PhD

| No. | Document Title/Bates |
|-----|---------------------|
| | **Expert Reports** |
| 1. | Expert Report of D. Paul Regan, November 9, 2022. |
| | **Legal Pleadings** |
| 2. | Amended Complaint for Violations of the Federal Securities Laws, *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.,* filed on August 17, 2020. |
| | **Deposition Testimony** |
| 3. | Deposition of Chris Camden, July 14, 2022. |
| 4. | Deposition of Patrick McGrievy, August 24, 2022. |
| 5. | Deposition of Ernest A. Leyendecker III, September 22, 2022. |
| 6. | Deposition of Catherine Anne Green, September 28, 2022. |
| 7. | Deposition of Lea Frye, October 7, 2022. |
| 8. | Deposition of Robert Daniels, October 13, 2022. |
| 9. | Deposition of James Kleckner, October 14, 2022. |
| 10. | Deposition of Mark L. Zajac, November 2, 2022. |
| 11. | Deposition of D. Paul Regan, January 20, 2023. |
| | **Deposition Exhibits** |
| 12. | Exhibit 173, APC-00000768–769. |
| 13. | Exhibit 259, APC-00013459–460. |
| 14. | Exhibit 269, APC-00060382–383. |
| 15. | Exhibit 271, APC-00069320–321. |
| 16. | Exhibit 274, APC-00307805–807. |
| 17. | Exhibit 342, APC-00113409–417. |
| 18. | Exhibit 343, KPMG_APC_eA_0008461–464. |
| 19. | Exhibit 485, KPMG_APC_eA_0002511–529. |
| 20. | Exhibit 490, APC-00001864–865. |
| 21. | Exhibit 491, APC-00005093–100. |
| 22. | Exhibit 492, KPMG_APC_eA_0009897–920. |
| 23. | Exhibit 494, KPMG_APC_eA_0009644–668. |
| 24. | Exhibit 496, KPMG_APC_0026442–452. |
| | **Produced Documents** |
| 25. | APC-00001813 |
| 26. | APC-00002132 |
| 27. | APC-00002563 |
| 28. | APC-00012037 |
| 29. | APC-00012384 |
| 30. | APC-00018993 |
| 31. | APC-00029762 |
| 32. | APC-00029952 |
| 33. | APC-00061952 |
| 34. | APC-00089442 |
| 35. | APC-00090153 |
| 36. | APC-00091554 |
| 37. | APC-00091671 |
| 38. | APC-00091782 |
| 39. | APC-00147909 |
| 40. | APC-00147963 |
| 41. | APC-00152882 |
| 42. | APC-00153489 |
| 43. | APC-00153862 |
| 44. | APC-00154334 |
| 45. | APC-00154339 |
| 46. | APC-00156333 |
| 47. | APC-00171559 |
| 48. | APC-00173231 |
| 49. | APC-00220001 |
| 50. | APC-00223043 |
| 51. | APC-00229007 |
| 52. | APC-00245433 |
| 53. | APC-00265282 |
| 54. | APC-00284670 |
| 55. | APC-00294937 |

**Documents Relied Upon**
Expert Report of J. Richard Dietrich, PhD

| No. | Document Title/Bates |
| --- | --- |
| 56. | APC-00304205 |
| 57. | APC-00307132 |
| 58. | APC-00308160 |
| 59. | APC-00309632 |
| 60. | APC-00325494 |
| 61. | APC-00349767 |
| 62. | APC-00356404 |
| 63. | APC-00362397 |
| 64. | APC-00577160 |
| 65. | APC-00577161 |
| 66. | APC-00622586 |
| 67. | APC-00626533 |
| 68. | APC-00636521 |
| 69. | APC-00653389 |
| 70. | APC-00704026 |
| 71. | APC-00719562 |
| 72. | APC-00736688 |
| 73. | APC-00736694 |
| 74. | APC-00737596 |
| 75. | APC-00739080 |
| 76. | APC-00784657 |
| 77. | APC-00852342 |
| 78. | APC-00853569 |
| 79. | APC-00886732 |
| 80. | APC-00931740 |
| 81. | APC-01167170 |
| 82. | APC-01228541 |
| 83. | APC-01271207 |
| 84. | APC-01281886 |
| 85. | APC-01283759 |
| 86. | APC-01354805 |
| 87. | APC-01364738 |
| 88. | APC-01376854 |
| 89. | APC-01741046 |
| 90. | APC-01749352 |
| 91. | APC-01750958 |
| 92. | KPMG_APC_0009950–953 |
| 93. | KPMG_APC_eA_0002543 |
| 94. | KPMG_APC_eA_0006079 |
| 95. | KPMG_APC_eA_0006135 |
| 96. | KPMG_APC_eA_0007382 |
| 97. | KPMG_APC_eA_0007469 |
| 98. | KPMG_APC_eA_0008001 |
| 99. | KPMG_APC_eA_0008457 |

**SEC Filings**

| | |
| --- | --- |
| 100. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2006, filed on February 28, 2007. |
| 101. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2007, filed on February 29, 2008. |
| 102. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2008, filed on February 25, 2009. |
| 103. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2009, filed on February 23, 2010. |
| 104. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2010, filed on February 23, 2011. |
| 105. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2011, filed on February 21, 2012. |
| 106. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2012, filed on February 19, 2013. |
| 107. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2013, filed on February 28, 2014. |
| 108. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 20, 2015. |
| 109. | Cobalt International Energy, Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 23, 2015. |
| 110. | ConocoPhillips, Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 24, 2015. |
| 111. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2015, filed on February 17, 2016. |
| 112. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 17, 2017. |
| 113. | Anadarko Petroleum Corporation, Form 10-Q for the Quarterly Period ended March 31, 2017, filed on May 2, 2017. |
| 114. | Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 15, 2018. |
| 115. | ConocoPhillips, Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 20, 2018. |

**Appendix A**

## Documents Relied Upon
### Expert Report of J. Richard Dietrich, PhD

| No. | Document Title/Bates |
|-----|----------------------|
| 116. | Occidental Petroleum Corporation, Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 28, 2020. |

**Accounting Literature**

| | |
|-----|----------------------|
| 117. | Accounting Standards Codification, Topic 105, *Generally Accepted Accounting Principles* . |
| 118. | Accounting Standards Codification, Topic 360, *Property, Plant, and Equipment* . |
| 119. | Accounting Standards Codification, Topic 450, *Contingencies* . |
| 120. | Accounting Standards Codification, Topic 805, *Business Combinations* . |
| 121. | Accounting Standards Codification, Topic 932, *Extractive Activities – Oil and Gas* . |
| 122. | Accounting Standards Update No. 2010-03. |
| 123. | AU Section 110, *Responsibilities and Functions of the Independent Auditor* . |
| 124. | AU Section 722, *Interim Financial Information* . |
| 125. | FASB Exposure Draft, "Proposed Amendments to Statement of Financial Accounting Concepts," September 24, 2015. |
| 126. | FASB Master Glossary. |
| 127. | FASB Staff Position No. FAS 19-1. |
| 128. | Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information.* |
| 129. | Statement of Financial Accounting Concepts No. 8, *Chapter 1, The Objective of General Purpose Financial Reporting.* |
| 130. | Statement of Financial Accounting Concepts No. 8, *Chapter 3, Qualitative Characteristics of Useful Financial Information.* |
| 131. | Statement of Financial Accounting Standards No. 19, *Financial Accounting and Reporting for Oil and Gas Producing Companies* . |

**Public Materials and Information**

| | |
|-----|----------------------|
| 132. | AICPA, "Audit and Accounting Guides: Entities with Oil and Gas Producing Activities – Clarified," August 1, 2018. |
| 133. | AICPA, "Code of Professional Conduct." |
| 134. | AICPA, "Financial Reporting Executive Committee," available at https://www.aicpa.org/interestareas/frc/accountingfinancialreporting/finrec.html. |
| 135. | AICPA, "Statement on Standards for Forensic Services." |
| 136. | Anadarko Petroleum Corporation, "Anadarko Announces Another Deepwater Gulf of Mexico Discovery," February 4, 2009, available at http://media.corporate-ir.net/media_files/nys/apc/Shenandoah2-4-09.pdf. |
| 137. | Code of Federal Regulations, Title 17 – Commodity and Securities Exchanges, Chapter II – Securities and Exchange Commission, Part 210. |
| 138. | FASB, "Rules of Procedure." |
| 139. | FASB, "Standard-Setting Process," available at https://www.fasb.org/Page/PageContent?PageId=/about-us/standardsettingprocess.html&isstaticpage=true&bcpath=tff. |
| 140. | FASB, "Superseded Standards," available at https://fasb.org/page/PageContent?pageId=/reference-library/superseded-standards.html. |
| 141. | Financial Accounting Foundation, "FASB Accounting Standards Codification – About the Codification." |
| 142. | Offshore Engineer, "Marathon sells Shenandoah stake," available at https://www.oedigital.com/news/449676-marathon-sells-shenandoah-stake. |
| 143. | PCAOB, "Mission, Vision, and Values," available at https://pcaobus.org/about/mission-vision-values. |
| 144. | PCAOB, "About," available at https://pcaobus.org/about. |
| 145. | PCAOB, "Archive –Standing Advisory Group," available at https://pcaobus.org/about/advisory-groups/archive-advisory/standing-advisory-group. |
| 146. | PCAOB, "Basics of Inspections," available at https://pcaobus.org/oversight/inspections/basics-of-inspections. |
| 147. | PCAOB, "Enforcement," available at https://pcaobus.org/oversight/enforcement. |
| 148. | PCAOB, "Standards," available at https://pcaobus.org/oversight/standards. |
| 149. | SEC Advisory Committee on Improvements to Financial Reporting, "Final Report of the Advisory Committee on Improvements to Financial Reporting to the United States Securities and Exchange Commission," August 1, 2008. |
| 150. | SEC Staff Accounting Bulletin No. 99, Materiality, August 12, 1999. |
| 151. | SEC, "All About Auditors: What Investors Need to Know," June 24, 2002, available at: https://www.sec.gov/reportspubs/investor-publications/investorpubsaboutauditors#. |
| 152. | SEC, "Division of Enforcement," available at https://www.sec.gov/page/enforcement-section-landing. |
| 153. | SEC, "Filing Review Process," available at https://www.sec.gov/divisions/corpfin/cffilingreview. |
| 154. | SEC, "Financial Reporting Manual." |
| 155. | SEC, "Speech by SEC Staff: Remarks Before the 2006 AICPA National Conference on Current SEC and PCAOB Developments by Scott A. Taub," available at https://www.sec.gov/news/speech/2006/spch121106sat.htm. |
| 156. | SEC, "Speech by SEC Staff: Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments by Todd E. Hardiman," available at https://www.sec.gov/news/speech/2007/spch121107teh.htm. |
| 157. | SEC, "What We Do," available at https://www.sec.gov/about/what-we-do. |

**Other Documents**

| | |
|-----|----------------------|
| 158. | Brady, Jennings, and Shappard, "Petroleum Accounting:  Principles, Procedures and Issues," PwC, 8th Edition. |
| 159. | Bureau of Ocean Energy Management, U.S. Department of the Interior, "Deepwater Gulf of Mexico," December 31, 2019. |
| 160. | Deloitte, "A Roadmap to Accounting for Contingencies and Loss Recoveries," 2022. |
| 161. | Frank Jahn, Mark Cook, and Mark Graham, "Hydrocarbon Exploration and Production," 2nd Edition, (Oxford, UK: Elsevier, 2008). |
| 162. | Harrison, Kenneth and Lawrence Tomassini, "Judging the Probability of a Contingent Loss: An Empirical Study," Contemporary Accounting Research, Vol. 5 (2), Spring 1989. |
| 163. | Joseph Aharony and Amihud Dotan, "A Comparative Analysis of Auditor, Manager and Financial Analyst Interpretations of SFAS 5 Disclosure Guidelines," Journal of Business Finance and Accounting 31, nos. 3–4 (2004). |
| 164. | *TSC Indus., Inc., v. Northway, Inc.,*  426 U.S. 438 (1976). |

**Note:  In addition to the documents in this list, I relied upon all documents cited in my report, appendices, and backup.**

# J. RICHARD DIETRICH

Professor Emeritus of Accounting
Department of Accounting and Management Information Systems
The Ohio State University

| | | | |
|---|---|---|---|
| *University Address*: | 400 Fisher Hall<br>Fisher College of Business<br>The Ohio State University<br>2100 Neil Avenue<br>Columbus, OH 43210 | *Home Address*: |  |

EDUCATION:

Ph.D., Industrial Administration, Carnegie-Mellon University, 1981.

M.S., Accounting, Carnegie-Mellon University, 1977.

M.S., Measurement and Control, Carnegie-Mellon University, 1974.

B.S., Physics, Carnegie-Mellon University, 1973.

POSITIONS AT COLLEGES AND UNIVERSITIES:

Professor Emeritus of Accounting, The Ohio State University, 2020-present.

Professor of Accounting, The Ohio State University, 2000-2020.

Chair, Department of Accounting and MIS, The Ohio State University, 2000-2012, 2015-2016.

Professor of Accountancy, University of Illinois at Urbana-Champaign, 1991-2000.

Professor of Accounting, University of Texas at Austin, 1990-1991.

Associate Professor of Accounting, University of Texas at Austin, 1985-1990.

Visiting Associate Professor of Accounting, University of Chicago, 1987-1988.

Assistant Professor of Accounting, University of Texas at Austin, 1981-1985.

Visiting Assistant Professor of Industrial Administration, Carnegie-Mellon University, 1982-1983.

Instructor of Accounting, University of Texas at Austin, 1979-1981.

CONFIDENTIAL

**Appendix B**

ACADEMIC HONORS:

The Ohio State University Fisher College of Business, Executive MBA Faculty Recognition Award for Outstanding Teaching, June 2005.

Deloitte & Touche Professor, University of Illinois at Urbana-Champaign, 1991-2000.

Arthur Andersen & Co. Centennial Faculty Fellow, University of Texas at Austin, 1989-1991.

Peat Marwick Mitchell & Co. Centennial Faculty Fellow, University of Texas at Austin, 1984-1989.

University of Texas College of Business Administration Foundation Advisory Council Award for Teaching Innovation, 1986.

University of Texas University Accounting Association Outstanding Faculty Member Award, 1985.

University of Texas Joe D. Beasley Award for Teaching Excellence in the Graduate School of Business, 1984.

PROFESSIONAL EMPLOYMENT/CONSULTING EXPERIENCE/BOARD SERVICE:

Member, Financial Reporting Executive Committee (FinREC) of the American Institute of Public Accountants, September 2015-March 2019.

OSU Health Plan Inc., Board of Directors, Finance Committee Member and Chair, March 2007-June 2010, July 2011-December 2016.

Member, Standing Advisory Group of the Public Company Accounting Oversight Board, January 2007-December 2008.

Expert witness or consultant addressing securities litigation and professional responsibilities, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023.

National Association of Securities Dealers, Presenter for "Understanding the Sarbanes-Oxley Act Symposium," November 2003, April 2004, June 2005, July 2006.

U.S. Securities & Exchange Commission, Academic Fellow in the Office of the Chief Accountant, 1999-2000.

United States Business School in Prague, Faculty Instructor, Fall 1998, Fall 1999, Fall 2000.

Coopers & Lybrand, LLP, member of Academic Advisory Committee, 1994-1997.

AICPA National Management Advisory Services Training Program, Associate Director, June 1986, June 1987.

PUBLICATIONS: <u>Articles in Refereed Journals</u>

(with Karl A. Muller and Edward J. Riedl) "On the Validity of Asymmetric Timeliness Tests of Accounting Conservatism," *Review of Accounting Studies*, May 2022.

(with Zahn Bozanic and Bret Johnson) "SEC Comment Letters and Firm Disclosure." *Journal of Accounting and Public Policy*, September 2017.

"Discussion of Information Externalities Along the Supply Chain: The Economic Determinants of Suppliers' Stock Price Reaction to their Customers' Earnings." *Contemporary Accounting Research*, February 2011.

(with Karl A. Muller and Edward J. Riedl) "Asymmetric Timeliness Tests of Accounting Conservatism." *Review of Accounting Studies*, March 2007.

(with Steven Kachelmeier, Don Kleinmuntz, and Tom Linsmeier) "An Experimental Examination of Forward-Looking, Non-Financial Performance Disclosures." *Journal of Accounting Research*, September 2001.

(with Mary S. Harris and Karl A. Muller III) "The Reliability of Investment Property Fair Value Estimates", *Journal of Accounting and Economics*, October 2000.

(invited commentary) "Discussion of Voluntary Disclosure Choice and Earnings Information Transfer." *Journal of Accounting Research*, Supplement 1989.

(with Darwin Klingman, Michael Mannino, John Mote, Nancy V. Phillips, and David Schkade) "Educating Information Systems Managers: A New Approach," *Journal of Information Systems*, Spring 1989.

(with Robert B. Thompson and Chris Olsen) "The Influence of Estimation Period News Events on Standardized Market Model Prediction Errors," *The Accounting Review*, July 1988.

(with Robert B. Thompson and Chris Olsen) "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the Wall Street Journal Index." *Journal of Accounting Research*, Fall 1987.

(with Chris Olsen) "Vertical Information Transfers: The Association Between Retailers' Sales Announcements and Suppliers' Security Returns." *Journal of Accounting Research*, Supplement 1985.

(with James W. Deitrick) "Bond Exchanges in the Airline Industry: Analyzing Public Disclosures," *The Accounting Review*, January 1985.

(invited commentary)  "Discussion of Methodological Issues Related to the Estimation of Financial Distress Prediction Models: A Summary of the Discussion." *Journal of Accounting Research*, Supplement 1984.

"Effects of Early Bond Refundings: An Empirical Investigation of Security Returns." *The Journal of Accounting and Economics*, April 1984.

(with Walter T. Harrison and Lawrence A. Tomassini) "The Use of Control Groups in Capital Market Research." *Journal of Accounting Research*, Spring 1983.

(with Robert S. Kaplan) "Empirical Analysis of the Commercial Loan Classification Decision." *The Accounting Review*, January 1982.

(with Dennis Brandl and James M. Sivak) "Soft Landing a Simulated Rocket Under Computer Control." *Computer*, December 1975.

(with Roman L. Weil) "Partial Rank, Linear Management Information Systems." *The Accounting Review*, October 1974.

PUBLICATIONS: Articles in Non-Refereed Journals

(with D. Paul Newman) "Cooperative Behavior in a Multiperiod Agency Setting." (abstract only) *Proceedings of the American Accounting Association 1982 Mid-West Regional Meeting*.

WORKING PAPERS:

(with Karl A. Muller and Edward J. Riedl) "Regarding the Use of Return Variance Variables to Debias the Asymmetric Timeliness Measure," 2022.

GRANTS:

(with Steve Kachelmeier, Don Kleinmuntz and Tom Linsmeier) Coopers & Lybrand Foundation, "An Experimental Laboratory for Financial Reporting Standards: The Price Risk Experiment," $78,519, January 1998.

(with Don Kleinmuntz and Tom Linsmeier) Coopers & Lybrand Foundation, "An Experimental Laboratory for Financial Reporting Standards," $62,686, August 1996.

Accounting Education Change Commission, Project Discovery grant to the University of Illinois (co-author of proposal), $250,000, January 1991.

IBM Corporation, Management of Information Systems Grant (member of project team), $2.8 million, April 1985.

University of Texas, Project QUEST, "Large Scale Token Ring Network," $200,000 equipment grant, November 1986.

Peat Marwick Foundation, Research Opportunities in Auditing Grant, June 1984.

University of Texas, Graduate School of Business
Summer Research Grant, June-August 1985.
Summer Research Grant, June-August 1984 (funding not taken).
Academic Development Grant (with J.C. Fellingham), June-August 1982 (funding not taken).
Academic Development Grant (with J.C. Fellingham), June-August 1981.

University of Texas, University Reserach Institute
Research Grant (with Chris Olsen and Robert Thompson), Spring 1985.
Special Research Grant, November 1981.

**Appendix B**

SEMINAR AND CONFERENCE PAPERS PRESENTED:

American Accounting Association
> Accounting Program Leadership Group Meeting, February 2005.
> Annual Meeting, August 1998, August 1994, August 1989, August, 1987, August 1985, August 1984.
> Midwest Regional Meeting, March 1982

At universities
> The Ohio State University, February 2000, June 1998.
> Virginia Commonwealth University, December 1999.
> New York University, October 1997.
> Southern Methodist University, November 1994.
> Stanford University, July 1990.
> Duke University, March 1990.
> University of Illinois, February 1990.
> Texas Christian University, October 1987.
> University of Florida, November 1986.
> University of Michigan, March 1986.
> University of Pittsburgh, July 1983.
> Vanderbilt University, October 1982.
> Carnegie-Mellon University, October 1982.
> University of California at Berkeley, November 1981.
> Northwestern University, March 1980.
> University of Michigan, March 1980.

At other meetings:

American Medical Records Association Annual Meeting, "Training Information Managers of the Future," October 1988.

Workshop on Collaborative Learning Classrooms, "Integrating Technology into Teaching: Classroom 2000," University of Maryland, June 1988.

IBM Higher Education Conference, "Local Area Networks," March 1988.

OAC'86 (sponsored by The American Federation of Information Processing Societies-AFIPS), "Future Directions in Mainframe Connected Personal Computers," March 1986.

Conference on Accounting Earnings and Security Valuation: Current Research Issues, sponsored by the Institute of Professional Accounting of the University of Chicago, June 1985.

Workshop on the Impact of Micro-Computers In Graduate Schools of Business, Stanford University, February 1985.

Peat Marwick Mitchell & Co. Mid-South and Southwest Annual Bank Meeting, "Modeling Risk Classifications for Bank Loans and Receivables," June 1984.

**Appendix B**

DISCUSSANT, SESSION CHAIR, CONFERENCE ORGANIZER:

Session Chair, American Accounting Association Annual Meeting, 2002.

Session Chair, American Accounting Association Annual Meeting, 1994.

Session Chair, American Accounting Association Annual Meeting, 1992.

Discussant, American Accounting Association Annual Meeting, August 1987.

Discussant, American Accounting Association Annual Meeting, August 1981.

EDITORIAL SERVICE: Editorial Boards

Associate Editor, *Journal of Accounting and Economics*, 1991-1996.

Member, *The Accounting Review*, 1987-1989.

EDITORIAL SERVICE: Other

*Journal of Accounting Research*

*Journal of Accounting, Auditing and Finance*

*Quarterly Review of Economics and Business*

*Journal of Accounting and Public Policy*

*Contemporary Accounting Research*

*Journal of Finance*

*Journal of Financial and Quantitative Analysis*

OTHER REVIEW SERVICES:

Faculty reviews requested by the following institutions:
University of California at Irvine
University of Colorado
Emory University
Harvard University
University of Iowa
University of Michigan
University of Notre Dame
University of Oregon
University of Pennsylvania
University of Rochester
Southern Methodist University
Stanford University
Washington University

AACSB accounting accreditation reviews requested by the following institutions:
University of Arizona
University of Wisconsin

**Appendix B**

University of Miami
University of Kentucky
University at Buffalo, State University of New York
University of Utah
University of Southern California
Michigan State University
Virginia Tech

Program reviews requested by the following institutions:
University of Arizona
Claremont McKenna College
University of Iowa
University of Utah

MEMBERSHIP IN ACADEMIC ORGANIZATIONS:

American Accounting Association

POSITIONS IN ACADEMIC ORGANIZATIONS:

Member, Accreditation Quality Committee, Association to Advance Collegiate Schools of Business, July 2010-July 2013.

Member, Accounting Accreditation Committee, Association to Advance Collegiate Schools of Business, July 2007-June 2010.

Chair, American Accounting Association Committee on Regulation, 2006-2007.

American Accounting Association SEC Liaison Committee, 2000-2003.

American Accounting Association Committee on Notable Contributions to the Accounting Literature, 1982-83, 1987-88, 1999-2000.

American Accounting Association Outstanding Educator Award Committee, 1992-1993.

American Accounting Association Annual Program Committee, 1991-1992.

American Accounting Association Project Consulting Committee, 1981-1984.

INSTRUCTIONAL INNOVATIONS AND DEVELOPMENTS:

Revision of Illinois MBA core curriculum to integrated core curriculum. Principal designer of overall curriculum design; detailed accounting theme designer, 1994-1995.

Revision of Introductory Accounting courses at the University of Illinois to incorporate Project Discovery concepts and pedagogy, 1991-1994.

Associate Director of Project Discovery, a project to revise undergraduate accounting education; funded in part by a $250,000 grant to the University of Illinois from the Accounting Education Change Commission, 1991-1993.

**Appendix B**

Associate Director of the Information Systems Management Concentration, Graduate School of Business, University of Texas, a curriculum development project funded in part by a $1,000,000 grant from IBM Corporation, 1985-1991.  Duties included design and implementation of two MBA courses:

    BA 390C: Computer Systems Hardware and Software
    BA 390J: Data Communications, Networks, and Distributed Computing

FORMAL DEVELOPMENT AND RENEWAL: Conferences Attended

Annual Meeting, American Accounting Association, San Diego, CA, August 2017

FASB/AAA Conference, Norwalk, CT. January 2016.

FASB/AAA Conference, Norwalk, CT. January 2015.

FASB/AAA Conference, Norwalk, CT. January 2014.

FASB/AAA Conference, Norwalk, CT. December 2012.

FASB/AAA Conference, Norwalk, CT. December 2011.

Annual Meeting, American Accounting Association, Denver, CO, August 2011

FASB/AAA Conference, Norwalk, CT. November 2010.

Annual Meeting, American Accounting Association, San Francisco, CA, August 2010

FASB/AAA Conference, Norwalk, CT. November 2009.

FASB/AAA Conference, Norwalk, CT. November 2008.

FASB/AAA Conference, Norwalk, CT. November 2007.

Annual Meeting, American Accounting Association, Chicago, IL, August 2007

Accounting Program Leadership Group Annual Seminar, San Diego, CA, February 2007.

FASB/AAA Conference, Norwalk, CT. December 2006.

Annual Meeting, American Accounting Association, Washington, DC, August 2006

FASB/AAA Conference, Norwalk, CT. December 2005.

Financial Accounting and Reporting Section, American Accounting Association, Austin, TX. January, 2004

Accounting Program Leadership Group Annual Seminar, Las Vegas, NV, February 2004.

Annual Meeting, American Accounting Association, Orlando, FL, August 2004

FASB/AAA Conference, Norwalk, CT. December 2004.

PCAOB/AAA Conference, Washington, DC. December 2004.

Financial Accounting and Reporting Section, American Accounting Association, Orlando, FL., January, 2003

Annual Meeting, American Accounting Association, Honolulu, HI, August 2003

CONFIDENTIAL

**Appendix B**

Annual Update, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Washington, D.C., June 2003

FASB/AAA Conference, Norwalk, CT. December 2003

*Journal of Accounting and Economics* Conference, sponsored by the University of Rochester and the Massachusetts Institute of Technology, June 2001.

*Journal of Accounting Research* Conference, sponsored by the University of Chicago, May 1996.

Corporate Accounting Policy Seminar, sponsored by the American Accounting Association, October 1995.

Financial Reporting Research Conference, sponsored by the American Accounting Association and the Financial Accounting Standards Board,  December 1994.

Year 2000 Curriculum Conference, University of Southern California, March 1994.

Financial Reporting Research Conference, sponsored by the American Accounting Association and the Financial Accounting Standards Board,  December 1993.

Rethinking Financial Reporting: An Agenda for the Twenty-First Century, sponsored by Deloitte & Touche, April 1993.

DOCTORAL DISSERTATION COMMITTEES:

| Name | University | Year | Major Supervision | Reading Member |
|------|------------|------|-------------------|----------------|
| Neeraj Mittal | The Ohio State University | 2004 | Yes | |
| Taehee Choi | The Ohio State University | 2002 | | Yes |
| Greg Sommers | The Ohio State University | 2002 | | Yes |
| Takashi Yaekura | University of Illinois | 2000 | Yes | |
| Joe Comprix | University of Illinois | 2000 | Yes | |
| Vernon Richardson | University of Illinois | 1997 | Yes | |
| Karl Muller | University of Illinois | 1997 | Yes | |
| TJ Atwood | University of Illinois | 1995 | Yes | |
| Taehee Lee | University of Illinois | 1994 | Yes | |
| Thomas R. Finnegan | University of Illinois | 1993 | Yes | |
| William D. Terando | University of Illinois | 1993 | Yes | |
| David Manry | University of Texas | 1992 | Yes | |
| Craig Lefanowiz | University of Texas | 1990 | | Yes |
| Sid Howard Credle | University of Texas | 1989 | Yes | |
| In-Chul Na | University of Texas | 1987 | Yes | |
| Wayne H. Shaw | University of Texas | 1985 | Yes | |
| Jack Edward Wilkerson | University of Texas | 1984 | Yes | |
| Jean Marie Baldwin Hudson | University of Texas | 1984 | | Yes |
| Michael Lloyd Ettredge | University of Texas | 1982 | | Yes |

**Appendix B**

RECENT UNIVERSITY SERVICE

Ohio State University Senate; member, 2012-2016.

Ohio State University Senate Fiscal Committee; member, 2012-2018; chair 2013-2017.

Ohio State University Faculty Cabinet, member, 2013-2017.

Ohio State University Risk Management Committee; member, 2013-2020.

Ohio State University Research Committee, member, 2013-2017.

Ohio State University Parking Advisory Committee, member, 2015-2019.

**Appendix C**

## J. RICHARD DIETRICH
Testimony Provided Within Past Four Years

1. Securities and Exchange Commission v. RPM International, Inc. and Edward W. Moore, Case No. 1:16-cv-01803.  United States District Court for the District of Columbia.

   Deposition testimony: April 2019

2. In re: FIRSTENERGY SOLUTIONS CORP., et al., Debtors, Chapter 11, Case No. 18-50757 (Jointly Administered). United States Bankruptcy Court, Northern District of Ohio.

   Declaration filed: January 2020

3. In Re Chicago Bridge & Iron Company N.V. Securities Litigation, Case No. 1:17-CV-1580. United States District Court, Southern District of New York.

   Report filed: April 2020

4. DANIEL COHEN, individually and as next friend of RENEE COHEN, ALBERT COHEN, LAUREN COHEN, and MARTIN COHEN, BETTIE COHEN, ZEPHYR OIL & GAS FUNDING CO., LLC, ZEPHYR ACQUISITION HOLDINGS LLC, COHEN CAPITAL MANAGEMENT, and COHEN ASSET MANAGEMENT LLC, Plaintiffs, VS. CHICAGO BRIDGE & IRON COMPANY N.V., PHILIP K. ASHERMAN, RONALD A. BALLSCHMIEDE, and WESTLEY S. STOCKTON, Defendants. CASE NO. 17-10-128720, DISTRICT COURT OF MONTGOMERY COUNTY, TEXAS, 457th JUDICIAL DISTRICT.

   Report filed: December 2020
   Deposition Testimony: December 2020
   Trial Testimony: January 2021

5. Carolyn J. Logan, Plaintiff, v. Salix Pharmaceuticals, Ltd., and Valeant Pharmaceuticals International, N/K/A Bausch Health Americas, Inc., Defendants. Case No. 2019-0059-SG, In the Court of Chancery of the State of Delaware.

   Report filed: May 2022
   Deposition Testimony: January 2023

# Exhibit 109



# About the Codification

## (v 5.11)

February 2023 (v 5.11)

# FASB Accounting Standards Codification®
## About the Codification
## (v 5.11)

***About the Codification* version numbers** – *About the Codification* contains a version number indicating the degree of change within a particular version. Versions ending with ".0" represent substantive changes to the text, whereas versions ending with a number other than zero represent editorial or clerical corrections.

|  | Page |
|---|---|
| FASB Accounting Standards Codification® | 3 |
| Codification Research System | 4 |
| Content Matters | 5 |
| Population of codified standards as of July 1, 2009 | 5 |
| Standards issued by standard setters other than the SEC | 5 |
| Standards issued by the SEC | 6 |
| Cross-referencing between standards and Accounting Standards Updates and the Codification | 6 |
| Grandfathered content excluded from the Codification as of July 1, 2009 | 7 |
| General | 7 |
| Non-GAAP | 7 |
| Governmental accounting standards | 7 |
| Structure and Style Matters | 8 |
| Classification codes | 8 |
| Topical structure | 8 |
| Accounting Standards Codification Hierarchy | 8 |
| Topics | 8 |
| Subtopics | 9 |
| Sections | 9 |
| Subsections | 13 |
| Paragraph groups | 14 |
| Paragraphs | 14 |
| Referencing the Codification in notes to financial statements and other documents | 14 |
| Broad references in notes to financial statements | 14 |
| Detailed references in other documents | 14 |
| Content-related structure and style matters | 15 |

Page

Intersecting content.................................................................................................15

Editorial standards, style, and other matters ...........................................................15

Glossary...............................................................................................................16

Show All in One Page .........................................................................................16

General Codification matters .................................................................................17

Materiality ..........................................................................................................17

Ongoing standard-setting process...........................................................................18

Effective date and superseded standards..................................................................18

Ongoing standard-setting process...........................................................................18

Pending Content....................................................................................................18

Maintenance Updates.............................................................................................19

Feedback...............................................................................................................19

GAAP Financial Reporting Taxonomy and SEC Reporting Taxonomy........................21

Background ...........................................................................................................21

Section 75,GAAP Taxonomy Elements ..................................................................21

Codification Paragraphs .........................................................................................22

## FASB Accounting Standards Codification®

Welcome to the Financial Accounting Standards Board (FASB) *Accounting Standards Codification*® (Codification).

The FASB *Accounting Standards Codification*® is the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied to nongovernmental entities. The Codification is effective for interim and annual periods ending after September 15, 2009. All previous level (a)-(d) US GAAP standards issued by a standard setter are superseded. Level (a)–(d) US GAAP refers to the previous accounting hierarchy. All other accounting literature not included in the Codification will be considered nonauthoritative. See Codification Topic 105, Generally Accepted Accounting Principles, for additional details.

The Codification structure is significantly different from the structure of previous standards. This document provides information that will help in obtaining a good understanding of the Codification structure, content, and style.

© 2023 Financial Accounting Foundation

## Codification Research System

The *FASB Accounting Standards Codification*® Research System (Codification Research System) streamlines the research process. The Codification Research System has numerous features to assist users with research.

The benefit of performing research using the Codification is that users can identify all related content in one location much more easily than researching the thousands of previous standards. The FASB suggests the following steps when conducting research:

1. Browse the topical structure and related tables of contents. Because all related content is organized topically, users should be able to identify most content by topical browsing. Based on direct feedback, more than ninety percent of users responded that they know the Topic that they need to research.

2. Users should use the text search feature only for very specific items (for example, guidance about inducements). Text search is based on specific language. Deviations from a selected search expression will lead to certain relevant content being excluded from search results. The Codification Research System does incorporate certain tools to help overcome the issue, but searching will always be constrained.

February 2023 (v 5.11)

## Content Matters

### Population of codified standards as of July 1, 2009

#### Standards issued by standard setters other than the SEC

The Codification includes all authoritative literature (defined as level (a)–(d) US GAAP of the previous US GAAP hierarchy) issued by a standard setter. It does not include standards for state and local governments. The source of the standards was the *as-amended* versions as provided by the standard setter. Therefore, the Codification does not identify documents that solely amend other standards. For example, FASB Statement No. 149*, Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, is an amendment of FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*, so the content of Statement 149 is included through the as-amended version of Statement 133.

As of July 1, 2009, the Codification was composed of the following literature issued by various standard setters:

1. Financial Accounting Standards Board (FASB)
   a. Statements (FAS)
   b. Interpretations (FIN)
   c. Technical Bulletins (FTB)
   d. Staff Positions (FSP)
   e. Staff Implementation Guides (Q&A)
   f. Statement No. 138 Examples.
2. Emerging Issues Task Force (EITF)
   a. Abstracts
   b. Topic D.
3. Derivative Implementation Group (DIG) Issues
4. Accounting Principles Board (APB) Opinions
5. Accounting Research Bulletins (ARB)
6. Accounting Interpretations (AIN)
7. American Institute of Certified Public Accountants (AICPA)
   a. Statements of Position (SOP)
   b. Audit and Accounting Guides (AAG)—only incremental accounting guidance
   c. Practice Bulletins (PB), including the Notices to Practitioners elevated to Practice Bulletin status by Practice Bulletin 1
   d. Technical Inquiry Service (TIS)—only for Software Revenue Recognition.

© 2023 Financial Accounting Foundation

**Standards issued by the SEC**

To increase the utility of the Codification for public companies, portions of authoritative content issued by the SEC and selected SEC staff interpretations and administrative guidance have been included for reference in the Codification, such as:

1. Regulation S-X (SX)
2. Financial Reporting Releases (FRR)/Accounting Series Releases (ASR)
3. Interpretive Releases (IR)
4. SEC Staff guidance in:
   a. Staff Accounting Bulletins (SAB)
   b. EITF Topic D and SEC Staff Observer comments.

The section titled Securities and Exchange Commission (SEC) Sections provides technical information on how SEC content is presented.

The SEC Sections do not contain the entire population of SEC rules, regulations, interpretive releases, and staff guidance. For example, the Codification does not include all content related to matters outside the basic financial statements, such as Management's Discussion and Analysis (MD&A), or to auditing or independence matters.

Content in the SEC Sections is expected to change over time in accordance with the SEC's normal procedures for making changes to SEC rules, regulations, interpretive releases, and staff guidance. The SEC's normal update procedures are not changed by the inclusion of SEC content in the Codification, and, accordingly, there may be delays between the release of the SEC's changes and updates to the Codification.

The Codification does not replace or affect guidance issued by the SEC or its staff for public companies in their filings with the SEC. Furthermore, the content labeled as SEC staff guidance does not constitute rules or interpretations of the SEC, nor does such guidance bear official Commission approval.

If you find any discrepancies between the SEC content as presented in the Codification and the underlying SEC content, please use the content feedback feature of the online Codification Research System to submit your comments.

## Cross-referencing between standards and Accounting Standards Updates and the Codification

The Codification includes a Cross Reference report that allows users to identify where previous standards reside in the Codification, or the standards contained in a specific location in the Codification. Similarly, the report displays a detailed list of all content included in the Codification together with the specific location(s) within the Codification.

1. If the Cross Reference report lists the source of the content, then the FASB deemed the content as authoritative material for purposes of the Codification.
2. If the Cross Reference report does not list the source of the content from existing authoritative literature, then the FASB deemed it as superseded or nonessential. Although, in a limited number of cases, the source for authoritative content does not

appear because the FASB replaced the content with content from other standards.

For each piece of standards content used in the Codification, the Cross Reference report includes the following information:

1. *Standards*. Standard type, year (if applicable), number, and paragraph.
2. *Codification*. Topic, Subtopic, Section, and paragraph.

## Grandfathered content excluded from the Codification as of July 1, 2009

### General

The authoritative release of the Codification as of July 1, 2009, excludes grandfathered material. Users need to access the relevant standards for such grandfathered items. See Codification Section 105-10-70 for a discussion of grandfathered material.

## Non-GAAP

The FASB concluded that the Codification represents authoritative US GAAP. Therefore, the Codification does not include guidance for non-GAAP matters such as:

1. Other Comprehensive Basis of Accounting (OCBOA)
2. Cash Basis
3. Income Tax Basis
4. Regulatory Accounting Principles (RAP).

## Governmental accounting standards

The Codification does not include governmental accounting standards.

© 2023 Financial Accounting Foundation

February 2023 (v 5.11)

## Structure and Style Matters

## Classification codes

The FASB developed a hybrid classification system specifically for the Codification.

The following is the structure of the classification system:

XXX-YY-ZZ-PP where XXX = Topic, YY = Subtopic, ZZ = Section, PP = ParagraphIn

the case of SEC content, an "S" precedes the Section number.

## Topical structure

### Accounting Standards Codification Hierarchy

#### *Topics*

Topics represent a collection of related guidance. For example, Leases is a Topic. The Topics correlate very closely to standards issued by the International Accounting Standards Board (IASB).

The Topics reside in Areas which can be categorized as follows:

1.  The General Principles Area (Topic Codes 105–199).

2.  The Presentation Area (Topic Codes 205–299) addresses how information is presented in the financial statements.

3.  The Assets, Liabilities, and Equity Areas (Topic Codes 305–399, 405–499, and 505–599, respectively) contain guidance about accounting for assets, liabilities, and equity (e.g., cash,accounts payable, additional paid-in capital).

4.  The Revenue and Expenses Areas (Topic Codes 605–699 and 705–799, respectively) contain guidance about accounting for revenues, expenses, gains, and losses.

5.  The Broad Transactions Area (Topic Codes 805–899) contains guidance about various financial statement accounts and its Topics are generally event or transaction-oriented for example, business combinations, derivatives, nonmonetary transactions).

6.  The Industry Area (Topic Codes 905–999) contains guidance about specific industries or types of activity.

### Industry and Broad Transaction Topics

The following approach was applied for placing content into the Codification Topics:

1.  First filter—Industry content. If a piece of content related solely to a single industry, thecontent was placed in that particular industry.

2.  Second filter—Broad transaction content. If a piece of content did not relate to a singleindustry and it related to a broad transaction, the content was placed in that broad transaction.

3.  For all other content that did not meet the industry or broad transaction filters, the content was authored in a general Topic.

© 2023 Financial Accounting Foundation                                                    **9** of **23**

One of the goals of the Codification was to eliminate redundant content, which can result in user confusiongeneral guidance in the Industry Topics, Industry Topics only contain incremental industry-specific guidance. The entities within the scope of the industry must follow the industry-specific guidance and all other relevant guidance contained in other Topics that does not conflict with theindustry guidance.

To provide consistency, the Codification segregates Industry Topics into Subtopics that mirror the general Topic structure. This provides multiple ways to access the content—by Industry Topic or by general Topic.

### Subtopics

Subtopics represent subsets of a Topic and are generally distinguished by type or by scope. For example, Operating Leases and Capital Leases are two Subtopics of the Leases Topic distinguished by type of lease. Each Topic contains an Overall Subtopic that generally represents the pervasive guidance for the Topic. Each additional Subtopic represents incremental or unique guidance not contained in the Overall Subtopic. In some cases, the Overall Subtopic represents overall guidance. In other cases, the Overall Subtopic may not contain overall guidance but, instead, may represent miscellaneous content that does not fit into another Subtopic.

Subtopics unique to a Topic use classification numbers between 00 and 99. In addition, Topics—primarily Industry Topics—may contain Subtopics that mirror the general Topics. For example, the general Receivables Topic is 310, the general Inventory Topic is 330, and the Agriculture Topic is 905. The Agriculture Topic may include Subtopics for Receivables, Inventory, and so forth. The Subtopic classification number is the classification number of the related Topic. In this case:

1.  Agriculture—Receivables is 905-310.
2.  Agriculture—Inventory is 905-330.

For additional details, see the discussion under the heading titled Intersecting content.

### Sections

Sections represent the nature of the content in a Subtopic such as Recognition, Measurement, Disclosure, and so forth. Every Subtopic uses the same Sections. If there is no content for a Section then the Section will not display.

Similar to Topics, Sections correlate very closely with Sections of individual International Financial Reporting Standards.

The Sections of each Subtopic are as follows:

XXX-YY-ZZ where XXX = Topic, YY = Subtopic, ZZ = Section

| XXX-YY-00 | Status |
| XXX-YY-05 | Overview and Background |
| XXX-YY-10 | Objectives |
| XXX-YY-15 | Scope and Scope Exceptions |
| XXX-YY-20 | Glossary |

| | |
|---|---|
| XXX-YY-25 | Recognition |
| XXX-YY-30 | Initial Measurement |
| XXX-YY-35 | Subsequent Measurement |
| XXX-YY-40 | Derecognition |
| XXX-YY-45 | Other Presentation Matters |
| XXX-YY-50 | Disclosure |
| XXX-YY-55 | Implementation Guidance and Illustrations |
| XXX-YY-60 | Relationships |
| XXX-YY-65 | Transition and Open Effective Date Information |
| XXX-YY-70 | Grandfathered Guidance |
| XXX-YY-75 | XBRL  Elements |

The following is a description of the Sections:

XXX      YY-00      Status

This Section includes references to the Accounting Standards Updates that affect the Subtopic. For example, the Section includes information similar to the following:

1. Paragraph 310-10-35-1A added by Accounting Standards Update 2022-01.
2. Paragraph 360-10-35-7 amended by Accounting Standards Update 2014-09.
3. Paragraph 810-10-50-5 superseded by Accounting Standards Update 2009-17.

XXX-YY-05   Overview and Background

This Section provides a general overview and background on the Subtopic. It does not provide historical background of the standard setter, due process, or similar items. It may contain certain material generally considered useful to a user to understand the typical situations required by the standard. This Section does not summarize the requirements of the Subtopic.

XXX-YY-10            Objectives

When available, the Objectives Section states the high-level objectives of the Subtopicbut does not discuss the main principles of the Subtopic.

XXX-YY-15            Scope and Scope Exceptions

This Section outlines the items (for example, the entities, transactions, instruments, or events) to which the guidance in the Subtopic does or does not apply. It does not containactual accounting or reporting guidance (for example, subsequent measurement).

In cases where a Topic contains multiple Subtopics, the Overall Subtopic typically contains the pervasive scope for the entire Topic, including the other Subtopics. The remaining Subtopics then refer to the Overall Subtopic and address the specific exceptions from the pervasive Overall Scope. Users must be aware that the Overall ScopeSection is not a summary but, instead, represents the scope for the Overall Subtopic and the baseline for the other Subtopics, which may include different scope inclusions or exclusions.

February 2023 (v 5.11)

In many circumstances, guidance codified in a Subtopic may apply equally to all items within the Subtopic's scope. However, certain codified guidance within the Subtopic may apply only to a subset of items (such as restricted scope guidance). In those circumstances, the restricted scope language was placed with the restricted scope guidance. For example, if a certain measurement standard was allowed only for a specific transaction, then the restricted scope would appear only in the corresponding measurement Section together with the specific measurement requirement.

As described in the discussion under the heading titled Intersecting content, the majority of Industry Subtopics intersect with General Topics. In these cases, users must be cognizant of the Industry Topic scope and the related General Topic scope.

XXX-YY-20    Glossary

This Section contains all the glossary terms used in the Subtopic.

The Master Glossary contains all terms identified as glossary terms throughout the Codification. Clicking on any term in the Master Glossary will display where the term is used. The Master Glossary may contain identical terms with different definitions, some of which may not be appropriate for a particular Subtopic. For any particular Subtopic, users should only use the glossary terms included in the particular Subtopic Glossary Section (Section 20).

XXX-YY-25        Recognition

This Section addresses the criteria, timing, and location (within the financial statements) for recognizing a particular item.

XXX-YY-30        Initial Measurement

This Section addresses the criteria and amounts used to measure a particular item at date of recognition. In many cases, this Section may be empty because the initial standards did not include initial measurement.

XXX-YY-35        Subsequent Measurement

This Section relates almost exclusively to assets, liabilities, and equity. It addresses the criteria and amounts used to measure a particular asset, liability, or equity item subsequent to the date of recognition (for example, impairment, fair value changes, depreciation, amortization, and similar items).

XXX-YY-40        Derecognition

This Section relates almost exclusively to assets, liabilities, and equity. It addresses the criteria, the method to determine the amount of basis, and the timing to be used when derecognizing a particular asset, liability, or equity item for purposes of determining gain or loss, if any.

XXX    YY-45    Other Presentation Matters

This Section includes other presentation matters related to the Subtopic. Some examples include:

1.    Specific balance sheet classification
2.    Specific cash flow requirements
3.    Specific effect on earnings per share.

XXX-YY-50  Disclosure

This Section contains specific disclosure requirements for a Subtopic. It does not include general disclosure requirements that may reside in the Notes to Financial Statement Topic and other general presentation Topics. This Section may include references to general disclosure requirements that encompass the items addressed by the Subtopic. For example, the Receivables Subtopic contains a link to the general financial instrument disclosure requirements that relate to receivables.

XXX-YY-55         Implementation Guidance and Illustrations

This Section contains implementation guidance and illustrations, which are an integral part of the standards. The Codification separates implementation guidance and illustrations from the main body of the standards but provides references and links in bothdirections.

This Section provides guidance relating to the standards in simplified and generalized situations. Applying the standards to actual situations requires judgment, and the implementation guidance and illustrations are intended to aid in making those judgments.The implementation guidance and illustrations assume that all items addressed are material to the entity. Because the implementation guidance and illustrations cannot address all possible variations, users must consider carefully the facts and circumstances in actual situations when applying the provisions of the Subtopic.

XXX-YY-60         Relationships

This Section includes references to other Subtopics that may contain guidance related tothe Subtopic. The references point to content in another Topic that is the object of the other Topic or the material otherwise relates to the particular Topic. For example, the Income Taxes Topic may have discussions of LIFO reserves as the object of an illustration or example. In this case, the Relationships Section of the Inventory Topic would refer to the LIFO material in the relevant Income Taxes Subtopic.

The relationships provide simple references to the relevant content but do not include a complete description of the relationship. In addition, the Section does not contain requirements.

While the goal is to include as many relevant relationships as possible, users should notassume that the lists are exhaustive.

© 2023 Financial Accounting Foundation

XXX-YY-65            Transition and Open Effective Date Information

This Section contains references to paragraphs within the Subtopic that have opentransition guidance.

The transition guidance will appear in an emphasized manner in the text of the standards Sections. After the transition period lapses, the Codification Research System will remove the outdated guidance and the emphasis on the new content.

[**NOTE:** The Codification was written with an assumed effective date of December 31, 2008. As a result, transition and open effective date guidance for dates before December31, 2008, is not in the Codification (despite the fact that the effective date may not have occurred yet) because of its imminent removal as authoritative content. As such, there is no transition or effective date information in the Codification for such guidance. Users can search the original standards.]

XXX-YY-70            Grandfathered Guidance

This Section contains descriptions, references, and transition periods for content grandfathered after July 1, 2009, by an Accounting Standards Update. See CodificationSection 105-10-70 and the grandfathered content section for more information about grandfathered materials.

XXX-YY-75            XBRL Elements

This Section contains the related XBRL Elements for the Subtopic.

Securities and Exchange Commission (SEC) Sections

As noted in the section titled Standards issued by the SEC, SEC content is included for reference to improve the usefulness of the Codification for public companies. The systemattempts to embed relevant SEC content for reference in the same Topics and Subtopics as all other content. The goal was to place SEC content within applicable Sections, using unique SEC Section codes to distinguish the content. An "S" precedes the SEC Section codes.

SEC content has developed through different mechanisms and is not as easily codifiedusing the same model as the non-SEC content without modifying existing rules, regulations, and so forth. Instead, all original SEC content remains essentially intact inthe S99-SEC Materials Sections, except that SEC Observer comments made at EITF meetings are no longer shown with the related material from EITF Issues, and some Observer comments have been edited for appropriate context. The other SEC Sectionscontain links to the relevant content within the S99-SEC Materials Sections.

The Codification Research System will display the SEC content in separate Section following non-SEC content.

### *Subsections*

Subsections are a further segregation of a Section and, except for the General Subsection, occur in a limited number of cases. Each Section has at least one Subsection, usually General. A Section may contain additional Subsections as a means of filtering content related to multiple Sections of the same Subtopic. Unlike a Section, a Subsection is not numbered. A Subsection differs from a paragraph heading because the Codification Research System provides a feature to combine all

Subsection content for a Topic, for example, the Receivables—Overall Subtopic includes Subsections for Acquisition, Development, and Construction Arrangements. This allowsa user to combine all content related to acquisition, development, and construction arrangements.

### *Paragraph groups*

Paragraph groups represent a series of related paragraphs under the same paragraph heading. The Topic structure allows paragraph groups to be subordinated to other paragraph groups because of dependencies. As a result, the paragraph groups are presented in a hierarchy. Within the Codification, one ">" symbol or a combination with one or more "·" symbols precede each paragraph group heading. The number of "·" symbols followed by a ">" symbol identifies the hierarchy among paragraph groups. For example, the following illustrates the hierarchy of the paragraph group headings in Section 740-10-45:

>Statement of Financial Position Classification of Income Tax Accounts
·> Tax Accounts, Other Than Deferred
·· > Unrecognized Tax Benefits.

When pending content text reflects a wording change in a heading, the hierarchical structure will be the same. However, the text will show ">" symbols instead of "·" symbols for heading text changes made prior to July 25, 2022.

### *Paragraphs*

To ensure accurate links, paragraph numbers will not change over time. The content of a paragraph may be amended, but the paragraph number will remain constant.

New paragraphs will be inserted between existing paragraphs using a letter extension. For example, a new paragraph inserted between paragraphs 50-5 and 50-6 would be 50-5A.

## Referencing the Codification in notes to financial statements and other documents

References to the Codification follow an established pattern.

### Broad references in notes to financial statements

While the FASB does not provide guidance on how specific requirements of GAAP are referred to in notes to financial statements the FASB encourages the use of plain English to describe the broad Topic. For example, to refer to the requirements of the Derivatives and Hedging Topic, we suggest a reference similar to "as required by the Derivatives and Hedging Topic of the FASB Accounting Standards Codification."

### Detailed references in other documents

For purposes of establishing a consistent referencing approach for items such as working papers, articles, textbooks, and other similar items, the FASB suggests the following approach for referencing Codification content from outside the Codification:

1. FASB ASC {Codification reference}, for example:

    a. Topics—FASB ASC Topic 310 [, Receivables]

    b.    Subtopics—FASB ASC Subtopic 310-10 [, Receivables—Overall]

    c.    Sections—FASB ASC Section 310-10-15 [, Receivables—Overall—Scope]

    d.    Paragraph—FASB ASC paragraph 310-10-15-2

    e.    Subparagraph—FASB ASC subparagraph 310-10-15-2(a).

## Content-related structure and style matters

### Intersecting content

As noted in the industry discussion under the heading titled Topics, Industry Subtopics mirror the general Topic structure both in title and classification code, and the content resides in the Industry Topic. The use of a consistent code allows the FASB to create one version of the content that resides in a single location but allows users to access the same content from multiplelocations in the navigation structure. For example, a user can access the system from the perspective of the agriculture industry looking for inventory content. Alternatively, the user could access inventory and find the agriculture industry content. In this case, Codification Topic 330 represents Inventory and Codification Topic 905 represents the Agriculture Industry.

As noted above, industry content resides in the Industry Topic. Therefore, Codification Subtopic 905-330 represents the Inventory Subtopic of the Agriculture Industry. When browsing Codification Topic 330, users will see Subtopic 905—Agriculture. That represents an intersection link to the content in Codification Subtopic 905-330.

In the case of intersecting content, users must be cognizant of the industry scope and the scope of the general Topic. To continue the previous example, the user of Codification Subtopic 905-330 (Agriculture/Inventory) must be cognizant of the scopes for Codification Topic 905 (Agriculture) and Codification Topic 330 (Inventory).

### Editorial standards, style, and other matters

#### *Entity vs. other forms*

Standards before July 1, 2009, used numerous terms to describe an entity, such as *company*, *organization*, *enterprise*, *firm*, *preparer*, and so forth. To provide consistency, the FASB adopted the term *entity* as the appropriate term. As a result, *entity* replaces all previous uses of comparable terms.

#### *Comparable terms—shall and should*

Similar to the multiple terms used to refer to an entity, standards have used various words or phrases to refer to a requirement, such as *should*, *shall*, *is required to*, *must*, and others. The FASB believes such terms represent the same concept—the requirement to apply a standard.

To establish consistency, the Codification uses the term *shall* throughout the standards Sections. The Implementation Guidance and Illustrations Sections typically address example scenarios, and the words *would* and *should* are used to indicate that these represent hypothetical situations. See the discussion under the heading titled Sections for a discussion of the Implementation Guidance and Illustrations Section.

© 2023 Financial Accounting Foundation    

February 2023 (v 5.11)

## Glossary

Throughout the Codification process, glossary terms were identified either in the glossary or within the actual text of the standards. In many cases, a glossary term relates specifically to a particular Subtopic or Topic. The Master Glossary contains all terms identified as glossary terms throughout the Codification. Clicking on any term in the Master Glossary will display where the term is used. The Master Glossary may contain identical terms with different definitions, some of which may not be appropriate for a particular Subtopic.

Each Subtopic includes a Glossary Section with the terms used in that Subtopic. The standards Sections indicate glossary references at the first occurrence of a term in every Subsection. For any particular Subtopic, users should only use the glossary terms included in the particular Subtopic Glossary Section (Section 20).

## Show all in one page

In the Codification ResearchSystem at the top of the page in a Topic or a Subtopic, a user can click on "Show All in One Page." In the Topic, the system will show all of the Subtopics and Sections in that Topic while in the Subtopic, the system will show all of the Sections in that Subtopic

If the user clicks on "Show All in One Page" to join all Subtopics or Sections, the resulting page will not include section 75 XBRL Elements. If the user wants to see that Section, they will have to navigate specifically to that Section.  Those Sections must be printed separately.

© 2023 Financial Accounting Foundation

## General Codification matters

### Materiality

Codification Topic105 includes a discussion of materiality. Over the years, various standards have included language stating that a standard is applicable if an item is material. Retaining such individual materiality references in the Codification could lead users to believe that materiality applies to one set of standards, but not another. This is not the case.

## Ongoing standard-setting process

### Effective date and superseded standards

With the issuance of FASB Statement No. 168, *The* FASB Accounting Standards Codification®
*and the Hierarchy of Generally Accepted Accounting Principles*, the FASB approved the
Codification as the source of authoritative US GAAP for nongovernmental entities for interim
and annual periods ending after September 15, 2009. The Codification supersedes all existing
non-SEC standards. The Codification Research System will include the superseded standards for
archive purposes.

### Ongoing standard-setting process

The results of the ongoing standard-setting activity will be an Accounting Standards Update
composed of the background and basis for conclusions together with an appendix of Accounting
Standards Update Instructions. The title of the combined set will be Accounting Standards
Update YYYY-XX, where YYYY is the year issued and XX is the sequential number for each
Accounting Standards Update with that year. For example, the combined numbers would be
2009-01, 2009-02, and so forth. All authoritative US GAAP issued by the FASB will be issued
in this format, regardless of the form in which such guidance may have been issued previously
(for example, EITF Abstracts, FASB Staff Positions, FASB Statements, FASB Interpretations,
and so forth). Accounting Standards Updates also will be issued for amendments to the SEC
content in the Codification.

The FASB will organize the contents of Accounting Standards Updates using the same Section
headings as those used in the Codification. The contents of the Accounting Standards Update
Instructions will include marked changes. However, the Codification itself will not display
marked changes in the body of the Codification, other than in an archived version of the
Accounting Standards Update Instructions.

The FASB does not consider new Accounting Standards Updates as authoritative in their own
right and will not amend Accounting Standards Updates. Instead, the Accounting Standards
Updates serve only to provide background information about the issue, update the Codification,
and provide the basis for conclusions on changes in the Codification. An Accounting Standards
Update is a transient document to initiate the Board's process of creating Accounting Standards
Update Instructions. The Accounting Standards Update Instructions will be the source used to
update the Codification and the instructions will be available on the website. The FASB will
update the Codification Research System and release a new Accounting Standards Update
concurrently.

### Pending Content

As the FASB amends existing Codification paragraphs, both the current paragraph and the
updated paragraph will reside in the Codification until such time that the new guidance is
completely effective for all entities. During that period, the Codification Research System will
emphasize the newly amended paragraph as Pending Content and will provide a link to the
related transition guidance. The intent of the Pending Content boxes is to provide users with
information about how a paragraph will change when new guidance becomes authoritative.

When an amended paragraph is fully effective, the outdated guidance will be removed from the paragraph and the amended paragraph will remain without the Pending Content box.

Given different fiscal year-ends, the Pending Content boxes must remain in the system for a period of time sufficient for all entities to obtain the authoritative guidance that applies to their circumstances. After that period of time, the original content is removed and the Pending Content no longer appears as pending. The model to be applied when calculating the "roll-off" date is as follows:

> The expected roll-off date should be six months following the latest fiscal year-end that an "extreme entity" (that is, an entity who adopts at the latest possible date allowed by the transition) could have applied the **original** requirements.
>
> a. Assume an Accounting Standards Update has an effective date for **fiscal years beginning after** November 15, 20X1. This would result in the latest fiscal year-end that an "extreme entity" could have applied the **original** requirements as beginning on November 15, 20X1, and ending November 14, 20X2.
> b. Applying this model would result in a roll-off date of May 14, 20X3.
>
> Note: The purpose of the six-month period is to allow sufficient time for an entity to be aware of the change during its financial statement preparation and audit processes and to access the content without the need to use the archive feature. In the event that an entity does not complete its financial statements within six months, the entity can still access the previous content using the Codification archive feature.

## Maintenance Updates

While the intent is to produce error-free content, any publishing process inadvertently may have irregularities. To accommodate the immediate nature of the necessary corrections, the FASB issues Maintenance Updates. These documents are prepared by the FASB staff and are not addressed by the Board. Maintenance Updates provide nonsubstantive corrections to the Codification, such as editorial corrections, link-related changes, and source fragment information changes (used for Cross Reference and the Print with Sources).  Maintenance Updatesappear on the Codification website under Other Sources.

## Feedback

The FASB asks for constituent feedback on the Codification system and content. The Codification Research System allows users to submit content feedback at the paragraph level. Once submitted, the content feedback will be analyzed and processed, as necessary. In the event that the feedback requires a change to the Codification, the revision will be made in an Accounting Standards Update.

The FASB staff will evaluate feedback and consult with the Board as necessary.

The FASB requests the following types of feedback:

1. Overall, non-content-related matters. Please use the feedback link on the home page. In particular, we would like feedback that addresses Codification Research System functionality and performance.
2. Content-related matters. Please access the most relevant paragraph to provide the feedback

and use the paragraph level feedback feature to submit your comments. In particular, we would like feedback that addresses:

a.  Fatal errors of any type

b.  Questions about or concerns with US GAAP requirements.

© 2023 Financial Accounting Foundation

# GAAP Taxonomy

## Background

The GAAP Financial Reporting Taxonomy and SEC Reporting Taxonomy (collectively referred to as the "GAAP Taxonomy") are lists of computer-readable tags in XBRL (eXtensible Business Reporting Language) format that are available for preparers to assign to their financial statements. The GAAP Taxonomy is essentially a dictionary of financial statement terms for GAAP requirements and common reporting practices as provided in the Codification. The elements in the GAAP Taxonomy allow computers to automatically search for, assemble, and process data so it can be readily accessed and analyzed by investors, analysts, journalists, and regulators. The GAAP Taxonomy is required in the creation of XBRL interactive data filings (i.e., XBRL-formatted financial statements) submitted to the SEC.

Including the GAAP Taxonomy elements in the Codification assists preparers in selecting the most appropriate element to be used for their filing to the SEC in XBRL format for the specific reporting requirement. As the Codification is updated, the GAAP Taxonomy is likewise updated for elements referenced to the Codification. However, while the Codification is updated throughout the year, improvements to the GAAP Taxonomy are released annually for acceptance by the SEC. As a result, the elements contained in the Codification may be inconsistent with an SEC-accepted version of the GAAP Taxonomy, which is static upon its release annually. The elements that are new or modified in a development GAAP Taxonomy (not yet released and accepted by the SEC) will be noted as Pending_addition or Pending_removal.

## Section 75, XBRL Elements

The GAAP Taxonomy elements that are referenced to the guidance in a Codification Subtopic are listed in the Subtopic's Section 75. Links from the GAAP Taxonomy elements to the SEC guidance in a Subtopic are listed in the Subtopic's Section S75, also titled, XBRL Elements.

If a Subtopic contains both Sections 75 and S75, navigating to *either* Section within the Codification Research System (the System) will open a webpage that contains the content of *both* Sections. On such webpages, the SEC Section content will be shown in its entirety below the FASB Section content, in a box having a black "Securities and Exchange Commission (SEC)" header.

In Section 75, each GAAP Taxonomy element's listing includes:

- ■ A standard label for the element.
- ■ The element's name.
- ■ Citations of paragraphs in the Subtopic that are referenced by the element.
- ■ Citations of paragraphs in other Subtopics that are referenced by the element.

Within the System, each paragraph citation in a GAAP Taxonomy element's listing is a link that can be clicked to navigate to cited paragraph.

There is no change history for the links from the GAAP Taxonomy to the Codification. However, the GAAP Taxonomy includes information on new, revised, or deprecated elements that

© 2023 Financial Accounting Foundation

indicate when an element was modified and the nature of the change since the last annual release of the GAAP Taxonomy.

## Codification Paragraphs

The elements from the GAAP Taxonomy that are referenced to a Codification paragraph are included within the "See XBRL Elements" option to the right of the paragraph under the ellipsis. If present, elements will be displayed immediately in a pop-up window to the right under "XBRL Elements" and will be linked to a Section 75. If there are no elements linked to a paragraph, "No XBRL Reference available" will appear in the pop-up window under "XBRL Elements."

The GAAP Taxonomy elements that are listed in the pop-up window are grouped according to paragraph or subparagraph and by reference role. The reference role is assigned based on the origin of the element. For example, a disclosureRef role refers to documentation that details an explanation of the reporting requirements and an exampleRef role refers to documentation that illustrates, by example, the application of the concept. Within each role group, elements are listed in alphabetical order.

Each element label listed in the box is a link to the information for the element found in Section 75 of that Subtopic and clicking on the element label in Section 75 will open the related Codification content.

© 2023 Financial Accounting Foundation                    **23** of **23**

# Exhibit 110

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------x

In re:

ANADARKO PETROLEUM CORPORATION

SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

------------------------------------x


REMOTE VIDEOTAPED DEPOSITION OF

BJORN STEINHOLT

Poway, California

March 13, 2023


Reported By:

ERIC J. FINZ

Page 8

Report of Born I. Steinholt, CFA.")

BY MR. GRUENSTEIN:

Q.    Mr. Steinholt, today we are focused on your most recent report, which was January 25, 2023.  And I've marked that as Exhibit 549.

Can you just confirm that that is in fact your most recent report?

A.    Yes, it is.

Q.    Has anything in your background, your personal background changed since your last deposition that you would want to note?

A.    No.

Q.    And you understand that you submitted this report in rebuttal of a report prepared by Peter Keller?

A.    Yes, I did.

Q.    Okay.  And we're going to -- that has already been marked, but we'll put it in the system as Exhibit 505.  But I understand you also have it in front of you.  Correct?

A.    I do.

Q.    Okay.  So today when I refer

to your report, even though you have quite a few in this case, you'll understand that I'm referring to the report, Exhibit 549?

A.   Yes.

Q.   Okay.  If you could open up that report and we can start on page 1, footnote 1.

A.   I'm there.

Q.   Four lines down you say, "From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of those cash flows."

What do you mean by the timing and associated risk of those cash flows?

A.   This is exactly the same footnote that I had in my other expert report.  And in terms of the timing of the cash flows, if you get a dollar tomorrow, that is more valuable than a dollar five years from now.

Q.   Okay.  And what do you mean by the associated risk?

A.    We have a discount rate that includes an adjustment for risk when we present value future cash flows.  So the riskier the investment is, the less valuable a dollar five years from now would be, using the discounted cash flow approach to fundamental value analysis.

Q.    How does the concept of associated risk of the cash flow relate to an investment like the Shenandoah field?

MR. DROSMAN:  Mr. Gruenstein, you cut out at the beginning of that.  Do you mind repeating the question, I didn't catch it?

MR. GRUENSTEIN:  Sure.  Let me go a little bit closer.  Is that better?

MR. DROSMAN:  Yes.

Q.    I asked, how does the concept of associated risk of the cash flow relate to an investment like the Shenandoah field?

A.    The Shenandoah field, at the beginning of the class period, was

discussed as a field that may have an EUR, the estimated ultimate recovery, of a billion barrels of oil. And if the stock price in the future was $50 per barrel, that would be $50 billion. However, those $50 billion would be generated sometime into the future. In fact, years into the future. So consequently, that $50 billion would not be worth $50 billion at the beginning of the class period.

Q. So just to clarify. You said that if the stock price in the future was $50. I assume you mean the price of oil?

A. If the -- yes. If the stock -- if the oil price, in other words, the price that Anadarko sold the oil for in the future was $50, and I'm just using round numbers for the purposes of doing an easy calculation, not because I have determined that the oil price in the future would be $50.

But yes, you're correct, I was referring to the oil price per barrel. And I was referring to the EUR being --

and I just picked a billion barrels of oil because that is sometimes referenced by the analysts.

Q.    So does the risk include the risk that the price of oil might drop?

A.    Well, there is -- there is risk, there is an upside risk and there is a downside risk, right.  The risk just means that it's different than what you had expected.  In terms of the way we commonly talk about risk, we are typically more concerned with the downside risk.  The downside risk being that, well, ten years from now the oil price is going to be significantly less than $50.  But of course there is also an upside list.

Q.    And would you also agree that the --

MR. DROSMAN:  Ben, I don't think that he --

Q.    -- includes --

MR. DROSMAN:  I don't think he was through answering the question.

MR. GRUENSTEIN:  Oh, I'm

think that that is probably where he gets it from.  It could be from Anadarko too. I'm not sure.  But --

Q.    Just hold on one second.

Why don't we go to Shen-4.  I apologize if I interrupted you, if there is anything else you wanted to say on the last question.

A.    Yeah, the only thing I wanted to say is that you ask me questions, and I'm trying to think is the source of that information Mr. Keller or is the source of that information actually, you know, reading the ConocoPhillips press release or something else.  And I just -- you know, I just don't remember every little detail about this case.  So I don't want to, you know, you know, it's a factual issue.  Whatever they disclosed, they disclosed.

Q.    Okay.  Why don't we talk about, starting on page 26, the section on Anadarko's announcement of Shen-4.

Do you see that section of your report?

A.    Yes, I do.

Q.    Okay.  And then you say on 42, paragraph 42, you say, "Furthermore, Mr. Keller's subjective interpretation still does not mean that investors knew that Shenandoah was not commercially viable."

So I notice that you use the phrase "was not commercially viable," as opposed to in 3 you used "was unlikely to be commercially viable."

Is that based on plaintiffs' allegations?

A.    Yes, it is.

MR. DROSMAN:  Objection; failed to read the entire sentence.

Q.    You can answer.

A.    The specific reference to commercially viable is a reference, and I even have a footnote to that particular term.  And the footnote is the Steinholt report, paragraph 28, section J.

So that's why I put that footnote in there, so that, yes, that's where I get it from.

Q.    Okay.  And what's the difference in your mind between "was not commercially viable" and "was unlikely to be commercially viable"?

A.    What's the difference?

Q.    Is -- does "was not commercially viable" mean that there was zero percent of commercial viability?

A.    Well, I do not have any, you know, additional color to the plaintiffs' allegations than my summary of my understanding in the initial report that we discussed also at the last deposition when we actually went through each one of these subsections.  And I was answering questions on each one of them at my prior deposition.

Now, I haven't had any change in terms of my understanding of plaintiffs' allegations from the first time you asked me about it, about them, until now, today.  Other than my recollection in terms of my first report may not be as clear as it was on the first time I took the deposition.  Right

now I'm kind of focusing on Mr. Keller.

Q.    Right.

But the fact that you're using different language going from "was unlikely to," to "was not," does that suggest that the allegation is that the likelihood of commercial viability decreased between Shen-3 and Shen-4?

MR. DROSMAN:  Objection; calls for speculation, lack of foundation.

A.    The -- it is based on my understanding of plaintiffs' allegations. That is the way that they characterize their allegations as of the time Shen-4 results were disclosed.  Which is different than the way that they characterized their allegation -- allegations at the time the Shen-3 was disclosed.

Q.    But would you agree that "was not commercially viable" is a lower likelihood of commercial viability than "unlikely to be commercially viable"?

MR. DROSMAN:  Objection; calls

for speculation, lack of foundation, vague and ambiguous.

A.   I think the text -- I think it speaks for itself.  I mean, not being commercially viable is different than whatever the term was, more likely than not uncommercial.

Q.   It's different -- I'm sorry.

A.   Yeah, it's different, yes.

Q.   And it's different in the sense that it's a lower likelihood of commercial viability, when you say "was not commercially viable."  Right?

MR. DROSMAN:  Objection; calls for speculation, lack of foundation, vague and ambiguous.

A.   Yes, I mean, very bad went to worse, yes.  I mean, it's not -- but, you know.

Q.   And another way to put it is that the risk associated with the Shenandoah fields increased from Shen-3 to Shen-4.  Correct?

MR. DROSMAN:  Same objections.

Q.   Well, let me ask you this

question:  When we started the deposition I was asking you about risk as you used the term in footnote 1.  So as Shenandoah became less commercially viable, is it fair to say that the risk associated with that future cash flow increased?

MR. DROSMAN:  Objection.  If you want to give him a copy of the complaint, Ben, maybe he can parrot the allegation.

MR. GRUENSTEIN:  No, no.

A.    If something is not commercially viable, you know, you wouldn't think there would be any, you know, future cash flow from that particular resource.  Because you wouldn't think that Anadarko would go through and actually develop it.

So ultimately it's going to be a decision made by Anadarko.  But, you know, you wouldn't think under those circumstances that Anadarko would go forward and develop.  Now, with respect to unlikely to be commercially viable, you know, it's very, very unlikely that

they would go through with it.  But I mean, that's, you know, you would have to kind of ask those questions in terms of -- from the industry experts to kind of assess that.  And it's not something that I can particularly assess.

But I do want to say that even after the disclosure of the corrective -- the disclosure of the alleged truth, that didn't -- you know, analysts discussed -- the company said there was just an accounting adjustment.  The analysts -- in terms of the writedown at least.

And the analysts were talking about well, what does that mean.  Well, it's unlikely that they will go forward with it.

So, you know, even there, you could have some value to the Shenandoah even after the ultimate disclosure of the alleged truth.  It was something that the analysts wrestled with a little bit.

I'm just basing my estimate of the damages based on capturing the -- this particular -- the impact of this

# Exhibit 111

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

GEORGIA FIREFIGHTERS' PENSION     : Civil Action No. 4:20-cv-00576
FUND, Individually and on Behalf of All Others    :
Similarly Situated,                               :
                                       :
                                       :
          Plaintiffs,                       :
                                       :
                  v.                          :
                                       :
ANADARKO PETROLEUM                 :
CORPORATION, R.A. WALKER, ROBERT     :
G. GWIN, ROBERT P. DANIELS, and       :
ERNEST A. LEYENDECKER, III,         :
                                       :
          Defendants.                    :
                                       :

**SUR-REPLY REPORT OF ALLEN FERRELL, PH.D.
CONFIDENTIAL
June 12, 2024**

## I.    Background

1.    On December 10, 2021, I submitted an expert report in this matter ("Ferrell Report").[1] In the Ferrell Report, I formed the following two opinions regarding price impact:[2]

- On 18 out of the 21 alleged misstatement dates identified in the Complaint, there was no statistically significant price increase. On the remaining three alleged misstatement dates, the Shenandoah disclosures on these dates were stale and, as such, assuming markets are efficient, I would not expect Anadarko's stock price to react to these Shenandoah disclosures. Moreover, on these three dates, market commentators attributed Anadarko's stock price increase to factors unrelated to Shenandoah.

- There is no reliable economic basis to conclude that the alleged Anadarko May 2, 2017 corrective disclosures about Shenandoah had a price impact on Anadarko's stock price.[3]

2.    On February 3, 2022, Plaintiffs submitted the expert rebuttal report of Bjorn Steinholt, CFA dated February 2, 2022 ("Steinholt Rebuttal Report").[4] In that report, Mr. Steinholt states that he was asked to "review and discuss" the Ferrell Report.[5] Mr. Steinholt claims that I "did not actually perform an event analysis to quantify the impact, if any, of the Corrective Disclosure on Anadarko's stock price on May 3, 2017."[6,7] Mr. Steinholt then contends that I "ignored economic evidence that clearly demonstrates price impact relating to [the Corrective Disclosure]," including the following:[8]

---

[1] The Ferrell Report provides information on my qualifications and defines capitalized terms. My updated CV is attached hereto as **Appendix 1**.

[2] Ferrell Report, ¶ 17.

[3] In the Ferrell Report, I explained that Anadarko disclosed three pieces of information after market close on May 2, 2017: "(1) that Shen-6 was a dry hole; (2) that Anadarko was suspending appraisal activity at Shenandoah; and (3) that Anadarko was taking an impairment charge related to the Shenandoah project," which I understand Plaintiffs allege as the corrective disclosures. Ferrell Report, ¶ 54.

[4] Mr. Steinholt previously submitted a report dated October 1, 2021 in this matter ("Steinholt Report").

[5] Steinholt Rebuttal Report, ¶ 3.

[6] Steinholt Rebuttal Report, ¶ 42.

[7] The Steinholt Rebuttal Report states that "[t]he Corrective Disclosure in this case is Anadarko's suspension of further appraisal work on Shenandoah due to lack of commercial viability, resulting in an impairment charge of $467 million and the write-off of $435 million of exploratory well costs, totaling $902 million." Steinholt Rebuttal Report ¶ 11. To avoid confusion, I use Mr. Steinholt's "Corrective Disclosure" terminology in this report to refer to the alleged corrective disclosures.

[8] Steinholt Rebuttal Report, ¶ 7.

1