# EXHIBIT 2

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

---------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

---------------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ROCCO DETOMO, JR., Ph.D.

Thursday, March 9, 2023

Reported By: Lynne Ledanois, CSR 6811

Job No. 5781021

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHER DISTRICT OF TEXAS

HOUSTON DIVISION

--------------------------------------------------x

In re ANADARKO PETROLEUM     Civil Action No.

CORPORATION SECURITIES     4:20-cv-00576

LITIGATION

--------------------------------------------------x

Videotaped deposition of ROCCO DETOMO, JR., Ph.D.,taken in Indialantic, Florida commencing at 11:34 a.m. EST on Thursday, March 9, 2023 before Lynne Ledanois, Certified Shorthand Reporter No. 6811

///

Page 2

REMOTE APPEARANCES

Counsel for the Lead Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP

BY: RACHEL JENSEN

RAFFI FRIEDMAN

NICOLE GILLILAND

Attorneys at Law

655 West Broadway

Suite 1900

San Diego, California 92101

rjensen@rgrdlaw.com

Counsel for the Defendants:

CRAVATH, SWAINE & MOORE LLP

BY: LAUREN PHILLIPS

CHARLES BLOOM

BENJAMIN GRUENSTEIN

Attorneys at Law

Worldwide Plaza

825 Eighth Avenue

New York, New York 10019

lphillips@cravath.com

Page 3

REMOTE APPEARANCES

ALSO PRESENT:

John MacDonnell, Videographer

Kallie Gallagher, Occidental

Lyndon Pittinger

Page 4

INDEX OF EXAMINATION

| Examination by: | Page |
| --- | --- |
| Ms. Jensen | 10 |
| Ms. Phillips | 248 |

///

Page 5

2 (Pages 2 - 5)

CONFIDENTIAL

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 527  Expert Report of Dr. Rocco        18
        Detomo, Jr., 1/25/23;

Exhibit 528  Document headed, Shenandoah:        74
        Sizing it Right, A Retrospective,
        Tech Forum, 7/18/17;

Exhibit 529  Document headed, The Role of the  94
        Engineer in Exploration:
        Expected Value, Lisa Ward,
        11/10/20;

Exhibit 530  Document headed, Shenandoah:        126
        Major Discovery Confirmed
        Valued at $4/share,
        BOFAS_APC-000259;

Exhibit 531  Document headed, Development        135
        Full Field Economics, April 2015,
        APC-00027887;

Exhibit 532  Document headed, Meeting of the    145
        Board of Directors, August 1 & 2,
        2016, Day 1 Slides,
        APC-00784657;

///

Page 6

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 540 Email chain, 10/21/15,            207
        APC-00052041;

Exhibit 541 Document headed, Shenandoah        232
        Exploration - Development
        September 2013,
        APC-00001505;

Exhibit 542 Document headed, Chapter 3, Risk    240
        Analysis of Exploration Prospects;

///

Page 8

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 533 Email chain, 7/27/16,            161
        APC-00264139;

Exhibit 534 Document headed, Asphaltene        176
        Onset Pressure Uncertainty and
        Other Asphaltene Issues in
        Field Development Planning,
        APC-01760992;

Exhibit 535 Document headed, 2016 Q1 IPT        184
        Partner Meeting, April 5, 2016,
        APC-01183190;

Exhibit 536 Document headed, Shenandoah Field   190
        Development, Flow Assurance,
        October 23, 2014;

Exhibit 537 Email, 9/5/14,                195
        APC-00011721;

Exhibit 538 Document headed, Asphaltene        199
        Mitigation, April 2015;
        APC-00044530;

Exhibit 539 Document headed, "Workshop Day 1:   202
        Reservoir Uncertainties,
        November 18, 2014,
        APC-00349108;

///

Page 7

Thursday, March 9, 2023

11:34 a.m. EST

---------------------------------------------------

THE VIDEOGRAPHER:  We're on the record.

It's 11:34 a.m. Eastern time on March 9th, 2023.        11:34AM

This is the deposition of Dr. Rocco Detomo, Junior.

We're here in the matter of Anadarko Petroleum Corporation securities litigation.

I'm John McDonnell, the videographer with Veritext.                11:35AM

Before the reporter swears the witness, would counsel please identify themselves beginning with the noticing attorney.

MS. JENSEN:  Good morning.  This is Rachel Jensen from Robbins Geller Rudman & Dowd on behalf    11:35AM of plaintiffs in the class.  With me this morning and today are Raphaella Friedman and Nicole Gilliland.

MS. PHILLIPS:  Good morning.  This is Lauren Phillips of Cravath Swaine & Moore for the        11:35AM defendants.  With me are my colleagues Benjamin Gruenstein and Charles Bloom of my firm and Kallie Gallagher of Occidental.

ROCCO DETOMO, JR., Ph.D., having been duly sworn, testified as follows:      11:35AM

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL

EXAMINATION                    11:35AM
BY MS. JENSEN:

Q   Good morning, Dr. Detomo.  Where are you physically located today?

A   Physically located at my residence in    11:36AM Florida on the East Coast just south of Cape Canaveral.

Q   Is anybody else in the room with you?

A   No.

Q   Do you have any documents in reach?    11:36AM

A   The only document I have is a written copy of my report.

Q   Is that a clean copy?

A   Yes, it is.

Q   Any other documents?    11:36AM

A   No.

Q   And have you removed all technology not needed for this deposition today?

A   Yes, I believe so.

Q   Okay.  Have you ever been deposed before?    11:36AM

A   Yes.

Q   How often or how many times?

A   Twice.

Q   And what occasion were those depositions?

A   One occasion was in defense of a case with a 11:36AM

Page 10

drilling contractor, turnkey drilling contractor with 11:37AM Shell.  And the other was a case associated with a patent suit.

Q   Were you a percipient witness or an expert witness in the drilling contractor case?    11:37AM

A   I believe it was an expert witness because I had not participated in the drilling of the well.

Q   And what party did you appear on behalf of?

A   On behalf of Shell Oil.    11:37AM

Q   You used to work for Shell Oil; correct?

A   Yes.

Q   What is the name of that case?

A   I do not recall.  It was in the early 1990s.

Q   What was the nature of your opinion?    11:38AM

A   Nature of my opinion was a technical evaluation as to whether or not the well had penetrated salt.

Q   And was your testimony admitted in that case?    11:38AM

A   The case was settled out of court the day before it was to go to trial.

Q   You mentioned another case.  What was the patent case?

A   It was a patent lawsuit between two seismic 11:38AM

Page 11

service providers that provide ocean bottom seismic   11:38AM capability.

Q   And what was the nature of your opinion in that case?

A   The nature of my opinion was to -- whether   11:38AM or not the one design and implementation infringed upon the patent of the other.

Q   And was your testimony admitted in that case?

A   I don't know the current resolution of that  11:39AM case.  I have not heard anything for approximately one year.

Q   So you don't know one way or the other?

A   Correct.

Q   The patent case that you mentioned, was    11:39AM that -- I may mispronounce this, Magseis FF LLC versus Seabed Geosolutions U.S. Inc.?

A   Yes.  And it's Magseis.

Q   Thank you.  You did have your deposition taken in that case; correct?    11:39AM

A   Yes.

Q   And you told the truth in that deposition; correct?

A   Yes.

Q   That was not a securities fraud case;    11:40AM

Page 12

right?    11:40AM

A   No.

Q   Neither was the other contractor drilling case?

A   No.    11:40AM

Q   Your opinions have never been admitted in a securities fraud case; correct?

A   Correct.

Q   Did you prepare for this deposition?

A   I reread certain sections of my report, so   11:40AM yes.

Q   Did you meet with anyone?

A   Yes.

Q   And who did you meet with?

A   I met with some of the Cravath lawyers.    11:40AM

Q   And which lawyers did you meet with?

A   I met with Lauren Phillips, Charles Bloom and -- principally.  I think Mr. Ben Gruenstein actually sat in on part of it.

Q   How long did you meet with the Cravath    11:41AM folks?

A   You mean in preparation for this?

Q   Yes.

A   I met twice, both times for a few hours.

Q   And when did you meet with them?    11:41AM

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL

A   I believe last Friday.  I would have to     11:41AM
check to be absolutely sure, but I believe last Friday
and then the Friday before.
Q   So you met with them on -- it would be
Friday, February 24th and March the 3rd?     11:41AM
A   To the best of my recollection, that was the
two days.
Q   You said a couple of hours each.  How much
time total did you meet with the attorneys?
A   So I would say between -- for those two     11:42AM
meetings, the total was between four and six hours.
Q   You mentioned that you reviewed or
rereviewed portions of your report.  Is there
anything in your report you would like to withdraw
or modify?     11:42AM
A   No.
Q   You stand by your report in its entirety?
A   Yes.
Q   Is there any further work you intend do?
A   Not that I am aware of.  I'm not aware of     11:42AM
any other work that I have been asked to perform in
the future.
Q   Any opinions you intend to offer at trial
other than those set forth in your report?
A   There are no opinions I intend to offer that 11:42AM

Page 14

are different than the ones in my report.     11:42AM
Q   I take it that you've read Dr. Merrill and
Mr. Pittinger's reports.  Have you read any other
expert reports in this case?
A   Those are the only two expert reports I've     11:43AM
read.
Q   When were you retained in this case?
A   I was retained in this case I believe a
little over a year ago.
Q   So in 2022, approximately what month?     11:43AM
A   I would guess February, but I would have to
check records to be sure.
Q   Do you know who the defendants are in the
case?
A   I know that the title on the defendants is     11:43AM
Georgia Firefighters Fund, which I am assuming is a
company that represents investments.  But that's all I
know about it.
Q   Okay.  So just to be clear, the suing
party is the plaintiffs; right?  Who were the     11:43AM
defendants in the case?
A   Oh, the defendants, sorry.  The defendants
in this case were originally Anadarko Corporation.
Q   Are you saying that it's a different
defendant now?     11:44AM

Page 15

A   Well, Anadarko Corporation was bought by     11:44AM
Occidental Corporation.
Q   And do you know whether Occidental is a
named defendant in this case?
A   I'm assuming they are because they inherit   11:44AM
that liability.  So I'm assuming that the current
defendant is Occidental.
Q   Do you know who the other defendants are?
A   I believe there were some individual
defendants who were actually employees of Anadarko at  11:44AM
the time, but I could not -- I would recognize a few
of them, but I would not be able to recite the entire
list.
Q   Do you know any of those individuals?
A   Personally, no.     11:45AM
Q   Any other capacity?
A   No, I've never run into them work wise or
otherwise.
Q   You worked with Occidental before?
A   Not closely and not in a partnership.  But I 11:45AM
do know or have occasion to have been acquaintances
with people who have worked at Occidental.
Q   And who is that?
A   I'm trying to recall their names.
There's -- I don't recall names offhand, but I know     11:45AM

Page 16

there are people I've met at industry conferences who  11:45AM
have had conversations -- worked at Occidental.
Q   How many hours have you spent on this
case?
A   Again, I would have to make an estimate     11:46AM
without checking records, but my estimate off the top
of my head would be between 400 and 600 hours.
Q   How many of those hours did you spend on
your report?
A   I would guess two-thirds of those hours were 11:46AM
on the report.
Q   How much have you been paid by defendants
in this case?
A   I'm paid by the hour at the rate of $300 per
hour.     11:46AM
Q   And so what is the total?
A   Let's see.  So 400 times 300 would be
$120,000.
Q   Do you have any outstanding invoices?
A   Yes.     11:47AM
Q   And in what amount?
A   I believe it's $1500.
Q   If you'll bear with me, I'm going to mark
an exhibit here.  Okay.
Dr. Detomo, you should be able to see what  11:47AM

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

I've marked as Exhibit 527. I'm hoping that you will recognize this document.

(Whereupon, Exhibit 527 was marked for identification.)

THE WITNESS: I just clicked in Veritext, I see the document. Let me open it.

At least the cover page appears to be the cover page of my report.

BY MS. JENSEN:

Q And that's your name on the front page of the report?

A Yes, it is.

Q Could you scroll through just briefly -- if you read the whole thing, we'll probably just spend the whole day on this one question, so let's not do that.

If you can just scroll through and confirm for me that that is a true and accurate copy of your expert report from January 25th, 2023.

A Yes, this looks like you have to click instead of scroll. So I would like to -- I don't know if there is a quick way to get to the end.

Q Let's go off the record for a second.

A Okay.

THE VIDEOGRAPHER: We're off the record.

Page 18

It's 11:49 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 11:53 a.m.

BY MS. JENSEN:

Q Okay. So, Dr. Detomo, I just want to reask the question.

Does this appear to be a true and accurate copy of your expert report dated January 25th, 2023?

A Yes, it is.

Q Who wrote this report?

A I did.

Q Did you receive any assistance in writing the report?

A I received some assistance in -- around what topics and in terms of providing documents, but I wrote all of the report. So nobody wrote any sections of it.

Q What assistance did you receive around what topics to write on?

A So it was just a list of topics. So, for instance, I was instructed to read and give my opinion on complaints. I was instructed to read and give my opinion on the expert reports.

And so -- and that's what I did.

Page 19

Q Okay. When you say "complaints," do you mean the amended complaint in this case?

A It was a complaint that had -- I'm not sure exactly which version of the complaint it is. But there was a version of the complaint that had a series of statements in it that I responded to in my report, a complaint from the plaintiffs.

Q In terms of providing documents, did you receive documents from counsel for purposes of your report?

A Counsel did forward documents to me when I requested them or I requested document about a certain area or a topic, yes.

Q Did you receive assistance in editing your report?

A I believed some comments about what I had written but not specifically in doing editing of the report. So I actually went back and made some edits myself.

But the edits, they were just suggestions about, hey, you need to clarify this and things like that.

Q Did you talk to anyone about the content of your report before it was finalized?

A I had talked to the Cravath lawyers about

Page 20

the version of my report before I finalized it.

Q How many times?

A The report was a body of work which was not written all at one time, so it was written over the period of a number of months.

And occasionally I would send a version to the Cravath lawyers and ask them if they -- you know, if there were anything that needed clarification or if there was something else I needed to address.

So, for instance, the expert reports came in later. And then I had to go through and write the areas that addressed them.

Q What was your assignment?

A My assignment was to read the information that was available and to offer my expert opinion on the validity or comments on the -- on what I read, mostly around technical matters, well, entirely around technical matters.

Q Now, in your report, you say that you were asked to review and respond to the expert reports of Dr. Merrill and Mr. Pittinger; correct?

A Yes.

Q Also says that you were retained to provide opinions about Anadarko's appraisal of the

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

Shenandoah prospect in its public statements related 11:58AM thereto; correct?

A   For some -- I don't know all of the public statements, but to the subset of public statements I was provided, yes.   11:58AM

Q   And the public statements that you were provided, those are the ones that you commented on in your report?

A   Yes.

Q   So the purpose of your report was to rebut 11:59AM Dr. Merrill and Dr. Pittinger; correct?

A   No, the purpose of my report was to make comment as to my technical opinion with respect to some of the opinions that they had made.  So in my professional experience, some of those opinions I 11:59AM agreed with and some of them I did not.

Q   Okay.  So I think I'm asking a different question.  So maybe we're kind of crossing each other here.

A   Okay.   11:59AM

Q   So what I'm saying is that the purpose of your report, as you just mentioned, was to respond to the plaintiffs' expert reports; correct?

A   That was one of the purposes.  The purpose was to offer my technical opinion about comments and 11:59AM

Page 22

issues that were raised, technical opinions about 12:00PM them.

Q   That was all within the scope of rebutting the reports of Dr. Merrill and Mr. Pittinger; correct?   12:00PM

A   I was not specifically asked to rebut them. I was asked to make comment on them and the ones I disagreed with, I rebutted.

Q   Okay.  So maybe we're just not understanding each other exactly because there's 12:00PM some terminology around this in litigation.

So do you understand that there is a difference between affirmative opinions and rebuttal opinions?

A   Yes.   12:00PM

Q   Okay.  So that's what I'm trying to get at.  So your opinions are in rebuttal to Dr. Merrill and Mr. Pittinger; is that right?

A   A number of opinions I made in here were in rebuttal to theirs, yes.   12:01PM

Q   So now we're getting somewhere.  So let's talk about outside of rebuttal, what are the opinions that you're offering that are not just in rebuttal?

A   I would have to look specifically for those. 12:01PM

Page 23

Those would be some of the opinions that Dr. Merrill 12:01PM or Mr. Pittinger had to which I didn't comment.

Q   I think we were getting a little confused here.  So what I'm trying to ask you is:  Could you please identify any opinion that you're offering 12:01PM that is not in rebuttal?

A   I did not specifically go through and identify which particular lines that I agreed with. So I only captured in the report the ones in general I disagreed with.   12:02PM

There may be one or two in there where I mentioned that I agree with a certain opinion.  But I would have to look for them.

Q   Okay.  So if I understand correctly then, all of your opinions are in rebuttal to Dr. Merrill 12:02PM and Mr. Pittinger?

A   Most of the opinions I wrote of in the report are in rebuttal, yes.

Q   So now what I'm trying to get at is tell me which opinions are not in rebuttal.   12:02PM

A   I would have to look through the report to identify exactly which ones.  But I think -- give me a second.  Let me think.  I think there were some comments -- well, I would have to speculate.

I believe there were some comments by 12:03PM

Page 24

Mr. Pittinger associated with the purpose of Rose & 12:03PM Associates' software, which there were certain parts of his opinions about that that I agreed with.

Q   So let's not focus on what you did not say.  Let's focus on what you did say.   12:03PM

You can refer to your report if you need to.  But my question is:  Which of your opinions, if any -- maybe there's none.  But which opinions, if any, are not in rebuttal to Dr. Merrill and Mr. Pittinger?   12:03PM

A   Without going through and specifically looking for them and searching for them in the report, I would not be able to state which ones they are off the top of my head.

Q   Okay.  We can go through your report.  Why 12:04PM don't you go through your report and tell me which ones are not in rebuttal.

A   Can I search within this document?

Q   I believe so.  Let's go off the record for a moment.   12:04PM

THE VIDEOGRAPHER:  We're off the record it's 12:04 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record. It's 12:12 p.m.   12:12PM

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

BY MS. JENSEN:

Q   Okay.  So, Dr. Detomo, you have had an opportunity to look at your report.  Are you able to answer the question that I asked?

A   I don't -- I don't find a specific example that I could show in my report at this time to -- that would be an affirmative response to an opinion by Dr. Pittinger -- or Dr. Merrill or Mr. Pittinger.  I believe that was your question.

Q   So my question, I want to make sure we understand each other.  You were talking earlier about your rebuttal opinions as we call it in the business.

So my question to you is:  Do you have any opinions that are outside the scope of rebuttal, and that's what you were asked to look through your report for?

A   Yes, and my answer is I do not find in my report affirmative opinions or anything confirming or affirmative opinions about those, so no.

Q   Okay.  You can set that aside.

MS. JENSEN:  I'm going to mark another exhibit.  Give me a moment here.  I need to restart my Exhibit Share.  Bear with me for a moment.

You should be able to see in your Exhibit

Page 26

Share a document that's been previously marked as Exhibit 4798.

A   Yes.

Q   And my question is whether you recognize this to be Dr. Merrill's expert report that you were responding to in your report?

A   I'm opening it.

Yes, this is the document I reviewed.

Q   Let me show you another document.

You should be able to see in your Exhibit Share a document that's been previously marked as Exhibit 499.

Will you please confirm that this was the Pittinger expert report that you were responding to in your report?

A   Is the one you just put in 499?

Q   Yes, it is.

A   Because it went in a different order, but okay.  Apparently it orders them by number.

Q   That's right.  I should have mentioned that.  It can get a little confusing.

A   Yes, I recognize this report.  This is the one I reviewed.

Q   You can set that aside for now.

A   Okay.

Page 27

Q   Dr. Detomo, earlier I asked you about your compensation in this case.  So I believe you testified that you're being compensated at an hourly rate of $300 per hour?

A   Yes.

Q   But your report says $600 per hour; correct?

A   I don't recall that.  I would have to look at my report to see.

Q   Look at Paragraph 14.  You have the hard copy in front of you; right?

A   Yes.

Q   You can look at the hard copy.  We wanted to authenticate your expert report in the first instance, but I think from here on out, it would probably be easier to refer to the hard copy.

A   Okay.  Paragraph 14?  That's an error.

Q   It's actually 300?

A   It is 300, that's an error.

Q   Would you like to amend your report to state that you're being compensated at the rate of $300 per hour?

A   Yes, I would.  I'm surprised because I know for a fact I wrote 300 in there at one time.  So yes.

Because it's never been 600, although 600

Page 28

would have been nice.

Q   Okay.  You can set that aside for now.

A   Okay.

Q   I want to ask you about your opinions.

Are you offering an expert opinion in this case on Shenandoah's commerciality?

A   I'm offering an opinion on what it takes for something to be commercial.  So in terms of whether or not it's commercial at different stages, the only thing I can say is if something is commercial, then it has a clear definition.

So I'm not sure when you say whether or not something is going to be commercial, I don't know how to define that.  But I can make a comment as to whether or not something currently meets or whether or not it will be commercial, yes.

Q   So my question is a little different.

Are you offering an expert opinion on whether or not Shenandoah was commercially viable during the class period?

A   I'm not exactly sure what the word "viable" means.  I can offer an opinion as to whether or not it was -- during the class period, whether or not the proper work was being done to define whether or not it was commercial.

Page 29

8 (Pages 26 - 29)

CONFIDENTIAL

Q   The answer to my question is no?        12:21PM

A   I don't know what the word "viable" means. So you have to define that. What do you mean by "viable"?

Q   You're not familiar with that term?        12:21PM

A   Not with respect to commerciality. So I would say I could offer an opinion as to whether or not something is commercial.

Q   So are you offering an opinion on whether or not Shenandoah was commercial during the class        12:21PM period?

A   Yes.

Q   And is your opinion that it was commercial at the time?

A   No, it's my opinion that the right        12:21PM information was being collected to decide if it was commercial.

Q   So you're not offering an opinion one way or the other whether Shenandoah was commercial during the class period?        12:21PM

A   You can only offer an opinion about commerciality if you have the information that defines it.

During the class period, the information was ambiguous enough to not know yet whether or not        12:22PM

Page 30

it was commercial.        12:22PM

So during the class period I could not say, with the information at that time, whether or not it was going to be commercial. By today's information I can.        12:22PM

MS. JENSEN:  I'm going to strike the answer after "going to be commercial" as beyond the scope and nonresponsive.

Q   Are you offering an expert opinion on the work of petroleum or reservoir engineers?        12:22PM

A   Yes.

Q   Are you offering an expert opinion on the work of geologists in this case?

A   Yes.

Q   Geophysicists?        12:23PM

A   Yes.

Q   Are you offering an expert opinion on faulting and compartmentalization?

A   Yes.

Q   Are you offering an expert opinion on the        12:23PM impact of asphaltene deposition and mitigation?

A   I'm offering the level of knowledge and experience that I have with respect to it.

As to whether it reaches the level of expert opinion, I don't know what that level is, but        12:23PM

Page 31

I have quite a bit of experience with it.        12:23PM

Q   Are you offering an expert opinion that Anadarko's statements to investors were not false and misleading as to Shenandoah?

A   The expert opinions that I -- or the        12:24PM disclosures to the public that I reviewed, yes, they were not misleading in my expert opinion.

Q   Are you offering an opinion that Anadarko's statements to investors were appropriate under SEC disclosure rules?        12:24PM

A   The ones I reviewed, yes.

Q   Are you offering an expert opinion that the alleged omissions were legally immaterial?

MS. PHILLIPS:  Objection.

THE WITNESS:  Yes.  Okay.        12:24PM

Yes, I don't have an opinion on what defines the legality of what they did. I can only respond as to the technical merit of what they said.

BY MS. JENSEN:

Q   Are you opining that the alleged omissions        12:24PM were unimportant to investors?

A   Any -- when you report to investors, you usually report truthfully facts. And any -- I'm not sure how to define whether or not omissions are important.        12:25PM

Page 32

Every piece of information to an investor        12:25PM might be important, but not all information is always exposed to investors or anyone outside of the company.

Q   Are you offering a truth on the market        12:25PM defense?

A   I'm not sure I understand what market defense is.

Q   Are you offering a truth on the market defense?        12:25PM

A   I do not know what that is, so I would have to say I can't comment one way or another without knowing what it is.

Q   So in formulating your report, you reviewed documents that were provided to you by        12:26PM counsel, as you mentioned earlier; correct?

A   Yes.

Q   And you also reviewed academic papers?

A   Yes.

Q   And to what areas did you turn to academic        12:26PM literature to review?

A   Well, I reviewed -- I referenced a number of academic papers that I was already familiar with. So, for instance, information academic papers on turbidite deposition. I referenced academic papers on        12:26PM

Page 33

9 (Pages 30 - 33)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

mitigations for asphaltenes. And I'm sure I 12:27PM referenced others as well, so...

Q Did you review papers about topics you had less recent or direct experience working with?

A I'm trying to recall any topics that I had 12:27PM that I made comments on that I did not have a lot of experience with. So I may or may not have.

I don't recall specifically which papers I might have reviewed which were in areas that I had less experience with. Usually I looked for academic 12:28PM papers in areas that I was already familiar with.

Q And did you provide in the case all the academic papers or literature upon which you relied?

A Any of the ones that I quoted, I included in my -- that I referenced in my report, I included. I 12:28PM may or may not have read additional papers as well.

So I didn't reference every paper that I had read.

Q Did any of the other papers impact your thinking for the report? 12:28PM

A No, they did not.

Q What is meant by the acronym MMRA?

A MMRA is a term used to define a process for doing risk assessments.

Q What does the acronym mean or what does it 12:29PM

Page 34

stand for? 12:29PM

A The specifics of the acronym I would have to look up because they are -- they are specific to a company, but it's -- so I don't know what the two first Ms necessarily stand for without referencing it 12:29PM again. But it's a risk assessment methodology which is followed by Anadarko.

Q What is the company name?

A The company name that proposes MMRA is Rose & Associates. 12:29PM

Q What is the nature of the methodology?

A The nature of the methodology is to -- is to try to define both a risk-based volume assessment of an opportunity where the range of values have a great deal or a range of uncertainty associated with it. 12:30PM

Q You did not conduct your own MMRA analysis in this case, did you?

A No, I did not.

Q Did you ask anyone else to conduct an MMRA analysis for you? 12:30PM

A No, I did not.

Q Did you do your own calculations about what the P10 or P90 should have been at any given point leading up to or during the class period with respect to Shenandoah? 12:31PM

Page 35

A No, I have not. 12:31PM

Q You didn't because you didn't feel it was necessary to do so; correct?

A I didn't do it because I didn't have all the appropriate data that would be necessary to do it. 12:31PM

Q But you still stand by the conclusions of your report; right?

A I stand by the conclusions of my report based upon the number of times I've used that software in the past. 12:31PM

Q But you stand by your report even though you did not independently calculate any of the MMRA values?

A Yes.

Q Who typically conducts an MMRA analysis in 12:31PM a project like Shenandoah?

A The analysis is usually performed by an integrated team that each bring information to bear to assess what the different risk and range of values might be. 12:32PM

Q And who actually runs the analysis?

A It varies from company to company. It's usually one of the subsurface people, so either a geologist, geophysicist or reservoir engineer.

Q At Anadarko, it's the reservoir engineer; 12:32PM

Page 36

correct? 12:32PM

A I don't know if they have required it to be the reservoir engineer. I know the reservoir engineer at Anadarko actually did do some of the runs.

But I know that those runs are made by a 12:32PM variety of people.

Q At Anadarko, the runs were by engineers and not geophysicists or geologists; correct?

A Yes, I don't -- the numbers are reported from the team. So who actually pushed the buttons in 12:32PM the -- in running the program, I don't know specifically who did that.

Q You just don't know one way or the other?

A I know for a fact that the geology, the geophysics play a huge role in knowing what values to 12:33PM put in.

Q That's not the question I'm asking.

I'm asking whether you know at Anadarko who ran the MMRA analysis for Shenandoah?

A There are some runs that have a name 12:33PM associated with them. So those runs you would be able to know who ran them.

Q Right. It was the reservoir engineer; correct?

A On most of the ones I looked at, yes. 12:33PM

Page 37

10 (Pages 34 - 37)

Q  You're not aware of any run that had    12:33PM someone other than an engineer; right?

A  There were hundreds of runs.  So I don't recall any of them specifically having a name that was not a reservoir engineer.    12:34PM

Q  Now, in your experience, you've never had exclusive responsibility for conducting an MMRA analysis; right?

A  No, that's not true.

Q  Okay.  So which -- tell us about your    12:34PM experience where you had exclusive responsibility for conducting an MMRA analysis.

A  For one year I was Shell's representative to Rose & Associates for developing and applying their software.  So I actually made MMRA runs with    12:34PM Rose Associates' software many times.

Q  And when was that?

A  That was in the late 2000s, so 2006, 2007.

Q  And what -- who was your contact at Rose & Associates?    12:35PM

A  I worked mostly with Rocky Roden and -- and, let's see, Mike Forrest were leading the consortium meetings.

Q  What do you mean by "consortium meetings"?

A  The Rose & Associates software was built    12:35PM

Page 38

upon a series of consortiums that reached across a    12:35PM number of companies in order to gain input as to what companies would consider in building a risking software and volumetric calculation.

Q  Besides Rocky and Mike, did you have any    12:36PM other contacts at Rose & Associates?

A  Not specific.  I mean, there were various people that came and went, various experts.  So those two I think were integral to the development of the software.    12:36PM

Q  You discuss in your report the probabilistic and deterministic approaches; right?

A  Yes.

Q  And as to the probabilistic and deterministic approaches, the P90, P50 and P10    12:36PM scenarios should reconcile with deterministically derived quantities for low, best and high estimates; right?

A  Not exactly.  They are usually related, but they don't necessarily agree.    12:37PM

Q  So are you saying that's not industry standard?

A  No, there is no industry standard for risking or volumetric calculation.

Q  Okay.  We'll come back to that.    12:37PM

Page 39

Now, you reviewed a number of seismic    12:37PM images for this case; correct?

A  Yes.

Q  Can you describe how seismic images are created?    12:37PM

A  Sure.  One creates sound waves at or near the surface.  The sound waves propagate through the earth.  Anyplace that there is a change in the acoustic impedence in the earth, the sound waves are partially transmitted and partially reflected.    12:38PM

Any of the reflected sound energy that reaches back to the surface is collected with acoustic sensors.

And those acoustic waves, as they are collected back at the surface, can then be resembled    12:38PM and used to image a version of the earth that represents where acoustic impedences are hard and where they are soft.

Q  How long does it take to create a 3D seismic image?    12:38PM

A  Excuse me.

In the marine world, such as Shenandoah is, the seismic acquisition depends on the type of acquisition system used.  But the acquiring of the data typically takes anywhere -- usually on the    12:39PM

Page 40

range of months.    12:39PM

Once the data is acquired, it usually takes anywhere from eight months to two years to process the seismic data and create an image.

Then on top of that, the computing    12:39PM capacity and technical capability of the software improves over time.  So people typically go back and take older data and reprocess it in order to get an updated image.

So anyways, to get an image is years.    12:40PM

Q  And you didn't review the underlying seismic volume in this case; correct?

A  I looked at the acquisition and processing that was done on each of the seismic data volumes that were used by the Shenandoah JV, but I did not view the 12:40PM 3D data in a 3D viewer, no.

Q  And you did not create your own 3D interpretations for this case?

A  No, I did not.

Q  And you did not view that as necessary to    12:40PM your work?

A  I did not view it as -- it would have been interesting to do.  But it would have required a tremendous amount of time and access to a lot of digital data.  So it was not a practical thing to try  12:41PM

Page 41

11 (Pages 38 - 41)

CONFIDENTIAL

to approach.    12:41PM

Q    And despite not having reviewed the underlying seismic volume or creating your own 3D interpretation, you still stand by the conclusions in your report; right?    12:41PM

A    Yes, I do.  Having been a risk and general manager for seismic interpretive groups in the past, I have quite a bit of experience with looking at their output results and trying to identify strengths and weaknesses.    12:41PM

MS. JENSEN:  Okay.  Let's take a quick break.

THE WITNESS:  Okay.  How long?

MS. JENSEN:  Let's go off the record first.    12:42PM

THE VIDEOGRAPHER:  We're off the record. It's 12:41 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record, it's 12:57 p.m.    12:58PM

BY MS. JENSEN:

Q    Welcome back, Dr. Detomo.

A    Thank you.

Q    Let's turn to Appendix 2 of your report.

A    Okay.    12:58PM

Page 42

Q    Okay.  And this is your C.V.?    12:58PM

A    Yes, it is.

Q    And it's a true, accurate and complete?

A    Yes, it is.

Q    So you obtained degrees in physics and nuclear physics?    12:58PM

A    Yes.

Q    At Ohio State, did you take any courses in petroleum geology?

A    No.    12:58PM

Q    Did you take any courses in seismic interpretation?

A    No.  But I did take courses in acoustic wave propagation.

Q    Did you take any courses in geological risk assessment?    12:59PM

A    No.

Q    Economics?

A    Yes.

Q    Which courses?    12:59PM

A    It was like economics -- it was a senior -- a course I took as a senior in undergraduate.  Just a general course in economics, undergraduate course in economics.

Q    Like Econ 101?    12:59PM

Page 43

A    Yes, I don't recall the number.    12:59PM

Q    Any courses in petroleum engineers?

A    No.

Q    Did you take any finance or business courses?    12:59PM

A    No.

Q    After you obtained your degrees, you worked at Shell for a good spell; right?

A    Yes, I worked at Shell for 33 years.

Q    And from there you started a consulting    12:59PM business?

A    Yes.

Q    Shell is the only oil company you've worked for; right?

A    The only oil company I worked directly for,    1:00PM yes.

Q    At Shell did you receive any formal training in petroleum training?

A    Yes.

Q    What courses?    1:00PM

A    A series of courses in petroleum engineering that stretched over a few weeks during my first few years and then courses in petroleum engineering depending upon the requirements of the job I was doing at the time.    1:00PM

Page 44

Q    And your positions were as a geoscientist;    1:00PM right?

A    Only initially.

Q    What were all your -- let's take a step back.    1:00PM

So your discipline was geoscience; right?

A    When I joined Shell Oil Company, I was hired as a geoscientist.

Q    Did you take any formal training courses in geology?    1:01PM

A    Yes.

Q    Which courses?

A    Three field trips to Big Bend, field trips to Wyoming, field trips to reach carbonates in the Gulf of Mexico, trips to look at turbidite outcrops in    1:01PM the Karoo in South Africa.

A number of office geology classes with senior geologists.  Shell ran an extensive program if you were working on a particular type of geology, so...    1:01PM

Q    Did you take or receive any formal training in economic analysis?

A    Yes.

Q    Which?

A    In order to move to a management position in    1:02PM

Page 45

12 (Pages 42 - 45)

CONFIDENTIAL

Shell, you needed to take a series of economic courses 1:02PM that were taught -- some were taught internally and some were externally provided.

Q    What were they?

A    They were mostly economic courses in how to 1:02PM calculate things like profit investment ratios in earnings, in all of the things you would need in order to evaluate the economics of a prospect or a field.

Q    And those were in-house?

A    Some of them were in-house and some of them 1:02PM they brought external consultants or companies in to teach us.

Q    But at Shell?

A    At Shell.

Q    What risk assessment software does Shell 1:03PM use internally, or did it at the time?

A    Shell uses an internal risk assessment series of software.  It's more than one type of software, it's really a process that they use.

And it has changed over time, obviously.    1:03PM The software and the process we used in the 1990s was very different than the process we used in 2012.

But the software is fairly homegrown and it includes both deterministic and probabilistic estimates.    1:03PM

Page 46

Q    You say it's homegrown, it's proprietary 1:03PM to Shell?

A    Yes.

Q    And so let's take the later time frame. What was it called by, say, 2010?    1:04PM

A    It was just called risk assessment --

Q    Okay.

A    -- at Shell.

Q    Okay.  Now, you personally run the risk assessment software in doing prospect valuations?    1:04PM

A    I have run the risk assessments and, in fact, I used to teach the risk assessment methodology for the -- at one time for the Gulf of Mexico.

Q    Teach it to whom?

A    To younger Shell employees.    1:04PM

Q    Okay.  And so the training was to do this with the homegrown software at Shell?

A    Yes.

Q    Did you ever take a Rose & Associate course in risk analysis?

A    As I mentioned, I was Shell's -- Shell is always interested in keeping tabs on other developments and so for one year, Shell paid to join the consortium and I was their representative to the Rose & Associates group.    1:05PM

Page 47

Q    But that's a different question.    1:05PM

A    So I would run the Rose & Associates software on our internal prospects to compare to our internal system for risking.

Q    You still haven't answered my question, 1:05PM which is did you take any courses?

A    I don't -- I would have to say no because they did not actually teach courses then.  So we would run the software and work together on it.  But they didn't teach it as a course.    1:05PM

Q    So you've never received any formal training?

A    No, on Rose & Associates' software from Rose & Associates, no.

Q    Now, the MMRA was used by Anadarko to 1:05PM estimate the potential of Shenandoah; right?

A    Yes.

Q    What are the inputs for the MMRA analysis?

A    Well, it depends.  Well, it has a series of inputs.  You have to estimate the geologic risk 1:06PM factor -- for risking, you have to estimate the geologic risk factor, which involves estimating the probability of trap, the probability of source, the probability of reservoir, the probability of seal.

And I'm not sure if I said charge, but 1:06PM

Page 48

there are like five major inputs into looking at 1:06PM that.

Then for volumes you have to input information about the size in terms of area, the thickness of the hydrocarbon column.  You usually 1:06PM have to put in a factor, some type of shake factor that accounts for the thinning at the edges of it.

You have to put in some information if you want recoverables about what the recovery factor is. You have to put in estimates for the porosity.    1:07PM

They usually deal with recovery as a single factor rather than looking at the components of recovery factor in Rose & Associates' software.

But anyways, you input these in and then it uses a -- an assumption about the distribution of 1:07PM values and the assumption is that they follow a logarithmic distribution.

So if you estimate two points on the logarithmic curve, it will estimate the third.

Typically they estimate P10, P90 and it 1:07PM will interpolate P50.

Q    What is meant by P10, P50 and P90 and how are they determined?

A    Yes, so P50 represents -- of anything, represents there's 50 -- an equal probability of it 1:08PM

Page 49

13 (Pages 46 - 49)

being bigger or higher than that value and lower than 1:08PM that value.

So P50 is a probability of 50 percent. So it has equal probability to be higher or lower.

Then one can also then estimate P10 and 1:08PM P90. Now, most of the industry with the exception of Marathon, but most of the industry refers to P10 as there only being a 10 percent chance that something is -- that it's that value or bigger and P90 would represent a 90 percent chance that 1:08PM something is that big or bigger.

So when you talk about a P90, that usually represents the small case. When you talk about P10, it usually represents a large case.

Q  What about P1, P99? 1:09PM

A  In exactly the same way, P1 would represent a 1 percent chance that it's that or bigger. So that would represent the most extreme limit of large -- how large it could be.

And P99 would represent a 99 percent 1:09PM chance it's that or bigger. So that would represent an almost slam dunk that it's at least that number.

Q  What's a risked mean?

A  The mean?

Q  Risked mean. 1:09PM

Page 50

A  I'm not sure if you're asking what -- there 1:09PM is a mean, I talked about P50 but there's also a mean as well. It's a mathematical term.

So a mean is if you average up the probability and the value of each and you add them 1:09PM you will up and you look at where the middle of the distribution is, that would be the mean.

If you mean what does risk mean, risk just represents the likelihood of occurrence.

Q  And do you view risked mean as 1:10PM interchangeable with a P50?

A  No.

Q  How are they different?

A  They are only the same if you have a perfect normal distribution. By normal distribution I mean 1:10PM it's symmetric on either side and it follows a typical mathematical exponential kind of distribution.

Not all distributions follow that. In the oil and gas industry, not all parameters follow that. 1:10PM

So the only time that the mean and that the P50 would be -- they are usually in the ballpark of each other, but there are certain prospects and certain opportunities where they are quite a bit different. 1:11PM

Page 51

Q  Are resource volumes represented by the 1:11PM P50?

A  Resource volumes are represented by a range, so...

Q  Are they -- is it the P50 or are they 1:11PM represented by a probability weighting?

A  When one talks about the volumetrics of an opportunity, even one that's being produced, there's still some uncertainty associated with it. So you usually deal with the range and you might -- for 1:11PM purposes of simple calculation, you might deal with either the P50 or the mean.

But in general you usually refer to the range. And the range depends upon company. Some companies it's P10, P90, some companies it's P20, 1:11PM P80.

Q  Did Anadarko use the P50 as the expected resource volume in its analysis?

A  Most of the time, but not all the time. Sometimes they refer to the mean value. So it was -- 1:12PM when they did their calculations, they usually used a P50 value.

Q  How do you calculate expected value?

A  So expected value is the value that you would get if you took each value -- each estimated 1:12PM

Page 52

value times its risk and you were to add it up. 1:12PM

So if I had a value of something that had a 10 percent likelihood of being one number or 50 percent likelihood of being another and a 90 percent likelihood of being a third, I could 1:13PM weight each of those values by their risk probability and then add them up together and divide.

So that would give you then a risk value. And the reality is you can do that mathematically 1:13PM across the entire curve or you can estimate it just from a few values.

Q  Are the P90, P10 and P50 incorporated into the expected value calculation?

A  In a -- they are included -- they are 1:13PM accounted for. I won't say they are necessarily included because it depends on how you do the calculation.

Q  Okay. Elaborate on that. What do you mean by "it depends on how you do the calculation"? 1:14PM

A  Well, if you're just doing a quick calculation you, can do it just from the three values, right, P10, P50, P90.

If you actually calculate a probability distribution for volumes, which might be a very 1:14PM

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

complex looking function, then you would actually add it up mathematically in a computer.

So you would actually integrate under that curve, so that would give you a more accurate estimate.

People who do simple calculations sometimes just do it with the three values, P10, P50, P90.

Q   Are costs incorporated into the expected value calculation?

A   Costs should be included into it if you want expected values because you have expected volumes and you should calculate what the costs would be if you were to pursue each of those expected volumes.

Not very many companies do that. A few do. And in my experience looking at Anadarko is that they did not do that, they did expected values usually using one of their P50 or mean values.

So they didn't necessarily calculate value for P10 or for P90.

Q   So is the P -- what about PIR10, is that predicated on the P50?

A   At Anadarko, the calculations that I saw were predominantly based upon either the P50 or the mean and the PIR of 10 would be a profit investment

Page 54

ratio at a 10 percent inflation factor.

Q   So did Anadarko assess the PIR10 using P50 alone?

A   Not always. But usually it looked to me like they substituted and did it based on the mean.

They didn't do it on an expected value basis including everything from P10 to P90. They only did it on the P50 value for the most part.

Q   What is the difference between MMBO and MMBOE?

A   MMBO is millions of barrels of oil and MMBOE is millions of barrels of oil equivalent. Millions of barrels of oil equivalent takes into account the expected gas that will come out of solution.

And so the gas in terms of heat value usually equates by about a factor of six, give or take a little bit.

So you would convert millions of cubic feet of gas into barrels of oil by dividing it by a certain factor. And that just gives you a way of adding up volumetrics.

Q   How big of a difference can there be, or in this case how much of a difference was there?

A   How much of a difference in general depends upon how much gas is dissolved in the oil. You can

Page 55

have oils that have very, very little gas, you can have oils that have a great deal of gas.

The oil at Shenandoah actually had a surprisingly high amount of gas dissolved in it for reservoirs of the same age and depth.

So it was a little usual.

Q   Do you know how much of a difference it was in this case?

A   I think it was around -- the gas-to-oil ratio was around 12 to 1500.

Q   In log-normal distributions, is it inappropriate to interchange those two terms?

A   Well, no, it's not -- a normal distribution is a Gaussian and a log-normal distribution is a distribution that is logarithmic on one side and a Gaussian on the other.

And a log-log distribution is one that's logarithmic on both axes.

So if you just said "a logarithmic distribution" and you didn't say anything else, people would assume you meant a log-normal distribution.

But there are log-log distributions. So, for instance, permeability and porosity are sometimes log-log.

Page 56

Q   So the answer is no?

A   Correct, the answer is no, you cannot just interchange them.

Q   So I would like to run through some of your career experience. We did it at a high level. Now I would like to ask you some more detailed questions.

From 1981 to 1983, you were a seismic processing geophysicist?

A   Yes.

Q   And from '83 to '88, you were a senior geophysicist and seismic land acquisition crew chief?

A   Yes.

Q   Eighty-eight to '89, you were a senior geophysical interpreter in coastal California?

A   Yes.

Q   So from '81 to '92, you worked exclusively as a geophysicist; correct?

A   Geophysicist although by the end, actually doing quite a bit of geology, because I had had a lot of the geologic training by then.

Q   Okay. So moving on into later into the '90s. So '95 for '97, you were involved with the Shell Enchilada field as the lead staff geophysical

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

interpreter?                              1:20PM

A    Yes.  So basically I ran a team, a small team of five subsurface people of which our job was to evaluate the field and the volumes and to build a development plan for it.                    1:20PM

Q    So you were the geophysicist; right?

A    I had technical responsibility for the geophysics and overall responsibility for generating the plan, yes.

Q    Okay.  Let's talk about your personal      1:21PM role.  So you mapped the seismic; is that right?

A    Yes.

Q    Were there any other geophysical tools that you used?

A    Well, I used quite a few.  So I helped      1:21PM guide -- even though I wasn't doing the seismic processing, I had enough seismic processing experience that I fed back a lot of recommendations and information to the people doing the seismic processing, including building a salt model and a      1:21PM velocity model so they could reprocess the seismic data.

I built the inputs for the reservoir model for the reservoir engineer that was working with us.

I worked closely with the geologists to      1:21PM

Page 58

define the stratigraphy of the basin and I generated   1:22PM both -- a number of papers, one of which won an award on Enchilada.  And I also generated a ten-minute video that was used for public to -- was made available to the public when the Enchilada   1:22PM platform was rolled out to sea.

Q    So that covers what you personally did on that project; right?

A    Yes.

Q    All right.  So from '97 to '98, you were   1:22PM the offshore development project manager for Cinnamon?

A    Yes.

Q    At some later point not during this deposition, you can explain to me all the -- how you   1:22PM name these fields, but --

A    Maybe when we go off, I'll tell you how they are done.

Q    Okay.  So what was your personal responsibility on this project?          1:23PM

A    So I was the offshore project manager.  So I was responsible for an office team that was doing what I had done and what my team had done at Enchilada but they were doing it for Cinnamon.  I had a team of a geologist, geophysicist, petrophysicist, reservoir   1:23PM

Page 59

engineer building the models for the subsurface.      1:23PM

But then I was also responsible for the construction and installation of the offshore platform, so I had a construction crew working in South Louisiana building a 750-foot tall steel      1:23PM structure that would seat on the seafloor and building the top sides.

And then responsible for getting it towed out, installed, working with the drilling company to put the drilling rig on it, to start drilling the      1:24PM wells and to hook up the pipelines, including negotiating the tara freight on the pipelines that we would feed our oil into.

Q    And did you -- were you responsible for the geophysics on the project?            1:24PM

A    Not directly, no.  I had a geophysicist working for me.

Q    And there was an engineer who led the risk assessment and economic analysis of that field?

A    Under my supervision, yes.            1:24PM

Q    You did not perform those tasks personally; right?

A    Practically -- I did not do a lot of the button pushing, but they were young people and so I had to work with them very closely to make sure that   1:24PM

Page 60

they got the evaluations done right, yes.            1:24PM

Q    But yes, it was an engineer that performed those tasks; correct?

A    Correct.

Q    Asphaltene was not a significant risk at      1:25PM Cinnamon; right?

A    No.

Q    Do you recall what the AOP of the oils were?

A    At Cinnamon?                        1:25PM

Q    Yes.

A    They were negligible.  They weren't worth -- the bigger issue at Cinnamon was waxes.

Q    There wasn't occasion for asphaltene mitigation then in that field there; right?      1:25PM

A    No.

Q    From '98 to 2002, you were working on a multidisciplinary team in the GoM?

A    It was principally in the Gulf of Mexico, but it started expanding.                  1:26PM

But yes, I was working deepwater in the Gulf of Mexico but then with offering advice to other deepwater plays around the world.

Q    So as the geophysicist, did you focus on the seismic?                            1:26PM

Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

A   I focused a lot on the seismic. In that 1:26PM period of time there was a significant number of -- which years, just to be sure?

Q   '98 to 2002.

A   Oh, '98 to 2002? 1:26PM

Q   Yes.

A   Okay. '98 to 2002, I was working mostly around a multidisciplinary team that was charged with finding and risking and calculating volumes for what we would call non-amplitude supported prospects or 1:26PM prospects that were not very obvious.

And so it was -- a lot of it was in the Gulf of Mexico and also with input to other places in the world, but yes.

Q   You had an engineer on that team? 1:27PM

A   Yes, I did.

Q   And the engineer on that team was responsible for evaluating recovery factor and running economics?

A   Yes. 1:27PM

Q   And that was not your role; correct?

A   My role was to supervise it and to make sure that those calculations were being done in accordance with the proper Shell methodologies.

Q   Right. That's the Shell proprietary 1:27PM

Page 62

system? 1:27PM

A   Right. So would I sit on a -- I would sit on a risk assessment team, much like the RCT that Anadarko had, and evaluate many of them.

Q   Anadarko didn't use that Shell system; 1:27PM right?

A   No.

Q   Do you recall any projects that you were personally involved in asphaltene mitigation during this time? 1:28PM

A   During that period of time or later than that?

Q   During that time.

A   Till 2002, I have to think.

We -- we did encounter some -- we did 1:28PM drill some wells that encountered asphaltenes, but they weren't developed that year. They were developed quite a bit later, so -- and mitigation was put in.

But we were aware of asphaltenes, we had 1:28PM considered them and they were something that was in the conversation already as to how we would handle if a development -- go ahead.

Q   I'm sorry. What was the AOP of those oils? 1:28PM

Page 63

A   I just remember the pressures we talked 1:29PM about now. Obviously the pressures that we were talking about in these wells were not at the extreme pressures, high pressures they were talking about with Shenandoah. 1:29PM

But the dropout pressure, if I remember right, was on the order of around 3 to 4,000 psi were the kind of dropout pressures we were typically looking at in terms of asphaltenes.

Q   Between 2002 and 2005, you were a global 1:29PM deepwater technical advisor?

A   Right. So during that period I would fly around the world and do training and risk assessments for all the deepwater plays for Shell around the world. 1:29PM

Q   Again, this is using Shell's proprietary system?

A   Right.

Q   Were you also involved with a Shell global quantitative integrated valuation team? 1:30PM

A   Yes, that was a team that was kind of like a hit team that would -- that I led that would go into an area and over the period of a month help them organize, evaluate and rank the portfolio of opportunities. 1:30PM

Page 64

Q   Was this called a QIE team? 1:30PM

A   Yes.

Q   What quantitative data did that team evaluate?

A   Could you rephrase the question? 1:30PM

Q   I believe -- I believe the name of the team is quantitative integrated evaluation team.

A   Right.

Q   Was there certain quantitative data that the team evaluated? 1:31PM

A   Yes, so this team would build a multidimensional subsurface model that, at the reservoir, existed at a reservoir scale but overall also existed at a geologic scale or even a basin scale. 1:31PM

So it was a multidimensional model that incorporated all the data. That's why it was called integrated.

So it incorporated all the seismic information, it incorporated all the geologic 1:31PM information and it incorporated all of the well and reservoir information and it did it at the level, very detailed obviously at the reservoir and at a much cruder level at the entire basin scale.

So it was a multi-scaled model. 1:32PM

Page 65

17 (Pages 62 - 65)

CONFIDENTIAL

Q   Did the QIE team do reserve estimation?   1:32PM

A   Yes.

Q   On probabilistic basis?

A   Both probabilistic and deterministic.

Q   What was your personal role in that work?   1:32PM

A   My personal role was to teach the methodology to ensure it was being followed and to QC the results of the team.

Q   Again, using Shell's proprietary system?

A   Yes.   1:32PM

Q   And the QIE is not deployed at Anadarko; right?

A   No, it is not.

Q   Now, in 2004 you were the head of global training for deepwater risk assessment; is that   1:32PM right?

A   Yes.

Q   So fairly senior position within the company by that point?

A   Yes.   1:33PM

Q   So as a senior person at the company, were you aware that in 2004, Shell revealed it had overstated its reserves by 3.9 billion BOE?

A   I became aware of it.

Q   And so it's an overstatement of about   1:33PM

Page 66

20 percent?   1:33PM

A   Yes, it was a -- it was an overstatement that there was -- by 20 percent, that's correct.  Due to discovered volumes that were never taken forward to be declared reserves.   1:33PM

Q   That prompted an SEC investigation; right?

A   I believe so.

Q   And the SEC accused Shell of being excessively permissive on its reserve estimations?

A   Yes.  I don't know what the SEC finally   1:33PM ruled.  It did not involve any of the things I was working on, so...

Q   Were you aware of the allegations?

A   I was aware of them.

Q   Okay.  And did Shell change its   1:34PM methodology after the investigation or litigation?

A   Shell changed its methodology in what you report as reserves, Shell did not change its methodology for how it calculated volumes or risking.

It changed its reporting requirements and   1:34PM did it very significantly.  Because we did reserves training at all levels of the company for many years, probably still do.

Q   Do you continue to use this methodology as a consultant?   1:34PM

Page 67

A   As a consultant, I use a methodology which   1:34PM is a combination of both my own experiences, the things I learned at Shell and the things I learned using our kinds of volumetric risking technologies that I have seen over my career.   1:35PM

Q   When you say your experience at Shell, are you talking about prior to the revelation of overstatement or what changed afterwards?

A   Well, the estimation of volumes and the risking of those volumes did not change substantially.  1:35PM What changed was the reporting of reserves.  So volumes which were not reserves before that are had been reported as reserves.  That's why they were overstated.

It's not that the volumes did not exist,   1:35PM it's just that there was no plan to develop them, so you can't report them as reserves.

Q   So that aspect of Shell's proprietary approach did not change?

A   No.   1:36PM

Q   Okay.  So between 2005 and 2008, you were a seismic manager; right?

A   Yes, in 2005 Hurricane Katrina wiped out the Shell office in New Orleans and there were some very substantial lease sales coming up in the Gulf of   1:36PM

Page 68

Mexico within three to four years, and so I was yanked   1:36PM off of the existing role that I was and brought in to manage as exploration seismic manager for the Gulf of Mexico to prepare for the upcoming lease sales and transferred to Houston.   1:36PM

Q   Okay.  So at that point you were no longer personally interpreting the seismic data; right?

A   Actually, I spent quite a bit of time interpreting seismic data because I had a team of about 130, 150 people working hard on developing an   1:37PM integrated seismic image of the entire Gulf of Mexico.

So all the little seismic data sets shot all over the place, I was responsible for buying seismic that would fill them in.  So I would sit there and sit with interpreters and interpret   1:37PM seismic data.

We were responsible for building the salt interpretation across the entire Gulf of Mexico and we were responsible for -- actually proposed a new seismic acquisition method which was picked up by   1:37PM the industry and grew quite a bit after that, the idea of shooting wide-azimuth seismic.

Q   So you sat with the people who were interpreting the seismic; right?

A   Yes, I sat with them and looked at the   1:38PM

Page 69

18 (Pages 66 - 69)

workstation and interpreted the data next to them, 1:38PM yes.

Q   That project was seismic focused; right? You didn't run econ analysis on those -- that seismic project? 1:38PM

A   I was actually on the leadership team that then, when it came time for the lease sales, we had to evaluate the potential economics of every prospect and every fault block that was up for sale so that we could make a suitable bid at the lease sales. 1:38PM

So I sat on that leadership team, yes.

Q   The leadership team, but you didn't do the underlying runs?

A   No, we had people who would run -- we had people that would run all the economic for every one 1:38PM of the prospects.

Q   From there you were in Nigeria; right?

A   Yes, 2008 I when to Nigeria as the Sub-Sahara geophysics manager.

Q   And so that was your role as a geophysics 1:39PM manager?

A   Well, it was actually more than geophysics because I was in -- also in charge of -- it was geophysics where geophysics was needed, but it was more reservoir engineering and planning for deepwater 1:39PM

Page 70

because Shell was -- needed someone to make a proposal 1:39PM as to how to develop a number of discoveries in deepwater.

So I kind of like supervised the team who was doing the volumetrics, the risking and the 1:39PM economics.

Q   Right. So there were folks running those analyses?

A   Correct.

Q   Did you -- what work, if any, did you 1:40PM personally perform in preparing reserve reports?

A   Well, when I was working at Gulf of Mexico, I would -- certainly when I was a project manager at Enchilada and at Cinnamon, I was directly responsible for the reserve reports for those field, right. 1:40PM

So would I sit there with a senior reserve person and generate the report that we would use for those fields.

After that --

Q   I'm sorry, my question was about Nigeria. 1:40PM

A   Oh, in Nigeria, I did not -- I had no role in generating the reserve reports.

Q   Okay. Between 2012 and 2014, you were involved in research on reservoir surveillance; right? 1:41PM

Page 71

A   Correct. 1:41PM

Q   What was your responsibility there?

A   So I ran a research team of approximately 25 people, 12 of which were in Houston in the U.S. and 13 were in the Netherlands. 1:41PM

And our job was multifold. We were looking at methodologies to monitor how fluids moved in a field.

So we would we came up with systems that would watch oil move, would watch gas move, would 1:41PM watch water move, would watch steam move, would watch chemicals move.

We came up with technologies that involved monitoring them with repeat seismic data to monitoring them with distributed acoustic fiber data 1:42PM in wells with vertical seismic profiles to monitoring them on an hourly basis with permanent systems that were continuous, running -- buried in the earth.

So we had a number of -- also monitoring 1:42PM the deflection of the seafloor as production was done or monitoring the change in gravity due to extraction of fluids.

So we had a whole series of technologies we were monitoring production with. 1:42PM

Page 72

Q   From there you left Shell; right? 1:43PM

A   Yes, I took full retirement.

Q   You founded your geophysical company?

A   Yes.

Q   Who are your clients? 1:43PM

A   So I had a range of clients, one of my clients continuously has been Shell, who hired me back immediately as a consultant. So I've been doing that and still -- they're still a client of mine. I have had a number of consultants in the oil and gas 1:43PM industry.

I've had a few consultants that were investment firms who needed information about expectations about what will happen in the oil and gas industry. 1:43PM

Then I had a number of companies who have equipment from an engineering perspective that I am very familiar with that hired me around patents and patent issues. So it's a range of clients. I try not to work too hard. 1:44PM

Q   All right. Let's turn to --

MS. JENSEN:  I'm going to mark an exhibit here. So bear with me.

You should be able to see what we've marked for identification as Exhibit 528. 1:45PM

Page 73

19 (Pages 70 - 73)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

(Whereupon, Exhibit 528 was marked for identification.) 1:45PM

MS. JENSEN: This, for the record, is a native file produced by the defendants in this case with the Bates number APC-01314375. 1:45PM

THE WITNESS: I see it.

BY MS. JENSEN:

Q   Have you seen this document before?

A   I'm trying to get the slide bar to work.

Q   So this time -- 1:46PM

A   I recognize the first page. I believe this was from a presentation by Anadarko internally.

Q   So you've seen this before?

A   I think so. I can't cannot -- I haven't -- well, again, this looks like ones you have to flip through the slide one at a time. But yes, it looks familiar. 1:46PM

Q   And so for the record, the custodian of this document, even though you can't see it on the document itself, is Paul Chandler. 1:46PM

Do you know who he is?

A   I do.

Q   Okay. Who's Paul Chandler?

A   Paul Chandler was one of the, I think, senior reservoir engineers I think at -- either 1:46PM

reservoir engineer or geologist on the development side. 1:46PM

Q   So just to clarify for you, geologist -- what is the difference between a geologist and a petroleum engineer? 1:47PM

A   Well, the real difference is whatever their job responsibilities are assigned to be. So in terms of training, they may have come from a whole variety of backgrounds.

But a petroleum engineer is responsible for defining how the hydrocarbons is going to get out of the reservoir and through the production system, right? 1:47PM

So they are responsible for things like what kind of completion, what size tubing, you know, all of the stuff that is going to get engineered from the reservoir to a delivery system, a pipe eventually. 1:47PM

The reservoir engineer is responsible for what happens in the reservoir in terms of how do fluids move in the reservoir, how much of it will move out and what rate will it move at. 1:48PM

Q   So this file was saved on Anadarko's network under fold belt.

Are you familiar with that? 1:48PM

Page 74

Page 75

A   Under -- 1:48PM

Q   That area within Anadarko?

A   No, I'm not familiar with different areas of storage at Anadarko.

Q   I'm talking about different groups. 1:48PM

A   Which group was it with?

Q   Fold belt.

A   Full?

Q   Fold belt?

A   Oh, fold belt, yes. I wasn't familiar with that, but I'm a little surprised because this would not typically be considered being in the fold belt. But okay. 1:48PM

Q   Now it's titled "Shenandoah: Sizing It Right a Retrospective" from July 8th, 2017. 1:49PM

This isn't long after Shenandoah was written off; correct?

A   I don't believe Shenandoah was written off. So I think -- but I think the date is correct.

Q   So you're not familiar with Shenandoah being written off at Anadarko? 1:49PM

A   Shenandoah took write-offs, but they didn't write off the entire field.

Q   Okay. So it's your testimony that Anadarko did not write off the entire field? 1:49PM

Page 76

A   Yes. 1:49PM

Q   Okay. And if you're wrong, does that change any of your opinions?

A   No.

Q   You're aware what a write-off is; right? 1:50PM

A   Yes, they took write-offs -- from my awareness, they took write-offs of certain wells and expenditures that had been on their books. But I don't believe the field was written off to completely to zero. So I don't recall seeing that at this point in time. 1:50PM

Q   Let's turn to the final slide. This one I do think you have to click every time.

A   Yes, I kind of guessed that, so I'm up to like -- the good news is you can click as fast as you want. 1:50PM

Q   I'm there. Tell me when you're there.

A   I'm there.

Q   Okay. Do you see the heading here, "Shenandoah - Takeaways"? 1:51PM

A   Yes.

Q   So do you understand this to be the takeaways from what was learned at Shenandoah?

A   Yes, it was a presentation that was given internally in the company to talk about what their 1:51PM

Page 77

20 (Pages 74 - 77)

CONFIDENTIAL

view looking back was. It's kind of a look-back.    1:51PM

Q   A look-back or a lessons learned; right?

A   Yes, lessons learned would be a little different, but I would call it a look-back.

Q   Okay. Well, the first line here, "Never    1:51PM discount an interpretation because it seems wrong or different. All interpretations are wrong until proven otherwise."

Would that be a lesson learned?

A   Usually a lesson learned has a    1:51PM recommendation for the future.

So you could -- because I actually work in capturing lessons learned.

But in terms of what happened, I would agree with that.    1:52PM

Q   It says, "Never discount an interpretation"; right? That's kind of an instruction for the future?

A   Correct.

Q   That's it; right?    1:52PM

A   Okay.

Q   And the discount interpretations here were the predevelopment's faulted maps; right?

A   The discounted interpretations are every interpretation because the final interpretation is yet    1:52PM

Page 78

to be -- yet to be determined.    1:52PM

Q   And Paul Chandler had interpretations on Shenandoah pretty early on; right?

A   Yes, he did.

Q   And his were discounted; correct?    1:52PM

A   Not sure they were discounted. I think they were considered, but there are many interpretations and as it says, don't discount them because they are all wrong. So...

Q   So you are aware that in this case, the    1:53PM development team had faults on their maps that were not accepted by the company?

A   At what time frame are you talking?

Q   I'm talking about 2014, 2015 in particular.    1:53PM

A   Yes, well, after Shen 4, the development team took over, so whatever faults they had on the map were accepted.

Q   So I'm talking about the time frame of early -- of 2014 through 2015, so the answer to my    1:53PM question is yes; right?

A   So after Shen 3, exploration put a fault on their map before -- and exploration was in charge of the development -- in charge of the evaluation, the appraisal.    1:54PM

Page 79

Before Shen 3, development had put faults    1:54PM on the map that exploration had not put on their map.

Q   So the second line, "If you have undesirable or inclusive data, don't ignore it.    1:54PM Factor it into your range of uncertainty."

So this indicates that from Paul Chandler's view, that they -- that the company had ignored undesirable or inconclusive data such as faulting; right?    1:54PM

MS. PHILLIPS: Objection as to form.

THE WITNESS: I believe exploration was taking faulting into account, because they were accounting for it in lowering their recovery factor.

What they didn't do was put faults on the    1:55PM map which would later turn out to be wrong.

BY MS. JENSEN:

Q   Okay. So from this perspective, so I understand that you've got your view on it, but this indicates that the lessons learned was that the    1:55PM undesirable data should be factored into the range of uncertainty?

MS. PHILLIPS: Objection as to form.

THE WITNESS: Yes, this doesn't say what the undesirable or inconclusive data is.    1:55PM

Page 80

BY MS. JENSEN:    1:55PM

Q   Right. And you're not aware of what Paul Chandler was advocating for throughout the class period in terms of the data?

A   No, I'm aware of what Paul Chandler was    1:55PM advocating for, but just as the first line said, he was advocating for his interpretation but all interpretations are wrong until proven otherwise.

Q   So let's look at Number 3, "Compartmentalization is the bane of most deepwater    1:55PM developments that fail."

So this expresses the belief that Shenandoah failed because of compartmentalization; correct?

A   Shenandoah hasn't started producing yet, so    1:56PM it's not clear whether or not it failed or not. But compartmentalization is an issue that has to be accounted for, yes.

Q   So that's not my question, though. If you could focus on my question.    1:56PM

In this instance he's saying -- expressing the view that Shenandoah failed at that time because of compartmentalization; correct?

MS. PHILLIPS: Objection as to form.

THE WITNESS: No, he just said    1:56PM

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL

compartmentalization is the bane of most deepwater developments that fail.

So he doesn't characterize Shenandoah as being one of those or not.

BY MS. JENSEN:

Q   Do you see at the bottom of this page -- I think you said earlier that you didn't think that Anadarko wrote off the field.

Do you see the reference here to May 2017, Anadarko wrote off $902 million associated with Shenandoah?

A   Yes.

Q   Okay.  And so does that refresh your recollection that Anadarko wrote off the entire field?

A   I don't see there -- it says "associated with Shenandoah," it doesn't say 902 million Shenandoah field.  So this is 902 million associated with it.  So it's part of it, yes, they did write off part of it.

Q   So you think there's some part of the field that was not written off?  So in other words, you think there was some amount of money that goes beyond $902 million?

A   Yes.

Page 82

Q   And what is that based on?

A   That's based upon the fact that the -- Anadarko did not write off all of the wells.  They did not write off -- they wrote off a series of wells, okay, but not all of it.

So they still thought the field had value.  They just were not prepared to pursue it.

Q   And so if they did write off the entire amount, that would indicate the converse, which is that they thought that Shenandoah had no value; correct?

MS. PHILLIPS:  Objection.

THE WITNESS:  No -- sorry.  If they wrote off the whole thing eventually, it just means that they did not have the means to pursue it.

BY MS. JENSEN:

Q   But your testimony is they did not write off the entire thing?

A   At this point in May of 2017, they had not written off the entire thing.

Q   Bear with me for a moment.

MS. JENSEN:  I apologize, we need to go off the record for a moment.

THE VIDEOGRAPHER:  Off the record.  It's 1:59 p.m.

Page 83

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.  It's 2:02 p.m.

BY MS. JENSEN:

Q   Dr. Detomo, would you please turn to slide 3 of this same document.  So it's going to require some quick clicking.

A   You don't think you can just click on the end and it go to the front?

Q   If you can do that, that's fine.  I don't think so, though.

A   No, you're right.

Slide 3.

Q   Okay.  So do you see -- do you see the same thing I see, which is "Shenandoah - Historic Overview"?

A   Yes.

Q   And there are several stars, the biggest star is on the right-hand side of the slide?

A   Yes.

Q   And it's a slide -- again, this is in 2017, but then there's a -- also the year 2018 is listed in this timeline?

A   Yes.

Q   Okay.  And under it says, "APC elects to

Page 84

withdraw from project completely due to reserve size and risk."

Do you see that?

A   Yes.

Q   Okay.  No reason to dispute that; correct?

A   No.

Q   You can set this aside.

A   I should point out that was way after May of 2017.

Q   That didn't refer to a write-down, did it?

A   I'm referring back to the last question you had asked before we went off.  You had asked about May 2017.

Q   Right.  And this one under 2018, it doesn't say anything about write-off, does it?

A   No, but in November of 2017, they proposed Well Number 7, so...

Q   We're kind of running off course here.  So, Dr. Detomo, if you could just focus on my questions, answer those questions.

A   Okay.

Q   Let's try to kind of stick with the program so that we don't get lost on frolics and detours; okay?

A   Okay.

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL

Q   Let's turn now to slide 55.    2:04PM

A   You're going to wear out my finger.

Q   Yes, mine too.

A   Yes.

Q   Do you see here there is a chart and it    2:05PM says, "Shenandoah Resource Estimate Through Time"?

A   Yes.

Q   Do you recognize this to be an evolution of Shenandoah's resource size over time?

A   Yes.    2:05PM

Q   What is the relationship of a mean -- of the mean of a probability distribution?  This would be the entire distribution.

A   The mean represents the weighted average of being effectively in the middle.    2:06PM

Q   The mean of a probability distribution, can it be used to characterize the distribution?

A   It's one of the ways one could characterize it, yes.

Q   So if the mean of a probability    2:06PM distribution decreases over time, it's an indication that the distribution is decreasing; correct?

A   It doesn't mean that the -- it depends on the range of the distribution, what the range of the distribution is doing as well.    2:06PM

Page 86

Q   Okay.  But it can be an indication that    2:06PM the distribution is decreasing; correct?

A   It can be one indication that the distribution could be decreasing.

Q   Okay.  So looking at this chart, you see    2:06PM that the mean of exploration's resource distribution for Shenandoah was 1200 MMBOE after Shen 2?  You may need to zoom in.

A   I was just looking for that.

Let me see if I can find where the zoom    2:07PM is.  Is there a way to zoom in?

MS. JENSEN:  Let's go off the record.

THE VIDEOGRAPHER:  We're off the record. It's 2:07 p.m.

(Recess taken.)    2:07PM

THE VIDEOGRAPHER:  Back on the record. It's 2:13 p.m.

BY MS. JENSEN:

Q   Welcome back.  I believe that you can see the numbers now on this chart.  So I'll ask you    2:13PM about some of them.

So looking at the bars in this chart, kind of in the middle of this slide, do you agree that the mean of exploration's resource distribution was 1200 MMBOE post Shen 2?    2:14PM

Page 87

A   Yes, that's what the chart says.    2:14PM

Q   Do you agree that after Shen 3 and Yucatan were drilled, the mean resource reduced to 920 MMBOE?

A   Yes, that's what is on this slide.    2:14PM

Q   And the fault model goes down to 740 MMBOE?

A   Yes.

Q   Okay.  After Shen 4, the joint estimate post RCT review was 425 MMBOE?    2:14PM

A   Wait a minute.  I'm working my way down. So the fault model post Shen 3, Yuc 2 was 740.  The post-drill Shen 4 was 754.  Fault model east fault block 590 and 85 percent to 550.

So joint exploration after Shen 4, 425,    2:15PM yes.

Q   And post Shen 5 goes down to 353?

A   Correct.

Q   And post Shen 6 goes down to 250 MMBOE?

A   Post Shen 6 development quick-look, 249.    2:15PM

Q   Okay.  MMBOE; right?

A   Excuse me.  I need to check.  I'm not sure if they aren't quoting MMBO or MMBOE.  Let me check.

Q   If you look right underneath -- it's kind of faint but right under those bars you see gross    2:16PM

Page 88

resource, MMBOE?    2:16PM

A   I see MMBOE under all the bars before Shen 4.  But below that I don't actually see MMBOE, I just see mean and there's nothing written underneath it.    2:16PM

So unless it's in a strange color and I can't see it.

Q   It's in a gray.

A   Is it in the bar?  I don't see it.

Q   It's right underneath them.    2:17PM

A   Unfortunately, in my version of the view graph, I see the P99, P90 mean, P10, P1 and the bar underneath.  There's nothing on the blue in the bar, so PowerPoint color.

Q   So I'll just represent to you that below    2:17PM those bars in gray is gross resources MMBOE.

A   Okay.  If it says MMBOE.

Q   You're aware that after Shen 6, it went down to 150 MMBO?

A   I'm aware that after Shen 6, they -- that it    2:17PM did lower -- after they went ahead and got all the data from Shen 6, Shen 6 sidetrack, et cetera, that they it did go down again.  So I don't recall exactly what the number was.

Q   In any event, we're talking a drop in the    2:18PM

Page 89

23 (Pages 86 - 89)

CONFIDENTIAL

mean resource from 1200 MMBOE to less than 200 MMBO 2:18PM over time?

A    Yes.

Q    About an 85 percent reduction; right?

A    That's the purpose of an appraisal is to    2:18PM narrow the range, yes.

MS. JENSEN:  I'm going to strike that answer.  It's nonresponsive.

Q    I'm just asking you:  It's 85 percent reduction; right?    2:18PM

A    Just a second.  From 1200 -- 85 percent would be -- yes, that's pretty close to it.  I would say pretty close to 85 percent, yes.

Q    Okay.  You can set this aside and back out of it.    2:19PM

A    Okay.

Q    In your report you criticize Mr. Pittinger's analysis of commerciality saying the calculation of expected value alone is incomplete.

Can you define the term "expected value"?    2:19PM

A    Yes, expected value would be -- the way I would define "expected value" would be the integration of the probability of occurrence times the likely volume for that occurrence.

Q    Okay.  And do you have a source for that    2:19PM

Page 90

definition?  Is there an industry source or    2:20PM literature source you can cite?

A    I don't have one off the top of my head. But I think if you look up "expected value," that's what you're going to see.    2:20PM

Q    What is the formula for expected value?

A    Probably the integration of the likelihood times the volume normalized to the total possibility.

Q    There is a formula; right?  There is an actual mathematical equation?    2:20PM

A    There is.

Q    And what is it?

A    I think it's going to be an integral from zero to 100 percent of the risk.  So that would be a value times the actual volume and then that integral    2:20PM normalized by the total would be the expected value. So it's going to look like an integral from zero to 100 times risk times that DX.

So yes, there is a formula for it.  I don't know anybody that really calculates that way,    2:21PM but that is the formula.

The cheap and easy way do it is to take a 10 percent probability of the 10 percent volume, a 90 percent probability of the 90 percent likelihood volume, which would be the P10, and the 50 percent    2:21PM

Page 91

probability of the 50 percent volume, multiply those    2:21PM together, add them all up and divide.  And that would give you a crude estimate of expected value. So...

Now, that only gives you the expected    2:22PM value of volume.  It doesn't give you expected value in terms of what the economics look like.

Q    So what would be the equation for expected value in economics?

A    Now, that gets a lot more complicated    2:22PM because if you only have the P90 value, in other words, you had a small volume, you would build a small development.

If you had the P10, a big field, you would build a big development.  And so the cost for each    2:22PM of those are different.

And I didn't see Anadarko ever doing that calculation calculating what the costs for different size developments for different size volumes would be.    2:22PM

So they only did it based upon the -- either the P50 or the median value.

Q    Okay.  So you're not aware of an expected value equation?

A    Expected value equation for value?    2:23PM

Page 92

Q    Yes.    2:23PM

A    I could write the equation for it, but I'm not aware of it ever having been done.

Q    So what would be the equation?

A    Okay.  So for each of the -- for each of the    2:23PM volumes, you have to have a development cost.  So for -- if you're going to do it on say every percent, you would have to have a development cost.

So what is the development cost associated with P10?  What's the development cost associated    2:23PM with P50?  What is the development cost associated with P90?  What is the development cost for every one of those in between, because there may be places where you change the development, you might change number of wells, you might change the size of the    2:23PM platform, you might change the size of the pipe.

And then if you have a cost for every one of those, then you could go through and do the economics for every one of them.

Basically you would have to do the    2:24PM economics for each of those and then add them all up.

Q    So you referred earlier to Rose & Associates; right?

A    Yes.    2:24PM

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL

Q   Rose & Associate is the industry leader in resource assessment with uncertainty; correct?   2:24PM

A   I have no knowledge of them being an industry leader. There's actually, as far as I know, very few companies that actually use it.   2:24PM

Q   So you don't think it's an industry leader?

A   No, I do not.

MS. JENSEN: I've introduced into the record a document which has been marked as Exhibit 529 for identification. So you should be able to see this.   2:24PM

(Whereupon, Exhibit 529 was marked for identification.)

THE WITNESS: Okay. Just a minute.   2:24PM

MS. JENSEN: For the record, this is an article called "The Role of the Engineer in Exploration: Expected Value." And this is from Rose & Associates.

THE WITNESS: Which number? I got it. Okay.   2:25PM

BY MS. JENSEN:

Q   529.

A   529. Got it.

Q   Have you seen this before?   2:25PM

Page 94

A   No.   2:25PM

Q   So there's an expected value equation here.

Do you see that?

A   I do.   2:25PM

Q   Any reason to dispute that that's the equation for expected value?

A   The thing I would argue is it's an estimate of expected value and it says underneath, "It's a very simple equation."   2:25PM

Q   But otherwise, no reason to dispute?

A   As an estimate of expected value, no, I think it's fine. It has probability chance times the expected value, et cetera, so...

Q   Also in this article it talks about the role of an engineer and says, "an engineer's role in exploration is to quantify. Geoscientists make interpretations of data and then engineers turn those interpretations into resource and economic assessments. The ultimate goal is to generate an inventory of opportunities that can be high graded, allowing investment in those that are the most financially worthy."   2:26PM

You don't have any reason to disagree with what's stated there; correct?   2:26PM

Page 95

A   I think you need that role. Whether or not that's the role of the reservoir engineer or the role of somebody else like an economics or a financial person depends upon the company.   2:26PM

Q   Further down into this article it talks about the importance of running these expected value equations. And it says, "If the expected value is positive, the project is an investment candidate, if it's negative, we're gambling. We can still invest in a project with a negative expected value, but likely we're going to lose money, and we'll certainly lose if we invest in enough of them."   2:26PM   2:27PM

Do you agree with that statement?

A   If you knew exactly what the commercial success volume was, yes. But the problem is you don't ever know what that value is.   2:27PM

And if you say that you are investing based solely upon that value, that that's also not true. Because there are many other things that come into account to decide whether or not you invest, sometimes even at a loss.   2:27PM

I was involved in a project where we invested in Saudi Arabia at a loss in order to have country entry. So you make investments for lots of different reasons.   2:28PM

Page 96

Q   There is a reference in here to full-cycle costs and that's the right way to run economics; right?   2:28PM

A   Can you tell me where you're talking about? What page?   2:28PM

Q   Yes, give me just one second. Hold on just one second. I have a tech issue. Hold on.

Okay. It's been resolved. If you turn down to Page 2 of this article.

A   Yes.   2:29PM

Q   So near the bottom, it talks about the NPV calculation?

A   Yes.

Q   And it says that it "accounts for all production (therefore revenue) and all costs and expenses over the life of the field."   2:30PM

A   Yes.

Q   Okay?

A   Yes.

Q   So in other words, full cycle costs should be inputted; right?   2:30PM

A   Yes, but I'm getting a little -- while you were waiting, I read this article, so this article appears to apply to an exploration well. So I'm a little confused that their calculations and their   2:30PM

Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

equations only apply to one probability and one    2:30PM
particular volume, not a range of them.

Q   So you can set that aside.

In your report you said that "the
calculation of expected value, alone, is    2:30PM
incomplete."

What do you mean by "incomplete" in that
context?

A   Can you tell me where you're referencing in
my report?    2:31PM

Q   Sure.  So Paragraph 64.

A   Fifty-four?

Q   Sixty-four.

A   Sixty-four.  Could you ask your question
again then?    2:31PM

Q   You said that it's incomplete, the
calculation of expected value alone is incomplete.

What did you mean?

A   The assumption is he assumes if you do the
calculation at the single P50 value with the P50 cost,    2:32PM
if that doesn't meet some commercial threshold, that
it's not commercial.  But that's not true.

Because you've ignored the uncertainty in
the range of the volumetrics and the uncertainty
associated with the cost.    2:32PM

Page 98

So just because that volume might not be    2:32PM
economic with a certain set of assumptions on cost,
if I were to change the assumptions on cost, that
volume may be very economic.

And given the range of volume, there may    2:32PM
be many volumes that are very economic.

So it's an incomplete assessment of value.

Q   And so is your critique there that you
think costs should be included?

A   In order to calculate -- yes, I think in    2:33PM
order to calculate a field's -- whether or not you're
going to develop a field, you have to reduce the
uncertainty to the point that you have a high level of
confidence that it's going to be economic at most, if
not all the ranges of what the outcomes are likely to    2:33PM
be.

Q   So how does expected value exclude or
include costs?

A   Well, if you're talking about expected
value, the value depends upon the cost.  If I    2:34PM
calculate the return on investment, the return on
investment has two parts -- has three parts to it.

One part is how much income do you get.
One part is how much money do you have to spend, and
the third part is what is the time in between those.    2:34PM

Page 99

So if I -- the way to improve the    2:34PM
economics of a project is to either sell more at a
higher price -- in other words, make more money --
reduce cost or get it earlier.

Q   So are you saying that the expected value    2:34PM
calculation does not take into account costs?

A   No, the expected value here only took into
account one set of estimated costs and one estimated
volume.  It did not take into account the range.

For instance, would Mr. Pittinger assume    2:35PM
that if I took these costs and applied it to the P10
value, would that be economic?  And so, you know,
it's an incomplete analysis.

Q   Okay.  In Paragraph 68 you say that each
partner had their own resource number; is that    2:35PM
right, some higher, some lower?

A   Yes, they all calculated resources
independently.

Q   But all the other partner estimates of
Shen mean resource sizes were smaller than Anadarko    2:35PM
exploration; correct?

A   I would have to revisit the chart showing
how they all compare.

Q   Okay.  In fact, the partner volumes and
Anadarko development were less than half of    2:36PM

Page 100

explorations estimated post Shen 3; correct?    2:36PM

A   I would have to see the values for what they
were post Shen 3.

Q   Okay.  But sitting here, you don't have
any reason to dispute that; right?    2:36PM

A   I don't have any reason to agree or disagree
with that because I don't know off the top of my head
the exact numbers for both of them post Shen 3.

Q   The Anadarko exploration research
estimates were much higher than other partners;    2:36PM
right?

A   I seem to recall that they were in at least
a number of cases higher.  I don't know if they were
always higher or if there were times where they were
lower.    2:37PM

Remember, when you say resource estimates,
I'm not sure if you're talking about the whole range
of estimates or if you're talking about a P50 or a
P90 or a P10.

Q   I said mean.    2:37PM

A   Okay.  The mean.  So the mean, I think there
were a number of times where Anadarko's were lower
than at least some of the partners, yes.

Q   Okay.  Now, as to the Shenandoah partners,
which ones were partners during the class period?    2:37PM

Page 101

26 (Pages 98 - 101)

CONFIDENTIAL

A   ConocoPhillips was a partner.  Venari was a   2:37PM partner.  Cobalt was a partner and then Marathon was a partner I think up through Shen 5.

Q   As to those partners, ConocoPhillips was trying to sell its working interest in Shenandoah   2:38PM since 2015; right?

A   It's not clear to me whether they were trying to sell their interest or whether or not they were trying to just upgrade their portfolio.  I believe ConocoPhillips was looking at restructuring   2:38PM their portfolio to have more capital to spend online -- onshore.

Q   You have no reason to dispute that ConocoPhillips was trying to sell its working interest in Shenandoah since 2015?   2:38PM

A   Well, they were shopping it around.  But I'm not sure they were actually willing to sell it unless they could get -- or the value that they wanted for it.

Q   Okay.  But they were shopping it around   2:39PM since 2015; right?

A   They did go out to the market and ask what people would be willing to pay.

Q   Okay.  Sound like semantics.  But in any event, okay.   2:39PM

Page 102

So ConocoPhillips non-consented to Shen 7;   2:39PM right?

A   Yes.

Q   Marathon did sell its working interest in Shenandoah during the class period; correct?   2:39PM

A   Yes.

Q   And in the end, Anadarko abandoned Shenandoah without making any money on Shenandoah; right?

A   Well, they exited, so -- but I don't know   2:39PM about what the final economics -- there are some complications financially in there.

So whether or not they actually made any money, didn't make any money, you know, and where that might actually have been made or not made, I   2:39PM would find it doubtful, but I don't know for sure because I'm not a financial person.  I don't know all the details of their backdoor arrangements.

Q   So because you're not a financial person, you don't have any opinion on that?   2:40PM

A   I don't know whether or not they made money or not.

Q   Okay.  All right.  Let's turn to Paragraph 97.

A   Okay.   2:40PM

Page 103

Q   I would like to turn your attention to the   2:40PM last sentence in that paragraph.

"Given the remaining uncertainties and the significant costs and time necessary to produce such discoveries," you mean oil discoveries, "decisions   2:40PM are continually made during the appraisal program to either:  Number 1, abandon the discovery as noncommercial, Number 2, continue appraising to further reduce uncertainty, or Number 3, move the effort to the 'development' phase."   2:41PM

Is that right?

A   Yes.

Q   And so the company is constantly visiting whether to abandon, continue or develop based on economic considerations; correct?   2:41PM

A   Based upon uncertainties during the appraisal.  The purpose of appraisal is to reduce the uncertainty.

Q   So the company's constantly revisiting which direction to go in; right?   2:41PM

A   The results of the last appraisal or the past appraisal drives an estimate of what additional appraisal needs to be done to reduce uncertainty.  You can't make a commercial assessment until you've finished appraisal.   2:41PM

Page 104

Q   So is your Paragraph 97 accurate or not?   2:41PM

A   Yes.

Q   Did you examine how the expected value of Shenandoah fields changed over time?

A   The way I would calculate expected value, I   2:42PM did not do it after each one, no.

Q   Did you examine how Anadarko's management's view of Shenandoah changed over time?

A   Well, exploration management's view was to continue appraising and reducing uncertainty, which is   2:42PM what they did.

Q   I'm not talking about exploration, I'm talking about Anadarko's senior management.

A   Well, exploration's senior management was driving what the decisions on exploration.   2:42PM

And even when exploration was done, they drove the decisions on the development team.  And the decision was to continue to appraise.

Q   So you're confining your answer to senior exploration management; is that right?   2:43PM

A   I believe the senior management above exploration could have made a decision to not -- to stop at any point in time, but they did not.

Q   Let's turn to Paragraph 34.

You refer in this paragraph to Anadarko's   2:43PM

Page 105

27 (Pages 102 - 105)

CONFIDENTIAL

public statements.                    2:43PM

A   Okay.

Q   Now, are you offering an opinion in this case that defendants did not engage in a fraudulent scheme?                    2:43PM

MS. PHILLIPS:  Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Yes, the only thing I commented on is whether or not the facts that were relayed in the public statements that I reviewed,    2:44PM whether or not those facts were truthful or not.

BY MS. JENSEN:

Q   So in answer to my question, the answer is no?

MS. PHILLIPS:  Same objection.    2:44PM

THE WITNESS:  The statements that they made were in my opinion truthful.

BY MS. JENSEN:

Q   But that's not my question.

A   Okay.                    2:44PM

Q   Just focus on my question.

A   Okay, repeat your question.

Q   Are you offering an opinion that defendants did not engage in a fraudulent scheme?

MS. PHILLIPS:  Same objection.    2:44PM

Page 106

THE WITNESS:  I'm not offering such an    2:44PM opinion.

BY MS. JENSEN:

Q   Are you offering an opinion that the defendants did not engage in any deceptive business    2:44PM practice?

MS. PHILLIPS:  Objection to the extent it calls for a legal conclusion.

MS. JENSEN:  That's an improper objection, by the way.  Go ahead.                    2:44PM

THE WITNESS:  I don't have any opinion as to whether or not that was true.  I only have an opinion as to whether or not what they relayed to the public was factually correct.

BY MS. JENSEN:                    2:45PM

Q   And when -- the statements that you looked at, those are the ones that are set forth in your report; correct?

A   Yes.

Q   Now, what are the plaintiffs alleging was    2:45PM misleading about the defendant's statements?

A   You're asking me?

Q   Yes.

A   Could you repeat that again?

Q   What are the plaintiffs alleging    2:45PM

Page 107

defendants were misleading about in their    2:45PM statements?

A   Okay.  Well, just a second.  I thought I had a section.  I wanted to find the exact wording.  I know -- I don't know why I can't find it.    2:46PM

Okay.  So without looking up the exact wording, to the best of my memory, one of the issues was around when they made a public announcement about Shen 3, they had made the announcement that the well had found thicker sand and I think that was    2:47PM one of the complaints was they felt that that was not accurate.

Q   Any others?

A   I think after Shen 4, there was some complaint about the fact that Shen 4 had found    2:48PM 600-plus feet of oil and then I -- those were probably the two that I recall off the top of my head.

So somewhere in my report is a list of each of those and you probably know where they are better than I do.  But I would have to look through    2:48PM it to find it offhand.  I guess I could look at the table of contents.

Q   So the allegations that you evaluated, they are within the four corners of your report; correct?                    2:49PM

Page 108

A   Yes.                    2:49PM

Q   Okay.  You also say that the alleged omissions "are either commonly known uncertainties, such as the risk of faulting, or detailed technical disagreements that I would not expect to be    2:49PM disclosed."

That's your position; correct?

A   One wouldn't normally, in talking about --

Q   I'm sorry to interrupt.

A   Go ahead.                    2:49PM

Q   Is that a yes?

A   Say the question again.

Q   Okay.  So I was quoting from your report, so --

A   Yes.                    2:49PM

Q   You say that "The alleged omissions that Plaintiffs identify are either commonly known uncertainties, such as the risk of faulting, or detailed technical disagreements that I would not expect to be disclosed."                    2:49PM

That's your position; right?

A   Yes.

Q   Are there criteria for company disclosures under federal securities laws?

A   I'm not familiar -- I'm not aware of what    2:50PM

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

the requirements of what should be disclosed are or   2:50PM
not.
    Q   Okay.  You're not a lawyer; right?
    A   No.
    Q   Okay.  You don't hold yourself out as a   2:50PM
securities law expert?
    A   No.
    Q   Now, you refer to commonly known
uncertainties.  What are you referring to?
    A   In the oil and gas industry, there are   2:50PM
certain terms which are interpreted in a common way.
So that I would -- we refer to those as commonly
known.
    Q   Okay.  So you're just referring to the
fact that there's certain terms that are interpreted   2:50PM
in a common way?
    A   Yes.
    Q   Okay.  That's all you mean by that?
    A   Yes.
    Q   Okay.  Are there any other commonly known   2:51PM
uncertainties that you're referring to there?
    A   Other than which ones?
    Q   Well, you just referred to your definition
of what that meant.
    A   Right.  So I said common -- they are   2:51PM

Page 110

commonly -- they are understood in a common way and   2:51PM
you asked if there were any others.
    Q   Okay.
    A   We did not talk about any specifically.  So
I don't know what the others are.   2:51PM
    Q   Right.  So you tell me.  That's how you
define that term, so I was just going off of your
testimony.  So what are you referring to here?
    A   Are you asking me what are some common
terms?   2:51PM
    Q   I'm talking about your report, Dr. Detomo.
So you used words, I'm trying to figure out what
those words mean.
        You say, "commonly known uncertainties."
What do you --   2:52PM
    A   Can you tell me where that paragraph is?
    Q   I already did, but yes, it's Paragraph 34.
    A   Okay.  As an example, a commonly used term
is when one refers to a well having penetrated sand or
whether a well had penetrated oil.   2:52PM
        So the common understanding is if you say
a well penetrated sand, then it's common
understanding that it doesn't have oil in it.
Otherwise you would say it penetrated oil.
    Q   So you're referring to commonly known   2:53PM

Page 111

uncertainties, you're talking about the phraseology   2:53PM
around sand versus oil?
    A   You asked for one example.  I just gave it.
    Q   So that's the type of example you're
talking about when you say that the omissions are   2:53PM
commonly known uncertainties?
    A   Another omission might be that in the
interpretation, there's the possibility of a -- say a
fault nearby.
        Now, if you --   2:53PM
    Q   So if you --
    A   If you don't know the fault's there, you
wouldn't disclose, oh, by the way, there may be a
fault nearby.
    Q   Okay.  So I think maybe we're   2:53PM
misunderstanding the purpose of me taking your
deposition.
        So I'm trying to understand what it is
that you're referring to, but then you're using
words like, well, it might be this.   2:54PM
        I'm trying to get to you tell me,
Dr. Detomo, what are the commonly known
uncertainties that you're referring to in
Paragraph 34?  Please give me an exhaustive list.
    A   An exhaustive list?   2:54PM

Page 112

    Q   An exhaustive list?   2:54PM
    A   It would take some time for me to develop an
exhaustive list.  I list the ones in the other parts
when I respond to the particular claims at the time.
        But an exhaustive list would require me   2:54PM
taking time and thought to write such a list down.
I gave two examples, so...
    Q   So those are your two examples then in
this case?
    A   How many examples are you looking for?   2:54PM
    Q   I'm looking for all of the examples that
apply to this case.
    A   Well, examples that apply to each of the
disclosures that were given are listed with each of
the disclosures, so I don't recall them all off the   2:55PM
top of my head, but they are in the report.
    Q   I would like to know each of the commonly
known uncertainties that your report relates to in
the context of this case.
    A   Okay.  You would, for instance -- you would   2:55PM
not disclose if your well had a problem.  You would
not disclose if your well took a kick.  You would not
disclose if your logging tool got stuck and required
fishing.  You would not -- I mean, so there are
literally --   2:56PM

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL

Q   Dr. Detomo, just one second. I still 2:56PM think you're not understanding the question.

A   I was giving you a list --

MS. PHILLIPS: Rachel, please don't interrupt Dr. Detomo. He's still answering your 2:56PM question, if you could let him continue.

MS. JENSEN: He's actually not answering my question.

MS. PHILLIPS: Please let him continue. He's still answer your question, Rachel. 2:56PM

MS. JENSEN: You can stop the speaking objections.

Q   Dr. Detomo, is that an allegation in this case?

A   I don't know. You asked for a list of 2:56PM things that you would not disclose.

Q   No, I did not, actually.

What I asked was: When you say the alleged omissions that plaintiffs identify are either commonly known uncertainties, such as the 2:56PM risk of faulting, I'm going to stop there, okay.

So I don't know if you looked at the complaint in this case. But are you saying that this case is about whether a logging tool got stuck? Is that what your understanding of this case is? 2:57PM

Page 114

A   No, I believe the last question you asked is 2:57PM can you give me an exhaustive list of things you wouldn't disclose and I was doing that.

Q   Actually, I said in the context of this case. I'm actually talking about the context of 2:57PM your statement here.

A   Right.

Q   So what I'm trying to ask you, Dr. Detomo, which is I think quite clear, is what are the alleged omissions in this case that you are 2:57PM referring to as commonly known uncertainties?

A   Okay. Let's go through and find each of the alleged statements and we can go through them one at a time.

Q   Okay. And just to be clear, Dr. Detomo, I 2:57PM don't want to go off on another frolic and detour.

A   Mm-hmm.

Q   I'm asking about you omissions, not statements.

A   Right. 2:58PM

Q   So do you have a list of omissions that are alleged somewhere in your report?

A   Some of the -- some of the plaintiffs' challenges are -- were around certain things being omitted. 2:58PM

Page 115

And so I'm responding to those. So I need 2:58PM to look at each of the plaintiff allegations in order to do that for you.

Q   Okay. I just wanted to make sure you appreciated the difference between the statement 2:58PM and --

A   Now I understand it.

So I'm looking at the alleged misstatement after Shen 1 on 119. I'm just double checking each of them to make sure that we don't miss any. 2:59PM

Q   Sure.

A   Well, for some reason I don't quote the actual words that go with it. I just talked about the part of the complaint that said that.

But for instance, in the complaint -- 3:01PM under part of the amended complaint there was a complaint that the Shenandoah well found approximately 15 percent -- 50 percent more of the same sand and confirmed down-dip thickening.

I believe part of the complaint was they 3:01PM did not disclose they had omitted the fact that they had not found oil, so...

Q   Okay. Any other omission?

A   Yeah. That was Shen 3.

So after Shen 4, the complaint alleged 3:02PM

Page 116

that Shen 4 confirmed massive salt deposits that 3:02PM would obstruct or prevent access to deposits. And so the complaint was is the fact that they had penetrated salt was omitted.

Q   Any other omission? 3:03PM

A   The reason that I said that you wouldn't normally disclose that is because every well penetrated salt.

Q   Any other omission?

A   I think part of the complaint after Shen 5 3:04PM was although the -- they had -- the Shen 5 well encountered more than 1,000 feet of net oil pay and expanded the eastern extent of the field, there was a complaint that they had not disclosed that they had encounter tar in the well. 3:04PM

And they omitted that. So that was part of the complaint.

I think those are the three most significant ones associated with those three wells.

Q   Are there any other omissions? 3:05PM

A   We already talked about the omission as to whether or not there were faults nearby.

And so I think there was a complaint Shen 4 had not disclosed that they had penetrated a fault, but one would normally not disclose that 3:05PM

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

especially since one doesn't know the a size or orientation of the fault.

Q   Any others?

A   There may be others. I don't recall. Those are the ones that I found quickly. For a more exhaustive list, I would have to spend more time to do more looking and research through.

Q   Okay. I mean that's my question. I want to know all the omissions that your report concerns.

So are those the omissions that your report concerns?

A   I think those are the major ones my report concerns.

Q   Are there any minor ones?

A   Not that I recall off the top of my head and not ones that would necessarily change, I think, my opinion of that -- that these types of things are typically not disclosed and are well understood.

Q   So I just want to make sure. Have we covered all the omissions that fall in that category according to your report?

MS. PHILLIPS: Objection, asked and answered.

THE WITNESS: To the best of my memory.

Page 118

BY MS. JENSEN:

Q   Okay. So, Dr. Detomo, I'm entitled to understand all of the bases for your report. So certainly if it was a basis for your report, you would have told me that right now?

A   To the best of my memory, yes.

Q   Okay. And if there was another omission that you were concerned with, it would appear in your report; correct?

A   Yes.

Q   Okay. So is it your opinion, then, that if a risk is a commonly unknown uncertainty, then a company has no duty to disclose it under the federal securities laws?

MS. PHILLIPS: Objection.

THE WITNESS: I don't know what -- it's not my area of expertise to say what is underneath the federal securities law in terms of what's disclosed and what's not.

BY MS. JENSEN:

Q   Right. So you don't have any idea one way or the other what's required to be disclosed legally; right?

A   True, correct.

Q   Ergo, you also have no opinion as to

Page 119

whether companies have a duty to correct statements that later become inaccurate?

MS. PHILLIPS: Objection.

THE WITNESS: Is that a question for me?

BY MS. JENSEN:

Q   Yes.

A   Could you repeat it?

Q   Do you have an opinion about whether companies need to correct statements that later become false or misleading?

MS. PHILLIPS: Objection.

THE WITNESS: I don't know what the requirements are for whether or not they need to do that.

BY MS. JENSEN:

Q   Is there any -- do you have any opinion as to whether companies have any duty to update investors?

MS. PHILLIPS: Objection.

THE WITNESS: My only opinion is what they tell them should be truthful.

BY MS. JENSEN:

Q   Beyond that, you really have no idea what the federal securities laws require; correct?

A   Correct.

Page 120

Q   All right. Now, there is another category of omissions that you discuss in your report. And that's that there's some detailed technical disagreements that you would not expect to be disclosed.

Now, again, you don't know what is required to be disclosed; correct?

A   Correct.

Q   And the term "technical" -- technical by that, it's often used as a term to downplay something; right?

MS. PHILLIPS: Objection.

THE WITNESS: No, I don't understand that statement.

BY MS. JENSEN:

Q   Okay. So are you saying that the whistleblower complaint to the SEC by the subsurface lead on Anadarko was just a technical disagreement?

A   I don't have an opinion as to what the motivation of that disagreement was.

What I do know is that the disagreements between different groups and different interpreters are actually encouraged because it makes sure that one explores all ranges of possibilities.

Q   So you just don't know the nature of the

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

SEC whistleblower complaint; correct?                3:09PM

A   I read it, but I don't have an opinion as to whether or not -- how it turned out or what the validity of it was.

Q   And allegations of fraud, do you consider   3:09PM allegations of fraud a technical disagreement?

A   If the allegations are allegations as to the technical veracity of what was there, I would consider it within my realm to comment on.

But if it's a -- if it's an allegation        3:10PM about other things, whether it's -- well, if it's about non-technical items of which I consider myself an expert, then I couldn't comment on them.

Q   You are aware that the teams at the time used words such as "ethically questionable"; right?   3:10PM

A   I've seen that written in places, but again, I'm not here to judge the ethics or to evaluate the ethics of what's done or any of that.  Just the facts that I had a chance to read through and understand.

Q   So ethical disagreements are beyond the   3:11PM purview of your report; correct?

A   Yes.

Q   Elsewhere in your report you say that nonconforming opinions needn't be disclosed; is that right?                                3:11PM

Page 122

A   To my knowledge, you would not disclose --   3:11PM there's always nonconforming opinions, so yes.

Q   So are you saying that only -- if only, for example, hypothetical, only a minority of folks at Enron thought they were committing fraud, then   3:11PM that didn't need to be disclosed because it was a nonconforming opinion?

A   No, I think if the facts are -- if you have an opinion on the facts, then those facts should be made -- you know, discussed within the company.   3:12PM

But it's very common for a company to take a broad range of opinions and to say, okay, which opinion are we going to -- technical opinion, when there is a lot of uncertainty, which opinion is it that we're going to go forward to?        3:12PM

I'm not an expert on fraud, but I would expect fraud to not be -- it's either fraud or it's not.  There's not an opinion about it.

Q   Okay.  So, again, your report doesn't touch on allegations of fraud or ethical   3:12PM disagreements?

A   No, it does not.

Q   Now, in your report you criticize the plaintiffs' experts for not opining whether Anadarko's statements were misleading to investors;   3:12PM

Page 123

correct?                                    3:12PM

A   Yes.

Q   And you say that Dr. Merrill's review of public perception is not supported; is that right?

A   I would have to see where it is, which   3:13PM perception you're talking about.

Q   That's fair.  Okay.  Let's just -- let's get a little more concrete.

A   Okay.

Q   Do you agree that financial analysts   3:13PM covering a company are part of public perception?

A   They are part of the public, yes.

Q   Now, you are familiar with the term "giant field"; right?

A   I'm familiar with the term's usage, yes.   3:13PM

Q   It means over 500 MMBOE net recoverable?

A   That's how some people have chosen to define it, that's not an industry accepted value.

Q   That's a generally understood term; right?

A   I wouldn't even say it was generally   3:14PM understood.  There are certain people who have proposed that as a term.

Q   Certainly people in the industry use it that way; right?

A   Not always at 500, no.                   3:14PM

Page 124

Q   And what is the different amount that   3:14PM you've heard?

A   It's often not defined by a specific number.  And the other thing is that that number changes over time because that number is always in reference to   3:14PM what else is being found; right?

So 20 years ago, you know, 500 meant one thing, today 500 means a different thing.  So it's just a kind of a mark in the sand that one keeps moving around.                                3:14PM

Q   Okay.  That's your testimony, that it's not 500 MMBOE?

A   My testimony is that it's not universally accepted to be 500 MMBOE.

Q   And it is sometimes used that way; right?   3:15PM

A   It is sometimes used that way.

Q   Okay.  Let me pull up an exhibit.

MS. PHILLIPS:  We've been going about an hour and I think we were supposed to break around 3:00, but whenever works for you.         3:15PM

MS. JENSEN:  Okay.  Give me a few minutes.  I think we can do one quick exhibit and then we can take a break.

Q   Dr. Detomo, you produced in this action an Anadarko third quarter 2015 operations report that   3:15PM

Page 125

32 (Pages 122 - 125)

called Shenandoah a giant oil discovery; correct?   3:15PM

A   I may have. I don't recall exactly the document you're talking about. But I'm sure you'll share it with me, yes, or you can tell me what page if it's in my report.   3:16PM

Q   Sure. I'm actually going to show you something different. I think that's the -- I think the record speaks for itself there.

MS. JENSEN: You should be able to see what's been marked as Exhibit 530.   3:16PM

(Whereupon, Exhibit 530 was marked for identification.)

MS. JENSEN: For the record, this is BOFAS_APC-000259.

THE WITNESS: Okay. I have it open.   3:16PM

BY MS. JENSEN:

Q   Do you recognize this document?

A   No, I don't believe I've seen it before.

Q   Okay. Have you heard of Bank of America Merrill Lynch?   3:16PM

A   Yes.

Q   Reputable firm; right?

A   Yes.

Q   And did you see -- I know the type might be a little small, but this is -- I'll state for the   3:17PM

Page 126

record is appears to be a report from Bank of   3:17PM America Merrill Lynch dated March 19th, 2013 and the -- it's a company update buy and the headline is "Shenandoah: Major discovery confirmed valued at $4 a share."   3:17PM

I'm going to direct your attention to the first paragraph here.

A   Okay.

Q   It begins by discussing a Shenandoah well. Do you see that?   3:17PM

A   Yes.

Q   You understand this to be Shenandoah 2?

A   Yes.

Q   And Bank of America is valuing Shen at $4 a share here?   3:17PM

A   That's what it says.

Q   Now, the report concerns the Shenandoah field; right?

A   I'm assuming that it means the Shenandoah field. It isn't specific, but since they are talking   3:18PM about a particular well, I would assume it to be that field.

Q   In other words, it's not the whole basin, it's this field?

A   Correct.   3:18PM

Page 127

Q   And do you see here in this paragraph,   3:18PM this first paragraph under "Shenandoah: 5500MM to 1 billion BOE potential," do you see that it says the management -- this is about midway through that paragraph.   3:18PM

A   Yes.

Q   The "management has taken the rare step of describing Shenandoah as a potential giant, meaning possibly more than 500 mm bbls."

Do you see that?   3:18PM

A   Yes.

Q   Okay. Based on this document, it appears that Bank of America Merrill Lynch heard the word "giant" and perceived it meant over 500 million barrels; correct?   3:19PM

A   Yes, it says -- it hedges, it says describes Shenandoah as a potential giant, meaning possibly more than 500 million barrels. So it does hedge on it.

But yes, they are saying it might be in that ballpark.   3:19PM

Q   Okay. And you're aware that in other Anadarko public statements, they didn't say just potential, they actually referred to Shenandoah as a giant oil discovery; correct?

A   No, I don't remember -- I don't remember the   3:19PM

Page 128

documents that I looked at them using the word   3:19PM "giant."

Q   I'll represent to you that you produced the document in which it did.

A   Okay.   3:19PM

Q   So if such a reputable organization as Bank of America Merrill Lynch agree Shenandoah is potentially a giant field, that would be reasonable to assume that at least some of the public perceived it that way?   3:19PM

A   Well, that -- yes, some of the public maybe perceived it that way, but it says potential and as long as a field is being appraised, it's just potential.

Q   Okay. And again, you don't have any   3:20PM reason to dispute that you produced the document from Anadarko that used the word "giant" without "potential" in front of it?

A   You haven't shown me such a document. I don't recall, but I don't dispute that I may have.   3:20PM

MS. JENSEN: Let's go ahead and take a quick break.

THE WITNESS: Time to come back?

MS. JENSEN: Let's go off the record.

THE VIDEOGRAPHER: Off the record, it's   3:20PM

Page 129

33 (Pages 126 - 129)

CONFIDENTIAL

3:20 p.m.                                    3:20PM
        (Recess taken.)
        THE VIDEOGRAPHER:  Back on the record.
It's 4:00 p.m.
BY MS. JENSEN:                               4:00PM
    Q    Welcome back, Dr. Detomo.
    A    Thank you.
    Q    In your report you reference the company
called Navitas.  Do you recall that?
    A    Yes.                                4:00PM
    Q    And you agree that Navitas only got
involved with Shenandoah after the class period?
    A    Yes.
    Q    Navitas isn't the current operator or the
operator at this time; correct?            4:01PM
    A    That's correct.
    Q    Beacon is?
    A    Beacon is the current operator.
    Q    So in preparing your report, you reviewed
Navitas's annual report?                    4:01PM
    A    I reviewed I believe Navitas's annual report
and Beacon's.
    Q    And you also reviewed Navitas's
presentation to investors?
    A    Yes, I reviewed of number of their     4:01PM

Page 130

documents.  I think so, but I would have for look at   4:01PM
the document to be sure.
    Q    You agree that these are public-facing
documents; correct?
    A    Yes.                                4:01PM
    Q    Generally designed to attract investments;
right?
    A    Yes.
    Q    And you did not review any of the internal
documents from Navitas showing its technical work;   4:01PM
right?
    A    I only reviewed the government and publicly
available documents.
    Q    So no internal documents from Navitas?
    A    No.                                 4:02PM
    Q    And Navitas is not traded on the New York
Stock Exchange?
    A    No, not that I am not aware of.
    Q    Not a U.S. company; right?
    A    I think it's mostly an investment group.   4:02PM
    Q    It's an Israeli company; right?
    A    Yes.
    Q    You're aware that Israeli companies have
less strict disclosure requirements than U.S.
companies?                                  4:02PM

Page 131

    A    I have no idea what the requirements are.    4:02PM
    Q    You don't know what the requirements are
here and you don't know the requirements there;
right?
    A    Correct.                            4:02PM
    Q    And with Beacon, same there, you haven't
reviewed any of its internal documents; correct?
    A    No.
    Q    As we're sitting here today, the field has
not yet been developed; is that correct?    4:02PM
    A    I was under the impression that it's being
developed as we speak, so they may have actually
drilled some wells by now.  They were going to
predrill the wells.
    Q    Let's put it this way, not one drop of oil    4:03PM
has been sold from Shenandoah as of this time;
correct?
    A    They are not producing yet.
    Q    And won't be for a year or longer;
correct?                                    4:03PM
    A    I believe it's 2024 is their projection.
    Q    And so it's not commercially successful at
this time?
    A    Correct.
    Q    Let's turn to Paragraph 66 of your report.    4:03PM

Page 132

    A    Okay.                               4:03PM
    Q    You got there faster than me.  Hold on one
second.
        So in this paragraph you say you have not
seen any evidence that the appraisal team or    4:04PM
management at Anadarko concluded that the prospect
was not commercially viable.  Do you see that?
    A    Yes.
    Q    Now, Dr. Detomo, you've heard the phrase
"hear no evil, see no evil"; right?         4:04PM
    A    Yes.
    Q    Now, did you read Mr. Pittinger's report
in preparing your own?
    A    Yes.
    Q    And in fact, Mr. Pittinger cited a number    4:04PM
of documents that indicated, among others, that the
base case NAV for Shenandoah at the time was zero.
        Do you recall that?
    A    I recall that -- some calculations that
indicated that that's what he was saying, yes.    4:04PM
    Q    Well, I mean, that's what the internal
documents reflected; right?
    A    Yes, but they were under certain
circumstances, along with a number of other
calculations.                               4:04PM

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

Q   But you don't deny that there was internal   4:04PM documents that were reflected in Mr. Pittinger's report that showed the base case NAV to be zero for Shenandoah?

A   At one time, yes.   4:05PM

Q   Let's turn to Paragraph 208.

A   Yes.

Q   Okay.  So you dispute Pittinger's report as to the PIR10 and you say, "There is no support for the contention that a project must reach a   4:06PM certain 'threshold' to continue appraisal."  Is that right?

A   That's correct.

Q   You discuss PIR in your report; correct?

A   Yes.   4:06PM

Q   I think you defined it earlier, it measures profits and investment ratio?

A   Yes.

Q   How do you calculate PIR?

A   You calculate PIR by calculating the profit   4:06PM of the field at the end of the field's life and after it's been abandoned and discount it at a certain factor and divide by the cost and expenditures of the field under the same factor.

So you just divide the same two numbers   4:06PM

and it gives you a ratio.  The ratio is usually   4:06PM greater than 1, but a lot of people quote it with 1 subtracted off, so .3 is .4.  If you actually calculate the ratio, it would be 1.3 or 1.4.

Q   So in Paragraph 79 of your report, you   4:07PM refer to PIR values and you say that what Pittinger quotes is for the mean or P50 cases; is that right?

A   Yes.

Q   So if you'll bear with me for a moment, we'll mark an exhibit.   4:07PM

Dr. Detomo, you should be able to see what has been marked for identification Exhibit 531.

(Whereupon, Exhibit 531 was marked for identification.)

MS. JENSEN:  This is a document that bears   4:08PM the Bates stamp APC-000277887.

THE WITNESS:  Yes.

BY MS. JENSEN:

Q   Do you recognize this document?

A   Just a second, I'm looking.   4:08PM

Yes.

Q   And you understand this to be a PowerPoint presentation on development full field economics for Shenandoah?

A   Yes.   4:09PM

Q   Okay.  So let's look to Page 20 or   4:09PM slide 20.

Okay.  You've seen this chart before?

A   Yes.

Q   And do you recognize this as being an MMRA   4:09PM analysis?

A   Yes.

Q   And can you explain how the MMRA tool was used to describe the resource distribution used -- there's the decision tree, actually, so let's go   4:09PM down to the next one.

How the MMRA tool was used to describe the resource distribution in the decision tree on slide 21?

A   Yes.  So the MMRA was used to define what   4:10PM the success case would look like and the success case here being defined as Shen -- you know, the two -- that the next wells would define success.

The fail case which, is that the -- that   4:10PM you would fail in the development of it, and then the fail early case was that you would exit it without developing.

So they had these three cases.  The MMRA only defined the risk in the volumes -- or the risk for -- and the volumes potentially for these cases.   4:11PM

The decision tree is a pretty standard kind of   4:11PM analysis one uses to try to decide under what circumstances one would -- what action would one take in the future.

Q   Can you describe how the geologic   4:11PM distribution is truncated above the commercial minimum field size and above the economic minimum field size?

A   Are you referring to a particular slide or are you just asking a general question?   4:11PM

Q   Generally in the decision tree?

A   Well, generally you truncate the volume because if the volume is below a certain threshold, it does not really enter the distribution as to -- does not enter the distribution as being anything effective   4:12PM that you could do with.

It usually falls in there.  It usually deals with the low side case -- in fact, it always deals with the low side case.

But in this case, again, you're back to   4:12PM the risk and the volumes and of the economics are separate from all this, right.

So -- but anyway, so that's what it -- it cuts off the lowest edge of it saying that that's not even an effective volume that you would pursue.   4:12PM

35 (Pages 134 - 137)

CONFIDENTIAL

Q   What are the branches that are shown in this tree and what's the basis for each of the probabilities in this decision tree?

A   Well, so you follow the decision tree from today and you say, if there's success -- there is a 37.4 percent chance of success.  Okay?

And then you would follow that over and if you had success, then -- and this was based upon a certain model, a certain set of assumptions.  Like one of the assumptions is that there was 100 million barrel production spar.

I believe this assumption also assumed wet trees, in other words, trees located on the seafloor which have different implications for cost and whatnot.

Given those things, if you had success, then they looked at the P10, P50 and P90 volumes, which you can see this is a symmetric distribution because the way MMRA works, they are always symmetric distributions.  That's why P90 always has the same percent chance as P10.

But anyways, for each of those, then they talked about what would be the expenditure and so -- and the expenditure about what you would do in Phase 2.  Because if you had a success -- this is

Page 138

talking about a two-phase one.

Phase 1, you would go ahead and put some development out there and then the chance of Phase 2, P50 chance of Phase 2 and then P10 was obviously if it's a huge field, then you would probably drill extra wells and stuff.  So that's why the gross capex goes up.

Q   So does it show -- does this decision tree show the costs for each of the five scenarios?

A   I believe it only shows the cost of the wells here and it takes into account using a spar of a certain size which has certain costs associated with it.

But again, this represents one model for a potential development, so...

Q   And is it your contention that Anadarko did not calculate an NPV10 for each of these five branches or for each of the branches?

A   They did not calculate -- they calculated in order to -- you know, I'm not sure if they actually calculated NPV or not, so -- because if they calculated NPV, then there would be a total estimated NPV for the whole three legs together.

So I don't recall seeing that, so I don't know for sure.  I would have to look through the

Page 139

presentation more in detail.

Q   Is it your contention that Anadarko did not calculate expected value based on running economics on multiple scenarios?

A   They ran it on -- in this case on 100 MPOD spar, which if you had the P10 full field, you would not build 100 MPOD spar; right?

So in that case, no.  They've assumed one development for the -- for all of the possible cases.

So I would say that this is not a realistic expectation as to what the cost would be for each of those possibilities.

Q   And have you done your own calculations as to what would be reasonable?

A   No, I have not.  But I would expect the decision tree to look different.

Q   Okay.  Because, I mean -- because you have experience with Shell, right, and they did things differently?

A   Well, but every company does decision trees, so the decision tree is pretty standard.

Q   Okay.  How does knowing a PIR10 help a company make decisions?

A   Not every company uses PIR10, so -- but one

Page 140

way to -- one factor that one takes into account is to -- assuming a 10 percent inflation rate, would the project make enough profit to compete in your general portfolio and would it at least make enough profit to exceed the cost of capital.

So one usually assumes the cost of capital is something like, you know, what you could make in other investments, say 5 to 10 percent.  So you would not usually do anything lower than that, although there have been exceptions.

And then you would use a PIR10 at that ratio in order to -- as one of the criteria in order to decide which opportunities you're willing to put your investments into.

But I will say there's other things that come in.  Some investments take 20 years to recover your investment, some investments take one year.

So you typically balance a portfolio with a range of things so that you are insulated against things like market fluctuations.

Q   And when you're talking about companies, again, you never worked at Anadarko; correct?

A   No, but I worked with a number of partners all of which calculate PIRs.

Q   But you've never worked at Anadarko;

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

correct?                                4:18PM

A    Correct.

Q    Now, no doubt you saw internal documents with a formula for projects needing to be equal to or greater than .3 PIR?                4:18PM

A    I saw documents that said that PIR.3 was a threshold.  But I also saw documentation specifically from Chris Camden that said it was just one of the criteria they would consider.

Q    And the threshold was something that    4:18PM Darrell Hollek testified about; correct?

A    Darrell Hollek testified that it was -- well, he testified to a number of things, but one of the things he testified to was that they saw it as a kinds of threshold, I believe he said.        4:19PM

Q    Now, who is more senior, Darrell Hollek or Chris Camden?

A    Darrell Hollek is more senior, but I doubt Darrell calculates PIRs.

Q    Who would have been more likely to be part    4:19PM of the portfolio management discussions and decisions?

A    Probably at a very high level, the portfolio is usually a global portfolio that you're managing. So yes, I would say at the most senior level, they    4:19PM

Page 142

discuss the portfolio.                        4:19PM

Q    And Darrell Hollek was at the top senior level; correct?

A    Yes, he was a senior.

Q    Okay.  How is NAV defined in the oil and    4:20PM gas industry?

A    Where are you talking about?

Q    Oh, so yes.  Step back.  Switch topics.

A    Okay.

Q    How is NAV defined in the oil and gas    4:20PM industry?

A    NAV, that abbreviation covers a number of things.  Could you put it in context for me?

Q    Have you ever heard of the term "net asset value"?                            4:20PM

A    Yes, usually I use a slightly different abbreviation for it instead of asset, but okay.  Yeah, net asset value.  I usually see it as net opportunity value, okay.  Asset value.

Q    Back to the question, how is it defined?    4:20PM

A    Net asset value is usually an estimation of what an asset is worth.  But there are some complicated and interesting ways that that is calculated.  So I'm used to seeing it.  I'm used to -- the most common place I think I've seen it used is    4:21PM

Page 143

when people are talking about asset trades or asset    4:21PM swaps.

Q    Okay.  So you're not familiar working -- you're not versant in working with NAV as a -- as a metric in the oil and gas industry?        4:21PM

A    No.  Usually that -- that metric would usually be calculated by financial people who were trying to either swap or use the asset as leverage somewhere else.

So in exploration and development, it's    4:21PM not a common metric that people would deal with. And I've never actually calculated net asset value.

Q    So then you don't know whether when a project is run at a certain oil price point that yields zero, that means it has a zero NAV?        4:22PM

A    So you can run -- you do the same thing when you calculate a PIR, you run it at a certain price point.

So the price point -- in fact, most companies -- I shouldn't say most companies.  At    4:22PM least the companies I'm familiar with run it at a series of price points.  So they don't run it at one price point because predicting the price of oil is pretty darn near impossible.

So I'm sure it is calculated at a certain    4:22PM

Page 144

price point, but I'm sure that that -- the reason    4:22PM it's usually used in asset swaps and things like that is because those are very short-term things and the price of oil is well known.

Where when you're talking about    4:22PM developments, the price of oil ten or 15 years from now is not very well known.  So they use different kind of numbers.

MS. JENSEN:  Okay.  I've now marked an exhibit which is Exhibit 532 a document that bears    4:23PM Bates stamp APC-00784657.  You should be able to see this in your Exhibit Share.

(Whereupon, Exhibit 532 was marked for identification.)

THE WITNESS:  Yes.  Meeting of the board    4:23PM of directors.

BY MS. JENSEN:

Q    Okay.  Do you recognize this document?

A    Let me take a look.  Some of the slides look familiar, but I'm not actually sure I've seen this    4:24PM particular document.

I've at least seen a couple of slides, but I don't know if I've seen this document or not.

Q    Okay.  Let's turn to --

A    I don't remember the midstream stuff in    4:24PM

Page 145

37 (Pages 142 - 145)

CONFIDENTIAL

here. So that's why I don't think I've actually seen this particular document.

Q   All right. In your report at Footnote 822 --

A   822 you said?

Q   Yes, this is at the end of Paragraph 912.

A   I see the reference.

Q   You see also that's the same document -- or at least according to the Bates number, the same document as what we've got up on the screen?

A   Right. I think that's the one I reference slide 6 through 9.

Q   Okay. You actually cite slides 91 and 92; right?

A   What was the footnote again?

Q   Footnote 822.

A   I'm in the wrong place. Sorry about that.
Graph or footnote 822?

Q   Footnote 822.

A   What page was it referenced on, do you recall?

Q   Page 420.

A   420, that's where I'm going wrong.
Yes, slides 91 through 92 and 105, okay.

Q   So you reference this as saying that

Page 146

Shenandoah is shown has providing long-term growth and having value; right?

A   Let me get to the slide. It takes awhile to refresh.
Yes, I see where I say that in Paragraph 912.

Q   Okay. I would like you to take a look at slide 90 in this document. So sorry, I'm talking about Exhibit 532.

A   Where it says, "Major Asset Overviews"?

Q   Exactly. Okay. That's Page 90 on the PDF or 89 -- yes, sorry. I'm looking for the number on the slide itself, it's the lower right-hand side and also for identification you can look at the Bates number, which is APC-00784747.
Do you see that page?

A   No, because I don't get any APC numbers on the individual slides.

Q   You saw "Major Asset Overviews;" correct?

A   Yes.

Q   So just scroll down one more.

A   Okay. "Opportunity Set"?

Q   Yes. "Opportunity Set: Materiality and Investment Returns."
Do you see that?

Page 147

A   Yes.

Q   The price deck here is $60; right?

A   Yes.

Q   That's the base case; right?

A   That's the case calculations are going to be done in, yes.

Q   So Anadarko ran its economics for Shenandoah throughout the class period at 50 or $60 a barrel; right?

A   I think there were other numbers at certain times, but I'm not sure which ones were in the class period and which ones were out, but okay.

Q   We're seeing -- or here this depicts bubbles. Do you see -- or circles, whatever you want to call them?

A   Yes.

Q   They are drawn relative to their asset size by net asset value in billions; correct?

A   Yes.

Q   The Y-axis, there is a rate of return on investment, the ROR?

A   Yes.

Q   And that's a capital efficiency measure; right?

A   Yes.

Page 148

Q   On the X-axis, it's the remaining resource MMBOE?

A   Yes.

Q   And again, the prospects on this graph are depicted in circles. I want to draw your attention to Shenandoah, which is at the far left bottom of the screen.
Do you see that?

A   Yes.

Q   It is the smallest bubble on the graph; right?

A   I'm trying to resolve because there's an arrow -- it looks like an arrow aiming up.

Q   There's Paon; right?

A   There's Paon, but then there is a line drawn from Shenandoah up towards where Paon is. I can't tell what that is.

Q   Right. It's like a speck; right?

A   No, because I -- well, I can't tell. All I know is --

Q   You can't see it. Let's put it that way.
It's the only project on the graph that has a net value lower than .5 billion; right?

A   Lower than .5 -- well, I don't know because I cannot see from this picture exactly what is

Page 149

38 (Pages 146 - 149)

CONFIDENTIAL

pointing to what. So it's either very small or something is pointing somewhere else. So I agree.

Q It's almost invisible, it's so small.

Okay. So -- and according to this graph, the remaining resource is less than 400 MMBOE; right?

A Yes. That's clear.

Q That would be 113 net?

A That would be what 113?

Q Net.

A Where are you reading that?

Q To Anadarko.

So there's gross, right, and then there's net?

A You're reading that off this slide?

Q I mean, you are aware of the different partners at Shen; right?

A Yes.

Q So that's what I'm saying, it's net?

A You're saying -- okay. Yeah. I'm assuming what they are plotting is net, yes.

Q Okay. Well, yes. And do you see here there is two asterisks next to Shenandoah?

A Yes, that I see.

Q What does that mean?

Page 150

A Well, according to the legend down at the bottom, it says, "Shenandoah metrics shown at $70 a barrel."

Q Okay. So Shenandoah is shown at 70 and no other project is; correct?

A Yes, probably because the -- yes. I won't speculate as to why, but yes.

Q Why do you think that is?

A Well, I would have to speculate as to why that is. There is a number of reasons one could do that.

It could have something to do with the quality of the oil. It could have something to do with the expected price in the future. It could have something to do with the profit margin in the Gulf of Mexico.

So I don't know.

Q I mean, logically speaking, and you probably know this from looking at documents, it would have been a zero had it been run at 60?

A Yes, I don't know that. I don't know why they did that.

Q Okay. Even at 70, the Shenandoah's NAV was the lowest of all of Anadarko's prospects on this graph; right?

Page 151

A No, it doesn't appear to be the lowest on either particular axis. Each axis has something lower.

Q What is lower on the ROR?

A On the ROR axis?

Q Sorry, what is the -- it's the lowest with both; right?

A The lowest on the ROR axis is GNB.

Q Sorry, withdrawn.

If -- in other words, Shenandoah had to have a favored oil price of $10 more than any other asset on this slide deck to avoid showing a zero; right, or a negative result?

A I don't know. I mean, all I know is what it says, it says 70. I don't know where it would be if you did it at a different value. I don't know why they did that.

Q Right. So setting aside the axis, Shen is the lowest NAV; correct?

A You're talking about the X-axis, the lowest number?

Q Forget about the axis, the lowest NAV?

A You're basing that on the size of the dot?

Q You have no reason to disagree with that; right?

Page 152

A Yes, I don't -- I don't know where -- I cannot either disagree or agree with it because I don't know where you're getting that fact from. So that could be true. I don't know.

I don't see that information from this graph.

Q Okay. Maybe the next slide will help clarify.

A Okay.

Q So recall again that the slide in the bubble corresponds to the NAV; right?

A Yes.

Q Okay. So let's look at the next line because I think you just couldn't see the speck that was Shenandoah.

Do you see on this next slide, slide 91, that Shenandoah is the smallest bubble?

A Sure, yes, I do between Colombia and Mozambique, right, it's a little small bubble.

Q Yes, I mean, it's like a dot?

A Yes.

Q You see also that it's higher on the increasing capital intensity side?

A Yes, I see that. Higher than what, but yes, higher than some things.

Page 153

39 (Pages 150 - 153)

CONFIDENTIAL

Q   Okay.                          4:37PM

A   But I think the real description, if I remember this right, is there is a slide later down that talks specifically about Shenandoah's strengths and weaknesses.                 4:37PM

So then these numbers are actually -- it's actually slide 105.

Q   So let's turn to that.

A   Okay.

Q   Let's look at this.             4:38PM

So the weaknesses here, do you see the reference to "Current development economics challenged"?

A   Yes, this is before Shen 5.  So yes, after Shen 4, that was true.            4:38PM

Q   Okay.  And after Shen 5, the MMBOE or the resource size reduced by almost 100 MMBOE; correct?

A   The mean or the P50 did, the uncertainty reduced quite a bit, which is kind of what you want to account for.  But yes.             4:39PM

Q   Look, I'm asking you a very specific question.  You're trying to answer with a different answer.  And I understand why you're doing that.  But let's just answer my question.

Which is after Shen 5, the resource size     4:39PM

Page 154

reduced by almost 100 MMBOE; correct?        4:39PM

A   The mean estimate of the resource side reduced by 100 MMBOE approximately.

Q   Let's turn back to the weaknesses on this slide.                            4:39PM

"Geologic uncertainty and the presence of faulting affect development risks," you have no reason to dispute that; right?

A   No, that's true.

Q   The technological hurdles increase     4:39PM regulatory and operational risk, you agree with that?

A   I agree with that.  It could possibly affect time to first production.  There's probably very little risk in actually accomplishing it.  The risk     4:39PM was in the time.

Q   So there is a reference below to 20,000 psi-rated drilling rig.

Do you see that?

A   Yes.                          4:40PM

Q   So the technological hurdles that are being discussed in the bullet above that, fair to say that that's something other than that particular issue of 20K psi?

A   No, I believe that's the technical issue     4:40PM

Page 155

they were referring to.                    4:40PM

Q   Why wouldn't it be in the same bullet?

A   I don't know, but the 20,000 psi development brings hurdles other than just the blowout preventer, right?  It brings a hurdle with a drilling rig, it     4:40PM brings a hurdle with the equipment you have to use.

So it brings some engineering hurdles with it, which, like I said, aren't insurmountable but typically add time and cost.

Q   So it's your testimony that there were no     4:41PM technological hurdles other than the 20K psi?

A   There are no technical showstoppers.

Q   But that's not what I asked you.  My question was --

A   There's always hurdles, the question is how     4:41PM high are they.

Q   So I was asking a really simple question, which is:  Is it your testimony that there was no other technological hurdle other than the 20K psi?

A   And the answer is no, there are always     4:41PM hurdles.

Q   Okay.  Including asphaltene mitigation?

A   I would not call that a hurdle, I would call that just something you have to plan for.

Q   So it's your testimony that that was not a     4:41PM

Page 156

hurdle?                            4:41PM

A   Not anything that was -- required any significant amount of concern.

Q   Okay.  So you had mentioned that this was after Shen 4; right?                 4:42PM

A   Yes.

Q   Okay.  Do you know when Shen 5 TD'ed?

A   Depending if we're talking about -- I believe, though, it was at the -- in 2016, somewhere around the end of 2016.             4:42PM

Q   So this board of directors slide is from August 1st and 2nd, 2016.  So does that refresh your recollection that this was after Shen 5?

A   Well, I think what -- under "Opportunity" it says, "Incorporation of Shen 5 results will improve     4:42PM the economics."  So obviously the results of Shen 5 are not included in here.

Q   And again, Shen 5 actually ended up with a decrease in the resource size; correct?

A   Shen 5 resulted in a decrease in the mean     4:43PM resource size.

Q   Okay.  At the bottom of the same slide, there is a "Key Play Statistics."

Do you see that?

A   Yes.                          4:44PM

Page 157

40 (Pages 154 - 157)

CONFIDENTIAL

Q   And it says the MMBOE is 113?   4:44PM

A   Yes.

Q   Okay.  And it also says that NAV at $70 is .01; right?

A   Yes.   4:44PM

Q   And again, this was a board of directors presentation in July of 2016; correct?

A   Yes, the undeveloped resources, the -- is the remaining resource to be -- I believe the remaining resource to be proved up because 113 is   4:44PM already less than what you just said they were estimating it from MMRA.

So in other words, this is undeveloped resource, there's -- the current resource that they are considering already discovered and developed, so   4:45PM this is what's remaining.  So it's not the total resource.

Q   Okay.  So under the strengths it says, "Shen 5 results are similar to Shen 2."  Right?

A   Yes.   4:45PM

Q   So the results had already come in for Shen 5?

A   Yes, the preliminary results had, yes.  The impact of them had not been fully calculated into everything yet.   4:45PM

Page 158

Q   And what is the basis for your testimony?   4:45PM

A   Well, I don't know why you would say under opportunities, incorporation of the results will improve the economics, okay.

So obviously they haven't included them in   4:45PM the economic calculation yet and even though that volume -- that mean volume has gone down, the overall result has -- they expect to improve it.

Q   Expect to.  But you've not seen the workup on that; right?   4:46PM

A   No, not on this slide.

Q   You have not -- you don't know the document that had that workup; right?

A   They did calculations later on after Shen 5 before drilling Shen 6.  So there were some   4:46PM presentations as part of the justification for drilling Shen 6 that showed information about how the -- how the results of Shen 5 were fully incorporated.  But that was much after this.  That was right before Shen 6.   4:46PM

Q   And the company decided to write down Shenandoah before the results of Shen 6 were known; correct?

A   Before -- I'm not exactly sure because Shen 6 -- lots of times there's results that are known   4:47PM

Page 159

internally before the well actually TDs.  Because   4:47PM there's lots of stuff that gets done.

And so the fact that Shen 6 was a wet well, I believe I would have to check, but there is a good chance that because Shen 6 was wet and they   4:47PM knew that before TD, that they actually went ahead with the write-down in May.

Q   So when did they find out that it was wet?

A   I would have to look at the records.  I don't -- let me see in the report.  I have something   4:47PM about timing, I think.

So -- no, you may be right.  I think what they decided on -- I think I'm wrong on that.  I think actually that wasn't the reason.

I think the reason they wrote down is they   4:48PM realized that they were never going to use those other wells, so they wrote down wells and volumes that they knew could not exist and that they were not going to use.

So they probably did that -- I am trying   4:48PM to remember the dates.  I know they did that in May of 2017.  Was it May 2017 or -- yes.  2016, but I think Shen 6 drilled that later, 2017.

So I'm not exactly sure, thinking about it out loud, but I'm sure it's because there were   4:48PM

Page 160

certain -- there was enough knowledge then to know   4:48PM that certain volumes being carried on the books were not accurate.  So they started writing some of it down.

MS. JENSEN:  I'm going to introduce   4:49PM another document.

All right.  You should be able to see what's been marked as Exhibit 533.

(Whereupon, Exhibit 533 was marked for identification.)   1:33PM

THE WITNESS:  Yes.

MS. JENSEN:  For the record, this is APC-00264139.  Let me say that again in case I missed a number.  APC-00264139.

Q   Do you see it?   4:50PM

A   Yes, I do.

Q   And have you seen this document before?

A   I'm just looking at it.

Okay.  I don't recall if I've seen this specific document before or not.   4:50PM

Q   Okay.  Just reorienting to the last document that we saw, you recall it was a board of directors PowerPoint presentation for July of 2016?

A   Yes.

Q   Okay.  And does this appear to be around   4:50PM

Page 161

41 (Pages 158 - 161)

CONFIDENTIAL

the same time frame?                                 4:51PM

A   According to the dates there, yes.  This is July 2016.

Q   Okay.  Great.  And there is a reference here to BOD slides that are attached to this email    4:51PM and this is an email from Gennifer Kelly to Ryan Morgan on July 27th, 2016.

And if you scroll down to the slides below, does the slide about Shenandoah look familiar?                                 4:51PM

A   Just a second.  Let me make sure I can see the whole slide.

Yes, that looks very similar to the other one.

Q   The other one that we saw that was a board    4:52PM of directors slide show?

A   Yes.

Q   Now let's scroll back up to the email and the email says, on the second paragraph there from Gennifer Kelly to Ryan Morgan, "Shenandoah is    4:52PM footnoted because the case was not selected in our 60-dollar base case.  We used a 70-dollar run where it was selected to get our numbers so that we wouldn't be showing zeros."

Do you see that?                             4:52PM

Page 162

A   Yes.                                      4:52PM

Q   And you understand that that would mean that Shenandoah would be showing zeros at a base case run at the same price deck as other fields which were still profitable?                        4:52PM

A   That's -- it claims that some numbers would be showing zeros, it's not clear which ones, but yes.

Q   This was the numbers where they had the NAV; right?

A   No, it doesn't say that.  It says "to get    4:53PM our numbers," it doesn't say specifically which numbers, but that could be.  But I can't tell from this note which numbers would be zero.

Q   Sure.  So if you look down at the Shenandoah slide again.                             4:53PM

A   Yes.

Q   You see there is an NAV number, it's a pretty low number, isn't it?

A   Just a second.

MS. PHILLIPS:  Objection, vague.           4:53PM

THE WITNESS:  I see NAV at $70.00 of 0.01.

BY MS. JENSEN:

Q   Right.  Fairly low number; right?

A   0.01 is 0.01.

Q   Almost zero if there was one less number    4:54PM

Page 163

there.  Okay.                                 4:54PM

And when she says that otherwise it would be showing zero, fair to infer from that you're talking about the NAV?

A   Yes, I don't -- I couldn't interfere    4:54PM directly exactly that.  I mean, one might make that inference.  But to know for sure, I would have to look at it a lot more closely and actually calculate to see if that's the number that goes to zero.

Q   Okay.  In any event, she's saying without    4:54PM inference that it would be showing zeros; right?

A   She said it would show -- some number in here would show zero.

MS. JENSEN:  Okay.  All right.  We've been going for about an hour.  Let's just take a quick    4:54PM break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We're off the record. It's 4:54 p.m.

(Recess taken.)                         4:55PM

THE VIDEOGRAPHER:  Back on the record. It's 5:05 p.m.

BY MS. JENSEN:

Q   Welcome back.

Do you believe that fluid quality is an    5:05PM

Page 164

important consideration in oil production?        5:05PM

A   Yes.

Q   And that it can ultimately impact the development system design?

A   Yes.                                      5:06PM

Q   And the percent of oil that can be economically recovered?

A   Yes.

Q   And the price paid per barrel?

A   Yes.                                      5:06PM

Q   What does it mean to commingle fluid in a wellbore?

A   Every individual sand in a field, if the sands are separated by some distance, even if it's small, and if they have any difference in either their    5:06PM pressures or their fluid details, then one can either produce them each separately or one can open up a wellbore to both of them at the same time.

If you open it up to two different reservoirs like that at the same time, you would    5:07PM refer to that as commingling.

Q   What is your understanding of why engineers would want to commingle fluids?

A   Well, if you can commingle fluids, some of the advantages are you -- if you didn't commingle    5:07PM

Page 165

42 (Pages 162 - 165)

Veritext Legal Solutions
866 299-5127

them, you would have to produce one and then produce the other. You could either do that in the same wellbore by doing a recompletion, you could do it in the same wellbore by putting in smart completions that allow you to switch back and forth between them or you could access them through another well.

So one of the advantages -- all of those things cost something. Whether I'm going to do one before the other and delay the production, whether I'm going to put a special completion -- smart completion equipment in the well or whether I'm going to drill a separate well, they all cost something. So one of the advantages of commingling is it saves you money.

Q Okay. And when is it not possible to commingle fluids?

A There are times -- it's always possible, there are just ramifications that might be unacceptable if you do.

So some of the ramifications are if the pressures are different by very much, then the higher pressure one will produce before the lower pressure one. Just because it's easier -- the fluid at a high pressure will flow to the wellbore first.

If the quality of the reservoir is

Page 166

different so that fluids can flow in one easy -- more easily than the other, then one of the reservoirs will preferentially produce before the other and that usually means you have to do something.

The other times you would -- so you might not want to commingle in those case. You might not want to commingle if the fluids are very, very different.

So if one fluid is -- has different characteristics and qualities than the other, you might not want to mingle them. There are rare occasions where you actually would. But they are pretty rare.

So some of the kind of differences you might see in the fluid besides pressure that you would have to account for is obviously asphaltenes, waxes and if there's any difference in the gas ratio or in the quality of the oil. So those things would all -- you would have to account for them in some way if you were going to commingle.

Q Okay. I think you hit on this earlier, but when it's not possible to commingle, an alternative would be isolating zones?

A You could isolate -- you could isolate

Page 167

zones. There are -- there is equipment, you can put that on a well now, it has been for a while where you can open one zone and then close it off and then open the other zone and then close it off. You can do that remotely.

So you can alternate between the zones. That would not commingle them.

You could also inject something down there to account for the differences in the fluid and that's pretty common to put a line down, inject some type of solvent. If one oil is heavier than the other, that will often help.

You can also do it by just producing one zone, the deeper -- typically the deeper zone first and then when that zone is pretty much produced, you just put cement in the bottom of the well and you punch some holes into the next zone. And then you produce those. Those are referred to as uphole recompletions.

Q Let me stop you there.

A Okay.

Q So you mentioned equipment and when did that equipment become available?

A That equipment is available today to do that. You put that in the well -- you design the well

Page 168

for that and you put that in the well at the time you what they call complete the well.

Q What is the equipment called?

A It's called completion equipment. So it's typically tubing, valves, sliding sleeves, and it's got a bunch of components to it. But it's all just generally referred to as completion equipment.

Q When was that available, made available?

A That is put in the well when you are getting ready to, quote, complete it. Because there are other things you have to do. When you leave a well, typically you seal up so the fluids can't flow in.

So you have to go and you have to dissolve that out. You typically -- when you put the completion equipment in, you acidize the well in order to clean it.

Q Right. But the equipment that you're referring to, you said it's available now; right?

A Yes, today. I mean that's standard equipment.

Q Right. And when was that first available in the industry?

A Sliding sleeves and smart completions have been available, obviously using them in Brunei in 2000 -- in 1999, 2000, so they've been available for a

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL

long time.   5:12PM

Q   And you also mentioned chemical completion or chemical injection?

A   Yes.

Q   And is that xylene soaks?   5:12PM

A   There is a couple of different ones, they have different reasons you use them.  So you -- for purposes of mingled reservoirs, xylene is probably the most common, but you put other kinds of chemicals down the well.   5:13PM

You put acids down in order to clean up the pore space near the wellbore.  You put xylene down, you put other kinds of solvents down in the well.

So there's a whole range of those that   5:13PM would -- you have the option to choose from.  Typically you will give an example of the well fluid to a professional engineering company who will tell you what the best fluid they have is to use in that circumstance.   5:13PM

Q   Now, an alternative would be drilling individual wells for each zone; right?

A   That's a possibility.  If the zones are big enough that they could support the independent cost of a well, then that would be a choice you would   5:14PM

Page 170

consider.   5:14PM

Q   And either way, it would require multiple wells that would drive up the cost; right?

A   Well, if alls you do is put sliding sleeves in the same well, that doesn't require a substantial   5:14PM cost.

But if you're going to drill a separate well, that would cost the cost of a well, yes.

Q   Do you agree that isolating zones for production in a multi-zone scenario would require   5:14PM intelligent completion to avoid commingling?

A   That's one approach.  You could do a smart completion to avoid the commingling.  That would be one approach.

Q   And so another problem with isolating   5:14PM zones would be that the production occurs at a slower rate than when the fluids are commingled; correct?

A   It depends on how different the zones are.  Right.  If the zones are not very different, then the   5:15PM answer is no.  It produces fine.

If the zones are very, very different, then yes, it could stretch things out.

Remember, the higher pressure zone will lower down until whatever the other pressure is.  So   5:15PM

Page 171

if the pressures aren't very different, then very   5:15PM soon the commingling is fine.

Q   Right.  But if they are different pressures, then the commingling is not fine?

A   Right.  But these reservoirs are at, you   5:15PM know, 15, 16, 17,000 psi and the difference between the different sands is only a few hundred.

Q   Slower rate of production impacts the NPV because you have to discount the value of the production number a longer period of time; correct?   5:15PM

A   Yes.

Q   And so if you're unable to commingle the fluids, it would negatively impact the NPV?

A   Depending on how you do it, to a small effect or to a large effect, yes, because it does not   5:16PM positively impact it, I can say that.

Q   Let's put it this way.  So it does not positively impact the economics?

A   It may not actually -- commingling may improve the economics and so it just depends on what   5:16PM your alternatives are.

Q   Right.  The inability to commingle?

A   Well, the --

Q   You kind of laughed.  I mean, the inability to commingle would negatively impact the   5:16PM

Page 172

economics?   5:16PM

A   The inability to commingle will raise your costs.  The question is does it also raise your production and your income?  So that's an economic calculation that has to be made.   5:16PM

Q   But all things being equal, if all other things held steady, then it would negatively impact the economics?

A   No, because if you're producing twice as much oil from two zones, okay, then the net present   5:17PM value of that could outweigh the actual cost of doing a smart completion.  That's why you would do it.

So it just depends on what you're costing versus what you're getting.  So you have to do that calculation.   5:17PM

Q   So you have to do a calculation for a particular project.  You cannot decide that in a vacuum?

A   Correct.

Q   Now, asphaltene instability can have major   5:17PM implications for field development; right?

A   If one does not account for them, it can have very major implications.

Q   So it could stretch from expenditure risk for one well to that of an entire field; right?   5:17PM

Page 173

44 (Pages 170 - 173)

CONFIDENTIAL

A    Well, the worst thing -- well, you would    5:17PM never allow a situation to occur where you would put in jeopardy a field because of asphaltenes. There are always inexpensive mitigation steps that you could take to account for it.    5:18PM

Q    So regardless of potential mitigation, it does have impacts?

A    It does have -- it impacts your plan, yes.

Q    Right. So -- and also commingling oil from different zones or reservoirs can exacerbate    5:18PM the asphaltene deposition issues; right?

A    Depending on what the asphaltene dropout pressure is in one reservoir versus the other reservoir, if you didn't account for it, you could create a problem.    5:18PM

Q    That's because commingling zones increase asphaltene onset pressures; right?

A    It can. It doesn't always and it's -- it can change the dropout pressure, but the dropout pressure -- estimating and measuring dropout pressures    5:19PM is not an exact science, so it's always something that you make sure you err on the safe side of.

So you don't try to run it very close to exactly the dropout pressure.

Q    Can you refer to asphaltene onset    5:19PM

Page 174

pressures with an acronym?    5:19PM

A    AOP.

Q    So I'm going to refer to AOP for ease of use there.

So AOPs cause precipitation and deposition    5:19PM in tubing, impeding the oil flow; right?

A    It could. But if you inject a solvent at the face of the reservoir, then that will stabilize -- or keep the asphaltene in solution and your risk of deposition along the equipment is highly reduced.    5:19PM

It also depends upon the pressure drop between the reservoir and the surface. So if that pressure drop is big, you run a bigger risk. If that pressure drop is small and it doesn't reach asphaltene pressure, you have no risk. So it    5:20PM depends.

Q    So part of the risk is that asphaltenes can plug tubing; right?

A    It can, but no one ever allows that to happen because you have pressure measurements in a    5:20PM wellbore and if it starts to -- if the size of the tubing or in the tubing -- if the size of the -- effective size of the tubing starts to shrink, you'll see that in your pressure measurement right away.

So you would never sit there and just    5:20PM

Page 175

continue to do it without taking action early on.    5:20PM

Q    I would like to show you a document.

MS. JENSEN: You should be able to see what's been marked as Exhibit 534. And the Bates number for this document is APC-01760992.    5:22PM

(Whereupon, Exhibit 534 was marked for identification.)

BY MS. JENSEN:

Q    Let me know when you're able to see this document.    5:22PM

A    I can see it.

Q    Oh, great. That was fast. Okay.

Do you recognize this document?

A    I looked at a lot of documents, but this one looks familiar. So I don't see anything in there that    5:23PM makes me think I didn't see it.

Q    Okay. So this is an article that you produced in this case?

A    Right.

MS. JENSEN: And for the record, this is a    5:23PM document or article with a -- that's entitled "Asphaltene Onset Pressure Uncertainty and Other Asphaltene Issues and Field Development Planning."

Q    You refer to this paper on asphaltene mitigation?    5:23PM

Page 176

A    Yes.    5:23PM

Q    And did you consider this document in forming your opinions?

A    I considered this document as consistent with my experiences with asphaltenes.    5:24PM

Q    This was published in 2017; correct?

A    Let me take a look. This was a paper presented in 2017 at the Offshore Technology Conference.

Q    Do you know when in 2017 it was --    5:24PM

A    Yes, well, it says on there, May 1st through 4th. Before COVID, the Offshore Technology Conference was always in Houston the first weekend in May.

Q    This came out in May of 2017?

A    Yes.    5:24PM

Q    I would like to turn your attention to Page 10.

A    It's Page -- it's Page 10 is the one with loss of PI due to asphaltene accumulation in the near wellbore.    5:25PM

Q    Right. What is PI?

A    Production index.

Q    Okay. This diagram is a productivity index?

A    Yes.    5:25PM

Page 177

45 (Pages 174 - 177)

CONFIDENTIAL

Q    And this relates to the loss of 5:25PM productivity due to asphaltene accumulation; right?

A    Under the -- yes, under the conditions they did there, which was the particular mitigation that they did where they did -- in this case they just did 5:25PM xylene washes every once in awhile to clean it up at the reservoir face.

Q    This is something that you mentioned earlier; right?

A    Yes. 5:26PM

Q    That being the xylene soaks?

A    Yes, this is one way of tackling it, but yes.

Q    Okay.  So in this chart it depicts that the productivity index was increased only 5:26PM temporarily?

A    Well, if all you do is soak it to solve it, you have not solved the problem, right.  Then you take the soak away and you're back to the same condition.  So yes. 5:26PM

Q    So -- but I'm just confirming that the -- what you referenced earlier, xylene washes -- or here it's called washes; right?  Is that the same?

A    No, not exactly because a xylene wash is a one-time thing.  You push it in and you wash it down 5:26PM

Page 178

there. 5:26PM

I'm talking about actually putting a continuous chemical injection system down in the wellbore so it runs continuously.  So that's I think kind of one of the things they talk about when they 5:27PM show their little chart on Page 9.

Q    Let's look at the paragraph before, which is now on Page 9 of the article.

A    Yes.

Q    And you see that it says, "Mitigation and 5:27PM remediation can be planned or not during the field development plan but they do not often address the root cause of asphaltene instability.  Most importantly, what happens in the reservoir stays usually in the reservoir, not allowing access to 5:27PM evidence collection for postmortem analysis, causing disastrous consequences such as loss of productivity, total shut down, expensive and time consuming xylene wash near production as shown" below. 5:28PM

Do you see that?

A    Yes.

Q    And again, this is a paper that you cited in your report; correct?

A    Right.  But -- yes.  So -- but that 5:28PM

Page 179

doesn't -- that's situation where that has nothing to 5:28PM do with commingling.  That's individual reservoirs and the individual reservoir's asphaltene dropout pressures at Shenandoah are pretty low, so that's not going to happen for many, many years.  And it may not 5:28PM happen at all if you have reservoir pressure support from the aquifer.

Q    I asked a very simple question.

MS. JENSEN:  I'm going to move to strike everything after "right." 5:28PM

Q    Okay.  So this talks about a loss of productivity and complete shut down.  You would agree those are disastrous consequences; correct?

A    Yes.

Q    You had talked about the level of 5:29PM asphaltenes for Anadarko.  Do you recall the level of asphaltenes in Anadarko -- I'm sorry, for Shenandoah?

A    Meaning the amount of asphaltene in solution in the -- 5:29PM

Q    The AOP?

A    Oh, the asphaltene onset pressure.  The individual reservoirs I believe were fairly low.  I don't recall the exact numbers, but I'm thinking somewhere between 5,000 and 9,000 psi. 5:29PM

Page 180

The issue was is when they commingle them, 5:29PM they got some numbers that were higher than that where the asphaltene dropout pressure for the commingled fluid might be higher.

So that was part of the uncertainty in 5:29PM question that if you did nothing, that that would be of concern.

Q    In fact, the blended oils was 19,500 psig; correct?

A    Without the numbers in front of me, I don't 5:30PM know for sure.  But it may be something around that order, yes.  I remember it was quite high.

Q    Extraordinarily high; correct?

A    Well, when you commingle things, extraordinary is a -- not a very definite word but it 5:30PM was high.

Q    And in fact, ConocoPhillips had never seen anything like it before; correct?

A    Well, that's true, but ConocoPhillips nor anyone else had drilled a 20,000 psi reservoir yet, so 5:30PM this is new area.

Q    Would you agree that the paper that you referenced in your report talks about how there's 5 percent of wells in the GoM that have severe issues related to asphaltenes? 5:31PM

Page 181

46 (Pages 178 - 181)

CONFIDENTIAL

A   I remember the paper said there were a number of them in there.  In fact, some of those fields are fields that Anadarko operates and they have successfully operated those fields with asphaltenes in them, so they are experienced in it.

Q   So compared to the 5 percent that is indicated in this article, how many of the Shenandoah wells had problems with asphaltene?

A   I don't know the exact number.  Remember, you can only measure that if you have a -- if you have a fluid sample, an oil fluid sample.  And they did not have fluid samples, obviously, at the wells that were wet.

And so the key fluid sample that drove -- fluid samples that drove these measurements were from Shen 4 sidetrack 1 and Shen 5.

So Shen 5 I believe had a slightly higher level in some of the reservoirs of the solution of asphaltenes.

Q   And which Shenandoah wells encountered tar?

A   Tar is a slightly different issue.  I believe the Shen 5 well encountered what's referred to typically as a tar mat.  And these also are not uncommon in deepwater.

Page 182

Q   In fact, Shen 1, Shen 4 sidetrack 2, Shen 5 and Shen 6 sidetrack 2 all encountered tar; correct?

A   They encountered different levels in different places of tar mats, yes.

Q   So the answer is yes; correct?

A   Yes.  They encountered different ones, yes.

Q   So that's four out of six wells indicated there was tar or asphaltene issues?

A   Well, I don't know what you mean by "issues."  There are tar mats there which typically are not extensive laterally.  That's why you don't find them consistently.  And there is asphaltenes, which one has to account for with mitigation techniques.

Q   So again, I believe the answer to my question is yes; right?

A   Okay.  Yes, they encountered tar and yes, they had fluids with asphaltenes.

Q   Okay.  Did you review any of the risk registers at Shenandoah?

A   I believe I looked at a risk register which lists all the possible risk and then also talks about what the -- usually it's broken up into what the threats and the mitigations are and, you know,

Page 183

et cetera.  So -- but yes, I think I looked at one -- at least one of them.

MS. JENSEN:  All right.  I've marked as Exhibit 535 a native document produced in this action and the Bates on it is APC-01183190.

(Whereupon, Exhibit 535 was marked for identification.)

BY MS. JENSEN:

Q   Do you see that?

A   535?

Q   Yes.

A   That's interesting, for some reason it came across as coming at 10:25 a.m., I have no idea why it's out of order with the rest of them.  It's a PowerPoint?

Q   Yes, it's a PowerPoint.  This appears to be a PowerPoint dated April 5th, 2016.

A   Yes, I have it up.

107 slides.

Q   We won't go through all of them, I promise.

A   Let me look at the first few.

Yes.

Q   You've seen this before?

A   Yes.

Page 184

Q   Now, if you fast click to 49.  Apologies, it's actually slide 50.

A   "Asphaltene Mitigation," yes.

Q   And the next slide?

A   After 50 or -- where it says "Testing Results" or you want to go one past that?

Q   That one I've got under slide 50.  I don't know if yours is different, but that's what I show is slide 50.

A   Okay.  I'm looking at "Shenandoah Testing Results."

Q   And the asphaltene onset pressures, what we've been calling AOP; right?

A   Yes.

Q   Range from 8,000 to 14,000 psi?

A   Yes.

Q   The commingling resulted in 16,000 to 20,000 plus psi?

A   Yes.

Q   Earlier you testified that you had worked on a project with AOP of I believe 4,000 psi?

A   Well, but the pressure in the reservoir was only about 12,000 psi, so yes.

Q   Right.  But the AOP was 4,000 psi?

A   Yes.

Page 185

47 (Pages 182 - 185)

CONFIDENTIAL

Q   You'll agree that 8,000 to 14,000 psi is   5:39PM
more severe or higher?

A   Well, the important parameter is the
distance between the reservoir pressure and the onset
pressure.  So in this case, if the reservoir pressure   5:39PM
is 20, you've got 6 to 12,000 psi range.  In the
case -- my case, it was 12 to 4, I had 8,000 psi
range.

Q   Okay.  And then with the commingling up to
20,000 K here?   5:39PM

A   Yes, that makes it considerably worse.

Q   Right.  Okay.  In this slide it depicts
that the precipitation in the tubing was expected
from day one of production and that would be
10,000 feet below mud line.   5:39PM

Do you see that?

A   Yes.  So what they did is they calculated
with no mitigation what would happen within the tubing
because as the fluid flows up the tubing, the pressure
drops and the temperature changes.   5:40PM

Q   That means that according to the slide,
which doesn't comment on that one way or the other,
it means from the very beginning other they would be
dealing with precipitation; correct?

A   With no mitigation, yes.   5:40PM

Page 186

Q   It doesn't say that on this slide, does   5:40PM
it?

A   Well, they continued to develop the field
and if was the case with mitigation, then the field
wouldn't be developable.   5:40PM

Q   Okay.  We can just set that aside because
we know that Anadarko wrote this off.

But in any event, below that it says,
"Asphaltene deposition at the rate of
2 barrels/20,000 barrels of oil flow."  Right?   5:40PM

A   That's what it says, yes.

Q   Let's turn to the next slide.

A   Okay.  Go ahead.

Q   Did you hear me?

A   Yes.  I'm looking at mitigations now.   5:41PM

Q   Okay.  This is after the slide we were
just looking at; right?  And the slide before was
depicting the severity of the problem; right?

A   It was predicting the potential severity of
the problem.   5:41PM

Q   Okay.  And then now under the mitigation
experience, it says that it has nine years of field
experience; right?

A   Yes.

Q   Ten plus wells; right?   5:41PM

Page 187

A   Yes.   5:41PM

Q   And it says that most productivity gains
from mitigation are gone with in 30 days; right?

A   That's what it says.

Q   Okay.  And you have no reason to dispute   5:41PM
that that's what Anadarko thought internally at the
time; right?

A   No, these are obviously soaks, right,
because you can see the timing of each soak.  So
that's not the only mitigation method.   5:42PM

But yeah, if that's all you do is soaks,
this is probably what you would get.

Q   It doesn't say here that it's only soaks,
does it?

A   Well, if it was continuous, it wouldn't go   5:42PM
up and down.

Q   But it doesn't say anything about soaks on
the slide, does it?

A   It does not say anything about it.

Q   All right.  Let's turn to the next slide,   5:42PM
"Mitigations Success and Path Forward."

A   Yes.

Q   This one says that the recent solvents are
much more effective but not restored for the long
term; right?   5:42PM

Page 188

A   I'm trying to see where you read the second   5:42PM
part from.  I see, "Recent solvents are much more
effective" and then I see, "Field trial for continuous
inhibition planned for 2017."

Q   And the productivity index on this diagram   5:43PM
is going down?

A   Productivity index will always go down as
you produce a field, doesn't stay constant.

Q   It's depicting a downward arrow; correct?

A   Yes, but I mean, it would do that even if   5:43PM
asphaltenes weren't there.

Q   Okay.

A   Productivity index always drops over time.

Q   This is Anadarko's track record; right?

A   This is a combination of their experience   5:43PM
and what they plan to try to do, yes.

Q   And they are referring to field trials?

A   Yes.

Q   They still didn't have any proven
strategies as of this time; correct?   5:44PM

A   Putting up a continuous chemical injection
at the face of the reservoir is a proven technology,
they just had not done it --

Q   Okay.

A   -- here.   5:44PM

Page 189

48 (Pages 186 - 189)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Q And this was the sum total of their 5:44PM mitigation success as they put it?

A I think there was a number of things in their mitigation, one was investigating this, one was doing soaks and another one was actually if in the 5:44PM worst case actually having to intervene with coil tubing.

Q And they found that the chemical injections were only 20 to 30 percent effective; right? 5:44PM

A The chemical injection soaks, yes.

Q Okay. You can set that aside.

MS. JENSEN: You should be able to see what's been marked as Exhibit 536.

And for the record, this is a document in 5:45PM native that was produced in this case with a Bates stamp APC-01677836.

(Whereupon, Exhibit 536 was marked for identification.)

BY MS. JENSEN: 5:46PM

Q Have you seen this document before?

A I'll look. I'm not sure if I've seen this exact presentation before. I may have seen it in a different form. But I do recognize a number of the slides. 5:47PM

Page 190

Q Okay. For the record, this is a 5:47PM PowerPoint presentation on "Shenandoah Field Development Flow Assurance - Dry Tree."

A Correct.

Q What's the difference between dry tree and 5:47PM wet tree?

A A wet tree sits on the seafloor. And a dry tree sits at the surface above the ocean.

Q Please turn to slide 7.

A "Why Ability to Enter the Well is 5:47PM Necessary?"

Q Okay. Do you see the second bullet there says, "Mixing of zones, cross flow may result in asphaltene destabilization, zone impairment resulting in productivity decline. Potential to 5:47PM lose recoverable reserves."

And there is a number of historical well impairment or failures below that.

A Yes, of which only two of them refer to asphaltene. One of them is wax paraffin, one is 5:48PM corrosion and one is sand.

Q Okay. So I'll --

A Those are all well impairments.

Q Right. I'm not asking you to categorize them. These -- it says here these are well 5:48PM

Page 191

impairment, well failure examples; right? 5:48PM

A Yes, there are examples of well failures.

Q And one of those well failures is the K2 and that was on account of asphaltene; correct?

A Yes, before they did mitigation. 5:48PM

Q This was an Anadarko well that you cited as a success?

A No, I cited the field as a success, not one particular well. So they learned from that well and then they made changes to the way they operated the 5:48PM field.

Q But this particle well, the K2 well failed because of asphaltenes?

A K2 is a field, there's one well in the K2 field. 5:49PM

Q That failed --

A K2 is not a well.

Q -- because of asphaltene; right?

A Yes.

Q And then also Constitution was also a well 5:49PM impairment or well failure example due to asphaltene?

A That's a -- Constitution in Ticonderoga are fields. And in those fields there was a well impairment, not necessarily a well failure but there 5:49PM

Page 192

was well impairment due to asphaltene, yes. 5:49PM

Q And, likewise, Ticonderoga was also a well failure due to asphaltene; right? So there's not actually just two, it's three?

A I believe they are a joint producing field. 5:49PM

Q Okay. And are you saying that's just one well then?

A I don't know exactly which well it is. They don't say which well here.

Q Okay. 5:50PM

A It would have been nice if they gave the well name.

Q In any event, they don't say it and for purposes of this slide, at the time when they were looking at this, there were historical well 5:50PM impairment/well failure examples due to asphaltene; correct?

A Yes, there are well failures if you don't take care of your well and you can see a bunch of reasons there why that can occur. 5:50PM

Q Let's walk through some of the asphaltene mitigation strategies that you talk about in your report.

You talked about chemical injection, we talked about that; right? 5:50PM

Page 193

49 (Pages 190 - 193)

CONFIDENTIAL

A   Yes, chemical injection -- I consider 5:50PM chemical injection to be a continuous injection at the well face.

Q   Coated tubing?

A   You can coat the tubing, you can buy special 5:51PM tubing that has coating on the inside that prevents asphaltene deposition from building up on it.

Q   And xylene soaks?

A   Xylene soaks were the examples that you showed there earlier where if you start to have -- you 5:51PM do nothing and if you start to have asphaltene deposition, you go down and basically try to wash it out with xylene.

Q   And production logging?

A   Production logging is when I put it as a 5:51PM mitigation, you want to do production logging so that you understand what's going on in your well.

So that's -- when I say "mitigation," information is power here.  If you're having an issue, you don't want to wait until is so severe 5:51PM that it's difficult to solve.  So production logging allows you to keep track of it.

Q   Use of completion equipment I believe you said was --

A   Right.  That's the sliding sleeves, the 5:52PM

Page 194

smart completions, all of that technology. 5:52PM

Q   And so those were the mitigation strategies that you mentioned in your report; correct?

A   Yes. 5:52PM

Q   Do you know who the flow assurance engineer was at Anadarko?

A   I do not, actually.  I probably saw their name once upon a time, but it wasn't a name I recall.

Q   Did you look at internal documents about 5:52PM what Anadarko knew at the time about mitigation strategies and how it might apply to Shenandoah?

A   I looked at some of their internal documentation, in particular I looked at some of their spreadsheets that define what their mitigation would 5:53PM be as a function of month and year just to understand how they were calculating costs, et cetera.

Q   But you didn't look at all the internal correspondence by the people who were responsible for it at the time? 5:53PM

A   I doubt I looked at all of them.

MS. JENSEN:  I've now pulled up for you what's been marked as Exhibit 537.

(Whereupon, Exhibit 537 was marked for identification.) 1:33PM

Page 195

MS. JENSEN:  For the record, this is a 5:53PM document that bears the Bates stamp APC-00011721.

THE WITNESS:  Okay.

BY MS. JENSEN:

Q   Okay.  If you'll take a look at -- you may 5:53PM need to zoom in here.  I know I need to.

So do you see this is an email from Nikhil Joshi to --

A   Yes.

Q   -- a number of people including Ms. Lea 5:54PM Frye and others with the subject "Shenandoah flow assurance report and impact on concept selection."

A   Yes.

Q   Okay.  Now, if you'll turn to Page 10.

A   Okay. 5:55PM

Q   There is a discussion here in the context of Shenandoah about asphaltene mitigation in Section 3.3 of this memo.

You see that?

A   Yes. 5:55PM

Q   Okay.  And there's discussion about asphaltene precipitation in the reservoir, 3.3.1.  And then there is a conclusion there which is underlined or underscored.

And do you see that? 5:55PM

Page 196

A   Not yet, I'm looking.  Down at the bottom 5:55PM right before 3.3.2.

Yes, I do see the part that's underlined.

Q   That part that's underlined says, "Therefore, water injection to maintain pressure 5:55PM cannot be considered as a reliable mitigation measure for asphaltene precipitation and deposition in the reservoir for concept selection."  Correct?

A   That's what it says, yes.

Q   If you turn down to the next page, there 5:56PM is a discussion on -- this is Page 11 of the PDF.  And it talks about solvents such as xylene.

Do you see that?

A   Are you talking about the underlined part right before 3.3.3? 5:56PM

Q   Yes.  But I'm talking about what is the context here.

And the context is the xylene soaks that you were talking about; right?

A   Yes. 5:56PM

Q   He concludes, "Therefore, asphaltene squeeze and/or solvent stimulations are not a reliable method to mitigate asphaltene deposition near wellbore."

Do you see that? 5:56PM

Page 197

50 (Pages 194 - 197)

A   Yes.                                5:56PM

Q   There's also --

A   Right below it, it says, "asphaltene deposition in the wellbore may be mitigated with chemicals but testing is required," on the same page.   5:57PM

Q   It says, "may be mitigated with chemicals but significant testing is required."  And it also says that chemical injections are only partly effective in preventing deposition; right?

A   Yes -- well, I believe that's true, but I'm   5:57PM not sure where it says that, so...

Q   Okay.  You remember that.
    It says that "Improved effectiveness is being pursued by developing new chemistries but such a technology should be considered as new and   5:57PM unproven."  Right?

A   Yes, but this document is from 2014.

Q   Understood.  This is at the time when they were deciding -- when they were appraising Shenandoah; correct?                        5:58PM

A   Yes, I believe this is right around the time of Shen 3.

Q   I'm going to show you another document.
    MS. JENSEN:  Let's go off the record.
    (Recess taken.)                        5:58PM

Page 198

THE VIDEOGRAPHER:  Back on the record.   6:03PM It's 6:03 p.m.
    MS. JENSEN:  You should be able to see in your Exhibit Share a document that has been marked as Exhibit 538.                         6:03PM
    (Whereupon, Exhibit 538 was marked for identification.)
    MS. JENSEN:  And for the record, this is a document produced in its native format in this case and the Bates number is APC-00044530.   6:03PM
    THE WITNESS:  Yes, I see it, "Asphaltene Mitigation April 2015."
BY MS. JENSEN:

Q   Okay.  Do you recognize this document?  You have seen this document before; right?   6:04PM

A   Yes, in fact, it has a -- I believe a -- you can tell there is a bunch of slides copied and pasted from a bunch of previous presentations, but yes.

Q   If you turn to slide 8 now, just again to orient us in time, this is now in 2015 and the   6:04PM heading here is "Asphaltene State of the Art"; right?

A   Yes.

Q   If you go to the second bullet here, it says the "Best chemical offers only 20 to 30 percent   6:05PM

Page 199

inhibition."  Right?                        6:05PM

A   At this time in 2015, that may be true.  I don't -- I'll take your word for it, but I don't know for a fact.

Q   But that's what Anadarko thought at the   6:05PM time?

A   That's what it says.

Q   Okay.  So that means that on the reverse side of the coin would be that 70 to 80 percent of asphaltene deposition would not be inhibited;   6:05PM correct?

A   No, I don't think you can draw that conclusion, but...

Q   I mean, if it offers only 20 to 30 percent inhibition, that means the remainder would be what   6:05PM it doesn't inhibit; correct?

A   I'm not sure I understand what a percent of non-inhibition is.  So I don't -- I don't -- without spending some time and understanding exactly what you're saying, that doesn't necessarily -- I can't   6:06PM comment on that.  I don't know.
    That doesn't sound exactly right to me.  But it's not an either/or.

Q   Okay.  Well, let's I guess agree to disagree on that one.                        6:06PM

Page 200

A   Okay.                                6:06PM

Q   So the next heading, though, says, "Field plugging known to occur with best chemical."  Right?

A   Yes, because they are talking about xylene washes.                                6:06PM

Q   Okay.  So plugging is still possible even with the best chemical at this time; right?

A   If -- yes, it's possible, if you wait too long.

Q   This is what the team is saying at the   6:06PM time; right?

A   Right.  Right.  But again, this is early in the project by the time they -- you can see a bunch of the slides in this that cut and pasted from previous slides.  This is a pretty new thing that they are   6:07PM looking at in 2014 and '15.  It isn't till later that they start kind of screwing down on exactly what their plan is.

Q   So the project started -- when did they discover Shenandoah?                        6:07PM

A   Original discovery was in 2008 or '09.

Q   Now we're in 2015; right?

A   Yes, but there was a three-year delay due to Macondo, but yes.

Q   We'll just -- talk about the way time   6:07PM

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL

passes; right? 6:07PM

So this is now 2015, that's a number of years after 2009; right?

A   That's true.

Q   More years between when it started and 6:07PM when they write the thing off in 2017; right?

A   There are more years -- there are years in between those things.  Typical wells take anywhere from, to drill, three to six months, yes.

Q   Now, when a tube is plugged, the 6:08PM production has to stop for it to be cleaned out; right?

A   If it's completely plugged or even substantially plugged, then it has to be cleaned out usually by scraping. 6:08PM

Q   And requires production to be stopped in order to do so; correct?

A   Yes, for a short time.  It doesn't take long to scrape the inside of a tube.

MS. JENSEN:  You should be able to see 6:09PM what I've marked as Exhibit 539.

(Whereupon, Exhibit 539 was marked for identification.)

MS. JENSEN:  For the record, this is APC-00349108. 6:09PM

Page 202

THE WITNESS:  "Workshop Day 1:  Reservoir 6:09PM Uncertainties, November 18, 2014."

BY MS. JENSEN:

Q   You've seen this document?

Do you see this document? 6:09PM

A   I'm looking to make sure I remember looking at this document.  I'm not sure I remember every slide in it, but yes, I remember looking at it.

Q   So if you turn to slide 81, fast click.

A   How come you can't find anything interesting 6:10PM on slide 2 or 3?

Q   I don't know.  But my finger is going to be tired after this.

So turning to slide 81, this refers to the different intervention types with respect to 6:10PM asphaltene mitigation; correct?

A   Is this the one that says, "Preliminary Costs - Dry Tree versus Wet Tree"?

Q   Yes.

A   Yes. 6:10PM

Q   Okay.  And these are the interventions that Anadarko was looking at at the time; right?

A   Yes, this is a version of that because the numbers tend to move around.  But yes, this is actually probably one of the more recent versions. 6:11PM

Page 203

Q   And it goes into the frequency of each of 6:11PM these intervention types?

A   Under the assumptions, it talks about -- let me see.  I don't see an intervention timeline or frequency here.  I see that if you decide to 6:11PM intervene, that it takes three to six months to mobilize for a wet tree intervention, because it takes that long to get a drill rig there, and two to three months to mobilize a dry tree intervention because a cable -- or a coiled tubing intervention on a platform 6:12PM is a lot easier to get.

But I don't see anything in here that says how often you would need to intervene, what the interval is or when it would even start.  Because obviously you wouldn't have to start until the 6:12PM pressure dropped quite a bit.

Q   Let's turn back to the slide before that, slide 80.

A   Okay.  There we go.  Intervention or xylene soaks with a frequency of once every one to two years. 6:12PM

Q   Let's look at the coiled tubing CT clean out.  Under there it says the "initial results indicate asphaltene deposition is a significant concern."

Do you see that? 6:12PM

Page 204

A   Yes. 6:12PM

Q   And the xylene soaks will allow frequency of one cleanout one to two years?

A   Yes.

Q   Now, under the xylene, that one assumes a 6:13PM frequency of once every three to 12 months?

A   Once pressure drops between AOP, yes.

Q   And then the acid stim/soak, that one frequency is once every one to two years?

A   Yes, but that's for scale deposition.  That 6:13PM doesn't have anything directly related to asphaltenes.  That's for something called scale.

Q   Okay.  And then the production logging, that one there needs to be a tubing cleanout and that's once per year? 6:14PM

A   Yeah, for the first two years.

Q   Right.

A   That actually is coupled.  And again, that's only in the case of commingling.

Q   At the time they were thinking they may 6:14PM need to do different zonal isolation completion scenarios; right?

A   They were considering that.  I don't know if they ever landed on exactly how they would -- which zones they might commingle and which not because they 6:14PM

Page 205

52 (Pages 202 - 205)

kept changing them and discussing which ones to do in 6:14PM which wells.

Q   Okay.  Now, if you look at slide 81, it discusses the preliminary costs.  We started looking at this before. 6:15PM

A   Yes.

Q   So there under the base case and the wet tree, the costs are over 40 million for each intervention?

A   Correct, that's because it's the cost of a 6:15PM drill rig to float out there and to be above the tree that's sitting on the seafloor.  So you have to pay for the rig.

Q   Right.  And then -- so that's -- during that time, during the intervention, there is no oil 6:15PM production at that time; right?

A   Most of that intervention time is getting things positioned.  So during the intervention itself, there is no production.  But interventions only take on the order of a few days. 6:15PM

Q   So I believe you mentioned earlier that Anadarko never really could decide on a mitigation strategy?

A   I think what they did is they had a portfolio of mitigations that they were going to 6:16PM

Page 206

consider, but since they didn't get to a final 6:16PM development plan, they didn't necessarily land on any of them, or maybe all of them.  So...

Q   Okay.

A   By the way, these are all interventions, 6:17PM there isn't anything in there that's just like continuous injection.  These are all if everything else fails and you have to intervene into the well, these are the possibilities you could do.

MS. JENSEN:  So there is no question 6:17PM pending, actually.  Let me show you a document that's been marked as Exhibit 540.  And for the record, this is APC-00052041.

(Whereupon, Exhibit 540 was marked for identification.) 6:17PM

THE WITNESS:  Okay.

BY MS. JENSEN:

Q   Now we're in late 2015; right?

A   Yes.  So 2015, this is probably about the time -- this is pretty late.  So this is Shen -- let 6:18PM me check the date on Shen 6.

This is after Shen 5, before Shen 6.

Q   Okay.  So if you look at Nikhil's email of October 21st, 2015, he says to Pat that they were pursuing the coating of the tubing that you 6:18PM

Page 207

mentioned earlier? 6:18PM

A   Yes.

Q   Okay.  And said that he was -- basically, "In short," he says, so now I'm quoting, "the tubing coating is not on the table for any of our wells 6:18PM today."

Is this an email that you had looked at before you submitted your report?

A   No, I don't believe I saw this email.

Q   Okay.  And you mentioned Typhoon in your 6:19PM report as an example of successful asphaltene mitigation; right?

A   Yes.

Q   Okay.  Typhoon was a Chevron project?

A   Yes. 6:19PM

Q   They used coated tubing in that project?

A   They did, yes, they did use coated tubing in the project.

Q   Okay.  And he's saying -- Joshi is saying that the tubing is still in the proof-of-concept 6:19PM phase; right?

A   Well, that may have been his awareness and his opinion.  I happen to have been aware of coated tubings being used for -- before that.  So he's aware of the one of Typhoon, but I was aware of others. 6:20PM

Page 208

Q   Right.  He was saying at this point 6:20PM they're still trying to figure out if it's feasible; right?

A   Right.  So he's not sure who to contact or how to -- according to the email I'm reading there, he 6:20PM didn't know who to contact or how to pursue it.

Q   He's saying at this point "the tubing coating is not on the table for any of our wells today."  Right?

A   That's what he says, yes. 6:20PM

Q   You are aware that by June of 2016, the coated tubing was only listed as a backup mitigation candidate?

A   I haven't seen where it was listed as a -- with the specific title "backup."  But I know it was 6:20PM one that -- and you can see from there that was at least potentially available and being considered.

Q   By September 2016, coated tubing was not even in the running as a consideration for a mitigation strategy; right? 6:21PM

A   That email indicated that he was not considering it in the development strategy at that point in time, yes.

Q   Right.  And a year later, it was not even a candidate at all for the mitigation; right? 6:21PM

Page 209

53 (Pages 206 - 209)

A    At that time it was not a candidate.    6:21PM

Q    Okay. So at this point of late 2016, coated tubing was not a candidate. Chemicals only offered 20 to 30 percent innovation; right?

A    You're talking about xylene soaks, xylene    6:21PM soaks offered potentially somewhere around that according to their documentation.

Q    Okay. And according to their documentation, plugging could still occur with the best chemicals; right?    6:21PM

A    Under the right circumstances, with no pressure support and without the proper mitigation and intervention, then it would be possible that that could be a problem.

Q    An according to Anadarko's documents at    6:22PM that time, the technologies for mitigation were still new and unheard of then; right?

A    No, I don't think they were new and unproven. They were still exploring what all the possibilities were. Obviously they had already proven  6:22PM some of the mitigation strategies in other fields.

Q    So according to documents we saw, it was expressed that they were new and unproven; correct?

A    They felt some of them were unproven. But others they had already used in some of -- Anadarko    6:22PM

Page 210

had also used in some of their other fields.    6:22PM

Q    The interventions could cost also up to $40 million as we saw; right?

A    If you were going to have to mobilize a drilling rig for a wet tree entry, it could cost    6:23PM upwards of 40 to $45 million, yes, or in that range.

Q    And even with that cost, the production could still be stopped; right?

A    Well, the -- you would only bring out that drilling rig if you wanted to prevent the production    6:23PM from being stopped. You would not allow the production to be stopped and then bring the drilling rig out.

Q    Right. And we talked earlier about the production stopping?    6:23PM

A    Yes, well, if the production stopped because the tubing had plugged up, then you would have to intervene in some way to clean that.

Q    And the production would be stopped during that time?    6:23PM

A    Oh, you mean in terms of production?

Q    Yes.

A    Yes, but you would know way before then if you were starting to run into a problem because the pressure would drop and your flow rates would start to  6:24PM

Page 211

drop down. So you would have ample warning and you    6:24PM would never allow that to happen.

MS. JENSEN: Okay. Let's take a break.

THE WITNESS: How long?

THE VIDEOGRAPHER: Off the record. It's    6:24PM 6:24 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 6:41 p.m.

BY MS. JENSEN:    6:41PM

Q    What tools are available to geophysicists to identify faults?

A    So faults can be -- for geophysicists, most faults that they identify are from their mapping of the seismic data where they look for discontinuities    6:42PM in the seismic as you move laterally.

But geophysicists also use faults that are seen in wells and sometimes faults that are implied from -- faults that are implied from tops that are measured in wells.    6:42PM

Q    What is a coherence map?

A    Yes, a coherency map, also referred to as a dissemblance volume or -- basically you take a volume of seismic data, which is a sample, you know, every say 10, 15 feet by 100 feet by 100 feet.    6:43PM

Page 212

You have this huge volume of data and you    6:43PM look at how similar the samples are laterally compared to each other.

If they look very similar, in other words, you're looking at something where events are    6:43PM continuous, if it looks very similar, you get a very low value. So a high coherency.

If they look very different because the event has been broken and there's something else juxtaposed against it, then the -- then the -- you    6:43PM would get a very low correlation.

So you can generate an entire volume of these correlations or dissemblance. Then if you kind of draw a map or traverse or anything through that, you'll see where things look coherent and    6:44PM where they don't look coherent.

That can sometimes be used to spot discontinuities in the data.

Q    And discontinuities also can be called faults; right?    6:44PM

A    Yes, discontinuities can be faults, they can be barriers, they can be seismic noise.

Q    Do anomalies -- I can't say that word.

A    Anomalies.

Q    Do anomalies on a coherency map indicate    6:44PM

Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

faults?                                         6:44PM

A    They may or may not.  Usually what you would do is you would look at how those anomalies, how those incoherences map out.  If the incoherence is a continuous set of discontinuities that can form a       6:44PM surface, then you would be more likely to interpret it as a fault.

Q    OBMI wireline logs, they can also identify faults; correct?

A    So the OBMI is a tool that goes in a well     6:45PM that looks basically at the layering of the sediment in a 3D sense around the wellbore.  So if there is a discontinuity in that layering in a wellbore, then that will give you an idea of what that discontinuity is.                                         6:45PM

But then you have to make an interpretation whether that discontinuity is a fault or is that discontinuity due to something else.

Q    You mentioned offset in your report.  You know the concept of offset; correct?       6:45PM

A    Yes.

Q    So what magnitude of offset would be required to competently map a fault in the seismic data?

A    So in order to confidently map a fault from  6:46PM

Page 214

the seismic data, you have to see that seismic data     6:46PM make a -- again, we talked about correlation, you would have to have a discontinuity in the seismic data as you move from one place laterally to the next.

The seismic data is limited to a certain     6:46PM frequency content.  And the frequency content gets lower and lower the deeper you go and if you go below salt.

And so the frequency content is inversely proportional to what you can resolve.  So the lower     6:46PM the frequencies, then you need a higher discontinuity in order to see it.

So at Shenandoah, based upon the seismic data that I saw in the images, I estimated it would be very difficult to map any discontinuities which     6:46PM were smaller than, say, about 300 feet.

Q    So your testimony is that the magnitude of offset required to confidently map a fault is about 300 feet?

A    To confidently map it.  You might extend     6:47PM that down to 200 feet but with a lot less confidence.

Q    Okay.  In the final interpretation do faults exceed that resolution?

A    Well, one of the other difficulties with interpreting faults down there is you would like to     6:47PM

Page 215

see that discontinuity, as I said, map out as a       6:47PM surface, so you would like to be able to extend it vertically up and down.

So that's difficult to do with the data at Shenandoah.  It's below salt, it's noisy, it has a       6:47PM lot of artifacts from the imaging that comes through the overlying salt.

But there are some places where you think you might be able to interpret a fault.

And so -- but there are also many places       6:48PM where faults were interpreted that were later proved to not exist.  So you can be fooled.

But yes, there are a couple of places where you could say, hey, I feel a little more confidence that there may be a fault there.       6:48PM

Q    Now, if a fault is identified in a borehole such as Shen 3 BP1 through logs or samples, that's also evidence of faulting; correct?

A    Usually you would only map it as a fault if you could tie it to an offset imaged in the seismic,     6:48PM right.

So would you want confirmation between the two sets of data because the well does not tell you how much offset is on a fault, it just tells you there is a discontinuity.                               6:48PM

Page 216

So if you go through a fault or if you see     6:48PM a discontinuity, it could be a very small discontinuity or it could be a larger one.  It's very difficult to tell.

Usually you like to correlate it with       6:49PM something that you see on the seismic that gives you more reason to believe it's real and that it's substantial.

Q    If one fault is identified in a borehole such as it was in Shen 1 bypass 1, you wouldn't       6:49PM expect that to be the only fault in the area in a field as large as Shenandoah, would you?

A    So the faults are a result of what is going on with the basin.

And so you would expect if there's any       6:49PM faulting for it to be different in different places of the basin.

So, for instance, up very close to the salt where things are moving and there's -- the sands are thinner and the salt is moving, you would     6:49PM expect it to be a little more distorted and potentially faulted than you would in the middle of the basin which wouldn't have that.

So if I see one fault, would I expect another, not necessarily.  Faults are difficult to       6:50PM

Page 217

55 (Pages 214 - 217)

predict, so -- without actually seeing them and mapping them.

But you certainly would not say if you saw one, you would at least consider the possibility that there may be others even if you could not map them.

Q   Do you agree that the north/south lineations in the Shenandoah coherency maps are faults?

A   I think some of them are likely to be faults.

Q   And are they normal or reverse faults?

A   Well, that's an interesting question.  So a normal fault is one in which you have extension and so things slide apart.  Reverse faults are when you have compression and they push one over the top of the other.

And most of the faults you would expect in Shenandoah basin to be normal faults.

But there are -- again, because the seismic data is so difficult, it's hard to tell for sure.

There is the possibility that this basin may have a reverse fault in it.  But there is no clear evidence indicating for sure that that's the

Page 218

case.

Q   So if it's -- assuming it's a normal fault, what would that tell you about the deformation history of the Shenandoah basin?

A   Well, the Shenandoah basin is formed by -- all the sediments in Shenandoah basin were laid down flat or pretty close to flat on the seafloor.

So as -- so the center -- the weight of the sediment at the center of that deposition started weighing the salt down that was underneath it and pushing the salt -- pushing it out of the way and causing it to flow laterally.

So the center of the basin sank and additional sediments filled it up.

So if I see normal faults, what it tells me is that the space -- the rate at which the salt is being pushed out is exceeding the rate at which the sediments can fill it in.  So then the sediments start to slide into the center.

Q   So would the stress creating the faults south of the Shenandoah field likely include the entire basin even under the field?

A   Not necessarily because it depends on when the salt moved compared to when the sediment filled in.

Page 219

So some of these faults, they may not extend down into the deeper part of the basin, they may not extend very far to the south.

In fact, most of them were interpreted as when you got to an area where you could see a little bit better in the seismic, which was away from the northern edge, even then the faults were not drawn all the way across the basin.

So no, not necessarily the faults don't have to extend very far.

Q   Well, would you expect for the faults to continue to the north into Shenandoah field proper?

A   You don't know.  The reason I say that is because you have to extrapolate to the north and as you move out of the center of the basin and you go towards its edges, the amount of simple normal faulting and the shape of it obviously north to south could change.

So if there is faulting there, understanding where it is becomes even more difficult.

Q   Let me ask you this:  If -- the stress field affects the basin?

A   Yes.

Q   Well, then explain why the eastern field

Page 220

area updip of Shen 3 would not have the same structural complexity as the western half of the field.

A   The western half of the field has a salt root, a salt face moving up against the sediments.

The area where updip of Shen 3 are sediments that have just been laid over the top of that are truncated.  So they are different stress areas.  So I would expect them to be different.

Now, what would the faulting look like in those areas and how much of it is there, as you get close to the salt base, I would expect more because that's because the stress will be higher.

But without having evidence, it would be real tough to put any of that on a map.

Q   So in your report you talk about high confidence faults; right?

A   Yes.

Q   How do you as a geoscientist identify them?

A   Well, I looked at -- if I interpret an event and I see a discontinuity, I look to see if I can find evidence of that discontinuity below it, above it, and does that discontinuity extend, you know, laterally.

If I can make sense of it so that I have a

Page 221

56 (Pages 218 - 221)

lateral surface that looks geologically reasonable, then I have a little more confidence in a fault like that.

If I can only map a very short piece, you know, one event has some offset on it but the one below it and the one above it doesn't, or I can't map it very far, then I just have less confidence that I am mapping a fault and consider the possibility I'm just mapping noise.

Q   If you extrapolate from the high confidence faults in the basin, you can hypothesize as to the frequency of significant faults in the areas of poor seismic; right?

A   You could try to hypothesize it, but then it's just a hypothetical fault.

Q   It would be maybe less high confidence, but it would still be a methodology for identifying potential faulting?

A   Yes, usually faulting you cannot map or you cannot really identify, but you recognize there's some possibility of it.

You usually try to deal with it in other ways. You either try to deal with it in terms of things like recovery factors and other ways rather than putting them on a map. Because the last thing

Page 222

you want to do is put a fault on a map which will drive where you put wells and then find out it doesn't exist.

Q   What information is necessary to add faults in the simulation stage?

A   When you're doing reservoir simulation?

Q   Yes.

A   Usually when people do reservoir simulations, if there is a clear fault, they will build it into the reservoir model.

If there's not a clear fault, most reservoir engineers I've worked with will experiment with putting in barriers and taking barriers out and looking at what the impact of such artificial barriers are.

And that's pretty common. In fact, even after the field starts producing, if the reservoir model doesn't explain very well the production you're making, reservoir engineers just kind of arbitrarily put barriers in the reservoir model to try to make the production agree with the model.

Q   That's a common technique; right?

A   That's a common technique among reservoir engineers.

Q   Do you know who Doug Shotts is?

Page 223

A   Yes.

Q   What was Doug Shotts's method for adding faults to his simulation?

A   Doug Shotts did a number of simulations. He did an experimental model simulation that just arbitrarily put in many fault, less faults, north/south faults, east/west faults, so -- and he explored from a model perspective like what would the impact of severe faulting be compared to less faulting.

So it wasn't based necessarily on data, it was just a model exercise.

Q   It was a commonly used modeling exercise; right?

A   I wouldn't say commonly used. It's one way to just explore as you -- as you get more information about a field, you get an idea of where do I sit within the range of possibilities; right. Do I sit with lots and lots of faults or do I sit with a few faults? So it gives you some idea of what kind of recovery factor to start using.

Q   You're aware that in Doug Shotts's simulation, there was a downside recovery factor with east/west faulting of 5 percent; right?

A   Well, it was more than just east/west, it

Page 224

was east/west and north/south faulting. East/west faulting would automatically imply that you had no aquifer support whatsoever because the aquifer has to move from -- the water has to move from the south to the north.

So it automatically assumed no aquifer support and it had compartments, I believe, that were on either a 1-mile by 2-mile rectangle, the whole field into independent rectangles and then what would a recovery be.

Q   Are you aware of any of Anadarko's resource assessments including that -- Shotts's 5 percent recovery factor?

A   Can you repeat the question?

Q   Yes, I may have asked it poorly. Let me try again.

Are you aware of any of Anadarko's resource assessments that included Shotts's downside recovery factor case of 5 percent in the resource distributions?

A   No, but neither did I see anywhere his upside was 35 percent. So they tended to use and land on numbers in between those two.

Q   So the answer to my question is no; right?

A   Yes.

Page 225

57 (Pages 222 - 225)

CONFIDENTIAL

Q   Looking at the -- I'm sorry, strike that.   7:01PM
Did you look at the record on the water samples that were acquired from some of the wells?

A   I looked very briefly at the water samples acquired.   7:01PM

Q   And did you look at the salinities on Shen 3 and Shen 6 which were between 195,000 and 240,000 ppm?

A   I remember that they were not that unusual. But yes, I remember they are in that range.   7:02PM

Q   Okay.  Based on that range, would you expect the water samples to be from the same basin wide aquifer?

A   So water samples are -- in terms of their connectivity are usually based more upon pressure   7:02PM because the salinity in the water is going to vary depending on how close you are to the salt face and how connected you are on this as the -- how much of that particular reservoir in that area is actually touching salt.  Because the salt dissolves back into   7:02PM the water.

So if they were very close and they had different salinities, you might expect that they -- at least at the highest levels, they might be different.   7:03PM

Page 226

But the salinities can be different updip   7:03PM and still be the same well downdip.

Q   Do you agree that fluid density is the controlling factor in the normal hydrostatic gradient?   7:03PM

A   Yes.

Q   Now, the Shen 3 water gradients varied; correct?

A   The water gradient was measured in each of the Shen 3 sands and they were slightly different   7:03PM depending which sand you measured them in.

Q   So shouldn't those fluids have the same density, the .500 used by Anadarko to project the oil-water contact in Shen 2?

A   They should have a density which is at least   7:03PM similar.  The actual projection depends more on -- it depends a little bit on pressure, but it obviously depends a lot on -- it depends a little bit on salinity.

It depends more on pressure, what the   7:04PM pressure in those wells, in those aquifers were. But that's always taken into account, so when someone does the projection, they calculate the density of the water and they use that to project up to the density of the oil.   7:04PM

Page 227

Q   You are aware that Chris Camden, who we   7:04PM discussed earlier, used the Yucatan 2 gradient instead of the Shen 3 gradient; right?

A   At what point in time?  Which well are you talking about?   7:04PM

Q   So this is in Pittinger's report at Paragraph 150.

A   I don't have a copy of Pittinger's report. But...

Q   You are aware of Chris Camden stating that   7:05PM "I'm using the Yuc 2 aquifer pressures to estimate OWCs.  I don't think the Shen 3 aquifer is connected to the west side of the field."

You're aware of that; right?

A   So now we're talking about at Shen 4.  Okay.   7:05PM So after Shen 4, because of the difference in pressure of the oil column in Shen 4 sidetrack 1 and bypass versus Shen 2, which is the nearest oil well, then there was a question as to whether or not you should use the water pressures in Yucatan 2, which is   7:05PM actually closer but across the middle of the basin, to estimate the oil-water contacts at Shen 4 or whether or not you should use the Shen 3 pressure, which is all the way across to the east side of the basin.

So that was a question and it made a   7:06PM

Page 228

slight difference in which one you used, but both of   7:06PM them are probably valid and the question is, which one do you think has better pressure connectivity to Shen 4?

Q   And what Chris Camden said was, "I don't   7:06PM think the Shen 3 aquifer is connected to the western side of the field"; right?

A   Yes, he said he doesn't think that.  There is no evidence saying it is or it isn't.

Q   Let's turn to Paragraph 520 of your   7:06PM report.

A   "Structure Mapping."

Q   Yes.  This is a quick side note, so the Figure 55 that we see there, is that the coherency map?   7:07PM

A   That is an extraction of a coherency map along a horizon that has been picked.  So somebody has interpreted a horizon that they think corresponds to a marker in the field and then they have extracted the coherency value from the volume at that map.  Yes.   7:07PM

Q   Okay.  Let's look at the paragraph above that, 520.

So you state in there that by this point of Shen 3, "the teams agreed there was evidence for both east/west and north/south faulting."  Correct?   7:08PM

Page 229

58 (Pages 226 - 229)

CONFIDENTIAL

A   Yes.    7:08PM

Q   You can set those aside.

What is siderite?

A   What is what?

Q   Siderite?    7:08PM

A   Siderite?

Q   Did I say it wrong?

A   It's said right.

Q   Okay.  You're going to have to fix the online Google pronunciation because they say    7:08PM "siderite."

A   Okay.  I won't guarantee I'm right, but that's what I always heard it referred to as.

Q   Take that up with Google.  I'm going to say it the wrong way.    7:08PM

A   That's fine.

Q   What is siderite?

A   Siderite is a mineral that is present in sediments and -- in certain sediments, so...

Q   Okay.  What does the presence of siderite    7:09PM have to do -- or what does it have to do with fluid properties?

A   So usually minerals come out of -- are leached out of rocks when they flow.

And so when you see a lot of siderite in a    7:09PM

Page 230

well and it corresponds also to where there has been    7:09PM a significant distortion or an inconsistency in the sediment, that's part of what you would use to try to interpret a fault.

Q   Is it an indication of hydrocarbon    7:10PM migration?

A   So hydrocarbons migrate a number of ways. When hydrocarbons -- they can migrate along a fault. So it can be indicative of that.

But hydrocarbons can also migrate    7:10PM vertically through poor seals, especially if the pressure differences are high.  There is a number of -- and hydrocarbons can migrate laterally through reservoirs.

There is a number of ways hydrocarbons can    7:10PM migrate.  But it could be -- it's not the only indication of a hydrocarbon migration, but it could imply that.

Q   Let's turn to Paragraph 263 on Page 128 of your report.    7:11PM

A   Yes.

Q   Here you say that no siderite -- I think I'm saying it now right -- was detected at Shen 2?

A   Right.  That was in the core analysis.  So they didn't see any of it, so that would make you    7:11PM

Page 231

think that the oil that's in those reservoirs filled    7:12PM those reservoirs up and then did not subsequently move.

MS. JENSEN:  Okay.  I've marked as an exhibit a document that bears the Bates stamp    7:12PM APC-00001505 and this is Exhibit 541.  You should be able to see it.

(Whereupon, Exhibit 541 was marked for identification.)

BY MS. JENSEN:    7:12PM

Q   This is going to require some fast clicking.

A   Okay.  September '13, so this must be post Shen 2.  What slide are we going to out of 168?

Q   Let's look at slide 75.  Apologies,    7:12PM slide 76.

(Discussion off the record.)

THE WITNESS:  There it goes.  It was just a pause in the computer.  I'm up to 45 now.

You said 70 what?    7:13PM

BY MS. JENSEN:

Q   Seventy-six.

A   "Siderite replacement grains," yes.

Q   Do you take it from this slide that there was presence of siderite in both Shen 2 and Shen 1?    7:13PM

Page 232

A   There are some there, but I don't think it    7:14PM was a substantial amount.  Whenever you get a piece of core, you analyze all of the grains that are in it. But they note examples of it in the rock.

Q   So there was siderite in both Shen 2 and    7:14PM Shen 1; right?

A   There was some in there.

Q   All right.  You can set that aside.

Paragraph 730 of your report, which is now Page 344, you talk about slickensides; right?    7:14PM

A   Yes.

Q   Okay.  Can you describe the difference between faults -- strike that.

What are slickensides and how do they form?    7:15PM

A   It's a characteristic in the cuttings that imply that there has been movement of the grains against each other.  And so it's usually indicative of some level of movement of grains as they slide past each other.  So it could be indicative of a fault.    7:15PM

Q   So sometimes slickensides occur along fault planes?

A   Yes.

Q   Do they sometimes occur along fracture planes?    7:16PM

Page 233

59 (Pages 230 - 233)

CONFIDENTIAL

A   Yes, fractures and faults are, for the most part, used interchangeably.  But yes, slickensides can be indicative of a fault or at least a discontinuity where one set of grains have slid against another.

Q   What are deformation bands in a rock?

A   So rocks can be deformed without actually breaking, right, without a fault, they can be bent.

And so a deformation band is an area where the sediments have been bent or deformed, but they have not created any offset.  So there is no faults.

Q   Does the formation of deformation bands require a significant offset along the plane in the deformation band?

A   It doesn't require any offset.  If there were offset, then you would have a fault.  So what the deformation band is, it's a zone which can extend laterally where the sediments have been deformed.  They have been bent but have not broken.

Q   And slickensides impact fluid flow across the fracture or deformation band?

A   They can if you have a deformation band, then you've jostled the grains around and you've probably distorted and reduced the porosity space between the grains.  And you may have made the path for which fluids need to flow more tortuous.

Page 234

So deformation bands can serve as a partial barrier to fluid flow.

Q   I would like to show you a document.  It's loading.  It's still loading.

A   I'm clicking on it to see when it shows up.

Q   Okay.

A   Did you get it loaded?

Q   You should be able to see what has been previously marked as Exhibit 71.

This is PDF of a PowerPoint presentation which bears the Bates stamp APC-00001146.

A   I can see it, a PowerPoint presentation from December 10th, 2014.

Q   Actually, this one because it's PDF, we can scroll down to slide 54.

A   Yes, indeed.

Q   Okay.  So this is a slide showing the Lower Wilcox A; right, a map of the Lower Wilcox A?

A   Just a minute.  I'm on lower Wilcox B, so I went one too many.

Q   Yes.

A   Lower Wilcox A, contour interval 250 feet.

Q   Okay.  And just to double check, so on -- so it's slide 54 even though it doesn't have an actual number on the PowerPoint.  Okay.

Page 235

A   Yes.

Q   All right.  And do you see the various wells for Shen depicted here or some of the wells?

A   Yes, I see some actual wells and I see some -- I see some recommended locations.

Q   Okay.  And you see a black line in this map that separates Shen 2 and Shen 3?

A   The northwest/southeast black gap, it's a gap in the map, that's why it's black.  That gap that separates -- or that runs between Shen 3 and Shen 2, yes, that's a fault.

Q   Okay.

A   That's interpreted as a fault.

Q   Now, are the contours aligned on either side of the feature?

A   No, they -- well, no, they are not and no, they shouldn't be.  Otherwise, there is no offset on the fault.

Q   Right.  Now, you just answered my next question, which is:  If the contours on other side of the line don't align, that means there's sediment that offset; right?

A   Right, there's offset here.  You can -- the easiest place to look is since the contour interval is 250 feet, every fourth one, I believe, they make a

Page 236

brighter blue line.

So you can look up where it says 51 east and see that that line is -- when you go to the other side of the fault is north of that.

So yes, there is an offset on this -- interpreted offset on this fault.

Q   Can you tell how much the offset is?

A   Well, the -- so the way to do the offset is you check from one side to the other side.  So here it looks like about -- now it changes a little bit.

So up to the north, it is around one and a half contours.  Down to the south, it's only about one contour.

So according to this map, up to the north it's about 400 feet and as I come further south, it -- by the time I get to the green, it's only about 50 to 100 feet and by the time -- then there are -- in the area where the two faults overlap, it changes again.

But up where the reservoir is, it's probably somewhere between 2 and 400 feet.

Q   And that fault with that offset separates Shen 2 and Shen 3; right?

A   Yes, the way it's interpreted, yes.

Q   Again, we talked earlier about Chris

Page 237

60 (Pages 234 - 237)

CONFIDENTIAL

Camden and in his email, but Shenandoah 3 was on   7:25PM
which side of the field?

A   Shenandoah 3 is on the east side of the field. It's the little white X where it says WR 52 Number 2 Appraisal.   7:26PM

Q   Right.

A   That's Shenandoah 3.

Q   And Chris Camden said he didn't think that the Shen 3 aquifer here on the eastern side of the field is connected to the western side of the field,   7:26PM and the western side of the field would be Shen 2; right?

A   Shen 2 is more a central field, but he said that, yes, that he wasn't sure that Shen 3 would necessarily in pressure communication with Shen 2.   7:26PM

Q   And he said it stronger than that; right? He said, I don't think the Shen 3 aquifer on the east side of the field as we're seeing this now is connected to the western side of the field which is where Shen 2 is?   7:26PM

A   Yes, I mean, he can say he thinks it, but he doesn't show any evidence one way or the other.

Q   You referred to Allan diagrams in your report; right?

A   Yes.   7:27PM

Page 238

Q   What is that?   7:27PM

A   It's a diagram you would make of the fault plane showing the juxtaposition of what's on one side of the fault to what's on the other side of the fault.

Because in this area, for instance, in   7:27PM Shen 2, in an interval of, say, 2,000 feet, 1,000 feet of it is hydrocarbon filled sand.

If you were to go on the other side of that fault and move that down, say, 3, 400 feet, that means a bunch of those sands are still   7:27PM juxtaposed against each other across the fault.

So an Allan diagram you usually use to try to estimate what sands might be juxtaposed across the fault.

Q   You're aware that Anadarko personnel   7:28PM talked about an Allan diagram project in the context of Shen?

A   They may have talked about it. I never saw an actual Allan diagram along any of these faults ever displayed. So they may -- if they did one, I never   7:28PM saw it.

Q   So let's turn to Page 86 of your report. You can set this aside.

A   I was going to slide it to 86.

Q   All done with that one.   7:28PM

Page 239

A   Okay. What paragraph or what page?   7:28PM Page 86?

Q   Page 86, Paragraph 100 -- sorry, 191.

A   Yes.

Q   In this paragraph you're commenting on   7:29PM Dr. Merrill's report with respect to the P1 and P99 in the MMRA distributions?

A   Yes.

Q   Have you ever heard of the paper by Rose & Associates from 2001 on the risk analysis of   7:30PM exploration prospects?

A   Yes.

Q   What does that paper concern?

A   That paper concerns the statistical distribution of things such as volumes and other key   7:30PM parameters and builds on other suppositions that have been done in the past and still are that says that those must -- that those volumes lie along -- or that those likelihoods fall along a logarithmic curve.

So if you were to plot in a logarithmic   7:30PM space P1, P10, P50, P90, P99, they would form a straight line.

Q   Okay. You should be able to see what's been marked as Exhibit 542.

(Whereupon, Exhibit 542 was marked for   7:31PM

Page 240

identification.)   7:31PM

THE WITNESS: Okay.

BY MS. JENSEN:

Q   Is this the article or document you were just talking about?   7:31PM

A   Not sure if this is the article or not. This is a part of -- I was wondering if it was part of their manual where they talk about the -- I don't know if this is actually the document or if it's a chapter out of a manual.   7:32PM

I haven't actually seen this very specific document before, but that's what it looks like.

Q   If you look at Page 26 of the article or otherwise, you can refer to Page 9 of the PDF.

A   Twenty-five -- 26, Table 6?   7:33PM

Q   Yes.

A   Okay.

Q   So are you aware that following the drilling of Shen 2, Anadarko's P10/P90 estimate was between 2.8 and 60?   7:33PM

A   I know it was big, but it was -- and which number was it you said was between 2.8 and 6.0?

Q   2.8 and 6.0.

A   You're talking about the volumes in place?

Q   Yes, for the P10/P90 estimate.   7:33PM

Page 241

61 (Pages 238 - 241)

CONFIDENTIAL

A   Right.  For volumes in place, right.  Yes, 7:33PM that sounds about right.

Q   So looking at this table, Table 6, and how you described the certainty of the Shenandoah project, what is the range of the expected P10/P90 7:34PM ratio?

A   At -- at the drilling of Shen 2 or --

Q   Let's go along -- yes, at that time and then with each well after that.

A   Well, I don't know exactly following the 7:34PM well, but I know that Shen 2 was, for all practical purposes, its own exploration well because it was not connected and it saw a completely different section than Shen 1.

So in a lot of ways, I would say based 7:34PM upon Shen 2, you know, that you would be in -- somewhere between wildcat and known productive trend and potentially even rank wildcat in a proven trend given that they were -- where they were located, how they were exploring, so somewhere in that range. 7:35PM

So somewhere between 10 and 220, if you go by their chart.  And I'm not sure I agree with their chart in all cases.  But if you use their chart, that's where I would expect you to be.

Q   So was there a development well drilled in 7:35PM

Page 242

the Shenandoah basin prior to 2014? 7:35PM

A   In the Shenandoah basin?  Prior to 2014, I don't recall the date that the Yucatan 1 or Coronado were drilled.  So I don't remember if one of them were before that. 7:35PM

The only other well that was obviously 2008, 2009 was the Shen 1 well, but one I think evidence certainly at this point and after this was that those two wells were not connected, so they weren't ineffectively the same basin. 7:36PM

Q   Was there a step-out or extension well drilled in the Shen basin prior to 2014?

A   Other than Shen 1, Coronado or Yucatan? Like I said, I don't recall the exact date.  I would have to look it up for when Yucatan 1 and Coronado 1 7:36PM took place.

But even if those were before that, then that would only put you in the wildcat in known productive trend, right.

So that would still put you in the 10 to 7:36PM 120 range for volumes.

MS. JENSEN:  I would like to take a quick break.

THE VIDEOGRAPHER:  We're off the record. It's 7:37. 7:37PM

Page 243

(Recess taken.) 7:37PM

THE VIDEOGRAPHER:  Back on the record. It's 8:01 p.m.

BY MS. JENSEN:

Q   Dr. Detomo, if you could please turn to 8:01PM Paragraph 918 of your report.

A   Okay.

Q   It starts on Page 421 and ends on 422.

A   Okay.

Q   Are you with me? 8:02PM

A   Yes.

Q   All right.  So in this paragraph you are criticizing Mr. Pittinger about economic calculations and as it starts on Page 422, you say that "information regarding fault 8:02PM compartmentalization was accounted for in explicit fault mapping and lower recovery rates (13.8 instead of 30 percent)."

What did you mean by "13.8 instead of 30 percent"? 8:02PM

A   Early on in the project, and according to the work done by the reservoir engineers, without any faulting at all, the estimation was because of the fluids and the porosity quality of the rock, that recovery efficiencies could approach over 30 percent. 8:02PM

Page 244

So some of the very early volume estimates used 8:03PM recovery factors of around 30 percent.

Once they became aware that there might be unmappable small-level faulting and other production issues, they lowered the recovery factor.  And I 8:03PM believe one -- the last recovery factor I remember them using was 13.8 percent for the recovery factor.

So that played into one of the components of the volume reduction.

Q   Okay.  Now turning to your report at 8:03PM Paragraph 112, Page 43.

A   Yes.

Q   You state, "There is no universally accepted definition of net pay and there is no prescriptive method for evaluating it." 8:04PM

Now, how would you define net pay?

A   A net pay is defined as the portion of an interval which has -- from which recoverable hydrocarbons can be extracted.

And so in general, in an interval, some of 8:04PM it may be high-quality sand and some of it may be lower, some of it may be shales.

So the net pay would then be an estimation of which part of it you can extract hydrocarbons from. 8:05PM

Page 245

62 (Pages 242 - 245)

CONFIDENTIAL

Q   And if there is no prescriptive methods   8:05PM
for evaluating net pay, how did Anadarko calculate
net pay?

A   Every petrophysicist who estimates net pay
defines a cutoff as to what -- based upon their logs   8:05PM
as to what level they think represents recoverable oil
and based upon those logs below which they think would
you not be able to recover the oil.

So if you have any two petrophysicists
evaluate the same well, you'll get slightly   8:05PM
different answers.

Q   So you can't describe how Anadarko
calculated net pay?

A   Sure, usually I can do it in technical
terms.  You take the gamma ray log, you go ahead and   8:06PM
define on the gamma ray log what the shale --
100 percent shale line is, what the 100 percent sand
line is, use that to estimate net sand, then you go to
the resistivity log.

You use the resistivity log in order to   8:06PM
find what the saturation of where the oils are and
you create a cutoff on that that looks to be
recoverable.

And then you overlay the two and extract
out the number of feet that you have within that   8:06PM

Page 246

interval which corresponds to what you've defined as   8:06PM
recoverable oil net pay.

Q   So is that how you would calculate it or
is that how Anadarko calculated it?

A   That's how every petrophysicist calculates   8:06PM
it.  The only question is where do you decide to put
those cutoff lines.  And those are an interpretation
or an estimation by the individual petrophysicist.

Q   And you're aware that the Society of
Petroleum Engineers has a definition for net pay;   8:07PM
right?

A   Yes.

Q   What's the definition under the Society
for Petroleum Engineers?

A   I don't recall it off the top of my head.   8:07PM
But it doesn't change my opinion because it amounts to
what I just described, including the process about how
you measure it.

Q   Even though you don't know what it is off
the top of your head, you say it's the same as what   8:07PM
you just said?

A   You asked me to tell you what the society
says it is.  I can't quote the society without looking
it up.

Q   In any event, the definition for the   8:07PM

Page 247

society would be an authoritative source on the   8:07PM
definition on net pay; correct?

A   Yes.

MS. JENSEN:  Okay.  No further questions
at this time.                           8:08PM

Let's go off the record.

THE VIDEOGRAPHER:  We're off the record.
It's 8:08 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.   8:08PM
It's 8:08 p.m.


EXAMINATION
BY MS. PHILLIPS:

Q   Thanks, Dr. Detomo.  I just have a few   8:08PM
questions for you.

You were asked questions about when the
company wrote down costs associated with Shenandoah.
Do you recall?

A   Yes.                           8:09PM

Q   When did the company write down costs
associated with Shenandoah?

A   May of 2017.

Q   And are you expressing an opinion as to
when the company made the internal decision to write   8:09PM

Page 248

down costs associated with Shenandoah?   8:09PM

A   No.

MS. PHILLIPS:  That's all for defendants.

MS. JENSEN:  We can go off the record.

THE VIDEOGRAPHER:  Off the record.  It's   8:09PM
8:09 p.m.

(Proceedings concluded at 8:09 p.m. EST)

Page 249

63 (Pages 246 - 249)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 11, 2023

*Lynne Marie Ledanois*

LYNNE MARIE LEDANOIS

CSR No. 6811

Page 250

---

NAME OF CASE: In re Anadarka Securities Litigation
DATE OF DEPOSITION: 3/9/23
NAME OF WITNESS: Rocco Detomo, Jr., Ph.D.
Reason codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

_____
Signature of Deponent

Page 251

---

Ms. Rachel Jensen, Esq.

rjensen@rgrdlaw.com

March 11, 2023

In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

March 9, 2023, Rocco Detomo, Jr. (JOB NO. 5781021)

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 252

---

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 253

---

64 (Pages 250 - 253)

CONFIDENTIAL

In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Rocco Detomo, Jr. (JOB NO. 5781021)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

WITNESS                Date

Page 254

65 (Page 254)