# EXHIBIT 6

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------------------x

In re ANADARKO PETROLEUM       Civil Action No.

CORPORATION SECURITIES         4:20-cv-00576

LITIGATION

------------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

LEA FRYE

Friday, October 7, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 142789

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHER DISTRICT OF TEXAS

HOUSTON DIVISION

---------------------------------------------------x

In re ANADARKO PETROLEUM        Civil Action No.
CORPORATION SECURITIES          4:20-cv-00576
LITIGATION

---------------------------------------------------x

Videotaped deposition of LEA FRYE, taken in Helena, Montana, commencing at 10:11 a.m. Central on Friday, October 7, 2022 before Lynne Ledanois, Certified Shorthand Reporter No. 6811

Page 2

REMOTE APPEARANCES

Counsel for the Defendants:
    CRAVATH, SWAINE & MOORE LLP
    BY: LAUREN ROSENBERG
        BENJAMIN WYLLY
        CHARLES P. BLOOM
    Attorneys at Law
    Worldwide Plaza
    825 Eighth Avenue
    New York, New York 10019
    lrosenberg@cravath.com
-and-
Counsel for the Defendants:
    SHIPLEY SNELL MONTGOMERY LLP
    BY: GEORGE SHIPLEY
    Attorney at Law
    712 Main Street
    Suite 1400
    Clutch City, Texas 77002
    gshipley@shipleysnell.com

///

Page 4

REMOTE APPEARANCES

Counsel for the Lead Plaintiffs:
    ROBBINS GELLER RUDMAN & DOWD LLP
    BY: RACHEL JENSEN
        MEGAN A. ROSSI
        RAPHAELLA FRIEDMAN
        FRANCISCO MEJIA
    Attorneys at Law
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    rjensen@rgrdlaw.com
-and-
    KENDELL LAW GROUP PLLC
    BY: JOE KENDALL
    Attorney at Law
    3811 Turtle Creek Boulevard
    Suite 1450
    Dallas, Texas 75219
    jkendall@kendalllawgroup.com

///

Page 3

REMOTE APPEARANCES

Counsel for the Witness:
    MINCES RANKIN PLLC
    BY: DAVID MINCES
        Attorney at Law
    4545 Bissonnet Street
    Suite 286
    Bellaire, Texas 77401
    david@mincesrankin.com

ALSO PRESENT:
David Halvorson, Videographer
Kallie Gallagher, In-House Counsel Occidental
Jen Edwards, In-House Counsel Occidental

Page 5

2 (Pages 2 - 5)

CONFIDENTIAL

THE VIDEOGRAPHER: We're back on the 11:42AM record at 11:42 a.m. Go ahead, please.

BY MS. JENSEN:

Q   Okay. Ms. Frye, you should be able to see in your Exhibit Share a document that has been 11:42AM marked as Exhibit 254. It is the native version of a document previously marked as 254 -- I'm sorry, this has been marked as 254A. It is the native version of prior Exhibit 254.

(Exhibit 254A was marked for identification 11:42AM by the court reporter.)

MS. JENSEN: For the record, it bears Bates stamp APC-01674681.

Q   Are you able to see this document?

A   Yes, I am.   11:43AM

Q   And do you recognize this document?

A   Let me look through it real quick. Is there just one page? Hold on.

Okay. I hit the wrong button.

Yes, I recognize this as a document that I 11:43AM would have worked on.

Q   And does this appear to be a true and accurate copy of the presentation that you made at the February 19th, 2014 meeting that we were discussing before the break?   11:44AM

Page 54

A   I honestly would not recall which meeting I 11:44AM would have presented this at as I made and presented lots of meetings over that time frame, probably in the hundreds. The time frame, I'm not sure.

Q   I can represent to you that my 11:44AM understanding is the metadata on this document is dated February 19th, 2014.

A   All right. Then sounds like this is the one.

Q   So you don't have any reason to doubt that 11:44AM this was the presentation that you made at the February 19th, 2014 meeting that we were discussing?

A   No, sounds like this is correct.

Q   Okay. You can set that aside.

A   Okay.   11:45AM

Q   So you continued to work throughout the spring of 2014 to understand the risks associated with Shenandoah; is that fair?

A   Yes, that's fair.

Q   And was tar a risk at the time?   11:45AM

A   We did do studies that identified tar as a possibility.

Q   Is that the same as asphaltene, or is that something different?

A   Asphaltene is the more technical term used 11:46AM

Page 55

in the industry, but it is in concept of layman's term 11:46AM what you use, tar. Same concept, very sticky.

Q   Can that be problematic for an oil prospect?

A   Yes, it can be.   11:46AM

Q   Why is that?

A   This tar-like substance can plug your access to the reservoir as in the perforations that allow the flow and the pore space itself near the wellbore that allows the hydrocarbon to flow into the well to 11:46AM ultimately come to the surface.

Q   And could it impact the recovery?

A   Yes.

Q   I want to show you what's been marked as Exhibit 347.   11:47AM

(Exhibit 347 was marked for identification by the court reporter.)

MS. JENSEN: For the record, this bears the Bates stamp APC-00604655.

THE WITNESS: Sorry, can you repeat the 11:47AM APC number to make sure I have the right one?

BY MS. JENSEN:

Q   Sure. Number 1, do you see the exhibit stamp 347?

A   Yes.   11:47AM

Page 56

Q   Okay. So that's a good sign.   11:47AM

The Bates number on the lower right-hand side is APC-00604655.

A   Okay. I'm there.

Q   Is that consistent with what you're 11:47AM looking at?

A   Yes.

Q   Okay. Great.

Do you recognize this document?

A   This looks like an email chain and the 11:48AM timestamp is in the 2014 time frame between multiple individuals including myself and my direct supervisor, Pat McGrievy, a fellow engineer in the Foldbelt Team, Brad Browning, and our fluid specialist Nikhil Joshi who worked at the company.   11:48AM

Q   And the bottom of the string, there is an email that kicks off the chain from Dan Bradley?

A   Yes.

Q   And who's Dan Bradley?

A   Dan Bradley would have worked at one of our 11:49AM partner companies, which is ConocoPhillips.

Q   So ConocoPhillips was a partnering company on the Shenandoah project?

A   Yes, they were.

Q   And do you recall a discussion around this 11:49AM

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

time about the impact or potential impact of 11:49AM asphaltene on the recovery rates?

A   Yes, I do.

Q   And Dan from ConocoPhillips was seeing a loss of approximately a third of the recovery due to 11:49AM the asphaltenes?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  I need to read here to see if he actually stated that.

BY MS. JENSEN:   11:50AM

Q   So I'm looking at his February 20th, 2014, 8:08 a.m. email.

A   Yes, it does say he was seeing a third of the recovery in Paragraph 3.

Q   And he also relayed that the asphaltene 11:50AM onset pressures were higher than anything ConocoPhillips had seen before?

A   Yes, he did state that earlier.

Q   Was that consistent with your views that are the asphaltene onset pressures were very high in 11:51AM Shenandoah?

A   Yes.

MS. ROSENBERG:  Objection, form.

THE WITNESS:  Yes, they were high compared to what I had seen in the past.   11:51AM

Page 58

BY MS. JENSEN:   11:51AM

Q   If you scroll up to higher in the chain, which of course is later in time, there is an email from Brad Browning on February 24th at 3:33 p.m.

Do you see that email?   11:51AM

A   Yes, I do.

Q   Who's Brad Browning?

A   Brad Browning was a senior above -- actually, I think he was called adviser, so he was at the highest level of promotions in the engineering 11:52AM chain for Anadarko and he worked in the Foldbelt Team as well under Pat McGrievy but on a different producing property.

Prior to me joining the team, he was helping to sort of overlook what was going on in 11:52AM Shenandoah as a minor part of his job responsibilities before I joined.

Q   And his comment here at the end of his sentence, he's commenting on Brad's observations.

Could you read the last sentence in his 11:52AM email before "thanks"?

A   In Brad Browning's email?

Q   Yes.

A   "I find his comment interesting that lighter oils will have a greater tendency to precipitate 11:53AM

Page 59

asphaltene. If that's the case, we might have the 11:53AM worst of all possible fluids:  High asphaltene weight percentage and light oils.  Thanks."

Q   So is that consistent with your recollection at the time that Anadarko and its 11:53AM partners were finding that there were problems with the fluids in Shenandoah?

A   Yes.  That's consistent, yes.

Q   Could you elaborate on that?  What was the problem?   11:53AM

A   The potential to have to abandon the reservoir at an earlier date than anticipated due to asphaltene dropping out, which results in a lower recovery factor overall the entire reservoir.

In addition, potential for extra costs 11:54AM associated with trying to treat and abate the asphaltenes in the well based on experiences we had had with other wells in the Gulf of Mexico.

Q   And did all of that add up to mean that the asphaltene was a drag on the economics for 11:54AM Shenandoah?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  It was identified as one of the potential risk factors we needed to understand better at that time with additional analysis of 11:54AM

Page 60

fluids.   11:54AM

BY MS. JENSEN:

Q   And did it result in the implication that water injection wells may be required as part of the base case --   11:55AM

MS. ROSENBERG:  Objection.

BY MS. JENSEN:

Q   -- for Shenandoah?

A   It made us feel that we needed to include a water injection scenario as a probability and cost it 11:55AM and understand how many wells and how many flow lines, what kind of equipment might be required, which then in turn also made us understand that we had to gather information about the formation itself to understand what water injection it could handle.   11:55AM

Q   And Dan, in his email to you, is wondering whether water injection is needed for the base case.

Do you recall that discussion?

A   Yes.  This is correct.

Q   And did you include water injection in 11:56AM your base case in this 2014 time frame?

A   I would not recall exactly on the time frame.  I know I did include water injection at some point over the project.  I just don't recall the actual time frame.   11:56AM

Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

Q   And by including that, that would be the   11:56AM capital cost for water injection; right?

A   Correct.

Q   Asphaltene continued to be problematic throughout the project; is that fair?   11:57AM

A   Correct.

MS. JENSEN:  I'm going to mark another exhibit.

(Exhibit 348 was marked for identification by the court reporter.)   11:57AM

MS. JENSEN:  You should be able to see what's been marked as Exhibit 348.

For the record, this is APC-00052392.

THE WITNESS:  Yes, I see it.

BY MS. JENSEN:   11:57AM

Q   Do you recognize this document?

A   This is an email chain, again.

Q   Does this appear to be a true and accurate copy of an email chain between yourself and Nikhil Joshi at Anadarko in October of 2015?   11:58AM

A   Yes.

Q   And on October 22nd, 2015, you write, "Ugh.  Not good news."

What is the not good news that you're referring to in your email?   11:58AM

Page 62

A   Upon knowing asphaltenes was an individual   11:59AM reservoir issue with this particular project and I say that individual reservoir, meaning there was multiple reservoirs that were not communicating with each other in a vertical aspect.   11:59AM

And they all had slightly different fluids.  We decided to take the different fluids from the different reservoirs and do additional testing in the lab to understand what would happen if we were to produce more than one reservoir that   11:59AM had different fluids together in one wellbore to understand does this impact our asphaltene dropout pressures and what would that look like.

And my "ugh, not good news" was in reference to the asphaltene onset pressure for a   12:00PM commingled sample was significantly higher than an individual zone by itself.

I don't recall the actual numbers, but it was significantly higher.

Q   Did these results impale the viability of   12:00PM commingled production?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  Yes, it did impair the potential to commingle in any one wellbore.

Page 63

BY MS. JENSEN:   12:00PM

Q   Could you elaborate on what that means?

A   When you commingle in a wellbore, you would take multiple zones and complete them and then allow those to flow together within that wellbore and   12:01PM produce it to the surface rather than doing one zone by itself.

And those fluids would mix in that wellbore as they came together.

Q   Would isolating each zone for production   12:01PM have a negative impact on Shenandoah's economics?

MS. ROSENBERG:  Objection to form.

THE WITNESS:  Yes, isolating individual zones would have a significant impact by one of two factors.  One way to handle it would be drill   12:01PM individual wells for every zone and there was significant number of zones.

I would have to have a document in front of me to remind me exactly how many zones, but I want to say we had the upper Wilcox 1, 2 and 3 and I   12:02PM want to say it was a lower Wilcox A, B, C, D and E, which would be eight.  I would have to verify that with a document, but that's my recollection on the zones.

And drilling eight individual wells would   12:02PM

Page 64

not work for every single drainage area across the   12:02PM field.

The other option you would have would be to compete each individual zone and produce it to the end of life.  And how that negatively will   12:03PM impact your economics is now you are getting production at a lower rate because you have one zone versus having more than one zone together and it takes a really long time to get that production.

So that impacts your net present value by   12:03PM discounting that value of production over a really long time.

BY MS. JENSEN:

Q   Was this issue discussed with management?

A   Yes.   12:04PM

Q   And was it ever disclosed by Anadarko to the market to your understanding?

A   My understanding, no.

Q   In 2014, was faulting also a risk to the Shenandoah project?   12:04PM

A   Yes, it was.

MS. JENSEN:  I'm going to mark an exhibit, so just give me a moment here.

(Exhibit 349 was marked for identification by the court reporter.)   11:33AM

Page 65

17 (Pages 62 - 65)

CONFIDENTIAL

will be retained by Veritext Legal Solutions.    8:19PM

(Proceedings concluded at 8:19 p.m.)

Page 294

NAME OF CASE: In re Anadarko Petroleum
DATE OF DEPOSITION: 10/7/22
NAME OF WITNESS: Lea Frye
Reason codes:
    1. To clarify the record.
    2. To conform to the facts.
    3. To correct transcription errors.
Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

_____
Signature of Deponent

Page 296

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 11, 2022

*Lynne Marie Ledanois*
LYNNE MARIE LEDANOIS
CSR No. 6811

Page 295

75 (Pages 294 - 296)