# EXHIBIT 2
# [Redacted]

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

------------------------------------------------------x

In re ANADARKO PETROLEUM          Civil Action No.

CORPORATION SECURITIES            4:20-cv-00576

LITIGATION

------------------------------------------------------x


**CONFIDENTIAL**


REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

J. RICHARD DIETRICH

Saturday, March 11, 2023


Reported By: Lynne Ledanois, CSR 6811

Job No. 5780790

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHER DISTRICT OF TEXAS

HOUSTON DIVISION

-----------------------------------------------x

In re ANADARKO PETROLEUM     Civil Action No.
CORPORATION SECURITIES        4:20-cv-00576
LITIGATION

-----------------------------------------------x

Videotaped deposition of J. RICHARD DIETRICH, taken in San Diego, California commencing at 9:02 a.m. on Saturday, March 11, 2023 before Lynne Ledanois, Certified Shorthand Reporter No. 6811

///

Page 2

---

REMOTE APPEARANCES

Counsel for the Lead Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP

BY: DANIEL DROSMAN

CHRIS YURCEK

Attorneys at Law

655 West Broadway

Suite 1900

San Diego, California 92101

ddrosman@rgrdlaw.com

Counsel for the Defendants:

CRAVATH, SWAINE & MOORE LLP

BY: LAUREN PHILLIPS

BENJAMIN GRUENSTEIN

Attorneys at Law

Worldwide Plaza

825 Eighth Avenue

New York, New York 10019

lphillips@cravath.com

ALSO PRESENT:

Soseh Kevorkian, Videographer

Kallie Gallagher

Page 3

---

INDEX OF EXAMINATION

Examination by:                    Page
Mr. Drosman                         7

///

Page 4

---

INDEX OF EXHIBITS

Deposition          Description          Page

Exhibit 548  Expert Report of J. Richard      24
             Dietrich, Ph.D., 1/25/23;

Exhibit 549  AICPA Audit and Accounting      122
             Guide;

Exhibit 550  Transcript of Deposition of      133
             Robert Strickling, 7/21/22;

Exhibit 551  ASC 932-360 25 and 35;          190

Exhibit 552  ASC 250-10-S99;                 264

Exhibit 553  FASB, About the Codification,   268
             V 5.10;

///

Page 5

---

2 (Pages 2 - 5)

CONFIDENTIAL

**Page 6**

Saturday, March 11, 2023

9:02 a.m.

-------------------------------------------------

THE VIDEOGRAPHER: Good morning. We're 9:02AM going on the record at 9:02 a.m. on March 11th, 2023.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of the camera and internet connection 9:03AM of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record. 9:03AM

This is Media Unit 1 of the video-recorded deposition of Dr. J. Richard Dietrich taken by counsel in the matter of In Re Anadarko Petroleum Corporation Securities Litigation filed in the United States District Court, Southern District of 9:03AM Texas. Case Number 4:20-cv-00576.

My name is Soseh Kevorkian from the firm Veritext and I'm the videographer. Our court reporter is Lynne Ledanois, also from the firm Veritext. 9:04AM

**Page 7**

At this time would counsel and all present 9:04AM please state their appearances and affiliations for the record, beginning with the noticing attorney?

MR. DROSMAN: Good morning. My name is Daniel Drosman. I'm from the law firm of Robbins 9:04AM Geller Rudman & Dowd on behalf of plaintiffs. And I'm here with my colleagues Megan Rossi and Chris Yurcek.

MS. PHILLIPS: Good morning. Lauren Phillips from Cravath Swaine & Moore on behalf of 9:04AM defendants. With me today are my colleague Benjamin Gruenstein and Kallie Gallagher from Occidental.

THE VIDEOGRAPHER: Thank you. Lynne, whenever you're ready.

9:04AM

J. RICHARD DIETRICH, Ph.D., having been duly sworn, testified as follows:

EXAMINATION

BY MR. DROSMAN:

Q    Can you please state your full name and 9:04AM spell your full name for the record?

A    My name is James Richard Dietrich, J-A-M-E-S, R-I-C-H-A-R-D, D-I-E-T-R-I-C-H.

Q    And can you please state your address for the record? 9:05AM

**Page 8**

A    1411 Eclipse Drive, E-C-L-I-P-S-E, San 9:05AM Marcos, two words S-A-N, M-A-R-C-O-S, California 92078.

Q    Since we're doing this deposition by remote video today, where are you physically located 9:05AM right now?

A    At my home address.

Q    Is there anyone else in the room with you today?

A    No. 9:05AM

Q    Do you have any documents with you?

A    I have two documents that are on a table behind me, my report and the report of Mr. Regan.

If you permit me to use them, it may make it more efficient. If not, that's okay too. But 9:05AM they are not in my reach currently.

Q    You may have your report before you, but the deposition protocol prohibits you from having any other documents besides your report before you.

Do you understand that? 9:06AM

A    Okay, sure.

Q    Okay. Have you removed all technology besides the computer you're using for today's deposition from the room?

A    They are in drawers in my desk. So they are 9:06AM

**Page 9**

physically in the room, but I don't have access to 9:06AM them.

Q    Do you have any markings or annotations at all on your report that's before you today?

A    No. 9:06AM

Q    Before we get started, let me just state some of the ground rules.

There is a court reporter present to transcribe all the questions and answers. In order for there to be a clear transcript, it's important 9:06AM that we try not to speak over each other.

Therefore, please wait for me to get my question out before answering and I'll do my best to let you finish answering before moving on to my next question. Does that make sense? 9:06AM

A    Yes.

Q    Additionally, it's important that you answer all of my questions audibly rather than head nod, head shake or some other gesture.

Do you understand? 9:07AM

A    Yes.

Q    Do you understand that the oath you were placed under today carries the same weight as the one given in a courtroom?

A    Yes. 9:07AM

3 (Pages 6 - 9)

CONFIDENTIAL

Q   Do you understand that your testimony   9:07AM
given today may be shown to a jury at trial?
A   I did not know that, but I do now.  I
understand, yes.
Q   Is there any reason, medical or otherwise,   9:07AM
that you don't think you can give your best
testimony here today?
A   No.
Q   If for any reason you don't understand any
of my questions, please tell me.  I'll be happy to   9:07AM
rephrase the question until you do understand it.
If you go ahead and answer a question, I'm
going to assume that you understood it.  Is that
fair?
A   Yes.   9:07AM
Q   Other than the exhibits that are
introduced today and shared and your expert report,
the deposition protocol in this case prohibits from
you accessing any other documents, including
handwritten notes, emails, text messages, web pages,   9:08AM
social media, video, audio or any other material.
Do you agree to abide by that provision of
the deposition protocol during today's deposition?
A   Yes.  Let me do one thing here for a second,
and that is to close any other windows that I have   9:08AM

Page 10

open on my one display.   9:08AM
So what I can see -- I have two displays,
what I can see on one display is the Zoom meeting
video along with the background on my display and I
have a second display and it has the Exhibit Share   9:08AM
presentation on it.
Q   Okay.  The deposition protocol also
prohibits you from consulting any outside sources of
information including cell phones, smartphones,
computers, the internet, text or instant messaging   9:09AM
services, emails, chats, blogs or websites such as
Twitter, Facebook or LinkedIn during today's
deposition.
Do you agree to abide by this provision of
the deposition protocol at today's deposition?   9:09AM
A   I do.  I will note that I have two cards in
front of me.  This was the login information.  I can
set that aside now.
This is how I keep a running total of my
hours worked on this project.  If I can keep that   9:09AM
out, that's fine.  If not, I can put it away.
Q   That's fine.  You can -- although, that's
fine, you can keep that in front of you.  So long as
it just contains hourly information.
A   Yes, right now it says one thing,   9:09AM

Page 11

March 11th, 8:35 a.m.  That's when I started.   9:09AM
Q   Okay.  While we're on the record the
deposition protocol also prohibits you from
communicating with anyone except as reflected on the
record.  This would include, for example, emails,   9:10AM
texts, instant messages and notes with counsel.
Do you agree to abide by this provision of
the deposition protocol?
A   Yes.
Q   Have you ever been deposed before?   9:10AM
A   Yes.
Q   How many times?
A   Oh, I would estimate between ten and 25.
Q   Was it always in an expert witness
capacity?   9:10AM
A   No.
Q   How many times have you been deposed as an
expert witness?
A   I think all but once or twice.
Q   The once -- the single or second time that   9:10AM
you were deposed as a nonexpert witness, what did
that relate to?
A   I served as the department chair of the
accounting and MIS department at Ohio State.  A
faculty member filed a lawsuit against the university   9:11AM

Page 12

and me.   9:11AM
Under Ohio law, I was dismissed as a
defendant.  But I was still a fact witness in the
case as it proceeded through the deposition.
After the deposition, the case was   9:11AM
dismissed.
Q   Were you ever deposed on any other
occasion as a nonexpert witness?
A   Not that I recall.  But I may have been
once.  I was involved in litigation involving the   9:11AM
shipment of a computer and I testified at trial and I
don't recall whether I was deposed or not in that
case.
It was 15 or 20 -- more than 20 years ago.
Q   And the litigation you described when you   9:12AM
were chair at Ohio State, what were the allegations?
A   A non-tenure track faculty member was hired
on a year-to-year basis by the department for
teaching.
As we brought up a new master's of   9:12AM
accounting program, I needed people with skill sets
that were different from his.
And so I simply did not contract with him
for a year and he asserted that that was a violation
of his rights as I think -- I think that he was   9:12AM

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL

asserting that as a Vietnam era veteran, that he had 9:12AM certain rights to hierarchy key which the university did not agree with.

So he filed a lawsuit against the university. 9:12AM

Q   Have you ever testified in court before?

A   Yes.

Q   How many times?

A   Perhaps three to five or six.

Q   Did you always testify as an expert 9:13AM witness?

A   No, in one case, this was the case that I brought personally dealing with a transportation of a computer.  There I testified as the plaintiff.

There's another lawsuit in which I was 9:13AM involved.  I don't believe I ever testified in that case, but I may have.

Q   What is that case?

A   I loaned another individual $150,000 and then he did not repay me and so I filed a lawsuit 9:13AM against him for repayment and we were in various stages of litigation in the State of Ohio for two or three or four years.

And this began with a loan that I think originated around 2012, somewhere in that time 9:14AM

Page 14

frame.  And it's still proceeding in the sense that 9:14AM he's now had his wages garnished to attempt to repay my loan.

Q   When was the first time you testified in court as an expert witness? 9:14AM

A   In court or deposition?

Q   In court.

A   Gosh, I admit I don't recall because I've infrequently testified in court.

Well, I'm reminded of another case where I 9:15AM testified in a hearing in the State of Ohio having to do with a tax matter where I testified pro bono.  That was ten or 15 years ago.

I testified in another hearing, I believe it was a hearing in the Delaware Chancery court. 9:15AM That may have been about ten years ago.

And I testified in state court in Texas, I believe in January of 2022.  And that may not be a complete list, but it's what comes to mind right now. 9:16AM

Q   The pro bono tax matter, did you testify as an accounting expert in that case?

A   Yes.

Q   Where was that -- where did that case take place? 9:16AM

Page 15

A   Columbus, Ohio. 9:16AM

Q   What was it captioned, what was the title of the case?

A   I don't recall.

Q   Do you recall any of the litigants in the 9:16AM case?

A   The case was a tax matter where the State of Ohio or one of the agencies of the State of Ohio was the plaintiff.  It had to do with property tax accounting and establishing the fair value of -- I 9:16AM think it was a steel plant or something like that up in the Cleveland, Ohio area.  But I don't remember the name of the company.

Q   For whom did you testify?

A   I testified for the state.  I think the 9:17AM person who contacted me was perhaps an assistant attorney general for the State of Ohio.  And they were looking for an expert who could explain what the concept of fair value was.

Q   And what was the state agency that you 9:17AM testified for?

A   Again, I remember working with a person who I believe was an assistant attorney general.  I don't know beyond that the details of the case.

She contacted me about two weeks before 9:17AM

Page 16

the hearing, as I recall, and said they needed an 9:17AM expert who could explain fair value to the hearing examiner, I think was the title of the individual.

Q   And approximately when was that?

A   I'm guessing somewhere around 2008 to 2012, 9:18AM in that time frame.

Q   You mentioned that you also testified in a Delaware Chancery matter; is that right?

A   Yes.

Q   Do you remember any of the litigants in 9:18AM that case?

A   No, not specifically today and I believe -- most of the work that I do, I sign confidentiality agreements.  I may be under a confidentiality agreement on that as well. 9:19AM

Q   Well, if you testified --

A   In any case, I don't remember the name of the company that engaged me.

Q   If you testified in court, presumably it was open to the public; right, sir? 9:19AM

A   I don't know that because there were -- during the proceedings, all guests, I think was the term that the vice chancellor used, were excluded from the courtroom.

Q   And when was that that you testified in 9:19AM

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

Delaware Chancery court?                    9:19AM

A    I'm guessing somewhere between 2008 and 2015.

Q    Did you testify as an expert accounting witness in that case?                    9:19AM

A    Yes.

Q    Was it a trial or a hearing?

A    I believe it was a hearing.

Q    What was the nature of the hearing?

A    There was a dispute that as far as it    9:19AM involved me had to do with whether -- what was the definition of revenue and whether or not one of the companies had revenue that it could or should or was required to record based on various transactions.

Q    Did you testify for the plaintiff or the    9:20AM defendant?

A    I believe it was the defendant.

Q    Your testimony in the state court of Texas, who were the litigants in that case?

A    Well, again, there was a taxpayer, I    9:20AM believe, and then the state itself.

Q    And did you testify as an expert accounting witness there?

A    I'm sorry.  When you said the state, I'm assuming that you're talking about this tax matter, am    9:20AM

Page 18

I misunderstanding?                    9:20AM

Q    You mentioned that you testified that you can recall on three different occasions, once in a pro bono tax matter, once in a Delaware Chancery court and once in the state court of Texas.  I'm    9:21AM talking about --

A    State court of Texas, I'm sorry.  I was thinking the State of Ohio.  I apologize.

The state court of Texas was a proceeding involving shareholders of a corporation and the    9:21AM corporation as a defendant.

Q    Which corporation was the defendant?

A    The caption that I am aware of was called CB&I.

Q    What is the corporation, who was the    9:21AM defendant?

A    Well, that -- the difficulty is that CB&I at some point was purchased by another company and there were a number of legal proceedings I think involving the corporate ownership of what I refer to as CB&I,    9:21AM which was Chicago Bridge & Iron.

So I don't -- I don't know who exactly was paid.  But I think the caption on the litigation was CB&I.

Q    And who was the acquiring company?    9:22AM

Page 19

A    I don't recall.  This was a shareholder of    9:22AM CB&I who filed a lawsuit against CB&I.

Q    Okay.

A    And then CB&I was acquired by some other company, I think.  It was not part of the transactions    9:22AM that I was involved with.  So I don't know the details of who else -- how this happened except that at some point over time, I believe there was another owner.

Q    Did you testify at a trial or hearing in that matter?                    9:22AM

A    That was in state court trial.  It was in Montgomery County.

Q    You mentioned that it was, you thought, in 2022; is that accurate?

A    It was I believe January 2022.  It may have    9:23AM been January 2021.  I'm not completely sure on the time now except that I am fairly certain I testified in January.

Q    For whom were you -- by whom were you retained?                    9:23AM

A    In that matter?

Q    Right.

A    I don't recall what my retention letter said on it.  It might have said Chicago Bridge & Iron.  I just don't recall.                    9:23AM

Page 20

Q    I take it you testified for the defendant;    9:23AM is that right?

A    Yes.

Q    And you were an expert accounting witness in that case; is that right?                    9:23AM

A    Yes.

Q    Did you prepare for today's deposition?

A    Yes.

Q    What did you do there?

A    Well, I laugh in a way because everything    9:24AM I've been doing is preparing in anticipation that my testimony would be used somewhere.

But let's start with after filing my report, and at that point I'd already seen Mr. Regan's report, so let's leave that out and talk    9:24AM about specifically for today's activity.

I had several Zoom meetings with Lauren Phillips and/or Ben Gruenstein.  There may have been others on those calls as well.

Mostly I went through documents and    9:25AM refreshed my memory on things just to be familiar with the documents that I thought you might present to me today.

Q    How many Zoom meetings did you have with the attorneys in this case to prepare for your    9:25AM

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

deposition?                            9:25AM

A   Two or three, I think.

Q   Okay.  I take it that since you account scrupulously for your time, you would know how much time in total you spent on these Zoom meetings;      9:25AM right?

A   I have a record of that, yes.

Q   How much time did you spend on the Zoom meetings?

A   I don't have those records in front of me.   9:25AM So without referring to them, I can't tell you.  I can estimate if that's helpful.

Q   What is your best estimate?

A   Between four and seven hours.

Q   Did you do anything else besides attend      9:26AM these Zoom meetings to prepare for your deposition?

A   Well, apart from reading documents, reviewing my report, reviewing Mr. Regan's report, no.

Q   What documents did you read to prepare for your deposition besides the reports?          9:26AM

A   Well, the documents that are in my report that are either footnoted or in the documents relied upon, I went through many of them.

I went through portions of the codification, specifically 932.  I looked at FAS 19.   9:26AM

Page 22

And I think that's how most of my time was spent.      9:26AM Perhaps not every moment, but most of it.

Q   How much time did you spend doing that approximately?

A   Again, because the deposition was          9:27AM rescheduled I think twice and so I had prepared for the original deposition date, then when it was rescheduled, I had more time to prepare.

So I'm guessing here because this is unusual for me to have this drawn out over a period   9:27AM of time between anticipating my deposition and the actual deposition.  But I'm guessing 20 to 40 hours.

Q   Are you represented by counsel today?

A   I don't have my own separate attorney, if that's your question, no.                        9:27AM

Q   Is anybody representing you at the deposition here today?

A   I don't know the answer to that.

Q   By whom were you retained?

A   Cravath.                               9:28AM

Q   By Cravath, you mean Cravath Swaine & Moore?

A   Yes.

Q   You understand that Cravath Swaine & Moore represents the defendants in this case; right?      9:28AM

Page 23

A   Yes.                                   9:28AM

Q   You understand that Cravath Swaine & Moore represented many of the deponents in this case, too?

A   Again, I don't know that.

Q   Do you know who is paying Cravath Swaine &    9:28AM Moore during your deposition today?

A   No.

Q   I take it you're not; correct?

A   That's correct.

Q   They are paying you; correct?          9:28AM

A   Yes.

MR. DROSMAN:  Why don't we mark as Exhibit 548 your report in this matter.  It's Tab 1.

(Whereupon, Exhibit 548 was marked for identification.)                               9:29AM

BY MR. DROSMAN:

Q   It should appear on your Exhibit Share momentarily.

A   Okay.

Q   You should see it.  You may need to       9:29AM refresh your browser.

A   Is it okay if I get my paper copy of it too now?

Q   Sure, you can look at your paper copy.

I take it that it's a complete version of    9:29AM

Page 24

the document that you submitted in this case;       9:29AM correct?

A   It is.  I could look on the Exhibit Share document but if I want to scan someplace quickly, it may be faster for me to do it with a paper copy       9:29AM because I'm more comfortable with that.

Q   Okay.

A   I now see Exhibit 548, so I click on that.

Q   Right.  Sometimes for larger documents, it takes a moment.                               9:30AM

Is Exhibit 548 a true and accurate copy of your expert report in this case?

A   Let me scan through it quickly.

Yes, it appears to be complete, accurate and true copy of my report.                      9:30AM

Q   And you've attached your curriculum vitae as Appendix B; correct?

A   Yes.

Q   Is that curriculum vitae accurate?

A   I'll just review it quickly.  It was at the  9:31AM time I submitted my report.  There has been one change that I am aware of since then.

Q   What is that?

A   It has to do with a working paper that's on Page 4 of my C.V.  And the caption on the C.V. says   9:31AM

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

"(with Karl A. Muller and Edward J. Riedl) 'Regarding 9:31AM the Use of Return Variance Variables to Debias the Asymmetric Timeliness Measure'." That paper is now under review with a journal called The Accounting Review. 9:31AM

Q   Besides that change that you just mentioned, any other inaccuracies in your report -- in your curriculum vitae?

A   That's the only item that I think has changed. 9:32AM

Q   Is the curriculum vitae complete?

A   I don't know what you mean by "complete."

Q   You have various headings, education, positions at colleges, professional employment, academic honors, publications, et cetera. 9:32AM

Is there anything that's missing that should have been included in those particular headings?

A   Oh, I see.  No.  This is consistent with the way I prepared copies of my curriculum vitae for my 9:32AM entire career.

Q   Does it include all of your professional employment?

A   It includes all of my professional employment as an accounting professor.  Prior to 9:33AM

Page 26

entering the Ph.D. program, I worked at Westinghouse 9:33AM Electric Corporation in Pittsburgh.

And that is not included here.

Q   Any other professional employment that's not included on your curriculum vitae? 9:33AM

A   Not that I recall.

Q   Any consulting experience that's not including in your curriculum vitae?

A   My consulting experience is shown under the caption "Professional Employment/Consulting 9:34AM Experience/Board Service."

In the fourth item down, it says, "Expert witness or consultant addressing securities litigation and professional responsibilities," and lists years from 2003 through 2023. 9:34AM

So that's the description of my expert witness or consulting work.

Q   My question is:  Is there any consulting experience that does not appear on your curriculum vitae? 9:34AM

A   That list of years would include every activity in which I was engaged as an expert witness or consultant.

Q   Is there any board service that's not included on this curriculum vitae? 9:35AM

Page 27

A   I don't believe so.  I served on the board 9:35AM of one entity that was inside -- it was affiliated with the Ohio State University.  Here it is.

The second item down under "Professional Employment/Consulting," it says, "OSU Health Plan 9:35AM Inc. Board of Directors, Finance Committee Member and Chair."

Yes, I think that's the only time I served on a board of directors.

Q   Any positions at colleges and universities 9:35AM not included in your curriculum vitae?

A   I don't believe so, no.

Q   Any publications not included in your curriculum vitae?

A   I think all of them are included, yes. 9:36AM

Q   Did you work for Cornerstone?

A   I'm sorry, did I work for Cornerstone?

Q   Do you do work for Cornerstone?

A   I work with Cornerstone.  They work to support me on several of my engagements. 9:36AM

Q   Are you aware that your curriculum vitae is listed on Cornerstone's website?

A   Not specifically.  I understand that it might be.

Q   What work do you do for Cornerstone? 9:36AM

Page 28

A   I don't do work for Cornerstone. 9:37AM Cornerstone does work for me.

Q   How did you come to be engaged by defendants in this case?

A   As I recall, I had a telephone call or an 9:37AM email from someone at Cornerstone indicating that they were suggesting names of possible experts to Cravath and wanted to know if I would be interested in speaking with them.

Q   When was that? 9:37AM

A   I'm sorry, when?

Q   Yes.

A   I believe that was in March of 2021 or within a month or two.  That's when I first was contacted by people at Cornerstone. 9:38AM

Q   If you turn to Paragraph 1 of your report.

Do you see that you've been retained by Cravath Swaine & Moore "as an independent witness to provide my opinions regarding Anadarko's accounting 9:38AM treatment for certain well costs and periodic assessments of nonproducing leasehold properties for impairment, particularly as applied to Anadarko's deepwater Shenandoah exploration project (the 'Shenandoah Project').

"I also have been asked to evaluate and 9:38AM

Page 29

8 (Pages 26 - 29)

CONFIDENTIAL

respond to certain financial accounting and 9:38AM reporting opinions expressed by D. Paul Regan, CPA/CFF, in his expert report dated November 9th, 2022 (the 'Regan Report')."

Is that an accurate reporting of your 9:39AM assignment in this case?

A   Yes.

Q   Looking through your report, I saw instances where you respond to certain opinions expressed by Mr. Regan, but I didn't see any 9:39AM instances where you provide opinions regarding Anadarko's accounting treatment for certain well costs and periodic assessments of nonproducing leasehold properties for impairment, particularly as applied to Anadarko's deepwater Shenandoah 9:39AM exploration project.

Isn't it true that you didn't express any opinions other than in response to Mr. Regan?

A   I would have to look at my report.  I believe I did. 9:39AM

Q   Go ahead and look at your report and point me to any of those nonresponsive opinions in your report.

A   I'm sorry, do any of those --

Q   Nonresponsive to Mr. Regan.  You told me 9:39AM

Page 30

that you have two assignments, one was to respond to 9:39AM Mr. Regan and one was to offer opinions.

I didn't see any instance in which you did not respond to Mr. Regan.

A   This will take a few minutes.  If you bear 9:40AM with me, I'll try to identify some.

Are you asking specifically where I said something like Anadarko's accounting was something, where "Anadarko" has to be in the sentence?

Q   No.  What I'm asking is:  You told me that 9:40AM your assignment was twofold, as an independent expert to provide your opinions regarding Anadarko's accounting treatment for certain well costs and period assessments of nonproducing leasehold properties for impairment, particularly as applied 9:41AM to Anadarko's deepwater Shenandoah exploration project and to evaluate and respond to certain financial accounting and reporting opinions expressed by D. Paul Regan.

I'm asking you to show me instances where 9:41AM you acted as an independent expert and did not respond to Mr. Regan.

A   Here is an example of what I think is responsive to your question.  On Page 42, there is a heading that says, "Anadarko's Decision to Continue to 9:41AM

Page 31

Suspend the Shen 3 Well Costs was Consistent with 9:41AM GAAP."

Q   That was not in response to Mr. Regan; is that correct?

A   Well, it's a plain statement that says I'm 9:41AM opining about Anadarko's decision irrespective of Mr. Regan's statement.

Q   I understand.  Is it in response to Mr. Regan or not?

A   I'm sorry, I don't understand the 9:42AM distinction you're asking me to draw.

Q   I'm asking you distinguish between three parts to your assignment in Paragraph 1.

I'm asking you to show me instances where you're not responding to Mr. Regan but instead 9:42AM offering your independent opinions as you state them in your description of the assignment.

A   As this example demonstrates, I made a plain statement about Anadarko's decision to suspend the Shen 3 well costs and that was irrespective of 9:42AM anything that Mr. Regan said.

I understand that Mr. Regan made statements about that, too, so one could look at that and say it was in response.

But in response to Mr. Regan, I could have 9:43AM

Page 32

simply said, here's why Mr. Regan's opinion is 9:43AM flawed.

I didn't do that here.  I talked about Anadarko's accounts.

So I believe I have done what I said in 9:43AM Paragraph 1 that I would do based on this example.

Q   Besides 7B to your report, which starts on Page 42, is there any other instance where rather than responding to Mr. Regan, you offer opinions as an independent expert witness? 9:43AM

A   Again, I don't have in mind -- well, if we go back and look at 6 on Page 39, the heading that says, "The Decision to Suspend the Costs Associated with Shen 3 as of December 31st, 2014 Was Consistent with a Reasonable Interpretation of ASC 932-360." 9:44AM

Again, it's related to the issues in the matter that I address and it is not directly in response to Mr. Regan.

In fact, I think if you look at Paragraph 91, 92, 93, 94 I don't see, just in a 9:44AM quick scan, Mr. Regan's name or the name of the report mentioned at all in there.

Q   Any other instances in which you acted as an independent expert and did not respond to Mr. Regan? 9:45AM

Page 33

9 (Pages 30 - 33)

CONFIDENTIAL

A   Going back through, if I look at Number 5, I think I see the same thing in 5 above on Page 38, "ASC 932-360-25-18 Itself is Consistent with This Interpretation of the Sufficient Quantity Criteria."

And I'm guessing it I go back before that -- let me start at the beginning of this whole section.

A, "Anadarko's Decision" -- this is on Page 32, "Anadarko's Decision to Suspend the Shen 3 Well Costs as of December 31st Was Consistent with GAAP."

Under that, I think most of that discussion is my independent opinions about the application of GAAP to the accounting issues in this matter.

So I don't know how to distinguish them in a way that you're trying to. So I'm sorry if I can't be more responsive, but I think the report is clear that I am offering my own independent opinions and not simply -- about the accounting issues and not simply responding to my opinions about Mr. Regan's opinions.

Q   Your opinions expressed in 7A and 7B, aren't they designed to rebut Mr. Regan's opinions?

A   I'm sorry, 7A, can you give me a page number

Page 34

for that, please?

Q   Sure. Pages 32 to 34, aren't those pages designed to rebut Mr. Regan's opinions?

A   No, I don't think they are designed to rebut specifically. They do have that effect.

But this is what I would consider affirmative statements about how GAAP, applied to the facts and circumstances that I examined, would lead to conclusions about proper accounting that Anadarko would be expected to follow. That's what this section does.

Now, I agree with you if you look at the heading on 7 where it says, "Mr. Regan's Opinion that GAAP Required Anadarko to Expense the Cost of Drilling is Flawed and Unreliable," and I do in the report make those conclusions without applying -- without opining directly on the proper accounting under GAAP for the facts and circumstances that Anadarko followed, or applied that to Anadarko.

So I think these are independent opinions. Again, I'm having difficulty understanding how you're trying to distinguish between these activities in a way that's -- that I am not understanding because I think this is doing what I said in Paragraph 1 that I would do.

Page 35

Q   You have two sentences that I read to you in Paragraph 1. You have Part 1 of your assignment and Part 2 of your assignment; right?

A   Yes.

Q   I'm asking you to tell me which parts of your report are your Part 1 of the assignment.

A   Well --

Q   Do you understand that question, sir?

A   Yes. And I do that in several ways. First in my report in Section 5, I explained relevant accounting standards in my opinions regarding how they are properly interpreted.

Then in Section 6, I explained professional judgment and the role of professional judgment.

Then in Section 7, I provided my opinions of proper accounting treatment for several activities involving Anadarko's exploration activities.

That's all dealing with the first part of my report or of my assignment.

Then, beginning on Page 45 in the heading entitled -- the heading "Mr. Regan's Analysis is Flawed and Unreliable," here I'm offering my opinions about his opinions.

Page 36

Q   That would be consistent with Part 2 of your assignment; right?

A   Correct.

Q   Okay. I'm just asking you to tell me which part is consistent with Part 1 of your assignment.

A   I believe I've done that.

Q   Okay. And nothing else that's consistent with Part 1 of your assignment; right, sir?

A   I have not said that. Again, I would have to carefully examine my entire document. I'm perfectly prepared to do it, but it will take me several minutes.

Q   Why don't you take a look at your document and tell me if there's anything other than Section 5, Section 7A, Section 7B that is consistent with the second part of your assignment or the first part of your assignment, which is to offer your independent opinions not in response to Mr. Regan.

A   Let me do this in realtime.

On Page 84, I see another heading that says, "Anadarko's Decision to Impair Shenandoah Project Costs as of Q1 2017 Was Consistent with GAAP."

And that goes on and explains why.

Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

Q   10A; is that correct?    9:53AM
A   Yes, I believe that's 10A.
Q   And that's consistent with Part 1 of your assignment; correct?
A   Correct.  I distinguish that from B, which   9:53AM is commenting on Mr. Regan's analysis.
Q   What do you mean you distinguish it?
A   You said that my assignment consists of two parts.  So 10A is the first part, my opinions concerning Anadarko's accounting.    9:53AM

And 10B is the second part, my opinions regarding Mr. Regan's analysis.

I believe there may be one other place in here that I can recall that has to do with materiality.    9:55AM

Let me try this another way.
Q   Mr. Dietrich, I don't want to take up any more time on the record.  Let me just recap so that I am sure that I understood you.

Part 1 of your assignment was to offer    9:56AM your independent opinions not in response to Mr. Regan and Part 2 of your assignment was to respond to Mr. Regan; correct?
A   Yes.
Q   Okay.  And you told me that Roman    9:56AM

*Page 38*

numeral 5 was consistent with Part 1 of your    9:56AM assignment; correct?
A   Yes.
Q   And you told me that Roman numeral 7A was consistent with Part 1 of your assignment; right?    9:56AM
A   Yes.
Q   Roman numeral 7B was consistent with Part 1 of your assignment; right?
A   Yes.
Q   And Roman numeral 10A was consistent with    9:57AM Part 1 of your assignment; correct?
A   Yes.

What I'm not saying, to be clear, is that is all of the places where I have offered opinions regarding Anadarko's accounting because I haven't    9:57AM had sufficient time to review the entire report.
Q   I understand.  Thank you.

Were there any matters you were asked not to opine on?
A   Not that I recall.    9:57AM
Q   Did you have assistance in writing your report?
A   Yes.
Q   Who assisted you?
A   Primarily two individuals at Cornerstone    9:58AM

*Page 39*

Research, Steve McBride and Sally Bai.  Perhaps a    9:58AM sentence or two will help you understand how I do my work.

This is very similar to work that I do as a faculty member where I have research or teaching    9:58AM assistants who help me as I'm preparing a research paper, for example, or classroom materials or they may help me -- I give them an assignment and say, go on learn about this and write something up for me so that I will be better informed about it.  They do    9:58AM that.

I then do it and decide what to do with that, if I want to incorporate it in my report, if so, how.  I extensively edit everything that I receive so that it's my words, not someone else's    9:59AM words.  So it's my report.
Q   Did you write every word in your report?
A   Again, I may not have written originally the words, but all the words that are here are my words.
Q   I understand that you've adopted some of    9:59AM the information that you've received, but I'm asking you if you wrote every word?
A   Explain what you mean by "write."
Q   If the word "Shen 3 well costs as of December 31, 2014 was consistent with GAAP," did you    9:59AM

*Page 40*

draft that or did you take that from somebody else    9:59AM and insert it into your report?
A   I don't recall.
Q   I'm asking you about every word in this report.  Did you prepare originally every word in    9:59AM this report or did you copy and paste some of the information that you received from assistants?
A   Well, there are lots of words that appear in this report that came from other documents, so that's why I'm having trouble when you say did I write every   10:00AM word.  No, I didn't write every word.

The words that come from the codification come from the codification.  The words that come from other documents come from other documents.
Q   Did you copy and paste any words from your   10:00AM assistants into the report?
A   No.
Q   You say that Cornerstone staff worked under your direction; right?
A   Yes.    10:00AM
Q   Did you supervise them?
A   Yes.
Q   And where were they located?
A   Steve I believe lives in Maryland and Sally lives in Chicago.    10:00AM

*Page 41*

11 (Pages 38 - 41)

CONFIDENTIAL

Q    Besides Sally Bai and Steve McBride, any other person assist you with your work in this engagement?

A    There may have been.

Q    What do you mean by that?

A    I don't recall all of the people who assisted me. For example, in tying off the footnotes and making sure they were properly formatted, Cornerstone staff took the lead on that and then I went through it and made sure that it was all done the way that I wanted it to be done.

Q    So you can't tell me the name of the -- the names of each person from Cornerstone staff that assisted you with your report; is that right?

A    There may be people at Cornerstone that assisted Sally and Steve in their work and I don't recall the names of all of those people.

I recall being on Zoom calls with people other than Sally and Steve several times.

Q    How many other people besides Sally Bai and Steve McBride were you on Zoom calls with?

A    I don't recall.

Q    Have you ever worked with Sally Bai and Steve McBride before?

A    Yes.

Page 42

Q    How many times?

A    Well, several. I don't know the specific number.

Q    Did you select these individuals for this particular engagement or did Cornerstone assign them to work with you?

A    When we start an engagement, I have a conversation with a senior member at Cornerstone and we talk about how to build a team to work with me.

And so in this case, as I recall, they suggested Sally and Steve, or perhaps I requested Sally and Steve because I worked with them before, I know how they work, I know what I can expect them to do and so I would choose to work with them.

Q    Did you review their curriculum vitae in advance of this engagement?

A    No.

Q    Do you know their qualifications as an accountant?

A    I know their capabilities because I've worked with them before.

Q    That wasn't my question.

My question was: Do you know their accounting qualifications?

A    No. Well, I believe they are both CPAs,

Page 43

they have education. Background, Steve went to Notre Dame, he was an accounting major.

So do I know things like that casually, yes. But the reason I'm not able to answer your question directly is those things are not important to me about the individual's capabilities.

Q    What did Ms. Bai do for you in this engagement?

A    She is very knowledgeable about the codification and so I would often have conversations with Sally about aspects of the codification to make sure that the way I was interpreting it was consistent with the way she was interpreting it.

Q    What else did she do?

A    I don't recall specifically except that she would do research for me at my request.

She was also knowledgeable of the documents, so I would say, Sally, which document does this -- I have all of the documents, but as you know, there were more than 500 document in this matter.

And I could say, I recall this document but I can't put my fingers on it easily, tell me which document it is, tell me the Bates number, tell me something about it so I know where to touch it.

Page 44

Sally would do that. So she was a quasi librarian for me.

Q    Anything else she did for you?

A    Not that I recall.

Q    What about Mr. McBride, what did he do for you in this engagement?

A    Steve would help me to organize the outline of my report. So we would talk through it, what I want my report to look like and he would make suggestions so that we got the outline the way I wanted it to be.

Q    Does Ms. Bai have a certified public accounting designation?

A    I don't know for certain. I think she does, but she is originally from Canada, I think. So she may be a CA instead of a CPA. I'm just not sure.

Q    And you understand that a CA is a chartered accountant; right?

A    Correct.

Q    Is a chartered accountant required to sit for and pass the CPA exam?

A    I don't know.

Q    Did Ms. Bai pass the CPA exam?

A    I don't know.

Q    You understand that a CPA specializes in

Page 45

12 (Pages 42 - 45)

CONFIDENTIAL

U.S. GAAP; right?    10:07AM

A   A CPA is a broad-based certification in accounting for people who have knowledge of U.S. GAAP, some IFRS, International Financial Reporting Standards, the United States Tax Code and U.S. 10:07AM auditing standards, among other topics.

Q   You understand that a chartered accountant works in IFRS and non-U.S. GAAP markets; right?

A   I know of chartered accountants who work here in the United States on U.S. GAAP. 10:07AM

Q   Do you understand that as of 2015, Canadian GAAP for all publicly accountable enterprises is the IFRS standard?

(Reporter clarification.)

THE WITNESS:  I don't recall the date 10:08AM specifically.  But I understand generally that Canada follows IFRS, yes.

BY MR. DROSMAN:

Q   Not U.S. GAAP; right?

A   No.  However, prior to the full adoption of 10:08AM IFRS, much of Canadian GAAP was consistent with U.S. GAAP.

Q   Does Ms. Bai have any industry experience in oil and gas accounting?

A   I don't know.    10:08AM

Page 46

Q   Does Mr. McBride have any industry 10:08AM experience in oil and gas accounting?

A   I don't know.

Q   You mentioned that you're being compensated for your work as an expert in this case; 10:08AM right?

A   Yes.

Q   You're being paid $800 an hour for any time spent working on this case; is that right?

A   Yes.    10:09AM

Q   You're being paid $800 an hour for your testimony at today's deposition; is that correct?

A   Yes.

Q   How much have you been paid to date?

A   I think somewhere about $100,000.    10:09AM

Q   How many hours have you spent on this case to date?

A   I don't know exactly.  I think somewhere around 150, maybe 175 now.

Q   And the $100,000 that you've been paid to 10:09AM date, were you paid that by Cravath Swaine & Moore?

A   Cornerstone handles my billing.  I don't know specifically, but I believe that Cravath Swaine & Moore made those payments, but it may have been somebody else.    10:10AM

Page 47

Cornerstone Research, as one of the 10:10AM services it provides to me, takes my monthly invoices and submits them to whomever is responsible for paying me.

And then they deposit into my bank account 10:10AM the amounts that I had billed.

Q   In addition to your compensation of $800 an hour, you're to receive compensation from Cornerstone based on its collected staff billings for its support of you in this case; right?    10:10AM

A   Yes.

Q   How does that work?

A   I don't know the details.  But what I do understand is that Cornerstone staff prepares its own -- Cornerstone prepares its own invoices based on 10:10AM staff work on my project and then because I'm supervising their work, I receive a percentage of the amount that they bill.

Q   What percentage?

A   I believe it's 7 1/2 percent.    10:11AM

Q   And you told me that Cornerstone works for you; right?  That's what you told me earlier in this deposition?

A   I'm being careful here on "work."  In the sense that I don't pay them, they do what I ask them 10:11AM

Page 48

do.    10:11AM

So they work under my direction and supervision.

Q   In fact, they pay you; right, sir?

A   Cornerstone does not pay me.  The agreement 10:11AM I have is with Cravath.

Q   I understand.  But you receive compensation from Cornerstone; correct, as part of this engagement?

A   Cornerstone makes a deposit into my bank 10:11AM account, yes.

Q   That would be a payment, wouldn't it?

A   It's a transfer.  Again, I don't want to get cross with you on this, but I don't want it to be characterized in a way that's inconsistent with the 10:12AM underlying economics.

Q   You told me that you receive 7 percent of Cornerstone's billings in the case; right?

A   Yes.  I'm sorry, thank you.  For that I am paid by Cornerstone, I agree.    10:12AM

Q   Okay.  How much additional compensation have you received from Cornerstone to date?

A   I don't know.  I'm guessing $25,000.

Q   How much has Cornerstone billed the client for their work assisting you in this matter?    10:12AM

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL

A   I don't know.                10:12AM

Q   Have you been paid -- you told me that you've been paid approximately $100,000 from the client for your engagement in this matter; right?

A   I think so.                10:13AM

Q   Is there any money outstanding?

A   Yes.

Q   How much is outstanding?

A   I think $40,000 would be my February invoice. I've not been paid for that yet.        10:13AM

Q   You told me that you've billed approximately 150 to 175 hours in this matter; is that correct?

A   Yes.

Q   How many billable hours has Cornerstone   10:13AM incurred on this engagement?

A   I don't know.

Q   If you turn to Appendix B to your report, your report is Exhibit 548, that's your curriculum vitae; right?                10:13AM

A   Yes.

Q   You list your eduction there; right?

A   Yes.

Q   In the process of obtaining your B.A. in physics, did you take any oil and gas courses?   10:14AM

Page 50

A   Very small matter, I have a B.S., not a B.A. 10:14AM in physics. And no, I do not recall taking specifically any oil and gas accounting courses.

Q   In the process of obtaining your master's in measurement and control, did you take any oil and   10:14AM gas accounting courses?

A   Not that I recall.

Q   In the process of obtaining your master's in accounting, did you take any oil and gas accounting courses?                10:14AM

A   I don't recall taking any organized courses. But -- by the way, just to be fulsome here, my master's in accounting was part of my Ph.D. program. So it was really a combined educational experience for both of those.                10:15AM

The reason I'm pausing is that many courses that I took were independent study courses. And one of the issues that was prominent at the time professionally was accounting for oil and gas.

So I read substantial amounts about oil   10:15AM and gas accounting and believe I may have been listed as a potential collaborator on a proposed research study on oil and gas accounting at that time.

Q   What do you mean by that?        10:15AM

Page 51

A   I don't recall whether it was the FASB   10:15AM specifically or whether there were a number of organizations that were trying to gather insights on accounting for oil and gas exploration and development.                10:16AM

And as a doctoral student, I was working with a faculty member or several faculty members who I believe submitted a proposal to investigate accounting for oil and gas that was not funded.

I believe the funding went to the        10:16AM University of Texas, to some faculty members at the University of Texas. But there were a number of projects around that time.

I believe that Tom Dyckman at Cornell was on one of the projects and I don't remember all the   10:16AM people. There were a number of projects that were done around that time.

I was considering writing a doctoral dissertation around oil and gas accounting.

So that's why -- sorry for the lengthy        10:17AM response to your question, but none of those learning activities would have taken place as in organized courses because I was the only doctoral student that was interested in the topic I think. There were only two or three doctoral students in   10:17AM

Page 52

accounting at the time at Carnegie.        10:17AM

And I did work with primarily one or two faculty members during that period of time.

Q   What did you write your doctoral dissertation on?                10:17AM

A   I should know that. I don't remember the title of the dissertation any more. It was on the debtor/creditor hypothesis and the effects of inflation on evaluation was sort of one part of it.

There was a separate distinct part that        10:18AM had do with exchanges of debt instruments.

The second half was a published work that's listed on my C.V. The title of my dissertation I'm not sure is listed on my C.V.

I don't see my dissertation title.        10:18AM

Q   You obtained a Ph.D. in industrial administration; is that right?

A   Carnegie's business school at the time offered degrees that were all in industrial administration because the founder wanted it to be   10:19AM known as industrial administration as opposed to business.

Q   What is industrial administration?

A   What we think of today as business and, in fact, Carnegie has changed the name of the business   10:19AM

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

school. But at the time that it was founded, the idea 10:19AM was that companies that were industrial corporations needed managers to run them. And those people were involved in industrial administration.

To the best of my knowledge, Perdue and 10:19AM Carnegie were the only two schools ever to have a master's in science in industrial administration degree. Carnegie has since changed the title of its degree to -- I think it's just an MBA.

Q   If we looked at your transcript for the 10:20AM Ph.D. program in industrial administration, would we see any oil and gas courses on that?

A   No.

Q   If we looked at your transcript for your master's in accounting degree, would we see any oil 10:20AM and gas courses there?

A   Not titled that. They would be called independent study courses.

Q   How many independent study courses did you take? 10:20AM

A   Probably more than half the courses I took were independent study or similar titles where it was -- I was the only student in the class as it were. It was not a class. It was just a learning activity.

Q   And would your transcript reflect the 10:20AM

Page 54

content of the independent studies or would it 10:20AM simply say "independent study"?

A   It would not reflect the content certainly. I'm not sure if the title of the course would be "independent study" or something similar to that that 10:21AM would have that meaning.

Q   I understand that you've been employed by Ohio State University; right?

A   Yes.

Q   And you taught there; is that correct? 10:21AM

A   Yes.

Q   Taught any oil and gas accounting courses while you were at Ohio State?

A   I did not teach a separate course in oil and gas accounting, no. 10:21AM

Q   Did you teach any oil and gas courses while you were at the University of Illinois Urbana-Champaign?

A   No.

Q   Have you taught any oil and gas classes at 10:21AM the University of Texas?

A   I don't believe so, no.

Q   Did you teach any oil and gas courses at the University of Chicago?

A   No. 10:22AM

Page 55

Q   Have you taught any oil and gas accounting 10:22AM courses at Carnegie-Mellon University?

A   No.

Q   Have you ever had any paid employment as an accountant in the oil and gas industry? 10:22AM

A   Not as an employee. But I have as a consultant.

Q   Any paid experience in the oil and gas industry in any other capacity?

A   Not as an employee. 10:22AM

Q   It's fair to say you've never been paid for your work in the oil and gas industry; is that right?

A   No, that's not fair.

Q   What paid work have you done in the oil 10:23AM and gas industry?

A   I've worked as a consultant for oil and gas companies.

Q   What oil and gas companies have you worked as a consultant for? 10:23AM

A   I have worked for BP, British Petroleum.

Q   When did you do that?

A   I don't recall exactly, but it was probably in the range of 2012 to 2017. Somewhere in there for -- I don't know. I want to say probably two years 10:23AM

Page 56

or so. 10:23AM

Q   Do you do accounting consulting for them?

A   Yes.

Q   What accounting work did you do for BP?

A   Sorry, we just ran into a confidentiality 10:24AM issue, I cannot go any further.

Q   You cannot tell me anything more about your engagement with BP?

A   The fact that I did work with BP is a matter of public record. 10:24AM

I filed two affidavits with courts, I think the Federal District Court in Louisiana, having to do with -- because they are public, I'm allowed to talk about them.

It had to do with the definition of 10:24AM revenue. But beyond that, I checked before the deposition and to be sure that I believe I'm still covered by a confidentiality agreement that I can't further describe my work with them.

Q   Did you work as an expert witness for BP? 10:25AM

A   I'm hesitating because I'm trying to figure out -- I believe the answer to that is no, I never prepared a report for BP, I never testified beyond these two affidavits that I filed. And the affidavits had to do with the definition of revenue. 10:25AM

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

And so I don't think that that work would be characterized as expert witness work as I understand that term. I think it was consulting work.

Q   Was the work that you performed for BP in connection with litigation?

A   I don't know specifically.

Q   You don't know whether you performed work in connection with litigation for BP?

A   That's correct. I don't know for certain.

Q   Why don't you know whether you performed in connection with litigation?

A   When BP hired me to serve as a consultant, I believe it had to do with a dispute over some kind of agreement involving BP and others. I don't know the details of the account -- of the legal issues involved because my involvement had to do with the accounting issues.

Q   Did the work you performed for BP include any work with respect to suspended well costs?

A   No.

Q   Did the work that you performed for BP include any work with respect to capitalized leaseholds?

A   No.

Page 58

Q   Any other paid work as an accountant in the oil and gas industry?

A   Not that I recall.

Q   BP is your only experience in the oil and gas industry; is that correct?

A   That's what I recall today, yes.

Q   At the top of Page 3 of Appendix B, there is a list of articles in refereed journals.

Do you see that?

A   Yes.

Q   I take it that these are the articles that you authored or coauthored; right?

A   Yes.

Q   Do any of these articles you've authored or coauthored pertain specifically to the oil and gas industry?

A   There was one that was set in the oil and gas industry. If you look on Page 3, one, two, three, four -- the fifth line down that says, "with Steven Kachelmeier Don Kleinmuntz and Tom Linsmeier," and then the title of the article is "An Experimental Examination of Forward-Looking Nonfinancial Performance Disclosures." It was published in the Journal of Accounting Research in September 2001.

That experimental setting was set in the

Page 59

context of oil and gas reserves and how to disclose oil and gas reserves.

Q   Any other article that you authored or coauthored that you believe pertains specifically to the oil and gas industry?

A   I believe that there was a second paper that we began but never published that's not shown and I don't remember the details of it very well anymore.

Q   Any other articles that you have authored or coauthored pertaining specifically to the oil and gas industry?

A   Not that I recall, no.

Q   Do any of these articles that you've authored or coauthored pertain specifically to oil and gas accounting?

A   Like I said, the one that I just mentioned does.

Q   Any others?

A   No.

MR. DROSMAN:  We can take a break now. This is a good time.

THE VIDEOGRAPHER:  Going off the record at 10:30 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're on the record at

Page 60

10:40 a.m.  And this is the beginning of Media 2 in the deposition of Dr. Richard Dietrich.

BY MR. DROSMAN:

Q   Mr. Dietrich, if you could turn to Page 6 of Exhibit 548, that's your report.

A   Sorry, Page 6 did you say?

Q   Do you see that on Footnote 18 that you cite to a British textbook entitled "Hydrocarbon Exploration and Production, 2nd Edition"?

A   Yes.

Q   Is that is an accounting textbook?

A   No.

Q   Are you an expert in oil and gas exploration, Mr. Dietrich?

A   No.

Q   Are you an expert in petroleum engineering?

A   No.

Q   Do you hold yourself out as an expert in geophysics?

A   No.

Q   An expert in geology?

A   No.

Q   Do you hold yourself out as an expert in auditing financial statements?

Page 61

16 (Pages 58 - 61)

CONFIDENTIAL

A   No.                          10:41AM

Q   Did you read this textbook before citing it?

A   Yes.

Q   You read the entirety of the textbook; is    10:41AM that right?

A   When I became involved with this case, I quickly realized that a lot of the terms that I was reading were not terms that I had sufficient knowledge to be able to interpret the documents in a way that I   10:41AM felt comfortable to use to make accounting determinations.

So I went out and bought several books.  I contacted a colleague at the University of Texas who taught their oil and gas accounting course, asked       10:42AM him what book he used.

There's what I consider to be an outstanding petroleum engineering department at the University of Texas.  I looked at their website for courses that they had describing oil and gas       10:42AM exploration and looked at their syllabi and found some textbooks that I thought would be helpful for me, bought the textbooks and read them.

Q   And you read this textbook cover to cover, I take it?                          10:42AM

Page 62

A   I don't recall if I read all of them cover   10:42AM to cover.  Because some of the textbooks covered topics that had to do with the development of fields or production or what is called midstream activities or downstream activities.  I would not have read about 10:43AM them because they would not be pertinent to the documents that I was reading.

Q   Did you read this textbook, "Hydrocarbon Exploration and Production, 2nd Edition," cover to cover?                          10:43AM

A   Probably not because it says production.  I don't recall today which chapters I read and, frankly, learning things interests me, it's how I chose my career path.

So in retirement I have a lot of time to    10:43AM read things that are not pertinent to any expert witness work that I am doing.

And so I don't recall -- I read those books probably about a year ago or more.

Q   Do you know what a dilettante is?       10:44AM

A   I'm sorry?

Q   Do you know what a dilettante is?

A   I do.

Q   What you described is consistent with being a dilettante; right?                 10:44AM

Page 63

A   No.  I would describe it as being broadly   10:44AM read, sir.

Q   Your Ph.D. was in business; right?

A   You've already read C.V., it says my Ph.D is in industrial administration.              10:44AM

Q   It was not in accounting; correct?

A   It had a concentration in accounting.

Q   You retired from university research and teaching in 2020; is that right?

A   I believe that's right, yes.             10:44AM

Q   When in 2020?

A   Well, I retired officially I think in June of 2020.  My last official day was May 21st of 2020.  But I was on leave of absence during the spring semester, so at some point in 2019 was my last date of 10:45AM paid work for Ohio State.

Q   Are you a certified public accountant?

A   No.

Q   Have you ever been a CPA?

A   No.                          10:45AM

Q   So I take it you've never sat for the CPA exam; is that right?

A   That's correct.

Q   Are you a member of the AICPA?

A   Yes.                          10:45AM

Page 64

Q   How long have you been a member of the       10:45AM AICPA?

A   Six years or so.

Q   When did you become a member?

A   Bear with me for a minute.  I can estimate   10:46AM that.

I became a member of the financial reporting executive committee of the AICPA in September 2015.  I believe I would have joined the AICPA around the time that I joined that committee.    10:46AM

I was not required to do so, but I found out that as a non-CPA but because I was an academic, I was permitted to join the AICPA.  I had not done that before that.

Q   Are you a member today of the AICPA?      10:47AM

A   I am.

Q   Do you pay dues?

A   Yes.

Q   Do you know what a CFF is?

A   Not specifically.                 10:47AM

Q   Do you know generally what a CFF is?

A   I believe it has to do with fraud examination.  The reason I'm pausing is the AICPA has an -- has a certification, but there is another organization, it's the -- what is it called?  It's   10:47AM

Page 65

17 (Pages 62 - 65)

fraud examiners.                              10:47AM

And so there is a CFE title as well. There is a number of titles. I don't recall all the titles that are available to people who are accountants.                              10:48AM

Q   I take it you're not a CFF; right?

A   That's correct.

Q   And you mentioned a CFA designation as well; correct?

A   CFE.                                    10:48AM

Q   I'm sorry, CFE?

A   Right. Interestingly, I have taught the course at Ohio State for students who want to take the CFE examination. But I've never taken it myself.

Q   I take it that you're not a CFE; is that    10:48AM right?

A   That's correct.

Q   Have you ever been employed as an independent auditor?

A   No.                                     10:48AM

Q   So I take it you've never planned an audit of any public company; correct?

A   That's correct.

Q   You've never performed an audit for any public company; right?                         10:48AM

Page 66

A   That's correct.                          10:49AM

Q   You've never tested internal controls as part of an audit for a public company; right?

A   Not as part of an audit, no.

Q   You've never interviewed employees as part    10:49AM of an audit of a public company; right?

A   That's correct.

Q   You've never prepared audit work papers; right?

A   That's correct.                          10:49AM

Q   You've never audited -- sorry. You've never edited audit work papers as part of an audit; right?

A   Not as part of an audit, no.

Q   You've never signed an audit opinion;       10:49AM correct?

A   Right.

Q   You mentioned that you were on the Standing Advisory Group of the PCAOB; is that right?

A   Yes.                                     10:49AM

Q   That was an advisory position; right?

A   Yes.

Q   The job of the standing group was to make recommendations to the PCAOB; right?

A   I briefly described in my report the role of 10:50AM

Page 67

the PCAOB's standing audit committee.         10:50AM

Beyond that, I suggest you look at the website.

Q   I did look at the website and it described the job of the Standing Advisory Group was to make    10:50AM recommendations to the PCAOB; is that correct?

A   Well, that group has been reconstituted since I was a member. I do not know what it says currently on the website.

When I was a member of the Standing    10:50AM Advisory Group, we met periodically with the PCAOB and discussed items -- issues having to do with the work of the board generally.

But I wouldn't characterize it as simply making recommendations.                         10:50AM

That's -- the reason I'm hesitating is I don't recall whether we ever voted as the SAG on recommendations to the board. Maybe we did, but I just don't recall that.

That was not how I would characterize the    10:51AM bulk of what we did with the PCAOB.

Q   How would you characterize it?

A   It was more advisory in nature. We discussed issues with them. We had an agenda before every meeting and the agenda was issues that were    10:51AM

Page 68

relevant to the work of the PCAOB generally, I think. 10:51AM

This was only a couple of years after the PCAOB had been organized. So there were a lot of issues, for example, auditing standards.

Prior to the existence of the PCAOB,         10:52AM auditing standards were developed by a committee of the AICPA.

So when the PCAOB came into existence, they were going to have their own auditing standards, but they didn't have many that they had    10:52AM written independently.

So the question was which ones should they take on first, which ones were most in need of change.

There were a lot of things like that on     10:52AM which we had discussions to try to advise the board.

Q   How long were you a member of the Standing Advisory Group of the PCAOB?

A   I think two years.

Q   What were the dates?                      10:52AM

A   Bear with me. It's in my C.V.

January 2007 to December 2008.

Q   How often did you meet as a member of the Standing Advisory Group of the PCAOB?

A   I don't recall specifically. It was       10:53AM

Page 69

18 (Pages 66 - 69)

CONFIDENTIAL

probably four to six times a year, perhaps every other 10:53AM month.

Q You understand that non-accountants serve on the Standing Advisory Group; right?

A Yes. 10:53AM

Q The Standing Advisory Group includes investors; right?

A I don't recall that it did then. It may now.

Q The Standing Advisory Group includes 10:53AM public company executives; correct?

A At that time I recall that there was one former CEO who was on the advisory group when I was.

Q Who was that?

A I don't recall his name. 10:54AM

Q The charter of the Standing Advisory Group isn't to conduct audits; right?

A That's correct.

Q The charter of the Standing Advisory Group is not to conduct investigations; correct? 10:54AM

A I don't believe so.

Q You understand that for investigations, that PCAOB employs former employees of big four auditing firms as examiners; right?

A I know that there are people who have worked 10:54AM

Page 70

for big four public accounting firms who now -- who 10:54AM subsequently worked for the PCAOB as examiners, yes.

Q The Standing Advisory Group of the PCAOB does not evaluate individual sets of auditor work papers to determine if the auditor being examined 10:54AM has conducted its audit in accordance with PCAOB standards; correct?

A That's correct.

Q On Page 6 of your curriculum vitae, there is a headline "Editorial Service: Other." 10:55AM

Do you see that?

A Yes.

Q What does "other" mean?

A Academic journals that are refereed have individuals that read every manuscript that's 10:55AM submitted for publication.

The people who are the reviewers often are not members of the editorial board. Sometimes they are. So the two things that I have listed here, member -- the accounting review, I was a member of 10:55AM the editorial board of the accounting review for that time period. Also I served as an associate editor of the Journal of Accounting and Economics for the time period shown there.

But I also did reviewing work for other 10:56AM

Page 71

journals that I have listed there. 10:56AM

So that means I was a reviewer, not as a member of the editorial board of that journal.

Q Do you continue to do any work for any of those journals under "Editorial Service: Other"? 10:56AM

A I have not recently, although surprisingly to me, I was just asked earlier this week to do a review for the Journal of Accounting and Public Policy.

I have not decided honestly whether to 10:56AM accept it or not.

Q When was the last time that you did work, editorial service work for those listed under "Editorial Service: Other"?

A I don't recall. 10:57AM

Q You don't have dates there; right?

A Correct.

Q Was it more than five years ago?

A Oh, I've been a reviewer for most of my academic life. So I probably started reviewing 10:57AM manuscripts somewhere in the early 1980s, and I continued through the period when I retired.

Since I retired, I don't recall if I've reviewed any other manuscripts, but I may have. I just don't recall. 10:57AM

Page 72

Q So you acted as a reviewer until the time 10:57AM you retired; is that correct?

A Yes.

Q So the last time you acted as a reviewer for one of the journals under "Editorial Service: 10:57AM Other" was two years ago; was that correct?

A Again, I don't recall. I don't keep careful track of when I do a review.

It's just a request comes in, I decide whether I have time to accept it. If I do, I accept 10:58AM it and write a review and send it back in a month to 45 days.

Q Let's take a look at Appendix C to your report.

A Okay. 10:58AM

Q This is a list of all of the cases in which you testified as an expert at trial or deposition in the previous four years; is that correct?

A Correct. 10:58AM

Q Is this list complete?

A Yes.

Q Is it accurate?

A It's accurate. Let me amend my previous statement. When I say it's complete, I engaged in one 10:59AM

Page 73

19 (Pages 70 - 73)

other activity that was confidential that I don't    10:59AM
characterize as being this.

It was -- it was not in a courtroom
setting, it was a different setting that did not
involve litigation or the courts.    10:59AM

It was a -- I'm not quit sure how to
characterize it. It was unusual. In my experience,
I've never seen anything like it before.

But I was asked to come in and provide my
opinions about an accounting matter.    10:59AM

Q    Did you testify in that case?

A    You have to be under oath to testify?

Q    Typically.

A    I was not under oath. I was under you pick
something that says you think you're saying something  11:00AM
that's the truth.

As I said, it was a very unusual tribunal
or something. I don't remember the name of it. I
apologize.

Q    Was it in the United States?    11:00AM

A    The meeting was in the United States, yes.

Q    Was the presentation that you provided in
the United States?

A    Yes. I was in the United States when I did
it, the organization itself is an international    11:00AM

Page 74

organization.    11:00AM

Q    Did you testify or did you provide
information on behalf of the plaintiffs or the
defendant?

A    I'm not sure. There was a dispute about a    11:00AM
matter and I was asked to come in and provide my
opinions and that's what I did. So I'm not sure who
asked me. I'm not sure who the sides were as it were.

Q    Did the matter involve oil and gas?

A    No.    11:01AM

Q    Did the matter involve oil and gas
accounting?

A    No.

Q    Is it fair to say that none of the
companies by whom you were retained in the last four  11:01AM
years are oil and gas companies; correct?

A    That's correct.

Q    Have you ever been qualified as an expert
in accounting matters by any court?

A    I've -- my testimony has been accepted by    11:01AM
courts as an accounting expert. So I don't know what
you mean by "qualified."

But I've never had a question about my
expertise when I've testified.

Q    What courts have accepted your testimony    11:02AM

Page 75

as an accounting expert?    11:02AM

A    Delaware Chancery court I know has. In
actual testimony this Item Number 4 down here, the
District Court of Montgomery County, Texas, I
testified in court there.    11:02AM

So within this four years, those were the
ones where -- well, one of them I think actually
precedes the date here, this one in the Delaware
Chancery court.

So it may be that during this four-year    11:03AM
period, the only one where I testified in court was
Item Number 4.

Q    Any other courts besides those listed on
Appendix C accept your testimony in court?

A    I don't recall all of the times that I have  11:03AM
testified. What I can tell you is I have never not
had my testimony accepted in any proceeding where I've
testified.

Q    Right. But you understand that that
statement would be relatively meaningless if you've    11:03AM
only testified once. So I'm trying to figure out
how many times courts have accepted your testimony
as an expert witness in accounting.

A    Well, and what I can refer you to is
Appendix C which says in the past four years, here's  11:03AM

Page 76

the testimony that I have provided.    11:04AM

Q    My question is not limited to the last
four years.

A    Yes, but the document I have in front of me
only shows the last four years and beyond that, I have 11:04AM
told you about one case where I know I testified in
Delaware Chancery court.

Beyond that, I don't have a specific
recollection of when I've testified in other
settings, in trial settings in court.    11:04AM

Q    So as you sit here today, you can't tell
me, besides the Delaware Chancery court case and the
State of Texas case listed on Appendix C, any other
cases where a court has accepted your testimony as
an accounting expert; right?    11:04AM

A    I simply don't recall.

Q    Have you ever testified as an expert in
auditing financial statements?

A    I have testified in matters having to do
with auditor independence having to do with auditing.  11:05AM

Q    Has a court ever accepted your testimony
where you were an expert in auditing financial
statements?

A    The testimony that I provided in the context
of auditor independence was a committee of the AICPA  11:05AM

Page 77

20 (Pages 74 - 77)

CONFIDENTIAL

and not at trial.                    11:05AM

Q   Were you under oath when you provided that testimony?

A   I don't recall, I believe I was.

Q   When was that?                    11:05AM

A   Gosh, that would have been somewhere between 2002 and 2010.

Q   And I take there was no judge presiding at that particular proceeding; correct?

A   I don't know the title of the person that    11:06AM was presiding, but there was a presiding officer certainly.

Q   Are you familiar with the term "generally accepted auditing standards"?

A   Yes.                    11:06AM

Q   It's abbreviated as GAAS; correct?

A   Yes.

Q   Have you ever been qualified by any court as an expert in GAAS?

A   No.  It's never come up.                    11:06AM

Q   Has your testimony ever been admitted in any accounting matters by any courts other than those you've told me about?

A   I don't know.

Q   You cannot think of any as you sit here    11:06AM

Page 78

today; correct?                    11:06AM

A   Well, I've written a number of reports.  I don't know what happens with the reports after I've written them and how they are used subsequently in legal proceedings unless I'm called in directly to    11:07AM testify.

Q   Have you ever been retained as an expert witness by any oil and gas company other than the BP case that we've talked about?

A   Not that I recall.                    11:07AM

Q   Have you ever been disqualified as an expert by any court?

A   No.

Q   Have you ever been disqualified as an expert in any legal proceeding?                    11:07AM

A   No.

Q   Have you ever been excluded as an expert by any court?

A   Not to my knowledge.

Q   Have you ever been excluded as an expert    11:07AM in any legal proceeding?

A   Not to my knowledge.

Q   Have you ever been criticized as an expert by any court?

A   I'm hesitating only because I'm not sure    11:08AM

Page 79

what that would look like, but as far as I know, no.  11:08AM

Q   You understand what the word "criticized" means; right?

A   Yes, what I'm having trouble with is when you say "by a court," I don't know how a court would    11:08AM criticize an expert.

Q   A court could do so orally or in writing; correct?

A   I suppose.  If that's the case, then no. I've never been orally criticized by a court.                    11:08AM

I have engaged in questioning by a vice chancellor once where he was trying to understand my testimony, I think.

After the two counsels finished their examination, cross-examination of me, he had some    11:08AM other questions he wanted me to answer and I answered his questions and he said, okay.

And what I know is that his ruling was consistent with everything to which I had testified. So in that sense, there was no criticism.  He was    11:09AM simply trying make sure that he understood what I was saying, I think, because it formed the basis for his opinion.

Q   Did that vice chancellor criticize you in any way in open court?                    11:09AM

Page 80

A   No.                    11:09AM

Q   Did he criticize you in any way in writing?

A   No.

Q   Have you ever been criticized as an expert    11:09AM in any legal proceeding?

A   Again, I'm not sure what you mean by "criticized," but not to my knowledge.

Q   Has a court ever excluded any of your opinions as an expert witness either in part or in    11:09AM full?

A   No.  However, in this Matter 4 here, opposing counsel asked the court to issue -- what I believe is called a motion in limine asking me -- instructing me not to testify about something that I    11:10AM said in deposition was outside of my scope and I had no intention of testifying.

So I do have on the record that there is a motion in limine, but it's about something that's irrelevant in the sense that I had no intention of    11:10AM testifying about it in any case.

Q   How did the court rule on that motion in limine?

A   The judge issued the motion or -- I think he accepted it.  But again, I think it was with the    11:10AM

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL

understanding that I was not going to testify about something -- about what was in there.

Q   So just so I'm clear, the court granted the motion to prevent you from testifying about the subject matter that was in the motion; correct?

A   Yes, which had nothing to do with my report or what I was asked to testify about. It was outside of the scope of my assignment.

Q   Besides what we just discussed with respect to Number 4 in Appendix C, has any other court ever excluded any of your opinions as an expert witness either in part or in full?

A   Not to my knowledge.

Q   Besides what we discussed with respect to Number 4 in Appendix C, has a court ever ruled that you may not testify as an expert on any topics in a particular case?

A   Again, not to my knowledge.

Q   Turn to Appendix A of your report.

A   Mm-hmm. Okay.

Q   The heading there is "Documents Relied Upon."

Do you see that?

A   Yes.

Q   And is this particular appendix complete?

Page 82

A   I believe so, yes.

Q   Is it accurate?

A   I believe so, yes.

Q   It contains a list of documents, facts and data that you relied on in forming your opinions; correct?

A   Yes.

Q   Did you review and consider any documents that you did not rely on?

A   I don't recall. I reviewed early on a large volume of documents to try to understand the issues in -- what I refer to as facts and circumstances of the individual transactions, how do I understand what's going on.

When I read the documents initially, that's what caused me to say, I need to learn more about oil and gas exploration.

And that's why I when out and bought several books and read those books so that I would understand better when somebody talked about, you know, a term that was used in oil and gas exploration, that I would understand that term so that I could then use that understanding to make accounting determinations.

Q   Are all those documents that you

Page 83

considered early on in your Appendix A?

A   I don't recall. What I've said here is these are the documents that I relied upon in forming my opinions.

Q   Right. I'm asking you whether all the documents that you considered as part of this engagement are included in Appendix A?

A   What I can tell you is I've done a lot of searches on the internet and certainly all of those searches are not included in this documents relied upon. They were just ways to help me understand issues or acronyms.

And so what I report to you is everything that I think was directly relevant in forming my opinions is in this list.

Q   You mentioned that you reviewed a voluminous group of documents early in your engagement; correct?

A   Yes.

Q   Are all of those included in Appendix A?

A   I don't recall.

Q   Did you make a list of those documents?

A   I did not.

Q   So you don't know one way or the other whether they are included; fair to say?

Page 84

A   I know that anything that I used as a basis for my opinions is included here, yes.

Q   I'm not asking that.

I'm asking whether the documents that you reviewed early on, you don't know one way or the other whether all of those documents are included in Appendix A; correct?

A   So what I hear you saying in essence is if I looked at a document, determined it was irrelevant and did I not include it in this list.

Well, if I would have concluded it was irrelevant, I wouldn't include it in a list because I wouldn't have relied on it.

Q   Fair enough. What did you review and consider but decide not to rely on?

A   You know, I don't know. There were a number -- like if we look at the email chains that we see here in these documents, I would have seen possibly the first email, the second email that went into the chain, the third email that went into the chain, the fourth email that went into the chain and then the final email that went into the chain.

So I would have listed the final email that included everything that was in those earlier emails because that single document would convey

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL

everything that I had used in my analysis.    11:16AM

Q    That wouldn't include instances where you reviewed a document, decided it wasn't relevant and put it aside; correct?

A    It would not, if there were any cases like    11:16AM that, and I am telling you I just don't recall if there were any like that.

Q    Did you access a database of documents produced by defendants in this case?

A    Yes -- well, let me be careful.  I reviewed    11:16AM a database of documents.  The documents I think came from defendants.  That database was organized for me by people at Cornerstone.

So I was not directly involved in the process by which those documents came to appear in    11:16AM that database.

Q    How were those documents selected, the documents in the database that you reviewed?

A    It's my understanding that I have access to all of the documents that have been produced in this    11:17AM matter.

There are times when I'd ask for documents and have been told that they have not been produced. But every document that I specifically requested that was available, typically I was asking for it    11:17AM

Page 86

because I had already read it and was simply trying    11:17AM to find a quick way to be able to recover that document and review it.

Q    This database that was prepared for you by Cornerstone, did you read every document in that    11:17AM database?

A    I believe so, yes, at least once.

Q    And do all of those documents appear on your Appendix A?

A    Again, if I did not rely on them, I would    11:18AM not have included them.  And I simply don't know, because I didn't do the cross reference the way that I would have needed to, to assure that each document that was in that database is something that I listed that's -- if I didn't think it was relevant to my    11:18AM opinions -- you know, let's suppose there is an email that says, hey, do you want to go have lunch today.  I might have reviewed that email and thought, well, that's got nothing to do with anything, I wouldn't have put it on this list.    11:18AM

Q    Would Cornerstone have selected an email that says, let's have lunch today, and put it in your database?

A    My understanding is that they put in my database everything that's -- all of the documents    11:18AM

Page 87

that are made available.    11:18AM

Q    You testified that you read all of those documents in your database; correct?

A    At least once.

Q    You understand that the defendants have    11:19AM produced hundreds of thousands of documents in this case.  Do you understand that?

A    I don't.  I don't know -- well, I can tell you I've not read hundreds of thousands of documents. I have read all of the documents that I have been    11:19AM aware of that relate to the accounting matters that I have been asked to form an opinion.

Q    Did you perform searches in the database of hundreds of thousands of documents produced in this matter?    11:19AM

A    Again, I'm unaware of a database that contains hundreds of thousands of documents.  The database that I'm aware of contained, I don't know, perhaps more than a thousand but not 100,000 documents.    11:20AM

Q    Did the database that you had in front of you, did it contain deposition transcripts?

A    Yes.

Q    Did it -- how many deposition transcripts did it contain approximately?    11:20AM

Page 88

A    Gosh, I don't know.  Ten maybe.    11:20AM

Q    Did you read all of those deposition transcripts?

A    Yes.

Q    And you listed the deposition transcripts    11:20AM that you read under "Deposition Testimony" on Appendix A; correct?

A    Let me review.

I know that I read Items 3 through 11 on that list.  And I don't recall today having read    11:20AM others.

I asked specifically because I had not seen the deposition of Chris Champion, who's the CAO, I believe.  And I was told there was no deposition transcript for him.    11:21AM

There may have been others that I also asked about whether a deposition transcript existed or not.

Q    Did you ask for all of the deposition transcripts that had been taken in this case?    11:21AM

A    No.  The reason for that is I understand there are deposition transcripts for people who were petroleum engineers and things like that that I think would not have provided any guidance to me with respect to the accounting issues.    11:21AM

Page 89

23 (Pages 86 - 89)

CONFIDENTIAL

Q   How would you know that without reading 11:21AM their deposition testimony?

A   Well, if their education expertise has to do with petroleum engineering issues, then to the extent that that's their expertise, it would not in my 11:22AM opinion be informative on the accounting matters.

Q   So what type of deposition -- what type of deponents were you looking for in this case?

A   Well, I was looking for people in managerial positions or accounting positions. 11:22AM

Q   What do you mean by "managerial positions"?

A   People who have responsibility over exploration, for example.  So it could be something like Mr. Leyendecker or Mr. Daniels. 11:23AM

Q   Did you read Mr. Walker's deposition testimony?

A   I don't recall Mr. Walker.  Who's he?

Q   You don't know who Mr. Walker is; is that correct? 11:23AM

A   I don't recall that name, but that doesn't mean I don't -- that I haven't read it or don't -- I just don't know.  There is a large number of names, as you know, in this matter and there may be someone whose name I forget. 11:23AM

Page 90

Q   Did you read all of the -- did you review 11:23AM all of the KPMG documents --

A   I'm sorry, you said Walker, like R.A. Walker?

Q   Al Walker, correct. 11:23AM

A   Okay.  So I don't recall reading his deposition transcript, but I now recall who he is.

Q   You understand that he was in a managerial position; right?

A   Yes. 11:24AM

Q   You understand that KPMG produced over 4,000 documents?

A   I don't have an estimate of the specific number of documents that they produced, no.

Q   Did you understand that they produced over 11:24AM 4,000?

A   I don't specifically have an understanding of the number of documents.  That's not surprising to me.  But many of the documents they would have produced in their audit work papers would have been 11:24AM unrelated to accounting for exploration activities.

Q   We requested specific documents and they produced those documents.  How do you know that they were unrelated without reviewing them?

A   Well, if they had to do with things like 11:25AM

Page 91

accounting for receivables, I can conclude on the 11:25AM basis of the topic that it was unrelated to accounting for oil and gas exploration activities and would not need to look any further.

Q   Did you review the entire universe of KPMG 11:25AM documents and decide which were relevant and which were not?

A   No.

Q   Did somebody do that for you?

A   Yes. 11:25AM

Q   Who did that?

A   I said, here's what I want, and then the staff at Cornerstone would have found those documents for me.

So their role in this regard was to do the 11:25AM initial legwork on going through thousands of documents so that if it was a document -- an audit work paper having to do with accounts receivable or payables, that they would know that that's not something I needed to see or was even interested in 11:26AM seeing.  It was just not relevant to my work.

So they would have screened that out for me.  That's what I want them do.

Q   Did you read each of the deposition transcripts on Appendix A in their entirety? 11:26AM

Page 92

A   Yes. 11:26AM

Q   Cover to cover; is that right?

A   Yes.

Q   You relied on the deposition testimony of Lea Frye; right? 11:26AM

A   I read it, yes.

Q   Did you rely on it?

A   I don't recall specifically.  There were certain things that she said that I found interesting and helpful to me.  There were other things that she 11:27AM said that I read them -- I mean, I didn't rely on them in the sense that she's not an expert on accounting for oil exploration.

So I wouldn't take at face value anything that she said about how to properly account for, for 11:27AM example, Shen 3.

So I'm aware of what she said, but I did not use that as a basis for my opinion.

Q   I take it Mr. Leyendecker is not an expert on accounting either; right? 11:27AM

A   I don't believe that he is.

Q   So I take it when you read Mr. Leyendecker's deposition, you would not take at face value anything that he said about how to properly account for, for example, Shen; correct? 11:28AM

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL

**Page 94**

A   Correct.

Q   And the same applies to Mr. Daniels, he's not an expert on accounting; right?

A   My understanding is he's not.

Q   So I take it when you reviewed Mr. Daniels's deposition testimony, you would not take at face value anything that he said about how to properly account for, for example, Shen; right?

A   Correct.

Q   Why did you read Ms. Frye's deposition testimony?

A   Well, multiple reasons. One, my understanding is that she had a significant position in the development group that was working jointly with the exploration group and so she had access to the underlying engineering data about the Shenandoah reservoirs.

And my understanding is that different engineering professionals can reach different opinions about the nature of the reservoirs and that there was a difference of opinion, as I understand it, between some people in the exploration group and some people in the development group.

My understanding is Ms. Frye was one of those people. So I was trying to understand the

**Page 95**

various views about what they were learning about the Shenandoah area, what was going on in that field.

Q   What was Ms. Frye's title at Anadarko?

A   I believe at different times she had different titles. I don't recall specifically what she was right before she left.

Q   Do you recall any of Ms. Frye's titles at Anadarko?

A   No, I don't.

Q   When you read Ms. Frye's deposition, did you disagree with any of the testimony?

A   I did not agree or disagree with her testimony. I was simply trying to understand her testimony, just as I did with other people.

Q   Did you consider Ms. Frye to be a credible witness?

A   I think the answer to that is yes, just as I did with Chris Camden, who I believe was over in the exploration group. So I was getting different perspectives from these people, but I think they respected each other from my reading of each of their depositions.

Q   Right. I'm not asking you the interpersonal relationships between Ms. Frye and

**Page 96**

others at Anadarko. I'm asking whether you considered Ms. Frye to be a credible witness?

A   No, no, I'm sorry, I'm trying to be responsive to that.

What I'm trying to say is I think Mr. Camden thought she was credible in her understanding of oil and gas exploration and I think she thought Mr. Camden was credible. And so I think they were each reinforcing that they both had credible views and I acknowledged that when I was reading her deposition transcript.

Q   Let me ask the question again because I never mentioned Mr. Camden in my question.

I'm asking you whether you considered Ms. Frye to be a credible witness, yes or no?

A   I'm pausing because you're using "credible" in a way that I think I understand, but could you help me and explain a little bit more what you mean by "credible"?

Q   Do you understand what the word means?

A   I just asked you to explain it to me. I don't understand it the way you're using it necessarily.

You've asked me to be clear that when you ask me a question, I understand what you're asking.

**Page 97**

I'm now asking you to clarify.

Q   Do you understand the word "credible"?

A   I have an understanding of the word independently of the way you're using it. It may be that you're using it the way I understand it. But I'm trying to have you explain to me so that I'm clear on what you're asking me.

So if you're asking me to use the word "credible" in the way that I would think about it, then the answer is yes, I think her testimony is credible.

Q   What is your understanding of the word "credible," sir?

A   We've just been through this. I asked you to explain it to me. Now you're asking me to explain it to you?

Q   Let me explain to you something. I am the attorney, I ask the question; you're the witness, you answer the questions. You don't get to ask me questions. I'm asking you what your understanding --

A   You had told me at the beginning of today's testimony that if I was unclear on what you were asking me, that I should ask you. So you have specifically told me that I should ask you questions

25 (Pages 94 - 97)

CONFIDENTIAL

if I needed clarification. Is that not what you said 11:33AM early on in this deposition?

Q   I think you may have misconstrued what I told you. I said if for any reason you don't understand any of my questions, please tell me.    11:33AM I'll be happy to rephrase a question until you do understand. That's what I said.

A   Can you rephrase the question, please?

Q   But you don't get to ask me questions.

A   Can you rephrase the question, please?    11:33AM

Q   Sure. Sir, what is your understanding of "credible"?

A   That's not the question you asked me.

Q   Sir, I can ask whatever questions I want.

Can you answer that question?    11:34AM

A   Look, again, I'm not trying to get crosswise with you. I'm trying to give you testimony that's responsive to your requests. So let me try to say what I think is credible.

It's when somebody has a basis --    11:34AM

Q   I'm asking you what your understanding of credible is.

A   That's what I'm trying to say.

Q   Answer that --

A   I'm sorry, I didn't mean to speak over you. 11:34AM

Page 98

Q   Please answer the question, what is your    11:34AM understanding of "credible," sir?

A   I think of somebody as being able to say -- someone is credible when they have a basis for a statement that they make and the statement is based on 11:34AM their understanding.

Q   Using your definition of credible, sir, did you consider Ms. Frye to be a credible witness?

A   Yes.

Q   You understood that question; right?    11:35AM

A   Yes, using my definition of credible, I think that her testimony was credible.

Q   Did you believe that all of Ms. Frye's deposition testimony was fruitful?

A   I don't recall everything that she said in   11:35AM her testimony. So I don't have a response to that.

Q   As you sit here today, is there any part of Ms. Frye's testimony that you believe was untruthful?

A   Not that I recall.    11:35AM

Q   Did you give more weight to certain parts of Ms. Frye's testimony than other parts of her testimony?

A   Not that I recall.

Q   Did any of Ms. Frye's testimony contradict 11:35AM

Page 99

the deposition testimony of any other witness?    11:36AM

A   Let me say this. I don't recall specifically her deposition well enough to know. But I believe she said that she believed Shen 3 had to be expensed because it was a dry hole.    11:36AM

I believe that if she said that, that was beyond her range of expertise about accounting. So I would have discounted that statement. But I don't recall that she actually said that in her deposition.    11:36AM

Q   Anything else you recall that you discounted from Ms. Frye's testimony?

A   Again, I don't recall the details.

My reading of her deposition was to try to gain an understanding of the extent to which there    11:36AM were differences of interpretation about what was being learned from the exploration process. And not just the differences, what was being learned from the exploration process itself.

Q   Let me repeat my question.    11:37AM

Anything else that you recall that you discounted from Ms. Frye's testimony?

A   No.

Q   Did you speak to any current Anadarko employees with respect to your engagement in this    11:37AM

Page 100

case?    11:37AM

A   Not that I recall.

Q   Did you speak to any former Anadarko employees with respect to your engagement in this case?    11:38AM

A   Not that I recall.

Q   Did you attempt to speak to any current or former Anadarko employees during the course of your engagement?

A   No.    11:38AM

Q   Did you reach out to Catherine Green during the course of your engagement?

A   No.

Q   You do understand that the law firm who retained you represents these people; right?    11:38AM

A   Again, specifically I don't know that. I know that they are representing some individuals, I don't know who.

Q   Did you ask to speak to any current or former Anadarko employees?    11:38AM

A   No.

Q   Did you have any reason to believe that you would have been unable to speak to any current or former Anadarko employees?

A   I don't know whether I would have been able 11:38AM

Page 101

26 (Pages 98 - 101)

to or not, but it wasn't relevant. I had no interest 11:38AM in speaking with them.

Q   Did you ask to speak to any KPMG current or former employees during the course of your engagement? 11:38AM

A   Let me clarify. I may have spoken with KPMG employees, but to my knowledge, they had nothing to do with the audit for Anadarko.

I know a lot of KPMG people in my professional career. And so have I spoken with 11:39AM anybody who's a KPMG employee having nothing to do with this case, probably.

Q   Did you speak to anyone from KPMG who was involved in the Anadarko audit during the course of your engagement? 11:39AM

A   Not to my knowledge.

Q   Did you ask to speak to any KPMG current or former employee who was involved in the Anadarko audit during the course of your employment?

A   No. 11:39AM

Q   Do you know whether your assistants at Cornerstone spoke to any current or former Anadarko employees who were relevant to this case?

A   To my knowledge, they did not.

Q   Do you know whether any of your assistants 11:40AM

Page 102

spoke to any current or former KPMGs who were 11:40AM involved in the Anadarko audit related to this case?

A   To my knowledge, they did not.

Q   Did you attempt to speak with any current or former employee of ConocoPhillips during the 11:40AM course of this engagement?

A   Again, I may know people who work for ConocoPhillips, I don't know. But I would not have made contact with anybody having anything to do with this matter. 11:40AM

Q   Did you attempt to speak with any current or former employees of Marathon during the course of your engagement?

A   Again, same response, not that I recall.

Q   You listed Mr. McGrievy's testimony on 11:41AM Appendix A. What was Mr. McGrievy's title?

A   I don't recall specifically.

Q   You list Mr. Kleckner's testimony on Appendix A. What was his title?

A   I don't recall. 11:41AM

Q   In your report you note that Mr. Regan asserted that he carried out his analysis on this engagement in accordance with AICPA's Statement on Standards for Forensic Services; right?

A   I know that he said that. 11:41AM

Page 103

Q   Your report doesn't state that you carried 11:41AM out your engagement under the same standards; correct?

A   That's correct.

Q   Why? 11:41AM

A   Because I don't normally include a statement like that in my expert reports.

Q   Your report does not cite any professional standards under which you carried out your engagement, does it? 11:42AM

A   That's correct.

Q   On Page 2 of your Appendix A, you indicate that you've reviewed eight work papers produced by KPMG; right?

A   Yes. 11:42AM

Q   Besides those eight work papers, did you review any other documents produced by KPMG?

A   Perhaps.

Q   What do you mean "perhaps"?

A   I don't have a specific recollection of how 11:42AM many paper -- work papers I would have reviewed. It's possible that it exceeded the number that I relied on. Because some of them may have been not pertinent to the accounting questions I was investigating.

Q   Did KPMG issue an audit opinion on the 11:43AM

Page 104

fairness of Anadarko's financial statements taken as 11:43AM a whole?

A   When?

Q   At any point from 2014 to 2017.

A   Yes, they issued their audit opinions 11:43AM associated with the annual financial statements that Anadarko submitted to the SEC on Form 10-K.

Q   Did you review each of those audit opinions?

A   I believe I did. 11:43AM

Q   Are they listed on your Appendix A?

A   Well, they would have been included in the 10-K itself. I'm looking.

So I have the Anadarko 10-Ks for beginning 2010, '11, '12, '13, '14, '15, '17 -- why am I 11:44AM missing '16 here?

Here it is, I have '16, sorry, Line 111. Yes.

So each one of them would have included KPMG's audit opinion inside that document. 11:45AM

Q   KPMG didn't issue a separate opinion on whether the accounting for Shen 3 was correct; isn't that right?

A   Not that I recall.

Q   Did you verify whether KPMG's audit was 11:45AM

Page 105

27 (Pages 102 - 105)

CONFIDENTIAL

carried out in accordance with PCAOB professional   11:45AM
audit standards?

A   I didn't independently verify that, no.

(Reporter clarification.)

BY MR. DROSMAN:   11:45AM

Q   Did KPMG forensic specialists assist KPMG auditors in procedures relating to the company's investigation of a whistleblower allegation or allegations during the years 2014 through 2017?

A   I'm aware that there was an investigation.   11:46AM My understanding is the investigation was instituted by, I believe, the audit committee of Anadarko or its board of directors.

And that there was subsequently SEC investigation, KPMG would certainly have been   11:46AM involved with that.

I don't recall specifically today which specific individuals are the classification of employees or partners at KPMG that were involved.

But my perception from my reading of the   11:46AM materials associated with that investigation was that it was a fairly substantial investigation that likely would have involved forensic people or other specialists inside KPMG.

Q   Did you understand that accounting for   11:47AM

Page 106

Shen 3 was part of this investigation that you just   11:47AM described?

A   Yes.

Q   Do you know one way or the other whether KPMG forensic specialists assisted KPMG auditors in   11:47AM procedures relating to the company's investigation of a whistleblower allegation?

A   I don't recall specifically, no.

Q   Did KPMG forensic specialists assist KPMG auditors in procedures relating to the company's   11:47AM investigation of whether Shen 3 was improperly accounted for?

A   I don't recall today the specifics of the investigation, so I don't recall that, no.

Q   In assessing the accounting for Shen 3,   11:48AM did you review KPMG forensic work papers and work product regarding the company's investigation into the accounting for Shen 3?

A   I read documents related to that.  My specific recollection is that one of the documents   11:48AM that I read that was fairly lengthy included some redacted materials as well as other materials related to the investigation that appear to me to be substantial investigation and clear results.

Q   I did not ask you whether you reviewed any   11:49AM

Page 107

documents related to the investigation.   11:49AM

What I asked you was:  In assessing the accounting for Shen 3, did you review KPMG forensic work papers or work product regarding the company's investigation into the accounting for Shen 3?   11:49AM

A   Again, I may have, I don't recall specifically.

Q   I take it you would want to review that information; correct?

A   Not necessarily, no.   11:49AM

Q   Why not?

A   Well, it would be interesting for me to see what another professional's view was, but that would be a factor that I would consider in my own analysis if I had access to it and read it.   11:49AM

But at the same time, it wouldn't be dispositive for me to read what they said.

What I can help you to understand is that different accounting professionals, even experts can have different views.   11:50AM

Q   Right.  You would take into account KPMG forensic examiners' work papers and work product in your analysis, wouldn't you want to review the information from KPMG forensic examiners regarding the company's investigation into the accounting for   11:50AM

Page 108

Shen 3?   11:50AM

A   Again, I might do that and I might not do that.

Q   Well, that would be relevant to your investigation; right?   11:51AM

A   It might be informative but it might not be relevant.

Q   You don't know one way or the other because you did not review that information; correct?   11:51AM

A   I know that based on what I reviewed, I believed I had a basis for understanding KPMG's view of Anadarko's accounting for its oil exploration activities.

Q   You understand that as part of its audit   11:51AM evidence, KPMG asked for and received various representations from management?

A   Yes.

Q   That included details surrounding Shen 3; correct?   11:51AM

A   Again, I don't recall specifically, but I would anticipate that it would have, yes.

Q   Were any of the people who provided representations to KPMG non-accountants?

A   I don't recall, but I would expect they   11:52AM

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

would be.                          11:52AM

Q   Were any of them nonfinancial reporting people?

A   I would expect that they would be.

Q   Why would you expert that?          11:52AM

A   Because in the management representation letter, that letter is typically provided by a senior executive or multiple senior executives.  And I would not expect all of those individuals to be accounting specialists.                          11:52AM

Q   Why not?

A   Well, because they are making representations about the operations of the business and so they would be business managers who would be responsible for the operations of the business and not 11:52AM specifically accountants.

Q   Wouldn't they be financial reporting personnel?

A   Not in the way that I would think of their day-to-day activities, no.          11:53AM

Q   Why not?

A   Financial reporting personnel are intended to take the operations of the business and represent them in the financial statements using accounting techniques.  But they are not the people that are    11:53AM

Page 110

actually running the business.          11:53AM

And so if you're the auditor, you want to know what representations are being made to you about the business operations.

Q   Why would you want to know that as the    11:53AM auditor?

A   Because that's the basis on which you're going to determine whether the financial statements were prepared in conformity with GAAP.

Q   Turn to Page 100, Paragraph 233.          11:53AM

MS. PHILLIPS:  Dan, whenever you're done with this line of questions, can we take a short break?

MR. DROSMAN:  Sure, we can take a break right now.                          11:54AM

MS. PHILLIPS:  Okay.  Great.  I figured it might be a good time.

MR. DROSMAN:  Okay.

THE WITNESS:  What time do you want to come back?                          11:54AM

THE VIDEOGRAPHER:  Going off the record at 11:54 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're on the record at 12:12 p.m. and this is the beginning of Media 3 in    12:12PM

Page 111

the deposition of Dr. J. Richard Dietrich.          12:12PM

BY MR. DROSMAN:

Q   Mr. Dietrich, you understand that you're still under oath?

A   Yes.                          12:12PM

Q   Could you turn to Page 100, Paragraph 233 of your report.

A   Okay.

Q   Paragraph 233 reads, "As mentioned previously, throughout the Class Period, KPMG          12:13PM evaluated numerous accounting decisions made by Anadarko with respect to the Shenandoah Project.  KPMG concluded that Anadarko's accounting treatment was consistent with GAAP, including multiple evaluations of whether indicators existed that the    12:13PM Shenandoah Project was impaired."

Do you see that?

A   Yes.

Q   In Paragraph 233 you mentioned KPMG; right?                          12:13PM

A   Yes.

Q   KPMG was Anadarko's external auditor; correct?

A   Yes.

Q   Are you offering any opinion that KPMG          12:13PM

Page 112

conducted its audits in accordance of PCAOB          12:13PM standards?

A   I'm not separately, no.

Q   What do you mean "not separately"?

A   Well, PCAOB -- I'm sorry, KPMG was required  12:13PM to conduct its audits consistent with PCAOB standards.

Q   Are you offering any opinion that KPMG, in fact, conducted its audits in accordance with PCAOB audit standards?

A   No.                          12:14PM

Q   Are you offering an opinion that KPMG complied with PCAOB standards during its audits of Anadarko?

A   No.

Q   Are you familiar with PCAOB audit          12:14PM standards?

A   Generally, yes.

Q   Have you reviewed Audit Standard 1015?

A   I don't recall today what Audit Standard 1015 says.                          12:14PM

Q   It's entitled "Due professional care in performing an audit."

Are you familiar with that standard?

A   Yes.

Q   You've reviewed that standard?          12:15PM

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL

A  When I was a member of SAG, I reviewed all 12:15PM of the audit standards at that time.

Q  I take it you're not talking about the Screen Actors Gild; right?

A  Sorry, I've never heard that reference 12:15PM before.  No, this was the Standing Advisory Group of the PCAOB.

Q  Would you agree that audits conducted under PCAOB standards do not provide absolute assurance about whether a company's financial 12:15PM statements are fairly presented under GAAP?

A  Yes.

Q  Would you agree that a financial statement audit cannot provide absolute assurance because of limitations inherent with an audit? 12:15PM

A  As audits are currently constructed, yes.

Q  Would you also agree that a properly planned and performed audit may fail to prevent or detect material misstatements in a company's financial statements? 12:16PM

A  It is possible.

Q  I'll show you what's been previously marked as Exhibit 491.  It's Tab 50 -- Tab 50.

Exhibit 491, do you have it before you, sir? 12:16PM

Page 114

A  I do not yet.  Let me search for it. 12:16PM

I have it now, yes.

Q  Okay.  Did you review this document?

A  Let me look at it.

Oh, this is the AFE, yes. 12:17PM

Q  Did you review this document?

A  I don't recall specifically, but I believe I did, yes.

Q  You don't remember this document specifically? 12:17PM

A  Not looking at it right now, no.

Q  So you don't know, as you sit here today, whether you reviewed this document; is that accurate?

A  I don't recall whether I reviewed it or not. 12:17PM

Q  Do you see that the letter is signed by Jeffrey E. Pachman; right?

A  Yes.

Q  He's listed as a project land advisor.

Do you see that? 12:17PM

A  Yes.

Q  Do you understand for whom he works?

A  I'm sorry, could you say that again, please?

I'm sorry, I still did not hear.

Q  Do you understand who he works for? 12:17PM

Page 115

A  I believe he works for Anadarko. 12:18PM

Q  What are the duties and responsibilities of a project land advisor?

A  I'm smiling because when I was at the University of Texas, we had a major inside the 12:18PM business school that was called landman.

And I initially did not know what a landman was, so I asked.  Landmans or project land advisors are involved with the management of the overall effort for lands that are being explored or 12:18PM developed.

Q  Did they act in a supervisory capacity?

A  I don't know.

Q  And this particular letter is dated April 8th, 2014. 12:18PM

Do you see that?

A  Yes.

Q  You understand that was before Shen 3 had been drilled; correct?

A  It was before it was drilled, yes. 12:19PM

Q  I'm going to refer today to documents that have Bates numbers by the last three numbers of the Bates number.

Do you the Bates number at the bottom of the page is APC-00005093, at the bottom of the page? 12:19PM

Page 116

A  The first page of this letter, I see -- 12:19PM

Q  There is a number at the bottom of the page, a series of letters and numbers.

Do you see that?

A  Yes. 12:19PM

Q  That's the Bates number.

A  Yes.

Q  I'm going to refer to the pages by the last three numbers of the Bates number.  Okay?

A  I got it.  So you said four zeros 5093? 12:19PM

Q  Right.

A  Sorry, I misunderstand.  I thought you meant 405093.

Q  Sorry for the confusion.

A  No worries. 12:20PM

Q  Turn to page ending 094 of Plaintiffs' Exhibit 491.

A  Yes.

Q  And the second sentence on that page begins, "Please note." 12:20PM

Do you see that?

A  Yes.

Q  It reads, "Please note that the 'dry hole case' equates to encountering wet sands and the 'success case' equates to encountering oil via LWD, 12:20PM

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

mud logs or other tools used while drilling through  12:20PM
the objective section."

Q   Do you see that?

A   Yes.

Q   Do you understand what LWD refers to?   12:20PM

A   I don't recall specifically.  I think it's some kind of logging device that's used during drilling, but I don't remember what the letters stand for.

Q   What kind of logging device is it?   12:21PM

A   There is a number of logging devices that -- again, my understanding is there are logging devices that are used while the drilling is in progress and then after drilling, there are other logging devices that are used that are more sensitive.   12:21PM

But as I've already explained, I'm not an expert in petroleum engineering and so I don't know all of the details.

Q   Do you see the AFE on page ending 095?

A   Yes.   12:21PM

Q   You understand what an AFE is; right?

A   Yes.

Q   Authorization for expenditure; correct?

A   Yes.

Q   Do you agree that this authorization for   12:21PM

Page 118

expenditure is the operative AFE for Shen 3?   12:21PM

A   I believe so.  This is Walker Ridge Block 52 Number 2 well.  So that would have been Shen 3, yes.

Q   Do you see that on the top right of the AFE, Shen 3 is defined as being an exploratory type   12:22PM well prior to commencement of drilling?

A   Yes.

Q   I take it you don't dispute that Shen 3 was an exploratory type well; right?

A   When it was drilled, that's right.   12:22PM

Q   It wasn't defined as a development well, was it?

A   No, not at this time.

Q   Was it ever defined as a development well?

A   I don't know.   12:22PM

Q   As you sit here today, you can't tell me whether it was defined as a development well; is that accurate?

A   I saw documents that said it was intended to be used as an injection well, which would be a kind of 12:23PM development well.

Q   What kind of development well would an injection well be?

A   It's called a service well.

Q   On this particular AFE, it's not defined   12:23PM

Page 119

as a service well, is it?   12:23PM

A   No.

Q   Professor Dietrich, I take it that in your opinion, AFEs don't really provide information that's important to determine whether an exploratory   12:23PM well should be capitalized or expensed; is that correct?

A   Well, I wouldn't say that exactly, but it's not determinative but it does say something about the cost that's expected to be incurred, again, that's not 12:23PM determinative.

But to the extent that it is describing something about the purpose of the well, that would help inform the accounting.

Q   You assert that it was improper for   12:24PM Mr. Regan to use this document to support his opinion about Shen 3 accounting; correct?

A   It depends how he used it.

Q   Does the AFE provide information that's important to ensure proper classification of the   12:24PM expenditures as either capital or periodic expenses?

A   I don't know the population of AFEs, what they might do.  So I can't answer that question fully.

Q   You don't know one way or the other whether the AFE provides information that is   12:25PM

Page 120

important to ensure proper classification of   12:25PM expenditures as either capital or periodic expense?

A   Are we referring to this specific AFE?

Q   AFEs in general.

A   Again, I don't know about the population of 12:25PM AFEs and what they might or might not cover.  So I just don't have a basis because I don't have a clear enough understanding of all of the different AFEs and what they might or might not be used for.

Q   So you don't agree that the AFE provides   12:25PM information that is important to ensure proper classification of the expenditures as either capital or periodic expense as a general rule?

A   I can speculate there are AFEs that are written to cover G&G costs.   12:25PM

If the AFE says its intent is to cover G&G costs and it is actually used for G&G costs, then we would look to GAAP accounting to determine how to account for G&G costs.

Q   But it wouldn't be accurate to say as a   12:26PM general rule that the AFE provides information that is important to ensure proper classification of the expenditures as either capital or periodic expenses; correct?

A   Well, again, it's the activity, not the   12:26PM

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

authorization that would provide a basis for determining how to account for that activity.

Q   I'm going to show you what we'll mark as Plaintiffs' Exhibit 549 for identification, Tab 5.

(Whereupon, Exhibit 549 was marked for identification.)

THE WITNESS:  Okay.  Tab 549, is that what you said?

BY MR. DROSMAN:

Q   Exhibit 549, do you have it before you?

A   I see it on my screen now, yes.

Q   Do you understand that this is the AICPA Audit and Accounting Guide entitled "Entities with Oil and Gas Producing Activities"?

A   Yes.  And do you understand this is not GAAP?

MR. DROSMAN:  Move to strike as nonresponsive.

Q   I didn't ask you that, did I, sir?

A   No, okay.  Then let me do it differently. This is not authoritative accounting guidance.

Q   Do you understand that this document is the AICPA Audit and Accounting Guide, Entities with Oil and Gas Producing Activities?

A   I note in the second paragraph down about

Page 122

AICPA where it says the Financial Reporting Executive Committee.  I was a member of that committee when this was issued, so yes, I'm familiar with the document.

Q   Have you reviewed it before?

A   Yes.

Q   Were you on the oil and gas producing activities task force, sir?

A   No.

Q   Did you review this particular accounting -- Audit and Accounting Guide for this engagement?

A   I did.

Q   Did you list it in your appendix of documents relied upon?

A   No.

Q   Is that because you didn't rely on it but you considered it?

A   I was aware of it, I did not rely on it because it is not GAAP.

Q   Did you review it as part of this engagement?

A   Probably.  As I said, I am a member of the AICPA.  At the time that this was issued, I was a member of FinREC.  And so I may have looked at it at that time, I may have looked at it subsequently, I

Page 123

don't remember.  But I am familiar with it.

Q   Do you see on the first page of Plaintiffs Exhibit 549 "About AICPA Audit and Accounting Guides"?

Do you see that heading?

A   Yes.

Q   Underneath that it reads, "This AICPA Audit and Accounting Guide has been developed by AICPA Entities with Oil and Gas Producing Activities Task Force to assist management in the preparation of their financial statements in conformity with U.S. generally accepted accounting principles (GAAP) and to assist practitioners in performing and reporting on their audit engagements."

Do you see that?

A   Yes.

Q   And is that consistent with your understanding, sir?

A   My understanding of what?

Q   This document.

A   Yes.

Q   But you don't know one way or the other whether you reviewed it for this particular engagement; correct?

A   I was asked to opine on GAAP, not on the

Page 124

AICPA's interpretations of GAAP.

Q   Maybe you misunderstood my question.  I did not ask you what you were asked to opine on.

I asked you whether you know one way or the other whether you reviewed this particular document or this Exhibit 549 as part of this engagement?

Can you answer that question?

A   Let me review the document.  May I refer to my bookcase which is right next to me here?

Q   Why you do you need to refer to your bookcase?

A   Because if I look at my bookcase and I have the book on it, then I would have reviewed it.

Q   You can do that.

A   I have a book on my bookcase called "Entities with Oil and Gas Producing Activities" dated August 1st, 2000 -- I believe it's '18.

The reason that helps me is I did look at that book and that appears to be the document that you have here.

Q   To answer my question, you did review this particular document for the purpose of --

A   The one place I have a question is this says that it was copyrighted 2017.  The one I have on my

Page 125

32 (Pages 122 - 125)

CONFIDENTIAL

bookshelf I believe is 2018. It may be the same 12:32PM document. Without taking the book off my shelf and looking at it, I cannot be sure it was exactly the same.

But I'll represent to you I'm familiar 12:32PM with the contents of the AICPA guidance.

Q　Go ahead and turn to Page 109 of Plaintiffs' Exhibit 549. Let me know when you're there.

A　Bear with me. I'm getting close. 12:32PM Page 109, yes.

Q　You see that the heading about a third of the way down that page is "Additional Considerations for Specific Audit Areas."

Do you see that? 12:33PM

A　Yes.

Q　Then under 8.89 is "Oil and Gas Properties - Acquisition, Exploration and Development Activities."

Do you see that? 12:33PM

A　The heading above 8.90, is that what you're referring to?

Q　Correct.

A　Yes, I see it.

Q　Did you review this information as part of 12:33PM

your engagement? 12:33PM

A　I don't recall specifically, but again, this has to do with instructions to an auditor about an audit, not about the accounting itself.

Q　Look at Page 10. 12:34PM

A　I'm sorry, Page 10?

Q　I'm sorry, 110.

A　Oh, 110, yes.

Q　Do you see 8.92?

A　Yes. 12:34PM

Q　It reads, "Following are several areas that deserve special attention in the auditing of oil and gas property and related accounts." And then there is a colon and the third bullet point down is "Authorization for expenditures." 12:34PM

Do you see that?

A　Yes.

Q　And then look down about two-thirds of the way down the page and there is a heading above 8.94, "Authorization for Expenditures." 12:34PM

Do you see that?

A　Yes.

Q　And if you look at the third sentence under 8.94, it reads, "The AFE provides information that is important to ensure proper classification of 12:34PM

the expenditures as either capital or periodic 12:34PM expenses."

Do you see that?

A　Yes.

Q　Do you agree or disagree with that? 12:35PM

A　I have no basis to disagree.

Q　I take it you agree with that; correct?

A　Again, I'm not as familiar with every possible use of an AFE to be able to say that I agree with that. 12:35PM

But I don't see any basis that says that that statement is untrue.

Q　Take a look back at your report, Page 60, Paragraph 132.

A　Okay. 12:35PM

Q　Are you there?

A　Paragraph 132; is that correct?

Q　Right. Okay. Do you see -- I think it's the fifth sentence down, it's the sentence beginning, "Second, Mr. Regan fails to acknowledge." 12:36PM

Do you see that?

A　"Second, Mr. Regan fails to acknowledge," yes, I see the statement.

Q　You wrote, "Second, Mr. Regan fails to acknowledge the deposition testimony of, among 12:36PM

others, Mr. Leyendecker, who provided testimony 12:36PM related to this specific document cited in the Regan Report."

Do you see that?

A　Yes. 12:36PM

Q　And then you continued, "Specifically, Mr. Leyendecker testified that the 'dry hole case' and the 'success case' terminology included in this document were terms used by drilling personnel within Anadarko to refer to the 'cost estimate for 12:36PM drilling'."

Do you see that?

A　Yes.

Q　And by "this document," I take it you're referring to Exhibit 491; is that right? 12:37PM

A　The document that we looked at previously, the AFE, yes.

Q　That's Exhibit 491; correct?

A　Yes.

Q　You cite to Mr. Leyendecker's and 12:37PM Mr. Daniels's deposition testimony for this interpretation of a dry hole case and a success case; right?

A　Yes.

Q　Did you encounter any deposition testimony 12:37PM

33 (Pages 126 - 129)

CONFIDENTIAL

that contradicted this interpretation of dry hole    12:37PM case and success case?

A    Sorry, I lost my place in my report again. Can you remind me of the paragraph you were looking at?    12:38PM

Q    We're looking at 132.

A    132, okay.  Thank you.

In my reading I saw the terms "dry hole, wet hole, success case" used in many places in a variety of ways.    12:38PM

I'm trying to be responsive to your question about did I see other people use these terms.  And the answer is yes.

Q    I didn't ask that question, sir.

A    Can you restate the question and I'll try to 12:38PM answer it.

Q    Stay with me and I think we can get through this question.

A    Okay.

Q    You wrote, "Specifically, Mr. Leyendecker 12:38PM testified that the 'dry hole case' and the 'success case' terminology included in this document were terms used by drilling personnel within Anadarko to refer to the 'cost estimate for drilling'."

That's what you wrote; right?    12:39PM

Page 130

A    Yes.    12:39PM

Q    You cite Mr. Leyendecker's and Mr. Daniels' deposition testimony for this interpretation of a dry hole case and a success case; right?    12:39PM

A    Yes.

Q    Did you encounter any deposition testimony that contradicted Mr. Leyendecker's and Mr. Daniels's deposition testimony interpreting dry hole case and success case?    12:39PM

A    With respect to that AFE or otherwise?

Q    With respect to the terminology being used by drilling personnel within Anadarko to refer to the cost estimate for drilling, any deposition testimony that contradicted that?    12:39PM

A    Not specifically with respect to this AFE, which is how I'm interpreting their deposition testimony.

Q    Sure.  Specifically with respect to this particular document, which is Plaintiffs'    12:39PM Exhibit 491, did you find any deposition testimony that contradicted Mr. Leyendecker's testimony that the dry hole case and the success case terminology included in this document were terms used by drilling personnel within Anadarko to refer to the    12:40PM

Page 131

cost estimate for drilling?    12:40PM

A    As I said, I saw many references to those terms.  I don't recall any that related specifically to this AFE and its use of those terms.

Q    Did you review Mr. Strickland's deposition 12:40PM testimony?

A    I don't believe I did.  Let me check to make sure.  I don't think it's on my list of documents.

I don't recall that deposition testimony.

Q    Did you review it?    12:41PM

A    I don't believe I did.

Q    You don't list it on your documents relied on; correct?

A    Correct.

Q    Do you know who Mr. Strickling is?    12:41PM

A    I do not recall who he is.

Q    Why didn't you review his testimony?

A    I don't have a specific reason since I don't know who he is and I don't know what his testimony would have said.    12:41PM

Q    Do you understand that he was deposed in this case?

A    I do now.

Q    Did you when you were preparing this report?    12:41PM

Page 132

A    I don't recall his name.    12:41PM

Q    So I take it you don't know what his title was; right?

A    I do not.

Q    You don't know his duties and    12:42PM responsibilities, do you?

A    I don't recall today, no.

Q    Did you know it at one point?

A    I don't recall.

MR. DROSMAN:  I'll show you what we'll    12:42PM mark as Plaintiffs' Exhibit 550, it's Tab 44.

(Whereupon, Exhibit 550 was marked for identification.)

BY MR. DROSMAN:

Q    Let me know when you have that document    12:42PM before you.

A    It hasn't come up yet on my viewer.

What is the tab number or the exhibit number, please?

Q    Exhibit number is Exhibit 550.    12:42PM

A    550, okay, I see it now.

Q    Please go ahead and look at the first page of that document.

Do you see that first page?

A    The first numbered page you mean?    12:43PM

Page 133

34 (Pages 130 - 133)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Q   Page 1, correct.   12:43PM

A   Yes, I see it.

Q   That's got the In Re Anadarko Petroleum Corporation securities litigation caption; correct?

A   Yes.   12:43PM

Q   It says, "Videotaped Remote Deposition of Robert Strickling."

Do you see that?

A   Yes.

Q   And you understand that he was deposed in   12:43PM this case; correct?

A   Correct.

Q   But you don't remember reviewing his testimony; right?

A   I don't.   12:43PM

Q   So I take it that you didn't bother looking at what Mr. Strickling had to say about Plaintiffs' Exhibit 491; right?

A   Can you repeat the question, please?

Q   I take it you didn't bother looking at   12:44PM what Mr. Strickling had to say about Plaintiffs' Exhibit 491; correct?

A   I don't know what you mean by "bother."  So let me state it differently.

I don't recall looking at this deposition   12:44PM

Page 134

transcript.   12:44PM

Q   Well, did you look at what Mr. Strickling had to say about Plaintiffs' Exhibit 491?

A   Well, if it's contained in this deposition transcript, then no, I did not look at what he said.   12:44PM

Q   Why not?

A   I don't have a particular reason for it except to say that I am not aware today of this deposition.

Q   I take it you were not aware when you were   12:45PM preparing your report for this deposition; correct?

A   Again, I don't recall being aware of it.

Q   Go ahead, if you would, and turn to Page 101 of Plaintiffs' Exhibit 550.

A   Page 101, I have it.   12:45PM

Q   Do you see that there is reference to a Plaintiffs' Exhibit 186 about midway down that page?

A   Yes.

Q   And I can represent to you that Plaintiffs' Exhibit 186 contains the identical   12:46PM letter that's contained in Paragraph -- in Plaintiffs Exhibit 491 to Mr. Pachman; okay?

A   Okay.

Q   So let's see.  If you turn to Page 105 of Mr. Strickling's deposition transcript.   12:46PM

Page 135

A   Okay.   12:46PM

Q   And look at Line 14 of that page.

Do you see it?

A   Where he says, "Okay"?

Q   The questioner.   12:46PM

A   The questioner says, "Okay."  Yes, I see that.

Q   And it reads, "Okay.  And if you look at the first -- or the second sentence of the second page of the letter, the letter on Page 094, it   12:46PM begins, "Please note.

"Do you see that?"

A   Yes.

Q   That's what I'm asking the witness.

A   Okay.   12:46PM

Q   And then the answer is:  "No, I haven't found that yet.  Just a moment.

"Question:  It's the second sentence of the second page of the letter.

"'Please note', yes.   12:46PM

"Question:  It reads:  Please note that the 'dry hole case' equates to encountering wet sands and the 'success case' equates to encountering oil via LWD, mud logs or other tools while drilling through the objective section.   12:47PM

Page 136

"Do you see that?"   12:47PM

A   Yes.

Q   "Answer:  Yes.

"Question:  Okay.  So this is in reference to an appraisal well; right?   12:47PM

"Answer:  Yes.

"Question:  And Mr. Pachman defines a dry hole case as encountering wet sands.

"Do you see that?

"Answer:  Yes.   12:47PM

"Question:  Wet sands would indicate an absence of hydrocarbons; correct?

"Answer:  Yes.

"Question:  And the success case, Mr. Pachman says for this appraisal well, equates to   12:47PM encountering oil via LWD.

"Do you see that?

"Answer:  Yes.

"Okay.  What does LWD stand for?

"Answer:  Logging while drilling.   12:48PM

"Question:  Okay.  And for the Shen 3 appraisal well, was it a dry hole case or a success case?

"Answer:  We encountered the wet sand, so if I were to -- it would be a dry hole case."   12:48PM

Page 137

35 (Pages 134 - 137)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

Q   Do you see that?                12:48PM

A   Yes.

Q   You did not consider that testimony, did you?

A   Consider what?                12:48PM

Q   I asked you whether you considered it, sir.

A   I don't know whether I read this or not.  If I did, I reached the same conclusion, it's irrelevant.

Q   If you would have read it, you wouldn't    12:48PM have included the deposition transcript because you didn't believe it was relevant; correct, in your appendix --

A   It's not relevant to the accounting for Shen 3.                12:48PM

Q   The definition of dry hole case or success case is not relevant to the accounting for Shen 3; is that your testimony?

A   Yes.

Q   And it's because Mr. Leyendecker and    12:48PM Mr. Daniels testified that the term the "dry hole case" and "success case" terminology included in the document were terms used by drilling personnel within Anadarko to refer to the cost estimate for drilling; correct?                12:49PM

Page 138

A   That's my understanding of their testimony, 12:49PM yes.

Q   Okay.  Mr. Strickling did not testify that the terms "dry hole case" and "success case" included in the document were used by drilling    12:49PM personnel within Anadarko to refer to the cost estimate for drilling, did he?

A   No, not in this portion of the deposition transcript that we read.

Q   Mr. Strickling testified that the Shen 3    12:49PM was a dry hole case because Anadarko encountered wet sands; right?

A   That's how I interpret his testimony, yes.

Q   Please look at what's been previously marked as Exhibit 340, it's Tab 6.            12:49PM

A   Okay.

Q   Do you have it before you?

A   I do.

Q   Have you reviewed this document before?

A   I don't recall.  Let me take a look at it.  12:50PM This is from Bridget Hill at ConocoPhillips to Morgan Coker at Anadarko.  I think but don't recall clearly that I read this before.

As I said, I read a lot of documents early on.  I read several documents that referred to    12:51PM

Page 139

Anadarko's partners' questions and initial positions  12:51PM about accounting for Shen 3.

So I anticipate that this was one of the documents I would have reviewed.  But I don't know that for sure.                12:51PM

Q   Exhibit 340 is not included in your Appendix A to your report as documents you relied on; correct?

A   Correct.

Q   So if you considered it, you didn't rely    12:52PM on it; is that fair?

A   Yes.

Q   And therefore, you would not have included it in your Appendix A; correct?

A   Correct.                12:52PM

Q   And you believe that you did consider Exhibit 340 or you don't know?

A   I don't know.  I think I may have read this. There were several documents that I read that were written close in time to December 31st, 2014, early    12:52PM 2015 about how to account for Shen 3 between the partners at Anadarko.

Q   Take a look at the email about a fifth of the way down the first page to Mr. Pachman.

Do you see that?                12:52PM

Page 140

A   A fifth of the way down from Mr. Pachman or  12:52PM to Mr. Pachman?

Q   It's from Mr. Pachman it appears about a fifth of the way down the first page of Exhibit 340, it's the second email.                12:53PM

A   I see yes, below the FYI, yes, I see.

Q   Okay.  You understand that this email was sent on January 7th, 2015; right?

A   Yes.

Q   And it was -- one of the recipients was    12:53PM Pat McGrievy; correct?

A   Yes.

Q   You did review his deposition testimony, didn't you?

A   I think so.                12:53PM

Q   Why did you review Mr. McGrievy's testimony?

A   Again, I read documents that I think may be helpful for me to understand the facts and circumstances so that I can make a determination on    12:53PM the accounting.

Q   And let's take a look at what Mr. Pachman said to Mr. McGrievy, Mr. Strickling and others on January 7, 2015.

Do you see he writes, "FYI, spoke with my    12:54PM

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

counterpart this morning about a few things at Shenandoah and just wanted to pass on one thing in particular - COP plans to write-off the cost of the Shen 3. Internally at COP, because the well found no hydrocarbons and has no future utility, the cost would not be written off as a dry hole."

Do you see that?

A   Yes.

Q   You understand what COP refers to, don't you?

A   ConocoPhillips, yes.

Q   And you didn't rely on this document; correct?

A   No.

Q   Did you consider this document when you described Shen 3 as a successful well?

A   I was aware that ConocoPhillips and Marathon both wrote off Shen 3 in their 2014 financial statements.

Q   Did you consider this document when you described Shen 3 as a successful well?

A   The word "successful well" is not defined in GAAP, so different people can have different definitions that they use when they are describing wells that are either successful or unsuccessful.

Page 142

So I note that people have different characterizations of the well, but none of them -- none of those determinations determine the accounting for Shen 3.

Q   Why not?

A   This is a little tricky to explain but not really hard to understand.

Even though the accounting method is called successful efforts versus full cost accounting, the word "successful" is not used in ASC 932 to determine how to account for a well cost.

Q   So why would you disregard the Anadarko employee's description of Shen 3 as successful?

A   I don't disregard it, but it has no particular substance in determining the proper accounting for an exploratory well or stratigraphic test well.

The term doesn't appear in GAAP.

Q   So if an Anadarko employee described Shenandoah 3 as a success, that wouldn't impact your conclusions with respect to whether it should be capitalized or expensed?

A   No. To go a little further on this, it may have impacted how Anadarko viewed it, but it doesn't impact me and how I view it in determining whether

Page 143

Anadarko's accounting is consistent with GAAP.

Q   Did you consider Plaintiffs' Exhibit 340 when you concluded that Shen 3 had no -- had future utility?

A   Again, I didn't have a determination one way or the other. I know there were different opinions about whether Shen 3 would have a future use as a water injection well.

Q   My question is: Did you consider Exhibit 340 when you concluded that Shen 3 had future utility?

A   Again, I may have read this. I may have taken it into consideration in understanding the issues. But I didn't rely on this and there's nothing here to rely on in terms of determining the accounting for Shen 3.

Q   Let's take a look at Exhibit 487, it's under Tab 14.

A   Okay. This is from somebody at Marathon. I see now. Yes.

Q   This document doesn't appear in your Appendix A to your report as a document that you relied on; correct?

A   I don't recall without going back and looking at it. But I think I read the document, but I

Page 144

don't think I would have relied on it.

Q   So it's fair to say you considered this document, you just didn't rely on it; is that right?

A   Let me say that I know that Marathon expensed Shen 3 on its books. Whether it was this document or another document that I looked at, I don't recall, so that's why I don't recall whether I read this one or not.

But if I did, I would have considered it but I wouldn't rely on it in making my accounting determination.

Q   You see that there is an email from a person Gary Wilson in this particular document, Plaintiffs' Exhibit 487?

A   Yes.

Q   You understand Mr. Wilson is the chief accounting officer for Marathon Oil Corporation; correct?

A   Yes.

Q   Marathon Oil Corporation was a partner of Anadarko's in the Shenandoah oil field exploration; correct?

A   Yes.

Q   If you take a look at the email, Mr. Wilson writes, "Hi, Cathy, I wanted to let you

Page 145

37 (Pages 142 - 145)

know that based on our interpretation of ASC 932, we have decided to expense the most recent Shenandoah appraisal well."

Do you see that?

A   Yes.

Q   You understand that Mr. Wilson sent this email on January 28th, 2015; right?

A   Yes.

Q   Did you consider this document when you concluded that Shen 3 was a successful well?

A   I don't think I concluded Shen 3 was a successful well.

I concluded that Shen 3 could be suspended consistent with the guidance in GAAP.

Q   Did you consider this document when you concluded that the costs of Shen 3 could be suspended consistent with -- in accordance with GAAP?

A   I don't recall specifically whether I considered this document.

What I do know is that I was aware that Marathon decided to expense Shen 3 at the time that I did my accounting analysis with respect to Anadarko's accounting for Shen 3.

Q   Did you consider this document when you

Page 146

concluded that Shen 3 had future utility?

A   I don't believe I concluded that Shen 3 had futility utility.

Q   Let's take a look at what has been marked as Exhibit 122, it's Tab 15.

A   Okay.

Q   You did not rely on this document, did you?

A   No.

Q   Did you consider this document?

A   I was aware that there was a difference of opinion within Anadarko personnel about whether Shen 3 had a future utility as a water injection well, yes.

Q   I didn't ask you that. I asked you whether you considered this document in the course of your engagement?

A   What I can tell you is I don't recall this particular document in reaching my understanding about Shen 3 as a water injection well.

But I may have read it.

Q   If you read it, you wouldn't have relied on it; is that accurate?

A   Whether Shen 3 could be used as a water injection well is not relevant to my opinion. So I wouldn't rely on any of it because it's not relevant

Page 147

to my determination about the accounting for Shen 3.

Q   Sir, try to answer my question. I didn't ask you why you didn't rely on it.

I asked you if you read it, you wouldn't have relied on it; is that accurate?

A   If I read it, would I have relied on it?

Well, no, it's irrelevant, I wouldn't rely on it because it doesn't matter.

Q   So let's take a look at this email.

It's from Chip Oudin; right?

A   Yes.

Q   Do you know who Chip Oudin is?

A   I recall his name, he works for Anadarko. I don't remember whether he's in exploration or development. I think he's on the development side, but again, I'm not sure.

Q   You don't know his title, I take it; correct?

A   No. He was one of the people that was part of either one of those two groups. I think there were four or five different professionals in each of those two groups that was involved with the Shenandoah project.

So I do remember his name as occurring frequently in the communication streams.

Page 148

Q   What were his duties and responsibilities?

A   I don't know.

Q   Do you see the subject of this email is "Shen 3 non-utility as Wilcox WI"?

Do you see that?

A   Yes.

Q   Mr. Oudin sent this email on February 2nd, 2015; right?

A   Yes.

Q   One of the people he sent it to was Paul Chandler; correct?

A   Yes.

Q   Do you know who Paul Chandler is?

A   I recall the name, but I don't recall his position.

Q   What were his duties and responsibilities?

A   I don't know.

Q   Did he work in exploration or development?

A   I don't recall. I think he was in development, but I'm not sure.

Q   Was he an accountant or non-accountant?

A   I don't recall.

Q   Mr. Oudin writes, "Beth, I checked with Lea and she said that Shen 3 cannot be utilized as a water injector given its current design."

Page 149

38 (Pages 146 - 149)

Do you see that?   1:06PM

A   Yes.

Q   Did you consider this document when you concluded that the costs of Shen 3 should be suspended in accordance with GAAP?   1:06PM

A   I was aware of this view.  Whether it's from this document or a different document, I don't recall.

But I was aware of this view and it did not affect my accounting decision.

Q   Let's take a look at what has been marked   1:06PM as Plaintiffs' Exhibit 290 for identification, Tab 16.

A   Okay.

Q   Did you rely on this document?

A   Let me take a look at it.   1:07PM

Q   It does not appear on your Appendix A, does it?

A   No, but I remember there was some discussion about who to involve in a meeting and whether that person was aware of the issue that's discussed in this  1:08PM memorandum.

So I don't know if it was this document or a similar document, but I remember reading something that sounds like this narrative.  But again, it's not determinative on the accounting for Shen 3.   1:09PM

Page 150

Q   Right.  I just asked you whether you   1:09PM relied on Exhibit 290 which does not appear in your Appendix A; correct?

A   Yes, I did not rely on it.

Q   Okay.  Can you tell me one way or the   1:09PM other whether you considered Exhibit 290 in the course of your engagement?

A   I may have.  I recall a narrative similar to this narrative.  It may be that I read this document and considered it and then did not rely on it.  I   1:09PM don't know today one way or the other.

Q   Take a look about halfway down the page, there is an email from Pat McGrievy.

Do you see it?

A   Yes.   1:10PM

Q   It's to Darrell Hollek.

Do you see that?

A   Yes.

Q   Who is Darrell Hollek?

A   I don't recall today.   1:10PM

Q   Do you know his position?

A   No.

Q   Did you read his deposition?

A   I don't recall.  I'm familiar with the name. I may have read his deposition, but I don't recall   1:10PM

Page 151

today.   1:10PM

No, didn't read his deposition.

Q   You did not read his deposition; is that correct?

A   It's not on my list of deposition testimony.  1:10PM I may have read it.  I don't have a specific recollection today of whether I read it or not.

Q   If you read it, wouldn't it have appeared on your Appendix A to your report?

A   Not if I didn't rely on it.   1:10PM

Q   And you can't tell me what his duties and responsibilities are; correct?

A   That's correct.

Q   Do you know what department he's in?

A   No.   1:11PM

Q   You don't know whether he is an accountant or not; correct?

A   I do not.

Q   Why did you decide not to read his deposition?   1:11PM

A   There are several people in the accounting area at Anadarko whose names I'm familiar with.  I don't recall his name being one of them.  But maybe I'm misremembering.

Q   My question is:  Why didn't you read his   1:11PM

Page 152

deposition?   1:11PM

MS. PHILLIPS:  Objection, misstates testimony.

THE WITNESS:  Again, I don't know if I read his deposition or not.   1:11PM

BY MR. DROSMAN:

Q   Why didn't you rely on his deposition?

A   If it had nothing that I considered to be helpful on which I would rely in making my own accounting determinations, I wouldn't list it under   1:12PM documents relied upon.

Q   Take a look at that email we talked about to Mr. Hollek.  It's dated November 14th, 2014; right?

A   Yes.   1:12PM

Q   Look at the third numbered point in that email, it begins, "The bottom line."

Do you see that?

A   Yes.

Q   It reads, "The bottom line, in our   1:12PM opinion, with the current data set is that we can neither prove nor disprove an OWC contact as the results of the data are not convincingly definitive in any scenario and we cannot sanction with this potentially ambiguous data set despite the level of   1:12PM

Page 153

39 (Pages 150 - 153)

CONFIDENTIAL

optimism from exploration."    1:12PM

Do you see that?

A    Yes.

Q    You would understand what OWC refers to; right?    1:12PM

A    Yeah, oil-water contact, yes.

Q    So I take it that you did not consider this document when you concluded that the costs of Shen 3 should be suspended in accordance with GAAP; right?    1:13PM

A    Again, I don't remember this document specifically.  But I would not rely on this in making the determination that I made about accounting for Shen 3.

Q    Why is that?    1:13PM

A    Because there's nothing here particularly that speaks to whether Shen 3 can be suspended or not.

Q    Are oil-water contacts relevant to the determination as to whether Shen 3 costs should be suspended in accordance with GAAP?    1:13PM

A    May or may not be.  In this case not.

Q    Why in this case not?

A    Because the guidance in 932 on suspending exploratory well costs is not predicated on subsequent wells having oil-water contacts or discovering    1:14PM

Page 154

hydrocarbons in the wellbore itself.    1:14PM

Q    Is whether Shen 3 could be used as a water injection well relevant to your accounting determination that costs of Shen 3 should be suspended?    1:14PM

A    No.  Let me modify one sentence.  You said, "should be suspended."  I said, "can be suspended."  Okay?

I'm not opining that Anadarko is required under GAAP to suspend Shen 3 well costs, simply that    1:14PM it can do so at its discretion.

Q    Is whether Shen 3 could be used as a water injection well relevant to your determination that the costs of Shen 3 could be suspended in accordance with GAAP?    1:15PM

A    No.

Q    Why?

A    There may be multiple bases on which one could reach a conclusion about whether Shen 3 could be suspended.  I based it on facts and circumstances that    1:15PM was unrelated to its use -- potential future use as a water injection well.

Q    If Lea Frye testified that Shen 3 wasn't a success, is that relevant to your determination --

A    No.    1:16PM

Page 155

Q    -- the costs of Shen 3 could be suspended    1:16PM in accordance with GAAP?

A    No.

Q    Why not?

A    There's nothing in GAAP that says that the    1:16PM decision -- the determination on whether to suspend or expense a well cost is based on, quote, success because the term "success" is not defined in GAAP and is not used in the guidance, except, as I say, it's used in the label of successful efforts accounting.    1:16PM

THE VIDEOGRAPHER:  Turn to Paragraph -- I'm sorry, go ahead.

A    I was going to say if you want I can explain what the term "successful efforts accounting" is used because it, too, is often misunderstood.  But I don't    1:16PM want to suggest what your question should be, it's your deposition, sir.  Go ahead, please.

Q    Turn to Paragraph 20 of your report.

A    Paragraph 20.  I apologize, in which exhibit or tab is my report?    1:17PM

Q    Your report is in Exhibit 548, it's Tab 1.

A    I see it, thank you.  Which paragraph did you want?

Q    It's on Page 9.

A    Page 9.  What paragraph?    1:17PM

Page 156

Q    Paragraph 20.    1:17PM

A    Okay.  Thank you.

Q    Sure.  If you look at the end of Paragraph 20 on Page 9, it begins, "Accordingly."

Do you see that?    1:17PM

A    I see it, yes.

Q    Then on the next page there is a sentence that begins, "Costs of drilling."

Do you see that?

A    Yes.    1:18PM

Q    It reads, "Costs of drilling the Shen 3 appraisal well were initially suspended in Q4 2014 pending further appraisal of the Shenandoah Project."  Right?

A    Yes.    1:18PM

Q    And you cite to Exhibit 490 and two other Bates-stamped documents for that proposition; correct?

A    Yes.

Q    Why did you use the word "initially"?    1:18PM

A    I'm sorry, I know you just showed me where it said that, I'm having trouble -- oh, I see, the last sentence in that paragraph.

At the conclusion of Q4 2014, Anadarko would have to determine how to account for those    1:18PM

Page 157

40 (Pages 154 - 157)

CONFIDENTIAL

costs associated with Shen 3. And so its initial 1:19PM determination was to suspend those costs.

Q   Its determination was to suspend those costs; right?  Why was that an initial determination? 1:19PM

A   I just said it initially suspended the costs pending further appraisal.

Q   Did Anadarko reverse its suspension decision because in 2014, Shen 3 was unsuccessful under ASC 932-360-25-18? 1:19PM

A   Now we can have fun.

First of all, although I refer to 932-360-25-18 in my report multiple times, it's actually not guidance that's used to determine subsequent measurement of an initially suspended 1:20PM well cost.  It really goes to 932-360-35-18.

So if you ask me more questions, I'll be glad to give you more of my opinions about how to properly read 932-360.

Q   Did Anadarko reverse its decision to 1:20PM suspect the costs of Shen 3?

A   I guess the reason I was not responding to that is there is not a reversal of a decision in the way that accounting works.  You make a determination and each quarter you update the accounting based on 1:20PM

Page 158

the information that you gather after the previous 1:20PM accounting period.

So it's not a reversal, at least accountants wouldn't use the term "reversal" for that.  We would just say that we accounted for it in 1:21PM this following way in a subsequent period based on new information.

Q   Did Anadarko update the accounting for Shen 3 costs based on the information that they gathered after the previous accounting period for 1:21PM every quarter after Q4 2014?

A   My understanding is that each quarter they reviewed the information they had and made a determination on whether to retain -- or whether to continue to suspend the costs for Shen 3 or not. 1:21PM And --

Q   Sorry, go ahead.

A   Sorry, I was going to say and my understanding is in the third quarter of 2016, they decided to expense the well. 1:21PM

Q   What is your understanding that Anadarko evaluated whether to suspend the costs for Shen 3 every quarter after Q4 2014?

A   My recollection is that each quarter, there was a meeting involving Anadarko's accounting 1:22PM

Page 159

personnel and others where they reviewed suspended -- 1:22PM all of the wells that had suspended costs and determined whether to continue them as suspended costs or to expense them.

Q   And what is that based on, that 1:22PM understanding?

A   I don't remember the Bates number, but there is a number of documents that -- the document that they had that meeting every quarter and what they determined. 1:22PM

There's actually two documents, there's one on the suspended well costs and there's another document on the nonproducing leaseholds.

Q   I'll show you what has been previously marked as Exhibit 339, Tab 8. 1:23PM

A   Okay.

Q   Would you look at that?

A   Okay, I have it up.

Q   Did you rely on this document?

A   I'm well aware of this document, but this 1:23PM document played no role in my accounting opinions.

Q   It's fair to say you did not rely on it; right?

A   Yes.  Yes, I think that's fair to say.

Q   It's also fair to say you did consider it; 1:24PM

Page 160

correct? 1:24PM

A   Yes.

Q   If you didn't rely on it, you didn't list it; correct?

A   I don't recall.  I'm guessing I would have 1:24PM listed this one because it's a very prominent document in the accounting for suspended well costs.

But I don't know whether it's listed on my documents relied upon or not.

Q   Well, let's take a look. 1:24PM

A   I'm guessing it is because I think I referred to it in my report and commented on it and footnoted it.

Q   Let's take a look at your Appendix A.

A   Okay. 1:24PM

Q   Under "Deposition Exhibits," you see Exhibit 339?

A   I'm sorry, I did not understand what your instruction was.  Can you say it again, please?

Q   Are you on Appendix A of your report? 1:25PM

A   I am.

Q   There is a list of deposition exhibits; correct?

A   Yes.

Q   Those are deposition exhibits that you 1:25PM

Page 161

41 (Pages 158 - 161)

relied on; right?    1:25PM

A    Yes.

Q    Is 339 listed there?

A    I don't see it, no.  But this also has a Bates number --    1:25PM

Q    We'll get there.

Do you see a list of produced documents?

A    Yes.

Q    There's Bates numbers for a number of documents; right?    1:25PM

A    Yes.

Q    And the beginning Bates number of this document is APC-00718257; correct?

A    This particular document, but this may have been produced more than once with different Bates    1:25PM numbers.  I don't know that.

Q    Okay.  Does this document appear in your documents relied on and were produced document?

A    It does not appear to be, no.

Q    So it's fair to say that this particular    1:26PM document, Exhibit 339, you did not rely on; correct?

A    Again, this particular documents with this Bates stamp is not listed, but that doesn't mean that I didn't rely on it.

Q    Did you rely on Exhibit 339 or --    1:26PM

A    Well, I am quite familiar with this    1:26PM document.

Q    So it's fair to say you at least considered this document that's Exhibit 339; correct?    1:27PM

A    Yes.

Q    But you may not have listed this document or an identical document under your list of documents considered; right, I mean documents relied upon?    1:27PM

A    I would have expected to have this document under some Bates number on my list of documents even though I did not rely on it for the accounting because I think that Mr. Regan did.  I think I would have commented on it in my report about his use of this    1:27PM document.

But again, I don't recall specifically either his reference to this document or my analysis of his opinion if it did refer to this document.

Q    Turn to the page ending 63, please, of    1:28PM Plaintiffs' Exhibit 339.

A    Okay.

Q    Turn to Page -- sorry, if you turn to the next page, 264.

A    264, okay.    1:28PM

Q    And you understand that this is a    1:28PM November 10th, 2016 Shenandoah 3 suspended well accounting analysis memo; correct?

A    Yes.

Q    If you turn to the page ending 266.    1:28PM

A    Yes.

Q    In the first full paragraph beginning at the seventh line begins "However, we do believe."

Do you see that?

A    Yes, last word on the line above, "However,    1:29PM we do believe," yes, I see that.

Q    It reads, "However, we do believe that given the well was unsuccessful under ASC 932-360-25-18, it is appropriate to reconsider whether it is reasonably possible that the wellbore    1:29PM has future utility in the development phase."  Right?

A    Yes.

Q    That was a conclusion of Anadarko's accounting people; correct?    1:29PM

A    Apparently, yes.

Q    They used the word "unsuccessful"; correct?

A    Yes.

Q    Was that erroneous for them to use that    1:29PM

word?    1:29PM

A    It's irrelevant as a matter of accounting how they characterize the well as successful or unsuccessful.  So --

Q    Sorry, go ahead.    1:29PM

A    So I have no opinion about whether the well is successful or unsuccessful.  They reached different conclusions at different points in time with respect to whether Shen 3 was successful or not.

Q    Okay.  They concluded as of November 2016    1:30PM that Shen 3 was unsuccessful.

You'd agree with me there; right?

A    I agree that this memorandum says that.  I also note that the memorandum was written in November 2016 and so I don't know what the view was on    1:30PM December 31st, 2014 about the, quote, success of Shen 3 except to note that it's not determinative of the accounting.

Q    So when the accounting folks at Anadarko wrote, we do believe that given the well was    1:30PM unsuccessful under GAAP, ASC 932-360-25-18, it's appropriate to consider whether it is reasonably possible that the wellbore has future utility in the development phase, they were citing to an irrelevant criteria; correct?    1:31PM

42 (Pages 162 - 165)

CONFIDENTIAL

A   In my opinion they were.   1:31PM

Q   Look at the --

A   To be clear, let me say, how Anadarko makes internal decisions within the range of GAAP is up to them. I don't know how they do that and I did not   1:31PM offer opinions about that. My opinions have to do with whether Anadarko's accounting conforms with GAAP.

Q   Let's take a look at the same page four lines from the top.

Do you see the sentence that begins, "The   1:32PM Shenandoah 3 well was drilled"?

A   Three lines from the top. Yes, I see that.

Q   It reads, "The Shenandoah 3 well was drilled as an exploratory stratigraphic test well."

A   Yes.   1:32PM

Q   "It was not drilled with the original intention of use as a water injection well. Therefore" --

A   Yes.

Q   Let me just finish.   1:32PM

"Therefore, it is not considered a development cost that should be capitalized, whether the well is successful or unsuccessful, under" ASC 932-360-2014.

Did I read that correctly?   1:32PM

Page 166

A   No. It's 932-360-25-14.   1:32PM

Q   Thank you for the correction.

Otherwise did I --

A   By the way, Dan, only accountants talk like this every day and do it without error. So you're   1:32PM doing great.

Q   I appreciate the kudos.

Do you agree with Anadarko's conclusion that Shen 3 suspended costs were not capitalizable development costs as of December 31, 2014 as a water   1:33PM injection well?

A   I didn't form an opinion about that.

Q   You don't have an opinion one way or the other; is that accurate?

A   That's correct.   1:33PM

Q   Were you asked to form an opinion on that issue?

A   No.

Q   That was not part of your assignment; correct?   1:33PM

A   I don't believe so.

Q   According to Anadarko's 2016 accounting analysis memo, Shen 3 exploratory suspended well costs were not capitalizable under ASC 932-360-25-14 as a development cost; right?   1:33PM

Page 167

A   That's their conclusion, yes.   1:34PM

Q   And according to Anadarko's 2016 accounting analysis memo, Shen 3 exploratory suspended well costs were not capitalizable under ASC 932-360-25-18 as an exploratory cost; correct?   1:34PM

A   That's what the memorandum says, yes.

Q   Absent these bases, what provisions of authoritative GAAP would permit Anadarko's continued capitalization of Shen 3 well costs under the successful method of accounting prior to Q3 2016?   1:34PM

A   First, I note that 932-360-25-18 has to do with initial recognition of well costs. That would be applicable in 2014 originally.

Subsequently, if you concluded that it was -- it would be a suspended cost, you then look   1:35PM to, by December 31st, 2014, whether or not that suspended cost continues and that's under 932-360-35-18, which has different language.

Q   So in answer to my question, absent these bases that we've just talked about, what provisions   1:35PM of authoritative GAAP would permit Anadarko's continued capitalization of Shen 3 well costs under the successful method of accounting prior to Q3 2016?

A   It's 932-360-35-18. And there's more than   1:35PM

Page 168

that, but that's the specific one that I think would   1:35PM reach -- that would allow a person to reach a different conclusion.

Q   You understand that Anadarko wrote off Shen 3 in Q3 2016; right?   1:36PM

A   Yes.

Q   And the write-off on that was approximately $64 million; right?

A   Somewhere in that range, yes.

Q   Did Anadarko disclose its write-off of the   1:36PM Shenandoah well during Q3 2016?

A   I don't recall specifically. We can look at their queue and see what it said, but I don't recall specifically what it said.

Q   You don't know one way or the other   1:36PM whether Anadarko disclosed its write-off of the Shenandoah well during Q3 2016; correct?

A   Not sitting here today, no.

Q   If Anadarko's management did not think the Shen 3 write-off was material, they were not   1:36PM required to disclose the Shen 3 write-off; right?

A   Again, I haven't looked at what their requirements for disclosure were specifically, but I think that's correct.

Q   Let me ask you a hypothetical question.   1:37PM

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL

Assume you have two companies that each 1:37PM hold a 50 percent interest in a material joint venture investment accounted for under GAAP.

Further assume that because of some event, the entire value of the joint venture investment was 1:37PM required to be reduced to zero under GAAP. Also assume that the loss was material to both companies.

If one of the two companies properly recognizes and discloses the loss of its investment, would that excuse the other company's failure to 1:37PM properly record and disclose the same loss under GAAP?

A   One of your assumptions was that the value of the investment went to zero. And the question is, is that a known fact or is that a judgment call by 1:37PM that management?

Q   Let's take both of those scenarios, let's assume it's a known fact.

A   Okay so.

Q   So can you answer my question? 1:38PM

A   If it's a known fact and a third party says, I'm holding your asset and by the way, it's now worth zero and so you're not going to recover anything, then both parties would have the same facts and circumstances, there would be no level of judgment 1:38PM

Page 170

coming into that except for materiality and you've 1:38PM already assumed that the amounts are material.

So the answer is they would both get to the same accounting result almost certainly. However, if it turned out that they had different 1:38PM opinions about what happened to that investment, they could then reasonably reach different accounting conclusions about the write-off or not write-off of the asset.

Q   Let's assume that both of the entities 1:39PM reached the same opinion that the value -- entire value of the joint venture investment was to be required to be reduced to zero under GAAP.

If one of the two companies properly recognizes and discloses the loss of its investment, 1:39PM would that excuse the other company's failure to properly record and disclose the same loss under GAAP?

A   Again, we're talking about a disclosure item here, I think, not the accounting item. 1:39PM

And we're presuming that GAAP or this disclosure requirement requires a certain kind of disclosure or certain kind of actions.

In other words, I'm having trouble with your hypothetical because anything can happen that 1:39PM

Page 171

may affect the final accounting determination. 1:39PM Without knowing all the facts and circumstances, I can't offer an opinion.

Q   Okay. So you offered an opinion if a third party had determined that the total value of 1:40PM the joint investment declined to zero, didn't you?

A   Yes.

Q   But you can't offer an opinion if both of the companies conclude that the entire value of the investment declined to zero dollars? 1:40PM

A   Well, again, on what basis did they reach a conclusion? How firm are they in that opinion? Is the amount material to them?

There's just a lot of issues that would have to be -- that I would have to have clear in my 1:40PM mind. It may be that if I had time to study your hypothetical, I could form an opinion, but I can't do it here in realtime.

Q   Well, it seems like you're dodging and weaving because I've already told you that the 1:40PM amounts were material; right?

A   Yes.

Q   So that's not --

A   Now, can you also cite GAAP that says what GAAP requires them do under the facts and 1:41PM

Page 172

circumstances as you presented them? Because I 1:41PM haven't gone back and done my review of GAAP to see what it requires under the fact and circumstances and that's what you're asking me to do. So I just can't it without following my process for making an opinion. 1:41PM

Q   Well, I'm telling you that GAAP in this circumstance, in this hypothetical requires -- requires --

A   So we're going to call this Dan GAAP because I don't know whether it's GAAP. 1:41PM

Q   Sir, we made a promise at the beginning of this case that you wouldn't interrupt me. Do you remember that?

A   I'm sorry. Go ahead.

Q   Let me finish my question and then you can 1:41PM respond, okay?

A   Okay.

Q   So we've already determined that GAAP requires -- requires both companies to reduce the entire value of the joint venture investment to 1:42PM zero; right?

A   It's your hypothetical, sir, if that's what you want to assert, fine. That's not a hypothetical, is it?

You're telling me that GAAP requires 1:42PM

Page 173

44 (Pages 170 - 173)

CONFIDENTIAL

something and I don't know the basis on which to 1:42PM know that GAAP requires it. So I can't say it's U.S. GAAP. I can just say it's your characterization of some GAAP.

That's why I'm holding up. This is -- 1:42PM

Q   Okay. I understand the source of confusion.

A   This is not about U.S. GAAP.

Q   Let's talk about U.S. GAAP, okay?

A   Okay. 1:42PM

Q   So this is part of the assumption, that because of some event, the entire value of the joint venture investment was required to be reduced to zero, required to be reduced to zero under U.S. GAAP. 1:42PM

A   Okay. Can you cite the codification topic and -- that would lead to that conclusion?

Q   You don't need the codification. You can assume for the purposes of this hypothetical that U.S. GAAP requires it to be reduced to zero, can't 1:43PM you? Can you make that assumption?

A   Look, under that assumption, I can make every other assumption that you've given me that leads to the same conclusion that you've asked me to assume implicitly in reaching this answer. 1:43PM

Page 174

Q   I haven't asked you to assume a 1:43PM conclusion, sir. I've asked you to assume certain fact. It seems like you're very resistent to assume those facts because you don't want to reach the conclusion. Is that accurate, sir? 1:43PM

A   No, it's that I'm not going to form an opinion when I don't have a sufficient basis to form an opinion and that's what you're asking me to do.

Q   No, I'm not, sir. I'm asking you to make certain assumptions. 1:43PM

Let's go through each of the assumptions, I want to make sure that you're on board with the assumption. Okay?

You don't have to agree with the assumption, you just have to make it. Do you 1:44PM understand how a hypothetical question works?

A   I do.

Q   So let's start. Assume you have two companies that each hold 50 percent interest in a material joint venture investment accounted for 1:44PM under U.S. GAAP. Can you make that assumption?

A   Okay.

Q   You made that assumption?

A   Yes.

Q   Okay. Second assumption, assume that 1:44PM

Page 175

because of some event, the entire value of the joint 1:44PM venture investment was required to be reduced to zero under U.S. GAAP.

Have you made that assumption?

A   There is a judgment involved in reaching 1:44PM that conclusion. You're asking me to take it as an assumption. Okay.

Q   You're with me so far, you've assumed 1 and 2; correct?

A   Yes. I have no idea whether 2 has a basis 1:44PM in GAAP except by your assumption.

Q   But you've made that assumption; right, sir?

A   I'm willing to accept it.

Q   Okay. Assumption Number 3, assume that 1:45PM the loss was material to both companies.

Can you make that assumption?

A   Who made the determination that the loss was material? You're asserting it by assumption; right?

Q   Right. You're just making that 1:45PM assumption, okay?

A   Okay.

Q   Now you've made these three assumptions. If one of the two companies properly recognizes and discloses the loss of its investment, would that 1:45PM

Page 176

excuse the other company's failure to properly 1:45PM record and disclose the same loss under GAAP?

A   What does "properly" mean?

Q   Well, sir, if they were required by U.S. GAAP -- 1:45PM

A   So here's how I interpret your question.

Q   -- to zero the value of the joint venture, that it would be proper for that first company to recognize and disclose the loss of the investment; right? 1:46PM

A   Okay. Let me see if I can restate it just slightly.

GAAP requires a company to expense an amount. Company A properly expenses the amount because GAAP requires it. Company B does not 1:46PM properly expense an amount that GAAP requires be expensed. So their financial statements are not prepared in conformity by GAAP by your set of assumptions.

Q   That wasn't my hypothetical. 1:46PM

A   Sounded like it to me.

Q   That wasn't my question.

My question was: If one of the two companies recognizes and discloses the loss of its investment under U.S. GAAP, would that excuse the 1:46PM

Page 177

45 (Pages 174 - 177)

CONFIDENTIAL

other company's failure to record and disclose the same loss under U.S. GAAP?

A   See, the confusion for me in part is I don't give a damn what company A does. If GAAP requires company B to expense an item, GAAP requires company B to expense the item.

So I don't know how this hypothetical is relevant for determining the accounting for company B. It makes its own determinations.

Q   If GAAP requires it, GAAP requires it; right, sir?

A   Yes.

Q   Turn to Page 42, Paragraph 94 of your report.

(Discussion off the record.)    1:47PM

THE VIDEOGRAPHER:  Going off the record at 1:47 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're on the record at 1:59 p.m. And this is the beginning of Media 4 in the deposition of Dr. J. Richard Dietrich.

BY MR. DROSMAN:

Q   Mr. Dietrich, if you could turn to Page 42, Paragraph 94 of your report. Exhibit 548 is your report.

Page 178

A   Thank you.    2:00PM

Q   If you have a hard copy of it, it may be easier to keep in front of you.

A   I've actually been trying to do it with this other system but -- I'll keep doing that, if it's okay. That way I'll look at my screen instead of looking away.

Q   Whatever method you prefer.

A   Thank you. What paragraph were you directing me to?

Q   We're on Paragraph 94. I'm looking at Page 42 of your report. I know that 94 begins on Page 41, but we're going to look at the portion of the report --

A   Okay.    2:00PM

Q   So do you see the sentence -- I think it's the last sentence of Paragraph 94 that begins, "In addition, Chris Camden."

Do you see that?

A   Yes.    2:01PM

Q   And you wrote, "In addition, Chris Camden (GoM Exploration Engineer) testified that appraisal programs are 'designed to eventually find out where the reservoir isn't' and that Shen 3 was always considered a successful appraisal well, despite not

Page 179

finding oil, because of the information it provided helped Anadarko define 'where the reservoir isn't as much as where it is' and gave Anadarko 'more clarity on the numbers that we should be working with [i.e., the estimated quantities of recoverable resources in the field]."

Do you see that?

A   Yes.

Q   And you cited the portion where Mr. Camden believed that Shen 3 was always a successful appraisal well; right?

A   I quoted that, yes.

Q   The portion about "always considered a successful appraisal well" isn't in quotes; right?

A   Yes, it's not. I don't know exactly why. You know, I would have to go back and look at his deposition testimony and see if that was just paraphrasing what he said.

Q   Why is that relevant?

A   It's not.    2:02PM

Q   Why did you write it then?

A   Again, in -- parts of my report are simply trying to explain what I understand about facts and circumstances before I apply accounting analysis to them.

Page 180

Q   But you told me that this was -- that this considering Shen 3 to be a successful appraisal well is an irrelevant fact; right?

A   Correct. Now --

Q   Did you conclude --    2:03PM

A   I'm sorry, let me be clear. When I was developing my report, I had not made determinations yet on the accounting. And so I didn't know when I was writing parts of the report what may or may not be important in making an accounting determinations.

So what you're seeing here is the work product by which I came to understand the facts and circumstances that were applicable to my accounting judgments on Anadarko's accounting for its -- its wells.

Q   Before submitting your report, why didn't you go back and edit out the irrelevant portions of your report?

A   I just didn't.

Q   So some portions of this report just include irrelevant facts; is that right?

A   Well, they may or may not be relevant to readers of my report as, again, I've testified to today, there's lots of discussion that I have seen in the record about successful or unsuccessful views to

Page 181

46 (Pages 178 - 181)

CONFIDENTIAL

describe the success of a well.                    2:04PM

And as a matter of accounting, the word "successful" or "unsuccessful" is not used in 932-360.

Q   Paragraph 95 -- by the way, is Chris    2:05PM Camden an accountant at Anadarko?

A   I don't believe so.

Q   Is he a financial reporting person at Anadarko?

A   I don't believe so.                    2:05PM

Q   Does that matter?

A   Well, it matters for knowing what the facts and circumstances are about which he does have knowledge.

But as far as the accounting               2:05PM determinations, it does not.

Q   Then go ahead and take a look at your Paragraph 95.

You write, "As a result, in my opinion, Anadarko's decision to suspend the Shen 3 well costs   2:05PM as of December 31, 2014 was reasonable and consistent with GAAP (specifically ASC 932-360), because the information from the Shen 3 appraisal well enabled Anadarko to both better estimate the size of the Shenandoah reservoir and reduce the   2:06PM

Page 182

uncertainty of the quantity of recoverable     2:06PM resources."

A   Uh-huh.

Q   That's what you wrote; correct?

A   Yes.                                   2:06PM

Q   That's your opinion; correct?

A   My opinion is with respect to Anadarko's decision, yes.

Q   You cite to two reasons why Anadarko's decision was reasonable and consistent with GAAP;   2:06PM correct?

A   I believe that that's a basis on which Anadarko made its accounting determination, yes.

Q   Were those proper bases?

A   As I explain in my report, there's judgment   2:06PM involved in accounting for certain items.  And here there's judgments on whether Anadarko can -- whether it can suspend drilling costs on Shen 3 and it can do so if it chooses to do so and is not required to do so if it chooses not to do so.  They have discretion here   2:07PM in my opinion.

So what I'm trying to say here is what my understanding is that supports Anadarko's decision to suspend Shen 3 well costs, not that they are required to suspend Shen 3 well costs based on this.   2:07PM

Page 183

Q   My question, sir, is much simpler.  I'm    2:07PM not sure if you understood it.

My question is:  When you wrote, "because the information from the Shen 3 appraisal well enabled Anadarko to both better estimate the size of   2:07PM the Shenandoah reservoir and reduce the uncertainty of the quantity of recoverable resources," were those proper bases upon which to base a decision?

A   I'm not saying they are proper or improper.  I'm saying I infer from Anadarko's decision that those   2:08PM were the bases on which they drew that conclusion.

Q   Did you examine those bases to determine whether Anadarko had a basis to suspend the Shen 3 well costs as of December 31, 2014?

A   I have an opinion that's based on my reading   2:08PM of GAAP on whether Anadarko could suspend Shen 3 well costs and that's the basis for my opinion about the accounting that was acceptable under GAAP for Anadarko with respect to Shen 3.

Q   Does your opinion that Anadarko could       2:09PM suspend the well costs for Shen 3 as of December 31, 2014 take into account whether Anadarko -- Shen 3 enabled Anadarko to better estimate the size of the Shenandoah reservoir?

A   No.                                     2:09PM

Page 184

Q   Is your opinion that Shen 3 could suspend   2:09PM the well costs for Shenandoah 3 as of December 31, 2014 take into account whether Shen 3 reduced the uncertainty of the quantity of recoverable resources?                                      2:09PM

A   That did not affect my judgment and my determination of Shen 3 -- of the accounting for Shen 3.

Q   What is the basis for your determination that as of December 31, 2014, Anadarko could suspend   2:09PM the Shen 3 well costs?

A   Again, there are several portions of 932-360 that are relevant here.  But I'll mention one in particular and that's 932-360-35-18 that says, I believe in that paragraph specifically, if there are   2:10PM multiple appraisal wells that are drilled, that they can be considered as a group when making a determination about -- pending the determination of whether proved reserves are found.

So it's 35-18, not 25-18 that Mr. Regan      2:10PM points to.

Q   So I guess my question is:  What is the factual basis for your determination that as of December 31, 2014, Anadarko could suspend the Shen 3 well costs?                                     2:11PM

Page 185

47 (Pages 182 - 185)

CONFIDENTIAL

A    Well, Shen 1 discovered oil and GAAP says   2:11PM
that once you discover oil, you can suspend additional
drilling costs pending a determination of whether
proved reserves are found.

At December 31st, 2014, Anadarko had not   2:11PM
reached a conclusion about whether proved reserves
were found, so it was left in a position of saying
that GAAP provides that drilling costs can continue
to be suspended.

Q    Any other factual basis for your   2:11PM
determination that as of December 31, 2014, Anadarko
could suspend the Shenandoah 3 well costs?

A    There's additional considerations that would
be considered potentially like are you continuing to
make progress in the well.  So sufficient progress   2:12PM
conditions, things like that.  We can go into if you
would like to.

Q    No, I'm just asking you to provide me with
all of the factual bases for your determination that
Shen 3 could suspend the well costs -- that Anadarko   2:12PM
could suspend the Shen 3 well costs as of
December 31, 2014.

And you told me about sufficient progress
being made and about multiple appraisal wells that
are drilled with the discovery of oil in at least   2:12PM

Page 186

one of them.   2:12PM

Any others?

A    Let me refer back to my report for a minute
so I can be clear on this.

So I'm looking at Paragraph 90, if you   2:13PM
want to follow along as well.

Q    I'm asking a question, sir.

A    Hang on, I'll answer your question.  I want
you to know what I'm looking at to assist me in
answering.   2:13PM

So I mentioned the sufficient quantity
criterion.  And then --

Q    Do you mean the sufficient progress
criteria?

A    There's two, sufficient progress and a   2:13PM
sufficient quantity criteria.

Q    Okay.  So those are the two criteria
you've mentioned so far.

Any other factual bases that you took into
account when determining Anadarko could suspend   2:13PM
Shen 3 well costs as of December 31, 2014?

A    There's one other criterion that is
mentioned at I think in 35-13, 14, somewhere in there,
which, you know, I can search through my document and
find it.  But what I'm telling you is that there are   2:14PM

Page 187

three that come to mind.   2:14PM

Q    Please list them for me.

A    Pardon me?

Q    Please list them for me.

A    Bear with me.   2:14PM

Q    I'm not asking you about your report.

A    I'm trying to use my report.

MS. PHILLIPS:  He's trying to answer your
question.  Can you just let him respond, please.

MR. DROSMAN:  Yes.   2:14PM

MS. PHILLIPS:  Thank you.

BY MR. DROSMAN:

Q    I'm just asking you what the factual basis
is for your determination that Anadarko could
suspend the Shen 3 well costs as of December 31,   2:15PM
2014.  I just want to know that information.  If you
need to look at your report to find that
information, be my guest.

A    Okay.  I'm trying to understand -- I'm
trying to understand the term the facts -- the   2:15PM
"factual basis."  I think that's what you asked me;
right?

Q    Yes.  So my understanding, sir, is that
you take accounting rulings and you apply those to
the facts to make a determination on the accounting;   2:15PM

Page 188

right?  You can't apply the accounting rules if you   2:15PM
don't have any facts; right?

A    Yes, that's what -- so what I'm trying to
figure out is do you want me to explain where in
accounting it says what to do or what the facts are on   2:15PM
which I'm basing my determination?

So the facts are these:  They have drilled
Shen 1, they found the oil.

They are continuing to make progress in
their drilling.  The amount of oil that they found   2:16PM
in Shen 1 is significant, it's not a dry hole.

They are continuing with their appraisal
program.  They drilled Shen 3.  It cost them 60-some
million dollars and that, under 932-360, constitutes
the basis for determining that that can be a   2:16PM
suspended well cost.

So that's the factual basis.

Q    Any other factual basis for your
determination that Anadarko could suspend the Shen 3
well costs as of December 31, 2014?   2:16PM

A    Not that I recall now.

MR. DROSMAN:  Why don't we take a break?

VIDEOGRAPHER:  We're going off the record
at 2:17 p.m.

(Recess taken.)   2:17PM

Page 189

48 (Pages 186 - 189)

CONFIDENTIAL

THE VIDEOGRAPHER: We're on the record at 2:29PM 2:29 p.m. This is the beginning of Media 5 in the deposition of Dr. J. Richard Dietrich.

MR. DROSMAN: I'm going to show you what we'll mark as Plaintiffs' Exhibit 551 for 2:29PM identification. This is Tab 32.

(Whereupon, Exhibit 551 was marked for identification.)

BY MR. DROSMAN:

Q   Let me know when you have it before you.   2:30PM

A   I just refreshed. What tab number was it again, please?

Q   Tab 32.

A   I'm not seeing a Tab 32.

Q   Maybe you can look for Exhibit 551.   2:30PM

A   Oh, yes, I see it. Sorry. Thank you.

Q   Sure. You know what this is; right?

A   Yes.

Q   This would be 932-360-25 and 932-360-35; right?   2:30PM

A   Yes.

Q   And you mentioned to me that your determination that Anadarko could suspend Shen 3 well costs as of December 31, 2014 was based on your reading of 932-360-35-18; correct?   2:31PM

Page 190

A   Well, there's several parts of it. The 2:31PM first one that I will refer you to is 932-360-25-9.

And if you look at D and E in that paragraph, you see D, "Costs of drilling and equipping exploratory wells," and then E, "Costs of 2:31PM drilling exploratory-type stratigraphic test wells."

And the instruction at the beginning of that paragraph is "All of the following are principal types of exploration costs, which include depreciation and applicable operating costs of 2:32PM support equipment and facilities and other costs of exploration activities."

So this paragraph sets out that D and E are exploratory costs.

If you look at E, you'll see why there's 2:32PM confusion about how to interpret 25-18 in particular. It says, "While the costs of drilling stratigraphic test wells are sometimes considered to be a geological and geophysical costs, they are accounted for separately under this subtopic for 2:32PM reasons explained in 25-17 through 25-18."

So that's explaining what the purposes of 25-17 and 25-18 are.

It was explaining why and there is a long story that goes behind that that I find interesting 2:32PM

Page 191

but almost nobody else does. I will be glad to 2:32PM explain it if you like.

So when we then go down to the next paragraph, 932-360-25-10, "The costs of drilling exploratory wells and the cost of drilling 2:33PM exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment and facilities pending determination of whether the well has found proved reserves." 2:33PM

Now, that language where it says "the well" and it also says "wells" is internally inconsistent. So somebody has to make a judgment about whether it says, the well has found proved reserves. 2:33PM

Here's why a reasonable interpretation would not say that a well individually must find proved reserves. That's because when Shen 1 was drilled, it found reserves, but it did not find proved reserves. 2:33PM

So if you believe "the well" means the individual well, and we'll talk more about this later, then you would say that every well that's drilled in deepwater that does not individually identify proved reserves would have to be expensed. 2:34PM

Page 192

That is not a reasonable interpretation of 25-10 in 2:34PM my opinion.

Q   Why --

A   Now -- I'm sorry, go ahead.

Q   Let me stop you there.   2:34PM

Why is that not a reasonable interpretation that every well that did not find proved reserves should be expensed?

A   Well, let me go on and explain why below. Because, again, this is the initial recognition 2:34PM section. So what we need to do now is look at 932-360-35.

Q   Before we get there --

A   I'm sorry.

MS. PHILLIPS: Dan, he's not done 2:34PM responding to your question. If you could let him finish.

THE WITNESS: That's okay.

BY MR. DROSMAN:

Q   I want to make sure we are on the same 2:34PM page. And maybe you're right.

Can you just tell me before you go to another provision, you said that it would not be a reasonable opinion that each well that did not find proved reserves should be expensed. I'm just asking 2:35PM

Page 193

49 (Pages 190 - 193)

CONFIDENTIAL

you why?　　2:35PM

A　If that were the case, every well that's drilled in an appraisal setting would result in expensing of all of them and that would be consistent with those costs being deemed G&G costs which are　2:35PM expensed as described somewhere here in what I just read.

But I apologize, this is going to take us back to the history.

When FAS 19 was written, G&G costs were　2:35PM always expensed and there was a proposal to expense all stratigraphic test wells.

And before final adoption, the board determined that stratigraphic test wells would be suspended and not expensed immediately.　2:36PM

So that's what Paragraph 25-17 and 25-18 are trying to explain.  In FAS 19, they were in the basis for conclusions I believe as Paragraphs 200 and 201.

They were brought into the codification　2:36PM when it was created to help the reader understand what stratigraphic test wells were because they would no longer refer to the basis for conclusions in FAS 19.

To be clear, FAS 19 basis for conclusions　2:36PM

Page 194

were never GAAP, but they were sometimes used by　2:36PM readers to help understand what the then standard was saying.

Q　Okay.  So --

A　Sorry, I just gave you a whole lot.  You　2:36PM just got five minutes of lecture in class, Dan.

Q　I just want to back up for a moment and ask you: Can you tell me why it was that it would not be a reasonable opinion that each well that did not find proved reserves to be expensed?　2:37PM

And you told me that that would require expenses all appraisal wells that were drilled.

A　Yes.

Q　And my question to you --

A　And Shen 1, that would be expensed too,　2:37PM because it didn't find proved reserves.

Q　Okay.

A　So every --

Q　No proved reserves in Shen 1; is that right?　　2:37PM

A　I'm sorry?

Q　No proved reserves in Shen 1?

A　That's correct, it found oil but it didn't find proved reserves.  If it would have found proved reserves, then you do an FID on it at that moment and　2:37PM

Page 195

we'd be done, everything else would be a development　2:37PM cost.

Q　932-360-35-18 speaks to wells that found oil but not did find proved reserves; right?

A　It speaks to the subsequent measurement of　2:38PM wells that have suspended costs.  And here's -- there are several places in here, but I'll refer to 932-360-35-18 because this one causes substantial confusion, I think.

If you look at the last sentence, I　2:38PM believe it is, so it's one, two, three, four, five -- six lines down.  It says, "For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than　2:38PM one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single integrated producing operation."

So the idea is if you're trying to find a　2:39PM reservoir and all of the appraisal wells are trying to identify that reservoir to determine whether there's proved reserves in the reservoir, then all of those costs for purposes of determining whether capitalized drilling costs shall continue to be　2:39PM

Page 196

capitalized pending the determination of proved　2:39PM reserves, a project may include more than one exploratory well or exploratory stratigraphic test well if the resources are intended to be extracted in a single integrated production -- producing　2:39PM activity.

That's the part that singly leads to the conclusion that it is permissible to take all of the suspended well costs regardless of whether there's any oil in the wellbore regardless -- notice,　2:40PM there's nothing in here about successful or unsuccessful even though those words show up a lot in the record.  They are not the basis by which an accountant makes this determination.

So that I think -- I hope helps.　2:40PM

Let me say one other thing on this one.

This method is called successful efforts accounting, right.  And here the successful effort means finding proved reserves.  So all of the costs after the initial exploratory well that identifies　2:40PM reserves are part of the process of identifying proved reserves.

If you do that successfully, all of the costs are now classified as a long-lived asset and depreciated.　　2:41PM

Page 197

50 (Pages 194 - 197)

CONFIDENTIAL

And if you don't find proved reserves, they are all expensed. That was the underlying rationale for the successful efforts method.

Q   Let's take a look at 932-360-35-18. You read some sentences at the end of that. Do you recall that?

A   Yes.

Q   Let's look at the first sentence for 932-360-35-18. "An exploratory well or an exploratory-type stratigraphic well may be determined to have found oil and gas reserves but those reserves cannot be classified as proved when drilling is completed."

Do you see that?

A   Yes.

Q   So did Shen 1 find reserves?

A   Yes.

Q   Did Shen 3 find reserves?

A   Not separately, no.

Q   Then it continues, "In those cases."

Do you see that?

A   Yes.

Q   So in the case that an exploratory well or exploratory-type stratigraphic well found oil or gas reserves; right?

Page 198

A   Yes.

Q   Then "the capitalized drilling costs shall continue to be capitalized if the well has found a sufficient quantity of reserves to justify its completion as a producing well."

Do you see that?

A   Yes.

Q   Did Shen 3 find a sufficient quantity of reserves to justify its completion as a producing well?

A   Not by itself, no.

Q   Did Shen 1?

A   I don't know the answer to that.

Q   What did you do to find that out?

A   I did not opine on the accounting for Shen 1.

Q   You told me that Shen 1 was the reason -- the oil reserves in Shen 1 was the reason that Shen 3 was permissible to capitalize; right?

A   Yes.

Q   So what did you do to find out whether Shen 1 had found a sufficient quantity of reserves to justify its completion as a producing well?

A   Again, you're not understanding it the way I understand it. Because in my evaluation of Shen 3,

Page 199

I'm not offering an opinion about Shen 1, although I think anyone and everyone would agree that Shen 1 was properly suspended who's an accounting expert.

There's never been a question about that and I didn't offer an opinion about that.

But Shen 1 did not find proved reserves, but it met the criterion here that I've described in the last sentence that said when you're evaluating the wells, you can evaluate them not individually but you can evaluate them in combination if they are intended to be extracted in a single integrated production operation.

So what that says is it does not matter whether there's oil in a particular wellbore in an appraisal well.

Q   Okay. I think I understood that.

What I'm asking is we're talking about whether Shen 1 justified the continued capitalization of Shen 3 well costs; right? That's what I'm asking you about.

So as part of that question, I'm asking you -- it says in those cases where oil and gas was found but not proved reserves, the capitalized drilling costs shall continue to be capitalized if -- you see the word "if" -- if the well has found

Page 200

a sufficient quantity of reserves to justify its completion as a producing well.

I'm asking: What did you do to determine whether Shen 1 found a sufficient quantity of reserves to justify its completion as a producing well?

A   Well, I did several things. One, and I apologize, I don't remember the document number. But as the appraisal wells were drilled, Anadarko revised its estimates of reserves in the reservoir and we can see over time what those reserves were.

I did not specifically see the analysis, but I performed my own analysis that said based on that much oil in the reservoir, what would be the expected amounts that Anadarko would receiver, would that be enough to justify completion of the well.

So I did that analysis informally in my mind. I did not see it done formally.

But again, I haven't seen every document that Anadarko has. I don't know whether they performed that analysis or not, but I presume that they did and simply accepted that they had made that determination.

So I didn't have to separately independently form that determination.

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL

Q   Sir, you said you performed that analysis   2:46PM
in your head.  Did I hear that correctly?
A   Yes.
Q   Does that head performed analysis appear
anywhere in the report?   2:47PM
A   No.
Q   Okay.  Do you intend to opine on that at
trial?
A   Do I intend to, no.  If I'm asked about it,
I may.   2:47PM
Q   And you told me you don't know whether
Anadarko performed the analysis to determine whether
Shen 1 had a sufficient quantity of reserves to
justify its completion of a producing well but you
assume they did; right, sir?   2:47PM
A   Yes, for multiple reasons I determined that
that was a reasonable assumption to make and I made
the assumption.
Q   Did you ask for documents to determine
whether they existed?   2:47PM
A   No.  I wasn't focused on that.  The issue
here seems to be on Shen 3 because it did not find oil
in the wellbore and so the question is:  Can Shen 3 be
suspended even if it did not find reserves in the
wellbore?   2:48PM

Page 202

Q   Let's go back to your head-performed   2:48PM
analysis.  Tell me what that analysis consisted of,
the one you performed in your head.
A   There's two parts of it, right.  The first
part is what are the costs to complete a well.  I've   2:48PM
looked at what that is.  It appears to be relatively
less of -- a relatively lower amount than drilling the
well itself.
    My understanding is what you have to do is
to push something into the well that creates a lot   2:48PM
of openings so that the oil can flow into the well.
    There is a cost associated with that that
I understand is called completing the well.
    In addition to that, there are many other
costs in figuring out how to get the oil from the   2:49PM
well over to land.
    The way I interpret 35-18 is not
completing the well, so it's a relatively small cost
that one would incur.  Then the question is:  How
much oil is the estimate that's in the reservoir?   2:49PM
    And those estimates are changing as they
drill wells and as they refine their analysis.
    So then we look at how much oil there is
and say, okay, how much value do I estimate that
they would get.   2:49PM

Page 203

Those are things that are sometimes   2:49PM
referred to as PIRs.  And so you can look at PIRs
over time, you can look at the barrels of oil that
they've estimated over time and try to determine
what that would turn into as a dollar measure and   2:49PM
whether that would justify completion of the well.
    So that's how I did it in my head.  I
assume that Anadarko similarly did that in its
analysis that I did not see.  And I determined that
KPMG would have looked for that in its audit work   2:50PM
that I did not review.
    So I assume for multiple reasons that
there was a basis for that and I note that Mr. Regan
did not challenge any of that in his report.
    So I did not focus on that.   2:50PM
Q   Sir, I'm asking you about this analysis.
    You told me that the various factors you
would use -- let's assign some dollar amounts.  The
cost to compete the well, what was that?
A   Let's call it 10 million.   2:50PM
Q   Is that what it was?
A   They didn't complete the well.
Q   You told me that you thought about the
cost to complete the well, that was one of the
factors that you used in this head analysis?   2:50PM

Page 204

A   Yes.   2:50PM
Q   What was the cost to complete Shen 1?
A   No, no, no.  Completing the well is after
you finish the well itself.  That's already been done.
    So now if you want to make it so that you   2:51PM
can actually use it to produce oil, you have to go
through the development phase and that means that
you have to go back into the wellbore and you now
have to make perforations in the wellbore itself
that will allow oil to leak or to move into the   2:51PM
wellbore so that it can be extracted.
    That's the cost of completing a well as I
understand it.
Q   How much was that for Shen 1?
A   It was never done for Shen 1.   2:51PM
Q   I understand.  How much was that
estimated?  You told me you performed this analysis.
A   I estimated it would cost $10 million.
Q   What was that based on?
A   It was based on my reading of the cost of   2:51PM
completing wells and other materials that I was
reading.
    I was trying to understand what the next
step in the process would be once it went over to
development, not because it affected the accounting   2:52PM

Page 205

52 (Pages 202 - 205)

CONFIDENTIAL

determinations I was making directly, but it did 2:52PM have an ancillary effect as you've identified.

Q So to complete the well for development, you estimated it would cost $10 million; right?

A Yes. 2:52PM

Q You also mentioned that there are many other costs; right?

A That are unrelated to this text but were questions that Anadarko personnel would consider in determining whether they were going to make a final 2:52PM investment decision in this reservoir.

Q And you mentioned that you calculated a PIR; is that right?

A I didn't calculate a PIR, they were -- I read documents that had PIRs calculated, yes. 2:52PM

Q What was the PIR for completing Shen 1 as a development well?

A I don't believe any of the PIRs that I read were based on completing one well. They were based on the field itself. 2:53PM

Q So do you know whether there were sufficient reserves in Shen 1 to justify its completion as a producing well?

A I based my accounting conclusions on a determination there was sufficient reserves. 2:53PM

Page 206

Q Is that an assumption, sir? 2:53PM

A Yes, but it's a reasonable assumption, I believe, based on Anadarko's actual accounting, again, the accounting for its partners, all of them would have depended on that same determination and I believe 2:54PM that those determinations were made. I just didn't see the documentation directly that said, here's the analysis that demonstrates that.

MR. DROSMAN: Move to strike as nonresponsive everything after "yes." 2:54PM

Q Okay.

A You don't like my answer.

Q I had asked you, sir: Is that an assumption?

I did not ask you whether it was a 2:54PM reasonable assumption or why you made the assumption. You answered that question with the word "yes."

I didn't need any other elaboration, sir. If I want it, I'll ask for it. 2:54PM

Do you understand that?

A I'll offer it if I choose to do so and you can strike it.

Q We were talking about how 932-360-35-18 justified the decision by Anadarko to continue 2:55PM

Page 207

suspending the costs of the Shen 3 well. Is there 2:55PM anything more you wanted to tell me about that?

A Not inside 18, no, but there are several other areas. Let's see.

There is -- there's discussion earlier in 2:55PM 35 about accounting for a field as opposed to an individual well. And...

In 932-360-35-16, as specified in paragraph 932-360-25-10 that we spoke about a few minutes ago, the cost of drilling an exploratory 2:57PM well or an exploratory-type stratigraphic test well shall be capitalized as part of the entity's uncompleted wells, equipment and facilities pending the determination of whether the well has found proved reserves. 2:57PM

Again, in context here what we're talking about stratigraphic test wells, that can reasonably be interpreted to mean the group of wells as described -- as we discussed earlier in 18.

Q Is "well" plural or singular in 2:58PM 932-360-35-16?

A It's singular in the way it's written. But again, much of this was written -- if you look here in 16, it was originally written in FAS 19, which was published in 1997, or adopted in 1977 when there was 2:58PM

Page 208

as yet very little drilling going on in deepwater Gulf 2:58PM of Mexico.

So what I think was generally considered in developing this guidance was based on the then typical onshore drilling but there is language to 2:58PM indicate if there are multiple appraisal wells or stratigraphic test wells, that they are to be accounted for jointly or can be accounted for jointly if the intention is to produce the oil in an integrated fashion from that field. 2:59PM

Q You're referring for 932-360-35-18; correct?

A That's one place. There's another place here that I'm looking for where it refers to a field.

And I don't know why I'm having 2:59PM difficulty. Let me point out, the version of GAAP that you put up version I recognize it, it is not the version that I normally read. And so the brackets and the sources are not the way I normally read it. That's why I'm having a little bit of 3:00PM trouble navigating this.

Q The brackets are the sources for the specific provision; right, sir?

A Yes, this is GAAP, there is no question about it. I'm just looking at it and there is a 3:00PM

Page 209

53 (Pages 206 - 209)

CONFIDENTIAL

reference here to a field as a basis for accounting 3:00PM and I'm just having trouble finding where the word "field" appears in 35.

Q    Maybe you can look later. I would like to ask you about 932-360-35-16. 3:00PM

A    Sixteen, okay.

Q    So just so I'm clear that we're on the same page, when it says "the costs of drilling an exploratory well or an exploratory-type stratigraphic well shall be capitalized pending the 3:01PM determination of whether the well has found proved reserves," are you suggesting that the singular "well" in 932-360-35-16 should be changed to the plural "wells"?

A    Yes. Well, it can be changed to the plural 3:01PM "wells" because if you drill an individual well and cannot find proved reserved in that well, then the answer is you would expense it, if you had that interpretation.

So what I'm saying is that's not a 3:01PM reasonable interpretation on a well-by-well basis or you would never -- nothing in the Shenandoah field would have been capitalized, even if they had found proved reserves except for perhaps the last well in the field. 3:02PM

Page 210

Q    And then you cited to -- part of your 3:02PM interpretation is based on the last sentence of 932-360-35-18 that reads, "For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination 3:02PM of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single integrated producing option (for example, the producing wells will operate with 3:02PM shared infrastructure)." Right?

A    Yes.

Q    Was Shenandoah 3 part of a -- intended to be extracted in a single integrated producing operation? 3:03PM

A    Well, the reserves that it's describing here are the oil in the reservoir that they find from their exploratory activities.

Based on the oil in the reservoir, they intend to extract that in a single integrated 3:03PM producing operation.

So therefore, that reservoir or reservoirs in the field would meet the qualifications as described in that sentence in my opinion.

Q    Can you describe the single integrated 3:03PM

Page 211

producing operation that all the Shen wells were 3:03PM intended to be extracted under?

A    The focus here should be on the resources, not on the wells for determining the last part of the sentence. So if the resources are intended to be 3:04PM extracted in a single integrated producing operation, that is that in the case of Shenandoah, if they had made a final investment decision, development would come in, they would determine where they wanted to drill wells for production, which may be existing 3:04PM wellbores, may not be existing wellbores.

So they would determine how to extract the oil from the reservoir or reservoirs in that field.

And that is also, as I understand it, a significant decision in how to develop a field and 3:05PM withdraw the oil from the field. And it's not necessarily the case that where any of the exploration wellbores are located would be used for production.

Q    Why is the development that you just 3:05PM described a single integrated producing operation?

A    Why is it? The reason is that Anadarko had started to go through the process of determining how they were going to produce from the field.

My understanding is they turn part of it 3:05PM

Page 212

over to development for determining how to build 3:05PM producing wells and they had to make a determination of how they were going to extract the oil back to land and so they were going to use -- apparently there's two very different types of mechanisms to do 3:06PM that.

And they were going to use what I recall being referred to as a semi-submersible system. I don't know the details of how a semi-submersible system, but it was one system to withdraw the oil 3:06PM from the entire Shenandoah field.

It becomes pertinent later because Anadarko determined when they decided not to continue, it was because the cost of building that system to withdraw oil back to the mainland was very 3:06PM expensive apparently and they were trying to figure out if they could build it into other fields that they had in the area.

So that's my understanding for why it met that criterion was because clearly it's very 3:07PM expensive to build something like that and you're going to extract all the resources from the field as one integrated producing operation.

Q    What are the criteria to determine whether the reserves are intended to be extracted in a 3:07PM

Page 213

54 (Pages 210 - 213)

CONFIDENTIAL

single indicated producing operation? 3:07PM

A Well, as I said, they were trying to use the semi-submersible extraction system. I don't recall the specific words, but it was clear that they intended to withdraw all of -- to move all of the 3:07PM production coming out of Shenandoah through this integrated system.

Q Put aside Shenandoah for a moment. If I am a young accounting student and I come to you and I say, Mr. Dietrich, I see this phraseology, 3:07PM "intended to be extracted in a single integrated producing operation," how should I make that determination, sir, what should I look at, what is your response?

A You mean to understand the concept or to 3:08PM understand whether that's what Anadarko was intending to do?

Q Put aside Anadarko, this young accounting student doesn't know anything about Anadarko. He's asking you, what standard should I apply to 3:08PM determine whether something is determined to be extracted in a single integrated producing operation, what do you say?

A Well, you say, how do they intend to extract the oil and get it back to a production facility? Are 3:08PM

Page 214

they going to do that on a well-by-well basis or are 3:08PM they going to aggregate the oil from the field into one large distribution channel and send it back that way?

Q Thank you very much, Mr. Dietrich, the 3:09PM young accounting student says, but is that the only thing I should look at?

A I think that will give you a good start.

Q Anything else I should consider when I'm making this determination, Mr. Dietrich? 3:09PM

A Well, you could speak to the production engineers at the facility whose accounting you're trying to understand and find out what they are doing and what they say for how they're going to get the oil from this field to some distribution point. 3:09PM

Q Do I just ask the production engineers, is it a single integrated production operation, and if they say yes, I should apply this particular standard? Is that you how I should do it?

A You could review what you mean by a single 3:09PM integrated production method or you could look about methods to produce oil once you've finished the development process and how you move it someplace.

So that's how to do it, right, you have to understand what they mean. This is now talking 3:10PM

Page 215

about an industrial activity that you're trying to 3:10PM understand as an accountant.

Q I'm asking you for the criteria. So you told me one of the criteria is how they intend to get it from the offshore to the mainland and whether 3:10PM they intend to use the same apparatus or separate apparatuses; correct?

A That's it.

Q Is there any other criteria?

A That's what we mean by "single integrated 3:10PM production operation."

Q Let's return to 932-360-35-16. I asked you whether you were suggesting that the word "well," which appears three times in that particular provision, should be changed to "wells" plural. And 3:11PM you told me yes.

Do you remember that testimony?

A Go back to 25-10 and you'll see the word "well" -- "wells" plural and "well" singular in the same sentence, yes. 3:11PM

Q So my question about 932-360-35-16 is: Are you suggesting that well "singular" which appears three times should be changed to "wells" plural?

I'm not asking why. I'm just asking 3:11PM

Page 216

whether. Can you answer that question? 3:11PM

A I'm saying that when you're interpreting as an accountant the guidance in 932, you have to make a judgment of whether you think that in context, given the facts and circumstances, that word should be 3:11PM "wells" instead of "well."

And if you take the entirety of 932-360, I think you can reasonably conclude that you can use the interpretation as plural.

Q You would concede that 932-360-25 and 35 3:12PM is authoritative GAAP; right?

A Yes.

Q You're changing the authoritative literature for the purposes of criticizing Mr. Regan's report, aren't you, sir? 3:12PM

A No.

Q Let me ask you this: Are you aware of any other authority that agrees with your interpretation that the word "well" in 932-360-25 and 35 should be changed to the plural "wells"? 3:12PM

A As I say, in 25-10, they use the word "wells" and "well" in the same sentence. Based on that, I infer that in the writing of these words, they tended to think in singular terms because at the time that was consistent with oil and gas producing 3:13PM

Page 217

55 (Pages 214 - 217)

CONFIDENTIAL

activities.                                3:13PM

Subsequently, this notion of stratigraphic test wells or appraisal wells, which are not defined in GAAP, became more prevalent in oil and gas exploration, especially in deepwater like the Gulf   3:13PM of Mexico.

And so accountants would reasonably interpret the language that's there.  It is expected that accounting professionals will interpret the guidance -- these are not accounting rules.  This is   3:13PM guidance in generally accepted accounting principles.

Q   Are you aware --

A   So -- sorry, so it's perfectly appropriate for accountants to make those determinations as I   3:14PM described in my report that they must make judgments.

Q   Just listen closely to my question because I think you didn't quite answer it.

My question is:  Are you aware of any other person who has interpreted 932-360-25 and 35,   3:14PM have singular "well" changed to plural "wells"?  Any other person you know who's done that?

A   I know by inference others who have done it.

Q   Who else has done that, sir?

A   Well, for example, Mr. Zajac, the KPMG   3:14PM

Page 218

partner, when somebody said, you know, does it matter   3:14PM whether there's oil in the well, and he said it may or may not matter.

I inferred from that that he was reading the same GAAP that I was and making a determination   3:14PM that you could drill a well that found no oil in the wellbore itself and you could suspend those costs.

I believe that was his testimony.  So I believe that his interpretation of GAAP is consistent with my interpretation of GAAP.   3:15PM

Q   Any other testimony from Mr. Zajac that leads you to the conclusion that he also believed that 932-360-25 and 35 should alter the word "well" to make it plural "wells"?

A   I don't recall anything else in his   3:15PM testimony.

Q   Any other person besides Mr. Zajac who has interpreted 932-360-25 and 35 to change the word "well" singular to "wells" plural?

A   Again, I'm sorry, I'm not finding the   3:15PM reference.  There is a reference to something here where they are talking about the field and not a well or wells.  They are clearly aggregating to the level of the field.

And so there's other language in here that   3:16PM

Page 219

I think other accounting professionals could look to   3:16PM to reasonably conclude that when one is looking at accounting for multiple appraisal wells, that it is consistent with the guidance in GAAP to consider them collectively if the intention is to have them   3:16PM be aggregated for purposes of producing oil from the field.

Q   So I'm not asking you about 932-360-25 and what in there justifies -- you purport to justify in your interpretation.  I'm asking you whether any   3:17PM individual you're aware of shares that interpretation?

A   I'm not aware of any individual who has a different interpretation either.

Q   I didn't ask that.                      3:17PM

I asked:  Are you aware of a single person who shares the interpretation that "wells" singular should be "well" plural in 932-360-25, 35?

A   I am not directly aware of any other individual's interpretation of 932 at all.   3:17PM

Q   So I take it that you're not aware of any other person who shares your interpretation that "well" singular should be changed to "well" plural in 932-360-25 and 35; is that accurate, sir?

MS. PHILLIPS:  Asked and answered.   3:18PM

Page 220

BY MR. DROSMAN:                             3:18PM

Q   Please answer the question.

MS. PHILLIPS:  You can respond.

THE WITNESS:  I know I can.  And I already have.                                           3:18PM

BY MR. DROSMAN:

Q   Are you refusing to answer the question, sir?

A   I've answered the question, sir.

Q   You have not.  Let me ask it again.   3:18PM

So I take it that you're not aware of any other person who shares your interpretation that "well" singular should be changed to "well" plural in 932-360-25 and 35?  Is that correct or incorrect, sir?                                           3:18PM

A   Well, as I say, in 932 itself, the words singular and plural "well" or "wells" appear in the same sentence apparently with respect to exactly the same concept.  That's what 932-360-25-10 says.

Am I aware of any individual that has an   3:18PM opinion about that, no, that they are confronted with that when they read 932-360-25-10 and must make that decision.

Q   Has the interpretation that "well" singular should be changed to "wells" plural in   3:19PM

Page 221

56 (Pages 218 - 221)

CONFIDENTIAL

932-360-25 and 35 ever appeared in any publication   3:19PM
that you're aware of?

A   Not that I am aware of.

Q   Has the interpretation that "well" singular should be changed to "wells" plural in   3:19PM ASC 932-360-25 and 35 ever been used by an auditor that you're aware of?

A   Not that I am aware of, except, as I mentioned before, Mr. Zajac's testimony.

Q   He did not testify that "wells" plural was   3:20PM the correct interpretation, did he?

A   Well, one can only interpret his statement using my interpretation of GAAP in my opinion.

Q   You concluded that it was permissible for Anadarko to suspend the Shen 3 well costs as of the   3:20PM conclusion of the drilling because reserves had been found in Shen 1; is that fair?

MS. PHILLIPS:  Objection, misstates the testimony.

THE WITNESS:  Yes.   3:20PM

BY MR. DROSMAN:

Q   Under that logic, the conditions necessary to capitalize the Shen 3 well costs were satisfied before Anadarko even started drilling Shen 3; correct?   3:21PM

Page 222

A   Yes.   3:21PM

Q   And under this logic, Anadarko could have drilled ten more dry holes in a row and continued to capitalize each well if the company was making sufficient progress assessing the entire Shenandoah   3:21PM project; correct?

A   Subject to the other conditions on continued capitalization of suspended well costs, yes.

Q   And this is all because Shen 1, an unconnected well more than 2 miles away from Shen 3,   3:21PM identified some level of reserves; is that right?

A   That's partially right.  That's not the only reason.

Q   What is the other reason?

A   Well, when Shen 1 was drilled, they already   3:21PM had an estimate or information from G&G analysis that indicated what the scope of the field might be, what the -- here we go, areal extent, A-R-E-A-L, how big was the field in area.

And because they had at that time an   3:22PM understanding of the geological nature of the potential reserves, they were able to form estimates of the size of that field and estimates of the amount of oil and gas in the field.

All of those considerations would have   3:22PM

Page 223

gone into their initial understanding of what that   3:22PM field looked like that gave reason for them to then drill these appraisal wells.

MR. DROSMAN:  I'm going to show you what we'll mark as Plaintiffs' Exhibit 552 for   3:22PM identification.  It's Tab 11.

A   Okay.

Q   Let me know when the document appears on your screen.

A   It's still not coming up for me.   3:23PM

MR. DROSMAN:  Let me correct the record. This has already been marked as Plaintiffs' Exhibit 488, so it's not 552.  It's 488 and it's Tab 11.

Q   It should be on your screen shortly.   3:24PM

A   Okay, Tab 11, 488, I see it.  Okay.

3:24PM

Page 224

But, okay.  Let's   3:25PM discuss it.

Q   And I'm asking you:  Did you rely on this particular document?

A   I don't recall.

Q   It's not listed in Appendix A, is it?   3:25PM

A   I don't recall.

Q   Look at your Appendix A to your report, it's not under "Deposition Exhibits"; correct?

A   Well, again, I see it here as one Bates number.  It could appear with different Bates numbers   3:25PM in production.

So I can't say even if it doesn't appear in my list of documents relied upon that I haven't seen it or didn't rely on it.  Because I don't know all of the possible Bates numbers under which it   3:26PM might appear.

Q   So we can agree, though, that Exhibit 488 with the Bates numbers 003056 does not appear in the list of documents upon which you relied; correct?

A   That's correct.   3:26PM

Page 225

57 (Pages 222 - 225)

CONFIDENTIAL



Q   By January 2015, Anadarko understood that Shen 3 didn't find any proved reserves; right?

A   Correct.                3:29PM

Q   In fact, by January of 2015, Anadarko understood that Shen 3 didn't find probable reserves; correct?

A   I don't think I saw a document that says that, but I don't believe that they found probable   3:30PM reserves, correct.

Q   By January 2015, Anadarko understood that Shen 3 did not find possible reserves; correct?

A   Let me restate.  Anadarko learned things in Shen 3 that gave them the ability to project updated   3:30PM information about the reserves in the Shenandoah field.

    And so I don't think that that statement literally is true.

Q   You believe --             3:30PM

A   Hence -- I'm sorry, let me finish.

    It depends again on how you interpret the word "found."  So do I have to physically have the wellbore touch it or can I know that it's 100 feet away?  And if based on drilling the well, I know   3:31PM

Page 228

that 100 feet away there is a reservoir that   3:31PM contains oil, one can say that I found the oil or not.  It's a judgment decision that someone in accounting needs to make.

Q   So was oil found in Shen 3, any   3:31PM hydrocarbons at all?

A   My understanding is that they were able to identify oil-water contact that was very close in proximity to the wellbore itself.

    So, again, one has to determine whether   3:31PM that means you found oil.  The language does not say, found in the wellbore.  So you have to decide what the term "found" means as the accountant.

Q   You told me earlier that oil-water contacts have no bearing on your accounting   3:32PM determination; right?

A   I don't recall saying that, but perhaps I did.  If I did, I may or may not have misspoken.

Q   Sir, we talked about oil-water contacts and looked at a document that said that there were   3:32PM no oil-water contacts at Shen 3.  Do you recall that?

A   I think what it said is there was no oil-water contact in the wellbore itself.

Q   Okay.  So your understanding based on what   3:32PM

Page 229

58 (Pages 226 - 229)

CONFIDENTIAL

that there were oil-water contacts at Shen 3?    3:32PM

A    I think in the descriptions that I read about the results of drilling Shen 3, they said they could project oil-water contacts within close proximity to Shen 3.    3:33PM

Q    So when we read the document earlier that said you couldn't project oil-water contacts, did you just disregard that document?

A    Again --

MS. PHILLIPS:  Objection, misstates the    3:33PM document.

THE WITNESS:  I read documents that had different interpretations about the results of drilling Shen 3.

BY MR. DROSMAN:    3:33PM

Q    I'm asking you specifically whether you credited the document that we looked at earlier regarding oil-water contacts?

A    I don't remember that document at this moment.    3:33PM

MR. DROSMAN:  Why don't we take a break?

THE VIDEOGRAPHER:  We're going off the record at 3:33 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're going back on the    3:47PM

Page 230

record at 3:47 p.m.  This is the beginning of    3:47PM Media 6 in the deposition of Dr. Richard Dietrich.

BY MR. DROSMAN:

Q    Okay.  Mr. Dietrich, I'm going to show you what has already been marked as Exhibit 332 for    3:47PM identification.  It's Tab 10.

A    Okay.  Okay.

Q    Exhibit 332 is an Anadarko accounting bulletin; right?

A    Yes.    3:47PM

Q    It's entitled "Well Classification and Disposition of Suspended Well Costs"; right?

A    Yes.

Q    You didn't rely on this document in drafting your report, did you?    3:48PM

A    I did not.

Q    Did you review it in drafting your report?

A    I reviewed it.  I've read it multiple times.

Q    But because you did not rely on it, you did not include it in your Appendix A; is that    3:48PM accurate?

A    Yes.  And if you note the date on here, July 1, 2007, that predates the codification.

Q    Did you determine that it was irrelevant?

A    I found it informative on a number of issues    3:48PM

Page 231

but none having to do with my accounting decisions.    3:48PM

Q    Please turn to Page 12 of the document.  There's two sets of Bates numbers, so I'm going to use the pagination on the document itself.

A    Okay.    3:48PM

Q    You see how there is a number of different examples given, I think there's four of them?

Do you see that?

A    Yes.

Q    Okay.  Let's take a look at Example 4.    3:49PM

Do you see Example 4 there?

A    Okay.

Q    And you see that Example 4 has an image of an offshore exploratory well; right?

A    I assume that's what it is from the    3:49PM description right below the picture, yes.

Q    And the description below the image reads, "Offshore exploratory well at Site A is drilled, finding proved reserves and establishing Site C as a proved area (but not Site B)."    3:49PM

Do you see that?

A    Yes.

Q    And you would agree that both C and B are sidetracks off of A; right?

A    I believe that those are other wellbores    3:49PM

Page 232

that came out of the same wells.  So that would    3:50PM constitute a sidetrack as I understand the term, yes.

Q    It continues, "A development sidetrack well is drilled at Site C and is completed as a producing."  Correct?    3:50PM

A    Yes.

Q    And then it continues, "An offset exploratory sidetrack well is drilled at Site B.  The well is dry and is plugged.  Costs of the wells on Site B are expensed."    3:50PM

Do you see that?

A    Yes.

Q    "For well count purposes, this is considered one well with multiple presentations."  Right?    3:50PM

A    Yes.

Q    Under your analysis, because oil was found at A and C, B need not be expensed; right?

A    No.

Q    Am I incorrect?    3:51PM

A    You're incorrect.  That's not my interpretation.

Q    Why would B be expensed based on your interpretation of the BAC?

A    The first sentence says it established    3:51PM

Page 233

59 (Pages 230 - 233)

CONFIDENTIAL

Site C as a proved area but not Site B.    3:51PM

Q   How does that impact your determination?

A   Because they already have proved reserves here that they've identified at A and C but not at B.

Q   Right.    3:51PM

A   So now they are drilling in a different area and there's not already evidence of oil in that reservoir. There is no equivalent to Shen 1 here as I interpret their diagram.

Q   Why is A not equivalent to Shen 1?    3:51PM

A   Well, the way they've described it, they don't think that what they learned from A is informative about the area around C.

Q   Why do you draw that conclusion from the language?    3:52PM

A   I'm sorry, not around -- around Site C, around Site B, because it says that they established Site C as a proved area but not Site B, so Site B is not a proved area. And so for whatever reason, they don't think that what they learned from finding proved    3:52PM reserves at A is informative about Site B.

So they have not found any reserves in that area.

Q   What in 932-360-25 and 35 justifies that conclusion?    3:52PM

Page 234

A   Well, again, the question is -- I'm    3:53PM speculating on what they're intending this diagram to show. But what I believe it's intended to show is that where Site B is, that may be a different reservoir or even a different field. So it may be    3:53PM unconnected to what they've learned from A and C.

There has to be some notion that these things are connected and I don't see that here. So my interpretation is these things are not connected.

Q   Okay. Where do you derive the requirement    3:53PM that there be a notion that the -- that the wells are connected in 932-360-25 and 35?

A   Well, in exploration, my understanding is that you identify an area where you think there may be a reservoir or multiple reservoirs in a field and you    3:54PM treat them based on what you learn from your G&G activities as an exploration area.

And there's just not enough in this example to show me what they think about the area where B is that caused me to think that they    3:54PM believed all of these things are tied together as opposed to simply having a common well.

Q   I'm not sure if you understood my question.

My question is: Where do you derive the    3:54PM

Page 235

requirement that there be a notion that the wells    3:54PM are connected in 932-360-25 and 35?

A   Well, the concept of an appraisal well follows from the idea that you're trying to learn something about a reservoir. And so I think it's    3:55PM implicit in the definition of an appraisal well, or a stratigraphic test well in the language of GAAP.

Q   Where in 932-360-25 and 35 does that appear?

A   Well, the definition of a stratigraphic test    3:55PM well is in 932-360-20.

Q   What is that definition?

A   I don't have it in front of me.

Q   Why do you believe that that definition requires connectedness?    3:55PM

A   I think a stratigraphic test well is intended to learn more about an area where you're drilling for oil where you already believe, based on one well, that you have found oil as Shen 1.

Q   Look at the image again. You understand    3:56PM that that's a single reservoir; right?

A   I understand that it's depicted as a single reservoir, but the person drilling the wells wouldn't know that without additional information. And if there was additional information that would allow them    3:56PM

Page 236

to do that, then I believe they would have proved    3:56PM reserves out to B.

Q   Right. They drilled B without knowing whether they would hit proved reserves; right?

A   Correct.    3:56PM

Q   B didn't hit proved reserves; right?

A   That's their example, yes.

Q   In fact, B was a dry hole; right?

A   Yes. So the picture as drawn there that appears to be in a strata that is oil rich is not    3:57PM consistent with the facts.

If you look at the other examples further up, you can see other evidence, right, of how they make those -- how they are trying to explain the accounting.    3:57PM

Q   I'm just asking you why A would not be equivalent to Shen 1 and B would not be equivalent to Shen 3?

A   Well, first, A didn't find proved reserves, that is, Shen 1 did not find proved reserves.    3:57PM

Q   Doesn't it say Zone A is an unproved area?

A   I'm sorry, Zone A?

Q   Oh, finding proved reserves, okay.

So because A found proved reserves, it would be a stronger case, right, for capitalizing C    3:58PM

Page 237

60 (Pages 234 - 237)

or B?                                    3:58PM
    A    Again, it depends on what -- I mean, if they then said based on their understanding C was a proved area but B was not, well, what difference do they have in saying that B is not a proved area?  I just don't    3:58PM know what they are intending to convey with this diagram.
    Q    Sir, you can look at the photo or the picture, the image and it shows that A and C both hit oil and that sidetrack B hit water, right, no    3:58PM oil?
    A    To be honest, I can't tell this from looking at that diagram.
    Q    You don't see the gray-shaded oil there?
    A    I see the words "oil" higher up.  I see    3:59PM "water" lower.  I see A that to me looks like it's down in the water.
        I see C that looks like it's down know in the water, that the TDs are in the water, not in the oil but yet they say they found proved reserves.  I    3:59PM don't know how to interpret this diagram.
    Q    You understand that A went right through the oil; right?
    A    That's an interpretation in the picture that's consistent with what I'm seeing, yes.    3:59PM

Page 238

    Q    You understand that C went right through    3:59PM the oil; right?
    A    Again, I think that's what the picture shows.
    Q    But B did not go through oil, did it?    3:59PM
    A    It doesn't look like it, no.
    Q    Instead, B hit water only; correct?
    A    I think that's what the picture shows, yes.
    Q    So why wouldn't -- why does B to be expensed whereas A found proven reserves?    4:00PM
    A    Well, first of all, this is Anadarko's diagram and Anadarko's judgment about how to apply GAAP to this set of facts and circumstances.  It does not mean that that is -- that that must be the conclusion for how to account for Well B.    4:00PM
        So again, there's many assumptions that are implicit in this example that I don't understand because they are not provided.
        So they've made assumptions and said, we're going to expense the cost of Site B.  They can    4:01PM make that determination under GAAP.
    Q    They can?
    A    Sure.
    Q    Is this an erroneous conclusion?
    A    As I think I've stated clearly in my report,    4:01PM

Page 239

there is an area of judgment that Anadarko can follow    4:01PM in making accounting determinations for its exploration activities.
        So apparently in this example, Anadarko would choose to expense the cost of Well B, but they    4:01PM could just as well suspend the cost of Well B under facts and circumstances that I think are consistent with this diagram.
    Q    Why do you think that they could have just as well suspended the cost of Well B?    4:01PM
    A    Well, if based on the representation I think you asked me to accept, that they have proved reserves at A, A and B are drilled in the same area and presumed to be the same reservoir, then the cost of B could be suspended.  However, they've already found    4:02PM proved reserves, so they are past that part of the accounting because they have proved reserves.
        What they are saying here is the drilling for B is outside of the proved area.  So therefore, it becomes an exploratory well even though they've    4:02PM already found proved reserves.
    Q    They don't say it's outside of the proved area, they say, "establishing Site C as a proved area"; correct?
    A    "But not Site B."    4:02PM

Page 240

    Q    Right.  Site B was not established as a    4:02PM proved area, it was not -- it didn't hit oil; right, sir?
    A    No, no, no.  At the time they drilled Site A, they found proved reserves and based on the    4:03PM proved reserves at Site A, they established Site C as a proved area but not Site B.
        So this was before they drilled B or C that they've already established that Site C is a proved area.    4:03PM
        Now, it turns out had they drilled wells at Site C and hit water but not oil, since it's in a proved area, it's a development well and would be capitalized.
    Q    I'm asking you about Site B.  You told me    4:03PM that they need not have expensed the cost for Site B but could do so if they chose to; correct?
    A    I can create assumptions under which that statement is true, yes.
    Q    So what -- why would you believe that they    4:04PM need not have expensed the costs of the sidetracked well at Site B?
    A    Again, if they believed that they were drilling into the same reservoir where they already had proved reserves, then that would be a development    4:04PM

Page 241

61 (Pages 238 - 241)

CONFIDENTIAL

well.                                  4:04PM

So the assumption that they made here is they are outside of the proved area, so now it becomes an exploration well.

And now, in that area, they have not found 4:04PM any oil. So not finding oil in that area means that you have not established the equivalent of Shen 1 in that area.

Q   Was Shen 3 drilled in a proved area, sir?

A   There was no proved area at all in the Shen 4:04PM field.

Q   So there were proved reserves at A but not at Shen 1; right?

A   Correct.

Q   So that gives a stronger justification for 4:05PM capitalizing the cost of Site B; correct?

A   Again, it depends how you interpret this diagram. You and I are not interpreting it the same way apparently and no, that's not true.

Q   Do you agree that the well drilled in 4:05PM Site B was properly expensed?

A   I believe GAAP permits the expensing of the cost of drilling Site B.

Q   Do you agree that Anadarko has followed U.S. GAAP in this example, Example Number 4? 4:05PM

Page 242

A   Yes.                                4:05PM

Q   Do you know whether this particular accounting bulletin was still the operative accounting bulletin for well classification and disposition of suspended well costs in 2014 through 4:06PM 2016?

A   By Anadarko?

Q   Correct. It's an Anadarko document; right?

A   Yes.                                4:06PM

Q   And so was this accounting bulletin still the operative accounting bulletin for Anadarko for well classification and disposition of suspended well costs in 2014 through 2016?

A   I've seen references to the document, which 4:06PM leads me to believe that they still referred to it, but in one deposition, I think it was the Green deposition, she said there were times that they made determinations that were beyond what was covered in this document.                          4:07PM

Q   So as far as you know, Plaintiffs' Exhibit 332 was still the operative accounting bulletin for well classification and suspended well costs in 2014 and 2016; correct?

A   What do you mean by "operative"?    4:07PM

Page 243

Q   I mean, it was -- it hadn't been    4:07PM superseded by another accounting bulletin on the same subject.

A   This is not GAAP. GAAP is the codification. This is a description that was written in 2007 prior 4:07PM to the codification that gave guidance to Anadarko personnel as I understand the document.

Q   Was this particular policy that was drafted in 2007 still the operative policy document in 2014 through 2016?                  4:08PM

A   I don't understand what you mean by "operative document."

Q   Of course you don't. Do you have an understanding of the word "operative," sir?

A   No. Are you saying authoritative?   4:08PM

Q   No, sir. Operative doesn't mean authoritative. It means is this still the policy in place in 2013 and 2015?

A   Based on what I read, I don't believe that this is solely the basis on which Anadarko accounting 4:08PM professionals make judgments. And I think the Catherine Green deposition stated that.

Q   Was there another policy that replaced this policy for the years 2014 and 2015?

A   I don't know all of the details about how 4:09PM

Page 244

Anadarko accounting personnel made determinations. 4:09PM

There may have been other documents, there may not have been other documents. They could simply sit down and have a conversation that says, based on our understanding of GAAP, how do we think 4:09PM that this could be accounted for and what are we choosing to do in our accounting.

That's perfectly consistent with the proper application of GAAP.

Q   Had this policy been amended after it was 4:09PM issued in 2017 before 2014 and 2016?

A   I don't know.

Q   Had this policy been supplemented before --

A   I don't know.                       4:09PM

Q   -- 2014 through 2016?

A   I'm sorry, I don't know.

Q   So you don't know whether this was the policy -- this Exhibit 332 was the policy in place in 2014 through 2016; correct?      4:10PM

A   Correct.

Q   Turn to Page 96, Paragraph 228 of your report. Let me know when you're there.

A   I found it.

Q   Okay.                               4:10PM

Page 245

62 (Pages 242 - 245)

A   Page 96?                    4:10PM

Q   Correct.

A   Paragraph 228, yes, I'm there.

Q   Do you see that Paragraph 228 carries over on to the next page, Paragraph 97 -- I mean Page 97?   4:10PM

A   Yes.

Q   Look at the second bullet point on Page 97.

A   Okay.

Q   Do you see that?                4:11PM

A   Yes.

Q   Okay.  And it reads, "Lastly, Mr. Regan's discussion of the evidence he cites is incomplete. Specifically, Mr. Regan includes a table that he purports to show a risked PIR of .22, well below   4:11PM the .30 threshold above at $60 a barrel."  Right?

A   Yes.

Q   And then you continue, "However, Mr. Regan only presents a portion of this table. Specifically, he removed from this table a column   4:11PM that reported the 'Pc' value for each scenario."

    Do you see that?

A   Yes.

Q   And I take it that the chart you're referring to is the chart in Exhibit 269 which you   4:11PM

Page 246

footnoted in 451 and 452; right?                4:11PM

A   Without confirming that, I believe that's true, yes.

Q   Let's go ahead and take a look at Exhibit 269.  It's Tab 17.  Let me know when you're   4:12PM there.

A   I have the document, yes.

Q   I'm sorry, did you say you pulled up the document?

A   Yes, I have.  Thank you.                4:12PM

Q   I take it that you reviewed this document; right?

A   Yes, I believe it's this document.  I've seen several documents like this.  I believe I've seen this specific document.                4:12PM

Q   Why did you cite to this document?

A   I'm sorry?

Q   Why did you cite to it?

A   Why did I cite it?

Q   Yes.                            4:13PM

A   Well, one of the things that is provided here is that P sub c column that Mr. Regan omitted and this, as Lea Frye's testimony stated, is the probability of commerciality.  That is, do they think they're going to take this thing to commercial   4:13PM

Page 247

operation.                        4:13PM

    We see the numbers over here at -- based on the assumptions underlying them as anywhere from 88 percent up to 100 percent.

    So at the time that this analysis was   4:13PM performed, they believed there was a very high probability of commerciality.  And simultaneously, Mr. Regan is using this document, as I recall, to assert that there was substantial doubt about the Shenandoah field becoming a commercial field.   4:14PM

    And so the point of my statement in my report was to say that his interpretation is inconsistent with evidence directly in this exhibit.

Q   Do you see "At PIR10" at the top, it looks like the -- maybe the fifth -- fourth column over   4:14PM from the left.

A   Yes.

Q   What does PIR10 mean?

A   It's a profit to investment ratio.  That's what PIR is.                        4:14PM

    10 means that the profit you're calculating is using a discount rate of 10 percent on future cash flows.

    And so the way that formula works is you take the discounted cash flows after considering all   4:14PM

Page 248

the costs of creating those inbound cash flows,   4:15PM discount that at 10 percent and divide by the investment that you make.

Q   Do you discount the investment?

A   It depends on when the investment occurs.   4:15PM So that would have been considered in the profit calculation as well in the timing.  But the investment is -- I'll stop there.

Q   In the column to the left, do you see "Net at NPV10"?                        4:15PM

A   Yes.

Q   What does "NPV10" mean in this document?

A   NPV is net present value, so this is net present value of the cash flows under the assumptions in the various rows here discounted at 10 percent.   4:15PM

Q   And how is net present value calculated in this document?

A   I don't know that it says in this document, but net present value is a very standard measure of cash flows that occur at different points in time.   4:16PM

    So, for example, a dollar today could be compared with a dollar a year from now but that dollar a year from now can't be added directly.  You have to discount it at 10 percent.

    So you would divide one dollar by 1.10 in   4:16PM

Page 249

63 (Pages 246 - 249)

CONFIDENTIAL

the denominator and then you can add the two numbers 4:16PM together.

Q   Do you see that the PIR10 figures vary depending on the contingency?

A   Yes.                                4:16PM

Q   Why is that?

A   Well, the NPV numbers vary.  And so as they vary, the PIR numbers will vary as well.

Q   Why do the NPV10 values vary?

A   Well, the modeling that is preparing these 4:17PM estimates is forecasting future cash flows that would include things like how quickly are you pumping oil out of this thing, how much is the cost for the lifting cost, all kinds of things that go into the calculations of cash flows in the future.            4:17PM

And that's what those various rows are talking about that we look -- zero contingency, facility only contingency.  They are making different assumptions here about how they are modeling these future cash flows.            4:18PM

Q   The zero contingency, what assumptions are made there?

A   I don't know.

Q   Facility only contingency, what assumptions are made there?                        4:18PM

Page 250

A   I don't know.                        4:18PM

Q   Recommended contingency, what assumptions are made there?

A   I don't know.

Q   Recommended contingency 20,000 well rates, 4:18PM what assumptions are made there?

A   I don't know.

Q   Recommended contingency 20,000 well rates optimized, what assumptions are made there?

A   Again, I don't know.                4:18PM

Q   What is a risked mean?

A   I'm sorry, a risk mean?

Q   Do you see the words "risked mean"?

A   Oh, risked mean, yes.

Q   What is that?                        4:18PM

A   Somehow they are taking into consideration certain risks.  I don't know what they are.  Then depending on whether they are considering risks or not, they get two different rows in their calculation.

Q   Can you tell me a single risk that they 4:19PM are taking into account?

A   I don't know specifically what they are considering to be risks.  I anticipate that there are multiple risks that they are considering.

Q   Just tell me one of those multiple risks. 4:19PM

Page 251

A   Well, you have to make assumptions in 4:19PM estimating future cash flows that if you find, say, a million barrels of oil in a reservoir, not all of that million barrels of oil can be extracted economically. So one of the things you have to do is look at the 4:19PM oil -- the sands to try to figure out how much oil you can actually get out.

That in turn depends on a number of factors as I understand them.  For example, are you going to use a water injection well to try to push 4:19PM more oil out into the wellbores for production?  And how will it actually work when you do that?

So I don't know what all the risks are. I've gained an appreciation that there is an awful lot of risk potentially in oil exploration and 4:20PM production.

But I don't know specifically what they are referring to in talking about these different contingencies or in the risked or unrisked models that they estimate.                        4:20PM

Q   Do you see P little C over on the far right column headed -- off of the far right column?

A   Yes.

Q   You understand what that acronym stands for; right?                                4:20PM

Page 252

A   Yes.                                4:20PM

Q   What does it mean?

A   It's probability of commerciality.

Q   Did you know that before you began this engagement?                                4:20PM

A   I don't believe so, no.  I don't know that I ever saw the term before I saw this -- before this engagement.

Q   How is probability of commerciality calculated?                                4:21PM

A   I don't know specifically what they did.

Q   Tell me generally what they did.

A   I think overall they have a model that says is it the case that we will create a field here that we can take to FID and what is the probability that 4:21PM we'll actually get to FID.  So that's the probability of commerciality.

Q   So tell me the formula to calculate that.

A   I don't know the formula to calculate that.

Q   Did you ever know the formula to calculate 4:21PM it?

A   No.  Again, I understand the concept, but how specifically they did that, I don't know.  My anticipation would be that it involves a number of factors.  But again, I don't know that.        4:22PM

Page 253

64 (Pages 250 - 253)

CONFIDENTIAL

Q    That's just an assumption you're making;    4:22PM right?

A    Yes.

Q    Do you see how the net present value 10 varies in the different rows?    4:22PM

A    Yes.

Q    For example, in the first row, it's 237 and 283; right?

A    Yes.

Q    And the PIR10 is .28 and .30 in the zero    4:22PM contingency row; right?

A    Yes.

Q    And the probability of commerciality is 88.2 and 100 percent; right?

A    Yes.    4:22PM

Q    Let's go ahead and look at the recommended contingency 20,000 well rates.  It's 191 and 232; right?

A    I'm sorry.  Hold on.

Q    Net present value 10?  It's the --    4:22PM

A    So not the optimized one, but just the recommended contingency for 20K well rates, 191, 232. Am I reading that correctly?

Q    Right.  Those are different from the net present value 10 reserve contingency, aren't they?    4:23PM

Page 254

A    Yes.    4:23PM

Q    And likewise, the recommended contingency 20,000 well rates is .20 and .22; correct?

A    Yes.

Q    And that's different from the PIR10 zero    4:23PM contingency; correct?

A    Yes.

Q    The probability of commerciality for the zero contingency is 88.2 and 100 percent; right?

A    Yes.    4:23PM

Q    And the probability of commerciality for the recommended contingency 20,000 well rates is 88.2 and 100 percent; right?

A    Yes.

Q    In fact, the probability of commerciality    4:23PM for every risked mean is 100 percent; right?

A    Every unrisked mean, yes.

Q    I'm sorry, every unrisked mean is 100 percent; right?

A    Yes.    4:24PM

Q    The probability of commerciality for every risked mean is 88.2; right?

A    Yes.

Q    Why did the -- why does the probability of commerciality stay unchanged when the net present    4:24PM

Page 255

value 10 and the PIR10 changed?    4:24PM

A    I don't know.

Q    Did you do anything to evaluate how the probability of commerciality figure was calculated?

A    I tried to find more detail and was    4:24PM unsuccessful in finding more detail.

Q    Did you reach out to anybody at the company and ask them?

A    No.

Q    Why not?    4:25PM

A    Because I am an independent expert, I'm not going to speak to somebody at Anadarko.

Q    Do you know whether the probability of commerciality figure is based on an underlying economic resource probability?    4:25PM

A    I don't know that.  But I anticipate that that's what it is intended to convey, yes.

Q    Do you know whether the probability of commerciality figure is based on engineering assumptions?    4:25PM

A    I anticipate that it is.

Q    Do you know that, sir, or are you just assuming it is?

A    Well, in order to project cash flows in the future, you have to project the amount of oil that's    4:25PM

Page 256

going to be produced from the wells.    4:25PM

    I presume that that is information that comes from the engineers.  It would not come from the accountants.

Q    Do you know whether the underlying    4:26PM engineering assumptions were realistic?

A    I don't know; but, again, to the extent that Anadarko personnel are using this chart to make decisions, I cannot imagine why they would not be realistic if Anadarko professionals were using them to    4:26PM make decisions.

    So I assumed -- I'm sorry.

    So I assume that these are their best estimates when they develop these.

Q    You understand that this is a fraud case;    4:26PM right, sir?

A    No.

Q    You don't understand that plaintiffs are alleging fraud in this case?

A    I've been asked to opine on the accounting.    4:26PM I don't know what the legal issues are because they don't relate to the accounting determinations I've been asked to make.

Q    Do you know whether the underlying economic assumptions were realistic that were used    4:27PM

Page 257

65 (Pages 254 - 257)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

for the probability of commerciality?   4:27PM

A   I assume they are.  I don't know based on separate analysis whether they are or not.

Q   Do you know whether the probability of commerciality based on resource probability   4:27PM assumptions were accurate or realistic?

A   Again, based on what I read, it appeared to me that Anadarko personnel understood these numbers to be representation of their understanding of the underlying economics and geology of the field.   4:27PM

Q   What does the probability of commerciality represent?

A   At the point in time that calculation was made, I understand it to mean what is the probability that we're actually going to get to a final investment   4:28PM decision and commence development and production of the field.

Q   And what is that understanding based on?

A   Well, there are a number of places over time where I've read statements by Anadarko professionals   4:28PM about when they think they are going to be able to have a final investment decision and that would be based on calculations that I think are similar to the ones that are represented here with the probability of commerciality.   4:28PM

Page 258

Q   And how is probability of commerciality   4:28PM calculated again?

A   I think I testified that I don't know specifically how it's done.

Q   Do you know if the probability of   4:29PM commerciality figure incorporates any kind of return on investment?

A   Well, the NPV10 number includes return on investment implicitly.

Q   I didn't ask you --   4:29PM

A   That's what the 10 is.  So the answer is I think it does because the NPV10 number considers return on investment.

Q   So you believe that the probability of commerciality incorporates a return on investment;   4:29PM is that right?

A   Yes.

Q   But you don't know the formula for calculating probability of commerciality; right?

A   I don't know specifically, no.   4:29PM

Q   The probability of commerciality doesn't change; correct?  It's always 88.2 and 100; right?

A   In the analysis that they have on this table, yes.

Q   The NPV10 numbers do change; correct?   4:30PM

Page 259

A   Yes.   4:30PM

Q   So why do you believe that the NPV10 numbers are somehow incorporated into the probability of commerciality?

A   Well, again, I anticipate that when Anadarko   4:30PM personnel make a determination on whether or not to take this field to commercial production, than they would consider NPV calculations similar to the NPV10 number that's here.

Q   Why does the probability of commerciality   4:30PM remain the same for each contingency?

A   I don't know.

Q   Given that you do not know how the probability of commerciality figure is calculated in this document, do you know whether the figures in   4:31PM the probability of commerciality column are reliable?

A   Again, I don't know independently, but they are in this document.  I've looked at other numbers here like PIR10 and, again, I know how to interpret   4:31PM that and I think those are reasonable interpretations.

Q   Do you think it's reasonable to have 88.2 and 100 percent for each of the contingencies?

A   Again, yes.

Q   You told me you don't know why it doesn't   4:31PM

Page 260

change; right?   4:31PM

A   Correct, but that doesn't mean that I don't think it's reasonable.

Q   And you think it's reasonable because it's in the document; is that why you think it's   4:32PM reasonable?

A   I think the numbers are reasonable based on both the NPV numbers and the PIR10 numbers, that the probability of commerciality is high and I think that this final column represents the probability of   4:32PM commerciality.

And so I conclude that they had a methodology that leads to those numbers.

Q   What is the price of -- price per barrel of oil assumed by this chart?   4:32PM

A   Sixty dollars.

Q   Would you agree that the price per barrel is an important assumption when evaluating economic commerciality?

A   Yes.   4:32PM

Q   Is there a risk to commerciality in this model if the price of oil was substantially lower than $60 a barrel?

A   Well, again, without knowing the details of their calculation, I would assume that they would   4:33PM

Page 261

66 (Pages 258 - 261)

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

forecast future -- future price of oil during the period of time that they expected to produce from this reservoir.

And that price of oil may go up or go down over time and that they would have considered that in developing -- in developing this table.

Q Why do you believe that, sir, that this is a forecast?

A Again, I'm saying they could do that. I am not saying they did do that, but it wouldn't be unreasonable for them or to simply pick a flat number and say, look, if the $60 a barrel continuously for the next 20 years as we pump oil, here's the numbers you get.

Q So is the $60 a barrel, is that the current price of oil or is that some sort of forecasted estimate?

A It may be that that's the assumed price of oil that they have throughout the entire period. I don't know because I did not see the details underlying this table; I saw only this table.

So I'm reading into it what I think would be reasonable parameters that would be included in the analysis and one of them, as you asked me a minute ago, is does the price of oil matter and the

Page 262

answer to that is yes.

Q And then why $60 a barrel, why not 40 or 80 or 100?

A They may have done multiple tables like this or they may have put probabilities on different oil rates over time and then compressed them into this one table. I don't know the details of how they did that.

Q Why did they choose 60, sir?

A I don't know why. The price of oil was fluctuating over the time period of this analysis and so they chose 60. I think there were other calculations on a higher rate, perhaps $80 a barrel.

And they may have used other numbers, I don't know. This is one table that I found.

Q Mr. Dietrich, doesn't ASC 932-10-S99 sub 22 discuss the determination of economic producibility?

A I would have to look at that documentation. I don't recall right now whether that is a staff accounting bulletin, whether it has to do with successful efforts, accounting, whether it has to do with reserve calculations. I don't recall what that reference to EK refers to.

MR. DROSMAN: Madam court reporter, what exhibit number are we on?

Page 263

(Discussion off the record.)

MR. DROSMAN: I'll show you what we'll mark as Plaintiffs' Exhibit 552 for identification. It's Tab 3.

(Whereupon, Exhibit 552 was marked for identification.)

(Discussion off the record.)

MR. DROSMAN: The document is entitled "S99 SEC Materials, Securities and Exchange Commission." It does not have Bates numbers but contains 13 pages and is paginated 1 through 13, 2 through 13, et cetera.

Q Mr. Dietrich, if you could turn to 932-10-S99-22.

A Is that the document that I see that's labeled 552, Tab 3 here?

Q Yes. You recognize this document; right?

A Yes.

Q This is authoritative GAAP; correct?

A Yes.

Q Go ahead and turn to 932-10-S99-22. Let me know when you're there.

A I'm sorry, I'm seeing 932-10-S99-5 is the last item in this document.

Q There's little parentheses around 1, 2, 3,

Page 264

4 -- look under 932-10-S99-1 and then A --

A I see, yes.

Q If you can go to sub 22.

Are you familiar with this provision?

A Yes.

Q It discusses the determination of economic producibility; right?

A For proved reserves, I believe, yes.

Q Does ASC 932-10-S99 sub 22 require reasonable certainty based on existing economic conditions including prices and costs at which economic producibility from a reservoir is to be determined?

A For proved reserves, yes.

Q Were there any proved reserves at Shenandoah?

A No.

Q So you're saying that this particular provision doesn't apply; correct?

A Well, I didn't evaluate it because they did not have proved reserves, so I can't offer a statement of whether it applies or not.

Q Mr. Dietrich, do you agree that whenever FASB issues new standards, that FASB includes a, quote, background and basis for conclusions, end

Page 265

67 (Pages 262 - 265)

CONFIDENTIAL

quote, specific to those new standards?   4:41PM

A   I'm pausing because prior to the codification, they issued statements of financial accounting standards.  I believe many, if not all of them have background information and a basis for conclusions after FASB was established in 1974.

Subsequent to the codification creation, statements and financial accounting statements are no longer issued.

Q   Would you agree that the background and basis for conclusion section summarizes the FASB's considerations in reaching a conclusion in the standard update?

A   No.  It may be intended to do that, but I don't know to extent that it actually does do that.

Q   Which distinction are you making?

A   When the board issues a basis for conclusions, I believe that it is trying to guide readers to understand how they make tradeoffs.  I believe they say that somewhere in the individual documents that this is what we're trying to do.

But it may be that it's another document that's describing the process that the board uses, I don't recall.

Q   Do you agree that whenever the FASB issued

new standards, it included reasons for accepting certain accounting approaches and rejecting others?

A   I think that's what they said they were trying to do when they wrote those basis for conclusions, yes.

Q   And would you agree with me that while the background and basis for conclusion section is not included in the FASB's codification, it may have information useful to explaining why authoritative GAAP was established?

A   The information contained in the basis for conclusion is not authoritative and was never authoritative.

It is intended to help people who are reading the standard understand why they made tradeoffs as they did.

Q   Let me ask my question again.  I'm not sure if you understood it or listened to it.

Would you agree with me that while the background and basis for conclusion section is not included in the FASB's codification, it may have information useful to explaining why authoritative GAAP was established?

A   It may.

Q   I'm going to show you 553 for   4:45PM

identification and it's Tab 35.   4:45PM

(Whereupon, Exhibit 553 was marked for identification.)

THE WITNESS:  I have it up.

BY MR. DROSMAN:   4:45PM

Q   Turn to Page 6, if you would, and look at the second paragraph beginning, "As of July 1, 2009."

Do you see that?

A   Yes.   4:46PM

Q   And it reads, "As of July 1, 2009, the codification was composed of the following literature issued by" the various standard setters.

One, "Financial Accounting Standards Board (FASB), A, statements (FAS)."   4:46PM

Do you see that?

A   Yes.

Q   Doesn't 1A above include FAS 19?

A   Yes.  Let me be careful.  FAS 19 is included in that description of statements issued by the Financial Accounting Standards Board as statements.

Q   Let's take a look at 551, which has already been introduced today.  It's the 932-360-25 and 35.  You may know it as Tab 32.

A   Okay.   4:47PM

Q   Do you see that the source for the codification is in brackets?  We discussed this earlier.

A   Yes.

Q   So this is the source codification; right?   4:47PM

A   Yes.

Q   And you've seen this before; right?

A   Yes.

Q   In fact, it's from the FASB website; right?   4:47PM

A   Well, I access it differently from the way I see it here, but yes.

Q   When you go on to the FASB website, you have a choice, you can print it with the sources and without; right?   4:47PM

A   If one were to print it, yes.

Q   You could view it with sources or without on the FASB website; correct?

A   I didn't know that.

Q   You didn't know that you could view ASCs with bracketed source information on the FASB website?   4:47PM

A   Well, if I'm trying to read GAAP, I don't need to know the source of the language.  I just need to know the language.   4:48PM

68 (Pages 266 - 269)

CONFIDENTIAL

Q    Isn't it true --                4:48PM

A    Sorry, to be fulsome, if I wanted to know the source, I can do a cross reference on the codification paragraph and find the source.  So I have a way of doing what is included in this presentation 4:48PM that you have, yes.  I just do it a different way.

Q    This particular document has the sources for ASC 932-360-25 and 35; right?

A    Yes.

Q    And isn't it true that all but two    4:48PM sections of ASC 932-360-25 and 932-360-35 were sourced from FAS 19?

A    Well, that's possible, but it doesn't mean everything that's in FAS 19 was brought over either.

Q    Let me ask the question again because I    4:49PM think maybe you forgot it.

Isn't it true that all but two sections of ASC 932-360-25 and 932-360-35 were sourced from FAS 19?

A    I haven't done that analysis and it would    4:49PM take me a considerable time to go through this now to be sure that everything that's here comes from FAS 19 except for the two exceptions that you've mentioned.

Q    You see that the source information is in red; right?                4:49PM

Page 270

A    I do.                4:49PM

Q    Nothing else in the document is in red besides the source information; right?

A    Yes, but again, I would have to go through and look at each bracket, open and close, and find out 4:50PM whether or not that was covered directly by FAS 19.

Q    Let's do it together, shall we?  Turn to the first page of 932-360-25.

A    There may be a faster way of doing this. What is it you're trying to get me to admit?    4:50PM

Q    Sir, I asked a question --

A    This is a really bad way to do GAAP determinations by looking at FAS 19.

Q    Sir, I asked you a question.  I said, isn't it true that all but two sections of    4:50PM ASC 932-360-25 and 932-360-35 were sourced from FAS? And you told me you couldn't possibly determine that, it would take you hours.  So I --

A    No, I didn't say hours, I said it would take considerable time.  So let's start.    4:50PM 932-360-25-1 does not appear to come from FAS 19.  Two does not appear to come from FAS 19. Three --

Q    Do you see those red brackets there, sir?

A    I do.                4:51PM

Page 271

Q    Okay.                4:51PM

A    I'm having trouble lining up in 3.  I see the open bracket that begins "only those exploration costs," and then I see a bracket FAS 19 Paragraph 147 closed bracket, closed bracket.  Okay.  Under the    4:51PM successful efforts method --

Q    Sir, we've established that the source is in red.  Do you see anything other than FAS 19 as the source for 3?

A    Well, let's take Paragraph 1, there is no    4:51PM reference to FAS 19.  I don't know if embedded in any of the other paragraphs there is language that was not derived from FAS 19.  I believe that's what you're asking me to determine.

Am I misunderstanding your question?    4:52PM

Q    Yes.  You didn't answer my question.  I'll reread it to you.

Sir, we established that the source is in red.  Do you see anything other than FAS 19 as a source for Paragraph 3?                4:52PM

Answer that question, okay?

I know you don't want to concede that FAS 19 is the source for Paragraph 3, but I think you're going to have to; right, sir?

A    I don't know.  I haven't done the analysis.  4:52PM

Page 272

Q    You can't look at Paragraph 3, scan it in    4:52PM two seconds and see that FAS 19 is the only source material for that?

A    I don't know if it's the only source material for that.  Look at Paragraph 1, I do not see  4:52PM a reference to FAS 19 there.

Does that mean that there is no language below in any of these paragraphs that is not cited directly back to FAS 19?  I don't know that.

Q    We're going to walk through it together,    4:53PM sir.  You're going to know by the end of this analysis.

A    All right.  We're on Paragraph 3.

Q    Look at the red text in 3.  Anything other than FAS 19?                4:53PM

A    I'm sorry, sir.  It's not whether there's anything other than FAS 19.

Q    That's my question, sir.  I'm not asking you to perform an analysis.

I'm asking you a question: Any other    4:53PM source information in Paragraph 3 other than FAS 19, yes or no?

A    I don't see anything.

Q    Any other source information in Paragraph 4 beside FAS 19?                4:53PM

Page 273

69 (Pages 270 - 273)

A  I don't see anything.                4:53PM

Q  Anything other than FAS 19 as the source for Paragraph 5?

A  I don't see anything.

Q  Anything other than FAS 19 as a source for Paragraph 6?    4:54PM

A  I don't see anything.

Q  Anything other than FAS 19 as a source for Paragraph 7?

A  I don't see any.                4:54PM

Q  Anything other than FAS 19 as a source for Paragraph 8?

A  I don't see anything.

Q  Anything other than FAS 19 as a source for Paragraph 9?    4:54PM

A  Let me be clear on Paragraph 9 of why I think your analysis you're asking me to perform is flawed.

In 932-360-25-9E, the language here says, "While the costs of drilling stratigraphic tests are    4:55PM sometimes considered to be geological and geophysical costs, they are accounted for separately under this Subtopic" -- that word could not have existed in FAS 19 because that language didn't exist at the time of FAS 19 for reasons explained in    4:55PM

Page 274

Paragraphs 932-360-25-17 through 25-18.    4:55PM

Again, that could not have existed in FAS 19 and you're representing to me that if it says after that FAS 19, Paragraph 17, it must have existed in FAS 19, that's not true.    4:55PM

Q  Sir, I didn't --

A  So we can continue this exercise, but at the end of it I will tell you that you cannot assert that everything that's in 932-360 derives from FAS 19 directly.    4:55PM

Q  Sir, I did not represent to you anything. I represented to you that this particular document with the source information contained in it was printed directly from the FASB website. That's what I represented.    4:56PM

What is the bracket at the end of 932-360-25-19 for the source information at the end of E?

A  Again, it says FAS 19, Paragraph 17 and what I'm telling you is that language does not appear in    4:56PM FAS 19, Paragraph 17 as written here.

Q  Take it up with the FASB, sir, this is just their document, isn't it?

A  And I'm telling you how to read their documents which you apparently don't understand.    4:56PM

Page 275

Q  You don't understand that the red source    4:56PM is the source information for that particular provision?  Is that difficult for you to get?

A  It gives you cross-referenced material back to the previous Statement of Financial Accounting    4:56PM Standards from which this language was derived.

Q  Sir --

A  It does not mean it is literally what was in FAS 19.  As I just demonstrated, this is not what is in FAS 19 under 932-360-25-9E.  That is not exactly    4:57PM the wording in FAS 19.

Q  I asked you if FAS 19 was the source for it, sir.  I didn't make any representation about --

A  It's not the source for all of it, no.

Q  Sir, anything other than FAS 19 the source    4:57PM for the provisions on Page 3?

A  Yes.

Q  What besides FAS 19 is indicated by the FASB as a source?

A  When the codification was created, the    4:57PM creators of the codification took all of the existing documentation and used that to form the codification. It is not simply republication of any existing Statement of Financial Accounting Standards.  I know that because I had two of my former students work on    4:58PM

Page 276

this codification project.    4:58PM

Q  Sir, I don't know whether you're not listening to my question --

A  You're certainly not listening to my answers.    4:58PM

Q  -- or whether you misunderstand it.  But I didn't ask you about republication or anything of the sort.

I asked you about the source.

A  What I'm telling you is what you're asking    4:58PM me to do does not exclusively tell you the source.  So when I point to 980, you say, is that source FAS 19? And I'm telling you no, that you're misinterpreting what it says.

Q  Is your testimony that the information in    4:58PM the brackets on Plaintiffs' Exhibit 551 is not the source information?

A  What I'm telling you is this language was prepared based on language that was in FAS 19 in part but not directly copied from FAS 19 word for word.    4:59PM

Q  That's called sourced; right, sir? Sourced from FAS 19, that's what the FASB calls it, don't they?

A  Yes.

Q  Okay.  So let's pay close attention to my    4:59PM

Page 277

70 (Pages 274 - 277)

question.                                            4:59PM
Any other sources indicated by the FASB other than FAS 19 on Page 3 of 6?
A   And the answer to that is no, and the reason is information that did not come from FAS 19 that was   4:59PM created in making the codification isn't sourced from a previous document.
MR. DROSMAN:  Move to strike as nonresponsive everything following the word "no."
Q   Take a look at Page 4 of 6.  Anything   5:00PM other than FAS 19 indicated as a source by the FASB for the provisions on Page 4?
A   Again, this language does not always derive exclusively from FAS 19; however, there are citations here to FAS 19.                                5:00PM
Q   Any other sources indicated by the FASB besides FAS 19 on Page 4 of 6?
A   As I said, they would not cite a source for material that was created originally for the codification.                                      5:00PM
Q   My question is:  Any other sources indicated by the FASB on Page 4 of 6 for the provisions on that page?
A   No.
Q   Turn to Page 5 of 6.  Do you see at the   5:01PM

Page 278

bottom of the page, there's SX 210.4-10 indicated as   5:01PM the sources for 932-360-S25-1 and S25-2?
A   Yes.
Q   You didn't fight me on that, did you, sir?
A   I'm agreeing with your statements.         5:01PM
Q   Look above there, do you see at 932-360-25-18, the FAS 19 is the source for that; correct?
A   25-18, yes.  And I note it's Paragraph 201, which is not authoritative in FAS 19.  It's in the   5:02PM basis for conclusion, as was the previous one, by the way, 25-17.
The pagination here on 25-17 leaves something out because you see the open bracket where it says FAS 19, comma.                            5:02PM
Then I don't see the conclusion of the citation there, but that's the paragraph 200 in the FAS 19.
Q   Take a look at Page 4 of 5, 932-360-35-16.
A   I'm sorry, Page 4 of 5?                     5:02PM
Q   Sir, just turn to 932-360-35-16.
A   Okay.  Oh, I see, down below here, okay.
Q   That's the pagination right on the bottom right?
A   Yes.                                        5:03PM

Page 279

Q   It's Page 4 of 5.                          5:03PM
A   Yes.  So you want me to look at 35 -- sorry, what is the paragraph number?
Q   932-360-35-16.
A   Sixteen, yes.                              5:03PM
Q   The source for that is FAS 19; correct?
A   That's what is shown here, yes.
Q   Do you dispute that, sir?
A   I've already told you that the source does not mean that every word that appears here comes from   5:03PM FAS 19.  That's not how I interpret the word "source" as I believe you're asking me to do.
I want to be clear that the words "FAS 19, Paragraph 31" appear here and nothing more.
Q   Sir, have I ever said that to you during   5:04PM this deposition today?
A   Said what to me?
Q   Have I ever said that the source means that the word appears there comes from FAS 19?  Have I ever said that?                              5:04PM
A   I don't recall.
Q   Not once did I say that.  I've asked you repeatedly --
A   Then I apologize if I interpreted --
Q   Let me finish my question, sir.  We've   5:04PM

Page 280

agreed that we're going to take turns, remember?   5:04PM
A   Okay.
Q   I'm going to finish my question.
Sir, what I've asked you repeatedly is whether the source for the particular information is   5:04PM FAS 19?  I'm asking you for 932-360-35-16, is the source FAS 19, yes or no?
A   No.  That's not the source exclusively based on how the FASB wrote this.  They were saying this paragraph refers back to FAS 19, that paragraph, not   5:05PM the thing was otherwise described.
They're telling you what a basis was on which this paragraph was written and that's all it says.  So when you say "the source," it's a source perhaps, I'll grant that.                          5:05PM
But I'm not agreeing that it's the exclusive source of that language that appears in the codification.
So I think the difficulty I'm having is when you say "the source," I don't agree with that.   5:05PM
Q   What are the other sources for 932-360-35-16 besides FAS 19?
A   It may be the original language that's in -- not in the codification.  It does not have another source.                                        5:06PM

Page 281

71 (Pages 278 - 281)

CONFIDENTIAL

Q   Is it original language that --   5:06PM
A   I've already cited to you several places where the language must be original because the construction does not include information that could have been prepared prior to the existence of the   5:06PM codification.
Q   I'm asking you if there are any other sources identified by the FASB for 932-360-35-16?
A   And I'm telling you they don't cite sources when they create the material themselves.   5:06PM
Q   I didn't ask that question.
I asked you whether the FASB identified any other sources besides FAS 19 for 932-360-35-16? Can you answer that question?
MS. PHILLIPS:  Asked and answered.   5:07PM
THE WITNESS:  Yes, they do not cite anything else.
BY MR. DROSMAN:
Q   Let's look at 932-360-35-18.
A   Okay.   5:07PM
Q   Does the FASB identify any sources other than FAS 19 as the source for the information in that provision?
A   I don't see anything else.  But again, I wouldn't see anything else if it was created by the   5:07PM

Page 282

FASB at the adoption of the codification.   5:07PM
MR. DROSMAN:  Move to strike everything after "I don't see anything else" as nonresponsive.
I'm going to go ahead and conclude the deposition for today.   5:08PM
MS. PHILLIPS:  Can we go off the record?
MR. DROSMAN:  Sure.
THE VIDEOGRAPHER:  We're going off the record at 5:08 p.m.
(Recess taken.)   5:08PM
VIDEOGRAPHER:  We're on the record at 5:28 p.m.  This is the beginning of Media 7 in the deposition of Dr. Richard Dietrich.
MS. PHILLIPS:  Thanks very much. Defendants don't have any further questions.   5:28PM
Thanks, Dr. Dietrich.
MR. DROSMAN:  Thanks.
THE VIDEOGRAPHER:  We're going off the record at 5:28 and this concludes today's testimony given by Dr. Richard Dietrich.   5:28PM
The total number of media units used was seven and will be retained by Veritext.
(Proceedings concluded at 5:28 p.m.)

Page 283

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 13, 2023

*Lynne Marie Ledanois*

LYNNE MARIE LEDANOIS
CSR No. 6811

Page 284

DANIEL DROSMAN, ESQ.

ddrosman@rgrdlaw.com

March 13, 2023

IN RE ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

MARCH 11, 2023, J. RICHARD DIETRICH, JOB NO. 5780790

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 285

72 (Pages 282 - 285)

CONFIDENTIAL

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 286

IN RE ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

J. RICHARD DIETRICH, JOB NO. 5780790

    E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

WITNESS                 Date

Page 287

73 (Pages 286 - 287)