UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | § § § § | Civil Action No. 4:20-cv-00576<br><br>CLASS ACTION<br><br>The Honorable Charles R. Eskridge III |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE STATE-OF-MIND TESTIMONY OF DR. ROBERT MERRILL AND LYNDON PITTINGER**

## TABLE OF CONTENTS


**Page**

I. PRELIMINARY STATEMENT ........ 1

II. ISSUE FOR RESOLUTION ........ 3

III. NATURE AND STAGE OF PROCEEDING ........ 3

IV. FACTUAL BACKGROUND ........ 4

V. LEGAL STANDARD ........ 6

VI. ARGUMENT ........ 7

A. Pittinger and Merrill Are Qualified to Offer the Challenged Opinions ........ 7

B. Defendants Attack a Strawman: the Experts Do Not Offer Impermissible State-of-Mind Opinions ........ 8

C. The Disputed Paragraphs Will Help the Jury Understand the Technical Record ........ 16

D. Defendants' State-of-Mind Objections Are Premature and Should Be Resolved at Trial ........ 18

VII. CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........ 4, 6, 7, 11

*Estevis v. City of Laredo*,
2023 WL 9312081 (S.D. Tex. Dec. 28, 2023) ........ 12, 15, 18

*Fisher v. Halliburton*,
2009 WL 5216949 (S.D. Tex. Dec. 21, 2009) ........ 18

*In re Actos (Pioglitazone) Prods. Liab. Litig.*,
2014 WL 120973 (W.D. La. Jan. 10, 2014) ........ 15

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2016 WL 9560113 (N.D. Tex. Oct. 3, 2016) ........ 6, 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022) ........ 11, 12

*Jenkins v. Helmerich & Payne Int'l Drilling Co.*,
577 F. Supp. 3d 587 (S.D. Tex. 2021) ........ 18

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ........ 6

*Marlin v. Moody Nat'l Bank, N.A.*,
248 F. App'x 534 (5th Cir. 2007) ........ 17

*Retractable Techs. Inc. v. Abbott Lab'ys, Inc.*,
2010 WL 11531436 (E.D. Tex. June 18, 2010) ........ 7, 8, 16

*Salas v. Carpenter*,
980 F.2d 299 (5th Cir. 1992) ........ 17

*United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*,
2024 WL 4508961 (N.D. Tex. Oct. 15, 2024) ........ 11, 12

*United States v. Valencia*,
600 F.3d 389 (5th Cir. 2010) ........ 6

*United States v. Vista Hospice Care, Inc.*,
2016 WL 3449833 (N.D. Tex. June 20, 2016) ........ 17

**Page**

*Wilson v. Woods*,
163 F.3d 935 (5th Cir. 1999) ........................................................................... 7

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78..................................................................................................................... 3

Federal Rules of Civil Procedure
Rule 26 ...................................................................................................... 2, 10
Rule 26(a)(2)(B)(i) ......................................................................................... 10

Federal Rules of Evidence
Rule 702 ........................................................................................... 2, 6, 10, 17

17 C.F.R.
§240.10b-5 ........................................................................................................ 3

## I. PRELIMINARY STATEMENT

As a threshold matter, Defendants' motion fails because it seeks to exclude testimony Plaintiffs' experts have already disclaimed. Defendants acknowledge that Plaintiffs' scientific experts Dr. Robert Merrill ("Merrill") and Lyndon Pittinger ("Pittinger") have expressly disavowed any opinion on the motivations, beliefs, or intent of Anadarko, its employees, or its partners. ECF 322-3 ("MTE") at 1. That should largely end the motion. Merrill and Pittinger will not tell the jury what anyone secretly intended, believed, or knew. They will do what geologists and petroleum engineers are qualified to do: explain a technical oil-and-gas record and the significance of the data, maps, pressure information, faulting evidence, appraisal decisions, resource estimates, and economic analyses reflected in that record.

Defendants try to turn that proper expert testimony into something else by attaching "state of mind" to more than 50 report paragraphs.[1] But the Disputed Paragraphs do not all address the same subject. Some identify the documents and communications the experts reviewed. Some describe conduct reflected in the record, including the creation, revision, and use of structural maps and data, and the flow of technical information. Some use words such as "aware," "concerned," or "understood" because the cited documents show what was

---

[1] Defendants seek to exclude ¶¶11(j), 13(a), 13(d), 13(n), 29, 36-38, 40, 56, 68, 77, 81, 93, 95-96, 102, 105-106, 115-116, 166, 190, 192, 216, 219, 231-233, 256, 299, 303-304, 307-308, 310-313, and 329 of the Corrected Expert Witness Report of Lyndon Pittinger, dated November 29, 2022 ("Pittinger Rpt.") (Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment (ECF 322-9) ("Rosenberg Decl."), Ex. 21), and ¶¶22, 35, 48, 59, 69-71, 73, 84, and 97 of the Expert Report of Robert Merrill, Ph.D., dated November 9, 2022 ("Merrill Rpt.") (Rosenberg Decl., Ex. 18) (together, the "Disputed Paragraphs").

communicated, received, or said. Others give technical opinions about faulting, compartmentalization, pressure data, connectivity, resource estimates, and economics. Still others summarize opinions supported elsewhere in the reports. Federal Rule of Evidence 702 requires the Court to evaluate the testimony actually offered, not Defendants' characterizations.

On the testimony actually offered, Defendants have no real qualifications challenge. They do not dispute that Merrill, a geologist, and Pittinger, a petroleum engineer, have nearly 100 years of combined oil-and-gas industry experience. Nor do they dispute that the subjects addressed in the challenged paragraphs fall within their expertise: Shenandoah's ("Shen") geology, reservoir characteristics, pressure data, faulting and compartmentalization risks, appraisal strategy, resource estimates, development scenarios, and commercial viability.

The challenged opinions also rest on a reliable and ordinary expert method. Merrill and Pittinger reviewed the contemporaneous technical record, including Anadarko and partner documents, maps, emails, presentations, pressure data, seismic and geologic information, resource estimates, and economics. They then applied their industry experience to explain what that record showed and why it mattered to the Shen appraisal. That is the kind of technical synthesis expert testimony exists to provide. Federal Rule of Civil Procedure 26 also required the experts to disclose the bases and reasons for their opinions. Defendants cannot convert required explanation of those bases into inadmissible state-of-mind testimony by mislabeling it.

This testimony is also helpful, as the record contains technical information a lay juror cannot evaluate unaided. While jurors can read an email referring to "connectivity," a

presentation using an unfaulted map, or a document discussing pressure data, Merrill and Pittinger can explain the significance of those items to reservoir size, appraisal risk, and commerciality testimony bearing directly on falsity, materiality, and scienter. It does not tell the jury what anyone secretly believed; it provides technical context necessary for jurors to understand the documents and draw their own conclusions.

Finally, Defendants' request is premature and overbroad. They challenge snippets from expert reports, not actual trial testimony. The reports will not be handed to the jury, and Plaintiffs do not intend to ask either expert to speculate about motive, intent, or private belief. If a trial question ever crosses that line, Defendants can object then, and the Court can rule in the context of the actual question. There is no basis to strike dozens of paragraphs now that state technical opinions, identify the bases for those opinions, summarize record-supported conclusions, or explain the technical significance of contemporaneous documents. Defendants' motion should be denied.

## II. ISSUE FOR RESOLUTION

Whether Merrill's and Pittinger's opinions, which apply geology and petroleum-engineering expertise to technical and business records and do not tell the jury what any person secretly intended or believed, are admissible.

## III. NATURE AND STAGE OF PROCEEDING

This securities fraud action was filed on February 19, 2020 (ECF 1), and the operative complaint was filed on August 17, 2020 (ECF 55). Plaintiffs allege that Defendants violated the Securities Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 by: (a) engaging in a scheme to defraud; (b) omitting to

state one or more material facts necessary to make their public statements not misleading; and (c) engaging in a fraudulent or deceptive act, practice, and course of business. ECF 55, ¶174.

Merrill and Pittinger submitted expert reports on November 9, 2022, and Pittinger submitted a corrected expert report on November 29, 2022. Defendants deposed Merrill on December 7, 2022 and Pittinger on December 16, 2022. In accordance with the Court's scheduling order (ECF 305 at 1), the parties filed *Daubert* and summary judgment motions on June 1, 2026. The final pretrial conference is set for May 18, 2027. *Id.*

## IV. FACTUAL BACKGROUND

Pittinger and Merrill are Plaintiffs' scientific experts, offered to help the jury understand technical evidence about the Shen project and oil-and-gas industry practices.

Pittinger is a petroleum engineer with 40 years in the energy industry and 30 years of oil-and-gas experience. Pittinger Rpt., ¶4. He examined technical and economic evidence surrounding Shen to help the jury "understand[] the engineering, resource assessment, and economic evaluations at both the technical and managerial levels at issue in the case." *Id.*, ¶3; *see also id.*, ¶6 & Appendix B (describing information considered). Based on his review and analysis of the record and his extensive experience, Pittinger opines that, *inter alia*, Shen's producible resource size range shrank with each well following Shen-2. *E.g.*, *id.*, ¶¶11(a), 13. He also concludes that Anadarko's operative resource range for Shen ignored its structural uncertainties, including fault compartmentalization and variability in reservoir thickness, and that the asphaltene deposition properties of Shen's crude oils negatively impacted Shen's commercial viability. *See, e.g.*, *id.*, ¶¶11, 13, 22, 39-166. Pittinger

concludes that Shen was more likely than not commercially unviable by April 2015, and that it was reasonably certain that Shen was not commercially viable by December 31, 2015. *See, e.g.*, *id.*,¶¶13, 228, 299-313.

Merrill has 48 years of oil-and-gas industry experience, including as Chief Geologist in an evolving deepwater Gulf of Mexico project, where he managed geological quality assurance on exploration and development projects and oversaw teams responsible for understanding the geological risks and uncertainty. Merrill Rpt., ¶¶8-9; *id.*, Appendix I. Merrill has a Ph.D. in Geology, an M.S. in Geology, and is a Fellow of the Geological Society of America and of the Geological Society of London. *Id.*, ¶¶9-11. He has served as the President and Secretary of the American Institute of Professional Geologists, has written numerous publications on oil and gas geochemistry, regional tectonics, and other industry topics, and was a co-editor of the Giant Fields of the Decade book series (decades 1990-2000, 2000-2010, and 2010-2020) examining trends related to "giant" oil and gas fields, including in their exploration, development, and economics. *Id.*, ¶¶11-12.

Merrill reviewed internal Anadarko and third-party documents, including mapping and seismological, geophysical, engineering, and risk assessment data, email correspondence from key members of the Shen project, and published technical documentation regarding analog fields in deepwater Gulf of Mexico. *Id.*, ¶¶14-15 & Appendix II. Based on his analysis of this information and application of his scientific expertise to the record, Merrill: (i) explains key geologic and industry terms and practices necessary to understand the evidence and relevant geologic principles related to assessing oil prospects; and (ii) opines that there were known risks and uncertainties about Shen leading up to and during the Class

Period, including, *e.g.*, significant evidence of compartmentalization and faulting, inadequate pressure data to reliably project oil-water contacts following Shen-3, tar, and shrinking resource size (*id.*, ¶¶17-18; *id.*, §§V-X).

## V. LEGAL STANDARD

Rule 702 requires the Court to decide whether Plaintiffs have shown that the proposed testimony is more likely than not admissible under the Rule's qualification, reliability, and helpfulness requirements. Fed. R. Evid. 702. "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2016 WL 9560113, at *3 (N.D. Tex. Oct. 3, 2016). A qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The focus…must be solely on principles and methodology [of the expert witness], not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). "The relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

If testimony falls within "the range where experts might reasonably differ," the testimony should go to the jury. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful



4924-5794-9113.v1

instruction on the burden of proof are the traditional and appropriate means" of challenging expert testimony. *Daubert*, 509 U.S. at 596.

## VI. ARGUMENT

### A. Pittinger and Merrill Are Qualified to Offer the Challenged Opinions

Defendants do not contest that Pittinger and Merrill are qualified technical experts in the oil-and-gas industry. Nor could they. Pittinger and Merrill have nearly 30 and 50 years of oil-and-gas industry experience as a petroleum engineer and geologist, respectively. Both have relevant academic training and decades of experience working on exploration and development projects at large oil companies, including deepwater projects in the Gulf of Mexico. *See* Merrill Rpt., Appendix I; Pittinger Rpt., Appendix A. Defendants' reliance on *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999), is misplaced. *See id.* at 937 (expert offered in accident reconstruction had never conducted studies in relevant field and was unable to show that his training gave him relevant expertise).

Defendants claim that neither Pittinger nor Merrill are qualified to offer the opinions contained in the Disputed Paragraphs because "state-of-mind testimony has 'no basis in any relevant body of knowledge or expertise[,]'" and "[a]bsent a 'basis in [the experts'] body of expertise,'" the Disputed Paragraphs must be excluded. MTE at 5. That premise fails. The experts do not offer such speculative testimony.

Defendants' own authority undercuts their argument. In *Retractable Techs. Inc. v. Abbott Lab'ys, Inc.*, 2010 WL 11531436 (E.D. Tex. June 18, 2010), the court excluded only the expert's ***unsupported*** assertions about intent, while recognizing that an expert may opine



4924-5794-9113.v1

on what a party "believed" when the opinion rests "on what [the expert] hears in open court during examination of these witnesses or from documents and other exhibits." *Id.* at *6-*7. Merrill and Pittinger base their opinions on the documents and data in the record, and *Retractable* therefore supports admitting them.

### B. Defendants Attack a Strawman: the Experts Do Not Offer Impermissible State-of-Mind Opinions

Defendants recognize that Merrill and Pittinger have repeatedly stated that they cannot, and will not, speculate as to the intent, motive, or state of mind of Defendants, Anadarko personnel, or Anadarko partners. MTE at 3. When Defendants asked the experts to speculate during their deposition, both refused. For example, Pittinger testified:

> Q. And do you take from that that he believed further appraisal should not happen?
>
> A. ***Whether he thought further appraisal should not happen is beyond the scope of my report.***

Ex. 1 at 123:16-21.[2]

> Q. And are you opining that that's what led Conoco to want to sell its interest?
>
> * * *
>
> A. ***I'm not opining why Conoco left.*** I am identifying a major development that occurred that was mentioned by Conoco to Anadarko about their interpretation following Shen-3.

*Id.* at 126:6-16.

> Q. Are you expressing an opinion as to why Anadarko continued appraising Shen-3 even though Lea Frye's PIR10 dropped below .3?

---

[2] Unless otherwise noted, all exhibits referenced herein are attached hereto, emphasis is added, and citations and footnotes are omitted.

* * *

A. ***I'm not expressing an opinion on motivation***.

*Id.* at 190:25-191:7; *see also id.* at 177:4-11, 177:21-179:9, 266:24-267:10. Merrill similarly testified:

> [Q.] And were the people in development 90 – at Anadarko 90 percent confident of particular faults?
>
> A. ***That's pure speculation***. That's complete speculation. ***I can't – I can't say that***.
>
> Yes, the development team, Rodriguez and others, did see faults. ***As to their certainty, I can't comment***.

Ex. 2 at 43:13-19.

> Q. Do you have any understanding of or any explanation of how Chip Oudin – who was involved in this on a day-to-day basis – was – said that he didn't know with any certainty that his interpretation was correct?
>
> * * *
>
> Q. – that you have been able to say with 90 percent certainty that yours is correct?
>
> * * *
>
> A. That's a very long question. ***I can't speak to Chip Oudin's state of mind***.
>
> What I can say is within the maps generated by the…development group, there were faults mapped. ***How Chip Oudin felt about them, I cannot say***."

*Id.* at 187:19-188:10.

Those affirmations should end the motion. Defendants are asking to exclude testimony the experts have already disclaimed. In any event, the Disputed Paragraphs do not contain the state-of-mind testimony Defendants describe.

Defendants' overbroad ask of the Court – striking more than 50 paragraphs as "state-of-mind" testimony – ignores that the Disputed Paragraphs are not interchangeable. Some identify documents and communications the experts reviewed. Some describe conduct shown in the record, including creation and editing of maps and presentations, and the flow of information about Shen. Some use words like "aware," "concerned," or "understood" because the cited documents show what was communicated, received, or said. Others give technical opinions about faulting, compartmentalization, pressure data, connectivity, resource estimates, and economics. Still others summarize opinions supported elsewhere in the reports. Defendants lump all of that together under one erroneous label. Rule 702 requires more. The Court must examine the experts' actual opinions, not Defendants' mischaracterizations.

The first category of Disputed Paragraphs comprises paragraphs identifying the opinions' bases. These identify the documents, emails, presentations, and data the experts considered and explain why those materials support their opinions. That is not an admissibility problem. Rule 26 requires it. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring "a complete statement of all opinions the witness will express and the basis and reasons for them"); *see also* Pittinger Rpt., ¶¶56, 93-96, 102, 105-106, 115-116, 192(a), 303-304, 307-308, 310-313; Merrill Rpt., ¶¶70-71. For example, Pittinger's ¶¶93-96, 102, 105-106, and 115-116 discuss the evidence supporting his Shen-3 opinions in ¶¶85-86. *See* Pittinger Rpt., ¶86 ("In short, the results of Shen-3 rendered Shen unlikely to be commercial. The evidence will be discussed further below."). Defendants cannot convert required disclosure of the opinions' bases into inadmissible state-of-mind testimony by changing the label.

The summary paragraphs should be treated the same way. *See id.*, ¶¶11(j), 13(a), 13(d), 13(n), 329; Merrill Rpt., ¶97. Defendants focus on Pittinger's ¶329, but that paragraph does not stand alone. It appears at the end of a section that walks through the documents, presentations, and economics on which he relied. Pittinger's ¶299 says exactly what follows: "The following paragraphs show documents that establish Anadarko senior management['s] negative view after Shen-4 and persisting up to condemning results from Shen-6." Pittinger Rpt., ¶299. Defendants cannot create a *Daubert* issue by isolating conclusions from the supporting analyses.

Other challenged paragraphs address conduct shown in the record. Defendants object, for example, to Pittinger's opinion that the evidence showed Exploration "censor[ed] technical work on the most important risk impacting the Shen project," and "avoided and censored reasonable discussion of faulting and its impact." *Id.*, ¶¶81, 166. Whatever Defendants say about the word "censoring," the opinion concerns what the record shows was done: technical work prepared by Development was removed from, or kept out of, presentations about Shen. That is not testimony about anyone's private intent. The same is true of Merrill's statement that "[t]here was continuing pressure to have one version of the map," which he tied directly to an email instructing that Anadarko present "'only one set of structure maps to partners.'" Merrill Rpt., ¶73 & n.36. Expert testimony about conduct reflected in the record is admissible, including testimony that certain conduct is consistent with a particular state of mind. *See United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*, 2024 WL 4508961, at *18 (N.D. Tex. Oct. 15, 2024) ("an expert is permitted to testify that certain practices or behaviors are consistent with a certain state of mind"); *In re*

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15044626, at *31 (E.D.N.Y. Oct. 26, 2022) (expert "permissibly offer[ed] an expert opinion as to a topic other than intent, motivation, or state of mind, such as the parties' behavior").

These opinions are reliable because they are grounded in communications and technical documents, then evaluated through decades of experience with large oil-and-gas development projects. They are relevant because that context helps the jury understand what the documents mean in industry context.

Some challenged paragraphs use words like "aware," "concerned," or "understood," but they do so in direct reference to record evidence showing what information was communicated, received, or stated in contemporaneous documents. That is not mind-reading. It is expert analysis of what the technical record showed and how it was circulated and used. *See, e.g.*, Merrill Rpt., ¶¶35, 48, 59, 69; Pittinger Rpt., ¶¶29, 40, 77, 102, 116, 192, 216, 231-232, 256. An expert does not speculate by identifying what the record itself says or by explaining the technical significance of the information transmitted. *Estevis v. City of Laredo*, 2023 WL 9312081, at *7 (S.D. Tex. Dec. 28, 2023) ("[T]o the extent Rodriguez's opinions regarding a witness or party's state of mind are based on information or evidence contained in the record, those opinions are admissible."); *Taylor*, 2024 WL 4508961, at *8-*9 (while expert's "'***conclusory*** assertions regarding a defendant's state of mind are not helpful,'" expert could offer opinion where he properly cited to multiple exhibits he believed stated the motives as fact and that contributed to his overall opinion); *Payment Card Interchange*, 2022 WL 15044626, at *31 (expert testimony admissible where an expert "cites to a source stating as a fact that the party or nonparty had that state of mind and

therefore does not offer a claim about state of mind 'as his expert opinion,' but rather 'referenc[es] this fact ... as the ***basis*** for his ultimate opinion'") (emphasis in original).

Defendants' examples illustrate the point. While Defendants complain that Pittinger and Merrill comment on parties' "awareness," Pittinger and Merrill directly tie their statements to the information they saw being communicated. Merrill Rpt., ¶48 ("Anadarko was aware of potential faulting at Shen before the Class Period began. For example, by the Spring of 2014, Anadarko geoscientist Arnold Rodriquez had mapped the Shen area with a significant number of faults cutting the prospect.") (citing additional evidence); Pittinger Rpt., ¶102 ("An email quoted below from Kleckner to McGrievy showed senior management's awareness of Development's identification of faults and its impact on appraisal strategy – where and in what order to drill the wells."); Pittinger Rpt., ¶256 (explaining Executive Committee "was made aware" of bleak view, and discussing evidence in subsequent paragraphs); Pittinger Rpt., ¶77 (opining it was "highly likely that Anadarko management was aware of the importance of compartmentalization no later than August 2014," based on observation that certain findings were important enough to be presented to partners – a conclusion drawn from his industry experience, the deposition of Chip Oudin, email correspondence from project leadership discussing the Shen-related information to be communicated to partners, and documents specifically discussing Anadarko's awareness of faulting and compartmentalization); *see also* Ex. 1 at 79:24-80:14 (asked whether he is "opining as to what anyone at Anadarko knew about the influence of [certain] factors on commercial viability," Pittinger stated: "I don't think that's for me to opine on[,] I just – I

look for evidence of who received the information, who is custodian of the information and whether they commented on it or not").

Defendants' complaints about the experts' supposed improper "extrapolation from" or "characterization of" evidence they reviewed go to weight, not admissibility. It is not improper for Pittinger to observe that "[t]here is evidence that senior management was concerned about the large difference in resource size" when he then cites to an email in which a member of Anadarko senior management tells the Development team leader that "'[o]ne of the issues I know Chuck [Meloy, a member of Anadarko's Executive Committee] still has is that Portfolio still contains Exploration scenario which he knows is different than our runs.'" Pittinger Rpt., ¶216; MTE at 8; *see also* Pittinger Rpt., ¶¶299-324 (supporting statement that Shen's economic viability was in "serious doubt" in ¶299 with documentary evidence, including email from defendant R.A. Walker referring to "'recent discussions about not wanting to take [Shen] to development'" (Pittinger Rpt., ¶303) and an email between Executive Committee members stating that "'[u]nder both scenarios, the model chooses not to invest in Shenandoah and it is deactivated post-2017'" (*id.*, ¶311)). Nor is it improper for Pittinger to comment on the impact of the Exploration team's unwillingness or reluctance to use a faulted map. MTE at 9 (citing Pittinger Rpt., ¶¶37-38). Exploration's insistence on presenting a unified, unfaulted map over the Development team's objections is well-documented in the evidence Pittinger relies on and discusses throughout his report. And despite Defendants' cherry-picking (MTE at 9), Pittinger was not "impermissibly characteriz[ing]" ConocoPhillips' beliefs about Shen when he stated that ConocoPhillips was "apparently expressing frustration in Exploration's performance." Pittinger Rpt., ¶106. The

email, which he quotes immediately following that statement, expressly describes an Anadarko Executive Committee member's understanding that:

> "[T]he Exploration meeting with Shenandoah Partners did not go well at all. Conoco called them out about not working with the partners at all on the next location…. Venari, Conoco and Cobalt all wanted a more easterly location to develop critical mass. Conoco explicitly indicated that Development and Exploration needed to be in future meeting to ensure our next well is getting us closer or to a minimal field size."

*Id.*

At most, Defendants' complaints about the experts' interpretation of evidence (MTE at 8-9) are fodder for cross-examination, not exclusion. The court in *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 WL 120973 (W.D. La. Jan. 10, 2014), made the same point in rejecting a similar contention:

> This Court has reviewed all six [claimed state-of-mind] statements—including the last, in which the Defendants complain Dr. Kessler implies something about Takeda's intent—and finds that each is supported within his report by sometimes-lengthy discussion of the data, information, and he no[t]es the sources upon which these statements are founded. The evidence at trial might very well show that some, all, or none of Dr. Kessler's opinions and statements are sound and the jury might grant those opinions no weight—but again, that is the purview of the trier of fact—not the gatekeeper when, as here, the expert's Report reveals that none are, on their face, speculative in nature, but are, on [their] face, based upon his review of reams of documents and information.

*Id.* at *16; *see also Estevis*, 2023 WL 9312081, at *7 ("Plaintiff complains that there is insufficient evidence to support Rodriguez's statement that both officers were aware of this information. Plaintiff's argument that Rodriguez is simply wrong about his assessment of the evidence is best saved for cross-examination.").

Finally, Defendants' authorities do not support the sweeping relief they seek. Those cases bar unsupported expert assertions about intent. They do not bar a technical expert from relying on documents, deposition testimony, and data to explain what the record shows and its significance. *See, e.g.*, *Retractable*, 2010 WL 11531436, at *6-*7 (expert could not opine on intent where he provided no basis, but could base opinion "regarding what [defendant] believed" "on what [expert] hears in open court during examination of these witnesses or from documents and other exhibits").

### C. The Disputed Paragraphs Will Help the Jury Understand the Technical Record

The Disputed Paragraphs will help the jury evaluate technical evidence, understand available information about Shen and what individuals within the project did with that information, and whether that use was consistent with sound oil-and-gas practice. They bring something lay jurors do not have: decades of oil-and-gas experience, including the ability to understand how technical teams assess fields like Shen. The record is full of technical data, and even ordinary-looking emails use industry terms that matter to commerciality.

For example, Pittinger explains that when Darrell Hollek, a member of Anadarko's Executive Committee, stated that his "'biggest concern would be number of wells needed ***if we find we don't have a lot of connectivity***,'" he was referencing "the downside risks of fault compartmentalization" – something a non-petroleum-engineer would not know from the phrase alone. Pittinger Rpt., ¶40 (emphasis in original); *see also id.*, ¶68 (opining that Exploration's insistence on an unfaulted structure map (discussed in evidence cited in

Pittinger's ¶¶69-72, immediately following) contradicted evidence presented in the Shen-1 BP2 wireline logs). Defendants' assertion that the Disputed Paragraphs do not provide useful information because jurors "'are able [to] make their own determinations about what relevant documents show'" (MTE at 10), is wrong. Pittinger's and Merrill's expertise allows them to note distinctions, interpret data, and draw inferences that a lay person may not. Expert testimony that "suggest[s] the inference which should be drawn from applying the specialized knowledge to the facts" is relevant. Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules.

The same is true across the other technical subjects in the reports. A lay juror can read that Anadarko used a no-fault map, but Merrill and Pittinger can explain why excluding faults from a map changes the estimate of connected resource and, in turn, commerciality. A lay juror can see references to pressure data and oil-water contacts, but Merrill can explain why the absence or distribution of that data affects whether one can reliably project field-wide connectivity. None of those opinions tells the jury what anyone secretly believed. Each supplies the technical meaning the jury needs to make sense of the documents.

Defendants' cases involve conclusory, unsupported expert testimony, often where experts lacked relevant expertise. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (expert's ***conclusory*** assertions that defendant acted with requisite state of mind for plaintiff's claims were not helpful to jury); *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) (same); *United States v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016) (medical doctor did not have expertise in marketing or business, and so his summary of business and marketing documents necessarily

lacked expert basis); *Fisher v. Halliburton*, 2009 WL 5216949, at *3 (S.D. Tex. Dec. 21, 2009) (experts conclusorily opined on defendants' "specific intent" to commit alleged tort); *Jenkins v. Helmerich & Payne Int'l Drilling Co.*, 577 F. Supp. 3d 587, 597 (S.D. Tex. 2021) (expert whose opinion about dangerous condition of stairs was excluded also could not offer opinion as to whether defendants should have known about condition).

### D. Defendants' State-of-Mind Objections Are Premature and Should Be Resolved at Trial

Defendants also ask the Court to decide this issue prematurely by challenging snippets from expert reports, not actual trial testimony. Many of Defendants' objections are based on particular phrasing used by the expert or selected quotations from written expert reports that will not be given to the jury. Defendants move to exclude summary and conclusion paragraphs, for example, as speculative and unreliable even though those paragraphs by their nature summarize opinions explained elsewhere. MTE at 7-8 (citing Pittinger Rpt., ¶¶11(j), 13(a), 13(d), 13(n), 329; Merrill Rpt., ¶97). But at trial, the experts will explain the evidence that formed their ultimate opinions; they will not simply recite summary paragraphs. If Defendants believe a particular trial question crosses the line, the Court can address that question with the testimony and evidentiary context in front of it. *See DePuy*, 2016 WL 9560113, at *7 (rejecting argument that expert was speculating about state of mind and noting "any alleged speculation within Dr. Drumwright's report…should be addressed to the Court in the context of the presentation of evidence at trial"); *Estevis*, 2023 WL 9312081, at *7 ("In summary, to the extent Rodriguez's opinions regarding a witness or party's state of mind are based on information or evidence contained in the record, those opinions are

admissible. His conclusory opinions about the state of mind of the parties and witnesses are inadmissible. The admissibility of Rodriguez's specific testimony will depend on the wording he uses at trial."). A narrower trial-management approach is the proper answer to Defendants' claimed concerns.

## VII. CONCLUSION

Merrill and Pittinger will not speculate about anyone's private motives or intent. They will do what qualified technical experts are allowed to do: explain a complex oil-and-gas record, identify the technical significance of information communicated in contemporaneous documents, and give opinions grounded in the record and their expertise. The Court should deny Defendants' motion without prejudice to a trial objection if a specific question crosses that line.

DATED: July 14, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK SOLOMON
DANIEL S. DROSMAN
LUKE O. BROOKS
HILLARY B. STAKEM
NICOLE Q. GILLILAND
T. ALEX B. FOLKERTH

s/ Hillary B. Stakem
HILLARY B. STAKEM

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Class Counsel

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
(SDTX Bar No. 30973)
Attorney-in-charge
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)

Texas Local Counsel for Plaintiff

## CERTIFICATION OF WORD COUNT

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 4,978 words, exclusive of the caption, the table of contents, the table of authorities, and the signature block.

DATED: July 14, 2026

s/ Hillary B. Stakem
HILLARY B. STAKEM

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing on all counsel of record who have appeared in this matter via the Court's CM/ECF system on this, the 14th day of July, 2026.

s/ Hillary B. Stakem
HILLARY B. STAKEM