# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------x

IN RE: ANADARKO PETROLEUM CORPORATE SECURITIES LITIGATION — Case No. 4:20-cv-576

---------------------------------x

December 16, 2022
10:07 a.m. (CST)

REMOTE VIDEOTAPED DEPOSITION

of LYNDON PITTINGER, held at the above time and date taken before Erica Ruggieri, RPR, CSR and Notary Public of The State of New York.

* * *

not have my own economic run. But in my 30 years of experience of doing economic evaluations it is -- I am certain that inclusion would have made the economic case extremely uneconomic.

Q. And in your 30 years of experience when someone identifies factors that were not considered as part of a model, do oil companies typically conduct another model that does take into account those factors?

MS. JENSEN: Objection, foundation. Objection to the extent it that calls for speculation.

A. Outside of the scope of my study of what other companies do.

Q. Okay. Is it typical for engineers to eyeball a study and say no, that doesn't take into account additional factors without then providing a model as to what those factors should be and how they would

-- how they would influence the model?

MS. JENSEN: Objection to form. Foundation. Misleading.

A. In my experience, objections might, you know, might occur in review sessions where various people provided input and if someone raised an objection or a concern or requested to change an assumption, they wouldn't necessarily be obligated to come up with their own model. They could ask the person running that model to revise what they have done. But I don't think that every assessment has to have its own economic model to be valid, especially when the -- when everything -- when the information is so strongly indicative of downward negative revision -- impacts on the economics.

Q. Are you opining as to what anyone at Anadarko knew about the

influence of these factors on commercial viability?

MS. JENSEN: Objection, vague.

A. I earlier mentioned the deposition of Lea Frye talking about commingling. When she was asked whether she had discussed commingling with management, she said yes. So I don't think that's for me to opine on. I just -- I look for evidence of who received the information, who is custodian of the information and whether they commented on it or not.

Q. Okay. How important to your opinion is it that the commercial threshold was .3?

A. How important. Well, the commercial threshold is -- well, which economic valuation are you referring to?

Q. Let me ask you perhaps a different way.

When you are opining as to whether Shenandoah was commercially

viable, you are looking at whether the evaluations were below a PIR factor of .30, correct?
A. That's not correct. I'm looking at whether the PIR10 was below .3 and I'm looking at the basis of what -- of what constituted the model, what were the assumptions and what issues did they include in a reasonable balanced realistic way.
Q. Okay. And is .3 a common threshold across the oil and gas industry?
MS. JENSEN: Objection to the extent that it calls for speculation. And vague.
A. That's -- that's outside of my report.
Q. Okay. Do you know whether .3 was Anadarko's threshold for all projects?
A. Let's go to my report.
Q. Footnote 2, page 4?
A. Almost there.
MS. JENSEN: Ben, while we are

exposed to it to a fair degree.

Q. Are you aware of anyone at Anadarko who had the view that the faulting in Shenandoah rendered Shenandoah not commercially viable before Shen-6?

A. I'm looking for a Browning quote in the report.

I guess I'd return to the quote that I read in paragraph 47 where Browning says: "But certainly, if we get more pressure breaks between appraisal wells, we'll have our answer."

And that's on, in reference to "we will know which is the case until a good number of wells are on production."

The degree of how broken up the reservoir was with compartmentalization really required producing the field. So the main risk is extremely difficult to address before you make your main investment.

Q. And other than this email from Browning, are you aware of anyone at Anadarko who was of the view that Shenandoah should not be appraised because of the risk of faulting?

A. There's a quote by Chip Oudin after Shen-4. Paragraph 138. "Serious thought to consider (and I know you didn't think that I was capable of them) [...] how do you go forward with a project sanction when you know your reservoir is compartmentalized but you don't know how big your compartments are?"

Q. And do you take from that that he believed further appraisal should not happen?

A. Whether he thought further appraisal should not happen is beyond the scope of my report. But rereading that quote. Serious thought to consider I'll leave out the other parentheses. How do you go forward with a project sanction

when you know your reservoir is compartmentalized and you don't know how big your compartments are.

I think he's identifying the key issue about compartmentalization and how the uncertainty around compartmentalization unfolds when you are primarily restricted to drilling wells rather than production testing.

Q. Are you aware of any of the partners who were of the view that the faulting resulted in Shenandoah being uncommercial prior to Shen-6?

MS. JENSEN: Objection to foundation. Objection to the extent that it calls for speculation.

A. In the context of this case I do know that Conoco wanted to exit and sell their interest in the Shenandoah project after Shen-3. Let's see, there's a good discussion.

There's a quote from Lea Frye

to McGrievy on paragraph 232: "Interesting. Dan from COP called me and wanted to chat. Based on Shen-1 pressures and the new interpretation of rafts across -- rafts areas COP is concerned. He has run volume sensitivities with new maps and oil-water contact variance and is seeing in place volumes basically cut in half. They are concerned about size and commerciality."

Soon after that Conoco approached -- well, I don't know the details. You had Conoco want to leave the project but was unable to dispose of their interest. And you had Marathon who did leave the project.

Q. Do you know what led Conoco or Marathon to leave the project other than speculation?

A. You want me to reread the paragraph I just read you?

Q. No. Are you saying that

that's what led Conoco to try to sell its interest?

A. The -- seeing the volume of oil in place cut by half is a very, very significant event.

Q. And are you opining that that's what led Conoco to want to sell its interest?

MS. JENSEN: Objection, misstates.

A. I'm not opining why Conoco left. I am identifying a major development that occurred that was mentioned by Conoco to Anadarko about their interpretation following Shen-3.

Q. Okay. Just so the record is clear, you said I'm not opining why Conoco left. Conoco did not actually leave after Shen-3, did they?

A. No, they didn't. They just wanted to leave.

Q. In paragraph 75, towards the bottom, it's six lines -- or

seven lines from the bottom it says: "Relatively poor seismic imaging below salt at this depth makes it extremely unlikely that all of the barriers isolating the fault blocks could be identified before development plans are made and production begins."

In that sort of situation how does an oil company typically deal with this sort of uncertainty?

MS. JENSEN: Objection to the extent that it calls for speculation. Foundation.

A. That's beyond the scope of my report.

MS. JENSEN: So Ben, we have been going for about an hour. Can we take a break?

MR. GRUENSTEIN: Yes. Just one second.

Q. When you say it goes beyond the scope of the report, do you mean that you don't know or you didn't look into it for this report?

making up the -- comprising the matrix of the formation. You have in one side of the field there's tremendous complexity.

Exhibit 33 shows the western side of the field increasing in complexity. That's what Exploration --

I lost you. Okay, you are back.

Q. I'm always here, don't worry.

A. This is Exploration's admission to help complex the western part of the field is when they are constrained with data. But unconstrained with data, the entire eastern block is faultless with oil-water contact, full all the way to the eastern side of the structure. That's the -- I think what he's getting to is now we need to understand the east side of the field.

By analogy on the western side

you have this tremendous level of complexity and on the eastern side this tremendous level of simplicity.

Q. And do you know how they intend to -- how Anadarko intended to understand the east side of the field?

MS. JENSEN: Objection to the extent it calls for speculation.

A. That's speculating and beyond the scope of my report.

Q. You don't think that it drilled Shen-5 and Shen-6 in order to understand the east side of the field?

MS. JENSEN: Are you saying their intention? I'll just object to vague.

A. Could you repeat the question?

Q. Sure. I said that you didn't think that the reason they drilled Shen-5 and Shen-6 was in order to understand the east side of the field?

MS. JENSEN: Objection to the extent it calls for speculation.
A. Their intent is beyond the scope of my report.
Q. Whose intent is beyond the scope of your report?
A. You are asking -- I assume you are asking me about Anadarko because Anadarko is the operator.
Q. Right.
A. Of the operation.
Q. So that's outside the scope of your report?
A. What their thinking and intent, yes, it is.
Q. And how about the people who work at Anadarko, that also outside the scope of your report?
MS. JENSEN: Objection, misleading.
Q. I'll ask the question again. And how about the people who work at Anadarko, was their intent also outside the scope of your report?

A. What was their intent to do what? Where Shen-5 and Shen-6 are located, is that the question?
Q. Yes.
A. The desires --
MS. JENSEN: Object to form.
A. And objectives of where they drilled their wells are beyond -- is beyond the scope of my report.
Q. Okay. Let's continue moving through your report. So let's go to section 6. It was appraising the Shenandoah resource starting on page 71.
In paragraph 168 you say: "Risk and uncertainties abound when the reservoir is almost six miles below the surface," and then you give some other characteristics.
Do those risks and uncertainties necessarily make a field commercially unviable?
MS. JENSEN: Objection, foundation.
A. Rose and Associates

provides a methodology of addressing risks and uncertainties by quantifying the potential range of outcomes and establishing a method by calculating the expected value which is a risk weighted result of many potential outcomes.

Q. Okay. So the mere existence of these risks and uncertainties does not necessarily make a field commercially unviable, correct?

A. Correct.

Q. And as the company learns more about the risks and uncertainties, can its views on commercial viability change?

MS. JENSEN: Objection. Calls for speculation. Foundation. What company are we talking about?

MR. GRUENSTEIN: A company.

MS. JENSEN: A hypothetical company. I'll also object to improper hypothetical.

A. Are you asking, for

creating an expected value calculation is applicable to Exploration appraisal and development.

Q. I was asking specifically about this line that Shen would now not likely receive funding and I take it that you mean for any of those three?

MS. JENSEN: Asked and answered.

A. Could you repeat your question because --

Q. I think we are all on the same page.

But you said that the PIR10 did drop below .3 at some point, correct?

A. It was below .3 for most of the class period.

Q. And was there an official PIR or did different groups do different analyses?

A. That's beyond the scope of my report. What was deemed official

is beyond the scope.

Q. Well, when you say -- but you did say that the PIR10 dropped below .3. You are referring to the one that Lea Frye created, correct?

A. Yes, Lea Frye presented to a member of the Executive Committee. So I assume that's representative of information that they are using to make their decisions.

Q. Do you know whether there were other PIR10s created?

A. I think there are one-sided, Exhibit 76, Exploration doing their own economics. But I was unable to find any form where those were discussed or presented so I can't attest to any level of confidence. There were Exploration -- other groups were doing the economics, but whether they had any influence on the decision-making I was unable to determine from the document production.

Q. Are you expressing an

opinion as to why Anadarko continued appraising Shen-3 even though Lea Frye's PIR10 dropped below .3?
MS. JENSEN: Objection, asked and answered.
A. I'm not expressing an opinion on motivation.
Q. Have you ever worked on a matter where a project continued to be appraised and the PIR was below the corporate threshold?
MS. JENSEN: Compound.
A. The scope of my work was to evaluate the -- Anadarko's data acquisition analysis and findings that they made from their present program on the Shenandoah field.
Q. Right. But you are relying on your experience. I'm entitled to ask about your experience.
MS. JENSEN: Objection, argumentative.
MR. GRUENSTEIN: Maybe a little.
A. I will stick with that's

beyond the scope of my report.

Q. Okay. So you are refusing to answer?

MS. JENSEN: He gave you an answer.

A. I gave you an answer. That's outside the scope of my report.

Q. I think it's a refusal to answer.

MR. GRUENSTEIN: Rachel, are you instructing him not to answer?

MS. JENSEN: I didn't give him an instruction.

MR. GRUENSTEIN: Okay.

MS. JENSEN: I do believe he answered your question.

MR. GRUENSTEIN: I don't see an answer other than it's outside the scope of his report, which is not a valid basis not to answer a question.

Q. Are you going to answer the question?

A. It's outside the scope of

have economic measures such as NPV but they don't assign it to NAV.

Q. What does it mean 2016 capital allocation in millions?

A. It is unclear to me that that's a net or a gross number. It appears to be a net capital allocation towards -- since this came from a Shenandoah slide I believe it would be a net allocation of $108 million net to the Shenan- -- to the Shenandoah project in the year of 2016.

Q. Still would that be, for example, the cost of an appraisal?

MS. JENSEN: Objection, vague. And to the extent it calls for speculation.

A. That calls for speculation because the number seems too high for one well.

Q. How much does an appraisal well cost or how much did the appraisal wells in this case cost?

A. I don't know precisely but

approximately 200 million to, in that range.

Q. So why would a hundred be too high for an appraisal?

A. Typically capital allocation numbers are net numbers that are relevant to the company itself and not inclusive of partners. So 108 million is -- would be more appropriate for a 30 percent working interest or a little high for a -- it's a little high for one well. So maybe there's carryover of Shen-4 costs -- oh, I'm sorry.

2016. They drilled Shen-5 and start Shen-6. So that number makes sense as a net capital allocation for Shenandoah Anadarko's working interest. And involves the full well of Shen-5 plus part of Shen-6 that was drilled before the end of the year.

Q. Okay. And are you expressing an opinion as to why the

company was allocating capital to what you describe as a valueless asset?

MS. JENSEN: Objection. This has already been asked multiple times. Calls for speculation.

A. I was not expressing an opinion regarding that. I was simply showing net asset value of zero.

Q. Let's look at 312. It says: "In March 2017, McGrievy informed Abendschein that the EC substantial write-down of the net book value carried by the Shen asset."

Do you know how much the write-down that was being discussed was?

A. No, I don't.

Q. Doesn't the magnitude of the write-down impact on the analysis of whether management viewed Shen as a going concern?

MS. JENSEN: Objection to

form.

A. That's beyond the scope of my report.

Q. Well, you are saying that the fact that there was a write-down demonstrated that Anadarko's senior management did not view Shen as a going concern. That's in your report. I'm trying to understand that statement.

A. Figure 78 shows a net asset value for the Shen project of 0.0 billion which I believe probably caused a problem with accounting because of being unable to carry -- to justify the carrying of costs, the carrying of book value.

Q. And did you review any documents on that?

A. No, I did not.

Q. So you are speculating?

MS. JENSEN: Objection, characterization. Argumentative.

A. I do have the quote that I understand talking with Luis that

STATE OF NEW YORK )
ss.:
COUNTY OF NEW YORK )

I, ERICA L. RUGGIERI, RPR and a Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings in the within-entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 2022.

ERICA L. RUGGIERI, RPR, CSR, CLR