UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | § § § § | Civil Action No. 4:20-cv-00576<br><br>CLASS ACTION<br><br>The Honorable Charles R. Eskridge III |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' DAMAGES EXPERT, BJORN I. STEINHOLT**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT AND FACTUAL BACKGROUND .................. 1

II. ISSUES FOR RESOLUTION .................. 4

III. NATURE AND STAGE OF THE PROCEEDINGS .................. 4

IV. LEGAL STANDARD .................. 4

V. ARGUMENT .................. 5

A. Steinholt Is Highly Qualified and His Opinions Are Relevant .................. 5

B. Steinholt's Event Study Methodology Is Widely Accepted, Reliable, and Will Assist the Jury .................. 5

C. Defendants' Challenges to the Results of Steinholt's Analysis Are No Basis to Exclude His Testimony .................. 8

1. Steinholt's Constant-Dollar Inflation Ribbon Fits Plaintiffs' Theory and Pittinger's Opinions .................. 8

2. Steinholt's Own Assumptions Support Admissibility, Not Exclusion .................. 13

3. Defendants' Already-Rejected Firestone Disaggregation Argument Goes to Weight, Not Admissibility .................. 17

VI. CONCLUSION .................. 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) .......... 18

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) .......... 7, 9, 17

*Bocanegra v. Vicmar Servs., Inc.*,
320 F.3d 581 (5th Cir. 2003) .......... 5

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
322 F. Supp. 3d 676 (D. Md. 2018) .......... 16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 10, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... *passim*

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 6

*Garvin v. Greenbank*,
856 F.2d 1392 (9th Cir. 1988) .......... 17

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) .......... 7, 17

*Halliburton Co. v Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......... 6

*In re Homestore.com, Inc.*,
2011 WL 291176 (C.D. Cal. Jan. 25, 2011) .......... 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
801 F. Supp. 3d 330 (S.D.N.Y. 2025) .......... 16

*In re Novatel Wireless Sec. Litig.*,
2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) .......... 7, 18

**Page**

*In re Under Armour Sec. Litig.*,
730 F. Supp. 3d 172 (D. Md. 2024) .......... 7, 9, 10, 17

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
923 F. Supp. 2d 511 (S.D.N.Y. 2013) .......... 17

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .......... 6

*Numatics, Inc. v. Balluff, Inc.*,
66 F. Supp. 3d 934 (E.D. Mich. 2014) .......... 16

*Puga v. RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) .......... 5

*Rock v. Ark.*,
483 U.S. 44 (1987) .......... 5

*SEC v. Leslie*,
2010 WL 2991038 (N.D. Cal. July 29, 2010) .......... 19

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
2023 WL 6314939 (S.D.N.Y. Sep. 28, 2023) .......... 8

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 27, 2019) .......... 7, 9, 10, 17

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) .......... 17

**STATUTES, RULES AN REGULATIONS**

Federal Rules of Evidence
Rule 702 .......... 1, 4, 9, 13

17 C.F.R.
§240.10b-5 .......... 7



4930-5897-0297.v1

**Page**

**SECONDARY AUTHORITIES**

Bradford Cornell & R. Gregory Morgan,
*Using Finance Theory to Measure Damages in Fraud on the Market Cases*,
37 UCLA L. Rev. 883 (June 1990) .................................................................. 14

Marge S. Thorsen, et al.,
*Rediscovering the Economics of Loss Causation*,
6 J. Bus. & Sec. L. 93 (2006) ........................................................................ 15



4930-5897-0297.v1

## I. PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

Plaintiffs have designated Bjorn Steinholt, CFA ("Steinholt"), as an expert witness to testify about market efficiency, loss causation, and damages. Steinholt has offered this testimony, applying the same event study methodology, in many securities-fraud cases, and he has never been excluded. Based upon this universally accepted methodology, Steinholt opines that Defendants' alleged misrepresentations and omissions caused Anadarko Petroleum Corporation's ("Anadarko" or the "Company") stock price to be artificially inflated during the period February 20, 2015 to May 2, 2017, inclusive (the "Class Period") and were a substantial cause of Class members' losses following a corrective disclosure, and he quantified the artificial inflation at no less than $1.75 per share from February 21, 2015 through July 26, 2016 and at least $1.92 per share for the remainder of the Class Period. Expert Report of Bjorn I. Steinholt, CFA ("Steinholt Rpt."), ¶¶14(d), 103-106.[1] His analysis and opinions are relevant, reliable, and admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Defendants do not dispute that Steinholt is qualified to offer the opinions in his report. They do not dispute that event studies and backcasting are accepted methods for analyzing loss causation and estimating per-share damages in securities cases. Nor do they identify a defect in Steinholt's regression showing that Anadarko's stock price suffered a statistically significant negative residual return on May 3, 2017. Instead, Defendants ask the Court to exclude Steinholt because they disagree with two applications of his methodology: his use of

---

[1] *See* Ex. 19 to the Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment (ECF 322-9) ("Rosenberg Decl.").

a constant-dollar inflation ribbon and his treatment of purportedly non-fraud news concerning Firestone. Those criticisms go to weight, not admissibility.

It is also Defendants' third run at Steinholt. The Court has held that he "easily clears the *Daubert* hurdle" (ECF 141 at 4), and it rejected Defendants' prior attacks on his event study at class certification (ECF 302 at 6-9). Nothing in this motion calls for a different answer.

Defendants' principal argument is that because one of Plaintiffs' scientific experts, Lyndon Pittinger ("Pittinger"), opines that Shenandoah was "more likely than not" uncommercial after Shen-3 and "certainly not commercially viable" after Shen-4, Steinholt's constant-dollar inflation ribbon is inconsistent with Plaintiffs' theory of liability. That argument misconstrues the experts' roles and rests on a premise the Court has already rejected: this is not a materialization-of-the-risk case. Plaintiffs do not allege merely that Defendants understated an unrealized risk, but that certain risks had already materialized by the start of the Class Period, and Defendants recklessly overstated the viability of Shenandoah and concealed negative information about the project from investors, creating artificial price inflation later removed by a corrective disclosure. *Id.* at 23-24. The argument also manufactures a conflict between Plaintiffs' experts that does not exist. Steinholt's report adopts the very gradation Defendants invoke, word for word. Steinholt Rpt., ¶28(j).

Steinholt's constant-dollar inflation ribbon fits Plaintiffs' theory because it measures ***maintained*** price inflation that left the stock upon Anadarko's May 2, 2017, disclosure that it was suspending further appraisal of Shenandoah and taking a large write-down. Plaintiffs do not claim that disclosure revealed Shenandoah to be certainly worthless; the news was



4930-5897-0297.v1

unquestionably negative, yet Anadarko and analysts still described the Company as evaluating a path forward. Even accepting Defendants' premise that the disclosure conveyed 100% unviability, warranting a probability haircut for the first ten months of the Class Period, Steinholt's conservative $1.75 per-share inflation estimate still holds. If the alleged truth from day one was that Shenandoah was 100% "not commercially viable at the outset of the Class Period," as Defendants say (ECF 322-5 ("MTE") at 6), the implied inflation would equal the entire value the market then placed on Shenandoah, which analysts pegged at $3.00 to $7.00 per share, several times Steinholt's $1.75 estimate. Applying Defendants' own probability haircut to the pre-Shen-4 valuations compiled by Defendants' own expert yields $1.99 per share, still above the figure Steinholt used. And even a successful critique would reach only the first ten months of the Class Period; it could not justify excluding Steinholt's opinions for shares purchased after December 31, 2015. Defendants may press these points on cross-examination, but they identify no methodological defect, and courts routinely reject identical arguments.

Defendants' Firestone argument likewise fails and merely repeats arguments the Court already addressed. The Court rejected the same disaggregation attack at class certification, including Defendants' methodology objections. ECF 302 at 6-8. Defendants' renewed contention that some of the estimated inflation should be attributed to Firestone is a competing theory for the jury, not a basis for exclusion.

Steinholt's testimony is relevant and reliable, and Defendants' motion should be denied in its entirety.

## II. ISSUES FOR RESOLUTION

1. Whether Defendants' disagreement with Steinholt's constant-dollar inflation ribbon for the first ten months of the Class Period (between February 23, 2015 and December 31, 2015) justifies the rare remedy of exclusion under Rule 702, or instead concerns the weight of Steinholt's damages opinions.

2. Whether Defendants' Firestone-related disaggregation argument is grounds for exclusion despite the Court's recent rejection of the same *Daubert* argument, or instead presents a competing interpretation of the May 3, 2017 stock-price decline appropriately tested through cross-examination and contrary expert testimony.

## III. NATURE AND STAGE OF THE PROCEEDING

This securities-fraud action was filed on February 19, 2020. The parties filed *Daubert* motions on June 1, 2026. Trial is set for May 2027.

## IV. LEGAL STANDARD

Rule 702 governs the admission of expert testimony. It permits a qualified expert to testify where specialized knowledge will help the trier of fact and the testimony rests on sufficient facts and on reliable, reliably applied principles and methods. Fed. R. Evid. 702.

The Court's role as "gatekeeper" involves a "'preliminary assessment' as to the validity of the reasoning or methodology underlying the testimony and 'whether that reasoning or methodology properly can be applied to the facts in issue.'" ECF 302 at 5.[2] "The focus, of course, must be solely on principles and methodology, not on the conclusions

---

[2] Unless otherwise noted, all citations are omitted, emphasis is added, and exhibits referenced herein are attached hereto.

that they generate." *Daubert*, 509 U.S. at 595. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (citing *Rock v. Ark.*, 483 U.S. 44, 61 (1987)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly, "'the rejection of expert testimony is the exception rather than the rule.'" *Puga*, 922 F.3d at 294; *see also Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 590 (5th Cir. 2003) (reversing exclusion of expert).

## V. ARGUMENT

### A. Steinholt Is Highly Qualified and His Opinions Are Relevant

Defendants do not dispute and the Court has already found that Steinholt, a Chartered Financial Analyst, is qualified to testify on matters relating to market efficiency, materiality, loss causation, and damages. Steinholt Rpt., ¶¶1-4; ECF 141 at 4 ("Steinholt easily clears the *Daubert* hurdle."); ECF 302 at 6 (Steinholt's qualifications cannot be disputed).

Nor do Defendants dispute relevance. Steinholt's opinions go directly to reliance, loss causation, and damages.

### B. Steinholt's Event Study Methodology Is Widely Accepted, Reliable, and Will Assist the Jury

There is no dispute that:

- Steinholt conducted regression and event study analysis consistent with academic literature and case law;
- Anadarko's stock price suffered a statistically significant negative residual return on May 3, 2017;

- Steinholt analyzed Company-specific news and possible non-fraud explanations for Anadarko's stock-price decline;
- Steinholt quantified per-share artificial inflation from the May 3, 2017 residual return; and
- Class members suffered economic damages if Plaintiffs prove the alleged fraud and the jury credits Steinholt's damages analysis.

Defendants do not contest that Steinholt's event study is an appropriate methodology. Event studies are commonly accepted in securities-fraud cases and conform with the loss causation principles that the Supreme Court set forth in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). As the Court previously held, Plaintiffs have already established, based on "binding precedent," that "the event study of the type [Steinholt] conducted is 'a well-established method for analyzing the effect' of company disclosures on stock prices.'" ECF 302 at 9 (citing *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683-84 & n.37 (5th Cir. 2015); *Halliburton Co. v Erica P. John Fund, Inc.*, 573 U.S. 258, 280-82 (2014)).

Consistent with standard event-study methodology, Steinholt's event study: (i) identifies statistically significant movements in Anadarko's stock price; (ii) identifies the Company-specific news that caused Anadarko's stock price to change; (iii) quantifies the daily stock-price movement caused by the Company-specific news by controlling for general market and industry factors; and (iv) analyzes the news that caused the stock price movements to determine whether, and if so, how, it related to the alleged misrepresentations. Steinholt Rpt., ¶¶103-106. At most, Defendants' motion disputes Steinholt's conclusions about the amount of inflation and the extent to which Company-specific news on May 3,

2017 was fraud-related – a disagreement appropriately decided by the jury, not on a *Daubert* motion.

In addition to loss causation, Steinholt opines on estimated per-share damages caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. The difference between Anadarko's trading price and its value absent the alleged fraud is the per-share inflation, commonly called "per share" or "out-of-pocket" damages. *Id.*, ¶103. Steinholt's inflation ribbon estimates inflation in the stock price attributable to the fraud on each day of the Class Period by working backward from the disclosures of the relevant truth (sometimes referred to as "backcasting"). *Id.*, ¶¶103-106; *cf. Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect.").

The methodology Steinholt employed to construct the value line is reliable, recognized as "the traditional measure of damages in Rule 10b-5 cases," and supported by academic literature and caselaw. *See* Steinholt Rpt., ¶¶103-106; *see also In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *11 (S.D. Cal. Oct. 25, 2013) (denying motion to exclude Steinholt and approving "backcasting" as "reasonable and logical"); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("the constant dollar inflation method is commonly used to calculate 10b-5 damages"); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *6-*8 (D. Ariz. Dec. 27, 2019) (constant-dollar inflation "an accepted methodology"); *In re Under Armour Sec. Litig.*, 730 F. Supp. 3d 172, 182 (D. Md. 2024)

("courts commonly accept the constant dollar inflation method"); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sep. 28, 2023) (same).

Because Steinholt applies a widely-accepted methodology, and does so reliably and consistent with his standard practices, his opinions are admissible.

### C. Defendants' Challenges to the Results of Steinholt's Analysis Are No Basis to Exclude His Testimony

#### 1. Steinholt's Constant-Dollar Inflation Ribbon Fits Plaintiffs' Theory and Pittinger's Opinions

Defendants argue that Steinholt's analysis is inadmissible because it uses a constant-dollar inflation ribbon even though Pittinger opines that Shenandoah was "more likely than not" uncommercial after Shen-3 and "certainly not commercially viable" after Shen-4. There is no "fundamental disagreement" between Plaintiffs' experts. Pittinger is an engineering expert; he does not offer an event study, a loss causation opinion, or a damages model. Steinholt is a damages expert; he assumes the facts Plaintiffs intend to prove and estimates the stock-price impact of the alleged relevant truth. Steinholt's report expressly states his assumption that "Shen was more likely than not uncommercial after the results of Shen-3, and certainly not commercially viable after Shen-4." Steinholt Rpt., ¶28(j). He also assumed that "[e]ach well post-Shen-2 reflected a significantly reduced Shen resource size." *Id.*, ¶28(a). Accepting Plaintiffs' allegations, Steinholt established when artificial inflation entered the stock price and how much of it remained when the May 2 disclosure occurred.

Beyond that, Defendants' argument boils down to a contention that the jury should reject Steinholt's conclusion about what those facts imply for inflation. That contention fails for several independent reasons.

First, that argument is not a Rule 702 issue, and courts have consistently rejected nearly identical challenges. *Smilovits*, 2019 WL 7282026, at *7-*9 (denying motion to exclude plaintiffs' expert's "constant dollar inflation" method because "[d]efendants' arguments go more to the correctness of [plaintiff's expert's] conclusions than the method by which he reaches them … the jury must assess the validity of [the expert's] conclusions"); *Baker*, 423 F. Supp. 3d at 909 ("whether [constant-dollar inflation] best approximates damages is a decision best left to the jury"). As the court in *Under Armour* explained in rejecting a similar argument:

> [B]ecause "the jury is ultimately responsible for deciding whether [constant dollar inflation], or another calculation, is a reasonable measurement of damages," [the expert's] "decision to use the [constant dollar inflation] method in this case is sufficiently reliable for purposes of *Daubert*." To the extent that Defendants contend that there is evidence in the record to show that the magnitude of the fraud fluctuated throughout the Class Period, the remedy is not exclusion, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

730 F. Supp. 3d at 182-83.

Second, Defendants' constant-inflation attack fails because it hinges on recharacterizing Plaintiffs' theory as a time-varying risk-premium theory. The Court rejected that premise at class certification, holding that Plaintiffs do not assert that Defendants merely "under-represented an ***unrealized*** risk," but instead assert that "certain risks had ***in fact*** materialized, yet Defendants actively misled investors to the contrary." ECF 302 at 23-24 (emphasis in original). The Court further held that Plaintiffs' damages model measures "'the difference between the price paid and the true value of the security at

the time of the initial purchase'" and therefore satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). ECF 302 at 24.

Far from raising a basis to exclude Steinholt, Defendants' argument that he should have accounted for varying inflation simply raises a factual dispute. As the court explained in *Smilovits*, "the Court must look to Plaintiffs, not Defendants, for the nature of their liability case." 2019 WL 7282026, at *8; *see also Under Armour*, 730 F. Supp. 3d at 182 (same). Thus, where "Plaintiffs claim they can prove an extent of knowledge at the beginning of the Class Period … that will support [plaintiffs' expert's] opinion that the full amount of the fraud-related inflation was in the stock from the start…. [T]he jury must assess the validity of [plaintiffs' expert's] conclusions." *Smilovits*, 2019 WL 7282026, at *6-*8; *Under Armour*, 730 F. Supp. 3d at 182 ("Plaintiffs claim they can prove their case and support [expert's] opinion that the full amount of the fraud-related inflation was in the stock from the start of the Class Period. As such, the jury must assess the validity of [expert's] conclusions.").

Defendants' characterization of Steinholt's class-certification rebuttal does not support their argument. Defendants contend that the only liability theory that fits Steinholt's model is that Defendants knew for certain Shenandoah was not commercially viable at the outset of the Class Period, with all of the inflation entering the stock at once. That is not what Steinholt said. His report adopts the gradation Defendants invoke: "Shen was more likely than not uncommercial after the results of Shen-3, and certainly not commercially viable after Shen-4." Steinholt Rpt., ¶28(j).

Third, Defendants' argument that investors would have reacted differently to a disclosure that it was "only ***likely*** that the project was unviable" during the first ten months of the Class Period, as opposed to "***certain*** that the project was unviable" during the remaining portion of the Class Period, is a matter for cross-examination, not a basis for exclusion. MTE at 2 (emphasis in original). It also rests on an erroneous factual assumption that the May 2, 2017 suspension of Shenandoah appraisal activities revealed that Shenandoah was "certainly not commercially viable." *Id.* at 9. It did not. On the May 3, 2017 conference call, defendant R.A. Walker explained that Anadarko was "continuing to evaluate exactly what the next steps ought to be," and that "we'll certainly talk to you about that as we and our partners decide on the next steps." Ex. 1 at 5. As Steinholt noted, at the end of the Class Period, even if Anadarko ultimately decided not to develop Shenandoah, Anadarko could always "sell it to someone else" – assuming it still had some economic value. Ex. 2 at 180:11-182:5 ("So yes, both … after the end of the class period and at the beginning of the class period, according to th[eir] allegation[s], there might have been some value to it."); *see also id.* at 184:14-186:8 ("[T]he same issues that plaintiffs alleged resulted in the suspension of the Shenandoah, were present at the beginning of the class period."); Rosenberg Decl., Ex. 22, ¶14 n.17.

Analysts also understood that Anadarko was "evaluat[ing] the path forward," which included deciding whether to "monetiz[e] the field or abandon[] it," not that it was 100% "doomed" or "certainly not commercially viable" (Ex. 3 (May 3, 2017 UBS report) at UBS_00017442):

- Ex. 4 (May 2, 2017 BMO report) at APC-01553910 ("APC evaluates a path forward following the #6 well.").
- Ex. 5 (May 2, 2017 Barclays report) at BARC_0002094 ("APC has suspended appraisal activit[ies] in [Shenandoah] to reevaluate.").
- Ex. 6 (May 2, 2017 Johnson Rice report) at APC-01334815 ("Appraisal activity is now suspended at the field while Anadarko evaluates its options.").
- Ex. 7 (May 2, 2017 Raymond James report) at APC-01553905 ("[T]he company has suspended appraisal activity in the field while it evaluates the path forward.").
- Ex. 8 (May 3, 2017 Deutsche Bank report) at APC-01334936 ("APC will evaluate the go-forward plan at Shenandoah (within the next 180 days).").

Some analysts went further. On May 2, 2017, RBC stated: "[w]e think APC remains committed to evaluating the potential of this project," implying a view that Shenandoah was still commercially viable. Ex. 9 at APC-01334917. A May 3, 2017 Cowen report, on the other hand, stated: "[w]e think there's a meaningful chance that Anadarko will not remain active on the prospect within the 180 day window," a view consistent with the alleged truth at the beginning of the Class Period that "Shen was more likely than not uncommercial." Ex. 10 at STEINHOLT_0009711.

Consequently, Steinholt's estimate does not capture the entire artificial inflation that a disclosure that Shenandoah was certainly unviable would have removed, just the portion of the inflation removed by the actual disclosure. The May 3, 2017, decline therefore marks a floor for the true inflation, not a ceiling, and it is one more reason Steinholt's $1.75 estimate is conservative.

### 2. Steinholt's Own Assumptions Support Admissibility, Not Exclusion

Defendants separately argue that Steinholt's damages methodology is unreliable because it conflicts with his own assumptions. That argument simply repackages the same merits dispute. Steinholt's report acknowledged the very facts Defendants emphasize: the alleged truth developed from "more likely than not uncommercial" after Shen-3 to "certainly not commercially viable" after Shen-4. Steinholt Rpt., ¶28(j). Steinholt then applied an accepted event-study and backcasting methodology to estimate the price inflation attributable to concealment of the alleged truth. Nothing in Rule 702 required him to abandon that accepted methodology and instead model a day-by-day risk premium the Court has already held is not Plaintiffs' theory.

Regardless, the argument's premise is wrong. Steinholt's ribbon is not flat. As Defendants acknowledge, it steps up from $1.75 to $1.92, with the lower figure earlier in the Class Period and the higher figure later, after Shen-4. MTE at 5. Backcasting reflects changes in inflation where the record supports them. Defendants' real complaint is that the method did not produce the particular downward adjustment they prefer for the first ten months, and that is a dispute about amount, not about methodology.

Defendants contend that for Steinholt's model to be "appropriate," it would need to "account for how the differences in Shenandoah's value would impact the overall pattern of inflation throughout the Class Period." *Id.* at 9. But Steinholt's model does that, ***conservatively*** estimating damages. Defendants' haircut adjusts one variable while ignoring the other. Early in the Class Period, the probability that Shenandoah would fail may have



4930-5897-0297.v1

been lower, but the value the market placed on Shenandoah was far higher. A probability discount means nothing until it is applied to the value at stake, and once both inputs are in the equation, Defendants' own adjustment raises the number rather than lowering it. In fact, Steinholt's estimate sits below what a truthful disclosure at the start of the Class Period would have caused, given how analysts then valued Shenandoah. Bank of America, for example, valued Shenandoah at roughly $4.00 per share on June 26, 2015. Disclosure of certain unviability would have eliminated the entire value, resulting in a price impact of $4.00 per share. Disclosure that failure was more likely than not still implies an impact above $2.00 per share. Steinholt estimates $1.75.

And as Defendants' expert Peter Keller noted, "the valuations also suggest that analysts attributed an increasingly smaller value to Shenandoah as the appraisal prospect progressed." Rosenberg Decl., Ex. 20, ¶97. Consequently, had Steinholt assumed that the relevant truth at the beginning of the Class Period was that Shenandoah was "certainly unviable," the price impact would have been larger earlier in the Class Period, when analysts attributed a greater value to Shenandoah, than the impact at the end of the Class Period ($1.75 per share) that Steinholt used to estimate inflation.

It is well known that the event study approach will likely "significantly understate the true damages," when inflated expectations are gradually reduced, as they were here, because the inflation is understated in the earlier periods. Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 906 (June 1990). Even so, the event study approach is almost always used and is the "gold standard, which is accepted by both courts and economists." ECF 86-1, ¶55 n.72

(quoting Marge S. Thorsen, et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006)).

The event study can also be checked against fundamental valuations, and here the market supplied them in real time. At his deposition, when asked about a 40% haircut due to Shenandoah still having some probability of being commercially viable, Steinholt explained:

> At this point in time the inflation that I have is $1.75. And for instance, if you're talking about Capital One, we are dealing with estimates of [$]4 to $7 per share value [on February 2, 2015]. [The inflation of $1.75] is only a fraction of that. It's also a fraction of the $3 per share estimated by Morgan Stanley [on March 3, 2015]. It's also a fraction of the 5.81 per share [estimated] by Imperial Capital [on April 9, 2015].

Ex. 2 at 220:6-221:21. Even with a 40% haircut, $1.75 remains conservative.

In fact, Defendants' own expert identified six firms providing valuations before the Shen-4 disclosure, a group that did not include Capital One's $4-$7 value of Shenandoah. Rosenberg Decl., Ex. 20 at Figure 8; *id.*, Appendix B; Exs. 11-21. These six firms' average valuation of Shenandoah to Anadarko pre-Shen-4 (when Shenandoah was "more likely than not uncommercial") was $3.31 per share. Applying a 40% haircut to that average yields $1.99 per share, still above the $1.75 Steinholt used. Even after examining Steinholt on this very topic, Defendants do not address his explanation for why his estimated inflation at the beginning of the Class Period is reasonable and conservative or argue that his reasoning is somehow flawed. Defendants simply proceed as if Steinholt's testimony and explanation do not exist.

Defendants' own description of Plaintiffs' theory worsens their problem. If, as Defendants insist, the only theory that fits Steinholt's model is that Shenandoah "was not

commercially viable at the outset of the Class Period" (MTE at 6), then no haircut applies at all, and the implied inflation is the full $3.00-$7.00 per share the market then placed on Shenandoah, a multiple of Steinholt's $1.75.

Importantly, Defendants' own expert Allen Ferrell ("Ferrell") has performed no economic analysis to demonstrate that a $1.75 per-share inflation at the beginning of the Class Period is unreasonable. He has performed no competing event study. He has performed no competing fundamental valuation analyses. No economic analysis in the record shows that Steinholt's inflation at the beginning of the Class Period is overstated, let alone materially so. Ferrell chose to critique rather than calculate, and that choice has consequences. As the court in *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676 (D. Md. 2018), held with respect to a similar challenge in a securities-fraud case:

> Defendants do not, however, submit their own rebuttal event study, and so they neither provide a contrary conclusion … nor an example of the "proper" methodology that should have been deployed in this case. Without more, Defendants' critiques go only to the credibility and weight of [plaintiffs' expert's] opinions, not their admissibility.

*Id.* at 688.

Defendants' reliance on *Comcast*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330 (S.D.N.Y. 2025), and *Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934 (E.D. Mich. 2014), is misplaced. Steinholt's model fits Plaintiffs' liability theory because it assumes the alleged truth Plaintiffs intend to prove and conservatively measures the market impact of the disclosure of that truth. The Court has already held that Plaintiffs' out-of-pocket inflation model is tied to their liability theory and satisfies *Comcast*. ECF 302

at 23-24. Defendants' disagreement with the amount of the price impact is precisely the kind of dispute that belongs before a jury. *Baker*, 423 F. Supp. 3d at 909-10; *Smilovits*, 2019 WL 7282026, at *7-*9; *Under Armour*, 730 F. Supp. 3d at 182.

Even if the jury were to conclude that Steinholt's constant-dollar estimate should be reduced, that would only impact the first ten months of the Class Period. And even for that time-frame, "the problem doesn't defeat the expert's model." *Household*, 787 F.3d at 424. Instead, the jury would be charged with estimating damages based on the evidence. *Id.*; *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931) (damages sufficient if shown "as a matter of just and reasonable inference, although the result be only approximate"); *Garvin v. Greenbank*, 856 F.2d 1392, 1401 (9th Cir. 1988) ("Damages need not be proven to a mathematical certainty," but rather an "intelligent estimate without speculation and conjecture."); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 532-37 (S.D.N.Y. 2013) ("losses resulting from securities fraud need not be proved with mathematical precision").

### 3. Defendants' Already-Rejected Firestone Disaggregation Argument Goes to Weight, Not Admissibility

Defendants separately argue that Steinholt failed to disaggregate the effect of news concerning a Firestone, Colorado explosion from the effect of the Shenandoah corrective disclosure because: (1) he used a Colorado peer-company index, which Defendants say cannot control for oil-and-gas industry movements; and (2) the Firestone explosion was a one-time event.

Defendants advanced these same arguments at class certification, and the Court rejected them. ECF 302 at 6-9; ECF 237 at 11. For example, the Court held that Steinholt's Firestone-control event study was not an unreliable "'shift in methodology'" because he used a Colorado peer-company index identified by Defendants' own expert in response to Defendants' Firestone argument. ECF 302 at 6-9. The Court concluded Steinholt's opinions were "based on accepted methods reliably applied to the facts of this case." *Id.* at 9. Defendants identify no new methodological defect; they simply ask the Court to revisit a causation dispute it has already held is a factual issue rather than a basis for exclusion.

Regardless, Defendants' arguments fail now for the same reason they failed then. Steinholt's Colorado peer group is comprised solely of oil-and-gas companies, so it controls for oil-and-gas industry news. ECF 118-1, ¶20. More, the broader industry index increased on May 3, so it did not explain any portion of Anadarko's May 3 decline, and assigning more weight to the broader industry would have increased the fraud-related decline. *Id.*; ECF 86-1 at 109. The parties also agree the relevant Firestone-related news concerned increased regulatory scrutiny, which was not a one-time event. ECF 284 at 34:6-8; ECF 239 at 9.

Finally, even if Defendants could show that Steinholt did not consider some potentially confounding factor, that "go[es] to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013); *see also Novatel*, 2013 WL 12144150, at *8 ("[T]he failure to include one of the relevant [non-fraudulent] variables does not dictate exclusion of the [loss causation] report as unreliable."); *In re Homestore.com, Inc.*, 2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) (expert who "[made] an attempt to account for other possible causes" met "the reliability

threshold"); *SEC v. Leslie*, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010) ("While [defendant] certainly may argue to the jury that [the loss causation expert] did not reliably filter out other confounding variables …, he has not shown that [the expert's] opinion is so unreliable that it must be excluded.").

## VI. CONCLUSION

Defendants identify no defect in Steinholt's methodology, offer no competing damages analysis, and largely reargue issues this Court has already decided. Defendants' motion should be denied in its entirety.

DATED: July 14, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK SOLOMON
DANIEL S. DROSMAN
LUKE O. BROOKS
HILLARY B. STAKEM
NICOLE Q. GILLILAND
T. ALEX B. FOLKERTH

s/ Luke O. Brooks
LUKE O. BROOKS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Class Counsel

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
(SDTX Bar No. 30973)
Attorney-in-charge
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)

Texas Local Counsel for Plaintiff

**CERTIFICATION OF WORD COUNT**

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 4,972 words, exclusive of the caption, the table of contents, the table of authorities, and the signature block.

DATED: July 14, 2026

s/ Luke O. Brooks
LUKE O. BROOKS

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing on all counsel of record who have appeared in this matter via the Court's CM/ECF system on this, the 14th day of July, 2026.

s/ Luke O. Brooks
LUKE O. BROOKS