UNITED STATES DISTRICT COURT`

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | § § § § | Civil Action No. 4:20-cv-00576<br><br>CLASS ACTION<br><br>The Honorable Charles R. Eskridge III |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. ISSUES REQUIRING RESOLUTION ..... 3

III. NATURE AND STAGE OF THE PROCEEDING ..... 4

IV. STATEMENT OF FACTS ..... 4

A. Background ..... 4

B. Defendants Touted Shenandoah While Concealing "Bad News" ..... 5

1. Shen-3 Was "Dry" but the "Spin Control Must've Worked" ..... 6

2. Shen-4 Hit a "Lot of Tar/Asphalt" and Defendants Eyed an "Exit Strategy" ..... 8

3. Shen-5 Found "a Lot of Tar" and Faulting ..... 10

4. Defendants Planned a "Substantial Writedown" Before Shen-6 ..... 11

C. Defendants' Scheme to Suppress the Truth ..... 12

1. Censoring Discussion of Risks: "Open Technical Discussion Is Not Something We Like to Do Here" ..... 13

2. Flouting Internal Policies, Which Led to "Bunk" Resource Estimates ..... 14

3. Violating GAAP and Anadarko's Own Accounting Policies ..... 15

4. Silencing Whistleblower Frye, Who Was "Scared" Anadarko Was Committing "Fraud to Our Outside Investors" ..... 17

D. While Frye Remained Muzzled, Anadarko Wrote Down Shen for $902 Million ..... 18

V. LEGAL STANDARDS ..... 19

VI. TRIABLE ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ..... 19

A. A Reasonable Jury Could Find Material Misstatements ..... 19




4900-1832-4412.v2

**Page**

1. Defendants Misrepresent Plaintiffs' Theory .................................. 20

2. Defendants' Statements Touting Shenandoah Obligated Them to Disclose Associated Negative Information ................................ 21

3. The Misstatements Are Actionable ............................................... 24

a. Defendants' Statements Were Not Puffery .......................... 24

b. Risk Statements ............................................................... 26

c. Accounting-Policy Statements ............................................ 27

d. Financial Statements ........................................................ 28

e. Sarbanes-Oxley Certifications ............................................ 28

B. Defendants' Scheme Challenges Fail ....................................................... 29

C. A Reasonable Jury Could Find Scienter .................................................. 30

D. Summary Judgment on Loss Causation Is Unwarranted ........................... 35

1. Plaintiffs' Evidence Easily Establishes Triable Issues on Loss Causation ....................................................................................... 35

2. Defendants' Arguments Contradict the Law and Ignore the Evidence ........................................................................................ 36

E. Control-Person Liability ........................................................................... 40

VII. CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) .......... 27

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) .......... 36, 37

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 19

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .......... 26

*Callinan v. Lexicon Pharms., Inc.*,
479 F. Supp. 3d 379 (S.D. Tex. 2020) .......... 25

*Christian v. Lowe's Cos., Inc.*,
2024 WL 3639518 (E.D. La. Aug. 2, 2024) .......... 12

*Cooper Tire & Rubber Co. v. Farese*,
423 F.3d 446 (5th Cir. 2005) .......... 30

*Damas v. Tex. Health Presbyterian Flower Mound*,
2022 WL 831813 (E.D. Tex. Jan. 28, 2022) .......... 12, 26

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
579 F. Supp. 3d 933 (S.D. Tex. 2022) .......... 6, 27

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014) .......... 27

*Flowers v. Wal-Mart Inc.*,
79 F.4th 449 (5th Cir. 2023) .......... 19, 33

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......... 34

*Gentry v. Hamilton-Ryker IT Sols., L.L.C.*,
102 F.4th 712 (5th Cir. 2024) .......... 19

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) .......... 37, 38

**Page**

*Hall v. Rent-A-Center, Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ........................................................ 25

*Hernandez v. United States*,
888 F.3d 219 (5th Cir. 2018) ........................................................................ 29, 40

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .............................................................................. 27

*In re Apache Corp.*,
2022 WL 4277350 (S.D. Tex. Sep. 15, 2022) ........................................................ 34

*In re BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) .................................................. 37, 38

*In re BP p.l.c Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................................................ 25

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) ........................................................... 23, 24

*In re Cassava Scis., Inc. Sec. Litig.*,
2024 WL 4824243 (W.D. Tex. Nov. 15, 2024) ...................................................... 35

*In re Concho Res. Inc.*,
2023 WL 2297425 (S.D. Tex. Feb. 23, 2023) ........................................................ 32

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................... 40

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ............................................................................. 27

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007) ................................................................. 25

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ......................................................... 24, 31, 32

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................................. 38



4900-1832-4412.v2

**Page**

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) .......................................................................... 19

*Jackson v. Gautreaux*,
3 F.4th 182 (5th Cir. 2021) ............................................................................. 20

*Kane v. Madge Networks N.V.*,
2000 WL 33208116 (N.D. Cal. May 26, 2000),
*aff'd sub nom. Kane v. Zisapel*,
32 F. App'x 905 (9th Cir. 2002) ...................................................................... 23

*KB Partners I, L.P. v. Pain Therapeutics, Inc.*,
2015 WL 3794769 (W.D. Tex. June 16, 2015) ................................................... 19, 22

*Lorenzo v. SEC*,
587 U.S. 71 (2019) ......................................................................................... 29

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .................................................................. 19, 26, 35, 38

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) ....................................................................................... 28

*Morrissey v. King*,
2014 WL 4802436 (N.D. Tex. Sep. 26, 2014) ..................................................... 26

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .......................................................................... 25

*Nguyen v. Radient Pharms. Corp.*,
946 F. Supp. 2d 1025 (C.D. Cal. 2013) ............................................................. 39

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................... 27

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ....................................................................... *passim*

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) ...................................................................... 27

**Page**

*Pub. Emps.' Ret. Sys. of Miss. v. Amedysis, Inc.*,
769 F.3d 313 (5th Cir. 2014) .................................................................. 16, 35, 37, 38

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ........................................................................... 25

*Schelling v. Microvast Holdings, Inc.*,
796 F. Supp. 3d 390 (S.D. Tex. 2025) ................................................................ 31

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ........................................................................... 25

*SEC v. Blackburn*,
431 F. Supp. 3d 774 (E.D. La. 2019)
*aff'd*, 15 F.4th 676 (5th Cir. 2021) ..................................................................... 30

*SEC v. Seghers*,
298 F. App'x 319 (5th Cir. 2008) ...................................................................... 35

*SEC v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sep. 30, 2021) ........................................................ 30

*Spitzberg v. Hou. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ........................................................................ 31, 36, 37

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014) .................................................................. 28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ......................................................................................... 32

*Tuchman v. DSC Commc'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ........................................................................... 33

*Yoshikawa v. Exxon Mobil Corp.*,
2024 WL 3802997 (N.D. Tex. Aug. 12, 2024) ...................................................... 30

**Page**

## STATUTES, RULES, AND REGULATIONS

Federal Rules of Civil Procedure
Rule 56 .......... 1
Rule 56(a) .......... 19

17 C.F.R.
§240.10b-5 .......... 29, 40
§240.10b-5(a) .......... 29
§240.10b-5(b) .......... 25, 28
§240.10b-5(c) .......... 29

# INDEX OF DEFINED TERMS

| **PARTIES** | |
|---|---|
| Plaintiffs | Class Representatives Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and the Class of investors certified by the Court in ECF 302 |
| Defendants | Anadarko, Gwin, Walker, Daniels, and Leyendecker, collectively |
| Anadarko/ Company | Anadarko Petroleum Corporation |
| Walker | R.A. Walker – Chairman, President, and Chief Executive Officer; Executive Committee member |
| Daniels | Robert P. Daniels – Executive Vice President of International and Deepwater Exploration; Executive Committee member (May 2013 – Dec. 2016) |
| Gwin | Robert G. Gwin – Executive Vice President of Finance and Chief Financial Officer; Executive Committee member |
| Leyendecker | Ernest A. Leyendecker, III – Senior Vice President of Exploration, Gulf of Mexico (Feb. 2014-Apr. 2015); Senior Vice President of International Exploration (Apr. 2015-Aug. 2016); Executive Vice President of International & Deepwater Exploration (Aug. 2016-Oct. 2017); Executive Committee member (Aug. 2016-Oct. 2017) |
| **ANADARKO EMPLOYEES** | |
| Blakeley | David Blakely – Manager of Gulf of Mexico Exploration Engineering |
| Camden | Chris Camden – Deepwater Exploration Engineering |
| Chandler | Paul Chandler – Senior Geological Advisor |
| Frye | Lea Frye – Senior Staff Reservoir Engineer, Gulf of Mexico Development |
| Green | Catherine Green – Property Accounting |
| Hollek | Darrell Hollek – Senior Vice President, Gulf of Mexico and International Development; Executive Committee member |
| Holly | Brad Holly – Vice President, Rockies Region (May 2013-Sept. 2016); Senior Vice President, U.S. Onshore Exploration and Production (Sept. 2016-May 2017) |
| Ingram | Mitchell Ingram – Executive Vice President of International, Deepwater & Exploration; Executive Committee member |

**Page**

| | |
|---|---|
| Kleckner | James Kleckner – Executive Vice President, International and Deepwater Operations (June 2013-Sept. 2016); Executive Committee member |
| McGrievy | Patrick McGrievy – General Manager, Deepwater Gulf of Mexico |
| Meloy | Chuck Meloy – Executive Vice President of U.S. Onshore Exploration and Production; Executive Committee member |
| Oudin | Charles "Chip" Oudin, III – Distinguished Geophysical Advisor, Gulf of Mexico Operations |
| Ramsey | Jonathan Ramsey – Exploration Manager, Central and Eastern Deepwater Gulf of Mexico |
| Shotts | Doug Shotts – Project Reservoir Engineering Advisor |
| Strickling | Robert Strickling – Reservoir Engineer, Exploration |
| Szabo | Shandell Szabo, Director of Investor Relations |
| **KEY TERMS** | |
| 3Q16 | Third quarter of 2016 |
| Class Period | February 20, 2015 to May 2, 2017, inclusive |
| Dry hole | A well incapable of economically producing saleable hydrocarbons in sufficient quantities to justify commercial exploitation. Often referred to as "wet" if only water is encountered. |
| EC | Anadarko's Executive Committee |
| GAAP | Generally Accepted Accounting Principles |
| GOM | Gulf of Mexico |
| MMBOE | Million Barrels of Oil Equivalent |
| BBOE | Billion Barrels of Oil Equivalent |
| OWC | Oil-water contact |
| PIR10 | Profit to Investment Ratio where both numerator and denominator are discounted at 10% per year. |
| RCT | Anadarko's Risk Consistency Team |
| SEC | U.S. Securities and Exchange Commission |

**Page**

| **DOCUMENTS** | |
|---|---|
| Defs.' Ex(s). | Exhibits attached to the Declaration of Lauren M. Rosenberg in Support of Defendants' Motion for Summary Judgment (ECF 315, 322-9) |
| Ex(s). | Exhibits attached to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Motion for Summary Judgment, filed concurrently herewith |
| MSJ | Defendants' Motion for Summary Judgment (ECF 322-1) |
| Regan MTE Opp. | Plaintiffs' Opposition to Defendants' Motion to Exclude Certain Testimony of D Paul Regan, filed concurrently herewith |
| Steinholt MTE Opp. | Plaintiffs' Opposition to Defendants' Motion to Exclude Testimony of Plaintiffs' Damages Expert, Bjorn I. Steinholt, filed concurrently herewith |

# I. INTRODUCTION

Defendants told investors one story about Shenandoah and told another internally. Publicly, the appraisal wells were "very successful," the resource range was "right in where we thought," and the project was "worthy of spending capital." Privately, Shenandoah was "[s]hy of break-even economics," "not commercially viable," and "shrinking with appraisal." Management eyed an "exit strategy," and Walker saw "no way we will want to take this to development today." When analysts reacted favorably to Defendants' positive discussion of a "very negative" appraisal well, one Anadarko manager marveled, "the spin control must've worked. Wow."

The gap between what Defendants knew and said is the heart of this case, and assessing that gap is the jury's job. Defendants ask the Court to do what Federal Rule of Civil Procedure 56 forbids: credit Defendants' self-serving testimony over contemporaneous documents, weigh witness credibility, and draw every inference against the non-moving party. The record shows that every well after Shen-2 shrank the field, that Defendants tracked the results daily, and that they worked to conceal bad news, down to banning maps showing faults in the field and cancelling technical presentations. Employees joked that "fault" had become "[t]he F word." Whistleblower Frye was "scared" she "could be implicated in a potential fraud to our outside investors."

Unable to confront that record, Defendants distort it. They insist Plaintiffs must prove Defendants thought Shenandoah was worthless on the first day of the Class Period, but Plaintiffs never pled that theory. From the outset, Plaintiffs alleged Defendants touted positive appraisal results while concealing the negatives that accompanied them. Judge

Atlas sustained that theory at the pleading stage. This Court certified a class on it. Defendants cannot recast Plaintiffs' case.

Defendants' other refrain is hindsight. They focus on milestones that a different company achieved in 2025, with different partners, well designs, and cost structure, using technology that was unavailable during the Class Period. But fraud is measured when the statements were made. Beacon Offshore's later production says nothing about whether Defendants leveled with investors a decade earlier during the Class Period.

Nor is scienter a close question. Defendants received real-time well results. They knew Shen-3 was "bad news" when they called it a success. They knew Shen-4 had "drill[ed] salt" and cut the field by 30% when they assured investors the resource range was unchanged. Their bonuses depended on reserve additions, and when their own engineers pushed back, Defendants "quell[ed]" the "internal insurrection." Summary judgment is rarely appropriate in a case that turns on knowledge and intent. On this record, it would be error.

Defendants' loss causation arguments are makeweight. On May 2, 2017 – after consistently hyping Shenandoah, concealing adverse developments, and representing the "rates of return … would be compelling" – Anadarko suspended appraisal activities and recognized a near-billion-dollar Shen-related write-off, and its stock price experienced a statistically significant fraud-related decline. Defendants mischaracterize the law, recycle arguments this Court already rejected, and raise fact issues inappropriate at summary judgment.

The motion should be denied.

## II. ISSUES REQUIRING RESOLUTION

1. Whether a reasonable jury could find Defendants made materially misleading statements by, *e.g.*, touting each appraisal well as a "success" while concealing that Shen-3 was a failure, Shen-4 drilled salt and cut the field by a third, Shen-5 hit unexpected tar and shrank the field further, and the project missed Anadarko's commerciality hurdle long before Shen-6.

2. Whether a reasonable jury could find Defendants further engaged in a fraudulent scheme or course of business by banning fault maps, silencing employees who raised concerns, flouting Anadarko's stated accounting policies, and concealing Frye's SEC complaint.

3. Whether a reasonable jury could find Defendants acted with scienter, given they tracked well results daily, described Shenandoah internally as "not commercially viable" and "shrinking with appraisal," suppressed negative information, and received large bonuses tied to reserve additions.

4. Whether a reasonable jury could find loss causation based on the statistically significant fraud-related stock price decline after the Company revealed it was suspending appraisal activities and recognizing a $902 million Shenandoah-related impairment.

5. Whether Plaintiffs' §20(a) claims survive, where Defendants' challenge to the primary claims fails and they do not contest control.

## III. NATURE AND STAGE OF THE PROCEEDING

This securities-fraud class action was filed in February 2020. ECF 1. The Court denied Defendants' motion to dismiss in January 2021 (ECF 63) and granted class certification in March 2026 (ECF 302). Trial begins May 2027. ECF 305.

## IV. STATEMENT OF FACTS

### A. Background

A prospect's value and commercial viability are based on producible resource size, recoverable reserves, costs to develop and operate, and risks. Defs.' Ex. 23 (Berk Rpt.), ¶¶11(a); 17; Ex. 7 (Frye Dep.) at 14:20-15:14. Prospects must clear company-specific projected return-on-investment thresholds to be commercial. Ex. 1 (Berk Dep.) 25:13-18, 26:10-15. Anadarko's measure for commerciality was the PIR10. Defs.' Ex. 21 (Pittinger Rpt.), ¶¶174-175; Ex. 122 (2024 Frye Decl.), ¶8. Anadarko required PIR10 above .3 for commercial viability. Ex. 10 (Hollek Dep.) at 53:6-54:8; Ex. 122 (2024 Frye Decl.), ¶9. Anadarko revisited commerciality after each well (Ex. 15 (Pittinger Dep.) at 26:14-28:17), and was "always measuring" profit-to-investment ratio. Ex. 46 (AAPG Convention Video) at 20:30-21:02. To estimate recoverable reserves (measured in MMBOE), Anadarko used the "Swanson's mean" of a range running from "P90" (90% chance the resource size exceeds that value) to "P10" (10% chance). The Swanson's mean is the most accurate figure in the range. Ex. 7 (Frye Dep.) at 36:17-42:4; Ex. 40.

Costs significantly affect commerciality. Defs.' Ex. 23 (Berk Rpt.), ¶20. Wells cost hundreds of millions of dollars to drill and maintain, so commerciality can turn on the number and types of wells required. Defs.' Ex. 21 (Pittinger Rpt.), ¶¶14, 20, 173.



4900-1832-4412.v2

Geological risks can also threaten commerciality. Faults can interfere with oil flow, and asphaltene can cause tar to block production tubing. Defs.' Ex. 18 (Merrill Rpt.), ¶¶20, 39, 90-91; Defs.' Ex. 21 (Pittinger Rpt.), ¶¶20-23, 266-273.

### B. Defendants Touted Shenandoah While Concealing "Bad News"

Before the Class Period, Anadarko announced its first two Shenandoah wells. In February 2009, Anadarko disclosed that Shen-1 found 300' of oil pay with "reservoir properties that appear to be of much higher quality than industry has seen previously." Ex. 20 at APC-01749407. On March 19, 2013, Anadarko announced that Shen-2 hit over 1,000' of oil pay, making it "***one of Anadarko's largest oil discoveries in the Gulf of Mexico***." Ex. 21 at APC-01749411.[1]

Anadarko's stock price rose 3.7% on March 20, 2013, adding $1.5 billion in market capitalization. Defs.' Ex. 19 (11/9/22 Steinholt Rpt.), ¶32. Walker told other executives "***we are on our way to 3 digits :)***" – meaning Anadarko's stock price. Ex. 43 at APC-00572955; Ex. 9 (Gwin Dep.) at 79:6-22. Analysts noted Anadarko took the "rare step" of describing Shen "as a ***potential giant***, meaning possibly more than 500mm bbls" and estimated Shen at "500mm – 1bn boe." Ex. 34 at BOFAS_APC-000259; Defs.' Ex. 22 (1/25/23 Steinholt Rpt.), ¶31. In March 2014, Anadarko reiterated Shen as an "[e]merging [g]iant [r]esource" and "$2 - $4 Billion Net Opportunity." Ex. 45 at slide 83.

[1] Unless otherwise noted, all emphasis is added and citations are omitted.

### 1. Shen-3 Was "Dry" but the "Spin Control Must've Worked"

The Class Period began on February 20, 2015, when Anadarko announced Shen-3's results, comparing it favorably to Shen-2 and stating it "enabled the projection of oil-water contacts … and reduced the uncertainty of the resource range." Defs.' Ex. 67 at APC-01751761. Defendants disclosed detailed, rose-tinted information about Shen-3, stating it found "approximately 50% (1,470 feet) more of the ***same*** reservoir sands" as "the Shenandoah-2 well, which encountered over 1,000 feet of net ***oil*** pay in ***excellent quality***" sands. *Id.* On March 3, 2015, Daniels touted Shen-3 as "***very successful***." Defs.' Ex. 70 at APC-00868410.

In reality, Shen-3 found no oil, slashed Shen's size, and did not enable projection of OWCs. Defs.' Ex. 21 (Pittinger Rpt.), ¶¶13(b), 85-116; Ex. 56. Daniels testified Shen-3 was a "dry hole," meaning it was "full of water" and "no hydrocarbons were found." Ex. 6 (Daniels Dep.) at 68:20-69:23; Ex. 12 (Leyendecker Dep.) at 164:24-165:6; Ex. 94. Dry holes are not successes; Shen-3 was "***bad news***" and "***very negative***" – the "***worst-case scenario***." Ex. 121 (2018 Frye Decl.), ¶5(b); Ex. 16 (Ramsey Dep.) at 64:7-25; Ex. 59; Ex. 4 (Chandler Dep.) at 139:7-9, 146:12-147:2, 275:3-8; Ex. 47 at APC-00005094; Ex. 5 (Chernoff Dep.) at 103:21-23; Ex. 18 (Strickling Dep.) at 105:15-107:5; Ex. 54. And Shen-3 was "***unsuccessful under [GAAP]***." Ex. 110 at APC-01720566. Results were so negative Defendants listed "Shenandoah challenges," along with the BP oil spill, as "[t]opics to avoid" with the media. Ex. 86 at 4.

Shen-3 decreased Shenandoah's size ***by 25%-50%***, which was "disappointing." Ex. 58 at APC-00617398; Ex. 7 (Frye Dep.) at 89:10-90:23; Ex. 53 at APC-00013459; Ex. 3 (Camden Dep.) at 123:24-125:6; Ex. 68 at APC-00021658 (mean dropped from 1200 to 740-920 MMBOE after Shen-3); Ex. 99 at slide 14 (the "resource [was] ***shrinking with appraisal***"). Shen accordingly fell "***[s]hy of break-even economics***" and was "***not commercially viable***" by December 2014. Ex. 64; Ex. 13 (McGrievy Dep.) at 184:5-23; *see also* Ex. 75 at slide 2 (PIR10 dropped below .3 hurdle rate).

Nor could Shen-3 estimate Shen's size by projecting OWCs, which required Shen-3 and Shen-2 to be in "pressure communication." "[T]he data coming out of the Shen 3 well was ambiguous and could not be used to project the oil-water contacts." Ex. 13 (McGrievy Dep.) at 121:4-19, 159:3-7; Ex. 7 (Frye Dep.) at 75:6-78:23, 219:11-220:1; Ex. 57 at APC-00016723; Ex. 14 (Oudin Dep.) at 124:20-125:12; Ex. 55 at APC-00348933. Worse, a potential sealing fault separated them, preventing extrapolation. Ex. 13 (McGrievy Dep.) at 121:4-19, 159:3-7; Ex. 7 (Frye Dep.) at 75:6-78:23, 219:11-220:1; Defs.' Ex. 18 (Merrill Rpt.), ¶¶81-82; Ex. 60. Indeed, Anadarko ***never*** established OWCs. Ex. 3 (Camden Dep.) at 216:9-22; Ex. 116.

Defendants knew this in real time – they watched Shen's "high-profile wells[']" results "[o]n a daily basis," received real-time updates, and "absolutely" knew Shen-3 was dry. Ex. 3 (Camden Dep.) at 129:12-130:22, 133:25-135:7. When Oudin saw analyst reactions were "[p]ositive on Shenandoah" post-Shen-3, he stated: "***the spin control must've worked. Wow***." Ex. 70 at APC-00159691; Ex. 14 (Oudin Dep.) at 159:8-161:3.

### 2. Shen-4 Hit a "Lot of Tar/Asphalt" and Defendants Eyed an "Exit Strategy"

On October 27, 2015, Anadarko announced to investors that Shen-4 was "a successful appraisal" that "encountered more than 620 net feet of oil pay." Ex. 30 at APC-00205702-03. The next day, Hollek claimed "[i]t was ***all oil***; we have no water in that" with "very good reservoir quality." Defs.' Ex. 79 at APC-00206914. On the same call, Daniels stated "[o]n the resource range, we're right in where we thought. We always do a probabilistic resource range; ***we're still in that range*** with the results of the well." *Id.* at APC-00206928. On November 11, 2015, Leyendecker called Shen a "remarkable discovery," and touted Shen-4's "620 feet of oil pay." Ex. 85 at APC-00655211. On February 2, 2016, Walker stated Shen was "***worthy of spending capital***." Defs.' Ex. 81 at APC-01751423.

Internally, Shen-4 was another disaster. Daniels testified that he knew in September 2015 – before the October 2015 call where he reaffirmed Shen's resource estimates – that "there was a reduction of about ***a third*** after Shen 4 of oil in place." Ex. 6 (Daniels Dep.) at 137:8-138:14; Ex. 81; Ex. 6 (Daniels Dep.) at 132:18-133:12 (Daniels testifying that he knew Shen was shrinking with each well post Shen-2); Ex. 94; Ex. 9 (Gwin Dep.) at 176:23-179:1; Ex. 7 (Frye Dep.) at 97:18-22, 100:14-101:9, 279:7-14; Ex. 11 (Kleckner Dep.) at 114:8-20.

Far from hitting "***all oil***," Shen-4 was "drilling ***salt***," which cannot hold hydrocarbons and blocks their movement. Ex. 79; Ex. 7 (Frye Dep.) at 95:6-21, 96:24-97:15; Ex. 121 (2018 Frye Decl.), ¶5(c); Ex. 6 (Daniels Dep.) at 115:2-116:17; Ex. 78.

This meant "a ***loss of almost 1bboe or about 1/3rd*** of the pre-drill STOIPS [oil in place]." Ex. 79; Ex. 83; Ex. 19 (Walker Dep.) at 161:25-162:6; Ex. 81 at APC-00196603; Ex. 13 (McGrievy Dep.) at 209:12-16; Ex. 7 (Frye Dep.) at 96:20-97:19. McGrievy told employees to "***keep a tight lid on this***" and that it "may have a ***profound effect***" on the project. Ex. 79. Anadarko eyed an "***exit strategy***," and the EC lost interest in developing Shen. *Id.*; Ex. 13 (McGrievy Dep.) at 213:19-214:8.

In January 2016, Daniels learned a Shen-4 sidetrack and bypass hit "***a lot of tar/asphalt***." Ex. 89; Ex. 6 (Daniels Dep.) at 149:2-24. It revealed "major fault/faults," and that ***50%*** of Shen's reserves were faulted out, *i.e.*, separated from the rest of the field, requiring additional wells. Ex. 11 (Kleckner Dep.) at 114:8-20; Ex. 6 (Daniels Dep.) at 120:3-16; Ex. 82; Ex. 4 (Chandler Dep.) at 171:2-20; Exs. 77, 87, 93; Defs.' Ex. 39 at slide 2; Ex. 7 (Frye Dep.) at 97:20-100:3.

October 2015 testing also showed that comingling oil from separate zones would create "a fantastic amount of asphaltene," forcing additional wellbores and significantly increasing costs. Ex. 76 at APC-00053552; Defs.' Ex. 21 (Pittinger Rpt.), ¶¶261-273. Asphaltene was expected to fill nine miles of tubing, and interventions were infeasible, unproven, or too expensive. Defs.' Ex. 21 (Pittinger Rpt.) ¶¶267-269, 272; Ex. 74 at slides 7-8; Ex. 52 at APC-00011731-34; Ex. 98 at APC-00236868.

Within days of Walker's public statement that Shen was "worthy of spending capital" (Defs.' Ex. 81 at APC-01751423), he declined Shen-related expenses "***given our recent discussions about not wanting to take [Shenandoah] to development***." Ex. 96 at

APC-00668985 (Walker: "I see ***no way*** we will want to take this to development today ….").

### 3. Shen-5 Found "a Lot of Tar" and Faulting

On May 24, 2016, Szabo claimed Defendants were "committed to the development." Defs.' Ex. 87 at APC-01753711-12. On the same call, Gwin claimed Shen's "rates of return here would be compelling … not just that break-even number, but the number at which you'd really be excited about sanctioning and moving the project forward." *Id.* at 10. On July 26, 2016, Defendants announced that Anadarko "encountered more than 1,040 net feet of oil pay" with Shen-5, "***extending*** the eastern limits of the field." Defs.' Ex. 91 at APC-01752195. On July 27, 2016, Gwin stated that Anadarko was "real pleased with what we saw in the #5 well." Defs.' Ex. 92 at APC-01319835. In August 2016, Holly claimed that the "partnership is excited about Shenandoah." Defs.' Ex. 93 at APC-01319809.

In reality, Shen-5 found "***a lot of tar***" which was "***unexpected***" and reduced Shen's size by another ***17%***. Ex. 106; Ex. 107 at 7-8; Defs.' Ex. 21 (Pittinger Rpt.), ¶319; Ex. 12 (Leyendecker Dep.) at 289:4-15. As Daniels was informed in May 2016, Shen-5 also "indicate[d] a sealing fault." Ex. 101; Ex. 6 (Daniels Dep.) at 157:10-25; Ex. 102 at slide 2. In June 2016, an EC presentation stated it was "[n]ot clear that partners will continue to participate" in Shenandoah given multiple "challenges" including that Shen's "resource size [was] ***shrinking with appraisal***." Ex. 104 at slide 13.

### 4. Defendants Planned a "Substantial Writedown" Before Shen-6

Anadarko filed its 2016 Form 10-K on February 17, 2017, stating that "Anadarko and its partners are continuing to work toward determining the commerciality of the Shenandoah field," Anadarko had "selected a Semisubmersible concept to support the potential development," and Anadarko was drilling Shen-6. Defs.' Ex. 98 at APC-00300444. But Defendants already knew that Shen-6 was dry, which was "the one scenario [Anadarko] feared the most." Ex. 113. On February 13, 2017, Leyendecker received a memorandum stating that Shen-6 was "all ***water bearing***. These results indicate the presence of faulting …. [T]he subsurface results and the resource implications of Shenandoah #6 have been disappointing. The probability for economic resource potential on the eastern flank of the Shenandoah field has materially diminished." Ex. 114 at APC-00089229.

Defendants had also decided against funding Shen and were told in December 2016 "that a fairly ***substantial write-down*** at Shenandoah would be ***imminent*** in 2017." Ex. 45 at APC-00307805; Ex. 112 at APC-00290059 (December 2016 email to Walker and Gwin stating Anadarko's "model cho[se] **not** to invest in Shenandoah") (emphasis in original); Ex. 103 at slide 9. A July 2016 EC presentation had also assigned Shen ***zero net asset value*** even at $70/barrel. Ex. 105 at slide 17; Ex. 108 at APC-00264139-40. An August 2016 presentation depicted Shen's unviability:




Ex 109 at slides 90-92, 105.

Defendants claim that they finally expensed and impaired Shen due to the "'present commodity-price environment'" in May 2017. MSJ at 12. This assertion is unconvincing because prices were ***lower*** for much of the Class Period, while Defendants were touting Shen. Defs.' Ex. 23 (Berk Rpt.), ¶28. And the third-party analyses Defendants base it on are "not competent summary judgment evidence because they do not reflect personal knowledge." *Christian v. Lowe's Cos., Inc.*, 2024 WL 3639518, at *6 (E.D. La. Aug. 2, 2024). They are "also hearsay." *Damas v. Tex. Health Presbyterian Flower Mound*, 2022 WL 831813, at *6 (E.D. Tex. Jan. 28, 2022) (summary judgment evidence inadmissible).

### C. Defendants' Scheme to Suppress the Truth

Defendants suppressed negative information about Shen to secure reserves-driven bonuses. Ex. 7 (Frye Dep.) at 19:5-22:13; *id.* at 51:14-52:4 (Exploration and "Ernie

[Leyendecker] stood to make a bonus if the resource estimate for Shenandoah was high"); Ex. 2 (Blakeley Dep.) at 44:9-45:13 ("goal of discovering 'X' amount of resources" influenced bonuses); Ex. 42. Their scheme involved numerous artifices in addition to the misrepresentations described herein.

### 1. Censoring Discussion of Risks: "Open Technical Discussion Is Not Something We Like to Do Here"

Defendants silenced employees who raised concerns, which Leyendecker called "quell[ing] our internal insurrection." Ex. 62 at APC-00617470. Leyendecker abruptly cancelled a spring 2015 presentation because it was negative on Shen. Ex. 17 (Shotts Dep.) at 150:19-151:4, 151:19-152:24, 154:10-18, 156:5-157:18; Exs. 69, 71-72; Ex. 73 (Meeting was cancelled because "the Exploration SVP [Leyendecker] was not happy with the content. Apparently, an ***open technical discussion is not something we like to do here***."). Employees mocked the obvious motive: suppressing negative information about Shen. Ex. 71; Ex. 14 (Oudin Dep.) at 165:11-167:18.

Employees were banned from showing faulted maps or giving candid assessments to partners. Ex. 7 (Frye Dep.) at 69:18-73:19; Ex. 51 at APC-00612283 ("[W]e have removed all references to faults."); Exs. 50, 61; Ex. 118 at APC-00017032 ("I have been restrained from open communication with partners and proceeding with project objectives ... my work has ***been rebuked and/or ignored*** ...."). Defendants' censorship was so extreme that employees joked that "fault" was "[t]he F word." Ex. 14 (Oudin Dep.) at 96:23-107:14, 134:4-135:14, 185:21-187:25; Ex. 60; Ex. 119 (presentation mocking Exploration's refusal to recognize faulting); Ex. 80 at APC-00645209.

### 2. Flouting Internal Policies, Which Led to "Bunk" Resource Estimates

Defendants also silenced Anadarko's RCT, which reviewed resource sizes to prevent exaggeration, by skipping any RCT review until after Shen-4. Ex. 7 (Frye Dep.) at 139:18-141:3; Ex. 88; Ex. 13 (McGrievy Dep.) at 215:18-216:19. This led to a "***preposterous***" exaggeration of Shen's size. Ex. 13 (McGrievy Dep.) at 216:2-19; Ex. 91.

A January 2016 RCT review cut Exploration's "mean" to 425 MMBOE, under the 500 MMBOE "giant" threshold. Ex. 7 (Frye Dep.) at 109:5-110:14, 111:21-113:10; Ex. 90; Ex. 13 (McGrievy Dep.) at 217:19-219:6. Yet Exploration, under Daniels and Leyendecker, reverted to 550 MMBOE, a 125 MMBOE (30%) exaggeration. Ex. 7 (Frye Dep.) at 110:15-112:6; Ex. 92; Ex. 121 (2018 Frye Decl.), ¶5(f). As Oudin stated when he learned Anadarko was still using the higher number: "***Bunk. Pure adulterated gibberish***." Ex. 95; Ex. 14 (Oudin Dep.) at 197:3-199:16.

Far from technical disagreement, Exploration's exaggerations and refusal to recognize faulting was "'ethically questionable.'" Ex. 13 (McGrievy Dep.) at 141:18-143:8, 144:14-145:2; Ex. 63 at APC-00617562. Oudin remarked, "'***the SEC thinks you would look good in orange***,'" meaning "***prison jumpsuit[s]***." Ex. 14 (Oudin Dep.) at 188:14-189:23; Ex. 84. Anadarko's resource estimates "were so high" "it made Anadarko look ***foolish, if not, stupid***." Ex. 14 (Oudin Dep.) at 189:8-11. When Development learned that Exploration mapped faults, then scrubbed them from official versions, Chandler exclaimed: "***The smoking gun??***" Ex. 60.

### 3. Violating GAAP and Anadarko's Own Accounting Policies

GAAP's successful efforts accounting method purportedly utilized by Anadarko is designed to highlight failures and risks involved in the search for oil and gas reserves by requiring companies to expense unsuccessful exploratory activities. *See, e.g.*, Defs.' Ex. 17 (Regan Rpt.), ¶¶42-47. Because such disclosures would undermine Defendants' fraud, they refused, violating GAAP and Anadarko's accounting policies to further their scheme.

GAAP and Anadarko's policy required it to expense exploratory wells that did not find oil, like Shen-3. Ex. 41 at APC-00001833-34; Defs.' Ex. 17 (Regan Rpt.), ¶48. But Leyendecker directed accounting ***not*** to expense Shen-3, and accounting suspended Shen-3's costs based on Defendants' misrepresentations about its results. Ex. 65; Ex. 111 at APC00718258-59; Ex. 8 (Green Dep.) at 88:12-89:15, 113:16-114:23, 116:18-22, 122:21-123:22, Ex. 66 at APC-00001822 ("Ernie [Leyendecker] agreed we should capitalize the well cost[s]"); Ex. 12 (Leyendecker Dep.) at 95:10-12; *see also* Regan MTE Opp. at 5-7 (detailing Anadarko's shifting Shen-3 accounting justifications). KPMG approved the accounting based on the same misrepresentations. Defs.' Ex. 27 at KPMG_APC_eA_0002514. Defendants failed to expense Shen-3 until November 2016, after Frye's whistleblower complaint. Ex. 8 (Green Dep.) at 88:12-89:12; Ex. 111 at APC-00718258-59.

Anadarko repeatedly stated: "At the end of each quarter, management reviews the status of all suspended exploratory drilling costs in light of ongoing exploration activities, in particular, whether the Company is making sufficient progress in its ongoing exploration

and appraisal efforts …." Defs.' Ex. 82 at APC-00227221. But when Anadarko finally expensed Shen-3, it recognized an internal "control was deficient from first quarter 2015 through the second quarter of 2016 because Property Accounting did ***not*** follow-up each quarter with Operations or Exploration on the evaluation of the future utility of the Shenandoah-3 well." Ex. 111 at APC-00718260.

Defendants' disclosure when they expensed Shen-3 in 3Q16 was misleading and carefully crafted to avoid any implication that Shen-3 raised doubts about Shenandoah's viability. Defendants told investors only that "the wellbore would [not] be used in the development of the project if a final investment decision is reached," omitting any information about Shen-3's negative results. *See* Regan MTE Opp. at 11-12. And ConocoPhillips' passing reference to dry hole costs at Shenandoah did little to alert investors to the extent of the problems Defendants' fraud concealed. *Cf. Pub. Emps.' Ret. Sys. of Miss. v. Amedysis, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (disclosure still "'new news'" even if some information "may have been technically available to the public" beforehand).

Anadarko also violated GAAP and its own policies by failing to expense and impair the remaining Shen costs. Throughout the Class Period, Anadarko stated: if "substantial doubt [arises] as to the economic or operational viability of [Shenandoah], the associated costs will be expensed at that time." Defs.' Ex. 91 at APC-01752173. Despite substantial doubt about Shenandoah's commerciality, Anadarko failed to recognize an impairment or expense its exploratory well costs until May 2017. *See supra* §§I.B.1.-4; Defs.' Ex. 17 (Regan Rpt.), ¶¶88-110.

### 4. Silencing Whistleblower Frye, Who Was "Scared" Anadarko Was Committing "Fraud to Our Outside Investors"

Defendants also silenced Frye, a longtime GOM engineer on both Exploration and Development teams. Ex. 7 (Frye Dep.) at 23:15-22, 31:5-8; Ex. 121 (2018 Frye Decl.), ¶¶2, 4. Frye had a reputation for "high moral standards" and being "direct and truthful." Ex. 67 at APC-00771596, 604; Ex. 13 (McGrievy Dep.) at 66:4-72:25; Ex. 14 (Oudin Dep.) at 260:23-261:8. McGrievy rated her performance "[e]xceptional" and called her "the beacon" of the team's technical and commercial efforts. Ex. 67 at APC-00771603.

In February 2014, Frye presented to Leyendecker and others on Shen risks including connectivity, costly water-injection, and unusually high asphaltene. Ex. 7 (Frye Dep.) at 43:15-44:22, 54:4-55:13; Ex. 120 at 3, 9-11, 17; Ex. 44. Displeased with Frye's honest assessment, Leyendecker "demean[ed]" and "humiliated" her, "berat[ing]" her in front of colleagues: "'You don't know anything.'" Ex. 7 (Frye Dep.) at 48:4-18, 49:14-23. Leyendecker presented "significantly more optimistic" though "misleading" economics to Walker – which Walker knew. Exs. 48-49. He promoted Leyendecker anyway. Ex. 19 (Walker Dep.) at 286:24-287:1.

By early 2016, Frye was "scared" that she "could be implicated in a potential ***fraud to our outside investors***." Ex. 7 (Frye Dep.) at 114:1-115:1. Frye reported her concerns to McGrievy, but nothing changed. Ex. 121 (2018 Frye Decl.), ¶6; Ex. 7 (Frye Dep.) at 114:1-115:1. Frye accordingly asked to be included in a reduction-in-force. Ex. 7 (Frye Dep.) at 246:13-247:15; Ex. 97. She was afraid to submit a complaint even anonymously because she "did not have faith in the company with the behaviors that [she] continued to

have seen that they would act on [her] behalf." Ex. 7 (Frye Dep.) at 251:5-25. When Defendants denied her request, Frye took a leave of absence due to her concern "that [she] would be associated with potential fraud." *Id.* at 117:13-118:22; Ex. 121 (2018 Frye Decl.), ¶7.

On May 9, 2016, Frye submitted an SEC whistleblower complaint about Anadarko's securities violations. Defs.' Ex. 41; Ex. 121 (2018 Frye Decl.), ¶8. After that, she resigned:

> My repeated attempts to have the company follow guidelines and practices and to report the findings honestly and realistically were met with abuse and retaliatory behavior. . . . this was observed and tolerated by numerous other managers and executives. For ***reporting false information to investors***, [Leyendecker] has been promoted and received large bonuses. Other executives have benefitted by selling their stock at inflated prices due to this ***blatantly false information***.

Ex. 100.

Defendants went to extraordinary lengths to conceal Frye's complaint. Ex. 7 (Frye Dep.) at 125:17-126:16, 285:10-23; Ex. 121 (2018 Frye Decl.), ¶13. On July 25, 2017, Frye filed a lawsuit seeking permission to disclose her complaint to investors. Ex. 123. On November 4, 2019, the Fifth Circuit rejected Defendants' confidentiality claims and published Frye's whistleblower allegations.

### D. While Frye Remained Muzzled, Anadarko Wrote Down Shen for $902 Million

The relevant truth emerged after market-close on May 2, 2017, when Defendants disclosed that Anadarko was recognizing a ***$902 million*** Shenandoah-related write-down and suspending appraisal activities. Defs.' Ex. 99 at APC-01752125-26. Anadarko

acknowledged internally that it abandoned Shen "***due to reserve size and risk***." Ex. 117 at slide 3. On May 3, 2017, Anadarko's stock price declined by a statistically significant 7.69%. Defs.' Ex. 19 (11/9/22 Steinholt Rpt.), ¶¶45, 99.

## V. LEGAL STANDARDS

Summary judgment is inappropriate unless Defendants can establish "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). As the moving party, Defendants "'bear[] the burden of establishing that no genuine issue of material fact exists.'" *Gentry v. Hamilton-Ryker IT Sols., L.L.C.*, 102 F.4th 712, 717 (5th Cir. 2024). "In reviewing the record, the 'court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023).

## VI. TRIABLE ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT

### A. A Reasonable Jury Could Find Material Misstatements

Whether a statement is misleading is a fact-bound "question for the jury, not the Court." *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 3794769, at *10 (W.D. Tex. June 16, 2015). Statements are misleading if they "'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008); *see Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009). A misstatement is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

### 1. Defendants Misrepresent Plaintiffs' Theory

Defendants' lead argument attacks a strawman. They claim Plaintiffs must prove that Defendants deemed Shenandoah completely commercially unviable on day one of the Class Period. That was never Plaintiffs' theory. Plaintiffs have always alleged that Defendants overstated Shen's potential and concealed material adverse facts about its producible resource size and commerciality. As this Court recognized: Plaintiffs do not assert that Defendants merely "under-represented an ***unrealized*** risk" but rather that "certain risks had ***in fact*** materialized, yet Defendants actively misled investors to the contrary." ECF 302 at 23-24 (emphasis in original). Because Plaintiffs' theory has not changed, *Jackson v. Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021), which addresses "new theories" at summary judgment, is inapplicable.

Bjorn I. Steinholt's damages model matches Plaintiffs' theory. *See* Steinholt MTE Opp. at 8-17. Plaintiffs will prove Defendants concealed negative information about Shen, inflating Anadarko's stock price until it suffered a statistically significant decline when Anadarko disclosed it was suspending appraisal activities and taking a near-billion-dollar write-down. Steinholt's opinions track Plaintiffs' case. Defendants pluck one line from Steinholt's report, ignoring his assumption that Shen was "more likely than not uncommercial" after Shen-3 and "certainly not commercially viable" after Shen-4. Defs.' Ex. 19 (11/9/22 Steinholt Rpt.), ¶28(j). Steinholt's model does not require proof that every concealed adverse fact existed in its final form on the first day of the Class Period. It measures inflation maintained by Defendants' continuing half-truths and omissions until

the May 2, 2017 disclosure revealed the relevant truth about Shenandoah's commerciality, size, and risks. *See* Steinholt MTE Opp. at 2.

#### 2. Defendants' Statements Touting Shenandoah Obligated Them to Disclose Associated Negative Information

The evidence shows Defendants repeatedly reported positive, specific facts about Shenandoah's appraisal, size, oil pay, reservoir quality, and commercial progress while concealing known, material, negative facts, including:

- Shen shrank by over half, below the "giant" threshold (500 MMBOE) that Defendants previously touted (§§IV.B.1.-2.);
- Shen-3 was dry and reduced Shen's size by 25%-50% (§IV.B.1.);
- Defendants knew about problematic faulting from the Class Period's start (§IV.B.1.);
- After Shen-3, Shen fell below Anadarko's commerciality "hurdle rate" of PIR10>0.3 (§IV.B.1.);
- Shen-4 hit salt, reducing the field by one-third of oil in place (§IV.B.2.);
- A Shen-4 sidetrack was abandoned due to tar (§IV.B.2.);
- By early 2016, Walker saw "no way we will want to take [Shen] to development" (§IV.B.2.);
- Shen-5 hit tar and cut the field another 17% (§IV.B.3.); and
- Defendants planned to write Shen off before Shen-6's results (§IV.B.4.).

Defendants' claim that they were not required to disclose these facts with their Class Period statements (Stmts. 1, 5-6, 8, 12, 15-19, 21, 24, 26-27, 29-31, 33, 35, 37, 40-42, 45-46[2]) fails.

"A disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) (statements that construction was "progressing" misleading amid undisclosed setbacks). "While disclosure of material information is not always compulsory, it is required when necessary "'to make ... statements made, in the light of the circumstances under which they were made, not misleading."'" *KB Partners*, 2015 WL 3794769, at *10. By touting positive appraisal findings without communicating negative developments, Defendants painted a misleading picture of Shenandoah's commerciality, size, and risks. Simply put, Defendants misled investors by giving the good without the bad.

Defendants' claim that Anadarko never announced Shen resource ranges is untrue. Pre-Class Period, Defendants pitched Shen as a "giant resource," which in industry parlance means a field with more than 500 MMBOE. §IV.B. During the Class Period, Daniels affirmatively told investors that Shenandoah's "resource range" remained "right in where we thought," confirming the market's prior understanding while omitting that Shen-3 and Shen-4 had shrunk the field. ECF 63 at 11-12 (pre-Class Period statements

---

2 References to "Stmts." herein refer to the Statements listed in Appendix A, attached hereto.

about Shenandoah's size "provide[] background and context" and "inform the reasonable understanding of later statements made during the Class Period").

Defendants ***never*** disclosed that Shen shrank with each well post-Shen-2, even as they hyped the appraisal. §§IV.B.1.-3. For example, Defendants claimed Shen-3 was "very successful," found 50% "more of the same reservoir sands" as oil-bearing Shen-2, and "enabled the projection of [OWCs] based on pressure data." Stmts. 1, 5-6; Defs.' Ex. 67 at APC-01751761; Defs.' Ex. 70 at APC-00868406. In reality, Shen-3 was a dry hole, the pressure data was "inconclusive," and Shen-3 halved the resource size. §IV.B.1.

These were not the type of inactionably vague, "general positive statements" dismissed in *Kane v. Madge Networks N.V.*, 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000) , *aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002). Nor do Plaintiffs claim Defendants' income statements required them to disclose adverse details of Shen's appraisal, making *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752-53 (S.D.N.Y. 2017), inapposite.

Defendants assert that they continued to believe Shenandoah could be developed even as they learned negative information about the field. This argument again resorts to the strawman argument discussed in §VI.A.1. Further, Defendants' assertion is belied by the evidence and a triable issue. It is also irrelevant to whether they provided investors information necessary to make their positive statements not misleading. They did not.

Defendants claim that Development estimated Shenandoah's likelihood of success at 88.2% as of February 1, 2016. Whether Defendants shared that belief is triable. Four days later, Walker referenced "our recent discussions about not wanting to take

[Shenandoah] to development." §IV.B.2. Either way, the estimate would not cure Defendants' failure to disclose that Shen-4 cut Shenandoah's size by 30%, drilled salt, found major faulting, and lost its sidetrack to tar. *Id.* Defendants had a duty to disclose those facts given their assurances that Shen-4 was "successful," "all oil," and "right … where we thought" on the resource range. Stmts. 12, 15-18, 21.

Defendants' assertion that their statements were not made misleading by Anadarko's failure to share faulted maps with partners, or by not disclosing Frye's whistleblower claims, are misplaced. Those machinations bear on scienter, and are part of the scheme. §§IV.C., VI.B.-C.

### 3. The Misstatements Are Actionable

#### a. Defendants' Statements Were Not Puffery

Puffery "'contain[s] no concrete factual or material misrepresentation.'" *Six Flags*, 58 F.4th at 220. Determining whether a statement is immaterial puffery is a fact-intensive determination inappropriate at summary judgment unless "'no reasonable investor would consider'" the statements as altering the total mix of information. *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 649-50 (S.D. Tex. 2021). Materiality is "'generally a decision for the jury.'" *Id.* at 655.

The misrepresentations here are not meaningless statements of vague optimism; they concerned a specific asset, reported tangible results, contained language with particular industry meanings, and could be measured against previous public statements, all of which Defendants knew investors viewed as material. *See* Stmts. 5-6, 8, 11-12, 14-16, 18-21, 24, 27-34, 39, 41-44; §§IV.B.1.-4; *Six Flags*, 58 F.4th at 220 (statements not

puffery "because they confirmed the projections previously provided by Defendants"); *Hall v. Rent-A-Center, Inc.*, 2017 WL 6398742, at *20 (E.D. Tex. Oct. 19, 2017). Indeed, Defendants unsuccessfully raised the same argument at the motion-to-dismiss stage. *Compare* ECF 62 at 13-14, *with* ECF 63 at 16.

Defendants' cases hold no differently. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001), dismissed generalized statements but recognized that "potential commercial viability" – the underlying subject of the statements here – was material. *In re BP p.l.c Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012), upheld compliance statements where compliance progress was tied to specific requirements, noting "[a] repeated utterance, even on a promise of progress, can become misleading" in context. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), and *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 898 (D. Minn. 2007), involved statements untethered to actual facts, unlike the well-by-well appraisal reports here. And *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 418 (S.D. Tex. 2020), did not hold that language referring to "success" was inactionable as a matter of law, particularly where, as here, a "successful" well has an industry-specific meaning. §IV.B.1.

Finally, Defendants' footnoted assertion that the statements were not false because of post-Class Period developments is illogical. MSJ at 26 n.15. "Fraud depends on the state of events when a statement is made, not on what happens later." *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010); *see also* 17 C.F.R. §240.10b-5(b) (falsity is assessed "***in the light of the circumstances under which [the statements] were made***"). In fact, this argument – along with Defendants' theme throughout their motion that "other

companies" have gone on "to achieve enormous success" with Shen – is inadmissible. MSJ at 3; *see also id.* at 1-2, 14, 19, 26, 37. It is based on "uncorroborated internet information," which is not "competent summary judgment evidence." *Morrissey v. King*, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sep. 26, 2014); *see also Damas*, 2022 WL 831813, at *6 ("'[U]nless properly authenticated, "any evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretations of the hearsay exception rules."'").

**b. Risk Statements**

Defendants do not dispute that the "risks" of: (1) "not encounter[ing] commercially productive oil or natural-gas reservoirs"; (2) finding "dry holes"; or (3) "fail[ing] to find commercial quantities of hydrocarbons" had occurred at Shenandoah when Anadarko disclosed their mere "possibility" in its February 20, 2015 and February 17, 2016 SEC filings. *Compare* MSJ at 27, *with* §§IV.B.1.-4; *see also* Stmts. 2, 22. As Judge Atlas held: "'When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future.'" ECF 63 at 15. A reasonable jury could find that by presenting these materialized risks as hypothetical, Defendants misled investors.

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015), does not compel a contrary conclusion. In this Circuit and others, a risk disclosure that describes an already-materialized risk as merely hypothetical is actionable. *See Lormand*, 565 F.3d at 249 (defendants "skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already

materialized"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104 (D.C. Cir. 2015).

Even Defendants' own case, *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 914 (E.D. La. 2014), recognizes that "[w]hen an issuer reveals a firm-specific risk and asserts that it 'may' affect the company's financial condition despite knowing that it already has done so, a stronger case exists for imposing liability." Here, contrary to Defendants' assertion, the relevant risk disclosure was Anadarko-specific. Defs.' Ex. 67 at APC-01751794; Defs.' Ex. 82 at APC-00227187.

**c. Accounting-Policy Statements**

Accounting-policy statements are actionable where "the disclosed policy no longer reflect[s] actual practice." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432-33 (5th Cir. 2002) (adopting *Novak*). Anadarko's statements about its accounting policy (Stmts. 3, 7, 23, 36, 47) were materially misleading because they weren't followed. §IV.C.3. Unlike the generic statements in *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 579 F. Supp. 3d 933, 498 (S.D. Tex. 2022), Defendants provided specific, factual – and misleading – descriptions of their accounting methods. §IV.C.3; Stmts. 3, 7, 23, 36, 47. And *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019), unlike here, addressed safety practices, not accounting methodologies necessary to understand the company's financials.

Defendants' Item 303 argument fails. Plaintiffs do not rely on Item 303 for a freestanding disclosure duty. The duty to disclose here arises from Defendants' half-truths.

*See* Stmts. 3, 23(a), 35, 47. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-64 (2024), held "pure omissions" are not actionable under Rule 10b-5(b), and it reaffirmed that half-truths are actionable. Defendants' timing argument also fails. The adverse developments present in late 2014 persisted and deepened throughout the Class Period, while Anadarko repeated the same MD&A in its Class Period filings. §§IV.B.1.-4.

**d. Financial Statements**

A jury could find Anadarko's financial statements misleading based on expert testimony and other evidence that Defendants' Shen accounting violated GAAP and their own policies. Whether those violations were mere disagreements over accounting judgment is itself a triable question, as is whether Defendants could refuse to expense Shen-3 despite knowing it was dry. *See* §§IV.B.1., IV.C.3.; Defs.' Ex. 17 (Regan Rpt.), ¶¶11, 48, 57-58, 69-87; *Six Flags*, 58 F.4th at 220-21 (accounting allegations actionable given dispute regarding whether adjustments were improper under reasonable accounting practices). The same is true regarding when substantial doubts about Shen's commerciality arose and required a write-down. §§IV.B.1.-4., IV.C.3.; Defs.' Ex. 17 (Regan Rpt.), ¶¶88-102. Defendants' authority (MSJ at 29) does not hold that violations of accounting policy and GAAP are inactionable where, as here, triable disputes exist about whether those violations were knowing or reckless.

**e. Sarbanes-Oxley Certifications**

Misleading Sarbanes-Oxley certifications like Defendants' are actionable. *See, e.g.*, *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 590, 595-96 (W.D. Tex. 2014).

Defendants do not challenge the material falsity of Walker's and Gwin's Sarbanes-Oxley certifications (Stmts. 48-51), and may not do so for the first time on reply. *Hernandez v. United States*, 888 F.3d 219, 224 n.1 (5th Cir. 2018).

### B. Defendants' Scheme Challenges Fail

Defendants' challenge to Plaintiffs' scheme claims is based on the wrong legal standard. Rule 10b-5(a) and (c) make it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> * * *
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person ….

17 C.F.R. §240.10b-5.

These provisions "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Judge Atlas held Plaintiffs' scheme claims "involved more than making misleading statements to the public." ECF 63 at 9-11, 16-18 ("'behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant'" is actionable). Defendants rely on pre-*Lorenzo* cases to argue an incorrect and constrained definition of deceptive conduct.

Plaintiffs will prove Defendants engaged in a multifaceted scheme, including making material misrepresentations (*see* Appendix A), and numerous other deceptive devices, all to perpetuate a misleadingly positive portrayal of Shen. ECF 63 at 10, 17. Evidence shows Defendants banned maps revealing faults, silenced employees' internal warnings about resource size and commerciality, and violated Anadarko's own accounting policies and GAAP by refusing to expense Shen-3 or impair Shenandoah. §§IV.C.1.-4.;

Ex. 121 (2018 Frye Decl.). As the Court found at the motion-to-dismiss stage, this is actionable misconduct. ECF 63 at 10, 17; *see also Yoshikawa v. Exxon Mobil Corp.*, 2024 WL 3802997 at *1-*2 (N.D. Tex. Aug. 12, 2024) (upholding scheme claim based on internal manipulation of accounting assumptions); *SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *5-*6 (S.D.N.Y. Sep. 30, 2021) (scheme upheld where defendant "covered up quantitative evidence of an impairment").

Defendants claim "there was nothing fraudulent about Anadarko's exercise of its business judgment" (MSJ at 23) to show Exploration's rosy Shenandoah maps to partners, but the rationale for Exploration's censorship is a triable issue. §IV.C.1. Once Frye submitted whistleblower claims about Defendants' public misrepresentations regarding Shenandoah, Defendants concealed those claims too. §IV.C.4. Whether Defendants retaliated against Frye for raising concerns is a fact question, separate from their later concealment of her SEC complaint. *Compare* MSJ at 24, *with* Ex. 121 (2018 Frye Decl.); §IV.C.4.

Triable issues of fact exist regarding whether Defendants engaged in a scheme or deceptive conduct to conceal adverse information regarding Shen's commerciality and producible resource size and Frye's whistleblower complaint. ECF 63 at 10.

### C. A Reasonable Jury Could Find Scienter

"When scienter is at issue, courts rarely grant summary judgment because of the element's subjective nature." *SEC v. Blackburn*, 431 F. Supp. 3d 774, 807 (E.D. La. 2019) *aff'd*, 15 F.4th 676 (5th Cir. 2021); *see also Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005) (same). Plaintiffs "meet the scienter requirement by showing that

the defendant[s] acted intentionally or recklessly." *Spitzberg v. Hou. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). Recklessness includes conduct that "'present[s] a danger of misleading buyers or sellers [of stock] which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Schelling v. Microvast Holdings, Inc.*, 796 F. Supp. 3d 390, 416 (S.D. Tex. 2025). The evidence here establishes scienter.

Each defendant "received and had actual knowledge that [their] statements to investors were materially misleading." *Venator*, 547 F. Supp. 3d at 663; §§IV.B.-C. For example, Daniels knew that Shen-3 was "very negative" when he announced that it was a "success." §IV.B.1. He also knew Shen-4 had reduced Shen's size by ***30%*** when he assured investors the resource range was unchanged. §IV.B.2. In February 2016, Walker told investors that Shen was "worthy of spending capital" while internally declining Shen-related expenses "given our recent discussions about not wanting to take [Shenandoah] to development." *Id.*

The EC had already lost interest in developing Shen when Gwin told investors in May 2016 that Shen's "rates of return here would be compelling ... not just that break-even number, but the number at which you'd really be excited about sanctioning and moving the project forward." §§IV.B.2.-3. On the same call, Gwin sat idly by while Szabo assured investors that Anadarko was "committed to the development." §IV.B.3. Daniels also remained mute while Hollek stated Shen-4 hit "all oil" despite knowing that Shen-4 hit "a lot of tar/asphalt." §IV.B.2.; Defs.' Ex. 79. Defendants' failure to correct misleading

statements by others further supports scienter. *See Venator*, 547 F. Supp. 3d at 665 (defendant present on a call "'had the opportunity to correct the speaker at the time'").

Each defendant received updates on Shenandoah wells in real-time, "[o]n a daily basis," and knew from meetings and communications with Anadarko engineers that Shen was far less valuable and more risky than publicly touted. §§IV.B.1.-4., IV.C.1.-2. Whether Defendants were severely reckless in touting Shen while ignoring its risks is a jury issue. *See In re Concho Res. Inc.*, 2023 WL 2297425, at *19-*20 (S.D. Tex. Feb. 23, 2023) (scienter supported where defendants "ignored their own data and recklessly disregarded known risks as they touted program as a success" and attended "meetings where the risk ... was discussed among technical teams, reservoir engineers, [and] management").

Leyendecker's scienter is further supported by his suppression of negative information, including berating Frye for her presentation discussing Shen's risks, cancelling a presentation discussing significant faulting, insisting that maps shared with Anadarko's partners not reflect faulting, and refusing to expense Shen-3. §§IV.C.1., IV.C.3. A jury could easily find Leyendecker's scienter. ECF 63 at 23 ("[T]he inference of scienter is at least as strong as the inference that Leyendecker simply chose not to believe Frye, the RCT, and others at Anadarko who had studied the Shenandoah project.").

Finally, Defendants' outsized financial motive to conceal Shen's decreasing potential supports scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007) ("personal financial gain may weigh heavily in favor of a scienter inference"). Exploration, including Daniels and Leyendecker, had every incentive to conceal the truth



4900-1832-4412.v2

about Shen – their compensation was structured so that they would receive large bonuses for discovering new reserves. §IV.C. Walker and Gwin were also loath to acknowledge the reality about Shen. From 2015-2017, Walker and Gwin received $52 million and $20 million in compensation, respectively, and also stood to receive massive bonuses and equity-based compensation if Shen was classified as a proved reserve. Exs. 31-32. Daniels further profited from the fraud by selling $3.1 million of his Anadarko stock. Exs. 29A, 42. Whether his sales are justified by the benign explanation Defendants offer is for a jury to decide, not the Court. *See Flowers*, 79 F.4th at 452.

The massive golden parachutes that Walker (***$98 million***) and Gwin (***$55 million***) received as a result of Anadarko's acquisition would not have materialized had their fraud been revealed and made Anadarko a less appealing acquisition target. Ex. 33A at 85. As Development noted when Anadarko was attempting to sell Shenandoah, being "open and transparent … might just talk [a purchaser] out of [the sale]." Ex. 116A at APC-00741020-22.

Defendants argue that their compensation cannot support scienter because "'virtually every corporation in the United States would be subject to fraud allegations.'" MSJ at 39 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). Unlike *Tuchman*, Plaintiffs' evidence shows Defendants knew their statements were misleading and "ignored significant red flags." ECF 63 at 23; *see also Six Flags*, 58 F.4th at 215 ("[P]erformance-based compensation can establish motive in circumstances 'when the potential bonus is extremely high and other allegations support an inference of scienter.'"). Nor does Defendants' "acquisition" of Anadarko stock (largely through

vesting stock options) negate scienter. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

Defendants next argue that it would not make sense to continue spending money on Shen if they knew it was uncommercial. But as the Fifth Circuit recognizes: "'The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a ***reckless***, gamble.'" *Six Flags*, 58 F.4th at 215. This District rejected the same argument in *In re Apache Corp.*, 2022 WL 4277350, at *7 (S.D. Tex. Sep. 15, 2022), where defendants "'gambl[ed] that they would figure something out, even though the Company's extensive explorations repeatedly failed to produce scientific support for their bold claims.'" That Shen-5 and Shen-6 were drilled as costlier "keeper" wells changes nothing. Anadarko's partners shared those costs, and the same "reckless gamble" logic applies.

Defendants also argue hindsight and business judgment, but ignore evidence that they knew or recklessly disregarded information contradicting their statements when made, unlike in the cases they cite. Far from ordinary disagreement, Exploration's and Development's numbers so diverged that it led to "preposterous" and "[b]unk" resource estimates, and caused an Anadarko engineer to comment, "'the SEC thinks you would look good in orange.'" §IV.C.2. Nor do Defendants' assertions that they had not yet reached a final decision inoculate their exaggeration of Shen's value and potential. Indeed, Defendants' misrepresentations led investors and analysts to believe Shen's results were unambiguously positive. Defs.' Ex. 23 (Berk Rpt.), ¶¶64, 69, 79-80.

Defendants argue in a footnote that "there is no evidence that Defendants at any point in time believed the project was unviable" (MSJ at 37 n.17) but ignore, *e.g.*, Walker's internal email stating: "I see no way we will want to take this [Shenandoah] to development today" and evidence demonstrating Shenandoah was "not commercially viable" as early as 2014. §§IV.B.1.-2.

Because "a reasonable jury can conclude that the defendant[s] knew [their] statements were false when made," summary judgment on scienter is inappropriate. *SEC v. Seghers*, 298 F. App'x 319, 333 (5th Cir. 2008).

### D. Summary Judgment on Loss Causation Is Unwarranted

Loss causation is the "causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258. Plaintiffs establish loss causation by identifying a corrective disclosure that revealed the concealed "relevant truth" and caused a """substantial amount" of price drop.'" *Amedysis*, 769 F.3d at 321-22. Questions concerning loss causation "'are ultimate questions for the trier of fact.'" *In re Cassava Scis., Inc. Sec. Litig.*, 2024 WL 4824243, at *17 (W.D. Tex. Nov. 15, 2024).

#### 1. Plaintiffs' Evidence Easily Establishes Triable Issues on Loss Causation

Defendants recklessly overstated Shenandoah's commercial viability and potential size while concealing adverse information. The relevant truth was revealed after-market-close on May 2, 2017, when Anadarko announced that it had "suspended further appraisal activities" at Shenandoah and was recognizing $902 million in Shenandoah-related write-downs. Defs.' Ex. 99 at APC-01752125-26; Ex. 33. The disclosure was corrective of the

fraud because it "reflect[ed] part of … the truth obscured by [Defendants'] fraudulent statements" and scheme. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009); *Spitzberg*, 758 F.3d at 688-89 ("the news of the well's abandonment could serve as a corrective disclosure").

Using an event study, Plaintiffs' expert, Steinholt, established that Anadarko's stock price declined by a statistically significant 7.69% on May 3, 2017. ECF 302 at 9; Defs.' Ex. 19, ¶99. Steinholt controlled for the Firestone-related news and found that Anadarko's fraud-related stock price decline was 3.42%, which was statistically significant at the 1% level. Defs.' Ex. 19, ¶99 & Ex. C.

Analyst reports confirm loss causation. [redacted] Ex. 37 at APC-01334952; Ex. 39 at UBS00069036; Ex. 36 at APC-01334945; Ex. 38 at APC-01334980; Ex. 35 at STEINHOLT_0009711-712; Defs.' Ex. 19, ¶¶57-60, 62-68.

### 2. Defendants' Arguments Contradict the Law and Ignore the Evidence

Unable to challenge Plaintiffs' loss causation evidence, Defendants overstate the law, raise red herrings, and re-urge arguments this Court has already rejected.

***First***, Defendants argue that the May 2 disclosure is not sufficiently connected to the fraud because it did not "unveil some years-long fraudulent scheme in which

Defendants concealed Shenandoah's lack of commercial viability." MSJ at 33. But the Fifth Circuit has made clear that corrective disclosures are not required to reveal fraud. *Flowserve*, 572 F.3d at 231 (it "is not required" for a corrective disclosure "directly to reveal that the [prior statement] was fraudulent").

Defendants mischaracterize their authority. *Amedysis* does not hold that the disclosure must explicitly "reveal[] the fraud"; it holds that the disclosure need only be "'related to' or 'relevant to' the defendants' fraud" – "not a steep or difficult" standard. 769 F.3d at 321-22. *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *27 (S.D. Tex. May 31, 2016), required evidence that the market understood the link between a disclosure and misrepresentations because, unlike here, the disclosure discussed dividend cuts generally, did not mention the ***subject*** of the fraud, and the plaintiffs' evidence tied the disclosure only to non-fraud factors.

Defendants next argue the May 2 disclosure is insufficient because it did not specifically reveal, *e.g.*, the negative Shen-4 sidetrack results or that Exploration scrubbed faults from maps. But the law does not require the type of fact-for-fact disclosure that Defendants demand. *See Flowserve*, 572 F.3d at 230 ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements."); *Spitzberg*, 758 F.3d at 688 (rejecting argument that "a corrective disclosure must squarely and directly contradict the earlier misrepresentations").

Defendants cite *BP* and *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004), to support their constrained reading of the relevant truth. But unlike in *BP*, the

disclosures here do not relate to "***non-fraudulent*** estimates" that plaintiffs "concede w[ere] accurately represented throughout the class period." 2016 WL 3090779, at *21-*22. And in *Greenberg*, unlike here, the alleged misstatement and disclosure concerned completely different topics. 364 F.3d at 666.

Defendants next argue that suspending appraisal based on Shen-6 was consistent with prior statements that a final investment decision depended on Shen-6. But the suspension and near-billion-dollar write-off contradicted earlier misrepresentations overstating Shen's viability and potential size and omitting adverse information. Regardless, "a necessarily contradictory relationship between the disclosures" and the misrepresentations is not required. *Lormand*, 565 F.3d at 266.

Defendants similarly contend that "FID hinged on oil prices." MSJ at 33. Besides being based on inadmissible evidence, that argument is irrelevant to whether Defendants concealed negative information about Shen's viability or whether the May 2 disclosure revealed the relevant truth. §IV.B.4. Evidence shows Defendants abandoned Shenandoah because of "reserve size and risk," not oil prices. §IV.D.; §IV.B.4. (Shenandoah had a ***$0*** net asset value even at $70/barrel). And any suggestion that investors already anticipated the suspension of appraisal activities belies common sense and the record, and is inappropriate at summary judgment. *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (whether disclosures added something "new" is a jury question).

At most, Defendants' arguments about the connection between the fraud and disclosure raise factual issues inappropriate for summary judgment. *See Amedysis*, 769

F.3d at 325 (the connection between "misleading statements and the alleged corrective disclosures … is a highly fact intensive inquiry").

***Second***, Defendants argue that the corrective disclosure did not cause Anadarko's May 3, 2017 stock price decline. But Defendants do not even attempt to establish that the Firestone-related news caused the decline. *See Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1040 (C.D. Cal. 2013) ("A[t] the summary judgment stage, a defendant would need to show that depreciation of a stock was the result of factors other than alleged false and misleading statements to prevail."). Nor could they. Steinholt controlled for the Firestone-related news and found the Shen news still caused a substantial portion of the decline. §VI.D.1. Anadarko's stock price fell 4.1% after the Shen disclosures and ***before*** the *Denver Post*'s Firestone article. Defs.' Ex. 19, ¶¶53-55; ECF 302 at 21. As the Court held, it is "[c]ommon sense" that the potential $140 million regulatory cost news did not solely cause a decline accompanying an actual $900 million write-off. ECF 302 at 21.

Defendants' only basis for their argument is that Steinholt's event study is unreliable. The Court already rejected the same arguments and found Steinholt's event study "is based on accepted methods reliably applied to the facts of this case." *Id.* at 6-9. Defendants' recycled contentions fail again. Steinholt's Colorado peer group is comprised solely of oil-and-gas companies, so it controls for oil-and-gas industry news. ECF 118-1, ¶20. Moreover, the broader industry index increased on May 3, so it did not explain any portion of Anadarko's May 3 decline – assigning more weight to the broader industry would have ***increased*** the fraud-related decline. *Id.*; ECF 86-1 at 109. The parties also



4900-1832-4412.v2

agree the relevant Firestone-related news concerned increased regulatory scrutiny, which was not a one-time event. ECF 284 at 34:6-8; ECF 239 at 9.

At most, the portion of the decline related to Firestone is a jury question. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("'as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement'").

### E. Control-Person Liability

Defendants' §20(a) argument falls with their primary-violation challenges. Because triable Rule 10b-5 issues remain, the control-person claims survive. Defendants do not contest control and may not do so for the first time on reply. *Hernandez*, 888 F.3d at 224 n.1.

## VII. CONCLUSION

Defendants' motion should be denied in its entirety.

DATED: July 14, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK SOLOMON
DANIEL S. DROSMAN
LUKE O. BROOKS
HILLARY B. STAKEM
NICOLE Q. GILLILAND
T. ALEX B. FOLKERTH

s/ Daniel S. Drosman
DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Class Counsel

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
(SDTX Bar No. 30973)
Attorney-in-charge
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)

Texas Local Counsel for Plaintiff

## CERTIFICATION OF WORD COUNT

In accordance with Rule 18(c) of Your Honor's Court Procedures, I hereby certify that this document contains 9,858 words, exclusive of the caption, the table of contents, the table of authorities, and the signature block.

DATED: July 14, 2026

s/ Daniel S. Drosman
DANIEL S. DROSMAN

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing on all counsel of record who have appeared in this matter via the Court's CM/ECF system on this, the 14th day of July, 2026.

s/ Daniel S. Drosman
DANIEL S. DROSMAN